# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA<br>　　　1600 Arch St., Suite 300<br>　　　Philadelphia, PA 19103<br><br>STATE OF NEW JERSEY<br>　　　Richard J. Hughes Justice Complex<br>　　　25 Market Street<br>　　　Trenton, NJ 08625-0080<br><br>STATE OF CALIFORNIA<br>　　　1300 I Street<br>　　　Sacramento, CA 94814<br><br>STATE OF COLORADO<br>　　　1300 Broadway, 10th Floor<br>　　　Denver, CO 80203<br><br>STATE OF DELAWARE<br>　　　Carvel State Office Building<br>　　　820 N. French Street, 5th Floor<br>　　　Wilmington, DE 19801<br><br>DISTRICT OF COLUMBIA<br>　　　441 4th Street, N.W.<br>　　　Suite 630S<br>　　　Washington, D.C. 20001<br><br>STATE OF ILLINOIS<br>　　　100 West Randolph St.<br>　　　Chicago, IL 60601.<br><br>COMMONWEALTH OF MASSACHUSETTS<br>　　　One Ashburton Place<br>　　　Boston, MA 02108<br><br>STATE OF MICHIGAN<br>　　　P.O. Box 30758<br>　　　Lansing, MI 48909<br><br>STATE OF MINNESOTA<br>　　　445 Minnesota Street, Suite 1400<br>　　　St. Paul, MN 55101 | Case No. _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

STATE OF NEW MEXICO
    408 Galisteo Street
    Villagra Building
    Santa Fe, NM 87501

STATE OF NORTH CAROLINA
    114 W. Edenton Street
    Raleigh, NC 27603

STATE OF OREGON
    1162 Court St. NE
    Salem, OR 97301

STATE OF RHODE ISLAND
    150 South Main Street
    Providence, RI 02903

STATE OF VERMONT
    109 State Street
    Montpelier, VT 05609

COMMONWEALTH OF VIRGINIA
    202 North Ninth Street
    Richmond, VA 23219

STATE OF WASHINGTON
    800 5th Avenue
    Suite 2000
    Seattle, WA 98104-3188

STATE OF WISCONSIN
    Post Office Box 7857
    Madison, WI 53707-7857

                  Plaintiffs,

           v.

ELISABETH D. DEVOS, *in her official capacity as Secretary of the United States Department of Education*
    400 Maryland Avenue, S.W.
    Washington, D.C. 20202

UNITED STATES DEPARTMENT OF EDUCATION
    400 Maryland Avenue, S.W.
    Washington, D.C. 20202

UNITED STATES OF AMERICA,

                 Defendants.

## INTRODUCTION

1.      Plaintiffs Commonwealth of Pennsylvania, State of New Jersey, State of California, State of Colorado, State of Delaware, District of Columbia, State of Illinois, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of New Mexico, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, Commonwealth of Virginia, State of Washington, and State of Wisconsin (collectively, "the Plaintiff States" or "the States") bring this action against Defendants Secretary Elisabeth D. DeVos, the U.S. Department of Education (the "Department"), and the United States of America to prevent implementation of the unlawful rule recently promulgated by the Department titled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule").

2.      If the Rule is permitted to take effect, students across the country will return to school in the fall with less protection from sexual harassment.[1] The Rule will reverse decades of effort to end the corrosive effects of sexual harassment on equal access to education—a commitment that, until now, has been shared by Congress and the Executive Branch across multiple elections and administrations, as well as by state and local officials and school

---

[1] Unless otherwise stated, this Complaint uses the term "sexual harassment" to encompass all forms of sexual harassment, including sexual violence and sexual assault.

administrators. And because of the Rule's impracticable effective date, primary, secondary, and postsecondary schools across the country will be required to completely overhaul their systems for investigating and adjudicating complaints of sexual harassment in less than three months, in the midst of a global pandemic that has depleted school resources, and with faculty, staff, and student stakeholders absent from their campuses due to the pandemic and, in many cases, on leave due to the summer.

3.      The Department claims that its Rule effectuates Title IX of the Education Amendments Act of 1972 ("Title IX"), but in reality the Rule undercuts Title IX's mandate to eradicate sex discrimination in federally funded education programs and activities.[2] The Rule creates substantive and procedural barriers to schools' investigation and adjudication of sexual harassment complaints, and discourages students and others from making sexual harassment complaints. As a result, fewer sexual harassment complaints will be filed, and schools will be less well equipped to protect their students' safety and rid their programs and activities of the pernicious effects of sex discrimination.

4.      The Rule is unlawful. Without adequate justification or explanation, the Rule strips away longstanding protections against sexual harassment in violation of Title IX's mandate to prevent and remedy sex discrimination, and in ways that conflict with other federal and state statutes and Supreme Court precedent. For example, the Rule will not allow a school to investigate and remedy an egregious but isolated incident of sexual harassment, including some forms of unwanted touching, under Title IX because such harassment is no longer sufficiently

_____

[2] With only limited exception, Title IX applies to all entities that receive federal funds from the Department, including primary, secondary, and postsecondary public and private schools, as well as museums, libraries, cultural centers and other entities that operate education programs or activities. Unless otherwise stated, this Complaint uses the word "schools" to refer generally to all recipients of federal funding subject to Title IX and the new Title IX Rule.

"pervasive" to fall within the Rule's narrowed definition of sexual harassment. Similarly, the Rule will eliminate a school's ability to open a Title IX investigation into sexual harassment of a former student because that student is no longer "participating" in an education program or activity—even where the former student left school *because of the sexual harassment* and even if the alleged perpetrator remains associated with the campus. In addition, the Rule will prevent a school from investigating a Title IX complaint by a student who is sexually harassed by another student at an off-campus apartment because the harassment did not take place "under the substantial control" of the school, even if the harassment limits the student's ability to benefit from or access the education program or activity. These and the Department's other newly created limitations on Title IX proceedings have no basis in Title IX.

5.      The Rule also creates arbitrary and unlawful procedural requirements that will chill reporting of sexual harassment and make it harder for schools to reach fair outcomes as they investigate and adjudicate those sexual harassment complaints that the Department still deems cognizable under Title IX. For example, in postsecondary schools, the Rule will require third-party advisors to conduct live, direct, oral cross-examination of the other party—even where the advisor selected is a parent or the other party's teacher and even where less traumatizing methods exist to allow parties to ask questions of each other.

6.      The Department's imposition of one-size-fits-all formal procedures—regardless of the nature of the complaint or the institutional setting—will prevent schools from formulating fair and equitable grievance procedures based on schools' individual circumstances and expertise in providing equitable educational opportunities to their students. In addition, the Rule's mandate that schools dismiss from Title IX proceedings sexual harassment complaints that fall outside the Rule's ambit will result in many schools feeling compelled—as a matter of state law, to ensure

the nondiscriminatory educational experience promised by Title IX, or both—to create separate grievance processes to investigate and adjudicate the same underlying allegations: one for sexual harassment that satisfies the Department's crabbed standards, which can be adjudicated in "Title IX proceedings," and another for sexual harassment as it has been widely understood, which must be relegated to "non-Title IX proceedings." The incentives that the Rule creates for schools are inequitable if not perverse: a school risks its federal funding if it does not strictly comply with even one of the Department's new procedural requirements, but a school that fails to respond to sexual harassment, even in a manner that is just short of clearly unreasonable, may not lose its funding.

7.     The Rule's defects stem in part from a flawed rulemaking process. The Department included in the final Rule new substantive provisions that are not a logical outgrowth of the proposed rule, negating the States' (and the public's) opportunity to comment on the consequences of these provisions. Further, the Department has buried even more requirements and prohibitions in its hundreds of pages of preamble and nearly two thousand footnotes, including some that conflict with the text of the final Rule itself. Moreover, the Department failed to provide the public with the data and analysis underlying the Rule, contributing to a cost-benefit analysis that arbitrarily and intentionally disregarded key factors, including the substantial and quantifiable mental health, physical health, emotional, and economic costs to students who are harmed as a result of the Rule.

8.     The Department acknowledges that sexual harassment is a form of sex discrimination that can create an unsafe and unwelcoming school environment, interfering with students' learning, impacting their mental and physical health well after the conduct itself has ceased, and potentially affecting survivors' family, friends, and other community members. It

also acknowledges that these harms are often exacerbated if the individual is forced to relive the incident of harassment in the context of investigatory, judicial, or other proceedings, such as the grievance procedures required by the Rule. Nevertheless, the Rule the Department has issued will exacerbate and inflict untold irreparable harm on students nationwide, including the more than 20 million school-age children enrolled in the Plaintiff States' public education systems and over 7 million students enrolled in the Plaintiff States' higher education institutions.

9.      According to the federal government's own data, sexual harassment against students remains pervasive and mostly unreported. With the Department's final Rule, sexual harassment will not become less common—but it will, as the Department acknowledges in the Rule, become even less regularly reported and remedied.

10.      Compounding the harms imposed by the Rule is its unduly short effective date of August 14, 2020, which is itself an affront to schools and students. Schools nationwide will be forced to undertake wholesale revisions of their sexual harassment policies and procedures in less than three months, in the midst of the ongoing global health crisis caused by the novel coronavirus (COVID-19) pandemic, and while most students and many administrators and faculty are away from school for the summer. This will leave schools unable to engage students, faculty, staff, parents, and other affected stakeholders in their educational communities as they ordinarily would when undertaking such an initiative, and thus unable to complete required internal review and approval processes. The resulting rushed policies will cause confusion and mistrust and will lack the buy-in necessary for effective implementation. Under normal circumstances, requiring schools to overhaul their policies and procedures, re-negotiate collective bargaining agreements, and implement the Rule's hiring, training, and other requirements in less than three months would impose an extraordinarily difficult burden. Given

the ongoing uncertainty caused by the COVID-19 pandemic and the strain it has placed on education institutions, Defendants' decision to require compliance with the Rule by August 14, 2020, is inexplicable.

11.     Plaintiffs respectfully request that the Court stay the effective date of the Rule pending judicial review; grant them declaratory and injunctive relief from the Rule, on a preliminary and permanent basis; vacate and set aside the Rule; and award them such other relief as is requested herein.

## JURISDICTION AND VENUE

12.     This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 701–06. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

13.     This Court has authority to issue declaratory relief, injunctive relief, and other relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the APA, 5 U.S.C. §§ 702, 705–706.

14.     This is a civil action in which Defendants are agencies of the United States or officers of such an agency. Venue is proper in this Court because a defendant resides in this district, a substantial part of the events giving rise to this action occurred in this district, and a plaintiff resides in this district and no real property is involved. *See* 28 U.S.C. § 1391(e)(1)(A)– (C).

## PLAINTIFF STATES

15.     Plaintiff Commonwealth of Pennsylvania is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Josh

Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1. Attorney

General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory

authority. 71 Pa. Stat. § 732-204.

16.     Plaintiff State of New Jersey is a sovereign state of the United States of America.

This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, the

State's chief legal officer. N.J. Stat. Ann. § 52:17A-4(e), (g).

17.     Plaintiff State of California is a sovereign state of the United States of America.

This action is being brought on behalf of the State by California Attorney General Xavier

Becerra, the State's chief law officer, Cal. Const., art. V, § 13, who has the duty to see that the

laws of the State are uniformly and adequately enforced, and Governor Gavin Newsom, the

State's chief executive officer, who is responsible for overseeing the operations of the State and

ensuring that its laws are faithfully executed, Cal. Const., art. V, § 1.

18.     Plaintiff State of Colorado is a sovereign state of the United States of America.

This action is brought on behalf of the State of Colorado by Attorney General Phillip J. Weiser,

who is the chief legal counsel of the State of Colorado, empowered to prosecute and defend all

actions in which the state is a party. Colo. Rev. Stat. § 24-31-101(1)(a).

19.     Plaintiff State of Delaware is a sovereign state of the United States of America.

This action is brought on behalf of the State of Delaware by Attorney General Kathleen

Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397,

403 (Del. 1941). General Jennings also brings this action on behalf of the State of Delaware

pursuant to her statutory authority. Del. Code Ann., tit. 29, § 2504.

20.     Plaintiff District of Columbia is a sovereign municipal corporation organized

under the Constitution of the United States. It is empowered to sue and be sued, and it is the local

government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Karl A. Racine. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81.

21.     Plaintiff State of Illinois is a sovereign state of the United States of America. This action is being brought on behalf of the State by Attorney General Kwame Raoul, the State's chief legal adviser to the State of Illinois. His powers and duties include acting in court on behalf of the State on matters of public concern. *See* 15 ILCS 205/4.

22.     Plaintiff Commonwealth of Massachusetts is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Maura Healey, who has both statutory and common-law authority and responsibility to represent the public interest for the people of Massachusetts in litigation, as well as to represent the Commonwealth, state agencies, and officials in litigation. *Feeney v. Commonwealth*, 366 N.E.2d 1262, 1266-67 (Mass. 1977); Mass. Gen. Laws ch. 12, § 3.

23.     Plaintiff State of Michigan is a sovereign state of the United States of America. This action is brought on behalf of the State by Attorney General Dana Nessel, the State of Michigan's chief law enforcement officer, pursuant to her statutory authority. Mich. Comp. Laws § 14.28.

24.     Plaintiff State of Minnesota is a sovereign state of the United States of America. This action is brought on behalf of the State by Attorney General Keith Ellison, the chief law officer of the State. Minn. Stat. § 8.01.

25.     Plaintiff State of New Mexico is a sovereign state of the United States of

America. New Mexico is represented by its Attorney General, Hector Balderas, who is

authorized to assert the state's interests in state and federal courts.

26.     Plaintiff State of North Carolina is a sovereign state of the United States of

America. This action is brought on behalf of the State of North Carolina by Attorney General

Joshua H. Stein, who is the chief legal counsel of the State of North Carolina and who has both

statutory and constitutional authority and responsibility to represent the State, its agencies, its

officials, and the public interest in litigation. N.C. Gen. Stat. § 114-2.

27.     Plaintiff State of Oregon, acting by and through the Attorney General of Oregon,

Ellen F. Rosenblum, is a sovereign state of the United States of America. The Attorney General

is the chief law officer of Oregon and is empowered to bring this action on behalf of the State of

Oregon, the Governor, and the affected state agencies under Or. Rev. Stat. §§ 180.060, 180.210,

and 180.220.

28.     Plaintiff State of Rhode Island is a sovereign state of the United States of

America. This action is brought on behalf of the State by Attorney General Peter F. Neronha, the

State's chief legal officer. R.I.G.L. § 42-9-5; R.I. Const., art. IX § 12.

29.     Plaintiff State of Vermont is a sovereign state of the United States of America.

This action is brought on behalf of the State by Attorney General Thomas J. Donovan, Jr., the

State's chief legal officer. *See* Vt. Stat. Ann. tit. 3, §§ 152, 157.

30.     Plaintiff the Commonwealth of Virginia is a sovereign state of the United States

of America. This action is brought on behalf of the Commonwealth by Attorney General Mark

R. Herring. As chief executive officer of the Department of Law, General Herring performs all

legal services in civil matters for the Commonwealth. Va. Const. art. V, § 15; Va. Code Ann.
§§ 2.2-500, 2.2-507.

31.     Plaintiff State of Washington is a sovereign state of the United States of America.
Washington is represented herein by its Attorney General, Bob Ferguson, who is the State's chief
legal adviser. The powers and duties of the Attorney General include acting in federal court on
matters of public concern to the State.

32.     Plaintiff State of Wisconsin is a sovereign state of the United States of America.
This action is brought on behalf of the State of Wisconsin by Attorney General Joshua L. Kaul
pursuant to his authority under Wis. Stat. § 165.015(6). Attorney General Kaul brings this action
at the request of Governor Tony S. Evers pursuant to Wis. Stat. § 165.25(1m).

33.     In filing this action, Plaintiff States seek to protect themselves and the students
and schools in their States from harm caused by Defendants' illegal conduct and prevent further
harm. Those injuries include harm to Plaintiff States' proprietary, sovereign, and quasi-sovereign
interests.

## DEFENDANTS

34.     Defendant Elisabeth D. DeVos is Secretary of the United States Department of
Education and is sued in her official capacity. Her principal address is 400 Maryland Avenue,
S.W., Washington, D.C. 20202.

35.     Defendant United States Department of Education is an executive agency of the
United States of America. Its principal address is 400 Maryland Avenue, S.W., Washington,
D.C. 20202.

36.     Secretary DeVos is responsible for carrying out the duties of the Department of Education under the Constitution of the United States of America and relevant statutes, including Title IX of the Education Amendments Act of 1972.

## FACTUAL ALLEGATIONS

## I.     STATUTORY AND REGULATORY BACKGROUND

### A.  Title IX of the Education Amendments of 1972

37.     Congress enacted Title IX in 1972 to remedy "one of the great failings of the American educational system" that had plagued America's education institutions for generations, namely, "the continuation of corrosive and unjustified discrimination against women" that "reaches into all facets of education." 118 Cong. Rec. 5803 (1972) (remarks of Senator Birch Bayh, original sponsor of Title IX).

38.     Title IX's mandate is broad and unequivocal: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 1972 Education Amendments Act, Pub. L. No. 92-318, § 901(a), 86 Stat. at 373 (codified at 20 U.S.C. § 1681(a)).

39.     Congress modeled Title IX on Title VI of the Civil Rights Act of 1964, which provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Civil Rights Act of 1964, Pub. L. No. 88352, § 601, 78 Stat. 252 (codified at 42 U.S.C. § 2000d).

40.     Both Title IX and Title VI "sought to accomplish two related, but nevertheless somewhat different, objectives": "to avoid the use of federal resources to support discriminatory

practices" and "to provide individual citizens effective protection against those practices."

*Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979).

41.     Fifteen years after enacting Title IX, Congress enacted legislation clarifying that,

if any part of an institution receives federal funding, the whole institution must comply with Title

IX. Civil Rights Restoration Act of 1987, Pub. L. 100–259, 102 Stat. 28 (codified in relevant part

at 20 U.S.C. § 1687), *superseding Grove City Coll. v. Bell*, 465 U.S. 555 (1984).

42.     To enforce Title IX, Congress "authorized and directed" every federal agency

providing financial assistance to education programs or activities to "effectuate the provisions

of" Title IX "by issuing rules, regulations, or orders of general applicability[.]" Pub. L. No. 92-

318, § 902, 86 Stat. at 374 (codified at 20 U.S.C. § 1682). The Department is one of many

federal agencies that provide financial assistance to education programs and activities.

43.     As a result, any regulations issued by the Department pursuant to Title IX must

"effectuate" Title IX's antidiscrimination mandate.

44.     Congress further mandated that no agency can issue a rule, regulation, or order

effectuating Title IX "unless and until approved by the President." Pub. L. No. 92-318, § 902, 86

Stat. at 374 (codified at 20 U.S.C. § 1682). In Executive Order 12250, the President delegated

this authority to the U.S. Attorney General. Exec. Order No. 12250, § 1-1, 45 Fed. Reg. 72,995

(Nov. 2, 1980).

45.     Congress empowered federal agencies to enforce their Title IX rules and

regulations through "the termination of or refusal to grant or to continue assistance" or "by any

other means authorized by law." Pub. L. No. 92-318, § 902, 86 Stat. at 374 (codified at 20 U.S.C.

§ 1682).

46.     Although Congress created a robust administrative enforcement scheme in Title IX, it also provided that any school that violates the statute should first receive notice of noncompliance and be allowed to come into voluntary compliance with Title IX. Pub. L. No. 92-318, § 902, 86 Stat. at 374 (codified at 20 U.S.C. § 1682).

47.     Congress provided for judicial review of any agency rule, regulation, or administrative enforcement decision issued to effectuate Title IX, which "shall not be deemed committed to unreviewable agency discretion." Pub. L. No. 92-318, § 903, 86 Stat. at 374–75 (codified at 20 U.S.C. § 1683).

48.     Separate from this administrative enforcement scheme, victims of discrimination can enforce Title IX through an implied private right of action, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979), including against States, Rehabilitation Act Amendments of 1986, 100 Stat. 1845 (codified at 42 U.S.C. § 2000d–7).

49.     In 1992, the Supreme Court confirmed that schools can be held liable for violating Title IX based on incidents of sexual harassment. *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75 (1992). And it further held that the students who have experienced sexual harassment can seek money damages from schools in private civil suits. *Id.* at 75-76.

50.     Since enacting Title IX, Congress has passed several other statutes reflecting its intent to provide strong protections for individuals subjected to sexual violence and assault.

