**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. **20-cv-01468-CJN** |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION OR 5 U.S.C. § 705 STAY PENDING JUDICIAL REVIEW**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

LEGAL STANDARD ................................................................................................. 3

FACTS AND BACKGROUND ................................................................................. 4

ARGUMENT ............................................................................................................. 8

I.  The effective date alone justifies a stay pending full judicial review. ............... 8

II.  Plaintiffs are likely to succeed on the merits of their remaining claims. .......... 13

    A.  The Rule's grievance process exceeds agency authority and is
        arbitrary and capricious. ............................................................................ 13

        1.  The Rule imposes unlawful requirements on K-12 schools. ................... 14

        2.  The Rule imposes unreasonable live-hearing requirements
            on postsecondary schools. ..................................................................... 18

        3.  The Rule abandons the Department's longstanding policies
            without adequate explanation. ............................................................... 21

    B.  The Rule impermissibly narrows Title IX. ............................................... 22

        1.  The Rule unlawfully places geographic restrictions on Title
            IX's protections that have no basis in the statute. ................................ 23

        2.  The Rule improperly narrows what constitutes sexual
            harassment. ........................................................................................... 25

        3.  The Rule unlawfully limits who can file a formal
            complaint. ............................................................................................. 30

        4.  The Rule exceeds the Department's authority by mandating
            that schools dismiss meritorious complaints. ...................................... 31

    C.  The Rule violates the procedural requirements of the APA. ..................... 32

        1.  Defendants' regulatory impact analyses are fatally flawed. ................... 32

        2.  The final Rule is not a logical outgrowth of the proposed
            rule. ...................................................................................................... 35

III.  The Rule will cause irreparable harm .............................................................. 37

    A.  Implementing the Rule will place oppressive burdens on schools
        and students. ............................................................................................. 38

    B.  Once implemented, the Rule will irreparably harm students by
        making it harder for schools to prevent, address, and remedy
        sexual harassment. ................................................................................... 41

IV.  The balance of the interests favor a stay or injunction. .................................... 45

CONCLUSION ......................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Chao,*
  298 F. Supp. 2d 104 (D.D.C. 2004) ........................................................................ 8

*Am. Med. Ass'n v. Reno,*
  57 F.3d 1129 (D.C. Cir. 1995) ............................................................................... 33

*Am. Radio Relay League, Inc. v. F.C.C.,*
  524 F.3d 227 (D.C. Cir. 2008) ............................................................................... 32

*Am. Water Works Ass'n v. EPA,*
  40 F.3d 1266 (D.C. Cir. 1994) ............................................................................... 36

*Ass'n of Private Sector Colleges & Univs. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012) ............................................................................... 35

*Bostock v. Clayton County,*
  --- S.Ct. ---, 2020 WL 3146686 (Jun. 15, 2020) ................................................... 27

*Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) ............................................................................. 33

*Cannon v. Univ. of Chicago,*
  441 U.S. 677 (1979) ..................................................................................... 4, 27, 28

*CSX Transp., Inc. v. Surface Transp. Bd.,*
  584 F.3d 1076 (D.C. Cir. 2009) ............................................................................. 36

*Cuomo v. U.S. Nuclear Regulatory Comm'n,*
  772 F.2d 972 (D.C. Cir. 1985) ................................................................................. 4

*DHS v. Regents of the Univ. of California,*
  --S.Ct.--,2020 WL 3271746 (June 18, 2020) ………………………………………..passim

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,*
  526 U.S. 629 (1999) ..................................................................................... passim

*District of Columbia v. U.S. Dep't of Agric.,*
  No. 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020) ........................ 3, 45

*Doe v. Univ. of Cincinnati,*
  872 F.3d 393 (6th Cir. 2017) ................................................................................. 20

*Duncan v. Walker*,
   533 U.S. 167 (2001) ........................................................................................ 27

*Feinerman v. Bernardi*,
   558 F. Supp. 2d 36 (D.D.C. 2008) ................................................................. 38

*Franklin v. Gwinnett Cty. Pub. Sch.*,
   503 U.S. 60 (1992) ..................................................................................... 4, 28

*\*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998) ................................................................................ passim

*Goss v. Lopez*,
   419 U.S. 565 (1975) ................................................................................ 14, 15

*Gresham v. Azar*,
   950 F.3d 93 (D.C. Cir. 2020) ......................................................................... 33

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ................................................................................ 15, 22

*\*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*,
   88 F.3d 1191 (D.C. Cir. 1996) ........................................................... 16, 21, 38

*League of Women Voters of the United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ........................................................................... 45

*Meritor Sav. Bank v. Vinson*,
   477 U.S. 57 (1986) ..................................................................................... 5, 27

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2014) ......................................................................... 4

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015) ................................................................................... 34

*\*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile
   Ins. Co.*, 463 U.S. 29 (1983) ............................................................. 16, 18, 21

*Nat'l Ass'n of Home Builders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012) ..................................................................... 33

*Nat'l Ass'n of Indep. Television Producers and Distribs. v. F.C.C.*,
   502 F.2d 249 (2d Cir. 1974) ............................................................................ 8

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
   138 S. Ct. 617 (2018) ..................................................................................... 25

iv

*Owner-Operator Independent Driver's Ass'n, Inc. v. Fed. Motor Carrier Safety*
 *Admin.*, 494 F.3d 188 (D.C. Cir. 2007) .................................................................. 33

*Petroleum Commc'ns, Inc. v. FCC*,
 22 F.3d 1164 (D.C. Cir. 1994) ............................................................................. 14

*Portland Cement Ass'n v. EPA*,
 665 F.3d 177 (D.C. Cir. 2011) ............................................................................... 4

*Doe v. Purdue Univ.*,
 928 F.3d 668 (7th Cir. 2019) ............................................................................... 20

*Solite Corp. v. EPA*,
 952 F.2d 473 (D.C. Cir. 1991) ............................................................................. 33

*Utah Copper Corp. v. U.S. Dep't of Interior*,
 88 F.3d 1191 (D.C. Cir. 1996) ............................................................................. 17

*\*Venetian Casino Resort, L.L.C. v. EEOC*,
 530 F.3d 925 (D.C. Cir. 2008) ....................................................................... 20, 21

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
 749 F.2d 788 (D.C. Cir. 1984) ............................................................................. 33

*Williams v. Bd. of Regents of Univ. Sys. of Georgia*,
 477 F.3d 1282 (11th Cir. 2007) ........................................................................... 24

## Statutes

5 U.S.C. § 553 ............................................................................................................... 36

5 U.S.C. § 705 ........................................................................................................... passim

5 U.S.C. § 706 ........................................................................................................... 8, 36

20 U.S.C. § 1092 ............................................................................................................ 6

20 U.S.C. § 1232g ....................................................................................................... 37

20 U.S.C. § 1681 ...................................................................................................... passim

20 U.S.C. § 1682 ...................................................................................................... passim

42 U.S.C. § 2000d ................................................................................................ 4, 25

## Regulations

34 C.F.R. § 100.7 ................................................................................................ 17, 37

34 C.F.R. § 106 ................................................................................................. 2, 4, 5

34 C.F.R. § 106.3 ............................................................................................. 13,17,22

34 C.F.R. § 106.81 ............................................................................................. 17, 37

83 Fed. Reg. 61,462 (Nov. 29, 2018) ................................................................... 7, 8, 28

85 Fed. Reg. 30,026 ............................................................................................. passim

85 Fed. Reg. 30,534 .................................................................................................. 10

85 Fed. Reg. 36,195 .................................................................................................. 10

## Department Policy

*Racial Incidents and Harassment Against Students at Educational Institutions*,

  59 Fed. Reg. 11,448 (Mar. 10, 1994) .......................................................... 5, 25, 27

*Revised Sexual Harassment Guidance: Harassment of Students by School Employees,*

  *Other Students, or Third Parties*, 66 Fed. Reg. 5512 (Jan. 19, 2001) ............................... passim

Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ.,

  Dear Colleague Letter regarding *Gebser v. Lago Vista* (Aug. 31, 1998) ............................ 6, 29

Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ.,

  Dear Colleague Letter regarding *Gebser v. Lago Vista* (Jan. 28, 1999) ............................. 6, 29

Russlyn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights,

  Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017) .................................... 5, 6, 29

*Sexual Harassment Guidance: Harassment of Students by School Employees,*
   *Other Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997)........................... passim

Stephanie Monroe, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ.,
   Office for Civil Rights, Dear Colleague Letter (Jan. 25, 2006)...................................... 5, 6, 29

U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017) ................................. 5, 6

U.S. Dep't of Educ., *Questions and Answers on Title IX and Sexual Violence*
   (Apr. 24, 2014, withdrawn Sept. 22, 2017) ........................................................... 5, 6

U.S. Dep't of Educ., *Race and National Origin Discrimination* (Jan. 10, 2020)........................ 25

U.S. Dep't of Educ., *Sexual Harassment: It's Not Academic Pamphlet* (1988)................. 5, 22, 26

## Other Authorities

Black's Law Dictionary (11th ed. 2019)...................................................................... 26

*Sex Discrimination Regulations, Review of Regulations to Implement Title IX,*
   Hearings before the. Subcomm. on Post-Secondary Educ. of the H. Comm. On Educ. and
   Labor, 94th Cong., 1st Sess., 170 (1975)....................................................... 25

## INTRODUCTION

Plaintiff States bring this motion to prevent immediate and irreparable harm to our States, the safety of our schools and their communities, and the rights of our students to an education free from sexual harassment in all its forms.[1] The new Rule issued by the U.S. Department of Education, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. Part 106) ("Rule"), will require primary, secondary, and postsecondary schools across the country to overhaul their policies for ensuring that sexual harassment does not impair students' access to education, and will make it harder for schools to protect their students from sexual harassment. Because the Department is unreasonably insisting on full compliance with the Rule by August 14, 2020, only preliminary relief will save Plaintiffs' schools and their students from suffering the irreparable consequences of the Department's regulatory overreach.

The Rule purports to implement Title IX of the Education Amendments Act of 1972, which Congress enacted to ensure that no person, on the basis of sex, is excluded from participating in, denied the benefits of, or subjected to discrimination under a federally funded education program or activity. 20 U.S.C. § 1681(a). Instead of effectuating the statute's purpose, however, the Rule erects barriers to schools' ability to prevent and remedy sexual harassment— including by mandating that schools employ a cumbersome and inequitable grievance process to respond to sexual harassment complaints under Title IX and by prohibiting schools from using Title IX to prevent and address many types of sexual harassment. The Department acknowledges that sexual harassment remains an endemic problem in education, with devastating impacts on students. The Department's response is a Rule that, according to its own analysis, will substantially reduce the number of sexual harassment investigations that schools conduct (by 33 percent for post-secondary schools and 50 percent for K-12 schools), 85 Fed. Reg. at 30,551,

---

[1] Unless otherwise stated, the term "sexual harassment" encompasses all forms of sexual harassment, including sexual violence and sexual assault.

30,565-68—not because there will be less sexual harassment but because fewer victims will come forward and schools will be required to ignore more complaints. In this way, and without adequate justification, the Department will knowingly *prevent* schools from addressing the still pervasive problem of sexual harassment, contrary to Title IX's promise that "[n]o person" shall be subject to sexual harassment.

The unlawful and arbitrary grievance process imposed by the Rule will weaken Title IX's protections, make schools less safe, place oppressive compliance burdens on schools, and undermine fair process. The Department mandated a prescriptive and inflexible grievance process while summarily dismissing equally effective and constitutionally sound alternative processes already used by many States. It failed to adequately address evidence that its requirements—including a requirement that schools take ten different steps over the course of more than 20 days before imposing even minor discipline, such as after-school detention in a K-12 school, and a requirement that postsecondary schools conduct live hearings with direct, oral cross-examination by parties' advisers—would chill reporting of sexual harassment and impede schools' efforts to be responsive to complaints. The Rule imposes complex, courtroom-like procedural requirements that demand significant hiring, training, and other resource commitments from schools, while threatening withdrawal of funding if a school runs afoul of even one of these requirements.

In addition to creating procedural barriers for sexual harassment complainants and schools seeking to prevent and remedy harassment, the Rule unlawfully narrows Title IX's substantive protections. The Rule tightly restricts the scope of sexual harassment claims under Title IX and requires dismissal of claims that fail to satisfy these heightened standards. The Rule thus prevents schools from investigating under Title IX conduct that has long been considered sexual harassment for purposes of Title IX, including harassment that occurs off campus but has on-campus effects, conduct that is severe but not pervasive, and sexual harassment of students who leave school due to the trauma they experienced. Such restrictions are contrary to the text and purpose of Title IX and exceed the Department's statutory authority.

The Rule's defects stem in part from a flawed rulemaking process, which deprived the States and the public of important information that would significantly impact them and included in the final Rule provisions that could not be anticipated from its proposal, leaving the public unable to comment meaningfully on the consequences and costs of the Rule. Moreover, the Department issued a cost-benefit analysis that disregards and underestimates critical costs and has buried even more requirements and prohibitions in its hundreds of pages of preamble and nearly two thousand footnotes, including some that impermissibly conflict with the text of the Rule itself.

As demonstrated by the nearly 70 declarations submitted with this motion, the Rule will undermine the mission of States' schools and agencies across the country and impose on the States significant monetary costs to address the educational burdens and health impacts resulting from the Rule. The imminent and irreparable harms the Rule will inflict on States and their schools and students, are compounded by the unreasonable effective date. The Department has left schools less than three months from promulgation to fully comply with all of the Rule's burdensome requirements—including hiring and training staff, engaging in required consultation with stakeholders, overhauling policies, revising grievance processes, and communicating the complex changes to students, families, and employees—all in the midst of global pandemic that has depleted their resources and disrupted their ordinary operations.

Accordingly, Plaintiffs respectfully request that the Court grant provisional relief staying or enjoining implementation of the Rule pending full judicial review.

## LEGAL STANDARD

A preliminary injunction is a stopgap measure to "preserve the relative positions of the parties" pending judicial review on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In an APA case, preliminary relief preserves the status quo so that final relief—vacatur of the Rule—remains available if the States prevail. *Nat'l Mining Ass'n v. U.S. Army Corps of*

*Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *see also DHS v. Regents of the Univ. of California*, 2020 WL 3271746, at *17 n.7 (U.S. June 18, 2020).

The APA separately authorizes the Court to "postpone the effective date of an agency action" pending judicial review to "preserve status" and "prevent irreparable injury." 5 U.S.C. § 705. Section 705 "plainly and simply 'authorizes courts to stay agency rules pending judicial review,'" *District of Columbia v. U.S. Dep't of Agric.*, No. 20-119 (BAH), 2020 WL 1236657, at *34 (D.D.C. Mar. 13, 2020) (quoting *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 562 (D.C. Cir. 2014) (Kavanaugh, J., dissenting in part)), to protect regulated sectors from incurring expensive changes to comply with regulations that might be set aside, or materially altered, after full judicial review, *see Portland Cement Ass'n v. EPA*, 665 F.3d 177, 189 (D.C. Cir. 2011).

