# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>       Plaintiffs,<br><br>    v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>       Defendants. | **Civil Action No. <u>20-cv-01468-CJN</u>** |

PLAINTIFFS' APPENDIX TO MEMORANDUM OF LAW
FOR PRELIMINARY INJUNCTION
OR 5 U.S.C. § 705 STAY PENDING JUDICIAL REVIEW

**APPENDIX – INDEX**

| Exhibit Number | Description |
|---|---|
| *U.S. Department of Education Policy Documents* | |
| Exhibit 1 | U.S. Dep't of Educ., *Sexual Harassment: It's Not Academic Pamphlet* (1988), https://files.eric.ed.gov/fulltext/ED330265.pdf |
| Exhibit 2 | *Racial Incidents and Harassment Against Students at Educational Institutions*, 59 Fed. Reg. 11,448 (Mar. 10, 1994) |
| Exhibit 3 | *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* , 62 Fed. Reg. 12,034 (Mar. 13, 1997) |
| Exhibit 4 | Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Aug. 31, 1998), https://www2.ed.gov/offices/OCR/archives/pdf/AppC.pdf. |
| Exhibit 5 | Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Jan. 28, 1999), https://www2.ed.gov/News/Letters/990128.html |
| Exhibit 6 | *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* , 66 Fed. Reg. 5512 (Jan. 19, 2001), |
| Exhibit 7 | Stephanie Monroe, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Jan. 25, 2006), https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html |
| Exhibit 8 | Russlyn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017), |
| Exhibit 9 | U.S. Dep't of Educ., *Questions and Answers on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf |
| Exhibit 10 | U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf |
| Exhibit 11 | U.S. Dep't of Educ., *Race and National Origin Discrimination* (Jan. 10, 2020), https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/race-origin.html |
| *Selected Comments* | |
| Exhibit 12 | Multistate Comment (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-18211 |
| Exhibit 13 | Washington State School Directors' Association Comment (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-30979 |
| Exhibit 14 | California Department of Education   (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-104672 |
| Exhibit 15 | Comment of Twenty-Four Private, Liberal Arts Colleges and Universities  (Jan. 30. 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-11959 |
| Exhibit 16 | California Community Colleges Comment  (posted Feb. 27, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-18418 |
| Exhibit 17 | Berkeley Unified School District Comment (Jan. 24, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-123981 |
| Exhibit 18 | San Francisco Unified School District Comment (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-104596 |
| Exhibit 19 | Los Angeles Unified School District Comment (Jan. 8, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-9010 |
| Exhibit 20 | Superintendent of Seattle Public Schools Comment (Jan. 28, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-10426 |
| Exhibit 21 | School Superintendents Association Comment (Jan. 22, 2018), https://www.regulations.gov/document?D=ED-2018-OCR-0064-7411 |

| Exhibit Number | | Description |
|---|---|---|
| Exhibit 22 | | National Education Association Comment (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-17760 |
| Exhibit 23 | | Center for American Progress Comment (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-31283 |
| Exhibit 24 | | Comment by Dr. Judith Herman on behalf of 902 Mental Health Professionals (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-104088 |
| Exhibit 25 | | American Psychological Association Comment (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-30626 |
| Exhibit 26 | | Student Advocates for Graduate Education Comment (posted Feb. 24, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-18002 |
| Exhibit 27 | | National Women's Law Center Comment (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-30297 |
| Exhibit 28 | | SurvJustice Comment (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-104615 |
| Exhibit 29 | | American Association of University Women of Hawaiʻi Comment (Jan. 27, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-11945 |
| *Declarations* | | |
| Exhibit 30 | Expert | Dr. Judith L. Herman, Professor of Psychiatry Part-Time, Harvard Medical School |
| Exhibit 31 | Expert | Michael Madowitz, Center for American Progress (CAP) |
| Exhibit 32 | OR | Aislinn Addington, Campus Advocate Coordinator, Oregon Sexual Assault Task Force |
| Exhibit 33 | WA | Sarah Albertson, Director and Managing Attorney, Equity and Civil Rights Office, Washington Office of Superintendent of Public Instruction |
| Exhibit 34 | DC | Anita Allen, Director, Comprehensive Alternative Resolution and Equity Team, District of Columbia Public Schools |
| Exhibit 35 | CA | Marty Alvarado, Vice Chancellor for Education Services and Support, California Community Colleges |
| Exhibit 36 | WA | Holly Ashkannejhad, Title IX Coordinator and Director, Office of Civil Rights Compliance and Investigation, Washington State University |
| Exhibit 37 | PA | Karen L, Baker, CEO, Pennsylvania Coalition Against Rape (PCAR) |
| Exhibit 38 | DE | Hannah Bakey, Title IX Coordinator, Goldey-Beacom College |
| Exhibit 39 | IL | Jamie C. Ball, Director, Equal Opportunity, Access & Title IX Coordination, Southern Illinois University Edwardsville |
| Exhibit 40 | CA | Nadine Burke-Harris, California Surgeon General |
| Exhibit 41 | NM | Angela Catena, Title IX Coordinator, University of New Mexico |
| Exhibit 42 | CA | Stephanie Chang, former Grievance Division Director, Student Advocate's Office, University of California Berkeley |
| Exhibit 43 | MI | Elizabeth Collins, Education Consultant, Civil Rights Compliance Coordinator, Methods of Administration, and Title IX Coordinator, MI Department of Education |

| Exhibit Number | | Description |
|---|---|---|
| Exhibit 44 | NC | Geoffrey Coltrane, Senior Education Advisor, Office of the Governor |
| Exhibit 45 | CA | Jacey Cooper, Chief Deputy Director for Health Care Programs and State Medicaid Director, California Department of Healthcare Services (DHCS) |
| Exhibit 46 | CA | Linda Darling-Hammond, President, California State Board of Education |
| Exhibit 47 | NJ | Guillermo de Veyga, Chief of Staff in the Office of the President, New Jersey City University |
| Exhibit 48 | IL | Kay Doan, Title IX Coordinator, Southern Illinois University Carbondale |
| Exhibit 49 | CA | Sharon Felix-Campos, Director, Office of Equal Opportunity, California Department of Education, Office of the State Superintendent |
| Exhibit 50 | OR | Angela S. Fleischer, Director of Equity Grievance and Title IX Coordinator, Southern Oregon University |
| Exhibit 51 | CO | Joseph A. Garcia, Chancellor, Colorado Community College System |
| Exhibit 52 | NM | Veronica C. Garcia, Superintendent, Santa Fe Public Schools |
| Exhibit 53 | WA | Connie Gardner, Title IX Coordinator, The Evergreen State College |
| Exhibit 54 | MA | Quinnelle Gomez, Director of Compliance and Title IX Coordinator, Boston Public Schools |
| Exhibit 55 | NJ | Diana Gonzalez, Deputy Secretary of Higher Education, New Jersey Office of the Secretary of Higher Education |
| Exhibit 56 | CA | Brittany Grice, Director, Office for Diversity, Equity and Inclusion and former Title IX Coordinator, Los Angeles County Community College |
| Exhibit 57 | CA | Julie Hall-Panameño, Director, Educational Equity Compliance Office and Title IX Coordinator, Los Angeles Unified School District |
| Exhibit 58 | WI | Sarah E. Harebo, Title IX and Clery Administrator, University of Wisconsin System |
| Exhibit 59 | NJ | AdulSaleem Hasan, Assistant Commissioner of Field Services, New Jersey Department of Education |
| Exhibit 60 | NJ | Valerie O. Hayes, Chief Officer for Institutional Diversity and Equity/Title IX Coordinator, Stockton University |
| Exhibit 61 | OR | Darci V. Heroy, Associate Vice President, Chief Civil Rights Officer, and Title IX Coordinator, University of Oregon |
| Exhibit 62 | OR | Katerine Hildebrandt, Civil Rights and Title IX Coordinator, Oregon Department of Education |
| Exhibit 63 | CA | Linda Hoos, Systemwide Title IX Compliance Officer, CSU System |
| Exhibit 64 | RI | Angélica Infante-Green, Commissioner, Rhode Island Department of Elementary and Secondary Education |
| Exhibit 65 | IL | Dr. Janiece Jackson, Superintendent, Lindop School District 92 |

| Exhibit Number | | Description |
|---|---|---|
| Exhibit 66 | CA | Stephanie Jarrett, Manager, Human Resources/Training and Compliance and Title IX Investigator, Sonoma County Junior College District |
| Exhibit 67 | WI | Jennifer Kammarud, Senior Policy Advisor, Wisconsin Department of Public Instruction |
| Exhibit 68 | VA | Shannon Kennedy, President, Rappahannock Community College |
| Exhibit 69 | OR | Kim D. Kirkland, Executive Director, Office of Equal Opportunity & Access and Title IX Coordinator, Oregon State University |
| Exhibit 70 | MA | Gerard T. Leone, Jr., General Counsel, University of Massachusetts |
| Exhibit 71 | PA | Karyn Lynch, Chief of Student Support Services and Title IX Co-Coordinator, School District of Philadelphia [still need final, signed 6.19.20] |
| Exhibit 72 | MA | Dr. James Mabry, President of Middlesex Community College, Chair, Massachusetts Association of Community Colleges |
| Exhibit 73 | CA | Stacy Alamo Mixson, Chief, Injury and Violence Prevention Branch, California Department of Public Health (CDPH) |
| Exhibit 74 | VA | Angela Nastase, Title IX Coordinator, George Mason University |
| Exhibit 75 | CA | Evelyn Nazario, Vice Chancellor for Human Resources, California State University System |
| Exhibit 76 | VT | Clare O'Shaughnessy, Title IX Coordinator and staff attorney, Vermont Agency of Education |
| Exhibit 77 | CA | Fannie Osran, former Conduct Division Director, Student Advocate's Office, University of California Berkeley |
| Exhibit 78 | CO | Angie Paccione, Executive Director, Colorado Department of Higher Education and Colorado Commission on Higher Education |
| Exhibit 79 | MA | Vincent A. Pedone, Executive Director of Council of Presidents, Massachusetts State University System |
| Exhibit 80 | PA | Jesus A. Peña, Esq., Vice President for Equity Compliance, liaison for Legal Affairs, Kutztown Univ., Interim Title IX Coordinator, Pennsylvania State System of Higher Ed. (PASSHE) [still need final, |
| Exhibit 81 | IL | Shawn Peoples, Title IX Coordinator, Eastern Illinois University |
| Exhibit 82 | MN | Clyde W. Pickett, Chief Diversity Officer, Minnesota State Colleges and Universities |
| Exhibit 83 | PA | Catherine Pope, Associate Vice Chancellor of Civil Rights and Title IX, University of Pittsburgh |
| Exhibit 84 | WA | Valery NL Richardson, Title IX Coordinator, University of Washingtong |
| Exhibit 85 | OR | Carli Rohner, Campus Coordinator, Oregon Sexual Assault Task Force |
| Exhibit 86 | DC | Avis Marie Russell, General Counsel, University of the District of Columbia |
| Exhibit 87 | NJ | Judith Ryan, Institutional Compliance Officer for Title IX, Rutgers University |

| Exhibit Number | | Description |
|---|---|---|
| Exhibit 88 | CO | Raúl M. Sánchez, Executive Director, Office of Equal Opportunity and Title IX Coordinator, Metropolitan State University Denver |
| Exhibit 89 | OR | Michele Roland Schwartz, Executive Director, Oregon Sexual Assault Task Force |
| Exhibit 90 | VA | Stacey Sokol, Title IX Coordinator, Richard Bland College |
| Exhibit 91 | CO | Tom Stritikus, President, Fort Lewis College |
| Exhibit 92 | CA | Suzanne Taylor, Systemwide Title IX Director, University of California System |
| Exhibit 93 | CA | Tony Thurmond, Superintendent of Public Instruction, State of California |
| Exhibit 94 | CA | Hayley Weddle, former member, Title IX Student Advisory Board, University of California System |
| Exhibit 95 | CA | Keasara Williams, Executive Director and Title IX Coordinator, Office of Equity, San Francisco Unifed School District |
| Exhibit 96 | IL | Barbara J. Wilson, Executive Vice President Academic Affairs, University of Illinois System |
| Exhibit 97 | VA | Ariana Wright, Director of Equity and Equal Opportunity/Affirmative Action, Office of Institutional Equity & Diversity, Old Dominion University |

# EXHIBIT 1

ED 330 265                                                      HE 024 352

| | |
|---|---|
| TITLE | Sexual Harassment: It's Not Academic. |
| INSTITUTION | Office for Civil Rights (ED), Washington, DC. |
| PUB DATE | Sep 88 |
| NOTE | 9p. |
| PUB TYPE | Guides - Non-Classroom Use (055) -- Reference Materials - General (130) |
| | |
| EDRS PRICE | MF01/PC01 Plus Postage. |
| DESCRIPTORS | *Civil Rights Legislation; College Students; Compliance (Legal); Federal Legislation; Higher Education; *Sexual Harassment; Social Behavior; Teacher Student Relationship |
| IDENTIFIERS | *Title IX Education Amendments 1972 |

ABSTRACT

This pamphlet addresses the issue of sexual harassment as it relates to students of postsecondary education institutions. It presents information concerning Title IX of the 1972 Education Amendments and provides answers to the following questions about sexual harassment: (1) What is an institution's legal responsibility to respond to allegations of sexual harassment? (2) What can a student who is confronted by sexual harassment do? (3) How does the grievance process work? (4) How does a student file an OCR (Office for Civil Rights) complaint? (5) Why should a student report a sexual harassment experience? and (6) What is the best way for an institution to deal with sexual harassment? Suggested considerations when developing an institution's sexual harassment grievance procedure are also provided. A list is provided of the U.S. Department of Education, Office for Civil Rights regional offices throughout the country. (GLR)

.

***********************************************************************
*     Reproductions supplied by EDRS are the best that can be made     *
*                   from the original document.                        *
***********************************************************************

ERIC     EXHIBIT 1

ED330265

HE 024 357



**SEXUAL HARASSMENT: IT'S NOT ACADEMIC**

U.S. Department of Education
Office for Civil Rights
Washington, D.C. 20202-1328

**U.S. DEPARTMENT OF EDUCATION**
Office of Educational Research and Improvement
EDUCATIONAL RESOURCES INFORMATION
CENTER (ERIC)

☐ This document has been reproduced as
received from the person or organization
originating it

☐ Minor changes have been made to improve
reproduction quality

● Points of view or opinions stated in this docu
ment do not necessarily represent official
OERI position or policy

ERIC

EXHIBIT 1

BEST COPY AVAILABLE

*H.*

> I was discussing my work in a public setting when a professor cut me off and asked if I had freckles all over my body.

## SEXUAL HARASSMENT:
## IT'S NOT ACADEMIC

Sexual harassment of students is a *real* and increasingly visible problem of serious consequence in higher education. A sexual harassment experience can affect all aspects of a student's life: it can threaten a student's emotional well-being, impair academic progress and even inhibit the attainment of career goals.

Most sexual harassment incidents involve a male harasser and a female victim, although there have been several reported cases involving female harassers and male victims as well as same-sex harassment. Other forms of discrimination, such as that based on race, may be combined with an incident of sexual harassment and further compound the severity of its effect and the difficulty of its resolution. Whatever the circumstances, academic institutions must address the problem in order to ensure all students a just and equal learning opportunity.

## TITLE IX AND SEXUAL
## HARASSMENT

Sexual harassment in educational institutions is not simply inappropriate behavior; it is against the law. Sexual harassment of students is a violation of Title IX of the 1972 Education Amendments in that it constitutes differential treatment on the basis of sex. Title IX applies to any educational program or activity which receives Federal funds and protects both employees and students.[*]

U.S. Department of Education
Office for Civil Rights
Washington, DC 20202–1328

September 1988

---

[*]Although sexual harassment against employees is contrary to Title IX, this pamphlet addresses only the issue of sexual harassment as it relates to students.

1


EXHIBIT 1

3

The law states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . .

In an August 1981 policy memorandum, the Office for Civil Rights (OCR) of the U.S. Department of Education reaffirmed its jurisdiction over sexual harassment complaints under Title IX and adopted the following working definition:

> Sexual harassment consists of verbal or physical conduct of a sexual nature, imposed on the basis of sex, by an employee or agent of a recipient that denies, limits, provides different, or conditions the provision of aid, benefits, services or treatment protected under Title IX.[2]



2

## QUESTIONS AND ANSWERS ABOUT SEXUAL HARASSMENT OF STUDENTS

**Question:** What is an institution's legal responsibility to respond to allegations of sexual harassment?

**Answer:** The responsibility is the same as it would be for any other sex discrimination complaint filed under Title IX. An institution can either utilize its general grievance procedure, required by Section 106.8 of the Title IX regulation, or develop and implement special procedures for handling sexual harassment allegations. Given the especially sensitive nature of this form of sex discrimination, some institutions have opted for the latter course of action and/or have instituted specific training in handling these cases. Title IX requires that grievance procedures be prompt and equitable.



**Question:** What can a student who is confronted by sexual harassment do?

**Answer:** There are many courses of action that a student can take in response to a sexual harassment experience. They include seeking advice informally, requesting third-party intervention, filing a formal complaint. For example, a student can do one or more of the following:

• Tell the harasser (in person or by letter *and* when it is reasonably certain that such action will not jeopardize the student's personal safety, academic status or professional future) that the behavior is neither humorous nor welcome and should cease immediately.

3


EXHIBIT 1

4

• Seek support from a friend, colleague or counselor.
• Keep a written record, documenting, as precisely as possible, what happened, when it took place, the names of witnesses, if any, the student's response, and any other information that may be helpful later.[5]
• Find out whether other students and/or employees have also been harassed and whether they could offer corroborating testimony.
• Seek advice on how to deal with the situation from a supportive and knowledgeable person.
• Find out what the campus grievance process is and discuss the options with an advisor and/or friend.
• File a complaint with the institution and/or with the Office for Civil Rights.



**Question:**  How does the grievance process work?

**Answer:**  There are many types of grievance procedures. Thus, it is difficult to describe the specific steps that would occur if a student decided to take action following a sexual harassment experience.

An exemplary procedure would provide the student with a variety of sources of initial, confidential and informal consultation concerning the incident(s), without committing the individual to the formal act of filing a complaint with its required subsequent investigation and resolution. Following informal consultation, a student could then decide whether to:

   • do nothing (rarely recommended);
   • take personal action (such as a letter to the harasser);

4

• request informal third-party mediation; or
• file a grievance which initiates formal investigation and resolution of a complaint.

Title IX mandates that all such complaints be investigated and resolved in a "prompt and equitable" manner. In some procedures, a single individual conducts the investigation; in others, it is accomplished by committee.

Investigating sexual harassment complaints often requires inquiries into interpersonal relations and may also involve professional ethics, behavior and judgment. Awareness of and sensitivity to the potentially negative effect on the lives and careers of both parties involved is of great importance in handling an investigation. Where there is evidence to substantiate a charge of sexual harassment, the institution must take immediate action to stop and prevent further harassment, as well as initiate appropriate remedial measures.

> They (the professors) should realize that they have a position of authority over you, and that's going to influence the way you think about them.

**Question:**  How does a student file an OCR complaint?

**Answer:**  The OCR complaint procedure is initiated by a letter to the OCR regional office serving the Department of Education administrative region where the college or university is located. (Regional OCR addresses begin on page 11.) The letter should include the name, address and daytime telephone number of the student, and provide the date(s) of, and sufficient information about, the alleged incident(s) so that OCR can understand the nature of the complaint.

5

 EXHIBIT 1

5

The complaint should be filed within 180 days from the last date of the alleged discrimination, unless the time for filing is extended by the responsible Department official or his designee.

One reason for extending the time for filing is if a student uses a postsecondary educational institution's internal grievance procedure, and then desires to file with OCR, such complaints must be filed within 60 days after the completion of an internal grievance procedure. Where OCR has jurisdiction, its investigation is limited to those allegations in the internal grievance procedure.

As a policy, OCR does not reveal the names or other identifying information about an individual unless it is necessary for the completion of an investigation or for enforcement activities against an institution that violates the law. OCR never reveals to an institution under investigation the identity of the person who filed the complaint, unless the person first gives OCR written consent to do so.

A student is not required by law to utilize the institutional grievance procedure before filing a complaint with OCR. However, in some institutions, filing a complaint with OCR precludes any further use of the institutional grievance procedures. Thus, a student does need to know what, if any, impact this action will have on utilizing or continuing the institutional grievance process.

**Question:**   Why should a student report a sexual harassment experience?

**Answer:**   The impact of sexual harassment on a student's educational progress and/or attainment of future goals can be significant and should not be underestimated. As a result of a sexual harassment experience, a student may, for example:

- receive an undeserved grade in a critical course;
- have to seek a new academic advisor;
- find it necessary to choose a new thesis topic;
- drop out of a chosen field of study;

6

- transfer to another college or university;
- be unable to obtain customary job referrals and references; and
- experience adverse emotional effects.

Harassing behavior, if ignored or not reported, is likely to continue and become worse rather than "go away." In addition, unless a sexual harassment experience is reported, the institution cannot take remedial action.

> Playboy centerfolds were used as Anatomy teaching slides. . . . In slides, lectures, teaching aids and even our own student note service, we found that nurses were presented as sexy, bitchy or bossy but never as professional health care workers.[8]

**Question:**   What is the best way for an institution to deal with sexual harassment?

**Answer:**   The Title IX regulation requires institutions to adopt and publish grievance procedures that provide for the prompt and equitable resolution of sex discrimination complaints. To comply with the requirement, an institution must:

- ensure that its Title IX grievance procedure is suitable and adequate for dealing with sexual harassment complaints; and
- ensure that the grievance procedure is publicized and accessible to the entire academic community.

In addition to responding to incidents that have already occurred, steps could be taken to prevent sexual harassment. To help prevent sexual harassment, an institution could:

- issue and disseminate an explicit statement which affirms its position that sexual harassment is a violation of institutional policy and will not be tolerated;

7



EXHIBIT 1

6

• develop and adopt a working definition that identifies conduct that would be considered harassment; and

• develop methods to inform new administrators, faculty and students of the institution's sexual harassment policy and grievance procedures.

In the final analysis, adoption of strong preventive measures is the best way to confront sexual harassment. Additionally, the Supreme Court has affirmed the right of an individual to pursue private legal action under Title IX. In the event of a lawsuit, previously instituted preventive measures may also serve to reduce institutional liability resulting from acts of sexual harassment.

> The students have to know that if they decide to take some course of action, it's not going to be wasted time. . . . If you take the risk to make a complaint, it's going to be listened to . . . taken seriously and we (the institution) are going to follow through on it . . . and be very serious about it.[9]

## SUGGESTED CONSIDERATIONS WHEN DEVELOPING AN INSTITUTION'S SEXUAL HARASSMENT GRIEVANCE PROCEDURE

The Title IX regulation requires institutions to adopt and publish grievance procedures providing for prompt and equitable resolution of complaints. With the exception of the prompt and equitable requirements, the following questions represent only suggestions which an institution may find helpful to consider when developing a sexual harassment grievance procedure.

• Is the grievance procedure flexible enough to accommodate the wide range of incidents of sexual harassment?

• Is the grievance procedure coordinated with other institutional grievance procedure systems?

• Can a student be accompanied by a friend or advisor throughout the complaint process?

• Does the grievance procedure provide an opportunity for informal consultation and, where appropriate, informal resolution before moving into formal procedures?

• After initial contact in the grievance procedure, does the complainant have:
  - control over whether or not further institutional action will be taken; and
  - an opportunity to participate in decision-making regarding the method for resolving the matter?

• Is the grievance procedure process credible to the constituency it is designed to serve?

• Are persons of authority, credibility and sensitivity involved in the grievance procedure process?

• Does the grievance procedure adhere to the Title IX regulations?

• Does the grievance procedure provide for independent and impartial investigation which produces persuasive findings based on:
  - thorough fact finding;
  - careful review; and
  - opportunity for appeal?

• Is every effort made to protect the confidentiality of the parties?

• Is the opportunity for reprisal and retaliation minimized?

• Does the grievance procedure provide prompt and equitable resolution of the complaint?

• Are there time frames in the grievance procedure by which a complaint should be investigated and resolved?

• Is a thorough yet timely remedy possible within the established timetable?

• Does the grievance procedure include appropriate remedy for the complainant and institutional corrective action where there is a finding of sexual harassment?

8

9



ERIC

EXHIBIT 1

7

- Does the grievance procedure include provisions for quality control, tracking, record keeping and data retrieval?

> I think we need to get away from the issue of getting caught. We need to get to the issue of how to stop (sexual harassment) from happening.[10]

**Footnotes**

1. Cited in Women Student's Coalition (WSC), *The Quality of Women's Education at Harvard University: A Survey of Sex Discrimination in the Graduate and Professional Schools Report, Harvard Univ.*, June 1980, p. 10.
2. OCR Policy Memorandum, August 31, 1981, from Antonio J. Califa, Director for Litigation, Enforcement and Policy Service, OCR to Regional Civil Rights Directors.
3. Frank J. Till, *Sexual Harassment: A Report on the Sexual Harassment of Students*, National Advisory Council on Women's Educational Programs, 1980, p. 18.
4. L. Miranda & Associates, Inc. (LM&A), personal interview with female undergraduate student, 1981.
5. Adapted from "Policy Statement on Sexual Harassment," Northeastern Illinois University, 1981, p. 3.
6. LM&A, op. cit., female undergraduate student, 1981.
7. Ibid, male undergraduate student, 1981.
8. P. Franklin, H. Mogling, P. Zatlin-Boring, R. Angress, "Sexual and General Harassment in the Academy: A Guide for Faculty, Students and Administrators", the Modern Language Association of America, 1981, p. 22.
9. LM&A, op. cit., male undergraduate student, 1981.
10. Ibid, professor of political science, 1981.

## FOR INFORMATION AND/OR MATERIALS ON SEXUAL HARASSMENT CONTACT:

### Region I

*Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont*

Regional Civil Rights Director
U.S. Department of Education
Office for Civil Rights, Region I
John W. McCormack POCH
Post Office Square, Rm. 222
Boston, Massachusetts 02109–4557
(617) 223–9662; TDD (617) 223–9695

### Region II

*New Jersey, New York, Puerto Rico, Virgin Islands*

Regional Civil Rights Director
U.S. Department of Education
Office for Civil Rights, Region II
26 Federal Plaza, 33rd Floor
New York, New York 10278–0082
(212) 264–4633; TDD (212) 264–9464

### Region III

*Delaware, District of Columbia, Maryland, Pennsylvania, Virginia, West Virginia*

Regional Civil Rights Director
U.S. Department of Education
Office for Civil Rights, Region III
3535 Market St.,
Room 6300
Philadelphia, Pennsylvania 19104–3326
(215) 596–6791; TDD (215) 596–6794

ERIC    EXHIBIT 1

8

### Region IV

*Alabama, Florida, Georgia, Kentucky,*
*Mississippi, North Carolina,*
*South Carolina, Tennessee*

Regional Civil Rights Director
U.S. Department of Education
Office for Civil Rights, Region IV
101 Marietta Tower – 27th Floor
Mail to: P.O. Box 1705
Atlanta, Georgia 30301–1705
(404) 331–2806; TDD (404) 331–7803

### Region V

*Illinois, Indiana, Minnesota,*
*Michigan, Ohio, Wisconsin*

Regional Civil Rights Director
U.S. Department of Education
Office for Civil Rights, Region V
401 South State Street – 7th Floor
Chicago, Illinois 60605–1202
(312) 353–2520; TDD (312) 353–2540

### Region Vi

*Arkansas, Louisiana, New Mexico,*
*Oklahoma, Texas*

Regional Civil Rights Director
U.S. Department of Education
Office for Civil Rights, Region VI
1200 Main Tower Bldg. – Suite 2260
Dallas, Texas 75202–9998
(214) 767–3936; TDD (214) 767–3315

### Region VII

*Iowa, Kansas, Missouri, Nebraska*

Regional Civil Rights Director
U.S. Department of Education
Office for Civil Rights, Region VII
P.O. Box 901381
10220 N. Executive Hills Blvd., 8th Fl.
Kansas City, Missouri 64190–1381
(816) 891–8026; TDD (816) 374–7607

### Region VIII

*Colorado, Montana, North Dakota,*
*South Dakota, Utah, Wyoming*

Regional Civil Rights Director
U.S. Department of Education
Office for Civil Rights, Region VIII
1961 Stout Street, Room 342
Denver, Colorado 80294–3608
(303) 844–5695; TDD (303) 844–3417

### Region IX

*Arizona, California, Hawaii, Nevada,*
*Guam, Trust Territory of the*
*Pacific Islands, American Samoa*

Regional Civil Rights Director
U.S. Department of Education
Office for Civil Rights, Region IX
221 Main Street, 10th Floor
San Francisco, California 94105–1925
(415) 227–8020; TDD (415) 227–8124

### Region X

*Alaska, Idaho, Oregon, Washington*

Regional Civil Rights Director
U.S. Department of Education
Office for Civil Rights, Region X
Mail Code 10–9010
915 Second Avenue
Seattle, Washington 98174–1099
(206) 442–1636; TDD (206) 442–4542

12

13


EXHIBIT 1

9

# EXHIBIT 2

# DEPARTMENT OF EDUCATION

## Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance

**ACTION:** Notice of investigative guidance.

**SUMMARY:** The Assistant Secretary for Civil Rights announces investigative guidance, under title VI of the Civil Rights Act of 1964, that has been provided to the Office for Civil Rights (OCR) Regional Directors on the procedures and analysis that OCR staff will follow when investigating issues of racial incidents and harassment against students at educational institutions. The investigative guidance incorporates and applies existing legal standards and clarifies OCR's investigative approach in cases involving racial incidents and harassment.

**EFFECTIVE DATE:** March 10, 1994.

**FOR FURTHER INFORMATION CONTACT:** Jeanette J. Lim, U.S. Department of Education, 400 Maryland Avenue, SW., room 5036 Switzer Building, Washington, DC 20202–1174. Telephone: (202) 205–8635. Individuals who use a telecommunications device for the deaf (TDD) may call the TDD number at (202) 205–9683 or 1–800–421–3481.

**SUPPLEMENTARY INFORMATION:** Title VI of the Civil Rights Act of 1964 (title VI), 42 U.S.C. 2000d *et seq.*, prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving Federal financial assistance. The Department of Education (Department) has promulgated regulations in 34 CFR part 100 to effectuate the provisions of title VI with regard to programs and activities receiving funding from the Department. The regulations in 34 CFR 100.7(c) provide that OCR will investigate whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with title VI and the Department's implementing regulations. The Department has interpreted title VI as prohibiting racial harassment.

The existence of racial incidents and harassment on the basis of race, color, or national origin against students is disturbing and of major concern to the Department. Racial harassment denies students the right to an education free of discrimination. To enable OCR to investigate those incidents more effectively and efficiently, a memorandum of investigative guidance has been distributed to OCR staff. The substance of this memorandum and the accompanying legal compendium are being published today with this notice

to apprise recipients and students of the legal standards, rights, and responsibilities under title VI with regard to this issue.

The guidance outlines the procedures and analysis that OCR will follow when investigating possible violations of title VI based upon racial incidents and harassment. The guidance relies upon current legal standards.

Dated: March 7, 1994.

**Norma V. Cantu,**
*Assistant Secretary for Civil Rights.*

## Investigative Guidance on Racial Incidents and Harassment Against Students

This notice discusses the investigative approach and analysis that the Office for Civil Rights (OCR) staff will follow when investigating issues of discrimination against students based on alleged racial incidents—including incidents involving allegations of harassment on the basis of race—that occur at educational institutions.[1] This guidance is supplemented by a corresponding compendium of legal resources for detailed legal citations and examples.

Under title VI of the Civil Rights Act of 1964 (title VI) and its implementing regulations, no individual may be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination on the ground of race, color or national origin under any program or activity that receives Federal funds. Racially based conduct that has such an effect and that consists of different treatment of students on the basis of race by recipients' agents or employees, acting within the scope of their official duties, violates title VI. In addition, the existence of a racially hostile environment that is created, encouraged, accepted, tolerated or left uncorrected by a recipient also constitutes different treatment on the basis of race in violation of title VI. These forms of race discrimination are discussed further below.[2]

---

[1] This investigative guidance is directed at conduct that constitutes race discrimination under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. (title VI), and its implementing regulations at 34 CFR Part 100, and not at the content of speech. In cases in which verbal statements or other forms of expression are involved, consideration will be given to any implications of the First Amendment to the United States Constitution. In such cases, regional staff will consult with headquarters.

[2] For the sake of simplicity and clarity, the term "race" shall be used throughout this guidance to refer to all forms of discrimination prohibited by title VI—i.e., race, color, and national origin.

### Jurisdiction

In all cases, OCR must first decide whether it has jurisdiction over claims involving racial incidents or harassment. Under the Civil Rights Restoration Act of 1987,[3] OCR generally has institution-wide jurisdiction over a recipient of Federal funds.

If an institution receives Federal funds, title VI requirements apply to all of the academic, athletic, and extracurricular programs of the institution, whether conducted in facilities of the recipient or elsewhere. Title VI covers all of the uses of property that the recipient owns and all of the activities that the recipient sponsors. Title VI covers all of these operations, whether the individuals involved in a given activity are students, faculty, employees, or other participants or outsiders.

### Standard Different Treatment by Agents or Employees

As with other types of discrimination claims, OCR will first apply a standard different treatment analysis to allegations involving racial incidents perpetrated by representatives of recipients. Under this analysis, a recipient violates title VI if one of its agents or employees, acting within the scope of his or her official duties, has treated a student differently on the basis of race, color, or national origin in the context of an educational program or activity without a legitimate, nondiscriminatory reason so as to interfere with or limit the ability of the student to participate in or benefit from the services, activities or privileges provided by the recipient.[4] In applying this standard different treatment analysis, OCR staff will address the following questions—

(1) Did an official or representative (agent or employee) of a recipient treat someone differently in a way that interfered with or limited the ability of a student to participate in or benefit from a program or activity of the recipient?

(2) Did the different treatment occur in the course of authorized or assigned duties or responsibilities of the agent or employee?[5]

---

[3] See 42 U.S.C. 2000d–4 (1988) (amending title VI).

[4] Note that such incidents can constitute violations of title VI even if they do not constitute "harassment," so long as they do constitute direct different treatment by agents or employees, as defined in this section, that interferes with or limits the ability of a student to participate in or benefit from the recipient's programs or activities.

[5] As used throughout this investigative guidance, the determination as to whether an agent or employee of a recipient is acting within the scope

EXHIBIT 2

(3) Was the different treatment based on race, color, or national origin?

(4) Did the context or circumstances of the incident provide a legitimate, nondiscriminatory, nonpretextual basis for the different treatment?

Where, based on the evidence obtained in the investigation, questions 1–3 are answered "yes" and question 4 is answered "no," OCR will conclude that there was discrimination in violation of title VI under this standard different treatment analysis. If questions 1, 2 or 3 are answered "no," or if questions 1 through 4 are answered "yes," OCR will find no violation under this theory. If warranted by the nature and scope of the allegations or evidence, OCR will proceed to determine whether the agent's or employee's actions established or contributed to a racially hostile environment as described below. OCR also will conduct a "hostile environment" analysis where actions by individuals other than agents or employees are involved.

*Hostile Environment Analysis*

A violation of title VI may also be found if a recipient has created or is responsible for a racially hostile environment—i.e., harassing conduct (e.g., physical, verbal, graphic, or written) that is sufficiently severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by a recipient. A recipient has subjected an individual to different treatment on the basis of race if it has effectively caused, encouraged, accepted, tolerated or failed to correct a racially hostile environment of which it has actual or constructive notice (as discussed below).

Under this analysis, an alleged harasser need not be an agent or employee of the recipient, because this theory of liability under title VI is premised on a recipient's general duty to provide a nondiscriminatory educational environment.

To establish a violation of title VI under the hostile environment theory, OCR must find that: (1) A racially hostile environment existed; (2) the recipient had actual or constructive notice of the racially hostile environment; and (3) the recipient failed to respond adequately to redress the racially hostile environment. Whether conduct constitutes a hostile environment must be determined from

of his or her official duties or employment must be made on a case-by-case basis, taking into account such factors as the relationship between the parties and the time, location and context of the alleged harassment.

the totality of the circumstances, with particular attention paid to the factors discussed below.

*Severe, Pervasive or Persistent Standard*

To determine whether a racially hostile environment exists, it must be determined if the racial harassment is severe, pervasive or persistent. OCR will examine the context, nature, scope, frequency, duration, and location of racial incidents, as well as the identity, number, and relationships of the persons involved. The harassment must in most cases consist of more than casual or isolated racial incidents to establish a title VI violation. Generally, the severity of the incidents needed to establish a racially hostile environment under title VI varies inversely with their pervasiveness or persistence.

First of all, when OCR evaluates the severity of racial harassment, the unique setting and mission of an educational institution must be taken into account. An educational institution has a duty to provide a nondiscriminatory environment that is conducive to learning. In addition to the curriculum, students learn about many different aspects of human life and interaction from school. The type of environment that is tolerated or encouraged by or at a school can therefore send a particularly strong signal to, and serve as an influential lesson for, its students.

This is especially true for younger, less mature children, who are generally more impressionable than older students or adults. Thus, an incident that might not be considered extremely harmful to an older student might nevertheless be found severe and harmful to a younger student. For example, verbal harassment of a young child by fellow students that is tolerated or condoned in any way by adult authority figures is likely to have a far greater impact than similar behavior would have on an adult. Particularly for young children in their formative years of development, therefore, the severe, pervasive or persistent standard must be understood in light of the age and impressionability of the students involved and with the special nature and purposes of the educational setting in mind.

As with other forms of harassment, OCR must take into account the relevant particularized characteristics and circumstances of the victim—especially the victim's race and age—when evaluating the severity of racial incidents at an educational institution. If OCR determines that the harassment was sufficiently severe that it would have adversely affected the enjoyment of some aspect of the recipient's

educational program by a reasonable person, of the same age and race as the victim, under similar circumstances, OCR will find that a hostile environment existed. The perspective of a person of the same race as the victim is necessary because race is the immutable characteristic upon which the harassment is based. The reasonable person standard as applied to a child must incorporate the age, intelligence and experience of a person under like circumstances to take into account the developmental differences in maturity and perception due to age.

To determine severity, the nature of the incidents must also be considered. Evidence may reflect whether the conduct was verbal or physical and the extent of hostility characteristic of the incident. In some cases, a racially hostile environment requiring appropriate responsive action may result from a single incident that is sufficiently severe. Such incidents may include, for example, injury to persons or property or conduct threatening injury to persons or property.

The size of the recipient and the location of the incidents also will be important. Less severe or fewer incidents may more readily create racial hostility in a smaller environment, such as an elementary school, than in a larger environment, such as a college campus. The effect of a racial incident in the private and personal environment of an individual's dormitory room may differ from the effect of the same incident in a student center or dormitory lounge.

The identity, number, and relationships of the individuals involved will also be considered on a case-by-case basis. For example, racially based conduct by a teacher, even an "off-duty" teacher, may have a greater impact on a student than the same conduct by a school maintenance worker or another student. The effect of conduct may be greater if perpetrated by a group of students rather than by an individual student.

In determining whether a hostile environment exists, OCR investigators will also be alert to the possible existence at the recipient institution of racial incidents other than those alleged in the complaint and will obtain evidence about them to determine whether they contributed to a racially hostile environment or corroborate the allegations.

Finally, racial acts need not be targeted at the complainant in order to create a racially hostile environment. The acts may be directed at anyone. The harassment need not be based on the ground of the victim's or complainant's race, so long as it is racially motivated

EXHIBIT 2

(e.g., it might be based on the race of a friend or associate of the victim). Additionally, the harassment need not result in tangible injury or detriment to the victims of the harassment.

If OCR finds that a hostile environment existed under these standards, then it will proceed to determine whether the recipient received notice of the harassment, and whether the recipient took reasonable steps to respond to the harassment.

### Notice

Though the recipient may not be responsible directly for all harassing conduct, the recipient does have a responsibility to provide a nondiscriminatory educational environment. If discriminatory conduct causes a racially hostile environment to develop that affects the enjoyment of the educational program for the student(s) being harassed, and if the recipient has actual or constructive notice of the hostile environment, the recipient is required to take appropriate responsive action. This is the case regardless of the identity of the person(s) committing the harassment—a teacher, a student, the grounds crew, a cafeteria worker, neighborhood teenagers, a visiting baseball team, a guest speaker, parents, or others. This is also true regardless of how the recipient received notice. So long as an agent or responsible employee of the recipient received notice, that notice will be imputed to the recipient.

A recipient can receive notice in many different ways. For example, a student may have filed a grievance or complained to a teacher about fellow students racially harassing him or her. A student, parent, or other individual may have contacted other appropriate personnel, such as a principal, campus security, an affirmative action officer, or staff in the office of student affairs. An agent or responsible employee of the institution may have witnessed the harassment. The recipient may have received notice in an indirect manner, from sources such as a member of the school staff, a member of the educational or local community, or the media. The recipient also may have received notice from flyers about the incident(s) posted around the school.

In cases where the recipient did not have actual notice, the recipient may have had constructive notice. A recipient is charged with constructive notice of a hostile environment if, upon reasonably diligent inquiry in the exercise of reasonable care, it should have known of the discrimination. In other words, if the recipient could have found out about the harassment had it

made a proper inquiry, and if the recipient should have made such an inquiry, knowledge of the harassment will be imputed to the recipient. A recipient also may be charged with constructive notice if it has notice of some, but not all, of the incidents involved in a particular complaint.

In some cases, the pervasiveness, persistence, or severity of the racial harassment may be enough to infer that the recipient had notice of the hostile environment (e.g., a racially motivated assault on a group of students). A finding that a recipient had constructive notice of a hostile environment meets the notice requirement of the analysis.

If the alleged harasser is an agent or employee of a recipient, acting within the scope of his or her official duties (i.e., such that the individual has actual or apparent authority over the students involved), then the individual will be considered to be acting in an agency capacity and the recipient will be deemed to have constructive notice of the harassment. If the recipient does not have a policy that prohibits the conduct of racial harassment, or does not have an accessible procedure by which victims of harassment can make their complaints known to appropriate officials, agency capacity—and thus constructive notice—is established.

The existence of both a policy and grievance procedure applicable to racial harassment (depending upon their scope, accessibility and clarity, and upon the acts of harassment) is relevant in the determination of agency capacity. A policy or grievance procedure applicable to harassment must be clear in the types of conduct prohibited in order for students to know and understand their rights and responsibilities. As discussed above, in the education context, the person from whose perspective the apparent authority of an agent or employee of a recipient must be evaluated is a reasonable student of the same age, intelligence and experience as the alleged victim of the harassment.

Finally, in order to find that the recipient had a duty to respond to notice of a racially hostile environment, OCR must examine the facts and circumstances to establish that the recipient knew or should have known that the conduct was of a racial nature or had sufficient information to conclude that it may have been racially based. OCR will consider whether the incident involved explicitly racial conduct or whether the circumstances indicate that, through symbols or other persuasive factors, the recipient should have recognized that the conduct was in fact, or was reasonably likely to have

been, racial (e.g., the hanging of nooses, random violence against minorities, etc.).

### Recipient's Response

Once a recipient has notice of a racially hostile environment, the recipient has a legal duty to take reasonable steps to eliminate it.[6] Thus, if OCR finds that the recipient took responsive action, OCR will evaluate the appropriateness of the responsive action by examining reasonableness, timeliness, and effectiveness. The appropriate response to a racially hostile environment must be tailored to redress fully the specific problems experienced at the institution as a result of the harassment. In addition, the responsive action must be reasonably calculated to prevent recurrence and ensure that participants are not restricted in their participation or benefits as a result of a racially hostile environment created by students or nonemployees.

In evaluating a recipient's response to a racially hostile environment, OCR will examine disciplinary policies, grievance policies, and any applicable anti-harassment policies.[7] OCR also will determine whether the responsive action was consistent with any established institutional policies or with responsive action taken with respect to similar incidents.

Examples of possible elements of appropriate responsive action include imposition of disciplinary measures, development and dissemination of a policy prohibiting racial harassment, provision of grievance or complaint procedures, implementation of racial awareness training, and provision of counseling for the victims of racial harassment.

### Conclusion

OCR will investigate allegations of racial incidents where the incidents fall within its jurisdiction. Based on the facts and circumstances of each case, OCR will use either or both the standard different treatment analysis and the hostile environment analysis to determine whether title VI has been violated.

---

[6] Of course, a recipient can and should investigate and respond to individual racial incidents if and as they arise—regardless of whether any particular incident is severe enough by itself to establish a racially hostile environment under Title VI. By doing so in a timely and thorough manner, the recipient might prevent the development of a racially hostile environment.

[7] Of course, OCR cannot endorse or prescribe speech or conduct codes or other campus policies to the extent that they violate the First Amendment to the United States Constitution.

EXHIBIT 2

If OCR determines that an agent or employee, acting within the scope of his or her employment, treated someone differently on the basis of race, color, or national origin without a legitimate, nondiscriminatory reason for the treatment (i.e., direct different treatment), then OCR will conclude that Title VI was violated. If OCR determines that a racially hostile environment exists at a recipient, the recipient had notice of it, and the recipient failed to take adequate action in response to the hostile environment, OCR will also find a violation. If OCR determines that a hostile environment was not established, or that a hostile environment was established but that the recipient either (1) did not have notice of it; or (2) had notice of it and took adequate action in response, OCR will find no violation.

**Appendix—Racial Incidents and Harassment Against Students— Compendium of Legal Resources**

This compendium provides an outline summarizing key legal resources (including statutes, regulations, cases, and letters of findings) to serve as a reference for the Office for Civil Rights (OCR) staff in investigating possible discrimination against students based on racial incidents—including incidents involving allegations of harassment on the basis of race—that occur at educational institutions. It is intended to be used in conjunction with the investigative guidance on racial incidents and harassment, and follows the same general outline as that guidance.[1]

The investigation and analysis of cases under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, (title VI) relies, to a large extent, on case law developed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, which prohibits discrimination on the basis of race, color, national origin, sex, and religion in employment.[2] See *Dillon*

---

[1] The investigation guidance is directed at conduct that constitutes race discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., (Title VI), and not at the content of speech. In cases in which verbal statements or other forms of expression are involved, consideration will be given to any implication of the First Amendment to the United States Constitution. In such cases, regional staff will consult with headquarters.

The term "race" shall be used throughout this compendium to refer to all forms of discrimination prohibited by Title VI—i.e., race, color, and national origin.

[2] Note that in addition to racial incidents/ harassment cases, many sexual harassment cases are cited throughout this compendium—because the legal standards and theories applicable to these two different types of discrimination are similar. See *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 859–60 (3d Cir. 1990) (both racial and sexual

*County District No. 1 and South Carolina State Department of Education*, No. 84–VI–16 (Civil Rights Reviewing Auth. 1987); *United States* v. *LULAC*, 793 F.2d 636, 648–49 (5th Cir. 1986); *Georgia State Conference of Branches of NAACP* v. *Georgia*, 775 F.2d 1403, 1417 (11th Cir. 1985); and *NAACP* v. *Medical Center, Inc.*, 657 F.2d 1322 (3d Cir. 1981). See also, generally, EEOC Revised Enforcement Guidance on Recent Developments in Disparate Treatment Theory, No. N–915.002 (July 14, 1992).[3]

**I. Jurisdiction**

OCR must first decide whether it has jurisdiction over a claim involving racial incidents or harassment. OCR has jurisdiction if the complaint alleges that the racially based conduct occurred in the context of an operation of an elementary, secondary, or postsecondary school or institution, or other entity that is a recipient of Federal funds.

*A. Title VI Prohibits Race Discrimination in Federally Funded Programs and Activities*

Title VI prohibits race discrimination in programs and activities that receive Federal financial assistance. See also 34 CFR part 100 (regulations effectuating provisions of title VI).

*B. OCR Has Institution-Wide Jurisdiction*

Under the Civil Rights Restoration Act of 1987,[4] OCR generally has institution-wide jurisdiction over a recipient of Federal funds.[5]

*C. Allegation Must Relate to an "Operation" of Recipient*

Discrimination must be alleged in an "operation" of a recipient. See 42 U.S.C. 2000d–4a.

*D. Specific Discriminatory Actions Prohibited*

The regulations implementing Title VI include provisions prohibiting discrimination based on race in terms of:

(1) Services: Provision of services or other benefits. 34 CFR 100.3(b)(1)(iii).

---

harassment are actionable based on right to nondiscriminatory environment).

[3] Of course, OCR will consider the differences between the contexts of employment and education.

[4] See 42 U.S.C. 2000d–4 (1988) (the section which amends Title VI).

[5] Note, however, that the Weggoner Amendment, 20 U.S.C. 1144(b), prohibits Federal agencies from directing or controlling the membership activities or internal operations of privately funded fraternities and sororities whose facilities are not owned by the recipient. This provision does not bar OCR from regulating recipients with respect to other activities of these groups.

(2) Privileges: Restriction of an individual's enjoyment of an advantage or privilege enjoyed by others. 34 CFR 100.3(b)(1)(iv).

(3) Participation: Opportunities to participate. 34 CFR 100.3(b)(1)(vi).

The regulations also include a general, catchall provision prohibiting race discrimination. See 34 CFR 100.3(b)(5).

*II. Standard Different Treatment by Agents or Employees*

As with other claims of race discrimination under Title VI, OCR should first apply a standard different (disparate) treatment analysis to allegations involving racial incidents perpetrated by representatives of recipients. In doing so, OCR must determine whether a student was treated differently than other students on the basis of race without a legitimate, nondiscriminatory, nonpretextual reason.

The basic elements of a different treatment case were set out by the U.S. Supreme Court in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973) (focusing on indirect evidence of such treatment), a Title VII employment case. See also *United States Postal Service Board of Governors* v. *Aikens*, 460 U.S. 711 (1983); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

*A. Prima Facie Case*

(1) Identify the racial group to which the complainant belongs for purposes of differential treatment analysis.

(2) Determine whether the complainant was treated differently than similarly situated members of other racial groups with regard to a service, benefit, privilege, etc., from the recipient. See, e.g., *University of Pittsburgh*, OCR Case No. 03–89–2035 (campus police treated black students more severely than white students); *Roosevelt Warm Springs Institute for Rehabilitation*, OCR Case No. 04–89–3003 (similar).

*B. Rebuttal of Prima Facie Case by Showing Legitimate, Nondiscriminatory Reason for Treatment*

After a prima facie case of race discrimination has been established against the recipient, OCR must then determine whether the recipient had a legitimate, nondiscriminatory reason for its action(s) which would rebut the prima facie case against it.

*C. Recipient's Rebuttal Overcome With Showing of Pretext*

If the prima facie case of discrimination is rebutted, OCR must

EXHIBIT 2

next determine whether the recipient's asserted reason for its action(s) is a mere pretext for discrimination. Ultimately, however, the weight of the evidence must convince OCR that actual discrimination occurred. See *St. Mary's Honor Center* v. *Hicks*, 113 S.Ct. 2742 (1993) (under title VII disparate treatment analysis, ultimate burden of persuasion regarding intentional discrimination remains at all times with plaintiff).

### III. Hostile Environment Analysis

A violation of Title VI may be found if racial harassment is severe, pervasive, or persistent so as to constitute a hostile or abusive educational environment. See *Meritor Savings Bank* v. *Vinson*, 477 U.S. 57 (1986) (sets similar standard for sexual harassment under title VII) (relying on *Rogers* v. *EEOC*, 454 F.2d 234, 238 (5th Cir. 1971) (race discrimination can consist of an "environment heavily charged with ethnic or racial discrimination"), cert. denied, 406 U.S. 957 (1972)); *Harris* v. *Forklift Systems, Inc.*, 114 S.Ct. 367 (1993) (reiterating *Meritor* standard). Accord, *Hicks* v. *Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir. 1987); *Snell* v. *Suffolk County*, 782 F.2d 1094, 1102 (2d Cir. 1986); *Gray* v. *Greyhound Lines, East*, 545 F.2d 169, 176 (D.C. Cir. 1976) (noting with approval that EEOC has consistently held that title VII gives employee right to " 'a working environment free of racial intimidation' "). See also, e.g., *Defiance College*, OCR Case No. 05–90–2024 (violation where college was aware of "repeated" and "patently offensive" verbal and physical racial harassment committed by students).

Whether conduct constitutes a hostile environment must be determined from the totality of the circumstances. See *Harris* v. *Forklift Systems, Inc.*, 114 S.Ct. 367 (1993) (under title VII, factors to consider may include frequency and severity of discriminatory conduct, whether it is physically threatening or humiliating or merely offensive, and whether it interferes with work performance; psychological harm is not required but may be taken into account like any other relevant factor); *Johnson* v. *Bunny Bread*, 646 F.2d 1250, 1257 (8th Cir. 1981) (court examined nature, frequency, and content of racial harassment, as well as identities of perpetrators and victims). See also *Snell*, 782 F.2d at 1103 (citing *Henson* v. *City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)) (same standard for sexual harassment).

### A. Harassment Must Be Severe, Pervasive or Persistent

1. Pervasive or Persistent

Where the harassment is not sufficiently severe, it must consist of more than casual or isolated racial incidents to create a racially hostile environment. Compare *Trenton Junior College*, OCR Case No. 07–87–6006 (title VI violated where college failed to provide adequate security for black basketball players who were subjected to a break-in, cross-burning, and placement of raccoon skins at their campus residences) with *University of California, Santa Cruz*, OCR Case No. 09–91–6002 (no finding of racial harassment where OCR found only isolated individual incidents over three-year period). See also, e.g., *Snell*, 782 F.2d at 1103 ("To establish a hostile atmosphere, * * * plaintiffs must prove more than a few isolated incidents of racial enmity * * *. Casual comments, or accidental or sporadic conversation, will not trigger equitable relief"); *Gates Rubber Co.*, 833 F.2d 1406; *Powell* v. *Missouri State Highway and Transportation Department*, 822 F.2d 798 (8th Cir. 1986); *Moylan* v. *Maries County*, 792 F.2d 746 (8th Cir. 1986); *Henson*, 682 F.2d at 904 (quoting *Rogers*, 454 F.2d at 238).

OCR and Federal courts have found a hostile environment where there was a pattern or practice of harassment, or where the harassment was sustained and nontrivial. See, e.g., *Wapato School District No. 207*, OCR Case No. 10–82–1039 (Title VI violated where teacher repeatedly treated minority students in racially derogatory manner). Compare *Walker* v. *Ford Motor Co.*, 684 F.2d 1355 (11th Cir. 1982) (hostile environment where use of derogatory terms was "repeated, continuous, and prolonged") with *Gilbert* v. *City of Little Rock*, 722 F.2d 1390 (8th Cir. 1983) (hostile environment not created by isolated and allegedly unrelated racial slurs), cert. denied, 466 U.S. 972 (1984).

2. Severe

The severity of individual incidents must also be considered. See, e.g., *Vance* v. *Southern Bell Telephone and Telegraph Co.*, 863 F.2d 1503, 1510–11 (11th Cir. 1989) (determination whether conduct is "severe and pervasive" does not turn solely on number of incidents; fact-finder must examine gravity as well as frequency) (decided under 42 U.S.C. 1981); *Carrero* v. *New York City Housing Authority*, 890 F.2d 569, 578 (2d Cir. 1989) ("It is not how long the * * * obnoxious course of conduct lasts. The offensiveness of the individual actions

* * * is also a factor to be considered.").

Generally, the severity of the incidents needed to establish a racially hostile environment varies inversely with their pervasiveness or persistence. See EEOC Policy Guidance on Current Issues of Sexual Harassment, No. N–915.050 (Mar. 19, 1990) ("the more severe the harassment, the less need to show a repetitive series of incidents").

*a. Special mission and duties of educational institutions.* The unique setting and mission of an educational institution must be taken into account when OCR evaluates the severity of racial harassment under title VI. School officials have a duty to provide a nondiscriminatory environment conducive to learning. See generally 34 CFR part 100 (regulations prohibiting any form of race discrimination which interferes with educational programs or activities under title VI).

*b. Characteristics and circumstances of victim—especially race and age.* OCR must take into account the characteristics and circumstances of the victim on a case-by-case basis—particularly the victim's race and age—when evaluating the severity of racial incidents at an educational institution. See *Harris* v. *International Paper Co.*, 765 F. Supp. 1509, 1515–16 (D. Me. 1991) (the appropriate standard to apply in a "hostile environment racial harassment case is that of a 'reasonable black person' "). See also, e.g., *Ellison* v. *Brady*, 924 F.2d 872 (9th Cir. 1991) (discussing differences in perspectives of men and women toward sexual harassment, and need to examine harassment from perspective of reasonable victim with characteristic upon which harassment was based).

The reasonable person standard as applied to children is "that of a reasonable person of like age, intelligence, and experience under like circumstances." Restatement (2d), Torts, Section 283A (1965) (Comment b: "The special standard to be applied in the case of children arises out of the public interest in their welfare and protection * * * "). See also, e.g., *Honeycutt* v. *City of Wichita*, 247 Kan. 250, 796 P.2d 549 (Kan. 1990) (adopting Restatement standard); *Standard* v. *Shine*, 278 S.C. 337, 295 S.E.2d 786 (S.C. 1982) (same); *Camerlinck* v. *Thomas*, 209 Neb. 843, 312 N.W.2d 260 (Neb. 1981) (same).

*c. Nature of incident.* The nature of the incident(s) should also be considered. See, e.g., *Vance* v. *Southern Bell Telephone and Telegraph Co.*, 863 F.2d at 1506–10 (hostile environment created where noose was hung twice at employee's workstation); *Watts* v. *New York City Police Department*, 724 F.

EXHIBIT 2

Supp. 99, 105 (S.D.N.Y. 1989) (same, based on two sexual assaults).

A single incident that is sufficiently severe may establish a racially hostile environment. See EEOC Policy Guidance on Current Issues of Sexual Harassment, No. N–915.050 (Mar. 19, 1990) and cases cited therein; *Barrett* v. *Omaha National Bank*, 584 F. Supp. 22 (D. Neb. 1983), aff'd, 726 F.2d 424 (8th Cir. 1984) (sexually hostile environment established by sexual assault).

*d. Size of recipient and location of incidents.* The size of the recipient and the location of the incidents also may be important.

*e. Identity of individuals involved.* The identity, number, and relationships of the individuals involved will also be considered on a case-by-case basis. See, e.g., *Wapato School District No. 207*, OCR Case No. 10–82–1039 (racial harassment of students by teacher was particularly opprobrious).

*f. Other incidents at the recipient.* OCR will also consider other racial incidents at the institution. See, e.g., *Midwest City-Del City Public Schools*, OCR Case No. 06–92–1012 (finding of racially hostile environment based in part on several racial incidents at school which occurred shortly before incidents in complaint).

*g. Harassment need not be directed specifically at complainant or tangibly harm complainant or victim.* The regulations implementing Title VI provide that a complaint may be filed by "[a]ny person who believes himself or any specific class of individuals to be subjected to discrimination prohibited by this part." 34 CFR 100.7(b). Thus, in hostile environment cases, the harassment need not be targeted specifically at the individual complainant. See *Waltman* v. *International Paper Co.*, 875 F.2d 468, 477 (5th Cir. 1989) (all sexual graffiti in office, not just that directed at plaintiff, was relevant to plaintiff's claim); *Hall* v. *Gus Construction Co.*, 842 F.2d 1010, 1015 (8th Cir. 1988) (evidence of sexual harassment directed at others is relevant to show hostile environment); *Gates Rubber Co.*, 833 F.2d at 1415 ("one of the critical inquiries in a hostile environment claim must be the *environment*" as a whole) (emphasis in original); *Walker* v. *Ford Motor Co.*, 684 F.2d 1355, 1358–59 (11th Cir. 1982) hostile environment established where racial harassment made plaintiff "feel unwanted and uncomfortable in his surroundings," even though it was not directed at him).

The harassment need not be based on the ground of the complainant's or victim's race, so long as it is racially motivated. See, e.g., *Center Grove Community School*, OCR Case No. 15–91–1168 (title VI violated where white girl was forced to withdraw from all-white school, as result of harassment by classmates which included note criticizing her association with black student at another school).

To establish a hostile environment, harassment need not result in a tangible injury or detriment to the complainant or the victim of the harassment. *Vinson*, 477 U.S. at 64. See also, e.g., *Harris* v. *Forklift Systems, Inc.*, 114 S.Ct. at 371 (under title VII several factors are considered including whether behaviors interfere with work performance; psychological harm is not required but may be taken into account like any other relevant factor); *Gilbert*, 722 F.2d at 1394 (environment "which significantly and adversely affects the psychological well-being of an employee because of his or her race" is enough to constitute title VII violation); *Bundy* v. *Jackson*, 641 F.2d 934, 943–45 (D.C. Cir. 1981) (protection against race and sex discrimination extends to "psychological and emotional work environment").

### B. Notice

A recipient has a duty to provide a nondiscriminatory educational environment, but it must somehow receive notice of racial harassment in order to be found responsible for it. See *Vinson*, 477 U.S. at 72; see also *Steele* v. *Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir. 1989); *Lipsett* v. *University of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988).

#### 1. Actual Notice

A recipient may be found liable for racial harassment if it has actual knowledge of the racially offensive behavior or actions. See, e.g., *Hunter* v. *Allis-Chalmers Corp.*, 797 F.2d 1417 (7th Cir. 1986) (liability exists if management-level employees were aware of barrage of offensive conduct); *Katz* v. *Dole*, 709 F.2d 251 (4th Cir. 1983) (actual knowledge where victim complains of harassment to appropriate authorities); *Henson* v. *City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).

#### 2. Constructive Notice

A recipient may be found liable where it reasonably should have known of the harassment—e.g., because the harassment was so pervasive that its awareness may be inferred. See *Paroline* v. *Unisys Corp.*, 879 F.2d 100 (4th Cir. 1989) (liability may be imputed where employer knew or should have known about prior conduct of harasser toward other women), vacated in part on other grounds, 900 F.2d 27 (4th Cir. 1990);

*Yates* v. *Avco Corp.*, 819 F.2d 630 (6th Cir. 1987) (constructive notice where employee harassed women on a daily basis); *Waltman*, 875 F.2d 468 (possibility of constructive notice where sexual graffiti existed in numerous locations); *Vance* v. *Southern Bell Telephone and Telegraph Co.*, 863 F.2d at 1510–11; *Swentek* v. *USAir, Inc.*, 830 F.2d 552 (4th Cir. 1987).

If the alleged harasser is an agent or employee of a recipient, acting within the scope of his or her official duties (i.e., such that the individual has actual or apparent authority over the students involved), then the individual will be considered to be acting in an agency capacity and the recipient will be deemed to have constructive notice of the harassment. See, e.g., *Kauffman* v. *Allied Signal, Inc., Autolite Division*, 970 F.2d 178 (6th Cir.) ("scope of employment" standard for holding employers liable for supervisory harassment is based on traditional agency principles, such as when and where harassment took place, and whether it was foreseeable), cert. denied, 113 S.Ct. 831 (1992). See also EEOC Policy Guidance on Current Issues of Sexual Harassment, N–915.050 (Mar. 19, 1990) (apparent authority exists where third parties reasonably believe that actions of supervisor represent exercise of authority possessed by virtue of employer's conduct).[6]

In evaluating whether constructive notice should be imputed to a recipient, the availability, coverage and public dissemination of antidiscrimination policies and grievance procedures for students will be considered in determining whether the recipient has made a sufficient effort to become aware of racial incidents if and when they occur. See *Meritor Savings Bank*, 477 U.S. at 72–73 (existence of uninvoked grievance procedures and policies against discrimination is relevant to issue of employer liability for sexual harassment, but not dispositive).

### C. Recipient's Response

#### 1. Duty to Take Reasonable Steps to End Harassment

Once a recipient has notice of a racially hostile environment, it has a duty to take reasonable steps to eliminate it. If it fails to respond adequately to the hostile environment, then the recipient may be found to have

---

[6] As discussed supra, in the education context, the person from whose perspective the apparent authority of an agent or employee of a recipient must be evaluated is a reasonable student of the same age, intelligence and experience as the alleged victim of the harassment.

EXHIBIT 2

violated title VI. See, e.g., *California State University, Chico,* OCR Case No. 09–89–2106 (inadequate response to racial harassment where university had no written grievance procedure and failed to interview most of the individuals involved); *Township High School District No. 214,* OCR Case No. 05–82–1097 (OCR found violation where school district failed to take adequate steps to correct repeated racial harassment by students, of which employees were aware. See also, e.g., *Snell* v. *Suffolk County,* 782 F.2d 1094 (2d Cir. 1986) (responsibility depends on gravity of harm, nature of work environment, and resources available); *Hall* v. *Gus Construction Co., Inc.,* 842 F.2d 1010 (8th Cir. 1988) (employer will be liable for failing to discover what is going on and to take remedial steps when actions are so numerous, egregious, and concentrated as to add up to campaign of harassment); *Paroline,* 879 F.2d 100 (4th Cir. 1989);

*Henson* v. *City of Dundee,* 682 F.2d 897, 904 (11th Cir. 1982).

**2. Response or Remedy Should Redress Actual Problems**

The appropriate response or remedy for a hostile environment should be tailored to redress the specific problems experienced at the institution. See, e.g., *Trenton Junior College,* OCR Case No. 07–87–6006 (region developed remedial plan with college that included staff training on racial harassment, payment of compensation to harassed students and individuals who assisted the students in arranging for their safety, implementation of special efforts— including financial aid—to recruit black students, and development of plan for handling future harassment complaints).

**3. Response Must Reasonably Attempt to Prevent Recurrence**

The responsive action taken by a recipient must be reasonably calculated to prevent recurrence and ensure that individuals are not restricted in their

participation or benefits as a result of a racially hostile environment created by students or non-employees. See, e.g., *Brooms* v. *Regal Tube Co.,* 881 F.2d 412 (7th Cir. 1989) (response must be reasonably calculated to prevent further harassment under particular facts and circumstances of case at time allegations are made; courts should not focus solely on whether remedial activity ultimately succeeded, but should determine whether total response was reasonable); *Waltman* v. *International Paper Co.,* 875 F.2d 468, 476 (5th Cir. 1989) (response must be reasonably calculated to halt harassment); *Bundy* v. *Jackson,* 641 F.2d 934 (D.C. Cir. 1981) (employer liable where supervisor had full notice of harassment and did nothing to stop or investigate practice; employer must take all necessary steps to investigate and correct harassment—including warnings, appropriate discipline, and other means of preventing harassment).

[FR Doc. 94–5531 Filed 3–9–94; 8:45 am]

BILLING CODE 4000-01-P

EXHIBIT 2

# EXHIBIT 3



# DEPARTMENT OF EDUCATION

**Office for Civil Rights; Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties**

**ACTION:** Final policy guidance.

**SUMMARY:** The Assistant Secretary for Civil Rights issues a final document entitled ''Sexual Harassment Guidance'' (Guidance). Sexual harassment of students is prohibited by Title IX of the Education Amendments of 1972 under the circumstances described in the Guidance. The Guidance provides educational institutions with information regarding the standards that are used by the Office for Civil Rights (OCR), and that institutions should use, to investigate and resolve allegations of sexual harassment of students engaged in by school employees, other students, or third parties.

**FOR FURTHER INFORMATION CONTACT:** Howard I. Kallem. U.S. Department of Education, 600 Independence Avenue, S.W., Room 5412 Switzer Building, Washington, D.C. 20202–1174. Telephone (202) 205–9641. Internet address: Howard__Kallem@ed.gov For additional copies of this Guidance, individuals may call OCR's Customer Service Team at (202) 205–5413 or toll-free at 1–800–421–3481. Individuals who use a telecommunications device for the deaf (TDD) may call the Department's toll-free number, 1–800–421–3481, in conjunction with the phone company's TDD relay capabilities. This Guidance will also be available at OCR's site on the Internet at URL http://www.ed.gov/offices/OCR/ocrpubs.html.

**SUPPLEMENTARY INFORMATION:**

## Purpose of the Guidance

Title IX of the Education Amendments of 1972 (Title IX) prohibits discrimination on the basis of sex in education programs and activities receiving Federal financial assistance. Sexual harassment of students can be a form of discrimination prohibited by Title IX. The Office for Civil Rights has long recognized that sexual harassment of students engaged in by school employees, other students, or third parties is covered by Title IX. OCR's policy and practice is consistent with the Congress' goal in enacting Title IX—the elimination of sex-based discrimination in federally assisted education programs. It is also consistent with United States Supreme Court precedent and well-established legal principles that have developed under Title IX, as well as under the related

anti-discrimination provisions of Title VI and Title VII of the Civil Rights Act of 1964.

The elimination of sexual harassment of students in federally assisted educational programs is a high priority for OCR. Through its enforcement of Title IX, OCR has learned that a significant number of students, both male and female, have experienced sexual harassment, that sexual harassment can interfere with a student's academic performance and emotional and physical well-being, and that preventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn.

The Guidance applies to students at every level of education. It provides information intended to enable school employees and officials to identify sexual harassment and to take steps to prevent its occurrence. In addition, the Guidance is intended to inform educational institutions about the standards that should be followed when investigating and resolving claims of sexual harassment of students. The Guidance is important because school personnel who understand their obligations under Title IX are in the best position to prevent harassment and to lessen the harm to students if, despite their best efforts, harassment occurs. The Guidance discusses factors to be considered in applying the standards and examples that are designed to illustrate how the standards may apply to particular situations. Overall, the Guidance illustrates that in addressing allegations of sexual harassment, the judgment and common sense of teachers and school administrators are important elements of a response that meets the requirements of Title IX.

In addition, it is clear from the Guidance that not all behavior with sexual connotations constitutes sexual harassment under Federal law. In order to give rise to a complaint under Title IX, sexual harassment must be sufficiently severe, persistent, or pervasive that it adversely affects a student's education or creates a hostile or abusive educational environment. For a one-time incident to rise to the level of harassment, it must be severe.

As illustrated in the Guidance, school personnel should consider the age and maturity of students when responding to allegations of sexual harassment. The Guidance explains that age is relevant in determining whether sexual harassment occurred in the first instance, as well as in determining the appropriate response by the school. For example, age is relevant in determining whether a

student welcomed the conduct and in determining whether the conduct was severe, persistent, or pervasive. Age is a factor to be considered by school personnel when determining what type of education or training to provide to students in order to prevent sexual harassment from occurring.

Notably, during the time that the Guidance was available for public comment, several incidents involving young students occurred in public schools and were widely reported in the press. In one incident a school reportedly punished a six-year-old boy, under its sexual harassment policy, for kissing a female classmate on the cheek. These incidents provide a good example of how the Guidance can assist schools in formulating appropriate responses to conduct of this type. The factors in the Guidance confirm that a kiss on the cheek by a first grader does not constitute sexual harassment.

Consistent with the Guidance's reliance on school employees and officials to use their judgment and common sense, the Guidance offers school personnel flexibility in how to respond to sexual harassment. Commenters who read the Guidance as always requiring schools to punish alleged harassment under an explicit sexual harassment policy rather than by use of a general disciplinary or behavior code, even if the latter may provide more age-appropriate ways to handle those incidents, are incorrect. First, if inappropriate conduct does not rise to the level of harassment prohibited by Title IX, school employees or officials may rely entirely on their own judgment regarding how best to handle the situation.

Even if a school determines that a student's conduct is sexual harassment, the Guidance explicitly states that Title IX permits the use of a general student disciplinary procedure. The critical issue under Title IX is whether responsive action that a school could reasonably be expected to take is effective in ending the sexual harassment and in preventing its recurrence. If treating sexual harassment merely as inappropriate behavior is not effective in ending the harassment or in preventing it from escalating, schools must take additional steps to ensure that students know that the conduct is prohibited sex discrimination.

## Process in Developing the Guidance

Because of the importance of eliminating sexual harassment in schools, and based on the requests of schools, teachers, parents, and other interested parties, OCR determined that it should provide to schools a

EXHIBIT 3

comprehensive discussion of the legal standards and related issues involved in resolving sexual harassment incidents. While this document reflects longstanding OCR policy and practice in this area, it also reflects extensive consultation with interested parties. Even before making documents available for formal comment, OCR held a series of meetings with groups representing students, teachers, school administrators, and researchers. In these discussions, OCR gained valuable information regarding the realities of sexual harassment in schools, as well as information regarding promising practices for identifying and preventing harassment. These insights and learning are reflected in the Guidance.

**Issuance of the Guidance for Comment and the Format of the Final Guidance**

On August 16, 1996, the Assistant Secretary for Civil Rights published a notice in the **Federal Register** (61 FR 42728) regarding the availability of a document entitled: ''Sexual Harassment Guidance: Peer Sexual Harassment'' (Peer Guidance) and inviting comments on the document. Subsequently, on October 4, 1996, the Assistant Secretary published in the **Federal Register** (61 FR 52172) a request for comments on a document entitled: ''Sexual Harassment Guidance: Harassment of Students by School Employees'' (Employee Guidance). Both notices stated that the guidance documents reflected longstanding OCR policy and practice and invited comments and recommendations regarding their clarity and completeness.

The most significant change in the format of the final document is that it combines the two separate guidance documents into one document that addresses sexual harassment of students by peers, school employees, or third parties. Commenters frequently stated that a combined document would be clearer and easier to use. OCR agrees. Thus, the term ''Guidance'' when used in this preamble refers to the combined document that incorporates both the Peer Guidance and the Employee Guidance.

**Analysis of Comments and Changes**

In response to the Assistant Secretary's invitations to comment, OCR received approximately 70 comments on the Peer Guidance and approximately 10 comments on the Employee Guidance. Many commenters stated that the guidance documents provided comprehensive, clear, and useful information to schools. For instance, one commenter stated that the Peer Guidance was ''a godsend * * * in one

convenient place [it provides] the clear implications of the statutes, regulations, and case law.'' Another commenter stated that the Guidance ''will assist universities * * * in maintaining a harassment-free educational environment.''

Commenters also provided many specific suggestions and examples regarding how the final Guidance could be more complete and clearer. Many of these suggested changes have been incorporated into the Guidance.

The preamble discusses recurring and significant recommendations regarding the clarity and completeness of the document. While the invitations to comment on the Peer Guidance and Employee Guidance did not request substantive comments regarding OCR's longstanding policy and practice in the area of sexual harassment, some commenters did provide these comments. In instances in which OCR could provide additional useful information to readers related to these comments, it has done so in the preamble. Comments are grouped by subject and are discussed in the following sections.

*The Need for Additional Guidance*

*Comments:* Many commenters agreed that a document combining the Peer Guidance and the Employee Guidance would provide more clarity to schools. Commenters disagreed, however, regarding whether, and what type of, additional information is needed to enhance schools' understanding of their legal obligations under Title IX. Some commenters asked for more detailed analysis regarding the applicable legal standards, including hard and fast rules for determining what is harassment and how a school should respond. Other commenters, by contrast, found OCR's guidance documents, including the extensive legal citations, to be too detailed and ''legalistic.'' They expressed a need for a document that is simpler and more accessible to teachers, parents, school administrators, and others who need to know how to recognize, report, or respond to sexual harassment.

*Discussion:* As the Guidance makes clear, it is impossible to provide hard and fast rules applicable to all instances of sexual harassment. Instead, the Guidance provides factors to help schools make appropriate judgments.

In response to concerns for more analysis of the legal standards, OCR has provided additional examples in the Guidance to illustrate how the Title IX legal standards may apply in particular cases. It is important to remember that examples are just that; they do not cover

all the types of situations that may arise. Moreover, they may not illustrate the only way to respond to sexual harassment of students because there is often no one right way to respond.

OCR also believes that there is a legitimate concern that school administrators, teachers, students, and parents need an accessible document to assist them in recognizing and appropriately responding to sexual harassment. Accordingly, OCR has developed, in addition to the final Guidance, a pamphlet for conveying basic information regarding parties' rights and responsibilities under Title IX. The pamphlet includes information from the Guidance that would be most useful to these groups as they confront issues of sexual harassment. Concurrent with the issuance of this Guidance, the pamphlet will be issued with copies available from all OCR offices and an electronic posting on OCR's web site. For a copy of the pamphlet, individuals may call OCR's Customer Service Team at (202) 205–5413 or toll-free 1–800–421–3481. Copies will also be available from all OCR enforcement offices, and the pamphlet will be posted on OCR's site on the Internet at URL http:// www.ed.gov/offices/OCR/ocrpubs.html.

*Additional Guidance on the First Amendment*

*Comments:* Many commenters asked OCR to provide additional guidance regarding the interplay of academic freedom and free speech rights with Title IX's prohibition of sexual harassment. Several of these commenters wanted OCR to announce hard and fast rules in this area, although commenters disagreed on what those rules should be. For instance, one commenter requested that OCR tell schools that the First Amendment does not prevent schools from punishing speech that has no legitimate pedagogical purpose. Another commenter, by contrast, wanted OCR to state that classroom speech simply can never be the basis for a sexual harassment complaint. Other commenters requested that OCR include specific examples regarding the application of free speech rights.

*Discussion:* As the documents published for comment indicated, the resolution of cases involving potential First Amendment issues is highly fact- and context-dependent. Thus, hard and fast rules are not appropriate.

However, in order to respond to concerns that schools need assistance in making these determinations, OCR has provided additional examples in the Guidance regarding the application of

EXHIBIT 3

the First Amendment principles discussed there.

### Application of Guidance to Harassment by Third Parties

*Comments:* Several commenters stated that it was unclear whether the Guidance applies if a student alleges harassment by a third party, i.e., by someone who is not an employee or student at the school.

*Discussion:* The Guidance clarifies that the principles in the Guidance apply to situations in which, for example, a student alleges that harassment by a visiting professional speaker or members of a visiting athletic team created a sexually hostile environment. The Peer Guidance did, in fact, discuss the standards applicable to the latter situation in which students from another school harassed the school's students.

The applicable standards have not changed, but the final Guidance clarifies that the same standards also apply if adults who are not employees or agents of the school engage in harassment of students.

### Application of Guidance to Harassment Based on Sexual Orientation

*Comments:* Several commenters indicated that, in light of OCR's stated policy that Title IX's prohibition against sexual harassment applies regardless of the sex of the harassed student or of the sex of the alleged harasser, the Guidance was confusing regarding the statement that Title IX does not apply to discrimination on the basis of sexual orientation.

*Discussion:* The Guidance has been clarified to indicate that if harassment is based on conduct of a sexual nature, it may be sexual harassment prohibited by Title IX even if the harasser and the harassed are the same sex or the victim of harassment is gay or lesbian. If, for example, harassing conduct of a sexual nature is directed at gay or lesbian students, it may create a sexually hostile environment and may constitute a violation of Title IX in the same way that it may for heterosexual students. The Guidance provides examples to illustrate the difference between this type of conduct, which may be prohibited by Title IX, and conduct constituting discrimination on the basis of sexual orientation, which is not prohibited by Title IX. The Guidance also indicates that some State or local laws or other Federal authority may prohibit discrimination on the basis of sexual orientation.

### The Effect on the Guidance of Conflicting Federal Court Decisions

*Comments:* Several commenters requested clarification of the standards to be applied to sexual harassment cases in States subject to the jurisdiction of the United States Court of Appeals for the Fifth Circuit, specifically in light of the Fifth Circuit's decision in *Rowinsky* v. *Bryan Independent School District*, 80 F.3d 1006 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 165 (1996).

*Discussion:* One beneficial result of the Guidance will be to provide courts with ready access to the standards used by the agency that has been given the authority by law to interpret and enforce Title IX. Courts generally benefit from and defer to the expertise of an agency with that authority.

Nevertheless, OCR recognizes that recent Fifth Circuit decisions add to schools' confusion regarding Title IX legal standards. In *Rowinsky*, the Fifth Circuit held that a school is not liable under Title IX even if it is on notice of peer sexual harassment and it ignores or fails to remedy it, unless it responds differently based on the sex of the alleged victim. Consistent with the vigorous dissent in *Rowinsky*, as well as with other Federal decisions contrary to the *Rowinsky* holding, OCR continues to believe that the *Rowinsky* decision was wrongly decided. In OCR's view, the holding in *Rowinsky* was based on a mistaken belief that the legal principle underpinning this aspect of the Guidance makes a school responsible for the actions of a harassing student, rather than for the school's own discrimination in failing to respond once it knows that the harassment is happening.

In two very recent decisions involving sexual harassment of students by school employees, the Fifth Circuit again applied Title IX law in a manner inconsistent with OCR's longstanding policy and practice. First, in *Canutillo Indep. School Dist.* v. *Leija*, 101 F.3d 393, 398–400 (5th Cir. 1996), the court held, again over a strong dissent and contrary to OCR policy, that a school district was not liable for the sexual molestation of a second grade student by one of her teachers because the student and her mother only reported the harassment to her homeroom teacher. The court determined that notice to the teacher was not notice to the school—notwithstanding that a school handbook instructed students and parents to report complaints to the child's primary or homeroom teacher.

Finally, in *Rosa H.* v. *San Elizario Indep. School Dist.*, 1997 U.S. App. LEXIS 2780 (Feb. 17, 1997), the Fifth Circuit reversed a jury finding that a school district was liable under Title IX for a hostile environment created by the school's male karate instructor, who repeatedly initiated sexual intercourse with a fifteen-year-old female karate student, often during the school day. The court held that, while ''there was no question that the student was subject to discrimination based on sex,'' a school is liable only in situations in which an employee who has been invested by the school board with supervisory power over the offending employee actually knew of the abuse, had the power to end the abuse, and failed to do so.

Several of the decisions discuss according ''appreciable deference'' to OCR's interpretation of Title IX in appropriate circumstances and contain other indications that Title IX law is evolving in the Fifth Circuit. When OCR investigates complaints involving schools in States in the Fifth Circuit (Texas, Louisiana, and Mississippi), it will in each case determine and follow the current applicable law, even if it is inconsistent with OCR policy. OCR will also participate where appropriate, and in conjunction with the Department of Justice, to shape the evolution of Title IX law in a manner consistent with the Guidance.

Inconsistent decisions do not prohibit schools in States in the Fifth Circuit from following the Guidance. Since the Guidance assists school in ensuring that students can learn in a safe and nondiscriminatory educational environment, it is the better practice for these schools to follow the Guidance. Indeed, in light of the evolving case law in the Fifth Circuit, following the Guidance may also be the safest way to ensure compliance with the requirements of Title IX. School personnel in States in the Fifth Circuit should also consider whether State, local, or other Federal authority affects their obligations in these areas.

### Notice

*Comments:* Several commenters recommended that additional guidance be provided regarding the types of employees through which a school can receive notice of sexual harassment. Commenters disagreed, however, on who should be able to receive notice. For instance, some commenters stated that OCR should find that a school has received notice only if ''managerial'' employees, ''designated'' employees, or employees with the authority to correct the harassment receive notice of the harassment. Another commenter suggested, by contrast, that any school employee should be considered a

EXHIBIT 3

responsible employee for purposes of notice.

*Discussion:* The Guidance states that a school has actual notice of sexual harassment if an agent or responsible employee of the school receives notice. An exhaustive list of employees would be inappropriate, however, because whether an employee is an agent or responsible school employee, or whether it would be reasonable for a student to believe the employee is an agent or responsible employee, even if the employee is not, will vary depending on factors such as the authority actually given to the employee and the age of the student. Thus, the Guidance gives examples of the types of employees that can receive notice of harassment. In this regard, it is important for schools to recognize that the Guidance does not necessarily require that any employee who receives notice of the harassment also be responsible for taking appropriate steps to end the harassment or prevent its recurrence. An employee may be required only to report the harassment to other school officials who have the responsibility to take appropriate action.

OCR does not agree with those commenters who recommend that a school can receive notice only through managerial or designated employees. For example, young students may not understand those designations and may reasonably believe that an adult, such as a teacher or the school nurse, is a person they can and should tell about incidents of sexual harassment regardless of that person's formal status in the school administration.

*Comments:* Several commenters stated that constructive notice, or the ''should have known'' standard, puts schools in the untenable position of constantly monitoring students and employees to seek out potential harassers.

*Discussion:* Constructive notice is relevant only if a school's liability depends on notice and conduct has occurred that is sufficient to trigger the school's obligation to respond. As the examples in the Guidance indicate, constructive notice is applicable only if a school ignores or fails to recognize overt or obvious problems of sexual harassment. Constructive notice does not require a school to predict aberrant behavior.

### Remedying the Effects of Harassment on Students

*Comments:* Several commenters expressed concern regarding the Guidance's statement that schools may be required to pay for professional counseling and other services necessary

to remedy the effects of harassment on students. Some comments indicated confusion over the circumstances under which the responsibility for those costs would exist and concern over the financial responsibility that would be created. Others stated that schools should not be liable for these costs if they have taken appropriate responsive action to eliminate the harassing environment, or if the harassers are non-employees.

*Discussion:* The final Guidance provides additional clarification regarding when a school may be required to remedy the effects on those who have been subject to harassment. For instance, if a teacher engages in *quid pro quo* harassment against a student, a school is liable under Title IX for the conduct and its effects. Thus, appropriate corrective action could include providing counseling services to the harassed student or paying other costs necessary to remedy the effects of the teacher's harassment. On the other hand, if a school's liability depends on its failure to take appropriate action after it receives notice of the harassment, e.g., in cases of peer harassment, the extent of a school's liability for remedying the effects of harassment will depend on the speed and efficacy of the school's response once it receives notice. For instance, if a school responds immediately and appropriately to eliminate harassment of which it has notice and to prevent its recurrence, it will not be responsible for remedying the effects of harassment, if any, on the individual. By contrast, if a school ignores complaints by a student that he or she is persistently being sexually harassed by another student in his or her class, the school will be required to remedy those effects of the harassment that it could have prevented if it had responded appropriately to the student's complaints, including, if appropriate, the provision of counseling services.

### Confidentiality

*Comments:* Many commenters recommended additional clarification regarding how schools should respond if a harassed student requests that his or her name not be disclosed. Some commenters believe that, particularly in the elementary and secondary school arena, remedying harassment must be the school's first priority, even if that action results in a breach of a request for confidentiality. These commenters were concerned that, by honoring requests for confidentiality, schools would not be able to take effective action to remedy harassment. Other commenters believe that if requests for confidentiality are

not honored, students may be discouraged from reporting harassment. These commenters, therefore, argue that declining to honor these requests would be less effective in preventing harassment than taking whatever steps are possible to remedy harassment, while maintaining a victim's confidentiality. Finally, some commenters were concerned that withholding the name of the victim of harassment would interfere with the due process rights of the accused.

*Discussion:* The Guidance strikes a balance regarding the issue of confidentiality: encouraging students to report harassment, even if students wish to maintain confidentiality, but not placing schools in an untenable position regarding their obligations to remedy and prevent further harassment, or making it impossible for an accused to adequately defend himself or herself. The Guidance encourages schools to honor a student's request that his or her name be withheld, if this can be done consistently with the school's obligation to remedy the harassment and take steps to prevent further harassment. (The Guidance also notes that schools should consider whether the Family Educational Rights and Privacy Act (FERPA) would prohibit a school from disclosing information from a student's education record without the consent of the student alleging harassment.) In addition, OCR has provided clarification by describing factors schools should consider in making these determinations. These factors include the nature of the harassment, the age of the students involved, and the number of incidents and students involved. These factors also may be relevant in balancing a victim's need for confidentiality against the rights of an accused harasser.

The Guidance also has been clarified to acknowledge that, because of the sensitive nature of incidents of harassment, it is important to limit or prevent public disclosure of the names of both the student who alleges harassment and the name of the alleged harasser. The Guidance informs schools that, in all cases, they should make every effort to prevent public disclosure of the names of all parties involved, except to the extent necessary to carry out a thorough investigation.

### FERPA

*Comments:* Several commenters stated that the Department should change its position that FERPA could prevent a school from informing a complainant of the sanction or discipline imposed on a student found guilty of harassment. Some commenters

EXHIBIT 3

argued that information regarding the outcome of a sexual harassment complaint is not an education record covered by FERPA. Other commenters argued alternatively that any information regarding the outcome of the proceedings is "related to" the complainant and, therefore, the information can be disclosed to him or her consistent with FERPA. In addition, some commenters asked for clarification that FERPA does not limit the due process rights of a teacher who is accused of harassment to be informed of the name of the student who has alleged harassment.

*Discussion:* As these comments indicate, the interplay of FERPA and Title IX raises complex and difficult issues. Regarding requests for clarification on the interplay of FERPA and the rights of an accused employee, the Guidance clarifies that the Department does not interpret FERPA to override any federally protected due process rights of a school employee accused of harassment.

Regarding whether FERPA prohibits the disclosure of any disciplinary action taken against a student found guilty of harassment, it is the Department's current position that FERPA prohibits a school from releasing information to a complainant if that information is contained in the other student's education record unless— (1) the information directly relates to the complainant (for example, an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution. However, in light of the comments received on this issue, the Department has determined that its position regarding the application of FERPA to records and information related to sexual harassment needs further consideration. Accordingly, the section on "Notice of Outcome and FERPA" has been removed from the Guidance. Additional guidance on FERPA will be forthcoming.

*Does Title IX Require Schools to Have a Sexual Harassment Policy*

*Comments:* Several commenters requested additional clarity regarding whether Title IX requires schools to have a policy explicitly prohibiting sexual harassment or to have grievance procedures specifically intended to handle sexual harassment complaints, or both.

*Discussion:* Title IX requires a recipient of Federal funds to notify students and parents of elementary and secondary students of its policy against

discrimination based on sex and have in place a prompt and equitable procedure for resolving sex discrimination complaints. Sexual harassment can be a form of sexual discrimination. The Guidance clearly states that, while a recipient's policy and procedure must meet all procedural requirements of Title IX and apply to sexual harassment, a school does not have to have a policy and procedure specifically addressing sexual harassment, as long as its non-discrimination policy and procedures for handling discrimination complaints are effective in eliminating all types of sex discrimination. OCR has found that policies and procedures specifically designed to address sexual harassment, if age appropriate, are a very effective means of making students and employees aware of what constitutes sexual harassment, that that conduct is prohibited sex discrimination, and that it will not be tolerated by the school. That awareness, in turn, can be a key element in preventing sexual harassment.

Dated: March 10, 1997.

**Norma V. Cantú,**

*Assistant Secretary for Civil Rights.*

**Sexual Harassment Guidance: Harassment of Students [1] by School Employees, Other Students, or Third Parties**

**Summary of Contents**

Introduction
Applicability of Title IX
Liability of a School for Sexual Harassment
Welcomeness
Severe, Persistent, or Pervasive
Notice
Recipient's Response
Prompt and Equitable Grievance Procedures
First Amendment

**Introduction**

Under Title IX of the Education Amendments of 1972 (Title IX) and its implementing regulations, no individual may be discriminated against on the basis of sex in any education program or activity receiving Federal financial assistance.[2] Sexual harassment of students is a form of prohibited sex discrimination[3] under the circumstances described in the Guidance. The following types of conduct constitute sexual harassment:

*Quid Pro Quo Harassment*

A school employee[4] explicitly or implicitly conditions a student's participation in an education program or activity or bases an educational decision on the student's submission to unwelcome sexual advances, requests for sexual favors, or other verbal, nonverbal, or physical conduct of a

sexual nature.[5] *Quid pro quo* harassment is equally unlawful whether the student resists and suffers the threatened harm or submits and thus avoids the threatened harm.

*Hostile Environment Sexual Harassment*

Sexually harassing conduct (which can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature)[6] by an employee, by another student, or by a third party that is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from an education program or activity, or to create a hostile or abusive educational environment.[7]

Schools are required by the Title IX regulations to have grievance procedures through which students can complain of alleged sex discrimination, including sexual harassment.[8] As outlined in this guidance, grievance procedures also provide schools with an excellent mechanism to be used in their efforts to prevent sexual harassment before it occurs.

Finally, if the alleged harassment involves issues of speech or expression, a school's obligations may be affected by the application of First Amendment principles.

These and other issues are discussed in more detail in the following paragraphs.

**Applicability of Title IX**

Title IX applies to all public and private educational institutions that receive Federal funds, including elementary and secondary schools, school districts, proprietary schools, colleges, and universities. The Guidance uses the term "schools" to refer to all those institutions. The "education program or activity" of a school includes all of the school's operations.[9] This means that Title IX protects students in connection with all of the academic, educational, extra-curricular, athletic, and other programs of the school, whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere.

It is important to recognize that Title IX's prohibition of sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct. For example, a high school athletic coach hugging a student who made a goal or a kindergarten teacher's consoling hug for a child with a skinned knee will not be considered sexual harassment.[10] Similarly, one student's demonstration of a sports maneuver or

EXHIBIT 3

technique requiring contact with another student will not be considered sexual harassment. However, in some circumstances, nonsexual conduct may take on sexual connotations and may rise to the level of sexual harassment. For example, a teacher's repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment.

Title IX protects any ''person'' from sex discrimination; accordingly both male and female students are protected from sexual harassment engaged in by a school's employees, other students, or third parties.[11] Moreover, Title IX prohibits sexual harassment regardless of the sex of the harasser, i.e., even if the harasser and the person being harassed are members of the same sex.[12] An example would be a campaign of sexually explicit graffiti directed at a particular girl by other girls.[13]

Although Title IX does not prohibit discrimination on the basis of sexual orientation,[14] sexual harassment directed at gay or lesbian students may constitute sexual harassment prohibited by Title IX. For example, if students heckle another student with comments based on the student's sexual orientation (e.g., ''gay students are not welcome at this table in the cafeteria''), but their actions or language do not involve sexual conduct, their actions would not be sexual harassment covered by Title IX. On the other hand, harassing conduct of a sexual nature directed toward gay or lesbian students (e.g., if a male student or a group of male students target a lesbian student for physical sexual advances) may create a sexually hostile environment and, therefore, may be prohibited by Title IX. It should be noted that some State and local laws may prohibit discrimination on the basis of sexual orientation. Also, under certain circumstances, courts may permit redress for harassment on the basis of sexual orientation under other Federal legal authority.[15]

It is also important to recognize that gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex, but not involving conduct of a sexual nature, may be a form of sex discrimination that violates Title IX if it is sufficiently severe, persistent, or pervasive and directed at individuals because of their sex.[16] For example, the repeated sabotaging of female graduate students' laboratory experiments by male students in the class could be the basis of a violation of Title IX. Although a comprehensive discussion of gender-based harassment

is beyond the scope of this Guidance, in assessing all related circumstances to determine whether a hostile environment exists, incidents of gender-based harassment combined with incidents of sexual harassment could create a hostile environment, even if neither the gender-based harassment alone nor the sexual harassment alone would be sufficient to do so.[17]

## Liability of a School for Sexual Harassment

### Liability of a School for Sexual Harassment by its Employees

A school's liability for sexual harassment by its employees is determined by application of agency principles,[18] i.e., by principles governing the delegation of authority to or authorization of another person to act on one's behalf.

Accordingly, a school will always be liable for even one instance of *quid pro quo* harassment by a school employee in a position of authority, such as a teacher or administrator, whether or not it knew, should have known, or approved of the harassment at issue.[19] Under agency principles, if a teacher or other employee uses the authority he or she is given (e.g., to assign grades) to force a student to submit to sexual demands, the employee ''stands in the shoes'' of the school and the school will be responsible for the use of its authority by the employee or agent.[20]

A school will also be liable for hostile environment sexual harassment by its employees,[21] i.e., for harassment that is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program or to create a hostile or abusive educational environment if the employee— (1) acted with apparent authority (i.e., because of the school's conduct, the employee reasonably appears to be acting on behalf of the school, whether or not the employee acted with authority);[22] or (2) was aided in carrying out the sexual harassment of students by his or her position of authority with the institution.[23] For example, a school will be liable if a teacher abuses his or her delegated authority over a student to create a hostile environment, such as if the teacher implicitly threatens to fail a student unless the student responds to his or her sexual advances, even though the teacher fails to carry out the threat.[24]

As this example illustrates, in many cases the line between *quid pro quo* and hostile environment discrimination will be blurred, and the employee's conduct may constitute both types of harassment. However, what is important

is that the school is liable for that conduct under application of agency principles, regardless of whether it is labeled as *quid pro quo* or hostile environment harassment.

Whether other employees, such as a janitor or cafeteria worker, are in positions of authority in relation to students—or whether it would be reasonable for the student to believe the employees are, even if the employees are not (i.e., apparent authority)—will depend on factors such as the authority actually given to the employee[25] (e.g., in some elementary schools, a cafeteria worker may have authority to impose discipline) and the age of the student. For example, in some cases the younger a student is, the more likely it is that he or she will consider any adult employee to be in a position of authority.

Even in situations not involving (i) *quid pro quo* harassment, (ii) creation of a hostile environment through an employee's apparent authority, or (iii) creation of a hostile environment in which the employee is aided in carrying out the sexual harassment by his or her position of authority, a school will be liable for sexual harassment of its students by its employees under the same standards applicable to peer and third party hostile environment sexual harassment, as discussed in the next section. That is, if the school fails to take immediate and appropriate steps to remedy known harassment, then the school will be liable under Title IX.[26] It is important to emphasize that under this standard of liability the school can avoid violating Title IX if it takes immediate and appropriate action upon notice of the harassment.

### Liability of a School for Peer or Third Party Harassment[27]

In contrast to the variety of situations in which a school may be liable for sexual harassment by its employees, a school will be liable under Title IX if its students sexually harass other students if (i) a hostile environment exists in the school's programs or activities, (ii) the school knows or should have known of the harassment, and (iii) the school fails to take immediate and appropriate corrective action.[28] (Each of these factors is discussed in detail in subsequent sections of the Guidance.) Under these circumstances, a school's failure to respond to the existence of a hostile environment within its own programs or activities permits an atmosphere of sexual discrimination to permeate the educational program and results in discrimination prohibited by Title IX. Conversely, if, upon notice of hostile environment harassment, a school takes immediate and appropriate

EXHIBIT 3

steps to remedy the hostile environment, the school has avoided violating Title IX. Thus, Title IX does not make a school responsible for the actions of harassing students, but rather for its own discrimination in failing to remedy it once the school has notice.

Sexually harassing conduct of third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic club) can also cause a sexually hostile environment in school programs or activities. For the same reason that a school will be liable under Title IX for a hostile environment caused by its students, a school will be liable if third parties sexually harass its students if (i) a hostile environment exists in the school's programs or activities, (ii) the school knows or should have known of the harassment, and (iii) the school fails to take immediate and appropriate corrective action.[29] However, the type of appropriate steps the school should take will differ depending on the level of control the school has over the third party harasser.[30] This issue is discussed in "Recipient's Response."

*Effect of Grievance Procedures on Liability*

Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination.[31] (These issues are discussed in the section on "Prompt and Equitable Grievance Procedures.") These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems, as required by Title IX. By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences.

Accordingly, in the absence of effective policies and grievance procedures, if the alleged harassment was sufficiently severe, persistent, or pervasive to create a hostile environment, a school will be in violation of Title IX because of the existence of a hostile environment, even if the school was not aware of the harassment and thus failed to remedy it.[32] This is because, without a policy and procedure, a student does not know either of the school's interest in preventing this form of discrimination

or how to report harassment so that it can be remedied. Moreover, under the agency principles previously discussed, a school's failure to implement effective policies and procedures against discrimination may create apparent authority for school employees to harass students.[33]

*OCR Case Resolution*

If OCR is asked to investigate or otherwise resolve incidents of sexual harassment of students, including incidents caused by employees, other students, or third parties, OCR will consider whether—(1) the school has a policy prohibiting sex discrimination under Title IX and effective Title IX grievance procedures;[34] (2) the school appropriately investigated or otherwise responded to allegations of sexual harassment; and (3) the school has taken immediate and appropriate corrective action responsive to *quid pro quo* or hostile environment harassment. (Issues related to appropriate investigative and corrective actions are discussed in detail in the section on "Recipient's Response.") If the school has taken each of these steps, OCR will consider the case against the school resolved and take no further action other than monitoring compliance with any agreement between the school and OCR. This is true in cases in which the school was in violation of Title IX, as well as those in which there has been no violation of Title IX.[35]

**Welcomeness**

In order to be actionable as harassment, sexual conduct must be unwelcome. Conduct is unwelcome if the student did not request or invite it and "regarded the conduct as undesirable or offensive."[36] Acquiescence in the conduct or the failure to complain does not always mean that the conduct was welcome.[37] For example, a student may decide not to resist sexual advances of another student or may not file a complaint out of fear. In addition, a student may not object to a pattern of sexually demeaning comments directed at him or her by a group of students out of a concern that objections might cause the harassers to make more comments. The fact that a student may have accepted the conduct does not mean that he or she welcomed it.[38] Also, the fact that a student willingly participated in conduct on one occasion does not prevent him or her from indicating that the same conduct has become unwelcome on a subsequent occasion. On the other hand, if a student actively participates in sexual banter and discussions and gives no indication that

he or she objects, then the evidence generally will not support a conclusion that the conduct was unwelcome.[39]

If younger children are involved, it may be necessary to determine the degree to which they are able to recognize that certain sexual conduct is conduct to which they can or should reasonably object and the degree to which they can articulate an objection. Accordingly, OCR will consider the age of the student, the nature of the conduct involved, and other relevant factors in determining whether a student had the capacity to welcome sexual conduct.

Schools should be particularly concerned about the issue of welcomeness if the harasser is in a position of authority. For instance, because students may be encouraged to believe that a teacher has absolute authority over the operation of his or her classroom, a student may not object to a teacher's sexually harassing comments during class; however, this does not necessarily mean that the conduct was welcome. Instead, the student may believe that any objections would be ineffective in stopping the harassment or may fear that by making objections he or she will be singled out for harassing comments or other retaliation.

In addition, OCR must consider particular issues of welcomeness if the alleged harassment relates to alleged "consensual" sexual relationships between a school's adult employees and its students. If elementary students are involved, welcomeness will not be an issue: OCR will never view sexual conduct between an adult school employee and an elementary school student as consensual. In cases involving secondary students, there will be a strong presumption that sexual conduct between an adult school employee and a student is not consensual. In cases involving older secondary students, subject to the presumption,[40] OCR will consider a number of factors in determining whether a school employee's sexual advances or other sexual conduct could be considered welcome.[41] In addition, OCR will consider these factors in all cases involving postsecondary students in making those determinations.[42] The factors include:

• The nature of the conduct and the relationship of the school employee to the student, including the degree of influence (which could, at least in part, be affected by the student's age), authority, or control the employee has over the student.

• Whether the student was legally or practically unable to consent to the sexual conduct in question. For

EXHIBIT 3

example, a student's age could affect his or her ability to do so. Similarly, certain types of disabilities could affect a student's ability to do so.

If there is a dispute about whether harassment occurred or whether it was welcome—in a case in which it is appropriate to consider whether the conduct could be welcome— determinations should be made based on the totality of the circumstances. The following types of information may be helpful in resolving the dispute:

• Statements by any witnesses to the alleged incident.

• Evidence about the relative credibility of the allegedly harassed student and the alleged harasser. For example, the level of detail and consistency of each person's account should be compared in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist. However, the absence of witnesses may indicate only the unwillingness of others to step forward, perhaps due to fear of the harasser or a desire not to get involved.

• Evidence that the alleged harasser has been found to have harassed others may support the credibility of the student claiming the harassment; conversely, the student's claim will be weakened if he or she has been found to have made false allegations against other individuals.

• Evidence of the allegedly harassed student's reaction or behavior after the alleged harassment. For example, were there witnesses who saw the student immediately after the alleged incident who say that the student appeared to be upset? However, it is important to note that some students may respond to harassment in ways that do not manifest themselves right away, but may surface several days or weeks after the harassment. For example, a student may initially show no signs of having been harassed, but several weeks after the harassment, there may be significant changes in the student's behavior, including difficulty concentrating on academic work, symptoms of depression, and a desire to avoid certain individuals and places at school.

• Evidence about whether the student claiming harassment filed a complaint or took other action to protest the conduct soon after the alleged incident occurred. However, failure to immediately complain may merely reflect a fear of retaliation or a fear that the complainant may not be believed rather than that the alleged harassment did not occur.

• Other contemporaneous evidence. For example, did the student claiming harassment write about the conduct, and his or her reaction to it, soon after it occurred (e.g., in a diary or letter)? Did the student tell others (friends, parents) about the conduct (and his or her reaction to it) soon after it occurred?

**Severe, Persistent, or Pervasive**

Hostile environment sexual harassment of a student or students by other students, employees, or third parties is created if conduct of a sexual nature is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program or to create a hostile or abusive educational environment. Thus, conduct that is sufficiently severe, but not persistent or pervasive, can result in hostile environment sexual harassment.

In deciding whether conduct is sufficiently severe, persistent, or pervasive, the conduct should be considered from both a subjective [43] and objective [44] perspective. In making this determination, all relevant circumstances should be considered [45]:

• *The degree to which the conduct affected one or more students' education.* For a hostile environment to exist, the conduct must have limited the ability of a student to participate in or benefit from his or her education or altered the conditions of the student's educational environment. [46]

•• Many hostile environment cases involve tangible or obvious injuries. [47] For example, a student's grades may go down or the student may be forced to withdraw from school because of the harassing behavior. [48] A student may also suffer physical injuries and mental or emotional distress. [49]

•• However, a hostile environment may exist even if there is no tangible injury to the student. [50] For example, a student may have been able to keep up his or her grades and continue to attend school even though it was more difficult for him or her to do so because of the harassing behavior. [51] A student may be able to remain on a sports team, despite feeling humiliated or angered by harassment that creates a hostile environment. [52] Harassing conduct in these examples alters the student's educational environment on the basis of sex.

•• A hostile environment can occur even if the harassment is not targeted specifically at the individual complainant. [53] For example, if a student or group of students regularly directs sexual comments toward a particular student, a hostile environment may be created not only for the targeted student, but also for others who witness the conduct. Similarly, if a middle school teacher directs sexual comments toward a particular student, a hostile environment may be created for the targeted student and for the students who witness the conduct.

• *The type, frequency, and duration of the conduct.* In most cases, a hostile environment will exist if there is a pattern or practice of harassment or if the harassment is sustained and nontrivial. [54] For instance, if a young woman is taunted by one or more young men about her breasts or genital area or both, OCR may find that a hostile environment has been created, particularly if the conduct has gone on for some time, takes place throughout the school, or if the taunts are made by a number of students. The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical. For instance, if the conduct is more severe, e.g., attempts to grab a female student's breasts, genital area, or buttocks, it need not be as persistent or pervasive in order to create a hostile environment. Indeed, a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment. [55] On the other hand, conduct that is not severe, persistent, or pervasive will not create a hostile environment; e.g., a comment by one student to another student that she has a nice figure. Indeed, depending on the circumstances, this may not even be conduct of a sexual nature. [56] Similarly, because students date one another, a request for a date or a gift of flowers, even if unwelcome, would not create a hostile environment. However, there may be circumstances in which repeated, unwelcome requests for dates or similar conduct could create a hostile environment. For example, a person may request dates in an intimidating or threatening manner.

• *The identity of and relationship between the alleged harasser and the subject or subjects of the harassment.* A factor to be considered, especially in cases involving allegations of sexual harassment of a student by a school employee, is the identity of and relationship between the alleged harasser and the subject or subjects of the harassment. For example, due to the power that a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student. [57]

• *The number of individuals involved.* Sexual harassment may be committed by an individual or a group.

EXHIBIT 3

In some cases, verbal comments or other conduct from one person might not be sufficient to create a hostile environment, but could be if done by a group. Similarly, while harassment can be directed toward an individual or a group,[58] the effect of the conduct toward a group may vary, depending on the type of conduct and the context. For certain types of conduct, there may be "safety in numbers." For example, following an individual student and making sexual taunts to him or her may be very intimidating to that student but, in certain circumstances, less so to a group of students. On the other hand, persistent unwelcome sexual conduct still may create a hostile environment if directed toward a group.

• *The age and sex of the alleged harasser and the subject or subjects of the harassment.* For example, in the case of younger students, sexually harassing conduct is more likely to be intimidating if coming from an older student.[59]

• *The size of the school, location of the incidents, and context in which they occurred.* Depending on the circumstances of a particular case, fewer incidents may have a greater effect at a small college than at a large university campus. Harassing conduct occurring on a school bus may be more intimidating than similar conduct on a school playground because the restricted area makes it impossible for the students to avoid their harassers.[60] Harassing conduct in a personal or secluded area such as a dormitory room or residence hall can also have a greater effect (e.g., be seen as more threatening) than would similar conduct in a more public area. On the other hand, harassing conduct in a public place may be more humiliating. Each incident must be judged individually.

• *Other incidents at the school.* A series of instances at the school, not involving the same students, could— taken together—create a hostile environment, even if each by itself would not be sufficient.[61]

• *Incidents of gender-based, but non-sexual, harassment.* Acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex, but not involving sexual activity or language, can be combined with incidents of sexual harassment to determine if the incidents of sexual harassment are sufficiently severe, persistent, or pervasive to create a sexually hostile environment.[62]

**Notice**

A school will be in violation of Title IX if a school "has notice" of a sexually hostile environment and fails to take immediate and appropriate corrective action.[63] A school has notice if it actually "knew, or in the exercise of reasonable care, should have known" about the harassment.[64] In addition, as long as an agent or responsible employee of the school received notice,[65] the school has notice.

A school can receive notice in many different ways. A student may have filed a grievance or complained to a teacher about fellow students sexually harassing him or her. A student, parent, or other individual may have contacted other appropriate personnel, such as a principal, campus security, bus driver, teacher, an affirmative action officer, or staff in the office of student affairs. An agent or responsible employee of the school may have witnessed the harassment. The school may receive notice in an indirect manner, from sources such as a member of the school staff, a member of the educational or local community, or the media. The school also may have received notice from flyers about the incident or incidents posted around the school.[66]

Constructive notice exists if the school "should have" known about the harassment—if the school would have found out about the harassment through a "reasonably diligent inquiry."[67] For example, if a school knows of some incidents of harassment, there may be situations in which it will be charged with notice of others—if the known incidents should have triggered an investigation that would have led to a discovery of the additional incidents. In other cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment—if the harassment is widespread, openly practiced, or well-known to students and staff (such as sexual harassment occurring in hallways, graffiti in public areas, or harassment occurring during recess under a teacher's supervision).[68]

In addition, if a school otherwise has actual or constructive notice of a hostile environment and fails to take immediate and appropriate corrective action, a school has violated Title IX even if the student fails to use the school's existing grievance procedures.

**Recipient's Response**

Once a school has notice of possible sexual harassment of students—whether carried out by employees, other students, or third parties—it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again. These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action.[69] As described in the next section, in appropriate circumstances the school will also be responsible for taking steps to remedy the effects of the harassment on the individual student or students who were harassed. What constitutes a reasonable response to information about possible sexual harassment will differ depending upon the circumstances.

*Response to Student or Parent Reports of Harassment; Response to Direct Observation by a Responsible Employee or Agent of Harassment*

If a student or the parent of an elementary or secondary student provides information or complains about sexual harassment of the student, the school should initially discuss what actions the student or parent is seeking in response to the harassment. The school should explain the avenues for informal and formal action, including a description of the grievance procedure that is available for sexual harassment complaints and an explanation of how the procedure works. If a responsible school employee or agent has directly observed sexual harassment of a student, the school should contact the student who was harassed (or the parent, depending upon the age of the student),[70] explain that the school is responsible for taking steps to correct the harassment, and provide the same information described in the previous sentence.

Regardless of whether the student who was harassed, or his or her parent, decides to file a formal complaint or otherwise request action on the student's behalf (including in cases involving direct observation by a responsible school employee or agent), the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. However, in all cases the inquiry must be prompt, thorough, and impartial. (Requests by the student who was harassed for confidentiality or for no action to be taken, responding to notice of harassment from other sources, and the components of a prompt and equitable grievance procedure are discussed in subsequent sections of the Guidance.)

EXHIBIT 3

It may be appropriate for a school to take interim measures during the investigation of a complaint. For instance, if a student alleges that he or she has been sexually assaulted by another student, the school may decide to immediately place the students in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation. Similarly, if the alleged harasser is a teacher, allowing the student to transfer to a different class may be appropriate. In cases involving potential criminal conduct, school personnel should determine whether appropriate law enforcement authorities should be notified. In all cases, schools should make every effort to prevent public disclosure of the names of all parties involved, except to the extent necessary to carry out an investigation.

If a school determines that sexual harassment has occurred, it should take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation.[71] Appropriate steps should be taken to end the harassment. For example, school personnel may need to counsel, warn, or take disciplinary action against the harasser, based on the severity of the harassment or any record of prior incidents or both.[72] A series of escalating consequences may be necessary if the initial steps are ineffective in stopping the harassment.[73] In some cases, it may be appropriate to further separate the harassed student and the harasser, e.g., by changing housing arrangements[74] or directing the harasser to have no further contact with the harassed student. Responsive measures of this type should be designed to minimize, as much as possible, the burden on the student who was harassed. If the alleged harasser is not a student or employee of the recipient, OCR will consider the level of control the school has over the harasser in determining what response would be appropriate.[75]

Steps also should be taken to eliminate any hostile environment that has been created. For example, if a female student has been subjected to harassment by a group of other students in a class, the school may need to deliver special training or other interventions for that class to repair the educational environment. If the school offers the student the option of withdrawing from a class in which a hostile environment occurred, the school should assist the student in making program or schedule changes and ensure that none of the changes adversely affect the student's academic record. Other measures may include, if

appropriate, directing a harasser to apologize to the harassed student. If a hostile environment has affected an entire school or campus, an effective response may need to include dissemination of information, the issuance of new policy statements, or other steps that are designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports that conduct.

In some situations, a school may be required to provide other services to the student who was harassed if necessary to address the effects of the harassment on that student.[76] For example, if an instructor gives a student a low grade because the student failed to respond to his sexual advances, this constitutes *quid pro quo* harassment for which the school is liable under Title IX regardless of whether it knew of the harassment. Thus, the school may be required to make arrangements for an independent reassessment of the student's work, if feasible, and change the grade accordingly; make arrangements for the student to take the course again with a different instructor; provide tutoring; make tuition adjustments; offer reimbursement for professional counseling; or take other measures that are appropriate to the circumstances. As another example, if a school delays responding or responds inappropriately to information about harassment, such as a case in which the school ignores complaints by a student that he or she is being sexually harassed by a classmate, the school will be required to remedy the effects of the harassment that could have been prevented had the school responded promptly and appropriately.

Finally, a school should take steps to prevent any further harassment[77] and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against a person who filed a complaint on behalf of a student, or against those who provided information as witnesses.[78] At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquiries to see if there have been any new incidents or any retaliation. To prevent recurrences, counseling for the harasser may be appropriate to ensure that he or she understands what constitutes harassment and the effects it can have. In addition, depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school

community to ensure that students, parents, and teachers can recognize harassment if it recurs and know how to respond.[79]

*Requests by the Harassed Student for Confidentiality*

The scope of a reasonable response also may depend upon whether a student, or parent of a minor student, reporting harassment asks that the student's name not be disclosed to the harasser or that nothing be done about the alleged harassment. In all cases a school should discuss confidentiality standards and concerns with the complainant initially. The school should inform the student that the request may limit the school's ability to respond. The school also should tell the student that Title IX prohibits retaliation and that, if he or she is afraid of reprisals from the alleged harasser, the school will take steps to try to prevent retaliation and will take strong responsive actions if retaliation occurs. If the student continues to ask that his or her name not be revealed, the school should take all reasonable steps to investigate and respond to the complaint consistent with that request as long as doing so does not preclude the school from responding effectively to the harassment and preventing harassment of other students. Thus, for example, a reasonable response would not require disciplinary action against an alleged harasser if a student, who was the only student harassed, insists that his or her name not be revealed, and the alleged harasser could not respond to the charges of sexual harassment without that information.

At the same time, a school should evaluate the confidentiality request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. The factors a school may consider in this regard include the seriousness of the alleged harassment, the age of the student harassed, whether there have been other complaints or reports of harassment against the alleged harasser, and the rights of the accused individual to receive information about the accuser and the allegations if a formal proceeding with sanctions may result.[80]

Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual complaint of harassment, other means may be available to address the harassment. There are steps a recipient can take to limit the effects of the alleged harassment and prevent its recurrence without initiating formal action against the alleged harasser or revealing the identity of the

EXHIBIT 3

complainant. Examples include conducting sexual harassment training for the school site or academic department where the problem occurred, taking a student survey concerning any problems with harassment, or implementing other systemic measures at the site or department where the alleged harassment has occurred.

In addition, by investigating the complaint to the extent possible—including by reporting it to the Title IX coordinator or other responsible school employee designated pursuant to Title IX—the school may learn about or be able to confirm a pattern of harassment based on claims by different students that they were harassed by the same individual. In some situations there may be prior reports by former students who now might be willing to come forward and be identified, thus providing a basis for further corrective action. In instances affecting a number of students (for example, a report from a student that an instructor has repeatedly made sexually explicit remarks about his or her personal life in front of an entire class), an individual can be put on notice of allegations of harassing behavior and counseled appropriately without revealing, even indirectly, the identity of the student who notified the school. Those steps can be very effective in preventing further harassment.

*Response to Other Types of Notice*

The previous two sections deal with situations in which a student or parent of a student who was harassed reports or complains of harassment or in which a responsible school employee or agent directly observes sexual harassment of a student. If a school learns of harassment through other means, for example if information about harassment is received from a third party (such as from a witness to an incident or an anonymous letter or telephone call), different factors will affect the school's response. These factors include the source and nature of the information; the seriousness of the alleged incident; the specificity of the information; the objectivity and credibility of the source of the report; whether any individuals can be identified who were subjected to the alleged harassment; and whether those individuals want to pursue the matter. If, based on these factors, it is reasonable for the school to investigate and it can confirm the allegations, the considerations described in the previous sections concerning interim measures and appropriate responsive action will apply.

For example, if a parent visiting a school observes a student repeatedly harassing a group of female students and reports this to school officials, school personnel can speak with the female students to confirm whether that conduct has occurred and whether they view it as unwelcome. If the school determines that the conduct created a hostile environment, it can take reasonable, age-appropriate steps to address the situation. If, on the other hand, the students in this example were to ask that their names not be disclosed or indicate that they do not want to pursue the matter, the considerations described in the previous section related to requests for confidentiality will shape the school's response.

In a contrasting example, a student newspaper at a large university may print an anonymous letter claiming that a professor is sexually harassing students in class on a daily basis, but the letter provides no clue as to the identity of the professor or the department in which the conduct is allegedly taking place. Due to the anonymous source and lack of specificity of the information, a school would not reasonably be able to investigate and confirm these allegations. However, in response to the anonymous letter, the school could submit a letter or article to the newspaper reiterating its policy against sexual harassment, encouraging persons who believe that they have been sexually harassed to come forward, and explaining how its grievance procedures work.

*Prevention*

A policy specifically prohibiting sexual harassment and separate grievance procedures for violations of that policy can help ensure that all students and employees understand the nature of sexual harassment and that the school will not tolerate it. Indeed, they might even bring conduct of a sexual nature to the school's attention so that the school can address it *before* it becomes sufficiently severe, persistent, or pervasive to create a hostile environment. Further, training for administrators, teachers, and staff and age-appropriate classroom information for students can help to ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond.

**Prompt and Equitable Grievance Procedures**

Schools are required by Title IX to adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex. [81]

Accordingly, regardless of whether harassment occurred, a school violates this requirement of Title IX if it does not have those procedures and policy in place. [82]

A school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities filed by students against school employees, other students, or third parties. [83] Title IX does not require a school to adopt a policy specifically prohibiting sexual harassment or to provide separate grievance procedures for sexual harassment complaints. However, its nondiscrimination policy and grievance procedures for handling discrimination complaints must provide effective means for preventing and responding to sexual harassment. Thus, if, because of the lack of a policy or procedure specifically addressing sexual harassment, students are unaware of what kind of conduct constitutes sexual harassment or that that conduct is prohibited sex discrimination, a school's general policy and procedures relating to sex discrimination complaints will not be considered effective. [84]

OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for—

(1) Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

(2) Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

(3) Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

(4) Designated and reasonably prompt timeframes for the major stages of the complaint process;

(5) Notice to the parties of the outcome of the complaint; [85] and

(6) An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate. [86]

Many schools also provide an opportunity to appeal the findings or remedy or both. In addition, because retaliation is prohibited by Title IX, schools may want to include a provision in their procedures prohibiting retaliation against any individual who files a complaint or participates in a harassment inquiry.

EXHIBIT 3

**Federal Register** / Vol. 62, No. 49 / Thursday, March 13, 1997 / Notices

Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience. In addition, whether complaint resolutions are timely will vary depending on the complexity of the investigation and the severity and extent of the harassment. During the investigation it is a good practice for schools to inform students who have alleged harassment about the status of the investigation on a periodic basis.

A grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint. Thus, the procedures should be written in language appropriate to the age of the school's students, easily understood, and widely disseminated. Distributing the procedures to administrators, or including them in the school's administrative or policy manual, may not by itself be an effective way of providing notice, as these publications are usually not widely circulated to and understood by all members of the school community. Many schools ensure adequate notice to students by having copies of the procedures available at various locations throughout the school or campus; publishing the procedures as a separate document; including a summary of the procedures in major publications issued by the school, such as handbooks and catalogs for students, parents of elementary and secondary students, faculty, and staff; and identifying individuals who can explain how the procedures work.

A school must designate at least one employee to coordinate its efforts to comply with and carry out its Title IX responsibilities.[87] The school must notify all of its students and employees of the name, office address, and telephone number of the employee or employees designated.[88] Because it is possible that an employee designated to handle Title IX complaints may him or herself engage in harassment, a school may want to designate more than one employee to be responsible for handling complaints in order to ensure that students have an effective means of reporting harassment.[89] While a school may choose to have a number of employees responsible for Title IX matters, it is also advisable to give one official responsibility for overall coordination and oversight of all sexual harassment complaints to ensure consistent practices and standards in handling complaints. Coordination of recordkeeping (for instance, in a

confidential log maintained by the Title IX coordinator) will also ensure that the school can and will resolve recurring problems and identify students or employees who have multiple complaints filed against them.[90] Finally, the school must make sure that all designated employees have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates.[91]

Grievance procedures may include informal mechanisms for resolving sexual harassment complaints to be used if the parties agree to do so.[92] OCR has frequently advised schools, however, that it is not appropriate for a student who is complaining of harassment to be required to work out the problem directly with the individual alleged to be harassing him or her, and certainly not without appropriate involvement by the school (e.g., participation by a counselor, trained mediator, or, if appropriate, a teacher or administrator). In addition, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis. Title IX also permits the use of a student disciplinary procedure not designed specifically for Title IX grievances to resolve sex discrimination complaints, as long as the procedure meets the requirement of affording a complainant a "prompt and equitable" resolution of the complaint.

In some instances, a complainant may allege harassing conduct that constitutes both sex discrimination and possible criminal conduct. Police investigations or reports may be useful in terms of fact-gathering. However, because legal standards for criminal conduct are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly.[93] Similarly, schools are cautioned about using the results of insurance company investigations of sexual harassment allegations. The purpose of an insurance investigation is to assess liability under the insurance policy, and the applicable standards may well be different from those under Title IX. In addition, a school is not relieved of its responsibility to respond to a sexual harassment complaint filed under its grievance procedure by the fact that a complaint has been filed with OCR.[94]

Finally, a public school's employees may have certain due process rights under the United States Constitution.

The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions. The rights established under Title IX must be interpreted consistently with any federally guaranteed rights involved in a complaint proceeding. In both public and private schools, additional or separate rights may be created for employees or students by State law, institutional regulations and policies, such as faculty or student handbooks, and collective bargaining agreements. Schools should be aware of these rights and their legal responsibilities to those accused of harassment. Indeed, procedures that ensure the Title IX rights of the complainant while at the same time according due process to both parties involved will lead to sound and supportable decisions. Schools should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.

**First Amendment**

In cases of alleged harassment, the protections of the First Amendment must be considered if issues of speech or expression are involved.[95] Free speech rights apply in the classroom (e.g., classroom lectures and discussions)[96] and in all other education programs and activities of public schools (e.g., public meetings and speakers on campus; campus debates, school plays and other cultural events[97]; and student newspapers, journals and other publications[98]). In addition, First Amendment rights apply to the speech of students and teachers.[99]

Title IX is intended to protect students from sex discrimination, not to regulate the content of speech. OCR recognizes that the offensiveness of particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX.[100] In order to establish a violation of Title IX, the harassment must be sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program or to create a hostile or abusive educational environment.[101]

Moreover, in regulating the conduct of its students and its faculty to prevent or redress discrimination prohibited by Title IX (e.g., in responding to harassment that is sufficiently severe, persistent, or pervasive as to create a hostile environment), a school must formulate, interpret, and apply its rules so as to protect academic freedom and free speech rights. For instance, while the First Amendment may prohibit a

EXHIBIT 3

school from restricting the right of students to express opinions about one sex that may be considered derogatory, the school can take steps to denounce those opinions and ensure that competing views are heard. The age of the students involved and the location or forum may affect how the school can respond consistent with the First Amendment.[102] As an example of the application of free speech rights to allegations of sexual harassment, consider the following:

**Example 1:** In a college level creative writing class, a professor's required reading list includes excerpts from literary classics that contain descriptions of explicit sexual conduct, including scenes that depict women in submissive and demeaning roles. The professor also assigns students to write their own materials, which are read in class. Some of the student essays contain sexually derogatory themes about women. Several female students complain to the Dean of Students that the materials and related classroom discussion have created a sexually hostile environment for women in the class. What must the school do in response?

*Answer:* Academic discourse in this example is protected by the First Amendment even if it is offensive to individuals. Thus, Title IX would not require the school to discipline the professor or to censor the reading list or related class discussion.

**Example 2:** A group of male students repeatedly targets a female student for harassment during the bus ride home from school, including making explicit sexual comments about her body, passing around drawings that depict her engaging in sexual conduct, and, on several occasions, attempting to follow her home off the bus. The female student and her parents complain to the principal that the male students' conduct has created a hostile environment for girls on the bus and that they fear for their daughter's safety. What must the school do in response?

*Answer:* Threatening and intimidating actions targeted at a particular student or group of students, even though they contain elements of speech, are not protected by the First Amendment. The school must take reasonable and appropriate actions against the students, including disciplinary action if necessary, to remedy the hostile environment and prevent future harassment.

**Footnotes**

1. This Guidance does not address sexual harassment of employees, although that conduct may be prohibited by Title IX. If

employees bring sexual harassment claims under Title IX, case law applicable to sexual harassment in the workplace under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e–2(a), and Equal Employment Opportunity Commission (EEOC) guidelines will apply). *See* 28 CFR 42.604 (Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance).

2. 20 U.S.C. 1681 *et seq.*, as amended; 34 CFR 106.1, 106.31(a)(b). In analyzing sexual harassment claims, the Department also applies, as appropriate to the educational context, many of the legal principles applicable to sexual harassment in the workplace developed under Title VII. *See Franklin* v. *Gwinnett County Public Schools,* 503 U.S. 60, 75 (1992) (applying Title VII principles in determining that a student was entitled to protection from sexual harassment by a teacher in school under Title IX); *Kinman* v. *Omaha Public School Dist.,* 94 F.3d 463, 469 (8th Cir. 1996) (applying Title VII principles in determining that a student was entitled to protection from hostile environment sexual harassment by a teacher in school under Title IX); *Doe* v. *Claiborne County,* 1996 WL 734583, *19 (6th Cir. December 26, 1996) (holding in a case involving allegations of hostile environment sexual harassment of a student by a teacher that Title VII agency principles apply to sexual harassment cases brought under Title IX); *Murray* v. *New York University College of Dentistry,* 57 F.3d 243, 249 (2nd Cir. 1995) (while finding notice lacking, court applied Title VII principles in assuming a Title IX cause of action for sexual harassment of a medical student by a patient visiting the school clinic); *Doe* v. *Petaluma City School Dist.,* 830 F.Supp. 1560, 1571–72 (N.D. Cal. 1993) (applying Title VII principles in determining that if school had notice of peer sexual harassment and failed to take appropriate corrective action, school liable under Title IX), *rev'd in part on other grounds,* 54 F.3d 1447 (9th Cir. 1995); *Kadiki* v. *Virginia Commonwealth University,* 892 F.Supp. 746, 749 (E.D. Va. 1995) (in Title IX case involving allegations of both *quid pro quo* and hostile environment sexual harassment, court indicated that Title VII standards should be applied).

In addition, many of the principles applicable to racial harassment under Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.,* and Title VII also apply to sexual harassment under Title IX. Indeed, Title IX was modeled on Title VI, *Cannon* v. *University of Chicago,* 441 U.S. 677, 694 (1979). For information on racial harassment, see the Department's Notice of Investigative Guidance for Racial Harassment, 59 FR 11448 (1994).

3. Consistent with Supreme Court decisions, *see Franklin,* 503 U.S. at 75 (expressly ruling that the sexual harassment of a student by a teacher violates Title IX), the Department has interpreted Title IX as prohibiting sexual harassment for over a decade. *Kinman,* 94 F.3d at 469 (Title IX prohibits hostile environment sexual harassment of student by teacher). Moreover, it has been OCR's longstanding practice to apply Title IX to peer harassment. *See also*

*Bosley* v. *Kearney R–1 School Dist.,* 904 F.Supp. 1006, 1023 (W.D. Mo. 1995); *Doe* v. *Petaluma City School Dist., Plaintiff's Motion for Reconsideration Granted,* 1996 WL 432298 (N.D. Cal. July 22, 1996) (reaffirming Title IX liability for peer harassment if the school knows of the hostile environment but fails to take remedial action); *Burrow* v. *Postville Community School District,* 929 F.Supp. 1193, 1205 (N.D. Iowa 1996) (student may bring Title IX cause of action against a school for its knowing failure to take appropriate remedial action in response to the hostile environment created by students at the school); *Oona R.–S.* v. *Santa Rosa City Schools,* 890 F.Supp. 1452 (N.D. Cal. 1995); *Davis* v. *Monroe County Bd. of Education,* 74 F.3d 1186, 1193 (11th Cir. 1996) (as Title VII is violated if a sexually hostile working environment is created by co-workers and tolerated by the employer, Title IX is violated if a sexually hostile educational environment is created by a fellow student or students and the supervising authorities knowingly failed to act to eliminate the harassment), *vacated, reh'g granted,* 91 F.3d 1418 (11th Cir. 1996); *cf. Murray,* 57 F.3d at 249 (while court finds no notice to school, assumes a Title IX cause of action for sexual harassment of a medical student by a patient visiting school clinic). *But see* note 27. Of course, OCR has interpreted Title IX as prohibiting *quid pro quo* harassment of students for many years. *See Alexander* v. *Yale University,* 459 F.Supp. 1, 4 (D.Conn. 1977), *aff'd,* 631 F.2d 178 (2nd Cir. 1980).

4. The term "employee" refers to employees and agents of a school. This includes persons with whom the school contracts to provide services for the school. *See Brown* v. *Hot, Sexy, and Safer Productions, Inc.,* 68 F.3d 525 (1st Cir. 1995) (Title IX sexual harassment claim brought for school's role in permitting contract consultant hired by it to create allegedly hostile environment).

In addition, while the standards applicable to peer sexual harassment are generally applicable to claims of student-on-student harassment, schools will be liable for the sexual harassment of one student by another student under the standards applicable to employee-on-student harassment if a student engages in sexual harassment as an agent or employee of a school. For instance, a school would be liable under the standards applicable to *quid pro quo* harassment if a student teaching assistant, who has been given the authority to assign grades, requires a student in his or her class to submit to sexual advances in order to obtain a certain grade in the class.

5. *Alexander,* 459 F.Supp. at 4 (a claim that academic advancement was conditioned upon submission to sexual demands constitutes a claim of sex discrimination in education); *Kadiki,* 892 F.Supp. at 752 (reexamination in a course conditioned on college student's agreeing to be spanked should she not attain a certain grade may constitute *quid pro quo* harassment); *see also Karibian* v. *Columbia University,* 14 F.3d 773, 777–79 (2nd Cir. 1994) (Title VII case).

6. *See e.g., Franklin,* 503 U.S. at 63 (conduct of a sexual nature found to support a sexual harassment claim under Title IX

EXHIBIT 3

included kissing, sexual intercourse); *Meritor Savings Bank FSB* v. *Vinson,* 477 U.S. 57, 60–61 (1986) (demands for sexual favors, sexual advances, fondling, indecent exposure, sexual intercourse, rape sufficient to raise hostile environment claim under Title VII); *Harris* v. *Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367 (1993) (sexually derogatory comments and innuendo may support a sexual harassment claim under Title VII); *Ellison* v. *Brady,* 924 F.2d 872, 873–74, 880 (9th Cir. 1991) (allegations sufficient to state a sexual harassment claim under Title VII included repeated requests for dates, letters making explicit references to sex and describing the harasser's feelings for plaintiff); *Lipsett* v. *University of Puerto Rico,* 864 F.2d 881, 903–4 (1st Cir. 1988) (sexually derogatory comments, posting of sexually explicit drawing of plaintiff, sexual advances may support sexual harassment claim); *Kadiki,* 892 F.Supp. at 751 (professor's spanking of a university student may constitute sexual conduct under Title IX); *Doe* v. *Petaluma,* 830 F.Supp. at 1564–65 (sexually derogatory taunts and innuendo can be the basis of a harassment claim); *Denver School Dist.* #1, OCR Case No. 08–92–1007 (same as to allegations of vulgar language and obscenities, pictures of nude women on office walls and desks, unwelcome touching, sexually offensive jokes, bribery to perform sexual acts, indecent exposure); *Nashoba Regional High School,* OCR Case No. 01–92–1377 (same as to year-long campaign of derogatory, sexually explicit graffiti and remarks directed at one student.)

7. *Davis,* 74 F.3d at 1194, *vacated, reh'g granted; Doe* v. *Petaluma,* 830 F.Supp. at 1571–73; *Moire* v. *Temple University School of Medicine,* 613 F.Supp. 1360, 1366 (E.D. Pa. 1985), *aff'd mem.,* 800 F.2d 1136 (3d Cir. 1986); *see also Vinson,* 477 U.S. at 67; *Lipsett,* 864 F.2d at 901; Racial Harassment Guidance, 59 FR 11449–50. *But see* note 27.

8. 34 CFR 106.8(b).

9. 20 U.S.C. 1687 (codification of Title IX portion of the Civil Rights Restoration Act of 1987).

10. *See also Shoreline School Dist.,* OCR Case No. 10–92–1002 (a teacher's patting student on arm, shoulder, and back, and restraining the student when he was out of control, not conduct of a sexual nature); *Dartmouth Public Schools,* OCR Case No. 01–90–1058 (same as to contact between high school coach and students); *San Francisco State University,* OCR Case No. 09–94–2038 (same as to faculty advisor placing her arm around graduate student's shoulder in posing for a picture); *Analy Union High School Dist.,* OCR Case No. 09–92–1249 (same as to drama instructor who put his arms around both male and female students who confided in him.)

11. *Cf. John Does 1* v. *Covington County School Bd.,* 884 F.Supp. 462, 464–65 (M.D. Ala. 1995) (male students alleging that teacher sexually harassed and abused them stated cause of action under Title IX).

12. Title IX and the regulations implementing it prohibit discrimination ''on the basis of sex;'' they do not restrict sexual harassment to those circumstances in which the harasser only harasses members of the

opposite sex in incidents involving either *quid pro quo* or hostile environment sexual harassment. *See* 34 CFR 106.31. In order for hostile environment harassment to be actionable under Title IX, it must create a hostile or abusive environment. This can occur when a student or employee harasses a member of the same sex. *See Kinman,* 94 F.3d at 468 (female student's alleging sexual harassment by female teacher sufficient to raise a claim under Title IX); *Doe* v. *Petaluma,* 830 F.Supp. at 1564–65, 1575 (female junior high school student alleging sexual harassment by other students, including both boys and girls, sufficient to raise claim under Title IX); *John Does 1,* 884 F.Supp. at 465 (same as to male students' allegations of sexual harassment and abuse by male teacher.) It can also occur in certain situations if the harassment is directed at students of both sexes. *Chiapuzo* v. *BLT Operating Co.,* 826 F.Supp. 1334 (D. Wyo. 1993) (court found that such harassment could violate Title VII).

In many circumstances, harassing conduct will be on the basis of sex because the student would not have been subjected to it at all had he or she been a member of the opposite sex; e.g., if a female student is repeatedly propositioned by a male student or employee (or, for that matter, if a male student is repeatedly propositioned by a male student or employee). In other circumstances, harassing conduct will be on the basis of sex if the student would not have been affected by it in the same way or to the same extent had he or she been a member of the opposite sex; e.g., pornography and sexually explicit jokes in a mostly male shop class are likely to affect the few girls in the class more than it will most of the boys.

In yet other circumstances, the conduct will be on the basis of sex in that the student's sex was a factor in or affected the nature of the harasser's conduct or both. Thus, in *Chiapuzo,* a supervisor made demeaning remarks to both partners of a married couple working for him, e.g., as to sexual acts he wanted to engage in with the wife and how he would be a better lover than the husband. In both cases, according to the court, the remarks were gender-driven in that they were made with an intent to demean each member of the couple because of his or her respective sex. *See also Steiner* v. *Showboat Operating Co.,* 25 F.3d 1459, 1463–64 (9th Cir. 1994), *cert. denied,* 115 S.Ct. 733 (1995) (Title VII case).

13. *Nashoba Regional High School,* OCR Case No. 01–92–1397. In *Conejo Valley School Dist.,* OCR Case No. 09–93–1305, female students allegedly taunted another female student about engaging in sexual activity; OCR found that the alleged comments were sexually explicit and, if true, would be sufficiently severe, persistent, and pervasive to create a hostile environment.

14. *Williamson* v. *A.G. Edwards & Sons, Inc.,* 876 F.2d 69 (8th Cir. 1989, *cert. denied* 493 U.S. 1089 (1990) (Title VII case); *DeSantis* v. *Pacific Tel. & Tel. Co., Inc.,* 608 F.2d 327 (9th Cir. 1979) (same); *Blum* v. *Gulf Oil Corp.,* 597 F.2d 936 (5th Cir. 1979) (same).

15. *See Nabozny* v. *Podlesny,* 92 F.3d 446 (7th Cir. 1996) (holding that a gay student

could maintain claims alleging discrimination based on both gender and sexual orientation under the Equal Protection Clause of the United States Constitution in case in which school district officials allegedly failed to protect the student to the same extent that other students were protected from harassment and harm by other students due to the student's gender and sexual orientation).

16. *See Vinson,* 477 U.S. at 65–66; *Harris,* 114 S.Ct. at 370–371; *see also Hicks* v. *Gates Rubber Co.,* 833 F.2d 1406, 1416 (10th Cir. 1987) (Title VII case); *McKinney* v. *Dole,* 765 F.2d 1129, 1138 (D.C. Cir. 1985) (Title VII case; physical, but non-sexual, assault could be sex-based harassment if shown to be unequal treatment that would not have taken place but for the employee's sex); *Cline* v. *General Electric Capital Auto Lease, Inc.,* 757 F.Supp. 923 (N.D. Ill. 1991) (Title VII case).

17. *See Harris,* 114 S.Ct. at 370–371; *Andrews* v. *City of Philadelphia,* 895 F.2d 1469, 1485–86 (3rd Cir. 1990) (Title VII case; court directed trial court to consider sexual conduct as well as theft of female employees' files and work, destruction of property, and anonymous phone calls in determining if there had been sex discrimination); *see also Hall* v. *Gus Construction Co.,* 842 F.2d 1010, 1014 (8th Cir. 1988) (Title VII case); *Hicks,* 833 F.2d at 1415; *Eden Prairie Schools, Dist.* #272, OCR Case No. 05–92–1174 (the boys made lewd comments about male anatomy *and* tormented the girls by pretending to stab them with rubber knives; while the stabbing was not sexual conduct, it was directed at them because of their sex, i.e., because they were girls.

18. The Supreme Court has ruled that agency principles apply in determining an employer's liability under Title VII for the harassment of its employees by supervisors. *See Vinson,* 477 U.S. at 72. These principles would govern in Title IX cases involving employees who are harassed by their supervisors. *See* 28 CFR 42.604 (regulations providing for handling employment discrimination complaints by Federal agencies; requiring agencies to apply Title VII law if applicable). These same principles should govern the liability of educational institutions under Title IX for the harassment of students by teachers and other school employees in positions of authority. *See Franklin,* 503 U.S. at 75.

19. The Supreme Court in *Vinson* did not alter the standard developed in the lower Federal courts whereby an institution is absolutely liable for *quid pro quo* sexual harassment whether or not it knew, should have known, or approved of the harassment at issue. 477 U.S. at 70–71; *see also Lipsett,* 864 F.2d at 901; EEOC Notice N–915–050, March 1990, Policy Guidance on Current Issues of Sexual Harassment, at p. 21. This standard applies in the school context as well. *Kadiki,* 892 F.Supp. at 752 (for the purposes of *quid pro quo* harassment of a student, professor is in similar position as workplace supervisor).

20. *Kadiki,* 892 F.Supp. at 754–755; *cf. Martin* v. *Cavalier Hotel Corp.,* 48 F.3d 1343, 1351 n.3 (4th Cir. 1995) (Title VII case); *Karibian,* 14 F.3d at 777–78; *Henson* v. *City of Dundee,* 682 F.2d 897, 910 (11th Cir. 1982) (Title VII case).

EXHIBIT 3

21. *See* note 4.

22. Restatement (Second) Agency §219(2)(d); *Martin,* 48 F.3d at 1352 (finding an employer liable under Title VII for sexual harassment of an employee in case in which the Manager used his apparent authority to commit the harassment; the Manager was delegated full authority to hire, fire, promote, and discipline employees and used the authority to accomplish the harassment; and company policy required employees to report harassment to the Manager with no other grievance process made available to them).

23. *See* Restatement (Second) of Agency §219(2)(d); EEOC Policy Guidance on Current Issues of Sexual Harassment at p. 28; *Karibian,* 14 F.3d at 780; *Hirschfeld* v. *New Mexico Corrections Dept.,* 916 F.2d 572, 579 (10th Cir. 1990) (Title VII case); *Martin,* 48 F.3d at 1352. *But see Rosa H* v. *San Elizario Ind. School Dist.,* 1997 U.S. App. LEXIS 2780 (5th Cir. Feb. 17, 1997). In *San Elizario* the Fifth Circuit reversed a jury finding that a school district was liable under Title IX for a hostile environment created by the school's male karate instructor, who repeatedly initiated sexual intercourse with a fifteen-year-old female karate student. The court held, contrary to OCR policy, that a school could not be found liable under Title IX pursuant to agency principles.

However, language in this and previous decisions indicates that Title IX law is evolving in the Fifth Circuit. When OCR investigates complaints involving schools in the Fifth Circuit (Texas, Louisiana, and Mississippi), it will in each case determine and follow the current applicable law. In light of the evolving case law in the Fifth Circuit, adhering to the standards in the Guidance may be the best way for schools in these States to ensure compliance with the requirements of Title IX. School personnel should also consider whether State, local, or other Federal authority affects their obligations in these areas.

24. *Karibian,* 14 F.3d at 780 (employer would be liable for hostile environment harassment in case in which allegations were that a supervisor coerced employee into a sexual relationship by, among other things, telling her she " 'owed him' for all he was doing for her as her supervisor"); *Sparks* v. *Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1558–60 (11th Cir. 1987) (Title VII case holding employer liable for sexually hostile environment created by supervisor who repeatedly reminded the harassed employee that he could fire her if she did not comply with his sexual advances).

25. *Cf. Karibian,* 14 F.3d at 780.

26. *Id.*

27. The overwhelming majority of courts that have considered the issue of sexually hostile environments caused by peers have indicated that schools may be liable under Title IX for their knowing failure to take appropriate actions to remedy the hostile environment. *See* note 7 and peer hostile environment cases cited in note 3. However, one Federal Circuit Court of Appeals decision, *Rowinsky* v. *Bryan Independent School Dist.,* 80 F.3d 1006 (5th Cir. 1996), *cert. denied,* 117 S.Ct. 165 (1996), has held to the contrary. In that case, over a strong dissent, the court rejected the authority of

other Federal courts and OCR's longstanding construction of Title IX and held that a school district is not liable under Title IX for peer harassment unless "the school district itself directly discriminated based on sex," i.e., the school responded differently to sexual harassment or similar claims of girls versus boys. For cases specifically rejecting the *Rowinsky* interpretation, *see e.g., Doe* v. *Petaluma, Plaintiff's Motion for Reconsideration Granted,* 1996 WL 432298 *6 (N.D. Cal. 1996); *Burrow* v. *Postville Community School Dist.,* 929 F.Supp. at 1193.

OCR believes that the *Rowinsky* decision misinterprets Title IX. As explained in this Guidance, Title IX does not make a school responsible for the actions of the harassing student, but rather for its own discrimination in failing to take immediate and appropriate steps to remedy the hostile environment once a school official knows about it. If a student is sexually harassed by a fellow student, and a school official knows about it, but does not stop it, the school is permitting an atmosphere of sexual discrimination to permeate the educational program. The school is liable for its own action, or lack of action, in response to this discrimination. Notably, Title VII cases that hold that employers are responsible for remedying hostile environment harassment of one worker by a co-worker apply this same standard. *See, e.g., Ellison* v. *Brady,* 924 F.2d at 881–82; *Hall* v. *Gus Construction Co.,* 842 F.2d 1010 (8th Cir. 1988); *Hunter* v. *Allis-Chalmers Corp.,* 797 F.2d 1417 (7th Cir. 1986); *Snell* v. *Suffolk,* 782 F.2d 1094 (2nd Cir. 1986); *Robinson* v. *Jacksonville Shipyards,* 760 F.Supp. 1486 (M.D. Fla. 1991).

Language in subsequent decisions indicates that Title IX law is evolving in the Fifth Circuit. When OCR investigates complaints involving schools in States in the Fifth Circuit (Texas, Louisiana, and Mississippi), it will in each case determine and follow the current applicable law. However, the existence of Fifth Circuit decisions that are inconsistent with OCR policy does not prohibit schools in these States from following the Guidance. In order to ensure students a safe and nondiscriminatory educational environment, the better practice is for these schools to follow the Guidance. Thus, schools should take prompt corrective action to address peer harassment of which they knew or should have known. Indeed, following the Guidance may be the safest way for schools in these States to ensure compliance with the requirements of Title IX.

28. *See* Restatement (Second) of Agency §219(2)(b).

29. As with peer harassment by its own students, a school's liability for the harassment of its students by third parties is based on its obligation to provide an environment free of discrimination. *Murray,* 57 F.3d at 250 (student participating in university dental clinic providing services to the public alleged harassment by a patient; while the court ruled in defendant's favor because of lack of notice, it considered such a claim actionable under Title IX); Racial Harassment Investigative Guidance, 59 FR

11450 (referring to harassment by neighborhood teenagers, guest speaker, and parents). *See, e.g.,* 29 CFR 1604.11(e); *Sparks* v. *Regional Medical Ctr.,* 792 F.Supp. 735, 738 n.1 (N.D. Ala. 1992) (Title VII case); *Powell* v. Las Vegas Hilton Corp., 841 F.Supp. 1024, 1027–28 (D. Nev. 1992) (Title VII case); *Magnuson* v. *Peak Technical Servs., Inc.,* 808 F.Supp. 500, 512–13 (E.D. Va. 1992) (Title VII case); *EEOC* v. *Sage Realty Corp.,* 507 F.Supp. 599, 611 (S.D.N.Y. 1981) (Title VII case); *cf. Dornhecker* v. *Malibu Grand Prix Corp.,* 828 F.2d 307 (5th Cir. 1987) (assuming Title VII required employer to respond appropriately to sexual harassment of an employee by a contractor, but finding employer's response sufficient). *See also* Restatement (Second) of Agency §219(2)(b).

30. For example, if athletes from a visiting team harass the home school's students, the home school may not be able to discipline the athletes. However, it could encourage the other school to take appropriate action to prevent further incidents; if necessary, the home school may choose not to invite the other school back. *Cf. Danna* v. *New York Telephone Co.,* 752 F.Supp. 594, 611 (S.D.N.Y. 1990) (telephone company in violation of Title VII for not taking sufficient action to protect its own employee from sexually explicit graffiti at the airport where she was assigned to work, e.g., contacting airport management to see what remedial measures could be taken).

31. 34 CFR 106.8(b) and 106.9.

32. *See* Racial Harassment Investigative Guidance, 59 FR 11450; *Murray,* 57 F.3d at 249 (an employer is liable for the harassment of co-workers if the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it".

33. EEOC Policy Guidance at p. 25 ("* * * in the absence of a strong, widely disseminated, and consistently enforced employer policy against sexual harassment, and an effective complaint procedure, employees could reasonably believe that a harassing supervisor's actions will be ignored, tolerated, or even condoned by upper management.")

34. 34 CFR 106.8(b).

35. If OCR finds a violation of Title IX, it will seek to obtain an agreement with the school to voluntarily correct the violation. The agreement will set out the specific steps the school will take and provide for monitoring by OCR to ensure that the school complies with the agreement. Schools should note that the Supreme Court has held that monetary damages are available as a remedy in private lawsuits brought to redress violations of Title IX. *Franklin,* 503 U.S. at 76. Of course, a school's immediate and appropriate remedial actions are relevant in determining the nature and extent of the damages suffered by a plaintiff.

36. *Henson,* 682 F.2d at 903 (Title VII case).

37. [T]he fact that sex-related conduct was "voluntary," in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII * * *. The correct inquiry is whether [the

EXHIBIT 3

subject of the harassment] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary. *Vinson,* 477 U.S. at 68.

38. *Lipsett,* 864 F.2d at 898 (while, in some instances, a person may have responsibility for telling the harasser directly that the conduct is unwelcome, in other cases a "consistent failure to respond to suggestive comments or gestures may be sufficient * * *."); *Danna,* 752 F.Supp. at 612 (despite female employee's own foul language and participation in graffiti writing, her complaints to management indicated that the harassment was not welcome); *see also Carr* v. *Allison Gas Turbine Div., GMC,* 32 F.3d 1007, 1011 (7th Cir. 1994) (Title VII case; cursing and dirty jokes by female employee did not show that she welcomed the sexual harassment, given her frequent complaints about it: "Even if * * * [the employee's] testimony that she talked and acted as she did [only] in an effort to be one of the boys' is * * * discounted, her words and conduct cannot be compared to those of the men and used to justify their conduct * * *. The asymmetry of positions must be considered. She was one woman; they were many men. Her use of [vulgar] terms * * * could not be deeply threatening.").

39. *Reed* v. *Shepard,* 939 F.2d 484, 486–87, 491–92 (7th Cir. 1991) (no harassment found under Title VII in case in which female employee not only tolerated, but also participated in and instigated the suggestive joking activities about which she was now complaining); *Weinsheimer* v. *Rockwell Int'l Corp.,* 794 F.Supp. 1559, 1563–64 (M.D. Fla. 1990) (same, in case in which general shop banter was full of vulgarity and sexual innuendo by men and women alike, and plaintiff contributed her share to this atmosphere). However, even if a student participates in the sexual banter, OCR may in certain circumstances find that the conduct was nevertheless unwelcome if, for example, a teacher took an active role in the sexual banter and a student reasonably perceived that the teacher expected him or her to participate.

40. The school bears the burden of rebutting the presumption.

41. Of course, nothing in Title IX would prohibit a school from implementing policies prohibiting sexual conduct or sexual relationships between students and adult employees.

42. *See* note 41.

43. In *Harris,* the Supreme Court explained the requirement for considering the "subjective perspective" when determining the existence of a hostile environment. The Court stated: "* * * if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." 114 S.Ct. at 370.

44. The Supreme Court used a "reasonable person" standard in *Harris,* 114 S.Ct. at 370–71 to determine whether sexual conduct constituted harassment. This standard has been applied under Title VII to take into account the sex of the subject of the harassment, *see, e.g., Ellison,* 924 F.2d at

878–79 (applying a "reasonable women" standard to sexual harassment), and has been adapted to sexual harassment in education, *Davis,* 74 F.3d at 1126 (relying on *Harris* to adopt an objective, reasonable person standard), *vacated, reh'g granted; Patricia H.* v. *Berkeley Unified School Dist.,* 830 F. Supp. 1288, 1296 (N.D. Cal. 1993) (adopting a "reasonable victim" standard and referring to OCR's use of it); Racial Harassment Guidance, 59 FR 11452 (the standard must take into account the characteristics and circumstances of victims on a case-by-case basis, particularly the victim's race and age).

45. *Harris,* 114 S.Ct. at 371; *See* Racial Harassment Guidance, 59 FR 11449 and 11452; *Brock* v. *United States,* 64 F.3d 1421, 1423 (9th Cir. 1995) (Title VII case); *Simon* v. *Morehouse Sch. of Medicine,* 908 F.Supp. 959, 969–970 (N.D. Ga. 1995) (Title VII case); *Al-Dabbagh* v. *Greenpeace, Inc.,* 873 F.Supp. 1105, 1111–12 (N.D. Ill. 1994) (Title VII case); *Watts* v. *N.Y.C. Police Dept.,* 724 F.Supp. 99, 104 (S.D.N.Y. 1989) (Title VII case).

46. *Davis,* 74 F.3d at 1126 (no Title IX violation unless the conduct has "actually altered the conditions of [the student's] learning environment"), *vacated, reh'g granted; Lipsett,* 864 F.2d at 898 (" altered" the educational environment); *Patricia H.,* 830 F. Supp. at 1297 (sexual harassment could be found where conduct interfered with student's ability to learn); *see also Andrews,* 895 F.2d at 1482 (Title VII case).

47. *Harris,* 114 S.Ct. at 371.

48. *See e.g., Doe* v *Petaluma,* 830 F. Supp at 1566 (student so upset about harassment by other students that she was forced to transfer several times, including finally to a private school); *Modesto City Schools,* OCR Case No. 09–93–1391 (evidence showed that one girl's grades dropped while the harassment was occurring); *Weaverville Elementary School,* OCR Case No. 09–91–1116 (students left school due to the harassment). *Compare with College of Alameda,* OCR Case No. 09–90–2104 (student not in instructor's class and *no* evidence of any effect on student's educational benefits or services, so no hostile environment).

49. *Doe* v. *Petaluma,* 830 F. Supp. at 1566.

50. *See Harris,* 114 S.Ct. at 371, in which the Court held that tangible harm is not required. In determining whether harm is sufficient, several factors are to be considered, including frequency, severity, whether the conduct was threatening or humiliating versus a mere offensive utterance, and whether it unreasonably interfered with work performance. No single factor is required; similarly, psychological harm, while relevant, is not required.

51. *See Modesto City Schools,* OCR Case No. 09–93–1391 (evidence showed that several girls were afraid to go to school because of the harassment).

52. *Summerfield Schools,* OCR Case No. 15–92–1029.

53. *See Waltman* v. *Int'l Paper Co.,* 875 F.2d 468, 477 (5th Cir. 1989) (Title VII case); *see also Hall,* 842 F.2d at 1015 (evidence of sexual harassment directed at others is relevant to show hostile environment under Title VII); Racial Harassment Investigative Guidance, 59 FR 11453.

54. *See, e.g., Andrews,* 895 F.2d at 1484 ("Harassment is pervasive when 'incidents of

harassment occur either in concert or with regularity'."); *Moylan* v. *Maries County,* 792 F.2d 746, 749 (8th Cir. 1986) (Title VII case); *Downes* v. *Federal Aviation Administration,* 775 F.2d 288, 293 (D.C. Cir. 1985) (same); *cf. Scott* v. *Sears, Roebuck and Co.,* 798 F.2d 210, 214 (7th Cir. 1986) (Title VII case; conduct was not pervasive or debilitating).

55. The U.S. Equal Employment Opportunity Commission (EEOC) has stated: "The Commission will presume that the unwelcome, intentional touching of [an employee's] intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII. More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment." EEOC Policy Guidance on Current Issues of Sexual Harassment, p. 17. *See also Barrett* v. *Omaha National Bank,* 584 F. Supp. 22, 30 (D. Neb. 1983), *aff'd,* 726 F.2d 424 (8th Cir. 1984) (hostile environment created under Title VII by isolated events, i.e., occurring while traveling to and during a two-day conference, including the co-worker's talking to plaintiff about sexual activities and touching her in offensive manner while they were inside a vehicle from which she could not escape).

56. *See also Ursuline College,* OCR Case No. 05–91–2068 (A single incident of comments on a male student's muscles arguably not sexual; however, assuming they were, not severe enough to create a hostile environment).

57. *Patricia H.,* 830 F.Supp. at 1297 ("grave disparity in age and power" between teacher and student contributed to the creation of a hostile environment); *Summerfield Schools,* OCR Case No. 15–92–1929 ("impact of the * * * remarks was heightened by the fact that the coach is an adult in a position of authority"); *cf. Doe* v. *Taylor I.S.D.,* 15 F.3d 443 (5th Cir. 1994), *cert. denied,* 115 S.Ct. 70 (1994) (Sec. 1983 case; in finding that a sexual relationship between a high school teacher and a student was unlawful, court considered the influence that the teacher had over the student by virtue of his position of authority).

58. *See, e.g., McKinney,* 765 F.2d at 1138–40; *Robinson,* 760 F. Supp. at 1522.

59. *Cf. Patricia H.,* 830 F. Supp. at 1297.

60. *See also Barrett,* 584 F. Supp. at 24 (harassment occurring in a car from which the plaintiff could not escape was deemed particularly severe).

61. *See also Hall,* 842 F.2d at 1015 (incidents of sexual harassment directed at other employees); *Hicks,* 833 F.2d at 1415–16 (same). *Cf. Midwest City-Del City Public Schools,* OCR Case No. 06–92–1012 (finding of racially hostile environment based in part on several racial incidents at school shortly before incidents in complaint, a number of which involved the same student involved in the complaint).

62. *See* note 17. In addition, incidents of racial or national origin harassment directed at a particular individual may also be aggregated with incidents of sexual or gender harassment directed at that individual in determining the existence of a hostile environment. *Hicks,* 833 F.2d at 1416;

EXHIBIT 3

*Jefferies* v. *Harris Community Action Ass'n,* 615 F.2d 1025, 1032 (5th Cir. 1980) (Title VII case).

63. In addition, even if there is no notice, schools may be liable for sexual harassment. *See* previous discussions of liability in situations involving *quid pro quo* harassment and hostile environment sexual harassment by employees in situations in which the employee acted with apparent authority or was aided in carrying out the harassment of students by his or her position of authority with the school.

64. *See Ellison* v. *Brady,* 924 F.2d 872, 881 (9th Cir. 1991), quoting *EEOC* v. *Hacienda Hotel,* 881 F.2d 1504, 1515–1516 (9th Cir. 1989) (Title VII cases); *Swentek* v. *USAir,* 830 F.2d 552, 558 (4th Cir. 1987), quoting *Katz* v. *Dole,* 709 F.2d at 255 (Title VII cases).

*But see Rosa H.* v. *San Elizario Indep. School Dist.,* 1997 U.S. App. LEXIS 2780 (5th Cir. Feb. 17, 1997) and note 23. In *San Elizario,* the Fifth Circuit held, among other things, that liability for hostile environment harassment cannot attach if the school has only constructive notice of the harassment. *See* note 23.

65. Whether an employee is an agent or responsible school employee, or whether it would be reasonable for a student to believe the employee is, even if the employee is not, will vary depending on factors such as the authority actually given to the employee and the age of the student.

With respect to the notice provisions applicable to schools under Title IX, one Federal Circuit Court of Appeals decision, *Canutillo Indep. School Dist.* v. *Leija,* 101 F.3d 393, 398–400 (5th Cir. 1996), has held, contrary to OCR policy, that a school district was not liable in a case in which one of its teachers sexually molested a second grade student, because the student and her mother only reported the harassment to her homeroom teacher. Notwithstanding that a school handbook instructed students and parents to report complaints to the child's primary or homeroom teacher, the court held that notice must be given to ''someone with authority to take remedial action.'' *See also Rosa H.* v. *San Elizario Indep. School Dist.,* 1997 U.S. App. LEXIS 2780 (5th Cir. Feb. 17, 1997), and notes 23 and 64. In *San Elizario,* the Fifth Circuit held, among other things, that although the fifteen-year-old student, whose karate instructor had repeatedly initiated sexual intercourse, ''was subject to discrimination on the basis of sex,'' a school district is only liable if an employee who has been invested by the school board with supervisory power over the offending employee actually knew of the abuse, had the power to end the abuse, and failed to do so.

Based on these and other decisions, Title IX law is evolving in the Fifth Circuit. When OCR investigates complaints involving schools in States in the Fifth Circuit (Texas, Louisiana, and Mississippi), it will in each case determine and follow the current applicable law. However, the existence of Fifth Circuit decisions that are inconsistent with OCR policy does not prohibit schools in these States from following the Guidance. In order to ensure students a safe and nondiscriminatory educational environment, it is the better practice for these schools to

follow the Guidance. For example, the better practice is for schools to ensure that teachers and other personnel recognize and report sexual harassment of students to the appropriate school staff so that schools can take prompt corrective action and ensure a safe educational environment. In addition, the Guidance makes clear that providing students with several avenues to report sexual harassment is a very helpful means for addressing and preventing sexually harassing conduct in the first place. Schools in States in the Fifth Circuit should also consider whether State, local or other Federal laws may affect their responsibilities in this regard.

66. Racial Harassment Guidance, 59 FR 11450 (discussing how a school may receive notice).

67. *See Yates* v. *Avco Corp.,* 819 F.2d 630, 634–36 (6th Cir. 1987) (Title VII case); *Katz* v. *Dole,* 709 F.2d 251, 256 (4th Cir. 1983) (same); *See also* Racial Harassment Investigative Guidance, 59 FR 11450.

68. *Cf. Katz,* 709 F.2d at 256 (the employer ''should have been aware of the * * * problem both because of its pervasive character and because of Katz' specific complaints * * *''); *Smolsky* v. *Consolidated Rail Corp.,* 780 F. Supp. 283, 293 (E.D. Pa. 1991), *reconsideration denied,* 785 F. Supp. 71 (E.D. Pa. 1992) (''where the harassment is apparent to all others in the work place, supervisors and coworkers, this may be sufficient to put the employer on notice of the sexual harassment'' under Title VII); *Jensen* v. *Eveleth Taconite Co.,* 824 F. Supp. 847, 887 (D. Minn. 1993) (Title VII case; ''[s]exual harassment * * * was so pervasive that an inference of knowledge arises * * *. The acts of sexual harassment detailed herein were too common and continuous to have escaped Eveleth Mines had its management been reasonably alert''); *Cummings* v. *Walsh Construction Co.,* 561 F. Supp. 872, 878 (S.D. Ga. 1983) (''* * * allegations not only of the [employee] registering her complaints with her foreman * * * but also that sexual harassment was so widespread that defendant had constructive notice of it'' under Title VII); *but see Murray,* 57 F.3d at 250–51 (that other students knew of the conduct was not enough to charge the school with notice, particularly in case in which these students may not have been aware that the conduct was offensive or abusive).

69. Schools have an obligation to ensure that the educational environment is free of discrimination and cannot fulfill this obligation without determining if sexual harassment complaints have merit.

70. In some situations, for example, if a playground supervisor observes a young student repeatedly engaging in conduct toward other students that is clearly unacceptable under the school's policies, it may be appropriate for the school to intervene without contacting the other students. It may still be necessary for the school to talk with the students (and parents of elementary and secondary students) afterwards, e.g., to determine the extent of the harassment and how it affected them.

71. *Cf. Bundy* v. *Jackson,* 641 F.2d 934, 947 (D.C. Cir. 1981) (employers should take corrective and preventive measures under

Title VII); *accord, Jones* v. *Flagship Int'l,* 793 F.2d 714, 719–720 (5th Cir. 1986) (employer should take prompt remedial action under Title VII). Racial Harassment Investigative Guidance, 59 FR 11450.

72. *Waltman* v. *Int'l Paper Co.,* 875 F.2d at 479 (appropriateness of employer's remedial action under Title VII will depend on the severity and persistence of the harassment and the effectiveness of any initial remedial steps); *Dornhecker* v. *Malibu Grand Prix Corp.,* 828 F.2d 307, 309–10 (5th Cir. 1987) (Title VII case; employer arranged for victim to no longer work with alleged harasser).

73. *Intlekofer* v. *Turnage,* 973 F.2d 773 (9th Cir. 1992) (Title VII case) (holding that the employer's response was insufficient and that more severe disciplinary action was necessary in situations in which counseling, separating the parties, and warnings of possible discipline were ineffective in ending the harassing behavior).

74. Offering assistance in changing living arrangements is one of the actions required of colleges and universities under the Campus Security Act in cases of rape and sexual assault. *See* 20 U.S.C. 1092(f).

75. *See* note 30.

76. University of California at Santa Cruz, OCR Case No. 09–93–2141 (extensive individual and group counseling); *Eden Prairie Schools, Dist.* #272, OCR Case No. 05–92–1174 (counseling).

77. Even if the harassment stops without the school's involvement, the school may still need to take steps to prevent or deter any future harassment—to inform the school community that harassment will not be tolerated. *Fuller* v. *City of Oakland,* 47 F.3d 1522, 1528–29 (9th Cir. 1995).

78. 34 CFR 106.8(b) and 106.9, incorporating by reference 34 CFR 100.7(e). Title IX prohibits intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX.

79. *Tacoma School Dist. No. 10,* OCR Case No. 10–94–1079 (due to the large number of students harassed by an employee, the extended period of time over which the harassment occurred, and the failure of several of the students to report the harassment, school committed as part of corrective action plan to providing training for students); *Los Medanos College,* OCR Case No. 09–84–2092 (as part of corrective action plan, school committed to providing sexual harassment seminar for campus employees); *Sacramento City Unified School Dist.,* OCR Case No. 09–83–1063 (same as to workshops for management and administrative personnel, in-service training for non-management personnel).

80. In addition, if information about the incident is contained in an ''education record'' of the student alleging the harassment, as defined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, the school should consider whether FERPA would prohibit the school from disclosing information without the student's consent. *Id.* In evaluating whether FERPA would limit disclosure, the Department does not interpret

EXHIBIT 3

FERPA to override any federally protected due process rights of a school employee accused of harassment.

81. 34 CFR 106.8(b). This requirement has been part of the Title IX regulations since their inception in 1975. Thus, schools have been required to have these procedures in place since that time. At the elementary and secondary level, this responsibility generally lies with the school district. At the postsecondary level, there may be a procedure for a particular campus or college, or for an entire university system.

82. *Fenton Community High School Dist.* # 100, OCR Case 05–92–1104.

83. While a school is required to have a grievance procedure under which complaints of sex discrimination (including sexual harassment) can be filed, the same procedure may also be used to address other forms of discrimination.

84. *See Vinson,* 477 U.S. at 72–73.

85. It is the Department's current position under the Family Educational Rights and Privacy Act (FERPA) that a school cannot release information to a complainant regarding disciplinary action imposed on a student found guilty of harassment if that information is contained in a student's education record unless—(1) the information directly relates to the complainant (e.g., an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution. *See* note 80. If the alleged harasser is a teacher, administrator, or other non-student employee, FERPA would not limit the school's ability to inform the complainant of any disciplinary action taken.

86. The section in the Guidance on ''Recipient's Response'' provides examples of reasonable and appropriate corrective action.

87. 34 CFR 106.8(a).

88. *Id.*

89. *See Vinson,* 477 U.S. at 72–73.

90. *University of California, Santa Cruz,* OCR Case No. 09–93–2141; *Sonoma State University,* OCR Case No. 09–93–2131. This is true for formal as well as informal complaints. *See University of Maine at Machias,* OCR Case No. 01–94–6001 (school's new procedures not found in violation of Title IX in part because they require written records for informal as well as formal resolutions). These records need not be kept in a student's or employee's individual file, but instead may be kept in a central confidential location.

91. For example, in *Cape Cod Community College,* OCR Case No. 01–

93–2047, the College was found to have violated Title IX in part because the person identified by the school as the Title IX coordinator was unfamiliar with Title IX, had no training, and did not even realize he was the coordinator.

92. Indeed, in *University of Maine at Machias,* OCR Case No. 01–94–6001, OCR found the school's procedures to be inadequate because only formal complaints were investigated. While a school isn't required to have an established procedure for resolving informal complaints, they nevertheless must be addressed in some way. However, if there are indications that the same individual may be harassing others, then it may not be appropriate to resolve an informal complaint without taking steps to address the entire situation.

93. *Academy School Dist. No. 20,* OCR Case No. 08–93–1023 (school's response determined to be insufficient in case in which it stopped its investigation after complaint filed with police); *Mills Public School Dist.,* OCR Case No. 01–93–1123 (not sufficient for school to wait until end of police investigation).

94. *Cf. EEOC* v. *Board of Governors of State Colleges and Universities,* 957 F.2d 424 (7th Cir.) (Title VII case), *cert. denied,* 113 S.Ct. 299 (1992); *Johnson* v. *Palma,* 931 F.2d 203 (2nd Cir. 1991) (same).

95. The First Amendment applies to entities and individuals that are State actors. The receipt of Federal funds by private schools does not directly subject those schools to the U.S. Constitution. *See Rendell-Baker* v. *Kohn,* 457 U.S. 830, 840 (1982). However, all actions taken by OCR must comport with First Amendment principles, even in cases involving private schools that are not directly subject to the First Amendment.

96. *See, e.g., George Mason University,* OCR Case No. 03–94–2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment); *Portland School Dist. 1J,* OCR Case No. 10–94–1117 (reading teacher's choice to substitute a less offensive term for a racial slur when reading an historical novel aloud in class constituted an academic decision on presentation of curriculum, not racial harassment).

97. *See Iota Xi Chapter of Sigma Chi Fraternity* v. *George Mason University,* 993 F.2d 386 (4th Cir. 1993) (fraternity skit in which white male student dressed as an offensive caricature of a black female constituted student expression).

98. *See Florida Agricultural and Mechanical University,* OCR Case No. 04–92–2054 (no discrimination in case in which campus newspaper, which welcomed individual opinions of all sorts, printed article expressing one student's viewpoint on white students on campus).

99. *Tinker* v. *Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 506 (1969) (neither students nor teachers shed their constitutional rights to freedom of expression at the schoolhouse gates); *Cf. Cohen* v. *San Bernardino Valley College,* (college professor could not be punished for his longstanding teaching methods, which included discussion of controversial subjects such as obscenity and consensual sex with children, under an unconstitutionally vague sexual harassment policy); *George Mason University,* OCR Case No. 03–94–2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment).

100. *See, e.g., University of Illinois,* OCR Case No. 05–94–2104 (fact that university's use of Native American symbols was offensive to some Native American students and employees was not dispositive, in and of itself, in assessing a racially hostile environment claim under Title VI).

101. *See Vinson,* 477 U.S. at 67 (the ''mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee'' would not affect the conditions of employment to a sufficient degree to violate Title VII), quoting *Henson,* 682 F.2d at 904; *cf. R.A.V.* v. *City of St. Paul,* 505 U.S. 377, 389 (1992) (citing with approval EEOC's sexual harassment guidelines).

102. *Compare Bethel School Dist. No. 403* v. *Fraser,* 478 U.S. 675, 685 (1986) (Court upheld discipline of high school student for making lewd speech to student assembly, noting that ''[t]he undoubted freedom to advocate unpopular and controversial issues in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior.''), *with Iota XI* 993 F.2d 386 (holding that, notwithstanding a university's mission to create a culturally diverse learning environment and its substantial interest in maintaining a campus free of discrimination, it could not punish students who engaged in an offensive skit with racist and sexist overtones).

[FR Doc. 97–6373 Filed 3–12–97; 8:45 am]

**BILLING CODE 4000–01–P**

EXHIBIT 3

# EXHIBIT 4

Archived Information

# Appendix C:
# Other Reference Materials

- **Letter from Richard W. Riley, U.S. Secretary of Education, August 31, 1998, regarding *Gebser v. Lago Vista***
- **State Hate Crimes Statutory Provisions**

C: Reference

EXHIBIT 4

C: Reference

EXHIBIT 4



THE SECRETARY OF EDUCATION
WASHINGTON, D.C. 20202

August 31, 1998

Dear Superintendent of Schools:

An important shared goal of educators throughout our country is to ensure that students have a safe and secure environment that is conducive to learning and that affords students equal educational opportunities regardless of their sex. School districts have a critical responsibility for preventing and eliminating sexual harassment discrimination. Sexual harassment of a student, if not appropriately addressed, can have serious, detrimental consequences for the student that impedes the student's education, and constitutes a breach of trust between the school and the student and family.

A recent Supreme Court decision took notice of the "extraordinary harm" that a student suffers when subjected to sexual harassment and abuse by a teacher. The Court emphasized that such conduct by a teacher "undermines the basic purposes of the educational system." Gebser v. Lago Vista Independent School District (June 22, 1998). The Gebser decision limited the availability of damages to a student in a private Title IX lawsuit against a school district. It did not, however, alter the fundamental obligations of schools and their employees to take prompt action to address instances of sexual harassment. This letter summarizes existing obligations and the effect of the Supreme Court decision.

C. Reference

Title IX Prohibits Sexual Harassment Discrimination

The Department of Education's Office for Civil Rights (OCR), which has the responsibility for enforcing Title IX, recently provided educational institutions with a detailed discussion of their responsibilities to prevent and, when it occurs, remedy sexual harassment of students. A copy of the guidance is available on the Department's web site at http://www.ed. gov/offices/OCR/sexhar00.html.

Title IX prohibits sex-based discrimination in education programs and activities operated by schools that receive federal financial assistance. Therefore, school districts are responsible under Title IX to provide students with a nondiscriminatory educational environment. As described in the guidance, sexual harassment of a student may violate this obligation. When a responsible school employee, such as a principal or teacher, learns of possible sexual harassment discrimination by others, Title IX requires the school to immediately investigate, to take appropriate steps to end the harassment, to eliminate the effects of the harassment, and to prevent the harassment from recurring.

The Department's Title IX regulation also requires schools to have well-publicized policies against discrimination based on sex, including sexual harassment discrimination; to have effective and well-publicized procedures for students and their families to raise and resolve these issues; and to take prompt and effective action to equitably resolve sexual harassment discrimination complaints. 34 CFR Part 106.8. In addition, each school district is required to designate at least one employee to coordinate and carry out its Title IX responsibilities. Id. I encourage you, at the outset of the new school year, to publicize and reaffirm these policies and procedures to returning and new members of the school community, including teachers, counselors, administrators, parents, and students.

The Gebser Decision Addresses Private Damages Claims

The Court's recent decision in Gebser was limited to private Title IX lawsuits for money damages. The Court in Gebser ruled that a private plaintiff in a court action can obtain money damages against a school district under Title IX if a school official who has the authority to take corrective action has actual notice of sexual harassment and is deliberately indifferent to it. The Gebser decision expressly distinguished the limits on private recovery of money damages from the Department of Education's enforcement of Title IX. Thus, the obligations of schools that receive federal funds to address instances of sexual harassment have not changed as a result of the Supreme Court decision. School districts must continue to take reasonable steps to prevent and eliminate sexual harassment discrimination.  In addition, pursuant to its published guidance, OCR will continue to enforce Title IX in this area, including by investigating complaints alleging sexual harassment discrimination.

EXHIBIT 4

<u>OCR Offers Technical Assistance</u>

Sexual harassment discrimination can have serious, detrimental consequences for students. Thus, school districts need to take the problem of sexual harassment very seriously. In addition to having well-publicized policies and procedures in place, schools should be taking preventative steps to identify problems — such as training staff to recognize and report potential harassment — and to follow up on any information indicating potential discrimination. OCR welcomes the opportunity to provide individual schools upon request with technical assistance and practical guidance to develop preventative programs.

The Department is committed to continuing our leadership role in ensuring equal educational opportunities for all students. The Department will continue to work with schools, parents and other interested parties to ensure that schools have effective policies and procedures in place to prevent sexual harassment. I have attached a contact list for OCR's enforcement offices for your convenience.

Thank you for your interest in this critical issue.

Yours sincerely,

Richard W. Riley

*[Enclosure omitted]*

EXHIBIT 4

**C: Reference**

# State Hate Crimes Statutory Provisions

(ALABAMA through MISSISSIPPI)

**C: Reference**

| | AL | AK | AZ | AR | CA | CO | CT | DC | DE | FL | GA | HI | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bias-Motivated Violence and Intimidation** | ● | ● | ● | | ● | ● | ● | ● | ● | ● | | | ● | ● | | ● | | | ● | ● | ● | ● | ● | ● | ● |
| **Civil Action** | | | ● | ● | ● | ● | ● | ● | | ● | | | ● | ● | | ● | | | ● | ● | | ● | | ● | |
| **Criminal Penalty** | ● | ● | ● | | ● | ● | ● | ● | ● | ● | | | ● | ● | | ● | | | ● | ● | ● | ● | ● | ● | ● |
| **Race, Religion¹, Ethnicity** | ● | ● | ● | | ● | ● | ● | ● | ● | ● | | ● | ● | ● | | ● | | | ● | ● | ● | ● | ● | ● | ● |
| **Sexual Orientation** | | | ● | | ● | | ● | ● | ● | ● | | | | ● | | ● | | | ● | ● | ● | ● | | ● | |
| **Gender** | | ● | ● | | ● | | | ● | | | | | | ● | | ● | | | ● | | | | | ● | ● |
| **Other²** | ● | ● | ● | | ● | | | ● | ● | | | | | ● | | ● | | | ● | ● | | ● | | ● | |
| **Institutional Vandalism** | ● | | ● | | ● | ● | ● | ● | ● | ● | ● | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | | ● | |
| **Data Collection³** | | | ● | | ● | | ● | ● | | ● | | | | ● | | ● | | | | | ● | | ● | ● | |
| **Training for Law Enforcement Personnel⁴** | | | | | ● | | | | | | | | | ● | | | | ● | | | | | | | |

1. The following states also have statutes criminalizing interference with religious worship: CA, DC, FL, ID, MD, MA, MI, MN, MS, MO, NV, NM, NY, NC, OK, RI, SC, SD, TN, VA, WV.

2. "Other" includes mental and physical disability or handicap (AL, AK, AZ, CA, DC, DE, IL, IA, LA, ME, MA, MN, NE, NV, NH, NJ, NY, OK, RI, VT, WA, WI), political affiliation (DC, IA, LA, WV) and age (DC, IA, LA, VT).

3. States with data collection statutes which include sexual orientation are AZ, CA, CT, DC, FL, IL, IA, MD, MN, NV, OR and WA; those which include gender are AZ, DC, IL, IA, MN, WA.

4. Some other states have regulations mandating such training.

© 1998 Anti-Defamation League. All rights reserved.   [Changes in state law may have occurred after this chart was compiled.  Consult state officials for updated information.]

EXHIBIT 4

**C: Reference**

# State Hate Crimes Statutory Provisions *(continued)*
*(MISSOURI through WYOMING)*

| | MO | MT | NE | NV | NH | NJ | NM[5] | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX[6] | UT[7] | VT | VA | WA | WV | WI | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bias-Motivated Violence and Intimidation | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | | • | • | • | • | • | • | • | • | • | |
| Civil Action | • | | • | • | • | • | | | | | • | • | • | • | • | | • | • | • | | • | • | • | | • | |
| Criminal Penalty | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | | • | • | • | • | • | • | • | • | • | |
| Race, Religion[1], Ethnicity | • | | • | • | • | • | • | • | • | • | • | • | • | • | • | | • | • | • | • | • | • | • | • | • | |
| Sexual Orientation | | | • | • | • | | | • | | | | | • | • | • | | • | • | | | • | • | | | • | |
| Gender | | | • | • | • | • | • | | | • | • | | | • | • | | | | • | | • | | • | • | | |
| Other[2] | • | • | | • | • | • | | | • | | • | | • | • | • | | • | • | • | | • | • | • | • | • | |
| Institutional Vandalism | • | • | | • | • | • | • | | | | | • | • | • | • | | | | • | | | • | • | | | |
| Data Collection[3] | | | • | • | | • | | | | | • | | • | • | • | | | | • | | • | | | | | |
| Training for Law Enforcement Personnel[4] | | | | | | | | | | | | | • | | • | | | | | | | | • | | | |

1. The following states also have statutes criminalizing interference with religious worship:
   CA, DC, FL, ID, MD, MA, MI, MN, MS, MO, NV, NM, NY, NC, OK, RI, SC, SD, TN, VA, WV.

2. "Other" includes mental and physical disability or handicap
   (AL, AK, AZ, CA, DC, DE, IL, IA, LA, ME, MA, MN, NE, NV, NH, NJ, NY, OK, RI, VT, WA, WI),
   political affiliation (DC, IA, LA, WV) and age (DC, IA, LA, VT).

3. States with data collection statutes which include sexual orientation are AZ, CA, CT, DC, FL, IL, IA, MD, MN, NV, OR and WA;
   those which include gender are AZ, DC, IL, IA, MN, WA.

4. Some other states have regulations mandating such training.

5. New York State law provides penalty enhancement limited to the crime of aggravated harassment.

6. The Texas Statute refers to victims selected "because of the defendant's bias or prejudice against a person or group."

7. The Utah Statute ties penalties for hate crimes to violations of the victim's constitutional or civil rights.

© 1998 Anti-Defamation League. All rights reserved.   [Changes in state law may have occurred after this chart was compiled. Consult state officials for updated information.]

EXHIBIT 4

# EXHIBIT 5

**THE SECRETARY OF EDUCATION**
WASHINGTON, D.C. 20202

January 28, 1999

Dear President:

An important shared goal of educators throughout our country is to ensure that students have a safe and secure environment that is conducive to learning and that affords students equal educational opportunities regardless of their sex. Colleges and universities have a critical responsibility for preventing and eliminating sexual harassment discrimination. Sexual harassment of a student, if not appropriately addressed, can have serious, detrimental consequences for the student, impedes the student's education, and constitutes a breach of trust between the school and the student.

A recent Supreme Court decision took notice of the "extraordinary harm" that a student suffers when subjected to sexual harassment and abuse by a teacher. The Court emphasized that such conduct by a teacher "undermines the basic purposes of the educational system." Gebser v. Lago Vista Independent School District (June 22, 1998). The Gebser decision limited the availability of damages to a student in a private Title IX lawsuit against a school district. It did not, however, alter the fundamental obligations of educational institutions and their employees to take prompt action to address instances of sexual harassment. Moreover, these obligations apply to colleges and universities as well as to school districts. This letter summarizes existing obligations and the effect of the Supreme Court decision.

**Title IX Prohibits Sexual Harassment Discrimination**

The Department of Education's Office for Civil Rights (OCR), which has the responsibility for enforcing Title IX, recently provided educational institutions with a detailed discussion of their responsibilities to prevent and, when it occurs, remedy sexual harassment of students. A copy of the guidance is available on the Department's web site at <http://www.ed.gov/offices/OCR/docs/sexhar00.html>.

Title IX prohibits sex-based discrimination in education programs and activities operated by schools that receive federal financial assistance. Therefore, colleges and universities are responsible under Title IX to provide students with a nondiscriminatory educational environment. As described in the guidance, sexual harassment of a student may violate this obligation.[1] When a student files a complaint, or a responsible school employee such as an

---

[1] In Davis v. Monroe County Board of Education, the Supreme Court, this term, will examine the issue of whether a school violates Title IX when it is deliberately indifferent to repeated complaints of peer sexual.

*Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation.*

---

Page 2

administrator, professor, or Title IX coordinator otherwise learns of possible sexual harassment discrimination by others, Title IX requires the school immediately to investigate, to take appropriate steps to end the harassment, to eliminate the effects of the harassment, and to prevent the harassment from recurring.

The Department's Title IX regulation also requires colleges and universities to have well-publicized policies against discrimination based on sex, including sexual harassment discrimination; to have effective and well-publicized procedures for students to raise and resolve these issues; and to take prompt and effective action to equitably resolve sexual harassment discrimination complaints. 34 CFR Part 106.8. In addition, colleges and universities are required to designate at least one employee to coordinate and carry out their Title IX responsibilities. Id. I encourage you to publicize and reaffirm these policies and procedures in ways that will assure all students and employees have access to this information.

**The Gebser Decision Addresses Private Damages Claims**

The Court's recent decision in Gebser was limited to private Title IX lawsuits for money damages. The Court in Gebser ruled that a private plaintiff in a court action can obtain money damages against a school district under Title IX if a school official who has the authority to take corrective action has actual notice of sexual harassment and is deliberately indifferent to it. The Gebser decision recognized the continuing ability of the Department to enforce Title IX and its implementing regulation through administrative procedures. Thus, the obligations of schools, including colleges and universities, that receive federal funds to address instances of sexual harassment have not changed as a result of the Supreme Court decision. Schools must continue to take reasonable steps to prevent and eliminate sexual harassment discrimination. In addition, pursuant to its published guidance, OCR will continue to enforce Title IX in this area, including investigating complaints alleging sexual harassment discrimination.

**OCR Offers Technical Assistance**

Sexual harassment discrimination can have serious, detrimental consequences for students. Thus, colleges and universities need to take the problem of sexual harassment very seriously. In addition to having well-publicized policies and procedures in place, colleges and universities should be taking preventative steps to identify problems -- such as training staff to recognize and report potential harassment -- and to follow up on any information indicating potential discrimination. OCR welcomes the opportunity to provide individual colleges and universities upon request with technical assistance and practical guidance to develop preventative programs.

The Department is committed to continuing our leadership role in ensuring equal educational opportunities for all students. The Department will continue to work with schools, students and other interested parties to ensure that colleges and universities have effective policies and procedures in place to prevent sexual harassment. I have attached a contact list for OCR's regional offices for your convenience.

---

Page 3

Thank you for your interest in this critical issue.

Yours sincerely,

Dick Riley

Richard W. Riley

Enclosure

-###-

---

[ Return to Key Policy Letters ]

Return to
ED Home

EXHIBIT 5

*This page last updated March 17, 1999 (pjk)*

EXHIBIT 6

## DEPARTMENT OF EDUCATION

### Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties

**AGENCY:** Office for Civil Rights, Department of Education.

**ACTION:** Notice of availability.

**SUMMARY:** The Assistant Secretary for Civil Rights, U.S. Department of Education (Department), announces the availability of a document (revised sexual harassment guidance) that replaces the 1997 document entitled "Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties," issued by the Office for Civil Rights (OCR) on March 13, 1997 (1997 guidance). We revised the guidance in limited respects in light of subsequent Supreme Court cases relating to sexual harassment in schools.

The revised guidance reaffirms the compliance standards that OCR applies in investigations and administrative enforcement of Title IX of the Education Amendments of 1972 (Title IX) regarding sexual harassment. The revised guidance re-grounds these standards in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages as distinct from Title VII of the Civil Rights Act of 1964 agency law. In most other respects the revised guidance is identical to the 1997 guidance. Thus, we intend the revised guidance to serve the same purpose as the 1997 guidance. It continues to provide the principles that a school should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance.

**FOR FURTHER INFORMATION CONTACT:** Address requests for copies of the revised sexual harassment guidance to Jeanette J. Lim, U.S. Department of Education, 400 Maryland Avenue, SW., room 5212 Switzer Building, Washington, DC 20202–1100. Telephone: (202) 205–5557 or 1–800–421–3481. For all requests submitted by letter, you must include the term "Revised Sexual Harassment Guidance."

If you use a telecommunications device for the deaf (TDD), you may call the TDD number at (202) 260–0471. The document is also available through the Internet at the following site: *http://www.ed.gov/ocr/shguide*

If you prefer to send your request through the Internet, use the following address: ocr@ed.gov

You must include the term "Revised Sexual Harassment Guidance" in the subject line of your electronic message.

Individuals with disabilities may obtain this document in an alternative format (*e.g.,* Braille, large print, audiotape, or computer diskette) by contacting the OCR Customer Service Team at 1–800–421–3481.

### Electronic Access to This Document

You may view this notice, as well as all other Department of Education documents published in the **Federal Register**, in text or Adobe Portable Document Format (PDF) on the Internet at either of the following sites: *http://ocfo.ed.gov/fedreg.htm* *http://www.ed.gov/news.html* To use PDF, you must have Adobe Acrobat Reader, which is available free at either of the previous sites. If you have questions about using PDF, call the U.S. Government Printing Office (GPO), toll free, at 1–888–293–6498; or in the Washington, DC, area at (202) 512–1530.

**Note:** The official version of this notice is the notice published in the **Federal Register**. Free Internet access to the official edition of the Federal Register and the Code of Federal Regulations is available on GPO Access at: http://www.access.gpo.gov/nara/index.html.

Dated: January 16, 2001.

**Norma V. Cantú,**
*Assistant Secretary for Civil Rights.*
[FR Doc. 01–1606 Filed 1–18–01; 8:45 am]
**BILLING CODE 4000–01–U**

## ENVIRONMENTAL PROTECTION AGENCY

[FRL–6933–6]

### Agency Information Collection Activities: Proposed Collection; Comment Request; Impact of Formal Environmental Policy Statements on the Teaching, Research and Operations of Colleges and Universities

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** In compliance with the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*), this document announces that EPA is planning to submit the following proposed Information Collection Request (ICR) to the Office of Management and Budget (OMB): "Impact of Formal Environmental Policy Statements on the Teaching, Research and Operations of Colleges and Universities"; EPA ICR #2013.01. Before submitting the ICR to OMB for review and approval, EPA is soliciting comments on specific aspects of the proposed information collection as described below.

**DATES:** Comments must be submitted on or before March 20, 2001.

**ADDRESSES:** Office of Enforcement and Compliance, EPA Region 10, 1200 6th Ave. (MS OEC–164), Seattle, WA 98101. Interested persons may obtain a copy of the ICR without charge; to do so, see the following Further Information Contact section.

**FOR FURTHER INFORMATION CONTACT:** Clark L. Gaulding; Academic Program Manager and Senior Policy Advisor; (206) 553–1849; fax (206) 553–7176. E-mail at <gaulding.clark@epa.gov>

**SUPPLEMENTARY INFORMATION:**

*Affected entities:* Entities potentially affected by this action are institutions providing college or university education leading to bachelors and graduate degrees.

*Title:* "Impact of Formal Environmental Policy Statements on the Teaching, Research and Operations of Colleges and Universities; EPA ICR #2013.01.

*Abstract:* Many universities and colleges have adopted formal statements of environmental policy, and more are being adopted all the time. This is probably good, but little is known about the impacts that these statements have on the actual behavior of our academic institutions. Do they make a difference, and, if so, how? Where's the evidence? Is articulated environmental policy a prophesy of future behavior at the schools that adopt them, or is it rhetoric, however well intended?

This survey study is intended to develop some possible answers to these questions. Written surveys and selected follow-up interviews will be conducted on a representative number of the approximately 4,000 campuses across the U.S. Part of the inquiry is statistical in nature; how many schools have a formal policy on the environment, and how many do not; does it make a difference whether the school is public or private, large or small, urban or rural? Does region make a difference? Of the schools with policies, when were they adopted and is there a trend? Finally, can anything be made of the numbers?

Beyond the numbers, the survey, and especially the interviews, will focus on (1) substance and (2) impact. A random cross-section of written policy statements will be analyzed in comparative fashion to understand not only who wrote them, but what topics they literally address (especially,

EXHIBIT 6

# REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## TITLE IX



**January 2001**

**U.S. Department of Education**
**Office for Civil Rights**

EXHIBIT 6

# PREAMBLE

## Summary

The Assistant Secretary for Civil Rights, U.S. Department of Education (Department), issues a new document (revised guidance) that replaces the 1997 document entitled "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties," issued by the Office for Civil Rights (OCR) on March 13, 1997 (1997 guidance). We revised the guidance in limited respects in light of subsequent Supreme Court cases relating to sexual harassment in schools.

The revised guidance reaffirms the compliance standards that OCR applies in investigations and administrative enforcement of Title IX of the Education Amendments of 1972 (Title IX) regarding sexual harassment.  The revised guidance re-grounds these standards in the Title IX regulations, distinguishing them from the standards applicable to private litigation for money damages and clarifying their regulatory basis as distinct from Title VII of the Civil Rights Act of 1964 (Title VII) agency law.  In most other respects the revised guidance is identical to the 1997 guidance.  Thus, we intend the revised guidance to serve the same purpose as the 1997 guidance.  It continues to provide the principles that a school[1] should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance.

## Purpose and Scope of the Revised Guidance

In March 1997, we published in the Federal Register "Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties."  62 FR 12034.  We issued the guidance pursuant to our authority under Title IX, and our Title IX implementing regulations, to eliminate discrimination based on sex in education programs and activities receiving Federal financial assistance.  It was grounded in longstanding legal authority establishing that sexual harassment of students can be a form of sex discrimination covered by Title IX.  The guidance was the product of extensive consultation with interested parties, including students, teachers, school administrators, and researchers.  We also made the document available for public comment.

Since the issuance of the 1997 guidance, the Supreme Court (Court) has issued several important decisions in sexual harassment cases, including two decisions specifically addressing sexual harassment of students under Title IX:  Gebser v. Lago Vista Independent School District (Gebser), 524 U.S. 274 (1998), and Davis v. Monroe County Board of Education (Davis), 526 U.S. 629 (1999). The Court held in Gebser that a school can be liable for monetary damages if a teacher sexually harasses a student, an

---

[1] As in the 1997 guidance, the revised guidance uses the term "school" to refer to all schools, colleges, universities, and other educational institutions that receive Federal funds from the Department.

EXHIBIT 6

official who has authority to address the harassment has actual knowledge of the harassment, and that official is deliberately indifferent in responding to the harassment. In Davis, the Court announced that a school also may be liable for monetary damages if one student sexually harasses another student in the school's program and the conditions of Gebser are met.

The Court was explicit in Gebser and Davis that the liability standards established in those cases are limited to private actions for monetary damages.  See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639.  The Court acknowledged, by contrast, the power of Federal agencies, such as the Department, to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate," even in circumstances that would not give rise to a claim for money damages.  See, Gebser, 524 U.S. at 292.

In an August 1998 letter to school superintendents and a January 1999 letter to college and university presidents, the Secretary of Education informed school officials that the Gebser decision did not change a school's obligations to take reasonable steps under Title IX and the regulations to prevent and eliminate sexual harassment as a condition of its receipt of Federal funding.  The Department also determined that, although in most important respects the substance of the 1997 guidance was reaffirmed in Gebser and Davis, certain areas of the 1997 guidance could be strengthened by further clarification and explanation of the Title IX regulatory basis for the guidance.

On November 2, 2000, we published in the Federal Register a notice requesting comments on the proposed revised guidance (62 FR 66092).  A detailed explanation of the Gebser and Davis decisions, and an explanation of the proposed changes in the guidance, can be found in the preamble to the proposed revised guidance.  In those decisions and a third opinion, Oncale v. Sundowner Offshore Services, Inc. (Oncale), 523 U.S. 75 (1998) (a sexual harassment case decided under Title VII), the Supreme Court confirmed several fundamental principles we articulated in the 1997 guidance.  In these areas, no changes in the guidance were necessary. A notice regarding the availability of this final document appeared in the Federal Register on January 19, 2001.

## Enduring Principles from the 1997 Guidance

It continues to be the case that a significant number of students, both male and female, have experienced sexual harassment, which can interfere with a student's academic performance and emotional and physical well-being.  Preventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn.  As with the 1997 guidance, the revised guidance applies to students at every level of education.  School personnel who understand their obligations under Title IX, e.g., understand that sexual harassment can be sex discrimination in violation of Title IX, are in the best position to prevent harassment and to lessen the harm to students if, despite their best efforts, harassment occurs.

One of the fundamental aims of both the 1997 guidance and the revised guidance has been to emphasize that, in addressing allegations of sexual harassment, the good judgment and common sense of teachers and school administrators are important elements of a response that meets the requirements of Title IX.

EXHIBIT 6

A critical issue under Title IX is whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects. If harassment has occurred, doing nothing is always the wrong response. However, depending on the circumstances, there may be more than one right way to respond. The important thing is for school employees or officials to pay attention to the school environment and not to hesitate to respond to sexual harassment in the same reasonable, commonsense manner as they would to other types of serious misconduct.

It is also important that schools not overreact to behavior that does not rise to the level of sexual harassment. As the Department stated in the 1997 guidance, a kiss on the cheek by a first grader does not constitute sexual harassment. School personnel should consider the age and maturity of students in responding to allegations of sexual harassment.

Finally, we reiterate the importance of having well-publicized and effective grievance procedures in place to handle complaints of sex discrimination, including sexual harassment complaints. Nondiscrimination policies and procedures are required by the Title IX regulations. In fact, the Supreme Court in Gebser specifically affirmed the Department's authority to enforce this requirement administratively in order to carry out Title IX's nondiscrimination mandate. 524 U.S. at 292. Strong policies and effective grievance procedures are essential to let students and employees know that sexual harassment will not be tolerated and to ensure that they know how to report it.

## Analysis of Comments Received Concerning the Proposed Revised Guidance and the Resulting Changes

In response to the Assistant Secretary's invitation to comment, OCR received approximately 11 comments representing approximately 15 organizations and individuals. Commenters provided specific suggestions regarding how the revised guidance could be clarified. Many of these suggested changes have been incorporated. Significant and recurring issues are grouped by subject and discussed in the following sections:

### Distinction Between Administrative Enforcement and Private Litigation for Monetary Damages

In Gebser and Davis, the Supreme Court addressed for the first time the appropriate standards for determining when a school district is liable under Title IX for money damages in a private lawsuit brought by or on behalf of a student who has been sexually harassed. As explained in the preamble to the proposed revised guidance, the Court was explicit in Gebser and Davis that the liability standards established in these cases are limited to private actions for monetary damages. See, e.g., Gebser, 524 U.S. at 283, and Davis, 526 U.S. at 639. The Gebser Court recognized and contrasted lawsuits for money damages with the incremental nature of administrative enforcement of Title IX. In Gebser, the Court was concerned with the possibility of a money damages award against a school for harassment about which it had not known. In contrast, the process of administrative enforcement requires enforcement agencies such as OCR to make schools

EXHIBIT 6

aware of potential Title IX violations and to seek voluntary corrective action before pursuing fund termination or other enforcement mechanisms.

Commenters uniformly agreed with OCR that the Court limited the liability standards established in Gebser and Davis to private actions for monetary damages. See, e.g., Gebser, 524 U.S. 283, and Davis, 526 U.S. at 639. Commenters also agreed that the administrative enforcement standards reflected in the 1997 guidance remain valid in OCR enforcement actions.[2] Finally, commenters agreed that the proposed revisions provided important clarification to schools regarding the standards that OCR will use and that schools should use to determine compliance with Title IX as a condition of the receipt of Federal financial assistance in light of Gebser and Davis.

### Harassment by Teachers and Other School Personnel

Most commenters agreed with OCR's interpretation of its regulations regarding a school's responsibility for harassment of students by teachers and other school employees. These commenters agreed that Title IX's prohibitions against discrimination are not limited to official policies and practices governing school programs and activities. A school also engages in sex-based discrimination if its employees, in the context of carrying out their day-to-day job responsibilities for providing aid, benefits, or services to students (such as teaching, counseling, supervising, and advising students) deny or limit a student's ability to participate in or benefit from the schools program on the basis of sex. Under the Title IX regulations, the school is responsible for discrimination in these cases, whether or not it knew or should have known about it, because the discrimination occurred as part of the school's undertaking to provide nondiscriminatory aid, benefits, and services to students. The revised guidance distinguishes these cases from employee harassment that, although taking place in a school's program, occurs outside of the context of the employee's provision of aid, benefits, and services to students. In these latter cases, the school's responsibilities are not triggered until the school knew or should have known about the harassment.

One commenter expressed concern that it was inappropriate ever to find a school out of compliance for harassment about which it knew nothing. We reiterate that, although a school may in some cases be responsible for harassment caused by an employee that occurred before other responsible employees of the school knew or should have known about it, OCR always provides the school with actual notice and the opportunity to take appropriate corrective action before issuing a finding of violation. This is consistent with the Court's underlying concern in Gebser and Davis.

Most commenters acknowledged that OCR has provided useful factors to determine whether harassing conduct took place "in the context of providing aid, benefits, or services." However, some commenters stated that additional clarity and examples regarding the issue were needed. Commenters also suggested clarifying

---

[2] It is the position of the United States that the standards set out in OCR's guidance for finding a violation and seeking voluntary corrective action also would apply to private actions for injunctive and other equitable relief. See brief of the United States as Amicus Curiae in Davis v. Monroe County.

EXHIBIT 6

references to quid pro quo and hostile environment harassment as these two concepts, though useful, do not determine the issue of whether the school itself is considered responsible for the harassment.  We agree with these concerns and have made significant revisions to the sections "Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program" and "Harassment by Teachers and Other Employees" to clarify the guidance in these respects.

### Gender-based Harassment, Including Harassment Predicated on Sex-stereotyping

Several commenters requested that we expand the discussion and include examples of gender-based harassment predicated on sex stereotyping.  Some commenters also argued that gender-based harassment should be considered sexual harassment, and that we have "artificially" restricted the guidance only to harassment in the form of conduct of a sexual nature, thus, implying that gender-based harassment is of less concern and should be evaluated differently.

We have not further expanded this section because, while we are also concerned with the important issue of gender-based harassment, we believe that harassment of a sexual nature raises unique and sufficiently important issues that distinguish it from other types of gender-based harassment and warrants its own guidance.

Nevertheless, we have clarified this section of the guidance in several ways.  The guidance clarifies that gender-based harassment, including that predicated on sex-stereotyping, is covered by Title IX if it is sufficiently serious to deny or limit a student's ability to participate in or benefit from the program.  Thus, it can be discrimination on the basis of sex to harass a student on the basis of the victim's failure to conform to stereotyped notions of masculinity and femininity.  Although this type of harassment is not covered by the guidance, if it is sufficiently serious, gender-based harassment is a school's responsibility, and the same standards generally will apply.  We have also added an endnote regarding Supreme Court precedent for the proposition that sex stereotyping can constitute sex discrimination.

Several commenters also suggested that we state that sexual and non-sexual (but gender-based) harassment should not be evaluated separately in determining whether a hostile environment exists.  We note that both the proposed revised guidance and the final revised guidance indicate in several places that incidents of sexual harassment and non-sexual, gender-based harassment can be combined to determine whether a hostile environment has been created.  We also note that sufficiently serious harassment of a sexual nature remains covered by Title IX, as explained in the guidance, even though the hostile environment may also include taunts based on sexual orientation.

### Definition of Harassment

One commenter urged OCR to provide distinct definitions of sexual harassment to be used in administrative enforcement as distinguished from criteria used to maintain private actions for monetary damages.  We disagree.  First, as discussed in the preamble to the proposed revised guidance, the definition of hostile environment sexual harassment used by the Court in Davis is consistent with the definition found in the proposed guidance. Although the terms used by the Court in Davis are in some ways different from

EXHIBIT 6

the words used to define hostile environment harassment in the 1997 guidance (see, e.g., 62 FR 12041, "conduct of a sexual nature is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from the education program, or to create a hostile or abusive educational environment"), the definitions are consistent. Both the Court's and the Department's definitions are contextual descriptions intended to capture the same concept -– that under Title IX, the conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program.  In determining whether harassment is actionable, both <u>Davis</u> and the Department tell schools to look at the "constellation of surrounding circumstances, expectations, and relationships" (526 U.S. at 651 (citing <u>Oncale</u>)), and the <u>Davis</u> Court cited approvingly to the underlying core factors described in the 1997 guidance for evaluating the context of the harassment. Second, schools benefit from consistency and simplicity in understanding what is sexual harassment for which the school must take responsive action.  A multiplicity of definitions would not serve this purpose.

Several commenters suggested that we develop a unique Title IX definition of harassment that does not rely on Title VII and that takes into account the special relationship of schools to students.  Other commenters, by contrast, commended OCR for recognizing that <u>Gebser</u> and <u>Davis</u> did not alter the definition of hostile environment sexual harassment found in OCR's 1997 guidance, which derives from Title VII caselaw, and asked us to strengthen the point.  While <u>Gebser</u> and <u>Davis</u> made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the <u>Davis</u> Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX. We also believe that the factors described in both the 1997 guidance and the revised guidance to determine whether sexual harassment has occurred provide the necessary flexibility for taking into consideration the age and maturity of the students involved and the nature of the school environment.

**Effective Response**

One commenter suggested that the change in the guidance from "appropriate response" to "effective response" implies a change in OCR policy that requires omniscience of schools.  We disagree.  Effectiveness has always been the measure of an adequate response under Title IX.  This does not mean a school must overreact out of fear of being judged inadequate.  Effectiveness is measured based on a reasonableness standard.  Schools do not have to know beforehand that their response will be effective. However, if their initial steps are ineffective in stopping the harassment, reasonableness may require a series of escalating steps.

# The Relationship Between FERPA and Title IX

In the development of both the 1997 guidance and the current revisions to the guidance, commenters raised concerns about the interrelation of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, and Title IX.  The concerns relate to two issues: (1) the harassed student's right to information about the outcome of a sexual harassment complaint against another student, including information about sanctions imposed on a student found guilty of harassment; and (2) the due process rights of

EXHIBIT 6

individuals, including teachers, accused of sexual harassment by a student, to obtain information about the identity of the complainant and the nature of the allegations.

FERPA generally forbids disclosure of information from a student's "education record" without the consent of the student (or the student's parent). Thus, FERPA may be relevant when the person found to have engaged in harassment is another student, because written information about the complaint, investigation, and outcome is part of the harassing student's education record. Title IX is also relevant because it is an important part of taking effective responsive action for the school to inform the harassed student of the results of its investigation and whether it counseled, disciplined, or otherwise sanctioned the harasser. This information can assure the harassed student that the school has taken the student's complaint seriously and has taken steps to eliminate the hostile environment and prevent the harassment from recurring.

The Department currently interprets FERPA as not conflicting with the Title IX requirement that the school notify the harassed student of the outcome of its investigation, i.e., whether or not harassment was found to have occurred, because this information directly relates to the victim. It has been the Department's position that there is a potential conflict between FERPA and Title IX regarding disclosure of sanctions, and that FERPA generally prevents a school from disclosing to a student who complained of harassment information about the sanction or discipline imposed upon a student who was found to have engaged in that harassment.[3]

There is, however, an additional statutory provision that may apply to this situation. In 1994, as part of the Improving America's Schools Act, Congress amended the General Education Provisions Act (GEPA) -– of which FERPA is a part -– to state that nothing in GEPA "shall be construed to affect the applicability of … title IX of the Education Amendments of 1972…."[4] The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between requirements of FERPA and requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. The Department is in the process of developing a consistent approach and specific factors for implementing this provision. OCR and the Department's Family Policy Compliance Office (FPCO) intend to issue joint guidance, discussing specific areas of potential conflict between FERPA and Title IX.

---

[3] Exceptions include the case of a sanction that directly relates to the person who was harassed (e.g., an order that the harasser stay away from the harassed student), or sanctions related to offenses for which there is a statutory exception, such as crimes of violence or certain sex offenses in postsecondary institutions.

[4] 20 U.S.C. 1221(d). A similar amendment was originally passed in 1974 but applied only to Title VI of the Civil Rights Act of 1964 (prohibiting race discrimination by recipients). The 1994 amendments also extended 20 U.S.C. 1221(d) to Section 504 of the Rehabilitation Act of 1973 (prohibiting disability-based discrimination by recipients) and to the Age Discrimination Act.

EXHIBIT 6

FERPA is also relevant when a student accuses a teacher or other employee of sexual harassment, because written information about the allegations is contained in the student's education record.  The potential conflict arises because, while FERPA protects the privacy of the student accuser, the accused individual may need the name of the accuser and information regarding the nature of the allegations in order to defend against the charges.  The 1997 guidance made clear that neither FERPA nor Title IX override any federally protected due process rights of a school employee accused of sexual harassment.

Several commenters urged the Department to expand and strengthen this discussion.  They argue that in many instances a school's failure to provide information about the name of the student accuser and the nature of the allegations seriously undermines the fairness of the investigative and adjudicative process.  They also urge the Department to include a discussion of the need for confidentiality as to the identity of the individual accused of harassment because of the significant harm that can be caused by false accusations.  We have made several changes to the guidance, including an additional discussion regarding the confidentiality of a person accused of harassment and a new heading entitled "Due Process Rights of the Accused," to address these concerns.

EXHIBIT 6

# REVISED SEXUAL HARASSMENT GUIDANCE:
## HARASSMENT OF STUDENTS[1]
## BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES

## Outline of Contents

I. Introduction

II. Sexual Harassment

III. Applicability of Title IX

IV. Title IX Regulatory Compliance Responsibilities

V. Determining a School's Responsibilities

    A.  Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

        1. Factors Used to Evaluate Hostile Environment Sexual Harassment

        2. Welcomeness

    B. Nature of a School's Responsibility to Address Sexual Harassment

        1. Harassment by Teachers and Other Employees

        2. Harassment by Other Students or Third Parties

    C. Notice of Employee, Peer, or Third Party Harassment

    D. The Role of Grievance Procedures

VI. OCR Case Resolution

VII. Recipient's Response

    A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

    B. Confidentiality

    C. Response to Other Types of Notice

VIII. Prevention

IX. Prompt and Equitable Grievance Procedures

X. Due Process Rights of the Accused

XI. First Amendment

EXHIBIT 6

## I. Introduction

Title IX of the Education Amendments of 1972 (Title IX) and the Department of Education's (Department) implementing regulations prohibit discrimination on the basis of sex in federally assisted education programs and activities.[2]  The Supreme Court, Congress, and Federal executive departments and agencies, including the Department, have recognized that sexual harassment of students can constitute discrimination prohibited by Title IX.[3]  This guidance focuses on a school's[4] fundamental compliance responsibilities under Title IX and the Title IX regulations to address sexual harassment of students as a condition of continued receipt of Federal funding.  It describes the regulatory basis for a school's compliance responsibilities under Title IX, outlines the circumstances under which sexual harassment may constitute discrimination prohibited by the statute and regulations, and provides information about actions that schools should take to prevent sexual harassment or to address it effectively if it does occur.[5]

## II. Sexual Harassment

Sexual harassment is unwelcome conduct of a sexual nature.  Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.[6]  Sexual harassment of a student can deny or limit, on the basis of sex, the student's ability to participate in or to receive benefits, services, or opportunities in the school's program.  Sexual harassment of students is, therefore, a form of sex discrimination prohibited by Title IX under the circumstances described in this guidance.

It is important to recognize that Title IX's prohibition against sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct.  For example, a high school athletic coach hugging a student who made a goal or a kindergarten teacher's consoling hug for a child with a skinned knee will not be considered sexual harassment.[7]  Similarly, one student's demonstration of a sports maneuver or technique requiring contact with another student will not be considered sexual harassment.  However, in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment.  For example, a teacher's repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment.

## III. Applicability of Title IX

Title IX applies to all public and private educational institutions that receive Federal funds, i.e., recipients, including, but not limited to, elementary and secondary schools, school districts, proprietary schools, colleges, and universities.  The guidance uses the terms "recipients" and "schools" interchangeably to refer to all of those institutions.  The "education program or activity" of a school includes all of the school's operations.[8]  This means that Title IX protects students in connection with all of the academic, educational, extra-curricular, athletic, and other programs of the school,

EXHIBIT 6

whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere.

A student may be sexually harassed by a school employee,[9] another student, or a non-employee third party (e.g., a visiting speaker or visiting athletes). Title IX protects any "person" from sex discrimination. Accordingly, both male and female students are protected from sexual harassment[10] engaged in by a school's employees, other students, or third parties. Moreover, Title IX prohibits sexual harassment regardless of the sex of the harasser, i.e., even if the harasser and the person being harassed are members of the same sex.[11] An example would be a campaign of sexually explicit graffiti directed at a particular girl by other girls.[12]

Although Title IX does not prohibit discrimination on the basis of sexual orientation,[13] sexual harassment directed at gay or lesbian students that is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's program constitutes sexual harassment prohibited by Title IX under the circumstances described in this guidance.[14] For example, if a male student or a group of male students target a gay student for physical sexual advances, serious enough to deny or limit the victim's ability to participate in or benefit from the school's program, the school would need to respond promptly and effectively, as described in this guidance, just as it would if the victim were heterosexual. On the other hand, if students heckle another student with comments based on the student's sexual orientation (e.g., "gay students are not welcome at this table in the cafeteria"), but their actions do not involve conduct of a sexual nature, their actions would not be sexual harassment covered by Title IX.[15]

Though beyond the scope of this guidance, gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping,[16] but not involving conduct of a sexual nature, is also a form of sex discrimination to which a school must respond, if it rises to a level that denies or limits a student's ability to participate in or benefit from the educational program.[17] For example, the repeated sabotaging of female graduate students' laboratory experiments by male students in the class could be the basis of a violation of Title IX. A school must respond to such harassment in accordance with the standards and procedures described in this guidance.[18] In assessing all related circumstances to determine whether a hostile environment exists, incidents of gender-based harassment combined with incidents of sexual harassment could create a hostile environment, even if neither the gender-based harassment alone nor the sexual harassment alone would be sufficient to do so.[19]

## IV. Title IX Regulatory Compliance Responsibilities

As a condition of receiving funds from the Department, a school is required to comply with Title IX and the Department's Title IX regulations, which spell out prohibitions against sex discrimination. The law is clear that sexual harassment may constitute sex discrimination under Title IX.[20]

Recipients specifically agree, as a condition for receiving Federal financial assistance from the Department, to comply with Title IX and the Department's Title IX regulations. The regulatory provision requiring this agreement, known as an assurance of

3

EXHIBIT 6

compliance, specifies that recipients must agree that education programs or activities operated by the recipient will be operated in compliance with the Title IX regulations, including taking any action necessary to remedy its discrimination or the effects of its discrimination in its programs.[21]

The regulations set out the basic Title IX responsibilities a recipient undertakes when it accepts Federal financial assistance, including the following specific obligations.[22]   A recipient agrees that, in providing any aid, benefit, or service to students, it will not, on the basis of sex—

- Treat one student differently from another in determining whether the student satisfies any requirement or condition for the provision of any aid, benefit, or service;[23]

- Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;[24]

- Deny any student any such aid, benefit, or service;[25]

- Subject students to separate or different rules of behavior, sanctions, or other treatment;[26]

- Aid or perpetuate discrimination against a student by providing significant assistance to any agency, organization, or person that discriminates on the basis of sex in providing any aid, benefit, or service to students;[27] and

- Otherwise limit any student in the enjoyment of any right, privilege, advantage, or opportunity.[28]

For the purposes of brevity and clarity, this guidance generally summarizes this comprehensive list by referring to a school's obligation to ensure that a student is not denied or limited in the ability to participate in or benefit from the school's program on the basis of sex.

The regulations also specify that, if a recipient discriminates on the basis of sex, the school must take remedial action to overcome the effects of the discrimination.[29]

In addition, the regulations establish procedural requirements that are important for the prevention or correction of sex discrimination, including sexual harassment. These requirements include issuance of a policy against sex discrimination[30] and adoption and publication of grievance procedures providing for prompt and equitable resolution of complaints of sex discrimination.[31]   The regulations also require that recipients designate at least one employee to coordinate compliance with the regulations, including coordination of investigations of complaints alleging noncompliance.[32]

To comply with these regulatory requirements, schools need to recognize and respond to sexual harassment of students by teachers and other employees, by other students, and by third parties.  This guidance explains how the requirements of the Title IX regulations apply to situations involving sexual harassment of a student and outlines measures that schools should take to ensure compliance.

4

EXHIBIT 6

## V. Determining a School's Responsibilities

In assessing sexually harassing conduct, it is important for schools to recognize that two distinct issues are considered. The first issue is whether, considering the types of harassment discussed in the following section, the conduct denies or limits a student's ability to participate in or benefit from the program based on sex. If it does, the second issue is the nature of the school's responsibility to address that conduct. As discussed in a following section, this issue depends in part on the identity of the harasser and the context in which the harassment occurred.

### A. Harassment that Denies or Limits a Student's Ability to Participate in or Benefit from the Education Program

This guidance moves away from specific labels for types of sexual harassment.[33] In each case, the issue is whether the harassment rises to a level that it denies or limits a student's ability to participate in or benefit from the school's program based on sex. However, an understanding of the different types of sexual harassment can help schools determine whether or not harassment has occurred that triggers a school's responsibilities under, or violates, Title IX or its regulations.

The type of harassment traditionally referred to as <u>quid pro quo</u> harassment occurs if a teacher or other employee conditions an educational decision or benefit on the student's submission to unwelcome sexual conduct.[34] Whether the student resists and suffers the threatened harm or submits and avoids the threatened harm, the student has been treated differently, or the student's ability to participate in or benefit from the school's program has been denied or limited, on the basis of sex in violation of the Title IX regulations.[35]

By contrast, sexual harassment can occur that does not explicitly or implicitly condition a decision or benefit on submission to sexual conduct. Harassment of this type is generally referred to as hostile environment harassment.[36] This type of harassing conduct requires a further assessment of whether or not the conduct is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program based on sex.[37]

Teachers and other employees can engage in either type of harassment. Students and third parties are not generally given responsibility over other students and, thus, generally can only engage in hostile environment harassment.

### 1. Factors Used to Evaluate Hostile Environment Sexual Harassment

As outlined in the following paragraphs, OCR considers a variety of related factors to determine if a hostile environment has been created, i.e., if sexually harassing conduct by an employee, another student, or a third party is sufficiently serious that it denies or limits a student's ability to participate in or benefit from the school's program based on sex. OCR considers the conduct from both a subjective[38] and objective[39] perspective. In evaluating the severity and pervasiveness of the conduct, OCR considers all relevant circumstances, i.e., "the constellation of surrounding circumstances, expectations, and relationships."[40] Schools should also use these factors to evaluate conduct in order to draw commonsense distinctions between conduct that constitutes

EXHIBIT 6

sexual harassment and conduct that does not rise to that level.  Relevant factors include the following:

- <u>The degree to which the conduct affected one or more students' education.</u>  OCR assesses the effect of the harassment on the student to determine whether it has denied or limited the student's ability to participate in or benefit from the school's program. For example, a student's grades may go down or the student may be forced to withdraw from school because of the harassing behavior.[41]  A student may also suffer physical injuries or mental or emotional distress.[42]  In another situation, a student may have been able to keep up his or her grades and continue to attend school even though it was very difficult for him or her to do so because of the teacher's repeated sexual advances.  Similarly, a student may be able to remain on a sports team, despite experiencing great difficulty performing at practices and games from the humiliation and anger caused by repeated sexual advances and intimidation by several team members that create a hostile environment.  Harassing conduct in these examples would alter a reasonable student's educational environment and adversely affect the student's ability to participate in or benefit from the school's program on the basis of sex.

  A hostile environment can occur even if the harassment is not targeted specifically at the individual complainant.[43]  For example, if a student, group of students, or a teacher regularly directs sexual comments toward a particular student, a hostile environment may be created not only for the targeted student, but also for others who witness the conduct.

- <u>The type, frequency, and duration of the conduct.</u>  In most cases, a hostile environment will exist if there is a pattern or practice of harassment, or if the harassment is sustained and nontrivial.[44]  For instance, if a young woman is taunted by one or more young men about her breasts or genital area or both, OCR may find that a hostile environment has been created, particularly if the conduct has gone on for some time, or takes place throughout the school, or if the taunts are made by a number of students.  The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical. For instance, if the conduct is more severe, e.g., attempts to grab a female student's breasts or attempts to grab any student's genital area or buttocks, it need not be as persistent to create a hostile environment.  Indeed, a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment.[45]  On the other hand, conduct that is not severe will not create a hostile environment, e.g., a comment by one student to another student that she has a nice figure.  Indeed, depending on the circumstances, this may not even be conduct of a sexual nature.[46]  Similarly, because students date one another, a request for a date or a gift of flowers, even if unwelcome, would not create a hostile environment.  However, there may be circumstances in which repeated, unwelcome requests for dates or similar conduct could create a hostile environment.  For example, a person, who has been refused previously, may request dates in an intimidating or threatening manner.

- <u>The identity of and relationship between the alleged harasser and the subject or subjects of the harassment.</u>  A factor to be considered, especially in cases involving allegations of sexual harassment of a student by a school employee, is the identity of

EXHIBIT 6

and relationship between the alleged harasser and the subject or subjects of the harassment.  For example, due to the power a professor or teacher has over a student, sexually based conduct by that person toward a student is more likely to create a hostile environment than similar conduct by another student.[47]

- The number of individuals involved.  Sexual harassment may be committed by an individual or a group.  In some cases, verbal comments or other conduct from one person might not be sufficient to create a hostile environment, but could be if done by a group.  Similarly, while harassment can be directed toward an individual or a group,[48] the effect of the conduct toward a group may vary, depending on the type of conduct and the context.  For certain types of conduct, there may be "safety in numbers."  For example, following an individual student and making sexual taunts to him or her may be very intimidating to that student, but, in certain circumstances, less so to a group of students.  On the other hand, persistent unwelcome sexual conduct still may create a hostile environment if directed toward a group.

- The age and sex of the alleged harasser and the subject or subjects of the harassment.  For example, in the case of younger students, sexually harassing conduct is more likely to be intimidating if coming from an older student.[49]

- The size of the school, location of the incidents, and context in which they occurred.  Depending on the circumstances of a particular case, fewer incidents may have a greater effect at a small college than at a large university campus.  Harassing conduct occurring on a school bus may be more intimidating than similar conduct on a school playground because the restricted area makes it impossible for students to avoid their harassers.[50]  Harassing conduct in a personal or secluded area, such as a dormitory room or residence hall, can have a greater effect (e.g., be seen as more threatening) than would similar conduct in a more public area.  On the other hand, harassing conduct in a public place may be more humiliating.  Each incident must be judged individually.

- Other incidents at the school.  A series of incidents at the school, not involving the same students, could — taken together — create a hostile environment, even if each by itself would not be sufficient.[51]

- Incidents of gender-based, but nonsexual harassment.  Acts of verbal, nonverbal or physical aggression, intimidation or hostility based on sex, but not involving sexual activity or language, can be combined with incidents of sexual harassment to determine if the incidents of sexual harassment are sufficiently serious to create a sexually hostile environment.[52]

It is the totality of the circumstances in which the behavior occurs that is critical in determining whether a hostile environment exists.  Consequently, in using the factors discussed previously to evaluate incidents of alleged harassment, it is always important to use common sense and reasonable judgement in determining whether a sexually hostile environment has been created.

## 2. Welcomeness

The section entitled "Sexual Harassment" explains that in order for conduct of a sexual nature to be sexual harassment, it must be unwelcome.  Conduct is unwelcome if

EXHIBIT 6

the student did not request or invite it and "regarded the conduct as undesirable or offensive."[53]   Acquiescence in the conduct or the failure to complain does not always mean that the conduct was welcome.[54]   For example, a student may decide not to resist sexual advances of another student or may not file a complaint out of fear.   In addition, a student may not object to a pattern of demeaning comments directed at him or her by a group of students out of a concern that objections might cause the harassers to make more comments.   The fact that a student may have accepted the conduct does not mean that he or she welcomed it.[55]   Also, the fact that a student willingly participated in conduct on one occasion does not prevent him or her from indicating that the same conduct has become unwelcome on a subsequent occasion.   On the other hand, if a student actively participates in sexual banter and discussions and gives no indication that he or she objects, then the evidence generally will not support a conclusion that the conduct was unwelcome.[56]

If younger children are involved, it may be necessary to determine the degree to which they are able to recognize that certain sexual conduct is conduct to which they can or should reasonably object and the degree to which they can articulate an objection. Accordingly, OCR will consider the age of the student, the nature of the conduct involved, and other relevant factors in determining whether a student had the capacity to welcome sexual conduct.

Schools should be particularly concerned about the issue of welcomeness if the harasser is in a position of authority.   For instance, because students may be encouraged to believe that a teacher has absolute authority over the operation of his or her classroom, a student may not object to a teacher's sexually harassing comments during class; however, this does not necessarily mean that the conduct was welcome.   Instead, the student may believe that any objections would be ineffective in stopping the harassment or may fear that by making objections he or she will be singled out for harassing comments or other retaliation.

In addition, OCR must consider particular issues of welcomeness if the alleged harassment relates to alleged "consensual" sexual relationships between a school's adult employees and its students.   If elementary students are involved, welcomeness will not be an issue:   OCR will never view sexual conduct between an adult school employee and an elementary school student as consensual.   In cases involving secondary students, there will be a strong presumption that sexual conduct between an adult school employee and a student is not consensual.   In cases involving older secondary students, subject to the presumption,[57] OCR will consider a number of factors in determining whether a school employee's sexual advances or other sexual conduct could be considered welcome.[58]   In addition, OCR will consider these factors in all cases involving postsecondary students in making those determinations.[59]   The factors include the following:

- The nature of the conduct and the relationship of the school employee to the student, including the degree of influence (which could, at least in part, be affected by the student's age), authority, or control the employee has over the student.

- Whether the student was legally or practically unable to consent to the sexual conduct in question.   For example, a student's age could affect his or her ability to do so. Similarly, certain types of disabilities could affect a student's ability to do so.

8

EXHIBIT 6

If there is a dispute about whether harassment occurred or whether it was welcome — in a case in which it is appropriate to consider whether the conduct would be welcome — determinations should be made based on the totality of the circumstances. The following types of information may be helpful in resolving the dispute:

- Statements by any witnesses to the alleged incident.

- Evidence about the relative credibility of the allegedly harassed student and the alleged harasser. For example, the level of detail and consistency of each person's account should be compared in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist. However, the absence of witnesses may indicate only the unwillingness of others to step forward, perhaps due to fear of the harasser or a desire not to get involved.

- Evidence that the alleged harasser has been found to have harassed others may support the credibility of the student claiming the harassment; conversely, the student's claim will be weakened if he or she has been found to have made false allegations against other individuals.

- Evidence of the allegedly harassed student's reaction or behavior after the alleged harassment. For example, were there witnesses who saw the student immediately after the alleged incident who say that the student appeared to be upset? However, it is important to note that some students may respond to harassment in ways that do not manifest themselves right away, but may surface several days or weeks after the harassment. For example, a student may initially show no signs of having been harassed, but several weeks after the harassment, there may be significant changes in the student's behavior, including difficulty concentrating on academic work, symptoms of depression, and a desire to avoid certain individuals and places at school.

- Evidence about whether the student claiming harassment filed a complaint or took other action to protest the conduct soon after the alleged incident occurred. However, failure to immediately complain may merely reflect a fear of retaliation or a fear that the complainant may not be believed rather than that the alleged harassment did not occur.

- Other contemporaneous evidence. For example, did the student claiming harassment write about the conduct and his or her reaction to it soon after it occurred (e.g., in a diary or letter)? Did the student tell others (friends, parents) about the conduct (and his or her reaction to it) soon after it occurred?

### B. Nature of the School's Responsibility to Address Sexual Harassment

A school has a responsibility to respond promptly and effectively to sexual harassment. In the case of harassment by teachers or other employees, the nature of this responsibility depends in part on whether the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

EXHIBIT 6

## 1. Harassment by Teachers and Other Employees

Sexual harassment of a student by a teacher or other school employee can be discrimination in violation of Title IX.[60]  Schools are responsible for taking prompt and effective action to stop the harassment and prevent its recurrence.  A school also may be responsible for remedying the effects of the harassment on the student who was harassed.  The extent of a recipient's responsibilities if an employee sexually harasses a student is determined by whether or not the harassment occurred in the context of the employee's provision of aid, benefits, or services to students.

A recipient is responsible under the Title IX regulations for the nondiscriminatory provision of aid, benefits, and services to students.  Recipients generally provide aid, benefits, and services to students through the responsibilities they give to employees.  If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex,[61] the recipient is responsible for the discriminatory conduct.[62]  The recipient is, therefore, also responsible for remedying any effects of the harassment on the victim, as well as for ending the harassment and preventing its recurrence.  This is true whether or not the recipient has "notice" of the harassment.  (As explained in the section on "Notice of Employee, Peer, or Third Party Harassment," for purposes of this guidance, a school has notice of harassment if a responsible school employee actually knew or, in the exercise of reasonable care, should have known about the harassment.)  Of course, under OCR's administrative enforcement, recipients always receive actual notice and the opportunity to take appropriate corrective action before any finding of violation or possible loss of federal funds.

Whether or not sexual harassment of a student occurred within the context of an employee's responsibilities for providing aid, benefits, or services is determined on a case-by-case basis, taking into account a variety of factors.  If an employee conditions the provision of an aid, benefit, or service that the employee is responsible for providing on a student's submission to sexual conduct, i.e., conduct traditionally referred to as quid pro quo harassment, the harassment is clearly taking place in the context of the employee's responsibilities to provide aid, benefits, or services.  In other situations, i.e., when an employee has created a hostile environment, OCR will consider the following factors in determining whether or not the harassment has taken place in this context, including:

- The type and degree of responsibility given to the employee, including both formal and informal authority, to provide aids, benefits, or services to students, to direct and control student conduct, or to discipline students generally;

- the degree of influence the employee has over the particular student involved, including in the circumstances in which the harassment took place;

- where and when the harassment occurred;

- the age and educational level of the student involved; and

EXHIBIT 6

- as applicable, whether, in light of the student's age and educational level and the way the school is run, it would be reasonable for the student to believe that the employee was in a position of responsibility over the student, even if the employee was not.

These factors are applicable to all recipient educational institutions, including elementary and secondary schools, colleges, and universities. Elementary and secondary schools, however, are typically run in a way that gives teachers, school officials, and other school employees a substantial degree of supervision, control, and disciplinary authority over the conduct of students.[63] Therefore, in cases involving allegations of harassment of elementary and secondary school-age students by a teacher or school administrator during any school activity,[64] consideration of these factors will generally lead to a conclusion that the harassment occurred in the context of the employee's provision of aid, benefits, or services.

For example, a teacher sexually harasses an eighth-grade student in a school hallway. Even if the student is not in any of the teacher's classes and even if the teacher is not designated as a hall monitor, given the age and educational level of the student and the status and degree of influence of teachers in elementary and secondary schools, it would be reasonable for the student to believe that the teacher had at least informal disciplinary authority over students in the hallways. Thus, OCR would consider this an example of conduct that is occurring in the context of the employee's responsibilities to provide aid, benefits, or services.

Other examples of sexual harassment of a student occurring in the context of an employee's responsibilities for providing aid, benefits, or services include, but are not limited to -- a faculty member at a university's medical school conditions an intern's evaluation on submission to his sexual advances and then gives her a poor evaluation for rejecting the advances; a high school drama instructor does not give a student a part in a play because she has not responded to sexual overtures from the instructor; a faculty member withdraws approval of research funds for her assistant because he has rebuffed her advances; a journalism professor who supervises a college newspaper continually and inappropriately touches a student editor in a sexual manner, causing the student to resign from the newspaper staff; and a teacher repeatedly asks a ninth grade student to stay after class and attempts to engage her in discussions about sex and her personal experiences while they are alone in the classroom, causing the student to stop coming to class. In each of these cases, the school is responsible for the discriminatory conduct, including taking prompt and effective action to end the harassment, prevent it from recurring, and remedy the effects of the harassment on the victim.

Sometimes harassment of a student by an employee in the school's program does not take place in the context of the employee's provision of aid, benefits, or services, but nevertheless is sufficiently serious to create a hostile educational environment. An example of this conduct might occur if a faculty member in the history department at a university, over the course of several weeks, repeatedly touches and makes sexually suggestive remarks to a graduate engineering student while waiting at a stop for the university shuttle bus, riding on the bus, and upon exiting the bus. As a result, the student stops using the campus shuttle and walks the very long distances between her classes. In this case, the school is not directly responsible for the harassing conduct because it did not occur in the context of the employee's responsibilities for the provision

11

EXHIBIT 6

of aid, benefits, or services to students.  However, the conduct is sufficiently serious to deny or limit the student in her ability to participate in or benefit from the recipient's program.  Thus, the school has a duty, upon notice of the harassment,[65] to take prompt and effective action to stop the harassment and prevent its recurrence.

If the school takes these steps, it has avoided violating Title IX.  If the school fails to take the necessary steps, however, its failure to act has allowed the student to continue to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program.  The school, therefore, has engaged in its own discrimination.  It then becomes responsible, not just for stopping the conduct and preventing it from happening again, but for remedying the effects of the harassment on the student that could reasonably have been prevented if the school had responded promptly and effectively.  (For related issues, see the sections on "OCR Case Resolution" and "Recipient's Response.")

## 2. Harassment by Other Students or Third Parties

If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows or reasonably should know[66] about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence.[67]  As long as the school, upon notice of the harassment, responds by taking prompt and effective action to end the harassment and prevent its recurrence, the school has carried out its responsibility under the Title IX regulations.  On the other hand, if, upon notice, the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex.[68]  In this case, the school is responsible for taking effective corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had it responded promptly and effectively.

Similarly, sexually harassing conduct by third parties, who are not themselves employees or students at the school (e.g., a visiting speaker or members of a visiting athletic team), may also be of a sufficiently serious nature to deny or limit a student's ability to participate in or benefit from the education program.  As previously outlined in connection with peer harassment, if the school knows or should know[69] of the harassment, the school is responsible for taking prompt and effective action to eliminate the hostile environment and prevent its recurrence.

The type of appropriate steps that the school should take will differ depending on the level of control that the school has over the third party harasser.[70]  For example, if athletes from a visiting team harass the home school's students, the home school may not be able to discipline the athletes.  However, it could encourage the other school to take appropriate action to prevent further incidents; if necessary, the home school may choose not to invite the other school back.  (This issue is discussed more fully in the section on "Recipient's Response.")

If, upon notice, the school fails to take prompt and effective corrective action, its own failure has permitted the student to be subjected to a hostile environment that limits

12

EXHIBIT 6

the student's ability to participate in or benefit from the education program.[71]  In this case, the school is responsible for taking corrective actions to stop the harassment, prevent its recurrence, and remedy the effects on the victim that could reasonably have been prevented had the school responded promptly and effectively.

### C. Notice of Employee, Peer, or Third Party Harassment

As described in the section on "Harassment by Teachers and Other Employees," schools may be responsible for certain types of employee harassment that occurred before the school otherwise had notice of the harassment.  On the other hand, as described in that section and the section on "Harassment by Other Students or Third Parties," in situations involving certain other types of employee harassment, or harassment by peers or third parties, a school will be in violation of the Title IX regulations if the school "has notice" of a sexually hostile environment and fails to take immediate and effective corrective action.[72]

A school has notice if a responsible employee "knew, or in the exercise of reasonable care should have known," about the harassment.[73]  A responsible employee would include any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility.[74]  Accordingly, schools need to ensure that employees are trained so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials.  Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.

A school can receive notice of harassment in many different ways.  A student may have filed a grievance with the Title IX coordinator[75] or complained to a teacher or other responsible employee about fellow students harassing him or her.  A student, parent, or other individual may have contacted other appropriate personnel, such as a principal, campus security, bus driver, teacher, affirmative action officer, or staff in the office of student affairs.  A teacher or other responsible employee of the school may have witnessed the harassment.  The school may receive notice about harassment in an indirect manner, from sources such as a member of the school staff, a member of the educational or local community, or the media.  The school also may have learned about the harassment from flyers about the incident distributed at the school or posted around the school.  For the purposes of compliance with the Title IX regulations, a school has a duty to respond to harassment about which it reasonably should have known, i.e., if it would have learned of the harassment if it had exercised reasonable care or made a "reasonably diligent inquiry."[76]

For example, in some situations if the school knows of incidents of harassment, the exercise of reasonable care should trigger an investigation that would lead to a discovery of additional incidents.[77]  In other cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment — if the harassment is widespread, openly practiced, or well-known to students and staff

13

EXHIBIT 6

(such as sexual harassment occurring in the hallways, graffiti in public areas, or harassment occurring during recess under a teacher's supervision.)[78]

If a school otherwise knows or reasonably should know of a hostile environment and fails to take prompt and effective corrective action, a school has violated Title IX even if the student has failed to use the school's existing grievance procedures or otherwise inform the school of the harassment.

### D. The Role of Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish grievance procedures providing for prompt and equitable resolution of sex discrimination complaints, including complaints of sexual harassment, and to disseminate a policy against sex discrimination.[79]  (These issues are discussed in the section on "Prompt and Equitable Grievance Procedures.")  These procedures provide a school with a mechanism for discovering sexual harassment as early as possible and for effectively correcting problems, as required by the Title IX regulations.  By having a strong policy against sex discrimination and accessible, effective, and fairly applied grievance procedures, a school is telling its students that it does not tolerate sexual harassment and that students can report it without fear of adverse consequences.

Without a disseminated policy and procedure, a student does not know either of the school's policy against and obligation to address this form of discrimination, or how to report harassment so that it can be remedied.  If the alleged harassment is sufficiently serious to create a hostile environment and it is the school's failure to comply with the procedural requirements of the Title IX regulations that hampers early notification and intervention and permits sexual harassment to deny or limit a student's ability to participate in or benefit from the school's program on the basis of sex,[80] the school will be responsible under the Title IX regulations, once informed of the harassment, to take corrective action, including stopping the harassment, preventing its recurrence, and remedying the effects of the harassment on the victim that could reasonably have been prevented if the school's failure to comply with the procedural requirements had not hampered early notification.

## VI. OCR Case Resolution

If OCR is asked to investigate or otherwise resolve incidents of sexual harassment of students, including incidents caused by employees, other students, or third parties, OCR will consider whether — (1) the school has a disseminated policy prohibiting sex discrimination under Title IX[81] and effective grievance procedures;[82] (2) the school appropriately investigated or otherwise responded to allegations of sexual harassment;[83] and (3) the school has taken immediate and effective corrective action responsive to the harassment, including effective actions to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects.[84]  (Issues related to appropriate investigative and corrective actions are discussed in detail in the section on "Recipient's Response.")

If the school has taken, or agrees to take, each of these steps, OCR will consider the case against the school resolved and will take no further action, other than monitoring compliance with an agreement, if any, between the school and OCR.  This is true in cases

14

EXHIBIT 6

in which the school was in violation of the Title IX regulations (e.g., a teacher sexually harassed a student in the context of providing aid, benefits, or services to students), as well as those in which there has been no violation of the regulations (e.g., in a peer sexual harassment situation in which the school took immediate, reasonable steps to end the harassment and prevent its recurrence). This is because, even if OCR identifies a violation, Title IX requires OCR to attempt to secure voluntary compliance.[85] Thus, because a school will have the opportunity to take reasonable corrective action before OCR issues a formal finding of violation, a school does not risk losing its Federal funding solely because discrimination occurred.

## VII. Recipient's Response

Once a school has notice of possible sexual harassment of students — whether carried out by employees, other students, or third parties — it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps

reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again. These steps are the school's responsibility whether or not the student who was harassed makes a complaint or otherwise asks the school to take action.[86] As described in the next section, in appropriate circumstances the school will also be responsible for taking steps to remedy the effects of the harassment on the individual student or students who were harassed. What constitutes a reasonable response to information about possible sexual harassment will differ depending upon the circumstances.

### A. Response to Student or Parent Reports of Harassment; Response to Direct Observation of Harassment by a Responsible Employee

If a student or the parent of an elementary or secondary student provides information or complains about sexual harassment of the student, the school should initially discuss what actions the student or parent is seeking in response to the harassment. The school should explain the avenues for informal and formal action, including a description of the grievance procedure that is available for sexual harassment complaints and an explanation of how the procedure works. If a responsible school employee has directly observed sexual harassment of a student, the school should contact the student who was harassed (or the parent, depending upon the age of the student),[87] explain that the school is responsible for taking steps to correct the harassment, and provide the same information described in the previous sentence.

Regardless of whether the student who was harassed, or his or her parent, decides to file a formal complaint or otherwise request action on the student's behalf (including in cases involving direct observation by a responsible employee), the school must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. The specific steps in an investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. However, in all cases the inquiry must be prompt, thorough, and impartial. (Requests by the student who

15

EXHIBIT 6

was harassed for confidentiality or for no action to be taken, responding to notice of harassment from other sources, and the components of a prompt and equitable grievance procedure are discussed in subsequent sections of this guidance.)

It may be appropriate for a school to take interim measures during the investigation of a complaint. For instance, if a student alleges that he or she has been sexually assaulted by another student, the school may decide to place the students immediately in separate classes or in different housing arrangements on a campus, pending the results of the school's investigation. Similarly, if the alleged harasser is a teacher, allowing the student to transfer to a different class may be appropriate. In cases involving potential criminal conduct, school personnel should determine whether appropriate law enforcement authorities should be notified. In all cases, schools should make every effort to prevent disclosure of the names of all parties involved -– the complainant, the witnesses, and the accused -- except to the extent necessary to carry out an investigation.

If a school determines that sexual harassment has occurred, it should take reasonable, timely, age-appropriate, and effective corrective action, including steps tailored to the specific situation.[88] Appropriate steps should be taken to end the harassment. For example, school personnel may need to counsel, warn, or take disciplinary action against the harasser, based on the severity of the harassment or any record of prior incidents or both.[89] A series of escalating consequences may be necessary if the initial steps are ineffective in stopping the harassment.[90] In some cases, it may be appropriate to further separate the harassed student and the harasser, e.g., by changing housing arrangements[91] or directing the harasser to have no further contact with the harassed student. Responsive measures of this type should be designed to minimize, as much as possible, the burden on the student who was harassed. If the alleged harasser is not a student or employee of the recipient, OCR will consider the level of control the school has over the harasser in determining what response would be appropriate.[92]

Steps should also be taken to eliminate any hostile environment that has been created. For example, if a female student has been subjected to harassment by a group of other students in a class, the school may need to deliver special training or other interventions for that class to repair the educational environment. If the school offers the student the option of withdrawing from a class in which a hostile environment occurred, the school should assist the student in making program or schedule changes and ensure that none of the changes adversely affect the student's academic record. Other measures may include, if appropriate, directing a harasser to apologize to the harassed student. If a hostile environment has affected an entire school or campus, an effective response may need to include dissemination of information, the issuance of new policy statements, or other steps that are designed to clearly communicate the message that the school does not tolerate harassment and will be responsive to any student who reports that conduct.

In some situations, a school may be required to provide other services to the student who was harassed if necessary to address the effects of the harassment on that student.[93] For example, if an instructor gives a student a low grade because the student failed to respond to his sexual advances, the school may be required to make arrangements for an independent reassessment of the student's work, if feasible, and change the grade accordingly; make arrangements for the student to take the course again

16

EXHIBIT 6

with a different instructor; provide tutoring; make tuition adjustments; offer reimbursement for professional counseling; or take other measures that are appropriate to the circumstances.  As another example, if a school delays responding or responds inappropriately to information about harassment, such as a case in which the school ignores complaints by a student that he or she is being sexually harassed by a classmate, the school will be required to remedy the effects of the harassment that could have been prevented had the school responded promptly and effectively.

Finally, a school should take steps to prevent any further harassment[94] and to prevent any retaliation against the student who made the complaint (or was the subject of the harassment), against the person who filed a complaint on behalf of a student, or against those who provided information as witnesses.[95]  At a minimum, this includes making sure that the harassed students and their parents know how to report any subsequent problems and making follow-up inquiries to see if there have been any new incidents or any retaliation.  To prevent recurrences, counseling for the harasser may be appropriate to ensure that he or she understands what constitutes harassment and the effects it can have.  In addition, depending on how widespread the harassment was and whether there have been any prior incidents, the school may need to provide training for the larger school community to ensure that students, parents, and teachers can recognize harassment if it recurs and know how to respond.[96]

### B. Confidentiality

The scope of a reasonable response also may depend upon whether a student, or parent of a minor student, reporting harassment asks that the student's name not be disclosed to the harasser or that nothing be done about the alleged harassment.  In all cases, a school should discuss confidentiality standards and concerns with the complainant initially.  The school should inform the student that a confidentiality request may limit the school's ability to respond.  The school also should tell the student that Title IX prohibits retaliation and that, if he or she is afraid of reprisals from the alleged harasser, the school will take steps to prevent retaliation and will take strong responsive actions if retaliation occurs.  If the student continues to ask that his or her name not be revealed, the school should take all reasonable steps to investigate and respond to the complaint consistent with the student's request as long as doing so does not prevent the school from responding effectively to the harassment and preventing harassment of other students.

OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees.  Thus, for example, if a student, who was the only student harassed, insists that his or her name not be revealed, and the alleged harasser could not respond to the charges of sexual harassment without that information, in evaluating the school's response, OCR would not expect disciplinary action against an alleged harasser.

At the same time, a school should evaluate the confidentiality request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students.  The factors that a school may consider in this regard include the seriousness of the alleged harassment, the age of the student harassed, whether there have been other complaints or reports of harassment against the alleged harasser, and the rights of the

EXHIBIT 6

accused individual to receive information about the accuser and the allegations if a formal proceeding with sanctions may result.[97]

Similarly, a school should be aware of the confidentiality concerns of an accused employee or student. Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused. The accused individual's need for confidentiality must, of course, also be evaluated based on the factors discussed in the preceding paragraph in the context of the school's responsibility to ensure a safe environment for students.

Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual complaint of harassment, other means may be available to address the harassment. There are steps a recipient can take to limit the effects of the alleged harassment and prevent its recurrence without initiating formal action against the alleged harasser or revealing the identity of the complainant. Examples include conducting sexual harassment training for the school site or academic department where the problem occurred, taking a student survey concerning any problems with harassment, or implementing other systemic measures at the site or department where the alleged harassment has occurred.

In addition, by investigating the complaint to the extent possible — including by reporting it to the Title IX coordinator or other responsible school employee designated pursuant to Title IX — the school may learn about or be able to confirm a pattern of harassment based on claims by different students that they were harassed by the same individual. In some situations there may be prior reports by former students who now might be willing to come forward and be identified, thus providing a basis for further corrective action. In instances affecting a number of students (for example, a report from a student that an instructor has repeatedly made sexually explicit remarks about his or her personal life in front of an entire class), an individual can be put on notice of allegations of harassing behavior and counseled appropriately without revealing, even indirectly, the identity of the student who notified the school. Those steps can be very effective in preventing further harassment.

### C. Response to Other Types of Notice

The previous two sections deal with situations in which a student or parent of a student who was harassed reports or complains of harassment or in which a responsible school employee directly observes sexual harassment of a student. If a school learns of harassment through other means, for example, if information about harassment is received from a third party (such as from a witness to an incident or an anonymous letter or telephone call), different factors will affect the school's response. These factors include the source and nature of the information; the seriousness of the alleged incident; the specificity of the information; the objectivity and credibility of the source of the report; whether any individuals can be identified who were subjected to the alleged harassment; and whether those individuals want to pursue the matter. If, based on these factors, it is reasonable for the school to investigate and it can confirm the allegations, the considerations described in the previous sections concerning interim measures and appropriate responsive action will apply.

EXHIBIT 6

For example, if a parent visiting a school observes a student repeatedly harassing a group of female students and reports this to school officials, school personnel can speak with the female students to confirm whether that conduct has occurred and whether they view it as unwelcome.  If the school determines that the conduct created a hostile environment, it can take reasonable, age-appropriate steps to address the situation.  If on the other hand, the students in this example were to ask that their names not be disclosed or indicate that they do not want to pursue the matter, the considerations described in the previous section related to requests for confidentiality will shape the school's response.

In a contrasting example, a student newspaper at a large university may print an anonymous letter claiming that a professor is sexually harassing students in class on a daily basis, but the letter provides no clue as to the identity of the professor or the department in which the conduct is allegedly taking place.  Due to the anonymous source and lack of specificity of the information, a school would not reasonably be able to investigate and confirm these allegations.  However, in response to the anonymous letter, the school could submit a letter or article to the newspaper reiterating its policy against sexual harassment, encouraging persons who believe that they have been sexually harassed to come forward, and explaining how its grievance procedures work.

## VIII. Prevention

A policy specifically prohibiting sexual harassment and separate grievance procedures for violations of that policy can help ensure that all students and employees understand the nature of sexual harassment and that the school will not tolerate it.  Indeed, they might even bring conduct of a sexual nature to the school's attention so that the school can address it before it becomes sufficiently serious as to create a hostile environment.  Further, training for administrators, teachers, and staff and age-appropriate classroom information for students can help to ensure that they understand what types of conduct can cause sexual harassment and that they know how to respond.

## IX. Prompt and Equitable Grievance Procedures

Schools are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex.[98]  Accordingly, regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policy in place.[99]

A school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities filed by students against school employees, other students, or third parties.[100]  Title IX does not require a school to adopt a policy specifically prohibiting sexual harassment or to provide separate grievance procedures for sexual harassment complaints.  However, its nondiscrimination policy and grievance procedures for handling discrimination complaints must provide effective means for preventing and responding to sexual harassment.  Thus, if, because of the lack of a policy or procedure specifically addressing sexual harassment, students are unaware of what kind of conduct constitutes sexual harassment or that such conduct is

EXHIBIT 6

prohibited sex discrimination, a school's general policy and procedures relating to sex discrimination complaints will not be considered effective.[101]

OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for —

- Notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed;

- Application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties;

- Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence;

- Designated and reasonably prompt timeframes for the major stages of the complaint process;

- Notice to the parties of the outcome of the complaint;[102] and

- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.[103]

Many schools also provide an opportunity to appeal the findings or remedy, or both. In addition, because retaliation is prohibited by Title IX, schools may want to include a provision in their procedures prohibiting retaliation against any individual who files a complaint or participates in a harassment inquiry.

Procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience. In addition, whether complaint resolutions are timely will vary depending on the complexity of the investigation and the severity and extent of the harassment. During the investigation it is a good practice for schools to inform students who have alleged harassment about the status of the investigation on a periodic basis.

A grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint. Thus, the procedures should be written in language appropriate to the age of the school's students, easily understood, and widely disseminated. Distributing the procedures to administrators, or including them in the school's administrative or policy manual, may not by itself be an effective way of providing notice, as these publications are usually not widely circulated to and understood by all members of the school community. Many schools ensure adequate notice to students by having copies of the procedures available at various locations throughout the school or campus; publishing the procedures as a separate document; including a summary of the procedures in major publications issued by the school, such as handbooks and catalogs for students, parents of elementary and secondary students, faculty, and staff; and identifying individuals who can explain how the procedures work.

EXHIBIT 6

A school must designate at least one employee to coordinate its efforts to comply with and carry out its Title IX responsibilities.[104]  The school must notify all of its students and employees of the name, office address, and telephone number of the employee or employees designated.[105]  Because it is possible that an employee designated to handle Title IX complaints may himself or herself engage in harassment, a school may want to designate more than one employee to be responsible for handling complaints in order to ensure that students have an effective means of reporting harassment.[106]  While a school may choose to have a number of employees responsible for Title IX matters, it is also advisable to give one official responsibility for overall coordination and oversight of all sexual harassment complaints to ensure consistent practices and standards in handling complaints.  Coordination of recordkeeping (for instance, in a confidential log maintained by the Title IX coordinator) will also ensure that the school can and will resolve recurring problems and identify students or employees who have multiple complaints filed against them.[107]  Finally, the school must make sure that all designated employees have adequate training as to what conduct constitutes sexual harassment and are able to explain how the grievance procedure operates.[108]

Grievance procedures may include informal mechanisms for resolving sexual harassment complaints to be used if the parties agree to do so.[109]  OCR has frequently advised schools, however, that it is not appropriate for a student who is complaining of harassment to be required to work out the problem directly with the individual alleged to be harassing him or her, and certainly not without appropriate involvement by the school (e.g., participation by a counselor, trained mediator, or, if appropriate, a teacher or administrator).  In addition, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process.  In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis.  Title IX also permits the use of a student disciplinary procedure not designed specifically for Title IX grievances to resolve sex discrimination complaints, as long as the procedure meets the requirement of affording a complainant a "prompt and equitable" resolution of the complaint.

In some instances, a complainant may allege harassing conduct that constitutes both sex discrimination and possible criminal conduct.  Police investigations or reports may be useful in terms of fact gathering.  However, because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively.[110]  Similarly, schools are cautioned about using the results of insurance company investigations of sexual harassment allegations.  The purpose of an insurance investigation is to assess liability under the insurance policy, and the applicable standards may well be different from those under Title IX.  In addition, a school is not relieved of its responsibility to respond to a sexual harassment complaint filed under its grievance procedure by the fact that a complaint has been filed with OCR.[111]

EXHIBIT 6

## X. Due Process Rights of the Accused

A public school's employees have certain due process rights under the United States Constitution. The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions. The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding. Furthermore, the Family Educational Rights and Privacy Act (FERPA) does not override federally protected due process rights of persons accused of sexual harassment. Procedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions. Of course, schools should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant. In both public and private schools, additional or separate rights may be created for employees or students by State law, institutional regulations and policies, such as faculty or student handbooks, and collective bargaining agreements. Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment.

## XI. First Amendment

In cases of alleged harassment, the protections of the First Amendment must be considered if issues of speech or expression are involved.[112] Free speech rights apply in the classroom (e.g., classroom lectures and discussions)[113] and in all other education programs and activities of public schools (e.g., public meetings and speakers on campus; campus debates, school plays and other cultural events[114]; and student newspapers, journals, and other publications[115]). In addition, First Amendment rights apply to the speech of students and teachers.[116]

Title IX is intended to protect students from sex discrimination, not to regulate the content of speech. OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX.[117] In order to establish a violation of Title IX, the harassment must be sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program.[118]

Moreover, in regulating the conduct of its students and its faculty to prevent or redress discrimination prohibited by Title IX (e.g., in responding to harassment that is sufficiently serious as to create a hostile environment), a school must formulate, interpret, and apply its rules so as to protect academic freedom and free speech rights. For instance, while the First Amendment may prohibit a school from restricting the right of students to express opinions about one sex that may be considered derogatory, the school can take steps to denounce those opinions and ensure that competing views are heard. The age of the students involved and the location or forum may affect how the school can respond consistently with the First Amendment.[119] As an example of the application of free speech rights to allegations of sexual harassment, consider the following:

Example 1: In a college level creative writing class, a professor's required reading list includes excerpts from literary classics that contain descriptions of explicit

EXHIBIT 6

sexual conduct, including scenes that depict women in submissive and demeaning roles. The professor also assigns students to write their own materials, which are read in class. Some of the student essays contain sexually derogatory themes about women. Several female students complain to the Dean of Students that the materials and related classroom discussion have created a sexually hostile environment for women in the class. What must the school do in response?

Answer: Academic discourse in this example is protected by the First Amendment even if it is offensive to individuals. Thus, Title IX would not require the school to discipline the professor or to censor the reading list or related class discussion.

Example 2: A group of male students repeatedly targets a female student for harassment during the bus ride home from school, including making explicit sexual comments about her body, passing around drawings that depict her engaging in sexual conduct, and, on several occasions, attempting to follow her home off the bus. The female student and her parents complain to the principal that the male students' conduct has created a hostile environment for girls on the bus and that they fear for their daughter's safety. What must a school do in response?

Answer: Threatening and intimidating actions targeted at a particular student or group of students, even though they contain elements of speech, are not protected by the First Amendment. The school must take prompt and effective actions, including disciplinary action if necessary, to stop the harassment and prevent future harassment.

EXHIBIT 6

# Endnotes

[1] This guidance does not address sexual harassment of employees, although that conduct may be prohibited by Title IX.  20 U.S.C. 1681 et seq.; 34 CFR part 106, subpart E.  If employees file Title IX sexual harassment complaints with OCR, the complaints will be processed pursuant to the Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance.  28 CFR 42.604.  Employees are also protected from discrimination on the basis of sex, including sexual harassment, by Title VII of the Civil Rights Act of 1964.  For information about Title VII and sexual harassment, see the Equal Employment Opportunity Commission's (EEOC's) Guidelines on Sexual Harassment, 29 CFR 1604.11, for information about filing a Title VII charge with the EEOC, see 29 CFR 1601.7–1607.13, or see the EEOC's website at www.eeoc.gov.

[2] 20 U.S.C. 1681; 34 CFR part 106.

[3] See, e.g., Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 649-50 (1999); Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 281 (1998); Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75 (1992); S. REP. NO. 100-64, 100th Cong., 1st Sess. 14 (1987); Sexual Harassment Guidance:  Harassment of Students by School Employees, Other Students, or Third Parties (1997 guidance), 62 FR 12034 (1997).

[4] As described in the section on "Applicability," this guidance applies to all levels of education.

[5] For practical information about steps that schools can take to prevent and remedy all types of harassment, including sexual harassment, see "Protecting Students from Harassment and Hate Crime, A Guide for Schools," which we issued jointly with the National Association of Attorneys General.  This Guide is available at our web site at: www.ed.gov/pubs/Harassment.

[6] See, e.g., Davis, 526 U.S. at 653 (alleged conduct of a sexual nature that would support a sexual harassment claim included verbal harassment and "numerous acts of objectively offensive touching;" Franklin, 503 U.S. at 63 (conduct of a sexual nature found to support a sexual harassment claim under Title IX included kissing, sexual intercourse); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 60-61 (1986) (demands for sexual favors, sexual advances, fondling, indecent exposure, sexual intercourse, rape, sufficient to raise hostile environment claim under Title VII); Ellison v. Brady, 924 F.2d 872, 873-74, 880 (9th Cir. 1991) (allegations sufficient to state sexual harassment claim under Title VII included repeated requests for dates, letters making explicit references to sex and describing the harasser's feelings for plaintiff) Lipsett v. University of Puerto Rico, 864 F.2d 881, 904-5 (1st Cir. 1988) (sexually derogatory comments, posting of sexually explicit drawing of plaintiff, sexual advances may support sexual harassment claim); Kadiki v. Virginia Commonwealth University, 892 F.Supp. 746, 751 (E.D. Va. 1995)

24

EXHIBIT 6

(professor's spanking of university student may constitute sexual conduct under Title IX); Doe v. Petaluma, 830 F.Supp. 1560, 1564-65 (N.D. Cal. 1996) (sexually derogatory taunts and innuendo can be the basis of a harassment claim); Denver School Dist. #2, OCR Case No. 08-92-1007 (same as to allegations of vulgar language and obscenities, pictures of nude women on office walls and desks, unwelcome touching, sexually offensive jokes, bribery to perform sexual acts, indecent exposure); Nashoba Regional High School, OCR Case No. 01-92-1377 (same as to year-long campaign of derogatory, sexually explicit graffiti and remarks directed at one student.

[7] See also Shoreline School Dist., OCR Case No. 10-92-1002 (a teacher's patting a student on the arm, shoulder, and back, and restraining the student when he was out of control, not conduct of a sexual nature); Dartmouth Public Schools, OCR Case No. 01-90-1058 (same as to contact between high school coach and students); San Francisco State University, OCR Case No. 09-94-2038 (same as to faculty advisor placing her arm around a graduate student's shoulder in posing for a picture); Analy Union High School Dist., OCR Case No. 09-92-1249 (same as to drama instructor who put his arms around both male and female students who confided in him).

[8] 20 U.S.C. 1687 (codification of the amendment to Title IX regarding scope of jurisdiction, enacted by the Civil Rights Restoration Act of 1987). See 65 FR 68049 (November 13, 2000) (Department's amendment of the Title IX regulations to incorporate the statutory definition of "program or activity").

[9] If a school contracts with persons or organizations to provide benefits, services, or opportunities to students as part of the school's program, and those persons or employees of those organizations sexually harass students, OCR will consider the harassing individual in the same manner that it considers the school's employees, as described in this guidance. (See section on "Harassment by Teachers and Other Employees.") See Brown v. Hot, Sexy, and Safer Products, Inc., 68 F.3d 525, 529 (1st Cir. 1995) (Title IX sexual harassment claim brought for school's role in permitting contract consultant hired by it to create allegedly hostile environment).

In addition, if a student engages in sexual harassment as an employee of the school, OCR will consider the harassment under the standards described for employees. (See section on "Harassment by Teachers and Other Employees.") For example, OCR would consider it harassment by an employee if a student teaching assistant who is responsible for assigning grades in a course, i.e., for providing aid, benefits, or services to students under the recipient's program, required a student in his or her class to submit to sexual advances in order to obtain a certain grade in the class.

[10] Cf. John Does 1 v. Covington County Sch. Bd., 884 F.Supp. 462, 464-65 (M.D. Ala. 1995) (male students alleging that a teacher sexually harassed and abused them stated cause of action under Title IX).

[11] Title IX and the regulations implementing it prohibit discrimination "on the basis of sex;" they do not restrict protection from sexual harassment to those circumstances in

EXHIBIT 6

which the harasser only harasses members of the opposite sex.  See 34 CFR 106.31.  In
Oncale v. Sundowner Offshore Services, Inc. the Supreme Court held unanimously that
sex discrimination consisting of same-sex sexual harassment can violate Title VII's
prohibition against discrimination because of sex.  523 U.S. 75, 82 (1998).  The Supreme
Court's holding in Oncale is consistent with OCR policy, originally stated in its 1997
guidance, that Title IX prohibits sexual harassment regardless of whether the harasser and
the person being harassed are members of the same sex.  62 FR 12039.  See also Kinman
v. Omaha Public School Dist., 94 F.3d 463, 468 (8th Cir. 1996), rev'd on other grounds,
171 F.3d 607 (1999) (female student's allegation of sexual harassment by female teacher
sufficient to raise a claim under Title IX);  Doe v. Petaluma, 830 F.Supp. 1560, 1564-65,
1575 (N.D. Cal. 1996) (female junior high student alleging sexual harassment by other
students, including both boys and girls, sufficient to raise a claim under Title IX); John
Does 1, 884 F.Supp. at 465 (same as to male students' allegations of sexual harassment
and abuse by a male teacher.)  It can also occur in certain situations if the harassment is
directed at students of both sexes.  Chiapuzo v. BLT Operating Corp., 826 F.Supp. 1334,
1337 (D.Wyo. 1993) (court found that if males and females were subject to harassment,
but harassment was based on sex, it could violate Title VII); but see Holman v. Indiana,
211 F.3d 399, 405 (7th Cir. 2000) (if male and female both subjected to requests for sex,
court found it could not violate Title VII).

In many circumstances, harassing conduct will be on the basis of sex because the student
would not have been subjected to it at all had he or she been a member of the opposite
sex; e.g., if a female student is repeatedly propositioned by a male student or employee
(or, for that matter, if a male student is repeatedly propositioned by a male student or
employee.)  In other circumstances, harassing conduct will be on the basis of sex if the
student would not have been affected by it in the same way or to the same extent had he
or she been a member of the opposite sex; e.g, pornography and sexually explicit jokes
in a mostly male shop class are likely to affect the few girls in the class more than it will
most of the boys.

In yet other circumstances, the conduct will be on the basis of sex in that the student's sex
was a factor in or affected the nature of the harasser's conduct or both.  Thus, in
Chiapuzo, a supervisor made demeaning remarks to both partners of a married couple
working for him, e.g., as to sexual acts he wanted to engage in with the wife and how he
would be a better lover than the husband.  In both cases, according to the court, the
remarks were based on sex in that they were made with an intent to demean each member
of the couple because of his or her respective sex.  826 F.Supp. at 1337.  See also Steiner
v. Showboat Operating Co., 25 F.3d 1459, 1463-64 (9th Cir. 1994), cert. denied, 115 S.Ct.
733 (1995); but see Holman, 211 F.3d at 405 (finding that if male and female both
subjected to requests for sex, Title VII could not be violated).

[12] Nashoba Regional High School, OCR Case No. 01-92-1397.  In Conejo Valley School
Dist., OCR Case No. 09-93-1305, female students allegedly taunted another female
student about engaging in sexual activity; OCR found that the alleged comments were
sexually explicit and, if true, would be sufficiently severe, persistent, and pervasive to
create a hostile environment.

EXHIBIT 6

[13] See Williamson v. A.G. Edwards & Sons, Inc., 876 F2d 69, 70 (8th Cir. 1989, cert. denied 493 U.S. 1089 (1990); DeSantis v. Pacific Tel. & Tel. Co., Inc., 608 F.2d 327, 329-30 (9th Cir. 1979)(same); Blum v. Gulf Oil Corp., 597 F.2d 936, 938 (5th Cir. 1979)(same).

[14] It should be noted that some State and local laws may prohibit discrimination on the basis of sexual orientation.  Also, under certain circumstances, courts may permit redress for harassment on the basis of sexual orientation under other Federal legal authority.  See Nabozny v. Podlesny, 92 F.3d 446, 460 (7th Cir. 1996) (holding that a gay student could maintain claims alleging discrimination based on both gender and sexual orientation under the Equal Protection Clause of the United States Constitution in a case in which a school district failed to protect the student to the same extent that other students were protected from harassment and harm by other students due to the student's gender and sexual orientation).

[15] However, sufficiently serious sexual harassment is covered by Title IX even if the hostile environment also includes taunts based on sexual orientation.

[16] See also, Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (plurality opinion) (where an accounting firm denied partnership to a female candidate, the Supreme Court found Title VII prohibits an employer from evaluating employees by assuming or insisting that they match the stereotype associated with their sex).

[17] See generally Gebser; Davis; See also Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-66 (1986); Harris v. Forklift Systems Inc., 510 U.S. 14, 22 (1993); see also Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987) (concluding that harassment based on sex may be discrimination whether or not it is sexual in nature); McKinney v. Dole, 765 F.2d 1129, 1138 (D.C. Cir. 1985) (physical, but nonsexual, assault could be sex-based harassment if shown to be unequal treatment that would not have taken place but for the employee's sex); Cline v. General Electric Capital Auto Lease, Inc., 757 F.Supp. 923, 932-33 (N.D. Ill. 1991).

[18] See, e.g., sections on "Harassment by Teachers and Other Employees," "Harassment by Other Students or Third Parties," "Notice of Employee, Peer, or Third Party Harassment," "Factors Used to Evaluate a Hostile Environment," "Recipient's Response," and "Prompt and Equitable Grievance Procedures."

[19] See Lipsett, 864 F.2d at 903-905 (general antagonism toward women, including stated goal of eliminating women from surgical program, statements that women shouldn't be in the program, and assignment of menial tasks, combined with overt sexual harassment); Harris, 510 U.S. at 23; Andrews v. City of Philadelphia, 895 F.2d 1469, 1485-86 (3rd Cir. 1990) (court directed trial court to consider sexual conduct as well as theft of female employees' files and work, destruction of property, and anonymous phone calls in determining if there had been sex discrimination); see also Hall v. Gus Construction Co., 842 F.2d 1010, 1014 (8th Cir. 1988) (affirming that harassment due to the employee's sex

EXHIBIT 6

may be actionable even if the harassment is not sexual in nature); Hicks, 833 F.2d at 1415; Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (the boys made lewd comments about male anatomy and tormented the girls by pretending to stab them with rubber knives; while the stabbing was not sexual conduct, it was directed at them because of their sex, i.e., because they were girls).

[20] Davis, 526 U.S. at 650 ("Having previously determined that 'sexual harassment' is 'discrimination' in the school context under Title IX, we are constrained to conclude that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute."); Franklin, 503 U.S. at 75 ("Unquestionably, Title IX placed on the [school] the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex.' … We believe the same rule should apply when a teacher sexually harasses and abuses a student." (citation omitted)).

OCR's longstanding interpretation of its regulations is that sexual harassment may constitute a violation. 34 CFR 106.31; See Sexual Harassment Guidance, 62 FR 12034 (1997). When Congress enacted the Civil Rights Restoration Act of 1987 to amend Title IX to restore institution-wide coverage over federally assisted education programs and activities, the legislative history indicated not only that Congress was aware that OCR interpreted its Title IX regulations to prohibit sexual harassment, but also that one of the reasons for passing the Restoration Act was to enable OCR to investigate and resolve cases involving allegations of sexual harassment. S. REP. NO. 64, 100th Cong., 1st Sess. at 12 (1987). The examples of discrimination that Congress intended to be remedied by its statutory change included sexual harassment of students by professors, id. at 14, and these examples demonstrate congressional recognition that discrimination in violation of Title IX can be carried out by school employees who are providing aid, benefits, or services to students. Congress also intended that if discrimination occurred, recipients needed to implement effective remedies. S. REP. NO. 64 at 5.

[21] 34 CFR 106.4.

[22] These are the basic regulatory requirements. 34 CFR 106.31(a)(b). Depending upon the facts, sexual harassment may also be prohibited by more specific regulatory prohibitions. For example, if a college financial aid director told a student that she would not get the student financial assistance for which she qualified unless she slept with him, that also would be covered by the regulatory provision prohibiting discrimination on the basis of sex in financial assistance, 34 CFR 106.37(a).

[23] 34 CFR 106.31(b)(1).

[24] 34 CFR 106.31(b)(2).

[25] 34 CFR 106.31(b)(3).

EXHIBIT 6

[26] 34 CFR 106.31(b)(4).

[27] 34 CFR 106.31(b)(6).

[28] 34 CFR 106.31(b)(7).

[29] 34 CFR 106.3(a).

[30] 34 CFR 106.9.

[31] 34 CFR 106.8(b).

[32] 34 CFR 106.8(a).

[33] The 1997 guidance referred to quid pro quo harassment and hostile environment harassment. 62 FR 12038–40.

[34] See Alexander v. Yale University, 459 F.Supp. 1, 4 (D.Conn. 1977), aff'd, 631 F.2d 178 (2nd Cir. 1980)(stating that a claim "that academic advancement was conditioned upon submission to sexual demands constitutes [a claim of] sex discrimination in education..."); Crandell v. New York College, Osteopathic Medicine, 87 F.Supp.2d 304, 318 (S.D.N.Y. 2000) (finding that allegations that a supervisory physician demanded that a student physician spend time with him and have lunch with him or receive a poor evaluation, in light of the totality of his alleged sexual comments and other inappropriate behavior, constituted a claim of quid pro quo harassment); Kadiki, 892 F.Supp. at 752 (reexamination in a course conditioned on college student's agreeing to be spanked should she not attain a certain grade may constitute quid pro quo harassment).

[35] 34 CFR 106.31(b).

[36] Davis, 526 U.S. at 651 (confirming, by citing approvingly both to Title VII cases (Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57,67 (1986) (finding that hostile environment claims are cognizable under Title VII), and Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998)) and OCR's 1997 guidance, 62 FR at 12041-42, that determinations under Title IX as to what conduct constitutes hostile environment sexual harassment may continue to rely on Title VII caselaw).

[37] 34 CFR 106.31(b). See Davis, 526 U.S. at 650 (concluding that allegations of student-on-student sexual harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits" supports a claim for money damages in an implied right of action).

[38] In Harris, the Supreme Court explained the requirement for considering the "subjective perspective" when determining the existence of a hostile environment. The Court stated–– "... if the victim does not subjectively perceive the environment to be abusive, the

29

EXHIBIT 6

conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  510 U.S. at 21-22.

[39] See <u>Davis</u>, 526 U.S. at 650 (conduct must be "objectively offensive" to trigger liability for money damages); <u>Elgamil v. Syracuse University</u>, 2000 U.S. Dist. LEXIS 12598 at 17 (N.D.N.Y. 2000) (citing <u>Harris</u>); <u>Booher v. Board of Regents</u>, 1998 U.S. Dist. LEXIS 11404 at 25 (E.D. Ky. 1998) (same).  See <u>Oncale</u>, 523 U.S. at 81, in which the Court "emphasized … that the objective severity of harassment should be judged from the perspective of a reasonable person in the [victim's] position, considering 'all the circumstances,'" and citing <u>Harris</u>, 510 U.S. at 20, in which the Court indicated that a "reasonable person" standard should be used to determine whether sexual conduct constituted harassment.  This standard has been applied under Title VII to take into account the sex of the subject of the harassment, see, e.g., <u>Ellison</u>, 924 F.2d at 878-79 (applying a "reasonable woman" standard to sexual harassment), and has been adapted to sexual harassment in education under Title IX, <u>Patricia H. v. Berkeley Unified School Dist.</u>, 830 F.Supp. 1288, 1296 (N.D. Cal. 1993) (adopting a "reasonable victim" standard and referring to OCR's use of it).

[40] See <u>Davis</u>, 526 U.S. at 651, citing both <u>Oncale</u>, 523 U.S. at 82, and OCR's 1997 guidance (62 FR 12041-12042).

[41] See, e.g., <u>Davis</u>, 526 U.S. at 634 (as a result of the harassment, student's grades dropped and she wrote a suicide note); <u>Doe v. Petaluma</u>, 830 F. Supp. at 1566 (student so upset about harassment by other students that she was forced to transfer several times, including finally to a private school); <u>Modesto City Schools</u>, OCR Case No. 09-93-1391 (evidence showed that one girl's grades dropped while the harassment was occurring); <u>Weaverville Elementary School</u>, OCR Case No. 09-91-1116 (students left school due to the harassment).  Compare with <u>College of Alameda</u>, OCR Case No. 09-90-2104 (student not in instructor's class and no evidence of any effect on student's educational benefits or service, so no hostile environment).

[42] <u>Doe v. Petaluma</u>, 830 F.Supp. at 1566.

[43] See <u>Waltman v. Int'l Paper Co.</u>, 875 F.2d 468, 477 (5th Cir. 1989) (holding that although not specifically directed at the plaintiff, sexually explicit graffiti on the walls was "relevant to her claim"); <u>Monteiro v. Tempe Union High School</u>, 158 F.3d 1022, 1033-34 (9th Cir. 1998) (Title VI racial harassment case, citing <u>Waltman</u>; see also <u>Hall</u>, 842 F. 2d at 1015 (evidence of sexual harassment directed at others is relevant to show hostile environment under Title VII).

[44] See, e.g., <u>Elgmil</u> 2000 U.S. Dist. LEXIS at 19 ("in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive"); <u>Andrews</u>, 895 F.2d at 1484 ("Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity'"); <u>Moylan v. Maries County</u>, 792 F.2d 746, 749 (8th Cir. 1986).

EXHIBIT 6

[45] 34 CFR 106.31(b).  See <u>Vance v. Spencer County Public School District</u>, 231 F.3d 253 (6th Cir. 2000); <u>Doe v. School Admin. Dist. No. 19</u>, 66 F.Supp.2d 57, 62 (D. Me. 1999).  See also statement of the U.S. Equal Employment Opportunity Commission (EEOC):  "The Commission will presume that the unwelcome, intentional touching of [an employee's] intimate body areas is sufficiently offensive to alter the conditions of her working environment and constitute a violation of Title VII.  More so than in the case of verbal advances or remarks, a single unwelcome physical advance can seriously poison the victim's working environment."  EEOC Policy Guidance on Current Issues of Sexual Harassment, 17.  <u>Barrett v. Omaha National Bank</u>, 584 F. Supp. 22, 30 (D. Neb. 1983), <u>aff'd</u>, 726 F. 2d 424 (8th Cir. 1984) (finding that hostile environment was created under Title VII by isolated events, i.e., occurring while traveling to and during a two-day conference, including the co-worker's talking to plaintiff about sexual activities and touching her in an offensive manner while they were inside a vehicle from which she could not escape).

[46] See also <u>Ursuline College</u>, OCR Case No. 05-91-2068 (a single incident of comments on a male student's muscles arguably not sexual; however, assuming they were, not severe enough to create a hostile environment).

[47] <u>Davis</u>, 526 U.S. at 653 ("The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity.  Peer harassment, in particular, is less likely to satisfy these requirements than is teacher student harassment."); <u>Patricia H.</u>, 830 F. Supp. at 1297 (stating that the "grave disparity in age and power" between teacher and student contributed to the creation of a hostile environment); <u>Summerfield Schools</u>, OCR Case No. 15-92-1929 ("impact of the ... remarks was heightened by the fact that the coach is an adult in a position of authority"); <u>cf. Doe v. Taylor I.S.D.</u>, 15 F.3d 443, 460 (5th Cir. 1994) (Sec. 1983 case; taking into consideration the influence that the teacher had over the student by virtue of his position of authority to find that a sexual relationship between a high school teacher and a student was unlawful).

[48] See, e.g., <u>McKinney</u>, 765 F.2d at 1138-49; <u>Robinson v. Jacksonville Shipyards</u>, 760 F. Supp. 1486, 1522 (M.D. Fla. 1991).

[49] <u>Cf. Patricia H.</u>, 830 F. Supp. at 1297.

[50] See, e.g., <u>Barrett</u>, 584 F. Supp. at 30 (finding harassment occurring in a car from which the victim could not escape particularly severe).

[51] See <u>Hall</u>, 842 F. 2d at 1015 (stating that "evidence of sexual harassment directed at employees other than the plaintiff is relevant to show a hostile environment") (citing <u>Hicks</u>, 833 F. 2d, 1415-16).  <u>Cf. Midwest City-Del City Public Schools</u>, OCR Case No. 06-92-1012 (finding a racially hostile environment based in part on several racial incidents at school shortly before incidents in complaint, a number of which involved the same student involved in the complaint).

EXHIBIT 6

[52] In addition, incidents of racial or national origin harassment directed at a particular individual may also be aggregated with incidents of sexual or gender harassment directed at that individual in determining the existence of a hostile environment.  Hicks, 833 F.2d at 1416; Jefferies v. Harris County Community Action Ass'n, 615 F.2d 1025, 1032 (5th Cir. 1980).

[53] Does v. Covington Sch. Bd. of Educ., 930 F.Supp. 554, 569 (M.D. Ala. 1996); Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982).

[54] See Meritor Savings Bank, 477 U.S. at 68. "[T]he fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII....  The correct inquiry is whether [the subject of the harassment] by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary."

[55] Lipsett, 864 F.2d at 898 (while, in some instances, a person may have the responsibility for telling the harasser "directly" that the conduct is unwelcome, in other cases a "consistent failure to respond to suggestive comments or gestures may be sufficient...."); Danna v. New York Tel. Co., 752 F.Supp. 594, 612 (despite a female employee's own foul language and participation in graffiti writing, her complaints to management indicated that the harassment was not welcome); see also Carr v. Allison Gas Turbine Div. GMC., 32 F.3d 1007, 1011 (7th Cir. 1994) (finding that cursing and dirty jokes by a female employee did not show that she welcomed the sexual harassment, given her frequent complaints about it:  "Even if ... [the employee's] testimony that she talked and acted as she did [only] in an effort to be one of the boys is ... discounted, her words and conduct cannot be compared to those of the men and used to justify their conduct....  The asymmetry of positions must be considered.  She was one woman; they were many men. Her use of [vulgar] terms ... could not be deeply threatening....").

[56] See Reed v. Shepard, 939 F.2d 484, 486-87, 491-92 (7th Cir. 1991) (no harassment found under Title VII in a case in which a female employee not only tolerated, but also instigated the suggestive joking activities about which she was now complaining); Weinsheimer v. Rockwell Int'l Corp., 754 F.Supp. 1559, 1563-64 (M.D. Fla. 1990) (same, in case in which general shop banter was full of vulgarity and sexual innuendo by men and women alike, and plaintiff contributed her share to this atmosphere.)  However, even if a student participates in the sexual banter, OCR may in certain circumstances find that the conduct was nevertheless unwelcome if, for example, a teacher took an active role in the sexual banter and a student reasonably perceived that the teacher expected him or her to participate.

[57] The school bears the burden of rebutting the presumption.

[58] Of course, nothing in Title IX would prohibit a school from implementing policies prohibiting sexual conduct or sexual relationships between students and adult employees.

EXHIBIT 6

[59] See note 58.

[60] Gebser, 524 U.S. at 281 ("Franklin ... establishes that a school district can be held liable in damages [in an implied action under Title IX] in cases involving a teacher's sexual harassment of a student...."; 34 CFR 106.31; See 1997 Sexual Harassment Guidance, 62 FR 12034.

[61] See Davis, 526 U.S. at 653 (stating that harassment of a student by a teacher is more likely than harassment by a fellow student to constitute the type of effective denial of equal access to educational benefits that can breach the requirements of Title IX).

[62] 34 CFR 106.31(b).  Cf. Gebser, 524 U.S. at 283-84 (Court recognized in an implied right of action for money damages for teacher sexual harassment of a student that the question of whether a violation of Title IX occurred is a separate question from the scope of appropriate remedies for a violation).

[63] Davis, 526 U.S. at 646.

[64] See section on "Applicability of Title IX" for scope of coverage.

[65] See section on "Notice of Employee, Peer, or Third Party Harassment."

[66] See section on "Notice of Employee, Peer, or Third Party Harassment."

[67] 34 CFR 106.31(b).

[68] 34 CFR 106.31(b).

[69] See section on "Notice of Employee, Peer, or Third Party Harassment."

[70] Cf. Davis, 526 U.S. at 646.

[71] 34 CFR 106.31(b).

[72] 34 CFR 106.31(b).

[73] Consistent with its obligation under Title IX to protect students, cf. Gebser, 524 U.S. at 287, OCR interprets its regulations to ensure that recipients take reasonable action to address, rather than neglect, reasonably obvious discrimination.  Cf. Gebser, 524 U.S. at 287-88; Davis, 526 U.S. at 650 (actual notice standard for obtaining money damages in private lawsuit).

[74] Whether an employee is a responsible employee or whether it would be reasonable for a student to believe the employee is, even if the employee is not, will vary depending on

EXHIBIT 6

factors such as the age and education level of the student, the type of position held by the employee, and school practices and procedures, both formal and informal.
The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action.  Gebser, 524 U.S. at 290, and Davis, 526 U.S. at 642.  The concept of a "responsible employee" under our guidance is broader.  That is, even if a responsible employee does not have the authority to address the discrimination and take corrective action, he or she does have the obligation to report it to appropriate school officials.

[75] The Title IX regulations require that recipients designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under the regulations, including complaint investigations.  34 CFR 106.8(a).

[76] 34 CFR 106.31.  See Yates v. Avco Corp., 819 F.2d 630, 636 (6th Cir. 1987); Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983).

[77] For example, a substantiated report indicating that a high school coach has engaged in inappropriate physical conduct of a sexual nature in several instances with different students may suggest a pattern of conduct that should trigger an inquiry as to whether other students have been sexually harassed by that coach.  See also Doe v. School Administrative Dist. No. 19, 66 F.Supp.2d 57, 63-64 and n.6 (D.Me. 1999) (in a private lawsuit for money damages under Title IX in which a high school principal had notice that a teacher may be engaging in a sexual relationship with one underage student and did not investigate, and then the same teacher allegedly engaged in sexual intercourse with another student, who did not report the incident, the court indicated that the school's knowledge of the first relationship may be sufficient to serve as actual notice of the second incident).

[78] Cf. Katz, 709 F.2d at 256 (finding that the employer "should have been aware of the problem both because of its pervasive character and because of [the employee's] specific complaints ..."); Smolsky v. Consolidated Rail Corp., 780 F.Supp. 283, 293 (E.D. Pa. 1991), reconsideration denied, 785 F.Supp. 71 (E.D. Pa. 1992) "where the harassment is apparent to all others in the work place, supervisors and coworkers, this may be sufficient to put the employer on notice of the sexual harassment" under Title VII); Jensen v. Eveleth Taconite Co., 824 F.Supp. 847, 887 (D.Minn. 1993); "[s]exual harassment ... was so pervasive that an inference of knowledge arises ....  The acts of sexual harassment detailed herein were too common and continuous to have escaped Eveleth Mines had its management been reasonably alert."); Cummings v. Walsh Construction Co., 561 F.Supp. 872, 878 (S.D. Ga. 1983) ("... allegations not only of the [employee] registering her complaints with her foreman ... but also that sexual harassment was so widespread that defendant had constructive notice of it" under Title VII; but see Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 250-51 (2nd Cir. 1995) (concluding that other students' knowledge of the conduct was not enough to charge the school with notice, particularly because these students may not have been aware that the conduct was offensive or abusive).

34

EXHIBIT 6

[79] 34 CFR 106.9 and 106.8(b).

[80] 34 CFR 106.8(b) and 106.31(b).

[81] 34 CFR 106.9.

[82] 34 CFR 106.8(b).

[83] 34 CFR 106.31.

[84] 34 CFR 106.31 and 106.3.  Gebser, 524 U.S. at 288 ("In the event of a violation, [under OCR's administrative enforcement scheme] a funding recipient may be required to take 'such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination.' §106.3.").

[85] 20 U.S.C. 1682.  In the event that OCR determines that voluntary compliance cannot be secured, OCR may take steps that may result in termination of Federal funding through administrative enforcement, or, alternatively, OCR may refer the case to the Department of Justice for judicial enforcement.

[86] Schools have an obligation to ensure that the educational environment is free of discrimination and cannot fulfill this obligation without determining if sexual harassment complaints have merit.

[87] In some situations, for example, if a playground supervisor observes a young student repeatedly engaging in conduct toward other students that is clearly unacceptable under the school's policies, it may be appropriate for the school to intervene without contacting the other students.  It still may be necessary for the school to talk with the students (and parents of elementary and secondary students) afterwards, e.g., to determine the extent of the harassment and how it affected them.

[88] Gebser, 524 U.S. at 288; Bundy v. Jackson, 641 F.2d 934, 947 (D.C. Cir. 1981) (employers should take corrective and preventive measures under Title VII); accord, Jones v. Flagship Int'l, 793 F.2d 714, 719-720 (5th Cir. 1986) (employer should take prompt remedial action under Title VII).

[89] See Doe ex rel. Doe v. Dallas Indep. Sch. Dist., 220 F.3d 380 (5th Cir. 2000) (citing Waltman); Waltman, 875 F.2d at 479 (appropriateness of employer's remedial action under Title VII will depend on the "severity and persistence of the harassment and the effectiveness of any initial remedial steps"); Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309-10 (5th Cir. 1987); holding that a company's quick decision to remove the harasser from the victim was adequate remedial action).

[90] See Intlekofer v. Turnage, 973 F.2d 773, 779-780 (9th Cir. 1992)(holding that the employer's response was insufficient and that more severe disciplinary action was

EXHIBIT 6

necessary in situations in which counseling, separating the parties, and warnings of possible discipline were ineffective in ending the harassing behavior).

[91] Offering assistance in changing living arrangements is one of the actions required of colleges and universities by the Campus Security Act in cases of rape and sexual assault. See 20 U.S.C. 1092(f).

[92] See section on "Harassment by Other Students or Third Parties."

[93] University of California at Santa Cruz, OCR Case No. 09-93-2141 (extensive individual and group counseling); Eden Prairie Schools, Dist. #272, OCR Case No. 05-92-1174 (counseling).

[94] Even if the harassment stops without the school's involvement, the school may still need to take steps to prevent or deter any future harassment –– to inform the school community that harassment will not be tolerated.  Wills v. Brown University, 184 F.3d 20, 28 (1st Cir. 1999) (difficult problems are posed in balancing a student's request for anonymity or limited disclosure against the need to prevent future harassment); Fuller v. City of Oakland, 47 F.3d 1522, 1528-29 (9th Cir. 1995) (Title VII case).

[95] 34 CFR 106.8(b) and 106.71, incorporating by reference 34 CFR 100.7(e).  The Title IX regulations prohibit intimidation, threats, coercion, or discrimination against any individual for the purpose of interfering with any right or privilege secured by Title IX.

[96] Tacoma School Dist. No. 10, OCR Case No. 10-94-1079 (due to the large number of students harassed by an employee, the extended period of time over which the harassment occurred, and the failure of several of the students to report the harassment, the school committed as part of corrective action plan to providing training for students); Los Medanos College, OCR Case No. 09-84-2092 (as part of corrective action plan, school committed to providing sexual harassment seminar for campus employees); Sacramento City Unified School Dist., OCR Case No. 09-83-1063 (same as to workshops for management and administrative personnel and in-service training for non-management personnel).

[97] In addition, if information about the incident is contained in an "education record" of the student alleging the harassment, as defined in the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g, the school should consider whether FERPA would prohibit the school from disclosing information without the student's consent.  Id. In evaluating whether FERPA would limit disclosure, the Department does not interpret FERPA to override any federally protected due process rights of a school employee accused of harassment.

[98] 34 CFR 106.8(b).  This requirement has been part of the Title IX regulations since their inception in 1975.  Thus, schools have been required to have these procedures in place since that time.  At the elementary and secondary level, this responsibility generally lies

EXHIBIT 6

with the school district.  At the postsecondary level, there may be a procedure for a particular campus or college or for an entire university system.

[99] Fenton Community High School Dist. #100, OCR Case 05-92-1104.

[100] While a school is required to have a grievance procedure under which complaints of sex discrimination (including sexual harassment) can be filed, the same procedure may also be used to address other forms of discrimination.

[101] See generally Meritor, 477 U.S. at 72-73 (holding that "mere existence of a grievance procedure" for discrimination does not shield an employer from a sexual harassment claim).

[102] The Family Educational Rights and Privacy Act (FERPA) does not prohibit a student from learning the outcome of her complaint, i.e., whether the complaint was found to be credible and whether harassment was found to have occurred.  It is the Department's current position under FERPA that a school cannot release information to a complainant regarding disciplinary action imposed on a student found guilty of harassment if that information is contained in a student's education record unless — (1) the information directly relates to the complainant (e.g., an order requiring the student harasser not to have contact with the complainant); or (2) the harassment involves a crime of violence or a sex offense in a postsecondary institution.  See note 97.  If the alleged harasser is a teacher, administrator, or other non-student employee, FERPA would not limit the school's ability to inform the complainant of any disciplinary action taken.

[103] The section in the guidance on "Recipient's Response" provides examples of reasonable and appropriate corrective action.

[104] 34 CFR 106.8(a).

[105] Id.

[106] See Meritor, 477 U.S. at 72-73.

[107] University of California, Santa Cruz, OCR Case No. 09-93-2131.  This is true for formal as well as informal complaints.  See University of Maine at Machias, OCR Case No. 01-94-6001 (school's new procedures not found in violation of Title IX in part because they require written records for informal as well as formal resolutions).  These records need not be kept in a student's or employee's individual file, but instead may be kept in a central confidential location.

[108] For example, in Cape Cod Community College, OCR Case No. 01-93-2047, the College was found to have violated Title IX in part because the person identified by the school as the Title IX coordinator was unfamiliar with Title IX, had no training, and did not even realize he was the coordinator.

37

EXHIBIT 6

[109] Indeed, in University of Maine at Machias, OCR Case No. 01-94-6001, OCR found the school's procedures to be inadequate because only formal complaints were investigated.  While a school isn't required to have an established procedure for resolving informal complaints, they nevertheless must be addressed in some way.  However, if there are indications that the same individual may be harassing others, then it may not be appropriate to resolve an informal complaint without taking steps to address the entire situation.

[110] Academy School Dist. No 20, OCR Case No. 08-93-1023 (school's response determined to be insufficient in a case in which it stopped its investigation after complaint filed with police); Mills Public School Dist., OCR Case No. 01-93-1123, (not sufficient for school to wait until end of police investigation).

[111] Cf. EEOC v. Board of Governors of State Colleges and Universities, 957 F.2d 424 (7th Cir. 1992), cert. denied, 506 U.S. 906 (1992).

[112] The First Amendment applies to entities and individuals that are State actors.  The receipt of Federal funds by private schools does not directly subject those schools to the U.S. Constitution.  See Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982).  However, all actions taken by OCR must comport with First Amendment principles, even in cases involving private schools that are not directly subject to the First Amendment.

[113] See, e.g., George Mason University, OCR Case No. 03-94-2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment); Portland School Dist. 1J, OCR Case No. 10-94-1117 (reading teacher's choice to substitute a less offensive term for a racial slur when reading an historical novel aloud in class constituted an academic decision on presentation of curriculum, not racial harassment).

[114] See Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University, 993 F.2d 386 (4th Cir. 1993) (fraternity skit in which white male student dressed as an offensive caricature of a black female constituted student expression).

[115] See Florida Agricultural and Mechanical University, OCR Case No. 04-92-2054 (no discrimination in case in which campus newspaper, which welcomed individual opinions of all sorts, printed article expressing one student's viewpoint on white students on campus.)

[116] Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506 (1969) (neither students nor teachers shed their constitutional rights to freedom of expression at the schoolhouse gates); Cf. Cohen v. San Bernardino Valley College, 92 F.3d 968, 972 (9th Cir. 1996) (holding that a college professor could not be punished for his longstanding teaching methods, which included discussion of controversial subjects such as obscenity and consensual sex with children, under an unconstitutionally vague sexual harassment policy); George Mason University, OCR Case No. 03-94-2086 (law professor's use of a

EXHIBIT 6

racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment.)

[117] See, e.g., University of Illinois, OCR Case No. 05-94-2104 (fact that university's use of Native American symbols was offensive to some Native American students and employees was not dispositive, in and of itself, in assessing a racially hostile environment claim under Title VI.)

[118] See Meritor, 477 U.S. at 67 (the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not affect the conditions of employment to a sufficient degree to violate Title VII), quoting Henson, 682 F.2d at 904; cf. R.A.V. v. City of St. Paul, 505 U.S. 377, 389 (1992) (citing with approval EEOC's sexual harassment guidelines); Monteiro, 158 F.3d at 1032-34 (9th Cir. 1998) (citing with approval OCR's racial harassment investigative guidance).

[119] Compare Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986) (Court upheld discipline of high school student for making lewd speech to student assembly, noting that "[t]he undoubted freedom to advocate unpopular and controversial issues in schools must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior."), with Iota Xi, 993 F.2d 386 (holding that, notwithstanding a university's mission to create a culturally diverse learning environment and its substantial interest in maintaining a campus free of discrimination, it could not punish students who engaged in an offensive skit with racist and sexist overtones.)

EXHIBIT 6

EXHIBIT 7

## U.S. Department of Education

[Search]

| Student Loans | Grants | Laws | Data |

**OCR**
Office for Civil Rights

- Home
- Programs/Initiatives
- Office Contacts
- Reports & Resources
- News
- About OCR
- Reading Room
- Frequently Asked Questions
- Careers/Internships
- Blog

# Dear Colleague Letter

## OFFICE OF THE ASSISTANT SECRETARY

January 25, 2006

Dear Colleague:

My purpose in writing to you is to increase awareness of an important issue affecting students — sexual harassment — and to remind you of the principles that a school should use to recognize and effectively respond to the sexual harassment of students in its programs and activities. As you know, the Office for Civil Rights (OCR) in the U.S. Department of Education (Department) is responsible for enforcing Title IX of the Education Amendments of 1972 (Title IX) and the Department's implementing regulations at 34 C.F.R. Part 106, which prohibit sex discrimination in education programs and activities operated by educational institutions that receive Federal financial assistance.

Longstanding legal authority establishes that harassment of students can be a form of sex discrimination covered by Title IX. I want to commend the efforts many of you have made to ensure that all students have a safe and secure educational environment that affords them equal educational opportunities regardless of their sex. Unfortunately, a significant number of students are still subjected to sexual harassment, which can interfere with a student's education as well as his or her emotional and physical well-being. Preventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn.

I am enclosing the Revised Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or Third Parties issued by OCR in January 2001. The guidance explains an educational institution's responsibility, as a condition of receiving Federal financial assistance, to take immediate and effective steps to end sexual harassment when it occurs, prevent its recurrence, and remedy its effects.

You should be aware that the guidance outlines standards applicable to OCR's enforcement of compliance in cases raising sexual harassment issues. It does not purport to discuss standards applicable to private Title IX lawsuits for monetary damages. You will also note that the guidance sometimes cites OCR resolution letters. These letters are fact-specific statements of the investigative findings and dispositions in individual cases and are not formal statements of OCR policy.

I am committed to the vigorous enforcement of Title IX and to ensuring equal opportunities in education for all students. In furtherance of that commitment, OCR plans to conduct compliance reviews related to sexual harassment in schools. OCR remains willing to support you in your voluntary efforts to comply with Title IX. If you need additional information about Title IX, have questions regarding the Department's policies, or seek guidance, please contact the OCR enforcement office that serves your state or territory for further assistance. I have enclosed the addresses and telephone numbers of those offices.

Thank you for your attention to this matter of vital importance to maintaining a safe environment for all students.

Sincerely,

Stephanie Monroe
Assistant Secretary
for Civil Rights

Enclosure

Addresses

Top

Last Modified: 01/10/2020

## How Do I Find...

- Student loans, forgiveness
- College accreditation
- Every Student Succeeds Act (ESSA)
- FERPA
- FAFSA
- 1098, tax forms

More >

## Information About...

- Transforming Teaching
- Family and Community Engagement
- Early Learning

## Related Topics

- How to File a Complaint
- Topics A-Z
- Civil Rights Data Collection (CRDC)
- Other Civil Rights Agencies
- Recursos de la Oficina Para Derechos Civiles en Español
- Resources Available in Other Languages

*Our mission* is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

**Student Loans**
Repaying Loans
Defaulted Loans
Loan Forgiveness
Loan Servicers

**Grants & Programs**
Apply for Pell Grants
Grants Forecast
Apply for a Grant
Eligibility for Grants

**Laws & Guidance**
Every Student Succeeds Act (ESSA)
FERPA
Civil Rights
New IDEA Website

**Data & Research**
Education Statistics
Postsecondary Education Data
ED Data Express
Nation's Report Card
What Works Clearinghouse

**About Us**
Contact Us
ED Offices
Jobs
Press Releases
FAQs
Recursos en español
Budget, Performance
Privacy Program
Subscribe to E-Mail Updates

   

EXHIBIT 7

EXHIBIT 8

Archived Information



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

April 4, 2011

Dear Colleague:

Education has long been recognized as the great equalizer in America. The U.S. Department of Education and its Office for Civil Rights (OCR) believe that providing all students with an educational environment free from discrimination is extremely important. The sexual harassment of students, including sexual violence, interferes with students' right to receive an education free from discrimination and, in the case of sexual violence, is a crime.

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX. In order to assist recipients, which include school districts, colleges, and universities (hereinafter "schools" or "recipients") in meeting these obligations, this letter[1] explains that the requirements of Title IX pertaining to sexual harassment also cover sexual violence, and lays out the specific Title IX requirements applicable to sexual violence.[2] Sexual violence, as that term is used in this letter, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol. An individual also may be unable to give consent due to an intellectual or other disability. A number of different acts fall into the category of sexual violence, including rape,

---

[1] The Department has determined that this Dear Colleague Letter is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at:*
http://www.whitehouse.gov/sites/default/files/omb/assets/regulatory_matters_pdf/012507_good_guidance.pdf. OCR issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This letter does not add requirements to applicable law, but provides additional information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to us at the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, DC 20202.

[2] Use of the term "sexual harassment" throughout this document includes sexual violence unless otherwise noted. Sexual harassment also may violate Title IV of the Civil Rights Act of 1964 (42 U.S.C. § 2000c), which prohibits public school districts and colleges from discriminating against students on the basis of sex, among other bases. The U.S. Department of Justice enforces Title IV.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

EXHIBIT 8

Page 2 – Dear Colleague Letter: Sexual Violence

sexual assault, sexual battery, and sexual coercion. All such acts of sexual violence are forms of sexual harassment covered under Title IX.

The statistics on sexual violence are both deeply troubling and a call to action for the nation. A report prepared for the National Institute of Justice found that about 1 in 5 women are victims of completed or attempted sexual assault while in college.[3] The report also found that approximately 6.1 percent of males were victims of completed or attempted sexual assault during college.[4] According to data collected under the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act (Clery Act), 20 U.S.C. § 1092(f), in 2009, college campuses reported nearly 3,300 forcible sex offenses as defined by the Clery Act.[5] This problem is not limited to college. During the 2007-2008 school year, there were 800 reported incidents of rape and attempted rape and 3,800 reported incidents of other sexual batteries at public high schools.[6] Additionally, the likelihood that a woman with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population.[7] The Department is deeply concerned about this problem and is committed to ensuring that all students feel safe in their school, so that they have the opportunity to benefit fully from the school's programs and activities.

This letter begins with a discussion of Title IX's requirements related to student-on-student sexual harassment, including sexual violence, and explains schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence. These requirements are discussed in detail in OCR's *Revised Sexual Harassment Guidance* issued in 2001 (*2001 Guidance*).[8] This letter supplements the *2001 Guidance* by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence. This letter concludes by discussing the proactive efforts schools can take to prevent sexual harassment and violence, and by providing examples of remedies that schools and OCR may use to end such conduct, prevent its recurrence, and address its effects. Although some examples contained in this letter are applicable only in the postsecondary context, sexual

---

[3] CHRISTOPHER P. KREBS ET AL., THE CAMPUS SEXUAL ASSAULT STUDY: FINAL REPORT xiii (Nat'l Criminal Justice Reference Serv., Oct. 2007), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf. This study also found that the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol. *Id.* at xviii.

[4] *Id.* at 5-5.

[5] U.S. Department of Education, Office of Postsecondary Education, Summary Crime Statistics (data compiled from reports submitted in compliance with the Clery Act), *available at* http://www2.ed.gov/admins/lead/safety/criminal2007-09.pdf. Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person, forcibly and/or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. 34 C.F.R. Part 668, Subpt. D, App. A.

[6] SIMONE ROBERS ET AL., INDICATORS OF SCHOOL CRIME AND SAFETY: 2010 at 104 (U.S. Dep't of Educ. & U.S. Dep't of Justice, Nov. 2010), *available at* http://nces.ed.gov/pubs2011/2011002.pdf.

[7] ERIKA HARRELL & MICHAEL R. RAND, CRIME AGAINST PEOPLE WITH DISABILITIES, 2008 (Bureau of Justice Statistics, U.S. Dep't of Justice, Dec. 2010), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/capd08.pdf.

[8] The *2001 Guidance* is available on the Department's Web site at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. This letter focuses on peer sexual harassment and violence. Schools' obligations and the appropriate response to sexual harassment and violence committed by employees may be different from those described in this letter. Recipients should refer to the *2001 Guidance* for further information about employee harassment of students.

EXHIBIT 8

Page 3 – Dear Colleague Letter: Sexual Violence

harassment and violence also are concerns for school districts. The Title IX obligations discussed in this letter apply equally to school districts unless otherwise noted.

## Title IX Requirements Related to Sexual Harassment and Sexual Violence

### Schools' Obligations to Respond to Sexual Harassment and Sexual Violence

Sexual harassment is unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Sexual violence is a form of sexual harassment prohibited by Title IX.[9]

As explained in OCR's *2001 Guidance*, when a student sexually harasses another student, the harassing conduct creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe. For instance, a single instance of rape is sufficiently severe to create a hostile environment.[10]

Title IX protects students from sexual harassment in a school's education programs and activities. This means that Title IX protects students in connection with all the academic, educational, extracurricular, athletic, and other programs of the school, whether those programs take place in a school's facilities, on a school bus, at a class or training program

---

[9] Title IX also prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, even if those acts do not involve conduct of a sexual nature. The Title IX obligations discussed in this letter also apply to gender-based harassment. Gender-based harassment is discussed in more detail in the *2001 Guidance,* and in the 2010 Dear Colleague letter on Harassment and Bullying, which is available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[10] *See, e.g., Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006) (acknowledging that while not an issue in this case, a single incident of sexual assault or rape could be sufficient to raise a jury question about whether a hostile environment exists, and noting that courts look to Title VII cases for guidance in analyzing Title IX sexual harassment claims); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000) ("'[w]ithin the context of Title IX, a student's claim of hostile environment can arise from a single incident'" (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999))); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (explaining that rape and sexual abuse "obviously qualif[y] as…severe, pervasive, and objectively offensive sexual harassment"); *see also Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (in the Title VII context, "a single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with intimate parts of the body are among the most severe types of sexual harassment"); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010) (noting that "'[o]ne instance of conduct that is sufficiently severe may be enough,'" which is "especially true when the touching is of an intimate body part" (quoting *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007))); *McKinnis v. Crescent Guardian, Inc.*, 189 F. App'x 307, 310 (5th Cir. 2006) (holding that "'the deliberate and unwanted touching of [a plaintiff's] intimate body parts can constitute severe sexual harassment'" in Title VII cases (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005))).

EXHIBIT 8

sponsored by the school at another location, or elsewhere. For example, Title IX protects a student who is sexually assaulted by a fellow student during a school-sponsored field trip.[11]

If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects.[12] Schools also are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures. Because of these requirements, which are discussed in greater detail in the following section, schools need to ensure that their employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly. Training for employees should include practical information about how to identify and report sexual harassment and violence. OCR recommends that this training be provided to any employees likely to witness or receive reports of sexual harassment and violence, including teachers, school law enforcement unit employees, school administrators, school counselors, general counsels, health personnel, and resident advisors.

Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures. Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates.

Regardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance procedures or otherwise requests action on the student's behalf, a school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. As discussed later in this letter, the school's Title IX investigation is different from any law enforcement investigation, and a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate the conduct. The specific steps in a school's

---

[11] Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities. For example, Title IX protects a high school student participating in a college's recruitment program, a visiting student athlete, and a visitor in a school's on-campus residence hall. Title IX also protects employees of a recipient from sexual harassment. For further information about harassment of employees, see *2001 Guidance* at n.1.

[12] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13. The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 643, 648 (1999).

EXHIBIT 8

investigation will vary depending upon the nature of the allegations, the age of the student or students involved (particularly in elementary and secondary schools), the size and administrative structure of the school, and other factors. Yet as discussed in more detail below, the school's inquiry must in all cases be prompt, thorough, and impartial. In cases involving potential criminal conduct, school personnel must determine, consistent with State and local law, whether appropriate law enforcement or other authorities should be notified.[13]

Schools also should inform and obtain consent from the complainant (or the complainant's parents if the complainant is under 18 and does not attend a postsecondary institution) before beginning an investigation. If the complainant requests confidentiality or asks that the complaint not be pursued, the school should take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation. If a complainant insists that his or her name or other identifiable information not be disclosed to the alleged perpetrator, the school should inform the complainant that its ability to respond may be limited.[14] The school also should tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs.

As discussed in the *2001 Guidance*, if the complainant continues to ask that his or her name or other identifiable information not be revealed, the school should evaluate that request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. Thus, the school may weigh the request for confidentiality against the following factors: the seriousness of the alleged harassment; the complainant's age; whether there have been other harassment complaints about the same individual; and the alleged harasser's rights to receive information about the allegations if the information is maintained by the school as an "education record" under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g; 34 C.F.R. Part 99.[15] The school should inform the complainant if it cannot ensure confidentiality. Even if the school cannot take disciplinary action against the alleged harasser because the complainant insists on confidentiality, it should pursue other steps to limit the effects of the alleged harassment and prevent its recurrence. Examples of such steps are discussed later in this letter.

Compliance with Title IX, such as publishing a notice of nondiscrimination, designating an employee to coordinate Title IX compliance, and adopting and publishing grievance procedures, can serve as preventive measures against harassment. Combined with education and training programs, these measures can help ensure that all students and employees recognize the

---

[13] In states with mandatory reporting laws, schools may be required to report certain incidents to local law enforcement or child protection agencies.

[14] Schools should refer to the *2001 Guidance* for additional information on confidentiality and the alleged perpetrator's due process rights.

[15] For example, the alleged harasser may have a right under FERPA to inspect and review portions of the complaint that directly relate to him or her. In that case, the school must redact the complainant's name and other identifying information before allowing the alleged harasser to inspect and review the sections of the complaint that relate to him or her. In some cases, such as those where the school is required to report the incident to local law enforcement or other officials, the school may not be able to maintain the complainant's confidentiality.

EXHIBIT 8

nature of sexual harassment and violence, and understand that the school will not tolerate such conduct. Indeed, these measures may bring potentially problematic conduct to the school's attention before it becomes serious enough to create a hostile environment. Training for administrators, teachers, staff, and students also can help ensure that they understand what types of conduct constitute sexual harassment or violence, can identify warning signals that may need attention, and know how to respond. More detailed information and examples of education and other preventive measures are provided later in this letter.

**Procedural Requirements Pertaining to Sexual Harassment and Sexual Violence**

Recipients of Federal financial assistance must comply with the procedural requirements outlined in the Title IX implementing regulations. Specifically, a recipient must:

(A) Disseminate a notice of nondiscrimination;[16]

(B) Designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX;[17] and

(C) Adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex discrimination complaints.[18]

These requirements apply to all forms of sexual harassment, including sexual violence, and are important for preventing and effectively responding to sex discrimination. They are discussed in greater detail below. OCR advises recipients to examine their current policies and procedures on sexual harassment and sexual violence to determine whether those policies comply with the requirements articulated in this letter and the *2001 Guidance.* Recipients should then implement changes as needed.

(A) *Notice of Nondiscrimination*

The Title IX regulations require that each recipient publish a notice of nondiscrimination stating that the recipient does not discriminate on the basis of sex in its education programs and activities, and that Title IX requires it not to discriminate in such a manner.[19] The notice must state that inquiries concerning the application of Title IX may be referred to the recipient's Title IX coordinator or to OCR. It should include the name or title, office address, telephone number, and e-mail address for the recipient's designated Title IX coordinator.

The notice must be widely distributed to all students, parents of elementary and secondary students, employees, applicants for admission and employment, and other relevant persons. OCR recommends that the notice be prominently posted on school Web sites and at various

---

[16] 34 C.F.R. § 106.9.
[17] *Id.* § 106.8(a).
[18] *Id.* § 106.8(b).
[19] *Id.* § 106.9(a).

EXHIBIT 8

locations throughout the school or campus and published in electronic and printed publications of general distribution that provide information to students and employees about the school's services and policies. The notice should be available and easily accessible on an ongoing basis.

Title IX does not require a recipient to adopt a policy specifically prohibiting sexual harassment or sexual violence. As noted in the *2001 Guidance*, however, a recipient's general policy prohibiting sex discrimination will not be considered effective and would violate Title IX if, because of the lack of a specific policy, students are unaware of what kind of conduct constitutes sexual harassment, including sexual violence, or that such conduct is prohibited sex discrimination. OCR therefore recommends that a recipient's nondiscrimination policy state that prohibited sex discrimination covers sexual harassment, including sexual violence, and that the policy include examples of the types of conduct that it covers.

(B) *Title IX Coordinator*

The Title IX regulations require a recipient to notify all students and employees of the name or title and contact information of the person designated to coordinate the recipient's compliance with Title IX.[20] The coordinator's responsibilities include overseeing all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints. The Title IX coordinator or designee should be available to meet with students as needed. If a recipient designates more than one Title IX coordinator, the notice should describe each coordinator's responsibilities (*e.g.*, who will handle complaints by students, faculty, and other employees). The recipient should designate one coordinator as having ultimate oversight responsibility, and the other coordinators should have titles clearly showing that they are in a deputy or supporting role to the senior coordinator. The Title IX coordinators should not have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest.

Recipients must ensure that employees designated to serve as Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the recipient's grievance procedures operate. Because sexual violence complaints often are filed with the school's law enforcement unit, all school law enforcement unit employees should receive training on the school's Title IX grievance procedures and any other procedures used for investigating reports of sexual violence. In addition, these employees should receive copies of the school's Title IX policies. Schools should instruct law enforcement unit employees both to notify complainants of their right to file a Title IX sex discrimination complaint with the school in addition to filing a criminal complaint, and to report incidents of sexual violence to the Title IX coordinator if the complainant consents. The school's Title IX coordinator or designee should be available to provide assistance to school law enforcement unit employees regarding how to respond appropriately to reports of sexual violence. The Title IX coordinator also should be given access to school law enforcement unit investigation notes

---

[20] *Id.* § 106.8(a).

EXHIBIT 8

and findings as necessary for the Title IX investigation, so long as it does not compromise the criminal investigation.

(C) *Grievance Procedures*

The Title IX regulations require all recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of sex discrimination complaints.[21] The grievance procedures must apply to sex discrimination complaints filed by students against school employees, other students, or third parties.

Title IX does not require a recipient to provide separate grievance procedures for sexual harassment and sexual violence complaints. Therefore, a recipient may use student disciplinary procedures or other separate procedures to resolve such complaints. Any procedures used to adjudicate complaints of sexual harassment or sexual violence, including disciplinary procedures, however, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution.[22] These requirements are discussed in greater detail below. If the recipient relies on disciplinary procedures for Title IX compliance, the Title IX coordinator should review the recipient's disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX.[23]

Grievance procedures generally may include voluntary informal mechanisms (*e.g.*, mediation) for resolving some types of sexual harassment complaints. OCR has frequently advised recipients, however, that it is improper for a student who complains of harassment to be required to work out the problem directly with the alleged perpetrator, and certainly not without appropriate involvement by the school (*e.g.*, participation by a trained counselor, a trained mediator, or, if appropriate, a teacher or administrator). In addition, as stated in the *2001 Guidance*, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. Moreover, in cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis. OCR recommends that recipients clarify in their grievance procedures that mediation will not be used to resolve sexual assault complaints.

---

[21] *Id.* § 106.8(b). Title IX also requires recipients to adopt and publish grievance procedures for employee complaints of sex discrimination.

[22] These procedures must apply to all students, including athletes. If a complaint of sexual violence involves a student athlete, the school must follow its standard procedures for resolving sexual violence complaints. Such complaints must not be addressed solely by athletics department procedures. Additionally, if an alleged perpetrator is an elementary or secondary student with a disability, schools must follow the procedural safeguards in the Individuals with Disabilities Education Act (at 20 U.S.C. § 1415 and 34 C.F.R. §§ 300.500-300.519, 300.530-300.537) as well as the requirements of Section 504 of the Rehabilitation Act of 1973 (at 34 C.F.R. §§ 104.35-104.36) when conducting the investigation and hearing.

[23] A school may not absolve itself of its Title IX obligations to investigate and resolve complaints of sexual harassment or violence by delegating, whether through express contractual agreement or other less formal arrangement, the responsibility to administer school discipline to school resource officers or "contract" law enforcement officers. *See* 34 C.F.R. § 106.4.

EXHIBIT 8

Page 9 – Dear Colleague Letter: Sexual Violence

### *Prompt and Equitable Requirements*

As stated in the *2001 Guidance*, OCR has identified a number of elements in evaluating whether a school's grievance procedures provide for prompt and equitable resolution of sexual harassment complaints. These elements also apply to sexual violence complaints because, as explained above, sexual violence is a form of sexual harassment. OCR will review all aspects of a school's grievance procedures, including the following elements that are critical to achieve compliance with Title IX:

- Notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;
- Application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence;
- Designated and reasonably prompt time frames for the major stages of the complaint process;
- Notice to parties of the outcome of the complaint;[24] and
- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

As noted in the *2001 Guidance*, procedures adopted by schools will vary in detail, specificity, and components, reflecting differences in the age of students, school sizes and administrative structures, State or local legal requirements, and past experiences. Although OCR examines whether all applicable elements are addressed when investigating sexual harassment complaints, this letter focuses on those elements where our work indicates that more clarification and explanation are needed, including:

(A) *Notice of the grievance procedures*

The procedures for resolving complaints of sex discrimination, including sexual harassment, should be written in language appropriate to the age of the school's students, easily understood, easily located, and widely distributed. OCR recommends that the grievance procedures be prominently posted on school Web sites; sent electronically to all members of the school community; available at various locations throughout the school or campus; and summarized in or attached to major publications issued by the school, such as handbooks, codes of conduct, and catalogs for students, parents of elementary and secondary students, faculty, and staff.

(B) *Adequate, Reliable, and Impartial Investigation of Complaints*

OCR's work indicates that a number of issues related to an adequate, reliable, and impartial investigation arise in sexual harassment and violence complaints. In some cases, the conduct

---

[24] "Outcome" does not refer to information about disciplinary sanctions unless otherwise noted. Notice of the outcome is discussed in greater detail in Section D below.

EXHIBIT 8

may constitute both sexual harassment under Title IX and criminal activity. Police investigations may be useful for fact-gathering; but because the standards for criminal investigations are different, police investigations or reports are not determinative of whether sexual harassment or violence violates Title IX. Conduct may constitute unlawful sexual harassment under Title IX even if the police do not have sufficient evidence of a criminal violation. In addition, a criminal investigation into allegations of sexual violence does not relieve the school of its duty under Title IX to resolve complaints promptly and equitably.

A school should notify a complainant of the right to file a criminal complaint, and should not dissuade a victim from doing so either during or after the school's internal Title IX investigation. For instance, if a complainant wants to file a police report, the school should not tell the complainant that it is working toward a solution and instruct, or ask, the complainant to wait to file the report.

Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime. Any agreement or Memorandum of Understanding (MOU) with a local police department must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation.[25] Moreover, nothing in an MOU or the criminal investigation itself should prevent a school from notifying complainants of their Title IX rights and the school's grievance procedures, or from taking interim steps to ensure the safety and well-being of the complainant and the school community while the law enforcement agency's fact-gathering is in progress. OCR also recommends that a school's MOU include clear policies on when a school will refer a matter to local law enforcement.

As noted above, the Title IX regulation requires schools to provide equitable grievance procedures. As part of these procedures, schools generally conduct investigations and hearings to determine whether sexual harassment or violence occurred. In addressing complaints filed with OCR under Title IX, OCR reviews a school's procedures to determine whether the school is using a preponderance of the evidence standard to evaluate complaints. The Supreme Court has applied a preponderance of the evidence standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.* Like Title IX,

---

[25] In one recent OCR sexual violence case, the prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances.

EXHIBIT 8

Page 11 – Dear Colleague Letter: Sexual Violence

Title VII prohibits discrimination on the basis of sex.[26] OCR also uses a preponderance of the evidence standard when it resolves complaints against recipients. For instance, OCR's Case Processing Manual requires that a noncompliance determination be supported by the preponderance of the evidence when resolving allegations of discrimination under all the statutes enforced by OCR, including Title IX.[27] OCR also uses a preponderance of the evidence standard in its fund termination administrative hearings.[28] Thus, in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (*i.e.*, it is more likely than not that sexual harassment or violence occurred). The "clear and convincing" standard (*i.e.*, it is highly probable or reasonably certain that the sexual harassment or violence occurred), currently used by some schools, is a higher standard of proof. Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX. Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.

Throughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence. The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing.[29] For example, a school should not conduct a pre-hearing meeting during which only the alleged perpetrator is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the complainant; a hearing officer or disciplinary board should not allow only the alleged perpetrator to present character witnesses at a hearing; and a school should not allow the alleged perpetrator to review the complainant's

---

[26] *See, e.g., Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) (noting that under the "conventional rule of civil litigation," the preponderance of the evidence standard generally applies in cases under Title VII); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252-55 (1989) (approving preponderance standard in Title VII sex discrimination case) (plurality opinion); *id.* at 260 (White, J., concurring in the judgment); *id.* at 261 (O'Connor, J., concurring in the judgment). The *2001 Guidance* noted (on page vi) that "[w]hile *Gebser* and *Davis* made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the *Davis* Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX." *See also Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

[27] OCR's Case Processing Manual is available on the Department's Web site, at http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html.

[28] The Title IX regulations adopt the procedural provisions applicable to Title VI of the Civil Rights Act of 1964. *See* 34 C.F.R. § 106.71 ("The procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference."). The Title VI regulations apply the Administrative Procedure Act to administrative hearings required prior to termination of Federal financial assistance and require that termination decisions be "supported by and in accordance with the reliable, probative and substantial evidence." 5 U.S.C. § 556(d). The Supreme Court has interpreted "reliable, probative and substantial evidence" as a direction to use the preponderance standard. *See Steadman v. SEC*, 450 U.S. 91, 98-102 (1981).

[29] Access to this information must be provided consistent with FERPA. For example, if a school introduces an alleged perpetrator's prior disciplinary records to support a tougher disciplinary penalty, the complainant would not be allowed access to those records. Additionally, access should not be given to privileged or confidential information. For example, the alleged perpetrator should not be given access to communications between the complainant and a counselor or information regarding the complainant's sexual history.

EXHIBIT 8

Page 12 – Dear Colleague Letter: Sexual Violence

statement without also allowing the complainant to review the alleged perpetrator's statement.

While OCR does not require schools to permit parties to have lawyers at any stage of the proceedings, if a school chooses to allow the parties to have their lawyers participate in the proceedings, it must do so equally for both parties. Additionally, any school-imposed restrictions on the ability of lawyers to speak or otherwise participate in the proceedings should apply equally. OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment. OCR also recommends that schools provide an appeals process. If a school provides for appeal of the findings or remedy, it must do so for both parties. Schools must maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings.

All persons involved in implementing a recipient's grievance procedures (*e.g.*, Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures. The training also should include applicable confidentiality requirements. In sexual violence cases, the fact-finder and decision-maker also should have adequate training or knowledge regarding sexual violence.[30] Additionally, a school's investigation and hearing processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed.

Public and state-supported schools must provide due process to the alleged perpetrator. However, schools should ensure that steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant.

(C) *Designated and Reasonably Prompt Time Frames*

OCR will evaluate whether a school's grievance procedures specify the time frames for all major stages of the procedures, as well as the process for extending timelines. Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable. Both parties should be given periodic status updates. Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint. Whether OCR considers complaint resolutions to be timely, however, will vary depending on the complexity of the investigation and the severity and extent of the harassment. For example, the resolution of a complaint involving multiple incidents with multiple complainants likely would take longer than one involving a single incident that

---

[30] For instance, if an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner.

EXHIBIT 8

occurred in a classroom during school hours with a single complainant.

(D) *Notice of Outcome*

Both parties must be notified, in writing, about the outcome of both the complaint and any appeal,[31] *i.e.*, whether harassment was found to have occurred. OCR recommends that schools provide the written determination of the final outcome to the complainant and the alleged perpetrator concurrently. Title IX does not require the school to notify the alleged perpetrator of the outcome before it notifies the complainant.

Due to the intersection of Title IX and FERPA requirements, OCR recognizes that there may be confusion regarding what information a school may disclose to the complainant.[32] FERPA generally prohibits the nonconsensual disclosure of personally identifiable information from a student's "education record." However, as stated in the *2001 Guidance*, FERPA permits a school to disclose to the harassed student information about the sanction imposed upon a student who was found to have engaged in harassment when the sanction directly relates to the harassed student. This includes an order that the harasser stay away from the harassed student, or that the harasser is prohibited from attending school for a period of time, or transferred to other classes or another residence hall.[33] Disclosure of other information in the student's "education record," including information about sanctions that do not relate to the harassed student, may result in a violation of FERPA.

Further, when the conduct involves a crime of violence or a non-forcible sex offense,[34] FERPA permits a postsecondary institution to disclose to the alleged victim the final results of a

---

[31] As noted previously, "outcome" does not refer to information about disciplinary sanctions unless otherwise noted.

[32] In 1994, Congress amended the General Education Provisions Act (GEPA), of which FERPA is a part, to state that nothing in GEPA "shall be construed to affect the applicability of title VI of the Civil Rights Act of 1964, title IX of Education Amendments of 1972, title V of the Rehabilitation Act of 1973, the Age Discrimination Act, or other statutes prohibiting discrimination, to any applicable program." 20 U.S.C. § 1221(d). The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between the requirements of FERPA and the requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. *See 2001 Guidance* at vii.

[33] This information directly relates to the complainant and is particularly important in sexual harassment cases because it affects whether a hostile environment has been eliminated. Because seeing the perpetrator may be traumatic, a complainant in a sexual harassment case may continue to be subject to a hostile environment if he or she does not know when the perpetrator will return to school or whether he or she will continue to share classes or a residence hall with the perpetrator. This information also directly affects a complainant's decision regarding how to work with the school to eliminate the hostile environment and prevent its recurrence. For instance, if a complainant knows that the perpetrator will not be at school or will be transferred to other classes or another residence hall for the rest of the year, the complainant may be less likely to want to transfer to another school or change classes, but if the perpetrator will be returning to school after a few days or weeks, or remaining in the complainant's classes or residence hall, the complainant may want to transfer schools or change classes to avoid contact. Thus, the complainant cannot make an informed decision about how best to respond without this information.

[34] Under the FERPA regulations, crimes of violence include arson; assault offenses (aggravated assault, simple assault, intimidation); burglary; criminal homicide (manslaughter by negligence); criminal homicide (murder and

EXHIBIT 8

disciplinary proceeding against the alleged perpetrator, regardless of whether the institution concluded that a violation was committed.[35] Additionally, a postsecondary institution may disclose to anyone—not just the alleged victim—the final results of a disciplinary proceeding if it determines that the student is an alleged perpetrator of a crime of violence or a non-forcible sex offense, and, with respect to the allegation made, the student has committed a violation of the institution's rules or policies.[36]

Postsecondary institutions also are subject to additional rules under the Clery Act. This law, which applies to postsecondary institutions that participate in Federal student financial aid programs, requires that "both the accuser and the accused must be informed of the outcome[37] of any institutional disciplinary proceeding brought alleging a sex offense."[38] Compliance with this requirement does not constitute a violation of FERPA. Furthermore, the FERPA limitations on redisclosure of information do not apply to information that postsecondary institutions are required to disclose under the Clery Act.[39] Accordingly, postsecondary institutions may not require a complainant to abide by a nondisclosure agreement, in writing or otherwise, that would prevent the redisclosure of this information.

## **Steps to Prevent Sexual Harassment and Sexual Violence and Correct its Discriminatory Effects on the Complainant and Others**

### **Education and Prevention**

In addition to ensuring full compliance with Title IX, schools should take proactive measures to prevent sexual harassment and violence. OCR recommends that all schools implement preventive education programs and make victim resources, including comprehensive victim services, available. Schools may want to include these education programs in their (1) orientation programs for new students, faculty, staff, and employees; (2) training for students who serve as advisors in residence halls; (3) training for student athletes and coaches; and (4) school assemblies and "back to school nights." These programs should include a

---

non-negligent manslaughter); destruction, damage or vandalism of property; kidnapping/abduction; robbery; and forcible sex offenses. Forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include rape, sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses are incest and statutory rape. 34 C.F.R. Part 99, App. A.

[35] 34 C.F.R. § 99.31(a)(13). For purposes of 34 C.F.R. §§ 99.31(a)(13)-(14), disclosure of "final results" is limited to the name of the alleged perpetrator, any violation found to have been committed, and any sanction imposed against the perpetrator by the school. 34 C.F.R. § 99.39.

[36] 34 C.F.R. § 99.31(a)(14).

[37] For purposes of the Clery Act, "outcome" means the institution's final determination with respect to the alleged sex offense and any sanctions imposed against the accused. 34 C.F.R. § 668.46(b)(11)(vi)(B).

[38] 34 C.F.R. § 668.46(b)(11)(vi)(B). Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the person is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses include incest and statutory rape. 34 C.F.R. Part 668, Subpt. D, App. A.

[39] 34 C.F.R. § 99.33(c).

EXHIBIT 8

Page 15 – Dear Colleague Letter: Sexual Violence

discussion of what constitutes sexual harassment and sexual violence, the school's policies and disciplinary procedures, and the consequences of violating these policies.

The education programs also should include information aimed at encouraging students to report incidents of sexual violence to the appropriate school and law enforcement authorities. Schools should be aware that victims or third parties may be deterred from reporting incidents if alcohol, drugs, or other violations of school or campus rules were involved.[40] As a result, schools should consider whether their disciplinary policies have a chilling effect on victims' or other students' reporting of sexual violence offenses. For example, OCR recommends that schools inform students that the schools' primary concern is student safety, that any other rules violations will be addressed separately from the sexual violence allegation, and that use of alcohol or drugs never makes the victim at fault for sexual violence.

OCR also recommends that schools develop specific sexual violence materials that include the schools' policies, rules, and resources for students, faculty, coaches, and administrators. Schools also should include such information in their employee handbook and any handbooks that student athletes and members of student activity groups receive. These materials should include where and to whom students should go if they are victims of sexual violence. These materials also should tell students and school employees what to do if they learn of an incident of sexual violence. Schools also should assess student activities regularly to ensure that the practices and behavior of students do not violate the schools' policies against sexual harassment and sexual violence.

**Remedies and Enforcement**

As discussed above, if a school determines that sexual harassment that creates a hostile environment has occurred, it must take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects. In addition to counseling or taking disciplinary action against the harasser, effective corrective action may require remedies for the complainant, as well as changes to the school's overall services or policies. Examples of these actions are discussed in greater detail below.

Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should undertake these steps promptly once it has notice of a sexual harassment or violence allegation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow students to change academic or living situations as appropriate. For instance, the school may prohibit the alleged perpetrator from having any contact with the complainant pending the results of the school's investigation. When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the

---

[40] The Department's Higher Education Center for Alcohol, Drug Abuse, and Violence Prevention (HEC) helps campuses and communities address problems of alcohol, other drugs, and violence by identifying effective strategies and programs based upon the best prevention science. Information on HEC resources and technical assistance can be found at www.higheredcenter.org.

EXHIBIT 8

Page 16 – Dear Colleague Letter: Sexual Violence

complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain. In addition, schools should ensure that complainants are aware of their Title IX rights and any available resources, such as counseling, health, and mental health services, and their right to file a complaint with local law enforcement.[41]

Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment. At a minimum, schools must ensure that complainants and their parents, if appropriate, know how to report any subsequent problems, and should follow-up with complainants to determine whether any retaliation or new incidents of harassment have occurred.

When OCR finds that a school has not taken prompt and effective steps to respond to sexual harassment or violence, OCR will seek appropriate remedies for both the complainant and the broader student population. When conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation.

Schools should proactively consider the following remedies when determining how to respond to sexual harassment or violence. These are the same types of remedies that OCR would seek in its cases.

Depending on the specific nature of the problem, remedies for the complainant might include, but are not limited to:[42]
- providing an escort to ensure that the complainant can move safely between classes and activities;
- ensuring that the complainant and alleged perpetrator do not attend the same classes;
- moving the complainant or alleged perpetrator to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;
- providing counseling services;
- providing medical services;
- providing academic support services, such as tutoring;

---

[41] The Clery Act requires postsecondary institutions to develop and distribute a statement of policy that informs students of their options to notify proper law enforcement authorities, including campus and local police, and the option to be assisted by campus personnel in notifying such authorities. The policy also must notify students of existing counseling, mental health, or other student services for victims of sexual assault, both on campus and in the community. 20 U.S.C. §§ 1092(f)(8)(B)(v)-(vi).

[42] Some of these remedies also can be used as interim measures before the school's investigation is complete.

EXHIBIT 8

Page 17 – Dear Colleague Letter: Sexual Violence

- arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record; and
- reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the harassment and the misconduct that may have resulted in the complainant being disciplined.[43]

Remedies for the broader student population might include, but are not limited to:

*Counseling and Training*
- offering counseling, health, mental health, or other holistic and comprehensive victim services to all students affected by sexual harassment or sexual violence, and notifying students of campus and community counseling, health, mental health, and other student services;
- designating an individual from the school's counseling center to be "on call" to assist victims of sexual harassment or violence whenever needed;
- training the Title IX coordinator and any other employees who are involved in processing, investigating, or resolving complaints of sexual harassment or sexual violence, including providing training on:
  - o the school's Title IX responsibilities to address allegations of sexual harassment or violence
  - o how to conduct Title IX investigations
  - o information on the link between alcohol and drug abuse and sexual harassment or violence and best practices to address that link;
- training all school law enforcement unit personnel on the school's Title IX responsibilities and handling of sexual harassment or violence complaints;
- training all employees who interact with students regularly on recognizing and appropriately addressing allegations of sexual harassment or violence under Title IX; and
- informing students of their options to notify proper law enforcement authorities, including school and local police, and the option to be assisted by school employees in notifying those authorities.

*Development of Materials and Implementation of Policies and Procedures*
- developing materials on sexual harassment and violence, which should be distributed to students during orientation and upon receipt of complaints, as well as widely posted throughout school buildings and residence halls, and which should include:
  - o what constitutes sexual harassment or violence
  - o what to do if a student has been the victim of sexual harassment or violence
  - o contact information for counseling and victim services on and off school grounds
  - o how to file a complaint with the school
  - o how to contact the school's Title IX coordinator

---

[43] For example, if the complainant was disciplined for skipping a class in which the harasser was enrolled, the school should review the incident to determine if the complainant skipped the class to avoid contact with the harasser.

EXHIBIT 8

Page 18 – Dear Colleague Letter: Sexual Violence

  - o   what the school will do to respond to allegations of sexual harassment or violence, including the interim measures that can be taken
- requiring the Title IX coordinator to communicate regularly with the school's law enforcement unit investigating cases and to provide information to law enforcement unit personnel regarding Title IX requirements;[44]
- requiring the Title IX coordinator to review all evidence in a sexual harassment or sexual violence case brought before the school's disciplinary committee to determine whether the complainant is entitled to a remedy under Title IX that was not available through the disciplinary committee;[45]
- requiring the school to create a committee of students and school officials to identify strategies for ensuring that students:
  - o   know the school's prohibition against sex discrimination, including sexual harassment and violence
  - o   recognize sex discrimination, sexual harassment, and sexual violence when they occur
  - o   understand how and to whom to report any incidents
  - o   know the connection between alcohol and drug abuse and sexual harassment or violence
  - o   feel comfortable that school officials will respond promptly and equitably to reports of sexual harassment or violence;
- issuing new policy statements or other steps that clearly communicate that the school does not tolerate sexual harassment and violence and will respond to any incidents and to any student who reports such incidents; and
- revising grievance procedures used to handle sexual harassment and violence complaints to ensure that they are prompt and equitable, as required by Title IX.

*School Investigations and Reports to OCR*
- conducting periodic assessments of student activities to ensure that the practices and behavior of students do not violate the school's policies against sexual harassment and violence;
- investigating whether any other students also may have been subjected to sexual harassment or violence;
- investigating whether school employees with knowledge of allegations of sexual harassment or violence failed to carry out their duties in responding to those allegations;
- conducting, in conjunction with student leaders, a school or campus "climate check" to assess the effectiveness of efforts to ensure that the school is free from sexual harassment and violence, and using the resulting information to inform future proactive steps that will be taken by the school; and

---

[44] Any personally identifiable information from a student's education record that the Title IX coordinator provides to the school's law enforcement unit is subject to FERPA's nondisclosure requirements.
[45] For example, the disciplinary committee may lack the power to implement changes to the complainant's class schedule or living situation so that he or she does not come in contact with the alleged perpetrator.

EXHIBIT 8

Page 19 – Dear Colleague Letter: Sexual Violence

- submitting to OCR copies of all grievances filed by students alleging sexual harassment or violence, and providing OCR with documentation related to the investigation of each complaint, such as witness interviews, investigator notes, evidence submitted by the parties, investigative reports and summaries, any final disposition letters, disciplinary records, and documentation regarding any appeals.

**Conclusion**

The Department is committed to ensuring that all students feel safe and have the opportunity to benefit fully from their schools' education programs and activities. As part of this commitment, OCR provides technical assistance to assist recipients in achieving voluntary compliance with Title IX.

If you need additional information about Title IX, have questions regarding OCR's policies, or seek technical assistance, please contact the OCR enforcement office that serves your state or territory. The list of offices is available at http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. Additional information about addressing sexual violence, including victim resources and information for schools, is available from the U.S. Department of Justice's Office on Violence Against Women (OVW) at http://www.ovw.usdoj.gov/.[46]

Thank you for your prompt attention to this matter. I look forward to continuing our work together to ensure that all students have an equal opportunity to learn in a safe and respectful school climate.

Sincerely,

/s/

Russlynn Ali
Assistant Secretary for Civil Rights

---

[46] OVW also administers the Grants to Reduce Domestic Violence, Dating Violence, Sexual Assault, and Stalking on Campus Program. This Federal funding is designed to encourage institutions of higher education to adopt comprehensive, coordinated responses to domestic violence, dating violence, sexual assault, and stalking. Under this competitive grant program, campuses, in partnership with community-based nonprofit victim advocacy organizations and local criminal justice or civil legal agencies, must adopt protocols and policies to treat these crimes as serious offenses and develop victim service programs and campus policies that ensure victim safety, offender accountability, and the prevention of such crimes. OVW recently released the first solicitation for the Services, Training, Education, and Policies to Reduce Domestic Violence, Dating Violence, Sexual Assault and Stalking in Secondary Schools Grant Program. This innovative grant program will support a broad range of activities, including training for school administrators, faculty, and staff; development of policies and procedures for responding to these crimes; holistic and appropriate victim services; development of effective prevention strategies; and collaborations with mentoring organizations to support middle and high school student victims.

EXHIBIT 8

# EXHIBIT 9

Archived Information



# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE FOR CIVIL RIGHTS

### THE ASSISTANT SECRETARY

### Questions and Answers on Title IX and Sexual Violence[1]

Title IX of the Education Amendments of 1972 ("Title IX")[2] is a federal civil rights law that prohibits discrimination on the basis of sex in federally funded education programs and activities. All public and private elementary and secondary schools, school districts, colleges, and universities receiving any federal financial assistance (hereinafter "schools", "recipients", or "recipient institutions") must comply with Title IX.[3]

On April 4, 2011, the Office for Civil Rights (OCR) in the U.S. Department of Education issued a Dear Colleague Letter on student-on-student sexual harassment and sexual violence ("DCL").[4] The DCL explains a school's responsibility to respond promptly and effectively to sexual violence against students in accordance with the requirements of Title IX.[5] Specifically, the DCL:

- Provides guidance on the unique concerns that arise in sexual violence cases, such as a school's independent responsibility under Title IX to investigate (apart from any separate criminal investigation by local police) and address sexual violence.

---

[1] The Department has determined that this document is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at* www.whitehouse.gov/sites/default/files/omb/fedreg/2007/012507_good_guidance.pdf. The Office for Civil Rights (OCR) issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This guidance does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, D.C. 20202.
[2] 20 U.S.C. § 1681 *et seq.*
[3] Throughout this document the term "schools" refers to recipients of federal financial assistance that operate educational programs or activities. For Title IX purposes, at the elementary and secondary school level, the recipient generally is the school district; and at the postsecondary level, the recipient is the individual institution of higher education. An educational institution that is controlled by a religious organization is exempt from Title IX to the extent that the law's requirements conflict with the organization's religious tenets. 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12(a). For application of this provision to a specific institution, please contact the appropriate OCR regional office.
[4] Available at http://www.ed.gov/ocr/letters/colleague-201104.html.
[5] Although this document and the DCL focus on sexual violence, the legal principles generally also apply to other forms of sexual harassment.

EXHIBIT 9

- Provides guidance and examples about key Title IX requirements and how they relate to sexual violence, such as the requirements to publish a policy against sex discrimination, designate a Title IX coordinator, and adopt and publish grievance procedures.

- Discusses proactive efforts schools can take to prevent sexual violence.

- Discusses the interplay between Title IX, the Family Educational Rights and Privacy Act ("FERPA"),[6] and the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act ("Clery Act")[7] as it relates to a complainant's right to know the outcome of his or her complaint, including relevant sanctions imposed on the perpetrator.

- Provides examples of remedies and enforcement strategies that schools and OCR may use to respond to sexual violence.

The DCL supplements OCR's *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, issued in 2001 (*2001 Guidance*).[8] The *2001 Guidance* discusses in detail the Title IX requirements related to sexual harassment of students by school employees, other students, or third parties. The DCL and the *2001 Guidance* remain in full force and we recommend reading these Questions and Answers in conjunction with these documents.

In responding to requests for technical assistance, OCR has determined that elementary and secondary schools and postsecondary institutions would benefit from additional guidance concerning their obligations under Title IX to address sexual violence as a form of sexual harassment. The following questions and answers further clarify the legal requirements and guidance articulated in the DCL and the *2001 Guidance* and include examples of proactive efforts schools can take to prevent sexual violence and remedies schools may use to end such conduct, prevent its recurrence, and address its effects. In order to gain a complete understanding of these legal requirements and recommendations, this document should be read in full.

Authorized by

 /s/

Catherine E. Lhamon                                        April 29, 2014
Assistant Secretary for Civil Rights

---

[6] 20 U.S.C. §1232g; 34 C.F.R. Part 99.
[7] 20 U.S.C. §1092(f).
[8] Available at http://www.ed.gov/ocr/docs/shguide.html.

EXHIBIT 9

## Notice of Language Assistance
## Questions and Answers on Title IX and Sexual Violence

**Notice of Language Assistance:** If you have difficulty understanding English, you may, free of charge, request language assistance services for this Department information by calling 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), or email us at: Ed.Language.Assistance@ed.gov.

**Aviso a personas con dominio limitado del idioma inglés:** Si usted tiene alguna dificultad en entender el idioma inglés, puede, sin costo alguno, solicitar asistencia lingüística con respecto a esta información llamando al 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o envíe un mensaje de correo electrónico a: Ed.Language.Assistance@ed.gov.

**給英語能力有限人士的通知:** 如果您不懂英語，或者使用英语有困难，您可以要求獲得向大眾提供的語言協助服務，幫助您理解教育部資訊。這些語言協助服務均可免費提供。如果您需要有關口譯或筆譯服務的詳細資訊，請致電 1-800-USA-LEARN (1-800-872-5327) (聽語障人士專線：1-800-877-8339),或電郵: Ed.Language.Assistance@ed.gov.。

**Thông báo dành cho những người có khả năng Anh ngữ hạn chế:** Nếu quý vị gặp khó khăn trong việc hiểu Anh ngữ thì quý vị có thể yêu cầu các dịch vụ hỗ trợ ngôn ngữ cho các tin tức của Bộ dành cho công chúng. Các dịch vụ hỗ trợ ngôn ngữ này đều miễn phí. Nếu quý vị muốn biết thêm chi tiết về các dịch vụ phiên dịch hay thông dịch, xin vui lòng gọi số 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), hoặc email: Ed.Language.Assistance@ed.gov.

**영어 미숙자를 위한 공고:** 영어를 이해하는 데 어려움이 있으신 경우, 교육부 정보 센터에 일반인 대상 언어 지원 서비스를 요청하실 수 있습니다. 이러한 언어 지원 서비스는 무료로 제공됩니다. 통역이나 번역 서비스에 대해 자세한 정보가 필요하신 경우, 전화번호 1-800-USA-LEARN (1-800-872-5327) 또는 청각 장애인용 전화번호 1-800-877-8339 또는 이메일주소 Ed.Language.Assistance@ed.gov 으로 연락하시기 바랍니다.

**Paunawa sa mga Taong Limitado ang Kaalaman sa English:** Kung nahihirapan kayong makaintindi ng English, maaari kayong humingi ng tulong ukol dito sa inpormasyon ng Kagawaran mula sa nagbibigay ng serbisyo na pagtulong kaugnay ng wika. Ang serbisyo na pagtulong kaugnay ng wika ay libre. Kung kailangan ninyo ng dagdag na impormasyon tungkol sa mga serbisyo kaugnay ng pagpapaliwanag o pagsasalin, mangyari lamang tumawag sa 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-877-8339), o mag-email sa: Ed.Language.Assistance@ed.gov.

**Уведомление для лиц с ограниченным знанием английского языка:** Если вы испытываете трудности в понимании английского языка, вы можете попросить, чтобы вам предоставили перевод информации, которую Министерство Образования доводит до всеобщего сведения. Этот перевод предоставляется бесплатно. Если вы хотите получить более подробную информацию об услугах устного и письменного перевода, звоните по телефону 1-800-USA-LEARN (1-800-872-5327) (служба для слабослышащих: 1-800-877-8339), или отправьте сообщение по адресу: Ed.Language.Assistance@ed.gov.

EXHIBIT 9

**TABLE OF CONTENTS**

Notice of Language Assistance ...................................................................................................iii

A.  A School's Obligation to Respond to Sexual Violence ............................................ 1

    A-1.  What is sexual violence?................................................................................1

    A-2.  How does Title IX apply to student-on-student sexual violence? .......................................1

    A-3.  How does OCR determine if a hostile environment has been created? ............................1

    A-4.  When does OCR consider a school to have notice of student-on-student sexual violence? ................................................................................................2

    A-5.  What are a school's basic responsibilities to address student-on-student sexual violence? ................................................................................................2

    A-6.  Does Title IX cover employee-on-student sexual violence, such as sexual abuse of children? ................................................................................................3

B.  Students Protected by Title IX ........................................................................... 5

    B-1.  Does Title IX protect all students from sexual violence?.....................................5

    B-2.  How should a school handle sexual violence complaints in which the complainant and the alleged perpetrator are members of the same sex?...............................5

    B-3.  What issues may arise with respect to students with disabilities who experience sexual violence? .............................................................................................6

    B-4.  What issues arise with respect to international students and undocumented students who experience sexual violence? ..........................................................7

    B-5.  How should a school respond to sexual violence when the alleged perpetrator is not affiliated with the school?.........................................................................9

C.  Title IX Procedural Requirements ...................................................................... 9

    C-1.  What procedures must a school have in place to prevent sexual violence and resolve complaints? ........................................................................................9

    C-2.  What information must be included in a school's notice of nondiscrimination? .............10

    C-3.  What are a Title IX coordinator's responsibilities?.............................................10

    C-4.  Are there any employees who should not serve as the Title IX coordinator? ..................11

    C-5.  Under Title IX, what elements should be included in a school's procedures for responding to complaints of sexual violence?...................................................12

    C-6.  Is a school required to use separate grievance procedures for sexual violence complaints?...................................................................................................14

EXHIBIT 9

**D.   Responsible Employees and Reporting** ................................................................**14**

D-1.   Which school employees are obligated to report incidents of possible sexual violence to school officials? ................................................................ 14

D-2.   Who is a "responsible employee"? ................................................................ 15

D-3.   What information is a responsible employee obligated to report about an incident of possible student-on-student sexual violence? ................................ 16

D-4.   What should a responsible employee tell a student who discloses an incident of sexual violence? ................................................................................ 16

D-5.   If a student informs a resident assistant/advisor (RA) that he or she was subjected to sexual violence by a fellow student, is the RA obligated under Title IX to report the incident to school officials? ................................................ 17

**E.   Confidentiality and a School's Obligation to Respond to Sexual Violence** .............................**18**

E-1.   How should a school respond to a student's request that his or her name not be disclosed to the alleged perpetrator or that no investigation or disciplinary action be pursued to address the alleged sexual violence? ........................... 18

E-2.   What factors should a school consider in weighing a student's request for confidentiality? ................................................................................ 21

E-3.   What are the reporting responsibilities of school employees who provide or support the provision of counseling, advocacy, health, mental health, or sexual assault-related services to students who have experienced sexual violence? ................ 22

E-4.   Is a school required to investigate information regarding sexual violence incidents shared by survivors during public awareness events, such as "Take Back the Night"? ................................................................................ 24

**F.   Investigations and Hearings** ................................................................**24**

F-1.   What elements should a school's Title IX investigation include? ....................... 24

F-2.   What are the key differences between a school's Title IX investigation into allegations of sexual violence and a criminal investigation? ........................... 27

F-3.   How should a school proceed when campus or local law enforcement agencies are conducting a criminal investigation while the school is conducting a parallel Title IX investigation? ................................................................................ 28

F-4.   Is a school required to process complaints of alleged sexual violence that occurred off campus? ................................................................................ 29

F-5.   Must a school allow or require the parties to be present during an entire hearing? ........ 30

EXHIBIT 9

F-6.  May every witness at the hearing, including the parties, be cross-examined? ................ 31

F-7.  May the complainant's sexual history be introduced at hearings? ................................... 31

F-8.  What stages of the investigation are included in the 60-day timeframe referenced
      in the DCL as the length for a typical investigation? .......................................... 31

G.  **Interim Measures** ............................................................................................**32**

G-1.  Is a school required to take any interim measures before the completion of its
      investigation? ................................................................................................. 32

G-2.  How should a school determine what interim measures to take? .................................... 33

G-3.  If a school provides all students with access to counseling on a fee basis, does that
      suffice for providing counseling as an interim measure? ................................................ 33

H.  **Remedies and Notice of Outcome** ................................................................**34**

H-1.  What remedies should a school consider in a case of student-on-student sexual
      violence? ......................................................................................................... 34

H-2.  If, after an investigation, a school finds the alleged perpetrator responsible and
      determines that, as part of the remedies for the complainant, it must separate the
      complainant and perpetrator, how should the school accomplish this if both
      students share the same major and there are limited course options? ........................... 36

H-3.  What information must be provided to the complainant in the notice of the
      outcome? ......................................................................................................... 36

I.  **Appeals** ......................................................................................................**37**

I-1.  What are the requirements for an appeals process? ...................................................... 37

I-2.  Must an appeal be available to a complainant who receives a favorable finding but
      does not believe a sanction that directly relates to him or her was sufficient? ............... 38

J.  **Title IX Training, Education and Prevention** ....................................................**38**

J-1.  What type of training on Title IX and sexual violence should a school provide to its
      employees? ....................................................................................................... 38

J-2.  How should a school train responsible employees to report incidents of possible
      sexual harassment or sexual violence? ..................................................................... 39

J-3.  What type of training should a school provide to employees who are involved in
      implementing the school's grievance procedures? ....................................................... 40

J-4.  What type of training on sexual violence should a school provide to its students? .......... 41

EXHIBIT 9

**K.  Retaliation** .................................................................................................**42**

    K-1.  Does Title IX protect against retaliation? ............................................ 42

**L.  First Amendment** .........................................................................................**43**

    L-1.  How should a school handle its obligation to respond to sexual harassment and sexual violence while still respecting free-speech rights guaranteed by the Constitution? ........................................................................................... 43

**M.  The Clery Act and the Violence Against Women Reauthorization Act of 2013** ......................**44**

    M-1. How does the Clery Act affect the Title IX obligations of institutions of higher education that participate in the federal student financial aid programs? ...................... 44

    M-2. Were a school's obligations under Title IX and the DCL altered in any way by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, including Section 304 of that Act, which amends the Clery Act? ...................................... 44

**N.  Further Federal Guidance** ...........................................................................**45**

    N-1.  Whom should I contact if I have additional questions about the DCL or OCR's other Title IX guidance? ................................................................................... 45

    N-2.  Are there other resources available to assist a school in complying with Title IX and preventing and responding to sexual violence? ................................................ 45

EXHIBIT 9

### A. A School's Obligation to Respond to Sexual Violence

**A-1.  What is sexual violence?**

    **Answer:**  Sexual violence, as that term is used in this document and prior OCR guidance, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent (*e.g.*, due to the student's age or use of drugs or alcohol, or because an intellectual or other disability prevents the student from having the capacity to give consent). A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse, and sexual coercion. Sexual violence can be carried out by school employees, other students, or third parties. All such acts of sexual violence are forms of sex discrimination prohibited by Title IX.

**A-2.  How does Title IX apply to student-on-student sexual violence?**

    **Answer:**  Under Title IX, federally funded schools must ensure that students of all ages are not denied or limited in their ability to participate in or benefit from the school's educational programs or activities on the basis of sex. A school violates a student's rights under Title IX regarding student-on-student sexual violence when the following conditions are met: (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program, *i.e.* creates a hostile environment; and (2) the school, upon notice, fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.[9]

**A-3.  How does OCR determine if a hostile environment has been created?**

    **Answer:**  As discussed more fully in OCR's *2001 Guidance*, OCR considers a variety of related factors to determine if a hostile environment has been created; and also considers the conduct in question from both a subjective and an objective perspective. Specifically, OCR's standards require that the conduct be evaluated from the perspective of a reasonable person in the alleged victim's position, considering all the circumstances. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. Indeed, a single or isolated incident of sexual violence may create a hostile environment.

---

[9] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13.  The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629, 643 (1999).

EXHIBIT 9

**A-4.   When does OCR consider a school to have notice of student-on-student sexual violence?**

**Answer:**  OCR deems a school to have notice of student-on-student sexual violence if a responsible employee knew, or in the exercise of reasonable care should have known, about the sexual violence. See question D-2 regarding who is a responsible employee.

A school can receive notice of sexual violence in many different ways. Some examples of notice include: a student may have filed a grievance with or otherwise informed the school's Title IX coordinator; a student, parent, friend, or other individual may have reported an incident to a teacher, principal, campus law enforcement, staff in the office of student affairs, or other responsible employee; or a teacher or dean may have witnessed the sexual violence.

The school may also receive notice about sexual violence in an indirect manner, from sources such as a member of the local community, social networking sites, or the media. In some situations, if the school knows of incidents of sexual violence, the exercise of reasonable care should trigger an investigation that would lead to the discovery of additional incidents. For example, if school officials receive a credible report that a student has perpetrated several acts of sexual violence against different students, that pattern of conduct should trigger an inquiry as to whether other students have been subjected to sexual violence by that student. In other cases, the pervasiveness of the sexual violence may be widespread, openly practiced, or well-known among students or employees. In those cases, OCR may conclude that the school should have known of the hostile environment. In other words, if the school would have found out about the sexual violence had it made a proper inquiry, knowledge of the sexual violence will be imputed to the school even if the school failed to make an inquiry. A school's failure to take prompt and effective corrective action in such cases (as described in questions G-1 to G-3 and H-1 to H-3) would violate Title IX even if the student did not use the school's grievance procedures or otherwise inform the school of the sexual violence.

**A-5.   What are a school's basic responsibilities to address student-on-student sexual violence?**

**Answer:**  When a school knows or reasonably should know of possible sexual violence, it must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E). If an investigation reveals that sexual violence created a hostile environment, the school must then take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its

EXHIBIT 9

effects. But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities.

Title IX requires a school to protect the complainant and ensure his or her safety as necessary, including taking interim steps before the final outcome of any investigation.[10] The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation. If the school determines that the sexual violence occurred, the school must continue to take these steps to protect the complainant and ensure his or her safety, as necessary. The school should also ensure that the complainant is aware of any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement. For additional information on interim measures, see questions G-1 to G-3.

If a school delays responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to a hostile environment. If it does, the school will also be required to remedy the effects of the sexual violence that could reasonably have been prevented had the school responded promptly and appropriately. For example, if a school's ignoring of a student's complaints of sexual assault by a fellow student results in the complaining student having to remain in classes with the other student for several weeks and the complaining student's grades suffer because he or she was unable to concentrate in these classes, the school may need to permit the complaining student to retake the classes without an academic or financial penalty (in addition to any other remedies) in order to address the effects of the sexual violence.

**A-6. Does Title IX cover employee-on-student sexual violence, such as sexual abuse of children?**

**Answer:** Yes. Although this document and the DCL focus on student-on-student sexual violence, Title IX also protects students from other forms of sexual harassment (including sexual violence and sexual abuse), such as sexual harassment carried out by school employees. Sexual harassment by school employees can include unwelcome sexual advances; requests for sexual favors; and other verbal, nonverbal, or physical conduct of a sexual nature, including but not limited to sexual activity. Title IX's prohibition against

---

[10] Throughout this document, unless otherwise noted, the term "complainant" refers to the student who allegedly experienced the sexual violence.

EXHIBIT 9

sexual harassment generally does not extend to legitimate nonsexual touching or other nonsexual conduct. But in some circumstances, nonsexual conduct may take on sexual connotations and rise to the level of sexual harassment. For example, a teacher repeatedly hugging and putting his or her arms around students under inappropriate circumstances could create a hostile environment. Early signs of inappropriate behavior with a child can be the key to identifying and preventing sexual abuse by school personnel.

A school's Title IX obligations regarding sexual harassment by employees can, in some instances, be greater than those described in this document and the DCL. Recipients should refer to OCR's *2001 Guidance* for further information about Title IX obligations regarding harassment of students by school employees. In addition, many state and local laws have mandatory reporting requirements for schools working with minors. Recipients should be careful to satisfy their state and local legal obligations in addition to their Title IX obligations, including training to ensure that school employees are aware of their obligations under such state and local laws and the consequences for failing to satisfy those obligations.

With respect to sexual activity in particular, OCR will always view as unwelcome and nonconsensual sexual activity between an adult school employee and an elementary school student or any student below the legal age of consent in his or her state. In cases involving a student who meets the legal age of consent in his or her state, there will still be a strong presumption that sexual activity between an adult school employee and a student is unwelcome and nonconsensual. When a school is on notice that a school employee has sexually harassed a student, it is responsible for taking prompt and effective steps reasonably calculated to end the sexual harassment, eliminate the hostile environment, prevent its recurrence, and remedy its effects. Indeed, even if a school was not on notice, the school is nonetheless responsible for remedying any effects of the sexual harassment on the student, as well as for ending the sexual harassment and preventing its recurrence, when the employee engaged in the sexual activity in the context of the employee's provision of aid, benefits, or services to students (*e.g.*, teaching, counseling, supervising, advising, or transporting students).

A school should take steps to protect its students from sexual abuse by its employees. It is therefore imperative for a school to develop policies prohibiting inappropriate conduct by school personnel and procedures for identifying and responding to such conduct. For example, this could include implementing codes of conduct, which might address what is commonly known as grooming – a desensitization strategy common in adult educator sexual misconduct. Such policies and procedures can ensure that students, parents, and

school personnel have clear guidelines on what are appropriate and inappropriate interactions between adults and students in a school setting or in school-sponsored activities. Additionally, a school should provide training for administrators, teachers, staff, parents, and age-appropriate classroom information for students to ensure that everyone understands what types of conduct are prohibited and knows how to respond when problems arise.[11]

**B.  Students Protected by Title IX**

**B-1.  Does Title IX protect all students from sexual violence?**

**Answer:**  Yes. Title IX protects all students at recipient institutions from sex discrimination, including sexual violence. Any student can experience sexual violence: from elementary to professional school students; male and female students; straight, gay, lesbian, bisexual and transgender students; part-time and full-time students; students with and without disabilities; and students of different races and national origins.

**B-2.  How should a school handle sexual violence complaints in which the complainant and the alleged perpetrator are members of the same sex?**

**Answer:**  A school's obligation to respond appropriately to sexual violence complaints is the same irrespective of the sex or sexes of the parties involved. Title IX protects all students from sexual violence, regardless of the sex of the alleged perpetrator or complainant, including when they are members of the same sex. A school must investigate and resolve allegations of sexual violence involving parties of the same sex using the same procedures and standards that it uses in all complaints involving sexual violence.

Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity and OCR accepts such complaints for investigation. Similarly, the actual or perceived sexual orientation or gender identity of the parties does not change a school's obligations. Indeed, lesbian, gay, bisexual, and transgender (LGBT) youth report high rates of sexual harassment and sexual violence. A school should investigate and resolve allegations of sexual violence regarding LGBT students using the same procedures and standards that it

---

[11] For additional informational on training please see the Department of Education's Resource and Emergency Management for Schools Technical Assistance Center – Adult Sexual Misconduct in Schools: Prevention and Management Training, available at http://rems.ed.gov/Docs/ASM_Marketing_Flyer.pdf.

EXHIBIT 9

uses in all complaints involving sexual violence. The fact that incidents of sexual violence may be accompanied by anti-gay comments or be partly based on a student's actual or perceived sexual orientation does not relieve a school of its obligation under Title IX to investigate and remedy those instances of sexual violence.

If a school's policies related to sexual violence include examples of particular types of conduct that violate the school's prohibition on sexual violence, the school should consider including examples of same-sex conduct. In addition, a school should ensure that staff are capable of providing culturally competent counseling to all complainants. Thus, a school should ensure that its counselors and other staff who are responsible for receiving and responding to complaints of sexual violence, including investigators and hearing board members, receive appropriate training about working with LGBT and gender-nonconforming students and same-sex sexual violence. See questions J-1 to J-4 for additional information regarding training.

Gay-straight alliances and similar student-initiated groups can also play an important role in creating safer school environments for LGBT students. On June 14, 2011, the Department issued guidance about the rights of student-initiated groups in public secondary schools under the Equal Access Act. That guidance is available at http://www2.ed.gov/policy/elsec/guid/secletter/110607.html.

**B-3.  What issues may arise with respect to students with disabilities who experience sexual violence?**

**Answer:**  When students with disabilities experience sexual violence, federal civil rights laws other than Title IX may also be relevant to a school's responsibility to investigate and address such incidents.[12] Certain students require additional assistance and support. For example, students with intellectual disabilities may need additional help in learning about sexual violence, including a school's sexual violence education and prevention programs, what constitutes sexual violence and how students can report incidents of sexual

---

[12] OCR enforces two civil rights laws that prohibit disability discrimination. Section 504 of the Rehabilitation Act of 1973 (Section 504) prohibits disability discrimination by public or private entities that receive federal financial assistance, and Title II of the American with Disabilities Act of 1990 (Title II) prohibits disability discrimination by all state and local public entities, regardless of whether they receive federal funding. *See* 29 U.S.C. § 794 and 34 C.F.R. part 104; 42 U.S.C. § 12131 *et seq.* and 28 C.F.R. part 35. OCR and the U.S. Department of Justice (DOJ) share the responsibility of enforcing Title II in the educational context. The Department of Education's Office of Special Education Programs in the Office of Special Education and Rehabilitative Services administers Part B of the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. 1400 *et seq.* and 34 C.F.R. part 300. IDEA provides financial assistance to states, and through them to local educational agencies, to assist in providing special education and related services to eligible children with disabilities ages three through twenty-one, inclusive.

EXHIBIT 9

violence. In addition, students with disabilities who experience sexual violence may require additional services and supports, including psychological services and counseling services. Postsecondary students who need these additional services and supports can seek assistance from the institution's disability resource office.

A student who has not been previously determined to have a disability may, as a result of experiencing sexual violence, develop a mental health-related disability that could cause the student to need special education and related services. At the elementary and secondary education level, this may trigger a school's child find obligations under IDEA and the evaluation and placement requirements under Section 504, which together require a school to evaluate a student suspected of having a disability to determine if he or she has a disability that requires special education or related aids and services.[13]

A school must also ensure that any school reporting forms, information, or training about sexual violence be provided in a manner that is accessible to students and employees with disabilities, for example, by providing electronically-accessible versions of paper forms to individuals with print disabilities, or by providing a sign language interpreter to a deaf individual attending a training. See question J-4 for more detailed information on student training.

**B-4.  What issues arise with respect to international students and undocumented students who experience sexual violence?**

**Answer:** Title IX protects all students at recipient institutions in the United States regardless of national origin, immigration status, or citizenship status.[14] A school should ensure that all students regardless of their immigration status, including undocumented students and international students, are aware of their rights under Title IX. A school must also ensure that any school reporting forms, information, or training about sexual violence be provided in a manner accessible to students who are English language learners. OCR recommends that a school coordinate with its international office and its undocumented student program coordinator, if applicable, to help communicate information about Title IX in languages that are accessible to these groups of students. OCR also encourages schools to provide foreign national complainants with information about the U nonimmigrant status and the T nonimmigrant status. The U nonimmigrant status is set

---

[13] *See* 34 C.F.R. §§ 300.8; 300.111; 300.201; 300.300-300.311 (IDEA); 34 C.F.R. §§ 104.3(j) and 104.35 (Section 504). Schools must comply with applicable consent requirements with respect to evaluations. *See* 34 C.F.R. § 300.300.
[14] OCR enforces Title VI of the Civil Rights Act of 1964, which prohibits discrimination by recipients of federal financial assistance on the basis of race, color, or national origin. 42 U.S.C. § 2000d.

EXHIBIT 9

aside for victims of certain crimes who have suffered substantial mental or physical abuse as a result of the crime and are helpful to law enforcement agency in the investigation or prosecution of the qualifying criminal activity.[15]  The T nonimmigrant status  is available for victims of severe forms of human trafficking who generally comply with a law enforcement agency in the investigation or prosecution of the human trafficking and who would suffer extreme hardship involving unusual and severe harm if they were removed from the United States.[16]

A school should be mindful that unique issues may arise when a foreign student on a student visa experiences sexual violence. For example, certain student visas require the student to maintain a full-time course load (generally at least 12 academic credit hours per term), but a student may need to take a reduced course load while recovering from the immediate effects of the sexual violence. OCR recommends that a school take steps to ensure that international students on student visas understand that they must typically seek prior approval of the designated school official (DSO) for student visas to drop below a full-time course load. A school may also want to encourage its employees involved in handling sexual violence complaints and counseling students who have experienced sexual violence to approach the DSO on the student's behalf if the student wishes to drop below a full-time course load. OCR recommends that a school take steps to ensure that its employees who work with international students, including the school's DSO, are trained on the school's sexual violence policies and that employees involved in handling sexual violence complaints and counseling students who have experienced sexual violence are aware of the special issues that international students may encounter. See questions J-1 to J-4 for additional information regarding training.

A school should also be aware that threatening students with deportation or invoking a student's immigration status in an attempt to intimidate or deter a student from filing a Title IX complaint would violate Title IX's protections against retaliation. For more information on retaliation see question K-1.

---

[15] For more information on the U nonimmigrant status, see http://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/questions-answers-victims-criminal-activity-u-nonimmigrant-status.

[16] For more information on the T nonimmigrant status, see http://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-human-trafficking-t-nonimmigrant-status.

EXHIBIT 9

**B-5.** **How should a school respond to sexual violence when the alleged perpetrator is not affiliated with the school?**

**Answer:** The appropriate response will differ depending on the level of control the school has over the alleged perpetrator. For example, if an athlete or band member from a visiting school sexually assaults a student at the home school, the home school may not be able to discipline or take other direct action against the visiting athlete or band member. However (and subject to the confidentiality provisions discussed in Section E), it should conduct an inquiry into what occurred and should report the incident to the visiting school and encourage the visiting school to take appropriate action to prevent further sexual violence. The home school should also notify the student of any right to file a complaint with the alleged perpetrator's school or local law enforcement. The home school may also decide not to invite the visiting school back to its campus.

Even though a school's ability to take direct action against a particular perpetrator may be limited, the school must still take steps to provide appropriate remedies for the complainant and, where appropriate, the broader school population. This may include providing support services for the complainant, and issuing new policy statements making it clear that the school does not tolerate sexual violence and will respond to any reports about such incidents. For additional information on interim measures see questions G-1 to G-3.

**C.**  **Title IX Procedural Requirements**

*Overview*

**C-1.** **What procedures must a school have in place to prevent sexual violence and resolve complaints?**

**Answer:** The Title IX regulations outline three key procedural requirements. Each school must:

(1) disseminate a notice of nondiscrimination (see question C-2);[17]

(2) designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX (see questions C-3 to C-4);[18] and

---

[17] 34 C.F.R. § 106.9.
[18] *Id.* § 106.8(a).

EXHIBIT 9

(3) adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee sex discrimination complaints (see questions C-5 to C-6).[19]

These requirements apply to all forms of sex discrimination and are particularly important for preventing and effectively responding to sexual violence.

Procedural requirements under other federal laws may also apply to complaints of sexual violence, including the requirements of the Clery Act.[20] For additional information about the procedural requirements in the Clery Act, please see http://www2.ed.gov/admins/lead/safety/campus.html.

*Notice of Nondiscrimination*

**C-2.  What information must be included in a school's notice of nondiscrimination?**

**Answer:**  The notice of nondiscrimination must state that the school does not discriminate on the basis of sex in its education programs and activities, and that it is required by Title IX not to discriminate in such a manner. The notice must state that questions regarding Title IX may be referred to the school's Title IX coordinator or to OCR. The school must notify all of its students and employees of the name or title, office address, telephone number, and email address of the school's designated Title IX coordinator.[21]

*Title IX Coordinator*

**C-3.  What are a Title IX coordinator's responsibilities?**

**Answer:**  A Title IX coordinator's core responsibilities include overseeing the school's response to Title IX reports and complaints and identifying and addressing any patterns or systemic problems revealed by such reports and complaints. This means that the Title IX coordinator must have knowledge of the requirements of Title IX, of the school's own policies and procedures on sex discrimination, and of all complaints raising Title IX issues throughout the school. To accomplish this, subject to the exemption for school counseling employees discussed in question E-3, the Title IX coordinator must be informed of all

---

[19] *Id.* § 106.8(b).

[20] All postsecondary institutions participating in the Higher Education Act's Title IV student financial assistance programs must comply with the Clery Act.

[21] For more information on notices of nondiscrimination, please see OCR's Notice of Nondiscrimination (August 2010), available at http://www.ed.gov/ocr/docs/nondisc.pdf.

EXHIBIT 9

reports and complaints raising Title IX issues, even if the report or complaint was initially filed with another individual or office or if the investigation will be conducted by another individual or office. The school should ensure that the Title IX coordinator is given the training, authority, and visibility necessary to fulfill these responsibilities.

Because the Title IX coordinator must have knowledge of all Title IX reports and complaints at the school, this individual (when properly trained) is generally in the best position to evaluate a student's request for confidentiality in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students. A school may determine, however, that another individual should perform this role. For additional information on confidentiality requests, see questions E-1 to E-4. If a school relies in part on its disciplinary procedures to meet its Title IX obligations, the Title IX coordinator should review the disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX as discussed in question C-5.

In addition to these core responsibilities, a school may decide to give its Title IX coordinator additional responsibilities, such as: providing training to students, faculty, and staff on Title IX issues; conducting Title IX investigations, including investigating facts relevant to a complaint, and determining appropriate sanctions against the perpetrator and remedies for the complainant; determining appropriate interim measures for a complainant upon learning of a report or complaint of sexual violence; and ensuring that appropriate policies and procedures are in place for working with local law enforcement and coordinating services with local victim advocacy organizations and service providers, including rape crisis centers. A school must ensure that its Title IX coordinator is appropriately trained in all areas over which he or she has responsibility. The Title IX coordinator or designee should also be available to meet with students as needed.

If a school designates more than one Title IX coordinator, the school's notice of nondiscrimination and Title IX grievance procedures should describe each coordinator's responsibilities, and one coordinator should be designated as having ultimate oversight responsibility.

**C-4. Are there any employees who should not serve as the Title IX coordinator?**

**Answer:** Title IX does not categorically preclude particular employees from serving as Title IX coordinators. However, Title IX coordinators should not have other job responsibilities that may create a conflict of interest. Because some complaints may raise issues as to whether or how well the school has met its Title IX obligations, designating

EXHIBIT 9

the same employee to serve both as the Title IX coordinator and the general counsel (which could include representing the school in legal claims alleging Title IX violations) poses a serious risk of a conflict of interest. Other employees whose job responsibilities may conflict with a Title IX coordinator's responsibilities include Directors of Athletics, Deans of Students, and any employee who serves on the judicial/hearing board or to whom an appeal might be made. Designating a full-time Title IX coordinator will minimize the risk of a conflict of interest.

*Grievance Procedures*

**C-5.   Under Title IX, what elements should be included in a school's procedures for responding to complaints of sexual violence?**

**Answer:** Title IX requires that a school adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints of sex discrimination, including sexual violence. In evaluating whether a school's grievance procedures satisfy this requirement, OCR will review all aspects of a school's policies and practices, including the following elements that are critical to achieve compliance with Title IX:

   (1)   notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;

   (2)   application of the grievance procedures to complaints filed by students or on their behalf alleging sexual violence carried out by employees, other students, or third parties;

   (3)   provisions for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence;

   (4)   designated and reasonably prompt time frames for the major stages of the complaint process (see question F-8);

   (5)   written notice to the complainant and alleged perpetrator of the outcome of the complaint (see question H-3); and

   (6)   assurance that the school will take steps to prevent recurrence of any sexual violence and remedy discriminatory effects on the complainant and others, if appropriate.

EXHIBIT 9

To ensure that students and employees have a clear understanding of what constitutes sexual violence, the potential consequences for such conduct, and how the school processes complaints, a school's Title IX grievance procedures should also explicitly include the following in writing, some of which themselves are mandatory obligations under Title IX:

(1)   a statement of the school's jurisdiction over Title IX complaints;

(2)   adequate definitions of sexual harassment (which includes sexual violence) and an explanation as to when such conduct creates a hostile environment;

(3)   reporting policies and protocols, including provisions for confidential reporting;

(4)   identification of the employee or employees responsible for evaluating requests for confidentiality;

(5)   notice that Title IX prohibits retaliation;

(6)   notice of a student's right to file a criminal complaint and a Title IX complaint simultaneously;

(7)   notice of available interim measures that  may be taken to protect the student in the educational setting;

(8)   the evidentiary standard that must be used (preponderance of the evidence) (*i.e.*, more likely than not that sexual violence occurred) in resolving a complaint;

(9)   notice of potential remedies for students;

(10)  notice of potential sanctions against perpetrators; and

(11)  sources of counseling, advocacy, and support.

For more information on interim measures, see questions G-1 to G-3.

The rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights. Procedures that ensure the Title IX rights of the complainant, while at the same time according any federally guaranteed due process to both parties involved, will lead to sound and supportable decisions. Of course, a school should ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant.

EXHIBIT 9

A school's procedures and practices will vary in detail, specificity, and components, reflecting differences in the age of its students, school size and administrative structure, state or local legal requirements (*e.g.*, mandatory reporting requirements for schools working with minors), and what it has learned from past experiences.

**C-6.  Is a school required to use separate grievance procedures for sexual violence complaints?**

**Answer:**  No. Under Title IX, a school may use student disciplinary procedures, general Title IX grievance procedures, sexual harassment procedures, or separate procedures to resolve sexual violence complaints. However, any procedures used for sexual violence complaints, including disciplinary procedures, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution (as discussed in question C-5), including applying the preponderance of the evidence standard of review. As discussed in question C-3, the Title IX coordinator should review any process used to resolve complaints of sexual violence to ensure it complies with requirements for prompt and equitable resolution of these complaints. When using disciplinary procedures, which are often focused on the alleged perpetrator and can take considerable time, a school should be mindful of its obligation to provide interim measures to protect the complainant in the educational setting. For more information on timeframes and interim measures, see questions F-8 and G-1 to G-3.

**D.  Responsible Employees and Reporting**[22]

**D-1.  Which school employees are obligated to report incidents of possible sexual violence to school officials?**

**Answer:**  Under Title IX, whether an individual is obligated to report incidents of alleged sexual violence generally depends on whether the individual is a responsible employee of the school. A responsible employee must report incidents of sexual violence to the Title IX coordinator or other appropriate school designee, subject to the exemption for school counseling employees discussed in question E-3. This is because, as discussed in question A-4, a school is obligated to address sexual violence about which a responsible employee knew or should have known. As explained in question C-3, the Title IX coordinator must be informed of all reports and complaints raising Title IX issues, even if the report or

---

[22] This document addresses only Title IX's reporting requirements. It does not address requirements under the Clery Act or other federal, state, or local laws, or an individual school's code of conduct.

EXHIBIT 9

complaint was initially filed with another individual or office, subject to the exemption for school counseling employees discussed in question E-3.

**D-2.  Who is a "responsible employee"?**

**Answer**:  According to OCR's *2001 Guidance*, a responsible employee includes any employee: who has the authority to take action to redress sexual violence; who has been given the duty of reporting incidents of sexual violence or any other misconduct by students to the Title IX coordinator or other appropriate school designee; or whom a student could reasonably believe has this authority or duty.[23]

A school must make clear to all of its employees and students which staff members are responsible employees so that students can make informed decisions about whether to disclose information to those employees. A school must also inform all employees of their own reporting responsibilities and the importance of informing complainants of: the reporting obligations of responsible employees; complainants' option to request confidentiality and available confidential advocacy, counseling, or other support services; and complainants' right to file a Title IX complaint with the school and to report a crime to campus or local law enforcement.

Whether an employee is a responsible employee will vary depending on factors such as the age and education level of the student, the type of position held by the employee, and consideration of both formal and informal school practices and procedures. For example, while it may be reasonable for an elementary school student to believe that a custodial staff member or cafeteria worker has the authority or responsibility to address student misconduct, it is less reasonable for a college student to believe that a custodial staff member or dining hall employee has this same authority.

As noted in response to question A-4, when a responsible employee knows or reasonably should know of possible sexual violence, OCR deems a school to have notice of the sexual violence. The school must take immediate and appropriate steps to investigate or otherwise determine what occurred (subject to the confidentiality provisions discussed in Section E), and, if the school determines that sexual violence created a hostile environment, the school must then take appropriate steps to address the situation. The

---

[23] The Supreme Court held that a school will only be liable for money damages in a private lawsuit where there is actual notice to a school official with the authority to address the alleged discrimination and take corrective action. *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 290 (1998), and *Davis*, 524 U.S. at 642. The concept of a "responsible employee" under OCR's guidance for administrative enforcement of Title IX is broader.

EXHIBIT 9

school has this obligation regardless of whether the student, student's parent, or a third party files a formal complaint. For additional information on a school's responsibilities to address student-on-student sexual violence, see question A-5. For additional information on training for school employees, see questions J-1 to J-3.

**D-3. What information is a responsible employee obligated to report about an incident of possible student-on-student sexual violence?**

**Answer:** Subject to the exemption for school counseling employees discussed in question E-3, a responsible employee must report to the school's Title IX coordinator, or other appropriate school designee, all relevant details about the alleged sexual violence that the student or another person has shared and that the school will need to determine what occurred and to resolve the situation. This includes the names of the alleged perpetrator (if known), the student who experienced the alleged sexual violence, other students involved in the alleged sexual violence, as well as relevant facts, including the date, time, and location. A school must make clear to its responsible employees to whom they should report an incident of alleged sexual violence.

To ensure compliance with these reporting obligations, it is important for a school to train its responsible employees on Title IX and the school's sexual violence policies and procedures. For more information on appropriate training for school employees, see question J-1 to J-3.

**D-4. What should a responsible employee tell a student who discloses an incident of sexual violence?**

**Answer**: Before a student reveals information that he or she may wish to keep confidential, a responsible employee should make every effort to ensure that the student understands: (i) the employee's obligation to report the names of the alleged perpetrator and student involved in the alleged sexual violence, as well as relevant facts regarding the alleged incident (including the date, time, and location), to the Title IX coordinator or other appropriate school officials, (ii) the student's option to request that the school maintain his or her confidentiality, which the school (*e.g.*, Title IX coordinator) will consider, and (iii) the student's ability to share the information confidentially with counseling, advocacy, health, mental health, or sexual-assault-related services (*e.g.*, sexual assault resource centers, campus health centers, pastoral counselors, and campus mental health centers). As discussed in questions E-1 and E-2, if the student requests confidentiality, the Title IX coordinator or other appropriate school designee responsible for evaluating requests for confidentiality should make every effort to respect this request

and should evaluate the request in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students.

**D-5. If a student informs a resident assistant/advisor (RA) that he or she was subjected to sexual violence by a fellow student, is the RA obligated under Title IX to report the incident to school officials?**

**Answer:** As discussed in questions D-1 and D-2, for Title IX purposes, whether an individual is obligated under Title IX to report alleged sexual violence to the school's Title IX coordinator or other appropriate school designee generally depends on whether the individual is a responsible employee.

The duties and responsibilities of RAs vary among schools, and, therefore, a school should consider its own policies and procedures to determine whether its RAs are responsible employees who must report incidents of sexual violence to the Title IX coordinator or other appropriate school designee.[24] When making this determination, a school should consider if its RAs have the general authority to take action to redress misconduct or the duty to report misconduct to appropriate school officials, as well as whether students could reasonably believe that RAs have this authority or duty. A school should also consider whether it has determined and clearly informed students that RAs are generally available for confidential discussions and do not have the authority or responsibility to take action to redress any misconduct or to report any misconduct to the Title IX coordinator or other appropriate school officials. A school should pay particular attention to its RAs' obligations to report other student violations of school policy (*e.g.*, drug and alcohol violations or physical assault). If an RA is required to report other misconduct that violates school policy, then the RA would be considered a responsible employee obligated to report incidents of sexual violence that violate school policy.

If an RA is a responsible employee, the RA should make every effort to ensure that *before* the student reveals information that he or she may wish to keep confidential, the student understands the RA's reporting obligation and the student's option to request that the school maintain confidentiality. It is therefore important that schools widely disseminate policies and provide regular training clearly identifying the places where students can seek confidential support services so that students are aware of this information. The RA

---

[24] Postsecondary institutions should be aware that, regardless of whether an RA is a responsible employee under Title IX, RAs are considered "campus security authorities" under the Clery Act. A school's responsibilities in regard to crimes reported to campus security authorities are discussed in the Department's regulations on the Clery Act at 34 C.F.R. § 668.46.

Page 17 – Questions and Answers on Title IX and Sexual Violence

EXHIBIT 9

should also explain to the student (again, before the student reveals information that he or she may wish to keep confidential) that, although the RA must report the names of the alleged perpetrator (if known), the student who experienced the alleged sexual violence, other students involved in the alleged sexual violence, as well as relevant facts, including the date, time, and location to the Title IX coordinator or other appropriate school designee, the school will protect the student's confidentiality to the greatest extent possible. Prior to providing information about the incident to the Title IX coordinator or other appropriate school designee, the RA should consult with the student about how to protect his or her safety and the details of what will be shared with the Title IX coordinator. The RA should explain to the student that reporting this information to the Title IX coordinator or other appropriate school designee does not necessarily mean that a formal complaint or investigation under the school's Title IX grievance procedure must be initiated if the student requests confidentiality. As discussed in questions E-1 and E-2, if the student requests confidentiality, the Title IX coordinator or other appropriate school designee responsible for evaluating requests for confidentiality should make every effort to respect this request and should evaluate the request in the context of the school's responsibility to provide a safe and nondiscriminatory environment for all students.

Regardless of whether a reporting obligation exists, all RAs should inform students of their right to file a Title IX complaint with the school and report a crime to campus or local law enforcement. If a student discloses sexual violence to an RA who is a responsible employee, the school will be deemed to have notice of the sexual violence even if the student does not file a Title IX complaint. Additionally, all RAs should provide students with information regarding on-campus resources, including victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance. RAs should also be familiar with local rape crisis centers or other off-campus resources and provide this information to students.

**E.  Confidentiality and a School's Obligation to Respond to Sexual Violence**

**E-1.  How should a school respond to a student's request that his or her name not be disclosed to the alleged perpetrator or that no investigation or disciplinary action be pursued to address the alleged sexual violence?**

**Answer:**  Students, or parents of minor students, reporting incidents of sexual violence sometimes ask that the students' names not be disclosed to the alleged perpetrators or that no investigation or disciplinary action be pursued to address the alleged sexual violence. OCR strongly supports a student's interest in confidentiality in cases involving sexual violence. There are situations in which a school must override a student's request

EXHIBIT 9

for confidentiality in order to meet its Title IX obligations; however, these instances will be limited and the information should only be shared with individuals who are responsible for handling the school's response to incidents of sexual violence. Given the sensitive nature of reports of sexual violence, a school should ensure that the information is maintained in a secure manner. A school should be aware that disregarding requests for confidentiality can have a chilling effect and discourage other students from reporting sexual violence. In the case of minors, state mandatory reporting laws may require disclosure, but can generally be followed without disclosing information to school personnel who are not responsible for handling the school's response to incidents of sexual violence.[25]

Even if a student does not specifically ask for confidentiality, to the extent possible, a school should only disclose information regarding alleged incidents of sexual violence to individuals who are responsible for handling the school's response. To improve trust in the process for investigating sexual violence complaints, a school should notify students of the information that will be disclosed, to whom it will be disclosed, and why. Regardless of whether a student complainant requests confidentiality, a school must take steps to protect the complainant as necessary, including taking interim measures before the final outcome of an investigation. For additional information on interim measures see questions G-1 to G-3.

For Title IX purposes, if a student requests that his or her name not be revealed to the alleged perpetrator or asks that the school not investigate or seek action against the alleged perpetrator, the school should inform the student that honoring the request may limit its ability to respond fully to the incident, including pursuing disciplinary action against the alleged perpetrator. The school should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate

---

[25] The school should be aware of the alleged student perpetrator's right under the Family Educational Rights and Privacy Act ("FERPA") torequest to inspect and review information about the allegations if the information directly relates to the alleged student perpetrator and the information is maintained by the school as an education record. In such a case, the school must either redact the complainant's name and all identifying information before allowing the alleged perpetrator to inspect and review the sections of the complaint that relate to him or her, or must inform the alleged perpetrator of the specific information in the complaint that are about the alleged perpetrator. *See* 34 C.F.R. § 99.12(a) The school should also make complainants aware of this right and explain how it might affect the school's ability to maintain complete confidentiality.

Page 19 – Questions and Answers on Title IX and Sexual Violence

EXHIBIT 9

and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and ensure  his or her safety as necessary. See question K-1 regarding retaliation.

If the student still requests that his or her name not be disclosed to the alleged perpetrator or that the school not investigate or seek action against the alleged perpetrator, the school will need to determine whether or not it can honor such a request while still providing a safe and nondiscriminatory environment for all students, including the student who reported the sexual violence. As discussed in question C-3, the Title IX coordinator is generally in the best position to evaluate confidentiality requests. Because schools vary widely in size and administrative structure, OCR recognizes that a school may reasonably determine that an employee other than the Title IX coordinator, such as a sexual assault response coordinator, dean, or other school official, is better suited to evaluate such requests. Addressing the needs of a student reporting sexual violence while determining an appropriate institutional response requires expertise and attention, and a school should ensure that it assigns these responsibilities to employees with the capability and training to fulfill them. For example, if a school has a sexual assault response coordinator, that person should be consulted in evaluating requests for confidentiality. The school should identify in its Title IX policies and procedures the employee or employees responsible for making such determinations.

If the school determines that it can respect the student's request not to disclose his or her identity to the alleged perpetrator, it should take all reasonable steps to  respond to the complaint consistent with the request. Although a student's request to have his or her name withheld may limit the school's ability to respond fully to an individual allegation of sexual violence, other means may be available to address the sexual violence. There are steps a school can take to limit the effects of the alleged sexual violence and prevent its recurrence without initiating formal action against the alleged perpetrator or revealing the identity of the student complainant. Examples include providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred; providing training and education materials for students and employees; changing and publicizing the school's policies on sexual violence; and conducting climate surveys regarding sexual violence. In instances affecting many students, an alleged perpetrator can be put on notice of allegations of harassing behavior and be counseled appropriately without revealing, even indirectly, the identity of the student complainant. A school must also take immediate action as necessary to protect the student while keeping the identity of the student confidential. These actions may include providing support services to the student and changing living arrangements or course schedules, assignments, or tests.

**E-2.  What factors should a school consider in weighing a student's request for confidentiality?**

**Answer:**  When weighing a student's request for confidentiality that could preclude a meaningful investigation or potential discipline of the alleged perpetrator, a school should consider a range of factors.

These factors include circumstances that suggest there is an increased risk of the alleged perpetrator committing additional acts of sexual violence or other violence (e.g., whether there have been other sexual violence complaints about the same alleged perpetrator, whether the alleged perpetrator has a history of arrests or records from a prior school indicating a history of violence, whether the alleged perpetrator threatened further sexual violence or other violence against the student or others, and whether the sexual violence was committed by multiple perpetrators). These factors also include circumstances that suggest there is an increased risk of future acts of sexual violence under similar circumstances (e.g., whether the student's report reveals a pattern of perpetration (e.g., via illicit use of drugs or alcohol) at a given location or by a particular group). Other factors that should be considered in assessing a student's request for confidentiality include whether the sexual violence was perpetrated with a weapon; the age of the student subjected to the sexual violence; and whether the school possesses other means to obtain relevant evidence (e.g., security cameras or personnel, physical evidence).

A school should take requests for confidentiality seriously, while at the same time considering its responsibility to provide a safe and nondiscriminatory environment for all students, including the student who reported the sexual violence. For example, if the school has credible information that the alleged perpetrator has committed one or more prior rapes, the balance of factors would compel the school to investigate the allegation of sexual violence, and if appropriate, pursue disciplinary action in a manner that may require disclosure of the student's identity to the alleged perpetrator. If the school determines that it must disclose a student's identity to an alleged perpetrator, it should inform the student prior to making this disclosure. In these cases, it is also especially important for schools to take whatever interim measures are necessary to protect the student and ensure the safety of other students. If a school has a sexual assault response coordinator, that person should be consulted in identifying safety risks and interim measures that are necessary to protect the student. In the event the student requests that the school inform the perpetrator that the student asked the school not to investigate or seek discipline, the school should honor this request and inform the alleged perpetrator that the school made the decision to go forward. For additional information on interim measures see questions G-1 to G-3. Any school officials responsible for

EXHIBIT 9

discussing safety and confidentiality with students should be trained on the effects of trauma and the appropriate methods to communicate with students subjected to sexual violence. See questions J-1 to J-3.

On the other hand, if, for example, the school has no credible information about prior sexual violence committed by the alleged perpetrator and the alleged sexual violence was not perpetrated with a weapon or accompanied by threats to repeat the sexual violence against the complainant or others or part of a larger pattern at a given location or by a particular group, the balance of factors would likely compel the school to respect the student's request for confidentiality. In this case the school should still take all reasonable steps to respond to the complaint consistent with the student's confidentiality request and determine whether interim measures are appropriate or necessary. Schools should be mindful that traumatic events such as sexual violence can result in delayed decisionmaking by a student who has experienced sexual violence. Hence, a student who initially requests confidentiality might later request that a full investigation be conducted.

**E-3.** **What are the reporting responsibilities of school employees who provide or support the provision of counseling, advocacy, health, mental health, or sexual assault-related services to students who have experienced sexual violence?**

**Answer:**  OCR does not require campus mental-health counselors, pastoral counselors, social workers, psychologists, health center employees, or any other person with a professional license requiring confidentiality, or who is supervised by such a person, to report, without the student's consent, incidents of sexual violence to the school in a way that identifies the student. Although these employees may have responsibilities that would otherwise make them responsible employees for Title IX purposes, OCR recognizes the importance of protecting the counselor-client relationship, which often requires confidentiality to ensure that students will seek the help they need.

Professional counselors and pastoral counselors whose official responsibilities include providing mental-health counseling to members of the school community are not required by Title IX to report *any* information regarding an incident of alleged sexual violence to the Title IX coordinator or other appropriate school designee.[26]

---

[26] The exemption from reporting obligations for pastoral and professional counselors under Title IX is consistent with the Clery Act. For additional information on reporting obligations under the Clery Act, see Office of Postsecondary Education, *Handbook for Campus Safety and Security Reporting* (2011), available at http://www2.ed.gov/admins/lead/safety/handbook.pdf. Similar to the Clery Act, for Title IX purposes, a pastoral counselor is a person who is associated with a religious order or denomination, is recognized by that religious

EXHIBIT 9

OCR recognizes that some people who provide assistance to students who experience sexual violence are not professional or pastoral counselors. They include all individuals who work or volunteer in on-campus sexual assault centers, victim advocacy offices, women's centers, or health centers ("non-professional counselors or advocates"), including front desk staff and students. OCR wants students to feel free to seek their assistance and therefore interprets Title IX to give schools the latitude not to require these individuals to report incidents of sexual violence in a way that identifies the student without the student's consent.[27] These non-professional counselors or advocates are valuable sources of support for students, and OCR strongly encourages schools to designate these individuals as confidential sources.

Pastoral and professional counselors and non-professional counselors or advocates should be instructed to inform students of their right to file a Title IX complaint with the school and a separate complaint with campus or local law enforcement. In addition to informing students about campus resources for counseling, medical, and academic support, these persons should also indicate that they are available to assist students in filing such complaints. They should also explain that Title IX includes protections against retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs. This includes retaliatory actions taken by the school and school officials. When a school knows or reasonably should know of possible retaliation by other students or third parties, including threats, intimidation, coercion, or discrimination (including harassment), it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and ensure his or her safety as necessary.

In order to identify patterns or systemic problems related to sexual violence, a school should collect aggregate data about sexual violence incidents from non-professional counselors or advocates in their on-campus sexual assault centers, women's centers, or

---

order or denomination as someone who provides confidential counseling, and is functioning within the scope of that recognition as a pastoral counselor. A professional counselor is a person whose official responsibilities include providing mental health counseling to members of the institution's community and who is functioning within the scope of his or her license or certification. This definition applies even to professional counselors who are not employees of the school, but are under contract to provide counseling at the school. This includes individuals who are not yet licensed or certified as a counselor, but are acting in that role under the supervision of an individual who is licensed or certified. An example is a Ph.D. counselor-trainee acting under the supervision of a professional counselor at the school.

[27] Postsecondary institutions should be aware that an individual who is counseling students, but who does not meet the Clery Act definition of a pastoral or professional counselor, is not exempt from being a campus security authority if he or she otherwise has significant responsibility for student and campus activities. See fn. 24.

Page 23 – Questions and Answers on Title IX and Sexual Violence

EXHIBIT 9

health centers. Such individuals should report only general information about incidents of sexual violence such as the nature, date, time, and general location of the incident and should take care to avoid reporting personally identifiable information about a student. Non-professional counselors and advocates should consult with students regarding what information needs to be withheld to protect their identity.

**E-4.  Is a school required to investigate information regarding sexual violence incidents shared by survivors during public awareness events, such as "Take Back the Night"?**

**Answer:**  No. OCR wants students to feel free to participate in preventive education programs and access resources for survivors. Therefore, public awareness events such as "Take Back the Night" or other forums at which students disclose experiences with sexual violence are not considered notice to the school for the purpose of triggering an individual investigation unless the survivor initiates a complaint. The school should instead respond to these disclosures by reviewing sexual assault policies, creating campus-wide educational programs, and conducting climate surveys to learn more about the prevalence of sexual violence at the school. Although Title IX does not require the school to investigate particular incidents discussed at such events, the school should ensure that survivors are aware of any available resources, including counseling, health, and mental health services. To ensure that the entire school community understands their Title IX rights related to sexual violence, the school should also provide information at these events on Title IX and how to file a Title IX complaint with the school, as well as options for reporting an incident of sexual violence to campus or local law enforcement.

**F.   Investigations and Hearings**

*Overview*

**F-1.  What elements should a school's Title IX investigation include?**

**Answer:**  The specific steps in a school's Title IX investigation will vary depending on the nature of the allegation, the age of the student or students involved, the size and administrative structure of the school, state or local legal requirements (including mandatory reporting requirements for schools working with minors), and what it has learned from past experiences.

For the purposes of this document the term "investigation" refers to the process the school uses to resolve sexual violence complaints. This includes the fact-finding investigation and any hearing and decision-making process the school uses to determine: (1) whether or not the conduct occurred; and, (2) if the conduct occurred, what actions

EXHIBIT 9

the school will take to end the sexual violence, eliminate the hostile environment, and prevent its recurrence, which may include imposing sanctions on the perpetrator and providing remedies for the complainant and broader student population.

In all cases, a school's Title IX investigation must be adequate, reliable, impartial, and prompt and include the opportunity for both parties to present witnesses and other evidence. The investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing.[28] Furthermore, neither Title IX nor the DCL specifies who should conduct the investigation. It could be the Title IX coordinator, provided there are no conflicts of interest, but it does not have to be. All persons involved in conducting a school's Title IX investigations must have training or experience in handling complaints of sexual violence and in the school's grievance procedures. For additional information on training, see question J-3.

When investigating an incident of alleged sexual violence for Title IX purposes, to the extent possible, a school should coordinate with any other ongoing school or criminal investigations of the incident and establish appropriate fact-finding roles for each investigator. A school should also consider whether information can be shared among the investigators so that complainants are not unnecessarily required to give multiple statements about a traumatic event. If the investigation includes forensic evidence, it may be helpful for a school to consult with local or campus law enforcement or a forensic expert to ensure that the evidence is correctly interpreted by school officials.  For additional information on working with campus or local law enforcement see question F-3.

If a school uses its student disciplinary procedures to meet its Title IX obligation to resolve complaints of sexual violence promptly and equitably, it should recognize that imposing sanctions against the perpetrator, without additional remedies, likely will not be sufficient to eliminate the hostile environment and prevent recurrence as required by Title IX. If a school typically processes complaints of sexual violence through its disciplinary process and that process, including any investigation and hearing, meets the Title IX requirements discussed above and enables the school to end the sexual violence, eliminate the hostile environment, and prevent its recurrence, then the school may use that process to satisfy its Title IX obligations and does not need to conduct a separate Title IX investigation. As discussed in question C-3, the Title IX coordinator should review the disciplinary process

---

[28] This answer addresses only Title IX's requirements for investigations. It does not address legal rights or requirements under the U.S. Constitution, the Clery Act, or other federal, state, or local laws.

EXHIBIT 9

to ensure that it: (1) complies with the prompt and equitable requirements of Title IX; (2) allows for appropriate interim measures to be taken to protect the complainant during the process; and (3) provides for remedies to the complainant and school community where appropriate. For more information about interim measures, see questions G-1 to G-3, and about remedies, see questions H-1 and H-2.

The investigation may include, but is not limited to, conducting interviews of the complainant, the alleged perpetrator, and any witnesses; reviewing law enforcement investigation documents, if applicable; reviewing student and personnel files; and gathering and examining other relevant documents or evidence. While a school has flexibility in how it structures the investigative process, for Title IX purposes, a school must give the complainant any rights that it gives to the alleged perpetrator. A balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions.[29] Specifically:

- Throughout the investigation, the parties must have an equal opportunity to present relevant witnesses and other evidence.

- The school must use a preponderance-of-the-evidence (*i.e.*, more likely than not) standard in any Title IX proceedings, including any fact-finding and hearings.

- If the school permits one party to have lawyers or other advisors at any stage of the proceedings, it must do so equally for both parties. Any school-imposed restrictions on the ability of lawyers or other advisors to speak or otherwise participate in the proceedings must also apply equally.

- If the school permits one party to submit third-party expert testimony, it must do so equally for both parties.

- If the school provides for an appeal, it must do so equally for both parties.

- Both parties must be notified, in writing, of the outcome of both the complaint and any appeal (see question H-3).

---

[29] As explained in question C-5, the parties may have certain due process rights under the U.S. Constitution.

EXHIBIT 9

*Intersection with Criminal Investigations*

**F-2.  What are the key differences between a school's Title IX investigation into allegations of sexual violence and a criminal investigation?**

**Answer:**  A criminal investigation is intended to determine whether an individual violated criminal law; and, if at the conclusion of the investigation, the individual is tried and found guilty, the individual may be imprisoned or subject to criminal penalties. The U.S. Constitution affords criminal defendants who face the risk of incarceration numerous protections, including, but not limited to, the right to counsel, the right to a speedy trial, the right to a jury trial, the right against self-incrimination, and the right to confrontation. In addition, government officials responsible for criminal investigations (including police and prosecutors) normally have discretion as to which complaints from the public they will investigate.

By contrast, a Title IX investigation will never result in incarceration of an individual and, therefore, the same procedural protections and legal standards are not required. Further, while a criminal investigation is initiated at the discretion of law enforcement authorities, a Title IX investigation is not discretionary; a school has a duty under Title IX to resolve complaints promptly and equitably and to provide a safe and nondiscriminatory environment for all students, free from sexual harassment and sexual violence. Because the standards for pursuing and completing criminal investigations are different from those used for Title IX investigations, the termination of a criminal investigation without an arrest or conviction does not affect the school's Title IX obligations.

Of course, criminal investigations conducted by local or campus law enforcement may be useful for fact gathering if the criminal investigation occurs within the recommended timeframe for Title IX investigations; but, even if a criminal investigation is ongoing, a school must still conduct its own Title IX investigation.

A school should notify complainants of the right to file a criminal complaint and should not dissuade a complainant from doing so either during or after the school's internal Title IX investigation. Title IX does not require a school to report alleged incidents of sexual violence to law enforcement, but a school may have reporting obligations under state, local, or other federal laws.

EXHIBIT 9

**F-3.  How should a school proceed when campus or local law enforcement agencies are conducting a criminal investigation while the school is conducting a parallel Title IX investigation?**

**Answer:**  A school should not wait for the conclusion of a criminal investigation or criminal proceeding to begin its own Title IX investigation. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, it is important for a school to understand that during this brief delay in the Title IX investigation, it must take interim measures to protect the complainant in the educational setting. The school should also continue to update the parties on the status of the investigation and inform the parties when the school resumes its Title IX investigation. For additional information on interim measures see questions G-1 to G-3.

If a school delays the fact-finding portion of a Title IX investigation, the school must promptly resume and complete its fact-finding for the Title IX investigation once it learns that the police department has completed its evidence gathering stage of the criminal investigation. The school should not delay its investigation until the ultimate outcome of the criminal investigation or the filing of any charges. OCR recommends that a school work with its campus police, local law enforcement, and local prosecutor's office to learn when the evidence gathering stage of the criminal investigation is complete. A school may also want to enter into a memorandum of understanding (MOU) or other agreement with these agencies regarding the protocols and procedures for referring allegations of sexual violence, sharing information, and conducting contemporaneous investigations. Any MOU or other agreement must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably, and must comply with the Family Educational Rights and Privacy Act ("FERPA") and other applicable privacy laws.

The DCL states that in one instance a prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances. OCR understands that this example may not be representative and that the law enforcement agency's process often takes more than ten days. OCR recognizes that the length of time for evidence gathering by criminal investigators will vary depending on the specific circumstances of each case.

EXHIBIT 9

*Off-Campus Conduct*

**F-4.   Is a school required to process complaints of alleged sexual violence that occurred off campus?**

**Answer:**  Yes. Under Title IX, a school must process all complaints of sexual violence, regardless of where the conduct occurred, to determine whether the conduct occurred in the context of an education program or activity or had continuing effects on campus or in an off-campus education program or activity.

A school must determine whether the alleged off-campus sexual violence occurred in the context of an education program or activity of the school; if so, the school must treat the complaint in the same manner that it treats complaints regarding on-campus conduct. In other words, if a school determines that the alleged misconduct took place in the context of an education program or activity of the school, the fact that the alleged misconduct took place off campus does not relieve the school of its obligation to investigate the complaint as it would investigate a complaint of sexual violence that occurred on campus.

Whether the alleged misconduct occurred in this context may not always be apparent from the complaint, so a school may need to gather additional information in order to make such a determination. Off-campus education programs and activities are clearly covered and include, but are not limited to: activities that take place at houses of fraternities or sororities recognized by the school; school-sponsored field trips, including athletic team travel; and events for school clubs that occur off campus (*e.g.*, a debate team trip to another school or to a weekend competition).

Even if the misconduct did not occur in the context of an education program or activity, a school must consider the effects of the off-campus misconduct when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity because students often experience the continuing effects of off-campus sexual violence while at school or in an off-campus education program or activity. The school cannot address the continuing effects of the off-campus sexual violence at school or in an off-campus education program or activity unless it processes the complaint and gathers appropriate additional information in accordance with its established procedures.

Once a school is on notice of off-campus sexual violence against a student, it must assess whether there are any continuing effects on campus or in an off-campus education program or activity that are creating or contributing to a hostile environment and, if so, address that hostile environment in the same manner in which it would address a hostile environment created by on-campus misconduct. The mere presence on campus or in an

EXHIBIT 9

off-campus education program or activity of the alleged perpetrator of off-campus sexual violence can have continuing effects that create a hostile environment. A school should also take steps to protect a student who alleges off-campus sexual violence from further harassment by the alleged perpetrator or his or her friends, and a school may have to take steps to protect other students from possible assault by the alleged perpetrator. In other words, the school should protect the school community in the same way it would had the sexual violence occurred on campus. Even if there are no continuing effects of the off-campus sexual violence experienced by the student on campus or in an off-campus education program or activity, the school still should handle these incidents as it would handle other off-campus incidents of misconduct or violence and consistent with any other applicable laws. For example, if a school, under its code of conduct, exercises jurisdiction over physical altercations between students that occur off campus outside of an education program or activity, it should also exercise jurisdiction over incidents of student-on-student sexual violence that occur off campus outside of an education program or activity.

*Hearings*[30]

**F-5.  Must a school allow or require the parties to be present during an entire hearing?**

**Answer:**  If a school uses a hearing process to determine responsibility for acts of sexual violence, OCR does not require that the school allow a complainant to be present for the entire hearing; it is up to each school to make this determination. But if the school allows one party to be present for the entirety of a hearing, it must do so equally for both parties. At the same time, when requested, a school should make arrangements so that the complainant and the alleged perpetrator do not have to be present in the same room at the same time. These two objectives may be achieved by using closed circuit television or other means. Because a school has a Title IX obligation to investigate possible sexual violence, if a hearing is part of the school's Title IX investigation process, the school must not require a complainant to be present at the hearing as a prerequisite to proceed with the hearing.

---

[30] As noted in question F-1, the investigation may include a hearing to determine whether the conduct occurred, but Title IX does not necessarily require a hearing. Although Title IX does not dictate the membership of a hearing board, OCR discourages schools from allowing students to serve on hearing boards  in cases involving allegations of sexual violence.

Page 30 – Questions and Answers on Title IX and Sexual Violence

EXHIBIT 9

**F-6.   May every witness at the hearing, including the parties, be cross-examined?**

**Answer:**   OCR does not require that a school allow cross-examination of witnesses, including the parties, if they testify at the hearing. But if the school allows one party to cross-examine witnesses, it must do so equally for both parties.

OCR strongly discourages a school from allowing the parties to personally question or cross-examine each other during a hearing on alleged sexual violence. Allowing an alleged perpetrator to question a complainant directly may be traumatic or intimidating, and may perpetuate a hostile environment. A school may choose, instead, to allow the parties to submit questions to a trained third party (*e.g.*, the hearing panel) to ask the questions on their behalf. OCR recommends that the third party screen the questions submitted by the parties and only ask those it deems appropriate and relevant to the case.

**F-7.   May the complainant's sexual history be introduced at hearings?**

**Answer:**   Questioning about the complainant's sexual history with anyone other than the alleged perpetrator should not be permitted. Further, a school should recognize that the mere fact of a current or previous consensual dating or sexual relationship between the two parties does not itself imply consent or preclude a finding of sexual violence. The school should also ensure that hearings are conducted in a manner that does not inflict additional trauma on the complainant.

*Timeframes*

**F-8.   What stages of the investigation are included in the 60-day timeframe referenced in the DCL as the length for a typical investigation?**

**Answer:**   As noted in the DCL, the 60-calendar day timeframe for investigations is based on OCR's experience in typical cases. The 60-calendar day timeframe refers to the entire investigation process, which includes conducting the fact-finding investigation, holding a hearing or engaging in another decision-making process to determine whether the alleged sexual violence occurred and created a hostile environment, and determining what actions the school will take to eliminate the hostile environment and prevent its recurrence, including imposing sanctions against the perpetrator and providing remedies for the complainant and school community, as appropriate. Although this timeframe does not include appeals, a school should be aware that an unduly long appeals process may impact whether the school's response was prompt and equitable as required by Title IX.

EXHIBIT 9

OCR does not require a school to complete investigations within 60 days; rather OCR evaluates on a case-by-case basis whether the resolution of sexual violence complaints is prompt and equitable. Whether OCR considers an investigation to be prompt as required by Title IX will vary depending on the complexity of the investigation and the severity and extent of the alleged conduct. OCR recognizes that the investigation process may take longer if there is a parallel criminal investigation or if it occurs partially during school breaks. A school may need to stop an investigation during school breaks or between school years, although a school should make every effort to try to conduct an investigation during these breaks unless so doing would sacrifice witness availability or otherwise compromise the process.

Because timeframes for investigations vary and a school may need to depart from the timeframes designated in its grievance procedures, both parties should be given periodic status updates throughout the process.

### G.  Interim Measures

### G-1.  Is a school required to take any interim measures before the completion of its investigation?

**Answer:** Title IX requires a school to take steps to ensure equal access to its education programs and activities and protect the complainant as necessary, including taking interim measures before the final outcome of an investigation. The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow the complainant to change academic and extracurricular activities or his or her living, transportation, dining, and working situation as appropriate. The school should also ensure that the complainant is aware of his or her Title IX rights and any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus or local law enforcement. If a school does not offer these services on campus, it should enter into an MOU with a local victim services provider if possible.

Even when a school has determined that it can respect a complainant's request for confidentiality and therefore may not be able to respond fully to an allegation of sexual violence and initiate formal action against an alleged perpetrator, the school must take immediate action to protect the complainant while keeping the identity of the complainant confidential. These actions may include: providing support services to the

EXHIBIT 9

complainant; changing living arrangements or course schedules, assignments, or tests; and providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred.

**G-2. How should a school determine what interim measures to take?**

**Answer:** The specific interim measures implemented and the process for implementing those measures will vary depending on the facts of each case. A school should consider a number of factors in determining what interim measures to take, including, for example, the specific need expressed by the complainant; the age of the students involved; the severity or pervasiveness of the allegations; any continuing effects on the complainant; whether the complainant and alleged perpetrator share the same residence hall, dining hall, class, transportation, or job location; and whether other judicial measures have been taken to protect the complainant (*e.g.*, civil protection orders).

In general, when taking interim measures, schools should minimize the burden on the complainant. For example, if the complainant and alleged perpetrator share the same class or residence hall, the school should not, as a matter of course, remove the complainant from the class or housing while allowing the alleged perpetrator to remain without carefully considering the facts of the case.

**G-3. If a school provides all students with access to counseling on a fee basis, does that suffice for providing counseling as an interim measure?**

**Answer:** No. Interim measures are determined by a school on a case-by-case basis. If a school determines that it needs to offer counseling to the complainant as part of its Title IX obligation to take steps to protect the complainant while the investigation is ongoing, it must not require the complainant to pay for this service.

EXHIBIT 9

## H.   Remedies and Notice of Outcome[31]

### H-1.   What remedies should a school consider in a case of student-on-student sexual violence?

**Answer:**  Effective remedial action may include disciplinary action against the perpetrator, providing counseling for the perpetrator, remedies for the complainant and others, as well as changes to the school's overall services or policies. All services needed to remedy the hostile environment should be offered to the complainant. These remedies are separate from, and in addition to, any interim measure that may have been provided prior to the conclusion of the school's investigation. In any instance in which the complainant did not take advantage of a specific service (*e.g.*, counseling) when offered as an interim measure, the complainant should still be offered, and is still entitled to, appropriate final remedies that may include services the complainant declined as an interim measure. A refusal at the interim stage does not mean the refused service or set of services should not be offered as a remedy.

If a school uses its student disciplinary procedures to meet its Title IX obligation to resolve complaints of sexual violence promptly and equitably, it should recognize that imposing sanctions against the perpetrator, without more, likely will not be sufficient to satisfy its Title IX obligation to eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. Additional remedies for the complainant and the school community may be necessary. If the school's student disciplinary procedure does not include a process for determining and implementing these remedies for the complainant and school community, the school will need to use another process for this purpose.

Depending on the specific nature of the problem, remedies for the complainant may include, but are not limited to:

- Providing an effective escort to ensure that the complainant can move safely between classes and activities;

---

[31] As explained in question A-5, if a school delays responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to be subjected to a hostile environment. In this case, in addition to the remedies discussed in this section, the school will also be required to remedy the effects of the sexual violence that could reasonably have been prevented had the school responded promptly and appropriately.

EXHIBIT 9

- Ensuring the complainant and perpetrator do not share classes or extracurricular activities;

- Moving the perpetrator or complainant (if the complainant requests to be moved) to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;

- Providing comprehensive, holistic victim services including medical, counseling and academic support services, such as tutoring;

- Arranging for the complainant to have extra time to complete or re-take a class or withdraw from a class without an academic or financial penalty; and

- Reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the sexual violence and the misconduct that may have resulted in the complainant being disciplined.[32]

Remedies for the broader student population may include, but are not limited to:

- Designating an individual from the school's counseling center who is specifically trained in providing trauma-informed comprehensive services to victims of sexual violence to be on call to assist students whenever needed;

- Training or retraining school employees on the school's responsibilities to address allegations of sexual violence and how to conduct Title IX investigations;

- Developing materials on sexual violence, which should be distributed to all students;

- Conducting bystander intervention and sexual violence prevention programs with students;

- Issuing policy statements or taking other steps that clearly communicate that the school does not tolerate sexual violence and will respond to any incidents and to any student who reports such incidents;

---

[32] For example, if the complainant was disciplined for skipping a class in which the perpetrator was enrolled, the school should review the incident to determine if the complainant skipped class to avoid contact with the perpetrator.

Page 35 – Questions and Answers on Title IX and Sexual Violence

EXHIBIT 9

- Conducting, in conjunction with student leaders, a campus climate check to assess the effectiveness of efforts to ensure that the school is free from sexual violence, and using that information to inform future proactive steps that the school will take;

- Targeted training for a group of students if, for example, the sexual violence created a hostile environment in a residence hall, fraternity or sorority, or on an athletic team; and

- Developing a protocol for working with local law enforcement as discussed in question F-3.

When a school is unable to conduct a full investigation into a particular incident (*i.e.*, when it received a general report of sexual violence without any personally identifying information), it should consider remedies for the broader student population in response.

**H-2.  If, after an investigation, a school finds the alleged perpetrator responsible and determines that, as part of the remedies for the complainant, it must separate the complainant and perpetrator, how should the school accomplish this if both students share the same major and there are limited course options?**

**Answer:** If there are limited sections of required courses offered at a school and both the complainant and perpetrator are required to take those classes, the school may need to make alternate arrangements in a manner that minimizes the burden on the complainant. For example, the school may allow the complainant to take the regular sections of the courses while arranging for the perpetrator to take the same courses online or through independent study.

**H-3.  What information must be provided to the complainant in the notice of the outcome?**

**Answer:** Title IX requires both parties to be notified, in writing, about the outcome of both the complaint and any appeal. OCR recommends that a school provide written notice of the outcome to the complainant and the alleged perpetrator concurrently.

For Title IX purposes, a school must inform the complainant as to whether or not it found that the alleged conduct occurred, any individual remedies offered or provided to the complainant or any sanctions imposed on the perpetrator that directly relate to the complainant, and other steps the school has taken to eliminate the hostile environment, if the school finds one to exist, and prevent recurrence. The perpetrator should not be notified of the individual remedies offered or provided to the complainant.

Sanctions that directly relate to the complainant (but that may also relate to eliminating the hostile environment and preventing recurrence) include, but are not limited to, requiring that the perpetrator stay away from the complainant until both parties graduate, prohibiting the perpetrator from attending school for a period of time, or transferring the perpetrator to another residence hall, other classes, or another school. Additional steps the school has taken to eliminate the hostile environment may include counseling and academic support services for the complainant and other affected students. Additional steps the school has taken to prevent recurrence may include sexual violence training for faculty and staff, revisions to the school's policies on sexual violence, and campus climate surveys. Further discussion of appropriate remedies is included in question H-1.

In addition to the Title IX requirements described above, the Clery Act requires, and FERPA permits, postsecondary institutions to inform the complainant of the institution's final determination and any disciplinary sanctions imposed on the perpetrator in sexual violence cases (as opposed to all harassment and misconduct covered by Title IX) not just those sanctions that directly relate to the complainant.[33]

**I.   Appeals**

**I-1.   What are the requirements for an appeals process?**

**Answer:**  While Title IX does not require that a school provide an appeals process, OCR does recommend that the school do so where procedural error or previously unavailable relevant evidence could significantly impact the outcome of a case or where a sanction is substantially disproportionate to the findings. If a school chooses to provide for an appeal of the findings or remedy or both, it must do so equally for both parties. The specific design of the appeals process is up to the school, as long as the entire grievance process, including any appeals, provides prompt and equitable resolutions of sexual violence complaints, and the school takes steps to protect the complainant in the educational setting during the process. Any individual or body handling appeals should be trained in the dynamics of and trauma associated with sexual violence.

If a school chooses to offer an appeals process it has flexibility to determine the type of review it will apply to appeals, but the type of review the school applies must be the same regardless of which party files the appeal.

---

[33] 20 U.S.C. § 1092(f) and 20 U.S.C. § 1232g(b)(6)(A).

Page 37 – Questions and Answers on Title IX and Sexual Violence

EXHIBIT 9

**I-2.  Must an appeal be available to a complainant who receives a favorable finding but does not believe a sanction that directly relates to him or her was sufficient?**

**Answer:**  The appeals process must be equal for both parties. For example, if a school allows a perpetrator to appeal a suspension on the grounds that it is too severe, the school must also allow a complainant to appeal a suspension on the grounds that it was not severe enough. See question H-3 for more information on what must be provided to the complainant in the notice of the outcome.

**J.   Title IX Training, Education and Prevention**[34]

**J-1.  What type of training on Title IX and sexual violence should a school provide to its employees?**

**Answer:**  A school needs to ensure that responsible employees with the authority to address sexual violence know how to respond appropriately to reports of sexual violence, that other responsible employees know that they are obligated to report sexual violence to appropriate school officials, and that all other employees understand how to respond to reports of sexual violence. A school should ensure that professional counselors, pastoral counselors, and non-professional counselors or advocates also understand the extent to which they may keep a report confidential. A school should provide training to all employees likely to witness or receive reports of sexual violence, including teachers, professors, school law enforcement unit employees, school administrators, school counselors, general counsels, athletic coaches, health personnel, and resident advisors. Training for employees should include practical information about how to prevent and identify sexual violence, including same-sex sexual violence; the behaviors that may lead to and result in sexual violence; the attitudes of bystanders that may allow conduct to continue; the potential for revictimization by responders and its effect on students; appropriate methods for responding to a student who may have experienced sexual violence, including the use of nonjudgmental language; the impact of trauma on victims; and, as applicable, the person(s) to whom such misconduct must be reported. The training should also explain responsible employees' reporting obligation, including what should be included in a report and any consequences for the failure to report and the procedure for responding to students' requests for confidentiality, as well as provide the contact

---

[34] As explained earlier, although this document focuses on sexual violence, the legal principles apply to other forms of sexual harassment. Schools should ensure that any training they provide on Title IX and sexual violence also covers other forms of sexual harassment. Postsecondary institutions should also be aware of training requirements imposed under the Clery Act.

Page 38 – Questions and Answers on Title IX and Sexual Violence

EXHIBIT 9

information for the school's Title IX coordinator. A school also should train responsible employees to inform students of: the reporting obligations of responsible employees; students' option to request confidentiality and available confidential advocacy, counseling, or other support services; and their right to file a Title IX complaint with the school and to report a crime to campus or local law enforcement. For additional information on the reporting obligations of responsible employees and others see questions D-1 to D-5.

There is no minimum number of hours required for Title IX and sexual violence training at every school, but this training should be provided on a regular basis. Each school should determine based on its particular circumstances how such training should be conducted, who has the relevant expertise required to conduct the training, and who should receive the training to ensure that the training adequately prepares employees, particularly responsible employees, to fulfill their duties under Title IX. A school should also have methods for verifying that the training was effective.

**J-2.** **How should a school train responsible employees to report incidents of possible sexual harassment or sexual violence?**

**Answer:** Title IX requires a school to take prompt and effective steps reasonably calculated to end sexual harassment and sexual violence that creates a hostile environment (*i.e.*, conduct that is sufficiently serious as to limit or deny a student's ability to participate in or benefit from the school's educational program and activity). But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities.

OCR therefore recommends that a school train responsible employees to report to the Title IX coordinator or other appropriate school official any incidents of sexual harassment or sexual violence that may violate the school's code of conduct or may create or contribute to the creation of a hostile environment. The school can then take steps to investigate and prevent any harassment or violence from recurring or escalating, as appropriate. For example, the school may separate the complainant and alleged perpetrator or conduct sexual harassment and sexual violence training for the school's students and employees. Responsible employees should understand that they do not need to determine whether the alleged sexual harassment or sexual violence actually occurred or that a hostile environment has been created before reporting an incident to the school's Title IX coordinator. Because the Title IX coordinator should have in-depth knowledge of Title IX and Title IX complaints at the school, he or she is likely to be in a better position than are other employees to evaluate whether an incident of sexual

EXHIBIT 9

harassment or sexual violence creates a hostile environment and how the school should respond. There may also be situations in which individual incidents of sexual harassment do not, by themselves, create a hostile environment; however when considered together, those incidents may create a hostile environment.

**J-3.** **What type of training should a school provide to employees who are involved in implementing the school's grievance procedures?**

**Answer:** All persons involved in implementing a school's grievance procedures (*e.g.*, Title IX coordinators, others who receive complaints, investigators, and adjudicators) must have training or experience in handling sexual violence complaints, and in the operation of the school's grievance procedures. The training should include information on working with and interviewing persons subjected to sexual violence; information on particular types of conduct that would constitute sexual violence, including same-sex sexual violence; the proper standard of review for sexual violence complaints (preponderance of the evidence); information on consent and the role drugs or alcohol can play in the ability to consent; the importance of accountability for individuals found to have committed sexual violence; the need for remedial actions for the perpetrator, complainant, and school community; how to determine credibility; how to evaluate evidence and weigh it in an impartial manner; how to conduct investigations; confidentiality; the effects of trauma, including neurobiological change; and cultural awareness training regarding how sexual violence may impact students differently depending on their cultural backgrounds.

In rare circumstances, employees involved in implementing a school's grievance procedures may be able to demonstrate that prior training and experience has provided them with competency in the areas covered in the school's training. For example, the combination of effective prior training and experience investigating complaints of sexual violence, together with training on the school's current grievance procedures may be sufficient preparation for an employee to resolve Title IX complaints consistent with the school's grievance procedures. In-depth knowledge regarding Title IX and sexual violence is particularly helpful. Because laws and school policies and procedures may change, the only way to ensure that all employees involved in implementing the school's grievance procedures have the requisite training or experience is for the school to provide regular training to all individuals involved in implementing the school's Title IX grievance procedures even if such individuals also have prior relevant experience.

EXHIBIT 9

**J-4.   What type of training on sexual violence should a school provide to its students?**

**Answer:**  To ensure that students understand their rights under Title IX, a school should provide age-appropriate training to its students regarding Title IX and sexual violence. At the elementary and secondary school level, schools should consider whether sexual violence training should also be offered to parents, particularly training on the school's process for handling complaints of sexual violence. Training may be provided separately or as part of the school's broader training on sex discrimination and sexual harassment. However, sexual violence is a unique topic that should not be assumed to be covered adequately in other educational programming or training provided to students. The school may want to include this training in its orientation programs for new students; training for student athletes and members of student organizations; and back-to-school nights. A school should consider educational methods that are most likely to help students retain information when designing its training, including repeating the training at regular intervals. OCR recommends that, at a minimum, the following topics (as appropriate) be covered in this training:

- Title IX and what constitutes sexual violence, including same-sex sexual violence, under the school's policies;
- the school's definition of consent applicable to sexual conduct, including examples;
- how the school analyzes whether conduct was unwelcome under Title IX;
- how the school analyzes whether unwelcome sexual conduct creates a hostile environment;
- reporting options, including formal reporting and confidential disclosure options and any timeframes set by the school for reporting;
- the school's grievance procedures used to process sexual violence complaints;
- disciplinary code provisions relating to sexual violence and the consequences of violating those provisions;
- effects of trauma, including neurobiological changes;
- the role alcohol and drugs often play in sexual violence incidents, including the deliberate use of alcohol and/or other drugs to perpetrate sexual violence;
- strategies and skills for bystanders to intervene to prevent possible sexual violence;
- how to report sexual violence to campus or local law enforcement and the ability to pursue law enforcement proceedings simultaneously with a Title IX grievance; and
- Title IX's protections against retaliation.

The training should also encourage students to report incidents of sexual violence. The training should explain that students (and their parents or friends) do not need to determine whether incidents of sexual violence or other sexual harassment created a

EXHIBIT 9

hostile environment before reporting the incident. A school also should be aware that persons may be deterred from reporting incidents if, for example, violations of school or campus rules regarding alcohol or drugs were involved. As a result, a school should review its disciplinary policy to ensure it does not have a chilling effect on students' reporting of sexual violence offenses or participating as witnesses. OCR recommends that a school inform students that the school's primary concern is student safety, and that use of alcohol or drugs never makes the survivor at fault for sexual violence.

It is also important for a school to educate students about the persons on campus to whom they can confidentially report incidents of sexual violence. A school's sexual violence education and prevention program should clearly identify the offices or individuals with whom students can speak confidentially and the offices or individuals who can provide resources such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance. It should also identify the school's responsible employees and explain that if students report incidents to responsible employees (except as noted in question E-3) these employees are required to report the incident to the Title IX coordinator or other appropriate official. This reporting includes the names of the alleged perpetrator and student involved in the sexual violence, as well as relevant facts including the date, time, and location, although efforts should be made to comply with requests for confidentiality from the complainant. For more detailed information regarding reporting and responsible employees and confidentiality, see questions D-1 to D-5 and E-1 to E-4.

**K.  Retaliation**

**K-1.  Does Title IX protect against retaliation?**

**Answer:**  Yes. The Federal civil rights laws, including Title IX, make it unlawful to retaliate against an individual for the purpose of interfering with any right or privilege secured by these laws. This means that if an individual brings concerns about possible civil rights problems to a school's attention, including publicly opposing sexual violence or filing a sexual violence complaint with the school or any State or Federal agency, it is unlawful for the school to retaliate against that individual for doing so. It is also unlawful to retaliate against an individual because he or she testified, or participated in any manner, in an OCR or school's investigation or proceeding. Therefore, if a student, parent, teacher, coach, or other individual complains formally or informally about sexual violence or participates in an OCR or school's investigation or proceedings related to sexual violence, the school is prohibited from retaliating (including intimidating, threatening, coercing, or in any way

EXHIBIT 9

discriminating against the individual) because of the individual's complaint or participation.

A school should take steps to prevent retaliation against a student who filed a complaint either on his or her own behalf or on behalf of another student, or against those who provided information as witnesses.

Schools should be aware that complaints of sexual violence may be followed by retaliation against the complainant or witnesses by the alleged perpetrator or his or her associates. When a school knows or reasonably should know of possible retaliation by other students or third parties, it must take immediate and appropriate steps to investigate or otherwise determine what occurred. Title IX requires the school to protect the complainant and witnesses and ensure their safety as necessary. At a minimum, this includes making sure that the complainant and his or her parents, if the complainant is in elementary or secondary school, and witnesses know how to report retaliation by school officials, other students, or third parties by making follow-up inquiries to see if there have been any new incidents or acts of retaliation, and by responding promptly and appropriately to address continuing or new problems. A school should also tell complainants and witnesses that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation, but will also take strong responsive action if it occurs.

**L.   First Amendment**

**L-1.   How should a school handle its obligation to respond to sexual harassment and sexual violence while still respecting free-speech rights guaranteed by the Constitution?**

**Answer:**  The DCL on sexual violence did not expressly address First Amendment issues because it focuses on unlawful physical sexual violence, which is not speech or expression protected by the First Amendment.

However, OCR's previous guidance on the First Amendment, including the 2001 Guidance, OCR's July 28, 2003, Dear Colleague Letter on the First Amendment,[35] and OCR's October 26, 2010, Dear Colleague Letter on harassment and bullying,[36] remain fully in effect. OCR has made it clear that the laws and regulations it enforces protect students from prohibited discrimination and do not restrict the exercise of any expressive activities or speech protected under the U.S. Constitution. Therefore, when a school works to prevent

---

[35] Available at http://www.ed.gov/ocr/firstamend.html.
[36] Available at http://www.ed.gov/ocr/letters/colleague-201010.html.

EXHIBIT 9

and redress discrimination, it must respect the free-speech rights of students, faculty, and other speakers.

Title IX protects students from sex discrimination; it does not regulate the content of speech. OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a hostile environment under Title IX. Title IX also does not require, prohibit, or abridge the use of particular textbooks or curricular materials.[37]

## M.  The Clery Act and the Violence Against Women Reauthorization Act of 2013

**M-1.  How does the Clery Act affect the Title IX obligations of institutions of higher education that participate in the federal student financial aid programs?**

**Answer:**  Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX. The Clery Act requires institutions of higher education to provide current and prospective students and employees, the public, and the Department with crime statistics and information about campus crime prevention programs and policies. The Clery Act requirements apply to many crimes other than those addressed by Title IX. For those areas in which the Clery Act and Title IX both apply, the institution must comply with both laws. For additional information about the Clery Act and its regulations, please see http://www2.ed.gov/admins/lead/safety/campus.html.

**M-2.  Were a school's obligations under Title IX and the DCL altered in any way by the Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, including Section 304 of that Act, which amends the Clery Act?**

**Answer:**  No. The Violence Against Women Reauthorization Act has no effect on a school's obligations under Title IX or the DCL. The Violence Against Women Reauthorization Act amended the Violence Against Women Act and the Clery Act, which are separate statutes. Nothing in Section 304 or any other part of the Violence Against Women Reauthorization Act relieves a school of its obligation to comply with the requirements of Title IX, including those set forth in these Questions and Answers, the 2011 DCL, and the *2001 Guidance*. For additional information about the Department's negotiated rulemaking related to the Violence Against Women Reauthorization Act please see http://www2.ed.gov/policy/highered/reg/hearulemaking/2012/vawa.html.

---

[37] 34 C.F.R. § 106.42.

Page 44 – Questions and Answers on Title IX and Sexual Violence

EXHIBIT 9

**N.  Further Federal Guidance**

**N-1.  Whom should I contact if I have additional questions about the DCL or OCR's other Title IX guidance?**

> **Answer:**  Anyone who has questions regarding this guidance, or Title IX should contact the OCR regional office that serves his or her state. Contact information for OCR regional offices can be found on OCR's webpage at https://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. If you wish to file a complaint of discrimination with OCR, you may use the online complaint form available at http://www.ed.gov/ocr/complaintintro.html or send a letter to the OCR enforcement office responsible for the state in which the school is located. You may also email general questions to OCR at ocr@ed.gov.

**N-2.  Are there other resources available to assist a school in complying with Title IX and preventing and responding to sexual violence?**

> **Answer:**  Yes. OCR's policy guidance on Title IX is available on OCR's webpage at http://www.ed.gov/ocr/publications.html#TitleIX. In addition to the April 4, 2011, Dear Colleague Letter, OCR has issued the following resources that further discuss a school's obligation to respond to allegations of sexual harassment and sexual violence:

- Dear Colleague Letter: Harassment and Bullying (October 26, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf

- *Sexual Harassment: It's Not Academic* (Revised September 2008), http://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.pdf

- *Revised Sexual Harassment Guidance: Harassment of Students by Employees, Other Students, or Third Parties* (January 19, 2001), http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf

EXHIBIT 9

In addition to guidance from OCR, a school may also find resources from the Departments of Education and Justice helpful in preventing and responding to sexual violence:

- Department of Education's Letter to Chief State School Officers on Teen Dating Violence Awareness and Prevention (February 28, 2013) https://www2.ed.gov/policy/gen/guid/secletter/130228.html

- Department of Education's National Center on Safe Supportive Learning Environments http://safesupportivelearning.ed.gov/

- Department of Justice, Office on Violence Against Women http://www.ovw.usdoj.gov/

EXHIBIT 9

# EXHIBIT 10



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

**September 2017**

**<u>Q&A on Campus Sexual Misconduct</u>**

Under Title IX of the Education Amendments of 1972 and its implementing regulations, an institution that receives federal funds must ensure that no student suffers a deprivation of her or his access to educational opportunities on the basis of sex. The Department of Education intends to engage in rulemaking on the topic of schools' Title IX responsibilities concerning complaints of sexual misconduct, including peer-on-peer sexual harassment and sexual violence. The Department will solicit input from stakeholders and the public during that rulemaking process. In the interim, these questions and answers—along with the *Revised Sexual Harassment Guidance* previously issued by the Office for Civil Rights[1]—provide information about how OCR will assess a school's compliance with Title IX.

**SCHOOLS' RESPONSIBILITY TO ADDRESS SEXUAL MISCONDUCT**

<u>Question 1</u>:

What is the nature of a school's responsibility to address sexual misconduct?

<u>Answer</u>:

Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and to respond appropriately.[2] In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond.[3]

---

[1] Office for Civil Rights, *Revised Sexual Harassment Guidance* (66 Fed. Reg. 5512, Jan. 19, 2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [hereinafter 2001 Guidance]; *see also* Office for Civil Rights, Dear Colleague Letter on Sexual Harassment (Jan. 25, 2006), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.

[2] 2001 Guidance at (VII).

[3] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a); 2001 Guidance at (V)(A)(1). Title IX prohibits discrimination on the basis of sex "under any education program or activity" receiving federal financial assistance, 20 U.S.C. § 1681(a); 34 C.F.R. § 106.1, meaning within the "operations" of a postsecondary institution or school district, 20 U.S.C. § 1687; 34 C.F.R. § 106.2(h). The Supreme Court has explained that the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. Accordingly, OCR has informed institutions that "[a] university does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." Oklahoma State University Determination Letter at 2, OCR Complaint No. 06-03-2054 (June 10, 2004); *see also* University of Wisconsin-Madison Determination Letter, OCR Complaint No. 05-07-2074 (Aug. 6, 2009) ("OCR determined that the alleged assault did not occur in the context of an educational program or activity operated by the University."). Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities. Under the Clery Act, postsecondary institutions are obliged to collect and report statistics on crimes that occur on campus, on noncampus properties controlled by the institution or an affiliated student organization and used for educational purposes, on public property within or immediately adjacent to campus, and in areas within the patrol jurisdiction of the campus police or the campus security department. 34 C.F.R. § 668.46(a); 34 C.F.R. § 668.46(c).

EXHIBIT 10

Each recipient must designate at least one employee to act as a Title IX Coordinator to coordinate its responsibilities in this area.[4] Other employees may be considered "responsible employees" and will help the student to connect to the Title IX Coordinator.[5]

In regulating the conduct of students and faculty to prevent or redress discrimination, schools must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty, including those court precedents interpreting the concept of free speech.[6]

## THE CLERY ACT AND TITLE IX

Question 2:

What is the Clery Act and how does it relate to a school's obligations under Title IX?

Answer:

Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX.[7] Each year, institutions must disclose campus crime statistics and information about campus security policies as a condition of participating in the federal student aid programs. The Violence Against Women Reauthorization Act of 2013 amended the Clery Act to require institutions to compile statistics for incidents of dating violence, domestic violence, sexual assault, and stalking, and to include certain policies, procedures, and programs pertaining to these incidents in the annual security reports. In October 2014, following a negotiated rulemaking process, the Department issued amended regulations to implement these statutory changes.[8] Accordingly, when addressing allegations of dating violence, domestic violence, sexual assault, or stalking, institutions are subject to the Clery Act regulations as well as Title IX.

## INTERIM MEASURES

Question 3:

What are interim measures and is a school required to provide such measures?

Answer:

Interim measures are individualized services offered as appropriate to either or both the reporting and responding parties involved in an alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending.[9] Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations.

---

[4] 34 C.F.R. § 106.8(a).
[5] 2001 Guidance at (V)(C).
[6] Office for Civil Rights, Dear Colleague Letter on the First Amendment (July 28, 2003), *available at* https://www2.ed.gov/about/offices/list/ocr/firstamend.html; 2001 Guidance at (XI).
[7] Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, Pub. L. No. 101-542, 20 U.S.C. § 1092(f).
[8] *See* 34 C.F.R. § 668.46.
[9] *See* 2001 Guidance at (VII)(A).

EXHIBIT 10

2

It may be appropriate for a school to take interim measures during the investigation of a complaint.[10] In fairly assessing the need for a party to receive interim measures, a school may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school make such measures available only to one party. Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator, making every effort to avoid depriving any student of her or his education. The measures needed by each student may change over time, and the Title IX Coordinator should communicate with each student throughout the investigation to ensure that any interim measures are necessary and effective based on the students' evolving needs.

## GRIEVANCE PROCEDURES AND INVESTIGATIONS

Question 4:

What are the school's obligations with regard to complaints of sexual misconduct?

Answer:

A school must adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct.[11] OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the school (i) provides notice of the school's grievance procedures, including how to file a complaint, to students, parents of elementary and secondary school students, and employees; (ii) applies the grievance procedures to complaints filed by students or on their behalf alleging sexual misconduct carried out by employees, other students, or third parties; (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (iv) designates and follows a reasonably prompt time frame for major stages of the complaint process; (v) notifies the parties of the outcome of the complaint; and (vi) provides assurance that the school will take steps to prevent recurrence of sexual misconduct and to remedy its discriminatory effects, as appropriate.[12]

Question 5:

What time frame constitutes a "prompt" investigation?

Answer:

There is no fixed time frame under which a school must complete a Title IX investigation.[13] OCR will evaluate a school's good faith effort to conduct a fair, impartial investigation in a timely manner designed to provide all parties with resolution.

Question 6:

What constitutes an "equitable" investigation?

---

[10] 2001 Guidance at (VII)(A). In cases covered by the Clery Act, a school must provide interim measures upon the request of a reporting party if such measures are reasonably available. 34 C.F.R. § 668.46(b)(11)(v).

[11] 34 C.F.R. § 106.8(b); 2001 Guidance at (V)(D); *see also* 34 C.F.R. § 668.46(k)(2)(i) (providing that a proceeding which arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result").

[12] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k). Postsecondary institutions are required to report publicly the procedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, and stalking, 34 C.F.R. § 668.46 (k)(1)(i), and to include a process that allows for the extension of timeframes for good cause with written notice to the parties of the delay and the reason for the delay, 34 C.F.R. § 668.46 (k)(3)(i)(A).

[13] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k)(3)(i)(A).

EXHIBIT 10

Answer:

In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed. A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.

An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case.[14]

Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms.[15] Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable. Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.[16]

Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident.[17] Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.[18]

## INFORMAL RESOLUTIONS OF COMPLAINTS

Question 7:

After a Title IX complaint has been opened for investigation, may a school facilitate an informal resolution of the complaint?

Answer:

If all parties voluntarily agree to participate in an informal resolution that does not involve a full investigation and adjudication after receiving a full disclosure of the allegations and their options for formal resolution and if a school determines that the particular Title IX complaint is appropriate for such a process, the school may facilitate an informal resolution, including mediation, to assist the parties in reaching a voluntary resolution.

---

[14] 2001 Guidance at (V)(A)(1)-(2); *see also* 34 C.F.R. § 668.46(k)(2)(ii).
[15] 2001 Guidance at (X).
[16] 34 C.F.R. § 106.31(a).
[17] 2001 Guidance at (VII)(B).
[18] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

EXHIBIT 10

## DECISION-MAKING AS TO RESPONSIBILITY

Question 8:

What procedures should a school follow to adjudicate a finding of responsibility for sexual misconduct?

Answer:

The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy. If the complaint presented more than a single allegation of misconduct, a decision should be reached separately as to each allegation of misconduct. The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard.[19]

The decision-maker(s) must offer each party the same meaningful access to any information that will be used during informal and formal disciplinary meetings and hearings, including the investigation report.[20] The parties should have the opportunity to respond to the report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility.

Any process made available to one party in the adjudication procedure should be made equally available to the other party (for example, the right to have an attorney or other advisor present and/or participate in an interview or hearing; the right to cross-examine parties and witnesses or to submit questions to be asked of parties and witnesses).[21] When resolving allegations of dating violence, domestic violence, sexual assault, or stalking, a postsecondary institution must "[p]rovide the accuser and the accused with the same opportunities to have others present during any institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice."[22] In such disciplinary proceedings and any related meetings, the institution may "[n]ot limit the choice of advisor or presence for either the accuser or the accused" but "may establish restrictions regarding the extent to which the advisor may participate in the proceedings."[23]

Schools are cautioned to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication. Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially.

---

[19] The standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases. In a recent decision, a court concluded that a school denied "basic fairness" to a responding party by, among other things, applying a lower standard of evidence only in cases of alleged sexual misconduct. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("[T]he lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."). When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided. A postsecondary institution's annual security report must describe the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking. 34 C.F.R. § 668.46(k)(1)(ii).
[20] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).
[21] A school has discretion to reserve a right of appeal for the responding party based on its evaluation of due process concerns, as noted in Question 11.
[22] 34 C.F.R. § 668.46(k)(2)(iii).
[23] 34 C.F.R. § 668.46(k)(2)(iv).

EXHIBIT 10

## DECISION-MAKING AS TO DISCIPLINARY SANCTIONS

Question 9:

What procedures should a school follow to impose a disciplinary sanction against a student found responsible for a sexual misconduct violation?

Answer:

The decision-maker as to any disciplinary sanction imposed after a finding of responsibility may be the same or different from the decision-maker who made the finding of responsibility. Disciplinary sanction decisions must be made for the purpose of deciding how best to enforce the school's code of student conduct while considering the impact of separating a student from her or his education. Any disciplinary decision must be made as a proportionate response to the violation.[24] In its annual security report, a postsecondary institution must list all of the possible sanctions that the institution may impose following the results of any institutional disciplinary proceeding for an allegation of dating violence, domestic violence, sexual assault, or stalking.[25]

## NOTICE OF OUTCOME AND APPEALS

Question 10:

What information should be provided to the parties to notify them of the outcome?

Answer:

OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently. The content of the notice may vary depending on the underlying allegations, the institution, and the age of the students. Under the Clery Act, postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final.[26] This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions.[27] For proceedings not covered by the Clery Act, such as those arising from allegations of harassment, and for all proceedings in elementary and secondary schools, the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and other steps the school has taken to eliminate the hostile environment, if the school found one to exist.[28] In an elementary or secondary school, the notice should be provided to the parents of students under the age of 18 and directly to students who are 18 years of age or older.[29]

---

[24] 34 C.F.R. § 106.8(b); 2001 Guidance at (VII)(A).

[25] 34 C.F.R. § 668.46(k)(1)(iii).

[26] 34 C.F.R. § 668.46(k)(2)(v). The Clery Act applies to proceedings arising from allegations of dating violence, domestic violence, sexual assault, and stalking.

[27] 34 C.F.R. § 668.46(k)(3)(iv).

[28] A sanction that directly relates to the reporting party would include, for example, an order that the responding party stay away from the reporting party. *See* 2001 Guidance at vii n.3. This limitation allows the notice of outcome to comply with the requirements of the Family Educational Rights and Privacy Act. *See* 20 U.S.C. § 1232g(a)(1)(A); 34 C.F.R. § 99.10; 34 C.F.R. § 99.12(a). FERPA provides an exception to its requirements only for a postsecondary institution to communicate the results of a disciplinary proceeding to the reporting party in cases of alleged crimes of violence or specific nonforcible sex offenses. 20 U.S.C. § 1232g(b)(6); 34 C.F.R. § 99.31(a)(13).

[29] 20 U.S.C. § 1232g(d).

EXHIBIT 10

Question 11:

How may a school offer the right to appeal the decision on responsibility and/or any disciplinary decision?

Answer:

If a school chooses to allow appeals from its decisions regarding responsibility and/or disciplinary sanctions, the school may choose to allow appeal (i) solely by the responding party; or (ii) by both parties, in which case any appeal procedures must be equally available to both parties.[30]

**EXISTING RESOLUTION AGREEMENTS**

Question 12:

In light of the rescission of OCR's 2011 Dear Colleague Letter and 2014 Questions & Answers guidance, are existing resolution agreements between OCR and schools still binding?

Answer:

Yes. Schools enter into voluntary resolution agreements with OCR to address the deficiencies and violations identified during an OCR investigation based on Title IX and its implementing regulations. Existing resolution agreements remain binding upon the schools that voluntarily entered into them. Such agreements are fact-specific and do not bind other schools. If a school has questions about an existing resolution agreement, the school may contact the appropriate OCR regional office responsible for the monitoring of its agreement.

*Note:* The Department has determined that this Q&A is a significant guidance document under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Reg. 3432 (Jan. 25, 2007). This document does not add requirements to applicable law. If you have questions or are interested in commenting on this document, please contact the Department of Education at ocr@ed.gov or 800-421-3481 (TDD: 800-877-8339).

---

[30] 2001 Guidance at (IX). Under the Clery Act, a postsecondary institution must provide simultaneous notification of the appellate procedure, if one is available, to both parties. 34 C.F.R. § 668.46(k)(2)(v)(B). OCR has previously informed schools that it is permissible to allow an appeal only for the responding party because "he/she is the one who stands to suffer from any penalty imposed and should not be made to be tried twice for the same allegation." Skidmore College Determination Letter at 5, OCR Complaint No. 02-95-2136 (Feb. 12, 1996); *see also* Suffolk University Law School Determination Letter at 11, OCR Complaint No. 01-05-2074 (Sept. 30, 2008) ("[A]ppeal rights are not necessarily required by Title IX, whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process before being removed from or otherwise disciplined by the University."); University of Cincinnati Determination Letter at 6, OCR Complaint No. 15-05-2041 (Apr. 13, 2006) ("[T]here is no requirement under Title IX that a recipient provide a victim's right of appeal.").

EXHIBIT 10

EXHIBIT 11

Skip to main content | About Us | Contact Us | FAQs |  Language Assistance ▾



**U.S. Department of Education**

| Student Loans | Grants | Laws | Data |

**OCR**
Office for Civil Rights

- **Home**
- **Programs/Initiatives**
- **Office Contacts**

- **Reports & Resources**
- **News**

- **About OCR**
- **Reading Room**
- **Frequently Asked Questions**

- **Careers/Internships**
- **Blog**

# Race and National Origin Discrimination
Frequently Asked Questions

Frequently Asked Questions >>



Answers to common questions + our FOIA reading room

**Overview**
Below are Frequently Asked Questions on Race and National Origin Discrimination.

**Frequently Asked Questions About Race and National Origin Discrimination - General** ▾

**Frequently Asked Questions About Race and National Origin** ▾

## How Do I Find...

- Student loans, forgiveness
- College accreditation
- Every Student Succeeds Act (ESSA)
- FERPA
- FAFSA
- 1098, tax forms

More >

## Information About...

- Transforming Teaching
- Family and Community Engagement
- Early Learning

## Related Topics

▪ **How to File a Complaint**

▪ **Topics A-Z**

▪ **Civil Rights Data Collection (CRDC)**

▪ **Other Civil Rights**

EXHIBIT 11

**Discrimination - Racial Harassment**

**Frequently Asked Questions About Race and National Origin Discrimination - English Learner Students** ▾

**Agencies**

---

- **Recursos de la Oficina Para Derechos Civiles en Español**

---

- **Resources Available in Other Languages**

---

| Topic | Discrimination |
| --- | --- |

---

**Frequently Asked Questions About Race and National Origin Discrimination - General**

### What is Title VI?

Title VI is a federal law that prohibits any entity that receives federal financial assistance (such as grants or student loans) from discriminating on the basis of race, color, or national origin.

Top

### What does "race, color, or national origin" mean within the context of Title VI?

Discrimination on the basis of race, color, or national origin includes discrimination based on a person's actual or perceived race, color, national origin, ethnicity, or ancestry. This includes discrimination based on the country, world region, or place where a person or his or her ancestors come from; a person's limited English proficiency or English learner status; or a person's actual or perceived shared ancestry or ethnic characteristics, including membership in a religion that may be perceived to exhibit such characteristics (such as Hindu, Jewish, Muslim, and Sikh individuals).

Top

### Are all school districts, colleges, and universities covered by Title VI?

Generally yes. All public school districts are covered by Title VI because they receive some federal financial assistance. All public colleges and universities and virtually all private colleges and universities are covered because they receive such assistance by participating in federal student aid programs. There are some private schools that do not receive any federal assistance, and Title VI does not apply to them.

Top

EXHIBIT 11

### Are all programs in a school, college, or university covered by Title VI if any part of it receives federal financial assistance?

Yes. All programs in a school or college are covered if the school district, college, or university receives federal financial assistance. Title VI covers all the operations of a school or college that receives financial assistance including academics, extracurricular activities, athletics, and other programs. Title VI applies to actions of a school or college regardless of where they occur, including those that take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere off campus.

Top

### Does Title VI protect only students?

No. Title VI protects all persons from discrimination, including parents and guardians, students, and to a limited degree, employees.

Top

### What types of Title VI cases does OCR handle?

OCR handles cases of race, color, and national origin discrimination involving a range of issues, such as discriminatory discipline, racial harassment, unequal access to educational resources, and denial of language services or equal educational opportunities to English learners.

Top

---

**Frequently Asked Questions About Race and National Origin Discrimination - Racial Harassment**

### What is racial and national origin harassment?

Racial and national origin harassment is unwelcome conduct based on a student's actual or perceived race or national origin. Harassers can be students, school staff, or even someone visiting the school, such as a student or employee from another school. Racial and national origin harassment can take many forms, including slurs, taunts, stereotypes, or name-calling, as well as racially-motivated physical threats, attacks, or other hateful conduct. Although none of the laws OCR enforces expressly address religious discrimination, OCR can investigate

EXHIBIT 11

complaints that students were subjected to ethnic or ancestral slurs; harassed for how they look, dress, or speak in ways linked to ethnicity or ancestry (e.g. skin color, religious attire, language spoken); or stereotyped based on perceived shared ancestral or ethnic characteristics. Hindu, Jewish, Muslim, and Sikh students are examples of individuals who may be harassed for being viewed as part of a group perceived to exhibit both ethnic and religious characteristics.

Top

### What are the responsibilities of school districts, colleges, and universities under Title VI to address racial and national origin harassment?

Title VI requires an educational institution to respond to racial or national origin harassment that is sufficiently serious to deny or limit a student's ability to participate in or benefit from the recipient's education programs and activities (i.e., creates a hostile environment).

When an educational institution knows or reasonably should know of possible racial or national origin harassment, it must take immediate and appropriate steps to investigate or otherwise determine what occurred. If an investigation reveals that the harassment created a hostile environment, the educational institution must take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.

Top

### How do educational institutions balance their Title VI obligations with individuals' First Amendment rights?

OCR has consistently reaffirmed that the Federal civil rights laws it enforces protect students from prohibited discrimination, and are not intended to restrict expressive activities or speech protected under the U.S. Constitution's First Amendment.

The fact that discriminatory harassment involves speech, however, does not relieve the school of its obligation to respond if the speech contributes to a hostile environment. Schools can protect students from such harassment without running afoul of students' and staff First Amendment rights. For instance, in a situation where the First Amendment prohibits a public university from

EXHIBIT 11

restricting the right of students to express persistent and pervasive derogatory opinions about a particular ethnic group, the university can instead meet its obligation by, among other steps, communicating a rejection of stereotypical, derogatory opinions and ensuring that competing views are heard. Similarly, educational institutions can establish a campus culture that is welcoming and respectful of the diverse linguistic, cultural, racial, and ethnic backgrounds of all students and institute campus climate checks to assess the effectiveness of the school's efforts to ensure that it is free from harassment. Schools can also encourage students on all sides of an issue to express disagreement over ideas or beliefs in a respectful manner. Schools should be alert to take more targeted responsive action when speech crosses over into direct threats or actionable speech or conduct.

Top

## How does OCR address racial and national origin harassment against students?

OCR investigates and resolves allegations that educational institutions that are recipients of federal funds have failed to protect students from harassment based on race, color or national origin. Where OCR identifies concerns or violations, educational institutions often resolve them with agreements requiring the educational institutions to adopt effective anti-harassment policies and procedures, train staff and students, address the incidents in question, and take other steps to restore a nondiscriminatory environment.

In addition to resolving investigations, OCR takes steps to inform schools of their obligation to provide a nondiscriminatory environment. To see relevant policy guidance relating to race-based harassment, please click here.

OCR's field offices also engage in a variety of technical assistance activities in collaboration with state and local education and law enforcement agencies to encourage educational institutions to improve their anti-harassment policies and procedures and to assist students and their parents to work with schools to enhance the schools' anti-harassment capability.

Top

EXHIBIT 11

**Frequently Asked Questions About Race and National Origin Discrimination - English Learner Students**

## What does Title VI require school districts to do for English learner students?

Under Title VI, school districts must take affirmative steps to ensure that English learner (EL) students (also sometimes referred to as English language learners or Limited English Proficient students) can participate meaningfully and equally in educational programs and services. For example, school districts must:

- identify EL students in a timely, valid, and reliable manner;
- offer all EL students an educationally sound language assistance program; provide qualified staff and sufficient resources to instruct EL students;
- ensure EL students have equitable access to school programs, activities, and services;
- avoid unnecessary segregation of EL students from other students;
- monitor the progress of EL students in learning English and doing grade-level classwork; remedy any academic deficits EL students incur while in a language assistance program;
- move EL students out of language assistance programs when they are proficient in English and monitor them to ensure they were not prematurely exited; and
- evaluate the effectiveness of EL programs.

More information is available on OCR's webpage about a school's civil rights obligations to English Learner students and Limited English Proficient parents.

Top

## Does OCR require school districts to follow a particular educational approach, such as bilingual education?

No. OCR does not require or advocate a particular educational approach to the instruction of EL students. School districts have substantial flexibility when developing programs to meet the needs of EL students.

Top

## What if parents do not want their child to have services to address their English needs?

EXHIBIT 11

Parents can opt to not have their children enrolled in a separate EL program. When a parent declines participation, the school district retains a responsibility to ensure that the student has an equal opportunity to have his or her English language and academic needs met. School districts can meet this obligation in a variety of ways (e.g. adequate training to classroom teachers on second language acquisition; monitoring the educational progress of the student).

Top

### How long does a school district have to provide special services to English learner students?

EL students must be provided with language assistance and related services until they are proficient enough in English to participate meaningfully in the regular program. To determine whether a child is ready to exit, a school district must use a valid and reliable assessment of a student's ability to read, write, speak and comprehend English.

Top

Last Modified: 01/10/2020

**Student Loans**

Repaying Loans

Defaulted Loans

Loan Forgiveness

Loan Servicers

**Grants & Programs**

Apply for Pell Grants

Grants Forecast

Apply for a Grant

Eligibility for Grants

**Laws & Guidance**

Every Student Succeeds Act (ESSA)

FERPA

Civil Rights

New IDEA Website

**Data & Research**

Education Statistics

Postsecondary Education Data

ED Data Express

Nation's Report Card

What Works Clearinghouse

**About Us**

Contact Us

ED Offices

Jobs

Press Releases

FAQs

Recursos en español

Budget, Performance

Privacy Program

Subscribe to E-Mail Updates

   

EXHIBIT 11

Case 1:20-cv-01468-CJN   Document 22-3   Filed 06/23/20   Page 195 of 1598

Notices   FOIA   Privacy Policy   Accessibility   Security   Information quality   Inspector General   Whitehouse.gov   USA.gov
Benefits.gov   Regulations.gov

EXHIBIT 11

EXHIBIT 12

  

**COMMONWEALTH OF PENNSYLVANIA OFFICE OF ATTORNEY GENERAL JOSH SHAPIRO ATTORNEY GENERAL**

**STATE OF CALIFORNIA OFFICE OF THE ATTORNEY GENERAL XAVIER BECERRA ATTORNEY GENERAL**

**STATE OF NEW JERSEY OFFICE OF THE ATTORNEY GENERAL GURBIR S. GREWAL ATTORNEY GENERAL**

January 30, 2019

***VIA Federal eRulemaking Portal & Mail***
The Honorable Betsy DeVos
Secretary
U.S. Department of Education
400 Maryland Avenue S.W.
Washington D.C. 20202

Re:    Comment on Proposed Rule Regarding Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance—Docket ID ED–2018–OCR–0064 (83 Fed. Reg. 61,462 (Nov. 29, 2018))

Dear Secretary DeVos:

On behalf of the Commonwealths of Pennsylvania and Kentucky, the States of New Jersey, California, Delaware, Hawai'i, Illinois, Iowa, Maine, Maryland, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia, we write to express our strong opposition to the *Proposed Rule Regarding Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* (the "proposed rule"), published by the Department of Education (the "Department") in the Federal Register on November 29, 2018. This rule seeks to impose procedures for the implementation of Title IX of the Education Amendments Act of 1972 (Title IX). Unfortunately, many of these proposed procedures would thwart the very purpose of Title IX—to provide equal access to educational opportunities. For this reason, we urge you to withdraw this rule.

1

EXHIBIT 12

Proper enforcement of Title IX is an issue of immense importance to our states, our resident students and families, our teachers, and our communities. The ability to learn in a safe environment free from violence and discrimination is critical and something that we as states prioritize and value.

Conduct that violates Title IX may also violate criminal laws, and state attorneys general, along with county and local prosecutors, have the responsibility to investigate and prosecute these violations when warranted. Many of our states prohibit discrimination based on sex.[1] We have a strong interest in vigorous enforcement of these laws and in ensuring that our own enforcement efforts are not undermined by a weaker federal regime.

Title IX applies to public K-12 schools as well as public colleges and universities, so the states are regulated entities under the proposal. And the states themselves regulate, and in many cases provide funding for, private educational institutions within their borders, which will be subject to the proposed rule to the extent they receive federal funds. Most importantly, the states have a profound interest in protecting the well-being of their students and in ensuring that they are able to obtain an education free of sexual harassment, violence, and discrimination.

We represent states in which schools[2] have worked to bring their procedures in line with Title IX's requirements: to provide students an educational environment free from discrimination based on sex, including sexual harassment and violence. The proposed rule imposes new requirements on schools and complainants that would mark a significant departure from that fundamental purpose of Title IX.

In this comment letter, we address aspects of the proposed rule that would be incompatible with Title IX, inappropriate exercises of the Department's authority, and unsupported by the facts. Section I of the comment provides relevant factual and legal background on sexual harassment and violence and its impact on education. Section II addresses the Department's proposal for a general rule to govern schools' obligations to respond to sexual harassment and violence. Section III addresses the proposed definitions of "complainant," "formal complaint," and "supportive measures." Section IV details problems with the Department's proposed formal grievance procedures. Section V requests clarification regarding how the proposed rule will interact with other federal, state, and local laws and policies. Section VI addresses other issues with the proposed rule. Section VII identifies flaws in the

---

[1] *E.g.*, Cal. Const., art. I, § 7(a) & (b); Cal. Educ. Code § 220; Cal. Gov't Code § 11135; Minn. Stat. § 363A.13; N.J.S.A. 10:5-12; Pa. Const. art. I, § 28.

[2] For purposes of this letter, "school" is defined consistent with the statute to include "any education program or activity receiving Federal financial assistance," which includes but is not limited to most elementary and secondary schools and institutions of undergraduate and higher graduate education. 20 U.S.C. § 1681, *et. seq.* We use "school" synonymously with the term "recipient" used by the proposed rule.

EXHIBIT 12

Department's regulatory impact analysis. And Section VIII speaks to the effective date of any Title IX rule adopted by the Department.

Finally, we are concerned that during the notice and comment process the Department of Education has not proactively released required records under the Administrative Procedure Act (APA). The APA requires federal agencies to reveal "for public evaluation" the "technical studies and data upon which the agency relies" in rulemaking, including reports and information relied on by the agency in reaching its conclusions.[3] We understand that studies relied on by the Department in preparing the Regulatory Impact Analysis[4] have not been made available to the public in contravention of the APA. In addition, tens of thousands of comments already submitted to Regulations.gov are also not available to the public,[5] even though the Notice of Proposed Rulemaking (NPRM) specifically indicates "all public comments about these proposed regulations" will be available for inspection "[d]uring and after the comment period" by accessing Regulations.gov. 83 Fed. Reg. at 61,463. We ask that the Department promptly make this information public and provide sufficient time for a meaningful response.

---

[3] *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (internal quotations and citations omitted).

[4] *See, e.g.*, 83 Fed. Reg. at 61,485 (discussing "examin[ation of] public reports of Title IX reports and investigations at 55 [institutions of higher education] nationwide").

[5] *Compare* https://www.regulations.gov/document?D=ED-2018-OCR-0064-0001 (stating that approximately 96,800 comments have been submitted as of 2:00 PM ET on January 30, 2019), *with* https://www.regulations.gov/docketBrowser?rpp=25&po=0&dct=PS&D=ED-2018-OCR-0064&refD=ED-2018-OCR-0064-0001 (allowing the public to access only 8,909 comments as of 2:00 PM ET on January 30, 2019).

EXHIBIT 12

Table of Contents

I. Title IX Guarantees Students an Equal Education Free of Sexual Harassment, Which is Pervasive and Deeply Harmful to Students. ........................................................ 7

II. The Department of Education's Title IX Standards Are Contrary to Title IX and Weaken Students' Protections Against Sexual Harassment and Violence. ...................... 12

    A. The Proposed Rule Would Narrow the Definition of "Sexual Harassment" In Ways that Would Undermine the Objectives of Title IX. ................................ 13

        1. The Proposed Definition of "Sexual Harassment" Would Significantly Depart from Previous Title IX Policy. ............................... 13

        2. The Proposed Definition of "Sexual Harassment" Would Fail to Account for the Context in Which Sexual Harassment Occurs. .............. 17

        3. The Proposed Definition of "Sexual Harassment" Would Chill Reporting. ................................................................................................... 18

    B. The Proposed Rule Would Inappropriately Limit Schools' Obligation to Respond to Sexual Harassment and Violence by Excusing Failures to Respond to Conduct that Does Not Occur "In an Education Program or Activity." ...................................................................................................... 19

    C. The "Actual Knowledge" Standard is Too Restrictive. ............................... 22

        1. The Proposed Rule Undermines the Purpose of Title IX and Creates an Improper Incentive to Willfully Ignore Sexual Harassment Because it Requires Schools to Respond Only if They Have "Actual Knowledge" of the Harassment. ....................................... 22

        2. Constructive Knowledge and Agency Principles Should Apply to the School's Notice of Sexual Harassment and Violence. ........................ 24

    D. The Proposed Rule Would Adopt a "Deliberate Indifference" Standard That Is Not Appropriate for Administrative Enforcement of Title IX. ................. 26

    E. Safe Harbor Provisions Are Inappropriate and Schools Must Investigate Any Potential Hostile Environment. ................................................................... 28

III. The Department Should Adopt Policies for Complaints that Maximize Reporting. ........ 31

    A. The Department's Proposed Definition of "Complainant" Is Too Restrictive. ................................................................................................... 31

    B. The Definition of "Formal Complaint" Creates a Barrier to Filing for Complainants, Particularly Underage Students, and Does Not Provide for Reasonable Accommodation. ............................................................... 32

    C. "Supportive Measures" Should be Responsive to a Complainant's Needs. ........ 33

IV. The Proposed Grievance Procedure Fails to Provide a Fair and Equitable Process for Resolving Formal Title IX Complaints. ................................................... 34

EXHIBIT 12

A.    Credibility Determinations Should Not Be Based Solely on Person's Status.................................................................................................. 35

B.    The Presumption of Non-Responsibility Improperly Tilts the Process in Favor of the Respondent. ....................................................... 35

C.    The Department Should Provide Prompt Timeframes and Should Not Encourage Good Cause Delay for Concurrent Law Enforcement Proceedings........................................................................................... 36

D.    When Issuing a Notice Upon Receipt of a Formal Complaint, Schools Should be Required to Protect Confidentiality and Preserve the Integrity of the Investigation.................................................................................... 38

E.    Schools Should be Allowed to Place Limited, Reasonable Restrictions on Discussions by the Parties.......................................................... 39

F.    The Proposed Hearing Procedures Will Chill Reporting, Burden Schools, and Harm Both Complainants and Respondents. .................................. 39

G.    Schools Should Not be Required to Provide Parties With Access to All Collected Evidence. .......................................................................... 42

H.    The Standard of Proof Should Remain Preponderance of the Evidence. ............. 43

I.    The Written Determination Must Include Steps to Eliminate Any Hostile Environment......................................................................................... 47

J.    The Department Should Clarify that both Complainants and Respondents Have Equal Access to the Appeal Process.............................................. 47

K.    Any Informal Resolution Must Empower Complainants and Seek Restorative Justice. ............................................................................. 47

L.    The Recordkeeping Retention Period Should Be Extended. ................................ 48

V.    The Department Should Not Adopt a Title IX Rule that Adversely Affects Schools' Ability to Go Beyond Title IX's Requirements in Addressing Sexual Harassment and Violence, Including Their Ability to Comply with Other Applicable Laws. ................................................................................... 49

A.    Title IX Cannot, And Does Not, Restrict The Ability of States and Schools To Provide Broader Protections Against Sex Discrimination. ............................ 49

B.    State Laws Provide Greater Protections for Students In Their States. ................. 52

VI.    Other Areas That Should Be Addressed Before Any Final Rule is Adopted. .................. 56

A.    Any Final Rule Should Reinstate the Longstanding Prohibition of Policies That "Suggest" Sex Discrimination. ...................................................... 56

B.    The Proposal to Eliminate the Requirement that Institutions Invoke the Statute's Religious Exemption in Writing Raises Concerns of Fair Notice to Students............................................................................................. 59

EXHIBIT 12

C.    Restriction of Remedies to Exclude "Damages" and Lack of Definition Inconsistently Limits Remedial Scheme Which Was Intended to Strike at the Entire Spectrum of Discrimination on the Basis of Sex. ................................ 60

D.    Any Final Rule Should Include Guidelines for Confidentiality. .......................... 61

E.    Schools Have Continuing Obligations Following a Finding of Responsibility or Following an Independent Investigation. .................................. 62

F.    The Proposed Rule Fails to Sufficiently Address the Family Educational Rights and Privacy Act (FERPA). ........................................................... 63

VII.   The Regulatory Impact Assessment Fails to Accurately Assess the Effect of the Proposed Rule. ...................................................................................................... 63

A.    Ignored Costs. ..................................................................................................... 63

1.    Allegations that Do Not Meet the Proposed Stringent Requirements May Still Resurface as Costly Lawsuits. ........................... 64

2.    The Department Should Consider the Relationship Between Uninvestigated Allegations and Short- and Long-Term Absences........... 65

3.    Costs to Transgender Students. ................................................................. 65

B.    Unreasonably Low Estimate of Percentage of Title IX Complaints Based on Sexual Harassment or Sexual Violence. ......................................................... 66

C.    The Department Provides Unreasonably Low Cost Estimates for Implementing the Proposed Rule........................................................................ 66

VIII.   The Department Should Delay the Effective Date of the Rule........................................ 68

IX.    Conclusion ...................................................................................................................... 69

6

EXHIBIT 12

## I.     Title IX Guarantees Students an Equal Education Free of Sexual Harassment[6], Which is Pervasive and Deeply Harmful to Students.

Title IX of the Education Amendments Act of 1972 is a civil rights statute that guarantees students equal access to educational programs and activities free of discrimination based on sex.[7] Since at least 1992, this right has been applied to protect students from sexual harassment and sexual violence that would limit or deny their ability to participate equally in the benefits, services, and opportunities of federally funded educational programs and activities.[8]

Sexual harassment of students occurs far too frequently—at all grade levels and to all types of students. More than 20 percent of girls aged 14 to 18 have been kissed or touched without consent.[9] In grades 7–12, 56 percent of girls and 40 percent of boys are sexually harassed every year, with nearly a third of the harassment taking place online.[10] In college, nearly two thirds of both men and women will experience sexual harassment.[11] More than 1 in 5 women and nearly 1 in 18 men in college were survivors of sexual assault or sexual misconduct due to physical force, threats of force, or incapacitation.[12] The federal government's own studies reaffirm these statistics: the U.S. Department of Justice's Bureau of Justice Statistics found that, on average, 20.5 percent of college women had experienced sexual assault since entering college,[13] while the Centers for Disease Control and Prevention found that one in five women

---

[6] Sexual violence and sexual assault can both be forms of sexual harassment. The term "sexual harassment" as used herein includes sexual violence, which courts and the Department have recognized is a subset of actionable conduct under the term "sexual harassment." *See, e.g.*, U.S. Dep't of Educ., Off. for Civil Rights, *Dear Colleague Letter*, at 1 (Apr. 4, 2011, withdrawn Sept. 22, 2017) (the "2011 DCL") ("Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX.").

[7] 20 U.S.C. § 1681(a).

[8] *Franklin v. Gwinnett Cty. Pub. Schs.,* 503 U.S. 60 (1992).

[9] Nat'l Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 1 (Apr. 2017), https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence.

[10] Catherine Hill & Holly Kearl, *Crossing the Line: Sexual Harassment at School*, AAUW 11 (2011), https://www.aauw.org/files/2013/02/Crossing-the-Line-Sexual-Harassment-at-School.pdf.

[11] Catherine Hill & Elena Silva, *Drawing the Line: Sexual Harassment on Campus*, AAUW 17, 19 (2005), https://history.aauw.org/files/2013/01/DTLFinal.pdf (noting differences in the types of sexual harassment and reactions to it).

[12] *E.g.*, David Cantor et al., *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct*, Association of American Universities 13-14 (Sept. 2015, reissued Oct. 2017), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/AAU-Campus-Climate-Survey-FINAL-10-20-17.pdf.

[13] *See generally*, Campus Climate Survey Validation Study, Final Technical Report (Jan. 2016), Appx. E, https://www.bjs.gov/content/pub/pdf/App_E_Sex-Assault-Rape-Battery.pdf; *see also* Sofi Sinozich & Lynn Langton, *Rape and Sexual Assault Victimization Among College-Age Females, 1995–*

EXHIBIT 12

have experienced sexual assault in their lifetimes.[14] And harassment is not limited to women: Men and boys are far more likely to be subjected to sexual assault than to be falsely accused of it.[15] Historically marginalized and underrepresented groups—such as girls who are pregnant or raising children, LGBTQ students, and students with disabilities—are more likely to experience sexual harassment than their peers.[16]

Despite the frequency of campus sexual harassment and violence, those subjected to it often refrain from reporting it. In 2016, only 20 percent of rape and sexual assault survivors reported these crimes to the police.[17] Only 12 percent of college survivors[18] and two percent of female survivors ages 14–18[19] reported sexual assault to their schools or the police. One national

---

*2013*, U.S. DOJ, Office of Justice Programs, Bureau of Justice Statistics (Dec. 2014), https://www.bjs. gov/content/pub/pdf/rsavcaf9513.pdf.

[14] Ctrs. for Disease Control & Prevention, *National Intimate Partner and Sexual Violence Survey*, https://www.cdc.gov/violenceprevention/pdf/nisvs_report2010-a.pdf; *see also* Ctrs. for Disease Control & Prevention, *Understanding Sexual Violence Fact Sheet*, https://www.cdc.gov/violenceprevention/pdf/sv-factsheet.pdf (last checked Jan. 21, 2019) (reporting that 1 in 2 women and 1 in 5 men experienced sexual violence other than rape during their lifetimes, about 1 in 5 women have experienced completed or attempted rape, 1 in 21 men have been made to penetrate someone else in their lifetime, and 1 in 3 female rape victims experienced it for the first time between 11-17 years old and 1 in 9 reported that it occurred before age 10).

[15] *E.g.*, Tyler Kingkade, *Males Are More Likely To Suffer Sexual Assault Than To Be Falsely Accused Of It*, Huffington Post (Oct. 16, 2015), https://www.huffingtonpost.com/2014/12/08/false-rape-accusations_n_6290380.html.

[16] Nat'l Women's Law Center, *Let Her Learn: Stopping School Pushout for Girls Who Are Pregnant or Parenting* 12 (2017), https://nwlc.org/resources/stopping-school-pushout-for-girls-who-are-pregnant-or-parenting (56 percent of girls aged 14 to 18 who are pregnant or raising children are touched or kissed without consent); Joseph G. Kosciw et al., *The 2017 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN 26 (2018), https://www.glsen.org/article/2017-national-school-climate-survey-1; *AAU Campus Climate Survey*, *supra* note 12, at 13–14 (nearly 25 percent of transgender or gender non-conforming students are sexually assaulted in college); Nat'l Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls With Disabilities* 7 (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/Final_nwlc_Gates_GirlsWithDisabilities.pdf ("[C]hildren with disabilities were 2.9 times more likely than children without disabilities to be sexually abused.").

[17] DOJ, Bureau of Justice Stats., *Criminal Victimization, 2016: Revised*, at 7 (Oct. 2018), https:// www.bjs. gov/content/pub/pdf/cv16.pdf.

[18] *Poll: One in 5 Women Say They Have Been Sexually Assaulted in College*, Wash. Post (June 12, 2015), https://www.washingtonpost.com/graphics/local/sexual-assault-poll; *see also Drawing the Line: Sexual Harassment on Campus*, *supra* note 11, at 2 ("[L]ess than 10 percent of these students tell a college or university employee about their experiences and an even smaller fraction officially report them to a Title IX officer.").

[19] *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence*, supra note 9, at 2.

EXHIBIT 12

survey found that of 770 rapes on campus during the 2014–2015 academic year, only 40 were reported to authorities under the Clery Act guidelines.[20] Students often choose not to report for fear of reprisal, because they believe their abuse was not important enough, or because they think that no one would do anything to help.[21] Reporting is even less likely among students of color,[22] undocumented students,[23] LGBTQ students,[24] and students with disabilities.[25]

When not addressed properly, sexual harassment can have a debilitating impact on a student's access to education.[26] For example, 34 percent of college survivors of sexual assault drop out of college,[27] often because they no longer feel safe on campus.[28]

This is why effective Title IX enforcement is crucial: Protecting students from the devastating effects of sexual harassment is a necessary component of an equal education free

---

[20] N.J. Task Force on Campus Sexual Assault, *2017 Report and Recommendations*, https://www.nj.gov/highereducation/documents/pdf/index/sexualassaultaskforcereport2017.pdf.

[21] RAINN, *Campus Sexual Violence: Statistics*, https://www.rainn.org/statistics/campus-sexual-violence.

[22] Colleen Murphy, *Another Challenge on Campus Sexual Assault: Getting Minority Students to Report It*, The Chronicle of Higher Education (June 18, 2015) (discussing underreporting by student of color), https://www.chronicle.com/article/Another-Challenge-on-Campus/230977; *see also* Kathryn Casteel, Julie Wolfe & Mai Nguyen, *What We Know About Victims of Sexual Assault in America*, Five Thirty Eight Projects (last checked Jan. 21, 2019), https://projects.fivethirtyeight.com/sexual-assault-victims (reporting results of the 2017 National Crime Victimization Survey (NCVS), finding that 77 percent of incidents of rape and sexual assault were not reported to the police and that 15 percent of the incidents of rape and sexual assault in the NCVS were reported by Hispanic respondents and 13 percent by non-Hispanic black respondent).

[23] *See* Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation*, N.Y. Times (Apr. 30, 2017), https://www.nytimes.com/2017/04/30/us/immigrants-deportation-sexual-abuse.html?mcubz=3.

[24] National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey: Executive Summary* 12 (Dec. 2016), https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf.

[25] Nat'l Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls with Disabilities* 7 (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/Final_nwlc_Gates_GirlsWithDisabilities.pdf.

[26] *E.g.*, Audrey Chu, *I Dropped Out of College Because I Couldn't Bear to See My Rapist on Campus*, Vice (Sept. 26, 2017), https://broadly.vice.com/en_us/article/qvjzpd/i-dropped-out-of-college-because-i-couldnt-bear-to-see-my-rapist-on-campus.

[27] Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. Student Retention: Res., Theory & Prac. 234, 244 (2015), https://doi.org/10.1177/1521025115584750.

[28] *E.g.*, Alexandra Brodsky, *How Much Does Sexual Assault Cost College Students Every Year?*, Wash. Post (Nov. 18, 2014), https://www.washingtonpost.com/posteverything/wp/2014/11/18/how-much-does-sexual-assault-cost-college-students-every-year/.

EXHIBIT 12

from discrimination. In enacting Title IX, Congress intended to ensure that all students, regardless of sex, have equal access to education. Title IX places the obligation on schools—not students—to provide educational programs and activities free from sex discrimination, sexual harassment, and sexual violence. A school's compliance with Title IX is not limited to responding appropriately to individual reports or formal complaints filed by students. Instead, schools have an affirmative legal obligation to stop harassment, eliminate hostile educational environments, prevent recurrence of harassment, and remedy its effects not only on those subjected to sexual harassment, but on the entire student body.[29]

Consistent with the purpose of the law, any Title IX regulation should focus on maximizing student access to an education free of sexual discrimination, harassment, assault, stalking, and domestic violence.[30] Yet the proposed rule does the opposite. It prioritizes reducing the number of Title IX investigations a school conducts, flipping Title IX on its head. It narrows the scope of schools' responsibility, contrary to decades of established law and practice, and ignores the reality of how sexual harassment affects a student's access to education. It will chill reporting of sexual harassment—which is already severely underreported—by imposing onerous burdens on students who seek to report sexual harassment and to vindicate their right to an equal education. It will make the standard for non-compliance so high that only schools who deliberately and intentionally flout the law will be required to take even the most basic remedial and preventative action, leaving many students without recourse or help from their school. And it will allow systemic harassment and toxic campus cultures to flourish by removing schools' well-established obligation to seek out and remedy such violations.

Equally concerning, the proposal blurs the lines between the procedures governing criminal proceedings and those applicable to non-criminal proceedings under Title IX. As a civil rights statute, Title IX is focused on ensuring equal access to educational programs and activities, not denying life and liberty to the guilty. In non-criminal proceedings, both parties are treated equally, with neither side receiving greater procedural protections than the other and with procedures designed to find the truth when the parties dispute the facts. But the proposed rule provides greater protections to respondents, and imposes significant and inappropriate burdens on complainants. Criminal procedures and protections do not apply in the Title IX context.

---

[29] *See generally Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998) ("In the event of a violation, [under OCR's administrative enforcement scheme] a funding recipient may be required to take 'such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination.' §106.3."); U.S. Dep't of Educ., Off. for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, at 20 (66 Fed. Reg. 5512, Jan. 19 2001) (the "2001 Guidance").

[30] The Violence Against Women Act, 42 U.S.C. 12291, recognizes the need to protect against domestic violence, assault, and stalking. Similarly, it is appropriate for the implementation of Title IX to recognize that domestic violence, assault, and stalking may impermissibly restrict access to educational opportunities on the basis of sexual discrimination.

EXHIBIT 12

At the end of the day, Title IX sets the floor—not the ceiling—on what schools must do to provide non-discriminatory education to all their students. Any Title IX regulation should encourage schools to uncover and prevent any harassment that negatively affects a student's access to education—not incentivize schools towards willful ignorance. And any Title IX regulations certainly cannot bar state and local governments and schools from responding more robustly to campus sexual harassment, or interfere with schools' compliance with other applicable federal, state, and local laws and policies that require such a response. Schools must continue to enjoy a right to establish codes of conduct and protections for students that go beyond what Title IX requires.

Working with the Department's Office for Civil Rights (OCR), many schools across the country have developed Title IX procedures that are fair to all parties, that reflect each school's unique circumstances, and that further the statute's anti-discrimination mandate. In many places, the proposed rule subverts these carefully refined policies. The Department's proposal is based on the misguided belief that schools are facing a torrent of frivolous Title IX complaints, but the effect will be to reduce the filing of bona fide complaints. The proposed rule introduces new biases into the process, imposes uniform requirements ill-suited to many schools' circumstances, and undermines the goal of a discrimination-free campus. The Department's proposal would reverse practices endorsed by both Democratic and Republican administrations;[31] contravene Supreme Court and other legal precedent and requirements, including the mandates of the APA; ignore the reality of where campus sexual assault occurs; impose onerous burdens on complainants; and run contrary to Title IX itself and other federal laws. The result will chill reporting of sexual harassment and prevent schools from effectively addressing its insidious effects.

It is vital that the Department's regulations support schools in fulfilling their Title IX obligations. As the Department noted in 2001, a "grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint."[32] But the Department lacks statutory authority to issue regulations, such as the proposed rule, that would impede enforcement of Title IX and limit schools' ability to rid their programs and activities of sex discrimination. Title IX mandates that no student "be excluded from participation in, denied benefits of, or be subjected to discrimination under any education program or activity" on the basis of sex.[33] And the Department's instruction from Congress is to "effectuate" this anti-discrimination mandate.[34] By effectively mandating ceilings to schools' Title IX investigations and tilting grievance

---

[31] *E.g.*, 2001 Guidance; U.S. Dep't of Educ., Off. for Civil Rights, *Dear Colleague Letter* (Jan. 25, 2006) (the "2006 DCL"); 2011 DCL.

[32] *E.g.*, 2001 Guidance at 20.

[33] 20 U.S.C. § 1681(a).

[34] 20 U.S.C. § 1682.

EXHIBIT 12

procedures against complainants, the rule undermines Title IX under the guise of enforcing it. The Department may not promulgate regulations that limit the effectiveness of the statutory mandate or hinder schools' efforts to combat discrimination even more vigorously than the statute requires.

## II.   The Department of Education's Title IX Standards Are Contrary to Title IX and Weaken Students' Protections Against Sexual Harassment and Violence.

The Department has proposed a general standard for the sufficiency of a school's response to sexual harassment that would mark a significant retreat from decades-long, bipartisan efforts to combat sexual harassment and its impact on equal access to education. Proposed § 106.44(a) would provide that "[a] recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States must respond in a manner that is not deliberately indifferent." This proposed standard—as well as the proposed definitions of "sexual harassment," "actual knowledge," "program or activity," and "deliberate indifference"—depart from current law and policy without any sound justification. As a result, the proposed rule does not effectuate the anti-discrimination mandate of Title IX as it applies to sexual harassment; rather, the rule would undermine it.

The Department's stated reason for proposing this rule is that "the administrative standards governing recipients' responses to sexual harassment should be generally aligned with the standards developed by the Supreme Court in cases assessing liability under Title IX for money damages in private litigation." 83 Fed. Reg. at 61,466. But the Department's "alignment" of the proposed rule with Supreme Court precedent is only partial and arbitrarily selective, incorrect as a matter of law, and unreasonable as a matter of policy. This proposal is ill-advised and should be withdrawn.

The Department does not point to any unfairness in the previous definition of sexual harassment, the application of constructive knowledge or agency principles, the requirement that schools address off-campus conduct, or the reasonableness standard—all of which have been in place for decades (and many of which continue to apply under Title VII[35]). The Department reverses course and removes protection for student subject to sexual assault based on an unreasoned desire to equate Title IX government investigations with private civil actions for money damages.

The Supreme Court distinguishes between the Department's administrative enforcement of Title IX and its decisions involving monetary damages actions. Unlike private civil money damages cases, the risk of significant monetary damages resulting from an OCR Title IX investigation is substantially reduced. This is because "Title IX requires OCR to attempt to

---

[35] Title VII of the 1964 Civil Rights Act prohibits employment discrimination based on race, color, religion, sex and national origin. 42 U.S.C. § 2000e *et seq*.

EXHIBIT 12

secure voluntary compliance" in the first instance.[36] In contrast, the Court's fear in *Gebser*[37] was allowing private parties "unlimited recovery of damages under Title IX" without actual notice to the schools.[38] In the Department's administrative enforcement scheme, a school is obligated to take corrective action, and rarely, if ever, loses its Title IX funding.[39] This does not raise the possibility of large damages awards or significant risk of losing federal funding, which the *Gebser* court acknowledged as its "central concern."[40] The Court was concerned that because Title IX was adopted under the Spending Clause, by simply accepting federal funds schools would make themselves liable for monetary damages for conduct that they were not only unaware of, but also that they would have remedied had they been made aware.[41] Conversely, "OCR always provides the school with actual notice and the opportunity to take appropriate corrective action before issuing a finding of violation."[42] The Department's application of the standards for private civil suit damages to Title IX enforcement actions ignores the distinctions the Supreme Court has drawn between administrative enforcement actions and cases seeking monetary damages.

### A. The Proposed Rule Would Narrow the Definition of "Sexual Harassment" In Ways that Would Undermine the Objectives of Title IX.

#### 1. The Proposed Definition of "Sexual Harassment" Would Significantly Depart from Previous Title IX Policy.

In § 106.44(e)(1), the Department has proposed a narrow definition of "sexual harassment" that represents a significant departure from its longstanding understanding of the term. The Department has done so without providing any meaningful justification for the abrupt change in decades' worth of consistent policy—which went through a notice and comment making process—and practice. Proposed § 106.45(b)(3) also requires schools to cease investigating any complaint of sexual harassment that does not meet the definition.

In its 1997 Guidance, the Department recognized that sexual harassment results from conduct that is "sufficiently severe, persistent, **or** pervasive that it adversely affects a student's

---

[36] 2001 Guidance at 15.

[37] *Gebser*, 524 U.S. 274.

[38] *Gebser* 524 U.S at 286.

[39] 2001 Guidance at 14–15.

[40] *Gebser*, 524 U.S at 287. *See also Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999); 20 U.S.C. §§ 1682 & 1683 (identifying that among other things, prior to termination of funds the department shall provide notice of the failure to comply, determine that compliance cannot be secured by voluntary means, file a written report with the committees of the House and Senate and wait thirty days, and provide for judicial review of the decision); 2001 Guidance at 14–15.

[41] *Gebser* 524 U.S. at 287; *See also Davis* 526 U.S. at 639; 2001 Guidance at iii–iv.

[42] 20 U.S.C. §§ 1682 & 1683; 2001 Guidance at iv.

EXHIBIT 12

education or creates a hostile or abusive educational environment."[43] After the Supreme Court in *Davis*[44] established a narrower definition of harassment for money damages actions, the Department in its 2001 guidance reinforced its interpretation that Title IX prohibits conduct of a sexual nature that is "severe, persistent, **or** pervasive."[45] It also reinforced the notion that the question of whether sexual harassment occurred requires a flexible analysis.[46] In 2001, the Department further recognized sexual harassment includes "unwelcome sexual advances" and "physical conduct of a sexual nature."[47] The Department has repeatedly emphasized in its guidance that the prohibition on sexual harassment requires schools to investigate "hostile environment" harassment[48] and to "eliminate discrimination based on sex in education programs and activities."[49] A prudential assessment is used to determine whether conduct is sufficiently severe or pervasive.[50] According to the Department, "the more severe the conduct, the less the need to show a repetitive series of incidents."[51] Thus, a single severe incident, or for example, repeated unwelcome sexual comments and solicitations, could create a hostile environment.

The Department now seeks to abandon its long-standing policy, backed by case law, in favor of a definition more restrictive than the Title IX statute and more restrictive than what is set forth in *Gebser* and *Davis*, which was created for the very different context of civil actions involving money damages. In § 106.44(e)(1), it proposes to require that harassment be severe,

---

[43] *See* U.S. Dep't of Educ., Off. for Civil Rights, *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997) (the "1997 Guidance"). As the Supreme Court recognized in *Cannon v. University of Chicago*, Title IX is patterned after Title VI, except for the substitution of the word "sex." 441 U.S. 677, 694-95 (1979). The Department's 1994 "Racial Incidents and Harassment Against Students at Educational Institutions" is another example of this consistent policy, as it sets forth the same definition of harassment for Title VI claims on the basis of race, color, or national origin. 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994) ("A violation of Title VI may also be found if a recipient has created or is responsible for a racially hostile environment --- i.e., harassing conduct (e.g., physical, verbal, graphic, or written) that is sufficiently severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in our benefit from the services, activities or privileges provided by a recipient.").

[44] 526 U.S. 629 (1999).

[45] 2001 Guidance at v.

[46] 2001 Guidance at vi ("We also believe that the factors described in both the 1997 guidance and the revised guidance to determine whether sexual harassment has occurred provide the necessary flexibility for taking into consideration the age and maturity of the students involved and the nature of the school environment.").

[47] 2001 Guidance at 2.

[48] 2001 Guidance at 5–7.

[49] 2001 Guidance at i.

[50] 2001 Guidance at 6.

[51] 2001 Guidance at 6.

14

EXHIBIT 12

pervasive, **and** objectively offensive for administrative enforcement of Title IX claims, thus adding a requirement that the conduct be objectively offensive and removing the possibility that a violation could be found on any one of three bases—the severity, the persistence, or the pervasiveness of the misconduct. In this part, it adopts part of the definition from the Court's requirements for sexual harassment in money damages actions. However, the Department also proposes to require that the harassment "effectively den[y]" the individual access to the school's education program or activity. Proposed § 106.44(e)(1)(ii). This is a sea change from the statute, which states that victims should not "be excluded from" or "denied" the benefits of an educational program or activity and from the Supreme Court's definition, which requires the harassment to "deprive" a victim of access to educational opportunities or benefits to be actionable.[52] By requiring that the harassment "effectively deny" the victim of equal access to educational programs or activities, the Department deviates significantly from its Title IX authority.

In its NPRM, the Department states its belief, without justification, that "responses to sexual harassment should be generally aligned with the standards developed by the Supreme Court" in private litigation for damages. 83 Fed. Reg. at 61,466. The Department extols the virtue of a uniform standard and states that the Court's decisions are rooted in textual interpretation of Title IX. *Id.* However, in doing so, the Department ignores both the uniformity with which sexual harassment has long been defined and enforced under both Title IX and Title VII, as well as the Supreme Court's own acknowledgment that administrative enforcement of Title IX can be more flexible than the Court's decisions regarding private money damages.[53]

The Department also ignores the prudential considerations that the Supreme Court identified in developing the standard for a civil suit for damages where Congress has not spoken on an issue, which are inapplicable in the administrative enforcement context. The *Gebser* court identified that while Congress expressly authorized administrative enforcement of Title IX, it did not expressly authorize either civil actions or the right for individual parties to obtain damages in court. Rather, the Supreme Court identified these rights by implication.[54] The Department cannot

---

[52] *Davis*, 526 U.S. at 650.

[53] *Davis*, 526 U.S. at 639 ("Federal Departments or agencies . . . may rely on any . . . means authorized by law . . . to give effect to the statute's restrictions.") (internal quotations omitted); *Gebser* 524 U.S. at 292 (stating that the Department of Education could administratively require the school to promulgate a grievance procedure because "[a]gencies generally have authority to promulgate and enforce requirements that effectuate the statute's non-discrimination mandate . . . even if those requirements do not purport to represent a definition of discrimination under the statute.") (internal quotations and citations omitted). *See supra* Section II.

[54] *See Gebser* 524 U.S. at 292 (acknowledging the power of the Department to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate, which are distinct from circumstances giving rise to a civil action for monetary damages); *id.* at 289 (discussing the difference between the "statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance" and a "judicially *implied* system of enforcement" that "permits

---

EXHIBIT 12

lawfully improperly restrict the enforcement and application of Title IX based on its misapplication of Supreme Court precedent.

Moreover, although Title VII does not provide a perfect analogy to Title IX, in this instance, it is instructive. Title VII regulations describe workplace harassment as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature."[55] The Supreme Court has reaffirmed the unwelcome component of harassment stating that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome."[56] The Supreme Court has also reaffirmed that to create a hostile environment the harassment can be either severe **or** pervasive, such that it either limits or alters the conditions of employment. In adopting the broader definition of sexual harassment for Title VII, the Court recognized that Congress had explicitly authorized a civil action in damages. The Court thereby further reinforced that its decisions in *Gebser* and *Davis* are limited to civil actions in damages, where Congress has not spoken, but do not extend to Federal agency enforcement of the statute, where Congress' clear mandate is to affirmatively "'protect' individuals from discriminatory practices carried out by recipients of federal funds."[57]

We are also concerned because Title VII prohibits gender-based harassment that is not sexual, which the Department has also consistently recognized under Title IX in its policy guidance and its enforcement practices.[58] This interpretation is consistent with the text and purpose of Title IX and Supreme Court cases interpreting Title VII in the employment context.[59] Despite this, the proposed regulations do not specifically address the prohibition against gender-based harassment. Thus, we recommend that, in issuing the final rule, the Department state explicitly that "unwelcome conduct on the basis of sex," in § 106.44(e)(1)(ii), covers all sex-based conduct.

Once again, by disregarding Supreme Court precedent and Title VII in its formulation of the proposed rule, the Department has embraced the notion that students in a school environment

---

substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice").

[55] 29 C.F.R. § 1604.11(a).

[56] *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986) (internal quotation marks omitted).

[57] *Gebser*, 524 U.S. at 287.

[58] 2001 Guidance at v; U.S. Dep't of Educ., Off. for Civil Rights, *Dear Colleague Letter Re: Title IX Coordinators* (Apr. 24, 2015), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf ("In addition, a recipient should provide Title IX coordinators with access to information regarding . . . incidents of sex-based harassment. Granting Title IX coordinators the appropriate authority will allow them to identify and proactively address issues related to possible sex discrimination as they arise.").

[59] *See, e.g.*, *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81–82 (1998); EEOC, *Sex-Based Discrimination*, https://www.eeoc.gov/laws/types/sex.cfm ("Harassment does not have to be of a sexual nature, however, and can include offensive remarks about a person's sex.").

EXHIBIT 12

should be unprotected from sex-based harassment, even though they would be protected in the employee-employer context. The Department lacks authority to carve out exclusions to this landmark civil rights legislation not drafted in statute and inconsistent with courts' precedent.

### 2.    The Proposed Definition of "Sexual Harassment" Would Fail to Account for the Context in Which Sexual Harassment Occurs.

The Department's proposed definition of "sexual harassment" is drafted to preclude schools, in many circumstances, from addressing hostile environment harassment, an important component of the schools' educational responsibilities and the Department's enforcement responsibilities. The requirement that harassment be severe, pervasive, **and** objectively offensive fails to take into account how harassment in a school setting frequently arises in a gradually escalating manner. Isolated and infrequent harassing behavior can become pervasive over time if left uncorrected, but the definition in the proposed rule does not require any remedial action until smaller problems have become larger, more significant ones. Failure to promptly address potential hostile environments could engender distrust in the institutions' ability to address sexual harassment on campus and create situations where the conduct that could have been prevented has exploded into something much more severe and potentially dangerous. This could increase liability under other legal theories, where a school could have stopped the conduct from escalating much sooner. Many schools are concerned that if they are not permitted to address conduct under Title IX until it becomes sufficiently severe, pervasive, and objectively offensive, they will fail to proactively avoid potential liability and fail to respond adequately to many harassing behaviors and will therefore be unsuccessful in establishing a welcome educational environment, free from gender discrimination.

Likewise, the severity requirement may exclude, for example, a situation in which the same group of students repeatedly makes unwelcome sexual comments or derogatory sex-based comments at multiple women walking by a fraternity house, thereby causing each of those women to alter their walking path. Even though the conduct is persistent, the school might not consider the offensive behavior severe enough or pervasive enough to warrant remedial action, given the one-time nature of the act as experienced by each of the women. But under Title IX, a school should address sexual harassment affecting multiple students before the harassing behavior escalates to the point where it is severe, pervasive, **and** objectively offensive for an individual student.[60]

Finally, the Department acknowledges that employee-on-student harassment includes instances where the provision of some aid or benefit is made contingent upon an individual's participation in unwelcome sexual conduct. However, the proposed rule improperly restricts this type of misconduct to employee-on-student conduct only. Students may engage in *quid pro quo*

---

[60] 2001 Guidance at 13–14 ("In other cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment—if the harassment is widespread, openly practiced, or well-known to students and staff.").

EXHIBIT 12

harassment as well. There are circumstances in which, for example, a student conditions assistance with studying on unwelcome sexual conduct. Likewise, students in positions of authority, such as teaching assistants or resident advisors, as well as students serving on boards, student government, clubs, or other activities, may condition the provision of aid or a school benefit on engaging in unwelcome sexual conduct. Conduct of this type contributes to a hostile sexual environment for students, and is undoubtedly a type of sexual harassment against which Title IX should protect.

### 3.   The Proposed Definition of "Sexual Harassment" Would Chill Reporting.

The rate of student reporting of incidents of sexual harassment in grades K-12 and on college campuses is already exceedingly low.[61] Survivors often fail to report sexual harassment as a result of trauma (13 percent of female sexual assault survivors attempt suicide[62] and 34 percent of college survivors drop out of college),[63] lack of confidence in the institution's protection and procedures, and lack of knowledge in the processes offered.[64]

A heightened requirement for sexual harassment will exacerbate the factors that prevent students from reporting the harassment they experience. Many students would question whether institutions will take their experiences seriously. Some will wonder whether their harassment will be seen as sufficiently severe by the school to warrant a response. And in many cases, individuals subjected to sexual harassment will not know whether the offensive conduct that they experienced was pervasive or an isolated event. The complicated definition of sexual harassment may also confuse students, many of whom already report a lack knowledge about or understanding of the Title IX grievance processes.[65] This restrictive definition turns the purpose of Title IX—to prevent and combat sexual violence—on its head. It fosters confusion and distrust among students and will likely chill reporting of sexual harassment, thus restricting

---

[61] *See supra* Section I.

[62] RAINN, *Victims of Sexual Violence Statistics*, https://www.rainn.org/statistics/victims-sexual-violence. By comparison, a national survey estimated that 0.5 percent of adults 18 years or over attempted suicide nationally. *See* American Foundation for Suicide Prevention, *Suicide Statistics*, https://afsp.org/about-suicide-statistics/.

[63] Senate Health, Education, Labor & Pensions Committee, Letter from Senators Murray and Hassan, Advocates and Survivors of Sexual Assault Urge Secretary DeVos to Withdraw Title IX Rule, Urge Students and Survivors to Make Their Voices Heard (Nov. 28, 2018), https://www.help.senate.gov/ranking/newsroom/press/murray-hassan-advocates-and-survivors-of-sexual-assault-urge-secretary-devos-to-withdraw-title-ix-rule-urge-students-and-survivors-to-make-their-voices-heard.

[64] Rutgers, The State University of New Jersey, Center on Violence Against Women and Children, *#iSpeak Student Experience, Attitudes and Beliefs about Sexual Violence Results*, *New Brunswick*, 1, 31 (2015) (hereinafter "Rutgers Survey"), https://socialwork.rutgers.edu/centers/center-violence-against-women-and-children/research-and-evaluation/campus-climate-project/reports-findings.

[65] Rutgers Survey, *supra* note 64, at 31–32.

EXHIBIT 12

schools' knowledge of harassment on campus and hampering their ability to address and prevent it.

    **B.**    **The Proposed Rule Would Inappropriately Limit Schools' Obligation to Respond to Sexual Harassment and Violence by Excusing Failures to Respond to Conduct that Does Not Occur "In an Education Program or Activity."**

Proposed § 106.44(a) requires a response only to "sexual harassment *in* an education program or activity." Proposed § 106.45(b)(3) similarly requires dismissal of Title IX complaints, even when the conduct alleged would constitute sexual harassment, if the conduct "did not occur *within* the recipient's program or activity." The proposed regulations thereby improperly narrow the scope of Title IX and sexual harassment complaints that will be investigated by focusing on whether the alleged *incident(s)* occurred in an education program or activity, rather than focusing on whether the incident(s) gave rise to *discrimination* in an educational institution's program or activity.

This change in focus directly contradicts the plain language of Title IX. Regardless of whether an incident giving rise to an alleged Title IX violation itself occurs in an education program or activity, Title IX protects students who, based on sex, are "excluded from participation in [or] . . . denied the benefits of . . . any education program or activity receiving Federal financial assistance."[66]

In keeping with the clear statutory text, both courts and the Justice Department have concluded a school may violate Tile IX by failing to respond adequately to alleged misconduct that occurred in a location outside the control of the school if that conduct causes a hostile environment in the education setting. As the U.S. Justice Department itself has explained: "When assessing whether off-campus rape creates a hostile environment on campus, courts have recognized that the pernicious effects of rape by another student are not limited to the event itself and can permeate the educational environment. This is due to the daily potential of the victim student encountering her assailant as they both live and learn at the college." [67]

The Department's proposed change is also an unjustified departure from preexisting and continuously repeated Department policy in effect since at least 2001. In 2001, the Department published guidance after engaging in a notice and comment process, stating that in determining whether a hostile environment exists, the educational institution must determine whether "the conduct denies or limits a student's ability to participate in or benefit from the program based on

---

[66] 20 U.S.C. § 1681(a).

[67] Statement of Interest of the United States 12–13, *Weckhorst v. Kan. State Univ.*, No. 16-2255 (D. Kan. filed July 1, 2016), ECF 26 (citations omitted) (collecting cases); *see also id.* at 11–14; Statement of Interest of the United States 12–21, *Farmer v. Kan. State Univ.*, No. 16-2256 (D. Kan. filed July 1, 2016), ECF 32; *Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d 763, 780-81 (W.D. Tex. 2018).

EXHIBIT 12

sex."[68] On January 25, 2006, the Department reiterated its support for existing policy by directing educational institutions to rely on the 2001 Guidance for their obligations regarding preventing and remedying sexual harassment.[69]

In 2011, the Department reiterated that schools have an obligation to assess whether there is a nexus between alleged off-campus harassment and the denial of access to an education program or activity. In this regard, the Department stated that "[s]chools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity . . . [b]ecause students often experience the continuing effects of off-campus sexual harassment in the educational setting [and, therefore] schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus."[70] Then on September 22, 2017—in this current administration—the Department stated that, "schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities."[71] This longstanding policy is also consistent with the Supreme Court's interpretation of Title IX.[72] By confining Title IX's jurisdiction to only sexual harassment and assault that occurred in the first instance "within" an education program or activity, § 106.45(b)(3), the proposed regulation ignores this precedent and is flatly inconsistent with the statutory text.[73]

Furthermore, there are a number of situations that underscore the need to evaluate the effect of conduct that occurs off-campus or outside an education program or activity to be consistent with Title IX protections. For example, a student forced to perform a sex act by students from his or her school at an off-campus location should be able to pursue Title IX remedies to protect her or him from further harassment on campus. Similarly, a student who is sexually abused by a teacher or professor near campus or off-campus should be protected by Title IX. In addition, an athlete who was sexually assaulted by a school trainer or doctor at any

---

[68] 2001 Guidance at 5.

[69] 2006 DCL at 6.

[70] 2011 DCL at 4.

[71] U.S. Dep't of Educ., Off. for Civil Rights, *Q&A on Campus Sexual Misconduct*, 1 n.3 (Sept. 22, 2017).

[72] *See, e.g.*, *Davis*, 526 U.S. at 644 (the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs."); *Gebser*, 524 U.S. at 278, 279 (assuming sexual harassment of the student complainant by the teacher under Title IX, even where sexual contact occurred in her home while giving her a book and "never on school property" but during school time).

[73] Requiring a recipient to only respond "to conduct that occurs *within* its 'education program or activity,'" 83 Fed. Reg. at 61,468 (emphasis added), is also directly contradictory to proposed § 106.44(a), which requires a response from "[a] recipient with actual knowledge of sexual harassment *in* an education program or activity." *Id.* (emphasis added).

EXHIBIT 12

time should be protected by Title IX. This is so even where the sexual assault occurred off campus—in the homes of the athletes who used the University's facilities, as well as other locations not operated or controlled by the University, such as hotels during events. If the proposed rule becomes final, school districts and Universities would be required to dismiss similarly egregious Title IX complaints simply because they occurred off-campus, even if they result in a hostile educational environment.

The Department's focus on the context in which sexual misconduct itself occurs also contradicts studies showing that off-campus conduct may create a hostile environment on campus, thus leading a student to be denied the benefits of an educational program or activity.[74] Even the studies relied on by the Department to justify the current policy changes, which are used to highlight the costs of sexual assault, do not distinguish between on- and off-campus assault.[75] Universities themselves acknowledge the effect off-campus activities can have on a student's on-campus learning.[76] It is arbitrary to assume that only harassment that occurs *in* an educational program or activity affects a student's access to the educational program or activity.

It is similarly arbitrary to limit Title IX's protections to activity occurring only in an educational program or activity when the Clery Act, 20 U.S.C. § 1092 (f), specifically recognizes that information regarding crimes occurring on "[p]ublic property . . . immediately adjacent to and accessible from the campus" is relevant to understand the crime statistics for the campus.[77] The Department attempts to clarify that "Title IX's 'education program or activity' language should not be conflated with Clery Act geography [because] these are distinct jurisdictional schemes," but this is a distinction without any obvious or appropriate purpose. It does not make sense to alert potential students to, for example, a rape that may occur outside the specific confines of an educational program or activity if that same incident would never affect the student's access to the educational program or activity.

In sum, the inquiry as to whether conduct that occurs off-campus or outside a school's program and activities creates a hostile environment under an education program or activity on the basis of sex is fact-specific and requires a school's careful assessment. The language of the

---

[74] *See, e.g.*, Christopher P. Krebs, Ph.D., et al., *The Campus Sexual Assault (CSA) Study,* National Institute of Justice 5–19 (Oct. 2007), https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf (finding two-thirds of campus sexual assaults occur off-campus but can still severely impact a student's access to the educational program).

[75] 83 Fed. Reg. at 61,485 (citing Cora Peterson et al, *Lifetime Economic Burden of Rape Among U.S. Adults*, 52 AM. J. of Preventative Med. 691 (2017)).

[76] *See, e.g.*, Isa Gonzalez, *Title IX Coordinator Discusses How Proposed Education Dept. Reforms Could Impact UD*, Flyer News (Dec. 17, 2018) (quoting University of Dayton's Title IX coordinator as explaining "[e]ven [for] students who live in landlord housing or near the campus footprint, their experience is often as if they are a residential student."), https://tinyurl. com/ybboqxn2.

[77] 34 C.F.R. § 668.46.

EXHIBIT 12

proposed regulation ignores this, in contravention of existing and long-held Department policy, as well as judicial, OCR, and Justice Department interpretations.

### C.   The "Actual Knowledge" Standard is Too Restrictive.

#### 1.   The Proposed Rule Undermines the Purpose of Title IX and Creates an Improper Incentive to Willfully Ignore Sexual Harassment Because it Requires Schools to Respond Only if They Have "Actual Knowledge" of the Harassment.

Previous Department policy required schools to address all student-on-student sexual harassment allegations if the school knew or reasonably should have known about them.[78] The Department has also long-imputed notice to a school when "any employee with authority to take action to redress the harassment, who has the duty to report to appropriate school officials . . . or an individual who a student could reasonably believe has this authority or responsibility" has notice of the harassment.[79] Finally, the Department has required agency principles (i.e., vicarious liability) to apply to most instances of employee-on-student harassment.[80] As the Department has previously recognized, including the "good judgment and common sense of teachers and school administrators" is key to judging compliance with Title IX.[81]

Now, absent adequate justification, the Department proposes to eliminate these elements of notice. Under proposed § 106.44(e)(6), a school lacks actual knowledge unless allegations are brought to the attention of an employee with the authority to institute corrective measures (or when a formal complaint is filed with the Title IX Coordinator). Teachers at the K-12 level are deemed officials with the authority to institute corrective measures, but not at the university level. Furthermore, the proposed rule eliminates vicarious liability for employee-on-student sexual harassment, requiring the "actual knowledge" standard in this context as well. In all contexts, if the respondent is the only one with notice, actual knowledge is not imputed to the school.

By defining "actual knowledge" narrowly and ignoring situations in which a school clearly ought to have known of sexual harassment, the proposed rule virtually abandons Title IX's overriding goal of addressing hostile environments, eliminating sexual harassment, and creating an educational environment free from discrimination on the basis of sex. The actual knowledge requirement shifts the burden from schools to students. Instead of requiring schools to address instances of sexual harassment of which they are aware because an employee who a student would reasonably believe has the authority to report or assist has received notice, the proposed rule would flip Title IX on its head and require students to report sexual harassment to

---

[78] 2001 Guidance at 13.

[79] *Id.*

[80] 2001 Guidance at 10.

[81] 2001 Guidance at ii.

EXHIBIT 12

authority figures whom they are generally hesitant to seek out or of whom they may not be aware.

The proposed rule creates an improper incentive structure for schools that discourages them from uncovering allegations and instead incentivizes them to shield themselves from learning about wrongdoing. In the very different context of civil suits for damages, the dissent in *Gebser* warned specifically about this phenomenon, stating that as long as schools "can insulate themselves from knowledge about this sort of conduct, they can claim immunity from damages liability."[82] The ongoing prospect of administrative enforcement of Title IX, even in the absence of "actual knowledge" of harassment, has deterred schools from ignoring problems. The Department now proposes to do away with that incentive. Instead, the proposed rule could create a situation where multiple employees, such as teachers (at the university level), resident advisors, campus medical personnel, school resource officers, or guidance counselors are fully aware of allegations of sexual harassment, but absent an explicit obligation to report to an official with authority to institute corrective measures, the school would not have a responsibility to investigate or take remedial action.

It is clear that in crafting the proposed rule, the Department ignored the evidence that students subjected to sexual harassment hesitate to report to officials with authority to take corrective action, due to various barriers, including lack of knowledge of reporting procedures, fear of being disbelieved, or fear of facing negative repercussions and additional harassment.[83] Campus climate surveys demonstrate that those subjected to sexual harassment often report to close acquaintances, and officials may find students reluctant to formally report.[84] Only 17 percent of students in one survey reported disclosing sexual harassment incidents to formal campus resources, while 77 percent disclosed to close friends and 52 percent reported to roommates.[85] However, the Department now requires students to directly report to specific authorities or file formal complaints. The proposed rule should not disregard such clear evidence that reporting on campus is complex and requires schools to be more vigilant in addressing sexual harassment.

---

[82] *Gebser* 524 U.S. at 298.

[83] Rutgers Survey, *supra* note 64, at 32.

[84] *Id.*

[85] Rutgers Survey, *supra* note 64, at 31–32.

EXHIBIT 12

### 2.    Constructive Knowledge and Agency Principles Should Apply to the School's Notice of Sexual Harassment and Violence.

The Department has not demonstrated any unfairness with the constructive knowledge or agency principles it has long-implemented, and there is no adequate justification for reversing course now.[86]

The Department has long required that a school should investigate, if a school knew or reasonably should have known of sexual harassment, whether by employees, students, or third parties.[87] This standard provides the required flexibility for universities since a constructive knowledge standard considers the school's size, its available resources, the public nature of the harassment, and the status of the individuals to whom the harassment was reported. Importantly, the "should have known" standard does not impute knowledge for isolated instances that a school, taking reasonable care, would not be aware of. However, a constructive notice standard prevents schools from willfully ignoring obvious signs of harassment, such as graffiti in public places,[88] systemic abuse of power by a teacher, constant unwelcome cat-calling, or other abusive behavior of a sex-based nature at known locations. Requiring schools to act on constructive knowledge ensures investigations into a hostile environment or culture of harassment, which is a primary purpose of Title IX. Constructive knowledge has been the Department's long-standing position in Title IX cases, and the Department has put forward no convincing rationale for abandoning this eminently sound approach.[89]

In the proposed rule, the Department also reverses course on agency principles, upending years of federal government positions on this important issue and even flouting Supreme Court

---

[86] If the Department nevertheless adopts the proposed "actual knowledge" standard, it should adopt mandatory, prompt reporting requirements for all non-confidential employees, so that Title IX Coordinators and other officials with authority to institute corrective measures are notified of sexual harassment more quickly. Mandatory reporters should include those individuals are considered "responsible employees" under current policy. *See* 2001 Guidance at 13. At the same time, students should have people to confide in, while knowing that their discussions will be kept confidential. Following best practices and prior Department guidance and practice schools should be required to make public (1) the individuals to whom students can report confidentially with no fear of being required to file a formal complaint and (2) the individuals who are required to report harassment to officials with corrective authority. *E.g.*, U.S. Dep't of Educ., Off. for Civil Rights, *Questions and Answers on Title IX and Sexual Violence*, at D-4, E-13, 16, 22 (Apr. 29, 2014, withdrawn Sept. 22, 2017) (the "2014 Q&A"). Converting Department policy into a proposed rule could help to mitigate (but not resolve) the problems with the proposed "actual knowledge" standard.

[87] 2001 Guidance at 13–14.

[88] 2001 Guidance at 14

[89] *See* 2001 Guidance at 14 ("If a school otherwise knows or reasonably should know of a hostile environment and fails to take prompt and effective corrective action, a school has violated Title IX even if the student has failed to use the school's existing grievance procedure or otherwise inform the school of the harassment.")

EXHIBIT 12

guidance.[90] Agency principles should continue to apply to employee-on-student harassment, just as they do to supervisor-on-employee harassment. The Department previously explained that notice to a school is triggered when the employee is or appears to be acting in the context of carrying out his or her responsibility to students.[91] In *Gebser*, the U.S. Department of Justice stated that it is appropriate to hold a school responsible in such instances because "the teacher was aided in accomplishing the harassment by his agency relationship with the recipient or his apparent authority."[92] In light of this, it is particularly disturbing that the proposed rule exempts the school from actual knowledge when the only person with actual knowledge is also the respondent. This requirement would apply to the K-12 context as well. It sets up a scenario in which a student would have no valid Title IX claim when any school employee, including a school leader such as a superintendent, principal, or vice principal, repeatedly harasses or sexually assaults them in class or during school-related activities, unless the misconduct was known by another responsible school official.[93] This proposed rule must be stricken. As indicated in prior guidance, a school should be required to address conduct by an individual taking advantage of the position of authority and concomitant access to students afforded to them by the education institution, regardless of the school's notice.[94]

The 2001 guidance articulated the standards and possible scenarios for applying agency principles in situations involving employee-on-student harassment.[95] The guidance appropriately recognized that the application of vicarious liability to schools would require a determination that the employee was acting or appearing to act in the context of the employee's duties, and it set out multiple potential factors to consider before imposing liability.[96] That careful approach, based on evidence and experience, should not be reversed without ample justification. Requiring schools to take action based on constructive knowledge and agency principles also provides an opportunity to protect schools from later dealing with situations that could have been resolved with much less damage had the school acted more quickly to alleviate the problems.

---

[90] *Franklin*, 503 U.S. 60 (implying that agency principles may be appropriate in the Title IX context).

[91] 2001 Guidance at 10.

[92] *Gebser*, 524 U.S. 274, No. 96-1866, Statement of Interest of the United States, 9 (filed Jan. 16, 1998).

[93] *See, e.g. Salazar v. South San Antonio Independent Sch. District*, 2017 WL 2590551 (5th Circuit), cert. denied, 138 S. Ct. 369 (holding that district could not be liable under Title IX for principal of elementary schools repeated sexual molestation of an elementary school student, because the principal who engaged in the molestation was the only one aware of the conduct).

[94] 2001 Guidance at 10.

[95] 2001 Guidance at 10-12.

[96] 2001 Guidance at 10-11.

EXHIBIT 12

Once again, Title VII is instructive. Under Title VII, the definition of "employer" includes any "agent of the employer,"[97] and courts routinely look to agency principles to determine employer liability for employee harassment.[98] Here, as in other areas of the proposed regulations, the Department sets up a scenario in which school employees are afforded better protection from harassment than students, who are far more vulnerable due to their age and experience. If a school can be held liable for monetary damages for supervisor-on-employee harassment under Title VII, then surely the Department of Education should require schools to at least respond to employee-on-student harassment under Title IX. Furthermore, schools arguably have more responsibility to protect their K-12 students, because they act *in loco parentis* while students are in attendance. [99]

The Department has failed to articulate intervening circumstances, facts, or evidence that would justify a reversal from the application of consistent agency policy and decisions to employee-on-student harassment. The proposed rule change should not be adopted.

### D.   The Proposed Rule Would Adopt a "Deliberative Indifference" Standard That Is Not Appropriate for Administrative Enforcement of Title IX.

Since at least 1997, the Department has understood Title IX to require schools to act reasonably in taking steps to end sexual harassment and prevent its recurrence.[100] Specifically, schools are required to act in a "reasonable, commonsense" manner in addressing sexual harassment and to take "prompt and effective" steps once they have knowledge of harassment.[101] Moreover, the existing regulations, in effect since 1975, have required schools to have procedures that provide a "prompt and equitable" response to any complaint of sex discrimination, a requirement that the Department has consistently enforced for decades and applied to all forms of sex discrimination, including sexual harassment.[102]

Under the proposed rule, even a school that responds unreasonably, untimely, and ineffectively to sexual harassment may avoid repercussions, so long as the school's response is not "deliberately indifferent." Proposed § 106.44(a). And "only" a "response to sexual harassment" that is "intentionally" and "clearly unreasonable in light of the known circumstances" will be considered "deliberately indifferent." *Id.*

---

[97] 42 U.S.C. § 2000e(b).

[98] *Vinson* at 72 ("[W]e do agree with the EEOC that Congress wanted court to look to agency principles for guidance in this area.")

[99] *Veronia School District 47J v. Acton*, 515 U.S. 646, 656 (1995) (discussing that the duty is both "custodial and tutelary").

[100] 1997 Guidance.

[101] 2001 Guidance at iii, 15

[102] 34 C.F.R. 106.8(b).

EXHIBIT 12

The Department has failed to justify such a policy change. The NPRM does not point to any instances in which schools were burdened or unfairly penalized as a result of the reasonableness standard. To the contrary, the proposed rule neglects the purpose of the Department's administrative enforcement of Title IX, which is to provide schools with an opportunity to correct prior actions in response to sexual harassment and address a hostile environment moving forward (before they incur liability for damages).[103] Rarely does administrative enforcement lead to the dramatic step of withholding Title IX funding; rather, the Department's role is to "make schools aware of potential Title IX violations and to seek voluntary corrective action."[104] Without some basis for demonstrating that the reasonable care standard was inadequate or overly burdensome for schools, it is inconsistent with the intent of Title IX to adopt a standard that is less protective of students who experience discrimination.

Although the Department purports to draw its "deliberately indifferent" standard from case law, it misses the mark. Courts have concluded that "[r]esponses that are not reasonably calculated to end harassment are inadequate."[105] And a failure to investigate alleged sexual harassment can be unreasonable in light of the circumstances, even absent a formal complaint.[106] Again, the requirement that schools not act with deliberate indifference in response to complaints, as adopted by the courts for money damages actions, is immaterial to the Department's administrative enforcement of Title IX.[107] The Department should intervene to ensure schools are responding appropriately to sexual harassment allegations well before the school would be liable for money damages in a civil suit for its failure to act.

In addition, students should receive protection from sexual harassment at least equal to the protection afforded employees in the workplace. Under Title VII, employers (including schools) are liable for acts of sexual harassment in the workplace unless the employer "can show that it took immediate and appropriate corrective action."[108] Students are generally more vulnerable to sexual harassment than adult employees, particularly in grades K-12, since they are both minors and subject to compulsory school attendance requirements.[109] Under the proposed

---

[103] *See North Haven Bd. of Ed. v. Bell,* 456 U.S. 512, 521 (1982) (reiterating that the text of Title IX should be accorded "'a sweep as broad as its language.'").

[104] 2001 Guidance at iii–iv (stating that if OCR finds violations of Title IX, it must first "attempt to secure compliance by voluntary means.").

[105] *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012) (holding that a university did not engage in efforts that were "reasonably calculated to end [the] harassment").

[106] *E.g.*, *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 696 (4th Cir. 2018) (holding a school administrator responsible for a claim of retaliation under Title IX, and stating that the retaliation spanned a sufficient period that the University should have taken "reasonable steps to address it").

[107] *See supra* Section II.

[108] 29 C.F.R. §§ 1604.11

[109] *See supra* Section I.

EXHIBIT 12

rule, an employee who is sexually harassed can sue a school *for money damages* if the school fails to take immediate and appropriate corrective action, but the Department of Education cannot take even non-monetary enforcement action against a school that fails to protect a student from sexual harassment unless the school's response failed the much higher "deliberate indifference" standard. Furthermore, graduate students who teach and other student employees of a school may fall under a complicated enforcement scheme, depending on whether they are considered "employees" or "students." The Department should not create this artificial disparity in the enforcement of sexual harassment prohibitions, which would indicate to students that the Government takes student safety less seriously than employee safety. If anything, the Department should afford students greater protection from sexual harassment due to their vulnerabilities.

E.     **Safe Harbor Provisions Are Inappropriate and Schools Must Investigate Any Potential Hostile Environment.**

The proposed rule provides several safe harbor provisions for schools. Taken together with the deliberate indifference standard, the safe harbor provisions severely curtail the Department's ability to meaningfully enforce Title IX's anti-discrimination objectives. Curtailing OCR's ability to independently review comprehensively how schools handle sexual harassment complaints is contrary to its mandate to investigate compliance with Title IX. The new rule would incentivize schools to do the bare minimum in enforcement of Title IX, contrary to the statutory mandate to provide educational programs and activities that are free from harassment.

The safe harbor provisions take various forms. The first, proposed § 106.44(b)(1), provides schools a safe harbor from a finding of deliberate indifference if they carry out grievance procedures consistent with those outlined in the rule in response to a formal complaint. 83 Fed. Reg. at 61,469. Any failure to fairly and adequately implement those procedures in a manner that is equitable, timely, or effective is seemingly irrelevant. Such a safe harbor erodes schools' responsibility to investigate hostile educational environments. This is of particular concern in the K-12 context where most complaints are taken verbally and informally by a dean, vice principal or other administrator who plays multiple roles.

The other safe harbors are equally untenable. Proposed § 106.44(b)(2) provides a safe harbor to a school where, upon actual knowledge of multiple complaints against the same respondent, the Title IX coordinator files a complaint on the complainant's behalf and the school follows the proposed grievance procedures. The proposed rule, in § 106.44(b)(3), also provides a safe harbor from a finding of deliberate indifference if a school that has actual knowledge of sexual harassment, absent a formal complaint, merely offers the complainant supportive measures. 83 Fed. Reg. at 61,469. Finally, in proposed § 106.44(b)(5), the Department also prevents OCR from a finding of deliberate indifference solely because OCR would have come to a different responsibility conclusion. 83 Fed. Reg. at 61,470.

Title IX imposes an affirmative obligation on schools to ensure that students are not subject to discrimination on the basis of sex. As a result, the Department has long recognized that

28

EXHIBIT 12

schools have an obligation to take reasonable steps to prevent harassment "whether or not the student who was harassed makes a complaint or otherwise asks the school to take action."[110] Consistent with this recognition, the 2001 Guidance made it clear that a school's obligation to investigate and respond to a report of harassment does not depend on the filing of a formal complaint: "Once a school has notice of possible sexual harassment of students—whether carried out by employees, other students, or third parties—it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again."[111] Federal courts have reaffirmed schools' affirmative obligation to protect their students from harassment.[112]

The proposed rule fails to recognize the obligation of schools to address harassment in the absence of a formal complaint (unless, of course, a complainant receives written notice of the available resolution options and, voluntarily and without coercion, decides not to pursue the complaint). By implication, therefore, it suggests that a school's Title IX responsibilities are triggered only when a student begins the formal complaint process. This, of course, is false: nothing in the language of Title IX supports such a narrow view of a school's obligations. To the contrary, Title IX prohibits discrimination on the basis of sex in education programs receiving federal funds, period. So at a minimum, a school that is put on notice of evidence of harassment, through whatever means, has an obligation to investigate and, if it determines that harassment is occurring, take steps to address it and provide notice of the outcome of its process. Any rule purporting to implement Title IX must make this fact clear: once a school has actual knowledge of harassment, it must investigate—even if the student has not reported it to the school.

Any final rule must also make clear that schools are obligated to investigate and address systemic problems of which they are made aware. The Department has regrettably stepped away from its own obligation to identify systemic violations of Title IX.[113] It should not compound this error by limiting the obligations of schools to investigate such violations. Incidents of harassment rarely occur in a vacuum: too often, they are fueled by the presence of a toxic culture or hostile environment that enables such abuses. Title IX's prohibition on discrimination on the basis of

---

[110] 2001 Guidance at 15.

[111] *Id.*

[112] *Feminist Majority Found.*, 911 F.3d at 692 ("We are satisfied that the University was obliged to investigate and seek to identify those students who posted the threats and to report the threats to appropriate law enforcement agencies."); *see also Abbott v. Pastides*, 900 F.3d 160, 173 (4th Cir. 2018) (observing that "universities have obligations not only to protect their students' free expression, but also to protect their students").

[113] *E.g.,* Adam Harris, *Memo Outlines Education Dept. Plans to Scale Back Civil-Rights Efforts,* The Chronicle of Higher Education (June 15, 2017), https://www.chronicle.com/blogs/ticker/memo-outlines-education-dept-plans-to-scale-back-civil-rights-efforts/118937.

EXHIBIT 12

sex thus requires schools that are made aware of systemic discrimination to respond, and to do so in a manner commensurate to the scope of the problem. By failing to affirmatively state that schools have such an obligation, the proposed rule rewrites Title IX in a way that is inconsistent with its plain language and clear purpose.

In the same vein, creating a safe harbor for merely providing supportive measures to a student subjected to sexual harassment (or a parent complainant) who was not informed of or was otherwise unaware of the procedural step of filing a formal written and signed complaint is particularly unjust. Under the proposed rule, a school with knowledge of sexual assault against a student cannot be found to have responded inadequately as long as it offered the survivor a change of class schedule or some other similarly meager support. Deeming a school to have fully satisfied its Title IX obligations by providing only supportive measures to individuals subjected to sexual harassment who do not file formal complaints is likely to chill reporting and reduce investigations into a hostile educational environment, as individuals subjected to sexual harassment will find the process inadequate and will likely lose trust in the institution's processes.

Additionally, any provision on supportive measures must ban schools from pressuring students subjected to sexual harassment into accepting supportive measures in lieu of an investigation or grievance mechanism. The Department should prohibit even subtle incentives to accept supportive measures over formal adjudications. Any indication of students being steered or pressured into accepting only supportive measures or being discouraged from pursuing other options (such as local law enforcement) should be thoroughly investigated by OCR and remediated by the school.

Finally, the safe harbors remove OCR's discretion in Title IX enforcement. OCR's independent weighing of the evidence surely is a relevant factor in determining whether a school has been or is being deliberately indifferent (or unreasonable). Suppose, for example, OCR finds that, despite adopting the proper procedures for addressing formal complaints, the school's decision-makers always find in favor of complainants, or always find in favor of respondents. Absolute safe harbors remove OCR's ability to determine a school's liability if there is a pattern or practice of shielding respondents or favoring complainants. The Assistant Secretary, after a thorough investigation, should have the discretion to decide whether a school's determination of responsibility was discriminatory, or whether a school's overall climate is a discriminatory one.

The Department should remove the safe harbor provisions from the proposed rule.[114]

---

[114] While we strongly oppose the existence of any safe harbor in any final rule, if the Department nevertheless continues to include them, we strongly recommend any safe harbor incentivize schools to provide additional protections.

EXHIBIT 12

III.    **The Department Should Adopt Policies for Complaints that Maximize Reporting.**

A.    **The Department's Proposed Definition of "Complainant" Is Too Restrictive.**

Proposed § 106.44(e)(2) defines "complainant" as "an individual who has reported being the victim of conduct that could constitute sexual harassment, or on whose behalf the Title IX Coordinator has filed a formal complaint."[115] This definition raises many problems.

Importantly, the proposed definition of "complainant," in conjunction with the proposed definition of "formal complaint" (which must be "a document signed by a complainant or by the Title IX Coordinator"), effectively preclude third parties from filing formal complaints of sexual harassment, which triggers the recipient's obligation under the proposed rule to initiate an investigation or proceedings to address the allegations.[116] This is a departure from prior guidance, which recognized that a school must investigate and take appropriate remedial action "regardless of whether the student [subjected to sexual harassment], student's parent, or a third party files a formal complaint."[117]

The proposed shift in policy regarding who may file a formal complaint of sexual harassment ignores the realities of how sexual harassment is reported on campus. Only a small percentage of campus sexual violence is formally reported, for reasons previously articulated.[118] And instances of sexual harassment are often communicated to close confidants, who may report such incidences to appropriate officials. In K-12 schools, instances of sexual harassment or violence are often reported by a parent or guardian on behalf of a student or another student or employee witness to the sexual harassment. By eliminating the requirement that schools initiate investigations in response to information reported by third parties, the Department's proposal will result in more harassment going unacknowledged and unaddressed. The proposed definition

---

[115] "For purposes of this definition, the person to whom the individual has reported must be the Title IX Coordinator or another person to whom notice of sexual harassment results in the recipient's actual knowledge under [the proposed rule]." These comments address this part of the definition of "complainant" in their discussion of the "actual knowledge" standard.

[116] In some States, a parent or guardian could file a formal complaint on behalf of a minor child, but on this issue, the Department's proposed rule would defer to state law and local educational practice. *See* 83 Fed. Reg. at 61,482.

[117] 2014 Q&A at D-2, 15–16. Existing Department guidance also recognizes that, in some instances, the survivor may not want the school to proceed with an investigation and appropriately established several factors for a school to weigh in balancing whether to move forward over a survivor's objections. The factors to weigh include the survivor's wishes along with the school's duty to provide a safe and nondiscriminatory environment for all students, the seriousness of the alleged harassment, the age of the student harassed, whether there have been other reports of harassment against the alleged harasser, and the rights of the accused individual to receive information about the accuser and the allegations, where a formal proceeding with sanctions may result. 2001 Guidance at 17-18.

[118] *See supra* Section I & Section II.C.

EXHIBIT 12

should be modified to clarify that a third party, such as a witness, parent, guardian, or school employee, may file a formal complaint.[119]

More broadly, the proposed rule will yield results that cannot be squared with schools' obligations under Title IX and the case law applying it. Schools have a legal obligation to take reasonable steps to prevent and eliminate sexual harassment, including hostile environment harassment.[120] Yet the proposed rule places the burden on individuals subjected to sexual harassment to report harassment in a particular manner. In addition, a hostile environment "can occur even if the harassment is not targeted specifically at the individual complainant. For example, if a student, group of students, or a teacher regularly directs sexual comments toward a particular student, a hostile environment may be created not only for the targeted student, but also for others who witness the conduct."[121] Similarly, a school's repeated failure to respond appropriately to allegations of sexual assault may contribute to a hostile environment for students who have not themselves been the subject of an assault. It is not clear from the Department's proposal whether students who have witnessed but who have not been "targeted" by harassment may qualify as individuals who may file a formal complaint. Consistent with existing policy, the Department should clarify that these individuals may file formal complaints.

B.     **The Definition of "Formal Complaint" Creates a Barrier to Filing for Complainants, Particularly Underage Students, and Does Not Provide for Reasonable Accommodation.**

Proposed § 106.44(e)(5) defines the "formal complaint," which must be filed to trigger most of the protections set forth in the remainder of the regulation, as "a document signed by a complainant or by the Title IX Coordinator alleging sexual harassment . . . and requesting initiation of the recipient's grievance procedure." *Id.* This requirement is inconsistent with the objective of the statute because it creates an unnecessary barrier to obtaining the protections against discrimination promised unequivocally by Title IX's text. It is also a departure from the existing regulations, which require a recipient to establish procedures for addressing "*any action* which would be prohibited by*" the regulation.[122] As applied, a recipient could dismiss a meritorious complaint of which it has notice or fail to take action solely for immaterial technical reasons, such as the complaint not being signed or failing to include specific language "requesting initiation" of the grievance procedures.

---

[119] We recognize that schools reasonably may respond differently to complaints filed by those subjected to sexual harassment and complaints filed by third parties, but the appropriateness of a school's response should be fact-specific. *See* 2001 Guidance at 18 (identifying "factors" that "will affect the school's response" when "information about harassment is received from a third party (such as from a witness to an incident or an anonymous letter or telephone call)").

[120] *E.g.*, 2001 Guidance at 5–14.

[121] 2001 Guidance at 6 & n. 43 (collecting cases).

[122] 34 C.F.R. § 106.8(b) (emphasis added).

EXHIBIT 12

Furthermore, the proposed regulation ignores the reality in elementary and secondary schools throughout the nation that complaints of sexual harassment are most often brought to the attention of administrators verbally by children, many of whom will be unaware of the proposed regulation's prescriptions. As such, the proposed regulation will too often result in K-12 students being deprived of their rights under Title IX based on the mere technicality of not filling out and signing a written document. In this regard, we note that the Department has included no cost estimate for training students (or their parents and guardians) on the new sweeping changes in the regulations. They will nonetheless be responsible for meeting these procedural requirements to obtain any relief.

In addition, the proposed rule runs afoul of other federal civil rights laws because it fails to specify that reasonable accommodations in the grievance process shall be provided for individuals whose disabilities may inhibit their ability to read, write, and sign a complaint.[123] Moreover, for a complainant who is under 18, as many in the schools affected by this regulation are, the proposed regulations do not address how schools will implement this requirement if a parent later disagrees with a child complainant's decision to file or is not consulted prior to filing. The change also creates unnecessary administrative costs, paperwork, and delay because schools must create or receive a signed document before executing their clear responsibilities under the law to investigate and, as necessary, stop the harassment, prevent its recurrence, and remedy its effects.

### C. "Supportive Measures" Should be Responsive to a Complainant's Needs.

Under prior guidance, the Department acknowledged that Title IX may require a school to take "interim measures" to protect a complainant and other students before the conclusion of an investigation.[124] In § 106.44(e)(4), the proposed rule would introduce the new term "supportive measures" and would provide that implementing supportive measures may itself be an adequate response in some cases of sexual harassment.

The proposed rule provides a safe harbor to a school that "offers and implements supportive measures *designed to* effectively restore or preserve the complainant's access to the recipient's education program or activity," without regard to whether the supportive measures are actually (or even reasonably) effective in accomplishing that objective. Further, for supportive measures to be effective, a school must acknowledge the crucial role of the complainant and, as needed, the respondent in crafting such measures and work with the parties to design appropriate measures after assessing what is needed to stop the harassment, prevent its recurrence, and address its effects. The Department should clarify that although schools should not be required to provide every measure the student requests, they should give due

---

[123] *See generally* Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; Americans with Disabilities Act of 1990 as amended, 42 U.S.C. § 12131, *et. seq*.

[124] 2001 Guidance at 16, 18 ("It may be appropriate for a school to take interim measures during the investigation of a complaint.")

EXHIBIT 12

consideration to what the student who was harassed deems appropriate supportive measures in light of the circumstances, so that access to programs and activities can be assured.

The proposed rule would provide that supportive measures offered to a complainant or respondent should be designed to avoid "unreasonably burdening the other party." 83 Fed. Reg. at 61,496. By comparison, Department policy issued between 2001 and 2014 consistently emphasized that, in adopting interim measures, schools should minimize the burden on the student who was harassed. For example, the 2001 Guidance stated that such measures should "be designed to minimize, as much as possible, the burden on the student who was harassed."[125] The 2014 Guidance stated that schools should minimize the burden on the complainant. For example, if the complainant and alleged perpetrator share the same class or residence hall, the school should not, as a matter of course, remove the complainant from the class or housing while allowing the alleged perpetrator to remain without carefully considering the facts of the case."[126]

We agree that schools should endeavor to avoid "unreasonably burdening" alleged perpetrators, but we believe this principle requires elaboration. The Department should clarify that, consistent with prior policy, there should be a presumption against imposing unnecessary burdens on the complaining student when devising supportive measures. By crafting appropriate and individualized measures, this can be done even while protecting the due process rights of the respondent during the pendency of the investigation.

And the Department should likewise make clear that schools retain their local flexibility to deal immediately with potentially predatory or violent situations, even in ways that significantly burden one or more students, and even before a formal complaint has been filed or there has been an adjudication of responsibility, when necessary to meet their responsibilities for student safety and well-being. In such situations, to ensure the safety and well-being of its students, a school may need to impose a temporary and immediate suspension on a student, subject to the right for that student to have a prompt hearing with a right to return to the educational environment.

## IV.   The Proposed Grievance Procedure Fails to Provide a Fair and Equitable Process for Resolving Formal Title IX Complaints.

In 2001, the Department recognized that "[s]trong policies and effective grievance procedures are essential to let students and employees know that sexual harassment will not be tolerated and to ensure that they know how to report it."[127] This is why the Department has consistently required school grievance procedures to provide for "prompt and equitable resolution of sex discrimination complaints."[128] In many places, the proposed rule fails to meet

---

[125] 2001 Guidance at 16.

[126] 2014 Q&A at G-2, 33.

[127] 2001 Guidance at iii.

[128] 2001 Guidance at 14.

EXHIBIT 12

this standard: it improperly tilts the proceedings in favor of the respondent, it prevents schools from imposing reasonable controls that protect confidentiality and ensure fair proceedings, and it burdens schools and students alike with untenable hearing requirements. In other places, the proposed rule requires clarification to ensure a truly equitable process. As such, the proposed grievance procedures must be substantially revised in order to comply with Title IX.

### A.    Credibility Determinations Should Not Be Based Solely on Person's Status.

To ensure that all evidence is evaluated objectively, the proposed rule states that "credibility determinations may not be based on a person's status as a complainant, respondent, or witness." Proposed § 106.45(b)(1)(ii). We agree that all evidence must be considered fairly and objectively by recipient schools. But fact-finders should not be categorically prohibited from considering any factor—including the person's status and motivations for offering their testimony—when determining credibility. As the EEOC has recognized in the employment context, no single factor is determinative of credibility.[129] Instead, the final rule should state that "credibility determinations may not be based <u>solely</u> on a person's status as a complainant, respondent, or witness."

### B.    The Presumption of Non-Responsibility Improperly Tilts the Process in Favor of the Respondent.

The proposed rule states that there is a "presumption" that the respondent is "not responsible" for the alleged sexual harassment. §§ 106.45(b)(1)(iv) & (b)(2)(i)(B). The presumption appears aimed at protecting respondents in a manner akin to the presumption of innocence in criminal cases. But the grievance procedures are non-criminal in nature, so a criminal presumption by another name is not appropriate. Relatedly, but more fundamentally, the presumption contradicts the regulation's stated goal of promoting impartiality by inherently favoring the respondent's denial over the complainant's allegation. Instead the allegation and the denial must be treated neutrally, as competing assertions of fact whose truth can only be determined after an investigation. The problem would be even starker if any final regulation were to retain recipients' ability to choose a "clear and convincing" evidence standard (which we contend is not appropriate). The presumption of non-responsibility and the "clear and convincing" standard of evidence likely would, in practice, compound one another and raise an exceedingly high bar to any finding of responsibility for sexual harassment.

Accordingly, there should be no presumption regarding the respondent's responsibility.

---

[129] EEOC, Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

EXHIBIT 12

**C.      The Department Should Provide Prompt Timeframes and Should Not Encourage Good Cause Delay for Concurrent Law Enforcement Proceedings.**

Since 1980, the regulations have required that schools provide a "prompt" resolution to any allegation of discrimination prohibited by this part.[130] Department policy interpreting the regulations has also required grievance procedures for resolving allegations of sexual harassment to be completed "promptly."[131] Proposed § 106.45(b)(1)(v) would require schools to establish "reasonably prompt timeframes for conclusion of the grievance process." According to the preamble, the Department has selected the language "reasonably prompt" to track "the language in the Clery Act regulations at 34 C.F.R. § 668.46(k)(3)(i)(A)." 83 Fed. Reg. at 61,473. We are concerned that schools will likely construe "reasonably prompt" as imposing a more relaxed timeliness obligation than "promptly." Other than a desire to provide consistency with the Clery Act, the Department does not provide an adequate justification for a change that may result in further delays in completion of the resolution process for both parties to a sexual harassment investigation, each of whom have a significant interest in a prompt resolution. The Department should strike "reasonably," so that change in wording does not constitute a departure from its long-established guidance without adequate justification.

In addition, we urge the Department to reaffirm, in issuing any final rule, the goal of completing investigations of formal complaints in a 60-day timeframe,[132] subject to the institutions' need for flexibility for practical concerns and to protect due process rights. Timely resolution of grievance procedures is vital for complainants who may be re-victimized as the process drags on without resolution or relief. As the Department has recognized, "OCR experience" had shown that "a typical investigation takes approximately 60 calendar days following receipt of the complaint," although "the complexity of the investigation and the severity and extent of the harassment" can necessitate a longer process.[133] In the proposed rule, the Department notes that "[s]ome recipients felt pressure in light of prior Department guidance to resolve the grievance process within 60 days." But nowhere does the Department claim that OCR's experience has changed. Rather than abandon this timeline, the Department should provide schools with guidelines for timeliness that continue to recognize that grievance procedures can vary in length based on the complexity of the investigation, the severity of the harassment, and factors outside of the schools' control, such as the unavailability of witnesses.[134]

---

[130] *See* current 34 C.F.R. § 106.8(b), proposed § 106(c).

[131] *E.g.*, 2001 Guidance at 19; 2011 DCL at 8.

[132] Of course, other stages such as appeals will have a separate prompt timeframe, as OCR has consistently recognized.

[133] 2011 DCL at 12; *see also* 2014 Q&A at 31.

[134] *E.g.*, state administrative procedures that require multiple stages but are still completed within a prompt timeframe.

36

EXHIBIT 12

Such a definition will also provide clear notice to schools of the Department's expectations for a prompt resolution.

Finally, the Department provides in proposed § 106.45(b)(1)(v) that schools many temporarily delay the process for good cause, which can include "concurrent law enforcement activity." For several reasons, any final rule should be clear that concurrent law enforcement activity, without more, is not good cause to delay Title IX proceedings. First, "because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively."[135] Conduct may restrict a student's access to education even though it does not rise to the level of a criminal violation. Second, as we discuss more fully elsewhere, schools generally have an independent obligation under Title IX to investigate and resolve complaints of sexual harassment—regardless of any parallel criminal investigation.

Generally, school and law enforcement officials should de-conflict their investigations to avoid prejudicing each other's investigation. Although concurrent law enforcement activity should not be considered sufficient grounds for delaying Title IX proceedings, some limited circumstances would support good cause for a temporary delay. For example, a school may find good cause to delay a portion of a Title IX investigation at the request of a prosecutor to protect the integrity of a criminal investigation, or "a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence."[136] But "once notified that the police department has completed its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation."[137] And schools should not refrain from providing supportive measures in the interim.

Therefore, if the Department finalizes its proposal, § 106.45(b)(1)(v) should be revised to reflect that "concurrent law enforcement activity" may be grounds for delaying Title IX proceedings only when there is good cause beyond the mere existence of concurrent law enforcement activity. That said, any final rule should also clarify that schools must tell complainants of their right to file a concurrent criminal complaint and not dissuade them from doing so.

---

[135] 2001 Guidance at 21 & n.110 (citing *Academy School Dist. No 20*, OCR Case No. 08-93-1023 (school's response determined to be insufficient in a case in which it stopped its investigation after complaint filed with police); *Mills Public School Dist.*, OCR Case No. 01-93-1123 (not sufficient for school to wait until end of police investigation)).

[136] 2011 DCL at 10 & n.25.

[137] *Id.* (noting that in "one recent OCR sexual violence case, the prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances").

EXHIBIT 12

**D.     When Issuing a Notice Upon Receipt of a Formal Complaint, Schools Should be Required to Protect Confidentiality and Preserve the Integrity of the Investigation.**

In § 106.45(b)(2)(i)(B), the proposed rule defines the notice a school must provide upon receipt of a formal complaint. We agree that due process requires that a respondent have access to information about the complained-of conduct in order to have a meaningful opportunity to prepare an effective response. But by requiring schools in all circumstances to send written notices that identify the complainant and detail the allegations, the proposed rule fails to address the potential confidentiality concerns of both the complainant and the respondent. For example, a written notice sent to the parties that names the complainant and details the allegations could be leaked or forwarded to unrelated third parties. This could damage the respondent's reputation,[138] invite retaliation against the complainant, threaten both parties' access to education, and, depending on the information disclosed regarding the complainant's medical information related to sexual violence, violate state and federal health care privacy laws.[139]

We are also concerned by the proposal's mandate that the required notice be provided "[u]pon receipt of a formal complaint," proposed § 106.45(b)(2)(i)(B), and then supplemented on an "ongoing" basis, "[i]f, in the course of an investigation, the recipient decides to investigate allegations not included in the notice provided pursuant to paragraph (b)(2)(i)(B)." § 106.45(b)(2)(ii). As long as the respondent receives the necessary information early enough to have a meaningful opportunity to prepare a response, schools should retain some discretion as to when they provide a respondent information about allegations being investigated. For example, a school may wish to conduct a preliminary investigation to determine whether the new allegations are credible or whether alleged systemic conduct is occurring. Schools may also need to delay notice to avoid prejudicing the investigation.

To avoid these problems, any final rule should instead advise schools to provide the respondent with prompt written notice of the filing of a formal Title IX complaint, including the specific allegations against her or him, the applicable grievance procedures and conduct code sections, a prompt timeframe for providing access to relevant information about the allegations, and an opportunity to respond. This would allow schools to continue to protect both parties by, for example, sending respondents only an initial written notice about the existence of a complaint and specific allegations, and then providing him or her with relevant information in person, including additional details about the alleged conduct and the identity of the complainant. Any final rule should also allow schools to protect respondents and complaints in other ways, such as by barring them from disclosing personally identifiable information except as necessary to prepare a response.

---

[138] *E.g.*, 2001 Guidance at 18 ("Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused.").

[139] *E.g.*, 2001 Guidance at 17–18.

EXHIBIT 12

Any final rule should also allow schools to withhold the identity of the complainant in certain circumstances. We agree that in many circumstances, the respondent must be informed of the complainant's identity to prepare an adequate response. But there are circumstances in which a school may not need to identify a complainant who has requested confidentiality, such as when the complaint involves harassment in a public setting (e.g., a teacher saying something to a whole class or systemic problems at a fraternity). In addition, when a school moves forward with a complaint on behalf of a student who has requested confidentiality, the school can still provide prospective relief, such as sexual harassment training and guidance that can meets it obligations to prevent harassment and address its effects. Students who have declined to pursue a formal investigation should not be identified against their will if appropriate corrective measures can still be pursued.

Finally, any final rule should require any notice to include a warning that retaliation against the complainant, including by making statements or spreading rumors intended to intimidate or dissuade him/her from filing or pursuing a Title IX complaint, constitutes an independent Title IX violation.

### E.    Schools Should be Allowed to Place Limited, Reasonable Restrictions on Discussions by the Parties.

In § 106.45(b)(3)(iii), the proposed rule bars schools from restricting the parties from discussing the allegations under investigation. We agree that parties cannot be barred from disclosing information needed to prepare a response or prepare for an interview or hearing. But there are several circumstances in which a school may need to place reasonable limitations on the ability of both parties to discuss the allegations. For example, a school may be able to respect a complainant's request for confidentiality by requiring the respondent to not disclose the complainant's identity unless necessary to prepare his or her response. In addition, schools should be allowed to limit (in the short term) discussions to preserve the integrity of the investigation, such as limiting conversations between parties and witnesses to prevent witness tampering. Finally, effective interim supportive measures should continue to include a school's ability to restrict the respondent from contacting the complainant or otherwise harassing or retaliating against him or her during the pendency of the investigation. Therefore, any final rule should state that the school must not restrict the ability of either party to discuss the allegations under investigation as necessary to prepare a response or prepare for an interview or hearing.

### F.    The Proposed Hearing Procedures Will Chill Reporting, Burden Schools, and Harm Both Complainants and Respondents.

Proposed § 106.45(b)(3)(vi) allows K-12 institutions to conduct live hearings at their discretion. Live hearings place a sharp spotlight on both parties. K-12 students—particularly those in elementary and middle school—will typically lack the maturity necessary to participate. They also have greater vulnerability to potential traumatization or re-traumatization. In addition, allowing live hearings raises serious privacy concerns for children, particularly with respect to

EXHIBIT 12

student witnesses. The final rule should not allow live hearings in the K-12 context unless otherwise required by state law.

If live hearings do take place in K-12 schools, the final rule should include minimum protections for student parties and witnesses who testify, and require schools to protect the confidentiality of the participants and the process. Given the privacy considerations for underage minors and potential for re-traumatization, the complaining and responding student should never be required to testify in the same room or to face each other in any cross-examination. The regulation should also provide exceptions for student testimony and participation where the student's maturity level would make in-person participation inappropriate.

In § 106.45(b)(3)(vii), the proposed rule requires all institutions of higher education to conduct live hearings at which each party's advisor must be allowed to conduct cross-examination of the other party. As we discuss below, any final rule should not mandate live hearings, return advisors to a supporting role only, and only allow party questioning via neutral third parties.

First, although some states require them, live hearings can pose problems. Schools may have a legitimate interest in avoiding circumstances that may subject the complainant to further harassment. Particularly in cases of sexual violence, requiring the complainant to face the respondent risks re-traumatizing a survivor. In addition, live hearings can be burdensome on institutions. They are typically overseen by faculty members or school staff who, no matter how dedicated they are to a fair process, are not professional mediators or judges. Months or even years can pass between hearings, which can undermine the efficacy of training, while the presence of attorneys for either party risks intimidating the panel and overtaking the proceedings. And finding a time when the panel members, the parties, and all witnesses are available can delay proceedings. To avoid these problems, some schools instead have the fact-finder or investigator conduct hearings with, or take sequential evidence from, all parties and witnesses, with the parties able to submit questions in advance. This allows for the solicitation of live testimony and enables the fact-finder to personally evaluate the speaker's credibility.[140]

Therefore, the final rule should permit investigations via methods other than live hearings, subject to constitutional due process protections.

Second, requiring cross-examination by a party's advisor during a live hearing will create serious problems to both the school and the parties. The opportunity for the parties to pose questions is an important element of fact-finding. Indeed, the ability to pose questions of witnesses and the other party protects both respondents and complainants. But the Department's shift to cross-examination by advisors has created even greater problems—problems that will

---

[140] *E.g.*, *Doe v. Univ. of S. California*, 241 Cal. Rptr. 3d 146, 163 (Cal. Ct. App. 2018) (holding that "[w]here a university's determination turns on witness credibility, the adjudicator must have an opportunity to assess personally the credibility of critical witnesses," but not finding due process violation in the university's decision to not hold a live hearing).

EXHIBIT 12

inhibit the Department's stated goals of discovering the truth and reducing the burden on schools. 83 Fed. Reg. at 61,476.

Advisor-led cross-examination will be untenable. Some parties may choose to bring in attorney advisors. This risks disparate treatment if, for example, the complainant has an attorney advisor and the respondent has an institution-provided faculty member advisor. In cases in which the school is required to provide the advisor, schools are concerned that they could later be challenged for failing to provide an adequate advisor. Attorney-advisor cross-examination also risks intimidating the non-lawyer faculty or staff member(s) who typically oversee Title IX hearings. To ensure that the fact-finder can run a fair and effective hearing, schools may feel the need to hire attorneys to serve as dedicated Title IX fact-finders, which would impose an even greater expense and burden on institutions. In addition, cross-examination by an advisor of the party's choice—which could be an attorney, a family member, or a fellow student—risks harassing the respondent, retraumatizing the complainant, and further deterring survivors from filing formal complaints.[141]

To avoid these problems, any final rule should permit the practice already widely used in schools that hold live hearings. Each party should be allowed to bring to a hearing or interview an advisor of his or her choice who serves only a supportive function. The complainant and respondent should be allowed to pose questions through a neutral third party, such as the fact-finder overseeing the hearing. This would balance the need for each party to ask questions of the other party, the need for the fact-finder to evaluate how the parties respond to live questions, and the need to protect all parties from trauma, intimidation, and further harassment. The Department must also ensure that adjudicators are sufficiently empowered to control the proceedings and place some reasonable limitations on the questioning of the parties and witnesses. By making relevance the only ground for excluding questions, 83 Fed. Reg. at 61,476, the Department's proposal would result in protracted and unwieldy hearings that would impose additional costs on schools and parties (costs not reflected in the Department's regulatory impact analysis). Such hearings may not ultimately protect respondents and complainants from abusive or harassing questioning or, most importantly, facilitate the discovery of truth.

---

[141] *See, e.g.*, Tom Lininger, *Bearing the Cross*, 74 Fordham L. Rev. 1353, 1357 (2005) ("As a general matter, victims willingness to report crimes varies inversely with their fear of embarrassment during cross-examination."); Anoosha Rouhanian, *A Call for Change: The Detrimental Impacts of Crawford v. Washington on Domestic Violence and Rape Prosecutions*, 37 B.C.J.L. & Soc. Just. 1, 35 (2017); William J. Migler, *An Accused Student's Right to Cross-Examination in University Sexual Assault Adjudicatory Proceedings*, 20 Chap. L. Rev. 357, 370 (2017); H. Hunter Bruton, *Cross-Examination, College Sexual-Assault Adjudications, and the Opportunity for Tuning Up the "Greatest Legal Engine Ever Invented"*, 27 Cornell J.L. & Pub. Pol'y 145, 176 (2017).

EXHIBIT 12

### G.      Schools Should Not be Required to Provide Parties With Access to All Collected Evidence.

In § 106.45(b)(3)(viii), the proposed rule details how institutions must prepare investigative reports and provide the parties with access to evidence. These provisions raise several serious concerns.[142]

First, no platform exists that is wholly immune from "downloading or copying the evidence." Among many other vulnerabilities, the relevant evidence could easily be photographed using a smartphone camera. The final rule should not require schools to provide such sensitive information in a way that exposes both the respondent and the complainant.

Second, providing all parties access to "any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility" is overbroad. Schools should not be required to provide the parties with access to evidence that is privileged and confidential, such as "communications between the complainant and a counselor or information regarding the complainant's sexual history."[143] Schools also cannot provide parties with access to evidence that it itself cannot use, such as an illegal voice recording in a state such as Pennsylvania that requires two-party consent.[144] Nor should a school provide either party with evidence that was collected as part of the investigation but which is irrelevant.

Nor can schools be required to provide access to information where doing so is barred by the Family Educational Rights and Privacy Act (FERPA). The Department mischaracterizes the law when it asserted in the preamble that this provision "is consistent" FERPA, "under which a student has a right to inspect and review records that directly relate to that student." 83 Fed. Reg. at 61,475. FERPA does not allow one student to review information about other students. 34 C.F.R. § 99.12(a). And not every piece of evidence obtained as part of an investigation is necessarily "directly related to" *each* student who is a party to an investigation for the purposes of FERPA.[145] For example, a complainant's full medical history, even if obtained as part of an investigation to ascertain the extent of alleged physical injuries, is both irrelevant to the specific

---

[142] *See, e.g.*, Richard Reed, *Feds concerned about loophole that may have enabled UO to get alleged rape victim's records,* The Oregonian (June 13, 2015), https://www.oregonlive.com/education/index.ssf/2015/06/feds_voice_concern_about_looph.html (discussing disclosure of student's confidential counseling records regarding an alleged rape on campus and the impact on the survivor and other legal liability).

[143] 2011 DCL at 11 n.29.

[144] Digital Media Law Project, *Recording Phone Calls and Conversations*, http://www.dmlp.org/legal-guide/recording-phone-calls-and-conversations (last checked Jan. 18, 2019).

[145] 20 U.S.C. § 1232g(a)(4)(A)(i).

EXHIBIT 12

allegation at issue and not at all "directly related" to the respondent. Likewise, "if a school introduces an alleged perpetrator's prior disciplinary records to support a tougher disciplinary penalty, the complainant would not be allowed access to those records."[146]

Therefore, any final rule should permit schools to place reasonable limitations on a respondent's access to information.

### H.      The Standard of Proof Should Remain Preponderance of the Evidence.

Proposed regulation § 106.45(b)(4)(i) requires the recipient to:

> [A]pply either the preponderance of the evidence standard or the clear and convincing evidence standard, although the recipient may employ the preponderance of the evidence standard only if the recipient uses that standard for conduct code violations that do not involve sexual harassment but carry the same maximum disciplinary sanction. The recipient must also apply the same standard of evidence for complaints against students as it does for complaints against employees, including faculty.

Although the proposed regulation expressly provides an "option" regarding the standard that may be used, requiring that the preponderance of the evidence standard only be used if it is also used in other specific contexts could effectively eliminate the preponderance of the evidence standard in Title IX proceedings. This proposal is presented under a veneer of treating complaints equitably, but would, in fact, often create an inequitable situation at odds with Title IX's text and intent, exceed the Department's authority under Title IX, and be strikingly unfair to those subjected to sexual harassment and sexual violence.

First, the idea that a heightened standard of proof should apply to claims of sexual harassment and violence in school disciplinary processes misapprehends these proceedings' fundamental purpose. While of great consequence to all parties involved, these are not criminal proceedings. In criminal proceedings, a heightened standard of proof is constitutionally mandated and appropriate given the retributive nature of criminal sanctions, as well as the potential of loss of life or liberty. In contrast, student disciplinary proceedings must be viewed in light of the institutions' educational missions. As stated in a publication by the Association for Student Conduct Administration, "[t]he goal is to protect the academic environment."[147] That goal is undermined by a standard that "says to the victim/survivor, 'Your word is not worth as

---

[146] 2011 DCL at 11.

[147] Chris Loschiavo & Jennifer Waller, PhD, *Preponderance of the Evidence Standard: Use in Higher Education Campus Conduct Processes*, 1, 3, Association for Student Conduct Administration, https://www.theasca.org/files/The%20Preponderance%20of%20Evidence%20Standard.pdf.

EXHIBIT 12

much to the institution as the word of accused' or, even worse, that the institution prefers that the accused student remain a member of the campus community over the complainant."[148]

Second, the "preponderance of the evidence" standard in this context is widespread and has been in use for decades. In fact, the Department has required schools to employ this standard since at least 1995, under both Democratic and Republican administrations.[149] Further, contemporaneous surveys showed that the majority of colleges and universities employed this standard even before the Department's 2011 guidance.[150] Tellingly, multiple rounds of comments on Title IX guidance in the past 20 years yielded no complaints about, or even mention of, the preponderance of evidence standard.[151]

While the proposed rule pushes back on the analogy to civil litigation as one of its rationales for employing the clear and convincing standard, 83 Fed. Reg. at 61,477, the Department cannot dispute that the preponderance of the evidence standard is typical in civil lawsuits, including ones in which civil rights violations—such as Title IX and Title VII—are alleged.[152] The 2001 Guidance noted that "[w]hile *Gebser* and *Davis* made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the *Davis* Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX."[153] The Department's proposed rule turns Title IX on its head, making it harder for a victim of sex discrimination to obtain relief than a respondent. In this regard, a respondent will now be able to sue a school for a "due process" violation of Title IX and only have to prove the

---

[148] *Id.* at 4.

[149] Katherine K. Baker, et al., *Title IX & the Preponderance of the Evidence: A White Paper*, Feminist Law Professors 1, 10 (Aug. 7, 2016), http://www.feministlawprofessors.com/wp-content/uploads/2017/07/Title-IX-Preponderance-White-Paper-signed-7.18.17-2.pdf (citing Letter from Gary D. Jackson, Reg'l Civil Rights Dir., Off. for Civil Rights, U.S. Dep't of Educ., to Jane Jervis, President, The Evergreen St. Coll. (Apr. 4, 1995) (Clinton Administration); Letter from Howard Kallem, Chief Att'y, D.C. Enforcement Off., Off. for Civil Rights, U.S. Dep't of Educ., to Jane Genster, Vice President and General Counsel, Georgetown Univ. (Oct. 16, 2003) (George W. Bush Administration)).

[150] *Id.* at 7 (citing two studies showing that shortly before 2011 DCL, (1) 80 percent of schools with a standard of evidence used the preponderance standard and (2) 61 percent of college and university administrators surveyed used the preponderance standard).

[151] *Id.* at 9–10.

[152] *See, e.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) (noting that under the "conventional rule of civil litigation," the preponderance of the evidence standard generally applies in cases under Title VII); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252–55 (1989) (approving preponderance standard in Title VII sex discrimination case) (plurality opinion); *id.* at 260 (White, J., concurring in the judgment); *id.* at 261 (O'Connor, J., concurring in the judgment).

[153] 2001 Guidance at vi; *see also Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

44

EXHIBIT 12

case by a preponderance of the evidence, whereas the complainant would have to prove sexual harassment in the first instance by the higher clear and convincing standard.

Further, as acknowledged in the NPRM, the Department's own OCR uses a preponderance of the evidence standard. 83 Fed. Reg. at 61,477. OCR's Case Processing Manual requires that a noncompliance determination be supported by the preponderance of the evidence when resolving allegations of discrimination under all the statutes enforced by OCR, including Title IX.[154]

The "preponderance of the evidence" standard is the only standard of proof that can provide for an "equitable resolution" of student harassment complaints,[155] as required under Title IX.[156] Absent a statutory instruction to the contrary, the Department has no authority to depart from the usual allocation of risk between parties to grievance proceedings. In discussing appellate rights, the Department recognizes that each party in grievance proceedings is equally deserving of an accurate outcome. 83 Fed. Reg. at 61,478–79. This recognition makes the Department's proposal to use a standard other than preponderance of the evidence—which privileges one party's interests over others' and the search for truth—all the more inexplicable.

To be sure, this proposed regulation applies by its terms to complaints against employees as well, and some colleges and universities have policies for faculty under which a higher standard of proof is used. But schools have a qualitatively different relationship with their employees than their students. In the modern university context, courts "have increasingly recognized a college's duty to provide a safe learning environment both on and off campus."[157] This most obviously manifests itself in the student housing context, where students are almost entirely dependent on the university for security, and have little to no power to enhance their security themselves.[158] The proposed regulation's requirement that schools can only use a preponderance of the evidence standard for student complaints if they use that same standard for

---

[154] U.S. Dep't of Educ., *Case Processing Manual,* Art. III, § 303, https://www2. ed.gov/about /offices/list/ocr/docs/ocrcpm.pdf. Notably, this Manual was updated under this Administration (in November 2018) and retained the preponderance of the evidence standard.

[155] *Herman & Maclean v. Huddleston*, 459 U.S. 375, 390 (1983) ("A preponderance-of-the-evidence standard allows both parties to 'share the risk of error in roughly equal fashion.' Any other standard expresses a preference for one side's interests.") (internal quotation marks omitted). *See also Steadman v. SEC*, 450 U.S. 91, 96 (1981) (same).

[156] *See* 34 C.F.R. §106.8(c) (construing Title IX to require equitable resolution of grievances).

[157] Kristen Peters, Protecting the Millennial College Student, 16 S. Cal. Rev. L. & Soc. Just. 431, 448 (2007); *see also Duarte v. State*, 88 Cal. App. 3d 473 (Cal. 1979) (noting that students "in many substantial respects surrender[]the control of [their] person[s], control of [their] own security to the university"); *Mullins v. Pine Manor Coll.*, 449 N.E.2d 331, 335–36 (Mass. 1983) (holding that "[p]arents, students, and the general community . . . have a reasonable expectation, fostered in part by colleges themselves, that reasonable care will be exercised to protect resident students from foreseeable harm.").

[158] *See Mullins*, 449 N.E.2d at 335.

EXHIBIT 12

complaints against employees ignores the fundamental fact that schools are obliged to protect their students in different ways than their employees, which is especially true for students who are minors.[159]

The proposed rule prohibits schools from having a different standard of proof for allegations of sexual harassment than it does for other infractions that carry the same potential sanctions. The reasons provided for this change further highlight the inherent one-sidedness underlying the proposal to alter the standard of proof. Here, the Department only discusses the "heightened stigma often associated with a complaint regarding sexual harassment," 83 Fed. Reg. 61,477, but fails to recognize the trauma associated with being subjected to sexual harassment or violence, and how this could be exacerbated by applying an evidentiary standard of proof favoring the accused over the individual subjected to sexual harassment or violence.

The proposed rule will have the effect of deterring complainants from filing administrative school complaints and instead encourage additional costly civil litigation, an additional cost impact for which the Department fails to account. Assuming that the Department's proposed regulations are adopted, a complainant filing a civil lawsuit under Title IX would now be required to meet the same extremely high burdens—e.g., standards for deliberate indifference, actual knowledge, and sexual harassment—in school as in court. But the court case would be adjudicated under the preponderance of the evidence standard, a lower burden of proof than would be available in many school grievance proceedings under the proposed rule. In addition, the complainant would be able to obtain damages in court, something that the Department's proposed rule explicitly prohibits in the administrative context.

The problem is that civil adjudication is only an alternative for students with means to pursue it. Students without the financial means would be uniformly disadvantaged in pursuing sexual harassment complaints. Additionally, where school proceedings are perceived unfair or unduly burdensome, some students may choose to pursue criminal actions, which can be re-traumatizing for a person subjected to sexual harassment and more stigmatizing for the accused.

Finally, the proposed rule may also prove unworkable for many institutions that will be unable to meet two masters. To meet the second requirement of consistency between faculty and student complaints, colleges and universities will most frequently be required to adopt the higher standard of proof, clear and convincing, since tenured faculty often are entitled by law and contract to an application of the higher standard. But to meet the first requirement of consistency between conduct code violations with similar maximum penalties, many colleges and universities that handle all conduct code violations using a preponderance of the evidence standard would be required to adopt the higher standard of proof. The Department's rule will thus likely require colleges and university to enact far reaching changes to conduct violation policies and practices that extend well beyond the scope of the Department's authority to regulate under Title IX, inappropriately reaching conduct that has nothing to do with

---

[159] *See supra* note 99.

EXHIBIT 12

discrimination on the basis of sex—for example, cheating and simple battery. Further, the Department provides no explanation for why these proceedings—faculty disciplinary standards and code of conduct complaints—are more appropriate analogues to Title IX's disciplinary proceedings than Title VII or sexual harassment civil proceedings in court.

## I.    The Written Determination Must Include Steps to Eliminate Any Hostile Environment.

Proposed § 106.45(b)(4)(ii) provides a summary of what the final written determination must include. Any final rule should confirm that the written determination must also include assurances that the school will take steps to prevent recurrence of harassment, correct its discriminatory effects, and prevent any retaliation against the complainant.[160] As we have discussed, the effects of harassment can go beyond the complainant and the respondent. The Department has long recognized that Title IX requires schools to "eliminate any hostile environment that has been created," which may require implementing corrective measures throughout the education community.[161]

## J.    The Department Should Clarify that both Complainants and Respondents Have Equal Access to the Appeal Process.

As currently written, § 106.45(b)(5) states that "[i]n cases where there has been a finding of responsibility, although a complainant may appeal on the ground that the remedies are not designed to restore or preserve the complainant's access to the recipient's education program or activity, a complainant is not entitled to a particular sanction against the respondent." This could be read to suggest that a complainant can only appeal the remedies provided and not the substantive findings. To avoid a rule that could be read to favor one party over another, any final rule should clarify that both complainant and respondent should be given equal grounds for appeal. In addition, the final rule should clarify that even if a complainant is not entitled to a particular sanction, complainant can still appeal and seek a different sanction than the one imposed.

## K.    Any Informal Resolution Must Empower Complainants and Seek Restorative Justice.

In § 106.45(b)(6), the Department proposes to allow informal resolution of any sexual harassment complaint. The use of informal resolution has been shown to have powerful remedial benefits in the criminal justice system.[162] But any use of informal resolution under Title IX must be voluntary and only initiated after the parties have full notice of their options, including the right to proceed with a formal resolution process. In addition, informal resolution should allow

---

[160] 2001 Guidance at 17.

[161] 2001 Guidance at 16.

[162] *E.g.*, Common Justice, *Common Justice Model*, https://www.commonjustice.org/common _justice_model (last checked Jan. 29, 2019).

EXHIBIT 12

for an option to access voluntary restorative justice. And schools should have the option not to offer informal resolution in cases of sexual violence or assault, which may raise more difficult issues that some schools may not have the resources to adequately address.

To that end, any final rule that allows schools to offer an informal resolution process must require them to provide complainants and respondents with written notice of the options for informal resolution at the outset, but not pressure students to pursue an informal resolution. Confirmation that the parties received written notice of the availability of informal resolution should be maintained by the school. Any final rule should also state that any informal resolution process must involve a trained staff member. With voluntary written consent of both parties, a face-to-face meeting may be part of an informal process, but at no point should a complainant be required to resolve the problem alone with the respondent.[163] Both parties must receive written notice of the outcome of the informal resolution process, including any remedies and sanctions. Finally, both parties must be informed of the right to discontinue the informal process at any time and file a formal complaint.[164]

### L.      The Recordkeeping Retention Period Should Be Extended.

Sections 106.45(b)(7)(i)–(ii) of the proposed rule set forth a requirement that all recipients "create, make available to the complainant and respondent, and maintain for a period of three years records of" any sexual harassment investigation, the results of that investigation, any appeal from that investigation, and all training materials relating to sexual harassment. The explicit requirement to retain such records is a positive step that will help improve consistency in investigations and allow the Department to assess compliance with Title IX.

But the Clery Act requirement to report all crimes that occurred within the last three years has little to do, as a matter of policy or law, with how long recipients should *retain records* of sexual harassment and sexual assault after they have been reported. It does not follow that the period of *retention* for such records should be tied to the Clery Act's limitation period for *reporting* specific campus crimes.[165]

In fact, when interpreting the Clery Act's requirement to "Retain Records," the Department has explicitly held that all three years of records relied upon for annual reporting must be kept for another three years *after* the publication of that year-end report—or "in effect,

---

[163] 2001 Guidance at 21.

[164] *Id.* In some cases, informal resolution may also require the existence of a safety guardrail to ensure that the school has made a sufficient inquiry to determine the scope of likely harm to the complainant and others in the school community and the extent of the injuries to fashion appropriate redress.

[165] *See* The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092(f); 34 C.F.R. 668.46(c)(1) (requiring schools to annually report all crimes which occurred in the prior three calendar years by the end of the following year).

EXHIBIT 12

seven years."[166] The proposed regulation asserts that it "tracks the language in the Clery Act," thereby implying that this proposed change is consistent with current law. 83 Fed. Reg. at 61,471, 61,473, 61,475, 61,476, 61,478. However, as demonstrated above, the proposed three-year retention requirement is inconsistent with the Clery Act's seven-year retention requirements. The retention period in the proposed regulations therefore should be, at minimum, seven years.

In addition, as a practical matter, a three-year recordkeeping requirement could undermine criminal prosecutions related to the incidents at issue. For example, several states have no statute of limitations for rape or certain other serious sexual offenses.[167] In other states, the statutes of limitations for sexual offenses far exceed the three-year recordkeeping requirement.[168] And sexual offenses against minors are often subject to significantly lengthened statutes of limitations.[169]

The proposed regulations therefore would permit recipients to discard vital records that could help the criminal prosecution of sexual assault and rape well before the statute of limitations for such crimes has run, thereby potentially letting the perpetrators of these serious crimes go free. Given that so many related crimes have statutes of limitations substantially longer than the three-year requirement in the proposed regulations, the retention policy is inadequate, and should be extended in any final rule.

## V.   The Department Should Not Adopt a Title IX Rule that Adversely Affects Schools' Ability to Go Beyond Title IX's Requirements in Addressing Sexual Harassment and Violence, Including Their Ability to Comply with Other Applicable Laws.

### A.   Title IX Cannot, And Does Not, Restrict The Ability of States and Schools To Provide Broader Protections Against Sex Discrimination.

The proposed rule's new general standard and definitions of terms, as discussed above,[170] would narrow schools' obligations to respond to sexual harassment and assaults and decrease the

---

[166] U.S. Dep't of Educ., *The Handbook for Campus Safety and Security Reporting* 9–11 (2016 Ed.); *see also id.* at 6–11 ("As with all other Clery Act-related documentation, your institution is required to keep emergency test documentation for seven years.").

[167] *See, e.g.*, Cal. Penal Code §§ 261, 799; N.J.S.A. 2C:1-6a(1).

[168] Any "major sexual offense" committed in the state of Pennsylvania can be prosecuted within twelve years of its occurrence. 42 Pa.C.S.A. § 5552(b)(1).

[169] In California, for example, assaults against minors can be prosecuted at any point up until the victim's 40th birthday. Cal. Penal Code § 801.1(a)(2). In Pennsylvania, assaults against minors can be prosecuted until the victim's 50th birthday. 42 Pa.C.S.A. § 5552(c)(3). In New Jersey, "criminal sexual contact" involving minor victims may be prosecuted up to five years after the victim turns 18. N.J.S.A. 2C:1-6b(4).

[170] *See supra* Section II.

EXHIBIT 12

protections afforded to those subjected to sexual harassment and assault. In addition, this newly-narrowed definition of sexual harassment could potentially have negative consequences in other contexts. Section 106.45(b)(3) of the proposed regulation holds that whenever "the conduct alleged by the complainant would not constitute sexual harassment as defined in section 106.44(e) . . . , the recipient *must dismiss* the formal complaint with regard to that conduct." (emphasis added). One reading of this requirement would dictate that no recipient could attempt to address sexual harassment or assault if the basis of those claims did not fit within the newly-narrowed federal definition provided in the proposed regulations, even where the recipient's own policy or state law would nevertheless prohibit the actions alleged by the complainant. We believe that the proposed rule at § 106.45(b)(3), if finalized, must be revised to state, consistent with other parts of the proposed regulation,[171] that Title IX cannot, and does not, restrict the ability of states and schools to provide broader protections against sex discrimination. Further, we believe that the Department should ensure that schools can continue to enforce additional civil rights protections.

Even if the proposed rule allows broader protections against sex discrimination, mandating that schools dismiss Title IX complaints that fall outside of the regulations' scope will still burden schools by requiring them to create two separate procedures: one for Title IX sexual harassment and one for conduct that may constitute sexual harassment under other applicable law or policies but not under the Department's interpretation of Title IX. 83 Fed. Reg. at 61,475 (noting that "a recipient remains free to respond to conduct that does not meet the Title IX definition of sexual harassment"). Yet the Department has long held that Title IX does not require a school "to provide separate grievance procedures for sexual harassment complaints."[172] Indeed, many schools prohibit sexual harassment in the school's code of student conduct.[173]

---

[171] Other sections of the proposed regulation accurately reflect that Title IX does not preempt the field of sex discrimination. *See, e.g.*, 83 Fed. Reg. at 61,475 ("a recipient remains free to respond to conduct that does not meet the Title IX definition of sexual harassment"); (responses could include "responding with supportive measures for the affected student or investigating the allegations through the recipient's student conduct code" and that "such decisions are left to the recipient's discretion in situations that do not involve conduct falling under Title IX's purview").

[172] 2001 Guidance at 19.

[173] *E.g.*, Uni. of Pittsburgh, *Title IX—Policies and Procedures*, https://www.titleix.pitt.edu /policies-procedures (Jan. 17, 2019); San Francisco Unified School District (SFUSD), *Administrative Regulation 5145.3* (Aug. 8, 2016), http://www.sfusd.edu/en/assets/sfusd-staff/Equity/Nondiscrimination, %20Harassment%20-%20AR%205145.3%20-%20English%20(8.8.16).pdf (defining harassment on the basis of sex as "[a]cts of verbal, nonverbal, or physical aggression, intimidation, or hostility that are based on sex, gender identity, or gender expression, regardless of whether they are sexual in nature, where the act has the purpose or effect of having a negative impact on the student's academic performance or of creating an intimidating, hostile, or offensive educational environment …."); Rutgers, the State University of New Jersey, *Policy Prohibiting Discrimination and Harassment,* Section 60.1.12 (rev. Jul. 5, 2016), http://catalogs.rutgers.edu/generated/ejbppp_current/pg67.html (including indirect harassment and hostile environment created by generalized harassing behaviors); The George Washington Univ., *The Sexual and*

EXHIBIT 12

Moreover, it's unclear what a school would do differently when considering a non-Title IX sexual harassment complaint, given that the Department purports to believe that its grievance proposals constitute the floor of fair and equitable proceedings.

If the Department were, however, to impose regulations that inhibit state laws or recipient codes of conduct that are more protective of those subjected to sexual harassment for behavior that falls outside of the Department's narrowed definition of sexual harassment under Title IX, those regulations would be inconsistent with civil rights law and Title IX generally. In creating the Department of Education, Congress explicitly announced its intention "to protect the rights of State and local governments and public and private educational institutions in the areas of educational policies and administration of programs," and specifically not to "to increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the

---

*Gender-Based Harassment and Interpersonal Violence Policy* (July 1, 2018), https://my.gwu.edu/files/ policies/SexualHarassmentFINAL.pdf (defining gender-based harassment to include "harassment based on gender, sexual orientation, gender identity or gender expression, which may include acts of aggression, intimidation or hostility, whether verbal or non-verbal, graphic, physical or otherwise …."); Georgetown Univ., *Code of Student Conduct 2018-2019*, Section 33, https://studentconduct.georgetown.edu/code-of- student-conduct (defining sexual harassment "as any unwelcome conduct of a sexual nature, including sexual advances, request for sexual favors, or other verbal or physical conduct of a sexual or gender-based nature when: [1] Submission to such conduct is made explicitly or implicitly a term or condition of an individual's employment or academic relationship; or [2] Submission to or rejection of such conduct is used as a basis for making an employment or academic decision affecting an individual; or [3] Such conduct has the purpose or effect of interfering with an individual's work or academic performance, denying or limiting an individual's ability to participate in or benefit from the University's education programs, or creating an intimidating, hostile, or offensive environment for work or academic pursuit"); Howard Univ., *Code of Student Conduct* (Apr. 18, 2015), Section VI.23, http://www.howard.edu/ secretary/documents/StudentCodeofConductApprovedApril182015.pdf (same); D.C. Code § 38- 1802.04(C)(1A)(5) ("title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) … shall apply to a public charter school"); District of Columbia Public Charter School Board, *Resources for Transgender and Gender-Nonconforming Students* (last checked Jan. 24, 2019), https://www.dcpcsb.org/ resources-transgender-and-gender-nonconforming-students ("Title IX protects all students, including transgender and gender-nonconforming students, from sex discrimination. Title IX encompasses discrimination based on a student's nonconformity with sex stereotypes and gender identity, including a student's transgender status"); Office of the State Superintendent of Education, *Civil Rights and Gender Equity Methods of Administration (MOA) Coordination*, https://osse.dc.gov/service/civil-rights-and- gender-equity-methods-administration-moa-coordination ("Under federal law, all students in the District are protected against discriminatory actions based upon a student's sex, race, ethnic origin or disability. [Career and Technical Education] [(]CTE[]) students and families should expect the following: … Your school and school district must post the federal laws that explicitly note your rights that protect you against any type of discrimination that would prevent deter you from equal access to enrolling and completing CTE courses; … [ and] Your school and school district must draft grievance policies, let you know how to file a grievance, and who the contact person is …."); Wash. Admin. Code § 478-121-155 (2017) (prohibiting, in the Student Conduct Code for the University of Washington, sexual harassment).

EXHIBIT 12

States.[174] Moreover, federal laws that are designed to protect citizens are presumed to allow for the enactment of state and local legislation that is more protective, barring explicit *congressional* intent to the contrary.[175] For example, Title VII, which prohibits discrimination in employment in certain contexts, does not bar states from prohibiting discrimination in employment in other contexts that are not covered by Title VII.

Nothing within Title IX's text or history suggests Congress intended the unusual result of impeding state and local efforts to protect those subjected to sexual harassment more broadly than Title IX or preventing schools from proactively avoiding Title IX liability (or for that matter, impeding their efforts to comply with other federal laws that may apply, such as Title VII).

### B.      State Laws Provide Greater Protections for Students In Their States.

As might be expected, states already have enacted laws that provide greater protections than those required by Title IX.

For example, California defines sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature, made by someone from or in the work or educational setting," so long as the conduct would have "the purpose or effect of having *a negative impact* upon the individual's work or academic performance, or of creating an intimidating, hostile, or offensive work or educational environment."[176] This definition goes beyond the definition in the proposed regulation, which would require that the objectionable conduct "effectively den[y]" the complainant of equal access to the educational program or activity. 83 Fed. Reg. at 61,496. California also provides clear protection against discrimination for sex-based and gender-based harassment, including harassment on the basis of gender identity and sexual orientation. Sexual harassment can be proved based on a showing of severity or pervasiveness, which, as discussed provides additional protections not in the proposed rule.

---

[174] 20 U.S.C. § 3403(a).

[175] *See Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1543 (D.C. Cir. 1984) ("[F]ederal legislation has traditionally occupied a limited role as the floor of safe conduct; before transforming such legislation into a ceiling on the ability of states to protect their citizens, and thereby radically adjusting the historic federal-state balance, . . . courts should wait for a clear statement of congressional intent."); *Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Engineers*, 335 F.3d 607, 617 (7th Cir. 2003) ("[M]any federal regulatory laws, establish a floor, but not a ceiling, on state and local regulation.").

[176] Cal. Ed. Code § 212.5(c); *see also* Cal. Educ. Code 48900.2 (sexual harassment must "be sufficiently severe **or** pervasive to have a negative impact upon the individual's academic performance or to create an intimidating, hostile, or offensive environment").

EXHIBIT 12

Another example is the state of Oregon, which has a number of laws that protect the civil rights of students.[177] By statute and regulation, Oregon prohibits discrimination on the basis of sex,[178] and also prohibits sexual harassment of students by staff and other students.[179] Higher

---

[177] The Oregon Attorney General represents both the Oregon Department of Education and the Higher Education Coordinating Commission, which have roles in addressing discrimination in Oregon's colleges and universities.

[178] Oregon Revised Statute (ORS) 659.850(1) prohibits discrimination defined as: "… any act that unreasonably differentiates treatment, intended or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on race, color, religion, sex, sexual orientation, national origin, marital status, age or disability. "Discrimination" does not include enforcement of an otherwise valid dress code or policy, as long as the code or policy provides, on a case-by-case basis, for reasonable accommodation of an individual based on the health and safety needs of the individual." It further provides in (2) that: "A person may not be subjected to discrimination in any public elementary, secondary or community college education program or service, school or interschool activity or in any higher education program or service, school or interschool activity where the program, service, school or activity is financed in whole or in part by moneys appropriated by the Legislative Assembly."

[179] Oregon Administrative Rule (OAR), Chapters 589-021; ORS 342.704. The latter provides in relevant part:

(1)       (b) Sexual harassment of students includes:

(A) A demand for sexual favors in exchange for benefits; and

(B) Unwelcome conduct of a sexual nature that has the purpose or effect of unreasonably interfering with a student's educational performance or that creates an intimidating, offensive or hostile educational environment; …

(c) All complaints about behavior that may violate the policy shall be investigated;

(d) The initiation of a complaint in good faith about behavior that may violate the policy shall not adversely affect the educational assignments or study environment of the student; and

(e) The student who initiated the complaint and the student's parents shall be notified when the investigation is concluded.

(2) The State Board of Education shall adopt by rule minimum requirements for school district policies on sexual harassment of staff by students and other staff including, but not limited to, requirements that:

(a) All staff and students are subject to the policies;

(b) Sexual harassment of staff includes:

(A) A demand for sexual favors in exchange for benefits; and

(B) Unwelcome conduct of a sexual nature that has the purpose or effect of unreasonably interfering with a staff person's ability to perform the job or that creates an intimidating, offensive or hostile work environment;

(c) All complaints about behavior that may violate the policy shall be investigated;

EXHIBIT 12

Education Coordinating Commission (HECC) regulations, which apply to both private career schools and post-secondary universities, prohibit schools from "otherwise limiting any student in their enjoyment of a right, privilege or opportunity," which likely includes harassment claims.[180] Aggrieved students can file a complaint with HECC, which then reviews the complaint and determines whether it is valid.[181] Once HECC issues its order, such order would be subject to a contested case hearing through the Oregon Office of Administrative Hearings.[182]

All universities in Oregon are also required to have a written sexual assault protocol,[183] but many of the proposed rule's provisions would create inconsistencies. The protocol applies to

---

(d) The initiation of a complaint in good faith about behavior that may violate the policy shall not adversely affect any terms or conditions of employment or work environment of the staff complainant; and

(e) The staff member who initiated the complaint shall be notified when the investigation is concluded.

[180] OAR 715-011-0050(8).

[181] OAR 715-011-0075

[182] OAR 715-011-0085.

[183] ORS 350.255 provides:

(1) Each public university listed in ORS 352.002 (Public universities), community college and Oregon-based private university or college shall adopt a written protocol to ensure that victims of sexual assault receive necessary services and assistance in situations where:

(a) The alleged victim of the sexual assault is a student at the university or college and the alleged sexual assault occurred on the grounds or at the facilities of the university or college; or

(b) The alleged perpetrator of the sexual assault is a student at the university or college, or a member of the faculty or staff of the university or college, regardless of where the alleged sexual assault occurred.

(2) A written protocol adopted under subsection (1) of this section must ensure that each victim who reports a sexual assault is provided with a written notification setting forth:

(a) The victim's rights;

(b) Information about what legal options are available to the victim, including but not limited to:

(A) The various civil and criminal options the victim may pursue following an assault; and

(B) Any campus-based disciplinary processes the victim may pursue;

(c) Information about campus-based services available to the victim;

(d) Information about the victim's privacy rights, including but not limited to information about the limitations of privacy that exist if the victim visits a campus health or counseling center; and

(e) Information about and contact information for state and community-based services and resources that are available to victims of sexual assault.

(3) A written notification provided under subsection (2) of this section must:

---

EXHIBIT 12

situations in which the alleged victim is a student and the assault occurred on the grounds or at the facilities of the university or if the alleged perpetrator is a student or member of faculty of the university, regardless of the location. As such, under Oregon law, universities have the ability to regulate activities of students that occur off-campus.[184] Under Oregon law, the complainant may provide notice to the university generally in order to trigger a review required by state standards; the complainant need not inform an official with authority to take corrective action as required under the proposed rule. Under Oregon law, public universities, including community colleges, and Oregon-based private universities and colleges, regardless of religious affiliation, are required to follow the sexual harassment and assault protocol.[185] Accordingly, in Oregon, the Department's proposed rule will drastically narrow the scope of Title IX investigations by imposing bottlenecks on almost every phase of the process, including the physical locations subject to the law, the level of formality of the notice required to initiate a grievance process, the applicable definition of "harassment," and the standard by which culpability must be determined. As a result, the proposed rule conflicts with Oregon's multiple discrimination statutes.

Another example is the state of Washington, which provides broad civil rights protections to individuals subjected to harassment and violence on the basis of sex and sexual orientation through its Law Against Discrimination (WLAD).[186] Because the Department's proposed Title IX regulation does not mention sexual orientation, Washington's law arguably provides greater civil rights protections. Further, because the purpose of the law is to deter and to eradicate discrimination in Washington, it requires liberal construction, and "nothing contained in the law shall 'be construed to deny the right to any person to institute any action or pursue any civil or criminal remedy based upon an alleged violation of his or her civil rights[.]'"[187]

Similarly, the state of Nevada, like California, defines sexual harassment more broadly than the proposed rule contemplates. Nevada's sexual harassment codes and guidelines are

---

(a) Be written in plain language that is easy to understand;

(b) Use print that is of a color, size and font that allow the notification to be easily read; and

(c) Be made available to students:

(A) When a sexual assault is reported;

(B) During student orientation; and

(C) On the Internet website of the university or college.

[184] ORS 350.255.

[185] *Id.*

[186] Wash. Rev. Code § 49.60; Wash. Rev. Code § 49.60.030(1) ("The right to be free from discrimination because of … sex, … sexual orientation, is recognized as and declared to be a civil right."); *see also* Const. art. XXXI, §§ 1–2 (amend. 61) (equality of right shall not be denied or abridged on account of sex).

[187] *Marquis v. City of Spokane*, 922 P.2d 43, 49 (Wash. 1996).

EXHIBIT 12

designed to permit State agencies and organizations to be proactive and discipline or remove an employee before his/her actions subject the State to liability.[188] Further, Nevada's Clark County School District, like California, includes a broader definition of sexual harassment than the proposed regulation, identifying prohibited conduct as "sufficiently severe, persistent, **or** pervasive to limit a student's ability to participate in or benefit from an educational program or to create an intimidating, hostile, or offensive educational or work environment."[189]

Likewise, the University of Nevada, in Las Vegas and Reno, defines sexual harassment more broadly than the proposed rule, explaining sexual harassment incudes "sexual advancements, requests for sexual favors, and other visual, verbal or physical conduct of a sexual or gender bias nature" in situations including when "[t]he conduct has the purpose or effect of substantially interfering with an individual's academic or work performance, or of creating an intimidating, hostile or offensive environment in which to work or learn."[190]

The proposed rule's conflict with a number of current proactive laws and policies that deal with sexual harassment in many of our states, together with the decreased protections the proposed rule would afford to victims of sexual harassment, is yet another reason we oppose the proposed rule.

## VI.    Other Areas That Should Be Addressed Before Any Final Rule is Adopted.

### A.    Any Final Rule Should Reinstate the Longstanding Prohibition of Policies That "Suggest" Sex Discrimination.

Section 106.8(b)(2)(ii) of the proposed regulation unnecessarily, and without adequate justification, narrows the types of discriminatory publications that a recipient is prohibited from using and distributing to its applicants, students, and employees. The current regulation states that a recipient cannot "use or distribute a publication . . . which *suggests*, by text or illustration, that such recipient treats applicants, students, or employees differently on the basis of sex."[191] For many years, this section has addressed the use and distribution of materials by recipient

---

[188] *E.g.*, Nevada Admin. Code 284.0995.

[189] Clark County School District Regulation, *Discipline: Harassment*, https://ccsd.net/district/ policies-regulations/pdf/5141.2_R.pdf; *see also* Washoe County School District's policy, https://www. washoeschools.net/site/default.aspx?PageType=3&ModuleInstanceID=1853&ViewID=7b97f7ed-8e5e-4120-848f-a8b4987d588f&RenderLoc=0&FlexDataID=6800&PageID=1189 ("Sexual Harassment is a form of sexual discrimination that involves unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when submission to or rejection of this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance or creates an intimidating, hostile or offensive educational or work environment. The term sexual harassment includes sexual violence under Title IX of the Educational Amendments.").

[190] *See* University of Nevada, Las Vegas, *Policy Against Sexual Harassment,* § 4(c), https://www. unlv.edu/hr/policies/harassment#7 (last checked Jan. 28, 2019).

[191] 34 C.F.R. 106.9(b)(2) (emphasis added).

EXHIBIT 12

educational institutions that promote and perpetuate sex stereotypes through images or pictures, thereby discouraging applicants of one sex or another from applying or participating in a career path or type of class or program. The proposed change limits the prohibition to only publications that explicitly "state" a school's policy of engaging in different treatment on the basis of sex. This change is fundamentally inconsistent with Title IX's goals, for at least two reasons.

First, the proposed change is contrary to clearly established Supreme Court precedent that explicitly recognizes the right to be protected from discrimination and harassment based on sex, including sex stereotyping.[192] The Department has provided no statistical or other evidence to show that the rationale for this important provision has changed, or that sex-stereotyping no longer needs to be remedied in our educational institutions.[193] Nor has it provided any justification for retreating from clearly-established Supreme Court law on this issue.

---

[192] *See Price Waterhouse*, 490 U.S. at 251 ("As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype of their group . . ."); *Oncale.*, 523 U.S. at 80 (recognizing that harassment on the basis of sex can include harassment of a female in "sex-specific and derogatory terms" motivated by "general hostility to the presence of women"); *see also* 2001 Guidance at 3 (recognizing that "gender-based harassment, which may include acts of verbal . . . hostility based on sex or sex-stereotyping . . . is also a form of sex discrimination to which a school must respond, if it rises to a level that denies or limits a student's ability to participate in or benefit from the educational program.").

[193] The published policies and other distributed materials of a school can be particularly susceptible to "suggestions" of sex stereotyping, even where they do not "state" discriminatory rules. A prospective student is often introduced to an educational institution and its course offerings through the visual images in its publications issued by mail or posted on its website. Both male and female students continue to be subjected to sex stereotyping in the forms of visual images, statements, and conduct that discourages them from engaging in, limits, or denies their access to vocational and education career paths based on sex. This includes male students discouraged from engaging in dance or theater because these occupations are not sufficiently "masculine," and female students discouraged from participating in science or engineering based on stereotypical conceptions of a woman's ability to do math and science. *See, e.g.*, Rachael Pells, *Sexism in schools: 57% of teachers admit to stereotyping girls and boys*, Independent (Feb. 8, 2017), https://www.independent.co.uk/news/education/education-news/sexism-schools-poll-teachers-stereotypes-boys-girls-stem-subjects-sciences-maths-tech-a7567896.html (also noting that female employees in the US account for less than a quarter of STEM workers, despite making up almost half the overall workforce); Daniel Reynolds, *You Throw Like a Girl: Gender Stereotypes Ruin Sports for Young Women*, Healthline (July 2, 2018) (girls receive less encouragement from teachers and family members to be physically active and participate in sports; as a result, girls ages 8 to 12 are 19 percent less active, according to 2016 study), https://www.healthline.com/health-news/gender-stereotypes-ruin-sports-for-young-women#1; Claire Cain Miller, *Many Ways to Be a Girl, but One Way to Be a Boy: The New Gender Rules*, N.Y. Times (Sept. 14, 2018) (three quarters of girls 14 to 19 said they felt judged as a sexual object or unsafe as a girl, and three-quarters of boys said strength and toughness were the male character traits most valued by society), https://www.nytimes.com/2018/09/14/upshot/gender-stereotypes-survey-girls-boys.html; Suzanne Vranica, *Stereotypes of Women Persist in Ads*, Wall St. J. (Oct. 17, 2003).

EXHIBIT 12

Second, the proposed change is fundamentally inconsistent with the plain language of § 1681(a), which states that no person shall be "excluded from participation in [or] be denied the benefits of . . . any education program or activity receiving Federal financial assistance."[194] As the Supreme Court has recognized, Title IX protects students "not only . . . from discrimination, but also . . . from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity receiving federal financial assistance'."[195] Therefore, a school can violate Title IX where a student is denied access to educational benefits and opportunities on the basis of gender, even in the absence of a facially discriminatory policy.[196]

The proposed change is inconsistent with and unsupported by the plain language of Title IX because it only prohibits explicit intentional discrimination while allowing implicit discrimination, which can nevertheless deny students a fair and equal education. Courts have consistently recognized and upheld Title IX regulations that prohibit policies found to have a discriminatory effect on one sex.[197] Indeed, this proposed change itself constitutes a discriminatory policy in violation of Title IX.

Moreover, prohibiting policies that "suggest" discrimination is not unique to the Title IX context; the Fair Housing Act and its implementing regulations have similarly been interpreted to prohibit publications advertising housing that "suggests" that a particular race would be disadvantaged.[198]

Finally, the proposed regulation's stated justification—that it would "remove subjective determination" from evaluating violations and make the requirement "more clear"—cannot excuse a result that harms the intended beneficiaries of Title IX—those subjected to discrimination on the basis of sex. 83 Fed. Reg. at 61,482. The justification also rings hollow, since, for more than thirty years, courts and administrators of Title IX have applied this regulation and others to address sex-stereotyping without apparent difficulty. The Department

---

[194] 20 U.S.C. § 1681(a).

[195] *Davis*, 526 U.S. at 650; *see also Vinson*, 477 U.S. at 64 (stating in the employment context that Title VII's arguably narrower discriminatory prohibitions "evince[] a congressional intent to strike at the entire spectrum of disparate treatment of men and women").

[196] *See Davis*, 526 U.S. at 650 ("The statute makes clear that . . . students must not be denied access to educational benefits and opportunities on the basis of gender.").

[197] *See Mabry v. State Bd. of Cmty. Colleges & Occupational Educ.*, 813 F.2d 311, 317 n.6 (10th Cir. 1987) (compiling "regulations implementing Title IX [that] prohibit some facially neutral policies."); *Sharif by Salahuddin v. New York State Educ. Dep't*, 709 F. Supp. 345, 361 (S.D.N.Y. 1989) ("Several Title IX regulations specifically prohibit facially neutral policies. . . . with a discriminatory *effect* on one sex.").

[198] *See, e.g.*, *Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 326 (4th Cir. 2013) (interpreting Fair Housing Act, 42 U.S.C. 3604(c) (prohibiting any publication which "indicates" discrimination); *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991) (same).

EXHIBIT 12

provides no support, empirical or otherwise, for its position that schools or courts have been hampered by a lack of clarity in this rule.

In sum, the stated basis for such a dramatic change is unsupported and inconsistent with Title IX's plain statutory language and objectives, established case law, and congressional intent.

## B. The Proposal to Eliminate the Requirement that Institutions Invoke the Statute's Religious Exemption in Writing Raises Concerns of Fair Notice to Students.

The Department proposes to amend § 106.12 to eliminate the current requirement that an educational institution "shall" advise OCR "in writing" if it wishes to invoke Title IX's statutory exemption for educational institutions controlled by religious organizations to the extent application of Title IX "would not be consistent with the religious tenets of such organization."[199] The proposed amendment is unnecessary and raises a concern that students at some institutions will not know their rights under Title IX until it is too late.

The proposed amendment is unwarranted because schools' burden in notifying the Department regarding religious exemptions is minimal. The Department characterizes the current rule as "confusing," 83 Fed. Reg. at 61,482, but identifies no basis for confusion. And schools have successfully asserted religious exemption in letters to the Department hundreds of times over the past several decades.

In addition, we are concerned that the proposed amendment will lead to more students unknowingly enrolling in schools that believe themselves to be exempted from Title IX but do not claim the exemption publically, only to learn of their school's position after they seek to assert their Title IX rights. Students should know before they matriculate whether (and to what extent) their school intends to comply with Title IX, and they should be able to assume that they will enjoy Title IX's full protections unless the school has informed them otherwise. No student should learn, only after becoming a victim of discrimination, that their school considered itself exempt from the relevant requirements of Title IX. Even worse, under the proposal, a school seemingly could wait to assert its exemption from Title IX until after it initiates grievance procedures and a complainant undergoes cross-examination and has personal information shared with the respondent and others.

If the Department eliminates the current rule's letter requirement, the Department should require schools to disclose their Title IX exemption status to current and prospective students in writing and bar schools from claiming an exemption after the fact if they have affirmatively represented that they comply with Title IX.

---

[199] 20 U.S.C. § 1681(a)(3).

EXHIBIT 12

**C.     Restriction of Remedies to Exclude "Damages" and Lack of Definition Inconsistently Limits Remedial Scheme Which Was Intended to Strike at the Entire Spectrum of Discrimination on the Basis of Sex.**

Even in circumstances where an egregious violation of Title IX might warrant relief to an individual subjected to sexual violence and assault, proposed § 106.3(a) removes the ability of the Department to assess "damages," a remedy long available under common law. 83 Fed. Reg. at 61,495. In addition, the proposed regulation fails to define "damages," potentially leaving it open to an overly broad interpretation with a great impact on the intended beneficiaries of the statute, those subjected to sex discrimination. Therefore, the scope and impact of the change proposed by the Department on intended beneficiaries of the statute, and on the Department's ability to address and remedy noncompliance has not been adequately explained.

Specifically, the proposed change is contrary to the plain language of the statute, which authorizes the use of "any other means authorized by law."[200] The change inconsistently limits the Department's authority to provide remedies for noncompliance to only those means authorized in equity. The statutory enforcement language in Title IX mirrors language from the Civil Rights Act of 1964. But there, the drafters identified precisely where remedies would be limited.[201] Congress did not provide such a limit here. Yet the Department would impose one for the first time, more than 45 years after the passage of Title IX. This undermines Title IX's purpose and improperly usurps Congress's role.

Furthermore, OCR's public resolution agreements reflect that where noncompliance is found, the Department has historically provided compensatory or remedial services (e.g., counseling, tutoring, and academic support) to overcome or remedy the effects of harassment on the student, including, as warranted, funding for tuition where a student withdraws from the institution because a recipient has created, encouraged or permitted a hostile environment on the basis of sex.[202] Without a definition of damages, we are concerned that the proposed change may

---

[200] 20 U.S.C. § 1682.

[201] 42 U.S.C. 2000a-3 (limiting relief to "preventative relief" only).

[202] *Southern Methodist University*, OCR Complaint Nos. 06-11-2126; 06-13-2081; 06-13-2088, https://www2.ed.gov/documents/press-releases/southern-methodist-university-agreement.pdf (in sexual harassment/sexual violence matter, requiring University to reimburse complainant for all university-related expenses (tuition/fees, housing/food, and books) incurred for the fall semester minus any scholarship and grant assistance received, and all counseling expenses incurred over a two-year period); *Tufts University*, OCR Complaint No. 01-10-2089, https://www2.ed.gov/about/offices/list/ocr/docs/investigations/01102089-b.html (in sexual harassment/sexual violence matter, voluntary resolution agreement includes reimbursement to the student complainant for educational and other reasonable expenses, incurred during a year time period, and a complaint review which, as appropriate, would provide remedies, such as referrals to counseling); *Princeton University*, OCR Complaint No. 02-11-2025, https://www2.ed.gov/about/offices/list/ocr/docs/investigations/02112025.html (in sexual harassment/sexual violence matter, voluntary resolution agreement includes reimbursement for appropriate University-related expenses, as well as expenses for counseling, that Students 1-3 incurred

EXHIBIT 12

be used to impermissibly limit the authority granted by Congress to the Department to utilize "any other means authorized by law," thereby resulting in remedies and regulations that are inconsistent with the statute and its objectives, which include providing "individual citizens effective protection against [discriminatory] practices" and "overcom[ing] the effects" of such discrimination.[203]

### D.    Any Final Rule Should Include Guidelines for Confidentiality.

Issues relating to the confidentiality of information are critical to any discussion of how to effectively investigate and remedy sexual harassment and assault. As a result, any rule implementing Title IX should separately address schools' obligations with respect to requests by complainants to keep information confidential.[204] A school must, for instance, take all reasonable steps to honor a request from a complainant to keep his or her identity confidential. They should, however, notify the complainant that maintaining confidentiality may limit the schools' ability to effectively investigate and respond to allegations of harassment and that, depending on the nature of the complaint, certain information—including the identity of the complainant—must be disclosed if the student wishes to file a Title IX complaint. The school should inform the student of the actions it will take regardless of whether the student wishes to go forward with a formal complaint, including that it will take reasonable steps to prevent retaliation.

Furthermore, any final rule should make clear that a request by a student to maintain confidentiality does not free the school of its obligation to investigate and respond to the allegation. Rather, the school must still "investigat[e] the complaint to the extent possible,"[205] and it must also take reasonable actions to prevent recurrences of the conduct alleged by the complainant.

As discussed in Section IV.D, it may be possible to conduct a full investigation without revealing the name of the complainant. In other matters, a complete investigation may not be possible, but the school can nonetheless take certain actions, including seeking to identify whether there have been other complaints regarding the same individual and implementing measures that reiterate and reinforce Title IX prohibitions and provide remedies for the complainant that do not impact the due process rights of the respondent. And under all

---

from the date each first reported alleged sexual assault/violence to the date of the resolution); *City University of New York, Hunter College*, OCR Complaint No. 02-13-2052, https://www2.ed.gov/about/offices/list/ocr/docs/investigations/02132052.html (in sexual harassment/sexual violence matter, voluntary resolution agreement includes assessing whether complainant in case 1-3 and 5-7 and 9-12 suffered effects as a consequence of College not offering counseling or other interim measures or from any hostile environment created and take steps to address these effects).

[203] 20 U.S.C. § 1682; *Gebser*, 524 U.S. at 286, 288.

[204] *See* 2001 Guidance at 17–18.

[205] 2001 Guidance at 18.

EXHIBIT 12

circumstances, a school should consider whether other corrective action short of disciplining the accused individual may be appropriate.[206]

Finally, any final rule should make clear that, independent of specific requests by individuals to maintain confidentiality, schools have an affirmative obligation to preserve the confidentiality of all documents and evidence utilized in investigations of Title IX complaints.

## E.     Schools Have Continuing Obligations Following a Finding of Responsibility or Following an Independent Investigation.

The proposed regulations fail to explain the obligations Title IX imposes on schools following a finding of responsibility. Rather, the proposed regulations seem to imply that a school's duties upon such a determination extend no further than disciplining the students determined to be responsible, and then only if the determination was made through a formal proceeding. *E.g.*, Proposed § 106.45(b)(4). But schools' obligations go much further.

First, as discussed in Section II.E, a school has an independent obligation to protect its students by preventing and remedying harassment, even in the absence of a formal report. A school must take steps to end the harassment, if it is ongoing, and to prevent future harassment by the same individual. If the conduct was enabled by or reflects a toxic culture or other systemic problems, the school must address such systemic issues.

Furthermore, schools must address the effects of the harassment, which may include appropriate remedial actions for the complainant or the broader community.[207] It is for this reason that the safe harbor provisions addressed above[208] are inconsistent with Title IX to the extent that they erode schools' continued responsibilities to their students.

Critically, any regulations should also specify that a school's obligation to respond following a determination of harassment is not time-limited, and that the school must take steps to ensure that its remedial efforts are successful and to identify whether further efforts are necessary. The full extent of this obligation will depend in part on the nature and severity of the conduct at issue, but in all circumstances the school should understand that it maintains an obligation to take reasonable steps to address the ongoing impact of a violation of Title IX.

---

[206] *See* 2001 Guidance at 18 ("Examples include conducting sexual harassment training for the school site or academic department where the problem occurred, taking a student survey concerning any problems with harassment, or implementing other systemic measures at the site or department where the alleged harassment has occurred.").

[207] *See, e.g.*, *Gesber*, 524 U.S. at 288–89; *Feminist Majority Found.*, 911 F.3d at 696.

[208] *See supra* Section II.E.

EXHIBIT 12

### F.      The Proposed Rule Fails to Sufficiently Address the Family Educational Rights and Privacy Act (FERPA).

As noted in Part IV.G, the proposed regulations do not adequately address the Family Educational Rights and Privacy Act (FERPA).[209] For example, FERPA generally forbids disclosure of information from a student's "education record" without consent of the student (or the student's parent).[210] The regulations need to address whether proposed regulation § 106.45(b)(3)(v)'s requirements that recipients provide each "party whose participation is invited or expected [at a hearing] written notice of the date, time, location, participants, purpose of all hearings, investigative interviews, or other meetings with a party" can include information about the sanction that will be implemented. Additionally, the proposed regulations and their accompanying justification focus only on the rights of respondents to have access to their educational records. *See, e.g.*, 83 Fed. Reg. at 61,475 (citing a student's "right to inspect and review records that directly relate to that student" pursuant to FERPA); 83 Fed. Reg. at 61,476 ("[t]he scope of the parties' right to inspect and review evidence collected by the recipient is consistent with students' privacy rights under FERPA, under which a student has a right to inspect and review records that directly relate to that student."). Equally important, however, and completely unaddressed by the proposed regulations, is the right of the complainant to have their educational records kept private.[211] The interplay of these competing rights should be addressed in any final regulations, particularly in light of Title IX's mandate that grievance procedures be equitable.[212]

## VII.     The Regulatory Impact Assessment Fails to Accurately Assess the Effect of the Proposed Rule.

The Department asserts the proposed regulations were issued "only on a reasoned determination that their benefits justify their costs," 83 Fed. Reg. at 61,484. However, even a cursory review of the Department's costs analysis reveals its inadequacy. The Department acknowledges that it "cannot estimate the likely effects of these proposed regulations with absolute precision." 83 Fed. Reg. at 61,484. While we agree it is difficult to precisely estimate the costs of the proposed regulations, a minimal review of the Department's analysis shows the costs of the proposed regulations are much higher than it estimates.

### A.      Ignored Costs.

The Department states the economic analysis explicitly excludes economic consequences of sexual assault incidents themselves, stating that it is "only intended to capture the economic

---

[209] 20 U.S.C. § 1232g.

[210] 20 U.S.C. § 1232g (b)(1).

[211] 20 U.S.C. § 1232g (b)(1).

[212] *See* 34 C.F.R. § 106.8(c) (requiring grievance procedures adopted pursuant to Title IX provide for "equitable resolution" of student complaints).

EXHIBIT 12

impacts of this proposed regulatory action." 83 Fed. Reg. at 61,485. The Department's statement is self-contradictory. The proposed regulatory action is exclusively aimed at changing the laws and regulations governing sexual assault and harassment, which have concrete and obvious economic costs. The analysis cannot possibly capture the economic impacts of the proposed regulatory action if it excludes from any analysis the actual economic costs incurred by students subjected to sexual harassment and violence—the very students the regulations govern. To provide a cost estimate that even marginally reflects the realities of the regulation, the costs of sexual assault and harassment must be considered. For example, the cost of rape in the United States has been estimated to be $122,461 per survivor, or $3.1 trillion over all survivor's lifetimes, and these costs are borne by survivors, society, and the government.[213] In addition to considering the costs of sexual assault and harassment, the Department should consider the economic impact on students who will lose access to their education as a result of being denied justice under these proposed regulations.

However, even setting aside the rippling costs of students subjected to sexual harassment whose sexual assaults would be excluded from Title IX's purview, there are additional costs that the proposed regulation ignored.

### 1.     Allegations that Do Not Meet the Proposed Stringent Requirements May Still Resurface as Costly Lawsuits.

While the Department finds savings in narrowing Title IX's scope, it ignores the costs stemming from the exclusion of allegations that would no longer fall within that scope. The Department anticipates a decreased number of investigations under the drastically scaled-down requirements in covered conduct/location, as well as the reduction in "responsible employees" to whom conduct may be reported. However, in order to seek justice for themselves, students will be forced file their allegations in court or with law enforcement. It is unreasonable to assume that the proposed changes will simply make these allegations disappear, especially amidst nationwide trends of increasing filings of sexual harassment and assault claims.[214]

The Department has the ability to assess, based on a review of prior and existing cases, how many will not be addressed or resolved under the proposed regulations. But it failed to undertake this task or provide the public with accurate and adequate information about the

---

[213] Peterson et al., *Lifetime Economic Burden of Rape Among US Adults,* 52 Am. J. of Preventative Med. 691 (2017). These costs were not unknown to the Department, as the Department cited this study in their analysis. 83 Fed. Reg. at 61,485 n.16. The Department nevertheless disregarded these costs by assuming they would be unaffected by the proposed regulations. *Id.* at 61,485.

[214] *See* Jamie D. Halper, *In Wake of #MeToo, Harvard Title IX Office Saw 56 Percent Increase in Disclosures in 2018, Per Annual Report,* The Harvard Crimson (Dec. 14, 2018), https://www.thecrimson.com/article/2018/12/14/2018-title-ix-report; U.S. Equal Employment Opportunity Commission, *EEOC Releases Preliminary FY 2018 Sexual Harassment Data,* (Oct. 4, 2018), https://www.eeoc.gov/eeoc/newsroom/release/10-4-18.cfm (stating "charges filed with the EEOC alleging sexual harassment increased by more than 12 percent from fiscal year 2017").

EXHIBIT 12

impact. Nevertheless, it is reasonable to anticipate that because the Department has narrowed its jurisdiction, the nation will see both an increase in Title IX complaints in civil and criminal courts, as well as an increase in costly lawsuits alleging non-Title IX causes of action.

### 2.    The Department Should Consider the Relationship Between Uninvestigated Allegations and Short- and Long-Term Absences.

Complainants whose Title IX allegations are not investigated may also have increased absences, which would decrease receipt of tuition and attendance-related funding by institutions of higher education (IHEs) and local educational agencies (LEAs). The Department did not include lost tuition costs for complainants who drop out or take a leave of absence from colleges or universities, or any decrease in attendance-related funding for LEAs, despite such absences being clearly contemplated as possible supportive measures for sexual misconduct complainants.[215] According to the Campus Climate Survey Validation Study, over 8 percent of rape victims and 1.6 percent of sexual battery victims dropped classes and changed their schedule, and over 21 percent of rape victims and 5.9 percent of sexual battery victims considered taking time off school, transferring, or dropping out.[216] These absences may have direct and indirect costs, which warrant the Department's consideration.[217]

### 3.    Costs to Transgender Students.

Finally, the Department fails to even the mention the term "transgender" in the proposed regulations.[218] This overt exclusion may make transgender students less likely to report on-campus sexual harassment or sexual assault to the designated "coordinator." According to a recent survey of transgender people, 17 percent of K-12 students and 16 percent of college or

---

[215] *Sample Language for Interim and Supportive Measures to Protect Students Following an Allegation of Sexual Misconduct,* White House Task Force to Protect Students from Sexual Assault 1, 6 (Sept. 2014), https://www.justice.gov/archives/ovw/page/file/910296/download.

[216] Krebs et al, *Campus Climate Survey Validation Study Final Technical Report*, Bureau of Justice Statistics Research and Development Series 1, 114 (Jan. 2016), https://www.bjs.gov/content/pub/pdf/ccsvsftr.pdf.

[217] U.S. Dep't of Educ., et al., *Dear Colleague Letter Regarding Chronic Absenteeism* at 1 (Oct. 7, 2015), https://www2.ed.gov/policy/elsec/guid/secletter/151007.html ("A growing and compelling body of research demonstrates that chronic absence from school . . . is a primary cause of low academic achievement and a powerful predictor of which students will eventually drop out of school.").

[218] The Department withdrew its May 13, 2016 Dear Colleague Letter on Transgender Students less than a year after its joint issuance with the U.S. Department of Justice's Civil Rights Division (U.S. Dep't of Educ., Office for Civil Rights, & U.S. DOJ, Civil Rights Division, *Dear Colleague Letter*, 1 (Feb. 22, 2017)).

EXHIBIT 12

vocational school students who were out or perceived as transgender reported leaving school because of mistreatment.[219]

**B.** **Unreasonably Low Estimate of Percentage of Title IX Complaints Based on Sexual Harassment or Sexual Violence.**

The Department's assumption that sexual harassment and sexual assault make up only 50 percent of Title IX complaints (83 Fed. Reg. at 61,488) is unreasonably low, relies on an unclear baseline, and ignores the nationwide uptick in sexual harassment complaints discussed above. As we have explained, sexual harassment is pervasive.

In addition to the low initial baseline, studies show there is an upward trend of sexual harassment-related Title IX complaints.[220] The Department's own OCR reported that there was a 277 percent increase and an 831 percent increase in its receipt of sexual violence complaints at the K-12 and postsecondary levels, respectively, since Fiscal Year 2011.[221] This upward trend means, at a minimum, that averaging prior years' complaints is not a fair extrapolation of sexual harassment-related Title IX claims.

**C.** **The Department Provides Unreasonably Low Cost Estimates for Implementing the Proposed Rule.**

The Department significantly underestimates the amount of time that will be required by Title IX coordinators to review any final rule and to revise local grievance procedures accordingly. The Department estimates that for LEAs, the Title IX Coordinator and a lawyer will spend 4 hours and 8 hours, respectively, reviewing any final regulations. 83 Fed. Reg. at 61,486. For IHEs, the Department estimates review would take 8 and 16 hours, respectively. 83 Fed. Reg. at 61,487. Given the dramatic nature of the changes contained in the proposed regulations, and the extensive and nuanced changes that will be required of recipients' own policies, it is unreasonable to assume that Title IX coordinators will require only a day or less to review, and that educational institutions' attorneys will only take two days or less to review. Further, the Department severely underestimates the time that will be required to revise grievance procedures to comply with any new regulations. The Department assumes that for LEAs, Title IX Coordinators will spend 4 hours and lawyers will spend 16 hours on revising grievance procedures. 83 Fed. Reg. at 61,486. The Department estimates these times will be doubled for IHEs. *Id.* This includes no time for stakeholder input on grievance procedure revisions and

---

[219] S.E. James, et al, *The Report of the 2015 U.S. Transgender Survey*, National Center for Transgender Equality 1, 11 & 136 (Dec. 2016), http://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.

[220] Celene Reynolds, *The Mobilization of Title IX across U.S. Colleges and Universities, 1994-2014,* 00 Social Problems 1 (Mar. 2018), https://doi.org/ 10.1093/socpro/spy005.

[221] U.S. Dep't of Educ., Off. for Civil Rights, *Securing Equal Educational Opportunity: Report to the President and Secretary of Education* (Dec. 2016), https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2016.pdf.

EXHIBIT 12

underestimates the amount of time required to revise procedures. Finally, the Department anticipates it will only take a single hour for Title IX coordinators to create or modify a "safe harbor" form for complainants who report sexual harassment but who do not want to file a formal complaint. 83 Fed. Reg. at 61,494. It is unreasonable to assume that a significant document intended to serve as a "safe harbor" would be created in only one (1) hour by a Title IX Coordinator, and that an attorney would not even review it. These cost estimates are arbitrary and unreasonably low.

The Department also assumes the Title IX Coordinator, investigator, and a decision maker will each spend 16 hours in training. 83 Fed. Reg. at 62,486. It is concerning that the Department would contemplate only that a single investigator and a single decision-maker would or should attend the training. 83 Fed. Reg. at 61,486. Especially since the Department is anticipating limiting the number of people who can accept formal complaints, it will be essential to provide training to all staff who interact with students regarding how to counsel students on the appropriate channels for instigating formal complaints. It will also be essential to provide training for students, parents and guardian on how to properly file complaints, so that they do not lose their rights due to an inconsequential procedural mistake. Further, the Department does not accurately represent the costs for training hearing officers and panels during live hearings, where they will need to be versed in evidentiary procedure and taking examination and cross-examination. In addition, the Department "do[es] not calculate additional costs in future years as [it] assume[s] that recipients will resume training of staff one[sic] their prior schedule after Year 1." 83 Fed. Reg. at 61,487. This limitation to one year of training costs and to training only individuals who can receive formal complaints underscores the Department's inappropriate focus away from the protection of students who are meant to be protected by Title IX.

There are also several ways in which the Department inappropriately underestimates the costs of investigations. First, the Department estimates "a reduction in the average number of investigations per IHE per year of 0.75." 83 Fed. Reg. at 61,487. It is unreasonable to assume this reduction, given that reports are, as described above, increasing, and the proposed regulations create significant additional avenues for complaints filed by respondents. Second, while the Department assumes an approximate reduction of 0.18 of the number of IHE investigations by disregarding off-campus sexual harassment (83 Fed. Reg. at 61,487), the Department fails to allocate time for the investigation that would need to occur for the jurisdictional analysis to establish where the incident occurs.

In addition to underestimating the time it will take for a recipient to investigate Title IX complaints, the Department underestimates the cost for the parties' representation in the investigative process. For responses to a formal complaint at the LEA level, the Department assumed that both parties would obtain legal counsel who would work for one hour and, in the alternative, estimated an average cost non-attorney advisor cost would be two attorney hours. 83 Fed. Reg. at 61,487. The calculated cost the Department associated with the representation is flawed in two respect. First, the Department assumes a rate of $90.71 per hour. 83 Fed. Reg. at

EXHIBIT 12

61,486. The Department provides no basis for this assumed rate for an attorney, which is significantly lower than the average hourly rate of attorneys.[222] Second, it is unreasonable to assume adequate representation could occur with representation by an attorney for only one hour (or two hours for a non-attorney) for a hearing, particularly one involving a complex investigation of a sexual assault.

Finally, the Department fails to appropriately estimate the costs of the live hearings required under the proposed regulations. The Department will require live hearings at IHEs, but fails to consider many of the increased costs this requirement will entail. For example, the Department does not estimate any costs for transcription and translation services that may be needed. Further, the Department estimates that in 60 percent of IHEs, the Title IX Coordinator also serves as the decision-maker. 83 Fed. Reg. at 61,488. Only allowing costs for an additional adjudicator in 40 percent of hearings is arbitrary and in direct contradiction to proposed regulation § 106.45(b)(4) which precludes the decision-maker from being the same person as the Title IX Coordinator of the investigation.

## VIII.   The Department Should Delay the Effective Date of the Rule.

If the Department adopts a final rule along the lines of its proposal, it should give schools adequate time to respond before the rule takes effect. We believe that an effective date no earlier than three years from the date of the final rule would be appropriate.

A compliance window of three years or more is warranted because the proposed rule represents a stark departure from the substantive and procedural standards that educational institutions have been applying for years. Schools will need time to overhaul their procedures, hire new staff, train employees, and disseminate information to students. Smaller schools in particular will require an extended period to come into compliance. For reasons discussed above, the Department's new rule will cause confusion among students, staff, and other stakeholders however quickly they are implemented, but the confusion will only be compounded if the Department does not allow schools enough time to respond appropriately.

Adopting an earlier effective date would be inconsistent with the Department's recent approach to other regulations that would apply to fewer schools than the proposed Title IX rule, and that would not require such significant programmatic changes. For instance, the Department has seen fit to allow schools until July 2019 to comply with provisions of its 2014 Gainful

---

[222] *See, e.g.*, Jay Reeves, *Top 10 Hourly Rates by City*, Lawyers Mutual Byte of Prevention Blog, (Apr. 6, 2018), https://www.lawyersmutualnc.com/blog/top-10-lawyer-hourly-rates-by-city (listing lawyer rates by practice area ranging from $86/hour to $340/hour); Hugh A. Simons, *Read This Before You Set Your 2018 Billing Rates*, Law Journal Newsletters (Nov. 2017), http://www.lawjournalnews letters.com/2017/11/01/read-this-before-you-set-your-2018-billing-rates/ (indicating first year associates cost their employers approximately $111/hour). Further, it is unreasonable to assume adequate representation could occur with representation by an attorney for only one hour (or two hours for a non-attorney).

EXHIBIT 12

Employment rule[223] and its 2016 Borrower Defense rule,[224] and delayed the effective date of the 2016 Program Integrity and Improvement rule until July 2020.[225] Setting aside the reasonableness of the Department's decisions with respect to these other regulations, it would only be appropriate for the Department to adopt a similar compliance period for Title IX rule that would have more far-reaching consequences for many more schools.

## IX.     Conclusion

Proper enforcement of Title IX has an immense impact on our states, our colleges and universities, our K-12 schools, and most importantly, our students. Title IX requires schools to provide an education that is free from sexual harassment, violence, and discrimination. Our educational institutions, relying on prior guidance from the Department, have spent many years developing procedures and policies to address these issues, and they have made great strides in fostering more open and inclusive educational environments. The proposed rule, however, is a step backward, rather than a step forward, in achieving Title IX's goals. It would inject confusion and bias into the Title IX adjudicatory process. Survivors of sexual harassment and violence would face significant reporting obstacles under the new rule, further undermining the already too low sexual violence and harassment reporting rates. The proposed rule is not consistent with Title IX as written and fails to further its goals. It should be withdrawn.

Respectfully submitted,

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

GURBIR S. GREWAL
Attorney General
State of New Jersey

XAVIER BECERRA
Attorney General
State of California

KATHLEEN JENNINGS
Attorney General
State of Delaware

---

[223] *See* 83 Fed. Reg. 28,177 (June 18, 2018).

[224] *See* 83 Fed. Reg. 6,458 (Feb. 14, 2018); 83 Fed. Reg. 34,047 (July 19, 2018).

[225] 83 Fed. Reg. 31,296 (July 3, 2018).

EXHIBIT 12

KARL A. RACINE
Attorney General
District of Columbia

AARON M. FREY
Attorney General
State of Maine

CLARE E. CONNORS
Attorney General
State of Hawai'i

BRIAN FROSH
Attorney General
State of Maryland

KWAME RAOUL
Attorney General
State of Illinois

KEITH ELLISON
Attorney General
State of Minnesota

TOM MILLER
Attorney General
State of Iowa

AARON D. FORD
Attorney General
State of Nevada

ANDY BESHEAR
Attorney General
Commonwealth of Kentucky

HECTOR BALDERAS
Attorney General
State of New Mexico

70

EXHIBIT 12

JOSH STEIN
Attorney General
State of North Carolina

ELLEN ROSENBLUM
Attorney General
State of Oregon

PETER F. NERONHA
Attorney General
State of Rhode Island

T.J. DONOVAN
Attorney General
State of Vermont

BOB FERGUSON
Attorney General
State of Washington

71

EXHIBIT 12

# EXHIBIT 13



221 College Street NE
Olympia, WA 98516
wssda.org or 360-493-9231

January 30, 2019

# Title IX Regulations – WSSDA Public Comment

## Introduction

The Washington State School Directors' Association (WSSDA) is a state agency authorized by statute to coordinate a program of policymaking and school district management in support of school boards.[1] WSSDA's membership is comprised of all 1,477 elected school board directors across Washington state and its major functions include providing model policies, legal guidance, advocacy, and leadership development for school board directors.

WSSDA's model policies, which are pertinent to these comments, include Model Policy 3205 – Sexual Harassment of Students Prohibited; Model Policy 3207 – Prohibition of Harassment, Intimidation, and Bullying; Model Policy 3210 – Nondiscrimination; and Model Policy 4241 Classroom Management, Discipline, and Corrective Action. State laws prescribed the development of these model polices with key stakeholders, such as the Office of Superintendent of Public Instruction (OSPI). State laws also require school boards to adopt policies for most of these same matters that, at a minimum, incorporate the provisions in WSSDA's model policies.[2]

As the state agency tasked with providing model policies and legal guidance to K-12 public schools, WSSDA has significant concerns about the Department's proposed Title IX draft rules as applied in the K-12 public school context.

## Comments by section
### § 106.6 – Effect of other requirements and preservation of rights

The proposed regulations need to clarify the scope of the federal regulations and specify that they do not supersede state nondiscrimination or civil rights laws and do not prevent a state from exercising its own authority.

Washington state has adopted regulations and guidelines governing a school district's responsibilities to respond to sexual harassment. These state regulations include discrete anti-discrimination and discipline due process regulatory structures. Without further clarification, the proposed rules would cause confusion about which procedure to follow in order to be in compliance. Therefore, WSSDA requests that the regulations make clear that the federal rules do not preclude a determination that a recipient's actions constitute discrimination under state civil rights laws.

---

[1] Revised Code of Washington (RCW) 28A.345.010
[2] RCW 28A.640.020(2)(b); RCW 28A.300.285(1); RCW 28A.642.020

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                                                1

### § 106.8 – *Designation of coordinator, dissemination of policy, and adoption of grievance procedure*

#### *(2)(c) Adoption of grievance procedure*

The proposed regulations should not require school districts to adopt and publish a grievance procedure that specifically aligns to the proposed federal grievance procedure. Instead, the regulations should recognize that when states have acted on their own authority to require districts to adopt grievance procedures related to nondiscrimination, sexual harassment, harassment, and student discipline due process, districts should adopt and publish grievance procedures that align with their state's requirements.

As noted above, Washington school districts have their own existing requirements to adopt and publish grievance procedures related to nondiscrimination, sexual harassment, harassment, and student discipline due process. If left unchanged, the proposed provision for adoption of the federal grievance procedure will create uncertainty in the K-12 environment and impose unnecessary burden school districts.

#### *(2)(d) Application*

The proposed regulations should not limit the application of Title IX to events that occur in the geographic United States.

For many school districts in Washington, field trips across the U.S. – Canada border are common. Field trips to other destinations outside the United States, although less common, still happen regularly. School districts might wonder if the federal regulations required dismissal of formal complaints about cross-border sexual violence, without first evaluating whether the alleged incident had continuing effects back in the United States. Constricting the application of Title IX to events occurring in the United States does not serve K-12 students, their families, or the intent of Title IX.

### § 106.44– *Recipient's response to sexual harassment*

#### *(a)–(b)(4) Deliberate Indifference*

The proposed regulations should not dictate the *deliberate indifference* standard for responding to conduct that is not a formal compliant (see comments below). Many states, including Washington, have existing anti-discrimination and harassment laws and regulations that govern the specific procedures that K–12 schools must follow in response to formal complaints of sexual harassment. The *deliberate indifference* standard is different from the standard in these state laws and regulations.

Many states also have separate laws and regulations that outline the due process protections for students who are disciplined for violations of a school district's code of conduct. With the proposed regulations, it is unclear how or when the Title IX response standard governs in the context of other existing nondiscrimination and student discipline laws.

The proposed standards for Title IX are vastly different from existing standards that apply, and it's not clear how the proposed Title IX standards apply in the context of existing standards—or how existing standards would apply in the context of the proposed Title IX standards. It might be impossible for

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                                    2

WSSDA to provide districts with model policies and procedures to carry out their obligations in response to allegations of sexual harassment.

*(b)(5) The Assistant Secretary will not deem […] deliberate indifference […] merely because […].*
The proposed regulations lack accountability for school districts. The proposed regulations state that the Department will not question a school district's determination of whether sexual harassment occurred.

Deferring to a school district's determination is not always appropriate. Accountability is necessary to make progress toward Title IX's purposes. Additionally, impotent regulation will likely result in more private litigation with significant risks for school districts.

*(c) Emergency Removal*
The proposed regulations should not preempt state emergency removal laws.

The proposed regulations appear to establish specific due process requirements for a student's emergency removal based on allegations of sexual harassment. The proposed regulations would create a *higher* level of due process for emergency removals in situations of alleged sexual harassment than for any other behavioral violation as established by Washington state's student discipline rules. The emergency removal provisions in Washington's discipline rules were the result of significant input from multiple stakeholders into the rulemaking process of our state education agency, the Office of Superintendent of Public Instruction (OSPI). If left unrevised, the proposed regulation would constitute an unprecedented federal preemption of Washington's state and local student discipline rules. It will be difficult and costly to provide districts with model policies that address the different due process procedures and school districts will struggle to comply.

The proposed regulation also requires a school district to undertake an individualized safety and risk analysis before emergency removing a respondent. However, the proposed regulation does not clarify whether a school district is required only to make an individualized determination based on the respondent, or if the school district is required to complete a formal threat assessment before administering an emergency removal.

### § 106.44(e) – Definitions

*(1) Sexual Harassment*
The proposed definition of *sexual harassment* is too narrow for its regulatory purpose. As written, the definition conflates the tougher private litigation standard from tort liability, which provides the remedy of monetary damages with the less stringent administrative standard, which provides the remedy of addressing and ending the discrimination through corrective action without monetary damages.

Washington's courts have clarified that the compliance standard for administrative enforcement fittingly differs from that of tort liability. Accordingly, WSSDA's Model Policy 3205 – Sexual Harassment of Students Prohibited, uses the administrative definition of sexual harassment found in the 2011 Dear Colleague Letter from Office of Civil Rights (OCR). This definition encourages students to report sexual harassment early, before such conduct becomes severe or pervasive, so that districts can take steps to prevent the harassment from creating a hostile environment.

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                                      3

It might seem that districts would benefit from using the tougher tort liability standard when considering whether to respond to district-level complaints of sexual harassment because districts could more often dismiss the complaint as not rising to a sufficiently severe level. However, it is likely that districts will experience increased private litigation under tort law, through which monetary remedies are available, and more often lose such lawsuits because their district policies encouraged dismissal instead of taking the prompt or preemptive corrective action that would have allowed the district to prevail in a private lawsuit.

*(2) Complainant*
The proposed definition of *complainant* should not exclude third parties from being the complainant.

In the K-12 context, it is not reasonable to expect or require children to advocate for themselves. In Washington, some of the most serious peer-on-peer sexual violence cases have involved children younger than eight or nine years old. Many cases have involved children with disabilities. In all cases, parents or third-party advocates were complainants acting on a child's behalf. Excluding parents and third parties from the definition of *complainant* severely and unfairly limits children's access to a school district's grievance procedure.

*(5) Formal complaint*
The proposed regulations distinguish a *formal complaint* from any other circumstance that does not meet the requirements of a formal complaint. Particularly given the proposed limitations on who can be a complainant, the proposed definition of *formal complaint* should not require a written and signed allegation. Additionally, the proposed definition of *formal complaint* should not specify that the conduct occurred within the district's education program or activity.

In the K-12 public school context, it is fundamentally flawed and unfair to place a procedural hurdle on children that in order to request that the district initiate its grievance procedures the child must put allegations in writing and then sign the document. It is commonplace for a credible report to lack the component of an explicit sexual harassment allegation. Younger children are just learning to write, even a basic sentence, and cannot be required to provide a written allegation.

Additionally, the proposed definition inappropriately confines the conduct that can constitute sexual harassment to that which occurs within the district's education program or activity. School districts already struggle to understand their obligation to respond to allegations of sexual harassment occurring in a location other than school, such as harassment that occurred on overnight trips or on the internet through cyberbullying, but continuing to affect students at school. By adding this requirement, the proposed regulations confuse the issue further.

*(6) Actual knowledge*
The proposed definition should not restrict the category of employees who may have *actual knowledge* of sexual harassment to the Title IX coordinator, a school district official who has authority to institute corrective measures on behalf of the school district, or a teacher when in the context of student-on-student in elementary and secondary school. The proposed regulations should also remove the language indicating that *actual knowledge* does not include the circumstance of the recipient also being the respondent.

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                                                    4

The 2001 Guidance established that most school or school district employees who interacted with children and families were "responsible employees" whose notice of harassment would trigger a school district's obligation to respond. The guidance stated, "[E]ven if a responsible employee does not have the authority to address the discrimination and take corrective action, he or she does have the obligation to report it to appropriate school officials." This standard makes sense in K-12 school systems. Children are more likely to report incidents to a trusted adult in their school, including school counselors, principals, paraeducators, coaches, and school bus drivers. Families are more likely to report to their child's school principal, as parents see principals as having authority and a duty to respond allegations of harassment. Under the proposed regulations, it appears a school district would not be obligated to respond to these reports under Title IX. This considerable narrowing of the categories of employees who may have *actual knowledge* of harassment has great potential to harm children.

This proposed definition of *actual knowledge* also appears to relieve a school district from responsibility to respond to harassment when the school personnel member who has notice of the harassment is also responsible for the harassment.

This proposed definition significantly limits when a school district is obligated to respond to sexual harassment. Several district employees could know about harassment, or even be engaging in harassment, and the district would have no duty to stop the harassment under these regulations until an employee who falls into the narrow category of employees identified in the proposed definition receives notice.

The proposed definition greatly diminishes a regulatory tool that has created norms and practices in classrooms and across Washington's K-12 system to address and end the sexual harassment of children in a timewise manner. Absent that tool, the risk of prolonged harm increases, as does the risk of litigation, relying on state tort law for remedies.

### § 106.45 – Grievance procedures for formal complaints of sexual harassment

#### (a) Discrimination on the basis of sex

The proposed regulations appear to provide that when a respondent is not afforded grievance procedures in § 106.45, the school district has engaged in sex discrimination under Title IX. Although more guidance from the Department is needed, this appears to mean that the procedural due process rights in these proposed regulations apply in *every case* arising in the K-12 context in which a student makes a formal complaint alleging that he or she has been sexually harassed. As noted above, this would constitute an unprecedented and extraordinary federal preemption of state and local student discipline procedures for a discrete category of student behavior.

#### (b) (i) Treat complainants and respondents equitably

The proposed regulation should require interim or supportive measures to protect a complainant during the investigation. Instead, it appears to say that a school district is not obligated to provide remedies to a complainant until it has made a finding of responsibility for sexual harassment against

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                                                5

the respondent. Revised regulations will help districts avoid perpetuating discrimination by their inaction during an investigation.

Additionally, the proposed regulations do not provide standards for how to design remedies and corrective action to restore or preserve a student's access to the recipient's education program or activity. As part of the clarification, the regulations should state that districts should design remedies to minimize the burden on the student who was harassed as much as possible.

The proposed regulations state that a school district must provide due process protections for respondents before imposing any disciplinary sanctions. The rules should clarify that a school district may implement interim measures to keep students safe and to stop ongoing harassment while an investigation is ongoing. The rules should further clarify that interim measures that effect the respondent, such as separating the parties or implementing a temporary safety plan, would not be considered disciplinary sanctions.

*(b)(iii) Conflicts of interest*
The proposed regulation is unclear about the actual standard for avoiding conflict of interest and it would benefit from additional clarification. For example, the issue of conflict of interest is common when a school district hires their legal counsel, insurance carrier, or risk pool to complete an investigation or respond to a formal complaint.

*(b)(iv) Presumption respondent is not responsible*
The proposed rule should clarify that the presumption that the respondent is not responsible does mean that the district should decline to provide interim measures during the investigation process. The proposed rules should further clarify that the presumption does not diminish districts' responsibilities to keep students safe and supported before an investigation is completed and any remedies are put in place.

*(b)(v) Reasonably prompt timeframes*
The proposed regulations allow for the temporary delay of the grievance process for good cause, such as concurrent law enforcement activity. Although some delay may be appropriate when law enforcement is also investigating, the proposed regulations should clarify that school districts need to take appropriate affirmative steps to protect students from harassment regardless of law enforcement activity.

*(b)(2), (b)(3) Notice and Ongoing Notice*
The proposed regulations establish specific notice and ongoing notice requirements that do not address the possible need to protect the complainant from ongoing sexual harassment or retaliation. Additionally, the proposed regulations do not address requirements under FERPA to protect student information. Without conducting a preliminary investigation to determine the potential risk of releasing information about the complainant, or putting interim measures in place to protect the complainant, a school district may expose the complainant or others involved in the complaint to risk of harm.

*(3) Investigations of a formal complaint*
The proposed regulations should not require districts to dismiss complaints that do not constitute sexual harassment as defined in the regulations.

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                                      6

Harassment complaints in K-12 often involve a multitude of concerns, including discrimination or harassment based on other protected classes, retaliation, privacy, personnel actions, and procedural questions. As written, the proposed regulations require districts to dismiss these other complaints that are not strictly sexual harassment and are silent as to what a district's responsibility is to those other concerns. If a district dismisses the concerns altogether, they would likely violate several state and federal laws. If the district dismisses the concerns from the Title IX investigation, and pursues them in a concurrent process, the process will likely be chaotic for both the district and complainant.

Currently, a school district may need to respond to allegations of off-campus or out-of-school sexual harassment by evaluating whether the student is now experiencing, while in school, continued effects of that incident—that is, a hostile environment. Social media is ubiquitous in the K-12 setting as is the risk of cyberbullying. However, the proposed regulations do not address whether districts have an obligation to investigate the possibility of an in-school hostile environment resulting as a continuing effect of out-of-school harassment. Instead, the proposed regulations appear to confine its investigation to conduct occurring within the district's education program or activity.

*(3)(ii) Presenting witnesses*

As written, the proposed regulations create a special type of discipline hearing for two specific kinds of behavioral violations: sexual harassment and sexual assault. In Washington's existing K-12 student discipline frameworks, which include student due process rules and school policies, student disciplinary hearings are not designed to be adversarial proceedings between two parties. Requiring adversarial hearings between students in the K-12 sector would constitute a radical change to the way schools provide due process to students and manage behavior expectations in schools. In addition to the issues connected to singling out sexual behavior for different treatment, public schools are not staffed, trained, or prepared for this fundamental re-working of student discipline procedures.

*(3)(iii) Discussing allegations*

The proposed regulations should be revised to provide protections for complainants and others who participate in an investigation regarding retaliation. Without this clarification, school districts may fail to protect students from ongoing harassment and retaliation.

*(3)(iv) Advisor*

The proposed regulations appear to limit who may accompany a child to meetings and proceedings related to their sexual harassment complaint. In the K-12 context, this is challenging because a child may be limited to only one parent at a meeting. Further, if a parent accompanies his or her child, the district might prevent that parent from also having an advocate or legal counsel in the meetings or proceedings.

The regulations should clarify that states should be able to identify and provide for when parents of minor children need to be involved. The proposed regulations are silent regarding whether a parent of a minor child has the right to participate in a hearing, a right to notice, or no rights at all.

The regulations should clarify what activities are "grievance proceedings." It would likely be challenging to allow a complainant and respondent to be present together in meetings and proceedings. Moreover, it may be inappropriate for parties to be present at some proceedings where their presence may compromise the investigation or student privacy, such as witness interviews and disciplinary hearings.

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                              7

*(3)(v) Notice to parties*

This proposed requirement would create additional layers of procedure and could extend the period of investigations. It is not clear why this is necessary in the context of K-12 schools.

*(3)(vi) Hearing*

The proposed regulation appears to allow alleged perpetrators more rights to question an alleged victim's previous sexual behavior than state law allows in criminal proceedings. *See* Revised Code of Washington (RCW) 9A.44.020. What's more, the limits on questioning proposed here are not as clear as federal rape shield rules, which are designed to protect victims against invasions of privacy, potential embarrassment, and stereotyping. *See* Fed. Rules of Evidence 412. This will be difficult to enforce, will require a significant amount of training for investigators, and will very likely expose complainants to further harassment.

Additionally, the proposal would appear to permit minors to be questioned about consent and previous sexual behavior, even if the offense is statutorily impossible for a minor to consent to, such as rape or other sexual contact by an adult. The proposed regulations should include a blanket exception to the issue of addressing sexual conduct of a minor child. Most K-12 cases involve children who are not legally competent to provide consent.

The procedural requirement to require parties the opportunity to question each other is not appropriate in the K-12 context. Children involved in sexual harassment investigations should not be allowed to question each other about the allegations or behavior. This will likely become a fight between the parents of the complainant and the parents of the respondent, and could be traumatizing to both children. It is often the case that young children who engage in behaviors that constitute sexual harassment and sexual assault are also victims of abuse themselves. It would be inappropriate to subject children to adversarial, criminal trial-like grievance procedure.

This proposed procedure is contrary to existing K-12 discrimination, harassment, and disciplinary proceedings. The cost of training to ensure school districts are compliant with Title IX and other state and federal laws will be extraordinary.

In addition, this proposed requirement will lengthen investigations, which is contrary to the requirement that investigation timeframes be prompt. Under state law, school districts are required to complete an investigation and respond to the complainant in writing within 30 calendar days of receiving a formal complaint. This timeframe is intended to provide adequate amount of time not only for determining what happened, but also in determining whether any systemic hostile environment or issues of discrimination are present that need to be addressed.

*(3)(viii) Inspecting and reviewing evidence*

The proposed procedural requirement is overly burdensome for K-12 school districts. Most school districts will not have access to potentially costly digital applications that restrict parties from downloading or copying records. It is challenging for school districts to protect student information under FERPA while also providing access to evidence in a timely manner. Further, this proposed requirement will lengthen investigations, which is contrary to the requirement that investigation timeframes be prompt.

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                        8

The proposed regulation is also contrary to how K-12 school districts investigate allegations of student misconduct. It is not always appropriate to share evidence with related parties. This issue is best left to the expertise of local school officials. Washington's statewide student discipline rules require school districts to allow for inspection of records at the discipline appeal process.

The proposed regulation would be a dramatic change to the way K-12 school districts investigate incidents of harassment, bullying, and other related behavioral violations.

*(3)(ix) Investigative Report*

The proposed regulation appears to require a school district to allow parties at least 10 days to review and respond to a draft investigative report. This is unnecessary in the K-12 context. Under existing grievance frameworks, parties may identify concerns for further review or challenge determinations during an appeal. Further, this proposed requirement will lengthen investigations, which is contrary to the requirement that investigation timeframes be prompt.

*(4)(i) Decision makers and standard of evidence*

This proposed regulation is problematic in the K-12 context because most of the 295 school districts in Washington are small, with one administrator acting as Title IX coordinator and decision maker regarding complaints of sexual harassment and other forms of discrimination. This official is typically the school district superintendent. In contrast, decisions regarding responsibility for behavioral violations and disciplinary actions are typically left to school principals who are directly accountable for students.

This will be costly for small school districts to train additional staff and contract with third-party investigators.

In Washington, school districts are currently required to conduct investigations and decisions related to sexual harassment and discrimination at the district level because they quite often involve systemic issues that require a district-wide response. Decisions should not be made at the building level, as they are for discipline issues.

It is problematic to require a recipient to apply the same standard of evidence for complaints against students as it does for complaints against employees because standards of proof for employment investigations are usually locally bargained in Washington. This would give teachers the ability to set district-wide standards of review for all complaints. That decision should be made by the state or locally elected school board members.

Washington requires school districts to use the preponderance of evidence standard for determinations of sexual harassment. Different standards may be appropriate for determining the culpability of a respondent. However, Title IX is a nondiscrimination law and the rules should effectuate Title IX's nondiscrimination mandate, rather than focus on individual disciplinary proceedings. Given this, the preponderance of evidence is the appropriate standard for determining a school district's responsibility to address sexual harassment and resulting hostile environments.

In addition, it is confusing and administratively challenging to allow school districts to use a different standard for a narrow category of complaints and behavioral violations regarding sexual harassment when the preponderance of evidence standard will still apply to all other types of discrimination

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                                                    9

complaints. Training school districts on multiple evidentiary standards will be daunting, and districts will struggle to meet compliance.

*(4)(ii) Written decision*

The proposed regulations related to the written decision further conflate a sexual harassment investigation with a disciplinary proceeding for behavioral violations. The proposed regulations for a written decision are not appropriate for issues involving minor children in the K-12 context.

In the K-12 context, a sexual harassment investigation is designed to determine whether a student experienced sexual harassment and if so, what remedies are necessary to stop the harassment, eliminate a hostile environment, prevent the harassment from reoccurring, and address any effects of the hostile environment. Determinations of an individual student's culpability should be handled under a school district's code of conduct and state student discipline due process laws.

In addition, sharing information between parties about remedies and disciplinary actions in a written decision will lead to FERPA violations.

The proposed requirement that an appeal by either party "stays" the determination is also problematic. This practice is not accepted in other K-12 proceedings. A judge, for example, would almost never stay a school's suspension or expulsion order pending an appeal. If a school district, determines after a thorough investigation that sexual harassment occurred, school officials need to implement remedies as soon as possible (in addition to continuing any interim measures already in place).

*(5) Appeals*

The proposed regulations regarding appeals is not function for the K-12 context because in existing K-12 processes, appeals of sexual harassment determinations and appeals of discipline (that is, appeals related to a student's culpability or the appropriateness of a disciplinary sanction against a student) are governed by separate laws, regulations, and board policies and procedures. In Washington, a complainant's appeal regarding a sexual harassment determination would go to the school district's school board, while a respondent's appeal regarding a discipline sanction would go to the school district's superintendent (who is typically the decision maker in sexual harassment complaints). Combining these processes into one appeal is not workable.

This process perpetuates an adversarial, quasi-judicial dispute process between students regarding discrete allegations of student misconduct. The regulations are silent on how complainants can appeal school district actions that perpetuate sex discrimination or fail to eliminate a hostile environment. The proposed regulations should aim to hold the school district accountable for their response to sexual harassment. Yet they do not appear to create space for that type of complaint or appeal.

*(6) Informal resolutions*

The proposed informal resolution paragraph is concerning because there are limited situations where informal resolution of sexual harassment and sexual assault allegations between parties, especially between children, would be appropriate. It is improper for a child who complains of harassment to be required to work out the problem directly with the alleged perpetrator. Moreover, in cases involving allegations of sexual assault, informal resolution or mediation is not appropriate in any case. There is

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                                    10

no compelling reason under Title IX to permit a school district to attempt to get a third grade victim of sexual assault to consent to mediation.

This is also problematic in the K-12 context because children should not be asked to provide voluntary written consent to waive their civil rights. School districts should not be permitted to seek a waiver for ensuring children are safe and protected from harassment. If informal resolution is appropriate, complainants must be notified of the right to end the informal process at any time and begin the formal complaint process.

The proposed regulation also creates a potential conflict of interest by giving a school district the option to seek waivers from children and then stop investigations. By waiving their responsibility to complete an investigation and put remedies in place, a school district cannot ensure an alleged perpetrator does not harm other students. To be free of sex discrimination, school districts must instead build systems to ensure students affected by sexual harassment are heard, protected, and given uninterrupted access to their education.

The regulations should clarify when informal resolutions are not appropriate and further clarify a school district's responsibility to ensure that sexual harassment stops and does not recur.

*(7) Recordkeeping*
The proposed paragraph regarding recordkeeping is problematic because record retention schedules are set at the state-level. In Washington, districts must retain records related to discrimination complaints for six years. Setting a different standard in federal regulation will be confusing to states and will require extensive training.

## Primary concerns identified in WSSDA's public comment

- The proposed regulations do not make sense in the K–12 school district context.
- The proposed regulations provide much less guidance than previously provided to school districts regarding how to stop or fix alleged sexual harassment. Instead, the proposal focuses almost entirely on a prescriptive grievance procedure—a procedure that creates a new problem by conflating sexual harassment investigations with discipline proceedings.
- The proposed regulations set completely different standards and procedures for responding to one category of discriminatory behavior. These standards and procedures also conflict with existing Washington state and federal nondiscrimination regulations and guidance, and Washington's student discipline due process regulations. Providing model policies to guide school districts on how the proposed Title IX standards and procedures apply in the context of these multiple, existing processes will be challenging and expensive. School districts will struggle to comply with these new requirements simultaneously and ensure schools are free from sexual harassment.
- The proposed regulations do not require or encourage school districts to implement interim measures to keep students safe and stop ongoing harassment during an investigation. A school district's inaction during an investigation could create or perpetuate a hostile environment. Ensuring that interim measures are put in place is a critical first step to eliminating sexual harassment in schools.
- The proposed regulations on informal resolutions (such as mediation) will not work because children should not be asked to waive their rights and mediation is almost never appropriate for most types of sexual harassment.

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                                                11

- It is critical for school districts to respond promptly and consistently to potential discrimination, including discrimination resulting from sexual harassment. In addition to ensuring safe and equitable access to schools for all students regardless of sex, this avoids a system that forces discrimination complaints out of schools into courts. Narrowing school districts' responsibility to respond to sexual harassment by adopting narrow definitions of "sexual harassment," of what a "formal complaint" looks like, and of who can make a complaint will have the opposite effect, increasing the likelihood that families will feel that they need to go to court for relief.

EXHIBIT 13
WSSDA Comment on Proposed Title IX Regulations                                                              12

# EXHIBIT 14



**CALIFORNIA DEPARTMENT OF EDUCATION**

**TONY THURMOND**
STATE SUPERINTENDENT OF
PUBLIC INSTRUCTION

1430 N STREET, SACRAMENTO, CA 95814-5901 • 916-319-0800 • WWW.CDE.CA.GOV

January 30, 2019

The Honorable Betsy DeVos, Secretary of Education
U.S. Department of Education
400 Maryland Ave., SW
Washington, DC 20202

Dear Secretary DeVos:

Subject: Docket ID ED-2018-OCR-0064

The California Department of Education (CDE) submits the following comments on proposed regulations regarding Title IX of the Education Amendments of 1972 (Title IX).

It is important to make efforts toward setting Title IX requirements in order to ensure an adequate, appropriate, and consistent response to allegations of harassment and assault in schools nationwide. However, these proposed regulations largely fail to meet this objective and would, instead, weaken victim protections.

We believe it is important that students, staff, and faculty are treated fairly and afforded adequate opportunity to pursue education at all levels. However, by narrowing the definition of sexual harassment, these regulations would effectively deny equal access to educational programs before a school is required to act to protect students. These regulations also fail to require action be taken when a report is made to non-teaching staff. Furthermore, the proposed regulations impose prescriptive procedures on victims who report a complaint and further reduce a school's obligation to protect students. These changes are especially inappropriate in a kindergarten through twelfth grade (K–12) setting. Young children are particularly sensitive to trauma and, often, are unable to verbalize social-emotional and other safety concerns.

Our concerns with the proposed regulations and their impact on schools, specifically K–12 schools, are further detailed below.

**The proposed regulations would narrow the definition of sexual harassment, undermining the objectives of Title IX.**

The CDE disagrees with the choice to redefine sexual harassment narrowly and require it to rise to the level of being "so severe, pervasive, **and**[1] objectively offensive that it

---

[1] Emphasis added

EXHIBIT 14

The Honorable Betsy DeVos
January 30, 2019
Page 2

effectively denies a person equal access to the recipient's program or activity" before action is required. This definition is especially inappropriate in a K–12 setting where, as in California, elementary and secondary education is compulsory, leaving parents and students in the difficult position of enduring harassment that is deeply discomforting or disturbing when it nevertheless fails to meet the high bar proposed in the regulations. Yet, in order to ensure the safety of students, schools must be responsible for addressing instances of harassment long before those behaviors become severe enough to meet the proposed definition of harassment. It should also be noted that there is little consensus on what is "objectively offensive" in terms of verbal or written sexual harassment, leaving this standard open to interpretation. The CDE believes that the U.S. Department of Education's (ED) definition should include conduct that has the purpose or effect of having a negative impact upon the individual's ability to benefit from and participate in the educational environment or of creating an intimidating, hostile, or offensive educational environment. This should include acts of cyber sexual bullying.

Furthermore, while older students and those in college may, in some circumstances, be able to recognize severe harassment or assault, younger children deal with trauma much differently, as do many students with disabilities. Young children—especially those who do not have other options during the day because their parents do not have childcare alternatives or they receive their only meals at school—may prioritize those needs over any social-emotional needs or safety concerns. The impact of such trauma on a student's ability to learn, and thus on his or her access to education, may not be evident until much later, especially for students who may be nonverbal or have other difficulties expressing its impact.

Changes to address these comments should be made to the regulations as a whole, but they are especially important with respect to K–12 schools.

**The regulations would not require schools to act when a report of sexual harassment is made to non-teaching staff.**

The proposed regulations appropriately state that a report to a K–12 teacher triggers a requirement for further action under Title IX. However, the CDE disagrees that reporting to other K–12 staff does not trigger a requirement for further action under Title IX. Teachers and staff (e.g., teacher aides, counselors, nurses, psychologists) serve *in loco parentis* for elementary and secondary students to an extent that is not replicated in a higher education context. More importantly, for students who may be unsure exactly what has transpired, it is important that they be able to share their experiences with an adult with whom they feel comfortable and who can respond appropriately based on their knowledge of a student's maturity and experience. This is especially true for students with disabilities, who may have trouble connecting with or confiding in unknown adults.

EXHIBIT 14

The Honorable Betsy DeVos
January 30, 2019
Page 3

**The regulations would impose prescriptive procedures on victims who report a complaint and create confusion for local educational agencies and families.**

The CDE supports the proposal to not require a live hearing with in-person cross-examination in the elementary and secondary context. Being forced to relive trauma can be deeply disturbing for adults; it is even more problematic for young students who do not have the same internal coping mechanisms as adults and may be re-traumatized by such proceedings. However, the CDE does not support the proposed regulations which would require, that "[i]f no hearing is held, the decision-maker must afford each party the opportunity to submit written questions, provide each part with the answers, and allow for additional, limited follow-up questions from each party." Imposing prescriptive procedures of posing and answering questions in writing places a significant inhibition on a victim's willingness to come forward with a complaint, particularly at the elementary and secondary school level, and unnecessarily ties the hands of and places an enormous burden on the investigators who need discretion to properly guide the investigation. Further, this requirement may involve potential Family Educational Rights and Privacy Act (FERPA) violations, and the proposed regulations do not clarify what schools and districts are to do when there is a conflict between the proposed regulations and the FERPA provisions.

California schools and districts have local procedures for investigating complaints of harassment, imposing discipline for violations of the student code of conduct, and addressing personnel issues. The proposed regulations will likely create confusion regarding the interplay of the various processes for local educational agencies and families, including the varying and duplicative notification requirements.

**Some of the proposed regulations are inappropriate for students in K–12 schools.**

Among the questions asked by the ED in its proposed rule was whether these regulations should apply to elementary and secondary schools at all. Of course, K–12 students are entitled to federal civil rights protection, including through Title IX, and therefore regulations implementing Title IX should appropriately address K–12 students' needs.

We at the CDE know that there are student services and mental health professionals who are deeply engaged in the meaningful and important work of identifying and addressing student trauma. The CDE believes it is important to set some basic standards for response, but that must be done in a way that respects the professional experience and opinions of those closest to the students in question.

For all of the reasons described above, these proposed regulations fail to protect students and, as a result, we urge the ED to revise them to address these failures. We hope that you will also heed the comments of our partner agencies, Los Angeles Unified School District, University of California, and the California Attorney General.

EXHIBIT 14

The Honorable Betsy DeVos
January 30, 2019
Page 4

If you have any questions or concerns regarding these comments, please contact
Shanine Coats, Federal Policy Liaison, at 916-445-4291 or scoats@cde.ca.gov.

Sincerely,

Tony Thurmond

TT:sc
2019-00504

EXHIBIT 14

EXHIBIT 15



3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA  19103-2799
215.981.4000
Fax 215.981.4750

Michael E. Baughman
direct dial:  215 981 4964
direct fax:  215 827 5907
baughmanm@pepperlaw.com

January 30, 2019

**Via Hand Delivery and Federal eRulemaking Portal**

The Honorable Betsy DeVos
Secretary of Education
C/O Brittany Bull
United States Department of Education
U.S. Department of Education
400 Maryland Ave. SW, Room 6E310
Washington, DC 20202

Re:   Comments on Proposed Title IX Regulations

Dear Secretary DeVos:

Our Firm writes to comment on the Department of Education's (the "Department") Notice of Proposed Rulemaking under Title IX of the Education Amendments of 1972 (the "Proposed Regulations"), on behalf of twenty-four private, liberal arts colleges and universities located throughout the United States:  Antioch University, Barnard College, Bryn Mawr College, Bowdoin College, Carleton College, Colby College, Connecticut College, Dickinson College, Franklin & Marshall College, Gettysburg College, Hamilton College, Haverford College, Hobart and William Smith Colleges, Macalester College, Middlebury College, Mount Holyoke College, Muhlenberg College, Rhode Island School of Design, Skidmore College, Swarthmore College, Trinity College, Wellesley College, Wesleyan University, and Williams College  (collectively the "Institutions").  We appreciate the effort that the Department has made to consider a wide range of issues relating to the challenging area of sexual harassment and assault.  We further appreciate that the Department is striving to provide "clarity, permanence, and prudence [through] regulation properly informed by public participation in the full rulemaking process" (Preamble, p. 61,464) and trust that comments of the regulated community – schools, colleges and universities – will be carefully considered. Several aspects of the Proposed Regulations, such as the flexibility to use informal resolution

| Philadelphia | Boston | Washington, D.C. | Los Angeles | New York | Pittsburgh |
| Detroit | Berwyn | Harrisburg | Orange County | Princeton | Silicon Valley | Wilmington |

www.pepperlaw.com

EXHIBIT 15



The Honorable Betsy DeVos
Page 2
January 30, 2019

processes in certain cases, are well-thought out and will be very beneficial to the higher education community. Other aspects of the Proposed Regulations, however, merit re-consideration and/or further work to ensure that they advance Title IX's goal of educational environments free from discrimination and harassment – a goal our clients share.

For many years, the Institutions have worked tirelessly to address the complex problem of sexual assault and sexual harassment among members of their communities. They have made significant investments of time and resources to develop policies tailored to their campus communities, hire appropriate staff, and ensure that appropriate support resources are available to students. Their responses to incidents of sexual harassment are of the utmost importance to their communities – students, faculty, alumni, and administrators demand that they get this issue right. With or without federal law, the Institutions will continue to make addressing sexual harassment in a careful, thorough, and fair way among the highest of their priorities.

While the statistics vary, there can be no reasonable debate that sexual assault is a far too prevalent problem throughout our country, including on our campuses. Each of the Institutions has developed policies, procedures, trainings, and programs to combat sexual violence, and consistently monitor the effectiveness of those policies and procedures. The core of the Institutions' work focuses on providing appropriate support to victims of sexual harassment and violence, and ensuring accountability for individuals who violate their policies. Each of the Institutions is also deeply committed to treating every member of our communities with respect, care, and fairness.

Although each of the Institutions has as a defining goal that their policies and procedures both address the effects of sexual violence while ensuring fundamental fairness to all participants, they have developed differing policies to achieve these goals. The model chosen by each Institution is based on careful consideration of many factors, including what has worked for them in years of experience, what best fits their individual school's mission, culture and values, what is most sensible given the size and the unique organization of their administrations and programs, and what kinds of sexual harassment cases they each most commonly face, which can differ significantly in nature, scope, and quantity and in ways that may warrant significantly differing approaches. Simply because their policies may be different does not, however, mean that they do not achieve the same goals of consistent, evidence-based results through a careful, thorough and fair process. Colleges and universities employ experienced and dedicated professionals who are on the front lines of addressing sexual harassment and violence every day. These professionals are better positioned than the Department to determine what will and will not be effective in adjudicating these complex cases.

EXHIBIT 15



The Honorable Betsy DeVos
Page 3
January 30, 2019

Our primary concern with the Proposed Regulations is that the Department seeks to remove the autonomy of private, independent schools like the Institutions, by seeking to impose a uniform, "one-size-fits-all" set of procedures for handling all allegations of sexual violence and sexual harassment, for every school in the United States, regardless of the school's size, history, geography, mission, values, or culture. The Department can and should address situations where recipients of federal funds intentionally discriminate on the basis of sex. But it is ill-equipped to regulate the many details of student disciplinary proceedings. Rather than setting forth broad principles, the regulations seek to micro-manage how schools will handle every aspect of an investigation of sexual harassment, ranging from mandating adversarial cross-examination at a live hearing to dictating when a school must file or dismiss a complaint of sexual harassment. The Institutions, like every school in the country, will be required to re-write their policies and procedures to follow the Department's directives, even if their current policies have been developed with community input, have worked well, and have achieved reliable results.

Respectfully, we question whether the minute details of internal student disciplinary matters are appropriately regulated by the federal Department of Education with a single, one-size-fits-all set of mandatory procedures. Moreover, from a purely legal perspective, we question whether the Department has the authority to do so. Title IX forbids colleges and universities who receive federal funds from engaging in intentional gender discrimination, but it does not purport to dictate how their disciplinary proceedings should be handled. Indeed, the Proposed Regulations are contrary to the very Supreme Court cases that the Department claims to be applying. We also submit that a number of the specific details of the Proposed Regulations are unnecessary, will have unforeseen consequences, and will cause considerable harm.

We urge the Department to reconsider the Proposed Regulations.

## I.  As a Threshold Matter, The Department Has Not Established It Has Authority to Dictate How Schools Handle Their Internal Disciplinary Proceedings

Proposed § 106.45 purports to set out details as to how every college and university in the Nation must handle claims of sexual harassment. It requires that separate individuals investigate the facts from those who decide responsibility. It dictates the precise wording of certain elements of notices to parties. It sets exact deadlines. It requires a live hearing. It requires that schools allow direct cross-examination by an advisor, and that schools provide an advisor to conduct cross-examination if a party does not have one of their own. It sets forth specific evidence that can and cannot be considered. It dictates that a school must dismiss a complaint depending on the geography where the misconduct occurred. The list goes on and on for almost ten pages.

EXHIBIT 15



The Honorable Betsy DeVos
Page 4
January 30, 2019

The Department appears to find its authority to do all of this from the following proposition contained in § 106.45(a): "A recipient's treatment of a complainant in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under Title IX. A recipient's treatment of the respondent may also constitute discrimination on the basis of sex under Title IX." Of course, any action by a recipient of federal funds "may" constitute discrimination on the basis of sex, but only if an adverse action is taken ***because of*** someone's gender. *See, e.g., Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 865 (8th Cir. 2011) ("Title IX imposes liability on a school district for discrimination only if the discrimination is 'on the basis of sex.' We glean from this language of the statute a requirement of underlying intent, and therefore motivation, on the part of the actor to discriminate because of one's sex or gender."); *Hyman v. Cornell Univ.*, 834 F. Supp. 2d 77, 82 (N.D.N.Y. 2011) (dismissing Title IX claim where "Plaintiff alleged that [the university] ignored her [complaint], but she did not, as the law requires, allege facts to indicate that [the university] ignored her ***because she is a woman***.") (emphasis in original), *aff'd*, 485 F. App'x 465 (2d Cir. 2012).

If the mere possibility that a recipient of federal funds "may" act with discriminatory intent were enough to regulate, then the Department could literally regulate every aspect of a school's programs, on the theory that some action by the school "may" be discriminatory in some circumstances. A professor "may" give a student a poor grade because she is a woman. A club "may" exclude a student because he is a man. An administrator "may" fire a subordinate because of his sexual identity. The mere possibility of discrimination does not justify the Department's imposition of a complex regulatory scheme on a recipient of federal funds.

The question, instead, is whether the Department has reasonably interpreted Title IX to ***require*** schools to engage in the exhaustive processes set out by the Department in the Proposed Regulations. It has not. Title IX does not speak in any way on the issue of how a school must handle an internal complaint to address sexual harassment. In fact, case law involving claims brought by both complainants and respondents makes very clear that Title IX does not require schools to do the things the Department is now proposing. First, the Department's assertion that a school's failure to follow the detailed procedures it commands constitutes "deliberate indifference" under Title IX is contrary to the very two Supreme Court cases on which the Department claims to rely. Second, it is well-settled that schools do not violate Title IX by failing to provide the types of "due process" protections the Department wants to require. Instead, a school violates Title IX only if a flawed process is specifically undertaken ***because of*** a student's gender.

There is, in sum, no legal basis under Title IX for requiring schools to do what the Department is now considering requiring them to do.

EXHIBIT 15



The Honorable Betsy DeVos
Page 5
January 30, 2019

    **A.**    *The Supreme Court Has Held That Failure to Follow a Particular Disciplinary Process is Not a Violation of Title IX and That Schools Should Retain Flexibility In Responding to Allegations of Sexual Harassment*

        In the commentary to the Proposed Regulations, the Department suggests that the Proposed Regulations are meant to follow the Supreme Court's foundational law in this area, namely *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274 (1998) and *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999).[1]  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462, 61,468 (Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106) (noting that "we are persuaded by the policy rationales relied on by [*Gebser* and *Davis*] and believe it's the best policy approach.").  Section 106.44 of the Proposed Regulations states that the Department will not take action against a school unless it has actual knowledge of sexual harassment or violence and then responds with "deliberate indifference" – apparently a reference to the liability standards set out in *Gebser* and *Davis*.  Section 106.44(b) then states that a school "***must*** follow procedures consistent with section 106.45 in response to a formal complaint" and that, if it does so, "the recipient's response to the formal complaint is not deliberately indifferent and does not otherwise constitute discrimination under Title IX."  (emphasis added).  In other words, the Proposed Regulations are premised on the notion that a school's failure to follow the detailed procedures it has proscribed – such as missing a deadline by one day or failing to use the exact wording prescribed by the regulations – constitutes deliberate indifference, and is therefore a violation of Title IX.

        While the Institutions agree that *Davis* and *Gebser* properly set out their obligations, the Department's Proposed Regulations fundamentally misunderstand *Gebser* and *Davis*.  "Deliberate indifference" is not a measure of the quality (or quantity) of a school's procedures for processing complaints of past acts of sexual harassment.  It is an official decision by a recipient of federal funds not to address known, ongoing harassment, that subsequently subjects a student to additional harassment.  *Davis* involved claims that a fifth grader had repeatedly harassed another student over a period of many months, the parents reported the conduct to the school, but the school did almost nothing about it.  *Id.* at 633-35.  The harassment thus continued unabated.  *Id.*  The Supreme Court held that a school does not violate Title IX simply because harassment occurs in its programs, but only where (1) "the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities," *id.* at 633; (2) the school's deliberate indifference "subjects" the student to sexual harassment, *id.* at 645;

---

    [1] Section 106.45(a) states that "A recipient's treatment of a complainant in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX."  It is the *Gebser* and *Davis* line of cases that set out when, in practice, that is the case.

EXHIBIT 15



The Honorable Betsy DeVos
Page 6
January 30, 2019

and (3) the harassment caused by the school's deliberate indifference is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit" provided by the school. *Id.* at 633.  In other words, deliberate indifference is not a measure of the process a school has in place to address past incidents of sexual harassment, but is instead an "an official decision by the recipient not to remedy" known, ongoing harassment, such that the school's own actions "subject" the student to harassment by allowing it to continue. *Gebser*, 524 U.S. at 290 (internal quotation marks and citation omitted); *see Doe v. University of Kentucky*, 2019 U.S. Dist. LEXIS 8897 at*33-*34 (E.D. Ky. Jan. 18, 2019) ("Whether the University failed to discipline is not the question before this Court.  Instead, in this lawsuit, [Plaintiff] must turn her focus to whether the University acted 'clearly unreasonably' in attempting to prevent any harassment. This aspect of Doe's Complaint takes issue with the University's administrative *process* rather than its alleged indifference to Plaintiff's *harassment*. The Court agrees that, on the facts before it, complaining about the process rather than the response to the alleged harassment itself is simply not actionable by Plaintiff under Title IX." (emphasis in original)).

Rather than requiring a specific, uniform response to sexual harassment in educational programs, *Davis* makes crystal clear that Title IX ***does not*** require schools to engage in any particular action aimed at bringing harassment to a stop, including a disciplinary response: "We stress that our conclusion here – that recipients may be liable for their deliberate indifference to known acts of peer sexual harassment – does not mean . . . ***that administrators must engage in particular disciplinary action.***"  *Davis*, 526 U.S. at 648 (emphasis added).  It emphasized that "courts should refrain from second guessing the disciplinary decisions made by school administrators" and that "[s]chool administrators will continue to enjoy the flexibility they require" in responding to student misconduct.  *Id.*  Title IX does not require schools to "remedy" peer harassment through particular methods, nor does it require schools to provide any particular process or remedy that a student may want.  *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) ("[v]ictims do not have a right to particular remedial demands" under Title IX).  "On the contrary, [schools] must merely respond to known peer harassment in a manner that is not clearly unreasonable."  *Davis*, 526 U.S. at 649.

Thus, under *Davis*, schools must address a situation, but are not required to engage in disciplinary action specifically.  *See, e.g.*, *Rost v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1123 (10th Cir. 2008) ("Many factors in the record counseled caution in determining whether discipline was appropriate in this case, and the district's judgment call not to pursue discipline was not clearly unreasonable and deliberately indifferent.").  Nor are schools required to follow any particular procedures in responding to sexual harassment.   Indeed, courts routinely hold that deliberate indifference is not shown simply by pointing out that a school deviated from its own policy.  *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d

EXHIBIT 15



The Honorable Betsy DeVos
Page 7
January 30, 2019


156, 169 (5th Cir. 2011) ("A district's 'failure to comply with [its] regulations . . . does not establish the requisite . . . deliberate indifference.'" (alteration in original; quoting *Gebser*, 524 U.S. at 291-92)); *Facchetti v. Bridgewater Coll.*, 175 F. Supp. 3d 627, 638 (W.D. Va. 2016) ("[A] Title IX defendant's failure to comply with its own policy does not prove deliberate indifference, under clear Supreme Court precedent."); *Doe v. Bd. of Educ. of Prince George's County*, 982 F. Supp. 2d 641, 657 (D. Md. 2013) ("[T]he Supreme Court has held that the failure to follow sexual harassment grievance procedures does not prove deliberate indifference under Title IX."). In fact, in *Gebser* itself, the Supreme Court held that a school's failure to have in place any grievance procedures ***at all*** was not deliberate indifference or actionable discrimination under Title IX. *Gebser,* 524 U.S. at 291 (holding that a school's failure to adopt grievance procedures for resolving sexual harassment claims does not, by itself, constitute discrimination under Title IX).

Years of case law interpreting Title IX makes clear that schools should have flexibility and discretion in responding to sexual harassment. If the absence of a grievance procedure is not deliberate indifference, then it cannot be deliberate indifference – and thus a violation of Title IX – to use a process without cross-examination, to use one standard or proof over another, or to use a single investigator model or some other model of adjudication. Courts have, in fact, regularly found that a school's use of one procedure over another in a disciplinary proceeding does not constitute deliberate indifference, nor are particular shortcomings in an investigation or hearing actionable under Title IX. *See, e.g.*, *Oden v. Northern Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (holding that college's nine-month delay in proceedings was not deliberately indifferent, even if it may have been negligent and in violation of school's own policy); *Karasek v. Regents of the Univ. of Cal.*, No. 15-cv-03717-WHO, 2016 U.S. Dist. LEXIS 98949, at *45-46 (N.D. Cal. July 28, 2016) (finding allegations that the university failed to update plaintiff during its investigation and disciplinary process were, at most, "nonactionable negligence, laziness, or carelessness," and not deliberate indifference); *Preusser v. Taconic Hills Cent. Sch. Dist.*, No. 1:10-CV-1347 (MAD/CFH), 2013 U.S. Dist. LEXIS 7057 (N.D.N.Y. Jan. 17, 2013) ("Upon receipt of a Title IX grievance, a school district is not required to proceed in a particular manner, even if there are policies in place that would appear to require the initiation of a formal investigation.").

Thus, in the context of sexual harassment involving members of a school's community, a school violates Title IX only if it has knowledge of sexual harassment and fails to take some measures reasonably calculated to stop it. *See K.C. v. Cty. Schs.*, 306 F. Supp. 3d 970, 982 (W.D. Ky. 2018) ("in nearly every case discussing deliberate indifference regarding a school's *response* to reports of harassment, abuse, or discrimination, the Sixth Circuit's focus has been on whether the school could have or should have done [things] differently in order to bring the . . . harassment to a *stop*." (emphasis and alterations in original)). The Supreme Court has

EXHIBIT 15



The Honorable Betsy DeVos
Page 8
January 30, 2019

flatly rejected the notion that schools must follow a particular set of guidelines in processing sexual harassment complaints about past behavior.  Rather than following *Gebser* and *Davis*, the Proposed Regulations turn those decisions on their heads.

**B.**     ***Title IX Does Not Require That Schools Provide "Due Process" to Students in Disciplinary Proceedings Involving Sexual Harassment, and "Due Process" is Inapposite for Private Institutions***

Each of the Institutions is dedicated to providing fundamental fairness to each complainant and respondent in every case, consistent with their local state law, as well as providing a non-discriminatory process for adjudicating complaints of sexual harassment. Notions of fundamental fairness, however, are quite different from "due process," a set of specific, procedural protections used in criminal law and other settings involving deprivation of rights guaranteed by the state.  Private institutions, including the signatories of this letter, are not arms of the state.  *See State v. Schmid,*  423 A.2d 615, 620 (1980) ("A private college or university, however, stands upon a different footing in relationship to the state. Such an institution is not the creature or instrument of state government."); *M.B. v. McGee*, Civil Action No. 3:16cv334, 2017 U.S. Dist. LEXIS 44796, at *27 n.20 (E.D. Va. Mar. 24, 2017); *Bleiler v. College of the Holy Cross*, Civ. A. No. 11-11541-DJC, 2013 U.S. Dist. LEXIS 127775, at *13 (D. Mass. Aug. 28, 2013); *Kelley v. Univ. of Richmond*, Civil Action No. 3:06CV203-JRS, 2006 U.S. Dist. LEXIS 35925, at *6-7 (E.D. Va. June 2, 2006).  There is simply no authority to transform private institutions into state actors under a statute that is designed to prevent intentional gender discrimination.

There is no obligation under Title IX to employ any particular form of disciplinary proceedings, nor does Title IX require cross-examination, live hearings, or any of the other procedures the Department intends to require.  This is, of course, consistent with decades of case law observing that courts should not re-try a college's internal disciplinary matters, and generally establishing the appropriate standard as one of fundamental fairness.  *See, e.g., Napolitano v. Princeton Univ. Trustees*, 453 A.2d 263, 275 (1982) ("We agree with the trial judge that he should not have become a super-trier under due process considerations."); *Clayton v. Trustees of Princeton Univ.*, 608 F. Supp. 413, 415 (D.N.J. 1985) ("My conclusion in this case is that Princeton has accorded Mr. Clayton fundamental fairness in convicting him of cheating, and that is all that the law requires.");  *Fellheimer v. Middlebury College*, 869 F. Supp. 238, 244 (D. Vt. 1994) ("Thus it is clear that Constitutional due process standards should not be used to judge the College's compliance with its [policies].")

Moreover, concepts of "due process" are distinct from Title IX's prohibition against intentional discrimination on the basis of sex.  In fact, it is well settled, in case law

EXHIBIT 15



The Honorable Betsy DeVos
Page 9
January 30, 2019

involving claims brought by respondents,[2] that Title IX does not require schools to provide a set of procedures that conform with notions of "due process."  While a school can violate Title IX if a flawed process or procedure has led to an erroneous outcome, that is so **only** if the erroneous outcome was motivated by the student's sex.  Courts have held that their role under Title IX is "neither to advocate for best practices or policies nor to retry disciplinary proceedings."  *Yu v. Vassar College*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015).  Rather, the sole question under Title IX is whether, when a school disciplines a student "for sexually assaulting a fellow student, it discriminated against him based on his gender in violation of Title IX."  *Id.*; *see also Doe v. Colgate Univ. Bd. Of Trustees*, — Fed. App'x —, 2019 U.S. App. LEXIS 1258, at *13 (2d Cir. Jan. 15, 2019) ("Assuming that his insistence that the sexual encounters were consensual was sufficient to raise a disputed issue of material fact on the question of misconduct, to resist summary judgment John Doe must demonstrate a genuine dispute of material fact as to whether Colgate's actions were motivated by gender bias.").   Thus, "[m]ere allegations a flawed proceeding 'led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination' does not satisfy an erroneous outcome claim."  *Saravanan v. Drexel Univ.*, Civ. A. No. 17-3409, 2017 U.S. Dist. LEXIS 166940, at *9 (E.D. Pa. Oct. 10, 2017) (quoting *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994)).  There must instead be a causal connection between the flawed process and a student's gender, such that the school can be said to have engaged in the action **because of** the student's gender.  *See Colgate*, 2019 U.S. App. LEXIS 1258 at *13; *Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018).

Thus, failure to have in place certain policies, like cross-examination, live hearings, or the right to counsel, does not violate Title IX, absent a showing that the school's disciplinary actions were motivated by the student's gender.  *See, e.g.*, *Gebser*, 524 U.S. at 291 (school's failure to adopt grievance procedures for resolving sexual harassment claims does not itself constitute discrimination under Title IX); *Yusuf*, 35 F.3d at 715 ("[A]llegations of a procedurally or otherwise flawed proceeding that has led to adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss.");  *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 822-23 (E.D. Pa. 2017) (same); *Yu*, 97 F. Supp. 3d at 462-71 (rejecting arguments that various alleged procedural flaws in process, including refusal to allow live cross-examination violated Title IX, where there were no allegations that the actions were motivated by gender bias).[3]

---

[2] As to Section 106.45(a)'s statement that "A recipient's treatment of the respondent may also constitute discrimination on the basis of sex under Title IX," this line of cases explains when that is so.

[3] In fact, even where a process is written in a way that favors the accuser, rather than the accused, courts routinely dismiss Title IX claims because victims of sexual assault can be of any gender, and a "victim-centered approach does not raise an inference of gender bias."  *Rossley v. Drake Univ.*, No. 4:16-cv-00623-RGE, 2018 U.S.

EXHIBIT 15



The Honorable Betsy DeVos
Page 10
January 30, 2019

      In the commentary to the Proposed Regulations, the Department relies heavily on *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), for the proposition that cross-examination and live hearings should be required in Title IX cases. *Baum*, however, involved a public university and that portion of the decision rested entirely on the Due Process Clause to the United States Constitution. *Id.* at 581. In discussing the Title IX claim, the court found that the lack of cross-examination might show an erroneous outcome, but went on to hold that the plaintiff must also show that the University's actions were motivated by gender bias to prove a Title IX claim – due process is not an element of a Title IX claim. *Id.* at 586-87.[4]

* * *

      The Department misinterprets Title IX. Title IX does not require schools to engage in all the detailed processes set out in the Proposed Regulations and/or to require private institutions to follow novel concepts of "due process" in internal, private student discipline proceedings. Schools may not discriminate against members of their communities "on the basis of sex." But it is not sex discrimination to decide that cross-examination by attorneys is an unreasonable way to resolve internal student discipline issues. Because the Department lacks the authority to do what it is proposing, it should reconsider the Proposed Regulations.

## II.    As a Matter of Policy, Schools Should Have Flexibility to Decide What Model of Adjudication Works Best at Their Own Institutions

      Setting aside the question of appropriate authority to require extraordinarily burdensome and costly processes at every institution of higher education in the country, experience and legal precedent indicate that institutions need flexibility to determine their own internal procedures in accordance with their missions, cultures, administrative structures, and other factors that vary from campus to campus. The Institutions – and presumably schools throughout the Nation – will continue their hard work to create processes that work best for ***both***

---

Dist. LEXIS 184836, at *58 (D. Iowa Oct. 12, 2018); *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 886 (N.D. Ohio 2017) ("[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against alleged perpetrators, is not equivalent of demonstrating bias against male students" (internal quotation marks omitted)); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Oh. 2015) (same); *King v. Depauw Univ.*, No. 2:14-cv-70, 2014 U.S. Dist. LEXIS 117075, 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) (same); *Haley v. Virgnia Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) (stating that "a bias against people accused of sexual harassment and in favor of victims . . . indicate[s] nothing about gender discrimination").

    [4] *Baum* is also a single decision from the Sixth Circuit, and it is far from clear whether it would be followed by other courts. *See, e.g.*, *Doe v. Princeton Univ.*, 2019 U.S. Dist. LEXIS 4449 at *21 (D.N.J. Jan. 9, 2019) (questioning whether Third Circuit would follow *Baum*).

EXHIBIT 15



The Honorable Betsy DeVos
Page 11
January 30, 2019

complainants and respondents in sexual harassment matters.  Our communities demand it.  We face the risk of lawsuits if we don't get cases right.  And it is simply the right thing to do by our students.

But one size does not fit all.  Methods that might work well at one institution might not work well at another. A live hearing might make sense at a large public institution which has administrators with experience in conducting such hearings.  By contrast, a smaller, rural school might find that, with fewer resources and employees, some other model, such as a single investigator model, utilizing an outside professional with relevant experience, is the best fit for them.  Moreover, the Proposed Regulations' inflexible approach and rigid rules will limit the Institutions' ability to adjust their policies based on experience in years to come.

By dictating the precise procedures that every school in the country must follow in investigating and adjudicating Title IX cases, the Department would deprive schools of the flexibility they need to adopt policies and procedures that fit best for their institution.  Under Title IX and in other contexts, including disciplinary matters and academics, courts have long recognized that colleges and universities – particularly private ones – are each unique, and their internal decisions should be subject to considerable deference.  *See, e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision, . . .  they should show great respect for the faculty's professional judgment."); *Rost*, 511 F.3d at 1123 ("[W]e are discouraged from second-guessing school disciplinary decisions."); *Doe v. Hamilton Cty. Bd. of Educ.*, 329 F. Supp. 3d 543, 570 (E.D. Tenn. 2018) (Title IX "is not an open invitation for courts, which are often unacquainted with the realities of and constraints on school discipline, to second-guess school actions with the benefit of hindsight" (internal quotation marks and brackets omitted)); *Swartley v. Hoffner*, 734 A.2d 915, 921 (Pa. Sup. Ct. 1999) ("[I]t is not the place of this Court to second-guess academic decisions and judgments made in colleges and universities."); *Boehm v. Univ. of Penn. Sch. of Vet. Med.*, 573 A.2d 575, 579 (Pa. Super. Ct. 1990) ("[C]ourts are more reluctant to interfere in the disciplinary proceedings of a private college than those of a public college" because "[a] majority of courts have characterized the relationship between a private college and its students as contractual in nature.  Therefore, students who are being disciplined are entitled only to those procedural safeguards which the school specifically provides.").  Institutions that handle these cases every day are simply better positioned than the federal government to decide what works best for them.

EXHIBIT 15



The Honorable Betsy DeVos
Page 12
January 30, 2019

## III.   Specific Concerns with the Procedures in the Proposed Regulations

Putting aside our overall concerns with the Department's efforts to dictate the specifics of schools' internal disciplinary processes, many of the more than 50 specific requirements are problematic.  These ambiguities and practical challenges are further evidence that it is not wise for the Department to dictate elaborate regulations as to the details of student disciplinary proceedings, since the only "fix" for problems discovered in implementation will be a lengthy regulatory process.  We highlight below some of our specific concerns.

### A.   *Mandating that Schools Have Live Hearings with Cross-Examination Will Likely Increase Complexity, Costs, and Delays, and May Deter Reporting*

While cross-examination may be an important element in court proceedings, colleges and universities are not courts, nor should they be.  They are educational institutions whose primary functions include educating their students and providing a safe and welcoming environment for their communities.  Those found responsible for sexual harassment will not be sent to jail.  The maximum penalty an institution can utilize is to require a student to leave.  Thus, a school disciplinary proceeding is an internal, administrative proceeding that decides only whether the school's policies have been violated.

Administrative proceedings can – and, on a daily basis in a variety of contexts, do – reach reliable results without adversarial cross-examination.  In fact, even with respect to public schools who are subject to the Due Process Clause, as of today, only the United States Court of Appeals for the Sixth Circuit has held that cross-examination is required under principles of due process.  Other Courts of Appeals have held that cross-examination at a student disciplinary proceeding in state schools is not an essential element of due process.  *See, e.g.*, *Gorman v. University of Rhode Island*, 837 F.2d 7, 16 (1st Cir. 1988) ("As for the right to cross-examination, suffice it to state that the right to unlimited cross-examination has not been deemed an essential requirement of due process in school disciplinary cases." (citing *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972); *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 159 (5th Cir. 1961)).  We are aware of no authority for the proposition that the right to cross-examine witnesses is required at a private institution.  *See Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 894 (M.D. Tenn. Sept. 27, 2018) (noting that *Baum* did not apply to a private school, and instead the procedures due were those set out in the agreement between the school and the student).

We are likewise unaware of another context where the federal government has dictated that a private entity is prohibited from making a decision as to whether its internal policies have been violated unless it provides a live hearing with cross-examination.  For

EXHIBIT 15



The Honorable Betsy DeVos
Page 13
January 30, 2019

example, Title VII also prohibits discrimination on the basis of sex (as well as other characteristics).  While the stakes are high when continued employment is at issue, any employer is free to fire an employee for sexual harassment based on whatever administrative process it deems appropriate for adjudicating such claims.

In other contexts, both public and private, auditors, investigators, and regulators regularly conduct investigations that form the basis for a decision, without adversarial cross-examination.  For example, when the Department of Education's Office for Civil Rights conducts an investigation into violations of Title IX, schools have no right to question witnesses (or even to know who they are).  Presumably, the Department nevertheless believes the procedures set out in its Case Processing Manual are both fair and producing reliable results.

That numerous private (and even public) entities have for decades conducted internal administrative proceedings without live hearings or cross-examination belies the notion that they are essential to obtaining reliable results.  To the contrary, fair and reliable outcomes can be achieved through any number of methods of investigation and adjudication.  In non-panel models, where the investigator gathers the evidence and the investigator or an independent adjudicator makes a decision, well-trained investigators and adjudicators will test the assertions of all parties, including asking questions that probe the veracity of each party's account.  Similarly, for schools that use a hearing model, a well-trained panel or adjudicator will ask the same type of probing questions that a single investigator would.  Many of the Institutions have procedures in place that allow the parties to submit questions challenging facts and credibility through means other than live, adversarial cross-examination.

There are numerous practical problems with requiring live cross-examination by an advisor, which are left unresolved by the Department, leaving colleges and universities to wade into unknown territory.  For example:

- The Proposed Regulations would require schools to allow attorneys to conduct cross-examination on behalf of parties.  This will most certainly turn classrooms into courtrooms, increasing the length of proceedings and the complexity of managing such hearings.  And, particularly at smaller schools like the Institutions, it may be unreasonable to expect college faculty and administrators to act as judges, controlling the conduct of professional advocates.  Adversarial cross-examination will require the adjudicator to make real-time evidentiary decisions, including application of Proposed Section 106.45(b)(3)(vii)'s prohibitions on prior sexual history.  The lack of clear rules as to the scope of cross-examination also means that lawyers might use lengthy, repetitive and aggressive cross-

EXHIBIT 15



The Honorable Betsy DeVos
Page 14
January 30, 2019

examination to harass witnesses and encourage them to withdraw their claims.  Schools may be forced to hire judges or lawyers to oversee such proceedings.

- Section 106.45(b)(3)(vii) states that "[i]f a party does not have an advisor present at the hearing, the recipient must provide the party an advisor aligned with that party for to [sic] conduct cross-examination."  What does it mean to provide an advisor "aligned" with that party?  Further, it is unreasonable to require schools to provide a faculty member or administrator to conduct cross-examination, like an attorney, at a live hearing with an attorney on the other side. The Institutions' staff and faculty have different professional experiences and few are legally trained.  Moreover, much as a lawyer would be required to do before a trial, these educators would be required to extensively study the entire record to prepare for cross-examination.  Schools may find these positions nearly impossible to fill on a volunteer basis and may need to incur new costs.  Moreover, last-minute requests for advisors will undoubtedly cause delays and re-scheduling.

- Section 106.45(b)(3)(vii) states that "If a party or witness does not submit to cross-examination at the hearing, the decision-maker ***must*** not rely on any statement of the party or witness in reaching a determination regarding responsibility." (Emphasis added).  This creates a rule even more stringent than the Federal Rules of Evidence, which at least have numerous hearsay exceptions.  Again, we are aware of no other regulation forbidding a private entity from giving weight to a written statement in an internal proceeding determining whether internal policies were violated.  The proposed rule would require that every single witness – no matter how minor the factual point, whether contested or uncontested – must appear at hearings, making them exponentially longer and more complicated.  Must they appear in person? For an unlimited period of time?  Also, what is a "statement" of the party?  Does the rule mean that written evidence, such as text messages, may not be considered without the witnesses' appearance?  What if the Respondent confesses in a text message but decides not to appear?  What if a witness with exculpatory evidence moves across the country, dies, or otherwise becomes unavailable?  Such a binary, restrictive rule will not work well in practice.  It is a prime example of why schools should have flexibility to determine what works

EXHIBIT 15



The Honorable Betsy DeVos
Page 15
January 30, 2019

and does not work based on their years of handling such cases, rather than having rules dictated to them by the Department of Education.

Finally, and perhaps most importantly, adversarial cross-examination will unnecessarily increase the anxiety of both parties going through the process. For complainants in particular, this may lead them to simply not come forward or utilize the school's process, no matter how meritorious their claims may be. As a result, our campuses will be less safe. Such a result is fundamentally inconsistent with the goal of Title IX and the Institutions' goals, which is to have educational programs and activities that are free from sexual harassment, in all of its forms.

**B.      *The Proposed Regulations Should Not Cover Employees***

As explained above, while Title VII also prohibits discrimination on the basis of sex, it does not require the type of detailed disciplinary proceedings set out in the Proposed Regulations. While a private employer could presumably fire an employee for sexual harassment after conducting an internal investigation, a college or university receiving federal funds would be required to first give the employee a live hearing with cross-examination. This makes no sense whatsoever. Why should private employees in every industry but higher education be subject to the general rules governing at-will employees, while employees at private colleges and universities are suddenly vested with certain "due process" rights? Such a result also makes no allowances for collective bargaining agreements, state law variances, and other complexities within the legal context for employment. Indeed, the Proposed Regulations create the risk of conflicts with employers' obligations under Title VII and state law. The problem is particularly acute with respect to students who are also employees, creating yet another layer of intersecting laws and guidance. Schools would likely need to re-write all of their employment policies which, particularly with respect to faculty policies, could be extremely time consuming and challenging.

**C.      *The Proposed Regulations Should Not Require Schools to Dismiss Complaints Involving Conduct that Occurs Outside of its Programs or Activities or Falls Outside of the Department's Precise, Limited Definition of "Sexual Harassment"***

Section 106.45(b)(3) states that if the conduct alleged in a formal complaint "would not constitute sexual harassment as defined" by the Proposed Regulations or "did not occur within the recipient's program or activity, the recipient ***must*** dismiss the formal complaint with regard to that conduct." (Emphasis added.) At a minimum, the word "must" should be changed to "may." ***Requiring*** a school to dismiss a complaint involving a sexual assault that

EXHIBIT 15



The Honorable Betsy DeVos
Page 16
January 30, 2019

occurs between two students, because it happened across the street from campus rather than on campus, is problematic in several respects.

       First, there are definitional problems.  The definition of "sexual harassment" includes an evaluation of whether the conduct is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's educational program or activity." As the whole purpose of having an investigation is to decide this issue, it makes little sense to **require** schools to dismiss claims at the outset on this basis.  Nor is there clear guidance as to what it means for conduct to occur within an institution's "programs or activities."  Indeed, the question has spawned considerable litigation.  *See*, *e.g.*, *Feminist Majority Foundation v. Hurley*, 2018 U.S. App. LEXIS 35556 (4th Cir. Dec. 19, 2018) (competing majority and dissenting opinions over whether statements on anonymous social media platform were made in the school's programs or activities).  How are schools to define this issue in their policies if the courts cannot?  The lack of clear definitions will invite litigation against schools, with allegations that the school did not dismiss a complaint based on one party's interpretation of these definitions.

       Second, while the Department seems in the Preamble to intend to permit schools to handle off-campus conduct or other forms of sexual harassment that do not meet the Department's definitions under a separate code of conduct, the proposed regulatory language uses the mandatory phrasing that schools "must dismiss" such reports.  Assuming that in all cases it is perfectly clear where, when, and how the events occurred is counter to the experience at many of the Institutions that these issues are often contested and must be determined by the investigation and adjudication itself.  Conceptually, there is no principled reason why a school should not be permitted to handle these issues under the same set of procedures under which it handles Title IX matters.  Requiring yet another set of policies and procedures for handling sexual assault complaints depending on their geography will be confusing to our communities, and is an unnecessary additional administrative burden.

       Relatedly, the definition would arguably prevent schools from adjudicating claims where the victim is not a student (even if the perpetrator is), since non-students generally do not participate in the school's educational programs.  This creates the risk of incentivizing assailants to target students who are not members of their own school's community, which is of particular concern to single-sex schools whose students might be the target of such activity.  Schools should have the flexibility to take disciplinary action against their students where their conduct – even if occurring off-campus or involving a victim who is not a student or employee – presents an ongoing risk to members of its community or is inconsistent with the school's mission and values.  At many of the Institutions, it is common practice for our students to socialize on other local campuses.  This mandate increases the risk to their students, who are already more

EXHIBIT 15



The Honorable Betsy DeVos
Page 17
January 30, 2019

vulnerable by virtue of being in unfamiliar places. They will be far more appealing as targets for violence if a perpetrator's institution would be prevented from pursuing Title IX disciplinary action for such conduct.  It also potentially creates an unprincipled set of distinctions where a student could be held responsible for a fight in a bar that occurs off-campus, but the school might not be permitted to hold a student responsible for a sexual assault that occurs off-campus.

> **D.**    ***The Proposed Regulations Should Not Require Schools to Bring a Formal Complaint Based Solely on Two Reports of Misconduct***

Section 106.44(b)(2) of the Proposed Regulations states that "When a recipient has actual knowledge regarding reports by multiple complainants of conduct by the same respondent that could constitute sexual harassment, the Title IX Coordinator ***must*** file a formal complaint." (Emphasis added).  While it may well be appropriate for a school to act on its own if it has more than one report involving a respondent, the Proposed Regulations improperly remove the school's discretion to evaluate each case on its merits.  There may be circumstances where a complainant reports sexual harassment, but is adamant that no action be taken.  Traditionally, schools have weighed that request against the broader interest in campus safety, and sought to honor the complainant's request where they can.  (Indeed, New York Law ***requires*** colleges and universities to do this. *See* N.Y. Educ. Law § 129-B).[5]  Two reports against one individual might raise a broader safety issue.  But they might not, particularly where one or more of the prior reports does not relate to sexual assault, or where the individual accused is no longer a student.

This Proposed Rule is also in tension with the requirement in § 106.45(c)(3)(vii) that schools disregard statements provided by witnesses or parties at a hearing who do not submit to cross-examination.  If the alleged victims are unwilling to participate in the process, and be subject to cross-examination, then the adjudicator is not permitted to hear the complainant's account.  How could the complaint then result in any findings?  If any formal complaint filed by the school is doomed to failure from the start, why should it be required at all?

Schools should have the flexibility to weigh the facts and circumstances of each case to determine whether independent action by the institution – perhaps against the wishes of complainants – is required.  The Proposed Regulations fail to appreciate that each of these situations turns on its own facts, is nuanced, and should not be governed by a single set of inflexible rules for every institution in the United States.

---

[5] It does not appear that the Department has carefully considered how its Proposed Regulations may conflict with state laws, which will create even more uncertainty and confusion.

EXHIBIT 15



The Honorable Betsy DeVos
Page 18
January 30, 2019

> **E.** ***The Proposed Regulations Should Not Inflexibly Require Schools to Disclose All Evidence Obtained During the Course of the Investigation***

Section 106.45(c)(viii) would require schools to allow both parties to review all evidence "that is directly related to the allegations raised in a formal complaint, including evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility." Investigators sometimes receive highly confidential information during the course of an investigation, ranging from medical records, to family information, to mental health counseling notes. They may also receive highly sensitive documents, including photographs or videos that should not be shared in a way that could lead to misuse. Schools should have flexibility to redact or withhold such information, at least where it is not sufficiently relevant that it will be considered by the adjudicator.

Again, the Department is proposing a rule of disclosure that is even broader than what would happen in a court proceeding. Under the Federal Rules of Civil Procedure, for example, parties are entitled to discovery only of information "relevant to any party's claims." Fed. R. Civ. P. 26(b)(1). And, courts have discretion (as well as enforcement authority) to order that certain highly confidential, personal or otherwise sensitive information not be disclosed or be disclosed only subject to certain terms or conditions. Fed. R. Civ. P. 26(c) (allowing court to limit the scope of discovery to protect a party "from annoyance, embarrassment, oppression, or undue burden or expense"). Under the Department's Proposed Regulations, schools will apparently have no discretion whatsoever to protect parties from the disclosure of information that will not even be seen by the adjudicator in the case. This makes no sense.

This provision, along with the provision requiring schools to bring a formal complaint upon two reports of misconduct, may discourage complainants who seek assistance, rather than disciplinary action, from coming forward, stymying Title IX's purpose of ensuring educational environments free of discrimination. Particularly at smaller schools like the Institutions, students can feel social pressure not to report misconduct. If students know that their wish to maintain confidentiality will be overridden if another complainant reports misconduct involving the same respondent, or if they know that private, potentially embarrassing information, including medical or mental-health records, will be disclosed, they may be much less likely to seek the assistance and resources from the school to address the effects of the incident.

EXHIBIT 15



The Honorable Betsy DeVos
Page 19
January 30, 2019

F. *The Proposed Regulations Should Allow Institutions Flexibility to Choose the Appropriate Burden of Proof for Their Disciplinary Proceedings*

   Section 106.45(b)(4)(i) of the Proposed Regulations states that schools can use either the preponderance of evidence standard or the clear and convincing evidence standard, but contains important limitations.  Specifically a school may use the preponderance of evidence standard only if (1) it also uses that standard in all other disciplinary matters that have the same potential maximum penalty; and (2) it uses the same standard for both employees (including faculty) and students.

   Schools should have the flexibility to make their own decisions on the appropriate burden of proof to use in their internal disciplinary proceedings.  The Proposed Regulations would indirectly regulate the standard of proof schools use in other disciplinary proceedings. This result does not make sense in practice, nor is it legally appropriate.  For example, a school may have an automatic penalty of expulsion for certain academic misconduct.  In such cases, it may make sense to have a clear and convincing evidence standard for academic misconduct where the penalty is automatic, but a different standard where the sanction can vary based on the nature of the conduct.  It is both impractical and unwise to dictate that the same standard must be used for employees, faculty, and students.  Employees might be subject to collective bargaining agreements that require a certain level of proof.  Tenured faculty are typically subject to requirements and protections that have been negotiated over time, through shared governance processes, and are embodied in faculty codes or handbooks.

G. *The Proposed Regulations Should Allow Schools to Place Reasonable Restrictions on Disclosure of Information During Investigations*

   Section 106.45(b)(3)(iii) of the Proposed Regulations states that a school must "not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence."  The Department should not restrict schools from placing reasonable restrictions on disclosure of information during investigations.  During the course of the investigation, having details of the information under investigation published to social media, in student newspapers, or other platforms, risks the fairness and integrity of the investigations. Moreover, many Institutions already wrestle with multiple complaints from participants in the process about defamation, misrepresentation and retaliation.  This is especially so on small campuses, where students tend to know each other and information spreads far faster than the institutional investigation will proceed, especially under the Proposed Regulations. Further, the Proposed Regulations appropriately put the burden on the school to conduct investigations and prove responsibility; it is therefore unclear why the regulations give the parties unfettered rights to "gather" relevant evidence, rather than encouraging them to share it with the institution.

EXHIBIT 15



The Honorable Betsy DeVos
Page 20
January 30, 2019

**H.**     ***The Proposed Regulations Should Not Put Immovable Timelines on Review of Evidence and the Investigation Report***

Section 106.45(b)(3)(viii) & (ix) would require schools to give each party "at least ten days" to submit a response to evidence used in the investigation and then "at least ten days" to review the investigative report before a hearing. While parties should be given time to review the evidence and report, the Department should not mandate the time periods because, again, one uniform rule does not fit all circumstances schools face in practice. There may well be reasons to expedite proceedings in certain circumstances. For example, incidents that are reported that include significant violence or other contributing factors to deem a student "a risk to the campus community" may result in interim measures being put in place. This may be separation from another student with a shared class or it may be an interim suspension which separates a student from the institution for the duration of the conduct process. These interim measures can have significant impacts on the parties, particularly a Respondent who is separated from the institution. Schools should have the flexibility to expedite proceedings in a way that allows both thoroughness and fairness. As with other aspects of the Proposed Regulations, here the Department is suggesting a rule more rigid than in court proceedings, where courts routinely can and do expedite hearings where time is of the essence.

**I.**     ***Other Issues***

We note several other issues the Department should consider if it declines to revisit and refine the Proposed Regulations:

First, the Proposed Regulations should make clear that a school's compliance with the regulations does not violate the Federal Educational Rights and Privacy Act ("FERPA"). Proposed §106.6(e), which states: "The obligation to comply with this part is not obviated or alleviated by the FERPA statute or regulations," does not clearly do this. The Clery Act Regulations, at 34 C.F.R. § 668.46(l) do, and these regulations should be just as clear.

Second, the Proposed Regulations should make clear that they do not create any civil liability. As explained above, the Proposed Regulations appear to be based on a fundamental misunderstanding of Title IX and are inconsistent with well-settled case law. If the Department chooses to regulate in a way inconsistent with the case law, it should make clear that it is not intending to create a standard for civil liability.

Third, the Proposed Regulation will require schools to completely re-write their policies and procedures and set up new systems for adjudicating Title IX cases. It will also require them to re-train all of those responsible for implementing Title IX on these new policies

EXHIBIT 15



The Honorable Betsy DeVos
Page 21
January 30, 2019

and procedures.  This will take time.  The regulations should have a lengthy implementation period – at least eight months – and an effective date of July 1, at the beginning of the academic year, to allow schools to develop new policies and procedures, conduct training, and education their communities about the changes.

## IV.    Conclusion

We appreciate the opportunity to comment on the Proposed Regulations.  The Department revoked its prior guidance in this area because it had "imposed these regulatory burdens without affording notice and the opportunity for public comment." https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.  We hope that the Department will carefully consider our comments about the regulatory burden it is now imposing, which in many ways is even more onerous than the prior, revoked guidance.  If a lesson was learned from the prior guidance, that lesson should have been that the federal government is not well-suited to dictating the detailed steps and procedures for all schools to handle complex, nuanced, internal disciplinary proceedings.  We hope that the Department will learn from experience, and reconsider the wisdom of the regulations it is proposing.

The Institutions stand willing to assist the Department in any way we can.

Respectfully,

Michael E. Baughman

MEB

EXHIBIT 15

# EXHIBIT 16



**ELOY ORTIZ OAKLEY**
Chancellor
Executive Office

Docket ID: ED-2018-OCR-0064

**Submitted via www.regulations.gov**

Kenneth L. Marcus
Assistant Secretary for Civil Rights
Department of Education
400 Maryland Avenue SW
Washington, DC 20202

   *RE:  Title IX of the Education Amendments of 1972 (34 CFR § 106)*

Dear Mr. Marcus:

This letter responds to the Department of Education's Notice of Proposed Rulemaking ("NPRM") for rules that would govern the obligations of educational institutions receiving federal funds ("recipients") to respond to sexual harassment allegations. The NPRM was published in the Federal Register on November 29, 2018.

I am the Chancellor of the California Community Colleges, responsible for giving effect to the policies of the California Community Colleges Board of Governors ("Board"). The Board regulates 73 community college districts and 115 colleges that serve more than 2.1 million students annually. It is the largest and most diverse post-secondary educational institution in the United States. We serve Californians and international students in every region throughout the state. The Chancellor's Office also serves as an appellate body for hundreds of discrimination complaints arising at the college level. This letter is joined by the Los Angeles Community College District, Los Rios Community College District, San Francisco Community College District, El Camino Community College District, and Peralta Community College District.

The proposed rules are deeply concerning. Taken together, they fundamentally alter the threshold for investigating sexual harassment on our campuses to an unreasonable standard, create unnecessary barriers for already traumatized victims, and transform a respondent's presumption of innocence from a shield to a spear. Taken together, they will have a significant chilling effect on sexual harassment victims' ability and willingness to bring forward allegations of sexual harassment. This will make our campuses less safe. The proposed rules will also impose significant financial and logistical burdens on our campuses. The many California community colleges that already have resource

EXHIBIT 16



California
Community
Colleges

**ELOY ORTIZ OAKLEY**
Chancellor
Executive Office

challenges or are located far from cities where expertise is available to implement the proposed rules fully will be disproportionately affected.  At the core of these proposed rules is the department's decision to apply selectively the standards developed by courts for the imposition of liability under Title IX to an administrative process that should be focused on creating safe campus environments for students.  This approach is unwise, and will undermine the effectiveness of Title IX.

To summarize the proposed rules, a recipient college must respond to allegations of sexual harassment only if the conduct rises to the level of quid pro quo harassment, "serious and pervasive" harassment, or constitutes a crime, and the recipient has "actual knowledge" of the harassment from a victim's report to either the Title IX Coordinator, or to another official "with authority to institute corrective measures."  To avoid a violation of Title IX, a recipient is required merely to respond to allegations of sexual harassment in a manner that is not "deliberately indifferent."  "Known reports" of sexual harassment must be addressed, but only with non-punitive, non-disciplinary "supportive measures."  A recipient's duty to investigate sexual harassment allegations may be triggered under two circumstances: (1) a victim filing a formal written complaint with the recipient's EEO Officer, or an official "with authority to institute corrective measures;" or (2) where the recipient "has actual knowledge of reports by multiple complainants of conduct by the same respondent that could constitute sexual harassment."  When the formal grievance process is triggered, the proposed rules require an investigation, the exchange of evidence, a live hearing with cross-examination, and a written adjudication.  Complainants and respondents must be treated "equally" in the formal process, and recipients must provide supportive measures to both, including an "aligned" advisor to conduct cross-examinations during the live hearing.  According to the NPRM, a recipient's failure to treat complainants and respondents "equally" could constitute sex discrimination.  Under the proposed rules, it is likely that determinations that sexual harassment occurred will require "clear and convincing evidence," a standard significantly higher than the more appropriate "preponderance of the evidence" standard.

Our concerns encompass each of the elements of the proposed rules described above, and are explained in more detail below.

**34 CFR § 106.30 – The definition of "sexual harassment" is too narrow.**

The proposed rules would allow recipients to ignore sex-based misconduct that could have significant impacts on student safety.  They would define sexual harassment to

2

EXHIBIT 16



**ELOY ORTIZ OAKLEY**
Chancellor
Executive Office

include: (1) quid pro quo harassment that conditions educational benefits on participation in sexual activity; (2) unwelcome conduct of a sexual nature that is so severe, pervasive, and objectively offensive that it denies equal access to education; and (3) sexual assault.  The regulations do not purport to address conduct below these thresholds because "Title IX does not prohibit sex-based misconduct that does not rise to that level of scrutiny."  83 Fed. Reg. 61466.

The practical effect of this regulation is that state and local governments will impose separate processes to address sexual harassment that falls below the Title IX threshold identified in the proposed rules.  This will be inefficient for colleges and confusing for complainants and respondents.  Those responsible for implementing sexual harassment policies will often find it difficult or impossible to determine whether sexual misconduct conduct falls above or below the Title IX threshold.

**34 CFR § 106.44(a) – The "actual knowledge" requirement is too narrow.**

The proposed regulations impose a duty to "respond" to allegations of sexual harassment only when a recipient has "actual" knowledge of sexual harassment.  This approach is flawed.

First, the proposed rules do away with imputed knowledge and constructive knowledge that are common to this area of the law, and which motivate campus officials to be vigilant about sexual harassment.  The actual knowledge requirement undermines this.

The definition of ''actual knowledge'' is also unduly restrictive.  Actual knowledge of sexual harassment allegations only occurs with notice "to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient."  A complainant should be able to report sexual harassment to a broad class of officials, who would have a duty to take action.  As the NPRM acknowledges, who constitutes an official with "authority to institute corrective measures" is undefined, and will be subject to a fact-intensive inquiry regarding the responsibilities of individual school officials that student complainants would have no knowledge of.  83 Fed. Reg. 61467.  The identity of the officials to whom victims may report sexual harassment and expect a response should be certain, and should encompass a broader array of individuals than the proposed rules contemplate.

The consequences of the actual knowledge requirement are predictable.  A department within a recipient college could have serious, pervasive sexual harassment known to

3

EXHIBIT 16



California
Community
Colleges

**ELOY ORTIZ OAKLEY**
Chancellor
Executive Office

members of a department, including a department's leadership.  Under the proposed rule, the recipient would not have actual knowledge, and would have no duty to respond.  And actual knowledge would not be established by a third-party report of sexual harassment.

Recipients should be required to act when a broader range of school officials receive credible allegations of sexual harassment, regardless of their source.  This change is necessary to protect students and faculty members adequately from discriminatory conduct that inhibits their ability to benefit from college educational programs.

**34 CFR § 106.44(a) – The "deliberate indifference" standard is too weak.**

The proposed rules would fail to incentivize recipients to take strong action to ensure campuses and students are free from sexual harassment.  When a recipient has "actual knowledge" of sexual harassment (not merely actual knowledge of an allegation), the proposed rules only require that it must avoid "deliberate indifference" to the report.  "Deliberate indifference" is described as a response that would be "clearly unreasonable in light of all the known circumstances."  83 Fed. Reg. 61468.

The federal government should encourage recipients to strive for more effective responses through stronger rules, not ones that are so elastic they implicitly sanction "looking the other way."  The department's rationale for departing from the current "reasonableness" standard is that the "deliberate indifference" standard is more deferential to local campus disciplinary processes.  That rationale does not justify giving license to a host of unreasonable responses that fail adequately to protect campuses and complainants and yet may not rise to the level of "deliberate indifference."

**34 CFR §§ 106.30, 106.45(b)(1)(i), and 34 CFR § 106.45(b)(1)(ix)  – The "supportive measures" requirements are unnecessary and expensive.**

We support in principle the presumption of innocence for respondents as proposed by 34 CFR § 106.45(b)(1)(iv).  However, the department goes beyond this presumption of innocence to establish a concept of "equal treatment" that requires a host of non-disciplinary, non-punitive "supportive measures" to be provided to complainants and respondents alike that will impose expenses upon California community colleges that are not justified.  In addition, and perhaps more insidious, the extent to which the rules would require recipients to provide services to accused harassers is unprecedented, belies the department's expressed view that claims of sexual harassment should be

EXHIBIT 16



**ELOY ORTIZ OAKLEY**
Chancellor
Executive Office

taken seriously, and suggests instead that the department views claims of sexual harassment as unreliable.[1]

The proposed rules also limit a recipient's duty to provide supportive measures to complainants who have reported sexual harassment to the Title IX Coordinator, or to another official with authority to institute corrective measures. A report to another college official will not require supportive measures, or any other response.

The department's effort to "level the playing field" between complainants and respondents by requiring equality in the provision of supportive services is blind to the fiscal realities of California community colleges, and the need to prioritize the allocation of scarce resources to the victims of sexual harassment. There may be circumstances where the provision of supportive services to respondents is "appropriate," but the proposed rules create a requirement that is not warranted by our collective experience.

**34 CFR § 106.45 – The grievance procedure triggers are insufficient.**

A recipient's duty to invoke the grievance process (which includes an investigation) is triggered under only two circumstances: (1) a victim of sexual harassment files a formal written complaint with the recipient's EEO Officer, or an official "with authority to institute corrective measures;" or (2) the recipient "has actual knowledge of reports by multiple complainants of conduct by the same respondent that could constitute sexual harassment." Under the second circumstance, the EEO Officer is authorized to invoke the grievance process if a complaint has not been filed.

These grievance process triggers are infused with the deficiencies discussed above related to the narrow actual knowledge requirement, the heightened definition of sexual harassment, and the uncertain identity of the official with corrective measure authority. Taken as a whole, we can expect that under this approach, significant

---

[1] The Proposed rules define "supportive measures" as "non-disciplinary, non-punitive individualized services offered as appropriate, . . . without . . . charge, to the complainant or the respondent." Supportive measures the proposed rules would require complainants and respondents to have equal access to may include "counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures." 83 Fed. Reg. 61470.

EXHIBIT 16



**ELOY ORTIZ OAKLEY**
Chancellor
Executive Office

instances of sexual misconduct that adversely affect campus life will be unreported and uninvestigated.

**34 CFR §§ 106.44, 106.45(b)(3)(vii) – The grievance process unduly expensive and will chill reporting of sexual harassment.**

The proposed rules establish a grievance process that will be unduly expensive, and more importantly will have a chilling effect on the reporting of sexual harassment.

The proposed rules require that once a complaint gives the recipient actual knowledge of sexual harassment, the grievance process must be followed, through a gauntlet of due process protections for the respondent, to a full adjudication.  There may be circumstances where an "off-ramp" would be appropriate.  It is not clear that the proposed rules provide one.

<u>Live hearing and cross-examination</u>

The proposed rules require that at least ten days before the hearing, the parties must exchange their evidence.  Then the recipient must provide a live hearing with cross-examination of witnesses.  A decision maker may not consider the testimony of a party or witness who refuses to be cross-examined.

The proposed rules establish a special process for cross-examination.  First, the cross-examination must be conducted by an advisor who is "aligned" with the person on whose behalf the cross-examination is being conducted.  Second, the cross-examination of the complainant and the respondent are to be in separate rooms while allowing the other party to view the cross-examination through an audio-video linkage.  The cross-examination process will lead to unfair proceedings, chill reporting of sexual harassment, and is unwarranted according to the department's own rationale for the proposed rules.

The cross-examination requirement is not compatible with the stated purpose of the proposed rules, which are tailored in many ways to address the potential liability of <u>recipients</u>.  Relying on *Cannon v. Univ. of Chicago*, 414 U.S. 677, 704 (1979), the department explains that Title IX is "designed primarily to prevent recipients of federal financial assistance from using the funds in a discriminatory manner."  83 Fed. Reg. 61466.  This approach underlies many provisions including the "actual knowledge" requirement, and the limited definition of "sexual harassment."  The cross-examination

EXHIBIT 16



**ELOY ORTIZ OAKLEY**
Chancellor
Executive Office

requirement, however, abandons this rationale.  The confrontation inherent in cross-examination is designed to protect parties facing liability—it will not reliably serve the interests of a recipient in avoiding discrimination.  A better approach for scrutinizing the parties' testimony, and one more in line with the department's stated concern for protecting against discrimination by recipients, would be to have an objective, trauma-informed decision-maker conduct any needed questioning.

Under this proposed rule, complainants will be required to submit to a trial in order to advance their right to a safe educational environment.  While there may be rare instances where this level of process is necessary to separate fact from fiction, it should not be required in every case.  This approach tips the balance too far in the direction of intimidating complainants, and will decrease the reporting of sexual misconduct.

<u>Advisors</u>

The proposed rules also require recipients to provide either party an advisor if the party does not have an advisor.  This rule is problematic for at least two reasons.

First, it is not clear what level of training an advisor is expected to have.  Under the proposed rules, the advisor role may be filled by an attorney retained by the complainant or the respondent.  In many cases one party will be able to afford to retain a skilled attorney to conduct the cross-examination, while the other will need to rely upon a less well-trained advisor provided by the recipient.  This disparity belies the department's stated objective of ensuring an equitable process.

In addition, the dual advisor requirement presents a significant financial and logistical burden for California community colleges that will likely not have sufficient, trained staff available to fulfill this obligation and so will be required to contract the service at significant expense.  Requiring community colleges to hire advisors, in addition to a separate coordinator, investigator, and decision-maker, will create a financial burden that is unsustainable in our system.

<u>Cross-examination technology</u>

The proposed rules require that recipients provide separate rooms with technology to enable parties to simultaneously see and hear answers and questions.  This rule would create an undue financial burden for our colleges due to the lack of space and facilities

EXHIBIT 16



California
Community
Colleges

**ELOY ORTIZ OAKLEY**
Chancellor
Executive Office

to comply with this requirement.  Further, purchasing the technology to enable cross-examination in different rooms would represent another unnecessary expense.

**34 CFR § 106.44(a) and (b)(4) – The jurisdictional limitation will have adverse consequences within the United States**

California Community Colleges offer programs abroad in Europe, Asia, and other countries through California Colleges for International Education, a consortium of California community colleges.  (See ccieworld.org/index.html, last visited Jan. 18, 2019.)  However, the proposed rules do not require recipients to respond when they have actual knowledge of sexual harassment allegations that arise outside the United States—regardless of the nexus those allegations have to recipient educational programs.  Setting aside why the department would decline to exercise jurisdiction in this way, this rule will also have domestic consequences.  Upon returning, victims may encounter perpetrators on campus, and be denied even supportive measures.  A complaint could be dismissed merely because of where the sexual harassment occurred, and the student would have no remedy.

This rule is inadequately protective of students studying abroad.

**34 CFR § 106.44(e)(5) – The requirement of a signed complaint is an unnecessarily bureaucratic obstacle.**

The proposed rules impose strict requirements on the content of sexual harassment complaints that are unnecessary, unduly burdensome, and will chill the reporting of claims.  All formal complaints must be signed and filed with the Title IX Coordinator.  The signature requirement is anachronistic and unnecessary in the age of email.

In addition, the complaint must enumerate every allegation, and may not rely upon other documents like a police report or a previous verbal report.  This requirement is incompatible with the California community colleges long-held view that sexual harassment victims need not file multiple reports of the same incident to trigger the procedures required by federal and state law.  One incident report, whether with law enforcement or a responsible party on campus, will provide sufficient notice to all concerned parties.

The final rule should eliminate these unnecessarily bureaucratic requirements.

EXHIBIT 16



**ELOY ORTIZ OAKLEY**
Chancellor
Executive Office

**34 CFR § 106.45(b)(1)(iii) – The dual-investigator requirement is expensive an unnecessary.**

The department claims that the proposed rules will decrease costs for recipients across the country.  While it may be true that overall costs of compliance will decline due to the chilling effect the regulations will have on reporting incidents, it is clear that the costs of individual sexual harassment cases will significantly increase, without any expectation of improved results.  This approach to cost containment strikes the wrong balance of public interests.

The proposed rules would eliminate the single-investigator model, creating financial and logistical concerns, especially for colleges in rural areas where the availability of expertise is limited.  The proposed rules would require community colleges to hire and train a Title IX Coordinator, two investigators, a "decision-maker," and advisors for both parties when they are unable to afford one.  (34 CFR § 106.45(b)(3)(vii).)  Recipients will need to be prepared to deploy five separate people to address every sexual harassment complaint.   Community colleges often have individuals serving multiple functions in a Title IX matter due to their staffing constraints and limited resources.

The proposed rules should be amended to eliminate the need for f multiple investigators, and the requirement to provide support persons for respondents.  These changes would ease the financial burden of compliance.

**34 CFR § 106.45(b)(4)(i) – The "clear and convincing evidence" standard is inappropriate.**

This proposed rules appear to allow colleges to apply either the "preponderance of the evidence" standard that applies in most civil litigation, or the significantly higher "clear and convincing evidence" standard that typically applies in cases challenging administrative decisions, when determining whether a sexual harassment complaint is substantiated.

The effect of the "clear and convincing" evidence standard, particularly in combination with the other obstacles these proposed rules present to complainants, will be to impose a substantial additional burden on sex harassment victims, likely discouraging all but the most determined victims from proceeding with meritorious complaints.  The department's approach should be much more protective of students and campus safety.

9

EXHIBIT 16



**ELOY ORTIZ OAKLEY**
Chancellor
Executive Office

**34 CFR § 106.45(b)(5) – The appeals provisions are unequitable.**

The proposed rules give colleges the discretion to allow both parties to appeal a determination following completion of the hearing process.  However, the proposed rules prohibit complainants from appealing the adequacy of the sanction or discipline imposed (or not imposed) upon the respondent.  No conditions are imposed upon a respondent's appeal.  This approach is not equitable, and undermines the purposes of Title IX, which was intended to restore victims' ability to enjoy and access educational benefits or activities, free from sex discrimination or harassment.  However, if a respondent's discipline does not fully restore a complainant's access to education, the complainant should be able to appeal.

Thank you for the opportunity to submit comments on the NPRM.

Eloy Ortiz Oakley
Chancellor of the California Community Colleges

EXHIBIT 16

# EXHIBIT 17



**Berkeley Unified School District**

January 24, 2019

Submitted via U.S. Mail and www.regulations.com

Brittany Bull c/o Secretary Betsy DeVos          Kenneth Marcus
U.S. Department of Education                      U.S. Department of Education
400 Maryland Avenue, SW, 6E310                    400 Maryland Avenue, SW
Washington, DC 20202                             Washington, DC 20202

Re: Docket No. ED-2018-OCR-0064, RIN 1870-AA14, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

Dear Ms. Bull, Assistant Secretary Marcus and Secretary DeVos,

The U.S. Department of Education (DOE)'s proposed changes to Title IX policy will significantly affect how schools, including K-12 public schools, handle cases of discrimination based on sex, including sexual harassment and sexual violence.

The Berkeley Unified School District (BUSD) is deeply committed to preventing and addressing sex-based discrimination, including all forms of sexual misconduct. We are an urban school district comprised of approximately 10,000 students with great diversity in terms of race, religion, ethnicity, and socio-economic status. No matter what the outcome of this rulemaking process, we will continue to emphasize best practices and ensure that our policies and resolution processes are open, equitable, and protect the rights of all involved parties.

Partly in response to effective advocacy on the part of our students, BUSD has made a concerted effort in the past few years both to prevent sexual harassment and to respond to it appropriately when it occurs. We have hired a Title IX Coordinator, revamped our District complaint processes, implemented professional development for our employees, and invested in preventive training programs for staff and students. We have also invested in restorative justice staff and programming in our secondary schools, in an effort to focus on redressing the harms caused by, among other things, unwelcome sexual conduct. We have long rejected the notion that respect for victims of sexual misconduct is inconsistent with a commitment to providing due process for students accused of doing harm, and we are proud of our efforts to uphold both values in our policies and practices. Despite the advances we have made in these areas, BUSD is aware that we have more work to do to ensure that all students feel safe and supported in our schools.

In light of our commitment to addressing this issue, and our community's deep involvement in it, we object to the time frame under which comments on this process are to be

EXHIBIT 17



**Berkeley Unified School District**

accepted by the DOE. The majority of the public comment period coincides with a time when students, families and educators are preoccupied with winter break and final exams. In December, our Superintendent wrote to Secretary DeVos, urging her to extend the timeline for public comment. To date, the deadline has not been extended.

BUSD is nevertheless submitting the following comments on the proposed rules. Our comments below are directed at the aspects of the proposed rules that most directly affect K-12 school districts.

We wish to emphasize that, while the proposed changes have received more attention in the higher education context, they will apply with equal effect in K-12 districts. The children we serve are different in many ways from the college students who will be affected by these revisions. The vast majority of our students have not reached the age of majority, and we now know that their brains are still developing in significant ways. College students - young adults but adults nonetheless - may be able to navigate bureaucratic systems, but many children cannot. We urge the DOE to keep that distinction in mind as you consider our comments. Our overriding priority is to **keep students** safe and in school, where they can learn and thrive. We fear that some of the proposed revisions will frustrate that mission, because they may make it more difficult for K-12 districts to foster safe and supportive learning environments.

The comments below do not necessarily comprise the entirety of the comments or concerns that members of our Board of Education or District staff have regarding the proposed rules. We expect that individual members of our community will also submit comments on the proposed rules.

These comments were adopted and approved by the Berkeley Unified School District Board of Education unanimously on January 23, 2019.

1. Addressing Harassment That Occurs Off-Campus or Online

*Rule summary (§§ 106.30, 106.45(b)(3)):* Schools "must dismiss" a formal complaint if the alleged conduct "did not occur within the [school's] program or activity."

Currently, Title IX requires schools to provide student survivors reasonable accommodations needed to stay in school and have equal access to educational opportunities, regardless of their decision to undergo a school investigation or the status of that investigation. This is true regardless of whether the incident occurred on-campus or during a school-related activity. Accommodations can include medical services, counseling, safety plans, and/or academic support services, such as tutoring.

The proposed rules would only require that schools be held responsible for investigating incidents reported to have taken place "within its education program or activity," which may

EXHIBIT 17



**Berkeley Unified School District**

restrict a response to complaints of off-campus incidents, such as those that occur at off-campus student parties. It may also create confusion about whether schools are required to respond to social media/online harassment, such as the sharing of explicit photos or demeaning or racist messages. For example, if a middle school student is being sexually harassed by her classmates on Instagram or Snapchat, this could limit the school's obligation to investigate the complaint.

Under California Education Code, school districts are limited in their ability to discipline students for conduct that occurs off-campus and is unconnected to a school activity. Ca. Ed Code. section 48900(s). But we believe that it is critical that school districts maintain the tools to address all instances of harassment that affect students in school, even if the district's disciplinary options are limited by other laws.

Sexual harassment that happens off campus and outside of school activity is no less traumatic than similar harassment that happens on campus. The impact on the student's education can be the same or worse, especially if the student survivor is forced to see their harasser regularly at school.

The proposed regulations should continue to recognize that, even if not all disciplinary options are available, schools are responsible for addressing sexual harassment that occurs outside of a school program or activity, to avoid additional incidents, acts of retaliation, and to maintain safe and equitable learning environments.

2.      Definition of Harassment

*Rule summary (§§ 106.30, 106.45(b)(3)):* Schools "must dismiss" a formal complaint if it alleges conduct that is not (i) an employee requesting sexual favors in return for good grades or other educational benefits; (ii) "unwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the [school's] education program or activity"; or (iii) "sexual assault."

The Supreme Court and current Title IX guidance define "sexual harassment" as "unwelcome conduct of a sexual nature," requiring a response by the school before it effectively forces a student out of class or school. Narrowing the definition may require that schools only respond to repeated conduct, or a well-established pattern of conduct. This definition fails to take into account the age and developmental level and capacities of K-12 students, who are unlikely to report a second instance of sexual harassment, particularly if their first report was ignored because the reported behavior had not yet risen to the "severe and pervasive" standard.

The proposed regulation should maintain the current definition of "sexual harassment" to prevent the dismissal of students' traumatic experiences and to ensure that it does not make it harder for reporting parties to prove their victimization.

EXHIBIT 17



**Berkeley Unified School District**

3.     Notice

_____*Rule summary (§§ 106.44(a), 106.30)*: Schools would not be required to address sexual harassment unless there was "actual knowledge" of the harassment by (i) a Title IX coordinator; (ii) a K-12 teacher (but only for student-on-student harassment, not employee-on-student harassment); or (iii) an official who has "the authority to institute corrective measures."

It is already the case that many sexual harassment and sexual assault victims do not report because they do not know how or to whom to report. The proposed rule sets a higher bar than under the existing rules, under which a District is required to intervene if they "reasonably" should have known about a violation. Under the proposed rule, schools will be faulted only if they are "deliberately indifferent" to known sexual harassment.

With the proposed changes, districts would also be given authority to be turn away from incidents that are reported to responsible adults working with youth. This is because the proposed rules also change who a student can report their sexual assault to, and what that person's ability to pursue action would look like. A survivor will likely talk to someone they trust and believe will support them.

Right now, if a student goes to their playground supervisor or coach, that employee is responsible for reporting it to the school and/or Title IX Coordinator. The proposed rules, however, require that allegations are reported only to officials who have the authority to take "corrective action," such as the school's or district's Title IX Coordinator, or for students in grades K-12, to a teacher. Requiring students to speak to someone they may not have met or feel comfortable with means that many cases will likely go unreported.

The proposed regulations should adopt the same "responsible adult" standard for responsibility of any K-12 district employee to relay a report in cases of disclosed or observed sexual harassment of a student to a designated authority, consistent with their obligation to report disclosed or observed abuse or neglect of a student to the local child protective services agency.

Thank you for the opportunity to submit comments on the NPRM.

Sincerely,

Donald Evans, Ed. D, Superintendent
On behalf of the Berkeley Unified School District Board of Education

EXHIBIT 17

# EXHIBIT 18



# *San Francisco Unified School District*

555 Franklin Street, 3rd Floor, San Francisco, CA 94102
Telephone (415) 241-6054 Fax (415) 241-6371

**Dr. Vincent Matthews**
*Superintendent of Schools*

**Danielle M. Houck**
*General Counsel*
daniellehouck@sfusd.edu

**Keasara Williams**
Director of Equity and
Title IX Coordinator
williamsk3@sfusd.edu

January 30, 2019

Brittnay Ball
U.S. Department of Education
400 Maryland Avenue SW, Room 6E310
Washington, DR 2020

   RE: Docket No. ED-2018-OCR-0064, Comments in Response to Proposed Rulemaking:
   Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
   Federal Financial Assistance.

Dear Ms. Ball,

As the Superintendent of San Francisco Unified School District, as well as the designees
responsible for ensuring compliance with Title IX of the Education Amendments of 1972 (Title
IX), on behalf of the students we serve, we strongly oppose the Department of Education's
Proposed Rulemaking to amend the current Title IX regulations. If the Department of Education
adopts the proposed rule, it will be harmful to all of our students, which will in turn have a major
impact on the overall school climate and potential safety of our students.

SFUSD serves more than 60,000 students and is the sixth largest school District in California.
We have over 130 school sites and employ approximately 10,000 employees. While the
Department of Education oversees the K-12 setting, its proposed amended regulations do not
appear to take into account the unique challenges and specifics of the K-12 schools, as the
amendments seem tailored to higher education. The proposed regulations only point out these
differences in a few occasions and, as proposed, are not feasible for K-12 schools. By not
distinguishing between K-12 and higher education throughout many of the proposed regulations,
the regulations are open for interpretation by schools, as well as students and families.

As set forth below, SFUSD opposes the Department of Education's proposed regulation. We
focused our public comments on the areas we see as most problematic for our students.

1

EXHIBIT 18

Ms. Brittnay Ball
Re: Proposed Title IX Regulations
January 30, 2019

## Proposed Regulation 106.44(A): Definition of Sexual Harassment

Sexual harassment is currently defined as "unwanted" or "unwelcome" conduct "of a sexual nature." The Department of Education's decision to narrow the definition of sexual harassment to "severe, pervasive, and objectively offensive," will create additional harm and potential long term impact for students in the K-12 setting. When incidents happen at the K-12 setting, they are always alarming due to the age of the students involved. Parents expect that regardless of how "severe" a situation is, their child has experienced some distress, trauma, or impact, and that the school will address it. In addition, if less severe incidents are not addressed because they do not rise to the level "severe" as defined by the proposed, it is SFUSD's experience that the situation will increase in severity and the conduct will also likely be repeated and become "pervasive."

In addition, allowing principals and teachers to decide what they think is "objectively offensive" is problematic. School site staff are unlikely to understand this legal term and many therefore fail to investigate reports.

Further, school sites are responsible for teaching and educating students about healthy relationships and appropriate boundaries/behaviors. Requiring the staff to wait until an incident becomes "severe" and "pervasive" interferes with our obligation to proactively educate students. This impact will also undoubtedly lead to students feeling unsafe because the school is unable to act. In the same regard, the students who are engaging in the inappropriate conduct will not understand the severity or the impact of their actions if the school is unable to respond due to these limiting definitions. The proposed regulations arguably requires us to wait to address the misconduct until after students have been effectively denied equal access. For minor students this will lead to a potentially permanent impact on their educational experience, which could include students missing class to avoid the accused student or cutting (overall declining attendance), self-harm, or further assault and/or retaliation.

As educators, it is the school's duty to keep students safe from harassment that occurs on campus. SFUSD currently must take affirmative steps to stop the harassment and make sure students feel safe and supported at school, regardless of the severity, as soon as schools learn of the conduct.

Under the proposed definition, the student who has been the target of discrimination or harassment would potentially have withdrawn from school and their ability to access their education would have already been jeopardized. Because SFUSD provides compulsory education to students, it must take steps to stop the harassment, as required by California state law. It should also be noted that the proposed definitions within the regulations make the definition of "sexual harassment" more narrow than California Law (in addition to other analogous Federal nondiscrimination laws (ie, Title VI, ADA, 504).

EXHIBIT 18

Ms. Brittnay Ball
Re: Proposed Title IX Regulations
January 30, 2019

## Proposed Regulation 106.44(A): Off Campus Conduct "Within Its Education Program or Activity"

The regulation also states that Title IX will only apply to off campus conduct "within its educational program or activity." First, this is contrary to California Law. California Education Code extends District to incidents that occur "while going to or coming from school." (California Education Code Section 48900(s)(2)). Second, anyone who works in the K-12 setting knows that what happens outside of school does not stay outside of school. Specifically, the use of social media and other electronic apps have made it very hard for schools to keep "off campus conduct" from affecting students' learning environment at schools. When off-campus conduct spills into our K-12 schools, we must take steps to address it. This is also required by California Law.

As such, the proposed regulations should reflect the reality that off-campus conduct will likely have a negative impact on the educational environment in most cases and SFUSD believes that the Department of Education should craft language that necessitates a response for those incidents as well. Specifically, by not addressing social media reports immediately, these incidents have the potential to become even more serious and have an even greater impact on the students.

Finally, this proposed regulation is inconsistent with California's mandatory reporting requirements with respect to reporting child abuse and notifying the authorities about child pornography. If a K-12 staff member knows that another student is cyber harassing someone and/or sharing naked pictures/videos of a minor student off or on campus, the staff member must report this to California's Child Protective Services and/or the local police as suspected child abuse. Under the proposed regulations, however, school site staff are placed in an untenable position of having knowledge of potential abuse but no jurisdiction or authority to address the harm.

## Proposed § 106.44(B): Title IX Coordinator's Role

The proposed regulations state that the Title IX Coordinator is "required to coordinate the effective implementation of supportive measures." The regulation also proposes the language that the "Title IX Coordinator must serve as the point of contact for the affected students to ensure that the supportive measures are effectively implemented." SFUSD agrees it is crucial for interventions and supports during and after each incident. However, at a District the size of SFUSD (and with even larger districts), site administrators are responsible for coordinating student interventions and supports with the appropriate staff members (including principals, deans, social workers, counselors, etc.).

While the SFUSD's District Title IX Coordinator provides advice and support when incidents are reported, the District Title IX Coordinator relies on designated people at each school site to help implement the recommended actions. With over 60,000 students and various complaints throughout the year, the District Title IX Coordinator cannot reasonably coordinate every situation requiring interventions or supports. In the K-12 setting, the proposed regulations should reference that the District Title IX Coordinator can designate that responsibility to appropriate trained school site staff who can carry out those supports.

EXHIBIT 18

Ms. Brittnay Ball
Re: Proposed Title IX Regulations
January 30, 2019

## Proposed Regulation 106.45: Designation of Three Roles

The proposed rules state that District's must designate three separate people for each of the following roles: 1) the Title IX Coordinator, 2) the investigator, and 3) the decision-maker. In the K-12 setting, it is possible that a school only has one administrator and/or one person who has been specifically trained as a Title IX specialist. Requiring schools to have a different investigator and decision maker, would require some schools to have someone not trained or familiar with Title IX investigations act as either the investigator or the decision maker.  This "investigator-only" is not feasible in the K-12 setting.

SFUSD spends considerable time training and working with administrators and other school site staff on how to identify harassment and, investigate and resolve Title IX Complaints. K12 administrators are also responsible for administering student disciple. Deferring one of those responsibilities to someone else who is not trained, and not experienced in either investigations or discipline, would lead to confusing and inequitable results.

Further, in most K12 Districts, it is impracticable to require the Title IX Coordinator to provide direct advice and counseling to every single school site when any and all cases are reported. As such, like most K-12 Districts, SFUSD has designated Title IX "Site Officers" who have been provided specialized training so they can more effectively respond. Site Officers are often the site administrators/principals. They have the knowledge to understand how to comply with Title IX, but are also tasked with investigating the site level cases. In most schools, in would be impossible to designate the three roles to three different people as required by the proposed regulation.

## Proposed Regulation 106.45(B)(1): Presumption of No-Wrongdoing

SFUSD is in full agreement that all parties to a Title IX Complaint, or in any other complaint and investigation, should be treated fairly. SFUSD disagrees with the proposed changes which will now include a "presumption that the respondent is not responsible for the alleged conduct." Title IX Investigators must remain objective and neutral in an investigation. In contrast, the proposed "presumption" of no-wrongdoing, essentially requires and investigator to begin the investigation by promising the reporting party is not truthful. While the proposed changes state that the "requirement is added to ensure impartiality by the recipient until a determination is made," it actually does the opposite.

Investigators should be completely impartial and should review all the facts as presented to them. Based on the evidence they should then make a determination. Requiring the instigator to presume the accused student is not responsible for the alleged conduct, confuses the burden of proof and invites investigators to use the impermeability high standard of "beyond a reasonable doubt." Title IX investigations in the K-12 setting are not criminal investigations. Investigators should not presume either party is more truthful than the other, but must instead approach investigation in a fair and impartial manner.

4

EXHIBIT 18

Ms. Brittnay Ball
Re: Proposed Title IX Regulations
January 30, 2019

## Proposed Regulation 106.45(B)(2): Notice of Allegations

The proposed regulations state that "recipient must provide written notice to the parties of the recipient's grievance procedures and of the allegations," including:

- "identities of the parties involved in the incident, if known;
- the specific section of the recipient's code of conduct allegedly violated;
- the conduct allegedly constituting sexual harassment under this part and under the recipient's code of conduct;
- and the date and location of the alleged incident, if known;
- provide sufficient time to prepare a response before any initial interview;
- include a statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process; and
- inform the parties that they may request to inspect and review evidence under § 106.45(b)(3)(viii)."

SFUSD agrees that the accused student must be afforded due process, including notice of the allegations and an opportunity to respond. However, is it neither necessary or reasonable for a K-12 school site administrator to send this level of detail in a written notice for all sexual harassment cases. Requirements to allow "parties" to "inspect and review evidence" and disclose the identity of all parties is also extremely worrisome and may well violate FERPA and other state privacy laws.

Finally, K-12 public institutions do not have "codes of conduct." Instead, they have policies approved by the Board of Education pursuant to California Education Code. This entire section, and the wording of these requirements, do not fit the K-12 setting and cannot be carried out by school site administrators when responding to sexual harassment complaints.

## Proposed Regulation 106.45(B)(3): Investigations of a Formal Complaint

The proposed changes state that "because most parties and many witnesses are minors in the elementary and secondary school context, sensitivities associated with age and developmental ability may outweigh the benefits of cross-examination at a live hearing." SFUSD strongly agrees with this statement. Cross-examination of a minor by an opposing party during a live hearing, or during a school site investigation, is extremely problematic and can cause serious trauma to the minor. If no hearing is held, the proposed guidance states that for elementary and secondary schools, the "decision-maker must afford each party the opportunity to submit written questions, provide each party with the answers, and allow for additional, limited follow-up questions from each party."

Both District Title IX Coordinator and Site Coordinators in SFUSD are trained on investigating sexual harassment claims, including weighing evidence and making determinations. At the school site level, investigations must move quickly due to the sensitive nature of the allegations

5

EXHIBIT 18

Ms. Brittnay Ball
Re: Proposed Title IX Regulations
January 30, 2019

and the age of the enrolled in K-12 schools. Often, the investigator is able to corroborate the allegations through written statements, video footage or other evidence. Requiring an administrator to allow for "each party the opportunity to submit written questions" in all cases is therefore unnecessary and will very likely cause unreasonable delay.

Finally, the proposed regulations are duplicative of state law in that the California Education Code sets fourth an extensive and detailed process for students.

## Conclusion

SFUSD is at the forefront of K-12 Title IX Compliance in California. We have been and remain committed to creating clear policies and procedures for all students so they are aware of the process and their rights. SFUSD has also worked very hard to create clear systems and guidance for our school site staff to ensure that schools are effectively responding to complaints in a manner that is focused on the students' needs and success. With the goal of keeping all students safe and creating an equitable educational environment for all students to thrive in the twenty-first century, SFUSD's Title IX policies and procedures have been strengthened and implemented consistent with the current regulations and previous Department of Education guidance. These proposed regulations will negatively impact SFUSD students and all K-12 students by directly limiting when and how schools handle sexual harassment complaints. This will have a lasting impact on students, including SFUSD's most vulnerable students, whom SFUSD fights so hard to protect.

Based on all of the reasons above, SFUSD strongly opposes the proposed regulations and request that they be withdrawn in their entirety.

Sincerely,

Dr. Vincent Matthews
Superintendent

Danielle Houck
Chief General Counsel

Keasara Williams
District Title IX Coordinator

EXHIBIT 18

# EXHIBIT 19

**MEMBERS OF THE BOARD**

**MÓNICA GARCÍA, PRESIDENT**
**KELLY GONEZ**
**DR. GEORGE J. MCKENNA III**
**NICK MELVOIN**
**SCOTT M. SCHMERELSON**
**DR. RICHARD A. VLADOVIC**



**LOS ANGELES UNIFIED SCHOOL DISTRICT**
**ADMINISTRATIVE OFFICES**
333 South Beaudry Avenue, 24th Floor
Los Angeles, California 90017
Telephone: (213) 241-7000 | Fax: (213) 241-8442

**AUSTIN BEUTNER**
Superintendent

January 8, 2019

Submitted via www.regulations.gov

Brittany Bull
U.S. Department of Education
400 Maryland Avenue SW, Room 6E310
Washington, DC 20202

Re: Docket No. ED-2018-OCR-0064, Comments in Response to Proposed Rulemaking: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

Dear Ms. Bull:

As the Superintendent of the Los Angeles Unified School District and on behalf of the students we serve, we strongly oppose the Department of Education's Notice of Proposed Rulemaking to amend regulations implementing Title IX of the Education Amendments of 1972 (Title IX). If finalized, the proposed rule will be detrimental to the wellbeing of our students, which in turn will have a major impact on school climate, student safety, achievement and learning.

L.A. Unified is the second largest school district in the nation, enrolling approximately 600,000 students in kindergarten through 12th grade at over 1,300 schools and centers, and authorizing 225 independent public charter schools. L.A. Unified has set the standard in the State and nationally for its proactive and comprehensive policies and procedures in place to protect students from sex discrimination and harassment under Title IX.

The Department of Education (DOE) is proposing to rewrite the federal Title IX guidance regarding the way K-12 schools handle allegations of sexual harassment and assault. For the reasons explained below, these proposed rules will result in fewer protections for victims, while also imposing a multitude of new policy and procedural burdens on schools. Below are our more specific public comments organized sequentially by proposed regulation.

## Proposed Regulation §106.3
### *Available Remedies*
Although this proposed regulation states that DOE will not assess damages against a recipient school district, the proposed narrowing of the definition of sexual harassment would limit valid complaints to those for which a court would find monetary damages against a school district. It is unclear why the liability standard for monetary damages is being proposed for the definition under regulations governing administrative complaint procedures when that remedy is expressly excluded from the same proposed regulations. If monetary damages are not a remedy under these regulations, setting the same standard seems inconsistent and is likely to lead to confusion in the administrative context.

EXHIBIT 19

### Proposed Regulation §106.6
#### *Effect of Other Requirements and Preservation of Rights*
Although this language appears to address constitutional issues with the proposed regulations, the proposed regulations themselves do not comport with the Equal Protection Clause with regard to nondiscrimination. In addition, since Title IX is not a criminal statute, it is unclear why the proposed regulations include a reference to the Fifth Amendment. The proposed regulation also mentions the Family Educational Rights and Privacy Act ("FERPA") but does not clarify what school districts are to do when there is a conflict between the proposed regulations and FERPA provisions. The proposed regulations should clearly state that FERPA, the more specific provision, controls where education record information is involved. Prior Title IX guidance fully addressed this issue; the proposed regulations exacerbate the potential conflicts. In addition, the reference to Title VII appears to be misplaced because those provisions for employees are covered in a separate body of law.

### Proposed Regulation §106.8
#### *Designation of Coordinator, Dissemination of Policy, and Adoption of Grievance Procedures*
The proposed regulation states each recipient must designate at least one employee as a Title IX coordinator. There is no further clarification in this part about how the Title IX coordinator must function under the grievance procedures with a separate investigator and decision maker (see below comments regarding the proposed grievance procedure for a fuller discussion of the incompatible roles and responsibilities). The proposed regulation states that the policy and grievance procedures only apply to discrimination "against a person in the United States," which is overly restrictive. The proposed regulations do not contemplate complaints involving students at a school-sponsored activity that occurs in another country.

### Proposed Regulation §106.12
#### *Private religious exemption*
The proposed regulation not only relaxes the requirements of a private religious organization to claim an exemption, it also allows for the exemption claim to occur after a complaint and investigation. The proposed regulation does not address how this after-the-fact exemption would comply with notice, investigation, and response requirements articulated in other proposed regulations. Additionally, the proposed regulations do not address what a private religious organization's obligations may be if a student of that organization engages in misconduct involving another student at a non-exempt organization (e.g., at a school dance). The proposed regulations fail to address whether the exempt organization would have an obligation to cooperate with an investigation conducted by the other school.

### Proposed Regulation §106.44
#### *Recipient's Response to Sexual Harassment*
By aligning the definition of sexual harassment with court decisions determining monetary damages, the proposed regulation narrows the definition of sexual harassment in the K-12 administrative context. It creates a higher bar in that misconduct of a sexual nature will only be considered "sexual harassment" if it rises to the above definition. Under the proposed regulations, the student who may be still engaged in some school activities despite being subjected to unwelcome conduct of a sexual nature would be ignored because that level of exposure to sexual misconduct is not "harassment" and does not obligate anyone to investigate and follow up. In K-12, it is too late to formally address misconduct after students have been effectively denied equal access (e.g., student is failing, late to or ditching classes, declining attendance, dropping out of school, hospitalized, suicidal, physically assaulted). K-12 education is compulsory and students have a fundamental right to an education, thus K-12 students do not have the choice to attend school or not despite the misconduct or climate issues, whether minor or severe. The onus should not be on a child target of misconduct to remove him/herself from his/her fundamental right to an education in order to be taken seriously. The new definition of sexual harassment suggests otherwise. K-12 educators must ensure student safety before students can be educated. Educators act in loco parentis and thus are

2

EXHIBIT 19

obligated to take more affirmative protective measures with children/students rather than waiting for a student to disengage from school. The goal of nondiscrimination laws should be to guard against the misconduct escalating to the point that a child's access to education is in jeopardy and thus, the proposed regulation should allow school districts to use this prerogative in proactively implementing grievance procedures, consistent with State law requirements.

In addition, the proposed regulation and definition includes more narrowly tailored language for harassment compared to analogous federal nondiscrimination laws (i.e., Title VI, ADA, 504). Therefore, this proposed regulation creates a standard where equal protection under the law is not equal depending on what protected category the misconduct is based on. No other protected characteristics in federal laws and regulations have this type of narrow definition. To ensure equal protection for all students, the definition of sexual harassment should remain the same as it has for decades, which is consistent with other federal nondiscrimination laws and regulations as well as State laws.

Sexual harassment as currently defined (unwelcome conduct of a sexual nature) is already historically underreported because survivors are often embarrassed, fear blame and are concerned about not being believed. In a report by the American Association of University Women (AAUW), it was shown that among students in grades 7-12 who were sexually harassed, only about 9 percent reported the incident to a teacher, guidance counselor, or other adult at school.[1] The proposed definition with the more narrowly tailored language expressly allows lesser offenses along the continuum to be disregarded, further compromising reporting efforts. The United States has not eradicated harassment of a sexual nature using the current definition, which begets the question why the definition is being narrowed in the K-12 setting where the safety and well-being of students are paramount.

Research has shown that lesser forms of misconduct left unchecked lead to escalation of the behavior and ultimately disengages and disempowers targets. In a study published by the Centers for Disease Control and Prevention, it was found that "bullying behavior and homophobic teasing, if not resolved or redirected, may escalate in nature. This escalation may increase the potential for sexually harassing behavior."[2] If the proposed regulations were final, K-12 educational settings would not be obligated to intervene at earlier stages of misconduct thus empowering the accused parties to engage in more egregious behavior leading to proven larger societal issues, such as physical abuse, drug abuse, and even criminal behavior. The proposed regulation should recognize that this behavior occurs along a continuum. In the K-12 educational setting, where social emotional learning is part of the development of a positive school climate, there should be more flexibility to resolve these issues locally at earlier stages to proactively ensure student and campus safety. That flexibility exists for school districts addressing any other nondiscrimination complaint under federal laws and regulations.

### Section 106.44e5
In addition to narrowing the definition of sexual harassment, the proposed regulation also narrows the definition of what constitutes a formal complaint to only those that are in writing, signed by the complainant, and that specifically request initiation of the recipient's grievance procedure. Additionally, the Title IX Coordinator must file a formal complaint if actual knowledge of multiple complaints of sexual harassment by the same respondent would constitute sexual harassment (using the proposed definition). In the K-12 context, students may not be equipped to file a formal complaint, which would lead to underreporting and potentially escalating misconduct prior to school officials having knowledge or

---

[1] Hill, C. & Kearl, H. (2013). *Crossing the Line: Sexual Harassment at School.* Retrieved from AAUW Website: https://www.aauw.org/files/2013/02/Crossing-the-Line-Sexual-Harassment-at-School.pdf

[2] Centers for Disease Control and Prevention, *The Bully-Sexual Violence Pathway in Early Adolescence,* Retrieved from CDC Website: https://www.cdc.gov/violenceprevention/pdf/asap_bullyingsv-a.pdf

EXHIBIT 19

addressing the issues. Further, it would not be appropriate to expect students of various ages and cognitive or developmental levels to be expected to file a formal complaint before the K-12 setting takes appropriate precautions or investigates. Therefore, the proposed regulation should allow for broader means of filing a formal complaint.

### Section 106.44e6

Pursuant to the proposed regulations, "actual knowledge" of a complaint is only present when the formal complaint as indicated above is brought/reported to the attention of the Title IX Coordinator, an official with authority to institute corrective measures, or a teacher in the K-12 context. This proposed definition would drastically limit who is expected to provide due diligence or who a student should come to when seeking support, again limiting the ability of complainants to complain unless it is the procedurally "right" way. In the K-12 context, there are other significant stakeholders (e.g., counselors, nurses, psychologists) who are actively engaged with supporting students who can and should follow up with the complaint. Thus, the proposed "actual knowledge" standard limits the ability for a formal complaint to be made or for an entity/recipient to be responsible for due diligence. Further, young children in particular can and should be able to report to any school-related adult to obtain support with a complaint which realistically will not be in writing or signed and will most likely not include specific language that they are invoking the grievance procedure. The DOE argues this rule provides clarity and a uniform standard; what is clear is that the proposed regulations would reduce the recipient's overall obligation to respond to sexual harassment leaving the responsibility with select individuals and the burden on the complainant to bring it to the "right" people. This does not take into account the ability of a K-12 student (in the majority of cases, a minor) to self-report. This also does not take into account the increased level of secondary students participating in dual enrollment programs in the college setting and implications for how to address sexual harassment complaints in that context. The proposed regulation should allow for broader means of filing a formal complaint, similar to what State laws already provide.

Further, the proposed regulation allows that a formal complaint investigation does not need to proceed if the alleged conduct does not rise to the level of the proposed narrower definition of sexual harassment. This is counter-intuitive. The proposed regulation is silent as to how schools can determine whether the student's educational access was denied without an investigation, in particular when the allegations are being asserted by a child or friend of a child. The proposed regulation should provide some parameters, aligned with Title IX and other federal nondiscrimination laws and regulations applicable in the K-12 setting, for addressing these matters that fall within the definition of sexual harassment not linked to litigation/monetary damages.

### Off Campus Misconduct with a Nexus to Campus Not Being Addressed

The proposed regulation states that unless behavior occurs on campus or in school-related activities, schools are not accountable. However, in the K-12 setting, social media posts off-campus and use of related "apps" can easily result in a disruption on a K-12 campus and thus be a necessary responsibility of the district to address (e.g., students sharing nude pictures taken of another student). California law recognizes this and allows for addressing some behavior that is off campus and cyber-related when there is a nexus to the school. The proposed regulation contradicts efforts under California law. Thus, the proposed regulation should consider implications of off-campus behavior to the campus, make allowances for that scenario, and defer to State law. As First Lady Melania Trump noted in a May 2018 Rose Garden speech as reported by NPR, "As we all know, social media can both positively and negatively affect our children, but too often it is used in negative ways." The Federal Commission on School Safety heard testimony supporting that "34 percent of high schoolers in America are cyberbullied, and 80 percent of students who are cyberbullied are also bullied at school" and that various detrimental impacts occur as a result.

By not addressing off-campus behavior with a nexus to on-campus behavior, this proposed regulation leaves less serious misconduct unaddressed or left to occur multiple times and/or become more severe,

4

EXHIBIT 19

especially if a higher evidentiary standard is also adopted. Overall, it impedes K-12 students' ability to obtain redress for misconduct that is not explicitly related to school activities. Children are not adults and should not be subjected to sexually-related misconduct without prevention and intervention when off-campus behavior then carries over to on-campus behavior.

### *Proposed Regulation Conflicts with Mandated Reporting Requirements*

The proposed regulation conflicts with K-12 employees' obligation to report suspected child abuse, which sexual misconduct can be an indication of, and does not align with K-12 employees' suspected child abuse mandated reporting responsibilities. For example, an employee could be obligated to report the behavior to child protective services as suspected child abuse and yet have no obligation to take further steps regarding the misconduct as a formal complaint for investigation administratively under this rule. The proposed regulation should take into account that State law may have different, more protective requirements that conflict with the proposed regulation.

### *Overly Prescribed and Duplicative Proposed Notification Requirements*

The proposed regulation allows school districts to take into account a complainant's wishes whether to formally investigate and still address restoration of their access to educational programs. The school district is then required to give written notice to the complainant of rights to pursue a complaint or to file one later should they desire. Under Title IX and California law, school districts are already required to notify parties of their rights annually, including procedures for filing complaints. This proposed rule is one of a series of new forms of notice and is an additional administrative and duplicative measure. Further, California law also provides additional Title IX related notice requirements. K-12 districts should not have to provide multiple notices regarding the same law; this is confusing and unnecessary.

### *Overly Prescriptive Application of Interim Measures*

The proposed regulation requires that when providing remedies and an accuser is seeking relief from contact with the alleged abuser, the relief cannot "burden" the accused. While due process is important, in the K-12 setting, there are times where the remedy cannot be of equal impact for both parties who are children. For example, site administrators by State law have discretion to move K-12 students in and out of classes and in some cases may absolutely have to move a student out of a class away from another student as an interim safety measure. One party will be "burdened" and the regulations suggest such a burden could be a violation of Title IX. This hampers a school administrator's ability to make an educated decision regarding a remedy based on their training and experience. K-12 settings should have more flexibility in separating students in compulsory education without invoking a violation.

### *Inconsistent and Overly Prescriptive Requirements Proposed for Title IX Coordinator*

Under the proposed regulation, the Title IX Coordinator is required to coordinate the effective implementation of supportive measures; in the K-12 context supportive measures can be provided and coordinated by a multitude of other designated staff (e.g., counselors, deans, assistant principals) and are needed to be in some cases. While it is important for the Title IX Coordinator to assist a school if not already acting as an administrator in the implementation of Title IX processes at a site, this assistance is not required and may conflict with job descriptions for the designated Title IX Coordinator at a K-12 site to also coordinate effective implementation of supportive measures. The Title IX Coordinators at a K-12 school site are not solely working in this capacity, but have other duties (e.g., teacher, assistant principal, counselor) with specific job descriptions. In some positions, it would be part of their job description to coordinate such services such as those of a counselor, while in others it would not such as those of a teacher who can also be designated by the site to be a Title IX Coordinator. Because of the size of a public school district (e.g., multiple sites with thousands of students, in addition to associated employees) it is not possible to have one individual act as Title IX Coordinator. School districts are not funded to have one individual solely responsible for this duty at each site, but instead necessitates that Title IX responsibilities be shared at every site/level of the K-12 institution. In addition, K-12 districts need more flexibility in

5

EXHIBIT 19

determining as to who carries out responsibilities, such as taking into account student choice and comfort level for check-ins and monitoring, than this proposed regulation allows.

### *Undermining Student Safety with Proposed Interim Measures Process*

Safety is paramount. Remedies that involve immediate safety regardless of findings should be implemented and should not be contingent upon a lengthy investigation or appeal processes similar to court proceedings. It is to the benefit of all the parties to minimize further recurrence of allegations or suggestions of allegations immediately. Educators are in the best position to determine student needs at the local level, which is echoed in the Federal Commission on School Safety's recent report. An external agency of non-educators should not dictate when is best to implement remedies. While Section 106.44e4 suggests remedies may be implemented immediately, the proposed regulations also seem to suggest certain remedies should not be decided upon until the investigation is completed and by a party not directly involved with the primary sources, and therefore less able to determine credibility and/or be familiar with the documentary evidence. As noted in the recently issued Federal Commission on School Safety Report (Dec. 2018, at p. 68), "We see victims of bullying and harassment tend to miss more days of school and are more likely to leave the district when the perpetrators are not removed from school."

### **Proposed Regulation §106.45**
### *Grievance Procedures for Formal Complaints of Sexual Harassment*

Investigations are often initiated by less specific allegations, therefore specific codes of conduct must be determined as the initial investigation progresses and cannot always be stated upfront with certainty. It is possible under this proposed regulation that an investigator could have to provide multiple written notices in addition to those outlined in other proposed regulations throughout each investigation based on this new requirement.

The proposed regulation requires further notice to parties of grievance procedures upon receipt of complaints. However, Title IX and State law already require annual proactive notice to parties of grievance procedures. It is counterintuitive to explain grievance procedures after a formal complaint requesting initiation of grievance procedures is received when the point of providing proactive notice is to ensure parties know their rights in advance. This change to the regulations is reactive instead of proactive requires additional administrative paperwork and is duplicative.

The proposed regulations add parties to the general Title IX notice, such as professional organizations, which do not have much bearing on K-12 institutions. Members of professional organizations with obligations under the proposed regulations will already receive their notice as an employee. The proposed regulations do not clarify how to select appropriate professional organizations, nor whether the organization has a right of action/standing that warrants the need to provide the organization with separate notice. The proposed regulations do not clarify whether general notice on the internet serves as notice to all members of the community, which would include interested organizations.

California law already prescribes uniform grievance procedures in the K-12 setting. The proposed regulations create an overly prescriptive grievance system in a one-size fits all manner that would create a dual system. In this way, the proposed regulations are inconsistent with all other federal nondiscrimination laws and regulations as well as existing State mandated grievance systems where Title IX is implicated. The proposed regulation should allow for the existing State grievance procedures for addressing discrimination and harassment to continue as the established grievance system in the K-12 setting.

Cross-examinations by representatives/attorneys of alleged assailants would unnecessarily delay the investigation and can be a never-ending series of responses and counter-responses. The proposed regulation allows the parties to dictate what follow-up questions should be asked of the parties in the

6

EXHIBIT 19

investigation, to submit those questions, and to expect responses in certain timelines. This is not developmentally appropriate in the K-12 setting when working with issues between children versus adults.

### *Concerns with Proposed Exchange of Information and Privacy/Confidentiality Violations*

The proposed regulation is inappropriate in the K-12 setting as investigative findings involve information and statements involving children at various developmental levels, due to age and disability. For example, the due process protections articulated in the proposed regulations could have five year olds (or their representatives/attorneys) facing off against other five year olds as to the veracity of the allegations and evidence with responses and counter-responses being exchanged. This is not necessary because: (1) it does not take into consideration best practices in interviewing and obtaining statements in a developmentally appropriate manner from children or students with disabilities who are the primary sources; (2) it creates an air of intimidation and potential further victimization/trauma for the complainant or reporter and for possible witnesses; (3) the proposed regulation allows confidential student information to be shared across countless numbers of individuals; (4) an appeal process can address concerns regarding the investigation without sharing FERPA protected information and overprescribing the investigation process; and, (5) formal discipline proceedings involving possible exclusion of a student as guided by State law in the K-12 setting already include significant due process for the accused. The proposed regulations appear to equate sexual harassment with formal discipline; this is not the case in the K-12 system, where state law may require interventions prior to exclusionary discipline, depending on severity.

The proposed regulation allows for the parties, in preparation for responding to the investigation, to discuss K-12 student information with others such as the name of the students involved and that they are alleging sexual misconduct. The trauma, increased risk of retaliation, and FERPA violations from these disclosures required by the proposed regulations are potentially exponential. The proposed regulation is unrealistic, unwieldy, and time consuming, as they expressly require a minimum of three individuals to coordinate efforts under the new grievance procedures as outlined below.

### *Increased Proposed Administrative Burden*

The proposed regulations are overly prescriptive, creating more administrative burdens on the investigative process without a clear rationale. As an example, as written the proposed regulations would require the following notifications:

> (1) Provide notice to all parties on the web, in handbooks, etc., including unions and professional organizations;
>
> (2) Provide another notice to all parties after a "formal complaint" is received;
>
> (3) Provide a notice of rights again if the parties agree to mediate;
>
> (4) Provide a separate form of notice if the parties agree to informal resolution;
>
> (5) Ensure sharing all evidence with specific student identifying information electronically in a manner that cannot be copied or downloaded by all parties, though parties are free to communicate to anyone in relation to the matter in order to corroborate or refute;
>
> (6) Ensure questions from all parties are submitted to all/relevant parties/representatives;
>
> (7) Obtain responses from all parties in 10 days and submit the responses to all parties/representatives;
>
> (8) Provide notice of findings to all parties simultaneously.

These prescribed steps create dichotomies in the role of the Title IX Coordinator versus investigator, versus decision-maker, and dictates that all evidence, whether relevant or not, must be shared with all parties before inception of the first interview and conclusion of the investigation. Additionally, there is a contradiction in that all evidence is to be frontloaded to the involved parties and yet interviews are part of the actual evidence gathering. If a complaint had all the evidence up front there would be no need for an investigation in the first place. This creates less flexibility and becomes more paper- and process-intensive in the K-12 setting, rather than considering safety and educational needs.

EXHIBIT 19

The role of the Title IX Coordinator is, at best, inconsistent in the proposed regulations. As written, the Title IX Coordinator receives a complaint or initiates a complaint if multiple incidents of harassment by same respondent are known—but does not investigate or make decisions. However, the Title IX Coordinator must coordinate effective implementation of supportive services in the interim that are equal in impact to all parties. The Title IX Coordinator does not decide on effective supportive measures until an investigation is concluded—another decision-maker does this.

### *Unworkable Proposed Requirement for Information Sharing in an Electronic Format*
The proposed regulation dictates that evidence be shared in an electronic format that cannot be duplicated or shared, which means locating and purchasing such forms of technology regardless of what current systems institutions are already using, which creates an unfunded and likely unachievable administrative mandate. The proposed regulation, as drafted, does not address the fact that electronic forms of communication can easily be captured by taking screenshots using another electronic device such as the ubiquitous cell phone. It also does not account for the fact that a high poverty district cannot assume that its K-12 students and families have sufficient technological means to receive information electronically with sufficient internet access nor would it be developmentally appropriate to conduct such activities with a child. In the case of children, there is the potential for multiple caregivers per child to be involved with their respective children, exponentially multiplying the potential unauthorized redisclosures.

States and school districts already have investigation procedures in place and thus, the proposed regulations create a system that is overly prescriptive and creates a dual system. There is no need to align administrative enforcement in the K-12 setting with civil litigation and court proceedings as they have different purposes and outcomes. When school districts are regularly attempting to reduce the impact of investigations and disciplinary procedures that create a school to prison pipeline, the proposed regulations take an administrative investigation and exacerbate this effort by equating it to legal proceedings with no rationale to support such a drastic change.

### *Contradictory Proposed Standards of Proof*
There are contradictory references to standards of proof, asserting the recipient has flexibility in choosing the standard between preponderance of the evidence (current standard) and clear and convincing evidence (not a standard used by all States in student discipline). However, in addition to offering school districts the above choice, the proposed regulations also incompatibly require the standards of proof for an administrative complaint regarding sex discrimination to align with (1) student disciplinary procedures involving conduct that could result in similar discipline and (2) grievance procedures involving employees (who have union contracts in addition to institutional grievance procedures and statutory rights for which the standard of proof differs from students). The standards are different in the contexts indicated above and make no sense in K-12 institutions nor should they be collapsed as though they are one and as though they have the same implications. In K-12 education, the first responsibility is to teach appropriate behavior. Administrative investigations allow for that outcome. Any exclusion of a student from compulsory K-12 education already involves significant due process under State laws, which is not accounted for or acknowledged in the proposed regulations. The proposed regulations provide no flexibility or deference for existing grievance procedures; they are overly directive and a landmine for compliance violations.

Administrative investigations in the K-12 setting are intended to be pre-litigation measures to resolve matters at more local levels for safe, expeditious and less costly resolution. It is not intended to replicate processes involved in litigation such as discovery and cross-examination whether a hearing is conducted or not.

### *Inconsistent Proposed Recordkeeping Requirement*
The proposed regulation would require records be maintained for three years, yet the timeline for filing discrimination complaints with the DOE Office for Civil Rights is six months from when the violation

8

EXHIBIT 19

occurred or the complaining party knew of the violation. Further, State laws have prescribed retention of records timelines that differ. The proposed regulations offer no rationale for establishing this timeframe.

### *Overly Prescriptive Designation of Three Roles*

The proposed regulation requires a separate Title IX Coordinator, investigator and decision-maker. In K-12 setting, it is possible that a school only has one administrator. Having an investigator-only model, does not take into consideration that the school administrator may be the Title IX designee at the site, be the investigator, be the point person that also has to refer (in some cases by State law) students for particular forms of discipline. In a large institution, a separate Title IX Coordinator cannot physically provide direct services to every site. Further, if an accused is an employee, the site administrator with line authority is in the best position to investigate due to confidentiality with personnel issues and may also be the decision-maker. Ultimately, the site administrator has final responsibility for compliance at a site in the K-12 setting. The site administrator should not be precluded from being the Title IX Coordinator for that site, a knowledgeable investigator familiar with school district policy and the school community, and a decision-maker, which are all typical functions described in a site administrator's job description. Under the proposed regulations, a separate decision-maker that is not involved in any of the underlying primary investigation makes decisions about how to proceed with the investigative findings. Under State laws, site administrators are obligated to address, investigate and intervene regarding complaints of discrimination, including following established disciplinary procedures, if applicable. Discipline that involves exclusion (such as expulsion) already has specific requirements for standards of evidence and due process under State law. This would create a conflicting process that would not be the same as that for other disciplinary proceedings, further exacerbating unequal treatment.

### Conclusion

The proposed regulations establish quasi-litigation processes at odds with administrative complaint procedures in all other nondiscrimination contexts for K-12 students. The overly prescriptive designations and procedures will lead to school officials focusing on "avoiding legal jeopardy rather than achieving school safety," to quote the recent Final Report of the Federal Commission on School Safety (Dec. 2018, at 69). The same report noted, that overly prescriptive federal guidance can "undercut the ability of local officials to address the impact of disciplinary matters on school safety." Therefore, we respectfully request that local solutions and existing state procedures remain in place.

L.A. Unified's mission is to ensure academic achievement so that each and every student graduates college and career ready. However, in order for students to thrive and ultimately graduate, they must feel safe, cared for, connected and respected. The proposed rule will impair L.A. Unified's goal by not only impacting how sexual harassment complaints are handled, but it will also have far-reaching consequences on student safety, school climate, and achievement. If the proposed regulations are adopted, K-12 schools will likely see a reduction in the reporting of sexual harassment, unwieldy compliance obligations for multiple student misconduct issues, and ultimately a climate which would allow lesser level misconduct of this nature to fester unchecked. Because of these reasons, we strongly oppose the proposed regulations and request that they be withdrawn in its entirety.

Sincerely,

Austin Beutner
Superintendent

EXHIBIT 19

# EXHIBIT 20

January 28, 2019



The Honorable Betsy DeVos
Secretary

Kenneth Marcus
Assistant Secretary for Civil Rights

U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202

Dear Secretary DeVos and Assistant Secretary Marcus,

As Superintendent of Seattle Public Schools (SPS), I am writing to you on behalf of the members
of our community to detail concerns that have been raised within SPS regarding the U.S.
Department of Education's (Department) proposed changes to 34 C.F.R. Part 106, the regulation
implementing Title IX of the Education Amendments of 1972 (Title IX). SPS is the largest
school district in Washington state, currently serving over 52,000 public school students at 103
schools. SPS has a deep commitment to every student's journey – to ensure that each student will
graduate ready for college, career, and life.

Although the proposed changes purport to "provide appropriate standards for how recipients
must respond to incidents of sexual harassment," the majority of changes were not written with a
clear understanding of their application in a Pre-Kindergarten to 12th grade (PreK -12) public
school environment such as SPS. Among other things, the proposed changes do not appear to be
trauma-informed, do not take into consideration developmental norms or markers thereby not
being age-appropriate, and do not consider the obligations that arise in a PreK-12 setting based
on other federal regulations (i.e. Section 504 of the Rehabilitation Act of 1983; the Individuals
with Disabilities Education Act) when addressing incidents impacting students with disabilities.

It is apparent that the proposed changes were written with an emphasis on detailing a formal
adjudicative process to determine accountability and responsibility for behavior in a college or
university setting. In that regard, since Title IX also applies in a PreK-12 educational context, the
proposed regulations need to recognize that our core work as educators in this setting is to
support students and student learning. To that end, we fully embrace our responsibility to provide
safe and civil school environments free from discrimination, including discrimination on the
basis of sex.

However, our objective when addressing alleged student misconduct likely has significant
differences than post-secondary settings. We focus our efforts to find educationally and
behaviorally sound methods and interventions to appropriately modify student behavior, not to
develop and enforce quasi-judicial processes. As a result, any proposed revision to the Title IX
regulation that seeks to provide appropriate standards on how to respond to incidents and formal
complaints of sexual harassment must reflect educationally-based responses to these types of

reports in a PreK-12 setting, even including those instances when an individual files a formal complaint.

While more specific detail is provided in the attached document regarding potential impact of the proposed changes within a PreK-12 setting, some clear examples that the proposed changes clearly failed to consider a PreK-12 educational setting are as follows:

- According to the proposed regulations, a parent/guardian has no standing to submit a complaint on behalf their aggrieved child. See proposed section 106.44(e)(2). Specifically, the proposed regulation defines a complainant only as an individual who is the victim of conduct that could constitute sexual harassment or the recipient's Title IX Coordinator.

- Proposed section 106.45(b)(3)(viii), which requires the organization provide both parties equal opportunity to inspect and review any evidence obtained as a part of the investigation, does not consider the potential FERPA violations inherent in school district staff disclosing the educational records, such as disciplinary records, Section 504 Plans, or Individualized Education Plans, of one party to the other party. I confirmed with our district staff who conduct these types of investigations that a student's educational record does constitute evidentiary material relevant to an investigation.

- While the proposed section 106.45(b)(v) does not require a live hearing in a PreK-12 setting, the requirement in 106.45(b)(vi) that the decision-maker, who must be different from the Title IX Coordinator, ask each party and any witnesses any relevant questions and follow-up questions – and this action occurs subsequent to allowing the parties to provide responses to the investigative report – does not consider the amount of time this process takes. This is more reflective of an adversarial adjudicative process. Our school district places an emphasis on restorative practices that are shown to be both more effective at addressing student misconduct in the PreK-12 educational setting; and, most importantly, restorative practices are less likely to involve implicit biases in their implementation.

Consequently, on behalf of Seattle Public Schools, I request that the Department carefully consider input from public school districts and revisit its proposed changes to the Title IX regulation for the reasons stated above and in the attached document. Any changes to the Title IX regulation must fully consider its application to a PreK-12 public school environment, not just to the post-secondary educational context. The Department's failure to fully consider the impact to school districts like ours across the country lends itself to more confusion, not less.

Sincerely,

Denise Juneau
Superintendent
Seattle Public Schools

EXHIBIT 20

In the enclosed document, Seattle Public Schools has highlighted in yellow the specific provisions in the proposed regulation where we have comments or questions. Our comment or question is then written below the yellow highlighted portion and is highlighted in blue.

~ Superintendent Denise Juneau

Seattle Public Schools

_____

1

EXHIBIT 20

For the reasons discussed in the preamble, the Secretary proposes to amend part 106 of title 34 of the Code of Federal Regulations as follows:

PART 106—NONDISCRIMINATION ON THE BASIS OF SEX IN EDUCATION PROGRAMS OR ACTIVITIES RECEIVING FEDERAL FINANCIAL ASSISTANCE

1.  The authority citation for part 106 continues to read as follows:

Authority:  20 U.S.C. 1681 *et seq.*, unless otherwise noted.

2.  Section 106.3 is amended by revising the title and paragraph (a) to read as follows:

**§ 106.3 Available remedies**

(a) Remedial action. If the Assistant Secretary finds that a recipient has violated this part, such recipient shall take such remedial action as the Assistant Secretary deems necessary to remedy the violation, which shall not include assessment of damages against the recipient. Nothing herein prohibits the Assistant Secretary from deeming necessary equitable relief to remedy a violation of this part.

* * * * *

3.  Section 106.6 is amended by revising the title and adding paragraphs (d), (e) and (f) to read as follows:

**§ 106.6 Effect of other requirements and preservation of rights.**

* * * * *

(d) *Constitutional protections.* Nothing in this part requires a recipient to:

(1) Restrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution;

2

EXHIBIT 20

(2) Deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution; or

(3) Restrict any other rights guaranteed against government action by the U.S. Constitution.

(e) *Effect of Section 444 of General Education Provisions Act (GEPA)/Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. 1232g and 34 CFR Part 99.* The obligation to comply with this part is not obviated or alleviated by the FERPA statute or regulations.

(f) *Title VII of the Civil Rights Act of 1964.* Nothing in this part shall be read in derogation of an employee's rights under title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* or any regulations promulgated thereunder.

* * * * *

4.  Section 106.8 is revised to read as follows:

**§ 106.8 Designation of coordinator, dissemination of policy, and adoption of grievance procedures.**

(a) *Designation of coordinator.* Each recipient must designate at least one employee to coordinate its efforts to comply with its responsibilities under this part. The recipient must notify all its students and employees of the name or title, office address, electronic mail address, and telephone number of the employee or employees designated pursuant to this paragraph.

*(b) Dissemination of policy.*

EXHIBIT 20

(1) *Notification of policy.* Each recipient must notify applicants for admission and employment, students, employees, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient that it does not discriminate on the basis of sex in the education program or activity that it operates, and that it is required by title IX and this part not to discriminate in such a manner. Such notification must state that the requirement not to discriminate in the education program or activity extends to employment and admission (unless Subpart C does not apply to the recipient) and that inquiries about the application of title IX and this part to such recipient may be referred to the employee designated pursuant to section 106.8(a), to the Assistant Secretary, or both.

(2) *Publications.*

(i) Each recipient must prominently display a statement of the policy described in paragraph (b)(1) of this section on its website, if any, and in each handbook or catalog that it makes available to persons entitled to a notification under paragraph (b)(1) of this section.

(ii) A recipient must not use or distribute a publication stating that the recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by this part.

(c) *Adoption of grievance procedures.* A recipient must adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part and of formal complaints as defined in section 106.44(e)(5). A recipient must provide notice of

4

EXHIBIT 20

the recipient's grievance procedures, including how to report sex discrimination and how to file or respond to a complaint of sex discrimination, to students and employees.

(d) *Application.* The requirements that a recipient adopt a policy and grievance procedures as described in this section apply only to exclusion from participation, denial of benefits, or discrimination on the basis of sex occurring against a person in the United States.

* * * * *

5.  Section 106.9 is removed and reserved.

6.  Section 106.12 is amended by revising paragraph (b) to read as follows:

* * * * *

(b) *Assurance of exemption*. An educational institution that seeks assurance of the exemption set forth in paragraph (a) of this section may do so by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part that conflict with a specific tenet of the religious organization. An institution is not required to seek assurance from the Assistant Secretary in order to assert such an exemption. In the event the Department notifies an institution that it is under investigation for noncompliance with this part and the institution wishes to assert an exemption set forth in paragraph (a) of this section, the institution may at that time raise its exemption by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization, whether or not the institution had previously sought assurance of the exemption from the Assistant Secretary.

* * * * *

5

EXHIBIT 20

7.   Subpart D—Discrimination on the Basis of Sex in Education Program or Activities Prohibited is amended by adding sections 106.44 and 106.45 to read as follows:

**§ 106.44 Recipient's response to sexual harassment**.

(a) *General.* A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States must respond in a manner that is not deliberately indifferent. A recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances. – **Seattle Public Schools comment/question:  The use of the "deliberate indifference" standard lacks any clarity, thereby producing a vague and unworkable standard as compared against the now rescinded OCR guidance, which stated, in essence, that the obligation of a recipient was to stop any harassing behavior, prevent recurrence of harassing behavior, and remedy any effects of harassing behavior experienced by a complainant or aggrieved student.**

*(b) Specific circumstances.*

(1) A recipient must follow procedures consistent with section 106.45 in response to a formal complaint. If the recipient follows procedures (including implementing any appropriate remedy as required) consistent with section 106.45 in response to a formal complaint, the recipient's response to the formal complaint is not deliberately indifferent and does not otherwise constitute discrimination under title IX. **Seattle Public Schools comment/question - What standard of assessing whether a recipient's response was not deliberately indifferent if an aggrieved party chooses not to use the formal complaint process? There should be a way of providing a minimum standard to responding to any report of alleged sexually harassing behavior irrespective of**

6

EXHIBIT 20

**whether a party uses a formal or informal complaint process. Again, previous guidance from OCR offered a standard by which a recipient could develop effective responses to reports of alleged sexual harassment.**

(2) When a recipient has actual knowledge regarding reports by multiple complainants of conduct by the same respondent that could constitute sexual harassment, the Title IX Coordinator must file a formal complaint. If the Title IX Coordinator files a formal complaint in response to the reports, and the recipient follows procedures (including implementing any appropriate remedy as required) consistent with section 106.45 in response to the formal complaint, the recipient's response to the reports is not deliberately indifferent.

(3) For institutions of higher education, a recipient is not deliberately indifferent when in the absence of a formal complaint the recipient offers and implements supportive measures designed to effectively restore or preserve the complainant's access to the recipient's education program or activity. **Seattle Public Schools comment/question – Are public PreK-12 educational institutions not being offered same standard by which to respond to informal complaints?** At the time supportive measures are offered, the recipient must in writing inform the complainant of the right to file a formal complaint at that time or a later date, consistent with other provisions of this part.

(4) If paragraphs (b)(1) through (b)(3) of this section are not implicated, a recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States must, consistent with paragraph (a) of this section, respond in a manner that is not deliberately indifferent. A recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances.

7

EXHIBIT 20

(5) The Assistant Secretary will not deem a recipient's determination regarding responsibility to be evidence of deliberate indifference by the recipient merely because the Assistant Secretary would have reached a different determination based on an independent weighing of the evidence.

(c) *Emergency removal.* Nothing in this section precludes a recipient from removing a respondent from the recipient's education program or activity on an emergency basis, provided that the recipient undertakes an individualized safety and risk analysis, determines that an immediate threat to the health or safety of students or employees justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal. This provision shall not be construed to modify any rights under the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, or title II of the Americans with Disabilities Act.

(d) *Administrative leave.* Nothing in this section precludes a recipient from placing a non-student employee respondent on administrative leave during the pendency of an investigation.

(e) *Definitions*. As used in this part:

(1) *Sexual harassment* means:

(i) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct;

(ii) Unwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or

8

EXHIBIT 20

(iii) Sexual assault, as defined in 34 CFR 668.46(a). **Seattle Public Schools comment – referring to 34 CFR 668.46(a) evidences the Department's emphasis on the proposed revision of the regulation to post-secondary institutions because this provision references the Clery Act, which does not apply to recipients that are PreK-12 educational settings.**

(2) *Complainant* means an individual who has reported being the victim of conduct that could constitute sexual harassment, or on whose behalf the Title IX Coordinator has filed a formal complaint. **Seattle Public Schools comment/question – This definition does not give parents/guardians standing to file a formal complaint on behalf of their minor child, as most students in PreK-12 educational setting are under the age of eighteen. Again, this evidences the proposed changes were made with an emphasis on post-secondary recipients and not elementary/secondary recipients.** For purposes of this subsection, the person to whom the individual has reported must be the Title IX Coordinator or another person to whom notice of sexual harassment results in the recipient's actual knowledge under section 106.44(e)(6).

(3) *Respondent* means an individual who has been reported to be the perpetrator of conduct that could constitute sexual harassment.

(4) *Supportive measures* means non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed. Such measures are designed to restore or preserve access to the recipient's education program or activity, without unreasonably burdening the other party; protect the safety of all parties and the recipient's educational environment; and deter sexual harassment. Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in

9

EXHIBIT 20

work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures. The recipient must maintain as confidential any supportive measures provided to the complainant or respondent, to the extent that maintaining such confidentiality would not impair the ability of the institution to provide the supportive measures. The Title IX Coordinator is responsible for coordinating the effective implementation of supportive measures.

(5) *Formal complaint* means a document signed by a complainant or by the Title IX Coordinator alleging sexual harassment against a respondent about conduct within its education program or activity and requesting initiation of the recipient's grievance procedures consistent with section 106.45. **Seattle Public Schools comment/question – See statement above regarding the provision defining complainant: students who are minor children may not have the capability to complete or sign a legal document. By this provision, they are seemingly not given the opportunity to submit a formal complaint unless they have the legal capacity to pursue formal processes. It seems unfair to minor students that their only option would be having the Title IX Coordinator file a complaint on their behalf.**

(6) *Actual knowledge* means notice of sexual harassment or allegations of sexual harassment to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient, or to a teacher in the elementary and secondary context with regard to student-on-student harassment. **Seattle Public Schools comment/question – By limiting the type of staff member who can be a responsible employee with actual knowledge in the elementary and secondary context again speaks to a lack of understanding of the other types of staff members – not just teachers – who come into contact with students on a regular basis. For**

EXHIBIT 20

**example, school counselors, school psychologists, school nurses, to name a few, are also certificated staff members who by law have an obligation to report to law enforcement or child protective services allegations of abuse, including sexual violence, toward students. This provision does not recognize their professional obligation to ensure the safety and well-being of students in PreK-12 educational context.** Imputation of knowledge based solely on respondeat superior or constructive notice is insufficient to constitute actual knowledge. This standard is not met when the only official of the recipient with actual knowledge is also the respondent. **Seattle Public Schools question/comment – We hold our staff members to high expectations in their behavior toward students, parents, and other staff members. In that regard, our district should rightfully be held accountable for any staff member who engages in alleged misconduct, including sexual harassment, toward another individual within our environment. The notice to act appropriately, including the obligation to not act in a discriminatory or harassing manner, is conveyed to all staff members during their onboarding. To relieve a recipient of an obligation to ensure its staff members act with the highest degree of professionalism – and in fact, giving a staff member the ability to perpetrate sexual harassment by allowing them to hide the information – does not serve the purpose of ensuring a safe, civil educational or work environment free from prohibited discrimination or harassment. The Department should, thereby, also take a stand to have recipients hold their staff members to high expectations, not be the entity to lower expectations regarding professional conduct by a recipient's staff.** The mere ability or obligation to report sexual harassment does not qualify an employee, even if that employee is an official, as one who has authority to institute

EXHIBIT 20

corrective measures on behalf of the recipient.

**§ 106.45 Grievance procedures for formal complaints of sexual harassment.**

(a) *Discrimination on the basis of sex.* A recipient's treatment of a complainant in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX. A recipient's treatment of the respondent may also constitute discrimination on the basis of sex under title IX.

(b) *Grievance procedures*. For the purpose of addressing formal complaints of sexual harassment, grievance procedures must comply with the requirements of this section.

(1) *Basic requirements for grievance procedures*. Grievance procedures must—

(i) Treat complainants and respondents equitably. An equitable resolution for a complainant must include remedies where a finding of responsibility for sexual harassment has been made against the respondent; such remedies must be designed to restore or preserve access to the recipient's education program or activity. An equitable resolution for a respondent must include due process protections before any disciplinary sanctions are imposed;

(ii) Require an objective evaluation of all relevant evidence – including both inculpatory and exculpatory evidence – and provide that credibility determinations may not be based on a person's status as a complainant, respondent, or witness;

(iii) Require that any individual designated by a recipient as a coordinator, investigator, or decision-maker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. A recipient must ensure that coordinators, investigators, and decision-makers receive training on both the definition of sexual harassment and how to conduct an investigation

12

EXHIBIT 20

and grievance process, including hearings, if applicable, that protect the safety of students, ensure due process protections for all parties, and promote accountability. Any materials used to train coordinators, investigators, or decision-makers may not rely on sex stereotypes and must promote impartial investigations and adjudications of sexual harassment;

(iv) Include a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process;

(v) Include reasonably prompt timeframes for conclusion of the grievance process, including reasonably prompt timeframes for filing and resolving appeals if the recipient offers an appeal, and a process that allows for the temporary delay of the grievance process or the limited extension of timeframes for good cause with written notice to the complainant and the respondent of the delay or extension and the reasons for the action. Good cause may include considerations such as the absence of the parties or witnesses, concurrent law enforcement activity, or the need for language assistance or accommodation of disabilities;

(vi) Describe the range of possible sanctions and remedies that the recipient may implement following any determination of responsibility;

(vii) Describe the standard of evidence to be used to determine responsibility;

(viii) Include the procedures and permissible bases for the complainant and respondent to appeal if the recipient offers an appeal; and

(ix) Describe the range of supportive measures available to complainants and respondents.

(2) *Notice of allegations*.

EXHIBIT 20

(i) *Notice upon receipt of formal complaint*. Upon receipt of a formal complaint, a recipient must provide the following written notice to the parties who are known:

(A) Notice of the recipient's grievance procedures.

(B) Notice of the allegations constituting a potential violation of the recipient's code of conduct, including sufficient details known at the time and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved in the incident, if known, the specific section of the recipient's code of conduct allegedly violated, the conduct allegedly constituting sexual harassment under this part and under the recipient's policy, and the date and location of the alleged incident, if known. The written notice must include a statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process. The written notice must also inform the parties that they may request to inspect and review evidence under paragraph (b)(3)(viii) of this section and inform the parties of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process.

(ii) *Ongoing notice requirement*. If, in the course of an investigation, the recipient decides to investigate allegations not included in the notice provided pursuant to paragraph (b)(2)(i)(B) of this section, the recipient must provide notice of the additional allegations to the parties, if known.

(3) *Investigations of a formal complaint.* The recipient must investigate the allegations in a formal complaint. If the conduct alleged by the complainant would not constitute sexual harassment as defined in section 106.44(e) even if proved or did not occur within the recipient's program or activity, the recipient must dismiss the formal

14

EXHIBIT 20

complaint with regard to that conduct. When investigating a formal complaint, a recipient must—

(i) Ensure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the recipient and not on the parties;

(ii) Provide equal opportunity for the parties to present witnesses and other inculpatory and exculpatory evidence;

(iii) Not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence;

(iv) Provide the parties with the same opportunities to have others present during any grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice, and not limit the choice of advisor or presence for either the complainant or respondent in any meeting or grievance proceeding; however, the recipient may establish restrictions regarding the extent to which the advisor may participate in the proceedings, as long as the restrictions apply equally to both parties;

(v) Provide to the party whose participation is invited or expected written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings with a party, with sufficient time for the party to prepare to participate;

**(vi)** For recipients that are elementary and secondary schools, the recipient's grievance procedure may require a live hearing. With or without a hearing, the decision-maker must, after the recipient has incorporated the parties' responses to the investigative report under paragraph (b)(3)(ix) of this section, ask each party and any witnesses any

EXHIBIT 20

relevant questions and follow-up questions, including those challenging credibility, that a party wants asked of any party or witnesses. If no hearing is held, the decision-maker must afford each party the opportunity to submit written questions, provide each party with the answers, and allow for additional, limited follow-up questions from each party. With or without a hearing, all such questioning must exclude evidence of the complainant's sexual behavior or predisposition, unless such evidence about the complainant's sexual behavior is offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the evidence concerns specific incidents of the complainant's sexual behavior with respect to the respondent and is offered to prove consent. The decision-maker must explain to the party proposing the questions any decision to exclude questions as not relevant; **Seattle Public Schools question/comment – The use of an adversarial process in all aspects of responding to a formal complaint does not take into consideration the context of the PreK-12 educational setting. The amount of time this process would take limits the ability of PreK-12 educators to align corrective measures to student behavior. That is, in order to effectuate a positive change in student behavior, the student must understand the relationship between the misconduct and the corrective action. If too much time passes, there is less chance effective change of student behavior can occur. The adjudicative process that is being required even though this provision is being asserted as applying to elementary and secondary school setting, is more appropriate in post-secondary settings where the parties have higher and more nuanced cognitive functioning, and where timely action to align student conduct with corrective action is not generally expected (as is the case when dealing with young children).**

EXHIBIT 20

(vii) For institutions of higher education, the recipient's grievance procedure must provide for a live hearing. At the hearing, the decision-maker must permit each party to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at a hearing must be conducted by the party's advisor of choice, notwithstanding the discretion of the recipient under subsection 106.45(b)(3)(iv) to otherwise restrict the extent to which advisors may participate in the proceedings. If a party does not have an advisor present at the hearing, the recipient must provide that party an advisor aligned with that party for to conduct cross-examination. All cross-examination must exclude evidence of the complainant's sexual behavior or predisposition, unless such evidence about the complainant's sexual behavior is offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the evidence concerns specific incidents of the complainant's sexual behavior with respect to the respondent and is offered to prove consent. At the request of either party, the recipient must provide for cross-examination to occur with the parties located in separate rooms with technology enabling the decision- maker and parties to simultaneously see and hear the party answering questions. The decision-maker must explain to the party's advisor asking cross-examination questions any decision to exclude questions as not relevant. If a party or witness does not submit to cross-examination at the hearing, the decision-maker must not rely on any statement of that party or witness in reaching a determination regarding responsibility;

(viii) Provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation. **Seattle Public Schools comment/question – In revision 106.6(e) above, the proposed regulation states that FERPA prohibitions against disclosing students' educational**

17

EXHIBIT 20

**records does not obviate or alleviate a recipients obligations to respond in accordance with the Title IX regulation. 106.45(viii) requires as a part of formal complaint investigation the disclosure of evidentiary material to parties to give them an ability to meaningfully respond. In a PreK-12 educational context, evidentiary material gathered as a part of investigation oftentimes includes a student's disciplinary and educational record (i.e. Section 504 Plan, Individual Education Plan developed pursuant to IDEA), as determinations whether manifestations of a student's disability played a role in the behavior being exhibited are a part of deciding responsibility. This provision requires an elementary and secondary school to release this private information to a non-parent. While the proposed revision is asserting that FERPA would not apply, other federal provisions (e.g. IDEA) and state privacy protections (e.g. Washington state constitutional protections regarding privacy) would likely apply.** Prior to completion of the investigative report, the recipient must send to each party and the party's advisor, if any, the evidence subject to inspection and review in an electronic format, such as a file sharing platform, that restricts the parties and advisors from downloading or copying the evidence, and the parties shall have at least ten days to submit a written response, which the investigator will consider prior to completion of the investigative report. The recipient must make all such evidence subject herein to the parties' inspection and review available at any hearing to give each party equal opportunity to refer to such evidence during the hearing, including for purposes of cross- examination; and

      (ix) Create an investigative report that fairly summarizes relevant evidence and, at least ten days prior to a hearing (if a hearing is required under section 106.45) or other time of determination regarding responsibility, provide a copy of the report to the parties for their review and written response. **Seattle Public Schools comment/question – The**

18

EXHIBIT 20

allowance of the parties to review and provide responses to an investigative report serves to extend the timeframe to complete an investigation and impairs a PreK-12 recipient's ability to effectuate meaningful changes to student behavior, if found to be misconduct. Moreover, for those school districts that have a limited number of schools, parties may sometimes have to remain in the same school building. This "battle of responses" as a part of the adjudicative process fosters more hostility, not less, between the parties, where there is a high likelihood that they will remain within the same public school district. The Department needs to be more thoughtful regarding the impact of an adversarial process within the PreK-12 educational context and look to provide and detail restorative justice options that align with best practices for effectively responding to sexual assault or sexual violence.

*(4) Determination regarding responsibility.*

(i) The decision-maker(s), who cannot be the same person(s) as the Title IX Coordinator or the investigator(s), must issue a written determination regarding responsibility. To reach this determination, the recipient must apply either the preponderance of the evidence standard or the clear and convincing evidence standard, although the recipient may employ the preponderance of the evidence standard only if the recipient uses that standard for conduct code violations that do not involve sexual harassment but carry the same maximum disciplinary sanction. The recipient must also apply the same standard of evidence for complaints against students as it does for complaints against employees, including faculty.

(ii) The written determination must include—

(A) Identification of the section(s) of the recipient's code of conduct alleged to have been violated;

19

EXHIBIT 20

(B) A description of the procedural steps taken from the receipt of the complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held;

(C) Findings of fact supporting the determination;

(D) Conclusions regarding the application of the recipient's policy to the facts;

**(E)** A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any sanctions the recipient imposes on the respondent, and any remedies provided by the recipient to the complainant designed to restore or preserve access to the recipient's education program or activity; **Seattle Public Schools comment/question – Disclosure of sanctions imposed against a respondent may be violative of student privacy protections within federal and state provisions or privacy protections of respondent staff members afforded by federal and state employment laws.**

(F) The recipient's procedures and permissible bases for the complainant and respondent to appeal, if the recipient offers an appeal.

(iii) The recipient must provide the written determination to the parties simultaneously. If the recipient does not offer an appeal, the determination regarding responsibility becomes final on the date that the recipient provides the parties with the written determination. If the recipient offers an appeal, the determination regarding responsibility becomes final at either the conclusion of the appeal process, if an appeal is filed, or, if an appeal is not filed, the date on which an appeal would no longer be considered timely;

(5) *Appeals*. A recipient may choose to offer an appeal. If a recipient offers an

EXHIBIT 20

appeal, it must allow both parties to appeal. In cases where there has been a finding of responsibility, although a complainant may appeal on the ground that the remedies are not designed to restore or preserve the complainant's access to the recipient's education program or activity, a complainant is not entitled to a particular sanction against the respondent. As to all appeals, the recipient must: (i) notify the other party in writing when an appeal is filed and implement appeal procedures equally for both parties; (ii) ensure that the appeal decision-maker is not the same person as any investigator(s) or decision- maker(s) that reached the determination of responsibility; (iii) ensure that the appeal decision-maker complies with the standards set forth in section 106.45(b)(1)(iii); (iv) give both parties a reasonable, equal opportunity to submit a written statement in support of, or challenging, the outcome; (v) issue a written decision describing the result of the appeal and the rationale for the result; and (vi) provide the written decision simultaneously to both parties.

(6) *Informal resolution*. At any time prior to reaching a determination regarding responsibility the recipient may facilitate an informal resolution process, such as mediation, that does not involve a full investigation and adjudication, provided that the recipient--

(i) Provides to the parties a written notice disclosing--

(A) The allegations;

(B) The requirements of the informal resolution process including the circumstances under which it precludes the parties from resuming a formal complaint arising from the same allegations, if any; and any consequences resulting from participating in the informal resolution process, including the records that will be maintained or could be shared; and

(ii) Obtains the parties' voluntary, written consent to the informal resolution process.

EXHIBIT 20

*(7) Recordkeeping.*

(i) A recipient must create, make available to the complainant and respondent, and maintain for a period of three years records of--

(A) Each sexual harassment investigation including any determination regarding responsibility, any disciplinary sanctions imposed on the respondent, and any remedies provided to the complainant designed to restore or preserve access to the recipient's education program or activity;

(B) Any appeal and the result therefrom;

(C) Informal resolution, if any; and

(D) All materials used to train coordinators, investigators, and decision-makers with regard to sexual harassment.

(ii) A recipient must create and maintain for a period of three years records of any actions, including any supportive measures, taken in response to a report or formal complaint of sexual harassment. In each instance, the recipient must document the basis for its conclusion that its response was not clearly unreasonable, and document that it has taken measures designed to restore or preserve access to the recipient's educational program or activity. The documentation of certain bases or measures does not limit the recipient in the future from providing additional explanations or detailing additional measures taken.

EXHIBIT 20

# EXHIBIT 21



[Docket ID ED-2018-OCR-0064]

January 22, 2018

The Honorable Betsy DeVos
Secretary
U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, DC 20202

Dear Secretary DeVos:

On behalf of AASA, The School Superintendents Association, representing more than 13,000 public school superintendents across the nation, I write to offer comments on the proposed amendments to regulations implementing Title IX of the Education Amendments of 1972. We generally applaud the Department's desire to simplify and streamline federal regulations on districts, but believe several elements of these proposed Title IX regulations will have the opposite impact: provide less flexibility to districts in handling potential Title IX violations, add new and unaccounted for costs in changing current policies and procedures, and open districts up to increased litigation costs. Our greatest concern is that the proposed Title IX regulations will undermine our efforts to ensure each and every child in our school has a safe and healthy learning environment. It is for these reasons that we oppose any regulatory changes that would compromise the integrity of the 2001 Title IX guidance, which has been of invaluable assistance to school leaders across the country

For the better part of two decades, the Department has used one consistent standard to determine if a school district violated Title IX by failing to adequately address sexual harassment and assault. The Department's 2001 Guidance, which went through public notice-and-comment and has been enforced in both Democratic and Republican administrations,[1] defines sexual harassment as "unwelcome conduct of a sexual nature."[2] The 2001 Guidance requires schools to address student-on-student harassment if *any employee* "knew, or in the exercise of reasonable care should have known" about the harassment. In the context of employee-on-student harassment, the Guidance requires schools to address

---

[1] These standards have been reaffirmed time and time again, in 2006 by the Bush Administration, in 2010, 2011, and 2014 in guidance documents issued by the Obama Administration, and even in the 2017 guidance document issued by the current Administration. U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Sexual Harassment* (Jan. 25, 2006) [hereinafter 2006 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html; U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010) [hereinafter 2010 Guidance], *available at* https://ww2ed.gov/about/offices/ list/ocr/letters/colleague-201104.pdf; U.S. Dep't of Educ. Office of Civil Rights, *Dear Colleague Letter: Sexual Violence* at 4, 6, 9, &16 (Apr. 4, 2011) [hereinafter 2011 Guidance], *available at* https://ww2ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; U.S. Dep't of Educ. Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* 1-2 (Apr. 29, 2014) [hereinafter 2014 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf; U.S. Dep't of Educ. *Office for Civil Rights, Questions and Answers on Campus Sexual Misconduct* (Sept. 2017) [hereinafter 2017 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

[2] U.S. Department of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001) [hereinafter 2001 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

EXHIBIT 21

[Type here]

harassment "whether the [school] has 'notice' of the harassment."[3] Under the 2001 Guidance, schools that do not "take immediate and effective corrective action" would violate Title IX. These standards have appropriately guided OCR's enforcement activities, effectuating Title IX's nondiscrimination mandate by requiring schools to quickly and effectively respond to serious instances of harassment and fulfilling OCR's purpose of ensuring equal access to education and enforcing students' civil rights.

We believe your proposed regulations will have the unintended impact of altering the policies and practices from the 2001 Guidance that district personnel have implemented for almost two decades, guidance they rely on and that has proven a critical asset in addressing these issues of harassment. There is a real cost in terms of training and professional development to changing practices and policies that are so embedded into the fabric of the school district that we believe are functional and working. We worry that at a time when district finances are stretched, these regulations, if implemented as proposed, present yet another unfunded mandate from Washington. While some regulatory changes certainly have merit, we believe these proposed regulations on Title IX do not have merit. Further, we believe these proposed rules have the potential to increase the likelihood of litigation in districts, which is something AASA has long sought for ways to reduce. Because the proposed rules greatly restrict when and how districts can investigate and under what circumstances students can report, we are deeply worried that students may be less likely to view the Office of Civil Rights (OCR) as the main avenue for addressing and resolving their Title IX complaints against schools. Currently, Title IX's application to sexual harassment is more broadly interpreted for OCR enforcement than for civil litigation, and because of that, and the broader remedies that OCR can offer (which also would become more limited under the proposed rules if finalized), students have been able to find OCR's response to their Title IX complaints against educational investigations sufficient. If OCR no longer offers the same remedies and has more stringent standards for enforcing Title IX, then presumably students will find civil litigation to be the better avenue for addressing their grievances against schools, which could lead to a significant and much costlier redirection of district resources towards addressing Title IX complaints and violations in court.

Below, we have listed our concerns with the proposed regulation in order of greatest to least importance.

## 1.   § 106.44(a), 106.30

AASA believes that when a child reports they have been sexually assaulted or harassed to any school personnel then the district has an obligation to investigate, and that allowing schools to ignore reports made to the majority of school employees under the proposed rules would be an unconscionable attack on the safety of students and our obligations to ensure their safety in school. Limiting the responsibility of the district to investigate only incidents that children report to teachers or an official with the authority to institute corrective action could lead to the child's report going unaddressed and the child being harmed again. We know young children can form bonds with a host of school personnel whether it be a cafeteria worker, coach, bus driver, janitor or paraprofessional and we would never want to assume that these individuals should not be obligated to report any potential Title IX violations. We are opposed to any scenario in which the district could somehow disregard the information a child presents to those without the authority to institute corrective action simply because of their technical status within the regulation. It also underestimates the care we entrust all our employees to put towards students' safety. These individuals are valued members of the school community and there are

---

[3] *Id.*

EXHIBIT 21

[Type here]

countless examples of how their knowledge about a child's home-life, experience in school or personal needs has been critically important to ensuring the child is safe in and out of school and receives an appropriate education.

The Department has long required schools to address *student-on-student* sexual harassment if almost any school employee[4] either knows about it or should reasonably have known about it.[5] This standard takes into account the reality that many students disclose sexual abuse to employees who do not have the authority to institute corrective measures, both because students seeking help turn to the adults they trust the most and because students are not informed about which employees have authority to address the harassment. The 2001 Guidance also requires schools to address all employee-on-student sexual harassment, "whether or not the [school] has 'notice' of the harassment."[6] The 2001 Guidance recognized the particular harms of students being preyed on by adults and students' vulnerability to pressure from adults to remain silent and accordingly acknowledged schools' heightened responsibilities to address harassment by their employees.  As leaders of our school districts, it is of utmost importance to us that if a student is sexually abused by an employee, that our schools do everything they can to stop the abuse and ensure that the student is able to learn in a safe educational environment.

Further, we have concerns with how this regulation would interact with state mandatory reporter laws that require that all school personnel to bring concerns to the district if they suspect rape or sexual abuse of any kind. If a cafeteria worker reports to a principal that a student confided that she has been sexually abused by a teacher at the school would the district really have no responsibility to address the harassment within the context of Title IX, but have a simultaneous obligation to report this information to Children and Family Services divisions? At the very least, the conflicting requirements will create confusion to schools and employees regarding their responsibilities to report sexual harassment, including sexual assault, of which they are on notice.  Consequently, this would likely open up schools in our districts to litigation and require us to expend resources to train our employees on how they must concurrently comply with the Title IX rules and with state laws that seem to have conflicting requirements.

Finally, we are concerned that the district would have no obligation to investigate or implement corrective action if a child reports harassment or abuse by a teacher. This, again, really makes no sense and does not consider the reality that students will report to who they trust the most, and that these individuals are often not district-level Title IX Coordinators or officials with authority to institute corrective measures. This also runs counter to some state laws that prohibit sex between a school employee and a student.

There is no good reason why a school district would not choose to investigate a Title IX claim just because the claim was shared with someone other than a teacher or official who can institute corrective measures. We strongly oppose this proposed change to the Title IX rules.

**2.   § 106.30**

---

[4] This duty applies to "any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility." 2001 Guidance, *supra* note 2 at 13.

[5] *Id* at 14.

[6] *Id.* at 10.

EXHIBIT 21

[Type here]

The proposed regulations also change the definition of sexual harassment to define it as "unwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the [school's] education program or activity"[7] and mandates dismissal of complaints of harassment that do not meet this standard. AASA believes that all students have a right to a safe and healthy learning environment and activities and that the new, elevated standard could put less pressure on district personnel to address harassment when it first appears and is most easy to address. The current standard that school administrators rely upon from the 2001 guidance defines sexual harassment as unwelcome conduct of a sexual nature[8] which appropriately charges schools with responding to harassment before it escalates to a point that students suffer severe harm. Under the Department's proposed, narrower definition of harassment, students would be forced to endure repeated and escalating levels of abuse, from a student or teacher, before their schools would be required to investigate and stop the harassment. This proposed standard inappropriately imports a standard used in lawsuits for money damages into the standard used for administrative enforcement of Title IX, and would move districts in the opposite direction of what we believe the federal government should be encouraging school personnel to do today.

### 3.   § 106.45(b)(3)(vi)-(vii))

School leaders strongly object to allowing K12 students to be subject to a live hearing. While we understand that schools can continue to ask students to submit and answer written questions or have a neutral school official ask questions orally, we oppose the possibility of a new layer to the investigative process that would subject students to a cross-examination by a parent, lawyer, or another student (including, possibly, friends of the student who perpetrated the offense). It is totally unclear under what context the district would have to grant the opportunity to have a live hearing, who would preside over the live hearing, what responsibility the district would have to mitigate any re-traumatization of students during the live hearing, what district personnel would have to attend the live hearing, whether the district would have to hold the live hearing on school grounds, and most importantly why it is appropriate to force a minor to participate in this type of activity. The live cross examination requirement would also lead to sharp inequities if one party can afford an attorney and the other cannot. If anything, the addition of a live hearing places a new burden to districts as personnel will need to be trained in how to facilitate and monitor a live hearing and ensure appropriate participation by all parties involved in a live hearing and how to view the evidence that arises during a live hearing. Furthermore, what is the obligation of district personnel if a student or school employee does not show up to the live hearing? Is the investigation terminated? We urge you to remove this investigatory option from districts' purview.

### 4.   (§ 106.45(b)(4)(i))

AASA is concerned by the requirement that districts adopt a separate definition that that which applies under Title VII to employees-- and, perversely, imposes a more stringent definition for students, which would make it harder for students than adults in non-education workplaces to get help when they are sexually harassed. Under Title VII districts are potentially liable for harassment of an employee if the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment." If the employee is harassed by a supervisor, the school is automatically liable if the harassment resulted in a tangible employment action such as firing or demotion, and otherwise unless the school can prove that

---

[7] Proposed rule § 106.30.

[8] 2001 Guidance, *supra* note 2.

EXHIBIT 21

[Type here]

the employee unreasonably failed to take advantage of opportunities offered by the school to address harassment. [9] However, under the proposed rules, a school would *only* be liable for harassment against a student if it is (1) deliberately indifferent to (2) sexual harassment that is so severe, pervasive, and objectively offensive that it denied the student access to the school's program or activity; (3) the harassment occurred within the school's program or activity; *and* (4) a school employee with "the authority to institute corrective measures" had "actual knowledge" of the harassment. In other words, under the proposed rules, schools would be held to a far lesser standard in addressing the harassment of students—including minors—under its care than addressing harassment of adult employees.

The drastic differences between Title VII and the proposed rules would mean that schools would be prohibited from taking the same steps to protect children in schools from harassment and discrimination that they are required to take to protect adults in the same setting. AASA does not believe that there should be a more demanding standard for taking action to address sexual harassment experienced by children than adults in the workplace. We also think these two opposing standards will be confusing to school personnel who need to understand what they can and should report and address in both contexts. In addition, the conflict between the proposed Title IX rules (which apply to the harassment of employees) and Title VII will create confusion and expose school districts to potential liability, given that in many cases it will be impossible to comply with both these rules and Title VII in addressing sexual harassment of employees.

5.  **§ 106.30, 106.45(b)(3)**

As an organization that strongly advocates for increased local control and flexibility we are shocked by the change in the proposed regulation that would take away the ability of districts to initiate an investigation because the sexual misconduct occurred online or off-campus. It is common practice for district administrators to discipline students for off-campus conduct whether it's the use of drugs or alcohol at a house party, cyberbullying, hazing, physical assault, etc. What may start in school often spills over into student life at home, in the community, and online. Conversely, something originating on a weeknight or on a weekend—in person or online—will often spillover into the school day and school environment. While monitoring and taking steps to address these activities can be burdensome district policies have been built around doing so. The way we read this regulation, if a student is *sexually* assaulted over the weekend at a friend's house—instead of, for example, *physically* assaulted at that same home—the school cannot investigate the assault simply because it is sexual in nature. This would unduly tie the hands of school leaders who believe every child deserves a safe and healthy learning environment. Superintendents understand that student relationships continue outside the school and need the flexibility to continue to address harassment that happens outside of school grounds. Why limit how districts can respond to sexual harassment that occurs outside of an education program or activity, when our districts are already responding to other forms of misconduct that occur outside an education program or activity when it impacts a student's ability to feel safe and learn?  What these proposed rules would do is make schools vulnerable to litigation by students rightfully claiming that they are being treated differently based on sex because schools would be forbidden to investigate sexual harassment, but not other forms of harassment that are not sexual.  These rules will tie our hands not only in how we protect our students, but in how we mitigate any potential litigation.

---

[9] *Meritor*, 477 US at 476, 477 (citing *Burlington Industries, Inc. v. Ellerth*, 118 S. Ct. 2257, 2270 (1998); *Faragher v. City of Boca Raton*, 118 S. Ct. 2275, 2293 (1998)).

EXHIBIT 21

[Type here]

The Department notes that if conduct occurs off campus the district may still process the complaint under a different conduct code, but not Title IX. This alternative to its required dismissals for Title IX investigations is confusing and impractical. The proposed regulations offer no guidance or safe harbor for schools to offer parallel sexual harassment proceedings that do not comply with the detailed and burdensome procedural requirements set out in the proposed rule. Districts that did so would be forced to contend with respondents' complaints that the school had failed to comply with the requirements set out in the proposed regulation and thus violated respondents' rights.

**6.   § 106.45(b)(6)**

AASA is also opposed to adding a new, specific administrative option such as mediation for resolving Title IX allegations and investigations. Given the age of our students and need to frequently engage with parents, district administrators already have many informal measures they can and do deploy to ensure the parties understand what an investigation means and what consequences can occur if an investigation takes place that is legitimate or unfounded. None of these informal options currently preclude a student from pursuing a formal investigation. We do not need any more tools at our disposal, particularly those that would potentially be subject to additional federal guidance or legal guidelines when the current options we use are adequate.

In conclusion, AASA asks that you do not move forward with this regulation as it will have a harmful impact on the ability to fairly and appropriately address Title IX allegations and investigations in the K-12 context. If you have any additional questions, please reach out to AASA's Advocacy Director, Sasha Pudelski, at spudelski@aasa.org.

Sincerely,

Sasha Pudelski

Sasha Pudelski
Advocacy Director
AASA, The School Superintendents Association

EXHIBIT 21

# EXHIBIT 22



NATIONAL
EDUCATION
ASSOCIATION
nea.org
*Great Public Schools
for Every Student*

1201 16th St., N.W.  |  Washington, DC  20036   |  Phone: (202) 833-4000

*Lily Eskelsen García*
*President*

*Rebecca S. Pringle*
*Vice President*

*Princess R. Moss*
*Secretary-Treasurer*

*John C. Stocks*
*Executive Director*

January 30, 2019

**Sent via Electronic Submission at https://www.regulations.gov**

Brittany Bull
U.S. Department of Education
400 Maryland Avenue S.W.
Room 6E310
Washington, DC 20202

**RE**  **Docket No. ED-2018-OCR-0064-0001 Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance (RIN 1870-AA14)**

Dear Ms. Bull:

The National Education Association ("NEA") appreciates the opportunity to comment on the notice by the U.S. Department of Education ("ED") of their proposed amendments to regulations relating to Title IX of the Education Amendments of 1972 ("Title IX") (the "proposed rule"). The proposed rule would erode the school climate for all students, particularly in K-12 schools, where educators play a key role in fostering equality, respect, and healthy relationships among students during important phases of their social and emotional development. Rather than building on the progress that has been made toward achieving safe and inclusive schools for all students, the proposed rule obligates schools to shield harassing behaviors and discourages students from coming forward about harassment.

NEA knows that all students are vulnerable to sexual harassment and violence, that far too few instances are reported, and that problematic behaviors and attitudes can be remedied with effective and age-appropriate interventions. Far from extending more fairness into Title IX processes, the proposed rule would drastically scale back schools' ability to address sexual harassment while also introducing inflexible procedural requirements for investigating complaints, many of which are blatantly inappropriate for young students in K-12 schools. Among the more glaring reversals of policy in the proposed rule are:

EXHIBIT 22

- A sharply narrowed definition of sexual harassment, which would require schools to ignore harassment until it becomes repeated and severe;[1]

- Limitations on institutional responsibility, including a higher notice standard for triggering liability and the exclusion of off-site conduct;[2]

- Weakened standards governing institutional responses to reported harassment, including a safe harbor for schools that merely adhere to certain procedural requirements and insulation from liability for all responses to sexual harassment that are not "deliberately indifferent";[3]

- Arduous requirements for grievance procedures, including live hearings and cross-party questioning by attorney advisors that pit students against each other in adversarial proceedings;[4] and

- Allowing religious schools to claim a right to violate Title IX, even if the school never previously requested a religious exemption from ED.[5]

This sharp reversal of course will erode the progress that has been made toward ensuring equal access to education and encouraging schools to adopt policies that help students cultivate healthy, respectful relationships with all of their peers. As discussed in detail below, many of the changes contemplated by the proposed rule are incompatible with Title IX's premise of ensuring a non-discriminatory educational environment and equitable grievance procedures for addressing all forms of sex discrimination, including sexual harassment and sexual assault.

Because K-12 schools are often the first place where young people experience and report gender-based violence or sexual harassment, NEA's more than three million members—who include teachers, counselors, and education support professionals—know that they have a key role to play in preventing and addressing sexual harassment among our youngest students. NEA and its members believe that effective anti-harassment policies and early intervention are imperative to protecting child safety, ensuring full and equal access to education, and building the foundation for healthy relationships and gender attitudes in the future.

In the higher education context, NEA represents both faculty and staff at colleges and universities around the country, as well as students studying to be teachers, some of whom are also employed on their campuses. While this comment letter focuses primarily on K-12 schools, the proposed rule poses some of the same fundamental problems within post-secondary institutions, and has particular implications for adult students, as noted in the discussion below.

---

[1] Proposed §§ 106.30 & 106.45(b)(3).
[2] Proposed §§ 106.30, 106.44(a), & 106.45(b)(3).
[3] Proposed §§ 106.44(a) & 106.44(b)(1)-(4).
[4] Proposed § 106.45(b)(3)(vi)-(vii).
[5] Proposed § 106.12(b).

EXHIBIT 22

**The Proposed Rule Would Lead to More Sexual Harassment and Violence in Schools and Harm Educational Outcomes.**

If implemented, the proposed rule will negatively impact learning and health due to both its substance and the overall chilling effect it will have on reporting and prevention of sexual harassment and violence, as well as on the grievance process. Under the proposed rule, our elementary, middle, and high schools will be less safe for all students, and educational outcomes will suffer. This will impact the entire trajectory of students' educational lives, beginning at a critical young age when they are first forming ideas and attitudes about appropriate behaviors and healthy relationships, up through their experiences as young adults on college campuses.

Although it does not receive as much attention as the prevalence of sexual assaults on college campuses, sexual harassment among K-12 children is a serious and widespread problem that adversely affects students' emotional and educational development. One in four girls and one in six boys will be sexually abused before they turn 18 years old.[6] And girls are far more likely than boys to be sexually harassed in school, with a recent study finding that more than half of all girls (56 percent) in grades 7-12 experience sexual harassment.[7] Any form of sexual harassment is likely to have a profound impact on students' ability to participate in and benefit from their education—the physical and psychological harms caused by sexual harassment lead to worse academic, disciplinary, and retention outcomes in schools. And when not effectively addressed, sexual harassment creates a toxic school environment for all students.

ED's Office of Civil Rights ("OCR") has long recognized that sexual harassment can "interfere with a student's academic performance and emotional and physical well-being" and that "[p]reventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn."[8] Research likewise shows that targets of sexual harassment experience anxiety, distress, confusion, loss of self-esteem, and depression.[9] K-12 students who experience sexual harassment are likely to react by talking less in class, not wanting to go to school, and finding it hard to pay attention in school.[10] And by the time they reach college, sexually victimized students are more likely to drop classes, change residences,

---

[6] Finkelhor, D., Hotaling, G., Lewis, I.A., Smith, C. Sexual abuse in a national survey of adult men and women: Prevalence, characteristics, and risk factors. (1990) Child Abuse and Neglect, 14 (1), pp. 19-28.

[7] Catherine Hill & Holly Kearl, *Crossing the Line: Sexual Harassment at School*, AAUW, 11 (2011) [hereinafter *Crossing the Line*], *available at* https://www.aauw.org/research/crossing-the-line. Other reports indicate that 7 in 10 girls experience harassment before they leave high school. *See, e.g.*, Alyson Klein and Evie Blad, *DeVos Rewrites Title IX Guidance on Sexual Assault and Harassment*, EDUCATION WEEK, Nov. 27, 2018, *available at* https://www.edweek.org/ew/articles/2018/11/28/devos-rewrites-title-ix-guidance-on-sexual.html.

[8] U.S. Dep't of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001) [hereinafter 2001 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

[9] *See e.g.*, Greetje Timmerman, *Adolescents' Psychological Health and Experiences with Unwanted Sexual Behavior at School*, 39 Adolescence 156, 817-25 (2004).

[10] AMERICAN ASSOCIATION OF UNIVERSITY WOMEN, HOSTILE HALLWAYS: BULLYING, TEASING AND SEXUAL HARASSMENT IN SCHOOL (2001) [hereinafter *Hostile Hallways*].

EXHIBIT 22

and have lower GPAs, creating long-term adverse consequences for professional success and earning potential.[11]

Girls are sexually harassed at higher rates than boys, and girls who suffer these forms of trauma are more likely to have serious behavioral, emotional, and health problems.[12] Additional barriers to success in school often follow because the victims feel powerless and unable to control their life and its trajectory.[13] These negative outcomes are exacerbated when sexual harassment goes unaddressed, leaving victimized students feeling vulnerable and afraid. Feeling unsafe at school has been correlated with declining academic performance, skipping school, and dropping out.[14] A recent survey found that nearly one-third (32 percent) of students who experienced harassment reported not wanting to go to school as a result of the harassment, and girls were more likely than boys to report harassment affecting them in this way.[15]

Despite the profound negative consequences of harassment and sexual violence, very few instances are actually reported. A recent study found that only 9 percent of students who had experienced sexual harassment at school reported the incident to a teacher, guidance counselor, or other adult at school.[16] This problem persists into post-secondary education, where an estimated 80 percent of campus sexual assaults and rapes go unreported.[17]

Students do not report their sexual harassment for a variety of reasons, which may include fear of retaliation or revictimization, fear that they will not be believed, or feelings of shame or embarrassment.[18] Some students—especially students of color, undocumented

---

[11] Victoria L. Banyard et al., *Academic Correlates of Unwanted Sexual Contact, Intercourse, Stalking, and Intimate Partner Violence: An Understudied but Important Consequence for College Students*, J. of Interpersonal Violence, 1-18 (June 21, 2017), *available at* http://journals.sagepub.com/doi/10.1177/0886260517715022.

[12] Yael Dvir et al., *Childhood Maltreatment, Emotional Dysregulation, and Psychiatric Commodities*, Harvard Review Psychiatry 22, 149-161 (2014), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4091823/; Stephanie Dallam, *The Long-Term Medical Consequences of Childhood Trauma*, *in* THE COST OF CHILD MALTREATMENT: WHO PAYS? WE ALL DO., 1-14 (K. Franey, R. Geffner, & R. Falconer eds., 2001), *available at* https://www.leadershipcouncil.org/1/res/dallam/4.html.

[13] David Finkelhor & Angela Browne, *The Traumatic Impact of Child Sexual Abuse: A Conceptualization*, Am. J. of Orthopsychiatry 55, 1-7 (1985), *available at* http://www.csom.org/train/victim/resources/the%20traumatic%20impact%20of%20child%20sexual%20abuse.pdf.

[14] *See, e.g.*, *Hostile Hallways*, *supra* note 10 at 4.

[15] *Crossing the Line*, *supra* note 7 at 3.

[16] *Crossing the Line*, *supra* note 7 at 2. A different study found that only 2 percent of girls ages 14 to 18 report sexual assault to their schools or the police. National Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 2 (Apr. 2017) [hereinafter *Let Her Learn: Sexual Harassment and Violence*], *available at* https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence.

[17] U.S. DEP'T OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS, RAPE AND SEXUAL VICTIMIZATION AMONG COLLEGE-AGED FEMALES, 1995-2013 (2014), *available at* https://www.bjs.gov/content/pub/pdf/rsavcaf9513.pdf.

[18] *See, e.g.*, RAINN, *Campus Sexual Violence: Statistics*, https://www.rainn.org/statistics/campus-sexual-violence.

EXHIBIT 22

students,[19] LGBT students,[20] and students with disabilities—face even higher barriers to reporting sexual harassment and violence than their peers, especially in terms of reporting to police.[21] For example, these students may face an increased risk of being subjected to police violence or deportation, or fear contributing to the criminalization of boys of color. For these students, Title IX protections in schools may be their only avenue for relief.

Rather than seeking to address the causes of underreporting, the proposed rule would discourage even more young students from coming forward by sending the message that adults and schools do not believe victims of harassment. Among other things, the proposed rule imposes a presumption in all Title IX investigations that no harassment actually occurred,[22] and forces schools to respond to complaints of sexual harassment by first issuing written notice of any code of conduct that prohibits knowingly making false statements.[23] A child who actually summons the courage to report harassment will thus immediately be told that the school assumes it did not happen and that she or he will be in trouble if she or he is not telling the truth. This message is emotionally and psychologically damaging to students, especially when continually reinforced throughout their educational experience into college.

Many other provisions in the proposed rule, described in more detail below, not only roll back prior ED policies and guidance that sought to encourage reporting,[24] but would impose arduous procedural requirements that would insulate students accused of sexual misconduct and make it harder for those who experience sexual misconduct to seek remediation. The proposed rule would reverse decades of policy and turn Title IX inquiries into formal adversarial proceedings.

A one-size-fits-all adversarial process is particularly inappropriate for K-12 schools. Classrooms are not courtrooms. Incidents of sexual harassment and violence impact far more students than the victim and the perpetrator. In drafting the proposed rule, ED loses sight of the fact that Title IX is not just about adjudicating sexual assault claims on college campuses; rather, Title IX's mandate of equal access to education regardless of sex is fulfilled by giving schools the tools they need to prevent sexual harassment in all its forms and to meaningfully and holistically address it when it occurs. This is especially true in the K-12 context, where educators

---

[19] *See* Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation*, NY TIMES (April 30, 2017), *available at* https://www.nytimes.com/2017/04/30/us/immigrants-deportation-sexual-abuse.html?mcubz=3.
[20] Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey: Executive Summary* 12 (Dec. 2016) [hereinafter *2015 U.S. Transgender Survey*], *available at* https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf.
[21] Studies also show that these students experience sexual harassment at higher rates than their other peers. *See, e.g., Let Her Learn: Sexual Harassment and Violence, supra* note 16 at 2-3.
[22] Proposed § 106.45(b)(1)(iv).
[23] Proposed § 106.45(b)(2)(i)(B).
[24] *See* U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010) [hereinafter 2010 Guidance], *available at* https://ww2ed.gov/about/offices/ list/ocr/letters/colleague-201104.pdf; U.S. Dep't of Educ., Office of Civil Rights, *Dear Colleague Letter: Sexual Violence* at 4, 6, 9, &16 (Apr. 4, 2011) [hereinafter 2011 Guidance], *available at* https://ww2ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* 1-2 (Apr. 29, 2014) [hereinafter 2014 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

EXHIBIT 22

have a greater responsibility to develop students' social attitudes and values and to ensure that our youngest students are safe and able to stay in school.

**The Proposed Rule Would Diminish Schools' Obligations to Prevent and Address Sexual Harassment and Violence.**

The proposed rule drastically narrows the scope of Title IX protections by restricting when and how districts can investigate and under what circumstances students can report sexual harassment. The overwhelming effect of the new rule is to limit schools' obligations to students who file complaints of sexual harassment and violence under Title IX. Under the new policy, schools will likely investigate far fewer complaints, and ED will hold fewer schools accountable for failing to ensure that they are free of sexual harassment and assault. This is particularly troubling in the context of K-12 schools, where appropriate oversight from ED could have the greatest impact in encouraging schools to address the root causes of and remediate the potential long-lasting effects of sexual violence.

This marked reduction in school responsibility results from ED importing into its proposed rule the narrow standards that apply in private litigation for money damages under Title IX and applying them in the administrative enforcement context.[25] But private suits for individual monetary damages serve a fundamentally different purpose than Title IX's administrative enforcement process. Where private civil suits primarily serve to provide compensation to a victim of sexual harassment, often long after the harassment occurred, administrative enforcement focuses on securing immediate corrective action for not only the individual student victim but for other students who have potentially been impacted by the incident. For that reason, OCR's enforcement practice is proactive and seeks to make schools aware of potential Title IX violations and encourage voluntary corrective action by the school before OCR pursues termination of federal funding or other enforcement mechanisms. Intervention by OCR is not in itself punitive; it is an opportunity for the federal government to proactively ensure that schools are using best practices to prevent and address sexual harassment in order to meet their obligations for receiving federal funds. But the proposed rule thwarts the preventative and remedial actions that promote positive school climates and protect students from sexual harassment by restricting the instances in which schools are permitted to respond to reported incidents and weakening the standards that apply to those institutional responses.

---

[25] In fact, the definition of "sexual harassment" under the proposed rule is even more restrictive than the test for a valid Title IX claim in civil litigation in some federal circuits. *See, e.g.*, *Feminist Majority Foundation v. Hurley*, 911 F.3d 674 (4th Cir. 2018) (Plaintiff must show that harassment was "sufficiently severe *or* pervasive to create a hostile (or abusive) environment in an educational program or activity") (emphasis added) (citing *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc)). In contrast, cases applying a standard that mirrors the proposed rule highlight the egregious results of this break with prior administrative policy. *See, e.g.*, *Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279 (11th Cir. 2003) (holding that second-grade child plaintiffs could not recover damages from their school board for failure to address conduct by a fellow student over a period of months that included, among other things, forcibly rubbing his body against one, forcibly grabbing their chests, and demands for oral sex because it did not have "the systemic effect of denying the girls equal access to education"); *Ross v. Mercer Univ.*, 506 F. Supp. 2d 1325 (M.D. Ga. 2007) (holding that rape would not meet the standard because a single rape is not "pervasive").

EXHIBIT 22

First, schools would only be permitted to investigate the most extreme complaints of sexual harassment and violence due to a dramatically limited definition of what constitutes "sexual harassment" triggering a Title IX investigation. Schools would only need to investigate reports of "unwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access" to education.[26] This is a far more limited definition of sexual harassment than "unwelcome conduct of a sexual nature," which was previously used by OCR in the Title IX context.[27] Indeed, the proposed rule's definition of "sexual harassment" is even more limited than the standard applied in cases of workplace harassment of adults, which asks only whether "unwelcome . . . verbal or physical conduct of a sexual nature . . . unreasonably interfere[ed] with an individual's work performance or creat[ed] an intimidating, hostile, or offensive working environment."[28] In other words, in order to obtain proactive relief under Title IX from OCR, a K-12 student would have to endure more extreme levels of harassment in school than an adult woman in her office would have to endure in order to have a viable Title VII claim.

Not only will the proposed rule subject students to more severe and repeated forms of harassment before schools are required to intervene, it will also introduce inconsistent and unworkable standards for effectively addressing harassment of vulnerable groups protected by other federal nondiscrimination laws. As educators know, sexual harassment and violence operate on an intersectional basis and disproportionately impact LGBTQ students, students with disabilities, and girls of color.[29] Under the proposed rule, sexual harassment that, for example, draws on racial stereotypes could lead to different outcomes depending on whether it is categorized as race discrimination, which is actionable when it is "sufficiently serious" so as to "limit" a student's ability to participate in or benefit from his or her education—a broader standard—or, alternatively, as "sexual harassment" as narrowly defined in the proposed rule.

Second, schools "must dismiss" a formal complaint if the alleged conduct "did not occur within the [school's] program or activity."[30] This runs counter to a longstanding mandate under prior Title IX guidance to eliminate any harassment that creates a "hostile environment" at school, regardless of where it took place, and federal court decisions applying that same rule.[31] Many of the ways in which students are commonly harassed by peers would be outside of the protections of Title IX under the proposed rule. Students would no longer be protected from harassing behaviors such as using cell phones or social media sites to call students sexually-charged epithets, spread sexual rumors, rate students on sexual activity or performance,

---

[26] Proposed §§ 106.30 & 106.45(b)(3).

[27] 2001 Guidance.

[28] 29 C.F.R. § 1604.11(a); *see also, e.g.*, *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004) (to be actionable under Title VII, plaintiffs must show "harassing behavior 'sufficiently severe *or* pervasive to alter the conditions of [their] employment'" (emphasis added)) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

[29] *See, e.g.*, *Let Her Learn: Sexual Harassment and Violence*, *supra* note 16 at 2-3; Human Rights Campaign, *Growing Up LGBT in America* (2012) at 16, *available at* http://hrc-assets.s3-website-us-east-1.amazonaws.com//files/assets/resources/Growing-Up-LGBT-in-America_Report.pdf; Gay, Lesbian, and Straight Educ. Network, *The 2013 National School Climate Survey* (2014) at xvi, *available at* http://www.glsen.org/sites/default/files/2013%20National%20School%20Climate%20Survey%20Full%20Report_0.

[30] Proposed §§ 106.30, 106.45(b)(3).

[31] *See, e.g.*, *Feminist Majority*, 911 F.3d at 687-89.

EXHIBIT 22

disseminate explicit photographs or videos of a student, or circulate, show, or create emails or websites of a sexual nature. And Title IX coordinators and other school officials charged with addressing sexual harassment could be helpless to address this conduct even when it interferes with the classroom environment or keeps the harassed students from coming to school.

For postsecondary institutions, removing responsibility for incidents that occur outside of formal programs or on off-campus property egregiously misunderstands the nature of a college or university environment. Many of the educational and social benefits of a residential college experience occur in the larger aspect of the campus community—including affiliated student groups and organizations, off-campus learning and work experiences, fraternities and sororities, and other places that students gather to study, learn, and socialize—and therefore must be included in the scope of institutional responsibility.

Third, schools would not be responsible for investigating any instances of sexual harassment unless a very specific category of school "officials" know about the harassment. Under the proposed rule, schools would not be required to address sexual harassment unless there was "actual knowledge" of the harassment by (i) a Title IX coordinator;[32] (ii) a K-12 teacher (but only for student-on-student harassment, not employee-on-student harassment); or (iii) an "official" who has "the authority to institute corrective measures."[33] For example, if a K-12 student told an adult school employee they trust—such as a playground supervisor, guidance counselor, or athletics coach—that they had been sexually harassed or assaulted by another student, or if they told a teacher that they had been sexually abused by another school employee, their school would have no obligation under Title IX to help them. This is a sharp break with prior guidance, which required schools to take proactive steps to prevent and address harassment that employees knew or reasonably should have known about.

Fourth, schools may be compelled to adopt a more demanding standard of proof in evaluating claims of sexual harassment. A standard of proof reflects a judgment about how to balance competing interests. Preponderance of the evidence, which was applicable under the 2011 Guidance,[34] is the only standard of proof that treats both sides equally, and is consistent

---

[32] Limiting schools' obligations to investigate sexual harassment to cases of actual knowledge by a Title IX coordinator is especially problematic in the K-12 context where some schools do not even have a dedicated Title IX coordinator onsite. In some cases, one Title IX coordinator may serve an entire school district and, in others, there is no designated Title IX coordinator at all. *See, e.g.*, Sue Klein, *Reinvigorating the Role of the Title IX Coordinator: A Requirement and Resource* at page v, FEMINIST MAJORITY, *available at* http://www.feminist.org/education/pdfs/Full-Title-IX-Coordinators-9-16.pdf.

[33] Proposed §§ 106.30 & 106.45(b)(3).

[34] The Department has required schools to use the preponderance standard in Title IX investigations since as early as 1995 and throughout both Republican and Democratic administrations. For example, its April 1995 letter to Evergreen State College concluded that its use of the clear and convincing standard "adhere[d] to a heavier burden of proof than that which is required under Title IX" and that the College was "not in compliance with Title IX." U.S. Dep't of Educ., Office for Civil Rights, *Letter from Gary Jackson, Regional Civil Rights Director, Region X, to Jane Jervis, President, The Evergreen State College* (Apr. 4, 1995), at 8, *available at* http://www2.ed.gov/policy/gen/leg/foia/misc-docs/ed_ehd_1995.pdf. Similarly, the Department's October 2003 letter to Georgetown University reiterated that "in order for a recipient's sexual harassment grievance procedures to be consistent with Title IX standards, the recipient must … us[e] a preponderance of the evidence standard." U.S.

EXHIBIT 22

with Title IX's requirement that grievance procedures be "equitable." The 50/50 preponderance standard recognizes the high costs of a false conclusion to either the harassed student or the harasser by avoiding any presumption that the conduct did or did not occur. But under the proposed rule, schools would be required to use the clear and convincing standard in student sexual harassment investigations if the clear and convincing standard is used in complaints against employees or in other student violations of its code of conduct that carry the same potential penalties as a finding of sexual harassment.[35]

Finally, schools would only be required to respond to known sexual harassment in a manner that is not "deliberately indifferent."[36] The proposed rule creates a "safe harbor" whereby schools that simply adhere to the new prescribed procedural requirements (regardless of the ultimate finding) are by definition not deliberately indifferent.[37] Further, any response to the harassment that is not "clearly unreasonable" will shield a school from liability.[38] Workplace harassment laws hold employers to a higher standard in addressing sexual harassment than ED's proposed rule would apply to K-12 schools.[39] In this respect, the proposed rules would again provide young students with less protection from harassment in schools than adults receive in their workplaces. Adding to the confusion and absurdity, in the higher education context, many students are employed by their colleges and universities. These student-employees may be subject to differing levels of protection depending on whether they are classified as students or as employees.

Together, these provisions of the proposed rule would increase trauma for survivors and create a toxic school climate by insulating harassment and violence.

**The Proposed Rule Would Erode the School Climate for all Students.**

As a representative of education professionals committed to great public schools for all students, NEA is particularly concerned about the ways in which the proposed rule will impede progress toward healthy and inclusive school environments, beginning with our youngest

---

Dep't of Educ., Office for Civil Rights, *Letter from Howard Kallem, Chief Attorney, D.C. Enforcement Office, to Jane E. Genster, Vice President and General Counsel, Georgetown University* (Oct. 16, 2003), at 1, available at http://www.ncherm.org/documents/202-GeorgetownUniversity--110302017Genster.pdf.

[35] Proposed § 106.45(b)(4)(i). Although the proposed rule purports to give schools a choice between these standards, by tying the standard for student harassment to the standard applied to harassment by employees and/or other student code violations, ED is effectively requiring a standard of proof that gives preference to accused harassers. Where school employees have contracts that require use of the clear and convincing standard in all employee misconduct investigations, schools would be required to adopt the same standard for student sexual harassment investigations, even if the school uses the preponderance standard for all other types of student misconduct. And regardless of the standard applied in employee misconduct investigations, if the school uses a clear and convincing standard for any investigations of other serious student conduct violations, it would likewise be required to apply this higher standard to sexual harassment investigations.

[36] Proposed § 106.44.

[37] Proposed §§ 106.44(a) & 106.44(b)(1)-(4).

[38] Proposed § 106.44.

[39] 29 C.F.R. § 1604.11(a).

EXHIBIT 22

students.[40] Elementary, middle and high schools are places to foster equality, respect, and healthy relationships among students during important phases of their social and emotional development. Educators have a key role to play in teaching students about consent, personal boundaries, and healthy relationships.[41] Robust anti-harassment trainings and policies are essential to correcting harassing behaviors and creating positive school climates for all students, both girls and boys. As ED itself stated when it rescinded the 2011 and 2014 Guidance, "[i]n the forty-five years since the passage of Title IX, we have seen remarkable progress toward an educational environment free of sex discrimination."[42] Now, breaking sharply from its prior policies, ED wants to roll back the progress it has made towards achieving safe and inclusive schools for all students.

The proposed rule would create perverse incentives for schools to shield destructive, abusive behaviors and erode positive school climates. It would encourage schools to avoid Title IX liability by adopting practices that make reporting sexual harassment and violence unnecessarily burdensome, complex, or traumatic in order to deter students from coming forward. It would incentivize schools to discourage student access to trusted adults in order to limit the cases in which employees deemed responsible are aware of the harassment and required to take corrective measures. And schools would have reason to bypass proven best practices and create an environment that intimidates and marginalizes victims and survivors. Alleviating schools from their responsibility to proactively prevent and redress harassment is detrimental to all students.

Together, these provisions would send the message that sexual harassment will be tolerated—even actively defended—in our K-12 schools. Insulating perpetrators and withdrawing protections and support from victims is harmful to both the harasser and harassed student. Harassment among young students presents an opportunity to correct problematic behaviors early on, educate students about equality and respect, and foster healthier attitudes around sex and gender for the future. This can only be achieved when schools are rewarded, not deterred, from adopting robust training practices and policies that allow them to prevent, root out, and head-on address ongoing harassment.

And limiting K-12 schools' obligations to address incidents of sexual harassment fails to acknowledge that harassers may themselves be victims of abuse. Depending on the age of the child and other factors, harassing behavior or other sexual misconduct may be an indicator that the perpetrator himself or herself is actually a possible victim of other sexual or physical abuse. Educators are uniquely positioned to interrupt the perpetuation of harassment and abuse during

---

[40] Inclusion is a critical component of a healthy school climate. *See, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) ("[C]lassroom discussion is livelier, more spirited, and simply more enlightening and interesting when the students have the greatest possible variety of backgrounds.").

[41] The Every Student Succeeds Act explicitly recognizes the need for programs and activities that "improve instructional practices for developing relationship-building skills, such as effective communication, and improve safety through the recognition and prevention of coercion, violence, or abuse, including teen and dating violence, stalking, domestic abuse, and sexual violence and harassment." 20 U.S.C. § 7118 (5)(C)(iv) (2015).

[42] U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter* (Sept. 22, 2017) [hereinafter 2017 Colleague Letter], *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf

EXHIBIT 22

these developmentally critical years if they are supported by effective policies that address social inequality, consent, physical boundaries, inappropriate behavior, and other important health concepts.[43]

Contrary to ED's claim that the new rule is necessitated by a current lack of due process and flexibility in investigating sexual harassment complaints, nothing about the earlier, now-rescinded 2011 and 2014 Guidance limited the use of age-appropriate restorative or alternative justice practices once sexual harassment had been elevated to the complaint and grievance stage.[44] The prior guidelines simply acknowledged that in order to address sexual harassment in any meaningful way and to prevent future harassment, schools must first be held accountable for fulfilling their obligations under Title IX, including taking proactive steps to learn about ongoing harassment. Far from allowing for greater flexibility, the proposed rule's rigid, adversarial requirements for investigating complaints, such as limiting grievance procedures to formal complaints,[45] the inclusion of attorney advisors,[46] and cross-party questioning,[47] will make it harder, not easier, to creatively and holistically correct harassing behavior and educate K-12 students about sex discrimination.

Finally, the proposed rule would permit religious schools to opt out of Title IX compliance without notice or warning to ED or to current or prospective students, which will make schools less inclusive and deny students and parents the information necessary to make choices about whether to expose themselves to potentially harmful, discriminatory school environments. Current policy allows religious institutions to claim religious exemptions from compliance with Title IX by notifying ED in writing and identifying the conflict between their religious tenets and specific Title IX provisions.[48] The proposed rule removes that requirement,[49] which would allow schools to conceal their intent to discriminate, exposing students to harm, especially LGBTQ students, pregnant or parenting students (including those who are unmarried), and students who access or attempt to access birth control or abortion services.

**Conclusion**

NEA believes that all children deserve the best chance to learn and succeed. Effective anti-harassment policies that create safe and supportive school environments are necessary to achieving that mandate. ED wants to tie the hands of educators when it comes to preventing and remedying harassing behaviors, which will make schools less safe, harm educational outcomes,

---

[43] *See, e.g.*, School Safety Omnibus Amendment Act of 2018 (22-951) (report of the Committee on Education for the Council of the District of Columbia), *citing* Beth Jacobson, *Three Ways Schools Can Help Prevent Sexual Assault*, America's Promise, April 26, 2018.

[44] *See, e.g.*, OAKLAND UNIFIED SCH. DIST. Board Policy 5145.7 Sexual Harassment (revised June 14, 2017), *available at* https://www.ousd.org/Page/15492.

[45] Proposed §§ 106.44(b) & 106.45.

[46] Proposed § 106.45(b)(3).

[47] Proposed § 106.45(b)(3)(vii).

[48] 34 C.F.R. § 106.12.

[49] Proposed § 106.12.

EXHIBIT 22

and erode school climates for all students. The proposed rule is inconsistent with, and undermines the purposes of, Title IX, and must be withdrawn.

Sincerely,

/s/
Alice O'Brien
General Counsel
National Education Association

/s/
Keira McNett
Staff Counsel
National Education Association

/s/
Gypsy Moore
Civil Rights Law Fellow
National Education Association

/s/
Donna Harris-Aikens
Education Policy & Practice Director
National Education Association

EXHIBIT 22

EXHIBIT 23



Center for American Progress

1333 H Street, NW, 10th Floor
Washington, DC 20005
Tel: 202 682.1611 • Fax: 202 682.1867

www.americanprogress.org

Submitted via www.regulations.gov

Kenneth L. Marcus                                            January 30, 2019
Assistant Secretary for Civil Rights
Department of Education
400 Maryland Avenue SW
Washington DC, 20202

**RE: Public Comment in Response to the Notice of Proposed Regulation ED-2018-OCR-0064, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

Dear Mr. Marcus,

The Center for American Progress (the "Center") is a non-partisan think tank committed to improving the lives of all Americans through bold, progressive ideas as well as strong leadership and concerted action. This includes a commitment to ensuring that all individuals have access to quality education, free from sexual harassment and violence. We are writing to express our strong opposition to the Department of Education's (the "Department") Notice of Proposed Rulemaking ("Proposed Rules") to amend rules implementing Title IX of the Education Amendment Act of 1972 ("Title IX") as published in the Federal Register on November 29, 2018. The Proposed Rules ignore the devastating impact of sexual harassment in schools. Instead of effectuating Title IX's purpose of keeping students safe from sex discrimination – including sexual abuse and other forms of sexual harassment – the Department is attempting to undermine Title IX protections by making it harder for students to report abuse, allowing schools to ignore reports when they are made, and unfairly tilting the investigative process in favor of respondents. It is doing this while failing to engage in a robust and accurate cost-benefit analysis, in violation of the Administrative Procedure Act. For these reasons, the Center calls on the Department to withdraw the Proposed Rules in their entirety.

## I.     The Proposed Rules fail to respond to the realities of sexual harassment in schools.

There are far too many students who experience sexual harassment in educational environments. In grades 7 through 12, 56 percent of girls and 40 percent of boys are sexually harassed in any given school year.[1] During college, 62 percent of women and 61 percent of men experience sexual harassment.[2] Men and boys are far more likely to be victims of sexual assault than to be

[1] Catherine Hill & Holly Kearl, *Crossing the Line: Sexual Harassment at School*, AAUW (2011) [hereinafter *Crossing the Line*], *available at* https://www.aauw.org/research/crossing-the-line.
[2] Catherine Hill & Elena Silva, *Drawing the Line: Sexual Harassment on Campus*, AAUW 17, 19 (2005) [hereinafter *Drawing the Line*], *available at* https://history.aauw.org/aauw-research/2006-drawing-the-line (noting differences in the types of sexual harassment and reactions to it).

1

EXHIBIT 23

falsely accused of it.[3] This is all compounded by the fact that survivors generally underreport instances of sexual harassment and assault. Already, only 12 percent of college survivors[4] and 2 percent of girls ages 14 through 18[5] report sexual assault to their schools or the police. Students often choose not to report for fear of reprisal, because they believe their abuse was not important enough or because they think no one will do anything to help.[6] Some students – especially students of color, undocumented students,[7] LGBTQ students,[8] and students with disabilities – are less likely than their peers to report sexual assault to the police due to an increased risk of being subjected to police violence and/or deportation. Survivors of color may not want to report to the police and add to the criminalization of men and boys of color. For these students, schools are often the only avenue for relief but when schools fail to provide effective responses, the impact can be devastating.[9] Too many survivors end up dropping out of school because they do not feel safe on campus; some are even expelled for lower grades in the wake of their trauma.[10]

## II.     The Proposed Rules would violate the Administrative Procedure Act.

Although agencies have general authority to engage in rulemaking, that authority is not without limits. Under the Administrative Procedure Act (APA), "agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to a constitutional right," or "in excess of statutory jurisdiction, authority, or limitations" shall be held unlawful and set aside.[11] An agency must provide "adequate reasons" for its rulemaking, in part by "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for its action including a rational connection between the fact found and the choice made."[12]

The Department fails to provide "adequate reasons" or "examine relevant data" to support its proposed regulations. It predicates its cost calculations on limited data sets – like the Civil Rights Data Collection (CRDC) and the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act) data sets – that have significant quality issues, explicitly acknowledges data constraints in developing its cost baseline, and provides an incomplete and unconvincing outline of the costs and benefits resulting from the implementation

---

[3] *E.g.*, Tyler Kingkade, *Males Are More Likely To Suffer Sexual Assault Than To Be Falsely Accused Of It*, HUFFINGTON POST (Dec. 8, 2014) [last updated Oct. 16, 2015], https://www.huffingtonpost.com/2014/12/08/false-rape-accusations_n_6290380.html.

[4] *Poll: One in 5 women say they have been sexually assaulted in college*, WASHINGTON POST (June 12, 2015), https://www.washingtonpost.com/graphics/local/sexual-assault-poll.

[5] *Let Her Learn: Sexual Harassment and Violence*, *supra* note **Error! Bookmark not defined.** at 1.

[6] RAINN, *Campus Sexual Violence: Statistics*, https://www.rainn.org/statistics/campus-sexual-violence.

[7] *See* Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation*, NY TIMES (April 30, 2017), https://www.nytimes.com/2017/04/30/us/immigrants-deportation-sexual-abuse.html?mcubz=3.

[8] National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey: Executive Summary* 12 (Dec. 2016) [hereinafter *2015 U.S. Transgender Survey*], *available at* https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf.

[9] *E.g.*, Audrey Chu, *I Dropped Out of College Because I Couldn't Bear to See My Rapist on Campus*, VICE (Sept. 26, 2017), https://broadly.vice.com/en_us/article/qvjzpd/i-dropped-out-of-college-because-i-couldnt-bear-to-see-my-rapist-on-campus.

[10] *E.g.*, Alexandra Brodsky, *How much does sexual assault cost college students every year?*, WASHINGTON POST (Nov. 18, 2014), https://www.washingtonpost.com/posteverything/wp/2014/11/18/how-much-does-sexual-assault-cost-students-every-year.

[11] 5 U.S.C. § 706(2)(A), (B), (C).

[12] *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (June 20, 2016) (citing *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 103 (1983)).

2

EXHIBIT 23

of the Proposed Rules. These facts indicate that the Department has failed to provide the necessary "rational connection" between the underlying facts and its decision to engage in its proposed rulemaking. The Department also significantly underestimated the full scope of costs – direct and indirect – that would accrue under this rule, stating that "the proposed regulations…do not impose total costs greater than zero",[13] despite severely underestimating or not considering other relevant and significant costs. For those reasons, the rules are arbitrary and capricious in nature and would violate the APA.

III.    **The Proposed Rules fail to account for or appropriately estimate associated costs and benefits.**

The Department failed to perform a comprehensive and transparent analysis of the regulatory impact of the costs associated with the Proposed Rules. In addition to asserting cost-savings related to a reduced number of investigations, for which the Department has not provided sufficient underlying documentation, the rules also appear to either underestimate or otherwise not consider other important costs. Until the Department submits cost estimates that are not based on unclear assumptions and flawed data sets, and until the Department can provide the public with these important data, studies, and analyses, it is unable to arrive at a permissibly accurate rule cost and is therefore engaged in arbitrary and capricious rulemaking.

a.    **The cost-savings estimated by the Department are based on unclear assumptions and flawed data sets.**

The Department posits that, on balance, the rule would result in cost-savings in the range of $286.4 million to $367.7 million over ten years. The bulk of these costs-savings arise from an anticipated reduction in the number of investigations. At the Local Education Agency (LEA) level, the Department explains that "a reduction in the average number of investigations of 1.62 per LEA per year…would result in a cost savings of $57,136,120 per year"[14] while, at the Institute of Higher Education (IHE) level, "an average reduction of [0.93] investigations per year per IHE …[would] result in a net cost savings of $41,440,300 per year".[15] While the Department explains that the reason for this reduction is primarily due to "the requirement to investigate only in the event of formal complaints"[16] – an implicit acknowledgement that the Proposed Rules' provisions will stifle the filing of complaints by survivors, in direct opposition to the requirements and spirit of the statute – the rationale used to explain this cost-saving is anything but clear.

The Department states that it used "Clery Act data to impute the likely effect of these proposed regulations on various institutions", noting a difference in investigation rates at larger (more than 10,000 students) versus smaller four-year institutions and stating that its rules would result in a 50 percent reduction in that rate difference. The basis on which the Department assumed a 50 percent reduction is unclear. This reduction would supposedly lead to a decrease of 0.75 IHE investigations per year. The Department also assumes, based on Clery Act reports, that the

---

[13] 83 Fed. Reg. at 61484.
[14] 83 Fed. Reg. at 61488.
[15] Ibid.
[16] 83 Fed. Reg. at 61487.

EXHIBIT 23

number of investigations would drop by a further 0.18 investigations when discounting off-campus sexual harassment investigations, which the Department lauds as a cost-saving despite the fact that assaults that occur within a recipient's educational program or activity, regardless of location, must still be afforded similar protections under Title IX.

More importantly, however, is the fact that the Department predicates such calculations on data sets provided by the Clery Act. While Clery Act data is an important resource, any user must seriously consider the limitations of its data sources. The American Association of University Women (AAUW) has investigated underreporting related to the Clery Act and concluded that reported campus safety and crime statistics reflect the fact that "some schools have built the necessary systems to … disclose accurate statistics – and others have not."[17] Other studies of Clery Act data and educational institutions have identified similar concerns about underreporting, overreporting, and misreporting of data around sexual assault.[18]

On the LEA level, the Department is even less clear about its calculations, simply stating that it "assumes that only 50% of the incidents reported in the CRDC would result in a formal complaint, for a reduction in the number of investigations of 1.62 per year". Again, the basis of the Department's assumption regarding formal complaints is not provided. While the CRDC provides another important source of data for the public, it is also limited by the quality of data it imports. Unfortunately, problems have been reported regarding the accuracy of some of the data that school districts have provided to the Department through the CRDC.[19] This is particularly true around the sexual harassment reports, on which the Proposed Rules so heavily rely. The AAUW has analyzed the CRDC sexual harassment data and determined that many school

---

[17] *See, e.g.,* American Association of University Women, *89 Percent of Colleges Reported Zero Incidents of Rape in 2015* (May 10, 2017), https://www.aauw.org/article/clery-act-data-analysis-2017/; American Association of University Women, *91 Percent of Colleges Reported Zero Incidents of Rape in 2014* (Nov. 23, 2015), https://www.aauw.org/article/clery-act-data-analysis/.

[18] *See, e.g.,* California State Auditor, *Clery Act Requirements and Crime Reporting: Compliance Continues to Challenge California's Colleges and Universities*, Report 2017-032 (May 2018); National Academies of Sciences, Engineering, and Medicine, *Innovations in Federal Statistics: Combining Data Sources While Protecting Privacy* 44 (2017) ("the data on sexual violence reported by many institutions in response to the [Clery] act's requirements is of questionable quality"); Corey Rayburn Yung, *Concealing Campus Sexual Assault: An Empirical Examination*, 21 Psychology, Public Policy, and Law 1 (Feb. 2015) ("[T]he ordinary practice of universities is to undercount incidents of [on-campus] sexual assault. Only during periods in which schools are audited [by the Department of Education for Clery Act compliance] do they appear to offer a more complete picture of sexual assault levels on campus. Further, the data indicate that the [Department audit] has no long-term effect on the reported levels of sexual assault, as those crime rates returned to previous level after an audit was completed."); James Guffey, *Crime on Campus: Can Clery Act Data from Universities and Colleges be Trusted?*, 9 ASBBS eJournal 51 (Summer 2013) ("under-reporting of burglary and rape among Clery Act required universities is significant"); Kristen Lombardi & Kristin Jones, Center for Public Integrity, *Campus Sexual Assault Statistics Don't Add Up: Troubling Discrepancies in Clery Act Numbers* (Dec. 2, 2009) ("But there's little doubt that the differing interpretations of the law are sowing confusion — with one school submitting sexual assault statistics beyond what's required and another the bare minimum. Ultimately, these loopholes, coupled with the law's limitations, can render Clery data almost meaningless."), https://publicintegrity.org/education/sexual-assault-on-campus/campus-sexual-assault-statistics-dont-add-up/; Heather M. Karjane, et al., *Campus Sexual Assault: How America's Institutions of Higher Education Respond* viii (Oct. 2002) ("Only 36.5 percent of schools reported crime statistics in a manner that was fully consistent with the Clery Act.").

[19] *See, e.g.,* Evie Blad, *How Bad Data from One District Skewed National Rankings on Chronic Absenteeism*, Education Week (Jan. 9, 2019) http://blogs.edweek.org/edweek/rulesforengagement/2019/01/chronic_absenteeism.html; Anya Kamenetz, *The School Shootings that Weren't*, National Public Radio (Aug. 27. 2018), https://www.npr.org/sections/ed/2018/08/27/640323487/the-school-shootings-that-werent; Andrew Ujifusa & Alex Harwin, *There Are Wild Swings in School Desegregation Data. The Feds Can't Explain Why*, Education Week (May 2, 2018), https://www.edweek.org/ew/articles/2018/05/02/there-are-wild-swings-in-school-desegregation.html.

4

EXHIBIT 23

districts were simply reporting no incidents, rather than collecting and reporting the true numbers of cases of sexual harassment that were reported or resulted in discipline.[20]

To rely on such data sets to enact sweeping changes to Title IX law means that the projected costs are not being conducted in a rigorous or high-quality manner and are likely to be inaccurate and underestimated. A select task force on the study of harassment in the workplace – a bipartisan body of the Equal Employment Opportunity Commission – issued a report in 2016 that explicitly acknowledged the dearth of data as it related to workplace harassment and did not accept data at face value, instead acknowledging that not all claims will be represented in available data sets given rampant underreporting and systemic data collection challenges. The Department must seek to adopt the same attitude and standard when developing cost estimates based on limited and flawed data sets. The Department should fully acknowledge the limitations of its data sources and methodologies and consider utilizing complementary data sets that at least attempt to fill the gaps. However, as it stands, the lack of transparency surrounding the Department's cost calculations and assumptions, as well as the poor data quality that formed the basis of its cost estimates, leads the Center to request that the Department halt its rulemaking while it revisits its cost calculations, reviews the accuracy of the Clery Act and CRDC data on which its calculations rely, and make its underlying calculations available to the public.

### b. The Department does not account for the impact its Proposed Rules would have on the underlying rate of sexual harassment and the resulting impact on its cost-benefit analysis.

The Department states that "[it] does not believe it is reasonable to assume that these proposed regulations will have a quantifiable effect on the underlying rate of sexual harassment occurring in the education programs or activities of recipients."[21] However, the Department does not explain the basis for its non-belief. It does, however, acknowledge that sexual harassment can be deterred.[22] In creating significant disincentives for people to file complaints and thus reducing already-low rates of reporting of sexual misconduct, the risk of such misconduct being detected and punished will be minimized, which in turn will reduce the system's general deterrent effect. The Department has not accounted for the impact of weakened deterrence and reduced individual enforcement on rates of sexual assault and cost estimates, and must revisit its cost-benefit

---

[20] *See, e.g.*, American Association of University Women, *Three-Fourths of Schools Report Zero Incidents of Sexual Harassment in Grades 7-12* (Oct. 24, 2017), https://www.aauw.org/article/schools-report-zero-incidents-of-sexual-harassment/; Lisa Maatz, American Association of University Women, *Why Are So Many Schools Not Reporting Sexual Harassment and Bullying Allegations?*, Huffington Post (October 24, 2016), https://www.huffingtonpost.com/lisa-maatz/why-are-so-many-schools-n_b_12626620.html; American Association of University Women, *Two-Thirds of Public Schools Reported Zero Incidents of Sexual Harassment in 2013–14* (July 12, 2016), https://www.aauw.org/article/schools-report-zero-sexual-harassment/;
[21] 83 Fed. Reg. at 61485.
[22] Ronet Bachman et al., *The Rationality of Sexual Offending: Testing a Deterrence/Rational Choice Conception of Sexual Assault*, 26 Law & Society Rev. 343, 357 (1992) ("The more certain respondents were that the scenario male would be dismissed from school or arrested, the less likely they were to report that they would commit sexual assault under the same set of hypothetical conditions."); Camille Nelson et al., *Organizational Responses for Preventing and Stopping Sexual Harassment: Effective Deterrents of Continued Endurance*, 56 Sex Roles 811, 812 (2007) ("the perception that remedial actions will be taken to punish perpetrators and enforce anti-harassment policies often results in significant decreases in sexual harassment frequency"); Inez Dekker & Jullian Barling, *Personal and Organizational Predictors of Workplace Sexual Harassment of Women by Men*, 3 J. of Occupational Health Psychology 7 (1998) (sexual harassment is "more likely" in an employment setting "if male employees perceive their employer as unwilling to deal seriously with sexual harassment complaints and punish those found guilty of sexual harassment");

EXHIBIT 23

analysis in order to better capture the costs that will arise out of the increased number of underlying incidents.

> **c. The Department underestimates and omits important social and economic costs that would fundamentally change its cost-benefit analysis.**

Another troubling aspect of the rules' cost estimate is the costs that were not considered or dismissed as too difficult to calculate. One such set of costs are those related to supportive measures. The rules encourage recipients to direct survivors towards services that fall under supportive measures: "…[W]e propose adding paragraph (b)(3), which states that, for institutions of higher education, in the absence of a formal complaint, a recipient is not deliberately indifferent when it implements supportive measures designed to effectively restore or preserve access to the recipient's education program or activity".[23] In recognizing that the process of filing a formal complaint, as outlined in the Proposed Rules, will inevitably lead to fewer survivors reporting their harassment and initiating Title IX investigations, the Department seems to provide recipients with a supposedly palatable alternative that would provide students with other services to deal with their assault. Suggested services include "counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures".[24] However, the Department refuses to provide an estimated cost range for the provision of these services, stating that "[d]ue to the lack of adequate information about such fee structures and the highly personalized nature of supportive measures provided to complainants and respondents, we cannot at this time provide such estimates with any precision."[25]

By dismissing any cost estimation related to supportive measures, the Department essentially zeroes out this cost category. In encouraging recipients to provide supportive measures in the absence of formal complaints, however, it is reasonable to assume that such services, and the cost of such services, will increase. For example, increasing campus escort services and other security services will require additional staff hires and working hours. Even the rules' assumption that counseling services are already largely offered for free to students is not accurate – many students are still responsible for co-pays for mental health services[26] and not all students receive insurance (as of 2016, 8.7 percent of all students, or 1.7 million, remained uninsured).[27]

Another unconsidered cost relates to transfers and additional schooling. Exposure to a hostile environment can have extremely high costs for individual students, especially when avoiding these environments is preferable to confrontation in a dispute setting or to remaining in the environment in which the harassment occurred. Students may choose to transfer out of a hostile

---

[23] 83 Fed. Reg. at 61469 (§ 106.44(b)).

[24] Ibid.

[25] 83 Fed. Reg. at 61487.

[26] *See, e.g.,* Teachers College Columbia University, *What's New in the Columbia Health Insurance Plan*, https://www.tc.columbia.edu/insurance-immunization-records/health-insurance/whats-new-in-the-columbia-health-insurance-plan/.

[27] Jeremy Bauer-Wolf, *After the ACA, Fewer Uninsured Students*, Inside Higher Ed (Mar. 30, 2018) https://www.insidehighered.com/news/2018/03/30/obamacare-has-led-fewer-uninsured-students-study-finds.

EXHIBIT 23

environment by opting to pursue their education at a different institution. However, there are many costs associated with this strategy. The bulk of the upfront costs relate to credits that become 'stranded assets', when the investment that students, families, and public institutions make to help students acquire skills is lost. The result is that these students will need additional credits in order to receive a degree – if they receive one at all – and will spend more time out of the labor market. In 2014, the Department itself found that the average transfer student loses 27 earned credits after transferring.[28] The Government Accountability Office also found that transfer students spend an extra 0.25 years in school before graduating.[29]

According to a 2017 analysis from Complete College America, each additional year of schooling costs roughly $51,000 for students at two-year colleges and $68,000 for students at four-year colleges – and in both cases, the majority of those costs come from foregone earnings. Indirect costs are even higher, as stranded assets also reduce the probability of degree attainment for transfer students and increase the probability of a skill mismatch in later careers.

## IV.    The Proposed Rules would undermine Title IX protections in other significant ways.

In addition to the severe flaws in the Proposed Rules' cost estimations, there are other key aspects of the rules that would cause irreparable harm to survivors of sexual harassment and undermine Title IX protections. These harms are explored in greater depth by partner organizations in their submitted public comments but we have included them here given their importance. It is also important to note that many of the points provided below would themselves – outside of the scope of the regulatory impact analysis – make propagation of these rules illegal, as they run contrary to the directives and requirements contained in Title IX statute.

- The proposed definition of harassment improperly prevents schools from providing a safe learning environment.
- The proposed notice requirement undermines Title IX's discrimination protections by making it harder to report sexual harassment and assault.
- The Proposed Rules' notice and deliberate indifference standards and definition of sexual harassment create inconsistent rules for students versus employees.
- The Department's proposed "deliberate indifference" standard would allow schools to do virtually nothing in response to complaints of sexual harassment and assault.
- The Proposed Rules would require schools to ignore harassment that occurs outside of a school activity, even when it creates a hostile educational environment.
- The Proposed Rule's requirement that a respondent be presumed not responsible for harassment is inequitable and inappropriate in school proceedings.
- The Proposed Rules would improperly require survivors and witnesses in college and graduate school to submit to live cross-examination by their named harasser's advisor of choice, causing further trauma.

---

[28] National Center for Education Statistics, *Transferability of Postsecondary Credit Following Student Transfer or Coenrollment: Statistical Analysis Report*, https://nces.ed.gov/pubs2014/2014163.pdf.
[29] Government Accountability Office, *Transfer Students: Postsecondary Institutions Could Promote More Consistent Consideration of Coursework by Not Basing Determinations on Accreditation*, https://www.gao.gov/new.items/d0622.pdf

EXHIBIT 23

- The Proposed Rules would allow schools to pressure survivors into traumatizing mediation procedures with their assailants.
- The Proposed Rules would force many schools to use a more demanding standard of proof to investigate sexual harassment than they would use to investigate other types of student misconduct.
- The Proposed Rules fail to impose clear timeframes for investigations and allow impermissible delays.
- The Proposed Rules are inconsistent with the Clery Act.
- The Proposed Rules would allow schools to claim religious exemptions for violating Title IX with no warning to students or prior notification to the Department.

## V.   **Conclusion**

Instead of effectuating Title IX's prohibition on sex discrimination in schools, the Department's Proposed Rules serve only to protect schools from liability when they fail to address complaints of sexual harassment and assault and tilt the investigative process in favor of respondents at the expense of survivors. The Department also fails to properly calculate accurate cost estimates related to the implementation and enforcement of its Proposed Rules, among other key considerations. The rules are arbitrary and capricious in nature and are in violation of the APA. The Center calls on the Department to immediately withdraw the Proposed Rules and instead focus its energies on vigorously enforcing the Title IX requirements that the Department has relied on for decades, to ensure that schools can promptly and effectively respond to sexual harassment and assault.

Sincerely,

Jamila Taylor
Senior Fellow, Women's Initiative
Center for American Progress

EXHIBIT 23

# EXHIBIT 24

*Submitted via www.regulations.gov*

January 30, 2019

Kenneth L. Marcus
Assistant Secretary for Civil Rights
Department of Education
400 Maryland Avenue SW
Washington, DC 20202

*Re:  ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*

Dear Mr. Marcus:

I am a Professor of Psychiatry at Harvard Medical School and the author of a book, *Trauma and Recovery,*[1] which is considered a fundamental text for understanding psychological trauma.  I am a founder of the Victims of Violence Program in the Department of Psychiatry at Cambridge Health Alliance, a teaching hospital of Harvard Medical School, where for over 30 years I have trained post-graduate students in the mental health disciplines how to promote healing in traumatized people.

On behalf of the 902 undersigned mental health professionals and trauma specialists, I am submitting this joint comment letter in response to the Department of Education's Notice of Proposed Rulemaking ("NPRM" or "proposed rules") to express our strong opposition to the Department's proposal to amend rules implementing Title IX of the Education Amendment Act of 1972 (Title IX) as published in the Federal Register on November 29, 2018.

Based on our experience in treating survivors of sexual assault and harassment, it is our opinion that many of the new proposed rules will cause increased harm to students who report sexual harassment, including sexual assault, to their schools, and will discourage students who have been victimized from coming forward.  The net effect of the new proposed rules will be to reinforce the shaming and silencing of victims, which has long prevailed in our society, and to worsen the problem of sex discrimination in education.

Incidents of sexual assault and harassment are extremely common.  National epidemiological studies conducted by the Department of Justice[2] and the CDC[3] have repeatedly documented the fact that roughly 20-25% of women have been sexually assaulted, most commonly by men they know.   Young women ages 18-25, that is, women of college age, are at the highest risk.[4]

---

[1] JL Herman: Trauma and Recovery: *The Aftermath of Violence—From Domestic Abuse to Political Terror.*  New York: Basic Books, 1992, 1997, 2015.
[2] P. Tjaden & N. Thoennes: *Prevalence, Incidence, and Consequences of Violence Against Women: Findings from the National Violence Against Women Survey.*  Washington, DC: US Department of Justice, 1998.
[3] MJ Breiding, SG Smith, KCBasile et al: "Prevalence and Characteristics of Sexual Violence, Stalking, and Intimate Partner Violence Victimization---National Intimate Partner and Sexual Violence Survey—United States 2011."  *Center for Disease Control and Prevention: Morbidity and Mortality Weekly Report,* September 5, 2014.
[4] S Sinozich & L Langton, *Special Report: Rape and Sexual Assault Victimization among College-Age Females, 1995-2013.* Washington DC:  US Department of Justice, 2014

1

EXHIBIT 24

Although under Title IX, schools are required to respond to acts of sexual violence that impact students' access to education, in practice, many schools utterly fail to protect victims or hold perpetrators accountable.   Many victims who dare to complain still encounter dismissive, shaming, or frankly punitive attitudes from authority figures.   Many perpetrators can still reasonably expect tolerance, if not frank encouragement, for their behavior from authority figures and from their peers.   Understanding this reality, victims of sexual assault and harassment are generally reluctant to come forward.   In a recent study of rape on college campuses, only 8% of sexual assaults were reported to police.[5]

Acts of sexual assault and harassment are assertions of raw power, intended to demonstrate total dominance over victims and to remind them to know their place.   These acts degrade victims in the eyes of others so that they will be publicly stigmatized and scorned should they dare to complain.   People who have been subjected to these assaults experience terror, helplessness and profound humiliation.   Sexual assaults, because of their gratuitous cruelty, are among the most harmful of traumatic experiences.[6]

The response of the survivor's community--family, peers, and especially authority figures-- is of immense importance in determining the course of recovery.   Survivors who are met with compassion and support usually recover well; such support repairs the survivor's trust in other people.[7]   On the other hand, survivors who are met with indifference or blame from authority figures will predictably suffer increased symptoms of post-traumatic stress and depression, as they will feel abandoned and betrayed by their community.[8]

Authority figures in schools are therefore in a position of great social responsibility.   Given the prevalence of sexual assault and harassment and the vulnerability of teenage and college age women, it is incumbent on school authorities to develop pro-active measures of intervention based on an understanding of the social realities of sexual assault and the psychology of people who have been traumatized.   These proposed rules seem to disregard both the seriousness of the problem of sexual harassment and assault, and the profound harm to victims that results.

In particular, the following rules would exacerbate psychological harms to victims:

Rule 106.30:  This proposed rule unfairly limits the supportive measures that schools could offer in order to help survivors in the aftermath of trauma.   Following sexual assault and harassment, survivors often suffer from intrusive, overwhelming flashback memories of the event, as well as nightmares, insomnia, and pervasive feelings of terror.   Any reminder of the event, such as encountering the perpetrator in a dormitory or classroom, provokes these symptoms, which interfere with the student's ability to concentrate on her studies and participate in campus life.

---

[5] MP Koss: "Hidden Rape: Sexual Aggression and Victimization in a National Sample of Students of Higher Education."  In *Rape and Sexual Assault*. Vol 2. Ed. AW Burgess. New York: Garland, 1987, 3-26.
[6] RC Kessler, A Sonnega, E Bromet et al: "Posttraumatic Stress Disorder in the National Comorbidity Survey." *Archives of General Psychiatry* 1995; 52:1048-1060.
[7] AW Burgess & LL Holmstrom, "Adaptive Strategies and Recovery from Rape."  *American Journal of Psychiatry* 1979; 136:1278-1282.
[8] CP Smith & JJ Freyd: "Institutional Betrayal."  *American Psychologist* 2014; 69: 575-587.

2

EXHIBIT 24

It is incumbent on the school to take active measures to protect the survivor, including measures that may inconvenience the accused perpetrator.  It is neither unreasonable nor excessively harsh to ask the accused to make some accommodations to stay away from the survivor, such as changing classes or transferring to a new dormitory.   However, there is no justification for a "mutual" no-contact order, which presumes that both parties are equally in need of protection from one another.

Rule 106.45(b)(1)(iv):  This rule requires schools to presume at the outset that the accused perpetrator is not responsible.  This means in effect the school is required to presume that the complaining victim is lying, reinforcing sexist rape myths, and prejudging the institutional response in favor of the accused perpetrator.   In reality, false complaints of sexual assault are exceedingly rare, while false denials and claims of innocence are commonplace.

The presumption of innocence is appropriate in criminal proceedings, where the liberty of the accused is at stake, in order to protect the accused individual against the overweening power of the state.  It is not appropriate in matters of educational discipline, where what is at stake is the privilege of the accused to be part of an educational community.   It is certainly not appropriate as applied to gender-based violence, where perpetrators currently enjoy what amounts to impunity.[9] This rule would continue to foster impunity for perpetrators.  By implementing rules that give undue advantage to perpetrators, schools would humiliate and re-traumatize survivors of sexual assault and harassment and perpetuate sex discrimination.

Rule 106.45(b)(3)(vi-vii):  This rule requires students who file formal Title IX complaints to submit to cross-examination in a "live hearing" by the accused student's "advisor of choice." For survivors of sexual assault and harassment, this means being subjected to hostile attacks on their credibility and public shaming at a time, following a traumatic event, when they may feel most vulnerable.   It also means being forced to relive their traumatic experiences in excruciating detail, a situation almost guaranteed to aggravate their symptoms of post-traumatic stress.   For these reasons, a requirement for live cross-examination is likely to cause serious to harm victims who complain and to deter even more victims from coming forward.

Rule 106.45(b)(6):  This rule would allow schools to use an "informal resolution process," such as mediation, for resolving complaints. Survivors of campus sexual assault and harassment, faced with the prospect of an extremely hostile and re-traumatizing process for investigation of formal complaints, are at high risk of being pressured to consent to mediation as a less forbidding option.   Mediation, however, is never appropriate in situations of sexual violence and harassment, because it is a method of resolving disputes based on the presumption that both parties are equally responsible for the problem.  To apply mediation to complaints of gender-based violence and harassment is to perpetuate sexist prejudices that blame the victim.   This option can only result in further humiliation of the victim.

In sum, these proposed rules will perpetuate sex discrimination in schools, by preventing schools from taking reasonable measures to protect and care for survivors of sexual assault, and by adding to the burden of trauma for survivors who have the courage to come forward.   Rather than implementing these proposed rules, the Department of Education should redirect its

---

[9] K Daly & B Bonhours: "Rape and Attrition in the Legal Process: A Comparative Analysis of Five Countries." *Crime and Justice* 2010; 39: 485-565.

EXHIBIT 24

attention to enforcement of existing Title IX requirements that schools respond with care and diligence to the problems of campus sexual assault and harassment.

Thank you for the opportunity to submit comments on the NPRM.

Sincerely,

Judith L. Herman, M.D.
Professor of Psychiatry (Part Time)
Harvard Medical School

Joined by,

Abbe Blum, Ph.D., Saybrook University
Abby Adis
Abby Seixas, LMHC
Abigail Love, M.D. MPH, Cambridge Health Alliance
Adam MacDonald, LMSW
Adam Maughan, B.S., University of Tennessee
Adele D'Ari, Ed.D., Washington Falls Psychotherapy
Adina Kleiman, Ph.D., Private Practice
Adriana Reyes
Ainhoa Indurain, LPC, Chicago Children's Advocacy Center
Alan Groveman, Ph.D., Chester Psychological Services, LLC
Albert Everling, M.A.
Alessandro Piselli, Ph.D., Boston College
Alex Pirie, Immigrant Service Providers Group/Health
Alexander Colts, MSW, M.P.H., Cambridge Health Alliance
Alexandra Altman, LICSW
Alexandra Dimant, LCSW
Alexandra R. Kaufman, Psy.D.
Alexandra Zelin, Ph.D.
Alexis D. Brooks, M.D.
Alexis Truslow, LMHC
Alicia M. Flanagan, MSW, LICSW
Alisa Garner, MA
Alisa Greco, LMHC
Alisa Young, M.A., LPC
Alison Curdt, Psy.D.
Alison Segal, Ph.D., Healthy Behaviors of Westchester
Allison Miller, Ph.D.
Allison Shapre, LCMHC, AMHCA
Alysha Warren, MA
Alyson Morse Katzman, Safe Havens Interfaith Partnership Against Domestic Violence
Alyssa Iannuccilli, LMHC
Alyssa LoGrasso, MSW Student
Amanda Cutler, LCSW, M.A.
Amy Blake, LCSW
Amy H. Eden, LICSW
Amy Itzkovitz, LICSW
Amy K. Friedman, Ph.D.
Amy K. Keisling, ACSW, LCSW, BCD

4

EXHIBIT 24

Amy Leach, LCSW, NASW
Amy McCollom, MSW
Amy Present, LMHC
Andrea Carusona, LMHC
Andrea Cole, Ph.D.
Andrea Corn, Psy.D.
Andrea Gordon, M.D., Cambridge Health Alliance
Andrea L. Bross, Ph.D., South Shore Counseling & Psychological Services
Andrea Singer, M.A., The New School for Social Research
Andrea Werner Insoft
Angela Radan, Ph.D., Cambridge Health Alliance
Angie Rush, LCSW
Anita P. Sharma, Political Asylum Immigration Representation (PAIR) Project
Ann Dercole
Ann Marie Madigan, M.D.
Anna Campion, Ph.D.
Anna Kharaz, LMHC
Anna Rabkina, M.D., Cambridge Health Alliance
Anna Stothart, Psy.D, LMHC
Annabel Gill, LCSW, Cambridge Health Alliance
Anne Hernandez, Boston Public Schools
Anne Huhman, MSW
Anne P. DePrince, Ph.D., University of Denver
Anne R. Tavel, Ph.D., Private Practice
Anner Eliot, Ph.D.
Annie Drehkoff, M.S., CCLS, Chicago Children's Advocacy Center
Annie Kawalski, LCSW
Archana Varma, M.D.
Arielle Scoglio, M.P.H., Veterans Health Administration
Ashley Wilkins, LSW, Chicago Children's Advocacy Center
Asli Baykal, Ph.D., LCSW
Associate Professor Carolyn Quadrio, School of Psychiatry, University of New South Wales, Sydney, Australia
Audrey A. Wagner, Ph.D.
Aviva Bock, CCMHC, LMHC
Barbara D'Arthenay, LICSW
Barbara Finn, Ph.D., ABPP, FAGPA, Stanford Dept. of Psychiatry
Barbara Hamm, Psy.D., Harvard Medical School
Barbara J. Saltzstein, MSW, LICSW, Private Practice
Barbara Shapiro, M.D., Psychoanalytic Center of Philadelphia; University of Pennsylvania School of Medicine
Barbara Suter, Ph.D., NYU Postdoctoral Program in Psychoanalysis and Psychotherapy
Barbara Turk, Psy.D.
Barbara W. Burkart, LMHC, Private Practitioner
Bernard Epstein, LCSW
Bernasha Anderson, Ph.D., American University
Beth Carlson, Ph.D., L.P., Augsburg University
Beth Davenport, LICSW
Beth E. Molnar, Sc.D., Northeastern University
Beth Levine, LCSW-C
Beth Marx, LCSW, Boston Medical Center
Beth Rontal, LICSW
Beth Sperber Richie, Ph.D., Trauma Psychologist

5

EXHIBIT 24

Beth Wilson, Ph.D., Psychological Health Roanoke
Bonnie Barnard-Lopez, LCSW-C
Bonnie L. Calabrese, Berkeley Unified School District
Bradley Bryk, M.A.
Breanne Wilhite, Harvard T.H. Chan School of Public Health
Brenda A. Austin, Ph.D., National Academy of Neuropsychology
Brenda Bemporad, Ph.D.
Brenda Solomon, M.D., Chicago Institute for Psychoanalysis
Brenda Steinberg, Ph.D.
Brian J. Pare, Riverside Community Care, Dedham, MA
Brian Walsh, RN, CHA Everett Hospital
Brianna Delker, Ph.D.
Brittny Maravelias
Bruce McCarter, M.A., Psy.D., Private Practice
C. Paula Krentzel, Ph.D.
Caitlin Clevenger, M.S., University of Tennessee
Caleb Englander, LICSW
Camilla Pearson, MSW, LGSW
Candice S. Miller, LCSW/Psychoanalist, Private Practice
Candida Spano Cucharo, MSW, MBA, New York State Association for Infant Mental Health, Inc.
Cara Crisson, Psy.D.
Cara McClain, M.A., University of Tennessee
Carly Parnitzke Smith, Ph.D., Penn State College of Medicine
Carol A. Lambert, MSW
Carol Hendler, LCSW-C, MSW
Carol Johnson
Carol Kemelgor, LCSW
Carol Presant, LMSW
Carol S. Goldbaum, Ph.D., Juniper Center
Caroline B. Goldberg, LCSW, AAPCSW, IARPP, NJSCSW
Caroline Krehbiel, Ph.D., NCSP
Carolyn Gerard, LMFT, Private Practice
Carolyn J. Smith, Ph.D., Eastern Shore Associates
Carrie Ruggieri, LMHC, BCETS, AEDP Institute
Caryl Beth Thomas, M.A., LMHC, ACMT, Massachusetts Department of Mental Health, American
Music Therapy Association
Caryl Morris, Ph.D., LICSW
Catherine Balletto, LICSW
Catherine Bohn, Psy.D.
Catherine Haines, OTR/L, Cambridge Health Alliance
Catherine Hondorp, D.C., S.E.P.
Celine Stillman, LCSW, NYSSCSW
Chana Kahn, LCSW
Chantal Pico, LCPC
Charlotte Strauss Swanson, University of Tennesee-Knoxville
Chelsea A., Emerson Hospital Behavioral Health
Chelsea Davies, LCSW, Center for Violence Prevention and Recovery at Beth Israel Deaconess Medical
Center
Cherylynne Berger, MSW, LCSW, Private Practice in Psychotherapy
Christa M. Marshall, Psy.D.
Christi M. Collins, Psy.D
Christie M. Platt, Ph.D., Private Practice
Christina Lee, M.D., Cambridge Health Alliance

6

EXHIBIT 24

Christine M. Jackson, MSW
Christine Routhier, MT-BC, LMHC, Sound Living Therapy Services
Cindi Flores, MSW Candidate, EBNHC, LCHC, Salem State University
Cindy Chandler-Guy, LICSW
Cindy Crabb, M.Ed., LPC, ACA
Cindy Su
Claire Carswell, M.D., Harvard Medical School
Claire Olivier, PMHNP, CNS-BC, Olivier Group Wellness Center
Clare R. Brown, LPC
Colette Linnihan, LCSW
Colleen J. O'Brien, Psy.D., Cambridge Health Alliance
Connie Evert, Ph.D., Psychologist
Corinne Masur, Psy.D.
Cristy Novotney, MSW
Cynthia Baum-Baicker, Ph.D., Scattergood Foundation for Behavioral Health
Cynthia Berman, Psy.D.
Cynthia Kennedy, LICSW, Center for Violence Prevention and Recovery at Beth Israel Deaconess
Medical Center
Cynthia N. Mendelson, Ph.D.
Cynthia S. Tavilla, Psy.D.
Cynthia Simpson, LICSW
Cynthia Worth, Ed.D.
D. Cameron
Dale Gody, Ph.D., ABPP, Chicago Psychoanalytic Institute
Dalphine E. Meadows, LMSW
Dana Charatan, Psy.D., Private Practice
Dana L. Sinopoli, Psy.D., Private Practice
Daniel Campbell, Greater Washington Society for Clinical Social Work
Danielle Catrillo, M.P.H., Dornsife School of Public Health
Danielle M. Caggiano, LICSW, Private Practice
David Celiberti, Ph.D.
David Ray, LCSW
David Shirley, M.S., Psychology Doctoral Candidate , University of Utah
David Zelaya, M.Ed., Cambridge Hospital
Deanna N. Cor, Ph.D., LPC, NCC
Deanna Seather-Brady, LICSW
Deborah C. Rosenkrantz, LICSW
Deborah Estrada, MSW, Chicago Children  Advocacy Center
Deborah Fishman, MSN, PMHCNS-BC
Deborah H. Dawes, Ph.D., Center for Psychology
Deborah Hellerstein, Ph.D.
Deborah K. Saunders, LCSW
Deborah L. Block, Ph.D.
Deborah Lynne Korn, Psy.D.
Deborah Moran, M.D.
Deborah Sarson, Cambridge Health Alliance
Deborah Weisinger, Psy.D.
Deborah Wolozin, Ph.D.
Debra Abrams, LICSW
Debra F Schiffman, LCSW-C
Dee Mosbacher, M.D., Ph.D.
Deirdre Modesti, Ph.D.
Denise E. Elliott, Psy.D.

EXHIBIT 24

Denise Krouse, MC, LMHC, MDFT
Denise Lensky, Ph.D., Private Practice
Deslonde Parkinson, LMHC
Diane Girdwoyn Caspe, M.S., LCSW
Diane W. Johnson, LCMHC, Psychotherapist, LCMHC
Dianne Turenne, LCMHC
Dina del Amo, Psy.D.
Diya Kallivayalil, Ph.D.
Donald R. Watson II, M.A. MFT, Community Counseling Centers of Chicago
Donna Hawx, Ph.D., Association for Women in Psychology
Donna M. Van Kirk, Ed.D., Psychologist, Psychologists of Northwest Arkansas
Donna Newman-Bluestein, BC-DMT, LMHC
Dorothy Kresz, MBA, LCSW, WCSPP
Dr. Evelyn Goodman
Dr. Jessica Tartaro
Dr. Joyce Maguire Pavao , Pavao Consulting and Coaching
Dr. Lisa Roth
Dr. Nuri A. Hammett
Dr. Patricia L. Papernow, Psychologist
Dr. Ruth M. Lull, APA, MPA
Dr. Susan Kavaler-Adler, Executive Director of the Object Relations Institute
Dwight Dugan, LCSW
Ed Semansky, J.D., M.A.
Eden Brenner
Edward Yeats, Ph.D.
Eileen Chodos
Eileen M. Dunn, PsyD, Washington Baltimore Center for Psychoanalysis, Private Practice
Eileen M. Russell, Ph.D, AEDP Institute
Elaine Rodino, Ph.D., Private Practice
Eleanor B. Krolian, LCSW, Private Practice
Eleanor Roffman, Ed.D., Lesley University
Eleanor Vohryzek, LMFT
Eline Potoski, LCSW, Arbor Counseling LLC
Eliot Gelwan, M.D., Emerson Behavioral Health
Elisa Elkin-Cleary, LICSW
Elisabeth Ellis Waingrow, MSW, LICSW, NASW
Elisheva Dan, Ph.D., Mass. Institute for Psychoanalysis
Elissa Levine, LCSW-C, LICSW
Elissa Q. White
Elizabeth Buckley, LICSW
Elizabeth Camlin, LCSWC
Elizabeth Cohen, Ph.D.
Elizabeth Cohn Stuntz, LCSW
Elizabeth de Bethune
Elizabeth G. Brenner, LICSW, Therapy Training Boston
Elizabeth Glaeser
Elizabeth Grace Burkhart, LICSW , Private Practice
Elizabeth L. Bennett, Ed.D., Private Practice
Elizabeth L. Vitale, MSN, Psy.D., Psychotherapy Partners, LLC
Elizabeth M. Stern, LICSW, Private Practice
Elizabeth Malaret
Elizabeth Mooers, LICSW
Elizabeth Parsons, Psy.D., Dept. of Psychiatry, Harvard Medical School

EXHIBIT 24

Elizabeth Philbert, RN, Cambridge Health Alliance
Elizabeth Rider, M.Ed., Vanderbilt University
Elizabeth Robinette Wade
Elizabeth Southwell, BA
Elizabeth Stahler, LICSW, College Counseling
Elizabeth Zoob, LICSW, Women's Mental Health Collective
Ella Pecsok. Ph.D.
Ellen Goldsmith, LICSW
Ellen Nasper, Ph.D., Yale University School of Medicine
Ellen Rome, LICSW
Ellen Somberg, Psy.D.
Ellen V. Garbuny, LSW
Elliot Spengler, M.A., University of Tennessee, Knoxville
Emily Aber, LCSW
Emily K. Fitton, LCSW
Emily Schatzow, M.Ed.
Emma Chaitin
Erica S. Nazzaro, LICSW
Erika L. Francis-Raniere, Ph.D.
Erin Hetzel, LICSW
Erin Ramsey, LCSW, Center for Violence Prevention and Recovery at Beth Israel Deaconess Medical
Center
Estelle B. Freedman, Stanford University
Estelle Disch, Ph.D., Boston Associates to Stop Treatment Abuse and University of Massachusettts
Boston
Esther Rothblum, Ph.D., San Diego State University
Eugenia Monroy-Advis LCSW
Evan Imber-Black, Ph.D., American Family Therapy Academy
Eve K. Lesses, LICSW
Eve N. Bogdanove, MSW, LICSW
Evelyn Gladu, LMHC
Faye Fiore, LMFT
Federica Latta, Ph.D.
Fernando Gonzalez III, Chicago Children's Advocacy Center
Frances Rekrut, Ph.D.
Francine G. Rosenfeld, MSW
Francine Ronis, LPC
Gabel Viera, LCSW
Gabrielle Cavallacci, LICSW
Gail B. Shulman, LMHC, Somerville/Cambridge Outpatient Clinic(Riverside Community Care)
Gail Charpentier, LMHC, Gail Charpentier, LMHC, Psychotherapy
Gail Fries, MSW, LICSW
Geraldine M. Gamble, RN, MSN, Veterans Administration, Retired
Ghislaine Boulanger, Ph.D.
Gianine D. Rosenblum, Ph.D.
Gilberto Gamba, Cambridge Health Alliance
Ginger Ryan, LICSW
Ginna Donovan, Ph.D., Women's Mental Health Collective
Gladys Valdez, Ph.D.
Gloria Acosta, LICSW, Cambridge Health Alliance
Goldie Eder, LICSW, BCD, Harvard Medical School and Smith College School for Social Work
Grace Chem, Ph.D., LMFT
Greta Jankauskaite, M.A.

9

EXHIBIT 24

Greta Spoering, LICSW, Emerson College, Healing & Advocacy Collective
Gretchen Kurdziel Adams, M.A., Cambridge Health Alliance
Gretchen Pauley, LICSW
Hannah Miller, LICSW, Cambridge Health Alliance
Harlene Goldschmidt, Ph.D.
Helen Youngju Kim, M.A., UC Berkeley Counseling & Psychological Services
Helene Lieb, Ed.D. , American Psychological Association
Hemda Arad, Ph.D, IARPP Member
Hilary Sherry, The Menninger Clinic
Hillary Halpern, M.S., N.C. State University Counseling Center
Holly Aldrich, LICSW
Holly Clause, LCMHC, Private Practice
Holly Friedman Housman, Cambridge Health Alliance
Hope Williams, LCSW, American Indian Health Service of Chicago
Howard H. Covitz, Ph.D., ABPP , Private Practice
Ina Harizanova, Psy. D.
Inge S. Hoffmann, Department of Psychiatry, Cambridge Hospital, Harvard University Medical School
Ingrid Avison, MSW Candidate, The Center for Hope and Healing and Salem State University
Irna Gadd, LCSW
Isabel Peixoto, LCSW
Isabelle Lorans, LCSW, SEP
J. Patricia Thatcher, MSW, LICSW, The LifeWorks Center, Cambridge, Ma
J. Wesley Boyd, M.D., Ph.D., Cambridge Health Alliance/Harvard Medical School Center for Bioethics
Jack D. Haden, LCSW
Jack Nowicki, LCSW, Jack Nowicki's Collaborative Counseling, Consulting, & Training
Jacob A. Palm, Ph.D.
Jacquelin Alden Baker Ellery, Mental Health Therapist in Private Practice
Jacqueline Botwinick, LCSW
Jaime Francisco Matorras, LMHC
Jaine Darwin, Psy.D., ABPP, Harvard Medical School
Jaleesa Pirtle , Chicago Children's Advocacy Center
James A. Chu, Harvard Medical School
James Stewart Lang, M.D., Cambridge Health Alliance
Jamie Steele, LMFT
Jane M Brodwyn, Psy.D.
Jane MacDonald, Ph.D.
Jane Tucker, Ph.D., New York University Postdoctoral Program in Psychotherapy and Psychoanalysis
Jane W. Bloomgarden, Ph.D., WCSPP
Janet Russo, LICSW, LADC-I
Janet S. Mazziotti, LICSW
Janette Dingee
Janice Furlong, MSW, LICSW, Boston University School of Social  Work
Janice Muhr, Ph.D., Psychotherapy Action Network
Janice Waters, M.S., LCPC, Chicago Children's Advocacy Center
Javier Andres Vargas
Jayme A. Shorin, LICSW, Victims of Violence Program, Cambridge Health Alliance
Jean Esther Williams, MSW
Jean Walbridge, ACSW, LCSW
Jeanie Barnard, LCSW
Jeanne Marecek, Ph.D.
Jeff Ruser, M.A.
Jen Johnson, CNM
Jenna Caggiano, LMHC, R-DMT

10

EXHIBIT 24

Jenna Gilmore, M.A., University of Tennessee
Jennifer Bakalar, Ph.D.
Jennifer Brady, University of Maryland, College Park
Jennifer Clemons, LCSW, LCAS
Jennifer Heneberry, LICSW
Jennifer Hoult, J.D.
Jennifer J. Freyd, Ph.D., Professor of Psychology, U. of Oregon
Jennifer M. Gomez, Ph.D., Wayne State University
Jennifer Markell, LICSW, Private Practice
Jennifer O'Keeffe, Ph.D.
Jennifer Tattersall, LCSW
Jenny Abrams, M.D.
Jenny Berz, Ph.D.
Jenny Otero, The Center for Hope and Healing, Inc.
Jerald Kay, M.D.
Jessica Gold, M.D., M.S., Washington University in St Louis
Jessica Hammann
Jessica Lutkenhouse, Psy.D.
Jessica Roberto
Jessica Salgado, MSW
Jessica Slatus, LCSW
Jessie Weisstein, LCSW
Jill Cermele, Drew University
Jill Gentile, Ph.D., NYU Postdoctoral Program in Psychotherapy and Psychoanalysis
Jill Jackson, LICSW, Private Practice
Jill Pedrick, LISCW, Pedrick Counseling, and Spaulding Rehab Hospital
Jill Salberg, Ph.D., ABPP, NYU Postdoctoral Program in Psychotherapy and Psychoanalysis
Jo Ellen Boskind, LICSW, Private Practice
Jo Oppenheimer, Psychologist, American Psychologist Association
Jo-Anne Bachorowski, Ph.D., Vanderbilt University
Jo-Anne Ochalla, LICSW, Center for Violence Prevention and Recovery
Joan Copperman, Ph.D.
Joan Fiorello, Ph.D.
Joan M. Cook, Ph.D., Yale University
Joan O'Connell, LICSW
Joan Saperstan
Joan Wolkin, Ph.D.
Joanne Simiola
Jody Porter, LCSW, Westchester Chapter, NYSSCSW
John C. House, Ph.D.
John Drollinger
John Heil, Doct. Arts, Psychology, Psychological Health Roanoke
Jon Reeves, Ph.D., Boston University
Jordan Thibodeaux, Ph.D., Arkansas Tech University
Joseph Berlin, LCSW, Cambridge Health Alliance
Josephine A. Bottone, LICSW
Joset Navach Munro, LICSW, BCD, NESTTD,  NASW,  ISTSS
Josue Fernandez, M.D., Cambridge Health Alliance
Joyce Heyman, LPC
Joyce Slochower, Ph.D., NYU Post Doctoral Program
Judith A. Tribbett, M.A.
Judith Beavan, MSW
Judith C. Powell, Ph.D.

11

EXHIBIT 24

Judith C. Simon, MSW., Ph.D.
Judith D. Ferlise, M.A., LPC, Private Practice
Judith Flaxman, Ph.D., Director of Psychological Services, Center for Multimodal Treatment
Judith Goodman, LICSW, AEDP
Judith Jordan, American Psychological Association
Judith Silvan, LICSW, LCSW, Certified AEDP Therapist & Supervisor
Judy Hu, LMHC
Julia Blencowe, MSW
Julia Broussard, MSW, LCSW
Julia Martinez, CSW, Latino Behavioral Health Services
Julia Matson, LCSW, Chicago Children's Advocacy Center
Julia Rothenberg
Julia Strehlow, MSW, LCSW, Chicago Children's Advocacy Center
Julian C. Ernst, LCSW, Cambridge Health Alliance
Julianne Bloch
Julianne Gaut, LCSW
Julie Goschalk, LICSW
Julie Harmon, Ph.D.
Julie Heim Jackson, Ph.D., Private Practice
Julie Leavitt, D.Min., Lesley University
June Siegel, MSW, LCSW, Private Practice
Kara Swedlow, Ph.D., Psychoanalytic Institute of Northern California
Karen Adler, M.D.
Karen Pando-Mars
Karen Pierce, M.D.
Karen Rosica, Psy.D., Faculty University of  Colorado Health Sciences
Karen Tompkins
Karen W. Saakvitne, Ph.D., Smith School for Social Work
Karen Zilberstein, LICSW
Karol Maybury, Ph.D., University of Maine, Farmington
Kate Glazer, LCSW, Institute for Psychoanalytic Research and Training
Kate Halliday, LCSW
Kate Lingren, LSW, Boston College School of Social Work, Private Practice
Kate Scherzo, Ph.D.
Kate Shirley, M.A.
Kate Washton, LCSW, Westchester Center for the Study of Psychoanalysis and Psychotherpay
Kate Zona, Ph.D., Cambridge Health Alliance
Kate Zuby, M.S., UC Berkeley Counseling & Psychological Services
Katharine Esty, Ph.D., LICSW
Kathe Miller, M.D., Harvard Medical School
Katherine A. Lenger, M.A.
Katherine Campbell, LCSW
Katherine Jones, Ph.D.
Katherine Shrager, Psy.D.
Kathleen Bedford
Kathleen DeZenzo, LICSW
Kathleen J. Coutu, MSW, LICSW
Kathleen O'Donnell, Ph.D., Hines Veterans Hospital
Kathleen U. Evans, MSN, APRN,PMH/CNS/BC, Johns Hopkins Bayview Medical Center, Community
Psychiatry
Kathryn Ackerman, M.D., M.P.H., Boston Children's Hospital, Harvard Medical School
Kathryn Becker-Blease, Oregon State University
Kathryn Gambach, LCSW

12

EXHIBIT 24

Kathryn White, Ph.D.
Kathy Calderon, LCPC, C4
Katie Gentile, John Jay College of Criminal Justice
Katy Cording, Psy.D.
Katy Dirks, M.Ed.
Katy Irving, LCSW, Chicago Children's Advocacy Center
Katya Zinn, It's On Us Lesley
Kayla DeCant, M.Ed
Kayla Weiner, Ph.D.
Kelliann Burke
Kelly Champion, Cadeus Behavioral Health
Kelly Hurst, Ph.D.
Kelly Perry
Kelly Wells, LCSW-C
Kendahl M. Shortway, Psy.D. , Kean University
Kenneth Feiner
Kerry A. Sheehan
Kerry Rollins, MSW
Kevin Krumvieda, Ph.D.
Kevin M. Fry, M.A., The University of Tennessee, Knoxville
Kevin Montgomery, Graduate Student
Kijai Corbett, MSW, Cambridge Health Alliance
Kim Fightmaster, MSCP
Kim Neal J.D., MSW
Kim Novak, LCSW
Kimberly Kilfoyle, M.D., Cambridge Health Alliance
Kimberly M. Mcclung, RN, Cambridge Health Alliance
Kimberly Welch, LMHC
Kirsten Carraway, Ph.D.
Kirsten Meisinger, M.D., MHCDS, Cambridge Health Alliance
Kristin B. Powell, Ph.D., New Peaks Neuropsychology
Kristin Hoffner, Arizona State University
Kristina L. Vadas, MSW, LCSW
Kristine Panik, M.D., University of California, Berkeley
Kristy M. Keefe, Psy.D. , Western Illinois University
Kurt M. Hanus, M.A.Ed., LCPC
Kylie O'Rourke, Pathways for Change
Lara Jirmanus, M.D., MPH, Cambridge Health Alliance and Harvard FXB Center for Health and Human Rights
Latifat Cabirou, M.S.
Laura Cotton, LICSW, Cambridge Health Alliance
Laura L. Adery, M.A., Vanderbilt University
Laura Matlack, Psy.D.
Laura S. Brown, Ph.D.
Laure Kowalski
Laurel Xu, Cambridge Health Alliance
Lauren Baker
Lauren Fougere
Lauren Hamrick, M.A.
Lauren Millerd, LCSW
Lawrence D. Blum, M.D., Clinical Faculty, University of Pennsylvania
Lawrence G. Rosenberg, Ph.D., Cambridge Health Alliance/ Harvard Medical School
Leda Adams, LMHC

13

EXHIBIT 24

Leena Kulkarni, HSPH
Leigh Howard, LCSW
Lénie Torregrossa, M.S., Vanderbilt University
Leslie Baker, LICSW
Leticia St. Remy, Parenting Journey
Leticia Y. Flores, Ph.D., University of Tennessee
Lillian Fox MSW, LICSW, National Association of Social Workers-Mass. Chapter
Lin Reicher, Ed.D. , Clinical Psychologist, Private Practice
Linda A Standley, LMHC
Linda Dolph, ATR, LMHC
Linda Hershman, LMFT, Couples and Family Wellness Center
Linda L. Michaels, Psy.D., MBA, Psychotherapy Action Network
Linda M. Hill, M.S., LMCSW
Linda M. Ludwig, Ph.D.
Linda McEwen, M.A.
Linda Monahon, Ph.D.
Linda Rakoff, LICSW
Linda Story Stephenson, LICSW, Fenway Health
Linda Ware, LICSW
Lindsey Sanborn, Harvard Graduate School of Education
Linwood Small, Ph.D., Columbia College of South Carolina
Lior Givon, Cambridge Health Alliance
Lisa Alber, LICSW
Lisa Barondes, MSW
Lisa Elswit, MSSW, LCSW
Lisa Etzel, M.A.
Lisa Fusaro, Psy.D.
Lisa Makstein, LCSW-C, LICSW
Lisa Martin, LCSW-R, CASAC
Lisa Najavits, Ph.D.
Lisa Ness, Psy.D.
Lisa Sussman, Ph.D.
Liz Mongillo-Herman, Ph.D., Women's Center for Psychotherapy
Lizabeth Roemer, Ph.D.
Lizbeth K. Garcia-Bravo, Ph.D.
Lizzette I Potthoff, LCSW, LCAS
Lori Allen, Ph.D., Oregon Mind Body Institute
Lori Miller-Freitas, LICSW, NASW
Lori Reineke, Ph.D.
Lotte Smith-Hansen, Ph.D., Clinical Psychologist
Louise D Bickman, Ph.D., ABPP
Louise Newman, M.D., University of Melbourne
Luanne Grossman, Psy.D., Massachusetts Institute for Psychoanalysis
Luisa Ehrich, LCSW
Lynn Crook, M.Ed., Investigative journalist
Lynn Groff Loomis, M.Ed., LPC
Lynn Passy, Ph.D., NYU Postdoctoral Program in Psychoanalysis and Psychotherapy
Lynne C. Bishop, LMHC
Lynne Layton, Ph.D., Harvard Medical School
Lynne M. Gaby, M.D., George Washington University School of Medicine, Department of Psychiatry
Magali Flores, Harvard T.H. Chan School of Public Health
Maggie Jarmolowski, LICSW
Mala Chin

14

EXHIBIT 24

Mana Kheang, The Center for Hope and Healing
Marcia Taylor, M.S.Ed., MSW
Margaret Barris, LCSW-C, Barris Counseling
Margaret M. Spier, Ph.D.
Marge Coffey, MSW
Margit Winckler, Ph.D.
Marguerite Hamel-Nardozzi, LICSW
Maria Minkova
Mariam Rahmani
Marianne K. Fougere
Marie Weinstein. Ph.D.
Marilyn Hajer, LICSW
Marilyn Krantz LCSWR, NYS Society of Clinical Social Workers
Marilyn Marks, LICSW
Marilyn Unger-Riepe, LICSW
Marion B. Houghton, Ed.S., LMFT, Center for Psychotherapy and Psychoanalysis of NJ
Marisa L. Whitley, M.A., Department of Psychology, University of Tennessee
Maritza Cristina Pachano , Parenting Journey
Marjorie A Bosk, Ph.D., Clinical Child Osychologist
Marjorie Perkins, M.A.
Mark D. Norton, LICSW
Mark Finn, Ph.D.
Marla Somova, Ph.D.
Marla Zipin, Ph. D.
Marla Zucker, Ph.D., Boston University
Marlena E. Rupp, Psy.D.
Marlene Heald, ACSW, LCSW
Marriah C. Kalil, M.S., LMFT
Marsha Frankel, LICSW
Marsha Heiman, Ph.D.
Marsha Morris, Ph.D.
Marshall S. Harth, Ph. D. , Ramapo College of New Jersey
Marta Bobinski, The Center for Hope and Healing Inc.
Martha Mendes, CSW, CASUDC
Martha Temple, Psy.D., Division 39 of the APA
Martin H. Williams, Ph.D., Williams Forensic Mental Health Services
Martita Lopez, Ph.D., Licensed Clinical Psychologist PLLC
Mary A. Waterstreet, Ph.D.
Mary Ann C. Holtz, LMHC
Mary C. Burke, Ph.D., Carlow University
Mary Calabrese
Mary Eldridge, MSW, CAPSW, CA
Mary Mahoney-Smith, Cambridge Health Alliance
Mary R. Harvey, Ph.D., Violence Transformed, Public Health Advocacy Institute at Northeastern
University School of Law, Victims of Violence Program, The Cambridge Health Alliance, Department of
Psychiatry, Harvard Medical School
Mary Valmas, Ph.D., Department of Psychiatry, Harvard Medical School
Maryann Parrott, LCMHC, LMFT, CAS, MP  Counseling • Psychotherapy
Maryrose C. Coiner, Ph.D.
Matt Cerne, LMHC, LRC, M.Ed., MBA, Emerson Hospital
Maureen Clancy
Maureen J. Hudak, Psy.D., APA, NJPA, ISSTD
Maureen T. Kaye, MFT

15

EXHIBIT 24

Maxine Weinreb, Ed.D.
Maxwell Beshers, LCSW
Mayra Castillo, MJ, Chicago Children's Advocacy Center
Meagan J. Brem, M.A., University of Tennessee-Knoxville
Meaghan Creedon, Psy.D.
Meg Connor, MA, LMHC, Lesley University Division of Counseling and Psychology
Meg Sullivan, LCSW, National Association of Social Workers
Megan Baumgardner, M.Ed., The University of Tennessee
Megan Panici, LSW
Megan Schmidt, M.A. , University of Tennessee
Meghan B. Mitchell, Ph.D.
Melanie J. Brunt, Cambridge Health Alliance
Melanie M. Lantz, Ph.D.
Melinda Kulish, Ph.D., Cambridge Hospital, Harvard Medical School
Melissa Coco, LICSW
Melissa Cordero, Psy.D., UCSB
Melissa Doyle, LICSW, Center for Violence Prevention and Recovery
Melissa Goldbach
Melissa Sepe Chepuru, LMSW, NYSSCSW
Melysa Friedman, LICSW
Merri Lea Shaw, LICSW, Private Practice
Michael C. Singer, Ph.D., Derner Institute for Advanced Psychological Studies, Adelphi University, New York
Michael I. Loewy, Ph.D., California School of Professional Psychology
Michael Slevin, LCSW-c
Michael Strupp-Levitsky, MAT, M.A., Long Island University Brooklyn
Michael Thackrey, M.D.
Michaela Mendelsohn, Ph.D.
Michele R. Klau, RNCS, Cambridge Health Alliance
Michele R. Renchner, Ph.D.
Michelle Marchese, MSW, LICSW
Michelle Mattero, Chicago Children's Advocacy Center
Michelle Montero, Psy.D. , APA, AASP
Michelle Palmer, LICSW, Wendt Center for Loss and Healing
Michelle R. Johnson, M.D., Cambridge Health Alliance
Michelle Roover, LICSW
Miguel Andres Quinones, Center for Hope and Healing
Mike Lew, M.Ed., The Next Step Counseling & Training
Mikki Broughton, LMFT
Mimi Licht, LICSW
Miriam C. Tepper, M.D.
Molly Holmes, BSN, RNC-OB
Molly M. Eggleston, MPH, CPH, MCHES
Molly McDonald, Ph.D., University of California, Santa Barbara
Monica Ballarano, BS
Monica Bies, CU Center on Domestic Violence
Monica Blum, Ph.D.
Monica Carsky, Ph.D., Joan and Sanford Weill Medical College of Cornell University
Monique Bowen, Ph.D., Antioch University
Nalini Kuruppu
Nancy B. Austin, Psy.D.
Nancy Bottger, Connecticut Society for Psychoanalytic Psychology

EXHIBIT 24

Nancy Burke, Ph.D., Psychotherapy Action Network/Chicago Center for Psychoanalysis/Northwestern University Feinberg School of Medicine
Nancy H. Sheridan, LICSW
Nancy Lawrenz, Psy.D., APA, APsA, Chicago Institute for Psychoanalysis
Nancy Maguire, Psy.D.
Nancy McWilliams, Ph.D., Rutgers University
Nancy Rihan-Porter, MBBS, Cambridge Public Health Department
Nancy W. Thomas, LPC
Nanette Gartrell, M.D.
Nani Swaminathan
Naomi Azar, Ph.D., Private Practice
Natalie Blocher, Univeristy of Tennessee-Knoxville. Clinical Doctoral Student
Neftali Martinez
Neha Mistry, M.A.
Nelida Arancibia, LCSW
Nick Packard, LCSW
Nicolae Dumitrascu, Ph.D., Boston University
Nicole M. Modes, M.Ed., Family and Community Resources, INC.
Nicole O'Connor, M.D., Cambridge Health Alliance
Nicolina Fedele, Ph.D., Jean Baker Miller Institute
Nina Allred
Nina Friedman, LICSW
Nina McGlinchey
Odelya Gertel Kraybill, Ph.D., Expressive Trauma Integration
Olga Madrid, Sexual Assault - Bilingual Counselor
Orli Avi-Yonah, Ph.D.
Paige A. Lee, Ph.D., UC Berkeley
Pam McConnell, LICSW
Pamela Brigham MSW, LICSW, Private Practice
Pamela Geib, Ed.D., APA
Patricia A. Geller, Ed.D.
Patricia Axsom O'Brien, M.Div, LICSW
Patricia Demont, Ph.D.
Patricia Powell Hundley, M.A., L.P.A., Clinical Psychologist, Fairview Psychological Services, P. A.
Pattie Heyman, LICSW
Patty Collinge, LMHC
Paul Kaiser, LCSW, Nationally Certified Psychoanalyst
Paul Scoglio
Paula A. Schmidt, LICSW
Paula Flamm, LCSW, UC Berkeley
Paula G. Llaneza, LMHC
Paula Shulman, LMFT
Peggy Bice, LCSW
Peggy J. Burke, Ph.D., Americican Psychological Association
Penelope Asay, Ph.D., ABPP
Persephone Crittenden, M.S., M.A., Cambridge Health Alliance
Peter Pruyn, LMHC, Private Practice
Peter Sahagian, LPN , Cambridge Health Alliance
Peter V. Kelsey, National Association of Social Workers
Peter Zook, MSW, LCSW, PSPP
Phil Marokus
Philip Cushman, Ph.D.
Phillip M. Brown, LICSW, Cambridge Health Alliance and Harvard Medical School

EXHIBIT 24

Phyllis L. Sloate Ph.D., FIPA, BCPsa
Priscilla House, LCSW
Prium Deshmukh, M.D., Cambridge Health Alliance
Professor Nicola Gavey, University of Auckland
Rachel B. Singer, LCSW-C, The Mindful Heart LLC
Rachel Carretta, M.A., University of Tennessee
Rachel Dash, MSW, LICSW
Rachel Hathaway, M.D., Harvard Medical School, Cambridge Health Alliance
Rachel Isaacson, M.P.H.
Rachel Maskin, University of Tennessee, Knoxville
Rachel Vogel, M.D., Cambridge Health Alliamce
Rachel Woehr, Chicago Children's Advocacy Center
Rachel Z Ritvo M.D.
Ramie Lipeles, LICSW, Private Practice
Rana Gordon, Ph.D.
Randi Taylor, Ph.D.
Raquel Carrera, LCPC, NCC
Rashika J. Rentie, Ph.D.
Raul Martinez, Ph.D.
Rebecca E. Rosenblum, Private Practice, Boston Area Trauma Recovery Network (TRN)
Rebecca Goldberg, LCSW
Rebecca L. Schacht, Ph.D., University of Maryland, Baltimore County
Rebecca Rogers, M.D., Cambridge Health Alliance
Rebekah Rollston, M.D., M.P.H., Cambridge Health Alliance
Renana Yanai-Anter, LICSW
Renee Cammarata Hamilton, MSW, MPA, Cambridge Health Alliance, Department of Community
Health Improvement
Renee Mikorski, M.S., Psychologist
Rev. Jennifer L. Paty, Amy Blake LCSW, Imago Maine and C4 Couples
Rev. Jory Agate, M.Div., LMHC
Revital Silver
Rhiannon Reaves, LCPC, Chicago Children's Advocacy Center
Richa Gawande, Ph.D., Center for Mindfulness and Compassion, Cambridge Health Alliance
Richard B. Pazol, Psy.D.
Richard J. Ross, M.D., Ph.D., Professor of Psychiatry at the Perelman School of Medicine
Richard M. Waugaman, M.D., Georgetown University School of Medicine
Richard Maisel, Ph.D.
Rina Bernardez, MSW, Cambridge Health Alliance
Rob Drinkwater, Ph.D., CHA, Harvard Medical School
Robert B. Staples, Psy.D.
Robert E. Smith, LPN. MM
Robert Fox, Job Stress Solutions
Robert P. Marlin, M.D., Ph.D., M.P.H., Harvard Medical School, Cambridge Health Alliance
Robert R Gerlits, MSW
Roberta Rachel Omin, LCSW
Robin C. Hollister, Psy.D., Private Practice
Robin G. Freedman, M.A., LPC, R.G. Freedman Counseling Serviceslease Select
Robin Tracy, CMHC
Robyn Katz Adelman, M.A. LMHC
Rochelle Sokoll, MSW, LICSW
Rommell Washington, LCSW, Crime Victims Treatment Center-NYC
Ronald Molin, Ph.D. Licensed Psychologist
Rosa Maria Rigol, Ph.D.

18

EXHIBIT 24

Rosalie Lipfert, Smith College
Rose Milano, LCSW, American Indian Health Service of Chicago
Rosie McMahan, M. Ed., ACS, Optimistic Options
Ruth Fallenbaum, Ph.D.
Sabrina Herman, LICSW
Sacha Emerson, LICSW
Sam Lipschultz, LCSW, Cambridge Health Alliance
Samantha Sanderson Brown, Psy.D.
Samuel B. Rogers, Ph.D., Psychological Health - Roanoke
Sandra Dixon, Psy.D.
Sandra Dorros, LICSW
Sandra Katz, LICSW
Sandra M. DeJong, M.D.
Sandra Miller, RN, LCSW, LMFT
Sandra Shapiro, Ph.D., National Institute for the Psychotherapies, NYC., Retired
Sara Banks Freilich, Ph.D.
Sarah Canale, M.D., Cambridge Health Alliance
Sarah Nunez, LCSW, M.S.
Sarah Piontkowski, Ph.D.
Sarah R. Lowe, Ph.D.
Sarah Roos, M.A., Chicago Children's Advocacy Center
Sarah Swettberg, M.Ed, FNP-BC
Sariya Idriss, MSW, Cambridge Health Alliance and Boston University
Scott M. Banford, LCSW
Scott Pytluk, Ph.D., ABPP
Sean Daughtry
Sean J. McGlew, Psy.D., L.P., Cambridge Health Alliance
Seana Scopa, RN, Cambridge Health Alliance
Sebastian Mitchell Barr, Ph.D., Cambridge Health Alliance, Harvard Medical School
Seth Grossman, Psy.D.
Shana Perrucci, Ph.D.
Shannon R. Gamble, LMHC
Shari Yacouby
Sharon C. Broder
Sharon C. Wilsnack, Ph.D., University of North Dakota School of Medicine & Health Sciences
Sharon Chirban, Ph.D., Harvard Medical School, Boston Children's Hospital
Sharon Risch, Ph.D.
Sharon Schwartz, LICSW, EMDRIA Certified Consultant
Sharon Smith
Sheetal Patel, Ph.D.
Sheila DeMelle, LICSW, Private Practice
Shelby Ortega, Ph.D.
Shelley Hartz, MSN, CS
Shelley Rattet, Ph.D., Brookline Community Mental Health Center
Sheri Gold, LCSW
Sheryl Knopf, LICSW
Shin Shin Tang, Ph.D. , Oregon Mind Body Institute
Shirley Tung, LCSW
Sidney Miller, LCSW, Ph.D.
Skye Haberman
Smita Chirayath, RN
Sohee Park, Ph.D., Vanderbilt University
Soledad Vera, Ph.D.

19

EXHIBIT 24

Sondra Malling, LCPC, BC-DMT, Mt. Sinai Hospital
Sonja Linn, Ph.D.
Sophie Glikson Cahen
Stefanie Krantz, J.D., CHC
Stephani Morgan, LMSW
Stephanie Baird, EMDR Trauma Psychotherapist
Stephanie Cazeau, The Center for Hope and Healing
Stephanie Kors, M.A. , University of Tennessee
Stephanie Lechich, M.A, APA
Stephanie M. Slye, Psy.D.
Stephanie Randazzo, PMHNP-BC
Stephen Frantz, PA-C , Cambridge Health Alliance
Stephen Kerzner, M.D.
Stephen Portuges, Ph.D., Journal of the American Psychoanaltic Association
Stephen Slaten, Ph.D.
Stephen Soldz, Ph.D., Boston Graduate School of Psychoanalysis
Stephen W. Dolat, Cambridge Health Alliance
Steve Lindberg, Cosmo Specialty Fibers
Steve Milan, LCSW
Steven D. Hollon, Ph.D., Vanderbilt University
Sue Grand, Ph.D. , NYU
Sue Schmitz, LMHC, ATR , Lahey Health Behavioral Services
Sue Snyder Pederson, LCSW SEP
Sue Soler, LCSW-C
Sujatha Subramanian, Ph.D., IPTAR
Summer Jackson, LCSW, UC Berkeley
Susan Aeschbach, LICSW, National Association of Social Workers
Susan Blank, LPC, NCC
Susan Broner, LICSW
Susan Deane-Miller
Susan E Sprung, MSW, LICSW
Susan H Gere, Lesley University
Susan Hale Zeichner, Psy.D.
Susan Jocelyn, Ph.D.
Susan L. Perry, LICSW
Susan Morrissey MSN RN, Cambridge Health Alliance
Susan O'Doherty, Ph.D.
Susan Perkins, Ph.D.
Susan Pollock, LADC II
Susan Ryan, Psy.D.
Susan Schwartz, Psy.D.
Susan White
Suzan Wolpow, LMHC, LRC
Suzanne Burger, Psy.D.
Suzanne Eagan Beverly, LMHC, BC-DMT, Psychotherapist
Suzanne McKenna, Ph.D.
Suzanne S. Borstein, Ph.D.
Sydney Thorn, LICSW
T.Furness-Ullrich, Psy.D.
T.G. Dodson
Talya Rabina, Psy.D.
Tamar Naor, LMHC, Private Practice
Tamara Pincus, LICSW, Tamara Pincus & Associates

20

EXHIBIT 24

Taylor MacLean, M.A., Kean University
Tegan Barson, Psy.D.
Teresa Hsu-Walklet, Ph.D.
Thamara Subramanian, M.P.H.
The Rev. Anna Broadbent, LPC , St. James Episcopal Cathedral
Theodora Pintzuk, LCSW
Theodore Bradford, LICSW, Private Practice
Theresa Mitton, LICSW, ISSTD
Tiffany Leonard, Psy.D.
Tori Martinez, BSW, University of Texas at Austin
Tracy A. Knight, Ph.D.
Trudy Bond, Ed.D.
Tybe Diamond MSW,, Washington School of Psychiatry faculty
Umi Chong, Psy.D.
Valerie Rosenfeld, LCSW-R
Vanpat Pensuwan, M.D.
Venus Masselam
Veronica Akins
Vincent J. Gennaco, LP,HSPP
Vivian Linder, LCSW
Wanda S Needleman M.D., Therapy Exploitation Link Line
Wendy Forman, Ph.D.
Wendy S. Epstein, Ph.D.
William Goeren, LCSW
William Payne, Ph.D.
Yehudit Sidikman, ESD Global Inc.
Young
Yvonne Allie, MPS, LCAT, IEA, NYIPT
Yvonne Jenkins, Ph.D.
Zoë B. Whaley, MSW, CAPSW

EXHIBIT 24

# EXHIBIT 25



AMERICAN
PSYCHOLOGICAL
ASSOCIATION
Services, Inc.

January 30, 2019

Brittany Bull
U.S. Department of Education
400 Maryland Avenue SW
Washington D.C., 20202

The American Psychological Association (APA) appreciates the opportunity to respond to the Request for Information (RFI) published in the Federal Register on November 29, 2018 (Docket Number ED-2018-OCR-0064) related to regulations implementing Title IX of the Education Amendments of 1972.

APA is the leading scientific and professional organization representing psychology in the United States, with more than 115,700 researchers, educators, clinicians, consultants, and students as its members.  APA's mission is to advance the creation, communication and application of psychological knowledge to benefit society and improve people's lives.  We are writing to express concerns about certain aspects of the rule that may impact victims' willingness and ability to report sexual harassment and assault, in turn impacting equal access to educational programs and activities. Psychologists are uniquely qualified to address sexual assault as both researchers and practitioners.  Our response to these draft regulations is based on APA policy and grounded in psychological research.

Sexual misconduct has a significant negative impact on learning and achievement and compromises students' ability to complete college and contribute to society as expected. Sexual assault experiences before entering or during their secondary education years threaten to hamper or derail student development and success beyond higher education. An effective Title IX is critical in supporting student wellness and academic achievement.

Campus sexual misconduct, including sexual assault, is much more common than many people imagine. Estimates of sexual assaults of college women have been remarkably consistent over time[i], despite efforts to address the problem.  Surveys regularly show that approximately 15 to 20 percent of college women report experiencing rape or attempted rape during their college career, and that over 50 percent report experiencing some form of unwanted sexual contact.  Although many studies do not have diverse samples, higher rates of victimization are found among women who are members of sexual and ethnic minorities[ii].  Racial and ethnic minority women report high levels of assault and harassment[iii] with Native American and Alaskan Indian women at the highest risk.  Men too can be victims of sexual assault, most often by other men, and at lower rates than women[iv]. Transgender and gender non-conforming college students appear to be at significantly higher risk for sexual assault and harassment compared to their heterosexual counterparts[v]. In addition, despite students with disabilities reporting higher rates of sexual violence victimization compared to students without disabilities[vi], federally-funded research and programs practically render their experiences invisible[vii].

750 First Street, NE
Washington, DC 20002-4242
(202) 336-5500
(202) 336-6123 TDD



EXHIBIT 25
Please Recycle

Advocating for APA members and psychology

www.apaservices.org
www.apa.org



AMERICAN
PSYCHOLOGICAL
ASSOCIATION
Services, Inc.

Title IX implementation should be guided by research on campus sexual assault to ensure the program works as it is intended: to create a climate on campus where all students have an opportunity to learn and succeed.  We respectfully request that the Department carefully consider the impact of the proposed changes, particularly changes that could lead to under reporting of sexual misconduct, re-victimization or traumatization of the parties involved.

**APA urges the Department to maintain a broad definition of sexual harassment.**

Of all crimes, sexual assault is one of the most underreported.  According to the Department of Justice, only 23 percent of sexual assaults were reported to police in 2016 and 40 percent in 2017[viii].  The false reporting rate for sexual assault is about 2 to 3 percent[ix], which is no different than false reporting rates for other crimes.  Furthermore, these statistics do not include other forms of sexual harassment, which are more common and less likely to be reported to authorities.  Sexual victimization is caused by a wide array of sexual misconduct, including sexual contact with another person who could not consent or did not want the contact and can result in decreased academic well-being such as lowered academic efficacy and higher levels of stress[xxi].  A reported 34 percent of college students who experience sexual assault drop out of college[xii].  Rape and other forms of sexual assault also negatively impact on victims' mental and physical health.  Four out of five rape victims subsequently suffer from chronic physical or psychological conditions[xiii].

In keeping with the intent of the Clery Act, which is to foster transparency on campus crime reporting, APA urges the Department to maintain a broad definition of sexual harassment.  The proposed regulation narrows the definition of sexual harassment under Title IX from "unwelcome conduct of a sexual nature" under the Department of Education's 2011 guidance to a three-part definition that includes the conditioning of a benefit or service on participation in unwelcome sexual conduct; sexual assault as defined under the Clery Act; and unwelcome conduct on the basis of sex that is so "severe, pervasive, and objectively offensive that it effectively denies a person equal access" to educational programs or activities.

Research maintains that students are unlikely to report harassment when their experience does not match common beliefs about what rape is, particularly when the incident involves someone they know and/or alcohol[xiv], although the physical and mental health consequences of the experience still occur.  Further, experiences that are deemed as less "severe" forms of victimization can also lead to negative outcomes and increase a victim's risk of further victimization.  In addition to limiting the definition of harassment to the most extreme cases, it raises concerns that victims, who are often uncertain as to whether their experiences qualify as sexual assault, will be further discouraged from considering unwanted sexual conduct as reportable.  Thus, narrowing the definition of incidents that invoke formal responsibilities under Title IX will impact the way students perceive their experience and impact their decision to report.

750 First Street, NE
Washington, DC 20002-4242
(202) 336-5500
(202) 336-6123 TDD

Advocating for APA members and psychology

www.apaservices.org
www.apa.org


Please Recycle   EXHIBIT 25



AMERICAN
PSYCHOLOGICAL
ASSOCIATION
Services, Inc.

**APA encourages the Department not to limit the geographic scope of reporting.**

We are also concerned that the limited geographic scope of the proposed regulation could also lead to under reporting.  As currently written, the proposed regulation excludes incidents that happen outside of an educational program and eliminate protections for students studying abroad. Campus climate surveys show that the clear majority of sexual misconduct occurs off-campus.  Past guidance has indicated that sexual harassment that initially occurred off-campus and outside of an institution's education program or activity would be reportable if there were continuing effects of that incident that created a hostile environment for the victim on campus.  This is particularly impactful for community colleges and commuter colleges, where most student activities take place off-campus and outside of campus housing.

Additionally, the proposed regulation does not address how online sexual harassment might be handled.  Over a third of girls and one-fourth of boys in grades 7-12 have experienced online harassment and the data clearly demonstrate impact on the victims' academic progress: 18 percent did not wish to go to school; 13 percent found it hard to study; 17 percent had trouble sleeping, and 8 percent stayed home from school[xv].

**APA advises the Department to maintain flexibility in the reporting process.**

We strongly encourage the Department to consider whether the proposed changes will impact the willingness and ability of victims to report sexual assault.  Psychological research shows that regaining a sense of control is essential to survivors' recovery[xvi]. Victims of sexual misconduct need to be believed, validated, and supported to enhance disclosure, adaptive coping, and control.  The goals of the criminal justice, medical, and university disciplinary systems are different than what victims need, and victims fear that the investigation process will be confusing, traumatizing, and futile.  Thus, the process of disclosure presents a barrier to victims of sexual assault. Approximately 59 percent of victims who disclose talk to their family or friends and wait to disclose their experience[xvii].

Under the proposed regulation, the institution is only obligated to respond when the Title IX coordinator or another employee who has the authority to take corrective action on behalf of the institution receives actual notice.  The proposed regulation limits the people to whom a victim can report that will trigger a Title IX investigation.  This narrowing of potential reporters could discourage victims from disclosing their experiences.  Under past regulations and guidance, this obligation was triggered when a college knew or should have known about the possible harassment.

**APA strongly encourages the Department to maintain flexibility in resolving complaints.**

750 First Street, NE
Washington, DC 20002-4242
(202) 336-5500
(202) 336-6123 TDD

Advocating for APA members and psychology

www.apaservices.org
www.apa.org



EXHIBIT 25

Please Recycle



AMERICAN
PSYCHOLOGICAL
ASSOCIATION
Services, Inc.

The Department should aim for a process that builds trust between students and their institutions and that allows victims the greatest flexibility of options for resolution. As written, the proposed regulations propose a formal hearing or mediation process that mimic legal proceedings and are thus adversarial in nature. Specifically, the requirement to allow live cross-examination has the potential to re-traumatize victims and ultimately cause them to disengage with the systems that should be supporting them[xviii]. Being forced to engage with proceedings that mimic a legal environment can retraumatize victims and ultimately lead to disengagement due to lack of choice. Institutions may also delay resolution of complaints while a law enforcement investigation is pending. This policy could force students to wait months or even longer for a resolution to their complaints; meanwhile they are suffering serious harm, including reduced learning and achievement[xix]. We suggest widening the scope of incidents that could be considered for formal complaints while also allowing greater flexibility for institutional responses, as opposed to forcing victims and the accused into an oppositional, legalistic procedure. APA supports expanding victims' options for institutional response so that they have non-adversarial choices for resolution.

In addition, the proposed regulations state that an advisor will be afforded to all parties involved but it is not specified if this advisor will be an attorney. Without guaranteeing all students receive the same quality of legal representation, a dynamic is created where those with power and privilege may have an unequal advantage in hearing proceedings. In other words, students with limited access to financial resources will be at a significant disadvantage.

**APA urges the Department to provide a framework for student support and recovery.**

For reports that are not formal complaints, the institution may still respond, and the regulations put forth "supportive measures" that the institution may wish to offer the complainant. These services, similar in concept to "interim measures" under previous guidance, must be non-disciplinary and at no cost to the students. The measures described in the regulation include counseling, mutual restrictions on contact between the parties, leaves of absence, increased security, and other measures. The preamble to the regulation cites these measures as a means of avoiding a more protracted and potentially charged proceeding. We suggest that these measures include medical and psychological services for victims to support recovery and required rehabilitation options for students who have been found responsible for sexual misconduct but remain on campus.

Currently there is no formalization of sanctions, no requirement to use any qualified treatment personnel, and no standard method for rehabilitation. If concern for victim safety is not central to the proposed options, general campus safety is challenged and the perception that "nothing happens" will persist. Victims should be assured a well-publicized pathway to medical and psychological services that support recovery, and which are confidential and within which they can hear about their options. Institutions should

750 First Street, NE
Washington, DC 20002-4242
(202) 336-5500
(202) 336-6123 TDD

Advocating for APA members and psychology

www.apaservices.org
www.apa.org



EXHIBIT 25
Please Recycle



explicitly address the supportive measures that will be offered to victims.  We also suggest that schools be required to specify the steps they take to rehabilitate those accused who are found responsible but retained on campus[xx].  There is a robust and growing body of scientific literature on community engagement and restorative approaches to addressing sexual harassment from which these approaches can be drawn[xxi].

**APA proposes increased collaboration and transparency.**

Reporting sexual harassment accurately and addressing it safely is not a trivial matter.  Scientific knowledge and a transparent scientific process should guide this work if it is to have integrity and accuracy.  In addition to the recommendations suggested above, we recommend periodic comprehensive assessments of campus climate at no cost to institutions using methods that meet the needs of campus administrators, students, and educational communities.  These assessments should balance the need for scientific standardization with flexibility for individual institutions and provide an accurate assessment of the effectiveness of different approaches to sexual harassment.

In closing, psychology has much to contribute to addressing campus sexual assault.  It is our goal to assist in steering the national dialogue from a crisis-oriented one to one that ensures empowerment, safety and accountability, while focusing on evidence-based solutions.  While this goal goes beyond the scope of this request for comment, it is with that intent that APA engages in this dialogue.  If we may provide any further input, please contact Amalia Corby (acorby-edwards@apa.org or 202-336-6068) or Jennifer Smulson (jsmulson@apa.org or 202-336-5945).

750 First Street, NE
Washington, DC 20002-4242
(202) 336-5500
(202) 336-6123 TDD
Please Recycle

EXHIBIT 25

Advocating for APA members and psychology

www.apaservices.org
www.apa.org



**AMERICAN**
**PSYCHOLOGICAL**
**ASSOCIATION**
Services, Inc.

[i] Koss, M. P., Gidycz, C. A., & Wisniewski, N. (1987). The scope of rape: incidence and prevalence of sexual aggression and victimization in a national sample of higher education students. *Journal of Consulting and Clinical Psychology*, *55*(2), 162–170. https://doi.org/10.1037/0022-006X.55.2.162. Fisher, B.S., Sloan, J.J., Cullen, F.T., & Lu, C. (1998). Crime in the ivory tower: The level and sources of student victimization. *Criminology, 36,* 671-699. Kilpatrick, D. G., Resnick, H. S., Ruggiero, K. J., Conoscenti, L. M., & McCauley, J. (2007). *Drug-facilitated, incapacitated, and forcible rape: A national study*. Final Report. NCJRS Document # 219181. U.S. Department of Justice.

[ii] Abbey, A. D., Jacques-Tiura, A. J., & Parkhill, M. R. (2010). Sexual assault among diverse populations of women: Common ground, distinctive features, and unanswered questions. In H. Landrine & N. F. Russo (Eds.), *Handbook of diversity in feminist psychology* (pp. 391–425). New York: Springer Publishing Co.

[iii] Breiding, M. Prevalence and Characteristics of Sexual Violence, Stalking, and Intimate Partner Violence Victimization—National Intimate Partner and Sexual Violence Survey, United States, 2011. MMWR Surveill Summ. 2014 Sep 5; 63(8): 1–18.

[iv] Walters, M.L., Chen J., & Breiding, M.J. (2013). *The National Intimate Partner and Sexual Violence Survey (NISVS): 2010 Findings on Victimization by Sexual Orientation*. Atlanta, GA: National

[v] Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools. New York: GLSEN. S., R. W., & Rankin, S. R. (2017). College Sexual Assault and Campus Climate for Sexual- and Gender-Minority Undergraduate Students. *Journal of Interpersonal Violence*. https://doi.org/10.1177/0886260517696870

[vi] Cantor, D. et al. Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct (2015). https://www.aau.edu/sites/default/files/%40%20Files/Climate%20Survey/AAU_Campus_Climate_Survey_12_14_15.pdf

[vii] National Council on Disability. Has the Promise Been Kept? Federal Enforcement of Disability Rights Laws (2018). https://ncd.gov/progressreport-publications/2018/has-promise-been-kept

[viii] Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, National Crime Victimization Survey, 2010-2016 (2017)

[ix] Lisak, D., Gardinier, L., Nicksa, S., & Cote, A. M. (2010). False allegations of sexual assault: An analysis of ten years of reported cases. *Violence Against Women*, *16*(12), 1318–1334. https://doi-org.proxy.lib.umich.edu/10.1177/1077801210387747

[x] Banyard, V. L., Demers, J. M., Cohn, E. S., Edwards, K. M., Moynihan, M. M., Walsh, W. A., & Ward, S. K. (2017). Academic correlates of unwanted sexual contact, intercourse, stalking, and intimate partner violence: An understudied but Important consequence for college students. *Journal of Interpersonal Violence*, 08862605171771502. https://doi.org/10.1177/0886260517715022

[xi] Baker, M. R., Frazier, P. A., Greer, C., Paulsen, J. A., Howard, K., Meredith, L. N., … Shallcross, S. L. (2016). Sexual victimization history predicts academic performance in college women. *Journal of Counseling Psychology*, *63*(6), 685–692. https://doi.org/10.1037/cou0000146

[xii] Mengo, C.; Black, B. Violence Victimization on a College Campus: Impact on GPA and School Dropout. Journal of College Student Retention: Research, Theory & Practice 0(0) 1-15 (2015)

750 First Street, NE
Washington, DC 20002-4242
(202) 336-5500
(202) 336-6123 TDD

Advocating for APA members and psychology

www.apaservices.org
www.apa.org



EXHIBIT 25
Please Recycle



AMERICAN
PSYCHOLOGICAL
ASSOCIATION
Services, Inc.

xiii Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools. New York: GLSEN.

xv American Association of University Women. Crossing the line: Sexual harassment at school. (2011) https://www.aauw.org/files/2013/02/crossing-the-line-sexual-harassment-at-school-executive-summary.pdf

xvi Ranjbar, V., & Speer, S. A. (2013). Revictimization and recovery from sexual assault: Implications for health professionals. *Violence and Victims*, *28*(2), 274–287. https://doi-org.proxy.lib.umich.edu/10.1891/0886-6708.11-00144

xviii Campbell, R., Greeson, M.R., Bybee, D., & Fehler-Cabral, G. (2012). Adolescent sexual assault victims and the legal system:
Building community relationships to increase prosecution rates. American Journal of Community Psychology, 50, 141-154. Campbell, R., Greeson, M.R., Fehler-Cabral, G., & Kennedy, A. (2015). Pathways to help: Adolescent sexual assault victims' disclosure and help-seeking experiences. Psychology of Women Quarterly, 21(7), 824-847. Patterson, D., & Campbell, R. (2010). Why rape survivors participate in the criminal justice system. Journal of Community Psychology, 38, 191-205.

xix Jordan, C. E., Combs, J. L., & Smith, G. T. (2014). An Exploration of Sexual Victimization and Academic Performance Among College Women. *Trauma, Violence, & Abuse*, *15*(3), 191–200. https://doi.org/10.1177/1524838014520637

xx Lamade, R.V., Lopez, E.C., Koss, M.P., Prentky, R.A., & Brereton, A. (2017). Developing and implementing a treatment intervention for college students found responsible for sexual misconduct. Submitted to the Journal of Aggression, Conflict, and Peace Research. https://doi.org/10.1108/JACPR-06-2017-0301

xxi Nowell, B., & Foster-Fishman, P. (2011). Examining multi-sector community collaboratives as vehicles for building organizational capacity. American Journal of Community Psychology, 48, 193-207. doi:10.1007/s104664-010-9364-3. Koss, M. P., White, J. W., & Lopez, E. C. (2017). Victim voice in re-envisioning responses to sexual and physical violence nationally and internationally. American Psychologist, 72, 1019-1030. doi:10.1037/amp0000233. Koss, M.P., Wilgus, J., & Williamsen, K.M. (2014). Campus sexual misconduct: Restorative justice approaches to enhance compliance with Title IX guidance. Trauma, Violence, & Abuse, 15, 242 - 258. doi: 10.1177/1524838014521500.

750 First Street, NE
Washington, DC 20002-4242
(202) 336-5500
(202) 336-6123 TDD
Please Recycle
EXHIBIT 25

Advocating for APA members and psychology

www.apaservices.org
www.apa.org

EXHIBIT 26



To Whom It May Concern:

As graduate student advocates, we are acutely aware of the difficulties that graduate students overcome to achieve success in higher education.  The SAGE coalition is deeply concerned by the changes to Title IX proposed by Secretary DeVos. A large body of work has shown that sexual misconduct continues to be a crisis on campuses nationwide.[1] A staggering 21-38% of college students will experience faculty/staff-perpetrated sexual harassment and 39-64.5% experience student-perpetrated sexual harassment during their time at their university.[2,3] Graduate students are a uniquely vulnerable population and protections currently provided under Title IX are vital for access to education and success in their programs.[2] Title IX addresses sexual harassment, sexual violence, sexual misconduct, and gender-based discrimination; SAGE firmly believes that Secretary DeVos's proposed rules will deleteriously impact the success and safety of graduate students, ultimately denying graduate students access to educational benefits and opportunities.[3] Several of the proposed changes weaken or abolish these protections and, should they be implemented, will create an unsafe environment for students and restrict access to educational programs.

Here, we provide evidence that the proposed changes will negatively impact victims and enable the university to avoid involvement, deny responsibility, and impede survivors' access to education based on sex discrimination (including sexual harassment). We believe that these proposed changes to Title IX will undermine the

---

[1] Some studies show more than one in every three women as being sexual assault survivors, with graduate students victimized at frighteningly high rates, see DeKeseredy, W. S., Hall-Sanchez, A., & Nolan, J. (2018). College campus sexual assault: The contribution of peers' proabuse informational support and attachments to abusive peers. *Violence against women*, 24 (8), 922-935.

[2] 38% of women and 23% of men in graduate or professional school have been victimized by sexual harassment from members of their institution's faculty or staff. Rosenthal, M. N., Smidt, A. M., & Freyd, J. J. (2016). Still Second Class: Sexual Harassment of Graduate Students. *Psychology of Women Quarterly*, 40(3), 364–377.  https://doi.org/10.1177/0361684316644838

34.1% of students who have experienced sexual assault dropout of college, higher than the overall dropout rate for college students. ("Violence Victimization on a College Campus," Mengo & Black, 2015).

[3] Data shows that there is a higher risk for assault while attending institutions of higher education, see Bachar, K., & Koss, M. (2001). From prevalence to prevention. *Sourcebook on violence against women*, 117-142.

EXHIBIT 26



spirit of Title IX and allow sexual harassment to be further institutionalized and increase traumatization of victims from these abuses.

**The proposed rules would require schools to ignore Title IX complaints if the harassment took place off-campus.** Most graduate students live off campus, and are often required to participate in activities that take place off campus but directly impact our educational pursuits (e.g., fieldwork, internships, off-campus service). Implementing this rule would remove vital protections for graduate students from discrimination on the basis of sex (including sexual harassment). Furthermore, the vast majority of sexual assaults take place in survivors' homes[4]. It is critical that Title IX investigations are empowered to address all complaints, and universities are compelled to respond to sexual harassment complaints of students both on and off-campus.

**The proposed rules that narrow the definition of sexual harassment and require schools to ignore harassment unless it is "severe and pervasive" and "objectively offensive".** This definition is inadequate to describe sexual harassment, and creates a different standard for these types of complaints. It is inappropriate to define such actions in institutions of higher education or any scenario other than between minors and peer-inflicted, as described by the Supreme Court in *Davis v. Monroe*, (1999). SAGE believes that the language proposed by Secretary DeVos erroneously broadens the Supreme Court's definition that was described in *Davis v. Monroe* (1999), which explicitly described sexual harassment between peers, (student-on-student harassment) and between minors (5th grade students). This definition should not be applied to sexual harassment other than in scenarios that are reflective of the circumstances the Court described.  This definition does not protect students from harassment perpetrated by faculty, staff, student teaching assistants, who are both faculty and student at the same time. Graduate students are both employees and mentors, while also being students. This definition should not be applied to institutions of higher education, unless the relationships between graduate students, undergraduates, mentors, and employees will be explicitly described and guidance given on cases of harassment for each relationship. This includes what definition should apply when someone holds multiple roles, as a large number of graduate students do. When delivering the opinion of the court in *Davis v. Monroe*, Justice O'Connor wrote:

> "Whether gender-oriented conduct is harassment depends on a constellation of surrounding circumstances, expectations, and relationships *Oncale* v. *Sundowner Offshore Services, Inc.,* 523 U.S. 75, 82, including, but not limited to, the harasser's and victim's ages and the number of persons involved. Courts must also bear in mind that

---

[4] Perpetrators of Sexual Violence: Statistics," RAINN, at
https://www.rainn.org/statistics/perpetrators-sexual-violence.
Data shows that 87% of college students live off-campus Hill, C. & Kearl, H. (2011). "Crossing the line": Sexual harassment at school. AAUW.

EXHIBIT 26



> schoolchildren may regularly interact in ways that would be unacceptable among adults. Moreover, that the discrimination must occur "under any education program or activity" suggests that the behavior must be serious enough to have the systemic effect of denying the victim equal access to an education program or activity."

SAGE asserts that using a definition of sexual harassment that defines behavior of school-aged children and directs the courts to "...bear in mind that schoolchildren may regularly interact in ways that would be unacceptable among adults," is not appropriately applied to peer harassment that takes place between adults in institutions of higher learning.

**Narrowing the definition of sexual harassment will make survivors less likely to come forward, exacerbating the well-documented crisis of underreporting.** Only 5-20% of student victims report sexual assault. Common reasons for not reporting include thinking nothing will be done about it, or feeling "embarrassed, ashamed".[7,8,9] The proposal recognizes "...sexual harassment continues to present serious problems across the nation's campuses," yet further narrowing of this definition and underplaying the travesty of sexual harassment risks making victims less likely to report, increasing the likelihood of further and possibly escalated levels of harassment through emboldening perpetrators. Implementing this change will effectively deny a person equal access to the recipients education program and make campus more dangerous for graduate students.

Over 30 years ago, the Supreme Court of the United States recognized sexual harassment as a form of discrimination in *Meritor Savings Bank v. Vinson* (1986). In that ruling, the Supreme Court favorably cites the Equal Employment Opportunity Commission (EEOC) policy and guidelines on sexual harassment.  The EEOC states, "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of sexual nature constitutes sexual harassment when the conduct explicitly or implicitly affects an individuals employment, unreasonably interferes with an individual's work performance or creates an intimidating or hostile, or offensive work environment." Moreover, in 2014, The White House Task Force to Protect Students from Sexual Assault defines sexual harassment as **"unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal or physical conduct of sexual nature."  We believe this definition should be added to the proposed definition of sexual harassment**. SAGE calls on the Department of Education to protect graduate students from retaliation and facilitate reporting by accurately defining sexual harassment as described by the White House Task Force to Protect Students.

**The proposal further deters survivors from coming forward to report by forcing institutions of higher learning to "conduct live hearings" and force survivors to submit to cross-examination.** This cross-examination can be performed by whomever the perpetrator chooses. This could be a lawyer, parent, or roommate.  This creates an adversarial model, yet fails to provide protections that

EXHIBIT 26



are necessary when such models are implemented in a courtroom.[5] There are no protections built into the system to ensure the cross-examiner has knowledge or training, nor is there a clause to ensure both parties have equal access to competent and equivalent representation. This institutionalizes re-traumatization of victims and skews the outcome due to implicit bias.[6] These biases are systematically exploited by representation strategies that have been proven ineffective repeatedly in adversarial courts of law.[10, 11] Needless to say, our universities are not a court of law and should be focused on creating a safe environment, free of discrimination. Title IX should not impose an adversarial model where power dynamics, unregulated/inequitable access to resources, and bias determine the outcome of an investigation.

**The combination of the proposed change 1) to assume no harassment has taken place and 2) allowing schools to delay investigations for good cause will endanger students.** The proposed changes that state Title IX procedures must include "…a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process," may result in survivors having to endure further sexual harassment and trauma and delay preventative or intervening measures.  By disallowing universities to apply prompt measures, which ensure access to a discrimination-free education, while investigations are ongoing compromises the very safety of students. Combining this with the proposed rule allowing schools to create "temporary delays" or "limited extensions" for "good cause" will force students to endure harassment and abuse while investigations are delayed.  SAGE believes this is in direct conflict with the purpose of Title IX intended by Congress. We suggest that specific protective measures are described that do not unfairly place victims in proximity to their abusers while investigations are ongoing.

While delivering the opinion of the Supreme Court ruling on *Meritor Savings Bank v. Vinson* (1986), Justice Rehnquist wrote: "The gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome." 29 CFR 1604.11(a) (1985) Yet, the proposed rule changes do not emphasize the key issue of conduct that are unwelcome, but rather they focus on conduct that has already become so "Severe, pervasive, and objectively offensive" that it most certainly has already destroyed the survivor's educational opportunities. We are perplexed that the Department of Education would chose to frame their guidelines in a reactionary rather than preventive manner. Title IX provides a protection from sex-based discrimination, including sexual harassment, and the Department of Education

---

[5] Additionally, data shows that these processes are excessively traumatic for victims and despite policy changes, and lengthier cross-examinations, courtroom cross-examination policies for sexual assault cases have changed little since the 1950s. Zydervelt, S., et al., *Lawyers' Strategies for Cross-examining Rape Complainants: Have We Moved Beyond the 1950s?* The British Journal of Criminology, 2017. 57(3): p. 551-569.

[6] "…if one set out intentionally to design a system for provoking symptoms of traumatic stress it would look very much like a court of law".Herman, J. L. (2005). Justice From the Victim's Perspective. *Violence Against Women*, *11*(5), 571–602. https://doi.org/10.1177/1077801205274450

EXHIBIT 26



should strive for the prevention of sexual harassment. In the case where these protections fail, the remedy should be focused on creating systems to keep sexual harassment from happening to other students, and not focus on mitigating liability of the institution.

*Student Advocates for Graduate Education (SAGE) is a coalition of Graduate Student Organizations from leading U.S. public research universities who are committed to improving the quality of graduate student life at their own campuses, and promoting access, quality, and opportunity for graduate and professional students at the federal level. This statement has the support of graduate student leaders from:*

*The Ohio State University*

*Rutgers University*

*Texas A&M University*

*University of Arizona*

*University of California-Berkeley*

*University of California-Davis*

*University of California-Irvine*

*University of California-San Diego*

*University of Maryland*

*University of Michigan*

*University of North Carolina-Chapel Hill*

*University of Pittsburgh*

*University of Texas-Austin*

*University of Washington*

EXHIBIT 26



SAGE

# EXHIBIT 27

January 30, 2019

Kenneth L. Marcus
Assistant Secretary for Civil Rights
Department of Education
400 Maryland Avenue SW
Washington, DC 20202

Submitted via www.regulations.gov

**Re: ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance.**

Dear Mr. Marcus:

We are writing on behalf of the National Women's Law Center in response to the Department of Education's (the Department) Notice of Proposed Rulemaking ("NPRM" or "proposed rules") to express our strong opposition to the Department's proposal to amend rules implementing Title IX of the Education Amendment Act of 1972 (Title IX) as published in the Federal Register on November 29, 2018.

The National Women's Law Center ("the Center") is a nonprofit organization that has worked since 1972 to combat sex discrimination and expand opportunities for women and girls in every facet of their lives, including education. Founded the same year as Title IX of the Education Amendments of 1972 was enacted, the Center has participated in all major Title IX cases before the Supreme Court as counsel[1] or amici. The Center is committed to eradicating all forms of sex discrimination in school, specifically including discrimination against pregnant and parenting students, LGBTQ students, and students who are vulnerable to multiple forms of discrimination, such as girls of color and girls with disabilities. This work includes a deep commitment to eradicating sexual harassment (including sexual violence) as a barrier to educational success. We equip students with the tools to advocate for their own Title IX rights at school, assist policymakers in enforcing Title IX and strengthening protections against sexual harassment and other forms of sex discrimination, and litigate on behalf of students whose schools fail to adequately address their reports of sexual harassment in violation of Title IX.

As attorneys representing those who have been harmed by sexual violence and other forms of sexual harassment, we know that too often when students seek help from their schools to address the harassment, they are retaliated against or pushed out of school altogether. For example, one of our current plaintiffs, Jane Doe, was fourteen years old when she was repeatedly subjected to sexual harassment, including three sexual assaults in schools bathrooms by multiple older male peers.[2] When Jane and her friends reported the assaults and other harassment to the school, instead of investigating the incidents, a school resource officer coerced her into revising her previous written statement to say she was a "willing participant" in her own assaults.[3] The school then suspended Jane for so-called "sexual misconduct" and offered no counseling, tutoring, or other accommodations to address the impacts of the harassment and help her again feel safe at school.[4] Terrified of returning to school, Jane, who was previously a

---

[1] *E.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005); *Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629 (1999).
[2] Compl. at ¶ 1, *Doe v. Sch. Bd. of Miami-Dade Cnty.*, No. 1:19-cv-20204 (S.D. Fla. Jan. 15, 2019).
[3] *Id.* at ¶¶ 2, 49-51.
[4] *Id.* at ¶¶ 2-3.

EXHIBIT 27

conscientious and ambitious student, was absent for more than three months and now has a full academic quarter of failing grades on her high school transcript.[5] She was forced to transfer to another school when it became clear that no meaningful steps would be taken to protect her.

DarbiAnne Goodwin, another current client of the Center's, was a high school sophomore when she was sexually assaulted by a male classmate over winter break.[6] When they returned to school, he and his friends spread sexual rumors about her, subjected her to sexual slurs, and threatened to physically attack her.[7] However, her school refused to conduct an adequate investigation or otherwise take steps to provide a safe educational environment for her.[8] As a result, Darbi developed post-traumatic stress disorder (PTSD) and was effectively pushed out of school not once, but twice—once into homebound instruction, and a second time into cyber school, an inferior alternative school where she was forced to withdraw from two of her courses and retake a third course she had already completed the previous year.[9] Once an A-student who had been active in extracurricular activities, Darbi suffered a sharp decline in her grade point average and had to leave the student council and turned down a nomination to be its president.[10]

Jane and Darbi's experiences are just two examples of how a school's failure to address sexual harassment can result in a very real loss of educational opportunities for survivors. Rather than working to ensure that fewer students face such experiences and that schools take more effective steps to address sexual harassment, the Department's proposed rules would make it more likely that those who experience sexual assault and other forms of harassment confront the same types of inadequate school responses as Jane and Darbi. In a reversal of longstanding Department policy, schools would be encouraged—and in many cases, required—to do less to address sexual harassment. There is simply no valid justification for the Department's proposal.

The Department proposes to remove significant protections for students and employees who experience sexual assaults and other forms of sexual harassment, apparently motivated by unlawful sex stereotypes that women and girls are likely to lie about sexual assault and other forms of harassment and by the perception that sexual harassment has a relatively trivial impact on those who experience it. Just weeks before rescinding two important Title IX guidances on sexual violence and issuing "interim guidance" in advance of these proposed rules, Secretary DeVos diminished the full range of sexual harassment that deprives students of equal access to educational opportunities, claiming, "if everything is harassment, then nothing is."[11] Former Acting Assistant Secretary Candice Jackson reinforced the myth of false accusations, claiming that "90 percent" of her office's Title IX investigations were the result of "drunk[en]" sexual encounters and regret.[12] Neomi Rao, the Administrator of the Office of Information and Regulatory Affairs, presaged Ms. Jackson's rhetoric about false accusations stemming from regret, when she claimed that "casual sex for women often leads to regret" and causes them to "run from their

[5] *Id.* at ¶ 3.

[6] *Goodwin v. Pennridge Sch. Distr.*, 309 F. Supp. 3d 367, 371 (E.D. Pa. 2018); *see also* Pl.'s Mot. for Summ. J. at 1, *Goodwin v. Pennridge Sch. Dist.*, No. 17-cv-3570-TR (E.D. Pa. Jan. 14, 2019).

[7] *Goodwin*, 309 F. Supp. 3d at 372; Pl.'s Mot. for Summ. J. at 1, *Goodwin*, No. 17-cv-3570-TR.

[8] *Goodwin*, 309 F. Supp. 3d at 372; Pl.'s Mot. for Summ. J. at 1, *Goodwin*, No. 17-cv-3570-TR.

[9] *Goodwin*, 309 F. Supp. 3d at 372, 374; Pl.'s Mot. for Summ. J. at 1, *Goodwin*, No. 17-cv-3570-TR.

[10] *Goodwin*, 309 F. Supp. 3d at 373; Pl.'s Mot. for Summ. J. at 5, 9, *Goodwin*, No. 17-cv-3570-TR.

[11] Dep't of Educ., *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017) [hereinafter *DeVos Prepared Remarks*], *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

[12] Erica L. Green & Sheryl Gay Stolberg, *Campus Rape Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. TIMES (July 12, 2017), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html.

EXHIBIT 27

choices," leading to assault allegations.[13] And President Trump himself has repeatedly publicly dismissed and disputed allegations of sex-based harassment and violence made by women.[14] Tellingly, these officials have not expressed the same skepticism of the denials made by men and boys accused of sexual harassment, including sexual assault.

      The harm of the Department's proposal to both students and schools cannot be overstated. The proposed rules would make schools more dangerous for all students, with especial risk to students experiencing sexual harassment who are students of color, pregnant and parenting students, LGBTQ students, and/or students with disabilities, as they are more likely to experience sexual harassment and more likely to be ignored, punished, and pushed out of school entirely. Simultaneously, schools would be forced to adopt inflexible, costly, and ineffective procedures that would expose them to more litigation and that create less inclusive and equitable communities.[15]

      The proposed rules ignore the devastating impact of sexual violence and other forms of sexual harassment in schools. Instead of effectuating Title IX's purpose of protecting students and school employees from sexual abuse and other forms of sexual harassment—that is, from unlawful sex discrimination—they make it harder for individuals to report abuse, allow (and sometimes require) schools to ignore reports when they are made, and unfairly tilt the investigation process in favor of respondents, to the direct detriment of survivors. For the reasons discussed at length in this comment, the Center unequivocally opposes the Department's proposed rule and calls for its immediate withdrawal.

---

[13] Neomi Rao, *"The Feminist Dilemma"*, YALE FREE PRESS (Apr. 1993), https://afj.org/wp-content/uploads/2019/01/02-The-Feminist-Dilemma.pdf.

[14] When White House officials Rob Porter and David Sorensen resigned amidst reports that they had committed gender-based violence, the president tweeted: "Peoples [sic] lives are being shattered and destroyed by a mere allegation. … There is no recovery for someone falsely accused—life and career are gone. Is there no such thing any longer as Due Process?" Donald Trump (@realDonaldTrump), TWITTER (Feb. 10, 2018, 7:33 AM),
https://twitter.com/realDonaldTrump/status/962348831789797381. *See also* Jacey Fortin, *Trump's History of Defending Men Accused of Hurting Women*, N.Y. TIMES (Feb. 11, 2018), https://www.nytimes.com/2018/02/11/us/trump-sexual-misconduct.html (about harassment claims against former Fox News host, Bill O'Reilly, Trump said: "I don't think Bill did anything wrong," adding, "I think he's a person I know well. He is a good person," and about sexual harassment claims against former chairman of Fox News, Roger Ailes, Trump said he "felt very badly" for him and that "I can tell you that some of the women that are complaining, I know how much he's helped them."); Lisa Bonos, *Trump asks why Christine Blasey Ford didn't report her allegations sooner. Survivors answer with #WhyIDidntReport*, WASH. POST (Sept. 21, 2018),
https://www.washingtonpost.com/news/soloish/wp/2018/09/21/trump-asks-why-christine-blasey-ford-didnt-report-her-allegation-sooner-survivors-answer-with-whyididntreport/?utm_term=.3ca0d0017c36 (about sexual assault claims against Justice Brett Kavanaugh, Trump doubted Dr. Ford's account, stating "if the attack on Dr. Ford was as bad as she says, charges would have been immediately filed with local Law Enforcement Authorities"); Allie Malloy, et al., *Trump Mocks Christine Blasey Ford's Testimony, Tells People to 'Think of Your Son'*, CNN (Oct. 3, 2018), https://www.cnn.com/2018/10/02/politics/trump-mocks-christine-blasey-ford-kavanaugh-supreme-court/index.html (reporting on Trump mocking Dr. Ford's testimony before the Senate Judiciary Committee);

[15] *See* Letter from Ass'n of Am. Univs. (AAU) to Brittany Bull at 4 (Jan. 24, 2019) [hereinafter AAU Letter], https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Higher-Education-Regulation/AAU-Title-IX-Comments-1-24-19.pdf (discussing "higher costs associated with the regulation's prescribed quasi-court models"); Letter from Ass'n of Indep. Colls. and Univs. (AICUM) to Sec'y Elisabeth DeVos at 2 (Jan.23, 2019) [hereinafter AICUM Letter], http://aicum.org/wp-content/uploads/2019/01/AICUM-public-comments-on-Notice-of-Proposed-Rulemaking-%E2%80%9CNPRM%E2%80%9D-amending-regulations-implementing-Title-IX-of-the-Education-Amendments-of-1972-Title-IX%E2%80%9D-Docket-ID-ED-2018-OCR-0064.pdf ("[s]uch financial costs and administrative burdens may be overwhelming"); Letter from The School Superintendents Ass'n (AASA) to Sec'y Elisabeth DeVos at 1, 2, 3 (Jan. 22, 2019) [hereinafter AASA Letter], http://aasa.org/uploadedFiles/AASA_Blog(1)/AASA Title IX Comments Final.pdf (discussing "new and unaccounted for costs in changing current policies and procedures, … increased litigation costs," "a real cost in terms of training and professional development to changing practices and policies," and "much costlier redirection of district resources towards addressing Title IX complaints and violations in court").

EXHIBIT 27

Part I illustrates the prevalence, underreporting, and pernicious effects of sexual harassment and assault on students' equal access to educational opportunities. Part II describes how the proposed rules would permit or require schools to ignore reports of sexual harassment and assault. Part III details how the students would be denied necessary supportive measures and remedies under the Department's proposal. Part IV details how the proposed grievance procedures would permit or require schools to unlawfully favor respondents over complainants and retraumatize survivors and other harassment victims. Part V describes how the proposed rules would weaken the ability of the Department to remedy sex discrimination and broaden the ability of schools to engage in sex discrimination. Part VI explains that the proposed rules exceed the Department's authority to effectuate Title IX's nondiscrimination mandate. Parts VII-IX describe how the proposed rules would conflict with Title VII, the Clery Act, and many state laws. Part X explains how the Department's actions in conducting its cost-benefit analysis violated the Administrative Procedure Act, the Information Quality Act, Executive Orders 13563 and 12866. Part XI details how the Department failed to follow other procedural requirements in violation of numerous laws, including Title IV, the Regulatory Flexibility Act, and Executive Orders 12250, 13132, 13175, and 13272. Part XII responds to the Department's Directed Questions by explaining how various provisions of its proposal are unworkable and fail to take into account the unique circumstances of various parties and/or schools.

## I.   Sexual harassment, including sexual assault, is a pervasive problem in school but is chronically underreported and has severe consequences for a student's education.

### A.   Sexual harassment, including sexual assault, is pervasive in schools across the country.

Students experience high rates of sexual harassment. In grades 7-12, 56 percent of girls and 40 percent of boys are sexually harassed in any given school year.[16] More than one in five girls ages 14 to 18 are kissed or touched without their consent.[17] During college, 62 percent of women and 61 percent of men experience sexual harassment,[18] and more than one in five women and nearly one in 18 men are sexually assaulted.[19] Historically marginalized and underrepresented groups are more likely to experience sexual harassment than their peers. Native, Black, and Latina girls are more likely than white girls to be forced to have sex when they do not want to do so.[20] Fifty-six percent of girls ages 14-18 who are pregnant or parenting are kissed or touched without their consent.[21] More than half of LGBTQ students ages 13 to 21 are sexually harassed at school.[22] Nearly one in four transgender and gender-nonconforming students are

---

[16] Am. Ass'n of Univ. Women (AAUW), *Crossing the Line: Sexual Harassment at School* 2 (2011) [hereinafter *Crossing the Line*], https://www.aauw.org/files/2013/02/Crossing-the-Line-Sexual-Harassment-at-School.pdf.

[17] Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 1 (Apr. 2017) [hereinafter *Let Her Learn: Sexual Harassment and Violence*], *available at* https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence/.

[18] AAUW, *Drawing the Line: Sexual Harassment on Campus* 17, 19 (2005) [hereinafter *Drawing the Line*], https://history.aauw.org/files/2013/01/DTLFinal.pdf (noting differences in the types of sexual harassment and reactions to it).

[19] *E.g.*, AAU, *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct*, 13-14 (Sept. 2015) [hereinafter *AAU Campus Climate Survey*], https://www.aau.edu/sites/default/files/%40%20Files/Climate%20Survey/AAU_Campus_Climate_Survey_12_14_15.pdf.

[20] *Let Her Learn: Sexual Harassment and Violence*, *supra* note 17, at 3.

[21] Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Are Pregnant or Parenting* 12 (2017) [hereinafter *Let Her Learn: Pregnant or Parenting Students*], *available at* https://nwlc.org/resources/stopping-school-pushout-for-girls-who-are-pregnant-or-parenting/.

[22] GLSEN, *The 2017 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* 26 (2018) [hereinafter *2017 National School Climate Survey*], *available at* https://www.glsen.org/article/2017-national-school-climate-survey-1.

EXHIBIT 27

sexually assaulted during college.[23] Students with disabilities are 2.9 times more likely than their peers to be sexually assaulted.[24]

Sexual harassment and assault occurs both on-campus and in off-campus spaces closely associated with school. Nearly nine in ten college students live off campus.[25] Forty-one percent of college sexual assaults involve off-campus parties.[26] Many fraternity and sorority houses are located off campus. Students are far more likely to experience sexual assault if they are in a sorority (nearly one and a half times more likely) or fraternity (nearly three times more likely).[27] When schools fail to provide effective responses, the impact of sexual harassment and assault can be devastating.[28] Too many individuals who experience sexual assault or other forms of sexual harassment end up dropping out of school because they do not feel safe on campus; some are even expelled for lower grades in the wake of their trauma.[29] For example, 34 percent of college student survivors of sexual assault drop out of college.[30]

**B.   Sexual harassment, including sexual assault, is consistently and vastly underreported.**

Reporting sexual harassment can be hard for most victims, and the proposed rules would further discourage students from coming forward to ask their schools for help. Already, only 12 percent of college survivors who experience sexual assault,[31] and only 7.7 percent of college students who experience sexual harassment, report to their schools or the police.[32] Only 2 percent of girls ages 14 to 18[33] report sexual assault or harassment. Students often choose not to report for fear of reprisal, because they believe their abuse was not important enough,[34] because they are "embarrassed, ashamed or that it would be too emotionally difficult,"[35] because they think the no one would do anything to help,[36] and because they fear that reporting would make the situation even worse.[37] Common rape myths, such as those perpetuated in statements made by officials in this Administration, that a victim could have prevented their assault if they had only acted differently, wore something else, or did not consume alcohol, only exacerbate underreporting.

---

[23] *AAU Campus Climate Survey*, *supra* note 19 at 13-14.

[24] Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for: Girls With Disabilities* 7 (2017) [hereinafter *Let Her Learn: Girls with Disabilities*], *available at* https://nwlc.org/resources/stopping-school-pushout-for-girls-with-disabilities.

[25] Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*, N.Y. TIMES (Aug. 5, 2016), https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-cost-who-knows.html (87 percent).

[26] United Educators, *Facts From United Educators' Report - Confronting Campus Sexual Assault: An Examination of Higher Education Claims* (2015), https://www.ue.org/sexual_assault_claims_study.

[27] Jennifer J. Freyd, *The UO Sexual Violence and Institutional Betrayal Surveys: 2014, 2015, and 2015-2016* (Oct. 16, 2014), *available at* https://www.uwire.com/2014/10/16/sexual-assault-more-prevalent-in-fraternities-and-sororities-study-finds (finding that 48.1 percent of females and 23.6 percent of males in Fraternity and Sorority Life (FSL) have experienced non-consensual sexual contact, compared with 33.1 percent of females and 7.9 percent of males not in FSL).

[28] *E.g.*, Audrey Chu, *I Dropped Out of College Because I Couldn't Bear to See My Rapist on Campus*, VICE (Sept. 26, 2017), https://broadly.vice.com/en_us/article/qvjzpd/i-dropped-out-of-college-because-i-couldnt-bear-to-see-my-rapist-on-campus.

[29] *E.g.*, Alexandra Brodsky, *How much does sexual assault cost college students every year?*, WASH. POST (Nov. 18, 2014), https://www.washingtonpost.com/posteverything/wp/2014/11/18/how-much-does-sexual-assault-cost-students-every-year.

[30] Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. STUDENT RETENTION: RES., THEORY & PRAC. 234, 244 (2015), *available at* https://doi.org/10.1177/1521025115584750.

[31] *Poll: One in 5 women say they have been sexually assaulted in college*, WASH. POST (June 12, 2015) [hereinafter Washington Post Poll], https://www.washingtonpost.com/graphics/local/sexual-assault-poll.

[32] *AAU Campus Climate Survey*, supra note 19 at 35.

[33] *Let Her Learn: Sexual Harassment and Violence*, *supra* note 17 at 2.

[34] *AAU Campus Climate Survey*, *supra* note 19 at 36.

[35] *Id.*

[36] RAINN, *Campus Sexual Violence: Statistics*, https://www.rainn.org/statistics/campus-sexual-violence.

[37] 2017 National School Climate Survey, *supra* note 22, at 27.

EXHIBIT 27

Survivors of sexual assault may also be unlikely to make a report to law enforcement because, in many instances, criminal reporting often does not serve survivors' best interests. Police officers are concerned with investigating crimes and catching perpetrators; they are not in the business of providing supportive measures to survivors and making sure that they feel safe at school. And some students—especially students of color, undocumented students,[38] LGBTQ students,[39] and students with disabilities—can be expected to be even less likely than their peers to report sexual assault to the police due to increased risk of being subjected to police violence and/or deportation. Survivors of color also may not want to report to the police if their assailant is non-white, in order to avoid exacerbating the overcriminalization of men and boys of color.

### C.   Students who do report sexual harassment are often ignored or even punished by their schools.

Unfortunately, students who reasonably choose not to turn to the police often face hostility from their schools when they try to report. Reliance on common rape myths that blame individuals for the assault and other harassment they experience[40] can lead schools to minimize and discount sexual harassment reports. An inaccurate perception that false accusations of sexual assault are common[41]—despite the fact that men and boys are far more likely to be victims of sexual assault than to be falsely accused of it[42]—can also lead schools to dismiss reports of assault and assume that complainants are being less than truthful. Indeed, many students who report sexual assault and other forms of sexual harassment to their school face discipline as the result of speaking up, for engaging in so-called "consensual" sexual activity[43] or premarital sex,[44] for defending themselves against their harassers,[45] or for merely talking about their assault with other students in violation of a "gag order" or nondisclosure agreement imposed by their school.[46] The Center regularly receives requests for legal assistance from student survivors across the country who have been disciplined by their schools after reporting sexual assault.[47]

---

[38] *See* Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation*, N.Y. TIMES (April 30, 2017), https://www.nytimes.com/2017/04/30/us/immigrants-deportation-sexual-abuse.html?mcubz=3.

[39] National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey: Executive Summary* 12 (Dec. 2016) [hereinafter *2015 U.S. Transgender Survey*], https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf.

[40] *See e.g.*, Bethonie Butler, *Survivors of sexual assault confront victim blaming on Twitter*, WASH. POST (Mar. 13, 2014), https://www.washingtonpost.com/blogs/she-the-people/wp/2014/03/13/survivors-of-sexual-assault-confront-victim-blaming-on-twitter.

[41] David Lisak et al., *False Allegations of Sexual Assault: An Analysis of Ten Years of Reported Cases*, 16(12) VIOLENCE AGAINST WOMEN 1318–1334 (2010), *available at* https://doi.org/10.1177/1077801210387747.

[42] *E.g.*, Tyler Kingkade, *Males Are More Likely To Suffer Sexual Assault Than To Be Falsely Accused Of It*, HUFFINGTON POST (Dec. 8, 2014) [last updated Oct. 16, 2015], https://www.huffingtonpost.com/2014/12/08/false-rape-accusations_n_6290380.html.

[43] *See, e.g.*, Brian Entin, *Miami Gardens 9th-grader says she was raped by 3 boys in school bathroom*, WSVN-TV (Feb. 8, 2018), https://wsvn.com/news/local/miami-gardens-9th-grader-says-she-was-raped-by-3-boys-in-school-bathroom; Nora Caplan-Bricker, *"My School Punished Me"*, SLATE (Sept. 19, 2016), https://slate.com/human-interest/2016/09/title-ix-sexual-assault-allegations-in-k-12-schools.html; Aviva Stahl, *'This Is an Epidemic': How NYC Public Schools Punish Girls for Being Raped*, VICE (June 8, 2016), https://broadly.vice.com/en_us/article/59mz3x/this-is-an-epidemic-how-nyc-public-schools-punish-girls-for-being-raped.

[44] Sarah Brown, *BYU Is Under Fire, Again, for Punishing Sex-Assault Victims*, CHRONICLE OF HIGHER EDUC. (Aug. 6, 2018), https://www.chronicle.com/article/BYU-Is-Under-Fire-Again-for/244164.

[45] NAACP Legal Defense and Educ. Fund, Inc. & Nat'l Women's Law Ctr., *Unlocking Opportunity for African American Girls: A Call to Action for Educational Equity* 25 (2014) [hereinafter *Unlocking Opportunity*], https://nwlc.org/wp-content/uploads/2015/08/unlocking_opportunity_for_african_american_girls_report.pdf.

[46] *See, e.g.*, Tyler Kingkade, *When Colleges Threaten To Punish Students Who Report Sexual Violence*, HUFFINGTON POST (Sept. 9, 2015), https://www.huffingtonpost.com/entry/sexual-assault-victims-punishment_us_55ada33de4b0caf721b3b61c.

[47] As of this writing, NWLC is litigating on behalf of three student survivors who were punished or otherwise unfairly pushed out of their high schools when they reported sexual harassment, including sexual assault. Nat'l Women's Law Ctr., *Miami School*

EXHIBIT 27

Women and girls of color already face discriminatory discipline due to race and sex stereotypes.[48] Schools are also more likely to ignore, blame, and punish Black and Brown women and girls who report sexual harassment due to harmful race and sex stereotypes that label them as "promiscuous,"[49] and less deserving of protection and care.[50] For example, Black women and girls are commonly stereotyped as "Jezebels," Latina women and girls as "hot-blooded," Asian American and Pacific Islander women and girls as "submissive, and naturally erotic," and Native women and girls as "sexually violable" due to the legacy of colonization.[51]

With respect to Black girls specifically, studies show that adults view Black girls as more adult-like and less innocent than their white peers, a phenomenon referred to as "adultification," and that Black girls are stereotyped as "hypersexualized"; as a result, schools are likely to treat their reports of sexual harassment with less seriousness, and more likely to place blame on Black girls for their victimization.[52] Indeed, Black women and girls are especially likely to be punished by schools for their behaviors. For example, The Department's 2013-14 Civil Rights Data Collection (CRDC) shows that Black girls are five times more likely than white girls to be suspended in elementary and secondary school, and that while Black girls represented 20 percent of all preschool enrolled students, they were 54 percent of preschool students who were suspended.[53] Schools are also more likely to punish Black women and girls by labeling them as the aggressor when they defend themselves against their harassers or when they respond in age-appropriate ways to traumatic experience because of stereotypes that they are "angry" and "aggressive."[54]

Schools may rely on many other stereotypes to ignore, blame, and/or punish students who report sexual harassment. For example, students who are pregnant or parenting are more likely to be blamed for sexual harassment than their peers, due in part to the stereotype that they are more "promiscuous" because they have engaged in sexual intercourse in the past. Similarly, LGBTQ students are less likely to be believed and more likely to be blamed due to stereotypes that they are more "promiscuous," "hypersexual," "deviant," or bring the "attention" upon themselves.[55] Students with disabilities, too, are

---

*Board Pushed Survivor of Multiple Sexual Assaults Out of School, Says NWLC* (Jan. 15, 2019), https://nwlc.org/press-releases/miami-school-board-pushed-survivor-of-multiple-sexual-assaults-out-of-school-says-nwlc; Nat'l Women's Law Ctr., *Pennridge School District Consistently Pushes Survivors of Sex-Based Harassment Out of School, Says NWLC* (Aug. 9, 2017), https://nwlc.org/press-releases/pennridge-school-district-consistently-pushes-survivors-of-sex-based-harassment-out-of-school-says-nwlc; Nat'l Women's Law Ctr., *NWLC Files Lawsuit against PA School District for Failing to Address Sexual Assault of High School Student* (May 31, 2017), https://nwlc.org/press-releases/nwlc-files-lawsuit-against-pa-school-district-for-failing-to-address-sexual-assault-of-high-school-student.

[48] Nat'l Women's Law Ctr., *Let Her Learn: A Toolkit To Stop School Pushout for Girls of Color* 1 (2016) [hereinafter *Let Her Learn: Girls of Color*], *available at* https://nwlc.org/resources/let-her-learn-a-toolkit-to-stop-school-push-out-for-girls-of-color.

[49] *E.g.*, Nancy Chi Cantalupo, *And Even More of Us Are Brave: Intersectionality & Sexual Harassment of Women Students of Color*, 42 HARVARD J.L. & GENDER 16, 24-29 (forthcoming), *available at* https://ssrn.com/abstract=3168909.

[50] Georgetown Law Center on Poverty and Inequality, *Girlhood Interrupted: The Erasure of Black Girls' Childhood*, 1 (2018) [hereinafter *Girlhood Interrupted*], https://www.law.georgetown.edu/poverty-inequality-center/wp-content/uploads/sites/14/2017/08/girlhood-interrupted.pdf.

[51] Cantalupo, *supra* note 49, at 24-25.

[52] *Girlhood Interrupted, supra* note 50, at 2-6.

[53] U.S. Dep't of Education, Office for Civil Rights, *A First Look: Key Data Highlights on Equity and Opportunity Gaps in Our Nation's Public Schools*, at 3 (June 7, 2016; last updated Oct. 28, 2016), https://www2.ed.gov/about/offices/list/ocr/docs/2013-14-first-look.pdf.

[54] *Unlocking Opportunity, supra* note 45, at 5, 18, 20, 25. *See also* Sonja C. Tonnesen, *Commentary: "Hit It and Quit It": Responses to Black Girls' Victimization in School*, 28 BERKELEY J. GENDER, L. & JUST. 1 (2013), http://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=1312&context=bglj.

[55] *See, e.g.*, Gillian R. Chadwick, *Reorienting the Rules of Evidence*, 39 CARDOZO L. REV. 2115, 2118 (2018), http://cardozolawreview.com/heterosexism-rules-evidence; Laura Dorwart, *The Hidden #MeToo Epidemic: Sexual Assault Against Bisexual Women*, MEDIUM (Dec. 3, 2017), https://medium.com/@lauramdorwart/the-hidden-metoo-epidemic-sexual-assault-against-bisexual-women-95fe76c3330a.

EXHIBIT 27

less likely to be believed because of stereotypes about people with disabilities being less credible[56] and because they may have greater difficulty describing or communicating about the harassment they experienced, particularly if they have a cognitive or developmental disability.[57]

The changes to Title IX enforcement that the NPRM proposes must be considered against the backdrop of underreporting and a pervasive culture in which those who do report sexual harassment, including sexual assault, are likely to be blamed and disbelieved. Unfortunately, and as explained in great detail throughout this comment, rather than seeking to remedy that culture, the NPRM reinforces false and harmful stereotypes about those who experience sexual harassment and proposes rules that would further discourage reporting and make it harder for schools to adequately respond to complaints.

II. **The proposed rules would hobble Title IX enforcement, discourage reporting of sexual harassment, and prioritize protecting schools over protecting survivors and other harassment victims.**

For the better part of two decades, the Department has used one consistent standard to determine if a school violated Title IX by failing to adequately address sexual assault or other forms of sexual harassment. The Department's 2001 Guidance, which went through public notice-and-comment and has been enforced in both Democratic and Republican administrations,[58] defines sexual harassment as "unwelcome conduct of a sexual nature."[59] The 2001 Guidance requires schools to address student-on-student harassment if *any employee* "knew, or in the exercise of reasonable care should have known" about the harassment. In the context of employee-on-student harassment, the 2001 Guidance requires schools to address harassment "whether or not the [school] has 'notice' of the harassment."[60] Under the 2001 Guidance, the Department would consider schools that failed to "take immediate and effective corrective action" to be in violation of Title IX.[61] These standards have appropriately guided the Department's Office of Civil Rights' (OCR) enforcement activities for almost twenty years, effectuating Title IX's nondiscrimination mandate by requiring schools to quickly and effectively respond to serious instances of harassment and fulfilling OCR's purpose of ensuring equal access to educational opportunities and enforcing students' civil rights.

---

[56] The Arc, *People with Intellectual Disabilities and Sexual Violence* 2 (Mar. 2011), *available at* https://www.thearc.org/document.doc?id=3657

[57] *E.g.,* Nat'l Inst. of Justice, *Examining Criminal Justice Responses to and Help-Seeking Patterns of Sexual Violence Survivors with Disabilities* 11, 14-15 (2016), *available at* https://www.nij.gov/topics/crime/rape-sexual-violence/Pages/challenges-facing-sexual-assault-survivors-with-disabilities.aspx.

[58] These standards have been reaffirmed time and time again, in 2006 by the Bush Administration, in 2010, 2011, and 2014 in guidance documents issued by the Obama Administration, and even in the 2017 guidance document issued by the current Administration. U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Sexual Harassment* (Jan. 25, 2006) [hereinafter 2006 Guidance], https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html; U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010) [hereinafter 2010 Guidance], https://ww2ed.gov/about/offices/ list/ocr/letters/colleague-201104.pdf; U.S. Dep't of Educ. Office of Civil Rights, *Dear Colleague Letter: Sexual Violence* at 4, 6, 9, &16 (Apr. 4, 2011) [hereinafter 2011 Guidance], https://ww2ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; U.S. Dep't of Educ. Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* 1-2 (Apr. 29, 2014) [hereinafter 2014 Guidance], https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf; U.S. Dep't of Educ. Office for Civil Rights, *Questions and Answers on Campus Sexual Misconduct* (Sept. 2017) [hereinafter 2017 Guidance], https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

[59] U.S. Dep't of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001) [hereinafter 2001 Guidance], https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

[60] *Id.*

[61] *Id.*

EXHIBIT 27

This standard appropriately differs from the higher bar erected by the Supreme Court in the particular and narrow context of a Title IX sexual harassment lawsuit seeking monetary damages from a school. To recover monetary damages, a plaintiff must show that the school was deliberately indifferent to known sexual harassment that was severe and pervasive and deprived a student of equal access to educational opportunities and benefits.[62] But in establishing that standard, the Court recognized that it was *specific* to private suits seeking monetary damages, not to administrative enforcement. It explicitly noted that the standard it announced did not affect agency action: the Department was still permitted to administratively enforce rules addressing a broader range of conduct to fulfill Congress's direction to effectuate Title IX's nondiscrimination mandate.[63] It drew a distinction between "defin[ing] the scope of behavior that Title IX proscribes" and identifying the narrower circumstances in which a school's failure to respond to harassment supports a claim for monetary damages.[64] And it recognized that the liability standard for money damages does not limit the agency's authority to "promulgate and enforce requirements that effectuate [a] statute's nondiscrimination mandate."[65] The 2001 Guidance likewise addressed the difference between suits for money damages and Department enforcement, concluding that it was inappropriate for the Department to limit its enforcement activities to the narrower damages standard and that the Department would continue to enforce the broad protections provided under Title IX. Indeed, in the current proposed regulations, the Department acknowledges that it is "not required to adopt the liability standards applied by the Supreme Court in private suits for money damages."[66] Yet, despite knowing that adopting such a standard creates higher burdens for students who are sexually harassed to get help from their schools, the Department nevertheless insists on importing those standards without adequate justification.

Indeed, under proposed § 106.30, the Department seeks to import into the agency's enforcement effort a standard that is *more stringent* than the Supreme Court's standard for monetary damages in Title IX harassment cases. The Court defined sexual harassment as conduct that "effectively denie[s] [a person] equal access to an institution's *resources* and *opportunities*" or its "*opportunities and benefits.*"[67] The Department proposes a standard requiring a showing that the harassment *denies* a student of access to a school's "program or activity"[68]—a significantly more burdensome threshold than *effective denial of equal access to* a school's resources, opportunities, or benefits, which requires a student to have to be far more harmed in their education before a school must intervene.

In seeking to impose this liability standard to cabin the Department's enforcement of Title IX, the Department ignores key distinctions that the Supreme Court has specifically recognized between the practical realities of agency enforcement and court action. For instance, under the proposed rules a school would not be required to respond to reports of sexual harassment unless a school official "with the authority to institute corrective measures" had "actual knowledge" of the harassing conduct. This notice standard is drawn from the Court's opinion in *Gebser v. Lago Vista Independent School District*.[69] But in

---

[62] *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 290 (1998) (detailing standard for employee-on-student harassment); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (detailing standard for student-on-student harassment).
[63] *Gebser*, 524 U.S. at 291-92 (citing 20 U.S.C. § 1682).
[64] *Davis*, 526 U.S. at 639.
[65] *Gebser*, 524 U.S. at 292 (citing 20 U.S.C. § 1682).
[66] 83 Fed. Reg. at 61468, 61469.
[67] *Davis*, 526 U.S. at 631.
[68] Proposed § 106.30.
[69] *See Gebser*, 524 U.S. at 290. The Department further misstates the law by claiming that the proposed rules adopt the "*Gebser/Davis* standard" of notice. *See* 83 Fed. Reg. at 61467. The Court in *Davis* did not require a plaintiff alleging student-on-student harassment to prove actual knowledge by an appropriate person with the "authority to institute corrective measures." *See e.g.*, Brian Bardwell, *No One Is an Inappropriate Person: The Mistaken Application of Gebser's "Appropriate Person" Test to Title IX Peer-Harassment Cases*, 68 Case W. Res. L. Rev. 1343, 1347-48. Moreover, nine circuit courts do not require plaintiffs to prove actual knowledge by an "appropriate person" in any of their peer-harassment cases that cite Davis. *See, e.g.*, *L. L. v.*

EXHIBIT 27

*Gebser*, the Court reasoned that this actual notice standard is appropriate for suits seeking monetary relief by analogy to the Department's enforcement mechanism for withdrawing federal funding. The Court observed that before a school could be deprived of federal funding for a Title IX violation, it must receive notice of that violation, because the Department's enforcement mechanism *requires that OCR provide notice* to a school by advising the school about its failure to comply with Title IX requirements and giving it an opportunity to come into voluntary compliance *before* initiating enforcement proceedings.[70] Thus, *Gebser* recognizes (and nowhere questions) OCR's authority to initiate Title IX enforcement proceedings whether or not school officials had prior notice of the violation; it is *OCR* that puts the official with authority to institute corrective measures on notice of sexual harassment, if such an official did not have notice before the complaint was filed. *Gebser*'s notice requirement in money damages lawsuits was explicitly designed to mirror the effect of this pre-enforcement notice by OCR, which is already built into the Department's administrative enforcement mechanisms. Importing the *Gebser* notice requirement into this administrative enforcement mechanism serves no purpose other than sheltering schools from Title IX enforcement proceedings. While the Department asserts that it is "mindful of the difference"[71] between private litigation for damages and agency enforcement, the proposed rules ignore these differences.

The Department also ignores important distinctions between suits seeking different remedies. Although proof of a school's deliberate indifference is required in Title IX suits for money damages, *lawsuits for equitable relief* do not require a showing of deliberate indifference.[72] It has been the position of the United States for 20 years, since its amicus brief in *Davis*, that the standards currently enforced by the Department are the same as those applied in lawsuits for equitable relief.[73] Given that the *Gebser* standard does not apply in lawsuits seeking only equitable relief, it is especially perverse to apply that standard to agency enforcement efforts to secure such relief. The Department's proposal to apply the liability standard for money damages in the administrative context is arbitrary and capricious, as it threatens to create significant asymmetries between equitable remedies pursued through administrative means and the courts.

As set out in further detail below, the notice requirement, definition of harassment, and deliberate indifference standard set out by the Supreme Court for the unique circumstances of determining schools' monetary liability have no place in the far different context of administrative enforcement, with its iterative process and focus on voluntary corrective action by schools. By choosing to import those liability standards, the Department threatens devastating effects on students.

---

*Evesham Twp. Bd. of Educ.*, 710 F App'x 545 (3d Cir. 2017); *Yan Yan v. Penn State Univ.*, 529 F. App'x 167 (3d Cir. 2013); *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517 (3d Cir. 2011); *DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008); *Doe v. Bellefonte Area Sch. Dist.*, 106 F. App'x 798 (3d Cir. 2004); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001); *Dawn L. v. Greater Johnstown Sch. Dist.*, 614 F. Supp. 2d 555, 568 (W.D. Pa. 2008) (explaining that *Davis* "prohibit[s] student on student sexual discrimination when 'the harasser is under the school's disciplinary authority'").

[70] *Gebser*, 524 U.S. at 288-89.

[71] 83 Fed. Reg. at 61480.

[72] *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979). *See also Frederick v. Simpson College*, 160 F. Supp. 2d 1033, 1035-36 (S.D. Iowa 2001) (deciding that the heightened *Gebser* standard for claims seeking monetary damages does not apply to claims requesting equitable relief).

[73] *See, e.g.*, Brief for the United States as Amici Curiae Supporting Petitioner, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) (No. 97-843), https://www.justice.gov/osg/brief/davis-v-monroe-county-bd-educ-amicus-merits (explaining "requirement of actual knowledge and deliberate indifference responds to concerns about subjecting a fund recipient to potential liability for money damages" but "petitioner may establish a violation of Title IX and *entitlement to equitable relief* if she can show [petitioner] was subjected to a hostile environment in the school's programs or activities, respondent's officials knew or should have known of the harassment, and they failed to take prompt, appropriate corrective action") (emphasis added).

EXHIBIT 27

A.  **The proposed rules' definition of sexual harassment and standards for when schools are responsible for addressing harassment create inconsistent rules for students versus employees.**

Under Title VII, the federal law that addresses workplace harassment, a school is potentially liable for harassment of an employee if the harassment is "sufficiently severe *or* pervasive to *alter* the conditions of the victim's employment."[74] If the employee is harassed by a coworker or other third party, the school is liable if it "knew or should have known of the misconduct" and (2) failed to take immediate and appropriate corrective action.[75] If the employee is harassed by a supervisor, the school is automatically liable if the harassment resulted in a tangible employment action such as firing or demotion, and otherwise unless the school can prove that the employee unreasonably failed to take advantage of opportunities offered by the school to address harassment.[76] Schools are liable for harassment of employees under Title VII if the harassment occurs in a work-related context outside of the regular place of work[77] or outside of work but results in an impact on the work environment.[78] However, under the proposed Title IX rules, a school would only be held responsible for harassment against a student if it is (1) deliberately indifferent to (2) sexual harassment that is so severe, pervasive, *and* objectively offensive that it *denied* the student equal access to the school's program or activity; (3) the harassment occurred within the school's program or activity; and (4) a school employee with "the authority to institute corrective measures" had "actual knowledge" of the harassment. In other words, under the proposed rules, schools would be held to a far lesser standard in addressing the harassment of students—including the sexual harassment and abuse of children under its care—than in addressing harassment of adult employees.

Moreover, in contrast to the Title VII approach, which recognizes employer responsibility for harassment enabled by supervisory authority, and in contrast to the 2001 Guidance, the proposed rule does not recognize any higher obligation by schools to address harassment of students by school employees who are exercising authority over students. The 2001 Guidance imposed liability when an employee "is acting (or . . . reasonably appears to be acting) in the context of carrying out these responsibilities over students" and engages in sexual harassment, without regard to whether school officials had notice of this behavior.[79] By jettisoning this standard, the Department would free schools

---

[74] *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (emphasis added).

[75] *Meritor Savings Bank v. Vinson*, 477 US 57, 63 (1986) (internal quotations and brackets omitted); Equal Employment Opportunity Commission, *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 18, 1999) [hereinafter EEOC Guidance] (An employer is automatically liable for harassment by "a supervisor with immediate (or successively higher) authority over the employee."), https://www.eeoc.gov/policy/docs/harassment.html.

[76] *Meritor,* 477 US at 63.

[77] *Nichols v. Tri-Nat'l Logistics, Inc.*, 809 F.3d 981, 985-86 (8th Cir. 2016) (holding that district court erred in analyzing hostile work environment claim by plaintiff, a truck driver, by excluding alleged sexual harassment of plaintiff by her driving partner during mandatory rest period); *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) (concluding that Title VII covered sexual harassment during course of employer-mandated training, where training facility was controlled by a third party); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967 (9th Cir. 2002) (concluding that potential client's rape of female manager at business meeting outside her workplace was sufficient to establish hostile work environment since having out-of-office meetings with potential clients was job requirement); *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 135 (2d Cir. 2001) (concluding that "work environment" included short layover for flight attendants in foreign country where employer provided block of hotel rooms and ground transportation).

[78] *Lapka,* 517 F.3d at 983 (explaining that, to be actionable, harassment need only have consequences in the workplace); *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 409-10 (1st Cir. 2002) (stating that harasser's intimidating conduct outside workplace helped show why complainant feared him and why his presence at work created a hostile work environment); *Duggins v. Steak 'N Shake, Inc.*, 3 F. App'x 302, 311 (6th Cir. 2001) (stating that employee may reasonably perceive her work environment as hostile if forced to work for someone who harassed her outside the workplace).

[79] 2001 Guidance, *supra* note 59. ("If an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling,

EXHIBIT 27

from liability in many instances even when their employees use the authority they exercise as school employees to harass students. Under the proposed rules, for example, schools would bear no responsibility for the harms inflicted by serial abusers like Larry Nassar, George Tyndall, and Richard Strauss, who assaulted hundreds of students in their roles as school doctors, leaving survivors too embarrassed or afraid to report.

The drastic differences between Title VII and the proposed rules would mean that in many instances schools are *prohibited* from taking the same steps to protect children in schools that they are *required* to take to protect adults in the workplace, as set out further below.[80] And when they are not affirmatively prohibited from taking action, the proposed rules still create a more demanding standard for children in schools than for adults in the workplace to get help in ending sexual harassment.

### B. The proposed definition of harassment improperly prevents schools from providing a safe learning environment.

Proposed §§ 106.30 and 106.45(b)(3) define sexual harassment as (1) "[a]n employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct"; (2) "[u]nwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the [school's] education program or activity"; or (3) "[s]exual assault, as defined in 34 CFR 668.46(a)." The proposed rules mandate dismissal of all complaints of harassment that do not meet this standard. Thus, if a complaint did not allege quid pro quo harassment or sexual assault, a school would be *required* to dismiss a student's Title IX complaint if the harassment has not yet advanced to a point that it is actively harming a student's education. A school would be required to dismiss such a complaint even if it involved harassment of a minor student by a teacher or other school employee. A school would be required to dismiss such a complaint even if the school would typically take action to address behavior that was not based on sex but was similarly harassing, disrupting, or intimidating. The Department's proposed definition is out of line with Title IX purposes and precedent, discourages reporting, unjustifiably creates a higher standard for sexual harassment than other types of harassment and misconduct, and excludes many forms of sexual harassment that interfere with equal access to educational opportunities.

The Department does not provide a persuasive justification to change the definition of sexual harassment from that in the 2001 Guidance, which defines sexual harassment as "unwelcome conduct of a sexual nature."[81] The current definition rightly charges schools with responding to harassment before it escalates to a point that students suffer severe harm. But under the Department's proposed, narrower definition of harassment, students would be forced to endure repeated and escalating levels of abuse, from a student or teacher, before their schools would be permitted to take steps to investigate and stop the harassment. As the School Superintendents Association (AASA) states, the proposed definition would "move [schools] in the opposite direction of what … the federal government should be encouraging school personnel to do today."[82] Similarly, the National Association of Secondary School Principals (NASSP) opposes the proposed definition because it "completely ignores the fact that students excel at a

---

[80] Of course, as set out in greater detail in Part VII. below, school employees are also protected by Title IX from sex discrimination in the workplace, but the proposed rules fail to grapple with how schools are to navigate the conflicting requirements of Title VII and the proposed rules in addressing workplace sexual harassment.
supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex, the recipient is responsible for the discriminatory conduct").
[81] *Id.*
[82] AASA Letter, *supra* note 15, at 3-4.

EXHIBIT 27

higher level when there are fewer distractions or outside influences that negatively impact their learning, such as bullying or harassment"[83]

Schools are already escaping liability for money damages in the courts under this demanding standard even when they fail to address harassment that harms students. For example, in one particularly troubling case from the 11th Circuit, three second-grade girls reported that a male classmate was repeatedly touching their chests, rubbing his body against them, chasing them, and using highly explicit and graphic language about the sex acts he wanted to subject them to (e.g., "suck [their] breasts till the milk came out" and have them "suck the juice from his penis").[84] Although two of the girls were so upset that they faked being sick four or five times to avoid going to school, the court found that the school was not liable for money damages because there was "no concrete, negative effect on either the ability to receive an education or the enjoyment of equal access to educational programs or opportunities."[85] The proposed rules would not only ensure that schools also escape administrative enforcement in such cases, but would also actually prohibit schools from being more responsive to harassment complaints to ensure students are able to learn in a safe educational environment. In other words, under the proposed rules, the school would not only not face consequences for failing to respond to the girls in a case like the 11th Circuit's, it would also be *required* to ignore them. This would particularly harm elementary and secondary school students, who are often forced to be in close proximity to their harassers because they are legally required to attend school and have less autonomy than students in higher education to make decisions about where they go and what they do at school.

In addition, the proposed rules are inconsistent with the Supreme Court's liability standard for money damages, which holds schools liable for sexual harassment that, *inter alia*, "effectively denie[s] [a person] *equal* access to an institution's *resources* and *opportunities*" or its "*opportunities* or *benefits*."[86] Setting aside for a moment the fact that agency enforcement standards need not—and should not—be as demanding as litigation standards for money damages, the proposed rule is nonetheless still more burdensome than the Supreme Court's standard because denial of equal access to a school's "program" or "activity" is a more burdensome threshold than denial of equal access to a school's "resources," "opportunities," and "benefits."

The Department's proposed definition is also vague and complicated. Administrators, employees, and students would struggle to understand which complaints meet the standard. These difficulties would be significantly compounded for elementary and secondary school students and students with developmental disabilities. Students confronted with this lengthy, complicated definition of sexual harassment would have a hard time understanding whether the harassment they endured meets the Department's narrow standard. How would these students know what allegations and information to put in their formal complaint in order to avoid mandatory dismissal? A student may believe that she suffered harassment that was both severe and pervasive, but does she know whether it was also "objectively offensive" and whether it "effectively denied" her of "equal access" to a "program or activity?" This definition was created with the legal process in mind, contemplating trained lawyers and judges carefully weighing whether conduct meets each element of the standard. It was not intended to be applied as a threshold for determining whether any action can be taken in response to the requests made by students—many of them minors—in their own words for help from the school officials they trust. Students are not equipped to understand the complexities of this definition, nor should they be asked to carefully measure

---

[83] Letter from Nat'l Ass'n of Secondary School Principals (NASSP) to Ass't Sec'y Kenneth L. Marcus at 2 (Jan. 18, 2019) [hereinafter NASSP Letter], https://www.nassp.org/wordpress/wp-content/uploads/2019/01/NASSP_Title_IX_Comments_-_1.17.19_V2.pdf..
[84] *Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003).
[85] *Id.*
[86] *Davis*, 526 U.S. at 631 (emphasis added).

EXHIBIT 27

and parse their complaints when all they are asking for is their school to stop their sexual harassment and ensure that they can learn in a safe environment.

The Department's proposed definition would discourage students from reporting sexual harassment. Already, the most commonly cited reason for students not reporting sexual harassment is the fear that it is "insufficiently severe" to yield a response.[87] Moreover, if a student is turned away by her school after reporting sexual harassment because it does not meet the proposed narrow definition of sexual harassment, the student is even more unlikely to report a second time when the harassment escalates. Similarly, if a student knows of a friend or classmate who was turned away after reporting sexual harassment, the student is unlikely to make even a first report. By the time a student reports sexual harassment that the school can or must respond to, it may already be too late: because of the impact of the harassment, the student might already be ineligible for an important AP course, disqualified from applying to a dream college, or derailed from graduating altogether.

In addition, the proposed definition excludes many forms of sexual harassment, including some that schools are required to report under the Clery Act's requirements. Under the proposed rules, schools would be required to dismiss some complaints of stalking, dating violence, and domestic violence, while also being required to report those complaints to the Department under Clery.[88] These inconsistent requirements would cause confusion among school administrators struggling to make sense of their obligations under federal law and demonstrate the perverse nature of sharply limiting schools' ability to respond to harassment complaints.

Finally, the Department's harassment definition and mandatory dismissal requirement would create inconsistent rules for sexual harassment as compared to other misconduct. Harassment based on race or disability, for example, would continue to be governed by the more inclusive "severe *or* pervasive" standard for creating a hostile educational environment.[89] And schools could address harassment that was not sexual in nature even if that harassment was not "severe and pervasive" while, at the same time, being required to dismiss complaints of similar conduct if it is deemed sexual. This would create inconsistent and confusing rules for schools in addressing different forms of harassment. It would send a message that sexual harassment is less deserving of response than other types of harassment and that victims of sexual harassment are inherently less deserving of assistance than victims of other forms of harassment. It would also force students who experience multiple and intersecting forms of harassment to slice and dice their requests for help from their schools in order to maximize the possibility that the school might respond, carefully excluding reference to sexual taunts and only reporting racial slurs by a harasser, for example.[90] Further, it would also make schools vulnerable to litigation by students who rightfully claim that being subjected to more burdensome requirements in order to get help for sexual harassment than their peers who experience other forms of student misconduct, is discrimination based on their sex, in direct violation of Title IX. In other words, schools would be hard-pressed to figure out how to comply with Title IX when they are instructed to follow a new set of rules that demands responses that violate Title IX.

---

[87] Kathryn J. Holland & Lilia M. Cortina, *"It Happens to Girls All the Time": Examining Sexual Assault Survivors' Reasons for Not Using Campus Supports"*, 59 Am. J. Community Psychol. 50, 61 (2017), *available at* https://doi.org/10.1002/ajcp.12126.
[88] *See* 20 U.S.C. § 1092(f)(6)(iii); 20 U.S.C § 1092(f)(6)(iv)); 34 C.F.R. § 668.46(a)).
[89] *See e.g.*, *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (applying "severe or pervasive" standard to racial discrimination hostile work environment claim).
[90] *See* Joanna L. Grossman & Deborah L. Brake, *A Sharp Backward Turn: Department of Education Proposes to Protect Schools, Not Students, in Cases of Sexual Violence*, Verdict (Nov. 29, 2018), *available at* https://verdict.justia.com/2018/11/29/a-sharp-backward-turn-department-of-education-proposes-to-protect-schools-not-students-in-cases-of-sexual-violence.

EXHIBIT 27

The Department's repeated attempts to justify its proposed definition by citing "academic freedom and free speech"[91] are unpersuasive. Harassment is not protected speech when it creates a "hostile environment"[92] that limits a student's ability to participate in or benefit from a school program or activity.[93] The Supreme Court made clear nearly a half century ago in *Tinker v. Des Moines* that school officials can regulate student speech if they reasonably forecast "substantial disruption of or material interference with school activities" or if the speech involves "invasion of the rights of others."[94] There is no conflict between Title IX's regulation of sexually harassing speech in schools and the First Amendment.

### C.  The proposed notice requirement undermines Title IX's discrimination protections by making it harder to report sexual harassment, including sexual assault.

Under proposed §§ 106.44(a) and 106.30, schools would only be responsible for addressing sexual harassment when one of a small subset of school employees actually knew about the harassment. Schools would not be required to address sexual harassment unless there was "actual knowledge" of the harassment by (i) a Title IX coordinator, (ii) an elementary or secondary school teacher (but only for student-on-student harassment, *not* employee-on-student harassment); or (iii) an official who has "the authority to institute corrective measures."[95] This is a dramatic change, as the Department has long required schools to address *student-on-student* sexual harassment if almost any school employee[96] either knows about it or should reasonably have known about it.[97] This standard takes into account the reality that many students disclose sexual abuse to employees who do not have the authority to institute corrective measures, both because students seeking help turn to whatever adult they trust the most, regardless of that adult's official role, and because students are likely not informed about which employees have authority to address the harassment. The 2001 Guidance also requires schools to address all employee-on-student sexual harassment, "whether or not the [school] has 'notice' of the harassment."[98] The 2001 Guidance recognized the particular harms of students being preyed on by adults in positions of authority, and students' vulnerability to pressure from adults to remain silent, and accordingly acknowledged schools' heightened responsibilities to address harassment by their employees.

In contrast, under the proposed rules, schools would not be required to address any sexual harassment unless one of a small subset of school employees had "actual knowledge" of it. The proposed rule also unjustifiably limits the set of school employees who are able to receive actual notice that triggers the school's Title IX duties. For example, if a college or graduate student told their professor, residential advisor, or teaching assistant that they had been raped by another student or by a professor or other university employee, the university would have no obligation to help them. If an elementary or secondary school student told a non-teacher school employee they trust—such as a guidance counselor, teacher aide, playground supervisor, athletics coach, bus driver, cafeteria worker, or school resource officer—that they

---

[91] 83 Fed. Reg. at 61464, 61484. *See also* proposed § 106.6(d)(1), which states that nothing in Title IX requires a school to "[r]estrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution."

[92] See Grossman & Brake, *supra* note 90 ("There is no legitimate First Amendment or academic freedom protection afforded to unwelcome sexual conduct that creates a hostile educational environment.").

[93] 2001 Guidance, *supra* note 59.

[94] 393 U.S. 503, 513, 514 (1969).

[95] Proposed § 106.30.

[96] This duty applies to "any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility." 2001 Guidance, *supra* note 59 at 13.

[97] *Id* at 14.

[98] *Id.* at 10.

EXHIBIT 27

had been sexually assaulted by another student, the school would have no obligation to help the student.[99] And if an elementary or secondary school student told a teacher that she had been sexually assaulted by another teacher or other school employee, the school would again have no obligation to help her.[100]

Perversely, the proposed rules thus provide a more limited duty for elementary and secondary schools to respond to a student's allegations of sexual harassment by a school employee than by a student, an outcome that is especially concerning given that one in three employee-respondents in elementary and secondary schools sexually abuse multiple student victims.[101] The proposed rules are also particularly unworkable for elementary and secondary school students who are very young, students with physical or intellectual disabilities, and English Language Learners, who not only may struggle with describing their harassment, but who may have closer relationships with their teacher aides, members of their Section 504 team or Individualized Education Program (IEP) team, school psychologists, and other school employees who are not their teachers or the Title IX coordinator.

Because the proposed rules do not define who employees with "authority to institute corrective measures" are, many students at all levels of education who want to be sure they will receive help from their schools would need to report harassment directly to their Title IX coordinator—even though school district and university Title IX coordinators are usually central office administrators who do not work in students' school buildings and are usually strangers to the student body.

Sexual assault is very difficult to talk about. Proposed §§ 106.44(a) and 106.30 would mean even when students find the courage to talk to the adult school employees they trust, schools would frequently have no obligation to respond. For example, if the proposed rules had been in place, colleges like Michigan State and Penn State would have had no responsibility to stop Larry Nassar and Jerry Sandusky—even though their victims reported their experiences to at least 14 school employees over a 20-year period—including athletic trainers, coaches, counselors, and therapists[102]—because those employees are not considered to be school officials who have the "authority to institute corrective measures." These proposed provisions would absolve some of the worst Title IX offenders of legal liability. It is therefore unsurprising that the AASA objects to these proposed rules as "an unconscionable attack" on student safety,[103] and that NASSP fears they will "lead to even more nonreporting from victims, which could lead to prolonged harassment and suffering."[104]

The Department incorrectly relies on two Circuit cases that mis-cite *Gebser* in order to support its position in proposed § 106.30 that "the mere ability or obligation to report sexual harassment does not qualify an employee … as one who has authority to institute corrective measures" on behalf of the school.[105] One of the cases, *Plamp v. Mitchell*, cites a passage from *Gebser* that merely explains why it is necessary for *the Department* to provide notice to an official with "authority to institute corrective measures" before the Department can initiate an "administrative enforcement proceeding"; the quoted *Gebser* passage says nothing about what type of notice is required before a *school* can initiate an

---

[99] *See* proposed § 106.30 (83 Fed. Reg. at 61496) (for elementary and secondary schools, limiting notice to "a teacher in the elementary and secondary context with regard to student-on-student harassment).

[100] *See id.*

[101] Magnolia Consulting, *Characteristics of School Employee Sexual Misconduct: What We Know from a 2014 Sample* (Feb. 2018), https://magnoliaconsulting.org/news/2018/02/characteristics-school-employee-sexual-misconduct.

[102] Julie Mack & Emily Lawler, *MSU doctor's alleged victims talked for 20 years. Was anyone listening?*, MLIVE (Feb. 8, 2017), https://www.mlive.com/news/index.ssf/page/msu_doctor_alleged_sexual_assault.html.

[103] AASA Letter, *supra* note 15, at 2-3.

[104] NASSP Letter, *supra* note 83, at 1.

[105] 83 Fed. Reg. at 61497.

EXHIBIT 27

investigation into a sexual harassment complaint.[106] The second case, *Santiago v. Puerto Rico*, in turn relies on *Plamp*.[107] Neither case's incorrect citation of *Gebser* supports the Department's effort to restrict schools' obligation to respond to reports of sexual harassment.

### D.  The proposed rules would *require* schools to dismiss reports of harassment that occurs outside of a school activity, even when it creates a hostile educational environment.

Proposed §§ 106.30 and 106.45(b)(3) would *require* schools to dismiss all complaints of off-campus or online sexual harassment that happen outside of a school-sponsored program—even if the student is forced to see their harasser at school every day and the harassment directly impacts their education as a result. To understand why Title IX requires schools to respond to out-of-school harassment, one only need look at the Department's own recent decision to cut off partial funding to the Chicago Public Schools for failing to address two reports of out-of-school sexual assault, which the Department described as "serious and pervasive violations under Title IX."[108] In one case, a tenth-grade student was forced to perform oral sex in an abandoned building by a group of 13 boys, eight of whom she recognized from school. In the other case, another tenth-grade student was given alcohol and sexually abused by a teacher in his car. If the proposed rules become final, school districts would be required to dismiss complaints of similarly egregious behavior simply because they occurred off-campus outside a school program, even if they result in a hostile educational environment.

The proposed rules conflict with Title IX's statutory language, which does not depend on where the *underlying conduct* occurred but instead prohibits discrimination that "exclude[s a person] from participation in, . . . denie[s a person] the benefits of, or . . . subject[s a person] to discrimination under any education program or activity . . . ."[109] For almost two decades, the Department's guidance documents have agreed that schools are responsible for addressing sexual harassment if it is "sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program,"[110] regardless of where it occurs.[111] No student who experiences out-of-school harassment should be forced to wait until they are sexually harassed again on school grounds or during a school activity in order to receive help from their school. Nor has the Supreme Court ever suggested that a school must ignore harassment that occurs off school grounds under Title IX. In *Gebser*, for example, the harassment at issue included multiple instances in which a teacher had sexual intercourse with a middle school student, though "never on school property."[112] In considering whether the school had actual notice of the "sexual relationship"

---

[106] *Id.* (quoting *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 459 (8th Cir. 2009) (quoting *Gebser*, 524 U.S. at 289 ("Presumably, a central purpose of requiring notice of the violation 'to the appropriate person' and an opportunity for voluntary compliance before *administrative enforcement proceedings* can commence is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures.") (emphasis added))).

[107] *Id.* (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 75 (1st Cir. 2011) (citing *Plamp*, 565 F.3d at 458)).

[108] *See* David Jackson et al., *Federal officials withhold grant money from Chicago Public Schools, citing failure to protect students from sexual abuse*, CHICAGO TRIBUNE (Sept. 28, 2018), https://www.chicagotribune.com/news/local/breaking/ct-met-cps-civil-rights-20180925-story.html.

[109] 20 U.S.C. § 1681(a).

[110] 2001 Guidance, *supra* note 59.

[111] 2017 Guidance, *supra* note 58 at 1 n.3 ("Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities"); 2014 Guidance, *supra* note 58 ("a school must process all complaints of sexual violence, regardless of where the conduct occurred"); 2011 Guidance, *supra* note 58 ("Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity"); 2010 Guidance, *supra* note 58 at 2 (finding Title IX violation where "conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," regardless of location of harassment).

[112] *Gebser*, 524 U.S. at 278.

EXHIBIT 27

sufficient to subject it to liability for money damages,[113] the Court never suggested that the fact that the sexual encounters occurred outside of school somehow rendered them irrelevant under Title IX. If off-campus harassment, including assault, lies beyond the reach of Title IX, *Gebser* would be a case in which the question of the school's actual notice of harassment made no legal difference and thus a very strange vehicle for the Court to establish the rule of actual notice as a prerequisite to money damages.

Nevertheless, under the proposed rules, if an elementary or secondary school student is being sexually harassed by her classmates on Instagram or Snapchat outside of school, or on the way to/from school in a private carpool, her school would be forbidden from investigating the complaint or ending the harassment—even if as a result of the harassment she has become too afraid to attend class and face her harassers. Similarly, if a middle school student is raped at a classmate's house, the school would not be allowed to take action to remedy the impact of the assault—even if seeing the rapist every day in their classes, hallways, or cafeteria leaves her unable to function in school. Even if a parent reports that a school employee is sending their child sexually explicit messages via text or social media, or, as in *Gebser*, that a teacher has initiated a sexual relationship with their child outside of school, the school would still be required to dismiss those complaints—an especially concerning result given that mobile devices are the most common method of communications between school employees, including child sexual abusers, and students.[114] Not only do the proposed rules prohibit elementary and secondary schools from responding appropriately and adequately to these harrowing examples of sexual harassment, they fail to take into account the unique circumstances of elementary and secondary school students with disabilities, who are often segregated from their peers and even removed to off-site educational and day services, where they are isolated and more vulnerable to child sexual abuse.[115]

Similar harm would accrue to students at institutions of higher education. According to a 2014 U.S. Department of Justice report, 95 percent of sexual assaults of female students ages 18-24 occur outside of school.[116] In a leaked version of the proposed rules, the Department itself cited a study finding that 41 percent of college sexual assaults occur off campus.[117] But under the proposed rules, if a college or graduate student is sexually assaulted by a classmate in off-campus housing, their university would be required to dismiss their complaint—even though almost nine in ten college students live off campus.[118] If a student is assaulted off-campus by a professor, his college would be required to ignore his complaints—even if he would be required to continue attending the professor's class. Although the preamble briefly mentions one case where a Kansas State college fraternity was considered an "education program or activity" for the purposes of Title IX, the Department fails to explain conclusively whether all fraternities and sororities are covered by Title IX.[119] Many schools may therefore interpret the proposed rules to prevent them from addressing any sexual harassment that occurs in fraternities, sororities, and other social clubs not recognized by the school (*e.g.*, the Harvard final clubs[120])—a particularly troubling outcome given that students are more likely to be sexually assaulted if they belong to a fraternity or sorority.[121]

---

[113] *Id.* at 291.

[114] Magnolia Consulting, *supra* note 101.

[115] Nat'l Council on Disability, *The Segregation of Students with Disabilities* 18-19 (Feb. 2018), https://ncd.gov/sites/default/files/NCD_Segregation-SWD_508.pdf.

[116] U.S. Dep't of Justice, Bureau of Justice Statistics, *Rape and Sexual Assault Victimization Among College-Age Females, 1995–2013* at 6 (Dec. 2014), https://www.bjs.gov/content/pub/pdf/rsavcaf9513.pdf.

[117] Letter from Anne C. Agnew to Paula Stannard et al., *HHS Review: Department of Education Regulation – Noon September 10*, U.S. Dep't of Health & Human Servs. 79 n.21 (Sept. 5, 2018), https://atixa.org/wordpress/wp-content/uploads/2018/09/Draft-OCR-regulations-September-2018.pdf.

[118] Sharpe, *How Much Does Living Off-Campus Cost?*, *supra* note 25.

[119] 83 Fed. Reg. at 61468.

[120] *E.g.*, Harvard University, *Unrecognized Single-Gender Social Organizations*, (Dec. 5, 2017), https://www.harvard.edu/president/news/2017/unrecognized-single-gender-social-organizations.

[121] Freyd, *supra* note 27.

EXHIBIT 27

Although the proposed rules' preamble explains that an incident is considered to have occurred "within" a school program or activity if the school "owned the premises; exercised oversight, supervision, or discipline; or funded, sponsored, promoted, or endorsed the event or circumstance," the Department fails to include this explanation in the language of the proposed rules themselves, making it even more difficult for students and schools to understand their rights and obligations under this already-confusing multi-factor test.[122]

The proposed rules would also pose particular risks to students at community colleges and vocational schools. Approximately 5.8 million students attend community college (out of 17.0 million total undergraduate students),[123] and 16 million students attend vocational school.[124] But because none of these students live on campus, harassment they experience by faculty or other students is especially likely to occur outside of school, and therefore outside of the protection of the proposed Title IX rules.

Finally, proposed § 106.8(d) would create a unique harm to the 10 percent of U.S. undergraduate students who participate in study abroad programs. If any of these students report experiencing sexual harassment during their time abroad, including within their study abroad program, their schools would be required to dismiss their complaints—even if they are forced to see their harasser in the study abroad program every day, and even if they continue to be put into close contact with their harasser when they return to their home campus.

Representatives of school leaders like the AASA[125] and NASSP[126] oppose mandatory dismissal of complaints alleging out-of-school harassment. They recognize that out-of-school conduct "often spill[s] over into the school day and school environment" and this is why it is already "common practice" for school districts across the country to "discipline students for off-campus conduct[,] whether it's the use of drugs or alcohol at a house party, cyberbullying, hazing, physical assault, etc."[127] By forcing schools to dismiss complaints of out-of-school sexual harassment, the proposed rules would "unduly tie the hands of school leaders who believe every child deserves a safe and healthy learning environment."[128] It would also require schools to single out complaints of sexual harassment by treating them differently from other types of student misconduct that occur off-campus, perpetuating the pernicious notion that sexual harassment is somehow less significant than other types of misconduct and making schools vulnerable to litigation by students claiming unfairness or discrimination in their school's policies treating harassment based on sex differently from other forms of misconduct.

### E. The Department's suggestion that schools conduct parallel "non-Title IX" proceedings for complaints that would be mandatorily dismissed under the proposed rules is confusing, impractical, and unlikely to be followed.

The Department notes that if conduct does not meet the proposed rule's definition of harassment or occurs outside of school, schools could still process the complaint under a different conduct code, but not Title IX. This "solution" to its required dismissals for Title IX investigations is confusing and impractical. Students and school employees do not make complaints "under Title IX": they make

---

[122] 83 Fed. Reg. at 61468.
[123] Statista, *Community colleges in the United States - Statistics & Facts*, https://www.statista.com/topics/3468/community-colleges-in-the-united-states; National Center for Education Statistics, *Fast Facts*, https://nces.ed.gov/fastfacts/display.asp?id=372 (about 17.0 million students enrolled in undergraduate programs in fall 2018).
[124] David A. Tomar, *Trade Schools on the Rise*, THE BEST SCHOOLS (last visited Jan. 20, 2019), https://thebestschools.org/magazine/trade-schools-rise-ashes-college-degree (an estimated 16 million students were enrolled in vocational schools in 2014).
[125] AASA Letter, *supra* note 15, at 5-6.
[126] NASSP Letter, *supra* note 83, at 1.
[127] AASA Letter, *supra* note 15, at 5-6.
[128] *Id.* at 5.

EXHIBIT 27

complaints of sexual harassment. Schools faced with determining when to have a non-Title IX proceeding to address sexual harassment allegations that do not meet the proposed rules' standard, as opposed to one "under Title IX," have little guidance on how to proceed. Would any such alternative proceeding have to exclude any reference to, or consideration of, the sexual nature of the harassment or assault complained of? Would the initial complaint carefully avoid making any reference to the sexual nature of the harassment or assault in order to have access to such non-Title IX proceedings? The proposed regulations offer no guidance or safe harbor for schools to offer parallel sexual harassment proceedings that do not comply with the detailed and burdensome procedural requirements set out in the proposed rule. Schools with such parallel proceedings would no doubt be forced to contend with respondents' complaints that the school had failed to comply with the requirements set out in the proposed rules and thus violated respondents' rights as therein described. Schools are therefore likely to err on the side of taking no action at all on complaints that must be dismissed under the proposed rules.

### F.   The proposed "deliberate indifference" standard would allow schools to do virtually nothing in response to complaints of sexual assault and other forms of sexual harassment.

The "deliberate indifference" standard adopted by the proposed rules is a much more lax standard for measuring schools' response to sexual harassment than that set out by the current guidance, which requires schools to act "reasonably" and "take immediate and effective corrective action" to resolve harassment complaints.[129] Under the proposed rules, by contrast, schools would simply have to not be deliberately indifferent; in other words, their response to harassment would be deemed to comply with Title IX as long as it was not *clearly* unreasonable. The deliberate indifference standard would exacerbate the problem that survivors and other harassment victims who are met with "indifference" or "blame" from authority figures suffer increased symptoms of post-traumatic stress and depression in addition to the trauma of the underlying assault.[130]

The Department's proposed "safe harbors" within this deliberate indifference standard weaken it still further, allowing schools to avoid liability even if they unreasonably handled a Title IX complaint. As long as a school follows the requirements set out in proposed § 106.45, the school's response to harassment complaints could not be challenged, effectively insulating them from any review as long as they check various procedural boxes.[131] NASSP opposes this standard precisely because it would allow schools to "treat survivors poorly as long as the school follows various procedures in place, regardless of how those procedures harm or fail to help survivors."[132] And by codifying the rule that the Department would not find a school deliberately indifferent based on a school's erroneous determination regarding responsibility, the Department further provides a safe harbor for schools that erroneously determine that sexual harassment *did not occur*, but does not provide a corresponding rule protecting schools from liability if they erroneously decide that sexual harassment *did* occur.[133] This means it would always be safer for a school to make a finding of non-responsibility for sexual harassment. Indeed, such a rubber stamp finding would be completely permissible under the proposed rules as long as the school went through the motions of the required process.

---

[129] 2001 Guidance, *supra* note 59.

[130] Letter from 903 Mental Health Professionals and Trauma Specialists to Ass't Sec'y Kenneth L. Marcus at 3 (Jan. 30, 2019) [hereinafter Mental Health Professionals Letter], https://nwlc.org/wp-content/uploads/2019/01/Title-IX-Comment-from-Mental-Health-Professionals.pdf.

[131] *See* proposed § 106.44(b)(2) ("If the Title IX Coordinator files a formal complaint in response to the reports, and the recipient follows procedures (including implementing any appropriate remedy as required) consistent with proposed § 106.45 in response to the formal complaint, the recipient's response to the reports is not deliberately indifferent.").

[132] NASSP Letter, *supra* note 83, at 2.

[133] *See* proposed § 106.44(b)(5), 83 Fed. Reg. at 61471 (explaining that proposed § 106.44(b)(5) is meant to clarify that OCR will not "conduct a de novo review of the recipient's investigation and determination of responsibility for a particular respondent").

EXHIBIT 27

The practical effects of this proposed rule would shield schools from any accountability under Title IX, even if a school mishandles a complaint, fails to provide effective supports for survivors and other harassment victims, and wrongly determines against the weight of the evidence that no sexual assault or harassment occurred.

**III.    The proposed rules impermissibly limit the supportive measures and remedies available to sexual harassment complainants.**

**A.  The proposed rules do not contemplate restoring or preserving "equal" access to "educational opportunities"—only "access" to the "education program."**

The proposed rules refer repeatedly to supportive measures (§§ 106.30, 106.44(b)(3), and 106.45(b)(7)(ii)) and remedies (§§ 106.45(b)(1)(i), 106.45(b)(4)(ii)(E), 106.45(b)(5), 106.45(b)(7)(i)(A), and 106.45(b)(7)(ii)) that are "designed to restore or preserve *access* to the recipient's *education program or activity*."[134] This proposed language on supportive measures and remedies is problematic for a number of reasons. First, it is inconsistent with the Department's own proposed definition of sexual harassment, which covers conduct that "effectively denies a person *equal access* to the recipient's education program or activity." Under the Department's inconsistent proposal, even if a student or employee reports sexual harassment that satisfies the narrow definition in proposed § 106.30, their school would only be required to give them supportive measures or remedies that restore or preserve some "access," not "equal access."

Second, the proposed rules are inconsistent with the Supreme Court's liability standard for money damages in two ways (again, setting aside the fact that agency enforcement standards need not and should not be as demanding as litigation standards for money damages). First, restoration of "access" is an incomplete remedy for the harm and violation of Title IX created by denial of "equal access." Second, as mentioned above in Part II.B, restoration of access to a school's "program" or "activity" is not equivalent to the more demanding requirement of restoration of equal access to a school's "resources," "opportunities," and "benefits." The remedies required by the rule thus fail to correct the violation of Title IX that occurs when harassment "effectively denie[s] [a person] *equal* access to an institution's *resources* and *opportunities*" or its "*opportunities* or *benefits*."[135]

These inconsistencies would have significant implications on the ability of complainants to enjoy equal, nondiscriminatory access to educational opportunities. For example, under the proposed rules a high school addressing sexual assault could simply enroll a student survivor in an alternative program, such as a cyber or evening school, thereby restoring "access" to the school district's "education program" without ensuring the student's ability to attend her brick-and-mortar day school (the educational "opportunity") on "equal" terms with her classmates who have not suffered sexual harassment. "Restoring or preserving access" to a program is a minimal standard and an insufficient metric for determining what supportive measures and remedies are necessary or appropriate.

**B.  Complainants would not be entitled to the full range of "supportive measures" necessary to ensure equal access to educational opportunities.**

Under proposed § 106.30, even if a student suffered harassment that occurred on campus and made a complaint that properly alleged it was "severe, pervasive, *and* objectively offensive," the school

---

[134] Proposed § 106.45(b)(7)(ii) (recordkeeping of actions, including supportive measures, as a result of reports or formal complaints).
[135] *Davis*, 526 U.S. at 631 (emphasis added).

EXHIBIT 27

would still be able to deny the student the "supportive measures" they need to stay in school. In particular, the proposed rules allow schools to deny a student's request for effective "supportive measures" on the grounds that the requested measures are "disciplinary," "punitive," or "unreasonably burden[] the other party." For example, a school might feel constrained from transferring a respondent to another class or dorm because it may "unreasonably burden" him, thereby forcing a harassment victim to change all of her own classes and housing assignments in order to avoid her harasser. In addition, schools may interpret this proposed rule to prohibit issuing a *one-way* no-contact order against an assailant and require a survivor to agree to a *mutual* no-contact order, which implies that the survivor is at least partially responsible for her own assault. However, such a rule would be contrary to decades of expert consensus that *mutual* no-contact orders are harmful to victims, because abusers often manipulate their victims into violating the mutual order,[136] and would allow perpetrators to turn what was intended to be a protective measure for the student survivor into a punitive measure against the survivor. The proposed rule would also be a departure from longstanding practice under the 2001 Guidance, which instructed schools to "direct[] *the harasser to have no further contact with the harassed student*" but not vice-versa.[137] And groups such as the Association for Student Conduct Administration (ASCA) agree that "[e]ffective interim measures, including … *actions restricting the accused*, should be offered and used while cases are being resolved, as well as without a formal complaint."[138]

The proposed rule also fails to contemplate any *restorative* supportive measures that are often necessary to ensure a complainant's equal access to educational opportunities. Despite including a long list of examples of supportive measures in the preamble and in the language of proposed § 106.30, the Department makes no mention of restorative measures, such as the ability to retake a class, to remove a "Withdrawal" or failing grade from the harassment victim's transcript, or to obtain reimbursement of lost tuition after being forced to withdraw and retake a course as a result of sexual harassment.

### C. The proposed rules would steer students in higher education toward ineffective supportive measures and would bar some elementary and secondary school students from receiving any supportive measures at all.

Proposed §106.30 would require a "formal complaint" signed by a complainant or a Title IX coordinator, requesting initiation of the grievance procedures, in order for the student to receive help.[139] If a formal complaint is not submitted, institutions of higher education would be able to avoid Title IX liability under the safe harbor in § 106.44(b)(3) by simply providing "supportive measures." This safe harbor may incentivize institutions of higher education to steer students away from filing a "formal complaint" and toward accepting "supportive measures" instead. However, because "supportive measures" are defined very narrowly in proposed § 106.30 (as detailed in Parts III.A-III.B), the interaction of proposed §§ 106.30 and 106.44(b)(3) may result in many students receiving ineffective "supportive measures."

The proposed definition of "formal complaint" would also harm elementary and secondary school students in particular. Children in elementary and secondary schools are likely not equipped to draft a written, signed, formal complaint that alleges the very specific and narrow definition of harassment under the proposed rules. Unlike college and graduate students, who are guaranteed at least some supportive measures in the absence of a formal complaint under the safe harbor in proposed § 106.44(b)(3),

---

[136] *E.g.*, Joan Zorza, *What Is Wrong with Mutual Orders of Protection?* 4(5) DOMESTIC VIOLENCE REP. 67 (1999), *available at* https://www.civicresearchinstitute.com/online/article.php?pid=18&iid=1005.

[137] 2001 Guidance, *supra* note 59, at 16.

[138] Ass'n for Student Conduct Admin., *ASCA 2014 White Paper: Student Conduct Administration & Title IX: Gold Standard Practices for Resolution of Allegations of Sexual Misconduct on College Campuses* 2 (2014) [hereinafter ASCA 2014 White Paper], https://www.theasca.org/Files/Publications/ASCA%202014%20White%20Paper.pdf.

[139] The Department does not justify its requirement that a formal complaint be signed.

EXHIBIT 27

elementary and secondary school students would not be guaranteed any supportive measures if they do not sign a formal complaint, and accordingly, may not get any help at all because of their inability to sufficiently describe the harassment allegations in their written complaint.

IV. **The grievance procedures required by the proposed rules would impermissibly tilt the process in favor of respondents, retraumatize complainants, and conflict with Title IX's nondiscrimination mandate.**

Current Title IX regulations require schools to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of student and employee complaints" of sexual misconduct.[140] The proposed rule at § 106.8(c) purports to require "equitable" processes as well. However, the proposed rules are also riddled with language that would require schools to conduct their grievance procedures in a fundamentally *inequitable* way that favors respondents.

The Department repeatedly cites the purported need to increase protections of respondents' "due process rights" to justify weakening Title IX protections for complainants, such as proposing § 106.6(d)(2), which specifies that nothing in the rules would require a school to deprive a person of their due process rights. But the current Title IX regulations already provide more rigorous due process protections than are required under the Constitution. The Supreme Court has held that students facing short-term suspensions from public schools[141] require only "some kind of" "oral or written notice" and "some kind of hearing."[142] The Court has explicitly said that a 10-day suspension does not require "the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident."[143] Furthermore, the Department's 2001 Guidance already instructs schools to protect the "due process rights of the accused."[144] Adding proposed § 106.6(d)(2) provides no new or necessary protections and inappropriately pits Title IX's civil rights mandate against the Constitution when no such conflict exists.[145] As Liberty University notes:

> "Institutions need not create and operate trial court systems in order to prevent sex discrimination from blocking student access to federally supported higher education programs. A smaller and less prescriptive approach is all that is required—one that recognizes that there is a criminal justice system with all its due process for those who seek to access an adversarial system for their day in court."[146]

Further, there is no evidence to support the Department's claim that schools have somehow abandoned due process in order to comply with current Title IX rules and guidances. While it may be true that students disciplined for sexual assault have been litigating more frequently since the 2011 Guidance and 2014 Guidance were issued, the simpler explanation for any such uptick in legal claims is that these guidances improved schools' policies and procedures, made it easier for survivors to report sexual assault, and therefore made warranted disciplinary outcomes for respondents more likely. Respondents today are

---

[140] 34 C.F.R. § 106.8(b).

[141] Constitutional due process requirements do not apply to private institutions.

[142] *Goss v. Lopez*, 419 U.S. 565, 566, 579 (1975).

[143] *Id.* at 583. *See Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 23 (D. Me. 2005); *B.S. v. Bd. of Sch. Trs.*, 255 F. Supp. 2d 891, 899 (N.D. Ind. 2003); *Coplin v. Conejo Valley Unified Sch. Dist.*, 903 F. Supp. 1377, 1383 (C.D. Cal. 1995); *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 247 (D. Vt. 1994).

[144] 2001 Guidance, *supra* note 59 at 22.

[145] The odd phrasing of the proposed rules also suggests that the Department may be seeking to extend Due Process Clause obligations to private entities covered by Title IX, but of course any such imposition of Constitutional obligations on private actors is well beyond the Department's power.

[146] Letter from Liberty University to Sec'y Elisabeth DeVos at 2 (Jan. 24, 2019) [hereinafter Liberty University Letter], http://www.liberty.edu/media/1617/2019/jan/Title-IX-Public-Comments.pdf.

EXHIBIT 27

likely "just as litigious as they were prior to the [2011 Guidance]," but "there are simply more of them today. This is not because of problems that the [2011 and 2014 Guidances] caused; rather, it is because of the problems [they] corrected."[147]

We note that some have welcomed the proposed rule changes by erroneously claiming that the proposed rules would protect Black men and boys from being unfairly disciplined for false allegations; these arguments have effectively erased the experiences of Black women and girls, who are not only more likely than white women and girls to be sexual harassed,[148] but are also often ignored, blamed,[149] pressured to stay silent,[150] suspended by their schools,[151] and/or pushed into the criminal justice system[152] (i.e., the "sexual abuse-to-prison pipeline").[153] There is no data to substantiate the claim that Black men and boys are disproportionately disciplined by schools for sexual misconduct; in fact, the Department's own elementary and secondary school data shows that 0.3 percent of Black boys and 0.2 percent of white boys are disciplined for *sexual harassment,* a minor difference compared to the wide disparity between the proportion of Black boys (18 percent) and white boys (6 percent) who are disciplined for *any type of student misconduct.*[154] While we continue to strongly advocate against discriminatory discipline practices and policies in schools, we note that any claim that these proposed rules are motivated by such concern is sharply undercut by the fact this administration rescinded—without adequate justification—the Department's 2014 Guidance addressing unfair discipline of students of color in December 2018,[155] during the public comment period for the proposed Title IX rules.

Finally, there is no evidence that Title IX has been in any way "weaponized" against respondents. A 2018 report studying more than 1,000 reports of sexual misconduct in institutions of higher education found that "[f]ew incidents reported to Title IX Coordinators resulted in a formal Title IX complaint, and fewer still resulted in a finding of responsibility or suspension/expulsion of the responsible student."[156] Despite the Department's unsubstantiated concern for respondents, the study found that "[t]he primary outcome of reports were victim services, not perpetrator punishments."[157] Moreover, any argument that focuses on the false narrative that respondents' due process rights have been increasingly violated over the years because of current and rescinded OCR guidance completely ignores complainants who are still treated unfairly in violation of Title IX and are often pushed out of schools from inadequate and unfair responses to their reports.

---

[147] Erin E. Buzuvis, *Title IX and Procedural Fairness: Why Disciplined-Student Litigation Does Not Undermine the Role of Title IX in Campus Sexual Assault*, 78 MONTANA L. REV. 71, 72 (2017), https://scholarship.law.umt.edu/cgi/viewcontent.cgi?article=2416&context=mlr.

[148] *Unlocking Opportunity, supra* note 45, at 24-25.

[149] *E.g.*, Cantalupo, *supra* note 49, at 1, 16, 24, 29.

[150] Lauren Rosenblatt, *Why it's harder for African American women to report campus sexual assaults, even at mostly black schools*, LOS ANGELES TIMES (Aug. 28, 2017), https://www.latimes.com/politics/la-na-pol-black-women-sexual-assault-20170828-story.html.

[151] *See supra* notes 43-46 and accompanying text.

[152] Nia Evans, *Too Many Black Survivors Get Jail Time, Not Justice*, NAT'L WOMEN'S LAW CTR. (Dec. 14, 2018), https://nwlc.org/blog/too-many-black-survivors-get-jail-time-not-justice.

[153] Human Rights Project for Girls, Georgetown Law Ctr. on Poverty and Inequality, and Ms. Found. for Women, *The Sexual Abuse to Prison Pipeline: The Girls' Story* (2015), https://rights4girls.org/wp-content/uploads/r4g/2015/02/2015_COP_sexual-abuse_layout_web-1.pdf.

[154] U.S. Gov't Accountability Office, *K-12 Education: Discipline Disparities for Black Students, Boys, and Students with Disabilities* (Mar. 2018), https://www.gao.gov/assets/700/690828.pdf.

[155] Dep't of Justice & Dep't of Educ., *Dear Colleague Letter* (Dec 21, 2018), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201812.pdf.

[156] Tara N. Richards, *No Evidence of "Weaponized Title IX" Here: An Empirical Assessment of Sexual Misconduct Reporting, Case Processing, and Outcomes*, L. & HUMAN BEHAVIOR (2018), *available at* http://dx.doi.org/10.1037/lhb0000316.

[157] *Id.*

EXHIBIT 27

A.  **The proposed rule's requirement that a respondent be presumed not responsible for harassment is inequitable and inappropriate in school proceedings.**

Under proposed § 106.45(b)(1)(iv), schools would be required to presume that the reported harassment did not occur, which would ensure partiality to the respondent. This presumption would also exacerbate the rape myth upon which many of the proposed rules are based—namely, the myth that women and girls often lie about sexual assault.[158] The presumption of innocence is a criminal law principle, inappropriately imported into this context.[159] Criminal defendants are presumed innocent until proven guilty because their very liberty is at stake: criminal defendants go to prison if they are found guilty. There is no such principle in civil proceedings generally or civil rights proceedings specifically, and Title IX is a civil rights law that ensures that sexual harassment is never the end to anyone's education. As NASSP notes, this proposed rule would result in schools being "required[ ]to deny harassment victims of due process."[160]

The proposed non-responsibility presumption is inconsistent with the Department's own explanation of why it is proposed. The Department explains that the requirement "is added to ensure impartiality by the recipient until a determination is made," but requiring a presumption *against the complainant's account* that harassment occurred is anything but impartial. In fact, the presumption ensures partiality to the named harasser, particularly because officials in this Administration have spread false narratives about survivors and other harassment victims being untruthful and about the "pendulum swinging too far" in school grievance proceedings against named harassers. This undoubtedly will influence schools to conclude this proposed rule means that a higher burden should be placed on complainants. The presumption of non-responsibility may also discourage schools from providing crucial supportive measures to complainants, in order to avoid being perceived as punishing respondents.[161]

Proposed § 106.45(b)(1)(iv) would only encourage schools to ignore or punish historically marginalized groups that report sexual harassment for "lying" about it.[162] As explained above in Part I.C., schools may be more likely to ignore or punish harassment victims who are women and girls of color,[163] pregnant and parenting students,[164] LGBTQ students,[165] and students with disabilities because of harmful stereotypes that label them as less credible and in need of protection by their schools.

This presumption conflicts with the current Title IX rules[166] and other proposed rules,[167] which require that schools provide "equitable" resolution of complaints. A presumption in favor of one party

---

[158] Indeed, the data shows that men and boys are far more likely to be victims of sexual assault than to be falsely accused of it. *See, e.g.,* Kingkade, *supra* note 42.

[159] *See also* the Department's reference to "inculpatory and exculpatory evidence" (proposed § 106.45(b)(1)(ii)), the Department's assertion that "guilt [should] not [be] predetermined" (83 Fed. Reg. at 61464), and Secretary DeVos's discussion of the "presumption of innocence" (Elisabeth DeVos, *Betsy DeVos: It's time we balance the scales of justice in our schools*, Wash. Post (Nov. 20, 2018), https://www.washingtonpost.com/opinions/betsey-devos-its-time-we-balance-the-scales-of-justice-in-our-schools/2018/11/20/8dc59348-ecd6-11e8-9236-bb94154151d2_story.html.

[160] NASSP Letter, *supra* note 83, at 2.

[161] *See* Michael C. Dorf, *What Does a Presumption of Non-Responsibility Mean in a Civil Context*, Dorf on Law (Nov. 28, 2018), https://dorflawl.org/2018/11/what-does-presumption-of-non.html.

[162] *See, e.g.,* Kingkade, *supra* note 46.

[163] *E.g.,* Cantalupo, *supra* note 49 at 1, 16, 24, 29; *Let Her Learn: Girls of Color*, *supra* note 48 at 1.

[164] Chambers & Erausquin, *The Promise of Intersectional Stigma to Understand the Complexities of Adolescent Pregnancy and Motherhood*, Journal of Child Adolescent Behavior (2015), https://www.omicsonline.org/open-access/the-promise-of-intersectional-stigma-to-understand-the-complexities-ofadolescent-pregnancy-and-motherhood-2375-4494-1000249.pdf.

[165] *See e.g.,* David Pinsof, et al., *The Effect of the Promiscuity Stereotype on Opposition to Gay Rights* (2017), *available at* https://doi.org/10.1371/journal.pone.0178534.

[166] 34 C.F.R. § 106.8(b).

[167] Proposed §§ 106.8(c) and 106.45(b).

EXHIBIT 27

against the other is not equitable. This proposed presumption is also in significant tension with proposed § 106.45(b)(1)(ii), which states that "credibility determinations may not be based on a person's status as a complainant" or "respondent."

**B. The proposed rules would require live cross-examination by the other party's advisor of choice in higher education and would permit it in elementary and secondary schools.**

Proposed § 106.45(b)(3)(vii) requires colleges and graduate schools to conduct a "live hearing," and requires parties and witnesses to submit to cross-examination by the other party's "advisor of choice"— often an attorney who is prepared to grill a survivor about the traumatic details of an assault, or possibly an angry parent or a close friend of the respondent, or a teacher, coach, or other adult in a position of authority over the complainant or witness. Proposed § 106.45(b)(3)(vi) would allow elementary and secondary schools to use this process, even when children, who are likely to be easily intimidated under hostile questioning by an adult, are complainants and witnesses.[168] The adversarial and contentious nature of cross-examination would further traumatize those who seek help through Title IX to address assault and other forms of harassment—especially where the named harasser is a professor, dean, teacher, or other school employee. Being asked detailed, personal, and humiliating questions often rooted in gender stereotypes and rape myths that tend to blame victims for the assault they experienced[169] would understandably discourage many students—parties and witnesses—from participating in a Title IX grievance process, chilling those who have experienced or witnessed harassment from coming forward.[170] The requirement that schools must provide each party "an advisor aligned with that party to conduct cross-examination" would not account for the existence of multiple complainants and/or multiple respondents, who may not have mutually aligned interests and whose interests may not be served by a single advisor conducting cross-examination on their collective behalf. Nor would the proposed rules entitle the individual who experienced harassment to the procedural protections that witnesses have during cross-examination in the criminal court proceedings that apparently inspired this requirement. Schools would not be required to apply general rules of evidence or trial procedure;[171] would not be required to make an attorney representing the interest of the complainant available to object to improper questions; and would not be required to make a judge available to rule on objections. The live cross-examination requirement would also lead to sharp inequities, due especially to the "huge asymmetry" that would arise when respondents are able to afford attorneys and complainants cannot.[172] According to the president of Association of Title IX Administrators (ATIXA), the live cross-examination provision

---

[168] *See, e.g.,* Gail S. Goodman et al, *Testifying in Criminal Court: Emotional Effects on Child Sexual Assault Victims,* MONOGRAPHS OF THE SOCIETY FOR RESEARCH IN CHILD DEVELOPMENT, Serial no. 229, Vol. 57, No. 5, at p.85 (1992).
[169] Zydervelt, S., Zajac, R., Kaladelfos, A. and Westera, N., *Lawyers' Strategies for Cross-Examining Rape Complainants: Have we Moved Beyond the 1950s?*, BRITISH JOURNAL OF CRIMINOLOGY, 57(3), 551-569 (2016).
[170] *See, e.g.,* Eliza A. Lehner, *Rape Process Templates: A Hidden Cause of the Underreporting of Rape*, 29 YALE J. OF LAW & FEMINISM 207 (2018) ("rape victims avoid or halt the investigatory process" due to fear of "brutal cross-examination"); Michelle J. Anderson, *Women Do Not Report the Violence They Suffer: Violence Against Women and the State Action Doctrine*, 46 VILL. L. REV. 907, 932 936-37 (2001) (decision not to report (or to drop complaints) is influenced by repeated questioning and fear of cross-examination); As one defense attorney recently acknowledged, "Especially when the defense is fabrication or consent—as it often is in adult rape cases—you have to go *at* the witness. There is no way around this fact. Effective cross-examination means exploiting every uncertainty, inconsistency, and implausibility. More, it means attacking the witness's very character." Abbe Smith, *Representing Rapists: The Cruelty of Cross-Examination and Other Challenges for a Feminist Criminal Defense Lawyer*, 53 AM. CRIM. L. REV. 255, 290 (2016).
[171] The proposed rules impose only mild restrictions on what it considers "relevant" evidence. *See* proposed § 106.45(b)(3)(vi) (excluding evidence "of the complainant's sexual behavior or predisposition, unless such evidence about the complainant's sexual behavior is offered to prove that someone other than the respondent committed the conduct alleged" or to prove consent). The problems inherent in the evidence restrictions the Department chooses to adopt (and those it chooses not to) are discussed in Part IV.E.
[172] Andrew Kreighbaum, *New Uncertainty on Title IX*, INSIDE HIGHER EDUCATION (Nov. 20, 2018), https://www.insidehighered.com/news/2018/11/20/title-ix-rules-cross-examination-would-make-colleges-act-courts-lawyers-say.

EXHIBIT 27

alone—"even with accommodations like questioning from a separate room—would lead to a 50 percent drop in the reporting of misconduct."[173]

The Department assumes that cross-examination will improve the reliability of a decision-maker's determinations of responsibility and allow them to discern "truth."[174] But the reality is much more complicated, particularly in schools, where procedural protections against abusive, misleading, confusing, irrelevant, or inappropriate tactics are largely unavailable. Empirical studies show that adults give significantly more inaccurate responses to questions that involve the features typical of cross-examination, like relying on leading questions, compound or complex questions, rapid-fire questions, closed (i.e., yes or no) questions, questions that jump around from topic to topic, questions with double negatives, and questions containing complex syntax or complex vocabulary.[175] While these common types of questions are likely to confuse adults and result in inaccurate or misleading answers, these problems are compounded and magnified when such questions are targeted at children or youth.[176] Indeed, there is a large, consistent, and growing body of research that shows that children subject to cross-examination-style questioning are more likely to repudiate accurate statements and to reaffirm inaccurate ones.[177] And matters unrelated to whether the witness is telling the truth significantly influence the effects of cross-examination on a witness' testimony. For example, children with low levels of self-esteem, self-confidence, and assertiveness—all of which are characteristcs of children who have experienced sexual misconduct—are less likely to provide accurate statements during cross-examination.[178]

[173] *Id.*

[174] 83 Fed. Reg. at 61476. The Department offers no evidence to support its assumption; it merely cites a case which relies on John Wigmore's evidence treatise. *See id.* (citing *California* v. *Green*, 399 U.S. 149, 158 (1970) (quoting John H. Wigmore, 5 Evidence sec. 1367, at 29 (3d ed., Little, Brown & Co. 1940))).

[175] Emily Henderson, *Bigger Fish to Fry: Should the Reform of Cross-Examination Be Expanded Beyond Vulnerable Witnesses*, 19(2) INTERNATIONAL J. OF EVIDENCE AND PROOF 83, 84-85 (2015) (collecting studies of adults).

[176] Saskia Righarts, Sarah O'Neill & Rachel Zajac, *Addressing the Negative Effect of Cross-Examination Questioning on Children's Accuracy: Can We Intervene?*, 37 (5) LAW AND HUMAN BEHAVIOR 354, 354 (2013) ("Cross-examination directly contravenes almost every princple that has been established for eliciting accurate evidence from children.").

[177] Rhiannon Fogliati & Kay Bussey, *The Effects of Cross-Examination on Children's Coached Reports*. 21 PSYCH., PUBLIC POLICY, & LAW 10 (2015) (cross-examination led children to recant their initial true allegations of witnessing transgressive behavior and significantly reduced children's testimonial accuracy for neutral events); Saskia Righarts et al., *Young Children's Responses to Cross-Examination Style Questioning: The Effects of Delay and Subsequent Questioning*, 21(3) PSYCH., CRIME & LAW 274 (2015) (cross-examination resulted in a "robust negative effect on children's accuracy"; only 7% of children's answers improved in accuracy); Fiona Jack and Rachel Zajac, *The Effect of Age and Reminders on Witnesses' Responses to Cross-Examination-Style Questioning*, 3 J. OF APPLIED RESEARCH IN MEMORY AND COGNITION 1 (2014) ("adolescents' accuracy was also significantly affected" by cross-examination-style questioning); Rhiannon Fogliati & Kay Bussey, *The Effects of Cross-Examination on Children's Reports of Neutral and Transgressive Events,* 19 LEGAL & CRIM. PSYCHOL. 296 (2014) (cross-examination led children to provide significantly less accurate reports for neutral events and actually reduced the number of older children who provided truthful disclosures for transgressive events); Joyce Plotnikoff & Richard Woolfson, *'Kicking and Screaming': The Slow Road to Best Evidence*, in *Children and Cross-Examination: Time to Change the Rules?* 21, at 27 (John Spencer & Michael Lamb eds. 2012) (a hostile accusation that a child is lying "can cause a child to give inaccurate answers or to agree with the suggestion that they are lying simply to bring questioning to an end"); Rachel Zajac & Harlene Hayne, *The Negative Effect of Cross-Examination Style Questioning on Children's Accuracy: Older Children are Not Immune*, 20 APPLIED COGNITIVE PSYCHOLOGY 3 (2006) (43% of older children changed their originally correct answers to incorrect ones under cross-examination); Rachel Zajac et al., *Asked and Answered: Questioning Children in the Courtroom*, 10 PSYCHIATRY, PSYCHOLOGY AND LAW 199 (2003); Rachel Zajac & Harlene Hayne, *I Don't Think That's What Really Happened: The Effect of Cross-Examination on the Accuracy of Children's Reports*, 9(3) J. OF EXPERIMENTAL PSYCH.: APPLIED 187 (2003) ("Cross-examination did not increase the accuracy of children who made errors in their original reports. Furthermore, cross-examination actually decreased the accuracy of children whose original reports were highly accurate.").

[178] Rachel Zajac et al., *Disorder in the Courtroom: Child Witnesses Under Cross-Examination*, 32 DEVELOPMENTAL REV. 181, 187 (2012).

EXHIBIT 27

The proposed rule's flat prohibition on reliance on testimony that is not subject to cross-examination[179] would force survivors to a "Hobson's choice" between being revictimized by their assailant's advisor or having their testimony completely disregarded, and would prohibit schools from simply "factoring in the victim's level of participation in [its] assessment of witness credibility."[180] It would also make no allowance for the unavailability of a witness and would not allow any reliance at all on previous statements, regardless of whether those statements have other indicia of reliability, such as being made under oath or against a party's own interest. This would require schools to disregard relevant evidence in a variety of situations in a manner that could pose harms to both parties and would hinder the school's ability to ensure that their findings concerning responsibility are not erroneous.

Neither the Constitution nor any other federal law requires live cross-examination in public school conduct proceedings. The Supreme Court has not required any form of cross-examination (live or indirect) in disciplinary proceedings in public schools under the Due Process clause. Instead, the Court has explicitly said that a 10-day suspension does not require "the opportunity … to confront and cross-examine witnesses."[181] The vast majority of courts that have reached the issue have agreed that live cross-examination is not required in public school disciplinary proceedings, as long as there is a meaningful opportunity to have questions posed by a hearing examiner.[182] The Department itself admits that written questions submitted by students or oral questions asked by a neutral school official are fair, effective, and wholly lawful ways to discern the truth in elementary and secondary schools,[183] and proposes retaining that method for elementary and secondary school proceedings. It has not explained why the processes that it considers effective for addressing harassment in proceedings involving 17- or 18-year-old students in high school would be inequitable or ineffective for 17- or 18-year-old students in college. Nor does it explain why it seeks to require live hearings and cross-examination of students in schools when such a process is rarely, if ever, required of employees in workplace sexual harassment investigations.

The proposed rules also ignore the reality that many survivors of sexual assault develop anxiety, depression, PTSD, or other mental illnesses as a result of their assault. Survivors with PTSD, as well as survivors with other disabilities, have the right to request accommodations under Section 504[184] and the Americans with Disabilities Act (ADA),[185] and elementary and secondary students have accommodation rights under the Individuals with Disabilities in Education Act (IDEA).[186] These disability accommodations include the right to answer questions in writing or through a neutral school employee instead of being subjected to live cross-examination by their assailant's advisor. By denying institutions

---

[179] *See* proposed § 106.45(b)(3)(vii) ("If a party or witness does not submit to cross-examination at the hearing, the decision-maker must not rely on any statement of that party or witness in reaching a determination regarding responsibility.").

[180] Liberty University Letter, *supra* note 146, at 5.

[181] *Goss*, 419 U.S. at 583. *See also Coplin*, 903 F. Supp. at 1383; *Fellheimer*, 869 F. Supp. at 247.

[182] The Department cites to one case, *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) to support its proposed cross-examination requirement. However, *Baum* is anomalous. *See e.g.*, *Dixon*, 294 F.2d at 158, *cert. denied* 368 U.S. 930 (1961) (expulsion does not require a *full-dress judicial hearing, with the right to cross-examine witnesses."); *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) (holding no due process violation in expulsion of college student without providing him right to cross-examination); *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972) ("The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings.); *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 16 (1st Cir. 1988) (a public institution need not conduct a hearing which involves the right to confront or cross-examine witnesses). *See also A Sharp Backward Turn*, *supra* note 92 (*Baum* "is anomalous.").

[183] 83 Fed. Reg. at 61476.

[184] 29 U.S.C. § 794; 34 C.F.R. pt. 104.

[185] 42 U.S.C. § § 12131-12134; 28 C.F.R. pt. 35.

[186] 20 U.S.C. §§ 1400-1419; 34 C.F.R. pt. 300. *See also* U.S. Dep't of Educ., Office for Civil Rights, *Frequently Asked Questions on Effective Communication for Students with Hearing, Vision, or Speech Disabilities in Public Elementary and Secondary Schools* (2014) [hereinafter Disability Guidance], https://www2.ed.gov/about/offices/list/ocr/docs/dcl-faqs-effective-communication-201411.pdf.

EXHIBIT 27

of higher education the ability to provide these accommodations to their students, proposed § 106.45(b)(3)(vii) would force these schools to violate Section 504 and the ADA.

Ironically, mandated live cross-examination also fails to meet the Department's own stated goal of flexibility. Indeed, it is in sharp conflict with that stated goal. Throughout the preamble, the Department repeatedly criticizes the 2011 and 2014 Guidances for lacking "flexibility" and requiring a "one-size-fits all" approach," and repeatedly claims that the proposed rules allow for such "flexibility."[187] Yet requiring all institutions of higher education to facilitate live, trial-like hearings with cross-examination to address any allegation of sexual harassment, whether employee-on-student, employee-on-employee, student-on-employee, student-on-student, other third party-on-student, or other third party-on-employee, and regardless of the type of behavior alleged, is the very definition of inflexibility. While this proposed requirement "is problematic for all institutions, regardless of size and resources available,"[188] it would fall particularly heavily on community colleges, vocational schools, online schools, and other educational institutions that lack the resources of a traditional four-year college or university. The difficulty and burden imposed by this mandate will also likely ensure that proceedings to address sexual harassment allegations are consistently delayed, harming all who seek prompt resolution of such matters and especially harming those who are depending on final determinations to address and remedy harassment.

Most fundamentally, in requiring institutions of higher education to conduct live, quasi-criminal trials with live cross-examination to address allegations of sexual harassment, when no such requirement exists for addressing any other form of student or employee misconduct at schools, the proposed rules communicate the message that those alleging sexual assault or other forms of sexual harassment are uniquely unreliable and untrustworthy. Implicit in requiring cross-examination for complaints of sexual harassment, but not for complaints of other types of student misconduct, is an extremely harmful, persistent, deep-rooted, and misogynistic skepticism of sexual assault and other harassment complaints. Sexual assault and sexual harassment are already dramatically underreported. This underreporting, which significantly harms schools' ability to create safe and inclusive learning environments, will only be exacerbated if any such reporting forces complainants into traumatic, burdensome, and unnecessary procedures built around the presumption that their allegations are false. This selective requirement of cross-examination harms complainants and educational institutions and is contrary to the letter and purpose of Title IX.

Unsurprisingly, superintendents, Title IX experts, student conduct experts, institutions of higher education, and mental health experts overwhelmingly oppose these proposed rules on live cross-examination. The AASA "strongly object[s]" to allowing elementary and secondary schools to submit their students to live cross-examination.[189] ATIXA also opposes live, adversarial cross-examination, instead recommending that investigators "solicit questions from the parties, and pose those questions the investigators deem appropriate in the investigation interviews."[190] ASCA agrees that schools should "limit[] advisors' participation in student conduct proceedings."[191] The American Bar Association recommends that schools provide "the opportunity for both parties to ask questions through the hearing

[187] 83 Fed. Reg. at 61466, 61468, 61469, 61470, 61472, 61474 n.6, 61477.
[188] *E.g.*, Liberty University Letter, *supra* note 146, at 4.
[189] AASA Letter, *supra* note 15, at 4.
[190] ATIXA, *ATIXA Position Statement on Cross-Examining: The Urge to Transform College Conduct Proceedings into Courtrooms* 1 (Oct. 5, 2018), *available at* https://atixa.org/wordpress/wp-content/uploads/2018/10/ATIXA-Position-Statement_Cross-Examination-final.pdf.
[191] *ASCA 2014 White Paper*, *supra* note 138 at 2 (2014).

EXHIBIT 27

chair."[192] The Association of Independent Colleges and Universities in Massachusetts (AICUM), representing 55 accredited, nonprofit institutions of higher education, oppose the cross-examination requirement because it would "deter complainants from coming forward, making it more difficult for institutions to meet Title IX's very purpose—preventing discrimination and harassment, stopping it when it does occur, and remedying its effects."[193] The Association of American Universities (AAU), representing 60 leading public and private universities, oppose the requirement because it can be "traumatizing and humiliating" and "undermines other educational goals like teaching acceptance of responsibility."[194] And over 900 mental health experts who specialize in trauma state that subjecting a survivor of sexual assault to cross-examination in the school's investigation would "almost guarantee[] to aggravate their symptoms of post-traumatic stress," and "is likely to cause serious to harm victims who complain and to deter even more victims from coming forward."[195]

### C. The proposed rules would allow schools to pressure survivors of sexual assault, and students victimized by school employees, into traumatizing and inequitable mediation procedures with their assailants.

Proposed § 106.45(b)(6) would allow schools to use "any informal resolution process, such as mediation" to resolve a complaint of sexual harassment, including sexual assault, as long as the school obtains the students' "voluntary, written consent." Mediation is a strategy often used in schools to resolve peer conflict, where both sides must take responsibility for their actions and come to a compromise. However, mediation is never appropriate for resolving sexual assault, even on a voluntary basis, because of the power differential between assailants and victims, the potential for re-traumatization, and the implication that survivors somehow share "partial" responsibility for their own assault.

Mediation can also be especially harmful in cases of employee-on-student harassment, where again a significant power differential means a teacher or faculty respondent can essentially coerce a student victim into "consenting" to mediation and to a harmful mediation outcome. The potential for harm is also greater in cases of adult-on-child sexual abuse, where both the adult abuser and adult mediator can coerce or manipulate the minor victim into "consenting" to mediation and any mediation outcomes. The dangers of mediation are also exacerbated at schools where mediators are untrained in trauma and sexual assault and at some religious schools, where mediators may be especially like to rely on harmful rape myths, such as "good girls forgive," that retraumatize survivors.[196] Minor students may be especially likely to feel they have no choice other than to consent to mediation if adult school officials are encouraging them to participate in the process and are especially vulnerable to being pressured into whatever resolution is favored by the adult mediator, whether or not they believe such a resolution to be adequate or responsive to their needs. Furthermore, students with developmental disabilities—both complainants and respondents—are vulnerable to being pressured or manipulated into participating in mediation and agreeing to harmful mediation outcomes, including outcomes that unfairly remove a complainant or respondent with a disability from their current school and instead push them into an alternative school.

In contrast to the proposed rule, the Department recognized in its 2001 Guidance that students must always have "the right to end [an] informal process at any time and begin the formal stage of the

---

[192] Am. Bar Ass'n, *ABA Criminal Justice Section Task Force On College Due Process Rights and Victim Protections: Recommendations for Colleges and Universities in Resolving Allegations of Campus Sexual Misconduct* 8-10 (June 2017).
[193] AICUM Letter, *supra* note 15.
[194] AAU Letter, *supra* note 15.
[195] Mental Health Professionals Letter, *supra* note 130.
[196] *E.g.*, Grace Watkins, *Sexual Assault Survivor to Betsy DeVos: Mediation Is Not a Viable Resolution*, Time (Oct. 2, 2017), http://time.com/4957837/campus-sexual-assault-mediation.

EXHIBIT 27

complaint process."[197] This right to end mediation or other informal processes at any time is a critical safeguard to ensure that participation in such processes remains fully voluntary and that those participating in such processes are not inappropriately pressured or coerced into inappropriate resolutions. In contrast, proposed § 106.45(b)(6) would allow schools to "preclude[] the parties from resuming a formal complaint" after starting an informal process—even if a survivor changes her mind and realizes that mediation is too traumatizing to continue, or even if someone participating in the process realizes she is being inappropriately pressured to accept a particular resolution. Such a rule would empower schools to lock students into the continuation of informal processes even if those processes reveal themselves to be ineffective or harmful, effectively denying students the ability to withdraw their consent to these processes. For those who have experienced sexual assault or other forms of harassment, this coercion would compound the harm of the underlying violation.

> For all of these reasons, the Department recognized in its 2001 Guidance that even "voluntary" consent to mediation is never appropriate to resolve cases of sexual assault. Experts also agree that mediation is inappropriate for resolving sexual violence. For example, the National Association of Student Personnel Administrators (NASPA), representing student affairs administrators in higher education, stated in 2018 that it was concerned about students being "pressured into informal resolution against their will."[198] Likewise, both the AASA[199] and NASSP[200] oppose the use of mediation in a manner that would preclude a party from pursuing formal procedures in school Title IX proceedings. Mental health experts also oppose mediation for sexual assault because it would "perpetuate sexist prejudices that blame the victim" and "can only result in further humiliation of the victim."[201]

### D. The proposed rules would allow and in some instances force schools to use a more demanding standard of proof to investigate sexual harassment than they use to investigate other types of misconduct.

> The Department's longstanding interpretation of Title IX requires that schools use a "preponderance of the evidence" standard—which means "more likely than not"—to decide whether sexual harassment occurred.[202] Proposed § 106.45(b)(4)(i) departs from that practice, and establishes a system where schools could elect to use the more demanding "clear and convincing evidence" standard in sexual harassment matters, while allowing all other student or employee misconduct investigations to be governed by the preponderance of the evidence standard, even if they carry the same maximum

---

[197197] 2001 Guidance, *supra* note 59, at 21.

[198] Nat'l Ass'n of Student Personnel Administrators (NASPA), *NASPA Priorities for Title IX: Sexual Violence Prevention & Response* 1-2 [hereinafter *NASPA Title IX Priorities*], *available at* https://www.naspa.org/images/uploads/main/NASPA_Priorities_re_Title_IX_Sexual_Assault_FINAL.pdf.

[199] AASA Letter, *supra* note 15 at 6.

[200] NASSP Letter, *supra* note 83, at 2.

[201] Mental Health Professionals Letter, *supra* note 130 at 3.

[202] The Department has required schools to use the preponderance standard in Title IX investigations since as early as 1995 and throughout both Republican and Democratic administrations. For example, its April 1995 letter to Evergreen State College concluded that its use of the clear and convincing standard "adhere[d] to a heavier burden of proof than that which is required under Title IX" and that the College was "not in compliance with Title IX." U.S. Dep't of Educ., Office for Civil Rights, *Letter from Gary Jackson, Regional Civil Rights Director, Region X, to Jane Jervis, President, The Evergreen State College* (Apr. 4, 1995), at 8, http://www2.ed.gov/policy/gen/leg/foia/misc-docs/ed_chd_1995.pdf. Similarly, the Department's October 2003 letter to Georgetown University reiterated that "in order for a recipient's sexual harassment grievance procedures to be consistent with Title IX standards, the recipient must … us[e] a preponderance of the evidence standard." U.S. Dep't of Educ., Office for Civil Rights, *Letter from Howard Kallem, Chief Attorney, D.C. Enforcement Office, to Jane E. Genster, Vice President and General Counsel, Georgetown University* (Oct. 16, 2003), at 1, http://www.ncherm.org/documents/202-GeorgetownUniversity--110302017Genster.pdf.

EXHIBIT 27

penalties.[203] Indeed in some instances, the proposed rules would require that schools utilize the "clear and convincing evidence" standard.[204]

The Department's decision to allow schools to impose a more burdensome standard in sexual harassment matters than in any other investigations of student or employee misconduct appears to rely on the stereotype and false assumption that those who report sexual assault and other forms of sexual harassment (mostly women) are more likely to lie than those who report physical assault, plagiarism, or the wide range of other school disciplinary violations and employee misconduct. When this unwarranted skepticism of sexual assault and other harassment allegations, grounded in gender stereotypes, infect sexual misconduct proceedings, even the preponderance standard "could end up operating as a clear-and-convincing or even a beyond-a-reasonable-doubt standard in practice."[205] Previous Department guidance recognized that, given these pervasive stereotypes, the preponderance standard was required to ensure that the playing field, at least on paper, was as even as possible. The Department now ignores the reality of these harmful stereotypes by imposing a standard of evidence that encourages, rather than dispels, the stereotype that women and girls lie about sexual assault and other harassment, a result that is contrary to Title IX.

*1.   The preponderance standard is the only appropriate standard for Title IX proceedings.*

The preponderance standard is used by courts in all civil rights cases—including Title IX cases brought by *respondents* claiming their schools wrongly disciplined them for committing sexual assault.[206] It is also used for nearly all civil cases, including where the conduct at issue could also be the basis for a criminal prosecution.[207] The preponderance standard is also used for people facing more severe deprivations than suspension, expulsion or other school discipline, or termination of employment or other workplace discipline, including in proceedings to determine paternity,[208] competency to stand trial,[209] enhancement of prison sentences,[210] and civil commitment of defendants acquitted by the insanity defense.[211] The Supreme Court has only required something higher than the preponderance standard in a narrow handful of civil cases "to protect particularly important individual interests,"[212] where consequences far more severe than suspension, expulsion, or firing are threatened, such as termination of

---

[203] Proposed § 106.45(b)(4)(i) would permit schools to use the preponderance standard *only if* it uses that standard for all other student misconduct cases that carry the same maximum sanction *and* for all cases against employees. This is a one-way ratchet: a school would be permitted to use the higher clear and convincing evidence standard in sexual assault cases, while using a lower standard in all other cases.

[204] Proposed § 106.45(b)(4)(i) (explaining that the clear and convincing evidence standard must be used if schools use that standard for complaints against employees, and whenever a school uses clear and convincing evidence for any other case of student misconduct).

[205] Michael C. Dorf, *Further Questions About the Scope of the Dep't of Education's Authority Under Title IX*, DORF ON LAW (Dec. 3, 2018), https://dorfonlaw.org/2018/12/further-questions-about-scope-of-dept.html#more.

[206] Katharine Baker et al., *Title IX & the Preponderance of the Evidence: A White Paper* (July 18, 2017), http://www.feministlawprofessors.com/wp-content/uploads/2017/07/Title-IX-Preponderance-White-Paper-signed-7.18.17-2.pdf (signed by 90 law professors).

[207] To take one famous example, O.J. Simpson was found responsible for wrongful death in civil court under the preponderance standard after he was found not guilty for murder in criminal court under the beyond-a-reasonable-doubt standard. *See* B. Drummond Ayres, Jr., *Jury Decides Simpson Must Pay $25 Million in Punitive Award*, N.Y. TIMES (Feb. 11, 1997), https://www.nytimes.com/1997/02/11/us/jury-decides-simpson-must-pay-25-million-in-punitive-award.html.

[208] *Rivera v. Minnich*, 483 U.S. 574, 581 (1987).

[209] *Cooper v. Oklahoma*, 517 U.S. 348, 368 (1996).

[210] *McMillan v. Pennsylvania*, 477 U.S. 79, 91-92 (1986).

[211] *Jones v. United States*, 463 U.S. 354, 368 (1983).

[212] *Addington v. Texas*, 441 U.S. 418, 424 (1979) (civil commitment).

EXHIBIT 27

parental rights,[213] civil commitment for mental illness,[214] deportation,[215] denaturalization,[216] and juvenile delinquency with the "possibility of institutional confinement."[217] In all of these cases, incarceration or a permanent loss of a profound liberty interest was a possible outcome—unlike in school sexual harassment proceedings. Moreover, in all of these cases, the government and its vast power and resources was in conflict with an individual—in contrast to school harassment investigations involving two students with roughly equal resources and equal stakes in their education, two employees who are also similarly situated, or a student and employee, where any power imbalance would tend to favor the employee respondent rather than the student complainant.[218] Preponderance is the only standard of proof that treats both sides equally and is consistent with Title IX's requirement that grievance procedures be "equitable."[219]

For this reason, Title IX experts and school leaders alike support the preponderance standard, which is used to address harassment complaints at over 80 percent of colleges.[220] The National Center for Higher Education Risk Management (NCHERM) Group, whose white paper *Due Process and the Sex Police* was cited by the Department,[221] has promulgated materials that require schools to use the preponderance standard, because "[w]e believe higher education can acquit fairness without higher standards of proof." [222] The white paper by four Harvard professors that is cited by the Department[223] recognizes that schools should use the preponderance standard if "other requirements for equal fairness are met."[224] ATIXA takes the position that

---

[213] *Santosky v. Kramer*, 455 U.S. 745, 758 (1982).

[214] *Addington*, 441 U.S. at 432.

[215] *Woodby v. INS*, 385 U.S. 276, 286 (1966).

[216] *Chaunt v. United States*, 364 U.S. 350, 353 (1960); *Schneiderman v. United States*, 320 U.S. 118, 125 (1943).

[217] *In re Winship*, 397 U.S. 358, 367-68 (1970).

[218] Despite overwhelming Supreme Court and other case law in support of the preponderance standard, the Department cites just two state court cases and one federal court district court case to argue for the clear and convincing standard. 83 Fed. Reg. at 61477. The Department claims that expulsion is similar to loss of a professional license and that held that the clear and convincing standard is required in cases where a person may lose their professional license *Id*. However, even assuming expulsion is analogous to loss of a professional license, which is certainly debatable as it is usually far easier to enroll in a new school than to enter a new profession, this is a weak argument, as there are numerous state and federal cases that have held that the preponderance standard is the correct standard to apply when a person is at risk of losing their professional license. *See, e.g., In re Barach*, 540 F.3d 82, 85 (1st Cir. 2008); *Granek v. Texas State Bd. of Med. Examiners*, 172 S.W. 3d 761, 777 (Tex. Ct. App. 2005). As an example, the Department cites *Nguyen v. Washington State Dep't of Health*, 144 Wash.2d 516 (Wash. 2001), *cert. denied* 535 U.S. 904 (2002) for the contention that courts "often" employ a clear and convincing evidence standard to civil administrative proceedings. In that case, the court required clear and convincing evidence in a case where a physician's license was revoked after allegations of sexual misconduct. But that case is an anomaly; a study commissioned by the U.S. Department of Health and Human Services found that two-thirds of the states use the preponderance of the evidence standard in physician misconduct cases. *See* Randall R. Bovbjerg et al., *State Discipline of Physicians* 14-15 (2006), https://aspe.hhs.gov/sites/default/files/pdf/74616/stdiscp.pdf. *See also* Kidder, William, *(En)forcing a Foolish Consistency?: A Critique and Comparative Analysis of the Trump Administration's Proposed Standard of Evidence Regulation for Campus Title IX Proceedings* (January 27, 2019), *available at* http://ssrn.com/abstract=3323982 (providing an in depth comparative analysis of the many instances in which the preponderance standard is used instead of the clear and convincing evidence standard).

[219] The Department's bizarre claim that the preponderance standard is the "lowest possible standard of evidence" (83 Fed. Reg. at 61464) is simply wrong as a matter of law. Courts routinely apply lower standard of proof in traffic stops ("reasonable suspicion") and conducting searches ("probable cause"). *Terry v. Ohio*, 392 U.S. 1 (1968) (traffic stops); U.S. Const. amend. IV (searches).

[220] Heather M. Karjane, et al., *Campus Sexual Assault: How America's Institutions of Higher Education Respond* 120 (Oct. 2002), https://www.ncjrs.gov/pdffiles1/nij/grants/196676.pdf.

[221] 83 Fed. Reg. at 61464 n.2.

[222] The NCHERM Group, *Due Process and the Sex Police* 2, 17-18 (Apr. 2017), *available at* https://www.ncherm.org/wp-content/uploads/2017/04/TNG-Whitepaper-Final-Electronic-Version.pdf.

[223] 83 Fed. Reg. at 61464 n.2.

[224] Elizabeth Bartholet, Nancy Gertner, Janet Halley & Jeannie Suk Gersen, *Fairness For All Students Under Title IX* 5 (Aug. 21, 2017), https://dash.harvard.edu/bitstream/handle/1/33789434/Fairness%20for%20All%20Students.pdf.

EXHIBIT 27

any standard higher than preponderance advantages those accused of sexual violence (mostly men) over those alleging sexual violence (mostly women). It makes it harder for women to prove they have been harmed by men. The whole point of Title IX is to create a level playing field for men and women in education, and the preponderance standard does exactly that. *No other evidentiary standard is equitable*.[225]

ASCA agrees that schools should "[u]se the preponderance of evidence (more likely than not) standard to resolve all allegations of sexual misconduct"[226] because "it is the only standard that reflects the integrity of equitable student conduct processes which treat all students with respect and fundamental fairness."[227] Indeed, even the Department admits it is "reasonable" for a school to use the preponderance standard.[228]

>    2.   *The Department's proposed rules are inconsistent with other civil rights laws and impose double standards for sexual harassment versus other student and employee misconduct.*

By permitting and sometimes mandating the clear and convincing evidence standard in sexual harassment proceedings, the Department treats sexual harassment differently from other types of school disciplinary violations and employee misconduct, uniquely targeting and disfavoring sexual harassment complainants. First, the Department argues that Title IX harassment investigations are different from civil cases, and therefore may appropriately require a more burdensome standard of proof, because many Title IX harassment investigations do not use full courtroom procedures, such as active participation by lawyers, rules of evidence, and full discovery.[229] However, the Department does not exhibit this integrity for the lack of full-blown judicial proceedings to address other types of student or employee misconduct, including other examples of student or employee misconduct implicating the civil rights laws enforced by the Department. Schools have not as a general rule imposed higher evidentiary standards in other misconduct matters, nor have employers more generally in employee misconduct matters, to make up for the fact that the proceedings to address such misconduct fall short of full-blown judicial trials, and the Department does not explain why such a standard is appropriate in this context alone.

Second, although the proposed rules would require schools to use the "clear and convincing" standard for sexual harassment investigations if they use it for *any* other student or employee misconduct investigations with the same maximum sanction,[230] and would require that it be used in student harassment investigations if it is used in *any* employee harassment investigations, the proposed rules would not prohibit schools from using the clear and convincing standard in sexual harassment proceedings *even if* they use a lower proof standard for *all* other student conduct violations.[231] School leaders agree that requiring different standards for sexual misconduct as opposed to other misconduct is inequitable. NASSP notes that by requiring schools to "use an inappropriate and more demanding standard of proof to investigate sexual harassment than to investigate other types of student misconduct," the proposed rule would "deny harassment victims . . . due process."[232] NASPA recommends the preponderance standard:

---

[225] ATIXA, *ATIXA Position Statement: Why Colleges Are in the Business of Addressing Sexual Violence* 4 (Feb. 17, 2017), *available at* https://atixa.org/wordpress/wp-content/uploads/2017/02/2017February-Final-ATIXA-Position-Statement-on-Colleges-Addressing-Sexual-Violence.pdf.
[226] *ASCA 2014 White Paper, supra* note 138.
[227] ACSA, *The Preponderance of Evidence Standard: Use In Higher Education Campus Conduct Processes*, https://www.theasca.org/files/The%20Preponderance%20of%20Evidence%20Standard.pdf.
[228] 83 Fed. Reg. at 61477.
[229] *Id.*
[230] Proposed § 106.45(b)(4)(i).
[231] *See* Grossman & Brake, *supra* note 90 ("It is a one-way ratchet.").
[232] NASSP Letter, *supra* note 83, at 2.

EXHIBIT 27

> Allowing campuses to single out sexual assault incidents as requiring a higher burden of proof than other campus adjudication processes make it – by definition – harder for one party in a complaint than the other to reach the standard of proof. Rather than leveling the field for survivors and respondents, setting a standard higher than preponderance of the evidence tilts proceedings to unfairly benefit respondents.[233]

By allowing and in some contexts requiring schools to impose higher evidentiary standards in sexual harassment proceedings than in comparable misconduct proceedings, the Department would allow disparate treatment targeting those who have experienced sexual harassment, in violation of Title IX and other laws against sex discrimination.

Further, many school employees have contracts that require using a more demanding standard of evidence than the preponderance standard for employee misconduct investigations.[234] The proposed rules would force those schools to either (1) impose the same standard of proof for *all* cases of misconduct that carry the same maximum sanction as Title IX proceedings (and thereby eliminating any flexibility schools have to define how they handle misconduct of a nonsexual nature, completely exceeding the Department's authority),[235] or (2) maintain the clear and convincing evidence standard for only employee misconduct and student sexual misconduct proceedings. The latter choice would leave schools vulnerable to liability for sex discrimination, as schools cannot defend specifically disfavoring sexual harassment investigations, which is a form of sex discrimination, by pointing to collective bargaining agreements or other contractual agreements for employees that require a higher standard.[236]

### 3. The proposed rules impose double standards for complainants versus respondents.

By allowing schools to use a "clear and convincing evidence" standard, the proposed rule would permit schools to tilt investigations in favor of respondents and against complainants. The Department argues that sexual harassment investigations may require a more demanding standard because of the "heightened stigma" and the "significant, permanent, and far-reaching" consequences for respondents if they are found responsible for sexual harassment.[237] But the Department ignores the reality that Title IX complainants face "heightened stigma" for reporting sexual harassment as compared to other types of student or employee misconduct, and that complainants suffer "significant, permanent, and far-reaching" consequences to their education or their career if the school fails to meaningfully address the harassment.[238] In the context of peer sexual harassment, both the complainant and the respondent have an equal interest in obtaining an education. In matters involving the sexual harassment of a student by a school employee, the complainant's educational interest is at least as strong as the respondent's employment interest. And in matters involving sexual harassment between employees, both the complainant and the respondent have interests in ensuring that they can continue in their jobs. Catering only to the impacts on respondents in designing a grievance process to address sexual harassment is inequitable.

---

[233] *NASPA Title IX Priorities*, *supra* note 198 at 1-2.

[234] *See* Grossman & Brake, *supra* note 90 (clear and convincing evidence is "the standard the [American Association of University Professors] has urged on colleges and universities for faculty discipline and which some unionized institutions have incorporated in collective bargaining agreements with institutions").

[235] Although the Department claims that it wants to give schools "flexibility" in choosing their standard of proof,[235] Proposed § 106.45(b)(4)(i) would effectively force schools to use "clear and convincing evidence" for student sexual harassment investigations if "clear and convincing evidence" is used by that school in *employee* sexual harassment investigations. Given that most schools already use the preponderance standard in student Title IX proceedings, many of them would be forced to change their procedures—hardly the "flexibility" that the Department claims it wishes to provide.

[236] *See* 34 C.F.R. § 106.51 ("A recipient shall not enter into a contractual or other relationship which directly *or indirectly* has the effect of subjecting employees or students to discrimination….").

[237] 83 Fed. Reg. at 61477.

[238] For example, 34 percent of college students who are sexually assaulted drop out of school. Mengo & Black, *supra* note 30, at 234, 244.

EXHIBIT 27

4. *The shift in treatment of the standard for sexual misconduct matters appears to stem from the Department's belief that individuals alleging sexual misconduct are not credible.*

All in all, the Department's justifications for allowing and in some instances imposing the clear and convincing evidence standard are without merit. Although claiming otherwise, the Department is not proposing this change to give schools flexibility, because in many instances schools would be forced to apply the clear and convincing evidence standard regardless of their judgment as to the appropriateness of the standard. The Department is not proposing this change because it is recommended by the experts who engage with and work at schools, as most experts oppose use of the clear and convincing evidence standard. Nor is the Department proposing this change in order to ensure equity for all parties, as the proposed rules would actually make Title IX proceedings more *inequitable*, violating Title IX's mandate for equitable grievance procedures. And finally, the Department is not proposing this change because it is consistent with most legal actions that involve civil rights complaints or wherein similar losses are at stake, as those civil actions uniformly use the preponderance of the evidence standard. Thus, in an arbitrary and capricious fashion, the Department proposes this rule that effectively mandates an inappropriate standard of proof, impacting thousands of students and employees at schools, without any adequate justification, apparently based on nothing more than the harmful myth that those alleging sexual assault and other forms of sexual harassment are inherently less credible than those alleging other forms of misconduct.

**E.   The proposed rules would allow schools to consider irrelevant or prejudicial evidence, including irrelevant or prejudicial sexual history evidence, in sexual harassment investigations.**

Despite adding numerous procedural requirements to the proposed rules, the Department fails to include a rule that evidence must be excluded in a sexual harassment investigation if it is irrelevant,[239] or if it is relevant but its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the factfinder, undue delay, wasting time, and/or needlessly presenting cumulative evidence.[240]

One particularly troubling consequence of this omission is that the proposed rules at §§ 106.45(b)(3)(vi)-(vii) improperly allow schools to consider any evidence related to the sexual history between the parties if it is "offered to prove consent"—even if such evidence relies on victim-blaming and "slut-shaming" myths that cause unfair prejudice to the complainant, mislead the investigator(s) or decisionmaker(s), or render the evidence entirely irrelevant to the investigation. In contrast, the 2014 Guidance instructed schools to "recognize that the mere fact of a current or previous consensual dating or sexual relationship between the two parties does not itself imply consent or preclude a finding of sexual violence."[241] The proposed rules not only provide no such instruction, but by explicitly allowing consideration of a previous sexual relationship in these circumstances, it invites schools to improperly conclude that such sexual history demonstrates consent.

The Department cites Federal Rule of Evidence 412 to support its proposed rules without mentioning that Rule 412 contains different restrictions on the admissibility of sexual history evidence in criminal versus civil proceedings.[242] In criminal cases, such evidence may be offered by the defendant without restriction.[243] But in civil cases, sexual history evidence is admissible to prove consent only if "its

---

[239] *See* Fed. R. Evid. 401, 402.
[240] *See* Fed. R. Evid. 403.
[241] 2014 Guidance, *supra* note 58, at 31.
[242] 83 Fed. Reg. at 61476.
[243] Fed. R. Evid. 412(b)(1)(B).

EXHIBIT 27

probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party."[244] The Department fails to explain why it seeks to import the criminal rule rather than its civil counterpart to school sexual harassment proceedings, which, to the extent they are properly analogized to trials in a court of law at all (a dubious proposition), are self-evidently civil rather than criminal in nature.

### F.   The proposed rules fail to impose clear timeframes for investigations and allow impermissible delays.

Proposed § 106.45(b)(1)(v) would require schools to have "reasonably prompt timeframes," but does not define what constitutes "reasonably prompt." This provision would also allow schools to create a "temporary delay" or "limited extension" of timeframes for "good cause," where "good cause" may be "concurrent law enforcement activity" or the "need for language assistance or accommodation of disabilities." In practice, these delays, particularly in combination with the delays likely to be created by the rules' burdensome requirements of live trial-like proceedings in all harassment investigations, are likely to result in violations of Title IX's promptness requirement under current § 106.8(b) and proposed § 106.8(c). In contrast, the 2011 and 2014 Guidances recommended that schools finish investigations within 60 days,[245] and the 2001 Guidance continues to prohibit schools from delaying a Title IX investigation merely because of a concurrent law enforcement investigation.[246] All of these guidances recognized that while criminal investigations seek to punish an abuser for misconduct, Title IX investigations are intended to preserve or restore complainants' equal access to any educational opportunities that have become inaccessible as a result of harassment.

Many schools may wrongly interpret proposed § 106.45(b)(1)(v) to allow them to delay Title IX investigations indefinitely if there is any concurrent law enforcement activity. This is especially concerning for students in elementary and secondary schools, as well as adult students with developmental disabilities, whose reports of sexual abuse may automatically trigger a law enforcement investigation under state mandatory reporting laws. As a result, these students would have no way to secure a timely school investigation and resolution, as the mere act of reporting could trigger an automatic delay.

Schools may also wrongly interpret proposed § 106.45(b)(1)(v) to allow for effectively unlimited delays if any party or witness requires a disability accommodation. As discussed in Part IV.B, individuals who develop anxiety, depression, PTSD, or other mental disabilities as a result of sexual harassment or assault, as well as students with preexisting disabilities, are entitled to reasonable disability accommodations under Section 504, the ADA, and the IDEA.[247] However, many schools require documentation in order for a student to receive disability accommodations, and documentation for certain diagnoses, such as PTSD, are often unavailable for a period of time due to persistence-based diagnostic criteria.[248] Schools may believe that the proposed rules would allow them to indefinitely delay harassment or assault proceedings while they wait for diagnoses that necessarily take time to make, rather than moving forward in promptly accommodating an individual's emergent needs. In addition, because institutions of higher education are not required to accept an incoming student's documentation of their disability from their IEP in secondary school, complainants and respondents with disabilities in higher education may encounter delays in simply obtaining new documentation of their disability. Survivors with disabilities already face many barriers to obtaining relief, including long distances between their

---

[244] Fed. R. Evid. 412(b)(2).
[245] 2014 Guidance, *supra* note 58, at 31; 2011 Guidance, *supra* note 58, at 12.
[246] 2001 Guidance, *supra* note 59, at 21. *See also* 2014 Guidance, *supra* note 58, at 27-28; 2011 Guidance, *supra* note 58, at 10.
[247] *See supra* notes 184-186 and accompanying text.
[248] Taylor S. Parker, *The Less Told Story: The Intersection of Title IX and Disability* at 14-16, *at* https://www.stetson. edu/law/academics/highered/home/media/Title%20IX%20and%20Disability%20Taylor%20S%20Parker.pdf.

EXHIBIT 27

school's Title IX and disability offices,[249] inaccessible sexual assault training programs and materials, inaccessible sexual assault services, and service providers who lack disability training.[250] They should not be forced to endure additional delays in obtaining the accommodations they need to meaningfully participate in their Title IX investigations. Likewise, the proposed rules should not allow schools to delay Title IX proceedings based on the school's failure to provide disability accommodations promptly in violation of existing disability civil rights laws. Rather, the need for prompt proceedings to address harassment allegations is an additional reason that schools must promptly provide the disability accommodations to which an individual is entitled.

For the same reasons, schools should not be allowed to rely on proposed § 106.45(b)(1)(v) to impose unreasonable delays if any party or witness requires language assistance. Students and guardians are already entitled to language assistance under Title VI.[251] A school's failure to provide language assistance in a timely manner in violation of Title VI should not be a valid basis for delaying a Title IX investigation. Rather, the need for a timely sexual harassment investigation should require a school to promptly provide any necessary language assistance.

School leaders and experts alike agree that proposed § 106.45(b)(1)(v) would cause unacceptable delays in investigations. NASSP opposes this standard because it would allow schools to "deny harassment victims . . . due process … if there is also an ongoing criminal investigation."[252] ATIXA agrees that a school that "delay[s] or suspend[s] its investigation" at the request of a prosecutor creates a safety risk to a survivor of sexual assault and to "other students, as well."[253]

### G.  The proposed rules may require schools to provide respondents appeal rights that they deny complainants.

Although Secretary DeVos has claimed that the proposed rules make "[a]ppeal rights equally available to both parties,"[254] they may not in fact provide equal *grounds for appeal* to both parties. In proposed §§ 106.45(b)(1)(i), 106.45(b)(1)(vi), 106.45(b)(4)(ii)(E), 106.45(b)(5), and 106.45(b)(7)(i)(A), the Department's repeatedly draws a distinction between "remedies" and "sanctions," implying that sanctions are not a category of remedies. Proposed § 106.45(b)(5) also explicitly affirms the right of complainants to appeal their remedies while stating that "a complainant is not entitled to a particular sanction." As a result, schools are likely to conclude that the proposed rules would bar complainants from appealing a school's resolution of a harassment complaint based on inadequate sanctions imposed on a respondent, while allowing respondents to appeal their sanctions. Allowing only the respondent the right to appeal a sanction decision would be both unfair and a violation of the requirement of "equitable" procedures, because complainants are also affected by sanction decisions. For example, in instances of sexual assault, if their assailant is still allowed to live in the same dorm as the survivor, or to teach a class that is required for the survivor's major, the survivor may experience further trauma from repeated encounters with their assailant and be exposed to the risk of further harassment or assault.

---

[249] *Id*. at 2.
[250] National Council on Disability, *Not on the Radar: Sexual Assault of College Students with Disabilities* 33-58 (Jan. 30, 2018), *available at* https://ncd.gov/publications/2018/not-radar-sexual-assault-college-students-disabilities.
[251] 42 U.S.C. § 2000d to d-7; U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter: English Learner Students and Limited English Proficient Parents* 37-38 (2015) [hereinafter Language Guidance], https://www2.ed.gov/about/offices/list/ocr/letters/ colleague-el-201501.pdf.
[252] NASSP Letter, *supra* note 104, at 2.
[253] ATIXA, *ATIXA Position Statement on the Proposed Legislation Entitled: Promoting Real Opportunity, Success, And Prosperity Through Education Reform (PROSPER) Act (Higher Education Act Reauthorization)* (Jan. 18, 2018), https://atixa.org/wordpress/wp-content/uploads/2015/03/ATIXA-POSITION-STATEMENT-ON-PROSPER-ACT-Final.pdf.
[254] DeVos, *supra* note 159.

EXHIBIT 27

Experts and school leaders alike support equal appeal rights. The American Bar Association recommends that the grounds for appeal include "a sanction disproportionate to the findings in the case (that is, too lenient or too severe)."[255] ATIXA announced in October 2018 that it supports equal rights to appeal for both parties, "[d]espite indications that OCR will propose regulations that permit inequitable appeals."[256] Even the white paper by four Harvard professors that is cited by the Department[257] recognizes that schools should allow "[e]ach party (respondent and complainant) [to] request an impartial appeal."[258] NASSP notes that by requiring schools to give unequal appeal rights with respect to sanctions, the proposed rule would "deny harassment victims . . . due process."[259]

Additionally, the Department mischaracterizes court precedent to support its position that complainants should not be permitted to appeal a respondent's sanction.[260] While the Department asserts that *Davis*[261] and *Stiles ex rel. D.S. v. Grainger County, Tennessee*[262] support its proposed rule preventing complainants from appealing particular sanctions, those cases merely explain that that "*courts* should refrain from second-guessing the disciplinary decisions made by school administrators."[263] These cases do not prohibit students, whether complainants or respondents, from appealing their school's disciplinary decisions through their school's Title IX grievance process. Similarly, the third case cited by the Department, *Sanches*, merely explains that "[s]chools are not required to … accede to a [complainant's] remedial demands"[264]—it does not prohibit complainants from appealing a school's determination as to what remedies or sanctions are appropriate.

### H. The proposed rules would allow and would in some instances require schools to violate individuals' privacy rights.

The proposed rules at § 106.45(b)(3)(viii) and 106.45(b)(4)(ii)(E)) would allow or even require schools to violate students' privacy rights, making both complainants and respondents vulnerable to retaliation. Proposed § 106.45(b)(3)(viii) would require schools to allow both parties to inspect and review any evidence "directly related to the allegations" obtained as part of the investigation, even evidence upon which the school "does not intend to rely in reaching a determination regarding responsibility." First, this proposed rule is confusing, as it suggests that schools may ignore relevant evidence without placing any limitations on their discretion to do so. Moreover, by allowing unfettered access to irrelevant or prejudicial evidence that the school does not intend to rely upon in making its decision, including sexual history evidence, this provision would open the door to retaliation against complainants, respondents, and witnesses.

Proposed § 106.45(b)(4)(ii)(E)) would require schools to disclose to both parties "any sanctions" on the respondent and "any remedies" for the complainant, even in cases where such a disclosure would violate the Family Educational Rights and Privacy Act (FERPA).[265] This proposed rule would depart from twenty-two years of Department guidance, which recognized that while complainants could be informed

---

[255] Am. Bar Ass'n, *supra* note 192, at 5.
[256] ATIXA, *ATIXA Position Statement on Equitable Appeals Best Practices* 1 (Oct. 5, 2018), *available at* https://atixa.org/wordpress/wp-content/uploads/2018/10/2018-ATIXA-Position-Statement-Appeals.pdf.
[257] 83 Fed. Reg. at 61464 n.2.
[258] Bartholet, et al., *supra* note 224.
[259] NASSP Letter, *supra* note 83, at 2.
[260] 83 Fed. Reg. at 61479.
[261] 526 U.S. at 648.
[262] 819 F.3d 834, 848 (6th Cir. 2016).
[263] *Davis*, 526 U.S. at 648; *Stiles ex rel. D.S.* v. *Grainger Co., Tenn.,* 819 F.3d 834, 848 (6th Cir. 2016).
[264] *Sances v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167-68 (5th Cir. 2011) (emphasis added).
[265] 20 U.S.C. § 1232g(b)(1) (generally forbidding disclosure from a student's "education record," which includes written information about the complaint, investigation, and outcome of a disciplinary proceeding, without consent of the student).

EXHIBIT 27

of the sanctions imposed on a respondent if (1) the sanction "directly relates" to the complainant or (2) the harassment involves sexual assault, stalking, dating violence, domestic violence, or other violent crime at a postsecondary institution,[266] that respondents should not be informed of any remedies for complainants at all.[267] Schools should not be forced to choose between violating their obligations under Title IX or violating students' privacy rights under FERPA.

> **I.  The proposed rules would allow schools to destroy records relevant to a student or employee's Title IX lawsuit or administrative complaint and would allow repeat employee offenders to escape accountability.**

Proposed § 106.45(b)(7) would require schools to keep records of sexual harassment proceedings for only three years, which would limit complainants' ability to succeed in a Title IX lawsuit or OCR complaint. First, because the Title IX statute does not contain a statute of limitation, courts generally apply the statute of limitation of the "most analogous" state statute,[268] such as a state's civil rights statute or personal injury statute,[269] the latter of which varies from one to six years depending on the state.[270] As a result, proposed § 106.45(b)(7) would allow schools in many states to destroy relevant records before a student or employee has an opportunity to file a complaint or complete discovery in a Title IX lawsuit. Second, given that OCR complaints involving campus sexual assault have, in recent years, taken an average of more than four years to resolve,[271] proposed § 106.45(b)(7) could potentially allow the majority of schools undergoing an OCR investigation to destroy relevant records and thus escape liability.

The proposed rule would also make students vulnerable to school employees who are repeat offenders. Unlike students, school employees have the ability to harass numerous victims (students and fellow employees) during many years or decades at a school. But the proposed rule would permit schools to destroy records involving employee-respondents after three years, allowing repeat employee offenders to escape accountability despite multiple complaints, investigations, or findings against them.

> **J.  The proposed rules fail to include a prohibition on retaliation against parties and witnesses.**

Current Title IX rules prohibit retaliation through incorporation of Title VI rules.[272] But given the extensive and detailed explication of procedures and procedural rights in the proposed rules, it is not clear why the Department declined to include an explicit prohibition of retaliation against individuals for making a sexual harassment complaint or participating in a sexual harassment investigation. Proposed §§ 106.45(b)(1) (required grievance procedures) and 106.45(b)(2) (notice to parties) do not include prohibition of retaliation against parties and witnesses or any notice of the right to be free from retaliation. The Department's failure to include clear prohibitions against retaliation is confusing and unjustifiable.

---

[266] 2017 Guidance, *supra* note 58 at 6; 2014 Guidance, *supra* note 58 at 36-37; 2011 Guidance, *supra* note 58, at 13-14; 2001 Guidance, *supra* note 59, at vii; 1997 Guidance, 62 Fed. Reg. at 12034, 12038, 12051. *See also* 20 U.S.C. 1232g(b)(6)(C)(i).
[267] 2014 Guidance, *supra* note 58, at 36.
[268] Nat'l Women's Law Ctr., *Breaking Down Barriers* at 91 n.354 (2015), https://nwlc.org/wp-content/uploads/2015/08/BDB07_Ch6.pdf.
[269] *Id.* at 92 n.355-57.
[270] Parker Waichman LLP, *Statutes of Limitations – A Legal Guide*, http://www.statutes-of-limitations.com/search?statutes_next_page=1&state_id=Choose%20Jurisdiction&case_type_id=-7&year_limit=Year%20Limit&x=60&y=14.
[271] Jake New, *Justice Delayed*, Inside Higher Ed (May 6, 2015), https://www.insidehighered.com/news/2015/05/06/ocr-letter-says-completed-title-ix-investigations-2014-lasted-more-4-years.
[272] 34 C.F.R. § 106.71 (incorporating 34 C.F.R. § 100.7, the Title VI regulation prohibiting "intimidatory or retaliatory acts").

EXHIBIT 27

**K.  The proposed rules' suggestion that these inequitable grievance procedures are necessary in order to avoid sex discrimination against named harassers and assailants turns Title IX on its head.**

Proposed § 106.45(a) asserts that a school's "treatment of the respondent" may constitute sex discrimination in violation of Title IX, implying that the inequitable, complainant-hostile procedures set out in the proposed rules are necessary to avoid sex discrimination against the respondent. This suggestion that Title IX's prohibition of sex discrimination entitles a respondent to particular rights and protections when being investigated for sexual harassment turns Title IX on its head. Title IX was enacted to protect individuals from discrimination on the basis of sex in educational programs and activities, with the recognition of the long and pernicious history of discrimination against women and girls in schools. This protection against sex discrimination necessarily includes ensuring that students who experience sexual harassment continue to have equal access to educational opportunities. Proposed § 106.45(a) threatens to invert that purpose by turning named harassers and rapists into a protected class.[273]

The proposed rules thus threaten to create a system in which it is easier to show that schools engaged in reverse "sex discrimination" against respondents than sex discrimination against students and employees who experienced sexual harassment. The proposed rules suggest a respondent might be able to claim a Title IX violation merely by showing that the school deviated from the procedural requirements set out in the rules.[274] By contrast, nowhere in the proposed rules or preamble does the Department indicate that depriving a *complainant* of procedural protections would be a Title IX violation; due process for *respondents*, however, is explicitly mentioned repeatedly.[275] Thus, it appears that the only way a complainant could prove a Title IX violation in the Department's judgment would be to show that (i) she suffered sexual harassment that was "so severe, pervasive, and objectively offensive that it denied [her] access to the [school's] education program or activity"[276]; (ii) the harassment "occur[red] within the [school's] program or activity"[277]; (iii) a school employee with "the authority to institute corrective measures on behalf of the [school]" had "actual knowledge" of the harassment;[278] and (iv) their school's response was "deliberately indifferent" or "clearly unreasonable."[279] This is a much, much higher bar than violating the procedural requirements for grievance procedures under the proposed rules. As a result, the proposed rules will likely incentivize schools to protect against allegations of reverse sex discrimination by respondents than allegations of sex discrimination by complainants claiming inadequate and unfair responses to their sexual harassment.[280] This incentive would be exacerbated by proposed § 106.44(b)(5), which provides that a school could not be held to be deliberately indifferent to harassment "merely because" it decided there was no sexual harassment and the Department "reaches a different determination." The result is a system of rules that perversely, unfairly, and unlawfully creates fewer rights under Title IX for individuals who are sexually harassed than for individuals who are alleged to have sexually harassed others.

---

[273] Grossman & Brake, *supra* note 90 (criticizing the Department's attempt to "traffic in a false equivalence that is supported by neither law nor logic").
[274] Proposed § 106.45(a).
[275] 83 Fed. Reg. at 61462, 61465, 61472 (three times), 61473, 61477, 61484, 61489 (twice), 61490.
[276] Proposed § 106.30.
[277] Proposed § 106.45(b)(3).
[278] Proposed § 106.30.
[279] Proposed § 106.44(a).
[280] Grossman & Brake, *supra* note 90 ("If it is sex discrimination against the accused student to subject him to an unfair process, but only sex discrimination against the complainant if her complaint is met with deliberate indifference, then siding with respondents is the less perilous path toward Title IX compliance.").

EXHIBIT 27

### V.   The proposed rules would weaken the ability of the Department to remedy sex discrimination and broaden the ability of schools to engage in sex discrimination.

#### A.   The proposed rules would inappropriately shift the Department's focus away from remedying sex discrimination.

Like all civil rights laws, at the core of Title IX is its mandate against sex discrimination.[281] However, the Department's proposed revision to § 106.3(a) would erase the word "discrimination" entirely from the provision setting out the remedial action that the Department may require. The current § 106.3(a) acknowledges that remedial action under Title IX flows from the Department's determination that a school has "discriminated" on the basis of sex and authorizes the Department to order that a school take such action necessary "to overcome the effects of such discrimination." In contrast, the proposed rule would omit any reference to "discrimination" from the regulation entirely, instead focusing on remedying "violations" of Title IX. These changes are troubling for a number of reasons. First, this amendment unjustifiably expands rights for respondents to challenge "violations" of their procedural rights under these proposed rules, shifting the Department's enforcement efforts further away from protecting the right to equal access to educational opportunities for individuals who have been sexually harassed. Second, the proposed removal of the Department's obligation to provide remedies that "overcome the effects of such discrimination" suggests a decision has been made to ignore the far-reaching effects of sexual harassment and other forms of discrimination on the victims and on others in the school community. We are therefore concerned that the proposed changes to § 106.6(a) not only reflect the Department's goal of inappropriately narrowing its nondiscrimination mandate but also signal to schools that they will no longer be held fully accountable for permitting or engaging in illegal sex discrimination.

#### B.   The proposed rules do not make it clear whether students who have suffered sex discrimination in violation of Title IX would be entitled to monetary compensation through OCR enforcement.

The Department fails to clearly explain whether monetary compensation would be available to a complainant who has suffered sex discrimination, including sexual harassment, in violation of Title IX. The proposed rule at § 106.3(a) would deny complainants of any "assessment of damages" against their schools for violations of Title IX. The Department claims this is because it is "mindful of the difference" between private litigation (where money damages are available) and agency enforcement (where money damages are not available).[282] However, the Department's explicit goal in issuing the proposed rules is to make "[agency] standards … generally aligned with the standards developed by the Supreme Court" in cases of sexual harassment.[283] An outright prohibition of money damages in cases of sexual harassment is indefensible and inconsistent with the Department's own stated rationales; if the Department seeks to subject sexual harassment victims who seek agency enforcement to the same stringent standards as are imposed in private litigation for money damages, it cannot justify precluding those same students from obtaining money damages through agency enforcement.

The Department creates further confusion in the preamble when it explains that it could still require a school to "reimburse" a student for "reasonable and documented expenses," "restor[e]" a student's impermissibly revoked scholarship, "adjust" an employee's salary or retirement credit,[284] or otherwise require a "payment of money" to "bring[] a [school] into compliance with Title IX."[285] The Department, however, fails to explain the difference between impermissible "damages" and permissible

---

[281] 20 U.S.C. § 1681(a).
[282] 83 Fed. Reg. at 61480.
[283] *Id.* at 61466.
[284] *Id.* at 61480.
[285] *Id.* at 61489.

EXHIBIT 27

"reimburse[ments]," "adjust[ments]," "expenses," or "payment[s]." The result is that neither students nor schools would understand whether monetary compensation would be available if a student suffers sex discrimination in violation of Title IX and files a complaint with the Department.

**C.   The proposed rules would allow schools to publish materials that suggest disparate treatment of applicants, students, or employees on the basis of sex, and would inappropriately seek to reduce the amount of information available to parents and applicants about whether schools comply with Title IX.**

Proposed § 106.8(a)(2)(ii) would prohibit schools from using or distributing a publication "*stating* that [it] treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by this part (emphasis added)." In contrast, the current equivalent, § 106.9(b)(2), prohibits schools from using or distributing a publication that "*suggests*, by text or illustration, that such recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by this part (emphasis added)." Under the proposed rules, only overt statements of discrimination would be prohibited, and schools would not be held responsible, for example, for publications that serve to steer students to particular courses of study or employees to particular roles on the basis of sex, as long as the school stopped short of overt discriminatory statements.

Further, proposed § 106.8(b)(1) would remove the requirement (currently in § 106.9(a)) that a recipient must notify "parents of elementary and secondary school students" that it does not discriminate on the basis of sex. Proposed § 106.8(b)(2) would remove the requirement (currently in § 106.9(b)) that a recipient include a non-discrimination statement in each "announcement, bulletin, … or application form," while adding the requirement for inclusion of the statement on its "website" and in "handbooks." And the NPRM proposes deleting current § 106.9(c), which requires that a recipient not to discriminate in distributing its publications, to apprise its recruiters of its policy of non-discrimination, ensure that recruiters adhere to such a policy.[286]

The NPRM claims that proposed § 106.8(b)(1) "would streamline" the list of who has to be notified about the schools' non-discrimination policy.[287] But the NPRM does not give any reason why the list needs to be streamlined, or why, if it does, parents of elementary and secondary school students should be the ones deprived of information that they have received for over 40 years. Nor will this amendment actually reduce burden on school districts, as the requirement to notify parents that the recipient does not discriminate remains in the regulations of 25 other federal agencies, many of which (such as the United States Department of Agriculture (USDA) through its free and reduced price meals program) provide federal financial assistance to elementary and secondary schools.

The NPRM claims that proposed § 106.8(b)(2) likewise "streamlines" the list of publications that must include the non-discrimination statement "to reduce burden on recipients."[288] But again the NPRM offers no reason why it needs to be streamlined or why the particular items proposed to be dropped—such as application forms—are the appropriate ones to cut. Nor does the NPRM explain why it added "handbooks" to the list or how that item overlaps (or not) with the items deleted—such as announcements and bulletins. If handbooks are no different, then there is no reason for the change. If it they are different from announcements and bulletins, then the practical effect will be to increase the burden on recipients because, as noted above, the requirement to include the non-discrimination statement in announcements, bulletin, and applications remains in the regulations of 25 other federal agencies, many of whom (such as

---

[286] 83 Fed. Reg. at 61482.
[287] *Id.* at 61481.
[288] *Id.* at 61482.

EXHIBIT 27

the USDA through its free and reduced price meals program) provide federal financial assistance to elementary and secondary schools.

NPRM's only explanation for deleting current § 106.9(c) is again to reduce burden, suggesting that the availability of websites will suffice.[289] This explanation makes no sense. Current § 106.9(c) does not require that the publications identified in proposed § 106.8(b)(2) (currently in § 106.9(b)) be distributed. It requires that when they are distributed, they must be distributed *without discrimination on the basis of sex*. That is, for example, a school district could not send school catalogs to parents of girls but ignore parents who have only boys. Nor does the NPRM even mention, much less justify the elimination of, the last portion of current § 106.9(c), which requires a recipient to train its recruiters on its non-discrimination policy and to ensure that its recruiters adhere to the policy. These are important requirements to ensure that a recipient's non-discrimination policy is not diluted in the field. They should not be deleted. These proposed changes are just more examples of the Department's efforts to weaken civil rights protection for students and school employees.

### D. The proposed rules would allow schools to claim "religious" exemptions for violating Title IX with no warning to students or prior notification to the Department.

The current rules allow religious schools to claim religious exemptions from particular Title IX requirements by notifying the Department in writing and identifying which Title IX provisions conflict with their religious beliefs. The proposed rules remove that requirement and permit schools to opt out of Title IX without notice or warning to the Department or students. This would allow schools to conceal their intent to discriminate, exposing students to harm, especially women and girls, LGBTQ students, pregnant or parenting students (including those who are unmarried), and students who access or attempt to access birth control or abortion.[290] Transgender students are especially at risk because this proposed change threatens to compound the harms created by (i) the Department's decision in February 2017 to rescind Title IX guidance on the rights of transgender students; (ii) the Department's decision in February 2018 to stop investigating civil rights complaints from transgender students regarding access to sex-segregated facilities; and (iii) HHS's leaked proposal in October 2018 for the Department and other federal agencies to define "sex" to exclude transgender, non-binary, and intersex students. It allows schools to assert post facto religious justifications for discrimination in violation of Title IX, to the detriment of students.

Further, the Department's proposed rule permitting religious schools to covertly opt out of Title IX requirements directly conflict with the current[291] and proposed[292] rules' requirements that each covered educational institution "notify" all applicants, students, employees, and unions "that it *does not* discriminate on the basis of sex." By requiring a school to tell students that it does not discriminate while simultaneously allowing it to opt out of anti-discrimination provisions whenever it chooses, the Department is creating a system that enables schools to actively mislead students. This bait-and-switch practice demonstrates that the Department is more interested in protecting schools from liability when they discriminate than in protecting students from discrimination.

---

[289] *Id.*

[290] *See* Jeremy W. Peters et al., *Trump Rescinds Rules on Bathrooms for Transgender Students*, N.Y. TIMES (Feb. 22, 2017), https://www.nytimes.com/2017/02/22/us/politics/devos-sessions-transgender-students-rights.html; Moriah Balingit, *Education Department no Longer Investigating Transgender Bathroom Complaints*, WASH. POST (Feb. 12, 2018), https://www.washingtonpost.com/news/education/wp/2018/02/12/education-department-will-no-longer-investigate-transgender-bathroom-complaints; Erica L. Green et al., *'Transgender' Could Be Defined Out of Existence Under Trump Administration*, N.Y. TIMES (Oct. 21, 2018), https://www.nytimes.com/2018/10/21/us/politics/transgender-trump-administration-sex-definition.html.

[291] 34 C.F.R. § 106.9(a).

[292] Proposed § 106.8(b)(1).

EXHIBIT 27

**VI.**     **The proposed rules would exceed the Department's authority to effectuate Title IX's nondiscrimination mandate.**

As discussed above, proposed § 106.45(b)(3) *requires* schools to dismiss complaints of sexual harassment if they do not meet specific narrow standards. If the school determines that the complaint does not allege harassment that meets the improperly narrow definition of severe, pervasive, *and* objectively offensive, or that does not meet the other two proposed definitions of sexual harassment,[293] it *must* be dismissed, per the command of the rule. If severe, pervasive, *and* objectively offensive conduct occurs outside of an educational program or activity, including most off-campus or online harassment, it *must* be dismissed. However, the Department lacks the authority to require schools to dismiss complaints of discrimination. Under Title IX, the Department is only authorized to issue rules "to effectuate the [anti-discrimination] provision of [Title IX]." Title IX does not delegate to the Department the authority to tell schools *when they cannot* protect students against sex discrimination.[294] By requiring schools to dismiss certain types of complaints of sexual harassment, without regard to whether those forms of harassment deny individuals educational opportunities on the basis of sex, proposed § 106.45(b)(3) fails to effectuate Title IX's anti-discrimination mandate and would force many schools that, for example, already investigate off-campus sexual harassment under their student conduct policies to abandon these anti-discrimination efforts. While the Department is well within its authority to require schools to adopt civil rights protections to effectuate Title IX's mandate against sex discrimination, it does not have authority to cabin schools' otherwise lawful responses to sex discrimination or to force schools to violate students' and employees' rights under Title IX and other civil rights laws by forcing schools to dismiss reports of sexual harassment.

**VII.**     **The proposed rules threaten to violate the Title VII rights of school employees, exposing employees to an increased risk of sexual harassment and schools to Title VII liability.**

Although the regulations and the preamble indicate that the Department was primarily focused on peer sexual harassment in the rulemaking process, Title IX also protects school employees from sex discrimination, including sexual harassment.[295] The proposed rules as drafted would apply to sexual harassment complaints and investigations involving the millions of employees who work for school districts, colleges, and universities covered by Title IX, including the disproportionately female workforce employed in elementary and secondary schools.[296] While the proposed rules assert, "Nothing in this part shall be read in derogation of an employee's rights under Title VII of the Civil Rights Act of 1964,"[297] the rules make no attempt to grapple with the complexities created by the overlap and conflict posed by their mandates and employee protections under Title VII. As a result, they threaten employees' Title VII rights to be free from sexual harassment in the workplace and place schools in the impossible position of being

---

[293] Proposed § 106.30 also provides two other definitions of sexual harassment: (1) "An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct"; or (2) "Sexual assault, as defined in 34 CFR 668.46(a)."

[294] *See* Michael C. Dorf, *The Department of Education's Title IX Power Grab*, VERDICT (Nov. 28, 2018), https://verdict.justia.com/2018/11/28/the-department-of-educations-title-ix-power-grab.

[295] 34 C.F.R. § 106.51(a).

[296] In 2011-2012, 76.3% of teachers in public elementary and secondary schools were female compared to 74.8% in private elementary and secondary schools. *See* Nat'l Ctr. for Educ. Statistics, *Table 209.10. Number and percentage distribution of teachers in public and private elementary schools, by selected characteristics: Selected years, 1987-88 through 2015-16*, https://nces.ed.gov/programs/digest/d17/tables/dt17_209.10.asp; In 2011, 48.2% of faculty in degree-granting postsecondary institutions were female. *See* Nat'l Ctr. for Educ. Statistics, *Table 315.10. Number of faculty in degree-granting postsecondary institutions, by employment status, sex, control, and level of institution: Selected Years, fall 1970 through fall 2016*, https://nces.ed.gov/programs/digest/d17/tables/dt17_315.10.asp.

[297] Proposed § 106.6(f).

EXHIBIT 27

forced to choose which federal mandate they will violate when addressing workplace harassment complaints. For this reason, both advocates for employee interests (*e.g.*, the National Employment Lawyers Association) and advocates for employer interests (*e.g.*, the College and University Professors Association for Human Resources) have submitted comments harshly critiquing the proposed rules and their impact.

First, as set out in detail above, the proposed rules mandate both dismissal of complaints that allege conduct that does not meet the standard set out in the proposed rules and dismissal of most complaints alleging off-campus or online harassment. These standards, however, do not align with Title VII's protections. Under the proposed regulations, with certain limited exceptions, sexual harassment is defined as and limited to "[u]nwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity."[298] In contrast, the relevant inquiry under Title VII is whether the harassment "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."[299] Although the proposed regulations require that the harassment be severe "and" pervasive, the Title VII standard requires only that the harassment be sufficiently severe "or" pervasive to create a hostile work environment.[300] In addition, the question of whether the harassment denies "equal access to the recipient's education program or activity" is not directly relevant to the Title VII question of whether an individual's work performance is unreasonably interfered with or an intimidating, hostile, or offensive working environment has been created. Moreover, Title VII includes no categorical exception for harassment that takes place outside the workplace, asking instead whether the harassment "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment"[301] rather than the location in which the unlawful harassment occurred.[302] Yet the proposed rules squarely mandate that schools dismiss sexual harassment complaints, apparently including employee sexual harassment complaints, that do not conform to the cramped requirements of the proposed rules, whether or not they violate Title VII.

Similarly, the actual notice and deliberate indifference standard that the proposed regulations mandate for consideration of sexual harassment complaints differ sharply from applicable standards under Title VII. If an employee is harassed by a coworker, the employer is liable if it knew or should have known about the harassment and failed to take reasonable steps to address the harassment.[303] If an employee is sexually harassed by his or her supervisor, the employer is ordinarily strictly liable, regardless of whether it had any notice of the harassment.[304] If the harassment by a supervisor did not result in a tangible employment action, the employer may be able to establish an affirmative defense to a

---

[298] Proposed § 106.30.

[299] 28 C.F.R. § 1604.11(a). In its entirety, Section 1604.11(a) provides:

> Harassment on the basis of sex is a violation of section 703 of title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is sued as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect or unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

[300] *Meritor*, 477 U.S. at 67 (describing harassment actionable under Title VII as that "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"); *Harris*, 510 U.S. at 22 (actionable harassment is harassment that is "so severe or pervasive that it created a work environment abusive to employees because of their . . . gender . . . .").

[301] 28 C.F.R. § 1604.11(a).

[302] *See supra* notes 77 and 78 and accompanying text.

[303] *Faragher v. City of Boca Raton,* 524 U.S. 775, 799, 806 (1998); *Burlington Industries, Inc .v. Ellerth,* 524 U.S. 742, 759 (1998).

[304] *Faragher*, 524 U.S. at 792.; *Ellerth*, 524 U.S. at 765.

EXHIBIT 27

supervisor harassment claim if it can show that it took reasonable care to prevent sexual harassment and to correct sexual harassment and that the employee unreasonably failed to avail himself or herself of any avenues provided by the employer to correct or address harassment.[305] All of this is sharply different from the *clearly* unreasonable/deliberate indifference standard set out in the proposed rule.

As set out in detail above, the proposed rules require procedurally burdensome processes to address sexual harassment, like cross-examination and live hearings, which would delay schools' prompt responses to employee complaints. And just as they subject students with sexual harassment complaints to uniquely hostile and burdensome proceedings, the proposed rules appear to require schools to institute more complainant-hostile processes for employee sexual harassment matters than other discrimination-related matters and other employee misconduct matters, opening them to possible Title VII liability for discrimination on the basis of sex. Moreover, courts might easily conclude that it would not be unreasonable for an employee to decline to avail himself or herself of these uniquely complainant-hostile proceedings, which would mean that employers relying on such proceedings to address employee complaints of sexual harassment would have no affirmative defense available in cases of sexual harassment by a supervisor.[306]

Most fundamentally, analysis of the numerous differences between the sexual harassment standards mandated in the proposed rules and the sexual harassment standards required by Title VII actually *understates* the mismatch between the proposed rules and the employment context, because (in sharp contrast to the approach taken by the proposed rules) Title VII in no way prohibits employers from taking action to address harassment that does not rise to a level that is not yet actionable under Title VII. To the contrary, employers are consistently encouraged, by the Equal Employment Opportunity Commission, by employment lawyers, and by human resources professionals, to intervene to address harassment long before it rises to such a level, in order to promote an inclusive and productive workplace culture, as well as to minimize the likelihood that harassment ever becomes so severe or pervasive as to alter an employee's workplace conditions and expose an employer to liability.[307] The proposed rules are absolutely contrary to these principles.

While one might argue that the boilerplate language in the proposed rules indicating that nothing therein derogates employee Title VII rights means that schools may disregard the requirements set out in the proposed rules when considering employee complaints of sexual harassment, schools choosing this path would run significant risks. They would invite OCR complaints or lawsuits by harassment respondents alleging that their Title IX rights under the proposed regulations had been violated. Such a legal challenge by respondents would no doubt rely heavily upon the Department's suggestion that any deviation from the proposed rules may constitute sex discrimination against respondents in violation of Title IX.[308] The confusion and potential litigation created by the proposed rules threatens harm to employees and employers, serving no one's interest.

---

[305] *Faragher*, 524 U.S. at 805; *Ellerth*, 524 U.S. at 764-65.

[306] *See, e.g.*, *Minarsky v. Susquehanna County*, 895 F.3d 303, 313-14 & n.12 (3d Cir. 2018) ("If a plaintiff's genuinely held, subjective belief of potential retaliation from reporting her harassment appears to be well-founded, and a jury could find that this belief is objectively reasonable, the trial court should not find that the defendant has proven the second *Faragher-Ellerth* element as a matter of law. Instead, the court should leave the issue for the jury to determine at trial.")

[307] *See, e.g.*, U.S. Equal Employment Opportunity Comm'n, *Select Taskforce on the Study of Harassment in the Workplace* (June 2016), https://www.eeoc.gov/eeoc/task_force/harassment/upload/report.pdf; Chai R. Feldblum & Sharon P. Masling, *Convincing CEOs to Make Harassment Prevention a Priority*, SOCIETY FOR HUMAN RESOURCE MANAGEMENT (Nov. 19, 2018), https://www.shrm.org/resourcesandtools/hr-topics/employee-relations/pages/convincing-ceos-to-make-harassment-prevention-a-priority.aspx.

[308] *See* proposed § 106.44(a).

EXHIBIT 27

**VIII.**     **The proposed rules are inconsistent with the Clery Act.**

A number of the Department's proposed rules are inconsistent with the Clery Act, which the Department also enforces, and which also addresses the obligation of institutions of higher education to respond to sexual assault and other behaviors that may constitute sexual harassment, including dating violence, domestic violence, and stalking. First, the proposed rules prohibiting schools from investigating off-campus and online sexual harassment conflict with Clery's notice and reporting requirements. The Clery Act requires institutions of higher education to notify all students who report sexual assault, stalking, dating violence, and domestic violence of their rights, regardless of "whether the offense occurred on or off campus."[309] The Clery Act also requires institutions of higher education to report all sexual assault, stalking, dating violence, and domestic violence that occur on "Clery geography," which includes all property controlled by a school-recognized student organization (such as an off-campus fraternity); nearby "public property"; and "areas within the patrol jurisdiction of the campus police or the campus security department."[310] The proposed rules would undermine Clery's mandate and create a perverse system in which schools would be required to report instances of sexual assault that occur off-campus to the Department, yet would also be required by the Department to dismiss these complaints instead of investigating them.

Second, the Department's definition of "supportive measures" is inconsistent with Clery, which requires institutions of higher education to provide "accommodations" and *protective measures* if "reasonably available" to students who report sexual assault, dating violence, domestic violence, and stalking.[311] The Clery Act does not prohibit accommodations or protective measures that are "punitive," "disciplinary," or "unreasonably burden[] the other party." Third, the proposed rules' unequal appeal rights conflict with the preamble to the Department's Clery rules stating that institutions of higher education are required to provide "an equal right to appeal if appeals are available," which would necessarily include the right to appeal a sanction.[312]

Finally, Clery requires that investigations of sexual assault and other sexual harassment be "prompt, fair, and impartial."[313] But the proposed rules' indefinite timeframe for investigations conflicts with Clery's mandate that investigations be prompt. And the many proposed rules discussed above that tilt investigation procedures in favor of the respondent are anything but fair and impartial.

Although the Department acknowledges that Title IX and the Clery Act's "jurisdictional schemes … may overlap in certain situations,"[314] it fails to explain how institutions of higher education should resolve the conflicts between two different sets of rules when addressing sexual harassment. These different sets of rules would likely create widespread confusion for schools.

**IX.**     **The proposed rules fail to consider federalism principles and ignore the obligations imposed on schools by state and local requirements.**

The proposed rules seek to set a national standard on various matters related to the investigation and adjudication of claims of sexual assault and other forms of sexual harassment by school districts and public and private institutions of higher education. Those same topics are the subject of state, local, and

---

[309] 20 U.S.C. § 1092(f)(8)(C).
[310] 20 U.S.C. § 1092(f)(6)(iii); 20 U.S.C § 1092(f)(6)(iv)); 34 C.F.R. § 668.46(a)).
[311] 20 U.S.C. § 1092(f)(8)(B)(vii); 34 C.F.R. § 668.46(b)(11)(v).
[312] U.S. Dep't of Educ.; Violence Against Women Act; Final Rule, 79 Fed. Reg. at 62752, 62778 (Oct. 20, 2014) (codified at 36 C.F.R. Pt. 668), https://www.gpo.gov/fdsys/pkg/FR-2014-10-20/pdf/2014-24284.pdf.
[313] 20 U.S.C. § 1092(f)(8)(b)(iv)(I)(aa).
[314] 83 Fed. Reg. at 61468.

EXHIBIT 27

tribal laws. Yet, the proposed rules contain no discussion of preemption, contrary to both Executive Order 13132, Executive Order 12988, and the 2009 Presidential Preemption Memorandum, and provide no guidance to institutions bound by state, local, or tribal requirements that run contrary to the proposed rules.

Executive Orders have recognized the special federalism concerns when a federal agency regulates matters that are traditionally reserved to the states. The 2009 Presidential Memorandum requires that "preemption of State law by [federal] executive departments and agencies should be undertaken only with full consideration of the legitimate prerogatives of the States and with a sufficient legal basis for preemption."[315] It is unclear whether by the proposed rules the Department intends to preempt contrary state requirements, but it appears the Department has engaged in no such consideration. The proposed rules ignore the significant efforts states have made to increase student protections from sexual harassment, including sexual assault; in at least 10 states, current statutory provisions do not align with the Department's proposed rules in some way.[316] In fact, recently, 145 state legislators from 40 States plus the District of Columbia submitted a joint comment letter to the Department opposing the proposed rules because, among other things, they claim that the Department ignores the efforts of many states that passed laws addressing sexual harassment in schools.[317] And 48 members of the New York State Legislature, which recently passed strong laws designed to protect college students from sexual harassment, also submitted a letter opposing the proposed rules, calling them "a dangerous attempt to dismantle student protections that would undoubtedly create unnecessary hurdles to combat incidents of rape and sexual assault. . . ."[318] The Council of the District of Columbia also expressed opposition to the proposed rules, stating that they "represent a serious misstep in the ongoing effort to address safety and stop discrimination in education."[319]

For example, proposed § 106.45(b)(4)(i) identifies two—and only two—potential evidentiary standards that a recipient's decision-maker may use to determine whether a respondent has engaged in sexual harassment, as the proposed rules define that term; a "clear and convincing evidence" standard must be used in resolving complaints against students if that standard is used in resolving complaints against employees and a "preponderance of the evidence" standard may only be used if the recipient uses that standard for other conduct code violations that carry the same maximum disciplinary sanction. The proposed rules thus conflict with state laws that require a decision maker to use the "substantial evidence" or "substantial and competent evidence" standard in resolving sexual harassment complaints.[320] These

---

[315] Memorandum from the President for the Heads of Executive Agencies re: Preemption (May 20, 2009).
[316] *See e.g.*, California (Cal. Educ. Code § 67386, Cal. Educ. Code § 66290.1); Connecticut (Conn. Gen. Stat. Ann. § 10a-55m); Hawaii (Haw. Rev. Stat. Ann. § 304A-120), Illinois (110 Ill. Comp. Stat. Ann. 155); Maryland (Md. Code Ann., Educ. § 11-601); New Jersey (N.J. Stat. Ann. § 18A:61E-2); New York (N.Y. Educ. Law §§ 6439-49); Oregon (Or. Rev. Stat. Ann. § 350.255, Or. Rev. Stat. Ann. § 342.704); Texas (Tex. Educ. Code Ann. § 51.9363); and Virginia (Va. Code Ann. § 23.1-806).
[317] Letter from State Legislators to Ass't Sec'y Kenneth L. Marcus at 2 (Jan. 25, 2019), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2019/01/State-Legislator-Comment-Letter-1.25.pdf.
[318] Letter from Members of New York State Legislature to Sec'y DeVos (Jan. 28, 2019), *available at* https://www.nystateofpolitics.com/2019/01/rozic-organizes-push-against-title-ix-changes/.
[319] Comment from Council of District of Columbia to Sec'y Elisabeth DeVos (Jan. 30, 2019), submitted via regulations.gov.
[320] Cal. Educ. Code § 48918(h) ("A decision of the governing board of the school district to expel shall be supported by substantial evidence showing that the pupil committed any of the acts enumerated in Section 48900," including "an allegation of committing or attempting to commit a sexual assault … or to commit a sexual battery"); Kan. Stat. Ann. § 72-6116(a)(8) (student suspension of more than 10 days must be "based on substantial evidence"); *Bd. of Educ. of City Sch. Dist. of City of New York v. Mills*, 741 N.Y.S.2d 589, 591 (App. Div. 2002) (explaining that in New York the "substantial and competent" evidence standard for student suspension proceedings is "imposed by statute," citing State Administrative Procedure Act § 306[1]); Minn. Stat. Ann. § 122A.40(14) ("substantial and competent evidence" before teacher may be terminated); Miss. St. § 37-9-1 ("The standard of proof in all [student] disciplinary proceedings shall be substantial evidence.").

EXHIBIT 27

standards have been interpreted to be less burdensome than the "preponderance of evidence" standard.[321] The proposed regulations would also seem to conflict with state laws that require that schools *always* use of preponderance of the evidence standard for making determinations in sexual harassment matters.[322] Depending on whether that recipient uses the preponderance standard for other conduct code violations, the law could conflict or not.

Similarly, a state law provision granting a student the right to present the testimony of the student's witnesses by affidavit appears to conflict with proposed § 106.45(b)(3)(vii)'s prohibition against relying on any statement of a person who does not submit to cross-examination.[323]

These are only a few examples. No doubt an exhaustive search of the statutes and regulations of every State, tribe, and locality would produce more. Yet the Department does not appear to have undertaken any such search. Executive Order 13132 anticipated precisely the problem of potential contradictory regulatory obligations by requiring the Department to consult with elected[324] (not non-elected)[325] state and local officials "early in the process of developing the proposed regulation," and to publish a federalism summary impact statement. Executive Order 13175 imposes the same early consultation and impact statement requirements for preemption of Tribal laws.[326] The burden to obtain the relevant information is the Department's.

The proposed rules also fail to meet the requirements imposed on the Department regarding regulations that may have preemptive effect and give no guidance to schools that must navigate contradictory legal obligations. First, the proposed regulations fail to specify "in clear language the preemptive effect, if any, to be given the regulation[s],"[327] in violation of Executive Order 12988. Second, the implicit regulatory preemption in the proposed regulations does not appear to be "restricted to the minimum level necessary to achieve the objectives of the statute pursuant to which the regulations are promulgated,"[328] in violation of Executive Order 13132. Indeed, given that, as set out above, many of the proposed rules are outside of its regulatory authority to effectuate Title IX, these rules presumably cannot have preemptive effect. However, the lack of clarity the Department provides about the NPRM's intended preemptive effects, if any, would create a source of confusion for schools that are attempting to ensure that they follow state, local, tribal, and federal law.

### X.  **The Department's actions in conducting its cost-benefit analysis violated the Administrative Procedure Act, the Information Quality Act, Executive Order 13563, and Executive Order 12866.**

---

[321] *Mills*, 741 N.Y.S.2d at 591 ("the Court of Appeals has defined substantial evidence as 'less than a preponderance of the evidence …'" but "we are unconvinced that use of the competent and substantial evidence standard risks an erroneous deprivation of the student's liberty and property interests"); Christine Ver Ploeg, *Terminating Public School Teachers for Cause Under Minnesota Law*, 31 WM. MITCHELL L. REV. 303, 313 (2004) ("substantial and competent evidence" standard is "typically viewed as less burdensome than the 'preponderance' standard").

[322] Cal. Educ. Code § 67386(3) (requiring all institutions of higher education that accept state financial assistance to provide that "the standard used in determining whether the elements of the complaint against the accused have been demonstrated is the preponderance of the evidence").

[323] Kan. Stat. Ann. § 72-6116(a)(5) (student potentially subject to suspension of more than 10 days must be granted right "to present the pupil's own witnesses in person or their testimony by affidavit").

[324] Executive Order 13132, §§ 1(d), 6(a), 6(c)(1)-(2).

[325] Office of Management and Budget, *Guidance for Implementing E.O. 13132,* M-00-02, at 4 (Response to Question 8) (Oct. 28, 1999).

[326] Executive Order 13175, § 5(c); Department of Education's Consultation Plan, Part IV.A.1.d.

[327] Executive Order 12988 § 3(b)(2)(A).

[328] Executive Order 13132 § (4)(c).

EXHIBIT 27

The Department claims that the proposed rules would reduce the number of sexual harassment investigations conducted by schools and accordingly would save $286.4 million to $367.7 million over the next 10 years.[329] However, it failed to disclose the data it relied on, failed to assess the accuracy of this data, and failed to account for many significant costs to students and schools imposed by the proposed rules, in violation of the Administrative Procedure Act, the Information Quality Act, Executive Order 13563, and Executive Order 12866.

### A. The Department failed to disclose the information it relied on in developing its proposed rules and failed to assess the quality of this information in violation of the Administrative Procedure Act, Executive Order 13563, and Information Quality Act.

Agencies engaged in rulemaking are required by the Administrative Procedure Act (APA) to disclose "for public evaluation" all reports, studies, and data they relied on,[330] including information used for the Regulatory Impact Analysis required under Executive Order 12866,[331] so that the public can determine whether the agency may be drawing improper conclusions based on erroneous information.[332] Executive Order 13563 also requires agencies to provide the public an opportunity to view online and comment on "all pertinent parts of the rulemaking docket, including relevant scientific and technical findings." The Department has failed to meet both of these requirements. For example, despite referring in the proposed rules' preamble to "public reports of Title IX reports and investigations at 55 [institutions of higher education] nationwide"[333] and a "sample of public Title IX documents"[334] as sources relied upon in creating the proposed rules, the Department did not make these documents available or even identify which schools or reports were reviewed. Similarly, it failed to publish online the underlying data or statistical model used to estimate the number of Title IX investigations currently conducted by schools and the projected cost savings from reducing the number of investigations under the proposed rules.[335] Nor were the "[p]rior analyses" it used in assessing regulatory flexibility made available in the rulemaking docket.[336] As a result of the Department's failures to disclose this information, the public has been denied the opportunity to assess the accuracy of the Department's methodology and conclusions, in violation of the APA and Executive Order 13563.

The APA also requires all agencies to examine the data they use in rulemaking for inaccuracies.[337] The Department is also required under its own Information Quality Act (IQA) guidelines to assess information quality for utility, objectivity, and integrity, where objectivity indicates "accuracy, reliability, and unbiased nature of information."[338] However, in estimating the number of sexual harassment cases that are currently being investigated and that would be investigated under the proposed rules, the Department relied almost exclusively on the Civil Rights Data Collection (CRDC) and the Clery Act,[339] both of which contain serious inaccuracies. It is common knowledge that several portions of

---

[329] 83 Fed. Reg. at 61463, 61484.

[330] *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008).

[331] *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199, 201-202 (D.C. Cir. 2007)

[332] *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1121 (D.C. Cir. 1984).

[333] 83 Fed. Reg. at 61485.

[334] *Id.* at 61487.

[335] *Id.* at 61485-89.

[336] *Id.* at 61490-93.

[337] *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015); *see also id.* ("agencies do not have free rein to use inaccurate data"); *New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992) ("an agency's reliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data is arbitrary" (quotation marks omitted)).

[338] U.S. Dep't of Educ., *Information Quality Guidelines* (effective Oct. 1, 2002), https://www2.ed.gov/policy/gen/guid/infoqualguide.html.

[339] 83 Fed. Reg. at 61485.

EXHIBIT 27

the CRDC contain errors,[340] and, most relevant to the proposed rules, that many school districts consistently and inaccurately report that they receive zero complaints of sexual harassment from students or that no complaints of harassment result in student discipline.[341] Similarly, approximately 90 percent of colleges consistently report in their annual Clery statistics that they received zero reports of rape on their campuses[342]—part of a broader and alarming pattern of underreporting and misreporting of sexual assault that has been well-documented for more than a decade[343] and that is consistent with the Department's own enforcement findings.[344] Yet the Department failed to identify any of these weaknesses in accuracy and reliability of the CRDC and Clery data, a clear violation of both the APA and the Department's own IQA guidelines.

Moreover, statements by Department and Administration officials provide concern about the reliability and biased nature of the data, reports, and studies relied on by the Department in proposing changes to Title IX. Just a few weeks before rescinding two important Title IX guidances on sexual violence and issuing "interim guidance" in advance of these proposed rules, Secretary DeVos lamented that the "devastating reality of campus sexual misconduct" included the "lives of the accused" that had been "lost" and "ruined" and cited examples of purported "due process" failures caused by rescinded guidance, when such "due process" failures would actually have been in violation of the rescinded guidance.[345] In that same speech, she diminished the full range of sexual harassment that deprives

---

[340] *See, e.g.,* Evie Blad, *How Bad Data from One District Skewed National Rankings on Chronic Absenteeism,* EDUCATION WEEK (Jan. 9, 2019) http://blogs.edweek.org/edweek/rulesforengagement/2019/01/chronic_absenteeism.html; Anya Kamenetz, *The School Shootings that Weren't,* NATIONAL PUBLIC RADIO (Aug. 27. 2018),
https://www.npr.org/sections/ed/2018/08/27/640323347/the-school-shootings-that-werent; Andrew Ujifusa & Alex Harwin, *There Are Wild Swings in School Desegregation Data. The Feds Can't Explain Why,* EDUCATION WEEK (May 2, 2018), https://www.edweek.org/ew/articles/2018/05/02/there-are-wild-swings-in-school-desegregation.html.
[341] *See, e.g.,* AAUW, *Three-Fourths of Schools Report Zero Incidents of Sexual Harassment in Grades 7-12* (Oct. 24, 2017), https://www.aauw.org/article/schools-report-zero-incidents-of-sexual-harassment https://www.aauw.org/article/schools-report-zero-incidents-of-sexual-harassment; Lisa Maatz, AAUW, *Why Are So Many Schools Not Reporting Sexual Harassment and Bullying Allegations?,* HUFFINGTON POST (October 24, 2016), https://www.huffingtonpost.com/lisa-maatz/why-are-so-many-schools-n_b_12626620.html; AAUW, *Two-Thirds of Public Schools Reported Zero Incidents of Sexual Harassment in 2013–14* (July 12, 2016), https://www.aauw.org/article/schools-report-zero-sexual-harassment.
[342] *See, e.g.,* AAUW, *89 Percent of Colleges Reported Zero Incidents of Rape in 2015* (May 10, 2017), https://www.aauw.org/article/clery-act-data-analysis-2017; AAUW, *91 Percent of Colleges Reported Zero Incidents of Rape in 2014* (Nov. 23, 2015), https://www.aauw.org/article/clery-act-data-analysis.
[343] *See, e.g.,* California State Auditor, *Clery Act Requirements and Crime Reporting: Compliance Continues to Challenge California's Colleges and Universities,* Report 2017-032 (May 2018); National Academies of Sciences, Engineering, and Medicine, *Innovations in Federal Statistics: Combining Data Sources While Protecting Privacy* 44 (2017) ("the data on sexual violence reported by many institutions in response to the [Clery] act's requirements is of questionable quality"); Corey Rayburn Yung, *Concealing Campus Sexual Assault: An Empirical Examination,* 21 PSYCHOLOGY, PUBLIC POLICY, AND LAW 1 (Feb. 2015) ("[T]he ordinary practice of universities is to undercount incidents of [on-campus] sexual assault. Only during periods in which schools are audited [by the Department of Education for Clery Act compliance] do they appear to offer a more complete picture of sexual assault levels on campus. Further, the data indicate that the [Department audit] has no long-term effect on the reported levels of sexual assault, as those crime rates returned to previous level after an audit was completed."); James Guffey, *Crime on Campus: Can Clery Act Data from Universities and Colleges be Trusted?,* 9 ASBBS EJOURNAL 51 (Summer 2013) ("under-reporting of burglary and rape among Clery Act required universities is significant"); Kristen Lombardi & Kristin Jones, *Campus Sexual Assault Statistics Don't Add Up: Troubling Discrepancies in Clery Act Numbers,* CTR. FOR PUBLIC INTEGRITY (Dec. 2, 2009) [last updated Mar. 26, 2015] [hereinafter *Campus Sexual Assault Statistics Don't Add Up*] ("But there's little doubt that the differing interpretations of the law are sowing confusion — with one school submitting sexual assault statistics beyond what's required and another the bare minimum. Ultimately, these loopholes, coupled with the law's limitations, can render Clery data almost meaningless."), https://publicintegrity.org/education/sexual-assault-on-campus/campus-sexual-assault-statistics-dont-add-up; Heather M. Karjane, et al., *Campus Sexual Assault: How America's Institutions of Higher Education Respond* viii (Oct. 2002) ("Only 36.5 percent of schools reported crime statistics in a manner that was fully consistent with the Clery Act.").
[344] *Campus Sexual Assault Statistics Don't Add Up, supra* note 343 ("Nearly half of the 25 Clery complaint investigations conducted by the Education Department over the past decade [1999-2009] determined that schools were omitting sexual offenses collected by some sources or failing to report them at all.").
[345] *DeVos Prepared Remarks, supra* note 11.

EXHIBIT 27

students of equal access to educational opportunities, claiming, "if everything is harassment, then nothing is."[346] While heading the Department's Office for Civil Rights and just a few months before the 2011 and 2014 guidance documents were rescinded, former Acting Assistant Secretary Candice Jackson, reinforced the myth of false accusations, claiming that "90 percent" of her office's Title IX investigations were the result of "drunk[en]" sexual encounters and regret[347] and requiring her staff to read excerpts from a book that baselessly labeled college campuses as "a secret cornucopia of accusation."[348]

Other officials in this Administration have propagated rape myths about false accusations and victim-blaming, again raising questions about the integrity of the information relied on by government officials in developing proposed changes to the Title IX rules. Neomi Rao, Administrator of Office of Information and Regulatory Affairs when the office approved the Department's proposed Title IX rules for publication, claimed in her college newspaper that "if [a woman] drinks to the point where she can no longer choose, well, getting to that point was part of her choice."[349] In another article, Ms. Rao questioned the "feminist chant that women should be free to wear short skirts or bright lipstick" and echoed Ms. Jackson's rhetoric about false accusations stemming from regret, claiming that "casual sex for women often leads to regret" and causes them to "run from their choices."[350] Ms. Rao also wrote dismissively about "sexual and racial oppression," framing them as merely "[m]yths" that "create hysteria" from "whining new group[s]."[351] While these statements were made years ago during Ms. Rao's time in college, these remarks, particularly when paired with OIRA's failure to take into account the costs that the proposed rules would impose on victims of harassment and assault (as detailed below) raise significant questions regarding her judgment on these matters.

Finally, the president himself has encouraged these harmful and false rape myths. Not only has he openly bragged about "grab[bing]" women by their genitalia,[352] but he also continues to deny the experiences of women and girls who have experienced sex-based harassment and violence. When at least 16 women alleged that he sexually harassed them, he claimed that "every woman lied"[353] and later formalized his assertion into an official White House statement.[354] When White House officials Rob Porter and David Sorensen resigned amidst reports that they had committed gender-based violence, the president tweeted: "Peoples [sic] lives are being shattered and destroyed by a mere allegation. … There is no recovery for someone falsely accused—life and career are gone. Is there no such thing any longer as Due Process?"[355]

[346] *Id.*

[347] Green & Stolberg, *supra* note 12.

[348] Democracy Forward, *Advocacy Groups Advance Legal Fight Against Secretary DeVos's Unconstitution Rollback of Survivor Protections* (Jan. 14, 2019), https://democracyforward.org/updates/advocacy-groups-advance-legal-fight-against-secretary-devoss-unconstitutional-rollback-of-survivor-protections.

[349] Neomi Rao, *Shades of Gray*, YALE HERALD (Oct. 14, 1994), https://assets.documentcloud.org/documents/5684266/01-Shades-of-Gray-Neomi-Rao.pdf.

[350] Neomi Rao, *"The Feminist Dilemma"*, *supra* note 13.

[351] Neomi Rao, *Submission, Silence, Mediocrity*, YALE FREE PRESS (Nov. 1993), https://www.documentcloud.org/documents/5684271-Rao-Submission-Silence-Mediocracy.html.

[352] Derek Hawkins, *Billy Bush says there were 8 witnesses to Trump's 'Access Hollywood' comments*, WASH. POST (Dec. 4, 2017), https://www.washingtonpost.com/news/morning-mix/wp/2017/12/03/he-said-it-billy-bush-reiterates-that-trumps-access-hollywood-tape-is-real.

[353] Ben Jacobs, *Trump Uses Gettysburg Address to Threaten to Sue Sex Assault Accusers,* THE GUARDIAN (Oct. 22, 2016), https://www.theguardian.com/us-news/2016/oct/22/donald-trump-gettysburg-contract-with-america-sue-accusers-hillary-clinton.

[354] John Wagner, *All of the Women Who Have Accused Trump of Sexual Harassment Are Lying, the White House Says*, WASH. POST (Oct. 27, 2017), https://www.washingtonpost.com/news/post-politics/wp/2017/10/27/all-of-the-women-who-have-accused-trump-of-sexual-harassment-are-lying-the-white-house-says.

[355] Donald Trump (@realDonaldTrump), TWITTER (Feb. 10, 2018), https://twitter.com/realDonaldTrump/status/962348831789797381.

EXHIBIT 27

In the context of these and countless other biased, rape-apologist statements made by the Department and the Administration, it is even more troubling that the Department failed to disclose or assess the credibility of the data, reports, and studies it relied on during this rulemaking process.

**B.    The Department failed to identify significant costs that the proposed rules would inflict on students who experience sexual assault or other sexual harassment, in violation of Executive Order 12866.**

Executive Order 12866 requires agencies to assess all costs and benefits of a proposed rule "to the fullest extent that these can be usefully estimated." However, the Department failed to identify any costs of the proposed rules to students or employees who experience sexual harassment and failed to recognize that the proposed rules would not reduce costs but simply shift costs from schools to victims of sexual harassment.[356] Nor did the Department acknowledge that it is inappropriate to prioritize cost savings at all over educational harm to students; after all, the Department, in enforcing Title IX, is charged with preventing and remedying sex discrimination in education, not reducing costs to schools.[357] Contrary to the Department's unjustified assumption that "the underlying rate of sexual harassment" would be reduced,[358] the proposed rules would in fact allow bad actors to engage in repeated and persistent harassment with impunity, thereby increasing the underlying rate of harassment and its associated costs to those who experience it.

Sexual assault inflicts enormous costs on survivors. A single rape can cost a survivor between $87,000 and $240,776.[359] Survivors are also three times more likely to suffer from depression, six times more likely to have PTSD, 13 times more likely to abuse alcohol, 26 times more likely to abuse drugs, and four times more likely to contemplate suicide.[360] The lifetime costs of intimate partner violence, which can constitute sexual harassment in educational settings, including related health problems, lost productivity, and criminal justice costs, can total $103,767 for women and $23,414 for men.[361] The Centers for Disease Control and Prevention estimates that the lifetime cost of rape is $122,461 per survivor, resulting in an annual national economic burden of $263 billion and a population economic burden of nearly $3.1 trillion over survivors' lifetimes.[362] More than half of this cost is due to loss of workplace productivity, and the rest due to medical costs, criminal justice fees, and property loss and damage.[363] About one-third of the cost is borne by taxpayers.[364] None of these costs, nor the significant costs to those suffering sexual harassment short of sexual assault, are mentioned in the rulemaking docket.

The Department also ignores the specific costs that students face when they are sexually assaulted. Although it acknowledges that 22 percent of survivors seek psychological counseling, 11 percent move residence, and 8 percent drop a class, it declined to analyze whether the proposed rules

---

[356] *See* Grossman & Brake, *supra* note 90 ("Costs are not saved, but shifted.").

[357] *See* Grossman & Brake, *supra* note 90 ("[t]he Department of Education is not a neutral beancounter.").

[358] 83 Fed. Reg. at 61485.

[359] White House Council on Women and Girls, *Rape and Sexual Assault: A Renewed Call to Action* 15 (Jan. 2014), https://www.knowyourix.org/wp-content/uploads/2017/01/sexual_assault_report_1-21-14.pdf.

[360] Feminist Majority Foundation, *Fast facts - Sexual violence on campus* (2018), http://feministcampus.org/wp-content/uploads/2018/11/Fast-Facts.pdf.

[361] Inst. for Women's Policy Research, *Dreams Deferred: A Survey on the Impact of Intimate Partner Violence on Survivors' Education, Careers, and Economic Security* 8 (2018), https://iwpr.org/wp-content/uploads/2018/10/C474_IWPR-Report-Dreams-Deferred.pdf.

[362] Cora Peterson et al., *Lifetime Economic Burden of Rape Among U.S. Adults*, 52(6) Am. J. Prev. Med. 691, 698, (2017), *available at* https://stacks.cdc.gov/view/cdc/45804/cdc_45804_DS1.pdf.

[363] *Id.* at 691.

[364] *Id.* at 691.

EXHIBIT 27

would detrimentally affect student survivors' need to access mental health services, seek alternative housing, or withdraw from a course or from school.[365] Nor did the Department attempt to calculate any other incremental costs to those who experience sexual harassment, such as medical costs for physical and mental injuries; lost tuition and lower educational completion and attainment for those who are forced to withdraw from a class, change majors, or drop out, because their school refused to help them; lost scholarships for those who receive lower grades as a result of sexual violence or other sexual harassment; and defaults on student loans as a result of losing tuition and/or scholarships. Each of these omissions is a violation of Executive Order 12866. The harm to those affected by sexual harassment literally did not enter into the Department's calculations.

### C. The Department inflated schools' estimated cost savings in violation of Executive Order 12866.

The Department significantly inflated the current number of Title IX investigations in order to inflate the "cost savings" of reducing these investigations. To estimate the number of Title IX investigations at institutions of higher education, the Department relied on a 2014 Senate report that allowed institutions of higher education to report whether they had conducted "0," "1," "2-5," "6-10," or ">10" investigations of sexual violence in the previous five years.[366] Without justification or indeed any explanation whatsoever, the Department rounded up for each of these categories. If a school reported that it had conducted "2-5" or ">10" investigations, the Department inputed "5" and "50," respectively, into its model,[367] far higher than the medians of 3.5 and 30 investigations for those two categories.[368] Elsewhere, the Department inexplicably assumed that there are twice as many "sexual harassment investigations" as there are "sexual misconduct investigations," without defining what these terms mean.[369] As a result, the "estimate" that each institution of higher education conducts 2.36 investigations per year is highly inflated. It follows that the Department's estimated "cost savings" from reducing the number of investigations at institutions of higher education is also significantly inflated.

A similar method is used to inflate the current number of Title IX investigations in elementary and secondary schools. The Department knows that many elementary and secondary schools fail to investigate known reports of sexual violence. In September 2017, it was investigating 135 school districts for failing to address 153 cases of sexual violence.[370] In 2018, it withdrew partial funding from the Chicago Public Schools for Title IX violations, including failing to address nearly 500 complaints of student-on-student sexual violence in less than 3 months and 624 sexual assault complaints in a single semester.[371] Yet the Department assumed that the number of reports of sex-based harassment that each school reported in the CRDC was equal to the number of investigations conducted by each school district.[372] As a result, the "estimate" that each school district conducts 3.23 investigations per year and the "cost savings" of reducing this number are both significantly inflated.

Inflated estimates aside, the Department's goal of reducing costs to schools by reducing the number of Title IX investigations is contrary to the purpose of Title IX and would make schools more

---

[365] 83 Fed. Reg. at 61487.
[366] 83 Fed. Reg. at 61485.
[367] *Id.* at 61485.
[368] *Id.* at 61485 n.18.
[369] *Id.* at 61485.
[370] U.S. Dep't of Educ., Office for Civil Rights, *List of districts that have open Title IX sexual violence investigations at the elementary/secondary level* (Sept. 6, 2017),
https://mediaassets.scrippsnationalnews.com/cms/dcbureau/SchoolSexAssaults/elementarysecondary.pdf.
[371] Associated Press, *624 sex assault complaints at Chicago schools this semester* (Nov. 29, 2018),
https://apnews.com/ad8c79d567ff461a94642373579bd588.
[372] 83 Fed. Reg. at 61485.

EXHIBIT 27

dangerous for all students. As set out above, sexual assault and other forms of sexual harassment are already vastly underreported. Even when students do report sexual harassment, schools often choose not to investigate their reports. According to a 2014 Senate report cited by the Department,[373] 21 percent of the largest private institutions of higher education conducted fewer investigations of sexual violence than reports received, with some of these schools conducting seven times fewer investigations than reports received.[374] Instead of trying to reduce the number of investigations further, the Department should be working to combat the problems of underreporting and under-investigation.

### D. The Department omitted significant costs to schools in violation of Executive Order 12866.

The Department also failed to consider many new costs to schools that the proposed rules would create. First, it greatly underestimated the total number of hours needed to change schools' internal policies and re-train employees and the associated cost of these hours. The Department assumed without justification that changing schools' internal policies and re-training administrators would require: (i) at the elementary and secondary school level, a total of 24.5 hours for a Title IX coordinator, 16 hours each for the investigator and decisionmaker, 24.5 hours for a lawyer, and two hours for a web developer in elementary and secondary schools; and (ii) in institutions of higher education, a total of 33 hours for a Title IX coordinator, 16 hours each for the investigator and decisionmaker, 49 hours for a lawyer, and two hours for a web developer.[375] But school administrators and survivor advocates know that changing an internal policy can take many months and require the input of a task force comprised of a wide range of stakeholders. As the AASA stated in its comment opposing the proposed rules, "There is a real cost in terms of training and professional development to changing practices and policies that are so embedded into the fabric of the school district that we believe are functional and working."[376]

Second, the Department omitted the cost to schools of students' greater demand for psychological and medical services as a result of being ignored, retraumatized, and punished by their schools when they report sexual harassment. Institutions of higher education are already spending significant amounts of money on campus mental health services; imposing new barriers and creating new stressors would only exacerbate these rising costs.

Third, the Department failed to consider the reality that schools would incur greater litigation costs if they investigated fewer reports of sexual harassment. Even if the rules are finalized, they would not have a dispositive effect on how Title IX claims are decided in private litigation. In a United Educators (UE) study of 305 reports of sexual assault from 104 colleges and universities between 2011 and 2013, more than one in four reports resulted in legal action, costing schools about $200,000 per claim, with 84 percent of costs resulting from claims brought by survivors and other harassment victims.[377] A second UE study of reports of sexual assault during 2011-2015 found that schools lost about $350,000 per claim, with some losses exceeding $1 million and one reaching $2 million.[378] As the AASA explained in its comment, "If [the Department] no longer offers the same remedies and has more stringent standards for enforcing Title IX, then presumably students will find civil litigation to be the better avenue

---

[373] *Id.* at 61485 n.17.
[374] U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, U.S. Senate Subcomm. on Fin. & Contracting Oversight, *Sexual Violence on Campus: How too many institutions of higher education are failing to protect students* 9 (July 9, 2014), https://www.mccaskill.senate.gov/SurveyReportwithAppendix.pdf.
[375] 83 Fed. Reg. at 61486.
[376] AASA Letter, *supra* note 15, at 2.
[377] United Educators, *supra* note 26.
[378] United Educators, *The High Cost of Student-Victim Sexual Assault Claims and What Institutions Can Do* 3 (2017), https://static1.squarespace.com/static/53e530a1e4b021a99e4dc012/t/590501f74402431ac4900596/1493500411575/FN-+RE-+2017.04-+High+Cost+of+Student-Victim+SA+Claims.pdf.

EXHIBIT 27

for addressing their grievances against schools, which could lead to a significant and much costlier redirection of district resources towards addressing Title IX complaints and violations in court."[379] In addition, as set out above, the proposed rules would also expose schools to significant potential Title VII liability due to the conflicts between Title VII and the rules' requirements, and possible liability under contradictory state, local, or tribal standards.

Fourth, the Department failed to adequately consider the costs of mandating live hearings to resolve all formal complaints of sexual harassment that meet the standards set out in the proposed rules. Although the Department notes that 87 percent of institutions of higher education already use a hearing board,[380] it does not describe what hearing procedures are currently implemented at these institutions and fails to consider the additional costs of adopting all of the burdensome and inflexible hearing procedures required by the proposed rules. Associations representing higher education institutions have recently submitted comments to the Department raising concern about mandating live hearings with cross-examination and the costs and burdens this would place on schools. For example, the AAU cited "higher costs associated with the regulation's prescribed quasi-court models,"[381] the AICUM observed that "[s]uch financial costs and administrative burdens may be overwhelming," and the AASA stated that this proposed rule would "place[] a new burden to districts as personnel will need to be trained in how to facilitate and monitor a live hearing and ensure appropriate participation by all parties involved in a live hearing and how to view the evidence that arises during a live hearing."[382]

Finally, the proposed rules would likely cause a significant decrease in application and enrollment rates for both male and female students at schools that "reduce" their Title IX activities. Research shows that students are more likely to apply to and enroll at a school where they know sexual harassment is being addressed and not ignored. For example, a July 2018 study found that schools' application and enrollment rates increased significantly in the one to three years after the Department launched a Title IX investigation.[383] In contrast, the proposed rules seek to decrease the number of Title IX investigations at each school. This sends a signal to students that they will not be safe, and that neither their school nor the Department will intervene to ensure that sexual harassment is being addressed. As a result, schools would likely see a significant decrease in both application and enrollment rates if they adopt the minimal requirements in the proposed rules.

Because of the Department's failure to disclose the data it relied on and failure to assess the accuracy of their data, the public is still unable to meaningfully comment on the cost-benefit analysis conducted by the Department, with the exception of noting all of the costs that the Department should have considered but failed to do.

XI.    **The Department failed to follow proper procedural requirements before issuing these proposed rules.**

A.    **The Department has not complied with Title IV's statutory requirement of delayed effective dates.**

---

[379] AASA Letter, *supra* note 15, at 2.
[380] 83 Fed. Reg. at 61488.
[381] AAU Letter, *supra* note 15, at 4.
[382] AASA Letter, *supra* note 15, at 4.
[383] Jason M. Lindo et al., *Any Press is Good Press? The Unanticipated Effects of Title IX Investigations on University Outcomes*, Nat'l Bureau of Econ. Res. 12-13 (July 2018), *available at* http://www.nber.org/papers/w24852.

EXHIBIT 27

The NPRM states that "the changes made in the regulatory action materially alter the rights and obligations of federal financial assistance under Title IV" of the Higher Education Act.[384] But these regulatory changes are not being adopted in compliance with requirements that apply to all regulations "affecting" Title IV programs.

Title IV requires that "any regulatory changes initiated by the Secretary *affecting the programs under this subchapter* [Title IV] that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date."[385]

Notably, this language is also not limited to regulations that rely on any Title IV provision as their authority for the proposed regulations, despite Congress' use of such language elsewhere.[386] As the NPRM itself acknowledges, these proposed regulations would materially alter the rights and obligations of federal financial assistance under Title IV and thus are plainly "affecting" the programs.[387]

The drafting history confirms Congress's intent that this provision be read broadly. Initially, Section 1089(c)(1) was limited to "regulatory changes initiated by the Secretary affecting the *general administration of* the programs" under Title IV. But Congress struck out the term "general administration" in 1992, thus removing that limitation on coverage. The House Report explained that Congress removed that language because the Secretary had relied on it as an excuse not to engage in negotiated rulemaking on some regulations. The report explained that the Secretary had interpreted this language "too narrowly" so that "only those provisions affecting all programs" were subject to the effective date language. By removing that language, Congress "intend[ed] that the effective dates of *all regulations* on Title IV are driven by the Master Calendar requirements."[388]

### B. The Department failed to obtain approval from the Department of Justice or work with the Small Business Administration, contrary to executive orders and statute.

The Department appears to have made no effort to work with other federal agencies as required by law and executive order.

#### 1. *Executive Order 12250 requires approval of proposed regulations by the Attorney General prior to publication.*

Executive Order 12250 requires any NPRM that addresses sex discrimination under Title IX to be reviewed and approved by the Attorney General prior to its publication in the Federal Register.[389] That authority (although not the authority to approve final regulations) has been delegated to the Assistant Attorney General for Civil Rights.[390] The Attorney General's input and consideration is crucial, as the Department of Justice is regularly involved in interpreting and enforcing Title IX rules.

---

[384] 83 Fed. Reg. at 61483.
[385] 20 U.S.C. § 1089(c)(1).
[386] *See*, *e.g.*, 20 U.S.C. §§ 1090(b) (governing regulations "promulgated pursuant to this subchapter"), 1090(e)(6) ("regulations prescribed under this subchapter"), 1091(e) ("regulations issued under this subchapter"), 1094(c)(1) & (c)(3)(B)(i)(I) (prescribed).
[387] 83 Fed. Reg. at 61483.
[388] Both quotations in this paragraph are from H.R. Rep. 102-447, 76-77, 1992 U.S.C.C.A.N. 334, 409-410. In the second quotation, emphasis was added.
[389] Executive Order 12250 §§ 1-202, 1-402.
[390] 28 C.F.R. § 0.51(a).

EXHIBIT 27

There is no indication in the proposed rules that this requirement was met. Indeed, there is no mention of this Executive Order in the NPRM at all. This omission may be one reason why, as we note later in this comment, there has been no attempt to address to how these proposed changes will interact with the Title IX regulations of other federal agencies, including when recipients receive financial assistance both from the Department and from other agencies and thus are simultaneously bound by inconsistent and contradictory Title IX regulations. As an example, the Department of Education's proposed Title IX rules are inconsistent with the USDA's Title IX rules.[391]

Further, close coordination with the Department of Justice is crucial with regard to Title IX and sexual harassment in particular. For example, the Solicitor General of the United States previously informed the Supreme Court that it was the view of the United States that the deliberate indifference standard identified in *Gebser* did not apply to a federal agency enforcing Title IX administratively[392] and the Department of Justice has stated the same conclusion in its Title IX Legal Manual.[393] As a further example, in the Title IX context, Department of Justice has also encouraged agencies to seek damages for victims of discrimination in agency enforcement proceedings, in contrast to the prohibition on assessment of damages in the proposed rule.[394] The Department of Justice should necessarily be involved in any reversal of these and other positions by the proposed rule.

### 2. The Regulatory Flexibility Act and Executive Order 13272 require notification of the Small Business Administration early in the regulatory process.

The Regulatory Flexibility Act (RFA)[395] and Executive Order 13272 are intended to ensure that federal agencies consider the effect of proposed regulations on small governmental and private entities. This consideration is particularly important for proposed rules like these, which would dramatically impact small schools and school districts. To further that goal, both the statute and executive order require the Department to involve the Chief Counsel for Advocacy (Chief Counsel) of the Small Business Administration at critical stages. (Other obligations of the RFA and Executive Order 13272 will be discussed later in this comment).

The NPRM contained an initial regulatory flexibility analysis (IFRA).[396] But the NPRM did not say that the Department had shared a draft IFRA with the Chief Counsel when the Department submitted its draft rule to Office of Information and Regulatory Affairs of the Office of Management and Budget (OIRA) under Executive Order 12866 (i.e., August 31, 2018), as required by Executive Order 13272 § 3(b).

The NPRM also did not say that the Department was transmitting a copy of the IFRA to the Chief Counsel after it was published in the Federal Register, as required by the RFA.[397] Absent such

---

[391] *See*. 7 C.F.R. § 15a.110(b) (proposed § 106.3(a) is inconsistent with USDA rule on remedial action); 7 C.F.R. §§ 15a.135, 15a.140 (proposed § 106.8 is inconsistent with USDA rules on designation of responsible employee and adoption of grievance procedures); 7 C.F.R. § 15a.205 (proposed § 106.12(b) is inconsistent with USDA rule on religious exemptions).

[392] U.S. *Amicus* Brief, *Davis v. Monroe County Bd. of Educ.*, No. 97-843, at 19-25 (Nov. 1998).

[393] Dep't of Justice, *Title IX Legal Manual*, https://www.justice.gov/crt/title-ix ("Importantly, for purposes of administrative enforcement of Title IX and as a condition of receipt of federal financial assistance—as well as in private actions for injunctive relief—if a recipient is aware, or should be aware, of sexual harassment, it must take reasonable steps to eliminate the harassment, prevent its recurrence and, where appropriate, remedy the effects.").

[394] *Id.* ("[A]gencies are encouraged to identify and seek the full complement of relief for complainants and identified victims, where appropriate, as part of voluntary settlements, including, where appropriate, not only the obvious remedy of back pay for certain employment discrimination cases, but also compensatory damages for violations in a nonemployment context.").

[395] 5 U.S.C. § 601 et al.

[396] *See* 83 Fed. Reg. at 61490-493.

[397] 5 U.S.C. § 603(a).

EXHIBIT 27

transmission, the Chief Counsel had no formal notice of the NPRM and thus missed its opportunity to comment on behalf of affected smaller entities. This is more than a hypothetical possibility, given the Chief Counsel's recent objections to other Department NPRMs.[398] And while other commenters might be able to raise the same concerns (if they had been properly notified), the Department is required to give "every appropriate consideration" to the Chief Counsel's views,[399] and to issue a "detailed statement of any change made to the proposed rule in the final rule as a result of the comments."[400]

### C.  The Department failed to engage in required consultation with Native American tribes and small entities.

The NPRM identified the types of stakeholders with whom it purportedly conducted listening sessions and discussion.[401] Notably absent from those lists were officials from Indian Tribes and small entities. Those omissions reflect a violation of Executive Order 13175 and the Regulatory Flexibility Act.

### 1.  *The Department failed to consult Indian Tribal Governments in violation of Executive Order 13175 and the Department's consultation policy.*

Title IX applies to any recipient that receives federal financial assistance for an education program or activity, including education programs or activities operated by Indian Tribes.[402] More than 25,000 students attend more than 125 school districts controlled by tribes and there are 17,000 students enrolled in more than 30 institutions of higher education controlled by tribes.[403] Of these students, Native girls ages 14-18 are more than twice as likely as the average girl aged 14-18 (11 percent versus 6 percent) to be forced to have sex when they do not want to do so.[404] The proposed rules would dictate how school districts and colleges operated by Indian Tribes would have to adjudicate allegations of sexual harassment, including sexual violence.

These proposed rules have tribal implications and thus require consultation with tribal officials under section 5(a) of Executive Order 13175. The Department does not appear to have met any of the requirements of its own Consultation Plan: there is no indication that the Department notified potentially affected Indian tribes in writing that the proposed rules have tribal implications and gave them at least 30 days to prepare for a consultation activity (IV.B.); that the Department engaged in any of the specified consultation mechanisms (IV.A.2 & C); or that the Department diligently and serious considered tribal views (IV. preamble & D). Merely allowing comment on the NPRM now is plainly not sufficient to meet these obligations.

Further, as discussed previously, these proposed rules may conflict with Tribal laws, and thus the Department was required to consult with tribal officials "early in the process of developing the proposed regulation."[405] There is no evidence that the Department did so, to its detriment.

---

[398] Letter from Small Bus. Admin. to Sec'y Elisabeth DeVos (Aug. 30, 2018), *available at* https://www.sba.gov/advocacy/8-30-18-comments-general-provisions-federal-perkins-loan-program-federal-family-education.
[399] Executive Order 13272 § 3(c).
[400] 5 U.S.C. § 604(a)(3).
[401] 83 Fed. Reg. at 61463-464.
[402] *See* Office of Legal Counsel, U.S. Dep't of Justice, *Applicability of Section 504 of the Rehabilitation Act to Tribally Controlled Schools*, 28 Opinions of Office of Legal Counsel 276 (Nov. 16, 2004); U.S. Dep't of Educ., Office for Civil Rights, *Office for Civil Rights Jurisdiction Over Tribally Controlled Schools and Colleges* and accompanying *Questions and Answers Regarding Tribally Controlled Schools and Colleges* (Feb. 14, 2014).
[403] U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers Regarding Tribally Controlled Schools and Colleges* (Response to Question 1) (Feb. 14, 2014).
[404] *Let Her Learn: Sexual Harassment and Violence*, *supra* note 17, at 3.
[405] Executive Order 13175 § 5(c)(2); Dep't of Educ.'s Consultation Plan, Part IV.A.1.d.

EXHIBIT 27

Given the important government-to-government relationship that has been recognized by the United States with tribal sovereigns, it is particularly concerning that the Department would engage in such a significant matter without full consultation with tribal leaders. The NPRM should be withdrawn until such consultations can occur.

### 2. The Department failed to consult small entities in violation of the RFA.

Title IX applies to a diverse range of school districts and institutions of higher education. As required by the RFA,[406] the NPRM contains an estimate of the number of small entities to which the proposed rule will apply. The NPRM estimates that the overwhelming majority of school districts (more than 99 percent) are small entities;[407] and that 68 percent of all two-year institutions of higher education and 43 percent of all four-year institutions of higher education are small entities.[408] The Department did not certify that the regulations, if promulgated, would not have a significant economic impact on small entities.[409] Thus, the Department implicitly found that the regulations would have a significant economic impact. To the extent the Department did not expressly make such a finding because it estimated that small entities would experience a net cost savings, that would disregard the plain text of the statute; the statute does not require that the economic impact be adverse in order to trigger the RFA's requirements.[410] And it is clear from the proposed rules that small entities *will* have to invest significant resources to develop new processes required by the NPRM, like live hearings. Indeed, schools and member organizations representing school administrators and institutions have expressed concern about the costs inherent in the proposed rules' various procedural requirements.[411] The fact that the NPRM does not address these perceived costs demonstrates that the Department did not meaningfully consult with small entities before publishing the proposed rules.

When a proposed rule has a significant economic impact on a substantial number of small entities, the RFA requires the promulgating agency to give those small entities "an opportunity to participate in the rulemaking for the rule through the reasonable use of techniques such as—

> (1) the inclusion in an advance notice of proposed rulemaking, if issued, of a statement that the proposed rule may have a significant economic effect on a substantial number of small entities;
> (2) the publication of general notice of proposed rulemaking in publications likely to be obtained by small entities;
> (3) the direct notification of interested small entities;
> (4) the conduct of open conferences or public hearings concerning the rule for small entities including soliciting and receiving comments over computer networks; and
> (5) the adoption or modification of agency procedural rules to reduce the cost or complexity of participation in the rulemaking by small entities.[412]

The Department does not appear to have engaged in any such techniques. The NPRM itself is silent on any steps it took to notify small entities of the NPRM. Contrary to the mandatory requirements of the RFA, the Department did nothing special to notify and solicit comments from small entities. The

---

[406] 5 U.S.C. § 603(b)(3).
[407] 83 Fed. Reg. at 61490.
[408] *Id.* at 61491.
[409] *Cf.* 5 U.S.C. § 605(b).
[410] U.S. Small Bus. Admin., Office of Advocacy, *A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act* 20 n.70, 23-24 (Aug. 2017).
[411] *See supra* note 15.
[412] 5 U.S.C. § 609(a).

EXHIBIT 27

Federal Register notice alone was not sufficient, otherwise Section 609(a) would have no meaning. This statutory violation requires, at a minimum, a second round of comments after the Department has used reasonable techniques to notify small entities of the opportunity to participate in the rulemaking.

**D.   The Department did not assess how these proposed rules would interact with other civil rights statutes enforced by the Department and the regulations enforced by other federal agencies.**

The NPRM proposes significant changes to the Department's Title IX regulations. But those regulations are part of a complicated web of non-discrimination obligations involving not only sex, race and disability discrimination provisions enforced by the Department but also involving sex discrimination regulations enforced by more than two dozen other federal agencies – many of which fund the same educational institutions as the Department.

*1.   Any proposed solution should not treat claims of sexual harassment differently than claims of racial or disability harassment.*

The Department's proposed rules solely address sex discrimination, including sexual harassment, under Title IX. But the Department previously has interpreted the protections under Title IX, Title VI of the Civil Rights Act (race, color, and national origin), and Section 504 of the Rehabilitation Act (disability) as a piece.[413] There is no reason, for example, why a named sexual harasser should be given more protections by the Department than a named anti-Semitic harasser, or why an employee who sexually harasses students enjoys greater protections than an employee who racially harasses students.

But the Department's Assistant Secretary for Civil Rights Kenneth Marcus recently held, in his appellate role, that Title VI itself requires schools to respond to complaints of racial discrimination and harassment in a way significantly at odds with the obligations in the proposed rules.[414] The Assistant Secretary held that a school's "failure to consider" relevant evidence "when presented" by a student (or, more precisely, when the student tried to discuss the evidence "or otherwise present their position") "fall[s] short of an appropriate response to student complaints of harassment." This was so even though the Department's Title VI regulations do not expressly require the establishment of "prompt and equitable" grievance proceedings.

The Assistant Secretary also concluded that a school's failure to respond appropriately to an act of race or national origin discrimination (in that case, at a single event, charging students who were perceived to be Jewish $5 to attend a lecture, but waiving the fee for other students) could result in the creation of a hostile environment in violation of Title VI. The Assistant Secretary further held that it was "immaterial" whether the discriminatory activity was conducted by other students "or a third party outside group" because both "would have been arguably accountable to the University in the context of these facts." And the Assistant Secretary, without mentioning the need to find deliberate indifference, remanded the case back for his staff to determine whether a hostile environment on the basis of national origin or race in violation of Title VI "existed" at the University at the time of the event (2011). Finally, the Assistant Secretary held that a school that is on notice of discriminatory conduct on campus must "take appropriate responsive action" to "eliminate any hostile environment."

These legal standards—which Assistant Secretary Marcus apparently viewed as flowing from the statute, since no regulations are cited—are sharply distinct from the different standards proposed for Title

---

[413] *See, e.g.*, 2001 Guidance, *supra* note 58.
[414] Letter from Kenneth L. Marcus, Assistant Secretary re: Appeal of OCR Case No. 02-11-2157 (Rutgers University) (Aug. 27, 2018).

EXHIBIT 27

IX, demonstrating the impropriety of the proposed rules, as Title VI has long been understood to be a key touchstone for the interpretation of Title IX.[415] The Department's attempt to sharply divorce the standards schools are instructed apply in analogous circumstances of harassment and discrimination is inequitable, unjustified, and will sow confusion among those charged with enforcing these and complying with these inconsistent obligations.

> *2.   Any changes to the Title IX regulations should be done in coordination with the more than 20 other federal agencies that have Title IX regulations.*

The proposed rules ignore the fact that more than twenty federal agencies have promulgated Title IX regulations and most of those agencies all provide financial assistance to school districts, colleges, and universities, who are therefore bound by multiple agencies' Title IX rules. Most of those other agencies adopted their virtually identical final Title IX regulations based on a single common NPRM. Those twenty-plus final regulations were themselves closely modeled on the Department's regulation.

The Department acknowledges that the standards in its proposed rules around sexual harassment are not legally required and that it "could have chosen to regulate in a somewhat different manner."[416] That necessarily means that other federal agencies are free to maintain their existing Title IX regulations and enforce them in a manner consistent with the Department's earlier interpretations. If that happens, an educational institution could be subjected to conflicting obligations. And there is reason to think it is likely to happen, as the National Science Foundation has already publicly committed to focusing on sexual harassment by college and university grant recipients.[417]

The Regulatory Flexibility Act requires the Department to identify and address "all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule,"[418] and Executive Order 12866 requires it to "avoid regulations that are inconsistent, incompatible, or duplicative with … those of other Federal agencies."[419] The Department has failed to comply with this mandate.

### E.   The Department provided an inadequately short time period for public comment despite repeated, reasonable requests for an extension.

Throughout the comment period, advocates, students, members of congress, and members of the public requested extensions to the comment period, with no response. The Center and over 100 organizations, as well as thousands of students and members of the public, noted that the 60-day comment period was opened in the midst of the holiday season. This was a particularly busy time for students, who were juggling final exams, preparations for winter break, and traveling home for the holidays. Teachers and school administrators were similarly overburdened. Due to the inopportune timing of the comment period and due to the sheer magnitude of the proposed changes, a meaningful extension of the comment period would have been the only way to ensure that the public had a real opportunity to comment.

Further still, in the middle of the comment period, this Administration began the longest government shutdown in our nation's history. Starting on December 22, 2018 and ending on January 25, 2019, the partial government shutdown has impacted roughly a quarter of federal agencies. There was not

---

[415] *See, e.g., U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 600 n.4 (1986); *Grove City Coll. v. Bell*, 465 U.S. 555, 566 (1984) (Title IX was patterned after Title VI).
[416] 83 Fed. Reg. at 61466 (actual knowledge), 61468 (deliberate indifference).
[417] Nat'l Science Found., *NSF Announces New Measures to Protect Research Community From Harassment* (Sept. 19, 2018), https://www.nsf.gov/od/odi/harassment.jsp.
[418] 5 U.S.C. § 603(b)(5).
[419] Executive Order 12866 § 1(b)(10).

EXHIBIT 27

a definitive statement from administration officials as to whether public comments, or requests for agency action were being accepted and considered by agency officials during the shutdown. It was unclear whether the main conduits for online public participation in rulemaking, regulations.gov and federalregister.gov, were operating during that time due to a lapse in appropriations. When visiting federalregister.gov, visitors have been confronted with a message stating that the site is not being "supported." On January 16, 2019, regulations.gov was shut down completely[420]—with no notice or warning—leaving members of the public with no option to submit their comments electronically.[421] While assurances were given that the website would become operational within 24 hours, members of the public continued to be left with the distinct impression that neither site was operational or being updated, and there was significant confusion about whether both sites remained available for accepting public comments throughout the government shutdown. Such widespread confusion inevitably discouraged the public from submitting comments.

The Department of Education's decision to extend the deadline by two days because of *regulations.gov's* inaccessibility was woefully inadequate and did not sufficiently respond to the many requests for a *meaningful* extension to the comment period. Further still, because the online comment portals were not being updated due to the shutdown, the comment deadline is still listed as January 28th at both *federalregister.gov*[422] and as both January 28th and January 30th at *regulations.gov*,[423] which is most certainly causing public confusion and uncertainty about when the comment period actually ends. The Department's proposed "fix" did nothing to alleviate public confusion and provide interested parties with the opportunity to participate in the rulemaking process. The proposed rules should be withdrawn because the public was not able to meaningfully participate.

### F. The proposed rules ignore the will of the American public and should be withdrawn.

The Department's proposed rules are so far out of step with the general public's views on sexual harassment, they are decidedly undemocratic. The American public overwhelmingly agrees that strong Title IX protections are necessary to ensure student survivors' equal access to educational opportunities.

The majority of the American people support strong Title IX protections, including those in the 2011 Guidance and 2014 Guidance that the Department rescinded in September 2017. Last fall, when the Department asked the public for input on deregulation (i.e., which rules the Department should repeal, replace, or modify),[424] over 12,000 people submitted comments about Title IX, with 99 percent of them supporting Title IX and 96 percent explicitly urged the Department to preserve its 2011 Guidance.[425] They were joined by more than 150,000 other people who signed petitions and statements in support of the Department's 2011 Guidance and 2014 Guidance.[426] However, just one day after the public comment

---

[420] The regulations.gov landing page displayed a message stating that the site "is not operational due to a lapse in funding, and will remain unavailable for the duration of the government shutdown."

[421] The Title IX rules specify that the Department of Education will not accept comments by email or fax. While regulations.gov was down, the only options were to mail in comments or hand-deliver them.

[422] Federal Register, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* (last visited Jan. 27, 2019), https://www.federalregister.gov/documents/2018/11/29/2018-25314/nondiscrimination-on-the-basis-of-sex-in-education-programs-or-activities-receiving-federal.

[423] Regulations.gov, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* (last visited Jan. 27, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-0001.

[424] U.S. Dep't of Educ., *Evaluation of Existing Regulations*, 82 Fed. Reg. at 28431 (June 22, 2017) https://www.regulations.gov/contentStreamer?documentId=ED-2017-OS-0074-0001&contentType=pdf.

[425] Tiffany Buffkin et al., *Widely Welcomed and Supported by the Public: A Report on the Title IX-Related Comments in the U.S. Department of Education's Executive Order 13777 Comment Call*, Cal. L. Rev. Online 2 (forthcoming) (Sept. 25, 2018) [last revised Dec. 31, 2018), available at https://ssrn.com/abstract=3255205.

[426] *Id.* at 27-28 (48,903 people signed petitions and statements supporting Title IX and the 2011 Guidance); Caitlin Emma, *Exclusive: Education reform groups team up to make bigger mark*, Politico (Sept. 6, 2017),

EXHIBIT 27

period closed, the Department rescinded both the 2011 Guidance and the 2014 Guidance and issued the 2017 Guidance, when it could not possibly have finished reading and considering all of the comments it had received.[427] The rescission was an anti-democratic move contrary to the APA, which was enacted to hold non-elected agency officials like Secretary DeVos accountable to constituents by requiring agencies to consider public comments during the rulemaking process.

The Department's proposed rules ignore the cultural milestones that have demonstrated the public's interest in eliminating sexual harassment, including sexual assault, from our schools and workplaces. In the past sixteen months, the #MeToo hashtag has used more than 19 million times on Twitter,[428] the Time's Up Legal Defense Fund raised more than $24 million to combat sexual harassment,[429] and state legislators passed more than 100 bills strengthening protections against sexual harassment.[430] In fall 2018, millions of people gathered across the country, online, and on the steps of the Supreme Court in solidarity with Dr. Christine Blasey Ford, Professor Anita Hill, and other survivors who have courageously come forward yet have been denied justice. In the face of this overwhelming support for survivors of sexual violence and those confronting other forms of sexual harassment, the Department's proposed Title IX rules contravene the basic notion that the right to be free from sexual harassment and violence is a human right and the right to not have one's education harmed by sexual harassment is a civil right.

More than 800 law professors, scholars, and experts in relevant fields have signed letters opposing the proposed regulations.[431] Similarly, survivors at Michigan State University, University of Southern California, and Ohio State University who were sexually abused by Larry Nassar, George Tyndall, and Richard Strauss expressed opposition to the Department's proposed rules.[432] In a letter to Secretary DeVos and Assistant Secretary Marcus, more than 80 of these survivors shared their concern that "[t]he proposed changes will make schools even less safe for survivors and enable more perpetrators to commit sexual assault in schools without consequence."[433] They agreed that if these rules are finalized, "fewer survivors will report their assaults and harassment, schools will be more dangerous, and more survivors will be denied their legal right to equal access to educational opportunities after experiencing sexual assault."[434] More than 900 mental health professionals submitted a comment condemning the proposed rules, claiming that the rule would "cause increased harm to students who report sexual harassment, including sexual assault, . . . [and] discourage students who have been victimized from

https://www.politico.com/tipsheets/morning-education/2017/09/06/exclusive-education-reform-groups-team-up-to-make-bigger-mark-222139 (more than 105,000 petitions delivered to Department of Education supporting 2011 and 2014 Title IX Guidances).

[427] Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter rescinding 2011 Guidance and 2014 Guidance* (Sept.22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

[428] Monica Anderson & Skye Toor, *How social media users have discussed sexual harassment since #MeToo went viral*, PEW RESEARCH CTR. (Oct. 11, 2018),
http://www.pewresearch.org/fact-tank/2018/10/11/how-social-media-users-have-discussed-sexual-harassment-since-metoo-went-viral.

[429] Natalie Robehmed, *With $20 Million Raised, Time's Up Seeks 'Equity And Safety' In The Workplace*, FORBES (Feb. 6, 2018), https://www.forbes.com/sites/natalierobehmed/2018/02/06/with-20-million-raised-times-up-seeks-equity-and-safety-in-the-workplace/#f1425ca103c5.

[430] Andrea Johnson, Maya Raghu & Ramya Sekhran, *#MeToo One Year Later: Progress In Catalyzing Change to End Workplace Harassment*, NAT'L WOMEN'S LAW CTR. 1 (Oct. 19, 2018), https://nwlc.org/resources/metoo-one-year-later-progress-in-catalyzing-change-to-end-workplace-harassment.

[431] Letter from 201 Law Professors to the Sec'y Elisabeth DeVos and Ass't Sec'y Kenneth L. Marcus (Nov. 8, 2018), http://goo.gl/72Aj1b; Letter from 1,185 members of Nat'l Women's Studies Ass'n to Sec'y Elisabeth DeVos and Ass't Sec'y Kenneth L. Marcus, (Nov. 11, 2018), https://sites.google.com/view/nwsa2018penletter/home.

[432] Letter from 89 Survivors of Larry Nassar, George Tyndall, and Richard Strauss at Michigan State University, Ohio State University, and University of Southern California to Sec'y Elisabeth DeVos and Ass't Sec'y Kenneth Marcus (Nov. 1, 2018), at 2, https://www.documentcloud.org/documents/5026380-November-1-Survivor-Letter-to-ED.html.

[433] *Id.* at 1

[434] *Id.* at 2.

EXHIBIT 27

coming forward," and that they would also "reinforce the shaming and silencing of victims, which has long prevailed in our society, and [] worsen the problem of sex discrimination in education."[435]

Rather than listening to survivors, students, and mental health professionals who understand the impact of trauma, the Department has chosen to listen to education lobbyists that have spent tens of thousands of dollars asking the Trump administration on fewer Title IX requirements.[436]

## XII.    Directed Questions

### A.  Q1: The proposed rules are unworkable for elementary and secondary school students and fail to take into account the age and developmental level of elementary and secondary school students.

As set out in detail above, the following proposed rules are especially unworkable for elementary and secondary school students because they fail to take into account the age and developmental level of those students and fail to consider the unique aspects of addressing sexual harassment in elementary and secondary schools: the narrow definition of harassment, narrow notice standard, mandatory dismissal of out-of-school harassment, requirement of a formal complaint to trigger deliberate indifference liability, permitted use of live cross-examination, permitted use of mediation, and lack of a clear timeframe (see Parts II.B-II.D, III.C, IV.B-IV.C, and IV.F above for more detail).

### B.  Q2: Proposed §§ 106.44(b)(3) and § 106.45(b)(3)(vii) would subject students in both elementary and secondary schools and in higher education to different types of harm.

Proposed § 106.44(b)(3) would, as discussed in more detail in Part III.C, incentivize institutions of higher education to steer students who report sexual harassment away from filing a formal complaint and toward simply accepting "supportive measures." This is harmful because "supportive measures" are defined narrowly in proposed § 106.30 to exclude many types of effective accommodations, including transferring the respondent out of the complainant's classes or dorm, or obtaining a one-way no-contact order against the respondent. Moreover, schools are only required to provide supportive measures that preserve or restore a complainant's "access" to the "education program or activity," not measures that preserve or restore "equal access" to educational opportunities and benefits.

All schools, regardless of type or students' age, should be required to provide supportive measures to students who report sexual harassment regardless of whether there is a formal complaint. However, no school should enjoy a safe harbor merely because it has provided supportive measures in the absence of a formal complaint, as schools should be considering the safety of all students and whether or not a failure to investigate or engage in disciplinary action against the respondent would subject the complainant and/or other students to harm.

Proposed § 106.45(b)(3)(vii) would also be unnecessarily traumatic for complainants in higher education and unnecessarily inflexible for institutions of higher education (see Part IV.B above for more detail). All students, regardless of age or type of school, should be allowed to answer questions through a neutral school official or through written questions—not through any type of live and adversarial cross-examination.

---

[435] Mental Health Professionals Letter, *supra* note 130.
[436] *See* Dana Bolger, *Betsy DeVos's New Harassment Rules Protect Schools, Not Students*, N.Y. TIMES (Nov. 27, 2018), https://www.nytimes.com/2018/11/27/opinion/betsy-devos-title-ix-schools-students.html.

EXHIBIT 27

**C. Q3: The proposed rules are unworkable in the context of sexual harassment by employees and fail to consider other unique circumstances that apply to processes involving employees.**

The following proposed rules are especially unworkable in the context of sexual harassment of students by employees and fail to consider other unique circumstances that apply to processes involving employees: the deliberate indifference standard, narrow definition of sexual harassment, narrow notice standard, mandatory dismissal of out-of-school harassment, permitted use of live cross-examination in elementary and secondary schools, required use of live cross-examination in higher education, permitted use of mediation, and permitted (and in many cases, required) use of the clear and convincing evidence standard (see Parts II.A-II.D and IV.B-IV.D.2 above for more detail).

In addition, proposed § 106.45(b)(7) would allow schools to destroy records involving employee-respondents after three years, allowing repeat employee offenders to escape accountability despite multiple complaints, investigations, or findings against them (see Part IV.I above for more detail).

Furthermore, because of myriad conflicts with Title VII standards and purposes, the proposed rules are also unworkable when the harassment victim is an employee. Schools following the proposed rules in such circumstances would deny employees' Title VII rights and face significant risk of increased Title VII liability (see Part VII above for more detail).

**D. Q4: Proposed § 106.45(b)(1)(iii) fails to ensure that schools would provide necessary training to all appropriate individuals, including those at the elementary and secondary school level.**

Regardless of its content, proposed § 106.45(b)(1)(iii) is inadequate and effectively meaningless because the rest of the proposed rules create a definition of sexual harassment that is in conflict with Supreme Court precedent and incorrect as a matter of law. Even if a school followed all of the proposed rules meticulously, including proposed § 106.45(b)(1)(iii), it would still be training its employees on the wrong definition of sexual harassment.

Assuming for a moment the legitimacy of these rules, proposed § 106.45(b)(1)(iii) is still inadequate because it would not require training of all school employees. It is not enough for schools to only train coordinators, investigators, and adjudicators on sexual harassment. Many school employees—including teachers, guidance counselors, teacher aides, playground supervisors, athletics coaches, cafeteria workers, school resource officers, bus drivers, professors, teaching assistants, residential advisors, etc.—interact with students on a day-to-day basis and are better-positioned than the Title IX coordinator and other high-ranking administrators to respond to sexual harassment before it escalates. This is especially true at the elementary and secondary school level, where the age differential has a greater impact on students and where students are more susceptible to grooming by adult sexual abusers. However, while school employees are in the best position to know whether other employees are engaging in inappropriate behaviors with students, they cannot respond adequately to sexual harassment if they do not know how to identify it, how to recognize grooming behaviors, or how to report sexual harassment to the Title IX coordinator. In addition, these school employees are the ones who must help implement supportive measures, such as homework extensions, hall passes to see a guidance counselor, and no-contact orders. But they cannot effectively do so if they do not understand the grievance process and the mechanisms for protecting student safety. Furthermore, all school employees should be trained on employee-on-student sexual harassment so that they can identify inappropriate conduct and interactions with students.

EXHIBIT 27

Proposed § 106.45(b)(1)(iii) is also inadequate because it would not require trainings to be trauma-informed. Scientific, trauma-informed approaches are critical to sexual assault investigations. For example, in order to ensure that investigations are reliable in ascertaining what actually occurred between the parties in a complaint, investigators should be knowledgeable about common survivor responses to sexual assault, such as tonic immobility, an involuntary paralysis common among survivors during their assaults[437] that has been recognized by psychiatrists[438] and legal scholars[439] in numerous peer-reviewed publications. Judges, too, have recognized the importance of trauma-informed training in properly adjudicating sexual assault cases. In fact, the National Judicial Education Program (NJEP), a project sponsored by the U.S. Department of Justice, produced a training manual written for judges by a nationwide survey of judges on what they wish they had known before they had adjudicated a sexual assault case.[440] These judges agreed that many survivor responses that "appear counterintuitive to those not knowledgeable about sexual assault" are in fact quite common among survivors,[441] including tonic immobility, collapsed immobility, dissociation, delayed reporting, post-assault contact with the assailant, imperfect retrieval of memories, and a flat affect while testifying.[442]

Finally, proposed § 106.45(b)(1)(iii) is inadequate because it does not require employees to be trained on stereotypes and implicit biases impacting the full range of protected classes or on how to address the unique needs of harassment victims who are people of color, LGBTQ individuals, and/or people with disabilities. As explained above in more detail in Parts I.C and IV.A, schools are more likely to ignore or punish certain groups of students who report sexual harassment, including women and girls of color (especially Black women and girls), LGBTQ students, and students with disabilities because of stereotypes and implicit bias.

### E.  Q5: Parties with disabilities

The following proposed rules fail to take into account the needs of students with disabilities and fail to consider the different experiences, challenges, and needs of students with disabilities: the narrow definition of sexual harassment, narrow notice standard, mandatory dismissal of out-of-school harassment, required presumption of no harassment, permitted use of live cross-examination in elementary and secondary schools, required use of live cross-examination in institutions of higher education, permitted use of mediation, and lack of a clear timeframe (see Parts II.B-II.D, IV.A-IV.C, and IV.F above for more detail).

---

[437] *E.g.*, Francine Russo, *Sexual Assault May Trigger Involuntary Paralysis*, SCIENTIFIC AMERICAN (Aug. 4, 2017), https://www.scientificamerican.com/article/sexual-assault-may-trigger-involuntary-paralysis; James Hopper, *Why many rape victims don't fight or yell*, WASH. POST (June 23, 2015), https://www.washingtonpost.com/news/grade-point/wp/2015/06/23/why-many-rape-victims-dont-fight-or-yell.

[438] *E.g.*, Juliana Kalaf et al., *Sexual trauma is more strongly associated with tonic immobility than other types of trauma – A population based study*, 25 J. AFFECTIVE DISORDERS 71-76 (June 2017), *available at* https://www.sciencedirect.com/science/article/pii/S0165032716317220; Brooke A. de Heer & Lynn C. Jones, *Investigating the Self-Protective Potential of Immobility in Victims of Rape*, 32 VIOLENCE & VICTIMS 210-29 (2017), *available at* http://connect.springerpub.com/content/sgrvv/32/2/210; Kasia Kozlowska, et al., *Fear and the Defense Cascade: Clinical Implications and Management*, 23 HARVARD REV. PSYCHIATRY 263-87 (July/Aug. 2015), *available at* https://journals.lww.com/hrpjournal/toc/2015/07000.

[439] Melissa Hamilton, *The Reliability of Assault Victims' Immediate Accounts: Evidence from Trauma Studies*, 26 STAN. L. & POL'Y REV. 269, 298, 301-03 (2015), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2492785;

[440] Nat'l Judicial Educ. Program, *Judges Tell: What I Wish I Had Known Before I Presided in an Adult Victim Sexual Assault Case*, LEGAL MOMENTUM (2010) [hereinafter *Judicial Manual on Sexual Assault*], *available at* https://victimsofcrime.org/docs/nat-conf-2013/judges-tell-8-15-12_handout.pdf.

[441] *Judicial Manual on Sexual Assault*, *supra* note 440, at 2.

[442] *Id.* at 6-9.

EXHIBIT 27

The proposed § 106.44(c) may also encourage schools to impose unfair or excessive discipline on respondents with disabilities. This risk is exacerbated by the fact that proposed § 106.45(b)(1)(iii) would not require training on least restrictive remedies for school employees, including school police.

### F. Q6: Proposed § 106.45(b)(4)(i) should require all schools to use the preponderance of the evidence standard in all Title IX proceedings.

The preponderance of evidence standard is the only standard of evidence that should be used in Title IX cases in all schools, regardless of what standard is used in disciplinary proceedings for other student misconduct and regardless of what standard is used in faculty misconduct proceedings (see Parts IV.D and VII for more detail).

### G. Q7: Proposed § 106.45(b)(3)(viii) is unclear and would facilitate prohibited retaliation.

Proposed § 106.45(b)(3)(viii) fails to provide clarification on the admissibility of irrelevant or prejudicial evidence and opens the door to retaliation against complainants, respondents, and witnesses (see Part IV.H for more detail).

### H. Q8: Proposed § 106.45(b)(7) would allow schools to destroy records relevant to a student or employee's Title IX lawsuit or administrative complaint and would allow repeat employee offenders to escape accountability.

As discussed in more detail in Part IV.I above, proposed § 106.45(b)(7) would allow schools in many states to destroy relevant records before a student or employee complainant is able to file a complaint or complete discovery in a Title IX lawsuit; and would allow the average school in an OCR investigation to destroy relevant records before the investigation is completed. In addition, the proposed rule would allow schools to destroy records involving employee-respondents after three years, allowing repeat employee offenders to escape accountability despite multiple complaints, investigations, or findings against them.

### I. Q9: Proposed § 106.45(b)(3)(vii) lacks flexibility and would be especially burdensome on schools that are not a traditional four-year college or university.

The proposed rule lacks flexibility and would be especially burdensome on community colleges, vocational schools, online schools, and other educational institutions that lack the resources of a traditional four-year college or university (see Part IV.B for more detail).

\* \* \* \* \*

The Department's proposed rules import inappropriate legal standards into agency enforcement, rely on sexist stereotypes about individuals who have experienced sexual harassment, including sexual assault, and impose procedural requirements that force schools to tilt their Title IX investigation processes in favor of respondents to the detriment of survivors and other harassment victims. Instead of effectuating Title IX's prohibition on sex discrimination in schools, these rules serve only (1) to cabin schools' ability and obligation to address sexual harassment and (2) to protect named harassers and rapists from accountability for their actions. Twenty-eight of this Administration's 30 major regulatory actions have already been successfully challenged in federal court,[443] and this NPRM, if finalized, is likely to be successfully challenged as well.

---

[443] Margot Sanger-Katz, *For Trump Administration, It Has Been Hard to Follow the Rules on Rules*, N.Y. TIMES (Jan. 22, 2019), https://www.nytimes.com/2019/01/22/upshot/for-trump-administration-it-has-been-hard-to-follow-the-rules-on-rules.html.

EXHIBIT 27

For all of the above reasons, the National Women's Law Center calls on the Department of Education to immediately withdraw this NPRM and instead focus its energies on vigorously enforcing the Title IX requirements that the Department has relied on for decades, to ensure that schools promptly and equitably respond to sexual harassment.

Sincerely,

Emily J. Martin
Vice President for Education & Workplace Justice
emartin@nwlc.org

/s/ Shiwali Patel
Shiwali Patel
Senior Counsel
spatel@nwlc.org

/s/ Elizabeth Tang
Elizabeth Tang
Legal Fellow
etang@nwlc.org

/s/ Margaret Hazuka
Margaret Hazuka
Legal Fellow
mhazuka@nwlc.org

EXHIBIT 27

# EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

January 30, 2019

Submitted via www.regulations.gov
Kenneth L. Marcus
Assistant Secretary for Civil Rights
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

**RE: ED Docket No. ED-2018-OCR-0064, RIN 1870-AA14, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance***

Dear Mr. Marcus:

We are writing on behalf of SurvJustice, Inc. in response to the U.S. Department of Education ("Department")'s Notice of Proposed Rulemaking ("NPRM" or "proposed regulations") to express our strong opposition to the Department's proposal to amend regulations implementing Title IX of the Education Amendment Act of 1972 ("Title IX"), as published in the Federal Register on November 29, 2018.

## INTRODUCTION

The Department's proposed Title IX regulations, along with its previous rescission of the 2011 and 2014 guidance documents issued under the Obama administration, make schools unsafe for students. The proposed regulations are dangerous for students and schools alike in that, if implemented, perpetrators of sexual harassment (which includes sexual violence and is how our comment will refer to the umbrella term that includes various types of sexual misconduct) would have the means to inflict widespread harm, avoid accountability, and impose liability for causing such harm onto their schools. The effects of changing applicable Title IX standards by narrowing the definition of sexual harassment, limiting the scope of school responsibility for investigating reports of sexual violence, and reducing the number of school officials who are capable of initiating a Title IX investigation (among other things) will be far-reaching. These proposed regulations will discourage students across the country who experience sexual violence from reporting it to their schools. Even in the case of those students who attempt to report despite the odds being stacked against them, many will find that there is no assistance or remedy available to them, thereby forcing them to choose between continuing their education in a hostile environment, attempting to transfer, or dropping out. Furthermore, the proposed regulations, if implemented, will reinforce the normalization of sexual violence on college campuses and secondary schools alike.

These proposed regulations would fundamentally alter Title IX and undermine its entire purpose. If this administration insists on making such significant changes, the process should at least include the input of survivors, advocates, legal professionals, mental health care providers, and many others who engage in this work on a regular basis. Any new Title IX regulations

EXHIBIT 28

1

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

should be centered on creating and maintaining pathways to justice and ensuring access to an equitable and safe education for all survivors—especially those who are most likely to experience sexual violence, which includes students of color, LGBTQIA students, and students with disabilities. However, in their current form, the proposed regulations lack such insight and thus should not be codified because it is clear that the purpose of the NPRM is to serve the interests of accused students and institutions only, as opposed to promoting and protecting civil rights in the education context.

### *SurvJustice's work as it relates to campus sexual assault*

Founded in 2014, SurvJustice is a national nonprofit dedicated to assisting survivors of sexual violence in seeking justice. SurvJustice provides legal assistance, policy advocacy, and institutional trainings across the United States. We prioritize the needs of survivors in all of our work. As a survivor-founded and led organization, we understand that the trauma which results from sexual violence often leaves survivors feeling alone and unsure of what to do next. SurvJustice exists to help survivors learn about their rights and options in order to pursue their own personal means of justice with an attorney by their side every step of the way. Our goal is always to ensure that survivors have all the information they need to make informed decisions about their own cases, thereby helping to restore the sense of control that sexual violence takes away. We are also committed to taking an intersectional and sensitive approach to working with survivors—we know that anyone can experience sexual violence and that it harms people in different ways. By providing high-quality legal services to survivors, we seek to hold perpetrators and enablers of sexual violence accountable.

SurvJustice is the only organization that provides legal assistance in campus proceedings across the nation. Upon accepting a case, we provide assistance remotely from our office in D.C. and travel as needed. We offer discounted services and various payment options to ensure affordability for students, which sets us apart from law firms. The majority of the requests for legal assistance that we receive come from students at institutions of higher education. SurvJustice staff members help sexual violence survivors navigate the campus grievance process, such as by assisting them with reporting the violence and going through any investigation, advising them in campus hearings, coordinating on any appeals or appeal responses, and ensuring access to accommodations and other services. Our staff members frequently serve as "advisors of choice" for college students in institutional disciplinary actions for cases involving allegations of sexual assault, domestic violence, dating violence, stalking, and/or retaliation, as provided for by the Clery Act through amendments from the 2013 Violence Against Women Reauthorization Act, 20 U.S.C. § 1092(f)(8)(B)(iv)(II) ("Clery Act"). Our organization also represents survivors in civil litigation or refers survivors to other qualified lawyers for such representation. Finally, SurvJustice often assists survivors in reporting crimes to law enforcement, advocates for police investigation and prosecution of perpetrators, and serves as media representatives for survivors and their families in high-profile criminal cases.

Our commitment to assisting survivors of sexual violence and protecting the right to an education free of discrimination makes SurvJustice well-poised to comment on the proposed regulations. We have a wealth of firsthand experience with this issue as we directly represent

EXHIBIT 28

2

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

survivors every single day. Based on this experience, we vehemently oppose the Department's proposed Title IX regulations.

SurvJustice's comment is offered by Executive Director Katherine W. McGerald[1] and Senior Staff Attorney Carly Mee,[2] both of whom are experienced attorneys in cases involving sexual and intimate partner violence, with invaluable assistance from SurvJustice's legal and policy interns, who are students themselves: Laura Alexander (George Washington University graduate student), Grace Quintana (University of Minnesota law student), Grace Perret (Georgetown University undergraduate student), Nikki Wolfrey (University of Virginia law student), Maria Baez de Hicks (University of Arkansas law student), and Sarah Jurinsky (George Washington University undergraduate student).

### *The Department's proposed regulations vitiates its stated mission and the purpose of Title IX.*

Department officials have repeatedly criticized the protections that Title IX affords to women and other survivors of sexual harassment, including sexual violence. These officials have based much of their criticism on discriminatory stereotypes and unfounded generalizations about female students in general and female victims of sexual violence in particular—despite the fact that Title IX protects *all* victims of discriminatory conduct on the basis of sex. In speaking about the issue of sexual harassment in the education context, and in developing these proposed regulations, Department officials have relied on the longstanding and inaccurate stereotype that women and girls tend to lie about or misunderstand their own experiences of sexual violence and harassment[3]. This practice of relying on such unfounded stereotypes is not limited to Department officials: many others who interact with victims do the same. For example, a recent study published in the Psychology of Violence determined that police routinely rely on rape myths, such as that the victim was lying or had given consent, in judging whether a case should be referred to a prosecutor.[4] However, Department officials have a responsibility to break this harmful pattern and avoid relying on unsupported myths in enforcing Title IX.

---

[1] Katherine McGerald has provided legal representation to hundreds of clients and survivors for with a focus on providing holistic legal services to survivors of sexual assault, domestic violence, intimate partner violence, harassment based on gender or gender identity, and stalking. Her areas of expertise include intimate partner violence litigation, sexual assault litigation, family court proceedings, and trial advocacy. She has served as a faculty member for basic lawyering skills training through the Sargent Shriver National Center on Poverty Law, as a presenter at the NYS Bar Association Legal Assistance Partnership Conference, and as a presenter in many Continuing Legal Education classes on trial strategy and technique, stalking and technology, how to admit evidence at trial, family offenses, domestic violence and proving your case, and trial preparation.

[2] Carly Mee is a Virginia-barred attorney who provides direct assistance to survivors in campus, civil, and criminal systems to college and high school students. She assisted with achieving federal court recognition of a new form of privilege that applies between victims and advocates, which was a historic win. She has conducted numerous trainings on Title IX, the Clery Act, and FERPA for attorneys, law enforcement, school officials, and students. Her writing has been featured in *The Washington Post* and she has provided legal commentary in CNN, the Independent, Buzzfeed, NPR, and various other media outlets. She also serves as a liaison to the American Bar Association Commission on Domestic & Sexual Violence.

[3] *See, e.g.,* Benjamin Wermund, *DeVos' Donations Spark Questions About Her Stance On Sexual Assault*, POLITICO (Jan. 9, 2017), https://www.politico.com/story/2017/01/betsy-devos-education-sexual-assault-233376; Erica L. Green & Sheryl Gay Stolberg, *Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. TIMES (July 13, 2017) (emphasis added), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html (citing Jackson's statement that "[i]n most investigations . . . there's 'not even an accusation that these accused students overrode the will of a young woman. Rather, the accusations — 90 percent of them — fall into the category of 'we were both drunk,' 'we broke up, and six months later I found myself under a Title IX investigation because *she* just decided that our last sleeping together was not quite right.'").

[4] Romeo Vitelli, *Rape Myths and the Search for True Justice*, PSYCHOLOGY TODAY (Oct. 26, 2017), https://www.psychologytoday.com/us/blog/media-spotlight/201710/rape-myths-and-the-search-true-justice. *See also* ACADEMIC

EXHIBIT 28                                                                                                                    3

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

Officials within this administration have repeatedly criticized core civil rights achievements, such as legal protections against sexual harassment.[5]  In contrast to the Department's proactive solicitation of views from those representing the interests of students accused of sexual harassment or assault, Secretary DeVos agreed to meet with organizations representing the interests of sexual harassment and assault survivors only after repeated, collective requests from those organizations. Such meetings were rare and limited in time, as SurvJustice itself experienced. Moreover, it is clear from the proposed rules that the Department ignored the credible perspectives of SurvJustice and organizations like us. Instead, it relied on the views of individuals arguing that women tend to lie about sexual harassment and assault, even though such individuals spoke primarily about personal, unverified anecdotes without any reliable data to support their position.

Given that the Department has proposed regulations that contradict its stated mission and its responsibility to enforce Title IX, SurvJustice unequivocally opposes the Department's proposed regulations. For the reasons discussed at length in this comment, SurvJustice requests that the Department immediately revoke these misguided proposed regulations and engage in a process that involves meaningful consideration of all parties' perspectives and experiences, including survivors of sexual harassment/assault. If the proposed regulations are implemented, the Department will give colleges and universities free license to shirk their responsibility to provide safe and equitable access to education for all students. Finally, since the Department seeks to fundamentally alter campus disciplinary processes *only with regard to sexual harassment complaints* (but not any other potentially criminal and prosecutable offenses), it must explain and justify why it seeks to create a special standard for only this type of misconduct.

## THE NPRM SHOULD NOT BE CODIFIED

### I.   The proposed regulations fail to properly address the realities of sexual harassment in the education context.

The proposed regulations ignore the devastating impact of sexual violence in schools. Instead of effectuating Title IX's purpose by keeping students safe from sexual violence and other forms of sexual harassment—that is, from unlawful sex discrimination—the proposed regulations make it harder for students to report abuse. They also allow (and in some cases even *require*) schools to

---

PRESS, ENCYCLOPEDIA OF MENTAL Health 3 (Howard S. Friedman, ed., 2nd ed. 2015) ("Common rape myths may include: women often lie about rape, a victim's clothing can precipitate a sexual assault, rape is the fault of the victim if she was intoxicated, and when a male pays for a date, the woman is expected to reciprocate with sexual intercourse."); ROUTLEDGE, CRITICAL ISSUES ON VIOLENCE AGAINST WOMEN: INTERNATIONAL PERSPECTIVES AND PROMISING STRATEGIES 96 (Holly Johnson et al. eds., 1st ed. 2014) ("Allegations that women lie about sexual assault are not new. . . . Despite social advancements in the past several decades regarding rape awareness, negative attitudes and belief in 'rape myths' are still pervasive.").
[5] In a book published in 2005, Ms. Jackson stated that laws to combat sexual harassment gloss over "the reality that unwanted sexual advances are difficult to define." CANDICE JACKSON, THEIR LIVES: THE WOMEN TARGETED BY THE CLINTON MACHINE 138 (2005). Ms. Jackson regularly questions the veracity of sexual harassment and assault claims made by women, stating, for example: "[I]t wasn't enough that women are not legally forbidden anymore from getting an education and entering the workforce. Feminists and other leftists thought the problem of workplace sexual harassment needed a legal remedy. Since sexual harassment is such a nebulous experience, defined so subjectively and turning on the perceptions of the people involved, laws banning it are difficult to articulate. But they have tried anyway, with the side result that many men self-censor themselves to avoid being accused of sexual harassment, and institutions remove valid expressions of art and learning to avoid "even the appearance of sexual harassment." *Id.*

EXHIBIT 28

4

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

ignore reports and unfairly tilt the investigation process in favor of accused students, to the direct detriment of survivors, under the false guise of "due process." SurvJustice fully supports the constitutional right to due process because it is a fundamental protection of liberty in our society. Furthermore, SurvJustice has every interest in ensuring that accused students receive due process in campus disciplinary proceedings because we do not want our clients to have to suffer through a second process if procedural violations occur and the outcome is subsequently overturned. However, the proposed regulations severely miss the mark on what actually constitutes due process, and instead the Department has gone far beyond what is due in order to give special rights to accused students.

    **a. Sexual harassment is far too common in our schools, and the proposed regulations would significantly worsen this problem.**

Far too many students experience sexual harassment. Consider the following statistics:

- In grades 7–12, 56% of girls and 40% of boys are sexually harassed in any given school year.[6] More than 1 in 5 girls ages 14–18 are kissed or touched without their consent.[7]
- During college, 62% of women and 61% of men experience sexual harassment.[8] More than 1 in 5 women and nearly 1 in 18 men are sexually assaulted in college.[9]
- Men and boys are far more likely to be victims of sexual assault themselves than to be falsely accused of committing such acts.[10]

Historically marginalized and underrepresented groups are more likely to experience sexual harassment than their peers:

- 56% of girls ages 14–18 who are pregnant or parenting are kissed or touched without their consent.[11]
- More than half of LGBTQIA students ages 13–21 are sexually harassed at school.[12]

---

[6] Catherine Hill & Holly Kearl, *Crossing the Line: Sexual Harassment at School*, AAUW (2011) [hereinafter *Crossing the Line*], https://www.aauw.org/research/crossing-the-line.

[7] National Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 1 (Apr. 2017) [hereinafter *Let Her Learn: Sexual Harassment and Violence*], https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence.

[8] Catherine Hill & Elena Silva, *Drawing the Line: Sexual Harassment on Campus*, AAUW 17, 19 (2005) [hereinafter *Drawing the Line*], https://history.aauw.org/aauw-research/2006-drawing-the-line (noting differences in the types of sexual harassment and reactions to it).

[9] *E.g.*, David Cantor et al., *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct*, ASSOCIATION OF AMERICAN UNIVERSITIES 13-14 (Sept. 2015) [hereinafter *AAU Campus Climate Survey*], https://www.aau.edu/key-issues/aau-climate-survey-sexual-assault-and-sexual-misconduct-2015.

[10] *E.g.*, Tyler Kingkade, *Males Are More Likely To Suffer Sexual Assault Than To Be Falsely Accused Of It*, HUFFINGTON POST (Dec. 8, 2014) [last updated Oct. 16, 2015], https://www.huffingtonpost.com/2014/12/08/false-rape-accusations_n_6290380.html.

[11] National Women's Law Center, *Let Her Learn: Stopping School Pushout for Girls Who Are Pregnant or Parenting* 12 (2017) [hereinafter *Let Her Learn: Pregnant or Parenting Students*], https://nwlc.org/resources/ stopping-school-pushout-for-girls-who-are-pregnant-or-parenting.

[12] Joseph G. Kosciw et al., *The 2017 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN 26 (2018) [hereinafter *2017 National School Climate Survey*], https://www.glsen.org/article/2017-national-school-climate-survey-1.

EXHIBIT 28

5

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

- Nearly 1 in 4 transgender and gender-nonconforming students are sexually assaulted during college.[13]
- Students with disabilities are 2.9 times more likely than their peers to be sexually assaulted.[14]

Sexual harassment occurs both on-campus and in off-campus spaces closely associated with school:

- Nearly 9 in 10 college students live off campus.[15]
- 41% of college sexual assaults involve off-campus parties.[16] Students are far more likely to experience sexual assault if they are in a sorority (nearly 1.5 times more likely) or fraternity (nearly 3 times more likely).[17]
- Only 8% of all sexual assaults occur on school property.[18]

**b. Incidents of sexual harassment and sexual violence are already underreported due to the poor treatment that survivors face in seeking justice.**

It is already extremely difficult for victims to report sexual harassment and violence as doing so takes a significant toll on them. Survivors who do report face disbelief, shaming, guilt, and many other inappropriate reactions from officials within the various justice systems and even from their own loved ones. They also fear retaliation by perpetrators and their associates. The proposed regulations would worsen this problem by further discouraging students from coming forward. Already, only 12% of college survivors[19] and 2% of girls ages 14-18[20] report sexual assault to their schools or the police. Survivors do not report for a number of reasons, including fear of reprisal. Often, they have also been made to believe that their abuse was not important enough or that no one would do anything to help—rightfully so, given the low prosecution rate of perpetrators who commit sexual violence and the even lower rate of meaningful consequences even for perpetrators who are charged and convicted.[21] Some students—especially students of color, undocumented students,[22] LGBTQIA students,[23] and students with disabilities—are even

---

[13] *AAU Campus Climate Survey*, *supra* note 9 at 13-14.

[14] National Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls With Disabilities* 7 (2017) [hereinafter *Let Her Learn: Girls with Disabilities*], https://nwlc.org/resources/stopping-school-pushout-for-girls-with-disabilities.

[15] Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*, NEW YORK TIMES (Aug. 5, 2016), https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-cost-who-knows.html (87%).

[16] United Educators, *Facts From United Educators' Report - Confronting Campus Sexual Assault: An Examination of Higher Education Claims*, https://www.ue.org/sexual_assault_claims_study.

[17] Jennifer J. Freyd, *The UO Sexual Violence and Institutional Betrayal Surveys: 2014, 2015, and 2015-2016* (Oct. 16, 2014), https://www.uwire.com/2014/10/16/sexual-assault-more-prevalent-in-fraternities-and-sororities-study-finds (finding that 48.1% of females and 23.6% of males in Fraternity and Sorority Life have experienced non-consensual sexual contact, compared with 33.1% of females and 7.9% of males not in FSL).

[18] RAINN, *Scope of the Problem: Statistics*, https://www.rainn.org/statistics/scope-problem.

[19] *Poll: One in 5 women say they have been sexually assaulted in college*, WASHINGTON POST (June 12, 2015), https://www.washingtonpost.com/graphics/local/sexual-assault-poll.

[20] *Let Her Learn: Sexual Harassment and Violence*, *supra* note 7 at 1.

[21] RAINN, *Campus Sexual Violence: Statistics*, https://www.rainn.org/statistics/campus-sexual-violence.

[22] *See, e.g.*, Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation*, N.Y. TIMES (April 30, 2017), https://www.nytimes.com/2017/04/30/us/immigrants-deportation-sexual-abuse.html?mcubz=3.

[23] National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey: Executive Summary* 12 (Dec. 2016) [hereinafter *2015 U.S. Transgender Survey*], *available at* https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf.

EXHIBIT 28

6

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

less likely than their peers to report sexual violence to the police as they face an increased risk of being subjected to police violence and/or deportation. In addition, survivors of color are often silenced as they face pressure to not go to the police because doing so could be seen as contributing to the criminalization of men and boys of color. For all of these reasons, schools are often the only avenue for relief for survivors. Furthermore, even for those who may report to the police, the criminal justice system does not afford them protections that enable them to continue pursuing an education. Comparatively, schools have the ability to provide meaningful accommodations (such as excused absences and extensions on assignments, free counseling, dormitory reassignments, and No Contact Orders) that may be necessary to remain in school.

When schools fail to provide effective responses to reports of sexual harassment, the impact of these incidents can be that much more devastating.[24] Far too many survivors are effectively forced out of school because they do not feel safe on campus, with 34% of college survivors dropping out. Many schools have even expelled survivors when their grades suffer as a result of trauma.[25]

## II.   The proposed regulations would hinder Title IX enforcement, discourage reports of sexual harassment, and allow schools to avoid accountability instead of protecting students who experience sex discrimination.

For the better part of two decades, the Department has used one consistent standard to determine if a school violated Title IX by failing to adequately address sexual harassment. The Department's 2001 Guidance, which went through public notice-and-comment procedures and has been enforced by both Democratic and Republican administrations,[26] defines sexual harassment as "unwelcome conduct of a sexual nature."[27] The 2001 Guidance requires schools to address student-on-student harassment if *any employee* "knew, or in the exercise of reasonable care should have known" about the harassment. In the context of employee-on-student harassment, the 2001 Guidance requires schools to address harassment "whether or not the [school] has 'notice' of the harassment."[28] Schools that do not "take immediate and effective

---

[24] *See, e.g.,* Audrey Chu, *I Dropped Out of College Because I Couldn't Bear to See My Rapist on Campus*, VICE (Sept. 26, 2017), https://broadly.vice.com/en_us/article/qvjzpd/i-dropped-out-of-college-because-i-couldnt-bear-to-see-my-rapist-on-campus.

[25] *See, e.g.,* Alexandra Brodsky, *How much does sexual assault cost college students every year?*, WASHINGTON POST (Nov. 18, 2014), https://www.washingtonpost.com/posteverything/wp/2014/11/18/how-much-does-sexual-assault-cost-students-every-year. *See also* Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. Student Retention: Res., Theory & Prac. 234, 244 (2015), *available at* https://doi.org/10.1177/1521025115584750.

[26] These standards have been reaffirmed time and time again: in 2006 by the Bush Administration, in 2010, 2011, and 2014 in guidance documents issued by the Obama Administration, and even in the 2017 guidance document issued by the current Administration. U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Sexual Harassment* (Jan. 25, 2006) [hereinafter 2006 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html; *see also* U.S. Dep't of Educ. Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010) [hereinafter 2010 Guidance], *available at* https://ww2ed.gov/about/offices/ list/ocr/letters/colleague-201104.pdf; *see also* U.S. Dep't of Educ. Office of Civil Rights, *Dear Colleague Letter: Sexual Violence* at 4, 6, 9, &16 (Apr. 4, 2011) [hereinafter 2011 Guidance], *available at* https://ww2ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; *see also* U.S. Dep't of Educ. Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* 1-2 (Apr. 29, 2014) [hereinafter 2014 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ; *see also* U.S. Dep't of Educ. *Office for Civil Rights, Questions and Answers on Campus Sexual Misconduct* (Sept. 2017) [hereinafter 2017 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

[27] U.S. Department of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (2001) [hereinafter 2001 Guidance], *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

[28] *Id.*

EXHIBIT 28                                                                                          7

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

corrective action" are in violation of Title IX. These standards have appropriately guided OCR's enforcement activities, effectuating Title IX's nondiscrimination mandate by requiring schools to promptly and effectively respond to instances of sexual harassment, and in turn fulfilling OCR's purpose of enforcing students' civil rights.

This standard appropriately differs from the higher bar erected by the U.S. Supreme Court in the very specific and narrow context of a civil Title IX lawsuit seeking monetary damages against a school due to its response (or lack thereof) upon receiving actual notice of sexual harassment. To recover monetary damages, a plaintiff must show that the defendant school was deliberately indifferent to known sexual harassment that was severe and pervasive and that deprived a student of access to educational opportunities and benefits.[29] However, in establishing that standard, the Court recognized that it was appropriately limited to civil lawsuits seeking monetary damages and would not apply in the context of administrative enforcement. The Court specifically noted that this standard did not affect agency action; rather, the Department was still permitted to administratively enforce rules addressing a broader range of conduct to fulfill Congress's direction to effectuate Title IX's nondiscrimination mandate.[30] The Court drew a distinction between "defin[ing] the scope of behavior that Title IX proscribes" and identifying the narrower circumstances in which a school's failure to respond to harassment supports a civil claim for monetary damages.[31] The 2001 Guidance also directly addressed this precedent, concluding that it was inappropriate for the Department to limit its enforcement activities by applying the more stringent standard and stating that the Department would continue to enforce the broader protections provided under Title IX. Indeed, in the current proposed regulations, the Department itself acknowledges that it is "not required to adopt the liability standards applied by the Supreme Court in private suits for money damages."[32] As set out in further detail below, the Supreme Court's notice requirement, harassment definition, and deliberate-indifference standard are all designed to account for the unique circumstances involved when determining monetary liability in a civil case proceeding under Title IX's private right of action. These holdings have no place in the vastly different context of administrative enforcement with its iterative process and focus on voluntary corrective action by schools. By choosing to import these civil liability standards, the Department confuses its enforcement mechanisms with court processes that have no place in administrative proceedings, which would certainly have devastating effects on students who remain without recourse.

**a. The Department's proposed regulations use inconsistent standards for students and employees regarding what constitutes notice, deliberate indifference, and sexual harassment.**

Under Title VII, a federal law that addresses workplace harassment, a school is potentially liable for harassment of an employee if the harassment is "sufficiently severe *or* pervasive to *alter* the conditions of the victim's employment (emphasis added).[33] When an

---

[29] *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 290 (1998) (detailing standard for employee-on-student harassment); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) (detailing standard for student-on-student harassment).

[30] *Gebser*, 524 U.S. at 291-92 (citing 20 U.S.C. § 1682).

[31] *Davis*, 526 U.S. at 639.

[32] 83 Fed. Reg. 61468, 61469.

[33] https://www.eeoc.gov/laws/statutes/titlevii.cfm Did you mean to cite Title VII here as the statute instead of the link to the website with it? Not sure.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

employee is harassed by a coworker or other third party, the school is liable if it: (1) "knew or should have known of the misconduct," and (2) failed to take immediate and appropriate corrective action.[34] If a supervisor harasses an employee, the school is automatically liable if such harassment resulted in a tangible employment action (such as firing or demotion) unless it can prove that the employee unreasonably failed to take advantage of opportunities offered by the school to address the harassment. [35] However, under the Department's proposed regulations, a school would only be liable for harassment against a student if (1) it is deliberately indifferent to sexual harassment that is so severe, pervasive, *and* objectively offensive that it *denied* the student access to the school's program or activity; (2) the harassment occurred within the school's program or activity; and (3) a school employee with "the authority to institute corrective measures" had "actual knowledge" of the harassment. In other words, schools would be held to a far more lenient standard when addressing the harassment of students under its care—including minors—than when addressing the harassment of its adult employees.

Moreover, in contrast to Title VII, which recognizes employer responsibility for harassment enabled by supervisory authority, and in contrast to the 2001 Guidance, the proposed regulations fail to recognize any meaningful obligation by schools to address harassment of students by school employees who are exercising authority over students. The 2001 Guidance imposed administrative responsibility when an employee "is acting (or . . . reasonably appears to be acting) in the context of carrying out these responsibilities over students" and engages in sexual harassment.[36] By jettisoning this standard, the Department would free schools from accountability in many instances, even when their employees use the authority they exercise as school employees to harass students. For example, under the proposed regulations, schools may not have to hold serial abusers such as Larry Nassar (who assaulted hundreds of students in his role as a school doctor at Michigan State University) responsible if survivors are too uncomfortable or afraid to report to the school official who meets this narrow definition.

This drastic difference between Title VII and the proposed Title IX regulations would mean that, in many instances, schools are actually *prohibited* from taking the same steps to protect students that they are *required* to take to protect employees in the workplace, as set out further below. Even in instances in which schools may not be prohibited from taking action, the proposed regulations would still apply a more demanding standard to students in schools (many of whom are children) than for adults in the workplace when they seek assistance regarding sexual harassment and violence.

---

[34] *Meritor Savings Bank v. Vinson*, 477 US 57, 476-477 (1986) (internal quotations and brackets omitted); Equal Employment Opportunity Commission, *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 18, 1999) [*hereinafter* EEOC Guidance], *available at* https://www.eeoc.gov/policy/docs/harassment.html ((an employer is automatically liable for harassment by "a supervisor with immediate (or successively higher) authority over the employee").

[35] *Meritor,* 477 U.S. at 477 (citing *Burlington Industries, Inc. v. Ellerth*, 118 S. Ct. 2257, 2270 (1998); *Faragher v. City of Boca Raton*, 118 S. Ct. 2275, 2293 (1998)).

[36] 2001 Guidance, *supra* note 25. ("[I]f an employee who is acting (or who reasonably appears to be acting) in the context of carrying out these responsibilities over students engages in sexual harassment – generally this means harassment that is carried out during an employee's performance of his or her responsibilities in relation to students, including teaching, counseling, supervising, advising, and transporting students – and the harassment denies or limits a student's ability to participate in or benefit from a school program on the basis of sex, the recipient is responsible for the discriminatory conduct.").

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

**b. The Department's proposed notice requirement undermines Title IX's discrimination protections by making it harder for individuals to report sexual harassment and violence.**

Under the proposed regulations, schools would be responsible for addressing sexual harassment only when one of a small subset of school employees actually knew about the harassment. Specifically, schools would not be required to address sexual harassment unless there was "actual knowledge" of the harassment by (i) a Title IX coordinator, (ii) a K-12 teacher (but only for student-on-student harassment, *not* employee-on-student harassment); or (iii) an official who has "the authority to institute corrective measures."[37] This is a drastic change: The Department has long required schools to address student-on-student sexual harassment if almost *any* school employee[38] either knew about it or should reasonably have known about it.[39] This well-established standard, which encompasses more employees, takes into account the reality that many students disclose incidents of sexual harassment to employees who do not have the authority to institute corrective measures but can speak to a higher-up official who does. Students seeking help first turn to adults whom they trust and feel comfortable around, which is typically not a higher-up official with whom they have never interacted; instead, it would be someone such as a teacher, a resident advisor, an athletic coach, or someone else with whom they interact on a regular basis. Moreover, most students do not know which employees have the authority to address the harassment and would not even know whom to seek out. The longstanding "should have known" standard ensured that employees would be held accountable for purposely turning their backs on students who seek to report sexual harassment, as several employees did at Michigan State University when they failed to take any action after students disclosed Larry Nassar's abuse to them

The 2001 Guidance also properly requires schools to address all employee-on-student sexual harassment "whether or not the [school] has 'notice' of the harassment."[40] This requirement was an explicit acknowledgment of the particular harm suffered by students when adult employees prey upon them and the pressure that adult employees can exert over students to ensure their silence. This heightened responsibility for instances of harassment by their own employees also served to recognize that schools have control over their own employees.

By contrast, under the proposed regulations, if a K-12 student were to report to a trusted non-teacher school employee—such as a guidance counselor or teacher's aide—that she or he had been sexually assaulted, the school would have no obligation to respond and assist.[41] If a K-12 student reported to a teacher that she or he had been sexually assaulted by a school employee, the school would have no obligation to respond and assist.[42] Perversely, then, the proposed regulations provide a more limited duty for K-12 schools to respond to a student's report of

---

[37] Proposed rule § 106.30.

[38] This duty applies to "any employee who has the authority to take action to redress the harassment, who has the duty to report to appropriate school officials sexual harassment or any other misconduct by students or employees, or an individual who a student could reasonably believe has this authority or responsibility." 2001 Guidance, *supra* note 27 at 13.

[39] *Id.* at 14.

[40] *Id.* at 10.

[41] *See* proposed rule § 106.30 (83 Fed. Reg. 61496) (for K-12, limiting notice to "a teacher in the elementary and secondary context with regard to student-on-student harassment).

[42] *See id.*

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

sexual harassment when the perpetrator is a school employee than when the perpetrator is a student. Similarly, if a college student told their professor or RA that a fellow student, a faculty member, or a school employee had raped them, the school would have no obligation to respond and assist. As detailed above, a multitude of factors combine to make it notoriously difficult for survivors to report sexual violence. Sections 106.44(a) and 106.30 would further discourage reporting. Further, even if a student were to find the courage to report to a trusted school employee, the school would frequently have no obligation to respond and assist. If the proposed regulations had been in effect a few years ago, colleges such as Michigan State and Penn State would not have been required to stop Larry Nassar and Jerry Sandusky, enabling them to abuse even more students—just because the students who bravely came forward reported the sexual abuse to athletic trainers and coaches, who lack the "authority to institute corrective measures." These proposed provisions would absolve some of the worst Title IX offenders of responsibility. There should be no "wrong" employee to approach to report sexual violence, and students should not have to go from person to person just to get their school to intervene. All school employees should be committed to ensuring student safety. In fact, school officials themselves object to this new limitation, with the AASA stating that it is "opposed to any scenario in which the district could somehow disregard the information a child presents to those without the authority to institute corrective action simply because of their technical status within the regulation. It also underestimates the care we entrust all our employees to put towards students' safety."[43]

The following real-life examples demonstrate how these proposed regulations could harm students if implemented:

1. In April 2017, a high school student in Alachua, Florida was assaulted by another student off-campus, which **she reported to the high school guidance counselor (a non-teacher school employee) the next day**. The student's mother sued the school for failing to investigate the case and hold the perpetrator for his actions through disciplinary action. The perpetrator had allegedly assaulted two other students and school staff members allegedly knew about both incidents at the time of the survivor's report. If the proposed regulations are implemented, survivors such as the student in this case will have no method to hold K-12 schools accountable for failing to protect them and for effectively forcing them to continue attending classes with perpetrators of assault.[44]

2. In September 2018, a non-verbal high school student with autism was assaulted and sexually abused by a teacher's aide in Rutherford, Tennessee. **A custodian witnessed the abuse firsthand** and reported the assault to the school principal. The student's parents are suing the school for failing to protect the student, failing to hold the aide accountable, and for failing to conduct thorough background checks. The school would have not been liable under the proposed regulations had the custodian not reported what they had seen.[45] This example also demonstrates how the proposed regulations make students with

---

[43] AASA letter at 2.

[44] CBS4 Gainesville, "Mother of Santa Fe High student says police, school officials didn't report sexual assault," *CBS4 News Gainesville*, Aug. 31, 2018, https://mycbs4.com/news/local/mother-of-santa-fe-high-student-says-police-school-officials-didnt-report-sexual-assault.

[45] Brinley Hineman, "Family of special needs student sues Rutherford County school board over sexual assault," *Murfreesboro Daily News Journal*, Jan. 23, 2019, https://www.dnj.com/story/news/2019/01/23/rutherford-county-schools-lawsuit-autism-sexual-abuse/2643521002/.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

disabilities particularly vulnerable; not only are students with disabilities more vulnerable to sexual abuse than their peers, they are also less likely to have access to the "correct" responsible employees (as defined through the proposed regulations) and are less likely to report experiences of abuse.[46]

3. In 2017, a first-year student at the University of North Texas **told her resident assistant** that she had been raped by three members of the basketball team. Two of the alleged perpetrators later called the student and suggested she join their "escort service," a call to which the RA listened as well. The University of North Texas allegedly pressured the student not to report to local police, preferring to investigate the allegations through University processes. The student alleges that UNT officials refused to investigate any broader situation within the basketball team, though the perpetrators were not allowed on campus during the investigation and were eventually removed from the basketball team. None of the perpetrators faced charges of sexual assault in court. Under the proposed regulations, the school could not have been liable for reports made to an RA, even if the RA themselves had witnessed or heard direct evidence of the complainant's allegations (as in this example).

4. Seo-Young Chu alleges that she was raped and repeatedly sexually harassed by her Stanford professor and dissertation advisor, Jay Fiegelman, while she attended Stanford in the 1990s. **Chu reported the misconduct to another professor,** Herbert Lindenberger, who reported to the **Chair of the English Department**, while another graduate student reported to the **Dean's Office**. Chu alleges other professors enabled and protected Fiegelman's behavior. Stanford suspended the professor for two years, but he eventually resumed teaching. Under the proposed regulations, Stanford would not have been responsible for investigating Fiegelman, despite the fact that multiple professors knew of and attempted to report the assault.[47]

c. **The new proposed definition of harassment improperly prevents schools from providing students with a safe learning environment.**

The proposed regulations define sexual harassment as "unwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the [school's] education program or activity"[48] and mandate dismissal of complaints that do not meet this burdensome standard. Under this definition, even if a student reports sexual harassment to the "right person," the school would still be *required* to ignore the student's complaint if the harassment has not yet advanced to a certain level of severity. A school would have to dismiss such a complaint even if it involved harassment of a minor student by a teacher or other school employee, despite having an interest in investigating and terminating that employee to prevent further abuse. In this way, the Department's proposed definition fails to

---

[46] David Cantor, Bonnie Fisher, et al., "Report on the AAU Climate Survey on Sexual Assault and Sexual Misconduct," *American Association of Universities*, Oct. 20, 2017, https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/AAU-Campus-Climate-Survey-FINAL-10-20-17.pdf.

[47] Vanessa Rancaño, "Former Grad Students: Our Professors Raped Us," *KQED*, Dec. 7, 2017, https://www.kqed.org/news/11633019/years-later-women-find-their-voice-to-speak-out-against-sexual-misconduct-by-professors.

[48] Proposed rule § 106.30.

EXHIBIT 28

12

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

align with Title IX's purpose and precedent. It also discourages reporting and excludes many forms of sexual harassment that still interfere with access to educational opportunities.

Moreover, the Department fails to provide a persuasive justification for changing the definition of sexual harassment from the 2001 Guidance, which defines sexual harassment as "unwelcome conduct of a sexual nature."[49] This broader definition rightly requires schools to respond to harassment before it escalates to a point that students suffer even further or more severe harm. Instead of intervening early on, schools would have to wait until harassment escalates even further, thereby severely jeopardizing students' safety and even putting their lives at risk. For example, a student who reports verbal sexual harassment could be turned away without any institutional intervention, at which point the abuse could quickly escalate to sexual assault. Students would be forced to endure repeated and escalating levels of abuse, whether from a peer or a school employee, before their schools would be required to investigate and intervene. This poses a risk that more students will be raped or even killed by perpetrators who are not stopped earlier on but instead feel empowered to escalate their abuse as a result of the lack of school intervention. Furthermore, if a school turns away a student who reports sexual harassment, that student is extremely unlikely to then report a second time when the harassment escalates.

The Department repeatedly attempts to justify its proposed definition by citing "academic freedom and free speech."[50] However, harassment is not protected speech if it creates a "hostile environment,"[51] i.e., if the harassment limits a student's ability to participate in or benefit from a school program or activity.[52] Furthermore, schools have the authority to regulate harassing speech: the U.S. Supreme Court held in *Tinker v. Des Moines* that school officials can regulate student speech if they reasonably forecast "substantial disruption of or material interference with school activities" or if the speech involves "invasion of the rights of others."[53] There is thus no conflict between the First Amendment and Title IX's regulation of sexually harassing speech.

The following examples demonstrate how the proposed definition of sexual harassment could harm students if implemented:

1. If the proposed regulations were implemented, schools may be able to dismiss cases in which sexual harassment takes place online as "insufficiently severe." The proposed definition disregards the considerable psychological trauma inflicted through online harassment and could absolve schools from responsibility for not stepping in earlier, especially if online harassment transitions into physical harassment and/or violence. Courts have held that online harassment constitutes sufficient basis for schools to act against harassers, as in *Feminists Majority Foundation v. University of Mary Washington*,

---

[49] 2001 Guidance, *supra* note 25.
[50] 83 Fed. Reg. 61464, 61484. *See also* § 106.6(d)(1), which states that nothing in Title IX requires a school to "[r]estrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution."
[51] *See* Joanna L. Grossman & Deborah L. Brake, *A Sharp Backward Turn: Department of Education Proposes to Protect Schools, Not Students, in Cases of Sexual Violence*, VERDICT (Nov. 29, 2018) [hereinafter *A Sharp Backward Turn*], *available at* https://verdict.justia.com/2018/11/29/a-sharp-backward-turn-department-of-education-proposes-to-protect-schools-not-students-in-cases-of-sexual-violence. ("There is no legitimate First Amendment or academic freedom protection afforded to unwelcome sexual conduct that creates a hostile educational environment.").
[52] 2001 Guidance, *supra* note 25.
[53] 393 U.S. 503, 513-514 (1969).

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

in which the majority opinion stated that "the offenders could have been disciplined or prosecuted without infringing on the First Amendment." [54]However, these new rules create a grey area in which online harassment could be subject to discipline at significantly lower rates. This would discourage survivors from reporting additional instances of harassment or assault if their initial report was dismissed as "insufficiently severe," exposing survivors to repeated and increasingly intense abuse.

2. The proposed definition of harassment also allows schools to ignore cases which they have determined are not so "severe, pervasive, and objectively offensive" as to "effectively [deny the student] equal access to the recipient's education program or activity." In 2014, a student referred to by the pseudonym "Deena" began to receive significantly lower grades after she was assaulted, including a "D" and an "F." Her GPA dropped to a 2.0 and her concerns were dismissed by her academic dean, who allegedly told her that "Lots of students graduate with a 2.0." [55]While Deena's academic prospects were significantly impaired by her assault (and could have eventually driven her to drop out), under the proposed definition of harassment, cases like hers would not be considered grounds to hold schools liable for protecting survivors' access to education.

### *Stalking, Intimate Partner Violence, and Dating Violence under the Proposed Regulations*

The Department's proposed definition of sexual harassment is particularly problematic when considered in the context of stalking allegations. It is unclear from the proposed regulations whether stalking complaints would have to meet the stringent "so severe, pervasive, and objectively offensive" standard to avoid being dismissed. The current standard that schools rely upon from the 2001 guidance defines sexual harassment as unwelcome conduct of a sexual nature. This definition appropriately charges schools with responding to harassment before it escalates to the point that a student suffers severe harm. Stalking presents a particularly unique risk to the health and safety of college students because there is a significant connection between stalking and intimate partner homicide.[56]

Stalking is very common on college campuses and within the college population. Persons aged 18 to 24 (which is the average age of most college students) experience the highest rates of stalking victimization.[57] Research also shows that there are even higher rates of stalking victimization among college-aged women than among the general population. The *National College Women Sexual Victimization Study* found that over 13 percent of college women had

---

[54] Lauren Camera, *Court rules schools must investigate threats – anonymous, online, or otherwise*, U.S. NEWS AND WORLD REPORT (Dec. 20, 2018), https://www.usnews.com/news/education-news/articles/2018-12-20/court-rules-schools-must-investigate-threats-anonymous-online-or-otherwise.
[55] Cari Simon, *On top of everything else, sexual assault hurts the survivors' grades*, WASHINGTON POST (Aug. 6, 2014), https://www.washingtonpost.com/posteverything/wp/2014/08/06/after-a-sexual-assault-survivors-gpas-plummet-this-is-a-bigger-problem-than-you-think/?utm_term=.f6fd59aa8475.
[56] *Judith McFarlane et al., "Stalking and Intimate Partner Femicide," Homicide Studies 3, no. 4 (1999).*
[57] Katrina Baum, Shannan Catalano, Michael Rand, and Kristina Rose, "Stalking Victimization in the United States" (Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, 2009).

EXHIBIT 28

14

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

experienced stalking in the academic year prior to the study.[58] It is important to note that stalking often occurs in the context of both dating violence and sexual violence. In one study, researchers found that 43 percent of victims were stalked by a current or former boyfriend, and in 10 percent of incidents, the victim reported that the stalker committed or attempted forced sexual contact.[59] Other research about sexual assault on college campuses found that the perpetrators of these assaults were premeditating, repeat offenders who employed classic stalking strategies (such as surveillance and information-gathering) to select and ensure the vulnerability of their victims.[60]

In any new regulations, the Department should adopt the standard that harassing conduct creates a hostile environment "if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program." This definition, which comes from the Department's 2001 "Dear Colleague Letter,"[61] appropriately recognizes that schools should never permit violence and harassment to interfere with a student's education. Yet the proposed regulations improperly depart from earlier Department guidance by stating that schools do not have to investigate complaints involving "unwelcome conduct of a sexual nature" that "limit[s]" but does not "deny" a students' ability to learn. However, the Department has erred in adopting this for its proposed regulations because, as stated above, the U.S. Supreme Court limited this narrow definition of sexual harassment solely to "private suit[s] for money damages" brought by students against schools.[62] At the campus level, schools should investigate *all* allegations of sexual harassment and it is crucial that the definition of sexual harassment encompass stalking in order to ensure student safety.

SurvJustice therefore proposes that the Department incorporate the definition of sexual harassment contained within the 2001 Guidance in any forthcoming regulations instead of the improper language currently contained in the proposed regulations. In the alternative, we propose that the Department revise prong (3) to read "Sexual assault, Dating violence, Domestic violence, and stalking where based on sex, as defined in 34 CFR 668.46(a)." This would sufficiently protect victims of stalking, intimate partner violence, and dating violence by including those types of misconduct within the definition.

The definitions from 34 CFR 668.46(a) are as follows:

**Stalking**[63]
**(i)** Engaging in a course of conduct directed at a specific person that would cause a reasonable person to -
**(A)** Fear for the person's safety or the safety of others; or
**(B)** Suffer substantial emotional distress.
**(ii)** For the purposes of this definition -

---

[58] Bonnie S. Fisher, Francis T. Cullen, and Michael G. Turner, "Sexual Victimization of College Women" (Washington, DC: U.S. Department of Justice, National Institute of Justice, 2000).
[59] *Id.*
[60] David Lisak and Paul Miller, "Repeat Rape and Multiple Offending Among Undetected Rapists," *Violence and Victims* vol. 17, no.1 (February 2002).
[61] https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf
[62] *See Davis v. Monroe County Board of Education*, 526 US 629 (1999).
[63] 34 CFR 668.46(a)

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

**(A)** *Course of conduct* means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property.

**(B)** *Reasonable person* means a reasonable person under similar circumstances[64] and with similar identities to the victim. [65]

**(C)** *Substantial emotional distress* means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

### Dating Violence[66]

Violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim.

**(i)** The existence of such a relationship shall be determined based on the reporting party's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

**(ii)** For the purposes of this definition -

**(A)** Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse.

**(B)** Dating violence does not include acts covered under the definition of domestic violence.

### Domestic Violence[67]

**(i)** A felony or misdemeanor crime of violence committed -

**(A)** By a current or former spouse or intimate partner of the victim;

**(B)** By a person with whom the victim shares a child in common;

**(C)** By a person who is cohabitating with, or has cohabitated with, the victim as a spouse or intimate partner;

**(D)** By a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred, or

**(E)** By any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred.

---

[64] New York case law highlights the importance of why past experiences of the complainant are relevant to the allegations of defendant's intention to place the complainant in reasonable fear of physical injury. People v. Payton, 161 Misc. 2d 170, 175, 612 N.Y.S.2d 815, 818 (Crim. Ct. 1994). *See also* People v. Goetz 68 N.Y.2d 96 at 114, 506 N.Y.S.2d 18, 497 N.E.2d 41. In order to constitute a 'true threat' which will support a conviction for aggravated harassment, it must be shown that under the circumstances, an ordinary, reasonable recipient familiar with the context of the communication would interpret it as a true threat of injury, whether or not the defendant subjectively intended the communication to convey a true threat. Put this in the context of something that seems benign- the classic example of sending flowers to the victim. Most reasonable people would view this as a thoughtful or kind gesture. But what if the abuser told the victim that he would send her flowers on the day he was going to kill her?

[65] In its first decision interpreting the statute, the Court of Appeals emphasized that the statutory requirement of intent was appropriately limited to an intent to engage in a course of conduct targeted at a specific person and did not include an additional intent to cause a specific result, such as fear. The statute thus focuses on what the offenders do, not what they mean by it or what they intend as their ultimate goal. In this manner, the law could properly reach those "delusional stalkers who believe either that their victims are in love with them or that they can win their victims' love by pursuing them.". If the Legislature had required that the stalker intend to frighten or harm the victim, the statute would be debilitated and a great many victims endangered. People v. Stuart, 100 N.Y.2d 412, 427, 765 N.Y.S.2d 1, 797 N.E.2d 28 (2003).

[66] Id.

[67] Id.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

If the proposed Title IX regulations do not include stalking within the definition of sexual harassment, student safety will be greatly at risk.[68] In addition, Title IX definition will not satisfy the civil rights law's stated purpose of promoting and protecting civil rights in education. The exclusion of stalking would exclude dangerous behaviors—many of which we have seen committed against our clients—from Title IX's coverage. Some examples of these types of behaviors include: (1) following a student to their classes, workplace, or home; (2) repeatedly contacting a student despite frequent requests to cease communication; (3) threats of self-harm if a student does not stay in a relationship with a perpetrator or otherwise comply with their requests; (4) isolation from friends and family; and (5) endangerment of safety through behavior such as reckless driving, to name just a few. Although this conduct would likely be covered under the Clery Act (and thereby entitle victims to pursue the school disciplinary process and trigger other victim rights), simultaneous exclusion from Title IX would cause unnecessary confusion for students and staff.

### d. Proposed rules §§ 106.30 and 106.45(b)(3) would require schools to ignore sexual harassment that occurs outside of a school activity or program, even when it results in the creation of a hostile environment on campus.

The proposed regulations would *require* schools to ignore all complaints involving off-campus or online sexual harassment (including sexual violence) that occur outside of a school-sponsored program—even if, for example, the student is forced to see the perpetrator on campus every day and therefore creates a hostile environment on campus. To understand why it is crucial to maintain Title IX protections for off-campus activities, one need only look at the Department's own recent decision to cut off partial funding to the Chicago Public Schools for failing to address two reports of off-campus sexual assault, which the Department described as "serious and pervasive violations under Title IX."[69] In one case, a tenth grade student was forced to perform oral sex in an abandoned building by a group of 13 boys, 8 of whom she recognized from school. In the other case, another tenth-grade student was given alcohol and sexually abused by a teacher in his car. If the proposed regulations are codified, school districts would be required to dismiss similarly egregious complaints simply because of the location.

This proposal directly conflicts with Title IX's statutory language, which does not depend on where the *underlying conduct* occurred but instead prohibits discrimination that "exclude[s a person] from participation in . . . denie[s a person] the benefits of, or . . . subject[s a person] to discrimination under any education program or activity[.]"[70] For almost two decades, the Department's guidance documents have held schools responsible for addressing sexual harassment if it is "sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program,"[71] regardless of where it occurs.[72]

---

[68] *See, e.g.,* Model Campus Stalking Policy, https://www.futureswithoutviolence.org/model-campus-stalking-policy/ (last visited Jan. 30, 2019).

[69] *See* David Jackson et al., *Federal officials withhold grant money from Chicago Public Schools, citing failure to protect students from sexual abuse*, Chicago Tribune (Sept. 28, 2018), https://www.chicagotribune.com/news/local/breaking/ct-met-cps-civil-rights-20180925-story.html.

[70] 20 U.S.C. § 1681(a).

[71] 2001 Guidance, *supra* note 27.

[72] 2017 Guidance, *supra* note 26 at 1 n.3 ( ("Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities."); 2014 Guidance, *supra* note 26 ("a school must process all complaints of sexual violence, regardless of where the conduct occurred"); 2011 Guidance, *supra* note 26 ("Schools may have an obligation to respond

EXHIBIT 28                                                                                                   17

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

The Department's proposed regulations ignore the reality that sexual harassment often occurs off campus and outside of a school program or activity, yet such incidents are no less traumatic than on-campus harassment as the effects transfer back to the campus.[73] For example, there is still a severely negative impact on a student's education if s/he is forced to see the harasser regularly at school. Furthermore, a great deal of school life occurs off-campus—and in turn, a great deal of sexual harassment. Notably, almost 9 in 10 college students live off campus[74] and much of student life takes place outside of school-sponsored activities. If a professor invites a student to his house under the guise of professional mentorship and then rapes the student, the college would be required to ignore the student's complaint—even if he has to continue taking the professor's class. If a student rapes another student at an off-campus party, the college would not need to investigate—even if she sees the rapist every day in class, the dining hall, or residential hallways. Furthermore, if schools interpret the proposed regulations to prevent them from addressing harassment that occurs off-campus at fraternity and sorority houses,[75] it would be particularly problematic as students of all genders are more likely to be sexually assaulted if they belong to a fraternity or sorority.[76] The reality is that this proposal would make it so that perpetrators receive a free pass as long as they commit abuse in the right location. Repeat offenders will be able to systematically target victims, knowing they can get away with it. The majority of students who seek legal assistance from SurvJustice have experienced sexual violence at an off-campus location, such as a party at someone's house. It is rare for sexual violence to occur on campus in a dorm room. Pursuant to the proposed regulations, then, the vast majority of survivors would be left without any recourse.

The proposed regulations would also pose unique risks to students at community colleges and vocational schools. Students at these institutions do not live on campus, meaning that any harassment committed against them by faculty or other students is especially likely to occur off campus. The proposed regulations would leave these students completely unprotected.

e. **The Department's proposed incorporation of the civil deliberate indifference standard would allow schools to take virtually no action in response to complaints of sexual harassment.**

---

to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity."); 2010 Guidance, *supra* note 26 at 2 (finding Title IX violation where "conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school," regardless of the location of the harassment).

[73] The Department itself admitted in the previous leaked draft of the NPRM that 41% of college sexual assaults occur off campus. *See* Letter from Anne C. Agnew to Paula Stannard et al., *HHS Review: Department of Education Regulation – Noon September 10*, U.S. DEP'T OF HEALTH & HUMAN SERVICES 79 n.21 (Sept. 5, 2018) [*hereinafter* Draft NPRM], *available at* https://atixa.org/wordpress/wp-content/uploads/2018/09/Draft-OCR-regulations-September-2018.pdf.

[74] Sharpe, *How Much Does Living Off-Campus Cost?*, *supra* note 15.

[75] Although the preamble mentions one case where a Kansas State college fraternity was considered an "education program or activity" for the purposes of Title IX, the Department emphasizes that there are many "factors" and that the determination would be specific to each incident. For example, it would depend on whether the school "owned the premises; exercised oversight, supervision, or discipline; or funded, sponsored, promoted, or endorsed the event or circumstance" (83 Fed. Reg. 61468). This multi-factor test is not only unnecessarily unclear and confusing but also is not included in the proposed regulatory language, making it difficult for students and schools to understand their rights and obligations under Title IX. Schools might certainly conclude that § 106.30 and § 106.45(b)(3) mandates dismissal of complaints from all students who are sexually assaulted at unrecognized fraternities, sororities, and other unrecognized social clubs; at unaffiliated local bars and clubs; in non-residential housing; and through online channels in many instances.

[76] Freyd, *supra* note 17.

EXHIBIT 28

18

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

The deliberate indifference standard adopted by the Department in the proposed regulations is a much lower standard than what is required of schools under current guidance, which requires schools to act "reasonably" and "take immediate and effective corrective action" to resolve harassment complaints.[77] This change would mean that schools merely have to avoid acting in a manner that is clearly unreasonable. This is the civil standard that applies in civil lawsuits brought against institutions to obtain monetary damages, and therefore, the Department is again seeking to apply a standard that remains inappropriately burdensome for evaluating *campus* complaints. The practical effects of this proposed rule would shield schools from any administrative accountability under Title IX, even they mishandle complaints, fail to provide effective support for survivors, wrongly determine against the weight of the evidence that an accused harasser was not responsible for sexual assault, or commit other violations that may not rise quite to the level of deliberate indifference.

Examples of how the proposed "deliberate indifference" standard would harm survivors include, but are not limited to:

1. In Tuscaloosa, AL, a student killed herself after the University of Alabama allegedly failed to appropriately handle her sexual assault case. The student's parents sued the school, alleging that the University failed to support their daughter by connecting her to resources or helping her stay in school after the assault. Under the "deliberate indifference" standard in the proposed regulations, the University would not have been liable under Title IX for failing to actively support this student because they could claim their actions in the situation were "not clearly unreasonable," and that they could not have known that their lack of support would drive her to commit suicide.[78]

2. Under the proposed "deliberate indifference" standard, UC Berkeley would have been allowed to ignore allegedly mishandled sexual misconduct cases. A February 2018 report by the Office of Civil Rights found that UC Berkeley received 401 oral and written complaints of sexual harassment or violence, the majority of which were settled through informal processes, and that investigations of sexual assault could take up to three years, an unreasonable period of time given that most undergraduate programs last four years. Under the proposed regulations, UC Berkeley would have only needed to claim each individual response was "not clearly unreasonable" given the circumstances, despite a clear pattern of indifference towards survivors of assault.[79]

### III.   The proposed regulations impermissibly limit the "supportive measures" available to those who report sexual harassment, § 106.30.

Under the proposed regulations, even if a student suffered harassment that occurred on campus *and* it was "severe, pervasive, and objectively offensive," the school would still be able

---

[77] 2001 Guidance, *supra* note 27.

[78] CBS/AP, "Parents of alleged rape victim sue University of Alabama over her suicide," *CBS News,* 4 July 2017. https://www.cbsnews.com/news/megan-rondini-suicide-parents-sue-university-of-alabama-alleged-rape/

[79] Anjali Shrivastava, "UC Berkeley mishandled 8 Title IX cases, federal investigators say," *The Daily Californian,* 1 March 2018. http://www.dailycal.org/2018/03/01/uc-berkeley-mishandled-eight-title-ix-cases-federal-investigators-say/

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

to deny the "supportive measures" that student needed to continue pursuing an education. In particular, the proposed regulations allow schools to deny a student's request for effective "supportive measures" on the grounds that the requested measures are "disciplinary," "punitive," or that they "unreasonably burden[] the other party." For example, a school might feel constrained from transferring a reported harasser to another class or dorm because it would place an "unreasonabl[e] burden," thereby forcing the survivor to change all of her own class and housing assignments in order to avoid seeing the harasser. Groups such as the Association for Student Conduct Administration (ASCA) agrees that "[e]ffective interim measures, including … *actions restricting the accused*, should be offered and used while cases are being resolved, as well as without a formal complaint."[80] In addition, schools may interpret this propose regulation to prohibit issuing a unilateral no-contact order against an assailant and instead require a survivor to agree to a *mutual* no-contact order, which imposes burdens on the survivor solely for reporting sexual harassment and arguably constitutes retaliation by the school.[81] This is a departure from longstanding practice under the 2001 Guidance, which instructed schools to "direct[] *the harasser to have no further contact with the harassed student*" but not vice-versa.[82] Our concern is *not* that survivors should be able to contact perpetrators; in fact, our significant experience in this work has shown us that no survivor has any interest in contacting the person who harassed them and against whom they sought a no-contact order. The problem lies in that mutual no-contact orders unfairly limit survivors from freely moving about campus simply because they filed a report. Even more alarmingly, mutual no-contact orders serve as a mechanism for accused students to file retaliatory complaints against survivors by falsely alleging violations of the mutual no-contact order. SurvJustice has seen firsthand that accused students repeatedly use this tactic (such as by claiming that a survivor-complainant was in the dining hall at the wrong time, for example, or walked by them in a campus building hallway) in order to retaliate. The survivor is then forced to endure an investigation into the falsely alleged violation, which takes a severe toll.

Prior to the 2017 rescission of Title IX guidance, SurvJustice often advocated for schools to provide accommodations to our clients, including during the pendency of an investigation, so that they could continue to safely pursue their education. SurvJustice often requested unilateral no-contact orders on our clients' behalf but opposed mutual no-contact orders because of our aforementioned view that they are retaliatory. SurvJustice has observed schools issuing mutual no contact orders on a regular basis and that these mutual no-contact orders are forms of retaliation when there is no basis to place the order against our clients other than the fact that they made a Title IX complaint. In such instances, schools limit victims' access to educational opportunities and benefits as a direct result of the victims' assertion of their federal rights and utilization of the Title IX grievance process.

---

[80] Association for Student Conduct Administration, *ASCA 2014 White Paper: Student Conduct Administration & Title IX: Gold Standard Practices for Resolution of Allegations of Sexual Misconduct on College Campuses* 2 (2014) [hereinafter *ASCA 2014 White Paper*], https://www.theasca.org/Files/Publications/ASCA%202014%20White%20Paper.pdf.

[81] *See, e.g.*, Joan Zorza, *What Is Wrong with Mutual Orders of Protection?* 4(5) DOMESTIC VIOLENCE REP. 67 (1999). Experts have recognized for decades that *mutual* no-contact orders are harmful to victims, because abusers often manipulate their victims into violating the mutual order.

[82] 2001 Guidance, *supra* note 25, at 16.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

As a former prosecutor in the sex crimes and domestic violence units, and a litigator in New York Family Court[83] on cases involving sexual and intimate partner violence, I know that domestic violence and stalking mutual orders of protection (akin to mutual no-contact orders)[84] are very difficult (if not impossible) to enforce.[85] Abusers consistently utilize them to retaliate against former intimate partners, intentionally placing them in fear of facing sanctions.[86]

Although the general sentiment on mutual protective orders indicates that proper issuance of mutual orders must take place within an actual court system[87]—which already has procedures in place to test evidence and determine standards of abuse by all parties—the Department instead argues that in a Title IX setting schools are issuing using mutual protective orders not because evidence has been found to prove complainants pose a risk to their perpetrators or to their perpetrators access to education but because of respondents' claiming "supportive measures" for survivors are "disciplinary" or overly "punitive" or that they "unreasonably burden the other party."

Again, the Department is elevating rights of the accused over the civil rights of the accuser. Title IX is a civil rights remedy to provide equal access to education, but placing sanctions on an accuser for simply reporting sexual harassment may violate the accuser's due process rights.[88]

The proposed regulation suggests that its definition of supportive measures is a neutral stance in the face of allegations prior to an adjudication, but this simply is not true. By prohibiting such measures from ever "unreasonably burdening the other party," the Department strips institutions of the ability to impose unilateral no-contact orders or other safety measures designed to protect the complainant *when it identifies the need to do so*. If implemented, this provision will lead to

---

[83] For more information regarding the background of SurvJustice Executive Director Katherine W. McGerald, please visit http://www.survjustice.org/staff.

[84] Elizabeth Topliffe, *Why Civil Protection Orders Are Effective Remedies for Domestic Violence but Mutual Protective Orders are Not*, 67 Indiana Law Journal 951, 1039-1065, (1992). "In general, mutual protective orders are not enforced as well as regular orders. Also, the mutual protection order often prejudices the victim in future proceedings" (1061). Police don't know how to respond, often don't arrest (1061-1062). Abusers use mutual protection orders as weapons against those they abuse in future legal proceedings, including "divorce proceedings, civil proceedings on domestic violence, and criminal proceedings against the abuser . . . husbands will often seek new forms of control when the old (violence) fails" (1062).

[85] *Id.*

[86] *Id.*

[87] *Id.* at 1060 ("Judicial behavior strongly influences the possibility of future violence and issuing a mutual protection order can send a message both to the batterer and to the victim regarding violence"). *Id* at 1061 ("[Batterers] could easily understand a mutual protection order to mean that the court blames the victim as much as the batterer. The implication is that there is no accountability by the batterer."). *Id* ("Furthermore, the victim herself can recognize this implicit message . . . when myths [that the woman either instigates or deserves the abuse] are bolstered by the judicial system's response, the woman feels that there is no place where she will be understood. The woman often finds the court's approach degrading, and the experience reinforces the woman's belief that she is to blame for her abuse").

[88] *See, E.g.* Jane F. Golden, "Mutual Orders of Protection in New York State Family Offense Proceedings: A Denial of 'Liberty' Without Due Process of Law," in *Columbia Human Rights Law Review* 18:2 (Spring 1987), 309. Mutual Orders of Protection in Practice…"create the appearance that both parties were found to be violent" at 319, "may work against the woman in a subsequent divorce action" at 318; "May encourage police not to take action when survivors call about an abusive partner, or may discourage reporting if they believe police may not enforce or may call child protective services to take their children" at 319; "A final problem with mutual orders of protection, identified by the Task Force, is that they perpetuate the myth that battered women are responsible for the violence directed against them" at 319.

EXHIBIT 28

complainants alone bearing the burden of making any changes to their housing or academics in order to feel safe. Ironically, the Department repeatedly emphasizes that supportive measures are "designed to restore or preserve access to the recipient's education program or activity." Considering that complainants will be forced to limit participation in education programs or activities due to this definition, this emphasis is clearly not intended to treat parties equitably and will, in fact, harm the civil rights of survivors.

**IV.    The proposed regulations would allow schools to claim religious exemptions after violating Title IX, with no prior notification to students or the Department that they would seek to claim such an exemption.**

The current rules allow schools to claim religious exemptions by notifying the Department in writing of the specific Title IX provisions that conflict with their religious beliefs. The proposed regulations modify this requirement of advance notice by permitting schools to retroactively opt out of the requirement that they adhere to administrative Title IX requirements or face withdrawal of federal funding. Such schools would not be required to notify students, parents, or the Department in advance that they would be seeking such an exemption; instead, schools would be able to seek an exemption after a federal complaint is filed against them. This would allow schools to conceal their intent to discriminate against populations of students that religious institutions often discriminate against on the basis of sex, including LGBTQIA students, pregnant or parenting students (including those who are unmarried and those who have become pregnant as a result of rape), and students who access or attempt to access birth control or abortion.[89]

In particular, this provision will further decrease the disproportionately low reporting rates for LGBTQIA survivors at religious institutions. It is well understood that LGBTQIA students who are not public about their sexuality are already less likely to report intimate partner violence because the decision to report often forces LBGTQIA students to reveal their sexuality, which could be traumatic and even dangerous, especially in the context of religious institutions that go so far as to punish students for not being heterosexual or seek to forcibly "reform" them. Uncertainty regarding whether or not their institution will take their experiences of sexual violence seriously could depress reporting rates even further and effectively prohibit queer survivors from accessing the resources that they may need in the aftermath of abuse.

Many marginalized populations already experience sexual violence at higher rates than other groups. The denial of Title IX protections for religious reasons will only serve to multiply their trauma. According to the National Sexual Violence Resource Center, lesbian, gay, and bisexual students experience sexual violence at significantly higher rates than their heterosexual peers.[90] For transgender students, the risk is even more pronounced: 47% of respondents to the 2015

---

[89] Transgender students are especially at risk because this proposed change threatens to compound the harms created by (i) the Department's decision in February 2017 to rescind Title IX guidance on the rights of transgender students;[89] (ii) the Department's decision in February 2018 to stop investigating civil rights complaints from transgender students regarding access to sex-segregated facilities; and (iii) HHS's leaked proposal in October 2018 for the Department and other federal agencies to define "sex" to exclude transgender, non-binary, and intersex students. Erica. L. Green et al., *'Transgender' Could Be Defined Out of Existence Under Trump Administration*, NEW YORK TIMES (Oct. 21, 2018),
https://www.nytimes.com/2018/10/21/us/politics/transgender-trump-administration-sex-definition.html.
[90] National Sexual Violence Resource Center, *Sexual Violence and Individuals Who Identify as LGBTQ*,
https://www.nsvrc.org/sites/default/files/Publications_NSVRC_Guides_Sexual-Harassment-Bullying-Youth.pdf.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

National Transgender Discrimination Survey had experienced sexual assault at some point during their lives, and 1 in 10 had been sexually assaulted in the past year.[91] Allowing religious schools to effectively deny LGBTQIA students protection under Title IX propagates the extremely damaging myth that LGBTQIA individuals cannot or do not experience sexual assault, which in turn can cause queer survivors to doubt their own experiences of sexual violence and harassment.[92] The Department's previous statements that Title IX does not protect transgender students from discrimination "on the basis of gender identity"[93] further supports the fact that it refuses to protect all students from gender-based discrimination and violence.

Further, the provision regarding religious exemptions directly conflicts with the current[94] and proposed[95] regulations requiring that each covered educational institution "notify" all applicants, students, employees, and unions "that it *does not* discriminate on the basis of sex." By requiring schools to tell students that they do not discriminate while simultaneously allowing them to opt out of anti-discrimination provisions, the Department is enabling schools to actively mislead students. This bait-and-switch practice sends a clear message to students that the Department has no intention of holding schools accountable for discriminating against students. In turn, this sends a message to students that they should not bother filing Title IX complaints with OCR, as there will be no consequences because the Department will likely *never* find that a school is out of compliance with Title IX.

### V.    The grievance procedures required by the proposed regulations would impermissibly tilt the process in favor of accused students, retraumatize complainants, and conflict with Title IX's nondiscrimination mandate.

Current Title IX regulations and guidance require schools to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of student and employee complaints" of sexual misconduct.[96] The proposed regulations also purport to require "equitable" processes.[97] However, they are simultaneously riddled with language that would require schools to conduct grievance procedures in a fundamentally *inequitable* way that favors accused students and goes far beyond the requirements of due process.

The Department repeatedly uses the purported need to protect accused students' due process rights in order to justify weakening Title IX protections for complainants. It also proposes a provision that specifies that nothing in the rules would require a school to deprive people of their due process rights.[98] However, this language is wholly unnecessary, as schools have *never* been required to deprive anyone of due process rights. In fact, the current Title IX regulations and the rescinded guidance provided more rigorous protections to accused students

---

[91] National Center for Transgender Equality, *A Report of the National Transgender Discrimination Survey*, https://transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf.
[92] RAINN, *LGBTQ Survivors of Sexual Violence*, https://www.rainn.org/articles/lgbtq-survivors-sexual-violence
[93] Moriah Balingit, *The Washington Post*, "Education Department no longer investigating transgender bathroom complaints," https://www.washingtonpost.com/news/education/wp/2018/02/12/education-department-will-no-longer-investigate-transgender-bathroom-complaints/?utm_term=.d93a74c4d526.
[94] 34 C.F.R. § 106.9(a).
[95] Proposed rule §106.8(b)(1).
[96] 34 C.F.R. § 106.8(b).
[97] *See* proposed rule § 106.8(c).
[98] Proposed rule § 106.6(d)(2).

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

than those required under the Constitution. The U.S. Supreme Court has held that students facing short-term suspensions from public schools[99] require only "some kind of" "oral or written notice" and "some kind of hearing."[100] The Court has explicitly said that a 10-day suspension does not require "the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident."[101] The Court has also approved at least one circuit court decision holding that expulsion from a public school does not require "a full-dress judicial hearing."[102] Furthermore, the Department's 2001 Guidance explicitly instructs schools to protect the "due process rights of the accused."[103] The addition of § 106.6(d)(2) provides no new or necessary protections and inappropriately pits Title IX's civil rights mandate against the Constitution when no such conflict actually exists.

***The NPRM improperly mandates turning Title IX proceedings into quasi-trials and only for disciplinary matters involving sexual harassment.***

The grievance procedures outlined in proposed §160.45 reflect an attempt by the Department to turn disciplinary and grievance processes *only for complaints involving sexual harassment*,[104] but not for any other potentially criminal and prosecutable offenses, into quasi-court like adversarial proceedings—complete with protections analogous to those provided in criminal court for accused students. This undermines the function of Title IX as a statute designed to address historic sex discrimination in the education context: "Title IX is about institutional accountability, a civil rights mechanism to hold institutions accountable for providing equitable education," not a criminal trial with the rights required of criminal court proceedings.[105]

**a. The proposed rule's requirement that an accused student be presumed not responsible for harassment is inequitable and inappropriate in school proceedings.**

Under proposed rule § 106.45(b)(1)(iv), schools would be required to presume that a report of harassment is false, which is biased in favor of accused students and effectively shifts the burden of proof to the complainant. This proposed presumption also conflicts with proposed § 106.45(b)(1)(ii), which states that "credibility determinations may not be based on a person's status as a complainant" or "respondent." This presumption would also exacerbate rape myths upon which many of the proposed regulations are based—namely, the myth that women and girls often lie about sexual assault.[106] *The presumption of innocence is a criminal law principle,*

---

[99] Constitutional due process requirements do not apply to private institutions.

[100] *Goss v. Lopez*, 419 U.S. 565, 566, 579 (1975).

[101] *Id.* at 583. *See also Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 23 (D. Me. 2005); *B.S. v. Bd. of Sch. Trs.*, 255 F. Supp. 2d 891, 899 (N.D. Ind. 2003); *Coplin v. Conejo Valley Unified Sch. Dist.*, 903 F. Supp. 1377, 1383 (C.D. Cal. 1995); *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 247 (D. Vt. 1994).

[102] *E.g., Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 158 (5th Cir. 1961), *cert. denied*, 368 U.S. 930 (1961).

[103] 2001 Guidance, *supra* note 27 at 22.

[104] This is referred to as "rape exceptionalism." Naomi Mann, *Taming Title IX Tensions*, 20 J. CONST. L. 631, 666 (2018); Michelle Anderson, *Campus Sexual Assault Adjudication and Resistance to Reform,* 125 YALE L.J. 1940, 2000 (2016).

[105] *Id.*

[106] Indeed, the data shows that men and boys are far more likely to be victims of sexual assault than to be falsely accused of it. *See, e.g.,* Kingkade, *supra* note 10.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

*incorrectly imported into this context.*[107] Criminal defendants are presumed innocent until proven guilty because their very liberty is at stake in that they face imprisonment if they are found guilty. There is no such principle in civil proceedings or civil rights proceedings, and Title IX is a civil rights law that ensures that sexual harassment is never the end to anyone's education, making it most analogous to civil proceedings. It is entirely inappropriate to import criminal procedures and protections into the campus disciplinary process. Notably, this is not what the U.S. Constitution provides and to do so would fly in the face of such a sacred document.

Title IX has always required schools to treat parties equitably. A presumption that one party is lying (and again, a presumption that is *provided only to those accused of sexual harassment under Title IX* but not any other potentially criminally prosecutable offense) fundamentally alters this equitability framework. Instead, institutions would be forced to take a position before any evidence is examined or weighed. The Department's claim that this provision promotes impartiality is a blatant attempt to detract from how it advances only the interests of those accused of sexual harassment and creates a special standard that applies solely for proceedings involving allegations of sexual harassment.

Moreover, § 106.45(b)(1)(iv) would encourage schools to ignore or punish historically marginalized and underrepresented groups for allegedly lying when they report sexual harassment.[108] Schools also may be more likely to ignore or punish survivors who are women and girls of color,[109] pregnant and parenting students,[110] and LGBTQIA students[111] because of harmful race and sex stereotypes that label them as "promiscuous." If all perpetrators are presumed innocent, all survivors are confronted with the parallel assumption that if sexual contact did occur, they (the survivors) must have played some part in initiating or wanting the contact. The effects of the assumption that survivors are somehow to blame for their experiences are intensified for historically marginalized populations already burdened with harmful stereotypes of promiscuity. Please see below for examples:

**Women and girls of color**: Women and girls of color already face unfair discipline due to race and sex stereotypes.[112] Schools are also more likely to ignore, blame, and punish women and girls of color who report sexual harassment due to harmful race and sex stereotypes that

---

[107] *See also* the Department's reference to "inculpatory and exculpatory evidence" (§ 106.45(b)(1)(ii)), the Department's assertion that "guilt [should] not [be] predetermined" (83 Fed. Reg. 61464), and Secretary DeVos's discussion of the "presumption of innocence" (Betsy DeVos, *Betsey DeVos: It's time we balance the scales of justice in our schools*, Washington Post (Nov. 20, 2018), https://www.washingtonpost.com/opinions/betsey-devos-its-time-we-balance-the-scales-of-justice-in-our-schools/2018/11/20/8dc59348-ecd6-11e8-9236-bb94154151d2_story.html.

[108] *E.g.*, Tyler Kingkade, *When Colleges Threaten To Punish Students Who Report Sexual Violence*, HUFFINGTON POST (Sept. 9, 2015), https://www.huffingtonpost.com/entry/sexual-assault-victims-punishment_us_55ada33de4b0caf721b3b61c.

[109] *E.g.*, Nancy Chi Cantalupo, *And Even More of Us Are Brave: Intersectionality & Sexual Harassment of Women Students of Color*, 42 HARVARD J.L. & GENDER 1, 16, 24-29 (forthcoming); https://ssrn.com/abstract=3168909; National Women's Law Center, *Let Her Learn: A Toolkit To Stop School Pushout for Girls of Color* 1 (2016) [hereinafter *Let Her Learn: Girls of Color*], https://nwlc.org/resources/let-her-learn-a-toolkit-to-stop-school-push-out-for-girls-of-color.

[110] Chambers & Erausquin, *The Promise of Intersectional Stigma to Understand the Complexities of Adolescent Pregnancy and Motherhood*, JOURNAL OF CHILD ADOLESCENT BEHAVIOR (2015), https://www.omicsonline.org/open-access/the-promise-of-intersectional-stigma-to-understand-the-complexities-ofadolescent-pregnancy-and-motherhood-2375-4494-1000249.pdf.

[111] *See, e.g.*, David Pinsof, et al., *The Effect of the Promiscuity Stereotype on Opposition to Gay Rights* (2017), https://doi.org/10.1371/journal.pone.0178534.

[112] *Let Her Learn: Girls of Color*, *supra* note 109 at 1.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

label them as "promiscuous."[113] For example, Black women and girls are commonly stereotyped as "Jezebels," Latina women and girls as "hotblooded," Asian American and Pacific Islander women and girls as "submissive, and naturally erotic," Native women and girls as "sexually violable as a tool of war and colonization," and multiracial women and girls as "tragic and vulnerable, historically, products of sexual and racial domination" (internal quotations and brackets omitted).[114] Black women and girls are especially likely to be punished by schools. For example, the Department's 2013–14 Civil Rights Data Collection (CRDC) shows that Black girls are five times more likely than white girls to be suspended in K-12, and that while Black girls represented 20% of all preschool enrolled students, they were 54% of preschool students who were suspended.[115] The Department's 2015–16 CRDC again shows that Black girls are more likely to be suspended and expelled than other girls.[116] Schools are also more likely to punish Black women and girls by labeling them as the aggressor when they defend themselves against their harassers or when they respond to trauma because of stereotypes that they are "angry" and "aggressive."[117] The effects of many of these harmful trends were extremely evident in a recent incident in Binghamton, New York, in which four Black middle school girls were strip-searched after appearing "hyper and giddy" in the cafeteria. One of the students received an in-school suspension after refusing to remove her clothing.[118] This incident is not only a clear example not only of how Black girls are more likely to be punished in school but also of how they are considered less vulnerable to the trauma induced by violations of bodily autonomy, as is the case in strip-searches and incidents of sexual violence.

**Pregnant or parenting students:** Women and girls who are pregnant or parenting are more likely to experience sexual harassment than their peers, due in part to the stereotype that they are more "promiscuous" because they have engaged in sexual intercourse in the past. For example, 56% of girls ages 14–18 who are pregnant or parenting are kissed or touched without their consent.[119]

**LGBTQIA students**: LGBTQIA students are more likely to experience sexual harassment than their peers. For example, more than half of LGBTQIA students ages 13–21 are sexually harassed at school,[120] and nearly 1 in 4 transgender and gender-nonconforming students

---

[113] *E.g.*, Cantalupo, *supra* note 109 at 16, 24-29.

[114] *Id.* at 24-25.

[115] U.S. Dep't of Education, Office for Civil Rights, *A First Look: Key Data Highlights on Equity and Opportunity Gaps in Our Nation's Public Schools*, at 3 (June 7, 2016; last updated Oct. 28, 2016), https://www2.ed.gov/about/offices/list/ocr/docs/2013-14-first-look.pdf.

[116] U.S. Dep't of Education, Office for Civil Rights, *School Climate and Safety: Data Highlights on School Climate and Safety In Our Nation's Public Schools* (Apr. 2018),
https://www2.ed.gov/about/offices/list/ocr/docs/school-climate-and-safety.pdf.

[117] NAACP Legal Defense and Educational Fund, Inc. & National Women's Law Center, *Unlocking Opportunity for African American Girls: A Call to Action for Educational Equity* 5, 18, 20, 25 (2014), https://nwlc.org/wp-content/uploads/2015/08/unlocking_opportunity_for_african_american_girls_report.pdf. *See also* Sonja C. Tonnesen, *Commentary: "Hit It and Quit It": Responses to Black Girls' Victimization in School*, 28 BERKELEY J. GENDER, L. & JUST. 1 (2013), http://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=1312&context=bglj.

[118] Carla Herreria, "NY Middle School Faces Scrutiny After Parents Claim 4 Black Girls Were Strip-Searched," *Huffington Post,* 26 January 2019. https://www.huffingtonpost.com/entry/students-strip-searched-new-york_us_5c4d1f70e4b0e1872d4476df.

[119] *Let Her Learn: Pregnant or Parenting Students, supra* note 11 at 12.

[120] *2017 National School Climate Survey, supra* note 12 at 26.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

are sexually assaulted during college.[121] However, LGBTQIA students are also less likely to report sexual assault to school authorities or the police because they are rightfully concerned about further discrimination or retaliation due to their LGBTQIA status.[122] They are also less likely to be believed due to stereotypes that they are more "promiscuous" or bring the "attention" upon themselves.

**Students with disabilities:** As the Department notes in the preamble,[123] students with disabilities have different experiences, challenges, and needs." But the proposed regulations are especially harmful to students with disabilities, who already face additional barriers to equal access to education and are 2.9 times more likely than their peers to be sexually assaulted.[124] They are also less likely to be believed due to stereotypes about people with disabilities and often have greater difficulty describing the harassment they experience.[125]

In our work representing survivors of sexual violence, we already witness significant issues at the campus level wherein investigators, hearing panels, and Title IX officials rely on gender stereotypes and myths about false allegations as well as engage in victim-blaming techniques. This proposed rule would only further codify, and deem as relevant, such egregious falsehoods, misconceptions, and shoddy investigative techniques—in turn conveying that the Department approves and endorses them.

**b. The proposed regulations would improperly require survivors and witnesses in colleges and graduate programs to submit to live cross-examination by their named harasser's advisor of choice without any procedural protections, causing further trauma.**

Proposed rule § 106.45(b)(3)(vii) requires colleges and graduate schools to conduct a "live hearing," and states that parties and witnesses must submit to cross-examination by the other party's "advisor of choice." This advisor could be an attorney who verbally attacks the survivor's character instead of engaging in genuine questioning to aid the fact-finding process. It could even be an angry parent or a close friend of the accused student who would lack any training or experience in conducting cross-examination, while also holding a position of severe bias. Furthermore, the adversarial and contentious nature of cross-examination would further traumatize college and graduate-school survivors who seek help through Title IX. Being forced to endure detailed, personal, and humiliating questions (often rooted in gender stereotypes and rape myths that tend to blame victims for incidents of sexual violence)[126] would understandably discourage many students—including both parties and witnesses—from participating in a Title IX grievance process, thereby chilling those who have experienced or witnessed harassment

---

[121] *AAU Campus Climate Survey, supra* note 9 at 13-14 (Sept. 2015), https://www.aau.edu/key-issues/aau-climate-survey-sexual-assault-and-sexual-misconduct-2015.

[122] *2015 U.S. Transgender Survey, supra* note 23 at 12.

[123] 83 Fed. Reg. 61483.

[124] *Let Her Learn: Girls with Disabilities, supra* note 14 at 7.

[125] *E.g.*, Angela Browne, et al., *Examining Criminal Justice Responses to and Help-Seeking Patterns of Sexual Violence Survivors with Disabilities* 11, 14-15 (2016), https://www.nij.gov/topics/crime/rape-sexual-violence/Pages/challenges-facing-sexual-assault-survivors-with-disabilities.aspx.

[126] Zydervelt, S., Zajac, R., Kaladelfos, A. and Westera, N., *Lawyers' Strategies for Cross-Examining Rape Complainants: Have we Moved Beyond the 1950s?*, BRITISH JOURNAL OF CRIMINOLOGY, 57(3), 551-69 (2016).

EXHIBIT 28

SurvJustice Inc.
1015 15ᵗʰ St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

from coming forward. Confoundingly, the proposed regulations implement this requirement without guaranteeing any of the procedural protections that parties and witnesses have during cross-examination in the criminal court proceedings that apparently inspired this requirement. Schools would not be required to apply rules of evidence or make a prosecuting attorney available to object or a judge available to rule on objections. The live cross-examination requirement would also lead to sharp inequities if one party can afford an attorney and the other cannot.

Educational institutions are not courtrooms with the prescribed protections of court proceedings. The Department is fundamentally changing the nature of educational disciplinary proceedings into quasi-legal trials by requiring adversarial cross-examination. Showing its lack of expertise in trial work, the Department does not even account for any training that would be required for hearing panelists or others, the limits of these quasi-legal trials, or the protections necessary to prevent complete chaos with its proposals.[127]

The Department's failure to recognize the unique nature of disciplinary processes at educational institutions constitutes willful ignorance with dangerous consequences. Requiring students and their advisors to prepare and conduct cross-examination switches the burden of conducting an investigation from the institution to the students. This could require institutions to provide counsel to all parties. It could make institutions liable for ineffective assistance of counsel. It could force institutions to hire retired judges as hearing chairs. In sum, this would require resources that schools simply do not have. The utter lack of information contained within the NPRM shows the Department's lack of understanding about the ramifications of its proposals; alternatively, it suggests that the Department is *willfully ignorant* of these predictable collateral problems. Regardless of the reason for the deficiencies, the Department's proposal is simply not workable as it stands; in fact, it may not be workable even with additional details, as many institutions would not have the capacity and resources to accommodate this requirement that would involve significant allocations of time, money, resources, and policy revisions.

### *The proposed rule misstates the law*

Neither the Constitution nor any other federal law requires live cross-examination in school conduct proceedings. The U.S. Supreme Court does not require any form of cross-examination (live or indirect) in public school disciplinary proceedings under the Due Process Clause.[128] Instead, the Court has explicitly stated that a 10-day suspension does not require "the opportunity . . . to confront and cross-examine witnesses"[129] and has approved at least one circuit court decision holding that expulsion does not require "a full-dress judicial hearing, with the right to cross-examine witnesses."[130] The vast majority of courts that have reached this issue agree that live cross-examination is not required in public school disciplinary proceedings as

---

[127] Mann, *supra* note 86, at 657. "Adding [mandatory] counsel would complicate the proceedings by importing outside legal rules based on adversarial systems. Schools and educational institutions would need to learn to navigate and utilize these foreign systems. Critically for students, the use of counsel would shift the burden of investigating and proving allegations from the educational institution to the students. This is a high burden that would disproportionately fall on them."

[128] Of course, private schools are not impacted by Constitutional due process requirements.

[129] *Goss*, 419 U.S. at 583. *See also Coplin*, 903 F. Supp. at 1383; *Fellheimer*, 869 F. Supp. at 247.

[130] *E.g.*, *Dixon*, 294 F.2d at 158, *cert. denied*, 368 U.S. 930 (1961). *See also Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) (holding no due process violation in expulsion of college student without providing him to right to cross-examination).

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699
SURVJUSTICE

long as there is a meaningful opportunity to have questions submitted to and posed by a hearing examiner.[131] The Department itself admits that written questions submitted by students or oral questions asked by a neutral school official are fair and effective ways to discern the truth in K-12 schools,[132] and it therefore proposes retaining that method for K-12 proceedings. The Department has failed to explain why the processes that it considers effective for adjudicating sexual harassment complaints in proceedings involving 17- or 18-year-old students in high school would somehow be ineffective for 17- or 18-year-old students in college.

In a radical shift from prior practice and guidance- and from the Department's stated mission- the Department's misguided and unrelenting advocacy for adversarial cross-examination shows the Department's blatant disregard for victims and support for those accused of sexual harassment or assault. The Department's reasoning for this shift is one-sided, focusing on carefully selected federal cases that have described the need for cross-examination in educational settings while ignoring the split in how courts understand institutional due process obligations to include or exclude adversarial cross-examination.[133] A close examination of federal case law regarding the due process protections required in student disciplinary cases reveals a substantially different landscape from what the Department described in the proposed rules[134] Many federal appellate courts have grappled with this concept and questioned whether there is a procedural due process right to any cross-examination at all or contemplated that any such right would be narrow.[135] Indeed, many courts have recognized that "[f]undamental fairness

---

[131] *See A Sharp Backward Turn*, *supra* note 51 (*Baum* "is anomalous.").

[132] 83 Fed. Reg. 61476.

[133] Sara O'Toole, "Campus Sexual Assault Adjudication, Student Due Process, and a Bar on Direct Cross Examination," in *University of Pittsburgh Law Review* 79, 511-542 (Spring 2018). (""An examination of the due process case law in educational settings and an application of the analysis from *Mathews v. Eldridge* supports the recommendation against personal cross-examination. A balancing of the *Mathews* factors demonstrates that the limited additional value of personal cross-examination and a university's interest in maintaining an affordable and effective adjudication system weigh against the interest of the student, who is offered a variety of procedural protections aside from personal cross-examination" "*Morrissey v. Brewer:* "It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands")

[134] *Id.* ("An analysis of the requirement of direct cross examination under the *Mathews* balancing factors reveals that it is not mandated by due process in university disciplinary settings…" "The potential harm to a student dismissed from school should not be minimized, but his or her interest is not the same as a criminal defendant or even a civil defendant…"
"Next, a court would consider the risk of erroneous deprivation of the student's interest and the probable value of allowing direct cross-examination during the hearing… – *Goss* held that "requiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action…" "In light of the disputed nature of the facts and the importance of witness credibility in [the] case, due process required that the panel permit the plaintiff to hear all evidence against him and to direct questions to his accuser through the panel.' Therefore, the court found that directing questions through a panel would have provided sufficient due process." Citing: *Donohue v. Baker*, 976 F. Supp. 136, 147 (N.D.N.Y. 1997). "Distinctive characteristics of sexual assault adjudication may decrease the effectiveness of personal cross-examination. Complaints of sexual assault involve instances of intimate attack that may traumatize survivors physically and emotionally. When survivors of sexual assault are personally cross-examined, it often adds to their trauma and may make it more difficult for them to share their stories…" "Considering the alternative of directing questions through a panel, the added value of allowing personal cross-examination is limited in the university setting. Moreover, the risk of erroneous deprivation is low because universities have established protective processes that provide notice and a hearing to handle disciplinary matters…"

[135] Mann, *supra* note 86, at 658; *See also* Newsome v. Batavia Local School Dist., 842 F.2d 920, 925–26 (6th Cir. 1988) (deciding that there is no right to cross-examine adverse witnesses in expulsion proceedings due to the burden it would place on school employees); Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987) ("Where basic fairness is preserved, we have not required the cross-examination of witnesses . . . ."); Brewer v. Austin Independent School Dist., 779 F.2d 26, 263 (5th Cir. 1985) (rejecting argument that accused had a procedural due process right to cross-examination in a suspension case and stating, "[W]e reject any suggestion that the technicalities of criminal procedure ought to be transported into school suspension cases."); Boykins v. Fairfield Bd. Of Education, 492 F.2d 697, 701 (5th Cir. 1974) (holding that the right to cross-examination is not required in expulsion proceedings); Flaim v. Med. College of Ohio, 418 F.3d 629, 636 (6th Cir. 2005) ("Some circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases.");

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURV JUSTICE

without adversarial cross-examination is satisfied where the accused is provided with the opportunity to know the substance of the evidence against him and has the opportunity to provide evidence and testimony on his behalf."[136] A review of the body of law regarding this issue—as opposed to the one federal appellate decision that the Department cites—makes it clear that there are limits that may be appropriately placed on cross-examination once fundamental fairness has been provided.[137]

Not surprisingly, experts on Title IX and student conduct procedures similarly oppose these proposed regulations. The Association of Title IX Administrators ("ATIXA") announced in October 2018 that it opposes live, adversarial cross-examination, stating that instead "investigators should solicit questions from the parties, and pose those questions the investigators deem appropriate in the investigation interviews."[138] The Association for Student Conduct Administration ("ASCA") agrees that schools should "limit[] advisors' participation in student conduct proceedings."[139] The American Bar Association ("ABA") recommends that schools provide "the opportunity for both parties to ask questions through the hearing chair."[140]

### The proposed rule mischaracterizes cross-examination

Cross-examination is an invaluable tool for attorneys—*when done well*.[141] But very few attorneys, let alone parents or friends, would be able to conduct a successful cross-examination. Still, some argue that adversarial questioning is necessary for campus sexual misconduct cases even though it is not used for other student misconduct matters such as drug use, vandalism, and nonsexual assault or harassment. The Department states in its proposed rules that cross-examination "takes aim at credibility like no other procedural device" because it enables the accused to "probe the witness's story to test her memory, intelligence, or possible ulterior

---

Gorman v. University of Rhode Island, 837 F.2d 7, 16 (1st Cir. 1988) ("[T]he right to unlimited cross-examination has not been deemed an essential requirement of due process in school disciplinary cases."); Winnick v. Manning, 460 F.2d 545, 549 (2d Cir. 1972) ("The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings."); Dixon v. Alabama State Board of Education, 294 F.2d 150, 159 (5th Cir. 1961).

[136] Mann, *supra* note 86, at 659. *See also* Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987) ("Where basic fairness is preserved, we have not required the cross-examination of witnesses and a full adversary proceeding."); Goss v. Lopez, 419 U.S. 565, 581 (1975); *Flaim*, 418 F.3d at 636, 641 (deciding whether the "accused individual has the right to respond and defend, which will generally include the opportunity to make a statement and present evidence" when the accused had the "opportunity to present his version of events . . .

[and] point out inconsistencies or contradictions in the officer's testimony"); *Winnick*, 460 F.2d at 549 ("The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings."); *Dixon*, 294 F.2d at 158–59.

[137] *See* Mann, *supra* note 86, at 660-61 ("evidence does not need to be questioned in the traditional adversarial context, the content of cross-examination may be limited, the individuals that may be cross-examined may be limited, cross-examination may be denied where not material to the result, cross-examination does not have to be face-to-face, and cross-examination may be performed through a third party. Permissible cross-examination may be oral or written, with some courts holding that there is no right to change the submitted written questions in response to the victim's testimony at a hearing. The cross-examination may be in front of a hearing board or an investigator) (internal citations omitted).

[138] Association of Title IX Administrators, *ATIXA Position Statement on Cross-Examining: The Urge to Transform College Conduct Proceedings into Courtrooms* 1 (Oct. 5, 2018), https://atixa.org/wordpress/wp-content/uploads/2018/10/ATIXA-Position-Statement_Cross-Examination-final.pdf.

[139] *ASCA 2014 White Paper*, *supra* note **Error! Bookmark not defined.** at 2 (2014).

[140] American Bar Association, *ABA Criminal Justice Section Task Force On College Due Process Rights and Victim Protections: Recommendations for Colleges and Universities in Resolving Allegations of Campus Sexual Misconduct* 8-10 (June 2017).

[141] Michael R. Black, Cross Examination: The Greatest Legal Engine for the Discovery of Truth: A Comparative Analysis of the American and English Rules of Cross-Examination, 15 S.U. L. Rev. 397 (1988)

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

motives,"[142] but the Department fails to make the case for why there must be adversarial cross-examination. Questions need not be adversarial to assess credibility or any potential bias or to test the facts the witness is alleging. Nearly all courts to consider the issue have found that fairness can be fully achieved through questioning by a neutral college administrator. And although the Department of Education says that its proposal will avoid "any unnecessary trauma" that might result from the parties questioning one another directly, there is nothing concrete in the proposed rules or the Department's history to show that it consulted survivors about this.

This brings us to an important question the Department and those who advocate for adversarial cross-examination must ask—what is the point of the cross-examination? Is it to assess credibility, test bias, or determine the facts of the case—or is to trap, harass, try to confuse, and get out only the facts that are best for your client's case?[143] If it is the former, then there is no reason the questions cannot be asked by a hearing examiner; if the latter, then truth is not really being sought, which decimates the Department's argument of adversarial cross-examination as the greatest engine for the truth.[144] As a litigator, I understand the importance of cross-examination before a fact-finder and how to best "sell" your case; however, in an educational setting where the truth is being sought, an advisor can challenge a complainant's or witnesses' credibility by submitting questions for an impartial hearing examiner to ask in an educational disciplinary hearing. As long as the parties have been able to present their facts and evidence, due process is satisfied. Those arguing that this is not the same as cross-examination have yet to demonstrate how, exactly, this procedure is insufficient.

Many attorneys have never participated in a hearing or trial; this means that many of those most adamantly pressing for cross-examination in campus proceedings lack significant firsthand knowledge about or experience with this topic. As litigators know, "cross-examination, when conducted in the proper manner, can be an invaluable tool to the trial lawyer." However, when conducted in court, there are safeguards fundamental in the process of cross-examination to ensure fairness that are simply not present in an educational disciplinary proceeding. At a minimum, these safeguards require that a neutral judge with experience serving as an arbiter in cross-examination processes (and therefore able to identify situations in which cross-examination is being abused) must be present to ensure that counsel is not misleading the fact-finder. There is nothing in the proposed provisions to safeguard against the abuse of cross-examination by either advisors of the complainant or the respondent, which fundamental fairness requires.

Shockingly, the proposed regulations offer *no guidance, framework, or even advice* for the realities parties and institutions will face if these misguided proposed rules are codified. Numerous questions are not answered by the Department, most notably:

- Who will object during the live, adversarial cross-examination (surely witnesses with no legal training cannot be expected to object while testifying)?
- Who will make any rulings on objections (and what is the legal training of that person making the rulings)?

---

[142] The Department cites *Doe v. Baum*, Case No. 17-2213, 2018 U.S. App. LEXIS 25404 (6th Cir. Sept. 7, 2018)

[143] *Id* at 403 ("Since a lawyer may make the truth or fact appear as if it were fiction and the untruth appear as if it were fact, the use of cross examination is quite vulnerable to abuse.)

[144] *See E.g.*, The Truth Engine: Cross-Examination Outside the Box, Francis P. Karam, (2017).

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

- Will schools be required to provide legal counsel to both parties so that the "advisors" conducting the cross-examination have, at a minimum, some legal training?
- Will schools then be open to ineffective assistance of counsel claims?
- When an attorney pushes the envelope and asks a question that he or she knows is not permissible, but does so to shake up the witness or plant an idea in the heads of the fact-finders, will the attorney or school be liable for that overreach?

We could go on. The number of questions and potential scenarios that remain unanswered by the Department are endless. Without these, and other, safeguards and processes in place, the Department is potentially subjecting itself and institutions to significant liability and monetary damages. More importantly, these quasi-legal proceedings could severely harm the very students (both accused and complainants) the Department is charged with protecting.

### The NPRM inappropriately places undue burdens and pressures upon survivors of sexual harassment

**c. The proposed regulations would improperly allow schools to pressure survivors into participating in traumatizing mediation procedures, even with regard to complaints of sexual violence.**

Proposed rule § 106.45(b)(6) would allow schools to use "any informal resolution process, such as mediation" to resolve a complaint of sexual harassment, as long as the school obtains the students' "voluntary, written consent." Even worse, the Department states that, once consent is obtained and the informal process begins, schools may then "preclude[] the parties from resuming a formal complaint," thereby barring survivors from pursuing the formal complaint process. In doing so, the Department fails to recognize the significant potential for re-traumatization when schools rob survivors of the choice to seek justice on their own terms, thereby mimicking the control that was taken from them during an incident of sexual violence.

Even if schools were to permit survivors to re-enter the formal process, mediation is a strategy often used in schools to resolve peer conflicts and involves both sides' taking responsibility for their actions while reaching a compromise. In that light, mediation is *never* appropriate for resolving sexual violence or harassment complaints, even on a voluntary basis— the Department itself recognized this in its 2001 Guidance. Survivors should not be placed into a room with someone who abused them to "work things out" (thereby insinuating that they share responsibility for the assault), nor should they be exposed to the risk of being retraumatized, coerced, or bullied during the mediation process. Experts also agree that mediation is inappropriate for resolving sexual violence. For example, NASPA - Student Affairs Administrators in Higher Education stated in 2018 that it was concerned about students' being "pressured into informal resolution against their will."[145] SurvJustice has the same concerns that mediation will not be *truly* voluntary. It is entirely possible that schools will seek to pressure survivors into participating in mediation given that this is an effective way to resolve matters

---

[145] NASPA - Student Affairs Administrators in Higher Education, *NASPA Priorities for Title IX: Sexual Violence Prevention & Response* 1-2 [hereinafter *NASPA Title IX Priorities*], https://www.naspa.org/images/uploads/main/NASPA_Priorities_re_Title_IX_Sexual_Assault_FINAL.pdf.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

quickly and quietly, in turn protecting institutions' reputations. Furthermore, minors would be particularly vulnerable to such pressure; it is hard to imagine that a child would feel able to advocate for a formal process if an adult employee is suggesting that they go through the mediation process. Then, once a student has "agreed" to meditation, schools could refuse to end the informal process and start a formal investigation—even if the student realizes that mediation is too traumatizing to continue or that it would not result in an outcome that ensures her or his safety. Survivors are very likely to be dissatisfied with the outcome, given that the nature of mediation means that it generally does not result in the imposition of sanctions like a favorable outcome in a formal process would.

It is also concerning that the Department has not stated any training requirements for mediators. It has not documented any requirement that students receive notice about their rights so that they are aware that they do not have to participate in mediation. Overall, this proposal has not been adequately considered or developed, and it will do significant and irreversible damage to those who come forward about sexual harassment.

### d. The proposed regulations would force many schools to use a more demanding standard of proof to investigate sexual harassment than used to investigate other types of student misconduct or other civil wrongs.

The Department's longstanding practice requires that schools use a "preponderance of the evidence" standard—meaning "more likely than not"—in Title IX cases to decide whether sexual harassment occurred.[146] Proposed rule § 106.45(b)(4)(i) departs from that practice and instead establishes a system in which schools may elect to use the more burdensome "clear and convincing evidence" standard for sexual harassment cases, while allowing all other student misconduct cases to be governed by the preponderance of the evidence standard, even if the proceedings carry the same potential sanctions.[147] The Department's decision to allow schools to impose a more burdensome standard on those who report sexual violence conveys its reliance on the stereotype and assumption that survivors (who are predominately girls and women) are more likely to lie about sexual violence than students who report physical assault, plagiarism, or other school policy violations. However, this sexist belief is unsupported; in fact, boys and men are far more likely to be *victims* of sexual assault than to be *falsely accused* of sexual assault.[148]

---

[146] The Department has required schools to use the preponderance standard in Title IX investigations since as early as 1995 and throughout both Republican and Democratic administrations. For example, its April 1995 letter to Evergreen State College concluded that its use of the clear and convincing standard "adhere[d] to a heavier burden of proof than that which is required under Title IX" and that the College was "not in compliance with Title IX." U.S. Dep't of Educ., Office for Civil Rights, *Letter from Gary Jackson, Regional Civil Rights Director, Region X, to Jane Jervis, President, The Evergreen State College* (Apr. 4, 1995), at 8, http://www2.ed.gov/policy/gen/leg/foia/misc-docs/ed_ehd_1995.pdf. Similarly, the Department's October 2003 letter to Georgetown University reiterated that "in order for a recipient's sexual harassment grievance procedures to be consistent with Title IX standards, the recipient must … us[e] a preponderance of the evidence standard." U.S. Dep't of Educ., Office for Civil Rights, *Letter from Howard Kallem, Chief Attorney, D.C. Enforcement Office, to Jane E. Genster, Vice President and General Counsel, Georgetown University* (Oct. 16, 2003), at 1, http://www.ncherm.org/documents/202-GeorgetownUniversity--110302017Genster.pdf.

[147] Proposed rule § 106.45(b)(4)(i) permits schools to use the preponderance standard *only if* it uses that standard for all other student misconduct cases that carry the same maximum sanction *and* for all cases against employees. This is a one-way ratchet: a school would be permitted to use the higher clear and convincing evidence standard in sexual assault cases, while using a lower standard in all other cases.

[148] *E.g.*, Kingkade, *supra* note 10.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

The preponderance standard is used by courts in all civil rights cases.[149] It is the only standard of proof that treats both sides fairly, and it is consistent with Title IX's requirement that grievance procedures be "equitable." By allowing schools to use a "clear and convincing evidence" standard, the proposed rule would tilt investigations significantly in favor of respondents and against complainants. Increasing the burden that complainants face to prove that sexual harassment occurred is particularly problematic in light of the fact that it is already difficult to prove that such an incident occurred as a result of the inherent lack of physical evidence and the common yet mistaken belief that testimony does not constitute sufficient evidence to make a finding of responsibility. The Department argues that Title IX investigations may need a more demanding standard because of the "heightened stigma" and the "significant, permanent, and far-reaching" consequences for respondents found responsible for sexual harassment.[150] Yet this ignores the reality that Title IX complainants themselves face heightened stigma for reporting sexual harassment, as compared to other types of misconduct, and that complainants suffer "significant, permanent, and far-reaching" consequences to their education if their schools fail to meaningfully address the harassment. In fact, 34% of college survivors drop out of college after a sexual assault.[151] Both parties therefore have an equal interest in continuing to pursue their education. It is inequitable to cater only to the purportedly more serious impact on accused students in designing a grievance process to address harassment.

Many Title IX experts support the preponderance standard, which was used to address harassment complaints at more than 80% of colleges even prior to the 2011 Dear Colleague Letter's clarification about the correct standard.[152] The NCHERM Group, whose white paper *Due Process and the Sex Police* was cited by the Department,[153] has promulgated materials that require schools to use the preponderance standard because "[they] believe higher education can acquit fairness without higher standards of proof." [154] A white paper by four Harvard professors that is cited by the Department[155] also recognizes that schools should use the preponderance standard if "other requirements for equal fairness are met."[156] ATIXA's position is that "any standard higher than preponderance advantages those accused of sexual violence (mostly men) over those alleging sexual violence (mostly women). It makes it harder for women to prove they have been harmed by men. The whole point of Title IX is to create a level playing field for men and women in education, and the preponderance standard does exactly that. *No other evidentiary standard is equitable.*"[157] NASPA - Student Affairs Administrators in Higher Education

---

[149] Katharine Baker et al., *Title IX & the Preponderance of the Evidence: A White Paper* (July 18, 2017), http://www.feministlawprofessors.com/wp-content/uploads/2017/07/Title-IX-Preponderance-White-Paper-signed-7.18.17-2.pdf (signed by 90 law professors).

[150] 83 Fed. Reg. 61477.

[151] Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. STUDENT RETENTION: RES., THEORY & PRAC. 234, 244 (2015), https://doi.org/10.1177/1521025115584750.

[152] Heather M. Karjane, et al., *Campus Sexual Assault: How America's Institutions of Higher Education Respond* 120 (Oct. 2002), https://www.ncjrs.gov/pdffiles1/nij/grants/196676.pdf.

[153] 83 Fed. Reg. 61464 n.2.

[154] The NCHERM Group, *Due Process and the Sex Police* 2, 17-18 (Apr. 2017), https://www.ncherm.org/wp-content/uploads/2017/04/TNG-Whitepaper-Final-Electronic-Version.pdf.

[155] 83 Fed. Reg. 61464 n.2.

[156] Elizabeth Bartholet, Nancy Gertner, Janet Halley & Jeannie Suk Gersen, *Fairness For All Students Under Title IX* 5 (Aug. 21, 2017), https://dash.harvard.edu/bitstream/handle/1/33789434/Fairness%20for%20All%20Students.pdf.

[157] Association of Title IX Administrators, *ATIXA Position Statement: Why Colleges Are in the Business of Addressing Sexual Violence* 4 (Feb. 17, 2017), https://atixa.org/wordpress/wp-content/uploads/2017/02/2017February-Final-ATIXA-Position-Statement-on-Colleges-Addressing-Sexual-Violence.pdf.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

recommends the preponderance standard: "Allowing campuses to single out sexual assault incidents as requiring a higher burden of proof than other campus adjudication processes make it—by definition—harder for one party in a complaint than the other to reach the standard of proof. Rather than leveling the field for survivors and respondents, setting a standard higher than preponderance of the evidence tilts proceedings to unfairly benefit respondents."[158] ASCA agrees that schools should use "[u]se the preponderance of evidence (more likely than not) standard to resolve all allegations of sexual misconduct"[159] because "it is the only standard that reflects the integrity of equitable student conduct processes which treat all students with respect and fundamental fairness."[160]

### e.   The proposed regulations fail to impose clear timeframes for investigations and allow impermissible delays.

The Department maintains the requirement that schools provide "reasonably prompt timeframes" for resolving complaints but also allows them to create a "temporary delay" or "limited extension" of timeframes for "good cause," which it says would include "concurrent law enforcement activity."[161] In contrast, previous Title IX guidance recommended that schools finish investigations within 60 days and prohibited schools from delaying a Title IX investigation simply because there was an ongoing criminal investigation.

Under the Department's proposal, if there is an ongoing criminal investigation, a school would be permitted to delay even beginning any Title IX investigation for an unspecified length of time. While criminal investigations seek to punish abusers for their conduct, Title IX investigations should seek to ensure that complainants are able to access educational opportunities that become inaccessible due to harassment. Students should not be forced to wait months or even years until after a criminal investigation is completed in order to seek resolution from their schools. ATIXA agrees that a school that "delay[s] or suspend[s] its investigation" at the request of a prosecutor creates a safety risk to the survivor and to other students as well, whom the perpetrator could go on to harm.[162]

One of the most significant ramifications of the September 2017 Interim Guidance issued by this Department of Education is the length of time investigations are taking. Since the interim guidance was released, SurvJustice has not had a single case that was completed in 60 days as the 2017 Q&A guidance recommended. Moreover, the majority of our cases have taken *a full year* to complete. During that timeframe, survivors do not receive any information from the school about the status of their complaint unless they ask, and even then they frequently do not get a response. In addition, we have observed that schools send repeated notices that the process is being delayed without providing any reason for an estimated new date. These open-ended,

---

[158] *NASPA Title IX Priorities, supra* note 145 at 1-2.

[159] *ASCA 2014 White Paper, supra* note **Error! Bookmark not defined.**.

[160] Chris Loschiavo & Jennifer L. Waller, *The Preponderance of Evidence Standard: Use In Higher Education Campus Conduct Processes*, ASSOCIATION FOR STUDENT CONDUCT ADMIN, https://www.theasca.org/files/The%20Preponderance%20of%20Evidence%20Standard.pdf.

[161] Proposed rule § 106.45(b)(1)(v).

[162] Association of Title IX Administrators, *ATIXA Position Statement on the Proposed Legislation Entitled: Promoting Real Opportunity, Success, And Prosperity Through Education Reform (PROSPER) Act (Higher Education Act Reauthorization)* (Jan. 18, 2018), https://atixa.org/wordpress/wp-content/uploads/2015/03/ATIXA-POSITION-STATEMENT-ON-PROSPER-ACT-Final.pdf.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

lengthy investigations convey to other students that there is no point in coming forward as they will simply be strung along while they suffer. Further, the prolonged investigations take a very real toll on survivors and interfere with their access to education. They suffer from severe stress, changes in sleep and appetite, inability to focus, isolation, and many other problems as they are forced to relive their worst nightmare for a year because their school will not conclude the investigation. They are also consistently retraumatized by the repeated interviews, phone calls, and emails from the school. Even for those who ultimately obtain an outcome that restores some measure of safety (such as if the perpetrator is suspended or expelled for sexual violence), the process has tainted their educational experience to the point that they decide to drop out or transfer.

Examples of how the proposed regulations' failure to impose clear timeframes could harm students include, but are not limited to:

1. A February 2018 report by the Office of Civil Rights found that UC–Berkeley received 401 oral and written complaints of sexual harassment or violence, the majority of which were settled through informal processes. The report found that when cases actually were investigated, these investigations could take up to three years, an unreasonable period of time given that most undergraduate programs last four years. The report also found that most cases were closed after complainants graduated or left the program. Under the proposed regulations, these delays would not constitute a violation of Title IX, despite Berkeley's clear failure to provide students with a "prompt and equitable" response to their case.[163]

2. Similarly, a male student at Southern Methodist University dropped out of school after the University "failed to provide a 'prompt and equitable response'" to the assault and "failed to protect the victim from further harassment and embarrassment following the assault." The Department of Education found that the school violated Title IX in prolonging its response, but under the proposed regulations, the school would not have been found responsible. In effect, these proposed rules encourage universities to prolong cases until the survivor drops out or graduates, as was the case in both of these examples. These proposed provisions could discourage survivors from pursuing their cases and effectively removes responsibility from schools to discipline perpetrators while they are still students.[164]

**f. The proposed regulations would require schools to grant unequal appeal rights.**

Although Secretary DeVos claims that the proposed regulations make "[a]ppeal rights equally available to both parties,"[165] they do not in fact provide equal *grounds for appeal* to both parties, because complainants are barred from appealing a school's resolution of a harassment complaint based on the sanctions' inadequacy. Allowing only the respondent the right to appeal a

---

[163] Anjali Shrivastava, "UC Berkeley mishandled 8 Title IX cases, federal investigators say," *The Daily Californian,* 1 March 2018. http://www.dailycal.org/2018/03/01/uc-berkeley-mishandled-eight-title-ix-cases-federal-investigators-say/
[164] Jake New, "When the Victim is Male," *Inside Higher Ed,* 12 December 2014, https://www.insidehighered.com/news/2014/12/12/smu-found-violation-title-ix-after-not-investigating-male-students-claim-sexual
[165] DeVos, *supra* note 107.

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

sanction decision is both unfair and a violation of the requirement that procedures be equitable. Survivors are just as affected by sanction decisions as accused students. For example, if their abusers are still allowed to live in the same dorm as them, or if they are still in the same classroom, survivors may experience further trauma or even have to drop out of school to ensure their safety.

Experts support equal appeal rights. The ABA recommends that the grounds for appeal include "a sanction disproportionate to the findings in the case (that is, too lenient or too severe)."[166] ATIXA announced in October 2018 that it supports equal appeal rights for both parties, "[d]espite indications that OCR will propose regulations that permit inequitable appeals."[167] Even the white paper by four Harvard professors that is cited by the Department (p.9–10 n.2) recognizes that schools should allow "[e]ach party (respondent and complainant) [to] request an impartial appeal."[168]

## VI.    The proposed regulations are inconsistent with the Clery Act.

A number of the Department's proposed regulations are inconsistent with the Clery Act, which the Department enforces and which also addresses the obligation of colleges and universities to respond to sexual assault, dating violence, domestic violence, and stalking, as noted in the earlier section of this comment on stalking. Further examples include, the proposed regulations prohibiting schools from investigating off-campus and online sexual harassment conflict with the Clery Act's reporting requirements for policy violations that would also constitute sexual harassment under Title IX (such as sexual assault). The Clery Act requires colleges and universities to notify in writing all students who report sexual assault, stalking, dating violence, and domestic violence of their rights regardless of "whether the offense occurred on or off campus."[169] The Clery Act also requires colleges and universities to report all incidents of sexual assault, stalking, dating violence, and domestic violence that occur on "Clery geography," which is defined to include all property controlled by a school-recognized student organization (such as an off-campus fraternity), nearby "public property," and "areas within the patrol jurisdiction of the campus police or the campus security department."[170] The proposed regulations would therefore undermine and conflict with the Clery Act's mandate while creating an upside-down system in which schools would have to publicly disclose instances of sexual assault that occur off-campus but would be required by the Department to dismiss any complaints filed about these same incidents and not investigate them.

The Clery Act also requires that investigations of sexual assault, dating violence, domestic violence, and stalking be "prompt, fair, and impartial."[171] However, as previously noted, the proposed regulations set forth an unclear timeframe for investigations that conflicts with Clery's mandate that investigations be prompt. In addition, the many proposed regulations discussed

---

[166] American Bar Association, *supra* note 140, at 5.
[167] Association of Title IX Administrators, *ATIXA Position Statement on Equitable Appeals Best Practices* 1 (Oct. 5, 2018), https://atixa.org/wordpress/wp-content/uploads/2018/10/2018-ATIXA-Position-Statement-Appeals.pdf.
[168] Bartholet, et al., *supra* note 156.
[169] 20 U.S.C. § 1092(f)(8)(C).
[170] 20 U.S.C. § 1092(f)(6)(iii); 20 U.S.C § 1092(f)(6)(iv); 34 C.F.R. § 668.46(a)).
[171] 20 U.S.C. § 1092(f)(8)(b)(iv)(I)(aa).

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

SURVJUSTICE

above that tilt investigation procedures in favor of the respondent are anything but fair and impartial.

Although the Department acknowledges that Title IX and the Clery Act's "jurisdictional schemes . . . may overlap in certain situations,"[172] it fails to explain how institutions of higher education should resolve the conflicts between two different laws when addressing sexual assault, dating violence, domestic violence, and stalking. These conflicting rules would create widespread confusion for schools and students.

**VII.**    **The proposed regulations requiring schools to dismiss sexual harassment complaints go beyond the Department's authority to effectuate the nondiscrimination provisions of Title IX and are unworkable in practice.**

Section 106.45(b)(3) of the proposed regulations actively *requires* schools to dismiss complaints of sexual harassment if such complaints do not meet strict standards. If a school determines that a complaint of sexual harassment does not meet the improperly narrow definition (meaning that the harassment is severe, pervasive, and objectively offensive), the school *must* dismiss it under the proposed rule. Further, even if the harassment is severe, pervasive, and objectively offensive, a school *must* dismiss the complaint if it occurs outside of an educational program or activity, including most off-campus and online harassment. However, the Department lacks the authority to require schools to dismiss complaints of discrimination. Under Title IX, the Department is authorized to issue rules only "to effectuate the [anti-discrimination] provision of [Title IX]." Title IX does not delegate to the Department the authority to dictate when schools *cannot* address sex discrimination.[173] By requiring schools to dismiss certain types of complaints of sexual harassment, without regard to whether those forms of harassment deny students educational opportunities on the basis of sex, § 106.45(b)(3) fails to effectuate Title IX's anti-discrimination mandate. It would also force many schools that already investigate off-campus conduct, pursuant to their existing student conduct policies, to abandon these anti-discrimination efforts and launch a thorough revision of their policies. While the Department is well within its authority to require schools to adopt civil rights protections to effectuate Title IX's mandate against sex discrimination, it lacks the authority to force schools to violate students' and employees' civil rights under Title IX by forcing schools to ignore sexual harassment. Furthermore, in creating this mandate, the Department forces schools to choose between adhering to administrative regulations or facing repeated civil liability in lawsuits brought by students, as courts have often held that schools act with deliberate indifference when they fail to respond to a complaint of sexual harassment *even if it occurred off campus*.[174] Schools should not have to face the catch-22 of facing federal investigations and losing their

---

[172] 83 Fed. Reg. 61468.

[173] *See* Michael C. Dorf, *The Department of Education's Title IX Power Grab*, VERDICT (Nov. 28, 2018), https://verdict.justia.com/2018/11/28/the-department-of-educations-title-ix-power-grab.

[174] *See generally* Dana Bolger, *Betsy DeVos's New Harassment Rules Protect Schools, Not Students*, New York Times (Nov. 27, 2018) https://www.nytimes.com/2018/11/27/opinion/betsy-devos-title-ix-schools-students.html last viewed January 30, 2019.
DR. EDWARD F. DRAGAN, *Title IX: What Constitutes Actual Notice of Sexual Harassment or Sexual Violence in a School Setting? http://education-expert.com/2017/06/title-ix-constitutes-actual-notice-sexual-harassment-sexual-violence-school-setting/*

EXHIBIT 28

SurvJustice Inc.
1015 15th St. NW, Suite 632
Washington, D.C. 20005
P: 202.869.0699 | F: 202.860.0699

federal funding or repeatedly being found civilly responsible and having to pay significant monetary damages.

The Department further notes that, if conduct does not meet the proposed regulation's definition of harassment or if it occurs off-campus, schools may still process the complaint under a different conduct code. However, they may not process it under a conduct code relating to Title IX. This "solution" to the required dismissals for Title IX investigations is both confusing and impractical. The proposed regulations offer no guidance or safe harbor for schools to offer parallel sexual harassment proceedings that do not comply with the detailed and burdensome procedural requirements set out in the proposed rule. Schools that did so would no doubt be forced to contend with accused students' complaints that the school had failed to comply with the requirements set out in the NPRM and thus violated accused students' rights as described in the NPRM.

**CONCLUSION**

The Department's proposed regulations import inappropriate criminal and civil legal standards into administrative agency enforcement, rely on sexist stereotypes about survivors of sexual harassment, and impose procedural requirements that force schools to provide Title IX procedures that favor accused students to the detriment of survivors and in violation of the equitable process requirement of Title IX. Instead of effectuating Title IX's prohibition on sex discrimination in schools, these proposed regulations serve only to protect schools from liability if they fail to respond to complaints of sexual harassment. SurvJustice calls on the U.S. Department of Education to immediately withdraw this NPRM and instead focus its energies on vigorously enforcing the Title IX requirements that the Department has relied on for decades in order to ensure that schools promptly and effectively respond to sexual harassment, remedy its effects, and prevent its recurrence.

Thank you for the opportunity to submit comments on the NPRM. Please do not hesitate to contact Katherine W. McGerald at Katherine.McGerald@SurvJustice.org to provide further information or facilitate discussion.

Katherine W. McGerald, Esq.
Executive Director
SurvJustice, Inc.
1015 15th Street NW
Suite 632
Washington, D.C. 20005
202-869-0699

EXHIBIT 28

# EXHIBIT 29



January 27, 2019

Kenneth L. Marcus
Assistant Secretary for Civil Rights
Department of Education
400 Maryland Avenue SW
Washington, DC 20202

via electronic submission

Re: Docket No. ED-2018-OCR-0064, RIN 1870–AA14, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

Dear Assistant Secretary Marcus:

On behalf of the American Association of University Women of Hawaii (AAUW of Hawaii), we are writing in response to the Department of Education's Notice of Proposed Rulemaking to express our strong opposition to the proposed rules relating to sexual harassment ("Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance") as published in the Federal Register on November 29, 2018.

AAUW of Hawaii is a state-wide organization made up of six branches (Hilo, Honolulu, Kauai, Kona, Maui, and Windward Oahu) and includes just over 450 members with over 1,700 supporters and partners statewide. As advocates for equity in education, AAUW of Hawaii promotes the economic, social, and physical well-being of all persons. We vehemently oppose the Department of Education's proposed rule, which would significantly and detrimentally impact women's and girls' ability to access education free from sexual harassment or assault. We urge the Department to immediately withdraw its current proposal.

**Prevalence of Sexual Harassment and Violence**

Most researchers who study campus sexual harassment and assault agree in terms of data and statistics. For example, many scholars cite that approximately 20 percent of college women experience rape or attempted rape (Kahn, 2003; Koss, Gidycz, and Wisniewski, 1987; Rapaport and Burkhart, 1984; Schwartz and DeKeseredy, 1997; Wechsler and Wuethrich, 2002; Weiss, 2013). Additionally, many scholars agree that reporting is likely conservative because rape is such an under-reported crime. As many as 50 percent of college women will not report their rape or sexual assault (Khan, 2004; Koss, et el. 1987; Rapaport and Burkhart, 1984). While there has been much research on campus sexual assault, little has changed in terms of the number of assaults and attempted assaults reported annually (Reynolds, 2018). In fact, Reynolds analyzed

1

EXHIBIT 29

10,225 Title IX complaints filed with the Office of Civil Rights between 1994-2014 using data collected from a Freedom of Information Act (Reynolds, 2018). The sheer number of Title IX complaints in this study speaks to the continuing need to take seriously and enforce Title IX policy as it currently stands.

In the state of Hawaii, sexual harassment and violence is also prevalent. Recently, the University of Hawaii was audited by the federal Office of Civil Rights, and the ruling from the federal audit was made public March 2, 2018. It was determined that during the years of the federal audit, August 1, 2013 to October 1, 2017, violations occurred on all 10 University of Hawaii campuses. As a direct result of non-compliance, the University of Hawaii mismanaged several Title IX cases (Office of the University Rights Reference Number 10136001, 2017). Although the University System has taken measures to ensure Title IX compliance, among other issues, there is still not a Title IX officer on all 10 campuses at the time this document was written. In terms of K-12 education, the Hawaii Department of Education was recently sued by the ACLU in December 2018 due to unequal treatment of girls' athletic programs (Hawaii ACLU, 2018). In response to these overarching issues related to discrimination, during the 2018 legislative session, the state of Hawaii passed a state Title IX bill, and AAUW of Hawaii was instrumental in advocating for the passage of this law.

**Issues with the Notice of Proposed Rule Making**

The Department of Education's proposed Title IX rule would exacerbate problems of underreporting and lead to fewer students coming forward and receiving the support and action they need from their schools when they experience sexual harassment or sexual violence. AAUW of Hawaii is particularly concerned about the following provisions:

*The NPRM makes it impossible for interim accommodations that would allow survivors to request that their perpetrator be removed from shared dorm and/or class space.*

Often, issues related to sexual violence and harassment are intensified in circumstances where survivors and perpetrators share dorm or class space (Hill and Silva, 2005). Due to power dynamics, often withdrawing from shared space becomes the responsibility of survivors, and many survivors will change their patterns, behavior, and use of space because they fear encountering their assailant (Hill and Silva, 2005). Under prior guidance, schools were allowed to remove perpetrators from shared class and living space so that the survivor's education would not be further compromised by discrimination.

The NPRM, would prohibit schools from removing perpetrators from shared space unless the survivor successfully wins a disciplinary hearing. Instead, for these critical interim measures to be put in place survivors would likely have to bear the full burden of housing, class, and other changes.  However, often survivors choose not to have a formal proceeding or need accommodations while the hearing is proceeding, therefore, many students will be forced out of class, common space, and living arrangements, thus further damaging their education. Additionally, the Department would allow schools to issue mutual no-contact orders, which could make survivors' experience worse than if they had not filed a complaint.

2

EXHIBIT 29

Schools should have the ability to make interim arrangements that include removing accused students from shared dorms and/or classes before disciplinary proceedings when the survivor's education will be harmed if the changes are not made.

*The NPRM requires that schools establish live cross-examination, where an accused student's representative can directly question a survivor.*

The Department would require that universities and institutions of higher education provide for direct cross-examination by a party's advisor of choice. Live cross-examination and forcing survivors to retell their story, in contrast to written questions submitted to the hearing panel, will likely re-traumatize survivors and discourage students from reporting (Kahn, 2003; Koss, Wilgus, and Williamsen, 2014). In addition, the proposed rule does not entitle any parties involved procedural protections during cross-examination.

Previously, the Department permitted panels to test parties' reliability through the submission of written questions. Written questions provide a balance between the need to test the reliability of the evidence and the risk of re-traumatizing survivors. The Department of Education should allow schools to use written questions during the examination procedure.

**State Specific Questions**

As the state of Hawaii works to address recent Title IX violations, both at the state DOE and University level, the Notice of Proposed Rule Making threatens statewide progress, and it is unclear how state Title IX law would be implemented should the NPRM take effect. The history and origins of Title IX and the 2018 state Title IX bill demonstrate that constituents in the state of Hawaii take seriously the intent and spirit of Title IX law. As a state, policymakers, advocates, and constituents wish to protect students against sexual harassment and assault. Given the arguments outlined in this letter, AAUW of Hawaii respectfully asks that the Secretary for Civil Rights reconsiders the Notice of Proposed Rule Making.

Further, the proposed rule fails to ensure equal access to education for all students, including students who experience sexual harassment. For that reason, we urge the Department of Education to immediately withdraw its current proposal.

Younghee Overly, State Public Policy Chair
AAUW of Hawaii
 publicpolicy-hi@aauw.net

Hannah Liebreich, Title IX Specialist
AAUW of Hawaii
hliebreich88@gmail.com

EXHIBIT 29

# References

Armstrong, E. A., & Hamilton, L. T. (2013). Paying for the Party. Harvard University Press.

Hill, C., & Silva, S. (2005). Drawing the Line: Sexual Harassment on Campus. AAUW Educational Foundation.

Kahn, A. S., Jackson, J., Kully, C., Badger, K., & Halvorsen, J. (2003). Calling it rape: Differences in experiences of women who do or do not label their sexual assault as rape. Psychology of Women Quarterly, 27(3), 233-242.

Koss, M. P., Gidycz, C. A., Wisniewski, N. (1987). Scope of rape: Incidence and prevalence of sexual aggression and victimization in a national sample of higher education students. Journal of Consulting and Clinical Psychology, 55(2), 162-170.

Koss, M. P., Wilgus, J. K., & Williamsen, K. M. (2014). Campus sexual misconduct: Restorative justice approaches to enhance compliance with Title IX guidance. *Trauma, Violence, & Abuse*, *15*(3), 242-257.

Hawaii ACLU. (2018, December). Title IX Lawsuit: ACLU Sues over Lack of Female Athletic Facilities at DOE Schools.  Retrieved from Hawaii Free Press. http://www.hawaiifreepress.com/ArticlesMain/tabid/56/ID/21306/Title-IX-Lawsuit-ACLU-Sues-over-Lack-of-Female-Athletic-Facilities-at-DoE-Schools.aspx.

Rapaport, K., & Burkhart, B. R. (1984). Personality and attitudinal characteristics of sexually coercive college males. Journal of Abnormal Psychology, 93(2), 216 221.

Reynolds, C. (2018). The Mobilization of Title IX Across US Colleges and Universities, 1994 2014. *Social Problems*.

Schwartz, M. D., & DeKeseredy, W. (1997). Sexual assault on the college campus: The role of male peer support. Sage Publications.

The United States Department of Education, Office for Civil Rights (2017). Resolution Agreement with The University of Hawaii at Mānoa. Office of Civil Rights Reference Number 10136001.

Wechsler, H., & Wuethrich, B. (2002). Dying to drink: Confronting binge drinking on college campuses. Rodale Books.

Weiss, K. G. (2013). Party school: Crime, campus, and community. Boston, MA: Northeastern University Press.

EXHIBIT 29

EXHIBIT 30

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | **Civil Action No. 20-cv-01468-CJN** |

Decl. of Judith Herman                                      Civil Action No. 20-cv-01468

EXHIBIT 30

## DECLARATION OF JUDITH L. HERMAN, M.D.

I, Judith L. Herman, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

2.      I submit this Declaration in support of the litigation challenging the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (the "Title IX Rule" or Rule).  I submit this declaration in my personal capacity as an expert in understanding and treating trauma. This declaration is based on my personal knowledge, my familiarity with Title IX of the Education Amendments of 1972, my review of the Rule, the knowledge and expertise I have acquired in the course of 50 years as a medical professional, over 30 of which I have spent as an academic specializing in sexual assault, and my review of the research studies, and journal and periodical articles footnoted herein.

### Background, Responsibilities, and Qualifications

3.      I am currently a Professor of Psychiatry Part-Time at Harvard Medical School.  In that role, I supervise psychiatric residents and post-doctoral psychology fellows and teach a seminar on treatment of trauma patients.  Prior to assuming part-time status in 2015, I had been a Clinical Professor of Psychiatry at Harvard Medical School since 1999. I am a Distinguished Life Fellow of the American Psychiatric Association and have received numerous awards in my field, including the Lifetime Achievement Award from the International Society for Traumatic Stress Studies.  A true and correct copy of my Curriculum Vitae is attached here as Exhibit A, along with a list of my publications (including those in the last ten years).

Decl. of Judith Herman                                      Civil Action No. 20-cv-01468

EXHIBIT 30

4.      I am also the author of a book, *Trauma and Recovery*, which is considered a fundamental text for understanding psychological trauma, as well as a founder of the Victims of Violence Program in the Department of Psychiatry at Cambridge Health Alliance, a teaching hospital of Harvard Medical School.  For more than 30 years, I have trained post-graduate students in the mental health disciplines on how to promote healing in traumatized people.

5.      I have also worked directly with hundreds of victims of sexual assault, both in the immediate aftermath of trauma and on an ongoing basis as the victims proceed with the long process of recovery.  I have developed clinical expertise regarding what mechanisms can aid victims in reporting assault, and what social responses, including by individuals in positions of authority, will help or impede their recovery.

6.      Based on my experience in treating survivors of sexual assault and harassment, it is my opinion that many aspects of the Rule will cause substantial harm to students who report sexual harassment, including sexual assault, to their schools, and will discourage students who have been victimized from coming forward.  The net effect of the Rule will be to reinforce the shaming and isolation of students who have been subjected to harassment, exacerbate the trauma and mental health impacts experienced by victims, and increase gender-based discrimination, harassment, and violence in education.

7.      In the past four years, I have not testified as an expert, at trial, or by deposition, in any matter.

8.      I am not being compensated for my work on this declaration.

### Increased Exposure to Sexual Assault and Harassment

9.      The Rule's narrowed definition of "sexual harassment" requiring that students be subjected to harassment that is severe, persistent, **and** objectively offensive, to qualify for relief,

Decl. of Judith Herman

Civil Action No. 20-cv-01468

EXHIBIT 30

is detrimental to their well-being.  This standard necessitates prolonged exposure to harassment,

which risks escalating harmful effects to a student's mental health.  These negative effects

include anxiety, increased isolation, increased risk of self-harm, distress, depression, and suicidal

ideation.

10.     The harmful effects manifest in the classroom as well.  Research and my

experience working with victims has shown that continued exposure to sexual harassment is

associated with lower grades, negative academic performance, and dropouts.[1]  A significant

portion of students subjected to sexual harassment in grades 7 through 12 reported that they did

not want to attend school as a result of what happened to them.[2]  30 percent of harassed students

said that sexual harassment caused them to have a difficult time studying.[3]  Furthermore, 10

percent of harassed students were got into trouble at school as a result of the sexual harassment.[4]

11.     When students are forced to continue to interact with those who sexually harass

them, it interrupts their daily lives, as most victims seek to minimize interaction with their

harassers.  In my experience, victims' desire to avoid their perpetrators often comes at costs to

themselves - psychologically, physically, and financially.  Research has shown that 11 percent of

harassed students in grades 7 through 12 said they stayed home from school because of the

---

[1] *See* Karen Rothman, et al., *Sexual Assault Among Women in College: Immediate and Long-Term Associations with Mental Health, Psychosocial Functioning, and Romantic Relationships*, JOURNAL OF INTERPERSONAL VIOLENCE (2019). https://journals.sagepub.com/doi/10.1177/0886260519870158. (Finding that women with a history of college sexual assault reported lower grade-point averages, poorer class attendance and increased risk of dropout).

[2] Catherine Hill and Holly Kearl, *Crossing the Line: Sexual Harassment at School*, 11 AM. ASS'N OF U. WOMEN 22 (2011), https://www.issuelab.org/resource/crossing-the-line-sexual-harassment-at-school.html (32 percent of students reported that they did not want to go to school as a result of the sexual harassment.).

[3] *Id.*

[4] *Id.*

Decl. of Judith Herman                                    Civil Action No. 20-cv-01468

EXHIBIT 30

harassment.[5]  Other students changed the way they went to and from school or quit an activity or sport.[6]  With regard to college students, 34 percent of victims drop out of school altogether.[7]  When students drop out of college, they incur a large financial burden as well, often sacrificing a semester's tuition.[8]

12.     I have seen these effects first-hand in my treatment of survivors of sexual assault and harassment.  Research is consistent with my own experience in demonstrating that when subjected to sexual harassment by peers, student victims become alienated from school, and relationships with teachers are undermined.[9]  The effects of sexual harassment on a student victim have been characterized as even more harmful than bullying in a school setting.[10]  Victims of continued sexual harassment manifest physical effects as well, including feeling nauseated and having difficulty sleeping.[11]  The increased exposure and severity of harassment required by

---

[5] *Id.* (9 percent of students in the same age range reported that they changed the way they went to or from school, and 8 percent of students quit an activity or sport.)

[6] *Id.*

[7] Cecilia Mengo and Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J. OF C. STUDENT RETENTION: RES., THEORY & PRAC. 234, 244 (2015), https://doi.org/10.1177/1521025115584750. Audrey Chu, *I Dropped Out of College Because I Couldn't Bear to See My Rapist on Campus*, VICE (Sept. 26, 2017) https://broadly.vice.com/en_us/article/qvjzpd/i-dropped-out-of-college-because-i-couldnt- bear-to-see-my-rapist-on-campus.

[8] Alexandra Brodsky, *How Much Does Sexual Assault Cost College Students Every Year?*, WASH. POST (Nov. 18, 2014), https://www.washingtonpost.com/posteverything/wp/2014/11/18/how-much-does-sexual-assault-cost-college-students-every-year/?utm_term=.fb31d3014e29.

[9] Hill, *supra* note 2, at 16.

[10] James Gruber and Susan Fineran, *Sexual Harassment, Bullying, and School Outcomes for High School Girls and Boys*, 22(1) VIOLENCE AGAINST WOMEN, 15 (2015).

[11] *Id.* (31 percent of students from the same study of harassed students between grades 7 through 12 said they felt sick to their stomach as a result of the sexual harassment. Trouble sleeping was a problem for 19 percent of students, including 22 percent of girls and 14 percent of boys; girls

---

Decl. of Judith Herman                                      Civil Action No. 20-cv-01468

EXHIBIT 30

the Rule for action to be taken by schools, only exacerbates the physical and psychological harms impacting victims.

13.     The harm from an environment where sexual harassment remains unaddressed extends beyond the individual victim.[12]  Settings where frequent and prolonged experiences of sexual harassment are witnessed by other students create a climate where they perceive that sexual harassment is tolerated and condoned by teachers and school administrators.[13]  A culture of perceived tolerance not only discourages already hesitant students from coming forward if they themselves are victimized,[14] but also creates confusion as to what is considered acceptable conduct in the minds of youth.  Uncertainty over what is considered harassment or assault, coupled with uncertainty surrounding what, if any action, schools will take, makes educational institutions less safe.

14.     Under sections 106.30 and 106.44 of the Rule, the supportive measures required to be provided to complainants are quite limited and the standard is inadequate.  Although the school is required to "promptly contact the complainant to discuss the availability of supportive measures," (after a school receives "actual knowledge" of sexual harassment in an education

---

were also more likely than boys to say they had a hard time sleeping for quite a while, rather than a short time.)

[12] Hill, *supra* note 2.

[13] *See* Gruber *supra* note 10, at 17.

[14] *See e.g.* DOJ Bureau of Justice Stats., *Criminal Victimization, 2016: Revised*, at 7 (Oct. 2018), https://www.bjs.gov/content/pub/pdf/cv16.pdf. (2016 statistics showing only 20 percent of rape and sexual assault survivors reported these crimes to the police.); *Poll: One in 5 Women Say They Have Been Sexually Assaulted in College*, Wash. Post (June 12, 2015), https://www.washingtonpost.com/graphics/local/sexual-assault-poll; *Let Her Learn: Stopping School Pushout for Girls Who Are Pregnant or Parenting* 2 (2017). https://nwlc.org/resources/stopping-school-pushout-for-girls-who-are-pregnant-or-parenting. (only 12 percent of college survivors and two percent of female survivors ages 14-18 reported sexual assault to their schools or the police.)

Decl. of Judith Herman                                    Civil Action No. 20-cv-01468

EXHIBIT 30

program or activity) the supportive measures simply cannot "unreasonably burden" the respondent, and whether the offered "supportive measures" restore and preserve a student's equal access is judged only under the extremely low "deliberate indifference" standard. These provisions risk harm to students who do not receive supports that are even minimally effective in meeting their needs.

15.     Research supported by the Substance Abuse and Mental Health Services Administration confirms that adverse childhood experiences including sexual assault and other forms of harassment are strongly related to the development and prevalence of a wide range of health problems throughout a person's lifespan.[15]  Even assuming that the supportive measures provided to victims, such as changes in class schedule, are executed in a manner that does not further alienate the student, such measures are crisis responses.  They are necessary in the short-term, but not sufficient as long-term responses in mitigating harm produced by harassment and assault.

16.     In addition, the Rule limits the ability of the supportive measures to effectively stop and prevent further harassment, because the measures cannot unreasonably burden the respondent or act as discipline in any way.  As applied, student victims will be the ones forced to change housing and classes in order to avoid further traumatization or harassment.  As such, the requirement for the short-term institutional response set forth in the Rule remains inadequate and creates educational inequities for victims.  When respected authority figures in powerful

---

[15] *See also* Rothman et al.*, supra* note 1 at 3-4 (65 percent of sexual assault survivors develop symptoms of Post-Traumatic Stress Disorder (PTSD) weeks, months and even years after the event; many survivors develop symptoms of major depressive disorder or internalize feelings of stigma and guilt which lead them to disengage emotionally in their personal relationships).
[15] *See* Jennifer J. Freyd and Carly Parnitzke Smith, *Institutional Betrayal*, 69(6) AMERICAN PSYCHOLOGIST 575, 575-578 (2014); *See also* Louise F. Fitzgerald, et. al, *Antecedents and Consequences of Sexual Harassment in Organizations: A Test of an Integrated Model*, 82(4) Journal of Applied Psychology, 578 (1997).

Decl. of Judith Herman                                          Civil Action No. 20-cv-01468

EXHIBIT 30

institutions fail to respond actively and compassionately to individuals who report assault or harassment, victims perceive these authority figures as either indifferent to or complicit with perpetrators of sexual assault.  This often causes them to feel abandoned and emotionally disengaged from the educational community, and betrayed by authority figures within the institution.  This directly and detrimentally effects students' access to education.[16]

### Increased Barriers to Reporting and Investigating and Resolving Complaints

17.     The Rule sets forth a number of procedures that will chill reporting and prevent schools from investigating and resolving complaints.

18.     The Department acknowledges that reporting rates for sexual harassment and assault are lower than prevalence rates, recognizes that the Rule will result in a sharp drop in investigations, "but disagrees that the final regulations will discourage or chill reporting."[17]

19.     Research confirms that logistical hurdles to making a report discourage reporting.[18] The Rule requires the victim to put the complaint in writing and include a specific written request for investigation.  In my experience, formal and technical requirements of this nature will further chill reporting.[19]

---

[16] *See* Jennifer J. Freyd and Carly Parnitzke Smith, *Institutional Betrayal*, 69(6) AMERICAN PSYCHOLOGIST 575, 575-578 (2014); *See also* Louise F. Fitzgerald, et. al, *Antecedents and Consequences of Sexual Harassment in Organizations: A Test of an Integrated Model*, 82(4) Journal of Applied Psychology, 578 (1997).

[17] 85 Fed. Reg. at 30067.

[18] Victoria Kar-Yan Sit, Dep't of Applied Psychology and Human Development, Univ. of Toronto, dissertation, *The Development and Psychometric Evaluation of the Sexual Assault Help-seeking Barriers Scale*, at 38 (2018). https://tspace.library.utoronto.ca/bitstream/1807/92123/3/Sit_Victoria_201811_PhD_thesis.pdf.

[19] *Id.* (accessibility barriers are relevant to help-seeking decisions, and include limited availability of resources or services in one's community, prohibitive costs of services or lack of health insurance, lack of transportation, and long wait times).

Decl. of Judith Herman                                      Civil Action No. 20-cv-01468

EXHIBIT 30

20.     The Rule also weakens the confidentiality and privacy protections for victims of sexual assault and harassment.  Among other things, the respondent is permitted to share the allegations under investigation with anyone, including on social media, and a third party advisor chosen by the respondent, such as a school friend, is entitled to non-relevant documents related to the allegations.  Rule §§ 106.45(b)(5)(iii) & (vi).  Studies demonstrate that concerns about confidentiality and fear of retaliation are leading reasons why victims choose not to report sexual harassment or assault.[20]  In my experience and based on research relating to victims of sexual violence, victims fear that if their name and allegations become public they may face backlash from peers, hostility, judgment, disbelief and other social or legal consequences.[21]

21.     In my experience treating survivors of harassment and assault, the Rule's requirements regarding the complaint process and the parameters for cross-examination of witnesses will further discourage reporting and are likely to lead to unnecessary additional trauma for students and less probative information for adjudicators.

22.     Adversarial live hearings have greater potential to discourage victims from coming forward.  They also raise the potential for more aggressive and demeaning challenges to the credibility of complainants at a time when what they most need for healing from trauma is social support.  When a live hearing is necessary for the overall fairness of the process to the accused, cross-examination conducted by submitting questions to a neutral third-party is

---

[20] *E.g.* Marjorie R. Sable, et al., *Barriers to Reporting Sexual Assault for Women and Men: Perspectives of College Students*,  55(3) J. OF AM. C. HEALTH 159 (Nov./Dec. 2006); Chiara Sabina and Lavina Y. Ho, *Campus and College Victim Responses to Sexual Assault and Dating Violence: Disclosure, Service Utilization, and Service Provision*, TRAUMA VIOLENCE ABUSE (Feb. 4, 2014), http://tva.sagepub.com/content/early/2014/02/04/1524838014521322.

[21] Jill Shcwarz, et al., *Sexual Assault on College Campuses: Substance Use, Victim Status Awareness, and Barriers to Reporting*, 1(2) BUILDING HEALTHY ACADEMIC COMMUNITIES 54 (2017).

Decl. of Judith Herman                                          Civil Action No. 20-cv-01468

EXHIBIT 30

preferable to direct cross-examination by an attorney where possible to minimize traumatization or re-traumatization for survivors.

23.     The Rule puts schools at risk of losing the trust of the very students Title IX is designed to protect.  The Department acknowledges that the Rule will result in far fewer investigations, which means fewer formal findings by the institution and fewer perpetrators who have received a disciplinary sanction.  E.g., Rule, pp. 30,550, 30,553-30,554, 30,548-30,549, 30,568 (stating that Title IX investigations will decrease by about 33% per year in colleges and Universities, 50% per year in elementary and secondary schools, and 50% for non-schools, such as libraries, as a result of the Rule).

24.     Research shows that a lack of confidence in the outcome of reporting already exists among victims.[22]  Victims' decisions to report can often depend on their trust and perception of legitimacy of the process, and their belief that organizations will follow fair procedures.[23]  In my experience, and in surveys conducted on the topic, students already perceive the process for reporting sexual assault as intimidating, unlikely to result in accountability, and unsympathetic.[24]  The requirements set forth in the Rule will serve to increase this mistrust.  As a result, students who are subject to sexual harassment and violence will be less likely to come forward to receive the help and support they need to move forward.  In the absence of

---

[22] *Id.*

[23] *Id.*

[24] Kristen Jones*, Barriers Curb Reporting on Campus Sexual Assault,* the Center for Public Integrity (updated Mar. 26, 2015), https://publicintegrity.org/education/barriers-curb-reporting-on-campus-sexual-assault/.

Decl. of Judith Herman                                          Civil Action No. 20-cv-01468

EXHIBIT 30

appropriate resolution and response, our school campuses will become less safe and the incidence of sexual harassment and violence is likely to increase.[25]

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on June *13*, 2020 at *Cambridge, MA*.

_____, M.D.
Judith Herman
Professor of Psychiatry Part-Time, Harvard University
Medical School

---

[25] *See* Camille Nelson, et.al., *Organizational Responses for Preventing and Stopping Sexual Harassment: Effective Deterrents of Continued Endurance*, 56 SEX ROLES 811, 812 (2007)("The perception that remedial actions will be taken to punish perpetrators and enforce anti-harassment policies often results in significant decreases in sexual harassment frequency.")

Decl. of Judith Herman                                    Civil Action No. 20-cv-01468

EXHIBIT 30

# EXHIBIT 31

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

Decl. of Michael Madowitz

EXHIBIT 31

Civil Action No. 20-cv-01468

## DECLARATION OF MICHAEL MADOWITZ

I, Michael Madowitz, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.       I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

2.       I submit this Declaration in support of the litigation challenging the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or Rule). I have compiled the information in the statements set forth below in my personal capacity as an expert in public economics, cost-benefit analysis, and the methodology, analysis, and implementation of public policy. This declaration is based on my personal knowledge, my review of the U.S. Department of Education's (the "Department") Notice of Proposed Rulemaking ("NPRM") and the final regulation ("Rule") and accompanying Regulatory Impact Analysis, and the knowledge and expertise I have acquired in my training and professional experience, including as an economist and technical expert at the Center for American Progress (the Center).

### Background, Responsibilities, and Qualifications

3.       I have been employed at the Center since 2013, where I have served as a nationally recognized expert on public economics. I use advanced valuation methodologies to measure the costs and benefits of programs and policy changes and have conducted hundreds of cost-benefit analyses and policy simulations focused on the long-term effects of public health, education, environmental, and macroeconomic policies. I regularly serve as a technical expert on the Center's high-profile institution-wide reports, ensuring methodological transparency and analytical accuracy. From 2011-12, I served as a Dissertation Fellow for Resources for the Future where I conducted

Decl. of Michael Madowitz

Civil Action No. 20-cv-01468

EXHIBIT 31

empirical and simulation research on state and local tax revenue volatility, and the implications for design of carbon pricing policy at state and federal level. I also served as a Forecasting Consultant at Southern California Edison from 2006-2008, where I worked on the production, improvement and support of short-term electricity demand forecasting models.

4.      I also serve as a peer referee for cost-benefit analysis article submissions to highly selective academic journals and provide pre-publication reviews of proposals from academics, think tanks, and national and state-level campaigns for both political parties. I hold a doctoral candidacy in economics and a master's degree in applied mathematics from the University of California, San Diego and received a bachelor's degree in economics and international relations from Pomona College in Claremont, CA in 2002. Attached as Exhibit A is a true and correct copy of my curriculum vitae and a list of my publications in the past ten years. .

5.      Based on my experience in analyzing the cost modeling of public policy, the Rule's cost-benefit analysis (as articulated in the Regulatory Impact Analysis) is problematic in ways that render it fundamentally flawed. Not only is the analysis based on flawed data sets and missing important underlying documents, but its material assumptions go unsupported and, at times, unexplained. Further, the methodology does not reflect the accuracy or rigor consistent with practice in the field and the Department's calculations themselves are at times incomplete, inconsistent, or flawed. Finally, the Regulatory Impact Analysis fails to consider a number of other significant economic costs both inherent to, and a result of, the Rule's provisions, such as the increased costs for sexual assault and harassment to survivors, the downstream social and economic costs, and the full extent of the costs for supportive measures as well as technological and physical systems necessitated by the Rule.

Decl. of Michael Madowitz                                         Civil Action No. 20-cv-01468

EXHIBIT 31

6.     In the past four years, I have not testified as an expert, at trial, or by deposition, in any matter.

7.     I am being compensated at a rate of $400 per hour for my work on this declaration and this case.

**Failure to Disclose Data Sets and Information Necessary to Understand the Cost-Benefit Analysis Methodology and Conclusions**

8.     The first step in evaluating a completed cost-benefit analysis is replicating the original analysis. The Rule's cost-benefit analysis is impossible to completely reproduce, let alone evaluate, because the Department failed to disclose to the public the required fundamental underlying information and the complete cost-benefit analysis methodology during the NPRM public comment period. The Department only provided such information (per multiple Freedom of Information Act (FOIA) requests)[1] after the NPRM comment period had lapsed; the information that was eventually provided was also incomplete and, in some instances, contained basic mathematical errors. In order to fully interrogate, assess, and reproduce the Rule's cost-benefit analysis, complete documents, studies, and data sets would have been needed, including but not limited to loaded wage rates assumed for investigators, mediators, and decision-makers and explicit baseline time and costs of investigations. A full list of sources for assumptions about current and post-Rule personnel time and costs of Title IX proceedings in both the NPRM and Rule would also have been required. In some cases, it is possible to overcome the challenges of a single error, but when an opaque calculation is compounded with error in either computation or description, it

---

[1] National Center for Youth Law and the Center for American Progress, FOIA Request, "Request for Extension of Comment Period for Proposed Rule Regarding Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance – Docket ID ED-2018-OCR-0064". Among other things, this FOIA request, dated January 17, 2019, notes that "The Department relied on a number of documents and analyses that it did not make available to the public, thus making it impossible for the public to determine whether the agency is drawing improper conclusions from its documents and analyses or to otherwise meaningfully comment. Several of these documents and analyses involve the Department's Regulatory Impact Analysis, which attempts to assess the costs of the proposed regulations as required by Executive Order 12866 as modified by Executive Order 13563."

Decl. of Michael Madowitz

Civil Action No. 20-cv-01468

EXHIBIT 31

becomes impossible to fix the Department's cost estimates without the underlying documents, studies, and data sets.

### Flaws in Underlying Information: Incomplete and Inconsistent Data Sets

9.      The Department bases the bulk of its cost savings on an anticipated reduction in the number of investigations, which results from recipients no longer being required to conduct investigations (in as many cases as they would have prior to the Rule) and from diverting formal investigations into less costly informal resolutions. The Department's conclusion regarding the reduction in investigations arises from calculations based on data sets provided by the Clery Act and the Civil Rights Data Collection (CRDC), each of which have issues and limitations that make heavily relying upon them problematic.

10.      Clery Act data is an important resource, but it must be treated with caution given the data's serious limitations. The American Association of University Women (AAUW) reviewed underreporting related to the Clery Act and found that "some schools have built the necessary systems to … disclose accurate statistics – and others have not" when it comes to reported campus safety and crime statistics.[2] Other studies of Clery Act data and educational institutions have identified similar concerns about underreporting and misreporting of data around sexual assault.[3] The Department acknowledges these data set limitations in its reference to studies cited by NPRM

---

[2] *See, e.g.,* American Association of University Women, "89 Percent of Colleges Reported Zero Incidents of Rape in 2015," May 10, 2017, available at https://www.aauw.org/article/clery-act-data-analysis-2017/; American Association of University Women, "91 Percent of Colleges Reported Zero Incidents of Rape in 2014," November 23, 2015, available at https://www.aauw.org/article/clery-act-data-analysis/.

[3] *See, e.g.,* California State Auditor, "Clery Act Requirements and Crime Reporting: Compliance Continues to Challenge California's Colleges and Universities" (Sacramento, CA: California State Auditor, 2018), available at https://www.auditor.ca.gov/pdfs/reports/2017-032.pdf; Corey Rayburn Yung, "Concealing Campus Sexual Assault: An Empirical Examination," *Psychology, Public Policy, and Law* 21 (1) (2015): 1-9; National Academies of Sciences, Engineering, and Medicine, "Innovations in Federal Statistics: Combining Data Sources While Protecting Privacy" (Washington, DC: The National Academies Press, 2017), available at https://www.nap.edu/catalog/24652/innovations-in-federal-statistics-combining-data-sources-while-protecting-privacy; Kristen Lombardi and Kristin Jones, "Campus Sexual Assault Statistics Don't Add Up: Troubling Discrepancies in Clery Act Numbers," *Center for Public Integrity*, December 2, 2009, available at https://publicintegrity.org/education/sexual-assault-on-campus/campus-sexual-assault-statistics-dont-add-up/.

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

commenters but, despite this, the Department did not take steps towards addressing and rectifying these flaws – such as by finding supplementary data sets.[4]

11.     While the CRDC provides another important source of publicly available data, its utility is also limited by the quality of its data input. Problems have been reported regarding the accuracy of some of the data that school districts have provided to the Department via the CRDC.[5] This is particularly true of the number of sexual harassment incidents reported. The AAUW analyzed CRDC sexual harassment data and determined that many school districts were simply reporting zero incidents, rather than collecting and reporting the true numbers of cases of sexual harassment that were reported or resulted in discipline.[6]

12.     Clery Act and CRDC data are valuable resources but due to their inherent limitations – something the Department even acknowledges[7] – the Department should have utilized supplementary data sets that at least attempt to fill in the gaps. For example, supplementing the cost-benefit analysis with information from datasets such as the Bureau of Justice Statistics' (BJS) National Crime Victimization Survey, the Center for Disease Control and Prevention's (CDC) Youth Risk Behavior Surveillance System, and the Federal Bureau of Investigation's (FBI) National Incident-Based Reporting System – each of which provide data on rape, sexual assault, stalking, or

---

[4] 85 Fed Reg. at 30555

[5] *See, e.g.,* Evie Blad, *How Bad Data from One District Skewed National Rankings on Chronic Absenteeism*, Education Week (Jan. 9, 2019) http://blogs.edweek.org/edweek/rulesforengagement/2019/01/chronic_absenteeism.html; Anya Kamenetz, *The School Shootings that Weren't*, National Public Radio (Aug. 27. 2018), https://www.npr.org/sections/ed/2018/08/27/640323347/the-school-shootings-that-werent; Andrew Ujifusa & Alex Harwin, *There Are Wild Swings in School Desegregation Data. The Feds Can't Explain Why*, Education Week (May 2, 2018), https://www.edweek.org/ew/articles/2018/05/02/there-are-wild-swings-in-school-desegregation.html.

[6] *See, e.g.,* Pamela Yuen, "Three-Fourths of Schools Report Zero Incidents of Sexual Harassment in Grades 7-12," *American Association of University Women*, October 24, 2017, available at https://www.aauw.org/article/schools-report-zero-incidents-of-sexual-harassment/; Lisa Maatz, "Why Are So Many Schools Not Reporting Sexual Harassment and Bullying Allegations?", *Huffington Post*, October 24, 2016, available at https://www.huffingtonpost.com/lisa-maatz/why-are-so-many-schools-n_b_12626620.html; Erin Prangley, "Two-Thirds of Public Schools Reported Zero Incidents of Sexual Harassment in 2013–14," *American Association of University Women*, July 12, 2016, available at https://www.aauw.org/article/schools-report-zero-sexual-harassment/.

[7] 85 Fed Reg. at 30556

Decl. of Michael Madowitz                                        Civil Action No. 20-cv-01468

EXHIBIT 31

sexual violence[8] – would have at the very least provided the public with additional clarity on the true number of cases of sexual harassment that were reported at the Local Education Agency and Institute of Higher Education level and resulted in a more complete accounting of the reporting landscape and a more accurate cost calculation.

13.    Because of the Department's decision to base the Rule's cost estimates in large part on calculations using Clery Act and CRDC data, the data quality issues presented by these data sets (i.e., incomplete, limited, and potentially inconsistent information regarding the incidents of sexual harassment) means the cost-benefit analysis is likely to be inaccurate and unreliable. The Department's assertion that these data sets were the most high quality available to it does not acknowledge that it could have supplemented them with the data sets discussed in Paragraph 10, and does not change the fact that the Department based its cost estimates on flawed data sets that render its cost-benefit analysis unreliable.

## Flaws in Material Assumptions

### Assumptions Regarding Reduction in Investigation Rates

14.    The Department posits that, on balance, the Rule would result in a net cost between $48.6 million and $62.2 million over ten years. These relatively minimal costs, considering the scope of the changes required by the Rule, arise from an anticipated reduction in the number of incidents to which recipients will respond set forth in the NPRM and Rule – 1.62 fewer investigations per Local Education Agency per year (a 50 percent reduction compared to the

---

[8] The BJS' National Crime Victimization Survey collects nationally representative data that include nonfatal personal crimes like rape and sexual assault along with factors such as age, sex and the time and place of the crime. *See* Bureau of Justice Statistics, "Data Collection: National Crime Victimization Survey (NCVS)," available at https://www.bjs.gov/index.cfm?ty=dcdetail&iid=245; The CDC's Youth Risk Behavior Surveillance System is a biennial national survey of 9th to 12th grade students that collects data about, among other things, students' experiences of sexual violence. *See* Centers for Disease Control and Prevention, "Youth Risk Behavior Surveillance System (YRBSS) Overview," available at https://www.cdc.gov/healthyyouth/data/yrbs/overview.htm; The FBI's National Incident-Based Reporting System collects crime statistics through the Unified Crime Reporting Program on crimes that include sex offenses like rape and sexual assault. *See* Criminal Justice Information Services Division, "2018 National Incident-Based Reporting System," available at https://ucr.fbi.gov/nibrs/2018.

Decl. of Michael Madowitz

Civil Action No. 20-cv-01468

EXHIBIT 31

baseline rate of investigations asserted in the NPRM and Rule) and 1.89 fewer investigations per Institute of Higher Education per year (a 33 percent reduction for Group 2 Institutes of Higher Education compared to the baseline rate of investigations asserted in the NPRM and Rule).[9] As the Rule notes, Group 2 recipients are those who currently follow guidance issued by the Obama administration (under the 2011 Dear Colleague Letter and 2014 Q&A) but who the Department believes will amend their Title IX activities once this Rule is finalized and implemented. The Department explains that the reason for this reduction in investigations per year is primarily due to "the requirement to investigate only in the event of formal complaints,"[10] but it is important to note that, in reproducing the Rule's costs, I found that reducing the number of investigations across school types resulted in cost savings that make up more than 87 percent of the Rule's total anticipated cost savings. In other words, the only reason this Rule's cost increases are modest is that the Department assumes dramatic cost savings due to a significant reduction in the number of Title IX investigations.

15.     At the Local Education Agency level, "the Department assumes that only 50 percent of the incidents reported in the CRDC would result in a formal complaint..."[11] The Department does not provide a basis or any support for this central assumption. Indeed, it acknowledges that there is a lack of information regarding the actual number of investigations conducted each year at the Local Education Agency level.[12] Given the fundamental importance the Department has given the assumed reduction in investigations in achieving cost savings, the lack of support for this claim undermines the integrity of its analysis.

---

[9] 85 Fed. Reg. at 30568
[10] *Id.* at 30567
[11] *Id*. at 30568
[12] *Id*.

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

16.     At the Institute of Higher Education level, the Department states that it used "Clery Act data to impute the likely effect of these regulations on various institutions",[13] noting a difference in investigation rates at larger (more than 10,000 students) versus smaller four-year institutions, the latter of which have relatively higher investigation rates, and explaining that its Rule would result in a 40 percent reduction in the rate difference between larger and smaller schools. The Department's reasoning underlying its assumption that there would be a 40 percent reduction in this rate difference is unclear. This reduction would supposedly lead to a decrease of 1.60 Institute of Higher Education investigations per institution per year. The Regulatory Impact Analysis does not provide sufficient information to enable me to determine how much of the reduction comes from an increase in the rate of investigations at larger Institutes of Higher Education or from a decrease in the rate of investigations at smaller Institutes of Higher Education.

17.     The Department also assumes that, based on Clery Act data, the number of investigations would drop by a further 0.29 investigations when discounting off-campus sexual harassment investigations across all school types. First, the use of Clery Act data as the sole data source to impute these effects at the Institute of Higher Education level is highly problematic due to limitations of the data set (see Paragraph 8). This is particularly hard to justify given that in the Regulatory Impact Analysis the Department supplements Clery Act data with data it compiled from a Senate Subcommittee on Financial and Contracting Oversight report survey. Second, the reason for the presumed reduction in investigations is not clearly explained. Third, the Department does not provide any additional information to explain its assumptions or rationale, making it difficult to evaluate the accuracy of its claims. This renders its assumption unreliable and insufficiently supported.

---

[13] *Id.* at 30567

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

<u>Assumptions Regarding Underlying Rate of Sexual Harassment</u>

18.    The Department states that "[it] has insufficient evidence to assume the final regulations will have an effect on the underlying rate of sexual harassment,"[14] in essence claiming the Rule will have no effect on the underlying rate of sexual harassment. However, by raising reporting, filing, and investigation thresholds and altering grievance procedures, the Rule will inevitably result in a reduction in the rate of Title IX investigations—a conclusion the Department itself asserts at the Institute of Higher Education and Local Education Agency level. Given that fewer incidents of sexual harassment will be investigated under the Rule, the likelihood of this harassment being detected and punished will also be reduced, which in turn will reduce the system's general deterrent effect.[15] This logic is in large part based on the criminology of sexual harassment: perpetrators of sexual harassment and assault are often repeat offenders and, if not held to account, are likely to recommit the offense.[16] Studies have found that at least two-thirds of college students who commit rape are repeat offenders and are responsible for over 90 percent of all campus rapes.[17] If the Department has an empirical basis for its assumption that changing procedures will have no effect on the underlying rate of sexual harassment, it should offer this evidence. Instead, the Department cites studies, provided by commenters of its NPRM, that undermine its argument—for instance, that requirements similar to those in the Rule are a reason many survivors do not report

---

[14]  *Id*. at 30541.

[15]  Ronet Bachman, Raymond Paternoster, and Sally Ward, "The Rationality of Sexual Offending: Testing a Deterrence/Rational Choice Conception of Sexual Assault," *Law & Society Review* 26 (2) (1992): 343-357; Camille Gallivan Nelson, Jane A. Halpert, and Douglas F. Cellar, "Organizational Responses for Preventing and Stopping Sexual Harassment: Effective Deterrents or Continued Endurance?", *Sex Roles* 56 (11-12) (2007): 811-822.

[16] Inez Dekker and Jullian Barling, "Personal and Organizational Predictors of Workplace Sexual Harassment of Women by Men," *Journal of Occupational Health Psychology* 3 (1) (1998): 7-18,

[17] Jim Hopper, "Sexual Assault: Repeat Rape by College Men," available at https://www.jimhopper.com/sexual-assault-and-the-brain/repeat-rape-by-college-men/(last accessed September 2019).

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

harassment or assault[18]—but fails to provide a basis that supports its assumptions that the underlying rate will remain unchanged.[19]

19.     Until the Department can provide sufficient evidence demonstrating that the underlying rate of sexual harassment will not increase following the Rule's implementation, one must consider that a reduction in the system's deterrent effect may increase the rate of harassment and, consequently, the overall cost of sexual harassment. It is important to note that a Regulatory Impact Analysis is required to consider all costs to society, so the Department's very narrow consideration of how the Rule could affect the frequency of sexual harassment is a material oversight.

20.     Numerous studies provide credible estimates of the cost of sexual violence. For example, one study cited in the Regulatory Impact Analysis places the marginal lifetime costs of rape at $122,461 per individual victim and $3.1 trillion for all victims—likely an underestimate given that the average age of victims in this study is 25 years, compared to the relatively younger Title IX covered population.[20] Women who experience physical or psychological abuse utilize significantly more mental health services (2.5 and 2 times more, respectively) than non-abused women.[21] Also, women experiencing ongoing abuse have total annual health expenditures that are

---

[18] Cora Peterson and others, "Lifetime Economic Burden of Rape Among U.S. Adults," *American Journal of Preventive Medicine* 52 (6) (2017): 691–701.

[19] Jacquelyn Wiersma-Mosley and James Diloreto, "The Role of Title IX Coordinators on College and University Campuses," *Behavioral Sciences* 8 (4) (2018): 38; Heather M. Karjane, Bonnie S. Fisher, and Francis T. Cullen, "Campus Sexual Assault: How America's Institutions of Higher Education Respond," Final Report, NIJ Grant # 1999-WA-VX-0008. Newton, MA: Education Development Center, Inc.; Angela F. Amar and others, "Administrators' Perceptions of College Campus Protocols, Response, and Student Prevention Efforts for Sexual Assault," *Violence and Victims* 29 (4) (2014): 579–593.

[20] The lifetime cost estimates calculated in Amar et al.'s paper are based on an average victim aged 25 and thus likely understate the costs for the relatively younger population being considered in this Rule. See Cora Peterson et al, "Lifetime Economic Burden of Rape Among U.S. Adults".

[21] A.E. Bonomi and others, "Health Care Utilization and Costs Associated with Physical and Nonphysical-Only Intimate Partner Violence," *Health Services Research* 44 (3) (2009): 1052-67.

Decl. of Michael Madowitz                                      Civil Action No. 20-cv-01468

EXHIBIT 31

42 percent higher than women who have never been abused.[22] In addition, victims of intimate partner violence, sexual violence or stalking lost a collective 741 million productive days (i.e., lost school or work days) and experienced a collective $110 billion loss in short-term productivity.[23] These are all costs that would accrue if the rate of sexual harassment is to increase, as it has the likelihood to do under the Rule. The Department may think the effect size is small but asserting an effect of zero is a very strong claim, made even stronger in cases such as this, where there is evidence (as explained above) that the Rule will cause the underlying rate of sexual harassment to increase.

**Figure 1: Regulatory Impact Analysis Projected Complaint Outcomes for Group 2 Institutes of Higher Education[24]**



21.     The reduction in the number of reports that can result in sanctions is not explicitly stated but, based on my cost replications, would be dramatic. For Institutes of Higher Education in

---

[22] Ibid.

[23] Cora Peterson and others, "Short-term Lost Productivity per Victim: Intimate Partner Violence, Sexual Violence, or Stalking," *American Journal of Preventive Medicine* 55 (1) (2018): 106–110.

[24] Under the baseline, all complaints at Group 2 Institutes of Higher Education have the same result – specifically, that there are 5.7 complaints, investigations, and formal hearings each per year and zero appeals.

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

Group 2 – the schools on which the Department models its cost reductions – the Regulatory Impact Analysis indicates that from a baseline of 5.70, there is a 50 to 75 percent drop in investigations that result in possible sanctions for the respondent. Figure 1, above, depicts this breakdown, with one-third of investigations not occurring at all, another one-sixth of investigations being resolved informally, and half resulting in formal grievance procedures (of which half of are either appealed or not appealed). The notion that reducing the odds of being sanctioned for sexual assault or harassment to half, or even a quarter, of existing levels would have zero effect on the underlying number of offenses committed is an extremely strong modeling assumption and one for which the Department does not provide rhetorical, let alone statistical, justification.

### Flaws in Methodology

#### Exclusive Focus on Reduction in Investigations

22.     It is highly unusual in agency rulemaking or academic literature for a cost-benefit analysis to focus on so few sources of cost reductions—in this case, modeling large cost savings based on a reduction in the number of Title IX investigations—while dismissing other potentially large effects—such as assuming that a reduction in the number of Title IX investigations will have no effect on the underlying rate of sexual harassment—without a significant effort at evaluating these assumptions. The industry standards for cost-benefit analyses practiced by economists, including those working to fulfill the legal requirements governing rulemaking, take the effects on the broader economy into consideration in a far more substantial manner than present here.

23.     The Department's stated rationale for precluding consideration of the Rule's larger economic and social impacts are that "[the Department has] no evidence indicating that Federal Title IX guidance or regulation has an effect on the underlying number of incidents of sexual harassment or assault" but "[t]o the extent that such effects are relevant to our evaluation of the

Decl. of Michael Madowitz

Civil Action No. 20-cv-01468

EXHIBIT 31

likely costs of these final regulations, [the Department offers] supportive measures 'without fee or charge to the complainant or respondents.'"[25] Not taking these costs into account based on the offered rationale is not accepted practice for a cost-benefit analysis.

24.     Even if the impacts are difficult to precisely quantify, there are widely accepted methods a Regulatory Impact Analysis may employ when an agency is unable to quantify exact values due to uncertainty, including a series of techniques for analyzing trade-offs and detailed Office of Management and Budget guidance for calculating these effects.[26] The Regulatory Impact Analysis presents no evidence that the Department attempted to perform these calculations. Instead, the Regulatory Impact Analysis preemptively states that the projected effect of the Rule on the underlying rate of sexual harassment and reporting is zero. This is not consistent with generally accepted practice of agencies, institutions or academics with respect to cost-benefit analyses.

<u>Cost Modeling Shortcomings</u>

25.     To model the costs and benefits of the Rule, the Department must show its logic in clear terms. As was the case in the NPRM, the Rule's cost modeling is fundamentally flawed because it is not possible to reproduce its figures by following the Rule's stated assumptions.

26.     To begin, the Regulatory Impact Analysis does not establish a sufficient, or sufficiently clear, baseline for cost estimates. The Department establishes a baseline rate of 3.23 investigations at Local Education Agencies and 5.70 investigations at Institutes of Higher Education;[27] while this is an important input to a cost estimate, it is not sufficient to generate an accurate representation of projected cost without a baseline and post-Rule cost per investigation.

---

[25] 85 Fed. Reg. at 30546.

[26] For a preliminary overview of some of these methods, see, e.g., Office of Management and Budget, "Regulatory Impact Analysis: A Primer," available at https://www.reginfo.gov/public/jsp/Utilities/circular-a-4_regulatory-impact-analysis-a-primer.pdf (last accessed September 2019).

[27] 85 Fed. Reg. at 30565

Decl. of Michael Madowitz                                        Civil Action No. 20-cv-01468

EXHIBIT 31

27.     Indeed, the Department's approach to establishing a baseline rate of Institute of Higher Education investigations and determining changes in investigation rates is difficult to follow or rationalize and has become even more convoluted in the Rule in comparison to the NPRM. The Department starts with data from the Senate Subcommittee survey, corresponding to four ranges (0 to 0.2, 0.4 to 1, 1.2 to 2, and >2 investigations per Institute of Higher Education per year), and arrives at a baseline of 5.70, largely by top-coding the ">2" category to "10" without offering any support for this choice. Top-coding is problematic because it requires statisticians to either acquire outside information to interpret what occurs above the top-coded value – 2 offenses per institution per year, in this case – or, as the Department does, to arbitrarily assign a value and render all further analysis as speculative.  The Department offers the caveat that "this top-coding approach may result in an overestimate of the number of sexual misconduct investigations conducted at institutions."[28] An important distinction in the Regulatory Impact Analysis of both the NPRM and the Rule is that the Department has structured its methodology so any over-estimate in the baseline cost of investigations, number of investigations, or both will result in lower overall costs from the regulations. As discussed below, the Department's cost savings for Group 2 Institutes of Higher Education is largely driven by baking roughly $90,000 per Institute of Higher Education per year into baseline Title IX investigation costs. Top-coding data is never desirable but doing so without any justification or rationale is not standard practice.

28.     The discussion of baseline costs for Institute of Higher Education investigations is so opaque that even having read numerous Regulatory Impact Analyses, I could not understand how this baseline cost was constructed from the text of the Rule. Even imputing other likely data, besides the limited data made available by the Department, and following the text failed to produce a

---

[28] *Id.*

Decl. of Michael Madowitz

Civil Action No. 20-cv-01468

EXHIBIT 31

baseline that was consistent with the implausibly large cost savings reported in the Rule's accounting statement. It was only after repeated failures to replicate cost savings of similar magnitude to those reported in the Regulatory Impact Analysis that I began working backward from the accounting statement and discovered such savings were only possible if the baseline costs of Group 2 Institute of Higher Education proceedings were already as high as they would be under the Rule. This is a highly questionable assumption that goes almost completely unmentioned in the text and for which the Rule offers no support whatsoever. The Regulatory Impact Analysis' failure to establish a clear set of baseline costs to estimate the Rule's cost savings and distributional effects is inconsistent with generally accepted practice and undermines the conclusions of the cost-benefit analysis.

29. The lack of a clear baseline further obfuscates the Department's questionable assumption that the cost of the average response to a formal complaint will not materially increase at Group 2 Institutes of Higher Education under the Rule, in spite of the numerous new requirements of the Rule. The modeled cost savings are based on the assumption that, for each Title IX complaint at an Institute of Higher Education today, complainants and respondents each obtain or are provided with an advisor for 60 hours. No evidence is offered in support of these figures. This modeling seems at odds with Secretary DeVos's description of the Title IX process in November 2019: "If there is a hearing, both the accuser and the accused may or may not be allowed legal representation."[29] As discussed below, the failure to establish this baseline may have contributed to the Regulatory Impact Analysis' failure to properly value costs the Rule imposes on complainants under the Department's own methodology.

---

[29] Department of Education, "Prepared Remarks by Secretary DeVos at the Independent Women's Forum Annual Awards Gala", November 13, 2019, available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

Decl. of Michael Madowitz

Civil Action No. 20-cv-01468

EXHIBIT 31

30.     It is also important that any rule clearly lay out its figures and assumptions so that an agency and the public can learn from and comment on the rulemaking process. As such, it is unusual to see so few tables in a Regulatory Impact Analysis. While the technical details in rulemaking vary by rule and relevant evidence base, it is worth noting that a Department of Education cost-benefit analysis with respect to an analogous agency rule (RIN 1820-AB73) displays considerably more quantitative analysis and provides seven tables that clearly enumerate individual costs.[30] The lack of quantitative analysis here is indicative of the cursory approach to analysis of the Regulatory Impact Analysis as a whole.

31.     The Department's lack of consideration or inclusion of the downstream social and economic costs of the Rule is also striking. Although estimating the potential effects of altering investigation requirements for a rarely reported offense with very large costs is difficult, a credible estimation requires consideration of a wide range of risks. There are numerous examples and resources in modern cost-benefit analyses that could have been used for guidance. For example, there are a number of federal departments and agencies that offer guidance on how to properly conduct cost-benefit analyses in the presence of some uncertainty.[31] If the Department did not think it was possible to summarize these effects in a single figure, it should have, at a minimum, offered a range of possible values for these effects, either through a formal sensitivity analysis or through other commonly accepted methods, like a "breakeven analysis", which the Office of Information

---

[30] Department of Education, "RIN 1820-AB73: Assistance to States for the Education of Children with Disabilities; Preschool Grants for Children with Disabilities," available at
https://www.federalregister.gov/documents/2016/03/02/2016-03938/assistance-to-states-for-the-education-of-children-with-disabilities-preschool-grants-for-children (last accessed March 2016).

[31] *See, e.g.* Office of Management and Budget, "Regulatory Impact Analysis: A Primer," available at
https://www.reginfo.gov/public/jsp/Utilities/circular-a-4_regulatory-impact-analysis-a-primer.pdf (last accessed September 2019); Environmental Protection Agency, "Guidelines for preparing economic analyses." available at
https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses (last accessed December 2019).The Department could have also availed itself of academic research to improve its analysis, including 157 researchers affiliated with the National Bureau of Economic Research's (NBER) Economics of Education Program.

Decl. of Michael Madowitz

Civil Action No. 20-cv-01468

EXHIBIT 31

and Regulatory Affairs describes as an "important tool" in its Regulatory Impact Analysis primer.[32]
The Department failed to take any of these steps here.

**Flawed and Incomplete Cost Calculations**

<u>Conceptual Errors in Institute of Higher Education Cost Savings from the Reduced Rate of
Investigations</u>

32.      Reproducing the Rule's baseline cost estimates—that is, the initial conditions
from which the cost savings and incremental costs arise—with total certainty has proven
impossible, given conflicting and absent information in the Regulatory Impact Analysis both in
the NPRM and in the Rule. However, using all available data sources noted in the Regulatory
Impact Analysis and following the Rule's cost descriptions in text, I was able to plausibly deduce
baseline cost estimates as well as a cost savings that closely mirror a portion of the Rule's cost
savings. The precise numbers here may differ slightly from some of the Department's estimates,
in part due to inconsistencies in the Regulatory Impact Analysis; however, the precise values of
the cost savings are less important than the nature and scale of costs described, as these represent
one of the only instances where the Department concretely expresses the likely outcome of the
Rule.

---

[32] *See, e.g.* Office of Management and Budget, "Regulatory Impact Analysis: A Primer," available at
https://www.reginfo.gov/public/jsp/Utilities/circular-a-4_regulatory-impact-analysis-a-primer.pdf (last accessed
September 2019); Environmental Protection Agency, "Guidelines for preparing economic analyses." available at
https://www.epa.gov/environmental-economics/guidelines-preparing-economic-analyses (last accessed December
2019).

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

**Table 1: Regulatory Impact Analysis text-based Cost Estimates for Investigations/Hearings**

| | | Group 2 Institute of Higher Education cost of formal investigation | | | | |
| | | Baseline | | Post-Rule | | |
| Rate | Personnel | Hours | Sub-cost | Hours | Sub-cost | Difference |
|---|---|---|---|---|---|---|
| $65.22 | TIX coordinator | 24 | $1,565 | 24.0 | $1,565 | |
| *$25.26** | Admin assistant | 40.0 | $1,010 | 40.0 | $1,010 | |
| $90.71 | Complainant lawyer | 60.0 | $5,443 | 40.0 | $5,443 | |
| $90.71 | Respondent lawyer | 60.0 | $5,443 | 40.0 | $5,443 | |
| *$35.83** | Investigator | 40.0 | $1,433 | 40.0 | $1,443 | |
| *$65.22* | Decision-maker | 16.0 | $786 | 16.0 | $786 | |
| $18.58 | Student | 24 | $446 | 24 | $446 | |
| $18.58 | Student | 24 | $446 | 24 | $446 | |
| $100 | Flat cost | | $0 | | $100 | |
| Cost per investigation** | | $15,680 | | $15,780 | | $100 |
| Formal complaints resulting in investigations per Institute of Higher Education | | 5.70 | | 3.81 | | -1.89 |
| Formal complaints resulting in hearings per Institute of Higher Education | | 5.70 | | 2.86** | | -2.84 |
| Number of Group 2 Institutes of Higher Education | | | 3,383 | | | |
| Total formal investigations & hearings | | 19,283 | | 9,667 | | -9,616 |
| Total cost | | $302,359,008 | | $152,544,037 | | $149,814,971 |

* According to the Regulatory Impact Analysis, these loaded wages should be imputed as $33.40 using Regulatory Impact Analysis' 'unless specified' methodology (83 Fed. Reg. at 61486), though doing so would produce cost estimates much higher than the Department presents. I have used wages from the most closely matching occupation from the data source specified.[33]
** Excludes appeals and informal resolution costs in order to be consistent with the Department's baseline scenario.
*** Includes annual reductions per Institute of Higher Education of 1.89 formal investigations and a further 0.95 due to formal investigations being resolved informally.
Note: Some totals may not sum due to rounding.

[33] Loaded wages are derived from OES 2017 pay for All Occupations for education services, per footnote 1965 of the Rule (85 Fed. Reg. at 30567). The source link provided in the Regulatory Impact Analysis sends the reader to data from a different year. Relevant OES data used in the Department's cost estimates is available at https://www.bls.gov/oes/2017/may/naics2_61.htm.

Decl. of Michael Madowitz

EXHIBIT 31

Civil Action No. 20-cv-01468

33.     Based on available personnel costs in the Regulatory Impact Analysis, I calculated a formal Institute of Higher Education investigation cost of $15,680, which is not inclusive of the appeals cost.[34] Taken together with Group 2 Institutes of Higher Education's new rate of formal resolution investigations (a reduced number of 2.86 formal investigations with hearings per year per Institute of Higher Education compared to the 5.70 figure assumed in the baseline),[35] this leads to a total post-Rule investigation cost of approximately $153 million for just Institutes of Higher Education—almost exactly half the baseline cost of $303 million. This post-Rule cost savings is a combination of $90 million and $101 million in cost savings for formal complaints at Local Education Agencies and Institutes of Higher Education, respectively, as well as $16 million and $10 million in cost savings for informal resolutions at Local Education Agencies and Institutes of Higher Education, respectively, for a total annual cost saving of $217 million.[36] Overall, these calculations closely mirror the Rule's proposed cost savings of $218.7 million per year resulting from reduced investigations and informal resolutions.[37] The above table describes the only plausible reconstruction of the Department's published procedure that allows for cost savings that closely approach the Department's figures.

34.     The Department's baseline assumption that Group 2 Institutes of Higher Education currently spend such significant amounts on investigations drives virtually all cost savings for Institutes of Higher Education in the Regulatory Impact Analysis, a fact that is apparent from the way the Department then claims a reduction in investigations as a result of the

---

[34] Following the Rule's cost model, the average cost per investigation is $15,680 (excluding appeals). The only cost change clearly imposed by the Rule is the $100 flat fee (see Table 1).

[35] The Rule estimates a baseline average of 5.7 investigations of sexual harassment per Institute of Higher Education per year (*see* 85 Fed. Reg. at 30565). Following implementation of the Rule, this rate will be reduced by 1.89 (*see* 85 Fed. Reg. at 30567), resulting in a post-Rule investigation rate of 3.81 investigations per Institute of Higher Education per year, 25% of which are resolved without a formal grievance hearing (*see* 85 Fed. Reg. at 30569).

[36] There are 6,766 Institutes of Higher Education and, according to the Rule, 50 percent of those Institutes of Higher Education are in Group 2 (see 85 Fed. Reg. at 30566), for a total of 3,383 Institute of Higher Education in Group 2.

[37] 85 Fed. Reg. at 30569.

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

Rule's requirements. However, the Department offers no basis for the assumption that 50 percent of Group 2 Institutes of Higher Education currently spend this much on each investigation, nor explains why these costs differ so dramatically from Group 1 Institutes of Higher Education and Local Education Agencies. Because the Department provides an extremely high estimate of pre-Rule costs of investigations to Institutes of Higher Education while providing no basis for the estimates, there is insufficient evidence for the prediction of cost savings.

35.      There also appears to be a substantive failure by the Department to appropriately incorporate economic incentives in the cost estimates. The Department flatly states, "We note that our model makes no distinction between whether advisors are secured by complainants, respondents, or recipients—such a fact would not affect our estimate."[38] There is an overwhelming amount of tension in any claim that shifting costs from one party to another would have no effect on a cost estimate because cost-shifting inherently changes incentives. In economic terms, the Department's claim assumes that the quantity purchased is unaffected by price; in legal terms, this would imply that attorney fee clauses are irrelevant.

### Improper Exclusion of Distributional Effects on Complainants

36.      In both the NPRM and the Rule, the Department's own methodology indicates a clear economic measure of the costs to victims under the Rule that it improperly excludes from the Regulatory Impact Analysis. In the NPRM, the Department explicitly stated its assumption that both parties would choose to pay advisor fees, establishing a willingness-to-pay measure on the part of complainants to voluntarily proceed with complaints. These advisor fees create a revealed preference of $3,628 per investigation that Office of Management and Budget guidelines indicate should be considered a transfer of benefits that produces distributional

---

[38] *Id.* at 30561.

Decl. of Michael Madowitz

Civil Action No. 20-cv-01468

EXHIBIT 31

effects, which is defined as "how both benefits and costs are distributed among sub-populations of particular concern."[39] By baking parties' willingness-to-pay for private advisor fees into the baseline and then zeroing out these benefits to parties whose proceedings are eliminated in the cost savings estimate, the Department is double-counting benefits.

37.     Quoting from Office of Information and Regulatory Affairs' Regulatory Impact Analysis FAQ: "According to Circular A-4,—[o]pportunity cost is the appropriate concept for valuing both benefits and costs. The principle of "willingness-to-pay" (WTP) captures the notion of opportunity cost by measuring what individuals are willing to forgo to enjoy a particular benefit. (P. 18)." According to Office of Information and Regulatory Affairs, "[t]o the extent possible, agencies should estimate people's valuations of benefits and costs using revealed preference studies based on actual behavior."[40]

38.     In the Rule, the language on advisor fees has been changed and, on its face – since these fees are no longer explicitly voluntary payments from complainants – the Rule does not establish the same value of the benefit of foregone investigations to complainants. However, insofar as complainants voluntarily engage in the formal complaint process and the Department acknowledges a monetary time cost per complainant, the Rule's Regulatory Impact Analysis does indeed establish a baseline willingness-to pay-measure for complainants and fails to account for the transfer of benefits this implies under the Rule. While the Department is double-counting benefits by a lesser degree compared to the NPRM – it is now doing so on the basis of student time as opposed to advisor fees – it is nonetheless double-counting by ignoring the foregone benefits to complainants. The Department may not have wished to highlight the clear

---

[39] Office of Management and Budget, "Regulatory Impact Analysis: Frequently Asked Questions (FAQs)," available at https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/assets/OMB/circulars/a004/a-4_FAQ.pdf (last accessed June 2020).
[40] Ibid.

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

distributional effects in both the NPRM and the Rule, but the Department's own methodologies used in both Regulatory Impact Analyses provide textbook measures of these effects.

39.     The Department's own methodology implies that the reduction in investigations deprives complainants of a benefit they value at a minimum of $4.9 million per year, collectively (based on willingness-to-pay established by voluntary student participation time).[41] The Regulatory Impact Analysis fails to account for these costs or provide distributional accounting that would explain an offsetting benefit transfer and its impacts, as required. The Regulatory Impact Analysis could have included, as part of its analysis, the offsetting cost savings to respondents. If it had done so, it should have stated as such, so as to make clear the shift in distributional analysis. However, since no such indication was made, one can assume that the benefit was simply not considered.

<u>Cost of Supportive Measures</u>

40.     Given the emphasis the Department places on access to supportive measures for students, the Department's lack of explanation for its flat cost for supportive measures ($250 per provision) as well as the Department's calculated total cost of offering supportive measures per year ($31,164,490) make it likely the Regulatory Impact Analysis significantly understates the Rule's costs.[42]

---

[41] The Department's methodology implies 24,137 fewer Local Education Agency investigations, valued at a minimum of $87 each ($7.25 per hour for 12 complainant hours) for a total willingness-to-pay of $2.1 million per year, and 6,394 fewer IHE investigations, valued by complainants at $446 each (24 complainant hours at $18.58) for a total willingness-to-pay of $2.85 million.

[42] 85 Fed. Reg. at 30558. In response to public comment, the Department provided Table VI (85 Fed. Reg. at 30558) – a sensitivity analysis of the cost of supportive measures – but the figures within this table do not correspond with the figures found within the text of the Rule. For example, the total cost of supportive measures at $250 per provision comes to $31,164,490 in the Rule's text but within the sensitivity analysis table, the "total cost of final regulations" is $89,953,995 – a figure which can be found nowhere else in the Rule. It is unclear what this or the other figures in Table VI correspond to.

Decl. of Michael Madowitz

Civil Action No. 20-cv-01468

EXHIBIT 31

41.     The Rule repeatedly cites studies showing the significant financial burden of sexual harassment and assault on victims but refuses to incorporate these costs into the Rule's cost-benefit analysis. The extensive costs of increased health care utilization, including mental health treatment, as well as additional security protections and changes to schoolwork schedules, which the Department acknowledges as key aspects of supportive measures, only enter the analysis in the form of student time and a flat $250 cost per set of supportive measures. This blasé treatment of the steep costs of providing adequate supportive measures, which the Department stresses all recipients must provide, leads to cost modeling that becomes detached from reality. For example, the Department assumes that each set of supportive measures, which it asserts will take 24 hours of student time at the Institute of Higher Education level, can be provided for less than $10.50 per hour, a cost far below any of the loaded wage costs the Department uses throughout its cost modeling.

42.     In addition, considering the long list of services available as supportive measures, including "counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures,"[43] the Department's total annual cost of $31,164,490, which accounts for the costs to all 16,606 Local Education Agencies, 6,766 Institutes of Higher Education, and 600 other Title IX entities, does not come close to covering the substantial costs that will emanate from the provision of even a few of these services by school staff or outside professionals that recipients will be responsible for covering. If one were to even split the total cost of supportive measures across all Title IX entities, the cost

---

[43] 85 Fed. Reg. at 30401

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

of providing supportive measures per school per year would total just $1,300, or five provisions of supportive measures. The cost of providing counseling, adjustments to coursework and living arrangements, and enhanced campus security alone will dwarf this small figure, and the number of students requesting supportive measures will undoubtedly be greater than five.

<u>Burden to Students and Discrepancies Between the Local Education Agency and Institute of Higher Education Levels</u>

43.     In response to public comments, the Department included a new cost to students across three cost categories: the informal resolution process, the formal complaint process, and the appeals process. In order to calculate this time burden, the Department assigns wage rates to students – the federal minimum wage at the Local Education Agency level, the median hourly wage for all workers at the Institute of Higher Education level, and the average of the two for students at other Title IX entities. However, assigning these costs does not adequately compensate for the time burden to students. When a student participates in any one of these newly implemented processes, he or she may need to miss class time or homework assignments – and both the direct cost of education, as well as the opportunity cost of missing this education, are summarily dismissed as irrelevant by the Department, which only compensates students as if they are regular employees. The method used in the Rule – applying a simple wage-based measure— is appropriate for placing a value on simple time wasted or saved, as was done in the Regulatory Impact Analysis for the Environmental Protection Agency's greenhouse gas emissions and fuel economy standards rules.[44] A revealed preference approach to valuation is the Office of Management and Budget's preferred measure and could be applied by valuing, for example, what students pay for counseling services. However, time missed in class is not the

---

[44] "Regulatory Impact Analysis: Final Rulemaking for 2017-2025 Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards", EPA-420-R-12-016 (2012), available at https://nepis.epa.gov/Exe/ZyPDF.cgi/P100EZI1.PDF?Dockey=P100EZI1.PDF

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

appropriate measure for an activity that can compound into lifetime earnings losses, as is shown in literature cited in the Department's Rule. In addition, the Rule does not consider the impact of increased time burden on student guardians. Particularly at the Local Education Agency level, the Rule does not consider time spent by guardians coordinating, transporting, and facilitating student participation in supportive measures (e.g., counseling) or guardians' resulting lost income.

44.     The time students will spend on formal complaints, informal resolutions, and appeals at the Local Education Agency level is assumed to be half of that at Institute of Higher Education level, but the Department provides no explanation for this difference. The Rule does confirm that live hearings are optional at the Local Education Agency level but this fact does not account for the huge discrepancy in time burdens between students at Local Education Agencies compared to Institutes of Higher Education. While direct costs of missing classes are lower at the Local Education Agency level, the compounding costs of missed educational opportunities and missed classes and homework on lifetime earnings at Local Education Agencies is potentially greater because of the foundational nature of K-12 classes and the longer period over which these costs can compound.[45]

## Costs of Capital Equipment

45.     There are explicit requirements within the Rule for facilities and equipment, primarily in the form of information technology and physical space requirements to host live formal complaint hearings. However, the Regulatory Impact Analysis' cost estimates and sensitivity analysis do not appear to provide cost estimates for the required capital equipment nor

---

[45] Emma Dorn and others, "COVID-19 and student learning in the United States: The hurt could last a lifetime," McKinsey and Company, June 1, 2020, available at
https://www.mckinsey.com/~/media/McKinsey/Industries/Public%20Sector/Our%20Insights/COVID-19%20and%20student%20learning%20in%20the%20United%20States%20The%20hurt%20could%20last%20a%20lifetime/COVID-19-and-student-learning-in-the-United-States-FINAL.ashx

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

offer an estimate of how many recipient locations would incur additional costs as a result of the required upfront outlays needed to host proceedings. Given recent changes to classroom learning as a result of COVID-19, during which many classes are being delivered virtually, capacity to hold virtual live hearings may be greater; however, many of these same limitations may apply.

46.    The Department also included a new cost category – recordkeeping and technology costs, including those needed for live hearings – which it asserts will cost $100 per provision. The basis for this flat cost is unclear. Given that some schools lack the requisite technology needed to conduct live hearings and would have to invest in procuring this equipment, these costs would most certainly exceed $100 per provision, particularly as the Department now asserts that the number of formal investigations under the Rule will be reduced. Therefore, the total annual cost for schools to provide recordkeeping and technology – to be spent on secure hardware and software in order to conduct live hearing as well as create audiovisual recordings and hearing transcripts –will also be supposedly lower, at $286 per school per year, a gross underestimate considering the new requirements of the Rule.[46] Not only is this figure well below what it would cost a school to procure the necessary technology, such as laptops and software to conduct live and secure hearings, as well as to engage in record-keeping, it also assumes that each school has equivalent resources or are of similar sizes and structures. This is clearly not the case as not all schools are similarly resourced, funded, or of similar sizes or structures, since some may have larger student bodies or consist of multiple campuses and thus may require additional equipment.  While these limitations may not apply as readily now given that live hearings can be conducted virtually while schools grapple with COVID-19, they

---

[46] See Figure 1. Half of all formal investigations proceed to live hearings, for a total of 2.86 live hearings per Title IX entity per year. The Department offers a flat cost of $100 per provision of record-keeping and technology to aid in conducting live hearings, meaning that it has determined each Title IX entity will require $286 per year to procure the necessary technology and engage in relevant record-keeping.

Decl. of Michael Madowitz                                    Civil Action No. 20-cv-01468

EXHIBIT 31

are important to consider once students return to campus and in-person live hearings are initiated.

## Conclusion

47.     Applying the economic principles of modeling the costs of implementing public policy to the cost benefit analysis of the Rule as presented in the Regulatory Impact Analysis, reveals it to be insufficient and flawed in a number of material ways. Unreliability of data inputs, inconsistent and incomplete calculations, unsupported assumptions, undisclosed data and documents needed to understand the methodologies and conclusions, and unaccounted for costs are among the most salient problems presented by the Regulatory Impact Analysis. These issues raise serious concerns regarding the accuracy and reliability of the Department's analysis as a whole.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 14th day of June, 2020

Michael Madowitz
Economist, Center for American Progress

Decl. of Michael Madowitz                                   Civil Action No. 20-cv-01468
EXHIBIT 31

EXHIBIT 32

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | Civil Action No. <u>20-cv-01468-CJN</u> |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF AISLINN ADDINGTON

I, Aislinn Addington pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.    I am the Campus Advocate Coordinator for the Oregon Sexual Assault Task Force ("SATF" or "Task Force"), a non-profit organization located in Keizer, Oregon, which provides resources, training, and education in sexual assault prevention and response. I have BA, MA, and PhD degrees in Sociology with a graduate certificate in Women, Gender, and Sexuality Studies. I have extensive professional and academic experience in gender equity and social justice policy.

2.      I have been employed with SATF since March 2020 and prior to that I was the Director of the Center for Equity and Gender Justice at Western Oregon University in Monmouth, Oregon. My duties as Campus Advocate Coordinator include serving as a statewide content expert, providing confidential technical assistance to over 1,000 practitioners on college campuses per year as well as working in the capacity of a campus advocacy training specialist. Additionally, I serve as a campus advocacy training specialist. I facilitate a Victims of Crime Act grant project in coordination with Oregon's Department of Justice to fund and create sustainable campus-based advocacy programs at eight colleges and universities across Oregon. I update and manage SATF's online Campus Advocate program for 300+ online students per year and collaborate with other SATF staff to design curriculum and deliver content to practitioners across Oregon.

3.      As part of my duties with SATF and my professional experience in this field, I am familiar with the standards for victim advocacy in context of sexual violence, and the requirements to implement and manage an effective victim advocacy program in higher education settings. I am also familiar with research and literature in the field of sexual assault prevention, prevalence, and impacts.

4.      I submit this Declaration in support of the State of Oregon's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through other SATF personnel who have collaborated in gathering this

Decl. of Aislinn Addington                                                    Case No. 20-cv-01468-CJN
EXHIBIT 32

information from our organization, and on the basis of documents reviewed. I have also familiarized myself with the Rule in order to understand its immediate impact on Oregonians.

**Limiting the scope of the definition of Title IX directly impacts survivors**

5.      I work directly with campus-based professionals who are engaged in sexual violence prevention, advocacy, and response, providing training and technical assistance. SATF works to support the efforts of campuses across Oregon in making their communities safe and free from violence, and in supporting students, staff, and faculty who experience violence and harassment. SATF offers dedicated support to campus advocates and advocacy programs, and joins our campus partners in envisioning a world free from violence by supporting campus-based prevention programs. We also provide a variety of trainings and assistance related to campus compliance, investigation, and response.

6.      Requiring a standard of severe, pervasive **_and_** objectively offensive limits the number of students that could seek redress via their educational institution and conflicts with policies and laws that currently use the language "severe, pervasive **_or_** objectively offensive."

7.      This requirement, in combination with the requirement that students must 1) be current students 2) have experienced violence in the context of the educational activity 3) be in the United States (rather than, for example, in a university affiliated travel or exchange program) establishes a threshold that would cause many students to access a "parallel" or separate process (as outlined in ORS 350.255)  to have their experiences with violence addressed by the institution.

8.      The Title IX process should strive to minimize retraumatization, which in turn will create a more fair and equitable process for all parties, and not to unfairly subject one party to retraumatization when other options are available. It is possible to achieve a thorough, equitable, and fair process without requiring live cross-examination. In fact, many schools in Oregon already engage in these practices. Many schools, regardless of whether they hold a live hearing, allow

reporting and responding parties to submit questions after reviewing interviews and evidence, and will then utilize an investigator or the chair of the conduct committee to ask all relevant questions.

9.      Research has demonstrated that many survivors experience additional trauma following an assault when they are exposed to invasive, unnecessary, and victim-blaming questioning.[1] Based on our experience and research in the field of sexual violence prevention and treatment, SATF believes that once survivors are made aware they will have to undergo live cross-examination once they report, this will result in a chilling effect on help-seeking and reporting.

10.     The requirement to participate in live cross-examination does not account for the cultural complexities faced by many students in Oregon schools, both as complainants and respondents.

    a. Students that identify with a marginalized group may face additional barriers and stress while engaging with Title IX processes. Students, staff and faculty that engage with a Title IX process must navigate not only the school's process, but also the identities they personally hold. Survivors that identify as part of a historically marginalized group (based on race, sexual orientation, gender expression, or disability) are more likely to experience violence than their Caucasian, cisgender, non-disabled, and heterosexual peers, and are less likely to report violence than those same peers.

    b. Respondents in particular may not wish to submit to live cross-examination for fear that transcripts or other means of documenting the live hearing process may be made accessible or otherwise utilized in civil or criminal justice proceedings, or fear the Title IX process is biased against them based on their race or ethnicity.

    c. The also Rule impedes speech of respondents by revoking any party's ability to have previously submitted evidence and interviews be examined in the context of the case when a party will not submit to cross-examination. This portion of the Rule is prohibitive to enacting a fair and equitable process for respondents in this

---

[1] See for examples: Dr. Jennifer Freyd's work on institutional betrayal with sexual assault survivors in the university and criminal justice systems at https://dynamic.uoregon.edu/jjf/institutionalbetrayal/, especially Smith, C. P., & Freyd, J. J. (2013). Dangerous safe havens: Institutional betrayal exacerbates sexual trauma. Journal of Traumatic Stress, 26, 119-124. https://dynamic.uoregon.edu/jjf/articles/sf2013.pdf; Maier, S. L. (2008). "I Have Heard Horrible
Stories . . .": Rape Victim Advocates' Perceptions of the Revictimization of Rape Victims by the Police and Medical System. Violence Against Women, 14(7), 786–808. https://doi.org/10.1177/1077801208320245.

Decl. of Aislinn Addington                                    Case No. 20-cv-01468-CJN
EXHIBIT 32

instance, effectively removing their ability to provide evidence and participate in interviews that may hold bearing on the outcome of a finding of responsibility.

d. Schools with Title IX systems that adjudicate people of color at disproportionate rates to the demographic representation of students belonging to these communities will be at risk for disproportionately impacting respondents.

e. By requiring the hearing to be both live and "verbal", students staff and faculty that experience auditory or verbal disabilities (permanent or temporary) may be unfairly impacted in the implementation of cross-examination and a "live" hearing model.

11.     In Oregon, many of our schools have worked diligently to ensure that students, faculty and staff that have experienced sexual harassment have the ability to connect with confidential advocacy resources in their county, and students, faculty or staff that have been reported to have perpetrated sexual harassment are connected with confidential legal or support resources (such as Legal services, attorneys in their county specializing in Title IX response, or Respondent Services centers).

12.     As a result Rule's provisions regarding cross-examination, nonprofits and community services that were previously trained by institutions regarding the Title IX process will now have to receive additional training regarding on not only how the Title IX process at their local college or university will be changed, but also will have to receive substantial training regarding how to offer support to  students, faculty and staff navigating the live cross-examination specifically.  These burdens would be shared across institutions of higher education, community programs and the State. Schools will need to spend additional person-power in order to cross train community programs. Programs would have to devote already strained resources (staff, primarily) to attend training. The State funds part of all community based advocacy agencies in every county in Oregon, so any burden on finances directly impacts State resources for emergency services funds and other program elements. These changes will be cost-prohibitive to many community-based

nonprofits that are seeing funding decreases as a result of COVID-19's national and global economic impact.

13.     The cross-examination provisions in the Rule will also preclude victim service advocates from serving as advisors, as the cross-examination function directly conflicts with their professional ethics. Instead, advocates that have previously served as the advisor of choice in a role that is survivor and support focused will now not be able to support students as the main advisor of choice. This is inherently inequitable for reporting students, as it specifically removes one of the main support resources utilized by survivors of violence as Title IX advisors of choice. In effect, it drastically limits who a student may choose as an informed, trauma-responsive and supportive advisor of choice, simply because of the cross-examination component in the Rule.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 12th day of June, 2020

_____
Aislinn Addington

Campus Advocate Coordinator

OREGON SEXUAL ASSAULT TASK FORCE

Decl. of Aislinn Addington                                      Case No. 20-cv-01468-CJN
EXHIBIT 32

# EXHIBIT 33

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF SARAH ALBERTSON

I, Sarah Albertson, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Director and Managing Attorney in the Equity and Civil Rights Office, which is an Office within the Washington Office of Superintendent of Public Instruction ("OSPI"). I received a Juris Doctor (J.D.) degree from Seattle University School of Law in 2013. I am a member of the Washington State Bar Association. I have been employed by OSPI in the Equity and Civil Rights Office since April 2014.

Decl. of Sarah Albertson                                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

2.      The information herein reflects my personal knowledge, including my knowledge of the agency's positions as its representative, my experience in the field of civil rights and education, and information I have obtained from OSPI business records and through OSPI personnel who have assisted me in gathering information from our agency. I have also familiarized myself with the U.S. Department of Education's ("ED" or the "Department") regulation entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Rule") in order to understand its impact on OSPI and K–12 schools in Washington.

3.      The new Title IX rules do not create additional protections against sexual harassment for Washington state students and employees. Instead, the Rules set a narrower definition of sexual harassment than in existing Washington law, set a lower bar for when schools must respond to notice of sexual harassment than Washington requires, and differ from Washington law and OSPI regulations aimed to eliminate sex discrimination in Washington schools. The new Rules also prescribe a grievance process for this new Title IX subset of sexual harassment that does not make sense for K–12 schools and does not align with existing Washington complaint procedure requirements. To implement these rules, OSPI will need to adopt considerable new regulations and guidance to ensure Washington school districts can comply with the new Rule and Washington law and to ensure Washington students are protected from all forms of sexual harassment, not just as defined in the Title IX Rule.

**Background about OSPI**

4.      OSPI is the state education agency that oversees primary and secondary (K–12) public schools in Washington. Washington K–12 schools serve over 1,147,000 students in over 2,400 schools, 295 school districts, 11 charter schools, and seven tribal compact schools.

Decl. of Sarah Albertson                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

Demographics of Washington students include the following: 48.3% identify as female, 51.6% male, and 0.1% gender X; 45.3% of students are identified as low income, qualifying for free and reduced-priced school meals; 11.7% of students are identified as English-language learners: and 14.4% identified as students with disabilities receiving special education services.

5.      The Equity and Civil Rights Office at OSPI carries out OSPI's statutory duty to promulgate rules and guidelines to eliminate discrimination in Washington school districts. This includes Chapter 392-190 of the Washington Administrative Code (WAC), entitled *Equal Educational Opportunity—Unlawful Discrimination Prohibited*, and agency guidelines for implementing Washington's Equal Educational Opportunity laws, entitled "Preventing & Addressing Discrimination in Student Discipline" (October 2019) and "Prohibiting Discrimination in Washington Public Schools" (February 2012) (guidelines hereinafter referred to collectively as "OSPI guidance").

6.      OSPI receives federal funds from the Department, and all Washington school districts and other local education agencies receive federal funds from the Department as well through formula subgrants provided by OSPI. As a result, OSPI and all Washington school districts are subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's new Rule. Additionally, OSPI is responsible for ensuring that subgrantee school districts comply with Title IX requirements.

**Summary of Existing Washington K–12 Discrimination and Sexual Harassment Law, Policy, and Guidance**

7.      The Equity and Civil Rights Office at OSPI is responsible for monitoring and ensuring school districts' compliance with state and federal civil rights laws, including: chapter 28A.640 of the Revised Code of Washington (RCW); chapter 28A.642 RCW; chapter 392-190 WAC; Title VI of the Civil Rights Act of 1964; Title IX of the Education Amendments of 1972;

Decl. of Sarah Albertson                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

Section 504 of the Rehabilitation Act of 1973; and Title II of the Americans with Disabilities Act of 1990. The Equity and Civil Rights Office is comprised of six staff: a Managing Attorney, three Program Supervisors, a Program Attorney, and one support staff member. The Program Attorney and two of the Program Supervisors are also J.D.s and members of the Washington State Bar Association. The Equity and Civil Rights staff are responsible for civil rights compliance monitoring, complaint investigation, training, and technical assistance for all 295 school districts (as well as 11 charter schools and seven tribal compact schools) in Washington state. The Equity and Civil Rights staff also develop, implement, and revise OSPI regulations and guidance to eliminate discrimination in public school employment, counseling and guidance services for students, recreational and athletic activities, access to course offerings, and in textbooks and instructional materials, as required under Washington law (chapters 28A.640 and 28A.642 RCW).

8.      OSPI monitors all 295 school districts, 11 charter schools, and seven tribal compact schools on their compliance with state and federal sex discrimination laws, including monitoring the adequacy of their sexual harassment policies and grievance procedures, Title IX Coordinator designations and trainings, and disseminations of Title IX policies.

9.      OSPI provides technical assistance regarding eliminating sex discrimination to school districts and to Washington families.

10.      From 2015–2019, OSPI has received 64 complaints of discrimination in public schools, and 24 of those complaints have been related to sex discrimination under chapter 28A.640 RCW and Title IX.

11.      In 1975, chapter 28A.640 RCW was adopted, prohibiting discrimination in Washington public schools based on sex, including sexual harassment. The statute specifically states that inequality in the educational opportunities afforded women and girls at all levels of the

Decl. of Sarah Albertson                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

public schools in Washington state is a breach of Article XXXI, section 1, Amendment 61, of the Washington State Constitution, which requires equal treatment of all citizens regardless of sex.

12.     In 1994, the Washington legislature amended RCW 28A.640.020 to define sexual harassment, require school districts to adopt sexual harassment policies, and direct OSPI to develop criteria for use by school districts in developing sexual harassment policies.

13.     In 2010, Washington adopted chapter 28A.642 RCW, which prohibits discrimination in Washington public schools on the basis of race; creed; religion; color; national origin; honorably discharged veteran or military status; sexual orientation; gender expression; gender identity; the presence of any sensory, mental, or physical disability; or the use of a trained dog guide or service animal by a person with a disability. The legislature directed OSPI to develop regulations and guidelines to eliminate discrimination in public school employment, counseling and guidance services for students, recreational and athletic activities, access to course offerings, and in textbooks and instructional materials.

14.     As directed in chapters 28A.640 and 28A.642 RCW, OSPI has developed and amended regulations which are codified in chapter 392-190 WAC. OSPI last revised the regulations in December 2014. The December 2014 revisions provide a more efficient and equitable process for resolution of discrimination complaints for both school districts and families (as described in Paragraphs 22–28 below).

15.     Passed by the Washington State Legislature in 1994, and codified in RCW 28A.640.020(f) and WAC 392-190-020, Washington state law defines "sexual harassment" in public schools as: "unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact, or other verbal or physical conduct or communication of a sexual nature between two or more individuals if (a) submission to that conduct or communication is made a term or

condition, either explicitly or implicitly, of obtaining an education or employment; (b) submission to or rejection of that conduct or communication by an individual is used as a factor in decisions affecting that individual's education or employment; or (c) that conduct or communication has the purpose or effect of substantially interfering with an individual's educational or work performance, or of creating an intimidating, hostile, or offensive educational or work environment." An OSPI regulation (WAC 392-190-056) clarifies that for the purpose of this definition, sexual harassment may include conduct or communication that involves any of the following types of interactions: adult to student, student to adult, student to student, adult to adult, male to female, female to male, male to male, and female to female.

16.    OSPI guidance requires Washington school districts to address sexual harassment that takes place in any school program or activity. This includes in school facilities, on a school bus, or at off-campus locations, such as a school-sponsored field trip or training program at another location. Schools must also respond to sexual harassment that takes places off-campus when it creates a hostile environment on-campus.

17.    Washington state law and OSPI regulations prohibit all discriminatory harassment in public schools under the same legal standards and complaint procedure requirements. For example, schools and OSPI use the same legal standards and complaint procedures for allegations of sexual harassment, disability harassment, or race-based harassment.

18.    WAC 392-190-007 provides that, for purposes of administrative enforcement, OSPI generally applies the definitions, requirements, and procedural safeguards set forth by the United States Department of Education pursuant to Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act, Title IX of the Education Amendments of 1972, and Title VI of the Civil Rights Act of 1964.

Decl. of Sarah Albertson                                     Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

19.    In line with the Title IX guidance issued in 2001 by the U.S. Department of Education, Office for Civil Rights, entitled "*Revised Sexual Harassment Guidance Harassment of Students By School Employees, Other Students or Third Parties,*" OSPI regulations and guidance require schools that know, or should have known, about any type of discriminatory harassment, including sexual harassment, to take prompt and appropriate action to determine what happened. If an investigation reveals that discriminatory harassment has occurred, the school district must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring.

20.    In addition to the federally required Title IX Coordinators and Section 504 Coordinators, Washington schools are required by state law to designate a Civil Rights Compliance Coordinator who is responsible for monitoring and coordinating the school's compliance with chapter 28A.642 RCW and OSPI regulations and guidance prohibiting discrimination in schools. The Civil Rights Compliance Coordinator is also responsible for ensuring that all discrimination complaints communicated to the school are promptly investigated and resolved. Many schools select one staff member to serve as both the Civil Rights Compliance Coordinator and the Title IX Coordinator. In small school districts, this staff member is often the district's Superintendent.

21.    Washington state law and OSPI regulations and guidance require each school district to adopt and implement a sexual harassment policy and procedure to eliminate sexual harassment in connection with any responsibility, function, or activity within the jurisdiction of a school district (RCW 28A.640.020; WAC 392-190-057 and 392-190-058). A school district's sexual harassment policy and procedure must be easily understood and apply to all school employees, volunteers, parents, and students—including, but not limited to, conduct between

Decl. of Sarah Albertson                                      Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

students. OSPI regulations require the policy to incorporate the following criteria: (1) a definition of sexual harassment consistent with the definition in RCW 18A.642.020; (2) responsibilities of employees and volunteers; (3) investigative and complaint procedures consistent with those described in Paragraphs 22–28; (4) remedies available to targets of sexual harassment; (5) disciplinary actions against violators; (6) reprisal, retaliation, and false accusations prohibition; (7) dissemination and implementation of the policy; and (8) internal review of the policy (WAC 392-190-057).

22.      OSPI regulations outline the discrimination complaint process all school districts must use in responding to allegations of discrimination, including sexual harassment. This process includes three possible steps: (1) a complaint to the school district Superintendent (or designee), (2) an appeal to a board or party, and (3) a complaint to OSPI (WAC 392-190-065 through 392-190-075).

23.      Regarding the complaint to the school district Superintendent (or designee), OSPI regulations state that anyone (including students, parents, employees, or third parties) may file a complaint, and complaints must be submitted in writing by mail, fax, email, or hand delivery to any administrator or compliance coordinator. When a school receives a discrimination complaint, the appropriate compliance coordinator (Title IX, Civil Rights, or Section 504) must ensure the school district conducts a prompt and thorough investigation (WAC 392-190-065). This process is separate from any discipline proceedings involving an alleged perpetrator. After the investigation, the superintendent must respond to the complainant within thirty calendar days after receiving the complaint, unless otherwise agreed to by the complainant or if exceptional circumstances related to the complaint require an extension of the time limit. The school district's response must include a summary of the results of the investigation, whether the school district

Decl. of Sarah Albertson                                  Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

failed to comply with civil rights requirements related to the complaint, notice of the complainant's right to appeal, and any corrective measures determined necessary to address any noncompliance. School districts must use the preponderance of evidence standard in reaching their determinations.

24. Each school district's complaint procedure must also provide an option to appeal the district's decision to a party or board that was not involved in the initial complaint or investigation (WAC 392-190-070). For most school districts, this is the school board of directors. A school district may establish a time limit to file appeals. However, appeal time limits must be no less than ten calendar days from the date the complainant received the district's response to the complaint. The school district must respond to the appeal in writing within thirty calendar days after receiving the appeal, unless otherwise agreed to by the complainant. The appeal decision must include notice of the complainant's right to file a complaint with OSPI. The school must send a copy of the appeal decision to OSPI.

25. In 2014, OSPI amended the OSPI regulations to no longer require the school district's appeal process to include a hearing before the school district's board of directors. However, a school district may continue to use the previous school board appeal process to meet the appeal requirements.

26. A school district may also offer mediation, at the districts' expense, to resolve complaints at any time during the complaint procedure.

27. If complainants disagree with the appeal outcome, they may file a complaint to the OSPI Equity and Civil Rights Office (WAC 392-190-075). When OSPI receives a complaint, OSPI evaluates the complaint to determine if it will initiate an investigation. The investigation may include reviewing relevant information, conducting interviews, or completing an on-site review. At its discretion, OSPI may investigate additional issues related to the complaint that were not

Decl. of Sarah Albertson                                        Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

included in the initial complaint or appeal. Following an investigation, OSPI makes an independent determination as to whether the school district failed to comply with chapter 392-190 WAC or OSPI guidance and may require corrective actions if the school district is found out of compliance.

28.     OSPI requires school districts to use the preponderance of evidence standard for determinations of discrimination, including sexual harassment, for students and staff.

29.     In 2014, OSPI amended chapter 392-190 WAC to provide for the option of making a discrimination complaint to OSPI instead of requiring school districts to conduct a formal administrative hearing through the Office of Administrative Hearings to hear appeals of discrimination complaints. The hearing requirement was removed to allow for a more efficient and equitable resolution of discrimination complaints for families and school districts. The change was also made to enable a less adversarial and more cooperative process to resolve discrimination complaints and to ease the financial burden (due to many parties' sense of needing legal representation in a hearing setting) and the emotional burden on families and school districts when confronting these issues.

30.     As noted above, the discrimination complaint process outlined in OSPI regulations is separate from student and employee discipline processes. For example, if a school district determines that an individual was subject to sexual harassment that substantially interfered with their educational or work performance, the school must remedy the hostile environment regardless of whether any discipline is warranted against any perpetrator under any student or employee codes of conduct. Similarly, an individual may violate a student or employee code of conduct by engaging in behavior that does not rise to the level of sexual harassment as defined in the OSPI regulations.

Decl. of Sarah Albertson                                          Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

31.     Generally, OSPI has not established definitions for actionable conduct that school districts must use in their student codes of conduct or student discipline policies and procedures. Rather, standards for student behavior, definitions of behavioral violations, and types of discipline imposed are generally decided at the local level.

32.     For the purposes of collecting data related to student discipline, Washington's Comprehensive Education Data and Research System (CEDARS) defines "Sexual Harassment" as "conduct or communication intended to be sexual in nature, is unwelcome by the targeted person(s) and has the potential to deny or limit another student(s) ability to participate in or benefit from a school's education program." CEDARS defines "Sexually Inappropriate Conduct" as "obscene acts or expressions, whether verbal or non-verbal. Includes behaviors that may be subject to local student conduct codes, such as: Public Display of Affection, Lewd Conduct, or Indecent Exposure." These definitions are used for coding conduct for state reporting; OSPI does not require schools to use these definitions in their student codes of conduct.

**The New Title IX Rule Will Make Sexual Harassment Discrimination Harder to Identify, Investigate, Remedy, and Eliminate in Washington K–12 Schools**

33.     To the extent the Title IX Rule requires OSPI and Washington school districts to revise state and local regulations, policies, and procedures to conform to the Rule, OSPI is concerned that a number of the Rule's provisions will harm Washington K–12 schools and students, as explained below.

34.     The narrow definition of sexual harassment in the Title IX Rule does not consider unwelcome conduct to be sexual harassment (and thus requiring a district response) until the conduct becomes "so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the [federal funding] recipient's education program or activity." OSPI is concerned this definition does not include several categories of conduct that Washington statutes and OSPI

Decl. of Sarah Albertson                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

regulations explicitly consider to be sexual harassment, such as unwelcome sexual advances or requests for sexual favors, including those that may be objectively offensive but not pervasive, or pervasive but not severe (but not all three), or that have not yet so impacted the victim as to deny equal educational access. OSPI's implementation of the Title IX Rule's definition of sexual harassment would harm Washington schools and school communities by allowing unwelcome sexual conduct and sexually hostile environments to persist. When this conduct is allowed to persist, it becomes more engrained in the school culture and makes sex-based discrimination overall harder to eliminate. To protect Washington students from this type of conduct, OSPI will need to require schools to implement a separate but parallel sexual harassment policy and procedure that applies to a broader definition of sexual harassment. OSPI anticipates that this will create confusion in school districts, making it harder for districts to address sexual harassment. As a result, OSPI anticipates school districts will be vulnerable to litigation or administrative enforcement actions, either by OSPI for a failure to meet state law requirements or by the Department for a failure to meet Title IX requirements, or both.

35.    When schools do not respond to sexual harassment that falls outside of the narrow Title IX definition, the school's failure to respond may result in lack of confidence in the school's response to sexual harassment and chill future reporting.

36.    The new Title IX Rule does not require a school district to investigate unless a formal complaint is filed by the individual alleged to be the victim of the conduct or their parent/guardian. Title IX Coordinators may also file a complaint, but the Title IX rules do not identify any circumstances in which the Title IX Coordinator is required to do so. In instances where victims are unwilling or unable to file a formal complaint, this lower standard for the school district's response will not ensure that harassment is fully investigated and stopped. Additionally,

Decl. of Sarah Albertson                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

the Rule's removal of standards for when a Title IX Coordinator must respond to harassment absent a formal complaint harms schools and school communities by eliminating any check on the Title IX Coordinator's discretion to stop a hostile environment.

37.     By limiting who may file a formal complaint, the new Rule does not require schools to take steps beyond supportive measures when a third party raises an allegation of sexual harassment. Implementation of this standard would harm school communities because schools would not be required to investigate or address sexually hostile environments that they have clear notice of.

38.     Without a formal complaint, school districts must still provide supportive measures, and that alone could be considered enough under the Rule. Implementation of this standard would harm Washington schools and school communities by not requiring schools to investigate further to determine the extent of the harm (such as the pervasiveness of the harassment) or the extent of the hostile environment—or to stop the conduct from reoccurring. To prevent this harm, OSPI will need to require schools to implement a separate but parallel sexual harassment policy and procedure that requires schools to investigate and take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. OSPI anticipates that simultaneous implementation of multiple policies and procedures will cause confusion among staff and parties, making it harder for school districts to address sexual harassment.  As a result, OSPI anticipates school districts will be vulnerable to litigation or administrative enforcement actions, either by OSPI for failure to meet state law requirements or by the Department for a failure to meet Title IX requirements, or both.

39.     The new regulations limit Title IX's applicability to events that occur in the geographic United States. In Washington, school district employees drive children from Point

Decl. of Sarah Albertson                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

Roberts, an exclave American community, back and forth across the U.S.–Canada border every school day. School district employees in Washington also regularly escort children on trips to Canada and other destinations outside the United States. When read together with the location-specific language in § 106.8, § 106.44, and § 106.45, school districts would arguably be permitted under the Rule to be deliberately indifferent regarding sexual violence committed by school employees or students if the violence occurs while their bus is on the Canada-side of the border. Even before the new Rule was published, school districts struggled to understand their authority and obligation to respond to alleged sexual harassment that occurred in a location other than school—such as harassment that occurred on overnight trips or on the internet through cyberbullying—but continued to affect students at school. This confusion has led to school districts not taking necessary steps to address a hostile environment that continued to affect students at school and has resulted in enforcement action by OSPI. The new location-specific requirements further confuse the issue.

**The New Title IX Rule Necessitates the Creation of Supplemental Guidance and Alternative Standards and Procedures for Addressing Sex Discrimination Not Actionable under the Rule**

40.     By narrowing the definition of actionable sexual harassment and establishing requirements that only apply to conduct that falls within that narrow definition, the Title IX Rule will require OSPI and Washington school districts to implement alternative standards and procedures in order to address sexual harassment that does not meet the Rule's definition, and to address non-sexual harassment sex discrimination that is not covered by the Rule.

41.     The Title IX Rule requires schools to adopt and publish a grievance procedure that complies with the requirements of with the Rule. This imposes a burden and uncertainty in Washington school districts, which have their own existing grievance procedures related to

Decl. of Sarah Albertson                                          Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

nondiscrimination, sexual harassment, harassment, and student discipline due process. School districts will need to determine what conduct does and does not fall under the Rule; revise their policies and grievance procedures for addressing "Title IX sexual harassment" (as described in Paragraph 63); establish alternate policies, procedures, and/or code of conduct provisions for "non-Title IX" sexual harassment and sex discrimination, including determining how and when to apply the Rule's standards and procedures versus those required under state law; train all employees on when sexual harassment must be reported under the different standards; disseminate information about the new policies and procedures to faculty, staff, the student body, and parents/guardians; revise all training materials and recordkeeping procedures; and post all revised training materials on their websites. OSPI anticipates additional time burdens, costs, and resource expenditures for school districts related to compliance with the Rule.

42.     The new Title IX Rule does not align with Washington's statutory definition of sexual harassment. While the Rule appears to give schools flexibility to respond to behavior commonly known as sexual harassment that does not fall within the new narrow definition, it requires schools to implement the Rule's grievance procedures with respect to conduct that does fall within the Rule's definition.

43.     Based on OSPI's experience as regulators, school districts will struggle to know when to use state sexual harassment standards and procedures, the new Title IX grievance procedures, or both. In instances when school districts are required to use both processes at the same time, districts will have a difficult time doing so, even assuming they receive considerable training and guidance from OSPI. Providing all necessary training and guidance will be extremely difficult, if not impossible, prior to the Rule's August 14 implementation deadline for the reasons discussed in Paragraph 66 below. OSPI anticipates additional time burdens, costs, and resource

Decl. of Sarah Albertson                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

expenditures for school districts related to compliance with the Rule. What is more, a school district's failure to simultaneously implement the policies and procedures correctly may result in enforcement action by OSPI or the Department, or may expose the district to litigation.

44.     Washington school districts already have robust policies in place to ensure schools are free from sexual harassment. Training school districts on how the new Title IX standards and procedures apply in the context of these multiple, existing processes will be challenging and expensive for OSPI for the reasons discussed in Paragraph 66 below. In addition, the procedures in the Rule are such a significant departure from the current process that OSPI will need to make sure we make contact with every school district in the state to provide training. This will be expensive because of the amount of OSPI staff time needed to develop the new process, create training material, deliver the training, and provide ongoing technical assistance. OSPI anticipates this staff time will exceed several hundred hours, and OSPI may need to hire additional staff to ensure it has capacity to meet this need along with its other existing nondiscrimination enforcement obligations. Even with the training and ongoing technical assistance, school districts will struggle to simultaneously meet compliance with these new requirements and ensure schools are free from sexual harassment.

45.     OSPI and schools will need to create a new process for complainants and respondents to view the investigation report and evidence as required in § 106.45(b)(5)(vi) of the Rule. The Rule requires schools to send a copy of the investigation report to each party 10 days before making a determination. Setting up this new process will be an additional administrative burden on small school districts with few administrators who already have a difficult time securing adequate resources to conduct investigations without the added burden of preparing a formal report. In conducting investigations, OSPI has found that many Washington schools do not have

Decl. of Sarah Albertson                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

access to file-sharing software; this will hamper investigators' ability to share the investigative report and evidence between the parties required by the Rule. School districts will also need additional staff to determine what evidence is permissible to be shared and to redact the investigation report and all evidence as necessary. All of these steps will prolong the time for the complainant and respondent to receive an outcome, which leaves both students in limbo and distracts from their education. A prolonged investigation may also subject a complainant to a hostile environment or leave a complainant without remedies necessary to restore access to their education for a longer period of time.

46.     OSPI is concerned the Title IX Rule's provisions requiring schools to share confidential, sensitive information used during in the investigation with the respondent (the individual who the complainant alleges sexually harassed them) will create a chilling effect for complainants reporting harassment and providing supporting evidence.

47.     OSPI and school districts will need to create a new process for providing each party the opportunity ask relevant, written questions to other parties or witnesses as required in § 106.45(b)(5)(vii) of the Rule. In many instances, this will fall on young children or the parents of young children. Requiring schools to allow the party to question another party or witness will harm schools and school communities because it prolongs the investigation, creates a high-conflict and potentially counterproductive adversarial process, may subject victims of sexual harassment to further trauma, and serves as a deterrent for victims of sexual harassment and assault to file a complaint. Subjecting victims to written cross-examination involves a very high possibility of re-traumatization, even if only relevant questions are allowed to be submitted. The rules also do not give OSPI or school districts clear guidance on whether any party must read or respond to the questions posed to them. The questioning process will also incur additional administrative burdens

Decl. of Sarah Albertson                                      Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

on small school districts with few administrators that already have difficulty securing adequate resources to conduct investigations—including setting up this new process, training staff, and allocating the staff time necessary for all student information to be redacted as necessary.

48.     If the questioning process in § 106.45(b)(5)(vii) is implemented, OSPI will need to develop extensive guidance to ensure that this process does not result in further traumatization and sex-based discrimination. Among other things, the guidance would include the types of information that can be asked in cross-examination questions, redactions of personal information of students in questions, the provision of accommodations for individuals with disabilities to participate in this process, and the provision of language assistance services for parties with limited English proficiency. The last time OSPI developed and published guidelines that were of a similar nature—namely, guidelines issued to school districts in 2019 for preventing and addressing discrimination in student discipline—an OSPI staff member was dedicated to conducting research, identifying existing resources, and composing a draft of the guidelines; OSPI Equity and Civil Rights Office staff convened multiple internal meetings with OSPI leadership to discuss the scope and content of the guidelines; the guidelines were extensively reviewed by OSPI staff in other divisions; and external stakeholders reviewed the guidelines before they were published. All told, the process took over a year-and-a-half to complete.

49.     The Title IX Rule's requirement to address discrimination and student discipline as part of the same process creates confusion when addressing hostile-environment complaints involving multiple respondents. The rules are unclear about how OSPI or Washington schools should reach determinations of responsibility in situations where a complainant alleges they are subject to a hostile environment created by multiple respondents and the evidence supports a finding that a hostile environment has been created—but the evidence does not support a

Decl. of Sarah Albertson                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

determination of responsibility for any one respondent. This too may necessitate that OSPI develop clarifying guidance.

50.     By linking the civil rights investigation and the discipline proceedings together, the Title IX Rule does not consider that the definition of sexual harassment in a civil rights investigation is set at the state level, while defining misconduct in student conduct codes is left to local school district decision-making. OSPI requires schools to take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects—but this does not include an explicit requirement to administer discipline to any student.

51.     In situations where an emergency expulsion is considered for a student with a disability, the new Title IX Rule will make it difficult for schools to meet compliance with the Rule and with state and federal disability laws. State law, at WAC 392-140-510, prohibits a school district from implementing an emergency expulsion that exceeds 10 school days: an emergency expulsion must end or be converted to another form of discipline within 10 school days from the start of the emergency expulsion. The Individuals with Disabilities Act (IDEA), Section 504, and OSPI regulations require schools to conduct a manifestation determination before a student with a disability has been removed for more than 10 school days. However, because the Title IX Rule requires schools to combine the discrimination and student discipline processes—and because the new rules require administrative steps which prevent completion of the discrimination complaint process within 10 days—schools will be unable to simultaneously meet both requirements.  A school district's failure to simultaneously implement the policies and procedures correctly may result in enforcement action by OSPI or the Department, or may expose the district to litigation.

Decl. of Sarah Albertson                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

52.     The new Rule appears to establish specific due process requirements for the emergency removal of a respondent that are triggered only when sexual harassment is alleged. Training school districts on the different due process procedures will be difficult, and districts will struggle to meet compliance because the Rules will require a deviation from Washington's uniform statewide legal requirements governing the due process afforded to students who are emergency expelled from public school. The necessary training will be extensive, further taxing limited state and school district resources.

53.     Simply put, public schools are not staffed, trained, or prepared in any way for this sort of fundamental re-working of student discipline procedures. The likely need for the establishment of parallel alternative standards and processes, and the Rule's ambiguities that cry out for clarifying guidance, will compound the burdens of compliance.

54.     OSPI is also concerned that implementing the Title IX Rule along with parallel processes for non-Title IX sexual harassment and discrimination will result in the risk of increased litigation or enforcement action by OSPI. The new Title IX rules are unclear about how a school district must respond to an informal complaint of sexual harassment, beyond that the district should provide supportive measures and that the district's response likely does not require initiation of the grievance process.

55.     Narrowing school districts' responsibility to respond to sexual harassment by adopting narrow definitions of "sexual harassment" and of what a "formal complaint" looks like will increase the likelihood that families will feel that they need to go to court for relief, where they may seek to enforce state-law standards. The Rule's ambiguities as to the extent of state-law preemption and what is required or permitted with respect to Title IX and non-Title IX sexual harassment compound these risks.

Decl. of Sarah Albertson                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

**New Title IX Rules Conflict with Existing Washington Statutes, Rules, and Guidance Prohibiting Discrimination and Sexual Harassment in K–12 Schools**

56.     The Washington State Legislature, OSPI, and state courts have articulated a specific standard for compliance when school districts respond to discriminatory harassment, including sexual harassment: A school district is responsible for addressing discriminatory harassment about which it knows or reasonably should have known. OSPI regulations (WAC 392-190-0555) require schools on notice of sexual harassment to take prompt and appropriate action to investigate and take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. The OSPI regulations (WAC 392-190-0555) further clarify that OSPI deems a school to have notice of discriminatory harassment if a reasonable employee knew, or in the exercise of reasonable care should have known, about the harassment.

57.     The Title IX Rule is inconsistent with existing Washington law, common law, and OSPI regulations and guidance on responding to sexual harassment, including in the following ways:

a.   The Title IX rules narrowly define sexual harassment to likely exclude several categories of conduct that a Washington statute (RCW 28A.640.020), OSPI regulations (WAC 392-190-56), and OSPI guidelines explicitly consider to be sexual harassment, such as unwelcome sexual advances or unwelcome requests for sexual favors.

b.   The Title IX rules limit the definition of hostile environment sexual harassment to conduct that "effectively denies" a child equal access to the school's education program or activity. A Washington statute (RCW 28A.640.020) and OSPI regulations (WAC 392-190-056), by contrast, define sexual harassment to include

Decl. of Sarah Albertson                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

conduct that "substantially interferes" with a child's educational performance, or creates an intimidating, hostile, or offensive educational environment for the child.

c.  The Rule only requires schools to respond to sexual harassment in a way that is not "deliberately indifferent." But OSPI guidelines state that schools must take prompt and appropriate action to determine what happened. Under Washington law— whether or not a formal complaint is filed—if the school determines sexual harassment more likely than not occurred, the school must take reasonable, prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, and remedy its effects.

d.  The Rule limits who can file a formal complaint to only the victim of the conduct, the parent or guardian of a child who is the victim of the conduct, or the Title IX Coordinator. OSPI regulations (WAC 392-190-065), however, require schools to respond to formal complaints made by anyone, including third parties and parents who are no longer legal guardians of their age 18+ K–12 students. OSPI has received several formal discrimination complaints filed by non-guardian family members, non-victim district employees, advocates, and community members.

e.  The Rule does not require a school to respond to sexual harassment which they have constructive knowledge of, or should have known about in the exercise of reasonable care. But OSPI regulations (WAC 392-190-0555) require schools to respond to sexual harassment and assault the school knew or should have known about, by investigating to determine what occurred.

f.  The Rule does not require school districts to respond to sexual harassment that occurs off-campus if the conduct does not occur within the school's educational

programs and activities, or within locations, events, or circumstances over which the school district exercises substantial control over both the respondent and the context in which the sexual harassment occurs. But the OSPI guidelines require schools to respond to sexual harassment that occurs off-campus—even outside of the school's educational programs and activities—when the off-campus conduct creates a hostile environment on-campus.

g.  The Title IX Rule requires school districts to provide a different due process rights during an emergency removal to students alleged to have engaged in sexual harassment than to students alleged to have engage in any other type of misconduct. OSPI regulations (chapter 392-400 WAC), however, make clear that due process requirements for emergency removals apply to all children regardless of the alleged conduct.

h.  The Rule requires several time-intensive administrative steps in the grievance procedure (such as written notice of meetings, 10 days to review the investigation report and all evidence, and the opportunity to submit written questions to other parties). OSPI regulations (WAC 360-190-065) require schools to complete an investigation and submit a written response to the complainant within 30 calendar days after the school received the complaint. In OSPI's experience as regulators, many schools have difficultly completing discrimination investigations and responding in writing within 30 calendar days, especially when complaints include complicating factors. Common complicating factors include involvement of law enforcement, limited staff capacity, scheduling with parents and minors, multiple allegations, and overlap with Section 504 or IDEA requirements. With these

Page 23 of 32

complicating factors, OSPI believes schools will fail to meet the 30-day timeline in the existing state regulations in order to complete the administrative steps in the new Title IX grievance procedure.

i.  The Rule establishes three permissible grounds for a complainant to appeal the school district decision. OSPI regulations (WAC-392-190-065), however, do not limit the permissible bases for an appeal. OSPI regulations require schools to provide an option to appeal, limited only by the time in which an appeal must be filed.

j.  The Rule limits the context in which a K–12 school must respond to sexual harassment by only considering a "program or activity" of the school to be locations, events, or circumstances where the school exercised substantial control over both the respondent and the context in which the sexual harassment occurred. OSPI regulations and guidelines do not include such limitations and require a school to respond to sexual harassment that happened in a program or activity of the school regardless of whether the school had substantial control over the respondent. This includes sexually harassing conduct by a parent volunteer, police officer, visiting student-athletes, or any other community volunteer or third party. OSPI prohibits discrimination "with regard to any program or activity conducted by or on behalf of a school district or public charter school including, but not limited to, recreational and athletic activities, extracurricular activities, preschool, adult education, community education, and vocational-technical program activities" (WAC 392-190-005). The OSPI regulations specifically state that a school violates a student's right to be free from discriminatory harassment if sexual harassment

Decl. of Sarah Albertson                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

limits or denies the student's ability to participate in or benefit from the school's course offerings, including any educational program or activity (WAC 392-190-055).

58. As discussed below, these differences between the Title IX Rule and Washington standards and procedures will require OSPI to conduct a massive, systemic review of current state and local laws, regulations, and guidance; make drastic changes on an emergency basis in order to meet the August 14 deadline to fully comply with the Rule; and expend substantial resources to support school districts, educators, and students/families in navigating a complex and confusing new system. OSPI anticipates the staff time needed to prepare this guidance and training by the August 14 deadline will exceed several hundred hours. OSPI also anticipates that, in the upcoming school year, OSPI will need to maintain at least the equivalent of a 50 percent of a full-time equivalent employee to provide ongoing training to school district personnel and answer district and parent/advocate questions regarding the parallel state and Title IX regulatory requirements and enforcement. The approximate cost of this is $62,000 for an OSPI program supervisor.

**Revising K–12 Discrimination and Sexual Harassment Regulations and Guidance Will Be Complex, Time-Consuming, and Costly**

59. OSPI has issued considerable guidance to Washington schools regarding sexual harassment and the required components of school's sexual harassment complaint procedures. The process to review and revise existing OSPI sexual harassment regulations, guidance, and trainings will be extensive and will require significant OSPI and school staff time. OSPI will need to determine to what extent OSPI regulations and guidance must to be changed and to what extent OSPI regulations and guidance may allowably differ from the new Title IX rules. OSPI anticipates the staff time needed to prepare this guidance and training by the August 14 deadline will exceed several hundred hours. OSPI also anticipates that, in the upcoming school year, OSPI will need to

Decl. of Sarah Albertson                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

maintain at least the equivalent of a 50 percent of a full-time equivalent employee to provide ongoing training to school district personnel and answer school district and parent/advocate questions regarding the parallel state and Title IX regulatory requirements and enforcement. The approximate cost of this is $62,000 for an OSPI program supervisor.

60.     OSPI does not have authority to revise, or require the state Legislature to revise, Washington statutes regarding sexual harassment in public schools and the required components of school's sexual harassment complaint procedures. Unless and until changes are made to Washington laws that are in tension with the Title IX Rule, OSPI will have to operate under two binding legal systems, in the face of a federal rule that is vague and ambiguous as to the scope of its preemption of state law.

61.     OSPI will need to carefully review the 2000+ page Title IX rule and discussion against the large body of OSPI rules and guidance to decide what changes need to be made.

62.     To the extent that OSPI regulations will need to be changed, OSPI will have to initiate administrative rulemaking, which takes several months at a minimum. Washington's rulemaking procedures (chapter 34.05 RCW) require multiple notice filings, a public comment period of at least 20 days, and a public hearing. Consistent with OSPI's agency rulemaking protocols, OSPI will also need to engage with key stakeholders, including schools, professional education organizations and agencies, and families, throughout the rulemaking process to ensure the revised regulations will work for Washington's K–12 schools. Realistically, given the short timeline for implementation, OSPI will need to consider whether expedited or emergency rulemaking is necessary. *See* RCW 34.05.350; RCW 34.05.353. After any revisions to the OSPI regulations, OSPI will need to provide notice to schools, training, and guidance on any changes. If the new Title IX rules are implemented, all Washington school districts will need to revise their

Decl. of Sarah Albertson                                          Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

sexual harassment policies accordingly. All Washington school districts require school board approval to adopt or revise policies.

63.     Every Washington school district will need to revise their nondiscrimination complaint procedure and sexual harassment complaint procedure to comply with the grievance process in the new Title IX Rule. Many Washington school districts require school board approval to adopt or revise procedures. To align with the new policies and procedures, OSPI and districts will also need to revise trainings, student and employee handbook language, and annual notices. In light of the challenges OSPI and districts currently have in understanding the scope of the Title IX Rule's changes to Washington state and local nondiscrimination complaint procedures, OSPI estimates the staff time required to align the policies and procedures with federal law and develop guidance and training for school districts will exceed several hundred hours, not inclusive of staff time and resources needed to implement the changes in each school district. All of this is deeply exacerbated by current school facility closures caused by the COVID-19 pandemic.

64.     Washington law and OSPI regulations require schools to conspicuously post their sexual harassment policy throughout each school building and provide it to each employee. Schools must also include information about the sexual harassment policy and nondiscrimination complaint procedures in all publications of the school or school district setting forth the rules, regulations, procedures, and standards of conduct for the school or school district. As such, the new Title IX Rule's definition of sexual harassment and new grievance procedure requirements will require every Washington school to update every student handbook and every other publication that sets forth the rules, regulations, procedures, and standards of conduct for the school. OSPI has developed sample student handbook language about sexual harassment and the complaint procedure and translated the information into eleven languages. This resource will need

Decl. of Sarah Albertson                               Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

to be re-drafted, re-published, and re-translated. OSPI anticipates this will require at least 40 hours of OSPI staff time to draft and publish this resource and will likely require substantial resources in each school district to update and reprint student handbooks, which are commonly printed in the spring.

66.    In addition to guidance for schools, OSPI has developed numerous resources for families based on Washington's definition of sexual harassment and the existing discrimination and sexual harassment complaint procedures. These resources will need to be revised based on the changes made as a result of the new Title IX Rule. For example, OSPI has developed parent information sheets (translated into eleven languages) about the discrimination complaint process and discriminatory harassment, including sexual harassment. Each information sheet will need to be re-drafted, re-published, and re-translated.

66.    Based on the new requirements in the Title IX rules—and considering the impact on existing state civil rights law and policy—OSPI will need to internally train all Equity and Civil Rights staff as well as all district level Civil Rights Compliance Coordinators, Title IX Coordinators, and other state and district staff who serve as investigators and decision makers. OSPI may also need to train individuals who serve as advisors or who are involved in appeal hearings or other appeal processed. OSPI's training will need to be highly detailed given how significant Rule's changes are and how confusing it will be for schools to have separate systems for Title IX and non-Title IX sexual harassment. OSPI anticipates a lot of confusion and a lot of questions from schools. The training will need to leave school district staff with a level of understanding sufficient to explain the two separate systems to students and families. OSPI anticipates the staff time needed to prepare this guidance and training by the August 14 deadline will exceed several hundred hours. OSPI also anticipates that, in the upcoming school year, OSPI

Decl. of Sarah Albertson                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

will need to maintain at least the equivalent of a 50 percent of a full-time equivalent employee to provide ongoing training to school district personnel and answer school district and parent/advocate questions regarding the parallel state and Title IX regulatory requirements and enforcement. The approximate cost of this is $62,000 for an OSPI program supervisor. After travel restrictions related to COVID-19 are lifted, OSPI anticipates needing to provide live, in-person training to all school districts in Washington. This will entail planning and providing at least nine full-day trainings, including at least one training in each Educational Service District region in the state. The costs for this training would certainly exceed $10,000 in OSPI staff travel costs alone, not including school district staff travel costs to attend. This estimate is also not inclusive of OSPI and school district staff time to prepare for and attend the training. District-level Civil Rights Compliance Coordinators and Title IX Coordinators, or their designees, will also then need to train every school district employee—which, in the 2019–20 school year, numbered in excess of 184,000 personnel.

67.     OSPI will need to engage in significant outreach efforts and develop new resources to inform school districts and families about how new the Title IX Rule changes impact existing Washington protections for students against sexual harassment.

68.     Unlike in the post-secondary setting, most Washington school districts do not have staff whose sole role relates to responding to sex-based discrimination. In the K–12 setting, school districts must find time and resources (for example, hiring substitute teachers and negotiating new training schedules with employee representatives) to allow superintendents and building-level staff, such as teachers, principals, and school counselors, to attend training.

69.     The Title IX Rule's definition of sexual harassment is so narrow and overall insufficient that if a Washington school were to implement the Rule alone, OSPI would consider

Decl. of Sarah Albertson                                  Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

the school at risk of violating Washington state law prohibitions against sexual harassment in public schools. The Title IX Rule's definition of sexual harassment does not cover conduct explicitly stated in Washington state's statutory definition of sexual harassment, such as unwelcome sexual advances or requests for sexual favors. This will likely require schools to follow all Washington statutes, regulations, and guidance when responding to sexual harassment—but have an additional, parallel sexual harassment grievance procedure for situations that fit into Title IX Rule's narrow definition of sexual harassment. As such, the two definitions of sexual harassment and the multiple grievance processes will require OSPI to develop considerable guidance and training to meet its statutory obligation to eliminate sex discrimination in public schools.

### Planning and Implementing the New Title IX Rules during a Public Health Emergency Will Be Extraordinarily Burdensome

70.    On March 13, 2020, Governor Inslee ordered all public K–12 schools in Washington state to close through April 24, 2020. On April 6, the Governor announced all schools would remain closed from providing traditional, in-person instruction through the rest of the 2019–20 school year. At this time, it is not certain that school buildings will open for the start of the 2020–21 school year.

71.    The current COVID-19 pandemic presents challenges in conducting civil rights investigations and implementing corrective measures at the school district and OSPI levels. The primary challenge at OSPI has been staff capacity as OSPI staff had been consumed by providing guidance to schools about educating, grading, supporting, and graduating students while the school buildings are closed. OSPI has also had to adjust corrective measures and timelines for implementation of corrective measures to reflect the uncertainty of school buildings re-opening.

Decl. of Sarah Albertson                          Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

72.    Revising Washington's sexual harassment rules and guidance during this public health emergency will be extremely difficult. School districts, children, and families are currently sorting through an unprecedented time as they develop and implement new, untested protocols and modalities to educate Washington children.

73.    Providing training to school districts on the Title IX Rule and how it will interact with existing Washington law and policy will be extremely difficult in the midst of the COVID-19 pandemic. Limited paid professional development hours for school district staff will likely need to be used to provide training on new, online technology to educate students.

74.    The Title IX Rule's requirement that the Title IX Coordinator cannot be the same person as the decisionmaker means that, if the Rule is implemented, most small Washington schools will need to identify and train new staff to serve in this role while also responding to changes in education delivery during the COVID-19 pandemic. These small school districts are also more likely not to have funding for administrative staff over the summer months.

75.    OSPI anticipates the new administrative requirements in the Title IX Rule for the complaint process will be difficult for schools to create while school buildings are closed and staff time is limited. For example, and as noted above, OSPI is not aware of many K–12 schools that have file sharing software to allow parties to view, but not download, investigation materials and evidence. To meet this new requirement—while also protecting student confidentiality—schools will likely have to ask parties to inspect the records at the school site, but not copy or take the information with them. However, using this method to meet the new requirement will likely not be possible in the midst of the COVD-19 pandemic.

Decl. of Sarah Albertson                                   Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this ⊥⊥ day of June, 2020

Sarah Albertson

Managing Attorney, Equity & Civil Rights Office

Office of the Superintendent of Public Instruction

Decl. of Sarah Albertson

Civil Action No. 20-cv-01468-CJN

EXHIBIT 33

# EXHIBIT 34

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF ANITRA ALLEN

I, Anitra Allen, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Director of the Comprehensive Alternative Resolution and Equity ("CARE") Team at the District of Columbia Public Schools ("DCPS"). My educational background includes a Master of Education degree from Bowie State University and certification as a Title IX Coordinator and Civil Rights Investigator. I have worked in the area of educational compliance with DCPS for 16 years and served as a Director since 2011. The DCPS CARE Team was created under my leadership in 2017.

Decl. of Anitra Allen                                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 34

2.      I submit this Declaration in support of the District of Columbia's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or Rule).  I have compiled the information in the statements set forth below through personal knowledge. I have also familiarized myself with the Rule in order to understand its immediate impact on DCPS.

**Background about DCPS**

3.      DCPS schools are located throughout the entire District. As of the 2019-2020 school year, over 51,000 students are enrolled in DCPS's 116 schools. DCPS also employs approximately 10,000 individuals, including teachers and support staff. DCPS provides quality education to a socially and culturally diverse mix of young people. Approximately 60% of DCPS students identify as African American, followed by 20% identifying as Hispanic, 15% identifying as Caucasian, and 5% identifying as Asian, Multicultural, or Other. DC Public Schools' culturally and racially diverse student population has a key social indicator in common: 77% of these students are economically disadvantaged. DCPS strives for students to reach their full potential through rigorous and joyful learning experiences provided in a nurturing environment.  DCPS's vision is that every student feels loved, challenged, and prepared to positively influence society and thrive in life.

4.      Each year, the Mayor of the District of Columbia proposes a budget and financial plan for DCPS to the Council of the District of Columbia, the central and chief legislative and policy-making body for the District of Columbia.  The "state" education agency in the District of Columbia is the Office of the State Superintendent of Education ("OSSE").  OSSE oversees federal education

programs and related grants administered in the District of Columbia and develops state-level standards aligned with school, college, and workforce readiness expectations, among other responsibilities.

5.     The District receives federal funds from the Department to support its primary and secondary education programs. As a result, DCPS is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

### Summary of Existing Title IX Sexual Misconduct Policy

6.     DCPS has created and adopted District-wide codes of conduct for its students and employees, including a sexual misconduct policy and student code of conduct, that prohibit sexual harassment and sexual misconduct by students, employees, and faculty and establish grievance processes for addressing complaints of sexual harassment.

7.     The policies which address sexual harassment include the Grievance Policy, School Year 2019-20 K-12 Student Discipline Policy Guidance, Bullying Prevention Policy, and the Prevention of Sexual Abuse by Staff Policy. These policies extend to activities that occur off-campus. For example, the School Year 2019-20 K-12 Student Discipline Policy Guidance and the Bullying Prevention Policy cover school-sponsored events off DCPS grounds, and the Prevention of Sexual Abuse by Staff Policy prohibits school employees from transporting students in personal vehicles and meeting with students off campus and after school hours without the knowledge and consent of the student's parent or guardian.

8.     The Title IX coordinator and Title IX investigators are housed in the Office of Compliance on the CARE Team. The CARE Team has eight employees who handle Title IX matters in addition to other significant duties and responsibilities.  These duties include responding to complaints filed with the Department of Education's Office for Civil Rights, the D.C. Office of

Decl. of Anitra Allen                                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 34

Human Rights, and the Office of the State Superintendent of Education. The CARE Team also facilitates any agreements or corrective actions that arise as a result of these complaints.

9.      During the 2019-2020 school year, the CARE Team received 201 Title IX complaints. During the 2018-2019 school year, the CARE Team received 309 Title IX complaints. Each complaint is thoroughly investigated. Under current policies, DCPS does not conduct hearings.

10.      Current DCPS policy covers harassment that occurs both on and off-campus.[1] DCPS's Bullying Prevention Policy and the School Year 2019-20 K-12 Student Discipline Policy Guidance prohibit harassment that occurs off-campus under the following conditions: (1) at any school-sponsored activity or event, including those that occur off DCPS grounds; (2) on public and school transportation, including stop locations; (3) walking to and from school; and (4) any place where a student has access to technology, as a result of the Bullying Prevention Policy's applicability to cyberbullying.

11.      DCPS's Grievance Policy lays out a grievance procedure for students who have been subjected to harassment, including sexual harassment. Grievants – who may be students, parents, guardians, a vested party, or a school visitor who has knowledge of an incident – can make a complaint verbally or in writing to any school staff member, who must then report the complaint to the school principal by the end of the next school day. Investigations conclude and a written report with the investigation findings are completed. An appeals process is also available. The Office of Integrity oversees the two-level appellate process. Level I of the appeals process is reviewed and decided by the designated instructional superintendent and Level II is reviewed by a three-person panel designated by the Chancellor with the final decision issued by the Chief Integrity Officer.

---

[1] Off-campus behavior is addressed in the SY 2019-20 Discipline Policy Guidance.

Decl. of Anitra Allen                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 34

12.     Determinations of outcome in the grievance process are made in consideration of the preponderance of the evidence.

13.     DCPS has been undergoing revisions to its policies regarding student-on-student sexual misconduct and sex-based discrimination to ensure that the policies comply both with federal Title IX requirements and District law, including the D.C. School Safety Omnibus Amendment Act of 2018 and the D.C. Human Rights Act. This resource-intensive process began over a year ago and is near completion. The proposed revised policy is known as the Student-on-Student Sexual Harassment, Sexual Assault, and Dating Violence Policy.

14.     This proposed policy contains a broad definition of "sexual harassment," comporting with long-standing Title IX guidance prior to the narrowing of the definition in the Rule, as well as the D.C. School Safety Omnibus Amendment Act of 2018  The policy defines "sexual harassment" as any unwelcome or uninvited sexual advance, request for sexual favors, sexually motivated physical conduct, stalking, or other verbal or physical conduct of a sexual nature that can be reasonably predicted to:

- Place the aggrieved in reasonable fear of physical harm to their person;
- Cause a substantial detrimental effect to the aggrieved's physical or mental health;
- Interfere with the aggrieved's academic performance or attendance at school;
- Interfere with the aggrieved's ability to participate in or benefit from the services, activities, or privileges provided by a school.

Sexual harassment can include requests for sexual favors, sexual advances, or verbal, non-verbal, physical or written statements which make someone feel uncomfortable, intimidated, or threatened. Sexual harassment can be communicated verbally, in writing, online, or through physical behavior. Sexual harassment can be aimed at a student's gender identity or gender

expression, or gender-nonconformity/gender variance in a way that damages the student's ability to learn or participate in school activities. Sexual harassment includes both quid pro quo harassment and harassment that creates a hostile environment (i.e., so severe, persistent, *or* pervasive as to deny or limit a person's ability to participate in or benefit from the school's programs or activities).

15.     The Bullying Prevention Policy "extends to incidents of misconduct that have a significant impact on the school environment, even if they did not occur on school grounds or at a school-sanctioned activity."

16.     The proposed Student-on-Student Sexual Harassment, Sexual Assault, and Dating Violence Policy follows the complaint procedure in the Grievance Policy.  An aggrieved student or a third party may report an incident of sexual misconduct or sex-based discrimination to any member of the school staff or to the DCPS Title IX Coordinator. If a DCPS employee receives a report about an incident of sexual misconduct or discrimination, or otherwise has reason to know that such an incident occurred or is likely to occur, that staff member must immediately contact the DCPS Title IX Coordinator.

17.     The Title IX Coordinator or a designee must receive, investigate, and resolve all sexual misconduct reports. The proposed policy revisions for sexual misconduct and sex-based discrimination provide for a preponderance of the evidence standard. Under a preponderance of evidence standard, an investigator looks at the evidence to conclude whether allegations are more likely to be true than untrue. At the conclusion of the investigation, both the aggrieved and the responder (the alleged perpetrator of the incident) will be provided written notice of the outcome, known as the Letter of Resolution. Each party has the right to file an appeal.

Decl. of Anitra Allen                                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 34

**District Law Requirements for Investigating Allegations of Sexual Misconduct and Sex-Based Discrimination**

18.     District law mandates investigations of sexual misconduct and sex-based discrimination at or involving District schools. The District of Columbia Council passed the D.C. School Safety Omnibus Amendment Act of 2018 ("DCSSOAA") to promote and protect District students' safety by preventing sexual harassment, sexual assault, and dating violence against students by faculty, staff, and other students in District schools. DCSSOAA requires District schools to "[i]nterrupt or stop each specific act of student-on-student sexual harassment, sexual assault, or dating violence, prevent its recurrence, and address its effects, whether or not the incident is the subject of a criminal investigation." D.C. Code § 38-952.02(a)(2)(A). The DCSSOAA defines sexual harassment as

> any unwelcome or uninvited sexual advances, requests for sexual favors, sexually motivated physical conduct, stalking, or other verbal or physical conduct of a sexual nature that can be reasonably predicted to:
> (a) Place the victim in reasonable fear of physical harm to his or her person;
> (b) Cause a substantial detrimental effect to the victim's physical or mental health;
> (c) Substantially interfere with the victim's academic performance or attendance at school; or
> (d) Substantially interfere with the victim's ability to participate in, or benefit from, the services, activities, or privileges provided by a school.

*Id.* at § 38-952.01(5) *et. seq.* To comply with the requirements of both the DCSSOAA and the Rule's changes to Title IX investigations, DCPS would have to rely on separate Title IX and non-Title IX policies to investigate sexual harassment.

19.     The Rule also fails to protect students to the same extent as required by the D.C. Human Rights Act of 1977 ("DCHRA"). The DCHRA, the country's most expansive state human rights law, protects District residents from discrimination in housing, employment, public accommodations, and education based on up to 21 protected traits. The DCHRA prohibits sex discrimination in educational institutions, which includes "deny[ing], restrict[ing], or … abridge[ing]

Page 7 of 11

or condition[ing] the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified." D.C. Code § 2–1402.41.

20.     The Rule's new requirements would require schools to dismiss complaints about sexual harassment that do not meet the Department's stricter standards. Dismissing such complaints directly contradicts the requirements of the DCSSOAA and the DCHRA, forcing DCPS to investigate allegations of both Title IX and non-Title IX sexual harassment under different policies.

21.     An updated Title IX track will require significantly more time to resolve cases and additional burdens on administrative staff. More specifically, the Title IX track will require:

- Adjustments to intake process to ascertain if a student/parent wants to pursue a formal grievance filing (which must be submitted in writing);

- Prescribing support services for all involves parties;

- Providing each party the opportunity to review the investigative report and provide feedback prior to its finalization; and

- Providing each party the opportunity to pose questions to the other side in lieu of holding hearings.

22.     Additionally, D.C. Municipal Regulations grievance procedures mandate a 10-day resolution timeline. In addition to time required for investigations, the new Title IX regulations require an additional minimum of 20 days for the review of the investigative report by parties. Thus, DCPS will be required to develop different timelines for responses to Title IX-related grievances and non-Title IX grievances, which will be a complicated and time-consuming process.

Decl. of Anitra Allen                                        Civil Action No. 20-cv-01468-CJN
EXHIBIT 34

## Revising Existing Sexual Misconduct Policies

23.     In order to comply with the August 14, 2020 effective date, DCPS will have to make adjustments in the following areas within a very limited timeframe: training, policy development, and internal business procedures and logistics.

24.     Four new training modules will need to be developed and conducted before the start of school year 2020-2021. One of the newly developed training modules will require completion for all "responsible employees," which includes approximately 9,900 staff. The estimated cost for development of all of the training modules is approximately $45,000. The training modules include Certified Title IX Coordinator Training for six members of the CARE Team and designated local school points of contact; Title IX Appeal/Decision Maker Training for the three-person appeal panel and Instructional Superintendents; and Responsible Employee Title IX Training for all DCPS employees and other stakeholders who have reporting obligations under the new regulations. In accordance with the new Title IX regulations, all training materials will need to be reviewed and posted on the DCPS website in a manner that is appropriate for public consumption.

25.     For over a year, DCPS has been engaged in a resource-intensive process of drafting District-wide policies on sexual misconduct and sex-based discrimination in DCPS schools, policies which are in the final stages of approval. This policy revision was designed to comport with both federal Title IX law and District-level regulations.

26.     The policy required careful drafting of definitions and language, intentional procedure development, public posting of the document and solicitation of public comments (a two-month long process), the review and implementation of stakeholder feedback (another two-month process), and several cycles of review. This full process has taken more than a year to reach finalization.

27.     The Rule's changes to Title IX would require this process to restart from essentially the ground up: DCPS will have to rewrite a significant body of policies and procedures in response

to the new regulations. Should the Title IX Rule be implemented, DCPS must incorporate the new regulations into its policies to ensure compliance while at the same time ensuring that its policies maintain the higher behavioral standards required by local regulations.

28.     The DCPS CARE Team will have to analyze and adjust most components of our work with sex-based discrimination. The following would have to be adjusted in the draft policy in response to the Rule:

- The policy's definitions and language;

- The compliance team's structure and investigation and case closure processes;

- Updates to directives to all employees; and

- Policy revisions to address shifts in student and guardian expectations.

29.     Policy redevelopment is very costly. DCPS has already spent a significant amount of money on development and effective implementation, including the printing of materials like brochures and posters. The Rule does not account for the funds that school systems like DCPS have spent to keep their policies in line with long-standing Title IX regulations. DCPS will now have to undergo this process yet again – for which DCPS will have to expend another significant amount of funds and divert constrained resources and personnel to ensure compliance within mere months in order not to lose Title IX funding. Revising policies at the scale required by the new regulations will take more time than is currently allowed under the implementation schedule. Moreover, it will require resources that would have otherwise gone to students.

30.     Structural and policy changes of the magnitude included in the Rule will require a great deal of time, costs, and human capital, which will take resources away from our students when DCPS staff is tasked with revamping our educational system in response to COVID-19. DCPS is already facing tight budget constraints. DCPS is currently addressing the COVID-19 pandemic and

Decl. of Anitra Allen                                                      Civil Action No. 20-cv-01468-CJN

EXHIBIT 34

working to ensure that our students receive a quality education. In addition to fiscal challenges, there are increased demands on staff to improve the virtual learning experience for students. The additional task of staff learning and implementing new Title IX rules during the pandemic will be especially arduous, when staff are being inundated with other types of training and policies related to the pandemic and distance learning, and significant resources are being devoted to planning how and when to reopen school as well as paying for retrofitting buildings and classrooms in accordance with social distancing safety guidance.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 11th day of June, 2020

Anitra Allen
Director of the Comprehensive Alternative
Resolution and Equity Team, District of Columbia
Public Schools

Decl. of Anitra Allen                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 34

EXHIBIT 35

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. <u>20-cv-01468-CJN</u> |

## DECLARATION OF MARTY ALVARADO

I, Marty Alvarado, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am a resident of the State of California.  I am employed by the California Community Colleges Chancellor's Office as the Vice Chancellor for Educational Services and Support.  My principal responsibilities include providing leadership and support for the academic affairs and student services programs.  I am responsible for developing and implementing agency-wide policies and programs related to student support, instructional delivery and

Decl. of Marty Alvarado                                                    Case No. 20-cv-01468-CJN
EXHIBIT 35

curriculum, with the aim of increasing student success rates and closing achievement gaps.

2.      Prior to joining the Chancellor's Office, I provided support for scaling-up regional cross-sector partnerships and state systems engaged in large-scale transformation. This work focused on building regional ecosystems to support pathways to college and career success and economic advancement across the State. I have 20 years of experience in higher education and the community college system, including in program development and implementation, community engagement and partnerships, industry engagement and work-based learning, and workforce training.

3.      I submit this Declaration in support of the litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) (the Title IX Rule or Rule).

4.      I make this Declaration based upon my personal knowledge, my familiarity with Title IX of the Education Amendments of 1972, my review of the Title IX final regulations, and the knowledge and expertise I have acquired in the course of my 20-year career within higher education and the community college system. Furthermore, I make this Declaration based on a review of records and information kept in the regular course of the Chancellor's Office's business and made available to me in the course of my duties at the Chancellor's Office, and information provided to me by other employees at the Chancellor's Office, including those who work under my direction and supervision and those who do not. If called as a witness, I could and would testify competently as to the matters set forth below.

**California Community Colleges Mission and Governing Principles**

5.     The California Community Colleges are part of the State of California's public higher education system.  Cal. Const., art. XVI, § 8; Cal. Educ. Code § 66700.  The California Community Colleges are the largest postsecondary system in the United States, with more than 2.1 million students attending one of 115 colleges (114 colleges with campuses) each year, and 1.5 million students who enrolled in the Spring 2020 semester.

6.     Our colleges are the state's most common entry point into collegiate degree programs, the primary system for delivering career technical education and workforce training, a major provider of adult education, apprenticeship, and English as a Second Language courses, and a source of lifelong learning opportunities for California's diverse communities.

7.     The community colleges' primary mission, as directed by California law, is to offer academic and vocational instruction at a lower division level for both younger and older students to enable those students to advance California's economic growth and global competitiveness.  Cal. Educ. Code § 66010.4(a)(1) & (3).  The core principle surrounding these missions is that higher education should be available to all, which the community college system implements through a longstanding policy of full and open access to its colleges.

8.     Consistent with that principle, the California Equity in Higher Education Act establishes the policy of the State of California to afford all persons equal rights and opportunities in postsecondary educational institutions, including the California Community Colleges.  *Id.* §§ 66251, 66270.  As such, it is the policy of the State of California that all persons, regardless of sex, are free from discrimination of any kind in the State's postsecondary educational institution.  *Id.* §§ 66281.5, 87100, 87400; 5 Cal. Code Regs. § 59300.

9.     The Board of Governors of the California Community Colleges sets policy and

Decl. of Marty Alvarado                                                 Case No. 20-cv-01468-CJN
EXHIBIT 35

provides guidance for the 73 districts that constitute the system. Board members have legislatively granted authority to develop and implement standards for classes, student academic requirements, and employment of academic and administrative staff. Cal. Educ. Code § 70901(b). The Board's responsibilities also include oversight and fiscal affairs leadership over the California Community Colleges, including: providing general supervision over community college districts; providing representation, advocacy, and accountability for the California Community Colleges before state and national legislative and executive agencies; and administering state and federal support programs. *Id.* § 70901(b), (b)(4)(A), & (b)(5)(A). The Board is responsible for preparing the system's budget, identifying total revenue needs in order to properly serve the educational system, and identifying expenditures for the state general apportionment and for categorical programs, new programs, and budget improvements. *Id.* § 70901(b)(5)(A)(I). The Board also advises and assists governing boards of community college districts on the implementation and interpretation of state and federal laws affecting community colleges. *Id.* § 70901(b)(14).

10.     Chancellor Eloy Ortiz Oakley serves as the Chief Executive Officer of the Board of Governors and oversees the California Community Colleges' executive office. As authorized by statute, the Board has extensively delegated to the Chancellor's Office its responsibilities over oversight and fiscal affairs leadership over California Community Colleges. *Id.* § 71090(b). The Chancellor's Office is responsible for carrying out the policies of the Board, including the development of fiscal plans, a legislative agenda, a budget for the community college system, and the execution of grants to community college districts to carry out statewide . programs in furtherance of the Board's policies.

11.     In Winter 2020, approximately 56.29% of our enrolled students identified as

female and 42.27% identified as male.  Nearly 60% of enrolled students in the California

Community Colleges are age 24 or younger.[1]  The majority of California community college

students live off-campus.

12.     Because of the California Community Colleges' mission and mandate to support

and provide access to low-cost postsecondary education to all, many of its students are among

the most financially vulnerable in California.  According to a March 2019 study by The Institute

for College Access and Success (TICAS), 50 percent of California Community College students

surveyed had experienced food insecurity in the 30 days prior to the administration of the survey,

60 percent experienced housing insecurity, and 19 percent had been homeless in the prior year.

According to TICAS, these figures "were higher than were estimates for other public higher

education sectors in California and higher than most national numbers as well."  Sara Goldrick-

Rab & Debbie Cochrane, Addressing the Basic Needs of California Community College

Students.[2]

**Changes in Title IX Regulations**

13.     The California Community Colleges system receives federal funding from the

United States Department of Education, and its component colleges are education entities

covered by Title IX's requirements and are required to comply with the Department's new Title

IX regulations.

14.     The Chancellor's Office regularly provides guidance to community college

districts on legal and compliance matters.  Because the Rule will impose substantial new

---

[1] Data from https://datamart.cccco.edu/Students/Student_Term_Annual_Count.aspx.
[2] Available at https://ticas.org/files/pub_files/hope-ticas-cccco-brief.pdf (last visited June
10, 2020).

Decl. of Marty Alvarado                                                    Case No. 20-cv-01468-CJN
EXHIBIT 35

requirements upon community college districts, the Chancellor's Office will commit significant time and effort in the coming weeks to ensure districts understand the Rule's requirements.

15.     The Chancellor's Office has so far devoted at least twenty staff hours to review the Rule's changes, including the Department's 2,000 plus pages of lengthy explanation, and to analyze the impact of the Rule. The Rule is complex and requires the implementation of almost an entirely different Title IX system than the one currently in place. For example, the Rule will drastically change the Title IX student conduct and discipline process at the district level. Ensuring compliance with the Rule will require training existing staff, and/or hiring additional staff or contractors to act as hearing officers and investigators, among others. Hiring and training these individuals will require significant financial resources. One approach under consideration would require a minimum of 3-6 months and the redirection of existing staff and a redirection of approximately $25,000 - $50,000 in resources per training module (video, content, design) for sharing on the California Community Colleges' professional development technology platform. We would estimate up to 4 modules would be required, requiring a budget of approximately $150,000 - $200,000 in upfront costs to develop the training modules. In addition, the New Rule will require the acquisition of technology for remotely-conducted direct examinations and evidence-sharing software. As is common whenever there is a significant change in the law, the Chancellor's Office will receive myriad requests for individualized guidance from districts—particularly from the more than sixty districts that lack a general counsel—which will place significant burdens on Chancellor's Office operations.

16.     I understand that the Rule's effective date is August 14, 2020, and that by that date, the California Community Colleges will have to be in compliance with the Rule's requirements. The California Community Colleges system will not be able to implement the

provisions of the Rule by August 14, 2020 without experiencing irreparable and immediate harm.

17.     As detailed below, the COVID-19 pandemic has disrupted our system's ability to provide instruction to students in person and has required staff and students to shift almost entirely to remote learning.  Staff have also been required to work remotely while addressing the changes in educational instruction.

18.     Reviewing and revising the system's policies, procedures, and processes to come into compliance with the Rule will require the California Community Colleges to divert considerable staff time and resources that are currently dedicated to our system's COVID-19 pandemic response.  Over the course of the pandemic, the Chancellor's office has released 7 Executive Orders and 22 guidance memos addressing the effects of the COVID-19 pandemic on the community college system and its students.  The purpose of these actions has been to ensure the continuity of education and to streamline administrative requirements in order to address the significantly increased burdens on community colleges.  (*See, e.g.*, CCCCO Exec. Order No. 2020-2 (March 27, 2020); CCCCO Exec. Order No. 2020-4 (April 27, 2020); CCCCO Exec. Order No. 2020-5 (April 27, 2020); CCCCO Exec. Order No. 2020-6 (May 13, 2020)).[3]

19.     The Community College Districts have also dedicated substantial resources towards addressing this pandemic, including facilitating the transition of classes to an online platform, taking steps to ensure the health and well-being of their communities, and making efforts to coordinate direct student support.

---

[3] Available at https://www.cccco.edu/About-Us/Chancellors-Office/Divisions/Communications-and-Marketing/Novel-Coronavirus/co-communications-to-colleges.

Decl. of Marty Alvarado                                      Case No. 20-cv-01468-CJN
EXHIBIT 35

20.     The COVID-19 pandemic has also led to substantial projected cuts and deferrals to the system's budget and resources for the current fiscal year and FY 2020-21. These projected changes will not only have an immediate impact on the California Community Colleges' programs, but are expected to continue through the next fiscal year, if not longer.

21.     Given the substantial changes between the NPRM and the Rule just issued, we will need to further review our regulations and if additional changes are required, go through another rule-making process involving public review and comment, and review by the Board of Governors at two successive bi-monthly meetings, before adoption to ensure that our regulations fill the gaps now created by the Department in enforcement of Title IX's nondiscrimination mandate. If revisions are required, this process would not be completed until January 2021, at the earliest, and would involve dozens of hours of effort by Chancellor's Office legal staff, in addition to staff of the Educational Services Division and other stakeholders throughout the Community College system.

22.     System-wide, this has required the adoption and implementation of a parallel procedural track for sexual misconduct cases that would fall outside the reach of Title IX due to the narrow scope and specific procedural requirements of the Rule. This means at the local level, adopting the Rule will require districts to adopt new procedures.

**The Unprecedented Challenges COVID-19 Has Presented to the California Community College System and Its Students**

23.     It will be nearly impossible for the California Community College Districts to change their Title IX policies, procedures, and processes by the effective date while the COVID-19 public health emergency is ongoing. The pandemic has had a severe impact on the State's

budget and anticipated revenues for the California Community Colleges system. (See

Department of Finance, *May Revision to the Governor's Budget* (May 13, 2020)). Furthermore,

the California Community Colleges have experienced unprecedented disruptions to their

educational services and programs as a result of the pandemic, which has required ongoing

administrative guidance to staff, as well as completely new infrastructure and a virtual system to

provide remote instruction to students.

24.    In March 2020, the California Community Colleges adjusted their priorities for

FY 2020-21 to address the needs of colleges and students during the COVID-19 crisis, while

mitigating disruption to instruction. The California Community Colleges have also had to divert

state resources from other priorities to address the impact of the public health emergency. The

California Community Colleges Chancellor's Office has redirected approximately $8,287,116 in

funds to support community colleges in responding to the COVID-19 crisis alone. The current

proposed budgetary constraints create additional difficulties for the system to accomplish

existing priorities and programs, and has required the system to reallocate funding and resources.

25.    On May 14, 2020, Governor Newsom released the May revision for the State's

budget for FY 2020-21, which detailed drastic budget adjustments for the State's higher

education institutions, including the California Community Colleges. When the Governor's

budget was originally released on January 10, 2020, the budget projected a $5.6 billion surplus

for FY 2020-21 and $21 billion in reserves. The May 7 revision now projects a $41 billion

decline in revenues by the end of FY 2020-21 with a $13 billion increase in health and human

services program costs and other pandemic-related expenditures, resulting in a projected budget

shortfall of $54 billion as compared to the January budget proposal. The May 7 Revision

reduces ongoing funding for the California Community Colleges system in FY 2020-21 by

Decl. of Marty Alvarado                                          Case No. 20-cv-01468-CJN
EXHIBIT 35

approximately $1.1 billion as compared to the January budget proposal. This includes a reduction of Student Centered Funding Formula support by approximately 10%, the Strong Workforce Program by 55%, five categorical programs each by 15%, Calbright College by 15%, and the Adult Education program by ten percent. The May Revision also eliminates all of the one-time California Colleges funding proposed in January and defers June apportionment payments for FY 2019-20 of $330 million and FY 2020-21 of $662 million to the following fiscal years.

26. The California Community College system is facing these severe budgetary cuts while at the same time expending additional and unforeseen costs and resources to address unprecedented challenges in responding to the COVID-19 pandemic. Like other educational institutions, all of the California Community Colleges have transitioned to online delivery or have implemented social distancing guidelines for services that cannot be provided online. The Chancellor's Office and the community colleges have made and continue to make significant efforts to respond to the hardship experienced by students, such as the inability to meaningfully participate in online instruction, and not having access to technology, support services, and food. These efforts have required considerable staff time, including those staff whose primary responsibilities have been shifted from other duties to responding urgently to the public health emergency.

27. Six Chancellor's Office staff members have been re-deployed as contact tracers as required by the Governor's Office, while other staff have had to redirect time to redesign and adjust previously planned events and host additional information sessions and meetings. Staff have also had to constantly monitor U.S. Department of Education guidance and information, websites, and webinars, as well as meet with partner state and federal agencies such as California

Decl. of Marty Alvarado                                    Case No. 20-cv-01468-CJN
EXHIBIT 35

Department of Social Services and Veterans Affairs to negotiate and coordinate emergency policies, guidance, and reporting directly related to vulnerable student populations. Finally, staff have had to respond to questions regarding federal and state guidance, and review and update program plans, reporting deadlines, and other operational functions that are now delayed or need to be redesigned due to COVID-19, such as the creation of a process for colleges to request carry-over funding for categorical program budgets.

28.    In addition, the Chancellor's Office has expended significant time and resources to provide guidance and information to individual community college districts during this crisis. Further to the executive orders and guidance documents referenced above, these activities have included a weekly webinar hosted by Chancellor's Office staff to answer questions and provide updates regarding pandemic relief and other issues regarding educational instruction and support services. The Chancellor's Office has also issued almost daily updates to districts about COVID-19.

29.    Moreover, the Chancellor's Office has had to work with the telecommunications industry to provide internet services and computers at no or reduced cost for students who need them. There continue to be unmet needs, however, and districts across California have had to seek assistance from private philanthropic organizations to try to supplement the Chancellor's Office's efforts to provide resources for the needs of students.

30.    Despite extensive efforts to fulfill their mission to continue to provide higher education for their students, the effects of the pandemic, and the resultant fiscal crisis, have caused several community colleges to express concern to the Chancellor's Office that they may not have the resources they need to continue to adapt and respond to a crisis of an unknown duration. The California Community College system has estimated that the costs of mitigating

Page 11 of 13

the COVID-19 crisis during 2019-2020 total more than $114,948,596 between staff related costs, supplies and equipment, operating expenses, and other necessary expenses. It is estimated that for 2020-2021, there will be $154,087,529 in additional expenses.

31.     Districts have also expressed fear that during this time, some students will withdraw from one or more of their courses due to a lack of resources to continue their education. Many students are still without access to requisite technology, such as laptops and internet, to transition to online learning platforms. Many students who were employed while pursuing their education have lost jobs due to COVID-19. Many students are also experiencing impacts to their mental and physical health. For instance, districts have seen increases in instances of domestic violence during this pandemic. One District reported a 98 percent increase in students who have dropped all of their courses for Spring Quarter when compared to the same time period in 2019, as well as a 38 percent increase in students who dropped at least one course. In total, there was a 64 percent increase in the total number of sections dropped.

32.     The financial impacts of COVID-19 have presented significant challenges for the California Community Colleges, and have resulted in new unmet costs of over $208 million for the fiscal year 2019-2020. Preliminary estimates of unanticipated costs for the 2020-21 fiscal year currently stand at $201 million. The California Community Colleges anticipate relief for only a small portion of these costs, and this aid is not yet available. Loss in enrollment has a negative ripple effect on the state's community colleges because 70 to 90 percent of most colleges' funding is based on enrollment and declines in enrollment reduce base and supplement grants for colleges.

33.     The California Community Colleges system is experiencing significant and unforeseen disruptions as a result of COVID-19. Its already limited resources are further

Decl. of Marty Alvarado                                          Case No. 20-cv-01468-CJN
EXHIBIT 35

stretched thin responding to the urgent needs of students and staff during a time when there are drastic cuts expected to the California Community Colleges' budget. Now, our system will have to immediately divert staff and resources from the COVID-19 response in order to attempt to implement the requirements of the Rule by the August 14 effective date, requiring substantial costs and impacting our capacity to respond to the pandemic.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on June $\underline{11}$, 2020 at Sacramento, California.

Marty Alvarado
Vice Chancellor
Educational Services and Supports
California Community Colleges Chancellor's Office

Decl. of Marty Alvarado                                    Case No. 20-cv-01468-CJN
EXHIBIT 35

# EXHIBIT 36

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | **Civil Action No. <u>20-cv-01468-CJN</u>** |

## <u>DECLARATION OF HOLLY ASHKANNEJHAD</u>

I, Holly Ashkannejhad, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.  I am the Title IX Coordinator and Director of the Office of Civil Rights Compliance & Investigation ("CRCI") at Washington State University ("WSU" or the "University") located in Pullman, Washington. My office serves WSU system-wide, including providing services and support to our Vancouver, Spokane, Tri-Cities, Everett, Bremerton, Global Campus, and extension sites. My educational background includes a J.D. from Lewis and Clark Law School in Portland, Oregon. I

Decl. of Holly Ashkannejhad         Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

have been employed as the Director and Title IX Coordinator for WSU since April 2019.  Prior to

that, I served as the Assistant Director (2016-2019) and Civil Rights Investigator (2014-2016) in

CRCI.

2.      I submit this Declaration in support of the State of Washington's litigation regarding

the recently issued final rule entitled *Nondiscrimination on the Basis of Sex in Education Programs*

*or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the "Title IX Rule" or

"Rule"). I have compiled the information in the statements set forth below through personal

knowledge, through University personnel who have assisted me in gathering this information from

our institution, and on the basis of institutional documents or data that have been provided to and/or

reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate

impact on WSU.

3.      WSU was founded in 1890 as Washington's original land-grant university. WSU is

chartered by the state of Washington, and is governed by the Board of Regents, whose members are

appointed by the governor, which provides direction to the WSU President.  The Washington state

legislature also approves annual operating and capital budgets for WSU, including state funding for

WSU.

4.      WSU receives federal funds from the United States Department of Education (the

"Department"). As a result, WSU is subject to Title IX of the 1972 Education Amendments Act

("Title IX"), 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106—

including the newly published Rule.

5.      WSU serves citizens and students throughout the State of Washington, with

educational sites in Pullman, Spokane, Tri-Cities, Vancouver, Everett, Bremerton, and through our

online Global Campus, as well as over 500 study abroad programs in over 48 countries. WSU serves

Decl. of Holly Ashkannejhad                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

31,607 students and employs over 7000 employees system-wide.   Following the Integrated Postsecondary Education Data System ("IPEDS") definition for total enrollment (which excludes students in Education Abroad), WSU has 52.6% female students and 27.7% minority students (defined per IPEDS as including Asian Americans, Black or African Americans, American Indian or Alaskan Native, Hispanics of any race, Native Hawaiian or Pacific Islander, or Two or More Races) enrolled system-wide; 35.6% of students are the first in their families to attend college.  WSU's main campus is in Pullman, Washington, where it serves 20,976 students (30% multicultural) representing 48 states and 106 countries.  WSU offers 98 undergraduate majors, 78 master's degree programs, 65 doctoral degree programs, and 3 professional degree programs in medicine, pharmacy, and veterinary medicine.  WSU has 11 colleges, advancing knowledge in hundreds of disciplines.

6.      WSU-Pullman students have access to a variety of housing options, including on-campus residence halls or apartments, off-campus Greek houses, or living off-campus in Pullman, Washington, many within less than a mile from the University.  84% of new freshmen live on campus.  Other WSU sites do not offer on-campus housing at this time.  However, WSU Tri-Cities leases a portion of its campus to a private developer who offers housing designed for students.

7.      Students throughout the WSU system are subject to the rules in the WSU Standards of Conduct for Students and the Washington Administrative Code (WAC) 504-26, which are administered by the WSU Center for Community Standards through conduct officers or conduct board hearings.  Among other things, the WSU Standards of Conduct for Students prohibit gender discrimination, including sexual misconduct, stalking, and other sexual harassment  by students against other students or third-parties; these prohibitions in the WSU Standards of Conduct for Students are consistent with WSU Policy Prohibiting Discrimination, Discriminatory Harassment, Sexual Harassment, and Sex and Gender Based Violence, Executive Policy 15 ("WSU's Policy

Prohibiting Discrimination").   Likewise, WSU's Policy Prohibiting Discrimination applies to employees system-wide, who are also subject to disciplinary sanctions pursuant to the WSU Faculty Manual, the Administrative Professional Handbook, WAC 357.40 (civil service employees), or applicable collective bargaining agreement.

8.      Pursuant to WAC 504-26-015, the jurisdiction of the WSU Standards of Conduct for Students applies to conduct that occurs on University premises or in connection with University-sponsored activities, including transit to or from the activity.  The jurisdiction of the WSU Standards of Conduct for Students also applies to conduct that occurs off University premises and not in connection with University-sponsored activities, if the conduct adversely affects the health and/or safety of the University community or the pursuit of the University's vision, mission, or values.  The WSU Standards of Conduct for Students note that the University has the sole discretion to make a determination regarding whether the jurisdiction of the WSU Standards of Conduct for Students applies to off-campus activity.  In making this determination, the conduct officer considers whether the alleged conduct (a) Requires the University to exercise jurisdiction under law or as required by federal or state agencies; (b) Negatively impacted the reputation of the University or its students; (c) Occurred on the property of recognized or registered student organizations; (d) Caused physical, mental, or emotional harm to another; or (e) Was recognized by onlookers, complainants, or witnesses as being carried out by a student or recognized or registered student organization.

9.      The WSU Standards of Conduct for Students outline the University's rules for reviewing misconduct allegations and determining appropriate sanctions.  For matters potentially involving suspensions greater than 10 days and expulsion, students receive a conduct board hearing pursuant to WAC 504-26-403, which operates as an full adjudicative, administrative law hearing adhering to the provisions of the Washington Administrative Procedure Act, Wash. Rev. Code

(RCW) 34.05.413 through 34.05.476, and chapter 10-08 WAC Model Rules of Procedure. Conduct board hearings are relatively formal hearings described in more detail in paragraph 18 below. For all other matters, students are provided a conduct officer hearing pursuant to WAC 504-26-402. A conduct officer hearing is a less formal hearing where the University gives the respondent student notice of the hearing, access to the information the University will rely on in the hearing, and a chance to respond to the evidence. Conduct officers receive information from witnesses in individual interviews, including both the respondent and complainant if they choose to participate. There is no opportunity for cross examination, although parties are given the opportunity to respond to the other's statements. Cross examination in a conduct officer live hearing is not required. Following a conduct board or conduct officer hearing, any party may appeal the decision to the University appeals board.

10.     Conduct board hearings are administered and conducted by presiding officers. WSU contracts with the Washington Office of Administrative Hearings to provide Administrative Law Judges (ALJs) as independent and legally trained presiding officers. Conduct and appeals boards are three-member boards made up of students, faculty, and staff. Each individual conduct and appeals board is empaneled from a pool of eligible individuals. There are currently thirty individuals in the conduct board pool and fifteen individuals in the appeals board pool.

11.     CRCI is the central resource throughout the WSU system for complaints of sex discrimination, sexual harassment, sexual assault, stalking, intimate partner violence, and other forms of sex and/or gender based discrimination. CRCI staff consists of (1) a Director/Title IX Coordinator, (2) a Senior Compliance Coordinator/ADA Coordinator, (3) a Compliance Assistant, (4) a Human Resource Assistant, (5) four Civil Rights Investigators/Coordinators, (6) an Investigative Program Coordinator, and (7) an Office Assistant. CRCI assesses and investigates, as appropriate, complaints implicating the WSU's Policy Prohibiting Discrimination. CRCI also provides technical guidance to

the University community on civil rights laws and regulations, including Title IX, the Americans with Disabilities Act, equal employment opportunity and affirmative action obligations, the Clery Act, etc.

12.     WSU's Title IX administration includes the WSU Lead Title IX Coordinator in CRCI, and multiple Title IX Deputy Coordinators, including Jill Creighton, Associate Vice President/Dean of Students; Domanic Thomas, WSU-Vancouver Vice Chancellor of Student Affairs; James Mohr, WSU-Spokane Vice Chancellor of Student Affairs; Chris Meiers, WSU-Tri-Cities Vice Chancellor of Student Affairs; Anne McCoy, Deputy Director of Athletics; Debbie O'Donnell, WSU-Global Director of Marketing and Student Services; and our partners in WSU Human Resource Services. CRCI's Title IX responsibilities include the following:

a.  The Lead Title IX Coordinator in CRCI has responsibility for:

   i.  Coordinating the University's efforts to comply with and carry out its responsibilities under Title IX and its implementing regulations;

   ii.  Coordinating the investigation of all complaints of discrimination on the basis of sex;

   iii.  Providing yearly training to the other Title IX administrators on WSU specific practices;

   iv.  Providing consultations and making recommendations to University departments regarding Tile IX compliance, including, but not limited to, providing review and recommendations on employment practices, single-sex courses/extracurricular activities, admissions, recruitment, and/or advising practices;

   v.  Reviewing Title IX materials, pamphlets, trainings, communications, and other documents to ensure compliance with Title IX;

Decl. of Holly Ashkannejhad                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

     vi.   Ensuring WSU grievance procedures comply with Title IX;

     vii.   Coordinating employee climate surveys, related to Title IX;

     viii.   Developing and coordinating employee trainings on sexual harassment and sexual misconduct;

     ix.   Providing Title IX training to Deputy Title IX Coordinators and/or liaisons on a yearly basis;

     x.   Record-keeping of Title IX complaints and monitoring for patterns; and

     xi.   Analyzing relevant data and developing reports.

b.   The Deputy Title IX Coordinators in Student Affairs roles have responsibility for:

     i.   Referring complaints of sexual harassment, sex discrimination, or sex and gender based violence to CRCI;

     ii.   Coordinating academic and support services for students, including for students experiencing Title IX concerns and who are pregnant or parenting;

     iii.   Coordinating interim measures for reporting and responding parties, which may include, but is not limited to, coordinating housing, support resources, and/or academic/work schedules;

     iv.   Coordinating primary prevention and awareness training for new students;

     v.   Receiving training on Title IX from CRCI or external resources on a yearly basis;

     vi.   Administering the student campus climate survey;

     vii.   Delegating the above tasks as appropriate—if delegated, the Deputy Title IX Coordinator is responsible for ensuring the delegate is trained and knowledgeable about their specific responsibilities. Delegates may be

identified as a Title IX Liaison, in order to appropriately identify them to students: and

    viii. Jill Creighton, the Associate Vice President/Dean of Students, is also responsible for coordinating the student conduct adjudication and sanctioning processes for the WSU system.

c. Human Resource Services staff share responsibilities for Title IX support and are responsible for:

    i. Providing information on WSU processes for reporting, as well as resource information, on request;

    ii. Providing advice and recommendations regarding Title IX Compliance for employees to CRCI, the Office of the Provost, and/or the Faculty Senate, as needed;

    iii. Referring complaints to CRCI as appropriate;

    iv. Serving as a knowledge expert regarding interim measures and sanctioning processes in employee investigations; and

    v. Providing support, recommendations, and review for equity in employment compensation, search processes, and job descriptions.

d. The Athletics Deputy Title IX Coordinator has responsibility for:

    i. Coordinating Title IX training and education for student athletes, coaches, and athletic administrators and staff;

    ii. Coordinating, delegating, and/or participating in Title IX compliance reviews relating to equity in Athletics, including but not limited to: student interests

and abilities, athletic benefits and opportunities, athletic financial assistance, compensation equity, facilities equity, and policy equity;

iii.   Coordinating athletics related interim measures;

iv.   Referring complaints to CRCI as appropriate; and

v.   Delegating the above tasks as appropriate within Athletics—if delegated, the Deputy Title IX Coordinator is responsible for ensuring the delegate is trained and knowledgeable about their specific responsibilities.

13.     During the 2018-2019 academic year, CRCI received 566 reports, including 381 complaints alleging sex discrimination and/or harassment. CRCI's complaint processing, investigations, consultations, and overseeing Title IX operations at WSU system-wide is resource intensive, costing WSU roughly $500,000.00 yearly.  This does not include the costs associated for providing support services, case management, conduct officer hearings, conduct board hearings, employee disciplinary sanctioning processes, or appeals, thus the overall cost to WSU of administering its Title IX grevience process is substantially higher than $500,000.00 per year.  Based on these complaints, CRCI conducted 60 formal investigations, 48 based on sex and/or gender discrimination and/or harassment, into allegations regarding student and/or employee conduct. CRCI also provided 136 consultations and made referrals in 102 matters, which, depending on the information received, could include discussing options available to a reporting party, providing information on confidential or other resources, including law enforcement reporting; facilitating supportive measures or administrative resolutions; or providing information on processes and policies to individuals.  In formal investigations involving a student respondent, CRCI found 23 violations of WSU's Policy Prohibiting Discrimination (22 of which were based on sex and/or gender harassment); 10 matters involving complaints of sex and/or gender harassment involving a student respondent did

not result in a violation finding. Regardless of the outcome of CRCI's investigation, CRCI refers the matters to the WSU Center for Community Standards for review by a conduct officer to determine whether a conduct officer or conduct board hearing is appropriate for violations of WSU's Policy Prohibiting Discrimination or other WSU Standards of Conduct for Students. Students have an opportunity to resolve matters prior to a conduct officer or conduct board hearing. Many students chose to accept responsibility and appropriate sanctions; however, 13 referrals received hearings from either a student conduct officer or a student conduct board.

14.      WSU's Policy Prohibiting Discrimination was last revised on April 13, 2020, and the WSU Standards of Conduct for Students were last updated on March 16, 2020. The processes for revising and updating these policies is described in paragraphs 23 below; a description of the resources necessary for the recent update to WSU's Policy Prohibiting Discrimination is described in paragraph 26 below.

15.      WSU prohibits sexual harassment, including unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature or on the basis of sex and/or gender, when the conduct meets the definitions described in WSU's Policy Prohibiting Discrimination for Discriminatory Harassment, Quid Pro Quo Harassment, Stalking, Sexual Misconduct, or Intimate Partner Violence, or the conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. The definitions referenced include:

     a.  Discriminatory Harassment: WSU defines discriminatory harassment as unwelcome, intentional conduct, on the basis of membership in a protected class, which is so severe or pervasive, and objectively offensive, that it substantially and unreasonably (1) interferes with, or has the potential to interfere with, an individual's ability to

participate in WSU employment, education, programs, or activities; (2) adversely alters the condition of an individual's WSU employment, education, or participation status; (3) creates an objectively abusive employment, program, or educational environment; or (4) results in a material or substantial disruption of WSU's operations or the rights of students, staff, faculty, visitors, or program participants. Discriminatory harassment includes sexual harassment, which is discriminatory harassment on the basis of sex and/or gender.

b. Quid Pro Quo Harassment: WSU defines quid pro quo harassment as:

    i. Submission to unwelcome verbal or physical conduct of a sexual nature made either explicitly or implicitly a term or condition of any individual's employment or education; or

    ii. Submission to or rejection of unwelcome verbal or physical conduct of a sexual nature by an individual used as the basis of employment or educational decisions affecting the individual.

c. Sexual Misconduct: WSU defines sexual misconduct as nonconsensual sexual contact (including sexual intercourse) and sexual exploitation.  Sexual misconduct includes sexual assault and other sexual violence.

    i. WSU defines consent to sexual activity as being clear, knowing, and voluntary, which requires that, at the time of the act, and throughout the sexual contact, all parties actively express words or conduct that a reasonable person would conclude demonstrates clear permission regarding willingness to engage in sexual activity and the conditions of such activity. Even if words or conduct alone seem to imply consent, sexual activity is nonconsensual when:

1. Force or coercion is threatened or used to procure compliance with the sexual activity, where Force is the use of physical violence, physical force, threat, or intimidation to overcome resistance or gain consent to sexual activity, and Coercion is unreasonable pressure for sexual activity. When an individual makes it clear through words or actions that the individual does not want to engage in sexual contact, wants to stop, or does not want to go past a certain point of sexual interaction, continued pressure beyond that point may be coercive. Other examples of coercion may include using blackmail or extortion to overcome resistance or gain consent to sexual activity.

2. The person is asleep, unconscious, or physically unable to communicate his or her unwillingness to engage in sexual activity; or

3. A reasonable person would or should know that the other person lacks the mental capacity at the time of the sexual activity to be able to understand the nature or consequences of the act, whether that incapacity is produced by illness, defect, the influence of alcohol or another substance, or some other cause. When alcohol or drugs are involved, a person is considered incapacitated or unable to give valid consent if the individual cannot fully understand the details of the sexual interaction (i.e., who, what, when, where, why, and how), and/or the individual lacks the capacity to reasonably understand the situation and to make rational, reasonable decisions.

Decl. of Holly Ashkannejhad                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

ii.  WSU defines nonconsensual sexual contact as any intentional sexual touching, however slight, with any object or body part, by one person against another person's intimate parts (or clothing covering any of those areas), or by causing another person to touch his or her own or another person's intimate body parts without consent and/or by force. Sexual contact also can include any intentional bodily contact in a sexual manner with another person's nonintimate body parts. It also includes nonconsensual sexual intercourse.

iii.  WSU defines sexual exploitation as when a person takes nonconsensual or abusive sexual advantage of another for his/her own advantage or benefit, or to benefit or advantage anyone other than the one being exploited, and that behavior does not otherwise constitute one of the other sexual misconduct offenses explained above. Examples of sexual exploitation may include, but are not limited to:

1.  Causing or attempting to cause the incapacitation of another person to gain sexual advantage over such other person;

2.  Invading another person's sexual privacy;

3.  Prostituting another person;

4.  Engaging in voyeurism. A person commits voyeurism if, for the purpose of arousing or gratifying the sexual desire of any person, he or she knowingly views, photographs, records, or films another person, without that person's knowledge and consent, while the person being viewed, photographed, recorded, or filmed is in a place where he or she has a reasonable expectation of privacy;

Decl. of Holly Ashkannejhad                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

5.  Knowingly or recklessly exposing another person to a significant risk of sexually transmitted disease or infection;

6.  Exposing one's intimate parts in nonconsensual circumstances;

7.  Sexually based stalking and/or bullying.

d.  Stalking: WSU defines stalking as engaging in a course of conduct directed at a specific person that would cause a reasonable person to:

   i.  Fear for his or her safety or the safety of others;

   ii.  Fear for harm to his or her property or the property of others; or

   iii.  Suffer substantial emotional distress.

e.  Intimate Partner Violence: WSU defines intimate partner violence as conduct or threats which are targeted against a person with whom an individual is in or has been in a romantic, sexual, or dating relationship, where the conduct or threats are used to coerce, intimidate, or control the person. This may include physical, verbal, emotional, psychological, or financial assault and/or control. It may also include direct or indirect conduct, as well as threats or conduct directed towards the person's family, friends, property, or pets. Such conduct is a violation of WSU's policy where it meets one or more of the four factors described in the definition of Discriminatory Harassment.

16.  Under applicable state laws and regulations, as well as its formal policies, WSU is authorized to address off-campus sexual harassment or sexual misconduct and will address it, where the jurisdictional elements in the WSU Standards of Conduct for Students or the WSU Policy Prohibiting Discrimination are met.  In addition to the jurisdiction outlined in the WSU Standards of Conduct for Students (see paragraph 8 above), WSU's Policy Prohibiting Discrimination also outlines jurisdiction for WSU's review of complaints relating to discrimination, discriminatory harassment,

Page 14 of 31

sexual harassment, and sex and gender based violence.  WSU's Policy Prohibiting Discrimination applies to all students, faculty, staff, and others having an association with the University if the incident:

    a.  Occurred on WSU-owned or -controlled property;

    b.  Occurred in connection with WSU activities, programs, or events;

    c.  Has the effect of, or the potential to, unreasonably interfere with or limit an individual's work, academic performance, living environment, personal security, or participation in any activity at WSU;

    d.  Includes unlawful acts that directly affect WSU programs, community members, or property insofar as such acts materially and substantially interfere with the missions, functions, processes, and goals of the WSU community; or

    e.  Includes unlawful acts that result in a guilty plea to or conviction of a felony.

    17.    Washington state's Law Against Discrimination (WLAD), RCW 49.60.030, guarantees the right to be free from discrimination because of race, creed, color, national origin, sex, honorably discharged veteran or military status, sexual orientation, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal, and as of June 11, 2020, citizenship or immigration status, pursuant to Senate Bill 5165. Under this law, individuals may file civil lawsuits in state courts or file a complaint with the Washington State Human Rights Commission.  In addition, pursuant to WAC 357-25-027, agencies must have a sexual harassment policy for employees that utilizes the Equal Employment Opportunity Commission's definition of sexual harassment, identifies reporting options, notifies covered individuals that the employer is under a legal obligation to respond to allegations under the policy, notifies the complainants of the status

and outcome of an investigation, and includes a prohibition on retaliation, amongst other requirements.

18.     The Washington Administrative Procedure Act, RCW 34.05 (Washington APA) requires Washington higher education institutions to provide students with a full adjudicative proceeding where a student faces suspension or expulsion or is charged with sexual misconduct amounting to a felony under criminal law (*Arishi v. Wash. State Univ.*, 385 P.3d 251 (Wash. App. 2016)).  The formal adjudicative proceeding includes procedural rights, such as the right to be advised and represented by counsel; reasonable notice of the hearing; the authority of the presiding officer to issue subpoenas, discovery orders, and orders of protection; testimony under oath; the right to present, object to, and cross-examine witnesses; and written findings.  As such, pursuant to state law, Washington state universities already provide appropriate due process rights to all student participants in adjudicative proceedings concerning sexual harassment or sexual misconduct where suspension or expulsion is a possibility.

19.     WSU Title IX complaints are processed through multiple departments, offering a system of checks and balances designed to protect the rights of all participants. Complaints are initially reviewed by CRCI; as described in paragraph 13 above, CRCI estimates approximately $500,000 of resources is dedicated to processing Title IX complaints at CRCI alone.  As needed, a CRCI Civil Rights Investigator/Coordinator will conduct a neutral investigation, culminating in a report, which determines whether or not WSU's Policy Prohibiting Discrimination was violated, using a preponderance of the evidence standard.  CRCI refers reports involving students to the Center for Community Standards, for review under the WSU Standards of Conduct for Students.  This review may involve a student conduct officer or student conduct board hearing and appeals to an independent University appeals board.  CRCI refers reports involving employees to the responding party's

Decl. of Holly Ashkannejhad                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

supervisor, for review under various employment policies. All aspects of these proceedings, including the investigation, use a preponderance of the evidence standard.

20.     Due to the COVID-19 pandemic, CRCI and the WSU Center for Community Standards have altered their processes to provide for remote investigations and conduct hearings. Remote investigations pose significant challenges for WSU, as well as investigation participants, in a number of ways, including: (1) financial and personnel resources have been diverted to developing operations-continuity and emergency-management plans, as well as preparing and training staff for telecommuting (university departments are also preparing for budget cuts), (2) investigative efficiency is impacted, due to challenges with available video-conference and network access, which are not always reliable (e.g. during video-conference interviews, investigators are experiencing unstable connections, requiring investigators to ask questions multiple times), as well as limitations on access to office equipment (e.g. equipment used to create physical investigation files, printers, scanners, etc), which extend timeframes for work performed remotely, (3) investigative interviews must be conducted via audio or video-conference, which can hinder rapport-building, limit investigators' ability to observe visual evidence or witness behavior, and raise confidentiality concerns in that an investigator does not necessarily know who else may be listening at the other end of the call, and (4) University personnel are developing options to ensure services are accessible to individuals with disabilities.

21.     Because the Rule requires significant changes to the process and standards for handling Title IX issues, WSU will need to review all of its applicable regulations, policies, guidance, and other materials to implement the changes needed to come into compliance with the Rule. The Rule requires that all such changes be made by August 14, 2020.  Since the Rule was published on May 6, 2020, WSU has already engaged in multiple forums, trainings, meetings, and policy/procedure

Decl. of Holly Ashkannejhad                                    Civil Action No. 20-cv-01468-CJN
   EXHIBIT 36

development involving multiple employees across the system, and anticipates continuing this resource heavy development right up to August 14, 2020. Changes to WSU's Title IX process will require participation and employee time (i.e. financial resources) from several departments in addition to CRCI, including Student Affairs, Finance, Rules and Procedures, and Human Resource Services. The amount of time and money required to make these changes is unknown at this time, but is highly likely to require at a multiple employees to coordinate costing tens of thousands of dollars.

22.     WSU anticipates internal challenges to revising existing sexual harassment policies, particularly in the midst of a pandemic that has significantly disrupted normal operations. WSU is already working hard to ensure all students and employees understand the policy requirements and their bases, as well as WSU's obligations to protect freedom of speech and the rights of Title IX participants.     The recent amendment of WSU's Policy Prohibiting Discrimination was the culmination of a two-year review of policies, which involved gathering extensive student, staff, and faculty feedback, and stakeholder buy-in, before the policy was officially revised on April 13, 2020. Although not required (revision requirements are described in paragraph 23), community buy-in and understanding is necessary to ensure a functional, healthy process and representation of various affected interests, and WSU anticipates engaging in a similar process for any new revisions to the policy that may be necessitated by the Title IX Rule—a process which is not only time-consuming (as noted above, the last revision took two years), but extremely difficult when combined with operating challenges under the national health emergency.

23.     Revision of WSU's Policy Prohibiting Discrimination follows WSU's Policy on Policies, Executive Policy #5 (EP 5). For substantive changes, EP 5 requires analysis and proposal, approval to proceed, draft preparation, preliminary review/approval through multiple University offices and constituents, and final approval through the President's Cabinet.

Decl. of Holly Ashkannejhad                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

24.     Given that many University officials who are involved in policy-approval (e.g., partners in the Division of Student Affairs, Office of the Provost, the WSU Division of the Attorney General's Office, the Faculty Senate, Human Resource Services, and others) are currently engaged in responding to and supporting students and staff during the national public health emergency caused by the COVID-19 pandemic, in addition to their normal responsibilities, WSU anticipates significant delays in its ability to revise WSU's Policy Prohibiting Discrimination at this time.

25.     To implement the new Rule, WSU will also need to amend its Standards of Conduct for Students.  The Standards of Conduct for Students are codified in Washington's Administrative Code (which also adopts the Washington APA for certain proceedings); therefore, revision of the Standards of Conduct for Students will involve a lengthy rulemaking process as required by the WSU Business Policies and Procedures Manual 10.35 (which describes the steps for revision and notes that a typical code revision "will take at least seven months to process") and the Washington APA (per RCW 34.05, an institution may adopt a temporary emergency rule, but must actively engage in the steps to adopt the rule as a permanent rule, which may involve prenotice inquiry, feasibility studies, rules development agenda, notice of the proposed rule, public participation, petitions, adoption, incorporation, and filing).  Based on experience, WSU has learned that extensive community buy-in is important to a policy's success, and as such, WSU anticipates engaging in a resource intensive system wide review and feedback process for any updates to the Standards of Conduct for Students. In addition, WSU will need to amend employee handbooks and assess collective bargaining agreements (CBAs) for compliance with the Rule. If CBAs require revision in light of the Rule, they will need to be independently renegotiated with each represented group—which is typically a months-long process on its own.

26.    In addition to revising WSU's Policy Prohibiting Discrimination and the Standards of Conduct for Students, WSU will need to update many other materials, including: CRCI's Procedural Guidelines, CRCI's intake packets and handouts, CRCI's website pages, WSU's Executive Policy website pages, Human Resource Services website pages, Employee Discrimination/Sexual Harassment training modules, and Student Discrimination/Sexual Harassment Training modules. These changes represent a significant investment in time and resources (for comparison, WSU's recent updates to the WSU Policy Prohibiting Discrimination took over two years and involved significant time for employees to research laws, policy, regulations, case law, and guidance documents; the formation of a system-wide Working Group with approximately 20 members that met on a monthly basis over a two year time period; multiple department reviews, which necessitated re-review by CRCI and the Working Group; and multiple student, employee, and community forums to present on materials and request feedback). WSU anticipates a similar expenditure of time and resources through this summer, involving the CRCI Director/Title IX Coordinator & CRCI compliance staff to update all CRCI procedures and materials, develop and provide training, and provide technical guidance to other departments; Communications and Marketing staff to develop marketing and informational materials to share the changes with the WSU community, the Office of the Provost to update the faculty manual to be in compliance with the Rule and to retrain faculty review boards; Human Resource Services consultants to review and update employee manuals, resources, and handouts and to identify and train advisors for live hearing processes;  Center for Community Standards staff to update the WSU Standards of Conduct for Students, retrain advisors, and update all materials and handouts, and a multitude of outreach and training across the system to ensure that employees, counselors, support services, community partners, and other relevant stakeholders are well-informed and can accurately support potential victims of sexual harassment and

Decl. of Holly Ashkannejhad                                                                 Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

sexual violence. Again, this process will at a minimum cost the University thousands of dollars if not tens of thousands of dollars.

27.     CRCI, Human Resource Services, and the Division of Student Affairs regularly provide training on Title IX, sexual harassment policy, and prevention to students and employees. For example, CRCI alone provides approximately 100 in-person scheduled and at-request trainings each year and also develops on-demand trainings for students and employees regarding the WSU Policy Prohibiting Discrimination, CRCI Investigation & Reporting Options, Disabilities/Pregnancy/Parenting Rights, Employee Reporting Requirements, Campus Security Authority responsibilities, and Resources for Survivors of Sexual Assault, Stalking, or Intimate Partner Violence. For CRCI alone (not counting the hours and resources devoted by Human Resource Services and the Division of Student Affairs to providing trainings on hearing processes, supervisory roles, conduct board member requirements, etc), developing, providing, and then answering follow up questions for trainings is a significant resource investment. The costs in time and money for to accomplish these tasks will again likely be in the hundreds of hours and tens of thousands of dollars. Trainings are required for employees within six months of hire and every five years after; however, trainings are offered on a regular basis on a variety of topics. Students are provided opportunities for sexual harassment prevention and policy training throughout the academic year in a variety of formats. CRCI also communicates information about the policies, procedures, and resources to address sexual harassment at the beginning of the Fall and Spring semesters on a yearly basis. In addition, WSU provides every member of the student conduct board and appeals board pools, as well as each ALJ who presides over conduct board hearings, substantial training. The trainings include sessions on the WSU student conduct process, bias, due process and Title IX.

Decl. of Holly Ashkannejhad                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

28.    Any changes to WSU's Policy Prohibiting Discrimination and the Standards of Conduct for Students that will be necessitated by the Rule will require extensive retraining of all students, staff, and faculty, representing a significant investment of time and resources.    Most immediately, WSU will need to train conduct officers, ALJs, the conduct board and appeals board pools, and any decision makers for employee cases on the new policies.    The amount of time and resources involved in merely drafting and enacting new policies to comply with the Department's new Rule—much less designing and administering training to scores of students, faculty, staff, and affiliates—will be extraordinary.

29.    This significant investment is compounded by the Department's truncated timeline that coincides with a once-in-a-generation public health emergency and WSU's summer break, which severely hampers the University's ability to communicate and act quickly.    In addition, Washington State's governor has instructed state agencies, including WSU, to begin preparing now for a fifteen percent (15%) cut in state funding, this at a time when the Department is demanding swift, immediate, and significant financial investment from WSU to implement its new Rule.    Thus, the Department's August 14, 2020 implementation date is likely impossible for WSU to fully meet and will cause a significant strain on already scarce resources.

30.    In reviewing the new Rule, issued by the Department on May 6, 2020, and based on my experience in addressing allegations of sexual harassment and discrimination in higher education, I have concerns that some of the new requirements will negatively impact undergraduate, graduate, and professional students at WSU, as well as WSU employees.    WSU has identified a number of provisions of the new Rule which will harm its ability to protect students and employees from sexual harassment and gender discrimination that may interfere with their education.

Decl. of Holly Ashkannejhad                                    Civil Action No. 20-cv-01468-CJN
    EXHIBIT 36

31.     WSU strives to create equitable processes for students and employees.  The new Rule requires an institution to treat victims of sexual harassment (as defined by the Department) differently than victims of any other form of discriminatory harassment.  For example, a student could raise a concern of discriminatory harassment on the basis of race, and the institution would look to whether that conduct was sufficiently severe *or* pervasive and whether it *substantially interfered* with their educational access.  Yet, for a student experiencing sexual harassment, the institution would be looking for conduct that was severe *and* pervasive and that *effectively denied* them equal access to the school's education program or activity.  WSU appreciates that the new Rule specifically indicates that an institution may address misconduct that does not fit within the narrowly defined Title IX definitions and jurisdiction under different institutional policies.  However, the Rule enforces the idea that sexual harassment is somehow different than other forms of harassment, and that it must fit into a narrower standard before it is a violation of an individual's civil rights.  It is also concerning that employees receive greater rights under Title VII of the Civil Rights Act, than employees or students do under Title IX—these different standards for the same type of conduct do not make sense and will disproportionately harm students who experience sex- or gender-based discrimination. The Rule's preamble goes to great lengths to explain these differences, but the ultimate outcome is a framework of different standards depending on an individual's status and protected class.

32.     The requirement that institutions are limited to following the Rule's framework for responding to conduct "that occurs within its 'education program or activity,'" and that the complainant needs to be in an educational program or activity or attempting to be in an educational program or activity at the time they file a complaint, creates disparities in WSU's response to similar matters.  WSU, like many educational institutions, is a strong part of the community that it resides in; community partnerships and trust are of utmost importance to the University. Under the new

regulatory framework, WSU must apply the Rule's grievance procedures for a complaint from a student who experienced a sexual assault at a fraternity house, but is not required to do the same for a community member who experienced a sexual assault at the same fraternity house. This creates potential disparities if different standards are applied, or at the very least, requires WSU to make difficult decisions about which of its policies to change in light of the Rule and undertake the costly and time-intensive process of making any such changes. One can easily envision the frustration of community members if complainants and respondents were treated differently depending who owned a piece of property, both within a block of the University's campus. A potential strategy for eliminating this disparity, given the Rule's allowance for institutions to address conduct under other policies, would be for WSU to apply the Rule's grievance procedures to all discrimination or sexual harassment complaints. However, this will require more extensive policy changes to offer more time-intensive and costly procedural rights that are not required by the Rule: a budgetary and resource intensive proposition that the University is not currently prepared for, and for which there has been no fiscal impact assessment or allocation of funding. Finally, because some of WSU's campuses (for example, the main WSU-Pullman campus which is located in a small, rural town) draws a large number of students to the community who would not otherwise be there, WSU has some level of obligation to hold those individuals to an agreed upon standard to maintain the good will of the community. As has been seen throughout our country, universities cannot rely on the criminal justice system to process complaints of sexual misconduct, stalking, or intimate partner violence, and must do what is within their power to address any misconduct of their students in the community.

33.     The regulations also enforce different treatment for complaints alleging sexual harassment versus sex discrimination. An individual who alleges they were denied services due to their sex has different grievance procedural rights than an individual who specifically alleges they

were effectively denied access to an educational program due to sexual harassment. Again, this reinforces the idea that sexual harassment is somehow different than other forms of discrimination or discriminatory harassment, and that alleged sexual predators receive more protections than other alleged perpetrators of discrimination or discriminatory harassment. This different treatment impacts individuals who have been subjected to sexual harassment –it sends a message to potential complainants that it is harder for them to file a complaint which can create a chilling effect on reporting, which then harms WSU's ability to keep individuals safe. For example, if a student experiences sexual violence, but is afraid to report, the perpetrator has an opportunity to then harm more members of our community. If individuals are afraid to report, they are also less likely to receive information about resources and other support options – including safety provisions, such as connecting students in danger with law enforcement, protection orders, victim advocates, safe housing, and other resources. The regulations also are antithetical to WSU's mission to treat individuals equally and promote fair and equitable proceedings for all.

34. The Rule's requirement that a decision maker may not consider any statement made that is not subject to cross-examination is extremely harmful. WSU is particularly situated to see this, as we already have a formal hearing process that has been in place for several years. When students report to the University, they are doing so as an alternative, or perhaps as a supplement to a report to the criminal justice system. In my own experience and WSU's, reporting students do not necessarily understand that the WSU system is quite formal, providing for an ALJ, subpoena authority, discovery of evidence, and other litigation-like procedures. We have found that, after reporting concerns to an investigator, many students (including complainants, respondents, and witnesses) feel overwhelmed by the formal nature of the hearing process and may drop out of the process, not agreeing to testify at a formal conduct board hearing. It is antithetical to the University's ideals to compel, through a

subpoena, the testimony of a complaining witness.  In addition, even where a subpoena is issued by another party, there is no guarantee that the participant will attend, or if they do attend, share any relevant information.    Under the current student conduct process, "Evidence, including hearsay evidence, is admissible if in the judgment of the presiding officer it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." (R.C.W. 34.05.452). Per WAC 504-26-403, cross examination is "permitted to the extent necessary for full disclosure of all relevant facts and issues;" where a party or witness does not submit to cross-examination, the decision maker can consider whether or not the hearsay evidence is reliable or admissible.   Absent such testimony, if the conduct board is not allowed to consider evidence already gathered by a well-trained and neutral investigator, the conduct board is deprived of relevant information which very well may help protect the University community at large or maintain the innocence of a responding party.  The Rule deprives the conduct board of the ability to consider reliable evidence, which may harm the community or the parties involved.

35.    In addition, the cross-examination requirement creates a disparity by only applying to Title IX matters as defined by the Rule.  For example, an academic integrity board could expel a student based on evidence that is not subject to cross-examination (as described in paragraph 34, RCW 34.05.452 allows for admission of hearsay evidence in some circumstances), but under the Rule, the conduct board could not do so in a Title IX matter.  Thus, WSU would be in a position to expel a cheating student, but would have to allow a student who subjected another to egregious sexual misconduct to stay at the institution based on equally inculpatory evidence.  The unfairness of this is mind-boggling, particularly given that an institution's decision to expel a student is not equivalent to any criminal sanction.  Until now, WSU has long had the authority to expel a student based on neutrally gathered evidence. The student is not subjected to restraints on life or liberty and is welcome

Decl. of Holly Ashkannejhad                              Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

to apply at another institution immediately thereafter. Based on my experience reviewing and investigating serious violations of sexual harassment, universities must have some authority to address the conduct of those participating in their programs to ensure that all students have access to a safe and productive learning environment free of discrimination. The loss of this authority is a major step back in institutions' ability to provide a safe environment, free of sexual harassment and sexual violence. Furthermore, the fact that this provision forces the decision-maker to rely only on evidence subject to cross-examination at a live hearing may encourage parties to retaliate against each other – if one party can scare the other away from participating in a formal hearing, that party may be able to ensure an outcome favorable to themselves,

36. Similarly, from experience, WSU is familiar with the impact of investigations into employee matters. Throughout those investigations, WSU often receives relevant and credible evidence, and yet, some employees, after experiencing the disruption of an investigation or fearing for negative consequences for their academic or professional careers, may want to back of out participating in a live hearing process. Again, the new Rule prevents an institution from considering relevant evidence if this occurs. Imagine a particularly egregious situation, in which an investigator gathers significant, reliable, and credible statements from witnesses about severe sexual harassment in the workplace. Suppose that witnesses, for whatever reason (e.g., they have left the institution or they fear negative consequences for their academic or professional careers), then decide not to engage in the live hearing process, and thus do not submit to cross-examination. Under the Rule, the decision-maker cannot rely on the reliable statements gathered by the well-trained investigator, and thus may not be able to make a violation finding, even if institution has credible information that the responding party is a danger to the community. Under the Rule, the University can do nothing.

Decl. of Holly Ashkannejhad                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

37.    Additionally, as is well known by University employees, student witnesses are particularly difficult to schedule and often skip meetings or hearings, if it is not a top priority.  Thus, a relevant witness who shared complete information with an investigator may choose not to participate in a formal conduct hearing—for example, because they have conflicting school or work responsibilities and wish to prioritize their own education and academic success.  In order to make the correct decision, the conduct board or officer needs to be able to review and assess credibility on all evidence gathered by a neutral and well-trained investigator, which may include statements of absent witnesses.  Finally, institutions often rely on information gathered by professionals in law enforcement or the medical establishment during the course of their duties.  Universities cannot reasonably expect that these professionals will be able to attend all student or employee conduct hearings, and the new Rule calls into question whether an institution can admit these crucial pieces of evidence into the decision-making process.

38.    In sum, the cross-examination requirement unreasonably restricts the University's ability to address misconduct. One can imagine how this might be perceived in the court of public opinion, should records be requested by a media organization, or by members of the University community, not to mention the parties directly affected by the proceedings. WSU has set certain values, standards, and expectations for the university community, including those described in the WSU Policy Prohibiting Discrimination.  WSU has set these standards because it is the right thing to do, and also because it creates a safe space for students of all backgrounds, genders, ethnicities, races, religion, etc., to reap the benefits of a college education.  The Rules, by harming WSU's ability to adequately address sexual misconduct or sexual harassment, harms WSU's reputation by creating a perception that WSU is an unsafe institution and one that does not care about victims of sexual misconduct or sexual harassment, which could not be further from the truth.

Decl. of Holly Ashkannejhad                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

39.     Conflicting state and federal requirements resulting from the Rule may also create complications for the University. WSU is subject to the Washington Law Against Discrimination, RCW Chapter 49.60 (WLAD), which prohibits sex discrimination in employment and public accommodation.  In the area of public accommodation (e.g. supplying students with an education), WSU is subject to strict liability for sexual harassment carried out by an employee against a student. *Floeting v. Grp. Health Coop.*, 434 P.3d 39, 44 (Wash. 2019).  In the employment context, WSU is subject to liability for sexual harassment in employment when it knows or should know of harassment and fails to take reasonably prompt and corrective action.  *Glasgow v. Ga.-Pac. Corp.*, 693 P.2d 708 (Wash. 1985).   In addition, WLAD defines actionable sex discrimination in employment as unwelcome conduct on the basis of sex that affect the terms or conditions of employment. *Id.* Having multiple layers of rules, which are dependent on the context and complainant status, unnecessarily complicates grievance procedures, making it more difficult for complainants to navigate which rules apply to them, and making training of persons not intimately familiar with legalese exceptionally difficult.

40.     Because WSU already has a formal grievance process, governed by the Washington APA, WSU is uniquely positioned to see the impact a mandatory formal process will have on parties. In addition to being burdensome, complicated, and time-consuming for individuals who should be focusing their attention on their education or work, the formal process creates disparities based on income.  A student with the means to consult with an attorney is at an advantage, not just in that they are receiving legal advice, but because they now have someone to help them navigate the process and file paperwork, attend hearings, and submit documentation, reducing their burden and time commitment. The Rule permits parties with means to hire an attorney not only to provide advice, but

to represent the party at a hearing and cross-examine witnesses, whereas parties who lack such means likely will not have access to an attorney.

41.    The Rule's provision requiring an institution to provide an advisor for a party without one at a live hearing to ask cross-examination questions creates institutional liability and disparities for parties. An institution may (1) provide a non-legally trained advisor for all individuals lacking an advisor, or (2) provide an attorney advisor for all individuals lacking an advisor, Both options have the potential to create an unlevel playing field—in either example, a hearing may result in one party receiving legal advice and the other not. Furthermore, even though the advisor rule is specific to cross-examination needs, if one party has an attorney, should the institution expand the scope of the provided advisor's role to provide similar legal services and advice to the other party? This expansion is clearly fairer, but again, having to pay an attorney's hourly rates for each proceeding creates a significant fiscal impact and resource requirement that was not considered by the Department.

42.    The new Rule also limits an institution's ability to initiate an informal resolution process. Of note, under the Rule, an informal resolution process is not allowed for matters involving an employee respondent and student complainant, and an informal resolution process is not available without a formal complaint. This overly broad restriction limits WSU's ability to take informal steps in matters where a complainant may not want to participate in a formal investigation and creates the potential for a respondent to cause further harm to the complainant or others. For example, consider a matter involving allegations that an instructor subjected a student to sexual harassment, yet the student cares about the instructor (which is not an uncommon sentiment expressed by complainants) and does not wish to impose the formal investigative and disciplinary process. Say the student tells the Title IX Coordinator that they want the instructor to learn from the incident, not to be punished. Under the new Rule, the institution must inform the student that such an informal resolution is not an

option, and as a result, the student may decline to file a formal complaint—leaving the University without any ability to address the issue. Even if the Title IX Coordinator filed a complaint in this example, the grievance process would likely not result in a violation finding if the complainant does not participate, due to the evidentiary restrictions discussed above.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this _l_ day of _June_, 20 20

Holly Ashkannejhad

Director, Title IX Coordinator
Office of Civil Rights Compliance & Investigation
Washington State University

Decl. of Holly Ashkannejhad                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 36

EXHIBIT 37

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN. <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of the United States Department of Education*; UNITED STATES DEPARTMENT OF EDUCATION; UNITED STATES OF AMERICA, <br><br> Defendants. | **Case No. 20-cv-01468-CJN** |

### DECLARATION OF KAREN L. BAKER

I, Karen L. Baker, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the CEO at the Pennsylvania Coalition Against Rape (PCAR) located in Harrisburg, Pennsylvania. My educational background includes a Master's degree in Social Work, from the University of Kansas and I am licensed as a Master's Level Clinical Social Worker. I have been employed as PCAR's CEO since May 2018. Prior to that, I directed PCAR's national center, the National Sexual Violence Resource Center (NSVRC), since its opening in July 2000. The NSVRC provides information, training, and support to a wide range of professionals in education, employment, public health, victim services, and other realms throughout the country to enhance

sexual violence prevention and services. While at PCAR, I served as a Board Member for the Association for the Treatment of Sexual Abusers, where I co-chaired their national prevention committee; served as an Editor on the Sexual Assault Report; and currently serve as a Governor-appointed member of the Pennsylvania Commission on Crime and Delinquency; and as an Advisory Board member of the national organization, Stop It Now.

2.      As CEO of PCAR, I am responsible for the overall functioning of the organization including staffing, finances, fund raising, and policies and procedures. I work closely with the Board of Directors to establish and implement sound policies and strategic goals for the organization.

3.      I submit this Declaration in support of the Commonwealth of Pennsylvania's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge. I have also familiarized myself with the Rule in order to understand its immediate impact on PCAR.

4.      PCAR has worked to end sexual violence and advocate for the rights and needs of all victims from sexual abuse, harassment and assault since 1975. We currently work with a network of sexual assault centers to provide free and confidential services to individuals in all 67 counties in Pennsylvania. Our network provides services to an estimated 30,000 victims and family members on an annual basis.

Decl. of Karen L. Baker                                           Case No. 20-cv-01468-CJN
EXHIBIT 37

5. Pennsylvania's sexual assault centers provide training, policy review and counseling support to educational institutions and work collaboratively with school administrators and Title IX coordinators for opportunities to collaborate.

6. In the 2019-2020 state budget, PCAR received a state appropriation of $10.9 million from Pennsylvania. This appropriation supports a number of our organization's programming to end sexual violence, and in relation to Title IX, funds technical assistance to practitioners, prevention education including campus sexual assault prevention and response, public awareness and the operational budget of sexual assault centers.

7. Currently, Pennsylvania is in the process of adopting a short-term budget which will have flat funding for only 5 months based off of the 2019-20 budget which already creates financial constraints on organizations such as ours.

8. Based on our analysis of the Title IX Rule and expertise from providing services to survivors we believe that there will be a significant increase in demand for legal representation, crisis and long-term counseling, and advocacy within the educational system from students who are sexually assaulted, as a direct result of the new Rule. In 2018-19, rape crisis centers served 451 student victims. With the new Rule, PCAR anticipates that rape crisis centers will see more student victims reaching out for counseling, advocacy, legal advice, and for assistance in advisor roles. Furthermore, rape crisis centers already are requesting training and technical assistance from PCAR to understand the rule changes and how they will be implemented. PCAR's one-day trainings typically cost approximately $2,500.

9. This increased demand will require additional state funds at a time where many rape crisis centers are already understaffed and experiencing a spike in public demand.. Right now, four staff members, whose roles are primarily funded through the state budget and Victims of Crime Act

Decl. of Karen L. Baker                                                                    Case No. 20-cv-01468-CJN
EXHIBIT 37

(VOCA) grants, are triaging requests made to PCAR for policy, training, and legal assistance . To meet the increased demand, PCAR will likely need to delay or cancel other important trainings for law enforcement, prosecutors, medical advocates. This reallocation of staff time to respond to Title IX rule changes will likely detract from other priorities and projects at both PCAR and rape crisis centers, requiring additional resources and funds to sustain core services and work.

10.     Public outcries for justice, like the MeToo Movement, and increased awareness of the debilitating consequences of sexual abuse, assault and harassment have resulted in a higher demand for trauma informed victim services over the past several years. During the COVID-19 quarantine, we see even greater demands emerging as victims and their families struggle to access services and helpful prevention resources.

11.     Some key examples of how the Rule will negatively impact victim services include:

a. Pennsylvania's network of trained professionals and decades of academic research and practitioners recognize the significance of trauma-informed support and systems of response for victims of sexual harassment, abuse, and assault. This includes the understanding of how sexual misconduct can affect a survivor's safety, educational pursuits, memory, and actions. The Rule does not reflect this complexity and is highly likely to further traumatize victims. Forcing a victim to participate in a live hearing with cross-examination is not trauma-informed and is likely to create a chilling effect on students coming forward to seek help and report sexual misconduct to authorities. Withholding a supportive measure from a victim who has survived rape or another form of sexual violence because it could be perceived as "punitive" or "burdensome" to a respondent is not trauma-informed, nor is it aligned with the spirit of Title IX—to address sex discrimination and the hostile effects it can have a

Decl. of Karen L. Baker                                      Case No. 20-cv-01468-CJN
EXHIBIT 37

victim's ability to fully participate in educational programs and activities. Drawing a line between which reports of sexual misconduct are required to be investigated and which are optional for the institution to pursue sends a strong and offensive message to victims of off-campus rape and sexual assault—that they do not matter as much as victims who were assaulted on campus. This is not trauma-informed because we know that regardless of the location of an assault, it can have a negative impact on a student's ability to fully participate in educational programs and activities. The narrowing of the scope of sexual harassment, added steps in reporting, presumptions of innocence, and re-traumatizing procedures are likely to add up to victims choosing not to come forward at all. This not only harms individual victims. It also harms the entire campus community, which will be less safe for all because administrators will not know the true prevalence of sexual violence on their campus, where it occurs, and how to best address and prevent it. All these harms will lead to an increased demand for counseling and advocacy services.

b. Based on the new guidelines' definitions for terms such as "harassment"; processes for determining supportive measures and conducting hearings and investigations; exemptions for religious institutions; and limiting the requirement to investigate claims to only those that occur on school property, create significant barriers for students to come forward with claims. This will delay adjudication and support for victims and subsequently will result in victim service providers at local rape crisis centers filling in the gap for mental health, counseling and legal services resulting from the new campus procedures that are not victim centered.

Decl. of Karen L. Baker                                          Case No. 20-cv-01468-CJN
EXHIBIT 37

c. Given the extensive changes required by the Title IX Rule and limited time of 3 months for K-12 and post-secondary schools to implement changes to policy, procedure and training, we expect that more institutions will reach out to sexual assault centers to help fill this gap in order for schools to be in compliance for the 2020-21 school year.

12. On behalf of PCAR and Pennsylvania's sexual assault centers, we are very concerned of the negative impact of the Title IX Rule once it is in effect on August 14, 2020. Sexual assault center staff will experience an increased demand for services and stretch victim services beyond current funding parameters. These drastic changes to Title IX will stretch limited state dollars within the network of rape crisis centers, resulting in a negative impact for Pennsylvania, victims, and communities.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 18th day of June, 20 20

Karen L. Baker, CEO
_____
[Declarant]
[Title]

Decl. of Karen L. Baker                                      Case No. 20-cv-01468-CJN
EXHIBIT 37

EXHIBIT 38

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. **20-cv-01468-CJN** |

**DECLARATION OF HANNAH BAKEY**

I, Hannah Bakey, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and

correct:

      1.     I am an Advisor and the Title IX Coordinator at Goldey-Beacom College ("Goldey-

Beacom" or "GBC"), located in Wilmington, Delaware. I have been employed as Advisor and Title

IX Coordinator since July 2017.

      2.     I submit this Declaration in support of the State of Delaware's litigation against

Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department

of Education (the "Department"); and the United States of America regarding the recently issued Rule

entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through Goldey-Beacom College personnel who have assisted me in gathering this information from our institution, and through documents that have been provided to or reviewed by me.  I have also familiarized myself with the Rule in order to understand its immediate impact on Goldey-Beacom College.

### Background about Goldey-Beacom College

3.     Goldey-Beacom traces its founding back to 1886 as Wilmington Commercial College. GBC currently enrolls more than 1,800 students from more than 22 states and 60 nations, approximately 300 of whom live in on-campus housing.  GBC is accredited by the Middle States Commission on Higher Education and Accreditation Council for Business Schools and Programs, has more than 80 faculty, and offers 41 degree options for students, including bachelor's degrees in psychology, criminal justice, English, human services, and communications and media, as well as a variety of associate's, bachelor's, and master's programs in business fields.  Goldey-Beacom also has a doctoral program for business administration.

4.     Goldey-Beacom's campus is located on 24 acres in a suburban area of Delaware known as Pike Creek Valley.  It currently consists of (i) the Fulmer Center and Fulmer Annex, which house GBC's academic classrooms and its faculty and administrative offices, (ii) the Joseph West Jones Center, which houses GBC's library, computer center, athletics department, career services office, fitness center, and student lounge, (iii) four apartment-style residence halls, and (iv) athletic fields (soccer, softball, and recreational tennis and basketball courts).  A major campus construction project currently underway will add a fifth residence hall and significantly expand the Joseph West

Decl. of Hannah Bakey                                                      Case No. 20-cv-01468-CJN

EXHIBIT 38

Jones Center, allowing GBC to offer additional services to the campus community, including new dining facilities and an expanded athletics department.

5.      GBC has been approved by the Delaware Department of Education as institution of higher education, and is subject to Delaware laws applicable to institutions of higher education in Delaware including those regarding educational privacy and sexual assault policies.

6.      Goldey-Beacom receives federal funds from the Department. As a result, the college is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

### Goldey-Beacom's Existing Title IX Policies

7.      Goldey-Beacom has adopted a Student Code of Conduct, a Faculty Policy and Resource Manual, and a Staff Personnel Policy Manual that prohibit sexual harassment and sexual misconduct by students, faculty, staff, volunteers, contracted employees, and third-party vendors and establishes a grievance process for addressing complaints of sexual harassment. GBC has also issued a *Pledge to Promote a Safe Environment: Notice of Non-Discrimination*, which sets forth GBC's commitment to protecting the rights and dignity of all students, and its commitment to maintaining "a safe environment that is free from all forms of assault, harassment, and discrimination," including sexual assault and sexual harassment (https://tinyurl.com/ybamlxww).

8.      GBC has appointed a Title IX Coordinator as well as a Title IX Deputy Coordinator to ensure GBC's compliance with Title IX. GBC has no specific Title IX Office, but publishes and circulates how the Title IX Coordinator or Title IX Deputy Coordinator can be contacted, as well as methods for reporting anonymously. The Title IX Coordinator is responsible for training new and returning students at the undergraduate, graduate and doctoral levels and coordinating an investigation and the institution's response when a report is received. This includes providing parties with

Decl. of Hannah Bakey                                    Case No. 20-cv-01468-CJN

EXHIBIT 38

resources, information regarding protective measures and accommodations, and on- and off-campus services available. Additionally, the Title IX Coordinator works on ensuring all polices related to sexual harassment, sexual misconduct, and sex-discrimination are updated and compliant with federal and state regulations.

9.     In 2019, the Title IX Coordinator received 17 reports from students or employees. A report is someone bringing an incident to a Title IX Coordinator to determine if there is a possible Title IX violation. The Title IX Coordinator does intake for the complainant or the reporting party if not the complainant, and, if feasible, the respondent. Here, "complainant" is the person affected by the alleged sexual harassment/misconduct/discrimination. The "respondent" the person who has allegedly perpetrated the harassment/misconduct/discrimination.  Two of the 17 reports received were escalated to institutional investigations.

10.     An institutional investigation is when two investigators meet with the complainant, the respondent, and any relevant witnesses/parties. The investigators compile interviews and any relevant evidence into a fact-finding report that is then provided to the Title IX Coordinator who makes a decision regarding findings and subsequent sanctions.

11.     The other 15 reports were either referred to Student Affairs (because the conduct was determined not to be within the scope of Title IX), not investigated based on the complainant's wishes, or only required accommodations that were put in place (for example, a student going through a criminal proceeding regarding physical domestic violence needed extensions in their current courses; this was coordinated by the Title IX Coordinator). The Title IX Coordinator responded to all 17 reports with outreach to the alleged victim to provide resources for requesting accommodations or protective measures as well as information on the institution's processes and on- and off-campus services.

Decl. of Hannah Bakey                                                      Case No. 20-cv-01468-CJN

EXHIBIT 38

12.    Goldey-Beacom's policies are reviewed each year when preparing its Annual Security and Fire Safety Report. Should a revision be needed, the Title IX Coordinator proposes such revisions to GBC's Executive Council who reviews the request and approves or denies it. The timeframe for these processes is driven by the kind of revisions that need to occur. Changing a few sentences to offer more clarity can be drafted and approved within a week whereas larger revisions of GBC's grievance procedures and responses to reports can take months to properly research, draft, and approve. Goldey-Beacom has not initiated any consultation with the United States Department of Education's Office of Civil Rights when revising its policies

13.    Goldey-Beacom defines "sexual harassment" as including any unwanted sexual gesture, physical contact, or statement which a reasonable person would find offensive, humiliating, or would interfere with required tasks or career opportunities at GBC.  This is the current definition in GBC's Annual Security and Fire Safety Report and applies to students, faculty, staff, volunteers, contracted employees, and third-party vendors.

14.    GBC applies its *Pledge to Promote a Safe Environment: Notice of Non-Discrimination* to protect the rights and dignity of all GBC students "regardless of whether the incident occurs on or off campus," including with respect to incidents involving charges of sexual assault or sexual harassment.  Thus, GBC applies the Pledge outside of (i) "locations, events, or circumstances over which [GBC] exercised substantial control over both the respondent and the context in which the sexual harassment occurs," (ii) "any building owned or controlled by a student organization that is officially recognized by" GBC, and (iii) the United States.

15.    GBC allows Title IX complaints to be filed online (https://forms.gbc.edu/title-ix-complaint.asp), as well as by email or other form of direct communication to a Title IX Coordinator. Currently, all GBC employees are designated as Responsible Employees; therefore, anyone can relay

Decl. of Hannah Bakey                                               Case No. 20-cv-01468-CJN

EXHIBIT 38

a report to any employee and that information will be delivered to a Title IX Coordinator/Deputy Coordinator. Only a Title IX Coordinator/Deputy Coordinator can initiate institutional responses such as an investigation. A complaint can be filed anonymously, and by someone other than the victim. If the complainant is not the victim, the complainant is asked to identify the victim's affiliation with GBC, and is given the option (but not required) to identify their relationship to the victim (if they know the victim). Personally identifiable information about the complainant, respondent and other necessary parties will be treated as confidential and only shared with persons who have a specific need to know, *i.e.*, those who are investigating/adjudicating the report or those involved in providing support services to the victim, including accommodations and protective measures. By only sharing personally identifiable information with individuals on a need-to-know basis, GBC will maintain as confidential any accommodations or protective measures provided to the victim to the extent that maintaining such confidentiality would not impair the ability of GBC to provide the accommodations or protective measures

16.     Goldey-Beacom has designed a process for ensuring that investigations and hearings are conducted promptly, fairly, and impartially. All complaints are reviewed by a Title IX Coordinator, who conducts a preliminary assessment, which may include speaking to the victim and the accused (or attempting to). If it appears that a Title IX violation may have occurred, the Title IX Coordinator issues a letter simultaneously to the victim and accused stating that a Title IX Investigation has been opened and the violation that may have occurred. Investigators then conduct thorough interviews with the victim, the accused, and any witnesgas that may have relevant information, and then produce a fact-finding report to the Title IX Coordinator. The Title IX Coordinator reviews the report, which may contain interview summaries, sworn statements, photos, videos, and documents. Using the fact-finding report produced by the investigators, and applying a

Decl. of Hannah Bakey                                                        Case No. 20-cv-01468-CJN

EXHIBIT 38

preponderance of the evidence standard, the Title IX Coordinator then determines if a Title IX violation has occurred. Each report is a unique situation that requires different levels of response. Therefore, it is hard to give a firm estimation of the time and costs of GBC's response report since each has an individualized needs that require a range of time spent and expenses incurred. It takes 3 people an average of 25 hours to investigate each situation which results in a range of $1,800 per investigation in terms of time and resources spent. Goldey-Beacom does not currently conduct live hearings at which parties are allowed to ask questions of each other and witnesses.

17.     In 2019, GBC did not see any appeals for any findings made. All parties are entitled to an appeal, should they decide to utilize one. Currently, GBC's appeals process can only be requested if one or more of the following criteria is met: (1) the decision and/or sanction imposed is not appropriate in light of the nature of the Title IX violation; (2) lack of evidence of a Title IX violation; and/or (3) new evidence which was not previously available and would have a significant impact on the decision/sanction. A request for appeal and the reason for such must be submitted to the Title IX Coordinator within 10 business days of receiving the Title IX Coordinator's decision. New investigators and a new Title IX Coordinator may be assigned. If either party is unhappy with the Title IX Coordinator's decision after their appeal, either party may appeal to GBC's Executive Council within 10 business days of receiving the decision. The Executive Council will review the fact-finding report and all evidence gathered in the initial investigation as well as the any new evidence from the appellate investigation to make a decision. The Executive Council's decision is final.

### Harm to Goldey-Beacom:
### Revising Existing Sexual Misconduct Policies

18.     To comply with the new rule, GBC will need to revise the Student Code of Conduct, the Faculty Policy and Resource Manual, and the Staff Personnel Policy Manual. Different pieces in

Decl. of Hannah Bakey                                                          Case No. 20-cv-01468-CJN

EXHIBIT 38

each of these documents will require different levels of review and revision. A Title IX Task Force has been assembled from employees form Human Resources, Compliance, Athletics and Title IX. This Task Force will draft and revise policies within the group to then present to GBC' Executive Council for review and approval. All policies related to sexual misconduct will need to be rewritten, including Goldey-Beacom's Pledge. Because the final rule significantly narrows the definition of sexual harassment as well as the jurisdiction of Title IX protections, GBC will also need to draft supplemental policies and procedures in addition to revising the current processes to be compliant.

19. Based on the research required, the different departments at GBC needing to be consulted, and the nature of drafting, revising, and approving grievance process procedures, I estimate that a normal timeframe to review and revise GBC's grievance procedures in preparation for the Title IX Rule—essentially a complete overhaul—would be around six months.

20. The Title IX Coordinator has assembled a Task Force comprised of members from Athletics, Compliance and Training, Human Resources, and Student Affairs to be consulted in the initial revision process. As the scope of the Title IX Rule reaches across a variety of departments at GVC, it is important to ensure that all areas are considered and consulted when drafting the new procedures to be compliant with the Title IX Rule.

21. Once the initial revision is complete and a draft of updated policies and procedures has been prepared, it will be sent to Goldey-Beacom's Executive Council for final review and approval.

22. The public health emergency caused by the COVID-19 pandemic is also imposing additional challenges to Goldey-Beacom as it works to revise its procedures, not the least of which is not knowing what the Fall 2020 semester will look like, with a number of important but unanswered issues—e.g., the number of students who will still be engaged in remote learning versus the number

Decl. of Hannah Bakey                                                    Case No. 20-cv-01468-CJN

EXHIBIT 38

of students who will be on campus; COVID-19's ongoing impact on GBC's revenue and funding—that will affect when and how GBC implements its new policies and procedures and disseminates notice of them to students, faculty, and staff.

23.     Additionally, Goldey-Beacom is in the process of determining how it will address conduct that falls outside of Title IX as defined by the Title IX Rule, but violates, for example, the Student Code of Conduct, the Faculty Policy and Resource Manual, or the Staff Personnel Policy Manual. GBC is considering whether to adjudicate such conduct through a parallel process to its Title IX, through a process similar to GBC's current grievance procedures, or through GBC's Office of Student Affairs' conduct processes, and is considering whether the response will require new offices or staff positions or transferring or renaming existing offices or staff positions. Whichever process is chosen, it will impose additional financial and resource burdens on Goldey-Beacom.

24.     Goldey-Beacom has also determined that compliance with the new requirements imposed by the Title IX Rule will also require hiring new staff. GBC is aware that more staff will need to either be designated to partake in this process or hired. Most likely, GBC will draw on current staff members to be appointed as hearing board members/decision-makers, as well as advisors to either party. This will require increased training for these staff members and these additional duties will cost those staff members valuable time and resources that could have gone toward serving the larger Goldey-Beacom Community in other ways. Depending on the organization running these sessions as well as the length, the cost of one training/seminar can range from $100 to $500. GBC's expenses for these trainings will vary, as every person will not need to attend each training. However, it is estimated that GBC would have 12 individuals all needing to be trained.

Decl. of Hannah Bakey                                        Case No. 20-cv-01468-CJN

EXHIBIT 38

25.     In addition to all handbooks regarding conduct of students, faculty and staff, Goldey-Beacom's website will need to be revised to include all training materials as mandated by the new Title IX Rule.

26.     Goldey-Beacom's sexual harassment policy information is circulated annually to all current students, faculty and staff. Once the Annual Security Report has been finalized and published, all current students receive email notification of where to find this report from GBC's Clery Compliance Officer. Faculty and staff receive email notification relaying the same information from GBC's Compliance and Training Coordinator. All faculty and staff are sent online training at the beginning of each academic year focused on sexual misconduct and how to report known incidents of such; this training is through 360 Stay Safe, a virtual platform that educates employees on sexual assault and harassment and ways to recognize and report such.  A Human Resources representative reviews GBC's Obligation to Report policy with all new hires to ensure they understand their responsibilities as Responsible Employees. Additionally, employees receive training on sexual harassment and supervisors receive such as well as supplemental training on handling reports of sexual harassment as mandated by the Delaware Discrimination in Employment Act.

27.     GBC will need to train decision-makers and advisors on the new requirements as well as the Title IX Coordinator and Title IX Deputy Coordinator. Since GBC has a third-party investigative group on retainer, their training is coordinated through that organization. Until the Title IX Coordinator and Title IX Deputy Coordinator have received sufficient training on the new Title IX Rule, all training will need to be out-of-house. This includes webinars, online courses and conferences focused on compliance with the new Rule as well as combatting bias and remaining impartial. Depending on the organization running these sessions as well as the length, the cost of one training/seminar can range from $100 to $500. GBC's expenses for these trainings will vary, as every

Decl. of Hannah Bakey                                                  Case No. 20-cv-01468-CJN

EXHIBIT 38

person will not need to attend each training. However, it is estimated that GBC would have 12 individuals all needing to be trained.

28.    Goldey-Beacom will need to develop new communication materials to educate the Campus Community about the new rule. Any presentations that had been scheduled for educating on the institution's response to reports of sexual misconduct will need to be revised, including sessions for New Student Orientation, Athletic Staff Orientation, and GBC's Welcome Weekend, typically held the weekend before the start of the Fall Semester.

29.    Goldey-Beacom is gravely concerned about its ability to comply with the new obligations and processes imposed by the Title IX Rule by the August 14, 2020 effective date. Among the many tasks Goldey-Beacom will need to complete, it will need to:

- Completely restructure its Title IX grievance procedures, including the implementation of a hearing board, which GBC does not currently have.

- Decide how to address conduct that falls outside of Title IX under the Title IX Rule, and then draft and disseminate the new policies.

- Identify "officials with authority" and those who will serve as hearing board members, and then ensure that these individuals are all properly trained.

- Update the Student Code of Conduct, the Faculty Policy and Resource Manual, and the Staff Personnel Policy Manual, and other school resources (*e.g.*, website) to reflect the Title IX Rule and any separate processes for conduct that falls outside of the Title IX Rule.

- Develop training materials for students, faculty, and staff on their obligations under the Title IX Rule, and then disseminate those materials and actually train students, faculty, and staff, many of whom may still be in remote learning or work situations due to the COVID-19 pandemic.

- Determine who will serve in any new roles that must be created and, if new employees must be hired, engage in a hiring process for them.

30.    The August 14, 2020 effective date of the Title IX Rule poses another significant problem for Goldey-Beacom and other institutions of higher education in Delaware: the Title IX

Decl. of Hannah Bakey                                                    Case No. 20-cv-01468-CJN

EXHIBIT 38

personnel at many of these institutions, including GBC, are also responsible for their school's Clery Act compliance. GBC and other schools must get their annual Clery Act-mandated security reports prepared for submission by the U.S. Department of Education's October 1, 2020 deadline. Delaware post-secondary institutions, including GBC, also have to complete and file by October 1, 2020 the sexual assault reports required by Chapter 90A, Title 14 of the Delaware Code. The reports required under both laws require a detailed historical analysis of statistics and policy implementation on Goldey-Beacom's campus. Doing this work along with a complete overhaul of GBC's Title IX and other misconduct processes will be exceptionally difficult, if not impossible, to complete by August 14, 2020. These individuals will be pulled from a variety of departments including Human Resources, Athletics, Compliance, Advisement and others.

**Harm to Goldey-Beacom:**
**Responding to Complaints Under New Requirements**

31.     Based on my experience as Goldey-Beacom's Title IX Coordinator, I believe that requiring mandatory live hearings, requiring all parties to be provided an advisor (or a lawyer), allowing direct cross-examination of students, not allowing consideration of evidence unless a party submits to cross-examination, and requiring hearing panels to make evidentiary decisions on the spot, will impose significant financial and resource burdens on Goldey-Beacom. Goldey-Beacom will need to hire new staff—including advisors, mediators, hearing panel members, and administrative personnel—to implement the new procedures required by the Title IX Rule. Due to the timing of the Rule and its implementation date, it is difficult to estimate the time and resources expended. As an institution, GBC is still trying to understand the effects COVID 19 had on our revenue for Spring as well as the effects on future revenue from the Summer and Fall Semesters. As a result, there is no clear estimation on the resources available for this, let alone an estimate of what would be spent.

Page 12 of 16

32.     I also believe, based on my experience as Goldey-Beacom's Title IX Coordinator, that the use of courtroom-like hearings, with adversarial cross-examination by advisers (or lawyers), under the new Title IX Rule will create an intimidating process for victims, who may already be suffering from a variety of psychological responses to trauma, and lead to a significant decrease in victims willing to move forward with formal investigations into reported conduct. And for those victims who are willing to more forward, the additional effort involved to assist each of them through the process and help them understand the process will be more time-consuming under the new Title IX Rule, and will require GBC to expend additional resources. Finally, while the new Title IX Rule provides specific criteria by which a Title IX Coordinator can investigate without a victim signing a formal complaint, these criteria are narrow and do not take into account how the process itself will affect victims wanting to pursue their institution's grievance procedures.

33.     As Goldey-Beacom's Title IX Coordinator, I believe that the ability to review and inspect all evidence is essential to ensuring due process for both the victim and the accused. However, setting up a system in which all parties are provided with copies of all evidence will, combined with the narrowed definition of retaliation in the Title IX Rule, make witnesses more afraid of cooperating with Title IX investigations. I also believe it will impose significant additional financial and resource burdens on GBC. GBC will need to research and implement different technologies or review methods to ensure responsible viewing of the investigative report and all relevant evidence. Recently and from the guidance from our third-party investigators, the Title IX Coordinator would permit both parties to review and respond to the investigative report through reading the investigative report in the Title IX Coordinator's office. Now, Goldey-Beacom will need to consider how different methods of sending this investigative report allow different manipulations and distribution of the document. GBC will need to determine what method of review will permit both parties to view the report and evidence in

Decl. of Hannah Bakey                                                Case No. 20-cv-01468-CJN

EXHIBIT 38

total without allowing either party to distribute the document freely. While each party is entitled to sharing this document with their advisor, it would not, for example, be appropriate for the investigative report to be circulated through a residence hall or athletic team.

34.       While GBC is a private institution and has the privilege of making decisions about the kind of conduct and comportment it will permit on its campus, the way in which the new Title IX Rule aims to set a floor, rather than a ceiling, for impermissible conduct is troubling when it comes to increased litigation.  I believe that there is a risk that institutions choosing to implement broader sexual misconduct polices aimed to address conduct that falls outside of the Title IX Rule's new, narrow definition of sexual harassment will put the institution at risk for litigation.

### Harm to Goldey-Beacom and its Campus Community:
### Harder to Identify, Remedy, and Eliminate Sexual Harassment

35.       The changes to the definition of sexual harassment and the narrow scope of Title IX jurisdiction under the new Rule has an impact that extends beyond the costly and time-consuming process of completely overhauling GBC's policies and procedures. These new requirements stand to communicate to the Goldey-Beacom community that our care for them stops at the boundaries of our campus and nation. While the Title IX Rule has a dramatic impact on what GBC needs to do immediately to be compliant, the new Rule also has negative implications for relations among students and faculty/staff and the larger GBC Community.

36.       Based on my experience as Title IT Coordinator, the new Title IX Rule could have a chilling effect on reporting or on victims who initiate a formal process, the GBC Community will be less safe than it is today. We can only address the conduct of which we are aware, and if reporting decreases, we will likely not know about some of the conduct that infringes on the safety of community members.  Victims come forward and seek justice when they feel safe enough to be taken seriously and feel that they will be supported.  The intensity of the process required by the Rule and

Decl. of Hannah Bakey                                                                    Case No. 20-cv-01468-CJN

EXHIBIT 38

the requirement to declare that the respondent will be presumed not responsible communicate the opposite to any victims weighing the decision of reporting. With decreased reporting and formal complaints, the institution will have fewer footholds for addressing sexual misconduct, sexual harassment and sex discrimination.

37.     The Title IX Rule makes it more difficult for GBC to provide a safe campus environment, as it will have the effect of decreased reported and formal complaints; fewer reports and complaints will result in GBC running the risk of remaining ignorant about conduct that creates an unsafe environment. The narrowed scope and limited definition of sexual harassment will interfere with Goldey-Beacom's ability to prevent and remedy sexual harassment. The Title IX Rule also makes it difficult for GBC to ensure a fair and equitable process, specifically as it relates to providing advisors for parties who do not have one. As Title IX Coordinator, I have serious concerns about equity regarding advisors of choice. This provides an opportunity for those who are financially advantaged to hire an attorney to conduct their cross-examination. Should the institution not provide an attorney, would the institution be responsible for not facilitating an equitable process? If the situation were reversed and GBC did provide an attorney, but the other party did not or was not able to hire one, has GBC provided an equitable process? The Title IX process is supposed to serve as an alternative to criminal proceedings so students and employees can maintain access to their education or educational programs and activities. Not only does the requirement regarding adversarial cross-examination bring this process closer to a criminal proceeding, it allows those who are have the financial resources to secure a substantial advantage in the process. Regardless of which status the party holds in the investigation, either complainant or respondent, no one should be able to skew the investigative process in their favor through the use of a professionally trained lawyer that the other party simply may be able to afford.

Decl. of Hannah Bakey                                   Case No. 20-cv-01468-CJN

EXHIBIT 38

\*     \*     \*

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __18__ day of June, 2020.

_____

Hannah Bakey
Advisor and Title IX Coordinator
Goldey-Beacom College

Decl. of Hannah Bakey                                                                Case No. 20-cv-01468-CJN

EXHIBIT 38

# EXHIBIT 39

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. **20-cv-01468-CJN** |

## <u>DECLARATION OF JAMIE C. BALL</u>

I, Jamie Ball, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am the Director for Equal Opportunity, Access & Title IX Coordination at Southern Illinois University Edwardsville ("SIUE") located in Edwardsville, Illinois. My educational background includes a Bachelor's degree in psychology from Oglethorpe University, conferred in 1995 and a Juris Doctor degree from Southwestern University School of Law, conferred in 2004. I have been employed as the Director for Equal Opportunity, Access and Title IX Coordination since June 18, 2018.  I have additional professional experience as a higher education administrator in various capacities, as well as a public sector civil rights investigator, and litigator in private practice.

Decl. of Jamie C. Ball

Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

2.      I submit this Declaration in support of the State of Illinois's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through SIUE's personnel who have assisted me in gathering this information from our institution, on the basis of documents that have been provided to and/or reviewed by me.  I have also familiarized myself with the Rule in order to understand its immediate impact on SIUE.

### Background about Southern Illinois University Edwardsville

3.      SIUE currently serves approximately 10,400 undergraduate students, 2,100 graduate students, and 530 professional practice students.  There are 992 faculty members, 406 administrative professionals, 1,075 Civil Service staff members, 559 Graduate Assistants, and 1,411 Student Workers.

4.      SIUE traces its origin to a recommendation in 1956 by the Southwest Illinois Council for Higher Education. The Council was convinced that higher education facilities were needed in the Metro-East part of the greater St. Louis area. Council members hired consultants, whose reports documented that need, and appealed to Southern Illinois University, 100 miles south, to establish satellite campuses.  In 1957, SIU opened two "residence centers" in Alton and East St. Louis. In the fall of 1965, Southern Illinois University Edwardsville moved onto its new campus: 2,660 acres of rolling land and woods dotted with lakes.

5.      SIUE serves traditional college-aged undergraduate students, with many commuting from the surrounding areas and some residential, as well as many non-traditional students. The campus offers a balance of instruction, research, and public service programs consonant with its role

as the only public university in southwestern Illinois. SIUE also administers the School of Dental Medicine in Alton, and operates a center in East St. Louis.  SIUE offers undergraduate programs, masters' programs, and some doctoral programs, encompassing instruction in arts and sciences, education, social services, business, engineering, and the health professions in order to improve the quality of life, economy, health care, and environment in the greater St. Louis metropolitan area. SIUE serves the most populous region of downstate Illinois. The campus is located in the eastern part of the metropolitan St. Louis statistical area - home to more than 2.8 million people.

6.      Students may choose to live on campus in contemporary residence halls or apartments, or live off-campus. Approximately 2,600 undergraduate and graduate students live in campus housing, including 61.9% of new freshman.  The rest of the student population lives within a 60-mile radius of campus.

7.      Southern Illinois University is a multi-campus university comprising two institutions, Southern Illinois University Carbondale (SIUC), with a School of Medicine in Springfield, and Southern Illinois University Edwardsville (SIUE), with a School of Dental Medicine in Alton and a center in East St. Louis. A nine-member Board of Trustees, appointed by the Governor, governs Southern Illinois University and sets policy for the University in accordance with established missions and goals. The President of Southern Illinois University is chief executive officer, reporting to the Board of Trustees. The Chancellors of SIUE and SIUC report directly to the President and are responsible for the operation of their respective institutions.  Operations of SIUE are funded through a combination of state and federal appropriations, tuition and fees, and grants and contracts.

8.      SIUE receives federal funds from the Department. As a result, SIUE is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

Decl. of Jamie C. Ball                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

**SIUE's Existing Title IX Sexual Misconduct Policy**

9.      SIUE has adopted a Title IX General Policy Statement, Sexual Assault and Misconduct Policy, a Sexual Harassment Policy, Sexual Harassment Complaint Procedures, and a Student Conduct Code, that prohibit sexual harassment and sexual misconduct by students, employees, and faculty, and establish a grievance process for addressing complaints of sexual harassment.

10.      SIUE's Title IX functions are housed in the Office for Equal Opportunity, Access, and Title IX Coordination (EOA).  The full time office staff is comprised of one Director and one Office Manager.  The Director also serves as the Title IX Coordinator.  A small team of faculty and staff volunteers provide as-needed assistance with investigations and serve as hearing officers on appeals. In addition to Title IX work, the EOA office has responsibility for responding to all other types of civil rights complaints, is responsible for all employee accommodations pursuant to the Americans with Disabilities Act Amendments Act, and also develops and implements SIUE's Affirmative Action program.

11.      For academic year 2018-2019, SIUE received 24 reports of sexual violence, 4 reports of Domestic Violence, 6 reports of Dating Violence, and 11 reports of stalking.  Additionally, SIUE received 6 reports of Sexual Harassment. A report signifies notification to the EOA office of some allegation of harm under the applicable policy.  Where a complainant requests and/or agrees to an investigation and adjudication of the allegations, a formal complaint is initiated.  From these reports, one of the stalking cases and two of the sexual harassment cases proceeded to a formal complaint and investigation.  Because SIUE's current procedure contemplates adjudication by way of a single investigator model, no hearings were conducted during the 2018-2019 academic year.  For all other reports, the EOA office worked with the reporting party to identify supporting and mitigation strategies to assist with the impact of the reported harm.

Decl. of Jamie C. Ball                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

12.     SIUE has an extensive collaborative process for the revision of University-wide policies, and thus previous substantive revisions to the University's sexual assault and sexual harassment policies took up to a year to complete.

13.     Per University policy, "*Sexual Harassment in employment means any unwelcome sexual advances, requests for sexual favors, or any conduct of a sexual nature, when: Submissions to or toleration of such conduct is made, either explicitly or implicitly, a term or condition of an individual's employment (this is a type of quid pro quo - meaning "this for that" - sexual harassment); or Submission to or rejection of such conduct by an individual is used as a basis (or threatened to be used as a basis) for employment decisions or assessments affecting such individual (this is a type of quid pro quo - meaning "this for that" - sexual harassment); or Such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment (this is a type of hostile environment sexual harassment). Sexual Harassment in higher education means any unwelcome sexual advances, requests for sexual favors, or any conduct of a sexual nature, when: Submission to or toleration of such conduct is made, either explicitly or implicitly, a term or condition affecting the student's participation in or benefit from any of the academic, educational, extra-curricular, athletic, or other programs of the University (this is a type of quid pro quo - meaning "this for that" - sexual harassment ); or Such conduct has the purpose or effect of substantially interfering with a student's academic performance or creating an intimidating, hostile, or offensive academic environment (this is a type of hostile environment sexual harassment). Hostile environment sexual harassment occurs when unwelcome conduct of a sexual nature is so severe, persistent, or pervasive that it affects an employee's work performance, limits a student's ability to participate in or benefit from a University program or activity, or creates an intimidating, threatening or abusive working or academic environment. Sexual harassment*

Decl. of Jamie C. Ball                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

*generally includes something beyond the mere expression or display of views, words, symbols, images, or thoughts that some person finds offensive. Totality of the Circumstances: In determining whether alleged conduct constitutes sexual harassment, the record as a whole and the totality of the circumstances will be considered. Circumstances may include the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance or ability to participate in or benefit from the University's programs. The objective severity of the conduct will be judged from the perspective of a reasonable person in the position of the alleged victim and not on the intent of the person engaging in the conduct."*

14.     SIUE's Student Conduct Code currently defines its jurisdiction for off-campus incidents as extending to 1. events and meetings sponsored by the University or University-recognized student organizations; 2. meetings or events where students represent the University or University-recognized organizations; 3. practicum, internship, student field trip, student teaching, clinical settings, extension centers, independent study settings, and study abroad and travel abroad settings; and 4. other off campus conduct such that the student's conduct substantially interferes with the mission of the University including but not limited to, interference with the safety and well-being of self or others and/or interference with the academic pursuits of its students, faculty, or staff.

15.     Any member of the SIUE community may make a complaint under the Sexual Harassment Complaint Procedure.  A potential complainant is not required to make a complaint in writing, however, there are forms available for that purpose.  Complaints may also be made in person. Where an incident has occurred for which the victim(s)/survivors(s) are not able or willing to serve as a complainant, the Title IX Coordinator may initiate the complaint under limited circumstances. Identities of potential parties to a complaint are maintained as confidential; however, when a formal

Decl. of Jamie C. Ball                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

investigation is initiated, the respondent is notified of the identity of the person who is the alleged victim of the misconduct and provided sufficient information to put the respondent on notice of the circumstances which necessitated the investigation. When reporting of incidents is required, care is taken to remove identifying information and report data in aggregate form.

16.     SIUE's current procedure for adjudicating complaints of sexual harassment or misconduct allows the investigator(s) on the case to reach findings of facts and to determine whether a policy violation has occurred. Accordingly, live hearings are not conducted for the initial adjudication of a complaint involving sexual harassment or misconduct. While the parties to the investigation are afforded a meaningful opportunity to direct the inquiries that they believe are essential to the investigation, there is currently no cross-examination conducted as part of the initial decision making process. If a party requests an appeal, a hearing is conducted during which the parties are permitted an indirect form of cross examination which involves questions being moderated and asked by the hearing officer(s). During all phases of the investigation and adjudication process, including any appeal process, parties are allowed to have an advisor/support person of their own choosing available to assist them. However, these advisors/support persons do not speak or act on a party's behalf; their primary role is to ensure a party's well-being during the process.

17.     The process of conducting Title IX investigations has been made more complex by the COVID-19 pandemic. While video conferencing technology is helpful, the typical on-campus connections which allow for the organization and implementation of investigations is currently not available. These are the real-time conversations between members of the investigative team that would typically take place in order to advance the investigative process. Additionally, conducting interviews with parties and witnesses must be done by phone or video conferencing. This has necessitated adapting currently used software tools and the learning of new technologies. While this

Decl. of Jamie C. Ball                                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

is functional, it is not ideal as it takes considerably more effort to establish clear and complete communication which is essential for an effective investigation.

### The New Rule Creates an Undue Burden on SIUE to Reconcile State and Federal Law Requirements.

18.     In Illinois, the Preventing Sexual Violence in Higher Education Act ("PSVHEA") establishes requirements for all Illinois colleges and universities to address, investigate, and resolve complaints related to campus sexual violence, domestic violence, dating violence, and stalking. 110 ILCS 155/1 et seq.

19.     Illinois law mandates that all universities "shall adopt a comprehensive policy concerning sexual violence, domestic violence, dating violence, and stalking consistent with governing federal and State law." 110 ILCS 155/10. The policy must permit students to report an alleged violation of the comprehensive policy regardless of where the incident occurred. Id.

20.     While the new Rule does not prohibit addressing conduct that may have occurred off campus, the new Rule mandates the dismissal of such complaints for the purposes of sexual harassment under Title IX.  As a result, SIUE will be required to maintain more than one complaint process depending on the location of the alleged incident.

21.     PSVHEA requires schools to implement detailed complaint resolution procedures. SIUE will have to devote time and resources to attempting to reconcile the strictures of the Rule and State law requirements, assuming the procedures can even be reconciled.

### Burdens of Revising SIUE's Existing Sexual Misconduct Policies

22.     In order to be fully compliant with the new Title IX regulations, SIUE will need to review and revise its Student Code of Conduct, its Title IX General Policy Statement, its Sexual Assault and Misconduct Policy, and its Sexual Harassment Complaint procedures.

Decl. of Jamie C. Ball                                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

23.     The prescribed process as required by university policy for the revision of a University-wide policy such as Title IX related grievance procedures would first require the Director of EOA, as the Responsible Official, to present the suggested revisions to the University Policy Council.  The Policy Council is made up of representatives from each  Vice-Chancellor area, and the Office of General Counsel.  Upon receipt of a proposed policy and related information, the Chair of the Policy Council will call an official meeting of the Policy Council to conduct an overview of the proposed policy. The Policy Council shall have the authority to return the proposed policy at any time to the Responsible Official with additional written recommendations for changes, revisions, and/or corrections and the Responsible Official may resubmit the proposed policy to the Policy Council after each such return.  The Policy Council, upon completion of its review of the proposed policy and having addressed all issues raised in discussions with the Responsible Official, shall forward written findings and recommendations and the proposed policy to the Office of the Chancellor. Upon receipt of the Policy Council's findings and recommendations, the Chancellor's Office shall submit the final proposed policy along with all related recommendations (in addition to relevant background information) to the Chancellor's Council for review and consideration. The Chancellor's Council shall issue a recommendation to the Chancellor to approve, modify or reject the proposed policy. If the Chancellor's Council or the Policy Council determines that a University-related constituency group, committee, and/or task force should review a proposed policy, the Chair of the Policy Council shall refer the proposed policy to the appropriate vice chancellor or Responsible Official to effect such a review. Solicited constituency groups, which include students, committees, and/or task forces may review the proposed policy and submit recommendations to the vice chancellor or Responsible Official. The recommendations shall then be forwarded to the Chancellor's Council and/or the Policy Council for consideration.

Decl. of Jamie C. Ball                                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

24.     While SIUE's typical policy review and revision process does contemplate a means for implementing policies which are required by state and federal law, there are discretionary aspects of the new Title IX Regulations which necessitate critical decision making on the part of the SIUE community.  During the summer months, many of the employees who are key to that decision making process are unavailable, as they work on 9-month contracts.  Most of SIUE's students are away from campus and not fully connected to University activities during the summer months.  And due to the current COVID-19 pandemic, the University is not conducting any on-ground courses at this time, and thus no SIUE students are on campus to participate in the policy review process.  As a consequence, the implementation of any new policy by August 14th, 2020 will be undertaken without the necessary and required support and participation of the SIUE community.

25.     SIUE, like all colleges and universities, is in the midst of undertaking the enormous logistical efforts necessary to ensure the safety of its students and employees which are posed by the COVID-19 pandemic.  Accordingly, SIUE's resources are already stretched to an extraordinary degree and the teams of employees who would typically be available to assist with the steps necessary to undertake and implement an extensive change in policy and procedure are, by necessity, prioritizing the projects which will ensure that SIUE can continue to deliver its academic programs.

26.     In order to respond to "non-Title IX sexual harassment," i.e., harassment that it must dismiss under § 106.45(b)(3)(i) because it falls outside of the Rule's definition, that takes place outside the college/university's "education program or activity," or that takes place outside the United States, SIUE will have to address these incidents by way of its Sexual Harassment Policy and Student Conduct Code.  This will require a significant effort to re-educate the campus community about which types of conduct fall under which policy and procedure.

Decl. of Jamie C. Ball                                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

27.     In order to achieve this re-education, all related websites would need to be updated and additional informational and training resources will be required.  The estimated time associated with developing these resources would ordinarily be a matter of months, but as noted throughout, the staff and other resources that would typically be available to assist with such projects are necessarily triaging the impacts of the COVID-19 pandemic on SIUE's efforts to prepare for a fall 2020 semester. Costs for such additional resources are estimated to be in the tens of thousands of dollars.

28.     In order to comply with prohibition of the single investigator model; to conduct trainings; to conduct investigations; and to hold hearings, SIUE will need to hire or contract with additional staff.  While previously the University utilized volunteer faculty and staff members for some of these tasks that is no longer feasible with the new Title IX Rule's requirements.  The process for developing new positions, recruiting, hiring and training would generally take approximately ten weeks at a minimum.  This assumes a perfectly efficient and successful search, and presumes that a newly hired employee has immediate availability, which is not always the case.  Having new employees in place and prepared in advance of the August 14th, 2020 deadline will be an extraordinary challenge.  The costs associated with recruiting, hiring, training and compensations could easily run into the hundreds of thousands of dollars. This additional expense comes at a time when all SIUE functional arears are asked to identify ways in which they can reduce spending.

29.     SIUE has a program of annual training of students and employees which includes the disseminating of Title IX and sexual harassment policy.  For students, this training is typically available during the summer months, and for employees, this training is offered during the fall semester.  The curricula for these training activities have to be identified, designed, and developed well in advance of the actual training periods.  As the training materials for the upcoming academic year have already been developed, the process of updating them will require additional time and

Decl. of Jamie C. Ball                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

resources, which are both in short supply. Further, there is not sufficient time to even develop a new student training, as the summer 2020 student training is already being implemented.

30.     In order to comply with the new Rule, SIUE will have to provide extensive additional training to advisors and decision makers so that they will be adequately prepared to participate in the additional complexities of the hearing process. An appropriate training resource will likely cost in the tens of thousands of dollars. Given the unavailability of many key employees during the summer months, it will be unlikely that all necessary training can be completed in advance of the August 14th, 2020 deadline.

31.     SIUE will also have to reeducate the entire campus community about the new requirements. This will necessitate the development and dissemination of additional materials and the updating of training and orientation resources. The cost associated with this effort is estimated to be in the thousands of dollars.

32.     SIUE is greatly concerned about its ability to comply with the August 14, 2020 effective date. Even under ideal or normal circumstances, the implementation timeline would have been extremely challenging. Given the additional demands imposed on SIUE as required by COVID-19 pandemic planning, the August 14th 2020 effective date becomes a practical impossibility.

33.     The August 14, 2020, effective date will make it more difficult for SIUE to fulfill its obligations under Title IX to provide all students equal access to education; train all students/faculty/staff on their obligations under Title IX; and ensure that all students/faculty/staff are aware of their rights under Title IX.

### Difficulty Responding to Complaints Under New Requirements

34.     In order to allow for functional mandatory live hearings, additional investments in space and technology will be necessary, an expense which is likely to be in the tens of thousands of dollars. As campus crews are prioritizing the construction and modification projects necessitated by

Decl. of Jamie C. Ball                                   Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

COVID-19 safety guidelines, it is uncertain when resources would be available to assist with reconfiguring spaces, installing furniture and equipment, etc.

35.     Conducting live hearings for every formal complaint will also necessitate the identification and investment of administrative resources to support the logistics of these hearings.

36.     Because of the additional complexity of the hearing process required by the Rule, hearing officers will either need to be legal professionals with the skill necessary to manage cross examination and make evidentiary decisions, or SIUE will need to make a significant additional investment in the training of the faculty and staff volunteers who have historically assisted with the hearing function on appeals.

37.     Significant additional costs will be associated with hiring outside professionals to serve as advisors and/or hearing officers.  It is anticipated that persons who are qualified to serve in these roles would have rates in the hundreds of dollars per hour.

38.     Live, mandatory cross-examination of the complainants and respondents by advisors will be inherently adversarial and stressful.  While hearing officers will be tasked with limiting questioning to relevant topics, it will be impossible to "unring the bell" and undo the impact of an improper or abusive question, even if a party is not required to answer it.  Additionally, the cross-examination requirement will likely deter many potential complainants from ever reporting; if they perceive that they are required to participate in a process involving cross-examination, they will forego that process all together and remain silent.

39.     The requirement that SIUE provide an advisor to a student for the purposes of conducting cross-examination introduces an additional risk of liability.  A student who is assigned such an advisor may assert that the advisor was ineffective and thus negatively affected the outcome

Decl. of Jamie C. Ball                                      Civil Action No. 20-cv-01468-CJN

EXHIBIT 39

of the hearing process.  As SIUE is effectively required to assume responsibility for the advisors it assigns to students, this will create an additional new litigation risk for SIUE.

**The Rule Will Make It Harder to Identify, Remedy, and Eliminate Sexual Harassment**

40.     The impact of heightening the definition of sexual harassment, narrowing the scope of "program or activity," forcing SIUE to dismiss complaints that fall outside of either definition and proceed under a separate code provision will likely be considerable confusion as the SIUE community attempts to rapidly adjust to the changes.  In situations where a process is not clear and functional, potential complainants are deterred from participating in that process, and where the process is initiated, parties will have less confidence in its effectiveness.

41.     While it is impossible to know exactly how many incidents of sexual assault and sexual harassment already go unreported, it is my observation and understanding that many people who are affected by sexual assault and harassment do not report what has happened to them.  This is for a variety of personal and systemic reasons.  It is my opinion that the changes to the investigation and adjudication process required by the new Title IX Rule will compound these reasons and further deter reporting.  When incidents are not reported, the institution has no meaningful opportunity to respond.  As a consequence, the community becomes less safe because there will fewer meaningful opportunities to identify the perpetrators of sexual misconduct.  Research suggests that persons who commit an act of sexual misconduct have done so more than once. (Zinzow, H. M., Thompson, M. (2015). *A longitudinal study of risk factors for repeated sexual coercion and assault in U.S. college men. Archives of Sexual Behavior, 44, 213-222.*)  If incidents go unreported, this creates the risk that serial offenders will go unidentified and allowed to cause more harm in the community.  Moreover, because of fears and confusion associated with the new Title IX Rule, students who would benefit from supportive measures may not come forward to seek them.  This will result in considerable harms

relating to student well-being, first and foremost, but also student persistence and retention, which in turn becomes an institutional harm.

42.     Because of the timing and the procedural confusion that will result from the Rule in its current form, the Rule will ultimately make it more difficult for SIUE to fulfill its obligations under Title IX to provide all students equal access to education and to provide a safe campus environment for all students, and to prevent and remedy sexual harassment, and to provide a fair and equitable process for all students.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __19th__ day of __June__, 2020

_____
Jamie C. Ball
Director for Equal Opportunity, Access & Title IX Coordination
Southern Illinois University Edwardsville

Decl. of Jamie C. Ball                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 39

# EXHIBIT 40

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COMMONWEALTH OF PENNSYLVANIA,
STATE OF NEW JERSEY, STATE OF CALIFORNIA,
STATE OF COLORADO, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF ILLINOIS,
COMMONWEALTH OF MASSACHUSETTS, STATE
OF MICHIGAN, STATE OF MINNESOTA, STATE OF
NEW MEXICO, STATE OF NORTH CAROLINA,
STATE OF OREGON, STATE OF RHODE ISLAND,
STATE OF VERMONT, COMMONWEALTH OF
VIRGINIA, STATE OF WASHINGTON, STATE OF
WISCONSIN,

**CIVIL ACTION No. 20-cv-01468**

Plaintiffs,

v.

ELISABETH D. DEVOS, *in her official capacity as
Secretary of Education*; UNITED STATES
DEPARTMENT OF EDUCATION, and UNITED
STATES OF AMERICA,

Defendants.

## DECLARATION OF NADINE BURKE HARRIS

I, Nadine Burke Harris, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true

and correct:

      1.      I am the Surgeon General of California.  I was appointed to this position by

Governor Gavin Newsom on January 21, 2019.  As Surgeon General, I work to address healthcare

from a preventive rather than reactive frame to support the health of all Californians.

      2.      I submit this Declaration in support of the State of California's litigation against

Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States

Department of Education ("ED" or the "Department"), and the United States of America regarding

the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule").   This declaration is based on my personal knowledge, my familiarity with Title IX of the Education Amendments of 1972, my review of Notice of Proposed Rulemaking, Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462 (Nov. 29, 2018), and the Title IX Rule, and the knowledge and expertise I have acquired in the course of my career as a physician, public health and policy educator, and researcher on the effects of Adverse Childhood Experiences on health outcomes.  If called and sworn as a witness, I could and would testify competently to the information in this declaration.

3.      I am a pediatrician by training.  I received my bachelor's degree in integrative biology from the University of California, Berkeley, and my medical degree from the University of California, Davis.  After receiving a master's degree in public health from the Harvard School of Public Health, I completed my residency in pediatrics at Stanford University.  I am licensed to practice medicine in the State of California.

4.      Prior to my appointment as California Surgeon General, I was founder and CEO of the Center for Youth Wellness (CYW), a national leader in the effort to advance pediatric medicine, raise public awareness, and transform the way society responds to children exposed to adverse childhood experiences (ACEs) and toxic stress.  I founded and led the Bay Area Research Consortium on Toxic Stress and Health, a partnership between CYW and UCSF Benioff Children's Hospitals, to advance scientific screening, biomedical measurement, and treatment of toxic stress.

5.      Both my experience as a pediatrician and as a researcher in pediatric medicine have demonstrated that highly stressful experiences such as sexual harassment or sexual violence have a likelihood of causing serious mental and physical harm to children and adolescents, including young people in high school and college, disrupting developing brain architecture and affecting short- and

long-term health.  Because early childhood and adolescence – which extends into college-aged years -- are particularly sensitive periods of development, both positive and negative experiences have a more pronounced ability to influence biological systems.  Prolonged exposure to serious and negative stress leads to long-term changes to development of neurologic, hormonal, immune, and generic regulatory systems—a biological condition now known as the toxic stress response—which has been demonstrated to have significant lifetime consequences for children and adolescents.

6.      Studies (including my own research) have shown that intense, severe, or prolonged stress experienced in childhood, including the type caused by sexual harassment or assault, disrupts the brain and other organ systems, and increases the risk of stress-related disease and cognitive impairment well into the adult years.[1]  Research into childhood adversity has shown that trauma suffered while young (called Adverse Childhood Experiences or ACEs) have a dose-response relationship with serious and lasting consequences not only for short-term health, learning, and development, but also for later health outcomes.[2]  The higher the cumulative dose of adversity, the greater the risk to health and wellbeing over the lifetime.  Researchers have made robust connections between suffering ACEs and experiencing increased morbidity and mortality as an adult, including increased risk for 9 out of 10 of the leading causes of death in the United States.[3]

---

[1] *See, e.g.,* Monica Bucci et al., *Toxic Stress in Children and Adolescents*, 63 Advances in Pediatrics 403 (Aug. 2016), https://www.sciencedirect.com/science/article/abs/pii/S0065310116300020; American Association of. Pediatrics Committee on Psychosocial Aspects of Child and Family Health, *Early Childhood Adversity, Toxic Stress, and the Role of the Pediatrician: Translating Developmental Science into Lifelong Health* (Dec. 2011), http://pediatrics.aappublications.org/content/early/2011/12/21/peds.2011-2662; Child Welfare Information Gateway, U.S. Dep't of Health & Human Servs, *Understanding the effects of maltreatment on brain development* (April 2015), https://www.childwelfare.gov/pubPDFs/brain_development.pdf.

[2] *Id.*; *see also* Pamela Cantor, et al., *Malleability, plasticity, and individuality: How children learn and develop in context*, 23 Applied Developmental Science 307 (Jan. 2018), https://www.tandfonline.com/doi/pdf/10.1080/10888691.2017.1398649?needAccess=true; Vincent J. Felitti et al., *Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults. The Adverse Childhood Experiences (ACE) Study*, 14 Am. J. Preventive Med. 245 (May 1998), https://www.ncbi.nlm.nih.gov/pubmed/9635069.

[3] Karen Hughes, et al., *The effect of multiple adverse childhood experiences on health: A systematic review and meta-analysis*, National Vital Statistics System, National Center for Health Statistics, Center for Disease Control and Prevention (Aug. 2017), https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(17)30118-4/fulltext; Melissa

Decl. of Nadine Burke Harris                              Civil Action No. 20-cv-01468
EXHIBIT 40

Children and adolescents who have suffered ACEs such as emotional, physical, and sexual abuse are also more likely to suffer from mental health problems, acute and chronic medical conditions, and poor social development.[4]  Research further demonstrates that trauma experienced in childhood has intergenerational downstream effects, including effects on DNA regulation, harming the children of those who have suffered ACEs.[5]

7.      Having reviewed the Title IX Rule, I have serious concerns regarding the likelihood that its provisions will lead to increased trauma and toxic stress among students who experience sexual harassment or sexual violence.  As a result, the State of California is likely to incur increased expenditures to provide healthcare to such students.

8.      The Title IX Rule requires students who have experienced sexual harassment to show that the conduct they have suffered is "severe, pervasive, and objectively offensive" and effectively denies them equal access to education before a Title IX complaint investigation may be initiated.  The heightened level of harassment required as the predicate for initiation of a Title IX investigation that may culminate in relief for the victim and sanctions for the respondent essentially requires the victim to undergo prolonged and severe toxic stress.  Even temporary exposure to toxic stress can result in increased levels of physical and mental illness, including asthma, infection, obesity, anxiety, depression, and possible suicidal ideation, in the short term, and negative health

---

T. Merrick, et al., *Vital Signs: Estimated Proportion of Adult Health Problems Attributable to Adverse Childhood Experiences and Implications for Prevention—25 States, 2015-2017* Center for Disease Control and Prevention, Morbidity and Mortality Weekly Report 999 (Nov. 2019) https://www.cdc.gov/mmwr/volumes/68/wr/mm6844e1.htm; Center for Youth Wellness, *Data Report: A Hidden Crisis. Findings on Adverse Childhood Experiences in California* (2014).

[4] Bonnie D. Kerker et al., *Adverse Childhood Experiences and Mental Health, Chronic Medical Conditions, and Development in Young Children*, 15 Academic Pediatrics 510 (Sept.-Oct. 2015), https://www.academicpedsjnl.net/article/S1876-2859(15)00173-4/abstract; Bucci et al., *supra* note 1 at 406; Deborah Lee Oh et al., *Systematic Review of Pediatric Health Outcomes Associated with Childhood Adversity*, 18 BMC Pediatrics 1 (Feb. 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5824569/.

[5] Félice Lê-Scherban et al., *Intergenerational Associations of Parent Adverse Childhood Experiences and Child Health Outcomes*, 141 Pediatrics 141 (June 2018), http://pediatrics.aappublications.org/content/141/6/e20174274.long; Jennifer E. DeVoe, et al., Nat'l Academies of Sciences, Engineering and Medicine, *Vibrant and Healthy Kids: Aligning Science, Practice, and Policy to Advance Health Equity* (2019), https://www.nap.edu/read/25466/chapter/1.

Decl. of Nadine Burke Harris                                    Civil Action No. 20-cv-01468
EXHIBIT 40

outcomes in the long term such as cardiovascular disease, cancer, and chronic lung disease.[6]  These poor outcomes are more likely when there is prolonged exposure to severe toxic stress and may occur even before the harassment experienced by the victim rises to the heightened level under the Title IX Rule.

9.      The Title IX Rule also strictly circumscribes the educational institution personnel at post-secondary institutions who may accept such a formal complaint for investigation from a student and prohibits all students from filing a formal complaint after leaving any school, even if the departure is because of the sexual harassment and assault.  These unnecessary barriers to relief limit the ability of students to get the help they need and the ability of institutions to address and prevent future harassment.

10.      My own research has been confirmed by the findings of the National Academies of Sciences, Engineering, and Medicine, which elucidated the consensus of scientific evidence in its recent report, *Vibrant and Healthy Kids: Aligning Practice and Policy to Advance Health Equity*, demonstrating that early intervention is vital in alleviating the negative effects of toxic stress on mental and physical health outcomes.[7]  When trauma is neglected and allowed to persist and become more severe, the level of medical intervention required to treat the damage caused by the trauma increases, thereby increasing costs of treatment.  More delayed intervention also has a lower success rate in mitigating or preventing the negative health effects of toxic stress.  This also results in increased short and long-term health care costs.  Some of these costs will be borne by the State, through Medi-Cal or other state-funded programs such as those funded through California's Department of Mental Health.

11.      Medi-Cal is California's Medicaid program – a public health insurance program that provides health care services for low-income individuals including families with children, seniors, persons with disabilities, foster care, and pregnant women.  13.2 million Californians, over a quarter

---

[6] *Id.*
[7] DeVoe, et al., *supra* note 5 at 29-76, 105-107, 115, 473-544.

Decl. of Nadine Burke Harris                                      Civil Action No. 20-cv-01468

EXHIBIT 40

of California's non-elderly residents, are enrolled in the Medi-Cal program. Medi-Cal is a source of healthcare coverage for 40% of children in California.

12.    Starting January 1, 2020, the Medi-Cal program pays for Medi-Cal clinicians' use of an ACEs screening protocol called PEARLS (Pediatric ACEs and Related Life Events Screener). The PEARLS questionnaire includes questions on sexual abuse, including unwanted touching.[8] This tool is intended to allow clinicians to discover, recognize, and treat ACEs and toxic stress earlier.

13.    Implementing and utilizing PEARLS will require the State of California to expend Medi-Cal funds to help detect and treat ACEs and toxic stress.  The investment the State makes in early treatment, including detecting sexual harassment and assault, is expected to result in better physical, mental, and emotional health overall and lower costs of care in the long term.

14.    By contrast, the Title IX Rule's provisions are likely to increase the negative health effects of sexual harassment and assault on residents in the State.  The likely result is both an increase of overall health care expenditures by the State, including higher than anticipated Medi-Cal reimbursements, and a reallocation of existing resources to meet the increased need of individuals experiencing the negative health outcomes resulting from toxic stress.  These are significant and serious harms for the State and its residents.

15.    I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge.


Executed on June 8, 2020 at San Francisco, California.

_____
Nadine Burke Harris, MD, MPH
Surgeon General of California

---

[8] Kadiatou Koita et al., *Development and implementation of a pediatric adverse childhood experiences (ACEs) and other determinants of health questionnaire in the pediatric medical home: A pilot study*, 13 PLOS ONE 12 (Dec. 12, 2018), https://doi.org/10.1371/journal.pone.0208088.

Decl. of Nadine Burke Harris                                        Civil Action No. 20-cv-01468
EXHIBIT 40

# EXHIBIT 41

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | **Civil Action No. 20-cv-01468-CJN** |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF ANGELA CATENA

I, Angela Catena, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Title IX Coordinator at the University of New Mexico ("UNM") located in Albuquerque, New Mexico. My educational background includes an MA in Community Counseling and a PhD in Counselor Education. Additionally, I have 11 years of experience working with those impacted by sexual violence. I have been employed as the UNM Title IX Coordinator since December 2018. I have also worked as a Training and Development Specialist with an emphasis on prevention

work and program evaluation, a Program Specialist developing a Gendered Violence Prevention Program for a large state university, as well as a faculty member prior to accepting my current role.

2.      I submit this Declaration in support of the State of New Mexico's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below, through personal knowledge, numerous webinars and conferences focused solely on the proposed regulation changes, as well as personal extensive research, given that the University will be required to make substantial changes after successfully completing a three-year agreement with the Department of Justice ("DOJ") with respect to Title IX.  I have also familiarized myself with the New Rule in order to understand its immediate impact on UNM.

3.      UNM was founded in 1889, N.M.S.A. 1978, § 21-7-1, and is New Mexico's largest University, with a total enrollment of 22,792 students statewide in 2019, including enrollment at its four branch campuses. UNM's branch campuses are located throughout the state, in Taos, Gallup, Valencia, and Los Alamos. UNM's main campus also includes its School of Law, School of Medicine, and Health Sciences Center.

4.      As of 2019, UNM employs nearly 10,000 people, of which 3,192 are regular or temporary faculty.

5.      The UNM Office of Equal opportunity (OEO) is the independent, impartial, and neutral campus entity designated to ensure compliance with all University policies that apply to civil

rights, including allegations of civil rights violations. OEO investigates, tracks, and resolves all Title IX and other discrimination complaints on behalf of and against its faculty, staff and students across its campuses in New Mexico and in its international programs, including both those directly administered by UNM and those administered in cooperation with entities in other countries.

6.      In 2016, UNM entered into a three-year agreement with the DOJ in an effort to improve its handling of Title IX cases. UNM successfully ended its agreement with the DOJ in December of 2019. The University submitted a final report to the DOJ in October 2019 documenting its extensive revisions and improvements in Title IX training, investigation and reporting obligations to comply with the Title IX regulations now updated and issued by the ED.

7.      In order to comply with DOJ's mandates for Title IX, UNM revised its policies to comply with the Title IX guidance applicable at the time. It also revised its Discrimination Claims Procedure (DCP), which guides the investigative procedure for Title IX reports.  UNM spent three years training campus faculty, staff and students on the policy revisions, submitted 13 formal status reports, and provided more than 10,000 pages of data and information to the DOJ between October 2016 and October 2019.  Under the Agreement, UNM presented in-person sexual misconduct awareness training for 36,900 students in 711 separate mandatory training sessions, including in-person interactive training (entitled The Grey Area) on sexual harassment for all incoming students during its New Student Orientation program.  The training focused on the applicable Title IX guidance and the DCP. The Grey Area consists of two segments: one in a large group and one in a smaller, more interactive setting, and lasts between 1.5 and two hours.  The training for students included undergraduate and graduate students at all of the University's campuses, including its School of Medicine and branch campuses. The University required all of its employees to participate in annual mandatory training sessions on effective responses to sexual misconduct reports and achieved 98%

compliance for staff. Between 2016 and 2019, the University trained 21,473 unique individual employees on the applicable Title IX guidance.

8.   UNM offers both on and off-campus housing, and beginning in the fall 2019 semester, all incoming freshmen are required to live on campus.  More than 90% of students live off-campus after their freshman year.

9.   All UNM codes of conduct contain provisions against sexual misconduct and provide remedies.  University Administrative Policy (UAP) 2740 is the University's Sexual Misconduct policy and is applicable to allegations of sexual misconduct made by or against a student, staff, or faculty member that occur within the course of a UNM program or activity or have continuing adverse effects on campus, regardless of where the alleged activity occurred.  If off-campus sexual misconduct occurs within the course of a UNM program or activity or has continuing adverse effects that create a hostile environment on campus or within a UNM program or activity, the University may take interim measures and, depending on the circumstances, will investigate the conduct. *Id.*, Subsection.

10.   Both its Student Code of Conduct[1] and Visitor Code of Conduct,[2] which apply to the Albuquerque campus and all branch campuses, prohibit any form of sexual misconduct. Similarly, its Regents' Policy 2.3 ("Equal Opportunity, Affirmative Action, Anti-Harassment, and Anti-Retaliation")[3] prohibits all forms of sexual harassment, including sexual misconduct. If, after an investigation pursuant to this section, a finding is made that a staff member violated this policy, disciplinary action may be issued pursuant to UAP 3215 ("Performance Improvement") for staff.[4]

---

[1] Student Code of Conduct - http://pathfinder.unm.edu/campus-policies/student-code-of-conduct.html
[2] Visitor Code of Conduct - http://pathfinder.unm.edu/campus-policies/visitor-code-of-conduct.html
[3] Regents' Policy 2.3 – http://policy.unm.edu/regents-policies/section-2/2-3.html
[4] UAP 3215 - http://policy.unm.edu/university-policies/3000/3215.html

Decl. of Angela Catena                                        Case No. 20-cv-01468-CJN
EXHIBIT 41

11.     Further, all forms of sexual harassment, including sexual misconduct, are considered violations of the <u>Faculty Handbook Policy C09 ("Respectful Campus")</u>.[5] If, after an investigation pursuant to this section, a finding is made that a faculty member committed any form of sexual harassment, including sexual misconduct, disciplinary action may be issued pursuant to <u>Faculty Handbook Policy C07 ("Faculty Disciplinary Policy")</u>.[6]

12.     Finally, all forms of sexual harassment, including sexual misconduct, are considered violations of the student handbook known as the Pathfinder.

13.     In 2013, UNM created the Sexual Misconduct and Assault Response Team (SMART) a victim-centered, victim-controlled, coordinated response team composed of community and University members designed to quickly respond to cases of sexual misconduct. The SMART team includes advocates and UNM police officers who have been trained under prior Title IX guidance and best practice and consistent with the Violence Against Women Act (VAWA) Amendments to the Jeanne Clery Act.

14.     UNM established the LoboRESPECT Advocacy Center in 2015 to support students who have experienced sexual misconduct. The LoboRESPECT Advocacy Center was also created as the designated center to lead sexual misconduct prevention training to all incoming students. LoboRESPECT also provides trainings to the athletics department on a regular basis and offers customizable trainings in addition to their already established workshops, ranging from boundary setting to healthy relationships and bystander intervention.

15.     In addition to the LoboRESPECT Advocacy Center, UNM has identified additional confidential reporting locations and/or persons. Currently, UNM has designated the Women's

---

[5] Faculty Handbook Policy C09 - <u>https://handbook.unm.edu/c09/</u>
[6] Faculty Handbook Policy C07 - <u>https://handbook.unm.edu/c07/</u>

Decl. of Angela Catena                                              Case No. 20-cv-01468-CJN
EXHIBIT 41

Resource Center, LGBTQ Resource Center, newly opened Vassar House, and the Director of the Learning Environment Office as confidential reporting locations. Furthermore, UNM has identified multiple Respondent Support Persons (RSPs), who are not confidential, to assist student Respondents in navigating the University's administrative processes. These designations were informed by national best practices to ensure parties are provided with the support and information needed to mitigate adverse impact and assist in navigating the University structures for continued support.

16.     Respondent Support Persons and Confidential Reporters undergo an extensive amount of training prior to finalizing their respective designation. Their training involves a thorough understanding of Title IX, the OEO process, UNM's appeal processes, sanctioning, interim measures, and the rights and responsibilities of the parties. Given the already extensive knowledge requirements, the training timelines are broken up over a period of weeks or months. The New Rule requires the University to retrain the already identified support persons, addressing substantial changes to Title IX jurisdiction and process in an extremely limited time frame. Additionally, it is uncertain what role(s) these support persons would play in a hearing. These individuals do not have legal backgrounds and would not be equipped to cross-examine parties. Their role would change dramatically to meet the demands of the New Rule, with no additional financial or educational support to    meet the new requirements.

17.     UNM was awarded a three-year, $300,000 Campus Grant by the Office of Violence Against Women in 2018. This grant focuses on VAWA-related offenses and is in conflict with specific areas of the New Rule. With contradicting or unclear guidance, the University finds itself at odds with appropriate implementation of services and training efforts to continue combatting sexual misconduct and uphold the spirit of Title IX. Specifically the changes made to the Title IX regulations contradicts VAWA's mission of supporting those impacted by sexual misconduct. Title IX's

definitions now more closely align with VAWA, however, the new rule significantly reduces an institution's ability to stop, remedy, and prevent sexual harassment. Allowing universities the opportunity to address sexual misconduct concerns that fall outside of Title IX's jurisdiction creates inconsistent approaches across the country and weakens Title IX as the federal guiding regulations to addressing sexual  harassment in post-secondary institutions.

18.     UNM administration receives funds directly from the state budget but also received federal funds, grants and loans. The New Mexico Higher Education Department (HED), established under the executive office of the Governor, aids in flow-through of grant funds, but does not directly regulate UNM.

19.     The University of New Mexico receives federal funds from the Department. As a result, UNM is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

20.     The UNM Office of Equal Opportunity (OEO) is comprised of the OEO Director, Associate Director, Title IX Coordinator, two Compliance Managers, 4 EEO Compliance Specialists (investigators), one Data Manager, one Administrative Assistant, and one Student Employee. OEO addresses concerns related to civil rights violations, with Title IX accounting for approximately half of the total reports received annually.

21.     OEO is responsible for reviewing and addressing reports alleging discrimination and/or harassment based upon a protected status.

22.     The OEO administrative assistant is responsible for maintaining the office's day-to-day functioning, greets guests who enter the office, provides referrals, manages the main email account, manages office travel, and oversees the student employee. The student employee supports

the administrative assistant in the office's day-to-day operations. They may also assist OEO staff in projects based upon need and/or their interest.

23.     The OEO data manager retrieves online reports and inputs them into OEO's database. They also provide technological support to the OEO staff and oversee building maintenance and repairs. The data manager produces OEO's data reports and manages the reporting database.

24.     OEO compliance specialists' primary function is to investigate allegations of civil rights harassment and discrimination. They are also responsible for providing civil rights-related trainings to the University and greater community.

25.     OEO compliance managers work directly with compliance specialists and oversee their caseload performance. Compliance managers investigate higher level and more complex cases and are also required to provide trainings to the campus and greater community.

26.     The Title IX Coordinator oversees the institution's compliance with Title IX, facilitates campus climate surveys, provides Title IX trainings to the University and greater community, and provides guidance to UNM's leadership.

27.     The OEO Associate Director oversees the Compliance Managers, Administrative Assistant, Data Manager, and Student Employee. They also support the Director in overall functioning of OEO and may also investigate cases involving high-level staff and faculty, assist in ADA accommodations, and provide trainings to the campus and community.

28.     The OEO Director oversees OEO's functions and operations. The Director is also the University's ADA Coordinator and Interim Chief Compliance Officer. The Director  provides trainings, oversees the University's affirmative action plan, engages in strategic planning, and reports directly to the President of the University.

29.     Since UNM began a concerted education campaign, the number of harassment and discrimination reports to the University has risen. National best practice suggests that a rise in complaints indicates that people understand policy and trust the resolution process.



30.     A report is defined as a complaint reported to OEO. A case is a report that OEO accepts jurisdiction over, with respect to civil rights. A formal investigation involves a fact finding process and determination of policy violations. An informal resolution is an approach to address lower level allegations in a non-punitive manner. A monitoring period of ninety (90) days is enacted at the conclusion of an informal resolution to ensure the conduct does not recur.

31.     For every report OEO receives, outreach is sent to the affected party with a list of available campus resources. For cases determined to be non-jurisdictional to OEO, the matter may be referred to the appropriate campus entity to take action to remedy the concern. Resources are also sent to the Respondent.

32.     University Administrative Policy ("UAP") 2740: Sexual Misconduct and UAP 2720: Prohibited Discrimination and Equal Opportunity were last revised on February 26, 2020.

33.     As outlined in UAP 2740, sexual harassment is defined as "unwelcome conduct of a sexual nature. Sexual harassment covered by this policy generally falls into one of two categories: quid pro quo and hostile environment. Conduct of a sexual nature becomes a violation of this policy when:

- submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or academic advancement (**quid pro quo**);

- submission to or rejection of such conduct by an individual is used as the basis for employment decisions or academic decisions affecting such individual (**quid pro quo**); or

- unwanted conduct of a sexual nature is sufficiently serious (i.e., severe, pervasive, or persistent) and objectively offensive as to deny or limit a person's ability to participate in or benefit from the University's programs, services, opportunities, or activities; or when such conduct has the purpose or effect of unreasonably interfering with an individual's employment (**hostile environment**).

"Mere offensiveness is not enough to create a hostile environment. Although repeated incidents increase the likelihood that harassment has created a hostile environment, a serious incident such as a sexual assault, even if isolated, can be sufficient.

"In determining whether harassment has created a hostile environment, consideration will be made not only as to whether the conduct was unwelcome to the person who feels harassed, but also whether a reasonable person in a similar situation would have perceived the conduct as objectively offensive. Also, the following factors will be considered:

Decl. of Angela Catena                                                    Case No. 20-cv-01468-CJN

EXHIBIT 41

- The degree to which the conduct affected one or more student's education or individual's employment.

- The nature, scope, frequency, duration, and location of incident or incidents.

- The identity, number, and relationships of persons involved.

- The nature of higher education, such as inherent power differentials.

"While sexual harassment often takes place under circumstances where a power differential between the persons involved exists, this policy recognizes that sexual harassment also may occur between persons of the same University status: student-student, faculty-faculty, and staff-staff, or between peers. Additionally, the prohibition against sexual harassment applies regardless of the genders of the parties. Sometimes harassers target a person who has authority over them.  Harassers can also be persons who are not members of the University community, such as contractors or visitors. Regardless of the source, the University does not tolerate this kind of behavior and the University is committed to maintaining an environment free from sexual harassment."

34.    The University reviews complaints involving harassment that take place both on and off campus. If the Respondent is affiliated with UNM, OEO will take steps necessary to address the conduct. If the Complainant is affiliated with UNM but the Respondent is not, OEO will provide the Complainant with resources and interim measures to ensure they are able to continue their job and/or education. If the Respondent is employed with an outside entity, OEO may work with the employer to address the conduct concerns.  In all circumstances, OEO sends resources to the affected party, irrespective of jurisdiction.

35.    OEO receives complaints through a variety of avenues. An individual  may submit a report electronically through the EthicsPoint or Advocate system, contact OEO by email, phone, or

in-person as a walk-in. Additionally, the UNM Police Department shares all restraining orders, police reports, and incident reports with the OEO Director, Associate Director, and Title IX Coordinator. Individuals may also file a report by contacting one of the OEO staff directly with their concerns. All UNM employees, with the exception of designated confidential reporters, are responsible employees per UAP 2740.

36.     UNM's Office of University Counsel (OUC) is currently drafting a process to begin conducting live hearings related to Title IX and other cases.

37.     UNM utilizes a preponderance of the evidence standard for all of its investigations, consistent with civil rights law and with all other disciplinary processes within the University.

38.     Conducting Title IX investigations while working remotely assumes parties have access to a computer, the internet, and that they are safe where they are sheltering in place, which may not be the case. The greatest challenge we face during the COVID-19 pandemic is around the concern for safety. For those who are sheltering in place with their abuser, the ability to address their circumstances is limited and may be impossible.

39.     The faculty on UNM's main campus has recently voted to unionize. However, faculty at UNM's Health Sciences Center, Law School, and branch campuses are not unionized. How unionized faculty discipline will be addressed will be determined by CBAs that are not yet in place. In addition, faculty who did not unionize may be disciplined in a manner that differs from their union counterparts. These new circumstances will further complicate a complete overhaul of gender discrimination policies.

40.     If UNM is required to change existing policies to comply with new Title IX regulations, it will require changes to UAP 2720 (discrimination) and UAP 2740 (sexual misconduct. As a public University, UNM utilizes a collaborative process for input on policy changes from campus

constituencies, including subject matter experts. Once a policy is in draft form, the entire campus community is given an opportunity to review and comment on the policy for 30 days. The policy office will consider the comments and finalize a draft that must be approved in writing by the UNM President.

41.     Once policy is changed, the policy changes must then be reflected in disciplinary policies for faculty, staff and students, which requires differing processes for each body.

42.     The processes are time consuming, and often, inconsistent polices result due to hindrances at the various faculty, staff and student levels. Inconsistent policies and procedures make investigative processes confusing and are part of the reason for the DOJ review of UNM in 2015. Policy changes by fall 2020 would be virtually impossible, especially with most of the campus working virtually due to COVID-19.

43.     Once discrimination policies are changed, faculty policies must be changed and require faculty action and approval. Staff discipline policies must be changed and require staff involvement. Student polices must change and require student body input and student governance approval.

44.     COVID-19 poses additional challenges to implementing new policies. Stakeholders are not on campus and it is not clear when they will return and in what fashion, especially prior to the fall 2020 semester.

45.     UNM has several campus partners involved with addressing Title IX complaints. These include campus housing, University Police Department, Clery Act Coordinator,  Dean of Students, Human Resources, Office of the Provost, Faculty Senate, Staff Council, Respondent Support Persons and Confidential Advocates, Office of University Counsel, Office of Violence Against Women Campus Grant members, and OEO staff. Additionally, the Office of the President

and the Board of Regents are included in the appellate line for investigative determinations. All of these partners will require new training before implementing such drastic policy changes. When UNM was under the DOJ agreement, it took several years to change policies, train the required parties and constituents, train the campus community, make changes to websites and attendant documents, and whole scale changes to training. It would be impossible to train all of the required individuals by fall 2020.

46.     UNM spent approximately 1.2 million dollars implementing changes required by the DOJ during the 3-year agreement period, a sum that UNM lacks currently, especially in light of COVID-19.

47.     All websites, training materials (live and online), syllabi, and other materials will need to be changed if Title IX regulations go into effect as issued on May 6, 2020. The OEO DCP and all attending documents, waivers, release forms, Title IX training guides, reporting requirements and website information will require updates. The current materials are consistent with the VAWA amendments to Clery and will be inconsistent with grant requirements if the regulations are changed as issued on May 6, 2020.

48.     UNM has an annual online training that is required for faculty and staff, including TAs/GAs and all other student employees. The training was purchased from EVER-FI and is consistent with prior Title IX guidance. UNM will be required to purchase a new online training system. The original cost of the training system was $55,000 for the first year and an additional $75,000 for each subsequent year of our three-year contract, totaling $205,000.  If the training system must be modified to address the New Rule, this will require substantial time and money.

The University will have to retrain the entire campus community. All incoming students receive live training and this training will need to be reworked and reformatted to match the new Title IX

regulations. This cannot happen prior to fall2020 due to COVID-19 and the abrupt changes to remote working and learning environments. Additionally, fall 2020 semester status remains unknown given the uncertainties of the  COVID-19 trajectory and its implications on higher education. It is worth mentioning UNM has had an average employee training rate of 92.6% since 2016. Having already trained a significant percentage of employees on one guidance will no doubt be a challenge to retrain with vastly different guidance in a three-month period. Additionally, as of 2018, 6,384 undergraduates and 2,973 graduate students received in-person Grey Area training with online follow-up training for each following year. Recreating, producing, distributing, and training the entire UNM campus on a vastly different process in less than three months is not only unrealistic, but it also sets larger institutions with less resources up to fail.

49.     In addition to reeducating the UNM campus, including its branch campuses, law school, and school of medicine, the necessity of constant messaging will be required to clarify changes that have been decided upon over six years ago and have been enforced and reinforced over the years. Additionally, consistency in messaging is vital to ensuring clarification and reinforcement of the regulation changes is communicated effectively to the entire UNM campus community. Overseeing consistent messaging on such a great scale would require countless hours of reviewing, tracking, and updating information in real time. This also runs the risk of misunderstanding and miscommunication of the new requirements.

50.     UNM is currently drafting a policy that provides for a live hearing process. It is unclear how UNM will be able to afford the cost of live hearings based on the high numbers of reports received in the last 5 years.

Decl. of Angela Catena                                                      Case No. 20-cv-01468-CJN
EXHIBIT 41

UNM has held three Title IX-related evidentiary hearings in the last year or so: one regarded a staff member, one a faculty member, and one regarded a student. Each case was substantially different, and in total, required a private hearing officer and a transcriber.

51.     The hearing involving the staff member was a Constitutionally-required post-deprivation hearing regarding a termination for a violation of UNM's Title IX policy that proceeded pursuant to University Administrative Policy 3215 and our existing Peer Hearing Procedure with little to no variation therefrom. The case involved Constitutional liberty interests in the staff member's reputation as well as property interests in his continued employment. It took place over the course of three days. UNM was represented by outside counsel; however, all the hard costs and fees associated with that representation and the hearing were borne by State Risk Management. UNM thus incurred no out-of-pocket expenses for the staff hearing. That being said, the lost opportunity costs associated with the hearing - including the time and productivity of each of the Panel members, the Respondent, and the witnesses - could arguably be quite high. The cost for this case was $8,000 for a transcriber.

52.     Similarly, the hearing involving the faculty member was a Constitutionally-required post-deprivation hearing regarding a suspension for a violation of UNM's Title IX policy that proceeded pursuant to Faculty Handbook Policy C07 and our existing Peer Hearing Procedure with little to no variation therefrom. The case involved Constitutional property interests in the staff member's continuing employment only. That hearing took place over the course of one day. UNM handled that matter through its in-house legal counsel, and no transcriptionist was retained; thus, UNM again incurred no out-of-pocket costs to conduct the hearing. Again, however, the lost opportunity costs associated with the hearing could be quite high.

Decl. of Angela Catena                                                        Case No. 20-cv-01468-CJN

EXHIBIT 41

53.     The hearing involving the student was ordered by the Board of Regents as a result of the student's appeal from OEO's determination of a violation of UNM's Title IX policy. In its order, the Board mandated that the student be given an evidentiary hearing before a neutral hearing officer. There was no specific policy or procedure providing for such a hearing. The hearing also did not involve a deprivation, as the sanction for the OEO determination had not yet been issued. UNM retained a hearing officer at its own expense, who required UNM to engage a transcriptionist for the hearing, also at UNM's expense. All told, including pre-hearing, hearing, and post-hearing process and the transcriptionist's fees, that single, approximately four-hour hearing cost UNM $35,321.97 out-of-pocket.

54.     One hearing lasted three days and placed an immense strain on the panel members who willingly rose to the challenge. If all Title IX cases were allowed live hearings (approximately 450 in 2019), the cost to UNM would be astronomical. In addition, in one Title IX hearing, both parties had private counsel. The parties were staff and certainly the cost of counsel was high. Having counsel involved created a quasi-judicial atmosphere to the hearing and the hearing was long, complex, and emotionally taxing for all who were involved.

55.     UNM also had a student hearing where one student had private counsel and one student had only an advocate. The students in the live hearing both seemed very traumatized by the whole experience.

56.     While having both parties represented by advisors of choice who could provide the parties with "the same opportunities" is ideal, OEO is concerned about the practicalities of carrying this out. OEO is specifically concerned about circumstances in which one party hires a lawyer as their advisor of choice, while the other party cannot afford an attorney to be their advisor of choice. At this time, UNM does not have any lawyers or advisors employed and designated to cross-examine

individuals in hearings related to sexual assault on campus. Such individuals will need to be hired and specially trained on such duties. Furthermore, it is unconceivable to expect an advocate to become well-versed in cross-examination as this is counterintuitive to their University-designated role as a helper and supporter. Additionally, OEO is concerned about the confidentiality issues that will arise from involving advisors of choice who are not subject to rules of confidentiality (such as religious leaders, friends, and family members) in such matters. An additional concern involves the use of intimidation tactics during cross-examination. While this may be subtle at times, and the hearing officer can assist in dismissing irrelevant or unfair questions, once it is said the damage is already done. The Department of Education is wrong in its belief that recipients assert control over all of the platers involved in a hearing.

57.     Furthermore, it is not feasible for the University to remain timely in our process when a live hearing is required as Section 106.45(b)(3)(vii) outlines. The need to ensure that both parties have an advisor of their choice will only exacerbate this challenge further. OEO anticipates having delays caused solely by administrative needs, even though such delays will not be an excusable reason for delay under the new regulations.

58.     UNM has no way to compel parties to testify. OEO worries that this process of only considering the statements of an individual who is cross-examined will encourage retaliation against and/or intimidation of participants in the formal investigation process. Complainant or Respondent, for example, could retaliate against or intimidate a witness for the other party who might have incriminating information about them. Due to the long nature of this process, parties would have plenty of time to intimidate and convince witnesses – or Complainants – not to participate. This is especially true in circumstances where there is a significant power imbalance between the parties.

This is not only patently unfair, but counters the stated goals of the Department in developing a formal investigation process of finding the truth in a fair adjudicatory process.

59.     The process for addressing departmental investigations, or complaints with multiple impacted parties or environmental concerns, is left with little to no guidance. Recipients are left with more ambiguity on how to appropriately address concerns that are not individual investigations, therefore running the risk of either causing more harm by not appropriately stopping the behavior, remedying its effects, and preventing recurrence of the conduct, or addressing the concerns in a haphazard way that is not compliant with federal guidance. Additionally, the Rule provides no guidance on how to proceed with complaints pursued by the Title IX Coordinator because of severity, pervasiveness or pattern of conduct. The New Rule's lack of thoroughness opens recipients and Title IX Coordinators to increased litigation from both parties as they make the best educated guess on how to proceed with nebulous reports.

60.     The New Rule changed the definition of sexual harassment. The new definition identifies sexual harassment as "unwelcome sexual conduct; or unwelcome conduct on the basis of sex that is so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or sexual assault as defined in 34 CFR 668.46(a)." Section 106.30 (emphasis added). The New Rule significantly increases the severity of allegations required for an institution to act upon alleged misconduct.

61.     Further, the definition under the new regulations increases confusion regarding what constitutes a hostile environment. Requiring a behavior that is "severe, pervasive, *and* objectively offensive" conflicts with the Title VII definition, after which Title IX was modeled. Changing the standard under Title IX would effectively impact how institutions are able to address cases that meet both Title VII and Title IX violations. It is unclear why the Department believes entirely separate

processes should exist for employees and for students when it comes to sexual assault allegations. For employees of the University, a learning environment is their working environment, therefore, an attempt to separate the two for First Amendment concerns is unrealistic. Indeed, maintaining parallel processes only adds to the administrative burden – both in cost and labor – that UNM already faces, in the midst of an already adverse budgetary situation.

62.     The New Rule requires a recipient to respond to complaints of sexual harassment in an education program or activity of the recipient. This change notably leaves out a wide swath of activity that would normally fall under a University's purview. It significantly limits an institution's ability to investigate allegations that occur off campus and/or outside of school-sanctioned events, but still clearly impact the campus environment. The New Rule fails to consider the needs of commuter and community colleges – a category in which UNM and its four statewide branch campuses fall – and the number of complaints that arise at off-campus housing unaffiliated with the University. Our University would be challenged to effectively address the effects of sexual harassment and prevent its recurrence if the institution does not have jurisdiction over University-affiliated individuals while taking part in activities not sponsored by the institution.

63.     As with fraternities, UNM and other universities devote significant resources to the promotion and oversight of athletics. Athletics is open only to University students and is directed by a University employee. OEO believes that athletics are most certainly an operation of the University and in turn, it is vital to maintain jurisdiction over all athletic and athlete-related matters. Our University has already struggled to hold athletes accountable for sexual harassment. If OEO's jurisdiction over off-campus sexual harassment claims involving athletes when they act outside a University activity is removed, it will become even more difficult.

64.     The newly issued Section 106.8(d) states that "[t]he requirements that a recipient adopt a policy and grievance procedures as described in this section apply only to exclusion from participation, denial of benefits, or discrimination on the basis of sex occurring against a *person in the United States*" (emphasis added). Section 106.8(d) will negatively impact UNM-affiliated individuals who are sexually assaulted or harassed by another UNM-affiliated individual while traveling outside of the United States.

65.     Every year, UNM students participate in over 200 study abroad programs. These programs predominantly consist of UNM students studying together, and in such programs, it is quite plausible that sexual assaults could occur between two UNM students. Section 106.8(d) will prevent OEO from taking jurisdiction over sexual assaults involving UNM-affiliated students solely because the assault occurred outside of the United States. This section would also severely limit OEO's ability to investigate sexual assaults involving faculty and staff who are sexually assaulted by another UNM-affiliated persons while participating in conferences and other activities abroad, as well as students studying online or outside of the United States.

66.     OEO recognizes that there are undoubtedly limits on UNM's ability to exercise jurisdiction over sexual misconduct that occur outside of the United States when the perpetrator is not affiliated with UNM. However, for those situations in which both parties are indeed affiliated with UNM, OEO can provide a fair adjudicatory process and should be afforded the opportunity to do so.

67.     In addition to failing to prevent or deter sexual assault, this section of the regulations to exclude individuals outside of the United States directly contradicts the Clery Act, which ensures a school's responsibility for its Clery Geography and its inclusion of foreign locations where a school has a program of study and administrative personnel onsite.

68.     Narrowing the requirements to proceed with formal complaints does not take into consideration the responsibility of the Title IX Coordinator in being able to stop, remedy, and prevent recurrence. If the Title IX Coordinator is in possession of information indicating a pattern of conduct, but does not have a participating Complainant, there still remains a duty to review and address those concerns. These changes are counter-productive to Title IX as a whole, in that these new requirements reduce a recipient's ability to address gender discrimination.

69.     The New Rule is likely to result in a decrease in reporting or a chilling effect on reporting. A decrease in reports does not necessarily indicate a decrease in prevalence. The chilling effect that will be caused by the narrowed scope of Title IX will effectively reduce the rates of reporting. Without accurate data and trends, the University will be at a disadvantage when expected to educate University leadership on trends and hot spots, as well as preventing sexual misconduct.

70.     If UNM is at a disadvantage to appropriately and effectively address sexual misconduct, the likelihood of hostile working and learning environments will inevitably increase.

71.     The investigative process is a stressful process for all parties involved. Placing additional burdens will likely chill reporting and cause complaints to go underground.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 11 day of June, 2020

Angela M. Catena, PhD
UNM Title IX Coordinator

Decl. of Angela Catena                                      Case No. 20-cv-01468-CJN

EXHIBIT 41

EXHIBIT 42

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF STEPHANIE CHANG

I, Stephanie Chang, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

      1.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

      2.      I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently

Page <strong>1</strong> of 7

EXHIBIT 42

issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (the "Title IX Rule" or Rule).  I submit this declaration in my personal capacity as a 2020 graduate of the University of California (UC) Berkeley.  This declaration is based on the Title IX knowledge and experience I acquired in the course of working with the Grievance Division of UC Berkeley's Student Advocate's Office.  The UC Berkeley's Student Advocate's Office is made up of four divisions—Academic, Financial Aid, Conduct, and Grievance—each of which houses caseworkers with differing expertise and experience.

### Title IX Experience

3.      From May 2019 to May 2020, I was the Grievance Division Director at UC Berkeley's Student Advocate's Office.  I previously served as a Grievance Division caseworker from February 2018 until May 2019.  As Director, I played a dual-facing role in supporting university-wide policy platforms, and I managed all cases under the Grievance Division.  The Grievance Division handles cases that include, but are not limited to, university formal grievances, graduate appeals, sexual violence and sexual harassment cases, Disabled Students' Program accommodations, discrimination/hate crimes reporting, and University of California Police Department complaints.

4.      Grievance Division caseworkers handle confidential one-on-one cases with complainants and advise them about options and resources available to them.  The Grievance Division helps complainants by doing things like assisting them in getting no-contact directives, changing class schedules, and assisting with providing emergency housing when necessary.

5.      Caseworkers are not required to report to the Title IX Office unless complainants want them to, and they are not able to provide legal advice.  However, they do refer complainants to PATH to Care, a center at UC Berkeley that provides confidential support to survivors of sexual violence and/or sexual harassment and can provide students with legal assistance.

Decl. of Stephanie Chang                                   Civil Action No. 20-cv-01468

EXHIBIT 42

6.      Caseworkers are trained extensively in sexual violence and sexual harassment protocol, sensitivity, confidentiality, working with clients one-on-one and client management.  Social workers from the university health center help lead trauma-informed trainings for caseworkers.  Caseworkers also have refresher training on conducting intakes and the questions they should ask during those intakes.  Caseworkers also participate in roundtable discussions with each other and their supervisors, which are opportunities for them to have open conversations about their cases.  They are able to ask questions about topics like interacting with trauma survivors and managing the stress that caseworkers experience.

7.      If a complainant wants to report to the Office for Prevention of Harassment and Discrimination, the Grievance Division will set up a meeting, and the student can pursue a formal or an informal process.

8.      The grievance process begins with a meeting where the caseworker asks about the support services the complainant has utilized, if the complainant has been connected to PATH to Care, if the complainant is working with Office for Prevention of Harassment and Discrimination, and if they want to pursue the informal or formal complaint process.

9.      While my work with UC Berkeley's Student Advocate's Office was focused with the Grievance Division and providing support to complainants, I met regularly with the Fannie Osran, the Conduct Division Director, to discuss general case updates and university-wide policymaking.  That said, we did not discuss specific sexual violence and/or sexual harassment cases or any personal identifying information to protect students' privacy, as well as confidentiality concerns surrounding their cases.

Decl. of Stephanie Chang                                          Civil Action No. 20-cv-01468

EXHIBIT 42

**Impact of Rule on College Students**

10.     The Rule will institutionalize the difficulties that complainants already face when deciding whether to report sexual violence and/or sexual harassment.  For instance, I know from working with complainants, managing caseworkers, and my work with PATH to Care, that the narrowed definition of sexual harassment will intensify the student concern that schools will not take complaints seriously—a doubt many complainants already feel towards reporting.  By narrowing the scope of what constitutes sexual harassment, the Rule solidifies complainants' fears that the university will not support them, and thus, will further negatively affect the underreporting of sexual violence and sexual harassment complaints that already exists.

11.     Requiring cross-examination—without requiring a neutral third-party to ask the cross-examination questions—will only further deter complainants from reporting sexual violence and sexual harassment cases, because in many cases, complainants simply do not want to interact with or be forced to see respondents again and/or be cross-examined by their attorney advisors.  In none of the sexual violence and sexual harassment cases I personally handled as a caseworker did a complainant opt to go through a formal investigation process because they feared not being taken seriously and/or being re-traumatized. This is because they do not believe that engaging in an investigation process with a hearing will bring them a healthy or positive resolution.  In most cases, a complainant's primary goal is to minimize or eliminate contact with the respondent, and move past the sexual violence and/or sexual harassment incident and heal.  As a caseworker, complainants shared with me that even when they are not in the same room with respondents, they feel like they are subjecting themselves to indirect contact through university correspondence or an investigator's questioning.  In my experience handling and managing sexual violence and sexual harassment cases, a formal complaint process with cross-examination is not something complainants want to endure

Decl. of Stephanie Chang                                    Civil Action No. 20-cv-01468

EXHIBIT 42

because it makes the healing process more difficult since the student conduct process as it stands is already arduous if seen through until sanctions against a respondent are implemented.

12.     The fact that the Rule also limits the cases that the university must investigate to incidents that occurred in the United States through an "education program or activity" under the "substantial control" of the university, will harm students nationwide because I know through my training and work as a caseworker that most sexual violence and sexual harassment incidents happen off campus.  Students at schools like UC Berkeley mostly live in private off campus housing.  For the most part, only freshman, resident assistants, and some transfer students live on campus. This Rule also excludes co-ops—17 houses and three apartments owned by the independent nonprofit Berkeley Student Cooperative—which are popular living spaces for UC Berkeley students. The Rule will especially have a negative impact on graduate students and post-doctoral students who almost never live on campus.

13.     Before the Rule, schools were prohibited from "us[ing] or distribut[ing] a publication of the type described in this paragraph which *suggests, by text or illustration*, that such recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by this part." 34 C.F.R. § 106.9(b)(2) (emphasis added). The Rule amends this provision to only prohibit a school from "us[ing] or distribut[ing] a publication *stating* that the recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by title IX or this part." 85 Fed. Reg. at 30,573 (to be codified at 34 C.F.R. § 106.8(b)(2)(ii) (emphasis added)).

14.     The Rule now allows colleges and universities to distribute publications that include images and text that reflects sex stereotyping in recruiting and other publications.  The sexual violence and sexual harassment recruitment and training materials that we utilize include language

Decl. of Stephanie Chang                                    Civil Action No. 20-cv-01468

EXHIBIT 42

that is gender neutral and allows complainants to define their own experiences. Complainants often shared with me that they believe their identity is part of the reason why they are harmed in the first place.   To the extent that the Rule's amendment permits the distribution of materials that include sex stereotypes in either images or text, transgender and non-binary students will be impacted, particularly students of color who identify as either, because these student groups already experience a lack of access to support systems on campus.  These students should receive materials and publications that are sensitive to these complex identity issues.

### Conclusion

15.   The Rule will deter students from reporting sexual violence and sexual harassment cases because the narrowed definition of sexual harassment will further their doubts as to whether to report incidents of sexual violence and sexual harassment in the first place. This reduction in reporting will be further exacerbated because complainants are forced to endure cross-examination by a party's advisor, if they want to participate in the complaint investigation process.

16.    The Rule will also make colleges less accountable by allowing them to ignore incidents that happen off-campus but nevertheless impact a student's education.

17.    If publications used to recruit individuals to universities and into various programs do not use inclusive and trauma-informed language, it is likely to impact universities' ability to recruit a gender-diverse group of investigators and caseworkers who appropriately reflect an inclusive student population.

Decl. of Stephanie Chang                                Civil Action No. 20-cv-01468

EXHIBIT 42

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 10th day of June, 2020

Stephanie Chang
2020 Graduate, University of California Berkeley

Decl. of Stephanie Chang                          Civil Action No. 20-cv-01468

EXHIBIT 42

# EXHIBIT 43

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF ELIZABETH COLLINS

I, Elizabeth Collins, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am an Education Consultant, the Civil Rights Compliance Coordinator, Methods of Administration (MOA) and Title IX Coordinator at the Michigan Department of Education (MDE) located in Lansing, Michigan. My educational background includes a Master of Arts in Education with an emphasis on K-12 Online Learning and Students with Disabilities. I have held the role of Title IX Coordinator since December 2014, and have worked on Title IX issues at MDE since April 2011.

Page 1 of 10

2.     I submit this Declaration in support of the State of Michigan's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through MDE personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on MDE, K-12 schools in Michigan, and institutes of higher education in Michigan.

**Background about MDE's Work in Education and State's Education Programs**

3.     The Michigan Constitution charges the Michigan Legislature with "maintain[ing] and support[ing] a system of free public elementary and secondary schools as defined by law." Mich. Const. art. VIII, § 2.

4.     While the school districts exercise primary responsibility over budgetary and other decisions for each district, MDE implements federal and state legislative mandates in education and carries out the policies of the State Board of Education. The State Board of Education has "leadership and general supervision over all public education." Mich. Const. art. VIII, § 3; Mich. Comp. Laws § 388.1009. The State Board of Education "serve[s] as the general planning and coordinating body for all public education, including higher education, and shall advise the legislature as to the financial requirements in connection therewith." Mich. Const. art. VIII, § 3.

Decl. of Elizabeth Collins                                                                                  Case No. 20-cv-01468
EXHIBIT 43

5.     Michigan provides more than \$13 billion each year to its 836 public school districts and 56 intermediate school districts. The 3,400 public school buildings in these districts educate more than 1.5 million students each year.

6.     For institutes of higher education, the Michigan Constitution charges the Michigan Legislature with "appropriating moneys to maintain" ten public universities in the state. Mich. Const. art. VIII, § 4. These ten universities are governed independently through constitutionally created boards. *See id.* §§ 5-6. Five other universities in the state also received state funding. In sum, over 257,000 students are enrolled in these fifteen state-funded universities across the state. These universities received nearly \$1.5 billion in state funding during the 2019-2020 fiscal year.

7.     Michigan is also home to 28 public community colleges. The Michigan Constitution requires the Michigan Legislature provide "financial support" for these colleges. *Id.* § 7. The community colleges received \$414 million through state appropriations during the most recent fiscal year.

8.     Michigan received over \$2 billion from the Department in 2019 for both K-12 schools and institutes of higher education.[1] As a result, Michigan's K-12 public schools and public institutes of higher education are subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

### MDE's Work on Combatting Sexual Harassment in Education in K-12 Schools

9.     Under Michigan state law, each local school district's board "shall adopt and implement a written sexual harassment policy." Mich. Comp. Laws § 380.1300a. State law further provides that the sexual harassment policies "shall prohibit sexual harassment by school district

---

[1] https://www2.ed.gov/about/overview/budget/statetables/21stbystate.pdf.

Page 3 of 10

Decl. of Elizabeth Collins                                                          Case No. 20-cv-01468

EXHIBIT 43

employees, board members and pupils directed toward other employees or pupils and shall specify penalties for violation of the policy." *Id.*

10.     As described above, I serve as the MDE Title IX Coordinator. In this role, I work to provide guidance to MDE leadership regarding the requirements under Title IX and to ensure compliance. I also provide technical assistance to local education agencies and Michigan constituents regarding the requirements of Title IX in Michigan schools, in order to ensure their compliance. This involves hundreds of telephone calls and email correspondence annually to assist local education agencies and K-12 students and parents navigate Title IX requirements.

11.     To assist local education districts combat sexual harassment, MDE has issued various memoranda and press releases, provided technical assistance, and conducted Civil Rights Compliance Reviews.

12.     In addition, in partnership with the Michigan Department of Health and Human Services, MDE created the Michigan Model for Health curriculum, a skills-based curriculum that provides comprehensive school health education for K-12 students and which includes details about the prevention of sexual assault. Sexual harassment and sexual assault are addressed through the curriculum during middle school as part of a module entitled Safe and Sound for Life: Social and Emotional Health and Safety.[2]

### Effect of the Rule on MDE's Work

13.     The implementation of the Rule will require a comprehensive review and revision of MDE's existing Title IX policies and procedures. Likewise, the Rule will require contact with schools across Michigan to ensure they are aware of the required changes and taking appropriate actions to

---

[2] More information about the Michigan Model for Health curriculum can be found at https://www.michiganmodelforhealth.org/about-mmh/mmh-overview.

Page 4 of 10

implement the Rule in advance of the August 14, 2020 deadline. I expect to field hundreds of telephone calls and emails from school districts seeking technical assistance regarding the changes to Title IX procedures and rules, which will be a significant investment of time.

14.     In anticipation of these requests for technical assistance, I have dedicated—and plan to reserve—significant time and resources to reviewing the Rule to ensure I can provide the local education agencies, students, and parents with correct information.

15.     In the near future, MDE intends to send correspondence to the local education agencies about the new Rule. This correspondence is expected to prompt numerous requests for technical assistance in implementing the new rules.

**Harm to Schools, Communities, and Individuals**

16.     In Michigan, most local education agencies are required to submit new policies and procedures for local board approval.[3] Thus, in advance of the August 14, 2020 deadline to implement the Rule or risk losing all federal funding, each local education agency will need to draft new policies and procedures for Title IX investigations to conform with the new Rule, and then seek approval of these new policies and procedures from their local school boards—many of which do not meet in the summer months. This process will create a significant burden on the districts given the limited amount of time. Districts will need adequate resources to develop new district policy and procedures, leaving less resources to create 'return to school' plans and other programs for use once the pandemic abates. As discussed further below, the burden is only heightened as a result of the ongoing COVID-19 pandemic that has placed tremendous pressure on the districts to develop return-to-school

---

[3] For example, Michigan Compiled Law §§ 380.1507 and 388.1766a require local education agency boards to approve sex education curricula, materials, and methods.

Decl. of Elizabeth Collins                                     Case No. 20-cv-01468

EXHIBIT 43

programs and also plans for how to deal with next school year in the event of a second wave of the virus.

17.    In addition, contractually, many school administrators have varied schedules in the summer months (i.e., time off for the month of July) and many school boards do not meet in July. As a result, many such districts will not have sufficient time to review the lengthy new Rule; develop thoughtful and informed policies and procedures to protect students; and present the new policies and procedures to the board in time for adoption.

18.    Furthermore, schools are required to disseminate their Title IX discrimination and grievance procedures in a means that is widely accessible to the public.[4] Many of these materials are typically printed by schools in the spring for fall dissemination. Now, schools will have to rescind the previous Title IX procedures that they have published and refer to new policies and procedures, likely on their website. School districts will likely not have enough time to complete this level of work with the necessary detail before August 14.

19.    Particularly concerning for Michigan's K-12 schools is the requirements under § 106.45(b)(6)(ii) of the Rule, which will require local education agencies to develop policies and procedures to either (1) conduct a live hearing with cross-examination of the victim and witnesses, or (2) permit "written, relevant questions that a party wants asked of any party or witness, [require the recipient of the questions] to provide each party with the answers, and allow for additional, limited follow-up questions from each party." Under either circumstance, the development of these policies and procedures will take significant time.

---

[4] *See* 34 C.F.R. §§ 106.8(b), 106.9 (under the amended Rules, 34 C.F.R. §§ 106.8(b)-(c)).

Decl. of Elizabeth Collins                                                    Case No. 20-cv-01468
EXHIBIT 43

20. Moreover, K-12 schools will need to train staff to facilitate hearings (or the exchange of questions) and to implement the LEA's new policies and procedures before the 2020-2021 school year. Local education agencies will not have sufficient time to conduct this training before August 14, 2020. The lack of sufficiently trained staff members in Michigan's K-12 schools will create roadblocks for students to submit harassment claims and for schools to ensure students are protected from harassment in the school environment.

21. Sexual harassment is harmful to victims' academic achievement and, consequently, economic achievement. Upon information and belief, the changes to Title IX procedures in the Rules will not assist local education agencies in prohibiting sexual harassment in K-12 schools in Michigan, thus negatively impacting Michigan students.

22. The changed definition of sexual harassment, the limitations on the location where the harassment must occur to prompt an investigation, and the requirement that Title IX complaints be in writing, among other changes, will likely decrease the number of Title IX investigations. Though the Rule may allow schools to act on incidents that fall outside of the Rule's limited definition of sexual harassment and outside of designated locations, *see* 34 C.F.R. § 106.45(b)(3)(i), upon information and belief, schools are unlikely to conduct investigations when not required by the Rule. Most schools are often strapped for funding and, thus, schools will likely use their limited resources to investigate only those incidents where the Rule specifically requires investigation. In addition, a two-tiered approach in which some incidents require Title IX investigation and grievance procedures and other incidents do not, will inevitably cause confusion for school administrators, students, and parents.

23. By explicitly excluding incidents of sexual assault or harassment that occur in private, off-campus, or study abroad programs from Title IX investigations, schools will be not be able to

Decl. of Elizabeth Collins                                        Case No. 20-cv-01468
EXHIBIT 43

address and prevent incidents of sexual harassment that may impact students' relationships within school and on campus.

24. For these reasons, upon information and belief, I expect there will be less Title IX investigations in Michigan schools as a result of the new Rule, thus risking further harm to Michigan students.

## Effect of COVID-19

25. The COVID-19 pandemic hit Michigan starting in March of 2020, and has continued to impact government services and education in the State. On March 13, 2020, Governor Whitmer issued an executive order temporarily closing all elementary and secondary school buildings in Michigan starting on March 16, 2020. As the pandemic continued to impact Michigan, on April 2, 2020, Governor Whitmer issued another executive order closing all K-12 school buildings in the State for the remainder of the 2019-2020 school year.

26. Since school buildings were closed in Michigan, MDE has dedicated an enormous amount of time and resources to assist districts and schools transition to an online learning environment.

27. In the midst of this unprecedented effort by MDE's staff, the economic burden created by the pandemic required the State to temporarily lay off the majority of State employees, including MDE employees, for one day per week or a similar amount of days. In addition, nearly all of MDE's staff members are working remotely.

28. With all of these burdens caused by the COVID-19 pandemic, it is unlikely MDE will have sufficient time to dedicate to assisting local education agencies implement appropriate policies and procedures that conform to the new Rules.

Page 8 of 10

Decl. of Elizabeth Collins
EXHIBIT 43

Case No. 20-cv-01468

29.     Similarly, schools in Michigan are currently faced with extreme hardship due to the pandemic. Schools are trying to implement online learning programs for students, while dealing with technology gaps, distance learning, continued learning, in addition to preparing for the next school year. Separately, schools continue to address services such as special education, free/reduced lunch, bussing, career and technical education, etc. All of these programs must continue in the midst of the schools interpreting and implementing a wide variety of COVID-19 specific legislation, enacted at the federal, state, and local levels.

30.     In addition to the lack of time to implement new policies and procedures based on the new Rule and lack of time to train staff members to facilitate the new Title IX rules and procedures by the August 14, 2020 deadline, there are numerous unknowns for Michigan schools caused by the pandemic. How will the pandemic impact school budgets? Governor Whitmer has been very transparent with the public that the State has lost significant funding streams that will negatively impact State Departments and potentially funding for local education agencies. How much it impacts MDE or the local education agencies is unknown.

31.     The limited timeframe, coupled with the potential reductions of staffing due to budget cuts resulting from the pandemic, will strongly impact MDE and Michigan's local education agencies' ability to comply with the new Rule, thereby threatening the loss of significant federal funding.

Decl. of Elizabeth Collins                                        Case No. 20-cv-01468
EXHIBIT 43

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this **12th** day of **June**, 20**20**

_____
Elizabeth Collins
Michigan Department of Education

Decl. of Elizabeth Collins                                    Case No. 20-cv-01468
EXHIBIT 43

# EXHIBIT 44

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | Civil Action No. **20-cv-01468-CJN** |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF GEOFFREY COLTRANE

I, Geoffrey Coltrane, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Senior Education Advisor for the Office of the Governor located in Raleigh, North Carolina. My educational background includes a Bachelor of Arts in Elementary Education from the University of North Carolina at Chapel Hill and a Master of Public Policy from Duke University.  I have been employed as Senior Education Advisor since June 2017.   Prior to my role with the Office of the Governor, I served as the Director of Institutional Research and Strategic

Initiatives at the North Carolina School of Science and Mathematics, a constituent institution of the University of North Carolina System, for nearly seven years.  I have also served as the Director of Program and Policy at the James B. Hunt, Jr. Institute for Educational Leadership and Policy and as the Research and Communications Director at the North Carolina New Schools Project.  I began my professional career as a Kindergarten and First Grade teacher with Durham Public Schools.

2.      As Governor Cooper's Senior Education Advisor, I serve as the Governor's primary liaison to the State Board of Education, the North Carolina Community College System, the University of North Carolina System, and other K-12 and postsecondary education stakeholders.  In addition, I advise the Governor on K-12 and postsecondary education policy issues, identify ways to promote and implement the Governor's education agenda, and facilitate consensus among education policymakers and stakeholders for the Governor's education agenda.  Lastly, I manage the Governor's Commission on Access to Sound Basic Education, which is focused on developing a plan for ensuring the state meets its constitutional obligation of every student having access to a sound, basic education.

3.      I submit this Declaration in support of the State of North Carolina's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or Rule). I have compiled the information in the statements set forth below through personal knowledge, through personnel who have assisted me in gathering this information from our State institutions, on the basis of documents that have been provided to and/or reviewed by me.

**Background about the State's Work in Education and State's Education Programs**

Decl. of Geoffrey Coltrane                                          Case No. 20-cv-01468-CJN
EXHIBIT 44

4.      The State's constitution guarantees the "right to the privilege of education" and charges the State with the "duty" to "guard and maintain that right."  N.C. Const. art. I, § 15.  North Carolina's constitution also requires that the State provide all of its students a "sound basic education."  *Leandro v. State*, 346 N.C. 336, 347, 488 S.E.2d 249, 254 (1997).

5.      North Carolina is home to 74 public universities and colleges, which collectively enroll more than 1.05 million students in public two- and four-year institutions.  These include 16 constituent higher education institutions in the University of North Carolina system governed by the University of North Carolina Board of Governors and 58 community colleges governed by the State Board of Community Colleges.

6.      At any given time there are around 940,000 students enrolled in an institution of higher education in North Carolina. These institutions employ more than 79,000 faculty and staff, including instructional staff, graduate assistants, management, administrative, and other support staff.

7.      In 2019, North Carolina's public higher education institutions received $896 million in federal funding from the Department, and are scheduled to receive more than $937 million in 2020. As a result, North Carolina's public higher education institutions are subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

8.      The North Carolina State Board of Education and the North Carolina Department of Public Instruction have general supervisory authority of K-12 public schools in North Carolina.  N.C. Gen. Stat. § 115C-10 to -22.

9.      The Board of Governors of the University of North Carolina has the responsibility for the planning, development, and overall governance of the UNC System.  N.C. Gen. Stat. § 116, et seq.  The Board of Governors has 24 voting members, elected by the North Carolina General

Assembly to staggered four-year terms.  Additionally, the president of the UNC Association of Student Governments serves as a nonvoting, ex officio member of the Board.  The Board elects the President of the UNC System.  The Board of Governors maintains The Code and the UNC Policy Manual.  The Code incorporates the requirements of the North Carolina constitution and General Statutes, as well as Board bylaws and other high-level policies.  The UNC Policy Manual provides more specific direction and policies on university matters, including a system-wide policy to establish legally supportable, fair, effective, and efficient procedures for student disciplinary proceedings related to sexual harassment and Title IX violations (Chapter 700.4—Student Conduct and Discipline).

10.    The State Board of Community Colleges (CC State Board) consists of 20 members— 10 appointed by the Governor, 8 elected by the General Assembly, and the Lieutenant Governor and the state treasurer, who serve as ex-officio members.  The CC State Board establishes policies, regulations, and standards for the administrative offices and the institutions that comprise the Community College System.

### Effect of Rule on Higher Education in North Carolina

11.    The Final Rule will have a profound effect on the State's institutions of higher education.  Staff at our State's colleges and universities will need to review the Final Rule and thoroughly review each of their guidance and implementation documents and policies on safe and inclusive learning environments, including investigative procedures and support for victims of sexual assault to ensure that they comply with the Final Rule.  To the extent that any current policies and procedures conflict with the Final Rule, the State's institutions will likely have to revise their resources or remove them, a potentially time-consuming and costly process.

12.    Many institutions in our State, for example, will be required to ensure that procedures are in place to, for example, conduct cross examination and preside over contentious cross

Decl. of Geoffrey Coltrane                                    Case No. 20-cv-01468-CJN
EXHIBIT 44

examination, without harming communities.  Should new procedures be required, implementing these may create burdens for the State's institutions, particularly before the effective date of the Final Rule.

### Effects of COVID-19

13.     In addition to its regular work, the State's educational institutions, like every institution in the State and country, have turned to focusing on the response to the effects of the novel coronavirus and resultant COVID-19 disease on the State, students, and schools.

14.     North Carolina has more than 49,480 lab-confirmed cases of the disease, which have resulted in more than 1,197 deaths.  On March 14, 2020, the Governor issued Executive Order 117, ordering the statewide closure of K-12 public schools to limit the spread of COVID-19.  The UNC System transferred from in-person instruction to alternative course delivery beginning on March 20. As a result, North Carolina higher education institutions closed their campuses in mid-March as institutions scrambled to implement remote learning in lieu of in-person instruction.

15.     With the State's higher-education institutions, students, and faculty in an environment where remote learning will be implemented at least until the Fall 2020 semester, the contemplated review and overhaul of Title IX proceedings required by the Final Rule will occur in an environment where these critical issues may not be able to be given the requisite weight and attention that they deserve.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 22nd day of June, 2020

_____

Geoffrey Coltrane
Senior Education Advisor,
Office of the Governor of North Carolina

EXHIBIT 45

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. **20-cv-01468-CJN** |

**DECLARATION OF JACEY COOPER**

I, Jacey Cooper, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

      1.     I am the Chief Deputy Director for Health Care Programs and State Medicaid Director for the California Department of Health Care Services ("DHCS"). DHCS oversees comprehensive health care in California for about 13 million Californians, nearly one-third of the State's population. DHCS's largest program is Medi-Cal, California's version of the federal-state Medicaid program under title XIX of the federal Social Security Act. As Chief Deputy Director and State Medicaid Director, my responsibilities include the overall management of the health care program divisions at

DHCS, including Health Care Delivery Systems, Health Care Financing, Health Care Benefits and Eligibility, Behavioral Health, and Legislative and Governmental Affairs.  I also represent Medi-Cal with our federal partners at the Centers for Medicare and Medicaid Services.  I have previously served as the Senior Advisor for Health Care Programs in the Director's Office and the Assistant Deputy Director for Health Care Delivery Systems.

2.     I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 10) (the "Title IX Rule" or "Rule").  I submit this declaration in my official capacity as the Chief Deputy Director for Health Care Programs and State Medicaid Director for DHCS.  I have compiled the information in the statements set forth below through personal knowledge, through DHCS personnel who have assisted me in gathering this information from our agency, and on the basis of documents that have been provided to and/or reviewed by me.

3.     DHCS is the single state agency charged with administering Medi-Cal, which is a critical source of health coverage for millions of students attending public school, charter schools, community colleges, and universities.  Through the fee-for-service and managed care delivery systems, Medi-Cal provides comprehensive health care benefits for Medi-Cal eligible children, including students in K-12 schools.  DHCS also administers California's Children's Health Insurance Program ("CHIP") program, most of which is accomplished through the Medi-Cal program by enrolling CHIP eligible individuals into managed care plans providing the full scope of Medi-Cal

Decl. of Jacey Cooper                                                                    Case No. 20-cv-01468-CJN

EXHIBIT 45

benefits.  DHCS's CHIP programs provide health coverage to eligible children, including students.  In total, more than 5.2 million children, ages 20 years and younger, are enrolled in Medi-Cal.

4.       DHCS's Integrated Systems of Care Division ("ISCD") oversees a comprehensive system of health for Medi-Cal eligible children through preventive screening, diagnostic, rehabilitation, and follow-up services.  The ISCD carries out this mission through administering a variety of programs intended to complement the coverage afforded under Medi-Cal or CHIP and to meet specific health care needs of targeted populations.  For example, the California Children's Services ("CCS") program provides diagnostic and treatment services, medical case management, and physical and occupational therapy services to children under age 21 with CCS-eligible medical conditions.  CCS also provides medical therapy services that are delivered at public schools.  DHCS spends more than $170 million in state and federal funds annually for CCS case management services alone.  Direct treatment services for Medi-Cal eligible children, which comprise about 70 percent of the CCS program, are integrated with and funded through the Medi-Cal program.  Treatment services for other children are funded through a mix of State, local and federal funds.

5.       DHCS partners with participating public schools to administer the Medi-Cal program for school aged children.  Through the School-Based Medi-Cal Administrative Activities Program ("SMAA"), DHCS and individual Local Education Agency ("LEA") claiming units promote access to health care for students in the public school system, preventing costly or long-term health care problems for at-risk students, and coordinating students' health care needs with other providers.  A "claiming unit" also known as an LEA, is the governing body of any school district, county office of education, or state special school that conducts certain administrative activities in connection with Medi-Cal-covered health services.  The primary purpose of the SMAA is to reimburse school claiming units for the federal share (50% or higher) of certain allowable costs incurred administering

Decl. of Jacey Cooper                                                    Case No. 20-cv-01468-CJN
EXHIBIT 45

the Medi-Cal Program.  Those activities include: Outreach and Referral; Facilitating the Medi-Cal Application; Arranging Non-Emergency/Non-Medical Transportation; Program Planning and Policy Development; and Medi-Cal Administrative Activities Claims Coordination.  DHCS provides approximately $140 million annually in federal funds for claims submitted on behalf of LEAs, Local Governmental Agencies ("LGAs"), and Local Educational Consortia ("LECs") for costs incurred performing SMAA.

6.      The Local Education Agency Medi-Cal Billing Option Program also provides reimbursement to LEAs (school districts, county offices of education, charter schools, community colleges, and university campuses) for certain covered health services provided by qualified health service practitioners to Medi-Cal eligible students under the age of 22.  LEAs pay for the services and are reimbursed by DHCS using federal matching funds, at 50% of allowable cost or greater, depending on the service.  DHCS provides approximately $130 million per year in federal matching funds to LEAs for Medi-Cal eligible services through the LEA Medi-Cal Billing Option Program.

7.      DHCS also oversees county-based delivery of specialty mental health services to certain Medi-Cal eligible children and youth, including students in K-12 schools.  The Medi-Cal Specialty Mental Health Services ("SMHS") program is a standalone "carve-out" managed care delivery system operated under the authority of a waiver approved by the Centers for Medicare and Medicaid Services under Section 1915(b) of the Social Security Act.  DHCS is responsible for administering and overseeing the Medi-Cal SMHS Waiver Program, which provides covered SMHS to qualified Medi-Cal beneficiaries through county mental health plans ("MHPs").  MHPs are required to provide or arrange for the provision of outpatient and inpatient SMHS to beneficiaries in their counties who meet SMHS medical necessity criteria, consistent with the beneficiaries' mental health treatment needs and goals, as documented in their client plans.  Specific services include,

among others, crisis intervention and stabilization, therapy, medication support services, and targeted case management.  DHCS delivers SMHS to nearly 300,000 children ages 20 years and younger at an annual cost of approximately $2 billion per year.  For children enrolled in SMHS managed care plans, the cost per child for SMHS, on average, is more than $7,000 per year.

8.      In accordance with Medicaid Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") provisions, Medi-Cal covers all medically necessary services covered by Medicaid for beneficiaries under the age of 21.  This includes services to "correct or ameliorate" defects and physical and mental illness conditions, even if such services are not included in California's Medicaid State Plan.  EPSDT services can include periodic health screening, vision, dental, and hearing services.

9.      In partnership with the California Office of the Surgeon General, DHCS has created a first-in-the-nation statewide effort to screen patients for Adverse Childhood Experiences ("ACEs") that lead to trauma and the increased likelihood of ACEs-Associated-Health Conditions due to toxic stress.  The goal of this initiative is to reduce ACEs and toxic stress by half in one generation.  All providers are encouraged to receive training to screen patients for ACEs.  By screening for ACEs, providers can better determine the likelihood a patient is at increased health risk due to a toxic stress response, which can inform patient treatment and encourage the use of trauma-informed care.  Detecting ACEs early and connecting patients to interventions, resources, and other supports can improve the health and well-being of individuals and families.  Beginning on January 1, 2020, DHCS pays Medi-Cal providers $29 per trauma screening for children and adults with Medi-Cal coverage.  By July 2020, providers must self-attest that the training has been completed to be eligible to continue receiving Medi-Cal payment for conducting ACEs screenings.  DHCS estimates that it will expend more than $21 million annually for clinicians' use of Medi-Cal funded ACEs screening protocols.

Decl. of Jacey Cooper                                                      Case No. 20-cv-01468-CJN
EXHIBIT 45

10.     Based on its understanding of the impacts of the Title IX Rule, DHCS has serious concerns that the Rule will increase the negative health effects of sexual harassment and assault on students in the State that Title IX no longer protects and the State's overall health care expenditures to address such effects.  These health expenditures could include higher than anticipated Medi-Cal reimbursements and a reallocation of existing resources to meet the increased need of affected students for health services that DHCS programs provide such as mental health counseling, medical services, and other resources.

11.     The Rule fails to account for the known costs associated with underlying incidents of sexual harassment and assault.  Sexual harassment and violence have serious and costly health consequences.  Researchers have found that "adverse experiences" such as sexual violence lead to a range of emotional and health consequences for survivors.  They are more likely to suffer chronic diseases, experience emotional and functional disabilities, engage in harmful behaviors, and have difficulties in their intimate relationships.[1]  Consequences of sexual violence can include physical injury and other medical problems, poor mental health outcomes, lost work productivity, decreased quality of life, and sometimes death.[2]  The consequences of sexual violence can be physical, like bruising and genital injuries, and psychological, such as anxiety, increased isolation, and increased risk of self-harm, distress, depression, and suicidal ideation.[3]  The harm may also be chronic.  Victims may suffer from post-traumatic stress disorder, experience re-occurring gynecological,

---

[1] Cal. Dep't of Public Health, Injury and Violence Prevention Branch, Sexual Violence Prevention (May 2020), https://www.cdph.ca.gov/Programs/CCDPHP/DCDIC/SACB/Pages/SexualViolencePrevention.aspx.

[2] Cal. Coalition Against Sexual Assault, The Cost and Consequences of Sexual Violence in California (Feb. 2018) (CALCASA), http://www.calcasa.org/wp-content/uploads/2018/02/CALCASA_CCofSV_FINALSpreads_2018.pdf.

[3] See Ctrs. for Disease Control & Prevention, Understanding Sexual Violence Fact Sheet (Jan. 2020), https://www.cdc.gov/violenceprevention/sexualviolence/fastfact.html.

Decl. of Jacey Cooper                                                          Case No. 20-cv-01468-CJN

EXHIBIT 45

gastrointestinal, cardiovascular and sexual health problems.[4]  Sexual harassment and violence is also linked to negative health behaviors.  For example, victims are more likely to smoke, abuse alcohol, use drugs, and engage in risky sexual activity.[5]  Children who are victims of sexual violence are especially vulnerable to both short- and long-term negative behavioral, mental, and emotional consequences, and are significantly more likely to be re-victimized in the future.[6]  In 2012, two-thirds of the costs ($89.7 billion) resulted from rapes and other sexual assaults of children.[7]  The Rule exacerbates this significant and costly public health problem,[8] and increases negative health impacts for students.  This will increase financial and administrative burdens for DHCS to provide counseling, health services, and other resources to students.

12.    The Rule creates barriers for students, concerned third parties, and schools, to investigate and take meaningful action to stop sexual harassment and violence, prevent recurrence, and address the effects, including the health effects.  These barriers include, but are not limited to, requiring a showing of severe, pervasive, and objectively offensive sexual harassment that effectively denies equal access to education before a Title IX complaint can be opened; explicit limitations on the individuals to whom a post-secondary student may complain in order to receive relief; additional barriers to making a complaint, such as requirements that the impacted student or their parent/guardian put the complaint in writing and include a request to initiate an investigation to start the investigation under most circumstances, regardless of the student's age, disability, or writing ability; prohibiting a student victim who has left a school due to sexual harassment and assault from

---

[4] *Id.*
[5] *Id.*
[6] *See* CALCASA, *supra* at p. 5.
[7] *Id.* at p. 20.
[8] *See* Understanding Sexual Violence Fact Sheet, *supra* (recent estimates put the cost of rape at $122,461 per victim, including medical costs, lost productivity, criminal justice activities, and other costs).

Decl. of Jacey Cooper                                          Case No. 20-cv-01468-CJN
EXHIBIT 45

filing a formal complaint; requiring schools act to mitigate sexual harassment only when they have actual knowledge of sexual harassment on campus; creating protracted back-and-forth processes for students in K-12 schools that delay final remedies for victims and require them to unnecessarily relive the experience; and subjecting victims of sexual assault and harassment in post-secondary schools to cross-examination by a third-party advisor, who could be the perpetrator's family member or close school friend.

13.     I have concerns that making it harder for schools to prevent and protect students from sexual harm and discrimination will worsen the effects of harassment on their mental and physical health, discourage reporting, make it less likely that students who experience sexual violence receive early intervention and timely mental and physical health supports.  Where a school responds inappropriately or provides a delayed response under the Rule, student victims and survivors can suffer additional psychological and physical harms.  Such harms will ultimately increase costs to the State through the various health care programs administered by DHCS and described above.

14.     I understand that the Department has projected substantial reductions with respect to the filing and investigation of bona fide complaints by those subjected to sexual harassment and violence under Title IX as a result of the Title IX Rule's requirements.  85 Fed. Reg. at 30,550, 30,553-30,554, 30,548-30,549, 30,568 (stating that Title IX investigations will decrease by about 33% per year in colleges and Universities, 50% per year in elementary and secondary schools, 50% for non-schools, such as libraries, as a result of the Title IX Rule).  DHCS will likely be required to allocate additional resources for mental and physical health services that they may not have otherwise required in order to manage the impact on students who have suffered from prolonged exposure to sexual harassment or who have not received a timely response, intervention, and long-term remedies, including a response from the school that stops the harassment.

15.     In the final rule, the Department estimates that supportive measures will cost $250 per provision.  85 Fed. Reg. 30,180-30,183, 30,574. 30,558-30,559.  The Department does not provide any information upon which this estimate is based.  Under the health care programs that DHCS administers for individuals and students, $250 would not cover even two hours of mental health counseling, and, on average, children receiving SMHS require more than 28 hours of therapy annually.  For minors in California, mental health care associated with rape and other sexual assault alone cost over $5 billion in 2012.[9]  Per rape or sexual assault, mental health care costs for minors amounted to $12,800, and $2,000 for college-age individuals.[10]  Similarly, associated medical care for minors cost over $1 billion,[11] and direct medical costs per rape or other sexual assault amounted to $1,300 for minors and college-age individuals.[12]  Given the research that shows the significant and costly effects of sexual assault and violence, and my own experiences administering programs for those impacted by traumatic incidents, such as sexual assault and violence, the Rule significantly underestimates the costs of supportive measures, which could include mental and physical health services borne by DHCS.  Because this estimate was not included in the Notice of Proposed Rulemaking, our State did not have an opportunity to provide meaningful comments on this cost estimate.

16.     I also have concerns that the Rule's barriers to protecting students from sexual harassment and violence will place increased pressures on Medi-Cal and other California healthcare services for the long-term.  Sexual harassment and violence have serious economic consequences, which the Rule fails to take into account.  The trauma resulting from sexual violence can impact a survivor's employment in terms of time off from work, diminished performance, job loss, or being

---

[9] CALCASA, *supra* at pp. 19-20.
[10] *Id.* at p. 24.
[11] *Id.* at pp. 19-20.
[12] *Id* at p. 24.

Decl. of Jacey Cooper                                                     Case No. 20-cv-01468-CJN
EXHIBIT 45

unable to work, and cause disability that limits employment.[13] These disrupt earning power and have a long-term effect on the economic well-being of survivors and their families.[14] For example, per rape or other sexual assault, the cost of lost work amounted to $5,800 for minors, and $4,000 for college-age individuals in California in 2012.[15] Quality of life losses accounted for the majority of the costs of sexual violence. Per rape or sexual assault, the cost of lost quality of life amounted to $178,100 for minors and $140,300 for college-age individuals.[16] This in turn will increase the likelihood that survivors and their families will need to rely on DHCS's services, like Medi-Cal, for physical and mental health services.

17.    In conclusion, DHCS is the backbone of California's healthcare safety net. We endeavor to preserve and improve the overall health and well-being of all Californians, including millions of students in public schools, charter schools, community colleges, and universities. I am deeply concerned that the Rule will worsen the damaging and costly health impacts of sexual harassment and violence on students and increase the burden on California's healthcare systems. The State and its health care system will bear the burden of the costs that the United States Department of Education refused to estimate and underestimated in its cost-benefit analysis.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __15__ day of June, 2020

Jacey Cooper

Chief Deputy Director and State Medicaid Director for California Department of Healthcare Services

---

[13] *See* CALCASA, *supra* at p. 5; Understanding Sexual Violence Fact Sheet, *supra.*
[14] *See* Understanding Sexual Violence Fact Sheet, *supra.*
[15] *See* CALCASA, *supra* at p. 24.
[16] *Id.*

Page 10 of 10

Decl. of Jacey Cooper                                        Case No. 20-cv-01468-CJN

EXHIBIT 45

# EXHIBIT 46

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | **CIVIL ACTION No. 20-cv-01468-CJN** |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF LINDA DARLING-HAMMOND

I, Dr. Linda Darling-Hammond, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am President of the California State Board of Education (SBE) and Charles E. Ducommun Professor of Education Emeritus at the Stanford Graduate School of Education and founding president of the Learning Policy Institute, created to provide high-quality research for policies that enable equitable and empowering education for each and every child.  While at Stanford University, I founded the Stanford Center for Opportunity Policy in Education and served as faculty

sponsor for the Stanford Teacher Education Program, which I helped to redesign.  I am also the author

of more than 25 books and more than 600 articles on education policy and practice.  I have consulted

widely with federal, state and local officials and educators on strategies for improving education

policies and practices and am the recipient of 14 honorary degrees in the U.S. and internationally.

2.      I began my career as a public school teacher and co-founded both a preschool and a

public high school.  I served as Director of the RAND Corporation's education program and as an

endowed professor at Columbia University, Teachers College before joining the Stanford faculty.  My

work has focused on educational equity and ensuring that students from all backgrounds receive

access to high quality teachers and an education that focuses on the needs of the whole child.  I

received my Ed.D. from Temple University (with highest distinction) and a B.A. from Yale

University (magna cum laude).

3.      I submit this Declaration in support of the State of California's litigation against

Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department

of Education ("ED" or the "Department"); and the United States of America regarding the recently

issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities*

*Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the "Title IX Rule" or Rule).

4.      This declaration is based on my personal knowledge, my familiarity with Title IX, my

review of the Notice of Proposed Rulemaking (NPRM) and the final regulation (Rule), and the

knowledge and expertise I have acquired in the course of 45 years as an educator, education systems

leader, education researcher, and expert in education quality, student outcomes, social emotional

learning and school climate, and equity.  If called and sworn as a witness, I could and would testify

competently to the information in this declaration.

**State Board of Education and California System of Common Schools**

Decl. of Linda Darling-Hammond                                    Civil Action No.  20-cv-01468
EXHIBIT 46

5.      As the President of the State Board of Education (SBE), my key responsibilities include presiding at SBE meetings and ensuring that agreed upon action is implemented; working with staff to prepare agendas for SBE meetings; serving as the spokesperson for the SBE, and keeping abreast of local, state, and national issues and informing SBE members of local, state, and national issues.

6.      The State of California's common system of K-12 public schools originates from the State Constitution and is funded by the State.  The State is ultimately responsible for the operation of its schools.  The State receives federal funding from the United States Department of Education to operate its pre-schools and system of K-12 common schools, which include its charter schools.  It is, therefore, obligated to comply with Title IX and its implementing regulations.

7.      The SBE was established first by statute in 1852, then by amendment to the California Constitution in 1884.  By statute, the SBE adopts rules and regulations for the government of the state's public schools, approves statewide academic content standards, adopts tests and sets policies for the statewide assessment system, implements state and federal school accountability requirements, approves allocation of certain state and federal funding sources, and studies the educational needs of the state and plans for improvement of the administration and efficiency of public schools.

### Immediate Harms to Schools, Students, and the State Caused by the Rule

8.      Based on my review of the NPRM and Rule issued by the Department, I understand that the Rule creates additional hurdles for students who are seeking to initiate the complaint process related to sexual harassment or assaults and limits the responsibility of local educational agencies (LEAs) to respond to complaints and prevent sexual harassment or assault of other students under their care.  These changes include, but are not limited to, a narrower definition of sexual harassment that requires a showing of severe, pervasive and objectively offensive sex-based harassment that

effectively denies equal access to education; additional barriers to making a complaint, such as requirements that the impacted student, or his or her parent or guardian, submit a written complaint to initiate the grievance process for an investigation to start under most circumstances, regardless of the student's age, disability, or writing ability, and a requirement that they be participating or attempting to participate in the school where the harm occurred at the time of the filing of the complaint.  I also understand that the Rule permits the Title IX Coordinator to sign and file a complaint on behalf of a child, but that such action is discouraged by the Department and, if a Title IX Coordinator does file on her or his own, the Department could find a school in noncompliance for doing so.  (*See e.g.*, 85 Fed. Reg. at 30,304 ("choice to initiate the grievance process must remain within the control of the complainant unless the Title IX Coordinator has specific reasons justifying the filing of a formal complaint over the wishes of a complainant."))

9.     Over the past decade, a robust body of research has emerged showing how biology and environment interact to produce human learning and development.  Research from the fields of neuroscience, developmental science, epigenetics, psychology, sociology, adversity science, resilience science, and the learning sciences has reinforced the importance of social emotional learning and supporting the whole child within K-12 education.  Specifically, relevant to the Rule, the literature highlights several important relationships among the educational setting, cognitive and social emotional development, and educational opportunities and outcomes for students.

- A safe and secure school climate is key to fostering positive learning environments: learning is social, emotional and academic.  When students feel threatened or unsafe, their ability to learn is impaired.
- Positive relationships with trusted adults and connectedness with the school community are critical to promoting positive cognitive development and can improve educational outcomes.

Decl. of Linda Darling-Hammond                                    Civil Action No.  20-cv-01468
EXHIBIT 46

- Trauma can negatively impact educational outcomes, whether experienced in the community or in a school setting.  Any form of harassment, whether intended or otherwise, can undermine students' attachment to school, as well as their focus, attention, and learning.

- Adversity affects learning—and the way schools respond matters.  When schools ensure that every adult is prepared to look for and listen to students' needs and experiences, the adverse effects of trauma can be reversed.  When schools ignore these needs, the adverse effects of trauma are exacerbated.[1]

10.      As a result, there are a number of predictable consequences—both academic and social—when schools are unable to meet the social emotional needs of their students or when the school climate exacerbates the social emotional health of students.  Research finds that traumatic conditions at school are associated with chronic absenteeism, which is in turn associated with reduced academic performance, and higher rates of dropout and failure to graduate.[2]  These outcomes, in turn, have broader societal effects.  For example, each student who drops out costs each state hundreds of thousands of dollars as a function of increased costs due to unemployment, crime, health care, and incarceration, and decreased income due to lower wages and capacity to pay taxes.[3]

---

[1] *Cantor, P., Osher, D., Berg, J., Steyer, L., & Rose, T. (2018). Malleability, plasticity, and individuality: How children learn and develop in context;* Darling-Hammond, L., Flook, L., Cook-Harvey, C., Barron, BJ & Osher, D. (2019). Implications for educational practice of the science of learning and development, Applied Developmental Science. https://doi.org/10.1080/10888691.2018.1537791; Darling-Hammond, L., Cook-Harvey, C.M. (2018). Educating the Whole Child. https://learningpolicyinstitute.org/product/educating-whole-child-report; *Osher, D., Cantor, P., Berg, J., Steyer, L., Rose, T. (2018). Drivers of human development: How relationships and context shape learning and development.*

[2] Ginsburg, A., Jordan, P., & Chang, H. (2014). Absences add up: How school attendance influences student success. San Francisco, CA: Attendance Works; Balfanz, R., & Byrnes, V. (2012). The importance of being in school: A report on absenteeism in the nation's public schools. Baltimore, MD: Johns Hopkins University Center for Social Organization of Schools.

[3] Rumberger, R. W. (2012). America cannot afford the stiff price of a dropout nation. San Jose, CA: Silicon Valley Education Foundation. https://www.civilrightsproject.ucla.edu/news/press-releases/featured-research-2016/school-suspensions-cost-taxpayers-billions/pr-rumberger-losen-hi-cost-discipline-2016.pdf]

Decl. of Linda Darling-Hammond                    Civil Action No.  20-cv-01468

EXHIBIT 46

11.      The COVID-19 pandemic has created additional challenges for supporting the social emotional needs of students.  In California, almost every school in the state has been physically closed for instruction since mid-March.  As a result of stay-at-home orders, many families have experienced economic hardship and significant disruption to their daily lives, which will predictably impact the social emotional health of students.  As we look ahead to the next school year, many students' social emotional health has been and will continue to be adversely affected by the COVID-19 pandemic, and LEAs will play a critical role in supporting these students.

12.      Attempting to implement this scheme by the Rule's effective date of August 14, 2020 is particularly daunting and is almost certain to distract from the planning and implementation of programs and services that are necessary to support students, staff and the broader school community amidst the uncertainty caused by the COVID-19 pandemic.  As a result of the pandemic, LEAs have been forced to implement distance learning strategies and provide instruction and other supports remotely.  Many LEAs are also further developing and refining their distance learning approaches in anticipation of further school closures into the next school year.  It would be a challenge for LEAs to implement the complex procedural scheme required under the Rule for the required grievance process in the best of circumstances.

13.      The three most important factors that prevent long term consequences to children from the stress associated with forms of trauma, such as sexual harassment, are access to early intervention, the safety in expressing such a grievance, and the ready access to an adult they trust.[4]  Schools are one of the most important places where all three must be provided.

---

[4] Masten, A.S., Best, K.M. and Garmezy, N (1990). Resilience and development: Contributions from the study of children who overcome adversity. Development and Psychopathology, 2(4), 425-444; Masten, A.S. & Coatsworth, J.D. (1998). The Development of competence in favorable and unfavorable Environments: Lessons from research on successful Children. The American Psychologist, (53(2), 205-220).

Decl. of Linda Darling-Hammond                                    Civil Action No.  20-cv-01468
EXHIBIT 46

14.     The Rule will undermine these three conditions as it fails to account for the unique aspects of the K-12 school system in a number of ways.

15.     First, the Rule is likely to result in an increase in child victims on our campuses because of the requirement to wait to open a complaint and investigate under Title IX until after the harm to the child has become so severe, pervasive, and objectively offensive that it effectively denies a child's equal access to education.  In practical terms, the Rule prevents school officials who know about sexually harassing conduct from investigating and resolving a complaint under Title IX until they have confirmation that the sexually harassing conduct has persisted to such a degree that a child is manifesting signs of school disengagement, such as tardiness, bed wetting, and school refusal. (85 Fed. Red. at 30,170.)  Research on absenteeism demonstrates how difficult it can be to identify and correct the causes of chronic absenteeism and how important it is to keep students in school in the first instance by addressing their needs before they become so traumatic that students feel they cannot attend.[5] The likely harm to future educational attainment of students who feel so severely and pervasively harassed as to feel that they are unable to continue at school is well-established from research documenting the difficulty of re-engaging students who have left school.

16.     The Rule's requirement that a child be subjected to sexual harassment so severe and pervasive as to effectively deny equal educational access before a school can take effective remedial action and disciplinary steps to stop the harassment under Title IX also ignores contemporary knowledge about trauma and social emotional development.  The impact of a sexual harassment or assault incident on a student's ability to learn, and thus on his or her access to education, may not be evident until long after that incident occurs.  Studies of the experience

---

[5] Attendance Works. (2016). Preventing missed opportunity: Taking collective action to confront chronic absence. San Francisco, CA: Attendance Works; U.S. Departments of Education, Health and Human Services, Housing and Urban Development, and Justice. (2015); Sutphen, R. D., Ford, J. P., Flaherty, C. (2010). Truancy interventions: A review of the research literature. Research on Social Work Practice, 20, 161-171.

Decl. of Linda Darling-Hammond                                    Civil Action No.  20-cv-01468
EXHIBIT 46

of harassment show that its attendant trauma can remain hidden long after the event.  But when support and therapy occur early, they can prevent the cascade of effects on learning and adaptation and the accumulation of risk factors that can lead to more serious emotional and learning consequences.[6]  This is particularly true for students who may be nonverbal or have other difficulties expressing its impact.

17.     Additionally, even before the emotional harm of the traumatic event or events reaches a level that "effectively denies" the victim equal access to education, the victim's ability to access education may have been substantially undermined.[7]  Under the Rule, even with the provision of supportive measures, the victim might be required to continue in an educational setting with other students or adults involved in the incident, potentially exacerbating the trauma. In fact, the Rule would prevent LEAs from investigating and resolving a complaint related to conduct for which the LEA had actual knowledge until the conduct is both severe *and* pervasive and the victim is re-traumatized, when the trauma reaches a level where it prevents the victim from participating in the educational setting.

18.     The longer that children experience chronic stress unbuffered by the support of a trusted adult, the greater the consequence to their learning and healthy development.  The unnecessarily lengthy (more than 20 day) grievance process required in the Rule for all pre-K through 12 schools.  The Rule's prohibition on providing effective remedies for complainants and taking interim remedial action against a perpetrator to stop further harassment until the conclusion of the process in the absence of a finding that alleged conduct poses "an immediate

---

[6]  Masten, A.S. (2011). Resilience in children threatened by extreme adversity: Frameworks for research, practice and translational synergy. Development and Psychopathology, 23, 141-154.

[7]  Stannard Gromisch, E. (2015). How trauma affects learning, memory and attention. http://www.brighthubeducation.com/special-ed-inclusion-strategies/66806-how-trauma-affects-learning-memory-and-attention/ (accessed Dec. 14. 2016); The National Traumatic Stress Network. (n.d.). Effects of complex trauma. http://www.nctsnet.org/trauma-types/complex-trauma/effects-of-complex-trauma (accessed Dec. 14, 2016).

Decl. of Linda Darling-Hammond                              Civil Action No.  20-cv-01468
EXHIBIT 46

threat to the physical health or safety of any student" will increase the time that children experience these increased risks to learning and health.[8]

19.     Additionally, the Rule and its preamble do not articulate a clear standard for when harassment is both severe *and* pervasive enough to effectively deny that complainant equal access to the education program.  It is reasonably foreseeable that many LEAs schools will adhere to the plain text of the regulation—which appears to require multiple, serious incidents that result in trauma that rises to a level that is the equivalent of being denied equal access to the education program.  Allowing harassing conduct and the trauma that it may cause to persist until such a point will lead to predictable harms to students, as described in Paragraphs 9, 10, & 16.

20.     Furthermore, the Rule's textual definition for sexual harassment and the requirement for a written complaint to proceed with an investigation means that, in effect, professionals may be asked to violate their own moral commitment to promptly investigate and resolve student and staff misconduct on a school campus when they have evidence that it has occurred.

22.     Second, the final Rule's requirement that complainants "must be participating in or attempting to participate in the education program or activity of the recipient with which the formal complaint is filed" can reasonably be anticipated to limit LEAs' ability to remediate systemic sexual harassment and protect potential victims from future misconduct.  Under this provision, a victim of sexual assault who withdraws from an education program, as a result of trauma or to limit the risk of exposure to the perpetrator, is unable to file a formal complaint.  As a consequence, the LEA could be foreclosed from completing an investigation and taking disciplinary action against the perpetrator, potentially exposing other students to harm.

23.     The risk of perverse results in the K-12 context is especially acute.  The underlying conduct (and as a result, attendant trauma) must rise to such a level of severity and

---

[8] McEwen, B.S.  Protective and damaging effects of stress mediators. The New England Journal of Medicine, (338,3), 171-179

Decl. of Linda Darling-Hammond                                     Civil Action No.  20-cv-01468
EXHIBIT 46

pervasiveness to effectively deny equal access before an LEA can respond.  It is easy to envision a student or the family concluding that, rather than exposing the student to further harassing conduct, enrollment in a different educational program is in the student's best interest.  Similarly, when the misconduct is so severe and pervasive as to effectively deny equal access to the education program, it would be understandable for a student or family to withdraw from the program rather than force the student to continue to be traumatized while waiting for the LEA to take action against the perpetrator upon conclusion of a lengthy grievance process.

24.     By both precluding the LEA from taking action to investigate and stop the misconduct unless it has risen to a level that is so severe and pervasive that it effectively denies equal access and limiting the LEA's authority to take remedial action against a perpetrator if the student withdraws from the education program, it is reasonably foreseeable that the Rule will hamstring the ability of LEAs to address systemic misconduct and protect future victims.

25.     Third, the Rule's mandate to dismiss Title IX claims where the alleged sexually harassing conduct does not occur in an education program or activity over which the LEA exercised substantial control ignores the fact that off-campus conduct can create a hostile, unwelcoming, and unsafe environment on campus in a number of ways.

26.     The findings of harm due to trauma exist no matter the location of the traumatic events.  Students who may be harassed on the way to or from school or who are subject to cyber-bullying or harassment are equally at risk of self-harm and school failure.[9]  It is reasonably foreseeable that the emotional harm students experience as a result of such conduct will be compounded by the Rule's limitation on the ability of trusted adults at the school to take action to protect students in these circumstances.

27.     Fourth, in a K-12 school system, there are many types of adults on campus who are in a position to stop and prevent harassing behavior, including instructional aides, coaches,

---

[9] Kowalski, R. M., & Limber, S. P. (2013). Psychological, physical, and academic correlates of cyberbullying and traditional bullying. *Journal of Adolescent Health*, *53*(1), S13-S20. https://www.sciencedirect.com/science/article/pii/S1054139X12004132

Decl. of Linda Darling-Hammond                              Civil Action No.  20-cv-01468
EXHIBIT 46

teaching assistants, security officers, secretaries, counselors, nurses, and psychologists.  As noted above, a critical feature of a supportive K-12 school environment is that students believe that they are connected to and can trust adults on campus.  This includes the belief that an adult staff member will help in a way that is effective and stops further harm, whether a student reports harassing behavior to the staff member or the staff member witnesses conduct that puts student safety and wellness at risk, such as conduct that violates a sexual harassment policy.

28.      With respect to the "effectively deny" standard, the Rule can be reasonably anticipated to undermine this trust, by precluding that trusted adult from taking sufficient action to protect the student from future misconduct when the underlying conduct does not rise to a level of severity and pervasiveness to effectively deny the student equal access.  The Rule therefore introduces barriers to the types of trusting relationships that are necessary for student success and is likely to make campuses less safe for our children.  As detailed above in Paragraphs 8, 9, 10, 16, & 18, these are serious harms to a school campus' culture and climate that can have immediate negative impacts on student graduation and attendance rates.

29.      Finally, the Rule requires the complainant to file a written complaint requesting initiation of an investigation before an LEA is required to investigate and respond to alleged sexual harassment.  This requirement fails to take into account the unique and specific circumstances in K-12 schools for children subjected to sexual harassment and is therefore likely to result in legitimate complaints of sexual harassment going unaddressed under Title IX for several reasons.

30.      This approach is inconsistent with how K-12 school systems operate.  Children often do not know who to approach if something has happened to them and may even be fearful of drawing attention to themselves, getting into trouble, or being blamed for what has occurred.  Schools are also busy places with little private time.  When a child finds a quiet moment with a trusted adult with whom they can talk or who sees that something is troubling them, they may

confide orally to that person.  They should have the expectation that the adult will be able to protect them.

31.     Few children or young people will feel comfortable filing a written complaint requesting the initiation of grievance procedures.  Young children in the early grades and those with learning disabilities may be cognitively unable to do so.  The Rule's limitation on authority to initiate investigations and take remedial action in the absence of a formal written complaint adds an unnecessary barrier to initiating remedial processes that is at odds with the reality of trusting relationships that many students, particularly the most vulnerable students, develop with adults on a K-12 campus.

32.     Additionally, these requirements do not reflect developmental needs, capacities, and abilities of young students.  Young children are particularly sensitive to trauma and, often, are unable to verbalize social-emotional or other safety concerns.  Research evidence indicates that the majority of abused children do not reveal or fail to disclose abuse during childhood.[10] Children need the support of adults, trained in appropriate child abuse and maltreatment interviewing techniques,[11] to identify the harm, the impact of the harm, and to bring a complaint forward.

33.     The Rule also fails to consider the special needs of our students with disabilities, particularly those with severe disabilities who may be unable to verbalize the harms they are experiencing or complete a written complaint.  It is well-evidenced that trauma can result in negative short- and long-term impairments to children's cognitive, socio-emotional, and neurobiological functioning,[12] which can even further impair the capacity of students with

---

[10] London, K., Bruck, M., Ceci, S. J., & Shuman, D. W. (2005). Disclosure of child sexual abuse: What does the research tell us about the ways that children tell? *Psychology, Public Policy, and Law, 11*(1), 194.

[11] Saywitz, K. J., Lyon, T., & Goodman, G. S. (2017). When interviewing children: A review and update. In J. Conte & B. Klika (Eds.), *APSAC handbook on child maltreatment* (pp. 310-329). Newbury Park, CA: Sage.

[12] Cantor et al. (2019).

Decl. of Linda Darling-Hammond                              Civil Action No.  20-cv-01468
EXHIBIT 46

disabilities to submit a complaint.  Available data indicate that children with disabilities are at increased risk of abuse but that abuse is often confused with conditions related to children's disabilities.[13]  The Committee on Child Abuse and Neglect and the Council on Children With Disabilities recommend that experienced professionals conduct a thorough evaluation that includes a structured interview with the child, if possible, a comprehensive physical examination and consultation with an expert in children with disabilities.[14]

34.      The requirement to file a written complaint before an investigation under Title IX can commence also risks re-traumatizing victims.  Under the Rule, orally recounting the alleged misconduct is insufficient to trigger an investigation and the potential for remedial action.  If the allegation was first shared orally, the Rule will force many students to recount again the traumatic event in order to prepare a formal written complaint.  Research on trauma notes that the need for children to recount the history of a traumatic event, including one that involves their sexuality, is typically a source of re-traumatization, and a trigger to the recurrence of symptoms of post-traumatic stress.  Such symptoms will include anxiety, depression, inability to sleep and avoidance of experiences, such as school.  Recounting of such events needs to be facilitated by trusted adults who have been trained in how to elicit such a history, in order to both establish a correct history of the event and prevent the sequelae of symptoms from the event.[15]

35.      The Rule's authorization of parents or guardians to file the formal written complaint on a child's behalf partially mitigates these concerns, but does not resolve them.  For many child victims, the parent or guardian may be unable or unwilling to pursue a formal written

---

[13] Hibbard, R. A., Desch, L. W., & Committee on Child Abuse and Neglect. (2007). Maltreatment of children with disabilities. *Pediatrics*, *119*(5), 1018-1025. https://pediatrics.aappublications.org/content/119/5/1018.short

[14] Hibbard, et al. (2007).

[15] Volume 3, Handbook on Development and Child Psychology (edited by Michael Lamb), see Chapter 12, on Children and the Law, Lamb, et al.; Volume 4, Handbook on Development and Child Psychology (edited by Bornstein and Leventhal), see Chapter 16, Children and the Law, by Cauffman, et al.

Decl. of Linda Darling-Hammond                         Civil Action No.  20-cv-01468
EXHIBIT 46

complaint.  This would leave the child responsible for filing the complaint and, if the child is unable to do so, would prevent the LEA from taking remedial action, even if an employee is aware of the alleged misconduct.  Moreover, it does not alter the fact that the child must necessarily again recount the incident and risk re-traumatization to allow the parent or guardian to complete and file a formal written complaint, and there may be instances where children will not want to reveal sexual harassment or assault to their parent or guardian.

36.     In sum, for the reasons detailed above, substantial research and evidence supports the conclusion that it is reasonably foreseeable that the Rule will have significant negative impacts for the health and well-being of students subjected to sexual harassment and violence on our campuses, the very students that Title IX is supposed to protect.  Moreover, it is likely that students will require additional mental health and other supports to stay in school under the Rule, which will divert existing resources from other State educational needs.  These harms were not addressed in the NPRM and therefore could not have been, and were not, considered among the consequences of the Rule in determining whether to adopt it.

37.     I understand that the final Rule included a cost-benefit analysis, which projected some net costs if the Rule goes into effect.  This calculation includes a significant decrease in complaints and reports of sexual harassment, assault, and violence being made, opened, and investigated in our K-12 schools.  The Department's projected reduction in complaints filed, opened, and investigated is not based on a reduction in incidents of sexual harassment, assault, or violence on our campuses, but rather based on the additional hurdles imposed by the Rule for a student to initiate the complaint process.  In fact, the cost-benefit analysis explicitly assumes that only half of the documented incidents of sexual harassment currently reported to the Department through the Civil Rights Data Collection will result in formal investigations.  85 Fed. Reg. at 30,568 (May 19, 2020).

38.     As a result, and for the reasons detailed above, the Rule will impose significant costs upon students who have been subjected sexual harassment, including those who have been

Decl. of Linda Darling-Hammond                                Civil Action No.  20-cv-01468
EXHIBIT 46

subjected to severe, pervasive or objectively offensive sexual harassment.  These costs, which are attributable to lower educational outcomes and the concomitant impact on future earnings, as well as the costs of later mental and physical disabilities and health care, were not addressed in the Rule's cost-benefit analysis.

39.      The cost-benefit analysis included in the Rule also did not address several reasonably foreseeable and substantial costs that the Rule would impose on the K-12 education system in California.  Schools serving students who have experienced trauma will need to incur higher costs for mental health and other supports for these students.  The Rule's addition of $250 per set of supportive measures is unlikely to be sufficient in most cases, given the research on trauma and its long-term impacts.  Having to absorb the costs imposed by the Rule in the near terms will only add insult to injury as many California schools grapple with budget cuts being proposed as a result of the economic fallout from the COVID-19 pandemic, and with the increased costs schools face to continue serving students in the midst of the COVID-19 outbreak. If schools do not incur those costs, the cost is likely to be borne by the student and by society, in terms of lower academic outcomes, potential dropout, and potential lifelong declines in earnings, among other possible negative consequences as detailed above in Paragraph 9, 10, 16 & 18.

40.      Additionally, for the reasons detailed above, it is reasonably foreseeable that the Rule will increase the rate of absences for victims of sexual harassment and assault, as well as the number of students who drop out of school.  In California, the bulk of the state and federal funding that LEAs receive is tied to "average daily attendance" or ADA, so LEAs will bear a cost of lost ADA revenue attributable to reduced attendance rates and higher drop-out rates under the Rule.

41.      Accordingly, the cost-benefit analysis included in the final Rule does not appear to account for a number of reasonably foreseeable costs that the Rule will impose on individual students, LEAs, and the K-12 system as a whole.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this  10th  day of June, 2020.

_____

Linda Darling-Hammond
President, State Board of Education

Decl. of Linda Darling-Hammond                      Civil Action No.  20-cv-01468
EXHIBIT 46

# EXHIBIT 47

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, in her official capacity as Secretary of Education; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | **Civil Action No. 20-cv-01468-CJN** |

**DECLARATION OF GUILLERMO DE VEYGA**

I, Guillermo de Veyga, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

   1.  I am the Chief of Staff in the Office of the President at New Jersey City University ("University" or "NJCU"), a public institution of higher education of the State of New Jersey located in Jersey City, New Jersey. My educational background includes a Ph.D. and an M.B.A. I have been employed as the Chief of Staff since January 2018. In this capacity, I direct and oversee high-level initiatives at the discretion of the President. I serve as the University's Government Relations Officer and represent the President internally and externally consistent with University

interests. In addition, I supervise a number of units and areas of operation at the discretion of the President. Among those who report to me is the Director of EEO/AA/Diversity in the Office of the President, who serves as the University's Title IX coordinator. I provide oversight of the work of that office in addressing Title IX regulation related matters. Before becoming Chief of Staff, I served in a number of roles in the division of Academic Affairs, culminating in my position as the Associate Vice President for Academic Affairs. During my tenure in Academic Affairs, I oversaw Academic Operations and Planning, Grants and Sponsored Programs, Continuing Education, as well as, several other areas in the division. During my time at the University, I have assisted in the implementation of initiatives impacting student success and effective financial stewardship. I also have expertise on improving minority access, higher education funding models, and creating accurate and sustainable revenue projections.

2.     I submit this Declaration in support of the State of New Jersey's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or "Department"); and the United States of America regarding the recently issued Rule entitled Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance. 85 Fed. Reg. 30,026 (May 19, 2020) ("Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through University personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on the University.

**Background of the University**

3.      Opened in 1929 as the New Jersey State Normal School at Jersey City, the institution was renamed New Jersey State Teachers College at Jersey City in 1935 and Jersey City State College in 1958, becoming a liberal arts institution in 1968. In 1998, the New Jersey Commission on Higher Education approved a change of institutional status and accepted the present name, New Jersey City University.

4.      Although the founding principles and mission of this urban institution—access and excellence—have not changed since the first day of class over 91 years ago, the University's physical presence has changed dramatically including a main and an additional location in Monmouth County in suburban area with different geography and demographics from its main campus. The University has 49 undergraduate degree major programs and 28 graduate degree programs, including 3 doctoral programs, offered in three colleges and a school of business; and it serves about 8,000 students from across New Jersey, the United States, and over 40 countries around the globe. The University's student body is very diverse. Undergraduate racial and ethnic breakdown: 8% Asian, 23% Black/African American, 40% Hispanic/Latinx, 19% White, 10% missing data or other; Graduate racial/ethnic breakdown: 6% Asian, 16% Black/African American, 26% Hispanic/Latinx, 39% White, 12% missing data or other.

5.      Students also engage in faculty supervised travel and study abroad. Typically, this involves approximately 25 overseas trips. In the past year there were four Title IX related complaints related to study abroad programs.

6.      Approximately 700 students reside in NJCU residence halls in Jersey City, however the University is primarily a commuter institution, thus many student interactions occur off campus.

7.      The University is an institution of the State of New Jersey authorized and operated pursuant to state law, N.J. Stat. Ann. § 18A:3B-1 et seq. and N.J. Stat. Ann. § 18A:64-1 et seq., and supported by tuition paid by students, appropriations from the State of New Jersey, and charitable sources. For FY 2019, NJCU received $28,444,000 in State appropriations.

8.      Additionally, the University is a recipient of federal funds from the Department. As a result, the University is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

**The University's Sexual Misconduct Policy and Investigations**

9.      The University's Office of Equal Employment Opportunity/Affirmative Action/Diversity ("EEO/AA") is the lead University office for the enforcement and coordination of the administration of sexual and gender-based misconduct policies. This office reports to the Chief of Staff in the Office of the President. The Director of the EEO/AA/Diversity Office ("Director") is the University's Title IX Coordinator and is assisted by three Deputy Title IX Coordinators (one each in Human Resources, Student Affairs, and Academic Affairs) and two investigators (one each in Public Safety and Student Affairs). The Deputy Title IX Investigator in the Dean of Student's Office oversees all day-to-day student policy and student judicial processes for the University.

10.     The Director investigates complaints of discrimination and harassment, conducts Title IX and State policy training for employees and student population, conducts specialized training for summer staff, chairs/coordinators and other groups, submits quarterly reports to the NJ Division of EEO/AA, serves as the co-chairperson of the Title IX Taskforce, serves a resource to management and executive leadership, serves as a member of the NJCU Diversity and Inclusion Council ("PDIC") and member of two subcommittees.

11.     All of the Title IX staff exercise additional responsibilities in the University. The Student Affairs Deputy Title IX Coordinator is an Associate Vice President who oversees all day-to-day operations for the Division of Student Affairs including: Childcare Center, Residence Life, Dean of Students, Women's Center, Counseling & Wellness, Center for Leadership & Engagement, Student Media, Veteran's Services, Office of Specialized Services, Community Service, Student Government, Campus Compact, Dining, Centralized Tutoring, and serves as co-chairperson of the Title IX Task Force. The Human Resources Deputy Title IX Coordinator is the Director of Talent Management, Learning and Development and Employee Relations who has responsibility for employee relation functions of the University for CWA, IFPTE, AFSCME unions, adjunct faculty contracts, and all articles of the AFT contract, serves as CEPA Officer and ADA Coordinator, administers all benefits including ABP, PERS, and TPAF pensions, manages the Employee Advisory Services, serves as the President's designee for all faculty sick leave, manages the University's United Way Campaign. The Deputy Title IX Coordinator in Academic Affairs is Interim Associate Dean of the College of Arts and Sciences ("CAS") with responsibilities related to 14 academic departments. The Associate Dean works closely with all department chairs and assists with matters such as course scheduling, faculty grievances, and faculty requests for released time, sabbaticals, travel, teaching schedules, sick leave, reappointment, and promotion and tenure. Other duties include participating in enrollment decisions, advisement, budget, joint programs, new programs, fund raising, sponsorship, and administration of intellectual and cultural events. The Associate Dean works collaboratively with chairs to assist in issues regarding faculty and adjunct grievances, budget issues, capital requests, grants and research, and course scheduling. The Associate Dean also addresses requests and issues raised by faculty and hears student grievances in the CAS. The Associate Dean will refer grievances as appropriate to the CAS student advisement

colleagues. The Associate Dean also serves on a team to support the needs of two academic programs (Honors and academic foundations), two cultural centers (Center for Latin Studies & Center for African Studies). The Title IX investigator in the Public Safety Department is a supervisor who has regular supervisory responsibilities related to the operation of the Public Safety Department. The Title IX investigator in the Student Affairs Division is the Interim Dean Students with responsibility for management and supervision of that office.

12.     The University has a Sexual and Gender-based Misconduct Policy Governing Students ("Student Policy"), last issued in September 2016.[1] The University has adopted a policy to address discrimination in the workplace. This policy is the State Policy Prohibiting Discrimination and Harassment in the Workplace, 6/1/12 ("Employee Policy"). Additionally, the University has adopted the State procedures for addressing discrimination complaints against its employees. This procedure is entitled the Discrimination and Harassment Complaint Process for Complaints against University Employees and Individuals Who Do Business with the University ("Employee Procedures").

13.     The Student Policy was revised in 2016 by the Office of the Dean of Students. The Employee Policy was revised in 2013 by the State of New Jersey Division of EEO/AA.

14.     Both the Student Policy and the Employee Policy allow third parties—individuals not subject to the harassment—to report harassment to the University. Complaints may be made by any member of the University community who has been directly affected by the conduct or has reasonable cause to believe that a violation of the Student Policy has taken place.

---

[1] New Jersey City University, "Sexual and Gender-based Misconduct Policy Governing Students," (Sept. 20, 2016) https://www.njcu.edu/about/njcu-policies-and-standards/student-services-and-responsibilities-policies/sexual-and-gender-based-misconduct-policy-governing-students.

Decl. of Guillermo de Veyga                                    Case No. 20-cv-01468-CJN
EXHIBIT 47

15.     The Student Policy covers conduct that occurs on and off campus. On campus includes any conduct that takes place on University land, institutional roads and buildings, leased premises, and leased premises and facilities of organizations affiliated with the University, including University housing. The Student Policy also covers any off-campus conduct that affects a clear and distinct interest of the University, for example where the behavior:

     a.  Involves conduct direct at or by a University student or other member of the University community, for example at a private house party or place of outside employment;

     b.  Occurs during University-sponsored events or functions including travel, recruitment activities, internships and service learning experiences;

     c.  Occurs during events of organizations affiliated with the University, including events of student-run organizations;

     d.  Occurs during a Study Abroad Program or other international travel;

     e.  Poses a disruption or threat to any members of the University community; or

     f.  Creates a hostile environment for any members of the University community.

16.     The Student Policy defines sexual harassment as sexually oriented behavior, deliberate or negligent, which adversely affects one's academic performance or work environment. It may involve conduct or comments that prevents the individual's access to the educational benefits and/or opportunities at NJCU.

17.     Hostile environment sexual harassment is conduct that if "unwelcome or pervasive enough can create an intimidating, hostile, and objectively offensive environment" and "can limit a student's ability to participate in or benefit from academic, athletic and/or other programs." The Student Policy acknowledges "the more severe the conduct, the less need there is to show a

repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical."

18.    Under the Student Policy, quid pro quo harassment is also prohibited and defined as "[u]nwelcome sexual advances, request for sexual favors, and other verbal or physical conduct of a sexual nature . . . when submission or rejection of such conduct is made a condition of academic evaluation or the conferral of any benefit." It includes implicit or explicit threats by "someone in authority" which could include employees or students in positions of authority.

19.    Examples of sexual harassment that violate the Student Policy include sufficiently severe single incidents, multiple incidents that are less severe, no-contact incidents, or incidents that occur over electronic and online means, such as:

    a.  Observation of private sexual activity from a hidden location or electronic means without consent of the participant(s);

    b.  Engagement in voyeurism (viewing another person's intimate parts or private sexual activity) in a place where that person would have a reasonable expectation of privacy;

    c.  Recording, photographing, disseminating, or transmitting intimate or sexual utterances, sounds, or images of private sexual activity and/or a person's intimate parts without the consent of the participants;

    d.  Unwelcome sexually-oriented and/or obscene gestures, verbal expressions, or comments of a sexual nature about an individual's body, clothing, or sexual experience;

    e.  Inappropriate displays of sexually suggestive objects or pictures;

    f.  Leering or ogling;

Decl. of Guillermo de Veyga                                    Case No. 20-cv-01468-CJN
EXHIBIT 47

g.   Email and Internet use that violates the policy; and

h.   Unsolicited, unwelcome flirtations, advances, and/or propositions of a sexual nature.

20.     The Student Policy also prohibits retaliation against Reports or Respondents by individuals or groups for a report of sexual misconduct. The Title IX Coordinator will review all reports of retaliation and determine whether to impose immediate corrective action or whether to refer the report for investigation. In making this determination, the Title IX Coordinator may consult with the Title IX Team or members of the Title IX Team.

21.     The University maintains designated Confidential Reporters to whom individuals may report incidents of sexual misconduct without the information being shared. In instances where strict confidentiality is maintained and the incident only reported to Confidential Reporters, the University will not be able to conduct an investigation into the allegations. The University keeps a report of every receipt of a complaint with an indication of the disposition of the complaint confidential.

22.     A responsible employee/community member is one who has an affirmative duty to report all instances of sexual misconduct to the Title IX Coordinator or Deputy Coordinator. Upon making a report, the University must take "immediate and appropriate steps to stop the harassment, remedy the effects, and prevent any reoccurrence." A formal written and signed complaint is not required to trigger the notification to the University.

23.     Upon notification of a report of sexual misconduct the Office of the Dean of Students and the Department of Public Safety may take immediate interim actions to protect the safety of the community including interim suspension, no-contact notices, modifying class or work schedules, making alternative housing arrangements, and addressing other academic concerns. Once

Decl. of Guillermo de Veyga                                    Case No. 20-cv-01468-CJN

EXHIBIT 47

the information has been reported to the Title IX Coordinator or Deputy Coordinator, the case will be assigned to an investigator.

24.      An investigation involving students under Title IX should typically be resolved within 60 University business days, unless there is good cause for delay. The investigator is required to provide notice to both parties of the initiation of an investigation, including the identities of both parties and a summary of the prohibited conduct and policy violations. The investigator is responsible for collecting evidence and interviewing both parties and witnesses. Every person interviewed is provided a draft summary of their statements to ensure accuracy and completeness. Under limited circumstances, parties may be permitted to submit written statements instead of interviews, but the final decision rests with the Title IX Coordinator or Deputy Coordinator.

25.      The parties in the Title IX process may provide other relevant materials, but the University maintains responsibility for gathering evidence. Subject to the Family Education Rights and Privacy Act, any evidence that the investigator determines is relevant will be provided to the parties for review and comment.

26.      Participation of parties or witnesses in the Title IX process is voluntary. However, if a party declines to participate, the University may continue to investigate the report and issue findings based on available information.

27.      The investigator in the Title IX process prepares an investigative report based upon the evidence gathered during the investigation including the evidence from the parties and witnesses and provides the outcome of the investigation to the Deputy Title IX Coordinator in Student Affairs, who then reviews the report and issues a determination to the students/individuals concerning the outcome. If the investigator determines that there is insufficient evidence of a policy violation, the investigation will be closed and parties notified. The Reporter has a chance to appeal. If the

investigator determines that there is sufficient evidence of a policy violation, both parties are notified of the outcome and options for sanctioning and the matter is referred to a Single Administrator.

28.     If a Single Administrator Process is used, the Administrator must be trained in Title IX and University policies and assisted by a second, trained staff member. The Administrator and Office of the Dean of Students meet separately with the parties, examine all documentation, and review evidence collected during the investigation. The Administrator renders a decision and forwards the decision including sanctions, if applicable, to the Office of the Dean of Students who provides notices of the final decision, including sanctions, to the parties. .

29.     Sanctions for Title IX violation may include, but are not limited to, housing relocation, dismissal from housing, dismissal from housing or leadership role (Resident Advisor, Student Government Association, club role, student employment), permanent no-contact orders, university probation, and/or university dismissal.

30.     For sexual misconduct investigations based upon a formal written complaint, either party may request that the complaint and investigation report be addressed in a formal hearing presided over by a Hearing Board rather than before a Single Administrator.  The determination to address the complaint and investigation report before a Hearing Board or before a Single Administrator is reserved to the Office of the Dean of Students.

31.     In those instances where a Hearing Board is constituted and convened, the Hearing Board members will interview the accused individual and evaluate the report of the Title IX investigator. Cross-examination is not permitted. Upon the conclusion of the hearing, the Hearing Board will forward a recommendation (decision on responsibility and sanction, if relevant) to the Office of the Dean of Students. Both parties are notified of the decision of the Dean of Students.

Decl. of Guillermo de Veyga                                          Case No. 20-cv-01468-CJN
EXHIBIT 47

32. The University has 60 days from the time the formal written complaint is filed to complete an investigation and render a decision of responsible or not responsible.

33. Throughout the investigative process, either party may avail themselves of advisors of their choice to provide support and guidance. The advisor may assist the party with all written submissions, but may not directly question witnesses or the other party and may not testify or obstruct the meeting in any way. The University has the right at all times to determine what constitutes appropriate behavior on the part of an advisor and to take appropriate steps to ensure compliance with the policy.

34. The Employee Policy invokes a definition of sexual harassment, hostile environment harassment, and quid pro quo harassment to the Student Policy. Both on-campus and off-campus conduct is prohibited in a similar scope to the Student Policy.

35. For violations of the Employee Policy, a similar investigation process is initiated.

36. Complaints made against an employee by another employee or student may be made orally or in writing. The complaint is investigated by the Director of EEO/AA who provides a report which evaluates the complaint and provides findings and conclusions concerning whether the Employee Policy has been violated. The duration of the process is typically 120 days.

37. In instances where the discrimination policy is violated, corrective measures such as counseling or training or disciplinary measures will be determined or referred by the President.  For employees who are not in a collective negotiations unit or in the classified civil service, corrective measures or discipline may be determined by the University President or referred to the appropriate Vice President for the Vice President's appropriate determination and handling, including the imposition of discipline.

38.     For employees who are in a collective negotiations unit or in the classified civil service, the procedure for the imposition of discipline is subject to applicable civil service regulations or the applicable collectively negotiated agreement.  In such instances, discrimination violations are converted into charges, which are subject to applicable due process procedures, which include administrative hearing procedures under the collectively negotiated agreement or before the New Jersey Office of Administrative Law. Thus, post-determination hearing procedures are typical for violations of the Employee Policy.

39.     Collectively negotiated agreements are typically conducted between the Governor's Office and union representatives for staff members of the university.

**Revision of Existing Sexual Misconduct Policies and Procedures Required by the Rule**

40.     Because of the differences in the scope of the Rule and the University's current sexual misconduct policies, the University will need to undergo a significant, unscheduled revision process of its current policies.

41.     The review process is conducted by the Policy Advisory Group, a committee created to review all new, non-academic policy proposals and fully developed University policies and provide guidance on the policy process. The committee is comprised of representatives from each division of the University to provide insight that will prove useful in addressing that division's questions or concerns. The revision of a policy such as the sexual misconduct policy would take about six months and require input from employees, students, parents as well as the relevant University stakeholders: Student Government Association, Dean of Students Office, Human Resources, Title IX Coordinator, General Counsel, Office of the Vice President for Student Affairs and Enrollment Management, Office of the Provost.

42.     Because of the short time until the Rule goes into effect, the University will be required to conduct a truncated review process and likely implement an interim policy that meets the basic requirements of the Rule until such a time it can conduct a thorough review, have the policy go through the vetting process through the University Senate, relevant offices, other policy committees, administration, and other stakeholders, until it is approved by the required bodies: Student Government Association, Office of the President, Title IX Task Force, Faculty Senate-Student Affairs Advisory Committee, Policy Advisory Group, and the Board of Trustees.

43.     In addition, the Faculty Senate and Board of Trustees do not convene over the summer. Thus, the NJCU will likely need to conduct two revisions to its policies to ensure both compliance with the Rule and the thoughtful input of its university community. Significant time and funds will be expended to undertake this process.

44.     In addition to changing its policy, NJCU will be required to revise all training materials, all of the brochures, student materials, admissions materials, handbooks, human resources policies and procedures, Title IX brochures, and website notifications. The Department is also requiring all training materials to be posted online.

45.     Thus, the University will have to 1) revise and adopt new policies; 2) revise all relevant training materials in accordance with the new policy; 3) train all of the necessary employees in the new policies; 4) revise all human resources, handbooks, student and employee orientation, and other materials in accordance with the policies; 5) disseminate all materials to faculty, staff, and students; and 6) put its training materials online. All of these revisions will require expenditure of significant unaccounted for funds for revisions of a very significant policy that affects the entire community in less than three months.

Decl. of Guillermo de Veyga                                      Case No. 20-cv-01468-CJN
EXHIBIT 47

46.     NJCU investigates all allegations of sexual harassment and sexual misconduct that fall under the definition of sexual harassment expressed in its Student Policy and Employee Policy. The definition of sexual harassment in the Rule differs significantly from that in NJCU's current policy. The scope of the NJCU's investigations of sexual misconduct allegations is also not geographically limited to conduct that occurs in its programs or activities, or that occurs in the United States. Conduct occurring in off-campus housing, for example, is currently investigated under NJCU's Title IX Policy. It is my understanding that such conduct would fall outside of the scope of the Rule. Thus, under the Rule, NJCU will be required to dismiss any investigations where the allegations do not meet the narrower definition of sexual harassment that the Department has proposed and/or do not occur within the geographic scope of the Department's definition of "program or activity." However, the Rule permits NJCU to continue to investigate other sexual misconduct that falls outside the Rule's parameters under its own code of conduct proceedings. This will require NJCU to create a parallel process, which will engender confusion among students and force NJCU to accumulate unnecessary costs.

47.     For example, NJCU may receive a report and conduct an initial review. In its initial review, it may find that the conduct is actionable sexual harassment under its Student Code of Conduct, but not under the Department's Rule. This complaint will then have to be formally dismissed as a Title IX investigation and referred to a different code of conduct investigation procedure and grievance process.

48.     The University will have to determine how a parallel process can be initiated and explained to the parties in a way that communicates that both processes will protect their rights. For example, if similar incidents occur on and off campus, the University will not be able to conduct an investigation into the off-campus conduct under the Title IX process, and will thus have to formally

Decl. of Guillermo de Veyga                                      Case No. 20-cv-01468-CJN

EXHIBIT 47

dismiss it and initiate a separate code of conduct process and communicate the dismissal to the parties.

49.     If NJCU does not create a parallel process to the Title IX process proposed by the Department, serious conduct that interferes with students' education and on-campus life will go unaddressed, allowing a hostile learning environment for students to develop. If a case is dismissed without the creation of a parallel process, an alleged victim must face the alleged perpetrator for the remainder of the academic year, thus leaving them open to re-traumatization and potentially re-victimization. Typically, a university would be able to relocate students in residence halls or in class. Without a parallel proceeding, this would be foreclosed.

50.     In addition to creating a parallel process, the University will have to expend significant time and resources training investigators, Title IX staff, hearing officers, and administrators on the new policies and procedures. For example, hearing officers never previously had to determine whether cross-examination questions were relevant or involved prohibited sexual history information. They would have to be trained on relevance and evidence prohibited by the Rule and how to explain their decisions on the spot during hearings. They will also need to be trained on how to control hearings with advisors conducting cross-examination of parties and witnesses.

51.     Because the University currently relies on a single-investigator model to conduct the majority of its sexual misconduct investigations, it will likely have to hire new staff to comply with the Rule and ensure that there are sufficient staff members to conduct both investigations and live hearings. It will have to figure out to accommodate an increased number of live hearings including finding staff and space to host them and work around students' schedules to do so.

52.     The University will have to make important decisions such as whether to train faculty and staff on how to conduct such cross-examinations or whether to hire outside counsel to act as attorneys. Additionally, many faculty and staff may balk at the possibility of having to conduct adversarial cross-examination, rather than acting in a support role, requiring the University to seek potentially costly alternatives. Either decision will require a significant expenditure of resources and comes with attendant concerns on the University and the community, particularly the students participating in the process.

53.     Specifically for the Employee Policy and Employee Procedures, the Final Rule will completely upend several aspects of the University's current process as well as affect the process spelled out both in state policies and collective bargaining agreements. Should the Title IX process required by the Department in the Rule be implemented along with current bargaining agreement processes, complainants and accused employees will be put through both a pre- and post-determination hearing process, costing additional time and money to the University to conduct both procedures.

54.     Because collective bargaining agreements are negotiated at the State-level, the University is not involved in that process, but new agreements will likely have to be negotiated that take the Rule's procedures into account.

55.     NJCU estimates that it will need to spend six months and $100,000 to review its policy, create a fulsome new policy, and create a parallel sexual misconduct policy and process that will handle conduct that falls outside the Rule's criteria but that the University nonetheless feels it must address.

**Harms to the University Community Resulting From the Rule**

56.     The narrowed definition of sexual harassment in the Rule will negatively impact the NJCU community. It will create the impression among students that only the most severe sexual misconduct will be recognized by NJCU's Title IX Policy, leading fewer victims to report sexual harassment. This, in turn, will lead to fewer cases of sexual harassment being adjudicated and more individuals who have caused harm to others and who could cause more harm in the future remaining on campus.

57.     The requirement that NJCU dismiss complaints in which the alleged conduct took place outside one of NJCU education programs or activities as defined by the Rule will also negatively impact the NJCU community. A large majority of the reports NJCU currently receives involve incidents that occurred off-campus and/or outside of a college-sponsored program or activity, but still create a hostile educational environment for the complainant and/or others. This restriction will create the impression among students that sexual harassment can only be addressed by NJCU if it occurs on campus, leading to further underreporting.

58.     The requirement that NJCU's Title IX grievance process include live hearings and cross-examination will discourage victims from reporting sexual harassment, as many will not want to undergo hostile questioning about a traumatic experience. Complainants who report sexual harassment notwithstanding these procedural requirements may suffer mental, emotional, and/or psychological consequences from submitting to cross-examination, and the experience may result in irreparable harm to those individuals. Additionally, cross-examination will structure the grievance process more like a trial, which will create an adversarial environment that NJCU has tried to avoid in its current process and increase the potential for inequities between the parties' advisors in terms of skill, experience, and expertise that could affect the outcome of the process.

Decl. of Guillermo de Veyga                                    Case No. 20-cv-01468-CJN
EXHIBIT 47

59.     The combined effect of all of these provisions will be to chill reporting of sexual harassment. In addition to allowing perpetrators of sexual harassment to remain on campus, this will cause harm to the NJCU community in a variety of ways, including by reducing institutional trust.

60.     The Rule will negatively the affect the students of NJCU in a variety of ways. Currently we are able to protect both the student and the respondent by holding separate interviews, allowing them to express themselves freely.  Under the new rule, issues of confidentiality including past personal experiences could be exposed because information not typically shared with students, i.e., information that the University does not rely on in making a determination, will have to be shared with students, even if it is prejudicial or could be used in a retaliatory or abusive manner.

61.     Additionally students may be traumatized by having to relive experiences with the alleged perpetrator being in the same room and later being constantly exposed if the case is dismissed and the University cannot address it under the Code of Conduct.

62.     NJCU students are primarily low-income, first generation, minority students who are already wary of litigation. Changing the process into a more court-like proceeding will undoubtedly keep some students from reporting, thus making the University less able to stop harassing conduct before it goes out of control. They are also unable to fund any external counsel and will therefore be marginalized even further if one party can afford counsel and another is provided a staff advisor.

63.     It is always the goal of NJCU to look at a student holistically and offer them assistance where needed.  This process does not allow a student to report their incident to the dean of students office confidentially and therefore they run a risk of being persecuted on campus by their peers if there is the requirement to meet face to face and be cross-examined.

**Harms to the University Community Compounded by COVID-19**

64.     In addition to all of the harms mentioned above, the University will have to navigate this process during an unprecedented time in our history. Pursuant to the Governor's orders, the University closed its doors to in-person instruction in March, which upended its entire operation. At the moment, University staff are in the process of determining whether and how to keep students and employees safe should the University re-open in the Fall semester. Even if the University does not resume in-person instruction, the University will face challenges implementing online instruction, particularly as many students have limited access to remote learning and requisite technology on a regular basis.

65.     The EEO/AA office is facing particular challenges during this time implementing its current Title IX policies. At the moment, there are significant concerns with conducting one-on-one meetings with all parties involved, including witnesses. All meetings have been replaced with phone or videoconferencing calls, which present confidentiality concerns. For example, it can be difficult to assess if another individual is within hearing distance of the meeting or if the student has privacy or safety concerns discussing allegations and is unwilling or unable to sit for an interview because of the unavoidable presence of others family members or others. The University has been working through how to ensure confidentiality while gathering testimony remotely. In addition, the University has been unable to forward testimony or intake reports to parties for confidentiality reasons and faces challenges obtaining signed statements or reports from the parties.

66.     Students face their own set of challenges participating in the investigative procedures remotely. Some students lack access to technology required to participate in testimonial process. In addition, because of the challenges families in our community are facing, including uncertain income and unemployment, many students cannot prioritize the investigative process

remotely. NJCU is working to figure out ways secure their participation, but the challenges would only be compounded by the onerous procedures required by the Rule, which may require hours-long hearings that students will be unable to attend remotely. Finally, many students do not have the available resources to find support personnel to advocate for them or assist them remotely. The University personnel are working with students to remedy these challenges, but the Rule would impose additional requirements that would only make the process more challenging.

67.     All of the challenges the University is currently facing in this environment will be compounded by the requirement to overhaul its policies, all of its procedures, and disseminate the information and implement the new procedures. For example, the University will have to train all of its investigators, administrators, staff support, and hearing officers remotely and train them to conduct new mandatory procedures that they have never conducted before in a remote setting. Hearing officers will have to conduct adversarial cross-examination by advisors and figure out how to control the proceedings all over a remote platform.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this ___19___ day of June 2020

_____
Guillermo de Veyga
Chief of Staff
New Jersey City University

Decl. of Guillermo de Veyga                              Case No. 20-cv-01468-CJN
EXHIBIT 47

# EXHIBIT 48

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. **20-cv-01468-CJN** |

## DECLARATION OF KAY DOAN

I, Kay Doan, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

    1.    I am the Title IX Coordinator at Southern Illinois University Carbondale (SIU) located in Carbondale, Illinois. My educational background includes a Bachelor of Science in Administration of Justice. I have been employed as the Director of the Office of Equity and Compliance and Title IX Coordinator since 2016. Prior to my current role, I was a police officer in the SIU Department of Public Safety for 30 years.

Decl. of Kay Doan                                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 48

2.      I submit this Declaration in support of the State of Illinois' litigation regarding the United States Department of Education ("ED" or the "Department") recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through Southern Illinois University personnel who have assisted me in gathering this information from our institution. I have also familiarized myself with the Rule in order to understand its immediate impact on Southern Illinois University.

3.      Southern Illinois University is governed by the SIU Board of Trustees, one of two public university systems in Illinois. Founded in 1869, SIU Carbondale is a strong, diverse, student-centered, research-intensive and comprehensive public university accredited by the Higher Learning Commission.  SIU Carbondale is a Carnegie-classified high research public university offering nearly 40 doctoral and professional degree programs, 80 programs at the master's level, 90 undergraduate fields of study and three associate degree programs. Nearly 12,000 students are served through the Graduate School, the Schools of Law and Medicine, and the University's many other collegiate units and schools. The fall 2019 enrollment includes 9,377 full-time and 2,318 part-time students. Of these students, approximately 2,300 lived in on-campus housing (prior to the COVID-19 pandemic).

4.      As part of a public university system, Southern Illinois University is funded, administered and regulated by the State of Illinois and the SIU Board of Trustees.

5.      Southern Illinois University receives federal funds from the Department of Education. As a result, the university is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

Decl. of Kay Doan                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 48

6.      Southern Illinois University has adopted a sexual misconduct policy within its Student Conduct Code and internal governing policy that prohibits sexual harassment and sexual misconduct. The process for which complaints of sexual misconduct and sexual harassment are processed is established in the *Discrimination (including sexual harassment) Complaint and Investigation Procedures* and are investigated through the Office of Equity and Compliance. Acts of sexual misconduct include but are not limited to the following: A.) Sexual assault – any sexual act directed against another person forcibly or against a person's will or where the person in question does not or is unable to give consent for any reason. B.) Sexual harassment – any unwelcome sexual advance, request for sexual favors or any conduct of a sexual nature which has the purpose or effect of: i.) substantially interfering with a student's academic performance, or ability to participate or benefit from any of the academic, athletic, educational, employment, extracurricular or other programs of the University; ii.) creating an intimidating, hostile or offensive environment. The official definition shall be that most recently adopted by the Board of Trustees. C.) Forcible fondling – intentional or attempted contact with the private body parts of another person without the consent of that person. D.) Stalking – engaging in a course of conduct, involving two or more independent actions which threatens or endangers the health, safety, emotional welfare or access to academic resources or employment of another person or which would cause a reasonable person to be fearful for his or her safety, health or emotional well-being and which does cause another person to be fearful for his or her health, safety or emotional well-being. E.) Dating and domestic violence – any action which serves to cause harm to another person or which may reasonably be expected to cause harm to another person which is committed against: a current or former spouse; a family member; an individual with whom they share a child; an individual with whom they are, or previously have been, engaged in a romantic or intimate relationship; or an individual with whom they share, or previously have shared, a

Decl. of Kay Doan                                          Civil Action No. 20-cv-01468-CJN

EXHIBIT 48

residence. F.) Other acts of sexual misconduct – any other act of a sexual nature which disrupts or negatively impacts the educational mission of the University, including but not limited to public displays of pornography; possession, creation or distribution of child pornography; the exchange of money, goods or services in exchange for any sexual activity; causing another person to witness or observe any sexual act without clear, voluntary consent; videotaping, photographing or otherwise recording sex acts without the clear, voluntary consent of all individuals involved; or sexual contact between individuals who are legally prohibited from marrying due to a familial relationship  G.) Retaliation – any act of reprisal, including negative or otherwise unwarranted treatment, related to the reporting of, or participation in, any complaint or adjudication of alleged sexual misconduct. For employees, internal governing policies prohibit sexual harassment (as defined by the State of Illinois) and are also investigated through the Office of Equity and Compliance. The investigation process is the same for all employees and students; however, different sanction processes are dependent on the individual's position – faculty, staff, or student – with appeals processes through the SIU Office of the Chancellor.

7.      Southern Illinois University's Director of Equity and Compliance serves as the university's Title IX Coordinator and has three staff, two investigators and a full-time Civil Service employee for administrative support. As Title IX Coordinator, the Director is responsible for recommending plans and policies for the Title IX program; providing leadership, coordination, and administration of Title IX trainings and programs; and overseeing investigations of Title IX claims against employees and students.

8.      Over the past three academic years, Southern Illinois University has had 19 Title IX sexual misconduct cases go through its investigative process. The remaining Title IX complaints were either not pursued at the complainant's request or based on lack of information, or settled informally

Decl. of Kay Doan                                        Civil Action No. 20-cv-01468-CJN
EXHIBIT 48

to the satisfaction of the complainant. Informal Resolutions may include supportive measures if the complainant requests supportive measures. Any supportive measures are provided through the Confidential Advisor's office. If the complainant only seeks supportive measures, the respondent is not involved in the process. If the complainant requests a formal complaint, with an Informal Resolution, instead of a formal adjudication process, the respondent is included in the process and may agree to be subject to sanctions.

9.     Illinois law defines sexual harassment in employment as any unwelcome sexual advances, requests for sexual favors, or any conduct of a sexual nature when: 1) submission to such conduct is either explicitly or implicitly made a term or condition of employment, and submission to or rejection of the conduct is used as a basis for making decisions about employment or 2) such conduct interferes with job performance or creates an intimidating, hostile, or offensive working environment (820 ILCS 61/3-5). As to education, Illinois law defines sexual harassment as any unwelcome sexual advances or requests for sexual favors made to a student by an executive, administrative staff or faculty member, or any conduct of a sexual nature that substantially interferes with the student's educational performance or creates an intimidating, hostile, or offensive educational environment (110 ILCS 155/5).

10.     Currently, Southern Illinois University addresses sexual misconduct matters within the university community, or elsewhere when the nature of the alleged misconduct, as determined by the Title IX Coordinator or designee, adversely affects the university (including its reputation with its constituents and the local community), or the pursuit of its mission, or which otherwise indicates that a student may pose a danger to the academic community.

11.     Student complaints alleging sexual misconduct by a student can be reported by the complainant themselves or others (such as other students, employees, university police, family and

friends) either because of first-hand knowledge or second-hand information. The Director of Equity and Compliance (also the Title IX Coordinator) determines if there is reasonable cause to believe that a sexual misconduct violation occurred and, if so, how such allegations are to be resolved in accordance with the provisions of the Sexual Harassment Policy and policy on Gender-Based Violence: Sexual Assault, Dating Violence, Domestic Violence, and Stalking. If an investigation is requested by the complainant or initiated by the Title IX Coordinator, notice will be provided to both parties regarding the investigation. Within the notice, the accused is informed of the alleged misconduct with sufficient details in support, their rights, the complainant's name, and their right to have an advisor (allowed to provide support only). Similarly, the complainant receives notice which includes sufficient details on the alleged misconduct, their rights, the respondent's name, and their right to have an advisor for support. Students charged with a sexual misconduct violation are requested to meet with the designated investigators during the investigative process unless an informal resolution is reached. If an informal resolution is not reached, the investigation will proceed. Personal information, such as hospital records, are generally not used in the investigative process and are not provided in the investigative report. Thus, if received, these records will remain confidential, unless the information is relevant to the outcome of the investigation, such as whether or not sexual intercourse took place. The Title IX Coordinator will determine if there is a violation of university policy. Both parties are notified of the findings and may appeal. If a respondent is found in violation and after an appeal process is complete, the case is transferred to Student Rights and Responsibilities or the appropriate Vice-Chancellor for sanctions. Sanctions may include suspension, expulsion, no contact orders, etc. If the possible sanction is expulsion or suspension, Student Rights and Responsibilities will hold a hearing in front of a panel to determine sanctions. The university takes

Decl. of Kay Doan                                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 48

extensive steps to keep the matter confidential and protect all parties' rights under the Family Educational Rights and Privacy Act (FERPA).

12.    Since the COVID-19 pandemic reached the State of Illinois, Southern Illinois University has had to transition to online and alternative delivery of teaching, reduce the number of students living in campus housing, send its employees home to work remotely, create new policies and procedures to address the effects of the pandemic and incur substantial, unexpected expenses. The current virtual environment has also presented challenges in conducting Title IX investigations. Face-to-face interviews are complicated by the lack of technology or reliable technology. Conducting interviews via telephone can impede the ability to adequately assess credibility. It also makes it more difficult for complainants and respondents to have advisors with them. The university is now diligently preparing to return students and employees to campus in an environment within the new guidelines of federal and state agencies.  The university community will have to adjust to many adaptations, such as adjusting classroom settings to allow for social distancing, reconfiguring workplace arrangements, accommodating those at a higher risk of being affected by the virus, incurring significant unplanned for expenses.  These and other efforts will provide a safe educational environment. The university simply does not have the additional resources to implement the requirements of the Rule by the effective date.

13.    With this new Rule, Southern Illinois University is required to review/revise its sexual misconduct policies, student conduct code, internal governing policies, and seek additional regulatory relief at the state level. This could take many months and would have unknown costs.

14.    Furthermore, the new Rule creates an undue burden on Southern Illinois University to reconcile state and federal law requirements. In Illinois, the Preventing Sexual Violence in Higher Education Act ("PSVHEA") establishes requirements for all Illinois colleges and universities to

Decl. of Kay Doan                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 48

address, investigate, and resolve complaints related to campus sexual violence, domestic violence, dating violence, and stalking. 110 ILCS 155/1 *et seq*. Illinois law mandates that all universities "shall adopt a comprehensive policy concerning sexual violence, domestic violence, dating violence, and stalking consistent with governing federal and State law." 110 ILCS 155/10. The policy must permit students to report an alleged violation of the comprehensive policy regardless of where the incident occurred. *Id.* While the new Rule does not prohibit addressing conduct that may have occurred off campus, the new Rule mandates the dismissal of such complaints for the purposes of sexual harassment under Title IX. As a result, Southern Illinois University will be required to maintain more than one complaint process depending on the location of the alleged incident. PSVHEA requires schools to implement detailed complaint resolution procedures. Southern Illinois University will have to devote time and resources to attempting to reconcile the strictures of the Rule and State law requirements, assuming the procedures can even be reconciled.

15.     The new Rule also conflicts with the university's collective bargaining agreements and the State Universities Civil Service System. Southern Illinois University's faculty and staff are represented by eleven collective bargaining organizations, with twenty-one collective bargaining agreements. Additionally, many of the staff are classified as civil servants for which the State Universities Civil Service System governs disciplinary action.

16.     The procedures in the collective bargaining agreements vary for different employment categories. The new Rule's requirement that a uniform process occur between students and employees will require SIU to re-negotiate its collective bargaining agreements. It is not feasible that this can be accomplished by August 14, 2020, especially in light of logistical difficulties resulting from the COVID-19 pandemic.

Decl. of Kay Doan                                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 48

17.    Once these policies are created, collective bargaining agreements are re-negotiated and additional regulatory relief is obtained, Southern Illinois University will then need to convene its faculty senate, staff councils and student government to begin the implementation and training processes. Again, it is unrealistic and, in fact, not able to be done prior to August 14, 2020 under the current circumstances and over the summer months when faculty and students are not on campus.

18.    In addition to re-negotiating collective bargaining agreements and obtaining regulatory relief, departments such as academic affairs, student affairs, general counsel, human resources, equity and compliance, labor and employee relations, and governmental affairs will all need to be consulted in the initial revision. This process alone will take several months in normal conditions.

19.    The new Rule requires a significant burden on staff and faculty in that in a shared governance model the university will need to receive comments from its faculty and staff councils and faculty senate, most of which are not ordinarily in session during the summer months.

20.    Once drafted, policy recommendations must be submitted to the SIU Board of Trustees for final approval, at periodic meetings already pre-scheduled for the year. Prior to approval the President will likely seek comments from senior leaders. We anticipate that this process will take a several weeks, if not months, to obtain final approval.

21.    As indicated, the State Universities Civil Service System will have to approve and modify its regulations to meet the new Rule, requiring a notice, comment and review process.

22.    During this COVID-19 pandemic, the university has had to spend millions of dollars directly related to the effects of the global health crisis and it anticipates spending a substantial amount more in its continuing efforts to respond to the effects of the pandemic in the delivery of education

Decl. of Kay Doan                                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 48

and student life activities for the coming academic year.  Additionally, the university has seen a significant, negative impact on various revenue streams due to the pandemic.

23.    At present, the university is unclear how it will now respond to non-Title IX sexual harassment claims that do not fall within the Rule's definition. This will need to be addressed in the comprehensive review of across-the-board policy and procedure development.

24.    Once new policy and procedures are established and approved, websites and catalogs will need to be updated and training material will need to be developed, again requiring several months.

25.    The university anticipates that it will have to hire additional staff or consultants to comply with the new rules, create and train a pool of available advisors and hearing officers, as well as provide updated training to the entire university community. At this time, the university does not have a budget for this new requirement and cannot estimate the amount that will be required at this time.

26.    Annually, all employees receive training on sexual harassment and preventing discrimination. Students annually receive training on sexual harassment, sexual violence prevention and consent requirements.

27.    The new Rule requires the university re-train all advisors and those responsible for making decisions as to cross-examination and evidentiary decisions on the records. At a minimum, this requires the university to train and prepare its Title IX Coordinator, as well as the staff of the Office of Equity and Compliance and Student Rights and Responsibilities, as well as the pool of new advisors and hearing officers, for which it will need to create. The preparation time needed to properly train such staff and then the time to conduct the training cannot effectively be accomplished over the course of the summer.

Decl. of Kay Doan                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 48

28.    The new Rule requires the university to reeducate the entire campus community about the new requirements as well as modifying student orientation materials and updating websites. The university anticipates that this process will take several months.

29.    SIU is extremely concerned about its ability to comply with the August 14, 2020 effective date, especially in re-negotiating collective bargaining agreements, seeking other regulatory relief as well as the rollout of training and student communications in light of the current COVID-19 pandemic demands while preparing for the fall semester.

30.    As the notice of proposed rulemaking occurred almost two years ago with over 100,000 comments from all communities, the university was obviously unable to plan or implement changes until the actual regulations were released. It was believed the Department of Education would consider the comments and revise problematic requirements.

31.    The August 14, 2020, effective date places extreme pressure on the university to fulfill its obligations to provide all students equal access to education and to train the entire campus community on their rights and obligations under Title IX, and is not feasible.

32.    With the short amount of time to prepare for the Rule's implementation and the Rule's requirement for cross-examination of the complainant, the respondent and witnesses with and immediate ruling on relevancy, Southern Illinois University must consider engaging trained consultants to provide the roles of advisors and decision makers.

33.    Southern Illinois University believes the cross-examination by advisors will harm students in that anyone's use of attorneys will intimidate witnesses, fundamentally altering the educational process so much that it would no longer serve its purpose and would instead effectively become an alternative and inferior courtroom for criminal conduct. Requiring an advisor to execute cross-examination of witnesses will exacerbate disparities in the process for those parties who can

Decl. of Kay Doan                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 48

afford an attorney advisor, compared to those who cannot, resulting in inequity for complainants and respondents alike.  Further, the Rule's exclusion of statements from any party or witness who does not subject themselves to cross-examination at a live hearing because of a variety of reasons upsets the balance of fairness. To withhold information gathered in an investigation from decision-makers runs counter to the university's duty to conduct a thorough investigation, considering all available information.

34.     The new Rule not only costs the university, it also costs students who are incapable of hiring a professional advisor for their personal interests.

35.     Southern Illinois University is also concerned that by providing the investigation report to the parties and their advisors prior to the hearing, it will open the door to the matter being pre-judged through social media bias's sound-bites for which the university will not be able to comment due to students' FERPA rights. In these instances, the community will likely have a pre-judgment bias for which the Rule specifically prohibits.

36.     Whether Southern Illinois University contracts its definition of a *complaint* and *sexual misconduct* to that required by the Rule or carves out another process is yet to be determined. The university is committed to providing a safe environment – the new requirements will have a chilling effect on victims of sexual misconduct. This Rule makes it more difficult for the university to fulfill its obligations under Title IX to provide all students equal access to education; provide a safe campus environment for all students; prevent and remedy sexual harassment; and provide a fair and equitable process for all students.

Decl. of Kay Doan                                          Civil Action No. 20-cv-01468-CJN

EXHIBIT 48

37. If reporting of sexual misconduct decreases as a result of the Rule, SIU will be less able to assist individuals who have been impacted by sexual misconduct, as well less able to address and remedy the impact of sexual misconduct. Regardless, the university is committed to complying with its legal responsibilities and fostering a campus climate welcome to all.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this /9ᵗʰ day of June 2020

Kay Doan

Director of Equity and Compliance & Title IX Coordinator

Decl. of Kay Doan                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 48

# EXHIBIT 49

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>                    Plaintiffs,<br><br>          v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>                    Defendants. | **Civil Action No. <u>20-cv-01468-CJN</u>** |

## <u>DECLARATION OF SHARON FELIX-CAMPOS</u>

1.      I, Sharon Felix-Campos, Director of the Office of Equal Opportunity, Office of the California State Superintendent, pursuant to 28 U.S.C. § 1746, declare and state that the following is true and correct:

2.      I submit this Declaration in support of the litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued final rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the "Title IX Rule" or Rule).

3.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

**Background and Overview of Substantial Harms Created by the Rule**

4.      I am the Director of the Office of Equal Opportunity within the California Department of Education's (CDE) Office of the State Superintendent.  I have served in this role for 30 years and have over 35 years in civil rights serving in different capacities.  As the Director, I am responsible for ensuring statewide compliance with State and Federal civil rights laws and regulations, including Title IX of the Education Amendments of 1972 (Title IX), Section 504 of the Rehabilitation Act of 1974 (Section 504), and the Americans with Disabilities Act (ADA).  I am also the designated Title IX Coordinator for the CDE and have served in this role for 30 years.  I have a bachelor's degree and have completed the course work for a Master's degree in Organization Development and Human Resources. This declaration is based on my personal knowledge, my familiarity with Title IX, Section 504, and the ADA, my review of the proposed regulation and final Title IX Rule, and the knowledge and expertise I have acquired in the course of 30 years of service and duties at the CDE.

5.      CDE receives federal funding from ED and is, therefore, obligated to comply with Title IX and its implementing regulations.  The Office of Equal Opportunity within the CDE is charged, in part, with ensuring statewide Title IX compliance by the 1,037 school districts in California established under the State's common system of schools.  The mission of the office is to provide guidance, leadership, and direction to the CDE civil rights program pertaining to the delivery of educational services and CDE employment.

6.      I have 18 years of experience specifically reviewing and resolving student complaints, including those filed involving sexual harassment, assault and violence in K-12 schools in California, and I have conducted compliance reviews of nearly all of the 1,026 school districts in California.  The assessment of compliance-related activities includes whether school districts have legally-compliant policies and procedures and are providing a prompt and

Decl. of Sharon Felix-Campos                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 49

equitable response to reports and complaints of sexual harassment, including assault and violence, made by students, parents, staff and third parties.

7.    The school districts that I work with to ensure compliance throughout the State of California are as diverse as the population of the State.  Some school districts are very remote and have only one or two schools, some are mid-size, and some are extremely large, such as Los Angeles Unified School District, the second largest district in the nation.  Because of this great diversity, the one-size-fits-all prescriptive approach to enforcement evinced in the Title IX Rule is not only cumbersome, but unworkable.

8.    If it goes into effect, the Title IX Rule would have serious consequences for the ability of K-12 schools throughout the State to provide an education environment free from discrimination and harassment, including assault and violence, on the basis of sex.  It would create many new child victims, who will suffer long-term trauma and significant mental health consequences as a result. These are consequences that the Notice of Proposed Rulemaking (NPRM) and the Title IX Rule explicitly ignored.

9.    The Title IX Rule will have an immediate and irreparable impact on student victims because the requirements in the Title IX Rule are so cumbersome and complex that these student victims and their parents and guardians will be discouraged from agreeing to move forward with the complaint investigation process.  If a complainant refuses to proceed, the Title IX Rule creates many barriers that make it difficult for the school to investigate properly to determine whether the complaints have merit and, if they do have merit, to provide remedies and disciplinary measures that not only support the harmed student, but help ensure a safe campus free from discrimination.

10.    Because the Title IX Rule fails to take into account the unique and specific circumstances for children subjected to sexual harassment in K-12 schools, it will result in many legitimate complaints of sexual harassment going unaddressed under Title IX.  The Title IX Rule requires that a written complaint be filed by the harmed child, an adult or guardian requesting an

Decl. of Sharon Felix-Campos                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 49

investigation, or a Title IX Coordinator before a school district is permitted to investigate and issue sanctions and remedies. The Title IX Rule states that the Title IX Coordinator can be found in violation of Title IX for proceeding with a Title IX investigation on his or her own. This approach is inconsistent with the reality of how K-12 school systems operate, and would prevent hundreds of students with real claims from getting effective remedies and schools from carrying out their duties to take appropriate disciplinary actions to stop sexual harassment, prevent recurrence, and eliminate a hostile environment.

### Substantial Harms Caused by the Title IX Rule

11.    The new Rule will result in an increase in child victims on our campuses and greater financial liability for the State because of the narrowed sexual harassment definition that, in effect, creates a requirement for schools to wait to open a complaint and investigate under Title IX until after the harm to the child has become so "severe, pervasive, and objectively offensive" that it "effectively denies" a child's equal access to education. For decades, Title IX has protected students from sexually harassing conduct that is severe *or* pervasive *or* persistent (not severe *and* pervasive) and a showing of denial of equal access was not required for a student to receive an effective remedy and a response to stop the sexual harassment and prevent it from reoccurring. Also, the Department did not mandate that a school dismiss complaints that did not meet the definition. In practical terms, the Title IX Rule prevents school officials who are aware of sexually harassing conduct from opening a formal complaint under Title IX to investigate and take action to stop the harassment until they have confirmation that the sexually harassing conduct has persisted to such a degree that a child has been subjected to significant harm. This is a recipe for an unnecessary increase in the number of student victims in our schools and in lawsuits from justifiably angry families. The Title IX Rule also makes absolutely no sense from an education perspective, as it is significantly more difficult and more costly to reengage and reenroll a student who has left school than it is to stop harmful conduct to a student to keep them in school.

Decl. of Sharon Felix-Campos                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 49

12.     The new "preemptive effect" provision mandates that schools address any Title IX allegations that fall within the sexual assault and harassment definitions under Title IX using the United States Department of Education's new complex set of procedural requirements. One of these new requirements, under the Title IX Rule is a mandate for that the student subjected to sexual harassment and violence be "participating in or attempting to participate" in the school at the time of complaint filing. When read together with the "preemptive effect" provision, the Title IX Rule creates a dangerous situation for schools and students. Based on these new provisions, school officials who have knowledge of student or staff sexual assault and harassment allegations may not investigate those allegations if the victim has left the District even if the conduct poses a danger not only to the harmed student but also to other students on campus because, under the Rule, the District may not be permitted to or able to take action to investigate and protect other students and the campus.

13.     The Rule's requirement that a child be denied equal educational access before a school can take action under Title IX ignores the fact that the impact of a sexual harassment or assault incident on a student's ability to learn, and thus on his or her access to education, may not be evident until long after that incident occurs, especially for students who may be nonverbal or have other difficulties expressing its impact. Again, the Title IX Rule creates unjustified barriers to relief and redress under Title IX for children who have been subjected to discrimination in our schools. This is in contravention of the statute's purpose and objectives.

14.     The Rule's high bar for initiating an investigation is especially inappropriate in a K–12 setting where, as in California, elementary and secondary education is compulsory and parents can be penalized with jail time when children do not attend. The Rule places parents and students in a difficult position because in order to receive relief under Title IX the  child victim must endure harassment that is deeply discomforting or disturbing for a significant period of time, before the incidents meet the heightened bar established by the Rule.

Decl. of Sharon Felix-Campos                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 49

15.     In addition, the Rule's mandate to dismiss Title IX claims where the alleged sexually harassing conduct is outside of "locations, events, or circumstances over which the [school] exercised substantial control over both the respondent and the context in which the sexual harassment occurs" in the first instance is irrational because conduct that originates off campus can nevertheless create a hostile environment on campus in a number of ways.  For example, a student who was sexually assaulted by another student after-school may face ongoing harm from that sexual assault after returning to school, particularly if the complainant and respondent students share classes on a small campus.  A requirement to dismiss such complaints under Title IX is contrary to its goal of ensuring our campuses are free from discrimination.

16.     Moreover, the Rule only applies a "deliberate indifference" standard to our response to sexual harassment, which places our students at risk, because it sanctions school districts to look the other way for sexual assault and battery, two offenses considered to be the most egregious under our education code.  At the same time, the Rule requires strict compliance with the onerous and prescriptive grievance procedures.  The different standards applied to the grievance process on the one hand and the response for students subjected to sexual harassment and assault on the other creates a disincentive for school districts to take strong action to ensure campuses and students are free from sexual harassment.  By doing so, the Rule creates inequities in the process for students subjected to sexual harassment and gives license to a host of unreasonable responses that fail adequately to protect campuses and complainants and yet may not rise to the level of "deliberate indifference."

17.     The principal impact of these changes, combined with the other changes discussed in this declaration, will be to increase confusion and distrust for children and their parents and potentially increase complaints made by the parents of children who have been harmed.

18.     The Rule will have significant implications for the health and well-being of students subjected to sexual harassment and violence on our campuses.  And, our State will pay the price when students drop out of school based on the trauma of experiencing sexual

Decl. of Sharon Felix-Campos                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 49

harassment that could have been stopped before it became severe and pervasive. Moreover, the State and its schools may pay a steep price for long-term mental health services and other supports for the victims. These costs were not calculated in the Title IX Rule's cost-benefit analysis.

19.    The Rule also has a set of one-size-fits-all requirement that fails to take into account the fact-specific nature of each complaint and conflict with other state laws that provide due process protections to students in California. For example, in California, if a student is facing an expulsion, under our education laws, we already have a live hearing process with live witness testimony that must be completed within 30 days and an appeal process from the hearing. But not every case of sexual harassment requires the same amount of process. To meet the Rule's requirement for these sexual harassment cases without having a live hearing, the decision-maker must "afford each party the opportunity to submit written questions, provide each party with the answers, and allow for additional, limited follow-up questions from each party." This will require school-site administrators to expend extensive time and resources on cases where the discipline to be imposed may not be more than a several day suspension (the maximum is five days under state law). In addition, to the extent students have lawyers, each case, no matter how small, will turn into an exercise in legal briefing and responses. The delays caused through these extensive processes that are not necessary for offenses that may result in only a one- or two-day suspension will prevent our school sites from acting swiftly to protect students, address misconduct before it becomes more serious, and eliminate the hostile environment.

20.    Absurdly, these requirements also result in unequal treatment of students subjected to sexual harassment and violence, who will have to endure far more questioning and delays before a resolution can be reached than students subjected to harassment and violence on any other basis protected by federal and state law.

Decl. of Sharon Felix-Campos                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 49

21.     By requiring education staff who serve as decision-makers to "explain to the party proposing the questions any decision to exclude questions as not relevant," the Rule also turns our educators into quasi-lawyers and our schools into quasi-courtrooms.

22.     The Rule prohibits schools from restricting parties' ability to discuss allegations and requires schools to provide parties and their advisors with all evidence directly related to the allegations, even if it is not relevant.  Because of the incredibly sensitive nature of sexual harassment and assault cases, these provisions conflict with other federal and state laws that strictly protect confidentiality of student records in K-12 schools, and these provisions can result in reputational and other harms to students when education documents and personal and sensitive information are shared and spread, including on social media and the internet.  The Rule does not provide sufficient privacy protections for victims who come forward.  There is already a well-documented underreporting issues and this will only further chill reporting on campuses.

23.     The extensive changes that Districts will have to make to their discipline and response grievance and other procedures to address the Rule's complex and onerous requirements, including the requirement to have an investigator, Title IX Coordinator, decisionmaker, and appeal person, and to create a separate system to address any sexual harassment conduct that is prohibited under state law, but no longer prohibited under Title IX, will be costly and difficult to implement in the inordinately short timeframe for implementation imposed by the United States Department of Education.  Our State's school are already severely impacted due to the unprecedented COVID-19 pandemic and the recently announced significant budget cuts. Many are struggling just to keep basic services for their students in place and plan for how to keep students safe in the coming school year.  The timeframe set by the United States Department of Education for compliance is unreasonable and arbitrary and will create great harm in our state.

24.     Considering all of the changes in the Rule and based on my experience overseeing Title IX compliance in the State for over 30 years, I anticipate: an increase in sexual harassment,

Decl. of Sharon Felix-Campos                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 49

including violence and assault, on our school campuses; more child victims of sexual harassment and violence; confusion among our administrators about their roles and responsibilities, which will exacerbate harm, and result in additional litigation from families; and campuses that are less safe and able to respond promptly and effectively to address and resolve sexual harassment.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on *[date]* 6/9/2020

*Sharon Felix-Campos*

SHARON FELIX-CAMPOS
Director of the Office of Equal Opportunity,
Office of the California State Superintendent

Page 9 of 9

# EXHIBIT 50

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | **Civil Action No. <u>20-cv-01468-CJN</u>** |

## <u>DECLARATION OF ANGELA S. FLEISCHER, MSW, LCSW</u>

I, Angela Fleischer, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Director of Equity Grievance/Title IX Coordinator at Southern Oregon University ("SOU") in Ashland, Oregon. I have over ten years of professional experience in program management, research, and direct services in the areas of trauma response and sexual assault intervention. I have been employed as SOU's Title IX Confidential Advisor since 2014 and

Decl. of Angela S. Fleischer                                                          Case No. 20-cv-01468-CJN

EXHIBIT 50

as SOU's Director of Equity Grievance since 2018. On or about June 1, 2020, I added the responsibilities of SOU Title IX Coordinator to my position, ending my responsibilities as Confidential Advisor.

2.     I have extensive experience regionally and nationally presenting trainings, developing curricula, and presenting on best practices in the area of interviewing, sexual violence prevention and response. I have trained professionals in multiple fields, including law enforcement, higher education, and direct service on these topics. I have served on multiple boards and committees on sexual violence prevention and student awareness in higher education, including the Oregon Sexual Assault Task Force.

3.     My job duties as Title IX Coordinator and Director of Equity Grievance include:

    a.   Serving as the primary resource for all campus constituents, including faculty, staff, and students related to Equity Grievance including Title IX complaints and Campus Choice Directs SOU Equity Grievance processes;

    b.   Receiving all complaints related to the University's Equal Opportunity, Harassment, and Sexual Misconduct Policy and directing and supervising all Investigators, Confidential Advisors, and Certified Advocates;

    c.   Tracking prevalence, patterns, and climate as these present within the case array;

    d.   Providing annual training to faculty, staff, students, equity grievance panel members, and appeal board members, as well as providing campus, local, state, and national support, expertise, and training on confidential advising, Title IX, and the equity grievance processes;

Decl. of Angela S. Fleischer                                    Case No. 20-cv-01468-CJN

EXHIBIT 50

e.   Responsibility for day to day direction and operation of the SOU Equity Grievance processes and Campus Choice/Title IX Program, including education and training the campus community;

f.   Directing case equity and due process related to interim measures, investigations, adjudication, resolution, and accommodations;

g.   Maintaining the Campus Choice/Title IX database and tracking to ensure compliance with designated timelines;

h.   Directing case assignments for investigators, process advisors, and confidential advisors and directing Equity Grievance Panel processes, including designating Chair, staff and faculty;

i.   Tracking, reporting, and participating in Clery Act compliance related to Equal Opportunity, Harassment, and Sexual Misconduct;

j.   Overseeing preparation of complete case files for Equity Grievance Panels/Title IX Hearings and as required for subpoenas;

k.   Overseeing and ensuring adequate, reliable and impartial investigations of reports and complaints of Title IX matters by administering the implementation of case management/investigatory plans, which may include: verifying whether the report constitutes sexual misconduct; appointing an investigative team; ensuring that reports and complaints are handled properly and in a timely manner; evaluating recommended interim measures; educating on the grievance and appeals process; notification of grievance decisions; and appropriate records maintenance;

Decl. of Angela S. Fleischer                                      Case No. 20-cv-01468-CJN

EXHIBIT 50

l.   Coordinating SOU's compliance with federal and state discrimination and sexual harassment laws;

m.  Continuously identifying and integrating best practices in the Title IX investigation arena into knowledge base and practice;

n.   Serving as SOU's resource on Title IX requirements and compliance and provide consultations to response teams as needed;

o.   Serving as a member of the Student Support Network and the Bias Response Team; and

p.   Providing oversight to the recruiting, training, supervising, and leadership of investigator, adjudicators and those involved with Title IX compliance.

4.      I submit this Declaration in support of the State of Oregon's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge as well as in cooperation with other SOU personnel who have assisted me in gathering this information from our institution, and on the basis of documents that I have reviewed. I have also familiarized myself with the Rule in order to understand its immediate impact on Southern Oregon University.

Decl. of Angela S. Fleischer                                    Case No. 20-cv-01468-CJN

EXHIBIT 50

**About Southern Oregon University**

5.      Southern Oregon University, founded in 1872 and accredited as an institution of higher education since 1939 is located in Jackson County, Oregon, one of Oregon's southernmost counties, and serves a number of Oregon's rural and agricultural communities. SOU's principal facilities are located in Ashland with additional non-residential campus buildings in Medford, Oregon.

6.      SOU enrolls over 6,000 students each year.  Approximately 1,700 of those students are Oregon residents.  SOU confers approximately 1,100 degrees each year. The institution employs 631 people including 190 faculty and 441 staff.

7.      SOU is one of seven institutions established as public universities in the State of Oregon pursuant to ORS 352.002, and subject to the regulation of the Oregon Higher Education Coordinating Commission.

8.      The university currently receives approximately 35% of its education and general funding revenue from the State of Oregon, with the remainder derived from tuition and fees. This amounts to approximately $21.65 million in allocated State higher education funding support. Southern Oregon University is governed by an independent governing board appointed by the governor and confirmed by the Oregon legislature.  The Board of Trustees of Southern Oregon University is vested with exclusive legal power and authority for the governance and administration of the university, excepting those powers and duties expressly granted by the Legislative Assembly to the Oregon Higher Education Coordinating Commission for the purpose of coordinating an accessible and affordable approach to higher education across the State of Oregon.

Decl. of Angela S. Fleischer                                    Case No. 20-cv-01468-CJN

EXHIBIT 50

9.      During the 2018-2019 academic year, SOU received approximately $15.96 million in federal funds from the Department (excluding research funding). As a result, SOU is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

### SOU's Title IX Sexual Misconduct Policy

10.      SOU has adopted an Equal Opportunity, Harassment, and Sexual Misconduct Policy ("Equal Opportunity Policy") that prohibits sexual harassment and sexual misconduct by students, employees, and faculty and establishes a grievance process for addressing complaints of sexual harassment. The Code of Student Conduct references the Equal Opportunity Policy and prohibits sexual harassment and sexual misconduct.

11.      The SOU Equal Opportunity Policy was last revised in September 2019 and approved by SOU's President in October 2019.  The core elements of the current policy were adopted in May 2016 after more than a year of discussion with student and employee groups and committees, outside consultants, and employee unions.[1]

12.      Southern Oregon University defines harassment as "as unwelcome conduct on the basis of actual or perceived membership in a protected class, by any member or group of the community."  *See* Equal Opportunity Policy at p. 5.  It further defines sexual harassment as "unwelcome, sexual, verbal, written, online or physical conduct."  *Id.* at p.6.  The Equal Opportunity Policy states:

>      Sexual harassment creates a hostile environment, and may be disciplined when it is:

---

[1] https://inside.sou.edu/assets/policies/Equal_Opportunity_Harassment_and_Sexual_Misconduct_101119.pdf

Decl. of Angela S. Fleischer                                    Case No. 20-cv-01468-CJN

EXHIBIT 50

- Sufficiently severe, persistent/pervasive and subjectively and objectively offensive that it,
  - has the effect of unreasonably interfering with, denying or limiting employment opportunities or the ability to participate in or benefit from the University's educational, social or residential program, and is
  - based on power differentials (quid pro quo), the creation of a hostile environment or retaliation.

*Id.*

13.     The Title IX office is housed in the office of Equity Grievance. The Director of Equity Grievance/Title IX Coordinator oversees all complaints submitted by students, staff or faculty related to sexual misconduct, bias, discrimination, and harassment including those complaints that fall under Title IX. SOU has recently experienced turnover and restructuring of staffing in areas related to student conduct, student life, Title IX, and equity grievance.  I have recently hired a new full time staff member to serve as an investigator who is scheduled to start his employment at SOU on June 29, 2020.

14.     The role of the investigators is to investigate one side (either complainant's or respondent's) of every complaint. There are three other university employees who serve on the Equity Grievance/Title IX team. These employees have large full-time institutional roles (Associate Provost, Dean of Students, Executive Director of the Student Health and Wellness Center) and serve on the Equity Grievance team in addition to their main role. Though they perform other duties at SOU, all are trained to process and investigate Title IX matters and they serve as Deputy Title IX Coordinators

15.     As Director of Equity Grievance/Title IX Coordinator, I am responsible for oversight and administration of our Title IX, bias and discrimination complaints.  I review all

Decl. of Angela S. Fleischer                                              Case No. 20-cv-01468-CJN

EXHIBIT 50

complaints, assign complaints to the investigators, determine interim measures where necessary, ensure compliance with our policies, recruit and train panelists, assign the panelists to each hearing, and assist in preparation of the hearing materials prepared for the panelists.  Following the hearing, I assist in administration of the appeal and perform similar tasks associated with facilitating the appeal and training the appeal panels.

16.     I assign two investigators to every complaint. I intentionally vary the assignments so no investigator is always assigned to the complainant or always assigned to the respondent. Investigators will take a statement from every disclosure that is reported. They will interview witnesses, coordinate with other areas around campus, and collect evidence. They also function as a guide for the complainant/respondent they are working with. They will help with academic accommodations, process understanding, and notify each party of their rights throughout the process.

17.     Once the investigators complete their interviews, they prepare a written report and provide commentary in a meeting with the Director of Equity Grievance/Title IX Coordinator, who determines whether the complaint should go to a hearing, does not constitute a policy violation,  or whether it is possible to resolve the matter by some other resolution process to which all parties mutually agree.

18.     The people who serve on the Equity Grievance Panels and appeal panels are trained yearly on due process as well as institutional policy.

19.     Over the past several years SOU have seen a significant rise in reporting. The data from the past three academic years are as follows:

Decl. of Angela S. Fleischer                                    Case No. 20-cv-01468-CJN

EXHIBIT 50

| Academic Year | Disclosures | Formal Reports | Hearings |
|---|---|---|---|
| 2016/17 | 140 | 60 | 4 |
| 2017/18 | 172 | 71 | 11 and 3 appeal |
| 2018/19 | 180 | 37 | 4 and 1 appeal |

20.    This data derives from the following definitions:

- **Total Number of Disclosures** are the total number of reports made in the academic year by students, staff or faculty.

- **Formal Reports** are reports that have come through the University's reporting system. Formal Reports reflect incidents where the entire Title IX team has been engaged, the need for investigation has been evaluated, and investigation has taken place if determined to be necessary. Formal reports must all be documented by the University as resolved, even if that resolution was simply case review and closure with no active investigation or response.

- **Reports to Law Enforcement** are not always made known to SOU. However, when they are known, the Director of Equity Grievance documents them. It is important to note that many reporters do not decide to report to law enforcement immediately after an incident. In these cases, reporting can occur outside of the University's academic year statistical analysis.

- **Informal Remedies** occur when the Equity Grievance Office receives a report from a person who does not want to make a formal University report. They may still ask for some kind of support or accommodation. These individuals may, however, be working with Law Enforcement. Many of the

Decl. of Angela S. Fleischer                                    Case No. 20-cv-01468-CJN

EXHIBIT 50

other types of reports may also at various points engage with informal remedies.

- **Unsubstantiated Reports** made by third party reporters which were not able to be confirmed or denied.

- **Unfounded Reports** are reports the Equity Grievance Office reviewed and determined to be unfounded.

- **No engagement** indicates reports that have originally come from third party reporters in which the individual about whom the report was made elects not to participate in Confidential Advising or any other process.

21.     Anyone affiliated with Southern Oregon University can file a complaint. Regardless of the type of report or choices made by the reporting party, they are clearly advised that activation of process, referral, support or assistance can occur at any time of their choosing.

22.     When filing a formal complaint, an investigator takes a statement from the complainant, who signs the formal complaint, and the Office of Equity Grievance reviews the complaint for policy violations and determines whether to proceed with an investigation. The utmost care is taken to ensure confidentiality for all those involved in the process. Information regarding investigations is rarely shared outside of the Equity Grievance/Title IX team and all participants are advised to take care with how and with whom they speak with related to the investigation.

23.     Southern Oregon University conducts live hearings. All hearings occur before a specially trained panel comprised of employees and administrators. The SOU Office of Equity

Decl. of Angela S. Fleischer                                      Case No. 20-cv-01468-CJN

EXHIBIT 50

Grievance takes great care to ensure the panelists represent diverse experiences and identities, have no conflict of interest with anyone involved in the hearing, and that they receive annual training. A member of the Equity Grievance team chairs the meeting. The Chair will often be the Director of Equity Grievance and is a non-voting member of the panel.  The Chair of the hearing may never be part of the rest of the investigation.

24.     Neither complainants nor respondents are required to attend the hearing. Both parties may opt to submit a statement in writing. However, both participants nearly always attend. They are both allowed a support person who can be an attorney. However, support people are not allowed to represent participants during the hearing by speaking, advocating, or examining witnesses on behalf of the participants. Parties are allowed to submit questions to the Chair of the hearing panel in writing to be asked of the other party or witnesses. There is no direct cross examination. If the complainant chooses not to attend the hearing, then they are required to be available for questions received from the respondent. Both parties are able to appeal the outcome and, should they do so, the Office of Equity Grievance convenes a separate appeal panel that reviews the record of the initial hearing and makes a decision on review of the record.

25.     Hearings are one of many processes that SOU expects to be affected by public health measures to address the COVID-19 pandemic. The State of Oregon has been under a public health emergency order since March 2020 limiting the size of gatherings, and SOU ceased holding in person classes in March 2020. Staff and faculty have been working remotely and it is not clear how the public health requirements will impact academic programs and administrative activities for the fall quarter that begins in September 2020. It is not clear if participants in hearings will be able

Decl. of Angela S. Fleischer                                          Case No. 20-cv-01468-CJN

EXHIBIT 50

to appear in person at all, including the panel itself. Conducting hearings entirely remotely, or with appropriate physical distance will pose logistical challenges SOU has not begun to address.

26.     In addition to other policies and funding requirements, Oregon law requires all institutions of higher education to have written policies regarding sexual assault, harassment, stalking, and dating violence that occur both on and off campus. ORS §§350.253, ORS 350.255.

27.     Southern Oregon University has two bargaining units serving employees of Southern Oregon University.  Those unions are the Associated Professors of Southern Oregon University and Service Employees International Union.

28.      The SOU Equal Opportunity policy applies to SOU faculty and staff as well as students.

29.     SOU has not yet determined if the Rule requirements for hearings are consistent with the procedures required under Collective Bargaining Agreements applicable for campus employees. If the Rule is determined to cover issues subject to mandatory bargaining, then SOU legal counsel will need to engage with labor counsel for the union(s); this process could take several months to complete.

30.     The Rule would require extensive new training and skills in order to implement, which will not be feasible to implement by the Rule's August effective date. The procedural requirements and training will require considerable investment at a time when SOU's resources are already stressed by responding to a global health pandemic and economic downturn. Hiring additional staff and investing in training and materials are particularly burdensome when SOU faces budget challenges like many State funded institutions and agencies.

Decl. of Angela S. Fleischer                                          Case No. 20-cv-01468-CJN

EXHIBIT 50

31.     The Rule mandates a quasi-judicial function, akin to a courtroom, with trained advisors in a setting intended to be educational and use personnel trained as educators and education administrators. The skill and education the Rule mandates for the hearing chair are burdensome. Higher education professionals have not been trained, nor should they be expected to oversee a courtroom-like proceeding. SOU employs two dedicated staff members to the Title IX process, while all other team members have significant full-time campus roles. The process and training requirements in the Rule imposes the burden on higher education professionals to acquire skills outside their role as educators. The cost for appropriate training for a current employee or contracting with an outside individual is costly and burdensome for Southern Oregon University. To meet the compliance deadline of August 14, 2020 SOU will need to find training with very little time to identify, assess and select the best option (e.g., affordability, quality of the instruction). The limited time may result in high-cost trainings, if the resources are even available nationally and statewide to meet the demand. For example, the Association of Title IX Administrators' (ATIXA) online trainings cost between $499-$1800. SOU will also be forced to divert funding from other operations, such as student programs to cover personnel training.

32.     Cross examination by a participant's representative in live hearings is not consistent with SOU's policy or values in connection with what is first and foremost a university conduct process intended to be educational in nature. In our process, students learn to take primary responsibility for their own participation in the process. Subjecting complainants or respondents to cross examination, by an advisor, likely an attorney, during a hearing that is part of an educational process is creating a situation that resembles a criminal justice process, without the procedural

Decl. of Angela S. Fleischer                                    Case No. 20-cv-01468-CJN

EXHIBIT 50

protections and professional training afforded participants in a criminal hearing. This requirement also raises questions of equity, as the Rule permits one participant to have an attorney advisor while another may not. SOU cannot afford to retain counsel for complainants and respondents.

33.     The requirement to provide advisors that are capable of cross examination for both parties during hearings will be extremely costly. SOU's current program structure employs all but one of the members of the Title IX team in all hearings. Further, SOU reads the Rule to require another advisor be available should an assigned advisor be deemed insufficient is logistically unfeasible because it would require SOU to have another employee—who also has a full-time job— essentially be on-call for the duration of the hearing. The training and funds required to either hire new employees to be advisors or train current employees to be advisors is not possible in the timeframe allotted for compliance, or in the foreseeable future. SOU would need to train at least three people, with an estimated cost of $500-$1000 for the initial training (not counting costs of materials, policy revision work, periodic retrainings, and FTE costs of changing and reallocating duties).

34.     The requirement to publish or have available all training materials is impracticable and inconsistent with trade practices common to the professionals who provide the necessary training. Many of the people or organizations from whom SOU receives training in the skills and program elements of Title IX compliance, fact finding, and sexual violence intervention and prevention provide that training for their professional livelihood and regard the written collateral, including slide shows, guidelines, and examples as their intellectual property. SOU therefore cannot publish the training materials in their entirety without legal liability.

Decl. of Angela S. Fleischer                                        Case No. 20-cv-01468-CJN

EXHIBIT 50

35.     The documents SOU will need to comprehensively review and possibly revise to comply with the Rule include the Equal Opportunity Policy, the student code of conduct, faculty handbook, employee handbook, and all materials specific to the reporting, investigation, and hearing process the SOU presently employs.

36.     The process for reviewing and revising policy documents at SOU is intended to be an open, participatory, and transparent process for bringing proposed changes forward.  It typically begins with bringing a proposed policy or revision to SOU Policy Council for feedback.  After receiving feedback from Policy Council, the proposed policy revisions must be presented to all campus constituencies impacted by the recommended changes, which can include impacted departments, committees, or other relevant groups.  This allows each impacted group to provide comment and feedback on the changes prior to adoption as final policy.  The author of the policy or revisions need not adopt changes for every comment provided, but they must provide each group, office or committee the opportunity to provide feedback.  After receiving feedback from Policy Council and the relevant campus committees or groups, the policy is presented to the SOU President.

37.     After initial review of the policy, the SOU President will approve the policy for posting on its website for community comment.  The policy is openly posted to the campus community for a minimum period of seven (7) calendar days and members of the community are invited to comment on the policy.  After the policy is posted for community comment, the author receives the feedback and assesses whether and to what extent to revise the proposed policy in light of the comments and feedback received during the process.  At that point, it is presented to the SOU

Decl. of Angela S. Fleischer                                    Case No. 20-cv-01468-CJN

EXHIBIT 50

President for final approval and adoption.  If the SOU President approves and adopts the policy or revisions, the adopted or revised policy is posted to SOU's website policy pages.  The entire process takes between two and four months.

38.     Revisions to SOU's Equal Opportunity policy will be a lengthy process because it impacts every person, group, and operation on campus.  This is particularly true because faculty leadership is not on contract during the summer to provide their input and do not return to campus until approximately September 15, 2020.  Because this policy applies to every student and employee, substantive revisions to this policy will need to be presented for comment to the SOU Office of Equity Grievance, Office of the President, Office of Student Life, Provost Office, Student Housing (including its student committees), Associated Students of Southern Oregon University (student government), SOU Faculty Senate, and SOU staff advisory committees.  This process could potentially take until the end of calendar year 2020 because we are on the "quarter system" and will not return to campus until September 15, 2020 and there are so many constituent groups from whom to collect feedback.

39.     SOU takes pride in having such a transparent process to policy revision. However, it is difficult to shepherd policy changes through the campus during a time when people are off-campus due to COVID-19.  SOU will continue to provide only remote education during the summer term which ends in September 2020.

40.     Due to the COVID-19 pandemic SOU has lost substantial funding and implemented furloughs. The implementation of a furlough program through the end of 2020, means all non-faculty staff members at the university have had their work time reduced by at least 20% and in

Decl. of Angela S. Fleischer                                             Case No. 20-cv-01468-CJN

EXHIBIT 50

some cases 40%, further limiting resources to deploy new policies. The additional time, energy, and training required by these new regulations are made even more difficult to realize with these additional budget and FTE constraints due to the global pandemic.

41.     As a result of the COVID-19 public health emergency, we have been inundated with changes to policy, procedures, service and operational changes that must be immediately prioritized and implemented.  Adding a major Title IX policy overhaul in the midst of the public health related undertakings presents a material burden to an already overwhelming effort.

42.     State agency support for programs like Title IX is historically limited by small staff and the amount of direct program support available, and SOU expects statewide budget impacts on the Oregon state agencies that it works with in this regard.

43.     SOU currently has a process that covers all sexual harassment on or off campus. This policy will remain in effect as it is a state requirement that SOU respond to both on and off campus sexual harassment, pursuant to ORS §§350.253, ORS 350.255.

44.     SOU provides the opportunity for yearly sexual harassment and sexual misconduct training for students, staff, and faculty. There is online training offered to the whole community as well as in person opportunities throughout the academic year. The review of training materials and incorporation of new information related to the Rule will require time, money, and staffing resources that are not available at this time.

**The Rule Will Make It More Difficult for SOU to
Identify, Remedy, and Eliminate Sexual Harassment**

45.     SOU was a signatory to the joint comment letter dated January 30, 2019 submitted to the Department titled, "Comments from Title IX Coordinators for the Oregon Public Universities

Decl. of Angela S. Fleischer                                                    Case No. 20-cv-01468-CJN

EXHIBIT 50

(ED-2018-OCR-0064)", and expressing concerns about the logistical, policy, and fiscal impacts of the proposed changes.[2]

46.     The final Rule does not address or mitigate the concerns set forth in the joint comment letter, including particularly the chilling effect on reporting, and trauma to survivors of harassment and sexual violence.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 12th day of June, 2020

_Angela Fleischer_
_____
Angela S. Fleischer

Director of Equity Grievance/Title IX Coordinator
SOUTHERN OREGON UNIVERSITY

---

[2] https://www.regulations.gov/document?D=ED-2018-OCR-0064-18403

Decl. of Angela S. Fleischer                                    Case No. 20-cv-01468-CJN

EXHIBIT 50

# EXHIBIT 51

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | Civil Action No. **20-cv-01468-CJN** |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF JOSEPH A. GARCIA

I, Joseph A. Garcia, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am the Chancellor of the Colorado Community College System ("CCCS"). Prior to my current role as Chancellor, I served as the President of the Western Interstate Commission for Higher Education from June 2016 to 2018. From 2011 to 2016, I served at the Lieutenant Governor of Colorado and Executive Director of the Colorado Department of Higher Education. Prior to 2016, I served as President of the Colorado State University-Pueblo and Pikes Peak Community College. I

Decl. of Joseph A. Garcia

EXHIBIT 51

Case No. 20-cv-01468

received my Juris Doctorate from Harvard University in 1983 and my Bachelor of Science in International Business from the University of Colorado in 1979.

2.      I submit this Declaration in support of the State of Colorado's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge and other CCCS personnel who have assisted me in gathering this information. I have also familiarized myself with the Rule in order to understand its immediate impact on CCCS.

## CCCS Background

3.      CCCS is Colorado's largest system of Higher Education and includes 13 colleges with over 40 locations across the state. The colleges that make up CCCS are the Arapahoe Community College, Colorado Northwestern Community College, Community College of Aurora, Community College of Denver, Front Range Community College, Lamar Community College, Morgan Community College, Northeastern Junior College, Otero Junior College, Pikes Peak Community College, Pueblo Community College, Red Rocks Community College, and Trinidad State. CCCS enrolled 121,479 students in the 2018-2019 academic year.

4.      CCCS and its member colleges are part of the State of Colorado and governed by Article 60, Title 23, of the Colorado Revised Statutes. The community colleges within CCCS are heavily reliant on State General Fund money and student tuition fees. Further, the community colleges receive federal funds from the Department pursuant to Title IV of the Higher Education Act. As a

Decl. of Joe Garcia                                                                    Case No. 20-cv-01468
EXHIBIT 51

result, the community colleges within CCCS are subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

  5.  CCCS received three hundred sixty-one (361) complaints of sexual misconduct in the past two years. In 2018, spring semester, CCCS received sixty-three (63) complaints that resulted in sixteen (16) formal investigations, and four (4) appeals. In 2018, summer semester, CCCS received twenty-five (25) complaints that resulted in three (3) investigations, and zero (0) appeals. In 2018, fall semester, CCCS received eighty-two (82) complaints that resulted in eighteen (18) investigations, and two (2) appeals. In 2019, spring semester, CCCS received one hundred and six (106) complaints that resulted in fifteen (15) investigations, and three (3) appeals. In 2019, summer semester, CCCS received seventeen (17) complaints that resulted in three (3) formal investigations, and one (1) appeal. In 2019, fall semester, CCCS received sixty-eight (68) complaints that resulted in seventeen (17) formal investigations, and one (1) appeal.

  6.  The thirteen community colleges have a designated Title IX Coordinator who oversees sexual misconduct complaints. Responsibilities include, but are not limited to: (i) acting as the point person for all civil rights complaints involving a student as complainant and/or respondent; (ii) oversight, supervision, and coordination of prompt and equitable investigation and grievance procedures to resolve civil rights complaints while assuring First Amendment protections; (iii) preventing and remediating stalking, intimate partner and relationship violence, and bullying and cyberbullying; (iv) training or convening of broad training requirements for CCCS employees, boards, investigators and appeals officers.

Decl. of Joseph A. Garcia                  Case No. 20-cv-01468
EXHIBIT 51

## Existing Title IX Sexual Misconduct Policy

7.      CCCS is required to adopt sexual misconduct policies pursuant to state statute. Colo. Rev. Stat. § 23-5-146(2)(a). These policies must generally conform to the time-tested single investigator model, whereby an individual employed by a college investigates and determines responsibility for sexual misconduct based on the preponderance of the evidence standard. Colo. Rev. Stat. § 23-5-146(3). Under this model, the parties are entitled to advisors, but those advisors do not question witnesses directly and, instead, all questions are asked through the investigator. *Id.* As required by Colorado law, CCCS has adopted robust sexual misconduct policies and procedures for employees, faculty, staff, and students that prohibit sexual harassment and sexual misconduct and establish a grievance process for addressing complaints of sexual harassment. These policies and procedures are more fully discussed below.

8.      CCCS currently defines sexual misconduct as Sexual Harassment, Non-Consensual Sexual Contact (or attempts to commit same), Non-Consensual Sexual Intercourse (or attempts to commit same), and Sexual Exploitation. The full definition is as follows:

> Sexual Harassment may be the result of a hostile environment, quid pro quo, and/or retaliation.
>
> A hostile environment exists when a person is subjected to sex- or gender-based verbal or physical conduct that is sufficiently severe, persistent, or pervasive to alter the conditions of a person's employment and/or unreasonably interfere with a person's ability to participate in or benefit from the System or College's educational program and/or activities, from both a subjective and objective viewpoint.
>
> The determination of whether conduct constitutes prohibited harassment can be based on the following circumstances:
>
> - the frequency of the conduct;
> - the nature and severity of the conduct;
> - whether the conduct was physically threatening;
> - whether the conduct was humiliating;
> - the effect of the conduct on the alleged victim's mental or emotional state;
> - whether the conduct was directed at more than one person;

- whether the conduct arose in the context of other discriminatory conduct;
- whether the conduct unreasonably interfered with the alleged victim's educational or work performance;
- whether a statement is a mere utterance of an epithet which engenders offense in an employee or student, or offends by mere discourtesy or rudeness; and
- whether the speech or conduct deserves the protections of the First Amendment and/or academic freedom.

Quid pro quo sexual harassment exists when a person engages in unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, and submission to or rejection of such conduct is used in determining educational and/or employment decisions.

Retaliatory sexual harassment is any adverse employment or educational action taken against a person because of the person's perceived participation in a complaint or investigation of sexual misconduct.

Non-Consensual Sexual Contact is:

- any intentional sexual touching,
- however slight,
- with any object,
- by any individual upon any individual,
- that is performed without consent and/or by force.

Sexual touching includes any bodily contact with the breasts, groin, genitals, mouth or other bodily orifice of another individual, or any other bodily contact in a sexual manner.

Non-Consensual Sexual Intercourse is:

- any sexual penetration or intercourse (anal, oral or vaginal);
- however slight,
- with any object,
- by any individual upon any individual,
- that is performed without consent and/or by force.

Sexual Exploitation occurs when a person takes non-consensual or abusive sexual advantage of another for his/her own advantage or benefit, or to benefit or advantage anyone other than the one being exploited, and that behavior does not otherwise constitute one of the other sexual misconduct offenses.

Examples of sexual exploitation include, but are not limited to:

- Invasion of sexual privacy.
- Prostituting another person.

Decl. of Joseph A. Garcia                                          Case No. 20-cv-01468
EXHIBIT 51

- Non-consensual video or audio-taping of sexual activity.
- Going beyond the boundaries of consent (such as letting uninvolved persons hide in a closet to secretly observe an act of otherwise consensual sex).
- Engaging in voyeurism.
- Knowingly transmitting a sexually transmitted infection (STI) or human immunodeficiency virus (HIV) to another person.
- Exposing one's genitals in non-consensual circumstances and/or inducing another to expose their genitals.
- Viewing or possessing child or adult pornography at work or on System or College-owned property.
- Sexually-based stalking and/or bullying may also be forms of sexual exploitation.

Other forms of sexual misconduct include, but are not limited to, the following, when the act is based on a person's actual or perceived sex or gender:

- Threatening or causing physical harm, extreme verbal abuse or other conduct which threatens or endangers the health or safety of any person.
- Intimidation, defined as implied threats or acts that cause an unreasonable fear of harm in another.
- Hazing, defined as acts likely to cause physical or psychological harm or social ostracism to any person within the System or College community, when related to the admission, initiation, pledging, joining, or any other group-affiliation activity; hazing is also illegal under Colorado law.
- Bullying, defined as repeated and/or severe aggressive behavior likely to intimidate or intentionally hurt, control or diminish another person, physically or mentally.
- Stalking, defined as a course of conduct directed at a specific person that is unwelcome and would cause a reasonable person to feel fear.
- Violation of any other System or College rule.

9.      CCCS currently defines its sexual misconduct jurisdiction to apply to behaviors that take place on the campus, at System or College sponsored events, and off-campus or online conduct when such conduct affects a substantial System or College interest. A substantial System or College interest is defined to include:

- Any action that constitutes criminal offense as defined by federal or Colorado law. This includes, but is not limited to, single or repeat violations of any local, state or federal law committed in the municipality where the System or College is located;
- Any situation where it appears that the accused individual may present a danger or threat to the health or safety of self or others;

Decl. of Joseph A. Garcia                                                    Case No. 20-cv-01468
EXHIBIT 51

- Any situation that significantly impinges upon the rights, property or achievements of self or others or significantly breaches the peace and/or causes social disorder; and/or
- Any situation that is detrimental to the educational interests of the System or College.

Any online postings or other electronic communication by students, including but not limited to cyber-bullying, cyber-stalking, and/or cyber-harassment, occurring completely outside of the System or College's control (e.g., not on System or College networks, websites or between System or College email accounts) will only be subject to this procedure when those online behaviors can be shown to cause a substantial on-campus disruption. Otherwise, such communications are considered speech protected by the First Amendment.

Off-campus discriminatory or harassing speech by employees may be regulated by the System or College only when such speech is made in an employee's official or work-related capacity.

Offensive conduct that does not rise to the level of discrimination or harassment may not result in the imposition of discipline under the System President's Procedures, but will be addressed through civil confrontation, remedial actions, education and/or effective conflict resolution mechanisms.

10.     When CCCS last revised its Sexual Misconduct Policy and Procedure in 2016, the process took six (6) months. After the United States Department of Education released its "Dear Colleague Letter" in 2011, it took CCCS thirteen (13) months to implement its vast changes.

11.     CCCS' grievance and investigation process allows for all faculty, staff, students, authorized volunteers, guests or visitors to file a complaint with the Title IX Coordinator. Within the policy/procedure, individuals are on notice of confidential reporting opportunities, both internal and external resources. The Title IX Coordinator conducts a preliminary inquiry to determine whether there is reasonable cause to believe a civil rights violation has occurred. If so, CCCS will initiate a prompt, thorough and impartial investigation. This investigation is designed to provide a fair and reliable determination about whether policies or procedures have been violated. If so, CCCS will implement a prompt and effective remedy designed to end the inappropriate behavior, prevent its recurrence and address its effects.

12.    A preliminary inquiry may, at the discretion of the Title IX Coordinator, include interviews with the complainant, respondent, witnesses, and/or other relevant parties. If no reasonable cause is found to initiate a formal complaint, the Title IX Coordinator shall inform the complainant of this decision in writing.

13.    CCCS makes every effort to complete the investigation and implement remedies, if any, no later than 60 days from the date the complaint is filed. If CCCS cannot resolve the formal complaint within this timeline, the Title IX Coordinator may extend the deadline when necessary, and for good cause, to properly investigate the complaint. CCCS will provide written notice to the parties of and the reason for the extension.

14.    CCCS's grievance procedure implements a single investigator model, meaning it does not include a live hearing or cross-examination. The investigator issues an investigation report that assesses by preponderance of evidence the facts against the sexual misconduct being alleged. The investigator does allow the complainant and respondent to submit questions through the investigator that they feel should be asked of the other. The complainant and the respondent have the opportunity to be advised by a personal advisor of their choice, at their expense, at any stage of the process and to be accompanied by that advisor at any meeting or hearing. An advisor may only consult and advise his or her advisee, but not speak for the advisee at any meeting or hearing. These procedures are entirely administrative in nature. The investigator may remove or dismiss an advisor who becomes disruptive or who does not abide by the restrictions on their participation as explained above.

### Effects of the New Rule on CCCS

15.    The new Title IX Rule will require CCCS to review and revise its current Sexual Misconduct and Civil Rights Grievance and Investigation Policy and Procedure and student code of conduct. When misconduct rises to the level of harassment, which may be based solely on whether the improper conduct occurred on-campus instead of off-campus, CCCS will be required to abandon

Page 8 of 11

the single investigator model and engage in a quasi-criminal procedure as set forth in the Title IX Rule.

16.     CCCS generally uses a committee to review and revise policies and procedures. Due to the lack of time, CCCS is conducting these changes with a small committee to expedite the process. Specifically, the CCCS Legal Affairs Department along with the Director of Civil Rights and Investigations will conduct the revisions, to then be reviewed by the community colleges' Title IX Coordinators, Vice President of Student Affairs, and College Presidents, and the System Chancellor. The State Board for Community Colleges and Occupational Education will then need to approve the new policies and procedures. Even with this truncated process, it will be extremely difficult for CCCS to meet the Department's arbitrary August 14, 2020, deadline. Further, this expedited process will not permit CCCS to seek valuable feedback from its constituents. In addition to the policy and procedure having to be revised, CCCS will have to revise all its template forms, published notices, all handbook publications, and training.

17.     To implement the new Rule, CCCS will need to hire at least three (3) additional full-time equivalent employees to conduct the decision-maker responsibilities and two (2) advisors. Unfortunately, due to budget constraints, CCCS will be unable to fill these positions in 2020-2021 and will have to utilize external resources.

18.     CCCS disseminates its non-discrimination and civil rights grievance and investigation process to all faculty, staff, and students annually. All staff are required to take an online Title IX specific training annually. To comply with the training requirements of the new Title IX Rule, CCCS' Director of Civil Rights and Investigations will have to be trained on the new Title IX regulations, to then be able to train all CCCS Title IX Coordinators, investigators, discipline officers, decision-

Decl. of Joseph A. Garcia                                                          Case No. 20-cv-01468
EXHIBIT 51

makers and advisors of choice. CCCS estimates that the time to prepare these trainings would be 7-8 months and, thus, cannot be complete by August 14, 2020.

19.     CCCS is significantly concerned with its ability to comply with all of these requirements by August 14, 2020, particularly given the current COVID-19 crisis.

## Effects of COVID-19

20.     In March of 2020, the World Health Organization announced that the global spread of COVID-19 should be characterized as a pandemic. In response to COVID-19, the President of the United States and the Governor of the State of Colorado both declared states of emergency. *Proclamation 9994*, 85 Fed. Reg. 337-38 (March 13, 2020); Executive Order D 2020 003 (March 11, 2020). On March 17, 2020, the Governor of Colorado issued Executive Order D 2020 017, "Ordering Coloradans to Stay at Home Due to the Presence of COVID-19 in the State," which closed CCCS and the community colleges for most purposes.

21.     On April 30, 2020, as a result of the COVID-19 crisis, Governor Polis issued Executive Order D 2020 050, "Declaring Insufficient Revenues Available for Expenditures and Ordering Suspension or Discontinuation of Portions of Certain State Programs and Services to Meet a Revenue Shortfall Due to the Presence of COVID-19 in the State of Colorado." In this Order, the Governor declared that "there are not sufficient revenues available for expenditure . . . to carry on the functions of the state government and to support its agencies and institutions." It is expected that, in fiscal year 2020/2021, Colorado will suffer a revenue shortfall in excess of $3 Billion. CCCS anticipates a 58% reduction in its budget during the 2020/2021 Fiscal Year and it remains to be seen to what extent the community college campuses will be open during the Fall of 2020 semester.

22.     CCCS is currently conducting investigations virtually, which imposes its own challenges. All positions and parties involved are acclimating to this new environment. Given the

economic impact of the COVID-19 crises, which the federal government has declared to be a national emergency, the fiscal cost of implementing the new regulations will be extraordinary.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this _12th_ day of _June_ 20 _20_

Joseph A. Garcia
Chancellor

Decl. of Joseph A. Garcia
EXHIBIT 51

# EXHIBIT 52

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | Civil Action No. **20-cv-01468-CJN** |

## DECLARATION OF VERONICA C. GARCIA, SUPERINTENDENT

I, Veronica C. Garcia, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

      1.      I am the Superintendent at Santa Fe Public Schools (SFPS) located in Santa Fe, New Mexico. I hold a doctorate in educational leadership. I have been employed as Superintendent since April of 2016.  Prior to working as Superintendent for SFPS in 2016, I served as the Executive Director for New Mexico Voices for Children—a state children's advocacy organization. I was also New Mexico's first cabinet Secretary of Education, in addition to serving as a teacher and principal in New Mexico.

2.      I submit this Declaration in support of the State of New Mexico's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or Rule). I have compiled the information in the statements set forth below through personal knowledge, through SFPS personnel who have assisted me in gathering this information from our institution, on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on SFPS.

3.      Santa Fe Public School District serves more than 13,000 students from kindergarten to grade 12, almost 80% of whom are Hispanic and 15% of whom are Caucasian.  Approximately 74.8% of enrolled students qualify for free and reduced-price lunch. Female students represent 49.4% of the students, while males represent 50.6 %. Special education students (including gifted) represent 16.6% of the students. 31% of SFPS students are proficient in English Language Arts, while 17.5% are proficient in Math.

4.      SFPS has adopted sexual misconduct policies and a student code of conduct that prohibits sexual harassment and sexual misconduct by students, employees, and faculty and establishes a grievance process for addressing complaints of sexual harassment. SFPS has established sexual harassment policies for all staff applicable both on and off-campus. *See* Standards of Professional Conduct, Duty to the Profession, No. 10 (prohibiting sexual harassment of a school employee, visitor or any person encountered while conducting official duties) and standards prohibiting public displays of affection "even with consulting adults" either on or off

Decl. of Veronica C. Garcia, SFPS                                              Case No. 20-cv-01468-CJN
EXHIBIT 52

school property, *Id.*, No 12.  Sexual harassment prevention training is required annually.  *Id.*, No. 11.

5.      SFPS has established sexual harassment policies for all students both on and off-campus. *See* 2019-2020 Santa Fe Public Schools Student Code of Conduct (applies to students "while off-campus whenever such conduct has a direct effect on the discipline or the learning environment or general welfare of the school and SFPS community.")

6.      SFPS is funded by both state and local taxes, administered by a board of education that hires its superintendent, and regulated by the New Mexico Public Education Department (PED).

7.      SFPS receives federal funds from the Department. As a result, SFPS is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

8.      Assistant Superintendent Hilario (Larry) Chavez is the Title IX coordinator for SFPS, among his other duties. His responsibilities as a Title IX coordinator include coordinating and monitoring the district's compliance with Title IX, as well as state civil rights requirements concerning discrimination and harassment based on sex. Mr. Chavez is also responsible for overseeing prevention efforts to avoid Title IX violations from occurring. He is responsible for implementing the district's discrimination complaint procedures with respect to sex discrimination and sexual harassment. Lastly, Mr. Chavez investigates complaints alleging discrimination based on sex, including sexual harassment. SFPS has no other dedicated Title IX staff.

9.      In the past school year, 2019/2020, SFPS conducted one investigation implicating Title IX. There were no Title IX complaints received by SFPS in the past year, and no hearings were conducted.

Decl. of Veronica C. Garcia, SFPS                              Case No. 20-cv-01468-CJN

EXHIBIT 52

10.     The SFPS sexual harassment policy for employees was adopted originally in 2002, amended in 2012. In 2012, SFPS reviewed and amended its policies. SFPS spent about a year reviewing and making amendments to existing policy. SFPS contracted with a law firm to complete the work at a significant expense to the school district. *See* SFPS BOE Policy 218, available at wwwsfps.info.

11.     The SFPS student discrimination and harassment was adopted in 2002 and most recently amended in 2017. *See* SFPS BOE Policy 330, available at wwwsfps.info.

12.     The SFPS has a prohibition and prevention of bullying, harassment and hazing policy that was adopted in 2002 and most recently amended in 2015. *See* SFPS BOE Policy 331, available at wwwsfps.info.

13.     SFPS defines sexual harassment as  "nonconsensual sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature on or off District property, when: (1) submission to such conduct is made either explicitly or implicitly a condition of an individual's employment, instruction or participation in school programs and activities; or (2) submission to or rejection of such conduct is used by the offender as the basis for employment decisions affecting the individual; or (3) such conduct has the purpose or effect of unreasonably interfering with the individual's work or creating an intimidating or hostile work environment." SFPS BOE Policy 218; *see* SFPS BOE Policies 330 and 331.

14.     SFPS policy states that "[s]exual harassment may be found in a single episode, as well as in persistent behavior. Both men and women are protected from sexual harassment, and sexual harassment is prohibited regardless of gender of the harasser. Sexual harassment is a misuse of power and the behavior creates an offensive, intimidating and hostile working environment." SFPS BOE Policy 218.

15.     SFPS policy identifies sexual harassment as a form of gender discrimination as defined in Title VII of the Civil Rights of 1964 in Section 703, and as a violation of federal law and district policy.

16.     The policy explains further that: "Sexual harassment is unwelcome sexual advances that include requests for sexual favors and written, visual or verbal conduct of a sexual nature. If the following conditions exist, those actions constitute sexual harassment: Submission to such conduct is made either explicitly or implicitly as a term or condition of an individual's employment; Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting the individual; or such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." SFPS BOE Policy 218.

17.     The policy requires any employee who receives a report of sexual harassment to report the allegation of sexual harassment to the building administrator, who is required to investigate all reported incidents of sexual harassment and take disciplinary action against a student if sexual harassment is determined through the investigation.  The policy requires investigation of all formal and informal, verbal or written complaints of sexual harassment brought to the attention of an administrator or supervisor. *See* SFPS BOE Policy 218.

18.     SFPS has a complaint procedure under its Student Code of Conduct for allegations involving students. Parents and students are directed to resolve their complaints at the school level in an informal manner if appropriate. *See* SFPS Student Code of Conduct at 25. If the complaint is not resolved informally, the parent or student can file a formal complaint. *Id.* For Code of Conduct violations that result in up to ten days suspension, there is no hearing. For violations of the Code of Conduct that could result in a suspension of longer than ten (10) days, or expulsion, a due process

hearing is held. *Id*. at 28; *see* 6.11.2.12 NMAC. The rules of evidence do not apply at the disciplinary hearing, thus a complainant is not required to testify, *see* 6.11.2.12 (I) NMAC, but the student has the right to cross-examine adverse witnesses for those witnesses who are called to testify at the hearing. If a witness is not called to testify at the hearing, the accused would not be able to cross examine that witness; however, that witnesses' testimony could be admitted into evidence through another witness. 6.11.2.12 (I) (ii) NMAC; *McAlister v. N.M. State Bd. of Educ.*¸1971-NMCA-088, 82- N.M. 731. The standard of proof at the disciplinary hearing is preponderance of evidence. 6.11.2.12 (I ) (iii) NMAC.

19.     SFPS faces challenges in conducting Title IX investigations now under the national public health emergency caused by the COVID-19 pandemic. Since March, the entire school district has been working remotely once the schools were closed by executive order. Currently, any meeting is required to be done virtually, rather than in person, which results in the investigation taking longer, or even being compromised altogether. Any hearing that results from an investigation would also need to be done virtually. Additionally, during the pandemic, any potential violations of SFPS policies or the Code of Conduct would have occurred off campus.

20.     The New Mexico Public School Code (Article 22, NMSA 1978) as implemented in the New Mexico Administrative Code defines "sexual harassment" of a student as "unwelcome conduct of a sexual nature (verbal, non-verbal or physical) when [ ] (1) submission to such conduct is made either explicitly or implicitly a term or condition of the advancement of a student in school programs or activities; (2) submission to or rejection of such conduct by a student is used as the basis for decisions/opportunities affecting the student; (3) such conduct substantially interferes with a student's learning or creates an intimidating, hostile or offensive learning environment." 6.11.2.7 (W) NMAC.  Rules of conduct for all public schools in New Mexico prohibit sexual harassment in

all New Mexico public schools, including for students whenever they are subject to school control. 6.11.2.9 (A) NMAC.

21.　　SFPS schools operate under a collective bargaining agreement (CBA) with the National Education Association (NEA)-New Mexico and with the Santa Fe Federation of School Employees (SFFSE).

22.　　The NEA CBA affirms that SFPS will "establish and maintain for all students and staff learning and working environments that provide fair and equitable treatment, including freedom from sexual harassment."

23.　　The NEA CBA provides for due process protections for employees which include "the employee's right to be apprised of allegations or charges, right to representation by an AR ("Association Representative) or other NEA-Santa Fe representative and progressive discipline appropriate to the specific action or incident." NEA CBA at 53. SFFSE employees are provided the right to "present his/her side of the story." SFFSE CBA at 16. Employees are not afforded the right to cross examine adverse witnesses, therefore it is likely that negotiations will need to be reopened and amended to comport with the changes required by the Title IX Rule.

24.　　Pursuant to the NEA CBA and New Mexico law, an employee who is terminated may challenge the Board's decision through an appeal process by arguing that the Board lacked "just cause" to terminate the employee. NMSA 1978, § 22-10A-24 (2003). An arbitrator or a reviewing court will examine the record to determine if there was substantial evidence to justify the Board's decision to terminate the employee under the preponderance of evidence standard.

25.　　SFPS employs approximately 2,000 employees who would be affected by the new Title IX regulations. SFPS would need to train all of its 2,000 employees to comply with N.M law as well as its obligations pursuant to Board policy. Each employee would be required to participate

in online training, about thirty minutes in length. At this time, it is unclear what the costs of this training would amount to, but could exceed $10,000 if the district is required to contract with a law firm for their services to conduct trainings, revise polices, etc.

26.     As a result of the changes required by the Title IX Rule, SFPS would need to review, and amend, its Student Code of Conduct, Board Policies, and CBAs. To make these changes would take at least three month, possibly longer since New Mexico schools are still closed. SFPS will not be able to make these changes by August 14, 2020. In fact, the SFPS Board of Education does not even meet in the month of July. Additionally, the changes required by the Title IX Rule would result in disparate treatment of employees who commit different offenses. For example, a student or employee who is alleged to have committed a battery would not be entitled to cross examine the victim of the battery, while a student or employee who is alleged to have sexually harassed another student or employee would require the testimony of the victim to support the allegations of sexual harassment.

27.     The August 14, 2020, effective date, along with the additional difficulties presented with the pandemic, will make will make it more difficult for SFPS to fulfill its obligations under Title IX to provide all students equal access to education because it will be difficult train all students/employees on their obligations under Title IX and ensure that all students/employees are aware of their rights under Title IX.

28.     According to the 2019-2020 Student Code of Conduct, a student who is suspended for less than ten (10) days is not afforded an opportunity to have a hearing. To comply with the Rule, SFPS may have to change its complaint process to allow for the opportunity for these accused students to have a hearing. This will increase the number of hearings which could result in the need for additional staff, for example, SFPS may need to hire an additional hearing officer, a translator,

or substitute teachers (to cover for teachers when participating in hearings). Likewise, employees who are alleged to have committed acts of sexual harassment are not currently entitled to have a hearing for offenses that do not result in termination, but do result in discipline. An increase in hearings results in additional costs, including legal costs. Again, SFPS may have to change its policies, including reopening negotiations under the CBAs, to allow for such employees to request a hearing prior to the imposition of discipline.

29.     SFPS faces a risk of increased litigation from new requirements since the definition of sexual harassment under the Rule differs from the definition under N.M. state law, as reflected in SFPS policies. For example, SFPS could be found to have negligently retained an employee who under state law committed sexual harassment, while under Title IX has not committed sexual harassment, if that employee were retained. Conversely, the same employee, if terminated, may have a cause of action against the District for termination without just cause.

30.     By heightening the definition of sexual harassment SFPS will be forced to dismiss complaints that fall outside of the definition for sexual harassment. This could lead to a decline in the reporting rate since conduct that was once considered to violate the code of conduct would be permissible conduct under the Rule. Students will likely feel that they should not bother to report instances of sexual misconduct, which could lead to schools that are less safe for students.

31.     Requiring victims to testify will also lead to dismissed complaints in situations where the victim feels intimidated by the accused. Furthermore, cases that proceed to a hearing without the testimony of the complainant may be dismissed for lack of substantial evidence.

Decl. of Veronica C. Garcia, SFPS                                          Case No. 20-cv-01468-CJN
EXHIBIT 52

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 11th day of June, 2020

Veronica C. Garcia, Ed.D.
Superintendent Santa Fe Public Schools

Decl. of Veronica C. Garcia, SFPS                                    Case No. 20-cv-01468-CJN
EXHIBIT 52

# EXHIBIT 53

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. 20-cv-01468-CJN |

## DECLARATION OF CONNIE GARDNER

I, Connie Gardner, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am the Title IX Coordinator at The Evergreen State College ("Evergreen" or the "College") located in Olympia, Washington. I have served as the Title IX Coordinator at Evergreen since July 2019. As the Title IX Coordinator, I am responsible for overseeing and implementing the College's obligations associated with Title IX of the Education Amendments Act of 1972. Including my current position, I have nine years of experience with Title IX compliance (since 2011), and have

worked in Higher Education since 2006. My educational background includes a Master's Degree from the University of Central Arkansas, and various professional certificates related to Title IX and compliance.

2. I have compiled the information in the statements below based on my personal knowledge from my work with Title IX, through Evergreen personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on Evergreen.

3. Evergreen, founded in 1967, is located in Olympia, Washington and has a second campus in Tacoma, Washington. It was first accredited by the Northwest Commission on Colleges and Universities in 1974. Evergreen is a public, liberal arts and sciences baccalaureate institution that has been recognized as one of the most innovative colleges in the United States. Evergreen offers two undergraduate degrees (Bachelor of Arts and Bachelor of Science), three masters degrees (Master of Environmental Studies, Master of Public Administration, and Master in Teaching), and over 60 programs of studies. Evergreen typically offers five to six interdisciplinary Study Abroad experiences led by Evergreen faculty throughout the world each year. Evergreen's undergraduate enrollment for the 2019-2020 academic year is approximately 2,600 students (2,400 undergraduates in Olympia, 115 undergraduates in the Tacoma program, 278 graduate students in Olympia, and 50 students in the Native Pathways program[1]). Evergreen employs approximately 190 faculty members and 502 staff members. Fall 2019 demographics[2] shows that 46% of Evergreen students are non-traditional (18-22) aged college students, with 40.4% identifying as male and 59.5% identifying as female. 44% of

---

[1] The Native Pathways program is a unique learning environment for students that are connected with or involved in the Native American or Indigenous community and culture. This program uses life-long indigenous learning concepts, and is a 12-credit intensive program. *See* www.evergreen.edu/nativepathways.

[2] Source: https://www.evergreen.edu/sites/default/files/Fall%20Enrollment%20Summary%202019_0.pdf.

Page 2 of 36

Decl. of Connie Gardner                                               Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

students are considered below the poverty level, 51.9% low-income level. 31.4% of students identified as people of color.[3]

4.      The Evergreen State College has two campuses: the main campus in Olympia, Washington and a campus in Tacoma, Washington. Evergreen's Olympia campus has over 1,000 acres of forest surrounding the campus. Evergreen's Olympia campus has residence facilities of both halls and apartments on campus. At the start of the 2019 academic year, 595 students lived on campus. Evergreen does not offer on-campus living in Tacoma. Evergreen does not own any off-campus residences in Olympia or Tacoma.

5.      Evergreen is a public institution of higher education and a state agency. Evergreen receives funding from a variety of sources. State and federal funding are significant funding sources for Evergreen and essential to its financial viability and stability. Evergreen received a biennial appropriation of $65,603,000 in the Washington State 2019-2020 budget.

6.      The Evergreen State College also receives federal funds from the federal Department of Education (Department). As a result, Evergreen is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106. This includes the Department's recently published final rule, entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule").

7.      Evergreen has a complex system and set of policies that prohibit sexual harassment and sexual misconduct and establish a process for addressing complaints about sexual harassment and sexual misconduct. These policies include:

---

[3] 12.5% Hispanic, 5.1% Black/African American, 3.8% American Indian/Alaskan Native, 3.1% Asian, .4% Pacific Islander.

Page 3 of 36

a.    The Sexual Harassment and Sexual Misconduct Policy[4] and the Non-Discrimination Policy,[5] both of which apply to students, staff, and faculty. These policies were promulgated and are subject to revision in accordance with Evergreen's policy revision process.

b.    The Student Code of Rights and Responsibilities (Wash. Admin. Code §174-123 (2018)), which applies to students and is promulgated in accordance with the procedures set out in Washington's Administrative Procedures Act.

c.    Evergreen has three collective bargaining agreements (CBAs) with faculty and staff that set out grievance procedures: the Classified Employees Contract, Student Support Services Staff Contract, and United Faculty of Evergreen.[6]

8.    The Title IX Office at Evergreen is a one-person office that reports to the President of the College. As the Title IX Coordinator, I am responsible for all Title IX and Clery Act compliance throughout Evergreen's campuses, and work in partnership with Evergreen's Office of Student Rights and Responsibilities and its Affirmative Action and Equal Opportunity Office to process complaints of Title IX violations. As the Title IX Coordinator, I am also responsible for providing training to faculty, staff, and students related to Title IX responsibilities and the Evergreen's associated procedures. As the Title IX Coordinator, I receive reports of alleged Title IX and sexual misconduct complaints, and I work with impacted individuals to provide support and educational/work adjustments. As the Title IX Coordinator, I uphold Evergreen's Sexual Harassment and Sexual Misconduct policy, educate the campus community on the policy and their roles as Responsible Employees, and coordinate annual trainings and educational programs in addition to working with

---

[4] https://www.evergreen.edu/policy/sexual-harassment-misconduct (last visited May 22, 2020).
[5] https://www.evergreen.edu/policy/nondiscriminationpolicyandprocedure (last visited May 22, 2020).
[6] https://www.evergreen.edu/humanresources/union-contract (last visited May 22, 2020).

Page 4 of 36

Decl. of Connie Gardner                        Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

the Affirmative Action and Equal Opportunity Office and Student Rights and Responsibilities to track timely completions of formal Title IX charges and investigations.

9.      From 2018 to present, Evergreen has received 177 notices of alleged Title IX violations, 33 of which were subject to investigation under the Student Code of Rights and Responsibilities and/or the Non-Discrimination policies. Twenty-three (23) of the investigations involved alleged Title IX violations by employees, seven (7) of which were substantiated. Ten (10) of the investigations involved alleged Title IX violations by students, nine (9) of which were substantiated. Two of the substantiated violations were appealed, which resulted in live hearings. Under its current policy, Evergreen allows anyone to submit a complaint of Title IX/Sex discrimination. Not all complaints fall under Title IX, and not all complaints go to a resolution phase. However, as the Title IX Coordinator, I take action to address all reports of alleged violations of the Sexual Misconduct policy. Once the Title IX Office has notice, I talk to the person who reported the alleged violation. During this conversation I obtain more details, discuss resources and support for Complainants/alleged victims and Respondents, and discuss resolution options. If the Complainant/alleged victim and the reporting party are not the same person, this conversation may happen with both parties. If Complainant would like to move forward with a resolution option (either informal resolution, supportive measures, or an investigation), their notice becomes a formal complaint. Formal complaints are investigated and, if substantiated, go through the appropriate grievance process as outlined in the applicable Evergreen policies. For example, if the Respondent is a student, then the Student Code of Rights and Responsibilities governs and offers a variety of appeal options, including the option of a full administrative hearing for conduct involving higher-level sanctions. For most cases of sexual harassment and Title IX violations, the appeal option will be a

Page 5 of 36

Decl. of Connie Gardner
EXHIBIT 53

Civil Action No. 20-cv-01468-CJN

full administrative hearing. For cases that are not at this high a level of violation (example: alcohol policy violation, disruption), other appeal options are available and used.

10.     Evergreen's Sexual Harassment and Sexual Misconduct Policy was last revised in January of 2015; the Non-Discrimination Policy was last revised in March of 2010; the Student Code of Rights and Responsibilities was last revised in June of 2018. Policy revision is time-intensive and involves multiple steps, as discussed in paragraph 31below.

11.     Both the Classified Employees and the Student Support Services Staff CBAs have terms of July 1, 2019 through June 30, 2021. The Faculty CBA has a term of June 15, 2018 through August 31, 2021. Similar to policy revision, CBA negotiation is time-intensive and subject to certain procedural requirements, as discussed in paragraph 29 below. Staff members at Evergreen, including Faculty Deans, Provosts, Director of Human Resources, and the Union representatives need to meet at least once before negotiations can start. Due to busy schedules and scheduling difficulties during summer it can take weeks, if not months to schedule the negotiations. Once negotiations start, and based on past experiences involving far less complex issues, it is likely to take tens of hours over weeks, if not months, to draft and agree upon a memorandum of understanding that will comply with the Title IX Regulations. Time and salary cost for hourly employees during the summer months (when faculty do not have contracts) will also be incurred.

12.     Evergreen's Non-Discrimination Policy and Procedure prohibits discrimination and behaviors that "if repeated, could constitute discrimination." This policy defines "harassment" using a "severe, persistent or pervasive" standard.[7]

13.     The Sexual Harassment and Sexual Misconduct policy defines sexual harassment as:

a form of discrimination based on the recipient's sex. It can involve persons of the same or differing sexes, sexual orientations, gender identities and gender

---

[7] https://www.evergreen.edfu/policy/nondiscriminationpolicyandprocedure, Section III, Definitions, F. Harassment.

Page 6 of 36

Decl. of Connie Gardner                                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

expressions. It is characterized by unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, including sexual assault. Such conduct violates this policy when:

a. Submission to such conduct, generally by agents or employees with some authority from the College, is made either an implicit or explicit condition of the individual's employment, academic status, or ability to participate in or to receive the educational benefits, services or opportunities of the College; or

b. Submission to, or rejection of, the conduct (generally conduct of agents or employees with some authority from the College) is used as a factor in decisions that affect tangible aspects of the individual's employment, academic status, or ability to participate in or to receive the educational benefits, services or opportunities of the College; or

c. Conduct (by anyone involved in a College program or activity, e.g., administrators, faculty members, students, contractors, vendor, volunteers and campus visitors) is sufficiently serious (i.e., severe, persistent, or pervasive) and objectively offensive so as to create an intimidating, hostile, or offensive working or learning environment, (i.e., to unreasonably interfere with an individual's employment, academic status, or deny or limit the individual's ability to participate in or to receive the educational benefits, services or opportunities of the College).[8]

14. The Student Code of Rights and Responsibilities also contains provisions that enumerate prohibited conduct, which includes sexual misconduct. *See* Wash. Admin. Code (WAC) § 174-123-170(2)(s) (2018). Sexual misconduct includes "sexual harassment, sexual exploitation, sexual violence, relationship violence, domestic violence, and stalking," all of which are defined in the Student Code of Rights and Responsibilities. *See* Wash. Admin. Code § 174-123-170(2)(s); 174-123-170(3) (2018).

15. Under applicable state regulations, Evergreen has jurisdiction over and will respond to reports of off-campus harassment affecting members of the Evergreen community. As the Title IX Coordinator, I respond to reports of harassment to ascertain jurisdiction. Pursuant to state regulations,

---

[8] https://www.evergreen.edu/policy/sexual-harassment-misconduct (last visited May 22, 2020).

Decl. of Connie Gardner
EXHIBIT 53

Civil Action No. 20-cv-01468-CJN

Evergreen has jurisdiction if the Respondent is a member of the Evergreen community and the alleged conduct is (a) on College premises, (b) associated with a College-sponsored activity or program, or (c) off-campus and "adversely affects a college community member's ability to participate in or benefit from the college's educational opportunities, programs, or activities, an employee's ability to engage in their work duties, or adversely affects the college's pursuit of its objectives." Wash. Admin. Code § 174-123-150(1)(a)-(c) (2018). If Evergreen does not have jurisdiction (if the Respondent is not a member of the Evergreen community), remedies can still be afforded to the Complainant, including academic/employment adjustments, restriction of the Respondent from campus, and/or support resources.

16.    Evergreen policies allow anyone to bring notice of an alleged violation (or submit a complaint) to either the Title IX Coordinator, the Director for Student Rights and Responsibilities, or the Affirmative Action and Equal Opportunity Officer. There is also a web-based form that anyone may submit to the office either giving their identifying information or anonymously. The College has also broadly defined "responsible employee" to encompass all staff, faculty and student resident assistants, with limited exceptions; responsible employees have a mandatory duty to report potential violations of the college's Sexual Harassment and Sexual Misconduct policy. Upon receipt of notice, I as the Title IX Coordinator meet with the impacted party to learn more about the substance of the complaint. I work with the individual, even if the complaint does not fall within the scope of Title IX, and refer it elsewhere as needed if the concern is not Title IX related. If the complaint is Title IX related, it is my duty to inform the impacted individual of the different resolution options. In either situation, resources and supportive measures are discussed.

17.    Evergreen's investigative and hearing process differs depending on whether the Respondent is a student or employee. Student Respondent rights are governed by Evergreen's Sexual

Decl. of Connie Gardner                                        Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

Harassment and Sexual Misconduct policy and the Student Code of Rights and Responsibilities. Employee Respondent rights are governed by Evergreen's Sexual Harassment and Sexual Misconduct policy and the applicable CBA. If the Respondent is a student, the allegations are investigated through the Student Conduct Office. If the Respondent is an employee, the allegations are investigated through the Affirmative Action and Equal Opportunity Office. When allegations are substantiated, hearings are available as follows:

Collective Bargaining Agreement provisions.

> i. The Classified Employees CBA[9] sets out the procedural rights of unit employees who are investigated and disciplined. Disputes, including appeals of discipline that has been imposed, are handled through established Grievance Procedures, Article 30, that have several levels focused on resolution of the issues between the parties at the lowest level, with several opportunities for appeal. If the parties are unable to resolve the issues at the lower levels, the final step in the process is arbitration, which includes a full hearing, cross-examination, and representation.
>
> ii. The Student Support Services Staff CBA[10] sets out the procedural rights of unit employees who are investigated and disciplined. Disputes, including appeals of discipline that has been imposed, are handled through established Grievance Procedures, Article 31, that have several levels focused on resolution of the issues between the parties at the lowest level, with several opportunities for appeal. If the parties are unable to resolve the issues at the

---

[9] https://www.evergreen.edu/sites/default/files/CBA%202019-2021%20Final.pdf.

[10] https://www.evergreen.edu/sites/default/files/SSSSU%20Final_0.pdf.

Page 9 of 36

Decl. of Connie Gardner
EXHIBIT 53

Civil Action No. 20-cv-01468-CJN

lower levels, the final step in the process is arbitration, for matters that do not involve suspensions or discharges of employees. Discipline involving suspension or discharge of employees is subject to a discipline review panel, which conducts a hearing where evidence is presented, but witnesses are not called to testify.

iii. The Faculty CBA[11] sets out the procedural rights of unit employees who are investigated and disciplined. Disputes, including appeals of discipline that has been imposed, are handled through established grievance procedures in Article 24 that have several levels focused on resolution of the issues between the parties at the lowest level, with several opportunities for appeal. If the parties are unable to resolve the issues at the lower levels, the final step in the process is arbitration, which includes a full hearing, cross-examination, and representation.

Student Code of Rights and Responsibilities.

After an investigation is completed, a determination of responsibility is made by a student conduct official and the Complainant and Respondent are given notice. Wash. Admin. Code § 174-123-230 (2018). Either party may appeal the decision. The following appeal options are available:

i. Brief Adjudicative Proceeding Appeal. This is a streamlined process in which a conduct review officer holds an informal hearing during which parties present witnesses and evidence. It is available when the sanction is a suspension of less than ten days, deferred action, or probation. Both parties

---

[11] https://www.evergreen.edu/sites/default/files/TESC-UFEAgreement18-21.pdf.

Decl. of Connie Gardner                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

have the right to an Advisor of their choosing at this stage, and they can choose to hire an attorney at their own expense; the Advisor may be consulted during the process but does not present the case or represent the party during the appeal. Parties are not allowed to directly cross-examine one another; questions are submitted to and asked by the presiding officer.

ii. Appeal Panel Hearing. This is a full adjudicative hearing conducted in accordance with the requirements of Washington's Administrative Procedure Act. It is available when the sanction is suspension of ten or more days, expulsion, or if the student conduct officer or a reviewing officer (including a Brief Adjudicative Proceeding officer) refers the matter to the panel. The parties are allowed to present witnesses and evidence at the hearing. Both parties have the right to an Advisor of their choosing at this stage; the Advisor may be consulted during the process but does not present the case or represent the party during the appeal. A party can choose to hire an attorney at their own expense. Parties are not allowed to directly cross-examine one another; questions are submitted and asked through the presiding officer, unless the party is represented by an attorney who is then allowed to conduct cross-examination.

18.     The Evergreen State College uses a "preponderance of evidence" standard for determinations of responsibility in all student conduct cases. This standard applies in proceedings addressing all violations of the Student Code of Rights and Responsibilities, including sexual harassment and sexual misconduct. The Affirmative Action and Equal Opportunity Office uses the preponderance of evidence standard for investigations of the Non-Discrimination Policy; however,

Decl. of Connie Gardner                                   Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

determinations and sanctioning of employees are conducted using applicable CBA disciplinary and grievance procedures, which establish a "just cause" standard.

19.     The challenges of conducting Title IX Investigations and working with individuals who have Title IX complaints during the pandemic of 2020 are already significant, even setting aside the need to implement the Department's new Title IX Rule. While classes and activities are being conducted remotely, Title IX still is in effect. Using technology to address Title IX issues remotely presents unique challenges, due to some individuals having different technical constraints (e.g., lack of internet service), and due to confidentiality concerns with remote-communication technology. The confidentiality guaranteed at certain stages of the process may be compromised, as Title IX investigators lack control over what happens on the other screen. The possibility of unauthorized recordings, as well as concerns about individuals hearing in the background, create difficulties even when best efforts are made to use secure platforms and ensure that the College is being thoughtful in the management of its responsibilities despite numerous factors that it simply cannot control.

20.     Moreover, if there is a hearing, the above-identified technological and privacy concerns apply, along with the logistical difficulties associated with coordinating with a hearing panel, parties, witnesses, evidence, private sharing of materials, and the ability to control the atmosphere during the hearing. In general, remote work is hard. Title IX remote work is even more challenging due to the need for constant, direct communication quickly with many parties when it is impossible to control the circumstances and technology at the other end of a phone or video conference.

21.     Under the COVID-19 Pandemic and Washington State's Stay at Home Order, Evergreen transitioned to remote learning quickly, and is continuing to transition and prioritize academic pedagogy, as this pandemic has changed higher education in many ways. Evergreen's financial status is and will continue to be highly impacted, which means budget cuts will need to

Decl. of Connie Gardner                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

occur, including by cutting professional positions (faculty and staff). With the budget constraints, Evergreen is also in a hiring freeze, so Evergreen will be constrained in its ability to fill any professional roles or positions that need to be filled for an unknown amount of time. This is in conjunction to the focus on continuing remote learning and all individuals working to maintain academic credibility, learn technology, and shift classroom pedagogy to keep the high standard that Evergreen is known for. These above factors will make it incredibly difficult for Evergreen to implement the entire 2020 Title IX Regulations by August 14, 2020. The grievance procedures prescribed in the rules dictate the need for several different personnel in the process, all of whom need to be highly trained. The hiring freeze, along with the budget cutting, makes it impossible for Evergreen to hire any new personnel, or to do sufficient training for these roles within the unrealistic timeline contemplated by the Rules. Investigators, Decision Makers, Appeal Decision Makers, Advisors, and Hearing Board chairs would all need to be trained if new personnel could not be hired. However, with staffing reductions and increased workload caused by the necessary planning and adjustments caused by COVID-19, such training would be difficult to accomplish even in the months following the August 14th implementation deadline. This difficulty is compounded if training needs to occur after the academic year begins, which is nearly impossible given teaching schedules and the flow of the academic year. The other impossible time constraint in regards to the August 14 implementation date is the need to negotiate CBAs. The Evergreen State College has three; not only will the grievance procedures need to be changed to update the proscribed procedures in the regulations, but the evidentiary standard will need to be changed. Additionally, there will need to be provisions in the CBAs that talk about training, not just for the specialized roles dictated in the grievance procedures, but for all faculty and staff to update and continually educate on Title IX.

22.     These already-existing difficulties would be drastically compounded by the need to implement the new Title IX Rule by August 14, 2020, while dealing with COVID-19 and the associated financial and logistical challenges. Budget cuts will be a reality and a significant challenge for the College, along with concerns about continued remote learning and the software and technology needs that all parties in a live hearing will need to have. Such a rapid and arbitrary implementation date in the midst of a pandemic will hinder implementation and exacerbate these inequities, creating circumstances in which parties may have inequitable access due to varied technology and personal living circumstances. Washington State has a number of laws that prohibit discrimination of the basis of gender that contain standards that do not clearly align with the standards in the new Title IX Rule, and that apply to students and faculty/staff at The Evergreen State College. If the Rule must be implemented by the August 14 deadline, Evergreen will at a minimum have to review all policies and regulations that touch on Title IX to assess whether changes are required for reconciliation with the Rule—and will have to undertake the processes needed to change its policies and regulations where necessary.

23.     Washington's Gender Equality in Higher Education Act, Wash. Rev. Code (RCW) § 28B.110 (1989), is based on Washington's Constitutional guarantee of equal treatment regardless of gender. The statute focuses on the elimination of gender discrimination, including sexual harassment, in higher education institutions. The implementing regulations are found at Wash. Admin. Code § 250-71 (1998), and impose obligations on institutions of higher education in their academic programs. *See* Wash. Admin. Code § 250-71-015(6) (1998) (applying requirements to "all instructional, research, and instruction and research related public service activities of the institution…").

24.     Additionally, the standards set out in the new Title IX Rule conflict with the protections contained in the public accommodations provision of Washington's Law Against

Decl. of Connie Gardner                                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

Discrimination (WLAD), Wash. Rev. Code § 49.60.215 (2018). "WLAD protects the customer's 'full enjoyment' of the services and privileges offered in public accommodations." *Floeting v. Group Health Cooperative*, 434 P.3d 39, 42, 434 P.3d 39 (2018). It also does not require severe, persistent and pervasive conduct, but rather allows that a single act, if "objectively discriminatory," can form the basis of a violation. *Id.* at 43-44. Washington State also recently enacted Engrossed Substitute House Bill 2327, which requires postsecondary educational institutions to disclose information about current and former employees who have been found to have committed, or are being investigated for, sexual misconduct, when those employees seek employment at other educational institutions. The definition of sexual misconduct for purposes of the WLAD is broader than that contained in the new Title IX Rule, and it is currently unknown how that will impact the implementation of the Rule or the new state law. The Rule does not provide sufficient guidance on the interaction between federal and state law to allow Evergreen to promptly determine what changes must be made to ensure its compliance with all applicable law, particularly given the ambiguity caused by the preemption language which seems to conflict with the provision that allows for institutions to pursue non-Title IX violations.

25.  Washington State laws define sexual harassment much more broadly with a focus on proactively eradicating sexual harassment and stopping behavior before it negatively affects an individual's right to be free from gender discrimination. The new Title IX Rule more narrowly defines sexual harassment and has different procedural requirements. At this stage, there are so many conflicts in applicable laws, policies, procedures, and other legal obligations that Evergreen cannot fully evaluate them prior to August 14, 2020, at its current staffing and funding levels. The only certainty is that the complexity associated with such an evaluation renders it impossible to do so effectively in the limited time afforded by the new Rule.

Decl. of Connie Gardner                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

26.     As noted above, Evergreen has unions that represent faculty, and unions that represent staff. In total, there are three unions representing employees at the College, each with a separately negotiated CBA.

27.     Each CBA contains its own distinct set of standards and procedures relating to discipline and grievances. While the procedures differ, all contain a "just cause" standard for any employee discipline. For additional information about those standards and procedures, see paragraph 13.a. above.

28.     Evergreen would be required to renegotiate each CBA with each separate union in order to revise the discipline and grievance procedures to bring them into compliance with the new Title IX regulations. In order to do this, Evergreen first needs to determine what the proposed policy revisions and/or amendments might be. It will take time to formulate any new proposals; typically this process would take months, particularly when it concerns the development of a policy involving subjects such as harassment and employee discipline. Once a policy is formulated, depending on the CBA, the union would have between 21 and 28 days to file a demand to bargain. Each union has the right to file a demand to bargain, regardless of whether the change is a Federal law or not. Given the significant changes that the new regulations will require to the grievance process, a demand to bargain is expected. Once a demand to bargain is filed, the parties begin scheduling and bargaining, both of which take substantial time, typically months. Even if Evergreen did not need time to formulate a policy and await a demand to bargain (which, on its own, would likely take from now until the August 14th implementation deadline), it is simply not viable to negotiate these changes with the unions during the summer months. Like most institutions of higher education, Evergreen does not operate with a full faculty or staff during the summer months. Faculty are not on contract during the summer, unless they receive a separately negotiated summer contract. This year, due to COVID-19, Evergreen faces

Page 16 of 36

Decl. of Connie Gardner                                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

even more difficulties because those relatively few faculty and staff who are working are consumed with contingency planning for Fall Quarter instruction and the health and safety of the campus community. The August 14th deadline for implementation—when bargaining must occur before any changes can be made—is not realistic even for an institution with one union; Evergreen has three unions.

29.    In addition to the CBAs that would need to be revised to comply with the new Title IX regulations, Evergreen's Sexual Harassment and Sexual Misconduct Policy and its Non-Discrimination Policy would need to be reviewed and revised. Review of each policy and revision of each policy will take many hours with the Director of Student Rights and Responsibilities, the Title IX Coordinator, and the Affirmative Action and Equal Opportunity Officer, who are responsible for administering the above stated policies. These individuals cannot revise the policies without involving their supervisors, including the Director of Human Resources and the President of Evergreen. Due to scheduling and the time commitment this takes, which will include multiple meetings at least an hour in length along with extensive hours of work to develop the policies outside of the meetings, it will take several months to develop solid drafts for circulation to the campus community. Once the policies are ready for circulation, the policies will need to be vetted throughout the campus community and with senior leadership, which will continue to take at least another month, assuming that there is room on the agenda to devote to discussions of the policies alongside the multitude of pressing issues generated by the COVID-19 pandemic. The cost of these revisions is in time commitment, in which each individual still has priorities of remote work and other responsibilities. Evergreen's Student Code of Rights and Responsibilities would also need to be reviewed and revised. Additionally, Evergreen would need to review and revise each of its publications, handbooks, forms, webpages, and training materials that relate to sexual harassment or gender discrimination. With the potential vast changes to

Page 17 of 36

Decl. of Connie Gardner                                         Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

the CBAs and policies that would need to be made to implement the Rule, the Faculty Agenda Committee will need to be involved in the changes and reviews, with the hope of updating the Faculty Handbook.[12] The Title IX grievance procedures dictate that employees must also go through the same grievance procedures that students do; therefore, the Faculty Handbook will need to be updated. The Faculty Agenda Committee at Evergreen is the group that will work with the Title IX Coordinator to write those changes, and bring those changes to a vote for all faculty.  Again, most faculty at Evergreen are not on contract during the summer months, and therefore, it will be impossible to complete this step before the August 14 deadline.

      30.    Evergreen has a collaborative policy-review process that includes significant stakeholder engagement, which typically takes months to work through. The degree and depth of stakeholder engagement is significantly greater than is typical of state agencies, as the College's policies affect all members of the campus community, and the College has adopted various principles of shared governance and must comply with its legal obligations when exercising its authority to promulgate regulations. These procedural requirements are, if anything, more complex in the context of policies relating to sexual harassment and sexual misconduct, which, due to the various legal requirements at play, moves forward on multiple tracks. The process is outlined below:

      a.    The first step in the process is the formation of a committee that includes representation from staff, faculty, and students. The committee gathers input from members of the campus community through feedback sessions, open comments, and other avenues as deemed appropriate by the committee, and then develops proposed policy language based on that input and any applicable legal requirements. Once the

---

[12] The Faculty Handbook at The Evergreen State College is the handbook used to dictate faculty processes, expectations, conduct standards, and guidance. The Faculty Handbook outlines their own grievance procedures that are not in line with the 2020 Title IX grievance procedures.

final proposal for policy revision has been vetted through the campus community, the revised policy will go to the Senior Leadership Group on campus, which is comprised of the President and five Vice Presidents. The feedback given from the Senior Leadership Group will be provided to the policy review committee, and feedback will be considered. For policies related to sexual misconduct and Title IX, the new policy will also be vetted through the Board of Trustees. If the Board of Trustees rejects all or a portion of the policy, then it can result in continued negotiations, additional need for community feedback, and additional need for data. This will elongate the process, as the Board of Trustees have pre-set meetings in which these conversations will need to occur. Board of Trustee meetings are scheduled for June, September, and November. The schedule of the Board of Trustees does not meet the need to have implementation by August 14, as it will be impossible to provide the Board of Trustees information and get their approval during the June meeting. Once that is complete, the policy will be submitted to the Policy Advisory Committee for final approval and publication. This internal process is used to develop Evergreen's policies, such as the Sexual Harassment and Sexual Misconduct policy, the impact of which is subject to collective bargaining, and as part of the process for developing rules that are subject to the requirements discussed in subsection b.

b. The Student Code of Rights and Responsibilities must be adopted in formal agency regulations because it falls within the definition of a rule under Washington's Administrative Procedures Act (APA). Wash. Rev. Code § 34.05.010(16) (2019). The Washington APA sets out the rulemaking and hearing requirements applicable to regulations concerning student conduct proceedings. At best, this is about a six-month

process given the mandatory timelines, notice, comment periods, and publication requirements under the Washington APA. *See* Wash. Rev. Code § 34.05.310-360 (2019). While the Washington APA allows for emergency rule making, Wash. Rev. Code § 34.05.350(1)(b) (2019), emergency rules are only effective for 120 days; a permanent rule can only be adopted by complying with the lengthier process. Wash. Rev. Code § 34.05.350(2) (2019). The adoption of emergency rules by the August 14th deadline would be difficult, if not impossible, particularly given the scarcity of resources Evergreen is experiencing due to COVID-19. Typically changing a policy takes an entire academic year to complete. Nor do I believe that it is advisable to rush to generate student conduct rules to implement the Title IX regulations during the summer, when most of the campus community is usually absent and, this year in particular, those who are present are busy dealing with issues associated with COVID-19. Promulgation of emergency rules simply to meet a deadline will not result in the thoughtful implementation of rules that can be permanently adopted, so it will generate more work in an area that requires careful attention and deliberation in order to ensure that the rights of all parties are protected. Moreover, this multiplication of work and costs does not just apply to the development of new policies and regulations: Evergreen would also have to train each of the individuals involved in implementing the rules (including every individual who is a mandatory reporter under federal or state law), issue new versions of each of the publications referenced in paragraph 30 above, train the members of the campus community and invest significant time and money to implement the emergency rules—and then do it all again when the permanent rules

Decl. of Connie Gardner
EXHIBIT 53

were implemented. This is untenable, especially at a time when Evergreen and our state is experiencing significant fiscal pressures due to the COVID-19 pandemic.

31. During the COVID-19 pandemic, changes to policy will be hindered in many ways. First of all, all employees at Evergreen have differing priorities in this time of crisis—including focusing on remote learning, making difficult decisions about future operations if a "return to normal" is not possible, and the unique challenges that come with remote education. Communication between the various groups that are focused on these issues will be slow while remote work continues due to technological constraints, summertime schedules, and varying family obligations and schedules—all of which makes group decision-making harder and more time-consuming. Because it takes longer to bring individuals together remotely and schedule meetings that work for all participants, especially during the summer, the feedback sessions will need to be provided for longer periods of time and in very different ways (remote, anonymous submission, town hall meetings, and individual feedback sessions), which lengthens the timeline considerably.

32. There are many people who will need to be involved in revising Evergreen's Sexual Harassment and Sexual Misconduct policy, in addition to making changes to the Non-Discrimination Policy and the Student Code of Rights and Responsibilities. As the Title IX Coordinator, I will begin this revision work together with the Affirmative Action and Equal Opportunity Officer and the Director of Student Rights and Responsibilities. However, this work will require significant consultation with legal counsel as well. Open conversations with students, faculty and staff of the Evergreen community will also be necessary in order to be transparent and provide all community members the ability to provide feedback. Evergreen considers their community (staff, faculty and students) major stakeholders as part of the concept of shared governance and therefore, must provide these open conversations. Additionally, the Senior Leadership Group, the Board of Trustees, and the

Page 21 of 36

Policy Advisory Committee[13] will all need to meet in order to review and assess any revisions to the policies. This is in addition to the time and financial commitment for training (training to include at least one week three times a year to focus on different roles and tasks; cost upwards of $10,000 for bulk training for individual roles and webinars to increase knowledge), including webinars and listserv conversations, which will be necessary to help all involved persons digest and fully understand any new regulations. All of this work will be time consuming, and while there is no number that can be put on it due to the unseen efforts of numerous individuals who are not hourly employees and will need to work additional hours without extra compensation, it definitely will be extensive—and will need to be prioritized due to the extremely short compliance timeline, despite the simultaneous need to prioritize the College's response to the unprecedented COVID-19 pandemic.

33.     There is no formal procedure that states any new policy must go through different committees than listed above. However, because Title IX is a hot-button topic, it will need to be vetted through many different groups and committees, including Faculty leadership and Geoduck Student Union, the college's student government. This is absolutely necessary to maintain a healthy and functional College community, which is a critical aspect of the educational experience Evergreen provides. There will also need to be time to get public comment from faculty, staff and students to the proposed revisions—again, to ensure all members of the community have a stake in the development of policies that will affect the community as a whole. Again, this will be a time consuming process and will require extensive coordination in a remote environment.

34.     The final approval step for any new policies will be through the Board of Trustees. To be clear, this is not a matter of approving a single policy. As noted above, in addition to approving any necessary revisions to its existing policies, Evergreen would need to go through a formal

---

[13] https://www.evergreen.edu/policy/developingandapprovingcollegepolicies.

Decl. of Connie Gardner                                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

rulemaking process, which requires notice and a public hearing before the Board of Trustees could approve the final rules. On top of that, there are the three distinct CBAs that would have to be revised via three separately negotiated memoranda of understanding. As mentioned, the number of people needed (the Board of Trustees, the President of the College, Senior Leadership, Human Resources, Union representatives, and key stakeholders) create undue burdens over the summer months when it is nearly impossible to coordinate due to the lack of summer contracts of a number of employees. Given the current pandemic and the current priorities of the Board, it is likely there will already be one or more special meetings of the Board of Trustees. Each special meeting takes many hours to coordinate, in addition to the finances of travel/coordinating media and communication to the Evergreen community. Adding additional special meetings to approve new policies and regulations— solely to meet an unnecessarily early compliance deadline—is extremely burdensome for the College and its community members.

35.     The COVID-19 pandemic has upended the lives and work of the members of the Evergreen community. In March, Governor Inslee issued Proclamation 20-12, which prohibited in-person classroom instruction and lectures in Washington's colleges and universities, with a few limited exceptions. Shortly thereafter, the Governor issued Proclamation 20-25, a shelter in place order that required individuals to shelter in place and that limited business activities to essential services only. Evergreen quickly—but not easily—pivoted to remote instruction and operations. This required faculty to rapidly adjust their programs and courses to a new platform, and required our staff to transition to remote working. At the same time, faculty and staff faced unprecedented challenges in meeting new needs of our students, many of whom encountered obstacles to effective remote learning and required emergency grants for technology and other basic needs.

Decl. of Connie Gardner                                              Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

36.     Because of COVID-19, Evergreen has experienced significant fiscal impacts. Lost revenue from our auxiliary programs (campus housing, parking, conferences, etc.) exceeds $4,000,000, and we are experiencing staff furloughs. The College is also facing hiring and spending freezes due to the fiscal impacts of COVID-19 on Washington State's economy. All this comes at a time when College faculty and staff have increased workloads due to the need to shift to different ways of providing services and instruction to our students. This is exacerbated by the broader uncertainties that we all face in this pandemic, which requires contingency planning and development of safety protocols that protect everyone's health.

37.     In addition to the heavy burden of evaluating how to implement the new Title IX regulations in the middle of the COVID-19 pandemic, Evergreen is also evaluating how it will manage its legal obligations under state law and how it will address harassment and other misconduct that does not meet the new definition of sexual harassment under the Rule. At this stage, Evergreen has been unable to develop any formal plan for how that will be handled, but it is clear that it is going to be necessary to create new policies and provisions to ensure that the members of our community are protected from sex discrimination and sexual harassment, and that Evergreen is meeting its legal obligations under all state and federal laws in light of the newly interjected complexities created by the Rule's narrow definition that departs from other, still applicable sexual harassment standards. Developing and implementing alternative processes for addressing harassment and discrimination that is not covered by the Title IX Rule is going to be costly, as it too will require a thoughtful approach, significant legal analysis, and other procedural steps discussed above. It will also likely require Evergreen to restructure its Title IX office, although what that restructure will look like is still uncertain. Right now the Title IX Office has only one person, who is also the Clery Compliance Officer. The work needed to comply with the 2020 Title IX Regulations is hefty and needs distinct

Decl. of Connie Gardner                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

individuals performing distinct roles. It is also expected that there is will be an increase in the resources that need to be allocated in terms of the number of live hearings that are required under the new provisions. Resources include additional technology, additional personnel with specific roles, and additional time commitments which mean additional compensation and ongoing expenses. Additionally, it will require significant use of space at a time when space at the College will be at a premium. Due to the social distancing requirements associated with COVID-19, the College will need to be able to hold the hearings in larger rooms and there will likely need to be multiple rooms in order to accommodate the needs of witnesses (who will now be required to testify due to the elimination of all hearsay exceptions and exemptions), and the needs of complainants and respondents. This comes at a time when the College needs to utilize its space to the fullest extent possible in order to enable employees to work with appropriate social distancing measures, and students to attend school with appropriate social distancing measures. With the increase in workload, more personnel will be needed which will likely alter the reporting structure for grievance procedures (meaning, the Title IX Office may need to oversee Title IX grievance procedures and the personnel who are involved, which currently does not happen at the College). This again is a very time-consuming process, as it will entail creating a new policy that works in conjunction with the Title IX policy, given the substantial overlap in the issues addressed by the different policies. This will require an extensive investment of time not only by myself as the Title IX Coordinator, but also by the Affirmative Action and Equal Opportunity Officer, the Director of Student Rights and Responsibility, the Assistant Attorney General, the Senior Leadership Group, and the Board of Trustees—at a time when these individuals are also addressing the significant challenges discussed above. All of this time takes financial resources as well, including the hiring of additional staff to perform these distinct roles, financial resources to provide training to all individuals a part of the process, and additional compensation if

Decl. of Connie Gardner
EXHIBIT 53

Civil Action No. 20-cv-01468-CJN

applicable. Additional personnel will be needed, meaning Evergreen would need to budget salary for an additional full-time professional staff. If this is impossible, Evergreen will need to budget for outside contractors (approximately $100 an hour), or additional compensation for current employees (approximately $100 an hour).

38.     In addition to the policy and rule revisions discussed above, there are numerous publications and resources that Evergreen will need to revise. The student handbook, websites at Evergreen including the Title IX website, Student Rights and Responsibilities website, Equal Opportunity and Affirmative Action website, and Police Services website will all need to make changes with the new policy. New publications and posters will need to be designed and published for the campus community, at the cost of approximately $500 a year. The faculty handbook, employee onboarding materials, job descriptions affected by changes made to implement the Rule, and all gender discrimination and sexual misconduct-related trainings and related materials will need to be updated. This process is yet another time-consuming aspect of implementation, as the changes need to be proposed, sent to Senior Leadership groups, approved, and then submitted for final approval. Under the Rule, all of that must be done by August 14 to ensure compliance.

39.     At Evergreen, all students, faculty and staff receive a notice annually that speaks to Title IX, the Sexual Harassment and Sexual Misconduct Policy, and other information related to sex and gender discrimination. Additionally, all incoming students receive information regarding the relevant policies and Title IX during orientation at a live session from the Title IX Coordinator. Faculty and Staff are also offered Sexual Harassment and Title IX training throughout the year. All of these materials and associated trainings would need to be revised to implement the Rule, in addition to the materials discussed above. I would anticipate these changes to be over 40 hours of additional work, in addition to printing charges of approximately $500 for policy statements.

Decl. of Connie Gardner                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

40.     With the new requirements, all Evergreen staff and faculty and all students will need to be trained and/or re-trained. This will need to include a comprehensive training program from the Title IX Coordinator and the Assistant Attorney General to train all faculty in accordance with a provision of their collective bargaining agreement. The Title IX Coordinator will also need to create a training and educational program for all students, including an introductory training for incoming students (all new undergraduate students, transfer students, and graduate students) through Orientation at the beginning of the academic year, and trainings for returning students through additional means.

41.     Perhaps the most intensive training requirements will be for those individuals who are involved in the process for handling notices and complaints of gender discrimination and sexual misconduct – Investigators and Hearing Panel Members, student conduct officers, Advisors, and any others who may be involved in the hearing or grievance process. While Hearing Panel Members and chairs have regularly received annual trainings, under the new Rule they will now also need to understand the intricacies of the rape shield laws incorporated into the Rule, and will need to be trained in applicable evidentiary principles so they are prepared to issue oral rulings on the record during cross-examination as required under the Rule. Training for facilitation of mediations will also be needed, in addition to Title IX Coordinator training, since the Title IX Regulations dictate new and different expectations. The Title IX Coordinator will need to be trained on jurisdiction, definitions, and the grievance procedure in order to be in compliance with the Regulations. For informal resolution options, according to the Regulations, mediation will be an option. However, the Regulations also state that mediations need to happen through trained mediators; therefore, specialized trainings need to occur for these specific roles as well. Evergreen estimates that providing the trainings described in this paragraph alone—investigation training, panel member training, and adjudication training—will

Decl. of Connie Gardner                                Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

cost $40,000 each year. Additional training and expenses for the Title IX Coordinator, including participation into ATIXA, will cost $15,000 annually for the membership and Title IX Coordinator training and materials including example policies and documentation. This estimate does not include the cost of any of the other trainings and materials, not to mention the costs for other aspects of implementation, discussed at length above.

42. The Evergreen State College will need to educate the campus community in many different ways in order to implement the Rule. New trainings will need to be created and rolled out, including training on being a Responsible Employee, consent workshops, and information on the new policy's extensive provisions that will affect students, faculty, and staff. To ensure the Rule's procedural requirements are met, Evergreen will need to develop and implement a new procedure for handling Title IX complaints, and with that, all investigators, adjudicators, and conduct panels will need to be trained in the new procedure. This will most likely need to be completed by an outside vendor who is vetted and approved in these distinct needs, which will run upwards of $30,000 annually. Publications will need to be changed, reprinted, and disseminated; it is estimated that printing costs alone are will cost approximately $2,000 annually. New training will need to be created for students as well, which will need to be given annually. This training will take extensive time and money to create, as the Title IX Coordinator will need to conduct research, create a training, solicit feedback, and work to implement it for all students in conjunction with orientation planning, Student Rights and Responsibilities to educate on the code updates, and faculty to assist in implementing these trainings. This process is time consuming, extensive, and highly collaborative—all of which will make it very difficult, if not impossible, to complete all necessary training and community education steps by the August 14 deadline. Currently, Evergreen is working to implement the EverFi Sexual Assault Prevention program, which costs $3,600 annually. The time burden is substantial, with

Decl. of Connie Gardner                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

approximately 10 hours being dedicated each week to implementing, tracking, and coordinating that each student has taken the module in order to comply with VAWA requirements.

43.     The concept of a live hearing as part of the grievance process is not new at Evergreen, but the Rule's mandatory live hearing requirement is going to create a significant time and financial burden. It also creates a more legalistic and contentious proceeding, which may detrimentally impact the health of the College community. Currently, Evergreen has a live hearing available as part of an appeal from an adjudication of a complaint of sexual misconduct. Providing this option strikes a balance between providing an opportunity for informal resolution and providing an avenue for formal due process in a contested hearing with due process that is aligned with long standing legal precedent. The formal process is an educational process with modified rules of evidence that, in my experience and the College's judgment, are appropriate for an educational process. When Evergreen runs a process that has modified rules, it allows for more transparency in the process, creating a more student centered approach that is educational and not punitive, allowing for learning to occur throughout the process and at the completion and beyond. By contrast, the Title IX Rule's mandatory hearing immediately and unnecessarily escalates an educational process into a confrontational and legalistic process with advocates for both parties and mandatory cross-examination of alleged victims. Now all Title IX matters will need to go to hearing, unless both parties consent to informal resolution. Based on my experience working in Title IX, I expect that this will result in an increase in the number of hearings. Evergreen expects to see a significant increase in the amount of time required to prepare for and schedule mandatory live hearings for any Title IX case, which will delay resolution of these important cases and distract students from their studies for extended periods. Usually Title IX cases should take 60 days to complete; with the need to schedule a live hearing, compile a record, formally

Decl. of Connie Gardner                                                Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

exchange evidence, and liaise with parties' advocates or legal counsel, among other procedural requirements, this timeframe will undoubtedly be extended.

44.     Due to the adversarial and adjudicatory nature of the mandatory live hearings, Evergreen expects that it will need to obtain specialized training for its hearing panel members, conduct officers, and Advisors, or alternatively, that it will need to hire individuals who already have relevant specialized training to perform those services. These roles will require more specialized, legal knowledge. For example, hearing panel members will need to understand rape shield laws and be able to manage cross-examination and make real-time rulings on relevance and other evidentiary matters. Similarly, Advisors will need to have the skills necessary to perform cross-examination; Evergreen does not currently have Advisors who have these skills. This means that Evergreen will either have to hire outside professionals in order to comply with the regulations, or provide specific training and compensation for professionals inside Evergreen. Without such training, there is risk of litigation for ineffective assistance of counsel type claims. If Evergreen hires an attorney to perform these services, it is expected that they would charge $250 an hour or more. Evergreen estimates that each Title IX complaint will cost at least $5,000 to complete the investigation and hearing, in light of these new requirements. This is not sustainable nor realistic in light of the College's budget, even without considering the financial impacts of the COVID-19 pandemic. Advisor training for Evergreen employees will run approximately $30,000, which needs to be done annually. This does not include compensation for overtime for the time taken by each live hearing, which can run anywhere from $100 per hearing to upwards of $5,000 per hearing.

45.     With the Title IX Regulations calling for cross-examination by the Advisor to the Complainant and the Respondent, this can cause extreme harm to these individuals. This includes causing trauma in an already traumatic situation and creating extreme inequities in the Title IX

Decl. of Connie Gardner                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

process. Complainants and Respondents being cross-examined by professionals in a fast paced, factual way is not trauma-informed and does not contribute to an educational experience that higher education institutions are committed to. In my opinion, this will do more harm than good. We are a higher education institution focused on mitigating the harm that has occurred, helping individuals learn from their experiences, continue in their academic pursuits, and achieve justice in a manner that is fair and equitable. These new rules create a purely legalistic environment that is not trauma-informed and encourage legalistic maneuvering and strategizing that, instead of fostering equal access to education, actively hinders it. Evergreen will need to take additional measures to support the emotional toll this takes on the parties, including contracting for support persons (counselors, etc.) that can cost over $100 an hour for those services. The other component of this is that cross-examination by Advisors will cause major inequities. Advisors may be anyone; this includes lawyers. However, hiring a lawyer comes at a financial cost that not all students are able to afford. If one student has a lawyer as an Advisor and another student has a friend as an Advisor, this inequity will allow for inequitable information and continued trauma. This aspect of the Rule is asking higher education institutions to mimic courts of law, which is problematic and counter to what is stated in the Rule. The goal of Higher Education is education and growth; these Regulations do not align with the goals and missions of higher education institutions. Higher Education professionals do not have law degrees; they do not have experience in courtrooms, and most students do not bring Title IX complaints to a legal level because of the trauma and threshold of the law. Because of this, this part of the Rule will hinder Complainants from moving forward with any formal complaint.

46.    There will need to be a way to share out Title IX hearing materials electronically in a safe, confidential, and protected way. The information disclosed in Title IX cases is sensitive and there are unique confidentiality concerns associated with both employment investigations and

Decl. of Connie Gardner                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

student-related records and investigations. Evergreen will need to purchase software or work with an outside company to set up protected documents, as it does not currently have technology in place to facilitate secure sharing of confidential documents with a group. This will take a lot of time in order to research best options, enter into a competitive bid process, and finalize contracts. In general, programs that do this type of service run about $10,000 a year, which will be an added, ongoing expense for the College.

47.     I am also concerned that the new Title IX regulations will delay resolution of Title IX cases and lend themselves to abuse. First, in my experience, there are cases in which there are multiple Complainants. This will lengthen the timeline of any formal resolution and complicate the live hearing component: If there is more than one Complainant, a live hearing may take more than a day, particularly as each Complainant is subject to cross-examination under the Rule. Multiple Complainants may cause investigations to last much longer because the limited investigative staff will need to obtain information related to every Complainant's allegations, which means the formal resolution processes in such cases may take longer than a semester or even a year. Second, the unfettered discretion of a party to select an Advisor of their choosing to cross-examine the other party lends itself to abuse. For example, I am concerned that there is nothing in the Rule preventing one party from selecting an Advisor who has their own history of abusing and intimidating the other party, which would chill that other party's rights.

48.     The requirements outlined in the Rule will cause delay to the resolution of Title IX cases. They may also delay resolution of non-Title IX sexual harassment since the new definition under Title IX is so narrow and investigations and procedures will now need to be separated in some manner.

Decl. of Connie Gardner
EXHIBIT 53                                           Civil Action No. 20-cv-01468-CJN

49.     The Rule's provisions relating to the parties being authorized to speak freely about the allegations are likely to result in disruption, and possibly litigation. The Title IX regulations apply to both students and employees, two groups who have different rights under the First Amendment, yet the Rule recognizes no such distinction. Similarly, individuals involved in these processes have different privacy rights, something the Rule also fails to address. Yet, the parties may now discuss the allegations, which is likely to be construed as retaliation, be disruptive, and could ultimately be unsubstantiated as part of the investigative and/or hearing process. For example, if a Complainant shares their story freely and calls the Respondent a "rapist," but the Respondent is found Not Responsible, this can create individual risk, institutional risk, and be disruptive to the campus community. Retaliation is a broad concept, and it is not unusual for a Respondent to allege retaliation anytime they perceive that they are being treated "unfairly." In a higher education setting, this can happen often. If parties are able to discuss allegations and someone is labeled a "rapist" and someone is treated differently because of that, this could be considered retaliation. While the Regulations state we can use supportive measures and remedies to make sure this does not happen, colleges cannot always control the community and the language used.

50.     The narrow definitions under the new Title IX Rule decrease the ways schools can help students impacted by sexual harassment. The most noticeable change is the removal of traditional "hostile environment" sexual harassment from actionable harassment as defined in the Rule. Prior to the Rule, "hostile environment" sexual harassment was defined in the disjunctive "severe, persistent, or pervasive." That type of conduct currently accounts for 90% of the sexual harassment reports at Evergreen. The Rule's new, narrower definition of sexual harassment means that some individuals will not be able to benefit from Title IX protections against gender discrimination that interferes with education. The narrower definition will chill the rate of reporting, and may even increase the amount

Decl. of Connie Gardner                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

of sexual harassment that occurs if victims do not feel that they can report and Respondents feel emboldened. This will not end sexual harassment, and instead will mean that some sexual harassment will not be reported or will go unaddressed unless it can be captured under other policies, regulations, and laws. The Rule's narrowing of jurisdiction to conduct that occurs on campus is also of concern to Evergreen. Evergreen is committed to addressing the impacts of sexual harassment and sexual misconduct that occurs off campus if it is affecting the work or academic environment of a member of the College community. The new Rule limits colleges and universities' jurisdiction to on-campus conduct only, but this does not mean that our students and employees will no longer be impacted by situations that happen off campus. Under the Rule, Title IX simply does not protect them. While campus policies can address situations that do not fall under Title IX, the narrowing of the definition of sexual harassment in Title IX, when other sexual harassment and gender discrimination definitions are broader under state and federal laws will create, at best, confusion, at worst, the potential for litigation, particularly when the regulations also contain a preemption clause.

51.     The new Title IX Rule states that a formal complaint must be in writing, able to be filed at any point in the day (even after business hours), and signed by the student or the Title IX Coordinator. I am concerned that the need for a written and signed statement can be scary and traumatic for Complainants. Signatures make it seem like the statement is a "contract" and that there is a formal need, which can be intimidating and discourage reporting. Evergreen is a public institution that is subject to Public Records Requests. While there are some laws protecting the identity of Complainants, they are not foolproof; depending on the circumstances, the ability to remain confidential or even private with a sensitive topic like sexual harassment will be difficult when, as under the Rule, the Complainant must submit a written complaint before the College can take any action. This too will hinder Complainants in coming forward, thus lowering the reporting rate without

Decl. of Connie Gardner                                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 53

ending sex discrimination. The requirement that a Complainant essentially be an enrolled student, or attempting to return at the time of filing the complaint is also of concern. This is at odds with other applicable laws and it is difficult to ascertain whether that means that sexual harassment/misconduct can be pursued under non-Title IX harassment or misconduct, or whether that would be precluded due to the Rule's vague preemption clause. At best, these provisions chill reporting of sexual harassment, while at worst they could exacerbate the situation and embolden harassers and stymie the College's efforts to foster a campus that is free of sexual harassment.

52.     The Evergreen State College currently receives over 100 notices of potential sexual harassment each year. While not all of those notices become complaints or prompt further action, receipt of informal notices allows the Title IX Office to work with each impacted party to provide support and resources. Under the new Title IX Rule, the College cannot act absent a formal complaint, even when it may be necessary for campus safety. Whereas, in the past, the College could move forward when a pattern that endangered the campus community was identified. In 2019-2020, Evergreen had one case that moved forward for a live hearing (i.e., an appeal hearing in Evergreen's current process). Evidence has shown that most students who experience sexual harassment want the behaviors to end, but do not feel comfortable moving to a formal resolution option. Because submitting a formal complaint will automatically trigger a formal resolution process under the new Rule, the new Rule is expected to chill reporting. Complainants will not feel comfortable coming forward when a formal hearing is the inevitable result. This means not only will individuals not get the resources and support they need, but also Evergreen will not even be able to track trends or understand the obstacles its students are facing. There is a real risk that the threat of continued sexual harassment will increase, meaning Title IX will no longer assure equitable access to education, but quite the opposite.

53. If Title IX/Sexual Misconduct reporting decreases, this does not mean that sex discrimination is not happening. It simply means it is not being reported, which means that the issues cannot be addressed or remedied. This is extremely problematic because not addressing issues may lead to systematic problems, negative experiences for the Evergreen community, and a lack of respect and care for others. This can affect retention, enrollment, campus climate, and the overall reputation and business of the College.

54. The 2020 Title IX Regulations will have extreme impacts on the finances of Evergreen, the workload of the Title IX Office, and the perception of care to individuals impacted by sexual harassment. Less reporting does not mean there is less sexual harassment; on the contrary, it means that sexual harassment is happening, and usually at a higher rate, but people are afraid to report. This can lead to extreme trauma to individual students, the perception of the college, and increased litigation, all of which harm the College's finances, operations, and central mission of providing a high-quality educational experience to all of its students.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this ⟨ ⟨ day of ○6, 2020

CONNIE GARDNER
TITLE IX COORDINATOR
THE EVERGREEN STATE COLLEGE

Decl. of Connie Gardner
EXHIBIT 53

Civil Action No. 20-cv-01468-CJN

EXHIBIT 54

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>                    Plaintiffs,<br><br>          v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>                    Defendants. | **Civil Action No. 20-cv-01468-CJN** |

**DECLARATION OF QUINNELLE GOMEZ**

I, Quinnelle Gomez, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Director of Compliance and Title IX Coordinator at the Boston Public Schools (BPS) located in Boston, Massachusetts. My educational background includes a Bachelor of Arts, and a Juris Doctor. I have been employed as Director of Compliance and Title IX Coordinator in BPS's Office of Equity since November 2018. Before becoming Director of Compliance and Title IX Coordinator, I was the Attorney Investigator for the City of Boston's Office of Fair Housing and Equity.

2.      I submit this Declaration in support of the Commonwealth of Massachusetts's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department");  and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through BPS's personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on BPS.

3.      BPS was founded in 1647 located in the city of Boston, Massachusetts. There are currently 53,094 students enrolled in 125 schools across the district. Approximately 10,344 individuals are employed by the BPS.

4.      BPS is funded through a combination of general funds from the City of Boston, which receives revenue from property and other taxes, Massachusetts's main funding mechanism for K-12 school districts known as the Chapter 70 program, and state and federal grants.

5.      BPS receives federal funds from the Department. As a result, BPS is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

6.      BPS has adopted a sexual misconduct policy that protects students by prohibiting sexual harassment and other sexual misconduct by students, employees, contractors, volunteers, and others who enter school buildings or participate in school-sponsored activities, and by

establishing a grievance process for addressing complaints. This sexual misconduct policy is also known as Equity Circular 3.

7.     The Office of Equity currently has four permanent staff members. The Assistant Superintendent is responsible for supervising all Title IX implementation in the district, including Title IX-related investigations, remedial action, and training. The Director of Compliance and Title IX Coordinator is responsible for conducting and/or managing investigations of possible violations of BPS's Equity Circulars, which are BPS's policies dealing with discrimination, harassment, and bias and include the policy that prohibits sexual misconduct toward students, Equity Circular 3. The Director of Training and Accommodations is responsible for responding to disability and religious accommodation requests from district employees, and administering training on how to prevent and address bias-based conduct. The Equity Manager is responsible for providing administrative and operational support to the Office of Equity.

8.     The Office of Equity defines a complaint of sexual misconduct as a verbal or written statement alleging that one or more incidents of inappropriate sexual conduct have occurred.  Any incident that may have violated Equity Circular 3 triggers an investigation into the complaint. The Office of Equity defines an investigation as a formal inquiry into an allegation of an incident that may have violated Equity Circular 3. A report is defined as a sexual misconduct complaint that has been communicated to the Office of Equity by a student, parent, or third party. Under Equity Circular 3, all employees are obligated to report any alleged incidents targeting students. School administrators and employees who serve in supervisory roles are obligated to contact the Office of Equity anytime they become aware of possible sexual misconduct toward a student. Most reports of sexual misconduct are investigated by the school principal or other designated school administrator in collaboration with the Title IX Coordinator and the Office of

Equity. The Office of Equity will, on occasion, conduct investigations of alleged sexual misconduct in situations where a) a student or family member is not satisfied with the results of the initial investigation by the school principal or other designated school administrator, or b) an allegation is egregious and/or involves possible employee misconduct. During the 2018-2019 school year, the Office of Equity received exactly 500 reports of sexual misconduct towards students.

9. BPS's sexual misconduct policy was last revised in September 2019. The revisions made to Equity Circular 3 were relatively minor, and the revision process took approximately two months, incorporating input from BPS's Department of Safety Services and BPS's Office of the Legal Advisor. The policy is currently being revised to reflect input from the Massachusetts Department of Children and Families.

10. BPS defines sexual harassment as unwelcome conduct of a sexual nature that denies or limits, on the basis of sex, a student's ability to participate in or to receive benefits, services, or opportunities in the school's program or activities.

11. BPS's Equity Circular 3 states that sexual misconduct (including sexual harassment) that occurs in a location other than a BPS building or outside of school or work hours may still constitute sexual misconduct and a violation of this policy if that behavior has the effect of disrupting a student's ability to learn.

12. Students who believe that they have been a target of, or subjected to, sexual misconduct may report incidents to any BPS employee, but are encouraged to report to a school administrator or the Office of Equity. Students' parents or guardians, teachers or other school or district personnel, or other third parties who interact with students may report sexual misconduct

of a student to any BPS employee, but are encouraged to report to a principal or other school administrator or to the Office of Equity.

13.    BPS uses a single investigator model to investigate allegations of sexual misconduct. A school-based investigator undertakes an investigation when a report is received at their school. School leaders (middle or high school headmasters or elementary school principals) are often the designated investigators, but can select a designee to lead an investigation, such as an assistant headmaster or assistant principal.  In instances where the reported sexual misconduct may constitute sexual violence, the student who is the alleged target of the sexual violence is questioned only once. This questioning is done the same school day as the disclosure either by the investigator or by a staff member who initially received the disclosure (for example, a school social worker or nurse). The school must determine the need for interim safety measures in partnership with their School Operational Leader, School Assistant Superintendent, and the Office of Equity. During the investigation of the complaint, witness statements must be obtained as soon as possible, but without interfering with the evidence-gathering phase of a police or other law enforcement investigation. When the investigation is completed, the designated investigator must submit an Equity Investigation Summary Form to the Office of Equity with all the relevant documents and digital or physical evidence as an attachment, including any police reports. If the investigator substantiates the complaint at the conclusion of the investigation, any student discipline is determined and implemented in collaboration with school operational leaders or school assistant superintendents as appropriate, or with the Office of Labor Relations should employee discipline be required. If an allegation is not substantiated, the reporter and the subject of the investigation receive a formal closure letter. Additional steps may be taken to support or address the impact of

the allegation on the individuals. Subjects and reporters are advised against taking any retaliatory action.

14.     If the investigator and school or district leaders determine that a student should be disciplined, the BPS Code of Conduct is triggered, which provides for a student disciplinary hearing process conducted by an administrator who did not conduct the investigation. The student disciplinary hearing process is the same regardless of the violation. Among the steps are a review and preparation of the evidence, opening and closing statements, and witness testimony (if there are witnesses). After the hearing, a consequence must be issued as appropriate under the BPS Code of Conduct and communicated in a timely manner in writing to the parent or legal guardian of the alleged perpetrator. If misconduct has not been found, the participants of the disciplinary hearing receive written notice of the findings of the hearing. Additional steps may be taken to offer support or address the impact of the allegation on the individual or on the school community.

15.     BPS limits the sharing of information about an investigation. A BPS confidential log must be completed whenever a student alleges they experienced sexual misconduct by another student, a BPS employee, a family member or acquaintance, or anyone else they interact with related to their travel to or from, or participation in, BPS instruction or activities. Documents submitted as part of the investigation are shared with a minimum number of appropriate school or district personnel on a need to know basis only, and with law enforcement authorities (where appropriate) or as otherwise provided by law. The Office of Equity and the Office of Legal Advisor determine when a health or safety emergency exists such that sharing documents with BPS police officers, local law enforcement, or others is appropriate. If the reporter or alleged victim is a minor, the parents or legal guardians are notified – unless the parent or legal guardian is the alleged perpetrator and/or if such notification will create substantial health risk to the student's health,

safety, or welfare. If the alleged perpetrator is a minor, the parents or legal guardians are notified of the complaint against their child. If the allegation may lead to a criminal investigation, the designated law enforcement investigator from the Boston Police Department provides the Office of Equity with additional guidance before the parents are notified. When the parents or legal guardians of the alleged perpetrator are notified, the designated investigator may not inform the perpetrator's family of the alleged target's identity or gender in order to maintain confidentiality.

16.    The Title IX Rule will impose increased costs and burdens on BPS.

17.    BPS will experience an increased burden to revise Equity Circular 3 (the sexual misconduct policy) and the Code of Conduct consistent with the Title IX Rule. The Office of Equity staff will need to incorporate the requirements of the new rule into Equity Circular 3 and the Code of Conduct. Multiple individuals and departments will need to review and give input on the revised Equity Circular 3 and Code of Conduct, including the district's legal advisor and the BPS Superintendent.

18.    BPS will also need to revise all employee, student, and parent training materials, and website notifications to reflect the Rule changes.

19.    The Office of Equity will need to collaborate with multiple relevant departments, and will need to retrain all schools, including all employees in a supervisory capacity and other employees as determined by their supervisor or manager, on how to correctly implement both the revised Equity Circular 3 and the revised Code of Conduct. Other employees can, and may opt to, participate in such a training, further increasing the burden on the Office of Equity.

20.    The Office of Equity will need to train all employees responsible for conducting Title IX investigations on the new requirements, creating an additional burden on Office of Equity staff.

Decl. of Quinnelle Gomez                                                Case No. 20-cv-01468
EXHIBIT 54

21.     BPS will be required to increase capacity on the school and district level to comply with the Rule's prohibition on the single investigator model. The regulations require three separate individuals to conduct a single Title IX complaint process, and this need for increased capacity may rise to the level of requiring an additional full-time equivalent employee in the Office of Equity.

22.     The requirement in the Title IX Rule that prohibits schools from restricting alleged victims' and alleged perpetrators' discussion of the allegations will cause harm to BPS students and to BPS's ability to conduct fair investigations. Given the young ages of BPS students, it is important for BPS to be able to restrict the sharing of personal and sensitive information. Without such a restriction, it is more likely that students will face retaliation and harassment.

23.     BPS anticipates budgetary and other capacity reductions in light of the national public health emergency caused by the COVID-19 pandemic. These reductions will place a further and tremendous burden on remaining staff to revise the Equity Circular 3, Code of Conduct, and training materials and train new staff by the Rule's effective date.

24.     BPS anticipates that it will be significantly burdensome for the district to comply with the Rule's effective date amid the COVID-19 pandemic because Central Office and school employees are consumed by extra duties required of school districts and school staff to ensure that students are safe and learning. The Office of Equity will also have to conduct remote training, which is far less effective than in-person training.

25.     Because of the ill-suited process and other requirements, the Title IX Rule may lead to fewer students reporting sexual misconduct, harassment, and assault. For example, strict requirements for bringing complaints may dissuade alleged victims from coming forward at all and are likely to have a serious chilling effect. Additional process requirements may also hinder

Decl. of Quinnelle Gomez                                                    Case No. 20-cv-01468
EXHIBIT 54

BPS's ability to investigate and resolve allegations quickly to ensure prompt measures are taken for the safety and support of students. As a result, BPS will be hindered in its ability to protect students' civil rights and equal access to education. This will likely cause harm to individual students, and to the district's ability to remedy sexual harassment and provide a safe learning environment.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 15th day of June, 2020

Quinnelle Gomez, J.D.
Director of Compliance and Title IX Coordinator
Boston Public Schools

Page 9 of 9

# EXHIBIT 55

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF DIANA GONZALEZ

I, Diana Gonzalez, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.    I am the Deputy Secretary of Higher Education in the New Jersey Office of the Secretary of Higher Education ("OSHE"). I hold a Master of Education ("M.Ed.") in College Student Affairs conferred by Rutgers, The State University of New Jersey ("Rutgers"). I have been serving as Deputy Secretary at OSHE since January 2017. I work closely with the Secretary of Higher Education and the rest of her leadership team to manage office operations and oversee the

Page 1 of 13

Decl. of Diana Gonzalez                                    Case No. 20-cv-01468-CJN

EXHIBIT 55

development and implementation of a number of policy priorities identified in the New Jersey State Plan for Higher Education, including such areas as Research, Innovation, and Talent, and Safe and Inclusive Learning Environments.[1] I also manage and supervise the Executive Director of New Jersey Educational Opportunity Fund, a State-funded, nationally-renowned student support program that serves students in need of academic and economic support throughout the State. I also conduct research for OSHE in a number of areas, including policy issues in regard to campus sexual assault, sexual violence prevention strategies, and the impact of State and federal policies on both students and college campuses.

2.    Previously, I worked at the Department of Residence Life within the Training and Personnel Division at Rutgers while enrolled in the M.Ed program. In this role, I received extensive college student personnel training, such as how to respond to students who may be showing signs of suicidal ideation or how to support students who have experienced an act of sexual violence. In addition, I was required to serve as a responder to on-campus residential issues, which included overseeing resident assistants as they handled complex cases that involved allegations of sexual assault or rape, domestic abuse, or alcohol poisoning. I also received training as a Title IX investigator in order to support the Rutgers Title IX coordinators in the investigative process.

3.    I submit this Declaration in support of the State of New Jersey's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 ("the Final Rule" or "the Rule"). I have compiled the information in the statements set forth below through personal

---

[1] State of New Jersey, "N.J. State Plan for Higher Education: Where Opportunity Meets Innovation" (Feb. 2019), https://nj.gov/highereducation/stateplan.shtml.

Page 2 of 13

EXHIBIT 55

knowledge, through OSHE personnel who have assisted me in gathering this information from our agency, and on the basis of documents that I have reviewed. In addition, I have also reviewed the Rule noted above in order to understand the immediate impact of the Rule on the State, its citizens and higher education institutions of New Jersey.

**Background about OSHE and New Jersey Higher Education**

4.      The State's higher education plan sets forth a vision for a Student Bill of Rights, which holds that every New Jerseyan, regardless of life circumstances, should have the opportunity to obtain a high-quality credential that prepares them for life after college. OSHE is the State's policy and coordinating agency for higher education that works to advance practices in higher education intended to ensure increased opportunity, access, and completion for New Jersey residents, as well as to develop higher education policies for the State.

5.      New Jersey is home to more than 80 institutions of higher education, including public, private, two-year, and four-year institutions. These include four public research universities, seven State colleges and universities, 18 community colleges, 15 independent not-for-profit four-year colleges, and 12 proprietary institutions.

6.      At any given time there are around 531,000 students enrolled in an institution of higher education in New Jersey. At least 43,126 out-of-state students enroll in New Jersey institutions of higher education every year. These institutions employ over 85,000 faculty and staff, including instructional staff, graduate assistants, management, administrative, and other support staff. Over 52,000 of these employees are full-time employees and over 32,000 are part time employees.

7.      In Fiscal Year 2019, the State provided a total of $1.74 billion to public colleges and universities in direct operating aid, including fringe benefits. The State also appropriated $522

Page 3 of 13

EXHIBIT 55

million in student financial aid assistance awarded directly to students attending both public and private institutions in New Jersey.

8.    New Jersey's public higher education institutions also received $1.59 billion in federal funding in Fiscal Year 2018. Independent not-for-profit higher education institutions in the State received $318 million in federal grants, contracts, and student financial aid in Fiscal Year 2018.

9.    OSHE also received a $35 million Gaining Early Awareness and Readiness for Undergraduate Programs ("GEAR UP") grant from the Department of Education in 2019. The grant will be administered over a period of seven years in conjunction with higher education partners to provide academic and enrichment support services to increase college attendance and success for economically disadvantaged students.

10.   OSHE has 20 full-time staff, all of whom provide statewide coordination on higher education. OSHE works closely with the institutions of higher education in the State to help support those institutions to meet needs of campuses and students. OSHE's role is multifaceted and includes convening forums, providing guidance, developing and implementing State higher education policy agendas, collecting and analyzing data, capital bonding administration, administering student support programs, applying for and managing federal grants, and, programmatic mission determinations, and university status determinations.

11.   OSHE also serves as the lead State agent of communication with the federal government regarding higher education issues, and is the State authorizer for all degree-granting institutions of higher education. State authorization, along with institutional accreditation by an ED-recognized accrediting body, are pre-conditions that institutions must meet in order to be eligible for federal student financial aid. OSHE also administers federal grant programs regarding college

Page 4 of 13

EXHIBIT 55

access, including on-going administration of the federal GEAR UP Grant and the now-concluded
College Access Challenge Grant program.

12.     OSHE is also one of the regulatory agencies for state higher education. OSHE is
responsible for promulgating and maintaining regulations for licensure criteria and degree
standards, institutional codes of ethics, community college chargebacks, residency requirements for
public institutions, and community college personnel regulations, as well as a number of State-
backed capital bond programs.

13.     The Secretary of Higher Education is empowered to enforce the observance of State
laws among institutions of higher education. N.J. Stat. Ann. § 18A:3B-34. OSHE also provides
guidance and general policy direction on a variety of matters for all institutions of higher education
within the State.

14.     The programs and policies that OSHE administers apply differently across
institutional sectors. For instance, in Fiscal Year 2020 the administration of Governor Murphy
instituted an outcomes-based allocation for operating aid disbursed to public four-year institutions.
And in Fiscal Year 2019, the administration instituted the Community College Opportunity Grant,
the state's first tuition-free college program.

15.     OSHE also administers programs, such as the Educational Opportunity Fund, a
state-funded program to support students who need additional academic and financial support to go
to college, and College Bound/GEAR UP, a state and federally funded program that serves students
in middle school and high school to prepare them to enroll in college and university.

### OSHE's Work on Sexual Harassment in Higher Education

16.     Executive Order 61 (Murphy, 2019) established the Safe and Inclusive Learning
Environment Working Group to focus on developing best practices for formulating inclusive

Page 5 of 13

EXHIBIT 55

policies and programs in higher education to improve safety, inclusion, and student supports on campuses. The working group included expert faculty, administrators, deans, presidents, students, and other stakeholders from across the State. It was tasked with three specific charges: 1) promoting the practice of data analysis through campus climate surveys; 2) establishing best practices for creating campus safety and inclusive environments; and 3) drafting an implementation guide for colleges on the recommendations set forth by New Jersey's 2017 Task Force on Campus Sexual Assault. The group convened at various times over a period of nine months with the support of OSHE staff, including myself, to develop tangible work products that would better support the work of the higher education community to address the issues of safety, inclusion, and campus sexual violence. The work products of the group include: an inventory of validated campus climate surveys and a corresponding instruction guide; a guidebook of exemplar institutional policies; an implementation guide based on the statewide 2017 Task Force on Campus Sexual Assault Report and Recommendations.[2] Many of these work products, which contain specific policies and procedures for documenting, investigating, and adjudicating sexual assault, will have to be revised if the Final Rule goes into effect.

17.     OSHE spent a month reviewing Safe and Inclusive Learning Environment Working Group participant applications to ensure diverse selection of perspectives from its members. From May to November, the working group met monthly, with OSHE staff routinely meeting internally and with the chairs to prepare for meetings. Once the documents were prepared, they went through several rounds of revisions by chairs, OSHE staff, and relevant State agency staff, to ensure content

---

[2] Safe and Inclusive Learning Environment, Working Group (Mar. 25, 2020) *available at* https://nj.gov/highereducation/documents/pdf/workinggroups/SafeandInclusiveLearningEnviron ment-FullDocument.pdf.

Page 6 of 13

Decl. of Diana Gonzalez                                              Case No. 20-cv-01468-CJN

EXHIBIT 55

was consistent with State and federal regulations, including Title IX, Title IV, the New Jersey Law against Discrimination, and the State's Anti-Harassment, Intimidation, and Bullying law.

18.    The current guidebook for institutional policies and implementation guide both rely on Title IX providing flexibility to schools to create and implement policies and procedures that suit their campus and accommodate their resources.

19.    OSHE plays an advisory and convening role in regard to schools' implementation of Title IX by bringing together experts and best practices for schools to utilize as resources. In addition, OSHE regularly communicates with Safe and Inclusive Learning Environment working group stakeholders, including Title IX coordinators, student affairs administrators, faculty, and students. OSHE coordinates expertise and resources for schools across the State.

20.    Finally, OSHE is coordinating with the Center on Violence Against Women and Children at Rutgers University to host a series of technical assistance workshops that will be open to practitioners at all postsecondary institutions in the State. The program will provide technical assistance workshops that cover such topics as: climate surveys, working with diverse student populations, and engaging with middle and high school populations. At these workshops, institutional staff will learn about the work products from the Safe and Inclusive Working Group

## Effects of the Final Rule on OSHE's Work

21.    The Final Rule will have a profound effect on OSHE's State-level work and its work with the institutions of higher education throughout the State. OSHE staff will be reviewing the Final Rule and briefing staff in State government on the Rule. The enactment of the Final Rule will necessitate a thorough review of many of the guidance and implementation documents on safe and inclusive learning environments that OSHE has produced and provided to institutions

Decl. of Diana Gonzalez                                        Case No. 20-cv-01468-CJN

EXHIBIT 55

22.     OSHE staff spent considerable time and resources planning for, finalizing, and disseminating the work products produced by the Safe and Inclusive Environments working group for the benefit of institutions of higher education throughout the State. This work brought together dozens of experts across the State as well as OSHE staff.

23.     The implementation guide based on the statewide 2017 Task Force on Campus Sexual Assault Report and Recommendations mentions Title IX 49 times throughout the document. The guide relies heavily on the policies and procedures that colleges and universities have disseminated and employed to enforce Title IX. The implementation guide also compiles best practices from a variety of institutions in the State and around the country. The guide also provides a variety of implementation options for institutions based on possible differences in the resources held by the institution. The guide also provides institutions with best practices regarding investigation and adjudication, including model examples for memorandums of understanding with law enforcement and local rape crisis center and appropriate investigative models; implementing trauma-informed training; using research-informed sanctioning methods; the use of restorative justice practices and offering students alternative resolutions. The faculty, administrators, deans, presidents, and students created this guide using resources that are consistent with the Department of Education's longstanding Title IX policies and guidance, which took institutions many years to adopt.

24.     When the Final Rule goes into effect, OSHE anticipates having to review all of the resources produced by the group and disseminated to schools around the State to assist in their implementation of such things as investigative procedures, campus climate surveys, and support for victims of sexual assault to ensure that they comply with the Final Rule. To the extent that they conflict, OSHE will have to revise these resources or remove them. It will likely have to do so

Page 8 of 13

Decl. of Diana Gonzalez                                        Case No. 20-cv-01468-CJN

EXHIBIT 55

without the benefit of the perspectives and expertise of the working group members. Prior consultations with the working group took nearly a year. OSHE will not have the benefit of that time if the Rule becomes effective in August. To ensure that schools have updated resources to turn to, OSHE's review and revision is likely to be truncated. And given COVID-19 response priorities and short staffing, OSHE is unlikely to have the time to do this before the Final Rule becomes effective, thus leaving higher education institutions in New Jersey, many already scrambling to comply with the Rule, with limited up-to-date resources.

25. In January 2019, OSHE co-hosted a listening session with various staff and administrators, including Title IX coordinators and general counsels, from public and independent institutions across the State to discuss the Department's Proposed Rule on Title IX. OSHE held this event to hear directly from our State's institutions of higher education about the potential impact of the Proposed Rule on campuses' policies and students.

26. OSHE then co-hosted a listening session after publication of the Final Rule with the same stakeholders to hear directly from institutions of higher education about the impact of the Final Rule on their policies, procedures, and communities. Over 140 attendees participated in the session, demonstrating the wide concern among institutions in the State about implementing the Rule and its effects on their work and students. Among other things, participants expressed their concerns about the effective date and their ability to conduct a thorough review process of their current policies by that date. They also were concerned about implementing procedures, such as providing advisors to conduct cross-examination that would be costly and counter-productive to their fact-seeking role and would disrupt the educational experience of students.

Page 9 of 13

Decl. of Diana Gonzalez                                    Case No. 20-cv-01468-CJN

EXHIBIT 55

27.     Since the publication of the Final Rule, OSHE has already received inquiries from school administrators expressing the need for assistance and clarification in interpreting and implementing the Rule.

28.     OSHE anticipates that it will likely have to convene more such forums should the Final Rule go into effect. For example, OSHE recently hosted a webinar for schools to assist New Jersey colleges and universities in understanding and responding to the new requirements. OSHE brought in experts to summarize the Final Rule and provide relevant analysis and applicability.

29.     In addition, New Jersey has a robust State anti-discrimination law that prohibits discrimination on the basis of sex, race, creed, color, national origin, nationality, ancestry, sex, pregnancy, breastfeeding, sexual orientation, gender identity or expression, disability, familial status, marital status, domestic partnership/civil union status, liability for military service, and in some cases atypical hereditary cellular or blood trait, genetic information, and age in places of employment, housing, and public accommodation, including schools. N.J. Stat. Ann. § 10:5-1 et seq. New Jersey also requires institutions of higher education to adopt a policy included in its student code of conduct prohibiting harassment, intimidation, and bullying. N.J. Stat. Ann. § 18A:3B-68. The webinar OSHE convened for schools also addressed New Jersey civil rights and non-discrimination requirements that still apply to institutions across the State.

30.     Because the Final Rule has engendered confusion among higher education institutions regarding conflicts with State law, OSHE understands such resources are necessary prior to the effective date and likely into the future. OSHE and other State agencies provided this webinar at no cost to higher education institutions throughout the State because many institutions will not be able to receive adequate training on the Rule prior to the August 14 effective date, particularly

Page 10 of 13

Decl. of Diana Gonzalez                                    Case No. 20-cv-01468-CJN

EXHIBIT 55

during a global pandemic and uncertainty about in-person instruction in the fall. If OSHE convenes other such webinars, they will also be provided at no cost.

## Effects on Students and Communities

31. All of OSHE's work on safe learning environments is formulated with the interest of students and campus communities throughout the State in mind. The State Higher Education Plan sets a vision to help make New Jersey's campus communities safer and more inclusive for students, faculty, and staff.

32. With that in mind, I have concerns that the standards and procedural requirements articulated in the Final Rule will have a negative impact on students' educational experience. In particular, the heightened standard for what constitutes sexual harassment under Title IX, the restrictive scope of application of the statute, live mandatory hearings, the requirement to provide advisors, and live cross-examination by an advisor requirement will have a negative chilling effect on sexual harassment reporting.

33. OSHE is focused on ensuring that every New Jerseyan, regardless of life circumstances, has the opportunity to obtain a high-quality credential that prepares them for life after college, and therefore assists schools with providing a safe learning environment to ensure students thrive and succeed. If the Final Rule reduces reporting, causes students to question whether their harassment was indeed sufficiently severe, pervasive, and objectively offensive, and as a result reduces schools' abilities to prevent harassment and address hostile environments on campus, this would be detrimental to students' ability to complete their college degrees. This ultimately undermines OSHE's mission.

Page 11 of 13

Decl. of Diana Gonzalez                                                    Case No. 20-cv-01468-CJN

EXHIBIT 55

## Effects of COVID-19

34.     In addition to its regular work, OSHE, like every institution in the State and country, has turned to near-full-time work on response to the effects of the novel coronavirus and resultant COVID-19 disease on the State, students, and schools.

35.     New Jersey, with over 167,000 lab-confirmed cases of the disease and over 12,000 deaths, is suffering from one of the worst outbreaks in the country, and indeed the world. Much of normal life for students and schools has been brought to a halt. This environment has forced the State into a full-time response to the crisis. On March 21, 2020, the Governor issued Executive Order 107 ordering all institutions of higher education in the State to cease in-person instruction (Murphy, 2020). As a result, New Jersey higher education institutions scrambled to implement remote learning in lieu of in-person instruction in mid-March.

36.     With only 20 staff members, many of whom are currently diverted to working on the response to the global pandemic, OSHE will have great difficulty reviewing and revising relevant sexual harassment and safe campuses documents already described. Over the past few months, OSHE has been participating in regular statewide COVID-19 task force meetings, providing regular guidance to institutions of higher education on COVID-19 response, reviewing pandemic sections of Emergency Operations Plans, reviewing waivers for in-person instruction, regularly communicating with all institutions, and managing several State restart groups.

37.     With OSHE, institutions, students, and the rest of the State currently in an environment where remote learning may be implemented in lieu of in-person instruction for the foreseeable future, the contemplated review and overhaul of Title IX proceedings required by the Final Rule will occur in an environment where these critical issues cannot be given the requisite weight and attention that they deserve.

Decl. of Diana Gonzalez                                      Case No. 20-cv-01468-CJN

EXHIBIT 55

38. The changes to Title IX proceedings in the Final Rule will also cause confusion and consternation at a time when campus communities are operating in an unprecedented context of high anxiety. The type of careful implementation of the Final Rule that is necessary to assuage the fears of the campus communities will be very difficult.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 18 day of June, 2020

Diana Gonzalez
Deputy Secretary, Office of the Secretary
of Higher Education of New Jersey

Decl. of Diana Gonzalez                                    Case No. 20-cv-01468-CJN

EXHIBIT 55

EXHIBIT 56

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | **Civil Action No. 20-cv-01468-CJN** |

**DECLARATION OF BRITTANY GRICE**

I, Brittany Grice, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

  1.  I am the Director for Los Angeles County Community College District's (LACCD) Office for Diversity, Equity and Inclusion. I have served in this role since March of 2018. However, prior to this time, since 2012, I served as a Title IX Coordinator or Deputy Title IX Coordinator in other California colleges and universities. In my current role, I oversee the District's administration of various civil rights programs, including those related to preventing and addressing discrimination and harassment, pursuant to Title VI of the Civil Rights Act of 1964, Title VII of the Civil Rights Act

of 1964, Title IX of Educational Amendments Act of 1972, the Americans with Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973.

2.      I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule").

3.      This declaration is based on my personal knowledge, my familiarity with Title IX, my review of the Rule, and the knowledge and expertise I have acquired in the course of approximately eight years of service and duties as either a Title IX Coordinator and Deputy Title IX Coordinator, during which I gained significant experience addressing and resolving complaints of all types of discrimination and harassment on the basis of protected class, including sexual harassment, and collectively worked with hundreds of students who have either made complaints pursuant to Title IX, or have been accused of committing sexual harassment in violation of school policy.  If called and sworn as a witness, I could and would testify competently to the information in this declaration:

**Background:  Los Angeles County Community College District**

4.      The LACCD receives federal funding from the United States Department of Education and is an education entity covered by the requirements of Title IX and subject to the regulations issued by the Department.

5.      LACCD is created by state statute, funded principally through the California state's K-14 budgetary allocation established by Proposition 98. LACCD is part of the California

Community College system, the largest system of higher education in the country, and is on its own one of the largest community college districts nationwide.

6.      The mission of LACCD is to foster student success for all individuals seeking advancement, by providing equitable and supportive learning environments at our nine colleges. The District empowers students to identify and complete their goals through educational and support programs that lead to completion of two or four-year degrees, certificates, transfer, or career preparation.

7.      LACCD is comprised of nine unique community colleges and enrolls up to 250,000 students each year. Our colleges exist to provide all in our community with the opportunity for a first, or second, chance at success and achieving their goals and dreams through further educational development.

8.      The LACCD colleges cover approximately 882 square miles across Los Angeles County. 56.6% of all LACCD students identify as female. More than half of all LACCD students are older than 25 years of age, and more than a quarter are 35 or older. LACCD is one of the leading educators of Latinx and Black students in the state. The District educates almost three times as many Latinx students and nearly four times as many Black students as all of the University of California campuses combined. Approximately eighty percent of LACCD students are from underserved populations, including local communities of color. Nearly 60,000 of our students are first-generation in their families to go to college. Nearly 8,000 students identify as members of the LGBTQ+ community. More than 15,000 high school students participate in our courses as part of dual-enrollment programs each year.

9.      Each year, 100% of our students live in private off-campus housing that is not affiliated with any of our colleges because we are currently a non-residential college system.

Decl. of Brittany Grice                                      Case No. 20-cv-01468
EXHIBIT 56

Approximately 1,500 of our students participate in intercollegiate athletics programs across the District, which include a travel component to other schools and locations for competitions and events.

### Overview of Immediate and Irreparable Harm to LACCD and its Students

10.     As discussed further herein, if the Rule concerning Title IX goes into effect as currently written, it will reduce LACCD's ability to effectively provide an educational environment free from discrimination on the basis of sex. The impact would be immediate and far reaching, as on the whole, the Rule in its present form will impede the District's efforts in making its campuses as safe as is reasonably possible, while also forcing the District to overlay extremely bureaucratic measures on what should be a student-centered resolution and developmental educational process.

11.     Furthermore, if it goes into effect on August 14, 2020 as planned, the Rule will result in immediate and irreparable harm to the District and the students it serves, as this compounded timeline during the national COVID-19 pandemic crisis, in which the city and county of Los Angeles is one of the country's most affected epicenters, prevents LACCD from having the reasonable opportunity to respond to the Rule's significant requirements, some of which the District was not aware the Department was contemplating due to the nature of the 18-month notice and comment process and the information provided therein. This is in addition to the tremendous strain the District is facing with regard to simply sustaining adequate personnel and operational resources without consideration of what are unquestionably sizable additional resources needed for meaningful implementation of the rule's many requirements.

12.     The District fully recognizes that an allegation of a civil rights violation committed against a student or another community member in its educational programs or activities is a serious charge that must be effectively addressed, with robust due process mechanisms for both parties. To that end, the District has already implemented a comprehensive process to give students and other

impacted parties alleging any complaint of discrimination or harassment based on protected class sufficient access to ensure their concerns can be duly addressed in a consistent fashion. The District uses a single procedure, based on a single holistic policy, to address complaints that constitute discrimination and harassment on the basis of protected class (or identity) under federal and/or state law. Not only is this single process conducive to helping all of our students understand their rights, options and expectations for participating in these resolution processes, it also allows the District to be intersectional in its approach when complaints alleging misconduct constituting discrimination or harassment on multiple bases are brought forth. The Rule will preclude this when the complaints of discrimination outside the scope of the Rule are made in conjunction with allegations that meet constitute Title IX sexual harassment or misconduct under the Rule.

13.     Though the explanatory preamble of the Rule highlights that schools have discretion in how to handle complaints that do not meet the Department's new standard of how sexual harassment shall be defined, where we must utilize the severe, persistent and objectively offensive standard for all complaints of harassment that do not otherwise fall within the Violence Against Women Act's definitions of sexual assault, domestic violence, dating violence or stalking, the Rule's explicit departure from the long-standing, current legal standards used to evaluate sex-based discrimination under Title IX, which also track with our state law requirements, mean that a substantial portion of LACCD's caseload must now be addressed through a new set of procedures that the District must hurriedly architect to be ready for Fall 2020 in the face of significant fiscal uncertainty. The new Rule forces LACCD and similarly situated institutions, including community colleges, to utilize two separate models to review and adjudicate civil rights based complaints, creating an enormous burden on already-strained resources that will impede the District developing a more capable system to address all civil-rights based complaints received at LACCD, and will

Decl. of Brittany Grice                                                                              Case No. 20-cv-01468
EXHIBIT 56

preclude the District from leveraging its existing internal subject-matter expertise in the most efficient way possible. Due to the complexity of the new procedural requirements, including the required designation of additional roles like advisors who must perform cross-examination duties, the District's overall case volume and the significantly enhanced role of the decision-maker to manage all relevancy considerations in the process, LACCD cannot possibly move all of its cases into the new model even if doing so did not create conflicts for the District in meeting its other legal obligations to respond to complaints of discrimination or harassment that do not constitute Title IX-harassment as defined under the Rule, because of all the additional time the adjudication process will take even after a thorough investigation. Because of the new requirements, LACCD will be required, on extremely short-order and without the opportunity to engage in typical shared-governance processes, to cannibalize existing resources by reassigning existing staff either in full or at least in part to execute these new requirements, severely negatively impacting other current educational support services. The threat to organizational disruption in other critical areas is very high, in addition to the likelihood that those employees who will be required to change at least some of their primary job functions will be expected to put in many additional significant hours developing the sufficient expertise to execute new duties, at a time when the District needs to be laser-focused enhancing existing support for its students in areas like basic needs and preparing for an eventual return to in-person learning with the enhancement of significant safety measures. Hiring all new staff for these positions given current budget realities in the face of the pandemic is simply not an option for LACCD.

14.     LACCD students and employees are also directly harmed by the timeline and additional bureaucratic steps required under the Rule in that they will not be the beneficiaries of an educational program come Fall that is as tailored and carefully crafted as it could be, even with diminished resources, because the District does not have the capacity to complete the consultative

Decl. of Brittany Grice                                                          Case No. 20-cv-01468
EXHIBIT 56

process it would ordinarily envision in re-designing the programming and training on addressing all complaints of discrimination. The harm students and employees will face as a result of the creation of those two systems, even under the best circumstances of operational efficiency, is that they will now be required to quickly learn two complex policy and procedural frameworks that are substantially similar in scope of what the processes actually cover, but differ markedly in how they are executed, without the District being able to provide the level of context that is deserving for such a monumental shift in what the community has come to know. District staff will have to compress many hours of work into the month of July to have a working training solution for the Fall term, and given the time of the year, wherein many employees are on vacation or may have reduced assignments entirely, LACCD cannot build the pool it would ordinarily seek of Title IX experts to support the learning and understanding of this new dual-system. Given the significant increase in the complexity of these processes, LACCD will have to make hard choices in allocation of time spent to meet the requirements at the expense of other critical student initiatives, all the while the District is engaged in collective bargaining negotiations, and will not have the time amongst our human resources to carefully refine the materials to maximize understanding of the processes as it should. LACCD also anticipates this may chill reporting because we will not have the resources to perform as many supplementary training sessions at our schools or in our community groups, to publish materials in as many relevant spaces as we would like and to do things to promote accessibility of the materials, such as translate the materials into other languages or create enhanced tools like infographics, because of the limitations of cost and time.

15.     While LACCD, like its sister institutions, provides educational programming and campaigns concerning student rights and responsibilities to make a complaint of discrimination and harassment at events like new student orientation, students are accustomed in the District to being

Decl. of Brittany Grice                                                          Case No. 20-cv-01468
EXHIBIT 56

trained on one process and one standard of a policy violation that applies to discrimination in all programs and activities, including those acts that have a continuing effect or spillover effect on a student's educational experience in the District. Even when the District has added additional due process protections to its procedures, the foundation of a single process, and how to effectively make a relevant report has sustained for well over five (5) years. The level of understanding the new Rule requires of both staff and students on the heightened legal standards of what now will constitute unlawful conduct on the timeline of a Fall 2020 implementation will require staff to spend more time developing training materials as the District anticipates being unable to condense the materials in a way that can be easily processed or explained in a typical training session given the dual systems, as well as the additional time training students and employees themselves, which the District estimates will include at least twice the time commitment on the part of all training participants for each session. While this education is critical, the reality is that students and employees are less likely to be engaged in lengthy training sessions that include many legalistic concepts, and there is risk that reporting of complaints will be decreased as a result, in addition to the community decreasing its overall level of knowledge in how to support complaint resolution processes in the District. Moreover, there will be a cost to the District for the time lost during these additional planning and training sessions since this effort will impact the ability of the District's employees to complete other necessary work.

16.     It is unavoidable that students and employees will now struggle to understand the scope of Title IX, as it has always been synonymous with sex-based discrimination in a broad sense that need only be, under a hostile environment theory, sufficiently severe, persistent or pervasive such that it limited a student's participation in or receipt of the benefit of an LACCD program, service or activity. With the Rule, a "Title IX" complaint can no longer be explained in a straightforward way, and students who are not able to understand the nuances of what a sexual harassment complaint

constitutes now due to the District's impending sudden departure from defining Title IX matters in a singular way will have to either engage in either extra reading and evaluation before they decide to seek help, or ask for a meeting to make a disclosure to someone they may not be ready to speak with in the first place so that they know which process they are supposed to use. In addition to the time spent in trainings themselves, LACCD anticipates there will be a cost to the District in processing complaints because of the lack of lead time our community has to prepare for the new model. Inevitably, there will be many questions about which prong under which a complaint can or should be processed when it is brought to the attention of one of our employees, and these questions will result in extra time spent triaging each case, causing delays that could be avoided if the District had the reasonable opportunity to work through how the two processes can be streamlined to the greatest extent possible and how they should best be taught to our community and employees who will implement the processes.

17.     Confusion is highly likely to abound as soon as the District adopts these competing standards. In addition to the community being confused about who is now legally required to report which complaints, when a student or employee does make contact with an employee designated to receive a report, there will be a significant increase in the time and resources required of each employee to describe the different standards and procedures, and the distinctions between the dual adjudication models, to complainants, particularly when the complaint does meet a Title IX-harassment standard but the complaint is intersectional in nature. There is both a cost associated with the additional training and educational support to give our employees the ability to navigate this complex conversation, as well as the additional time spent on each report explaining the new systems.

18.     The District conservatively estimates that the District's Office for Diversity, Equity & Inclusion staff, Office of General Counsel, Student Services leadership and College-based Title IX

Decl. of Brittany Grice                                                          Case No. 20-cv-01468
EXHIBIT 56

Coordinators (at least 36 staff members) will need to spend at least 200 hours collectively before August 14, 2020, digesting the complex and massive Rule, its preamble and footnotes, and contributing to directly updating training materials, at a cost of $576,000. These costs are only the beginning of what the District anticipates will be a substantial financial impact, through either reallocation of current resources as outlined above or spending on unnecessary turnkey resources in order to meet the looming compliance deadline. As LACCD moves forward in implementation in the midst of the COVID-19 crisis, it has been diligently exploring how it can realistically execute these new processes, some of which were not fully fleshed out in the notice and comment process. In this time of uncertainty in how our schools will operate in order to meet public health guidelines during the foreseeable future and the expectation we hastily identify new personnel who will have to suddenly develop a tremendous amount of subject matter expertise in the newly released Rule, the District faces a loss in its capacity to sustain its existing level of student services and expend funds in a time where there could not be a greater need to reduce unnecessary operational costs wherever reasonably possible to make way for the ability to holistically support each of our students in their educational journey during this unprecedented time.

### Conclusion

19.     Overall, the Rule will result in significant harm to the campus community at large, because our ability to protect students from sexual harassment and assault under Title IX is explicitly restricted and impaired in a number of ways, without relevant evidence that the previous expectations and standards as they related to receiving reports of possible violations under Title IX and LACCD's initial approach to evaluating the impact of possible sexual harassment against a student were not working.

20.     LACCD respects the goal to clarify the due process rights of students involved in these matters to promote transparency and consistency in outcomes; however, it is plain the Rule intends to

Decl. of Brittany Grice
EXHIBIT 56

Case No. 20-cv-01468

limit the tools a school has available to take responsive action to sexual harassment under the guise

of Title IX without justification, including by significantly convoluting what types of verbal, visual

or other non-physical sexual harassment can be considered a valid sex-based discrimination complaint

under Title IX.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 16th day of June, 2020

Brittany Grice
Director, Office of Diversity, Equity, and Inclusion

Decl. of Brittany Grice                                           Case No. 20-cv-01468
EXHIBIT 56

# EXHIBIT 57

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **CIVIL ACTION No. 20-cv-01468-CJN** |

## DECLARATION OF JULIE HALL-PANAMEÑO

I, JULIE HALL-PANAMEÑO, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

　　1.　　I am the Los Angeles Unified School District's Director of the Educational Equity Compliance Office and Title IX Coordinator.

　　2.　　I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education (the "Department"); and the United States of America regarding the

recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) (the "Title IX Rule" or "Rule").

3.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

### Background, Responsibilities, and Qualifications

4.      Los Angeles Unified School District (LAUSD or District) is the second-largest school district in the nation with 1,386 schools and centers, serving nearly 680,000 students, and authorizing 228 independent public charter schools.  The District is organized into six local districts in whole made up of 73.4% Latino, 10.5% percent white, 8.2% African American, 4.2% Asian, less than 1% American Indian or Alaskan Native, Native Hawaiian or Pacific Islander, and 2.1% Filipino students.  LAUSD has 123,579 students who are learning to speak English proficiently.  Approximately, 51.2% of the students are male and 48% are female.  LAUSD also employs 60,000 employees as the second-largest employer in L.A. County.  LAUSD's mission is to ensure academic achievement so that all students graduate college and career ready.  LAUSD receives federal funding from the United States Department of Education and, therefore, is obligated to comply with Title IX and its implementing regulations.

5.      I am the Director of the Educational Equity Compliance Office with the LAUSD.  I have served the District as an educator for over 26 years.  I have been the Director for almost seven years, in addition to previous roles as Coordinator and Specialist in the same office.  As the Director, I am responsible for ensuring district-wide compliance with state and Federal civil rights laws and regulations, including Title IX of the Education Amendments of 1972 (Title IX), Section 504 of the Rehabilitation Act of 1974 (Section 504), and the Americans with Disabilities Act (ADA).  As the Director, I am also the designated Title IX Coordinator for LAUSD and have served in this role for seven years.  As the Director of the office and designee for the District, I develop and update civil rights-related policies for the District, oversee various civil rights and

compliance-related investigations, provide training and advice to stakeholders, and collaborate in providing a civil rights lens to District initiatives.  I have masters and credentials in both school psychology and education administration.  Prior to my tenure in my various roles in the Educational Equity Compliance Office, I worked as a supervising school psychologist in the central city of Los Angeles, and before that I worked as a school psychologist with students with moderate to severe disabilities.

6.      This declaration is based on my personal knowledge, my familiarity with Title IX, Title VI, Section 504, and the ADA, my review of the Notice of Proposed Rulemaking (NPRM) and final regulation, and the knowledge and expertise I have acquired in the course of nearly 26 years of service and duties at the LAUSD and in working with thousands of students, families, complainants and respondents and with the United States Department of Education Office for Civil Rights.

7.      The Educational Equity Compliance Office (EECO) within the LAUSD serves as the District's office for supporting students' civil rights.  The EECO has District-wide responsibility to ensure compliance with applicable federal and state laws and regulations governing educational programs, including Title IX, Section 504 and ADA, so that all students and community members are treated equitably in the District's programs and activities and provided a safe, secure environment that is free from discrimination, harassment, intimidation, and bullying.

8.      The EECO develops, reviews, and revises LAUSD nondiscrimination policies. It provides training, support, and technical direction to LAUSD stakeholders, including students, parents/guardians, community, schools, local districts, and central LAUSD offices on harassment, discrimination, intimidation and bullying issues involving protected characteristics, including sex and gender.  The EECO responds to and investigates harassment, discrimination, intimidation and bullying complaint allegations, facilitates United States Department of Education Office for Civil Rights complaint investigations and California Department of

Decl. of Julie Hall-Panamen   o                                    Civil Action No. 20-cv-01468
EXHIBIT 57

Education special education compliance investigations, and conducts and coordinates internal prompt and equitable complaint investigations involving violations of federal and state laws. It assists with State and federal programming monitoring reviews and other audits for our schools and local districts.

9.     As the Director of the EECO, I develop and update nondiscrimination and related policies in collaboration with relevant stakeholders, set initiatives and direction for the office, provide technical assistance to stakeholders and oversee a team of administrators and support personnel in responding to investigations, coordinating training and development of resources and in responding to audits. I ensure the Board adopts best-in-class Title IX policies and procedures aligned with State and federal law and guidelines, mechanisms are in place for annual and ad hoc Title IX training, daily technical assistance is provided to support sites, complaint investigations are prompt, equitable and thorough in alignment with state and federal guidelines, and supportive measures and remedies are provided to immediately address and prevent recurrence.

10.     During my time with LAUSD, I have reviewed thousands of incidents or complaints filed about sexual harassment, assault and violence in LAUSD schools. With respect to investigation and resolution of complaints under Title IX and other civil rights laws, I establish protocols and training to use in investigations and in provision of advice based on State and federal guidance and best practices in ensuring student safety and fair and thorough investigations.

11.     With respect to training on nondiscrimination policies and procedures, including those under Title IX, I inform our work based on law and best practice and facilitate having systemic mechanisms in place to train site Title IX designees and interested stakeholders in Title IX, nondiscrimination, and in investigations.

12.     In the EECO, we provide daily advice to practitioners in responding to and addressing Title IX related misconduct, incidents, and complaints via the phone and by email.

Decl. of Julie Hall-Panamen   o                                    Civil Action No. 20-cv-01468
EXHIBIT 57

As Title IX Coordinator for the District in the EECO, I am the liaison on behalf of the District for United States Department of Education Office for Civil Rights complaint investigations. I have trained EECO administrators in timely responding to and expeditiously resolving complaints. We take pride in facilitating complaint resolutions that are student-centered, resolving complaints before formal findings of violations. In that role, we provide proactive and foundational policies, regularly train and provide daily assistance through various media to stakeholders in understanding and implementing the various responsibilities of Title IX, including responding to formal complaint investigations with external agencies and resolving complaints through appropriate administrative measures and supports.

13.     In the 2016-2017 school year, my office received and resolved 221 formal written Complaints, of which 13 involved sexual harassment, including sexual violence or assault by students against other students or employees. In the 2017-2018 school year, we received and resolved 189 formal written complaints of which 18 involved sexual harassment. In the 2018-2019 school year, we received 159 formal written complaints of which 20 involved sexual harassment. Formal investigations of this nature typically average two hours of review activities, 17.5 hours of investigative activities, six hours of analysis, 17 hours of report drafting and quality review, and finally one hour of monitoring activities for an overall total of approximately 43.5 hours. The activities are conducted in concert by a variety of staff in roles ranging from support staff to investigators to the Title IX Coordinator. Factoring average hourly salary costs of the various internal staff involved in the investigation process (and not including the site level staff and their responses and time), an investigation can cost a minimum of $2,600 each.

14.     In addition, in each of the respective years, the District at its various sites has responded to documented incidents of sexual harassment, including sexual violence or assault, in each respective year as follows: more than 2,329 (2016-2017), 2,163 (2017-2018) and approximately 1,928 (2018-2019). These number include those incidents that rose to the level of a formal written Complaint, as noted above.

15.     However, I estimate that students dramatically underreport sexually harassing conduct based on studies that indicate nationwide underreporting, and our Youth Risk Behavior Survey (YRBS), which is administered to a minimum of 25 middle and 25 high schools randomly selected by the Centers for Disease Control for a total of 1,387 high school students and 1,566 middle school students.  The District's 2017 YRBS survey found that students experienced a range of behavior from sexual dating violence (being forced by someone they were dating or going out with to do sexual things that they did not want to) (Number of survey responses=803), to experiencing sexual violence (being forced by anyone to do sexual things) (Number of survey responses=1,381), one or more times during the 12 months before the survey, to being physically forced to have sexual intercourse (when they did not want to) (Number of survey responses=1387).  The survey responses are a snapshot in time, not administered at every grade level nor received from every student and are voluntarily completed, so most likely the results are an underrepresentation of the prevalence of the experience of the behavior over a school year in a District like ours serving nearly 600,000 students.

16.     YRBS results also found that 1,383 of the students who responded to the survey indicated they did not go to school because they felt unsafe at school or on their way to or from school for a variety of reasons on at least 1 day during the 30 days before the survey.

17.     Separately, the District receives an Average Daily Attendance (ADA) rate of $15,919.68 dollars per student over a school year.  Each day missed by a student results in a negative impact to educational access for the student coupled with an $88 loss per day for the District.  In the survey scenario above, the District would theoretically lose $121,704.00 because that number of students did not go to school, assuming only one day per student, because they felt unsafe in the 30 days prior to the survey.  Considering school calendars are typically nine months in duration, this easily extrapolates to nearly $1,095,336.00 lost in a school year if as many students felt unsafe and did not attend school for a day in any given month.

**Impact of the Rule on the K-12 System**

Decl. of Julie Hall-Panamen   o                                    Civil Action No. 20-cv-01468

EXHIBIT 57

18.     In order for students to thrive and ultimately graduate, they must feel safe, cared for, connected to school, and respected.  If the Rule goes into effect, it would have immediate and highly detrimental consequences for our district and its K-12 schools' ability to provide an education environment free from discrimination, sexual harassment, assault and violence based on sex and result in unnecessary administrative and financial burdens.  In fact, due to the brand new requirement that a student be "participating in or attempting to participate" in a school when they file a complaint, the Rule goes a step further and actually bars complainants from filing complaints if they are effectively disengaged from the educational programs and activities.  Rule § 106.30.  This is coupled with the Rule's permissive stance on addressing behavior leading up to the new definition of sexual harassment as code of conduct violations.  The Rule will have far-reaching consequences on our students' ability to thrive and on student safety, school climate, and achievement.  Because it fails to adequately protect child victims of sexual harassment, violence and unwelcome conduct of a sexual nature, it reduces our ability to effectively prevent and deter such behavior and ensure equitable access to a free appropriate public education, exposes our district to potential legal liability, and increases the likelihood of ongoing and progressively more severe victimization.  While the standard the Rule espouses mirrors the standard the United States Supreme Court established for private lawsuits for monetary damages under Title IX, that standard does not make sense for administrative complaints that are handled by school officials who are required to ensure a safe campus and school climate.

19.     The Rule and the NPRM also ignore the significant harms to students.  Students depend on and trust the adults on their school campus to prevent and effectively respond to harm. The previous regulations and Department policies specifically required school districts to proactively respond to and take action to stop, prevent, and remedy any unwelcome conduct of a sexual nature that was severe, persistent, or pervasive, and now merely do not "preclude" them from doing so.  Instead, the final Rule creates an inequitable system that requires dismissal of Title IX complaints for students who cannot show harassment so severe and pervasive that they

are effectively denied equal access to school, and even when they do, only requires a response that is just short of clearly unreasonable.  In addition, the Rule requires strict compliance for all aspects of the Department's prescriptive and inflexible grievance process, and prohibits Districts with existing constitutionally compliant discipline processes from providing effective remedies for harmed students until more than 20 days after the harmful incident has passed.

20.     The Rule creates a number of barriers and complex requirements for student victims who seek an investigation and a resolution that gives them effective remedies and a disciplinary action designed to stop the conduct.

21.     The Rule is overly complicated, conflicts with other federal and state laws, and is internally inconsistent in practical application for several key areas that directly relate to campus safety and fairness, including removals, when to invoke grievances, how to address sexual misconduct, how to harmonize with formal discipline procedures, sharing information versus confidentiality, and retaliation versus free speech.

22.     The Rule reflects a lack of understanding of how our K-12 education system works and how children who are harmed interact in that system.  Because the Rule fails to take into account the unique and specific circumstances in K-12 schools, it will result in thousands of legitimate reports of sexual harassment going uninvestigated under Title IX and student victims disengaging from school due to feeling unsafe, when schools' hands are tied because they cannot promptly take even low-level disciplinary actions to prevent further sexual misconduct on their campuses.  As a result, the Rule contravenes the protective purposes of Title IX and reduces student benefits.

<u>Barriers to Initiating a Complaint Harm Schools and Children</u>

23.     The Rule makes it more difficult for a student to initiate a complaint investigation under the Title IX process.

24.     The Rule requires a written complaint requesting that the District "investigate the allegation" be filed by the harmed child or their parent or guardian with the Title IX Coordinator

Decl. of Julie Hall-Panamen   o                                    Civil Action No. 20-cv-01468
EXHIBIT 57

(if known) before a school district is permitted to conduct an investigation of the allegations. The Title IX Coordinator may also sign a written complaint to begin an investigation, but the preamble to the Rule makes it a potential Title IX violation for the Title IX Coordinator to do so, if the complainant (the student alleged to be the victim or the parent or guardian) does not decide to file the written complaint. 85 Fed. Reg. 30,296, fn. 1162.  In addition, if the District collects any statements from a student respondent before the formal complaint has been filed, the preamble says that these statements cannot be used by the investigators later on, because they were collected before we provided notice of the interview as required by the Rule.  85 Fed. Reg. 30,287, fn. 1142.

      25.     Based on my review of thousands of incidents or complaints in my various roles in the office over 15 years, the vast majority of complaints are taken orally in the first instance at a school-site from a staff member who witnesses the conduct or with whom the child has a trusting relationship.  These complaints have typically not been initially formalized in the way the Rule requires.  Children, particularly between the ages of 5-11, generally do not write and sign complaints.  Most children of any age do not know how to formally ask for the District to "investigate the allegation."  Parents and guardians hold their child's educational rights until the age of majority, and they most often file complaints on the child's behalf, but some parents and guardians are not available to support their child formally due to homelessness, lack of financial resources for phones or faxes, immigration concerns, abuse, interaction with the foster system, literacy, primary languages other than English, lack of formal education, disability and more. Sometimes parents are not able or do not know to file a complaint timely.  The school district is required to act in loco parentis and thus must advocate for children who are minors.  If a child was young and a parent was unable to advocate for them for reasons such as those mentioned above, serious sexual misconduct like touching of intimate parts could be left unchecked. Although the Rule states that a Title IX Coordinator can sign a complaint and proceed, the Rule incoherently also provides that such an investigation could violate Title IX without the

participation of the child or parent.  Other allegations of violations of civil rights do not require consent and written complaints in order to be taken seriously and investigated.

26.     The Rule further puts explicit emphasis on the interplay of the First Amendment and preserving the rights of the accused in this respect.  The result provides an unclear landscape for the District as to whether any verbal or visual unwelcome conduct of a sexual nature or based on sex must be dismissed as protected speech.  Because these are difficult calls that teachers and school-site administrators will need to make at the school-site level in the first instance, we will likely need to provide additional training and guidance to ensure compliance with both Title IX and the First Amendment.   And, if nothing else, it gives parties opportunities to make claims against our district that their First Amendment rights have been violated when asking them to refrain from speech directed at another students or students of an unwelcome sexual nature in the K-12 setting.

27.     Again, the Rule creates unnecessary and harmful barriers to relief and redress under Title IX for children subjected to sexual harassment and violence in our schools.  This is in contravention of the statute's purpose and objectives.

<u>Detrimental Impacts on School Safety</u>

28.     Under the California Constitution, K-12 educators must ensure student safety. The Rule will result in confusion, misapplication, and an increase in child victims on our campuses and greater financial liability for the District.  This is because of the dual Catch-22 requirement that requires districts to wait to open a complaint and investigate until after the harm to the child has become so severe, pervasive, and objectively offensive that it effectively denies a child's equal access to education coupled with the new prohibition on accepting a complaint for investigation, if a child has actually dis-enrolled and no longer attends or participates in the District's programs.  Rule § 106.30.

29.     In practical terms, the Rule prevents our school officials who know about sexually harassing conduct from opening a complaint under Title IX until they have confirmation that the

Decl. of Julie Hall-Panamen   o                              Civil Action No. 20-cv-01468
EXHIBIT 57

sexually harassing conduct has persisted to such a degree that it is both severe *and* pervasive, thereby likely reaching the level of the child avoiding school or not attending school (e.g., by failing school, withdrawing from school being hospitalized, and/or becoming suicidal). Yet, these same officials may have a legal obligation to report the same misconduct to child protective services agencies, including law enforcement, in some instances when the bar of "reasonable suspicion" for suspected child abuse is met. The Rule would instead treat such misconduct as a permissive opportunity to address a code of conduct violation.

30.      Students in California have a fundamental right to education; the onus cannot be on the child target of misconduct to show signs of denial of equal access (such as tardiness or crying or wetting the bed, as the preamble states (85 Fed. Red. at 30,170)) or to remove himself or herself from the education context in order to be taken seriously and yet simultaneously not be allowed to proceed with the complaint investigation process if the student has left the school and has no desire to return due to the sexually harassing conduct.

31.      This contradictory and delayed action approach makes no sense from an educational perspective, as it is significantly more difficult and more costly to reengage and reenroll a student who has left school than it is to provide supports and assistance to a student to keep them in school. The Rule will cause an unnecessary and irrational increase in the number of student victims in our schools and in lawsuits from justifiably angry families, even if we attempt to fill in the gaps in protection from sexual harassment created by the Rule with separate processes under our student conduct code. This is because parents may instead assert tort claims against the District, specifically aimed at attacking our inability to fulfill our constitutional duty to ensure campus safety and provide education, the perceived lack of an adequate code of conduct due, in part, to the District dismissing complaints under Title IX to process under a separate code section, and curtailed progressive discipline processes with either students or employees when Title IX sexual misconduct is involved. The additional anticipated litigation-related costs, inefficient and duplicative administration costs, and the costs in terms of physical

and emotional harm to our students are costs that the Department did not consider or calculate in the NPRM or the Rule.

32.     The Rule's high bar for initiating an investigation is especially inappropriate in a K–12 setting where elementary and secondary education is compulsory and parents can be penalized when children do not attend.  The Rule puts parents and students in the difficult position of being required to endure sexual harassment under Title IX when it fails to meet the newly heightened bar established by the Rule.

33.     Furthermore, the Rule's definitional requirement that a child subjected to sexual harassment be denied equal educational access before a school can take action under Title IX ignores the fact that the impact of a sexual harassment incident on a student's ability to learn, and thus on his or her access to education, may not be evident until long after that incident occurs. This is especially true for students who may be nonverbal, have other cognitive difficulties, or have other difficulties expressing the incident's impact.

34.     The Rule states that our District is not required to intervene at earlier stages of misconduct.  However, the failure to act empowers a respondent to engage in more egregious behavior that will ultimately impact both the safety of our broader school environment and student success in education and life.  In addition, under the Rule, the Title IX Coordinator is placed in a terrible position.  The Title IX Coordinator can no longer proceed quickly with an investigation upon receiving notice of the sexual harassment or assault and may be the target of liability for perceived compliance violations from all parties involved.  Even worse, the Rule's new limitations on supportive measures, with the confusing standard of "without unreasonably burdening the other party" and limitation on group supports, where the Rule only allows for supportive measures to a complainant or respondent, will likely give rise to additional claims for failure to keep other students who are minors safe.

35.     Research has shown, and I have seen in my experience, that lesser forms of misconduct left unchecked lead to escalation of the behavior.  When the behavior escalates, the

target of the misbehavior increasingly disengages and is less likely to report or come forward. For example, as Exhibit A, I am attaching a true and correct copy of the "Longitudinal Examination of the Bullying-Sexual Violence Pathway Across Early to Late Adolescence: Implicating Homophobic Name-Calling." This study commissioned by the Centers for Disease Control and Prevention concludes that bullying behavior and homophobic teasing, if not resolved or redirected, may escalate in nature. This escalation may increase the potential for sexually harassing behavior, and the prevention of bullying and homophobic name-calling in middle school may prevent later sexual violence perpetration.[1]

36.     The Rule fails to consider the significant implications for the health and well-being of students subjected to escalating sexual misconduct on our campuses that will be unaddressed under the new requirements. We know that students who are subjected to sexual harassment and violence are more likely to miss school and even drop out. It is not uncommon for parents not to send their children back to a school until they feel assured that the sexual harassment and any related school climate issues have been adequately addressed, or for parents in some cases to withdraw their child from a school or the district altogether due to exposure to such an instance. The Rule requires a "wait and see" system for persistent sexually harassing conduct that may not reach the level of "severe *and* pervasive," instead of severe *or* pervasive, and makes it too late for students to complain once they have completely disenrolled, even if they were subjected to sexually harassing behavior that meets the definitional requirements.

37.     The District will still have to create a system for addressing misconduct that is not allowed to be addressed under Title IX, and find some way for that system not to violate the Rule's new requirements, while also simultaneously addressing misconduct. The creation of a dual system will have real costs for students and for our District because of the delays inherent in waiting for a formal complaint for the most severe incidents, assessing which system will

---

[1] Dorothy L. Espelage, et al., *Longitudinal Examination of the Bullying-Sexual Violence Pathway Across Early to Late Adolescence: Implicating Homophobic Name-Calling*, 49 Journal of Youth and Adolescence 1880-1893 (2018).

Decl. of Julie Hall-Panamen   o                          Civil Action No. 20-cv-01468
EXHIBIT 57

address complaints, handing evidence over to different staff depending on whether the complaint is Title IX or non-Title IX, and, for those complaints under Title IX, addressing the significant number of days – 20 or more – that a District must wait to complete the process before it can implement effective remedies and take any disciplinary action.  Delays, confusion, and duplication of effort means that students do not get relief as fast and as early as possible, and the costs of such delays will be seen in terms of the need for additional mental health services, reduced attendance rates, and reduced graduation rates for students who have been subject to the trauma of sexual harassment, which could have been stopped before it became severe and pervasive.  It is troubling that the Department did not include such costs in the NPRM or Rule's cost-benefit analysis.

38.     Further, the Rule's mandate to dismiss Title IX claims where the alleged sexually harassing conduct or context of the sexually harassing conduct is not under the District's "substantial control" is irrational because the impact of conduct that originates outside of the District's "substantial control" can nevertheless create a hostile environment on campus in a number of ways.  For example, on an annual basis, LAUSD reviews or receives a significant volume of reports of Title IX incidents or complaints involving allegations of sexually harassing conduct originating from social media and other cyber sources (e.g., unwelcome sex-based picture sharing).  Additionally, the potential for issues and lack of clarity regarding what Title IX actually covers has increased in the environment of remote or distance learning as a perpetrator, who could be a student or a student's family member or an outsider, could access contact information of a whole electronic classroom of students, or break into side chats and other cyber means of asserting verbal and visual unwelcome conduct of a sexual nature or based on sex.

39.     LAUSD receives Title IX complaints involving allegations of sexually harassing conduct that occur outside of the District's "substantial control"  (e.g., after school hours or in cyber channels after the school day), but that nevertheless impact students' ability to concentrate and access school because the alleged perpetrator and victim share the same public school

Decl. of Julie Hall-Panamen   o                                      Civil Action No. 20-cv-01468
EXHIBIT 57

campus or educational program, other students find out about what happened off campus or remotely and discuss it on campus or in educational programs, and/or the alleged perpetrator references the off campus activity while at school but doesn't directly engage in harassing conduct on campus.

40.     The Department is aware of the impacts, as the Federal Commission on School Safety, in a report dated December 18, 2018, noted hearing testimony that, "34 percent of high schoolers in America are cyberbullied, and 80 percent of students who are cyberbullied are also bullied at school."[2]  Children should not be subjected to sexually related misconduct without prevention and intervention when such conduct carries over to our campuses.  A requirement to dismiss such complaints under Title IX is contrary to the statute's goal of ensuring that public school campuses are free from discrimination and contrary to evidence showing the prevalence and harms related to harassment that occurs outside of school activities that nevertheless have a nexus to school.

41.     When a recipient has actual notice of sexual harassment, the Rule only requires that it must avoid "deliberate indifference" to the report or complaint but mandates strict compliance with its prescriptive grievance procedure requirements.  This inequitable double standard inexplicably requires our District to focus on procedural compliance over a substantive response that eliminates sexual harassment in our schools.  This double standard will create confusion for harmed students and their parents about the duty that our District has under Title IX to take action to ensure campuses are free from sexual harassment.  It also sends the wrong message to students subjected to sexual harassment and violence that stopping and preventing further sexual harassment and assault on campus is not as important as adherence to rigid procedural requirements, thereby undermining the work we do every day to convey that ensuring campuses free from discrimination is a top priority for the District.  In this way, the Rule will also increase the potential for liability and litigation stemming from complaints by the parents of

---

[2] Federal Commission on School Safety, Final Report 19 (December 18, 2018), https://www2.ed.gov/documents/school-safety/school-safety-report.pdf.

Decl. of Julie Hall-Panamen   o                                   Civil Action No. 20-cv-01468
EXHIBIT 57

children who have been harmed and who identify inequities in the process, due to this double standard and other actions that we are now required to take under the Rule, such as rejecting complaints from a student who has transferred to another District at the time he or she files a complaint based on a sexual assault in our schools..

### Impact of New Rule on Confidentiality and Privacy

42.      The Rule states that when investigating a complaint a school may not "restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence."  Rule § 106.45(b)(5)(iii).  In the K-12 context, this broad rule in favor of allowing young children to share information about sensitive allegations, separate from gathering and presenting evidence, related to sexual assault and harassment is completely irrational. Children who will not be responsible for either conducting the investigation or defending themselves do not need to have unfettered ability to share such sensitive and personally harmful information with their classmates and school community, nor should their parent or guardian.

43.      Our school campuses are charged with ensuring the confidentiality of student records and data under Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and California education laws.  They also have a duty under Title IX (and similar state statutes) to prevent retaliation and harassment against individuals who make complaints on a protected basis.  The Rule requires all evidence, regardless of relevance, be disclosed to third parties and that districts allow the parties to discuss the complaint allegations, including the name of the complainant, details about the sexually harassing conduct, and the date and location of the events, without limitation.  As such, the Rule conflicts with FERPA's statutory requirement that schools ensure that school records remain confidential (except in limited circumstances), and is inconsistent with the requirement to ensure an adequate and reliable investigation because the Rule allows involved parties to share information while the investigation is ongoing, which could have a negative impact on actual and potential witnesses .

44.  The Rule states that the FERPA statute is preempted to the extent there is a conflict with the Rule.  Rule § 106.6(e).  The Rule requires that student-specific information, such as statements, witness statements, documents containing information about a student's "sexual predisposition", and everything short of psychological and medical records, be shared with other minors involved and their advisors.  Rule §§ 106.45(b)(4) & (5)(iv), (vi); 85 Fed. Reg. at 30,428. Although the Rule provides that districts could have parties and their advisors sign nondisclosure agreements, there is no provision for the situation where parties or their advisors refuse to sign a nondisclosure agreement, placing districts in further jeopardy of violating FERPA.  And the District has concerns about ensuring compliance with such an agreement by children, parents, and siblings, especially with the prevalence of social media.

45.  In addition to requiring districts to share personally identifiable information about student witnesses and others involved (not just the parties) from education records collected through the complaint process, which appears to directly contradict FERPA, the Rule unfathomably explicitly provides that there be no restrictions on the ability of parties to speak to everyone involved about the "allegations," while also requiring that allegations include the names of the parties and sufficient detail about the location of the allegations and the conduct related to the allegations themselves.  These requirements are set out under the guise of the First Amendment and self-advocacy with no real recognition of the potential the Rule sets for rampant intimidation or retaliation.

46.  These provisions of the Rule are unworkable, place school districts in a position to violate well-established federal law regarding confidentiality of education records, and will undoubtedly result in privacy violations, intimidation, retaliation, and further harm to involved parties.  Once again, the Rule places school districts in jeopardy by literally requiring a violation of other laws in order to comply with the new Title IX regulations.

47.  These aspects of the Rule also make it harder for the District to prevent retaliation and intimidation, and to protect young students from further harassment based on sex.  The Rule

is more likely to exacerbate a hostile environment on campus as rumors circulate and the child who came forward to try to stop the conduct is subjected to questions or bullying about the alleged sexual misconduct from peers.  In fact, under the Rule at least two rounds of questions to parties and witnesses and responses are required after evidence is gathered and the investigative report is submitted to the parties.  Rule § 105.45(b)(6)(ii) ("the decision-maker(s) must afford each party the opportunity to submit written, relevant questions that a party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party.")

48.     The Rule also states that even evidence upon which the District does not intend to rely in reaching a determination regarding responsibility must be transmitted to the other party and their advisor.  Such a broad requirement may result in the EECO having to provide extremely personal information to both students and their advisors of choice, which could expose the District to litigation under state and federal confidentiality and privacy laws.  As discussed above, the Rule does not give FERPA precedence in this circumstance, which adds to the confusion in the field.

49.     When irrelevant or personal information is shared, student witnesses and student parties can be harmed.  The requirement to share this type of information with multiple students and adults also increases the risk for students that such personal information will be disclosed on a widespread basis, by one student or another, under the auspices of preparing the case or discussing the "allegations" by involved parties.  The Department's non-disclosure agreement recommendation cannot be applied to minors, as they are unable to sign such agreements.

50.     The trauma, increased risk of retaliation from other students, and FERPA violations from these disclosures required by the Rule are potentially exponential.  In my role, I have seen instances repeatedly where students resort to self-harm from such exposure or from rumors.  I have also seen the explosive ability to spread sensitive content instantly using social media platforms, which results in increasing the original trauma from the incidents and shame

and stigma for one or more parties.  For example, we recently had a complainant tweet about misconduct she experienced to her 30,000 Twitter followers.

51.    Further, the Rule requires us to provide or transmit the evidence relied upon directly to the harmed individual – the child, if he or she wants to proceed, and the parent or guardian is not involved in filing the formal complaint.  This aspect of the rule makes little sense, as many children will not be able to internalize or retrieve or review the information at the level it will be communicated.

52.    While the final rule now includes an anti-retaliation and intimidation provision (§ 106.71), it is internally inconsistent with other aspects of the Rule that allow sensitive and private information to be shared widely, the potential for additional rumors, harm and trauma, the restrictions and/or permissive nature as to whether a district can or should act on misconduct below the Title IX bar, and the prohibitions in limiting speech of a sexual nature.  The provisions of Title IX as proposed will actually encourage retaliation.

53.    Previous guidance provided suggestions as to what constituted a prompt investigation, such as using 60 calendar days as a bar.  State law similarly provides statutory timelines for investigations of harassment and discrimination complaints.  The Rule invokes very specific investigation requirements that, from my years of experience, will most certainly extend the overall investigation almost indefinitely, negatively impacting a school district's ability to reach an outcome and provide supports or remedies.  Under the Rule, added steps that are now required for investigations include creating an initial report of evidence; sharing the report for question and answer follow-ups over an approximate two week period; the allowance of expert witnesses which creates a new inequity for those who do not have the means to secure them; creating a separate decision process; offering extensions as needed at multiple points of the investigation; and offering appeals to both parties.  This is separate and apart from the formal discipline requirements under state law and the additional or concurrent timelines and due process associated with formal discipline, which will likely result in delays in addressing formal

Decl. of Julie Hall-Panamen   o                           Civil Action No. 20-cv-01468

EXHIBIT 57

discipline to the point where discipline timelines for action will have passed.  For example, to proceed with an expulsion under state law, the District is required to hold a hearing within 30 days of issuing a suspension, but the District will not be able to move forward with either issuing the suspension or providing the notices required for the expulsion hearing until it completes the Department's mandatory process, which will take close to 30 days in most instances.  The Rule provides confusing and impractical overlays regarding the ability to remove a party on an emergency basis, but not affect educational access on another front.

54.    The Rule requires certain sexual misconduct per Clery and VAWA be treated as meeting the definition of sexual harassment, automatically invoking the Title IX grievance procedure with its associated timelines.  The Rule grants the victim of the misconduct control over whether the grievance procedure is invoked but has unclear language regarding whether or when the Title IX Coordinator is permitted to act.  This lack of clarity leaves school districts, and Title IX coordinators, open to legal challenge because, on the one hand, the school district may be accused of failing to protect the campus by not implementing any discipline for an egregious act to assuage the victim's wishes, or the school district could be legally challenged under the Rule for unilaterally moving forward contrary to the victim's desires.  Similarly, the Rule states that the Department can find a violation if a school district proceeds with a different but constitutionally adequate discipline process. This is so even in a case where the victim is fearful or shamed and doesn't want to go forward with a formal grievance, but under state student discipline laws the school recognized the harm and the need to protect campus safety.

55.    Existing state law mandates that certain conduct requires an administrator to act for the safety of the K-12 campus, where students are minors and we act in loco parentis.  The Rule does not recognize the danger of certain conduct to the overall climate of a campus that is filled with minors under the supervision of educators and somehow only allows for redress for the specific victim of the act, ignoring the impact on the school community in terms of safety and climate.  The Rule in fact states it is preemptive of state law.

Decl. of Julie Hall-Panamen   o                                    Civil Action No. 20-cv-01468

EXHIBIT 57

56.     There is no recognition in the Rule of how an act of sexual violence can affect minors who view it or learn of it, but have not been personally targeted.  Under the Rule, inexplicably school districts could be in violation of Title IX for providing group supports to address the larger campus climate.

57.     The Rule creates an arbitrary set of timelines and additional procedures under Title IX that preempt state discipline laws, including those that already require very specific due process procedures on a short timeline, for example, a live hearing with cross-examination within 30 days, for certain discipline removals that do not align with the separately mandated Title IX grievance procedures under the Rule.  This unworkable inconsistency unnecessarily places school districts in constant jeopardy of failing to comply with the Rule or state law.

**Additional Unaccounted Costs and Burdens Associated with New Rule**

58.     The Rule will result in other immediate and irreparable financial harm and administrative burdens for our District.

Increased Costs and Burdens Associated with the New Rule's Procedural Requirements

59.     The Rule fails to include extensive unaccounted-for costs required to implement its procedural requirements.  For example, the NPRM required that the decision-maker, the Title IX Coordinator, and the investigator be three different people.  Investigators typically have a caseload and consult with others; however, multiple investigators do not typically work on the same case.  The Rule states that the Title IX Coordinator could also serve as the investigator but now requires a fourth completely separate staff person to handle any appeal.  It is unrealistic, unwieldy, and time consuming to have a minimum of three to four individuals working on each formal complaint particularly at a school site.  Currently, the EECO has two specialists, two coordinators and two directors with three support staff that handle the volume of complaints that rise to district-level response, in addition to those that are not Title IX in nature.  Having a separate decision-maker in our work would add substantially to the personnel time and cost of investigations as outlined earlier and create an overall delay in investigation determinations.

Decl. of Julie Hall-Panamen   o                                        Civil Action No. 20-cv-01468

EXHIBIT 57

60.     In a district our size, each school and District site must immediately address and handle complaints due to the sheer volume of incidents observed, brought verbally or more formally.  The Rule essentially requires a formal complaint process for any Title IX sexual misconduct that rises to the level of student discipline, so if student discipline is contemplated, the entire grievance procedure would need to be invoked and processed first.  The Rule appears to prohibit any form of discipline prior to completing the Title IX grievance procedures, including notices and appeals—from a two-day in-school suspension to a detention or note in the file.

61.     Under the Rule, three persons would be required to support the work at each site just as it relates to Title IX matters, separate and apart from the staff involved with student discipline or providing supportive measures.  Assuming upwards of 1,323 educational sites in our District, this would be approximately 3,969 positions.  This is not inclusive of the number of staff required to preside over appeals.  If the positions supported more than one site, it would still hypothetically entail a couple of thousand positions dedicated to Title IX work at similar hourly rates to those of the administrators conducting investigations centrally.

62.     In addition, in an institution as large as ours, I cannot physically provide direct services on every report or complaint in the entire system, and certainly cannot also be the only person to oversee support measures and remedies issued at each site.  It requires that the work of the Title IX Coordinator be shared.  At some of our school-sites that handle complaints directly, there is only one school administrator.  It is only the school administrator who has authority to address confidential personnel matters, take corrective measures, issue formal student discipline, and issue discipline for complaints against employees.  In such a scenario, the model could not be implemented as proposed in the Rule, as a principal is the line authority for staff at a school site, whether or not additional administrators are added to fulfill the three proposed Title IX roles.

Decl. of Julie Hall-Panamen   o                              Civil Action No. 20-cv-01468

EXHIBIT 57

63.     Further, due to the immense size of the District, I require the assistance of staff in our local districts and at our school sites to coordinate effective implementation of supportive measures and remedies issued.  The Rule suggests that, as the Title IX Coordinator, I am the only one who can coordinate such measures, but counselors, deans, and assistant principals at our sites provide and coordinate such measures and have specific training in some cases to do so. Further, student discipline requires extensive due process under State law and is coordinated by additional staff separately for the various bases of formal discipline.  Because I cannot physically provide coordination of support and remedies at every site, each site needs a Title IX point person or a designee that supports Title IX compliance.  Some of those roles are not in a position to physically coordinate supports, while others are.  For example, a school counselor could coordinate counseling but not all sites have full time counseling support.

64.     This Rule does not consider the structure of K-12 public schools, the roles and variety of support providers in schools or the line authority for coordinating support or discipline in K-12 schools.  To implement the Rule, requires many staff members, not just one, and these costs are not identified in the NPRM or the Rule preamble, nor are the training costs related to these new requirements.

65.     To the extent that the District would be in violation of the Rule because we utilize multiple staff members to coordinate and provide supportive measures and remedies, this also increases our potential administrative enforcement burden because of Title IX complaints being filed against us with the Department's Office for Civil Rights.

66.     In California, under state law, if the District is proposing to expel a student, the student receives a live hearing within 30 days of any suspension from school.  California law also restricts a suspension to a total of five days for any incidents.  To meet the Rule's requirement for all sexual harassment cases without a live hearing that will impose no more than a five-day suspension, among other things, the District is now required to complete an investigative report for each case.   Prior to completing the investigation report, the District is

Decl. of Julie Hall-Panamen   o                          Civil Action No. 20-cv-01468
EXHIBIT 57

required to send to each party and the party's advisor, the evidence, relevant and irrelevant, subject to inspection and review, and the parties must have at least 10 days to submit a written response, which the investigator has to consider prior to completion of the investigative report. Rule § 106.45(b)(5)(vi). Then, "after [sending] the investigative report to the parties …. and before reaching a determination regarding responsibility, the decision-maker must afford each party the opportunity to submit written, relevant questions, provide that a party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party." Rule § 106.45(b)(6)(2). The final determination cannot be issued until at least 10 days after the parties have received the investigative report. Rule § 106.45(b)(5)(vii). At minimum, this means that the District will have to wait at least 20 days to take any disciplinary action on an incident of sexual harassment or assault that impacts individual students and the school campus. The Rule also requires a separate appeal process with exchange of documents and evidence for any disciplinary actions, even an in-school detention. Rule § 106.45(b)(8). The Rule even allows for "expert witnesses" in investigations; investigations which are not related to hearings per se in the K-12 context and which should not be based on a battle of the experts but on facts instead. 85 Fed. Reg. 30,348.

67.     Discipline is most effective when administered in close proximity to the precipitating event. This is so because students in the K-12 context at various developmental stages and cognitive levels will best associate the discipline as a consequence of the misconduct, and therefore a deterrent to additional or escalating misconduct, when closely linked to the behavior of concern. Additionally, witnesses of the misconduct or those who are in the same environment will ostensibly see the nexus of consequences to misconduct if closely aligned in time, which serves to reinforce feelings of safety and teaches behavior by example. Unfortunately, the Department's new mandated process needlessly extends the time needed to address a sexual misconduct incident in order to administer properly the submissions and follow-

ups identified in the Rule.  In addition, to the extent students have lawyers, each case, no matter how small, will turn into an exercise in legal briefing and responses and battles of the experts.

68.     In a District like ours, where 78% of our families qualify for free and reduced lunch, inequities will be compounded for families who do not have the means to hire attorneys to ensure the fidelity of their rights under the Rule.

69.     These requirements also mean that school-site administrators will expend extensive time on cases while separate discipline related state education laws impose separate and, in some instances, conflicting timelines and due process requirements, including that there is a maximum of five days of suspension allowed by law for any incident and sexual assault and battery require an immediate five day suspension, pending a live hearing to consider expulsion.

70.     Requiring every investigation to follow these prescriptive requirements is resource-intensive and will result in significant administrative burdens and costs for a small district let alone a large district like LAUSD – costs which the NPRM and the Rule did not include in the cost and impact estimates.  The administrative burdens include, but are not limited to, (1) annually training and providing formal written notice to all school-site employees of the new requirements, (2) training local district and central office administrators, as well as those who fulfill the roles of Title IX Coordinator/investigator/decision-maker/appeal review for each site, in the new protocols, and (3) providing formal written notice and assisting in navigating the complex procedures for impacted students and their families.

71.     The costs will include the cost to hire additional staff, including potentially outside counsel, and will result in scarce education dollars, that are being drastically reduced because of the COVID-19 pandemic, being taken away from teaching, supervision, and academic support for students.  All this is tasked upon districts additionally in the time where the Department has identified the necessity for federal waivers of timelines in other areas in recognition of the impact of COVID-19 on day-to-day operations.

Decl. of Julie Hall-Panamen   o                                    Civil Action No. 20-cv-01468

EXHIBIT 57

72.     In addition, this process is not developmentally appropriate for students in K-12 schools.  Students are learning, in an age-appropriate manner, boundaries, physical safety, self-advocacy, healthy relationships, and violence prevention among other social-emotional and safety skills from early education through secondary.  Their understandings of these principles or curriculum standards and the vernacular they have at their disposal is limited depending on their age, development, disability and level of instruction.  For example, students at early ages cannot be asked compound questions and respond in a manner that is responsive to all the concepts addressed in the question.  Students who are young or disabled may not understand the content being asked or provided to them for review.  It is not uncommon for students to grapple with causation at early ages and attribute fault to themselves when they are not at fault (e.g., when parents divorce).  Depending on a student's age, cognition or even cultural influences, a student may want to please the person interviewing them or may easily respond to a leading question with an answer the student believes is the response the reviewer or interviewer is expecting.  For reasons such as the above, the back and forth of questions and follow-ups in the new regulations do not address child development considerations and increase the District's administrative burden.

73.     By requiring education staff who serve as the decision-maker to "explain to the party proposing the questions any decision to exclude questions as not relevant," also turns our educators into quasi-lawyers and our schools into quasi-courtrooms.  Rule § 106.45(b)(6)(ii).  Under the Rule, when savvy lawyers now assert legal theories or civil remedies at their disposal as leverage to influence the decision-maker, an educator without legal training who does not have such recourse, issues could arise with respect to ensuring a fair process.

74.     These document-intensive processes in the regulations again focus staff time and attention away from the safety and educational needs in our schools. The Rule foreseeably will increase administrative burden as to time intensive investigations, follow-up leading to decisions, and in appeals.

75.     In California, the evidentiary standard for a student expulsion at the K-12 level is substantial evidence, not clear and convincing evidence and not preponderance of the evidence.  The Rule provides no flexibility or deference for California's system, which recognizes the intermediate standard for cases resulting in greater loss of educational access. Based on the new preemptive effect clause in the Rule, the Department appears to be creating an unnecessary conflict with California law that is not supportive of respondents.  The result of the preemptive effect clause here is that only students facing expulsion for sexual harassment and assault will have their expulsions determined under the preponderance of evidence standard, because this is the standard under California law applied in all other cases involving 1-5 days suspension for sexual assault and harassment.

<u>The New Rule is Based on Flawed Assumptions and Calculations</u>

76.     The NPRM stated that there would be cost savings for our District and other districts, but those estimates were based on flawed assumptions and calculations and not in consideration of a K-12 educational setting, state law requirements, and additional areas of impact not directly under Title IX jurisdiction.   In issuing the final version of the Rule, the Department has now revised its estimates and identified a net cost for schools.  However, the Department's cost-benefit analysis continues to be based on flawed assumptions and calculations.

77.     The costs for informal resolution will not go down for LAUSD because we already address 25% of our formal complaints through an informal resolution method, but the Rule increases the number of complaints that must be addressed through a formal method substantially.

78.     The process creates additional roles, such as "decision maker" and individual overseeing appeals that do not currently exist and in the past did not need to be strictly separated from the Title IX Coordinator, therefore creating hours and costs in work that didn't previously exist multiplied across an extensive school system.

79.     The Department's assumed pay rates are not accurate in Los Angeles.  The Department assumes the Title IX Coordinator would have a loaded wage rate of $65.22 per hour. The loaded wage rate for a Title IX Coordinator is on or around $72.50 per hour.  The Rule fails to consider actual market rates for attorneys, instead relying on the median hourly wage for attorneys in the education sector as reported by the Bureau of Labor Statistics.  The Department assumes the lawyer would have a rate of $90.71 per hour.  83 Fed. Reg. at 61,486.  However, in Los Angeles Unified School District, the average rate for outside counsel hired by our school district is on or about $210-350.00 per hour.

80.     To meet the exchange of evidence requirements, the District would have to ensure receipt and security of physical or electronic copies of evidence to student stakeholders free of charge as part of the California Constitution's free schools guarantee, a cost not accounted for by the Rule.  The Rule also does not take into account the needs in a high poverty district like ours, where students and families often do not have sufficient technological means to receive information electronically.  As such, the Rule does not account for either the cost of copy production, mail tracking, and other supports required to make certain that all families have equal access.

81.     The Department estimated that for each district, the Title IX Coordinator would spend 6 hours and the attorney would spend 24 hours to revise grievance procedures.  85 Fed. Reg. at 30,567.  For LAUSD, this is flawed because first the Rule would need to be reviewed for consideration of changes and impact.  Then, the Rule would need to be reviewed in light of State law.  Finally, current policy would need to be reviewed and updated to ensure compliance with the Rule and existing State law.  Further, the Rule may need to be negotiated with employee bargaining units, which will take an extensive amount of time.  Again, this would be occurring during the COVID-19 crisis when fluid communication is impaired and over the summer months, when employees are off of work and students are out of school.

Decl. of Julie Hall-Panamen   o                                    Civil Action No. 20-cv-01468
EXHIBIT 57

82.     The Department estimated that for each district, the Title IX Coordinator and a lawyer would spend 4 hours and 8 hours, respectively, to review the final regulations.  85 Fed. Reg. at 30,567.  Given the complexity and length of the regulations and changes from the originally proposed rule, it has already taken me more than 40 hours to review the Rule, and I estimate it will take another 120 hours to ensure that I have understood the 544 page preamble with additional rules and requirements in text and footnotes, and then assess how to change practices and other documentation based on those changes in particular in consideration of the additional time spent vetting policy as indicated below.  I also estimate that it will take our lawyers a minimum of 150 hours to review.  Our attorneys indicated it would take a minimum of this much time because the Rule is a steep departure from the prior regulations, state law is consistent with the prior regulations and has not been changed, and school districts must ensure nondiscrimination under both standards in student services, employment, business practices, and labor.

83.     In addition, the Rule has established burdens of proof and standards that differ not only from the prior regulations, but also from K-12 student discipline requirements, so those areas will also require review to ensure students are provided due process consistent with state requirements as well as the internally inconsistent Rule.  This cost estimate also does not take into account the actual time needed for policy review and vetting by the various office and units impacted by the changes in the Rule, which is the standard practice for policy review and approval in the District.  The Rule only allots 2 hours for administrator review and approval.  85 Fed. Reg. at 30,557.  Administrators and attorneys who oversee instruction, school safety or operations, student discipline, human relations, employee grievances, negligence lawsuits and school mental health would all assist in vetting the changes to this policy during a pandemic when time and collaboration is severely impacted.  In addition to requiring input from multidisciplinary experts, the Superintendent's Office as well as the School Board and their staff

Decl. of Julie Hall-Panamen   o                                  Civil Action No. 20-cv-01468
EXHIBIT 57

may also have questions and concerns about the changes in the Rule that would need to be implemented through policy.

84.     The District could conservatively estimate that 20 administrators with this multidisciplinary expertise, in addition to the Title IX Coordinator and legal staff, would review the policy resulting from the Rule, at an estimate of a minimum of 200 hours given the range and complexity of the Rule, the stark differences between the prior and new Rule, and the inconsistencies with state law requirements.  Administrators with this level of expertise generally have salaries in the range of $60 to $72.50 per hour, making the cost estimate for policy review, when added to the Title IX Coordinator and legal review, roughly and on the low end $240,000. If the review by the Superintendent is factored in, we conservatively estimate this review at 6 hours for our district based on other policy changes of this type and by School Board members and their staff (multiplied by 7 members on the School Board, along with seven staff members), the total cost for Year 1 for LAUSD would be exponentially more than the Department estimated.

85.     The Department's estimates for the amount of time to revise grievance procedures also does not take into account the number of hours for the School Board members to take up the Rule in a noticed meeting and to then pass the revised policies and grievance procedures incorporating the Rule, which we conservatively estimate at 8 hours, which may be delayed by restrictions in meeting under COVID-19 conditions.

86.     It also does not take into account the time for stakeholder input on grievance procedure revisions, which we conservatively estimate at 10 hours of staff time ($72.50 for Title IX coordinator).

87.     In sum, the total cost and timeline for reviewing and revising grievances procedures is far more than the Department estimates or allows.

88.     The Department underestimated the training costs associated with the Rule in both the NPRM and the Rule's preamble.  As the second largest employer in L.A. County, the

costs for any training in our District are significant and would be monumentally impacted by this requirement. Planning training curriculum takes hours, if not days, but is only the first step. Training must be individualized to the intended audience to be most salient. In our District, training would need to be tailored for administrators, Title IX Coordinators, investigators, decision-makers, panelists for appeals, employees at large, parents and students at every level of K-12. For example, an administrator would need to be able to train staff on definitions, complaint procedures, responsibilities and supports, and remedies as well as separately ensure students receive the content as noted above.

89.      Likewise, the four personnel team of Title IX-related responders would need individualized training specifically on handling various parts of the complaint, investigation, decision and appeals process. This is especially true of content that is heavily procedural, that involves law and civil rights and that addresses content of a sexual nature that must be appropriately steered for the developmental level of K-12 students. Add to these training considerations that staff do not remain fixed in their role in a school district or even within a school year, but may change classes taught, become administrators or other professionals, move locations, etc. and are restricted from working at their sites during the COVID-19 epidemic. The training would be required annually so it would not be a one-time cost and with ever-evolving staffing would require constant training on a regular basis. For example, the training would have to be delivered at over 1,300 locations in our District. The District would need hundreds of presenters; or a few presenters would need to capacitate existing site staff and train them over the space of a school year. Training logistics also compound the matter as in some cases training can only be held for some staff outside the instructional day and now most likely will be held remotely. If training is conducted in larger numbers by multiple individuals, it is possible to lose continuity of information delivered, in which case the District may have to resort to training in the form of on-line modules to ensure breadth and continuity of information. On-line training

Decl. of Julie Hall-Panamen   o                                    Civil Action No. 20-cv-01468
EXHIBIT 57

requires certain kinds of technology by users; it also is costly to develop and ultimately would not be as interactive.

90.     Required training or notice is then content that must be tracked, opportunities provided to make-up the training, progressive discipline dispensed in the case of employees if not completed, and other related processes must be developed and implemented.

91.     The NPRM also failed to include the costs of training students, parents and guardians in the Rule's requirements, which will be crucial to protecting their rights under a process like this one that is so procedurally complex and different from the prior process and other civil rights complaint processes available through the Department.  To properly implement the Rule, for example, students would have to understand what sexual harassment is, their rights and responsibilities, solutions or consequences, and how to access them.

92.     The Department also underestimates the cost of supportive measures.  The costs are generally more than $250 per provision (85 Fed. Reg. 30,558), because they can include incidental or regular counseling, several hours of meetings with various stakeholders to advise regarding and plan for on-going student safety, devising and implementing mutual no-contact orders, threat assessment, supervision and monitoring, academic interventions, student orientations, and curriculum and educational materials to address climate in addition to other support measures.

93.     In addition, the Department states the economic analysis explicitly excludes economic consequences of sexual assault incidents themselves, stating that it is "only intended to capture the economic impacts of this proposed regulatory action."  NPRM at 83 Fed. Reg. at 61,485; 85 Fed. Reg. at 30,458 ("Again, as discussed at length in the NPRM and elsewhere in this notice, the Department declines to include costs associated with underlying incidents of sexual harassment and assault in our estimate of the potential costs of this regulatory action as doing so would be inappropriate.").  The Department makes a false assumption that the

regulations will not have a quantifiable effect on the underlying rate of sexual harassment occurring in educational programs or activities.

94.      The federal government cannot redefine sexual harassment to be a more egregious behavior, leave lower levels of conduct to be permissively considered for follow-up, identify that investigations of sexual harassment and assault will decline significantly in its cost estimates, and presume that there will be no impact on the underlying rate of unwelcome conduct of a sexual nature or based on sex, in addition to sexual harassment.  As indicated earlier and repeatedly shown in research, behavior left unchecked escalates.  Therefore, the analysis cannot capture the economic impact if it does not capture the costs incurred by students subjected to unwelcome conduct of a sexual nature or based on sex, sexual harassment and violence and those who serve them.  Costs incurred should include possible medical, psycho-social, and mental health treatment sought by affected students individually, loss of educational benefit, loss of education revenue due to declines in attendance, and associated ramifications.  The Rule does not adequately capture such costs in its cost estimates for supportive measures.

95.      Even though the Department of Education Secretary Betsy Devos-led Federal Commission on School Safety Report found that "victims of bullying and harassment tend to miss more days of school and are more likely to leave the district when perpetrators are not removed from the school," the NPRM and Rule did not account for additional staff time spent in activities intended to bring disengaged students back to school and the ultimate loss of average daily apportionment or state funding of education for the District, such as outreach by social workers to reengage students in school, connecting students with community supports or student attendance review boards with panels of stakeholders from the school and city. *Id.*, p. 68 (Dec. 2018). The Rule's cost estimates for supportive measures are inadequate to capture the District's significant costs.

96.      With respect to loss in attendance revenues, the economic consequences of student absences on our District will be significant.  As described above, our District receives

Decl. of Julie Hall-Panamen   o                                          Civil Action No. 20-cv-01468
EXHIBIT 57

funding based on a calculation of pupil daily attendance.  Therefore, there will be a direct negative economic impact on District funding for each student who misses school due to unaddressed sex-related misconduct, sexual assault and harassment.

97.    The stringent new standards in the Rule make filing and investigating complaints of sexual harassment and sexual violence far more difficult for students and schools, and California laws continues to incorporate the Department's prior broader definition of sexual harassment.  The Rule does not account for the fact that the District will have to create a multi-tiered complaint response and discipline system or the considerable confusion and complexity this will create with respect to adequate day-to-day implementation.

98.    Other civil rights inexplicably receive greater protection under both state and federal law than Title IX, and LAUSD must implement a multi-tiered system based on the type of harassment experienced by the student.  Accordingly, the District may not see any savings in fewer investigations, but rather may be required to create a more cumbersome and complicated multi-tiered response system to address allegations while avoiding compliance landmines.

99.    As noted previously, fewer investigations do not equate to fewer incidents of sexual-related misconduct and the detrimental costs for students who disengage from their educational programs or require additional social-emotional supports to cope.  Those costs are shared with the District who no longer serves the student who leaves while losing ADA or who continues to keep the student engaged through various support mediums who now cannot receive restitution otherwise through the complaint process.  This is coupled with the new annual and recurring improperly calculated costs of hiring and training staff in the new roles of the Title IX coordinator, decision-maker, investigator, and appeal review panelist.

**Impact of Failure to Require Private Religious Schools to Request a Title IX Waiver**

100.    The Rule allows a private religious school to claim an exemption after a Title IX complaint and investigation is in progress.  The Rule puts students in our district who might attend a function, such as a school dance or athletic event, at such a school at risk of not being

able to obtain any relief from the private religious school if they are sexually assaulted or harassed while in that program or activity.  And our public institution would still have responsibilities under Title IX to provide services and supportive measures to help address the harm that the affected student suffered, while the private religious school could belatedly deny any responsibility or duty to the student after the student has gone through the process of filing a formal complaint.  LAUSD believes it is important to support all of its students, but other schools that receive federal funding should be required to tell students and the public whether they will comply with Title IX and provide third parties with a discrimination free environment before they participate in an education program or activity so that school districts and students can properly assess the potential harms and anticipate any costs.

### Conclusion

101.    Considering all of the changes in the Rule, LAUSD will see significant increases in financial costs beyond those estimated by the Department from additional policy development, impacted programs, required training, allocated positions to address Title IX matters, a separate and inconsistent complaint investigation mechanism, providing evidence to the parties in an electronic format or hard copy for inspection and review, time spent on far more complaint investigations for any case for which the district is seeking formal discipline, expert witness considerations, expenses on attorneys in investigations, losses of ADA, and litigation expenses for failing to address sexual harassment proactively or proceeding with an investigation to protect our campuses, after a harmed student has left the District as a result of the sexual harassment or assault.  The Rule underestimates or ignores these substantial costs.  Further, as discussed above, the impact on students subjected to sexual harassment and violence is substantial and unaccounted for.

102.    Considering all of the changes in the Rule and based on my experience overseeing Title IX compliance in LAUSD, I anticipate an increase in sexual harassment, including violence and assault, on our school campuses, more child victims of sexual harassment and violence, and

Decl. of Julie Hall-Panamen   o                                      Civil Action No. 20-cv-01468
EXHIBIT 57

unwieldy, time consuming, and confusing compliance obligations that will result in fewer successful prompt and equitable complaint resolutions.  The Rule will result in campuses that are less safe and less able to respond promptly and effectively to address sexual harassment, as well as additional litigation against our District from families of both respondents and complainants. Overall, the Rule reduces student protective benefits and substantially increases regulatory burden and costs.  At this time, the District reserves its right to comment separately regarding employment issues impacted by the New Rule.

103.    The Rule is overly directive and a landmine for compliance violations due to the lack of clarity and consistency.  In order to meet its requirements, the District will be required to attempt to harmonize the new requirements with existing law and processes and change dozens of impacted policies and procedures.  As discussed, the Rule does not adequately account for the significant additional professional development at all levels that is required for implementation.

104.    On March 16th, 2020, and the months following, the District, along with the rest of the country and the world, has experienced unprecedented times due to COVID-19.  The Governor and Mayor required citizens to implement Safer at Home measures to slow the curve of the contagion.  As a result, schools closed and students and employees began the process of executing distance learning measures which had never existed before, certainly not to such a vast degree.  Students and employees were forced to find ways to work electronically, be connected and engaged in very short order as the reality of the length of the sequestering became more evident.  The effort required the District at large to refocus its energy on the crisis and to streamline the work of all employees.  Normal policies and processes are not up and running; the District is navigating how to apply existing policies and procedures in new mediums.  The current announcement of the Title IX regulations is coming at an unfortunate time for all parties to fully evaluate existing systems, review the major overhaul of these regulations that add numerous new procedural steps and definitions, and attempt to ensure compliance with the new

regulations when existing systems are already not sustainable or are being significantly modified due to the pandemic. Simply put, it will be nearly impossible for the District to comply with the Rule by the effective date. Safety issues and legal challenges will most likely arise as a result of this unreasonable and unworkable expectation.

105. LAUSD has been working diligently to reduce the school-to-prison pipeline while also ensuring our campuses are safe and supportive of our students. The Rule takes our existing efficient and child and family centered administrative process and equates it to the process for civil litigation in pursuit of monetary damages. Our schools and our students will suffer significant, immediate harm as a result.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 19 day of June, 2020

Julie Hall-Panameño

**JULIE HALL-PANAMEÑO**

Decl. of Julie Hall-Panameno                    Civil Action No. 20-cv-01468

EXHIBIT 57

EXHIBIT 58

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. <u>20-cv-01468-CJN</u> |

## DECLARATION OF SARAH E. HAREBO

I, Sarah E. Harebo, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Title IX and Clery Administrator at the University of Wisconsin System ("UW System") located in Madison Wisconsin. My educational background includes a Juris Doctorate from Pennsylvania State University-Dickinson School of Law and a Master of Education in Higher Education Administration from Northeastern University. I have been employed as UW System's Title IX and Clery Administrator since May of 2019. Prior to beginning my role at UW System I have previously served as the Director of Equal Opportunity for the University of Maine

System and a Title IX Coordinator and Institutional Equity Officer at Smith College in Northampton, Massachusetts.

2.      I submit this Declaration to verify publicly available information regarding UW System's current Title IX policies and procedures and briefly summarize which of these policies and procedures may need to be adjusted based on the Department of Education's ("ED" or the "Department") recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or Rule). I have compiled the information in the statements set forth below through personal knowledge, through UW System personnel who have assisted me in gathering this information from our institution, on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on UW System.

### Background Information About the UW System

3.      UW System is one of the largest systems of public education in the country, serving approximately 170,000 students each year and employing 39,000 faculty and staff statewide.

4.      UW System was formed in 1971 when the State of Wisconsin combined the previous University of Wisconsin, which was created by constitution and state law in 1848, with the Wisconsin State Universities which originated from an 1857 state law creating the Board of Regents of Normal Schools.

5.      UW System consists of 13 universities across 26 campuses and statewide extension network. There are two doctoral campuses (Madison and Milwaukee); 11 comprehensive campuses (Eau Claire, Green Bay, La Crosse, Oshkosh, Parkside, Platteville, River Falls, Stevens Point, Stout,

Decl. of Sarah E. Harebo                                  Civil Action No. 20-cv-01468-CJN

EXHIBIT 58

Superior, and Whitewater); 13 branch campuses, and a statewide extension network with offices in every county.

6.    Students can find on-campus housing at all four-year UW System campuses.

7.    UW System has a current annual operating budget of $6 billion with $1 billion in state funding and $1.9 billion in gifts, grants, and contracts.

8.    UW System receives federal funds from the Department. As a result, UW System is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

<strong>Summary of UW System's Existing Title IX Sexual Misconduct Policy</strong>

9.    UW System has adopted Regent Policy 14-2, a sexual violence and sexual harassment policy that prohibits sexual harassment and sexual misconduct by students, employees, and faculty and establishes a grievance process for addressing complaints of sexual harassment.

10.    UW System employs a Title IX and Clery Administrator in the UW System Office of Compliance and Integrity housed within the Office of General Counsel. The institutions of the UW System each have a designated Title IX Coordinator that handles reports of sexual harassment and sexual misconduct. The structure, number of staff, and responsibilities of the Title IX office varies by institution.

11.    In fiscal year 2019 (July 1, 2018-June 30, 2019), there were a total of 1,360 Title IX cases reported across UW System's  institutions.[1] During this same time period a total of 161 of these Title IX cases went through an investigative process consistent with the Title IX policies and procedures of the reporting institutions.

---

[1] For the purposes of these reported data, "Title IX cases" were defined as those cases identified by each reporting institution as a Title IX related incident in their official Title IX record. Across the UW System, some institutions had different interpretations of cases included in their official Title IX records (e.g. some included cases from confidential sources while others did not).

Page 3 of 6

Decl. of Sarah E. Harebo                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 58

12.     Regent Policy 14-2 defines sexual harassment as follows:

*Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or educational experience, (2) submission to or rejection of such conduct by an individual is used as the basis for employment or academic decisions affecting such an individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or offensive working or learning environment.*

13.     Under current UW System complaint processes, any individual who has been subjected to an incident of sexual violence or sexual harassment, or who received a report of or witnessed an incident of sexual violence or harassment, may file a complaint.  UW System and its institutions provide confidential resources to parties who have been subjected to sexual violence or harassment. Under Board of Regents Policy 14-2 - individuals, including victims, who report to any of the offices or individuals noted above, or to any other university employee, except those noted below, cannot be assured absolute confidentiality.  However, information provided in the report and in any subsequent, related proceeding will be maintained in a confidential manner; only those individuals who have a need to know to fulfill obligations consistent with university policies or laws will be privy to certain information.

14.     All hearing procedures for complaints of sexual misconduct across UW System's institutions are required to comply with Chapters 4, 11, and 17 of Section UWS of the Wisconsin Administrative Code.

15.     During the current COVID-19 restrictions, UW System and its institutions have been able to maintain timely investigations virtually.

**Revising Existing Sexual Misconduct Policies**

16.     The Wisconsin Administrative Code, Section UWS governs the general procedures the University of Wisconsin System's schools must adhere to in addressing student non-academic

Decl. of Sarah E. Harebo                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 58

misconduct and faculty and staff misconduct. UW System's schools have all created rules, policies, and procedures that more specifically address misconduct, grievance, and Title IX procedures. The Title IX Rule may require changes to the Wisconsin Administrative Code, Regent Policy and potentially changes to individual schools' harassment policies and grievance procedures, which are found in student codes of conduct, housing materials, faculty and handbooks. In addition, programs, academic departments, and athletic departments within the System's schools often have their own rules, policies, procedures, and handbooks that will require revision.

17.     The Wisconsin Statutes set forth the procedure for promulgating new administrative rules. The state agency wishing to permanently change its administrative rules must draft scope statements for the Governor's approval. Wis. Stat. § 227.135. Upon receiving approval from the Governor, the agency must hold a preliminary public hearing and comment period on the statements of scope and prepare economic impact analyses. Thereafter, the agency must draft the proposed rules and submit them to the Legislative Council. From there, the rules undergo a formal notice and comment period. The agency must then submit the rule to the Governor for approval, then undergo legislative review prior to promulgation. This process typically takes 12 to 18 months.

18.     The Wisconsin Administrative Code has a separate procedure for promulgation of emergency rules, wherein compliance with notice, hearing, and publication requirements are waived if "preservation of the public peace, health, safety, or welfare necessitates putting the rule into effect prior to the time it would take effect if the agency complied with the procedures." Wis. Stat. § 227.24. This truncated process allows agencies to promulgate rules more quickly, but the emergency rules only remain in effect for 150 days with the option of extending them up to 120 additional days. Wis. Stat. § 227.24(1)(c) and (2). The agency may then initiate procedures to convert the emergency rule to a permanent rule as provided by Wis. Stat. § 227.24(4); however as a

Decl. of Sarah E. Harebo                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 58

practical matter and to avoid a coverage gap, when promulgating complex rules or making significant changes to an existing rule, the agency commences procedures of adoption of permanent rules in tandem. *See* Wisconsin Legislative Council *Administrative Rules Procedures Manual*, § 2.12(6)(b) an (c).

19.     Following promulgation of new administrative rules and/or Regent Policies, the System schools must revise their codes of conduct, student, faculty, and staff handbooks, and grievance and hearing procedures. UW System and its institutions will have to develop new materials, website content, and communications to relay the changes that are implemented to our existing code, policies, processes, and procedures. Changing policies and procedures at the individual schools involves the Chancellor's offices, Dean of Students' offices, human resources, the Title IX office, legal counsel, and others.

20.     The implementation of revised code and policies will require updates to procedural materials, handbooks, pamphlets, websites, and training materials.

21.     Currently, UW System Faculty and staff are required to take a Title IX training at time of hire and approximately every three years thereafter. Individual institutions may provide additional training opportunities to faculty and staff.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this ⸻ day of June, 2020

Sarah E. Harebo
Title IX and Clery Administrator
University of Wisconsin System

Decl. of Sarah E. Harebo                                      Civil Action No. 20-cv-01468-CJN

EXHIBIT 58

EXHIBIT 59

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>            Plaintiffs,<br><br>        v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>            Defendants. | Civil Action No. <u>20-cv-01468-CJN</u> |

<u>**DECLARATION OF ASSISTANT COMMISSIONER ABDULSALEEM HASAN**</u>

I, AbdulSaleem Hasan, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Assistant Commissioner of Field Services at the New Jersey Department of Education ("NJDOE"), and have served in this position since July 1, 2019. My educational background includes a Bachelor of Arts degree in Law and Justice from Rowan University in Glassboro, New Jersey, a Master of Arts Degree in Human Resource Management and Training Development from Seton Hall University, and an Educational Specialist Degree

from Seton Hall University. Before joining NJDOE, my career included serving as school administrator at various levels in the New Jersey public schools.

2.  I submit this Declaration in support of the State of New Jersey's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge and through NJDOE personnel who have assisted me in gathering this information. I have also familiarized myself with the Rule in order to understand its immediate impact on NJDOE and elementary and secondary schools in New Jersey.

### The New Jersey Department of Education and the State Educational System

3.  NJDOE oversees primary and secondary education in New Jersey. Our mission is to ensure that New Jersey's 1.4 million students have equitable access to high quality education and achieve academic excellence. The Division of Field Services provides support to district and school leaders and teachers to assist in implementing applicable State and federal standards and to promote effective use of resources in pursuit of high levels of student achievement. The Division of Field Services includes the following offices: Field Services Coordination; Fiscal Accountability & Compliance; Comprehensive Support; Professional Learning Network; and District Intervention & Support.

4.  The New Jersey Constitution requires the State government to maintain and support "a thorough and efficient system of free public schools" for residents aged 5 through 18. *N.J.*

Decl. of AbdulSaleem Hasan                                                    Case No. 20-cv-01468-CJN
EXHIBIT 59

*Const. art. VIII, § IV, para. 1.* Each school district receives State funding in accordance with the School Funding Reform Act of 2008, N.J. Stat. Ann. §§ 18A:7F-43 to -70.

5.  State statutes also require the Governor to appoint, upon the recommendation of the NJDOE Commissioner and with the advice and consent of the State Senate, full-time executive county superintendents of schools. N.J. Stat. Ann. §. § 18A:7-1; N.J. Stat. Ann. §. § 18A:7-5. Among other things, the county superintendents, who are State employees, review and subsequently approve or disapprove school budgets prepared by local school districts. N.J. Stat. Ann. §. § 18A:7-8.

6.  For the 2018-2019 school year, there were 584 operating school districts in New Jersey; there were 2,516 schools, including charter schools.

7.  NJDOE received $923,564,548 in federal educational funding from the Department and $1,604,148.00 from other federal agencies in 2018-2019 related to K-12 education. Some of this funding is retained by NJDOE, and some is passed through to schools and other entities. As a result, NJDOE is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

8.  The number of school district staff addressing sexual harassment varies among districts. Some school districts have only one Title IX Coordinator, and others have multiple Title IX Officers. In some cases, the Title IX Coordinator also has other duties, for example, serving as the Harassment, Intimidation and Bullying ("HIB") Coordinator and/or the Affirmative Action Officer.

## Schools' Obligations Under State Law Regarding
## Sex Discrimination and Sexual Harassment

9.  New Jersey statutes prohibit discrimination against any public school student "in admission to, or in obtaining any advantages, privileges or courses of study of the school by reason of race, color, creed, sex or national origin." N.J. Stat. Ann. § 18A:36-20.

10. Sexual harassment of students in elementary and secondary schools is included in the conduct addressed by New Jersey statutes prohibiting "Harassment, Intimidation or Bullying" ("HIB"). N.J. Stat. Ann. §§18A:37-13 to −32 (prohibiting, among other things, harassment based on gender, gender identity and sexual orientation.).  The NJDOE has promulgated regulations to implement the HIB statutes, N.J. Admin. Code §§ 6A:16-1.3, 6A:16–7.7 - 7.8, and these regulations can be revised only after public notice and comment in accordance with New Jersey's Administrative Procedure Act and regulations.  *See* N.J. Stat. Ann. §§ 52:14B-1 to -31; N.J. Admin. Code §§1:30 − 1.1 to - 6.7.

11. Each school district is required by statute to adopt its own policy prohibiting HIB, and the HIB statute and regulations mandate minimum standards for those policies. N.J. Stat. Ann. §18A:37-15. Each school district board of education must reassess annually its HIB policy, prevention programs, reports of the school safety/climate teams and related training needs. N.J. Admin. Code §6A:16-7.7(e).

12. Each school district's policy must include a definition of harassment, intimidation or bullying that is "no less inclusive than" the definitions provided in the HIB statutes and regulations. N.J. Stat. Ann. §18A:37-15(b); N.J. Admin. Code §6A:16-7.7(a)(2)(ii).

13. In part, the statutory definition includes "a single incident or a series of incidents . . . that . . . creates a hostile educational environment for the student by interfering with a student's

education or by severely or pervasively causing physical or emotional harm." N.J. Stat. Ann. §18A:37-14.

14. Whenever any school employee, school board member, contracted service provider, volunteer or student witnesses or has reliable information about an incident of HIB, they must report it to a school administrator or safe schools resource officer, who is required to immediately initiate the district's HIB procedures.  N.J. Stat. Ann. §18A:37-16.  A school administrator who receives a report from an employee and fails to initiate or conduct an investigation, or who should have known of an incident and fails to take sufficient action to minimize or eliminate the harassment, may be subject to disciplinary action. *Id.*

15. The New Jersey Law Against Discrimination ("LAD"), N.J. Stat. Ann. §§10:5-1 to-49, prohibits schools, except those operated by religious institutions, from discriminating against students based on sex. N.J. Stat. Ann. § 10:5-4; N.J. Stat. Ann. § 10:5-12(f). This includes prohibiting sexual harassment "that a reasonable student of the same age, maturity level, and [sex] would consider sufficiently severe or pervasive enough to create an intimidating, hostile or offensive school environment[.]"*L.W. ex rel. L.G. v. Toms River Regional Schools Bd. of Education*, 189 N.J. 381,402-403(2007). Schools are required to take action to prevent sexual harassment and must promptly address it if they knew or should have known about it. *Id.* at 407.

16. In addition to their statutorily mandated HIB policies, many school districts have adopted separate policies explicitly prohibiting sexual harassment that violates the LAD. These sexual harassment policies typically define sexual harassment consistent with prior Title IX guidance. My review of just a few of these policies shows that they define hostile environment sexual harassment to include conduct that is "sufficiently severe, persistent, *or* pervasive to

*limit* a student's ability to participate in or benefit from an educational program or activity, *or* to create a hostile or abusive educational environment." (emphasis added). *See, e.g.*, Collingswood Board of Education Sexual Harassment Policy (adopted Sept. 26, 2005), https://www.collingswood.k12.nj.us/ourpages/auto/2009/3/20/36430103/5751%20%20M_%20SEXUAL%20HARASSMENT.pdf; Lawrence Township Board of Education Sexual Harassment Policy (adopted Apr. 12, 2000, revised October 19, 2016), https://drive.google.com/drive/folders/0B7PaFlJzvz2gcnRmSE1DQ1E1SDQ; Haddonfield Board of Education Sexual Harassment Policy (revised Jan., 24, 2019, approved Feb. 28, 2019), https://boe.haddonfieldschools.org/wp-content/uploads/2019/04/Policy-5751-Sexual-Harassment-M.pdf.

17. Managing for Equity regulations require each district to develop a Comprehensive Equity Plan every three years.  N.J. Admin. Code §§ 6A:7 – 1.1 to -1.10.  NJDOE's Forms and Instructions for these plans specify that district boards of education must have a policy to "Prohibit or eliminate all forms of harassment, including sexual harassment, intimidation and bullying." https://www.nj.gov/education/equity/cep/2019-2022CEPPacket.pdf.  NJDOE is responsible for reviewing and approving the Comprehensive Equity Plans for each district.

18. Through the New Jersey Quality Single Accountability Continuum ("NJQSAC"), which is the state's accountability system for school districts, NJDOE reviews each school district's policy for Code of Student Conduct to ensure that all regulatory requirements are included. The NJQSAC also requires school districts to submit to NJDOE a statement of assurance, which in part addresses school climate, HIB prevention, and education of the community on HIB. N.J. Admin. Code § 6A:30, Appendix A.

19. Through New Jersey's School Safety Data System, school districts are required to report to NJDOE each alleged or confirmed incident of HIB based on gender/gender identity or sexual orientation, and must separately report each incident of sexual contact or sexual assault.

20. For the 2017-2018 school year, school districts reported 34 incidents of sexual assault and 326 incidents of sexual contact.  School districts investigated 1476 gender-based reports of HIB, and their investigations confirmed 1106, or about 75%, of those reports. Districts investigated 1268 reports of HIB based on sexual orientation, and their investigations confirmed 897, or 71% of those reports. Females were the target of approximately 75% of the gender-based HIB, but they were only 48.62% of the student population.

21. To assist school districts in complying with the HIB statute and regulations, the Law Against Discrimination, and the Comprehensive Equity Plan, the New Jersey Department of Education issues guidance and training materials.

**Compliance with Federal and State Standards for Addressing Sexual Harassment**

22. Under prior Title IX rules and guidance, because the federal standards and procedures were sufficiently similar to New Jersey statutes, regulations and court precedent, school districts' compliance with New Jersey standards and procedures would also satisfy their obligations under Title IX.  For that reason, school districts have typically followed New Jersey HIB procedures in addressing reports of sexual harassment.

**The Impact of the Final Title IX Rule**

23. Under the Final Title IX Rule, New Jersey school districts will be subject to different obligations under federal and State law.

24. For example, the Final Rule will require school districts to dismiss Title IX complaints alleging sexual misconduct that is not sufficiently "severe, pervasive and objectively offensive

that it effectively denies" the complainant equal access to the school's education program or activity. In contrast, as discussed above, New Jersey's statutes and regulations require schools to investigate and take remedial action in response to a broader range of alleged sexual misconduct, i.e., whenever sexual harassment is severe *or* pervasive or *interferes with* a student's education.

25. The Final Rule will require school districts to dismiss Title IX complaints if the alleged sexual misconduct did not occur in the district's education program or activity or did not occur in the United States. Although the Final Rule extends to "locations, events or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs," 34 C.F.R. 106.44(a), New Jersey law is broader. New Jersey HIB statutes and regulations require school districts to address allegations of sexual harassment regardless of where it occurs, if a school employee is aware of the conduct or a school administrator should have known of it, and when addressing it is reasonably necessary for reasons related to the rights, safety, security or well-being of students, or it substantially disrupts or interferes with the orderly operation of the school.  New Jersey law also requires school districts to respond to sexual harassment communicated electronically. N.J.S.A 18A:37-15.3; N.J.A.C. 6A:16-7.7(a)(2)(xix); N.J.A.C. 6A:16-7.5.

26. Because current school district standards for addressing HIB and sexual harassment under the LAD must comply with State statutes and State court precedents, school districts may be unable to amend their HIB or sexual harassment policies to conform to any narrower standards required by the Final Rule. Instead, they will need to adopt separate and distinct Title IX policies, while also retaining and complying with standards required by State law.

27. Requiring school districts to adopt separate policies and procedures to implement the Final Rule will be extremely time-consuming and financially burdensome.  School districts will need to devote extensive staff and attorney time to drafting and providing training on new Title IX standards and procedures. This will include determining which aspects of their current policies and procedures can continue to apply to both Title IX proceedings and State law proceedings, and which will require separate parallel proceedings.

28. State requirements designed to promote uniform, transparent practices for adopting new or revised policies make it unfeasible for school districts to do an effective job of devising and adopting policies and procedures required by the Final Rule by the August 14, 2020 effective date. For example, after school district staff or consultants draft new or revised policies, they must be considered and adopted by school district boards of education. These school boards must conduct all business at public meetings, which must be scheduled with public notice in accordance with New Jersey's Open Public Meetings Act, N.J. Stat. Ann. §§ 10:4-6 to -21. And if any school district HIB policies can be modified while still conforming with State HIB law and regulations, the HIB statute requires school district boards of education to use "a process that includes representation of parents or guardians, school employees, volunteers, students, administrators, and community representatives."  N.J. Stat. Ann. § § 18A:37-15(a). It would be very difficult for school districts to do this in an effective manner in three months, and even more difficult to do so during the summer break.

29. After drafting and adopting new policies to implement the new Title IX standards and procedures, school districts will need to disseminate them to employees, students, parents and the community, and will need to revise their websites to incorporate the new standards and procedures.

30. Some school districts are likely to need additional staff to serve as decision-makers, to comply with the Final Rule's requirement that the same person may not serve as Title IX Coordinator or investigator and decision-maker in a case.  Hiring additional staff will impose unanticipated costs, and based on my experience as a public school administrator and my current position, I believe that creating and filling new positions by the August 14 effective date will be extremely difficult in light of State standards and procedures for State review and approval of local school district budgets.

31. Because the Final Rule deems a school to have actual knowledge of allegations of sexual harassment when any elementary or secondary school employee has notice of the allegations, school districts will need to train all employees on what constitutes sexual harassment as defined in the Final Rule, their responsibility to report it, and the procedures for reporting. The Final Rule mandates that Title IX Coordinators, investigators, decision-makers and anyone who facilitates informal resolution processes receive comprehensive training on specific aspects of the recipient's Title IX procedures and standards. It is not feasible for school districts to do an effective job of preparing training materials based on completely new standards and procedures and then effectively train all of their employees before the August 14, 2020 effective date.

32. NJDOE will be faced with providing guidance to school districts regarding the new Title IX standards, and also guiding school districts in navigating the differing standards imposed by federal and State law.

33. The burdens to schools and students under the new Rule will continue after adopting and disseminating the new Title IX procedures.  Because New Jersey statutes and regulations require school districts to respond to a wider range of notice and sexually harassing conduct,

Decl. of AbdulSaleem Hasan                                                     Case No. 20-cv-01468-CJN
EXHIBIT 59

schools will also be required to carry out, and involve students in, separate procedures to comply with state law.  School districts will need to develop procedures for navigating a new, two-tiered or parallel investigation and remedial process. This will, at best, be time-consuming for staff, and will send confusing mixed-messages to students and the community.

34. For example, under the new Rule, after receiving a written complaint, a school district must first determine whether the allegations, if proven, were sufficiently "severe, pervasive and objectively offensive" that the victim has been effectively denied equal access to the school's educational programs or activities.  If not, the district must dismiss the Title IX complaint, and notify the complainant and respondent of that decision. To comply with State law, the district must then continue the investigation to determine whether the sexual harassment *interfered with* the victim's education or severely *or* pervasively caused emotional or physical harm. If it meets that standard, the school district must conclude that the sexual misconduct constituted an act of HIB based on gender, and must take remedial action as required by the HIB statutes and regulations.

35. If the allegations of the complaint are unclear, determining whether the Rule requires dismissal of a complaint under Title IX may not be an easy task. If schools make the wrong call and proceed when they should have dismissed the complaint, they risk losing federal funding.

36. Failure to address sexual misconduct that does not meet the Final Rule's newly narrowed definition of sexual harassment would leave serious sexual misconduct unaddressed. This would interfere with students' education and foster a sexually hostile educational environment.

37.  Devising, implementing and carrying out separate procedures to address Title IX violations and violations of New Jersey law will require a significant amount of additional time and costs for school district staff and attorneys.

**Harm to Schools and DOE due to COVID-19 Pandemic**

38. The costs and burdens to school districts and to NJDOE of implementing the new Rule at this time are exponentially increased due to the COVID-19 pandemic.

39. The COVID-19 pandemic has disproportionately impacted New Jersey. As of June 19, 2020, New Jersey has the 2nd highest number of positive cases in the nation, with over 167,000 people having tested positive, and over 12,000 of these resulting in death. Positive cases and deaths have occurred in every county in New Jersey.

40. Governor Murphy banned in-person instruction, effective March 18, 2020,  at all public, private, charter, renaissance and parochial elementary and secondary schools, and directed NJDOE to work with each public school district, as well as private and parochial schools as appropriate, to ensure that students are able to continue their educations through appropriate home instruction.

41. On May 4, 2020, Governor Murphy announced that for the remainder of the school year, school buildings will remain closed and remote learning will continue.

42. For the past several months, NJDOE's staff have devoted a majority of their time to addressing issues impacting schools due to COVID-19, and the pandemic continues to demand an overwhelming amount of staff time. This includes devising and implementing safe and effective ways to implement remote learning, address special education needs, provide food services for students eligible for free and reduced-cost meals, provide specialized day care for youth with physical, intellectual or developmental disabilities, complete the spring semester,

Page 12 of 14

evaluate the possibility of carrying out modified summer educational and extracurricular activities, and planning for the upcoming school year with the uncertainty of how long remote learning will continue and how to implement modifications and reduced capacity once some in-person learning resumes.

43. NJDOE has also compiled resources for the use of educators, parents and students in implementing remote instruction, and has collaborated with educational and media partners to create new online instructional programs for use during the ongoing remote learning period, and is continuing to update and expand these. NJDOE has issued guidance to school districts and local school boards to guide them in meeting legal requirements for remote meeting formats, confidentiality, public notice and comment for board meetings, and continuity of business operations, and is continuing to update and expand these.

44. In addition, NJDOE has compiled resources to assist parents and schools in supporting the emotional well-being of children and youth during the COVID-19 pandemic, including referrals to address illness and death, and is continuing to update and expand these.

45. On May 18, 2020, Governor Murphy announced a multi-staged plan for moving out of the shut-down. The first stage continues remote learning in K-12 schools, the second stage provides the potential for some in-person learning with modifications, and the third stage provides for in-person operations with reduced capacity. In accordance with an executive order issued by the Governor and re-opening protocols from the New Jersey State Interstate Athletic Association ("NJSIAA"), it is anticipated that high school sports under the jurisdiction of the NJSIAA may resume as early as July 13, 2020. NJDOE and school districts will need to devote a large amount of time to planning and carrying out each stage of academic and athletic re-opening.

46. The need to devote the majority of staff resources to addressing COVID-19 pandemic has prevented NJDOE from devoting the time needed to guide and assist school districts in properly implementing a rule change of this magnitude.

47. In responding to the pandemic, school district staff and school district boards of education have been faced with overwhelming burdens just to continue educating students. As a result, they have not been able to devote sufficient time to implementing the Rule in the most effective manner.

48. In ordinary circumstances, based on the procedural requirements for adopting new or revised policies, as well as the complexity and sensitivity of the substantive issues raised by the new Rule, most school districts would be unable to do an effective job of implementing the changes within three months. The current pandemic imposes additional burdens on school districts that will extend the time needed for effective implementation far beyond the August 14, 2020 deadline.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this **19** day of June 2020

AbdulSaleem Hasan
Assistant Commissioner
New Jersey Department of Education

Page 14 of 14

Decl. of AbdulSaleem Hasan

Case No. 20-cv-01468-CJN

EXHIBIT 59

# EXHIBIT 60

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | **Civil Action No. 20-cv-01468-CJN** |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF VALERIE O. HAYES

I, Valerie O. Hayes, J.D., M.S.W., D.Ed., pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Chief Officer for Institutional Diversity and Equity/Title IX Coordinator at Stockton University (the "University" or "Stockton")." My educational background includes the following degrees: B.A., J.D., M.S.W., D.Ed. I have been employed at the University as Chief Officer for Institutional Diversity and Equity/Title IX Coordinator since December 2014.

2.      I submit this Declaration in support of the State of New Jersey's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States

Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through University personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on the University.

### Background about the University

3.      Stockton University is a public university. The University's main campus in Galloway is located on over 1,600 acres in the Pinelands National Reserve. The University also has locations in Atlantic City, Hammonton, Woodbine, and Manahawkin. The University commenced its first academic year in 1971 and remains the only comprehensive college or university in southeastern New Jersey.

4.      The University's undergraduate degree programs are administered through its schools: Arts and Humanities, General Studies, Natural Sciences and Mathematics, Business, Education, Health Sciences, and Social and Behavioral Sciences. The University also offers a variety of Master's degrees areas, such as American Studies, Business Administration, Criminal Justice, Holocaust and Genocide Studies, Instructional Technology, Nursing, Occupational Therapy, Education, Social Work, Communications Disorders, Data Science and Strategic Analytics, Professional Science Masters, as well as the Doctor of Nursing Practice, the Education Doctorate in Organizational Leadership, and the Doctor of Physical Therapy.

Decl. of Valerie O. Hayes                                                    Case No. 20-cv-01468
EXHIBIT 60

5.      In the Fall of 2019, the University's undergraduate student body was 8,893 and its graduate student body was 1,041, for a total of 9,934. During Fall 2019, thirty-four percent of students lived in University-provided housing and sixty-six percent commuted.

6.      In the Fall of 2019, Stockton employed 1,600 staff, inclusive of approximately 700 full- and part-time faculty. The University has collective bargaining agreements with six employee unions.

7.      The University is governed by its Board of Trustees, which currently consists of twelve members. Pursuant to the New Jersey Higher Education Restructuring Act of 1994 (N.J.S.A. 18A:64-6), the Board has general supervision and oversight of the University.

8.      The University is supported in part by appropriations from the State of New Jersey. The State appropriated $24,348,000 to the University for FY20. In response to the COVID-19 pandemic, that appropriation was retroactively reduced by $12,942,000.

9.      For FY20, the University received federal funds from the Department of approximately $80 million in student financial aid, and approximately $5.5 million in other federal assistance, e.g., grants. As a result, the University is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX Regulations, 34 C.F.R. pt. 106.

### Preventing and Addressing Sexual Harassment

10.     The Office of Institutional Diversity and Equity (also referred to as the "Title IX Office") investigates allegations of sexual misconduct as well as other forms of prohibited discrimination and harassment, coordinates the compliance with the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act and the State's Ethics Commission rules, and provides training and education to the campus community related to each subject. I lead that office

as the Chief Officer for Institutional Diversity and Equity, and I serve as the Title IX Coordinator. My staff is comprised of an Investigator and an administrative support person. I oversee and collaborate with others on Title IX implementation, while the Investigator serves as the lead investigator in Title IX and other discrimination and EEO cases, working in partnership with staff co-investigator who has been trained on Title IX investigations and related issues.

11.    In addition to their other duties, the Director of Care & Community Standards serves as Deputy Title IX Coordinator for Students, and the Associate Director of Intercollegiate Sports serves as Deputy Title IX Coordinator for Gender Equity in Athletics. The Deputy Coordinators assist my office in ensuring that the University addresses its Title IX responsibilities. Stockton's Title IX Practitioners Group provides additional support to my office; in addition to the Deputy Coordinators and myself, it includes the Director of Public Safety, the Director for Residential Life, the Clery Compliance Coordinator, and the Director of the Women's, Gender and Sexuality Center among others.

12.    Reports and complaints of sexual misconduct at the University are directed to the Title IX Coordinator, who then determines if the report falls under the scope of any University policy or procedure which prohibit sexual misconduct, including sexual harassment. If it does, the Title IX Coordinator initiates an investigation at the complainant's request or where a pattern involving the same potential respondent exists, assigns investigator(s), and thereafter oversees the investigation.

13.    To date, there have been 246 reports of sexual misconduct received in the last five years.  The reporting categories used in those reports were sexual harassment, rape, sexual battery, sexual coercion, potential TIX-VAWA related intimate partner violence (dating and domestic violence) and stalking.  Of those reports, approximately 210 cases did not move beyond the report

stage due to jurisdictional issues (e.g., the complainant did not want to proceed, the respondent was not a University student or employee, the complainant or respondent was unknown and unidentifiable). Of the remaining reports, twenty-eight student-v-student cases resulted in administrative Title IX investigations leading to conduct hearings, and two student-v-student cases were voluntarily mediated under the Department's 2017 Interim Guidance on Sexual Misconduct. Of the twenty-eight cases, sixteen occurred in University-owned or -controlled residential areas, one occurred in a non-residential campus building, and eleven occurred in off-campus locations that were not owned or controlled by the University.

**Summary of Existing Title IX Sexual Misconduct Policies and Procedures**

14.     The University has adopted the following policies which prohibit sexual misconduct, including sexual harassment, by students, faculty and staff: Student Policy Prohibiting Sexual Misconduct and Discrimination in the Academic/Educational Environment ("Policy I-120" or "Student Policy"); Policy Prohibiting Discrimination in the Workplace ("Policy VI-28" or "Workplace Policy"), and the Campus Conduct Code (Policy I-55). The corresponding procedures establish grievance processes to address complaints of sexual misconduct and other complaints of discrimination.

15.     The Student Policy defines sexual harassment, in part, as severe, pervasive or persistent conduct of a sexual nature that has the purpose or effect of unreasonably interfering with academic/work performance or creating an intimidating, hostile or offensive academic/work environment. The Student Policy includes a section that explicitly addresses Title IX.

16.     The Workplace Policy defines sexual harassment in the same way that the U.S. Equal Employment Opportunity Commission defines sexual harassment: unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when,

for example: submissions to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; submissions to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

17.     The University has also adopted the Stockton University Resource Guide on Title IX: Sex Discrimination and Sexual Misconduct, which provides collective information about Title IX, the Workplace Policy, the Student Policy, the Clery Act, the Violence Against Women Act, the New Jersey Campus Sexual Assault Victim's Bill of Rights, and the New Jersey Law Against Discrimination. This Resource Guide provides, in part: "When sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school' programs or activities, a hostile environment exists and the school must respond."

## Current Procedures

18.     Reports of sexual misconduct, including sexual harassment, are given to the Title IX Coordinator for review and potential investigation. Any person may make a report or file a complaint. Sexual misconduct complaints are reviewed and assigned for formal investigation if the respondent is/was a current student or employee over whom the University has control when the alleged incident occurred. Student complainants are permitted to have an advocate with them throughout the process.  Student respondents are permitted to have an advisor with them through the process.

19.     Under the University's current procedures, a complaint is a detailed written statement alleging conduct in violation of the University's policies prohibiting discrimination, signed and dated by the Complainant. A report is a written account or verbal statement of an

incident that contains at a minimum, if known, the identity of or a description of who was involved, when and where the incident happened, and a description of what occurred. An investigation is an internal fact-finding conducted into the allegations that involves statements from the parties and witnesses, along with evidence provided by parties and witnesses and independently gathered by the investigator.

20.     Currently, during the fact-finding investigation, parties are strongly encouraged to maintain confidentiality to protect the privacy interest of individuals involved in the investigation. Parties and witnesses sign an acknowledgment that they understand confidentiality and the prohibition against retaliation. Parties may consult their advisors or advocates at any time during the process.

21.     Except for certain employees who are designated to receive privileged or confidential communications, all University employees are designated as "responsible employees," who must report sexual misconduct to the Title IX Office or the campus police.

**Procedures for Students**

22.     The investigator prepares a report summarizing interviews with complainants, respondents, and witnesses, along with evidence gathered.

23.     The Care & Community Standards Office conducts all student hearings and oversees the voluntary mediation process. Generally, a student Campus Hearing Board ("CHB") proceeding consists of a live hearing presided over by either an outside adjudicator/hearing officer or a hearing panel consisting of 3-5 trained faculty and staff members. In 2017, the University began retaining outside adjudicators, who are retired judges and attorneys, to serve as hearing officers for all sexual misconduct cases. The costs for these services vary based on the number and complexity of cases, but our cumulative costs have ranged from $25,000 to $60,000 per year. Due to reductions in

funding and other fiscal constraints resulting in part from the COVID-19 pandemic, it is unclear whether the University will be able to continue to hire outside adjudicators for this purpose, and will instead revert to a hearing panel of faculty/staff, who are not attorneys.

24.     The CHB process begins with a notice of charges to the respondent and an invitation to attend a Pre-Hearing Interview meeting. The Pre-Hearing Interview meeting reviews the hearing process, the student's rights, the charges and potential sanctions, answers any questions, and allows the respondent to enter a plea to the charges. The respondent has three plea options: "no plea," "not responsible" or "responsible." Following the Pre-Hearing Interview, all materials that were collected through the administrative investigation are made available to the complainant and respondent. All parties and witnesses are given three options of participation in the CHB process. First, full participation, which would mean attending the hearing, presenting information, answering questions, etc. Second, partial participation which means that the individual does not wish to be present at the hearing, will not be available to answer questions, but does allow any information provided during the investigation to be presented at the hearing. Third, no participation and no permission to use information gathered through the investigation. If the reporting party chooses partial participation, then a representative from the University serves as the complainant to present the case. Accommodations are made for any party or witness who does not wish to be physically present at the CHB. Video conferencing has been used in these cases.

25.     Complainants and respondents are permitted one advisor and one support person (e.g., an attorney, counselor, parent or roommate) throughout the CHB process. If a student does not have an advisor for the hearing, one is provided by the University, typically a staff member. Advisors and support persons are not permitted to actively participate in the hearing.

26.     Cross-examination is permitted only by having questions submitted to the hearing moderator or hearing officer for presentation. The moderator or hearing officer may limit questions that are irrelevant, excessive, or duplicative.

27.     A respondent may choose not to appear at the hearing, and if a respondent who does not appear at the hearing chooses to submit written evidence, it will be read into the record and will be considered in reaching a decision. No negative inference may be derived from the failure to participate in the hearing.

28.     The CHB will continue with proceedings, hearings and decisions regardless of whether the complainant and respondent are enrolled in the University.

29.     The hearing panel or adjudicator must issue a written decision and assign sanctions, if appropriate, within seven business days of the hearing.

### Procedures for Employees

30.     For employees, State regulations applicable to all State employees prescribe how the University must respond to reports of discrimination, including sexual harassment/sexual misconduct. N.J.A.C. 4A:7-3.1 et seq. (State Policy) and N.J.A.C. 4A:7-3.2 (Model Procedures). The investigation is conducted by a single investigator, who prepares an investigative report summarizing interviews with complainants, respondents, and witnesses, along with evidence gathered, credibility findings and conclusions. The State regulations require "prompt, thorough and impartial" investigations that, to the extent possible, respect confidentiality and the privacy interests of all persons involved and prohibit retaliation.

31.     After the investigation is completed, an investigatory report is prepared by the investigator who is either the Chief Officer for Institutional Diversity and Equity or designee. The investigatory report is submitted to the University President or designee for review and a

determination as to whether the allegation of a violation of the University's Policy Prohibiting Discrimination in the Workplace has been substantiated. If a violation has occurred, the University President/designee will determine the appropriate corrective measures necessary to immediately remedy the violation. The University President/designee issues a final letter of determination to the parties outlining the results of the investigation, and appeal rights.

### The Need to Implement Parallel Procedures

32.     The University currently addresses all sexual misconduct, including sexual harassment, sexual assault, and VAWA offenses using the same policies and fair, effective procedures for alleged violations of Title IX and State law/University Policy/Conduct Code.

33.     The final Title IX Rule establishes a number of new definitions, limits and procedural mandates that differ significantly from prior Title IX guidance and from current State/University standards. For example, the definitions of sexual harassment in the Student Policy and the Workplace Policy are consistent with the Department's 2001 Title IX Revised Sexual Harassment Guidance definition and the U.S. Equal Employment Opportunity Commission definition; however, these definitions are broader than the definition in the Rule. State/University standards permit any person to file a complaint, while the Rule permits schools to accept complaints only from individuals who are participating in or attempting to participate in the University's programs or activities when the complaint is filed. State/University standards also include a broader range of off-campus conduct (i.e., incidents that do not meet the Rule's definition of "within a program or activity"), and some conduct that takes place outside the United States.

34.     As a result, the University will need to use separate, parallel proceedings to address sexual misconduct claims and VAWA offenses that fall outside the newly narrowed scope of Title IX.  The University plans to respond to this "non-Title IX sexual harassment," using the existing

procedures for violations of the Campus Code of Conduct and the Student Policy Prohibiting Sexual Misconduct and Discrimination in the Academic/Educational Environment and its corresponding Procedure, and the Policy Prohibiting Discrimination in the Workplace, where appropriate.  The University decided to use existing procedures for "non-Title IX sexual harassment" because the scope of prohibited conduct under Title IX remains unclear despite the Department's narrower definition.   Furthermore, our existing procedures were developed and fine-tuned over the years with input from a range of stakeholders, and our experience demonstrates that those procedures are well-suited to sexual harassment proceedings, such as requiring that all cross-examination questions be asked by a neutral decision-maker, rather than the parties or their advisors.

35.     The University will also need to establish completely new Title IX procedures that comply with the Rule for reports and complaints that meet the new Title IX definitions and standards.

36.     My office will now have the additional task of determining, for every report or complaint, which of the parallel procedures must be followed. And if a complaint must be dismissed under the Rule because, for example, it becomes clear that the allegations would not meet the newly narrowed definition of sexual harassment, my office will then need to determine whether to proceed or continue under State or University policy. In some cases, students or employees charged with the same conduct and facing the same potential remedies or sanctions will have a different investigation and hearing process based on where the incident took place or the enrollment status of the complainant.

37.     Based on my training and experience, I anticipate that the new investigation and hearing procedures will require more time from staff and outside adjudicators, if we can afford to retain them. The tasks at hand warrant hiring additional staff, however, the University is currently

under a mandatory hiring freeze, and even if it were lifted, revenue cuts due to the pandemic make creating and filling new positions unfeasible.

38.    If the University did not maintain a parallel process in addition to the Title IX process mandated by the new Rule, serious conduct that interferes with students' education, campus life, and overall university experience would go unaddressed, allowing a hostile learning environment for students and a hostile working environment for employees to develop. This is inconsistent with Stockton's goal to provide equity for and inclusion of all students and employees.

**Training and Dissemination**

39.    In addition to maintaining these parallel processes, the University will have to expend significant time and resources on creating and administering training on the new Title IX policies and the precise procedures mandated by the Rule, as well as when and how to use the non-Title IX procedures.

40.    The University must train many individuals on the new requirements, including but not limited to: investigators, Title IX staff, all hearing officers/adjudicators, Care & Community Standards Office staff, Human Resources staff, employee Campus Hearing Board panelists, and advisors. This effort will require adequate time, practice, repetition, and enlisting the help of external consultants for training non-attorney advisors and hearing panelists.

41.    For just one example, unless attorneys or former judges can be used as hearing officers for all cases, Campus Hearing Board members will need to be trained on how to determine relevance of questions and how to control hearings with advisors conducting cross-examination of parties and witnesses.

Decl. of Valerie O. Hayes                                        Case No. 20-cv-01468

EXHIBIT 60

42.     The University will have to decide whether to train its faculty and staff serving as advisors on how to conduct cross-examinations or whether to instead hire outside counsel to act as advisors. Either choice will require a significant expenditure of resources.

43.     The Office of Institutional Diversity and Equity sends email and posts informational notices to students and employees each fall and spring semester regarding Title IX; these will need to be revised to reflect the new standards and procedures imposed by the Rule and reissued and posted.

### Revising Existing Sexual Misconduct Policies

44.     The following policies, procedures, and documents will need revision: Student Policy Prohibiting Sexual Misconduct and Discrimination in the Academic /Educational Environment, which is based on broader standards in State Regulations, Campus Conduct Code, Campus Hearing Board Procedure for Students, Employee Campus Hearing Board, Student Procedure Prohibiting Sexual Misconduct and Discrimination in the Academic / Educational Environment, Victim Resource Guide, Respondent Resource Guide, Guide to Residential Life, Title IX Resource Guide, all training materials, and other documents relating to Title IX. Because the Policy Prohibiting Discrimination in the Workplace is based on broader standards in State Regulations, it cannot be revised to incorporate the new Title IX standards, but it may be revised to reference the new Title IX standards and parallel procedures.

45.     Policies and procedures require multiple stages of review, often starting at the ground level requiring the formation of a committee or working group who then submit revisions on to the next level of reviewers. Revisions work up the chain of command and are reviewed by several levels before reaching the final approvers. Stockton's shared governance processes require consultation with labor relations personnel for administrative policy or procedure changes or that

Decl. of Valerie O. Hayes                                          Case No. 20-cv-01468

EXHIBIT 60

impact the terms and conditions of employment for faculty and staff in collective bargaining units. In addition, consultations are required, as appropriate, with Faculty Senate, Student Senate, impacted stakeholders, etc., before being presented to the final approvers.

46.     Policies ultimately require the Board of Trustees' approval – which involves a first reading and a second reading, over several months, before final approval. The Board of Trustees only meets five times per year. Procedures ultimately require the University President's approval.

47.     The Department suggests that because the effective date is during the "summer break," it will be easier for schools to revise their Title IX policies and procedures. 85 Fed. Reg. at 30,535. In fact, the opposite is true. The August 14, 2020 effective date makes it more difficult to do an efficient and effective job of revising policies and procedures, because many stakeholders are on ten-month contracts and not available during the summer months to participate in the revision process. In addition, the University observes a four-day work week during the summer months, which further limits the pool of individuals available to work on implementation by the compliance deadline.

48.     The University began the process of reviewing and revising its policies and procedures in response to the Department's 2017 guidance that relied upon the Department's January 2001 Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students or Third Parties. The University continued the process and modified its approach in response to the publication of the Department's proposed Rule in 2018, which proposed changes that differed from the Department's 2017 guidance, including a new definition of sexual harassment and more restrictions on addressing off-campus conduct. The proposed Rule in 2018 also imposed a completely new complaint, investigation, grievance and appeal process. The final Rule published in May 2020 made more changes to the definition of sexual harassment and the situations in which

off-campus conduct can be addressed, and further changes to the proposed complaint, investigation, grievance and appeals process.

49.     Despite our attempts to get a head-start on revising the Title IX procedures, the amount of work needed to complete the process is still overwhelming. And because the Department's requirements for key definitions and procedures changed from the 2017 guidance to the 2018 proposed Rule, and changed again in the final 2020 Rule, some of our work-in-progress had to be completely re-vamped. This resulted in additional expenditures of time and money. Although the Department states that schools "have been on notice for more than two years that a regulation of this nature has been forthcoming," 85 Fed. Reg. at 30,535, our experience shows that, despite our diligence, it is unrealistic for the Department to expect schools to do an effective job of implementing the 2020 Rule by the August 14, 2020 effective date.

50.     To date, the University has spent in excess of $25,000 on consultants associated with revising policies to comport with recent and upcoming changes in the Title IX standards, and we anticipate that there will be significant additional consultant costs to fully implement the new substantive and procedural requirements. In addition to the consultant work, my staff has spent more than 100 hours so far in research and other tasks, and will spend many more hours on reviewing current Title IX policies, devising and implementing revisions to comport with the new Rule, and training staff and the campus community.

51.     Collective bargaining agreements may limit any changes in procedures needed to comply with the 2020 Rule.  In the preamble, the Department acknowledges that some collective bargaining agreements may need to be renegotiated, 85 Fed. Reg. at 30,444, but the August 14 effective date would not generally allow sufficient time to complete such negotiations.

**Harms to the Campus Community Compounded by COVID-19**

Decl. of Valerie O. Hayes                                                    Case No. 20-cv-01468

EXHIBIT 60

52.     The COVID-19 pandemic has disproportionately impacted New Jersey. As of June 15, 2020, New Jersey has the 2nd highest number of positive cases in the nation, with over 167,000 people having tested positive, and over 12,000 of these resulting in death.

53.     The University is currently dealing with the challenges of remote learning and planning for the next academic year in the midst of the uncertainty created by the ongoing pandemic. Like all public universities in the State, Stockton ceased all in-person education in March in response to the pandemic and Governor Murphy's orders. Staff spent an overwhelming amount of time devising and implementing remote learning procedures, with the majority of faculty and staff also working remotely.

54.     The Title IX staff quickly mobilized to devise, implement and disseminate temporary remote procedures for addressing sexual harassment reports and complaints, while addressing health and safety and concerns for all involved, and privacy concerns for parties and witnesses.

55.     The remote procedures have resulted in challenges to staff conducting Title IX investigations and the hearing process. For example, staff has spent the bulk of their time and effort modifying procedures to assist parties in dealing with technology and privacy issues, disseminating information about how to file complaints during remote operations, as well as moving forward with investigations or hearings that were pending at the time remote operations were implemented. Individuals have reported challenges with technology, internet connectivity, and finding a private place to participate in the investigations. Conducting interviews when individuals cannot be physically with their support person or advisor has caused additional stress to the parties. And conducting interviews, meetings and hearings by telephone or videoconference raises confidentiality concerns. University personnel are working with participants to remedy these

Decl. of Valerie O. Hayes                                                    Case No. 20-cv-01468

EXHIBIT 60

challenges, but the stringent, inflexible grievance and hearing procedures mandated by the 2020 Rule will impose additional requirements that will make the process more daunting.

56.     On May 18, 2020, Governor Murphy announced a multi-staged plan for moving out of the shut-down. The first stage continues remote learning in higher education, the second stage provides the potential for some in-person learning with modifications, and the third stage provides for in-person operations with reduced capacity.

57.     All of the challenges the University is currently facing in overhauling its policies, all of its procedures, disseminating the changes and implementing the new procedures are made vastly more difficult under the constraints of the campus shutdown and the anticipated staged return to normal operations. For example, the University will have to conduct training remotely for all of its investigators, administrators, staff support, and hearing officers, and the training must teach them to conduct these completely new mandatory procedures on a remote platform. Hearing officers will have to oversee adversarial cross-examination conducted by advisors and solve how to control the proceedings, all over a remote platform. And, the University is likely to need to re-train these individuals once the University partially and then fully resumes in-person instruction or other activities, especially while public health concerns still require social-distancing, and some parties may desire an in-person hearing while others will choose to continue with a remote process.

**Harms to the University Community Resulting From the Rule**

58.     The narrowed definition of sexual harassment in the 2020 Rule will negatively impact the Stockton community. It means that only the most severe sexual misconduct will be recognized by the University's Title IX Policy, leading fewer victims to report sexual harassment. This, in turn, will lead to fewer cases of sexual harassment being addressed, and no sanctions or

even warnings for individuals who have caused harm to others and who could cause more harm in the future.

59.     The requirement that the grievance process include cross-examination by an advisor (instead of the hearing officer/ hearing panel), who may, for example, be a parent, club member or the other party's teacher, also will discourage reporting of sexual harassment. Many students will not want to undergo hostile questioning about a traumatic experience, which may have the effect of "re-victimizing" the complainant. In contrast, the University's current procedure of permitting cross-examination questions to be posed by the parties but presented by the neutral hearing officer or hearing board ensures fair process while minimizing trauma and re-victimization.

60.     Complainants who report sexual harassment notwithstanding these procedural requirements may suffer mental, emotional, and/or psychological consequences from submitting to cross-examination, and the experience may have lifelong adverse consequences, i.e., irreparable harm. This type of cross-examination will structure the grievance process like a trial, inclusive of an adversarial environment that the University has strived to avoid in its current process. And inequities between the parties' advisors in terms of skill, experience, and expertise are likely to affect the outcome of the process – or give the perception that it affected outcome.


61.     The combined effect of all of these provisions will be to chill reporting of sexual harassment. This will allow sexual harassment to continue unchecked, will allow perpetrators to move on to harass additional victims, and will thwart the University's efforts to provide the Stockton community with equal access to education.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 19 day of June, 2020

_____
Valerie O. Hayes
Chief Officer for Institutional Diversity and
Equity/Title IX Coordinator
Stockton University

Decl. of Valerie O. Hayes                                    Case No. 20-cv-01468
EXHIBIT 60

EXHIBIT 61

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | Case No. **20-cv-01468-CJN** |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of the United States Department of Education*; UNITED STATES DEPARTMENT OF EDUCATION; UNITED STATES OF AMERICA, | |
| Defendants. | |

## <u>DECLARATION OF DARCI V. HEROY, JD, MA, PHR</u>

I, Darci Van Duzer Heroy, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Associate Vice President, Chief Civil Rights Officer, and Title IX Coordinator at the University of Oregon ("University") located in Eugene, Oregon. I have a Juris Doctor, Certificate in Phase 4 Mediation, master's degree in International Policy, Analysis Certification as Professional of Human Resources, Certificate in International Mediation and Conflict Resolution, Certificates in Executive Coaching, and bachelor's degrees in both International Studies and Spanish. I have been employed as the University's Title IX Coordinator since January 2016. I am

responsible for ensuring institutional accountability and coordinating effective campus-wide compliance with the University's objective of eliminating discrimination, harassment, and sexual violence on campus.

2.      My duties include management of campus-wide efforts to reduce sexual assault, dating and domestic violence, and stalking, the oversight of the related work performed by deputy Title IX officers and all Title IX investigations. It is my office's role to provide institutional accountability in effectively responding to reported concerns and complaints related to prohibited discrimination and harassment. I also identify discrimination and harassment issues which require institutional attention, assess issues of importance and sensitivity, and advise the presidents and vice presidents of the University on developments in policy and organizational issues regarding all forms of prohibited discrimination and harassment and in establishing priorities and agendas.

3.      I submit this Declaration in support of the Plaintiff's motion for preliminary injunction in the above captioned litigation regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or Rule). I have compiled the information in the statements set forth below through University of Oregon personnel who have assisted me in gathering this information from our institution. I have also familiarized myself with the Rule in order to understand its immediate impact on the University of Oregon. I have personal knowledge of the facts set forth in this declaration and I am competent to testify about them.

4.      On January 30, 2019, the Title IX Coordinators for Oregon public universities submitted a public comment in response to the Title IX notice of proposed rulemaking. I was the signatory for the University of Oregon on that comment. *See* Oregon Title IX Comment Letter.[1]

---

[1] https://www.regulations.gov/document?D=ED-2018-OCR-0064-18403.

Decl. of Darci V. Heroy                                                Case No. 20-cv-01468-CJN
EXHIBIT 61

**Background about the University of Oregon**

5.      The University of Oregon was founded in 1859. Today, more than 22,000 students from all 50 states and more than 95 countries study at the University of Oregon. The University has more than nine schools and colleges, 325 degree and certificate programs, and more than 231,000 alumni.

6.      The University's campus covers more than 295 acres of land in the Willamette Valley in Oregon. More than 25% of undergraduate students live in University of Oregon affiliated housing. The University of Oregon employs more than 1,700 instructional faculty. It is the largest employer in Lane County with an annual operating budget of more than $1 billion.

7.      The University of Oregon is one of seven institutions established as public universities in the State of Oregon pursuant to ORS 352.002, and is required to coordinate with respect to certain activities with the other Oregon public universities through the Oregon Higher Education Coordinating Commission.

8.      The University currently receives funds from the State of Oregon and from the federal government, with the remainder derived from tuition and fees. The University of Oregon Trustees have broad authority to supervise and manage the University and may exercise all the powers, rights, duties and privileges expressly granted by law, except those powers and duties expressly granted by the Legislative Assembly to the Oregon Higher Education Coordinating Commission for the purpose of coordinating an accessible and affordable approach to higher education across the State of Oregon. Internal governance is also conducted in accordance with an institutional constitution, the Constitution of the University of Oregon, and allows for faculty participation through the University Senate.

9.      The University of Oregon receives federal funds from the Department of Education ("Department"). As a result, the University of Oregon is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

**Summary of University's Existing Title IX Procedures**

10.     The University has adopted a Discrimination Complaint and Response Policy, Student Conduct Code, and Student Sexual and Gender-Based Harassment Complaint Response Policy that define prohibited discrimination and the responsibilities of designated reporters. In addition, the University has Standard Operating Procedures ("SOPs"),[2] that set forth the processes for investigating complaints of discrimination and discriminatory harassment, including sexual harassment and sexual violence. The University has dedicated significant resources to continually update its policies and procedures to comply with federal regulations including the now rescinded 2011 Dear Colleague Letter, the 2014 Questions and Answers on Title IX and Sexual Violence, and the 2017 Dear Colleague Letter.

11.     The University of Oregon's Title IX Coordinator is located in the Office of Investigations and Civil Rights Compliance, which also has a Director of Investigations, three full-time and one part-time Investigators, and three administrative support positions. The office is responsible for receiving and investigating as appropriate all complaints of prohibited discrimination, harassment, and retaliation from students, employees, and campus community members; investigating possible policy violations; and assisting with campus training on reporting obligations and related policies. The office coordinates closely with related campus partners including the Dean of Students, Office of Student Conduct and Community Standards, University Ombuds Office,

---

[2] Available at https://investigations.uoregon.edu/formal-student-conduct-process.

Decl. of Darci V. Heroy                                                    Case No. 20-cv-01468-CJN
EXHIBIT 61

Employee and Labor Relations, Human Resources, and various support and legal services. The University has eight Deputy Coordinators, who are volunteer administrators located in different units across campus that support the Title IX Coordinator by receiving reports from those units, assisting with training, and dissemination of information. Staff and faculty serve as trained Appellate Officers. The Deputy Coordinators and Appellate Officers are trained annually on policies and procedures, including due process concerns. The Rule will require the University to hire more staff.

12.     The University's Standard Operating Procedures apply to all claims of prohibited discrimination, including but not limited to sexual harassment. Formal complaints are reviewed pursuant to a process that includes extensive fact-gathering, the creation of a Record that is provided to the parties at least four weeks before the hearing, and a live hearing (administrative conference) where parties may ask questions of one another or of any witnesses indirectly by providing those questions to the administrator. *See* SOPs. The average Title IX investigation and adjudication with a live hearing currently requires approximately 100 hours of the investigators' time. Appeals can add an additional 20-40 hours for review, depending on the complexity of the case.

13.     The University of Oregon provides individuals who have reported experiencing, witnessing, or who have been accused of prohibited discrimination and/or harassment access to supportive measures, including an advisor who may support the party. Complainants and Respondents are entitled to the advisor of their choice. In student conduct proceedings, the advisor's primary role is to provide guidance during the process, and advisors are instructed to not speak on behalf of the Complainant or Respondent during the hearing (administrative conference) except for providing brief closing remarks. *See* SOPs.

14.     Investigations and hearings are one of many processes that have been affected by public health measures to address the COVID-19 pandemic. The State of Oregon has been under a

public health emergency order since March 2020 limiting the size of gatherings. Executive Order 20-09 suspended in-person instructional activity at higher education institutions in Oregon. University staff and faculty have been working remotely and it is not clear how the public health requirements will impact academic programs and administrative activities for the fall. It is not clear if participants in hearings will be able to appear in person. Conducting hearings entirely remotely, or with appropriate physical distance and personal protective equipment, will continue to pose logistical and resource challenges.

### Harm to University – Conflict with State Law Requirements

15.     Oregon law requires all institutions of higher education to have written policies regarding sexual assault, harassment, stalking, and dating violence that occur both on and off campus. ORS 350.253, ORS 350.255. These statutes govern, and now conflict with, the mandates of the Regulation. For example, Oregon law prohibits discrimination on the basis of sex. ORS 659A.030. Harassment (ORS 166.065) and offensive sexual contact (ORS 163.415) are crimes under Oregon law, as is offensive contact with a minor (ORS 163.479). However, such conduct does not constitute "sexual harassment" under the Rule.

16.     Further, ORS 350.253 requires all institutions of higher education to define "sexual harassment" as "Sexual harassment is unwelcome conduct of a sexual nature. Sexual harassment can include unwelcome sexual advances, requests for sexual favors, or other verbal, nonverbal or physical conduct of a sexual nature where such conduct is sufficiently severe or pervasive that it has the effect, intended or unintended, of unreasonably interfering with an individual's work or academic performance or it has created an intimidating, hostile or offensive environment and would have such an effect on a reasonable person." *See* ORS 350.253. This definition conflicts with the Regulation, which defines "sexual harassment" as severe *and* pervasive conduct.

**Harm to University – Employee Processes and Collective Bargaining Agreements**

17.     The University has five unions: United Academics, which represents faculty, the Graduate Teaching Fellows Federation, which represents graduate students, Service Employee International Union, which represents classified staff, Teamsters, which represents trade professionals in printing and mailing services, and Fraternal Order of Police, which represents law enforcement employees. The policy changes required by the Rule will require union review and may involve revising terms of the Collective Bargaining Agreements.

18.     The University will also need to navigate the different processes for Title IX and Title VII, for example how to proceed if a complaint must be dismissed under the Rule because it does not meet the definition of "sexual harassment" or jurisdictional requirements set forth in the Rule but still constitutes sexual harassment under Title VII.

**Harm to University – Costs of Increased Training, Staff**

19.     The Rule will require extensive financial investments from the University at a time when the University faces unprecedented budgetary challenges arising from the pandemic. For example, the Rule will require the University to hire and train advisors who are capable of conducting cross-examination, and to hire and train decision-makers capable of making real-time relevancy determinations. Yet the University is currently subject to a hiring freeze and its resources are already stressed by responding to a global health pandemic and economic downturn.

**Harm to University – Revising Processes and Procedures**

20.     In order to comply with the Rule, the University will need to comprehensively review and likely revise its Discrimination Complaint and Response Policy, Student Code of Conduct, Student Sexual and Gender-Based Harassment and Violence Complaint and Response Policy, the Standard Operating Procedures, the faculty handbook, employee handbook, and all materials specific

to the reporting, investigation, and hearing process the University presently employs. The process for reviewing and revising these policy documents commonly involves multiple discussions and reviews with stakeholders, including students, faculty, unions, and counsel.

21.     In addition, the University will need to comprehensively review and possibly revise (with associated costs) training materials, training videos, training programs hosted through third-party vendors, websites, public communications, student organization websites and materials, contracting partners websites and materials, contracts with vendors and third-parties, and other associated materials and informational sites.

**Harm to University & University Community - Harder to Identify, Remedy, and Eliminate Sexual Harassment**

22.     The Rule states it does not expressly limit the University's ability to investigate complaints that fall outside of the scope of the new definition of sexual harassment. However, because institutions of higher education *must* dismiss sexual harassment claims falling outside the definition as provided in the Rule, the University will need to create separate grievance procedures for sexual harassment and other discriminatory conduct that does not fit the Department's definition of sexual harassment. Based on my experience, this difference in treatment of similar conduct will cause increased confusion among those who may wish to report and may have a chilling effect on reporting and participation in the investigations.

23.     The Rule's requirement that evidence not be considered unless subject to cross-examination may also impede the University's ability to respond to, resolve, or prevent continuing hostile environments for its students and employees. For example, if a Respondent admits to prohibited conduct but does not submit to cross-examination at the live hearing, the Rule specifies that the admission cannot be relied upon by a decision-maker in reaching a determination regarding responsibility.

24.     These and other concerns were raised in the Oregon Title IX Comment Letter.

25.     The safety of campuses nationwide relies on consistent and reliable complaint procedures, and on parties believing that the process is fair, compassionate, and consistent. By updating the regulations amid a pandemic, universities must take focus away from providing critical support to students to update processes that have been providing resolution to sexual harassment and discrimination claims for years.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 11th day of June, 2020

_____

Darci V. Heroy

Associate Vice President, Chief Civil Rights Officer &
Title IX Coordinator
UNIVERSITY OF OREGON

EXHIBIT 62

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. <u>20-cv-01468-CJN</u> |

## DECLARATION OF KATHERINE HILDEBRANDT

I, Katherine Hildebrandt, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Civil Rights and Title IX Coordinator at the Oregon Department of Education. My educational background includes a Bachelor of Arts degree in the Study of Women, Gender, and Sexuality and a Master of Arts degree in Higher Education Administration. I have been employed as the Civil Rights and Title IX Coordinator for the Oregon Department of Education ("ODE") since January 2020.  From July 2018 to January 2020 I was employed as the Campus

Decl. of Katherine Hildebrandt                                              Case No. 20cv01468

EXHIBIT 62

Coordinator for the Oregon Attorney General's Sexual Assault Task Force.  Since 2011 I have been employed in the field of sexual violence prevention and policy development.

      2.      As Civil Rights and Title IX Coordinator my duties include:

- Providing training (both in-person and through webinars) and technical assistance to schools, districts, and students on topics related to discrimination on the basis of sex, gender, sexual orientation and gender identity.

- Providing training and technical assistance on discrimination prevention, including application of federal and Oregon civil rights laws, and best practices in sex discrimination prevention and response.

- Assisting students, families/support systems, and districts who are engaged in ODE's complaint and appeals processes related to sex, gender, sexual orientation, and gender-identity discrimination. This may include providing 1-on-1 support and technical assistance, serving as a conciliator/mediator during the process, and/or providing follow-up training to districts if required by ODE's final order.

      3.      As part of my experience and professional duties I am familiar with the programs in place in K-12 schools in Oregon for preventing sexual misconduct, and with the resources available to and challenges schools are likely to encounter in attempting to revise programs and materials in order to comply with the Rule's requirements.

      4.      I submit this Declaration in support of the State of Oregon's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or

Decl. of Katherine Hildebrandt                                                                                    Case No. 20cv01468

EXHIBIT 62

"Rule"). I have compiled the information in the statements set forth below through personal knowledge, and through ODE personnel who have assisted me in gathering this information from our institution, on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on the Oregon Department of Education and the Oregonians we serve.

### Public Education in Oregon

5.      The Oregon Constitution charges the Oregon Legislature with appropriating funds "sufficient to ensure that the state's system of public education meets quality goals established by law." Or. Const., Art. VIII, § 8.  As of Fall 2019 there were 582,661 K through 12 students in Oregon. Of those, 179,985 are in grades 9 through 12. Those students attend more than 1,200 public schools organized into 197 school districts and thirteen non-district education providers in the State of Oregon.

6.      Approximately 38% of Oregon K-12 students in 2018-2019 identified in a demographic category other than "White". Asian, Hispanic/Latino, Multi-Racial, and Native Hawaiian/Pacific Islander student enrollment has increased since 2014-2015, but American Indian/Alaska Native, Black/African American, and White student group enrollment has declined.[1] Oregon has only recently begun counting students who identify as gender non-binary and estimates the number of such youth in grades 8-12 is as high as 13,000.

7.      The most recent statewide demographic figures for Oregon show approximately 22,000 K-12 students in Oregon are homeless, 55,000 are English Language learners, and approximately 49% of all K-12 students (more than 272,000) qualify for free or reduced price lunch.

---

[1] Oregon Statewide Annual Report Card for the 2018-2019 School Year. https://www.oregon.gov/ode/schools-and-districts/reportcards/Documents/rptcard2019.pdf

Decl. of Katherine Hildebrandt                                    Case No. 20cv01468

EXHIBIT 62

8.     The 2019-2021 Legislatively Adopted Budget includes $1.254 million in pass-through federal funds specifically for K-12 programs. Through the Elementary and Secondary Education Act (ESEA), the ODE receives and distributes federal education funds to eligible school districts throughout Oregon. Oregon public schools receive federal funds from the Department. As a result, Oregon public K-12 schools are subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106

9.     Oregon law provides that the Oregon State Board of Education shall set standards for and adopt rules for governance of public kindergarten, elementary, and secondary schools. The State Board of Education is also required by statute to adopt rules providing that no public elementary or secondary school shall discriminate in determining participation in scholastic activities. ORS 326.051. "Discrimination" has the same meaning as set forth in Section 659.850 of the Oregon Revised Statutes, including discrimination on the basis of sex and sexual orientation. Section 326.111 of the Oregon Revised Statutes establishes the Oregon Department of Education to administer the functions exercised by the State Board of Education.

10.     Oregon has numerous policies against the sorts of conduct implicated in the Rule. Oregon law prohibits discrimination on the basis of sex. ORS 659A.030. Harassment (ORS 166.065) and offensive sexual contact (ORS 163.415) are crimes under Oregon law, as is offensive contact with a minor (ORS 163.479). Oregon Revised Code Section 342.700 et seq. requires all public school districts, education service districts and public charter schools to adopt a sexual harassment policy applicable to all students and staff. The law sets forth the requirements for the policies, including definitions and consequences for assault, unwanted physical and verbal contact, and demands for sexual favors. ORS 342.704.

11.     It is a policy of the Oregon State Board of Education and a priority of the Oregon Department of Education that there will be no discrimination or harassment on the grounds of race, color, sex, marital status, religion, national origin, age, sexual orientation, or disability in any educational programs, activities or employment.

**Oregon Public Schools Cannot Revise and Implement Policies Necessary to Comply with the Rule by the August Deadline.**

12.     Public Schools will have to revise existing sexual harassment policies, and in many cases create brand-new policies from scratch. The drafting phase for new and revised policies will necessarily occur during summer holidays. Not all schools have full or even part time legal staff, but must contract outside counsel to prepare policies, or customize template policies. Policy and program development will take staff time away from other tasks, and create organizational disruption as existing staff are assigned new duties or even new position descriptions.

13.     Most school and district personnel do not work during the summer, and with public health measures limiting public gatherings around the State, the input from stakeholders within the school community (teachers, non-teaching staff, administrators) may be low or nonexistent. Schools that aim for such community input, which is considered a best practice in sexual harassment policy development, will face immense barriers. Without the input of the stakeholders who will be expected to understand, implement, and disseminate new policies, the policies themselves are less understandable and accessible.

14.     Local school districts (nearly 200 in total across the State) must submit their policies to school district boards for review and approval.  Most school boards recess over the summer holidays, starting in the middle of June, and do not come back into session until September. If extra or emergency sessions are necessary to consider and adopt new policies, they will incur unbudgeted

Decl. of Katherine Hildebrandt                                          Case No. 20cv01468

EXHIBIT 62

staff, space, and materials costs. The August 14, 2020 deadline will be next to impossible to achieve for many Oregon school districts given these hurdles.

15.     In addition to new policies dealing with a complex issue, schools must create new procedures (including reporting and response protocols), draft documents, create records management systems, and may need to create or revise websites and paper publications. I have reviewed the hours estimates in the Notice of Proposed Rule Making and discussed them with school district Title IX managers in Oregon and they do not adequately reflect all of the tasks and time necessary to comply with the Rule, for example a number of standard trainings in this field are 12 to 20 hours per professional, where the NPRM estimates 8 hours.

16.      Many districts will need to purchase proprietary software and/or consulting time from third parties to meet the Rule's August deadline for compliance. Such investments may in turn be subject to public contracting and procurement requirements, even if budgetary constraints make such investments feasible in the next 60 days.

17.     The Rule requires, at bare minimum, three distinct personnel to run each Title IX investigation. The conflict of interest requirements in the Rule will mean that many districts will need to identify, recruit, and possibly compensate additional personnel to avoid potential conflicts in different cases. All of these individuals will need to receive specific training; many school districts currently utilize their school board as an appeal body, adding many more individuals to that required training pool.

18.     To meet the compliance deadline of August 14, 2020 schools will have to scramble to find training, which may result in high-cost trainings, if the resources are even available nationally and statewide to meet the demand. For example, the Association of Title IX Administrators' (ATIXA)

online trainings cost between $499-$1800 per training.[2] TIXEdu, an Oregon-based Title IX training firm, charges $550 for online K-12 training.[3]  In searching for cheaper alternatives due to budgetary restrictions, schools may resort to low-quality trainings conducted by non-experts.

19.     Students will pay the price in either case. Schools will have to divert funding from student programs to cover personnel training. Inadequate training (a very likely possibility given the time frame and demand) will result in unfair and traumatizing processes for complainants and respondents. ODE provides no-cost training for school districts, but cannot accommodate training for approximately 200 school districts across 36 counties prior to August 14, 2020.

20.     Over half of Oregon's school districts contain less than 1,000 students, particularly in rural areas; two thirds of districts contain less than 300 students (ODE's Fall 2019 enrollment data). These mostly rural districts, who already struggle with funding and resources, will face additional barriers that will make compliance with the Rule's arbitrarily compressed timeline even more difficult and costly.

21.     Small districts also face logistical burdens arising from conflicts in Title IX investigations. It may be impossible for districts with very small staff, community members serving in multiple capacities, and small populations to find investigators and adjudicators without a personal connection to any of the parties or witnesses. This will require either training a much higher number of personnel, creating regional cooperation district agreements, or retaining outside contractors for investigations. All of these options will come at enormous costs to districts, which will be disproportionately burdensome for the smallest districts.

---

[2] https://atixa.org/atixa-event/summer-online-training-series/#faq
[3] https://www.tixedu.com/resources

Decl. of Katherine Hildebrandt                                      Case No. 20cv01468

EXHIBIT 62

22.     The Rule limits the definition of hostile environment sexual harassment to conduct that is severe, pervasive, **and** objectively offensive. This creates additional harm because that will make it difficult for districts to respond to many severe and harmful forms of sexual harassment, including extremely prevalent forms of harassment such as technology-facilitated sexual harassment (e.g., nonconsensual distribution of photos or videos.) The Rule also creates a different standard for sexual harassment than for other civil rights violations, subjecting sexual harassment survivors to an unfair and inequitable higher standard.

23.     The Rule narrows the scope of oversight in a way that will harm students. The impacts of trauma do not discriminate based on whether something happens in an "educational program or activity" or in a context adjacent to it. For a survivor, there is no discernable difference between what happens on the playground during recess and what happens in the city park after school – should a classmate assault them, they are then forced to see that classmate day in and day out at school. It will impact their educational experience regardless of where the conduct occurred.

24.     Oregon law mandates K-12 school policies cover a wider definition of sexual harassment than the new, narrow Title IX definitions. Oregon schools may therefore end up with two parallel processes, which may result in confusion for complainants and could lead to confusion and errors for district personnel. This also creates the probable outcome that some reports could be adjudicated twice, such as when a student reports that they were sexually assaulted off-campus at a private residence (conduct covered under Oregon's sexual harassment requirements, but which cannot be adjudicated under the Rule), and were subsequently teased, groped, and/or spammed with harassing texts and pictures about the incident from the respondent while at school the following week. (Such conduct may or may not be covered under the Rule, depending on whether such conduct is considered severe, pervasive, **and** objectively offensive).

Decl. of Katherine Hildebrandt                                          Case No. 20cv01468

EXHIBIT 62

25.     Multiple processes increase the likelihood of confusion, procedural error, and inconsistent results, which in turn may lead to investigations and district processes escalating more frequently to ODE, with corresponding increase in ODE costs in the form of staffing and material support. Procedural conflict and confusion also create a substantial risk of litigation for school districts, increasing the cost passed on to students and Oregon taxpayers, as well as the emotional burden on students who will be forced to endure multiple sexual harassment investigation processes as well as lengthy civil litigation procedures.

26.     Preventing schools from imposing basic discipline interferes with the most fundamental management requirements K-12 education and creates a double standard for students accused of misconduct of sexual nature versus all other types of misconduct (e.g. fighting, controlled substance use, vandalism). As the Title IX regulations acknowledge, K-12 schools operate *in loco parentis* and must have discretion to impose minimum conduct requirements in order to provide for a safe and equitable learning environment. 85 Fed. Reg. 30,039.

27.     If schools and teachers cannot impose prompt, basic discipline for sexual harassment they witness in the classroom, it will undermine their ability to create equitable learning environments through normal, accepted means for K-12 educational environments. For example, a teacher who witnesses a student violating other school rules may hand out a detention or educational assignment immediately; under the Rule, teachers would be prohibited from engaging in these kinds of routine disciplinary measures even if they directly witness sexual harassment or assault (e.g. a student groping another student in the classroom) until the incident has been investigated and adjudicated under the mandated grievance procedures, which take a minimum of 20 days. This may permit harassment and other sexual misconduct to persist and increase, to the detriment of the students individually and collectively.

Decl. of Katherine Hildebrandt                                              Case No. 20cv01468

EXHIBIT 62

28.     The Rule prevents school districts from restricting communications about allegations. Parties may use this as a means of retaliation, or to spread rumors about the other party. This sort of conduct violates anti-bullying and harassment statutes under Oregon law,[4] but school districts cannot prevent it, according to the language of the Rule.

29.     According to the 2019 Oregon Healthy Teens Survey[5]:

- 14.5% of 11th graders reported having felt pressured into sex (approximately 6,390 11th grade students in 2019)

- 6.2% reported having been physically forced into sex (approximately 2,733 11th grade students in 2019)

- 3.8% reported being hit/slapped/hurt by a partner (approximately 1,675 11th grade students in 2019)

- 7.2% of 8th graders and 6.1% of 11th graders reported unwanted sexual comments and attention at school within the last 30 days (approximately 3,310 8th grade students and 2,689 11th grade students in 2019)

30.     Students who cannot or are unwilling to report sexual harassment under the conditions imposed by the Rule will still experience harm. The impacts of the trauma will spill over into the classroom as survivors suffer academically and socially. Schools will still end up devoting significant financial and personnel resources to supporting students in these cases – they will just spend it later, when the effects of the trauma begin to manifest in academic decline, chronic absenteeism, problematic behavioral coping skills, or eventual dropout increases.

---

[4] https://www.oregon.gov/ode/students-and-family/healthsafety/Documents/bullyingguidance.pdf
[5] https://www.oregon.gov/oha/PH/BirthDeathCertificates/Surveys/OregonHealthyTeens/Pages/index.aspx. Whole numbers extrapolated from percentage of respondents against total numbers of enrolled students.

Decl. of Katherine Hildebrandt                                    Case No. 20cv01468

EXHIBIT 62

31.     Oregon schools will not be able to fulfill their obligations to provide an equitable education if they are only permitted to address sexual harassment following a lengthy grievance process that may deter victims from reporting. The best way to address sexual harassment is to intervene before it escalates; schools should not be required to wait until conduct is severe, pervasive, **and** objectively offensive to intervene or engage in routine measures of discipline. The educational environment of the school calls for an educational model of intervention, including the ability to have learning-based conversations and engage in measures of accountability at the first signs of potential harassment or violence.

32.     The Rule will make it more difficult for Oregon schools to fulfill their obligations under Title IX to provide all students equal access to education. The Rule will require schools to dismiss many complaints that impact student's educational access and success. Many incidents of sexual harassment, especially sexual assault, dating violence, and stalking, do not occur within an educational program or activity, but nonetheless impact students' educational access and success. A study cited in a U.S. Department of Education brief on teen dating violence, for example, notes that only half of students who reported experiencing dating violence experienced an incident on school grounds.[6]

### The Rule Will Increase the Harmful Effects of
### Sexual Harassment and Violence on Young Oregonians

33.     Downstream health impacts of unaddressed sexual harassment will require State funding for programs to help survivors of sexual harassment and assault. Students who experience sexual harassment will likely require a patchwork of social services both in the immediate aftermath

---

[6] (https://www2.ed.gov/about/offices/list/oese/oshs/teendatingviolence-factsheet.html#_edn12; original study citation Molidor, C., Tolman, R. Gender and Contextual Factors in Adolescent Dating Violence. Violence Against Women. Vol. 4 No. 2, April 1998, 180-194.

Decl. of Katherine Hildebrandt                                              Case No. 20cv01468

EXHIBIT 62

and long-term, especially if the impacts of the harassment are not addressed on the school level. Many Oregon sexual and domestic violence shelters report that they do not currently have the funding or capacity to meet the needs of all survivors who seek services. If schools ignore their responsibilities to mitigate the harmful impacts of sexual harassment, they will pass on these costs to other public social programs, including medical and mental health providers, shelters, and youth offender programs.

34.     Sexual harassment results in a variety of negative physical and mental health outcomes for survivors, including: depression, anxiety, posttraumatic stress disorder, unhealthy eating behaviors, substance use and abuse, social isolation, self-harming behaviors, and suicidal ideation. The National Women's Law Center's Let Her Learn survey found that girls who experienced sexual violence were more likely to feel anxious, depressed, or have intrusive thoughts or memories.[7]

35.     Middle and high school students who experienced sexual harassment or assault were more likely to experience depression and suicidal ideation, and more likely to binge drink. Students who experienced multiple victimizations had even high rates, such that 90% of victims of multiple sexual harassment or assault experiences reported depression, 63% reported suicidal ideation, and 50% reported binge drinking.[8]

36.     Sexual harassment is also harmful to the friends and supporters of students who experience sexual assault; friends who act as systems of support to sexual assault survivors

---

[7] National Women's Law Center, Let Her Learn Survey, Conducted by Lake Research Partners (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/final_nwlc_Gates_HarassmentViolence.pdf.
[8] Edwards, K. M., & Banyard, V. L. (2020). Prevalence and correlates of sexual revictimization in middle and high school youth. Journal of Interpersonal Violence, published online, 1-17. https://doi-org.proxy.lib.ohio-state.edu/10.1177/0886260520909191).

Decl. of Katherine Hildebrandt                                    Case No. 20cv01468

EXHIBIT 62

experienced many of the same impacts as survivors themselves, including nightmares, hypervigilance, and increased stress and anxiety.[9]

37.     The long term impacts on youth who experience dating violence include higher rates of drug use, suicidal ideation, binge-eating, and depression.[10] PTSD can chronically affect survivors of sexual assault and other forms of sexual harassment, and may affect survivors their entire lives.[11]

38.     Sexual violence has been well documented as contributing to academic decline and causes some survivors to delay their academic and career plans, or to leave school altogether. This leads many survivors to a lifetime of lower earning potential.

39.     The National Women's Law Center's Let Her Learn survey found that girls who experienced sexual violence were more likely have trouble concentrating on their studies, to be chronically absent, and experience exclusionary discipline at school.[12]

40.     Studies done on college students who experienced sexual harassment and assault showed that those students are likely to suffer academically, including a decrease in grades, in motivation to attend school, and in ability to retain information learned. These students are also more likely to drop out.[13]

---

[9] Campbell, R., & Wasco, S. (January 01, 2005). Understanding rape and sexual assault. *Journal of Interpersonal Violence, 20*(1), 127-131).

[10] Ackard, D. M., Eisenberg, M. E., & Neumark-Sztainer, D. (2007). Long-term impact of adolescent dating violence on the behavioral and psychological health of male and female youth. *Journal of Pediatrics*, *151*(5), 476. 10.1016/j.jpeds.2007.04.034).

[11] Campbell, R., Dworkin, E., & Cabral, G. (2009). An ecological model of the impact of sexual assault on women's mental health. *Trauma Violence and Abuse*, *10*(3), 225–246. https://doi-org.proxy.lib.ohio-state.edu/10.1177/1524838009334456).

[12] National Women's Law Center, Let Her Learn Survey, Conducted by Lake Research Partners (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/final_nwlc_Gates_HarassmentViolence.pdf.

[13] Banyard, V. L., Demers, J. M., & Cohn, E. S. (2017). Academic correlates of unwanted sexual contact, dating violence, and stalking. Journal of Interpersonal Violence, https://doi.org/10.1177/0886260517715022; Jordan, C. E., Combs, J. L., & Smith, G. T. (2014). An exploration of sexual victimization and academic performance among college women. Trauma, Violence, and Abuse, 15(3), 191–200. doi: 10.1177/1524838014520637.

Decl. of Katherine Hildebrandt                                          Case No. 20cv01468

EXHIBIT 62

41.     Recent college graduates report that their educational attainment and career choices are impacted by sexual assault. According to a study on the impacts of college sexual assaults, "Participants stated they lost self-esteem following the assault and stalled their education goals, thus derailing their career goals. Other participants directly attributed the assault to their underemployment, not using their degrees, and/or feeling that their positions were not the best use of their skills."[14]

42.     Individuals' whose earning potential has been disrupted because of sexual harassment are more likely to rely on state-funded services than they would have been if not subjected to sexual harassment. Survivors whose school or career plans are interrupted or derailed may never recoup their educational or earning potential. The long-lasting impacts of PTSD, depression, substance abuse issues acquired following an assault, or other effects of the harassment may result in job and income instability or even homelessness. Consequently, survivors may be more likely to rely on government-funded programs for healthcare, housing, employment, and more.

43.     Intimate partner violence and consequent trauma have high economic and social costs, including homelessness, substance abuse, and unemployment, as well as medical and mental health costs. The estimated cost of an experience of intimate partner violence is $81,960 per victim, but is likely more for young people who experience the consequences throughout their lives.[15]

---

[14] (Potter, S., Howard, R., Murphy, S., & Moynihan, M. M. (2018). Long-term impacts of college sexual assaults on women survivors' educational and career attainments. Journal of American College Health, 66(6), 496–507, p. 500 https://doi-org.proxy.lib.ohio-state.edu/10.1080/07448481.2018.1440574)
[15] Peterson, C., Kearns, M. C., McIntosh, W. L., Estefan, L. F., Nicolaidis, C., McCollister, K. E., Gordon, A., & Florence, C. (2018). Lifetime Economic Burden of Intimate Partner Violence Among U.S. Adults. American journal of preventive medicine, 55(4), 433–444. https://doi.org/10.1016/j.amepre.2018.04.049).

Decl. of Katherine Hildebrandt                                    Case No. 20cv01468

EXHIBIT 62

**Oregon's Public Schools are Operating with Extraordinary Constraints and Uncertainty Due to the COVID-19 Pandemic**

44.     The Rule's training and increased staffing requirements would be burdensome to implement even without the unprecedented global health crisis. Since March 2020 public schools throughout Oregon have had to make extensive changes in all aspects of operations and production. These changes are ongoing and ODE anticipates COVID-19 response will continue to take staff time and resources well into the fall of 2020 for both ODE and districts and schools throughout the Oregon.

45.     On March 8, 2020, Oregon Governor Kate Brown declared an emergency under ORS 401.165 et seq. due to the public health threat posed by the novel infectious coronavirus (COVID-19).

46.     On March 12, Governor Brown ordered all schools to close temporarily in an effort to help stop the spread of coronavirus in Oregon.

47.     On March 17, Governor Brown issued Executive Order 20-08. That Order physically closed all public schools through April 28 but required school districts to continue providing specified services. The Order directed ODE to provide further guidance to public schools regarding the Order's directives.  EO 20-08 also directed the State Board of Education, in collaboration with ODE, to "engage in any temporary rulemaking necessary to facilitate the directives in [EO 20-08], and the ability of public schools to respond to the ongoing emergency."

48.     On April 8, Governor Brown announced that Oregon students would not return to school this academic year.

49.     On April 23, 2020, the Governor issued Executive Order 20-12 directing everyone in Oregon to stay at home to the maximum extent possible. Executive Order 20-12 also orders State executive branch offices and buildings to close to the public and provide public services by phone to the greatest extent possible. The Order was effective immediately, and remains in effect until

Decl. of Katherine Hildebrandt                                                          Case No. 20cv01468

EXHIBIT 62

terminated by the Governor. In compliance with EO 20-12, on April 23, ODE closed the physical building and directed all staff to telework

50.     On April 23, Governor Brown issued Executive Order 20-20. That Order rescinded and replaced EO 20-08. EO 20-20 prohibits public and private schools from conducting in-person instruction during the effective period of EO 20-20 (April 28-June 30, 2020), unless such instruction is otherwise permitted by the Order or through directives issued by ODE.

51.     The Oregon Department of Education, led by the Director, has a responsibility under Oregon law to assist school districts and education service districts in interpreting and applying laws relating to public education.

52.     With respect to COVID-19, The Governor, in her executive orders, has directed ODE to provide guidance for school districts and the State Board of Education to engage in rulemaking necessary to facilitate the directives in the executive orders and the ability of public schools to respond to the ongoing emergency. Under the authority of the Governor's Executive Orders, the Agency has been working to develop guidance for school districts and to recommend to the State Board of Education changes in state law necessary to implement that guidance.

53.     EO 20-20 provides for the continuation of state school fund allocations so long as school districts provide specified services. The Order directs ODE to provide further guidance to public schools regarding the above directives.  EO 20-20 also directs the State Board of Education, in collaboration with ODE, to "engage in any temporary rulemaking necessary to facilitate the directives in [EO 20-20], and the ability of public schools to respond to the ongoing emergency."

54.     The Department is now working to develop guidance for the 2020-21 school year. The 2020-21 school year requires a high level of planning, iteration, communication, and collaboration.  ODE released the first round of guidance for the 2020-21 school year on June 10, 2020.

Decl. of Katherine Hildebrandt                                    Case No. 20cv01468

EXHIBIT 62

Oregon schools are in particularly challenging time for implementing significant policy changes because the Oregon Legislature passed new funding legislation in 2019, which when fully implemented was projected to invest $2 billion in Oregon education every two years. Over the past year Oregon schools have invested significant time and resources in planning and community engagement in response to this new investment. The source of funding was a new corporate activities tax. However, in the face of massive, unexpected changes in economic outlook, school districts throughout Oregon must completely revise budgets and programs for 2020-21, all while preparing for in-person instruction to recommence under strict new health and safety guidelines.

55.    For the 2020-21 school year, each public school will work under the direction of the school district to develop an Operational Blueprint for Reentry that is tailored to the local context and informed by local needs. Each public charter school will work under the direction of its sponsor to develop its own Operational Blueprint for Reentry that is tailored to the community it serves.

56.    COVID-19 public health precautions required all public schools in Oregon to undergo massive restructuring, beginning in April 2020. In light of the requirements in the 2020-2021 guidelines for schools, and the predicted budget shortfalls related to COVID-19, schools will not be able to devote the necessary time and financial resources to meet the Rule's August 14, 2020 compliance deadline. School district administrators will need to devote most of the summer months to preparing for the physical health and safety of their students in the fall, and responding to regional educational crises that have arisen in the wake of COVID-19. Tightening budgets and predicted shortfalls will make it even more difficult for personnel to receive the training they need and for schools to create the infrastructure to begin implementing the rules in the fall.

57.    Each Operational Blueprint for Reentry must address eight essential elements including Public Health Protocols; Equity; Instruction; and Family and Community Engagement. By

Decl. of Katherine Hildebrandt                                      Case No. 20cv01468

EXHIBIT 62

August 15 or prior to the beginning of the 2020-21 school year, the local school board (or private school operator) must review the Operational Blueprint for Reentry and make it available to the community online. The blueprints will require that every school, under the direction of the district, determine whether they teach all students on site, teach all students through new comprehensive distance learning or utilize a hybrid model.  This guidance requires a communicable disease management plan and close coordination between the schools, school districts, and the local public health authorities.

58.    The planning will be complex and challenging to ensure our schools open safely. Once the operational blueprints are developed, districts will need time with staff to prepare for the 2020-21 school year. This could include but is not limited to professional learning, training on new protocols, setting up physical spaces, designing instruction, setting up technology, and cleaning and disinfecting.

59.    After releasing the 2020-21 school year guidance, the ODE must now focus on the following supports for districts:

- Technology and online learning supports;

- Comprehensive distance learning guidance for schools that are not ready or not able to offer in-person instruction;

- Coordinating statewide procurement and contracting supports for districts;

- Develop guidance for specific populations;

- Communication supports.

60.    The Rule implementation deadline falls immediately prior to the beginning of school year and would require extensive commitment of staff and resources in order to operationalize, at a time when the State is facing severe budget shortfalls. School districts will be in an untenable position

Decl. of Katherine Hildebrandt                                                            Case No. 20cv01468

EXHIBIT 62

if forced to choose between cutting other services or programs in order to make the changes the Rule demands, or risk loss of federal funds due to inability to comply.

61.     On May 20, 2020, the Oregon Office of Economic Analysis released the May Economic and Revenue Forecast.  The State economists predicted that the "unprecedented" economic decline triggered by the coronavirus outbreak will take $2.7 billion, or roughly 11%, out of the current budget cycle. The Oregon Department of Education estimates the impact to School Districts budgets is a shortfall of $488,885,981.00.

62.     The State's Economists also reported that Oregon's new corporate activity tax, which took effect January 1 and was expected to $2 billion in each two year budget cycle for education, will bring in $414 million less than forecast in the current budget cycle.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 12th day of June, 2020

_/s/_____
Katherine Hildebrandt

Civil Rights and Title IX Coordinator

OREGON DEPARTMENT OF EDUCATION

Decl. of Katherine Hildebrandt                                                    Case No. 20cv01468

EXHIBIT 62

EXHIBIT 63

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>                    Plaintiffs,<br><br>          v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>                    Defendants. | **CIVIL ACTION No. 20-cv-01468-CJN** |

## DECLARATION OF LINDA HOOS

I, Linda Hoos, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the Title IX Rule or "Rule").

2.      If called and sworn as a witness, I could and would testify competently to the information in this declaration.  I serve as the Systemwide Title IX Compliance Officer for the California State University System (hereinafter "CSU" or "University"), under the general direction of the Associate Vice Chancellor for Human Resources.  I joined the Chancellor's Office in October 2018, after serving for approximately three years as the Assistant Vice President of the Office of Equity, Inclusion, and Compliance at California State Polytechnic University, Pomona where I was responsible for overseeing investigations, training and programming relating to matters involving sexual harassment and violence, dating and domestic violence, and stalking, as well as other claims of protected status discrimination, harassment, and retaliation.  I am also a licensed attorney in the State of California.  Between 2001 and 2015, I practiced civil and public rights litigation and conducted civil rights investigations, including employee complaints of discrimination, harassment, and retaliation.  I received my B.A. from Brown University and my J.D. from the Gould School of Law at the University of Southern California.

3.      In my current position, I provide oversight, training, technical assistance, leadership, and guidance with respect to systemwide compliance with CSU policies and procedures and federal and state laws and regulations in furtherance of CSU's responsibility to create, maintain, and sustain a safe and diverse workplace that fosters collaboration and inclusive excellence.

4.      Except where otherwise noted, this declaration is based on my personal knowledge, my familiarity with Title IX of the Education Amendments Act of 1972 ("Title IX"), my review of the Notice of Proposed Rulemaking re Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance dated November 29, 2018 (NPRM, 83 Fed. Reg. 61462, 61484 (Nov. 29, 2018) (to be codified at 34 C.F.R. 106), and my review of the final Title IX Rule and preamble to that final rule just issued on May 19, 2020, and the knowledge and expertise I

Decl. of Linda Hoos                                                          Civil Action No. 20-cv-01468

EXHIBIT 63

have acquired in the course of my years of service and duties at the CSU working with hundreds of student complainants, respondents, and witnesses and working on over fifty employee matters.  In my capacity as a Title IX Coordinator, I have conducted numerous intakes and investigations.  I have also overseen investigations conducted by my staff and provided assistance and mentoring to campus counsel.

5.      CSU receives federal funding from the United States Department of Education and is an education entity covered by the requirements of Title IX and subject to the regulations issued by the USDOE.

6.      CSU is created by state statute, funded in part by state budget allocations, and is part of the State of California's public higher education system.

7.      CSU's mission is to advance and extend knowledge, learning, and culture, especially throughout California; to provide opportunities for individuals to develop intellectually, personally, and professionally; to prepare significant numbers of educated, responsible people to contribute to California's schools, economy, culture, and future; to encourage and provide access to an excellent education to all who are prepared for and wish to participate in collegiate study; to offer undergraduate and graduate instruction leading to bachelor's and higher degrees in the liberal arts and sciences, the applied fields, and the professions, including the doctoral degree when authorized; to prepare students for international, multi-cultural society; and to provide public services that enrich the university and its communities.   (*See*  https://www2.calstate.edu/csu-system/about-the-csu/Pages/mission.aspx.) Consistent with this mission, CSU policy prohibits discrimination against students and employees on the basis of sex and other protected statuses.

### Background about the California State University System

Decl. of Linda Hoos                                                                      Civil Action No. 20-cv-01468
EXHIBIT 63

8.      According to University statistics from academic year 2019, CSU educates more than 480,000 students at 23 campuses across California.  Approximately 57% of enrolled students identify as female; 43% identify as male.  Approximately 90% of CSU students are undergraduates, and 74% of all students are between the ages of 18 and 24 (the average age of a CSU student is 23).  (*See* https://tableau.calstate.edu/views/SelfEnrollmentDashboard/EnrollmentSummary?iframeSizedToWindow=true&:embed=y&:showAppBanner=false&:display_count=no&:showVizHome=no)

9.      CSU's statistics also reflect that each year, approximately 51% of CSU students live in private off-campus housing (other than with parents or family).  Many campuses have Greek systems, and participation ranges from 1% to 12% depending on the campus.  Nearly 10,000 students participate in study abroad programs every year.

**Summary of Immediate Harms to the CSU, CSU Students, and the Community at Large**

10.      For the reasons explained below, the Rule will have an immediate, material, and deleterious effect on the CSU's ability to provide an education and working environment free from sex discrimination and sexual harassment.  This is because the Rule imposes, through  mandates and requirements without any funding for implementation, administrative burdens on colleges and universities that are unwieldy, unnecessary, costly, and will cause tremendous confusion to our students or employees – whether they are alleged victims of sexual misconduct (complainants), students or employees who have been accused of engaging in sexual misconduct (respondents), or students or employees who are witnesses to alleged sexual harassment (including sexual misconduct).

11.      The burden on the colleges and universities is only further amplified by the fact that the Rule has been issued in the midst of a global pandemic - a time when campus resources are focused on ensuring the health and safety of the campus community as well as the continuity of educational programming and employment.  Classes have been moved to remote learning platforms and most

Decl. of Linda Hoos                                                          Civil Action No. 20-cv-01468
EXHIBIT 63

employees are required to practice social distancing by telecommuting.  This is a time of great uncertainty as campuses prepare for an unknown fall environment.  The United States Department of Education simply did not provide enough time (less than 90 days), even under the best of circumstances to ensure that the policy revisions, statutorily required collaboration with campus stakeholders (including faculty who are often not present during the summer months), notice to and meetings with various unions as is required by collective bargaining agreements, and mandated training can occur in a meaningful way.  Given the complexities present in any revision to a major institutional policy, it is simply not possible to ensure adequate implementation in the time provided.

12.     The Rule will make students more reluctant to report sexual misconduct or seek resources.  As it is, students are already reluctant to file complaints or seek assistance from Title IX offices on college campuses.

13.     Throughout my tenure as a Title IX Coordinator, complainants have uniformly expressed anxiety and concern about utilizing the Title IX process.  Among the concerns expressed have been the impact to the respondent, embarrassment and shame about the incident that occurred, concern about the impact to their family, and fear of the difficulty and length of the process itself. The complexity and length of the grievance process, the fear of retaliation and retribution by peers, which ranges from social ostracization to coordinated personal attacks, as well as the knowledge that intimate details of their life will be discussed with strangers, are but a few additional reasons why students hesitate to report and fail to seek supportive measures or other resources.  For male students (regardless of sexual orientation), filing a complaint brings additional stigma and potential for ridicule due to social attitudes and stereotypes about men and masculinity.

14.     Requiring that cross-examination be conducted by advisors (many of whom may not be skilled in discussing highly personal and intimate matters), that written and signed complaints be

a pre-condition to initiating a grievance about a traumatic experience, and severely limiting the type of conduct considered to "rise to the level of" sexual harassment, will only serve to further discourage reporting.  When students and employees fail to come forward, they lose out not only on the grievance process, but also on the supportive measures that the university would otherwise provide under Title IX.  It is neither reasonable nor realistic to expect college students (many of whom are not yet 20 years old) and employees to understand (and remember during a crisis) that they are entitled to supportive measures even if they choose not to make a formal grievance.

15.     Students and employees will understandably view the Rule's courtroom-like processes and narrower definitions of prohibited conduct as creating unnecessary and painful hurdles designed to discourage them from coming forward and getting help.

**Immediate Harms:**
**Live Hearing, Cross-Examination, Advisor, Expert Testimony, and Sharing of Irrelevant Information Requirements**

16.     The Rule allows universities no deference or flexibility with respect to the manner of cross-examination; it assumes that adversarial interrogation of the type conducted in a courtroom or deposition is the best and most effective way to discover the truth -- and the only method to be used in a university hearing.  The Department reasons that "requiring questions to be asked by an advisor" avoids the "potential harm from personal confrontation between the complainant and the respondent," and therefore achieves the right "balance."  (83 Fed. Reg. at 61498; *see also* 85 Fed. Reg. at 30319 ("[H]aving advisors as buffers appropriately prevents personal confrontation between the parties while accomplishing the goal of a fair, truth-seeking process.")  However, there is no basis for assuming that questioning by a party's surrogate would be any less harmful or confrontational.  On the contrary, if the surrogate is a lawyer or parent (or both), the questioning could be far more aggressive and demeaning without increasing the likelihood of discovering the truth.

17.     In many of the school hearings that I have observed, the respective skills of the students and their advisors are inconsistent and unpredictable.  Individuals with financial means often choose attorneys to serve as their advisors; others resort to parents, friends, or lay-advisors who lack appropriate training or experience to serve as advisors under the Rules.  In the absence of: detailed evidentiary rules; advisors who are committed to a fair and respectful process that is sensitive to complexities of sexual harassment cases; and a hearing officer's power to subpoena all witnesses, the "'"greatest legal engine ever invented for the discovery of truth"'" (83 Fed. Reg. at 61467; 85 Fed. Reg. at 30328) can become, in the context of a sexual harassment, sexual misconduct, dating or domestic violence, or stalking hearing, a license to interrogate and a tool for personal attacks and intimidation that risks demeaning and devaluing the hearing process.

18.     In my role as CSU Title IX Compliance Officer, I routinely speak with Title IX Coordinators outside of the CSU system.  I am in regular contact with my counterparts at many universities in Southern California and speak frequently with my counterpart at the University of California systemwide office.  Along with the CSU, many, if not all, of the universities that I am in regular contact with employ the same highly effective alternative to allowing the advisor of a party to cross-examine the other party.  Specifically, cross-examination exclusively by the hearing officer.  In the past year, the CSU has also held over 50 hearings with hearing officers conducting questioning of the parties and witnesses.  The hearing officers have used questions that the parties have submitted prior to, and during, the hearing as well as questions that the hearing officer decided were necessary to reach a determination.  In my role, I have attended approximately 15 of these hearings to ensure compliance with our policy.

19.     In my experience, cross-examinations conducted by a hearing officer are effective, streamlined and fair, and far more likely to elicit the truth than are adversarial interrogations by

students' and employees' advisor-surrogates. Based on my observations at these hearings, allowing for the hearing officer to ask all questions also obviates the need for complex and legalistic rules necessary to put reasonable limits on each party's right to ask "[a]ll relevant questions and follow-up questions including those challenging credibility." Hearing officers at the CSU are comprised of attorneys and retired judges. In addition, these individuals are trained by the CSU to understand the complexities inherent when the subject matter involves sexual harassment and sexual misconduct. The CSU process requires that questions be submitted in writing to the hearing officer prior to, and during, the hearing. The hearing officer is then provided with an opportunity to review the questions for relevancy (amongst other things) and tone as well as to confer with the parties where the question is unclear or incomplete.

20.    The purpose of this process is to lessen the adversarial nature of the proceeding and (where students are involved) to maintain an educational component to the process, to ensure greater equity where one party is able to afford an attorney and the other is not, and to ensure that the parties are not unnecessarily subjected to demeaning, irrelevant questioning. The Rule eliminates this option; requiring instead that the advisor ask the question in the presence of both parties and then allow the hearing officer to determine relevancy. Not only will this greatly lengthen the hearing itself (which on average requires a full day), it will also provide an opportunity for overzealous advisors to belittle, demean, and demoralize students and employees alike by being able to ask embarrassing questions, even if they are not ultimately required to answer. Not being required to answer the question will do little to mitigate the damage once the proverbial cat is out of the bag.

21.    The Rule's effort to "level the playing field" by requiring that schools provide, to any student in need, "an advisor of their choice, who may be, but is not required to be, an attorney" (Rule §106.45(b)(5)(iv)), is also unreasonable and unworkable, because schools lack the administrative

Decl. of Linda Hoos                                              Civil Action No. 20-cv-01468
EXHIBIT 63

resources, expertise and infrastructure, not to mention funding, to identify, interview, retain and train individuals to conduct cross-examinations in sexual harassment hearings. In my experience working in higher education, employees and volunteers are extremely reluctant to serve as advisors if they will be required to cross-examine students, precisely because they recognize the incredibly negative impact that they could have on the student respondent or complainant, especially if they do not have sufficient expertise and experience. Schools should not be required to be in the business of developing legal systems staffed by advisor-advocates for the complainant and respondent.

22.      Ironically, the effect of the Rule will be to increase, not decrease, inequities and undermine CSU's mission to provide equal opportunities, resources, and benefits to all students. Having sat through many hearings during my time at the CSU, I have witnessed the distinct advantage when a student has the financial means to secure an attorney advisor.

23.      The CSU hearing process was designed to even the playing field by requiring questions to be submitted to the hearing officer in writing prior to being asked to ensure that the structure of the questioning is most likely to elicit necessary information in a manner appropriate for an educational administrative proceeding. In no way does this "stifle the value of cross-examination" or fail to serve the "truth-seeking purpose of an adjudication" as is articulated by the Department of Education. (85 Fed. Reg. at 30,313.) Rather, in the hands of a skilled hearing officer, a fair and equitable determination is just as likely to occur as with an advisor asking questions. More importantly, the risk of harm to students is diminished where a skilled hearing officer conducts the questioning as opposed to an overly zealous advocate not restrained by a robust evidence code.

24.      The preamble acknowledges that cross-examination is "traumatizing" for participants and allows for the adoption of "rules of decorum." (85 Fed. Reg. at 30,315.) The Rule itself is silent on what the rules of decorum may entail, silent as to how campuses are to enforce the rules of

decorum, and silent as to authority and protections institutions will have to address advisors who refuse to abide by these rules of decorum.  In the context of a highly charged hearing, where a parent, friend, sibling, or overly zealous attorney is an advisor, what is to prevent them from asking an opposing party about their immigration status, an unrelated suicide attempt, or any detail regarding their sexual peccadillos?  During a hearing, I have witnessed advisors attempting to skirt the rules that we have established in our policy and argue about the relevance of a party's sexual history in excruciating detail.  The hearing officer made clear that the advisor would be removed and only permitted to engage with the student during breaks if they continued in that vein.  What recourse does an institution have now where an advisor has not completed the cross-examination?  Must the hearing be post-poned or will the institution be required to have an alternate advisor ready to take over?  Yet again, the Rule creates an untenable situation for which there is no correct answer for the institution and questionable value of the requirement itself.

25.     Furthering the inequity, the Rule requires institutions to allow the parties to engage "expert witnesses," but does not permit institutions to adopt any of the well-developed evidence rules on the admissibility of expert testimony.  The addition of this very legalistic construct, without the accompaniment of well-settled legal parameters, into an educational proceeding is simply absurd.  Moreover, it further advantages students that have the financial means to hire expert witnesses, prolongs the length of the hearing, and is questionable as to whether it will add anything of value to the process.

26.     The preamble to the Rule expressly prohibits the CSUs from "excluding relevant evidence because such relevant evidence may be unduly prejudicial, concern prior bad acts, or constitute character evidence." (85 Fed. Reg. at 30,248.)  However, as with many of the grievance

process requirements this limitation is not grounded in the evidence code and in the lengthy preamble the Department has stated that institutions are not permitted to modify accordingly.

27.     In contrast, the Federal Rules of Evidence specifically allow courts to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." (Fed. Rule of Evid. 403.)  Based on my experience at hearings, it is not uncommon for questions to be posed that are facially relevant, but serve no other purpose than to unduly prejudice the fact-finder or harass or intimidate witnesses or parties.  Allowing advisors unfettered ability to pose questions without the safeguards that the rules of evidence provide will create chaos and not further the search for truth.  Allowing hearing officers to vet questions ahead of time using reasonable evidentiary parameters, as is currently provided for in the CSU process, avoids the opportunity for, or perception of, party advisors asking questions that are unduly prejudicial.

28.     Grievance proceedings concerning sexual misconduct and sexual harassment are – and should remain – a fair, search for the truth using a process that is informed by, and sensitive to, the particular subject matter of the grievance.  Particularly when students are involved, the addition of these legalistic requirements are unnecessary and potentially harmful.  If a hearing is required because witness credibility is central to the adjudication of the allegation, relevant cross-examination and other questioning should be conducted by a trained hearing officer, not attorneys or other advisors who have been retained to zealously advocate for their clients without particular interest in the other party's perspective or experience, and who, in my experience, often lack appropriate subject matter expertise, training and sensitivity.

29.     It is already enormously challenging to ensure the participation of a complainant where physical and emotional violence is present.  Explaining to a student that they are required to undergo interrogation by a person of the respondent's choosing, with no ability to object to questioning on any other bases beside relevancy will further deter reports and formal complaints of sexual assault and harassment, including dating and domestic violence and stalking formerly addressed under CSU procedures for conduct code violations, significantly.

30.     Further, the requirements that all evidence, whether relevant or not, be provided to the parties and their advisors and that universities are not allowed to limit students from talking about the allegations under investigation involve potential Family Educational Rights and Privacy Act (FERPA) violations, and the Rule appears to require CSUs to violate FERPA statutory provisions when there is a conflict between FERPA and the regulations.  Complainants are already wary of reporting and participating in any complaint process because of embarrassment and shame about the incident that occurred and fear that personal information about the assault or harassment will be spread widely and cause them additional reputational and other harm.  The refusal to allow universities to put reasonable limitations on disclosure of the allegations will further deter complainants from reporting and participating, which will make our school campuses less safe.

31.     All of the aforementioned requirements in the Rule will deter reporting and formal complaint filing.  Because the preamble to the Rule states that CSU is no longer permitted to even use the complainant's stated allegations in any proceeding for determining responsibility and sanctions, in effect, we will be precluded from taking any discipline or other action to meaningful deter future assault and harassment, when the complainant decides not to proceed with the formal investigation process.  This rule is beyond even other types of disciplinary and civil legal hearings. For example, rules of evidence permit the admission of "out-of-court" statements that have sufficient reliability to

be utilized in a court proceedings, but such statements are prohibited by the Rule. Rules of evidence also allow for the consideration of records kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, subject to certain criteria, however some records of this nature are also prohibited by the rule. Assuming the complainant voluntarily consents to its use in a hearing, a sexual assault response team (SART) exam is record that would likely be admissible in an administrative proceeding under the rules of evidence without the testimony of the individual that prepared the record. The Rules, however, would prohibit the admission of this evidence unless the nurse who performed the exam also participated in the hearing, the likelihood of which is low since nurses may only testify in response to subpoenas.

### Immediate Harms: Requiring all VAWA Act Violations to be Subject to Title IX Live Hearing Requirements

32.     The addition of dating and domestic violence and stalking to the conduct encompassed by sexual harassment in the Rule along with the requirement that all such alleged conduct violations must be processed under the grievance procedures proscribed by the Rule is a change that the Department made without providing the opportunity for public comment. (Rule §§ 106.30(a) & 106.6(h).) Domestic violence, in particular, is fraught with such complexity that individuals impacted by domestic violence often refuse to participate in criminal matters and recant allegations. The National District Attorney's Association prepared a white paper in 2017 that explains "[d]omestic violence victims differ from victims of other crimes in that the domestic violence victim and the offender are never strangers…victims of domestic violence have an intimate relationship that is often spousal, romantic, sexual, parental, social, psychological, and/or financial."[1] Currently, the decision

---

[1] National District Attorney's Association, Women's Prosecutors Section, *National Domestic Violence Prosecution: Best Practices Guide*, (2017) https://ndaa.org/wp-content/uploads/NDAA-DV-White-Paper-FINAL-revised-July-17-2017-1.pdf.

Decl. of Linda Hoos                                                                 Civil Action No. 20-cv-01468

EXHIBIT 63

to move forward with a campus investigation into allegations of domestic violence, where there concern regarding participation of the reporting party, requires balancing numerous factors, including the safety of the reporting party against the safety of the campus community at large. The prohibition on using statements and evidence provided by a witness who refuses to participate as well as statements made to a third party by a witness that refuses to participate effectively binds the institution's hands in these complicated matters. (85 Fed. Reg. at 30,347.) It is apparent that the Rule did not contemplate the impact of cross-examination and prohibition against the use of statements made by a party that does not participate in these matters. Had institutions been permitted to comment on this particular issue, and all of the attendant complexity, a possible resolution could have been a more nuanced approach to the use of statements in this administrative process.

### Immediate Harm:  Other Provisions That Will Chill Reporting, Reduce Deterrence on Campus, and Impose Significant Administrative and Final Burdens

33.     The Rule requires CSU to dismiss a complaint under Title IX unless the conduct is so severe, pervasive <u>and</u> objectively offensive that it effectively denies the victim equal access to education.  (New Rules § 160.30(a) and §160.45(b)(3)(i).)

34.     The Rule's definition of sexual harassment under Title IX is narrower than California and other federal laws (*e.g.*, Title VII of the Civil Rights Act of 1964; California's Fair and Employment and Housing Act, Unruh Civil Rights Act and Education Code), and the definition conflicts with the spirit and intent of the California Equity in Higher Education Act (Cal. Educ. Code § 66250 *et seq.*) and the California Donahoe Higher Education Act (Cal. Educ. §§ 66000 *et seq.*).

35.     The Rule's narrow definition of sexual harassment will undermine CSU's education and prevention efforts because of the limitations it places on CSU in terms of responding under Title IX to forms of sexual harassment that may be severe, pervasive, or objectively offensive – but not all three – or that impact a student's access to education or ability to benefit from it, but do not

Decl. of Linda Hoos                                                     Civil Action No. 20-cv-01468
EXHIBIT 63

"effectively deny" a student "equal access."  I expect that fewer Title IX complaints would move forward under this new threshold, and the Rule requires that we now dismiss such complaints and address them under our code of conduct provisions.  This heightened threshold and the confusion and administrative burdens created through this two-tiered system will erode student trust in the system, deter students from reporting complaints and getting the help they need to reach their educational goals, and damage campus climate.

36.     The Rule states that sexual harassment by a student or employee that *does not occur* in "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs", or in a "building owned or controlled by a student organization that is officially recognized by a postsecondary institution", *does not* violate Title IX, even if the consequences of such misconduct might "effectively den[y] a person equal access to the recipient's education program or activity." (New Rules §§ 106.30 & 106.44(a).)  For example, under the Rule, an alleged student-on-student sexual assault at a party in a private house a few blocks off campus *generally cannot* constitute a violation of Title IX, even though the student assaulted at that party may, as a result, have difficulty accessing or completing his or her education due to likelihood or fear of continued exposure to the respondent on-campus.

37.     The location of an assault, however, does not logically lessen the impact of attending an institution with the person who caused the harm.  Moreover, limiting the ability of the University to investigate and take appropriate action under Title IX may impede the institution's ability to protect other students from similar harm.  Students often prefer to report to the University rather than law enforcement.  This occurs for many reasons, including that it is rarely the desire of reporting students to put other students at risk of criminal prosecution.  More often they simply want help continuing their education.  In my experience, students who have been assaulted by another student need a quick

Decl. of Linda Hoos                                                   Civil Action No. 20-cv-01468
EXHIBIT 63

university response because of reasonable concerns about returning to campus and classes with the alleged assailant.

38.     Although, the Rule narrows the universe of prohibited conduct under Title IX, conduct that has historically been prohibited by Title IX (and under the Rule no longer will be) remains prohibited under California and other federal laws.  Due to differences in the law and recent court decisions, the CSU already has two separate policies for matters involving sexual harassment. As a result of the Rule, the CSU will now be required to develop, publish and utilize an additional separate sexual harassment policy – one for "Title IX sexual harassment," another for sexual misconduct, and yet another for "other prohibited sexual harassment" – which will use inconsistent definitions of prohibited conduct and different investigation and resolution processes.  This will require more administrative infrastructure (including undertaking two separate processes for many incidents), more complicated and time-consuming training of myriad stakeholders (e.g., students, employees, administrators, investigators, advisors, and hearing officers) that includes additional time and resources necessary to respond to questions and clarify different and inconsistent standards, and will impose a significant unfunded economic burden on the CSU.

39.     The Department proposes in the preamble to the Rule that universities can mitigate the necessity for a dual system, in part, by handling all of the other cases no longer covered by Title IX and other multi-jurisdictional cases under the onerous and costly live hearing process.  This is entirely unreasonable proposal because of both the expense, which the Department identifies as $18,072 per case, and the extensive staff and student time involved.

40.     In addition, because the Department has provided an appeal for any cases that the CSU dismisses under Title IX to handle under our own code of conduct processes, we will likely be forced to wait until the Title IX appeal process is completed before we can move forward with the separate

process under our own code of conduct procedures.  (Rule §106.45(b)(3).)  If the University proceeds, but the Department later decides that we incorrectly categorized the conduct as non-Title IX, then the Department has indicated that the CSU and the students would be required to complete the investigative process over again, under the Department's mandated procedure.

41.     In sum, under the Rule, the Department has mandated a costly and duplicative set of procedures.  The substantial costs and administrative burdens associated with the multi-tiered system will cause significant harm to students and the CSU on account of lengthy delays in resolution, multiple, duplicative, and confusing processes, and substantial new administrative costs and burdens.

42.     In addition, by narrowing the scope of the Department's purview with respect to sexual harassment, the Rule exponentially increases the confusion and complexity on campus by requiring institutions to create and operate – and students to understand – two policies prohibiting sexual harassment that are governed by different grievance processes and different standards.  The Rule naively contemplates an "ideal" complainant who can perfectly articulate the nature of the conduct that occurred and understand that the geography and type of conduct will necessarily result in a separate process.  There is little consideration that complainants and respondents are often unsophisticated young adults between the ages of 18 and 24, who do not have the resources to procure legal assistance or other support.  Expecting students to understand how to navigate varying requirements depending on the type of conduct alleged and where it occurs is simply unreasonable and unrealistic.

43.     As Systemwide Title IX Compliance Officer for the CSU, I lead the University's efforts to improve training, education and preventative measures that California law requires each campus to implement to combat "racism, sexism, and other forms of bias … [in furtherance of every California's postsecondary educational institution's] responsibility to provide equal educational

opportunity." (Cal. Educ. Code § 66252(b).) The task of discussing intimate behavior, explaining affirmative consent, sexual harassment and sexual misconduct (including, the behaviors, the complaint processes and the reporting options) to young adults – 74% of whom are between the ages of 18 and 24 – is extremely challenging.  Over the past several years, hundreds of thousands of CSU students and thousands of CSU employees have received comprehensive training on these complex and sensitive issues through various modalities.

44.     The Rule needlessly complicates the sexual harassment "landscape" and related grievance process.  For example, under the Rule, one student's complaint of sexual harassment by another student will, if substantiated, violate CSU policy, although, in some cases, not CSU's Title IX policy.  Which policy applies (i.e., "Title IX sexual harassment," or "other prohibited sexual harassment") will depend on such factors as the nature of the harassment (e.g., was it "severe, persistent, and objectively offensive," or merely "severe or pervasive?"), or the location or other circumstances of the incident.

45.     Enrolled and first year students along with employees will need to receive additional substantive and process-related training in addition to the training that they already receive. When a student or employee seeks to report a complaint or is being informed of a complaint against them, the Title IX Coordinator will have to spend a significant amount of time discussing which process might apply to the incident (rather than focusing on more important issues like the individual's experience, fears, needs and concerns about their classes or living/working arrangements).   These complex rules – and the necessary discussions about them – will create great confusion and frustration for our campus communities at a time when students and employees are already anxious and vulnerable due to the COVID-19 pandemic.

46.     CSU has an important interest in ensuring that students and employees receive equitable and adequate protection during the sexual harassment complaint process.  The Rule thwarts the CSU's interest in establishing one consistent set of rules and processes to ensure that students are protected when someone makes a sexual harassment complaint.

47.     Although written complaints are encouraged at the CSU, many students prefer to report a complaint orally (at least in the first instance), because it is difficult for them to write about their experience, or because they feel that they will communicate more effectively face-to-face with a person they trust.  The Rule, however, requires that complaints be made formally in writing with a request for investigation before an investigation can proceed, and be signed by the complainant, or otherwise indicate that the complainant is the person filing the formal complaint.  (Rule §106.30(a).) The Rule also prohibits students from filing a complaint after they have left the university, even if the reason for the departure was sexual assault, dating violence, stalking, or harassment.  (*Id.*)  Such procedural limitations serve no purpose other than to discourage or otherwise limit reporting and investigation of incidents by the CSU.  These procedural limits, along with statements in the preamble that the Department has created a new violation for Title IX Coordinators who proceed with a complaint investigation, when a complainant is unavailable to move forward, increase the liability for our campuses and put students in harm's way by undermining the CSU's ability to take prompt and equitable action to stop known harassment and assault on our campus and prevent perpetrators for harming other students.

### Immediate Harms: Additional Costs and Administrative Burdens Regarding Implementation of the Rule

48.     The NPRM estimated that the Rule will result in "cost savings for IHEs [institutions of higher education] over the ten-year horizon" (83 Fed. Reg. at 61,492) but these estimates were

based on flawed assumptions.  The preamble to the Rule has modified the initial estimates based on comments received from the public, however, the result is the same.  Some examples are noted below:

49.     The NPRM estimates that the Title IX Coordinator and a lawyer will spend 8 hours and 16 hours, respectively, to review the final regulations. (83 Fed. Reg. at 61,486.)  The Rule modified this estimate to 12 hours and 48 hours respectively.  (85 Fed. Reg. at 30,557).  This remains a gross underestimation.  Based on my experience, the extraordinary length of the Rule and preamble and the necessity to review even the footnotes, which include additional prohibitions and requirements not included in the text of the Rule, and the number of changes to existing policies and procedures that must be contemplated, including in more than one thousand footnotes, I estimate that the Title IX staff in the Chancellor's Office, Office of General Counsel, and other Chancellor's Office and University stakeholders (*e.g.,* unions, campus Title IX coordinators and investigators, Student and Academic Affairs professionals, Human Resources professionals, student, faculty and other stakeholders) will spend *hundreds of hours* reviewing the Rule and developing the policies and procedures and training needed to implement the Rule and, in particular, necessary to adapt to the two-tiered system that the Rule creates (*see e.g.,* paras. 35 & 41, *infra).*  To date, I, alone, have already spent over 40 hours reviewing the Rule and preamble.  As such, the total cost for Year 1 alone at the CSU will be many multiples of the Department's estimate described in the NPRM and subsequent modification.

50.     The NPRM and the Rule also grossly underestimate the training efforts and costs associated with the Rule.  Among other things, neither takes into consideration the costs of training *all* Title IX-related professionals, including, investigators, advisors, hearing officers, hearing coordinators, multiple decisionmakers (not to mention our students and employees) on the Rule's definitions, requirements and the two-tiered grievance process that inevitably flows from the Rule.

Decl. of Linda Hoos                                                          Civil Action No. 20-cv-01468
EXHIBIT 63

Such comprehensive training will be crucial to protecting our students' right to an educational environment free from discrimination and harassment, and fair process in student hearings.

51.     The NPRM and the Rule fail to meaningfully consider any of the costs associated with the emotional, mental health, and academic harms to student and employee victims of sexual harassment and assault, and the significant health, workplace, and academic support resources that the CSU will be required to expend to address the needs of individuals subjected to sexual harassment.

52.     The Rule rationalizes the marked reduction in protection for complainants and the restrictions it places on formal complaints advancing to the grievance process by stating that "supportive measures" will be utilized when investigations are not permitted.  The term "supportive measures" appears nearly 1000 times in the preamble and is relied upon heavily to justify the anticipated reduction in investigations as well as the anticipated increase in mental anguish due to cross-examination (85 Fed. Reg. at 30,316, 30,557).  The Rule describes "supportive measures" as encompassing everything from academic accommodations, to counseling, to safety escort services.

53.     However, for all of this emphasis on the importance of support measures, the Rule places the per provision estimate of supportive measures at a mere $250.  Most CSU campuses provide campus advocates for complainants, as is required by state law, as well as counseling services for both respondents and complainants.  In addition, numerous hours are spent with students and employees to work through class, housing and workplace accommodations in each and every matter. The Rule has created a far more complex and challenging process for participants.  The need for supportive measures will likely be even greater based on this process alone. In my experience, a hearing process is emotionally challenging for participants.  This will be exacerbated by the Rules, which lengthen the process and make it more adversarial.  This will require institutions to provide

even more support, including supportive measures for classes and counseling. The estimate is a woefully inadequate estimate of the costs that the campuses will bear.

54.     Considering all of the changes in the Rule, based on my experience, the CSU will experience a marked *increase* in administrative, training, and health and academic support costs to implement Title IX accompanied by a marked *decrease* in the level of reporting incidents of sexual harassment.

55.     The CSU currently provides live hearings for students accused of sexual misconduct who are facing a severe sanction.  The average cost per hearing is approximately $10,000.  Since July 2019, there have been over 50 hearings spread across 23 CSU campuses.  With the addition of dating and domestic violence as well as the inclusion of employees in the Rule, it is almost certain that the amount of hearings will increase and the cost of each hearing will increase as well as supported by the Department's own estimate of $18,072 per case.

56.     At the same time that the Department is requiring the CSU to implement a slew of costly new procedures and processes, CSU and all other schools in the state are facing an unprecedented decline in revenues due to the COVID-19 pandemic.  On May 14, 2020, Governor Newsom released the May revision for the State's budget for FY 2020-21, which detailed drastic budget adjustments for all of the State's universities, including the CSU system.   When the Governor's budget was originally released on January 10, 2020, the budget projected a $5.6 billion surplus for FY 2020-21 and $21 billion in reserves.  The May 7 revision now projects a $41 billion decline in revenues by the end of FY 2020-21 with a $13 billion increase in health and human services program costs and other pandemic-related expenditures, resulting in a projected budget shortfall of $54 billion as compared to the January budget proposal.  The May 7 revision further projects a $398 million decrease in funding for the CSU.

Decl. of Linda Hoos                                            Civil Action No. 20-cv-01468

EXHIBIT 63

57.    In sum, the Rule makes it more difficult for postsecondary institutions to comply with their responsibilities under both California and federal law to provide an educational environment free from discrimination and harassment and will result in our campuses being less safe and less able to respond promptly and effectively to address and resolve incidents of discrimination and harassment.  The Rule unnecessarily ties the hands of our CSU staff to take speedy action that is necessary to stop sexual harassment, prevent its recurrence, and address its effects not just on individual students, but our entire community, even while recognizing that the prescriptive procedures to which we must strictly comply are not required by any law or the constitution.  The Rule also creates substantial new costs and administrative burdens for our campuses and an unreasonable and unrealistic date for implementation, during a national pandemic, which has decimated our system's funding and required a significant diversion of resources to address the ongoing crisis.

Executed on this _10th_ day of _June_, 20_20_

Linda Hoos
Systemwide Title IX Compliance Officer
California State University System

Decl. of Linda Hoos                                    Civil Action No. 20-cv-01468

EXHIBIT 63

# EXHIBIT 64

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | **Civil Action No. 20-cv-01468-CJN** |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF ANGÉLICA INFANTE-GREEN, COMMISSIONER, RHODE ISLAND DEPARTMENT OF ELEMENTARY AND SECONDARY EDUCATION

I, ANGÉLICA INFANTE-GREEN, in my official capacity as Commissioner of the Rhode Island Department of Elementary and Secondary Education ("RIDE") and pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I have been employed as the Commissioner of RIDE since April of 2019.  I hold an M.A. in Education and in School Administration & Supervision from Mercy College.  Before assuming my current role, I served as the Deputy Commissioner of the New York State Education Department's Office of Instructional Support P-12. I began work in New York State in 2013 where

Decl. of Angélica Infante-Green                                                    Case No. 20-1468

EXHIBIT 64

my portfolio included overseeing the Office of Bilingual Education and World Languages; the Data

Systems and Educational Technology Office; the Office of Assessment, Standards, and Curriculum;

the Office of Special Education; and the Office of District and School Review.

2. As RIDE's Commissioner, I serve as the chief executive officer of the Rhode Island

Council on Elementary and Secondary Education (the "Council"), as well as RIDE's chief

administrative officer, and have been invested with broad interpretative and enforcement powers

and duties, as well as adjudicatory powers and duties exercised pursuant to the State's

Administrative Procedures Act (the "APA"), R.I. Gen. Laws § 42-35-1, *et seq*., including:

> (a) jurisdiction over "any matter of dispute. . . arising under any law relating to schools or education . . ." R.I. Gen. Laws §§ 16-39-1 and 16-39-3.1, including "all complaints relating to the anti-discrimination laws in the area of elementary and secondary education," R.I. Gen. Laws § 42-87-5(c);
>
> (b) a "duty" to "decide such controversies as may be appealed . . . from decisions of local school committees." R.I. Gen. Laws §§ 16-1-5(10) and 16-60-6(9)(viii); and
>
> (c) the power to decide "petitions for declaratory rulings as to the applicability of any statutory provision or of any rule or order of the agency" under the APA. *See* R.I. Gen. Laws § 42-35-8.

3. I submit this Declaration in support of the State of Rhode Island's litigation against

Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States

Department of Education ("ED" or the "Department"); and the United States of America regarding

the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or

Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title

IX Rule" or the "Rule"). RIDE's Chief Legal Counsel has assisted me in gathering the following

information.

## I.      The State's Role in Public Education and Education Programs

Decl. of Angélica Infante-Green                                          Case No. 20-1468
EXHIBIT 64

4.      The eight (8) members of the Council, who are appointed from the Rhode Island Board of Education by the Governor, have been authorized by the State Legislature:  (a) "[t]o adopt standards and require enforcement and to exercise general supervision over all elementary and secondary public and nonpublic education in the State  . . ." R.I. Gen. Laws § 16-60-4(a)(2); and (b) to maintain a department of elementary and secondary education.  *See id*. at (a)(6).

5.      The State has 189 public schools, including charter schools, in which some 143,329 students were enrolled during the 2019-2020 school year.

6.      The State's public education funding formula is set forth under title 16, chapter 7 of the Rhode Island General Laws, as well as pursuant to the State's Education Equity and Property Tax Relief Act (the "Funding Formula Act").  The mandated calculations include:

(i)      the cost of a "basic education program," which is defined as "the cost of education of resident pupils in grades twelve (12) and below in average daily membership for the residence year as determined by the mandated minimum program level;" as well as

(ii)     the "mandated minimum program level," which is "the amount that shall be spent by a community for every pupil in average daily membership."

7.      The fiscal year 2020 enacted budget for public education reflected the expenditure of some $1,239,252,258 in State funds, and $213,292,458 in federal funds.

8.      The State's utilization of federal funds and work with the U.S. Department of Education in the elementary and secondary school context, include, *inter alia,* the administration of:

(a)      Title I, Part D, Subpart I to support State agencies that are responsible for providing free public education for children and youth in institutions for neglected or delinquent children and youth, attending community day programs for neglected or delinquent children and youth, or in adult correctional institutions;

Decl. of Angélica Infante-Green                                                                    Case No. 20-1468
EXHIBIT 64

(b)     All of the federal program formula funds through a Consolidated Resource Plan submitted annually for each local educational agency ("LEA").[1] The funds, once allocated, are allotted to each eligible LEA, which will apply for the use of funds in accordance with the allowable uses under Title IV(A) and the General Provisions of ESSA, and RIDE ensures that awards made to the LEAs under Title IV Part A, subpart 1, are in amounts that are consistent with ESEA section 4105(a)(2); and

(c)     Rhode Island has established protocols for the identification and services for students who experience homelessness, based on the requirements outlined in the McKinney-Vento Homeless Assistance Act. Homeless children and youth are identified and reported through the Statewide educational data system.

9.      In addition, RIDE has adopted the *Rhode Island After-School Quality Standards and Indicators* pursuant to which all 21st Century Community Learning Center programs are required to be aligned, which places emphasis on a positive youth development and a whole child approach. These standards promote social and emotional learning, health and safety, positive relationships, family engagement, skill building, and youth voice and choice.

10.     There currently are twelve (12) accredited, degree-granting post-secondary institutions operating in the State, including two research universities, a community college, and a school of art, with over 83,000 enrolled students.

11.     The Rhode Island Council on Postsecondary Education (the "Postsecondary Council") is an independent public corporation vested with the responsibility of providing oversight for the system of public higher education in Rhode Island.  This system consists of two public institutions of higher learning, Rhode Island College ("RIC"), which serves approximately 7,800 students, and the Community College of Rhode Island ("CCRI"), with an average

---

[1] As used herein, LEAs shall refer to any public authority legally constituted within the state for either administrative control of, or to perform a service function for, public elementary or secondary schools in a city, town, school district, or other political subdivision of the state, or for a combination of school districts as are recognized in the state as an administrative agency for its public elementary or secondary schools.

Decl. of Angélica Infante-Green                                          Case No. 20-1468
EXHIBIT 64

enrollment of 14,011 full and part-time for-credit students in the 2019 academic year.  In addition, the Postsecondary Council has historically reviewed and approved audited financial Statements for the University of Rhode Island ("URI"), the only publicly-supported research institution in the State with a combined enrollment of 17,974 students.

12.     The Office of the Postsecondary Commissioner, which operates under the direction of the Commissioner of Postsecondary Education, is the administrative and research arm of the Rhode Island Council on Postsecondary Education.  The Postsecondary Council has eight (8) members, along with the Chair of the Board of Education *ex-officio,* and one non-voting student member.  *See* R.I. Gen. Laws §16-59-2.

13.     During fiscal year 2019:

    (a)     URI received State appropriations of $80.97 million to cover operating expenses in excess of $6.43 million;

    (b)     RIC's federal Perkins Loan program provided a refundable grant of approximately $2,521,000, and State appropriations to RIC in the form of direct appropriations, State capital plan funds and State contributed capital totaled some 67,945,085; and

    (c)     CCRI had direct appropriations, State contribution capital contributions and funds contributed from the Rhode Island Capital Plan Fund totaling some $56,085,283.

**II.     State Law and Programs on Sexual Harassment**

15.     Rhode Island's Civil Rights Act ("RICRA"), R.I. Gen. Laws §§ 42-112-1 *et seq*., protects against discrimination based on one's "race, color, religion, sex, disability, age, or country of ancestral origin," R.I. Gen. Laws § 42-112-1, and Rhode Island courts look to federal law construing analogous civil rights statutes in assessing discrimination claims under RICRA. *See, e.g., Doe v. City of Pawtucket,* 374 F.Supp.3d 188, 203 (D.R.I. 2019) citing *Colman v.*

*Faucher*, 128 F.Supp.3d 487, 491 n.8 (D.R.I. 2015) ("The Rhode Island Supreme Court analyzes [RICRA] claims using substantive federal law from analogous causes of action.").

16.     In addition, R.I. Gen. Laws § 16-38-1.1 and § 16-45-1.1(d)(1)(iv) prohibit discrimination on the basis of sex in all public elementary and secondary schools in the State, and R.I. Gen. Laws 16-38-1 provides that "no person shall be excluded from a public school on account of race or color, or for being over fifteen (15) years of age." *Id.*; *see also Regulations Governing Protections for Students Rights to be Free from Discrimination on the Basis of Sex, Gender, Sexual Orientation, Gender Identity, or Gender Expression*, 200 R.I. Admin. Code 30-10-100 (2018) (enforcing prohibitions on sex discrimination, including sexual orientation and gender identity discrimination).

17.     LEAs in the State also are required to adopt a policy for responding to incidents of dating violence and to provide dating violence education to students, parents, staff, faculty and administrators, *see* R.I. Gen. Laws § 16-21-30, § 16-85-2 and § 16-21-34, and all school districts must adopt the *Statewide Bullying Policy*, 200 R.I. Admin. Code 30-10-2.1 (2012).  In addition, RIDE has published a *Guide to Preventing Bullying, Teen Dating Violence and Sexual Violence in Rhode Island Schools* (2012).[2]

18.     RIDE's hearing officers have full discretion to handle complaints of sexual harassment in whatever manner they deem appropriate, consonant with the APA and fundamental dictates of due process.

---

[2] https://1.next.westlaw.com/Document/N53684C30FF7911E8BBCC8C5D4D2DDCAE/View/FullText.html?originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default)

Decl. of Angélica Infante-Green                                      Case No. 20-1468
EXHIBIT 64

19.     The Postsecondary Council has promulgated a *Sexual Harassment and Sexual Violence Policy* (March 12, 2018) (the "Harassment Policy"),[3] which defines "sexual harassment" as:

> unwelcome sexual advances, request for sexual favors, and any other verbal, non-verbal or physical conduct of a sexual nature when:
>
> (1)     Submission to such conduct is made, either explicitly or implicitly, a term or condition of an individual's education, employment, or participation in programs or activities at the Covered Entity;
>
> (2)     Submission to or rejection of such conduct by an individual is used as a basis for decisions affecting that individual's education, employment, or participation in programs or activities at the Covered Entity; or
>
> (3)     Such conduct is so severe or pervasive that it has the purpose or effect of unreasonably interfering with an individual's education, employment or participation in programs or activities at the Covered Entity and/or creating an intimidating, hostile, offensive or abusive employment, academic, extracurricular or living or learning environment for the individual at the Covered Entity.
>
> * * *
>
> Sexual harassment need not be intentional. The intent of the person who is alleged to have committed such behavior may not be relevant to determining whether a violation has occurred. The relevant determination is whether a reasonable person similarly situated could have reasonably considered the alleged behavior to be sexual harassment.

*Id*. at 3.

20.     The Harassment Policy requires that covered entities investigate complaints and allegations of sexual harassment and sexual violence against their employees pursuant to the Postsecondary Council's *Complaint Procedures for Discrimination, Sexual Harassment & Sexual Violence* (June 17, 2015) (the "Complaint Procedures"),[4] which provides, *inter alia*, that:

---

[3] https://www.riopc.edu/static/photos/2018/08/21/SexualHarassment_CPE_APPROVED_4-1-2015Tech_Rev._081418.pdf
[4] https://www.riopc.edu/static/photos/2018/08/22/OPC_Complaint_Procedures_8_2018.pdf

Decl. of Angélica Infante-Green                                   Case No. 20-1468
EXHIBIT 64

The Affirmative Action Officer/Title IX Coordinator shall meet with the Complainant to discuss the Complainant's concerns, and review the complaint procedure, determine the appropriate jurisdiction, and explain the different methods available to resolve the complaint under these procedures. (See: formal resolution and informal resolution, where applicable).

The purpose of this initial step is to assist individuals to identify the source of the concern and provide the Complainant with information concerning lnstitutional/OPC resources, policies and procedures; so that the Complainant might best assess  the most appropriate course of action, given their circumstances.

*Id.* at 9.

21.     The Harassment Policy goes on to provide that:

If it is determined that the Affirmative Action Office shall retain responsibility for the  case, the Affirmative Action Officer/Title IX Coordinator will ascertain from the Complainant which of the following procedural resolution options he/she prefers to utilize.

Informal Resolution (Not an Option for Sexual Violence Cases)
Formal Resolution

The selected option will be verified by the Complainant's signature. Selection of an option at this time will not preclude the Complainant from electing another option at a later time, where appropriate, as determined in consultation with the Affirmative Action Officer/Title IX Coordinator. Informal Resolution may only be utilized when both the Complainant and Respondent agree to it.

If it is determined that the case should not be addressed by the Affirmative Action Office, the Affirmative Action Officer or Title IX Coordinator will refer the Complainant to the appropriate office or department.

*Id.*

22.     The Informal Resolution procedure contains the following steps:

**Step 1: Notifying the parties**
Upon receipt of a complaint, the Office of Affirmative Action/Title IX Coordinator shall notify and meet with the Complainant and the Respondent.

**Step 2: Information gathering**
In an effort to fully understand the facts and positions of the Complainant and the Respondent, the Investigator shall take steps that he/she deems necessary to gather additional information from the parties or from others perceived to have knowledge of the allegations.

Decl. of Angélica Infante-Green                                          Case No. 20-1468
EXHIBIT 64

**Step 3: Resolution or Next Steps**
If all parties agree to the informal resolution process, the Affirmative Action Officer/Title IX Coordinator will make all reasonable attempts to resolve the matter within thirty (30) days. The specific details of each case will determine the best possible means for achieving a satisfactory resolution.
If the informal resolution process fails to resolve the matter to the satisfaction of both the parties, or the terms of the informal resolution as subsequently broken, either may request a Formal Resolution/Investigation of the charge within 10 calendar days of concluding the Informal Resolution Process.

*Id*. at 12-13.

23.     By contrast, the Formal Resolution process involves:

**Step 1: Complainant's Written Statement**
Normally, a signed incident complaint form containing a written Statement of allegations initiates the formal process. In order to enable the Investigator to most effectively investigate the complaint, the written Statement of allegations should contain a detailed description of the conduct being complained about, the name(s) of the alleged offender(s), the name(s) of the alleged victim(s), the names of any alleged witnesses, and the name of the person filing the complaint. The Affirmative Action Officer/Title IX Coordinator will provide assistance to anyone for whom completion of the complaint form is difficult or impractical. The person or persons filing the complaint and/or the alleged victim of discrimination shall be referred to hereinafter as the "Complainant." Anonymous complaints, and complaints filed by individuals who request confidentiality, will be investigated by the lnstitution/OPC to the extent possible pursuant to the procedures set forth herein.

**Step 2: Notifying the Respondent**
The person or persons identified as the alleged offender shall be referred to hereinafter as the "Respondent." Once the complaint has been filed, the Affirmative Action Officer/Title IX Coordinator will notify the Respondent(s) by written letter of its existence and provide him/her/ them with a copy of the signed complaint.

**Step 3: Respondent's Written Response**
The Respondent(s) will be provided an opportunity to file a formal response. The formal response shall be filed with the Affirmative Action Office/Title IX Coordinator by the Respondent(s) within twenty (20) days from the date the Respondent(s) received the signed complaint.
If the Respondent fails to timely file a formal response and/or elect(s) not to participate in the formal resolution process, the case will proceed and be investigated with or without the involvement of the Respondent.
If, during the investigation, the Complainant indicates a desire to withdraw his/her complaint, the Complainant shall sign a written Statement of withdrawal

containing the reasons therefore and the case may be closed in the discretion of the Affirmative Action Officer/Title IX Coordinator. However, the Affirmative Action Officer/Title IX Coordinator may continue to conduct the investigation and take action to address the issues raised by the Complainant regardless of the Complainant's wishes.

**Step 4: Investigation Process**
The Affirmative Action Officer/Title IX Coordinator or designee will act as investigator. The investigator is neutral, objective, and does not act as an advocate for either party. The investigator is authorized to contact any and all persons who may have information relevant to the complaint and shall have access to all relevant College/ University/OPC records. The investigator shall also collect and evaluate other available records and information relevant to the complaint and investigation (e.g. email communications, medical test results, photographs), as appropriate. The investigator shall maintain a record of the investigation, including any interviews, which shall be retained as an official Affirmative Action Office record.

**Step 5: Final Investigative Report**
A final investigative report shall be prepared which sets forth the findings of the Affirmative Action Officer/Title IX Coordinator or designee and the basis and rationale for his/her conclusion(s). Unless otherwise indicated in the report, the date of the report shall be considered the date upon which the results of the investigation become final. In making his/her findings, the Affirmative Action Officer/Title IX Coordinator or designee shall utilize the evidentiary standard of "preponderance of the evidence." The final investigative report shall normally be issued within sixty (60) days after the complaint is filed. When more than sixty (60) days is needed to complete the investigation, the Affirmative Action Officer/Title IX Coordinator or designee shall notify the parties and proceed as expeditiously as possible. Allegations or evidence of violations of policies and procedures that are discovered during the investigation but which are outside the jurisdiction of the Affirmative Action Officer/Title IX Coordinator shall be referred to the appropriate office for resolution. The Affirmative Action Officer/Title IX Coordinator or designee will simultaneously provide copies of the report to the Complainant and the Respondent, and will also send a copy to the appropriate Vice President/Provost or Associate Commissioner. The Complainant and Respondent will also be advised of the appeal process at that time.

*Id*. at 14-16.

### III.     The Negative Impact of the Proposed Rule

24.     The Title IX Rule will have a negative effect on the State-level work of RIDE

and, upon information and belief, upon the work of the Postsecondary Council, RIC, CCRI and

Decl. of Angélica Infante-Green                                                  Case No. 20-1468
EXHIBIT 64

the private colleges and universities throughout the State and will necessitate a thorough review of many of the guidance and implementation documents on safe and inclusive learning environments that have been promulgated.

### a.    Effects on Students and Communities

25.    All of the State's work on safe learning environments was formulated with the interest of students and campus communities throughout the State in mind, and I am concerned that the standards and procedural requirements articulated in the Title IX Rule will have a negative impact on students' educational experience. In particular, the heightened standard for what constitutes sexual harassment under Title IX, the restrictive scope of application of the statute, live mandatory hearings, the requirement to provide advisors, and live cross-examination by an advisor requirement will likely have a negative chilling effect on sexual harassment reporting.

### b.    Effects of COVID-19

26.    RIDE staff and, upon information and belief, the staff of the Postsecondary Council, the Rhode Island Department of Health, RIC and CCRI have spent considerable time and resources planning for, finalizing, and disseminating regulations designed to provide a safe school environment for students, and the Postsecondary Council's Complaint Procedures rely heavily on the policies and procedures that colleges and universities have disseminated and employed to enforce Title IX, and these procedures, as well as the less formalized procedures often followed by RIDE Hearing Officers, are consistent with the Department of Education's longstanding Title IX policies and guidance.  All of these policies and regulations will have to be reviewed in light of the Title IX Rule.

Decl. of Angélica Infante-Green                                                    Case No. 20-1468
EXHIBIT 64

27.     However, Rhode Island has been hard hit by the COVID-19 pandemic.  The
Governor declared a state of emergency on March 9, 2020, *see* Governor Gina Raimondo's
Executive Order 20-02, and to date, there are over 16,000 reported cases of COVID-19 infection
in the State, and there have been 876 fatalities.[5]

28.     Moreover, RIDE, the Postsecondary Council, RIC and CCRI have small legal
staffs – RIDE has a grand total of three full-time attorneys and the Postsecondary Council has
one – and both agencies are employing almost all of their resources as they scramble to adopt
best practices to guide the anticipated reopening of schools in the Fall.  Under such
circumstances, they simply will lack the capacity to do the work necessary to make the changes
and revisions to existing policy mandated by the adoption of the Title IX Rule.

29.     Finally, the changes to Title IX proceedings in the Rule will likely cause
confusion and anxiety at a time when school communities are operating in an unprecedented
context of high anxiety.

Executed on this 19th day of June, 2020.


ANGÉLICA INFANTE-GREEN,
Commissioner, R.I. Department of Elementary
and Secondary Education

---

[5] https://www.ri.gov/press/view/38625

Decl. of Angélica Infante-Green                                    Case No. 20-1468
EXHIBIT 64

EXHIBIT 65

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF DR. JANIECE JACKSON

I, Dr. Janiece Jackson, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Superintendent of Lindop School District 92 ("District" or "District 92"), located in Broadview, Illinois.  My educational background includes a Doctorate of Education in Leadership from Aurora University, a Master of Education in Administration from the University of Illinois at Chicago, a Master of Science Education in Adult Continuing Education from Northern Illinois University, and a Bachelor of Science Education in Business Education from Eastern Illinois

University.  I have served as Superintendent of Lindop School District 92 since 2015.  From 2008 to 2015, I was employed by Matteson School District 162 in Richton Park, Illinois, where I served as an Assistant Principal, then a Principal, and then a Grants Administrator.  Prior to that, I was employed by Bellwood School District 88 in Bellwood, Illinois, as Director of Curriculum and Instruction and Director of Personnel.  Prior to becoming an administrator, I taught High School Business at Whitney M. Young Magnet School in Chicago, Illinois.

2.      I submit this Declaration in support of the State of Illinois' litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through a combination of personal knowledge, information supplied by District personnel, and documents that I have reviewed.  I have also familiarized myself with the Rule in order to understand its immediate impact on District 92.

### Background on District 92

3.      Lindop School District 92 is an Illinois public school district that serves approximately 438 students in Prekindergarten through 8th Grade.  The District has 78 employees, including 39 certified staff members, 12 paraprofessionals, 4 custodians, 10 lunchroom staff members, 3 administrative assistants, 1 safety officer, 1 information technology intern and 8 administrators.  The District is comprised of one school, Edmund F. Lindop School, which is located at 2400 18th Avenue, Broadview, Illinois 60155.

4.      The District receives a combination of federal, State, and local funds.  The District is subject to the Illinois School Code, 105 ILCS 5/1 *et seq.*, along with implementing regulations

developed by the Illinois State Board of Education ("ISBE").  ISBE is responsible for administering education in the State of Illinois, through setting policies and guidelines for public and private Illinois schools and through auditing schools' performance via its annual Illinois Schools Report Card.

5.      The District receives federal funds from the Department.  As a result, the District is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

<strong>Summary of Existing Title IX Sexual Misconduct Policy</strong>

6.      The District has adopted a policy that prohibits sexual harassment and sexual misconduct by students and employees and establishes a grievance process for addressing complaints of sexual harassment.  Board Policy 7:20, *Harassment of Students Prohibited*, provides that no person, including a District employee or agent, or student, shall harass, intimidate, or bully a student on the basis of any actual or perceived legally protected category, including sex.

Board Policy 7:20 provides that any District employee who is determined, after an investigation, to have engaged in conduct prohibited by the Policy will be subject to disciplinary action, up to and including discharge.   Any District student who is determined, after an investigation, to have engaged in conduct prohibited by Board Policy 7:20, will be subject to disciplinary action, including but not limited to suspension and expulsion consistent with Board Policy 7:190, *Student Behavior*.

Pursuant to the jurisdictional provision set forth in Board Policy 7:190, the District investigates alleged instances of off-campus sexual harassment by District students where such alleged harassment interferes with, disrupts, or adversely affects the school environment, school operations, or an educational function.  Similarly, the District investigates off-campus conduct by

Decl. of Janiece Jackson                                                          Case No. 20-cv-01468-CJN

EXHIBIT 65

employees, including off-campus sexual harassment, where there is a reasonable nexus between the off-campus conduct and the employee's job responsibilities.

7.     I serve as the District's Nondiscrimination/Title IX Coordinator.  In that role, I am responsible for overseeing the District's compliance with federal and State nondiscrimination laws, including Title IX.  This includes ensuring that the school community is informed of the District's prohibition on harassment of students, including sexual harassment, and coordinating regular harassment awareness and prevention training opportunities.  The District also has designated Complaint Managers who are responsible for investigating complaints of harassment, including sex-based harassment.

8.     Board Policy 7:20, *Harassment of Students Prohibited*, was last revised in January 2020.  The revision process for Board Policy 7:20 included a review by the Board of Education's Policy Committee, followed by two readings by the full Board of Education, along with opportunities for input and feedback by members of the District community and general public throughout the process.

9.     Pursuant to Board Policy 7:20, a person engages in sexual harassment whenever he or she makes sexual advances, requests sexual favors, and/or engages in other verbal or physical conduct, including sexual violence, of a sexual or sex-based nature, imposed on the basis of sex, that:

(1)     Denies or limits the provision of educational aid, benefits, services, or treatment; or that makes such conduct a condition of a student's academic status; or

(2)     Has the purpose or effect of:
   a.  Substantially interfering with a student's educational environment;
   b.  Creating an intimidating, hostile, or offensive educational environment;
   c.  Depriving a student of educational aid, benefits, services, or treatment; or
   d.  Making submission to or rejection of such conduct the basis for academic decisions affecting a student.

Decl. of Janiece Jackson                                    Case No. 20-cv-01468-CJN
EXHIBIT 65

10.     Pursuant to the jurisdictional provision set forth in Board Policy 7:190, *Student Behavior,* the District investigates alleged instances of harassment by a student that take place outside of "locations, events or circumstances over which the District exercises substantial control over both the respondent and the context in which the sexual harassment occurs" and that occur outside the United States, where such alleged harassment interferes with, disrupts, or adversely affects the school environment, school operations, or an educational function.   Similarly, the District investigates alleged instances of harassment by employees that take place outside of "locations, events or circumstances over which the District exercises substantial control over both the respondent and the context in which the sexual harassment occurs" and that occur outside the United States, where there is a reasonable nexus between the alleged conduct and the employee's job responsibilities.

11.     Board Policy 7:20 provides that students are encouraged to report claims or instances of harassment, including sexual harassment, to the Nondiscrimination/Title IX Coordinator, Building Principal, Assistant Building Principal, a Complaint Manager, or any staff member with whom the student is comfortable speaking.   Supervisors, the Building Principal, or administrators who receive a report or complaint of sex-based harassment must promptly forward the complaint or report to the Nondiscrimination Coordinator or a Complaint Manager.   Pursuant to Board Policy 7:20, the District will investigate alleged sexual harassment of students when the Nondiscrimination Coordinator or a Complaint Manager becomes aware of an allegation, regardless of whether a written report or complaint is filed.

Investigations into complaints of sexual harassment are conducted according to Board Policy 2:260, *Uniform Grievance Procedure*.   Pursuant to Board Policy 2:260, the Complaint Manager will investigate the complaint or appoint a qualified person (such as the Building Principal, for allegations of student misconduct) to undertake the investigation on his/her behalf.

The Complaint Manager or designee may request, but may not require, that the complainant provide a written statement regarding the nature of the complaint. The Complaint Manager or designee will ensure that both parties have an equal opportunity to present evidence during an investigation. If the complainant is a student under 18 years of age, the Complaint Manager or designee will notify the complainant's parent(s)/guardian(s) that they may attend any investigatory meeting in which their child is involved. The complaint and identity of the complainant will not be disclosed except (a) as required by law or Board Policy 2:260, (b) as necessary to fully investigate the complaint, or (3) as authorized by the complainant. The identities of student witnesses similarly will not be disclosed except in limited circumstances.

Unless an extension of time is requested, within 30 school business days of the date the complaint was filed, the Complaint Manager or designee will file a written report of his/her findings with the Superintendent, who will review the written report and issue a written decision to the complainant and the accused. Board Policy 2:260 permits either party to appeal the Superintendent's decision to the Board of Education within 10 school business days after receiving the Superintendent's decision. Within 30 school business days of its receipt of the appeal, the Board will affirm, reverse or amend the Superintendent's decision or direct the Superintendent to gather additional information. The decision of the Board of Education is final.

12.     The District does not currently utilize a hearing process for sexual harassment complaints. To the contrary, Board Policy 2:260 expressly provides that "[the Policy] shall not be construed to create an independent right to a hearing before the Superintendent or Board."

13.     Board Policy 2:260, *Uniform Grievance Procedure*, was last revised in January 2020. Like the review process for Board Policy 7:20, the review process for Board Policy 2:260 included

Decl. of Janiece Jackson                                                                 Case No. 20-cv-01468-CJN

EXHIBIT 65

two readings by the Board of Education, review by the Board Policy Committee and opportunities for comment and feedback by District and community stakeholders.

### Harm to Schools – Conflicts with State Law Requirements

14.     The Title IX Rule's narrowed definition of sexual harassment, as "unwelcome conduct on the basis of sex that is so severe, pervasive and objectively offensive that it effectively denies a person equal access to the school's educational program or activity," is inconsistent with State law provisions governing how schools must respond to sexual harassment and misconduct. Pursuant to the *Illinois Human Rights Act* ("IHRA"), 775 ILCS 5/1-101 *et seq.*, the Illinois Department of Human Rights has jurisdiction over complaints alleging that a school failed to take corrective action to stop "severe *or* pervasive harassment" of a student based on a protected category, such as sex.  775 ILCS 5/5-102.2 (emphasis added).  Section 5A-101 of the IHRA defines "sexual harassment in elementary, secondary, and higher education," in part, as "unwelcome sexual advances or requests for sexual favors made by an elementary, secondary, or higher education representative to a student, or any conduct of a sexual nature exhibited by an elementary, secondary, or higher education representative toward a student, when such conduct has the purpose of substantially interfering with the student's educational performance or creating an intimidating, hostile or offensive educational environment."   775 ILCS 5/5A-101(E).   The Title IX Rule's definition of sexual harassment as "unwelcome conduct on the basis of sex that is so severe, pervasive *and* objectively offensive that it *effectively denies* a person equal access to the school's educational program or activity" would pose a significant challenge for Illinois school districts that are required to comply with both Title IX and the IHRA.

15.     This administrative challenge is exemplified by Section 106.45(b)(3) of the Title IX Rule, which requires that whenever "the conduct alleged by the complainant would not constitute

sexual harassment *as defined in section 106.30* even if proved . . . then the recipient *must dismiss* the formal complaint with regard to that conduct for purposes of sexual harassment under Title IX." Although the Rule states that "such a dismissal does not preclude action under another provision of the recipient's code of conduct," the Rule's mandate that schools dismiss Title IX complaints that fall outside of the regulations' narrowed scope will burden school districts by requiring them to create two separate procedures:  one for Title IX sexual harassment and one for conduct that would not meet the narrowed federal definition of sexual harassment but that may constitute sexual harassment under other applicable law, such as the IHRA.

16.    The Title IX Rule's seven-year recordkeeping requirement also poses a challenge for Illinois school districts that are required to comply with the *Illinois School Student Records Act* ("ISSRA")*,* 105 ILCS 10/1 *et seq.*  Specifically, Section 4(f) of ISSRA requires that "each school shall maintain student temporary records and the information contained in those records for not less than five years after the student has transferred, graduated, or otherwise withdrawn from the school." 105 ILCS 10/4(f).  In conjunction with ISSRA's five-year recordkeeping requirement, many Illinois school districts maintain a practice of scheduling destruction of student temporary records after a five-year period.  Section 106.45(b)(10) of the Title IX Rule provides that a school district must maintain, for a period of seven years, records of each sexual harassment investigation, including:  any determination regarding responsibility, disciplinary sanctions imposed on the respondent, and remedies provided to the complainant; any appeal and the result therefrom; and any informal resolution and the result therefrom.  As the investigatory materials described in Section 106.45(b)(10) would likely constitute student temporary records, this requirement poses a logistical challenge and may present additional costs for Illinois school districts that maintain a practice of scheduling destruction of student temporary records after a five year period, in that such districts will

now be required to either (a) extend the period of time for which they maintain all student temporary records to a period of seven years, or (b) maintain a separate destruction schedule for Title IX-related records than for other types of student temporary records.

**Harm to Schools – Revising Existing Sexual Misconduct Policies**

17.     The policy revisions necessitated by the Title IX Rule would impose a significant administrative and financial burden on the District.  The process and parameters governing the District's development and revision of policies are set forth in Board Policy 2:240, *Policy Development.*  Board Policy 2:240 provides that anyone may propose new policies, changes to existing policies or elimination of existing policies.  Proposed policy revisions are typically directed to the Superintendent, who then consults with legal counsel as well as relevant stakeholders, which may include members of the administration, faculty, staff, and/or students, regarding the proposed revisions.  The proposed revisions are then presented to the Board of Education's Policy Committee, which reviews and makes recommendations to the full Board regarding the proposed revisions.  Board Policy 2:240 provides that, except in limited circumstances, policies and/or policy revisions will not be adopted at the Board meeting at which they are first introduced.  Rather, proposed policy revisions are typically presented to the Board for a first reading and discussion, including an opportunity for public comment.  The Board then votes to adopt the proposed policy revisions at a subsequent meeting.

18.     Depending on the depth of the proposed policy revision and level of stakeholder and community interest and involvement in the subject matter, the process of revising a policy can take several months to a year, and the legal review and consultation process can cost several thousand dollars.

19.     If the Title IX Rule goes into effect, the District will be required to revise, at a minimum, the following Board policies:

      a.     Board Policy 2:260, *Uniform Grievance Procedure*
      b.     Board Policy 5:20, *Workplace Harassment Prohibited*
      c.     Board Policy 5:120, *Employee Ethics; Conduct; and Conflict of Interest*
      d.     Board Policy 7:20, *Harassment of Students Prohibited*
      e.     Board Policy 7:190, *Student Behavior*

20.     In addition to policy revisions, the Title IX Rule will necessitate revisions to the District's administrative procedures, exhibits and forms pertaining to sexual harassment complaints and investigations, along with the District's Parent Student Handbook.  This process will require the District's small administrative team to expend a substantial amount of time and resources.

21.     The District will also need to train its administrators, teachers and staff on the new requirements prescribed by the Rule and on the District's revised sexual harassment grievance process, and the District will be required to develop and/or revise communication materials to students and parents to educate them about the new standard, process, and procedures.

22.     In addition, if the Title IX Rule goes into effect and the Rule includes Section 106.45(b)(3)'s requirement that schools dismiss complaints based on conduct that does not meet the Rule's definition of "sexual harassment," the District will be required to develop not one, but two sexual misconduct policies and grievance procedures—one for alleged sexual harassment that meets the Title IX definition, and one for alleged sexual harassment that does not meet the Title IX definition but that nevertheless meets the definition of sexual harassment under State law or District policy.  The process of developing a parallel sexual misconduct policy and grievance procedure to operate where Title IX ends will effectively double the time, cost and administrative resources necessary to facilitate the District's compliance with the Title IX Rule.

23.     The District is concerned about its ability to comply with the August 14, 2020 effective date of the Rule, particularly in light of the current circumstances related to the COVID-19 public health crisis.  Since March 2020, the District has been heavily occupied with efforts to adjust to rapidly shifting federal and State orders and guidance pertaining to the provision of educational services during the COVID-19 pandemic.  The District will need to maintain such efforts in the coming months, as public health orders and guidance continue to evolve moving into the 2020-2021 school year.  Effectuating the Rule's required policy and procedure revisions, providing the required training to Title IX personnel, and educating students and employees on their obligations and rights under Title IX would take a significant amount of time even under typical circumstances.  In light of the present and continuing national public health emergency, the Rule's August 14, 2020 effective date will make it more difficult for the District to fulfill its obligations under Title IX to provide all students equal access to education, train all students and employees on their obligations under Title IX, and ensure that all students and employees are aware of their rights under Title IX.

**Harm to Schools – Responding to Complaints Under New Requirements**

24.     The District will be required to modify its grievance procedures and requirements in numerous respects if the Title IX Rule goes into effect, to incorporate elements including but not limited to:  (a) the new definition of and standard for a finding of Title IX sexual harassment; (b) the new definition of "complainant," as being limited to an individual who is reported to have been the victim of sexual harassment; (c) the process for filing a "formal complaint" and circumstances under which the Title IX Coordinator may elect to file a formal complaint; (d) procedures to permit both parties to be accompanied to any investigatory meeting or proceeding by an advisor of choice, who may be an attorney, and procedures governing the role of advisors; and (e) procedures to allow the complainant and respondent an equal opportunity to pose questions to the other party and to witnesses

prior to a determination of responsibility, by submitting both initial questions and limited follow-up questions to the decision-maker.  The District will also need to modify its grievance process to appoint a decision-maker for Title IX sexual harassment investigations that is a different individual than the Title IX Coordinator, which constitutes a departure from the District's current practice.

25.     Pursuant to Section 106.45(b)(5)(vi) of the Rule, the District will also need to develop a process for allowing both parties "an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including evidence upon which the [decisionmaker] does not intend to rely in making a determination regarding responsibility" and for affording the parties an opportunity and mechanism for submitting a written response regarding such evidence.  Given the sensitive nature of sexual harassment complaints and the likelihood that these investigatory materials may contain confidential student record information, medical information and/or mental health information, the District will need to provide additional training to the staff members responsible for overseeing this evidence production and response process.

**Harm to District Community - Harder to Identify, Remedy, and Eliminate Sexual Harassment**

26.     The Title IX Rule's heightened definition of sexual harassment and narrowing of the scope of schools' investigatory obligation to include only conduct that occurs "in [their] education programs or activities" will impede the District's ability to meaningfully identify and remediate sexual harassment by forcing the District to create two distinct sexual harassment and investigation processes, which will inevitably cause confusion among parties and pose logistical challenges for the staff members tasked with conducting investigations.  Such dual processes, combined with the Rule's mandatory dismissal requirement, will lead to delays in completing investigations, potentially resulting in further trauma to victims.

27.     The Rule will also have a chilling effect on reporting.     Namely, Section 106.45(b)(2)(i)(B)'s requirement that written notice of a formal complaint include, if known, "the identities of the parties involved in the incident," will prevent the filing of formal complaints by individuals who wish to remain anonymous and will require that, if the Title IX Coordinator elects to file a formal complaint, the Title IX Coordinator must deny any request by the complainant to remain anonymous.     By eliminating complainants' abilities to remain anonymous, the Rule will chill reporting of sexual harassment and prevent the District from comprehensively and effectively ameliorating its effects.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 12th day of June, 2020.

Dr. Janiece Jackson
Superintendent, Lindop School District 92

EXHIBIT 66

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMONWEALTH OF PENNSYLVANIA;
STATE OF NEW JERSEY; STATE OF
CALIFORNIA; STATE OF COLORADO;
STATE OF DELAWARE; DISTRICT OF
COLUMBIA; STATE OF ILLINOIS;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEW MEXICO;
STATE OF NORTH CAROLINA; STATE OF
OREGON; STATE OF RHODE ISLAND;
STATE OF VERMONT; COMMONWEALTH
OF VIRGINIA; STATE OF WASHINGTON;
STATE OF WISCONSIN,

**CIVIL ACTION No. 20-cv-01468-CJN**

Plaintiffs,

v.

ELISABETH D. DEVOS, *in her official capacity
as Secretary of Education*; UNITED STATES
DEPARTMENT OF EDUCATION; and UNITED
STATES OF AMERICA,

Defendants.

## DECLARATION OF STEPHANIE JARRETT

I, Stephanie Jarrett, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and

correct:

1.      I submit this Declaration in support of the State of California's litigation against

Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department

of Education ("ED" or the "Department"); and the United States of America regarding the recently

issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities

Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the "Title IX Rule" or "Rule").

2.      This declaration is based on my personal knowledge, my familiarity with Title IX of the Education Amendments of 1972 (Title IX), my review of the Notice of Proposed Rulemaking (NPRM) and newly finalized Rule, and the knowledge and expertise I have acquired in the course of eight years of service and duties as investigator.  This experience includes investigating approximately seventy (70) formal complaints and reports and working with hundreds of students who have made reports or complaints under Title IX and the respondents to those reports and complaints.

3.      Since 2016, I have served as the Manager of Human Resources/Training and Compliance and the Title IX investigator for the Sonoma County Junior College District ("College District").  I investigate all reports received from students, employees and/or third parties for sexual harassment and misconduct under Title IX and comparable state laws and regulations.  Prior to my current role, I served as the Title IX investigator at Cal Poly, San Luis Obispo, a public university, and at Hawaiʻi Pacific University, a private university.  If called and sworn as a witness, I could and would testify competently to the information in this declaration.

## Background:  Community College District

4.      The College District receives federal funding from the United States Department of Education and is an educational entity covered by the requirements of Title IX and subject to the regulations issued by the Department.

5.      The College District is created by state statute, primarily funded by state budget allocations, and is part of the State of California's public higher education system.

6.      The mission of the College District is to cultivate learning through the creative, intellectual, physical, social, emotional, aesthetic, and ethical development of Sonoma's diverse community.  This is accomplished by focusing on student learning to prepare students for transfer, improve foundational skills, or to provide a responsive career and technical education; providing a

comprehensive range of student development programs and services; promoting personal and professional growth; and fostering critical and reflective civic engagement.

7.      The College District has six (6) campuses and dedicated locations, which include the Santa Rosa Campus, Petaluma Campus, Public Safety Training Center, Shone Farm, and the Southwest Santa Rosa Center.

8.      The College District enrolls approximately 36,000 diverse students each year.  Fifty-five percent of students are female and forty-two percent are male students. Approximately 4,200 are 19 years old or younger, which includes high school students that are concurrently enrolled, and approximately 4,000 are between the ages of 20 and 29 years old.  In spring of 2014, the College District became a designated Hispanic Serving Institution, having a 45% Latinx student population.

9.      The College District provides students the opportunity for economic and social mobility.  Many students enter community college having had to overcome barriers to achieve academic success.  The College District's student population includes 1% as foster youth, 19% of students experiencing homelessness, 8% of students receiving disability resources and services, and approximately 18% first-generation students, students who are the first in their family to attend college.

10.      Each year, 100% of our students live in private off-campus housing that is not affiliated with any of our colleges because we are currently a non-residential college system. This means that we currently do not provide any housing for our students. Each year, approximately 180 students participate in study abroad programs.  Each year, approximately 500 of our students participate in athletics program, which include a travel component to other schools and locations for competitions and events.

Decl. of Stephanie Jarrett                                                                 Civil Action No. 20-cv-01468
EXHIBIT 66

11.     On an annual basis, the Title IX office initiates a review of an average of twenty-five (25) complaints and reports of sexual harassment, including sexual violence or assault.  For sexual harassment, we look at whether the student has alleged unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature, that creates an intimidating, hostile or offensive work or educational environment.  To investigate cases, we use a model where I as the investigator conduct an investigation with oversight and review by the Title IX Coordinator.  I act as a fact-finder and analyze information gathered, including making an assessment of credibility.  While students may bring an advisor of their choice to any meeting or interview related to their case, advisors do not conduct any part of the investigation process or cross-examine witnesses.

12.     Each semester, the College District administers an online sexual misconduct prevention training to all new students and a refresher course to continuing students.  Furthermore, in-person supplemental trainings and workshops are offered throughout the academic year, including to student athletes and all students participating in study abroad programs.

13.     If the Rule relating to Title IX goes into effect, the harm to the College District's ability to provide an educational environment free from harassment and assault on the basis of sex would be immediate and far reaching.  In addition, if it goes into effect, the Rule will result in immediate and irreparable harm because of the extensive costs and administrative burdens to implement its requirements.  Also, it is impossible to hold the necessary meetings with students, employees, faculty, and other stakeholders to obtain their input and feedback as required by California state law during the summer months in order to meet the unreasonable timeline set by USDOE for implementation on August 14, 2020.  Typically, College policy revisions made to the extent the Rule is requiring would take an academic year to review and implement.

Decl. of Stephanie Jarrett                                    Civil Action No. 20-cv-01468
EXHIBIT 66

14.     These harms are exacerbated due to the COVID-19 pandemic, as we are working furiously to provide different types of services to meet the needs of students and working with our employees to meet their needs and keep them safe under these new constraints.  Due to the COVID-19 pandemic, our College District is also facing severe budget cuts that will impact our ability to meet the requirements, which the Department has recognized will result in significant net costs.  It is unreasonable to roll out this rule when all attention and focus necessarily is on trying close-out the semester for our students dealing with the pandemic and prepare for a new type of educational environment, requiring physical distancing and safety precautions never seen before, in late August.

**Detrimental Impacts on Students and School Safety Caused by the Rule**
Narrowed Definition of Sexual Harassment and Barriers to Initiating an Investigation

15.     The Rule will result in a school climate that is less safe because the ability to address sexual harassment is limited so significantly under the Rule.  The College District's goal is to provide support and access to every single California student who desires to enroll and to support any learner who chooses to enhance either the path to a four-year degree or the technical education to prepare themselves for a job.  The Rule undermines this goal in a number of ways, including because the narrowed definition of sexual harassment requires a "wait and see" attitude, even when a student has been subjected to "severe" but not "pervasive" harassment, and because of its requirement that we dismiss complaints for students unless they have been "effectively denied equal access" to education. Rule § 106.30. Once students have been subjected to such an egregious level of harassment and, thereby, effectively denied equal access to their education, from my experience, many students will not return.

16.     Students will also feel that they are not safe, when they see that a person who has engaged in sexually harassing conduct (but whose conduct does not meet the narrowed definition and

standard) has not received any consequences nor any training or follow-up warning as a result of their behavior under Title IX.

17.     The new requirement in the final rule for a complainant to be "participating in or attempting to participate in" a College education program or activity at the time of filing a complaint poses a safety issue because we practically cannot address sexual harassment and assault allegations that are so severe that a student leaves our campus to avoid further harm.  Under the Rule, if we do not have a complainant who is permitted to file a complaint, practically, we cannot move forward with the investigation.  This type of limitation is extremely harmful for our College District.  For example, if the allegations of sexual assault shared by a complainant who has left the College District would have been substantiated, if the complaint was permitted to go forward, then the student who committed the offense would have been removed from campus not just for the safety of that student but for the safety of the entire campus.

18.     The harmful restrictions on our College District's ability to take prompt and equitable action to address sexual harassment and assault complaints and keep our campuses safe is created by the Rule's requirement that a formal complaint can only be filed by a student "participating or attempting to participating in" an education program or activity and because the Department has created a presumption against the Title IX Coordinator being able to proceed with an investigation in the absence of a complainant who feels comfortable moving forward.  Rule § 106.30; 85 Fed. Reg. at 30,296, fn. 1162.  In addition, the new preemptive effect clause prohibits the College District from addressing any complaints that meets the section 106.30 Title IX Rule definition of sexual harassment under the College District's own student conduct processes, where a complainant does not want to proceed.  See Rule § 106.6(h).

Decl. of Stephanie Jarrett                                    Civil Action No. 20-cv-01468
EXHIBIT 66

19.     The Rule creates a number of other significant and unnecessary barriers to reporting. Requiring impacted students to complete a written complaint, use specific wording to request an investigation, and to report to someone who is likely to be a stranger in order to simply open an investigation is not an approach that recognizes the trauma that a student will experience in sharing the story with a stranger, can increase the trauma experienced by the student, and will result in many students with legitimate complaints being denied access to Title IX's protections.

20.     Ultimately, the role of our office and of Title IX is to ensure our educational environment is free of harassment and discrimination.  With respect to the written complaint requirement, in my experience, when a person has been subjected to a traumatic event, it can be extremely difficult for them to write about that experience in a way that is cogent and easy to understand.  Furthermore, a rule that requires students to write down the harms they have experienced in order to access the investigation process is not trauma-informed and will result in students being subjected to further harm.  This requirement is out of touch with the population we serve.  A significant number of students who come to the community college are struggling with basic writing and other learning skills.  For many students, English is not their first language and some cannot write well.  Each of these student groups may not have the ability to effectively put their concerns into writing.

21.     Moreover, our students are not required to have a Community College email address; the administrative burden on our office simply to track down students who have reported sexual harassment so that we can make sure they meet the filing requirements will be extensive.  The Rule does not take into account and consider the additional costs for translation of written complaints that are written in the first instance in a person's native language.

Decl. of Stephanie Jarrett                                    Civil Action No. 20-cv-01468

EXHIBIT 66

22.     The Rule arbitrarily limits the individuals to whom a student can report in order to trigger Title IX's protections on a college campus.  As the NPRM and Rule acknowledges, who constitutes an official with "authority to institute corrective measures" is undefined, and will be subject to a fact-intensive inquiry regarding the responsibilities of individual school officials of which student complainants would have no knowledge, even if our campus sets forth a list of designated individuals.  For an individual not on the list, we would still need to conduct the inquiry, which is an additional burden we will have to undertake, as we determine in each case whether we can open a Title IX complaint and/or whether an alternative parallel process must be implemented to address any harm to the student and school climate.  83 Fed. Reg. 61467; Rule § 106.30.

23.     In my experience, almost all students report to someone other than an individual who would meet the "actual knowledge" requirements.  In the 2018-2019 school year, for all of the cases I investigated, only three of the students actually reported directly to the Title IX office.  Otherwise, students report to an instructor or a counselor or a coach with whom they have a relationship.  Students generally do not report to a Dean or Title IX Officer, because more often than not these individuals are strangers to them.  This is because when a student suffers something as personal, humiliating, and traumatic as sexual assault or harassment, in my experience, the student feels very uncomfortable sharing that experience with a person with whom they have no prior relationship and/or have not built trust.  Further, because of the transient nature of the students on our campus and the many other work and home-life responsibilities that our students have, even with the training we provide, many are still unaware of the Title IX office or how to find and locate the Title IX Officers and investigators.

24.     The students attending the District are here for a developmental and educational experience.  Many of them already experience significant barriers to completing their education, including lack of funds, the need to care for family, and to work to remain in school.  Many will not

have the bandwidth to take all of these bureaucratic steps required by the Rule for initiating the formal complaint process (and moving through to resolution).  When students do not see that our College District is investigating the complaint and able to move quickly stop the harassment or assault from recurring because we cannot take even more limited disciplinary measures, such as placing a short-term restriction on particular extracurricular activities for a respondent after notice, an investigation, and finding but prior to a full hearing and appeal, it will dramatically impact the complaining students' educational pursuit.  Many will likely transfer somewhere else, stop attending classes, or decide to no longer pursue higher education.

25.     Because of the diverse nature of and transience within our student population, even helping students understand the Rule's complex, overly legalistic and bureaucratic, and difficult to navigate requirements will require extensive staff time.  Trying to clarify for our students how to advocate for themselves and enforce their rights under the Rule is also going to be an incredible challenge because of the complexity of the Rule, and we have limited time to educate our student population outside of classroom hours.  Students who really need access to Title IX's protections will simply not have the opportunity to learn this new, complex, and overly legalistic and bureaucratic system to seek assistance.  These costs were unaccounted for in the Rule.

<u>Sexual Harassment and Assault under Substantial Control</u>

26.     The mandate to dismiss a Title IX complaint where the harassing incident(s) is not under the "substantial control" of the College District is out of touch with a college system like ours, where none of the students actually live on campus or in campus housing.  By limiting students from making complaints in this manner, the Rule gives license to students to behave in a discriminatory and harassing manner toward their peers with full knowledge that their behavior cannot be addressed in certain spaces, even if it is impacting the other student's access to education.  The Rule is likely to

embolden students to act out in spaces outside of the specific purview of the Rule, which again undercuts Title's IX purpose to end discrimination on campuses receiving federal funds.

27.     Furthermore, where some instances occur off campus and others occur on campus, the Rule restricts our ability to fully assess the hostile environment and requires us to ignore discriminatory conduct under Title IX that impacts our students.  Students will lose faith that the school is creating an environment free from sex discrimination if we are not taking action responding to an incident that we are aware of; there will be a chilling effect on students willing to come forward and trust us to protect them from further harassment.

28.     The Department's statement that we can address this problem by creating a separate, non-Title IX grievance procedure to address complaints that we previously addressed under Title IX is an inadequate response.  The dual process will create additional confusion for students who will struggle to understand why the conduct is not classified as discrimination any longer, which will undermine their trust in the overall complaint system.  In addition, because under the Rule students can appeal or challenge a "wrong" classification by the College District, there will be additional delays and unnecessary repetition and duplication in cases that is likely to reduce the effectiveness and timeliness of the response, further undermining trust in the process and a resolution that stops the sexual harassment and prevents further sexual harassment and/or assault.

29.     The Rule's limitation on addressing Title IX complaints for our students studying abroad will also harm our students, particularly when they return home and are still suffering from the impacts of sexual harassment or violence and/or if the respondent remains on campus and in class. In my experience, if we cannot effective remedies to such students or address their needs on campus, their education is far more likely to be impacted and they are far more likely to drop-out.

Decl. of Stephanie Jarrett                                                  Civil Action No. 20-cv-01468
EXHIBIT 66

<u>Requirement to Create Separate Process and Procedures</u>

30.     We will also have to create a multi-tiered process to address intersectional complaints, those that fall under Title IX and other federal anti-discrimination laws with broader coverage (i.e., Title VI and ADA) and complaints that the Department is mandating that we dismiss but that we must address under California law.  As such, the Rule effectively requires a multi-tiered system, which will create additional costs for our College District, which the NPRM and Rule did not account for.  It also creates additional confusion, not clarity, for staff, complainants and respondents.  Having to implement multiple processes will only extend the timeline for resolution further, which will result in dissatisfaction for both parties, a disincentive to persist in education, and violations that will go unchecked.

<u>Double Standard:  Strict Compliance for Prescriptive Grievance Procedures and Deliberate Indifference for Addressing Harm for Students Subjected to Sexual Assault and Harassment</u>

31.     The Rule holds our institution to a strict liability type of standard for adherence to the grievances procedure it mandates but states that we are only required to show that we were not "deliberately indifferent" to the need for supportive measures and remedies for complainants to address the discrimination.  Rule § 106.44(a).  The Rule essentially sanctions our campus to "look the other way" with respect to remedying and addressing known sexual harassment, assault, but requires us to strictly comply with grievance procedures, which, as currently designed, will deter complainants from participating in the investigation process.  This double standard is inconsistent with the goals and objectives of Title IX and our goals as a College District system, which are to provide equality and equity for both sexes, ensure an equitable grievance system, and create a sexual harassment and assault free environment on our campuses.

<u>Advisors Who Must Cross-Examine</u>

32.     The Rule's requirement that the College District allow parties to bring an advisor of their choosing to cross-examine the other party and witnesses at a live hearing will create significant inequities among students based on whether they have the financial resources to hire an attorney.

33.     The Rule requires the College District to provide advisors who must cross-examine witnesses and review evidence for students who do not have an advisor of their own choosing.   At times, faculty or staff members serve as advisors.  However, we have faculty and staff members who have already expressed that they would not feel comfortable or equipped to cross-examine a student. As such, we will have great difficulty finding adequately trained advisors on our campuses who are willing to serve.

34.     Therefore, ultimately, the only real way to ensure equity for students who do not have attorney advisors, is to pay for attorneys to serve as advisors to students, which is an extensive cost far beyond what the Rule estimates.  Given COVID-19 and the drastic budget cuts that we are facing, we will not be able to provide an attorney advisor for students and this will create great inequities when a student on one side of the complaint with more financial means can hire an attorney.

35.     These advisor-related requirements also create significant potential for greater liability for the District for complainants and respondents who are dissatisfied with the advisors chosen by the Community College, which is not accounted for in the cost estimate.

<u>Impact of the Rule on Reliability of Investigation and Privacy</u>

36.     The Rule states that the College District may not restrict the ability of either party to discuss the allegations under investigation.  This provision can interfere with the integrity of the investigation and it allows students to post information about the allegations on any media or social media without consequences.  As long as the student is adhering to the language of the Rule to not

retaliate or intimidate another party, in reality, they can post to a very large group with the name of the student who made the allegations and the specifics of the allegation. This type of posting can result in severe humiliation, re-traumatization, and shame for the student about whom the social media post is made due to the highly sensitive nature of sexual assault and harassment claims and the likelihood for "shaming and blaming" by others, including strangers, that occurs on social media as a result of such posts. A social media posting of this nature could be sufficient to chill a student from continuing through the grievance process, even though the posting would now be protected by the Rule. If the College District tries to stop the student from further postings or ask the student to remove the posting on the basis that the complainant feels intimidated, the student who posted the allegations can point back to the plain text of the Rule and to the many statements in the Rule's preamble supporting a student's unfettered right to share the allegations. This aspect of the Rule and the Department's statements about it leave our College District with little recourse and will undermine the integrity of investigations and our ability to conduct and conclude the investigation. This is so because one or more party may be unwilling to proceed after seeing that the College District cannot ensure confidentiality under the Rule. If a party is unwilling to proceed, then, under the Rule, the College District cannot use any statements that parties have made in reaching a determination. Furthermore, witnesses who see that there is no limitation on sharing the allegations and names of the parties may not trust the process enough to provide candid statements about the conduct or the impact of the conduct on either party.

37. In this way, the Rule also completely undermines the requirement in the existing and long-standing anti-retaliation Title IX regulation that applied "confidentiality" not just to the recipient but to the parties. This provision in the Rule also undermines federal student privacy laws that require investigations to be kept confidential, chills reporting and undermines my ability and the College

Decl. of Stephanie Jarrett                                          Civil Action No. 20-cv-01468

EXHIBIT 66

District's ability to make students feel comfortable when reporting and participating in the investigation. In this way, the Rule overreaches and is inconsistent with the requirement to ensure an adequate and reliable investigation. This provision makes it far more difficult for campuses to prevent retaliation and intimidation, and to protect students from further harassment on the basis of sex.

38.     The Rule also states that even evidence upon which the College does not intend to rely on in reaching a determination regarding responsibility must be transmitted to the other party and their advisor, who could a be friend or a relative or a witness. Such a broad requirement may result in our office having to provide extremely personal and sensitive information to both students and their advisors of choice. This requirement increases the risk that such information could be disclosed on a widespread basis, by one or the other party under the auspices of preparing the case. Reputational and emotional harm can result when irrelevant, personal information from either or both students is shared. Students who report already fear stigma and shame when they come forward and this will also further chill reporting. If we cannot prevent irrelevant data that may cause embarrassment to one or both parties from being disclosed, we will be causing unnecessary further harm to students. In the final rule, the Department says that colleges are permitted to enter into non-disclosure agreements with parties and advisors, but does not explain what we are supposed to do when a party refuses to enter into such an agreement or a non-party shares information—such as a witness, family member, or friend.

**Additional Unaccounted Costs and Burdens Associated with the Rule**

39.     Overall, the final rule's estimates regarding costs for implementing this extremely complex rule are based on flawed assumptions and calculations as detailed further below.

40.     The costs for informal resolution will not go down for our College Districts because we currently address 25% or more of our formal complaints through an informal resolution method.

41.     The Rule requires live hearings in every matter involving sexual harassment for which a formal complaint is filed.  The cost for each live hearing will be well above the cost estimated for such hearings.  In a preliminary review of the Rule, we conservatively estimate that such hearings will require approximately 75 staff hours and at least $8,000 to prepare and disseminate the evidence, discuss the evidence with the parties, provide the required notices, hold the hearing with properly trained decision-maker(s), prepare and write the decisions, ensure advisors are trained and qualified and available, schedule the hearing, and provide the technology for cross-examination.  Also, for hearings, the Rule assumes only one decision-maker, but we must train multiple decision-makers to be prepared to take cases and to serve as back-ups and to address any conflicts of interest that may arise.  The costs for identifying and training advisors and decision-makers are ongoing costs, because we will need to replenish and re-train when there is turnover and to ensure a sufficient pool at all times.

42.     With respect to the requirements for live hearings and cross-examinations, our campus does not currently have sufficient facilities with the technology to meet the Rule's requirement.  The Rule did not account for the costs to provide separate rooms and effective technology.

43.     The NPRM estimates that the Title IX Coordinator and a lawyer will spend 8 hours and 16 hours, respectively, to review the final regulations. (83 Fed. Reg. at 61486.)  Given the complexity of the Rule, I have already spent more than 20 hours reviewing the Rule and preamble and participating in training callas about the Rule, and I estimate that it will take me, the Title IX Coordinator and multiple lawyers at the College District at least 200 hours to fully review all aspects of the Rule's preamble and then assess how to change practices and other documentation based on those changes.   As such, the total cost for Year 1 at my College District would be far more than the estimate.

Decl. of Stephanie Jarrett                                          Civil Action No. 20-cv-01468
EXHIBIT 66

44.     The Rule estimates that a Title IX Coordinator and a lawyer will spend 12 hours and 48 hours respectively for revisions to policies.  (85 Fed. Reg. at 30557).  The Department's estimate for the amount of time to revise grievance procedures does not take into account the complexity of the Rule, the necessity for creating a parallel system, and the number of hours for the Board members to take up in a noticed meeting and pass revised grievance procedures incorporating the Rule, which we conservatively estimate at 10 hours.  It also does not take into account the time for stakeholder, including faculty, staff, and student, input on grievance procedure revisions, which we conservatively estimate at 30 hours of staff time.  These processes are mandated by College District policy and/or state law.

45.     The Department underestimates the training costs associated with the Rule.  The costs should have included the costs of training advisors, multiple decision-makers, and hearing officers on the Rule's requirements.  It should have also included the costs of training students, which will be crucial to protecting their rights in the process.  We estimate that it will take six to eight months to train students due to the transient nature of our student population, and the need to offer trainings at multiple times during the year to reach the entire population.

46.     The Department's assumed pay rate for lawyers is not accurate for Sonoma County Community College District.  The NPRM and Rule assumes a rate of $90.71 per hour. 83 Fed. Reg. at 61,486; 85 Fed. Reg. 30,567.  However, for our College, the average rate for lawyers that we contract with is $245.00 per hour at minimum.  And, as discussed above, many of the roles in the investigation hearing process that may have been taken on by education administrators prior to the Rule will now have to be taken on by lawyers, which the NPRM and the Rule does not factor into the calculations.

Decl. of Stephanie Jarrett                                                      Civil Action No. 20-cv-01468
EXHIBIT 66

47.     We are also likely to incur additional litigation costs and more exposure to potential liability because more students and their families will pursue litigation to obtain relief under the many different bases that the Department has now established for non-compliance.

48.     The Department also did not account for the costs to our student victims who do not report and then decrease their attendance or, even worse, drop-out entirely.

**Conclusion**

49.     Overall, the Rule will result in significant harm to the campus community at large, because our ability to protect students from sexual harassment and assault under Title IX is restricted and impaired.  Considering all of the changes in the Rule, I anticipate an increase in incidents of sexual harassment, including violence and assault on our campuses, and campuses that are less safe and able to respond promptly and effectively to address and resolve such harassment.

50.     The Rule will have significant implications for the health and well-being of students that have been subjected to sexual harassment and violence on our campus because it thwarts access to Title IX's protections.  Students who do not have closure on their complaints or feel their concerns do not matter to schools solely because their complaint was not packaged in the required manner, will ultimately feel their voice has been diminished and their place in the educational institution is not important.  All of this comes at a cost to the student in terms of emotional distress and a loss of faith in the educational system as a place that is student centered and focused on their success and safety. Based on my experiences, students whose access to a prompt and equitable complaint system is denied or limited are likely to choose other paths rather than persist and complete their college degrees.

//
//
//
//
//

Decl. of Stephanie Jarrett                                                    Civil Action No. 20-cv-01468
EXHIBIT 66

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 9th day of June, 2020

STEPHANIE JARRETT
Title IX investigator
Sonoma County Junior College District

Decl. of Stephanie Jarrett
EXHIBIT 66

Civil Action No. 20-cv-01468

# EXHIBIT 67

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. **20-cv-01468-CJN** |

## DECLARATION OF JENNIFER KAMMERUD

I, Jennifer Kammerud, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.    I am a Senior Policy Advisor at the Wisconsin Department of Public Instruction ("DPI") located in Madison, WI. My educational background includes a BA in Journalism with additional majors in Spanish and Political Science and a MA in Public Affairs and Administration from the University of Wisconsin at Madison. I have been employed at DPI, working in the Office of the State Superintendent since 2001. I am currently the Senior Policy Advisor at the agency and the Director of the Legislative and Policy Outreach Team.

Decl. of Jennifer Kammerud                                Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

2.    I direct the team responsible for federal and state relations, administrative rule development, and agency guidance processes. I oversee the submission of statutorily required reports, administrative rule promulgation, processes surrounding public comment on agency guidance documents, communication of the agency's position on federal rules, federal legislation, state legislation, and state policy related to schools, libraries, and the department, stakeholder outreach, and various legislative and policy analyses.

3.    I submit this Declaration in support of the State of Wisconsin's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through DPI personnel who have assisted me in gathering this information from our agency, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on DPI.

**Background Information Regarding DPI's Work in Wisconsin's Education Programs**

4.    DPI regulates elementary and secondary public and private schools in Wisconsin.

5.    DPI oversees 443 Local Educational Agencies, comprised of 517 high schools, 22 junior high schools, 347 middle schools, 1,217 elementary schools, 87 combined elementary and secondary schools, 209 charter schools, and 26 non-district charter schools, with a combined total student enrollment of 854,959. In the 2018-19 school year, 14 percent of students were students with disabilities, six percent of students were English learners, 40.7 percent of students were

Decl. of Jennifer Kammerud                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

considered economically disadvantaged, 69.3 percent of students were white, 9.1 percent of students were black or African American, 12.3 percent were Hispanic.

6.      In 2018, K-12 education programs in Wisconsin received approximately $566 million in funding from ED.

7.      The Wisconsin Constitution requires the state legislature to establish district schools which are to be "as nearly uniform as practicable" and "free and without charge for tuition to all children." Art. X §3, Wis. Constitution. The supervision of public instruction is vested in the Superintendent of Public Instruction ("State Superintendent") who is elected on a nonpartisan spring ballot for a term of four years. The State Superintendent is charged under Wisconsin statutes with the general supervision of public instruction and leads DPI in implementing policies and promulgating administrative rules. As a constitutional officer, the State Superintendent's powers can only be altered in certain ways by the Legislature. Courts have held that the Constitution prohibits granting authority over public instruction to other officers who are not subordinate to the State Superintendent. *Thompson v. Craney,* 199 Wis. 2d 674 (1996).

8.      The Wisconsin Constitution establishes two fundamental aspects of school finance: creation of a common school fund and designated minimum local tax contributions to qualify for such funds. Art. X §§ 2,4, Wis. Constitution. The remainder of the school finance system is a creature of statute. *See, generally*, Wis. Stat. § 121. The state provides financial assistance to school districts to achieve two basic policy goals: (1) to reduce reliance on the local property tax as a source of revenue for educational programs and (2) to guarantee that a basic educational opportunity is available to all pupils regardless of the local fiscal capacity of the district in which they reside.

9.      Under Wisconsin statutes the State Superintendent is a member of the University of Wisconsin Board of Regents and the Wisconsin Technical College System Board. The State

Decl. of Jennifer Kammerud                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

Superintendent also appoints members to a number of statutory and departmental advisory groups. The State Superintendent oversees licensing of teachers, approval of teacher preparation programs, academic standards, special education, statewide tests, school and district report cards, two state schools (the School for the Blind and Visually Impaired and the School for the Deaf and Hard of Hearing), pupil nondiscrimination and expulsion appeals from school districts, open enrollment, school choice programs, distribution of state and federal financial aids to schools, and public libraries.

10.     The general duties of the State Superintendent include developing and disseminating information to the public on all matters relating to preschool, elementary and secondary education. Wis Stat. § 115.28. These duties include making rules to establish standards of attainment and procedures for the examination and licensing of teachers, reviewing teacher licensing applications, and conducting complaint investigations and making recommendations for revocation of licenses if necessary. Responsibilities also include accepting and administering federal funds, developing and implementing a statewide assessment and accountability system, which requires issuing annual accountability report cards per state law, and Every Student Succeeds Act ("ESSA") accountability reports under federal law.

11.     DPI has staff throughout the agency responsible for meeting data reporting requirements under state and federal law. In order to meet many of these reporting requirements, the department has established and implements a WISE data system, which is a data collection system that allows LEAs to submit data to DPI from the student information system (SIS) vendor of their choice.

12.     DPI is responsible for administering the USDA nutrition programs, Institute of Museum and Library Sciences grants, Centers for Disease Control Youth Risk Behavior Surveys,

Decl. of Jennifer Kammerud                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 67

the Carl D. Perkins Career and Technical Education Act, the Individuals with Disabilities Education Act ("IDEA"), and the Elementary and Secondary Education Act.

### DPI's Work on Combatting Sexual Harassment in Education for Wisconsin

13.　Wisconsin has one of the oldest laws in the nation prohibiting discrimination against pupils in the public schools. Dating originally to the 1940's, § 118.13 of the Wisconsin statutes was last revised in 1986. The statute provides no pupil may be excluded from a public school, or from any school activities or programs, or be denied any benefits or treated in a different manner because of sex, race, religion, national origin (including a student whose primary language is not English), ancestry, creed, pregnancy, parental status, marital status, sexual orientation, physical disability, mental disability, emotional disability or learning disability.

14.　State statutes also specifically prohibit sex discrimination in physical education in public schools in first-class school districts. Wis. Stat. § 119.22.

15.　State statutes prohibit discrimination in the operation of independent charter schools on the basis of sex, race, religion, national origin, ancestry, pregnancy, marital or parental status, sexual orientation or physical, mental, emotional or learning disability. Wis. Stat. § 118.40(4)(b)2.

16.　Wisconsin teachers and administrative staff are also protected against discrimination in employment on the basis of sex, nationality or political or religious affiliation. Wis. Stat. § 118.20.

17.　All employees of public school districts are further protected from discrimination on the basis of age, race, creed, color, disability, marital status, sex, national origin, ancestry, arrest record, conviction record, military service, use or nonuse of lawful products off the employer's premises during nonworking hours, or declining to attend a meeting or to participate in any communication about religious matters or political matters. Wis. Stat. § 111.32.

Decl. of Jennifer Kammerud　　　　　　　　　　　　　　Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

18.     DPI provides technical assistance and resources on best practices for combatting discrimination and sexual harassment in education, including cyberbullying and pupil non-discrimination. DPI also provides resources to reduce and respond to sexual violence. DPI leverages partnerships with Wisconsin Safe and Healthy Schools Training and Technical Assistance Center, or "WISH Center," a collaboration between the CESA Statewide Network and the Wisconsin DPI. The WISH center is a state-wide delivery mechanism for alcohol, tobacco, other drug, violence, and bullying prevention training.

19.     Years of education and public health research have established the short and long-term effects of pervasive, persistent, and unaddressed sexual harassment and other forms of bullying and harassment. Health impacts include increased anxiety, depression, suicidality; increased risks of alcohol and drug use; increased risk of sexual violence and sexual risk behaviors; and physical health problems. Increased health risks of traumatic experiences, including repeated and unaddressed bullying and sexual harassment, can persist into adulthood and manifest as chronic conditions. With regard to education, experiences of unaddressed harassment and bullying can interfere with the students' ability to learn and perform well in school, weaken students' connections to school, and increase the likelihood of dropping out. Research shows that the effects of sexual harassment and other forms of bullying can be mitigated substantially by the actions of school leaders. Schools that actively support students and work to address harassment therefore create an environment that is more conducive to students' academic achievement and physical and mental wellbeing.

20.     DPI engages in extensive work on social and emotional learning, trauma sensitive schools, mental health support systems, equity, and culturally responsive practices, including but not limited to the following efforts:

Decl. of Jennifer Kammerud                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

- A DPI workgroup with the Department of Children and Families (DCF) on mandated reporting of child abuse and neglect (creation of online trainings, collective understanding of best practices);

- DPI career and technical education and civil rights compliance checks;

- DPI teen dating violence prevention lessons;

- DPI's complaint process for pupil non-discrimination; and

- DPI's support of the Youth Risk Behavior Survey (YRBS) to help districts/communities understand the self-reported risks of 7-12 grade students, including questions on sexual abuse and teen dating violence.

21. Wisconsin public school districts must develop and adopt policies prohibiting pupil harassment on the basis of sex. Wis. Admin. Code § PI 9.03(1)(b). District policies must provide for a formal acknowledgment of a discrimination complaint within 45 calendar days of filing and final resolution of the complaint within 90 calendar days of filing. The policy must provide for notice to the complainant of their right to appeal the districts final determination to the State Superintendent within 30 calendar days of the final determination. Wis. Admin. Code § PI 9.04. The State Superintendent has the authority to review local policies for compliance with the law. Wis. Admin. Code § PI 9.08.

22. Public school districts must annually report the number of discrimination complaints received during the prior school year. Wis. Admin. Code § PI 9.07. The report includes the number of complaints of sexual discrimination and/or harassment. Over the four most recent years for which reports are available (2014-15; 2015-16; 2016-17; and 2017-18 academic years), the statewide average number of discrimination complaints per year was 1,900 of which 890 were identified as complaints of sex discrimination or harassment. It is important to note that these numbers represent

Decl. of Jennifer Kammerud                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

all complaints received, not only complaints where discrimination or harassment was substantiated after investigation.

23.    The DPI also administers the YRBS, in partnership with the U.S. Centers for Disease Control and Prevention, which monitors health risk behaviors of high school students.

24.    DPI provides significant resources to schools to combat sexual harassment. The department has a 50% full-time equivalent position (Pupil Nondiscrimination Coordinator) on staff to provide technical assistance to school districts and parents seeking information about compliance with state and federal pupil nondiscrimination law. The coordinator fields several hundred calls annually in this topic. The coordinator is responsible for the collection of data and implementation of the self-evaluation activities specified in the Wisconsin Administrative Code.

25.    DPI's workgroup on sexual violence reduction and response includes members from DCF, Department of Health Services (DHS), and community partners (such as Wisconsin Coalition Against Sexual Assault (WCASA), Rape Crisis Center, school social workers).

26.    In 2019, DPI received a Rape Prevention Grant from DHS used to create content for online professional development modules for staff, parents, and students on rights and responsibilities related to sexual harassment at school, child sexual abuse, and human sex trafficking, including the following topics and trainings:

•    Anti-human trafficking lessons created for students in grades 7-12, complete with a facilitator guide and training;

•    Publicly available teen dating violence lessons through partnerships with community agencies;

•    DPI webpages with links and resources related to prevention of sexual harassment, including adult sexual misconduct at school;

Page 8 of 21

Decl. of Jennifer Kammerud                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

- Teaching and assistance on cyberbullying and internet safety, including web resources and trainings;

- Promotion of equity, including rights for LGBTQ+ community; and

- In partnership with Awareness to Action (A2A), creation of resources to help schools choose evidence-informed protective behaviors curriculum.

27.     DPI provides school districts with guidance documents and resources for understanding and complying with Title IX and has hosted conference workshops (from non-agency and agency presenters) on Title IX.

28.     DPI provides school districts with policies, procedures, and best practices for preventing child abuse and neglect (including child sexual abuse), internet safety and cyberbullying, human sex trafficking, and teen dating violence.

29.     DPI also conducts civil rights compliance checks on a targeted number of school districts that provide career and technical education and receive federal financial assistance.

30.     In addition to these efforts, the State Superintendent has a seat on the Child Abuse and Neglect Prevention Board and partnerships with state-wide advocates.

### Effect of Rule on DPI's Work

31.     This Rule will have an impact on multiple teams across DPI, requiring extensive coordination to ensure consistent application of the Rule. The Rule will impact work performed by DPI's civil rights coordinator, student services prevention and wellness team, special education team, and legal team, among other groups that address mental health, bullying, social work, school counseling, nondiscrimination and special education matters.

32.     DPI staff will need to analyze the Rule and any additional guidance from ED to be able to provide technical assistance to school districts, update or create resources and training, identify recurring issues and seek additional ED clarification, provide best practices and develop

Decl. of Jennifer Kammerud                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

Title IX Coordinator training resources, assist in developing model grievance procedures, and identify appropriate supportive measures. DPI staff will also need to engage in an extensive review of other areas of state and federal law that directly or indirectly address instances of sexual harassment, including state nondiscrimination law, IDEA, suspension and expulsion procedures, pupil records and confidentiality, and CTE compliance checks. This work will minimally need to be completed by the DPI's civil rights coordinator, school social work consultant, school counselor consultant, director of the student services, prevention, and wellness team, pupil nondiscrimination coordinator, director and assistant director of the special education team, assistant state superintendent of the division for learning support, legal counsel, senior policy advisor, and policy initiatives advisor. These staff will need to meet to discuss division of work and responsibilities, develop guidance around and resources to be reviewed by senior management, legal counsel, and external stakeholder groups prior to release. In preparing materials an analysis of how the rules relate to existing state statutes and rules will need to be performed. Those results will be discussed with the named DPI staff and other affected staff to determine policy application. Once guidance and materials are approved by senior management, additional DPI staff will be trained on the guidance and training and resource materials will be prepared for the field by DPI staff including, but not limited, to the aforementioned positions.

33.     The DPI's civil rights coordinator, school social work consultant, school counselor consultant, director of the student services, prevention, and wellness team, pupil nondiscrimination coordinator, director and assistant director of the special education team, assistant state superintendent of the division for learning support, legal counsel, senior policy advisor, and policy initiatives advisor have collectively expended more than 100 hours  analyzing and responding to the proposed rule and Rule. The DPI anticipates the same staff will now spend at least the same amount

Decl. of Jennifer Kammerud                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 67

of time to analyze the Rule to be able to provide guidance to school districts on how it must be implemented, as well as how the Rule impacts existing federal and state law.

34.    The DPI's current administrative rules addressing pupil nondiscrimination – Wis. Admin. Code ch. PI 9 - were initially adopted, in part, to harmonize with then existing federal law and guidance. DPI will likely be required to substantially revise these administrative rules to align with the Rule. Implementing a permanent change to administrative rules through a formal rulemaking process in Wis. Stat. § 227 is a process that takes several months to complete, at a minimum. Administrative rulemaking in Wisconsin consists of several required steps. First a state agency, in this case DPI, must develop a scope statement indicating its intent to make changes to an administrative rule. That proposed scope statement must follow a prescribed form that is sent to the governor to approve. There is not a timeline required for that approval. Once approved, the DPI has to wait a minimum of ten days before the State Superintendent can sign the scope statement, formally approving it and allowing agency staff to discuss changes to the rule. That timeframe can be affected if a preliminary administrative hearing on the scope statement is requested, requiring the scheduling of an open meeting to have the hearing before the state superintendent may approve the scope statement. Once a scope statement is approved the DPI may engage its staff and the public in drafting the specific language to be proposed. A draft of the proposed rule language must be submitted to the Wisconsin Legislative Council for a review. The Legislative Council has 30 days to complete that review. The DPI is then required to hold a public hearing on the proposed draft and a draft. The DPI is required to address the comments from Legislative Council and the public. The DPI may then submit a final proposed rule to the governor for review. There is no time limit on the governor's review. Once the governor has approved a rule to move forward, the DPI may submit the administrative rule for review to both houses of the state legislature. Leadership in both houses

Decl. of Jennifer Kammerud                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

has 10 days to refer the rule to a standing committee. Standing committees have 30 days during which they can take actions to extend the review period for an additional 30 days. If approved by standing committees, the rule advances to the Joint Committee for Review of Administrative Rules, which has 30 days with the rule, but can extend that timeframe. After the joint committee has approved the rule the agency may send it to the Wisconsin Legislative Reference Bureau for publication in the Administrative Register. The rule goes into effect the first day of the month after publication. There is an additional, separate process the DPI must follow if it wishes to pursue an emergency rule. Emergency rules are limited to 150 days with two 60-day extensions possible. As of June 9, 2020, DPI has not begun the administrative rule process.

35.     DPI will also likely be unable to fulfill the advisory role for school districts in time to provide meaningful help to school districts. School staff, as well as community agencies such as sexual assault service providers, look to DPI to provide resources and best practices for reducing and responding to sexual harassment in schools. DPI has the broad reach to enable the sharing of best practices learned from one area of the state with others and to help make connections for collaboration. Smaller school districts may not have as many pupil service staff like school social workers who have experience and training in sexual assault prevention and response, so they look to the state to provide this essential expertise and training. DPI works to advance equity by reducing the disparity in expertise between small and large districts, as larger districts may have the resources to employ additional personnel with expertise focused on implementing Title IX. When DPI provides resources and training it can result in fairer processes and procedures across the state, not only in resource rich areas. Schools would be less likely to provide trauma sensitive comprehensive policy and procedures without leadership from DPI. Just for example, school staff may not make connections amongst related laws in Wisconsin that could support a survivor of harassment or

Decl. of Jennifer Kammerud                          Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

assault such as amnesty for underage drinking laws (Wis. Stat. § 125.07(5)) and the right to an advocate (Wis. Stat. §§ 905.045, 950.045).

36.     The DPI is currently in the midst of responding to school needs related to COVID-19, which is affecting timelines around the development of additional guidance documents. In order to meet the Rule's effective date, school districts likely would need to have already begun the process of analyzing the Rule, drafting and adopting new policies and procedures, and implementing trainings necessitated by the Rule. School districts are focused on how to provide summer programming, school meals, and planning for the fall in the face of COVID-19. DPI staff who would normally be creating and providing these resources are currently

37.     There is a significant amount of uncertainty at this point as to how the Rule will preempt state and federal law. The Rule injects procedures and protections for individuals accused of sexual harassment that previously did not exist, while at the same time forcing all conflicts that could fall within the scope of Title IX into this formalized, adversarial process, denying school districts the full range of tools and best practices identified to address sexual harassment. K-12 students are at various developmental ages. The Rule will cause harm to students as districts will be unable to implement provisions to address behavior until processes are completed under this Rule. Students at these ages may not always understand their behavior or behavior may be the result of a disability. Additionally, the court-like environment created in the school to address allegations under the rule is also anticipated to cause emotional harm and trauma to students. Moreover, the standard required to exist for a complaint causes harm in and of itself as it is a standard that discourages complaints, which is not the school environment that is healthy for students and staff if school districts are to address sexual harassment and assault effectively. Effective interventions

Decl. of Jennifer Kammerud                              Civil Action No. 20-cv-01468-CJN
EXHIBIT 67

would occur before environments are severe and pervasive and would allow for behavioral changes and learning to instill preventative behaviors and interventions.

38.     DPI will have to complete its analysis of the Rule, seek guidance from ED for any areas which remain unclear, develop materials for school districts on how to develop and adopt policies and procedures and train staff on the new requirements, while at the same time receiving and addressing questions from school districts in the practical implementation of the Rule. This process would be a challenge to complete over the span of 12 months due to rulemaking requirements under state statutes potential state statutory changes, staffing requirements, and the coordination of internal and external discussions and trainings, let  alone in the span of a few months during a once in a generation pandemic in which school district resources are committed to navigating school closures and developing models of instruction that can be provided safely.

39.     DPI is concerned with the amount of resources and sophistication that school districts will be required to utilize to comply with the procedural requirements of the Rule.  School districts will need to identify, train, and possibly hire additional staff to implement the provisions of the rule. All staff will need to be trained to identify and respond to possible complaints. School district policies related to student and staff behavior will need to be updated. New processes will need to be created by school districts to handle complaints once filed.

### Harm to Schools, Communities, and Individuals

40.     In this current time of school closures due to the pandemic, schools will be forced to find a way to train all staff (including Title IX Coordinator, administrators, teachers, teacher's aides, bus drivers, cafeteria workers, counselors, school resource officers, maintenance staff workers, and many other employees) in complaint process and reporting requirements. All staff will need to be trained due to the definition of a school employee under the rule. Additionally, students, especially at a young age, will not know to distinguish between various types of school employees. This will

Decl. of Jennifer Kammerud                          Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

include creating online and in person training opportunities, all while schools are struggling to cope with the effects of COVID-19. These effects include not only the preparations around health and safety, but, for teachers, the required work to plan for instruction to occur both remotely and in person in the fall. This is a substantial additional workload for every educator in the school.

41.     It will take DPI time to create and publish all training materials and have these materials readily available on school district websites. Under normal circumstances, this could reasonably take one semester or school year to accomplish. DPI staff work closely with staff from DCF and DHS, as well as community agencies to ensure best practice guidance includes important stakeholders also focused on the reduction and response to sexual violence. It can take months for each step including the steps of assembling a team, producing content, and sending materials through the editing and approval process at DPI. A typical guidance document takes one year before it is published for the field. During the pandemic, the agency staff and related stakeholders needed for this work are extensively engaging in support for mental health supports and trauma response related to COVID and school closures. Some of these same staff are out on FMLA caring for their own families. With the additional work expectations and reduced staff timelines will necessarily be extended.

42.     Additionally, school districts will face demands on their resources in complying with the Rule, including but not limited to, the following:

- Costs for legal counsel/trainings from legal advisors;

- Staff time to update website and print resources on policies and procedures, including new grievance procedures;

- Costs of printing new policies and procedures;

- Time to train returning and new staff;

Page 15 of 21

- Time to create and deliver trainings to students on rights and complaint process;

- Time to create and deliver trainings to parents and community on rights, responsibilities, and new complaint processes;

- Time to centralize records;

- Time and resources to ensure any new processes can be operationalized remotely if the COVID-19 pandemic is still ongoing;

- Costs of subtracting staff time from other important work related to supporting the mental health of students during the pandemic, other school safety work, and prevention; and

- Time and resource expenditures related to back to school training that has not previously been budgeted. Back to school staff professional development and meetings are already shifting focus to supports for students related to COVID-19 and changes in schedule and learning due to school closures. Staff are working to change lesson plans to provide a method for making up for lost academic time due to closures and are already strained.

43.   The Rule's prohibition against K-12 schools imposing any kind of basic discipline without following ED's prescribed 20+ day process will erode trust of students in the ability and interest of the administration to take their complaint seriously and this may lead to reduced reporting and/or an increase of other types of retaliation or increased chances of re-traumatization of victims. Students who feel their complaint is not responded to in a timely manner may conclude the school does not care about them or their concerns. This could affect student mental health and cause trauma. Further, behavior could continue during this period further impacting the student and their ability to handle the behavior in a school environment the student is required to be present in under compulsory attendance laws. This window also causes harm to the perpetrator. Due to the developmental age of K-12 students, schools will be unable to address behavior by educating the

Decl. of Jennifer Kammerud                          Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

perpetrator about their behavior. Some behaviors may be caused by a disability, creating conflict as well for schools who may have otherwise addressed behavior through interventions described or created under individualized education plans required under the Individuals with Disabilities Education Act.

44.     Any instances of decreased reporting of Title IX violations would lead to the inability of schools to understand the true scope of the problems and to appropriately combat them. Any decrease in reporting means students are attempting to deal with situations themselves. This will result in a less positive and welcoming school climate, and cause harm to students who are not seeking help. Without understanding the problem staff will implement interventions for schools and individuals that do not address the real issues. Without finding effective interventions for positive outcomes students and school communities will be harmed. Staff will expend unnecessary resources with little result.

45.     DPI is concerned the Rule will discourage reporting; eliminate the ability of school districts to respond to problematic conduct with any kind of disciplinary action absent a formal and time-consuming disciplinary process; force students to address instances of sexual harassment using an intimidating and adversarial process; create a one-size-fits-all approach to all instances of sexual harassment, regardless of the range of potential issues that will need to be fit into this formalized, adversarial procedure; and require significant increases in resources dedicated to meeting procedural burdens that ultimately discourage students from seeking the protections of Title IX, narrow the scope of conduct protected under Title IX, and insulate the very kinds of behaviors and environments Title IX is intended to eliminate.

### Effect of COVID-19

46.     In response to COVID-19, Wisconsin closed all schools beginning on March 23, 2020, through the end of the school year, June 30, 2020. Schools were allowed to continue to

Page 17 of 21

provide meals to students as well as virtual instruction. Local school districts were allowed to designate essential staff to complete essential government functions. School board meetings were also allowed either virtually or in person following health guidelines. The 421 school districts were each responsible for developing and implementing their own remote educational program.

47.     DPI provided guidance and support to districts, requested and was granted waivers from the federal government under the Elementary and Secondary Education Act and USDA school nutrition programs, provided waivers to school districts from school district requirements as allowed under state law, and made policy decisions to help support school districts and the provision of educational services during the health emergency.  Waivers granted to date include requirements around a minimum number of school hours, civics test graduation requirement, and educator effectiveness.

48.     Policy guidance was provided by DPI regarding special education under the IDEA, and policies under state law related to graduation, attendance, course completion, and grades.  DPI also coordinated with DHS, in providing health-related guidance for schools.

49.     DPI is currently developing return to school guidance to keep students and staff safe, provide models for school operations, and illustrate best practices around teaching and learning to address new models of learning and learning losses related to the extended closure. It is recommended that schools develop at least three plans of operation for the next school year due to the continuing circulation of COVID-19. One is a return to in-person school. A second is virtual or remote learning contingencies. The third is a blended model of in-person and remote instruction. At this time all schools should also be prepared for the possibility that some students will not be able to return to school. This is a monumental amount of planning, representing a change to the entire way in which school districts approach school operations, which needs to occur in a short timeframe.

Decl. of Jennifer Kammerud                                 Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

School districts are planning multiple new scenarios under which school may occur in the fall including, but not limited to student rotations so not all students are present in the school every day, remote or virtual instruction, and blended learning models. These new instructional models will also pose challenges for processes required under the Rule.

50.     DPI is charged under the federal CARES Act with receipt of funds under the Elementary and Secondary School Emergency Relief Fund (ESSER). 174 million dollars were provided to Wisconsin under this fund. 17.5 million dollars are set aside from those dollars, primarily to address training and support that schools will need during the next school year and moving forward should closures again occur due to COVID-19. The DPI will be using funds to provide training to teachers on high quality instruction in a remote or virtual environment, expanding access to online learning, and providing additional training and support around mental health.

51.     Due to a safer at home order, almost all DPI staff have moved to a telework environment. This caused a significant shift in agency practices as all school district conferences and support that had previously been done in person had to be transitioned to a virtual environment. At the same time, DPI has reprioritized its time and focus across the agency. A common website and portal were created to receive and respond to questions related to COVID-19. Guidance was issued on a daily basis for a period of time to address a rapidly changing situation. Statutes and administrative rules created without this situation in mind continue to pose questions for school operations. New processes were created to work with stakeholders to effectively meet the needs of schools. All agency staff and divisions have been affected by COVID-19 and its implications.

52.     COVID-19 poses staffing, learning, and financial challenges to schools. The number one priority is to keep students and staff safe. Schools are absorbing a significant amount of new

Decl. of Jennifer Kammerud                          Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

health guidance affecting all aspects of their operations and school environment. They are confronting questions of how to safely transport students, clean and disinfect facilities, how to manage the flow of students to mitigate risk, and the safety precautions and personal protective equipment that needs to be in place.

53.     Each of the 421 school districts in Wisconsin and independent charter schools have done the best they can to ensure the safety of their staff and students, based on the resources available to them. This resulted in a wide variety of remote and virtual learning opportunities.

54.     Moving into the next school year, schools will need to evaluate students and address any learning loss. They will need to determine if additional education is required for special education students if goals were not met in individualized education plans. They also need to plan for a very different school year full of new health procedures and multiple health scenarios. They need to address how they will provide learning if they have to operate in a virtual environment for part or all of a year for some or all of their students. They need to have back up plans in place if they are closed. They need to plan for educational models that fit the unique situation of the school and evolving health scenarios. For instance, given bus transportation issues and the need for social distancing, can schools have only some of their students in school on any given day? And, if so, what does that mean for the learning the school provides to all students?  How will a school accommodate special needs students or English learners in this environment?

55.     Staffing at public schools is also affected. Staff who are at higher risk may decide not to return to school or may have anxiety about returning. Further, many teachers have not historically received training to teach in a virtual or remote environment. Schools will need to consider the training they will need to provide teachers so learning for students who are remote is more effective.

Decl. of Jennifer Kammerud                                     Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

56.     Public school finances are also affected, causing uncertainty for educational budgets. COVID-19 is affecting state budgets. K-12 education in Wisconsin is one of the largest expenditures in the state budget. As schools look ahead to their budgets next year they are concerned as to whether state-level budget cuts are coming and what that will mean for what they can offer students.

57.     In light of all this, schools will be challenged to find the time to create new policies and procedures, train staff, and develop resources for parents, staff, and students to effectively administer provisions related to the Rule. Further, schools will be confronted with perceived conflicts between this Rule and state statutes and rules. Those will take time to figure out and address. This presents additional challenges in light of the uncertainty, planning, and training needed to address changes to the school environment due to COVID-19.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __11__ day of June, 2020

Jennifer Kammerud
Senior Policy Advisor
Director, Legislative & Policy Outreach Team

Decl. of Jennifer Kammerud                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 67

# EXHIBIT 68

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | Civil Action No. **20-cv-01468-CJN** |

## DECLARATION OF SHANNON KENNEDY

I, Shannon Kennedy, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the President of Rappahannock Community College (RCC) in Virginia. I have served in that rule since July 1, 2019. I have a Bachelor of Science degree in Communications from Millersville University in Pennsylvania, a Master of Arts in English Education from Gardner-Webb University, and a Doctor of Education degree in Adult and Community College Education from North Carolina State University. I previously served as Executive Vice President at Cleveland Community

College in Shelby, North Carolina, where I worked for nearly 19 years. Before that, I worked at Gardner-Webb University.

2.       I submit this Declaration in support of the Commonwealth of Virginia's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education; and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or Rule). I have compiled the information in the statements set forth below through personal knowledge and through RCC personnel who have assisted me in gathering this information from our institution. I have also familiarized myself with the Rule in order to understand how it may impact the RCC community.

3.       Rappahannock Community College is a public community college with two campuses in Virginia and seventeen off-campus sites (13 serving dual enrollment students, 1 serving postsecondary students, and 3 serving both). RCC's service area includes the Middle Peninsula and Northern Neck regions of Virginia.

4.       RCC offers the following degrees or certificates for students who successfully complete approved programs: (1) Associate of Arts and Sciences degree, which is awarded to students majoring in a specialized curriculum who may transfer to four-year colleges or universities after completing their community college programs; (2) Associate of Applied Science degree, which is awarded to students majoring in occupational-technical curricula who may plan to obtain full-time jobs immediately after graduation; (3) Certificate, which is awarded to students who complete an approved non-degree curriculum (lasting less than two years in length); and (4) Career Studies Certificate, which is awarded to students who complete an approved program of study consisting of between 9 and 29 credit hours that is designed to give specific job skills in a short period of time.

Decl. of Shannon Kennedy                                                          Case No. 20-cv-01468
EXHIBIT 68

5.      In 2018-19, RCC's enrollment exceeded 4,000 students, and 963 degrees and certificates were awarded.

6.      The new Title IX Rule and the timeframe for its implementation are of significant concern to Rappahannock Community College. The Rule will impose a substantial administrative burden on RCC staff and faculty, and it will likely harm our students and campus community more broadly.

7.      As a very small institution, RCC does not have a dedicated position for our Title IX Coordinator. The individual who serves in the role of Title IX Coordinator has many other duties. It will be very challenging for that individual to dedicate enough time to properly learning and implementing the changes in the new Title IX Rule by mid-August.

8.      RCC's Title IX team consists of several faculty members. Faculty are not under contract during the summer and will not return to campus until August 17, 2020, after the implementation date of the new Rule.

9.      The "advisor" role is not well defined and no training guidelines are provided. Again, with a small staff, assigning and training potential advisors is often difficult, but will be particularly challenging by mid-August of this year.

10.     I am also concerned about inequities that may exist under the new Rule and harm to our students and campus community. A complainant or respondent who has a college-appointed advisor or family friend may not have the same opportunity or access as a complainant or respondent who can afford a paid attorney. Furthermore, higher education institutions like RCC are not courts of law. The Rule's imposition of litigation-like requirements in the formal process option is an incredible burden on already underfunded institutions like RCC.

Decl. of Shannon Kennedy                                        Case No. 20-cv-01468
EXHIBIT 68

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this tenth day of June, 2020, at Warsaw, Virginia.

_____
Dr. Shannon Kennedy
President, Rappahannock Community College

Decl. of Shannon Kennedy                                    Case No. 20-cv-01468
EXHIBIT 68

EXHIBIT 69

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | Civil Action No. **20-cv-01468-CJN** |

## DECLARATION OF KIM D. KIRKLAND, Ed.D.

I, Kim D. Kirkland, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Title IX Coordinator for Oregon State University and the Executive Director of its Office of Equal Opportunity and Access, located in Corvallis, Oregon. My educational background includes a Doctorate in Education, Leadership Studies. I have over 25 years of professional experience in higher education administration and in private industry. I have conducted and overseen investigations into allegations of discrimination, harassment, and sexual

violence, and developed training and compliance programs on civil rights topics. I have been the OSU Title IX Coordinator since 2017.

2.      As Title IX Coordinator I am responsible for: monitoring compliance with requirements regarding and the prevention of sexual harassment, gender discrimination, sexual assault, domestic violence, dating violence, and stalking; the oversight and monitoring of all Title IX related investigations at the University; and the delivery of Title IX training to new employees, as well as required critical training modules for OSU employees (Mandatory Reporting of Child Abuse and Neglect, Title IX, Sexual Harassment, Discrimination and ADA). In 2018, I led OSU's collaboration with the University of Oregon, hosting our 2nd Annual Title IX Workshop with 115 participants from law firms, K-12, non-profit, and community colleges, as well as other higher education institutions from across the state.

3.      I submit this Declaration in support of the State of Oregon's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge as well as in cooperation with other Oregon State University personnel who have assisted me in gathering this information from our institution, and on the basis of documents that I have reviewed. I have also familiarized myself with the Rule in order to understand its immediate impact on Oregon State University.

### About Oregon State University

4.      Oregon State University ("OSU" or "the University") is Oregon's largest university. The University enrolls around 30,000 students, approximately 23,000 of whom are undergraduates. Founded in 1868, OSU enjoys the distinction of being one of only two institutions in the United States that is a land, sea, space and sun-grant university.

5.      OSU is a public institution of higher education with physical campuses in Corvallis, Bend and Newport, Oregon, a Portland, Oregon presence, and a robust e-Campus.  As a land-grant institution, the University also has Extension offices in each county in Oregon. OSU employs over 4,000 full-time faculty and has more than 200 undergraduate academic programs and over 80 graduate programs.

6.      OSU is the largest employer in Benton County, Oregon, where the Corvallis campus is located. OSU's annual budget is over $1 billion.

7.      OSU receives funding from the State of Oregon Public University Support Fund as well as other State programs. In 2019, the amounts the University received from the State of Oregon totaled approximately $216 million.

8.      OSU receives over $400 million annually in federal funds, including approximately $200 million in student aid through the Department.[1]

9.      OSU is one of seven institutions established as public universities in the State of Oregon pursuant to ORS 352.002.

10.      OSU receives federal funds from the Department. As a result, the University is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

---

[1] https://fa.oregonstate.edu/sites/fa.oregonstate.edu/files/Baff/2019_annual_financial_report.pdf

Decl. of Kim D. Kirkland                                              Case No. 20-cv-01468-CJN

EXHIBIT 69

**Oregon State University's Sexual Misconduct and Discrimination Policy**

11.    The University has adopted a Sexual Misconduct and Discrimination Policy (University Policy 05-001) ("Sexual Misconduct Policy"), administered through the office of Equal Opportunity and Access. The University has also adopted a Responsible Employees and Reporting Incidents of Sexual Misconduct or Discrimination Policy (University Policy 05-005), also administered through the Office of Equal Opportunity and Access.

12.    OSU's Code of Student Conduct prohibits discriminatory misconduct, including sexual and gender-based harassment, non-consensual sexual contact, intimate partner violence, and stalking, among other prohibited behavior.

13.    OSU's Sexual Misconduct Policy prohibits discrimination based on sex, gender, gender identity (including transgender), gender expression, or sexual orientation. It also prohibits sexual misconduct, including sexual harassment, non-consensual sexual contact, non-consensual sexual intercourse, non-consensual sexual activity, sexual exploitation, intimate partner violence, and stalking. The Sexual Misconduct Policy defines sexual harassment to include unwelcome sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature that is sufficiently severe or pervasive that it has the effect, intended or unintended, of unreasonably interfering with an individual's work or academic performance because it has created an intimidating, hostile, or offensive environment and would have such an effect on a reasonable person.

14.    OSU's Title IX Coordinator may designate one or more Deputy Title IX Coordinators. Deputy Title IX Coordinators may be delegated the authority to investigate, oversee investigations, or take authority over relevant matters within their designated purview

15.    OSU's Sexual Misconduct Policy (and associated resolution processes) is applicable to all members of the university community, including, but not limited to, students, student

Decl. of Kim D. Kirkland                                              Case No. 20-cv-01468-CJN

EXHIBIT 69

organizations, faculty, staff, contractors, volunteers, and visitors.  In section 3.1 of the Policy, the University reserves the right to respond to incidents that occur on property owned, controlled, or used by the University, as well as conduct that occurs away from the University when the conduct could have the impact of limiting or denying any university community member's ability to participate in or benefit from an educational program or activity, or when it creates a hostile work or educational environment.

### Disruption to Written Policies and Procedures for Addressing Allegations of Student Misconduct

16.     In the University's current process for complaints against student responding parties, the investigation is conducted by an investigator. The University's current process permits for the parties to submit questions for the other during the investigation process. These questions are considered and, if relevant, asked by the investigator.  The party's responses are then shared by the investigator with the party who first raised the questions.  Once the investigation is complete there is an administrative conference with a hearing officer.  The University's current process does not include a live hearing.  During the administrative conference, the parties are given the opportunity to submit statements to the adjudicator.  The party's statements are then shared by the adjudicator with the other party. The parties are given the opportunity to submit a response to the other party's statement to the adjudicator

### Disruption to Written Policies and Procedures for Addressing Allegations of Employee Misconduct

17.     The University has both unionized and non-unionized employees.  The University has written policies and procedures for sexual misconduct, including sexual harassment, involving employees.

Decl. of Kim D. Kirkland                                                      Case No. 20-cv-01468-CJN

EXHIBIT 69

18.     In the University's current process for complaints against employee responding parties, the investigation is conducted by an investigator; once the investigation is complete there is a determination by an adjudicator.  The University's current process does not include a live hearing at this stage of the process.  The University's current process permits the parties to submit questions for the other via the investigation.   These questions are considered and, if relevant, asked by the investigator of the other party.  The party's responses are then shared by the investigator to the party who first raised the questions. The parties are also permitted to submit rebuttal statements during the investigation process.

19.     The University is in the process of determining if the Rule requirements for hearings are consistent with the procedures required under applicable Collective Bargaining Agreements and University policies and procedures related to employee matters.

### The Rule Requires Extensive Review of Existing Policies and Procedures

20.     To comply with the Rule the University will need to review and revise its Sexual Misconduct and Discrimination Policy, its two associated procedures for students and employees, the Code of Student Conduct, and other University policies and procedures.

21.     These revisions will require considerable time and effort of a number of involved offices:  Equal Opportunity and Access; Office of the Dean of Students; Employee and Labor Relations; Human Resources; Faculty Affairs; University Compliance; and, the Office of General Counsel, among others.

22.     In addition, OSU will need to prepare and revise websites, training materials, support documents, and resource information.

Decl. of Kim D. Kirkland                                              Case No. 20-cv-01468-CJN

EXHIBIT 69

23.     The Rule would require additional training in order for adjudicators to carry out the live cross-examination portion of the processes. Title IX coordinators, investigators, advisors and appellate officers will all require additional training on the new requirements of the Rule.

24.     The procedural requirements and training will require considerable investment and create significant administrative burden at a time when the University's resources are already stressed by responding to the COVID-19 global health pandemic.

25.     The process and training requirements in the Rule impose additional burden on the University which is made more difficult by the fourteen week timeframe imposed by the Rule.

26.     The University will have to provide and support live hearings, likely via technology that it currently either does not own or has not deployed for these offices.  The University will likely need to hire additional employees to serve as advisors to parties in the newly mandated live cross-examination process.  Further, the University anticipates waste of these resources as a matter may reach the cross-examination stage and a party's or witness' refusal to participate will necessitate the University cease consideration of the party's or witness' information gathered up to that moment. This framework and its associated mandates create potential waste of employee time and work product.

27.     The University represents that mandatory cross-examination by an advisor will harm both student reporting and responding parties.  The student accountability process is designed to advance the University's educational mission.  The adversarial nature of cross-examination by a party's advisor, as compared to a neutral party, creates anxiety, angst and significant added stress for both parties. Learning is not an adversarial experience; learning is student-centered and neutral in delivery.  The University represents that mandatory cross-examination of students by a non-neutral individual will be harmful to student parties and witnesses.

Decl. of Kim D. Kirkland                                             Case No. 20-cv-01468-CJN

EXHIBIT 69

28.     The University has programs that involve minor children.  Following the above, the University represents that the possible harm to student parties and witnesses who are minors is unfathomable.

29.     The University anticipates that it will now need to create a structure that offers three different routes for matters involving allegations of sexual misconduct; one under the new Title IX regulations; one under the Oregon state statute definitions that are applicable; and one that encompasses "general sexual misconduct" prohibited by University policy and the Code of Student Conduct.  Similarly, the University anticipates confusion among its campus community members as to which pathway is applicable to certain alleged misconduct, what process attaches, what rights are provided, and what process may be mandated, if any.  In particular, the University anticipates potential inequities resulting from the application of Title IX to only matters within certain programs, activities, or campus properties as compared to matters that occur one block over but involve the same allegations and potentially the same parties

30.     The University was a signatory to the joint comment letter dated January 30, 2019, submitted to the Department titled, "Comments from Title IX Coordinators for the Oregon Public Universities (ED-2018-OCR-0064)", expressing concerns about the logistical, policy, and fiscal impacts of the proposed changes.[2]

31.     The final Rule does not address or mitigate many of the concerns set forth in the joint comment letter, including particularly the chilling effect on reporting.

---

[2] https://www.regulations.gov/document?D=ED-2018-OCR-0064-18403

Decl. of Kim D. Kirkland                                    Case No. 20-cv-01468-CJN

EXHIBIT 69

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 11th day of June 2020

___/s/_____
Kim D. Kirkland

Title IX Coordinator and Executive Director of the Office of Equal Opportunity and Access

OREGON STATE UNIVERSITY

Decl. of Kim D. Kirkland                                    Case No. 20-cv-01468-CJN

EXHIBIT 69

# EXHIBIT 70

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | Civil Action No. **20-cv-01468-CJN** |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF GERARD T. LEONE

I, Gerard T. Leone, Jr. pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the General Counsel of the University of Massachusetts system ("UMass"), which includes four undergraduate campuses, a medical school, a law school, an endowment foundation, several business units, over 200 centers and institutes, and a Board of Trustees.  I am assigned within the Office of the UMass President, located at One Beacon Street in Boston, Massachusetts.  My educational background includes a Bachelor of Arts in American Political

Decl. of Gerard T. Leone                                              Case No. 20-cv-01468

EXHIBIT 70

History from Harvard University and a Juris Doctorate from Suffolk University Law School. I have been employed as the UMass General Counsel since December of 2017. Prior to that time, I was a Partner in the law firm of Nixon Peabody LLP, and before that, I was a government lawyer and criminal prosecuting attorney for twenty-five years. During that time, I served as an elected and appointed official as the First Assistant United States Attorney and Anti-Terrorism Coordinator in the District of Massachusetts; the Chief of the Criminal Bureau at the Massachusetts Attorney General's Office; and a two-term elected Middlesex District Attorney. Additionally, I have served several years as a county, state, and federal prosecuting trial attorney as an Assistant District Attorney, Assistant Attorney General, and Assistant United States Attorney.

2.      I submit this Declaration in support of the Commonwealth of Massachusetts's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education (the "Department"); and the United States of America regarding the recently issued rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through personnel from UMass who have assisted me in gathering this information from our institutions, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on UMass.

3.      UMass is a public university system comprised of four undergraduate campuses in Amherst, Boston, Dartmouth, and Lowell, a medical school in Worcester, and a law school at Dartmouth. UMass's flagship campus, University of Massachusetts Amherst, was founded in 1863. There are approximately 73,000 students enrolled across UMass's five campuses. As of Fall 2019,

Decl. of Gerard T. Leone                                                     Case No. 20-cv-01468

EXHIBIT 70

UMass had 5,823 faculty, including 4,167 full-time faculty. In addition, UMass currently has approximately 15,000 employees. UMass offers a broad spectrum of academic programs across its campuses, granting Bachelor of Arts degrees in over 60 fields, Bachelor of Science degrees in over 50 fields, and bachelor's degrees in a number of other areas, including Fine Arts and Business Administration. Master of Arts degrees are granted in more than 25 fields, Master of Science degrees are granted in over 45 fields, and a variety of other master's degrees are granted in specialized areas, including Education Teaching, Business Administration, and Public Health. UMass also grants Doctor of Philosophy degrees in over 50 fields. UMass has a combined total of 74 on-campus residences: 52 are located at the Amherst campus; one is located at the Boston campus; 10 are located at the Dartmouth campus (with 2 more in the process of being completed), and 11 are located at the Lowell campus. UMass estimates that approximately 40% of UMass's undergraduates live in on-campus residences.

4.     UMass received approximately $780 million in State appropriation for fiscal year 2019. UMass's annual appropriation is made up of base appropriations, fringe benefits, and smaller appropriations in support of specific campus-based programs. UMass is administered under its Enabling Statute, Massachusetts General Laws ch.75.

5.     UMass receives federal funds from the Department. As a result, UMass is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

6.     Each UMass campus has a Code of Student Conduct. UMass, through its Board of Trustees, has approved a Non-Discrimination and Harassment Policy, which the campuses have adopted (the "Policy"). Standards are developed to guide the campuses in establishing a grievance process for addressing student and employee complaints. The Policy prohibits

Decl. of Gerard T. Leone                                                    Case No. 20-cv-01468

EXHIBIT 70

unlawful discrimination, harassment, sexual harassment, and retaliation "in education, admission, access to or treatment in, its programs, services, benefits, activities, and terms and conditions of employment at UMass." The Policy applies to all members of the UMass community – including students, employees, faculty, applicants for admissions and employment, contractors, volunteers, and visitors.

7.      Each UMass campus has a Title IX Coordinator, who is charged with:  monitoring that campus's compliance with Title IX; ensuring appropriate education and training of staff and students; coordinating the investigation, response, and resolution of all reports under the Policy; coordinating interim measures and support resources available to community members; and coordinating appropriate actions to eliminate and prevent the recurrence of known prohibited conduct under the Policy.

8.      The number of individuals that handle Title IX matters varies with each UMass campus, but the complex dynamics of each campus require a team approach to address the multiple layers in Title IX matters in the higher ed context.  The information for each UMass campus is listed below:

- Equal Opportunity Office on the Amherst campus.  This Office has six employees handling Title IX matters: an Associate Director/Deputy Title IX Coordinator; Senior Investigator; Investigator, Intake/Technical Support Officer; the Office Manager; and the Associate Vice Chancellor for Equal Opportunity (AVC, EO)/Title IX Coordinator.

- Dean of Student Office on the Amherst campus. This Office has three employees handling Title IX matters: the Associate Dean of Students for Conduct and Compliance; and two Assistant Dean of Students for Student Conduct.

Decl. of Gerard T. Leone                                              Case No. 20-cv-01468

EXHIBIT 70

- <u>Office of Civil Rights and Title IX on the Boston campus</u>.  This Office has two employees handling Title IX matters: the Title IX Coordinator and the Civil Rights and Title IX Investigator.

- <u>The Dean of Students Office on the Boston campus</u>.  This Office has two employees handling Title IX matters: the Associate Dean of Students and Deputy Title IX Coordinator and the Investigator for Student Concerns.

- <u>Office of Human Resources on the Dartmouth campus</u>.  There are two individuals handling Title IX matters within the Human Resources office: the Title IX Coordinator and Title IX Investigator/Compliance Coordinator.

- <u>The Division of Student Affairs on the Dartmouth campus</u>.  This Office has three individuals handling Title IX matters: Associate Vice Chancellor for Student Affairs (Deputy Title IX Coordinator); the Director of Student Conduct (to be renamed Director of Community Standards); and the Assistant Director of Community Standards.

- <u>The Office of Equal Opportunity and Outreach and Diversity and Inclusion on the Lowell campus</u>.  This Office has three full-time employees handling Title IX matters: the Associate Vice Chancellor of Equal Opportunity and Outreach and Diversity and Inclusion/Title IX Coordinator/ADA Coordinator; and two Assistant Directors/Deputy Title IX Coordinators/ADA Coordinators.

- <u>The Office of Student Conduct on the Lowell campus</u>.  This Office has three full-time staff members handling Title IX matters: the Director of Conduct; the Associate; and the Coordinator/Case Manager.

- <u>The Office of Human Resources at the Medical School</u>.  At the Medical School, Worcester campus the Title IX investigations are conducted within Human Resources.

Decl. of Gerard T. Leone                                         Case No. 20-cv-01468

EXHIBIT 70

This Office has three to four employees handling Title IX matters and two individuals within Office of Management that may assist with Title IX matters.

9.      Over 400 employee and student Title IX/sexual misconduct cases have been reported during the past two fiscal years (July 1 through to June 30). Of those 400 reports, UMass teams investigated 200 complaints. The grievance procedure for each of the UMass campuses is generally described in Paragraph 13.

10.     The Policy was approved by the Board of Trustees on September 21, 2016. When the Board of Trustees approved the Policy, the campuses were required to adopt the Policy and establish written campus procedures for students and employees. Because of UMass's shared governance model, when a change is made to a campus policy, it requires input from various campus community student, faculty, and staff organizations. Depending upon the particular UMass campus, input may need to be shared with student government organizations, student affairs, housing and residential education, rape crisis centers or advocacy support centers, labor unions, human resources, the faculty senate, and other university organizations. For example, the UMass Amherst campus requires leaders, offices, and organizations to contribute to the development of a Title IX policy and procedure including:

- The creation of a task force to solicit initial feedback regarding the creation of a new policy and procedure;

- Formation of a working group comprised of subject matter specialists, such as EO office personnel, Dean of Students, Labor Relations, and the Provost's office to draft policy and procedure;

Decl. of Gerard T. Leone                                            Case No. 20-cv-01468

EXHIBIT 70

- A policy review committee comprised of a member of the Chancellor's staff; legal counsel; Vice Chancellors for Compliance, Human Resources, and Student Affairs; and the Provost;

- Input solicited from all Academic Deans;

- Campus review of draft policy by the Graduate Student Senate, Faculty Senate (or a faculty-union task force), Student Government Association, and key stakeholders such as student advocacy groups;

- Chancellor's Review; and

- Review by the Chancellor's Leadership Committee.

Accordingly, changes to campus policies and grievance procedures require several months; in the past, this process has taken anywhere from six months and two years to fully implement.

11.    The Policy defines "sexual harassment" as unwanted conduct of a sexual nature when: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, education, or participation in UMass's programs or activities; (2) submission to, or rejection of, such conduct by a person or persons is used as a basis for employment or educational decisions affecting such person or persons, or participation in UMass's programs or activities; or (3) such conduct unreasonably interferes with a person or person's work or academic performance, interferes with or limits a person or person's ability to participate in or benefit from a work or academic program or activity, or creates an intimidating, hostile, or offensive working or academic environment.

12.    The Policy applies to all members of the UMass community, including students, employees, faculty, applicants for admissions and employment, contractors, volunteers, and visitors. And the Policy applies to conduct that occurs in education, admission, access to or

Decl. of Gerard T. Leone                                      Case No. 20-cv-01468

EXHIBIT 70

treatment in, UMass's programs.  The Rule will require revisions to UMass's definition of

"sexual harassment" and grievance procedures for both students and employees at both the

UMass system level and the campus level.

13.     Neither the UMass system nor its campuses conduct "live" hearings for students

or employee grievances, as described in the Title IX Rule.  The grievance process utilized by the

UMass system and its campuses vary for students and employees, respecting the independence of

each campus.  Each UMass campus allows for advisors during the grievance process, provides a

description of the rights of the parties, and discusses and implements interim measures.

Currently, anyone may be an advisor, with a few exceptions. For example, at the UMass

Amherst campus, employees may not have attorneys as advisors.  The advisor's role is to support

and provide guidance during the conduct proceedings.  Advisors may not "represent" or

otherwise speak on behalf of the individual in any meeting or hearings, but an advisor may

confer with a party during meetings or hearings.

14.     While the rules about who may file a complaint vary slightly between the various

UMass campuses, generally any member of the campus community who believes they have been

subject to harassment or discrimination by any other member of the campus community may file

a formal complaint, and referrals may come from external entities including law enforcement and

members of the public.  The Title IX Coordinator also reserves the right to initiate a formal

grievance.

15.     A general description of UMass's undergraduate campus's student and employee

grievance procedures follows:

- UMass Boston. The UMass Boston campus's grievance process for students typically
  provides that an investigator investigates the allegations and prepares a report.  The parties

Decl. of Gerard T. Leone                                          Case No. 20-cv-01468

EXHIBIT 70

are informed of and provided with interim measures. The investigator's report is provided to an Administrative Review Committee (ARC) consisting of two to three trained faculty and staff members. The parties may also submit statements, including any questions they have for the other party or witnesses, to the ARC. The ARC reviews the investigator's report and party statements, and asks any questions they determine are appropriate of the investigator, parties, or witnesses. The ARC may adopt the investigator's report; consult with the investigator, request further investigation, or request re-investigation by a different investigator. The ARC then issues written findings and sanctions, if applicable. Both the complainant and the respondent may appeal the ARC decision within five business days of the decision on specified grounds outlined in the grievance procedures. Appeals are handled by the Vice Chancellor for Student Affairs or designee. Under UMass Boston's grievance process for employees, the Title IX Coordinator investigates the allegations pursuant to the campus's Internal Procedures and Process for Complaints Alleging Unlawful Discrimination, Harassment, Sexual Harassment or Hostile Environment in the Workplace. The Title IX Coordinator interviews the parties and witnesses (if any), and interim measures are discussed and provided. An investigatory report is prepared, making a determination as to whether the campus's policy was violated and sanctions were recommended. The investigatory report is then provided to the respondent's supervisor or Vice Chancellor. A findings letter is sent to the parties. If the findings are that the respondent violated the campus's policies, the Vice Chancellor and/or HR may accept, reject, or modify the recommended sanctions. The parties may appeal on specific grounds.

Decl. of Gerard T. Leone                                    Case No. 20-cv-01468

EXHIBIT 70

- <u>UMass Dartmouth.</u> The UMass Dartmouth campus's procedures for students include a Title IX investigator investigating the allegations. Interim measures are discussed and provided to the parties by the Title IX Coordinator and Deputy Title IX Coordinator in Student Affairs. There is a process for the students to submit questions to the other party or witnesses (if any) through the Title IX Investigation, and the parties may submit a written response to the Investigation Findings. The Investigation Report and written responses are considered by an Administrative Review Panel, which consists of three faculty/staff specifically trained in Title IX matters, charged with rendering the decision. Both parties may then appeal the decision of the Administrative Review Panel. An individual Appeal Officer makes the decision in the appeal, which is final. In general, UMass Dartmouth's campus procedures for employees include an investigation. The parties are informed of and provided with interim measures prior to the investigation. The findings of the investigation are shared with the parties. The results of the investigation are shared with the respondent's Division Head with recommendations for remedial action/sanctions. The parties have 10 days to appeal the findings to the Chancellor or designee.

- <u>UMass Lowell.</u> The UMass Lowell campus procedures for students include an investigation. Prior to the investigation, interim measures are discussed and provided to the parties. Following an investigation, the investigator prepares a report of the findings, which is reviewed by the Title IX Coordinator before it is distributed to the parties. If the respondent wants a panel review, then both parties may submit a response to the investigative report, which is included with the report. The panel, reviews the investigative report and the statements of the parties, and may ask for further review or

Decl. of Gerard T. Leone                                              Case No. 20-cv-01468

EXHIBIT 70

ask questions regarding the investigatory process. The panel reviews the "findings for sanctions" (if any) and makes a decision on the investigatory report. If a "finding for sanctions" is made and approved, the respondent has the right to an appeal. For employees, the UMass Lowell campus procedures typically include an investigation. Prior to the investigation, interim measures are discussed and provided to the parties. The parties and witnesses (if any) are interviewed, and any relevant documentation gathered during the investigation is reviewed. The investigators prepare a report summarizing the findings and their determination of whether a violation of the policy has occurred. The Associate Vice Chancellor of Equal Opportunity and Outreach & Diversity and Inclusion and the Senior Associate Vice Chancellor of Human Resources and Organizational Strategy & Effectiveness review the investigator's report. If the respondent is found to have violated the campus's policies, the respondent has a right to appeal under certain grounds.

- <u>UMass Amherst.</u> UMass Amherst's grievance process for students is managed by the Student Conduct and Community Standards Office and it includes the reporting party discussing the student conduct with a case administrator. A notice is then sent to the respondent, and interim measures are discussed and implemented as necessary. The administrator interviews the parties and witnesses (if any) and reviews any documentation requested or obtained through the investigation. The administrator may have follow-up interviews with the parties. If the respondent accepts responsibility, then sanctions are imposed, and the reporting party has a right to appeal. If the respondent accepts responsibility, but disputes the sanctions, the respondent has a right to a Sanction Review, and both parties have a right to appeal. If respondent does not accept

Decl. of Gerard T. Leone                                              Case No. 20-cv-01468

EXHIBIT 70

responsibility, or there are disputed facts, the case is referred to the University Hearing Board, which consists of three to five members comprised of faculty, staff and/or students, who determine responsibility with respect to any policies violated. Questions for consideration may be submitted by the respondent and the reporting party in advance of and/or during the hearing. The Hearing Board determines if the questions are relevant. If the respondent is found responsible, sanctions will be imposed by the Dean of Students or their designee. Both the complainant and the respondent have the right to appeal. All parties are invited, but not required, to participate in the hearing. Participants can attend the hearing in person or via video/phone teleconference. All parties, including witnesses, have the right to be accompanied by an advisor of choice to any conduct proceeding including the hearing. Where an employee (faculty, staff, or graduate student employee) is the respondent, the UMass Amherst campus grievance procedure is overseen by the Equal Opportunity Office. The UMass Amherst campus utilizes a single investigator model for employees where an investigator prepares a report after the investigation. In general, the investigator meets with the complainant to discuss interim measures and resources and to review their rights. The investigator discusses the allegations with the complainant, who then signs the complaint. The respondent is provided with written notice of the allegations, the policy document, resources, and notice of when to respond to the complaint. The respondent forwards any response together with any documentation to the Equal Opportunity Office, who provides copies to the complainant and the respondent's Vice Chancellor or Provost. The investigator then interviews the respondent, and the investigator investigations the allegations, interviewing witnesses (if any), reviewing documents obtained or requested,

Decl. of Gerard T. Leone                                              Case No. 20-cv-01468

EXHIBIT 70

and has follow-up interviews with the parties as necessary. The investigator drafts the investigative report, and a copy of the report is provided to the parties for any response or rebuttal. The investigator then provides the report with recommended findings and response/rebuttal received from the parties to the Adjudicator, who reviews these materials and puts forward a written adjudication. The report, written adjudication, and copies of responses received are sent to the Vice Chancellor/Provost for adoption, revision, or rejection. The parties are informed of transmittal and then provided with a decision following the Vice Chancellor/Provost determination. If a policy violation is found and accepted by the Vice Chancellor/Provost, a hearing to determine a sanction will occur under the auspices of the Academic Personnel Vice Provost (for faculty respondents) or with HR and Labor Relations for staff respondents by HR and Labor Relations. Either party may appeal the finding directly to the Chancellor's Office within thirty (30) days of the Vice Chancellor/Provost's decision. The Chancellor or designee will review the record and may choose to either affirm or revise the Vice Chancellor/Provost's decision or can elect to remand the matter back for additional fact-finding. The Chancellor's determination is final.

16.     Students and employees participating in the grievance process are informed in person about confidentiality, including what information is protected under the Family Educational Rights and Privacy Act or state laws. In addition, some of the UMass campuses utilize various secure case management platforms to store student and employee information obtained from reports and investigations, and access to these platforms is limited and protected. In all cases, investigators limit whom they speak to and provide reports to. Information is shared only on a need to know basis.

Decl. of Gerard T. Leone                                    Case No. 20-cv-01468

EXHIBIT 70

17.     UMass has formed a University-wide Committee comprised of representatives of all the campuses and managed by the Office of General Counsel to engage in discussion about the various changes required by the Rule.

18.     Under the Title IX Rule, UMass will likely need to hire additional staff to conduct the live hearings.  Individuals designated as decision-makers will need to undergo intensive training so that they may make complex evidentiary rulings at the live hearing – which resemble court proceedings in a criminal law setting.  Both the hiring and training of staff will come at considerable cost.

19.     The Title IX Rule requirement that a school provide an advisor to a student who does not obtain one will come at a cost. UMass will need to hire additional staff and/or add more responsibility to already thinly stretched staff who wear multiple hats, threatening to undermine the other work that they do.  UMass has determined that it is virtually certain that appointed advisors will need training about the law and sexual harassment proceedings.  UMass is also considering whether the advisors they provide may need a law degree. Either will come at a greater cost and drain resources.  Yet this may be necessary to ensure fairness in proceedings when another party retains an attorney advisor.  Scheduling mandatory live hearings will also delay the timeline for resolutions and present logistical challenges, especially where live hearings need to occur when UMass is in intercession during the summer or winter months.

20.     UMass has unionized employees with collective bargaining agreements (CBAs) that present complexities seemingly overlooked by the Department. For example, the Title IX Rule allows advisors of choice, including attorneys.  Under the CBAs, the union is the exclusive bargaining representative for the union employee.  The Rule doesn't reconcile this conflict.  In addition, in many cases, contractual agreements with these units require a "Loudermill" hearing

Decl. of Gerard T. Leone                                      Case No. 20-cv-01468

EXHIBIT 70

to be conducted prior to the suspension and termination of an employee for violation of university policy under Title IX. Certain procedures within the CBAs differ from the Title IX Rule. As a result of the Title IX Rule, CBAs will need to be reviewed and re-negotiated to, among other things, address the requirement that there be uniform application to students and employees and to address the fact that some employees have CBAs which outline grievance procedures before determining disciplinary action. This review will take considerable time and effort.

21.     As a result of the Title IX Rule, UMass will need to revise the Policy and its student and employee grievance procedures to comply with the Rule, and submit these changes to the Board of Trustees for a vote and passage. The next UMass Board of Trustees meeting is scheduled for July 20, 2020. The UMass campuses will need to adopt the Board of Trustees new policy on sexual harassment and institute grievance procedures for students and employees that include "live" hearings. The changes to the UMass system and campus policies will include changes in the definitions and application of jurisdiction for Title IX claims, the expansive role of the Title IX Coordinator, required appeals, and additional training, among other provisions.

22.     In addition, because of the Title IX Rule, UMass will need to modify, among other things, the Policy and related grievance procedures to comply with the Title IX Rule and to ensure redress for sexual harassment that falls outside the Rule's limited scope. UMass will incur in addition to training costs for its Title IX Coordinators, deputies, investigators , decision-makers, advisors, and individuals involved in the informal grievance process,  campus education expenses to ensure the campus community understands the policies and grievance processes established by both the Title IX Rule and non-Title IX sexual misconduct.

Decl. of Gerard T. Leone                                        Case No. 20-cv-01468

EXHIBIT 70

23.     In order to ensure that all the students, staff, and faculty are educated about the policies and the grievance procedures, UMass will incur additional costs.  There may be some confusion as to which policy and procedures applies.  Educating students and employees would clarify what conduct falls within the new Rule and the non-Title IX policy.  The estimated cost in educating UMass' students, staff, and faculty is $83,000.

24.     The process for bringing a policy before UMass's Board of Trustees for approval involves several stages and takes considerable time and effort.  The policy revision must follow a five-phase process developed in accordance with T13-093, UMass's *Policy for Creating and Establishing Board Policy and Standards,* before ultimately being presented to the Board of Trustees for final approval. The first "proposal" phase involves obtaining the approvals necessary to move forward with the proposed policy work. The timeframe for the "proposal" phase is between thirty (30) and sixty (60) days.  The second phase requires convening the pertinent UMass council to develop a draft of the policy.  The timeline for the "committee work" phase is sixty (60) to ninety (90) days.  The next "socialization" phase is a forty-five (45) calendar day period during which UMass's Board Policy Working Group (BPWG) reviews the policy draft and circulates it among the campuses for feedback. After the policy draft is socialized and approved by the BPWG, it enters the "final review" phase, which involves final review and endorsement by the Office of General Counsel and submission to the President's Council for consideration.  The timeline for the "final review" phase is about thirty (30) days.  Finally, the "approval" phase requires a vote of the President's Council as well as a recommendation from the President's Council to the Board of Trustees.  The process concludes when the policy is presented to the Board of Trustees for a final vote.  The timeline for the final "approval" phase is between thirty (30) and sixty (60) days, subject to the Board's meeting schedule.

Decl. of Gerard T. Leone                                                        Case No. 20-cv-01468

EXHIBIT 70

25. UMass has incurred significant revenue losses as a result of the Covid-19 pandemic. The residence halls and dining facilities are closed, resulting in a significant loss of millions of dollars of revenue to UMass. The UMass campuses have adjusted student room, board, and parking fees as a result of the closure of the residence halls. In addition, some contracts entered into with the UMass system and UMass campuses had to be renegotiated so that services could be adjusted or stopped during the COVID-19 pandemic, incurring additional significant costs to UMass. The University system is expected to lose approximately $70 million in revenue this fiscal year to student room and board refunds.

26. UMass will need to greatly revise and expand upon its training materials for Title IX coordinators, investigators, advisors, decision-makers, and those involved in facilitating informal resolutions. The process will include several phases and efforts, including hiring consultants to train on the specific requirements outlined in the Title IX Rule and develop written training materials for publishing on UMass System and campus websites. It is estimated that the total cost of hiring consultants, either per campus or collectively for the system, will exceed $500,000.

27. Each UMass campus will need to hire additional full-time and part-time staff to accommodate the requirements of the Title IX Rule. The salaries of these new staff members may range from $45,000 for an administrative assistant, to $120,000 for a Title IX Coordinator, a Title IX Deputy Coordinator, or an investigator. Accordingly, coming into compliance with the Title IX Rule may cost UMass at least $500,000 in new staff salaries.

28. UMass is extremely concerned about its ability – individually as campus teams and collectively as a system – to comply with the August 14, 2020 effective date. UMass must revise the Policy to conform to the Title IX Rule. The Board of Trustees process takes

Decl. of Gerard T. Leone                                    Case No. 20-cv-01468

EXHIBIT 70

considerable time. In order to meet the Rule's effective date, UMass will need to significantly alter and truncate its established processes, which ensure for proper review and input. In addition, each campus will need to adopt the Policy and institute written grievance procedures for both students and employees. The UMass campuses will need to discuss the new policy and grievance procedures with various on-campus constituencies and arrive at agreement and consensus per the UMass Board policies, By-Laws, and Governance Document. CBAs will likely need to be renegotiated to address some of the changes. Because of the short timeline, UMass will also need to outsource training, which will be very costly. UMass campuses have communicated their concern about how to meet the requirements by the effective date.

29.    The Rule's definition of "sexual harassment" will make it harder for UMass to address sexual harassment and assault that has a real impact on a student and the school community, but does not meet the heightened standard of "severe, pervasive, and objectively offensive." Individuals at UMass campuses have raised concerns regarding the narrowing of the scope of the sexual harassment definition, specifically that it will have a chilling effect on the filing of complaints.

30.    UMass expects that the formal and adversarial hearing requirements under the Title IX Rule – especially the requirement of mandatory cross-examination – will have a chilling effect on potential complainants to the detriment of student safety. Complainants will now be subject to direct questioning by the respondent's advisor, who may be an attorney. Research and experience shows that many sexual assault survivors avoid reporting their assault to law enforcement because of the ordeal that such questioning and a potential trial represent, and imposing procedures similar to a courtroom on educational institutions will likely have a deterrent effect. There are concerns that complainants will not want to see the process through

Decl. of Gerard T. Leone                                                    Case No. 20-cv-01468

EXHIBIT 70

and will only accept supportive measures, denying them of the opportunity of full redress. This may also make UMass campuses less safe for its students. These changes to the Title IX systems are more similar to the criminal justice system, which raises several troubling issues.

31.     The Title IX Rule makes it more difficult for UMass to prevent, address, and remedy sexual harassment and clashes with the values embraced by UMass. UMass is committed in policy, principle, and practice to maintaining an environment that prohibits discriminatory behavior and provides equal opportunity for all persons. UMass affirms its commitment to provide a welcoming and respectful work and educational environment, in which all individuals within the UMass community may benefit from experiences of others and foster mutual respect and appreciation of divergent views. The Title IX Rule places significant burdens on students and employees who report sexual harassment and will expose them to harsh treatment during the hearing process. This will discourage student and employees from reporting sexual harassment, making it more difficult for UMass to fulfill its obligations to provide a "welcoming and respectful" environment. If UMass is not aware of sexual harassment occurring on its campuses, it will be challenging to respond in a timely manner to remedy the effects of sexual harassment.

32. The Title IX Rule makes it clear that it does not apply to study abroad programs. The Policy applies to UMass's study abroad programs. Now, the UMass campuses will need separate procedures to address sexual misconduct that does not arise under the Title IX definition of sexual harassment for students attending a study abroad programs.

33.     In sum, the Title IX Rule presents significant changes and challenges to the present systems that protect those who allege as complainants, and those who are subject to such allegations as respondents. These changes and challenges, and the unreasonable expectation that

Decl. of Gerard T. Leone                                                    Case No. 20-cv-01468

EXHIBIT 70

UMass and our peer colleges and universities in higher ed can effectuate and comply by August

14, 2020 without significant resource and funding infusions, are extremely unreasonable and

result in violations of basic fairness and equity.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and
correct.

Executed on this 15th day of June, 2020

Gerard T. Leone, Jr.
General Counsel
University of Massachusetts        6/15/20

Decl. of Gerard T. Leone                                    Case No. 20-cv-01468

EXHIBIT 70

EXHIBIT 71

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. **20-cv-01468-CJN** |

## DECLARATION OF KARYN LYNCH

I, Karyn Lynch, pursuant to 28 U.S.C. § 1746, hereby declare that to the best of my knowledge and information the following is true and correct:

1.      I am The School District of Philadelphia's Chief of Student Support Services and Title IX Co-Coordinator.

2.      I submit this Declaration in support of the Commonwealth of Pennsylvania's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in*

Page 1 of 18

*Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) ("Rule"). I have compiled the information in the statements set forth below through personal knowledge and through School District of Philadelphia personnel who have assisted me in gathering this information. I have also familiarized myself with the Rule in order to understand its immediate impact on The School District of Philadelphia.

### Background and Current Process

3.      The School District of Philadelphia (hereinafter, "District") provides for the education of over 205,000 students, in traditional public schools and charter schools, making it one of the nation's largest school districts. Guiding these young people attending District-operated schools are over 9,000 teachers and counselors, with the District employing approximately 19,000 people in total to help support the vast student body. The District is comprised of over 200 District-operated schools, divided into 16 Learning Networks, plus an additional 87 Charter-operated schools, and 20 Alternative Education schools, spanning the City of Philadelphia. District-operated schools serve a diverse group of students and families, with demographics of approximately 47% African American, 23% Latino, 15% percent white, 9% Asian, 6% Multi Racial/Other, and <1% American Indian or Alaskan Native, Native Hawaiian or Pacific Islander, and with 114 different languages spoken at home. Approximately, 52% of the students are male, and 48% are female.

4.      The District receives funding from the United States Department of Education and, therefore, is obligated to comply with Title IX and its implementing regulations.

5.      I am the Chief of the Office of Student Support Services and Title IX Co-Coordinator for the District. I report directly to the District's Superintendent. I have served in this role for nine (9) years.  Prior to joining the District, I served as the Chief of Student Services

at Prince George's County Public Schools in Maryland.  I hold a Master's Degree in Public Administration from Columbia University and a Bachelor of Arts in Government from Dartmouth College.

6.      The District's mission is to deliver on the civil right of every child in Philadelphia to an excellent public school education and ensure all children graduate from high school ready to succeed, fully engaged as a citizen of our world. The District is governed by the Board of Education ("Board"), a nine-member body appointed by the Mayor of Philadelphia (the Board currently has eight members, with one vacancy).  The Board is responsible for approving the District's budget and establishing policy to guide District goals. The Board is further responsible for appointing the Superintendent, approving budgets, and granting and non-renewing charters for charter schools located within the District's borders. The Board is also responsible for adopting policies that regulate and facilitate the administration of laws and policies concerning the District's operations, including the resolution of complaints of discrimination and harassment.

7.      In March of 2018, the Board adopted revised versions of Policy 248, *Harassment and Discrimination of Students*, and Board Policy 348, *Harassment and Discrimination of Employees*, prohibiting sexual harassment and discrimination. These policies prohibit sexual harassment and sexual misconduct by and against students and employees and establish a grievance process for addressing complaints of sexual harassment. Policy 248 applies to allegations of sexual harassment on school property or during school-sponsored events, as well as off school property if the incident impacts the school community. Over the course of approximately one year, these policies and their implementing procedures were developed, reviewed and revised by the Office of Student Support Services and Office of Talent in

conjunction with review and approval by the United States Department of Education's Office of Civil Rights. The policies were adopted by the Board on March 15, 2018.

8.     The Office of Student Support Services and the Office of Talent within the District have District-wide responsibility to support schools in ensuring compliance with applicable federal and state laws and regulations and Board policies, including those prohibiting harassment and discrimination. The offices provide implementation guidance to schools intended to ensure that all students, employees and community members are treated fairly, equitably, and lawfully in the District's programs and activities and provided a safe, secure environment free from discrimination and harassment.

9.     In addition to other programs offered by individual schools or District-wide, the District's Department of Health, Safety & Physical Education in the Office of Curriculum, Instruction & Assessment, beginning in the 2019-2020 school year, implemented a mandatory health education curriculum adapted from "Rights, Respect, Responsibility," a K-12 sexuality education curriculum designed to involve young people in discussing personal, sometimes sensitive topics. The students learn about good communication, safety in relationships, and growth and development.

10.     The District has a Title IX Coordinator and two Co-Coordinators who administer the District's sexual harassment and discrimination policies and procedures. There are approximately 250 additional District-level and school-based employees involved in implementing the policies prohibiting harassment, discrimination, and bullying, as well as monitoring school climate and culture.

11.     The District's Title IX Coordinators and other employees monitor schools' responses to complaints and provide advice in responding to and addressing sexual misconduct,

incidents, and complaints that are made via the phone, email, and the District's online complaint intake form.  During the 2019-2020 school year, District schools reported 143 complaints of conduct alleged to be sexual harassment of a student[1].  The schools investigated and resolved all complaints in accordance with established grievance procedures set forth in Board policy and District administrative procedures.

12.     The Office of Student Support Services tracks complaints related to students and ensures that mechanisms are in place for annual and ad hoc sexual harassment training; daily technical assistance is provided to support schools; complaint investigations are prompt, equitable and thorough in alignment with state and federal guidelines; and supportive measures and remedies are provided to immediately address and prevent recurrence.

13.     Within the Office of Student Support Services exists an Office of Prevention and Intervention, an Office of Climate and Safety, and an Office of Student Rights and Responsibility.  The Office of Prevention and Intervention consists of a Director and sixteen (16) liaisons who are each assigned to a Learning Network.  The liaisons support the schools with implementing behavioral and mental health supports for students.  Liaisons also assist with the creation and implementation of safety plans and other supportive measures. The Office of Climate and Safety consists of a Director and sixteen (16) Climate and Culture Coaches. A Coach is assigned to one Learning Network.  The Coaches provide District-level support to the schools in their network with implementing school-wide interventions that focus on the prevention of bullying and harassment, including sexual harassment, and the creation of safe learning environments. If a student, as a result of an investigation, is referred for discipline, the

[1]     This number indicates incidents reported to the Title IX Coordinator. By the nature of the K-12 setting, there were likely more investigations conducted than were reported.

Decl. of Karyn Lynch                                           Case No. 20-cv-01468-CJN5
EXHIBIT 71

Office of Student Rights and Responsibility oversees the process, which includes a hearing before a hearing officer and the right to appeal.

14.     At the school level, each school designates a designee who conducts investigations of complaints of bullying or harassment by or against students, including allegations of sexual harassment. Upon receipt of the complaint and during the investigation, the designee, in collaboration with other school and District-level staff, assesses the need for and provides interim services and supportive measures to involved parties and witnesses.

15.     All complaints must be investigated, regardless of the severity of the allegation. Those complaints range from cyberbullying, to verbal harassment, to more serious allegations of physical assault. It is only after investigation that the schools are able to ascertain what happened and what steps to take next.

16.     An investigation consists of individual interviews with the respondent, complainant and any witnesses; collection of written statements; and, if applicable, collection of supplemental evidence (e.g., photographs and videos).  The school provides written notice of the outcome of the investigation to parents/guardians of the complainant and respondent.  During and after the investigation, the schools collaborate with other school and District-level staff to assess the need for ongoing services and supportive measures or other actions.

17.     In instances where a school's investigation results in a finding that a student-respondent is responsible and that the appropriate discipline is removal from the school, the school must submit a request to the Office of Student Rights and Responsibilities for a disciplinary transfer. A disciplinary transfer hearing is then held during which a school administrator and the respondent (along with their parent/guardian) are present.  The complainant/victim is also invited to provide an impact statement, if they choose to do so.  That

impact statement may be provided in person or submitted in writing, depending upon the complainant/victim's level of comfort. A disciplinary hearing officer facilitates the hearing. If the hearing officer affirms the finding of responsibility, the hearing officer determines whether the recommended level of discipline is appropriate, in accordance with applicable law, Board policy and Code of Student Conduct. The discipline could include a behavior contract, a lateral transfer to another District school, or a transfer to an alternative educational school placement. Respondents have the right to appeal any disciplinary hearing decision. Additionally, some incidents rise to the level of consideration for expulsion from the District. A formal expulsion hearing is held pursuant to the requirements in the Pennsylvania School Code and a decision is made by a vote of the Board.

## Detrimental Impact of the New Regulations on K-12 Schools

18.     The new Rule will have an immediate and adverse impact on school climate and the safety of K-12 students by limiting what triggers a Title IX investigation and creating barriers to when and how quickly schools can respond to sexual harassment and violence under Title IX. In addition, the new Rule creates inequitable, unnecessary, confusing and restrictive resolution requirements. Further, compliance with the new Rule will require significant changes in Board policy, administrative procedures, and staffing assignments, reallocation and hiring of additional staff (or expensive contracts with third parties), and necessitate complex and time consuming training in an incredibly short period of time.  All of this will result in complicated administrative, staffing, and financial burdens for which the Rule does not account.  And, it will even further compound the administrative, staffing, and financial complexities caused by the COVID-19 pandemic confronting school districts.

*Impact on Ability or Willingness to Report Sexual Misconduct*

19.     Even more fundamentally, the new Rule frustrates the District's ability to effectively prevent and deter sexual harassment, assault and violence under Title IX by imposing a formalistic written complaint requirement that, even if not designed to, will likely discourage or impede students who are unable to, uncomfortable with, or fearful of sharing what happened to them, let alone articulating their complaint in writing. In the K-12 setting, most children do not have the aptitude necessary to request a formal investigation, especially if they are traumatized or in crisis.

20.     The requirement that a complaint be in writing also creates barriers to students with disabilities who represent approximately 15% of our students (at least 19,000 District students). Some of these students may have disabilities which make it difficult or impossible for them to verbalize their complaint, let alone reduce their complaint to writing. The Rule fails to identify any exception to the burdensome complaint requirements to allow for accommodations to ensure all students gain access to Title IX's protections.

21.     Unlike the requirements in the new Rule, the District's established grievance process, which has been refined over the years based on actual experience and informed by the circumstances of the District's population, ensures that all students subject to sexual misconduct are able to report such misconduct easily, without unnecessary formality, in any manner accessible to them. To that end, the District provides complainants the option to 1) utilize an online Bullying and Harassment Reporting and Investigation ("BHRI") Form, 2) call a bullying/harassment hotline, or 3) send an email to a designated anti-harassment email address. Complainants can also make verbal complaints/reports to their school principal or any other member of the school staff.  In addition, all school employees who witness, suspect or are notified that a student has been subject to conduct that could constitute sexual harassment are

required to immediately report the incident to the building principal or designee or through the reporting form. Finally, under Pennsylvania law, all District employees are mandated to report child abuse and sexual misconduct.

22.     When misconduct is witnessed by an employee or a complaint of misconduct  is reported, it is essential that the school be able to take immediate steps to investigate and protect students, sometimes before a parent or guardian can be reached, so that issues can be addressed before they escalate. The delay inherent in having to wait for a formal written report before beginning the investigation may even begin, created by the Rule, could have profoundly negative effects on students, and potentially put them in harm's way, traumatizing student victims, witnesses, and even respondents.

*Impact Caused by Multiple Processes and Disclosure*

23.     The complex procedural requirements established by the Rule create delay-ridden barriers that hamper a school district's ability to take necessary immediate action to resolve complaints of sexual misconduct. Unlike a complaint of some other sort of misconduct which can be addressed promptly, under the Rule, victims and respondents involved in the Title IX complaint process are forced into a special, formal process that may traumatize the students while at the same time making them wait weeks for a resolution.

24.     The Rule's requirement to address Title IX complaints differently also creates a predicament for how to handle complaints that allege other types of misconduct along with sexual misconduct. For example, the District currently uses a consistent process for all types of harassment, providing clarity and predictability to students, families and staff about what to expect during a grievance process. The current use of a single process for all types of misconduct alleged in a single report allows for rapid resolution of the complaint and implementation of

appropriate discipline, if warranted, and supports to all parties involved, so students can resume their educational experience, minimizing disruption of teaching and learning.

25.     Even if the complaint is solely based on an allegation of sexual misconduct, the Rule forces school districts to convert to an inefficient, dual-track process of responding. Separate processes based on the level or severity of the sexual misconduct create confusion not only among students, but also among staff tasked with investigating and resolving complaints. Not only is a dual-process system confusing and inefficient, but it also increases the administrative burdens and costs associated with training staff and tracking and resolving matters, diverting time and resources from teaching and learning for students and staff.

26.     The Rule also fails to consider that students in the K-12 setting are minors who are still developing self-control, restraint, and understanding of consequences of their actions and words. Permitting students, regardless of age or understanding, to have unlimited access to and ability to disseminate information related to a complaint and investigation fails to protect victims, respondents and witnesses from the very real possibility that their highly personal and sensitive information will be shared throughout the school community.  If investigations determine that complaints are unfounded or involve misidentification of an alleged perpetrator, rumors may be spread and reputations and self-worth damaged as a result of the disclosures required by the Rule.

27.     Under the current process, students are not provided access to sensitive, identifying information about student witnesses, especially if that information is not relevant to the complaint. Under the new Rule, students and families will be made privy to all information obtained during interviews, even if it is unrelated to the incident or the students involved.

28.     Even if schools could require students and their families to sign enforceable nondisclosure statements, the reality is that students can be impulsive and fail to understand the impact of sharing highly sensitive and personal information; and information can be used to retaliate against or embarrass children and adults.  The Rule's allowance for unimpeded disclosure has the very real potential to aggravate and escalate the very dynamics underlying the issues being investigated and trigger retaliation, harassment, and, unfortunately, possible physical and psychological harm against complainants, witnesses, and respondents. Further, once students realize that their statements could be subject to broad disclosure amongst their peers, it is very likely that students will not be willing to provide witness statements or participate in any way in the grievance process. A lack of witnesses will impede the District's ability to fairly and accurately determine whether misconduct occurred.

*Impact on Current Policies and Procedures*

29.     The new Rule and its short time frame for compliance, issued at the end of the school year and while school districts across the country are already overwhelmed with issues created by the COVID-29 pandemic, places an unreasonable burden on school districts. As stated above, after careful consideration and community input, the Board of Education for the District revised its sexual harassment policy in 2018, and invested significant resources into training and communicating the new policy and procedures. Requiring a complete overhaul of the District's policies and processes by August 14, 2020, three months after issuing the Rule, is untenable and unduly burdensome.

30.     The Rule's formalistic requirements necessitate complete revision of the District's sexual harassment policies and administrative procedures. That process takes far more time than the new Rule's effective date allows. From start to finish, the policy revision process in the

District can take between four and five months, at a minimum. The process begins with program office staff and the District's Office of General Counsel reviewing and revising the policies. Revised draft policies are then sent to the Board's Policy Committee, which publicly convenes quarterly.  The Policy Committee spends two weeks reviewing the policies and providing feedback. The District spends two weeks responding to that feedback and making further policy revisions, then resubmits the draft policies to the Board. The policies are posted publicly for one week prior to a scheduled and advertised and public Policy Committee meeting.  At this meeting, the Board's Policy Committee, members of the public and community stakeholders can comment on and ask questions about the revisions, which often leads to additional considerations and revisions. Policies then receive public consideration, or "readings," at two monthly public action meetings of the full Board, providing further opportunity for Board and public comment.  At the second of the Board action meetings—which is typically nine to eleven weeks after the Policy Committee meeting—the Board votes on whether to adopt the revised policies.

31.     Although the Board could diverge from the timeline and process set forth above and permit the District to operate under an emergency or interim policy, requiring school districts to address and revise their policies over the summer months when schools are closed and school board meetings occur less frequently places an unfair burden on school districts and hampers the ability for students, families, employees and community stakeholders to participate in the revision process. It effectively would silence the voice of those most affected by the Rule and policy revisions, not to mention frustrate staff and students who may only be hearing about the new process for the first time when they return back to school in the Fall (while also navigating the many additional unknowns and changes students and staff will confront when

schools "reopen" following COVID-19 suspension of normal operations). Nevertheless, the

Board will have to do so in order to meet the August 14, 2020 effective date.

32.     Most District school-based employees are 10 month employees, meaning they

generally do not work from June 15 into August. Professional development days or training time

is largely dictated by collective bargaining agreements. It is already a challenge to find enough

time for training during a "regular" school year and the training calendar is carefully considered

and developed months in advance. The District cannot require 10 month staff to work during the

summer to fit in more training without incurring more costs.

33.     Training heading into the 2020-2021 school year will need to focus not only on

the use of technology in remote learning and how to implement social distancing, but also on

skills, strategies, and supports for students who have been out of school for months, losing

academic ground, and experiencing social emotional setbacks.  To attempt to jam in an entirely

additional set of training expectations to address a completely new Title IX grievance process on

top of that is unrealistic and verges on punitive. Further, any employees who will be tasked with

fulfilling the roles of investigators, decision makers, informal resolution facilitators, advisors and

appeals will require at least 8-10 hours of additional, specialized training each.

34.     In addition to requiring a revision to policies and training, the new Rule is likely

to require the District to hire additional staff to fill the mandated multi-person roles of

investigator, decision-maker, appeals officer, advisors, and informal resolution provider, or to

shift current staff away from other work, to the disadvantage of students. The District has already

expended considerable financial resources in the course of shifting from in-person instruction to

distance learning due to the COVID-19 pandemic in order to maintain continuity of education for

students (for example, purchase and distribution of approximately 85,000 Chromebooks to bridge the digital divide and enable accessibility to digital learning).

35.     The District cannot raise taxes and, in addition to federal and state funds, relies on local tax revenues streams for its funding, leading to significant financial impact on the District. The cost of hiring additional personnel, particularly personnel with the requisite background and experience to fill these roles, is prohibitive. The costs of outsourcing all or some of these roles could be even more expensive.  Either way, the Rule imposes an expensive, unfunded, complicated compliance mandate on school systems.

*Impact on School Climate and Student Safety*

36.     Under the Pennsylvania School Code, K-12 educators are required to ensure student safety. Numerous Board policies govern student and staff conduct and the District has implemented school-wide, evidence-based and data-driven approaches to supporting students, identifying and addressing behaviors that indicate children are in crisis and which can impact other students and the learning environment, and seeking to promote a safe, secure and positive school climate.

37.     The Rule's requirement that sexual misconduct be so severe, pervasive *and* objectively offensive that it effectively denies a student's access to education to be cognizable under Title IX hinders the District's efforts to immediately and adequately address conduct. Instead, the District must wait until the conduct has persisted to the point of impacting the school's climate and a victim's (and possibly respondent's) education before addressing it as a Title IX issue.

38.     Requiring the District to formally dismiss any complaints that on their face do not meet the elevated definition of sexual harassment will undoubtedly send a message to

complainants that their concerns are not important. While the new Rule does not preclude school districts from addressing the behavior under a different process, in practical terms many, if not most, students in the K-12 setting receiving an official dismissal of their complaints will lack the maturity and sophistication to internalize the dismissal letter as a simple formality and not an indication that the alleged behavior is acceptable and must be tolerated.

39.     This kind of formal rejection of a complaint has the potential to permanently impact a complainant's education and well-being. Rather than complain again and risk rejection of the complaint, complainants might attempt to resolve an ongoing matter themselves by skipping classes to avoid an aggressor, refusing to attend school at all, engaging in self-harm, or retaliating. This will further deny such students the advantages of equal educational access, negatively impact school climate and culture, and unfairly and unnecessarily contribute to short and long term deficits for students and the adults they become.

40.     Likewise, accused K-12 students may interpret a formal dismissal as a finding of no responsibility and be emboldened to continue the complained of misconduct. Even if the District addresses the conduct under a separate resolution process, the new Rule's mandatory dismissal requirement could send a mixed message leading young students to believe that a certain level of sexual misconduct is acceptable.

41.     While the new Rule would permit school districts to investigate the misconduct using a process outside of the formal Title IX requirements, as stated above, a dual process is confusing and, potentially, contributes to even more delay if a school district is required to pause any informal investigation pending an appeal of a dismissal. Hampering a school district's ability to formally intervene at early stages of misconduct impacts its ability to effectively and rapidly address issues that impact school climate and student safety.

42.     As stated above, the District has implemented policies and procedures that address student misconduct using supportive measures and appropriate discipline. However, in order to understand the concerns and put supportive measures in place, it is necessary to conduct some sort of initial inquiry. The new Rule's prohibition against the use in the investigation or decision of any interview of a respondent prior to a formal notice acts to discourage schools from conducting necessary initial inquiries of certain behaviors, but also may put students at risk of being traumatized from repeated inquiries to obtain the same information already shared.

43.     From a practical standpoint, the formalistic notice requirement fails to take into account that the District stands *in loco parentis* with its students. This status authorizes schools to provide the controls necessary to prevent infractions of discipline and interference with the educational process. This means that if a school employee witnesses sexual misconduct, it must be able to take immediate action, just as a parent would. If the school is required to wait until a formal complaint has been filed and respondent has been formally noticed before any inquiry about the misconduct (even though a school employee witnessed the incident in real time or on video) is admissible the school cannot immediately resolve the misconduct. The Rule's interference with a school's ability to act quickly to resolve this type of issue is harmful not only to the victim who relies on the school to act like a parent and rapidly address the misconduct, but also other students who were at the scene of the misconduct and saw no apparent action by the school to address the matter.

44.     The Rule will have far-reaching consequences on our students' ability to thrive and on student safety, school climate, and achievement. The Rule imparts lengthy response timelines and unnecessary administrative and financial burdens. Because it fails to adequately protect child victims of sexual harassment, violence and unwelcome conduct of a sexual nature,

the new Rule stifles a school district's ability to effectively prevent and deter such behavior and ensure equitable access to a free appropriate public education, exposes school districts to potential legal liability, and increases the likelihood of ongoing and progressively more severe victimization.

45.     Because the Rule fails to take into account the unique and specific circumstances in K-12 schools, across the country it could result in thousands of legitimate reports of sexual harassment going uninvestigated under Title IX.  Even if K-12 students are able to navigate the formal complaint requirements, the proscribed timelines established by the Rule delay resolution and frustrate a school's ability to act which further serves to harm students impacted by sexual misconduct and complaints.

46.     As stated above, the delays and overly formalistic requirements imposed upon K-12 schools may affect attendance rates which in turn will impact graduation rates and the future success of students whose concerns could have been more rapidly addressed or addressed before the sexual misconduct became severe and pervasive. This will affect not only the mental health of students, but also their ability to become productive members of society.

47.     Imposing a Rule that requires an investigation, decision-making and appeals process that is not only lengthy and costly, but also laden with legalistic details that are more appropriate for a criminal proceeding, interfere with school districts' *in loco parentis* status and inappropriately seek to micromanage a school district's role in governing student behavior and conduct.

48.     The above concerns address only a sample of the ways that the new Rule will negatively impact K-12 schools and students and sets schools up to fail. There are a myriad of other concerns including the double standard of importance applied to sexual harassment over

other types of harassment or discrimination, such as harassment based on race or national origin;

the harm to a child of being required to face cross examination by another child, and the

challenges of implementing the new Rule while schools are trying to prepare for reopening amid

ongoing concerns related to the COVID-19 pandemic while facing unprecedented shortfalls

within their budgets.

### Conclusion

49.     Based on my role as Chief of Student Support Services and Title IX Co-

Coordinator, I anticipate that the new Rule will have an immediate and negative impact on K-12

school districts and students, and will result in less safe schools and increased risks of litigation

by both victims and respondents. At a minimum, schools need more time to process the new

Rule to be able to develop policies and procedures that address the issues raised above and the

inconsistencies presented by the Rule.


I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and

correct.


Executed on this 20th day of June, 2020


KARYN LYNCH
Chief of Student Support Services
and Title IX Co-Coordinator

# EXHIBIT 72

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | Civil Action No. __20-cv-01468-CJN__ |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

**DECLARATION OF DR. JAMES MABRY**

I, Dr. James Mabry, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am President of Middlesex Community College, a public institution of higher education with campuses located in Bedford and Lowell, Massachusetts. I have held this position since February 15, 2015. Prior to my current role, I served as Vice President of Academic Affairs at Mesa Community College in Mesa, Arizona for seven years. Presently, I also serve as the Chair of

EXHIBIT 72

the Massachusetts Association of Community Colleges (the "MACC"). The MACC is an association between the fifteen state-funded community colleges in Massachusetts (each a "Community College," and collectively, the "Community Colleges") and is governed by a 15-member Council of Presidents and a chair that rotates annually. The purpose of the MACC is to support and enhance the well-being of the Community Colleges in service to their students, communities, and the Commonwealth.

2.     I submit this Declaration in support of the Commonwealth of Massachusetts's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education (the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through Community College personnel who have assisted me in gathering this information, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on the Community Colleges.

3.     The Community College system is the largest segment of public higher education in the Commonwealth of Massachusetts and enrolls over 150,000 credit and non-credit students and offers 564 unique associate degree concentrations and 593 certificate programs. The Community College system also has more than 12,300 total employees and includes: Berkshire Community College, Bunker Hill Community College, Bristol Community College, Cape Cod Community College, Greenfield Community College, Holyoke Community College, Massachusetts Bay Community College, Middlesex Community College, Massasoit Community College, Mount

Page 2 of 10

Decl. of Dr. James Mabry

Case No. 20-cv-01468

EXHIBIT 72

Wachusett Community College, Northern Essex Community College, North Shore Community College, Quinsigamond Community College, Roxbury Community College, and Springfield Technical Community College.

4.     The Community Colleges are public institutions of higher education and are supported in part by state legislative appropriation.  In Fiscal Year 2020, the Community Colleges received a total of almost $300 million from the state. The Community Colleges are governed according to M.G.L. Chapter 15A, *et seq.*, which, in part, authorizes oversight by the state's Board of Higher Education, and by their Boards of Trustees and Presidents.

5.     The Community Colleges receive federal funds from the Department.  As a result, the Community Colleges are subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

6.     The Community Colleges have adopted a Policy on Affirmative Action, Equal Opportunity and Diversity ("Policy") that prohibits sexual harassment and sexual violence by students, employees, and faculty and establishes a grievance process for addressing complaints of sexual harassment and sexual violence.

7.     Each Community College employs a trained Title IX Coordinator and support staff to administer the Policy and its grievance procedure in response to complaints of sexual harassment or sexual violence.

8.     Annually, the Community Colleges receive and investigate approximately 100-125 complaints of sexual harassment and/or sexual violence.  A complaint may be verbal or in writing. The Policy's grievance procedure follows an investigatory model and does not provide for hearings between the parties to a complaint.

Decl. of Dr. James Mabry                                              Case No. 20-cv-01468

EXHIBIT 72

9.    The Policy was significantly revised in 2000 in consultation with the Department's Office for Civil Rights in Boston ("OCR").  The revisions included the replacement of a hearing-based grievance process with an investigatory model.  Substantial revisions to the Policy were also made in 2011 following the issuance of OCR's 2011 *Dear Colleague Letter on Sexual Violence.* These changes too were made in consultation with OCR and the Massachusetts Department of Higher Education.  The Community Colleges have utilized this investigatory model for almost twenty years.

10.    The Policy currently defines "sexual harassment" as:  "Sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature when: (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment or academic decisions; or (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's academic or work performance by creating an intimidating, hostile, humiliating or sexually offensive learning or working environment."

11.    According to the Policy, a Community College reserves the right to investigate alleged sexual harassment and/or sexual violence occurring off-campus when such conduct adversely affects the Community College community, poses a threat of harm to the Community College community, interferes with the Community College's pursuit of its educational objectives and mission, and/or if a student or employee is charged with a serious violation of state or federal law.

12.    Pursuant to the Policy, any student who believes they have been sexually harassed in violation of the Policy may file a complaint under the Policy's complaint procedure.  The complaint procedure is administered by each Community College's Title IX Coordinator.  The Title IX Coordinators have extensive training and experience in responding to allegations of sexual harassment, including Level One and Level Two Association of Title IX Administrators (ATIXA)

Decl. of Dr. James Mabry                                                    Case No. 20-cv-01468

EXHIBIT 72

certification.  The complaint procedure includes an investigatory phase conducted by the Title IX Coordinator.  During this phase, the Title IX Coordinator conducts an investigation and prepares a Report of Preliminary Findings for distribution to the parties.  The parties may submit rebuttal statements in response to the preliminary report, which may prompt further investigation.  After considering the rebuttal statements and completing any additional investigation, the Title IX Coordinator prepares a Report of Final Findings and Recommendations, including disciplinary recommendations and sanctions, if any, for review by a designee selected by the Community College's President.  The designee is charged with accepting, rejecting, or modifying the Title IX Coordinator's report, including its findings and recommendations.  The designee's decision is issued to the parties and either party has a right to appeal the designee's decision to the President.  The President's appeal decision is final.

13.    The Policy's complaint procedure is conducted as confidentially as reasonably possible to protect the privacy rights of all individuals involved.  A Community College may share information concerning the complaint with parties, witnesses, union representatives and/or others during any phase of the procedure only on a need-to-know basis.  All individuals with whom information is shared are advised of the confidential nature of the information and directed not to discuss the matter with anyone other than a personal advisor, if applicable.

14.    Each party to a complaint may have a personal advisor.  In cases involving allegations of sexual violence the personal advisor may be an attorney.  The role of a personal advisor is limited to providing advice and counsel to the party throughout the grievance process.  Personal advisors are not permitted to interview witnesses, question other parties, or otherwise actively participate in the grievance process.

Decl. of Dr. James Mabry                                    Case No. 20-cv-01468

EXHIBIT 72

15. In order to comply with the new regulatory requirements, particularly the requirements associated with live hearings, the Community Colleges will be required to revise the Policy by dismantling its long-standing investigatory process and replacing it with a rigid, costly, and process-heavy structure, more akin to criminal cases. These efforts will require many hours and the involvement of the Community Colleges' General Counsel, Title IX Coordinators, and Affirmative Action Officers. These policy modifications will further require notice and impact bargaining with the Community Colleges' local and state-wide labor organizations, collaboration and consultation with the Massachusetts Board of Higher Education and Department of Higher Education, approval by each Community College's local Board of Trustees, and the development and facilitation of training programs for students and staff.

16. Under the Policy, students and employees may be subject to disciplinary action for sexual harassment and sexual violence that take place outside a college's "education program or activity," or that take place outside the United States. The new regulations effectively bar the Community Colleges from addressing this conduct under their Title IX policies. Therefore, in order to address the new restrictive scope of Title IX, these institutions will have to revise their Code of Student Conduct in order to accommodate and process cases of sexual harassment and sexual violence occurring outside a Community College "education program or activity" off-campus or during study abroad programs. Without taking these steps, there will be no effective remedy available to victims of sexual misconduct that occurs outside "education programs or activities" off-campus or abroad. These efforts too will require many hours and the involvement of the Community Colleges' General Counsel, Title IX Coordinators, Affirmative Action Officers, and Code of Student Conduct Officers. These policy modifications will also require notice and impact bargaining with the Community Colleges' local and state-wide labor organizations, approval by each Community College's local

Page 6 of 10

Decl. of Dr. James Mabry                                    Case No. 20-cv-01468

EXHIBIT 72

Board of Trustees, and the development and facilitation of training programs for students and staff. Institutions will also have to retrain or hire new staff to facilitate the new Code of Student Conduct procedures. These efforts will come at a considerable cost to the Community Colleges.

17.     The colleges will likely have to hire or contract with attorneys or others with extensive legal training to carry out the new requirements. The nature of the hearing and the legal acumen required of the advisors to provide effective advice and cross-examination of witnesses (including knowledge of rape shield laws and rules of evidence concerning relevance and credibility) will necessitate that the advisor in most cases be an attorney or otherwise possess requisite legal knowledge and skills. Further, an institution may face legal jeopardy and additional legal expenses where a party with a college-appointed advisor loses at the hearing and subsequently claims that the college failed to provide an adequate advisor thereby denying their due process rights to a fair hearing. For similar reasons, the hearing officer presiding over a live hearing will likely also need to be an attorney or have other specialized experience in sexual harassment litigation in order to effectively manage and administer the proceedings, including making evidentiary and relevancy determinations, responding to questions or objections, and controlling the participating advisors. Supplying advisors and hearing officers with the requisite knowledge and experience will come at considerable expense to these institutions. Presently, all parties to a sexual harassment or sexual violence complaint may select a personal advisor, including an attorney, at their own expense. The Community Colleges are not required to provide or pay for either party's personal advisor.

18.     The colleges have invested significant funds and resources in training their Title IX Coordinators to conduct investigations and draft reports of findings and recommendations. The Title IX Rule nullifies those efforts and requires the colleges to expend additional money and resources to train new investigators. Extensive retraining of Community College personnel will be required to

Page 7 of 10

Decl. of Dr. James Mabry                                        Case No. 20-cv-01468

EXHIBIT 72

familiarize them with the new policies and procedures. These efforts will require extensive time and attention from stakeholders and will no doubt be complicated by the threat posed by COVID-19 and current containment and mitigating requirements imposed on these institutions.

19.     Further, extensive student training will be required in order to educate students on the new regulations, particularly the new definition for sexual harassment, the elimination of off-campus or study abroad protections, the introduction of live hearings with cross examination, and the active participation of attorneys or other highly trained advisors. These efforts will require considerable time and expense and will be particularly challenging as a result of COVID-19 measures.

20.     Implementation of the new regulations by August 14, 2020 is unreasonable in light of the extensive changes presented and their impact on existing policies and procedures; the need for comprehensive and broad-based training programs for students, staff, and faculty; and the hiring of new personnel with special legal and Title IX expertise to serve as advisors and hearing officers. Satisfying these demands by August is further complicated by the current COVID-19 crisis, including the social distancing restrictions in place locally and nationally.

21.     The requirement that, upon a party's request, an institution must conduct a hearing in separate rooms via telecommunication equipment will be an expensive undertaking for the colleges.

22.     The heightened definition of sexual harassment could result in a student having to endure repeated and ongoing harassing conduct with no recourse under Title IX until the unreasonably high legal standard is met. As a result, the colleges will find it more difficult to address sexual harassment.

23.     Knowing that filing a complaint will result in a formal, judicial-like hearing that will entail live cross-examination from the respondent's advisor will likely dissuade some students from pursuing claims, to the detriment of the alleged victim's safety, as well as possibly the safety of others.

Page 8 of 10

Decl. of Dr. James Mabry                                                Case No. 20-cv-01468

EXHIBIT 72

. Research shows that many sexual assault survivors resist pursuing their cases with law enforcement because of the ordeal that a potential trial represents. Imposing a trial-like procedure on institutions will likely have the same deterrent effect. The fact that cross-examination will be conducted by an advisor, not the parties themselves, does not remedy the problem, particularly since that advisor may be an attorney.

24.    The complicated, formalized, judicial-like grievance process that institutions will be required to follow in response to a formal complaint is antithetical to the educational environment at the colleges. In higher education, student discipline is part of the teaching and learning process. Even in cases of an expulsion, the process is not punitive in the criminal law sense, but rather a determination that the student is unqualified to continue as a member of the educational community. To impose on the academic community the same due process requirements mandated under criminal law would undermine and frustrate the teaching and learning process.

25.    Community colleges enroll substantial numbers of high school age students through dual enrollment programs, home schooling programs, alternative high school programs, and inclusive concurrent enrollment initiatives. Should an incident occur involving one of these students, the regulations will require a college to use a live hearing regardless of the fact that one, or potentially both, of the parties could be under the age of 18. These same students would not be subject to a live hearing had the conduct in question occurred in their high school. There is no reason to believe that an 18-year-old college student is better equipped than an 18-year-old high school student to go

Page 9 of 10

Decl. of Dr. James Mabry                                     Case No. 20-cv-01468

EXHIBIT 72

through a live hearing and withstand cross-examination of a personal and sensitive nature by an experienced attorney.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 16th day of June, 2020

Dr. James Mabry
President, Middlesex Community College
Chair, Massachusetts Association of Community Colleges

Decl. of Dr. James Mabry                                    Case No. 20-cv-01468

EXHIBIT 72

# EXHIBIT 73

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF STACY ALAMO MIXSON

I, Stacy Alamo Mixson, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am Chief of the Injury and Violence Prevention Branch (formerly named the Safe and Active Communities Branch) for the California Department of Public Health (CDPH). CDPH has a broad and comprehensive scope of responsibility, including infectious disease control and prevention, patient safety, chronic disease prevention and health promotion, family health, and health equity.

2.     I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, and on the basis of documents that have been provided to and/or reviewed by me.

3.     CDPH's ultimate mission is to advance the health and well-being of California's diverse people and communities. I have served as a supervisor in multiple units within CDPH for 18 years. Prior to my employment at CDPH, I worked for other public health and safety entities for 9 years, including the California Department of Health Services, and the Child Health and Disability Prevention Program of the Sacramento County Health Department. I have personal knowledge of all the facts stated herein. If called and sworn as a witness, I could and would testify competently to the matters set forth herein:

4.     As the Chief of the Injury and Violence Prevention Branch, my responsibilities include formulating policies, overseeing operational procedures and providing administrative guidance to staff to support epidemiology, strategic planning and policy development, and programs for injury and violence prevention. I also advise on program and policy implications of legislation and regulations, and provide technical assistance to legislators, the Department of Finance and other key stakeholders. Additionally, I establish and maintain collaborations with counterparts in federal, state, and local agencies, as well as universities, professional societies, and private sector entities.

5.     CDPH recognizes that violence, including sexual violence, is a public health concern. The consequences of violence are costly and far-reaching – impacting nearly all health and mental

health outcomes throughout life. Research indicates that the effects of violence, including sexual violence, are immediate, lasting, and intergenerational. Violence results in increased medical and criminal justice costs, along with decreased employment and educational opportunities.[1] These effects touch socio-cultural, physical (including infrastructure and public services), economic, and educational environments (including educational institutions),[2] which redound to state agencies like CDPH tasked with providing critical services in these areas.

6.    Furthermore, and directly relevant to CDPH's work, exposure to violence has negative impacts on individual and community health outcomes. Witnessing or experiencing violence increases the risks of both mental health conditions (e.g. depression, post-traumatic stress disorder, anxiety, and suicide attempts) as well as chronic diseases (e.g. diabetes, lung disease, and cardiovascular disease).[3] Adverse experiences, such as severely traumatic, prolonged or cumulative exposure to sexual harassment or violence can result in toxic stress, which can disrupt early brain development, undermine the functioning of biological systems, and cause long-term health problems.[4] The effects of trauma extend beyond the individual to families and communities, including breaking down social networks and social relationships, as well as hindering access to basic needs

---

[1] H. Pinderhughes, et al., Adverse Community Experiences and Resilience (2015), 13. *Available at* https://www.preventioninstitute.org/publications/adverse-community-experiences-and-resilience-framework-addressing-and-preventing.

[2] *Id.*

[3] Debra E. Houry et al., *Preventing Multiple Forms of Violence: A Strategic Vision for Connecting the Dots* (2016), National Center for Injury Prevention and Control, Center for Disease Control and Prevention. *Available at* https://www.cdc.gov/violenceprevention/pdf/Strategic_Vision.pdf.

[4] *Preventing Violence in California*, California Department of Public Health: Violence Prevention Initiative (May 2017), 4-6. *Available at* https://www.cdph.ca.gov/Programs/CCDPHP/DCDIC/SACB/CDPH%20Document%20Library/Violence%20Prevention%20Initiative/Preventing%20Violence%20in%20California%20-%20The%20Role%20of%20Public%20Health.pdf; Pinderhughes, *supra* note 1 at 13-17.

Decl. of Stacy Alamo Mixson                                                      Case No. 20-cv-01468-CJN
EXHIBIT 73

such as food, shelter, education, and employment.[5] Because CDPH's mission is to protect the public's health and achieve positive health outcomes for individuals, families, and communities, we are particularly concerned with the holistic health hazards posed by exposure to trauma.

7.      CDPH utilizes a public health approach to preventing violence, i.e., it prioritizes the prevention and identification of underlying or root causes of violence. Our approach works to promote safe, stable, and nurturing relationships and environments by using data to understand and identify problems and adopt evidence-based strategies to address them. We also support policies that build and sustain healthy communities. For example, our California Essentials for Childhood Initiative addresses child maltreatment as a public health issue and works to create the context for healthy children and families through social norms change and the use of data to inform program and policy solutions. Further, our California Home Visiting Program (CHVP), mitigates the risk of Adverse Childhood Experiences (ACEs) on physical and mental health, offers nurse or public health paraprofessional services for pregnant and newly parenting families who have certain designated risk factors such as domestic violence, inadequate income, unstable housing, less than 12 years of education, substance abuse, and depression or mental illness. The development of CHVP was based on research demonstrating that home visiting programs produce positive outcomes and reduce societal costs (including the need for government assistance) associated with intimate partner violence, child maltreatment, youth crime, and substance abuse.

8.      In order to prevent the negative health and social consequences of sexual violence in particular, CDPH implements its Rape Prevention and Education Program (RPE). The RPE includes a community mobilization component whereby local rape crisis centers work with community members and partners such as local businesses, schools, community-based organizations, advocacy

---

[5] *Id.*

Decl. of Stacy Alamo Mixson                                          Case No. 20-cv-01468-CJN
EXHIBIT 73

groups, and family resource centers to raise awareness of what constitutes sexual violence, its effects, and how to prevent it. The community mobilization project also provides individual survivors and allies of survivors with resources with referrals for direct services when disclosures are made.

9.      The majority of RPE funding provides grants to local rape crisis centers who work with K-12 schools to implement comprehensive sexual violence policies that promote healthy relationships, and work to prevent dating abuse, sexual harassment and sexual violence. These policies may be promulgated in addition to any existing policy the school may have regarding general harassment and bullying and must comply with federal and state law. Grantee centers and schools are expected to hold regularly scheduled policy development meetings that are attended by, at a minimum, school administrators, counselors, youth leaders, teachers, and parents. There are currently 24 grantee rape crisis centers in the State, 16 of which work specifically on school policy as part of their scope of work.

10.      Consistent with CDPH's mission in preventing negative health outcomes for individuals and communities, CDPH personnel staffed to the RPE work with grantee centers and schools to promote research-based policies and practices for the prevention of sexual harassment and assault, so that all students are aware of what constitutes harassment and assault, what its consequences are, and in the event that incidents of harassment and/or assault have occurred, early detection so that victim students can receive the treatment and care they need. From a public health perspective, CDPH believes in allowing victims to begin the healing process as soon as possible, thereby helping to avoid the negative long term consequences of trauma.

11.      I understand the Rule issued by the U.S. Department of Education includes provisions that impose barriers to reporting and addressing sexual harassment and assault that undermine public health. These changes include, but are not limited to, requiring a showing of severe, pervasive, and

Decl. of Stacy Alamo Mixson                                      Case No. 20-cv-01468-CJN

EXHIBIT 73

objectively offensive sexual harassment that effectively denies equal access to education before a Title IX complaint can be opened; explicit limitations on the individuals to whom a post-secondary student may complain in order to receive relief; additional barriers to making a complaint, such as requirements that the impacted student or their parent/guardian put the complaint in writing and include a request to initiate an investigation to start the investigation under most circumstances, regardless of the student's age, disability, or writing ability; prohibiting a student victim who has left a school due to sexual harassment and assault from filing a formal complaint; requiring schools only act to mitigate sexual harassment when they have actual knowledge of sexual harassment on campus; creating protracted back-and-forth processes for students in K-12 schools that delay final remedies for victims and require them to unnecessarily relive the experience; and subjecting victims of sexual assault and harassment in post-secondary schools to cross-examination by a third-party advisor, who could be the perpetrator's family member or close school friend.

12.     The changes adopted in the Rule run counter to CDPH's focus on trauma-informed and survivor-centered practices in our public health programs, including the RPE.  Changes that expose victims to more acute and prolonged harm may discourage victims from coming forward, cause schools to delay investigation and response to sexual harassment, and lessen the standard of that response, are in conflict with CDPH's interests in preventing harm and getting victims the help they need as soon as possible. I believe these provisions are likely to result in increased harm to individuals and school communities.

13.     Research shows that sexual harassment and violence is already significantly underreported.[6] Additional barriers to reporting and reductions in protections for those subjected to

---

[6] *See* Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 1 (Apr. 2017), https://tinyurl.com/NWLC-Gates-

Decl. of Stacy Alamo Mixson                                           Case No. 20-cv-01468-CJN
EXHIBIT 73

sexual harassment and violence may result in increases in under-reporting, hindering communities' and State institutions' ability to address and prevent the conduct and RPE's ability to link survivors and their allies to appropriate services.

14.     The Rule may also negatively impact the development and implementation of comprehensive sexual violence prevention policies supported by the RPE. Schools are uniquely positioned to prioritize the prevention of, and response to, incidents of sexual violence by establishing school-wide policies. Through written guidance, schools can promote and sustain the development of social, emotional, and academic skills among students, and increase the capacity of staff to prevent and respond to incidents of sexual violence. As such, CDPH promotes policies that represent the best evidence-based practices in the field. Participating schools are encouraged to develop policies that reflect the highest standards. Changes to federal law de-prioritizing survivor safety and protection sets a lower bar than CDPH requires. This conflict is likely to cause confusion among schools, even those participating in the RPE. Some schools may understand the importance and necessity of the higher standard and reflect it in their policies, and some will simply adhere to the floor set by the federal law (if that). CDPH's administration of the program will be likely be impacted by this inconsistency, and the overall health and safety of our youth will suffer.

15.     CDPH's vision is to protect and improve the health of all Californians through research-based health and safety programs. I am concerned the Rule undervalues and underestimates the effect of harassment and assault on the well-being of the victim and his or her community, and the detrimental and wide-ranging effect the Rule is likely to have on how public schools approach trauma.

---

HarassmentViolence; DOJ, Bureau of Justice Stats., *Criminal Victimization, 2016: Revised*, at 7 (Oct. 2018), https://www.bjs. gov/content/pub/pdf/cv16.pdf.

Decl. of Stacy Alamo Mixson                                          Case No. 20-cv-01468-CJN
EXHIBIT 73

I declare under penalty of perjury under the laws of the United States that the foregoing is true

and correct. Executed on June _11_ , 2020 at _Sacramento_ , California

Stacy Alamo Mixson

Chief, Violence and Injury Branch, California Dep't of Public Health

Decl. of Stacy Alamo Mixson                                   Case No. 20-cv-01468-CJN

EXHIBIT 73

# EXHIBIT 74

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. **20-cv-01468-CJN** |

## <u>DECLARATION OF ANGELA NASTASE</u>

I, Angela Nastase, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Title IX Coordinator at George Mason University ("Mason") located in Fairfax, Virginia. My educational background includes a Juris Doctor and a Bachelors of Science in Education. I have been employed as a Title IX Coordinator in the State of Virginia since March 2017.

2.      I submit this Declaration in support of the Commonwealth of Virginia's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding

the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge. I have also familiarized myself with the Rule in order to understand its immediate impact on Mason.

3.      Mason is a public university founded in 1972.  Mason is the largest public research university in Virginia with over 37,000 students.

4.      Mason has three campuses located in Northern Virginia.   Additionally, Mason operates a campus in South Korea.  Mason students also participate in study abroad and other international learning opportunities.  While many Mason students live in on-campus housing, a significant portion of Mason students live in off-campus housing

5.       Mason receives federal funds from the Department. As a result, Mason is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

6.      Mason has adopted a sexual misconduct policy that prohibits sexual harassment by students, employees, and faculty and establishes a grievance process for addressing complaints of sexual harassment ("Policy 1202").   A copy of Policy 1202 is available here: https://universitypolicy.gmu.edu/policies/sexual-harassment-policy/.   Policy 1202 is enforced by Mason's Title IX Office.  Policy 1202 provides a fair and equitable process to those involved in sexual harassment matters.

7.      Mason will need to make significant changes to Policy 1202 as a result of the Rule.

8.      Those changes include, but are not limited to: (1) how Mason defines sexual harassment under Title IX, (2) how Mason will handle sexual harassment that does not fall under the

Decl. of Angela Nastase                                                        Case No. 20-cv-01468
EXHIBIT 74

definition of sexual harassment in the Rule, (3) how Mason will handle sexual harassment that occurs outside of Mason's "education program or activity," as defined in the Rule, (4) how Mason will handle sexual harassment that occurs outside of the United States, (5) Mason's process for dismissing complaints that do not constitute sexual harassment under the Rule, (6) Mason's process for investigating complaints of sexual harassment involving students, (7) Mason's process for investigating sexual harassment involving employees, (8) Mason's process for conducting hearings in sexual harassment cases involving students, (9) Mason's process for conducting hearings in sexual harassment cases involving employees, and (10) Mason's process for imposing sanctions on students and employees if a determination of responsibility is made.

9.      In particular, the Rule's definition of sexual harassment under Title IX (both with regard to the type of conduct and the location/context of the conduct) will require Mason to decide how it will handle sexual misconduct that falls outside of the definition of sexual harassment under the Rule and whether it will use different processes depending on whether sexual harassment falls within the scope of the Rule or outside of it.  To take one example, Mason will need to evaluate how to address sexual harassment and misconduct that occurs on Mason's South Korea campus or during study abroad programs.

10.     Making these changes will require significant time, energy, and resources by numerous Mason officials across many departments.  There are many stakeholders who need to be involved in decisions regarding a new Title IX process including the Title IX Office, the Dean of Students, the Office of Student Conduct, Student Support and Advocacy Center, Human Resources, the Office of the Provost, University Counsel, and Housing and Residential Life.  Additionally, because the Rule requires that the process it sets forth be applied to cases involving faculty, it is likely that Mason's administration will need to consult with Mason's Faculty Senate.  Additionally, Mason

wants to seek the input of students and student groups.  Once a revised Policy 1202 is drafted, it will need to be reviewed and approved by Mason's Senior Vice President and Provost.

11.     Under the best of circumstances making significant changes to a university policy requires many months of work.  These are obviously not the best of circumstances with Mason physically closed and employees teleworking because of COVID-19.   Additionally, Mason employees are dedicating significant time, energy, and resources to addressing issues related to COVID-19 and how Mason can safely reopen for the Fall 2020 semester.  The requirement to make the necessary changes to Policy 1202 to comply with the Rule by August 14, 2020 places a burden on Mason employees who are already heavily burdened by the challenges created by COVID-19.

12.     Revising Policy 1202 is further complicated by the uncertainty and unanswered questions the Rule creates for Mason (and other universities) about how to administer complaints of sexual misconduct.  For example:

     a.   If sexual misconduct occurred before August 14, 2020 (the implementation date of the Rule) should Mason apply its policies and procedures that were in existence at the time of the sexual misconduct or must it apply the procedures required by the Rule?

     b.   What constitutes a university exercising "substantial control over both the respondent and the context in which the sexual harassment occurs" such that the sexual harassment falls within the scope of Title IX as defined by the Rule?

     c.   What constitutes "control[ ]" of a building by a registered student organization such that sexual harassment occurring within the building falls within the scope of Title IX as defined by the Rule?

     d.   Is it permissible for someone other than the hearing officer (e.g., an employee's supervisor or the Office of Student Conduct) to determine the appropriate sanctions

when an individual is found responsible, or must the sanctions be determined by the same person who makes the determination of responsibility?

e.   What does it mean for a university to have the burden of proof to establish responsibility by the respondent if the university and the investigator must remain neutral between the parties?

f.   What constitutes "specific circumstances [that] prevent the recipient from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein" such that a university may dismiss a formal complaint?

13.    In addition to revising Policy 1202, Mason must review other policies, its Student Code of Conduct, Catalogue, Residential Student Handbook, Faculty Handbook, and other documents to determine whether any changes need to be made to those documents in order to comply with the Rule.  To the extent changes do need to be made, additional stakeholders will need to be engaged and time, energy, and resources will need to be expended to make the revisions.

14.    Mason's staff and relevant officials, myself included, are concerned about the university's ability to make the necessary revisions to Policy 1202 and other university documents by the effective date of August 14, 2020.  Having additional time to implement the rule would be helpful.

15.    Implementing the Rule will also require significant time and financial resources. Mason will likely need to invest additional financial resources into its Title IX office, including the hiring of additional staff, to meet the requirements of the Rule.

16.    Mason also currently uses and plans to continue to use an external hearing officer. The Rule's requirement that in-person hearings with cross examination must occur in employee cases and the Rule's limitations on when cases can be dismissed prior to a hearing will likely result in

Decl. of Angela Nastase                                                    Case No. 20-cv-01468
EXHIBIT 74

Mason conducting more hearings and, therefore, incurring additional costs for the external hearing officer.

17.     The short time frame to implement the Rule may result in Mason taking temporary or interim actions to meet the compliance deadline of August 14, 2020.  These temporary actions may increase the cost of compliance for Mason.  For example, Mason will not be able to hire new employees to assist with managing the Title IX process by August 14, 2020, so it is likely Mason will need to assign and train current employees to perform duties related to the Title IX process.  If Mason had additional time to comply with the Rule it would likely not need to take these temporary actions.

18.     Changing Policy 1202 and implementing the new procedures will also require educating employees and students on the new policy and procedures.  This will be particularly difficult given COVID-19 and the need to also educate employees and students on health and safety requirements if Mason is able to reopen for in-person education for the Fall 2020 semester.  The short compliance time frame also makes it likely that Mason will need to conduct multiple education campaigns to update employees and students on changes to the procedures when Mason moves from temporary solutions (put in place to meet the August 14, 2020 deadline) to the long-term solution.

19.     In short, the August 14, 2020, effective date will make it more difficult for Mason to fulfill its obligations under Title IX to provide all students equal access to education, train all students and employees on their obligations under Title IX, and ensure that all students and employees are aware of their rights under Title IX.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 12th day of June, 2020, at Fairfax, Virginia.

Decl. of Angela Nastase                                                     Case No. 20-cv-01468
EXHIBIT 74

Angela Nastase, JD
Title IX Coordinator
Office of Compliance, Diversity, and Ethics
George Mason University

Decl. of Angela Nastase                                    Case No. 20-cv-01468
EXHIBIT 74

EXHIBIT 75

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | **CIVIL ACTION No. 20-cv-01468-CJN** |

Plaintiffs,

v.

ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,

Defendants.

**DECLARATION OF EVELYN NAZARIO**

I, Evelyn Nazario, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the "Title IX Rule" or "Rule").  If

Decl. of Evelyn Nazario                                        Civil Action No. 20-cv-01468-CJN

EXHIBIT 75

called and sworn as a witness, I could and would testify competently to the information in this declaration.

## MY BACKGROUND

2.      I currently serve as the Vice Chancellor for Human Resources for the California State University System (hereinafter "CSU" or "University"), under the general direction of Chancellor Timothy P. White. Like the other CSU Vice Chancellors, my position is located in the CSU's Office of the Chancellor, in Long Beach, California.  The CSU employs approximately 55,000 individuals and is subject to ten collective bargaining agreements.

3.      I joined the CSU Chancellor's Office in January 2008 as the Senior Director for Human Resources Management, which entailed overseeing most day-to-day operations within Human Resources, including classification/compensation, payroll, benefits, recruiting, data analytics, information systems, and all general employment services.  In 2010, I was promoted to Assistant Vice Chancellor, and in 2012, I was promoted to Associate Vice Chancellor.  I was appointed to my current role as Vice Chancellor for Human Resources in 2018.  Prior to working for the CSU, I served as the Director of Compensation for University of California, Irvine for approximately two years.  Prior to working at UC Irvine, I worked in the private sector for many years and have thirty-eight years of human resources experience.  I received a Bachelor of Arts degree in psychology from Vanguard University of Southern California and a Master of Arts degree in organizational leadership from Brandman University.

4.      Systemwide Human Resources in the Chancellor's Office is responsible for developing systemwide policies covering all aspects of Human Resources, including but not limited to all employment-related policy, labor/employee relations, academic personnel, performance management, and investigation and resolution processes governing complaints arising out protected

Decl. of Evelyn Nazario                                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 75

activities (including claims governed by federal and state whistleblower protections) and protected status (including claims governed by Title IX of the Education Amendments of 1972 ("Title IX"); the Violence Against Women Reauthorization Act of 2013 (VAWA), which amends the Jeanne Clery Disclosure of Campus Security and Campus Crimes Statistics Act, under its Campus Sexual Violence Elimination Act provision (Campus SaVE Act); Titles VI and VII of the Civil Rights Act of 1964; Section 504 of the Rehabilitation Act of 1973; Title II of the Americans with Disabilities Act of 1990; the Age Discrimination Act of 1975; the California Fair Employment and Housing Act; and the California Equity in Higher Education Act, Education Code §§ 66250 - 66292.4.[1]

5.     Except where otherwise noted, this declaration is based on my personal knowledge, my familiarity with state and federal civil rights laws and protections including Title IX, my review of the Notice of Proposed Rulemaking re Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance dated November 29, 2018  (NPRM, 83 Fed. Reg. 61462, 61484 (Nov. 29, 2018) (to be codified at 34 C.F.R. 106), the final Rule issued on May 6, 2020 to be effective August 14, 2020, official data maintained by the CSU, and/or the knowledge and expertise I have acquired in the course of my years of service and duties in higher education.

**BACKGROUND REGARDING THE CALIFORNIA STATE UNIVERSITY SYSTEM**

6.     The CSU system was created in 1960 by state statute, the Donohoe Higher Education Act (also known as the "California Master Plan for Higher Education"), and functions as the State of California acting in its higher education capacity, complementing the University of California and California Community College systems.  The CSU is comprised of the Chancellor's Office located

---

[1] CSU policies governing complaints based on protected status and protected activity often refer to discrimination, harassment and retaliation as "DHR."

Decl. of Evelyn Nazario                                      Civil Action No. 20-cv-01468-CJN
EXHIBIT 75

in Long Beach, California, which serves as the headquarters, plus twenty-three separate and distinct campuses throughout the State, some of which predate the 1960 creation of the CSU – such as San José State University, the oldest public institution of higher education on the West Coast – and some of which were created later.  Some of these campuses also have satellite locations.  The CSU campuses are: CSU Bakersfield, CSU Channel Islands, Chico State, CSU Dominguez Hills, CSU East Bay, Fresno State, CSU Fullerton, Humboldt State, Long Beach State, CSU Los Angeles, Maritime Academy, CSU Monterey Bay, CSU Northridge, Cal Poly Pomona, Sacramento State, CSU San Bernardino, San Diego State, Cal Poly San Luis Obispo, San Francisco State, San Jose State, CSU San Marcos, Sonoma State and CSU Stanislaus.

7.     The system has an incredibly diverse student body of nearly 500,000 students and a similarly diverse workforce made up of approximately 55,000 employees.  CSU's workforce data, which includes detailed information on demographics and other information, may be accessed at CSU Employee Profile (available at https://www2.calstate.edu/csu-system/faculty-staff/employee-profile). Nearly one-third of CSU undergraduates are the first in their family to attend college.  Nearly three-quarters of CSU students are students of color. (See https://www2.calstate.edu/csu-system/about-the-csu/facts-about-the-csu/Pages/students.aspx.)    CSU conferred bachelor's degrees to 107,319 individuals in the 2018-19 academic year; it is the State's greatest producer of bachelor's degrees, driving California's economy in agriculture, information technology, business, hospitality, life sciences, healthcare, public administration, education, media, and entertainment. (See https://www2.calstate.edu/csu-system/about-the-csu/facts-about-the-csu/Pages/default.aspx.)

8.     CSU's mission is to advance and extend knowledge, learning, and culture, especially throughout California; to provide opportunities for individuals to develop intellectually, personally, and professionally; to prepare significant numbers of educated, responsible people to contribute to

Decl. of Evelyn Nazario                                           Civil Action No. 20-cv-01468-CJN

EXHIBIT 75

California's schools, economy, culture, and future; to encourage and provide access to an excellent education to all who wish to participate in collegiate study; to offer undergraduate and graduate instruction leading to bachelor's and higher degrees in the liberal arts and sciences, the applied fields, and the professions, including the doctoral degree when authorized; to prepare students for international, multi-cultural society; and to provide public services that enrich the university and its communities.  (*See* CSU Mission, available at https://www2.calstate.edu/csu-system/about-the-csu/Pages/mission.aspx.)  Consistent with this mission, and with longstanding federal and state law, CSU policy prohibits discrimination against students and employees on the basis of sex, gender, gender identity (including transgender), gender expression, and other protected statuses.

9.      Policies and processes relating to anti-discrimination laws as applied to CSU employees are set forth in CSU's ten collective bargaining agreements and the programs and guidelines governing unrepresented (at will) management and other personnel.  I am responsible for overseeing the contract negotiations process for all ten of CSU's bargaining agents (unions), from faculty to trades.  As the Department appears to acknowledge, the Rule substantially changes the terms and conditions of employment for all employees (included those who are represented), by among other things, significantly complicating and prolonging the process by which employee complaints are investigated and employees are disciplined for misconduct in the workplace.  The CSU will therefore be required to initiate the meet and confer with each of these constituency groups prior to August 14, 2020.

10.      Although the CSU is funded in part by state budget allocations and in part by tuition and fees, it also relies heavily on funds provided by the Department, in particular those relating to financial aid as part of the programs administered under Title IV of the Higher Education Act of 1965.  As a result, the CSU is subject to Title IX and the Department's Title IX regulations, 34 C.F.R. pt.

106. For the most recent academic year for which statistics are available, the 2018-19 academic year, the CSU received approximately $2.6- billion in financial aid funds for its students.  That is more than 55% of the aid funds awarded to CSU students.  By way of comparison, for the same period of time, the CSU received approximately $3.6 billion in state general funds and approximately $3.1 billion in tuition and fee revenue. (See https://www2.calstate.edu/csu-system/about-the-csu/facts-about-the-csu/Documents/facts2019.pdf.)  In essence, the federal Title IV aid is one of three crucial sources of billion-dollar funding.  The CSU and its students rely heavily on federal financial aid, and it is inconceivable the CSU could function without it.  Declining or doing without such funding is simply not an option for the CSU.

## IMMEDIATE HARM TO THE CSU AND ITS EMPLOYEES – UNIONIZED AND OTHER NON-MANAGEMENT EMPLOYEES

11.     Linda Hoos, who serves as the CSU's Systemwide Title IX Coordinator within my division, has submitted a separate declaration addressing the immediate and extremely disruptive and harmful effects the Rule will have on our campuses, including on their ability to provide an environment free from sex discrimination, and on our students, if and when the Rule is implemented. This declaration focuses on the troubling effects the Rule will have on the CSU with respect to its employees, the labor relations between management and the CSU's labor unions, and CSU management's crucial ability to enforce longstanding federal and state anti-discrimination laws relating to its workforce.

12.     For the reasons explained below, the Rule will have an immediate, material, and deleterious effect on the CSU's ability to provide a workplace environment free from sexual harassment and assault.

Decl. of Evelyn Nazario                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 75

<u>Existing Process and Protections Afforded to CSU Employees</u>

13.    The vast majority of CSU's non-management employees are guaranteed, as a matter of state law, extensive due process rights any time formal discipline is contemplated against them based on alleged misconduct.  This is true whether the alleged misconduct takes the form of sexual harassment or assault, sexual misconduct or any other form of misconduct.  Formal discipline in this context includes termination, demotion and any duration of unpaid suspension (even a single workday).  Some of these protections are triggered when a sanction is merely proposed (pre-deprivation) and some apply only after the sanction is imposed (post-deprivation). The protections are set forth in the California Education Code, sections 89530 through 89546, and they supplement other significant protections afforded to employees accused of misconduct, including rights provided by other state laws, applicable CBAs, and California judicial decisions (such as the California Supreme Court's *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, which guarantees a pre-deprivation hearing when the sanction is proposed).

14.    Among other things, represented employees are entitled to a full, live evidentiary hearing similar to a trial, which includes pre-hearing discovery, law and motion practice, the right to submit witnesses and documentary evidence at the hearing, and the right to cross-examine all witnesses presented by the university.  The hearing is administered by an independent state agency, the California State Personnel Board (SPB), and typically lasts multiple days.  An administrative law judge oversees the hearing and makes a recommendation to the full SPB Board.  The "burden of proof" is on the State, the university pays all costs associated with the hearing, and after the hearing concludes, the SPB renders a decision "affirming, modifying, or revoking" the discipline. (Cal. Educ. Code § 89539(b).)  This decision is the final word on the subject (absent action by a court, which

intercedes only under limited circumstances).  A summary of the rules provided by the SPB is provided at:  http://www.spb.ca.gov/content/appeals/Hearing_Pamphlet.pdf.  The complete rules governing hearings and appeals before the SPB can be found at: https://govt.westlaw.com/calregs/Browse/Home/California/CaliforniaCodeofRegulations?guid=I4B4ACC10C1C711DF82C3D10E5CD2C51C&originationContext=documenttoc&transitionType=Default&contextData=(sc.Default)&bhcp=1.

15.    An employee facing discipline has the right to "inspect any documents in the possession of, or under the control of," the CSU that are "relevant to the action taken or that would constitute 'relevant evidence'" under the California Evidence Code, in essence, pre-hearing discovery rights. (Cal. Educ. Code § 89539.1.)  If the employee believes the university has not complied with its discovery obligations, it may petition to compel discovery, and the SPB can hold the proceedings in abeyance if necessary.

16.    If the SPB decides that the sanction should be revoked or modified, state law requires that the employee be "restored to his position in accord with the decision, and shall be paid back salary equal to that which the employee would have earned if continuously employed in accord with the decision." (Cal. Educ. Code § 89540.)

17.    Faculty employees may use the SPB procedures or, at their election, may instead select one of two other methods of challenging discipline: a "faculty hearing committee composed of full-time faculty members, selected by lot from a panel elected by the campus faculty, which shall make a recommendation to the president of the state university," or a live evidentiary hearing before an arbitrator mutually agreed upon by the parties selected from a panel provided by an arbitration service such as the American Arbitration Association.  The right of a faculty hearing committee is required by California Education Code section 89542.5(a)(6), and the right to choose arbitration is

Decl. of Evelyn Nazario                                           Civil Action No. 20-cv-01468-CJN
EXHIBIT 75

one that was negotiated by the CSU and the faculty union, the California Faculty Association.  In all cases, the university pays 100% of the costs associated with the hearing. (Cal. Educ. Code § 89542.5(a)(5).)

18.     Additional rights provided to employees accused of, or complaining of, discrimination, harassment and/or retaliation on the basis of sex, gender or other protected statuses are set forth in ten collective bargaining agreements ("CBAs") involving 14 bargaining units – including units that represent faculty, academic professionals, police officers, the trades, student employees and many others.  The current CBAs can be found at: https://www2.calstate.edu/csu-system/faculty-staff/labor-and-employee-relations.   The CBAs include anti-discrimination and other grievance procedures that were negotiated over many years and updated through successive bargaining sessions and successive CBAs, and these provisions address prohibitions against sexual harassment and assault that overlap with the scope of Title IX.  These procedures do not replace but supplement the extensive due process rights outlined in state law, as summarized above.

19.     CSU policy further supplements the rights and protections afforded to all employees accused of sexual harassment or sexual assault.  The primary policy is found in CSU Executive Order 1096,   available   at   https://calstate.policystat.com/policy/6743499/latest/.   The   policy   (and accompanying procedures) are robust and provide many layers of due process protections for the accused, while also protecting the rights of those who make complaints.  The policy is frequently updated to account for legal developments and changes in best practices, including recent California court decisions such as *Doe v. Allee* (2019) 30 Cal.App.5th 1036, 1061.  The procedures are highly prescriptive and nuanced, with multiple levels of review.  They reflect a careful balancing of interests agreed to by the parties, to engender labor peace from the instructors who teach the CSU's students and other staff members, and they are a vital part of the CSU.

Decl. of Evelyn Nazario                                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 75

Investigation Process

20.     If an employee is alleged to have engaged in sexual harassment or assault (or retaliation against someone for having participated in an investigation or supported such a complaint), a thorough investigation is conducted in accordance with established CSU procedures by a trained internal or external investigator.  The CSU process grants accused employees substantial rights throughout the proceedings, including the right to be notified about the allegations with specificity, to have an advisor (from the union or otherwise), to review evidence before findings are made, and to obtain a copy of the full investigation report, including exhibits, without redactions.  The accused (and the complainant) can suggest additional witnesses to interview or additional documents for the investigator to review, or additional questions for the investigator to ask of the other party as well.[2]

Right of Review/Appeal

21.     If a policy violation is found by the CSU campus (i.e., discrimination, harassment or retaliation on the basis of sex, gender or other protected status, including sexual harassment and sexual misconduct), the accused also has a right, under state law and CSU policy, to appeal the finding to an independent unit within the Office of the Chancellor.   (And if a violation is not found, the complainant(s) can appeal.)  Three bases are provided for appeals: 1) "The investigation outcome is unsupported by the evidence"; 2) "Prejudicial procedural errors impacted the investigation outcome to such a degree that the investigation did not comply with this Executive Order;" or 3) "New evidence not available at the time of the investigation."  The Office of the Chancellor appeals unit has the authority and discretion to remand the matter back to the campus for further investigation or even reverse the findings. (CSU Executive Order 1096, Article IV.)   If the appeals unit upholds the

_____

[2] The California Public Safety Officers Procedural Bill of Rights provides additional rights and protections to police officers and other public safety officers whenever they are "under investigation and subjected to interrogation … that could lead to punitive action." (Cal. Govt. Code §§ 3300-3313.)

Decl. of Evelyn Nazario                                      Civil Action No. 20-cv-01468-CJN
EXHIBIT 75

findings, the campus decides whether discipline is warranted, in consultation with the relevant human resources or faculty affairs department.

<u>Due Process Protections in the Rule are Inconsistent with Existing Processes Required by State Law and Collective Bargaining Agreements.</u>

22.     In the commentary to the Rule, the Department makes clear that the procedural rights afforded to students are also required for employees, with apparently no exception or variation:

> "The Department appreciates support for its final regulations, which apply to employees. Congress did not limit the application of Title IX to students. Title IX, 20 U.S.C. 1681, expressly states: 'No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ….' Title IX, thus, applies to any person in the United States who experiences discrimination on the basis of sex in any education program or activity receiving Federal financial assistance. Similarly, these final regulations, which address sexual harassment, apply to any person, including employees, in an education program or activity receiving Federal financial assistance.

> \*   \*   \*

> The Department agrees that students and employees, including faculty and student workers, should not be treated differently under its final regulations. Employees should receive the same benefits and due process protections that students receive under these final regulations, and these final regulations, including the due process protections in § 106.45, apply to employees." (85 Fed. Reg. at 30,439.)

23.     This and other official statements by the Department make clear that the prescriptive procedures set forth in section 106.45 – including restrictions that, to my knowledge, are unprecedented in the law as applied to the workplace – will be applied exactly the same to employees and students alike.  This includes the requirements that (1) the university provide the respondent with an advisor, free of charge, if he or she does not have one; (2) the advisor be permitted to ask the other party and witnesses "all relevant questions;" (3) the hearing officer "must explain any decision to exclude a question as not relevant;" and (4) if the respondent, complainant or a witness does not submit to cross-examination at the live hearing, the decision-maker "must not rely on any statement

Decl. of Evelyn Nazario                                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 75

of that party or witness in reaching a determination regarding responsibility." As to the last requirement, the Department has emphasized the regulation is intended to be read literally, and does not include any exceptions, even for statements made "against a party's interest." (85 Fed. Reg. at 30,345.)

24.     Some of the mandatory procedures or prohibitions set forth in section 106.45, including the last three requirements identified above, are plainly incompatible with the laws governing the California State Personnel Board, the state agency that by statute hears most of the appeals relating to discipline imposed on non-management CSU employees. With respect to questioning at the hearing, for example, under the Rule, a hearing officer can reject questions only if they are not relevant; unlike the SPB Administrative Law Judge overseeing SPB hearings, who has far more discretion to limit questioning. The ALJ is required to admit evidence "if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs," and could therefore exclude questions that seek evidence that is more prejudicial than probative. Nor would an ALJ likely agree to provide an explanation for every question they disallow. The final requirement (no out-of-court statement without cross-examination), though, is perhaps the single most problematic, as it would preclude the SPB, an independent state agency governed by its laws and rules, from relying on huge swaths of evidence that it – and most courts (including criminal courts) – would consider to be highly probative and reliable.

25.     The nature of the inconsistencies between the SPB procedures for its hearing rules and the procedures required by the Department, would seem to require the CSU to create and provide – and pay for, directly and indirectly – an *additional* live evidentiary hearing in all instances where an employee is accused of Title IX sexual harassment. And the CSU would need to create this new hearing procedure before August 14 – approximately two months from now.

Decl. of Evelyn Nazario                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 75

26. The imminent effective date of the Rule does not relieve CSU of its obligation under the state labor relations law to provide notice to its unions and give them an opportunity to meet and confer over reasonably foreseeable impacts of policies that fall within the scope of representation. Since these new regulations impact discipline and the grievance process, which are addressed in many, if not all, of the CBAs, there are likely to be reasonably foreseeable impacts to terms and conditions of employment.  This means that despite the changes in the regulation, the applicable provisions in the CBAs cannot be modified without notice and an opportunity to bargain. Initial notice was provided to the unions on May 26, 2020, but we are unable to negotiate in earnest without a proposed policy (drafting is in progress). In my experience, past negotiations with unions regarding changes in policies have generally taken at least twelve months if not longer due to the complexity of the issues, nuances, and various competing interests at stake.  The costs, both direct (financial) and indirect (employee time), associated with negotiating the new policies that result from the Rule with ten bargaining units is enormous, and the expected timeframe would be unreasonable even in the absence of the current COVID-19 pandemic.

27. Employees accused of sexual harassment and other forms of sex or gender discrimination have every right to be treated fairly and equitably, and they are, as a matter of existing Title IX law, California law and CSU policy.  The new hearing elements required by the Rule will impose another layer of process for those employees, which is largely duplicative of existing processes but also different in ways that cannot be harmonized and applied to the same process.  This will delay resolution of complaints and disciplinary cases to the detriment of all parties and at significant cost to the CSU, at a time when it is already is facing unprecedented budget deficits due to the COVID-19 pandemic.

Decl. of Evelyn Nazario                                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 75

28.     While this is an enormous cost, especially during the current budget crisis, it pales in comparison to the cost the CSU would have to bear if it forfeited billions of federal financial aid dollars for its students – an option the Department has suggested to avoid the disruption caused by applying section 106.45 to employee respondents. (85 Fed. Reg. at 30,444 ("The Department reminds recipients that recipients *choose* to receive Federal financial assistance and that these final regulations are a condition of that Federal financial assistance. Recipients may wish to forego receiving Federal financial assistance if the recipients do not wish to renegotiate a collective bargaining agreement or are concerned about complying with State employment laws or other laws.") (emphasis in original).)

## IMMEDIATE HARM TO THE CSU's ABILITY TO REMOVE MANAGERS WHO VIOLATE THE LAW

29.     Executives, managers and supervisors in the CSU are part of the "Management Personnel Plan" (MPP). (Cal. Code Regs., tit. 5, §§ 42720-42729.) The MPP is an integrated personnel system addressing employment rights, benefits and conditions for employees designated as "management" or "supervisory" under the California labor law that applies to the CSU. MPP employees are at-will (they serve "at the pleasure" of the campus president or designee) and like all at-will employees, they do not have a right to appeal adverse employment actions to the State Personnel Board or arbitrator.[3]  With respect to complaints based on protected status or protected activity, they do have substantially the same rights as represented employees, including the right to review the evidence gathered by the investigator, to have an advisor, to suggest additional witnesses for the investigator to interview or documents for the investigator to review, to see a report of evidence, to appeal findings to the Office of the Chancellor, and so forth.

---

[3] MPP employees may nevertheless seek reconsideration of adverse employment actions pursuant to CSU policy. (CSU Executive Order 1106 (Reconsideration Procedures for Management Personnel Plan (MPP) Employees) available at https://calstate.policystat.com/policy/6591933/latest.)

30.     MPP administrators are entrusted with great responsibility, including setting expectations and examples for appropriate workplace conduct, supervising the conduct of other employees, and interacting with students.  As a matter of state law, the institution can often be held vicariously liable for MPPs' actions, including sexual harassment and assault, so much so that the State of California has mandated that all employers in the state with five or more employees provide supervisory-specific training for sexual harassment, including "at least two hours of classroom or other effective interactive training and education regarding sexual harassment prevention." (Cal. Senate Bill 1343, filed Sept. 30, 2018, *codified in part* at Cal. Govt. Code § 12950.1.)  Because of MPPs' crucial role as leaders and role models, they are held to higher standards and expectations for their behavior in the workplace, and they can be terminated swiftly and without cause, in accordance with state law and CSU policy.

31.     The Department fails to recognize the unique role of managers and supervisors within higher education, nor does it recognize the inherent conflict between an at-will employee's status and that employee's new right to a full, live evidentiary hearing to adjudicate allegations that could lead to termination – even though the employee can be terminated for any lawful reason.  After summarizing concerns expressed by commenters on this topic, the Department states:

> With respect to the general at-will employment doctrine …, where Title IX is implicated the Department has determined that the protections and rights set forth in these final regulations represent the most effective ways to promote Title IX's non-discrimination mandate, and recipients of Federal financial assistance agree to comply with Title IX obligations as a condition of receiving Federal funds….
>
> \*   \*   \*
>
> As explained above, the Department's final regulations apply to employees, and the Department cannot discern any meaningful justification to treat employees, including faculty, differently than students with respect to allegations of sexual harassment. The Department believes that students and employees should have the same protections with respect to regulations addressing sexual harassment. (85 Fed. Reg. at 30,441.)

32.     By making the mandated grievance process in the Rule applicable to employees, the Department has determined that when supervisors and managers are accused of sexual harassment as defined by Title IX, they are entitled to a trial-like evidentiary hearing (with representation by an advisor) – which has never been provided to managerial employees in the CSU, as a matter or law or policy – even though they could otherwise be terminated for **any** lawful reason. Left unaddressed by the Department is how a guaranteed evidentiary hearing process for an at-will employee, which disallows evidence that would otherwise be relevant anytime a party or witness does not make themselves available for cross-examination or decides not to participate in the hearing process, is consistent with the CSU's obligation under federal law (e.g., Title VII of the Civil Rights Act of 1964) and state law (e.g., the Fair Employment and Housing Act) to ensure that supervisors and managers engage in non-discriminatory and non-retaliatory conduct in the workplace including with respect to the employees they supervise.  Nor does the Department acknowledge the extent to which the Rule undermines an employer's duty under federal law (e.g., Title VII of the Civil Rights Act of 1964) and state law (e.g., the Fair Employment and Housing Act) to protect its employees from discrimination and retaliation in the workplace.  The effect of prolonging and greatly complicating the process for addressing allegations of sexual harassment by at-will employees would seem to emphasize the wrong question  – does the alleged conduct rise to the level of "sexual harassment"? – rather than the right one – is the conduct professional in the workplace and befitting of an administrator charged with supervising and evaluating other employees and whose acts can be imputed to the institution?

## COSTS, DISRUPTION, AMBIGUITY AND UNCERTAINTY CREATED BY
## THE NEW REGULATIONS

33.     Rather than simplifying an already complex area of the law, the Rule creates many ambiguities and uncertainties for institutions of higher learning relating to employees.  For example, the Rules will require the CSU to provide advisors to employee complainants and respondents without any consideration of how this requirement will be implemented consistent with duties imposed on the CSU under its labor relations laws and the CBAs. Indeed, the Department "acknowledges that some collective bargaining agreements may need to be renegotiated for a recipient to comply with these final regulations …" (85 Fed. Reg. at 30,444.)  While the regulations refer to these individuals as "advisors" they are closer to "advocates," given that they are expected to do all the questioning of the other party and witnesses, which is a task traditionally undertaken by someone with legal training. Does the CSU need to provide advocates to union-represented employees whose unions have not been trained to conduct cross-examination?  Does a union's established duty of fair representation extend to defending the employee, and conducing cross-examination, in Title IX hearings?  What if the complainant and respondent are from the same bargaining unit or union?  Does that create a conflict of interest or "bias" as far as the Department is concerned, requiring the CSU to appoint a separate advisor for one or both of them?  These are just some examples of the many ambiguities and uncertainties that will occupy much of my Labor Relations staff's time – which is already overtaxed – not to mention consulting with legal counsel, over the next two months and that need to be resolved by August 14.

34.     The requirement to provide advisors in particular will likely impose a huge (unfunded) cost on the CSU for services that are outside the scope of university business. To comply with existing law, in the absence of the Rule, the CSU conducted more than 50 sexual misconduct hearings within the past twelve months (on average just more than two per campus), which are limited to student

respondents. The Rule adds additional categories of alleged conduct that trigger hearings, including stalking, and requires hearings in connection with complaints against employee respondents as well as students. The number of hearings is therefore highly likely to increase, likely by 100% or more, which would translate to 100 cases per year (between four and five per campus, on average). And the cross-examination at hearings under the Rule is likely to be more time consuming because it will be conducted without the reasonable restrictions imposed by operative CSU policy on appropriate questioning.  As a result, the approximate average duration of a hearing is likely to double in duration.

35.     Therefore, in the twelve months after the Rule becomes effective there could be twice as many hearings as before, and four times as many hearing days. Although it is difficult to predict what the CSU's costs will be, the following conservative estimate illustrates the concern. If an advisor is requested by one party in half of the cases (one advisor in approximately 50 cases) and by both parties in another quarter of cases (two advisors in approximately 25 cases), and half of the advisors are lawyers or other professionals who charge a (discounted) rate of $300 per hour, and the average case requires 50 hours of time, CSU would incur at least $750,000 in direct third-party costs for advisors. This does not include the enormous indirect cost of CSU employee time – of advisors and administrators who participate in the hearings, and who are diverted from their other mission-driven tasks – and the necessity of many campuses hiring dedicated employees to support the hearings. Nor does this include the additional cost of hearing officers' time associated with overseeing the increased volume of hearings, which, as stated, are likely to be about twice as long in duration as before. With a current average cost of $10,000 per hearing, with 50 new hearings on average twice as long, on top of $750,000 paid to third-party advisors and the additional $1,000,000 paid to hearing officers, not to mention additional direct and indirect costs associated with training the advisors and employees

Decl. of Evelyn Nazario                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 75

regarding their responsibilities, the total unfunded mandate for the CSU alone would likely be several million dollars.

36.    The CSU also has serious concerns regarding how to implement the Rule consistent with its obligations under state law, in particular the California Fair Employment and Housing Act (FEHA), a comprehensive anti-discrimination law which includes prohibitions on discrimination and harassment in employment on the basis of sex, gender, gender identity and gender expressions. (Cal. Govt. Code §§ 12900-12996; Cal. Code Regs., tit. 2, Div. 4.1.) These prohibitions are broader in many respects than Title IX, especially as construed by the new regulations and evolving state law. While the Department has indicated the Rule does not preclude states from enforcing their anti-discrimination laws, the Rule nevertheless has created many uncertainties relating to how the CSU should and can proceed when faced with allegations concerning a nucleus of facts that implicates both Title IX and state laws, and how much process is "due" under those circumstances.

37.    The Department's statements in the preamble to the Rule also suggest that conduct (e.g., sexual harassment) that violates state law but does not "rise to the level" of a Title IX violation (for example because it is severe or pervasive but not both severe and pervasive) might be "fair game" if related to allegations of Title IX misconduct that were not substantiated (or were not pursued).  For example, the Department suggests that if allegations are not substantiated as a violation of Title IX (as defined by the Rule), either on the merits or because respondent chooses not to subject themselves to cross-examination, then CSU cannot terminate (or otherwise take action against) the employee based on such conduct even if that conduct caused significant harm in the workplace.  And CSU could face a Department investigation or sanction if, after the Department-mandated Title IX procedure, it finds no violation but finds a violation of its non-Title IX policy.

38.     The Rule represents an unprecedented intrusion into the longstanding, fundamental right of employers to make decisions regarding employment of at-will managers and supervisors and to impose reasonable workplace expectations of its employees (with respect to sexual misconduct conduct that is not both severe *and* pervasive).

39.     For all of these reasons, the Rule will create immediate and significant harm to the CSU, including to its ability to enforce federal and California law relating to sexual harassment and sexual assault and to discipline employees and even supervisors for misconduct that endangers the community.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this /5 day of June, 2020

Evelyn Nazario
Vice Chancellor of Human Resources
California State University System

Page 20 of 20

Decl. of Evelyn Nazario                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 75

# EXHIBIT 76

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF CLARE O'SHAUGHNESSY

I, Clare O'Shaughnessy, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am a staff attorney and the Title IX Coordinator for the Vermont Agency of Education. I have served in this role since 2014.

2. I submit this Declaration in support of the State of Vermont's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently

issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the "Title IX Rule" or Rule). I have familiarized myself with the Rule in order to understand its immediate impact on the State of Vermont.

### Vermont's Education System

3.      The "right to public education is integral to Vermont's constitutional form of government and its guarantees of political and civil rights." Vt. Stat. Ann. tit. 16, § 1. All children residing in Vermont, regardless of their sex, are entitled to a free public education. The Vermont Agency of Education and the State's public educators are deeply committed to ensuring that all children in the State enjoy equal educational opportunity.

4.      Vermont has approximately 250 public schools that serve over 80,000 children. In 2019, the State provided over $1.37 billion in funding to its school districts. The Agency of Education is responsible for supervising the expenditure and distribution of all money appropriated by the State to support the school districts. The Agency is also responsible for executing and monitoring federal education grants to Vermont schools on behalf of the federal government.

5.      Vermont received more than $103 million from the Department of Education in 2019 to supports its primary and secondary education programs, and estimates receiving over $107 million in 2020.[1]

6.      Vermont is also home to the University of Vermont, the Vermont State Colleges, and a number of private colleges. In 2019, Vermont State Colleges enrolled over 11,060 students. The University of Vermont enrolled over 12,800.

---

[1] https://www2.ed.gov/about/overview/budget/statetables/21stbystate.pdf

Decl. of Clare O'Shaughnessy                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 76

7.      Vermont higher education institutions received more than $50 million from the Department in 2019, and estimate receiving over $52 million in 2020.

**Vermont's Existing Laws and Policies on Sexual Harassment**

8.      Vermont law makes clear that "[i]t is the policy of the State of Vermont that all Vermont educational institutions provide safe, orderly, civil, and positive learning environments. Harassment, hazing, and bullying have no place and will not be tolerated in Vermont schools. No Vermont student should feel threatened or be discriminated against while enrolled in a Vermont school." Vt. Stat. Ann. tit. 16, § 570(a). Therefore, Vermont law instructs that "[e]ach school board shall develop, adopt, [and] ensure the enforcement of . . . harassment, hazing, and bullying prevention policies that shall be at least as stringent as model policies developed by the Secretary." *Id.* § 570(b). A "school board that fails to adopt one or more of these policies shall be presumed to have adopted the most current model policy or policies published by the Secretary." *Id.*

9.      Vermont statute requires that "[a]n educational institution that receives actual notice of alleged conduct that may constitute harassment shall promptly investigate to determine whether harassment occurred." *Id.* § 570f(a)(1). "If, after notice, the educational institution finds that the alleged conduct occurred and that it constitutes harassment, the educational institution shall take prompt and appropriate remedial action reasonably calculated to stop the harassment." *Id.* § 570f(a)(2).

10.     Vermont defines "harassment" as "an incident or incidents of verbal, written, visual, or physical conduct, including any incident conducted by electronic means, based on or motivated by a student's or a student's family member's actual or perceived race, creed, color, national origin, marital status, sex, sexual orientation, gender identity, or disability that has the purpose or effect of objectively and substantially undermining and detracting from or interfering with a student's educational performance or access to school resources or creating an objectively intimidating, hostile,

or offensive environment." Vt. Stat. Ann. tit. 16, § 11(a)(26)(A). It includes "[s]exual harassment, which means conduct that includes unwelcome sexual advances, requests for sexual favors and other verbal, written, visual, or physical conduct of a sexual nature when one or both of the following occur: . . . [s]ubmission to that conduct is made either explicitly or implicitly a term or condition of a student's education" or "[s]ubmission to or rejection of such conduct by a student is used as a component of the basis for decisions affecting that student." *Id*. § 11(a)(26)(B)(i).

11.     As instructed by statute, the Vermont Agency of Education has developed model policies and procedures for the prevention of hazing, harassment, and bullying. [2] The Agency developed these policies and procedures in consultation with a Harassment, Hazing, and Bullying Prevention Advisory Council established by the Secretary of Education. The members of the Harassment, Hazing, and Bullying Prevention Advisory Council include the Executive Director of the Vermont Human Rights Commission, the General Counsel of the Vermont-National Education Association union, the Executive Director of the Vermont Superintendents Association, the Executive Director of the Vermont Independent Schools Association, and the Executive Director of the Vermont School Boards Association.

12.     Vermont's current model policies and procedures on the prevention of hazing, harassment, and bullying were drafted in 2016. They are the product of a very lengthy, involved, collaborative process. They reflect the work of all of the above stakeholders—plus many more—to strike the best possible balance for Vermont's students, educators, administrators, and parents and guardians, in accordance with Vermont law and all federal laws then in effect.

---

[2] https://education.vermont.gov/documents/healthy-safe-schools-hhb-model-policy;
https://education.vermont.gov/documents/healthy-safe-schools-hhb-model-procedures.

Decl. of Clare O'Shaughnessy                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 76

13.     To my knowledge, most Vermont school districts have adopted the State's model policies and procedures on the prevention of hazing, harassment, and bullying verbatim or nearly so.

14.     Consistent with the state statutory requirement that an educational institution that receives actual notice of alleged conduct that may constitute harassment must promptly investigate to determine whether harassment occurred, Vermont's model procedures on harassment provide detailed instructions on how that investigation must be carried out. They require that "[i]n determining whether . . . conduct constitutes a violation of this policy, the investigator shall consider the surrounding circumstances, the nature of the behavior, past incidents or past or continuing patterns of behavior, the relationships between the parties involved and the context in which the alleged incidents occurred." They make clear that "[t]he complainant and accused will be provided the opportunity to present witnesses and other evidence during an investigation." And they require the school to "consider the impact of relevant off-campus conduct on the school environment where direct harm to the welfare of the school can be demonstrated or the conduct can be shown to pose a clear and substantial interference with another student's equal access to educational programs." They provide that "[w]hether a particular action constitutes a violation of this policy requires determination based on all the facts and surrounding circumstances." Upon the completion of the investigation, the investigator must prepare a report stating whether the allegation of harassment was substantiated. If the complaint is substantiated, the school must then take prompt and appropriate disciplinary and/or remedial action reasonably calculated to stop the harassment and remedy its effects on the victim(s). A complainant or their parent may request internal review if a finding is made that harassment did not occur; and they may request an independent review if the complainant is dissatisfied with the final determination as to whether harassment occurred, or believes that although a final determination was made that harassment occurred, the school's response was inadequate. The model procedures also

Decl. of Clare O'Shaughnessy                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 76

provide that a person determined to have engaged in harassment may appeal "directly to the school board of the school district" and "[t]he school board shall conduct a review on the record. The standard of review by the school board shall be whether the finding that an act(s) of hazing, harassment, and/or bullying has been committed constitutes an abuse of discretion by the school level fact finder."

### The Rule Would Impose Financial and Administrative Burdens on Vermont at a Time When the State Is Already Struggling with an Unprecedented Crisis

15.     Vermont's education system is facing unprecedented administrative and financial challenges due to COVID-19, and the Rule threatens to deepen these challenges ever further.

16.     The Agency of Education and school districts are working extremely hard to ensure continuity of learning for all students, despite the many challenges involved—particularly for students without access to computers or the internet, or students with disabilities who require supports and services to access education. They are striving to make sure that students, even in Vermont's most rural and remote areas, can still access nutritious meals through their schools. They are working to ensure continuity of mental health services, and countless other services that students access through their schools. And they are working to plan, without any precedent to guide them, how to eventually safely return students and staff to schools.

17.     At this time when the State's educators and educational administrators are being called on to do more than ever, the State is under tremendous financial strain. Due to the loss of employment, business closures, and low consumer spending in response to COVID-19, State revenues have fallen dramatically. The State's Education Fund is projected to close FY2020 with a $39.5 million deficit. The Education Fund's deficit is likely to continue to climb far higher in FY2021, although the State is not yet able to reliably estimate the deficit due to the evolving nature of the crisis.

18.     It would be a tremendously onerous and unnecessary burden for the Agency of Education, school districts, Vermont colleges and universities, and the many stakeholders in the Harassment, Hazing, and Bullying Prevention Advisory Council to have to divert extremely scarce resources and already-overburdened staff time to reviewing the Rule, analyzing its interplay with state laws and federal laws such as Family Educational Rights and Privacy Act, retraining staff, and defending litigation that may arise due to the unsettled state of law that the Rule would create—at a time when those resources and staff are desperately needed for the State's COVID-19 response. It would require Agency of Education staff and stakeholders, including those in the Harassment, Hazing, and Bullying Prevention Advisory Council, to spend likely hundreds of hours revising the State's (recently drafted) model policies and procedures on hazing, harassment, and bullying as necessary to conform to the Rule.

### The Rule Would Make It More Difficult to Respond to and Prevent Sexual Harassment

19.     Although the State and school districts are still reviewing the Rule and do not yet know the full extent of changes that the Rule would make to the State's and its school districts' sexual-harassment prevention and response policies, it is already clear that the Rule would create confusion and make it more difficult for schools to effectively respond to and prevent sexual harassment.

20.     The Rule would make schools' sexual-harassment policies and procedures more confusing and frustrating for students, staff, and parents and guardians. For instance, the Rule's definition of sexual harassment for Title IX purposes is narrower than Vermont's definition. *Compare* 85 Fed. Reg. at 30,574 (to be codified at 34 C.F.R. § 106.30(a)) *with* Vt. Stat. Ann. tit. 16, § 11(a)(26)(A). Although the Rule does not preclude Vermont schools from addressing conduct that does not meet Title IX standards under other codes of conduct, it is likely to engender confusion. For example, the Rule would require a school to dismiss a portion of a student's complaint if it did not

Decl. of Clare O'Shaughnessy                                           Civil Action No. 20-cv-01468-CJN
EXHIBIT 76

meet the Title IX standard. But that conduct might nonetheless be actionable under state law, which could require schools to create a two-track system for investigating and responding to harassment—one track for alleged conduct that fit within the new definition of harassment under Title IX and one for conduct that fit within the State's definition of harassment, but not the new definition under Title IX. See 85 Fed. Reg. at 30,574. This would make schools' policies and procedures for responding to sexual harassment allegations more complicated and confusing for all parties involved. Mitigating the effects of such confusion will require substantial resources to revise such policies, to train those tasked with administering them, and to explain the two-track system to the school community.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this _9th_ day of June 2020 at Williston, Vermont.

Clare O'Shaughnessy
Staff Attorney, Vermont Agency of Education

Decl. of Clare O'Shaughnessy        Civil Action No. 20-cv-01468-CJN

EXHIBIT 76

# EXHIBIT 77

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF FANNIE OSRAN

I, Fannie Osran, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

2.      I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities*

Decl. of Fannie Osran                                          Civil Action No. 20-cv-01468

EXHIBIT 77

*Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (the "Title IX Rule" or "Rule").  I submit this declaration in my personal capacity as a rising fourth-year student at the University of California (UC) Berkeley.  This declaration is based on the Title IX knowledge and experience I have acquired in the course of working with the Conduct Division of UC Berkeley's Student Advocate's Office.

### Title IX Experience

3.        I was the Conduct Division Director at UC Berkeley's Student Advocate's Office from May 2019 to May 2020.  Previously, I served as a Conduct Division caseworker from September 2017 until May 2019, and I will again serve as a Conduct Division caseworker from May 2020 to May 2021.  The Conduct Division supports students undergoing "student conduct" cases.  We handle cases involving violations of the general UC code of conduct, the UC Berkeley code of conduct, Title IX violations, among other campus conduct processes.  As Conduct Director, my responsibilities included overseeing all student conduct cases, managing 12-15 caseworkers, and hiring and training new caseworkers.

4.        When I was a Conduct Division caseworker ("caseworker"), I explained the student conduct process to respondents, accompanied respondents during their student conduct meetings and served as a support system, helped respondents gather evidence, and answered any questions they had about their cases as they navigated the student conduct process.

5.        Prior to becoming a caseworker, I participated in multiple trainings regarding sexual violence and sexual harassment cases and policies.  Caseworkers attend a director-led training three to four times a year, a Title IX training at the beginning of each year, weekly policy trainings, participate in ongoing discussions about how to interact with clients during intakes and client meetings, and attend workshops and roundtables on UC and federal sexual violence and

Decl. of Fannie Osran                                              Civil Action No. 20-cv-01468

EXHIBIT 77

sexual harassment changes.  As a caseworker and manager, I have directly handled and supervised sexual violence and sexual harassment cases.

6.      While my direct job is to work with respondents, I have worked closely with the Grievance Director and members of the Grievance Division who work with complainants so my lens of policy is always about both parties.  Given my work with the Grievance Director, my sexual violence and sexual harassment casework, my experience managing 12-15 caseworkers handling sexual violence and sexual harassment cases, and my work with the Conduct Division generally, I believe the Rule will result in immediate and irreparable harm because it will impair the UCs' and other colleges' ability to provide an education environment free from discrimination and harassment on the basis of sex, will lead to fewer protections for complainants, and a more burdensome process for respondents.

## Narrowing of Jurisdiction

7.      Under the Rule, colleges will only be responsible under Title IX for investigating cases that take place in an "education program or activity" in the United States and over which the university has substantial control.  Last year, UC Berkeley freshmen were not guaranteed on campus student housing.  More than half of the sexual violence and sexual harassment cases I have worked on or managed during my time with the Conduct Division have involved alleged Title IX violations (encompassed in the UC Berkeley Code of Conduct) that have occurred in private off-campus housing yet still impacted the complainants' access to and benefit from their education.  For this reason, I believe this change in the Rule will deter many students who have faced sexual violence and/or sexual harassment from reporting these off-campus incidents, since under the Rule colleges will have to dismiss such complaints and, under Title IX, will not be able to take any action to address them.

Decl. of Fannie Osran                                        Civil Action No. 20-cv-01468

EXHIBIT 77

8.     Based on my experience handling and managing sexual violence and sexual harassment cases, I believe this change in the Rule will also harm respondents. In some of the off-campus cases I have handled and managed, respondents have generally shared with me that they genuinely want to understand what they did wrong, that they want to try to understand the complainant's perspective, and once the student conduct process is over, that they are grateful they had the opportunity to learn.  Had these off-campus complaints not been initiated, respondents would not have realized the impact of their actions on other people and the harm they caused.

9.     Narrowing which sexual violence and sexual harassment incidents may be investigated not only negatively impacts respondents but our campuses as a whole since respondents will not be provided with a learning process that prevents some sexual violence and sexual harassment incidents from happening again. Based on my experience, I believe that respondents deserve an opportunity to understand what they did wrong so incidents do not happen again, just as complainants deserve Title IX protections when subjected to sexual violence and/or sexual harassment incidents that take place in private off-campus housing.

**Cross-Examination by Advisor of Choice**

10.     In addition, the Rule's cross-examination requirement will prevent both complainants and respondents from feeling safe and supported by their educational institutions. The Rule does not require that schools use neutral third parties to conduct cross-examination, instead allowing students to hire a lawyer as their advisor. This will negatively impact the process for students without the financial means to hire a lawyer and who will have to rely on their school to provide an advisor for them.  As a caseworker and Conduct Division Director, I have already seen how the conduct process adversely impacts low-income complainants and respondents who are less able to take time off school or work to prepare for and attend meetings and hearings, or

Decl. of Fannie Osran                                    Civil Action No. 20-cv-01468

EXHIBIT 77

whose parents cannot take time off work or pay for travel to provide support.  The Rule will only exacerbate these inequities.

11.     As Conduct Division Director, I worked with dozens of students who are inherently intimidated by the student conduct process.  Based on my experience, I believe that the requirement to have cross-examination by an advisor of choice will lower the number of sexual violence and sexual harassment incidents reported to colleges, since it will discourage complainants from reporting because cross-examination by a respondent's advisor is particularly intimidating and re-traumatizing to complainants.

12.     Cross-examination by a complainant's advisor during live evidentiary hearings will also force respondents into emotionally charged situations that become more like a courtroom. Through my casework, I have worked with several respondents who do not want a more adversarial process. The Rule does not set up the kind of restorative process that, in my experience, both parties often want.

## Witness Participation Requirement

13.     Furthermore, as a caseworker I have witnessed firsthand the challenges complainants and respondents face in finding witnesses who are willing to participate in the student conduct process.  There is no obligation for witnesses to participate in an investigation or to show up to a hearing, and in my experience handling and managing cases, it is sometimes even difficult to reach witnesses on the phone.  Under the Rule, if a decision maker is relying on witness testimony, the witness will now have to participate and undergo cross-examination.  If a witness refuses to participate, the decision-maker cannot rely on the witness' prior verbal or written statements in making a finding of responsibility.  Requiring witnesses to participate in Title IX student conduct investigations and hearings, and not permitting submission of declarations, has

Decl. of Fannie Osran                                    Civil Action No. 20-cv-01468

EXHIBIT 77

the potential of creating a one-sided process where one party does not get to tell their story because witnesses could not participate or refused to cooperate.

### Narrowed Definition of Sexual Harassment and New Participation at the Time of Complaint Filing Requirement

14.     The narrowed definition of sexual harassment that the Rule adopts only covers conduct that is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the [school's] education program or activity." This narrowed definition of sexual harassment will impact respondents who may be engaging in sexual violence and sexual harassment incidents but will not have the ability to learn what behavior is unacceptable until it becomes so severe and pervasive it denies a complainant equal access to a school's education program. In my experience, respondents generally want to learn from their actions. I believe the narrowed definition is harmful because it requires respondents and complainants to wait until behavior becomes so severe, pervasive, and objectively offensive that, in effect, the complainant loses equal access to the school's education program or activity before the school is permitted to investigate the conduct and take any disciplinary actions. If a school is permitted to address unacceptable behavior at the onset, then the behaviors can be stopped before they escalate to such a degree that the complainant suffers greater harm and the respondent is likely now facing a more severe disciplinary sanction.

15.     Currently, the UC only has one policy and procedure for addressing all incidents of sexual harassment and violence. And while the Rule does not prohibit schools from developing and implementing non-Title IX codes of conduct that do not align with their Title IX policies moving forward, doing so will cause confusion amongst students, staff, and school communities as a whole.

Decl. of Fannie Osran                                         Civil Action No. 20-cv-01468

EXHIBIT 77

16.     The Rule also prohibits a complainant from filing a formal complaint under Title IX, if they are no longer participating in or attempting to participate in the school.  So, for instance, if a student withdraws from a school because they have suffered from a sexual violence and/or sexual harassment incident and later decides to file a complaint, under the Rule, the complaint would be dismissed.  This would harm the complainant because without a Title IX investigation and/or sanctions imposed on the respondent, it is less likely that the complaint will return to campus;  this would harm the respondent because they would not be provided with an opportunity to learn from their behavior and the complainant's perspective; and this would harm the school and community at large since the respondent may believe they have not done anything wrong and engage in the same harmful behavior against other students or members of the school community.

## Conclusion

17.     The Rule makes college campuses less accountable since they will have a harder time investigating student-to-student and employee-to-student sexual harassment and violence that occurs in off campus housing and other off campus settings with a nexus to the education program or activity.  The Rule will harm our colleges and universities, because more complainants will not want to or be able to go through the hearing process on account of the cross-examination by advisors requirement, the narrowed definition of sexual harassment, and the prohibition on complaint filing for student complainants who are no longer participating in the institution because of the sexual assault and harassment they have suffered.  In addition, decision-makers will not be able to reach a determination because witnesses who provided statements during the investigation process are now unavailable for the hearing, and respondents will also be subjected to a harsher, more time consuming and less student-centered process.

Decl. of Fannie Osran                                        Civil Action No. 20-cv-01468

EXHIBIT 77

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 10 day of June, 2020

_Fannie Osran_
_____
Fannie Osran
Student, University of California Berkeley

Decl. of Fannie Osran                                  Civil Action No. 20-cv-01468

EXHIBIT 77

EXHIBIT 78

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. <u>20-cv-01468-CJN</u> |

## DECLARATION OF DR. ANGIE PACCIONE

I, Angie Paccione, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Executive Director of the Colorado Department of Higher Education ("CDHE") and the Colorado Commission on Higher Education (the "Commission"). I have a PhD and an MEd in education and human resource studies from Colorado State University, BAs in political science and psychology from Stanford University, and more than 20 years of experience in secondary and postsecondary education.

2.     As Executive Director I serve as a member of the Colorado Governor's Cabinet and am responsible for executing the Governor's agenda for higher education in the state of Colorado. In addition, as Executive Director of the Commission, I promote policies to ensure that Colorado's Public Institutes of Higher Education ("IHEs") and students are successful.

3.     I submit this Declaration in support of the State of Colorado's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or Rule). I have compiled the information in the statements set forth below through personal knowledge and through CDHE and Commission personnel who have assisted me in gathering this information. I have also familiarized myself with the Rule in order to understand its immediate impact on Colorado.

4.     Colorado is home to 31 IHEs, which collectively enroll more than 250,000 students. The governing board of each IHE is responsible for promulgating its institution's policies governing student conduct and discipline. Each IHE is also responsible for establishing policies and procedures governing its faculty, administrative, and classified employees. Each of Colorado's IHEs is governed by a board of regents, board of governors, or board of trustees either elected by the citizens of the state or appointed by the Governor with the consent of the Senate. Colo. Rev. Stat. §§ 23-20-102 (University of Colorado System), 23-30-102 (Colorado State University System), 23-40-104 (University of Northern Colorado), 23-41-101 (Colorado School of Mines), 23-51-102 (Adams State University), 23-52-102 (Fort Lewis College), 23-53-102 (Colorado Mesa University), 23-54-102

Decl. of Dr. Angie Paccione                                              Case No. 20-cv-01468
EXHIBIT 78

(Metropolitan State University of Denver), 23-56-102 (Western Colorado University), 23-60-104 (Colorado Community College System). Colorado statutes also authorize the creation of local district colleges. Colo. Rev. Stat. § 23-71-103. Colorado's two local district colleges are governed by boards elected by citizens of their districts.

5.      In the 2019/2020 fiscal year, the State of Colorado allocated $858 Million from the general fund to IHEs and $220.3 Million in student aid. IHEs collectively received over $464.6 million in federal funds from the Department in 2019 and are scheduled to receive more than $482.9 million in 2020.

6.      CDHE is a Department of the State of Colorado within the executive branch. Colo. Rev. Stat. § 24-1-114. The Commission, housed within CDHE, is the central policy and coordinating board for higher education in the State of Colorado. Colo. Rev. Stat. § 23-1-102. The powers and duties of the Commission include: (i) determining the role and mission of each IHE; (ii) setting systemwide goals of high quality, access, diversity, efficiency, and accountability; and (iii) developing a master plan for Colorado postsecondary education. Colo. Rev. Stat. § 23-1-108.

7.      Within CDHE is the Colorado Sexual Misconduct Advisory Committee, which is tasked with making recommendations to the Colorado General Assembly and IHEs concerning sexual misconduct policies and methods to reduce sexual misconduct at IHEs. The Committee is required to study and advise on best practices for addressing issues related to sexual misconduct, including: (i) how to handle incidents of sexual misconduct that occur outside of an IHE's programs, activities, or property; (ii) how to conduct cross-examination of parties and witnesses at hearings; (iii) whether a standard of reasonableness should be included in sexual misconduct policies; and (iv) whether IHEs should have higher standards than those required by federal law and regulation. Colo. Rev. Stat. § 23-5-147.

Decl. of Dr. Angie Paccione                                                          Case No. 20-cv-01468
EXHIBIT 78

8.      In reliance on the Department's historic Title IX guidance and research of best practices, the State of Colorado enacted Colorado Revised Statute § 23-5-146, "Sexual misconduct--policies--confidential resources--training--reports--definitions." Section 23-5-146 requires IHEs to develop fair and robust procedures – for the protection of complainants and respondents – for investigating and resolving reports of sexual misconduct which must, among other things:

(I)      Be fair, impartial, and prompt, and the institution must make a good-faith effort to complete an investigation or adjudicative process, excluding any appeals, within an average of sixty to ninety days, without jeopardizing the rights of a complainant or responding party. . . .

(II)     Include the preponderance of the evidence as the evidentiary standard when a student is the respondent, notwithstanding any other evidentiary standard in any other policy of the institution;

(III)    Outline the procedures to be followed in the investigation and adjudication process, which must specify that all questions go through the official individual or individuals conducting or participating in the investigation process; [and,]

(IV)     Provide the complainant and the responding party with the same opportunities to have an advisor or other person present during any part of the proceeding; except that the advisor or other person is not allowed to speak on behalf of the complainant or responding party during the course of the proceedings[.]

Colo. Rev. Stat. § 23-5-146. Policies adopted pursuant to the statute generally conform to the time-tested single investigator model, whereby an individual employed by an IHE investigates and determines responsibility for sexual misconduct based on the preponderance of the evidence standard. Colo. Rev. Stat. § 23-5-146(3).

9.      The role of CDHE and the Commission is to act as an ombudsman and advise students how to follow the policies and procedures for resolving complaints at the individual IHE where they are enrolled. However, once a student has exhausted the complaint process at his or her IHE, they may file a complaint with CDHE. CDHE has authority to modify state policies and request that an IHE review and, if necessary, modify their policies to try and prevent student problems.

10.     The Department's new Rule will require the State of Colorado to undergo costly and administratively difficult changes to these well-established systems—all by August 14, 2020. These changes will impose substantial burdens on Colorado, requiring the abandonment of approaches that work well—all in favor of an untested approach dictated by the federal government. Colorado is devoted to the implementation of policies, procedures, and State laws that are currently in place, and are working effectively to meet the requirements of Title IX. The Department's binding federal mandate will displace effective protections Colorado currently has in place. IHEs that fail to meet this new federal mandate also risk losing federal funds.

11.     The timing of the new Rule and its implementation date of August 14, 2020, is particularly troubling. On March 11, 2020, the Governor of the State of Colorado, Jared Polis, issued Executive Order D 2020 003, "Declaring a Disaster Emergency Due to the Presence of Coronavirus Disease 2019 in Colorado." On March 17, Governor Polis issued Executive Order D 2020 017, "Ordering Coloradans to Stay at Home Due to the Presence of COVID-19 in the State," which closed Colorado IHEs and many Colorado Departments for most purposes. As of the date of this declaration, CDHE's offices are closed and its staff is working from home. Implementation of the new rule without the use of basic office accommodations is simply unrealistic.

12.     On April 30, 2020, Governor Polis issued Executive Order D 2020 050, "Declaring Insufficient Revenues Available for Expenditures and Ordering Suspension or Discontinuation of Portions of Certain State Programs and Services to Meet a Revenue Shortfall Due to the Presence of COVID-19 in the State of Colorado." In this Order, the Governor declared that "there are not sufficient revenues available for expenditure . . . to carry on the functions of the state government and to support its agencies and institutions." (quoting Colo. Rev. Stat. § 24-2-102(4)). It is expected that, in fiscal year 2020/2021, Colorado will suffer a revenue shortfall in excess of $3 Billion and a 58%

reduction in higher education funding due to COVID-19. Between the lack of basic office resources

and drastic cuts to revenue, revising Colorado's sexual misconduct law and policy by August 14,

2020, is not feasible.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and
correct.

Executed on this 12th day of June, 2020

_Angie Paccione_

_____
Dr. Angie Paccione
Executive Director of the Colorado Department of
Higher Education and the Colorado Commission on
Higher Education

Decl. of Dr. Angie Paccione                                    Case No. 20-cv-01468
EXHIBIT 78

EXHIBIT 79

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | Civil Action No. <u>20-cv-01468-CJN</u> |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF VINCENT A. PEDONE

I, Vincent A. Pedone, Executive Director of the Council of Presidents of the Massachusetts State

Universities, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct,

to the best of my knowledge:

      1.     I am the Executive Director of the Council of Presidents (the "COP" or "Council") of

the nine Massachusetts State Universities. I have been employed as Executive Director since 2012.

Prior to my employment with the Massachusetts State Universities, I served nearly twenty years as

an elected member of the Massachusetts House of Representatives from the 15th Worcester District.

Decl. of Vincent A. Pedone                                Case No. 20-cv-01468
EXHIBIT 79

2.      The COP is an association consisting of the nine presidents of the state universities in Massachusetts (each a "State University," and collectively, "the State Universities"). The Council is chaired by a member president with the chair rotating annually between the presidents. The purpose of the COP is to support and enhance the well-being of the State Universities in service to their students, communities, and the Commonwealth.

3.      I submit this Declaration in support of the Commonwealth of Massachusetts's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education (the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through State University personnel who have assisted me in gathering this information, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on the Massachusetts State Universities.

4.      The State University system (the "System") is the second largest segment of public higher education in the Commonwealth of Massachusetts, enrolling over 52,000 students and producing 12,000 bachelor and master degree graduates annually. The System employs approximately 5,400 full-time and 4,200 part-time faculty, administrators, and staff.

5.      The State Universities include nine member institutions: Bridgewater State University, Fitchburg State University, Framingham State University, Salem State University, Westfield State University, Worcester State University, the Massachusetts College of Art and Design in Boston, the Massachusetts College of Liberal Arts in North Adams, and the Massachusetts

Decl. of Vincent A. Pedone                                             Case No. 20-cv-01468

EXHIBIT 79

Maritime Academy in Buzzards Bay. Each State University offers both commuter and residential student experiences.

6.      The State Universities are public institutions of higher education and are supported in part by direct state appropriation and state grants. In Fiscal Year 2020, the State Universities received a total of almost $275 million in direct appropriation from the Commonwealth of Massachusetts. This state funding represents roughly 35% of aggregate operating budgets of the nine State Universities collectively. The nine State Universities are governed according to M.G.L. Chapter 15A, et seq., which grants powers to their Boards of Trustees and President, and authorizes, in part, oversight by the state's Board of Higher Education.

7.      The State Universities receive federal funds from the Department. As a result, the state universities are subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

8.      The State Universities have had System-wide equal opportunity, affirmative action, and diversity policies and procedures in place for over 30 years. These have been updated over the years in response to changes in the law and guidance from the U.S. Department of Education. As part of this effort to update the State Universities Equal Opportunity, Diversity and Affirmative Action Plan (the "EO Plan"), the nine campuses developed the System's Sexual Violence Policy which address all forms of sex-based harassment and violence, including rape, sexual assault, stalking, domestic and dating violence, and sexual harassment. The EO Plan was most recently updated and approved by the Massachusetts Board of Higher Education in 2018.

9.      The EO Plan contains a System-wide Complaint Investigation and Resolution Process. This process is open to any member of the campus community, including faculty, staff, students and others who believe they have been subjected to or have knowledge of any form of

Decl. of Vincent A. Pedone                                                    Case No. 20-cv-01468
EXHIBIT 79

discrimination or harassment based on membership in any protected class, including sex, as well as any sexual harassment, sexual violence, gender-based violence, or retaliation.

10.     Each State University has an experienced, professional and trained Title IX Coordinator as well as additional trained staff, including Deputy Title IX Coordinators, to administer the EO Plan and its grievance procedure in response to complaints of sexual harassment or sexual violence. A complaint may be verbal or in writing. The Title IX Coordinators have extensive training and experience in responding to allegations of sexual harassment including certification trainings and/or other annual training offered through the COP and System legal counsel.

11.     The Plan's grievance procedure follows an investigatory model and does not provide for hearings between the parties to a complaint.

12.     The EO Plan prohibits "sexual harassment" as follows: "[u]nwelcome conduct of a sexual nature is prohibited when: submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or education; and/or submission to, or rejection of, such conduct by an individual is used as a basis for academic or employment decisions affecting that individual; and/or such conduct has the purpose or effect of substantially interfering with an individual's academic or work professional performance or creating a sexually intimidating or hostile employment, educational, or living environment."

13.     The EO Plan applies to all State University programs and activities, both on and off campus. Acts of sexual violence, sexual harassment, gender-based harassment, domestic violence, dating violence, stalking and retaliation that take place off campus may be subject to investigation and disciplinary action under the EO Policy when the conduct involves behavior by or toward a community member, which (1) occurs during State University-sponsored events or the events of organizations affiliated with the State University, including study abroad and outside internships; (2)

negatively impacts a person's access to education programs and activities; (3) adversely affects or disrupts the campus community; and/or (4) poses a threat of harm to the campus community.

14.     Since the implementation of the EO Plan, the State University campuses have witnessed increased awareness of sexual misconduct among all sectors of their communities – including faculty, staff, students, bystanders and visitors. By offering processes to report unwanted sexual advances and behavior, the State Universities have seen a noticeable and welcomed willingness of victims to come forward and report incidents of harassment and violence. The State Universities strongly encourage all who have experienced or have knowledge of sexual violence, sexual harassment, gender-based harassment, domestic violence, dating violence, stalking or retaliation in any State University program or activity, both on and off campus, to report the incident so that the State University can provide support and pursue an appropriate resolution.

15.     The EO Plan's complaint procedure provides protections for victims and due process for respondents. After implementation of interim protective measures as needed, there is an investigatory phase conducted by an Administrative Investigator who investigates and prepares a report of findings for review and response by the parties. A final report, with recommendations for Administrative Review by the Title IX Coordinator, EO Officer, or other designated State University official, is prepared. The Administrative Reviewer is charged with accepting, rejecting, or modifying the Investigative Report. The Notice of Outcome is issued to the parties and either party has a right to appeal. The decision of the appellate officer or body is final.

16.     The EO Plan's complaint procedure is conducted as confidentially as reasonably possible to protect the privacy rights of all individuals involved. A State University may share information concerning the complaint with parties, witnesses (if any), union representatives and/or others during any phase of the procedure only on a need-to-know basis. All individuals with whom

Decl. of Vincent A. Pedone                                                   Case No. 20-cv-01468
EXHIBIT 79

information is shared are advised of the confidential nature of the information and directed not to discuss the matter with anyone other than a personal advisor, if applicable.

17.     Each party to a complaint may have a personal advisor during the process. The personal advisor may be an attorney. However, students are not permitted to have advisors, advocates or attorneys speak for them during the proceedings. The role of a personal advisor is limited to providing discrete advice and counsel to the party throughout the grievance process. A main goal of the proceeding and sanctioning process is to educate the offending student as to why the offending behavior is prohibited by the EO Plan. Sanctions typically involve an educational component.

18.     In order to comply with the Title IX Rule, the State Universities will be required to revise the EO Plan, including its grievance procedures, as well as their respective Codes of Student Conduct. This will require the involvement of the State Universities' Title IX Coordinators, Code of Student Conduct Officers, and General Counsels. Modifications to these policies will further require notice and impact bargaining with the State Universities' local and state-wide labor organizations, collaboration and consultation with the Department of Higher Education, and approval by each State University's local Board of Trustees and the Massachusetts Board of Higher Education.

19.     Under the EO Plan, students and employees may be subject to disciplinary action for sexual harassment and sexual violence that takes place outside the State Universities' "education program or activity," or that take place outside the United States. The Title IX Rule effectively bars the State Universities from addressing this conduct under their Title IX policies.  Accordingly, these institutions will be forced to create new policies or revise existing policies and retrain or hire new staff in order to provide proper protocols and procedures for addressing this conduct. This policy creation or revision and retraining or hiring of staff will come at considerable cost to the State Universities.

Decl. of Vincent A. Pedone                                              Case No. 20-cv-01468
EXHIBIT 79

20.     The State Universities will likely have to hire or contract with attorneys or others with extensive legal training to carry out the requirements under the Title IX Rule. The nature of the hearing and the legal acumen required of the advisors to provide effective advice and cross-examination of witnesses (including knowledge of rape shield laws and rules of evidence concerning relevance and credibility) will necessitate that the advisor in most cases be an attorney or otherwise possess requisite legal knowledge and skills. Further, an institution may face legal jeopardy and additional legal expenses where a party with a college-appointed advisor loses at the hearing and subsequently claims that the institution failed to provide an adequate advisor thereby denying their due process rights to a fair hearing. For similar reasons, the hearing officer presiding over a live hearing will likely also need to be an attorney or have other specialized experience in sexual harassment litigation in order to effectively manage and administer the proceedings, including making evidentiary and relevancy determinations, responding to questions or objections, and controlling the participating advisors. Supplying advisors and hearing officers with the requisite knowledge and experience will come at considerable expense to these institutions which are already facing exigent financial circumstances due to the COVID-19 pandemic.

21.     The State Universities have invested significant funds and resources in training their Title IX Coordinators, Deputy Title IX Coordinators, Administrative Investigators, Administrative Reviewers, and Appellate Officers to conduct investigations, draft reports of findings and recommendations, and review and issue notice of outcomes and appeal decisions. The Title IX Rule nullifies those efforts and requires the State Universities to expend additional monies and resources to train new investigators. Extensive retraining of State University personnel will be required to familiarize existing and new staff with the new policies and procedures. These efforts will require extensive time and attention from stakeholders and will no doubt be complicated by the threat posed

by COVID-19 and current containment and mitigating requirements imposed on these institutions. Further, extensive student training will be required in order to educate students on the Title IX Rule, particularly the new definition of "sexual harassment," the elimination of off-campus or study abroad protections, the introduction of live hearings with cross examination, and the active participation of attorneys or other highly trained advisors. These efforts will require considerable time and expense and will be particularly challenging as a result of the unprecedented impact of the COVID-19 pandemic on colleges and universities.

22.     Implementation of the Title IX Rule by August 14, 2020 is unreasonable in light of the extensive changes presented and their impact on existing policies and procedures; the need for comprehensive and broad-based training programs for students, staff, and faculty; and the hiring of new personnel with special legal and Title IX expertise to serve as advisors and hearing officers. Satisfying these demands by August 14, 2020 is further complicated by the current COVID-19 pandemic, including the social distancing restrictions in place locally and nationally for the foreseeable future, and the additional expenses incurred by colleges and universities which are crippling many schools.

23.     The complicated, formalized, judicial-like grievance process that institutions will be required to follow in response to a formal complaint is antithetical to the educational environment at the State Universities. In higher education, student discipline is part of the teaching and learning process. Even in cases of an expulsion, the process is not punitive in the criminal law sense, but rather a determination that the student is unqualified to continue as a member of the educational community. To impose on the academic community the same due process requirements mandated under criminal law would undermine and frustrate the teaching and learning process. As a result, State University students may be intimidated and overwhelmed by the more formalized process and less likely to report

Decl. of Vincent A. Pedone                                      Case No. 20-cv-01468
EXHIBIT 79

instances of sexual violence. Those who are accused may be more likely to drop out of school rather than face what they see as a punitive, legal process.

24.     The vast percentage of State University employees are unionized; collective bargaining agreements ("CBA") dictate the terms and conditions of their employment.   The standard within the faculty CBA for instituting termination is "just cause."   The "just cause" standard allows the union to challenge the investigatory process under the grievance/arbitration contractual procedures, in addition to any appeals that are required under the new Title IX regulations.   Under non-faculty union contracts the standard for issuing discipline is just cause. The practice with these units includes conducting a hearing prior to the suspension and termination of an employee for violation of University Policy under Title IX. As a result of the Title IX Rule, CBAs will need to be reviewed and re-negotiated to, among other things, address the requirement that there be uniform application to students and employees, and to address the fact that some employees have CBAs which outline grievance procedures and standards of review before determining disciplinary action.

25.     Each State University may need to hire additional full-time and part-time staff, including hearing officers and attorneys, to accommodate the requirements of the Title IX Rule. Additional costs may also be incurred in terms of legal fees and consultant fees. Accordingly, coming into compliance with the Title IX Rule will cost the State Universities considerable monies.

26.     The State Universities expect that the formal and adversarial hearing requirements under the Title IX Rule – especially the requirement of mandatory cross-examination – will have a chilling effect on potential complainants to the detriment of student safety. Complainants will now be subject to direct questioning by the respondent's advisor, who may be an attorney.   Research shows that many sexual assault survivors avoid reporting their assault to law enforcement because of the

Decl. of Vincent A. Pedone
EXHIBIT 79

ordeal that a questioning and a potential trial represents, and imposing procedures similar to a courtroom on educational institutions will likely have a deterrent effect.

27.     On top of challenges presented to the State Universities by the current COVID-19 pandemic -- including uncertainty of the timeline and level of on-campus activities for their workforce and 52,000 students – they face campus budget deficits requiring reductions across all sectors of workforce and educational offerings as well as state appropriations reductions in the foreseeable future. Accordingly, the requirements to implement new Title IX Rule, provide training of the Title IX staff on the new policies and procedures, operationalize the Rule by educating the campus community to include all faculty, staff, and students, and the need to impact bargain changes to the current policy with our System labor unions no later than August 14, 2020, are overly burdensome to the Massachusetts State Universities.

28.     The State Universities have incurred substantial revenue losses as a result of COVID-19 pandemic. The residence halls and dining facilities were closed in March 2020, resulting in reimbursements to students costing tens of millions of dollars. The State Universities were forced to transition to remote learning in just a matter of weeks, incurring more costs. Other revenue streams have been significantly impacted, including loss of income for summer conferences, camps, visiting student groups and other activities. For Academic Year 2020-2021, the State Universities are currently planning for reduced student enrollment, reduced residence hall occupancy, reduced dining consumption and increased costs to support remote learning, physical distancing for on-campus learning, personal protective equipment and a myriad of other expenses associated with the current pandemic. In total, the State Universities losses could top more than $100 million. As public universities, our mission is to provide access to high-quality and affordable pathways to a degree.

Decl. of Vincent A. Pedone                                    Case No. 20-cv-01468
EXHIBIT 79

This unfunded mandate will further challenge the State Universities to meet our fundamental mission goal.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 12th day of June, 2020

Vincent A. Pedone
Executive Director
Massachusetts State Universities
Council of Presidents

Decl. of Vincent A. Pedone                                    Case No. 20-cv-01468
EXHIBIT 79

# EXHIBIT 80

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. **20-cv-01468-CJN** |

## DECLARATION OF JESUS A. PEÑA, ESQ.

I, Jesus A. Peña, Esq., pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Vice President for Equity, Compliance and liaison for Legal Affairs at Kutztown University (KU). In addition, I serve as the Interim Title IX Coordinator for the Pennsylvania State System of Higher Education (PASSHE).

2.      I have a Bachelor of Arts in history from Rutgers University and a Juris Doctor from Rutgers University Schools of Law. I am currently admitted to the practice of law in Pennsylvania,

New Jersey, Florida, and the District of Columbia. I have been employed with Kutztown University for 16 years.

3.        I submit this Declaration in support of the Commonwealth of Pennsylvania's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). The statements set forth in this declaration are based on my personal knowledge and experience, discussions with my colleagues at PASSHE, and documents I have reviewed. I have also familiarized myself with the Rule's requirements as part of my current responsibilities.

## Background about PASSHE

4.        PASSHE comprises 14 universities located across the Commonwealth of Pennsylvania. The system was established by statute on July 1, 1983, although some of the member universities have been in existence since the 19th century.

5.        PASSHE schools currently enroll nearly 100,000 degree-seeking students, with thousands of other students enrolled in certificate and career-development programs. PASSHE schools currently offer more than 2,3000 degree and certificate programs in more than 530 academic areas. There are nearly 800,000 living alumni of PASSHE schools, the vast majority of whom are residents of Pennsylvania.

6.        KU and other PASSHE schools offer numerous study-abroad opportunities. KU operates a number of study-abroad programs, and students are also eligible to participate in programs sponsored by any of the 13 other PASSHE schools.

Decl. of Jesus A. Peña, Esq.                                     Case No. 20-cv-01468-CJN

EXHIBIT 80

7.     The PASSHE system is overseen by a Chancellor, who reports to a Board of Governors. The members of the Board of Governors are either Commonwealth officials or individuals appointed by Commonwealth officials.

8.     PASSHE receives an annual appropriation from the Commonwealth's budget, which provides a significant portion of its operating budget. In recent years, PASSHE's annual appropriation has exceeded $470 million.

9.     PASSHE receives federal funds from the Department. As a result, all of the universities in the PASSHE system are subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

### PASSHE's Existing Title IX Sexual Misconduct Policies

10.     In my current role, I oversee KU's offices of Disability Services, Public Safety and Police Services and Social Equity and serve as the Title IX Coordinator for KU. I am also responsible for KU's protection of minors efforts as well as the University's Risk Assessment Plan.

11.     In addition, I am responsible for overseeing all Title IX investigations conducted at KU.

12.     I also serve as the Interim Title IX Coordinator for the PASSHE system. In this capacity, I serve as a resource for my fellow Title IX coordinators at other PASSHE schools. My fellow Title IX coordinators frequently contact me seeking assistance or advice with respect to their responsibilities.

13.     Each university that is part of the PASSHE system has adopted policies that prohibit sexual harassment and sexual misconduct by students, employees, and faculty, and establish a grievance process for addressing complaints of sexual harassment.

14.     Each university in the PASSHE system has a Title IX Coordinator who is responsible for overseeing implementation of these policies. Title IX coordinators may directly oversee other staff

Decl. of Jesus A. Peña, Esq.                                              Case No. 20-cv-01468-CJN
EXHIBIT 80

as well. At KU, I oversee a Deputy Title IX Coordinator and work closely with the Title IX Investigator who works with the Student Conduct Office. Decisions about the structure of each university's Title IX office are made by the university based on its own circumstances and needs.

15.     My fellow Title IX coordinators at PASSHE schools and I share a common goal: protecting all of our students. We strive to conduct all investigations fairly and impartially, and are neither pro-complainant nor pro-respondent.

16.     Chapter 505 of Title 22 of the Pennsylvania Code requires each university in the PASSHE system to create policies relating to "student conduct and judicial procedure," to include "substantive rules that define with reasonable specificity disciplinary offenses, penalties or sanctions and procedural guidelines to adjudicate rules violations." 22 Pa. Code § 505.1.

17.     The regulations in Chapter 505 apply to all student disciplinary offenses, including offenses relating to sexual misconduct.

18.     These regulations guarantee the following specific procedural rights to students accused of violations of university disciplinary policies:

  (1)  Reasonably specific advanced written notice of charges containing a description of the alleged acts of misconduct, including time, date and place of occurrence and the rules of conduct allegedly violated by the student.

  (2)  Advanced written notice of the date, time and place of the hearing, unless the right is waived in writing by the student.

  (3)  An opportunity for submission of written, physical and testimonial evidence and for reasonable questioning of witnesses by both parties.

  (4)  A reasonably sufficient interval between the date of service of charges and the date of the hearing to allow the student to prepare a defense.

  (5)  An impartial hearing body which may consist of a committee, board or individual appointed by the university president.

  (6)  Maintenance of a written summary or audiotape record of the hearing at university expense, though students may be required to pay the costs of copies of requested records.

(7)  A decision based upon evidence sufficient to make a reasonable person believe that a fact sought to be proved is more likely true than not.

(8)  A written decision in which the facts and reasons are set forth with reasonable specificity which shall be issued within 30 working days after the close of proceedings.

(9)  Identification by the student of an adviser, who may be an attorney, to be present at hearings. The adviser may only consult and interact privately with the student, unless the university grants the adviser permission to represent a student in a particular case.

22 Pa. Code § 505.3.

19.     Consistent with these regulations, the grievance procedures at all universities in the PASSHE system, including those procedures relating to Title IX, share certain elements in common. However, each university has formulated its own specific policies based on its individual needs and circumstances.

20.     For instance, Chapter 505 requires universities to conduct formal hearings to address disputed allegations of disciplinary violations involving a possible sanction of suspension or expulsion. Consistent with this requirement, all universities in the PASSHE system conduct live hearings to address disputed allegations of sexual misconduct involving such penalties.

21.     By contrast, the regulations allow each university to formulate its own policies relating to appeals of disciplinary decisions. At KU, students can appeal a hearing decision to an appellate board and from that board to the University President.

22.     In addition, each university is responsible for developing training materials that are appropriate for its specific needs.

**The Rule's Implementation Deadline**

23.     The Rule has generated a great deal of confusion and concern among Title IX coordinators at PASSHE schools.

24.    The length and complexity of the Rule, coupled with the fact that it represents a significant departure from the Department of Education's previous policies and regulations with respect to Title IX, have increased the challenges facing Title IX coordinators and other university officials who must ensure compliance with the Rule by August 14.

25.    Complying with the Rule will require each university in the PASSHE system to overhaul its policies and procedures relating to sexual misconduct on an extremely expedited timeframe. Between now and the implementation deadline, multiple employees in each of several different units at each of PASSHE's 14 universities will need to devote most of their time to preparing to implement the Rule.

26.    Each university will be required to update a variety of documents, including student codes of conduct, sexual misconduct policies, related procedures and training materials. At KU, we will need to update, at a minimum, the following documents that relate to the rights and obligations of students under Title IX; the Student Code of Conduct; Document on Student Rights & Welfare; Sexual/Gender Based Offenses Policy; Sexual Harassment Policy. Similar documents will need to be updated for faculty, staff, and others.

27.    Many of the universities within the PASSHE system have a shared governance model with respect to important policies. Changes to policies therefore require consultation with students, faculty, and other affected groups. The extent of the consultation and engagement varies at each institution. At KU, this shared governance model includes responsibilities and powers shared among the University Senate, the Administrative Council and the faculty union (Association of Pennsylvania State College and University Faculty [APSCUF]). However, under the current circumstances, meaningful consultation will be impossible before the August 14 deadline.

28.     Each university in the PASSHE system will need to overhaul its training programs and materials. These programs were developed by each university based on the university's individual needs.

29.     My colleagues and I have worked for years to develop training programs that effectively communicate to various groups within the university their rights and obligations, and that actively engage students, faculty, staff, and others in understanding the university's policies and procedures.

30.     The Rule will require us to overhaul all of our existing training programs. We will need to ensure not only that appropriate training materials are created for students, faculty, and other groups, but that individuals performing specific roles in the grievance process—including investigators, advisors, hearing officers, appeals officers and members of appeals boards—receive training on the new requirements of the Rule.

31.     Given the compressed timeframe, it will be extremely difficult for each university to develop and implement effective, appropriately tailored training programs prior to the Rule's implementation deadline. Rather, PASSHE and other state systems of post-secondary education will be forced to utilize remotely delivered and standardized training programs that are not tailored to our individual schools. Based on my experience, such programs are far less effective that those developed by individual schools to address their specific needs.

32.     All of the schools in the PASSHE system continue to struggle with the COVID-19 pandemic. KU is currently operating remotely, and as of the date of this Declaration, KU continues to work through various scenarios for the operation of in-person classes and other services for the upcoming fall semester. The continued uncertainty stemming from the pandemic will only add to the difficulty in complying with the Rule by August 14.

Decl. of Jesus A. Peña, Esq.                                        Case No. 20-cv-01468-CJN

EXHIBIT 80

## Substantive Concerns with the Rule

33.     My colleagues and I also have serious concerns about several requirements of the Rule.

34.     For instance, I understand that the Rule provides that universities "must dismiss" complaints that allege sexual misconduct that does not satisfy the requirements of the Rule, including misconduct that occurs outside a university's "program or activity," misconduct that occurs outside the United States, or misconduct that does not satisfy the Rule's geographic and stated requirements for establishing sexual harassment, and that such complaints can only be pursued under another provision of the school's code of conduct.

35.     Our universities do not currently have policies relating to "non-Title IX sexual harassment." As I understand the Rule, we will now need to create a framework for handling violations that fall outside the definition of violations that comprise "sexual harassment" under the Rule if we wish to continue to protect students from harassment that occurs off-campus, in study-abroad programs, or that otherwise fails to satisfy the requirements of the Rule.

36.     The impact of sexual harassment is not limited to the geographic location where the harassment occurs. We consider it part of our mission to protect students to address harassment that occurs in those situations not covered by the Rule, and will not arbitrarily ignore incidents of harassment based on where they happened to take place. As a result, I understand that we will need to have a process that addresses incidents of harassment not covered by the Rule.

37.     Clarity is essential in communicating with students and others about their rights and obligations relating to Title IX as well as grievance procedures more generally. I anticipate the creation of separate grievance procedures for Title IX and non-Title IX harassment will generate significant confusion on the part of students and others, which will likely lead to increased distrust in the grievance process.

Decl. of Jesus A. Peña, Esq.                                    Case No. 20-cv-01468-CJN
EXHIBIT 80

38.     All schools in the PASSHE system currently conduct formal hearings to address disputed allegations of sexual misconduct. At such hearings, the complainant and respondent are both permitted to have an advisor of their choice; however, advisors are not currently permitted to question parties or witnesses or otherwise play an active role at the hearing or in the processes leading up to the hearing.

39.     Both parties are permitted to question all witnesses. However, neither party is permitted to question the complainant or respondent directly; rather, questions to either the complainant or respondent are channeled through the hearing officer or through a third-party questioner.

40.     I understand that the Rule requires schools to allow complainants and respondents to select an advisor of their choice, without limitation, and that such advisors must be allowed to directly question witnesses and parties.

41.     As a result, I anticipate that some complainants and/or respondents will hire experienced attorneys to examine parties and witnesses at grievance hearings. I am very concerned that the active participation of experienced attorneys has the potential to create significant imbalances between the parties' advisors and undermine our efforts to provide a process that is fair to both parties.

42.     In addition, I expect that the involvement of attorneys will make it more difficult to recruit non-attorney university employees to participate in the hearing process as advisors, hearing panel members, or panel chairs.

43.     I also expect that allowing experienced attorneys to cross-examine students will undermine the willingness of students to participate in the grievance process. It is partly for this reason that our current process requires that cross-examination of complainants and respondents be conducted through the hearing examiner or another third-party questioner.

Decl. of Jesus A. Peña, Esq.                                    Case No. 20-cv-01468-CJN

EXHIBIT 80

44.     We have worked for years to build trust in the grievance process among students, faculty, and staff, at all PASSHE schools. I am concerned that the Rule's requirements will undo much of the success of those efforts and increase distrust among students and others. If students do not trust a school's grievance process, it is less likely that they will be willing to report incidents of sexual misconduct. As a result, I am concerned that the Rule will undermine our ability to enforce our grievance and disciplinary policies fairly and harm our efforts to address sexual harassment on our campuses.

Decl. of Jesus A. Peña, Esq.                                        Case No. 20-cv-01468-CJN

EXHIBIT 80

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this _22nd_ day of June, 2020

Jesus A. Peña, Esq.
Vice President for Equity, Compliance and
Liaison for Legal Affairs at Kutztown University

EXHIBIT 80

# EXHIBIT 81

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>_Plaintiffs,_<br><br>v.<br><br>ELISABETH D. DEVOS, _in her official capacity as Secretary of Education_; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>_Defendants._ | **Civil Action No. <u>20-cv-01468-CJN</u>** |

## <u>DECLARATION OF SHAWN PEOPLES</u>

I, Shawn Peoples, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

     1.     I am the Title IX Coordinator at Eastern Illinois University located in Charleston, Illinois. My educational background includes a Ph.D. in Higher Education Administration. I have been employed as the Director of the Office of Civil Rights & Diversity and Title IX Coordinator since 2016. Prior to my current role, I served as the Associate Director of the Office of Student Accountability & Support, and assisted with the administration of the university's student Code of Conduct.

2.      I submit this Declaration in support of the State of Illinois' litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through Eastern Illinois University personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on Eastern Illinois University.

## Eastern Illinois University

3.      Eastern Illinois University was established in Charleston, Illinois as a teacher's college in 1895. Today, it is a comprehensive university with a broad curriculum, including bachelor's and master's degrees in education, business, arts, sciences and humanities with enrollment of 7,621 students. The university is accredited by the Higher Learning Commission and many other accrediting bodies including the National Council for Accreditation of Teacher Education. The university offers 51 undergraduate degree programs, 32 graduate degree programs and 10 post-baccalaureate certificate programs and is divided into four degree granting colleges – College of Liberal Arts and Sciences, Lumpkin College of Business and Technology, College of Education, and College of Health and Human Services.

4.      Eastern Illinois University is located in Charleston, Illinois. Of its 7,621 students – approximately 1,900 live on-campus, 2,600 students live in the Charleston area, and the remaining

students attend classes online or remotely at satellite locations, or are in dual-credit courses at their local high school.

5.     As a public university, Eastern Illinois University is funded, administered and regulated by the State of Illinois and local board of trustees.

6.     Eastern Illinois University receives federal funds from the Department. As a result, the university is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

### Eastern Illinois University's Existing Title IX Sexual Misconduct Policy

7.     Eastern Illinois University has adopted a sexual misconduct policy within its Student Code of Conduct and internal governing policy that prohibits sexual harassment and sexual misconduct. For students, the Code of Conduct establishes the process for which complaints of sexual misconduct and sexual harassment are processed. Sexual misconduct is defined as any physical act of a sexual nature without the consent of the individuals involved. Behaviors include, but are not limited to: a) any form of sexual penetration without consent; b) intentional or knowingly touching of another person, either directly or through the clothing, of sexual organs, buttocks, or breasts for the purpose of sexual gratification or arousal without consent of the other person; c) indecent exposure with sexual intent; and d) use of email, text, phone, or any other form of communication to send sexually explicit materials that are unwelcomed by the recipient. For employees, internal governing policies prohibit sexual harassment (as defined by the State of Illinois) and claims are processed and investigated through the Office of Civil Rights & Diversity. Generally, a vice president over the alleged employee makes the determination if a policy is violated and issues a sanction. Dependent on the sanction, different processes occur depending on the employee's position – faculty versus others

Decl. of Shawn Peoples, PhD                                   Civil Action No. 20-cv-01468-CJN

EXHIBIT 81

– with ancillary appeals allowed through collective bargaining agreements and State Universities Civil Service System.

8.      Eastern Illinois University's Director of Civil Rights & Diversity serves as its Title IX Coordinator. This is a one-person office with a part-time graduate assistant for clerical assistance. As Title IX Coordinator, the Director is responsible for recommending plans and policies for the Title IX program; providing leadership, coordination, and administration of Title IX trainings and programs; and investigating Title IX claims against employees. Additionally, the university has a Director of Student Accountability & Support who holds the role of Deputy Title IX Coordinator and reports to the Vice President for Student Affairs. Within the Office of Student Accountability & Support is an additional individual who investigates Title IX complaints.

9.      Over the past three academic years, Eastern Illinois University has had nine Title IX matters go through its hearing process. The remaining Title IX complaints were either not adjudicated at the complainant's request or settled informally to the satisfaction of the complainant. Specifically, over the last academic year fourteen matters were settled informally: two alleged activities of individuals not related to EIU; five complainants requested no action be taken; four had claimants who were not responsive to a request to discuss and three complaints were resolved by informal processes to the satisfaction of the claimants.

10.      When the Student Code of Conduct was last revised in 2016 the process took well over four months, with many staff members involved researching guidance from the Department of Education as well as industry resources such as National Association of College and University Attorneys and NASPA, Student Affairs Administrators in Higher Education.

11.      Illinois law defines sexual harassment in employment as any unwelcome sexual advances, requests for sexual favors, or any conduct of a sexual nature when: 1) submission to such

Decl. of Shawn Peoples, PhD                                   Civil Action No. 20-cv-01468-CJN

EXHIBIT 81

conduct is either explicitly or implicitly made a term or condition of employment, and submission to or rejection of the conduct is used as a basis for making decisions about employment or 2) such conduct interferes with job performance or creates an intimidating, hostile, or offensive working environment (820 ILCS 61/3-5). As to education, Illinois law defines sexual harassment as any unwelcome sexual advances or requests for sexual favors made to a student by an executive, administrative staff or faculty member, or any conduct of a sexual nature that substantially interferes with the student's educational performance or creates an intimidating, hostile, or offensive educational environment (110 ILCS 155/5).

12.     Currently, Eastern Illinois University addresses sexual misconduct matters within the Charleston, Illinois region, or elsewhere when the nature of the alleged misconduct, as determined by the Vice President for Student Affairs or its designee, adversely affects the university (including its reputation with its constituents and the local community), or the pursuit of its mission, or which otherwise indicates that a student may pose a danger to the academic community.

13.     Student conduct complaints alleging sexual misconduct by a student can be initiated by the complainant themselves and others (such as other students, employees, university police, family and friends) either because of first-hand knowledge or second-hand information. The Director of Student Accountability & Support (also the Deputy Title IX Coordinator) determines if there is reasonable cause to believe that a sexual misconduct violation occurred and, if so, how such allegations are to be resolved in accordance with the provisions of the Student Conduct Code. Students charged with a sexual misconduct violation are required to meet with the designated investigator to facilitate a resolution of the matter. If an informal resolution is not reached, a formal hearing is scheduled with a panel of employees trained to hear the Title IX claim. Notice of such hearing is provided to the students at least three days before the hearing. Within the notice, the accused is

Decl. of Shawn Peoples, PhD                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 81

informed of the alleged misconduct with sufficient details in support, their rights, the complainant's name, and their right to have an advisor (allowed to provide support only). Similarly, the complainant receives notice of their right to have an advisor for support. During the recorded hearing, evidence is presented by the investigator and both the claimant and the respondent are allowed to submit questions to the hearing panel for consideration. Following the close of evidence, the hearing panel reaches a recommendation based on the preponderance of the evidence standard. The Director of Student Accountability & Support issues the determination if a violation occurred, and sanction. Each party has a right to appeal the decision to the Vice President for Student Affairs. Sanctions may include suspension, expulsion, no contact orders, etc. The university takes extensive steps to keep the matter confidential and protect both parties FERPA rights.

14.     Since the COVID-19 pandemic reached the State of Illinois, Eastern Illinois University has had to move its education to on-line delivery, evacuate the majority of its housing, send its employees home to work remotely, create new policies and procedures and expend millions of unfunded dollars. The university is now diligently preparing to return employees and students to campus to an environment within the new laws and guidelines of federal and state agencies – limited classroom sizes, workplace reconfiguring, accommodating those at a higher risk of being affected by the virus, expending additional, unfunded resources - in efforts to provide a safe educational environment. The university simply does not have the additional resources to focus on this new Rule.

**Harm to Eastern Illinois University – Reconciling State Law Requirements**

15.     The new Rule creates an undue burden on Eastern Illinois University to reconcile state and federal law requirements.

16.     In Illinois, the Preventing Sexual Violence in Higher Education Act ("PSVHEA") establishes requirements for all Illinois colleges and universities to address, investigate, and resolve

Decl. of Shawn Peoples, PhD                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 81

complaints related to campus sexual violence, domestic violence, dating violence, and stalking. 110 ILCS 155/1 *et seq.*

17.    Illinois law mandates that all universities "shall adopt a comprehensive policy concerning sexual violence, domestic violence, dating violence, and stalking consistent with governing federal and State law." 110 ILCS 155/10. The policy must permit students to report an alleged violation of the comprehensive policy regardless of where the incident occurred. *Id.*

18.    While the new Rule does not prohibit addressing conduct that may have occurred off campus, the new Rule mandates the dismissal of such complaints for the purposes of sexual harassment under Title IX.  As a result, Eastern Illinois University will be required to maintain more than one complaint process depending on the location of the alleged incident.

19.    PSVHEA requires schools to implement detailed complaint resolution procedures. Eastern Illinois University will have to devote time and resources to attempting to reconcile the strictures of the Rule and State law requirements, assuming the procedures can even be reconciled.

**The New Rule Conflicts with Eastern Illinois University's Collective Bargaining Agreements with Faculty and Staff and State Universities Civil Service System**

20.    Eastern Illinois University's faculty and staff are represented by ten unions, with thirteen collective bargaining agreements. Additionally, many of the staff are classified as civil servants for which the State Universities Civil Service System governs disciplinary action.

21.    Specifically:

    a.   University Professionals of Illinois (UPI) represents EIU's faculty. Under UPI's collective bargaining agreements for tenure-track faculty and non-tenure track faculty (including academic support professionals), each faculty member has a right to have a faculty panel review any sanction other than written reprimand or more than two days' of pay. For any sanction other than termination, the hearing is closed and

decisions are based on documentation provided to the panel (no testimony is provided). In seeking termination, the faculty member has the right to a hearing, confrontation of all witnesses with the panel making a recommendation to the President. The burden of proof is *clear and convincing*. Appeals are sent to the board of trustees for final action;

b. The American Federation of State County and Municipal Employees (AFSCME) represents the majority of EIU's clerical and service employees. Each of the three collective bargaining agreements requires the tenets of progressive discipline. Termination decisions trigger an employee's right to seek a formal hearing and review by the State Universities Civil Service System's Merit Board (a different state entity) in a quasi-judicial process with the burden of proof being *preponderance of evidence*.

22.     The new Rule's requirement that a uniform process occur between students and employees will require EIU to re-negotiate its collective bargaining. The last negotiations with UPI utilized the Federal Mediation & Conciliation Services and lasted a year.

**Eastern Illinois University's Additional Harm in Revising Existing Sexual Misconduct Policies**

23.     With this new Rule, Eastern Illinois University is required to review/revise its sexual misconduct policies, student code of conduct, internal governing policies, and seek additional regulatory relief at the state level.

24.     The new rule requires a significant burden on staff and faculty in that in a shared governance model, the university would desire to receive comments from its staff and faculty senates, not generally in session during the summer months.

Decl. of Shawn Peoples, PhD                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 81

25.     Setting aside re-negotiating collective bargaining agreements and obtaining regulatory relief, departments such as academic affairs, student affairs, general counsel, human resources, civil rights and diversity, employee and labor relations, governmental affairs and the office of student accountability and support will all need to be consulted in the initial revision. The university anticipates that this process alone will take a couple of months.

26.     The new Rule requires a significant burden on staff and faculty in that the shared governance model incorporates comments from its staff and faculty senates, not in session during the summer months.

27.     Once drafted, policy recommendations are then sent to the university's president for final approval. Prior to approval the President always seeks comments from his senior leaders. We would anticipate that this process would take a few weeks to obtain final approval.

28.     As indicated, the State Universities Civil Service System will have to approve and modify its regulations to meet the new Rule, requiring a notice, comment and review process as required by Illinois Administrative Code.

29.     During this COVID-19 pandemic, the university has had to spend millions of unfunded dollars and anticipates spending much more in its continuing efforts to respond to the effects of the pandemic on the delivery of education and student life activities for this Fall as well as sustaining loss of revenue due to cancellation of events.

30.     As Illinois law requires the university to respond to all sexual harassment claims – not as limited by the new Rule - the university is unclear how it will now respond to sexual harassment claims that do not fall within the Rule's definition. This will need to be addressed in the comprehensive review of across-the-board student code of conduct development.

Decl. of Shawn Peoples, PhD                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 81

31.     Once we can establish a new policy and procedures, websites and catalogs will need to be updated and training material will need to be developed – likely taking several months.

32.     The university anticipates that it will have to hire additional staff or consultants to comply with the elimination of the single investigator model, create and train a pool of available advisors as well as train stakeholders within the university – students, faculty and staff. At this time, the university does not have a budget for this new requirement and cannot estimate the amount that would be required at this time.

33.     Annually, all employees receive sexual harassment, sexual violence prevention and consent training. When a student first registers, s/he receives training on sexual harassment, sexual violence prevention and consent requirements; each subsequent registration s/he acknowledges receipt and reading of the university's Title IX policy and procedures.

34.     The new Rule requires the university to train all decision-makers and advisors as to cross-examination and evidentiary decisions on the records. At a minimum, this requires the university to revise and create new trainings as well as train and prepare its Title IX Coordinator, Title IX Deputy Coordinator as well as the staff in the Student Accountability & Support Office and the pool of new advisors which it will need to create. At this point in time, the university anticipates that this training process would take two months to complete.

35.     The new Rule requires the university to reeducate the entire campus community about the new requirements as well as modifying student orientation materials and updating websites. The university anticipates that this process will take a couple of months.

36.     The university is extremely concerned about its ability to comply with the August 14, 2020 effective date, especially in re-negotiating collective bargaining agreements, seeking other regulatory relief as well as the rollout of training and student communications in light of the current

Decl. of Shawn Peoples, PhD                                    Civil Action No. 20-cv-01468-CJN

EXHIBIT 81

COVID-19 pandemic demands as well as preparing for the Fall semester – now only two months away.

37.     As the notice of proposed rule making occurred almost two years ago with over 100,000 comments from all communities, the university delayed plans to implement until the final Rule was released.

38.     The August 14, 2020, effective date places extreme pressure on the university to fulfill its obligations to provide all students equal access to education; train all students/faculty/staff on their obligations under Title IX; and ensure that all students/faculty/staff are aware of their rights under Title IX.

**Harm to Eastern Illinois University in Responding to Complaints Under the New Rule**

39.     With the short amount of time to prepare for the Rule's implementation and the Rule's requirement that it provide advisors to conduct cross-examination of the complainant, respondent and witnesses and that hearing officers issue immediate rulings on relevancy of questions asked, Eastern Illinois University must consider engaging trained consultants to provide the roles of advisors and another set as decision makers.

40.     At this time, the university is reviewing its ability to retain outside professionals to serve as advisors and hearing officers and recognizes the possibility of an ineffective assistance of counsel claim.

41.     Eastern Illinois University believes the cross-examination by advisors will harm students in that attorneys will intimidate witnesses, fundamentally altering the educational process so much that it would no longer serve its purpose and would instead effectively become an alternative and inferior courtroom for criminal conduct. Requiring an advisor to execute cross-examination of witnesses will exacerbate disparities in the process for those parties who can afford an attorney

advisor, compared to those who cannot, resulting in inequity for complainants and respondents alike. Further, the Rule's exclusion of statements from any party or witness who does not subject themselves to cross-examination at a live hearing because of reasons such as - they don't want to be involved or they don't want to upset their friends by picking a side - upsets the balance of fairness. To withhold information gathered in an investigation from decision-makers runs counter to the university's duty to conduct a thorough investigation, considering all available information.

42.     The new Rule not only costs the university, it also costs students who are capable of hiring a professional advisor for their personal interests.

43.     Eastern Illinois University is also concerned that in providing the investigation report to the parties and their advisors prior to the hearing it will open the door to the matter being pre-judged through social media bias sound-bites for which the university will not be able to comment due to students' FERPA rights. In these instances, the community will likely have a pre-judgment bias for which the Rule specifically prohibits. The university believes that by providing the investigative report to the complainant and the respondent it has the possibility of harming one or the other or even both and opens the doors for others who were not part of the process to retaliate.

### The New Rule's Chilling Effect on Eliminating Sexual Harassment

44.     Whether Eastern Illinois University contracts its definition of a *complaint* and *sexual misconduct* to that required by the Rule or carves out another process is yet to be determined. The university is committed to providing a safe environment but the new requirements will have a chilling effect on victims of sexual misconduct. This Rule makes it more difficult for the university to fulfill its obligations under Title IX to provide all students equal access to education; provide a safe campus environment for all students; prevent and remedy sexual harassment; and provide a fair and equitable process for all students.

Decl. of Shawn Peoples, PhD                              Civil Action No. 20-cv-01468-CJN

EXHIBIT 81

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this _15_ day of _6_, 20_20_

Shawn Peoples, PhD

Director of Civil Rights & Diversity & Title IX Coordinator

Decl. of Shawn Peoples, PhD                         Civil Action No. 20-cv-01468-CJN

EXHIBIT 81

EXHIBIT 81

EXHIBIT 82

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | **Civil Action No. 20-cv-01468-CJN** |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

**DECLARATION OF CLYDE W. PICKETT**

I, Clyde W. Pickett, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.       I am the Chief Diversity Officer for the Minnesota State Colleges and Universities ("Minnesota State") located in St. Paul, Minnesota. My educational background includes a Bachelor of Science degree in Agricultural Economics from the University of Kentucky, a Master of Arts degree in Higher Education Leadership from Morehead State University in Kentucky and a Doctorate from the University of Pittsburgh. I have been employed as the Chief Diversity Officer since 2017.

Prior to that I served as the Special Assistant to the President for Diversity and Inclusion at the Community College of Allegheny County.

2.       I submit this Declaration in support of the State of Minnesota's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Final Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge and through Minnesota State personnel who have assisted me in gathering this information from our institution. I have also familiarized myself with the Rule in order to understand its immediate impact on Minnesota State.

3.       Minnesota State is the fourth-largest system of two-year colleges and four-year universities in the United States. Minnesota State is comprised of 30 two-year and 7 four-year state colleges and universities with 54 campuses located in 47 Minnesota communities. Minnesota State serves approximately 375,000 credit and career students each year. The diversity of our student body is one of our greatest assets. Of our credit students system-wide 27% are students of color, 56% are women, 4% are disabled students and 30% are PELL eligible. In addition, 45.8% are the first in their families attending higher education. We serve more students of color and American Indian students and more low-income students than all of the other higher education providers in Minnesota, combined. We are by far the state's largest provider of customized training and continuing education, serving employees and students trained at thousands of Minnesota's businesses and employers. Our campuses are critical to the economic success of Minnesota's regional and local economics. More than 87 percent of graduates get jobs related to their field of study.

4.      Minnesota State campuses are highly diverse in scope and type, ranging from urban to rural locations, from the very small (less than 500 students) to the very large (more than 15,000 students), from campuses that have traditional residential life programs to campuses that are completely commuter, and from campuses with student populations that consist largely of the traditional 18-22 age cohort to campuses that have a significantly larger older and non-traditional student population.

5.      Minnesota State is an independent state entity that is governed by a 15-member Board of Trustees.  The law creating the system was passed by the Minnesota Legislature in 1991 and went into effect July 1, 1995. The law merged the state's community colleges, technical colleges and state universities into one system.  For more information about Minnesota State Colleges and Universities, please view its website at www.minnstate.edu.  Minnesota State's operating statute is Minnesota Law Chapter 136F.

6.      Minnesota State's colleges and universities receive federal funds from the Department. As a result, the colleges and universities are subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

7.      Each of our colleges and universities has clear policies on sexual violence and harassment that follow the direction of the Minnesota State Colleges and Universities Board of Trustees Policy 1B.3 (Sexual Violence) and Board Policy 1B.1 (Equal Opportunity and Nondiscrimination in Employment and Education) and accompanying procedures.  These policies and procedures establish options for reporting incidents of sexual violence and harassment, call for supportive measures to affected parties, create investigative and disciplinary procedures, and require prevention training and other related services.

Page 3 of 13

Decl. of Clyde W. Pickett                                                    Case No. 20-cv-01468-CJN

EXHIBIT 82

8.     Because of the diversity of our 37 colleges and universities in scope, type, size, and location, the structure of their Title IX offices varies.  Some larger campuses have a full-time Title IX Coordinator and small staff, other smaller campuses may share a Title IX Coordinator with other campuses in a consortium model, while other campuses may have a Title IX Coordinator with many other non-Title IX responsibilities.  No matter the model, these offices have responsibility for processing complaints under our sexual harassment and sexual violence policies.

9.     Pursuant to Minnesota Statutes section 135A, subdivision 6, all postsecondary institutions within the State of Minnesota (not just Minnesota State Colleges and Universities institutions) must annually report statistics on sexual assault to the Minnesota Office of Higher Education, which compiles and reports the data.  A link to the 2019 report is available at https://www.ohe.state.mn.us/sPages/SADR.cfm.  In the last calendar year for which data were available, the Office of Higher Education indicates that there were 491 reports of incidents of sexual assault at postsecondary institutions within the State of Minnesota.  The total number of complaints alleging sex harassment against Minnesota State's faculty, in violation of Board Policy 1B.1, for the last five years is 117.  All of these complaints were investigated. Decision-makers upheld 42 of these complaints, resulting in 18 instances of discipline.  In addition, 13 individuals are no longer employed by Minnesota State.

10.     Board Policy 1B.1 (Equal Opportunity and Nondiscrimination in Employment and Education) was adopted in 1994 and last revised in 2015.  Board Policy 1B.3 (Sexual Violence) was adopted in 2004 and last revised in 2018.

11.     The Minnesota State definition of sexual harassment tracks the standards established by Title VII and the Minnesota Human Rights Act case authority.

Decl. of Clyde W. Pickett                                             Case No. 20-cv-01468-CJN
EXHIBIT 82

12.     Board Policies 1B.1 and 1B.3 apply to all individuals affiliated with Minnesota State Colleges and Universities, including but not limited to, its students, employees, applicants, volunteers, agents, and Board of Trustees.   In addition, the policy applies to persons who are on campus for commercial reasons.   Our campuses may exercise off-campus jurisdiction including when hazing is involved, when the policy violation occurs while participating in a college or university sanctioned or sponsored activity, when the victim of the policy violation is a member of the campus community, when the violation constitutes a felony under state or federal law, or when the violation adversely affects the educational, research, or service functions of the college or university.   These factors also may apply to policy violations occurring outside the United States, such as in overseas study programs or faculty-led trips to other countries.

13.     Minnesota State has long successfully used an investigator/decision-maker model in which trained investigators thoroughly investigate complaints of sexual violence and harassment and prepare an investigation report.   These reports then go to trained decision-makers, who decide whether or not our policies have been violated and, if so, the appropriate sanction.   Decision-makers typically are high-level college or university administrators.   Minnesota State policies and procedures then allow for an internal campus appeal for both parties.   In addition and importantly, our policies and procedures allow student respondents found in violation of our policy and subject to serious sanction (defined as subject to a suspension of ten days or more) to invoke a post-deprivation hearing with the Minnesota Office of Administrative Hearings before an administrative law judge (ALJ) completely independent from the college or university.   These administrative hearings (sometimes referred to as "contested case hearings" or "Ch. 14" hearings, referring to Chapter 14 of Minnesota Statutes) follow administrative rules that allow both parties discovery, including the ability to subpoena witnesses and evidence subject to approval from the ALJ, advance notice of witnesses and exhibits, the opportunity

Decl. of Clyde W. Pickett                                                    Case No. 20-cv-01468-CJN
EXHIBIT 82

to have representatives of their choice who may be attorneys, cross-examination of witnesses at the hearing subject to the control of the ALJ, and other rules typical of administrative hearings.   For additional information about these hearings, please see the Minnesota Office of Administrative Hearings website at https://mn.gov/oah/. The same process applies to employees, except for the post-deprivation OAH process.   Instead, our collective bargaining agreements provide for a pre-deprivation *Loudermill* hearing and a post-deprivation grievance process.

14.    The national public health emergency caused by COVID-19 has posed many challenges to conducting Title IX investigations. Our colleges and universities moved to alternative educational delivery methods, including remote learning, in mid to late March, dispersing students from campus, and are largely continuing that model over the summer. At the same time, most of our employees have been teleworking.   This has presented significant challenges to completing investigations, requiring, for example, interviews to be postponed or completed through technology.

15.    Minnesota Statutes section 135A.15 (Harassment and Violence Policy) requires our campuses to adopt a clear, understandable written policy on sexual harassment and sexual violence. Minn. Stat. § 135A.15, subd. 1(b). The policy must apply to students and employees and must provide information about their rights and duties. *Id.* The policy must apply to criminal incidents against a student or employee of a postsecondary institution; occurring on property owned or leased by the postsecondary system or institution; or at any activity, program, organization, or event sponsored by the system of institution, or by a fraternity or institution. *Id.*

16.    Among many other requirements under section 135A.15, the policy must ensure that a sexual assault victim has the right to decide when to repeat a description of the incident of sexual assault. Minn. Stat.  135A.15, subd. 2(11).  We are concerned that the final Title IX regulations,

Decl. of Clyde W. Pickett                                                 Case No. 20-cv-01468-CJN
EXHIBIT 82

particularly the federally-mandated cross-examination standards, may conflict with Minnesota Statutes section 135A.15, subdivision 2(11).

17.     The faculty of Minnesota State are represented by three labor organizations. Faculty at our universities are represented by the InterFaculty Organization; faculty instructors at our colleges are represented by Minnesota State College Faculty; and non-instructional faculty at our colleges and universities are represented by Minnesota State University Association of Administrative Service Faculty. In addition, Minnesota State employees are represented by American Federation of State, County and Municipal Employees, and the Minnesota Association of Professional Employees.

18.     Minnesota State's procedures governing the grievance of employee discipline differ from those in the Final Rule. The grievance policies in our collective bargaining agreements follow the usual labor model; to wit, an employee is given notice of the employer's intent to discipline and is accorded a *Loudermill* hearing. If the discipline is imposed, the particular labor organization has the contractual right to grieve the matter up to arbitration, which includes an evidentiary hearing before an arbitrator with the right to cross-examination. The Final Rule's imposition of a pre-deprivation evidentiary hearing adds an unnecessary and costly layer to the discipline process. It will also create a new requirement for discipline of at-will employees.

19.     Because of the Final Rule, Board Policies and Procedures 1B.1, 1B.1.1, 1B.3 and 1B.3.1 will have to be amended. Minnesota State's 1B3.1 sexual assault procedures will have to be extensively altered. This process can take months.

20.     Board policy and procedure amendments require the following steps:

    a.  The chancellor and chief of staff (or designee) develop the draft amendment to an existing board policy or system procedure. In this situation, a team has been

designated to review the Final Rule and prepare needed changes to these policies and procedures.

b. The draft is reviewed by general counsel, cabinet, presidents, and labor relations, before being posted for a system wide 30-day review and comment period. All comments are considered and revisions are made as appropriate.

c. The revised draft is then reviewed by marketing & communications, general counsel, and the chancellor. This process normally takes several months.

d. The proposed amendment is then presented to the Board of Trustees for a first reading and then again for a second reading. This represents a substantial challenge because the Board has fewer meetings over the summer. It may be that the earliest a board policy could be amended would be October or November.

e. In the interval between the first and second readings, interested parties submit comments for the consideration of the chancellor. Because of the strong interest of our student and labor organizations in combatting discrimination, we would normally expect extensive feedback on amendment to our anti-discrimination policies. As a consequence of Minnesota State's strong interest in preventing discrimination, we take such feedback very seriously. Because this is occurring in the summer and because of inhibitions imposed by COVID-19, the comment process may be less effective.

21. Not only does the Rule narrow the definition of "sexual harassment" for purposes of Title IX, it affirmatively requires dismissal of sexual harassment complaints that fall outside of the Rule's definition. Because Minnesota State has legitimate pedagogical and operational reasons for policing certain harassing conduct that occurs off-campus, or overseas, the Rule requires the

Page 8 of 13

development of two separate sets of policies and procedures to regulate Title IX and "non-Title IX" sexual harassment. The process also will require more advice and training being given to Title IX Coordinators, Human Resources and Equity and Diversity Officers. As stated above, Minnesota State is comprised of 37 separate colleges and universities with 54 locations. Training will be necessary for these categories of employees for each campus. Because of the two systems, students and faculty may find the process more confusing and daunting. This confusion could deter students and faculty from filing complaints.

22.     Revisions are not limited to policies and procedures. All handbooks, website notifications, and training materials will need to be revised at both the system office and campus levels.

23.     Each of our campuses must, at a minimum, distribute our policies against sexual harassment and sexual violence to students at the time of registration and to employees at the beginning of employment. In addition, campuses make the policies available on the websites and in student and employment handbooks and catalogs. The policies are also posted on campus bulletin boards. Again, that means individuals at all 37 colleges and universities will be implementing these changes, involving potentially hundreds of hours of work.

24.     Per Minn. Stat. section 135A.15, subd. 8, investigators, decision-makers, campus security officers and anyone else involved in the complaint adjudication process must receive annual training on how to conduct an investigation and hearing process that protected the safety of victims and promotes accountability. In addition, all incoming students and all new employees are required to receive training on sexual violence prevention measures and procedures to responding to incidents of sexual violence. Again, implementation will entail hundreds of hours of person-time.

Decl. of Clyde W. Pickett                                      Case No. 20-cv-01468-CJN
EXHIBIT 82

25.    In response to the new regulations, each of these policies and procedures and accompanying training and postings will have to be revised before August 14, 2020. Thus, each of Minnesota State's 30 two-year colleges and each of its 7 four-year universities must identify and task employees with these duties during the summer months and during a time of a pandemic. Such efforts will likely require hundreds of hours at a significant cost to the respective colleges and universities.

26.    As described above, Minnesota State is concerned about its ability to comply with the August 14, 2020 effective date because of the short timeframe. This is compounded by the absence of faculty and students in the summer and effects of COVID-19.

27.    The August 14, 2020, effective date will make it more difficult for college/university to fulfill its obligations under Title IX to provide all students equal access to education; train all students/faculty/staff on their obligations under Title IX; ensure that all students/faculty/staff are aware of their rights under Title IX.

28.    All Minnesota State colleges and universities follow a disciplinary process as outlined by the policy/procedure afforded to the parties. Minnesota State currently estimates an average of 20 to 30 hours of staff time is dedicated to the investigation and preparation for formal disciplinary hearings in sexual violence cases. If the discipline involves sanctions of suspension for 10 days or longer, the student has a right to a contested case hearing under Minnesota Statutes Chapter 14 before the Minnesota Office of Administrative Hearings. Contested case hearings are held after a disciplinary hearing, and require the colleges and universities to pay attorneys to represent them. It is estimated that a college or university spends on average about $17,000 in legal fees for each contested case hearing. In addition, Minnesota State institutions pay for the cost of the Office of Administrative Hearings' ALJ, estimated at $1,500 per hearing.

Decl. of Clyde W. Pickett                                    Case No. 20-cv-01468-CJN

EXHIBIT 82

29.     All of these additional costs for policy review, additional training and hearings occur at a time in which our budget (both state appropriation and tuition) is under severe stress from the economic impacts of COVID-19.

30.     Regarding advisors, college and university personnel do not wish to be required to conduct cross-examination of another party. They are not trained to conduct such examination nor is that adversarial role consistent with their typical student services or faculty role. As a result, our college and universities may be required to pay for lawyers to act as advisors for the parties at significant cost to the college or university. Minnesota State estimates it will be required to expend approximately $3,000 to $5,000 per advisor per evidentiary hearing proscribed by the Rule. The cross-examination component of the evidentiary hearing creates an opportunity for damaging over-zealousness on the part of advisors, which needs to be managed by the hearing official. In addition, bad conduct of the party advisor could have a deleterious effect on the mental health of the survivor/complainant. In addition, the numerous and detailed evidentiary requirements place the hearing beyond the reasonable capability of a non-lawyer to be the hearing official. Consequently, Minnesota State intends to have the Minnesota Office of Administrative Hearings perform the evidentiary hearings and anticipates incurring a $1,500 charge associated with hiring an ALJ for each hearing.

31.     We fear that this requirement will have the effect of discouraging student and employee complainants from coming forward with legitimate sexual assault and harassment allegations. Unredressed assaults and harassment may result in poor grades, absences and premature termination of studies.

32.     Minnesota State is concerned that the Final Rule's many technical aspects will create the potential for increased litigation and appellate actions, resulting in numerous remands for

Decl. of Clyde W. Pickett                                           Case No. 20-cv-01468-CJN

EXHIBIT 82

additional evidentiary hearings. We also fear this process turns a campus disciplinary, which is intended to be part of Minnesota State's overall educational mission, into more of a judicial proceeding.

33.     Minnesota State has a duty to its students and employees to provide them with an educational and work environment that is free from sexual harassment. To that end, we will continue to use our existing rigorous anti-discrimination policies and procedures for all complaints other than formal complaints meeting the Title IX definitions. Consequently, we will have two sets of policies and procedures, which likely will cause confusion.

34.     One sign of an anti-discrimination policy's strength and efficacy is the willingness of complainants to come forward. Minnesota State has taken many steps aimed at ensuring complainants feel comfortable in this process. Increasing the burden on a putative complainant by increasing the adversarial nature of the process by making the complainant a party, imposing onerous discovery, creating the practical necessity for an advisor, or even increasing the appearance of the burden will deter some complainants. Again, unredressed complaints will harm students' mental health resulting in poor grades, absences and students leaving education.

35.     As described above, the effect of the Final Rule will chill reporting. If reporting is chilled, our students will feel less safe on our campuses, with all the negative consequences on their ability to fully participate in the educational process. In addition, the declining complaint rate may embolden discriminatory conduct.

36.     The effects of an oversubscribed process send a signal that the campus climate is not welcoming to all students, particularly students from underrepresented groups. There is already growing concern of underreporting of assaults within the LGTQIA community. In addition, our system is home to a tribal community college and a university with a significant American Indian

community.  The fragility of these communities with a more proscribed process will likely increase

the number of underreported incidents.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and

correct.

Executed on this __12__ day of _June_ 2020

Clyde W. Pickett

Chief Diversity Officer
Minnesota State Colleges and Universities

Decl. of Clyde W. Pickett                                    Case No. 20-cv-01468-CJN

EXHIBIT 82

# EXHIBIT 83

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. **20-cv-01468-CJN** |

## DECLARATION OF CATHERINE POPE

I, Catherine Pope, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

     1.     I am the Associate Vice Chancellor of Civil Rights and Title IX at the University of Pittsburgh ("Pitt") located in Pittsburgh, Pennsylvania. I have been employed as Associate Vice Chancellor of Civil Rights and Title IX since October 2019. I was initially hired at Pitt as the institution's Title IX Coordinator in September 2015. Prior to joining Pitt, I served as Title IX Coordinator at Allegheny College (2014-2015) and Deputy Title IX Coordinator at Purdue University (2011-2014).

Decl. of Catherine Pope            Civil Action No. 20-cv-01468-CJN
EXHIBIT 83

2.     I have significant background and expertise in Title IX, VAWA, and Campus SaVE Act compliance, as well as in sexual-assault-prevention education. My educational background includes a bachelor's degree in English from the University of Dayton, a Master of Art in Philanthropic Studies from Indiana University, and Master of Science in Interdisciplinary Studies from Iowa State University. I am currently pursuing an EdD at Pitt. I hold certifications from United Educators (Title IX Coordinator Certification), ATIXA (Title IX/Civil Rights Investigations), and Margolis Healy (Clery Act).

3.     I submit this Declaration in support of the Commonwealth of Pennsylvania's litigation against Elisabeth D. DeVos in her official capacity as Secretary of Education, the United States Department of Education ("ED" or the "Department"), and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on Pitt.

### The University of Pittsburgh

4.     The University of Pittsburgh is a state-related research university, founded as the Pittsburgh Academy in 1787. Pitt offers numerous undergraduate, graduate, and professional degrees. The university currently enrolls over 23,000 undergraduate students and over 7,000 graduate and doctoral students. Pitt employs more than 5,300 full- and part-time faculty members and more than 6,200 full- and part-time staff.

5.     Pitt's principle campus is located in Pittsburgh, Pennsylvania. In Pittsburgh, Pitt offers 20 on-campus housing options—consisting primarily of shared dormitory or shared suite options—

and four off-campus, university-owned housing options. Forty-three percent of Pitt's student community lives in on-campus or Pitt-owned off-campus housing, and 57 percent of students live in other off-campus housing. Pitt also has four regional campuses across Western Pennsylvania, in Bradford, Greensburg, Johnstown, and Titusville.

6.      Pitt has been a part of the Commonwealth System of Higher Education since 1966. As a result, Pitt is "state-related": it receives an annual, non-preferred financial appropriation from the Commonwealth and offers discounted tuition to students who are Pennsylvania residents. In 2019, Pitt received nearly $200 million from the Commonwealth in appropriations, construction grants, and sponsored research programs.[1]

7.      In addition, Pitt's Board of Trustees includes a minority of state-appointed representatives.

8.      Pitt "receives significant financial assistance from the federal government," including the Department.[2] As a result, Pitt is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

### Pitt's Existing Title IX Policy and Title IX Office

9.      Pitt has adopted a sexual misconduct policy (the "Policy").[3]

10.     Pitt's sexual misconduct policy applies to "all members of the University community including all students, post-doctoral associates and post-doctoral scholars, research associates, faculty, faculty administrators, staff, staff administrators, Board of Trustee members and other

---

[1] Univ. of Pittsburgh, *Financial Report Fiscal Year 2019*, at 5, http://www.cfo.pitt.edu/documents/FY19AnnualReport.pdf.

[2] *Id.* at 31.

[3] Univ. of Pittsburgh, *Sexual Misconduct Policy 06-05-01* (revised June 8, 2018), https://www.cfo.pitt.edu/policies/documents/policy06-05-01web.pdf [hereinafter "Sexual Misconduct Policy"].

Decl. of Catherine Pope                                              Civil Action No. 20-cv-01468-CJN
EXHIBIT 83

University officials, whether full- or part-time, and guest lecturers, volunteers, advisory board members, and third parties such as contractors, and visitors."[4]

11.      Pitt's Policy does not distinguish between conduct that takes place within its education program and activities or outside of its education program or activities. Instead, it "governs all University-sponsored activities and interactions involving at least one University community member (personal and/or virtual), on campus or off campus, and non-University-sponsored events that occur off University property that do or may impact the work or educational environment at the University."[5]

12.      Sexual harassment is a form of prohibited sexual misconduct. Pitt defines "sexual harassment" as: "any unwelcome verbal or non-verbal sexual advances, requests for sexual favors, other verbal, virtual or physical conduct of a sexual nature and/or conduct directed at an individual(s) because of gender or gender stereotypes or identity when:

   a.   "Submission to such conduct is made either explicitly or implicitly a term or condition of a individual's employment or student status or participation in a University program or activity; or

   b.   "Submission to or rejection of such conduct is used as the basis for decisions affecting that individual with regard to employment (raises, job, work assignments, discipline, etc.) or to student status (grades, references, assignments, etc.); or

   c.   "Such conduct is severe or pervasive and objectively and subjectively has the effect of: i. Unreasonably interfering with an individual's work or equal access to education; ii. Creating an intimidating, hostile or offensive work or academic environment.

_____

[4] *Id.* at 1.

[5] *Id.*

Decl. of Catherine Pope                                          Civil Action No. 20-cv-01468-CJN

EXHIBIT 83

d.   "Such conduct, if repeated, is reasonably likely to meet the standard set forth above."[6]

13.     This sexual misconduct policy was updated most recently in 2015 and that policy process took 18 months. Accompanying procedures have been consistently updated to align with Department guidance.

14.     The sexual misconduct policy is incorporated by reference into Pitt's student code of conduct,[7] the faculty handbook,[8] and the staff handbook.[9]

15.     Pitt's student code of conduct applies to all Pitt students. The code of conduct establishes the processes and procedures to be used if a student is alleged to have violated the code of conduct or the sexual misconduct policy. The code of conduct does not provide for live hearings for sexual misconduct cases.[10]

16.     Pitt's faculty and staff handbooks are typically revised in January for release in July, ahead of the new academic year. The faculty and staff handbooks currently do not provide for live hearings.

17.     Currently, reports of sexual harassment can be made to the Title IX Office or to any staff or faculty member deemed a responsible employee. The responsible employee is obligated under school policy to inform the Title IX Office of the reported sexual harassment.

---

[6] *Id.* at 2.

[7] Univ. of Pittsburgh, *Student Code of Conduct* (effective Oct. 25, 2019), http://www.studentaffairs.pitt.edu/wp-content/uploads/2019/10/Revisions_for_2019_October-16-2019.pdf [hereinafter "student code of conduct"].

[8] Univ. of Pittsburgh, *Faculty Handbook* (effective July 1, 2019), https://www.provost.pitt.edu/faculty-handbook [hereinafter "faculty handbook"].

[9] Univ. of Pittsburgh, *Staff Handbook* (effective July 1, 2019), https://www.hr.pitt.edu/handbook [hereinafter "staff handbook"].

[10] Student code of conduct, *supra* note 7, at chs. 5, 6.

Decl. of Catherine Pope                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 83

18.     Pitt's Title IX Office consists of me, two full time investigators, two specialists, one outreach staff member, and three liaisons who work at our four regional campuses. Together, our office conducts trainings; helps students, faculty and staff receive interim measures; reviews complaints; facilitates informal resolutions; and conducts investigations.

19.     When reports of sexual harassment reach my office, complainants are given their options for interim measures and accommodations. Complainants are informed about informal options for resolution, which can include interim measures and educational meetings for respondents, or the formal process which involves the investigative process and includes determining if there has been a violation of University policy.

20.     Several options are available to report sexual misconduct or violence. First, any member of the University of Pittsburgh community can file an anonymous report on the University of Pittsburgh Police Department Web site (www.police.pitt.edu). Second, any member of the University of Pittsburgh community may file a complaint through the University's Office of Student Conduct if the respondent is a University of Pittsburgh student. Third, anyone who has experienced sexual harassment can file a formal complaint with the University's Title IX Office for investigation. Individuals on the regional campuses may also file a formal complaint with their local Title IX Liaison. Finally, any member of the University community can file anonymous complaints on the online bias reporting system.[11]

21.     Pitt currently uses the single investigator model to investigate and resolve all complaints of sexual harassment, as well as all other complaints of discrimination.

---

[11] Any member of the Pitt Community can make a report of sexual harassment on behalf of themselves or another person. Per policy all Pitt employees are required to report incidents of sexual misconduct of which they become aware. This information is used by the Office of Diversity and Inclusion to provide supportive measures.

Decl. of Catherine Pope                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 83

22.     When the Title IX Office receives a formal complaint of student-on-student sexual misconduct, a member of my team in the Title IX Office conducts the investigation. The investigation process includes (but is not limited to) interviewing the parties; reviewing evidence offered by the parties; interviewing witnesses offered by the parties; and allowing the parties to review relevant evidence and witness statements, often multiple times, in order to raise additional issues. To avoid breaches of confidentiality, the Title IX Office keeps possession all evidence collected during the investigation and allows the parties to access and review (but not photocopy or photograph) relevant evidence at any time in person. The function of the investigation is to determine whether the Policy has been violated and/or to recommend an appropriate sanction. Upon completing the investigation, the Investigator will create an investigative report summarizing the process, including findings indicating whether the Policy has been violated, the type of sexual misconduct involved as defined in the Policy, the facts and circumstances supporting the findings, and the recommended sanctions (if applicable). If the outcome of the investigation determines that the Policy was violated by a preponderance of the evidence, the investigative report and recommended sanctions are submitted to the appropriate administrator (department chair, school dean, director, supervisor, responsibility center head, or designee).  The appropriate administrator is not bound by the recommended sanctions; rather, he or she will review the submitted materials and make a final decision as to the appropriate sanction(s). Sanctions are based on the totality of the circumstances, including but not limited to, the nature and severity of the offense and/or on prior violations of University policy.

23.     Process for faculty and staff follows a similar process with differences built into the decision-making process. These differences include the responsible party involved in decisions making and the steps of the appeal processes.

Decl. of Catherine Pope                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 83

24.     During the last three years (academic years 2016-2019), my office received approximately 640 reports of possible violations of our sexual misconduct policy. Eighty-nine of these reports went through our formal complaint process. The remainder of these reports were resolved with our informal resolution process or referred to another internal department.  All reports are documented in our case management system.

25.     Educating the Pitt community about Title IX and our sexual misconduct policy is a significant part of my work. Under normal circumstances, we conduct approximately 55 trainings during a three-and-a-half week period every August, training approximately 7,000 individuals. These trainings range from large meetings with the entire undergraduate freshman class to smaller group sessions with students, faculty, teaching assistants, and international students. These trainings all take place in person to allow participants to ask questions.  Additionally, we provide online training for members of the Pitt community on requested basis throughout the year.

26.     The materials used for these trainings are prepared based on Pitt's current sexual misconduct policy, student code of conduct, as well as nationally recommended best practice models. Preparing and deploying these materials takes approximately 15 hours of work per week over the course of three months, typically in the summer term.

27.     The ongoing public health emergency caused by the novel coronavirus (COVID-19) pandemic has made our work more difficult.

28.     For example, we are now using online video chat software to hold meetings with faculty, staff, and students, and to conduct interviews of parties and witnesses. This is challenging as it removes the level of personal interaction and creates concerns about privacy and efficacy.  As well, many students are not responding to requests for meetings due to ongoing personal stressors of the pandemic.

Decl. of Catherine Pope                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 83

29.     Out of necessity, we are also using online video chat software to share confidential documents, which has raised additional challenges regarding security and confidentiality.

**Revising Pitt's Policies to Comply with the Rule will Impose Numerous Burdens**

30.     Complying with the Rule by August 14 2020—in the middle of a global pandemic—will require Pitt faculty and staff to spend an inordinate amount of time and effort to review, revise, and adopt new policies and procedures; revise training materials; and undergo training.

31.     Pitt is committed to providing a safe and welcoming experience for every single student, employee, and faculty member. Pitt is also committed to providing due process to any member of our community alleged to have committed sexual misconduct. Determining what additional policies and procedures we should adopt in light of the Rule's new legal requirements will require a careful and thoughtful approach to ensure we remain fully compliant while avoiding inadvertently discouraging anyone from reporting sexual harassment or confusing students, faculty, and employees about their rights under Title IX.

32.     The abbreviated timeline, coupled with the realities of COVID-19, significantly augments the challenge of carefully and thoughtfully adopting additional procedures and requirements in a way that ensures buy-in from our community and that best protects the rights of all students, faculty, and employees.

33.     To comply with the Rule, we will need to review, revise, and update existing policies and procedures as well as multiple documents and websites. These include the sexual misconduct policy, the student code of conduct, the faculty handbook, and the staff handbook. Additional changes will have to be addressed through relevant collective bargaining units.

34. As of now, we are working to create a new sexual misconduct policy that is compliant with the Rule. This includes time resources for the working group dedicated to this effort and costs for training and materials.

35. We are also planning to revise our current sexual misconduct and nondiscrimination policies to address those incidents of "non-Title IX sexual harassment," i.e., harassment that the school must dismiss under § 106.45(b)(3)(i) because the harassment falls outside of the Rule's definitions, but that the school can address under another provision of code of conduct, consistent with the Rule. While we are considering all options in this regard, one of the leading options is to retain our single investigator process for non-Title IX sexual harassment.

36. Our current single investigator process already incorporates due process protections, including many of the procedures codified by the Rule for Title IX investigation. But there are some divergences, including the absence of a live hearing. Instead, each party has the opportunity to review all of the relevant evidence collected during the investigation and to submit relevant questions of the other party or witnesses.

37. The Rule has caused significant uncertainty about the practical implications of enforcing a sexual misconduct policy consistent with the Rule, while also aiming to capture non-Title IX sexual harassment under a separate, but related policy.  The Rule's definitions of "sexual harassment" and "educational program or activity" create confusion for members of the community using the policy, and make unclear what conduct that constitutes sexual harassment under the Rule, and conduct that falls outside of the Rule.

38. Based on the Department's proposed regulation issued in November 2018, we began making initial plans for how Pitt would revise its code of conduct and other policies. But because the

Decl. of Catherine Pope                                     Civil Action No. 20-cv-01468-CJN
EXHIBIT 83

final rule made significant changes to the proposed regulation, we now have to rethink entirely how to incorporate the new requirements to achieve full compliance by August 14.

39.     Pitt's policies are developed, reviewed, revised, and adopted through a process of shared governance in which students, faculty, and staff all play a role. This process ensures that all relevant parts of the Pitt community have an opportunity to weigh in on important policies. This process also helps build buy-in from the students, faculty, and staff that will be operating under the policies, which ensures greater compliance once the policy is adopted.

40.     Under normal circumstances, reviewing and revising Pitt's sexual misconduct policy and student code of conduct to comply with the Rule would be a time-intensive process that requires the input of many stakeholders.

41.     University Policies are established and revised through a process containing the following steps[12]:

42.     First, a proposal to initiate a policy development process is submitted to the Chancellor for approval. In my experience, this process can take up to two months.

43.     For each approved proposal, a Charter must be prepared by the policy office and submitted to the Chancellor for approval. This Charter must: define the objective and scope of the policy development or revision; establish a process (generally a committee) to prepare a draft proposed policy or policy revision and its supporting documents; and define the review process and the stakeholders involved. Prior to approval of the Charter, the Chancellor will consult with the University Senate, which exists to create and maintain adequate communication channels among students, staff, faculty, and administrative officers, for discussion and consultation on all matters

---

[12] *See generally* Univ. of Pittsburgh, *Establishing University Policies: Policy 01-01-01* (effective Dec. 13, 2018), https://www.policy.pitt.edu/sites/default/files/Policies/01-Administrative_and_Organization/Policy%2001-01-01%20final.pdf.

Decl. of Catherine Pope                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 83

affecting the welfare of the University. The University Senate consists of two bodies—the Faculty Assembly and the Senate Council. The Charter must first be reviewed and approved by the relevant Senate committees before being reviewed and approved by the Faculty Assembly and then the Senate Council. Based on my prior experience, this process could take up to an additional six months.

44.     Approved Charters will be posted by the Policy Office on its website, https://www.policy.pitt.edu/.  There will be opportunity for public comment as well.

45.     Each approved Charter must define the requirements of the policy development or revision process. That process will be managed and supported by the Policy Office. Changes to the development or revision process must either be consistent with the terms of the Charter, or a new or amended Charter must be approved by the Chancellor.

46.     After moving through the process of approving the Charter, the committee is convened to draft the policy and must be submitted through relevant University Committees and then to the Chancellor for approval. The draft must be accompanied by a summary of the input provided during the review process defined in the Charter. The Chancellor will inform the University Senate of the final decision to approve or not approve the draft policy.

47.     In total, reviewing and revising Pitt's sexual misconduct policy and student code of conduct to comply with the Rule would normally take up to one full calendar year. The previous sexual misconduct policy revision took approximately eighteen months.

48.     The University Senate ordinarily holds it last meeting in May and does not reconvene until August. Due to the COVID-19 crisis, the University Senate will meet in June, but only to discuss if and how Pitt will reopen for in-person classes in the fall.

49.     Because of the August 14, 2020, effective date, we will be unable to conduct the full process laid out above, and will, instead, be forced to adopt an interim policy. As a result, the interim

policy we adopt will lack input and feedback from the very members of our community the policy is designed to protect.

50.     In addition to revising Pitt's sexual misconduct policy and student code of conduct, we will also have to revise all relevant training materials, as well as web and print materials. This process requires review by the Office of University Counsel and the Office of Student Conduct, which would normally take at least three months and thousands of dollars. Additionally, these materials must be consistent with the revised sexual misconduct policy and student code of conduct, meaning those documents need to be updated before the training can be fully revised and implemented.

51.      Pitt will need to reconfigure staffing and will potentially need to hire new staff to meet the standards set in the regulations, which will create significant costs. Additionally, the cost to provide and conduct training, and configure space to accommodate the hearings, will be an additional burden on our budget, especially given the constraints created by COVID-19.

52.     COVID-19 has significantly complicated our ability to revise Pitt's sexual misconduct policy and related policies. Pitt is devoting all its resources to protecting our community in light of COVID-19. We are currently under a hiring freeze and budgets are static. Staff time is additionally burdened by addressing the unanticipated concerns of students and staff during the pandemic.

53.     Pitt has closed its campuses and is currently evaluating multiple issues, including whether to re-open campuses for in-person classes in the fall. As a result, I have been instructed to prepare two Title IX training plans for the fall: one if Pitt re-opens normally and one if Pitt is still under operational restrictions. Preparing these two training options based on our existing policies would already require a significant amount of time and effort on the part of our office.

54.     We recently launched a new prevention office and had planned additional training sessions for the fall. We are now exploring how we can transition these to virtual sessions if necessary.

Decl. of Catherine Pope                                      Civil Action No. 20-cv-01468-CJN
EXHIBIT 83

Doing so based only on our existing policies would ordinarily require a significant effort to introduce new training content and modules to this planning. Incorporating the Rule's new requirements will require a significant amount of additional effort.

55. Revising all of our training materials to incorporate the Rule's new requirements will require the commitment of a full-time staff member for a number of weeks, which could have the impact of reducing efforts in other areas.

56. Because Pitt is still currently in the process of adopting an interim policy consistent with the Rule, I am not yet able to update the training materials for the fall.

57. As a result, the Rule's imminent effective date directly undermines my ability to conduct our August trainings and educate the students, faculty, and staff of Pitt about Title IX and our forthcoming revised sexual misconduct policy.

58. On August 15, 2020, we will have to start over. Using our shared governance process, we will have to again review, revise, and update the interim sexual misconduct policies, the student code of conduct, the faculty handbook, the staff handbook, and all related publications and training materials. Going through the process twice will create serious administrative costs.

59. Requiring us to adopt an interim policy without fully engaging with community input will hinder our shared governance process. Having adopted an interim policy on such a sensitive and significant policy issue as sexual misconduct could result in the appearance of a lack of transparency, which could lead to mistrust. This mistrust will undermine confidence in Pitt's commitment both to providing all students with due process and to preventing and remedying sexual harassment, even though Pitt will have no option but to forego robust community input in light of the effective date.

60. Once we finish the shared governance process, we will then have to clearly communicate the changes to our campus community, which will cause additional confusion.

Decl. of Catherine Pope                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 83

**The Rule Will Make Responding to Complaints of Sexual Misconduct More Cumbersome**

61.     Complying with the Rule's many requirements will present the University with significant challenges with regard to responding to complaints of sexual harassment and will make the process more burdensome for students.

62.     The Rule's requirement that the school dismiss complaints of conduct that does not constitute "sexual harassment" under the Rule's revised definition and, instead run such conduct through another policy or code section, will cause significant confusion and logistical complications and will burden students and my administrative staff.

63.     Currently, when we receive a report of sexual harassment, we have a single member of my team conduct an intake interview, explain the investigative process, and discuss the complainant's options in a single meeting. As we generate a plan to be compliant with the requirements of the Rule we will have to create a number of additional steps for those coming forward. First, we will have to ask if the student wants to proceed with an investigation. If the answer is yes, the complainant may need to speak with an investigator and provide an initial, significant statement so we can determine whether the allegation falls under the Rule's definitions. If the facts are unclear, the investigator may need to seek further consultation to determine which process to use. This has the potential to cause administrative burdens and delay, and it could undermine our ability to provide certainty to relevant parties as to the applicable processes.

64.     Once we have determined which process to use, we will explain to the complainant and respondent what to expect from the investigation and decision-making process. The need to address sexual misconduct that does not otherwise fall under the Rule presents us with many challenges on how to address those complaints.  One of these challenges that we are now facing is potential situations where we can less clearly identify with certainty the process under which a

complaint is handled. A complainant or respondent who was participating in the process may suddenly stop participating if the process switches to a different track.

65. In addition, a student may believe that a complaint should have proceeded under the Title IX process after we determined that it was not Title IX conduct, and vice versa. The student has the right to immediately appeal our decision to use the non-Title IX process, which risks creating further delays in remedying and processing complaints.

66. To fill the decision-maker role, we are considering hiring or contracting with one or more individuals with a legal background who can control a hearing process and enforce rules of decorum, and who will not be intimidated if two attorneys are conducting direct, oral cross-examination of students. The decision-maker would also have to appropriately apply the Rule's evidentiary requirements, including the requirement to issue relevancy determinations on the record. Because we don't know how the Rule will impact reporting or the filing of formal complaints, it is difficult to plan for what this position will look like moving forward.

67. Hiring new staff during a hiring freeze, with static budgets, will impose a substantial administrative burden and the reallocation of already-limited resources.

68. We will also have to develop rules of decorum to ensure a fair and equitable hearing process for both parties. These rules will have to be reviewed by the Office of University Counsel. This could take up to two months to complete.

69. To hold live hearings, we will have to conduct an inventory of our space and technology options.

70. We will also have to identify a cohort of advisors to serve if a party does not have an advisor to conduct cross-examination. We are currently thinking about recruiting volunteers from within our campus community and developing our own vetting system (to eliminate bias or conflict

of interest) and training program, but we are uncertain as to our final determination in this matter. This will create costs in both time and money that were not budgeted within this year.

71.     Having a cohort available at any moment to conduct cross-examination, as the Rule requires us to do, will require on-going training throughout the year to ensure that any volunteer advisor can step into the role at any moment.

72.     We will also have to conduct additional training of our investigators to enforce the new evidentiary requirements of the Rule, with very specific components based on the new regulations.  This will create costs in both time and money that were not budgeted within this year.

73.     We will also have to revise our investigative reports, which will require review by the Office of University Counsel.  This will create costs in both time and money that were not budgeted within this year

74.     The inability to consider any statement from any person unless that person submits to cross-examination will cause significant confusion and hamper our ability to remedy serious sexual misconduct on campus. We do not have subpoena power or any way to force parties or witnesses to attend hearings or submit to cross-examination. We have had problems in the past with parties and witnesses not cooperating with investigations, and this will continue.

75.     For example, the investigative report will contain all relevant evidence collected during the investigation, but we will not know until the hearing if we can consider any of it. This has the potential to harm both complainants and respondents equally.

76.     Under my understanding of what the Rule requires, if a student, faculty member, or staff member sexually assaulted only victims who are not participating or attempting to participate in Pitt's education program or activity, consistent with the rule we would be required to dismiss the formal complaint, and would, instead, have to pursue the conduct under a separate policy.

77.     The live hearing requirement with direct, oral cross examination by party advisors presents concerns related to equity. One party (respondent or complainant) may be able to afford to hire an experienced attorney versed in litigation and skilled in cross-examination, while the other party (respondent or complainant) may not have the resources to hire an individual with similar experience or may not understand why hiring such an individual may be beneficial. Parties are not required to obtain an advisor until the hearing, which means an advisor not assigned by the school but retained by the party may arrive at the hearing unfamiliar with the investigative report and unaware that she will be expected to conduct cross-examination.

78.     The serious possibility of attorneys conducting live, direct, oral cross-examination risks traumatizing participating parties and freezing out students.

79.     Pitt's current policy allows both parties access to the relevant evidence, but prevents any party from copying or taking the evidence with them. The Rule's requirement to provide parties and their advisors with walking copies of all evidence directly related to the allegations carries a serious risk of breach of confidentiality. Because the evidence relates to alleged sexual misconduct, there is a high likelihood that at least some of the evidence is highly sensitive. Parties routinely ask me who else has access to the evidence out of fear that someone will reprint it or post on social media.

80.     We are still trying to determine how we can best protect confidentiality while not inadvertently discouraging students from reporting sexual harassment. For example, although the Rule allows us to create and enforce non-disclosure agreements, those can be alienating and only add to the unnecessarily legalistic process created by the Rule.

**The Rule Will Make Identifying, Remedying, and Eliminating Sexual Harassment More Challenging**

81.     The Rule will present significant challenges with regard to preventing and remedying sexual harassment in Pitt's education programs and activities.

82.     Because we are being forced to manage multiple forms of sexual misconduct under separate processes (one for Title IX sexual harassment and one for non-Title IX sexual harassment) we will face significant challenges in clearly and effectively communicating the differences between the processes without suggesting that one is superior or inferior to the other. It is already difficult to educate campus on the many details to fully understand policies.  Having multiple polices on similar topics will only further complicate these situations.

83.     Our current sexual misconduct policy was adopted four years ago, and it has taken nearly as much time to fully educate the community on the policy such that people are aware of and comfortable with its rights and requirements. Adopting new policies—particularly on an interim basis, as the Rule's effective date will require us to do—will create the illusion of a lack of transparency.

84.     If we are perceived to be non-transparent, members of our campus community will lose trust in the process.

85.     Effectively communicating the new changes is especially challenging during the COVID-19 pandemic. We cannot seat thousands of students or faculty in an auditorium to conduct in-person trainings. We are currently exploring virtual training methods, such as an online training module, but these have the potential of being much less effective. Participants will be unable to ask questions, explore nuance, and pose hypotheticals to ensure that they fully understand the new policies.

86.     Because we will have extremely limited time to train and educate our campus community, our students, faculty, and staff may be less informed of their rights under Title IX and under Pitt's revised policies.

87.     Pitt has worked diligently to build a culture in which any type of sexual misconduct is unacceptable. With the Rule, we will now have to explain that some sexual misconduct, under law, must be treated differently than other sexual misconduct.

88.     As a result of the Rule, it is not unreasonable to expect, consistent with multiple comments on the proposed rule, that reporting of sexual harassment may go down due to confusion about revised policies, mistrust of the new procedures, fear of the other party sharing evidence, or fear of having to submit to direct, oral cross examination.

89.     Right now, our Title IX Office receives reports for all sexual harassment and discrimination cases. Among other benefits, this allows us to identify systemic problems. Based on 2019 AAU Campus Climate Survey data[13] we know that sexual misconduct is underreported nationally.

90.     The Rule will also likely undermine campus safety. Chilled reporting of sexual misconduct means that our office will have fewer resources with which to uncover a pattern of behavior, a particular bad actor, or an unsafe area of campus.

91.     In short, the Rule and its effective date presents extraordinary challenges to meeting the obligations under Title IX to provide all students equal access to education; train all students, faculty, and staff on their obligations under Title IX; and ensure that all students, faculty, and staff are aware of their rights under Title IX.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

---

[13] Am. Associ. Univ., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct* (Jan. 2020), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/Revised%20Aggregate%20report%20%20and%20appendices%201-7_(01-16-2020_FINAL).pdf.

Decl. of Catherine Pope                           Civil Action No. 20-cv-01468-CJN
EXHIBIT 83

Executed on this ___ day of June, 2020

CATHERINE POPE

Associate Vice Chancellor of Civil Rights and

Title IX
University of Pittsburgh

Page 21 of 21

Decl. of Catherine Pope                Civil Action No. 20-cv-01468-CJN

EXHIBIT 83

EXHIBIT 84

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, |

Civil Action No. **20-cv-01468-CJN**

                    Plaintiffs,

          v.

ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,

                    Defendants.

## DECLARATION OF VALERY NL RICHARDSON

I, Valery NL Richardson, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Title IX Coordinator at the University of Washington ("UW" or "University"). I work at the campus located in Seattle, Washington. My educational background includes a bachelor's degree in English from the University of California at Santa Barbara and a master's degree in college and university administration from Michigan State University. I have been employed as the UW's Title IX Coordinator since October 2018. From May 2017 to October

2018, I served as the UW's Deputy Title IX Coordinator and then Interim Title IX Coordinator. Prior to these positions, I was the Associate Dean for Student Affairs at the UW's Bothell, Washington, campus following more than fifteen years working for the University of California system.

2.      I submit this Declaration in support of the State of Washington's litigation against: Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America, regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) (the "Title IX Rule" or "Rule" or "Title IX Regulations"). I have compiled the information in the statements set forth below through a combination of personal knowledge and through the University's personnel who have assisted me in gathering this information from our institution on the basis of their personal knowledge and documents that have been provided to me. I have also familiarized myself with the Rule in order to understand its immediate impact on the University.

### Description of the University of Washington

3.      Founded in 1861, the UW is a public research university with campuses in Seattle, Tacoma, and Bothell, Washington. The UW is the largest university in the northwestern United States and is one of the oldest universities on the west coast. The UW offers more than 600 degree options across more than 300 programs. The 2019 Fall enrollment was nearly 60,000 students, including over 42,500 undergraduates and 16,800 graduate and professional students, and during the 2018-2019 academic year, the UW awarded over 17,800 degrees. Additionally, UW's Continuum College educates more than 50,000 students annually through a combination of in-

Decl. of Valery NL Richardson                          Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

person and online degree and certificate programs and continuing professional education programs, while over three thousand students per year participate in study-abroad programs.

4.     The University's three campuses occupy roughly 440 buildings on 792 acres, with more than 22 million gross square feet of space. UW employees fulfill many different roles and fall into many categories based on their roles and other factors. The University employs approximately 39,000 non-faculty/non-academic personnel staff, which includes graduate student employees. Across its three campuses, the UW employs approximately 14,500 bargained-contract classified staff, 10,700 professional staff, 930 non-contract classified staff, and 380 individuals whose work classification is shared among 4 additional categories. The UW also employs faculty and other academic personnel: as of October 2019, approximately 19,100 faculty, 1,900 academic staff, 1,900 residents and fellows, 880 postdoctoral scholars, 410 senior fellows, and 180 librarians. Additionally, the UW operates several medical centers, and at these locations, it employs another roughly 10,375 bargained-contract classified staff, 1,675 professional staff, and 750 non-contract classified staff.

5.     Each of the UW's three campuses has a unique culture and student body. At the Seattle campus, during the start of the 2020 winter quarter, approximately 9,475 students lived in university housing. At its Bothell and Tacoma campuses, approximately 310 and 285 students, respectively, lived in on-campus housing. Collectively across the three campuses, prior to the University's moving online in response to the public health pandemic, over 10,000 of the UW's nearly 60,000 students enrolled for the 2019 fall quarter lived in University housing. Approximately 3,000 additional students at the Seattle campus live in off-campus fraternity and sorority houses located just north of campus.

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

6.      The UW maintains several conduct codes. The Student Conduct Code, which went into effect on August 18, 2017, and is set forth in the Washington Administrative Code ("WAC") at Chapter 478-121, applies to both on-campus and off-campus student conduct. For example, the Student Conduct Code applies to our students while they are studying abroad or doing field work abroad in connection with their studies, approximately 2,650 of whom are supported by the Office of Global Affairs annually. Faculty are governed by the UW's Faculty Code, enacted as a matter of shared governance by the UW's Faculty Senate and approved by the UW's President. *See, e.g.*, Revised Code of Washington ("RCW") 28B.20.200 ("The faculty of the University of Washington shall consist of the president of the university and the professors and the said faculty shall have charge of the immediate government of the institution under such rules as may be prescribed by the board of regents.").

7.      UW librarians are expected to follow the Librarian Personnel Code, and the conduct of non-faculty employees is governed by a variety of agreements and policies, including: collective bargaining agreements, professionalism policies (such as those that apply to UW Medicine and UW School of Medicine employees), hospitable workplace policies (such as those that apply to facilities workers), UW Human Resources policies, workplace violence policies, and policies specific to departments or schools. Some rules and policies, such as Executive Orders and Administrative Orders (issued by the University's President) or Administrative Policies Statements (issued by other senior executives) apply to the entire University community. Prominent among these are the University's policies prohibiting discrimination, harassment, and retaliation, including: Executive Order No. 31 ("Nondiscrimination and Affirmative Action"), Executive Order No. 51 ("Sexual Violence Elimination Policy"), and Executive Order No. 54 ("Employee-Student Romantic Relationships and Conflict of Interest"). Unlike the Student

Decl. of Valery NL Richardson                                   Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

Conduct Code, these policies do not generally distinguish between on-campus and off-campus conduct and allow the UW to regulate certain off-campus conduct (*see infra*, ¶¶ 20-21).

8.      The UW is an agency of the State of Washington and is governed by a ten-member Board of Regents. Each Regent is appointed by Washington's Governor and confirmed by the Washington State Senate. The UW's fiscal year 2020 budget is $8.25 billion, including $1.09 billion in its General Operating Fund. The General Operating Fund supports the UW's core academic mission and operations. It is the source of funds to hire and pay faculty, enhance the student experience, support service efforts, and run the UW's administrative infrastructure. Tuition revenue makes up approximately 63% of the General Operating Fund, with the remainder coming from state funds, primarily legislative appropriations. Other major functional components of the UW's budget are: the UW Medicine health system, which includes its four hospitals and multiple neighborhood clinics (approximately 48% of the total budget); the UW's research enterprise (approximately 18%); and auxiliary activities (approximately 12%), which include large, self-sustaining business enterprises such as Continuum College, Housing and Food Services, Intercollegiate Athletics, and Parking & Transportation Services.

9.      UW receives federal funds from the United States Department of Education (the "Department"). As a result, UW is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106—including the newly published Rule.

### The UW's Current Title IX Policies

10.      The Office of the Title IX Coordinator at the University consists of two employees, the Title IX Coordinator and the Deputy Title IX Coordinator, and is responsible for providing the entire UW community of over 130,000 people:  leadership to advance the University's Title IX

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

mission, vision, and strategic priorities; information and assistance to individuals who wish to raise complaints or have concerns or questions related to gender equity and/or Title IX; consultation and collaboration with a broad range of University partners, offices, and programs who in turn provide support, resources, and outreach on Title IX matters and initiatives; assisting University entities responsible for responding to and investigating Title IX complaints; facilitation of University-wide Title IX-related education and outreach; monitoring and coordination of compliance with federal, state, and local laws, resolution agreements, and regulatory guidance; and identification and coordination of responses to patterns or systemic issues related to sexual harassment, gender-based discrimination, and other concerns related to sexual misconduct and Title IX.

11.     The (separate) Title IX Investigation Office is responsible for investigating complaints or reports that a University student engaged in conduct that violates any of the sexual misconduct provisions of the Student Conduct Code, which includes sexual assault, sexual harassment, sexual exploitation, indecent exposure, intimate partner violence, and stalking. The Title IX Investigation Office is staffed by the same investigators who comprise the University Complaint Investigation and Resolution Office ("UCIRO"), which investigates alleged violations of the University's Executive Order No. 31 prohibiting discrimination, harassment, and retaliation. As of May 28, 2020, six investigators and their manager conduct the investigations performed by these two offices. Two of the investigators predominantly investigate allegations involving students who have violated the sexual misconduct provisions of the Student Conduct Code.

12.     In addressing sexual violence, sexual harassment, and sex discrimination, the University prioritizes allowing individuals who have experienced harm to make decisions for themselves about whether they want to share what happened to them, seek University resources as

Decl. of Valery NL Richardson                                      Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

supportive measures, and/or make a report to the University for investigation. With protocols and procedures in place to prioritize the choices of those who have been harmed, a small percentage of incidents of which the University becomes aware, whether through SafeCampus—the University's violence prevention and response program—or through confidential victim advocates, result in formal reports, which are defined as a person who has been harmed deciding to tell an investigator/conduct officer about what happened to them and requesting an investigation of another student or employee's conduct.

13.     During the 2019 calendar year, 28 individuals contacted the Title IX Investigation Office to inquire about the reporting process or make a report that a UW student engaged in sexual misconduct. The Title IX Investigation Office met with 22 of these individuals to conduct an intake and determine whether an investigation was appropriate. (Six individuals did not meet with an investigator for intake meetings either because they decided against meeting, did not respond to the investigator, or contacted another University office and asked the University to address an issue through methods other than an investigation.) Following intake appointments, the Title IX Investigation Office initiated 15 investigations: four resulted in hearings that were completed, one resulted in a settlement before the investigation was completed, and one case is still pending but set for a hearing in June 2020.

14.     Two offices, UCIRO and Human Resources ("HR"), respond to the majority of Title IX-related complaints concerning UW employees. During 2019, UCIRO initiated approximately 17 investigations that included allegations of sexual harassment. This number included investigations that were requested by individuals or by UW departments or colleges/schools, or were conducted in response to notifications from agencies like the Equal Employment Opportunity Commission, the Washington Human Rights Commission, or the Office

of Civil Rights. UCIRO does not track the number of intake meetings where the individual raising the concern believes sexual harassment could be implicated, as UCIRO is staffed by trained attorneys who hear about individuals' concerns orally and then assess the expressed concerns for any potential violation of the University's policy prohibiting discrimination, harassment, and/or retaliation. If the behavior described would not constitute a violation of University policy, an investigation is not initiated. Accordingly, the number of intake meetings where individuals shared concerns that they believed might have amounted to instances of sexual harassment was likely higher than 17.

15.     During the 2019 calendar year, UW HR Operations, which consists of two operational units—Campus operations and the Medical Center operations—conducted a total of 15 investigations in which sex-related discrimination or harassment was alleged. Seven investigations were conducted based on the alleged conduct of UW employees on its three (educational) campuses and eight investigations regarding conduct allegations of employees working at its medical centers. Like UCIRO, UW HR does not track consultations that do not result in investigations. Also like UCIRO, UW HR conducts investigations of complaints of discrimination, harassment, and retaliation, although it sometimes investigates behavior that may not rise to the level of a rule violation.

16.     UW policies and procedures do not provide for employee hearings, other than a limited number of faculty adjudications. During 2019, one faculty adjudication involving sexual harassment and other sexual misconduct was filed, and that adjudication is still in process.

17.     The UW's current Student Conduct Code, codified at WAC 478-121, became effective on August 18, 2017. Along with the Student Conduct Code, the University adopted two agency-level policies, referred to as Student Governance and Policies ("SGP"), including SGP

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

Chapter 210, "Student Conduct Policy for Discriminatory and Sexual Harassment, Intimate Partner Violence, Sexual Misconduct, Stalking, and Retaliation." SGP 210 also went into effect on August 18, 2017. Executive Order No. 31, the University's policy prohibiting discrimination, harassment, and retaliation, and Executive Order No. 51, the University's "Sexual Violence Elimination Policy," were both last revised as of June 21, 2016. Executive Order No. 54, titled "Employee-Student Romantic Relationships and Conflicts of Interest," was last revised as of May 12, 2017. The portion of the Faculty Code related to standards of conduct was last revised as of October 17, 2018. A variety of revision dates apply for policies of specific departments, schools, colleges, or other UW subcommunities. For example, UW Medicine's "Policy on Professional Conduct," which incorporates Executive Order No. 31, was last revised October 12, 2017.

18.    The University has a number of policies and provisions regarding sexual misconduct. Sexual harassment is defined in both the Student Conduct Code and Executive Order No. 31. The Student Conduct Code, WAC 478-121-155, defines sexual harassment as:

> [U]nwelcome sexual advances, requests for sexual favors or other verbal, physical, or electronic conduct of a sexual nature when one of the conditions outlined in subsection (1) or (2) of this section is present: (1) Submission to, or rejection of, such conduct is made implicitly or explicitly a term or condition of a person's instruction, academic standing, employment, or participation in any university program, activity, or benefit, or is used as a basis for evaluation in making academic or personnel decisions; or (2) Such conduct creates a hostile environment, which is created when the conduct is sufficiently severe, persistent, or pervasive that it unreasonably interferes with an individual's academic or work performance, ability to participate in or benefit from the university's programs, services, opportunities, or activities, or the receipt of legitimately requested services when viewed through both a subjective and objective standard.

Executive Order No. 31, which applies to students, faculty, and staff, similarly defines sexual harassment as:

> [A] form of harassment characterized by: 1) Unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature by a person who has authority over the recipient when: a) Submission to such conduct is made

either an implicit or explicit condition of the individual's employment, academic status, or ability to use University facilities and services, or b) Submission to or rejection of the conduct is used as the basis for a decision that affects tangible aspects of the individual's employment, academic status, or use of the University facilities; or 2) Unwelcome and unsolicited language or conduct that is of a sexual nature and that is sufficiently severe, persistent, or pervasive that it could reasonably be expected to create an intimidating, hostile, or offensive working or learning environment, or has the purpose or effect of unreasonably interfering with an individual's academic or work performance. This also includes acts of sexual violence, such as sexual assault and sexual exploitation.

19.     In the University's 2016 climate survey, 71.3% of students who stated they were sexually assaulted identified the sexual assault as occurring off campus. Accordingly, the University deems it important and necessary to the health and safety of its students to assert authority over certain conduct that takes place off campus. In the context of allegations involving students, the University has investigated complaints made by University students or by University employees, regardless of the location of the behavior that led to the allegations, where the University "reasonably determines that the conduct adversely affects a university interest or, has continuing adverse effects or may create a hostile environment on university premises or in the context of a university-sponsored program or activity." WAC 478-121-040. When the person making the complaint is not a member of the University community and the alleged misconduct by a University student occurred off campus or not in connection with a University-sponsored program or activity (such as a study-abroad program), the University determines whether it has jurisdiction to investigate the complaint based on the jurisdictional statement in the Student Conduct Code. A number of factors impact the University's assessment of whether the conduct in question adversely affects a University interest, including but not limited to: whether the alleged conduct occurred in conjunction with or in close proximity to a University-sponsored program; whether the alleged misconduct involves an act or threat of violence; whether the alleged misconduct is perpetrated against another member of the University community; and whether the

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

alleged misconduct raises concerns for the health, safety, and welfare of the University community as a whole.

20.     In the context of allegations involving employees, the University has investigated off-campus conduct or conduct not within the scope of employment if there is a nexus to the University. Examples of such a nexus include where the conduct occurs at an off-campus location that is nonetheless a UW work site, such as on a research vessel or at the UW's Rome Center in Italy. Other examples of off-campus conduct that will be investigated include where the alleged conduct is likely to impact the work environment of employees because they will continue to work together, such as where the misconduct occurred during an off-campus event, workshop, or conference attended in an employment capacity.

21.     The University employs different complaint processes based on who is being alleged to have engaged in misconduct, which policy is alleged to have been violated, and to which office a complaint is made. To make a complaint under the University's current Student Conduct Code process, an individual[1] (who is a potential complainant, at this point) who has allegedly experienced harm meets with a Title IX Investigation Office investigator (sometimes also referred to as a conduct officer); the individual shares their report about what happened; and the investigator determines whether a potential violation of the sexual misconduct provisions of the Student Conduct Code has occurred. If so, the investigator prepares allegations, which the complainant reviews and confirms for accuracy. Once the complainant confirms the allegations to be accurate, the investigator sends them to the respondent(s) along with an explanation of the student conduct

---

[1] The majority of the time, this individual is a University student. Occasionally, however, individuals who met one of our students through social media and/or know one of our students outside of the University context contacts the University and requests an investigation. Depending upon the circumstances and any potential risk to University community members, the University may assert jurisdiction and investigate a complaint that is made by a member of the public.

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

process and the section(s) of the Student Conduct Code that might have been violated, as well as information detailing the respondent's rights in the conduct process.

22.     The investigator then meets with the respondent and hears their story, just as the investigator heard the complainant's story at the initial intake meeting. During the respondent's first interview, the respondent has the opportunity to learn what the complainant told the investigator and review any documentary evidence provided to date. During the initial meetings with the complainant and respondent, the investigator asks about potential witnesses, what relevant knowledge those witnesses may have, and for any relevant documentary evidence the party would like the investigator to consider.

23.     The investigator interviews witnesses identified by the parties or by other witnesses. The investigator also continues to collect documentary evidence. After each witness interview, the investigator sends the witness a summary of what that witness told the investigator and asks the witness to review the summary for accuracy and, based on any clarifications and revisions the witness provides, the investigator revises that witness's summary.

24.     Once all third-party witnesses have been interviewed (or had multiple opportunities to be interviewed) and once all potentially relevant and available documents have been gathered by the investigator, the investigator interviews the complainant a second time. Following the initial questioning of the complainant, the investigator shares with the complainant what the respondent shared during their first interview and what each witness shared, thus providing the complainant an opportunity to respond to this information. The investigator also provides the complainant an opportunity to review all documentary evidence and respond to it verbally. Following the second complainant interview, the investigator prepares a summary of what the complainant shared during both interviews, sends the summary to the complainant to review for completeness and accuracy,

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
   EXHIBIT 84

and seeks confirmation of the summary. Any necessary changes are made, and changes are explicitly identified by the investigator if those changes are potentially relevant to credibility assessments. The investigator then follows the same protocol and completes each of these same steps during a second interview with the respondent.

25.     Once all interviews have been completed and summaries prepared, the investigator may write a report. Pursuant to the requirements of Washington's Administrative Procedure Act ("APA"), RCW Chapter 34.05, and *Arishi v. Washington State University*, 196 Wash.App. 878 (2016), the investigator's report is deemed an initial order if the investigator either does not believe a preponderance of evidence supports a conclusion that a provision of the Student Conduct Code has been violated or concludes the Student Conduct Code has been violated and the appropriate sanction is probation, a disciplinary warning, or a loss of privileges. Both the complainant and the respondent have the opportunity to request an administrative review of the investigator's initial order. *See* WAC 478-121-300 through 478-121-345.

26.     If the investigator does not write the foregoing type of report, she or he will write a "Summary of Evidence." The investigator writes a Summary of Evidence if the investigator believes that, based on all evidence collected to date, a reasonable factfinder could conclude both that, (1) based on a preponderance of evidence, a violation of the Student Conduct Code has occurred, and (2) the appropriate sanction for such a violation could involve either the suspension or dismissal of a respondent. When an investigator writes a Summary of Evidence, the investigator requests a full adjudicative proceeding by sending a letter to the University's hearing officer pursuant to WAC 478-121-205.

27.     To make a complaint about the alleged misconduct of a University employee, an individual may elect that either UCIRO (faculty or staff) or HR (staff only, not faculty) investigate.

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

In either case, the complaint process is relatively similar. First, the complainant meets with an investigator to share information about the circumstances and situations comprising the complaint; the investigator then provides notice to the subject[2] about the alleged misconduct and reason for the investigation. The investigator thoroughly interviews the subject and witnesses, each of whom has the opportunity to provide relevant information and evidence; the investigator also asks all individuals interviewed to provide relevant documentation, such as emails, text messages, calendars, and other records. In many cases, the investigator will also review documents maintained in the ordinary course of business, such as departmental personnel files. Following interviews and review of documentary evidence, the investigator assesses and analyzes the evidence and makes a decision about whether University policy was violated. The investigator then shares their findings of the investigation with both the complainant and the subject. Depending on business-need-to-know, the investigator may also share the investigation findings with others in the relevant department or school. If the investigation resulted in a finding that University policy was violated, there may be additional processes the University must take before any appropriate corrective or disciplinary action may be implemented.

28.    As mentioned above (¶ 13), the Title IX Investigation Office initiated 15 investigations during the 2019 calendar year, five of which were referred to full hearings.  Once a Title IX Investigator has initiated a full hearing (in a case involving a student respondent), the University's hearing officer, aided by the University's hearing coordinator, begins the process outlined in WAC 478-121-400 through 478-121-453. The hearing process is initiated when the hearing officer sends a notice of the full hearing to the complainant, respondent, and University.

---

[2] Whereas the individual whose conduct is the topic of the investigation is called the respondent in the student process, that individual is called the subject in employee processes at UW.

Decl. of Valery NL Richardson                              Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

Each of the parties is provided with a complete copy of the record as prepared by the Title IX Investigator, including the Summary of Evidence, and each may review the information on which the investigator relied when deciding to convert the process to a full hearing.

29.     The complainant, respondent, and investigator each have an opportunity to submit a list of witnesses they believe should testify during the hearing. The complainant, respondent, and investigator also may each request the exclusion or addition of documentary evidence to the investigator's file. During a pre-hearing conference, the hearing officer hears the perspectives of the complainant, respondent, and investigator about witnesses, documentary evidence, and other issues known regarding the hearing to date. Within a week of the prehearing conference, the hearing officer issues a pre-hearing order outlining the witnesses allowed to testify during the hearing, the contents of the evidentiary file, and the rationale for any decisions made.

30.     The hearing, usually conducted within two to three weeks of issuance of the prehearing order, occurs in a hearing room where technology and deliberation rooms permit the complainant and respondent to testify remotely from while still seeing and hearing all testimony as it occurs. Each party may make opening remarks before witnesses are heard. Each witness is put under oath, and their testimony is subject to both direct- and cross-examination. The examination begins with the hearing officer's questions about the record and summary of that witness's interview with the investigator. Following the hearing officer's questions, the complainant, respondent, and investigator may submit—in real time and in writing—questions they would like to be asked of each witness. Before asking a proposed question, the hearing officer reviews it for relevance, appropriateness, and completeness. The hearing officer may ask the proposed written question as it was typed, modify the question, ask the proposing party for more information as to why the question is relevant or appropriate, ask the proposing party to clarify the

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

question, and/or decide against asking it. The complainant, respondent, and investigator all may object to any questions asked by the hearing officer or proposed by a party. If the hearing officer decides against asking a question, the hearing officer states the rationale for that decision. Following the questioning of all witnesses, the complainant, respondent, and investigator each may make closing remarks. Additionally, throughout the hearing process (during both the prehearing conference and the hearing itself), the complainant and respondent may have both a University-provided resource (either a student advocate or respondent resource) and an advisor of their choice with them. An advisor may represent a party at the hearing, and a party can, but is not required to, choose an attorney to serve as their advisor.

31.     Hearings involving allegations of sexual harassment or other sexual misconduct may occur pursuant to Faculty Code Section 25-71 following a UCIRO investigation of faculty. Following a UCIRO investigation, the dean of the investigated faculty member's college or school may present a written request to the University's Provost stating that the dean considers there to be a basis to adjudicate charges of wrongdoing. The adjudication process then follows procedures described in Chapter 28 of the Faculty Code, an adjudicative process that complies with the requirements of Washington's APA, the same law that governs hearings under the student conduct process.

32.     Hearings for employees represented by a union may occur in the form of an arbitration. The University was unable to identify any arbitrations during 2019 that involved allegations or actions based on sexual harassment, sexual violence, or other sexual misconduct.

33.     For non-faculty and/or non-classified employees, the University does not currently have a process which involves hearings. Instead, the University allows individuals alleged to have violated UW policy or policies to be heard at an interview or investigative meeting.

Decl. of Valery NL Richardson                                  Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

34.     When assessing whether a violation of University policy has occurred, the University employs the "preponderance of evidence" standard. This standard is codified in the Student Conduct Code under WAC 478-121-310 for brief adjudicative proceedings (those in which the investigator/conduct officer makes a decision) and under WAC 478-121-417 for full adjudicative proceedings (those investigations which become hearings). The preponderance of evidence standard applies to all violations of the Student Conduct Code, whether those violations involve sexual misconduct, academic misconduct, or behavioral conduct that is not sexual in nature. The University also employs the preponderance of evidence standard in assessing whether any reported conduct violated Executive Order 31, which applies to all employees at the University. Per Faculty Code section 28-34, when a complaint requires adjudication under the University's Faculty Code, the preponderance of evidence standard is also utilized. In short, the only standard of proof currently used by the University in determining whether any of its students or employees have violated a policy is preponderance of evidence.

### Harm to the University and Conflicts with State Law Requirements

35.     In addition to Title IX and Title VII of the Civil Rights Act of 1964, the University is also subject to: RCW Chapter 49.60, the "Washington State Civil Rights Act"; RCW Chapter 28B.110, Washington's "Gender Equality in Higher Education" law; and a recently enacted but not yet codified Washington law, Engrossed Substitute House Bill 2327, effective June 11, 2020, and titled "Postsecondary Educational Institutions--Sexual Misconduct." Among other requirements, this new law requires all Washington post-secondary institutions to employ a "preponderance of evidence" standard for any investigation into the conduct of a University employee based on allegations made by a University student; further, the bill requires that all

investigations into University employees be completed, regardless of whether or not the University employee resigns or leaves the institution, unless an alleged victim requests otherwise.

### Revision of Existing UW Sexual Misconduct Policies

36.     Because the University currently has different policies applying to different members of its community, the changes put forth in the new Title IX Regulations will require the University to revise numerous grievance policies and procedures. Revision of the Student Conduct Code requires not only amendment of the University's regulations under the Washington Administrative Code, WAC Chapter 478-121, including compliance with the rulemaking process under Washington's APA, RCW Chapter 34.05, it also means revising the University's internal "Student Governance and Policies" Chapter 210. Changes to SGP 210 require consultation and collaboration with the University's Faculty Senate and student government as a matter of "shared governance" and the democratic values that principle embodies. Requiring the University to significantly revise policies and related protocols, particularly on issues as significant as sexual misconduct, will be a burdensome process.

37.     The process for reviewing and revising grievance procedures for employees depends upon the type of employment. For faculty and other academic personnel, revision of the Faculty Code would be necessary. For the University's approximately 12,400 professional staff—who serve at will and are not currently entitled to a hearing process—a brand new grievance procedure addressing the requirements of the new Title IX Regulations would need to be developed and implemented. Creating, negotiating, and effectuating such new policies will require consultation and collaboration with numerous stakeholders and process partners, including multiple meetings to discuss alternative solutions, review of and response to feedback on policy drafts, obtaining support from those impacted by the policy changes, review by the Washington

Attorney General's Office (which serves as the University's legal counsel), and review and approval from faculty, students, and senior University administrative leadership.

38. Many stakeholders and process partners will need to be involved or consulted in the University's rulemaking and revision of policies, procedures, processes, materials, and training to ensure compliance with the Title IX Regulations. These include: the Title IX Coordinator and Deputy Title IX Coordinator; staff in each of the four offices across three campuses that investigate student conduct; the University's student conduct hearing officer and hearing coordinator; each of the three University campuses' Associated Students of the University of Washington undergraduate student governments, the Graduate and Professional Student Senate, members of the Faculty Senate (including the Senate Executive Committee, Faculty Council on Student Affairs, and Faculty Advisory Committee on Student Conduct); staff involved in employee investigations (including UCIRO investigators, human resources, and labor relations professionals); academic human resource professionals; student life staff; the University's four confidential victim advocates; the Respondent Resource Coordinator for all three campuses; SafeCampus (the University's violence prevention and response program) staff; University of Washington Police Department staff; staff in the Offices of the President and the Provost; University Policy and Rules Office staff; Office of Fraternity and Sorority Life staff; and the Office of the Attorney General.

39. Weeks, if not months, of both the Title IX Coordinator and Deputy Title IX Coordinator's time will be devoted exclusively to coordinating the revision of the University's current processes and, upon revision, to training those involved in the new hearing and appeals processes required by the Title IX Rule as well as educating the University community about the processes and options available to them. In addition, the Office of the Title IX Coordinator will

Page 19 of 28

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

need to update all educational and training materials and websites to reflect new processes and other changes made necessary by the new Title IX Rule.

40.     Revising the UW's Student Conduct Code, as codified in the Washington Administrative Code (WAC), requires that the University undergo rulemaking as outlined in Washington's APA, RCW 34.05.310. Similar to federal law, under Washington's APA, the University must file a preproposal statement of inquiry to involve the public at the initial stage of rulemaking. This requires that the University publish a schedule for rulemaking in the Washington State Register and campus newspaper. No fewer than 30 days after the preproposal is published, the UW must notify the public of the text of the rule change prior to a public hearing on the matter and solicit public comment. RWC 34.05.320. Following this notification, at least twenty days must elapse before the required public hearing may be held. However, this minimum twenty-day period may not be sufficient, depending on the nature and volume of public comments, to consult and collaborate with all of the stakeholders, process partners, and constituents mentioned above so as to address the public's comments and ensure that the proposed policies are fully vetted and do not contradict other policies. Following the public hearing, the University's Board of Regents must approve the proposed regulatory changes and, finally, the University must notify the public of the final adopted rule and its effective date. RWC 34.05.360.

41.     The process for revising UW Executive and Administrative Orders is contained in Executive Order No. 3 titled, "Executive Order and Administrative Order Procedure." Before the President can promulgate a new or amended Executive Order, it must be sent to the Faculty Senate, which is allowed 60 days for review and comment. If the President does not accept any proposed revisions, she must meet with the Faculty Senate Chair and seek to resolve the differences. The

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

President can also request reviews from others. After this process, the President may then issue the order, at which point it is final.

42.    An Administrative Policy Statement ("APS"), such as APS 46.3, "Resolution of Complaints Against University Employees," must be vetted by stakeholders prior to the Executive Office of the President and Provost receiving the proposed APS for approval. Once received by the Executive Office, the Vice Presidents for all units that will be impacted or affected by the APS must approve it.

43.    The Faculty Senate and its subcommittees need to be involved in any changes to policies impacting the faculty. Substantial changes to the Faculty Code require "Class A" legislation, a process that involves multiple stages of review and deliberation by various Faculty Senate bodies followed by a vote of all eligible faculty. Typically, a significant change to the Faculty Code requires an entire academic year to complete and sometimes more than a year.

44.    In addition to revising grievance policies, the University will need to revise a number of publications, trainings, and websites. Among these are the University's "STOP brochure," its "Know Your Rights & Resources" guide for anyone who is impacted by sexual misconduct, and other materials explaining the University's policies and procedures. Revising these documents will take a minimum of 30 hours of staff time. Additionally, the University will need to reprint many publications, first to incorporate immediate changes by the August implementation deadline and then a second round once appropriate stakeholders have been consulted to devise longer-term policy, procedure, and process solutions and revisions.

45.    The University will also likely need to update various training videos describing how the University addresses sexual violence, sexual harassment, and sex discrimination. Among such videos is the "Addressing Discrimination and Harassment at the University of Washington"

video prepared for and used by Campus HR Operations & Services during its bi-monthly orientation ("Welcome Day") for new employees. Revising this video will likely take 55-65 hours plus another 20-30 hours to produce a version of the video appropriate for the website (as opposed to orientation) and ensure its accessibility for those with disabilities. Further, individuals who provide training across the University will need to learn the new grievance policies and procedures and update their presentations and educational materials.

46.     The University's President writes to the entire University community at least once each year to call attention to support resources, reporting options, policy expectations, and education and prevention initiatives. "Title IX Community Conversations" are held on each of the three campuses throughout the year, and the Title IX Coordinator sends targeted communications to deans, directors, and other leaders. Staff who investigate allegations of sexual misconduct receive training through departmental programs or off-site workshops and conferences. Awareness and response/prevention information for faculty/staff is provided by various entities across the University and work is currently underway to implement standard education in both an online and in-person format for all students and employees.

47.     The University will need to train approximately seven UCIRO and Title IX investigators, twenty HR investigators, four confidential advocates, seven respondent resource providers, the hearing coordinator and hearing officer, the administrative review coordinator, twelve administrative review faculty panelists, and all presenters and trainers—roughly 50-60 staff in total. To take but one example of the financial costs this could entail, the salary expense (minus relevant benefit costs) for twenty human resource investigators to attend a four-hour training on the new Title IX rule will be about $4,000. Beyond those 20 investigators, the University will likely need to pay for at least an additional 33 individuals to receive training in addition to those

Decl. of Valery NL Richardson                                      Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

who would serve as advisors to parties during a full hearing or who will conduct hearings or appeals for allegations made against employees.

48.     The University will also need to develop a training that incorporates the Title IX Rule requirements as related to other UW policies. The development of such training will likely require significant time on behalf of trainers, the Title IX Coordinator, the Deputy Title IX Coordinator, the Attorney General's Office, and others. Once trained, the student conduct Administrative Review Coordinator will then need to adapt the training provided to faculty who serve on Administrative Review Panels. The University estimates that approximately 40 hours on average will be required to develop material for, write, prepare, and publish each of the training modules that must be modified to incorporate the new requirements imposed by the Title IX Rule. Modules that will require revision include, at a minimum, those regarding sexual harassment, the investigation process and role of a Title IX investigator, the hearing process, and those modules specific to sexual assault, stalking, and dating violence.

**Responding to Complaints Under the New Requirements**

49.     Responding to complaints under the new Title IX Regulations will impose time and monetary costs in addition to the intangible costs of confusion for individuals involved in both making and responding to complaints. Two separate grievance processes will be necessary to respond to the narrower definition of sexual harassment under the new Rule, on the one hand, and the broader range of conduct which is of concern to the University. Creation of these two separate processes will increase the burden on the University and the challenge of educating the University community, including complainants and respondents, on the differences between the various grievance processes: student actor vs. employee actor, on-campus vs. off-campus, narrower definition of sexual harassment vs. broader definition of sexual harassment, etc.

Page 23 of 28

50.    The University, at present, conducts live hearings in student conduct matters where suspension or dismissal are possible sanctions. The University employs two full-time staff who work exclusively on hearing-related responsibilities: a hearing officer and a hearing coordinator. The hearing officer spends approximately 90 hours of work for each hearing where administrative review/appeal is not requested, and approximately 110 hours of work for each hearing where either the complainant or respondent requests administrative review. Where legal counsel is involved or the parties are actively making requests and objections, the hearing officer spends additional time. The hearing officer's work on each hearing includes: approximately eight hours of initial case file review upon receipt from the conduct officer/investigator; approximately nine hours in the preparation, facilitation, and writing of the order from the prehearing conference; approximately 25 hours in analyzing and ruling on motions, drafting witness questions, and preparing for and presiding over the full hearing; approximately 52 hours compiling and analyzing evidence as well as writing the initial order; and, if either party seeks administrative review/appeal, approximately 14 hours reviewing the administrative review request, reviewing relevant evidence, and preparing the University's response.

51.    The hearing coordinator spends an average of 114 hours for each hearing where administrative review is not requested and an average of 123 hours per hearing when one party requests administrative review. The hearing coordinator's time breaks down as follows: approximately 15 hours reviewing the conduct officer file and initiating the full hearing; approximately 13 hours working with parties and their advisors to schedule the hearing, prepare the scheduling notice, and ensure logistics for the required date are complete; approximately 9 hours preparing for and attending the prehearing conference; approximately 34 hours between the prehearing conference and hearing, which includes time reviewing the hearing officer's prehearing

order, scheduling witnesses and arranging for their testimony, reminding all relevant parties of logistics related to the hearing, and preparing the hearing rooms and related technology; approximately 12 hours on the date of the hearing to set up for the hearing, facilitate the arrival of witnesses, and back up files to facilitate the hearing; approximately 32 hours reviewing and editing the hearing officer's order and compiling the agency's record; and approximately 10 hours related to receiving requests for administrative review, sending those to relevant parties, reviewing and editing the hearing officer's response, and completing records.

52.     The total financial cost for the hearing officer's and hearing coordinator's time per hearing is in the vicinity of $9,500 if no administrative review/appeal is requested, and over $11,000 with administrative review. Added to this expense is the cost of a stenographer and transcript preparation, which averages roughly $2,000 per hearing.

53.     The Title IX Rule requires that each party be provided with an advisor to conduct cross-examination if they do not select one for themselves, and this will add yet another hearing expense. The UW estimates that to consult with a party and effectively prepare cross-examination questions for each witness—the number of whom will likely increase since witness statements that might have previously been admissible under Washington's APA and hearsay exceptions must now be subject to direct cross-examination—will take such advisors roughly 30-40 hours, plus another eight hours for the hearing itself. If advisors must be provided to both parties, that means anywhere from 70-95 hours, and if those advisors are attorneys, the average hourly rate the UW currently pays for outside attorneys ranges from $300 to $350 per hour. In other words, this one new requirement alone, imposed by the Title IX Rule, could potentially increase the UW's costs by anywhere from $1,500 to more than $30,000 per hearing. The result could be total hearing

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

costs—counting only the hearing officer, hearing coordinator, stenographer, and party advisors— of approximately $13,000 at the low end to potentially $40,000-$50,000 at the high end.

54.     The Title IX Regulations' requirement of direct cross-examination will likely impose harm on both complainants and respondents. The goal of the UW's student conduct processes are, as much as possible, to educate participants and allow them to become functioning and valuable members of the University community. In cases where neither suspension or dismissal are anticipated or appropriate sanctions, the imposition of a hearing will negate the educational aims of the conduct process, as a hearing will create added pressure and mental stress for both parties. Individuals will foresee the process and consequences of the student conduct process as more serious and, likely more forbidding. Respondents in the process may lose the opportunity to accept responsibility for their actions and instead focus simply on avoiding punishment. Complainants, who must answer questions via direct cross-examination by a party advisor (quite possibly an attorney) will lose the protection of allowing a legally trained and neutral hearing officer to consider the appropriateness and relevance of each question before it is asked. a hearing officer assessing each proposed cross-examination question before it is asked to determine whether it ought to be modified or not asked, complainants may suffer additional trauma, including that caused by believing their school has caused additional harm by requiring they submit to a burdensome and retraumatizing process.   Exacerbating students' trauma in this way would likely heighten their support-services needs, thus placing added demand on those University resources.

55.     As indicated above, the University will continue to address a broader range of misconduct than is covered by the new Title IX Rule. As such, it anticipates an increase in litigation, as potential claimants test the University's regulation of conduct beyond that defined under the new Rule. The University also anticipates litigation based on the requirement that it

provide complainants and respondents with advisors to conduct cross examination. As the complainant and respondent cannot simultaneously prevail in a case, the University expects that, based on the outcome of individual cases, complainants or respondents may sue the University on the ground that it failed to provide an effective advisor. Regardless of the merit of any such lawsuits, the needless litigation will be burdensome and costly.

### The New Regulations Will Make It Harder to Identify, Remedy, and Eliminate Sexual Harassment.

56.     As mentioned, the University anticipates implementing two different grievance processes—a new process for conduct within the ambit of the new Title IX Regulations in addition to the University's current process for conduct that violates its broader definition of sexual misconduct, which focuses on the requirements of Title VII, state laws prohibiting sexual discrimination and misconduct, and the University's commitment to gender equity and eliminating sex-based discrimination that impinges on individuals' ability to access their education. This two-track system will be unnecessarily confusing and cumbersome without any compensating benefits.

57.     The Title IX Regulations' formal complaint requirement poses complications to the University's process that it is continuing to assess.  A signed complaint would effectively ensure that a respondent has access to the identity of a complainant, a potentially dangerous prospect in, for example, certain stalking or harassment cases where the respondent does not know the complainant's (full) name and might escalate the stalking or harassment using the new information.

58.     The process of reporting and participating in a sexual misconduct investigation is daunting under the best of circumstances. Knowing that a report and subsequent conduct proceedings will result in direct cross-examination by, potentially, a seasoned trial attorney would be an intimidating if not terrifying prospect for many survivors. Survivors, understanding this

Decl. of Valery NL Richardson                                   Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

prospect, will be less likely to report. Fewer reports mean an increase in instances of un-addressed misconduct, and un-addressed misconduct could well encourage more of it, thus potentially placing increased demands on the University's support services. In other words, this aspect of the new regulation will likely chill reporting, thereby encouraging misconduct and fostering the very sort of hostile environment Title IX seeks to eliminate. Trust in the University to address sexual misconduct will decline, reporting will be diminished, and students and employees, given no reasonable path forward for addressing their concerns, may leave our institutions.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __11th__ day of June, 2020

Valery NL Richardson, Title IX Coordinator
University of Washington

Decl. of Valery NL Richardson                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 84

EXHIBIT 85

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF CARLI ROHNER

I, Carli Rohner pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

      1.     I am the Campus Coordinator for the Oregon Sexual Assault Task Force ("SATF" or "Task Force"), a statewide non-profit organization located in Keizer, Oregon, which provides resources, training, and education in sexual assault prevention and response. I have previously served as a Campus Advocate Coordinator and Instructor for SATF. I have worked as a program advocate and trainer in sexual assault prevention and response in educational settings since 2005.

My educational background includes a Bachelor of Arts in Psychology with a specialty in Community Public Health. I have been employed with SATF since 2016.

2.      My duties as Campus Coordinator include providing statewide technical assistance and coordinating training for institutions of higher education in Oregon, including over 1000 practitioners per year. I facilitate Oregon SATF's annual Campus Investigator Training and Comprehensive Prevention trainings and assist over fifty institutions of higher education in Oregon (including private and public colleges and universities, community colleges, and medical school programs) that are seeking to improve and align their response, prevention and advocacy programs related to sexual violence. I also coordinate over thirty members of SATF's Campus subcommittee, facilitate our statewide Student committee, assist in national and statewide policy development and legislative efforts, and design curriculum. I have presented and published in the field of campus sexual violence prevention.

3.      As part of my duties with SATF and my professional experience in this field, I am familiar with the current program compliance requirements for Title IX and understand how such programs are generally funded and administered in Oregon. I am also familiar with research and literature in the field of sexual assault prevention, prevalence, and impacts.

4.      I submit this Declaration in support of the State of Oregon's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through other SATF personnel who have collaborated in gathering this

Decl. of Carli Rohner                                                            Case No. 20-cv-01468-CJN
EXHIBIT 85

information from our organization, and on the basis of documents reviewed. I have also familiarized myself with the Rule in order to understand its immediate impact on Oregonians.

### Sexual Violence Prevention and Victim Advocacy in Oregon Higher Education

5.      The SATF Campus Subcommittee is 1 of 8 subcommittees that serve as an advisory body to the Oregon Attorney General's Sexual Assault Task Force (SATF), a private, non-profit, non-governmental statewide agency. Professionals from 14 institutions across the state currently serve on the Campus Subcommittee, including several different 4-year public and private universities as well as community colleges. These professionals represent a variety of roles on campuses including Title IX Coordinators, campus-based advocates, preventionists, attorneys, Deans of Students, counselors, medical professionals including Sexual Assault Nurse Examiners, and student conduct professionals. The mission of SATF is to facilitate and support a collaborative, survivor centered approach to the prevention of and response to sexual violence. The Campus Committee submitted a comment in the rulemaking process on January 28, 2019.[1]

6.      Oregon law requires all institutions of higher education to have a written sexual assault protocol. ORS 350.255. All seven public universities in Oregon, community college and Oregon-based private university or college must have a written protocol to ensure that victims of sexual assault receive necessary services and assistance in situations where:

a.  The victim of is a student at the university or college and the assault occurred on the grounds or at the facilities of the university or college; or

b.  The perpetrator is a student at the university or college, or a member of the faculty or staff of the university or college, ***regardless of where the alleged sexual assault occurred***.

---

[1] Campus Committee Comment

Decl. of Carli Rohner                                                              Case No. 20-cv-01468-CJN

EXHIBIT 85

7.      Oregon has 45 institutions of higher education, including 2 year and 4 year institutions, institutions that offer advanced degrees (MBA, JD, PHD, etc.), and medical schools (such as Oregon Health Sciences University). Portland Community College (with multiple campuses in Multnomah County), Portland State University (with an urban campus in Portland, Oregon) and Oregon State University in Corvallis are amongst the largest schools in the state.

8.      In 2019 the Oregon Legislature adopted detailed annual training requirements for institutions of higher education in the areas of sexual harassment and sexual violence prevention. This requirement extends to third party investigatory teams. The cost of training on new Rule requirements in addition to State mandated training is staggering. Oregon institutions of higher education are required to provide or procure annual training (provided by either the school, statewide technical assistance providers or national specialists) for anyone involved in the college or university's Title IX process, including (but not limited to) Title IX coordinators, advisors of choice, deputies, advocates, hearing boards, and third party contractors. This requirement is to ensure that both claimants and respondents navigating a Title IX process at a school in Oregon interact with practitioners that are current in best practices, as well state and federal guidance related to Title IX processes.

9.      SATF staff have discussed the Rule requirements with professionals at Oregon institutions of higher education, who believe that the additional requirements, unaccompanied by funds to provide the training will be burdensome, particularly in a time of budget constraints.

10.     The training requirements under ORS 350.253(4) cover the following:

   a.  The relevant definitions and dynamics of sexual harassment, sexual assault, domestic violence, dating violence and stalking;

Decl. of Carli Rohner                                                Case No. 20-cv-01468-CJN
EXHIBIT 85

    b.   The prevalence of sexual harassment, sexual assault, domestic violence, dating violence and stalking both overall and, to the extent relevant data exists, within the educational and employment contexts;

    c.   Trauma-informed best practices for how to serve reporting and responding students, including utilizing trauma-informed principles of support or student-centered frameworks;

    d.   Best practices for addressing bias and increasing accessibility for students through the use of an anti-oppression framework; and

    e.   For investigators, how to conduct effective interviews, including best practices for interviewing sexual assault survivors.

11.    Oregon has taken unique steps to support trauma-informed victim advocacy. In 2016 the Oregon Legislature passed a law that allowed for Oregon advocates to have legally protected communications with students. This added another layer of support for students, staff and faculty that experienced sexual harassment. ORS 40.264; Oregon Evidence Rule 507-1.

12.    Following the implementation of advocate privilege, passed by the legislature in 2015, Oregon has seen a 138% increase in campus reporting, and a 122% increase in access to student support services on our campuses. Oregon has already implemented trauma informed processes that are responsive to not only the unique needs of claimants, but reduce stress on respondents as well. Oregon's movement forward in campus compliance and best practice is unprecedented nationally.

**The Rule inhibits the ability of institutions of higher education to provide all students with equal access to education and create campus safety**

13.    Requiring schools to have live cross-examinations will create a chilling effect for survivors, as discussed in more detail below. Unlike the hearings prescribed under the Rule, many

Oregon schools have worked to create hearing and decision making systems that allow for the responding student to have all opportunities to ask relevant questions of the reporting party, in a manner that does not further compound stress and trauma for either party (e.g., live hearings where the parties are not in the same room).

14.     Requiring complainants to be a current student of—or attempting to attend—the institution in order to bring forth a complaint of sexual harassment will inhibit the ability of Oregon schools to address violence happening on their campus. Many complaints in educational settings arise from disclosures from reporting students at time of withdrawal or post-withdrawal from the institution (usually a verbal disclosure to a school official, or written in the form of a medical leave request form or similar form detailing the violence that has been experienced by the student requesting leave or stating reason for leaving the institution).

15.     If an institution of higher education cannot receive and meaningfully address disclosures from former students or those connected with the university (e.g. residents of adjacent, off campus communities), risk to the institution is increased by allowing perpetrating individuals (be they students, staff, or faculty) to remain on campus. The Center for Disease Control & Prevention lists "Weak community sanctions against [interpersonal violence]" as a risk factor for perpetration of interpersonal violence.[2]  If individuals that harm others are allowed to remain within the context of the educational environment and not addressed by the institution, Oregon schools will likely see

---

[2] Yakubovich AR, Stöckl H, Murray J, Melendez-Torres GJ, Steinert JI, Glavin CE, Humphreys DK. Risk and protective factors for intimate partner violence against women: systematic review and meta-analyses of prospective-longitudinal studies. Am J Public Health. 2018;108(7):e1-e11.
Vagi KJ, Rothman EF, Laztman NE, Tharp AT, Hall DM, Breiding MJ. Beyond correlates: a review of risk and protective factors for adolescent dating violence perpetration. J Youth Adolesc. 2013;42:633–49.
Capaldi DM, Knoble NB, Shortt JW, Kim HK. A systematic review of risk factors for intimate partner violence. Partner Abuse 2012;3(2):231–80.

increased rates of victimization. Increased rates of victimization harm the institution of higher education by:

    a.   Increasing likelihood of attrition from the institution by victims/survivors (reducing overall funding for the institution by reducing tuition).

    b.   Increasing the likelihood of necessity for additional supports, such as counseling, advocacy and other resources to respond to students that have experienced violence.

    c.   Reducing safety for all students, staff and faculty, thus establishing an environment where there is not equitable access to educational activities.

16.    Limiting sexual violence response to enrolled students means many student survivors may not be able to meaningfully or effectively access higher education and responsive survivor services (like a functioning, trauma-informed Title IX system). In Oregon, many schools have created robust and effective partnerships to provide support services to students engaged with the Title IX process. The limitations in the Rule reduce effectiveness of these more comprehensive programs. Engagement with services:

    a.   Improves the likelihood that the reporting student will have greater earnings potential across their lifetime.

    b.   Reduces the likelihood of negative physical and mental health impacts (including PTSD).

    c.   Reduces the likelihood that the reporting student/survivor will need to access critical community supports, such as advocacy, housing, job assistance (including unemployment) and medical services.

**The Rule Will Increase Social and Economic Harms of Sexual Violence**

17.    Students that do not get effective, timely and trauma-informed support are less likely to complete their education. Effectively, these students leave the institution. Schools are impacted

due to reduced retention of students, meaning less revenue in regards to tuition. Students are less likely to increase their earning potential over the course of their lifetime due to not completing their education.

18.     Survivors of violence, whether student, staff, faculty, or community member, that do not receive timely, non-judgmental and trauma-informed care are more likely to require social supports (mental and physical health care costs increase, increased likelihood to experience future violence, as well as experience homelessness/houselessness). These are impacts felt financially at the state and national level.[3]

19.     The estimated lifetime cost of rape was $122,461 per victim, or a population economic burden of nearly $3.1 trillion (2014 U.S. dollars) over victims' lifetimes, based on data indicating more than 25 million U.S. adults have been raped. This estimate included $1.2 trillion (39% of total) in medical costs; $1.6 trillion (52%) in lost work productivity among victims and perpetrators; $234 billion (8%) in criminal justice activities; and $36 billion (1%) in other costs, including victim property loss or damage. Government sources pay an estimated $1 trillion (32%) of the lifetime economic burden.

**Live Cross-Examination will cause harm to reporting students**

20.     The requirements of live cross-examination for institutions of higher education are not aligned with equitable, student-centered, and ethical processes for reports of sexual harassment. The harm and trauma that results from subjecting survivors to live cross-examination creates an inequitable and unethical process for reporting students. Additional trauma suffered by survivors of violence not only creates personal costs (lost wages, impact on social relationships, etc.) but also increased social costs, as discussed above. Institutions may experience increased demands on

---

[3] Peterson, C., DeGue, S., Florence, C., & Lokey, C. N. (2017). Lifetime Economic Burden of Rape Among U.S. Adults. American journal of preventive medicine, 52(6), 691–701. https://doi.org/10.1016/j.amepre.2016.11.014

Decl. of Carli Rohner                                    Case No. 20-cv-01468-CJN
EXHIBIT 85

support and health services for students, faculty, and staff, as well as loss of cohesion and morale if increasing percentages of students do not complete their programs, and/or staff and faculty have high turnover.

21.     SATF agrees with the Department's position that it is not appropriate for reporting and responding parties to directly question each other. However we strongly disagree that utilizing an advisor of choice will effectively mitigate the trauma of live cross-examination. The use of an advisor of choice to administer cross-examination may even compound, instead of mitigate, the trauma of the experience; for example, one party could choose as their advisor a friend whom they know has embarrassing information about the other party as a tactic to humiliate and/or intimidate the party being cross-examined. A survivor being cross-examined by an advisor of choice who is a staff or faculty member of the university could also lead to institutional trauma, severely impacting the survivor's future engagement in their education.[4]

22.     The Title IX process should strive to minimize retraumatization, which in turn will create a more fair and equitable process for all parties, and not to unfairly subject one party to retraumatization when other options are available. It is possible to achieve a thorough, equitable, and fair process without requiring live cross-examination. In fact, many schools in Oregon already engage in these practices. Many schools, regardless of whether they hold a live hearing, allow reporting and responding parties to submit questions after reviewing interviews and evidence, and will then utilize an investigator or the chair of the conduct committee to ask all relevant questions.

23.     The live cross examination requirement will be extremely burdensome for institutions to implement. In order to implement this requirement in an equitable and informed manner, schools must seek additional training for current staff in cross-examination (a skillset that is

---

[4] Goldberg, S. B. (2019, January 10). Keep cross-examination out of college sexual assault cases. Chronicle of Higher Education. Retrieved from https://www.chronicle.com/article/Keep-Cross-Examination-Out-of/245448

Decl. of Carli Rohner                                                                 Case No. 20-cv-01468-CJN
EXHIBIT 85

not held widely by many student affairs or academic professionals working in institutions of higher education), or contract with a third party service that has the legal expertise to thoughtfully cross-examine a student in system that is not criminal justice oriented.[5] Both are extremely cost-prohibitive to schools, especially during a time of 1) decreased enrollment and 2) decreased financial resources due to COVID-19.

24. Advisors of choice conducting cross examinations creates an inherent lack of equity between parties, for which the institutions themselves may be liable. For example: if one student has access to legal counsel as an advisor, and the other has a staff member (with no legal background, but with introductory training from the institution), then both students have not been provided with equitable resources for the hearing itself. Instead of creating equity by providing all parties the ability to ask questions in a live setting, this model of live cross-examination can establish further disparities among students related to (at minimum) socio-economic status.

**Requirement that complainants be participating in an educational program limits ability of schools to provide a safe, equitable, and harassment free education environment.**

25. Many Oregon schools currently and regularly receive reports of sexual harassment from students:

    a. at time of taking medical leave or absence from the institution, often in the form of written declaration as to need for medical leave;

    b. after the reporting student has had an approved leave of absence from the institution, and is petitioning the leave to either be extended or for the institution to implement an academic remedy in order to return to school; or

---

[5] In Oregon, the average rate for lawyers with 0-3 years experience is $156/hour. Contracting with third party lawyers to conduct cross examination would be length of hearing (varies) x hourly rate. We anticipate that training for student affairs professionals would likely need to be 16+ hours in order for folks to have a basic understanding and engage ethically in cross-examination. It is hard to estimate hourly rate of such training, although SATF estimates a training of this magnitude would be $200-$800 per individual participant (of which schools would have multiple), based on the current rates schools are paying for Title IX investigator and similar trainings.

c. when the student has decided to leave the institution as a result of their experience with violence.

26.     Many students delay in reporting violence to their school, and the impacts of a traumatic experience with violence can cause students to discontinue their education. What we see in Oregon is consistent with literature that both describes a delay in reporting for traumatic,[6] person-centered crimes; and the decline in quality of life[7] (including ability to function in work and academic environments) experienced by those who are victims of crime, and particularly those who have experienced sexual harassment, assault and intimate partner violence[8].

27.     Students who have left the institution as a result of experiencing sexual harassment (especially if that sexual harassment was committed by an employee of the institution) should have the ability to seek remedy through the school's established Title IX process if their experience with violence meets all necessary requirements for reporting to the institution. Equitable access to education is the foundation of Title IX. A student leaving the educational institution (especially if the violence experienced was due to a staff or faculty member) is contradictory to the intent and spirit of Title IX. Title IX processes provide an alternative to the criminal justice system.  Limiting complaints to those "participating in or attempting to participate in" school is an unnecessary

---

[6] For examples, see U.S. Bureau of Justice Statistics, M. Planty and L. Langton, "Female Victims of Sexual Violence, 1994-2010," 2013; Wolitzky-Taylor et al, "Is Reporting of Rape on the Rise? A Comparison of Women with Reported Versus Unreported Rape Experiences in the National Women's StudyReplication," 2010; U.S. Bureau of Justice Statistics, T. Hart and C. Rennison, "Reporting Crime to the Police, 1992-2000," 2003;  D. Kilpatrick et al., "Drug-facilitated, Incapacitated, and Forcible Rape: A National Study," 2007; U.S. Bureau of Justice Statistics, M. Planty and L.

Langton, "Female Victims of Sexual Violence, 1994-2010," 2013; Wolitzky-Taylor et al, "Is Reporting of Rape on the Rise? A Comparison of Women with Reported Versus Unreported Rape Experiences in the National Women's Study-Replication", 2010

[7] Hanson, R. F., Sawyer, G. K., Begle, A. M., & Hubel, G. S. (2010). The impact of crime victimization on quality of life. Journal of traumatic stress, 23(2), 189–197. https://doi.org/10.1002/jts.20508

[8] Lonsway, K.A. Archambault, J. (2019). Victim Impact: How Victims Are Affected by Sexual Assault and How Law Enforcement Can Respond. End Violence Against Women International.

restriction that only increases the barriers and removes paths to justice and healing for those students looking to redress for students seeking to report.

28.     If students are disinclined to report violence, the effect is the perpetuation of unsafe campus environments. The scholarship in this area is clear:

> The wider ecological context of peer and community norms, however, is also very important and indicates how campuses may provide environments of opportunities for perpetrators. For example, criminological theory predicts, and previous research has found, that community and peer norms increase offender motivation for using violence in intimate and dating relationships (making individuals more likely to see dating violence as acceptable and survivors more likely to blame themselves for victimization; Schwartz, DeKeseredy, Tait, & Alvi, (2001). Schwartz and DeKeseredy (2000) found differences in campus sexual assault rates related to campus differences on a measure of male peer norm support for the use of coercion in intimate relationships. Communities have higher rates of sexual violence to the extent that community and peer norms support individual coercive behavior in relationships and provide excuses for those who use coercion (e.g., Schwartz & DeKeseredy, 1997, 1998, 2000).[9]

**The Implementation time frame of the Rule is unduly burdensome.**

29.     The Department's decision to publish and implement the final Rule at times when 1) students are not accessible to provide input and 2) during times of reduced capacity for many professionals working on campus (during winter break, near the closure of the academic year and graduation, and, most egregiously, during the middle of a global pandemic) demonstrate either a gross underestimation of the necessary time and input required to implement required changes, or deliberate indifference to the reality being faced by many institutions of higher education.

30.     Many educational institutions have governance processes requiring faculty, staff and students' participation in the implementation of any policy change (including those required by federal and state statute). Although institutions have had some notice that the new regulations may

---

[9] Banyard, V.L., Moynihan, M.M., & Crossman, M.T. (2009). Reducing Sexual Violence on Campus: The Role of Student Leaders as Empowered Bystanders. Journal of College Student Development 50(4), 446-457. doi:10.1353/csd.0.0083.

be released at any time, the compounding dynamic lack of clarity when the Department expected to promulgate a final Rule, together with a global pandemic necessitating school closures and operations conducted by remote work have created an environment where the arbitrary 90 day implementation period (with rules going into effect on August 14, 2020) is extraordinarily burdensome. Thoughtful and equitable implementation of the Rule's requirements, to the extent some can be equitably implemented at all, would require at least another year of preparation, training, and policy development.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 12th day of June 2020

_____

Carli Rohner

Campus Coordinator

OREGON ATTORNEY GENERAL'S SEXUAL ASSAULT TASK FORCE

Decl. of Carli Rohner                                        Case No. 20-cv-01468-CJN

EXHIBIT 85

EXHIBIT 86

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF AVIS MARIE RUSSELL

I, Avis Marie Russell, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

      1.      I am the General Counsel at the University of the District of Columbia ("UDC") located in Washington, D.C. My educational background includes an A.B. from Wellesley College and a J.D. from Tulane University. I have been employed as General Counsel since March 1, 2020, prior to which I was employed as Acting General Counsel beginning November 1, 2018.

2.      I submit this Declaration in support of the District of Columbia's ("the District") litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through both personal knowledge and UDC personnel who have assisted me in gathering this information from our institution, as well as on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on UDC.

**Background about the University of the District of Columbia**

3.      UDC's history began in 1851 with the founding of the Miner Normal School, the District's public higher education school for African-American women that focused on training teachers. In 1873, the Wilson Normal School was founded for white women that also focused on training teachers. In 1929, Congress converted the Miner Normal School and the Wilson Normal School into separate four-year teacher colleges. Following the Supreme Court's decision in *Brown v. Board of Educ.*, 347 U.S. 483 (1954), which held that state laws establishing racial segregation were unconstitutional, the two colleges merged to form the District of Columbia Teachers College. In 1977, the Teachers College merged with two other District public higher education institutions to create UDC. UDC has five colleges offering 81 undergraduate and graduate degree programs. As of Spring 2020, UDC has over 4,000 undergraduate and graduate students in either full- or part-time programs with over 1,100 faculty and staff.

Decl. of Avis Marie Russell                                Civil Action No. 20-cv-01468-CJN
EXHIBIT 86

4.      UDC is the District's only public higher education institution and is the District's most affordable higher education option for District residents. A historically black college, UDC remains highly diverse and enrolls more District public high school graduates than any other university.

5.      UDC offers in-person and online classes and degree programs.  UDC provides housing for students near the Van Ness campus and assists students with certain off-campus housing needs. The vast majority of students live off-campus. Approximately 145 students live in the UDC leased apartments.

6.      Embracing its essence as a historically black public university, UDC is dedicated to serving the needs of the District and producing lifelong learners who become leaders in the workforce, government, nonprofit sectors, and beyond. It is UDC's goal to create a welcoming environment for all both on and off campus. Housed in the District, which provides the country's most expansive non-discrimination laws, we want to make sure that we address any discrimination or misconduct swiftly in order to protect our welcoming environment.

7.      UDC's fiscal year 2020 operating budget includes approximately $33.5 million in federal grants and $8.3 million in DC agency grants.

8.      UDC receives federal funds from the Department. As a result, UDC is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

**Background on the University of District of Columbia's Title IX Policies**

9.      UDC has adopted policies that prohibit discrimination, harassment, and misconduct by students, employees, and faculty and established a grievance process for addressing complaints of sexual harassment. In 2015, UDC adopted a revised Code of Student Conduct that addresses academic and non-academic misconduct and sets forth reporting and hearing procedures. The Code of Student

Decl. of Avis Marie Russell                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 86

Conduct explicitly includes off-campus misconduct, including harassment and misconduct that occurs via telephones and other electronic devices. The Code of Student Conduct prohibits sexual misconduct and harassment by students, employees, and faculty, including harassment not based on a protected trait and establishes a grievance process for addressing complaints of sexual harassment. In 2014 UDC adopted a separate Anti-Discrimination and Harassment Policy that also prohibits sexual misconduct.

10. UDC houses its Title IX team within its Office of Risk Management. Evola C. Bates currently serves as UDC's Acting EEO/Title IX Coordinator. The responsibility of the Title IX Coordinator is to receive Title IX complaints, conduct investigations, and determine if there has been a violation of Title IX.

11. At the time of this writing, UDC has had one Title IX complaint in fiscal year 2020 that is still pending. In fiscal year 2019, UDC had five Title IX complaints. All complaints of Title IX violations are investigated. None of the complaints resulted in a finding of a violation of Title IX.

12. UDC's Anti-Discrimination and Harassment Policy defines "sexual harassment" as:

I. "unwelcome sexual advances, requests for sexual favors and other verbal or written communication, or physical conduct of a sexual nature, when:

    a. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or education;

    b. Submission to or rejection of such conduct by an individual is used as the basis for an individual's academic or employment decisions or evaluations; or

    c. Such conduct has the effect of unreasonably interfering with an individual's work performance or learning or of otherwise creating an intimidating,

Decl. of Avis Marie Russell                  Civil Action No. 20-cv-01468-CJN

EXHIBIT 86

hostile, or offensive environment. Such an environment exists when the conduct is sufficiently serious to deny or limit an individual's ability to participate in any aspect of a University program[.]"

13.    UDC's Code of Student Conduct defines "assault/sexual misconduct" as "any unwanted touching or physical contact, directly or indirectly, of a sexual nature. In addition, this includes verbal or explicit verbal attacks such as lewd comments towards the victim in a sexual nature. Sexual misconduct may occur without regard to the gender of the actor or the victim."

14.    UDC's Code of Student Conduct defines "harassment" as "[c]onduct, which has the foreseeable effect of unreasonably interfering with an identifiable individual's work or academic performance or creating an intimidating, hostile or offensive work or learning environment for an individual or a group of people. The Code's definition of harassment also includes a form of verbal, visual, written or physical act directed at intimidating any member of the University community, either on or off-campus. This includes creating an environment that demeans and inflicts psychological or emotional harm, or results in undue stress to an individual. This also applies electronically through the use of technology (e.g. telephone, text-messaging, computer, electronic mail, faxes and iPods or other electronic devices/media)."

15.    UDC's Code of Student Conduct prohibits cyberbullying and other misconduct via information technology, and also prohibits misconduct that occurs off-campus during a UDC-sponsored activity or event.

16.    Complaints include written reports of misconduct submitted to the Title IX coordinator and both oral and written reports of misconduct submitted to a UDC employee who then must report the matter to the Title IX coordinator. Complaints ultimately must be reduced to writing (with an exception for disabled students) provided to the Title IX coordinator and must include a

description of misconduct, relevant identifying and corroborating information, and requested corrective action. If UDC receives a sexual misconduct complaint from someone other than the victim, a member of UDC's Title IX staff will reach out to the victim to provide him or her with the opportunity to complete an intake form and provide information regarding the misconduct. Once the Title IX office receives a completed intake form, it begins investigating the claim(s). Depending on the nature and content of the claim(s), the Title IX office's investigation includes meeting with the complainant, respondent, and any witnesses as well as reviewing documents and records. Based on the investigation, the Title IX office will determine whether there was a violation of Title IX. If there is a finding of a Title IX violation, the matter is referred to UDC's judicial hearing process if the respondent is a student and to the Office of Talent Management if the respondent is an employee to determine disciplinary action. Complaints are kept confidential to the extent possible.

17.     District law mandates investigations of sexual misconduct and sex-based discrimination at or involving District schools. The District of Columbia City Council passed the D.C. School Safety Omnibus Amendment Act of 2018 ("DCSSOAA") to promote and protect District students' safety by preventing sexual harassment, sexual assault, and dating violence against students by faculty, staff, and other students in District schools. DCSSOAA requires District schools to "[i]nterrupt or stop each specific act of student-on-student sexual harassment, sexual assault, or dating violence, prevent its recurrence, and address its effects, whether or not the incident is the subject of a criminal investigation." D.C. Code § 38-952.02(a)(2)(A). The DCSSOAA defines sexual harassment as

> any unwelcome or uninvited sexual advances, requests for sexual favors, sexually motivated physical conduct, stalking, or other verbal or physical conduct of a sexual nature that can be reasonably predicted to:
> (a) Place the victim in reasonable fear of physical harm to his or her person;
> (b) Cause a substantial detrimental effect to the victim's physical or mental health;

Decl. of Avis Marie Russell                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 86

(c) Substantially interfere with the victim's academic performance or attendance at school; or

(d) Substantially interfere with the victim's ability to participate in, or benefit from, the services, activities, or privileges provided by a school.

*Id.* at § 38-952.01(5) *et. seq.* This definition of "sexual harassment" is broader than the Rule's new, narrowed definition with its restriction that schools not investigate sexual harassment until it becomes "severe, pervasive, and objectively offensive."

18.     The Rule fails to protect students to the same extent as required by the D.C. Human Rights Act of 1977 ("DCHRA"). The DCHRA, the country's most expansive state human rights law, protects District residents from discrimination in housing, employment, public accommodations, and education based on up to 21 protected traits. The DCHRA prohibits sex discrimination in educational institutions, which includes "deny[ing], restrict[ing], or … abridge[ing] or condition[ing] the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified." D.C. Code § 2–1402.41.

### Burden of Complying with the Rule's New Requirements

19.     Under the Rule, UDC would have to write new Title IX policies and procedures. The Title IX policies and procedures will have to be included in the student code of conduct and approved by the UDC Board of Trustees.

20.     After new policies and procedures are developed, they will have to be approved by the Cabinet and then sent to the applicable Board of Trustees committee(s) for review and to the Board of Trustees for approval. If changes to the District of Columbia Municipal Regulations are required, a 30 day comment period is required before the rule can become final.

21.     The COVID-19 pandemic has tightened UDC's budget, making the changes to UDC's current sexual harassment policies and procedures necessitated by the Rule more difficult to achieve.

Decl. of Avis Marie Russell                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 86

22.     Due to the Rule's requirements, UDC will have to shift away from its single investigator model, wherein UDC's Title IX coordinator received the complaint, conducted the related investigation and determined responsibility. UDC may need to hire additional staff or expand the responsibility of current staff to investigate complaints. UDC will also have to retain a person or panel to hear and decide a case, and a person or panel to hear the appeal or expand the role of those performing these functions in the judicial process. Further, in order to provide parties with advisors, UDC either will have to expand the roles of current employees, hire additional employees, or retain third parties to serve as advisors. All persons performing the role of Title IX coordinator, investigator, hearing officer, advisor or hearing the appeal will have to be trained. These changes necessarily will result in increased costs for UDC.

23.     UDC will have to train all faculty, staff, and students on the new Title IX requirements, resulting in increased use of university resources and increased costs.

24.      The August 14, 2020, effective date will pose a challenge for UDC to fulfill its obligations under Title IX to provide all students equal access to education; train all students/faculty/staff on their obligations under Title IX, and ensure that all students/faculty/staff are aware of their rights under Title IX.

25.     The new regulations would require trial-like proceedings and would delay UDC's ability to respond quickly to complaints. Requiring UDC to provide advisors to each party upon request, permitting such advisors to cross-examine students, and requiring every complaint be resolved with a live hearing would extend the process for everyone. Importantly, the expanded repertoire of quasi-judicial functions UDC will be expected to carry out during such hearings will inhibit UDC's ability to move swiftly to protect students from sexual harassment and misconduct.

26.    Title IX's removal of gender-based harassment from Title IX's definition of sexual harassment would leave a significant segment of UDC's student population without Title IX protections.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 9th day of June, 2020

_____
Avis Marie Russell

General Counsel, University of the District of Columbia

Decl. of Avis Marie Russell                                    Civil Action No. 20-cv-01468-CJN
EXHIBIT 86

# EXHIBIT 87

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF JUDITH RYAN

I, Judith Ryan, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am the University-wide Institutional Compliance Officer for Title IX at Rutgers, The State University of New Jersey ("Rutgers" or "the University"). I am based on the New Brunswick, New Jersey campus, but oversee the implementation of Title IX on the Newark, Camden, and New Brunswick campuses of the school. My educational background includes a J.D. degree from Western New England University School of Law and a B.A. degree from the University of Rhode Island. I was employed as the Director of Student Affairs Compliance and

University Title IX Coordinator from 2010 to 2013 at Rutgers. In 2015 I joined Rutgers University Ethics and Compliance as the Institutional Compliance Officer for Title IX. Prior to working at Rutgers, I was a senior attorney for the City of Philadelphia Law Department for 8 years where I served as investment counsel for the $4 billion Philadelphia Municipal Employees Retirement System. Prior to that, I worked as an attorney for the Federal Deposit Insurance Corporation. I began my career at the Resolution Trust Corporation as a contracts officer.

2.      I submit this Declaration in support of the State of New Jersey's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) ("Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through Rutgers personnel who have assisted me in gathering this information from our institution and on the basis of documents that have been provided to and/or reviewed by me. I have endeavored to familiarize myself with the Rule in order to evaluate its immediate impact on Rutgers.

**Background**

3.      Rutgers is a leading national research university and the State of New Jersey's preeminent, comprehensive public institution of higher education. Established in 1766, the University is the eighth oldest institution of higher education in the United States. More than 70,000 students and 23,400 full- and part-time faculty and staff learn, work, and serve the public at Rutgers locations across New Jersey and around the world.

4.      Rutgers is composed of three physical campuses constituting 29 schools and colleges, over 50,000 undergraduate students, and nearly 20,000 graduate students. Its 70,000+ students come from all 50 states and over 125 countries. Fifty-four percent of students are women and 46 percent are men. It is home to 300 research centers and institutes and boasts more than 500,000 alumni worldwide.

5.      Rutgers offers over 150 undergraduate majors and more than 500 graduate programs. It also offers over 180 study abroad programs in over 60 countries.

6.      Its three campuses are located in different regions of the State and are parts of diverse metro areas. Rutgers' New Brunswick campus is home to more than 50,000 students, including students enrolled in programs in Rutgers Biomedical and Health Sciences ("RBHS"). Rutgers' Newark campus hosts over 13,000 students annually. The school's Camden Campus hosts over 7,000 students annually.

7.      Approximately 15,000 Rutgers-New Brunswick students reside on campus in Rutgers-owned or operated buildings and facilities; the rest, approximately 35,000, reside off campus. Even greater percentages of Rutgers-Camden and Rutgers-Newark students reside off campus.

8.      Rutgers has a three-fold mission:

a.  Providing for the instructional needs of New Jersey's citizens through its undergraduate, graduate, and continuing education programs;

b.  Conducting the cutting-edge research that contributes to the medical, environmental, social, and cultural well-being of the State, as well as aiding the economy and the State's businesses and industries; and

Decl. of Judith Ryan                                                    Case No. 20-cv-01468-CJN
EXHIBIT 87

c.   Performing public service in support of the needs of the citizens of the State and its local, county, and State governments.

9.      Each component of the University's mission reinforces and supports the other two. Rutgers is dedicated to teaching that meets the highest standards of excellence, to conducting research that breaks new ground, and to providing services, solutions, and clinical care that help individuals and the local, national, and global communities where they live.

**Funding and Governance**

10.      Rutgers is an instrumentality of the State of New Jersey with independent governing boards. Rutgers' current governance structure is the product of the "Rutgers Law," an act of the New Jersey legislature in 1956 that specified certain powers and responsibilities of the newly configured Board of Governors. All of the University's property and educational facilities are impressed with a public trust for higher education of the people of the State. The Board of Governors presents an annual request for State support of the University to the New Jersey Department of the Treasury and the State covers a portion of Rutgers' operating budget. However, any debt issued by Rutgers is not backed by the State of New Jersey and Rutgers' debt is rated separately from the State.

11.      Approximately 20 percent of Rutgers' revenue is received from State appropriations and State-paid fringe benefits. The remaining revenue is received from tuition and fees (approximately 29 percent); patient care services (approximately 20 percent); sponsored research (approximately 13 percent); auxiliary enterprise (7 percent); federal and state student aid (5 percent); gifts and endowments (2 percent); and other sources of revenue (4 percent).

12.     Rutgers receives federal funds from the Department. As a result, Rutgers is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

13.     The Board of Governors has general supervision over the conduct of the University and is responsible for determining the programs and degree levels offered by the University. The Board of Trustees is designated under the Rutgers Law to serve in an overall advisory capacity to the Board of Governors.

**University-wide Title IX Compliance**

14.     I serve as the University's Title IX Compliance Officer, overseeing various areas of work on Title IX coordination, investigation, and compliance. Each of Rutgers' three campuses has a Title IX coordinator. The University also has a designated Title IX coordinator for complaints made against faculty, staff, and third parties (the Title IX Coordinator for Employees); a Title IX coordinator for RBHS; and a Title IX Coordinator for Rutgers-New Brunswick athletics who is based in the athletics department. Due to the size of the Rutgers-New Brunswick community, the New Brunswick Title IX office maintains two investigators and a case coordinator who report to the Rutgers-New Brunswick Title IX Coordinator.

15.     Title IX complaints are primarily governed by two University policies. Policy 10.3.12 "Student Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking and Related Misconduct,"[1] governs complaints against students. Policy 60.1.28, "Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking, and Related

---

[1] Rutgers, "Student Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking and Related Misconduct," *available at* https://policies.rutgers.edu/10312-currentpdf.

Decl. of Judith Ryan                                                                 Case No. 20-cv-01468-CJN

EXHIBIT 87

Misconduct by Employees and Third Parties,"[2] governs complaints against employees and third parties.

16.     The University's Title IX Coordinators, whose offices are located throughout the University, serve as the contact points for all University students affected by conduct prohibited by Policy 10.3.12 and oversee the administration of Policy 10.3.12 in a neutral and equitable manner. The Title IX Coordinators also are responsible for overseeing the University's response to all reports and complaints of conduct prohibited by Policy 10.3.12 and identifying and addressing any patterns or systemic problems revealed by such reports and complaints. In addition, the Title IX Coordinator for Employees is responsible for overseeing reports and complaints of conduct prohibited by Policy 60.1.28.

17.     Policy 10.3.12, which governs complaints against student respondents, includes detailed procedures governing the investigation and adjudication process. It was adopted in 2015 after a robust internal process involving the requisite levels of review and approval by the Board of Governors and most recently revised in December 2019.

18.     Policy 60.1.28 was adopted in 2016 and has not been revised. The Office of Employment Equity ("OEE") is responsible for investigating complaints under Policy 60.1.28 and the Title IX Coordinator for Employees is the Director of OEE. With respect to complaints against employees or third parties, the complaint and investigation procedures are set forth in the "Discrimination, Harassment, Workplace Violence, Sexual Misconduct and Retaliation Complaint

---

[2] Rutgers, "Policy Prohibiting Sexual Harassment, Sexual Violence, Relationship Violence, Stalking, and Related Misconduct by Employees and Third Parties," *available at* https://policies.rutgers.edu/60128-current-00004388xde114pdf.

Decl. of Judith Ryan                                                    Case No. 20-cv-01468-CJN
EXHIBIT 87

Process: Complaints Against University Employees and Third Parties" ("OEE Complaint Procedures").[3]

19.     The University opted to create and implement separate policies for allegations of sexual harassment involving students and those involving employees in recognition of the fact that students and employees have different roles within the University community and different rights and obligations under the law, University policies, and in the case of some employees, collective negotiations agreements. The University also recognized that it was impracticable to implement the same type of procedures typically involved in adjudicating student conduct issues in the employment context. Specifically, while the University wished to continue its established practice of utilizing hearings in student conduct matters, as is common in postsecondary institutions, such procedures are rarely utilized in determining whether employees have violated workplace policies and directives. The University also recognized that many of its employees are entitled to a post-disciplinary grievance hearing (or hearings) pursuant to the terms of applicable collective negotiations agreements or University policy, which students are not. Thus, unique considerations cover disciplinary proceedings for employees and students.

20.     The adoption and revision of University policies is governed by Policy 50.1.13, "Formation, Issuance and Maintenance of University Policies."[4] The Responsible Office (Student Affairs and Human Resources, for sexual harassment policies) and Responsible Executive (Senior Vice President for Academic Affairs and Senior Vice President of Human Resources and

---

[3] Rutgers, "Discrimination, Harassment, Workplace Violence, Sexual Misconduct and Retaliation Complaint Process: Complaints Against University Employees and Third Parties" *available at* https://uhr.rutgers.edu/sites/default/files/userfiles/DiscriminationHarassmentComplaintProcess.pdf.

[4] Rutgers, "Formation, Issuance and Maintenance of University Policies," Policy 50.1.13, *available at* https://policies.rutgers.edu/view-policies/governance-legal-matters-%E2%80%93-section-50.

Decl. of Judith Ryan                                                    Case No. 20-cv-01468-CJN

EXHIBIT 87

Organizational Effectiveness) are responsible for maintaining and updating policies and consulting with other University offices and stakeholders as needed in order to do so. The Board of Governors is the designated Approval Authority for Policies and therefore, any substantive policy changes (including those affecting legal and/or regulatory obligations and responsibilities) to University policies would be required to be presented to the Board of Governors for final approval, except employment-related policies may be revised or adopted upon approval of the Senior Vice President of Human Resources and Organizational Effectiveness.

21.     In addition to their primary work overseeing the investigation and adjudication of sexual harassment claims, the Title IX Coordinators work to ensure that students, faculty, and staff across all of the University's campuses are aware of sexual harassment/misconduct polices, available support resources, and complaint and investigative procedures. The Title IX offices have created numerous brochures and promotion materials (such as postcards) that have been placed in residence halls, delivered to off-campus residences, and sent to staff and faculty.[5] The University has also sent out emails to the community and prepared educational videos. Policy 60.1.28 and the OEE complaint procedures are also posted online and incorporated into online training materials provided to employees.

---

[5] A sample of some of the promotional materials created and disseminated by Rutgers' Title IX Office are available at the Office of Student Affairs and Compliance & Title IX's website, http://compliance.rutgers.edu/. Rutgers: Ethics and Compliance, "Title IX" https://uec.rutgers.edu/programs/title-ix/; Rutgers: Camden, "Title IX" https://respect.camden.rutgers.edu/; Rutgers: Newark, "Title IX Resources" https://myrun.newark.rutgers.edu/title-ix-resources; Rutgers: RBHS Office of Student and Academic Affairs: "What is Title IX?" https://oasa.rbhs.rutgers.edu/title-ix/; Rutgers: University Human Resources, "Title IX of the Education Amendments of 1972" https://uhr.rutgers.edu/uhr-units-offices/office-employment-equity/title-ix-education-amendments-1972.

Decl. of Judith Ryan                                          Case No. 20-cv-01468-CJN

EXHIBIT 87

22.    Rutgers currently uses a consistent definition of sexual harassment for complaints against both employees and students, tailored for the types of complaints governed by each Policy, respectively.

23.    Sexual harassment is defined in Policy 10.3.12 as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct, or communication of a sexual nature when:

    a.  Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's education, educational or campus life activities; or

    b.  Submission to, or rejection of such conduct by an individual is used as the basis for academic or student life decisions affecting that individual; or

    c.  Such conduct has the effect of unreasonably interfering with an individual's education or academic performance or creating an intimidating, hostile, demeaning, or offensive campus, work or living environment."

24.    Sexual harassment is defined in Policy 60.1.28 as "unwelcome sexual advances, requests for sexual favors, or other unwelcome written, verbal or physical conduct of a sexual nature when:

    a.  Submission to such conduct is made, explicitly or implicitly, a term or condition of an individual's education, employment, or participation in a University activity;

    b.  Submission to, or rejection of, such conduct by an individual is used as the basis for decisions affecting that individual's academic standing, employment status or participation in a University activity; or

    c.  Such conduct has the purpose or effect of unreasonably interfering with an individual's academic or work performance or creating an intimidating, hostile or

offensive environment for that individual's employment, education or participation in a University activity."

25.     Rutgers addresses sexual misconduct that occurs off campus. Rutgers policies govern sexual harassment, sexual assault, stalking, relationship violence and related misconduct committed by current Rutgers University students, employees (including faculty, staff, and student employees) and/or third parties (such as interns, volunteers, vendors, contractors, and subcontractors) that either:

    a.   Occurs on any University campus or in connection with University programs or activities including incidents of alleged sexual harassment that occur during a study abroad program; or

    b.   Creates a hostile environment for University employees or students; or

    c.   Involves a complaint by a current University student against another University student; or

    d.   Involves a complaint by a University employee or University student arising out of the Respondent's employment status with the University or third party's business or relationship with the University.

26.     To the extent possible, the University will also receive reports and investigate reported incidents committed by individuals who are not members of the University community in order to protect the University community and remediate the impact of the incident for the complainant and/or victim.

**Sexual Misconduct Violations and Investigations Against Students**

27.     Each academic year, the Title IX office receives over 200 reports of alleged violations of the Sexual Misconduct Policies, including sexual harassment, gender-based harassment,

sexual assault, non-consensual sexual contact, relationship violence, sexual exploitation, and stalking. The breakdown by campus is as follows:

| CAMPUS | ACADEMIC YEAR 2018-2019 Reports | ACADEMIC YEAR 2019-2020 (to date) reports |
|---|---|---|
| New Brunswick | 146 | 183 |
| Newark | 69 | 53 |
| Camden | 47 | 62 |
| **TOTAL** | **275** | **298** |

28.     The Title IX offices receive reports in any number of ways including through email, phone, in person, and an online reporting form. Referrals from the Rutgers University Police Department ("RUPD"), residence life, dean of students' offices, and other University departments or units may be investigated. There is no requirement that reports be written or signed. There is also no requirement that the alleged victim be the person to report the sexual harassment. Upon receipt of the report, the Title IX Coordinator communicates with the alleged victim (who is considered to be the complainant regardless of who reported the incident) to discuss, among other things, whether the victim/complainant wants the University to investigate. The victim/complainant is not required to complete any written complaint form in order to initiate an investigation. In certain limited circumstances, the Title IX Coordinator can initiate an investigation if the victim/complainant does not wish to do so, in which case the matter proceeds as a "University Action." The alleged victim/complainant is not required to participate in the investigation or disciplinary process and the Title IX Coordinator takes any requests for confidentiality into consideration. This process enables the University to obtain sufficient information about the allegations to proceed with an investigation, if appropriate. The University has not found it necessary to obtain a written complaint in all cases. The University does provide written notice to both parties of the allegations that will be investigated.

29.     Of the reports received by the Title IX Coordinators each academic year, around 15-20 result in full investigations.  Of these, Rutgers conducts about 8 hearings per year, as detailed in the chart:

| CAMPUS OR SCHOOL | ACADEMIC YEAR 2018-2019 investigations (hearings) | ACADEMIC YEAR 2019-2020 (to date) investigations (hearings) |
|---|---|---|
| New Brunswick | 12 (8) | 17 (8) |
| Newark | 2 (0) | 1 (0) |
| Camden | 0 (0) | 3 (0) |
| **TOTAL** | **14 (8)** | **21 (8)** |

30.     Policy 10.3.12 allows the Title IX Coordinator, in consultation with the RUPD, victim advocates, and other University personnel to consider requests for confidentiality when investigating and adjudicating a complaint. Factors that are taken into account in reviewing requests for confidentiality include the possibility of the alleged respondent committing additional acts of harassment or violence, whether the alleged act was perpetrated with a weapon, whether the victim is a minor, and whether the University has other means to obtain relevant evidence.

31.     Policy 10.3.12 also sets out a detailed list of rights that protects both victims and the due process rights of the accused. Throughout the investigation and hearing process, students have the right to:

    a.   A prompt and thorough investigation;

    b.   A fair hearing;

    c.   Equal access to information, evidence, resources, and information about counseling;

    d.   Participate or decline to participate in the investigation or hearing;

    e.   Have an advisor of their choosing present in all meetings and hearings;

    f.   Advance written notice of all meetings and hearings;

    g.   Present information and/or witnesses on their behalf;

h.   Choose not to present information or speak at any meetings or hearings with no negative inference derived from that choice;

i.   Adequate time to review the investigation report and any evidence to be presented to the Hearing Officer;

j.   Exclude any unrelated past behavior from investigation and disciplinary process; and

k.   An appeal.

32.   Parties and witnesses are asked not to share details about pending investigations with others in order not to compromise the integrity of the investigation process. However, there is no prohibition against parties or witnesses discussing the matter with others, as long as they do not do so in a way that impedes the University from conducting its investigation.

33.   If, upon a preliminary inquiry, a Title IX Coordinator determines that a report may constitute a violation of Policy 10.3.12, the University will consider whether interim measures should be implemented. The Title IX Coordinator or designee discusses options to resolve the complaint with the complainant, including through informal resolution or a formal investigation. The University seeks to resolve all complaints within 60 days of the initial report. However, unique circumstances may cause cases to vary and the time frames may be extended for good cause with a written explanation to the complainant and respondent.

34.   For all reports that proceed to investigation, the Title IX Coordinator designates an investigator or team of investigators to gather relevant evidence, interview the parties and relevant witnesses, and complete an investigation report within 30 days of the initial report. The Title IX Coordinator reviews the report and determines whether the information gathered supports charging the respondent with a violation of the Policy for engaging in prohibited conduct. The Title IX

Coordinator meets with both parties separately to review the report and the determination regarding the charging decision.

35.     Parties receive a copy of the report after appropriate information is redacted in accordance with the Family Educational Rights and Privacy Act ("FERPA"). Personally identifiable information is also redacted as well as medical information, or information that would only be available in student records. Documentary evidence is also provided with the report as well as summaries of statements, all of which are redacted in accordance with FERPA unless redactions would interfere with the purpose of Title IX to eliminate sex-based discrimination. Other information may be redacted at the discretion of the Title IX Coordinator if there are safety concerns related to disclosure. Video or audio recordings, which cannot feasibly be produced to parties are stored in a database system controlled by the University that parties can make an appointment to review with the appropriate Title IX Office. The parties also have the opportunity to submit written responses to the investigation report and other relevant information. These measures protect the privacy of both complainants and respondents and protect both parties as well as witnesses from harassment, humiliation, and retaliation.

36.     If the Title IX Coordinator determines that charges should be brought against the respondent, the Coordinator forwards the investigation report and notice of charges to the Student Affairs Officer responsible for student conduct on the relevant campus or school. That officer, in coordination with the Title IX Coordinator, makes a recommendation as to the appropriate sanctions and notifies the parties of the decision in writing. The Respondent must respond to the charges either as 1) Responsible; 2) Not Responsible; or 3) No Response. If the Respondent accepts responsibility, the sanction will be implemented. In circumstances where the Respondent has accepted responsibility, either party can appeal the sanction, but not the finding of a violation. If the

Respondent denies responsibility (or does not respond), a hearing is convened before a specially trained Hearing Officer.

37.     During the hearing both parties may make a statement and present witnesses. Only the Hearing Officer is permitted to ask questions of the parties and witnesses. The parties have the opportunity to suggest questions in writing to the Hearing Officer, which the Hearing Officer considers and may ask as deemed appropriate. Within two days of the conclusion of the hearing, the Hearing Officer will render a decision as to whether the respondent has violated the Policy and what sanction, if any, will be imposed and explain the basis for such decisions. Both parties may appeal the final decision and/or sanction imposed.

38.     In Rutgers' current proceedings, the Hearing Officer may consider statements by individuals who did not appear and testify at the hearing, but who provided interviews to the investigator and answered the investigator's questions.

39.     Rutgers allows for students to have an advisor of their choosing present throughout the investigation and hearing process and refers parties to resources to obtain advisors, but does not provide advisors. The advisor may only advise the student without disruption or direct intervention in meetings or hearings. The advisor cannot question witnesses or make objections. The advisor plays an important role in terms of providing support to the student and guiding them through the Title IX process. Because Title IX proceedings are part of the educational process and are not designed to function as adversarial, trial-like proceedings, it is crucial that students respond to the investigator, Title IX Coordinator or Hearing Officer in their own words. For these reasons, advisors are not permitted to ask or answer questions on the student's behalf and are limited to serving in an advisory capacity.

Decl. of Judith Ryan                                                    Case No. 20-cv-01468-CJN

EXHIBIT 87

**Sexual Misconduct Violations Against Employees and Third Parties**

40.     OEE handles the processing and investigating of complaints against employees of alleged violations of Policy 60.1.28. As stated above, the Director of OEE is the Title IX Coordinator for Employees. OEE also employs an associate director, four investigators, a case manager, and a human resources associate.

41.     In FY 2019, OEE received 66 formal and informal complaints of sexual harassment against employees and third parties. Of those, the University conducted 55 investigations.

42.     In order to initiate the investigation process, the complainant must submit a written and signed complaint. However, the University may initiate a "University Action" in which the University serves as the complainant in certain circumstances, such as where there is no individual complainant who has submitted a formal written complaint but the University is aware of sufficient information that leads the Title IX Coordinator for Employees to conclude that an investigation is warranted.

43.     Under the current OEE complaint procedures, the investigation is conducted by an OEE investigator whose factual findings are referred to the Director of OEE/Title IX Coordinator for Employees. The Director makes the determination as to whether the evidence supports finding that the respondent violated Policy 60.1.28 and issues a written letter of determination. The Director's determination and the investigation report are then relayed to the employee's unit for a determination as to appropriate action (including discipline). The Director is not authorized to issue or implement discipline against University employees.

44.     The complainant and respondent also receive a copy of the complaint, investigation report including any appended exhibits, and Director's letter of determination. Personal information

Decl. of Judith Ryan                                                  Case No. 20-cv-01468-CJN

EXHIBIT 87

is redacted and other information may be redacted on a case-by-case basis where deemed necessary and appropriate by the Director.

45.     Either party may appeal the Director's determination to the Associate Vice President for Labor Relations.

46.     The respondent's supervisors are responsible for determining whether to impose discipline, and the appropriate level of discipline, which may include consideration of the employee's prior disciplinary history for purposes of complying with contractual requirements concerning progressive discipline. The supervisors may consult the Office of Labor Relations or Office of Academic Labor Relations, as applicable, regarding compliance with the terms of relevant collective negotiation agreements and/or University policies concerning discipline and performance management. The supervisors may also consult the OEE Director/Title IX Coordinator for Employees. The decision concerning discipline is not issued or implemented until the conclusion of the appeal process.

47.     Depending on the terms and conditions of the individual's employment, the employee may be entitled to grieve any discipline issued, which may involve a grievance hearing (or multiple grievance hearings) and/or arbitration, but such a hearing or arbitration occurs after a policy violation has been found and discipline issued.

### Trainings

48.     Every year, incoming students are required to complete a web-based Title IX training program titled "Not Anymore," purchased from an outside vendor, that is overseen by the respective Title IX offices. Such trainings cover information related to University Policies 10.3.12 and 60.1.28, reporting obligations (for faculty and staff), resources for all parties, and how to support someone who discloses an incident of sexual misconduct. Additionally, the Athletics

Departments in Newark, New Brunswick, and Camden require student athletes to complete additional training pursuant to NCAA regulations, either through a web-based module or in-person training. OEE also oversees a mandatory web-based training for University employees that was purchased through an outside vendor. The University has expended significant time and resources in acquiring and developing these training modules for the University community. For example, the "Not Anymore" training costs $40,000 per year for the New Brunswick campus alone.

49.     In addition, on all campuses, staff members from the Title IX offices conduct in-person training on an "as requested" basis for students, faculty, and staff. Such trainings cover information related to the Sexual Misconduct Policy, reporting obligations (for faculty and staff), resources for all parties, and how to support someone who discloses an incident of sexual misconduct.

50.     The New Brunswick staff trains hearing officers once per year. Topics covered include background information about Title IX, Rutgers' investigation process, the hearing process, sanctions, assessing credibility, and basics on the effects of trauma and alcohol. In 2018, a University-wide training was held for Title IX Coordinators, investigators, and hearing officers. At present, additional training for hearing officers is conducted by campus Title IX Coordinators and hearing officers are required to participate in third party training programs.

**Administrative Process for Revising Policies to Comply with the Rule**

51.     Once the Rule has been read and digested by each of the Rutgers staff who will be involved in its implementation, Rutgers will need to take numerous steps to implement the Rule's requirements by August 14, 2020. Rutgers staff will need to review Policy 10.3.12 and 60.1.28 independently for required revisions and obtain input from relevant stakeholders, such as victims' advocates, the RUPD, faculty and student representatives, responsible officials, student conduct

officials, the University Senate, and other University personnel. Once that process is complete, the substantive changes must be approved by the Responsible Official. Policy 10.3.12 must also be approved by the Board of Governors before it can be formally adopted and implemented.

52.    Given the August 14, 2020 deadline for implementation of the new regulations, these processes will have to be executed in an expedited manner. And given the challenges of working during the COVID-19 pandemic, any required policy revisions may need to be approved by the Responsible Officials on an interim basis until final approval is obtained by the Board of Governors. This could lead to adopting a policy that has to be revised more than once in a year.

53.    In addition to policies that will need to be revised, the University will need time to communicate these policy decisions to the University community. The websites for all Title IX offices will have to be revised in accordance with the Rule and the newly adopted/revised policies. Each office's marketing materials that explain the reporting and investigation process will similarly have to be revised. The University will also need to develop and distribute the notices required by the Rule to students, applicants, employees, and the twenty-two (22) unions that represent University employees. Each of these items will take time to draft and develop, and cannot feasibly be done until after the policy review and revision process has concluded, further condensing the time the University will have to revise its policies in order to comply with the August 14, 2020 effective date of the Rule.

54.    Additionally, all training materials for students, faculty, and staff that are used to inform the campuses about reporting, investigation, and hearing processes will have to be revised. Given the Rule's abandonment of the concept of "responsible employees," the University will need to review and update its training materials regarding employee reporting obligations. All training documents, presentations, videos, and other materials will have to be thoroughly reviewed.

55.     The time spent by current employees to revise these training materials will be substantial. By way of example, University-wide training materials for Title IX training of Title IX Coordinators, investigators, and hearing officers were last revised in 2018. The process of updating these training materials alone took several months, supplemented by additional time and resources required to design, create and deliver educational materials to the University community. Similarly, in-person trainings are typically customized to fit their audience. Thus, each in-person training that Rutgers carries out separately for employees and students will require a separate revision process.

56.     The training materials will not only need to be revised by the effective date of the Rule, but according to the Department's website, all of the training materials must be made publicly available on the University's website by that date. This process will require Rutgers to engage with its third party vendors to make the materials public, which imposes an additional burden in an already compressed process.

57.     Additionally, Rutgers has found that one of the more effective ways to deliver messaging to the community is the use of informational videos. There will likely be additional expenses of several thousand dollars to develop and disseminate brief educational videos highlighting key changes to campus procedures. For example, the training video developed for faculty and staff cost $5,000 and another $1,560 to translate into Spanish. A "public service announcement" video recently developed for graduate students cost $4,000.

58.     Web-based modules used to train and inform students, faculty, and staff also will need to be revised. These modules are only updated as necessary and were not planned or anticipated to be revised this year, absent necessary changes caused by the Rule. The cost of implementing new web-based modules will depend on whether vendors raise their prices to accommodate for incorporating the changes.

Decl. of Judith Ryan                                                                 Case No. 20-cv-01468-CJN

EXHIBIT 87

**Implementing Parallel Procedures**

59.     Rutgers investigates all allegations of sexual harassment and sexual misconduct that fall under the definition of sexual harassment expressed in Policies 10.3.12 and 60.1.28. The definition of sexual harassment in the Rule differs significantly from that in Rutgers' policies. The scope of Rutgers' investigations of sexual misconduct allegations is also not geographically limited. However, under the Rule, Rutgers will be required to dismiss any investigations where the allegations do not meet the more stringent definition of sexual harassment and/or do not occur within the scope of the Department's "program or activity" definition.

60.     Although the Rule allows institutions to continue to investigate other sexual misconduct under their own code of conduct proceedings, in order to do so, the University would need either to create a parallel process or to apply the Rule's rigorous process to other alleged code of conduct violations. Applying the Rule's process would mean that serious conduct that interferes with students' education and on-campus life might be left unaddressed, which could foster a hostile learning environment for students. For example, if a student is required to withstand cross-examination by a family member of the accused in order to have their sexual harassment complaint adjudicated, they may opt to withdraw before the University can conduct an investigation, thus increasing the likelihood of sexual harassment continuing unabated.

61.     Currently all forms of sexual harassment, whether prohibited by Title IX, Title VII or State nondiscrimination laws, are covered by the same two policies. The creation of parallel policies and procedures will be time-consuming, complicated, engender confusion, and force the University to accumulate unnecessary costs. In addition, it will force the University to treat sexual harassment, as defined in the Rule, differently than other forms of illegal harassment covered by Title IX or other antidiscrimination rules.

62.     For example, the University may receive a complaint and conduct an initial review. In its initial review, it may find that the conduct is actionable sexual harassment under a University Policy (and/or Title VII or state law), but not under the Rule's definition of sexual harassment prohibited by Title IX. This complaint will then have to be formally dismissed as a Title IX investigation and referred to a different code of conduct investigation procedure and grievance process. The University will need to devote significant time and resources to determine how to implement this requirement in order to ensure its continued compliance with all governing federal and State laws.

### Implementation of the Rule's Procedural Requirements

63.     Under Policy 10.3.12 and 60.1.28, each party is permitted to have an advisor/support person of their choosing present at all meetings and hearings. However, under each policy, that advisor cannot advocate for or speak on behalf of the student or employee, ask questions, or interfere in the proceedings in any way. The Rule upends that arrangement.

64.     In the context of complaints against student respondents, the University has trained a group of staff and faculty who volunteer to serve as advisors for responding parties, and has trained the victim advocates at the Office for Violence Prevention and Victim Assistance to serve as advisors for complainants. Students may opt to work with one of these advisors at no cost to them or select their own advisor (such as an outside attorney, family member, or fellow student). If students wish to seek the assistance of an attorney, the Title IX Office in New Brunswick refers them to Student Legal Services, which partners with a large pool of local attorneys to provide legal representation at a significant discount to Rutgers students. Some students also may choose to proceed without an advisor.

Decl. of Judith Ryan                                                    Case No. 20-cv-01468-CJN
EXHIBIT 87

65.     In the context of complaints against employees or third party respondents, the parties are similarly permitted to have one support person present for any meetings they attend with OEE investigators, which may include a union representative, friend, family member, or attorney. Complainants seeking assistance in identifying a support person may also be referred to the same resources as stated above, as applicable.

66.     Currently, the advisor's role is circumscribed such that there is no need for the advisor to be trained in cross-examination or evidentiary standards. This avoids any issues caused by unequal representation of the parties in the investigation and hearing process, which the Rule's requirement may exacerbate.

67.     The Rule requires the University to provide advisors to parties and requires that the advisors carry out cross-examination in the hearing process. There is no current pool of staff and/or faculty who are appropriately trained to serve as advisors in the capacity envisioned under the Rule. In addition, serving in such a role could taint their ability to carry out their regular duties on campus. The costs to the University to provide advisors to carry out cross-examination may be significant. The established pool of volunteers may no longer be suitable to fill that function. The University will need to explore whether this function could be filled by existing staff or whether it will need to hire additional staff or external agents. Either of those options will increase costs to the University and create implementation challenges.

68.     Additionally, because parties may select lawyers to serve as their advisors, who in turn will be conducting live cross-examination subject to the evidentiary rules set forth in the Rule, qualified hearing officers will need to be identified and trained (or retrained) to carry out the hearing process and make immediate decisions on issues of relevancy and admissibility. In addition, hearing

Decl. of Judith Ryan                                                                 Case No. 20-cv-01468-CJN

EXHIBIT 87

officers will be required to explain their decisions on the spot. This is unlike anything the University's hearing officers are currently trained to carry out.

69.     The Rule forbids decision makers from relying on the statements of witnesses, including parties, who do not submit to cross-examination, but the Rule does not allow the University to exercise subpoena power to compel such cross examination. This will lead to the University being limited in its ability to conduct thorough hearings that are fair to both sides.

70.     Moreover, the University does not currently utilize a hearing as part of its investigation and adjudication process for complaints against employees and third parties, and therefore, the University has not had the occasion to date to identify or train anyone to serve as a hearing officer in such circumstances.

71.     In the event the University decides to retain outside hearing officers, typical hourly rates are $600 - $900 per hour. Title IX hearings usually last one business day and require pre-hearing preparation and post-hearing decision letters and, therefore, the estimated cost per hearing is $6,000 to $9,000. Based on the average number of hearings conducted at Rutgers per academic year, this could result in costs of $48,000 to $72,000 per academic year for matters involving student respondents alone.

72.     It is difficult to predict how many additional hearings may take place involving complaints against employees and third parties, as Rutgers current policies do not provide for hearings in such cases, but as set forth above, Rutgers conducts approximately 55 investigations pursuant to Policy 60.1.28 per year. Assuming the number of complaints remains steady after implementing the Rule (and that the Rule does not have a "chilling" effect on complainants' willingness to file formal complaints), the cost to conduct hearings using outside hearing officers in all such matters using the same estimate would be $330,000 to $495,000 per year.

73.     In addition, the revisions to the Policies will require the review of and revisions to ancillary documents, templates and notices used during the investigation and adjudication process, such as the initial notices provided to the parties at the outset of an investigation, templates for investigation reports and final written determinations, and instructions given to parties about the use and non-disclosure of evidence provided to them during the course of investigations. In addition, the University may need to consider whether to develop non-disclosure agreements to ensure that confidential information provided to the parties and their advisors are not misused for purposes unrelated to the investigation and hearing process.

74.     The University will have to create and implement a hearing process for complaints against respondent employees/third parties. Under the current OEE complaint procedures, investigations of such sexual harassment complaints are conducted by an OEE investigator and their findings are referred to the Director of OEE/Title IX Coordinator for Employees who makes a determination as to whether the evidence supports finding that the respondent violated Policy 60.1.28. That finding is then relayed to the employee's unit for a determination as to appropriate action (including discipline). Depending on the terms and conditions of the individual's employment, the employee may be entitled to grieve any discipline issued, which may involve a hearing, but such a hearing would occur after a policy violation has been found and discipline issued.

75.     Under the Rule, Rutgers will have to revise its policies and procedures in order to implement a pre-determination hearing process for complaints against employee respondents. The University will need to evaluate who to designate as the required "decisionmaker" who participates in the live hearing, determines whether the respondent has engaged in prohibited conduct, and decides the appropriate sanction (e.g., discipline). These decisions currently are made by different

individuals and offices based on their respective responsibilities and areas of expertise. Therefore, the University will need to carefully consider who to authorize to issue discipline through this process.

76.     Moreover, many of the University's employees are unionized and, pursuant to the terms of applicable collective negotiations agreements, are entitled to extensive post-disciplinary grievance procedures, which, in many cases, involve live hearings at which cross-examination also occurs. Therefore, because of the Rule, Complainants who pursue formal complaints against unionized employees may have to go through a hearing process as required by the Rule, in addition to the hearing procedures required by such grievance processes.

### Impact on the University Community

77.     In addition to its cost to the University, the Rule's requirement of cross-examination by an advisor would have a profound effect on the University community, including respondents, complainants, and witnesses. Many of the requirements of the Rule, particularly the requirement for live cross-examination by a respondent's attorney or advisor, could deter complainants from filing a formal complaint in order to avoid trauma associated with the hearing and adversarial cross-examination. According to the Rule, where no other independent evidence exists, the University therefore may be unable to hold respondents—including employees—accountable for known conduct, even if complainants and witnesses submit to interviews with the investigator. This is particularly concerning in the case of complaints against employee respondents, as the Rule precludes the University from utilizing any type of "informal resolution" processes to resolve such complaints, leaving complainants to choose between submitting to live cross-examination and the respondents facing no consequences for their actions.

78.     Should there be a decrease in reporting, Rutgers may not be able to identify possible trouble spots and trends, and students may, overall, feel less safe and that the University is doing less to protect them from sexual harassment.

### Impacts of the Novel Coronavirus Causing COVID-19

79.     As a result of a public health emergency resulting from spread of the novel coronavirus causing the COVID-19 disease, in March 2020, Rutgers University suspended all in-person instruction and moved nearly all of the University's operations to remote operations. All classes are now conducted online.

80.     Title IX Coordinators and investigators are faced with challenges in conducting investigations remotely. Students who are parties to an investigation may have challenges in finding safe places to be interviewed or participate in a hearing as their living environment may not provide a safe space to talk without their parents/family/roommates finding out about the investigation.

81.     In this environment, implementing the Rule by August 14, 2020 will be a particularly challenging and daunting task.

82.     Reviewing and digesting the Rule, and revising University policies accordingly, will require the input of many staff members who are adjusting to working remotely and are facing challenges in carrying out their regular work in such a manner. In addition, Rutgers will seek the input of students and other stakeholders at a time when none of them are on campus or likely to return to campus before the Rule becomes effective. The policy revisions will be substantial and will require several levels of review before being approved and implemented, all of which would be challenging under normal circumstances and would likely take months to adopt and implement. Instead, document review will have to be done solely by electronic means without having the opportunity to meet in person to fully discuss the issues and challenges presented by the regulations,

Decl. of Judith Ryan                                              Case No. 20-cv-01468-CJN

EXHIBIT 87

all while all University operations are focused on how to ensure a safe return to instruction in the fall for its three campuses, 70,000 students and over 20,000 staff and faculty.

83.     With the possibility that remote learning may continue into the Fall semester, the University will have to continue to adjust its policies of investigating sexual misconduct claims and conducting hearings remotely. Therefore, the University will need to evaluate and determine how to implement the Rule in unprecedented circumstances in which virtually all of its students, staff and faculty are off campus and able to participate in the investigation and adjudication only remotely.

84.     The COVID-19 pandemic has uprooted the entirety of the University community, creating uncertainty, stress and anxiety for many. The University is still in the process of determining whether, when and to what extent students, faculty and staff can return to campus. Asking the University community to review, implement, and adapt to an entirely new system for processing, investigating, and adjudicating complaints of sexual harassment during this time—and spring it on its community at the beginning of a new school year with little warning—can only add to these feelings of uncertainty, stress and anxiety.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this   18   day of June 2020.

_____
Judith Ryan
Institutional Compliance Officer – Title IX

Decl. of Judith Ryan                                                    Case No. 20-cv-01468-CJN
EXHIBIT 87

EXHIBIT 88

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | Civil Action No. **20-cv-01468-CJN** |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF METROPOLITAN STATE UNIVERSITY OF DENVER

I, Raúl M. Sánchez, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Executive Director of the Office of Equal Opportunity (OEO) and Title IX Coordinator at Metropolitan State University of Denver (MSU Denver, or the University) located in Denver, Colorado. My educational background includes a BA degree in Politics from Princeton University, an MA Degree in Latin American Studies from Stanford University, and a JD degree from Harvard Law School, Harvard University. I have been employed as the Executive Director of the Office of Equal Opportunity and Title IX Coordinator since November 2018.  Since 2000, I have held

similar positions with similar titles at Union County College (New Jersey), Stony Brook University (State University of New York), Washington State University, and University of Idaho.  Prior to 2000, I was an Associate Professor of Law at St. Mary's University (Texas); an Associate in the corporate area at two major law firms in New York City, a Program Officer with the Ford Foundation, and a law clerk at the Colorado Supreme Court.

2.      I submit this Declaration in support of the  State of Colorado's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule, entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or Rule). I have compiled the information in the statements set forth below through personal knowledge, through University personnel who have assisted me in gathering this information from our institution, on the basis of documents that have been provided and/or reviewed by me. I also have familiarized myself with the Rule to understand its immediate impact on the University.

**Background about the University**

3.      MSU Denver is located in Denver, Colorado, and was founded in 1965. The University is a commuter campus in which all of the students live off campus and commute to class. The University consists of five academic colleges and schools: College of Business; School of Hospitality, Events, and Tourism; College of Letters, Arts, and Sciences; College of Professional Studies; and School of Education.   The University has 106 majors, 91 minors, eight graduate programs, and 34 certificate programs. Students also have the option to customize their degree through the Individualized Degree Program. In Fall 2019, the University had 18,917 undergraduate students and 877 graduate students.  In Spring 2020, the University had 17,288 undergraduate students

and 873 graduate students. The University currently employs 586 faculty, 95 Classified staff, 678 administrators, 138 hourly employees, and 479 student employees.

4.    MSU Denver is an institution of the state and receives direct state funding to support its educational efforts. The Department of Higher Education/Colorado Commission on Higher Education oversees the University and its tuition/fee policies. The Joint Budget Committee, a bi-partisan committee of the Colorado Legislature, oversees the allocation of funding to MSU Denver and sets the tuition rate increases for the institution.

5.    The University receives federal funds from the Department. As a result, the University is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

### Summary of Existing Title IX Sexual Misconduct Policy

6.    The University currently maintains a single sexual misconduct policy that prohibits sexual harassment and sexual misconduct by students, employees, and faculty and establishes a grievance process for addressing complaints of sexual harassment.

7.    The office of the Title IX Coordinator consists of the Title IX Coordinator and one Equity Specialist.  The office is responsible for receiving and investigating allegations of violations of the Policy in the form of discrimination, sexual harassment, sexual assault, domestic violence, and stalking.  It usually handles all cases for investigation, except student-on-student sexual misconduct cases, which are usually addressed by the Title IX Investigator and Student Conduct Specialist, located in the Office of Student Conduct in the Office of the Dean of Students.  That position has been vacant since April 2020, because of a resignation; therefore, the Office of the Title IX Coordinator currently handles all Title IX and other discrimination investigations. In addition to investigations, the Title IX office advises supervisors, carries out discrimination and Title IX trainings for students, faculty, and staff.  The University requires all employees, including student employees, to complete

Decl. of Metropolitan State University of Denver                    Case No. 20-cv-01468
EXHIBIT 88

the following online trainings, which the Title IX office administers:  Accommodating Disabilities; Harassment and Discrimination Prevention; Bullying in the Workplace; and Check Point: Data Security and Privacy. The Title IX Coordinator complements the online training with in-person training sessions with all academic and administrative units.

8.      From June 2019, to May 2020, the University received 51 Title IX complaints. The University carried out 10 Title IX investigations involving employees and 29 involving students. Four student cases led to further conduct processes conducted by the Dean of Students Office. The Title IX Coordinator receives all complaints of alleged prohibited conduct.  The Title IX Coordinator or designee usually conducts a preliminary inquiry into the facts before determining whether an investigation or some other remedy is warranted.

9.      The current Policy was last revised in December 2018, in consultation with an Attorney Advisor from the ED's local Denver Office of Civil Rights.

10.     Below is an abbreviated version of the definition for sexual harassment currently in the University's Policy, which will be revised to be complaint with the Rule.[1]

> The Policy prohibits sexual harassment, a form of discrimination based on sex and/or gender. Sexual harassment encompasses *quid pro quo* sexual harassment, gender-based harassment, hostile environment sexual harassment, and sexual misconduct. Sexual harassment also covers unwelcome verbal or physical conduct of a sexual nature.
> …
> Sexual misconduct is a form of sexual harassment and is prohibited by the Policy. It is an egregious form of sex discrimination/sexual harassment. A number of acts are regarded as Sexual Misconduct including, but not limited to, nonconsensual sexual contact (including sexual intercourse), sexual assault, stalking on the basis of sex and/or gender, domestic violence involving sex, gender or sexual behavior, dating violence, and sexual exploitation.
> …

---

[1] The Policy in its entirety can be found at: https://www.msudenver.edu/policy/policylibrary/policiesa-z/ discriminationsexualmisconductandretaliation/.

Decl. of Metropolitan State University of Denver                    Case No. 20-cv-01468
EXHIBIT 88

11.    The University currently addresses harassment that takes place outside of "locations, events, or circumstances over which the University exercised substantial control over both the respondent and the context in which the sexual harassment occurs," not in "any building owned or controlled by a student organization that is officially recognized by the University," or outside of the United States consistent with the Dear Colleague Letter of 2011, which has been withdrawn by the the Department.  In other words, if the University finds a nexus to the institution, it will investigate such allegations of harassment.

12.    Responsible Employees, as defined in the Policy, are employees:

…who witness or receive information regarding an allegation of discrimination, sexual harassment, or sexual misconduct shall report immediately all known details to a supervisor and/or the OEO Director/Title IX Coordinator or designee, who is a neutral factfinder.[2]

All other members of the MSU Denver community are strongly encouraged to report to the OEO Director/Title IX Coordinator or designee, or, in matters concerning student sexual misconduct, to the Office of Student Conduct, any information about discrimination, sexual harassment, or sexual misconduct. Discrimination, sexual harassment, and sexual misconduct should be reported as soon as possible.  In circumstances where the complaint includes an allegation that a crime was committed, MSU Denver may be required to report such complaint to the police. An affected party may choose to report their complaint to MSU Denver and seek resolution under the Procedure and report their complaint to law enforcement and pursue criminal charges. Both options may be pursued simultaneously or separately.

---

[2] https://www.msudenver.edu/policy/policylibrary/policiesa-z/discriminationsexualmisconductandretaliation/

Decl. of Metropolitan State University of Denver                     Case No. 20-cv-01468
EXHIBIT 88

13.     The University currently does not: conduct live hearings; allow for cross-examination or formal submitted questions; or allow advisors to play a formal role in the investigation; however, the parties may be accompanied and advised by personal advisors, who can by anyone, as long as they are not a supervisor or a potential witness.   In employee and student cases, parties are allowed to submit evidence and pose questions that the investigator may consider asking the other party, if the investigator deems the question pertinent to the investigation. Student cases are handled by a single investigator.  Disciplinary decisions are decided by a single conduct officer.  Appeals are permitted. Employee cases are handled by the OEO Executive Director and Title IX Coordinator.  Appeals of investigative results may be appealed under limited bases to Human Resources.

14.     Difficulties for Title IX investigations have arisen as a result of the national public health emergency caused by the COVID-19 pandemic.  Complaints have declined during the pandemic, which may reflect fewer incidents of harassment, but it may also reflect the reluctance of complainants to come forward during the pandemic, for health and other reasons.  Investigations are best conducted in a live setting for the investigator to be able to access witness testimony.  This has not been possible during the pandemic; therefore, interviews have been carried out online.

### Harm to College/University – Conflicts with State Law Requirements

15.     Colorado's public institutes of higher education are required to adopt sexual misconduct policies pursuant to state statute. Colo. Rev. Stat. § 23-5-146(2)(a). These policies must generally conform to the time-tested single investigator model, whereby an individual employed by the institute investigates and determines responsibility for sexual misconduct based on the preponderance of the evidence standard. Colo. Rev. Stat. § 23-5-146(3). Under this model, the parties are entitled to advisors, but those advisors do not question witnesses directly and, instead, all questions are asked through the investigator. *Id.*

Decl. of Metropolitan State University of Denver                    Case No. 20-cv-01468
EXHIBIT 88

16. The new Rule will require a Colorado public institute of higher education to adopt different policies for sexual harassment and sexual misconduct, with vastly different procedures. When misconduct rises to the level of harassment, which may be based solely on whether the improper conduct occurred on-campus instead off-campus, the University will be required to abandon the single investigator model and engage in a quasi-criminal procedure.

17. The live hearing/cross examination requirement will require the University to train and advise lay persons to conduct trial-like proceedings, where they will need to understand and rule on evidentiary issues or hire legally trained hearing officers. In addition, the University will have to pay for advisors for parties in many instances. MSU Denver is already severely underfunded and runs OEO and General Counsel offices on a shoestring budget, with staffing that is extremely lean. The State of Colorado recently cut higher education funding by 58 percent, and MSU Denver is the lowest-funded state university. We simply do not have the budget to hire outside professionals to perform the duties the new Rule requires. Neither OEO nor the General Counsel's office can reasonably train lay persons to conduct hearings. We run the risk of having ill-managed hearings where one or both parties are harmed by ill-advised evidentiary rulings by a lay hearing officer. We cannot afford, either financially or operationally, the unfunded mandate of the new Rule. Requiring the University to revamp its entire Title IX process and secure the necessary resources in two months, while work is done remotely, and the University's budget is being severely cut is unreasonable.

**Harm to College/University – Revising Existing Sexual Misconduct Policies**

18. All of the following documents will need to be reviewed and revised to comply with the new Title IX regulations and the preamble that sets forth substantive requirements: MSU Denver's sexual misconduct policy and procedures; discrimination policy; student code of conduct; faculty handbook; employee handbook; and all related documents that describe investigative procedures.

Decl. of Metropolitan State University of Denver                    Case No. 20-cv-01468
EXHIBIT 88

The period of time allowed to comply with the new Rule, by August 14, 2020, is unreasonably short. The University will do everything possible to meet the deadlines; however, the volume of documents that must be reviewed and revised and given the short amount of time allowed to do so, may lead to errors that will result in deficient or inconsistent outcomes.

19.     The offices, individuals, or parties that will have to be consulted in the initial revision includes students, faculty, staff, Human Resources, General Counsel, and other relevant stakeholders. The process would be expected to take at least six months. The cost of hiring legally trained hearing officers and advisor will be $100,000 per year.

20.     The University's review process (e.g., public comment, approval by Faculty Senate and its subcommittees, policy committee, president's cabinet, Board of Trustees etc.) is impossible to carry out before Fall 2020. Assuming that all newly reviewed and revised documents would be available for review and input by the various committees and groups, the most expedited timeline would see completion of consultations with all interest groups, review and revisions by University committees, and necessary approvals by Spring 2021.

21.     The new Rule requires the University to make many substantial changes to the existing Title IX policies, procedures, and personnel and student infrastructure in a short period of time.  The risk is high that the institution will not  be able to train current employees  and/or hire new professionals in time to operate an efficient and effective system, as currently exists.  Victims will be discouraged from filing complaints, and if they do file them, they may reasonably fear that their complaint will not be fairly handled or judged.  The lack of faith and trust in the new Title IX structures could weaken trust in the University and its Title IX system for years to come.

22.     University plans to respond to "non-Title IX sexual harassment," i.e., harassment that it must dismiss under § 106.45(b)(3)(i) because it falls outside of the rule's definition, that takes place

Decl. of Metropolitan State University of Denver                              Case No. 20-cv-01468
EXHIBIT 88

outside the college/university's "education program or activity," or that takes place outside the United States by developing and maintaining separate policies and code of conduct provisions by possibly creating new offices or new staff positions; renaming existing offices or positions; developing different grievance procedures; and developing a referral process. The time and cost of developing and maintaining a separate infrastructure for non-Title IX cases will be costly. Such a cost is difficult to access but a reasonable estimate would be approximately $100,000 in recurring annual costs.

23.     The University is currently paying a private company $20,000 a year to provide discrimination and sexual harassment awareness trainings to all University employees, which must be repeated every two years.

24.     The University will have to train a substantial number of staff on the new requirements, including individuals yet to be hired for positions yet to be established; therefore, calculating cost and effort at this time can only be estimated. Such training also would cover decision-makers at hearings to referee cross-examination by advisors and the making of evidentiary decisions on the record. One-time training costs for the Title IX office, all staff, all faculty, and panel members would be approximately $100,000, and approximately $50,000 in recurring annual costs.

25.     The University will have to reeducate the entire campus community about the new Title IX requirements (e.g., new communication materials, revise new student orientation, revised new employee orientations, etc.). An estimated cost would be $50,000 in one-time costs.

26.     The University is concerned about its ability to comply with the August 14, 2020, effective date. The University will have to expend a large amount of time and money to meet the August 14, 2020, effective date.

Decl. of Metropolitan State University of Denver                    Case No. 20-cv-01468
EXHIBIT 88

27.     Despite concerns about being able to meet the August 14, 2020, deadline, the University began to make plans based on the Notice of Proposed Rulemaking (NPRM), only to have to re-think and re-plan things because of the changes in the final rule.

28.     The August 14, 2020, effective date will make it more difficult for the University to fulfill its obligations under Title IX to: provide all students equal access to education; train all students/faculty/staff on their obligations under Title IX; and ensure that all students, faculty, and staff are aware of their rights under Title IX.

**Harm to College/University – Responding to Complaints Under New Requirements**

29.     The University is considering the time and cost of mandatory live hearings, providing advisors to parties, allowing advisors to directly cross-examine students, not allowing college/university to consider evidence unless party submits to cross-examination, and making evidentiary decisions on the spot.  Some of the current staff can be trained, with time, to perform new functions; however, new personnel will have to be hired at a recurring annual cost of approximately $100,000.

30.      It is the University's best judgment that to avoid claims alleging ineffective assistance of counsel and violations of due process, the University must hire outside professionals to serve as advisors, hearing panel members, mediators, and hearing officers.   A conservative estimate of the costs of hiring such professionals is an annually recurring sum of $100,000.

31.     Precise harms to complainants and respondents caused by mandatory cross-examination by advisors are speculative at this time; however, based on other proceedings in other settings and based on reactions during current proceedings, expected harms can be reliably predicted to include:

    a.   Fewer Title IX complaints will be filed;

    b.   Re-traumatization, especially to the complainant;

Decl. of Metropolitan State University of Denver                    Case No. 20-cv-01468
EXHIBIT 88

    c.   Lengthier proceedings will lead to loss of time from studies and employment, and loss of income;

    d.   Outcomes will be less predictable and may have more to do with the skill of private attorneys hired by respondents;

    e.   Both parties will have to devote more preparation time for the hearings; and

    f.   Party statements will be more rehearsed and less spontaneous.

32.    The time for setting up a system to provide review access to all parties of all evidence will be substantial, especially as long as COVID restrictions are in place.  The parties will have to review evidence online, which adds the risk that they may copy anything they see online. All evidence obtained in paper form must be scanned and put online.  Such need will add to the administrative responsibility of at least two staff members. The cost is hard to measure, but easily at least an extra $20,000 per year.  One-time start-up costs will around $10,000.

33.    Every aspect of the Title IX infrastructure required by the new regulations must be developed, put in place, and staffed.  Especially for an institution like the University, which does not currently utilize a hearing-based system, most aspects of the new infrastructure will be new, including: a. physical space for hearings; b. hiring of trained hearing officers; c. hiring of trained counsel for the parties, as needed; d. data systems for the parties to review evidence; e. data systems to enable the parties to review training materials utilized by all Title IX team members in relevant trainings; and f. the establishment of parallel investigative and adjudicative systems for cases deemed not to be Title IX cases. Costs must be assessed for one-time set-up costs, like for data systems, and recurring annual costs, like salaries and benefits for new personnel.  The University currently and conservatively estimates one-time costs to be $100,000 and new recurring annual costs to be $200,000.

Decl. of Metropolitan State University of Denver           Case No. 20-cv-01468

EXHIBIT 88

34.     All aspects of the new requirements will bring increased risk of litigation by any party alleging that their rights were being violated by the institution, or enforcement action by the Department on the basis of the following issues:

a. The University does not meet the deadline of August 14, 2020, for any aspect of the new Title infrastructure.

b. any aspect of the new Title IX infrastructure is not functioning effectively,

c. The new regulations will require that the University maintain data files available to the public with the training materials that every member of the Title IX team has utilized in all Title IX-related training.  That will maintain accountability; however, it also will increase the possibility of frivolous lawsuits over whether training as been adequate.

d.  The University does not currently use a hearing-based system; therefore, all personnel operating in a hearing-based system as of August 14, 2020, must be trained.  Any one individual not doing their job thoroughly as of August 14, 2020, could give rise to a lawsuit.

**Harm to University & University Community - Harder to Identify, Remedy, and Eliminate Sexual Harassment**

35.     In trying to predict the overall impact of narrowing the definition of sexual harassment, narrowing scope of relevant "program or activity," forcing the University to dismiss complaints that fall outside of either definition, and proceed under a separate code provision, I expect the following to occur:

a. The current reporting rate will drop because reporting will be chilled.

b. The impact to the University community when reporting goes down will be widening belief that the University does not care about effectively addressing sexual harassment and other incidents of discrimination.

Decl. of Metropolitan State University of Denver                    Case No. 20-cv-01468
EXHIBIT 88

c. Other impacts or harms to students will be added stress to all students, but it will especially affect women, who are disproportionately affected by sexual harassment, and minorities, who are disproportionately affected by discrimination on the basis of race and ethnicity.

36.     Under the new Rule: reports of sexual harassment and other forms of discrimination will decline; students and employees will have less trust in the institution and doubt that it seeks to, and can effectively address complaints of sexual harassment; students, especially women and minorities will feel, and will be, less safe on campus; additional costs to fund the new Title IX infrastructure will force funds to be transferred from other areas of the University.   Therefore, University will have difficulty fulfilling its obligations under Title IX.   The University will find it increasingly difficult to: provide all students equal access to education; provide a safe campus environment for all students; prevent and remedy sexual harassment; provide a fair and equitable process for all students.

**Additional Concerns Related to COVID-19**

37.     Finally, the University does not believe that an implementation date for the new Rule of August 14, 2020, is feasible. On March 11, the World Health Organization announced that the global spread of COVID-19 should be characterized as a pandemic. That same day, the Governor of the State of Colorado, Jared Polis, issued Executive Order D 2020 003, "Declaring a Disaster Emergency Due to the Presence of Coronavirus Disease 2019 in Colorado."

38.     On March 13, 2020, President Donald J. Trump issued his "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak," pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5207. Proclamation 9994, 85 Fed. Reg. 337-38 (March 13, 2020).

Decl. of Metropolitan State University of Denver                    Case No. 20-cv-01468
EXHIBIT 88

39.     On March 17, 2020, Governor Polis issued Executive Order D 2020 017, "Ordering Coloradans to Stay at Home Due to the Presence of COVID-19 in the State," which physically closed the University for most purposes, although distance learning and operations continued.

40.     On April 9, 2020, the Colorado Department of Public Health issued its "Fourth Updated Public Health Order 20-24 Implementing Stay at Home Requirements," creating a limited exception from the Stay at Home Order for the University regarding "facilitating distance learning, providing in person classroom or laboratory education for less than 10 students per classroom or lab in medical training fields only, or performing essential functions . . . such as security, medical and mental health services, housing, food services, and critical research." *Id.* at 10.

41.     On April 26, 2020, Governor Polis issued Executive Order D 2020 044, "Safer at Home." Pursuant to this Order, the University is now permitted to provide limited in-person instruction for courses and programs that cannot not be taught remotely. Otherwise, the previous restrictions on the University remain in effect.

42.     On April 30, 2020, Governor Polis issued Executive Order D 2020 050, "Declaring Insufficient Revenues Available for Expenditures and Ordering Suspension or Discontinuation of Portions of Certain State Programs and Services to Meet a Revenue Shortfall Due to the Presence of COVID-19 in the State of Colorado." In this Order, the Governor declared that "there are not sufficient revenues available for expenditure . . . to carry on the functions of the state government and to support its agencies and institutions." (quoting Colo. Rev. Stat. § 24-2-102(4)). It is expected that, in fiscal year 2020/2021, Colorado will suffer a revenue shortfall in excess of $3 Billion and the State's higher education budget will be cut by 58%. It remains to be seen to what extent the University's campus will be open during the Fall of 2020 semester.

Decl. of Metropolitan State University of Denver                    Case No. 20-cv-01468
EXHIBIT 88

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this twelfth day of June, 2020.

_____

Raúl M. Sánchez, J.D.


Executive Director, Office of Equal Opportunity
Title IX Coordinator

Decl. of Metropolitan State University of Denver                    Case No. 20-cv-01468
EXHIBIT 88

EXHIBIT 89

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. <u>20-cv-01468-CJN</u> |

## DECLARATION OF MICHELE ROLAND SCHWARTZ

I, Michele Roland Schwartz pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Executive Director of the Oregon Sexual Assault Task Force ("SATF" or "Task Force"), a non-profit organization located in Keizer, Oregon, a national and state training and technical assistance provider, which harnesses the lived experiences of survivors and expertise of multi-disciplinary responders to ensure services to survivors are trauma-informed, survivor-centered, and offender-focused. My educational background includes a Master of Arts in

Decl. of Michele Roland Schwartz                                              Case No. 20-cv-01468-CJN

EXHIBIT 89

Interdisciplinary Studies with a focus in Sociology and Women's Studies and a Bachelor of Arts in Sociology. I have been employed with SATF since 2013.

2.      I have worked as a community-based advocate and nonprofit leader since 1999. I extensive experience in both direct service, organizational management, and policy development in the areas of domestic violence response and prevention, treatment and response to sexual trauma, and training professionals on best practices for responding to sexual assault and trauma. As SATF Executive Director I Oversee the Sexual Assault Training Institute, Sexual Assault Nurse Examiner, Campus, and Prevention Programs, and facilitate quarterly meetings for 100+ members appointed by the Oregon Attorney General representing: Advocacy Response, Campus, Criminal Justice, Prevention and Education, Men's Engagement, Medical-Forensic, Legislative and Public Policy, and Sex Offense Treatment and Management. I am also a member of the Oregon Alliance to End Violence Against Women, Department of Justice Victims' Rights Task Force, Crime Victims' and Survivor Services Division (CVSSD) Advisory Committee, Willamette University President's Commission on Sexual Harassment.

3.      As part of my duties with SATF and my professional experience in this field, I am familiar with the current program compliance requirements for Title IX and understand how such programs are generally funded and administered in Oregon. I am also familiar with research and literature in the field of sexual assault prevention, prevalence, and impacts.

4.      On January 28, 2019 SATF submitted comments to the Department during the rulemaking process.[1]

5.      I submit this Declaration in support of the State of Oregon's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States

---

[1] https://www.regulations.gov/document?D=ED-2018-OCR-0064-10462

Decl. of Michele Roland Schwartz                                     Case No. 20-cv-01468-CJN

EXHIBIT 89

Department of Education ("ED" or the "Department"); and the United States of America regarding

the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or*

*Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title

IX Rule" or "Rule"). I have compiled the information in the statements set forth below through

personal knowledge, through other SATF personnel who have collaborated in gathering this

information from our organization, and on the basis of documents reviewed. I have also familiarized

myself with the Rule in order to understand its immediate impact on Oregonians.

### The Oregon Sexual Assault Task Force

6.      SATF's mission is to improve the response to and prevention of sexual violence in

Oregon. Formerly called the Oregon Attorney General's Sexual Assault Task Force, The Task

Force was originally founded 1999 by Oregon's then-Attorney General Hardy Myers in

collaboration with statewide advocates, activists, and leaders to provide a multi-disciplinary,

collaborative response to sexual violence in Oregon. It is now a private, non-profit, non-

governmental statewide agency operating three programs and coordinating over 100 multi-

disciplinary members who serve as advisors on the Task Force Advisory Committees. SATF's

funding comes from grants from a number of federal, state, and local governmental sources.

7.      In organizing and maintaining a membership body, SATF seeks to facilitate cross-

discipline collaboration and cultivate victim-centered approaches to sexual assault primary

prevention, victim advocacy, medical forensic care, criminal prosecution and sex offender

management and treatment. Task Force members engage in a number of areas including: Advocacy

Response, Campus, Criminal Justice, Legislative & Public Policy, Medical-Forensic, Men's

Engagement, Offender Management, and Prevention Education. SATF develops and implements

Decl. of Michele Roland Schwartz                                    Case No. 20-cv-01468-CJN

EXHIBIT 89

programs and resources for communities through Oregon, including position papers, manuals, training, technical assistance, legislative and policy efforts, and primary prevention efforts.

8.      SATF provides hundreds of trainings a year to campus practitioners, law enforcement, and preventionists, engaging with over 18,000 Oregonians in 2019 to promote health sexual relationships and prevent sexual violence.[2]

## Prevalence of Sexual Violence

9.      In higher education contexts, "traditional" students are those that enter higher-education directly from secondary school or "high school." They typically enter and complete college between the ages of 18-24. National studies have shown that 1 in 5 female-identified students will experience sexual violence during college.[3] 27% of college women have experienced some form of unwanted sexual contact.[4]

10.     A majority of female victims of completed or attempted rape first experienced such victimization early in life, with 81.3% (nearly 20.8 million victims) reporting that it first occurred prior to age 25.[5] The majority of male victims (70.8% or an estimated 2.0 million) of completed or attempted rape reported that their first experience occurred prior to age 25.[6]

11.     Nearly two-thirds of college students experience sexual harassment, and less than 10% of these students tell a college or university employee.[7]

---

[2] Oregon SATF 2019 Year in Review. http://oregonsatf.org/wp-content/uploads/2019/12/2019-Year-in-Review.pdf
[3] U.S. Department of Justice, 2003 National Crime Victimization Survey
[4] Gross, A. M., Winslett, A., Roberts, M., & Gohm, C. L. (2006). An Examination of Sexual Violence Against College Women. *Violence Against Women*, *12*(3), 288–300. https://doi.org/10.1177/1077801205277358
[5] Smith, S.G., Zhang, X., Basile, K.C., Merrick, M.T., Wang, J., Kresnow, M., Chen, J. (2018). The National Intimate Partner and Sexual Violence Survey (NISVS): 2015 Data Brief – Updated Release. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.
[6] *Id.*
[7] Hill, Catherine & Silva, Elena. (2005). Drawing the Line: Sexual Harassment on Campus. American Association of University Women Educational Foundation.

Decl. of Michele Roland Schwartz                                              Case No. 20-cv-01468-CJN

EXHIBIT 89

12.     Almost half of all transgender people have been sexually assaulted at some point in their lives, and these rates are even higher for trans people of color and those who have done sex work, been homeless, or have (or had) a disability.[8]

13.     Studies show that women in Oregon experience rate higher than that of the national average, with 1 in 4 women experiencing sexual assault in her lifetime.[9]

### The Rule will be a financially burdensome unfunded mandate

14.     While Title IX allows institutions to continue to provide federal financial aid to students, it does not provide additional dollars for services or programs related to the implementation of policy, including the Rule.

15.     In Oregon, the cost to train any individual institutional staff member in the Title IX process ranges between $400 and approximately $3000 per training. Oregon law and policy reflect the goals of trauma informed, compassionate response to sexual misconduct and assault. The statutory training requirements reflect the need to invest in response teams guided by equity and high professional standards. However, the need for annual training to meet this standard makes the cost particularly burdensome in this State.

16.     In order for Oregon schools to equitably and thoughtfully implement the requirements of the Rule they must not only widen the pool of individual staff members trained to comply with additional hearing processes, form decision bodies, and conduct investigations but also retrain all staff currently working in Title IX processes.

---

[8] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). The report of the 2015 U.S. Transgender Survey. Retrieved from the National Center for Transgender Equality: https://www.transequality.org/sites/default/files/doc s/USTS-Full-Report-FINAL.PDF

[9] *The National Intimate Partner and Sexual Violence Survey | 2010 Summary Report

Decl. of Michele Roland Schwartz                    Case No. 20-cv-01468-CJN

EXHIBIT 89

17.     Policy implementation on college campuses is not a direct line from rule to implementation. Many colleges and universities in Oregon have established procedures for adopting federal guidance and any other policies that affect students, staff or faculty. These typically require the FTE of between 5-40 staff people, ranging from 6 weeks to 6 months. The financial cost for this could be calculated as number of staff required at each institution (minimum 3) x hours spent in policy approval process = dollars spent at just the policy implementation level.[10] This calculus of institutional personnel cost does not include training, cost of print materials to disseminate new changes to students, cost of print materials to change current forms, cost to update computer systems used to track and store student records related to Title IX, etc.

18.     Schools in Oregon are particularly impacted because of our state's inclusion of campus-based advocates as part of the Title IX Process. Professional advocates serve as the first point of contact and outreach at many Oregon schools. Because the new Title IX  rules create conditions that are directly in conflict with national Victim Advocate Ethics,[11] many of Oregon's schools will have to undergo a complete renovation of their outreach materials, procedure, and policies to remove advocates as a main, trauma-informed component of the Title IX system.

19.     For the few Oregon schools provide advocacy outreach to the reporting party ***and*** provide additional confidential support for respondents (usually in the form of a Respondent Outreach Coordinator or similar role, and commonly staffed by an MSW or similar discipline), those educational institutions will have to take additional time and incur costs related to augmenting their policy to reflect this position's role in relation to the new Rule requirements.

---

[10] A full time Title IX Coordinator at an Oregon higher education institution may make $80,000-$100,000 annually. Professionals in this area are estimating 5-30 hours a week of policy development time. 10 hours (.25 FTE) a week for approximately 8 weeks until the August implementation deadline is approximately $3500 of a $90,000 salaried employee's cost to the institution, not counting the time and value lost due to the person's unavailability for other job functions.
[11] https://www.ovc.gov/model-standards/ethical_standards.html

Decl. of Michele Roland Schwartz                                   Case No. 20-cv-01468-CJN

EXHIBIT 89

**Few Oregon programs have adequate funds to undertake a comprehensive program revision, which would be necessary by new Rule requirements.**

20.     Oregon schools each fund their sexual violence prevention and response efforts differently. There are over forty-five post-secondary institutions subject to the Rule in Oregon, however at any institution receiving public funding Covid-19 will have a severe impact. These funding streams are directly tied to local and national economies and student enrollment numbers. Prior to COVID-19, many schools were seeing a decrease in overall enrollment numbers for the 2019-2020 academic year. COVID-19 has already had a drastic financial impact on many schools, primarily due to loss of income associated with students unenrolling from the institution (meaning less tuition to the institution), and loss of revenue related to on-campus student housing and inability to host summer conferences/rent space to outside organizations, which pay the schools a fee to utilize campus space and resources.

21.     Not every institution of higher education has a dedicated prevention program (although they may provide online education to incoming and continuing students using e-modules). For those that do, funding comes (most commonly), from a collection of funding streams, including:

   a. Student fees (dependent on student enrollment, may also include student fees for medical services called "Student Health Fees")
   b. Student Affairs/Title IX budgets (also heavily tied to enrollment and the institution's financial wellbeing)
   c. Some institutions have prevention within their health/wellness center budgets, and some include prevention via the advocacy center's budget

22.     At many Oregon educational institutions schools, there is not even 1.0 FTE for prevention (some schools have zero FTE dedicated to violence prevention on campus). Though the VAWA Amendments to the Clery Act require prevention to be ongoing throughout a student's collegiate career, many Oregon schools must weigh their obligation to be compliant with unfunded federal mandates (like Title IX) or weigh losing their ability to offer federal financial aid to their

Decl. of Michele Roland Schwartz                                    Case No. 20-cv-01468-CJN
EXHIBIT 89

students. The result is that prevention services are often one of the first departments related to Title IX work on campus to be cut.

23.     Cutting prevention services means lost opportunities to intervene before sexual violence and misconduct occur, thus an increase in trauma and associated negative outcomes such as increased use of institutional mental and physical health services, reduced retention rate for students, and consequent loss of tuition revenue.

24.     Currently two schools in Oregon receive grants via The Office of Violence Against Women to fund prevention initiatives. One will be ending their grant cycle shortly, the other has approximately one year left in their grant cycle.

25.     On most campuses in Oregon, these are the main providers of trauma services (defined as the collection of providers and services that would be responsive to survivors of sexual harassment, sexual assault, rape, stalking, intimate partner violence and dating violence):

- o   Medical staff (including Physicians, Sexual Assault Nurse Examiners, Physicans Assistants, Registered Nurses, Psychiatric Nurse Practitioners, etc.);
- o   Mental Health services staff (including Psychologists, Counselors, MSWs, etc.);
- o   Campus-based advocates subject to the Victim-Advocate privilege;
- o   Accessibility and Disability Services; and
- o   Multicultural student service providers (including Queer Resource Centers, Multicultural Student Resource Centers, Pan-African/Black Student Commons, etc.)

26.     These entities on campus are typically supported by a combination of college/university line items, mostly funded by student fees (again, student fees are directly impacted by the amount of students enrolled at an institution, and the amounts vary annually).

27.     Eight schools in Oregon receiving funding from the Oregon Department of Justice Crime Victim and Survivor Services Department as part of the ongoing Victims of Crime Act (VOCA) project to directly hire and implement advocacy services on campus or in partnership with

local community-based Domestic Violence/Sexual Assault resource centers (Peace at Home in Roseburg, Oregon and the SAFE project in Coos Bay, Oregon). These awards are for three and two year cycles (respectively) with no guarantee of further funding.

28.     Some Oregon student associations (student governments) have demonstrated their will to have ongoing support for advocacy programs on campus, outlining line items in the student government budget or implementing additional student fees specifically to support advocacy and prevention services on campus, however, these are not a substitute for institutional infrastructure such a programs, policies, and paid professional staff.

29.     Two Oregon public higher education institutions that SATF is aware of receive nominal funding ($10,000 or less) for their advocacy services department from community philanthropists organizations. These funds are specific to survivor emergency services (like housing, food, basic needs).

30.     Most Community colleges located in Oregon do not receive specific funding for Title IX training, implementation or investigation (outside of FTE, which is often less than .25 of a practitioner's entire FTE). One Oregon community college has a full-time Title IX coordinator to coordinate investigations, prevention and response.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 12th day of June, 2020

_____
Michele Roland Schwartz
Executive Director
OREGON SEXUAL ASSAULT TASK FORCE

Decl. of Michele Roland Schwartz                                         Case No. 20-cv-01468-CJN

EXHIBIT 89

EXHIBIT 90

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF STACEY SOKOL

I, Stacey Sokol, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am Stacey Sokol, the Title IX Coordinator at the Richard Bland College ("RBC" and "College") located in Prince George County, Virginia.  My educational background includes Master of Education in Adult Learning and Master of Business Administration degrees. I have been employed as the College's Title IX Coordinator since April 1, 2019 and have worked in higher education for over 16 years.

EXHIBIT 90

2.      I submit this Declaration in support of the Commonwealth of Virginia's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, through RBC personnel who have assisted me in gathering this information from our institution, and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the Rule in order to understand its immediate impact on the College.

3.      Richard Bland College, established in 1960, serves approximately 2,400 undergraduate students.  Richard Bland College offers an associate of arts degree and an associate of sciences degrees for a diverse population of students.

4.       The College's student population, full-time, part-time, and transfer, ranges from 2,400-2,500 students.

5.      The College is governed by the College of William and Mary Board of Visitors, which acts on the recommendations of the RBC Committee, and is responsible for the management of funds, approval of budgets, approval of policies, appointing the University President and general oversight of College affairs.

6.      In addition to state, local and private funding, the College receives federal funds from the Department. As a result, RBC is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

7.      RBC has adopted policies and procedures that prohibit sexual harassment and sexual misconduct by students, employees, and faculty and establishes a grievance process for addressing complaints of sexual harassment.

8.      The College's related policies include its Discrimination, Harassment, Sexual Misconduct and Retaliation Policy; its Discrimination, Harassment, Sexual Misconduct, and Retaliation Complaint Resolution Policy Details; RBC Code of Student Conduct; RBC Faculty Handbook; RBC College Catalog; and its Student-Athlete Code of Conduct.

9.       The College's Title IX Department consists of one employee, the Title IX Coordinator, whose responsibilities include policy development, training, training development, and investigations.

10.      Over the past 18 months, the College has received 9 reports of possible violations of the Discrimination, Harassment, Sexual Misconduct and Retaliation Policy.  Of these reports, 8 were investigated via informal procedures and 1 report was investigated through RBC's formal investigative process.  While the total number of reports is small in number, the impact to the College is tremendous in terms of human capital that is expended on these investigations and pulled away from the College's mission-critical concerns.  Upon receipt of an alleged Title IX violation, the Coordinator notifies the College's Title IX team to assess the nature of the violation and complete a related threat assessment.  The Coordinator completes the investigation to include in-person interviews of the Reporting and Responding Parties, and possible witnesses.  RBC's current Title IX procedures do not include a live hearing process.  The Coordinator apprises the Title IX team of any new relevant information to include in its threat assessment.  RBC's Discrimination, Harassment, Sexual Misconduct and Retaliation Policy was last revised and became effective on September 27, 2019 after the three-month review process that included consultations with the ED's

Office of Civil Rights and review of other applicable federal or state laws, regulations, or policies. That review process did not involve as many issues as would be required to implement the new Title IX Rule.

11.     RBC currently defines sexual harassment as: "A form of discrimination based on sex. It is defined as unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature including but not limited to: verbal (e.g., specific demands for sexual favors, sexual innuendoes, sexually suggestive comments, jokes of a sexual nature, sexual propositions, or sexual threats); nonverbal (e.g., sexually suggestive emails, other writings, articles or documents, objects or pictures, graphic commentaries, suggestive or insulting sounds or gestures, leering, whistling, or obscene gestures); physical (e.g. touching, pinching, brushing the body, any unwelcome or coerced sexual activity including sexual assault). Sexual harassment, including sexual assault, can involve persons of the same or different sexes. Sexual harassment also may include sex-based harassment directed towards stereotypical notions of what is female/feminine versus male/masculine or a failure to conform to those gender stereotypes." Sexual harassment includes but is not limited to quid pro quo or hostile environment.

12.     RBC's Discrimination, Harassment, Sexual Misconduct and Retaliation Policy applies to on-campus conduct involving students, employees, faculty and staff, visitors to campus (including, but not limited to, students participating in camp programs, nondegree seeking students, exchange students, and other students taking courses or participating in programs at Richard Bland College), and contractors working on campus who are not Richard Bland College employees, and to students, visiting students, employees, faculty, and staff participating in Richard Bland College-sponsored activities off-campus.  The policy is applicable to any conduct that occurs off campus that has continuing effects that create a hostile environment on campus. The policy also is

applicable to conduct that involves the College's various technological resources, such as computers and Internet networks. Allegations of either on-campus or off-campus violations of the RBC Discrimination, Harassment, Sexual Misconduct and Retaliation Policy should be reported to the Title IX Coordinator's office. Allegations of harassment occurrences through the use of campus or personal technology also should be reported to the Title IX Coordinator's office.  The Title IX Coordinator oversees the investigation and resolutions of all reports and complaints made by all students, employees, and visitors to the campus of the alleged Prohibited Conduct in accordance with the policy. The Coordinator may delegate certain investigative responsibilities while maintaining oversight of the investigation.  The Coordinator does not serve as an advocate for either the Reporting Party or the Responding Party.

13.    All RBC employees, including full-time, part-time, volunteers, and student employees, are Responsible Employees for purposes of reporting Sexual Misconduct. Student employees are Responsible Employees when they receive information while acting in their capacity as an RBC employee.  Once in receipt of information regarding Sexual Misconduct, the Responsible Employee must directly report any information regarding the alleged incident to the Coordinator's Office without delay and should otherwise respect the privacy of the individuals involved. No RBC employee shall undertake any independent efforts to determine whether or not the report or complaint has merit or can be substantiated before reporting it to the Coordinator.  The report from the Responsible Employee should include all relevant details about the name of the alleged perpetrator (if known), the name of the person who experienced the alleged conduct, the name of others involved in the incident, and the date, time and location of the incident. The Responsible Employee may directly contact the Coordinator's Office.

Decl. of Stacey Sokol                                        Civil Action No. 20-cv-01468
EXHIBIT 90

14.     RBC is committed to protecting the privacy of any individual involved in the investigation and resolution of a report or complaint under the policy. With respect to any report or complaint under the policy, RBC will make reasonable efforts to protect the privacy of participants while balancing the need to gather information to assess the matter, take steps to eliminate the reported conduct, prevent its recurrence, and address its effects.  Privacy and confidentiality have distinct meanings under the policy.  Privacy means that information related to a report or complaint will be shared with a limited circle of RBC employees identified as needing to know in order to assist the assessment, investigation, and resolution of the matter. While not subject to a legal obligation of confidentiality, these individuals will respect the privacy of all individuals involved in the process and will not share information except as necessary to effectuate the policy or as required by law.  The privacy of student education records will be protected in accordance with RBC's policy for compliance with the Family Educational Rights and Privacy Act (FERPA). The privacy of an individual's medical and related records generally is protected by various federal and state laws depending upon the situation. Access to an employee's personnel records in Virginia may be restricted in accordance with the Virginia Freedom of Information Act, and, where applicable, Department of Human Resources Management (DHRM) Policy 6.05. Confidentiality exists in the context of laws that protect certain relationships, including licensed health-care professionals and employees providing administrative support for such licensed health-care professionals, mental health providers, counselors, and ordained clergy, all of whom may engage in confidential communications under Virginia law. These individuals cannot violate their obligation of confidentiality unless (i) given written consent to do so by the person who disclosed the information; (ii) there is a concern of serious physical harm to self or others; (iii) the conduct

Decl. of Stacey Sokol                                                                    Civil Action No. 20-cv-01468

EXHIBIT 90

involves suspected abuse or neglect of a minor under the age of 18; or (iv) as otherwise required or permitted by law or court order.

15.      RBC offers two possible methods for investigation and resolution of a complaint or report alleging violations of this policy: (1) Informal and (2) Formal. The Informal Investigation and Resolution method is not available for allegations of violent Sexual Assault. For alleged violations of this policy other than violent Sexual Assault, the Reporting Party and Responding Party have the option to proceed under the Informal Investigation procedure, when deemed permissible by the Coordinator. The Coordinator shall explain the Informal and Formal Investigation procedures to both the Reporting Party and Responding Party, if known. Under the Formal Investigation procedures, the Coordinator's Office shall conduct a prompt, thorough, reliable, and impartial investigation of the complaint. The Coordinator's Office shall discuss the complaint or report with the Reporting Party and Responding Party as appropriate and provide information about the Formal Investigation procedures and available resources. The Coordinator's Office shall explain to the parties that each has the opportunity to provide evidence and to suggest witnesses to be interviewed during the course of the investigation. The Coordinator's Office will notify and seek to meet separately with the Reporting Party, Responding Party, and witnesses, and will gather other relevant evidence and information. Both the Reporting Party and Responding Party shall have the same opportunity to review and respond to evidence obtained during a Formal Investigation. The Reporting Party and Responding Party shall be presented with all of the evidence gathered during the Formal Investigation in separate meetings. Neither the Reporting Party or Responding Party is required to participate in the Formal Investigation. However, the investigation may proceed and a finding of responsibility and imposition of sanctions may occur without the participation of the Reporting Party and/or the Responding Party. For complaints and reports involving Sexual

Misconduct, the Reporting Party and Responding Party may be accompanied by an advisor or support person of their choice at meetings and interviews at which he or she is present. The advisor or support person may not speak on behalf of the individual during, or participate directly in, meetings or interviews. The advisor may be excluded if he or she fails to respect this limitation. The Coordinator shall issue a written investigation report, which shall be provided to both the Reporting Party and the Responding Party separately but concurrently with the sanctions, if any, and notification of the right to appeal. RBC's current investigative process does not include live hearings in which cross-examination is allowed. Parties are allowed to respond information uncovered during the investigative process

16. The College, like other sister institutions, has found that the COVID-19 pandemic has impacted its ability to perform its internal Title IX investigations. The impact includes the impossibility of having in-person investigations, undermines the opportunity to evaluate the credibility of statements and information reported, causes delays in sharing of information, impedes the ability to provide supportive measures and services, impossibility of discerning whether reporters or witnesses are under duress or other undue influence, creates a challenge for resolving matters timely, and technology insecurities impact the availability of complainants, respondents, and third party witnesses.

17. Pursuant to Virginia Code § 23.1-806, the College's employees, who are considered responsible employees under state law, are required to report an act of sexual violence to the Title IX coordinator as soon as possible after addressing the immediate needs of the victim. This legal requirement creates confusion when considering the new regulations definition and expectation of responsible parties and a College's notice of an incident of sexual assault or sexual violence.

Decl. of Stacey Sokol                                    Civil Action No. 20-cv-01468

EXHIBIT 90

18.     In addition, pursuant to Virginia Code § 23.1-806, the College is required to maintain an investigatory geography, for incidences that are committed against a student attending the institution or may have occurred on campus, in or on a non-campus building or property, or on public property.  The new regulation would create confusion and potential inconsistencies on the location of incident and invoking application of the regulations.

19.     Pursuant to Virginia Code § 54.1-3904, a person who provides legal advice without authority may be charged or accused of unauthorized practice of law.  The ethical rules for the Commonwealth prohibit a non-lawyer representing another before a tribunal. Per the local rules, a "tribunal" includes "any agency, authority, board, commission or court when it determines the rights and obligations of parties to proceedings before it."  While the ED has indicated that the advisor role under the new regulations do not constitute the unauthorized practice of law, this rule creates confusion between the state's existing ethical rules and the Virginia Code and concern that unexpected consequences could result in unauthorized practice of law.

20.     In revising the current College policies, a number of relevant stakeholders, including Athletics, Academics, Finance, Police and Public Safety, Legal, Human Resources, Facilities, Student Success and Residence Life, will need to be consulted and this internal process could take more than six to twelve months to complete.

21.     In revising the College's policies, a number of key documents would need to be updated or revised to comply with the rule. These documents include the College's discrimination policies, various student handbooks, the faculty handbook, employee policies, organization guidance documents, threat assessment team protocols, student conduct protocols, the college catalog, and grievance procedures.

22.     The College, like other sister institutions, has found that the COVID-19 pandemic has impacted its ability to revise and update policies and procedures, including the Title IX related policies and documents.  Specifically for Title IX related policies, procedures and materials, the impact includes the reduction of College revenue, reallocation of College financial and human capital resources to support mission critical activities, stay-at-home orders which prevent stakeholders from meeting regularly on Title IX and sexual violence related matters, and technology insecurities which delay the dissemination and evaluation of new information.

23.     The College would still need to maintain a separate evaluation and investigatory process for sexual harassment that falls outside the narrower scope of Title IX under the new Rule. Even though this conduct would no longer fall under Title IX pursuant to the new Rule, the College will still need to investigate and address these reports to ensure the safety and wellbeing of our students. The College would have to develop a "triage" protocol to handle non-Title IX sexual harassment. This new protocol would require establishing new procedures, hiring additional staff, modifying current grievance procedures and expanding referral protocols.

24.     Given the new constraints of the new Rule, the College will have to expend additional resources, provide extensive, campus-wide training, and hire additional personnel, which is a challenge given COVID-19 related financial and environmental constraints.

25.     The College is deeply concerned about its ability to comply with the Department's August 14, 2020 effective date and is deeply concerned with the extent and resources that would have to be expended on implementing the new regulations by the effective date.

26.     The short time frame for implementation of the new Rule will make it extremely challenging for the College to fulfill its obligations under Title IX to provide all students equal

Decl. of Stacey Sokol                                                    Civil Action No. 20-cv-01468

EXHIBIT 90

access to education, train all students/faculty/staff on their obligations under Title IX, and ensure that all students/faculty/staff are aware of their rights under Title IX.

27.     The new evidentiary hearing process established under the new Rule will result in increased time, protracted hearing processes, new due process requirements and hurdles for the parties, increased staff demands, and potential psychological harm to students, who are complainants, respondents and witnesses.  As the disciplinary records are educational records, the new evidentiary hearing may result in problems with maintaining the confidentiality of supportive measures should an external proceeding, such as a criminal court case, demand discovery or a governmental office seek exculpatory evidence.

28.     The new Rule could have a "chilling" effect on students who may experience sexual harassment and be discouraged to report any incidents of gender-based discrimination, which would be contrary to the entire purpose of Title IX regulations and protections.  This chilling effect will also make it more difficult for the College to ensure an equitable learning environment for all students, because the College will not be able to address sexual harassment that is not reported.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 12th day of June, 2020, at South Prince George, Virginia.

_____
Stacey Sokol
Title IX Coordinator
Richard Bland College

Decl. of Stacey Sokol                                                      Civil Action No. 20-cv-01468
EXHIBIT 90

# EXHIBIT 91

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | Civil Action No. **20-cv-01468-CJN** |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA, | |
| Defendants. | |

## DECLARATION OF TOM STRITIKUS, PRESIDENT OF FORT LEWIS COLLEGE

I, Tom Stritikus, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

      1.      I am the President of Fort Lewis College located in Durango, Colorado. I arrived at FLC in August 2018 and began implementing strategies to advance higher education in Colorado, in addition to underpinning the college's mission of providing professional education and regional economic vitality. Previous to FLC, I was deputy director of education at the Bill & Melinda Gates Foundation. I served on the Global Learning Initiative, building a strategy to improve education in Sub-Saharan Africa and South Asia. In addition to this work in global education, I spent three years

leading work in improving education in the United States, where I oversaw initiatives of personalized learning, assessment for student learning, instructional leadership, and teacher preparation.Prior to joining the Foundation, I was the dean of the University of Washington College of Education. I earned my doctorate at the University of California, Berkeley in Language, Literacy, & Culture. As a scholar, my work examined the effects of bilingual education policy and teacher practice on the academic lives of Latino and Asian immigrants. I began my teaching experience with Teach For America in Baltimore.

2.      I submit this Declaration in support of the State of Colorado's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or Rule). I have compiled the information in the statements set forth below through personal knowledge and through Fort Lewis College personnel who have assisted me in gathering this information from our institution. I have also familiarized myself with the Rule in order to understand its immediate impact on Fort Lewis College.

**Fort Lewis College Background**

3.      Fort Lewis College was founded in Hesperus, CO in 1911 and later moved to Durango, CO in 1956. The College has roughly 3,230 undergraduate and 80 graduate students, 260 faculty, and 400 staff.  Between the School of Arts & Sciences, School of Business Administration, and School of Education, there are 51 degrees offered.

4.      Fort Lewis College has 17 residential buildings on campus, that can house up to 1500 students in a typical academic year.

5.      The College revenue sources include of tuition and fees, auxiliary revenue including room and board, funding from the State of Colorado, and federal, state and local grants.

6.      Fort Lewis College receives federal funds from the Department. As a result, Fort Lewis College is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

### Existing Title IX Sexual Misconduct Policy

7.      The College required to adopt sexual misconduct policies pursuant to state statute. Colo. Rev. Stat. § 23-5-146(2)(a). These policies must generally conform to the time-tested single investigator model, whereby an individual employed by the institute investigates and determines responsibility for sexual misconduct based on the preponderance of the evidence standard. Colo. Rev. Stat. § 23-5-146(3). Under this model, the parties are entitled to advisors, but those advisors do not questions witnesses directly and, instead, all questions are asked through the investigator. *Id.*

8.      Fort Lewis College has adopted a Sexual Misconduct Policy and Grievance Procedure that prohibits sexual harassment and sexual misconduct by students, employees, and faculty and establishes a grievance process for addressing complaints of sexual harassment. It is a single investigator model, without live hearings.

9.      The Title IX Coordinator facilitates processes and works with trained investigators selected from among staff and faculty. The various Vice Presidents and Associate Vice Presidents impose sanctions in formal procedures as needed. The Title IX Coordinator and/or the Counseling Center's case manager and victim advocate coordinate provision of supportive measures to victims.

10.     In 2019, 59 reports (allegations) about sexual misconduct were received. None involved hearings, as we do not currently use a hearing process. One led to a formal grievance procedure. 17 complaints were resolved informally. Complaint means a written allegation of sexual misconduct or retaliation that is made on the College's complaint form at

www.fortlewis.edu/tellsomeone. Any member of the College community who has been a victim of sexual misconduct is encouraged to report the matter to the appropriate supervisor(s) or the Coordinator.  If an individual wishes to notify the College of possible sexual misconduct and requires resolution, they must complete the College's complaint form.  All complaints alleging sexual misconduct will be resolved under the Fort Lewis College Grievance Procedure.  Inquiries relating to procedure can be made at any time to the Coordinator; however, a procedural inquiry alone does not constitute a complaint.

11.     The Sexual Misconduct Policy was last revised in October 2018. The Grievance Procedure which operates with the Sexual Misconduct Policy was also last revised in October 2018. Drafting of those policy revisions were begun in late February of 2018 and entailed extensive work to align various other procedures. There was no direct consultation with the ED's Office of Civil Rights in the various revisions.

12.     In its Sexual Misconduct Policy, the College defines Sexual Harassment as follows:

    a. Sexual Harassment.  Sexual harassment is defined as unwelcome conduct of a sexual nature, unwelcome sexual advances, requests for sexual favors, and other visual, verbal or physical conduct of a sexual nature.

    b. Quid Pro Quo (This for That):  Conduct may constitute sexual harassment if an individual's education, employment, living environment or participation in any College program or activity is (1) explicitly conditioned on submission by an individual to unwelcome sexual behavior or (2) decided in any part based on an individual's submission or rejection of unwelcome sexual behavior.

    c. Hostile Environment Sexual Harassment.  Whether an environment is "hostile" is a fact-specific inquiry based on subjective and objective factors. The complainant must have subjectively experienced unwelcome sexual conduct. Objectively, the conduct must have been, from the perspective of a reasonable person in the alleged complainant's position, sufficiently severe, persistent or pervasive that it unreasonably interferes with, limits or deprives an individual from participating in or benefiting from the College's education or employment programs and/or activities. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove harassment, particularly if the harassment is physical.

    d. Examples of Sexual Harassment: (1) unwelcome sexual advances, requests for sexual favors, and other visual, verbal or physical conduct of a sexual nature; (2) nonconsensual observation, creation or use of images or audio of another person's

sexual activity, intimate body parts or nakedness in person, electronically, through social media, in person, or through physical public posting.

e. Forms of Sexual Harassment: Sexual Harassment may be subtle and indirect or blatant and overt.  For example, it may (1) be conduct toward an individual of the opposite sex or the same sex; (2) occur between peers or between individuals in a hierarchical relationship; (3) be aimed at coercing an individual to participate in an unwanted sexual relationship or have the effect of causing an individual to change behavior; or (4) consist of repeated actions or may arise from a single or isolated incident if sufficiently egregious (such as an incident of sexual violence).

Moreover, the College's Sexual Misconduct Policy prohibits:

f.   Sexual violence.  Sexual violence is a form of sexual misconduct and refers to physical non-consensual sexual acts.  Sexual violence includes:

   i. Non-consensual sexual intercourse defined as: any penetration of the anus or vagina, however slight, with any body part or object, by one person upon another person, without consent and/or by force, and includes oral copulation (mouth to genital contact or genital to mouth contact), no matter how slight the penetration.

   ii. Non-consensual sexual contact defined as: intentional contact by a person, however slight, with the breasts, buttock, groin, or genitals of another; or touching another with any of these body parts; or a person touching another or themselves with or on any of these body parts; or any other intentional bodily contact in a sexual manner without consent and/or by force.

g. Stalking.  Stalking means engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for his or her safety or the safety of others or suffer substantial emotional distress, including causing a person to respond by altering their activities.

h. Intimate Partner Violence.  Intimate partner violence is a form of sexual misconduct and includes:

   i. Domestic violence defined as: any act of violence or threatened act of violence committed by (1) a current or former spouse or intimate partner of the victim, (2) a person with whom the victim shares a child in common, (3) a person who is cohabitating with or has cohabitated with the victim as a spouse or intimate partner, (4) a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or (5) any other person, against an adult or youth victim who is protected from that person's acts under the relevant domestic or family violence laws of the jurisdiction.

   ii. Dating violence defined as: any act of violence or threatened act of violence committed by a person who is or has been in a romantic or intimate relationship with the victim.  The existence of such relationship shall be determined based on a consideration of the following factors: (1) the length of the relationship; (2) the type of relationship; and (3) the frequency of interaction between the persons involved in the relationship.  Dating violence

includes threats, assault, or property damage as a method of coercion, control, punishment, intimidation or revenge.

13. The Grievance Procedure governs all students, faculty, staff, contractors, volunteers, affiliated entities, and other third parties regarding:

    a. Conduct that occurs on College property or at official College functions or at College sponsored programs conducted off campus.
    b. Conduct that occurs off College property if it has a potential continuing effect on campus or creates an ongoing hostile environment on campus, including, but not limited to, adversely affecting the health, safety or security of any member of the College community or the mission of the College.

14. The complainant in the College's Procedure may or may not be the victim. A third party may make a report of misconduct, discrimination, or retaliation, or the appropriate Vice President may, on behalf of Fort Lewis College, initiate a complaint, serve as complainant, and initiate proceedings without a formal complaint by the victim of misconduct. The College follows an investigative model whereby investigator(s) interview the complainant and the respondent separately and provide each party the opportunity to be heard and to respond.  There are no formal hearings. The complainant and respondent may each:

    a. Identify relevant witnesses.
    b. Submit questions to the Investigator, for use during interview(s) with the other party.
    c. Have an advisor of their choice present during any interview, which may include, but is not limited to, an attorney or an advocate from outside the College.  An advisor may not act or speak on behalf of a party.  It is a party's responsibility to select and pay for an advisor whose schedule permits attendance at scheduled interviews.
    d. Review and respond within five (5) working days to a written Draft Investigation Report, prior to finalization of the Investigation Report.
    e. Receive a copy of the final Investigation Report at the conclusion of the investigation and a Notice of Outcome, which will include a statement of factual findings and a determination as to whether or not there was a violation of policy.
    f. Receive a Notice of Sanction, if applicable, in writing.
    g. Where the case involved a possibility of suspension, expulsion or termination of employment or other long term or permanent separation from the College, a trained and unbiased Review Committee reviews the report prior to finalization for bias, impartiality and thoroughness of the investigation, and the existence of sufficient information to support any finding. The Review Committee may:
        i. Review the whole investigative file;

Decl. of Tom Stritikus        Case No. 20-cv-01468

    ii.  Consult with the Investigator(s);
    iii.  Approve the Investigation Report;
    iv.  Recommend additional investigation or a new investigation by the same or other investigator.  Any substantial changes to a Draft Investigation Report or a new Draft Investigation Report resulting from this action will trigger another review by the parties.

15.    Title IX investigations should involve face to face interviews and some teamwork. Because of the pandemic, these will occur online instead. Parties and witnesses frequently tell a different or additional story with their nonverbal cues than they do with their words. Interviewers can convey meaning of questions with body language, timing and nuances of tone. Much of this communication is lost on Zoom and similar tools. In complex matters, one investigator can take notes while another interviews, and the interviewee should be able to observe what both are doing. Zoom limits this possibility. No children of anyone engaged in the interview should be present, and no family members should wander through the background or be present in spaces where a hearing can be heard or seen. Lighting should not be distracting, much less sound. Entire phrases or sentences should not be missed because of temperamental sound equipment. But all of this happens in a typical group call online. Investigations at this point would have to be handled online, or in rooms that permit safety measures to be implemented.

16.    The new Rule will require the College to adopt different policies for sexual harassment and sexual misconduct, with vastly different procedures. When misconduct rises to the level of harassment, which may be based solely on whether the improper conduct occurred on-campus instead of off-campus, the College will be required to abandon the single investigator model and engage in a quasi-criminal procedure.

### Revising Existing Sexual Misconduct Policies

17.    In order to comply with the Rule, the College will need to review and revise every policy that is in any way disciplinary, including the Sexual Misconduct Policy, the Grievance

Procedure, the Student Conduct Policy, the Housing Guide, the Faculty Handbook, the Employee

Handbook, and policies and state law regarding Colorado classified employees.

18.     Typically the Title IX Coordinator would draft policy, with consultations with other

implicated offices such as the Equal Opportunity Coordinator and the College's attorney. They would

then submit it to the Coordinator's immediate supervisor, and they would then shepherd it through

the Cabinet, a relevant Committee of the Board of Directors, and ultimately to the Board of Directors.

This takes months, especially for major policy revisions.

19.     The policy implicates numerous stakeholder interests in the campus community.

These include Student Housing and Conference Services, Human Resources, the student senate, the

student public health organization, the campus victim advocacy office, the staff council, the College

attorney. Since it is summer, students are not as engaged and easy to get input from at this time as

they would be during the school year. Each of these must be contacted for the purpose of getting input

both at the leadership and membership level. The new Rule will call for extra depth and time for input.

Several other factors are at play in the issue of student input. Fort Lewis College began as a boarding

school for indigenous students during an era when boarding schools were a tool of cultural and

physical genocide. Sexual assault has a sweeping role in historical and modern physical and cultural

genocide of indigenous people. Fort Lewis College has primarily white leadership, and majority

minority enrollment, including roughly 40% indigenous enrollment. Many of our students face

technological barriers to connecting with the College when they are at home, which they almost all

are. The College must tread carefully in implementing regulations that can be widely viewed as

making the College complicit in a procedure that is fair to neither party. Getting input would, at a

minimum, take 80 hours of the Coordinator's time, or approximately $1391. The attorney's time

would be about 100 hours, or approximately $25000.

20.     Faculty Senate would need to be involved so as to ensure that faculty leadership, at a minimum, recognized the procedural issues created by the new regulations. This would cost about $957 to $1915 if each senator spent about 1 to 2 hours on the issue.

21.     A subcommittee of the Board would meet once a policy has been rewritten with input students and employees, in order to carefully vet the new policies and make recommendations to the College's board. The board typically meets several times per year, and has required significant advance notice in order to approve major changes to policy. The August board meeting is a retreat, not intended for major policy change. Passage of a new policy would require cabinet review along with the president and the provost, for about 5 to 10 hours of reading and group deliberation, the cost is about $5771 to $11,543.

22.     Due to the COVID-19 pandemic the Board is currently seriously preoccupied with an unanticipated 58% percent reduction in state funding for the College, where state funding comprises a major portion of the budget. While one-time federal funds have offset much of this loss for one year, the future remains uncertain. Significant staff layoffs and furloughs occurred on June 8, 2020, with potentially more to come, which is at the top of the priority list of the human resources department. Additional budget cuts and staff reductions are to come, and the budget office and human resources, as well as other leadership at our small college, have been working non-stop on the very survival of the College, much less a deep revamping of critical policy. The College has lost approximately $3.0M in revenue/funding due to the pandemic, and expects to have significant enrollment declines in the fall creating an additional budget shortfall of approximately $2.9M.

23.     The College will continue to respond to sexual misconduct which does not fit the Rule's sexual harassment definitions, or the jurisdictional scope of the Rule, including with formal and informal resolutions. It will have to write a grievance procedure and ensure that it aligns with

other policies and procedures. This will involve some rewriting of existing policies such as the Student Conduct Policy. The College will have to consider how to train on this misconduct. This will require 40 hours of the Coordinator's time, and 40 hours of time from the Director of Student Housing, 30 hours of time from the Equal Opportunity Coordinator, and 10 hours of time from an Associate Vice President of Student Affairs, for a total cost of $7,125.

24.     The College's employee handbook, faculty handbook, Student Conduct Policy, Housing Guide, Grievance Procedure, Sexual Misconduct Policy and existing student and staff online trainings as well as materials for in person trainings will all need to be revised with collaboration between the Title IX Coordinator, the Equal Opportunity Coordinator, The Student Housing Director, the Associate Vice President of Student Affairs, and the College's attorney. The Marketing Department will need to spend 20 hours updating webpages for a cost of $777. Online and in person training materials will need to be revamped both for the general student population, student employees, and non-student employees. This will require approximately 40 hours of time by the Title IX Coordinator, for a cost of $1,391.

25.     The College will need to hire and train an individual who can make nuanced law informed judgment calls in formal hearings, as well as other members of a hearing panel. The College will need to train individuals who can serve as advisors for purposes of cross examination, and likely who can serve as advisors for purposes of equity, when students do not have advisors. These may need to be hired, since employees would naturally be hesitant to volunteer for such a fraught role. Those individuals who could be recruited from within the College for these roles would need to be recruited, vetted, interviewed multiple times and trained extensively. Because certain cases can no longer be resolved informally, we will need to recruit, vet, hire and train for additional investigator

capacity as well.  Recruiting and hiring an employee in general takes 60 hours for a per employee. Training a staff member for this purpose will take 80 hours.

26.    The College currently has online training for new faculty and staff in reporting duties of "responsible employees" and for training new employees in Harassment and Discrimination prevention. The College is developing practices for annual online training. Online training is not effective in and of itself, and so training occurs and will continue to occur in person as well, in various department meetings, etc. Complex and legalistic procedures make this task even more complex

27.    The College will need to train the Title IX Coordinator, the Equal Opportunity Coordinator, various investigators, and panel members in decision maker obligations, especially in the hearing context. All of these individuals need to be able to explain these issues to parties and witnesses as needed, and panel members will need to implement them. This could involve 20 people needing to be trained for at least 40 hours each, for a total cost of $24,000.

28.    The College will need to develop and publish printed materials to give to parties or potential parties to cases. These will need to be about the formal process, the informal process, supportive measures, etc. The College will need to revamp its website on these issues as well. The College will need to develop a process for a complainant to transform their report into a complaint through "signing." The College will need to work with new student orientation to ensure that every student is advised per the regs. This includes orientation leaders, their supervisors, and a peer theater project. This could involve about 80 hours of time from the Marketing Department for a cost of $3,074, and 40 hours of time for the Orientation staff and peer educator project, for a cost of $1281.

29.    The College is very concerned about meeting the August 14, 2020 deadline. Because it is a small school, the Coordinator does not typically work full time in the summer. Similarly, numerous employees who might normally be engaged are not on contract in the summer, or have

Decl. of Tom Stritikus                                                          Case No. 20-cv-01468

limited hours in the summer. The highest levels of the College's administration are absolutely preoccupied and working long hours to attempt to secure the College's financial survival of the COVID-19 pandemic.

30. The College delayed formalizing new rules after the Notice of Proposed Rule Making, because it relied in good faith on the normal operation of regulations, which would allow adequate time for implementation. 100 days during a pandemic that has caused an absolute budget crisis for a public college that relies heavily on state funding is not adequate time.

31. Specifically, in March of 2020, the World Health Organization announced that the global spread of COVID-19 should be characterized as a pandemic. In response to COVID-19, the President of the United States and the Governor of the State of Colorado both declared states of emergency. Proclamation 9994, 85 Fed. Reg. 337-38 (March 13, 2020); Executive Order D 2020 003 (March 11, 2020). On March 17, 2020, the Governor of Colorado issued Executive Order D 2020 017, "Ordering Coloradans to Stay at Home Due to the Presence of COVID-19 in the State," which closed the College for may purposes.

32. On April 30, 2020, as a result of the COVID-19 crisis, Governor Polis issued Executive Order D 2020 050, "Declaring Insufficient Revenues Available for Expenditures and Ordering Suspension or Discontinuation of Portions of Certain State Programs and Services to Meet a Revenue Shortfall Due to the Presence of COVID-19 in the State of Colorado." In this Order, the Governor declared that "there are not sufficient revenues available for expenditure . . . to carry on the functions of the state government and to support its agencies and institutions." It is expected that, in fiscal year 2020/2021, Colorado will suffer a revenue shortfall in excess of $3 Billion. It remains to be seen to what extent the College's campus will be open during the Fall of 2020 semester.

33.     The August 14 deadline would absolutely make it more challenging for the College to fulfill its obligations under Title IX to provide all students equal access to education, train all students, faculty and staff on their Title IX rights and obligations.

### Responding to Complaints Under New Rule

34.     Mandatory live hearings will likely occur at least a few times a year. Three hearing panel members and potentially two paid advisors would have to be present at all times. Due to the option to cross examine witnesses, hearings could take a week. Paying three hearing panel members, and two advisors recruited from among staff for a week, would cost $6,000. In addition, three panel members would need a day or two of preparation and deliberation time would cost $1500. Requiring that evidence not be considered unless a party submits to cross examination imposes criminal procedure levels on a situation that is largely intended to be educational. Requiring that individuals who are not judges, not held to judicial standards of professionalism or trained as judges to make real time evidentiary decisions makes the processes under the new Rule very difficult. The College is also concerned that the new Rule favors parties with financial resources. It creates unfairness not only between parties in a given case, but laterally between all parties to all cases - some students will bring a parent with limited English proficiency to cross examine, and others will bring an expensive and well-prepared attorney. Even if a case does not result in formal resolution, a party's knowledge of financial inequities could act as a coercive factor in electing informal resolution or not reporting at all.

35.      If the College is unable to recruit advisors internally, it will need to hire them. The College would likely attempt to hire attorneys. This might incur costs including $5000 retainers and an hourly rate of $250 or more. If a major hearing were to take a week, the final cost for two advisors could be upwards of $20,000. A trained mediator would likely also charge $250 per hour, and if mediation including pre-meetings took 15 hours, this would cost $3,750 per incident. The efforts of

advisors could result in a legal claim for ineffective assistance of counsel, which is both costly and has a poor effect on the education of students.

36.     Two main areas of harm to complainants result from the mandatory right to cross-examination by advisors. The first is that it will chill complaints, and quite likely also reporting. It incentivizes minimizing the acts and their impacts so that the formal process would be less onerous than the one prescribed by the new Rule.

37.     The Rule is also silent on the particular issue of vulnerable witnesses like children, except inasmuch as it treats them like any other witness. Fort Lewis College has a day care center on campus and requiring a young child to appear at a live hearing and submit to cross examination without any finding as to the necessity of it is improper. The Rule is over broad and not tailored to the need for the testimony.

38.     Fort Lewis College's IT department would have to be involved in setting up a system to provide the parties and their advisers with all of the evidence. This might take 40 hours of their time, at a total cost of $1,680.

39.     The College will face cost barriers to implementing the regulations effectively when multiple investigators are needed, when multiple hearing rooms must be set up with technology to accommodate all of the parties and their advisors. These space considerations also encompass supporting parties in not encountering one another in the halls of a building during the hearing, etc. The College is a place that typically has noise of students coming and going and talking to one another, and is not the setting for quasi-judicial proceedings. All of this detailed administrative work, including room reservations, coordinating various employees' presence in spaces etc., must be done with minimal administrative support for the privacy of the parties. This would take 15 hours of the Coordinator's time, for a total cost of $480 per hearing.

40.     The new Rule will increase the risk of burdensome litigation against the College on behalf of complainants and/or respondents because of the numerous conflicts between the Rule and other federal laws (FERPA, Clery, VAWA, Titles VI and VII of the 1964 Civil Rights Act), state laws and Supreme Court precedent.  Additionally, the Rule's attempt to reinvent and judicialize the entire process creates numerous novel issues which will ultimately be resolved in the courts.

**The New Rule's Effect on Identifying, Remedying, and Eliminating Sexual Harassment**

41.     The College will continue to prohibit unacceptable behaviors. However, it will have to bifurcate its sexual misconduct policies and procedures. This will be confusing to our entire community. It will be time consuming for the College. In some cases, it will lead to a mistaken belief that the College might not respond to a student who is hurt while alone and abroad. Respondents, too, will need to be educated about why a particular procedure is being used. For either party, the choice of procedures will represent a potential point of conflict with each other and with the College.

42.     When individuals do not report sexual misconduct, it deteriorates their relationship with their education as a whole, as well as with the College. They have assessed that the College is not competent to the task of supporting them with the issue. They will remain without recourse and the College's entire community will be less safe as a result.

43.     Every report and complaint of sexual misconduct makes the community safer, and every decrease in reporting makes the community less safe. At a college with high enrollment from indigenous communities that have suffered state sanctioned violence, the College's failure to encourage reporting and address violence represents (and one might argue is) additional evidence that the state should be avoided. Colleges are intended to have rather the opposite effect. People are meant to graduate with hopes that their gifts, talents and knowledge will be embraced by any community, that they can and will make a difference and that they can navigate society safely with hope of recourse from the community when bad things happen.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 11th day of June, 2020

_____

Tom Stritikus

President, Fort Lewis College

EXHIBIT 92

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | **CIVIL ACTION No. 20-cv-01468-CJN** |

Plaintiffs,

v.

ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,

Defendants.

## <u>DECLARATION OF SUZANNE TAYLOR</u>

I, Suzanne Taylor, declare and state as follows:

1.      I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("USDOE" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or Rule).

2.      I am the Systemwide Title IX Director of the University of California (UC), and previously served as a Principal Title IX Investigator at the UC Office of the President (UCOP) and as a Senior Civil Rights Attorney for the U. S. Department of Education's Office for Civil Rights (OCR).  This declaration is based on my familiarity with Title IX of the Education Amendments of 1972 (Title IX), my review of the Notice of Proposed Rulemaking (NPRM) and newly finalized rule (Rule or Title IX Rule), and the knowledge and expertise I acquired through around 15 cumulative years of service at UC and OCR.

3.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

### Title IX Expertise

4.      I have been the Systemwide Title IX Director of the UC since April 2018.  In this role, I oversee implementation of UC's systemwide Sexual Violence and Sexual Harassment (SVSH) Policy and associated procedures; provide support to and oversight of the Title IX Coordinators at UC campuses and other locations; provide training to Title IX Coordinators, their staff, and their campus partners; develop, issue and implement systemwide guidance; and oversee UC's compliance with state and federal laws related to sexual harassment, including sexual violence (such as sexual assault, stalking and relationship violence).  Before becoming Systemwide Title IX Director, I was a Principal Title IX Investigator in the UCOP for around 18 months.  In that role, I formally investigated sexual harassment allegations for campuses throughout the UC system.  This entailed, for example, interviewing parties and witnesses, gathering and evaluating evidence, making factual findings, analyzing facts under UC's SVSH Policy, and writing investigation reports.  Prior to joining UC, I was a Senior Civil Rights Attorney for OCR for around 12 years.  In that role, I served as lead attorney

Decl. of Suzanne Taylor                                         Civil Action No. 20-cv-01468-CJN

in many sexual harassment-related matters, including complaint investigations and OCR-initiated compliance reviews addressing both individual and systemic issues, and provided training to school districts, colleges and universities regarding their Title IX obligations under OCR regulations and policy guidance.

### Background on the University of California

5.      UC receives federal funding from the United States Department of Education (USDOE) and is an education entity covered by Title IX and subject to regulations issued by the USDOE.

6.      UC is created by the state constitution, funded in part by state budget allocations, and is part of the State of California's public higher education system.

7.      The UC system includes ten campuses, five medical centers, and three national laboratories.

8.      In fall 2019, UC enrolled around 285,216 students, of which around 53% enrolled as female and 47% enrolled as male.  Around 79% of UC's students are undergraduates; of those, around 36% receive Pell Grants, and 40% are first generation college students (that is, students whose parents do not have a four-year college degree).

9.      Each year, a significant percentage of our students live in private off-campus housing that is not affiliated with UC; for example, around 53% of UC students who receive financial aid live off-campus, without family, during the current school year.  In the 2017-2018 academic year, 5,776 of our students participated in our Education Abroad programs (EAP), and additional UC students participated in non-EAP study abroad programs.

Decl. of Suzanne Taylor                                         Civil Action No. 20-cv-01468-CJN

### Background on the University of California's Title IX Policies

10. Each UC campus has a Title IX Coordinator who coordinates their location's compliance with Title IX. The Title IX Coordinators' responsibilities include, among others, responding promptly and equitably to reports of possible sexual harassment by identifying and overseeing supportive, interim and remedial measures, and supervising investigations; ensuring their campuses provide prevention programs and educational materials to students; providing training for investigators and others responsible for reporting or responding to reports of sexual harassment; and identifying and addressing patterns or systemic problems. Upon receiving a report of possible sexual harassment, the Title IX Coordinator does a preliminary assessment to determine, among other things, whether to initiate a complaint resolution process. Possible complaint resolution processes include formal investigation and adjudication, a less formal factual inquiry, or an alternative resolution process.

11. The number of sexual harassment reports received by UC Title IX offices varies by location, with UC's largest campus reporting receipt of over 600 reports between July 2017 and June 2018.

12. UC's current model for formally investigating allegations against students includes a thorough and impartial investigation in which a trained investigator makes factual findings and a preliminary determination of whether the person alleged to have engaged in harassment (the respondent) violated UC's SVSH Policy. After the investigation, the person who allegedly experienced the harassment (the complainant) and the respondent each decide whether to accept the investigator's preliminary determination. If both parties accept the preliminary determination, then student conduct officials decide any sanctions. If either party does not accept, then the University holds a hearing to determine whether the respondent violated the policy.

Decl. of Suzanne Taylor                                 Civil Action No. 20-cv-01468-CJN

13.     UC's investigation process is largely the same for employees and students.  However, in employee cases, the investigator both makes factual findings and determines whether the respondent violated the SVSH Policy.   Further, the process for deciding discipline is different depending on whether the respondent is a student, faculty member, or non-faculty employee.

14.     As discussed further below, if the Rule goes into effect, it will hinder UC's efforts to prevent, detect, and respond to sexual harassment by requiring unduly complicated and confusing procedures, requiring more burdensome procedures to resolve sexual harassment allegations against faculty and staff than are used for any other type of alleged misconduct, discouraging students and other members of the UC community from reporting sexual harassment and participating in UC's complaint resolution process, and undermining our efforts to ensure a comprehensive and meaningful response to sexual harassment incidents.  These outcomes may harm both individual UC community members who choose not to seek redress, and the broader UC community, which suffers far-reaching consequences of sexual harassment experienced by individuals.

15.     Additionally, if the Rule goes into effect, UC will experience an immediate and significant financial consequence due to the costs and administrative burdens required to implement its requirements.

**Rule's Hindrance of UC Efforts to Prevent, Detect, and Respond to Sexual Harassment Will Cause Harm to Both Individuals who Experience Sexual Harassment and the Larger Community**

16.     The Rule will result in unduly complex procedures that will be both confusing to the UC community and difficult for UC officials to administer.  The Rule requires first, that UC adopt grievance procedures with specific elements to resolve any "formal complaint" of sexual harassment, defined as a document either filed by a complainant who is participating in or attempting to participate in a UC program or activity, or signed by the Title IX Coordinator, and requesting an investigation;

Decl. of Suzanne Taylor                                    Civil Action No. 20-cv-01468-CJN

second, that UC "dismiss" any formal complaint if it does not allege "sexual harassment" (as narrowly defined in the Rule) that occurred in the United States and in a UC education program or activity; and third, that UC allow parties to appeal any dismissal, even if dismissal is mandatory. These requirements are problematic for several reasons.

17.     First, the Rule defines sexual harassment to encompass hostile environment sex-based harassment, quid pro quo sexual harassment, sexual assault, domestic and dating violence, and sex-based stalking; however, it narrowly defines hostile environment sexual harassment as unwelcome conduct that is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity."  This is more limited than the definition in UC's SVSH Policy, which is based on long-standing prior USDOE guidance and California state law. The most significant difference is that single incidents do not appear to meet the definition of hostile environment sexual harassment because they are not "pervasive."  Although isolated incidents would be considered sexual harassment if they constitute sexual assault, sexual assault is also defined narrowly.  This definition would not include, for example, a respondent forcing a complainant to touch the respondent's genitals, or a respondent touching a complainant's non-private body part (such as the face) with the respondent's genitals.  Consequently, UC would be required to dismiss such allegations from the grievance procedures required by the Rule, and instead use a separate process to address these matters, as discussed in paragraph 18.

18.     The Rule's requirement that UC dismiss from its Title IX grievance procedures alleged conduct that did not occur within a University program or activity adds to the complexity. Many student complaints stem from incidents that occur at private events or residences, at locations not owned or operated by UC (such as a bar or restaurant), or through social media, yet negatively

Decl. of Suzanne Taylor                                     Civil Action No. 20-cv-01468-CJN

affect the complainant's participation in a school program or activity (for example, where the complainant and respondent are in the same graduate student cohort or class). UC has a strong interest in addressing any hostile environment that may exist in our own programs and activities, and we routinely do so in accordance with our policy, previous Title IX regulations, and long-standing USDOE guidance. This is because we know that sexual harassment of students, particularly sexual assault, often occurs outside the University setting, yet can negatively affect the complainant's educational access. UC's commitment to responding complaints of such conduct is unchanged by the Rule's mandate to dismiss them. So, we will have to use a separate process to respond to these allegations as well.

19.     Similarly, thousands of UC students travel abroad every year through our Education Abroad Program, and we have a strong interest in ensuring they are not subject to a hostile environment while they do so. The Rule's requirement that we dismiss allegations of sexual harassment occurring outside the United States will result in a further bifurcated process, with separate procedures to resolve potentially egregious conduct occurring in a University program or activity based on an arbitrary geographical distinction.

20.     While the Rule mandates that we dismiss from the now-required Title IX grievance procedure reports that do not meet its arbitrary requirements, UC is still ethically obligated to respond to such reports. Additionally, we are required to respond to some such reports under state law. To do so, then, UC must administer two processes—one for complaints covered by the Rule, and one for all other complaints covered by UC's SVSH Policy—even though the nature and gravity of the conduct, and the stakes for the parties, may be quite comparable. Further, allegations that meet the Rule's requirements may be intertwined with allegations that do not, potentially causing us to apply

two different processes to the same complaint.  Also, UC's SVSH Policy covers conduct such as invasions of sexual privacy, indecent exposure, and violations of sexual harassment-related no-contact orders; these would also presumably fall under the alternative process.  Finally, pursuant to the Rule, the parties must now be allowed to appeal the mandatory dismissals required by the Department for sexual harassment matters that do not meet the narrowed sexual harassment definition and geographical and "program or activity" requirements.  This is so even if UC will nonetheless resolve the complaint under an alternative UC procedure.  This approach creates additional uncertainty and possible delay in the resolution under other UC policy, as the Title IX appeal proceeds.  This approach is administratively burdensome; confusing to those who must administer it, students, and employees; and contrary to the interests of our community.

21.     The Rule would require UC to include in our Title IX grievance procedures provisions that may be harmful to parties' well-being, which will likely discourage complainants from reporting as an initial matter, and complainants, witnesses, and even respondents from participating in the resolution process when there is a complaint.  In particular, the Rule would permit parties to cross-examine each other and witnesses, including challenging credibility, through their advisors at a live hearing.  While cross-examination is required in California in certain cases, the prospect of direct cross-examination by the other party's representative, potentially an attorney, is unnecessarily intimidating.

22.     Additionally, the Rule would allow UC to exclude cross examination questions only after they've been asked of the testifying party or witness, and on limited bases.  UC's existing process allows cross-examination to occur through the hearing officer, who has the opportunity to review and rephrase questions to ensure they are relevant and not harassing before asking them.  This better

Decl. of Suzanne Taylor                                        Civil Action No. 20-cv-01468-CJN

protects the parties' rights and their well-being. Without such safeguards, the cross-examination itself could be harassing.

23.     The Rule also states that UC must share evidence with both parties even if the University does not intend to rely on the evidence in reaching a determination regarding responsibility. This broad provision could arguably force Title IX offices to share sensitive private information, such as academic and employment records, and hurtful statements from witnesses about a party's perceived character including sexual reputation, with parties and their advisors, even when it is irrelevant. UC's current policy only requires the Title IX office to share information upon which the investigator intends to rely, which furthers the goal of reaching reliable conclusions, better protects the well-being of parties, and makes witnesses less vulnerable to retaliation for their participation. Implementation of the Rule risks invasion of privacy of both parties, creates the risk of widespread disclosure of sensitive information, and increases vulnerability to retaliation for both parties and witnesses.

24.     The Rule undermines UC's efforts to ensure a comprehensive response to sexual harassment and promote accountability by stating that a school need only respond to sexual harassment of which it has "actual knowledge," defined as notice to the Title IX Coordinator or other official "with authority to institute corrective measures." Each year, UC's campus Title IX offices receive numerous reports of sexual harassment through various means, such as phone calls, email, and oral reports. Reports have increased in recent years due, in part, to UC's designation of nearly all employees as "Responsible Employees" who must report possible sexual harassment of a student to their Title IX Coordinator. Responsible Employees include all employees not specifically designated as confidential, including student employees such as resident assistants.

Decl. of Suzanne Taylor                                    Civil Action No. 20-cv-01468-CJN

25.     When a UC Title IX Coordinator receives a report of possible sexual harassment of a student from a Responsible Employee or other source, the Title IX Coordinator contacts the student to inform them of their rights, facilitate their connection to resources, and identify measures that may be necessary to ensure the student's access to their educational program.  Based on their knowledge of all reports their office receives, and any trends or patterns they present, the Title IX Coordinator can also provide targeted education, tailor their training and prevention programs, and take other responsive steps outside the complaint resolution process.  This Responsible Employee obligation, then, helps ensure the University responds comprehensively to possible sexual harassment.  The Rule's definition of "actual knowledge" undermines this effort by creating confusion among employees that requires additional follow-up and education to correct.  The definition also undermines this effort by communicating that schools need respond only to reports made to a very limited number of officials.  Indeed, within days of the Department issuing the Rule, UC Title IX Coordinators learned that some employees wrongly read this provision as abrogating their duty under UC policy to report to the Title IX Coordinator.

**The Rule Requires More Burdensome Procedures for Sexual Harassment by Faculty and Staff than UC Uses for Other Allegations**

26.     The Rule would require that UC hold live hearings to determine whether faculty and staff respondents have engaged in sexual harassment covered by the Rule.  As noted above, UC's investigation process is largely the same for students and employees.  However, the process for deciding responsibility and any resulting discipline differs depending on whether the respondent is a student, faculty member, or non-faculty employee.  Each population has different rights and interests, and the adjudication process is therefore also different.

27.     Senate faculty with tenure have the right to a hearing before discipline is imposed.  In this hearing, University officials are not neutral but rather have the burden of proving the allegations. Further, a committee of other Senate faculty members makes factual findings, conclusions, and any recommendation on sanction.   For these and other reasons, this hearing does not meet the requirements in the Rule.

28.     Non-faculty employees may have a contractual right after imposition of discipline to invoke a grievance process pursuant to the applicable collective bargaining agreement, or otherwise seek redress under the applicable complaint resolution process.  These processes also do not align with or meet the Rule's hearing requirement.

29.     So, to these existing procedural rights of employees UC must now also add a live hearing.  This means Senate faculty will be entitled to two hearings before UC can administer discipline, potentially resulting in a lengthy and grueling process.  UC's administration will work with the Academic Senate to try to resolve this issue; however, under UC's system of shared governance (common to many university systems) only the Academic Senate can change their own Bylaws.

30.     The Rule would also allow faculty and staff respondents to appeal the outcome of the live hearing, a right that does not exist in other employee misconduct proceedings.  The net result of the live hearing and appeal requirements is it will be more difficult, and take longer, for UC to hold employees responsible for sexual harassment covered by the Rule than for essentially any other type of misconduct.

### Rule's Immediate Financial Consequences and Administrative Burdens on UC

31.     If the Rule goes into effect, UC will experience an immediate financial consequence due to the costs and administrative burdens required to implement it.  As noted above, the Rule requires that UC create parallel processes to respond to reports of similar alleged conduct that do and

Decl. of Suzanne Taylor                                    Civil Action No. 20-cv-01468-CJN

do not meet the requirements of a "formal complaint," allege conduct that occurred in the United States and in a University program or activity, and allege conduct that meets the Rule's definition of sexual harassment.  This will be administratively burdensome both to create and administer.

32.     Further, to implement the Rule's hearing requirement for faculty and staff, UC must hire or contract with hearing officers who have the skill, training and experience to carry out the attendant responsibilities, including making real-time determinations about the relevance of cross-examination questions, properly applying the evidentiary standard to determine what occurred, applying UC policy standards to substantiated facts to reach conclusions about policy violations, and preparing written reports that include the elements required by the Rule.  We must also have sufficient personnel to undertake the associated new administrative steps, such as preparing and sending the written notices required by the Rule, scheduling meetings, securing space for the hearing, communicating with parties and advisors, and testing technology.  On some campuses we may need to hire additional staff or retain outside contractors to take on these new requirements.  On other campuses, they will be absorbed by existing staff, increasing their already significant responsibilities.

33.     As also noted, the Rule would permit parties to cross-examine each other and witnesses, including challenging credibility, directly through their advisors at a live hearing. Throughout UC's complaint resolution process for student respondents, both the complainant and the respondent may bring an advisor of their choice to any meeting or interview related to their case, as well as the hearing.  The advisor's role is to provide support, guidance or advice; they do not conduct any part of the complaint resolution process or cross-examine parties or witnesses.  Particularly because many students cannot afford legal representation, their advisors may be family members, friends, or other individuals without legal training.  The Rule's requirement that advisors conduct

Decl. of Suzanne Taylor                                      Civil Action No. 20-cv-01468-CJN

cross-examination, then, creates an inequity that disadvantages parties without an advisor, or whose advisors are not attorneys or otherwise lack training and preparation to execute the adversarial questioning contemplated in the Rule.  To address this inequity, the proposed rules would require that the University provide advisors to any party who does not have one, to conduct cross-examination. UC already employs Campus Advocacy Resources and Education (CARE) advocates and Respondent Services Coordinators who are available to support complainants and respondents, respectively, throughout the process. These individuals are not trained to conduct cross-examination, nor is cross-examination an appropriate or expected duty.

34.     In addition to these employees, UC would be required to provide the additional advisor representation contemplated by the Rule.  UC's largest campus initiated around 30 formal sexual harassment investigations between July 2017 and June 2018.  With that volume, providing meaningful advisor representation, potentially to both parties in every matter, would be extremely costly and burdensome.

35.     The USDOE estimates that to  review the final regulations, a Title IX Coordinator will spend 8 hours and a lawyer 16 hours; to revise our grievance procedures to comply with the regulations, Title IX Coordinators will spend 8 hours and lawyers will spend 32; and, for training, a Title IX Coordinator, investigator and decision-maker will each spend 16 hours.

36.     These estimates are unreasonably low and do not account for the complexity of crafting and implementing a process that is not only legally compliant, but also treats both parties fairly and compassionately, and results in just and reliable outcomes.  The estimates also do not account for the many other campus officials with whom Title IX Coordinators must partner in order to do their work effectively.  UC most recently revised its student investigation and adjudication

Decl. of Suzanne Taylor                                                                     Civil Action No. 20-cv-01468-CJN

framework in 2019, to respond to a change in state case law.  For that revision, UCOP formed a workgroup with systemwide representation of key stakeholder groups, including legal counsel, Title IX officers and investigators, Student Conduct, CARE advocates, Respondent Services Coordinators, faculty, and students to advise on key policy decisions.  Everyone on the workgroup had to understand the legal change, and the ramifications for UC's policy.  The workgroup, led by UCOP's Assistant Director of Student Development and Engagement (Assistant Director) and me, convened and deliberated over several months.  During this time, the Assistant Director, senior attorneys in the Office of General Counsel, and I met regularly to actually draft the revisions.  Throughout the drafting process, we sought additional input from other key stakeholder groups, such as the Title IX Student Advisory Board.  Before we finalized the policy, UC President Janet Napolitano reviewed it, as did her policy advisory committee.  Because it was important for students and the broader UC community to understand the significance and impetus for the revisions, I worked with other offices – such as Student Affairs, Media Relations and the Office of General Counsel – to educate the UC community, including writing op-eds for publication in student newspapers; participating in events like student webinars; developing online content; and meeting with stakeholders across the system, such as Chancellors and other senior leaders, faculty representatives, and student groups; and presenting to the UC Regents Compliance and Audit Committee.  Many campus Title IX Coordinators similarly worked with stakeholders on their campuses to help educate their communities.  Because legal counsel on each campus must advise the campus Title IX Coordinators on policy implementation, the Office of General Counsel also specifically engaged counsel on all of the UC campuses.  After the policy was issued, each campus was instructed to conform its local procedures to comply with it.  This entailed campus Title IX officers and Student Conduct directors working with each other and their

Decl. of Suzanne Taylor                                    Civil Action No. 20-cv-01468-CJN

campus partners to revise their local procedures, and the Assistant Director, a Senior Attorney in the Office of General Counsel, and I reviewing those procedures.

37.     The Assistant Director, Senior Attorney and I also developed and provided two day-long training sessions – one in the north part of the state and one in the south – soon after the new policy was issued.  Around 75 individuals attended each of the two trainings, including campus Title IX officers, Title IX investigators, and other Title IX staff; campus legal counsel; Student Conduct officials; hearing officers; CARE advocates; Respondent Services Coordinators; and other stakeholders, many of whom travelled to attend.

38.     Questions naturally arose as the campuses implemented the new policy, often requiring consultation among campus officials, campus legal counsel, and the Office of the President. The Assistant Director, Senior Attorney and I provided additional in-person training to hearing officers and coordinators immediately after UCOP issued the policy, and to campus Title IX staff six months later, and also developed written guidance.

39.     It took UC over a year to complete all of these steps.

40.     I anticipate similar efforts will be required for UC to implement the changes required by the Rule.  However, because the Rule has significant implications for the adjudication of matters involving not only student respondents, but also faculty and staff, the stakeholder groups and individuals involved at all of these stages must be significantly expanded.  Further, the UC system

Decl. of Suzanne Taylor                                                    Civil Action No. 20-cv-01468-CJN

and local UC campuses will need to change the policies and procedures for taking corrective action involving senate and non-senate faculty, other academic appointees, and policy-covered staff, as well as represented staff covered by a collective bargaining agreement in a way that balances the interests of employees and the UC in terms of appropriate discipline procedures and protections that the Department states for the first time are now preempted by the regulation.

41.     Given the extensive effort and coordination required to comply, the USDOE's August 14, 2020 effective date for the Rule would be unreasonable under the best of circumstances. The challenges of the inexplicably and arbitrarily short timeline are magnified by the global pandemic in the midst of which it was issued:  UC resources are directed to the health and safety of its campus communities and the continuity of educational programming and employment, and there is great uncertainty as the UC and other schools prepare for an unknown fall environment.

42.     Moreover, the Department's requirement that UC implement costly new procedures that it states in the Rule will only result in fewer formal complaints opened and investigated, and, therefore less enforcement of Title IX, while UC and other schools face an unprecedented decline in revenues due to the COVID-19 pandemic, make the timeline callous as well.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 10th day of June, 2020

Suzanne Taylor
Systemwide Title IX Director,
University of California

Page 16 of 16

# EXHIBIT 93

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | **CIVIL ACTION No. 20-cv-01468-CJN** |

Plaintiffs,

v.

ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,

Defendants.

## DECLARATION OF TONY THURMOND

I, Tony Thurmond, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am the Superintendent of Public Instruction for the State of California.  I have been California's Superintendent of Public Instruction since January 2019.  In this role, I serve as the state official who oversees California's Department of Education.  The California Department of

Education provides leadership, assistance, oversight, and resources so that every California student has access to a quality education.

2.      I hold dual master's degrees in Law and Social Policy and Social Work (MSW) from Bryn Mawr College.  Prior to becoming Superintendent of Public Instruction, I served in a number of roles, including as an educator, social worker, and elected official.  From 2008-2012, I served on the West Contra Costa School Board, where, among other things, I helped build new schools, increase funding for counseling, after-school, music, and athletic programs, reduce school suspensions by 27%, and bring nutrition and wellness programs to our schools.  In the State Assembly, I championed legislation to, among other things, expand free school lunch programs, improve access for families for early education and childcare, and shift millions of dollars directly from prisons to schools.

3.      I submit this Declaration in support of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (the "Title IX Rule" or Rule). I have compiled the information in the statements set forth below through personal knowledge, based on my experience working in education for more than 20 years, and on the basis of documents that have been reviewed by me.  I and my staff have also familiarized ourselves with the new Title IX Rule in order to understand its immediate impact on California schools.  If called as a witness, I could and would testify competently as to the matters set forth below.

### Background

4.      As the Superintendent of Public Instruction, I provide education policy direction and oversight to the largest common system of public schools in the nation, which includes more than

Decl. of Tony Thurmond                                Civil Action No. 20-cv-01468

1,037 school districts, 11,800 schools, and 6,220,413 students.  Of these students, close to three million are in grades K-5; nearly one and a half million are in grades 6-8, and nearly two million are in grades 9-12.  In 2018-2019, 48.6% of California students were female and 51.4% of those students were male.

5.      All California public schools receive federal funds from the United States Department of Education.  As a result, California public schools are subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX regulations, 34 C.F.R. pt. 106.

## Substantial and Irreparable Harms:

## Effective Date, Administrative, and Financial Burdens

6.      The new Title IX Rule substantially limits our schools' ability to quickly address and resolve sexual harassment and violence complaints, creates significant harm for students subjected to sexual harassment and assault on our campuses, imposes substantial costs and burdens on our system, and impacts our capacity to respond to the COVID-19 pandemic.

7.      I understand that the new Title IX Rule's effective date is August 14, 2020 and that by that date, every school and district in the State of California will have to come into compliance with the Title IX Rule's requirements.

8.      This declaration is focused solely on the immediate and unreasonable administrative and financial burdens imposed by the Title IX Rule and the August 14, 2020 implementation date. It is my understanding that California State Board of Education President Linda Darling-Hammond and Director of the Office of Equal Opportunity Sharon Felix-Campos are addressing other immediate harms caused by the Title IX Rule.

9.      The California Department of Education and its one thousand and thirty-seven school districts will have to expend thousands of hours reviewing the new Title IX rule, including the Department's 544 plus pages of lengthy explanation of changes and nearly 2,000 footnotes, and analyzing the impact of the new Title IX rule on California laws, state and local grievance systems, policies, and procedures, and the individual district's policies, procedurals, protocols and training.

10.     Among other changes, the new Title IX rule is extremely complex and requires the implementation of almost an entirely different Title IX investigation and response system than the one currently in place under California law.  California law already provides a system that meets constitutional fairness requirements for school discipline, including providing a live hearing for students who may be facing expulsion.  But, the Title IX Rule now requires that all schools administer a complex, duplicative, burdensome, costly, and unnecessary 20-plus day process that includes four different staff members who at different times engage in multiple exchanges of documents between student parties and their advisors, create an investigative report, provide opportunity for review and comment of that report by student parties and advisors, and allow multiple opportunities to ask questions of the other party and receive responses, and develop an appeal process before a school-site can issue even the most minor discipline, such as a 30 minute after-school detention.  Furthermore, because of the changes in the new Title IX Rule, California schools and school districts will need to develop a secondary system and set of procedures that address harmful conduct no longer covered under the new Title IX Rule but that may create a hostile environment on the basis of sex.

11.     It will be nearly impossible for every school and district in the State of California to implement the Title IX Rule by August 14, 2020 without experiencing irreparable and immediate harm.  The COVID-19 pandemic has disrupted the system's ability to provide

instruction to students in person and has required staff and students to shift almost entirely to remote learning. Staff have also been required to work remotely while addressing the changes in educational instruction. Reviewing and revising the system's policies, procedures, and processes to come into compliance with the Title IX Rule will require California districts and schools to divert considerable staff time and resources that are currently dedicated to our system's COVID-19 pandemic response.

12.      The COVID-19 pandemic has not only created urgent operational and administrative burdens, but the pandemic has also led to substantial projected cuts and deferrals to the education system's budget and resources for the current fiscal year and FY 2020-21. These projected changes will have an immediate impact on California Department of Education and individual school district and site programs, which are anticipated at this time to continue through the next fiscal year, if not longer.

13.      The administrative burdens for schools who are trying meet the complex and detailed requirements of the new Title IX Rule are extensive.   On a statewide level, to meet the new Title IX Rule's requirements, the California Department of Education will need to address any conflicts with existing state laws and review and revise procedures and processes for conducting state audits for compliance. School districts will need to review and update policies and procedures after receiving required input from staff, students, and parents, this process is critical to implementation both because it is required by law in many instances, and because such a process helps to ensure buy-in and understanding from everyone involved. Of course, a process of this nature takes considerable time. E.g., California's Administrative Procedure Act. Cal. Gov't Code §§ 11346.2, 11346.4, 11346.45, 11346.5, 11346.6, 11346.8.

14.      School districts will also have to obtain Board approval for changes at a properly noticed Board meeting, during the summer months and during this COVID-19 crisis, when resources are stretched thin. Then, school districts will have to provide guidance, training, and information on the new policies and procedures to all staff, students, and parents, not just a few

select people, as the new Title IX Rule states.  In my experience, the process for reviewing and revising policies and procedures, obtaining input and Board approval, and beginning the training process typically takes a minimum of eight to ten months to complete during a time when we are not experiencing a nationwide pandemic.

15.     Districts will also need to allocate or re-allocate funding and resources for the staff who are needed to fill the four or many more roles required by the new Title IX Rule (depending on the size of the school district), which include the investigator, Title IX Coordinator, decisionmaker, and individual responsible for appeals.  These allocations and re-allocations will result in resources being taken away from other important education services, such as sufficient teachers, counselors, and social workers in our schools to meet day-to-day student needs.

16.     The August 14, 2020, effective date is unreasonable and unrealistic, and fails to account for the administrative requirements necessary to make such sweeping changes to policy, procedure, and practice, particularly during the national public health emergency caused by COVID-19 pandemic.  Our state schools are facing significant loss of revenue due to COVID-19 related budget cuts at the same time that they need to restructure the entire way that they provide education services and fulfill basic needs, such as providing free lunch, to all of the state's students.

17.     It will be nearly impossible for the more than one thousand school districts in California to change their Title IX policies, procedures, and processes by the effective date while the COVID-19 public health emergency is ongoing.  The pandemic has had a severe impact on the State's budget and anticipated revenues for the State's education system.  Furthermore, California's education system has experienced unprecedented disruptions to its educational services and programs as a result of the pandemic, requiring ongoing administrative guidance to staff and the individual districts, as well as completely new local infrastructure and virtual platforms to provide remote instruction to students.

Decl. of Tony Thurmond                                          Civil Action No. 20-cv-01468

18.     The State of California has had to divert state resources from other priorities to address the impact of the public health emergency.  The current proposed budgetary constraints create difficulties for the system to focus on existing priorities and programs, and has required the system to reallocate funding and resources.

19.     On May 14, 2020, Governor Newsom released the May revision for the State's budget for FY 2020-21, which detailed drastic budget adjustments for all of the State's K-12 schools.  When the Governor's budget was originally released on January 10, 2020, the budget projected a $5.6 billion surplus for FY 2020-21 and $21 billion in reserves.  The May revision now projects a $41 billion decline in revenues by the end of FY 2020-21 with a $13 billion increase in health and human services program costs and other pandemic-related expenditures, resulting in a projected budget shortfall of $54 billion as compared to the January budget proposal.

20.     The K-12 education system is facing these severe cuts to its budget while at the same time trying to address unprecedented challenges in responding to the COVID-19 pandemic, which has required additional and unforeseen costs and resources.  Like other educational institutions, all California schools have transitioned to online delivery.  The California Department of Education has made and continues to make significant efforts to respond to the severe disruptions experienced by students to enable them to meaningfully participate in online instruction and to address other critical needs such as access to technology, support services, and food insecurity.  These efforts have required considerable staff time, including staff and personnel whose primary responsibilities have been shifted from other duties to responding urgently to the public health emergency.

21.     The K-12 system is experiencing significant and unforeseen disruptions as a result of COVID-19.  The system's resources are already stretched thin trying to address the urgent needs of students and staff during a time when there are drastic cuts expected to the State of California's K-12 education budget.  Districts throughout the K-12 system will have to

immediately divert staff and resources from our COVID-19 response in order to implement the requirements of the new Title IX Rule, which, as stated above, will only create more harm for students subjected to sexual harassment and assault on our campuses, impose substantial costs and burdens on our system, and impact our capacity to respond to the pandemic.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 12th day of June, 2020

_____

Tony Thurmond
Superintendent of Public Instruction

Decl. of Tony Thurmond                                          Civil Action No. 20-cv-01468

# EXHIBIT 94

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

## DECLARATION OF HAYLEY WEDDLE, Ph.D.

I, Hayley Weddle, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth below.

2.      I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("ED" or the "Department"); and the United States of America regarding

the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (the "Title IX Rule" or "Rule").  I submit this declaration in my personal capacity as a doctoral student in the University of California San Diego Department of Education Studies.  This declaration is based on the Title IX knowledge and experience I have acquired in the course of serving in various leadership roles with the University of California ("UC").

## Title IX Experience

3.     As a former member of the UC Title IX Student Advisory Board, which is comprised of an undergraduate and a graduate student representative from each of the 10 UC campuses, I am familiar with Title IX and systemwide sexual violence and sexual harassment ("Sexual Violence and Harassment Policy") policies and procedures at the 10 UC campuses.  During the summer of 2018, I provided input for revisions made to the UC systemwide Sexual Violence and Harassment Policy.

4.     The UC Title IX Student Advisory Board serves as an advisory board whose primary purpose is to represent the student voice and relay student feedback to the UC administration regarding sexual violence and sexual harassment and the UC's continuing prevention and response efforts.

5.     From January 2018 to June 2019, the UC Title IX Student Advisory Board consulted with hundreds of students, administrators, and stakeholders on all UC campuses to help us better advocate for more fair, just, and trauma-informed Sexual Violence and Harassment Policy and Title IX procedures at the UC campuses.

6.     The UC Title IX Student Advisory Board includes student employees of sexual violence and sexual harassment advocacy and prevention offices on UC campuses, graduate and

Decl. of Hayley Weddle                                              Civil Action No. 20-cv-01468

professional students who research related issues of sexual violence and higher education, and undergraduate and graduate survivors and allies.

7.      I helped draft the January 30, 2019, UC Title IX Student Advisory Board comment letter in response to the Notice of Proposed Rulemaking ("NPRM") relating to the Title IX Rule.

8.      In preparation for drafting the comment letter, the UC Title IX Student Advisory Board's 19 members visited every UC campus and spoke with student groups, primarily student government groups, at each campus and connected with key sexual violence and sexual harassment advocacy and prevention offices on each UC campus.  At UC San Diego, I spoke with members of the Graduate Student Association, as well as staff who oversee the student conduct policies and procedures.  Overall, the UC Title IX Student Advisory Board consulted with dozens of students and sexual violence and sexual harassment advocacy and prevention staff members, and used their feedback to collaboratively write the comment letter.  We also supplemented our stakeholder feedback with our personal and professional experiences with Title IX advocacy and procedures.

9.      In addition to my work with the UC Title IX Student Advisory Board, during the winter 2018 quarter, I was part of the Hiring Committee for the UC systemwide Title IX Coordinator.  The Hiring Committee was tasked with recommending and interviewing final candidates.  Along with 10 members of the committee, I reviewed all candidates' CVs, participated in interviews and debrief sessions with the hiring committee, and ultimately participated in the decision to hire our current Title IX Coordinator, a decision that will impact the UC's continuing prevention and response efforts for years to come.

10.     During the spring 2019 quarter, I was also part of the UC systemwide Sexual Violence and Sexual Harassment Student Adjudication Framework Work Group ("Work Group").  The Work Group was comprised of 15 members, including representatives from the General Counsel's

Decl. of Hayley Weddle                                    Civil Action No. 20-cv-01468

office, Title IX office, respondent services, Campus Advocacy Resources and Education ("CARE"), the Student Conduct Director, and a faculty member.  I served as the student representative.  The mission of the Work Group was to change the UC adjudication framework back to a hearing adjudication model in response to new California case law.  We met biweekly on four occasions and developed a draft of a new adjudication model that will be used at all UCs.

11.    I also served as a UC Student Regent-Designate from July 2018 to July 2019 and as a UC Student Regent from July 2019 to June 30, 2020.

12.    The UC Student Regent is a position on the UC Board of Regents that serves an approximately one-year term as 'student regent-designate,' followed by a one-year term as a full voting member of the Regents.  I am currently serving a one-year term as a full voting member of the Regents.

13.    Through my role as a UC Student Regent-Designate, I was contacted by the University of California Student Association to assist with its comment letter in response to the Title IX NPRM.  The University of California Student Association is a coalition of students and student governments that aims to provide a collective voice for the more than 270,000 undergraduate, graduate, and professional students from all ten UC campuses. The University of California Student Association participates in the shared governance of the UC system, and seeks to advance higher education by empowering current and future students to advocate on their own behalf for the accessibility, affordability, and quality of the University of California system.  I was brought in by University of California Student Association as someone with Title IX knowledge and experience who could assist with drafting their comment letter.

14.    My work as a UC San Diego graduate student leader has also informed my Title IX work by providing me with access to graduate and professional students and the particular ways

in which they experience sexual violence and sexual harassment and navigate Title IX procedures. From July 2016 to July 2018, I served as Chief of Staff for the UC San Diego Graduate Student Association. The UC San Diego Graduate Student Association is the official representative body of graduate and professional students at UC San Diego, which exists to advocate for the rights and interests of our diverse community and for the betterment of academic and non-academic life of all graduate and professional students at UC San Diego.

15. Prior to serving in my roles with the UC Title IX Student Advisory Board, Hiring Committee for the UC Title IX Coordinator, Sexual Violence and Sexual Harassment Student Adjudication Framework Work Group, UC Board of Regents, and UC San Diego Graduate Student Association, I served as an adviser and operations manager for the Associated Students of UC San Diego from March 2013 to September 2016. As a UC staff member working in student affairs, I was trained on how to participate in Title IX hearings and assisted in adjudicating between three and five sexual violence and/or sexual harassment cases at UC San Diego (since we tried to spread them around because they were so time intensive and emotionally draining on staff), as well as approximately 15 general student conduct cases. My training consisted of trauma-informed training, as well as specific trainings on hearing procedures, Title IX, the UC systemwide Sexua Violence and Harassment Policy, and the UC San Diego student conduct policy.

### Impact of the Rule on UC Students

16. Based on my experience with the UC Title IX Student Advisory Board, Sexual Violence and Sexual Harassment Student Adjudication Framework Work Group, UC Board of Regents, UC San Diego Graduate Student Association, and as a former student affairs employee of UC San Diego, I believe the Rule will result in significant harm to students.

### Narrowing of Jurisdiction

Decl. of Hayley Weddle                                                    Civil Action No. 20-cv-01468

17.     Under the Rule, a university will be responsible for responding only to alleged misconduct that occurs in the United States in an "education program or activity" over which the university exercises substantial control over both the respondent and the context in which the sexual harassment occurs (§ 106.44(e)(5)).  I know from my experience working with the UC Title IX Student Advisory Board and student affairs at UC San Diego that this narrowing of jurisdiction will negatively impact complainants and respondents.  For example, if a recent graduate had a sexual violence and/or sexual harassment incident occur with a current student on campus—which has happened at the UC—the university could dismiss that complaint without an investigation because the university would not have substantial control over the respondent. Additionally, formal complaints may only be filed by a complainant who is "participating in or attempting to participate in" the university's program or activity.  This means that if a complainant decides to withdraw from the university due to the impact of a sexual violence and/or sexual harassment incident—which has also happened at the UC—and the complainant decides to file a formal complaint a couple of months later, the university must dismiss the complaint without an investigation because the complainant is no longer participating in or attempting to participate in an education program or activity.  I believe this change effectively narrows the opportunity for complainants to seek justice and eliminates institutions' responsibilities under Title IX to respond to situations that directly impact complainants' access to their educational institution.

18.     Through my experience working with the UC Title IX Student Advisory Board and student affairs at UC San Diego, I am also aware that sexual misconduct at off-campus parties not affiliated with or under the control of a university program is prevalent.  As noted in the UC Title IX Student Advisory Board comment letter, at UC Santa Cruz around 47% of undergraduate students do not live in university-sponsored housing, and at UC Berkeley up to 75% of

undergraduates live off campus.  Across the UC system, large percentages of undergraduate and graduate students live off campus and conduct occurring in private off campus housing would no longer trigger a university's obligation to respond under Title IX, unless the building is owned or controlled by a student organization that is officially recognized by the university.

19.     Similarly, undergraduate and graduate students sometimes conduct fieldwork in other parts of the country.  Based on my experiences as a UC staff member working in student affairs and as a graduate student generally, I am concerned that conduct occurring in these settings may go unreported and uninvestigated.

20.     Narrowing the scope of an educational institution's jurisdiction to only conduct in an education program or activity under the "substantial control" of the institution presents particular concerns for graduate students, who often live off campus, face unique power dynamics with their advisors, and regularly interact in spaces outside the boundaries of university programs and activities.  For example, for many graduate students, their advisor might be their sole supervisor for several years.  The advisor is likely closely connected to the graduate student's future career opportunities because advisors are responsible for writing recommendation letters, providing support in securing grant funding, as well as networking in their particular field.   In some programs, it is common for a graduate student to socialize with advisors off campus and outside of class because graduate students are also employees and can sometimes be seen as colleagues.  As employees starting in a new career, when invited to social gatherings, they are expected to attend or may feel pressure to attend because advisors are gatekeepers to their future job opportunities.  All of these factors increase the likelihood that when graduate students are subjected to sexual harassment and sexual violence, it will occur outside an "education program or activity" as defined by the Rule.

Decl. of Hayley Weddle                                    Civil Action No. 20-cv-01468

21.     Through my experience working with the UC Title IX Student Advisory Board and student affairs at UC San Diego, I am aware that misconduct at off-campus parties not affiliated with a university program or activity is also prevalent. When I was a UC staff member, most of the complainants I interacted with shared that the alleged sexual harassment and/or sexual violence had occurred off campus.

22.     Through my work with the UC Title IX Student Advisory Board, Sexual Violence and Sexual Harassment Student Adjudication Framework Work Group, UC Board of Regents, UC San Diego Graduate Student Association, and as a former student affairs employee of UC San Diego, both undergraduate and graduate students have voiced that misconduct that occurs off campus and at social events can have devastating impacts on their educational experience within the university.  Complainants and CARE staff members have shared with me that these incidents can negatively impact a survivor's ability to access classes, departmental spaces, housing, other services, and ultimately, remain enrolled.

<u>Access to Trauma-Informed Campus Title IX Processes</u>

23.     When I assisted with Title IX hearings as a UC San Diego employee, our hearing model did not allow for cross examination—all questions went through a neutral hearing officer. I am deeply troubled by the Rule's requirement that live hearings permit cross examination by advisors.  This requirement privileges students who can afford legal counsel.  Furthermore, UC campuses are not courtrooms, and such adversarial cross-examination fundamentally changes the nature of educational disciplinary proceedings into quasi legal trials without accounting for the training, limits, and protections that are necessary to ensure a just and fair student conduct disciplinary proceeding.  I am particularly alarmed that under the Rule if a complainant does not want to subject themselves to cross-examination, the university can no longer use any of the

complainant's statements, including the statements that contain the allegations.  In effect, if the complainant is not comfortable with cross-examination this means that unless there is a witness to the sexual violence and/or sexual harassment who is willing to be cross-examined (an unlikely witness to a rape, for example), it will be nearly impossible for the university to move forward with an investigation, and no sanctions would be issued to the respondent.

24.      I am also deeply troubled that there is no requirement that advisors or hearing bodies have any training in trauma-informed questioning techniques.  Through my UC Regent campus visits and work with the UC Title IX Student Advisory Board, I am aware of complainants on various UC campuses who expressed trepidation at continuing with the student conduct process when they learned they would need to be subjected to cross examination by the respondent's lawyer.  I have seen the fear of complainants visibly alleviated when they are told that advisors, investigators, and hearing officers have trauma-informed training, specifically on the impact of sexual violence and assault on memory.  The absence of critical trauma-informed training for hearing officers, investigators, and advisors will likely further discourage reporting and re-traumatize complainants.

<u>Ambiguity, Time Frame, and Discouraging of Reporting</u>

25.      Through my work with undergraduate and graduate students at the UC, I have become acutely aware that students across campuses often feel they are not knowledgeable about Title IX until they need to be.  Navigating Title IX information and resources can be daunting and confusing to students, and the changes to the definition of sexual harassment will only further confuse and alienate students.  For students, existing conduct policies are already long, arduous to get through, and difficult to parse.  Introducing a new definition will further students' confusion with regards to the student conduct process, particularly doing so in the middle of the COVID-19

Decl. of Hayley Weddle                                    Civil Action No. 20-cv-01468

pandemic when students are already feeling anxious and cannot take advantage of campus resources in person.  Furthermore, to expect universities to make changes to their Title IX policies and procedures and implement those by August 14, 2020, necessarily means that most campuses will face challenges in soliciting student and other stakeholder feedback prior to making those changes due to the limited time frame.  This inability to conduct a thoughtful process will result in a less understandable rule, exacerbating the ambiguity surrounding Title IX investigations and hearings for students, and deter them from lodging complaints.

26.      I am particularly concerned that language in the new definition states conduct must be severe and pervasive and objectively offensive such that it effectively denies equal access to education to be actionable under a university's Title IX policy.  This narrowed definition does not encompass several forms of misconduct currently considered sexual harassment by the UC and other institutions.  For example, the UC considers one-time forcible kissing as violating its sexual harassment policy.  If implemented, the Rule will effectively deny redress to a significant percentage of survivors of sexual harassment based on the fact that some things will no longer be considered misconduct under Title IX.  Narrowing the definition will also result in students being unsure if their experience qualifies and meets the new threshold, which will likely also inhibit reporting of sexual harassment across UC campuses, even though it would continue to be covered under the UC's Sexual Harassment and Violence Policy.  In effect, by reducing the responsibility of universities to address these and other forms of misconduct, the narrowed definition of sexual harassment rolls back critical protections for students.

<u>Imbalance of Expectations</u>

27.      The Rule places a greater burden on students than a Title IX student conduct proceeding previously required under the existing regulations.  A complainant will have to strictly

Decl. of Hayley Weddle                                                    Civil Action No. 20-cv-01468

comply with every step of the now mandated and prescriptive process: file and sign their formal complaint; help ensure their witnesses participate in the investigation and hearing; feel confident in the advisor assigned to them by their school (if they do not have the means to pay for an attorney or if they do not have other advisor alternatives); and subject themselves to cross examination in order to receive some form of remedy. Yet while the complainant is complying with these steps, the institution may negligently decide not to grant supportive measures for the complainant and will only be held to the deliberate indifference standard for its (in)actions. This inequity in the Rule appears to require the harmed student, rather than institutions, to ensure that students have access to an education that is free from sex discrimination, including sexual harassment and violence.

## Conclusion

28.     The Rule will have a chilling effect on reporting of sexual violence and sexual harassment across college campuses. Based on my experience, I believe that narrowing the scope of an educational institution's jurisdiction and not providing access to trauma-informed campus Title IX student conduct processes will negatively impact reporting of sexual violence and sexual harassment incidents. The aforementioned changes to the definition of sexual harassment will also deter students from coming forward to seek recourse and will generate confusion amongst complainants and respondents. Overall, the Rule places a far greater burden on students than before with respect to addressing sexual violence and sexual harassment incidents and will also chill reporting. When students do not come forward to report and our college campuses do not effectively address sexual harassment and violence, our campuses become less safe for all students.

Decl. of Hayley Weddle                                    Civil Action No. 20-cv-01468

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __9__ day of June, 2020

_____
Hayley Weddle
Doctoral Student, University of California San Diego

# EXHIBIT 95

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, | **CIVIL ACTION No. 20-cv-01468-CJN** |

Plaintiffs,

v.

ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION, and UNITED STATES OF AMERICA,

Defendants.

## DECLARATION OF KEASARA WILLIAMS

I, Keasara Williams, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am San Francisco Unified School District's Office of Equity Executive Director and Title IX Coordinator.

2.     I submit this Declaration in support of the State of California's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education ("USDOE" or the "Department"), and the United States of America regarding the

recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) (Rule). This declaration is based on my personal knowledge, my familiarity with Title IX of the Education Amendments of 1972 (Title IX), Section 504 of the Rehabilitation Act of 1974 (Section 504), and the Americans with Disabilities Act (ADA), my review of the Rule, and the knowledge and expertise I have acquired in the course of nearly six years in the Title IX field and in working with hundreds of students, families, complainants and respondents and with the USDOE Office for Civil Rights.  I have familiarized myself with the Rule in order to understand its immediate impact on the San Francisco Unified School District.

### Background, Responsibilities, and Qualifications

3.      San Francisco Unified School District and San Francisco County Office of Education (hereinafter, SFUSD or District) is the sixth-largest school district in the state with 136 school-sites, serving approximately 55,000 students, and employing around 10,000 employees.  SFUSD is made up of 27% Latino, 15% Caucasian, 7% African American, 35% Asian, less than 1% American Indian or Alaskan Native, 1% Pacific Islander, and 5% Filipino students.  Nearly 29% of students are English language learners.  Approximately, 52% of the students are male and 48% are female.  SFUSD's mission is to provide each and every student the quality instruction and equitable support required to thrive in the 21st century.

4.      SFUSD is part of the state system of common schools and receives funding from several sources.  Most of SFUSD's funding comes from the state.  SFUSD also receives federal funding from the United States Department of Education and, therefore, is obligated to comply with Title IX and its implementing regulations.

Decl. of Keasara Williams                                                    Civil Action No. 20-cv-01468

5.      I am the Executive Director of Student Experience and Equity Compliance and Title IX Coordinator for SFUSD.  I have served as Title IX Coordinator for more than four years.  Prior to joining SFUSD, I worked at Equal Rights Advocates as an Education Equity Staff Attorney.  I also have a Bachelor's (Sociology) and Master's Degree (Education) from the University of California, Berkeley, and a Juris Doctorate from UC Hastings College of the Law.

6.      In my current role at SFUSD, my responsibilities include Title IX compliance and investigating Uniform Complaints under the state's anti-discrimination grievance procedures.  I am responsible for ensuring district-wide compliance with state and federal civil rights laws and regulations, including Title IX, Section 504, and the ADA.  In this position, I supervise two staff members who are responsible for Title IX compliance, as well as directly advise our school site administrators and Title IX Site Officers when issues of harassment arise.  The Office of Equity is responsible for ensuring that schools are promptly and equitably investigating complaints, ensuring that interventions and supports are put into place, and that steps are being taken to end the harassment.  In addition, we speak directly to family members and students who report incidents of harassment to our office.

7.      The Office of Equity at SFUSD develops, reviews, and revises the District's nondiscrimination policies.  The office provides training and support to SFUSD's central office and stakeholders (including students, parents/guardians, community, and schools) on harassment, discrimination, retaliation, and intimidation issues involving protected characteristics, including sex and gender.  The office responds to and investigates harassment, discrimination, retaliation, and intimidation complaint allegations, facilitates USDOE Office for Civil Rights complaint investigations, and conducts and coordinates internal complaint

Decl. of Keasara Williams                                        Civil Action No. 20-cv-01468

investigations involving violations of federal and state laws.  The office also assists with state and federal programming monitoring reviews and other audits for our schools and local districts.

8.      During my time with SFUSD, I have reviewed hundreds of incidents or complaints filed about sexual harassment, assault, and violence in SFUSD schools.  With respect to investigation and resolution of complaints under Title IX and other civil rights laws, I assist with and advise school site administrators or Title IX Site Officers during their school site investigations into alleged incidents.  In addition, there are times in which I have to personally interview and/or investigate complaints that are brought to the school site or district level.

9.      With respect to training on nondiscrimination policies and procedures, including those under Title IX, I conduct yearly in person trainings to relevant school site staff, including principals, social workers, wellness coordinators, nurses, counselors, and athletic directors.  I also support school site administrators with the dissemination of training to their school staff members.  In person training is critical to ensure that when issues arise, the correct people are investigating and that investigations are being handled in a prompt and equitable manner and in compliance with federal and state law and regulations.  Not only is it important to know how to respond, by conducting trainings that include identifying harassment, our school site staff members are aware of what behaviors to look for and how to interrupt and report the behaviors to administrators when they do occur.

10.     In the Office of Equity, we provide daily advice to practitioners in responding to and addressing Title IX related misconduct, incidents, and complaints via telephone and by email.

Decl. of Keasara Williams                                    Civil Action No. 20-cv-01468

11.     I also work with SFUSD's School Health Department to ensure that age-appropriate curriculum is being taught to our students related to harassment and discrimination issues at our school sites.

12.     At our over 130 schools, the school sites are responding to numerous complaints on a weekly basis.  They range from cyber harassment, to verbal harassment, to more serious issues of physical sexual harassment and assault.  When the schools have an issue occur on campus, school site staff often times call the Office of Equity to consult on how to appropriately respond.  The schools are required to respond to every incident, even if they are unsure of the severity of it.  It is not until the school site investigates the matter that it is able to determine what happened and what steps to take.

13.     Because our office works with school site administration to properly investigate and remedy the situation in a timely manner, the Office of Equity does not directly investigate most complaints.  During the last three school years, school sites reported to the Office of Equity that they investigated approximately 290 sexual harassment and assault reports or complaints each year[1].  In comparison, during the 2016-2017 School Year, in the Office of Equity we directly investigated two (2) complaints related to Title IX, in 2017-2018 we investigated seven (7) complaints, and in 2018-2019 we investigated three (3) complaints.

**Impact of the Rule on the K-12 System**

14.     The Rule will be harmful to all of our students, and will have a major impact on the overall school climate and potential safety for our students.  It will have immediate and highly detrimental consequences for our district and its K-12 schools' ability to provide an

---

[1] This number only indicates incidents reported to the Office of Equity. By the nature of the K-12 setting, the Office of Equity knows that there were more investigations conducted than were reported to the Office of Equity.

Decl. of Keasara Williams                                    Civil Action No. 20-cv-01468

education environment free from discrimination, sexual harassment, assault, and violence based on sex.  Moreover, the Rule will result in immediate, unnecessary, and unaccounted for administrative and financial burdens.

15.     The Rule negatively impacts K-12 students by directly limiting when and how schools investigate sexual harassment and violence complaints under Title IX.  And, because it fails to adequately protect child victims of sexual harassment, violence, and assault, it reduces our district's ability to effectively prevent and deter such behavior and ensure equitable access to a free appropriate public education.  The Rule increases the likelihood of ongoing and progressively more severe victimization and exposes K-12 districts to an increase in potential legal liability.

16.     The Rule's limited scope also creates a concerning gap of harassing behaviors that need intervention but do not fall within the high threshold of behaviors covered by the Rule.  In order to address these harassing behaviors, school districts will need to rely on additional processes set forth in other district policies.  This creates a dual-process system that runs the risk of causing confusion among students and staff regarding how to properly address incidents as they occur.  Not only will the additional processes create increased administrative burdens and costs not accounted for by the Rule, but the confusion caused by the two different processes will likely lead to inefficient and ineffective interventions on behalf of students.

17.     The Rule creates many barriers and complex requirements for student victims to access help and obtain resolution under Title IX; these will likely deter many from coming forward to report and seek support.  For example, under the Rule, victims must file a formal complaint in order to have the incident investigated (a step that will be increasingly difficult in the K-12 setting) and victims are forced to participate in a formal process that will

likely serve to retraumatize the students all while preventing them from receiving resolution in a timely manner.  These barriers will likely deter many from coming forward to report and seek support.  As stated above, SFUSD schools work to resolve complaints early and upon the first report.  As discussed in more detail below, the impact of following the Rule's requirements will lead to students feeling unsafe and more severe incidents of harassment will likely occur because the school will not be able to initiate investigations as quickly.  The harmful requirements in the Rule include, but are not limited to, requiring a showing of severe, pervasive, and objectively offensive sexual harassment that effectively denies equal access to education before a Title IX complaint can be opened by the District; additional unnecessary barriers to making a complaint, such as requirements that the impacted student or their parent/guardian put the complaint in writing and include a request to initiate an investigation to start the investigation under most circumstances, regardless of the student's age, disability, or writing ability; prohibiting a student victim who has left a school due to sexual harassment and assault from filing a formal complaint; creating protracted back-and-forth processes for students in K-12 schools that delay final remedies for victims and require them to unnecessarily relive the experience; requiring schools to permit students, regardless of age, to have unfettered ability to disseminate information about the allegations and parties information; and requiring that all documents, even irrelevant documents, be provided to the child complainant and a third party advisor.

18.     The Rule also effectively gives students who are victims of other forms of discrimination (other than sexual- or gender-based harassment) more protections.  This creates a system where schools can move through investigations more equitably, fairly, and quickly if the allegations are related to other forms of harassment, bullying, and discrimination.  Through the Rule, USDOE is, in effect, discriminating against students on the basis of their gender by

limiting their protections as compared to other forms of discrimination (such as on the basis of disability, race, religion, etc.).  This inequitable response to sexual harassment sends the damaging message to victims that sexual harassment is prioritized less than other forms of harassment, and that the federal government is uninterested in protecting them against such harassment.

19.     The Rule also ignores the significant harms to students who are victims of sexual harassment.  Students depend on and trust the adults on their school campus to prevent and effectively respond to harm.  The Rule hamstrings schools and limits their ability to respond. With a system designed only to investigate and fully address a response that is "deliberately indifferent" to a student's plight and to act only if a child has already been subject to severe and pervasive harassment that has "effectively denied" equal access to school, the Rule will cause students to suffer long-term trauma and significant mental health consequences.

20.     Overall, the Rule reflects a lack of understanding of how our K-12 education system works and how children who are harmed interact in that system.  The Rule will have a lasting negative impact on students, including SFUSD's most vulnerable students.

<u>Barriers to Initiating a Complaint</u>

21.     There are a number of barriers in the Rule that make it more difficult and burdensome for a student to initiate a complaint under the Title IX process.

22.     The Rule requires that a written complaint be filed by a harmed child or parent.  The Rule further provides that this written complaint must be filed before a school district is required to investigate.  Based on my knowledge of the incidents or complaints reported to my office, the vast majority of complaints are made verbally in the first instance at a school-site from a staff member who witnesses the conduct or with whom the child has a trusting

relationship.  Many of our students are unable to articulate their concerns in writing, especially if they are in crisis.  As such, most students would be unable or uncomfortable to write and sign complaints.  Most children, at any age, do not yet have the skillset necessary to request a formal investigation into alleged sexual harassment.  Regardless of the Title IX complaint being made verbally or in writing, signed or unsigned, once a student reports the incident to an adult, it is crucial for the schools to investigate promptly, often the very same day, and sometimes before a parent or guardian has been reached to address the issues before they escalate in the environment of a small school campus.  If an allegation is found to be valid, it is also important to provide students with remedies beyond those allowed by the Rule's "Supportive Measures," such as required sexual harassment training, permanent class changes, behavioral contracts, or suspension.

22.     The Rule also does not consider the special needs of our students with disabilities, who are approximately 15% of our students (at least 8,000 students).  For our students with severe disabilities, it may be impossible for them to verbalize the harms they are experiencing.  The Rule does not identify exceptions to the onerous complaint requirements or provision of accommodations to ensure all students, including those with disabilities, can gain access to Title IX's protections.

23.     Further, by allowing the parent to file the complaint there may be times that the complaint is submitted by a parent without the consent of a student.  If a parent files a complaint and submits facts requisite to trigger a formal Title IX investigation, but the student does not want to participate, the process is forcing a student to go through the extremely lengthy and confusing process of the new Title IX investigation requirements.  Even though both the student or the parent can trigger an investigation as the student being deemed the "complainant," the

Rule is silent as to what a school or District is required to do if a parent wants to move forward with a complaint, but the minor student does not.  Or in the alternative, if the student wants to move forward with the complaint, but the parent or guardian does not.  Under the District's current policy, where there is such a dispute, the school will take steps to investigate the incident barring any overruling concerns, such as concerns for the safety of the victim.

<u>Detrimental Impacts on School Safety</u>

*Narrowed Definition of Sexual Harassment & Conflicts with State Law*

24.     Under the California Constitution, K-12 educators must ensure student safety.  The Rule will result in an increase in child victims on our campuses, less safe school campuses, and greater financial liability for the District because of the requirement to wait to open a complaint and investigate until after the harm to the child has become so severe, pervasive, and objectively offensive that it "effectively denies" a child's equal access to education.  In practical terms, the Rule, which goes so far as to mandate dismissal of such complaints that do not meet the heightened requirement, prevents our school officials who know about sexually harassing conduct from investigating a complaint under Title IX until they have confirmation that the sexually harassing conduct has persisted to such a degree that there are potentially permanent impacts on their education.  These impacts include students missing class to avoid the accused student, not attending school (cutting class), engaging in self-harm, and being subjected to further harassment, assault, and/or retaliation.

25.     Requiring that a child subjected to sexual harassment be denied equal educational access before a school can investigate under Title IX is inconsistent with reality and will invariably lead to long-term negative effects on the student's ability to engage with and access education after the harassment has ceased.  K-12 students are in the early development of the

Decl. of Keasara Williams                              Civil Action No. 20-cv-01468

foundation of their educational and interpersonal skills and waiting to act can create a greater negative impact on a student that may impair these skills as they grow older.  Although the negative impact may not manifest itself immediately, the impact on the student's educational access may have consequences that appear long after a school fails to respond to an incident in a timely manner.

26.     It is my experience that when less severe sexual harassment incidents are not investigated and addressed, the situation will increase in severity, and the conduct will also likely be repeated and become "pervasive."  However, when the behavior escalates to this degree, the student victim is likely to have already suffered from unnecessary permanent educational, emotional, and mental health impacts.  Failure to address these incidents as soon as possible can lead to additional mental health services and require support over and above what a school site can give.

27.     Not only does this create the potential for an extra cost to the district (and if it does not result in extra costs, there is always the possibility of a formal lawsuit from a family of a student who has suffered sexual harassment and assault under a negligence or other tort provision, which could include damages and more), but it could also lead to a family shouldering the burden of trying to secure additional services.  And, if the family is unable to afford additional services (or does not have the access or ability for some other reason), the student may not receive extra support, which will likely have a lasting impact on the student.

28.     The Rule prevents school districts from conducting formal Title IX investigations in order to intervene at earlier stages of misconduct.  Students engaging in inappropriate conduct need to understand the seriousness and the impact of their actions early on, in order to prevent escalation and harm that can impact both the safety of our broader school environment and the

respondent student's success in education and life.  In the K-12 setting, mandating dismissal of Title IX complaints is inconsistent with the research about how to effectively address sexual harassment on campus and the reality about what happens to campus safety and to student victims if schools wait too long to intervene.  This failure will result in greater harm to our students and overall school climate.

29.     While the Department suggests that schools can intervene earlier to investigate under their own code of conduct, it is not as simple as the Department suggests, because the Department preempts state and school site codes of conduct that include a disciplinary process that meets due process requirements from being used for Title IX complaints and also mandates a process that involves mandatory dismissal of non-Title IX complaints and the opportunity for appeal and OCR review of such dismissals.  The District will be required to create a separate process to fill the gaps identified above, but must now also create additional steps in the process to determine whether the report is non-Title IX or Title IX, provide appropriate notice of dismissal and an opportunity to appeal, and, potentially, stop the process under the District's code of conduct while the Title IX dismissal appeal proceeds to avoid violating the Rule's preemption provision.

30.     Moreover, school sites are responsible for teaching and educating students about healthy relationships and appropriate behaviors and boundaries.  To do this, it often requires some level of investigation and inquiry to determine what happened.  School sites will then implement interventions consistent with SFUSD's Safe and Supportive Schools Policy, such as by providing required individual lessons on sexual harassment, requiring the student to draft a reflection essay on the impact of their behavior, or required participation in community and counseling groups or community service.  By limiting schools to a narrow set of non-punitive

"supportive measures" to be implemented prior to the completion of a formal investigation, however, the Rule severely limits the ability of school-site administrators to effectively educate students in a timely manner.  Rather than allowing schools to intervene and educate quickly, the Rule requires that staff wait to do a formal investigation until an incident becomes "severe, pervasive, and objectively offensive."

31.     The vast majority of SFUSD's interventions are not suspension/expulsion, but according to this Rule would be looked at as punitive.  Not being permitted to institute the variety of interventions we have worked hard to implement in a non-punitive manner significantly interferes with our obligation to proactively educate students.

32.     Even where Administrators take steps to intervene using limited supportive measures, the Rule further hinders an administrator's ability to address ongoing harassing behavior by asserting that any interview of a respondent prior to the filing of a formal complaint may not be used as part of an investigation or adjudication.  This not only disincentivizes schools from conducting initial inquiries into harassing behavior that might not rise to the level of a formal complaint, but also runs the risk of retraumatizing students by requiring multiple interviews to receive the same information already obtained.

33.     Limiting the use of a respondent's interview or evidence reviewed prior to formal notice also does not take into account that many times incidents are seen in real time or on video shortly thereafter.  For example, if a student gropes or sexually assaults another student's intimate body part in the hallway and it is witnessed by an adult, the adult must take immediate action.  If an administrator had to stop and wait for the victim to write a complaint, then provide notice to the respondent and wait until they interviewed them (despite having witnessed the incident) without having any ability to quickly move through the process and potentially

Decl. of Keasara Williams                                Civil Action No. 20-cv-01468

discipline the student is not only unrealistic in a K-12 school, but also very harmful to not only the victim but all of the other students who witnessed the incident and saw no follow up by the adults in the school.

34.     The Rule also forces educational programs into the untenable position of undermining state law in order to comply with the tenets of the new regulations.  By requiring that a student's equal access to education be effectively denied prior to initiating a formal investigation into sexual harassment and then prohibiting a Title IX complaint from being filed after a student has left the school, even if on account of sexual harassment, the Rule is in tension with California state law requirements, such as those set forth by California Education Code's Educational Equity provisions (Section 200, et al.), which provides that state schools have an affirmative obligation to combat issues of sexism on campus and to ensure that all students have access to education free from discrimination and harassment.  Anticipating that conflict with state laws might arise, the Rule further reinforced the dissonance by expressly stating that, where a conflict arises, state law does not alleviate compliance with the Rule.   While, as stated above, non-Title IX codes of conduct may be able to mitigate some harm created by the Rule, where the Department effectively precludes a District from taking action, e.g., for Title IX complaints where a student is no longer participating or attempting to participate, there is no mitigation

35.     The Rule's high bar for initiating an investigation is especially inappropriate in a K–12 setting where elementary and secondary education is compulsory and not optional.   California's Education Code (Section 48900) prohibits sexual harassment and when students violate Section 48900 schools must investigate and immediately determine the appropriate discipline and interventions.  The Rule requires school districts to create a confusing and costly, dual procedural system to address complaints that are no longer covered by Title IX.

Decl. of Keasara Williams                                                  Civil Action No. 20-cv-01468

And, for those that are covered by Title IX, the Rule causes a conflict with state law because it prohibits immediate investigation and resolution by school-site staff in the absence of a formal, written complaint.

36.     In addition, the timelines set forth in the Rule directly conflict with the timelines for California's Mandatory Expulsion proceedings under the California Education Code.  In California, if schools investigate and have sufficient evidence to suspend a student, they can do that up to 5 days.  Further, if during that time period, schools receive additional information that is sufficient to rise to the level of one of the five categories of mandatory expulsion, an administrator must refer a student for expulsion.  Once that is done, the expulsion hearing must be done within 30 days (unless it is extended by agreement).  This timeline allows for sufficient due process and concludes in a live hearing (with the ability to call and examine witnesses and present evidence) under California law because of the removal of a students' compulsory education rights.  It will be nearly impossible for a California K-12 school or district to comply with the timelines in the Rule and provide its student with Due Process under the California Education Code and Constitution.

37.     Finally, California also already has a Title IX appeals process through the Uniform Complaint Procedure (California Code of Regulations, Title 5, sections 4600-4687).  The creation of a new Title IX appeal process will create an additional process for Title IX appeals.  This not only will be inefficient for SFUSD's Title IX Coordinator, it will cause confusion among students and families since all Title IX complaints have for so long been governed through the Uniform Complaint Procedures.

38.     While the inclusion of a reasonable person standard is usually a good thing as it allows for the party to evaluate the situation to think about the particular situation at hand, the

Rule does not specify whether the analysis is within the purview of the school.  In the K-12 setting, reasonable minds often differ drastically regarding how severe, pervasive, and objectively offensive an incident might be, especially when incidents involve our youngest and most vulnerable groups.  An interpretation of what is reasonable can vary from a parent of the accused to the parent of the victim, or even between the Title IX Coordinator or the decision maker.  Putting an administrator in the position to tell a young student that their experience is not "reasonable" can be harmful to the student, and will likely create a chilling effect on future reports.

*Conduct Only Within Education Program or Activity*

39.     Further, the Rule's mandate to automatically dismiss Title IX claims where the alleged sexually harassing conduct did not occur in the school's education program or activity is irrational because anyone who works in a K-12 school knows that what happens outside of the school does not stay outside of the school.  For example, on an annual basis, SFUSD receives a significant volume of reports of Title IX incidents or complaints involving allegations of sexually harassing originating from social media and other cyber sources that have a nexus to campus (e.g., unwelcome sex-based picture sharing).  With respect to social media, by not addressing those reports immediately, the incidents have the potential to become even more serious and have an even greater impact on multiple students.

40.     Images that are first shared outside of school are often discussed (or even re-shared) between students at school.  That type of conduct creates a hostile environment and one that needs to be addressed immediately by the school site through the Title IX investigation process.  In addition, it is also potentially criminal behavior, requiring schools to report the behavior to law enforcement and also take steps themselves to try to remedy the situation.

41.     Even more confusing is that Title IX Coordinators and investigators will have to conduct an analysis in all cases to determine whether they have jurisdiction to investigate a complaint.  During that time, an initial inquiry will need to be done to determine if there are any facts or evidence connecting it to school.  Due to the extended deadlines to respond, this will cause a significant waste of time, lead to confusion, and is unreasonably burdensome for the schools because of the possibility that an initial inquiry will not lead to a formal Title IX investigation under the process set forth in the Rules.  While such a complaint could then be process through the non-Title IX process, as discussed above, this creates significant duplication of effort and additional administrative burdens for our school-sites and needless delay, when time is of the essence for addressing sexual harassment that can escalate quickly.

42.     Further, the Rule is inconsistent with California's mandatory reporting requirements for child abuse.  If a K-12 staff member knows about cyber sexual harassment or that someone is sharing naked pictures or video of a student off campus (or on), the staff member is required to report to authorities.  Under the Rule, school staff are placed in an untenable position of having knowledge of these potential sexual abuses, but potentially being required by USDOE to dismiss a complaint under Title IX and not investigate even where there is evidence of the harms.  This is further evidence of the confusion and harm that can come from having these Rules in place or a dual investigation process (i.e., investigating a cyber bullying complaint under the District's bullying policy).

*Double Standard is Inequitable*

43.     When a recipient has "actual knowledge" of sexual harassment, the Rule only requires that they must avoid "deliberate indifference" when responding to the report, but yet is held to strict compliance for the complex and unnecessarily time-consuming procedural

Decl. of Keasara Williams                                    Civil Action No. 20-cv-01468

requirements.  This inequity in the Rule creates conflicting and confusing standards for schools to administer and explain to parents and inexplicably sanctions a response to the student complaining of sexual harassment and assault that is unreasonable, but just not clearly so.  The Rule increases the potential for liability and litigation stemming from complaints by the parents of children who have been harmed.

### Impact of Rule on Privacy, Confidentiality, Non-Retaliation, and Reliable Investigations

44.     The Rule states that when investigating a complaint, a school may not "restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence."  All students should be asked to keep the sensitive nature of the incident and investigation confidential.  They should be asked if there were witnesses to the conduct and the administrators should seek to speak to those witnesses to gather information, but students should not be sharing the information as that can lead to a hostile environment and likely retaliation by other students at the school.  Without a warning to students to not share information to their friends, young people will most likely immediately share their experiences, what conversations they had, spread rumors, and create a hostile environment, chilling effect, and potentially tamper the investigation process (either knowingly or unknowingly).

45.     Our school campuses are charged with ensuring the confidentiality of student records and data under Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and California education laws.  However, the Rule also states that even evidence upon which the District does not intend to rely in reaching a determination regarding responsibility must be transmitted to the other party.  During the course of Title IX investigations, school site

administrators learn a lot of information from students.  Oftentimes, what they learn is confidential, unrelated, and irrelevant.

46.     The Rule indicates that when FERPA would usually prohibit a party from having access to privileged and confidential student record information, the Rule would allow such disclosure, abrogating federal law.  The Rule goes beyond this, however, stating that in a K-12 setting a parent or guardian who has a legal right to act on behalf of a party will then have the same opportunity to review such records.  This would give parent of a student who is a party to a formal complaint the right to inspect records of other students, including student witnesses to the incidents.  By requiring that schools share that information, the Rule is requiring schools to risk violating students' FERPA rights and violating another federal law.

47.     Further, by disclosing the names of minors to other minors, the chance for retaliation will exponentially increase, creating further unsafe conditions for all students at school.  For example, if an investigator provides a student a list of the names of every other minor who provided any information, it is almost certain that a respondent will share that information. Schools might be able to mitigate this concern by requesting non-disclosure agreements after the investigation, as indicating in the Rules' preamble, however this strategy will likely be ineffective in the K-12 setting.  Students are young and at times impulsive; by providing that information to the respondent (even with a requirement of non-disclosure after the fact), the names and information will most certainly be shared among the other students.  This will lead to a myriad of other problems, including further retaliation, grievances from parents, and legal liability, and also cause a chilling effect on the school community so that no student is willing to come forward to be a witness in future cases.

**Additional Unaccounted Costs and Burdens Associated with the Rule**

48.     The Rule will result in other immediate and irreparable financial and administrative burdens and harms for our District.

Increased Costs and Burdens Associated with the Rule's Procedural Requirements

49.     The Rule fails to include extensive unaccounted-for costs required to implement its procedural requirements and does not consider the structure of K-12 public schools, the roles and variety of support providers in schools, or the line authority for coordinating support in schools.

50.     For example, the Rule requires that the decision-maker, the Title IX Coordinator, the investigator, and the appellate decision-maker be different people, with the sole exception that the Title IX Coordinator can also be the investigator.  In an institution with so many school sites, it is impossible for the District Title IX Coordinator to address every Title IX complaint in the entire District.  For most complaints, SFUSD's designated Title IX "site officers" (or school site Title IX Coordinators) currently handle complaints directly.  However, at a number of schools, there is only one school administrator, who has been trained as a Title IX specialist and who investigates site level cases, provides interim or supportive measures, and, when needed, administers student discipline.  It is unrealistic to assign and require three separate people to work on every complaint.  To comply with the Rule, at more than 130 educational sites in our District, we anticipate that we would need to hire and/or designate and change the job description for more than 200 additional staff members. In the alternative, the Office of Equity would have to hire additional skilled investigators to assist with the various different required roles, including to hire an additional attorney to help advise on the specifics of complying with the New Rule.

Decl. of Keasara Williams                                                    Civil Action No. 20-cv-01468

51.     Further, I require the assistance of staff at our school sites to coordinate effective implementation of supportive measures.  The Rule states that, as the Title IX Coordinator, I am the only one who can coordinate such measures, but other staff members at our school sites (administrators and wellness staff) actually provide and coordinate such measures and have specific training in some cases to do so, and are specifically experienced and trained to do so.  To ensure that supportive measures are effectively provided to students, it requires many staff members, not just one, and these costs are not identified in the Rule.

52.     It will be extremely difficult for each of our K-12 schools to comply with the Rule's requirement that for all sexual harassment cases without a live hearing, the decision-maker must "afford each party the opportunity to submit written, relevant questions that a party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party."  This is because in SFUSD, the Title IX Coordinator and Title IX "site officers" are trained to investigate sexual harassment allegations, including weighing evidence and making determinations.  At the school site level, investigations must move quickly due to the sensitive nature of the allegations and the age of the children enrolled in K-12 schools.  Often, the investigator is able to corroborate the allegations through video footage, witness statements, or other evidence; requiring an administrator in every matter to allow for "each party the opportunity to submit written questions" in all cases is unnecessary and will very likely cause unreasonable delay and additional expense of staff time.

53.     Requiring every investigation to follow these prescriptive requirements is resource-intensive and will result in significant administrative burdens and costs for SFUSD.  In addition to hiring additional staff, they will have to be trained to do different work.  Scheduling training time with school-site administrators is extremely difficult as they have very important

Decl. of Keasara Williams                                      Civil Action No. 20-cv-01468

jobs and are juggling a large number of different, critical tasks while running a school.  Adding additional differentiated training times with multiple administrators from each school site is simply not feasible.  In addition, some schools are very small and only have one administrator.  Some schools do not have the staff to perform those roles as defined in the Rule.

54.     Requiring staff who serve as the decision maker to "explain to the party proposing the questions any decision to exclude a question as not relevant" is a nuanced skill that some school-site administrators may not have and is a document-intensive process that will delay the resolution, and again focus staff time and attention away from the safety and educational needs in our schools.

55.     With everything that administrators face throughout their day, it will be a nearly impossible task to have them comply with all the different written notice requirements. Even with personalized training on these topics, administrators will struggle to complete all of these onerous duties, all while managing the numerous tasks required of a site administrator.  It is not reasonable to ask that an administrator address every single prescriptive requirement under the Rule on top of his or her other day-to-day responsibilities.

<u>Increased Costs and Burdens Associated with Implementing the New System</u>

*The Rule is Based on Flawed Assumptions and Calculations*

56.     The Rule's estimates are based on flawed assumptions and calculations and not in consideration of a K-12 educational setting, state law requirements, and additional areas of impact not directly under Title IX jurisdiction.

57.     The costs for informal resolution will not lessen for SFUSD because we already address the majority of our complaints at the school site, but the Rule increases the number of complaints that must be addressed through a formal method substantially, because

Decl. of Keasara Williams                                                    Civil Action No. 20-cv-01468

every Title IX incident that the District wants to address with any form of discipline from detention to a day of in-school suspension must go through a formal complaint process. Because more formal complaints are necessary, we need many additional staff to timely address the complaints.

58.    As discussed above, the process creates additional roles, such as "decision maker" that do not currently exist, therefore creating hours and costs in work that did not previously exist multiplied across an extensive school system.

59.    The Rule requires the recipient to send to each party, if any, the evidence subject to inspection and review in an electronic format or a hard copy. As discussed above, this raises serious FERPA concerns as documents shared with these families may contain information unrelated to the allegation and, most concerningly, private information of minor children that the school would otherwise be prohibited from sharing.

60.    Even where the Rule attempts to capture the costs associated with the Rule, their calculations grossly underestimate even the most basic calculations of costs associated with implementations. For example, USDOE estimated that for each district, the Title IX Coordinator and a lawyer would collectively spend 12 hours to review the final regulations. The Rule further asserts that a Title IX Coordinator, a lawyer, and an administrator would collectively spend 32 hours to revise the district's grievance procedures and policies. This cost estimate underestimates the actual cost that school districts will experience. For SFUSD, not only will the Title IX Coordinator and General Counsel have to review all new changes and create updated policies and procedures, but the Superintendents and other Executive Leadership Team Members will have to review and fully understand it.

61.     To date, SFUSD's two Title IX Coordinators, SFUSD Deputy General Counsel, and the Chief General Counsel have already spent more than 25 hours collectively reviewing the Proposed Regulations and the Final Rule.  SFUSD has not even begun to update its policy, to work through the logistics of how the changes will be implemented, or to bring the issues back to the Executive Leadership Team or Board of Education for review.  USDOE woefully underestimates the time and money this will cause to do a complete overhaul of its current policies and practices.  SFUSD estimates, this will take at minimum another 80-100 hours of work to reasonably attempt to implement the Rule.

62.     Finally, all changes will have to go through a process for Board of Education review and approval, which includes review by multiple committees and final Board approval. With summer approaching, the Board of Education will not likely be meeting again until August 2020 for first read of policies and the earliest this policy would be able to be passed is likely to be September or October 2020.  That does not include the subsequent (and extensive) training that will have to take place following the approval of the changes.

63.     In addition, due to COVID-19, our schools' return to campus in the fall is very uncertain.  SFUSD has been meeting virtually and conducting distance learning since March 16. With the transition to distance/virtual learning, SFUSD has been putting all of its resources into making sure students, families, and teachers have the supports they need going forward in light of the unknown duration of the COVID-19 pandemic.  Releasing the Rule in the middle of the pandemic, and then expecting that all of these changes will be implemented while K-12 districts are dealing with extremely unprecedented stresses (logistically, emotionally, and especially financially) is unreasonable and creates a situation in which it will be nearly impossible for SFUSD to comply with USDOE's unrealistic and arbitrary date of August 14, 2020.

64.     USDOE underestimates the training costs associated with the Rule.  First, the Rule failed to include the costs of training students, parents and guardians in the Rule's requirements, as well as the cost of training school site principals who are responsible for understanding and sharing the information about the District's updated policies.  In addition, we will have to train all staff and reprint all of our resources that have already been created, not to mention we will have to spend the time and human capital to redo the resources when they are clear and appropriate now.

65.     The Department makes a false assumption that the regulations will not have a quantifiable effect on the underlying rate of sexual harassment occurring in educational programs or activities.  The federal government cannot redefine sexual harassment to be a more egregious behavior, leave lower levels of conduct unchecked, exclude sexually harassing conduct not within an education program or activity, and presume that there will be no impact on the underlying rate of sexual harassment on our campuses.

66.     The analysis cannot capture the full economic impact if it does not capture the costs incurred by students subjected to sexual harassment and violence and those who serve them.  Costs incurred should include that of possible medical, psycho-social, and mental health treatment sought by affected students individually, loss of educational benefit, and the harms that come from such loss.  Even following the Rule, and providing supportive measures, the lasting impact of sexual harassment and violence often times necessitates a need for additional supports and expenses beyond what the school can provide and/or beyond their time at a particular school.

67.     While USDOE does seem to understand that additional resources will be needed to evaluate whether particular incidents occurred within the recipient's education program or

activity or in a circumstance in which the recipient would be otherwise required to investigate, USDOE explained that they have added time and cost to their analysis and believe that the Title IX Coordinators and investigators will have to engage in such an analysis in approximately 50 percent of incidents.  In turn, they assume that at the District level, it would be approximately 4 (four) hours for a Title IX Coordinator and 12 (twelve) hours for an investigator, which would cost approximately $10,338,310 per year.  This cost still undervalues the amount of time it takes to conduct an initial inquiry because of all of the time that investigators must wait throughout the process.  Therefore, while it may be only 4 and 12 hours of respective times of actual investigation, the time it takes to speak to parents to schedule meetings, explain the delayed process, provide even more supportive measures, keep students feeling safe and comfortable, as well as deal with likely retaliation, will lead to a far higher amount of money and time spent.  In addition, the amount of time that the Rule requires also will lead to even more staff time because of the unreasonable time allowances for every party to have time to review and respond to documents.  That delay alone will lead to more than 4 and 12 hours for each respective role.

68.     Even assuming that USDOE is correct that fewer cases are investigated and resolved by districts under Title IX, fewer investigations does not equate to fewer incidents of sexual-related misconduct on our campuses.  To the contrary, we anticipate a higher incidence of sexual harassment because of the wait and see approach.

69.     And, USDOE fails to account for the detrimental costs (including loss of Annual Daily Attendance money, which is the funding calculated by the day that schools receive from the State only when a student is in attendance at school) for students who disengage from their educational programs or require additional social-emotional supports to cope.  Those costs are shared with the District who no longer serves the student who leaves while losing money for a

student's Annual Daily Attendance or who must use resources to reengage a student who has left the District. These costs, coupled with the new annual and recurring improperly-calculated costs discussed above and the cost of hiring and training staff in the new roles of the Title IX coordinator, decision-maker, and investigator, will be significant for SFUSD.

70.     At this time, the aforementioned cost concerns associated with the implementation of the Rule are further exacerbated by the financial constraints school districts are experiencing as a result of responding to the COVID-19 pandemic. The State of California has just projected an 18 billion dollar budget cut to K-12 schools for the upcoming school year due to losses related to COVID-19 and there is already a very limited amount of money to be allocated to the current systems and practices. USDOE details additional expenses for every aspect of the Title IX process: supportive measures, informal process, formal process, appeals, and record keeping. Thus, it acknowledges that the Rule imposes some financial impact (but severely underestimates the impact, as discussed above) on all schools. And given the current economic state of the K-12 systems in California, it will be nearly impossible to find additional money for an overhaul of SFUSD's current policies and practice during this pandemic.

71.     While the cost of implementing the Rule would have been a burden for school districts under normal operations, districts are experiencing (and will continue to experience for some time) unprecedented shortfalls within their budgets. Requiring K-12 school sites to implement a new Title IX system within an unreasonable timeframe that ignores the full extent of the financial burdens experienced by K-12 school sites during this time immediately sets schools up to fail.

Decl. of Keasara Williams                                                    Civil Action No. 20-cv-01468

**Conclusion**

72.     Considering all of the changes in the Rule and based on my experience overseeing Title IX compliance in the District, I anticipate an increase in sexual harassment, including violence and assault, on our school campuses; more child victims of sexual harassment and violence because lesser level misconduct is permitted to fester without prompt investigation and response; and unwieldy, time consuming, and confusing compliance obligations that will result in fewer successful prompt and equitable complaint resolutions.  The Rule will result in schools that are less safe and less able to respond promptly and effectively to address sexual harassment, as well as the increased risk of litigation against our District from families of both respondents and complainants.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on _June 10, 2020_.


_____
KEASARA WILLIAMS
Office of Equity Executive Director
and Title IX Coordinator.

EXHIBIT 96

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

DECLARATION OF BARBARA J. WILSON

I, Barbara J. Wilson, pursuant to 28 U.S.C. § 1746, hereby declare that, to the best of my knowledge, the following is true and correct:

1.      I am the Executive Vice President/Vice President for Academic for Affairs for the University of Illinois System ("System"). In this role, I serve as the second most senior executive and the chief academic officer for the System, working closely with the chancellors and provosts of the Urbana-Champaign, Chicago, and Springfield universities (collectively "Universities") in defining

and shaping strategic academic priorities for the System, coordinating planning and budgeting across the System, and spearheading System-wide academic initiatives, among other duties.

2.      I submit this Declaration in support of the State of Illinois' litigation regarding the recently issued United States Department of Education ("ED" or the "Department") Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). Various System employees with responsibilities in the areas addressed in this Declaration have assisted me in gathering this information from the Universities.

3.      The System is governed by the Board of Trustees of the University of Illinois consistent with the authorities granted by various state statutes, including the University of Illinois Act, 110 ILCS 305/1 *et seq*. The University of Illinois is a land-grant university that was founded on February 28, 1867 as the Illinois Industrial University. Today, the University of Illinois System is made up of three Universities, located in Urbana-Champaign, Chicago and Springfield. The universities in Urbana-Champaign and Chicago are classified as doctoral universities with very high research activity that offer a variety of degrees at the bachelors, masters, and doctoral levels. The Springfield university is a comparatively smaller liberal arts institution classified as a master's degree college/university. UI Health, a part of The University of Illinois at Chicago, is a clinical enterprise that includes a 462-bed tertiary care hospital, 21 outpatient clinics, and 7 federally qualified Mile Square Health Center locations. UI Health is affiliated with or employs nearly 1,000 physicians and serves over 485,000 outpatient visits per year (see following table).

Decl. of Barbara J. Wilson, University of Illinois                    Case No. **20-cv-01468-CJN**

| Location | Number of students | Number of faculty (FTE*) | Number of staff (FTE) | Degrees offered | Number of schools/ colleges |
|---|---|---|---|---|---|
| Urbana-Champaign | 51,605 UG** 34,120 | 3,222 | 8,602 | 250+ | 17 |
| Chicago | 33,390 UG 21,641 | 2,949 | 9,744 | 260+ | 16 |
| Springfield | 4,275 UG 2,674 | 241 | 523 | 52 | 4 |
| System Offices | N/A | 3 | 401 | N/A | N/A |
| **Total** | **89,270 UG 58,435** | **6,415** | **19,270** | **560+** | **37** |

*FTE = "full-time equivalent employee"
**UG = "undergraduate student"

4.      The Universities have a mix of on-campus and off-campus housing. On-campus housing includes residence halls and other university-operated housing, such as living-learning communities and graduate housing. Students who live off campus may live in certified private residence halls, or other private housing. Prior to the COVID-19 pandemic, the numbers of students living on campus were as follows:

- Urbana-Champaign: 9,900
- Chicago: 3,385
- Springfield: 1,020

5.      The System receives federal funds from the Department. As a result, the System is subject to Title IX of the 1972 Education Amendments Act, 20 U.S.C. §§ 1681–88, and the Department's Title IX Rule, 34 C.F.R. pt. 106.

6.      Over the course of several years, the System, through its Universities, has adopted sexual misconduct policies that prohibit sexual harassment and sexual misconduct by students and employees and establish a grievance process for addressing complaints of sexual harassment. These policies and related processes have been developed with input from key institutional stakeholders, including faculty, staff, students, and, where appropriate, with the guidance of outside expertise.

Though difficult to estimate, the time and expense invested by the System and each of its constituent universities in the development, implementation, and continual refinement of sexual misconduct policies and processes is substantial. The System maintains a zero-tolerance approach to sexual misconduct in any form because it represents a direct violation of our institutional values. Additionally, the System has very recently adopted a policy on workplace-related intimate personal relationships, intended to address actual or potential conflicts of interest that can occur in some intimate personal relationships and that can interfere with the System's institutional mission by undermining the integrity of professional roles.

7.      Overall, the System, through its Universities, devotes significant personnel and resources to the oversight of Title IX compliance. Each university maintains independent investigation and compliance operations. These include Title IX Coordinators, investigators, and other staff, who provide training and outreach; receive and investigate complaints of discrimination and harassment to determine violations of university policies; make recommendations for findings and resolutions; assist in the implementation of protocols and procedures in compliance with local, state, and federal laws and institutional policies; provide guidance to faculty, staff, and students; and collaborate with campus partners on compliance and reporting obligations. Annual expenditures and time spent related to Title IX cannot be precisely estimated because of the extremely broad range of employees whose work touches Title IX, varying staffing needs at each university, volume, complexity of cases, regulatory and reporting changes, training requirements and other factors.

8.      Sexual harassment is defined broadly within our institutional policies, so as to provide students, employees and visitors with a safe and welcoming climate free of sexual discrimination, harassment, and violence.

Decl. of Barbara J. Wilson, University of Illinois                    Case No. **20-cv-01468-CJN**

9.      Any concerned party may initiate a sexual misconduct complaint alleging a violation of applicable sexual misconduct policies. Reports may be submitted via phone, website portal, email, or in person. Not all reports are made by potential victims and not all potential victims wish to proceed with investigations. The System works diligently to protect the confidentiality and privacy of potential victims to the extent possible in order to support and respect the parties involved and to provide a fair process to the parties during investigative/disciplinary actions.

10.     Grievance or investigative/disciplinary matters are not adversarial, and instead, especially in the student context, are an extension of the educational mission of the System. The institution is not only mindful of state law directives regarding sexual violence, but it also accepts its responsibility to create and foster a collaborative climate that cultivates the talents of diverse students, faculty, staff, and leaders. In its "Guiding Principles," the System commits to establishing policies, processes and operations defined by "mutual respect, trust, and an expectation of transparency and fair treatment." The student investigative/disciplinary systems are operated by faculty and students — non-lawyers who are not versed in the trial-like adversarial model. Hearings are a dialogue between the students and the decision-makers to evaluate the impact of the conduct on the academic community.   Information regarding sexual misconduct reports and investigations, including any outcomes, are shared only with employees with a legitimate educational interest or with external individuals or entities only on a need-to-know basis and only as permitted by policy and applicable law.

11.     Title IX administrators have voiced concerns that changes brought about by the Rule, including the shift to adversarial proceedings and potential confusion related to applicable evidentiary standards, will have a chilling effect on reporting and participation by students who experience sexual misconduct. If reporting of sexual misconduct decreases, the System and the Universities will be less

Decl. of Barbara J. Wilson, University of Illinois              Case No. **20-cv-01468-CJN**

able to assist individuals who have been impacted by sexual misconduct, and likely less able to address and remedy the impact of the sexual misconduct.

12.     The new Rule creates an undue burden on the System to reconcile state and federal law requirements. In Illinois, the Preventing Sexual Violence in Higher Education Act ("PSVHEA") establishes requirements for all Illinois colleges and universities to address, investigate, and resolve complaints related to campus sexual violence, domestic violence, dating violence, and stalking. 110 ILCS 155/1 et seq.

13.     Illinois law mandates that all universities "shall adopt a comprehensive policy concerning sexual violence, domestic violence, dating violence, and stalking consistent with governing federal and State law." 110 ILCS 155/10. The policy must permit students to report an alleged violation of the comprehensive policy regardless of where the incident occurred. Id.

14.     While the new Rule does not prohibit addressing conduct that may have occurred off campus, the new Rule mandates the dismissal of such complaints for the purposes of sexual harassment under Title IX.  As a result, the System will be required to maintain more than one complaint process depending on the location of the alleged incident.

15.     PSVHEA requires schools to implement detailed complaint resolution procedures. The System will have to devote time and resources to attempting to reconcile the strictures of the Rule and State law requirements, assuming the procedures can even be reconciled.

16.     Employee conduct and discipline policies and procedures in the higher education environment can be varied and complex because of the many different types of employee classifications, principles of shared faculty governance, tenure rights, collective bargaining agreements and other factors.

Decl. of Barbara J. Wilson, University of Illinois                    Case No. **20-cv-01468-CJN**

17.     The System is large and decentralized with unique needs and employment considerations at each University. As a result, the System is a party to 52 collective bargaining agreements on behalf of its Universities. The union contracts cover a wide variety of employee classifications, including clerical, service, police, trades, nurses, drivers and mechanics, technical and professional, and certain groups of faculty and graduate students. Significantly, the System has five separate bargaining units of faculty covering portions of tenured faculty and non-tenured faculty. Graduate student employees are also in collective bargaining units at the Universities.

18.     The standards and procedures in the collective bargaining agreements are different for the various employment categories.  They are a part of a multifaceted overlay of processes in the complex and highly regulated area of human resources in public sector higher education in Illinois.  Collective bargaining standards and procedures include due process requirements from federal and state laws and regulations, a shared governance statutory scheme, policies, and contractual commitments that often apply differently for union-represented employees in the varying categories with distinct process rights (*e.g.*, tenured faculty, contingent faculty, employees with state university civil service entitlements, and employees with contractual rights).

19.     The Rule requires a comprehensive evaluation of the far-reaching substantive and procedural changes. The Rule will impose new obligations that may impact our institution's already complex collective bargaining commitments. Integrating the new Rule's requirements with existing human resource practices and union contracts will require detailed coordination (and reconciliation of possible conflicting provisions) and engagement with the many unions representing our institution's employees to bargain the impact of the required changes. Given the number, diverse assortment of unions, multifaceted overlay of regulatory and consultative processes, it is impossible to predict the amount of time and expense that will be incurred.

20.     The new Rule will require the System to review and revise sexual misconduct policies, student codes of conduct, employee policies and procedures, websites, and to evaluate the need for legislative change at the state level. Under normal circumstances, completing these tasks would not be feasible in three months, let alone during a global pandemic.

21.     Representatives from the Title IX offices, human resources, student affairs, the faculty, labor relations, victim resource centers, student governance, labor unions, legal counsel, compliance, information technology, and others will all have roles and responsibilities to implement changes associated with the new Rule. Coordinating all of these institutional stakeholders in a large and complex organization such as the University of Illinois is a daunting task in three months under the best of circumstances.

22.     Given the August 14, 2020 implementation date, there is inadequate time to consult with numerous state agencies, such as the Illinois Board of Higher Education, the State Universities Civil Service System, Illinois Department of Human Rights, Illinois Department of Labor, to assess the new Rule's impact on existing state laws and regulations. Failure to consult with these regulatory agencies could result in policies and processes that are inconsistent with state law.

23.     The System and its Universities are working rapidly to prepare for implementation of the Rule. However, core principles such as shared governance and a commitment to fostering a culture of compliance are hallmarks of higher education across the country. Ignoring these institutional obligations and operational limitations for the sake of mandated expediency will present unnecessary and avoidable risk.

24.     The System relies on a mix of internal and external resources to satisfy an extraordinarily broad range of mandatory and voluntary training obligations in areas such as Title IX, ethics, research safety, human subject research, open meetings, freedom of information, and activities

Decl. of Barbara J. Wilson, University of Illinois            Case No. **20-cv-01468-CJN**

with minors, Clery Act, and continuing education for licensed professionals and others. Because the new Rule fundamentally alters the nature of investigative/disciplinary processes, and training requirements related thereto, all institutional employees involved in the process will have to be trained. Training cannot be fully developed until new policies and procedures have been adopted.

25.     The University of Illinois annual system-wide training is set to begin for approximately 90,000 students this summer. This training was created in partnership with an outside vendor at a cost of approximately $90,000, not including substantial staff time and resources. As currently designed, the training does not reflect the Rule, so it will either need to be re-designed at significant time and expense to the institution or supplemented with additional training at a later date. Separately, System-wide training for approximately 50,000 employees occurs during the spring semester for the entire employee population.  If employee training must be conducted in the fall to comply with the new Rule, the System still will have to train again in 2021 to meet annual training regulations imposed by the state.

26.     More importantly, extensive training will be required for hearing participants, investigators, advisors and decision-makers before any new policy can be implemented.  The System anticipates the need to retain outside expertise in addition to dedicating significant employee time and resources to expedite training compliance. It is impossible to predict with certainty the amount of time and full fiscal impact of these expenditures, especially during a time of fiscal uncertainty brought upon by the COVID-19 pandemic. This training must be very thorough and developed in a manner that, pursuant to the Rule, can be posted on a website for public reference.  Additionally, if outside parties are hired to investigate, assist in hearings, or serve as advisors, those individuals must undertake training related to federal and state requirements, as well as training regarding considerations specific to institutional policies and processes. The costs of developing and

implementing procedures, including establishing requisite training processes, are unknown and difficult to calculate.

27.     As the notice of proposed rulemaking occurred almost two years ago and garnered over 124,000 comments, the System could not presume to know, or act upon, any of the Rule's provisions until the final Rule was published.

28.     The COVID-19 pandemic has created massive uncertainty and public concern throughout the country and the world. The University of Illinois System continues to monitor developments and take all actions that are warranted as new information emerges in this rapidly changing environment. During the COVID-19 pandemic, the System has sustained extensive loss of revenue and has incurred substantial additional and unexpected expenses. It is difficult to predict with certainty the final amount of the adverse fiscal impact, but it is likely to exceed $150 million. The System is continually developing plans and taking actions to both protect the safety and health of our communities and to maximize continuity of business and academic operations. In March 2020, the System and its Universities took swift action to address the COVID-19 pandemic. Each university transitioned the majority of its operations, including academic instruction and related activities, to online delivery models for the spring and summer terms. The COVID-19 response effort also included substantially reducing the number of students residing in university housing facilities, providing resources for students and employees to work remotely, and creating policies to confront unprecedented circumstances facing higher education in Illinois and around the world. The System is focused on responding to this public health crisis, navigating the significant economic impact on operations and our surrounding communities, reimagining higher education delivery systems, and preparing for the return of students and employees in accordance with the state and federal guidance.

29.     There are numerous hurdles and challenges related specifically to conducting sexual misconduct investigations during the COVID-19 pandemic. The pandemic is causing major disruption in the ways we communicate both now and possibly in the future, depending on health and safety guidance from the federal and state government. For example, inconsistent, unavailable or unreliable technology makes it difficult for individuals to participate in interviews. Even now, some students who have been asked to participate in an interview have indicated that they either do not have technology, such as a laptop or tablet, or do not have access to reliable internet for a video call. Telephone interviews present numerous challenges, including maximizing the safeguarding of confidentiality. In addition, some students have been reluctant to participate in a sexual misconduct investigation interview if they are unable to have their advisor physically with them. It has also been difficult to arrange interviews due to students not being on-campus.

30.     Despite awareness of these unprecedented challenges and the fiscal and operational strain already placed on higher education, the Department chose this moment in time to publish rules that will fundamentally alter higher education operations. As a result, risks to institutions of higher education include inability to comply in a timely manner, incurring significant additional expenses, being unable to effectively and efficiently inform and train stakeholders, increased risks of litigation related to violations of the Rule and being forced to divert critical resources away from COVID-19 response efforts.

Decl. of Barbara J. Wilson, University of Illinois                    Case No. **20-cv-01468-CJN**

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this __19__ day of June, 2020

_____
Barbara J. Wilson

Executive Vice President/Vice President for Academic Affairs

Decl. of Barbara J. Wilson, University of Illinois                    Case No. **20-cv-01468-CJN**

# EXHIBIT 97

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA; STATE OF NEW JERSEY; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*; UNITED STATES DEPARTMENT OF EDUCATION; and UNITED STATES OF AMERICA,<br><br>Defendants. | **Civil Action No. 20-cv-01468-CJN** |

**DECLARATION OF ARIANA WRIGHT**

I, Ariana Wright, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.      I am the Director of Equity and Equal Opportunity/Affirmative Action in the Office of Institutional Equity & Diversity at Old Dominion University (ODU) in Norfolk, Virginia. I have served in that role since September 25, 2018. I have a Juris Doctor and a Bachelor's degree in Psychology. I previously served as Equal Opportunity Officer, Sr. EO Officer, and Assistant Director in the Office of Institutional Equity & Diversity.

2.      I submit this Declaration in support of the Commonwealth of Virginia's litigation against Elisabeth D. DeVos, in her official capacity as Secretary of Education; the United States Department of Education; and the United States of America regarding the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Title IX Rule" or "Rule"). I have compiled the information in the statements set forth below through personal knowledge, and through ODU personnel who have assisted me in gathering this information from our institution. I have also familiarized myself with the Rule in order to understand how it may impact the ODU community.

3.      Old Dominion University, located in the City of Norfolk in the metropolitan Hampton Roads region of coastal Virginia, is a dynamic public research institution. Approximately 24,000 students are currently enrolled at ODU, including 19,000 undergraduate students and almost 5,000 graduate students. ODU has over 900 faculty members, more than 500 administrators and professional faculty, over 1,000 classified employees, and more than 560 part time employees.

4.      At Old Dominion University, there are 6 academic colleges, an honors college, a school of continuing education, and a graduate school. The University offers over 150 degree programs on campus, as well as more than 100 programs available online through distance learning. ODU's Office of Study Abroad offers a wide variety of study abroad options around the world, including exchange programs, faculty-led programs, and hundreds of affiliated programs.

5.      ODU's campus covers 335 acres and includes nearly 150 campus buildings. ODU also has 3 extended higher education centers in the region.

6.      With respect to the new Title IX Rule, the August 14th implementation date does not reflect a realistic understanding of the time-consuming procedures institutions must engage in to

Decl. of Ariana Wright                                                    Case No. 20-cv-01468

implement the far-reaching changes included in the Rule.  For instance, our institution must conduct research, assemble working groups, effectuate changes to policies and procedures, identify ways to cover associated costs, identify staffing needs, make structural changes, develop and disseminate new trainings, communicate changes to employees and students, among other things. These processes are deliberate and collaborative, and thus can be quite prolonged. Attempts at implementation have already proven difficult due to reductions of fiscal and human resources resulting from the COVID-19 crisis.

7.      The new definition of sexual harassment raises the bar and makes it more difficult to address sexual behaviors that do not have a place in the learning and working environment. The requirement that behavior must be both sufficiently severe and pervasive creates this difficulty. In short, this is a concern because issues will have to escalate farther before the University can intervene with its Title IX procedures.

8.      Under the new Title IX Rule, the scope of Title IX excludes incidents that occur outside of the United States. This automatic exclusion will make it harder for institutions like ODU to protect their students and community because the University will be deprived of the opportunity to determine jurisdiction by assessing the scope of its control of the alleged parties. For example, if a report alleges student-on-student or employee-on-student harassment or misconduct, these instances should be covered by Title IX so that ODU can ensure the safety of its community.

9.      The required cross-examination under the new Rule will harm ODU and our campus community in many ways. First, complainants will be compelled to face the person who has allegedly violated them. Through this process, persons who have had traumatic experiences can be re-traumatized, thus creating a chilling effect. Second, requiring cross-examination presents the challenge of ensuring equitable representation, particularly when one party has a non-attorney

Decl. of Ariana Wright                                                                    Case No. 20-cv-01468

advisor in the hearing process. This will raise questions about what happens in the event that University is unable to provide an advisor who is legally trained. Our institution will also face an increased cost associated with ensuring equitable representation.

10.     Although the Rule appears to encourage mediation, there is no provision for associated financial/human resources.

11.     The Rule forces institutions to simulate courtroom/criminal procedures, which should not be the function of institutions of higher education and could discourage victims from making reports and seeking the assistance they need.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 16th day of June, 2020, at Norfolk, Virginia.

_____
Ariana Wright
Director of Equity and EO/AA
Old Dominion University

Decl. of Ariana Wright                                                    Case No. 20-cv-01468