**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, et al.,<br><br>                 *Plaintiffs*,<br><br>v.<br><br>Elisabeth D. DEVOS, in her official capacity as Secretary of the United States Department of Education, et al.,<br><br>                 *Defendants*,<br><br>FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION<br>510 Walnut St.<br>Suite 1250<br>Philadelphia, PA 19106,<br><br>INDEPENDENT WOMEN'S LAW CENTER<br>4 Weems Lane, #312<br>Winchester, VA 22601,<br><br>SPEECH FIRST, INC.<br>1300 I St. NW<br>Suite 400E<br>Washington, D.C. 20005,<br><br>       [*Proposed*] *Intervenor-Defendants*. | No. 1:20-cv-1468-CJN |

**PARTIALLY OPPOSED[*] MOTION TO INTERVENE AS DEFENDANTS
AND SUPPORTING STATEMENT OF POINTS AND AUTHORITIES**

      Plaintiffs ask this Court to throw out a Department of Education rule that was written to protect free speech and due process on college campuses. Movants are some of America's largest and most prominent advocacy organizations dedicated to promoting free speech and due process at colleges and universities. They seek to intervene in this case to protect their interests and to

---

      [*] Per LCvR 7(m), counsel for Movants, Plaintiffs, and Defendants discussed this motion in good faith to determine everyone's position. Plaintiffs oppose intervention. Defendants will take a position after reviewing this motion.

advance a legal theory that the Department of Education will not: that many of the rule's protections for college students are not just reasonable policy decisions—they are *constitutionally required*. Movants satisfy the requirements for both intervention as of right and permissive intervention, and they should be allowed to intervene to offer a perspective on the First and Fourteenth Amendments that will otherwise not be represented.

## BACKGROUND

On May 6, 2020, the Department of Education announced that it would issue a final rule imposing certain legal obligations under Title IX on federal funding recipients—a category that includes virtually all colleges and universities in the United States. One of the Final Rule's key provisions is its definition of conduct that qualifies as the kind of "sexual harassment" that Title IX requires funding recipients to investigate and punish. Among other things, the Final Rule defines "sexual harassment" to include "[u]nwelcome conduct [as] determined by a reasonable person" that is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 85 Fed. Reg. 30026, at 30574 (May 19, 2020). This definition is drawn from the Supreme Court's decision in *Davis v. Monroe County Board of Education*, 562 U.S. 629, 650 (1999), a case where a private plaintiff sued a funding recipient under Title IX for its deliberate indifference to peer sexual harassment.

The Final Rule's adoption of "the *Davis* standard" to define sexual harassment marks a departure from the Department's past guidance, which claimed to follow *Davis* but which described the attributes of actionable sexual harassment in the disjunctive ("severe, pervasive, *or* objectively offensive") and said that conduct that is "persistent" qualifies as harassment (even if it is not objectively offensive). *See, e.g.*, U.S. Dep't of Educ., *Dear Colleague Letter: Harassment and Bullying* at 2 (Oct. 26, 2010), https://bit.ly/2Bp3rg4. One of Plaintiffs' principal prayers for relief is that the Court throw out the new rule's definition of "sexual harassment" because it differs

from the broader and more subjective definition previously used by the Department. *See* Complaint for Declaratory and Injunctive Relief 106-07, Doc. 1 (June 4, 2020) ("Compl.").

Before the Final Rule was promulgated, the Foundation for Individual Rights in Education (FIRE) and the Independent Women's Forum—two of the proposed intervenors—submitted comments to the Department urging it to adopt the *Davis* standard because any broader definition of sexual harassment would violate the First Amendment. *See* Comment of the Foundation for Individual Rights in Education in Support of the Department of Education's Proposed Regulations on Title IX Enforcement (Jan. 30, 2019), https://bit.ly/2Nl6qss (FIRE Comment); IWF Comments on the Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance (Jan. 30, 2019), https://bit.ly/2Bw54J5 (IWF Comment). *Davis* itself strongly supports this position. In response to First Amendment concerns raised by Justice Kennedy in dissent, the *Davis* majority took care to define the conduct that funding recipients must punish in a manner that allows public university administrators "to refrain from a form of disciplinary action that would expose [them] to constitutional . . . claims." 562 U.S. at 649. Since *Davis*, courts have looked to that decision for guidance on the scope of "sexual harassment" that public universities may prohibit consistent with the First Amendment. *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 319 (3d Cir. 2008).

