**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMONWEALTH OF PENNSYLVANIA; STATE
OF NEW JERSEY; STATE OF CALIFORNIA; STATE
OF COLORADO; STATE OF DELAWARE;
DISTRICT OF COLUMBIA; STATE OF ILLINOIS;
COMMONWEALTH OF MASSACHUSETTS; STATE
OF MICHIGAN; STATE OF MINNESOTA; STATE
OF NEW MEXICO; STATE OF NORTH CAROLINA;
STATE OF OREGON; STATE OF RHODE ISLAND;
STATE OF VERMONT; COMMONWEALTH OF
VIRGINIA; STATE OF WASHINGTON; STATE OF
WISCONSIN,

        Plaintiffs,

        v.

ELISABETH D. DEVOS, *in her official capacity as*
*Secretary of the United States Department of Education;*
UNITED STATES DEPARTMENT OF EDUCATION;
UNITED STATES OF AMERICA,

        Defendants.

Civil Action No. 20-cv-01468-CJN

**AMICUS CURIAE BRIEF OF CALIFORNIA WOMEN'S LAW CENTER**

# TABLE OF CONTENTS

**Page**

I.    Introduction and Interest of Amicus ...............................................................1

II.   The Final Rule guts the long-established definition of "sexual harassment" under Title IX and the new, restricted definition will have damaging repercussions for women and girls ...............................................................................................6

    A.    The Final Rule's definition of "sexual harassment" excludes substantial categories of sexual misconduct from its scope, leaving students unprotected and assailants unpunished ...............................................7

    B.    The restrictive definition in the Final Rule protects perpetrators of sexual misconduct while endangering women and girls.................................10

III.  The Final Rule immunizes instances of sexual harassment and assault that occur off-campus and online, preventing women and girls from freely accessing educational opportunities .....................................................................................12

    A.    The Final Rule fails to protect students from sexual harassment off campus..............................................................................................12

    B.    The Final Rule fails to protect students from sexual harassment online .............14

IV.   The Final Rule requires schools to facilitate live cross-examination and allow voluntary mediation, creating further barriers to female survivors safely and effectively seeking justice ...............................................................................15

    A.    Women are harmed by the live cross-examination requirement ........................16

    B.    Mediation in the sexual harassment context, even if "voluntary," injures women ...............................................................................................18

V.    The Final Rule's "actual knowledge" requirement makes it substantially more burdensome for young women to report their complaints to the proper authorities—and therefore less likely that they will do so.............................21

VI.   The Final Rule's requirement that a school's response merely be "not deliberately indifferent" does not ensure that a school responds appropriately to complaints of harassment..............................................................................................24

VI.   Conclusion ...............................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Burlington Industries, Inc. v. Ellerth*,
  524 U.S. 742 (1998) ..................................................................................................9, 13

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999) ........................................................................................................22

*EEOC v. Sunbelt Rentals, Inc.*,
  521 F.3d 306 (4th Cir. 2008) ..........................................................................................22

*Harris v. Forklift Systems, Inc.*,
  510 U.S. 17 (1993) .............................................................................................................9

*MacCluskey v. Univ. of Conn. Health Center*,
  No. 17-0807, 2017 WL 6463200 (2d Cir. Dec. 19, 2017)................................................22

*Meritor Savings Bank, FSB v. Vinson*,
  477 U.S. 57 (1986) ..........................................................................................................13

*Parrish v. Sollecito*,
  249 F. Supp. 2d 342 (S.D.N.Y. 2003) .............................................................................13

*Reynaga v. Roseburg Forest Products*,
  847 F.3d 678 (9th Cir. 2017) ..........................................................................................22

*Weckhorst v. Kan. State Univ.*,
  241 F. Supp. 3d 1154 (D. Kan. 2017), *appeal filed*, No. 17-3208 (10th Cir. Sept. 26,
  2017)..................................................................................................................................14

## STATUTES

5 U.S.C. § 705..........................................................................................................................1

## REGULATIONS

29 C.F.R. § 1604.11 ................................................................................................................24

34 C.F.R. § 106.30 ..................................................................................................................21

34 C.F.R. § 106.30(a) .........................................................................................................7, 23

34 C.F.R. § 106.44(a) ................................................................................................ 12, 21, 24

34 C.F.R. § 106.45(b)(3)(i) ......................................................................................................9

34 C.F.R. § 106.45(b)(6) .................................................................................................15, 16

34 C.F.R. § 106.45(b)(6)(i) ....................................................................................................18

34 C.F.R. § 106.45(b)(9) ........................................................................................................15

34 C.F.R. § 106.45(b)(9)(i) ....................................................................................................15

85 Fed. Reg. 30026-01 (May 19, 2020), 34 C.F.R. Part 106 ...................................................1

# TABLE OF AUTHORITIES
(continued)

Page

## OTHER AUTHORITIES

Alexandra Brodsky, *Can Restorative Justice Change the Way Schools Handle Sexual Assault? Students and Schools Are Exploring Its Promise and Challenges*, The Nation (April 14, 2016)..................................................................................................19

Alyssa Peterson & Sehal Singh, *Know Your IX's State Policy Playbook*, CALIFORNIA WOMEN'S LAW CENTER 1 (2017)..................................................................................4, 16

Amelia Gentleman, *Prosecuting Sexual Assault: "Raped All Over Again,"* THE GUARDIAN (Sept. 13, 2013)..................................................................................17

Andrew Kreighbaum, *OCR: Colleges Can Use Mediation for Sex Assault*, INSIDER HIGHER ED. (Sept. 29, 2017)..................................................................................19

Anne Vetter, *I Reported My Rapist Today So He Can't Become a Supreme Court Justice Later*, WASH. POST (Oct. 4, 2018)..........................................................................12

Audrey Chu, *I Dropped Out of College Because I Couldn't Bear to See My Rapist on Campus*, VICE (Sept. 26, 2017)..........................................................................3, 15, 16

Betsy DeVos, Sec'y of Educ., Prepared Remarks by Secretary DeVos at the Independent Women's Forum Annual Awards Gala (Nov. 13, 2019)..........................................10

Bonnie S. Fisher *et al.*, NAT'L INST. OF JUST., *The Sexual Victimization of College Women* (2000) ..............................................................................................2, 5, 13

Caitlyn Bahrenburg, *Sexual Harassment Increases Blood Pressure and Poor Sleep in Women*, MD MAGAZINE (Oct. 3, 2018)..................................................................4

*Campus Sexual Violence: Statistics*, RAINN .......................................................4, 23

Carly Parnitzke Smith & Jennifer F. Freyd, *Institutional Betrayal*, 69 AM. PSYCHOL. 575-87 (2014)..................................................................................................18

Catherine Hill & Holly Kearl, *Crossing the Line: Sexual Harassment at School*, AMERICAN ASS'N OF UNIV. WOMEN 2 (Nov. 2011)..........................................2, 4, 8, 11, 14

Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18 J. OF C. STUDENT RETENTION: RES., THEORY & PRACTICE 1 (2015)..........................................................................3, 4, 15

Chang *et al.*, *Hope Under Assault: Understanding the Impact of Sexual Assault on the Relation Between Hope and Suicidal Risk in College Students*, 34 J. OF SOC. AND CLINICAL PSYCHOL. 221 (2015) ..........................................................................3

*Child Sexual Abuse Fact Sheet*, THE NATIONAL CHILD TRAUMATIC STRESS NETWORK (2009) ..........................................................................................................5

Christopher P. Krebs *et al.*, NAT'L INST. OF JUST., *The Campus Sexual Assault (CSA) Study* 5-2 (Dec. 2007)..........................................................................................3

**TABLE OF AUTHORITIES**
(continued)

Page

Dr. Amy Hardy *et al.*, *Does trauma memory play a role in the experience of reporting sexual assault during police interviews? An exploratory study*, 17 MEMORY 783-88 (2009) ....................................................................................................................... 17, 18

*Drinking "Settings" Tied to College Sexual Assault*, SCIENCE DAILY (Dec. 12, 2016) .............. 13

Emma Brown *et al.*, *Drinking is central to college culture—and to sexual assault*, WASH. POST (June 14, 2015) ........................................................................................................... 13

Erica L. Green & Sheryl Gay Stolberg, *Campus Rape Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. TIMES (July 12, 2017) ...................................................... 11

*Facts From United Educators' Report – Confronting Campus Sexual Assault: An Examination of Higher Education Claims*, UNITED EDUCATORS ........................................ 2, 4

Felicia Mitchell, *Keeping It All in the Family: Sexual Harassment Policies and Informal Resolution in Small Colleges*, NWSA JOURNAL 118 (1997) ................................................ 20

Grace Watkins, *Sexual Assault Survivor to Betsy DeVos: Mediation Is Not a Viable Resolution*, TIME (Oct. 2, 2017) ............................................................................... 19, 20, 21

*How College Campuses Handle Sexual Assaults*, NPR: Talk of the Nation (Dec. 3, 2009) ........ 20

Jennie Kihnley, *Unraveling the Ivory Fabric: Institutional Obstacles to the Handling of Sexual Harassment Complaints*, 25 L. & SOC. INQUIRY 69 (2000) ..................................... 20

Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation,* N.Y. TIMES (Apr. 30, 2017) .......................................................................................................... 5

*Job Search*, NATIONAL ASS'N OF COLLEGES & EMPLOYERS (Dec. 11, 2017) ............................. 14

Julie E. Samuels & Jan M. Chaiken, *Foreword* to Bonnie S. Fisher *et al.*, NAT'L INST. OF JUST., *The Sexual Victimization of College Women* (2000) ..................................................... 2

Kathryn J. Holland & Lilia M. Cortina, *The Evolving Landscape of Title IX: Predicting Mandatory Reporters' Responses to Sexual Assault Disclosures*, 41 L. & HUM. BEHAV. 429 (2017) .......................................................................................................... 3, 18

