# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, et al., | |
| *Plaintiffs,* | Civil Action No. 1:20-cv-01468 (CJN) |
| vs. | |
| ELISABETH DEVOS, Secretary of the U.S. Department of Education, et al., | |
| *Defendants.* | |

## BRIEF OF THE CIVIL RIGHTS AND ADVOCACY AMICI AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR STAY

_____

Kristen Clarke
D.C. Bar No. 3960085
Jon Greenbaum
D.C. Bar No. 489887
*David Hinojosa
LAWYERS' COMMITTEE FOR CIVIL
  RIGHTS UNDER LAW
1500 K Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
Email: kclarke@lawyerscommittee.org
       jgreenbaum@lawyerscommittee.org
       dhinojosa@lawyerscommittee.org

*pro hac application pending


June 30, 2020

*Cynthia E. Tobisman
*Geoffrey B. Kehlmann
GREINES, MARTIN, STEIN
& RICHLAND LLP
5900 Wilshire Boulevard, 12th Floor
Los Angeles, California 90036
Telephone: (310) 859-7811
Facsimile: (310) 276-5261
Email:  ctobisman@gmsr.com
        gkehlmann@gmsr.com
*pro hac application pending

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES      ii

STATEMENT OF INTERESTS OF AMICI CURIAE      viii

INTRODUCTION      1

ARGUMENT      3

I.      The Rule Undermines the Purpose of Title IX, is Arbitrary and Capricious, and Will Cause Irreparable Harm Because it Will Amplify the Roles of Biases, Prejudices, Stereotypes, and Discrimination Against Underserved Students and Deter Reporting and Adequate Investigations.      3

     A.      The purpose of Title IX is to prevent students from being excluded from or denied the benefits of educational opportunities because of sex-based discrimination, which significantly affects underserved students.      3

     B.      Title IX's enforcement scheme depends on individual reporting, but several changes in the Rule will cumulatively deter underserved students from reporting.      7

         1.      Arbitrary and capricious changes to reporting requirements and narrowing the scope of sexual harassment investigations contradict Title IX.      8

         2.      The arbitrary and capricious changes in the Rule will particularly harm underserved students and deprive them of Title IX's protections.      10

         3.      Law enforcement is not an option for many underserved students experiencing sexual harassment.      15

     C.      Imposing a quasi-criminal cross-examination procedure and heightened standard of proof will create an inequitable and traumatizing process for students of color, students with disabilities, and LGBTQ students who muster the courage to report sexual harassment.      17

     D.      The Rule's religious exemption changes would leave students without critical information regarding schools' Title IX compliance.      20

II.      The Balancing of Equities Weighs Heavily in Favor of Enjoining or Staying the Rule, Which Thwarts the Will of Congress and Places Survivors of Sexual Harassment in Harm's Way and Without a Safe Learning Environment.      21

CONCLUSION      23

CERTIFICATE OF SERVICE      25

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Bostock v. Clayton County, Georgia*,
 Nos. 17-1618, 17-1623, 18-107, __ S.Ct. __, 2020 WL 3146686 (June 15, 2020)       18-19

*Cent. United Life Ins. Co. v. Burwell*,
 827 F.3d 70 (D.C. Cir. 2016)                                                                                           7

*Center for Public Integrity v. United States Dep't of Defense*,
 411 F. Supp. 3d 5 (D.D.C. 2019)                                                                                   21

*Chevron U.S.A., Inc. v. NRDC*,
 467 U.S. 837 (1984)                                                                                                          7

*City of Arlington v. FCC*,
 569 U.S. 290 (2013)                                                                                                        10

*D.C. v. U.S. Dep't of Agric.*,
 No. 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020)                                  21-23

*FBME Bank Ltd. v. Lew*,
 125 F. Supp. 3d 109 (D.D.C. 2015)                                                                              21

*Jackson v. Birmingham Bd. of Educ.*,
 544 U.S. 167 (2005)                                                                                                          8

*Make the Road N.Y. v. McAleenan*,
 405 F. Supp. 3d 1 (D.D.C. 2019)                                                                                 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983)                                                                                                        8, 11

*Mylan Pharms., Inc. v. Shalala*,
 81 F. Supp. 2d 30 (D.D.C. 2000)                                                                                 21

*Texas Dep't of Hous. v. The Inclusive Communities Project*,
 135 S. Ct. 2507 (2015)                                                                                                    11

*Winter v. NRDC, Inc.*,
 555 U.S. 7 (2008)                                                                                                            21

TABLE OF AUTHORITIES

Page(s)

## Statutes, Rules and Regulations

34 C.F.R. Part 106                                                1, passim

34 C.F.R. § 106.12 (2018)                                          20

34 C.F.R. § 106.12(b)                                              20

5 U.S.C. § 706(2)(A), (C)                                           7

20 U.S.C. § 1681(a)                                                 3

20 U.S.C. §§ 1681-1688                                              3

Rule § 106.12(b)                                                   20

Rule § 106.30(a)                                                  8, 10

Rule § 106.44(a)                                                 8, 9, 10

Rule § 106.45(b)(1)(iv)                                             9

Rule § 106.45(b)(1)(iii)                                           21

Rule § 106.45(b)(1)(vii)                                           18

Rule § 106.45(b)(6)(i)                                             17

Rule § 106.71(b)(2)                                                 9

## Other Authorities

American Association of University Women Educational Foundation, *Hostile Hallways:*
  *Bullying Teasing, and Sexual Harassment in School* (2001)                      5
      https://files.eric.ed.gov/fulltext/ED454132.pdf

Angela Browne et al., *Examining Criminal Justice Responses to and Help-Seeking Patterns of*
  *Sexual Violence Survivors with Disabilities* (June 30, 2016)            14, 16, 19
      https://www.ncjrs.gov/pdffiles1/nij/grants/250196.pdf

Association of American Universities, *Report on the AAU Climate Survey on Sexual*
  *Assault and Sexual Misconduct* (Oct. 15, 2019)                                 5
      https://www.aau.edu/key-issues/campus-climate-and-safety/aau-campus-climate-survey-
      2019

# TABLE OF AUTHORITIES

**Page(s)**

Brian T. McMahon et al., *Hate Crimes and Disability in America*, 47 Rehabilitation
 Counseling Bulletin 66 (2004) .......................................................................... 6

Catherine Hill & Elena Silva, *Drawing the Line: Sexual Harassment on Campus* (2006) ... 5
 https://aauw.org/app/uploads/2020/02/AAUW-Drawing-the-line.pdf

Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus:
 Impact on GPA and School Dropout*
 18(2) J.C. Student Retention: Res., Theory & Prac. 234 (2015) ...................... 4
 https://www.researchgate.net/publication/277343957_Violence_Victimization_on_a_Colle
 ge_Campus_Impact_on_GPA_and_School_Dropout

Consortium for Citizens with Disabilities (CCD) Comment on ED-2018-OCR-0064
 (Jan. 30, 2019) .......................................................................................... 6, 11, 15
 http://www.c-c-d.org/fichiers/CCD-Title-IX-comments-1.30.19.pdf

Emily Henderson, *Bigger Fish to Fry: Should the Reform of Cross-Examination Be Expanded
 Beyond Vulnerable Witnesses?*, 19(2) Int'l J. of Evidence and Proof (2015) .............. 18

Erica L. Green & Sheryl Gay Stolberg, *Campus Rape Policies Get a New Look as the
 Accused Get DeVos's Ear, N.Y.* Times (July 12, 2017) .............................. 2-3
 https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-
 education-trump-candice-jackson.html

Gay, Lesbian and Straight Education Network (GLSEN), *The 2017 National School Climate
 Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in
 Our Nation's Schools* (2018) ................................................................ 5, 13, 19
 https://www.glsen.org/article/2017-national-school-climate-survey-1