51.     In 1990, Congress passed the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act"), Pub. L. No. 101–542, 104 Stat. 2384 (codified at 20 U.S.C. § 1092(f)), which imposes on postsecondary schools specific reporting requirements about crimes committed on campus.

52.     In 1994, Congress passed the Violence Against Women Act ("VAWA"), Pub. L.

No. 103–322, 108 Stat. 1902 (codified at 34 U.S.C. §§ 12291–12512), which provides for federal

funding to stop violent crimes committed against women.

53.     In 2013, Congress passed the Campus Sexual Violence Elimination Act as part of

the VAWA Reauthorization Act. Violence Against Women Reauthorization Act of 2013, Pub. L.

No. 113-4, 127 Stat.54 (codified at 20 U.S.C. § 1092(f)(8)(B)(iv) & (C)). The Campus Sexual

Violence Elimination Act amended the Clery Act to better align it with Title IX and provide for a

survivor-centered approach to prevention and enforcement in schools. It encouraged greater

transparency at higher education institutions and required such institutions to prevent sexual

violence, protect victims, and investigate and resolve on or off campus complaints of sexual

violence, including domestic violence, stalking, and dating violence.

**B.  The Department's 1975 Title IX Regulations**

54.     In 1975, the U.S. Department of Health, Education and Welfare, the Department

of Education's predecessor for matters relating to education, promulgated regulations to

effectuate the antidiscrimination mandate of Title IX. 34 C.F.R. pt. 106.

55.     The regulations required schools to "adopt and publish grievance procedures

providing for prompt and equitable resolution of student and employee complaints alleging any

action which would be prohibited by [the regulations]." 34 C.F.R. § 106.8(b).

56.     The regulations also prohibited schools from using or distributing publications

that "suggest[], by text or illustration, that such recipient treats applicants, students, or employees

differently on the basis of sex." 34 C.F.R. § 106.9(b)(2).

57.     Under the regulations, if the Department found that a school violated Title IX, the

school "shall take such remedial action as the Assistant Secretary [for Civil Rights] deems

necessary to overcome the effects of such discrimination." 34 C.F.R. § 106.3(a).

16

58.    Title IX provides an exemption for schools controlled by religious organizations if its application would be inconsistent with the religious tenets of the organization. Pub. L. No. 92-318, § 901(a)(3), 86 Stat. at 373 (codified at 20 U.S.C. § 1681(a)(3)). The regulations provided that any school that wished to claim the exemption was required to "submit[] in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization." 34 C.F.R. § 106.12(a)–(b).

59.    A congressional hearing to review these regulations reaffirmed Congress's intent to make the protections against sex discrimination in Title IX co-extensive with Title VI's protections against discrimination based on race, color, and national origin. For example, Senator Bayh noted that Title IX "sets forth prohibition and *enforcement* provisions which generally parallel the provisions of Title VI." *Sex Discrimination Regulations: Hearings before the Subcommittee on Postsecondary Education of the Committee on Education and Labor*, H.R. 94th Cong., First Session, at 170 (June 17, 20, 23, 24, 25, & 26, 1975) (statement of Senator Bayh of Indiana (quoting from his February 28, 1972, statement, 118 Cong. Rec. 5807 (emphasis in original))).

60.    The 1975 regulations were codified not only in the Department of Education's regulatory code, but also in the regulatory codes of 25 other agencies that also funded education programs.[3] *E.g.*, Nondiscrimination on the Basis of Sex in Education Programs or Activities

---

[3] *See* Agency for International Development, 22 C.F.R. pt. 229; Corporation for National and Community Service, 45 C.F.R. pt. 2555; Department of Agriculture, 7 C.F.R. pt. 15a; Department of Commerce, 15 C.F.R. pt. 8a; Department of Defense, 32 C.F.R. pt. 196; Department of Energy, 10 C.F.R. pt. 1042; Department of Health and Human Services, 45 C.F.R. pt. 86; Department of Homeland Security, 6 C.F.R. pt. 17; Department of Housing and Urban Development, 24 C.F.R. pt. 3; Department of Interior, 43 C.F.R. pt. 41; Department of

Receiving Federal Financial Assistance; Final Common Rule, 65 Fed. Reg. 52,858 (Aug. 30, 2000) (promulgating common rule to "promote consistent and adequate enforcement of Title IX" by the adopting agencies).

### C. The Department's Policy on Unlawful Sexual Harassment

61.     Since the 1980s, the Department has recognized that sexual harassment is a form of sex discrimination prohibited by Title IX.

62.     Under the Reagan Administration, the Department's Office for Civil Rights ("OCR") recognized sexual harassment as a serious problem that was prohibited by Title IX and issued enforcement and policy guidance to all OCR regional directors accordingly. U.S. Dep't of Educ., Office for Civil Rights, Policy Mem., Antonio J. Califa, Director for Litigation Enforcement and Policy Services (Aug. 31, 1981) ("Sexual harassment consists of verbal or physical conduct of a sexual nature, imposed on the basis of sex . . . that denies, limits, provides different, or conditions the provision of aids, benefits, services, or treatment protected under Title IX."); *see also* Dep't of Educ., *Sexual Harassment: It's Not Academic Pamphlet* (1988)[4] (requiring education institutions, where sexual harassment is found, to "take immediate action to stop and prevent further harassment, as well as initiate appropriate remedial measures").

63.     The Department's position has been consistent with interpretations of other anti-discrimination statutes.

---

Justice, 28 C.F.R. pt. 54; Department of Labor, 29 C.F.R. 36; Department of State, 22 C.F.R. pt. 146; Department of Transportation, 49 C.F.R. pt. 25; Department of Treasury, 31 C.F.R. pt. 28; Department of Veterans Affairs, 38 C.F.R. pt. 23; Environmental Protection Agency, 40 C.F.R. pt. 5; Federal Emergency Management Agency, 44 C.F.R. pt. 19; General Services Administration, 41 C.F.R. pt. 101-4; National Aeronautics and Space Administration, 14 C.F.R. pt. 1253; National Archives and Records Administration, 36 C.F.R. pt. 1211; National Science Foundation, 45 C.F.R. pt. 618; Nuclear Regulatory Commission, 10 C.F.R. 5; Small Business Administration, 13 C.F.R. pt. 113; Tennessee Valley Authority, 18 C.F.R. pt. 1317.

[4] https://files.eric.ed.gov/fulltext/ED330265.pdf.

64.     Under Title VII of the Civil Rights Act of 1964, sexual harassment is actionable if, among other things, it creates a hostile environment because it is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). Employees have a right to file a Title VII complaint after leaving employment for any reason.

65.     The Department has likewise incorporated the disjunctive "severe, pervasive, or persistent" definition of hostile environment harassment into its enforcement of Title VI's prohibition of discrimination on the basis of race, color, and national origin. Department policy stated that "harassment need not result in tangible injury or detriment to the victims of the harassment" to create a hostile environment. *Racial Incidents and Harassment Against Students at Educational Institutions*, 59 Fed. Reg. 11,448, 11,450 (Mar. 10, 1994). The Department further recognized that Title VI and Title IX set similar legal standards. *Id.* at 11,451 n.2. Title VI does not limit who is able to file a complaint of harassment based on race, color, or national origin.

66.     Beginning in 1997 and continuing until the promulgation of the Rule, OCR issued policy documents that established foundational requirements for how schools must respond to sexual harassment. The Department enforced these policies for more than two decades. *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997) (the "1997 Policy"); *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5512 (Jan. 19, 2001) (the "2001 Policy"); Stephanie Monroe, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Jan. 25, 2006) (the

"2006 Letter")[5]; Russlyn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for

Civil Rights, Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017) (the "2011

Letter")[6]; U.S. Dep't of Educ., *Questions and Answers on Title IX and Sexual Violence* (Apr. 24,

2014, withdrawn Sept. 22, 2017) (the "2014 Q&A")[7]; U.S. Dep't of Educ., *Q&A on Campus

Sexual Misconduct* (Sept. 2017) (the "2017 Q&A").[8]

67.     Both the 1997 Policy and the 2001 Policy went through a notice and comment

process prior to final publication in the Federal Register. *Sexual Harassment Guidance: Peer

Sexual Harassment*, 61 Fed. Reg. 42,728 (Aug. 16, 1996); *Sexual Harassment Guidance:

Harassment of Students by School Employees*, 61 Fed. Reg. 52,172 (Oct. 4, 1996); *Revised

Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or

Third Parties*, 65 Fed. Reg. 66,092 (Nov. 2, 2000).

68.     These policy documents set forth schools' obligation to provide students with an

education experience free from sexual harassment. That obligation entails preventing sexual

harassment, ending it when it occurs, preventing its recurrence, and remedying its effects.

69.     In these policy documents, the Department consistently set forth and reaffirmed

certain fundamental principles relating to administrative enforcement of Title IX with respect to

sexual harassment: (1) schools are obligated to take affirmative steps to prevent sexual

harassment, end harassment when it does occur, prevent its recurrence, and remedy its effects;

(2) unlawful sexual harassment is defined as unwelcome conduct of a sexual nature that denies

or limits a student's ability to participate in or benefit from the school's program based on sex;

---

[5] https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.

[6] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[7] https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

[8] https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

(3) unlawful sexual harassment can be caused by both quid pro quo harassment and a hostile environment; (4) a hostile environment is created by conduct that is severe, persistent, *or* pervasive—in other words, sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program; (5) schools are required to address harassing conduct occurring outside an education program or activity if the conduct creates a hostile environment in an education program or activity; (6) schools must adopt prompt and equitable grievance procedures that allow for, among other things, adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; and (7) schools may incorporate Title IX sexual harassment policies and procedures into their broader codes of conduct and grievance procedures.

70.      In these prior policy documents, the Department did not require schools to dismiss complaints that fell outside the scope of Title IX as defined by regulation; it did not limit who could file a complaint alleging unlawful sexual harassment; it did not dictate prescriptive grievance procedures; and it did not mandate the creation of policies and procedures for sexual harassment separate and apart from the schools' other civil rights policies, student codes of conduct, or faculty and employee handbooks.

71.      The Department's policy on administrative enforcement of Title IX remained consistent after the Supreme Court set heightened standards for liability in cases brought under Title IX's implied private right of action for money damages. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998); *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 632 (1999) (requiring school's actual knowledge of, and deliberate indifference to, harassing conduct for purposes of private claim for money damages).

72.     In two letters issued following *Gebser*, the Department advised that even after this decision, schools' obligations under the Department's administrative enforcement of Title IX remained unchanged. Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Aug. 31, 1998)[9]; Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Jan. 28, 1999).[10] The Department observed that the Supreme Court's decision did not alter the fundamental obligations of schools to take prompt action to address sexual harassment because the Court had "expressly distinguished the limits on private recovery of money damages from the Department of Education's enforcement of Title IX."

73.     Subsequent Department policy documents continued to reaffirm the principles embodied in the 1997 Policy and to distinguish the Department's administrative enforcement of Title IX from private claims for money damages against schools. *E.g.*, 2001 Policy ("reaffirm[ing] OCR's standards for administrative enforcement of Title IX" and "re-ground[ing] these standards in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages"); 2006 Letter (stating that the 2001 Policy "outlines standards applicable to OCR's enforcement of compliance in cases raising sexual harassment issues" and distinguishing these standards from those "applicable to private Title IX lawsuits for monetary damages"); 2011 Letter (reaffirming the 2001 Policy while also supplementing it); 2014 Q&A (reaffirming the 2001 Policy while seeking to "further clarify the legal requirements and guidance articulated in the [2011 Letter] and the 2001 Guidance and include examples of

---

[9] https://www2.ed.gov/offices/OCR/archives/pdf/AppC.pdf.

[10] https://www2.ed.gov/News/Letters/990128.html.

proactive efforts schools can take to prevent sexual violence and remedies schools may use to end such conduct, prevent its recurrence, and address its effects").

74.     In September 2017, the Department issued a letter withdrawing the 2011 Letter and the 2014 Q&A. Candice Jackson, Acting Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Sept. 22, 2017).[11] But the Department also issued a new interim Q&A that continued to explicitly reaffirm its 2001 Policy and many of the principles described above that had shaped Title IX enforcement for decades. 2017 Q&A.

## II.     THE DEPARTMENT'S NEW TITLE IX REGULATIONS

75.     In 2018, Defendants published in the Federal Register a notice of proposed rulemaking to address sexual misconduct under Title IX. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 83 Fed. Reg. 61,462 (Nov. 29, 2018).

76.     In a speech after the notice of proposed rulemaking was issued, Secretary DeVos suggested that students are over-reporting sexual harassment and making frivolous claims: "Too many cases involve students and faculty who have faced investigation and punishment simply for speaking their minds or teaching their classes. Any perceived offense can become a full-blown Title IX investigation. But if everything is harassment, then nothing is." Prepared Remarks by Secretary DeVos at the Independent Women's Forum Annual Awards Gala, U.S. Dep't of Educ. (Nov. 13, 2019).[12]

---

[11] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

[12] https://www.ed.gov/news/speeches/prepared-remarks-secretary-devos-independent-womens-forum-annual-awards-gala.

77.     Secretary DeVos's remarks are contrary to the federal government's own data, which indicates that, despite Title IX's success in reducing many forms of sex discrimination, sexual harassment remains widespread at all levels of education.

78.     Data reported by the U.S. Department of Education, the U.S. Department of Justice's Bureau of Justice Statistics, and the Centers for Disease Control and Prevention all demonstrate extraordinarily high rates of sexual harassment against students. For example, the Bureau of Justice Statistics found that 20 percent of college women had been sexually assaulted since entering college and one in three female rape victims had been assaulted for the first time between the ages of 11 and 17.

79.     Many other studies confirm these results. For example, a 2019 study found that one in four undergraduate women (25.9 percent), one in fifteen undergraduate men (6.8 percent), and one in four (22.8 percent) transgender or gender-nonconforming undergraduates have been sexually assaulted during college.

80.     In late February, the Department of Education lamented the troubling rise of sexual assault in K-12 public schools. In grades 7–12, 56 percent of girls and 40 percent of boys are sexually harassed every year, with nearly a third of the harassment occurring online. More than 20 percent of girls ages 14 to 18 have been touched or kissed without their consent.

81.     The vast majority of incidents of sexual harassment go unreported. One national study found that only 12 percent of college students who have experienced sexual assault reported the incident to their school or the police. That same study found that only two percent of female students aged 14–18 who were sexually assaulted reported the incident.

82.     On March 27, 2020, many Plaintiff States sent a letter to Defendants asking for the Rule to be delayed during the public health emergency caused by the COVID-19 pandemic. Plaintiff States received no response.

83.     Almost eighteen months after issuing the notice of proposed rulemaking, the Department published the final Rule in the Federal Register. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020). All schools must be in full compliance with the Rule by August 14, 2020.

84.     The Rule establishes binding obligations that prescriptively dictate how schools must respond to allegations of sexual harassment, in many instances *limiting* the ability of schools to respond to conduct that Title IX seeks to prevent.

85.     In promulgating the Rule, which sharply curtails investigation and enforcement, the Department has also upended decades of its own established policy. Much of this established policy went through two notice and comment processes in the late 1990s and early 2000s and has become well-established practice at schools in Plaintiff States.

86.     In spite of conclusive evidence in the administrative record that sexual harassment incidents are on the rise and underreporting is a significant concern, Defendants improperly narrow Title IX by excluding all but the most egregious sexual harassment from its protections.

87.     Defendants improperly eliminate protections for students who are denied equal access to education due to harassing conduct outside of a school's education program or activity, at, for example, an unauthorized fraternity party or in off-campus housing.

88.     Defendants also improperly eliminate protections for students if sexual harassment occurs during a U.S. school-sponsored study abroad program, at a U.S. school's foreign campus, or during a U.S. school-sponsored foreign field trip.

89.     Defendants improperly limit the circumstances under which a complainant or a school can file a formal complaint of sexual harassment.

90.     Defendants unlawfully require schools to dismiss any complaint that falls outside of the Department's narrow interpretation of Title IX. As a result, schools will be compelled—as a matter of state law, to ensure the nondiscriminatory educational experience promised by Title IX, or both—to establish separate grievance procedures in order to pursue these complaints under their own codes of conduct. At the same time, Defendants make clear that they will withdraw federal funding from schools that inadvertently miscategorize complaints and adjudicate them using the "wrong" grievance procedure. *E.g.*, 85 Fed. Reg. at 30,221 & 30,283 n.1129.

91.     The Rule turns Title IX on its head by placing schools at greater risk of losing federal funding if they fail to strictly implement each of the Rule's specified procedural requirements (by, for example, considering the statement of a complainant or witness who is unable or unwilling to testify at the live hearing) than if the response to sexual harassment itself is anything short of "clearly unreasonable."

92.     Schools that fail to comply with all of the Rule's many complicated, novel, counterproductive, and burdensome requirements by August 14, 2020, face significant consequences as they could come under investigation by the Department, face enforcement actions, and lose billions of dollars of much-needed federal funding.

### A. New Sexual Harassment Regulations

#### 1. Limitations on the Scope of Unlawful Sexual Harassment

93.     The Rule improperly narrows the definition of sexual harassment under Title IX to "conduct on the basis of sex that satisfies one or more of the following: (1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct; (2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or (3) 'Sexual assault' as defined in 20 U.S.C. 1092(f)(6)(A)(v),[13] 'dating violence' as defined in 34 U.S.C. 12291(a)(10), 'domestic violence' as defined in 34 U.S.C. 12291(a)(8), or 'stalking' as defined in 34 U.S.C. 12291(a)(30)." 85 Fed. Reg. at 30,574 (to be codified at 34 C.F.R. § 106.30(a) (*sexual harassment*)).

94.     The first prong excludes "quid pro quo" harassment by students who may be in positions of authority with respect to other students regarding educational aid, benefits, or services but may not be considered "employees" under applicable state law. A teaching assistant, for example, may not be considered an employee by a school but may nevertheless exercise significant or sole control over another student's grades. In fact, a separate notice of proposed rulemaking issued by the National Labor Relations Board proposes to exclude student employees

---

[13] "Sexual assault" means "an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation." 20 U.S.C. 1092(f)(6)(A)(v). These offenses are limited to: forcible rape, forcible sodomy, sexual assault with an object, forcible fondling, incest, and statutory rape. FBI, *Uniform Crime Reporting Program: National Incident-Based Reporting System Offense Definitions* (2012), https://ucr.fbi.gov/nibrs/2012/resources/nibrs-offense-definitions.

from the definition of "employee" under the National Labor Relations Act. 84 Fed. Reg. 49,691 (Sept. 23, 2019). The Rule never acknowledges this proposal.

95.     The second prong improperly elevates the definition of hostile environment sexual harassment in the context of Title IX's administrative enforcement scheme to the heightened standard used only for private civil actions that seek monetary damages. In requiring harassment to be "so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity" to qualify as hostile environment sexual harassment, Defendants impermissibly weaken the administrative enforcement scheme contemplated by Congress in enacting Title IX.

96.     The Department's definition requires students to endure repeated and escalating levels of harassment to the point of risking school avoidance; detrimental mental health effects, such as increased risk of self-harm and depression; declines in attendance; withdrawal; and even dropout before the Rule permits schools to stop the discrimination under Title IX.

97.     The Department's definition fails to address the unique circumstances for young children and children with disabilities who are unable to verbalize social-emotional and other safety concerns. The impact of such trauma on a student's ability to learn, and thus on access to education, may not be evident until much later, especially for students who may be nonverbal or have other difficulties expressing its impact. Such trauma impacts have far reaching consequences for a student's ability to stay in school, progress, and learn.

98.     The Department's new definition of hostile environment sexual harassment conflicts with Title VII of the Civil Rights Act of 1964, which protects school employees, including student employees, from sexual harassment that is "sufficiently severe *or* pervasive to alter the conditions of the victim's employment[.]" *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67

(1986) (emphasis added). The anomalous result is that school employees are afforded more protection from sexual harassment under Title VII than students at those very same schools are afforded under the Department's interpretation of Title IX.

99.     The Department also inexplicably deviates from the hostile environment harassment standard under Title VI of the Civil Rights Act of 1964, which protects individuals from harassment on the basis of race, color, or national origin if it is "severe, pervasive, or persistent"—even though the Department has consistently recognized the standard for harassment on the basis of sex and the standard for harassment on the basis of race, color, or national origin are coextensive. *Racial Incidents and Harassment Against Students at Educational Institutions*, 59 Fed. Reg. 11,448, 11,450 (Mar. 10, 1994).