A court should grant a preliminary injunction or a stay to plaintiffs who show (1) they are likely to succeed on the merits, (2) they are likely to experience irreparable harm in the absence of injunctive relief, (3) the balance of equities tip in their favor, and (4) the proposed relief is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985).

## FACTS AND BACKGROUND

Title IX's mandate is broad and unequivocal: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Sexual harassment runs afoul of this mandate and is prohibited by Title IX. *See Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75 (1992). Congress modeled Title IX on Title VI of the Civil Rights Act of 1964, which uses identical language to ban conduct based on race, color and national origin. 42 U.S.C. § 2000d. Both statutes sought to accomplish two objectives: "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979). Congress established a robust administrative enforcement

scheme, authorized the Department to withdraw federal funding for schools'[2] non-compliance, and directed federal agencies funding education programs to issue rules to "effectuate" Title IX's mandate. 20 U.S.C. § 1682.

In 1975, the Department's predecessor promulgated rules to effectuate Title IX's mandate. 34 C.F.R. pt. 106. During the Reagan Administration, the Department began affirmatively addressing sexual harassment as a serious problem in schools,[3] consistent with its interpretation and enforcement of Titles VI and VII of the Civil Rights Act of 1964.[4] For decades, the Department's policy documents consistently reaffirmed fundamental requirements for how schools must address sexual harassment.[5] As relevant to this motion, these documents explained that under Title IX and its implementing regulations schools were obligated to: (1) take affirmative steps to prevent, end, and remedy sexual harassment, defined as unwelcome conduct of a sexual nature that is so severe, persistent, *or* pervasive that it adversely affects a

---

[2] With only limited exceptions, Title IX applies to all entities that receive federal funds, including public and private schools, museums, libraries, cultural centers and other entities that operate education programs or activities. Unless otherwise stated, the word "schools" refers generally to all recipients of federal funding subject to Title IX and the new Title IX Rule.

[3] *E.g.*, U.S. Dep't of Educ., *Sexual Harassment: It's Not Academic Pamphlet* (1988) (Ex. 1) (quoting U.S. Dep't of Educ., Office for Civil Rights, Policy Mem., Antonio J. Califa, Director for Litigation Enforcement and Policy Services (Aug. 31, 1981)).

[4] E.g., *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986); *Racial Incidents and Harassment Against Students at Educational Institutions*, 59 Fed. Reg. 11,448, 11,449, 11451 n.2 (Mar. 10, 1994) (Ex. 2).

[5] *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997) (Ex. 3); *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5512 (Jan. 19, 2001) (Ex. 6); Stephanie Monroe, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Jan. 25, 2006) (Ex. 7); Russlyn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017) (Ex. 8); U.S. Dep't of Educ., *Questions and Answers on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017) (Ex. 9); U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017) (Ex 10).

student's ability to "participate in or benefit from" the school's program or activity; (2) address conduct occurring outside an education program or activity if it creates a hostile environment in an education program or activity; and (3) adopt a prompt and equitable grievance procedure which can be incorporated into existing codes of conduct and grievance procedures.

After the Supreme Court set heightened standards for plaintiffs seeking monetary damages under Title IX's implied private right of action, *see Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998), the Department reaffirmed longstanding principles embodied in its prior policies and distinguished its authority to administratively enforce Title IX from circumstances in which private parties could obtain damages.[6]

In subsequent years, Congress passed laws to enhance protections for individuals subjected to sexual assault on and off campus while also providing flexibility in administering grievance procedures. *E.g.*, Violence Against Women Reauthorization Act of 2013, (codified in relevant part in 20 U.S.C. § 1092(f)); Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f).

Through enforcement of and compliance with Title IX, schools have made great strides in reducing sex discrimination. But sexual harassment continues at alarming rates and remains largely underreported, even according to the federal government's own data. *See* 85 Fed. Reg. at 30,075-82 (citing, *e.g.*, Christopher Krebs et al., U.S. Dep't of Justice, *Campus Climate Survey Validation Study: Final Technical Report* app. E (Jan. 2016)). A 2019 study found that one in four undergraduate women, one in fifteen undergraduate men, and one in four transgender or gender-non-conforming undergraduates were sexually assaulted during college. Documents Produced to OMB, Nov. 13, 2019 3:00 PM meeting, Sexual Violence and Harassment in Schools

---

[6] *E.g.*, Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Aug. 31, 1998) (Ex. 4); Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Jan. 28, 1999) (Ex. 5); Ex. 6 at iv; Ex. 7 at 1; Ex. 8 at 2; Ex. 9 at ii; Ex. 10 at 1.

Fact Sheet, at 1 n.10, https://tinyurl.com/ycxlo5ld (link to "Fact Sheet, Studies and Articles 10") (citing Ass'n of Am. Univ., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct*, at ix (Oct. 15, 2019)). Yet, only about twelve percent of college survivors reported sexual assault. 85 Fed. Reg. at 30,073 (citing *Survey of Current and Recent College Students on Sexual Assault*, Kaiser Family Fdtn. & Wash. Post 24 (June 12, 2015), https://tinyurl.com /ycfuw7p7). More than 20 percent of girls aged fourteen to eighteen have been kissed or touched without their consent, but only five percent reported the incidents. Multistate Comment (Jan. 30, 2019) (Ex. 12 at 7 n.9) (citing Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 1, 2 (Apr. 2017)).

In 2018, Defendants published a notice of proposed rulemaking to address sexual harassment. 83 Fed. Reg. 61,462 (Nov. 29, 2018). It generated over 124,000 comments, the vast majority of which pointed out problems with the proposal and suggested alternatives. Almost eighteen months later, in the midst of the COVID-19 pandemic, Defendants published the final Rule and made it effective 87 days later. 85 Fed. Reg. 30,026 (May 19, 2020).

The Rule makes two categories of major changes in administrative enforcement of Title IX relevant to this motion. First, it imposes inflexible and prescriptive complaint, investigation, and hearing procedures. Rule §§ 106.30 (*formal complaint*); 106.45(b). Second, it narrows Title IX by limiting the conduct that schools can address under Title IX, by excluding conduct that occurs outside of a school's program or activity, regardless of the continuing impact in school; narrowing the definitions of both hostile environment harassment and quid pro quo harassment; and restricting which victims may file a complaint. Rule §§ 106.30(a) (*sexual harassment*), § 106.30(a) (*formal complaint*), 106.44(a). Schools must dismiss any complaint of harassment that falls outside of the Rule's narrowed scope, Rule § 106.45, forcing many schools to adopt parallel "non-Title IX sexual harassment" policies.

The Department's proposed and final regulatory impact analyses omit key reports and studies underlying its analysis, fails to include its complete cost-benefit methodology, include incomplete and inaccurate calculations, and intentionally disregard and underestimate cost

identified in comments. 85 Fed. Reg. 30,563–72; 83 Fed. Reg. 61,483–90. The Rule adds completely new provisions not present in the proposed rule, including confidentiality, preemption, severability, and additional investigation limitations. Rule §§ 106.6(h); 106.9; 106.18; 106.24; 106.30(a) (*formal complaint*); 106.45(b)(4); 106.46; 106.62; 106.71(a); 106.72; 106.82. And the Department includes additional—at times contradictory—requirements in hundreds preamble pages and nearly two thousand footnotes. *E.g.*, 85 Fed. Reg. at 30,336–37.

Finally, despite releasing the Rule in the midst of the COVID-19 pandemic, with concomitant budget cuts and hiring freezes, the Department made the Rule effective on August 14, 2020, leaving schools less than 90 days to make the sweeping changes the Rule requires.

## ARGUMENT

The arbitrariness of the Department's chosen effective date is itself sufficient to warrant a stay. 5 U.S.C. § 705. But the effective date is only one of many grounds on which Plaintiffs are likely to prevail. In both its mandatory grievance process and its substantive limitations on Title IX's reach, the Rule is not in accordance with Title IX, exceeds the Departments' authority, and is arbitrary and capricious. 5 U.S.C. § 706(2)(A), (C). Moreover, the process the Department employed to produce its flawed rule was itself tainted with procedural errors. Id at § 706(2)(D). The result is a Rule that will imminently cause Plaintiffs irreparable harm, which the public interest and balance of equities requires the Court to remedy. It should be stayed or preliminarily enjoined.

## I.  The effective date alone justifies a stay pending full judicial review.

The Department's decision to set an effective date of August 14, 2020, is arbitrary and capricious and already causing significant irreparable harm. *See Nat'l Ass'n of Indep. Television Producers and Distribs. v. F.C.C.*, 502 F.2d 249, 254 (2d Cir. 1974) (holding that an agency cannot set an "arbitrary or unreasonable" effective date even when exceeding APA minimum); *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Chao*, 298 F. Supp. 2d 104, 126-28 (D.D.C. 2004) (same), *aff'd in relevant part*, 409 F.3d 377 (D.C. Cir. 2005). The Department's demand that schools review and implement the Rule in less than three months, during a global health

crisis that has forced most schools to close their doors and expend significant resources to pivot to remote learning, is unrealistic, ill-considered, and wholly unjustified. And the Department's scant rationale for requiring schools to implement the Rule on such a short timeframe under current circumstances, 85 Fed. Reg. at 30,534-35, underscores the arbitrary nature of its decision.

Nearly every state ordered or recommended closing K-12 school buildings in response to the COVID-19 pandemic,[7] and many schools are devoting their already-limited resources to institute remote learning. The vast majority of postsecondary institutions also cancelled in-person instruction.[8] Schools across the country continue to struggle with whether, when, and how to safely conduct classroom instruction in the Fall. To implement the Rule prior to August 14, schools will need to reallocate resources to overhaul their policies relating to Title IX, hire needed personnel, and train faculty, students, and others.[9] To make matters worse, public schools face significant financial constraints and many schools are under hiring freezes and static or reduced budgets.[10] Requiring schools to reallocate time and resources that they would otherwise be using to develop remote learning methods and/or ensure their students' safety when students return to school will result in irreparable harm to both schools and students.

---

[7] Educ. Week, *Map: Coronavirus and School Closures*, https://tinyurl.com/yx7t73tz (last updated May 15, 2020).

[8] Entangled Solutions, *COVID-19: Higher Education Resource Center*, https://tinyurl.com/ y8wazqw2 (last updated May 28, 2020).

[9] All declarations are located in the appendix as Exhibits 30-98 arranged in alphabetical order by last name. *E.g.*, Alvarado ¶ 33; Thurmond ¶¶ 13-15; Bakey ¶¶ 19, 29-30; Ball ¶¶ 25, 27, 32, 34; Wilson ¶¶ 20-21, 28, 30; Fleischer ¶¶ 30-31; Hildebrandt ¶¶ 12-19; O'Shaughnessy ¶¶ 15-18; Kennedy ¶¶ 6-8; Ashkannejhad ¶¶ 20-22; Lynch ¶¶ 33-34.

[10] *E.g.*, Alvarado ¶¶ 23, 32-33; Grice ¶¶ 11, 13, 18; Hoos ¶ 56; Jarrett ¶ 14; Taylor ¶ 42; Thurmond ¶¶ 11-12, 16-20; Williams ¶¶ 70-71; Sanchez ¶ 42; Stritikus ¶¶ 22, 29-32; J. Garcia ¶¶ 21; Bakey ¶¶ 22, 31; Allen ¶ 30; Russell ¶ 21; Peoples ¶ 29; Ball ¶¶ 25-27; Wilson ¶¶ 28; Doan ¶ 22; Gomez ¶¶ 23; Leone ¶ 25; Pedone ¶¶ 22, 27-28; Collins ¶¶ 26-28; Pickett ¶¶ 25-26, 29; Fleischer ¶¶ 40, 42; Hildebrandt ¶¶ 52-62; Rohner ¶¶ 9, 23; Heroy ¶ 19; Kirkland ¶ 24; O'Shaughnessy ¶¶17; Sokol ¶ 24; Ashkannejhad ¶ 29; Gardner ¶ 36.

The Department only acknowledges these problems indirectly and fails to explain why giving schools less than three months while the pandemic is ongoing is "adequate[]." 85 Fed. Reg. at 30,534. Indeed, the Department inexplicably requires compliance with the Rule by August 14, 2020, while simultaneously granting a year-long waiver of other regulatory requirements concerning education funding "due to extensive school and program disruptions" caused by COVID-19. *See Notice of Waivers Granted Under Section 3511 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act*, 85 Fed. Reg. 36,195, 36,196 (Jun. 15, 2020) (waiving deadlines for states unable to timely expend vocational education grant funds). The Department's own admission of the "extraordinary circumstances" schools are facing from COVID-19 highlights the arbitrary and capricious nature of the Rule's effective date. *Id*.

Even in the absence of COVID-19, the Department's implementation timeline would be unrealistic. The Department's explanation of its arbitrary effective date summarily dismisses comments asking that schools be given enough time to come into compliance, including comments observing that the Department allowed institutions three or more years to come into compliance with other recent rules. *E.g.*, Ex. 12 at 68-69 (Jan. 30, 2019); *see* 85 Fed. Reg. 30,534.

To justify such a short timeframe, the Department offers just two reasons: "recipients have been on notice for more than two years that a regulation of this nature has been forthcoming," 85 Fed. Reg. at 30,535; and the implementation period "coincides with many schools' 'summer break,'" *id.* Neither explanation withstands scrutiny.

That the Department previewed aspects of the Rule as early as 2017 does not excuse the Department's unreasonable effective date. No responsible school would update its policies in reliance on a proposed rule. Proposed rules are not legally binding and the Department could only enforce its prior polices. Proposed rules also frequently change, just as this Rule changed significantly from the proposal. *See, e.g.*, Part II.C.2; Pope ¶ 38; Alvarado ¶ 21; Sanchez ¶ 27; Williams ¶ 61; Peoples ¶ 37; Wilson ¶ 27; Doan ¶ 30; Hayes ¶ 49. To suggest otherwise is to claim that the Department did not take seriously those comments questioning the fundamental

bases for the Rule and urging the Department to start over. And that it took the Department so long—more than thirty months—to issue the Rule only further highlights the absurdity of the Department's apparent belief that schools can implement it in less than three.

Moreover, the claim that schools can implement the Rule in three months because many are on summer break ignores how schools actually operate. It suggests school administrators are currently unoccupied and can easily turn their attention to overhauling their Title IX policies—which the Department certainly knows is not presently the case. *E.g.*, 85 Fed. Reg. at 36,196. Regardless, implementing the Rule is not nearly as easy as the Department assumes. *See* 85 Fed. Reg. at 30,567. Among many other tasks, schools must closely review 547 pages of preamble (and 1,971 footnotes); make a number of significant and sensitive decisions about school operations; create or revise many different policies; hire and/or train Title IX Coordinators, investigators, and decision-makers; and revise or create training materials that can be posted online without violating intellectual property law. *See* Compl. ¶¶ 160-61. Schools must also stay abreast of the Department's evolving guidance about implementation and enforcement—some of which the Department posts periodically on its blog, U.S. Dep't of Educ., *Office for Civil Rights Blog*, https://tinyurl.com/y87g8goh, and some of which the Department shares privately and individually over email, *see* ATIXA, *OCR OPEN Center Response Repository*, https://tinyurl. com/y873txe3 (collecting Department responses).