Despite adopting the *Davis* standard in part to avoid "a chill on free speech and academic freedom," 85 Fed. Reg. at 30,142, the Department stops short of saying that the *Davis* standard is *required* by the First Amendment. That is an important point of disagreement between the Department and Movants: while the Department purports to have selected one of a range of constitutionally permissible definitions of "sexual harassment," Movants' position is that the Final Rule uses a definition that could not be made broader without violating the First Amendment. This

disagreement between Movants and the Department has direct implications for this case. If Movants are correct, Plaintiffs' challenge to the Final Rule's use of the *Davis* standard must be rejected without regard to what Title IX and the Administrative Procedure Act might otherwise require. In contrast, if the Department is correct, the lawfulness of the Final Rule's use of the *Davis* standard will depend on whether that standard is consistent with the federal statutes that provide the basis for Plaintiffs' suit.

A similar dynamic exists with another of the Final Rule's major reforms: its enhanced due-process protections for students accused of sexual misconduct. In their comments, Movants urged the Department to adopt these protections, including notice of the allegations, a neutral decisionmaker, live hearings, and the right to cross-examination. *See* FIRE Comment, *supra*; IWF Comment, *supra*. The Department agreed. *See* 85 Fed. Reg. at 30,053-54. While the Department believes the Rule's protections are "inspired by principles of due process," the Department justifies the protections "independent of constitutional due process" and stresses that the protections "remain distinct from constitutional due process." *Id.* at 30,100-01. Movants do not agree; as applied to Plaintiffs and their public universities, many of the Rule's safeguards are mandated by the Due Process Clause.

Movants are nonprofit organizations dedicated to promoting free speech and due process on college campuses:

FIRE is a nonprofit membership organization with approximately 50 employees and a student network with student members on college campuses throughout the United States. FIRE staff work directly with college students and faculty who are subjected to disciplinary proceedings for engaging in conduct that is protected by the First Amendment. In instances when a disciplinary proceeding threatens to chill unpopular but constitutionally protected speech, FIRE staff educate

the accused of his or her rights and communicate with university administrators about their obligations under the Constitution. Considerable staff time and funds are devoted to these activities, and in recent years a significant share of these resources have been used to counter sexual misconduct proceedings at universities that provide few procedural protections for accused students and enforce conduct codes that use broad, amorphous definitions of prohibited "sexual harassment." If allowed to go into effect, the Final Rule's use of the *Davis* standard will reduce the frequency with which universities attempt to punish free speech on sensitive issues of gender and sex and thus allow FIRE to shift its resources to addressing other threats to protected speech on campus. FIRE does not have enough staff time or money to assist every student who approaches it for help, and the Final Rule's procedural protections and definition of sexual harassment will free up resources for use in other cases.

In addition to its involvement in individual disciplinary proceedings, FIRE also devotes considerable staff time and money to working with its Student Network members to educate college students about their free-speech and due-process rights. Members of FIRE's Student Network work to promote their own rights as well as the rights of other college students through public messaging about the constitutional limits on the authority of public universities to punish speech and how they may go about doing so, including speech on gender, sex, and other controversial topics that are sometimes the basis for discipline under university conduct codes that prohibit "sexual harassment." FIRE also spends money preparing printed materials on these issues for distribution on college campuses. If the Final Rule's procedural protections and its definition of "sexual harassment" are permitted to go into effect, FIRE and its student members will be able to shift these resources and efforts to promoting free speech and due process in other contexts.

At least one member of the FIRE Student Network is a student at a public university who is currently the subject of an enforcement proceeding for alleged sexual misconduct. This student's case involves a factual dispute, no hearing on the matter has yet been scheduled, and the accused student wants the benefit of the additional procedural protections the Final Rule would provide. Fewer procedural safeguards will apply to this case if it is adjudicated under existing university policy rather than in the manner that would be required under the Final Rule. This member of FIRE's Student Network thus stands to lose important procedural protections if the Court enjoins enforcement of the Final Rule, even temporarily.