Kayla Patrick & Nina Chaudry, *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence*, NAT'L WOMEN'S LAW CENTER 8 (Apr. 2017) ........................................................................................................... 3, 4, 15

Linda Geddes, *Why Sexual Assault Survivors Forget Details and Four Other Misconceptions About Sexual Violence*, B.B.C. FUTURE (Sept. 26, 2018) ........................... 17

Maeve Duggan, *Online Harassment 2017*, PEW RESEARCH CENTER (July 11, 2017) ................. 14

Marisela Huerta *et al.*, *Sex & Power in the Academy: Modeling Sexual Harassment in the Lives of College Women*, 32 SOC'Y FOR PERSONALITY & SOC. PSYCHOL. 616 (2006) .............. 3

Martha Chamallas, *Vicarious Liability in Torts: The Sex Exception*, 48 VAL. U.L. REV. 133 (2013) .......................................................................................................................... 12

Matthew Kimble *et al.*, *Risk of Unwanted Sex for College Women: Evidence for a Red Zone*, 57 J. OF AM. COLL. HEALTH 331 (2008) .................................................................. 23

**TABLE OF AUTHORITIES**
(continued)

Page

Michelle J. Anderson, *Diminishing the Legal Impact of Negative Social Attitudes Toward Acquaintance Rape Victims*, 13 NEW CRIM. L. REV. 644, 647 (2010)....................................5

NPR: TALK OF THE NATION (Dec. 3, 2009).................................................................20

Nsikan Akpan, *In Kavanaugh Debate, 'boys will be boys' is an unscientific excuse for assault,* PBS NEWS HOUR (Sept. 21, 2018)..........................................................11

Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter: Sexual Violence* 3 (Apr. 4, 2011).........................................................................................7, 21

Office for Civil Rights, U.S. Dep't of Educ., *Questions and Answers on Campus Sexual Misconduct* (Sept. 2017).................................................................................12

Office for Civil Rights, U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* 2 (Jan. 1, 2001)................................................................................ 7, 20, 21, 24

Pamela B. Paresky, *What's Wrong With Locker Room Talk*, PSYCHOLOGY TODAY (Oct. 10, 2016).......................................................................................................11

Patricia Frazier *et al.*, *Traumatic Events Among Undergraduate Students: Prevalence and Associated Symptoms*, 56 J. OF COUNSELING PSYCHOL. 450-60 (2009)..............................3, 4

Peter Baumann, *Deliberate Indifference: How to Fix Title IX Campus Sex-Assault Jurisprudence*, 106 GEO. L.J. 1139 (Apr. 2018)..............................................14, 22

*Poll: One in 5 Women Say They Have Been Sexually Assaulted in College*, WASH. POST (June 12, 2015)..................................................................................................4

*Prevalence Rates*, END RAPE ON CAMPUS .....................................................................2

*Promise and Challenges*, THE NATION (April 14, 2016) ............................................19

Rebecca N. Dick *et al.*, *Cyber Dating Abuse Among Teens Using School-Based Health Centers*, 134 AM. ACAD. OF PEDIATRICS e1560 (Nov. 2014)..........................................14, 15

Rebecca Weiant, *Removing Camouflaged Barriers to Equality: Overcoming Systemic Sexual Assault and Harassment at the Military Academies*, 25 MICH. J. GENDER & L. 75, 83 (2018)............................................................................................19

Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*, N.Y. TIMES (Aug. 5, 2016).........................................................................................13

*The Role of Social Media in the Job Search*, NATIONAL ASS'N OF COLLEGES & EMPLOYERS (Dec. 11, 2017)......................................................................................14

Sandy E. James *et al.*, *The Report of the 2015 U.S. Transgender Survey*, NATIONAL CENTER FOR TRANSGENDER EQUALITY 14 (Dec. 2016), ....................................5, 8

Sara O'Toole, Note, *Campus Sexual Assault Adjudication*, 79 U. OF PITT. L. REV. 511 (May 2016) ...............................................................................................17

Sarah Zydervelt et al., *Lawyers' Strategies for Cross-Examining Rape Complainants: Have We Moved Beyond the 1950s?*, 57 BRIT. J. CRIM. 551, 553 (May 2016) .....................17

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Sexual Violence Myths & Misconceptions*, ARIZONA COALITION TO END SEXUAL & DOMESTIC VIOLENCE ........................................................................................ 19, 20

Simon McCarthy-Jones, *Survivors of sexual violence are let down by the criminal justice system—here's what should happen next*, THE CONVERSATION (March 29, 2018) .............. 17

Sky Jordan, *Rape culture is normalized across college campuses*, THE STATE PRESS (Feb. 27, 2017). ........................................................................................................ 11

Stacey Kaltman *et al.*, *Psychological Impact of Types of Sexual Trauma Among College Women*, 18 J. OF TRAUMATIC STRESS 547-55 (2005) ........................................... 4

Stephanie Riger, Gender Dilemmas in Sexual Harassment Policies and Procedures, 46 AM. PSYCHOLOGIST 497-505 (1991) .................................................................... 20

Stephanie Saul & Kate Taylor, *Betsy DeVos Reverses Obama-Era Policy on Campus Sexual Assault Investigations*, N.Y. TIMES (Sept. 22, 2017) .................................... 19

*Teen Dating Violence in Cal. Schools: Know Your Rights*, CALIFORNIA WOMEN'S LAW CENTER 3 (Aug. 2017) ...................................................................................... 14

U.S. Dep't of Educ., *Know Your Rights: Title IX Prohibits Sexual Harassment and Sexual Violence Where You Go to School* ........................................................... 19

## I.    Introduction and Interest of Amicus

Amicus curiae California Women's Law Center ("CWLC") supports Plaintiffs' Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay Pending Judicial Review, requesting to enjoin or stay the implementation of "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 85 Fed. Reg. 30026-01 (May 19, 2020), 34 C.F.R. Part 106 (the "Final Rule").[1]

CWLC works to break down barriers and advance the potential of women and girls through transformative litigation, policy advocacy, and education.  CWLC is at the forefront of advocating to ensure that legislation and regulations will positively impact the wellbeing of women and girls.  A vital part of CWLC's mission is fighting for women's and girl's access to equal educational opportunities by ensuring that access to education is not impeded by gender discrimination.  CWLC strongly believes that young women and girls deserve the right to an education free from sexual harassment and violence.  CWLC therefore has a strong interest in ensuring effective enforcement of Title IX's protections in education through appropriate regulation and standards that advance Title IX's purpose of ensuring equal access to education and educational opportunities.

Fifteen organizations that share CWLC's interest in promoting effective enforcement of Title IX support and join CWLC's amicus brief.  These organizations are identified in the Addendum to the brief.

CWLC submits this amicus brief to explain how the Final Rule strips away long-established and important rights and protections for survivors of sexual harassment and abuse in educational institutions.  The Final Rule will lead to damaging effects for survivors.  Sexual harassment and assault are already markedly underreported, but the Final Rule will further deter survivors of sexual harassment and sexual violence from coming forward or filing complaints

---

[1] No party's counsel authored this brief in whole or in part.  No party, party's counsel, or person (other than amicus or its counsel) contributed money to fund this brief's preparation or submission.

against their attackers.  Those who do come forward will be forced into a traumatizing investigative process by the Final Rule's requirements, a process that is unlikely to yield equitable results.  Ultimately, the Final Rule will fail to adequately respond to or reduce incidents of sexual harassment and violence in educational programs, will deter reporting, and will limit access to educational opportunities in direct contradiction to the purpose of Title IX.

Women and girls bear the brunt of the negative effects of sexual harassment and will bear the brunt of the harm from the Final Rule.  The federal government's own analysis confirms that sexual harassment and assault of women and girls remain widespread problems in the United States.  Women and girls are more likely than men and boys to experience sexual harassment.[2] And women and girls of color are more likely than white women to be sexually harassed or assaulted and less likely to report it.[3]

The Final Rule does nothing to address these problems.  To the contrary, it backtracks by unwinding nearly two decades of Department of Education ("DOE") guidance that was far more protective of women and girls experiencing sexual harassment and assault at school, where sexual harassment and assault are major issues.  "College campuses host large concentrations of young women who are at greater risk for rape and other forms of sexual assault than women in the general population or in a comparable age group."[4]  In  2014, the Bureau of Justice Statistics found that 20 percent of college women reported they were sexually assaulted during college and

---

[2] *Facts From United Educators' Report – Confronting Campus Sexual Assault: An Examination of Higher Education Claims*, UNITED EDUCATORS, https://www.ue.org/sexual_assault_claims_study (last visited June 23, 2020) [hereinafter *United Educators*]; Catherine Hill & Holly Kearl, *Crossing the Line: Sexual Harassment at School*, AMERICAN ASS'N OF UNIV. WOMEN 2 (Nov. 2011), https://www.aauw.org/app/uploads/2020/03/Crossing-the-Line-Sexual-Harassment-at-School.pdf [hereinafter *Crossing the Line*] (research shows that "[g]irls [are] more likely than boys to be sexually harassed both in person (52 percent versus 35 percent) and via text, e-mail, Facebook, or other electronic means (36 percent versus 24 percent)").
[3] *Prevalence Rates*, END RAPE ON CAMPUS, https://endrapeoncampus.org/new-page-3/ (last visited June 23, 2020).
[4] Julie E. Samuels & Jan M. Chaiken, *Foreword* to Bonnie S. Fisher *et al.*, NAT'L INST. OF JUST., *The Sexual Victimization of College Women* iii (2000), https://www.ncjrs.gov/pdffiles1/nij/182369.pdf [hereinafter *Sexual Victimization*].

one in three female rape victims was assaulted for the first time between the ages of 11 and 17.[5]

One in five women, compared to one in 16 men, is sexually assaulted while in college.[6]

Title IX must protect women and girls from sexual harassment and assault at school;

otherwise, their access to education and educational facilities and programs cannot be equal.