Jerry Kang et al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124 (2012) ........ 17

Joseph Shapiro, *The Sexual Assault Epidemic No One Talks About*, NPR (Jan. 8, 2018) ... 9
 https://npr.org/2018/01/08/570224090/the-sexual-assault-epidemic-no-one-talks-about

Justin D. Levinson & Danielle Young, *Different Shades of Bias: Skin Tone, Implicit
 Racial Bias, and Judgments of Ambiguous Evidence*, 112 W. Va. L. Rev. (2010) .... 17

Kaleea R. Lewis et al., *Differential Perceptions of a Hypothetical Sexual Assault Survivor
 Based on Race and Ethnicity:  Exploring Victim Responsibility, Trauma, and Need for
 Social Support*, 67 Journal of American College Health (2019). ........................ 13

Karen Schulman, Kayla Patrick & Neena Chaudhry, Nat'l Women's Law Ctr., *Let Her
 Learn: Stopping School Pushout for Girls with Disabilities* (2017) .................. 6
 https://nwlc.org/wp-content/uploads/2017/04/Final_nwlc_Gates_GirlsWithDisabilities.pdf

# TABLE OF AUTHORITIES

**Page(s)**

Katelyn Burns, *Leaked Title IX Rule Would Allow Religious Schools to Discriminate—Without Saying Why*, Rewire News (Sept. 18, 2018) 20
https://rewire.news/article/2018/09/18/leaked-title-ix-rule-would-allow-religious-schools-to-discriminate-without-saying-why/

Kayla Patrick and Neena Chaudhry, Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence Nat'l Women's Law Ctr.* (2017) 4
https://nwlc.org/wp-content/uploads/2017/04/final_nwlc_Gates_HarassmentViolence.pdf

Kirwan Institute for the Study of Race and Ethnicity, *State of the Science: Implicit Bias* Review (2016) 11-12
http://kirwaninstitute.osu.edu/wp-content/uploads/2016/07/implicit-bias-2016.pdf

Lauren Rosenblatt, *Q&A: Why it's harder for African American women to report campus sexual assaults, even at mostly black schools*, LA Times (Aug. 28, 2017) 15
https://www.latimes.com/politics/la-na-pol-black-women-sexual-assault-20170828-story.html

Lawyers' Committee for Civil Rights Under Law Comment on ED Docket No. ED-2018-OCR-0064 (Jan. 30, 2019) 11

Leadership Conference on Civil and Human Rights Comment ED Docket No. ED-2018-OCR-0064 (Jan. 30, 2019) 11
https://civilrights.org/resource/civil-and-human-rights-community-joint-comment-on-title-ix-nprm/

Leigh Ann Davis, M.S.S.W., M.P.A., *People with Intellectual disability and Sexual Violence*, The Arc, at 2 (Mar. 2011) 16
https://thearc.org/wp-content/uploads/forchapters/Sexual%20Violence.pdf

Mary Beth Szydlowski, Advocates for Youth, *Sexual Health Education for Young People with Disabilities – Research and Resources for Educators* (Feb. 2016) 14
https://advocatesforyouth.org/resources/fact-sheets/sexual-health-education-for-young-people-with-disabilities/

Mary Dutton et al., *Characteristics of Help-Seeking Behaviors, Resources and Service Needs of Battered Immigrant Latinas: Legal and Policy Imp*lications
7 Geo. J. on Poverty L. & Pol'y 245 (2000) 15
http://bit.ly/Dutton2000

# TABLE OF AUTHORITIES

**Page(s)**

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students— 19 States and Large Urban School Districts, 2017*,
   63 Morbidity and Mortality Weekly Report (Jan. 25, 2019)    5
   https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf

NAACP Legal Defense and Educ. Fund, Inc. & Nat'l Women's Law Ctr., *Unlocking Opportunity for African American Girls: A Call to Action for Educational Equity* (2014)    12
   https://nwlc.org/wp-content/uploads/2015/08/unlocking_opportunity_for_african_american_girls_report.pdf

Nancy Chi Cantalupo, *And Even More of Us Are Brave: Intersectionality & Sexual Harassment of Women* Students *of Color*, 42 Harvard J.L. & Gender    19
   https://ssrn.com/abstract=3168909

National Council on Disability, *Not on the Radar: Sexual Assault of College Students with Disabilities* (Jan. 30, 2018)    6
   https://ncd.gov/publications/2018/not-radar-sexual-assault-college-students-disabilities

National Women's Law Center Comment on ED Docket No. ED-2018-OCR-0064 (Jan. 30, 2019)    11
   https://nwlc.org/wp-content/uploads/2019/02/NWLC-Title-IX-NPRM-Comment.pdf

Nat'l Women's Law Ctr. & Girls for Gender Equity, *Listening Session on the Needs of Young Women of Color* (2015)    13
   http://whatkidscando.org/pdf/GirlsforGenderEquity_Report.pdf

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,
   85 Fed. Reg. 30,026 (May 19, 2020)    1, 10

Rebecca Epstein et al., *Girlhood Interrupted:  The Erasure of Black Girls' Childhood*, Center on Poverty and Inequality, Georgetown Law (2017)    12
   https://www.law.georgetown.edu/poverty-inequality-center/wp-content/uploads/sites/14/2017/08/girlhood-interrupted.pdf    12

Rhiannon Fogliati & Kay Bussey, *The Effects of Cross-Examination on Children's Coached Reports*, 21 Psychol. Pub. Pol'y & L. 10 (2015)    18

Robert W. S. Coulter et al., *Prevalence of Past-Year Sexual Assault Victimization Among Undergraduate Students: Exploring Differences by and Intersections of Gender Identity, Sexual* Identity*, and Race/Ethnicity*, Prevention Science (2017)    6

# TABLE OF AUTHORITIES

**Page(s)**

Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?,* N.Y. Times
(Aug. 5, 2016)                                                                                    9
https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-
cost who-knows.html

Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, (Dec. 2016)   5, 15-16
https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf

*The Effects of Cross-Examination on Children's Coached Reports*,
21 Psychol. Pub. Pol'y & L. 10 (2015)                                                    18-19

United Educators, *Facts From United Educators' Report - Confronting Campus Sexual
Assault: An Examination of Higher Education Claims* (2015)                                  9
https://www.ue.org/sexual_assault_claims_study

U.S. Dep't of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance:
Harassment of Students by School Employees, Other Students, or Third Parties,*
Title IX (2001)                                                                      8, 10, 22
https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html

## STATEMENT OF INTERESTS OF AMICI CURIAE

Each Amici (collectively, "Civil Rights and Advocacy Amici") has a demonstrated interest of ensuring Title IX remains an enforceable civil rights act to protect students, especially underserved students of color, students with disabilities, and LGBTQ students, from sexual harassment, to redress sexual harassment, and to ensure students secure the benefits of and maintain equal access to a school's educational resources and opportunities.  Nearly all filed comments, individually or jointly with other organizations, in January 2019 in response to the Department's then-proposed Title IX rule concerning sexual harassment and assault investigations, which is the subject of this litigation, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. Part 106) ("Rule").

Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee") is a nonpartisan, nonprofit organization that was formed in 1963 at the request of President John F. Kennedy to involve the private bar in providing legal services to address racial discrimination.  The mission of the Lawyers' Committee is to secure equal justice under law, through the rule of law, targeting in particular the inequities confronting African-Americans and other racial and ethnic minorities.  The principal mission of the Educational Opportunities Project at the Lawyers' Committee is to ensure that all children have access to quality educational opportunities and to enforce civil rights protections for all students.  The Educational Opportunities Project achieves its mission by advocating on behalf of students of color, including those students with disabilities and those who identify as women and girls and as LGBTQ. This work includes litigation, public policy advocacy, and know-your-rights trainings advocating for the rights of persons of color under Title IX and ensuring they are able to access equal educational opportunities free from discrimination based on their sex, including sexual harassment and sexual assault.