100.     These inconsistent standards are contrary to the purpose of Title IX, which is to eliminate sex discrimination in education, including sexual harassment. The Department fails to provide adequate justification for treating harassment on the basis of sex differently from harassment on the basis of race, color, national origin, and disability, such that schools must bear significantly higher administrative and financial burdens to remedy the unlawful conduct on the basis of sex.

101.     Similarly, the Rule sets sexual harassment apart from all other conduct prohibited by Title IX, without adequate justification, thus providing less protection to survivors of sexual harassment than other victims under Title IX.

102.     The Rule further narrows Title IX's sexual harassment prohibitions to protect students only if the harassing conduct occurs in a school's "education program or activity." The Rule defines "education program or activity" to "include[] locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in

which the sexual harassment occurs, and also include[] any building owned or controlled by a student organization that is officially recognized by a postsecondary institution." 85 Fed. Reg. at 30,574 (to be codified at 34 C.F.R. § 106.44(a)).

103.    This improperly excludes from Title IX's protection harassment that takes place *outside* an education program or activity but nonetheless causes a student to "be excluded from participation in" and "be denied the benefits of" an equal education *in* that education program or activity. For example, it would exclude sexual harassment in off-campus housing—where it often occurs.

104.    This also effectively prevents schools from fulfilling their Clery Act/VAWA obligations to investigate all allegations of sexual assault, stalking, domestic violence, and dating violence both on and off campus.

105.    The Rule further unlawfully limits Title IX so that it protects students from sex discrimination only when the discriminatory conduct occurs "against a person in the United States." 85 Fed. Reg. at 30,573 (to be codified at 34 C.F.R. § 106.8(d)).

106.    This limitation misinterprets Title IX. Sex discrimination may flow from discriminatory decisions by a federally funded school relating to sexual harassment that took place outside the United States. Additionally Title IX applies to "all of the operations" of that school's education programs and activities, including those that operate abroad. Defendants' invocation of the presumption against extraterritoriality does not apply.

107.    Finally, the Rule requires schools, after receiving a formal complaint of sexual harassment, to "follow[] a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in

§ 106.30,[14] against a respondent." 85 Fed. Reg. at 30,574 (to be codified at 34 C.F.R.

§ 106.44(a)). A school that does not strictly implement the Department's specific procedures will

violate the Rule and risk coming under investigation and ultimately losing federal funding.

108.    At the same time, the Rule requires that schools, after receiving notice of sexual

harassment, respond to that harassment only in a manner that is not deliberately indifferent, i.e.,

"clearly unreasonable in light of the known circumstances," 85 Fed. Reg. at 30,574 (to be

codified at 34 C.F.R. § 106.44(a)).

109.    These inconsistent standards mean schools are at risk of losing federal funding if

they fail to strictly implement the Department's uniform procedures for handling formal

complaints, but face no risk to their funding if they respond to sexual harassment in a manner

that is just short of clearly unreasonable.

### 2.    Limitations on Filing and Responding to Complaints

110.    The Rule mandates that "[a]t the time of filing a formal complaint, a complainant

must be participating in or attempting to participate in the education program or activity of the

recipient with which the formal complaint is filed." 85 Fed. Reg. at 30,574 (to be codified at 34

C.F.R. § 106.30(a) (*formal complaint*)).

111.    This limitation applies regardless of whether the formal complaint is signed by the

victim of the harassment or by the Title IX Coordinator.

---

[14] The Rule defines "supportive measures" as individualized "non-disciplinary, non-punitive services" offered to a complainant or a respondent to "restore or preserve equal access" to the education program or activity without "unreasonably burdening the other party." They can be offered before, after or without the filing of a formal complaint. Examples include counseling, increased security and monitoring, changes of housing or changes in class schedules. 85 Fed. Reg. at 30,574 (to be codified at 34 C.F.R. 106.30(a) (*supportive measures*)).

112.     Because all conduct meeting the Rule's elevated definition of sexual harassment must go through the Rule's grievance process, the Rule prevents schools from sanctioning or removing a student or employee who has sexually harassed victims not participating or attempting to participate in the school's education program or activity at the time the formal complaint is made.

113.     This limitation improperly denies Title IX protection to former students who have left the school or transferred, even if *because of sexual harassment*, as well as to campus visitors or students from other schools who are harassed by school students or employees while participating in the school's education programs or activities on an intermittent basis. This limitation also fails to recognize that perpetrators of sexual harassment may go on to harass others if their conduct goes unaddressed, regardless of whether the perpetrator's original conduct was directed at a complainant participating in or attempting to participate in a school's education program or activity at the time that the formal complaint is made.

114.     The Rule also mandates that schools *must* dismiss any complaint that "would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States." 85 Fed. Reg. at 30,576 (to be codified at 34 C.F.R. § 106.45(b)(3)(i)).

115.     Although schools "must dismiss" these complaints, the Rule "does not preclude action under another provision of the recipient's code of conduct." 85 Fed. Reg. at 30,576 (to be codified at 34 C.F.R. § 106.45(b)(3)(i)).

116.     Defendants lack authority to require schools to dismiss complaints that do not meet Defendants' narrow interpretation of Title IX.

117.    Requiring schools to develop separate "Title IX sexual harassment" and "non-Title IX sexual harassment" policies and grievance procedures will cause confusion among students, faculty, and staff; will pose complex administrative and financial burdens; will undermine timely Clery Act/VAWA compliance; and will discourage students, faculty, and staff from reporting sexual harassment. All of these consequences undermine the purpose of Title IX.

118.    The Rule further eliminates the requirement in the existing 1975 regulation that remedies shall be designed to "overcome the effects" of discrimination and limits schools from issuing remedies that go beyond "restor[ing] or preserv[ing] access" for the individual complainant. 85 Fed. Reg. at 30,391 & 30,577 (to be codified at 34 C.F.R. §§ 106.3(a) & 106.45(7)(ii)(E)).

119.    These limitations on schools' ability to fully redress a sexually hostile environment on campus are inconsistent with Title IX's nondiscrimination mandate and long-standing Department policy requiring schools to take steps "to eliminate any hostile environment that has been created," which may include interventions for an entire class "to repair the educational environment" or for an "entire school or campus." 2001 Policy at 16.

### 3.  Prescriptive Grievance Process

120.    The Rule mandates adopting certain arbitrary and unlawful procedural requirements that will chill reporting of sexual harassment and make it harder for schools to provide a fair process to all of their students.

121.    The Rule requires that postsecondary schools "must provide for a live hearing," during which "the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility." 85 Fed. Reg. at 30,577 (to be codified at 34 C.F.R. § 106.45(b)(6)(i)). This cross-

examination "must be conducted directly, orally, and in real time by the party's advisor of choice." 85 Fed. Reg. at 30,577 (to be codified at 34 C.F.R. § 106.45(b)(6)(i)).

122.     As articulated in the preamble but not the Rule itself, the live-hearing requirement applies even if the complainant or respondent is a preschooler cared for at a university daycare center or a minor attending a university's college summer program, summer sports camp, or university-sponsored event for high school students.

123.     The live-hearing requirement also applies to faculty and employees of postsecondary institutions accused of sexual harassment. This mandate conflicts with some State employment laws and investigation procedures for expeditiously investigating discrimination claims.

124.     Direct, oral cross-examination risks traumatizing both complainants and respondents. Because the Rule prevents schools from placing reasonable limits on who may serve as a party's selected advisor, parties and witnesses may be cross-examined by anyone, even a parent or one's own teacher, which risks chilling reporting and deterring survivors from filing complaints.

125.     The mandate for direct, oral cross-examination will impose litigation-like requirements on an investigation and decision-making process intended for an educational setting, without regard to schools' and students' unique needs or to existing state or local requirements. Schools may feel compelled to hire lawyers or arbitrators to serve as decision-makers to ensure that hearings remain fair and to enforce any school-created rules of decorum. These unaccounted-for costs will impose additional burdens on schools, chill reporting and complaint filing, and undermine schools' ability to fulfill their Title IX obligations.

126.     Defendants arbitrarily reject less burdensome and less traumatizing methods of cross-examination, such as submitted questions via a neutral third party, which would still allow both parties to ask each other questions and fulfill the truth-seeking function while mitigating the likelihood of traumatization.

127.     The Rule further mandates that if either party "does not have an advisor present at the live hearing, the recipient must provide without fee or charge to that party, an advisor of the recipient's choice, who may be, but is not required to be, an attorney, to conduct cross-examination on behalf of that party." 85 Fed. Reg. at 30,577 (to be codified at 34 C.F.R. § 106.45(b)(6)(i)).

128.     The Rule creates unaddressed inequities, such as when one party's advisor may be an attorney and the other party's advisor may be a volunteer untrained in effective cross-examination. These inequities are inconsistent with the nondiscrimination mandate of Title IX and contrary to the 1975 regulatory requirement that school processes be "prompt and equitable." To avoid inequitable hearings and to reduce the risk of litigation, schools may feel compelled to hire attorneys or specially trained advocates to serve as advisors. These unaccounted-for costs will impose additional burdens on schools and undermine schools' ability to fulfill their Title IX obligations.

129.     The Rule further provides that during these hearings, "[b]efore a complainant, respondent, or witness answers a cross-examination or other question, the decision-maker(s) must first determine whether the question is relevant and explain any decision to exclude a question as not relevant." 85 Fed. Reg. at 30,577 (to be codified at 34 C.F.R. § 106.45(b)(6)(i)); *see also* 85 Fed. Reg. at 30,577 (to be codified at 34 C.F.R. § 106.45(b)(6)(i)) (listing types of irrelevant questions).

130.     In the preamble, the Rule arbitrarily and impermissibly forbids schools from adopting additional rules of evidence to ensure an equitable hearing. 85 Fed. Reg. 30,336–37. But the regulations themselves allow schools to adopt "provisions, rules, or practices other than those required by" 34 C.F.R. § 106.45 as long as they "apply equally to both parties." 85 Fed. Reg. at 30,575 (to be codified at 34 C.F.R. § 106.45(b)).

131.     Classrooms are not courtrooms, and school decision-makers are typically not attorneys or judges. Instead, school decision-makers are normally administrators and faculty members. Requiring them to rule on the relevancy of every question and "explain any decision to exclude a question as not relevant"—an obligation not required of Article III judges, Fed. R. Evid. 103(c)—will impose significant burdens on schools as they will either need to try to train non-lawyer decision-makers in the rules of evidence or hire lawyers or arbitrators to fill the role.

132.     The Rule further mandates that if a complainant, respondent, or witness "does not submit to cross-examination at the live hearing, the decision-maker(s) must not rely on any statement of that party or witness in reaching a determination regarding responsibility; provided, however, that the decision-maker(s) cannot draw an inference about the determination regarding responsibility based solely on a party's or witness's absence from the live hearing or refusal to answer cross-examination or other questions." 85 Fed. Reg. at 30,577 (to be codified at 34 C.F.R. § 106.45(b)(6)(i)). The Rule's preamble states that if a party does not appear at the hearing or refuses to submit to cross-examination, all of the party's statements are excluded, including the allegations that form the basis for the formal complaint itself and statements made in police and hospital reports. 85 Fed. Reg. at 30,347.

133.     Because most schools lack subpoena power and are not permitted to compel parties or witnesses to attend hearings, this provision will undermine the ability of schools to

fully address known sexual harassment in their education programs and activities whenever witnesses or parties refuse, or are unable, to submit to direct, oral cross-examination.

134.    The Rule does not impose the live hearing requirement on "other recipients that are not postsecondary institutions," even though these recipients may be museums, libraries, or cultural centers. 85 Fed. Reg. at 30,577 (to be codified at 34 C.F.R. § 106.45(b)(6)(ii)). The Department fails to explain why only postsecondary institutions are required to hold live hearings with direct, oral cross-examination by a third-party advisor.

135.    The Rule further states that schools must not "restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence." 85 Fed. Reg. at 30,576 (to be codified at 34 C.F.R. § 106.45(b)(5)(iii)).

136.    This provision fails to take into account the particularly challenging situation presented in primary and secondary schools, where young students are in a close environment. These schools now will be unable to restrict young minor complainants and respondents from sharing sensitive information with other minors. This provision increases the risk of retaliation, harassment, and the disclosure of sensitive, confidential, and other legally protected information to third parties.

137.    The Rule further requires schools to "[p]rovide both parties [and their third-party advisors] an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source." 85 Fed. Reg. at 30,576 (to be codified at 34 C.F.R. § 106.45(b)(5)(vi)). Schools must provide the evidence "in an electronic format or a hard copy."

138.    The Rule's preamble suggests that schools "may require parties and advisors to refrain from disseminating the evidence (for instance, by requiring parties and advisors to sign a non-disclosure agreement that permits review and use of the evidence only for purposes of the Title IX grievance process)." 85 Fed. Reg. at 30,304. However, this clarification is set forth only in the preamble and not found in the text of the Rule.

139.    As a result, schools—including and primary and secondary schools—will be required to provide *all* evidence collected during the investigation to both parties and their third-party advisors, without regard to relevancy, confidentiality, the need to protect witnesses (who may be young minors), or the implications of sharing sensitive information with and about young children. The suggestion of a non-disclosure agreement fails to account for the unique circumstances of primary and secondary education: While only a minor party's parent or guardian can sign the nondisclosure agreement, the school must still disclose the evidence to the minor complainant or respondent.

140.    The Rule further prohibits schools from imposing "disciplinary sanctions or other actions that are not supportive measures"—i.e., actions that "unreasonably burden[]" one party, 85 Fed. Reg. at 30,574 (to be codified at 34 C.F.R. § 106.30(a) (*supportive measures*))—unless the school follows "a grievance process that complies with § 106.45." 85 Fed. Reg. at 30,574 (to be codified at 34 C.F.R. § 106.44(a)).

141.    This requirement ignores the unique circumstances of K-12 schools, which will be unable to address the safety of their students and campuses through well-established and constitutionally sound forms of discipline—such as detention or a one- or two-day suspension—without going through a process that requires a minimum of 20 days and a formal appeal process. 85 Fed. Reg. at 30,576–78 (to be codified at 34 C.F.R. §§ 106.45(b)(5)(vi) (requiring

schools to give parties at least 10 days to submit a written response to all evidence directly

related to the allegations), (b)(5)(vii) (requiring schools to provide an investigative report fairly

summarizing the relevant evidence at least 10 days prior to a hearing or other time of

determination), (b)(8) (establishing appeal process)).

142.    This prescriptive grievance process establishes procedural requirements for

addressing allegations of sexual harassment that differ from the procedural requirements for

addressing other types of discrimination. Not only will this create disparities in the treatment of

members of different protected classes, contrary to Title IX's purpose, but it could also

significantly complicate proceedings in which a single individual is accused of perpetrating

multiple different types of discrimination.

143.    Title IX does not give Defendants authority to establish rules for primary and

secondary education institutions that upend and override local school discipline policies and

practices which meet Supreme Court standards and which allow for the flexibility needed by

school officials to maintain safety. Title IX authorizes the Department to issue regulations that

prevent and remedy sex discrimination, but does not authorize regulations that dictate the

particular process that must be used by schools when such process is unrelated to preventing and

remedying sex discrimination and when other K-12 processes already ensure fundamental

fairness.

144.    Finally, the preamble to the Rule admonishes that the "choice to initiate the

grievance process must remain within the control of the complainant unless the Title IX

Coordinator has specific reasons justifying the filing of a formal complaint over the wishes of a

complainant." 85 Fed. Reg. at 30,304. The preamble's requirement that the Title IX Coordinator

in a K-12 school set forth "specific reasons" before acting to protect a child is inconsistent with the *in loco parentis* status of school officials.

### 4. Family Educational Rights and Privacy Act

145.     The Rule conflicts with the Family Educational Rights and Privacy Act of 1974 ("FERPA") and the Department's own FERPA regulations. Pub. L. No. 93-380, § 513, 88 Stat. 484, 571–74 (codified as amended at 20 U.S.C. § 1232g).

146.     Defendants are charged with enforcing both FERPA and Title IX.

147.     The Rule imposes new obligations on schools that conflict with FERPA, despite the Department's statement in the preamble that a recipient "may comply with both these regulations and FERPA." 85 Fed. Reg. at 30,422.

148.     For example, the Rule requires that a school must provide both parties and their third-party advisors "an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint," including evidence the recipient does not intend to rely upon in reaching a determination regarding responsibility. 85 Fed. Reg. at 50,576 (to be codified at 34 C.F.R. §§ 106.45(b)(2)(i)(B) & (5)(vi)). However, FERPA prohibits the "release" of student "education records," which would include any such evidence containing information directly related to a student that is maintained by a school, without the written consent of the student (or parent, where applicable). 20 U.S.C. § 1232g(a)(4)(A), (b).

149.     In addition, the Rule permits consolidating "formal complaints as to allegations of sexual harassment against more than one respondent, or by more than one complainant against one or more respondents, or by one party against the other party, where the allegations of sexual harassment arise out of the same facts or circumstances." 85 Fed. Reg. at 30,576 (to be codified at 34 C.F.R. § 106.45(b)(4)). However, FERPA limits any right to review and inspect education

records that include information on more than one student to "only such part of such material or document as relates to such student or to be informed of the specific information contained in such part of such material." 20 U.S.C. § 1232g(a)(1)(A); *see Family Educational Rights and Privacy*, 73 Fed. Reg. 74,806, 74,832–33 (Dec. 9, 2008).

150.    The Rule prohibits schools from taking reasonable steps—already widely used consistent with FERPA—that both provide a fair process and comply with Congress's directive to protect student privacy.

151.    The Rule states that the "obligation to comply with this part is not obviated or alleviated by the FERPA statute, 20 U.S.C. 1232g, or FERPA regulations, 34 CFR part 99." 85 Fed. Reg. at 30,573 (to be codified at 34 C.F.R. § 106.6(e)).

152.    Defendants lack authority to implement these non-conflicting statutes in a way that creates a conflict and to resolve that conflict by superseding FERPA via regulation.

**B.  Changes to Other Title IX Regulations**

153.    Defendants make unlawful changes to the Department's other Title IX regulations, specifically, to the prohibition on discriminatory publications and the procedure required to claim a religious exemption.

154.    Before the Rule, schools were prohibited from "us[ing] or distribut[ing] a publication of the type described in this paragraph which *suggests, by text or illustration*, that such recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by this part." 34 C.F.R. § 106.9(b)(2) (emphasis added).

155.    The Rule amends this provision to prohibit a school only from "us[ing] or distribut[ing] a publication *stating* that the recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by title IX or this part." 85 Fed. Reg. at 30,573 (to be codified at 34 C.F.R. § 106.8(b)(2)(ii) (emphasis added)).

156.     Defendants fail to provide a reasoned explanation for eliminating this prohibition on publications that suggest discrimination—a prohibition that is intended to combat sex stereotyping—or any evidence that the standard used for over 40 years has somehow failed to accomplish the purpose of Title IX's antidiscrimination mandate. The arbitrary nature of this change is exemplified by adding a requirement in the Rule that "materials used to train Title IX Coordinators, investigators, decision-makers" and others "must not rely on sex stereotypes." 85 Fed. Reg. at 30,575 (to be codified at §106.45(b)(1)(iii)).

157.     The Rule also upends the prior long-standing application of Title IX's religious exemption. The Rule no longer requires an institution controlled by a religious organization claiming an exemption from all or part of Title IX to provide written notice to the Department with a declaration identifying which part of Title IX or the regulations conflicts with a tenet of the religion. Instead, schools now may declare an exemption for the first time after receiving a Title IX complaint. 85 Fed. Reg. at 30,573 (to be codified at 34 C.F.R. § 106.12(b)).

158.     Defendants fail to provide a reasoned explanation for this change, which will now leave prospective students, parents, and others in the dark about whether non-exempt schools will comply with Title IX's anti-discrimination requirements. Defendants also failed to identify support for the purported burden on education institutions that request the exemption and any cost-savings resulting from the change.

### C.  Effective Date

159.     The Rule's August 14, 2020, effective date fails to provide schools with adequate time to review and implement the new legal requirements in a way that fulfills Title IX's antidiscrimination mandate.