Reviewing and revising school policies and procedures—including the creation of parallel policies and procedures for "non-Title IX sexual harassment," *see infra* Part II.B.4— cannot be done by a Title IX Coordinator, an attorney, and an administrator alone, as the Department assumes. *See* 85 Fed. Reg. at 30,567. Instead, shared governance procedures for postsecondary schools and local school board procedures for K-12 school districts require multiple layers of review and approval to ensure significant educational policies best reflect the

needs of the school community.[11] Higher education faculty are usually not on payroll during the summer; many faculty governance bodies and public school boards do not meet during the summer;[12] and some schools require the establishment of policy committees or a public notice-and-comment period, which cannot take place without students and faculty.[13]

As a result, the Department's arbitrary deadline will force schools to rush through the processes of revising and/or creating policies, updating training materials, and instructing school communities on new policies and procedures. Some will be forced to adopt interim or emergency Title IX policies to comply with the effective date, *e.g.*, de Veyga ¶ 42; Ryan ¶ 52; Pope ¶ 49; Nastase ¶ 17, and will then have to restart the process over again shortly thereafter to adopt final policies, doubling the costs and time associated with the policy overhaul, *e.g.*, Pope ¶ 58; de Veyga ¶ 43; Ryan ¶ 52; Nastase ¶ 18; Gardner ¶ 30; Harebo ¶ 18. They will also have to revise materials, retrain faculty and administrators, and reeducate the school community once a final Title IX policy is adopted. *E.g.*, Pope ¶ 60; Nastase ¶¶ 17-18. These doubled costs constitute irreparable harm directly attributable to the effective date.

The rushed policy revision process will hinder schools' abilities to address and prevent sexual harassment. The effective date makes it more difficult, if not impossible, for schools to

---

[11] *E.g.*, Sanchez ¶¶ 19, 20; Peoples ¶¶ 24-27; Jackson ¶¶ 13, 17-19; Ball ¶¶ 23-24; Wilson ¶ 23; Doan ¶¶ 17-21; Leone ¶ 24; Pedone ¶ 18; Hayes ¶ 45; Pope ¶¶ 39-47; Richardson ¶ 36-38; Nastase ¶ 10; Gardner ¶¶ 30, 33; de Veyga ¶¶ 40, 41; Fleischer ¶¶ 35-39; Williams ¶ 62; Hasan ¶ 28; Taylor ¶ 36; Bakey ¶¶ 12, 18-19; Pickett ¶¶ 19-22; Allen ¶¶ 25-27; Peña ¶ 27.

[12] *E.g.*, Hoos ¶ 11; Hayes ¶ 47; de Veyga ¶ 43; Kennedy ¶ 8; Thurmond ¶ 14; Williams ¶ 62; Stritikus ¶ 29; Peoples ¶¶ 24, 26; Ball ¶ 24; Doan ¶ 17; Collins ¶¶ 16, 17; Pickett ¶ 26; Hildebrandt ¶¶ 13-14; Ashkannejhad ¶ 29; Gardner ¶¶ 11, 30, 31; Lynch ¶¶ 30, 32.

[13] *E.g.*, Harebo ¶ 17; Sanchez ¶ 20; Allen ¶ 26; Jackson ¶ 17; Pope ¶ 43; Gardner ¶¶ 30, 32-34; de Veyga ¶ 42; Peoples ¶ 28; Ball ¶ 23.

gather the input of students, parents, faculty, teachers, and administrators.[14] Proceeding without community input will risk creating misunderstanding and the appearance of lack of transparency, which will generate mistrust and a lack of buy-in from all sides, making the policies harder to implement. *See, e.g.*, Pope ¶ 59; Weddle ¶ 25. Overall, haste in revising and implementing policies will lead to extra confusion and delay in processing harassment complaints that would not exist if schools had sufficient time to iron out procedures.[15] Due to the time pressure imposed by the effective date, schools will be less able to address and prevent sexual harassment, resulting in irreparable harm to their students.

## II.  Plaintiffs are likely to succeed on the merits of their remaining claims.

### A.  The Rule's grievance process exceeds agency authority and is arbitrary and capricious.

The Department imposes unnecessarily inflexible and prescriptive formal grievance procedures that do not "effectuate" Title IX's mandate that "[n]o person" is subjected to sexual harassment in an education program or activity. 20 U.S.C. §§ 1681(a), 1682. Schools must strictly follow each and every procedural requirement before imposing "any disciplinary sanctions" against a respondent. Rule § 106.44(a). As a result, K-12 schools must take at least ten steps and wait more than 20 days before issuing even minor discipline. Rule § 106.45. Meanwhile, the Rule requires postsecondary institutions to conduct live hearings with direct, oral cross-examination by parties' advisors—even in cases that involve, for example, young children harassed at a daycare facility—and prevents them from establishing a more equitable set of evidentiary rules to ensure a fairer hearing. Rule § 106.45(b)(6)(i); 85 Fed. Reg. at 30,488-89. These and other measures arbitrarily abandon longstanding policy, exceed the Department's authority, and render the Rule unlawful.

---

[14] *E.g.*, Pope ¶ 49; Weddle ¶ 25; Ball ¶ 24; Sanchez ¶¶ 19-20; Stritikus ¶ 19; J. Garcia ¶ 16; de Veyga ¶ 41; Ryan ¶ 82; Fleischer ¶¶ 38-39; Rohner ¶¶ 29-30; Jarrett ¶ 44; Ashkannejhad ¶¶ 22, 25; Hoos ¶ 11; Sokol ¶ 20; Hildebrandt ¶ 13; Thurmond ¶¶ 13-14.

[15] *E.g.,* Grice ¶¶ 16-17; Gonzalez ¶ 38; Weddle ¶ 25; Sanchez ¶¶ 18, 21.

**1. The Rule imposes unlawful requirements on K-12 schools.**

By imposing a prescriptive and inflexible process on all schools, the Rule unlawfully disregards the unique circumstances of K-12 education. *See Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) (arbitrary and capricious to fail to account for circumstances that "appear to warrant different treatment for different parties"). Moreover, Title IX does not authorize the Department to override local K-12 school discipline procedures and replace them with a grievance process that does not further the purpose of Title IX, when schools are to be afforded necessary flexibility to maintain school safety while meeting constitutional due process standards. *See Goss v. Lopez*, 419 U.S. 565, 577-78 (1975).).

First, the Rule mandates a lengthy, multi-step grievance process that a school must follow before issuing even relatively minor discipline, such as an after-school detention or a one-day, in-school suspension. Rule § 106.44(a). K-12 schools must now provide advance written notice before conducting any party interviews or holding any meetings; provide the parties and their advisors all evidence "directly related to the allegations," regardless of relevance; allow parties and their advisors ten days to review and submit responses; complete an investigative report and provide it to the parties and their advisors ten days before the time of determination; have a separate decision-maker provide each party the opportunity to submit written questions and follow-up questions of any party or witness; explain any decisions to exclude questions based on relevance; make a final written determination; and provide an appeal. Rule §§ 106.45(b)(5)(iv), (5)(v), (5)(vii), (6)(i), (6)(ii), (8). But in the K-12 setting, school administrators must often act quickly, sometimes within the hour, to stop sexual harassment incidents before they escalate and cause trauma. *See* San Francisco Unified School District Comment (Jan. 30, 2019) (Ex. 18 at 2) (if incidents not addressed immediately, "the situation will increase in severity"). As commenters pointed out, these "inflexible procedural requirements" are "blatantly inappropriate for young students." Nat'l Educ. Ass'n Comment (Jan. 30, 2019) (Ex. 22 at 1).  Title IX does not authorize the Department to prevent schools from taking low-level disciplinary actions to quickly provide effective relief to victims of sexual harassment. To the contrary, the Supreme Court has

recognized that school districts have discretion to determine an appropriate process that complies with constitutional due process requirements. *Goss*, 419 U.S. at 580, 582 ("Events calling for discipline are frequent occurrences and sometimes require immediate, effective action. . . . In the great majority of cases [to meet the constitutional requirement] the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred."). The Department's suggestion that the emergency removal provision, § 106.44(c), adequately addresses the need for swift action, 85 Fed. Reg. at 30,181, fails to recognize that schools need to act quickly in a variety of situations that do not warrant the extreme sanction of removal.

The Rule further fails to take into account the unique role of educators in shaping children's behavior, severely limiting the ability of school-site administrators to expeditiously educate students through a host of interventions. Ex. 18 at 2; Los Angeles Unified School District Comment (Jan. 8, 2019) (Ex. 19 at 3); Superintendent of Seattle Pub. Schools Comment (Jan. 28, 2019) (Ex. 20 at 1-2); *see also* Williams ¶¶ 30-31. The Rule now categorizes these interventions, such as mandatory training or community service for students accused of sexual harassment, as "sanctions." *See* 85 Fed. Reg. at 30,182. Because K-12 districts must ensure school safety at many different school-site locations, and because every Title IX incident that should be addressed with some form of discipline must now go through the Rule's formal complaint process, significant staff resources will be needed to address the Rule's requirement for multiple employees at each site to address complaints. Ex. 18 at 4; Ex. 19 at 9; Washington State School Directors' Ass'n Comment (Jan. 30, 2019) (Ex. 13 at 9).

Second, the Rule makes it harder for K-12 students to file complaints by creating unnecessary bureaucratic steps before effective investigation can begin. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005) ("Title IX's enforcement scheme. . . depends on individual reporting."). To initiate an investigation, the Rule requires the impacted child regardless of age, disability, or writing ability, or their parent/guardian to submit a written formal complaint (generally signed) that includes a specific "request[] that the recipient investigate the allegation of sexual harassment" before an investigation can proceed. Rule § 106.30(a) (*formal*

*complaint*). But in the K-12 setting, the vast majority of complaints are made orally in the first instance at a school-site to a staff member who witnesses the conduct or with whom the child has a trusting relationship. Ex. 12 at 28, 33. Many young students are unable to articulate concerns in writing and many are unable, uncomfortable, or do not yet have the skills necessary to request a formal investigation. Cal. Dep't of Educ. Comment (Jan. 30, 2019) (Ex. 14 at 1) ("Young children are particularly sensitive to trauma and, often, are unable to verbalize social-emotional and other safety concerns."); Berkeley Unified School District Comment (Jan. 24, 2019) (Ex. 17 at 2); Ex. 13 at 4; Ex. 19 at 3-4. And because schools act *in loco parentis*, once a student reports sexual harassment, it is crucial for schools to investigate promptly—often the very same day, and sometimes before a parent or guardian has been reached—to address the harassment before it increases in severity. *E.g.*, Ex. 18 at 2; *see e.g.*, Hall-Panameño ¶¶ 20, 32-34, 53 (time is of the essence for addressing sexual harassment due to sheer volume of incidents and because it can escalate quite rapidly and spread without quick intervention). Moreover, the Department arbitrarily and capriciously failed to consider an "important aspect of the problem," *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983): the need for exceptions for students who may be unable to write because of their stage of development or disability and whose parent or guardian cannot fill the void. Ex. 13 at 4 (many cases of sexual harassment in the K-12 context involve children with disabilities); *see, e.g.*, Hall-Panameño ¶ 25 (putting onus on the harmed child to start investigation process makes consequence of even a short delay in formal investigation and discipline far more harmful).

Defendants purport to mitigate this harm to young children by allowing a Title IX Coordinator to initiate an investigation where a formal, written complaint is not filed. Rule § 106.30(a) (*formal complaint*). But the Rule's preamble inconsistently states that a Title IX Coordinator who initiates such an investigation without providing "specific reasons" for doing so may violate Title IX. 85 Fed. Reg. at 30,296 n.1162; 85 Fed. Reg. at 30,305; *see also Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1220 (D.C. Cir. 1996) (arbitrary and capricious for preamble to be inconsistent with the rule). The curtailment of a school district's

ability (and obligation) to investigate and respond on behalf of minor children is a sharp and unjustified departure from Title IX's purpose and long-standing Title IX policy and fails to consider the unique needs of K-12 schools to protect minor students. *E.g.*, Ex. 3 at 12,050 n.69.

Finally, the Rule conflicts with an existing and longstanding Title IX regulation that requires both parties and schools to maintain confidentiality during an investigation, except to the extent necessary to carry out the investigation process. *Compare* Rule § 106.81 (continuing to incorporate by reference 34 C.F.R. § 100.7(e)), *with* Rule § 106.71(a). By preventing schools from placing reasonable limitations on the ability of parties to discuss the allegations and requiring schools to provide parties with all evidence "directly related to the allegations," Rule §§ 106.45(b)(5)(iii), (vi) the Department fails to account for minor "complainants" and "respondents" directly receiving and sharing information with other minors. Allowing young students to share information about allegations without limit can rapidly lead to a hostile environment and retaliation by other students, which, in turn, creates a chilling effect for student witnesses involved in the investigation and unsafe conditions for all students. *See* Ex. 19 at 7; Ex. 13 at 9. The Department does not adequately support its revision and inconsistency as applied to investigations involving young students, disregarding harms identified by educators. *E.g.*, Ex. 19 at 7 ("The trauma, increased risk of retaliation, and FERPA violations from [allowing parties to discuss student information with others] are potentially exponential."); Ex. 18 at 5. In fact, the Rule's preamble exacerbates this problem by prohibiting schools from redacting personally identifiable information, such as the names of minors witnesses, thereby depriving schools of critical tools to prevent children of different developmental stages from sharing this information online or in school. 85 Fed. Reg. at 30,427. The Rule even prohibits schools from withholding documents, such as nude photos of minor students, when other state laws would prohibit and common sense would prevent a school from re-transmitting information to a minor complainant and a non-attorney advisor or relative. 85 Fed. Reg. at 30,431-32. The Department does nothing to remedy the potential for widespread transfer of documents and the ensuing harm to campus environment, students' rights, and privacy that can result.