The Independent Women's Law Center is a project of the Independent Women's Forum, a nonprofit, non-partisan 501(c)(3) organization founded by women to foster education and debate about legal, social, and economic policy issues. The Center supports this mission by devoting time and resources to advocating—in the courts, before administrative agencies, in Congress, and in the media—for equal opportunity, individual liberty, and access to the marketplace of ideas. The Center participates in free-speech litigation challenging universities "bias" and "harassment" policies, and the Forum has long studied and advocated for greater free-speech and due-process protections for college students. *See, e.g.*, Heather Madden, *Title IX and Freedom of Speech on College Campuses*, Policy Focus, Jan. 2016, https://bit.ly/2XgoQPS. Unsurprisingly, then, the Center and Forum were leading proponents of the Final Rule. In addition to the comment in support, the Center (along with Speech First) helped defeat Plaintiffs' proposals to delay the Final Rule in light of the coronavirus. *See* Independent Women's Law Center & Speech First, Letter to Secretary DeVos and Assistant Secretary Marcus (Apr. 9, 2020), https://bit.ly/3e4vEH0. Plaintiffs seek to relitigate that dispute in this case. *See* Compl. 7, 8, 25, 46, 50, 70.

Speech First is a membership association of college students, parents, faculty, alumni, and concerned citizens. Speech First is committed to restoring the freedom of speech on college campuses through advocacy, education, and litigation. Its student members are subject to speech codes and disciplinary procedures that violate the First Amendment and Due Process Clause but that, according to universities, comply with the Title IX guidance that the Final Rule has replaced. For example, Speech First has challenged speech-chilling "harassment" policies at the University of Michigan, *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019); the University of Texas, *Speech First, Inc. v. Fenves*, No. 19-50529 (5th Cir.); the University of Illinois, *Speech First, Inc. v. Killeen*, No. 19-2807 (7th Cir.); and Iowa State University, *Speech First, Inc. v. Wintersteen*, No. 4:20-cv-2 (S.D. Iowa). If the Final Rule stands, schools will bring their policies in line with it, freeing Speech First to spend its resources on other pressing constitutional concerns. And like FIRE, Speech First has student members who have been subject in the past, and could be subject in the future, to Title IX disciplinary proceedings.

Proposed intervenors' missions are related and complementary, and their views on the issues in this case are aligned. But still, they are three separate organizations with different counsel, independent resources, and unique missions. To conserve the Court's and the parties' resources, and to minimize their footprint in this case, proposed intervenors have joined forces. They are jointly moving to intervene and, if their intervention is granted, will make their arguments in one consolidated brief. Proposed intervenors will also follow whatever deadlines govern the existing Defendants.

## ARGUMENT

The Federal Rules allow "intervention of right" under Rule 24(a) and "permissive intervention" under Rule 24(b). "[T]he D.C. Circuit has taken a liberal approach to intervention." *Wilderness Soc. v. Babbitt*, 104 F. Supp. 2d 10, 18 (D.D.C. 2000); *see Nuesse v. Camp*, 385 F.2d

694, 702 (D.C. Cir. 1967) (emphasizing "the need for a liberal application [of Rule 24] in favor of permitting intervention"). A liberal approach to intervention is especially appropriate "where the subject matter of the lawsuit is of great public interest, the intervenor has a real stake in the outcome and the intervention may well assist the court in its determination through . . . the framing of issues." *Daggett v. Commission on Government Ethics*, 172 F.3d 104, 116–17 (1st Cir. 1999). Movants satisfy the standards for both intervention as of right and permissive intervention.

## I.    Movants are entitled to intervene as of right.

Under Rule 24(a), a court "must permit anyone to intervene who" (1) makes a timely motion to intervene, (2) has an "interest relating to the property or transaction that is the subject of the action," (3) is "so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," and (4) shows that he is not "adequately represent[ed]" by "existing parties." Fed. R. Civ. P. 24(a). Movants meet each of these four requirements. And any movant "who satisfies Rule 24(a) will also meet Article III's standing requirement." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003).

### A.    This motion is timely.

Movants have timely filed this motion. Plaintiffs filed the complaint on June 4, and Defendants were served with a copy on June 8, *see* Doc. 12. Attorneys representing Defendants entered an appearance only yesterday, a proposed briefing schedule for Plaintiffs' preliminary-injunction motion has not yet been filed, and this Court has made no substantive rulings. *E.g.*, *Cayuga Nation v. Zinke*, 324 F.R.D. 277, 282–84 (D.D.C. 2018) (motion timely when filed "in the early stages of the case" before Defendants "file[d] an answer" was timely, even though "the parties are currently briefing Plaintiffs' Motion for Preliminary Injunction"); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (motion timely when filed "less than two months after the plaintiffs filed their complaint and before the defendants filed an answer"); *WildEarth*

*Guardians v. Jewell*, 320 F.R.D. 1, 3 (D.D.C. 2017) (motion timely when filed "approximately sixteen weeks after the initial complaint was filed").