Young women are more likely to miss school because they feel unsafe, and in some instances,

they are forced to drop out of school altogether in order to avoid encounters with their assailant[7]

— 30 percent of survivors of sexual violence versus 14 percent of girls overall "have been absent

from school because [they] felt unsafe at school or on their way to school."[8]  Those who do stay

in school often suffer in other ways, whether by having trouble focusing in class or maintaining

their grades, or experiencing debilitating behavioral, emotional, and health problems.[9]  Those

who experience sexual harassment also often experience traumatic effects.[10]  College women

---

[5] *See* Complaint (ECF No. 1) at p. 24.  The Complaint provides additional statistics tracing further studies building upon these findings.

[6] Christopher P. Krebs *et al.*, NAT'L INST. OF JUST., *The Campus Sexual Assault (CSA) Study* 5-2, 5-5 (Dec. 2007), http://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf

[7] *E.g.,* Audrey Chu, *I Dropped Out of College Because I Couldn't Bear to See My Rapist on Campus*, VICE (Sept. 26, 2017), https://broadly.vice.com/en_us/article/qvjzpd/i-dropped-out-of-college-because-i-couldnt-bear-to-see-my-rapist-on-campus [hereinafter *Dropped Out*].

[8] Kayla Patrick & Nina Chaudry, *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence*, NAT'L WOMEN'S LAW CENTER 8 (Apr. 2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/final_nwlc_Gates_HarassmentViolence.pdf [hereinafter *Let Her Learn*].

[9] Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18 J. OF C. STUDENT RETENTION: RES., THEORY & PRACTICE 1, 3 (2015) [hereinafter *Violence Victimization*]; Kathryn J. Holland & Lilia M. Cortina, *The Evolving Landscape of Title IX: Predicting Mandatory Reporters' Responses to Sexual Assault Disclosures*, 41 L. & HUM. BEHAV. 429 (2017) [hereinafter *Evolving Landscape*] ("There can be devastating psychological and educational consequences of sexual assault, including depression, posttraumatic stress, suicidality, performance decline, and school withdrawal"); Marisela Huerta *et al.*, *Sex & Power in the Academy: Modeling Sexual Harassment in the Lives of College Women*, 32 SOC'Y FOR PERSONALITY & SOC. PSYCHOL. 616 (2006), http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.850.6892&rep=rep1&type=pdf p. 3.

[10] *Let Her Learn*, *supra* note 8 at 1 ("Not surprisingly, girls who suffer these forms of trauma are more likely to have serious behavioral, emotional and health problems."); *Evolving Landscape*, *supra* note 9 at 429 (citing, *e.g.*, Chang *et al.*, *Hope Under Assault: Understanding the Impact of Sexual Assault on the Relation Between Hope and Suicidal Risk in College Students*, 34 J. OF SOC. AND CLINICAL PSYCHOL. 221-38 (2015); Patricia Frazier *et al.*, *Traumatic Events Among*

face additional financial hurdles as a result of harassment, including being forced to pay out of pocket for off-campus housing and for support services like private counseling to help them work through the emotional trauma they suffered.[11]  Their schools' failure to protect them, or even to listen to them, will exacerbate these effects and prevent equal access.

The Final Rule also discourages reporting of sexual harassment and assault.  Young women and girls already underreport their experiences of sexual violence and assault at alarmingly high rates.[12]  Only 12 percent of college survivors[13] and fewer than 2 percent of girls ages 14-18 report sexual assault to their parents, schools, or the police.[14]  One report showed that 40 percent of those sexually assaulted delay reporting by an average of 11.3 months.[15]  Female students who do report their experiences are far more likely to report to parents and family members than anyone else,[16] and have expressed inherent discomfort in reporting to authority figures, including their schools.[17]

---

*Undergraduate Students: Prevalence and Associated Symptoms*, 56 J. OF COUNSELING PSYCHOL. 450-60 (2009); Stacey Kaltman *et al.*, *Psychological Impact of Types of Sexual Trauma Among College Women*, 18 J. OF TRAUMATIC STRESS 547-55 (2005)); *Violence Victimization*, *supra* note 9; Caitlyn Bahrenburg, *Sexual Harassment Increases Blood Pressure and Poor Sleep in Women*, MD MAGAZINE (Oct. 3, 2018), https://www.mdmag.com/medical-news/sexual-harassment-increases-blood-pressure-poor-sleep-women.

[11] Alyssa Peterson & Sehal Singh, *Know Your IX's State Policy Playbook*, CALIFORNIA WOMEN'S LAW CENTER 1, 36-37 (2017), https://www.cwlc.org/download/know-your-ixs-state-policy-playbook/?wpdmdl=4683&ind=S25vd19Zb3VyX0lYX1N0YXRlX1BvbGljeV9QbGF5Ym9vay5wZGY [hereinafter *Playbook*].

[12] *Playbook*, *supra* note 11 at 20 ("The vast majority of student survivors never report to law enforcement or campus officials."); *see also Campus Sexual Violence: Statistics*, RAINN, https://www.rainn.org/statistics/campus-sexual-violence (last visited June 23, 2020) [hereinafter *Campus Sexual Violence*] (only 20 percent of college survivors report sexual assault to law enforcement).

[13] *Poll: One in 5 Women Say They Have Been Sexually Assaulted in College*, WASH. POST (June 12, 2015), http://www.washingtonpost.com/graphics/local/sexual-assault-poll.

[14] *Let Her Learn*, *supra* note 8 at 2.

[15] *United Educators*, *supra* note 2.

[16] *Crossing the Line*, *supra* note 2 at 3 ("Girls were more likely than boys to talk with parents and other family members (32 percent versus 20 percent)").

[17] *Let Her Learn*, *supra* note 8 at 2 ("Yet very few girls actually report harassment and violence to an adult, their schools, or the police because they are scared, feel uncomfortable talking about it, do not want to get the perpetrators in trouble, or feel they should be able to handle it on their

Women of color, undocumented immigrant women, and LGBTQ students face additional barriers to reporting. "[F]or many undocumented victims, taking [the step to report] has become exceedingly difficult because of fears that the government will detain and deport them if they press charges . . . ."[18]

The Final Rule will exacerbate the already serious issue of underreporting by narrowing the scope of educational institutions' responsibility to prevent, investigate, punish, or deter sexual harassment and assault. In particular:

• The Final Rule creates a severely restricted definition of "sexual harassment" as compared to prior DOE guidance, effectively moving large categories of sexual harassment outside the scope of the rule. This places students at risk by allowing—in fact, *requiring*—schools to dismiss and ignore escalating or early incidents of sexual harassment and assault.

• The Final Rule only requires schools to address sexual harassment that occurs on campus or in buildings or educational activities controlled by the school, which effectively permits sexual assault and harassment at off-campus locations, on the internet, and on social media, where a substantial amount of sexual harassment and assault occurs. This deters survivors, especially women and girls, from making use of activities that are internet-based or that utilize social media. These are critical aspects of a student's

---

own.") (citing *Child Sexual Abuse Fact Sheet*, THE NATIONAL CHILD TRAUMATIC STRESS NETWORK (2009), https://www.nctsn.org/sites/default/files/resources//child_sexual_abuse_fact_sheet_parents_teach ers_caregivers.pdf); Michelle J. Anderson, *Diminishing the Legal Impact of Negative Social Attitudes Toward Acquaintance Rape Victims*, 13 NEW CRIM. L. REV. 644, 647 (2010) [hereinafter *Diminishing Legal Impact*] ("The typical rape does not include a prompt report to the police; many victims never report their most harrowing experiences to any authority figures") (citing *Sexual Victimization*, *supra* note 4 at 17, 23-24).

[18] Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation,* N.Y. TIMES (Apr. 30, 2017), https://www.nytimes.com/2017/04/30/us/immigrants-deportation-sexual-abuse.html?mcubz=3; Sandy E. James *et al.*, *The Report of the 2015 U.S. Transgender Survey*, NATIONAL CENTER FOR TRANSGENDER EQUALITY 14 (Dec. 2016), https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF ("More than half (57%) of transgender respondents said they would feel uncomfortable asking the police for help if they needed it.").

educational experience in forging social connections, accessing research, and connecting with women's and girls' access to such opportunities is restricted or discouraged, the purpose of Title IX cannot be fulfilled.

• The Final Rule requires schools to facilitate live adversarial cross-examination of survivors in sexual harassment proceedings and lifts the former ban on voluntary mediation in these cases, deterring and preventing survivors from safely and effectively seeking justice. Live cross-examination and mediation place survivors of sexual harassment and violence in a vulnerable and retraumatizing situation and thus have historically been disfavored in sexual harassment proceedings.

• The Final Rule does not require postsecondary schools to do anything to address complaints of sexual harassment or assault unless the school has "actual notice" via a formal complaint to only a handful of school authorities. This reverses the longstanding rule that constructive notice was sufficient, and erects additional obstacles to survivors coming forward to report their abuse.

• The Final Rule requires schools to respond to reported harassment merely by being "not deliberately indifferent" to the complaint. This lowers the standard from the prior requirement that a school take effective and timely steps to address and end the harassment.

In at least these respects, the Final Rule will force educational institutions to take enormous steps backward, backing away from established procedures and obligations to investigate, redress, and prevent sexual harassment and assault. It inevitably will reduce the access of female students to the equal opportunities that Title IX is supposed to guarantee. Implementation of the Final Rule should be enjoined or stayed.