The American Humanist Association ("AHA") is a national nonprofit membership organization based in Washington, D.C.  Founded in 1941, the AHA is the nation's oldest and largest humanist organization.  The AHA has tens of thousands of members and hundreds of chapters and affiliates across the country.  Humanism is a progressive lifestance that affirms—without theism or other supernatural beliefs—our responsibility to lead meaningful and ethical lives that add to the greater good of humanity.  The mission of the AHA's legal center is to protect one of the most fundamental principles of our democracy: the separation of church and state.  To that end, the AHA has litigated dozens of First Amendment cases nationwide, including in the U.S. Supreme Court.

The Education Law Center-PA ("ELC") is a non-profit, legal advocacy organization dedicated to ensuring that all students in Pennsylvania have access to a quality public education. ELC's priority areas include ensuring all students have equal access to safe and supportive schools and the full range of services and programs they need to succeed.  ELC works to eliminate systemic inequalities that lead to disparate educational outcomes based on race, gender, sexual orientation, gender expression, disability status, poverty, system-involvement, and other categories.  During ELC's forty-plus-year history, the organization has handled thousands of individual matters and impact cases, including multiple class action lawsuits.  ELC joins in this amicus brief due to its grave concerns that this Rule undermines the purpose of Title IX, is arbitrary and capricious, and will disproportionately impact students of color, students with disabilities, and LGBTQ students who are more likely to be victimized by sexual harassment in schools.

Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal") is the nation's oldest and largest non-profit legal organization committed to achieving full recognition of the civil rights of LGBTQ people, and people living with HIV through impact litigation, education, and public policy work.  Lambda Legal has extensive experience litigating cases, either as party counsel or amicus curiae, concerning the obligation of educational institutions to protect students

from discrimination and harassment at school on the basis of sexual orientation and gender identity.  *See, e.g.*, *Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996); *Adams ex rel. Kasper v. Sch. Bd. Of St. Johns Cty., Fla.*, 318 F. Supp. 3d 1293 (M.D. Fla. 2018); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267 (W.D. Pa. 2017); *Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135 (N.D.N.Y. 2011); *Henkle v. Gregory*, 150 F. Supp. 2d 1067 (D. Nev. 2001); *Colin ex rel. Colin v. Orange Unified Sch. Dist.*, 83 F. Supp. 2d 1135 (C.D. Cal. 2000); *E. High Sch. PRISM Club v. Seidel*, 95 F. Supp. 2d 1239 (D. Utah 2000); *E. High Gay/Straight Alliance v. Bd. of Educ. of Salt Lake City Sch. Dist.*, 81 F. Supp. 2d 1166 (D. Utah 1999).

The National Association of Councils on Developmental Disabilities ("NACDD") is the national nonprofit membership association for the Councils on Developmental Disabilities ("Councils") located in every State and Territory.  The Councils are authorized under federal law to engage in advocacy, capacity-building, and systems-change activities that ensure that individuals with developmental disabilities and their families have access to needed community services, individualized supports, and other assistance that promotes self-determination, independence, productivity, and integration and inclusion in community life.

The National Center for Parent Leadership, Advocacy and Community Empowerment ("National PLACE") has a membership of 65 local, state, and national parent-led organizations.  Its mission is to strengthen the voice of families and family-led organizations at decision-making tables to ensure that families and family-led organizations have a powerful voice and influence on all of the issues and decisions that impact children and families, especially those facing the greatest barriers and challenges due to disability/special healthcare needs, discrimination based on race, ethnicity, language, immigrant status, poverty, and other special circumstances.  Its members provide support to families of infants, toddlers, children, youth, and young adults, including the youth and young adults on college campuses who would be most harmed by the proposed rule, and thus, have an interest in the outcome of the case.

The National Center for Special Education in Charter Schools ("the Center") is dedicated to ensuring that students with disabilities have equal access to public charter schools and that such schools are designed and operated to enable all students to succeed. Founded in 2013, the Center is the first organization to focus solely on working with states, charter authorizers, special education advocates, and charter school organizations to improve access and create dynamic learning opportunities for the 300,000+ students with disabilities that attend school in one of the 7,000 public charter schools across 43 states and the District of Columbia. The Center is the leading voice for equity in the charter sector and upholds an unequivocal commitment to all students with disabilities and their families—regardless of whether students are enrolled in a traditional district public school or a public charter school.

No party nor counsel for a party authored the brief in whole or in part, and no party, counsel for a party, or person other than Civil Rights and Advocacy Amici, their members, or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

**INTRODUCTION**

Title IX of the Education Amendment Act of 1972 is the landmark federal civil rights law meant to ensure that students can benefit from educational opportunities free from discrimination on the basis of sex, including sexual harassment.[1]  Unfortunately, such discrimination is rampant—for example, more than one out of every four college women has experienced some form of unwanted sexual contact.  Thus, Title IX is crucial to fostering a safe and supportive school experience.

Yet, the United States Department of Education's final rule, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. Part 106) ("Rule"), will not make schools safer.  Instead, it will usher in a new, restrictive era of Title IX regulations that tilts heavily in favor of alleged perpetrators of sexual harassment, discourages reporting, and undermines the intent and purpose of Title IX.  The impact will be even harsher on underserved students (students of color, students with disabilities, and LGBTQ students) who, because of bias, prejudice, discrimination, and racism, already underreport sexual harassment.

Before the Department adopted its new regulations, an array of civil rights organizations, including Civil Rights and Advocacy Amici, explained in their comments to the Department that Title IX's civil rights enforcement procedures remain a critical refuge for underserved students. The Civil Rights and Advocacy Amici warned that narrowing the definition of sexual harassment, letting schools off the hook for off-campus incidents, limiting the persons to whom a report triggers an investigation, transforming the investigation regime into a quasi-criminal proceeding, and other changes that reverse decades of Title IX policies would both harm underserved students and conflict with the purpose of Title IX.

---

[1] Unless otherwise stated, "sexual harassment" refers to all forms of sexual harassment prohibited by Title IX, including sexual assault and sexual violence.

The Department went ahead anyway.  By transforming the Title IX sexual harassment investigation regime into quasi-criminal proceedings, the Rule will have a particularly chilling effect on many underserved students who already underreport incidents of sexual harassment. Indeed, Title IX remains the only avenue of recourse for many of these students, as law enforcement is not seen as a viable option for many.  As events transpiring across the nation over the last several weeks have magnified, there is a lack of faith and trust in law enforcement born from systemic negative stereotypes, bias, prejudice, discrimination, and racism, particularly for the Black community.  Thus, Title IX is a critical avenue for redress for underserved students.

But rather than confront the pernicious influences that lead underserved student populations to underreport sexual assault, the Rule will amplify those influences.  Under the Rule, it will be more difficult for vulnerable students to report harassment and less likely that they will be believed when they do muster the courage to ask for help.  The needs of underserved students will not be met under the newly designed process that constantly questions their legitimacy and honesty.  This adversarial regime, which applies exclusively to address sexual harassment—not other misconduct under Title IX and alleged misconduct under other civil rights statutes, like Title VI of the Civil Rights Act of 1964—and which senselessly imports elements of criminal procedure, will undoubtedly deter many students from seeking protection from sexual harassment.  Simply put, the Rule will undermine Title IX's stated purposes.