160.     For example, by August 14, 2020, every school in Plaintiff States must:

a.  Carefully review 547 Federal Register pages of preamble (and 1,971

footnotes), which improperly specify additional mandates and restrictions on

schools and provide critical information found nowhere in the eight pages of

regulations themselves as to how schools must implement the Rule, *e.g*., 85

Fed. Reg. at 30,296 n.1162 (a Title IX coordinator can sign a formal

complaint against the wishes of a complainant only if doing so "is not clearly

unreasonable in light of the known circumstances," contrary to the plain

language of the regulation); 85 Fed. Reg. at 30,287 n.1142 (suggesting that

school can be found in noncompliance for using a respondent's informal

statements, in response to a report of sexual assault, in a subsequently-filed

formal complaint process, because the school did not give the respondent

advance notice of the (informal) interview); 85 Fed. Reg. at 30,428 (stating

that if recipient obtains evidence about a party's sexual predispositions

directly related to allegations, the recipient should allow both parties and their

advisors an opportunity to review, contrary to the plain language of the

regulation); 85 Fed. Reg. at 30,273 (even though supportive measures for the

respondent are not required, failure to provide a respondent with supportive

measures could result in a deliberate indifference violation finding by the

Department);

b.  Determine if any state or local laws conflict with the regulations and are

therefore preempted, 85 Fed. Reg. at 30,573 (to be codified at 34 C.F.R.

§ 106.6(h));

c.  Revise all relevant policies, codes, handbooks, and grievance procedures for "Title IX sexual harassment," which may require multiple stages of review and approval under state or local law or school policy, 85 Fed. Reg. at 30,573 (to be codified at 34 C.F.R. § 106.8(c));

d.  Determine how to address "non-Title IX sexual harassment," which the school must dismiss under Title IX but can (and in some cases, must) address separately under codes of conduct or state law, 85 Fed. Reg. at 30,576 (to be codified at 34 C.F.R. § 106.45(b)(3)(i));

e.  For postsecondary schools, determine which faculty and staff members must, may, or must only with a complainant's consent, report sexual harassment, 85 Fed. Reg. at 30,041;

f.  Disseminate information about the new policies and procedures to the entire school community;

g.  Revise all training materials and recordkeeping procedures, and post all revised training materials on schools' websites, 85 Fed. Reg. 30,575 (to be codified at 34 C.F.R. § 106.45(b)(1)(iii)), 85 Fed. Reg. 30,578 (to be codified at 34 C.F.R. § 106.45(b)(10));

h.  Retrain all students, faculty, and staff on the new policies and procedures, including training the Title IX Coordinator, investigators, and decision-makers on the new grievance procedures; training decision-makers on how to make evidentiary decisions during a hearing and how to control cross-examination; and for primary and secondary schools, training all employees on the new

scope of sexual harassment under Title IX and how to report it; 85 Fed. Reg. at 30,574–75 (to be codified at 34 C.F.R. §§ 106.30, 106.45(b)(1)(iii));

i.  If the school previously had not provided for live hearings by a board or hearing officer (separate from the investigator) and had not provided appeal rights, it must hire and train separate investigators, decision makers, and/or appeal officers, 85 Fed. Reg. at 30,577–78 (to be codified at 34 C.F.R. §§ 106.45(b)(7), (b)(8));

j.  If the postsecondary school had not previously held live hearings, it must establish procedures and hire or appoint and train staff to serve as decision-makers, 85 Fed. Reg. at 30,577 (to be codified at 34 C.F.R. § 106.45(b)(6)(i));

k.  For postsecondary schools, appoint or hire a pool of advisors who are willing to conduct cross-examinations for parties who do not have an advisor, 85 Fed. Reg. at 30,577 (to be codified at 34 C.F.R. § 106.45(b)(6)(i)); and

l.  Renegotiate bargaining agreements and revise procedures for employees, including those who were at-will employees, prior to the preemptive effect provision added in the Rule, 85 Fed. Reg. at 30,439.

161.  Our schools must make many additional decisions—explicitly contemplated by Defendants in the preamble—about how to implement the Rule in a way that best provides for a safe and equitable education experience for all students. For example, Defendants note that postsecondary schools may consider adopting rules of decorum for live hearings to "forbid badgering a witness" or to "prohibit any party advisor or decision-maker from questioning witnesses in an abusive, intimidating, or disrespectful manner." 85 Fed. Reg. at 30,248, 30,319. Defendants also state that schools may develop non-disclosure or confidentiality agreements

(and concomitant enforcement mechanisms) to protect confidentiality when "a complainant reports sexual harassment but no formal complaint is filed," 85 Fed. Reg. at 30,296, or when providing the parties and advisors with all evidence directly related to the allegations, 85 Fed. Reg. at 30,304.

162.    And our schools must make all of these important, difficult, and resource-intensive decisions in a thoughtful and deliberate way during the ongoing COVID-19 pandemic that has resulted in the closure, recommended closure, or remote operation of virtually all primary, secondary, and postsecondary schools in Plaintiff States.

163.    Defendants' complicated changes to the Title IX regulations impose extraordinary and untenable administrative burdens and financial costs on education systems already facing unprecedented challenges due to a global health crisis of unknown duration. The crisis has required schools to provide new types of essential educational and support services while maintaining the health and safety of their staff and students.

164.    At this time, school administrators are already busy completing the spring semester, implementing modified summer programs, and preparing for the upcoming academic year—which will almost certainly commence in the midst of the ongoing pandemic. In addition, many of the administrative bodies necessary to review and approve changes to a student code of conduct, faculty handbook, or sexual misconduct policy—such as a faculty senate, faculty council, or local school board—do not meet during the summer.

165.    Defendants' unreasonable timeframe for compliance will also impose additional costs on schools at a time when many of them are facing severe budgetary constraints as a result of the COVID-19 public health crisis. By requiring schools to implement the Rule in less than three months, schools within Plaintiff States will likely have to re-direct staff and resources

dedicated to carrying out education-related operations during the pandemic to instead address the Rule's significant administrative requirements. Indeed, some already have.

166.    Defendants' timeframe is impossible for our schools to comply with in a way that does not create confusion; impose greater burdens and costs on students, faculty, and staff; and ultimately undermine Title IX's mandate.

### D.  Regulatory Impact Analyses

167.    Both the notice of proposed rulemaking and the Rule include a regulatory impact analysis ("RIA") prepared pursuant to Executive Orders 12866 and 13563.

168.    Both RIAs are fatally flawed.

### 1.  RIA in the Notice of Proposed Rulemaking

169.    In the proposed rule, the Department estimated a net cost *savings* of between $286.4 million to $367.7 million over ten years based solely on an anticipated decrease in Title IX investigations and complaint filings caused by the proposed regulations.

170.    But the Department failed to disclose the methodology upon which it relied in reaching is conclusions and provided only generalized estimates not grounded in evidence. The Department also failed to provide all of the underlying sources, studies, and reports on which it purportedly relied for the many assumptions critical to its cost-benefit analysis. As a result, the public was deprived of an opportunity to review and comment on these sources, in contravention of the APA.

171.    The Department's failure to provide this information in the notice of proposed rulemaking deprived the public of an opportunity to meaningfully comment on the Department's estimates and assumptions.

172.    In the Rule, the Department does not adequately explain its failure to provide the technical studies and data upon which it relied to prepare the RIA in the notice of proposed rulemaking. 85 Fed. Reg. 30,502–03.

### 2.  RIA in the Rule

173.    In the final Rule, the Department drastically changed its cost-benefit analysis from that in the notice of proposed rulemaking, ultimately concluding that the Rule's net *costs* will be between $48.6 million and $62.2 million over ten years. 85 Fed. Reg. at 30,569. The Department's explanation of this revised estimate is flawed and inadequate.

174.    Incidents of sexual violence and harassment have health, monetary, and other costs to the survivors, to school campuses, and to States that will bear the costs when students who are subjected to sexual harassment receive no relief from their schools. These costs include drop-out rates, class withdrawals, absenteeism, mistrust of education institutions, and harm to mental and physical health, all of which are independently harmful and can contribute to poor academic performance. 85 Fed. Reg. at 30,544–45.

175.    Although the Department acknowledged these harms and identified relevant studies that provide cost estimates in the proposed rule, it intentionally declined to include them in the cost-benefit analysis. 83 Fed. Reg. at 61,485; 85 Fed. Reg. at 30,538–46.

176.    The Rule will have the likely consequence of subjecting more students to harassment because it narrows the scope of Title IX's protections. *See* Part II.A, *supra*. The narrowed scope both diminishes Title IX's deterrent effect and limits schools' ability to respond to harassment. Thus, the costs attendant to increased incidents of harassment that will follow from the Rule are a necessary piece of the cost-benefit analysis.

177.    The Department anticipates a significant decrease in investigations of complaints as a result of the changes in the Rule. 85 Fed. Reg. at 30,550, 30,553–54, 30,548–49, 30,568

48

(stating that Title IX investigations will decrease by about 33 percent per year in colleges and universities and 50 percent per year in elementary and secondary schools as a result of the Rule). When investigations decrease, so do the number of responsibility findings and the number of sanctions issued to perpetrators of sexual harassment. These decreases have an appreciable impact on a school's ability to deter future and repeat sexually harassing conduct. Because fewer incidents of sexual harassment will be investigated under the Rule, the likelihood of this harassment being detected and punished will also be reduced, which in turn will reduce the system's general deterrent effect.

178.    Rather than recognizing the costs associated with increased sexual harassment, the Department unreasonably determined that the Rule's new, narrow scope would result in a cost *savings*—almost $200 million from fewer investigations into formal complaints. 85 Fed. Reg. at 30,568. Even if the Department is correct about the projected cost savings, it arbitrarily disregards that the costs are saved precisely because the narrow scope of the Rule is contrary to Title IX's anti-discrimination mandate.

179.    The Department also failed to analyze how the Rule will affect the national economy, despite at least one study cited by the Department in the notice of proposed rulemaking showing that the national economic burden of sexual violence is $263 billion a year—costs largely borne by States, state schools, and state public health care systems. 83 Fed. Reg. at 61,485 n.5.

180.    The Department also failed to properly consider the substantial administrative, staffing, and training costs the Rule imposes. The Department's estimates of what will be required for recipients to implement the Rule do not fully account for all related costs States' education institutions will bear.

181.    For example, the Department did not factor in all of the costs of hiring, training, and retraining staff to comply with Rule's new requirements.

182.    When the Department did consider administrative costs, it made unrealistic assumptions, such as the amount of time school administrators and employees would need to review and implement the Rule. 85 Fed. Reg. at 30,567. And, as the Department admitted, the States' education institutions will shoulder those and any other unaccounted-for financial and administrative expenses. 85 Fed. Reg. at 30,549.

183.    To the extent the Department's estimates assume that Title IX Coordinators and school attorneys need only read the eight pages of actual federal regulations, 85 Fed. Reg. at 30,567, this is irrational. The preamble, which itself is over 500 Federal Register pages, includes additional (improperly issued) requirements that appear nowhere in the regulations themselves and that the Department intends to enforce. *See* ¶ 160.a *supra*.

184.    The cost of meeting these administrative burdens is compounded by the Department's imposed effective date that requires schools to redirect resources away from managing their responses to the COVID-19 pandemic.

185.    Separately, the Rule provided inadequate estimates of the time recipients will need to expend responding to formal complaints of Title IX sexual harassment under the Rule's new procedures. 85 Fed. Reg. at 30,568–69.

186.    The Department's RIA fails to account for the many costs associated with the Rule and is therefore arbitrary and capricious. And in changing its analysis so drastically, the Department failed to provide an adequate reasoned explanation justifying these new significant costs.

**E.  Procedural Flaws**

187.    The Rule failed to comply with the APA's procedural requirements.

188.     The Rule contains new provisions that were not a logical outgrowth of, and could not have been anticipated based on, the notice of proposed rulemaking.

189.     The Rule expressly preempts state laws if there is any "conflict between State or local law and title IX as implemented by §§ 106.30, 106.44, and 106.45." 85 Fed. Reg. at 30,573 (to be codified at 34 C.F.R. § 106.6(h)). This regulatory provision was not disclosed to the public during the rulemaking process; to the contrary, the Department stated in the notice of proposed rulemaking that the proposed regulations will *not* have preemptive effect. *See* 83 Fed. Reg. at 61,468, 61,475. As a result, the States and the public were deprived of the opportunity to comment.

190.     The Rule also allows for the consolidation of "formal complaints as to allegations of sexual harassment against more than one respondent, or by more than one complainant against one or more respondents, or by one party against the other party, where the allegations of sexual harassment arise out of the same facts or circumstances." 85 Fed. Reg. at 30,576 (to be codified at 34 C.F.R. § 106.45(b)(4)). But the notice of proposed rulemaking makes no mention of consolidation. As a result, the States and the public were deprived of the opportunity to caution the Department that any consolidation must be done with the consent of the parties and account for confidentiality, including the requirements of FERPA, state privacy laws, and any harms to students.

191.     The Rule allows for dismissal of complaints if a "respondent is no longer enrolled or employed by the recipient," including if the respondent leaves a school during the investigation. 85 Fed. Reg. at 30,576 (to be codified at 34 C.F.R § 106.45(b)(3)(ii)). But, the notice of proposed rulemaking did not mention dismissal in this context at all and did not provide the States and the public with the opportunity to comment on the effect of such a dismissal.

192.     The Rule contains a new confidentiality provision that is internally inconsistent

with the existing confidentiality regulation already incorporated by reference from Title VI. The

existing confidentiality provision states that the "identity of complainants shall be kept

confidential except to the extent necessary to carry out the purposes of this part, including the

conduct of any investigation, hearing, or judicial proceeding arising thereunder." 85 Fed. Reg. at

30,579 (to be re-codified at 34 C.F.R. § 106.81 (incorporating by reference 34 C.F.R.

§ 100.7(e))). The new confidentiality provision in the Rule only requires "the recipient," not the

parties, to "keep confidential the identity of any individual who has made a report or complaint

of sex discrimination." 85 Fed. Reg. at 30,578 (to be codified at 34 C.F.R. § 106.71). The notice

of proposed rulemaking did not include this new confidentiality provision, depriving the States

and the public of the opportunity to alert the Department to the inconsistency.

193.     The Rule limits a victim's ability to benefit from Title IX protections by requiring

that they be currently "participating in or attempting to participate in the education program or

activity of the recipient with which the formal complaint is filed." 85 Fed. Reg. at 30,574 (to be

codified at 34 C.F.R § 106.30 (*formal complaint*)). This requirement is not a logical outgrowth

of, and could not have been anticipated based on, the notice of proposed rulemaking, which only

referenced precluding Title IX's grievance process for an individual who has never been enrolled

as a student of the school at which they are filing a complaint. 83 Fed. Reg. at 61,468.

194.     The Rule inserts various severability provisions that allow the balance of the Rule

to remain applicable even if provisions of the Rule are held invalid. 85 Fed. Reg. at 30,576–79

(to be codified at 34 C.F.R. §§ 106.9, 106.18, 106.24, 106.46, 106.62, 106.72). The notice of

proposed rulemaking did not mention the severability provisions and, therefore, did not provide

the States or the public with the opportunity to comment on the effect of such provisions.

195.    The Rule's preamble also includes a number of additional mandates and
prohibitions that the Department indicates it will enforce as if they have the force of law. Some
of these provisions conflict with the Rule. *E.g.*, ¶¶ 130, 160.a, *supra*. None of these mandates
and prohibitions are included in the Rule and, therefore, are unlawfully issued.

196.    Finally, the Rule does not include the approval of United States Attorney General
William P. Barr or his designate, as required by 20 U.S.C. § 1682 and Executive Order 12250.

## III.   THE RULE WILL CAUSE IMMEDIATE AND IRREPARABLE HARM TO PLAINTIFF STATES, SCHOOLS, AND STUDENTS.

197.    The Rule will cause immediate, irreparable harm to the proprietary, sovereign,
and quasi-sovereign interests of the States.

### A.   The Rule Will Harm Plaintiff States' Proprietary Interests

198.    The States, both themselves and through their publicly administered education
institutions, are directly regulated by the Rule. As a result, they will suffer direct proprietary
harm because of the Rule.

199.    Each of the States administers a system of primary and secondary public
education that is funded by both state and federal money:

    a.   *Pennsylvania*: The Pennsylvania Constitution charges the Pennsylvania
General Assembly with "provid[ing] for the maintenance and support of a
thorough and efficient system of public education to serve the needs of the
Commonwealth." Pa. Const. Art. III § 14. The Commonwealth provides more
than $12 billion each year to its 500 public school districts, which educate
more than 1.72 million students each year in 2,865 schools. Pennsylvania also
has approximately 3,000 nonpublic and private schools that range from pre-K
to high school. Pennsylvania received more than $1.36 billion from the

Department in 2019 to support its primary and secondary education programs. Pennsylvania is scheduled to receive more than $1.4 billion from the Department in 2020.

b. *New Jersey*: The Constitution and legislature charge the State of New Jersey with maintaining a "thorough and efficient system of free public schools" for residents ages five through 18. N.J. Const. Art. VIII, Sec. IV, Para 2; N.J. Stat. Ann. § 18A:7F-44(b). New Jersey has approximately 1.4 million students enrolled in public schools in grades K-12. The State allocates funding to local school districts in accordance with the School Funding Reform Act of 2008, N.J. Stat. Ann. § 18A:7F-43 to -70. The State provides over $8.4 billion in funding to its 584 local public school districts. In 2018–2019, New Jersey received $923,564,548 in federal education funding from the Department, and $1,604,148 from other federal agencies related to K-12 education.

c. *California*: The State is the legal and political entity with plenary responsibility for educating all California public school students. The State has the constitutional responsibility to establish and maintain the system of common schools and a free education, Cal. Const. art. IX, § 5, and to ensure that all California public school students receive their fundamental right to equal educational opportunity, regardless of sex and other protected factors, *id.* art. I, § 7(a) & art. IV, § 16(a). The State funds and oversees the operation of the largest common system of public schools in the nation, which serves nearly 6.2 million children in more than 10,500 schools. In 2018–2019, the State provided $54.7 billion in General Funds to its 1,037 local public school

districts. California also received more than $8.6 billion from the U.S. Department of Education in 2018–2019, and is scheduled to receive more than $8.8 billion from the Department in 2019–2020.

d. *Colorado*: Colorado's constitution pledges that the State will establish and maintain a thorough and uniform system of free public schools where all residents between the ages of six and 21 may be educated. Colo. Const. art. IX, § 2. Colorado's children are entrusted to that system through the State's compulsory attendance laws. Colo. Const. art. IX § 11; Colo. Rev. Stat. § 22-33-104. In the 2018–2019 academic year, Colorado was home to 178 operating school districts, 1,888 schools, and over 900,000 students. For school year 2019–2020, Colorado provided approximately $7.6 billion in state funding to districts and charter schools. Colorado also received more than $450 million from the Department for school year 2019–2020.

e. *Delaware*: The Delaware Constitution charges the Delaware General Assembly with "provid[ing] for the establishment and maintenance of a general and efficient system of free public schools." Del. Const. Art. X, § 1. For the 2019–2020 school year, Delaware was home to 19 operating school districts, with 194 traditional public schools, 23 charter schools, with more than 140 thousand students enrolled, and approximately 88 private schools that range from kindergarten through high school, with more than 15 thousand students enrolled. Delaware provides more than $1.4 billion each year to its public schools, and receives approximately $130 million from the Department for its primary and secondary education programs.

f.   *District of Columbia*: The District has 116 traditional public schools and 123 public charter schools with approximately 93,000 enrolled students, according to Fiscal Year 2019 data. The District received more than $103 million from the Department in 2019 to support its primary and secondary education programs. It is scheduled to receive more than $107 million in 2020.

g.   *Illinois*: The Illinois Constitution charges the State to "provide for an efficient system of high quality public educational institutions and services." Ill. Const. Art. X. Illinois provides over $8.89 billion to its approximately 852 school districts. These school districts educate approximately 1.98 million students each year in 3,872 public schools. Illinois also has approximately 198,643 students enrolled in non-public institutions. In the 2018–2019 school year, Illinois received approximately $3.66 billion in federal funds for its elementary and secondary education programs.

h.   *Massachusetts*: The Massachusetts Constitution requires that the Commonwealth provide adequate funding to educate all Massachusetts children. *McDuffy v. Secretary of Executive Office of Education*, 615 N.E.2d 516 (Mass. 1993). Massachusetts is home to 406 public preK-12 school districts, comprised of more than 1,800 schools and more than 950,000 students. Each year Massachusetts allocates more than $6 billion to these public school districts. To support its elementary and secondary programs, Massachusetts received approximately $689 million from the Department in Fiscal Year 2019 and is scheduled to receive almost $693 million from the Department in Fiscal Year 2020.

i.   *Michigan*: The Michigan Constitution charges the Michigan Legislature with

"maintain[ing] and support[ing] a system of free public elementary and

secondary schools as defined by law." Mich. Const. art. VIII, § 2. Michigan

provides more than $13 billion each year to its 836 public school districts and

56 intermediate school districts. The 3,400 school buildings in these districts

educate more than 1.5 million students each year. Michigan received

approximately $1.14 billion from the Department in 2019 to support its K-12

schools. Michigan is expected to receive over $1.18 billion from the

Department for the 2020–2021 school year.

j.   *Minnesota*: The Minnesota Constitution requires the legislature to establish a

general and uniform system of public schools. Minn. Const. Art. XIII § 1.