### 2. The Rule imposes unreasonable live-hearing requirements on postsecondary schools.

The Department imposes only on postsecondary schools—and on no other recipient—a courtroom-like grievance process and then prevents those schools from adopting additional procedures to make the process more equitable. *Compare* Rule § 106.45(6)(i) (postsecondary schools), *with* Rule § 106.45(b)(6)(ii) (all other recipients). Under the Rule, all postsecondary schools must provide live hearings before making a determination regarding responsibility, even for proceedings involving young children, such as those involving allegations of sexual harassment at a college daycare center. Rule § 106.45; 85 Fed. Reg. at 30,488-89. At these hearings, parties and witnesses must submit to direct, oral cross-examination by an adviser either selected by the party or provided by the school, but schools are unable to place reasonable limitations on who can serve as an advisor or adopt any reasonable evidentiary limitations besides certain limits as to relevance as defined by the Department. Rule § 106.45. If a party or witness does not submit to direct, oral cross-examination, the school must disregard any statement by that individual, even if an investigator has already questioned them and even though most schools lack the power to compel testimony. *Id.*

The Department ignores ample evidence presented to it that direct, oral cross-examination by an advisor will chill reporting, create potentially inequitable and traumatizing hearings that can harm complainants and respondents alike, and lead to less reliable outcomes. *State Farm*, 463 U.S. at 43 (agency acts arbitrarily when the explanation for its decision runs counter the evidence before it); *see*, *e.g.*, 85 Fed. Reg. at 30,315 n.1200 (citing Michelle J. Anderson, *Women Do Not Report the Violence They Suffer: Violence Against Women and the State Action Doctrine*, 46 Vill. L. Rev. 907, 936-37 (2001) (decision not to report or to drop complaints is influenced by fear of cross-examination)); 85 Fed. Reg. at 30,320-21 n.1222 (citing Saskia Righarts et al., *Addressing the Negative Effect of Cross-Examination Questioning on Children's Accuracy: Can We Intervene?*, 37 (5) Law & Human Behavior 354, 354 (2013)

("Cross-examination directly contravenes almost every principle that has been established for eliciting accurate evidence from children.")).

Under the Rule, a party could be directly, orally cross-examined by an attorney, whose tactics may be unsuited for an education setting. Or the party could be crossed by his own teacher or the other party's untrained angry parent or close friend. 85 Fed. Reg. at 30,340. The Department fails to adequately consider how aggressive or unprofessional questioning will harm complainants and respondents alike. *E.g.*, Ex.12 at 41 (citing Tom Lininger, *Bearing the Cross*, 74 Fordham L. Rev, 1353, 1357 (2005) ("As a general matter, victims' willingness to report crimes varies inversely with their fear of embarrassment during cross-examination.")); Comment by Dr. Judith Herman on behalf of 902 Mental Health Prof'ls (Jan. 30, 2019) (Ex. 24 at 3) (observing that cross-examination by the accused's "advisor of choice" "means being subjected to hostile attacks on their credibility and public shaming at a time, following a traumatic event, when they may feel most vulnerable" and is "almost guaranteed to aggravate their symptoms of post-traumatic stress"). The Department also fails to address the "important aspect" of inequity in the process, *see Regents*, 2020 WL 3271746, at *14 (U.S. June 18, 2020), wherein one party may be able to afford to retain a skilled attorney, while the other party, due to financial reasons, may rely on a friend or relative with no legal background, *see* School Sup. Assoc. Comment (Jan. 22, 2018) (Ex. 21 at 4); Am. Psychological Ass'n Comment (Jan. 30, 2019) (Ex. 25 at 4).

The Department's answer—that an impartial decision-maker renders "the professional qualifications of a party's advisor" non-determinative, 85 Fed. Reg. at 30,332—ignores the obvious advantage of an attorney-advisor. It also misses the point: mandating procedures in which one student party in an education setting may be subjected to courtroom-like interrogation does not ensure the "fair" or "equitable" process the Department says will follow from the requirement and is belied by the evidence. 85 Fed. Reg. at 30,095; *see* Nat'l. Women's Law Ctr. Comment (Jan. 30, 2019) (Ex. 27 at 26) ("The live cross-examination requirement would also lead to sharp inequities, due especially to the 'huge asymmetry' that would arise when respondents are able to afford attorneys and complainants cannot"); *see also Venetian Casino*

*Resort, L.L.C. v. EEOC*, 530 F.3d 925, 934 (D.C. Cir. 2008) (action that is the product of inconsistent reasoning is arbitrary and capricious).

To avoid harming the parties and chilling reporting, courts have endorsed various avenues for adversarial cross examination that are appropriate for an educational setting, such as questioning by a hearing officer or allowing the parties to submit written questions in advance of or in real time at the hearing. *See, e.g.*, *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400, 405 (6th Cir. 2017); *Doe v. Purdue Univ.*, 928 F.3d 668, 663-64 (7th Cir. 2019); *see also,* 85 Fed. Reg. at 30,326 n.1255 (seven courts of appeals and 16 states do not require cross examination in disciplinary proceedings). Defendants disregard these less harmful alternatives, claiming that direct, oral cross-examination by an advisor chosen by the parties is the only means of providing an adversarial, truth-seeking process. 85 Fed. Reg. at 30,330. But the Department belies its own point only pages later, stating that "the advisor is not required to perform any function beyond relaying a party's desired questions to the other party and witnesses." 85 Fed. Reg. at 30,341. Based on this formulation of the advisor's role, there is no reason the party could not just as easily write her desired questions down, to be asked by the decision-maker overseeing the hearing. *See, e.g.*, SurvJustice Comment (Jan. 30, 2019) (Ex. 28 at 30) (citing various institutions' support, such as the American Bar Association, for written questions presented by a neutral decisionmaker to satisfy due process in higher education settings). Indeed, schools have opted for these approaches to protect fair process while also allowing hearing officers to maintain control of the hearing. AAUW of Hawai'i Comment (Jan. 27, 2019) (Ex. 29 at 3) ("Written questions provide a balance between the need to test the readability of the evidence and the risk of retraumatizing."). Similarly, schools have appropriately eschewed having faculty and staff, who will have to interact with parties and witnesses in schools, from acting as adversarial cross-examiners. Comment of Twenty-Four Private Liberal Arts Colleges and Univs. (Jan. 30, 2019) (Ex. 15 at 1); *see Regents*, 2020 WL 3271746, at *14 (citing *State Farm*, 439 U.S. at 51) (agency that changes prior policy must consider "alternative[s]" that are "within the ambit of the existing [policy]").

Two other requirements only increase the arbitrariness of the Rule's postsecondary hearing requirement. First, the only evidentiary limits the Department imposes at the hearing are relevance, sexual predisposition, and prior sexual behavior. Rule § 106.45. Even though the Rule's text allows school to adopt other "equitable" procedures, Rule § 106.45(b), the Department in the preamble inconsistently prohibits schools from adopting other reasonable rules of evidence, such as unfair prejudice, that would protect parties and allow the hearing officer to control the process, 85 Fed. Reg. at 30,336-37; *see Kennecott Utah Copper Corp.*, 88 F.3d at 1220 (arbitrary and capricious for preamble to be inconsistent with the Rule). Second, the Rule requires schools to ignore any statements if the individual did not submit to cross-examination, Rule § 106.45(b)(6)(i), even if the party or witness was questioned by the investigator and commonly-used rules of evidence would permit some of their statement to be admitted. But most schools lack subpoena power and the Department in the preamble forbids schools from compelling testimony. *E.g.*, 85 Fed. Reg. at 30,348. The Rule thus imposes courtroom-like proceedings in an educational environment, then arbitrarily prevents schools from using other available legal tools to ensure an equitable hearing. *Venetian Casino Resort*, 530 F.3d at 934 (action that is the product of inconsistent reasoning violates APA).

### 3. The Rule abandons the Department's longstanding policies without adequate explanation.

Without a reasoned analysis, the Department has rescinded its longstanding policy that Title IX requires schools to take action "to overcome the effects of [] discrimination," 34 C.F.R. § 106.3, and eliminate "any hostile environment that has been created," which may include interventions for an entire class "to repair the educational environment" or for an "entire school or campus." Ex. 3 at 12,043. Instead, it adopts policy contrary to Title IX. It limits Title IX's remedies to "disciplinary sanctions" imposed on the respondent, "remedies designed to restore or preserve equal access" for the complainant, and action to "remedy the violation." Rule §§ 106.45(7)(ii)(E); 106.3(a). Rule §§ 106.45 The Department's decision runs contrary to the purpose of Title IX, which is to provide "effective remedies against discrimination." Civil Rights

Restoration Act of 1987, 1987 WL 61447, at 5. Such remedies serve to broadly eliminate "sex-based discrimination in federally assisted education programs," not just narrow, after-the-fact actions limited to the parties to a specific complaint. Ex. 3 at 12,034 ("[Office for Civil Rights] policy and practice is consistent with the Congress's goal in enacting Title IX—the elimination of sex-based discrimination in federally assisted education programs.").

The Department has also abandoned its longstanding policy that Title IX requires "effective action to stop the harassment and prevent its recurrence." Ex. 6 at 12; *see also* Ex. 3 at 12,044; Ex. 1 ("A sexual harassment experience can affect all aspects of a student's life . . . institution[s] must take immediate action to stop and prevent further harassment, as well as initiate appropriate remedial measures."). Instead, the Rule turns Title IX on its head: a school risks its federal funding if it does not strictly comply with even one of the Department's new procedural requirements, but a school that fails to respond to sexual harassment, even in a manner that is just short of clearly unreasonable, will not risk its funding. *Compare* Rule §§ 106.44(b)(1) ("a recipient must follow a grievance process that complies with § 106.45"); 106.45(b) ("recipient's grievance process must comply with the requirements of this section"), *with* Rule § 106.44(a) (schools must respond to harassment in a manner that is not deliberately indifferent, i.e., "clearly unreasonable in light of the known circumstances"). With this arbitrary double-standard, the Department threatens schools' funding should they not follow its procedural dictates, even though the Department acknowledges that these dictates are not required by the Constitution or federal law. *E.g.*, 85 Fed. Reg. at 30,101, 30,303, 30,330.

### B.  The Rule impermissibly narrows Title IX.

In enacting Title IX, "Congress gave the statute a broad reach." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). The Rule does the opposite: it limits the reach of Title IX and denies students protection from conduct that was previously unlawful. Specifically, the Rule restricts when and where sexual harassment must take place to violate Title IX, narrows what conduct qualifies as sexual harassment, and limits who can file a formal complaint to initiate a Title IX investigation. If a sexual harassment complaint falls outside of these cramped

confines, the Rule, instead of requiring schools to investigate, actually requires schools to *dismiss* such complaints for purposes of Title IX. These restrictions, alone and in combination, are contrary to law, arbitrary and capricious, and exceed statutory authority.

### 1. The Rule unlawfully places geographic restrictions on Title IX's protections that have no basis in the statute.

Sexual harassment is conduct on the basis of sex that excludes a student from participating in, denies a student the benefits of, or subjects a student to discrimination under an education program or activity. 20 U.S.C. § 1681(a); *see Davis*, 526 U.S. at 649-50. Title IX does not require that the harassment take place "in" an education program or activity, and none of the nine exceptions to Title IX's protections imposes any restrictions based on the location of the harassing conduct. 20 U.S.C. § 1681(a)(1)-(9). Nonetheless, contrary to the statutory text and purpose and without a reasoned explanation, the Rule limits Title IX's prohibition on sexual harassment to conduct that takes place *in* an "education program or activity," which the Department defines to be "locations, events, or circumstances" over which a school "exercise[s] substantial control over both the respondent and the context in which the sexual harassment occurs[.]" Rule § 106.44(a).

Title IX itself contains no such restriction. The Rule's imposition of such a restriction will lead to a significant reduction in complaints investigated, 85 Fed. Reg. at 30,550 (0.18 reduction per year in "off-campus investigations" in post-secondary schools), and absurd results that are clearly contrary to the statute's purpose, *e.g.*, 85 Fed. Reg. at 30,200 (on campus taunts and name calling after reported off-campus rape by two high-school boys may not meet the Rule's definition); 85 Fed. Reg. at 30,202 (use of personal phone to post sexually harassing messages online "during class time" may fall under Title IX, but the same conduct five feet off campus would not). Sexual harassment often occurs in the first instance outside the "substantial control" of a school but nonetheless creates a hostile education environment that can deny students educational benefits and exclude them from equal participation. Nationwide, nearly 9 in 10 college students live off campus, and even more K-12 students reside off campus. 85 Fed.

Reg. at 30,194 n.845 (citing Rochelle Sharp, *How Much Does Living Off Campus Cost? Who Knows?*, N.Y. Times (Aug. 5, 2016)). About 70 percent of college sexual assaults occur at a home, and 41 percent of college sexual assaults involve off-campus parties. 85 Fed. Reg. at 30,077 n.342 (citing Sofi Sinozich & Lynn Langton, U.S, Dep't of Justice, *Rape and Sexual Assault Victimization Among College-Age Females*, 1995-2013 6 (Dec. 2014)); 85 Fed. Reg. at 30,567 n.1968 (citing United Educators, *Confronting Campus Sexual Assault: An Examination of Higher Education Claims* 6 (2015), https://tinyurl.com/wfywmz6)). Sexual harassment at an off-campus party or house often has pernicious effects that permeate the education environment, potentially forcing the harassed student to avoid certain classes, limit education activities, or even drop out. *E.g.*, *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007). In the K-12 setting, online harassment is especially prevalent and destructive. *E.g.*, Ex. 18 at 3; 85 Fed. Reg. at 30,433 n.1597 (citing U.S. Dep't of Educ. *et al*., Fed. Comm'n on School Safety, *Final Report of the Federal Commission on School Safety* 19 (Dec.18, 2018) (noting testimony that "34 percent of high schoolers in America are cyberbullied, and 80 percent of students who are cyberbullied are also bullied at school")). K-12 students typically attend multiple classes with the same classmates in a single building, making it especially difficult for harassed students to avoid their abusers and making it more likely that the student will lose access to education.

The Department arbitrarily fails to consider these "important aspects of the problem," and instead rests its narrowing of the statute entirely on *Davis*. 85 Fed. Reg. at 30,195-96. But *Davis* did not "define the scope of the behavior that Title IX proscribes." *Davis*, 526 U.S. at 639. Instead, the Supreme Court construed only one category of sexual harassment under Title IX— conduct that subjects students to discrimination "under" an educational program or activity—in the context of a private civil suit. *Id.* at 644. The Court construed the word "under" to mean that that this type of harassment must "take place in a context subject to the school district's control" in order to be the result of the school's deliberate indifference. *Id.* at 645. But the preposition "under" modifies only one type of prohibited conduct under Title IX, and the Court did not

purport to apply its analysis to the rest of Title IX, which prohibits sexual harassment that excludes a student from participating in or denies a student the benefits of an education program or activity. 20 U.S.C. § 1681(a); *see Davis*, 526 U.S. at 650. The Department is not authorized to interpret Title IX in a way that "create[s] surplusage" in the statute. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 632 (2018).