Regardless of how many days it's been, "the timeliness requirement was not designed to penalize prospective intervenors for failing to act promptly," but only to prevent "prejudice [to] the existing parties." *Ute Indian Tribe of Uintah & Ouray Indian Reservation v. U.S. Dep't of the Interior*, No. 1:18-cv-00547, 2020 WL 1465886, at *1 (D.D.C. Feb. 5, 2020) (Nichols, J.) (cleaned up). Since "no substantive progress has occurred in this action," Movants' intervention could not "unduly disrupt the litigation or pose an unfair detriment to the existing parties." *100Reporters LLC v. DOJ*, 307 F.R.D. 269, 275 (D.D.C. 2014). And Movants agree to abide by whatever schedule the parties negotiate. *See Cayuga Nation*, 324 F.R.D. at 282, 284. This motion is timely.

**B.    Movants have a protected interest in this action.**

Movants also have a "legally protected interest in [this] action." *Karsner*, 532 F.3d at 885 (citing Fed. R. Civ. P. 24(a)(2)). This "interest" test is a "liberal" one. *Indep. Petrochemical Corp. v. Aetna Cas. & Sur. Co.*, 105 F.R.D. 106, 109-10 (D.D.C. 1985). It is "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse*, 385 F.2d at 700. The test is satisfied here.

As the description of Movants' activities provided above makes clear, Movants have an interest in this case that is the "mirror-image" of Plaintiffs'. *Builders Ass'n of Greater Chicago v. City of Chicago*, 170 F.R.D. 435, 440–41 (N.D. Ill. 1996). Plaintiffs' claim they "are being injured by the [Final Rule], and applicants claim that [they] will be injured by its invalidation." *Id.* at 440. While Plaintiffs allege that the Final Rule will force them to divert resources from other unrelated programs, *see* Compl. 70-72, exactly the inverse is true for Movants; the Final Rule will allow Movants to reallocate resources to other activities that would otherwise be used to resist unconstitutional disciplinary proceedings. If Plaintiffs have Article III standing to challenge the

Final Rule on a diversion-of-resources theory, *see Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), then it necessarily follows that Movants have a significantly protectable interest in defending it.

Wholly apart from the staff time and money that Movants will save if the Final Rule is permitted to go into effect, Movants have a second significantly protectable interest in this action: safeguarding the free-speech and due-process rights of their members. Disciplinary proceedings without notice of the charges, adjudication by a neutral decisionmaker, cross-examination, and other basic protections are fundamentally unfair and risk erroneous decisions with life-altering consequences for students. And expansive definitions of "sexual harassment" in university conduct codes have a chilling effect on speech concerning gender, sex, and related topics, and even speech on these subjects that many find offensive is valuable and protected by the First Amendment. *See Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) ("[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'"). As Movants' members prepare to return to campus and navigate pending Title IX hearings and draconian "harassment" codes, this case directly threatens their constitutional rights. Those rights plainly qualify as an "interest" under Rule 24(a)(2). *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1125 (3d Cir. 1992).

### C.    This action threatens to impair Movants' interests.

Movants' significant interests and their ability to protect those interests may be impaired "as a practical matter" by this action. Fed. R. Civ. P. 24(a)(2). This language in Rule 24 is "obviously designed to liberalize the right to intervene in federal actions." *Nuesse*, 385 F.2d at 701. When applying it, "courts in this circuit look to the practical consequences that the applicant may suffer if intervention is denied." *100Reporters*, 307 F.R.D. at 278.

If Plaintiffs invalidate the Final Rule, the practical consequences for Movants are substantial. It is a premise of Plaintiffs' lawsuit that the Final Rule's definition of "sexual harassment" will significantly narrow the types of speech and expressive conduct that universities prohibit and punish. Plaintiffs also complain that the Rule's procedural protections for the accused will make it harder for them to punish students. If these premises are correct—as they must be for Plaintiffs' injuries to be fairly traceable to the provisions of the rule they seek to challenge—then Movants unquestionably "stand to gain or lose by the direct legal operation" of this Court's ruling. *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991). For the same reasons that Plaintiffs stand to gain from a decision in their favor, Movants stand to lose.