## II.    The Final Rule guts the long-established definition of "sexual harassment" under Title IX and the new, restricted definition will have damaging repercussions for women and girls.

The Final Rule is a dramatic rollback of Title IX precedent that sends the United States decades backward in terms of protections for women and girls against sexual misconduct in their

schools.  The Final Rule limits the scope of schools' responsibilities by creating a new definition of sexual harassment that is sharply at odds with pre-existing DOE guidance and with the very purpose of Title IX—to provide equal access to educational opportunities and benefits to women and girls.  Far from furthering this goal by protecting women and girls from sexual harassment and assault while pursuing their education, the Final Rule's definition moves the dial to prioritize the protection of those who perpetrate sexual misconduct.

A.   **The Final Rule's definition of "sexual harassment" excludes substantial categories of sexual misconduct from its scope, leaving students unprotected and assailants unpunished.**

The Final Rule defines "sexual harassment" as "conduct on the basis of sex" that is "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity."  34 C.F.R. § 106.30(a).  The definition also includes quid pro quo harassment by a school employee, violence, and stalking.  *Id.*

This is a drastic change from the DOE's prior guidance issued in 2001, which provided a broad yet straightforward definition of sexual harassment as "unwelcome conduct of a sexual nature."[19]  This definition was again used in 2011 DOE guidance, which explained that sexual harassment included, but was not limited to, "requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature."[20]  The Final Rule's definition of sexual harassment is also at odds with the requirement in the 2011 Guidance that schools must respond when discrimination on the basis of sex creates a "hostile environment" that "den[ies] or limit[s] a student's ability to participate in or benefit from the school's programs or activities."[21]

The Final Rule's definition deviates from the prior guidance by imposing restrictive

---

[19] Office for Civil Rights, U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* 2 (Jan. 1, 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [hereinafter 2001 Guidance].
[20] Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter: Sexual Violence* 3 (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf [hereinafter *2011 Guidance*].
[21] *2011 Guidance*, *supra* note 20 at v-vi.

qualifiers that push most unwelcome sexual conduct out of the scope of the regulation.  Under the Final Rule, conduct is not sexual harassment—and schools have no obligations regarding the conduct—unless it is *not only* "unwelcome," but *also* "severe," "pervasive," *and* "objectively offensive."  This imposes a high hurdle and strips away much of the important protection of the prior established definitions.

The Final Rule's narrowed definition categorically excludes common types of sexual harassment that were covered by the old rule.  These include:

- Single incidents of sexual harassment, even if they are egregious, because they are not "pervasive."

- Persistent harassment of multiple individuals by a single perpetrator.

- Student to student quid pro quo.  For example, a student who conditions studying together or assistance with schoolwork on unwelcome sexual conduct would not trigger Title IX responsibility.  Also, students in positions of power—such as teaching assistants, resident advisors, and students serving on boards—would be permitted to condition a provision of aid or other benefit on unwelcome sexual conduct without repercussion.

- Verbal harassment—unwelcome sexual comments, jokes, or gestures—the most common form of sexual harassment on both K-12 and college campuses,[22] will fall outside the new definition.[23]

The Final Rule's definition stands in sharp contrast not only to the DOE's prior position, but also to the legal standards applicable in other similar contexts such as employment law.  For example, Title VII recognizes that when "quid pro quo" harassment is committed by individuals

---

[22] One 2016 study found that the majority of K-12 students who were out or perceived as transgender, and experienced some form of harassment, experienced verbal harassment (54 percent).  James *et al., supra* note 18 at 11.

[23] *Crossing the Line*, *supra* note 2 at 2 ("Verbal harassment (unwelcome sexual comments, jokes, or gesture) made up the bulk of the incidents . . . .  Facebook, or other electronic means affected nearly one-third (30 percent) of students.  Interestingly, many of the students who were sexually harassed through cyber-space were also sexually harassed in person.").

in positions of power in the workplace, a single incident can be enough to create liability, even if the harasser's actions are not ongoing or pervasive.[24]  It is illogical for such a scenario to constitute sexual harassment in a workplace setting but not in an educational setting, particularly in college where, just like in an employment setting, all aspects of a student's daily life—from academic success, residence, social life, and more—are controlled by those with more power than the student.  Further, under Title VII courts must weigh whether the sexual harassment has created a "hostile environment" in the workplace by evaluating the severity and pervasiveness of the conduct at issue under both objective *and* subjective standards, taking into account the victim's subjective perception that the environment is abusive.[25]  Under the Final Rule, young girls receive less protection at school than women do in the workplace under Title VII.

The Final Rule's restrictive definition of sexual harassment will necessarily limit a school's obligation to investigate and address reported incidents of sexual harassment.  Under the Final Rule, a formal complaint of sexual harassment need not be investigated—in fact, the complaint *must* be dismissed—if the alleged conduct does not rise to the level of the new definition.  34 C.F.R. § 106.45(b)(3)(i).  No initial investigation into the allegations need even take place, so a school is no longer required to even adequately determine whether a Title IX violation actually occurred before throwing out the complaint.  This will have an enormous impact, wiping out entire categories of harmful harassing conduct that previously required action by schools, and it will create an unnecessarily high barrier that will encourage students to not even bother submitting a formal complaint.  The new definition allows and encourages schools to sweep instances of sexual misconduct under the rug and sends the clear message to students that they must tolerate unwelcome sexual conduct, and their school will do nothing to help them.

Title IX's primary goal of equal access will be eviscerated if female students are deterred from reporting unwelcome sexual conduct at school unless and until it becomes "severe, pervasive, and objectively offensive."  By the time sexual misconduct rises to the level of

---

[24] *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 753-54 (1998).
[25] *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).

harassment that would require a school to respond under the new rule, a student's equal access to a school program or activity will already have been denied, and this inequity will be experienced disproportionately by women and girls.  Students will inevitably take steps to protect themselves from the harassing behavior to distance themselves from their assailants, filling the void left by the school's disinterest.  This, in turn, will discourage them from seeking out opportunities that the educational system should provide them equally.

> **B.** **The restrictive definition in the Final Rule protects perpetrators of sexual misconduct while endangering women and girls.**

The new definition of sexual harassment in the Final Rule will protect those who perpetrate sexual harassment and assault at the expense of those against whom this violence and harassment are perpetrated.  In fact, DOE Secretary Betsy DeVos explained in a November 13, 2019 speech (after the DOE issued the notice of proposed rulemaking) that the DOE *intends* to protect perpetrators of sexual harassment over those who are harassed, stating: "Too many cases involve students and faculty who have faced investigation and punishment simply for speaking their minds or teaching their classes.  Any perceived offense can become a fullblown Title IX investigation.  But if everything is harassment, then nothing is."[26]  This statement is a baseless exaggeration.  The previous definitions in prior guidance did not make "everything" harassment; they applied standards to delineate the boundaries between acceptable and unacceptable behavior.

Permitting schools to ignore and reject complaints about common forms of sexual harassment that would amount to actionable sexual harassment if committed outside of the academic context will foster an environment and culture in which sexual harassment and assault are permitted—even encouraged—rather than punished and stigmatized in education.  Permitting schools to ignore "early" forms of sexual harassment will embolden perpetrators and reinforce a

---

[26] Betsy DeVos, Sec'y of Educ., Prepared Remarks by Secretary DeVos at the Independent Women's Forum Annual Awards Gala (Nov. 13, 2019), https://www.ed.gov/news/speeches/prepared-remarks-secretary-devos-independentwomens-forum-annual-awards-gala.

culture of complicity and misogyny, further entrenching rape culture in the foundation of our schools.[27]  When school faculty, staff, and fellow students see their school repeatedly fail to protect its students from sexual harassment, sexual misconduct becomes normalized throughout the school and becomes part of its culture.[28]  This process of legitimizing sexual harassment and sexual violence perpetuates a deep-seated perception that most forms of sexual harassment are "no big deal."  One article reported that "[m]any of the students who admitted to sexually harassing others didn't think of it as a big deal (44 percent), and many were trying to be funny (39 percent).  These findings suggest that prevention efforts must address when attempted humor crosses the line and become harassment."[29]  This cultural attitude encourages perpetrators to continue engaging in forms of harassment that they can brush away as "locker room talk"[30] or the perennial excuse that "boys will be boys."[31]

The normalization of sexual harassment discourages women from seeking help because it minimizes their experiences, paints them as overreacting, and perpetuates stereotypes about women as overly dramatic, hysterical, or even liars.[32]  American culture and laws show a long history of mistrusting women who come forward with allegations of sexual harassment and

---

[27] Sky Jordan, *Rape culture is normalized across college campuses*, THE STATE PRESS (Feb. 27, 2017) http://www.statepress.com/article/2017/02/spopinion-rape-culture-is-normalized-on-campuses.

[28] *Crossing the Line*, *supra* note 2 at 2 ("Witnessing sexual harassment at school may 'normalize' the behavior for bystanders").

[29] *Id.* at 3-4.

[30] Pamela B. Paresky, *What's Wrong With Locker Room Talk*, PSYCHOLOGY TODAY (Oct. 10, 2016), https://www.psychologytoday.com/us/blog/happiness-and-the-pursuit-leadership/201610/whats-wrong-locker-room-talk.

[31] Nsikan Akpan, *In Kavanaugh Debate, 'boys will be boys' is an unscientific excuse for assault*, PBS NEWS HOUR (Sept. 21, 2018), https://www.pbs.org/newshour/science/why-boys-will-be-boys-is-an-unscientific-excuse-for-assault.