There is no good reason why.  The Department's lengthy 500-page preamble to the Rule certainly does not explain it.  Yet one thing is clear:  the Department's singling out of sexual harassment complaints strongly suggests that the Department views complaints of sexual harassment (primarily from women and girls) as less credible.  Public comments by the Department effectively confirm as much.  For example, the Department's former Acting Assistant Secretary for Civil Rights, Candice Jackson, baldly claimed that in most Title IX sexual assault investigations, there is "not even an accusation that these accused students overrode the will of a young woman."  Erica L. Green & Sheryl Gay Stolberg, *Campus Rape*

*Policies Get a New Look as the Accused Get DeVos's Ear*, N.Y. Times (July 12, 2017).[2]  She

went on to explain:  "Rather, the accusations—90 percent of them—fall into the category of

'we were both drunk,' 'we broke up, and six months later I found myself under a Title IX

investigation because she just decided that our last sleeping together was not quite right.'"  *Id.*

Defendant Secretary Devos, fueled by apparent sexist animus toward survivors,

spearheaded the Department's reengineering of Title IX from a civil rights statute to a shield for

perpetrators of harassment.  But the Department does not have the power to transform a law

enacted by Congress in such a manner.  Regulations like the Rule, which greatly undercut

protections from sexual harassment for underserved students, cannot pass muster under the

Administrative Procedure Act.  As shown below, the changes in the Rule fly in the face of

Title IX.  They are arbitrary and capricious.  And the substantial risks and consequences

associated with the Rule's implementation demonstrate how the balancing of hardships and the

public interest weigh heavily in favor of granting the injunction, and, alternatively, a stay.

## ARGUMENT

**I.**  **The Rule Undermines the Purpose of Title IX, is Arbitrary and Capricious, and Will Cause Irreparable Harm Because it Will Amplify the Roles of Biases, Prejudices, Stereotypes, and Discrimination Against Underserved Students and Deter Reporting and Adequate Investigations.**

**A.**  **The purpose of Title IX is to prevent students from being excluded from or denied the benefits of educational opportunities because of sex-based discrimination, which significantly affects underserved students.**

Title IX (20 U.S.C. §§ 1681-1688) was enacted to help ensure that students at state and

local institutions receiving federal funds have equal access to educational opportunities and

benefits free from discrimination on the basis of sex, including sexual harassment in all of its

forms.  20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be

---

[2] https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance").

Title IX's goal of eradicating sexual harassment is paramount because sexual harassment can have a devastating impact on students. Survivors of sexual harassment often develop post-traumatic stress disorder and anxiety, see their grades drop, withdraw from classes and extracurricular activities, and even leave school for good. Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. Student Retention: Res., Theory & Prac. 234, 235, 236-37, 244 (2015).[3] Survivors of sexual harassment experience negative physical and social effects, including trauma-induced illness, chronic pain and eating disorders, and increased likelihood of engaging in dangerous behaviors such as drug and alcohol abuse. Kayla Patrick and Neena Chaudhry, Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence Nat'l Women's Law Ctr.*, at 7 (2017).[4] They may also develop feelings of powerlessness or behavioral and learning problems. *Id.* Studies also show that they are subjected to exclusionary discipline and increased risks to sex trafficking and predators. *Id.* at 8.

Unfortunately, sexual harassment is highly prevalent in schools, especially among students of color, students with disabilities, and LGBTQ students, as well as students with intersectional identities. In a national survey of students in grades eight through eleven, 67 percent of Black girls reported being "touched, grabbed, or pinched in a sexual way," compared to 56 percent of White girls, and 28 percent of Black girls reported being "forced to kiss someone," compared to 15 percent of White girls. American Association of University Women Educational Foundation, *Hostile Hallways: Bullying Teasing, and Sexual Harassment in School*, at 31-32 (2001).[5] At the college level, research suggests that, though underreported, rates for all

---

[3] https://www.researchgate.net/publication/277343957_Violence_Victimization_on_a_College_Campus_Impact_on_GPA_and_School_Dropout
[4] https://nwlc.org/wp-content/uploads/2017/04/final_nwlc_Gates_HarassmentViolence.pdf
[5] https://files.eric.ed.gov/fulltext/ED454132.pdf

racial and ethnic groups are high—American Indian or Alaska Native (18.7%), Latinx (14.9%), White (14.7%), Other or multi-racial (14.5%), Black or African American (12.7%), and Native Hawaiian or Other Pacific Islander (11.9%).  Association of American Universities, *Report on the AAU Climate Survey on Sexual Assault and Sexual Misconduct*, at A7-36 (Oct. 15, 2019) ("2019 AAU Climate Survey").[6]

In addition, more than one-half of LGBTQ students ages 13-21 are sexually harassed at school.  *See* Gay, Lesbian and Straight Education Network (GLSEN), *The 2017 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, at 26 (2018) ("2017 National School Climate Survey").[7]  In fact, one study found that nearly three-quarters (73%) of LGBT students were sexually harassed in college.  Catherine Hill & Elena Silva, *Drawing the Line: Sexual Harassment on Campus*, at 17, 19, fig. 4 (2006).[8]  Nearly one in five (18%) of those students were harassed on a frequent basis, more than twice the rate among heterosexual students (7%).  *Id.*

Transgender students are especially vulnerable.  A recent study published by the Center for Disease Control found that nearly one-quarter of transgender students experienced sexual dating violence, were forced to have sexual intercourse, and were bullied.  Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts, 2017*, 63 Morbidity and Mortality Weekly Report 67, 69 (Jan. 25, 2019).[9]  Another study found that 24 percent of respondents in grades K-12 who were out as or perceived as transgender were physically attacked, 13 percent were sexually assaulted, and nearly one in five left school because of the severity of their mistreatment.  Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, at 133-135 (Dec. 2016) ("2015 USTS Survey").[10]

---

[6] https://www.aau.edu/key-issues/campus-climate-and-safety/aau-campus-climate-survey-2019
[7] https://www.glsen.org/article/2017-national-school-climate-survey-1
[8] https://aauw.org/app/uploads/2020/02/AAUW-Drawing-the-line.pdf
[9] https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf
[10] https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf

Transgender students of color were more likely to leave school as a result of mistreatment than White students (16%) and rates were higher among other groups:  American Indian (39%), Middle Eastern (36%), Black (22%), and Multiracial (21%).  *Id.* at 135.

These high rates of victimization follow transgender students into college:  24 percent were verbally, sexually, or physically harassed because of being transgender, and 16 percent of those students left school because of mistreatment.  *Id.* at 136; *see also* 2019 AAU Climate Survey, at ix.  Among the transgender undergraduate population, Black transgender students are significantly more likely to be assaulted than White transgender students.  Robert W. S. Coulter et al., *Prevalence of Past-Year Sexual Assault Victimization Among Undergraduate Students: Exploring Differences by and Intersections of Gender Identity, Sexual Identity, and Race/Ethnicity*, Prevention Science (2017).

Students with disabilities, too, are particularly vulnerable to sexual assault.  This is so for several reasons, "including physical challenges that can prevent them from protecting themselves, stereotypes about people with disabilities, and lack of opportunities for comprehensive sexual education."  Consortium for Citizens with Disabilities (CCD) Comment on ED-2018-OCR-0064, at 2 (Jan. 30, 2019) ("CCD Comment").[11]

Children with disabilities are nearly three times more likely to be sexually assaulted than children without disabilities.  Karen Schulman, Kayla Patrick & Neena Chaudhry, Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls with Disabilities*, at 7 (2017).[12]  A recent study found that in higher education, 31.6 percent of undergraduate women with disabilities reported nonconsensual sexual contact involving physical force or incapacitation, compared to 18.4 percent of undergraduate women without a disability.  National Council on Disability, *Not on the Radar: Sexual Assault of College Students with Disabilities*, at 11 (Jan. 30, 2018) ("National Council on Disability").[13]  In addition, analysts at the Federal

---

[11] http://www.c-c-d.org/fichiers/CCD-Title-IX-comments-1.30.19.pdf

[12] https://nwlc.org/wp-content/uploads/2017/04/Final_nwlc_Gates_GirlsWithDisabilities.pdf

[13] https://ncd.gov/publications/2018/not-radar-sexual-assault-college-students-disabilities

Bureau of Investigation found that hate crimes against persons with disabilities occurred more often at college campuses. Brian T. McMahon et al., *Hate Crimes and Disability in America*, 47 Rehabilitation Counseling Bulletin 66, 71-72 (2004). Rape was the third most frequent hate crime committed against persons with disabilities. *Id.* at 71. And people with disabilities who are also transgender experience yet greater rates of sexual assault—more than 60 percent of transgender persons with disabilities reported being sexually assaulted at least once. 2015 USTS Survey, *supra*, at 205. In K-12, more than four out of five (82%) transgender students with disabilities, or students perceived as such, were mistreated because of being transgender. *Id.* at 132.