Minnesota has over 330 public school districts and 169 charter schools, which

educate over 865,000 students. In Fiscal Year 2019, Minnesota spent

approximately $9.588 billion on E-12 education, the largest single expenditure

in its budget. In that year, Minnesota received approximately an additional

$508 million in elementary and secondary funding from the Department.

k.   *New Mexico*: The New Mexico constitution promises to establish and

maintain a uniform, free public school system "sufficient for the education of,

and open to, all the children of school age." N.M. Const. Art. 12, Sec. 1. In

2020, legislators appropriated $3.468 billion in state funds for public

education from prekindergarten through secondary schools, or 45.5 percent of

total recurring appropriations. In 2019, the definition of "school-age" was

revised to include students through age 22. The Fiscal Year 2021 budget

increased recurring appropriations by $216 million, or 6.6 percent, with significant additional funding to increase educator compensation, provide additional services to at-risk students, and provide professional development and mentorship support for early career teachers. Total federal support for New Mexico's elementary and secondary schools was $406,133,433.

l. *North Carolina*: North Carolina's constitution guarantees the "right to the privilege of education" and charges the state with the "duty" to "guard and maintain that right." N.C. Const. art. I, § 15. North Carolina's constitution also requires that the State provide all of its students a "sound basic education." *Leandro v. State*, 488 S.E.2d 249, 254 (N.C. 1997). For the 2014–2015 school year, North Carolina was home to 115 operating school districts, 2,592 schools, and more than 1.53 million students. For the 2014–2015 academic year, North Carolina contributed more than $8.08 billion in state funding for operating expenses and received more than $1.44 billion in federal funding for operating expenses.

m. *Oregon*: The Oregon Constitution charges the Oregon Legislature with appropriating funds "sufficient to ensure that the state's system of public education meets quality goals established by law." Or. Const., Art. VIII, § 8. As of fall 2019 there were 582,661 K-12 students in Oregon. Of those, 179,985 are in grades 9-12. Those students attend more than 1,200 public schools organized into 197 school districts in the State of Oregon. The 2019–2021 Legislatively Adopted Budget includes $1.254 million in pass-through federal funds for K-12 programs.

n.  *Rhode Island*: The Rhode Island Constitution charges the Rhode Island

General Assembly to "promote public schools . . . and to adopt all means

which it may deem necessary and proper to secure to the people the

advantages and opportunities of education[.]" R.I. Const., Art. XII, § 1. The

Rhode Island public elementary and secondary education system provides

education to approximately 143,000 students each year. Additionally, the

system has a cumulative annual budget of $2.2 billion and employs

approximately 21,000 teachers, administrators and staff.

o.  *Vermont*: The "right to public education is integral to Vermont's constitutional

form of government and its guarantees of political and civil rights." Vt. Stat.

Ann. tit. 16, § 1. The Vermont Agency of Education and the State's public

educators are deeply committed to ensuring that all children in the State enjoy

equal educational opportunity. Vermont has approximately 250 public schools

that serve over 80,000 children. In 2019, the State provided over $1.37 billion

in funding to its school districts. The Agency of Education is responsible for

supervising the expenditure and distribution of all money appropriated by the

State to support these schools. The Agency is also responsible for executing

and monitoring federal education grants to Vermont schools on behalf of the

federal government. Vermont received more than $103 million from the

Department of Education in 2019 to support its primary and secondary

education programs, and estimates receiving over $107 million in 2020.

p.  *Virginia*: Under the Constitution of Virginia, the General Assembly is

required to "provide for a system of free public elementary and secondary

schools for all children" in the Commonwealth. Va. Const. art. VIII, § 1. The

General Assembly must also "ensure that an educational program of high

quality is established and continually maintained." *Id.* These directives have

been adopted in the Code of Virginia, *see* Va. Code Ann. § 22.1-2, and the

Supreme Court of Virginia has confirmed that "education is a fundamental

right" under the state Constitution. *Scott v. Commonwealth*, 443 S.E.2d 138,

142 (Va. 1994). For the 2019–2020 school year, there were 2,106 public

schools in Virginia, including 1,860 schools, 155 local centers, and 91

regional centers. These schools educated nearly 1.3 million students in grades

K-12 in 2019. The Commonwealth provides approximately $7.3 billion each

year in state funding to its school. In Fiscal Year 2019, Virginia received more

than $710 million in federal funding to support the Commonwealth's primary

and secondary education programs. Virginia has also already received nearly

$634 million in federal funding for Fiscal Year 2020

q.  *Washington*: The Washington Constitution provides that it is the "paramount

duty of the state to make ample provision for the education of all children

residing within its borders, without distinction or preference on account of

race, color, caste, or sex." Wash. Const. art. IX sec. 1; *see McCleary v. State*,

269 P.3d 227 (Wash. 2012). Under its current biennial budget for 2019–2021,

Washington provides more than $27 billion to its public schools, which serve

over 1.1 million K-12 students annually. Washington received approximately

$728 million from the Department in 2019 to support its primary and

secondary public education programs, and is scheduled to receive approximately $745 million in 2020.

r.   *Wisconsin*: The Wisconsin Constitution charges the legislature with providing the establishment of public schools, "which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years." Art. X §3, Wis. Constitution. Wisconsin provides more than $5 billion each year to its public schools, which educate more than 850,000 students each year in 2,216 schools. Wisconsin also has approximately 790 nonpublic and private schools that range from pre-K to high school. Wisconsin received more than $560 million from the Department in 2019 to support its primary and secondary education programs. Wisconsin is scheduled to receive more than $575 million from the Department in 2020.

200.   Collectively, the States' systems of public primary and secondary education have an enrollment of more than 20 million students and receive more than $31 billion from the Department annually.

201.   Because each State receives federal funding from the Department for primary and secondary education, each State and its public primary and secondary education systems are subject to the Rule.

202.   In addition, each State funds, supports, and/or administers systems of postsecondary education:

a.   *Pennsylvania:* The Pennsylvania State System of Higher Education ("PASSHE") is a state-owned, funded, and administered network of 14

postsecondary schools across the Commonwealth with a combined enrollment of over 90,000 students each year. 24 P.S. §§ 20-2001-A to 20-2020-A. Pennsylvania provides PASSHE with more than $450 million each year. In addition, the Commonwealth System of Higher Education ("CSHE") consists of four "state-related" universities in Pennsylvania—Lincoln University, Pennsylvania State University, the University of Pittsburgh, and Temple University—that together educate more than 170,000 students. These universities are considered public institutions, and Commonwealth officials appoint a designated number of trustees to the governing board of each institution. CSHE universities receive an annual, non-preferred financial appropriation from the state and offer discounted tuition to Commonwealth residents. Pennsylvania provides nearly $600 million to the CSHE universities each year. Pennsylvania also has 14 community colleges that educate more than 120,000 students each year with nearly $300 million in annual public funding. Finally, eight institutions in Pennsylvania are private but receive state funding: Drexel University, Johnson College, Lake Erie College of Osteopathic Medicine, Philadelphia College of Osteopathic Medicine, Salus University, Thomas Jefferson University, University of Pennsylvania, and The University of the Arts. Pennsylvania institutions of postsecondary education received more than $930 million from the Department in 2019 and are scheduled to receive more than $970 million in 2020.

b. *New Jersey*: New Jersey is home to four public research universities, seven State colleges and universities, 18 community colleges, and 15 independent

non-profit four-year colleges. Over 531,000 students are enrolled in higher education institutions across the State with over 300,000 enrolled in public colleges. New Jersey's public colleges and universities are state-funded institutions that are governed by state law. In Fiscal Year 2019, the State provided a total of $1.74 billion to public colleges and universities in direct operating aid, including fringe benefits. The State also appropriated $522 million in student financial aid assistance that is awarded directly to students attending both public and private institutions in New Jersey. In Fiscal Year 2018, the federal government provided public colleges and universities in the state of New Jersey a total of $1.59 billion in federal funding—this includes appropriations, operating, non-operating, and financial aid. Similarly, independent not-for-profit institutions in New Jersey received over $318 million in federal grants and contracts as well as student financial aid in Fiscal Year 2018.

c. *California*: California operates and funds a system of colleges and universities, which include the University of California, California State University, and Community College systems. Collectively, these colleges and universities serve more than 2.8 million students. As of the Budget Act of 2019, for the 2018–2019 Fiscal Year, the State provided $19.5 billion in General Fund and Property Tax to its colleges and universities. California also received an estimated $5.7 billion from the Department in the 2018–2019 Fiscal Year, and is scheduled to receive more than $7.1 billion from the Department in the 2019–2020 Fiscal Year for its colleges and universities.

d.   *Colorado*: Colorado is home to 31 public universities and colleges, which collectively enroll more than 250,000 students. In Fiscal Year 2019–2020, Colorado provided $858 million from the general fund and $220.3 million in student aid. Colorado higher education institutions collectively received over $464.6 million from the Department in 2019 and are scheduled to receive more than $482.9 million in 2020.

e.   *Delaware*: Delaware is home to eight universities and colleges, which collectively enroll more than 60,000 students. In Fiscal Year 2020, Delaware provided $247 million in funding to higher education institutions. Delaware higher education institutions collectively received $68 million from the Department in 2019 and are scheduled to receive more than $71 million in 2020.

f.   *District of Columbia*: The University of the District of Columbia ("UDC") is the District of Columbia's public higher education institution. Over 4,000 students are enrolled at UDC, including the flagship university and the community college. For Fiscal Year 2020, UDC has a projected operating budget of $166.3 million, of which $33.5 million comes from federal grants and $8.3 million comes from District of Columbia agency grants.

g.   *Illinois*: Illinois has approximately 208 higher education institutions, including public, private, and technical schools, and community colleges, with approximately 720,000 students. Illinois has 12 public universities with roughly 182,000 students. The largest of the public universities is the University of Illinois Urbana-Champaign, which enrolls over 52,000 students

each year. Illinois also has over 271,000 students enrolled in public

community colleges. Illinois provides approximately $4 billion to its higher

education institutions, including $1.167 billion to universities and $410

million to community colleges. Illinois received at least $1 billion from the

Department in 2019 to support its postsecondary education programs and is

scheduled to receive more than $1 billion in 2020.

h. *Massachusetts*: Massachusetts has 29 public colleges and universities,

including 15 community colleges, nine state universities, and five separate

campuses of the University of Massachusetts system. More than 260,000

students attend Massachusetts institutions of public higher education.

Massachusetts provides $1.3 billion in annual support to its public colleges

and universities. Massachusetts is also home to 92 private higher education

institutions. Next to health care and finance, higher education is one of

Massachusetts's largest industries, employing over 135,000 faculty, staff, and

administrators. To support its postsecondary programs, Massachusetts

received approximately $562 million from the Department in Fiscal Year

2019 and is scheduled to receive nearly $584 million from the Department in

Fiscal Year 2020.

i. *Michigan*: The Michigan Constitution charges the Michigan Legislature with

"appropriating moneys to maintain" ten public universities in the state. Mich.

Const. art. VIII, § 4. These ten universities are governed independently

through constitutionally created boards. *See id.* §§ 5–6. Five other universities

in the state also receive state funding. In sum, over 280,000 students are

enrolled in these fifteen state-funded universities across the state. These universities received over $1.5 billion in state funding during the 2019–2020 Fiscal Year. Michigan is also home to 28 public community colleges. The Michigan Constitution requires the Michigan Legislature provide "financial support" for these colleges. *Id.* § 7. The community colleges received $414 million through state appropriations during the most recent fiscal year. Michigan institutions received more than $763 million from the Department in 2019 and are scheduled to receive more than $800 million in 2020.

j. *Minnesota*: Minnesota is home to the University of Minnesota, which includes five campuses, and the Minnesota State Colleges and Universities system, which includes seven universities and thirty community and technical colleges. Together, these public colleges and universities educate more than 415,000 students. In Fiscal Year 2020, the State is scheduled to provide $1.428 billion in funding to these colleges and universities. In the same year, postsecondary institutions in Minnesota are scheduled to receive an additional $479 million from the Department.

k. *New Mexico*: New Mexico has 24 public colleges and universities that deliver workforce training, adult education, and undergraduate and graduate degrees. New Mexico dedicated $905 million in state appropriations for its higher education system in the most recent fiscal year for some 75,000 full-time or full-time equivalent students. The Department provided approximately $400 million in student financial aid for higher education students in New Mexico for purposes of tuition at New Mexico higher education institutions.

l.  *North Carolina:* North Carolina is home to 74 public universities and colleges, which collectively enroll more than 1.05 million students. In 2019, North Carolina higher education institutions collectively received more than $896 million from the Department and are scheduled to receive more than $937 million in 2020. For Fiscal Year 2019–2020, the UNC System received more than $3.0 billion in state funding. For Fiscal Year 2019–2020, the Community College System received more than $1.1 billion in state funding.

m.  *Oregon:* Oregon has seven public universities, which had over 100,000 students enrolled in 2019, and seventeen community colleges, serving over 250,000 students in 2018–2019. In the 2017–2019 biennium state funding per full-time-equivalent student was over $7,900 per student in Oregon's public universities. For students in Oregon's community colleges, state funding in 2017–2019 was over $3,200 per full-time equivalent.

n.  *Rhode Island:* Rhode Island is home to the University of Rhode Island, Rhode Island College, and the Community College of Rhode Island. Collectively, the Rhode Island higher education system provides instruction to approximately 43,000 undergraduate and graduate students each year**.** This system employs approximately 4,500 faculty and support staff and has a combined operating budget of approximately $1 billion per year**.**

o.  *Vermont*: Vermont is home to the University of Vermont, the Vermont State Colleges, and a number of private colleges. In 2019, Vermont State Colleges enrolled over 11,060 students. The University of Vermont enrolled over 12,800. For Fiscal Year 2020, the State appropriated about $32 million to

fund the Vermont State Colleges and about $42 million to the University of Vermont. Vermont institutions received more than $50 million from the Department in 2019, and estimate receiving over $52 million in 2020.

p. *Virginia*: There are over 375 institutions of higher education operating in Virginia, including 39 public institutions, 30 private non-profit colleges and universities, five regional higher education centers, one public/private medical school, and over 300 for-profit, out-of-state, or vocational institutions. In 2019, there were over 525,000 students enrolled in Virginia's institutions of higher education. The current state budget in Virginia appropriated approximately $1.9 billion to higher education funding. Virginia's higher education institutions received more than $2.2 billion in federal funding in Fiscal Year 2019. Virginia also is home to 23 community colleges, in which 158,000 students were enrolled in 2019. Those community colleges received approximately $384 million in state funding in Fiscal Year 2019 and approximately $398 million in Fiscal Year 2020.

q. *Washington*: Washington has a "vital interest" in ensuring that accessible higher education opportunities are available to its residents. Wash. Rev. Code § 28B.07.010. Washington has six public baccalaureate colleges and universities: the University of Washington, Washington State University, Central Washington University, Eastern Washington University, Western Washington University, and the Evergreen State College. Washington also has a system of 30 public community and technical college districts comprised of 34 separate colleges, whose funding is coordinated by the Washington State

Board for Community and Technical Colleges. In addition, Washington is home to a number of independent, private colleges and a variety of other higher education institutions. Washington postsecondary institutions received approximately $444 million from the Department in 2019, and are scheduled to receive approximately $462 million in 2020. Washington's six public baccalaureate colleges and universities have a combined enrollment of over 116,000 students each year. Washington's community and technical colleges educate over 148,000 students each year. Altogether, Washington's operating budget for 2019–2021 provides over $4 billion to support the State's higher education system.

r. *Wisconsin*: Wisconsin is home to more than 70 universities and colleges that confer an Associate's degree or higher. All public universities in the State of Wisconsin are part of the University of Wisconsin System. The University of Wisconsin System is one of the largest systems of public higher education in the country, serving approximately 170,000 students each year through 13 universities across 26 campuses and a statewide extension network. Wisconsin higher education institutions collectively received $390 million from the Department in 2019 and are scheduled to receive more than $400 million in 2020.

203.    Collectively, the States' systems of publicly supported higher education have an enrollment of more than 7 million students and receive more than $15 billion from the Department annually.

204.     Each of the institutions in the States' systems of higher education receives federal funding and, as a result, is subject to the Rule.

205.     To comply with the Rule by the August 14, 2020, deadline, primary, secondary, and postsecondary schools face a number of obstacles that will impose substantial direct costs on these State-sponsored institutions. *See* Part II.C, *supra*.

206.     In addition, the ongoing national health emergency caused by the COVID-19 pandemic makes it nearly impossible for schools to review the Rule and revise their policies by August 14, 2020. As of filing, every primary and secondary school in all but one Plaintiff State has been ordered to physically close and to operate remotely. Primary and secondary schools in California have also been closed and conducting all operations remotely under mandatory public health orders since March 2020. Likewise, virtually all postsecondary schools in Plaintiff States are physically closed and operating remotely. All of Plaintiff States have imposed stay-at-home or safer-at-home orders that to some extent require students, faculty, and staff to work or engage in schooling from home. Schools in Plaintiff States do not know yet whether they will return in the fall for in-person classes.

207.     The Rule will require state-sponsored institutions to adopt new, costly, unnecessary, and unduly burdensome grievance procedures, forcing them to bear additional costs. *See* Part II.A.3, *supra*.

208.     Where a Plaintiff State's law and other federal laws, such as the Clery Act and VAWA, provide greater protections than the Rule, schools subject to these laws will need to create parallel code of conduct provisions and enforcement mechanisms—one addressing "Title IX sexual harassment" and one addressing "non-Title IX sexual harassment." So too will schools that wish to continue providing protections for students beyond the Rule out of concern for

campus safety and student well-being, to ensure the nondiscriminatory educational experience

promised by Title IX, or both.

209.     Having two code of conduct provisions and two enforcement mechanisms for

sexual harassment claims will burden students and schools alike and lead to significant

confusion. Schools must determine how to clearly and effectively communicate the existence of

different policies and the differences between them, without indicating that one policy's

protections and procedures take precedence over the other. Schools that receive notice of sexual

harassment will first have to gather enough information to determine which policy to use so they

can accurately advise the complainant on the process for pursuing a formal complaint. 85 Fed.

Reg. at 30,574–75 (to be codified at 34 C.F.R. § 106.44(a) ("The Title IX Coordinator must

promptly contact the complainant to . . . explain to the complainant the process for filing a

formal complaint.")). Where the facts are unclear, relevant school administrators must take time

to consult with general counsel and others, causing further delays. Where a school's Title IX

office does not handle non-Title IX sexual harassment investigations, but the investigation

reveals information indicating that harassment thought to fall outside of Title IX actually falls

within it (or vice versa), school administrators must determine how to hand off evidence between

different offices while clearly explaining to both parties what will happen next. And should a

party disagree with the school's determination that the harassing conduct falls under the school's

non-Title IX policy, the party can appeal and seek OCR review, adding further delays. 85 Fed.

Reg. at 30,577 (to be codified at 34 C.F.R. § 106.45(b)(8)(i)).

210.     The Rule's August 14 effective date will force schools to take temporary and

emergency measures to implement the Rule's minimum requirements, limiting schools' ability to

consult with students and others affected by the Rule in the process. Many schools and state or

local policies require this consultation before implementing such significant changes. The lack of engagement with and input from school communities will undermine the legitimacy of the resulting measures and potentially lead to lower compliance with the Rule's requirements.

211. The effective date of August 14, 2020, will also make it difficult for schools to take certain additional steps they consider important to protecting their students, employees, and others. For example, many schools may wish to craft non-disclosure agreements to protect the privacy of complainants and respondents during the pendency of an investigation or after resolution—but will not be able to do so before August 14.

212. The Rule will impede schools' efforts to prevent and respond to incidents of sexual harassment, including sexual assault. As a result, schools will be forced to devote additional resources to addressing the physical, emotional, psychological, and other consequences of sexual harassment.

213. Because they will face greater difficulties in combatting sexual harassment against students, schools will also be at risk of reputational harm as a result of the Rule.

214. All of these financial and other harms will be felt by state-sponsored education institutions—primary, secondary, and postsecondary—in the Plaintiff States. The States will suffer direct harm to their proprietary interests as a result of the Rule.