The Department's improper narrowing of Title IX will also lead to absurd and arbitrary results. Those harassed under Title IX will now receive less protection than those under Title VI, even though Title VI prohibits the same three categories of unlawful conduct on the basis of race, color, or national origin and defines "program or activity" in near-identical fashion as Title IX. *Compare* 42 U.S.C. §§ 2000d & d-4(a) with 20 U.S.C. §§ 1681 & 1687; *Sex Discrimination Regulations, Review of Regulations to Implement Title IX*, Hearings before the. Subcomm. on Post-Secondary Educ. of the H. Comm. On Educ. and Labor, 94th Cong., 1st Sess., 170 (1975) (Statement of Sen. Bayh) (in setting up "an identical administrative structure" Congress intended to provide the "same coverage" and "same statutory scope for Title IX as for Title VI"). But the Department has never cabined Title VI to prohibit only misconduct that takes place *in* a recipient's program or activity. *E.g.*, U.S. Dep't of Educ., *Race and National Origin Discrimination* (Jan. 10, 2020) (Ex. 11; Ex. 2 at 11,448.

### 2. The Rule improperly narrows what constitutes sexual harassment.

The Department adopts three definitions of sexual harassment, two of which contravene the text and purpose of Title IX. In addition to certain criminal offenses defined by the Clery Act, the Rule (1) narrows what was previously called "hostile environment harassment" into "[u]nwelcome conduct that" is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access" to an "education program or activity," and (2) limits "quid pro quo" harassment only to misconduct committed by a school "employee" (not a student or other individual). Rule § 106.30(a) (*sexual harassment*). These definitions rescind decades of consistent and longstanding Department policy, are contrary to law, and are arbitrary and capricious.

The Rule first narrows "hostile environment harassment" to only conduct that is "severe, pervasive, *and* objectively offensive." Rule § 106.30(a) (emphasis added). With this standard, the Department reverses nearly thirty years of well-reasoned policy that used the disjunctive phrase "severe, persistent, or pervasive" to capture what Title IX explicitly prohibits: sexually harassing conduct by an employee, another student, or a third party [that] s sufficiently serious that it denies or limits a student's ability to *participate in or benefit from* the school's program." Ex. 6 at 5 (emphasis added); 20 U.S.C. § 1681(a) ("be excluded from participation in, be denied the benefits of"); *see also* Ex. 1 at 4 (1988). The Department fails to provide adequate justification for this sea change in what Title IX proscribes and States and students have relied on prior policy for decades. *See Regents*, 2020 WL 3271746, at *14, 15. Under the Rule, weeks of inappropriate sexual touching by a teacher or classmate could fall outside of Title IX for not being "severe," despite the devastating effects such harassment would have on a student.

The Rule further narrows "hostile environment harassment" to only conduct that "effectively denies a person equal access" to education. Rule § 106.30(a) (*sexual harassment*). But as discussed, *supra* Part II.B.1, the text of Title IX protects individuals from being "excluded from participation in," "denied the benefits of," and "subjected to discrimination" under any education program or activity. 20 U.S.C. § 1681. The modifier "effectively," which requires a student to be actually cut off from their education before conduct is addressed, has no home in the plain text.[16] *Effective*, Black's Law Dictionary (11th ed. 2019) ("achieving a result"). And protecting only students who are "effectively denied" is inconsistent with the statute's plain text, which also protects students from being "excluded from participation in," "denied the benefits of," and "subjected to discrimination under" a program or activity. 20 U.S.C. § 1681(a).

---

[16] The Department refuses to define what conduct "effectively denies equal access" in the Rule's text and suggests inconsistent standards in the preamble. *Compare* 85 Fed. Reg. at 30,170 (third grader "bed-wetting" or "crying at night due to sexual harassment" is only "likely to constitute an example of denial of equal access"), *with id.* at 30,170 (recognizing that neither Title VII nor Title IX "requires 'tangible adverse action or psychological harm" before the sexual harassment "may be actionable").

Congress has not authorized the Department to limit the broad sweep of the statute's text nor to adopt an interpretation that fails to give effect to every word. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (mandating that every word of a statute must be given effect); *see also Bostock v. Clayton County*, ---S.Ct.---, 2020 WL 3146686, at \*11 (June 15, 2020) (observing that where Congress chooses "not to include any exceptions to a broad rule, courts apply the broad rule").

The new heightened standard for "hostile environment" harassment diverges from Title VI, on which Congress intentionally modeled Title IX. *E.g.*, *Cannon*, 441 U.S. at 704; *see also supra* Part II.B.1. For decades, the Department complied with near-identical language of both statutes and required schools to address sexual harassment to the same extent they addressed racial or national origin harassment: if it is severe, persistent, *or* pervasive. *E.g.*, Ex. 2 at 11,449, 11,451 n.2 (Title VI); Ex. 3 at 12,034 (Title IX). The Department justifies reversal of longstanding policy denying Congress's explicit connection between Title VI and Title IX. 85 Fed. Reg. at 30,529 ("The statutory text[] attending Title VI [and] Title IX . . . [gives] no indication that regulations arising from any of them must, or even may, serve as APA comparators[.]"). This conclusion is arbitrary and capricious: Congress made the operative texts virtually identical and stated its intent in the record. *See supra* Part II.B.1. The Department's invocation of Title IX's exceptions, 85 Fed. Reg. at 30,529 (citing 20 U.S.C. § 1681(a)(4), (8), (9)), likewise falls short: these provisions exempt certain categories of educational programs and activities from Title IX's reach but say nothing about what constitutes unlawful conduct.

The new heightened standard also diverges from Title VII, which protects school employees—including student workers—from discrimination on the basis of sex, including "severe or pervasive" harassment. *E.g.*, *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). The Department fails to adequately explain why students—and especially young children— should be subjected to more egregious physical or verbal mistreatment to have an actionable claim of harassment than adults in a workplace. *See Regents*, 2020 WL 3271746, at \*14, 15. The Department also fails to adequately explain how schools should now respond to harassment of student employees, who are protected by both Title VII and Title IX, instead simply insisting that

27

there is no conflict. *E.g.*, 85 Fed. Reg. at 30,222 ("The Department recognizes that employers must fulfill both their obligations under Title VII and also under Title IX. There is no inherent conflict between Title VII and Title IX[.]").

The Department's new definition of "hostile environment harassment" is particularly arbitrary for K-12 students. *See Petroleum Commc'ns*, 22 F.3d at 1172 (arbitrary and capricious to fail to account for circumstances that "appear to warrant different treatment for different parties"). Young children may be unable to recognize or verbalize the nature and extent of the harassment, including facts supporting denial of equal access. Ex. 14 at 1 ("Young children are particularly sensitive to trauma and, often, are unable to verbalize social-emotional and other safety concerns."); Ex. 21 at 2, 4 (under "narrower definition of harassment, students would be forced to endure repeated and escalating levels of abuse, from a student or teacher"). Where the harassment continues or resumes but the student cannot express severity and pervasiveness, failing to address the complaint is likely to chill further reporting. *See e.g.*, Ex. 25 at 2.

The Department justifies its new definition of "hostile environment harassment" primarily on a desire to align administrative enforcement with the later-adopted heightened framework for private civil monetary damages. 83 Fed. Reg. at 61,466-67; *see also* 85 Fed. Reg. at 30,032-46. But the Supreme Court adopted a heightened standard precisely because Congress did not create an express means of private civil enforcement of Title IX. *See Cannon*, 441 U.S. at 717 (creating an implied right of action); *Franklin*, 503 U.S. at 75-76 (private right of action extends to sexual harassment). Instead, Congress created an express mechanism for administrative enforcement, 20 U.S.C. § 1682, and the Court expected federal agencies to continue to "promulgate and enforce requirements that effectuate the statute's non-discrimination mandate . . . even if those requirements" would not be enforceable for money damages. *Gebser*, 524 U.S. at 292. The Rule spends many pages explaining the application of *Gebser* and *Davis*, but no pages explaining why aligning with a judicially-created standard for private enforcement fulfills Title IX's mandate to eliminate sexual harassment. *Cf.* 20 U.S.C. § 1682 (rules must "effectuate" Title IX).

Simply invoking the *Davis* standard, without addressing the Court's acknowledgement that it was being asked to "do more than define the scope of the behavior that Title IX proscribes," *Davis*, 629 U.S. at 639; *see also Gebser*, 524 U.S. at 283 ("petitioners seek not just to establish a Title IX violation but to recover damages"), is an insufficient explanation for the Department's reversal. The Department's administrative enforcement of Title IX serves principally to "'protect[]' individuals from discriminatory practices carried out by recipients of federal funds," not "compensate victims of discrimination." *Gebser*, 524 U.S. at 287. The Department undermines Title IX and exceeds its own authority by proscribing recipient school's ability to act on sexual harassment complaints only at the point where the complaints would rise to the level of liability for monetary damages. And the rationale for the sharp departure—to bring administrative enforcement standards in line with those for private litigation—is insufficient where the undisputed evidence in the record establishes that Title IX's "broad sweep" remains necessary because the prevalence of sexual harassment in schools, as lamented by the Department, is on the "rise."[17] In addition, the Department has consistently recognized that the heightened standard for private litigation is inapplicable to administrative enforcement. *See e.g.*, Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 10. Because the Department "change[d] course" from longstanding policy that "may have engendered serious reliance interests," it was "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 2020 WL 3271746, at *14, 15 (internal quotations and citations omitted). It failed to do so here.

In addition to narrowing hostile environment harassment, the Department limits quid pro quo harassment to only "employees." This arbitrarily excludes quid pro quo harassment perpetrated by students in positions of authority who may not be deemed employees under State law or even other federal laws. *Cf. Nat'l Labor Relations Bd., Jurisdiction - Nonemployee Status*

---

[17] E.g., U.S. Dep't of Educ., Secretary DeVos Announces New Civil Rights Initiative to Combat Sexual Assault in K-12 Public Schools, (Feb. 26, 2020), https://tinyurl.com/wuvsyjy.

*of University and College Students Working in Connection With Their Studies*, 84 Fed. Reg. 49,691 (Sept. 23, 2019) (proposing to exclude student employees from the definition of "employee"). As a result, an incident of a student teaching assistant conditioning grades on sexual favors would not violate Title IX, while the same conduct by a teacher would violate Title IX. *See e.g.*, Ex. 12 at 17-18. Here too the Department rescinds prior policy recognizing that quid pro quo harassment by a student in a position of authority is unlawful under Title IX with scant rationale. *E.g.*, Ex. 3 at 12,038 n.4 (applying quid pro quo to student teaching assistant with the authority to assign grades). The Department's only answer is that the Court in *Gebser* did not impose vicarious liability for damages under Title IX, 85 Fed. Reg. at 30,148, but under the Rule, all harassment, even employee quid pro quo harassment, is now untethered from agency principles: the Rule requires schools to respond to each type of harassment defined by the Rule and does not impose vicarious liability for either type. The Department's reasoning is therefore illogical, *Am. Fed'n of Gov't Emps. v. Fed. Lab. Rel. Authority*, 470 F.3d 375, 380 (D. C. Cir. 2006), ignores "important aspects of the problem," and fails to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns," *Regents*, 2020 WL 3271746, at *14, 15 (internal quotations and citations omitted).

### 3. The Rule unlawfully limits who can file a formal complaint.

After unduly narrowing what constitutes harassment and where it must occur, the Department adds a wholly new requirement unsupported by Title IX's text, that prevents schools from addressing harassment unless the complainant is "participating in or attempting to participate in the education program or activity" at the time of filing. Rule § 106.30(a) (*formal complaint*). If the "complainant"—defined as the "individual who is alleged to be the victim of conduct that could constitute sexual harassment"—no longer attends the school, the Rule

prevents the filing of a formal complaint.[18] As a result, the literal terms of the Rule prohibit a school from conducting an investigation if the victim left the school before filing a formal complaint—even if the victim left school *because of the sexual harassment*. *See* Rule § 106.44(a) (school must follow § 106.45 grievance process before imposing sanctions). The Department readily acknowledges this but fails to consider alternatives or remedy the illogical result. Likewise, the Rule prohibits a school from imposing *any* sanction on employees if they, for example, repeatedly assaulted non-student residents of the surrounding neighborhood. 85 Fed. Reg. at 30,138 (example of a complainant who has left school because of sexual harassment that could be addressed if the complainant "expresses a desire to re-enroll"); *id.* at 30,348 (school could offer not unreasonably burdensome supportive measures in serial predator situation).

### 4. The Rule exceeds the Department's authority by mandating that schools dismiss meritorious complaints.

For the first time ever, the Department requires schools to dismiss complaints if "the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved" or "did not occur in the recipient's education program or activity." Rule § 106.45(b)(3)(i). This dismissal requirement exceeds the Department's authority because it does not "effectuate" Title IX's mandate. 20 U.S.C. § 1682. It is also arbitrary and capricious.

The Department can only impose restrictions on schools, and withdraw funding for violation of those restrictions, to the extent they further the statute's mandate that no person "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity" on the basis of sex. 20 U.S.C. § 1681(a); *Gebser*, 524 U.S. at 292 (Congress provided authority to agency to promulgate and enforce requirements that effectuate Title IX's mandate). But a school's investigation of alleged sexual harassment, even if the conduct alleged does not meet the heightened standards set by the Rule, cannot *itself* be sex discrimination that violates Title IX. Indeed, the Department has foreclosed this possibility

---

[18] The Rule allows a Title IX coordinator to file a formal complaint, but it makes clear that under such circumstances the coordinator "is not a complainant." § 106.30(a).

because the Rule, which purports to enforce Title IX, specifically "does not preclude" schools from pursuing investigations of such allegations "under another provision of the recipient's code of conduct." Rule § 106.44(b)(3)(i). If the Department believed that such investigations were in fact sex discrimination, they would not be permissible even pursuant to code-of-conduct proceedings. Accordingly, conditioning federal funds on a requirement that schools must dismiss certain sexual harassment claims—a requirement that plainly has nothing to do with Title IX's antidiscrimination mandate—exceeds the Department's authority.

In addition, this dismissal requirement will likely compel schools to create parallel policies and grievance procedures—one addressing "Title IX sexual harassment" and one addressing "non-Title IX sexual harassment." Some schools will have to adopt parallel policies where a State's law and other federal laws provide greater protections and others will do so out of concern for student well-being and to continue addressing the same misconduct that has fallen under Title IX for decades. The Department does not acknowledge, let alone explain the substantial change in policy. *E.g.*, Ex. 6 at 19 ("Title IX does not require a school to adopt a policy specifically prohibiting sexual harassment or to provide separate grievance procedures[.]"). Having two code of conduct processes will decrease equal access to education, chill reporting, and undermine a transparent, fair process. *See* Part III, *infra*. Neither Title IX nor the APA allows the Department to mandate this result.