Moreover, Movants' interests will be affected not only by whether this Court upholds the Final Rule but also on what grounds. As Plaintiffs' complaint documents, the Department has not been consistent over time in its position on the definition of "sexual harassment" for purposes of Title IX, or on the procedures that universities must afford the accused in disciplinary proceedings. Compl. ¶¶ 16–25. If the Court considers and accepts Movants' constitutional arguments, it will establish that the Department *cannot* revert to the definitions and policies it has used in the past. If, on the other hand, the Court upholds the Final Rule as one of a range of approaches that are permissible under Title IX, the Department could in the future abandon its current positions. The potential stare decisis effects of this Court's decision provide a basis for intervention as of right here. *See Crossroads GPS v. FEC*, 788 F.3d 312, 320 (D.C. Cir. 2015); *Nuesse*, 385 F.2d at 702.

Participating in this case as an amicus would not enable Movants to adequately protect their interests in this case. This Court would not be required to consider Movants' constitutional arguments if they were presented only in an amicus brief, and Movants could not file motions or appeal from an adverse judgment. In short, intervention is necessary for Movants to safeguard their

significant interests in this case. *See Nuesse*, 385 F.2d at 704 & n.10 ("[R]elegat[ion] to the status of amicus curiae is not an adequate substitute for participation as a party.").

### D.     The existing parties do not adequately represent Movants' interests.

Movants' interests are not adequately represented by the existing parties. The inadequate-representation requirement is "not onerous" and "should be treated as minimal." *Dimond v. Dist. of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986); *100Reporters*, 307 F.R.D. at 279. It is satisfied when "the applicant shows that representation of his interest 'may be' inadequate"; "[t]he applicant need … not [show] that representation will in fact be inadequate." *100Reporters*, 307 F.R.D. at 279; *Dimond*, 792 F.2d at 192; *see Am. Tel.*, 642 F.2d at 1293 ("[Intervention is] ordinarily … allowed … unless it is clear that the party will provide adequate representation for the absentee."). Representation is inadequate when the existing parties have "a 'different' interest" from the movant, even if they have "'a shared general agreement,'" "'tactical similarity [in their] legal contentions,'" or "general alignment" on the correct outcome. *Fund for Animals*, 322 F.3d at 737; *Crossroads*, 788 F.3d at 321. Movants clear this low hurdle.

The D.C. Circuit "look[s] skeptically on [federal] government entities serving as adequate advocates for private parties." *Crossroads*, 788 F.3d at 321. Here, too, Movants' interests differ from those of the Department. In issuing the Final Rule, the Department explicitly sought to "balance protection from sexual harassment with protection of freedom of speech and expression." 85 Fed. Reg. at 30165. Movants, in contrast, represent interests on one side of those scales: the free-speech and due-process rights of university students and faculty. This case is therefore indistinguishable from *In re Sierra Club*, 945 F.2d 776 (4th Cir. 1991), where the Fourth Circuit held that South Carolina did not adequately represent the Sierra Club because the state was responsible for representing economic as well as environmental interests. As the Fourth Circuit has explained, "when a party to an existing suit is obligated to serve two distinct interests, which,

although related, are not identical, another with one of those interests should be entitled to intervene." *United Guaranty Residential Ins. Co.*, 819 F.2d at 475; *see also Kleissler v. United States Forest Service*, 157 F.3d 964, 972 (3d Cir. 1998); *Coalition of Ariz./N.M. Ctys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 845 (10th Cir. 1996).

The conclusion that Movants are not adequately represented follows from the Supreme Court's decision in *Trbovich*. In that case, the Secretary of Labor instituted an action to set aside an election of officers of the United Mine Workers of America. The union member whose complaint led the Secretary to sue sought to intervene in the action. The district court denied his motion to intervene and the court of appeals affirmed, but the Supreme Court reversed. The Court reasoned that, while the Secretary of Labor was charged with representing the union member's interest in the litigation, it also was charged with protecting the "vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 539 (1972). Because of the presence of this additional interest and its potential to affect the Secretary's approach to the litigation, it was "clear" to the Court "that in this case there is sufficient doubt about the adequacy of representation to warrant intervention." *Id*. at 538.