[32] *See* Erica L. Green & Sheryl Gay Stolberg, *Campus Rape Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. TIMES (July 12, 2017), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html?_r=0 ("Fatima Goss Graves, president of the National Women's Law Center . . . said she was 'worried that the department will turn into apologists for the sort of violence that happens on campus,' and that the Trump administration would 'allow myths about rape to be perpetuated'—including, she said, 'the whole idea that rape is just a drunken encounter gone wrong.'").

assault.[33]  Women and girls already are all too aware of the likelihood they will not be believed, which prevents them from speaking up and reporting in many instances.[34]  The Final Rule categorically minimizes most instances of sexual harassment and further entrenches this result.

## III.   The Final Rule immunizes instances of sexual harassment and assault that occur off-campus and online, preventing women and girls from freely accessing educational opportunities.

The Final Rule removes the responsibility of schools to investigate and address harassment that occurs online or in most off-campus locations.  This is a stark divergence from past guidance.  For instance, 2017 DOE Guidance stated that "[s]chools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities."[35]  If schools are not held responsible for preventing and addressing sexual misconduct in these contexts, schools are not fulfilling their mandate under Title IX to respond to hostile environments created by sex discrimination.  This change from the prior rule is arbitrary and harmful to women and girls.

### A.   The Final Rule fails to protect students from sexual harassment off campus.

The Final Rule only covers harassment at locations where the school "exercised substantial control over both the respondent and the context in which the sexual harassment occurs," "includ[ing] any building owned or controlled by a student organization that is officially recognized by a postsecondary institution."  34 C.F.R. § 106.44(a).  Most off-campus locations

---

[33] Martha Chamallas, *Vicarious Liability in Torts: The Sex Exception*, 48 VAL. U.L. REV. 133 (2013) ("Many courts continue to treat sexual abuse cases as exceptional, echoing the sentiments of old-fashioned (pre-1970s) criminal laws that once approached rape and sexual assault as qualitatively different from other forms of violence and erected special legal barriers to prosecution").

[34] *See* Anne Vetter, *I Reported My Rapist Today So He Can't Become a Supreme Court Justice Later*, WASH. POST (Oct. 4, 2018), https://www.washingtonpost.com/outlook/i-reported-my-rapist-today-so-he-cant-become-a-supreme-court-justice-later/2018/10/04/09d7bf10-c74d-11e8-b1ed-1d2d65b86d0c_story.html?utm_term=.12bf839051fd ("I didn't think reporting to my college would accomplish anything.  I'd seen rape cases with much more evidence than mine dismissed").

[35] Office for Civil Rights, U.S. Dep't of Educ., *Questions and Answers on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

are not covered by the Final Rule, including off-campus apartments rented by students.  This exclusion significantly limits the effectiveness of the Final Rule in preventing sexual harassment, as off-campus activities are a substantial component of academic life, particularly for college students.  "For nearly all types of sexual victimization, . . . off-campus victimization is more common . . . .  [O]ff-campus sexual victimizations may take place in bars and nightclubs or in student residences close to campus.  Even if a student is victimized off campus, she may be engaged in an activity that is connected to her life as a student at the college she attends."[36]  In addition, most college students live off campus.[37]  Thus, off-campus sexual harassment is a pervasive part of academic life.  For instance, a substantial amount of sexual assaults involve off-campus parties and off-campus college bars.[38]  By way of comparison, in the employment context, it is well-settled that there is a "continuum of the 'work environment' encompassed within the scope of discrimination Title VII proscribes," which "often carries beyond the work station's physical bounds and regular hours."  *Parrish v. Sollecito*, 249 F. Supp. 2d 342, 351 (S.D.N.Y. 2003) (citing, for example, *Burlington,* 524 U.S. at 748 [drinks with the supervisor in the hotel lounge during a business trip]; *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) [sexual relations with the supervisor at motels and restaurants after regular hours]).

Allowing schools to ignore off-campus harassment and assault will inevitably lead to a distortion of Title IX and is in direct conflict with the law's purpose to ensure equal access to all aspects of academic life.  The Rule will lead to absurd and illogical results.  For example, a

---

[36] *Sexual Victimization*, *supra* note 4 at 19.

[37] Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*, N.Y. TIMES (Aug. 5, 2016), https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-cost-who-knows.html (noting that 87% of higher education students live off-campus).

[38] *Drinking "Settings" Tied to College Sexual Assault*, SCIENCE DAILY (Dec. 12, 2016), https://www.sciencedaily.com/releases/2016/12/161212134631.htm (noting that "findings, reported in the January 2017 issue of the Journal of Studies on Alcohol and Drugs, suggest that 'drinking setting'—rather than drinking, per se—might be key" to a higher risk of sexual assault); Emma Brown *et al.*, *Drinking is central to college culture—and to sexual assault*, WASH. POST (June 14, 2015), https://www.washingtonpost.com/local/education/beer-pong-body-shots-keg-stands-alcohol-central-to-college-and-assault/2015/06/14/7430e13c-04bb-11e5-a428-c984eb077d4e_story.html?utm_term=.8dea00e18eb4.

school would be required to respond differently to similarly situated female students who attend the same school, attend the same classes, and live in the same dormitory, who are both attacked by the same male student if one of the attacks happens to take place at an off-campus party. This precise scenario played out at Kansas State University a few years ago. There, the school was found not liable for failing to respond to the complaint of a woman who had been raped by a fraternity member at an off-campus fraternity event and the fraternity house, but the school was found liable for failing to respond to the complaint of another woman who was raped by the *same* fraternity member where her assault had occurred at an "off-campus apartment complex 'close to the [Kansas State University] campus.'"[39] The Final Rule's exclusion of off-campus misconduct is arbitrary and inequitable.

### B.   The Final Rule fails to protect students from sexual harassment online.

The Final Rule fails to hold schools responsible for sexual harassment that occurs online. Students, especially young girls and women, increasingly rely on the internet and social media for access to academic, social, and career opportunities.[40] Like other forms of harassment, girls are more likely than boys to experience online sexual harassment.[41] Often, this abuse occurs in the context of dating relationships and is sometimes referred to as "cyber dating abuse."[42] Where

---

[39] Peter Baumann, *Deliberate Indifference: How to Fix Title IX Campus Sex-Assault Jurisprudence*, 106 Geo. L.J. 1139, 1151 (Apr. 2018) [hereinafter *Deliberate Indifference*] (citing *Weckhorst v. Kan. State Univ.*, 241 F. Supp. 3d 1154, 1181-82 (D. Kan. 2017), *appeal filed*, No. 17-3208 (10th Cir. Sept. 26, 2017)) (noting also that the apartments where the second alleged assault occurred were equally as close to campus as the fraternity house and off-campus site, where the fraternity event took place).

[40] *The Role of Social Media in the Job Search*, National Ass'n of Colleges & Employers (Dec. 11, 2017), https://www.naceweb.org/talent-acquisition/student-attitudes/the-role-of-social-media-in-the-job-search/; Maeve Duggan, *Online Harassment 2017*, Pew Research Center (July 11, 2017), http://www.pewinternet.org/2017/07/11/online-harassment-2017/ [hereinafter *Pew Research*].

[41] *Pew Research*, *supra* note 40; *see also Crossing the Line*, *supra* note 2 at 2.

[42] *Teen Dating Violence in Cal. Schools: Know Your Rights*, California Women's Law Center 3 (Aug. 2017), https://www.cwlc.org/download/teen-dating-violence-in-california-schools-know-your-rights/?wpdmdl=4699&ind=Q1dMQ1RlZW5EYXRpbmdWaW9sZW5jZVBhbXBobGV0MjAxN1s0XS5wZGY (citing Rebecca N. Dick *et al.*, *Cyber Dating Abuse Among Teens Using*

women and girls are exposed to sexual harassment online and on social media, they may fail to make use of those media and as a result be cut off from important educational opportunities.

The failure to stop online sexual harassment bleeds into the campus experience.  The fear, anxiety, and exhaustion brought on by the harassment remain present on-campus.  For example, a young girl who is sexually harassed online may miss school to avoid her harasser or may struggle to focus on her assignments in class due to anxiety and lack of sleep.[43]  Schools have a duty under Title IX to address these impediments to a student's equal access to education on the basis of sex, even if the harassing incident occurred online.  The Final Rule fails to meet this duty.

IV.    **The Final Rule requires schools to facilitate live cross-examination and allow voluntary mediation, creating further barriers to female survivors safely and effectively seeking justice.**

The Final Rule imposes new procedural requirements for addressing complaints of sexual harassment that create substantial obstacles to justice for women and girls who experience sexual harassment or assault in the academic environment.  The Final Rule institutes a requirement that a person who experiences sexual harassment or assault in a postsecondary institution must submit to live cross-examination, and it permits K-12 schools to provide for a live hearing.  34 C.F.R. § 106.45(b)(6).  The Final Rule also lifts the prior ban on voluntary mediation to resolve sexual harassment complaints, *id.* § 106.45(b)(9), and allows schools to facilitate informal resolution if all parties voluntarily agree in writing.  *Id.* § 106.45(b)(9)(i).  These aspects of the Final Rule are harmful to those who experience sexual harassment, primarily women and girls. Live cross-examination and voluntary mediation proceedings in the context of sexual harassment

---

*School-Based Health Centers*, 134 AM. ACAD. OF PEDIATRICS e1560 (Nov. 2014) ("[t]he 2013 National Youth Risk Behavior Survey found that more than half of high school students who experience sexual or physical abuse by a dating partner have also been bullied electronically")).
[43] *Violence Victimization*, *supra* note 9; *see also Dropped Out, supra* note 7; *Let Her Learn*, *supra* note 8.

investigations place survivors of sexual violence in unnecessarily vulnerable and potentially retraumatizing positions, and therefore have consistently been discouraged, including by the Department's 2001 and 2011 guidance.  The Final Rule places survivors at risk of unnecessarily multiplying the debilitating effects of sexual violence by making the investigation process more cumbersome, frightening, and traumatizing for survivors and instead more favorable to their assailants.[44]

### A.      Women are harmed by the live cross-examination requirement.

As discussed, women and girls already underreport instances of sexual harassment and assault.  The Final Rule subjects women attending postsecondary schools to the prospect of live cross-examination, which will only intensify already ingrained fears and trauma by adding the unnecessary turmoil of being forced to face their assailants again in person.[45]  While the Final Rule requires that cross-examination be conducted by a party's advisor rather than by a party personally, and requires that, upon a party's request, the live hearing be conducted virtually such that the parties are in separate rooms, these attempts to create some distance between the survivor and assailant do not avoid the potential for retraumatization.  Even if in separate rooms, the parties still will be able to see and hear each other in real time, so the effect for the survivor is not materially different from being in the same room.  34 C.F.R. § 106.45(b)(6).  Many women would rather forgo reporting altogether rather than face their assailant.[46]  Being forced to come face-to-face with her assailant live and in real time, even if visible only on a screen, is a reminder to the survivor of reasons why she might be hesitant to pursue the accusation.