The conclusions from the voluminous data are crystal clear: students of color, students with disabilities, and LGBTQ students need robust Title IX enforcement to share in the promise of equal educational opportunities. Yet, the Rule is designed to work against such assurances, as demonstrated below.

### B. Title IX's enforcement scheme depends on individual reporting, but several changes in the Rule will cumulatively deter underserved students from reporting.

Under the Administrative Procedure Act ("APA"), the Court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). "Where Congress 'has directly spoken' to the parameters of the agency's authority, 'the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016) (quoting *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984)). Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Encouraging reporting of sexual harassment is critical to giving effect to Title IX's remedial purposes. The Supreme Court has not minced words: "Title IX's enforcement scheme . . . depends on individual reporting." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005). Thus, any rational attempt to pursue the goals of Title IX would seek to *ease* the reporting burdens on students. The Rule does the opposite, disregarding congressional intent in an arbitrary and capricious manner with no adequate justification. It therefore violates the APA.

### 1. Arbitrary and capricious changes to reporting requirements and narrowing the scope of sexual harassment investigations contradict Title IX.

Under the Rule, schools will have no obligation to act if the alleged misconduct does not fit a narrow definition of sexual harassment. Rule §§ 106.30(a), 106.44(a). The Rule defines sexual harassment as including quid pro quo harassment on the basis of sex, and sexual assault, dating violence, domestic violence or stalking (per applicable statutes). Rule § 106.30(a). But if the conduct meets neither standard, it must be "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." *Id.* (emphasis added).

This stricter definition contrasts sharply with the Department's 2001 guidance and goes further than the standard governing liability for hostile environments, which previously proscribed conduct that was "severe, persistent, *or* pervasive." U.S. Dep't of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, Title IX, at vi, 2 (2001) (emphasis added) ("2001 Guidance").[14] Because the Rule now requires the sexual harassment to be "severe, pervasive

---

[14] https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html

*and* objectively offensive," students will be forced to face escalating harassment from a student or teacher before schools must initiate an investigation.

Moreover, under the Rule, schools will have no obligation to act if the sexual harassment occurs outside of an "education program or activity" not controlled by the school. Rule § 106.44(a).  The necessary and logical effect will be that schools will not address off-campus and online incidents, even if those incidents have damaging effects on campus.  For instance, if a transgender student of color is raped off campus, and that student has a class with their perpetrator, the school will not be required to investigate and institute any appropriate protections.  This change is almost certain to harm a substantial number of students, given that nearly nine in ten college students live off campus (Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*, N.Y. Times (Aug. 5, 2016)),[15] and 41 percent of college sexual assaults involve off-campus parties.  United Educators, *Facts From United Educators' Report - Confronting Campus Sexual Assault: An Examination of Higher Education Claims* (2015).[16]

And that is not all as the Rule imposes yet other hurdles to enforcement.  For example, unlike the implementing regulations for other civil rights laws, the Rule requires schools to start their investigations with the presumption that no sexual harassment occurred.  Rule § 106.45(b)(1)(iv).  This will effectively force schools to presume that the students who report sexual harassment are lying, skewing the proceedings in favor of the respondent.  Even worse, the Rule permits schools to charge students with making false statements—an individual who the school determines to have made a materially false statement in bad faith in the course of a grievance proceeding may be charged with violating applicable provisions of the recipient's code of conduct.  Rule § 106.71(b)(2).  Thus, the Rule will perpetuate and hamstring women with the sexist myth that women and girls tend to lie about sexual harassment.

---

[15] https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-cost-who-knows.html
[16] https://www.ue.org/sexual_assault_claims_study

Additionally, students will have fewer places to turn under the Rule.  Title IX protections were previously triggered by a complaint to anyone whom "a student could reasonably believe" had the authority to redress sexual harassment or had the duty to report student misconduct to appropriate school officials.  85 Fed. Reg. at 30,038-39.  Now, institutions of higher education need only respond to incidents of sexual harassment that are reported to the Title IX coordinator or a school official with "the authority to institute corrective measures."  Rule § 106.30(a).

And the Rule would hold schools responsible under Title IX only when they are "deliberately indifferent," Rule § 106.44(a)—meaning that schools will be subject to a standard that is far lower than the one established under existing guidance.  The 2001 guidance requires schools to act "reasonably" and "take immediate and effective corrective action" to resolve harassment complaints.  2001 Guidance, *supra*, at 13 & n.72.

Collectively, these provisions can be expected to prevent and deter complaints, investigations and remedies of otherwise actionable and harmful sexual harassment, thus, conflicting with the broad sweep of Title IX's power as intended by Congress in violation of the APA.  *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013) (In determining whether agency action exceeds statutory authority, "the question . . . is always whether the agency has gone beyond what Congress has permitted it to do.").  Indeed, the Department has acknowledged as much, noting that the Rule will result in a 33 percent reduction in investigations for post-secondary schools and a 50 percent reduction for K-12 schools and reductions in hearings, decisions, and informal resolutions.  85 Fed. Reg. at 30,551, 30,565-68.

### 2.   The arbitrary and capricious changes in the Rule will particularly harm underserved students and deprive them of Title IX's protections.

The changes to the definition of sexual harassment, scope of investigations and other reporting requirements detailed above will have demonstrable and detrimental impacts on underserved students.  The Department's failure to meaningfully consider evidence of these impacts, which were presented through numerous comments from Civil Rights and Advocacy

Amici and others,[17] and to, instead, marshal forward a plan wrought with its implausible decisions to ensure reports of sexual harassment decreased, violates the APA. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. The detrimental impact of the Rule's provisions on underserved students can be expected based on several reasons.

First, underserved students already suffer the effects of systemic implicit and explicit bias, prejudice, discrimination and stereotypes. Everyone possesses unconscious associations— "implicit bias"—that allow "attitudes or stereotypes" to influence their "understanding, actions, and decisions." Kirwan Institute for the Study of Race and Ethnicity, *State of the Science: Implicit Bias Review*, at 14 (2016) ("Kirwan").[18] Because people "are constantly exposed to certain identity groups being paired with certain characteristics, we can begin to automatically and unconsciously associate the identity with the characteristics, whether or not that association aligns with reality." *Id.* For example, the history of dehumanization of Black people during slavery and the Jim Crow era and current pop culture portrayals of Black people have created a strong implicit association between Black people and criminal activity. *Id.* at 14, 26.