**B. The Rule Will Harm Plaintiff States' Sovereign Interests**

215. The Rule will directly harm the States' sovereign interests by interfering with their primary authority to enact and enforce their own laws governing education institutions within their borders, as well as interfere with the important parallel role States have traditionally played in eliminating discrimination within their borders.

216. The Rule will directly harm the States' sovereign interests by inhibiting their ability to protect students from sexual harassment, provide campuses free from sex

discrimination, and fulfill their educational missions to provide equal opportunity, benefit, and access to students without regard to sex—all while retaining necessary federal funds.

217.    Traditionally, States have acted as the primary regulators of primary, secondary, and postsecondary education. Although the federal government has expanded its role in education, state and local officials continue to have primary responsibility for decisions relating to the oversight of education institutions.

218.    State and local officials have primary responsibility for overseeing K-12 schools and for setting policies relating to elementary and secondary education:

    a.    *Pennsylvania*: The Pennsylvania Department of Education oversees the 500 public school districts, more than 170 public charter schools, public cyber charter schools, public Intermediate Units, the education of youth in State Juvenile Correctional Institutions, and Head Starts and publicly funded preschools. The Pennsylvania State Board of Education reviews and adopts regulations that govern educational policies and principles and establish standards governing the educational programs of the Commonwealth. The Board of Education also approves the creation of new school districts or changes in the boundaries of existing districts, manages the State School Fund and adopts master plans for basic education. Local school boards exercise primary responsibility over budgetary and other decisions for each school district.

    b.    *New Jersey*: The Constitution and legislature charge the State of New Jersey with maintaining a "thorough and efficient system of free public schools" for residents ages five through 18. N.J. Const. Art. VIII, Sec. IV, Para 2; N.J. Stat.

Ann. § 18A:7F-44(b). The State Board of Education has general supervision and control of public education in the state, with exception of higher education. N.J. Stat. Ann. § 18A:4-10. The Commissioner of Education has supervision of all schools in the state that receive support or aid from state appropriations, other than institutions of higher education. N.J. Stat. Ann. § 18A:4-23.

c.   *California*: The State is the legal and political entity with plenary responsibility for educating all California public school students. The State funds and oversees the operation of the largest common system of public schools in the nation, which serves nearly 6.2 million children in more than 10,500 schools. The State has the constitutional responsibility to establish and maintain the system of common schools and a free education, Cal. Const., art. IX, § 5, and to assure that all California public school students receive their fundamental right to an equal educational opportunity, regardless of sex and other protected factors, *id.* art. I, § 7(a) & art. IV, § 16(a). The California State Superintendent of Public Instruction oversees the schools within the state. Cal. Const., Art. IX, § 2; Cal. Educ. Code § 33112. The California State Board of Education is responsible for adopting rules and regulations for elementary and secondary schools in California. Cal. Educ. Code § 33031.

d.   *Colorado*: The Colorado State Board of Education oversees the Colorado Department of Education and has general supervision authority of public schools in Colorado. Colo. Const. art. IX § 1; Colo. Rev. Stat § 22-2-107.

e. *Delaware*: The Delaware Department of Education exercises "general control and supervision over" Delaware's 19 operating public school districts, and has the ultimate responsibility for developing education policy, setting educational standards, and ensuring that school districts meet those standards. Del. Code Ann., tit. 14, § 121. The Delaware State Board of Education, by law, provides advice and guidance to the Delaware Secretary of Education on education policy, new initiatives, and budget requests, and approves regulations governing a wide variety of educational topics, including content standards, assessments, graduation requirements, educator evaluation, athletic regulations, and licensure and certification.

f. *District of Columbia*: The District of Columbia Office of the State Superintendent is the District of Columbia's state education agency tasked with overseeing K-12 education in the District. The District of Columbia Public Schools ("DCPS") is the traditional public school system in the District of Columbia. DCPS develops policies and codes of conduct for the traditional public schools in the District. DCPS engaged in a year-long resource-intensive process to update and ensure that its sexual harassment policies fully comport with prior guidance. That process is nearing completion; were this Rule to go into effect, DCPS would need to completely revamp its procedures at great cost of resource and time.

g. *Illinois*: The Illinois State Board of Education ("ISBE"), established under the Illinois School Code, administers elementary and secondary public education in the State of Illinois. ISBE oversees 852 public school districts, 141 public

charter schools, a state-operated educational facility, and numerous

cooperatives and regional programs. ISBE reviews and adopts regulations that

govern educational policies and principles and establishes standards governing

K-12 education programs. *See* 105 ILCS 5/1A-4.

h. *Massachusetts*: The Massachusetts Department of Elementary & Secondary

Education ("MA-DESE") serves as the chief regulator and administrator for

the public preK-12 school system in Massachusetts. Among other

responsibilities, MA-DESE distributes state and federal education money,

licenses educators, helps districts implement learning standards, monitors

schools and districts, and convenes districts to share best practices. The

Massachusetts Board of Elementary and Secondary Education ("MA-BESE")

is statutorily created and is comprised of 11 members, nine of whom are

appointed by the Governor. MA-BESE's responsibilities include promulgating

regulations governing schools and school districts, approving learning

standards, deciding when to intervene in a low-performing school district, and

hiring the MA-DESE commissioner. Local school committees oversee budget

and other decisions for each district and establish educational goals and

policies consistent with state law and statewide goals and standards instituted

by MA-BESE.

i. *Michigan*: The Michigan Constitution vests the State Board of Education with

"[l]eadership and general supervision over all public education, including

adult education and instructional programs in state institutions, except as to

institutions of higher education granting baccalaureate degrees," and the State

Board of Education "serve[s] as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith." Mich. Const. art. VIII, § 3. In the 2019–2020 school year, Michigan was home to 836 public school districts and 56 intermediate school districts with over 1.5 million students. While the school districts exercise primary responsibility over budgetary and other decisions for each district, the Michigan Department of Education implements federal and state legislative mandates in education and carries out the policies of the State Board of Education, and the State Board of Education has "leadership and general supervision over all public education." Mich. Const. art. VIII, § 3; Mich. Comp. Laws § 388.1009. The State Board of Education "serve[s] as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith." Mich. Const. art. VIII, § 3.

j.   *Minnesota*: In Minnesota, local school boards "have the general charge of the business of the district, the school houses, and of the interests of the schools thereof." Minn. Stat. § 123B.02, subd. 1. The Commissioner of the Minnesota Department of Education "adopt[s] goals for and exercise[s] general supervision over public schools and public educational agencies in the state." Minn. Stat. § 127A.05, subd. 3.

k.   *New Mexico*: The State regulates its 155 traditional secondary school districts and charter schools serving 330,029 students through the Public Education

Department, the State educational agency. The public school code applies to children from age five to 22. NMSA 1978, Sec. 22-1-2 (O).

l.  *North Carolina:* The North Carolina State Board of Education and the North Carolina Department of Public Instruction have general supervisory authority of public schools in North Carolina. N.C. Gen. Stat. § 115C-10 to -22.

m.  *Oregon*: Oregon law provides that the Oregon State Board of Education shall set standards for and adopt rules for governance of public kindergarten, elementary, and secondary schools. The State Board of Education is also required by statute to adopt rules providing that no public elementary or secondary school shall discriminate in determining participation in scholastic activities. ORS 326.051. "Discrimination" has the same meaning as set forth in Section 659.850 of the Oregon Revised Statutes, including discrimination on the basis of sex and sexual orientation. Section 326.111 of the Oregon Revised Statutes establishes the Oregon Department of Education to administer the functions exercised by the State Board of Education.

n.  *Rhode Island*: The Rhode Island Department of Education oversees 36 school districts with 300 schools and over 143,000 students. The 17-member Rhode Island Board of Education was created by the Rhode Island General Assembly and is responsible for the governance of all public education in Rhode Island. The Commissioner of Elementary and Secondary Education is responsible for carrying out "the policies and programs formulated by the council on elementary and secondary education" and "distribution of state school funds in accordance with law and the regulations of the board" R.I.G.L. § 16-1-5.

o.  *Virginia*: The Constitution of Virginia vests general supervision of the

Commonwealth's public school system in the Board of Education. Va. Const.

Art. VIII, § 4; *see also* Va. Code Ann. § 22.1-8. Standards of quality for the

Commonwealth's school system are set by the Board of Education, subject to

revision by the General Assembly. *See* Va. Const. Art. VIII, § 2. The Board of

Education develops guidance and promulgates regulations for the

administration of state programs. The Constitution further provides that,

"[s]ubject to the ultimate authority of the General Assembly," the Board of

Education has "primary responsibility and authority for effectuating the

educational policy" of the Commonwealth. Va. Const. Art. VIII, § 5. The

supervision of schools in each school division is vested in a local school

board. *Id.* § 7; *see also* Va. Code Ann. § 22.1-28.

p.  *Vermont*: Vermont's State Board of Education has the authority to establish

and advance education policy for the State. Vt. Stat. Ann. tit. 16, § 164.

Vermont's Secretary of Education has the authority to execute the policies

adopted by the State Board; evaluate the program of instruction in Vermont's

public schools; advise the Legislature concerning proposed laws affecting the

public schools; supervise and direct the execution of laws relating to the

public schools and ensure compliance; and supervise the expenditure and

distribution of money appropriated by the State for public schools. Vt. Stat.

Ann. tit. 16, § 212. The Secretary is also charged with annually determining

whether students in each Vermont public school are provided educational

opportunities substantially equal to those provided in other public schools. Vt. Stat. Ann. tit. 16, § 165.

q. *Washington*: The Washington Office of the Superintendent of Public Instruction ("OSPI") oversees the State's K-12 education system, which includes 295 public school districts (approximately 2,000 schools) and six state-tribal education compact schools. The Superintendent of Public Instruction supervises all matters pertaining to public schools, including but not limited to certifying educators, administering a statewide student assessment system, maintaining a manual of the Washington state common school code, and establishing a coordinated program for the prevention of sexual abuse of K-12 students. *See* Wash. Rev. Code §§ 28A.300.040, 041, 160. While OSPI oversees the public school system statewide, the primary governing body of each K-12 school is its locally elected school board.

r. *Wisconsin*: The Wisconsin State Superintendent provides "general supervision" of all public K-12 schools and has the responsibility to "[a]scertain the condition of the public schools, stimulate interest in education and spread as widely as possible a knowledge of the means and methods which may be employed to improve the schools." Wis. Stat § 115.28(1).

219.   Most States also exercise primary responsibility for regulating public postsecondary education in their borders:

a. *Pennsylvania*: The Pennsylvania Department of Education oversees the Commonwealth's Career and Technology Centers/Vocational Technical Schools and community colleges. The Pennsylvania State Board of Education

has the authority to review and adopt regulations that govern educational policies and principles and establish standards governing the educational programs of the Commonwealth, including the authority to adopt policies with regard to postsecondary schools, to regulate the community colleges, and to adopt master plans for higher education. The Pennsylvania State System of Higher Education is governed by a Board of Governors made up or appointed by Commonwealth officials. The Commonwealth System of Higher Education universities are governed by boards of trustees with a minority of representatives appointed by Commonwealth officials.

b. *New Jersey*: The Secretary of Higher Education is empowered to enforce the observance of State laws among institutions of higher education. N.J. Stat. Ann. § 18A:3B-34. The Secretary makes final administrative decisions over institutional licensure and university status as well as over a change in the programmatic mission of an institution under her purview. N.J. Stat. Ann. § 18A:3B-14. And the Secretary makes recommendations to the Governor and Legislature on higher education initiatives and programs of Statewide significance and implements Statewide planning on higher education. *Id.* The governing boards of each of New Jersey's public institutions of higher education "have authority over all matters concerning the supervision and operations of the institution including fiscal affairs, the employment and compensation of staff." N.J. Stat. Ann. § 18A:3B-6. They are required to compile and make public annual reports regarding their fiscal and governance condition. N.J. Stat. Ann. § 18:3B-35; N.J. Stat. Ann. § 18A:65-14.5. The

President's Council, consisting of the presidents of all higher education institutions that receive State funding, provide advice and policy recommendations to the Secretary of Higher Education. N.J. Stat. Ann. § 18A:3B-7, -8.

c.   *California*: The University of California is a public trust formed under the California Constitution and funded by the State. Cal. Const., art. IX, § 9; Cal. Educ. Code § 92100 et seq. The nation's largest four-year public university system, the California State University system, is also part of the State of California's public higher education system and includes twenty-three campuses across the State. Cal. Educ. Code §§ 89001, 84001. The California Community Colleges are also part of the State of California's public higher education system. Cal. Const., art. XVI, § 8; Cal. Educ. Code §§ 66700, 70900. The California Constitution mandates and funds a system of free public schools, Cal. Const. art. IX, §§ 5, 6, and sets a minimum funding level for "the moneys to be applied by the State for the support of school districts and community college districts." Cal. Const., art. XVI, § 8(b). State law directs the Board of Governors of the California Community Colleges to prepare the system's budget, identify total revenue needs in order to properly serve the education system, and identify expenditures for the state general apportionment and for categorical programs, new programs, and budget improvements. Cal. Educ. Code § 70901(b)(5)(A)(I).

d.   *Colorado*: The Colorado Commission on Higher Education, which is located in the Colorado Department of Higher Education, is the central policy and

coordinating board for higher education in the State of Colorado. Colo. Rev. Stat. §§ 23-1-102 and 24-1-114. The governing board of each institution of higher education is responsible for promulgating its institution's policies governing student conduct and discipline. Each institution is also responsible for establishing policies and procedures governing its faculty, administrative, and classified employees. Each of Colorado's institutions of higher education is governed by a board of regents, board of governors, or board of trustees (collectively, the "governing boards") either elected by the citizens of the state or appointed by the governor with the consent of the senate. Colo. Rev. Stat. §§ 23-20-102 (University of Colorado System), 23-30-102 (Colorado State University System), 23-40-104 (University of Northern Colorado), 23-41-101 (Colorado School of Mines), 23-51-102 (Adams State University), 23-52-102 (Fort Lewis College), 23-53-102 (Colorado Mesa University), 23-54-102 (Metropolitan State University of Denver), 23-56-102 (Western Colorado University), 23-60-104 (Colorado Community College System). Colorado statute also authorizes the creation of local district colleges. Colo. Rev. Stat. § 23-71-103. Colorado's two local district colleges are governed by governing boards elected by citizens of their districts.

e.  *Delaware*: The Delaware Department of Education, through its Higher Education Office, works with Delaware's public and private higher education institutions to ensure students have access to high quality education, and is the lead communication agency on higher education with the Federal government. The Higher Education Office is also responsible for providing for the

licensure of any institution of higher education that offer courses, programs, or degrees within Delaware but are not incorporated or located in Delaware.

f. *District of Columbia*: The University of the District of Columbia is an independent agency governed by a Board of Trustees, which has the power to adopt policy regulations for the university, including those relating to gender discrimination and sexual harassment. *See* D.C. Code § 38-1202.01(a).

g. *Illinois*: The Illinois Board of Higher Education ("IBHE") is the coordinating body for the state's systems of colleges and universities. IBHE adopts regulations that govern educational policies and standards governing postsecondary education. IBHE recommends to the State the budgetary needs for operations, grants, and capital improvements for higher education institutions and agencies. It approves proposals by public university governing boards and the Illinois Community College Board for new units of instruction, research, or public service. It also reviews existing instruction, research, and public service programs to determine their continued educational and economic justification.

h. *Massachusetts:* The Massachusetts Department of Higher Education, along with the Massachusetts Board of Higher Education ("MA-BHE"), serves as coordinator of Massachusetts's system of public higher education and as the employer of record. MA-BHE promulgates regulations to govern the state's public higher education system, establishes overall goals for the system, reviews and approves admission and program standards and five-year plans for higher education institutions, and receives and disburses federal funds.

MA-BHE is a statutorily created agency comprised of 13 members, including nine members appointed by the Governor.

i.   *Minnesota*: The Board of Trustees for the Minnesota State Colleges and Universities system has the authority to govern the seven universities and 30 colleges within its system. Minn. Stat. § 136F.06, subd. 1. The Office of Higher Education, which is headed by a Commissioner who is appointed by the Governor, oversees private colleges and universities in the State. Minn. Stat. § 136A.01, subd. 2.

j.   *New Mexico*: The New Mexico Constitution establishes seven four-year public postsecondary institutions and ten two-year branch community colleges that are regulated by boards of regents. In addition, the State operates seven two-year independent community colleges regulated by community college boards. The New Mexico Higher Education Department oversees all of these postsecondary institutions.

k.   *North Carolina*: The Board of Governors of the University of North Carolina has the responsibility for the planning, development, and overall governance of the UNC System, which is comprised of 17 constituent institutions. N.C. Gen. Stat. § 116, *et seq.* The Board of Governors has 24 voting members, elected by the North Carolina General Assembly to staggered four-year terms. Additionally, the president of the UNC Association of Student Governments serves as a nonvoting, ex officio member of the Board. The Board elects the President of the UNC System. The Board of Governors maintains The Code and the UNC Policy Manual. The Code incorporates the requirements of the

North Carolina constitution and General Statutes, as well as Board bylaws and other high-level policies. The UNC Policy Manual provides more specific direction and policies on university matters, including a system-wide policy to establish legally supportable, fair, effective, and efficient procedures for student disciplinary proceedings related to sexual harassment and Title IX violations (Chapter 700.4—Student Conduct and Discipline). The State Board of Community Colleges (CC State Board) is the governing authority for the 58 community colleges in the State. The CC State Board consists of 20 members—10 appointed by the governor, 8 elected by the General Assembly, and the lieutenant governor and the state treasurer, who serve as ex-officio members. The CC State Board establishes policies, regulations, and standards for the administrative offices and the institutions that comprise the Community College System.

l. *Oregon*: It is the law and policy of the State of Oregon to promote and support post-secondary education of its citizens, which benefits the economy of the State and the welfare of Oregonians. ORS §§ 350.001 et seq. The State regulates seven public universities in the State (ORS Chapter 352), as well as community colleges (ORS Chapter 341), and career and trade training (ORS Chapter 344). Section 350.050 *et seq.* of the Oregon Revised Statutes establishes the Higher Education Coordinating Commission, which sets standards for institutions of higher education. In addition to other policies and funding requirements, Oregon law requires all institutions of higher education to have written policies regarding sexual assault, harassment, stalking, and

dating violence that occur both on and off campus. ORS §§350.253, ORS 350.255

m. *Rhode Island*: The Council on Postsecondary Education provides oversight of the public higher education system in Rhode Island. The Council adopts standards, requires enforcement, and exercises general supervision over all public higher education in the state. R.I.G.L. § 16-59-4. Duties also include formulating broad policies to implement the goals and objectives of the Board of Education along with preparing and maintaining a 5-year budget for higher education that implements the financial recommendations of the Board of Education. The Rhode Island Office of the Postsecondary Commissioner supports the Board of Education and Council on Postsecondary Education as the State's higher education executive officer.

n. *Vermont*: The Vermont State Board of Education has the authority to issue certificates of approval and of degree-granting authority to post-secondary institutions in the state whose goals, objectives, programs, and resources meet State Board standards. Vt. Stat. Ann. tit. 16, § 176. Vermont's Higher Education Council reviews post-secondary institutions' eligibility for certain federal funding. Vt. Stat. Ann. tit. 16, § 2881. State officials make up a majority of the governing Board of Trustees for the Vermont State Colleges system, Vt. Stat. Ann. tit. 16, §§ 2172-74, and roughly half of the governing Board of Trustees for the University of Vermont, Vt. Stat. Ann. tit. 16, app. ch. 1 § 1-2.

o.   *Virginia*: The State Council of Higher Education for Virginia ("SCHEV") is

the Commonwealth's coordinating body for higher education. Pursuant to

state statute, SCHEV "advocate[s] for and promote[s] the development and

operation of an educationally and economically sound, vigorous, progressive,

and coordinated system of higher education in the Commonwealth." Va. Code

Ann. § 23.1-200. The coordination and governance of higher education in

Virginia are shared responsibilities among the General Assembly, the

Governor, the institutions of higher education, and SCHEV. The Governor

appoints members to public institutions' Boards of Visitors, the State Board

for Community Colleges, and SCHEV, and prepares and submits a biennial

budget. The General Assembly confirms the Governor's nominations, adopts

a biennial budget, and enacts legislation pertaining to higher education.

SCHEV develops a statewide strategic plan and provides policy and funding

recommendations. The governing boards at institutions of higher education set

institutional policy goals and priorities, approve budget requests to the

Governor and General Assembly, and ensure that institutions effectively and

efficiently use state funds.

p.   *Washington*: Each of Washington's six public baccalaureate colleges and

universities and each of its 30 community and technical college districts is

governed by a board of regents or board of trustees (collectively, the

"governing boards") appointed by the governor with the consent of the senate.