### C.  The Rule violates the procedural requirements of the APA.

#### 1.  Defendants' regulatory impact analyses are fatally flawed.

The Department's regulatory impact analyses ("RIA") in the proposed rule and the final Rule violate multiple procedural requirements and are arbitrary and capricious. An agency's proposed rule must include "the technical studies and data upon which the agency relies in its rulemaking," including reports, methodology, and information relied on by the agency in reaching its conclusions, and the "technical basis" for its conclusions. *Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 236 (D.C. Cir. 2008) (internal quotation marks and brackets omitted); *see also Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132-33 (D.C. Cir. 1995). The agency

cannot withhold critical information about the methodology because providing a partial record could be "fundamentally unfair." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 793 (D.C. Cir. 1984); *see also Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991) (serious procedural error when agency fails to reveal portions of the technical basis for proposed rule). And in the final rule, the RIA must take into account costs and benefits through a sound and consistent methodology, and account for all harms, both monetary and non-monetary. *E.g.*, *Owner-Operator Indep. Driver's Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188 (D.C. Cir. 2007); *Bus. Roundtable v. SEC,* 647 F.3d 1144, 1149, 1153 (D.C. Cir. 2011); *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020). A "serious flaw in its cost-benefit analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039-40 (D.C. Cir. 2012).

Here, Defendants withheld underlying technical studies, reports, and information relied upon for its cost-benefit analyses. *E.g.*, 85 Fed. Reg. at 30,565; 83 Fed. Reg. at 61,485; *see* Ctr. for Am. Progress Comment (Jan. 30, 2019) (Ex. 23 at 5) ("[T]he lack of transparency surrounding the Department's cost calculations . . . leads the Center to request that the Department halt its rulemaking . . . and make its underlying calculations available to the public"); Madowitz ¶ 8 (failure to disclose underlying information and complete analysis methodology renders it impossible to completely reproduce cost-benefit analysis). In addition, the proposed rule identified significant cost-savings derived primarily from an expected substantial reduction in formal complaints investigated and resolutions reached across schools nationwide. Ex. 23 at 3-4; Madowitz ¶ 12; 83 Fed. Reg. at 61,463, 61,487-88, 61,488; 85 Fed. Reg. at 30,548-49. However, the Department withheld critical information from the public including the methodology and information necessary to understand its estimates and conclusions underlying its assumptions regarding these costs savings, thereby leaving the States and the public bereft of the basis for its cost-savings figure. Ex. 23 at 3-4. Madowitz ¶¶ 7, 12-15. Moreover, the data sets contained in the Department's RIA calculating important baselines for determining costs, such as baseline numbers of investigations, were incomplete, rendering a re-

creation of its methodology impracticable. *See* 85 Fed. Reg. at 30,565; Ex. 23 at 5; Madowitz ¶¶ 26-28. These errors were far from harmless, as the Rule's actual costs far exceed the similarly flawed figures in the final Rule.

Although the Department now acknowledges that the Rule will result in millions in net costs, 85 Fed. Reg. at 30,549, it still failed to account for, or entirely underestimated, costs certain to be incurred by States' schools. These include the costs associated with hiring advisors, decision-makers, appeal reviewers, and investigators; multiple years of time and training to staff, students, and parents on the Rule's requirements; the cost of supportive measures; and equipment and other capital costs for live hearings. *See, e.g.*, Madowitz ¶¶ 38, 40-42; Cooper ¶ 15 (RIA's $250 supportive measure per provision estimate does not amount to even two hours of mental health counseling); Williams ¶ 50, 57, 64; Hall-Panameño ¶ 59; Ex. 23 at 6. The RIA and Rule rest on several significant flawed or unsupported calculations—such as the amount schools will expend on each investigation and hearing—which, if corrected, would reveal substantially higher implementation costs for schools throughout the nation. Madowitz ¶¶ 30-36, 40-44.

The Department also intentionally disregarded critical financial, health, and societal costs for students and States without providing an explanation for their exclusion. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (both economic and non-economic costs are "centrally relevant" to agency decisionmaking); *e.g.,* Ex. 23 at 5-6; Madowitz ¶ 20; 85 Fed. Reg. at 30,081, 30,548 (acknowledging studies calculating the average lifetime cost of being a rape victim but "declin[ing] to include costs associated with underlying incidents of sexual harassment and assault . . . as doing so would be inappropriate"). The Department ignored commenters' concerns regarding the costs of sexual harassment exacerbated by the Rule that redound to States, including increased absenteeism, lost revenue from dropouts, and attendant costs from increased unemployment and health services. 85 Fed. Reg. at 30,544-45, 30,548; Ex. 23 at 5; Ex. 24 at 1; *see also* Madowitz ¶¶ 18-19; Herman ¶¶ 9, 22; Burke Harris ¶ 7; Darling-Hammond ¶ 10; Mixson ¶ 5. The Department designed the Rule to reduce the number of sexual harassment allegations that schools investigate and remedy, and its cost savings rely on this outcome. *See* 85

Fed. Reg. at 30,551, 30,565-68 (Rule will result in a 33 percent reduction in investigations for post-secondary schools and a 50 percent reduction for K-12 schools and reductions in hearings, decisions, and informal resolutions). Reductions in investigations and resolutions will blunt deterrence and result in more harassment (and repeat harassment) and the above-enumerated costs. Ex. 23 at 5 n.22 (citing Ronet Bachman et al., *The Rationality of Sexual Offending: Testing a Deterrence/Rational Choice Conception of Sexual Assault*, 26 Law & Soc'y Rev. 343-57 (1992); Camille Gallivan Nelson et al., *Organizational Responses for Preventing and Stopping Sexual Harassment: Effective Deterrents or Continued Endurance?* 56 *Sex Roles* 811-22 (2007); Inez Dekker & Jullian Barling, *Personal and Organizational Predictors of Workplace Sexual Harassment of Women by Men*, 3 *Journal of Occupational Health Psychology* 7 (1998)); Ex. 24 at 2; 85 Fed. Reg. at 30,266 n.1095 (citing David Lisak & Paul Miller, *Repeat and Multiple Offending Among Undetected Rapists*, 17 Violence & Victims 1 (2002) ("undetected rapists" were repeat rapists and undetected repeat rapists committed on average of 5.8 rapes each)); *id.* at 30,546 (citing Valerie Wright, The Sentencing Project, *Deterrence in Criminal Justice* (2010) https://tinyurl.com/yadasudo ("offenders are more likely to be deterred from, and thus likely to engage in undesirable behaviors when there is reasonable certainty of some kind of accountability")). But the Department refuses to acknowledge this reality. *See* 85 Fed. Reg. at 30,545, 30,568 (it is "not apparent that a recipient's response to sexual harassment and assault under these final regulations would be likely to exacerbate the negative effects highlighted by commenters"). The inclusion of such downstream economic and social costs is routine practice in the development of RIAs, yet the Department arbitrarily and capriciously disregarded them here. Madowitz ¶ 29.

### 2. The final Rule is not a logical outgrowth of the proposed rule.

The Department's final Rule also contains new regulatory provisions that are not a logical outgrowth of the proposed rule, in violation of the APA. 5 U.S.C. §§ 706(2)(D) & 553(b); *see Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012); *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274-1275 (D.C. Cir. 1994). These provisions are

"surprisingly distant from the proposed rule," *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584

F.3d 1076, 1081 (D.C. Cir. 2009), (internal quotation marks omitted), because they contradict the

Department's explicit statements in the proposed rule, are not logically predicted by issues

presented in the proposed rule.

First, the final Rule preempts any "State or local law" that conflicts with "title IX as

implemented by §§ 106.30, 106.44, and 106.45." Rule § 106.6(h). But in the proposed rule, the

Department stated "nothing in the proposed regulations would prevent a recipient from initiating

a student conduct proceeding" when the alleged harassment does not fall within the Rule's new

definitional, locational, or geographic requirements. 83 Fed. Reg. at 61,468; *see also id.* at

61,475. As sovereigns, States have a unique interest in enforcing state laws, and could not have

predicted that the final Rule would purport to preempt conflicting state laws, including State

school and employee discipline and grievance procedures, and negotiated collective bargaining

agreements that contain different but constitutionally adequate protections. *See, e.g.*, 85 Fed.

Reg. at 30,456 (final regulation has preemptive effect over union contract or practice); 30,444

(recipients may wish to forego receiving Federal financial assistance if they do not wish to

renegotiate a collective bargaining agreement or are concerned about complying with state laws).

Second, Rule prohibits a school from investigating Title IX misconduct if the student is

not "participating in or attempting to participate in the education program or activity." Rule

§§ 106.30(a) (*formal complaint*), 106.6(h). The proposed rule contained no such limitation. In

the proposed rule's preamble, the Department suggested that any such limitation would apply

only if the complainant had *never* attempted to participate in the educational programs of the

school, and nothing would prohibit a school from addressing such a complaint under its own

student conduct code process. 83 Fed. Reg. at 61,468. The proposed rule did not provide notice

that the Department would prohibit schools from investigating and resolving Title IX complaints

brought by formerly enrolled sexual assault survivors who waited to file a complaint until after

they had safely transferred to another school. Nor did the proposed rule provide notice that

schools would be unable to sanction serious sexual misconduct committed by a student or employee against individuals not "participating or attempting to participate."

Third, the Rule creates seven new "severability" provisions permitting application of provisions if any other provision or subpart is held invalid. Rule §§ 106.9, 106.18, 106.24, 106.46, 106.62, 106.72, 106.82. If given an opportunity to comment on them, States would have explained how severability clauses are illogical for schools, given the regulations' interdependent provisions. Fourth, the Rule permits the consolidation of formal complaints against one or more respondents where the allegations of sexual harassment arise out of the same facts or circumstances. Rule § 106.45(b)(4). States would have cautioned that any consolidation must account for student privacy, given the amount of student information shared during the grievance process. *Compare* 20 U.S.C. § 1232g(a)(1)(A) (limiting student's right to review other student's education records), *with* Rule § 106.45(b)(5)(vi) (allowing all parties and advisors to review all evidence obtained as part of the investigation). Fifth, the Rule contains a new provision that only requires schools, not the parties, to keep information confidential during the investigation. Rule § 106.71(a). States would have pointed out that the new provision directly contradicts the existing confidentiality provision incorporated by reference through Title VI, Rule § 106.81 (incorporating by reference 34 C.F.R. § 100.7(e)), which applies to all parties, not just recipients.

Finally, the Department sets forth new mandates in the final Rule's preamble that are either inconsistent with the Rule itself or make it more difficult for schools to limit harm to parties. *Compare* Rule §.106.45(b) (allowing schools to adopt "provisions, rules, or practices other than those required by" Rule § 106.45 as long as they "apply equally to both parties"), *with* 85 Fed. Reg. at 30,336–37 (forbidding schools from adopting additional rules of evidence to ensure an equitable hearing). *See Kennecott Utah Copper Corp.*, 88 F.3d at 1220.

### III. The Rule will cause irreparable harm

The Rule threatens imminent and irreparable harm to the States' schools and students. Schools must reallocate limited time and money to implement the Rule. Once implemented, the Rule's narrowed protections and unnecessary procedural requirements will prevent schools from

properly addressing and remedying harassment. The Rule will also create confusion and chill reporting, frustrating the interest of schools to prevent harassment and provide a safe and equal educational opportunity to every student. Ultimately, the Rule will undermine Title IX's promise that no student "on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program." 20 U.S.C. § 1681(a).

### A. Implementing the Rule will place oppressive burdens on schools and students.

States and their schools must spend substantial time and money to implement the Rule, inflicting irreparable harm because Defendants' immunity from money damages makes these costs unrecoverable. *See Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008).

First, schools must revise all relevant policies, codes of conduct, handbooks, and grievance procedures for "Title IX sexual harassment."[19] To do so, they must identify any conflicting state or local laws, which the Rule preempts.[20] Postsecondary schools will further have to determine which faculty and staff members must, may, or must only with a complainant's consent, report sexual harassment. *E.g.*, Taylor ¶ 25; Ryan ¶ 54; Gardner ¶ 42. Where faculty or staff are unionized, schools will have to renegotiate bargaining agreements and

---

[19] *E.g.*, Hoos ¶ 49; Taylor ¶ 31; Thurmond ¶¶ 9-10; Weddle ¶ 25; Williams ¶¶ 60-61; Sanchez ¶¶ 18-21; Stritikus ¶¶ 17-19, 21, 23-24; J. Garcia ¶¶ 10, 16; Bakey ¶¶18, 25, 27-29; Allen ¶¶ 26-27, 29. Russell ¶¶ 19-20; Jackson ¶¶ 17-20, 24; Peoples ¶¶ 23-24, 30-31, 35; Wilson ¶ 20; Ball ¶ 22; Gomez ¶¶ 9, 17-18; Mabry ¶ 15; Leone ¶¶ 21-22, 26; Collins ¶ 16; Pickett ¶¶ 18-21; Catena ¶ 43; Fleischer ¶¶11, 29, 35; Hildebrandt ¶¶ 12, 15-16, 20-21; Rohner ¶ 30; Roland-Schwartz ¶¶ 17-19; Heroy ¶ 20; Kirkland ¶ 20; Pope ¶¶ 30, 33; Sokol ¶¶ 20-21; Nastase ¶¶ 7, 10, 13; Ashkannejhad ¶¶ 21, 23-25; Gardner ¶¶ 30, 32, 34; Harebo ¶¶ 16-17 19-20; Kammerud ¶¶ 31-34, 38-39; Doan ¶¶ 13, 16, 23-24; V. Garcia ¶¶ 25-26; Hayes ¶¶ 34-35, 44, 47, 50; de Veyga ¶¶ 40-41, 55; Hasan ¶¶ 26-28; Gonzalez ¶¶ 21, 24; Ryan ¶¶ 51-52, 75, 82; Infante-Green ¶¶ 24, 26; Coltrane ¶ 11; Lynch ¶ 30.

[20] *E.g.*, Felix-Campos ¶ 19; Hall-Panameño ¶¶ 69, 75; Nazario ¶ 36; Williams ¶¶ 34, 37; Jackson ¶ 14; Albertson ¶ 51; Gardner ¶ 24.

revise procedures for employees.[21] Schools also must revise all training materials and

recordkeeping procedures, and post those materials on their websites without violating

intellectual property laws.[22] These steps will take significant amounts of already-limited time and

money.[23]

Second, schools must clearly instruct the entire school community about the new Title IX

policies and procedures, and in many cases must hire new staff, or purchase new equipment, to

meet the Rule's novel requirements.[24] For primary and secondary schools, all employees must be

trained on how to report conduct falling within the Rule's narrower definition of sexual

---

[21] *E.g.*, Hoos ¶ 11; Peoples ¶¶ 20-22; Mabry ¶¶ 15-16; Pickett ¶¶ 13, 18, 20; Fleischer ¶ 11; Pope ¶ 33; Ashkannejhad ¶ 25; Grice ¶ 14; Taylor ¶ 40; Gardner ¶¶ 11, 26-28, 40; Pedone ¶¶ 18, 24; Leone ¶ 20; Nazario ¶ 33; Doan ¶ 16; Hayes ¶¶ 45, 51; de Veyga ¶¶ 53-54.