The Third Circuit's decision in *Pennsylvania v. President of the United States*, 888 F.3d 52 (3d Cir. 2018), is also instructive. In that case, the Little Sisters of the Poor, a group of Catholic nuns, sought to intervene to defend provisions of a Department of Health and Human Services rule that created a religious exemption to the Affordable Care Act's contraceptive mandate. The district court denied the Little Sisters' motion to intervene as of right on the grounds that they were adequately represented by the agency, but the Third Circuit reversed. In so ruling, the Third Circuit explained that the agency was tasked with "serving two related interests that are not identical:

accommodating the free exercise rights of religious objectors while protecting the broader public interest in access to contraceptive methods and services." *Id.* at 61. Because the agency was charged with balancing the Little Sisters' interest against other, competing interests that were also at stake in the litigation, the agency could not adequately represent the Little Sisters. The same is true here.

Moreover, the divergence of interests between the Department and Movants has direct consequences for the kinds of arguments each will make. In addition to its immediate interest in defending the Final Rule, the Department has a long-term interest in preserving the scope of its discretion to issue rules under Title IX. Consistent with that interest, which Movants do not share, the Department has been careful not to say that the First Amendment required it to use the *Davis* standard in its definition of "sexual harassment," or that the Due Process Clause required it to adopt the precise procedural protections in the Final Rule. Where, as here, proposed intervenors seek to make "real and legitimate additional or contrary arguments" to the government, that fact "is sufficient to demonstrate that the representation may be inadequate." *Brumfield*, 749 F.3d at 346.

Relatedly, because the Department's only interest is defending the Final Rule, the Department "merely seeks to defend the present suit and would accept a procedural victory." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016). Movants, by contrast, want a definitive ruling that accepts their constitutional arguments and binds future Departments. *See, e.g.*, *Crossroads*, 788 F.3d at 321 (finding the federal government an inadequate representative of the movant's interests because the government planned to raise a procedural standing argument).

Finally, the "burden is on those opposing intervention to show the adequacy of the existing representation." *Smuck v. Hobson*, 408 F.2d 175, 181 (D.C. Cir. 1969) (cleaned up). Because the positions and personnel of the Executive Branch can change over the course of a single case, it is "not realistic to assume" that the Department will forever defend Movants' position in this litigation. *Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246, 1256 (10th Cir. 2001). Movants "should not need to rely on a doubtful friend to represent [their] interests, when [they] can represent [themselves]" as intervenor-defendants. *Crossroads*, 788 F.3d at 321. At the very least, Movants will "serve as a vigorous and helpful supplement" to the Department and "can reasonably be expected to contribute to the informed resolutions of these questions." *NRDC v. Castle*, 561 F.2d 904, 912–13 (D.C. Cir. 1977); *accord 100Reporters*, 307 F.R.D. at 286 ("Though the Court agrees that the DOJ can represent capably many of the interests asserted by the [movant], the Court also has found that … the strength of the DOJ's position will be enhanced by the assistance of the [Movant]"). Movants should be granted intervention as of right.

## II.    Alternatively, Movants should be allowed to permissively intervene.

Even if Movants could not intervene as of right, they should be granted permissive intervention. The grant of a Rule 24(b) motion is at the sound discretion of the district court. *New Hampshire v. Holder*, 293 F.R.D. 1, 8 (D.D.C. 2013). Unlike Rule 24(a)(2), Rule 24(b) does not ask whether the existing parties adequately represent the movant's interests. *100Reporters LLC*, 307 F.R.D. at 286. Instead, "Rule 24(b) is just about economy in litigation." *City of Chicago v. FEMA*, 660 F.3d 980, 987 (7th Cir. 2011). Specifically, it asks whether the motion is "timely," whether intervention will "unduly delay or prejudice" the parties, and whether the movant's defense "shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b).

These requirements from Rule 24(b)'s text are all satisfied here. As explained, Movants filed their motion in a timely fashion. And their defenses—which "squarely respond" to Plaintiffs'

claims—obviously share common questions with the main action. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1111 (9th Cir. 2002). Nor will intervention cause any undue delay or prejudice. "Rule 24(b) mentions only *undue* delay; normal delay does not require denying intervention, because adding parties to a case almost always results in some delay." *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 323 F.R.D. 553, 561 (E.D. Va. 2018). Yet Movants will not slow this case down at all, since Movants will follow whatever briefing schedule governs Defendants. *100Reporters LLC*, 307 F.R.D. at 286–87; *Nat'l Coal. for the Homeless v. U.S. Veterans Admin.*, 1988 WL 126227, at *1 (D.D.C. 1988). Nor could Movants' participation possibly prejudice Plaintiffs (who must prove their case anyway) or Defendants (who should have to grapple with the constitutional implications of their arguments). *See League of Women Voters of Mich. v. Johnson*, 902 F.3d 572, 577–79 (6th Cir. 2018). Movants have further reduced any possible burden by joining forces, intervening together, and agreeing to submit consolidated briefs.