Additionally, live cross-examination enables an opportunistic assailant to try to grab the

---

[44] *Playbook*, *supra* note 11 at 21 ("[W]hen schools fail to foster an environment in which survivors feel safe reporting, survivors are left without the accommodations they need to stay in school, and perpetrators are rarely held accountable.").

[45] *Dropped Out*, *supra* note 7.

[46] For example, one survivor wrote, "[a]fter my assault, I found it difficult to breathe or think clearly after seeing my rapist in a hallway.  I cannot imagine how I might have reacted to sitting in a room with him, where he would have been free to directly question me about my rape.  Without basic protections like this in place, other survivors may be discouraged from coming forward at all."  *Dropped Out*, *supra* note 7.

upper hand by blaming the survivor and directly attacking the complainant's reputation and credibility, perpetuating harmful and false stereotypes about women who report.[47]  Such attacks are themselves retraumatizing:

- "When survivors of sexual assault are personally cross-examined, it often adds to their trauma and may make it more difficult for them to share their stories."[48]

- "It is not uncommon for complainants to report that the suspicion and disbelief that they encounter during cross-examination feels like a repeat of the trauma of being raped—a phenomenon often referred to as 'secondary victimization.'"[49]

- "[A survivor's] son, Oliver, told a newspaper how profoundly the cross-examination had affected her.  'As soon as she came out of the courtroom, she just burst into tears,' he said.  'She had tried so hard not to do it in front of the jury.  She described it as feeling as if she had been assaulted all over again.  All that she could think was that she was being attacked.  She found that extremely hard.'"[50]

The prospect of cross-examination can even impede a survivor's ability to access memory and relay the facts of her assault.  "People with PTSD will often try to avoid thoughts and feelings about the trauma.  Yet survivors will be forced to address the trauma in excruciating detail in court.  PTSD is also associated with exaggerated feelings of blame, overly negative thoughts and assumptions about oneself, and difficulties with memory."[51]  As a result, it is

---

[47] Amelia Gentleman, *Prosecuting Sexual Assault: "Raped All Over Again*," THE GUARDIAN (Sept. 13, 2013), https://www.theguardian.com/society/2013/apr/13/rape-sexual-assault-frances-andrade-court [hereinafter *Raped All Over Again*].

[48] Sara O'Toole, Note, *Campus Sexual Assault Adjudication*, 79 U. OF PITT. L. REV. 511, 536 (May 2016) (citing Sarah Zydervelt et al., *Lawyers' Strategies for Cross-Examining Rape Complainants: Have We Moved Beyond the 1950s?*, 57 BRIT. J. CRIM. 551, 553 (May 2016)).

[49] Zydervelt, *supra* note 48, at 553.

[50] *Raped All Over Again*, *supra* note 47.

[51] Simon McCarthy-Jones, *Survivors of sexual violence are let down by the criminal justice system—here's what should happen next*, THE CONVERSATION (March 29, 2018), https://theconversation.com/survivors-of-sexual-violence-are-let-down-by-the-criminal-justice-system-heres-what-should-happen-next-94138; *see* Linda Geddes, *Why Sexual Assault Survivors Forget Details and Four Other Misconceptions About Sexual Violence*, B.B.C. FUTURE (Sept. 26, 2018), http://www.bbc.com/future/story/20180926-myths-about-sexual-assault-and-rape-debunked (citing Dr. Amy Hardy *et al.*, *Does trauma memory play a role in the experience of*

neither fair nor accurate to justify the imposition of live cross-examination as a furtherance of fact-finding, as the Final Rule purports to do.  By subjecting survivors to these retraumatizing experiences, higher education institutions risk further eroding the trust that students place in the institution itself to take their reports seriously, which is already a problem for women and girls. "Although institutional betrayal can take many forms, violation of trust is one key component. Inadequate response systems for sexual assault can foster a deep sense of mistrust among community members."[52]

The Final Rule imposes draconian consequences for any survivor who does not submit to cross-examination: "if a party or witness does not submit to cross-examination at the hearing, the decision-maker must not rely on any statement of that [person] in reaching a determination[.]" 34 C.F.R. § 106.45(b)(6)(i).  In other words, where a survivor does not submit to cross-examination, her account of the harassment or assault becomes essentially meaningless, and there may be little or no other evidentiary support for the complaint.  In addition, there may be reasons that witnesses or parties may be unavailable for cross-examination that are unrelated to the reliability of their statements and even unrelated to the basic desire to avoid a live cross-examination, such as a parallel criminal proceeding or an absence from the region.  If protection of survivors, deterrence, and punishment for assailants are the goals, then the rules should permit testimony by sworn declaration and empower decision-makers to assign appropriate weight to statements not subject to cross-examination, rather than dictating they be disregarded entirely.

## B.  Mediation in the sexual harassment context, even if "voluntary," injures women.

The Final Rule allows for voluntary mediation of sexual harassment claims, reverting to the false characterization of sexual assault as a mere disagreement, and placing survivors in the undesirable position of needing to overcome both the fear of reporting their experience and the

---

*reporting sexual assault during police interviews? An exploratory study*, 17 MEMORY 783-88 (2009), https://www.tandfonline.com/doi/abs/10.1080/09658210903081835).

[52] *Evolving Landscape*, *supra* note 9 at 431(citing Carly Parnitzke Smith & Jennifer F. Freyd, *Institutional Betrayal*, 69 AM. PSYCHOL. 575-87 (2014), https://pages.uoregon.edu/dynamic/jjf/articles/sf2014.pdf).

systemic pressures to simply forgive and move on—even when they are not ready or able to do so.

Pressuring survivors to participate in mediation proceedings exposes them to the risk of retraumatization through unnecessary and unproductive contact with their assailant.  It also allows schools to avoid taking any real responsibility for addressing the assault.  As one survivor explained, speaking of her own experience with campus mediation, "I know what campuses can do with mediation. . . . They can intimidate and break down survivors, and they can opt out of even trying to do the right thing."[53]

The Obama administration's previous ban on mediation in this context, which the Final Rule rejects, stemmed from a recognition of this potential for retraumatization and the fact that the mediation process incorrectly implies that sexual assault is a mere misunderstanding between two individuals of equal power and authority.[54]  "[M]ediation perpetuates the myth that sexual assault is simply a misunderstanding between two people, rather than what it really is: a violent abuse of power.  Mediation fetishizes compromise, which for survivors often means premature forgiveness of serious harm.  It relies on the societal expectation that 'good girls forgive,' thereby perpetuating the same gender stereotypes that Title IX was intended to eliminate."[55]  The

---

[53] Andrew Kreighbaum, *OCR: Colleges Can Use Mediation for Sex Assault*, INSIDER HIGHER ED. (Sept. 29, 2017), https://www.insidehighered.com/quicktakes/2017/09/29/ocr-colleges-can-use-mediation-sex-assault (quoting Laura Dunn, executive director of SurvJustice).

[54] Rebecca Weiant, *Removing Camouflaged Barriers to Equality: Overcoming Systemic Sexual Assault and Harassment at the Military Academies*, 25 MICH. J. GENDER & L. 75, 83 (2018) (citing U.S. Dep't of Educ., *Know Your Rights: Title IX Prohibits Sexual Harassment and Sexual Violence Where You Go to School* 2, http://www2.ed.gov/about/offices/list/ocr/docs/title-ix-rights-201104.pdf; Stephanie Saul & Kate Taylor, *Betsy DeVos Reverses Obama-Era Policy on Campus Sexual Assault Investigations*, N.Y. TIMES (Sept. 22, 2017) http://www.nytimes.com/2017/09/22/us/devos-colleges-sex-assault.html); Alexandra Brodsky, *Can Restorative Justice Change the Way Schools Handle Sexual Assault? Students and Schools Are Exploring Its Promise and Challenges*, THE NATION (April 14, 2016), https://www.thenation.com/article/what-if-punishment-wasnt-the-only-way-to-handle-campus-sexual-assault/.

[55] Grace Watkins, *Sexual Assault Survivor to Betsy DeVos: Mediation Is Not a Viable Resolution*, TIME (Oct. 2, 2017), http://time.com/4957837/campus-sexual-assault-mediation/ [hereinafter *Mediation Not Viable*] (citing *Sexual Violence Myths & Misconceptions*, ARIZONA

2001 Guidance stated that mediation would "not be appropriate even on a voluntary basis" in cases of alleged sexual assault.[56]

By reframing the ultimate goal of the resolution process as a compromise, mediation downplays the abusive nature of the assailant's behavior. "[E]mphasizing compromise shifts the focus of the dispute process from formally concluding if sexual harassment occurred" to encouraging the parties to work things out, which "frames the behavior more as 'inappropriate' or as an 'emotional problem' than as sex discrimination."[57] Moreover, in mediation there may be a power imbalance between the parties that undermines and hinders survivors' ability to get the resolution they want.