Implicit bias can lead to structural inequality and discrimination. The Supreme Court acknowledged as much in striking down housing discrimination based, in part, on "unconscious prejudices." *Texas Dep't of Hous. v. The Inclusive Communities Project*, 135 S. Ct. 2507, 2522 (2015) ("Recognition of disparate impact liability under the FHA also plays a role in uncovering discriminatory intent: It permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment. In this way disparate-impact liability may prevent segregated housing patterns that might otherwise result from covert and

---

[17] *See, e.g., supra* n. 11 (CCD Comment); Lawyers' Committee for Civil Rights Under Law Comment on ED Docket No. ED-2018-OCR-0064 (Jan. 30, 2019) (on file with the Department); National Women's Law Center Comment on ED Docket No. ED-2018-OCR-0064 (Jan. 30, 2019) https://nwlc.org/wp-content/uploads/2019/02/NWLC-Title-IX-NPRM-Comment.pdf ; Leadership Conference on Civil and Human Rights Comment ED Docket No. ED-2018-OCR-0064 (Jan. 30, 2019) https://civilrights.org/resource/civil-and-human-rights-community-joint-comment-on-title-ix-nprm/.
[18] http://kirwaninstitute.osu.edu/wp-content/uploads/2016/07/implicit-bias-2016.pdf

illicit stereotyping.").  Implicit bias impacts decisions in education, too, and the Rule will only amplify harmful attitudes and stereotypes in that arena.  *See, e.g.*, Kirwan, *supra*, at 34-40 (noting research showing disparate discipline practices toward students of color, negative attitudes of pre-service teachers toward students of color, and professors' biases in favor of meeting with White males over others for mentorship opportunities).

Stereotypes about students of color as hypersexualized and "aggressive" make it less likely that misconduct against them will be deemed "severe" *and* "pervasive" *and* "objectively offensive," which will accordingly discourage them from reporting.  For example, Black women and girls are commonly stereotyped as "Jezebels," Latina women and girls as "hot-blooded," Asian American and Pacific Islander women and girls as "submissive, and naturally erotic," Native women and girls as "sexually violable as a tool of war and colonization," and multiracial women and girls as "tragic and vulnerable, and historically products of sexual and racial domination" (internal quotations and brackets omitted).  Nancy Chi Cantalupo, *And Even More of Us Are Brave: Intersectionality & Sexual Harassment of Women Students of Color*, 42 Harvard J.L. & Gender 1, 16, 24-25.[19]  Stereotypes of Black girls and women as "aggressive" and "promiscuous" date back to slavery, and research shows that these stereotypes have an impact on teachers and administrators, who often misidentify Black girls who defend themselves against their harassers as the aggressors.  NAACP Legal Defense and Educ. Fund, Inc. & Nat'l Women's Law Ctr., *Unlocking Opportunity for African American Girls: A Call to Action for Educational Equity*, at 5, 25 (2014).[20]

Black girls are also regularly "adultified" and viewed as less innocent and less needing of protection.  Rebecca Epstein et al., *Girlhood Interrupted:  The Erasure of Black Girls' Childhood*, Center on Poverty and Inequality, Georgetown Law, at 4-5 (2017).[21]  Black and

---

[19] https://ssrn.com/abstract=3168909
[20] https://nwlc.org/wp-content/uploads/2015/08/unlocking_opportunity_for_african_american_girls_report.pdf
[21] https://www.law.georgetown.edu/poverty-inequality-center/wp-content/uploads/sites/14/2017/08/girlhood-interrupted.pdf

Latina victims are also more likely to be blamed, as compared to White victims.  Kaleea R. Lewis et al., *Differential Perceptions of a Hypothetical Sexual Assault Survivor Based on Race and Ethnicity:  Exploring Victim Responsibility, Trauma, and Need for Social Support*, 67 Journal of American College Health 308, 312 (2019).  Aware that society sees them in this way, students of color will rightfully be skeptical that schools will view their experiences with sexual harassment as sufficiently serious to investigate, leading to lower rates of reporting.  *See* Nat'l Women's Law Ctr. & Girls for Gender Equity, *Listening Session on the Needs of Young Women of Color*, at 2, 7 (2015).[22]

LGBTQ students, too, will be more hesitant to report sexual harassment under the Rule. Even now, LGBTQ students have concerns about reporting sexual harassment.  Over half of LGBTQ students who were harassed or assaulted at school never reported the incidents.  2017 National School Climate Survey, *supra*, at 28.  The most common reason for this failure to report was doubt that the school would do anything about the harassment.  *Id.*  Sadly, this doubt is well founded.  Nearly two-thirds of LGBTQ students who reported harassment said that school staff did nothing in response or told them to ignore the harassment, while over one in five said that school staff told the student to change their behavior to avoid harassment, such as not acting "so gay" or dressing in a certain way.  *Id.* at 30-31.  Another reason that students gave for not reporting was fear of being "outed" to the school staff, their families, and their harassers.  *Id.*

The Rule would exacerbate *every one* of these concerns.  By weakening federal oversight and watering down what constitutes actionable sexual harassment, the Rule will contribute to the perception that reporting will do nothing to address a harassment situation, since schools will have less responsibility to do anything about it.  The Rule's restrictions on which people a student can make a report to will prevent students from approaching the LGBTQ-friendly school staff.  And the new grievance procedures that mandate the disclosure of the victim's identity to

---

[22] http://whatkidscando.org/pdf/GirlsforGenderEquity_Report.pdf

the alleged harasser will empower harassers to "out" LGBTQ students or seek violent retaliation against them.  Thus, instead of decreasing barriers to reporting, the Rule will erect new ones.

Similarly, students with disabilities are also expected to be further deterred from reporting under the Rule.  Students with disabilities are already less likely to be believed when they report sexual violence and often have greater difficulty describing the harassment they experience.  Angela Browne et al., *Examining Criminal Justice Responses to and Help-Seeking Patterns of Sexual Violence Survivors with Disabilities* 11, 14-15 (June 30, 2016) ("Examining Criminal Justice").[23]  People with disabilities do not report harassment because of extreme power imbalances and fear of repercussions.  *Id.* at 11-12, 14-15.  Indeed, biases, prejudices, and stereotypes about students with disabilities are prevalent.

For example, many people see students with disabilities as persons who are not sexual in nature and are child-like for their entire lives.  Still others hold negative stereotypes that people with disabilities who express sexual desires are sexual deviants and a menace.  Mary Beth Szydlowski, Advocates for Youth, *Sexual Health Education for Young People with Disabilities – Research and Resources for Educators* (Feb. 2016).[24]  These stereotypes actively work against students with disabilities by deterring them from reporting because of how they will be perceived, and by treating them differently once they do report.

The Department itself recognized in the Rule's preamble that students with disabilities have different experiences, challenges, and needs.  Yet, the Rule does nothing to address the impediments to addressing harassment and only compounds the problems.  For example, students with disabilities will be adversely affected by the Rule's limitations on to whom they can report harassment.  Frequently, students with disabilities develop closer and more trusting relationships with residential advisors, disability service offices, teaching assistants, professors, and other employees who are not the Title IX coordinator or other authorized reporting officials.

---

[23] https://www.ncjrs.gov/pdffiles1/nij/grants/250196.pdf
[24] https://advocatesforyouth.org/resources/fact-sheets/sexual-health-education-for-young-people-with-disabilities/

CCD Comment, *supra*, at 5.  Some students with communication impairments also rely on various devices or modes of communication, such as sign language or interpreters.  Title IX coordinators' lack of access to such supports will inhibit students with disabilities from reporting to the appropriate channels under the Rule.  National Council on Disability, *supra*, at 43-44.

### 3.   Law enforcement is not an option for many underserved students experiencing sexual harassment.

The Rule's barriers to reporting and enforcement will leave students with no possible recourse except going to the police.  Students suffering from off-campus sexual harassment or conduct that falls outside the new, narrow definition are likely to feel that their only options are to wait until their harasser's actions escalate or to report the conduct to the police.