Wash. Rev. Code §§ 28B.20.100 (University of Washington), 28B.30.100

(Washington State University), 28B.35.100 (Regional

Universities), 28B.40.100 (The Evergreen State College), 28B.50.100

(Community & Technical Colleges). Each governing board is responsible for

promulgating its institution's policies governing student conduct and

discipline pursuant to Washington's Administrative Procedure Act, Wash.

Rev. Code Chapter 34.05. *See* Wash. Rev. Code §§ 28B.20.130 (University of

Washington), 28B.30.150 (Washington State University), 28B.35.120

(Regional Universities), 28B.40.120 (The Evergreen State College),

28B.50.140 (Community & Technical Colleges). Each institution is also

responsible for establishing policies and procedures governing its faculty,

administrative, and classified employees. This process includes negotiating

collective bargaining agreements with those employees who are represented

by unions.

q.   *Wisconsin*: The Board of Regents of the University of Wisconsin System is

granted the primary responsibility for governance of the University of

Wisconsin System through enacting policies and promulgating rules for

governing the system, planning for the future needs of the State for university

education, ensuring the diversity of quality undergraduate programs while

preserving the strength of the State's graduate training and research centers,

and promoting the widest degree of institutional autonomy within the

controlling limits of system-wide policies and priorities established by the

board. Wis. Admin. Code § UWS 36.09. The State's Department of Safety

and Professional Services' Educational Approval Program is charged with

protecting the public by inspecting and approving private trade,

correspondence, business, and technical schools doing business within the

state. Wis. Stat. § 440.52.

220.    The States have primary responsibility for protecting the safety of their residents,

including children in K-12 institutions and children and adults attending postsecondary schools.

221.    Consistent with these responsibilities, the States have enacted laws and

regulations to prevent discrimination on the basis of sex in education institutions and to protect

the safety of students and others in K-12 and postsecondary schools. The States continue to

vigorously enforce these laws and regulations:

   a.   *Pennsylvania*: Under Act 16 of 2019, postsecondary institutions in

        Pennsylvania must adopt a clear, understandable written policy on sexual

        harassment and sexual violence that informs victims of their rights under

        federal and state law, including the crime victims' bill of rights. The

        Pennsylvania Department of Education subsequently created a model sexual

        harassment and sexual violence policy for postsecondary schools. Pa. Dep't of

        Educ., *Sexual Violence and Sexual Harassment Model Sexual Misconduct

        Policy*. Pennsylvania institutions have until June 30, 2020, to comply.

   b.   *New Jersey*: Every public institution of higher education, elementary school

        and secondary school in New Jersey is required to adopt a policy included in

        its student code of conduct prohibiting harassment, intimidation, or bullying.

        N.J. Stat. Ann. § 18A:3B-68; N.J. Stat. Ann. § 18A:37-15. New Jersey law

        sets out particular standards for conduct that must be prohibited under this

        policy. *Id.* The New Jersey Law Against Discrimination ("LAD"), N.J. Stat.

        Ann. § 10:5-1 to-49, prohibits all primary, secondary and postsecondary

schools, except any school operated by a religious institution, from

discriminating against students based on sex. This includes prohibiting sexual

harassment "that a reasonable student of the same age, maturity level, and

[sex] would consider sufficiently severe or pervasive enough to create an

intimidating, hostile or offensive school environment[.]" N.J. Stat. Ann.

§ 10:5-5(f); 10:5-12(l); *L.W. ex rel. L.G. v. Toms River Regional Schools Bd.*

*of Education*, 189 N.J. 381, 402–03 (N.J. 2007). Schools are required to take

action to prevent sexual harassment and must promptly address it if they knew

or should have known about it. *Id.* at 407. The LAD provides for

administrative or court enforcement by the State's Division on Civil Rights, as

well as a private right of action. N.J. Stat. Ann. § 10:5-13. In May 2019, New

Jersey enacted the Sexual Assault Victim's Bill of Rights, to ensure the

dignity and safety of victims and their access to necessary services and

investigative procedures. N.J. Pub. L. 2019-103.

c.   *California*: The California Equity in Higher Education Act establishes the

policy of the State of California to afford all persons equal rights and

opportunities in postsecondary education institutions of the State. Cal. Educ.

Code §§ 66251, 66252. As such, it is the policy of the State of California that

all persons, regardless of sex, are free from discrimination of any kind in the

postsecondary education institutions of the State. Cal. Educ. Code §§ 66270;

66281.5. State law authorizes the Board of Governors of the California

Community Colleges, the Trustees of the California State University, and the

Regents of the University of California to adopt regulations as required by law

to implement the nondiscrimination requirements set forth in state law. Cal.
Educ. Code § 66271.1. Under state law, for K-12 students, the definition of
sexual harassment includes unwelcome conduct of a sexual nature that has the
purpose or effect of having a negative impact upon the individual's academic
performance or of creating an intimidating, hostile, or offensive education
environment. Students are protected from sexually harassing conduct,
including cyber sexual bullying, that is related to a school activity or school
attendance, including but not limited to acts that occur while a student is going
to or coming from school, during lunch whether on or off campus, and while
going to or coming from a school-sponsored activity. Cal. Educ. Code §§ 200
& 48900, et seq. Separate and apart from state law school discipline
procedures, state law also establishes a detailed grievance process for
promptly and equitably investigating and resolving complaints of sexual
harassment and assault in K-12 schools under the state's Uniform Complaint
Procedures. These procedures include collecting evidence from both parties,
interviewing the parties and witnesses, issuing a letter of findings, and a right
to appeal to the California Department of Education. Cal. Educ. Code,
§ 33315; Cal. Code Regs., tit. 5, §§ 4610, et seq. State law does not prohibit
schools from acting outside the Uniform Complaint Procedures to more
quickly address reports and complaints.

d.  *Colorado*: Colorado law requires Colorado public universities and colleges to
adopt sexual misconduct policies for enrolled students. Colo. Rev. Stat. § 23-
5-146(2). These policies must contain fair, impartial, and prompt procedures

for the investigation of sexual misconduct, and require the college or

university to complete an investigation or adjudicative process within an

average of sixty to ninety days. *Id.* § 23-5-146(3)(d)(I). Although parties may

have advisors during the process, those advisors are not permitted to speak

and all questions for witnesses must go through the official individual or

individuals conducting or participating in the investigation and adjudication

process. *Id.* § 23-5-146(3)(d)(III)-(IV).

e.  *Delaware*: Under Delaware law, each public school district and charter school

is required to establish and disseminate a policy for responding to teen dating

violence and sexual assault that includes guidelines on mandatory reporting

and confidentiality, and protocols for responding to incidents of teen dating

violence and sexual assault. Del. Code Ann. tit. 14, § 4166. Higher education

institutions in Delaware with more than 1,000 students are required to offer to

sexual assault victims to report incidents perpetrated by or against a student to

law enforcement authorities servicing the institution, to inform victims of their

rights under the Delaware Victims' Bill of Rights, to inform victims of

available confidential medical and counseling services, and to report data to

the State of Delaware to ensure compliance with the law. Higher education

institutions are also required to provide training to responsible employees

regarding the prevalence and nature of sexual assaults on college campuses,

and the requirements of state and federal law. Del. Code Ann. tit. 14, ch. 90A.

f.  *District of Columbia*: The District of Columbia City Council passed the D.C.

School Safety Omnibus Act of 2018 ("DCSSOA") to promote and protect

District students' safety by preventing sexual harassment and dating violence against students by faculty, staff, and other students in District schools. The DCSSOA defines "sexual harassment" as "any unwelcome or uninvited sexual advances, requests for sexual favors, sexually motivated physical conduct, stalking, or other verbal or physical conduct of a sexual nature that can be reasonably predicted to: (A) Place the victim in reasonable fear of physical harm to his or her person; (B) Cause a substantial detrimental effect to the victim's physical or mental health; (C) Substantially interfere with the victim's academic performance or attendance at school; or (D) Substantially interfere with the victim's ability to participate in, or benefit from, the services, activities, or privileges provided by a school." D.C. Code § 38-952.01(5). The DCSSOA's broad definition of "sexual harassment" differs from the Rule's definition which restricts schools from investigating sexual harassment until it becomes "severe, pervasive, and objectively offensive." The D.C. Human Rights Act of 1977 ("DCHRA"), the country's most expansive state human rights law, protects District residents from sex discrimination in education institutions, which includes "deny[ing], restrict[ing], or . . . abridge[ing] or condition[ing] the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified." D.C. Code § 2–1402.41.

g.   *Illinois*: The Illinois School Code requires schools to create, maintain, and implement an age-appropriate policy on sexual harassment. 105 ILCS 5/10-20.69 (P.A. 101-418). The School Code also requires that all public school

classes that teach sex education in grades 6 through 12 must include course
material and instruction about unwanted physical and verbal sexual advances
and what may be considered sexual harassment or sexual assault. 105 ILCS
5/27-9.1(c)(8). In 2015, Illinois enacted the Preventing Sexual Violence in
Higher Education Act ("PSVHEA") establishing requirements for all higher
education institutions aimed at raising awareness about and addressing
campus sexual violence, domestic violence, dating violence and stalking. The
PSVHEA mandates that all universities "shall adopt a comprehensive policy
concerning sexual violence, domestic violence, dating violence, and stalking
consistent with governing federal and State law." 110 ILCS 155/10. It outlines
detailed requirements schools must follow to address and prevent sexual
violence.

h.   *Massachusetts*: Massachusetts has several state laws which protect against sex
discrimination and sexual harassment in education institutions. Mass. Gen.
Laws ch. 151C, § 2(g) (fair educational practices); Mass. Gen. Laws ch. 76,
§ 5 (discrimination on the basis of sex); Mass. Gen. Laws ch. 12, § 11H
(Massachusetts Civil Rights Act). Under Massachusetts law, prohibited sexual
harassment by an education institution includes "any sexual advances,
requests for sexual favors and other verbal or physical conduct of a sexual
nature when: (i) submission to or rejection of such advances, requests or
conduct is made either explicitly or implicitly a term or condition of the
provision of the benefits, privileges or placement services or as a basis for the
evaluation of academic achievement; or (ii) such advances, requests or

conduct have the purpose or effect of unreasonably interfering with an individual's education by creating an intimidating, hostile, humiliating or sexually offensive educational environment." Mass. Gen. Laws ch. 151C, § 1(e). The Massachusetts Commission Against Discrimination, a Massachusetts agency that investigates and adjudicates violations of anti-discrimination laws, enforces this prohibition for students seeking admission to any education institution or who are enrolled in vocational training institutions. Mass. Gen. Laws ch. 151C, § 3(a). The Massachusetts Board of Elementary and Secondary Education has promulgated regulations providing that: "All public schools shall strive to prevent harassment or discrimination based upon a student's race, color, sex, gender identity, religion, national origin or sexual orientation and all public schools shall respond promptly to such discrimination or harassment when they have knowledge of its occurrence." 603 Code Mass. Regs. 26.07(2). Massachusetts regulations contain requirements for schools' notification and complaint procedures for discrimination and harassment. 603 Code Mass. Regs. 26.08.

i.  *Michigan*: Under Michigan state law, each local school district's board "shall adopt and implement a written sexual harassment policy." Mich. Comp. Laws § 380.1300a. State law further provides that the sexual harassment policies "shall prohibit sexual harassment by school district employees, board members and pupils directed toward other employees or pupils and shall specify penalties for violation of the policy." *Id.*

j.   *Minnesota*: Under Minnesota law, in addition to the State's Human Rights Act

that prohibits any educational institution from engaging in sex discrimination,

Minn. Stat. § 363A.13, subd. 1, postsecondary institutions must have a written

policy on sexual harassment and sexual violence, Minn. Stat. § 135A.15,

subd. 1(b). The Minnesota State Colleges and Universities system has a policy

that prohibits sexual harassment that is "directed at verbal or physical conduct

that constitutes discrimination/harassment under state and federal law and is

not directed at the content of speech." Its sexual violence policy states that it

"is committed to eliminating sexual violence in all its forms." Minnesota law

requires local school boards to adopt written sexual harassment policies and

the Commissioner of the Minnesota Department of Education "maintain[s]

and make[s] available to school boards a model sexual, religious, and racial

harassment and violence policy." Minn. Stat. § 121A.03, subds. 1 & 2.

k.   *Oregon*: Oregon has numerous policies against the sorts of conduct implicated

in the Rule. Oregon law prohibits discrimination on the basis of sex. ORS

659A.030. Harassment (ORS 166.065) and offensive sexual contact (ORS

163.415) are crimes under Oregon law, as is offensive contact with a minor

(ORS 163.479). Oregon Revised Code Section 342.700 et seq. requires all

public school districts, education service districts and public charter schools to

adopt a sexual harassment policy applicable to all students and staff. The law

sets forth the requirements for the policies, including definitions and

consequences for assault, unwanted physical and verbal contact, and demands

for sexual favors. ORS 342.704.

l.  *Rhode Island*: Under Rhode Island law, discrimination on the basis of sex is

prohibited in all public elementary and secondary schools in the state. R.I.G.L.

§ 16-38-1.1. In 2007, the Lindsay Ann Burke Act was passed, requiring all

schools to adopt a policy responding to allegations of teen dating and sexual

violence. R.I.G.L. § 16-85-2. The Council on Postsecondary Education issued

a Sexual Harassment and Sexual Violence policy in 2015 to prohibit all forms

of sexual harassment and sexual violence that all faculty, staff and students at

all higher education entities in Rhode Island must comply with.

m.  *Virginia*: Virginia's General Assembly has enacted several statutes that

protect victims of sexual assault. For example, Virginia Code § 23.1-808

requires review of sexual violence policies annually. Virginia Code § 23.1-

806 requires that a review committee convene within 72 hours of a report of

an alleged act of sexual violence and determine whether the matter should be

referred to local law enforcement, and where the conduct may constitute a

felony, contact the local Commonwealth's Attorney (subject to certain privacy

protections). And Virginia Code § 23.1-807 requires that universities provide

access to or enter into memoranda of understanding with sexual assault crisis

centers or other victim support service.

n.  *Vermont*: Under Vermont state law, "[i]t is the policy of the State of Vermont

that all Vermont educational institutions provide safe, orderly, civil, and

positive learning environments. Harassment, hazing, and bullying have no

place and will not be tolerated in Vermont schools. No Vermont student

should feel threatened or be discriminated against while enrolled in a Vermont

school." Vt. Stat. Ann. tit. 16, § 570(a). Therefore, Vermont law instructs that "[e]ach school board shall develop, adopt, ensure the enforcement of . . . harassment, hazing, and bullying prevention policies that shall be at least as stringent as model policies developed by the Secretary." *Id*. § 570(b). The Secretary of Education has developed model policies and procedures for the prevention of hazing, harassment, and bullying. Vermont statute also requires that the board of trustees or other governing body of each postsecondary school operating in Vermont adopt and ensure enforcement of a policy establishing that harassment, as defined by Vt. Stat. Ann. tit. 16, § 11(a)(26), is a form of unlawful discrimination and therefore prohibited. The board is also required to establish procedures to address complaints of discriminatory harassment and to initiate educational programs designed to prevent such conduct. Vt. Stat. Ann. tit. 16, § 178.

o.  *Washington*: Washington law prohibits discrimination on the basis of sex in K-12 schools. Chapter 28A.640 Wash. Rev. Code. Regulations implementing this statute define sexual harassment for antidiscrimination purposes and establish required criteria for each school district's sexual harassment policy. Wash. Admin. Code §§ 392-190-056, 057. School districts are required to adopt sexual harassment policies and procedures that meet both state and federal antidiscrimination law requirements. The Washington State School Directors' Association has published model policies and procedures concerning issues such as harassment, gender inclusivity, and student discipline. Washington's Gender Equality in Higher Education Act, Chapter

28B.110 Wash. Rev. Code, prohibits discrimination on the basis of gender at Washington's higher education institutions. It requires each institution to develop and distribute policies and procedures for handling complaints of sexual harassment and sexual violence, as well as other rules and guidelines to eliminate sexual harassment and other forms of gender discrimination in higher education. Wash. Rev. Code § 28B.110.030(8). In 2014, the state legislature created a Campus Sexual Violence Prevention Task Force, which submitted its final report at the end of 2016. Among other things, the report contains summaries of initiatives launched by public and private institutions to combat sexual violence on campus, as well as positions and recommendations on many issues related to sexual violence prevention.

p. *Wisconsin*: Under Wisconsin law, each school board in charge of the K-12 public schools of the district bears the responsibility for developing policies prohibiting discrimination against pupils, including policies prohibiting discrimination on the basis of sex. Wis. Admin. Code §§ PI 9.01(1); 9.02(2). The Wisconsin Administrative Code provides that students, faculty, and staff within the University of Wisconsin System are subject to discipline, up to and including dismissal for engaging in acts of sex discrimination, including sexual assault, sexual harassment, dating violence, and stalking. Wis. Admin. Code §§ UWS 4, UWS 7, UWS 17. Additionally, University of Wisconsin System Board of Regents Policy 14-2 requires each school within the system to implement institutional procedures consistent with the policy, including providing education and training, defining prohibited conduct on the basis of

sex, identifying the institution's Title IX coordinator, designating responsible

employees, and describing available counseling, medical, legal, and other

resources for complainants, victims, and accused persons.

222.   Where a Plaintiff State's law provide greater protections than the Rule, schools

subject to these laws will need to create parallel code of conduct provisions and enforcement

mechanisms—one addressing "Title IX sexual harassment" and one addressing "non-Title IX

sexual harassment." *See* ¶¶ 208–209, *supra*.

223.   The Rule will undermine the goals of State laws and regulations by discouraging

reporting of sexual harassment, where, for example, victims do not wish to submit to cross-

examination or disclosure of sensitive information required by the Rule, and by exacerbating the

re-traumatization that could result from multiple rounds of interviews or adversarial cross-

examination by an interested party.

224.   Certain States require that policies governing K-12 and/or postsecondary schools

be subject to a rigorous regulatory process to include, in some cases, notice and comment

rulemaking. As a result, certain States will face difficulty in updating their regulations or policies

in time to comply with the effective date of the Rule. For example,

    a.   *California*: Rulemaking by the California Department of Education, the

California State Board of Education, and the State Superintendent of Public

Instruction must comply with the requirements of California's Administrative

Procedure Act. Cal. Gov't Code § 11340 et seq. These entities will need to

engage in rulemaking to amend state policies relating to non-discrimination

and complaint procedures for alleged violations of federal program statutes

and regulations in California's schools. Compliance with California's

Administrative Procedure Act requires public notice of the express terms of the proposed regulation and an opportunity for public discussions of proposed regulations before regulations can be adopted. Cal. Gov't Code §§ 11346.2, 11346.4, 11346.45, 11346.5, 11346.6, 11346.8 .

b. *New Mexico*: To comply with the Rule's new requirements, postsecondary schools will have to change their regents, faculty, staff, and student policies, as well as the entire discrimination claims process. These changes must be made subject to New Mexico's regulatory requirements, which include a period of 30 days at a minimum between publication of a notice of proposed rule and a hearing on the rule. NMSA 1978, § 14-4-5.2.

c. *Wisconsin*: In Wisconsin, K-12 institutions must provide for a public hearing and opportunity for public commentary at a board meeting before the board for public schools in a particular district may adopt new non-discrimination policies or procedures. Wis. Admin. Code § PI 9.03(3). Similarly, administrative rules and procedures affecting the University of Wisconsin System of public higher education must go through Wisconsin's administrative rulemaking process, complete with a period of notice of the proposed rule and public comment. Prior to allowing a proposed rule to proceed to a period of public comment, the Wisconsin Legislative Council staff serves as the Administrative Rules Clearinghouse. An agency must submit a proposed rule to the Clearinghouse for review and comment, prior to holding a public hearing on the rule. The Clearinghouse then assigns a Clearinghouse Rule number to the proposed rule and reviews the statutory

authority under which the agency intends to promulgate the rule as well as the

form, style and clarity of the rule. The Clearinghouse then submits a

Clearinghouse Report to the agency with its comments about the rule.

225.    The Rule will also harm the States' sovereign interests by requiring States with

policies and laws that are consistent with Title IX's anti-discriminatory aims but conflict with the

Rule's prescriptive grievance process to revise their codes, such as state employment laws,

student privacy laws, and student discipline codes, in order to avoid having their laws preempted

by the Rule, without even providing sufficient time for States to conduct such a review.