[22] *E.g.*, Grice ¶ 15; Jackson ¶¶ 16, 21; Peoples ¶ 34; Leone ¶ 26; Williams ¶ 64; Sanchez ¶ 25; J. Garcia ¶¶ 16, 18; Catena ¶¶ 47-48; Fleischer ¶ 34; Heroy ¶ 21; Bakey ¶¶ 18, 25-30; Allen ¶ 24; Pickett ¶ 22; Kirkland ¶ 22; Pope ¶ 50; Ashkannejhad ¶ 39; Gardner ¶ 39; Richardson ¶ 45, 48; Kammerud ¶ 41; Ball ¶¶ 27, 29; Wilson ¶¶ 25-26; Doan ¶¶ 24, 28; Hayes ¶¶ 39-40; de Veyga ¶¶ 44-45; Hasan ¶¶ 29, 31; Ryan ¶¶ 53-55, 57-58; Coltrane ¶ 11.

[23] *E.g.*, Alvarado ¶¶ 15, 30, 32; Cooper ¶ 15; Grice ¶ 18; Hoos ¶¶ 39, 49, 55-56; Jarrett ¶¶ 41, 46; Nazario ¶¶ 35, 67; Madowitz ¶¶ 45-46; Thurmond ¶¶ 9-10, 19; Williams ¶¶ 60-61; Sanchez ¶¶ 17, 19, 22-23, 29-30, 32-33, 42; Stritikus ¶¶ 18-25, 28, 32, 34-35, 38-39; Bakey ¶¶ 24, 27; Allen ¶ 24; Wilson ¶¶ 20, 25, 28; Leone ¶¶ 10, 17, 26; Pickett ¶¶ 23-24, 28, 30; Hayes ¶ 23; Ryan ¶¶ 55, 57, 70-72; V. Garcia ¶ 25; Catena ¶ 48; Fleischer ¶¶ 30-31, 33; Schwartz ¶¶ 14-15; Baker ¶ 9; O'Shaughnessy ¶¶ 16-17; Albertson ¶ 58; Ashkannejhad ¶¶ 13, 19; Gardner ¶¶ 11, 28-29, 32, 36-37, 39, 41-42; Heroy ¶ 12; Pope ¶¶ 51-52; Richardson ¶¶ 45, 47-48; Kammerud ¶¶ 33-34, 38.

[24] *E.g.*, Grice ¶¶ 14, 15, 18; Hall-Panameño ¶¶ 64, 70-71; Hoos ¶¶ 11, 45, 50, 54; Jarrett ¶ 45; Williams ¶¶ 53, 64; Sanchez ¶¶ 17, 23-25; Stritikus ¶¶ 13, 25; J. Garcia ¶ 18; Bakey ¶¶ 24, 26-29; Russell ¶ 22-23; Jackson ¶¶ 21, 25; Peoples ¶ 34-35; Ball ¶¶ 26-31, 37; Wilson ¶¶ 24-26; Gomez ¶¶ 19-20; Mabry ¶¶ 18-19; Leone ¶¶ 22, 26; Pedone ¶ 21; Pickett ¶24; V. Garcia ¶ 25; Catena ¶¶ 16, 45; Fleischer ¶¶ 30-31, 34, 44; Rohner ¶¶ 9, 23; Schwartz ¶¶ 14-16; Addington ¶ 12; Heroy ¶ 19, 21; Pope ¶¶ 25-26, 51, 60, 82-84; Nastase ¶¶ 8, 17-19; Albertson ¶ 44, 58; Ashkannejhad ¶¶ 27-28; Gardner ¶¶ 39-42; Richardson ¶¶ 45, 47-48; Harebo ¶ 21; Kammerud ¶ 40; Doan ¶¶ 25-28, 32; Hayes ¶¶ 37, 40, 42-43; de Veyga ¶¶ 44-45, 50-51; Hasan ¶¶ 29-30; Ryan ¶¶ 53-55, 57, 67.

harassment.[25] Schools that did not previously employ separate investigators, decisions-makers, or appeal reviewers must hire for these new positions.[26] Postsecondary schools that did not previously provide for live hearings must hire investigators, a pool of advisors, decision-makers, and then train them on the grievance procedures, how to conduct cross-examinations, and how to make evidentiary decisions.[27] They must further develop rules of decorum to attempt to maintain control of hearings and purchase equipment to conduct live hearings virtually or in separate rooms. *E.g.*, Hoos ¶ 24; Jarrett ¶¶ 41-42; Stritikus ¶ 39; Sanchez ¶¶ 32-33; Mabry ¶ 21; Pope ¶¶ 66, 68; Kirkland ¶¶ 22, 26; Alvarado ¶ 15; Gardner ¶¶ 37, 46; Rohner ¶ 13.

    Third, schools must determine how to address "non-Title IX harassment," which they must dismiss but can (and in some cases, must) address separately under codes of conduct.[28]

---

[25] *E.g.*, Albertson ¶¶ 34, 54-55; Jackson ¶¶ 14, 21; Taylor ¶¶ 37-40; Allen ¶ 24; Williams ¶¶ 53, 64; Hildebrandt ¶¶ 18, 21; O'Shaughnessy ¶ 19-20; Kammerud ¶ 45; Felix-Campos ¶ 11; Hasan ¶ 31.

[26] *E.g.*, Heroy ¶ 19; Sokol ¶ 24; Kammerud ¶ 39; Hildebrandt ¶¶ 12, 14; Bakey ¶¶ 24, 27, 29; Albertson ¶ 44; Ashkannejhad ¶ 27; Harebo ¶ 21; Jarrett ¶ 45; Taylor ¶¶ 32; Williams ¶¶ 50, 57-58, 69; Sanchez ¶¶ 19, 21-24, 29, 33; Stritikus ¶ 25; Russell ¶ 22; Peoples ¶ 32; Leone ¶¶ 18, 27; V. Garcia ¶ 28; Gomez ¶ 21; Pedone ¶¶ 19, 25; Kirkland ¶ 26; Pope ¶ 51; Mabry ¶ 16; Ball ¶¶ 28, 37; Wilson ¶ 26; Doan ¶¶ 25, 32; Hayes ¶ 37, 42; de Veyga ¶¶ 51-52; Hasan ¶ 30; Gonzalez ¶ 26; Ryan ¶ 70.

[27] *E.g.*, Jarrett ¶¶ 32-34, 41, 46; Stritikus ¶ 25, 34-35; Bakey ¶ 31; Leone ¶¶ 18-19, 22, 26-27; Sanchez ¶¶ 17, 19, 29-30 32-33; Gardner ¶¶ 41, 44; Mabry ¶ 17; Peoples ¶¶ 34, 39-40; Pedone ¶ 20; Fleischer ¶¶ 31-33; Kirkland ¶ 23; Pope ¶¶ 66, 70-73; Alvarado ¶ 15; Hoos ¶¶ 21, 50; J. Garcia ¶ 18; Pickett ¶¶ 24, 30; Richardson ¶ 47; Nazario ¶¶ 34-35; Rohner ¶ 23; Wright ¶ 9; Ashkannejhad ¶ 41; Catena ¶ 56; Taylor ¶ 32-34; Osran ¶ 10; Ball ¶¶ 30, 36-37, 39; Wilson ¶ 26; Doan ¶¶ 25, 27, 32; Hayes ¶¶ 37, 42; Gonzalez ¶ 26; Ryan ¶¶ 67-68.

[28] *E.g.*, Grice ¶¶ 12-14, 16-17; Hall-Panameño ¶¶ 31, 37; Hoos ¶¶ 38, 41-42; Jarrett ¶ 28; Mixson ¶ 14; Nazario ¶ 37; Osran ¶ 15; Taylor ¶ 20; Williams ¶¶ 16, 29, 41; Sanchez ¶ 22; Stritikus ¶ 16; Bakey ¶¶ 18, 23; Allen ¶¶ 18, 22; Jackson ¶¶ 15-16, 22, 26; Peoples ¶ 18; Ball ¶¶ 20, 26, 40; Mabry ¶¶ 16, 19; Leone ¶ 23; Pedone ¶ 19; Collins ¶ 22; Pickett ¶ 21, 33; Catena ¶ 17; Hildebrandt ¶¶ 24-25; Heroy ¶ 22; Kirkland ¶ 29; Pope ¶¶ 35, 63-65; O'Shaughnessy ¶ 19-20; Sokol ¶ 23; Albertson ¶¶ 34, 38, 41, 43-44, 54-55; Ashkannejhad ¶¶ 31-33; Gardner ¶ 38; Richardson ¶¶ 49, 55-56; Wilson ¶ 14; Doan ¶¶ 23-24; Hayes ¶¶ 33-34; de Veyga ¶¶ 46-48; Hasan ¶¶ 26-27, 3; Ryan ¶¶ 59-61; Lynch ¶ 25.

Schools will also have to train faculty, students, and staff on their rights and obligations under each policy and explain why some sexual misconduct is treated differently than other sexual misconduct.[29] Having dual policies will generate confusion and mistrust about the school's commitment to taking harassment seriously and providing every person with a fair process.[30]

### B. Once implemented, the Rule will irreparably harm students by making it harder for schools to prevent, address, and remedy sexual harassment.

States and their schools have a strong interest in providing every student a safe and equal education free of sexual harassment. Compl. ¶¶ 218-21. The Rule's narrow protections and unnecessary grievance process will make it harder for schools to promptly remedy sexual harassment. The Rule will also discourage students from reporting harassment, *see* Mixson ¶¶ 12-13; Pickett ¶ 35; Pope ¶¶ 88-89; Jarrett, ¶ 27; Chang, ¶¶ 10-11; Hoos, ¶¶ 12, 14-15, 29-31, 35, 47, 54; Taylor, ¶ 14; Weddle, ¶¶ 18-20, 24, 26, 28; Catena, ¶¶ 62-65; Ashkannejhad, ¶ 32; Leone ¶ 31; Hayes ¶ 59; de Veyga ¶ 58; Sokol ¶ 28; Wright ¶ 11; Kammerud, ¶ 45; Herman ¶¶ 21-22; Osran ¶¶ 7, 11, 17; Sanchez ¶ 35; Bakey ¶ 36; Wilson ¶ 11; Ball ¶ 41, which will further undermine the ability of schools to eliminate discriminatory and unsafe conduct. The adverse consequences of sexual harassment on students are profound and long-lasting. And ultimately, the States will be harmed by those adverse consequences through costs spent supporting victims of sexual harassment.

First, the Rule nearly guarantees that a school cannot promptly respond to allegations of harassment. Schools that receive a notice of sexual harassment must first gather enough

---

[29] *E.g.*, Pope ¶¶ 82-84; Albertson ¶ 58; Grice ¶ 15; Hall-Panameño ¶ 26; Jackson ¶ 21; Leone ¶ 22; V. Garcia ¶ 25; Catena ¶¶ 16-17; Addington ¶ 12; Nastase ¶ 17-19; Alberston ¶ 44; Gardner ¶¶ 39-41; Ball ¶¶ 18-2026-31; Doan ¶¶ 23-24; Hayes ¶ 36, 39; Hasan ¶ 27; Hoos ¶ 38; Mabry ¶ 16; Pedone ¶ 19; Pickett ¶¶ 21, 24; Rohner ¶ 8; O'Shaughnessy ¶ 19.

[30] *E.g.*, Pickett ¶¶ 21, 33; Catena ¶ 61; Pope ¶¶ 35, 37, 62-65, 74, 82-84; Albertson ¶¶ 34, 38-39, 41, 43-44, 54-55; Felix-Campos ¶ 17; Hall-Panameño ¶¶ 37, 41; Jarrett ¶¶ 28, 30; Grice ¶¶ 16-17; Hoos ¶ 38, 40-42; Mixson ¶ 14; Osran ¶ 15; Jackson ¶¶ 22, 26; Leone ¶ 23; Collins ¶ 22; Hildebrandt ¶¶ 24-25; Heroy ¶ 22; Kirkland ¶ 29; O'Shaughnessy ¶ 19; Williams ¶¶ 16, 41; Sokol ¶¶ 18, 23; Taylor, ¶ 20; Stritikus, ¶ 41; Ashkannejhad ¶¶ 31, 33; Ball ¶¶ 40-41; Wilson ¶ 11; de Veyga ¶¶ 46-47; Hasan ¶ 33; Gonzalez ¶ 30; Ryan ¶ 61; Infante-Green ¶ 29; Peña ¶ 37; Lynch  ¶¶ 40-41.

information to determine which policy—for Title IX sexual harassment or not—to use so they can accurately advise the complainant of the applicable procedure. *See* Rule § 106.44(a). Sometimes the proper procedure will not be immediately clear. For example, whether conduct is "so severe, pervasive, and objectively offensive" to a reasonable person "that it effectively denies a person equal access" to education is not always obvious and may require additional review. Pope ¶¶ 61-63; *see also* Darling-Hammond ¶ 16. In the meantime, harassment may persist, Hall-Panameño ¶ 37, and/or survivors may suffer additional trauma, Jackson ¶ 26. Exposure to "more acute and prolonged harm may discourage victims from coming forward." Mixson ¶ 12; *see* Cooper ¶ 13; Herman ¶ 13. And when harassing conduct "is allowed to persist, it becomes more engrained in the school culture and makes sex-based discrimination overall harder to eliminate." Albertson ¶ 34; Herman ¶ 13.

Once an investigation begins, a school may uncover evidence indicating that harassment thought to fall within Title IX actually falls outside it (or vice versa). If that happens, the school must figure out how to "dismiss" the complaint while still transferring the investigation to its proper place. *E.g.*, Pope ¶ 62; Ryan ¶ 62. Then the school must clearly explain to both parties what changes because of the transfer. Either party may find the new procedures to be unfavorable and suddenly stop cooperating. *See, e.g.*, Pope ¶ 64. Of course, the dismissal or transfer is itself appealable, leading to the prospect of further delays. Rule § 106.45(b)(8)(i); *see, e.g.*, Jarrett ¶ 28; Taylor ¶ 20; Williams ¶ 29; Pope ¶ 65; Hoos ¶ 40;. This drawn-out process that will chill complainants' willingness to come forward.