Allowing Movants to permissively intervene will have other benefits as well. For one, intervention has "the virtues of conserving judicial resources" by reducing the need for other litigation. *Hartman v. Duffy*, 158 F.R.D. 525, 536 (D.D.C. 1994) (quoting *Hill v. Western Electric Co.*, 672 F.2d 381 (4th Cir. 1982)). Intervention also avoids "the risk of inconsistent sequential adjudications of the critical issues." *Id.* Before the Final Rule, FIRE and Speech First regularly challenged, with the Center's support, universities' harassment policies in court. But if the Final Rule is upheld—particularly on the constitutional grounds that Movants plan to press—then many of these lawsuits can be avoided. Most universities accept federal funds, and most universities will adopt the procedural protections and the definition of actionable harassment adopted by the Final Rule. Because those provisions comply with the Constitution, Movants can reduce the number of

lawsuits they file—conserving substantial resources for the judicial system as a whole. *Students & Parents for Privacy v. U.S. Dep't of Educ.*, 2016 WL 3269001, at *3 (N.D. Ill. Jun. 15, 2016).

Moreover, "the magnitude of this case is such that [Movants'] intervention will contribute to the equitable resolution of this case." *Kootenai Tribe*, 313 F.3d at 1111. This case "impact[s] large and varied interests" but, without Movants' intervention, important perspectives will be missing. *Id.* For example, only Movants represent the college students who "directly" benefit from the Rule's protections for free speech and due process. *League of Women Voters of Mich.*, 902 F.3d at 579. And as advocacy organizations who *support* the Rule, Movants "represent the 'mirror-image'" of many of the interests that Plaintiffs seek to vindicate and are thus "uniquely qualified" to permissively intervene. *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 1505640, at *5 (W.D. Wis. Mar. 28, 2020) (quoting *Builders Ass'n*, 170 F.R.D. at 441).

Movants also have a wealth of experience and expertise to bear on the historical, factual, and legal questions in this case—questions that Movants have been actively studying, discussing, promoting, and litigating for years. As thought leaders and repeat players in this field, Movants' participation as parties will meaningfully assist the Court. *See, e.g.*, *See Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 10 (D.D.C. 2007); *City of Williams v. Dombeck*, 2000 WL 33675559, at *4 (D.D.C. 2000).

Movants have unique perspectives, unique expertise, unique interests, and unique constitutional arguments. This Court should exercise its "wide latitude" in the "inherently discretionary enterprise" of permissive intervention and allow Movants to join this case as defendants. *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 331 F.R.D. 5, 9 (D.D.C. 2019) (quoting *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998)).

**CONCLUSION**

The Court should grant Movants' motion to intervene and allow them to participate in this case as defendants.

Dated: June 25, 2020                          Respectfully submitted,

 _/s/  Charles J. Cooper_                       _/s/ William S. Consovoy_
Charles J. Cooper (D.C. Bar #248070)          William S. Consovoy (D.C. Bar #493423)
Brian W. Barnes (pro hac vice forthcoming)    Cameron T. Norris
Nicole J. Moss (D.C. Bar #472424)             Alexa R. Baltes (pro hac vice forthcoming)
COOPER & KIRK, PLLC                           CONSOVOY MCCARTHY PLLC
1523 New Hampshire Ave., NW                    1600 Wilson Blvd., Ste. 700
Washington, D.C. 20036                         Arlington, VA 22209
(202) 220-9600                                 (703) 243-9423
ccooper@cooperkirk.com                         will@consovoymccarthy.com
bbarnes@cooperkirk.com                         cam@consovoymccarthy.com
nmoss@cooperkirk.com                           lexi@consovoymccarthy.com

*Counsel for Foundation for*                   *Counsel for Speech First, Inc. and*
*Individual Rights in Education*               *Independent Women's Law Center*