The process further minimizes the seriousness of the assailant's conduct because it removes the threat of punishment for the assailant, "even if the alleged perpetrator admits guilt."[58] By removing the threat of punishment, the mediation process removes the main deterrent to recurring incidents of sexual harassment for the assailant and the school community as a whole. "[T]his focus [also] treats the sexual harassment as a single occurrence abstracted from institutional considerations, such as deterring others who sexually harass or prompting a reluctant complainant to lodge a complaint by her knowing that another woman is charging the same respondent with sexual harassment."[59] The assailant receives the clear message from the school that the consequences of an assault are minimal, perhaps no more onerous than the

---

COALITION TO END SEXUAL & DOMESTIC VIOLENCE, https://www.acesdv.org/about-sexual-domestic-violence/sexual-violence-myths-misconceptions/ (last visited June 23, 2020)).

[56] *2001 Guidance*, *supra* note 19 at 21.

[57] Jennie Kihnley, *Unraveling the Ivory Fabric: Institutional Obstacles to the Handling of Sexual Harassment Complaints*, 25 L. & SOC. INQUIRY 69 (2000) [hereinafter *Ivory Fabric*] (citing Felicia Mitchell, *Keeping It All in the Family: Sexual Harassment Policies and Informal Resolution in Small Colleges*, NWSA JOURNAL 118-25 (1997)).

[58] *Mediation Not Viable*, *supra* note 55 (citing *How College Campuses Handle Sexual Assaults*, NPR: TALK OF THE NATION (Dec. 3, 2009), https://www.npr.org/templates/story/story.php?storyId=121057891 (Kristen Lombardi notes that mediation often results in "no punishment" and "no repercussion for anything incriminating that an alleged perpetrator might say.")).

[59] *Ivory Fabric*, *supra* note 57 at 85 (citing Stephanie Riger, *Gender Dilemmas in Sexual Harassment Policies and Procedures*, 46 AM. PSYCHOLOGIST 497-505 (1991)).

embarrassment of discussing the allegations with the survivor.

Finally, the customarily confidential nature of mediation prevents survivors from coming forward publicly with their allegations, "allowing colleges and universities to avoid damage to their reputation," even when deserved.[60]

## V. The Final Rule's "actual knowledge" requirement makes it substantially more burdensome for young women to report their complaints to the proper authorities—and therefore less likely that they will do so.

The Final Rule imposes a strict "actual knowledge" requirement, under which a postsecondary school is *not required to respond to sexual harassment at all* unless the school's Title IX coordinator or an official with authority to institute corrective measures is proven to have had "actual knowledge" of the harassment. 34 C.F.R. §§ 106.44(a), 106.30. The Final Rule's requirement of "actual" knowledge, and its strict limitations on which persons can receive actionable notice, constrain schools' obligations and make it much more difficult for survivors to report assault. *Id.*

In contrast, the 2001 Guidance required schools to address student-on-student harassment if *any employee* "knew, *or in the exercise of reasonable care should have known*" about the harassment, and the Guidance required schools to address employee-on-student harassment "*whether or not the [school] has 'notice' of the harassment.*"[61] The 2001 Guidance explained that in some cases, "the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment—if the harassment is widespread, openly practiced, or well-known to students and staff."[62] In its 2011 Guidance, the Department made no attempt to disturb these requirements, stating that "[t]he school should undertake these steps promptly once it has notice of a sexual harassment or violence allegation."[63] Moreover, when the Supreme Court laid out a stricter notice requirement (which is not applicable in this context)

---

[60] *Mediation Not Viable*, *supra* note 55.
[61] *2001 Guidance*, *supra* note 19 at 10, 13 (emphasis added).
[62] *Id.* at 13-14.
[63] *2011 Guidance*, *supra* note 20 at 15.

for a private right of action under Title IX,[64] it specifically noted that the stricter standard was not equivalent to the standard used in the Office for Civil Rights enforcement context.[65]

The new standard requiring actual notice to only one or two designated individuals is also completely contrary to sexual harassment law in the employment context. Employment laws consistently require an employer to take action based on constructive knowledge, specifically because an "actual knowledge" standard allows employers to either put their heads in the sand, or create a draconian complaint process that they can hide behind.[66] Thus, the Final Rule creates lesser protections for young women in the educational environment than for adults in the workplace, when the opposite should be the case.

Allowing schools to escape liability by claiming lack of actual knowledge exploits the very fears and insecurities that contribute to underreporting in the first place. The former standard imposed an investigatory obligation and liability based on imputed or constructive knowledge, encouraging schools to be vigilant about sexual harassment, but the Final Rule does away with that. In its place, an "actual" notice standard commands and allows for a scenario whereby, for example, if a school department is experiencing serious, pervasive sexual harassment known to all department leadership but not the Title IX coordinator, the school has no duty to respond under the Final Rule.

---

[64] *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) (holding that a recipient could only be held liable in a private right of action for monetary damages if the recipient had "actual knowledge" of student-on-student sexual harassment or assault).

[65] *Id.*; *see also Deliberate Indifference*, *supra* note 39 at 1150 (noting that many courts recognize that the "actual notice" requirement itself requires additional flexibility to prove workable even in the context of private suits for monetary relief because "[a]t the outset, it is unclear how an institution could ever ex ante have actual knowledge of a single-instance of sexual assault").

[66] For instance, if a harasser is the plaintiff's co-worker, the plaintiff must prove that the employer knew or *should have known* about the harassment and failed to take effective remedial action. *See, e.g., Reynaga v. Roseburg Forest Products*, 847 F.3d 678, 689 (9th Cir. 2017); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008) (explaining that knowledge can be imputed to the employer if a reasonable person would have known about the harassment); *see also MacCluskey v. Univ. of Conn. Health Center*, No. 17-0807, 2017 WL 6463200, at *2 (2d Cir. Dec. 19, 2017) (articulating the test for negligence as "whether (1) the employer failed to provide a reasonable avenue for complaint or (2) it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." (internal quotations and citations omitted)).

By reducing the number of individuals to whom survivors can report, the Final Rule erects another barrier that disproportionately impacts young women at postsecondary institutions.  The requirement that a student at a postsecondary institution must make direct contact with one of only a handful of designated individuals with a formal complaint will exacerbate the reluctance to report, and the existing problem of underreporting will only get worse.  As discussed, young girls and women already underreport their experiences of sexual violence, and those who do report are far more likely to report to people they trust and with whom they already have a close personal relationship.  The Final Rule requires young women to forgo these safer and more comfortable reporting options and forces them instead to seek out authority figures whom they may never have met and likely are not even aware of.

Compounding the inherent logistical difficulties of this requirement is the fact that sexual assaults on college campuses occur more frequently during students' freshman and sophomore years[67] and, specifically, "during the first few months of the first and second semesters in college."[68]  Young women who have only just arrived on campus are less likely to know or understand how to locate the Title IX Coordinator or "an official who has the authority to institute corrective measures," 34 C.F.R. § 106.30(a), let alone find the resolve to report one of the most traumatizing experiences of their lives to such an individual.  While the DOE argues that this rule provides clarity and a uniform standard, it allows schools to ignore with impunity any and all cases where a survivor does not feel comfortable contacting the necessary party.  Previously, a school was responsible if it knew of or suspected an issue, but now the onus is on the complainant to bring her issue to the "right" person.

Moreover, placing the onus on survivors to navigate a reporting system condoned by the Final Rule improperly tips the balance of justice in favor of perpetrators.  By placing the responsibility on survivors of sexual violence to navigate an ever more convoluted and

---

[67] *Campus Sexual Violence*, *supra* note 12.
[68] *Id.*; *see also* Matthew Kimble *et al.*, *Risk of Unwanted Sex for College Women: Evidence for a Red Zone*, 57 J. OF AM. COLL. HEALTH 331 (2008).

intimidating system of reporting, the regulations unjustly favor the accused, who need do nothing more than remain silent and wait for their victims to lose the courage to come forward or fail to access the proper reporting channels.  If survivors are forced to share deeply personal stories with unapproachable authority figures in settings that may lead to further traumatization, survivors are less likely to report or follow through with the process due to mental and emotional trauma.  Shifting this heavy burden onto survivors contradicts Title IX's very purpose to remove discriminatory barriers to education and places women's and girls' health and safety at risk, while simultaneously allowing offenders and schools to avoid responsibility.

## VI.   The Final Rule's requirement that a school's response merely be "not deliberately indifferent" does not ensure that a school responds appropriately to complaints of harassment.

The high bar of the "actual knowledge" requirement is exacerbated by the Final Rule's standard for measuring a school's response once it has "actual knowledge" of sexual harassment or assault.  The Final Rule states that when a school has actual knowledge, its response to a complaint of sexual harassment or assault need only be "not deliberately indifferent," which is defined to mean that the response is not "clearly unreasonable in light of the known circumstances."  34 C.F.R. § 106.44(a).  In contrast, under the prior guidance, a school was required to respond to sexual harassment with steps that were "reasonable, commonsense" and "prompt and effective."[69]  The "deliberate indifference" standard does not ensure that schools *appropriately* respond to sexual harassment allegations, and it permits a school to respond in a way that is not specifically designed to end and redress the harassment.

Here too, the Final Rule deviates from established employment law standards.  An employer may be liable for sexual harassment in the workplace under Title VII if it cannot show that it "took immediate and appropriate corrective action."[70]  Thus, a school employee will receive greater protection from harassment at work than will a more vulnerable student subjected to similar conduct.

---

[69] *2001 Guidance*, *supra* note 19 at iii, 15.
[70] 29 C.F.R. § 1604.11.