But for many students, going to the police is not a realistic option.  Students of color, especially Black students, are more likely to have a mistrust of police stemming from a history of violence and mistreatment, as the recent nationwide demonstrations have underscored.  Additionally, students of color might not report to the police to avoid contributing to the criminalization of men and boys of color, particularly Black students.  Lauren Rosenblatt, *Q&A: Why it's harder for African American women to report campus sexual assaults, even at mostly black schools*, LA Times (Aug. 28, 2017);[25] *see also* 2015 USTS Survey, *supra*, at 188-89 (respondents with disabilities (70%), those living in poverty (67%), and respondents of color— including Middle Eastern (70%), Black (67%), and multiracial (67%) respondents—were likely to report being uncomfortable asking the police for assistance, as compared to 53% of White respondents).  Moreover, immigrant students of color may also be reluctant to report to the police out of fear of retribution.  Mary Dutton et al., *Characteristics of Help-Seeking Behaviors, Resources and Service Needs of Battered Immigrant Latinas: Legal and Policy Implications*, 7 Geo. J. on Poverty L. & Pol'y 245, 252 (2000).[26]

---

[25] https://www.latimes.com/politics/la-na-pol-black-women-sexual-assault-20170828-story.html
[26] http://bit.ly/Dutton2000

Some LGBTQ students, too, are unlikely to report sexual harassment to the police, because of a fear of being outed and/or not being taken seriously.  The transgender population is especially wary of going to the police—and for good reason.  A 2015 study found that 57 percent of transgender respondents reported being uncomfortable asking the police for help if they needed it.  2015 USTS Survey, *supra*, at 188.  In the past year alone, out of those who interacted with police officers who thought they were transgender, 58 percent were harassed, assaulted, or faced some other form of mistreatment at the hands of police.  *Id*. at 186.  Unable to turn to their school when sexual harassment occurs off campus, and reluctant to turn to the police, those students will effectively be shut out from relief and from education.  Indeed, a functional Title IX regime and an LGBTQ-friendly school staff member are often a student's only realistic pathway to justice.

Students with disabilities also tend to fear reporting sexual violence to law enforcement. Students with disabilities face barriers when making statements to police because they may not be viewed as credible due to having a disability.  Leigh Ann Davis, M.S.S.W., M.P.A., *People with Intellectual disability and Sexual Violence*, The Arc, at 2 (Mar. 2011).[27]  In one study, survivors reported being discouraged from reporting to police, because "they felt their disclosure was not believed, that they were not deemed credible, or that the 'burden of proof' was too high and they couldn't provide enough information."  Examining Criminal Justice, *supra*, at 12.

It is difficult to talk about sexual harassment.  Students will only report such a painful incident if they trust that an authority figure will believe them and follow through with a fair investigation.  Yet, the Rule will amplify prejudices and stereotypes that discourage underserved students from coming forward for help.  In so doing, the Rule strays from the purpose of Title IX, which is supposed to protect people from sex discrimination and to ensure students' equal access to educational opportunities, resources, and benefits.  Because it will effectively silence students who are already less likely to be heard, the Rule is arbitrary and capricious and conflicts

---

[27] https://thearc.org/wp-content/uploads/forchapters/Sexual%20Violence.pdf

with the purpose of Title IX.  Indeed, in promulgating the Rule, the Department arbitrarily and capriciously failed to consider an "important aspect of the problem," *State Farm*, 463 U.S. at 43—that students of color, students with disabilities, and LGBTQ students are disproportionately and particularly impacted by sexual harassment in school.  The Rule makes the situation worse.

### C. Imposing a quasi-criminal cross-examination procedure and heightened standard of proof will create an inequitable and traumatizing process for students of color, students with disabilities, and LGBTQ students who muster the courage to report sexual harassment.

The Rule will not just chill the reporting of sexual harassment, it will make the process less fair for students who muster the courage to make a report.  The Rule will transform Title IX by imposing a quasi-criminal proceeding that includes live cross-examination, blanket prohibitions on hearsay, a live hearing with real-time relevance and admissibility determinations, and, in some cases, a higher standard of proof than is typically used.  Previously, Title IX policy allowed schools to use indirect questioning by a neutral school official to prevent character attacks, victim-blaming, and retraumatization for the complainant.  The Rule will change this process, placing far greater burdens on alleged victims, especially underserved students who, because of bias, prejudice, discrimination, and negative stereotypes, are less likely to be believed by administrators.

Specifically, under the Rule, institutions of higher education investigating a report of sexual harassment must conduct a live hearing, and the "decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility."  Rule § 106.45(b)(6)(i).  Cross-examination at the live hearing must be conducted directly, orally, and in real time.  *Id.*

As a practical matter, these cross-examinations are likely to include character attacks and victim blaming and could come from an "advisor" of the alleged perpetrator, which will only further traumatize victims.  And, using cross-examination to explore "ambiguous evidence" and to assess credibility based on demeanor will only increase the risk of stereotypes infecting the

17

decision-making process.  *See, e.g.*, Justin D. Levinson & Danielle Young, *Different Shades of Bias: Skin Tone, Implicit Racial Bias, and Judgments of Ambiguous Evidence*, 112 W. Va. L. Rev. 307, 319–26 (2010); *see generally* Jerry Kang et al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124 (2012).

Empirical studies show that cross-examination may also undermine fact-finding in sexual harassment proceedings for both adults and children.  *See, e.g.*, Emily Henderson, *Bigger Fish to Fry: Should the Reform of Cross-Examination Be Expanded Beyond Vulnerable Witnesses?*, 19(2) Int'l J. of Evidence and Proof 83, 84-85 (2015) (collecting studies of adults); Rhiannon Fogliati & Kay Bussey, *The Effects of Cross-Examination on Children's Coached Reports*, 21 Psychol. Pub. Pol'y & L. 10 (2015).  For example, research shows that cross-examination leads children to recanting their initial true allegations of witnessing transgressive behavior and significantly reducing children's testimonial accuracy for neutral events.  *Id.*

The Rule also lets schools change the standard of proof from the "preponderance of the evidence" standard to the more demanding "clear and convincing evidence" standard, as long as they use the same standard against student and staff respondents.  *See* Rule § 106.45(b)(1)(vii). This will require some schools to use the "clear and convincing evidence" standard in student sexual harassment investigations because some school employees' collective bargaining agreements require use of the "clear and convincing evidence" standard for all employee misconduct investigations.  Imposition of this heightened standard will harm students who are already less likely to be believed.  For example, as shown, stereotypes about students of color being "promiscuous" or "aggressive" may lead administrators to blame them rather than believe them.

LGBTQ students, too, face bias and prejudice that affect their standing in society—and thus their credibility.  For example, one need look no further than the facts that gave rise to the Supreme Court's recent opinion in *Bostock v. Clayton County, Georgia*, Nos. 17-1618, 17-1623, 18-107, __ S.Ct. __, 2020 WL 3146686 (June 15, 2020).  There, three cases were consolidated

18

for the Court's opinion, but "[e]ach of the three cases . . . started the same way:  An employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender—and allegedly for no reason other than the employee's homosexuality or transgender status."  *Id*. at *3.  Against this societal backdrop, it is not surprising that LGBTQ students fear that if they report harassment, they will be mistreated, disbelieved, or blamed for their own assault—often because of hostility by school staff and discriminatory school policies or practices.  2017 National School Climate Survey, *supra*, at 29.

Similarly, students with disabilities may fear that they will not be believed solely because of their disabilities.  For example, they know that stereotypes and biases can lead school staff and advisors for the accused to question how someone with a disability would be sexually attractive.  Examining Criminal Justice, *supra*, at 11, 14-15.  In addition, some people with intellectual disabilities have trouble speaking or describing things in detail, or in proper time sequence.  In the criminal context, this causes prosecutors to be reluctant to prosecute cases where they must rely on testimony by people with disabilities.  Joseph Shapiro, *The Sexual Assault Epidemic No One Talks About*, NPR (Jan. 8, 2018).[28]  This is why Title IX proceedings are often the only place for students with disabilities to obtain relief from sexual harassment.  But the new quasi-criminal proceedings established under the Rule will likely deter students with disabilities.  With rigorous, or even light, cross-examination, perpetrators will be able to take advantage of survivors and avoid liability, thus nullifying the only option for redress of sexual harassment.