226.    The States also have an interest in participating in the administrative process

governing the Rule's adoption. The Department promulgated the Rule in a manner that deprived

the States of a meaningful opportunity to participate in this process.

### C.  The Rule Will Harm Plaintiff States' Quasi-Sovereign Interests

227.    Sexual harassment can lead to serious physical, emotional, psychological, and

other harms. These harms can continue long after an incident or incidents of sexual harassment

and can affect not just the individual subject to harassment, but friends, family members, and

community members.

228.    These harms are often exacerbated if the individual is forced to relive the incident

of harassment in the context of investigatory, judicial, or other proceedings.

229.    The Rule will undermine schools' efforts to combat sexual harassment,

discourage reporting of sexual harassment, and cause increased harm to students and others who

suffer sexual harassment in connection with educational programs.

230.    In addition to causing harm to individuals who suffer sexual harassment, the Rule

will undermine the educational mission of schools in the Plaintiff States, causing additional harm

to students, faculty, staff, and other residents of the Plaintiff States.

231.    The Rule will undermine State efforts to combat sexual harassment and ensure

safe and equal educational experiences for all students. For example,

    a.  *New Jersey*: The New Jersey Attorney General issued revised statewide

standards in 2018 on Supporting Victims of Sexual Assault. (AG Directive

2018-5). The dissemination and implementation of this Directive included

stakeholder meetings with a wide variety of actors in all of New Jersey's 21

counties, including school administrators, victim advocates, and attorneys. In

addition, the Office of the Secretary of Higher Education works with the

State's public and private higher education institutions to ensure students have

access to high quality education and serves as the lead communication agency

on higher education with the Federal government. In 2019, the Governor

signed Executive Order 61 (Murphy 2019), establishing a Safe and Inclusive

Learning Environment working group (among 4 other groups) that was

charged with developing an implementation guide for colleges and

universities based on the 2017 NJ Task Force on Campus Sexual Assault

report recommendations. The Secretary coordinated this wide variety of

stakeholders from the State's higher education institutions to create an

implementation plan including guidelines and best practices for schools

carrying out sexual harassment investigations and grievance procedures.

    b.  *Virginia*: In 2014, then Governor Terry McAuliffe issued Executive Order 25,

which established the Governor's Task Force on Combating Campus Sexual

Violence. Attorney General Herring chaired the Task Force, which provided a

final report and 21 recommendations to the Governor in May 2015. The work

of the Task Force was a collaborative effort that included top state leaders and

experts including Virginia's Secretaries of Education, Health and Human

Services, and Public Safety and Homeland Security, representatives from

higher education, student leaders, law enforcement, community advocates,

and health professionals. The recommendations were designed to provide a

safe and equitable learning and teaching environment for students, faculty

members, and staff by enhancing institutional response to campus sexual

violence with a sensitive and supportive approach to all parties involved.

232.    The States have a quasi-sovereign interest in protecting the safety and well-being

of their residents.

233.    Protecting public health is one of the police powers reserved to the States. The

States can reduce future health care costs when they effectively prevent their residents from

being subjected to sexual harassment in their education institutions. The States have an interest

in ensuring that funds are not diverted from other vital State priorities and programs towards

treating increased numbers of sexual harassment victims due to the Rule's failure to provide

sufficient protections to stop, prevent, and remedy sexual harassment and violence in State

schools.

234.    The States' interest is particularly strong in matters relating to the physical safety

of their residents and in those relating to the protection of children. The Rule harms these

interests by leaving many student victims and survivors of sexual harassment without adequate

relief, exacerbating the effects of harassment and resulting in school communities that are less

safe and unable to provide a nondiscriminatory environment, as required by Title IX.

## CAUSES OF ACTION

### COUNT I
### Agency Action Not in Accordance With Law
### (5 U.S.C. § 706(2)(A), (C)) – Title IX

235.     Plaintiff States incorporate by reference the foregoing paragraphs of this

Complaint as if set forth at length.

236.     Under the APA, a court shall "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

237.     Title IX provides that no person in the United States shall "be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance" on "the basis of sex." 20 U.S.C.

§ 1681.

238.     The purpose of Title IX is "to provide individual citizens effective protection

against" discriminatory practices. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979). Title

IX ensures that no student is excluded from participation in or denied the benefits of an

education because of sexual harassment.

239.     Congress created a robust administrative enforcement scheme for enforcing Title

IX's prohibition on discrimination on the basis of sex.

240.     The Rule violates Title IX in numerous ways, including by:

a.   Narrowing the definition of sexual harassment;

b.   Narrowing Title IX to apply only when sexual harassment occurs in a school's

education program or activity and inside the United States;

c.   Requiring a complainant to be "participating in or attempting to participate in

the education program or activity" of the school at the time a formal

complaint is filed; and

    d.   Placing schools at greater risk of losing federal funding if they fail to strictly satisfy every element of the Rule's prescriptive grievance process than if they respond to sexual harassment in a manner that is just short of clearly unreasonable.

241.    Defendants have acted in violation of Title IX and the APA. The Rule is therefore unlawful and must be set aside.

## COUNT II
## Agency Action in Excess of Statutory Authority
### (5 U.S.C. § 706(2)(C)) – Title IX

242.    Plaintiff States incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

243.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

244.    In Title IX, Congress authorized the Department only to issue rules and regulations that "effectuate the [substantive] provisions of" Title IX. 20 U.S.C. § 1682.

245.    Although the Department relied on this authority in issuing the Rule, the Rule does not "effectuate" Title IX. The following provisions, among others, do not effectuate Title IX's prohibition of discrimination on the basis of sex:

    a.   Mandating that schools dismiss formal complaints if "the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States"; and

b.  Mandating prescriptive grievance procedures for primary and secondary

education that override local school discipline policies and practices that meet

Supreme Court standards and allow for the flexibility needed to maintain

safety.

246.    Defendants have exceeded their statutory authority in violation of Title IX and the

APA. The Rule is therefore unlawful and must be set aside.

### COUNT III
### Agency Action Not in Accordance With Law & in Excess of Statutory Authority
### (5 U.S.C. § 706(2)(A), (C)) – FERPA

247.    Plaintiff States incorporate by reference the foregoing paragraphs of this

Complaint as if set forth at length.

248.    Under the APA, a court shall "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . not in accordance with law" or "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

249.    Defendants are charged with enforcing both Title IX and FERPA.

250.    FERPA prohibits the "release" of student "education records" without the written

consent of the student (or parent, where applicable). 20 U.S.C. § 1232g(b).

251.    Schools must comply with FERPA when handling a Title IX matter. Subject to a

limited exception, FERPA applies to Title IX disciplinary investigations, protecting the

education records of all students involved.

252.    The Rule violates FERPA by requiring schools to provide student education

records beyond what is allowed by FERPA.

253.    Defendants lack authority to implement these non-conflicting statutes in a way that creates a conflict and to resolve that conflict by superseding FERPA via a Title IX regulation.

254.    Defendants have exceeded their statutory authority and acted in violation of FERPA and the APA. The Rule is therefore unlawful and must be set aside.

## COUNT IV
### Agency Action That Is Arbitrary, Capricious, and an Abuse of Discretion
### (5 U.S.C. § 706(2)(A))

255.    Plaintiff States incorporate by reference the foregoing paragraphs of this Complaint as if set forth at length.

256.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [and] an abuse of discretion." 5 U.S.C. § 706(2)(A).

257.    A rule is arbitrary and capricious if, for example, the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

258.    The following aspects of the Rule, among others, are arbitrary and capricious:

a.  Requiring all schools to comply with the Rule by August 14, 2020;

b.  Creating inconsistent requirements between the Rule's preamble and the Rule itself;

c.  Proscribing standards for Title IX that are inconsistent with other civil rights laws applicable in schools;

d.  Imposing requirements inconsistent with the Clery Act/VAWA by preventing schools from timely and effectively fulfilling their obligations under these statutes to investigate allegations of sexual assault both on and off campus;

e.  Narrowing the definition of sexual harassment;

f.  Limiting Title IX's protections to sexual harassment that occurs in a school's education program or activity or inside the United States;

g.  Requiring a complainant to be participating in or attempting to participate in a school's education program or activity for a formal complaint to be filed;

h.  Establishing other complaint filing barriers without regard to the unique needs of K-12 students;

i.  Mandating that schools dismiss formal complaints if "the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States," but allowing schools to take action under other provisions of their code of conduct;

j.  Limiting the remedies that a school can issue to only those directly applicable to the complainant and for the limited purpose of "restoring or preserving access" to the school;

k.  Requiring postsecondary schools to provide live hearings with direct, oral cross-examination by a party's advisor, even if the complainant or respondent is a minor;

l.  Requiring postsecondary schools to provide parties with advisors to conduct direct, oral cross-examination;

m.  Requiring postsecondary schools to make immediate evidentiary decisions on the record during live hearings;

n.  Preventing postsecondary schools from considering any statement unless the party or witness submits to live, direct, oral cross-examination;

o.  Preventing K-12 schools from placing reasonable limitations on the parties' ability to discuss the allegations under investigation;

p.  Requiring all schools to provide parties with all evidence directly related to the allegations, without regard for relevance, confidentiality, the protection of witnesses (who may be young minors), or the implications of sharing sensitive information with and about young children;

q.  Prohibiting only school publications that "state" a discriminatory purpose or intent;

r.  Eliminating the notice requirement for institutions controlled by a religious organization; and

s.  Intentionally disregarding critical costs, providing inadequate and flawed assessments of the costs necessary to comply with the Rule, and providing inadequate justification for costs that the Rule imposes on schools.

259.   In promulgating the Rule, Defendants have acted in a manner that is arbitrary, capricious, and an abuse of discretion in violation of the APA. The Rule is therefore unlawful and must be set aside.

## COUNT V
### Without Observance of Procedure Required by Law
### (5 U.S.C. § 706(2)(D))

260.     Plaintiff States incorporate by reference the foregoing paragraphs of this
Complaint as if set forth at length.

261.     Under the APA, a court shall "hold unlawful and set aside agency action,
findings, and conclusions found to be without observance of procedure required by law."
5 U.S.C. § 706(2)(D).

262.     In issuing substantive rules, federal agencies are required to follow the notice and
comment process set forth in the APA.

263.     The agency must publish a "[g]eneral notice of proposed rule making" in the
Federal Register. 5 U.S.C. § 553(b). That notice must describe "either the terms or substance of
the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

264.     The agency must further provide "interested persons" an "opportunity to
participate in the rule making through submission of written data, views, or arguments with or
without opportunity for oral presentation." 5 U.S.C. § 553(c).

265.     To comply with the APA's notice-and-comment requirements, the agency's final
rule must be "a 'logical outgrowth' of the agency's proposed regulations." *Ass'n of Private
Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012). The agency
"must *itself* provide notice of a regulatory proposal." *Id.* at 462 (internal quotation marks
omitted). A final rule is not a logical outgrowth if "interested parties would have had to divine
[the agency's] unspoken thoughts, because the final rule was surprisingly distant from the
proposed rule." *Id.* at 461 (internal quotation marks omitted).

266.     The Rule is not a logical outgrowth of the notice of proposed rulemaking.
Specifically, the notice of proposed rulemaking failed to provide notice of provisions:

    a.   Explicitly preempting state and local laws that conflict with certain sections of the Rule;

    b.   Allowing for schools to consolidate complaints;

    c.   Allowing for dismissal if a respondent is no longer enrolled or employed by the recipient;

    d.   Creating a new confidentiality provision that is internally inconsistent with the existing confidentiality regulation already incorporated by reference from Title VI;

    e.   Prohibiting students from filing complaints if they are not participating in or attempting to participate in an education program or activity at the time of complaint filing; and

    f.   Purporting to make portions or sections of the Rule severable.

267.    In addition, "[u]nder APA notice and comment requirements, among the information that must be revealed for public evaluation are the technical studies and data upon which the agency relies in its rulemaking." *Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 236 (D.C. Cir. 2008) (internal quotation marks and brackets omitted). Agencies must provide these studies during the rulemaking "in order to afford interested persons meaningful notice and an opportunity for comment." *Id.* at 237. "[A]n agency [also] commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991).

268.    Defendants failed to provide interested parties with methodology for its cost-benefit analysis and the technical reports and data on which the agency relied in preparing the

notice of proposed rulemaking. This prevented Plaintiff States and others from meaningfully commenting on the Department's estimates.

269.    In promulgating a final rule, the agency must provide a statement of the "basis and purpose." 5 U.S.C. § 553(c). In this statement, the agency must "respond in a reasoned manner" to all public comments "that raise significant problems." *Am. Coll. of Emergency Physicians v. Price*, 264 F. Supp. 3d 89, 94 (D.D.C. 2017) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003)). "[F]ailure to address these comments, or at best its attempt to address them in a conclusory manner, is fatal to its defense." *Ass'n of Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012) (cleaned up).

270.    Among others, the Department failed to provide an adequate explanation for:

    a.  Prohibiting only school publications that "state" a discriminatory purpose or intent;

    b.  Eliminating the notice requirement for institutions controlled by a religious organization; and

    c.  Not providing interested parties with technical reports and data on which the agency relied in preparing the notice of proposed rulemaking.

271.    Any rule issued under Title IX must be approved by the President of the United States, who has delegated this authority to the Attorney General of the United States. 20 U.S.C. § 1682; Exec. Order No. 12,250, § 1-1, 45 Fed. Reg. 72,995 (Nov. 2, 1980).

272.    The Rule does not state that it was approved by the Attorney General of the United States or his designate.

273.    In promulgating the Rule, Defendants have failed to follow the procedural requirements of the APA and Title IX. The Rule is therefore unlawful and must be set aside.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff States request that this Court enter judgment in their favor and grant the following relief:

a.     Postpone the effective date of the Rule pending judicial review under 5 U.S.C. § 705;

b.     Declare the Rule unlawful pursuant to 5 U.S.C. § 706(2)(A), (C), & (D);

c.     Preliminarily and permanently enjoin the Department and its officers, employees, and agents from applying and enforcing the Rule;

d.     Vacate and set aside the Rule;

e.     Award Plaintiff States reasonable costs and expenses, including attorneys' fees; and

f.     Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**JOSH SHAPIRO**
*Attorney General*
*Commonwealth of Pennsylvania*
MICHAEL J. FISCHER (D.C. Bar No. 498539)
Chief Deputy Attorney General

*/s/ Aimee D. Thomson*
AIMEE D. THOMSON (D.C. Bar No. 1045758)
RYAN B. SMITH
JACOB B. BOYER
Deputy Attorneys General
Office of Attorney General
1600 Arch Street
Suite 300
Philadelphia, PA 19103
(267) 374-2787
athomson@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of Pennsylvania*

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*
MAYUR P. SAXENA
Assistant Attorney General

*/s/ Marie Soueid*
MARIE SOUEID
ESTELLE BRONSTEIN
EMILY WANGER
Deputy Attorneys General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 775-5846
Marie.Soueid@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

**XAVIER BECERRA**
*Attorney General of California*
*State of California*
MICHAEL NEWMAN
Senior Assistant Attorney General
CHRISTINE CHUANG
Supervising Deputy Attorney General

*/s/ Laura Faer*
LAURA FAER
CHRISTINA RIEHL
MARISOL LEÓN
SHUBHRA SHIVPURI
SRIVIDYA PANCHALAM
Deputy Attorneys General
California Attorney General's Office
1515 Clay Street, 20th Floor
Oakland, CA 94612-0552
(510) 879-3305
Laura.Faer@doj.ca.gov
*Attorneys for Plaintiff State of California*

**PHILIP J. WEISER**
*Attorney General*
*State of Colorado*

*/s/ Eric R. Olson*
ERIC R. OLSON
Solicitor General
MARTHA FULFORD (D.C. Bar No. 101194)
First Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
eric.olson@coag.gov
martha.fulford@coag.gov
*Attorneys for Plaintiff State of Colorado*

**KATHLEEN JENNINGS**
*Attorney General*
*State of Delaware*

*/s/ Christian Douglas Wright*
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
christian.wright@delaware.gov
*Attorney for Plaintiff State of Delaware*

**KARL A. RACINE**
*Attorney General*
*District of Columbia*

*/s/ Kathleen Konopka*
KATHLEEN KONOPKA (D.C. Bar No. 495257)
Deputy Attorney General, Public Advocacy Division
MICHELLE THOMAS (D.C. Bar No. 993514)
Chief, Civil Rights Section, Public Interest Division
BRENDAN DOWNES (D.C. Bar No. 187888)
NICOLE HILL (D.C. Bar No. 888324938)
SAMANTHA HALL[*]
KATE VLACH (D.C. Bar No. 1671390)
Assistant Attorneys General
Office of the Attorney General for the District of Columbia
441 4th St., N.W.
Suite 630S
Washington, DC 20001
(202) 724-6610
Kathleen.Konopka@dc.gov
[*] *Practicing in the District of Columbia under the direct supervision of Michelle D. Thomas, a member of the D.C. Bar. See D.C. Court of Appeals Rule 49(c).*
*Attorneys for Plaintiff District of Columbia*

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

/s/ *Alison V. Hill*
ALISON V. HILL
LIZA ROBERSON-YOUNG
GRETCHEN HELFRICH
Assistant Attorneys General
Office of the Attorney General State of Illinois
100 W. Randolph St.
Chicago, IL, 60601
(312) 814-3954
ahill@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*


**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

/s/ *Angela R. Brooks*
ANGELA R. BROOKS
ABIGAIL B. TAYLOR
ABRISHAM ESHGHI
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2590
angela.brooks@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*


**DANA NESSEL**
*Attorney General*
*State of Michigan*

/s/ *Fadwa A. Hammoud*
FADWA A. HAMMOUD
Solicitor General
TONI L. HARRIS
NEIL GIOVANATTI
Assistant Attorneys General
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
HammoudF1@michigan.gov
Harrist19@michigan.gov
GiovanattiN@michigan.gov
*Attorneys for Plaintiff State of Michigan*


**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

/s/ *Kevin Finnerty*
KEVIN FINNERTY
KATHRYN WOODRUFF
Assistant Attorneys General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 757-1058 (Voice)
(651) 757-1361 (Voice)
kevin.finnerty@ag.state.mn.us
kathryn.woodruff@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

**HECTOR BALDERAS**
*Attorney General*
*State of New Mexico*

*/s/ Tania Maestas*
TANIA MAESTAS
Chief Deputy Attorney General
PO Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
tmaestas@nmag.gov
*Attorney for Plaintiff State of New Mexico*


**JOSHUA H. STEIN**
*Attorney General*
*State of North Carolina*

*/s/ Sripriya Narasimhan*
SRIPRIYA NARASIMHAN (D.C. Bar No:
1029549)
Deputy General Counsel
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6400
SNarasimhan@ncdoj.gov
*Attorney for Plaintiff State of North Carolina*


**ELLEN F. ROSENBLUM**
*Attorney General*
*State of Oregon*

*/s/ Elleanor H. Chin*
ELLEANOR H. CHIN
Senior Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700
elleanor.chin@doj.state.or.us
*Attorney for Plaintiff State of Oregon*

**PETER F. NERONHA**
*Attorney General*
*State of Rhode Island*

*/s/ Shannon L. Haibon*
SHANNON L. HAIBON
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 Ext. 2018
shaibon@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*


**THOMAS J. DONOVAN, JR.**
*Attorney General*
*State of Vermont*
JOSHUA R. DIAMOND
Deputy Attorney General

*/s/ Rachel E. Smith*
RACHEL E. SMITH
JULIO A. THOMPSON
Assistant Attorneys General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
(802) 828-3171
rachel.e.smith@vermont.gov
julio.thompson@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

/s/ Jessica Merry Samuels
JESSICA MERRY SAMUELS (D.C. Bar No.
1552258)
Assistant Solicitor General
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219
(804) 786-6835
solicitorgeneral@oag.state.va.us
*Attorney for Plaintiff Commonwealth of
Virginia*

**ROBERT W. FERGUSON**
*Attorney General*
*State of Washington*

/s/ Kristin Beneski
KRISTIN BENESKI
Assistant Attorney General
AILEEN HUANG
Deputy Attorney General
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
kristin.beneski@atg.wa.gov
aileen.huang@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

**JOSHUA L. KAUL**
*Attorney General*
*State of Wisconsin*

/s/ Jeffery A. Simcox
ANNE M. BENSKY
Assistant Attorney General
JEFFERY A. SIMCOX
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 264-9451 (Bensky)
(608) 266-3861 (Simcox)
benskyam@doj.state.wi.us
simcoxja@doj.state.wi.us
*Attorneys for Plaintiff State of Wisconsin*