Second, the Rule's one-size-fits-all grievance process will undermine safety in K-12 schools. The formality of a written complaint will "deter many from coming forward to report and seek support." Williams ¶ 17; *see also* Hall-Panameño ¶ 25. For students with disabilities, a written complaint may be an insurmountable obstacle. Williams ¶ 22; Darling-Hammond ¶ 32-33, 35; Lynch ¶ 20. Parents may also be unavailable to file on their child's behalf for a variety of reasons, such lack of financial resources for phones or faxes, abuse, interaction with the foster system, literacy, or disability. Hall-Panameño ¶ 25. Then, by imposing a more than 20-day lag

period between harassing conduct and "any" discipline, the Rule hinders K-12 educators' ability to educate their students on acceptable conduct and keep their students safe from harassment. *See, e.g.*, Hildebrandt ¶¶ 26-27; Kammerud ¶ 37; Williams ¶¶ 28, 30-31, 33, 41; Felix-Campos ¶ 19; Darling-Hammond ¶ 18; Hall-Panameño ¶¶ 37; Thurmond ¶ 10; Albertson ¶ 34. Significant staff resources will be needed to address the Rule's requirement for multiple employees at each site to address complaints. Williams ¶¶ 50, 53, 57; Hall-Panameño ¶¶ 57, 59. Moreover, because the Rule directs schools not to restrict parties from discussing allegations, schools must take on costs to mitigate the increased risk of retaliation and intimidation. Williams ¶¶ 46-47; Felix-Campos ¶ 22; Hall-Panameño ¶¶ 45-47, 48-49; Gomez ¶ 22; Hildebrandt ¶ 28; Lynch ¶ 28. Schools will be hard-pressed to develop a mechanism that both adheres to the Rule and protects complainants, respondents, and witnesses from the dissemination of sensitive information, but nevertheless will have to spend time and money trying to walk the line between violating the Rule and risking subjecting students to retaliation and intimidation. Hall-Panameño ¶ 44.

Third, the Rule will impose unique burdens on postsecondary schools. Imposing direct, oral cross-examination by advisors and "imposing procedures similar to a courtroom on educational institutions" will "deter reports and formal complaints of sexual assault and harassment."[31] Students and employees will "view the Rule's courtroom-like processes and narrower definitions of prohibited conduct as creating unnecessary and painful hurdles designed to discourage them from coming forward and getting help."[32] In addition, limiting Title IX to prohibit only conduct that takes place under the school's control will create mistrust. Where

---

[31] Hoos ¶ 29; *see also* Herman ¶¶ 21-22; Osran ¶ 11; Taylor ¶ 21; Sanchez ¶ 31; Stritikus ¶ 36; Bakey ¶¶ 31, 32; Mabry ¶ 23; Leone ¶ 30; Pickett ¶¶ 30-31; Rohner ¶ 13; Addington ¶ 9; Pope ¶ 88; Wright ¶¶ 9, 11; Richardson ¶ 58; Pedone ¶ 26; Ball ¶ 38; Hayes ¶ 59; de Veyga ¶ 58; Baker ¶ 11; Peña ¶ 43; Bakey ¶ 32.

[32] Hoos ¶ 15; *see also* Pedone ¶¶ 23, 26; Infante-Green ¶ 25; Gonzalez ¶ 32; de Veyga ¶ 59; Hayes ¶ 61; Wilson ¶ 11.

students often live off campus, "[s]tudents will lose faith that the school is creating an environment free from sex discrimination" and "there will be a chilling effect on students."[33]

If fewer victims are willing to report and/or move forward with complaints—because they do not wish to subject themselves to cross-examination or because they fear their experience will not qualify as sexual harassment under the Rule's restrictive definition—schools will be less able to address incidents of sexual harassment, as they "can only address the conduct of which [they] are aware."[34] Fewer reports will also make it more difficult for schools to ensure a safe campus free from discrimination more broadly, as "[c]hilled reporting of sexual misconduct means that [schools] will have fewer resources with which to uncover a pattern of behavior, a particular bad actor, or an unsafe area of campus."[35]

The upshot is that the Rule will make it harder for schools to prevent sexual harassment, end harassment when it does occur, prevent its recurrence, and remedy its effects. Students who do not receive appropriate support after trauma such as sexual harassment are less likely to complete their education, more likely to require social support, and experience a higher rate of homelessness. Rohner ¶¶ 18-19. Early intervention "is vital in alleviating the negative effects of toxic stress on mental and physical health outcomes." Burke Harris ¶ 10; see Cooper ¶ 13. Intense, severe, or prolonged stress in childhood causes long-lasting effects on health. Burke Harris ¶ 6; Williams ¶ 26; Cooper ¶ 11; Herman ¶¶ 9-12, 15. Such adverse childhood experiences increase the risk for 9 out of 10 of the leading causes of death in the United States. Burke Harris ¶ 6. The cost of trauma increases with both the severity of the trauma and length of

---

[33] Jarrett ¶ 27; see also Chang ¶ 12; Hoos ¶¶ 37, 47; Taylor ¶ 18; Weddle ¶¶ 18-20; Catena ¶¶ 62-65, 69; Ashkannejhad ¶ 32; Baker ¶ 11; de Veyga ¶¶ 57, 59; Ball ¶ 40.

[34] Bakey ¶ 36; see also Sanchez ¶ 36; Stritikus ¶ 42-43; Mabry ¶ 23; Leone ¶ 30; Pickett ¶ 34, 35; V. Garcia ¶ 30; Catena ¶ 69; Sokol ¶ 28; Gardner ¶ 52; Richardson ¶ 58; Kammerud ¶ 44; Mixson ¶ 13; Jackson ¶ 27; Gomez ¶ 25; Pedone ¶ 26; Ball ¶ 40-42; Doan ¶ 37; Hayes ¶ 58; de Veyga ¶ 59; Ryan ¶ 78; Baker ¶ 11.

[35] Pope ¶ 90; see also Gardner ¶ 52-53; Richardson ¶ 58; Kammerud ¶ 44; Herman ¶ 24; Sanchez ¶ 36; Stritikus ¶ 42; Gomez ¶ 25; Mabry ¶ 23; Leone ¶¶ 30-31; Catena ¶¶ 69-71; Pickett ¶ 35.

response time. Burke Harris ¶ 10; Cooper ¶ 13. "[E]ach student who drops out costs each state hundreds of thousands of dollars as a function of increased costs due to unemployment, crime, health care, and incarceration, and decreased income due to lower wages and capacity to pay taxes." Darling-Hammond ¶ 10. Additionally, the Rule will result in higher healthcare expenditures by the States to meet the needs of children subjected to longer periods of toxic stress before receiving assistance. Burke Harris ¶ 14.

## IV. The balance of the interests favor a stay or injunction.

When seeking a stay or injunction, plaintiffs must demonstrate that the balance of the equities and the public interest weigh in favor of preliminary relief. *See League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12-15 (D.C. Cir. 2016). "There is generally no public interest in the perpetuation of unlawful agency action." *Id.* at 12 (citations omitted). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (internal quotations omitted). Because Plaintiffs are likely to succeed on the merits, as discussed *supra*, the agency's only harm is that it will be required to keep in place the existing regulation pending judicial review. That "hardship pales in comparison" to the "massive costs associated with implementing a sea change" in all of American education. *See District of Columbia,* 2020 WL 1236657, at *31 (D.D.C. Mar. 13, 2020).

## CONCLUSION

Plaintiffs respectfully request that the Court postpone the effective date of the Rule or preliminary enjoin the Rule until judicial review of its validity has concluded.

Dated: June 23, 2020                          Respectfully submitted,

**GURBIR S. GREWAL**                          **JOSH SHAPIRO**
*Attorney General*                            *Attorney General*
*State of New Jersey*                          *Commonwealth of Pennsylvania*
MAYUR P. SAXENA                               MICHAEL J. FISCHER
Assistant Attorney General                    Chief Deputy Attorney General

*/s/ Marie Soueid*                             */s/ Aimee D. Thomson*
MARIE SOUEID                                  AIMEE D. THOMSON (D.C. Bar No.
ESTELLE BRONSTEIN                             1045758)
EMILY WANGER                                  RYAN B. SMITH
Deputy Attorneys General                      JACOB B. BOYER
New Jersey Attorney General's Office          Deputy Attorneys General
Richard J. Hughes Justice Complex             Office of Attorney General
25 Market Street                              1600 Arch Street
Trenton, NJ 08625                             Suite 300
(609) 376-2564                                Philadelphia, PA 19103
Marie.Soueid@law.njoag.gov                    (267) 374-2787
*Attorneys for Plaintiff State of New Jersey* athomson@attorneygeneral.gov
                                              *Attorneys for Plaintiff Commonwealth of*
                                              *Pennsylvania*


**XAVIER BECERRA**                            **PHILIP J. WEISER**
*Attorney General of California*              *Attorney General*
*State of California*                         *State of Colorado*
MICHAEL NEWMAN
Senior Assistant Attorney General             */s/ Eric R. Olson*
CHRISTINE CHUANG                              ERIC R. OLSON
Supervising Deputy Attorney General           Solicitor General
                                              MARTHA FULFORD (D.C. Bar No. 101194)
*/s/ Laura Faer*                              First Assistant Attorney General
LAURA FAER                                    1300 Broadway, 10th Floor
CHRISTINA RIEHL                               Denver, CO 80203
MARISOL LEÓN                                  (720) 508-6000
SHUBHRA SHIVPURI                              eric.olson@coag.gov
SRIVIDYA PANCHALAM                            martha.fulford@coag.gov
Deputy Attorneys General                      *Attorneys for Plaintiff State of Colorado*
California Attorney General's Office
1515 Clay Street, 20th Floor
Oakland, CA 94612-0552
(510) 879-3305
Laura.Faer@doj.ca.gov
Attorneys for Plaintiff State of California

**KATHLEEN JENNINGS**
*Attorney General*
*State of Delaware*

/s/ *Christian Douglas Wright*
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
christian.wright@delaware.gov
*Attorney for Plaintiff State of Delaware*

**KARL A. RACINE**
*Attorney General*
*District of Columbia*

/s/ *Kathleen Konopka*
KATHLEEN KONOPKA (D.C. Bar No. 495257)
Deputy Attorney General, Public Advocacy Division
MICHELLE THOMAS (D.C. Bar No. 993514)
Chief, Civil Rights Section, Public Interest Division
BRENDAN DOWNES (D.C. Bar No. 187888)
NICOLE HILL (D.C. Bar No. 888324938)
SAMANTHA HALL[*]
KATE VLACH (D.C. Bar No. 1671390)
Assistant Attorneys General
Office of the Attorney General for the District of Columbia
441 4th St., N.W.
Suite 630S
Washington, DC 20001
(202) 724-6610
Kathleen.Konopka@dc.gov
[*] *Practicing in the District of Columbia under the direct supervision of Michelle D. Thomas, a member of the D.C. Bar. See D.C. Court of Appeals Rule 49(c).*
*Attorneys for Plaintiff District of Columbia*

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

/s/ *Alison V. Hill*
ALISON V. HILL
LIZA ROBERSON-YOUNG
GRETCHEN HELFRICH
Assistant Attorneys General
Office of the Attorney General State of Illinois
100 W. Randolph St.
Chicago, IL, 60601
(312) 814-3954

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

/s/ *Angela R. Brooks*
ANGELA R. BROOKS
ABIGAIL B. TAYLOR
ABRISHAM ESHGHI
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2590
angela.brooks@mass.gov

ahill@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

**DANA NESSEL**
*Attorney General*
*State of Michigan*

/s/ *Fadwa A. Hammoud*

FADWA A. HAMMOUD
Solicitor General
TONI L. HARRIS
NEIL GIOVANATTI
Assistant Attorneys General
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
HammoudF1@michigan.gov
Harrist19@michigan.gov
GiovanattiN@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**HECTOR BALDERAS**
*Attorney General*
*State of New Mexico*

/s/ *Tania Maestas*

TANIA MAESTAS
Chief Deputy Attorney General
PO Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
tmaestas@nmag.gov
*Attorney for Plaintiff State of New Mexico*

**ELLEN F. ROSENBLUM**
*Attorney General*
*State of Oregon*

/s/ *Elleanor H. Chin*

ELLEANOR H. CHIN
BRIAN S. MARSHALL DC Bar No. 501670
Senior Assistant Attorney General

*Attorneys for Plaintiff Commonwealth of
Massachusetts*

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

/s/ *Kevin Finnerty*

KEVIN FINNERTY
KATHRYN WOODRUFF
Assistant Attorneys General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 757-1058 (Voice)
(651) 757-1361 (Voice)
kevin.finnerty@ag.state.mn.us
kathryn.woodruff@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

**JOSHUA H. STEIN**
*Attorney General*
*State of North Carolina*

/s/ Sripriya Narasimhan

SRIPRIYA NARASIMHAN (D.C. Bar No:
1029549)
Deputy General Counsel
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6400
SNarasimhan@ncdoj.gov
*Attorney for Plaintiff State of North Carolina*

**PETER F. NERONHA**
*Attorney General*
*State of Rhode Island*

/s/ *Shannon L. Haibon*

SHANNON L. HAIBON
Special Assistant Attorney General
150 South Main Street

Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700
elleanor.chin@doj.state.or.us
*Attorney for Plaintiff State of Oregon*

Providence, RI 02903
(401) 274-4400 Ext. 2018
shaibon@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*


**THOMAS J. DONOVAN, JR.**
*Attorney General*
*State of Vermont*
JOSHUA R. DIAMOND
Deputy Attorney General

/s/ Rachel E. Smith
RACHEL E. SMITH
JULIO A. THOMPSON
Assistant Attorneys General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
(802) 828-3171
rachel.e.smith@vermont.gov
julio.thompson@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

/s/ Jessica Merry Samuels
JESSICA MERRY SAMUELS (D.C. Bar No. 1552258)
Assistant Solicitor General
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219
(804) 786-6835
solicitorgeneral@oag.state.va.us
*Attorney for Plaintiff Commonwealth of Virginia*


**ROBERT W. FERGUSON**
*Attorney General*
*State of Washington*

/s/ Kristin Beneski
KRISTIN BENESKI
Assistant Attorney General
AILEEN HUANG
Deputy Attorney General
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
kristin.beneski@atg.wa.gov
aileen.huang@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

**JOSHUA L. KAUL**
*Attorney General*
*State of Wisconsin*

/s/ Jeffery A. Simcox
ANNE M. BENSKY
Assistant Attorney General
JEFFERY A. SIMCOX
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 264-9451 (Bensky)
(608) 266-3861 (Simcox)
benskyam@doj.state.wi.us
simcoxja@doj.state.wi.us
*Attorneys for Plaintiff State of Wisconsin*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion for a Preliminary

Injunction and/or 5 U.S.C. § 705 Stay Pending Judicial Review and the Memorandum and

Exhibits in support thereof were served by electronic mail, with consent of Counsel for the

Defendants, on June 22, 2020.

Elisabeth D. DeVos
*Secretary of the United States Department of Education*
400 Maryland Avenue, S.W.
Washington, D.C. 20202
Carlotta.Wells@usdoj.gov
Benjamin.Takemoto@usdoj.gov
Daniel.Reiss@usdoj.gov

United States Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202
Carlotta.Wells@usdoj.gov
Benjamin.Takemoto@usdoj.gov
Daniel.Reiss@usdoj.gov

U.S. Attorney for the District of Columbia
c/o Civil Process Clerk
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Carlotta.Wells@usdoj.gov
Benjamin.Takemoto@usdoj.gov
Daniel.Reiss@usdoj.gov

Attorney General of the United States
c/o Assistant Attorney General for Administration
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Carlotta.Wells@usdoj.gov
Benjamin.Takemoto@usdoj.gov
Daniel.Reiss@usdoj.gov

*/s/ Marie Soueid*