## VII.   Conclusion

The Final Rule undermines the goals of Title IX and will have profound negative effects on students and others who suffer sexual harassment or assault in academic environments—primarily women and girls.  The implementation of the Final Rule should be enjoined or stayed.

Dated: June 30, 2020

Esra A. Hudson (pro hac vice pending)
Joanna S. McCallum (pro hac vice pending)
Manatt, Phelps & Phillips, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: 310-312-4000
ehudson@manatt.com; jmccallum@manatt.com

By: */s/ Joanna McCallum*
        Joanna McCallum

David Schur
Manatt, Phelps & Phillips, LLP
1050 Connecticut Ave., N.W. #600
Washington, D.C. 20036
Telephone: 202-585-6500
dschur@manatt.com

By: */s/ David Schur*
        David Schur

Amy Poyer (pro hac vice pending)
California Women's Law Center
360 N. Pacific Coast Hwy., Ste. 2070
El Segundo, CA  90245
Telephone: 323-951-1041
amy.poyer@cwlc.org

By: */s/ Amy Poyer*
        Amy Poyer
        *Counsel for Amicus Curiae*

**ADDENDUM TO CALIFORNIA WOMEN'S LAW CENTER AMICUS CURIAE BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

The following organizations support and join in California Women's Law Center's

amicus curiae brief:

- AnitaB.org

- Berkeley High School Stop Harassing

- Clearinghouse on Women's Issues

- Community Legal Aid Southern California

- Day One

- End Rape On Campus

- FreeFrom

- Girls Inc.

- Illinois Coalition Against Sexual Assault

- Legal Aid at Work

- Maryland Coalition Against Sexual Assault

- North Carolina Coalition Against Sexual Assault

- Rocky Mountain Victim Law Center

- Victim Rights Law Center

- Women's Law Project


Each organization has its own unique mission statement and has an interest in supporting

California Women's Law Center's amicus brief.

*AnitaB.org.*  AnitaB.org is an international nonprofit that seeks to advance its mission of

intersectional gender and pay parity within the technical workforce.  As an organization

committed to the advancement and empowerment of all women and girls, safety and security is

the cornerstone from which all other progress can be made.  AnitaB.org will continue to support all survivors of sexual misconduct and vocally condemn attempts to weaken the fight against sex- and gender-based violence, wherever they may take place.

*Berkeley High School Stop Harassing*.  Berkeley High School Stop Harassing works to address sexual harassment and assault at the secondary school level where minor aged students are especially vulnerable to the ambiguous, unlawful, and conflicting elements introduced by the new Title IX rules scheduled to go into effect on August 14, 2020.  The burden on thinly staffed public school districts to implement these rules is excessive and confusing.  And many school district staff will misunderstand and misinterpret the processes, requirements, and their obligations under the new rules, at the expense of students who report sexual harassment or assault.

*Clearinghouse on Women's Issues*.  The Clearinghouse on Women's Issues ("CWI") was established in 1974 to improve the status of women nationally and internationally.  CWI works to eliminate discrimination, including sex, age, ethnicity, or marital status.  CWI signs and supports amicus briefs to legal actions that further CWI's purpose.

*Community Legal Aid Southern California*.  The mission of Community Legal Aid Southern California is to provide civil legal services to low-income individuals and to promote equal access to the justice system through advocacy, legal counseling, innovative self-help services, in-depth legal representation, economic development, and community education.

*Day One*.  The mission of Day One is to reduce sexual abuse and violence while supporting and advocating for those affected by it.  Day One is the only agency in Rhode Island that is specifically organized to deal with issues of sexual assault as a community concern.  Day One provides treatment, intervention, education, advocacy, and prevention services to Rhode

Islanders of all ages—from preschool children to elder adults.  Additionally, Day One advocates for public policy initiatives and systemic changes that positively impact how Rhode Island families handle sexual abuse cases.  Day One believes that the Final Rules will lead schools to do even less in response to sexual violence and would make it that much harder for survivors to come forward.

*End Rape On Campus.*  End Rape On Campus ("EROC") works to end campus sexual violence through direct support for survivors and their communities; prevention through education; and policy reform at the campus, local, state, and federal levels.  EROC shares a strong interest in holding the Department of Education accountable for subjecting student survivors to harsher provisions that will strip away student survivor rights, will deter student survivors from coming forward, and will retraumatize student survivors as they engage in the Title IX process as the provisions are currently laid out.

*FreeFrom.*  FreeFrom is a national non-profit based in L.A. creating pathways to financial security and long-term safety for survivors of gender-based violence.  Access to higher education is crucial for survivors to earn a degree and maximize their earning potential.  Survivors have the right to be and feel safe while enrolled in school and protected against sexual harassment and assault.  The new Title IX rule changes roll back necessary protections that would create an unsafe learning environment for survivors and inhibit their ability to pursue their degree.

*Girls Inc.*  Girls Inc. is a nonprofit organization that inspires girls to be strong, smart, and bold through direct service and advocacy.  There are 79 local Girls Inc. affiliates that provide primarily after-school and summer programming to approximately 140,000 girls ages 5-18 in the U.S. and Canada.  Girls Inc.'s comprehensive approach to whole girl development equips girls to

navigate gender, economic, and social barriers and grow up healthy, educated, and independent. Informed by girls and their families, Girls Inc. also advocates for policies and practices to advance the rights and opportunities of girls and young women.  Combating sexual harassment and assault is a top priority for Girls Inc. because of its prevalence and harmful effect on students' ability to learn and thrive at all levels of education.

*Illinois Coalition Against Sexual Assault*.  The Illinois Coalition Against Sexual Assault ("ICASA") is a statewide non-profit organization comprised of 30 community-based sexual assault crisis centers working together to end sexual violence.  The centers provide 24-hour crisis intervention services, and counseling and advocacy for victims of sexual assault and their significant others.  Each center also presents prevention education programs in its local schools and communities.  ICASA supports survivors of sexual violence and opposes the changes to the Title IX Rule, which reduce the protections for students who experience sexual violence and sexual harassment.

*Legal Aid at Work*.  Legal Aid at Work ("LAAW") is a non-profit public interest law firm whose mission is to protect, preserve, and advance the employment and education rights of individuals from traditionally under-represented communities.  LAAW has represented plaintiffs in cases of special import to communities of color, women, recent immigrants, individuals with disabilities, the LGBTQ community, and the working poor.  LAAW has litigated a number of cases under Title IX of the Education Amendments of 1972 as well as Title VII of the Civil Rights Act of 1964.  LAAW has appeared in discrimination cases on numerous occasions both as counsel for plaintiff, as well as in an amicus curiae capacity.

*Maryland Coalition Against Sexual Assault*.  The Maryland Coalition Against Sexual Assault ("MCASA") is the statewide collective voice advocating for accessible, compassionate

care for survivors of sexual assault and abuse, and accountability for all offenders.  Established in 1982 as a private, not-for-profit 501(c)(3) organization, MCASA works closely with local, state, and national organizations to address issues of sexual violence in Maryland.  It is a membership organization that includes the state's seventeen rape crisis centers, a college consortium, health care personnel, attorneys, law enforcement, other allied professionals, concerned individuals, survivors of sexual violence and their loved ones.  MCASA includes the Sexual Assault Legal Institute ("SALI"), which provides legal services for sexual assault and abuse survivors.  MCASA and SALI provide support to survivors on college campuses through on-campus office hours, training, and direct representation.

*North Carolina Coalition Against Sexual Assault.*  The North Carolina Coalition Against Sexual Assault represents survivors in campus Title IX cases and believes that the Final Rules would wipe away access to relief under federal Title IX protections.

*Rocky Mountain Victim Law Center.*  Rocky Mountain Victim Law Center ("RMVLC") is a Colorado nonprofit law firm providing free legal services to victims of crime in Colorado through our Victim Rights Legal Services, Legal Information Network of Colorado, and Title IX programs.  RMVLC elevates victims' voices, champions victims' rights, and transforms the systems impacting them.  RMVLC provides legal information, referrals, limited assistance, legal representation, technical assistance, consultation, training, and outreach to victims of crime and services providers in Colorado.  It is RMVLC's position that the Final Rule removes invaluable support for survivors and disproportionately impact survivors of color. The Final Rule makes it less likely that survivors will seek help and support after victimization.  And the Final Rule is dangerous and harmful to student survivors and campuses across our country.  RMVLC supports all efforts working to ensure the Final Rule is never formally implemented.

*Victim Rights Law Center*.  The Victim Rights Law Center ("VRLC") is a nonprofit organization dedicated to serving the legal needs of sexual assault victims, particularly adolescents and young adults.  VRLC represents over 1,000 sexual assault survivors each year in the areas of education (K-12 and campus sexual assault), immigration, privacy, safety, employment, housing, financial stability, criminal justice advocacy, and helping victims of sexual assault stabilize their lives and create a safe and healthy environment in which to live, study, and work.  The VRLC understands the importance of helping survivors find their own justice, while at the same time ensuring their own dignity, privacy, and safety.  As such, the VRLC offers a uniquely well-informed perspective on the negative impact the Department of Justice Education's May 19, 2020 Final Rule will have on students who are victims of sexual violence.

*Women's Law Project*.  The Women's Law Project is a Pennsylvania-based nonprofit women's legal advocacy organization with offices in Philadelphia and Pittsburgh.  Founded in 1974, the mission of the Women's Law Project is to create a more just and equitable society by advancing the rights and status of all women throughout their lives.  To this end, Women's Law Project engages in high-impact litigation, advocacy, and education.  The Women's Law Project is a leading voice in the struggle for the improvement of institutional responses to all forms of violence against women and has represented survivors of sexual harassment and sexual assault in Title IX actions.