The bottom line:  The changes to the Title IX investigative and hearing process are inconsistent with the purpose of Title IX and will only serve to reinforce a culture that discounts the experiences of underserved students.

---

[28] https://npr.org/2018/01/08/570224090/the-sexual-assault-epidemic-no-one-talks-about

**D.    The Rule's religious exemption changes would leave students without critical information regarding schools' Title IX compliance.**

Since 1975, a religious institution that wishes to avoid complying with Title IX regulations must send a written notification to the Department, specifying which provisions it wishes to be exempted from and providing a religious rationale for the exception.  34 C.F.R. § 106.12 (2018).  This requirement has the benefit of giving current and prospective students advance notice whether they will be protected by Title IX, allowing students to make informed decisions about where to go to school.

The Rule would now arbitrarily and unnecessarily allow a school to *retroactively* claim an exemption *after* a Title IX complaint has been filed against it.  *See* Rule § 106.12(b).  The effects of these changes will be widespread, adverse, and immediate, because there are hundreds of ongoing Title IX investigations relating to sexual violence, many of which involve religious institutions.  Katelyn Burns, *Leaked Title IX Rule Would Allow Religious Schools to Discriminate—Without Saying Why*, Rewire News (Sept. 18, 2018).[29]  Under the Rule, religious schools could decide to invoke the exemption at any point during those investigations and abandon their students' cases, without fear of penalty for Title IX non-compliance.  The very existence of this escape hatch will exacerbate the perception among underserved populations that reporting under Title IX is pointless, thus undercutting the critical reporting regime necessary to Title IX's effectiveness.

The Rule's changes to the religious exemption provisions will particularly harm LGBTQ students.  Since 2013, more than six dozen religious institutions have requested Title IX exemptions from the Department regarding their treatment of LGBTQ students.  For example, in 2017, the Department granted religious exemptions to Appalachian Bible College in West Virginia, allowing the school to ban students from, among other things, "transitioning genders" and engaging in "sexual activities with members of the same sex."  Human Rights Campaign

---

[29] https://rewire.news/article/2018/09/18/leaked-title-ix-rule-would-allow-religious-schools-to-discriminate-without-saying-why/

Comment on ED Docket No. ED-2018-OCR-0064, at 6 (Jan. 30, 2019), citing Letter from Department of Education to Daniel L. Anderson, President of Appalachian Bible College (December 14, 2017) (on file with the Department of Education).  Under the current Title IX process, an LGBTQ student can obtain the information necessary to avoid attending a school like this.  Under the Rule's regime, however, LGBTQ students would not have advance notice as to whether their current or prospective school intended to discriminate against them.  LGBTQ students would have no way of knowing whether it would be safe for them to come out, date members of their own gender, or act in ways that affirm their gender identity.

## II.     The Balancing of Equities Weighs Heavily in Favor of Enjoining or Staying the Rule, Which Thwarts the Will of Congress and Places Survivors of Sexual Harassment in Harm's Way and Without a Safe Learning Environment.

In preliminary injunction determinations, the balancing of hardships and the public interest factors are merged when the government is the opposing party.  *See Center for Public Integrity v. United States Dep't of Defense*, 411 F. Supp. 3d 5, 14 (D.D.C. 2019) (citing *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015)).  "When balancing the equities, the Court must 'consider the effect on each party of the granting or withholding of the requested relief.'"  *Center for Public Integrity*, 411 F. Supp. 3d at 14 (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008)).  The Court should also examine the public consequences of granting or denying an injunction.  *See id.*  In challenges to agency action, "[i]t is in the public interest for courts to carry out the will of Congress and for an agency to implement properly the statute it administers."  *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 45 (D.D.C. 2000).

Here, as noted above and in Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction or Stay (Doc. 22-1, §§ I & III), the substantial and significant changes required of Plaintiffs and their public institutions under the Rule warrant a preliminary injunction or stay.  The Department concedes that these drastic changes will require significant training of employees for any person who facilitates an informal resolution process.  Rule § 106.45(b)(1)(iii).  Forcing these significant changes on the hundreds of universities across the

several states will create significant upheaval.  And once that "egg has been scrambled," "restor[ing] the status quo ante" will be considerably more disruptive.  *D.C. v. U.S. Dep't of Agric.*, No. 20-119 (BAH), 2020 WL 1236657, at *35 (D.D.C. Mar. 13, 2020).

This considerable burden resulting from implementation of the Rule is compounded by the severe consequences on the public that would result if the request for a preliminary injunction is denied.  As shown, underserved students, among many others, are likely to face significant harm if the Rule goes into effect.  The Rule exacerbates and amplifies the negative influences of bias, prejudice, discrimination, and negative stereotypes for student groups with the passage of processes and procedures that invite further mistreatment and maltreatment.  Ultimately, the new regime will deter survivors, especially underserved students, from seeking protection from Title IX discrimination and harassment.  This is contrary to a strong public interest of ensuring that the reporting process does not deter survivors from coming forward and, instead, allows them to readily access the resources and support they need.

In contrast to the overwhelming negative impacts that the Rule will have on survivors and the public at-large, enjoining the Rule will have little to no impact on the Department.  While the Department claims in the preamble that the Rule is designed to address concerns over the lack of due process for alleged perpetrators, the existing rules and guidance already provides due process protections, including appropriate notice and an opportunity to be heard in the proceedings.  2001 Guidance, *supra*, at 20-22.  As in other civil rights cases, those who believe their rights have been violated can, if necessary, turn to the courts.  Such litigation, too, is a sufficient deterrent for institutions to provide appropriate notice and opportunity to be heard.

In addition, here, as in *D.C. v. U.S. Dep't of Agriculture*, 2020 WL 1236657, the Department has been functioning under the existing Title IX regulations for several years.  Requiring the Department to wait to implement its Rule is no real hardship.  Indeed, any claimed harm from having to continue to implement the existing regulations while the merits of this proceeding is decided "pales in comparison" to the "massive costs associated with implementing

a sea change" of new Title IX regulations in K-12 schools and higher education institutions across the nation. *Id.* at *31. And while federal government agencies have an interest in administering federal laws, that interest is not absolute especially where state governments are challenging those rules. *See id.* Rather, the federal government's interest is further tempered by potential harm to individuals resulting from an erroneous application of the law. *See id.* (citing *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 65 (D.D.C. 2019)).

## CONCLUSION

For the reasons discussed here and in Plaintiffs' Motion for Preliminary Injunction or Stay, Civil Rights and Advocacy Amici respectfully urge this Court to enjoin the unlawful and unfair Rule and, alternatively, to stay the Rule until the merits can be resolved.

June 30, 2020

Respectfully submitted,

By:  /s/ Jon Greenbaum
Kristen Clarke
D.C. Bar No. 3960085
Jon Greenbaum
D.C. Bar No. 489887
*David Hinojosa
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
   UNDER LAW
1500 K Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
Email: kclarke@lawyerscommittee.org
        jgreenbaum@lawyerscommittee.org
        dhinojosa@lawyerscommittee.org
*pro hac application pending

*Cynthia E. Tobisman
*Geoffrey B. Kehlmann
GREINES, MARTIN, STEIN & RICHLAND LLP
5900 Wilshire Boulevard, 12th Floor
Los Angeles, California  90036
Telephone: (310) 859-7811
Facsimile: (310) 276-5261

23

Email:   ctobisman@gmsr.com
         gkehlmann@gmsr.com
*pro hac application pending

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on June 30, 2020, I electronically filed a copy of the foregoing Motion for Leave to File and Brief of Amicus Curiae using the CM/ECF System for the United States District Court for the District of Columbia, which will deliver notification of the instant filing to all counsel of record in this matter.

/s/ Jon Greenbaum
Jon Greenbaum