**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, *et al.* | ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Civil Action No. 1:20-cv-1468-CJN |
| ELISABETH DEVOS, in her official capacity as SECRETARY, UNITED STATES DEPARTMENT OF EDUCATION, *et al.* | ) ) ) ) ) | |
| *Defendants*. | ) ) ) | |

**BRIEF OF THE AMERICAN COUNCIL ON EDUCATION AND
24 OTHER HIGHER EDUCATION ORGANIZATIONS AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Stephanie J. Gold (D.C. Bar No. 461086)
Susan M. Cook (D.C. Bar No. 462978)
Kyle M. Druding (D.C. Bar No. 1044631)
Megan M. Wilson (D.C. Bar No. 1046533)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone: (202) 637-5491
stephanie.gold@hoganlovells.com

*Counsel for Amici Curiae*

Dated:  June 24, 2020

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................... ii

STATEMENT OF INTEREST ........................................................................................................ 1

SUMMARY OF ARGUMENT ........................................................................................................ 3

ARGUMENT .................................................................................................................................... 4

      I.      The Department's Final Rule Directs A Sea Change For Title IX
            Administration In Higher Education. ...................................................................... 4

      II.     The Abbreviated Compliance Deadline Set Forth In The Final Rule Will
            Be Difficult—If Not Impossible—For Institutions To Meet. ............................... 8

CONCLUSION ............................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cannon v. Univ. of Chi.*,
    441 U.S. 677 (1979) ................................................................................................4

*Davis v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999) ................................................................................................4

*Franklin v. Gwinnett Cty. Pub. Sch.*,
    503 U.S. 60 (1992) ..................................................................................................4

**Statutes**

Department of Education Organization Act,
    Pub. L. No. 96–88, 93 Stat. 669 (1979) ..................................................................4

20 U.S.C. § 1681(a) ..........................................................................................................4

**Regulations**

Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance,
    85 Fed. Reg. 30,026 (May 19, 2020) ............................................................ 3, 6, 15

Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance,
    83 Fed. Reg. 61,462 (Nov. 29, 2018) ..................................................................5, 6

Sexual Harassment Guidance: Harassment of Students by School Employees,
    Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997)
    *revised* (Jan. 19, 2001), *available at* https://bit.ly/3dc3mcG .............................4, 5

45 C.F.R. § 86.1 ...............................................................................................................4

**Executive Materials**

Exec. Order No. 12212,
    45 Fed. Reg. 29,557 (May 2, 1980) ........................................................................4

President Donald J. Trump, Proclamation on Declaring a National Emergency
    Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13,
    2020), a*vailable at* https://bit.ly/2SFUCUQ .......................................................12

**Other Authorities**

Am. Council on Educ., Comment Letter on Proposed Rule Amending Title IX
Regulations (Jan. 30, 2019), *available at* https://bit.ly/35zEOs1 ............................... 9, 10, 11

Am. Council on Educ., Statement by ACE President Ted Mitchell on Final Title
IX Regulations (May 6, 2020), *available at* https://bit.ly/2Bceh8W ...................................... 8

Bd. of Regents of Univ. of Wis. Sys., Chapter UWS 17:  Student Nonacademic
Disciplinary Procedures (eff. Sept. 1, 2009), *available at*
https://bit.ly/2xGV3XU ........................................................................................................... 11

Sydney Czyzon, *Title IX investigations transition online, await new federal
guidelines*, Marquette Wire (Apr. 29, 2020), https://bit.ly/2yoVPJw .................................... 14

Entangled Solutions, COVID-19:  Higher Education Resource Center,
https://bit.ly/2zafDAn (last visited June 24, 2020) ......................................................... 12, 13

Deirdre Fernandes, *Six Harvard graduate schools will hold only online classes
this fall*, Boston Globe (June 3, 2020), https://bit.ly/37eGQib ................................................ 13

Isabel L. Isselbacher, *Harvard Title IX Office Operations Continue Remotely
During COVID-19 Crisis*, Harvard Crimson (Mar. 31, 2020),
https://bit.ly/3b9UZxr .............................................................................................................. 14

Letter from Ted Mitchell, President, ACE, to Betsy DeVos, Sec'y of Educ., U.S.
Dep't of Educ. (Mar. 24, 2020), *available at* https://bit.ly/2W7Sdo8 ................................... 16

Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter:  Harassment
and Bullying (Oct. 26, 2010), *available at* https://bit.ly/2yPkXct ........................................... 7

Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter: Sexual
Harassment (Jan. 25, 2006), *available at* https://bit.ly/3dhCbxK............................................ 5

Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter: Sexual
Violence (Apr. 4, 2011), *available at* https://bit.ly/3dglR0f, ................................................... 5
*withdrawn* (Sept. 22, 2017), *available at* https://bit.ly/2L4omGY ........................................ 5

Office for Civil Rights, U.S. Dep't of Educ., Q&A on Campus Sexual Misconduct
(Sept. 2017), *available at* https://bit.ly/35Up8jt ..................................................................... 7

Office for Civil Rights, U.S. Dep't of Educ., Questions and Answers on Title IX
and Sexual Violence (Apr. 29, 2014), *available at* https://bit.ly/2YNAYuf........................... 5
*withdrawn* (Sept. 22, 2017), a*vailable at* https://bit.ly/2L4omGY ......................................... 5

Christina Paxson, Opinion, *College Campuses Must Reopen in the Fall.  Here's
How We Do It.*, N.Y. Times (Apr. 26, 2020), https://nyti.ms/2WIeVSL ............................... 13

U.S. Dep't of Educ., Background & Summary of the Education Department's
Proposed Title IX Regulation (Nov. 2018), *available at* https://bit.ly/3e8Ul5w......................6

U.S. Dep't of Educ., Summary of Major Provisions of the Department of
Education's Title IX Final Rule (May 6, 2020), *available at*
https://bit.ly/2xL9Ws4........................................................................................................8

U.S. Dep't of Educ., Title IX of the Education Amendments of 1972, Docket ID:
ED-2018-OCR-0064, https://www.regulations.gov (last visited June 24, 2020)....................6

## STATEMENT OF INTEREST

*Amici* are 25 associations of colleges, universities, educators, trustees, and other representatives of higher education in the United States.  *Amici* represent public, independent, large, small, urban, rural, denominational, non-denominational, graduate, and undergraduate institutions.  They have a strong interest in ensuring that their members are given the proper time to analyze, deliberate, and implement the extensive changes mandated by the first set of regulations issued under Title IX since the 1970s, especially in light of the unprecedented demands that responding to the evolving COVID-19 crisis has imposed on higher education institutions.[1]

*Amicus curiae* the American Council on Education ("ACE") represents all higher education sectors.  Its more than 1,700 members reflect the extraordinary breadth and contributions of degree-granting colleges and universities in the United States.  Founded in 1918, ACE seeks to foster high standards in higher education, believing a strong higher education system to be the cornerstone of a democratic society.  As a key part of its mission, ACE is committed to ensuring the continued vitality and workability of the federal civil rights protections enshrined in Title IX, including through the submission of *amicus curiae* briefs in cases of particular national import.

ACE is joined in this amicus brief by the following organizations, whose descriptions are found in the Addendum to this brief:

- American Council on Education;
- The Accreditation Council for Pharmacy Education;
- American Association of Community Colleges;
- American Association of State Colleges and Universities;

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

- American Association of University Professors;
- American Dental Education Association;
- American Indian Higher Education Consortium;
- Association of American Medical Colleges;
- Association of American Universities;
- Association of Catholic Colleges and Universities;
- Association of Governing Boards of Universities and Colleges;
- Association of Jesuit Colleges and Universities;
- Association of Public and Land-grant Universities;
- College and University Professional Association for Human Resources;
- Council for Advancement and Support of Education;
- Council of Independent Colleges;
- Middle States Commission on Higher Education;
- NASPA - Student Affairs Administrators in Higher Education;
- National Association of College and University Business Officers;
- National Association of Diversity Officers in Higher Education;
- National Association of Independent Colleges and Universities;
- National Collegiate Athletic Association;
- New England Commission of Higher Education;
- University Risk Management and Insurance Association; and
- WASC Senior College and University Commission.

*Amici* are deeply concerned that the U.S. Department of Education ("Department"), in its recently announced regulatory overhaul of Title IX, has set an unreasonable implementation deadline of August 14, 2020—less than three months following publication of the new regulations in the Federal Register. Colleges and universities will be unable to meet that deadline without diverting significant time and resources that are sorely needed to respond to the ongoing global pandemic. Without taking a position on the substance of Plaintiffs' challenge on the merits, *Amici* write to highlight the unique harms the August 14 compliance date imposes, and urge this Court to enjoin that deadline in order to allow American colleges and universities sufficient time to implement the new regulations.

## SUMMARY OF ARGUMENT

The Department recently issued final regulations under Title IX for the first time in nearly half a century.  *See* U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106) (hereinafter, "Final Rule").  The regulations are the result of a year-and-a-half-long rulemaking that culminated in a 600,000 word Federal Register notice.  The new regulations will require colleges and universities nationwide to restructure thousands of institution-specific policies and procedures in order to comply with scores of new administrative mandates.  And yet the Department has set an abbreviated compliance deadline of August 14, 2020, 87 days after the Final Rule was published in the Federal Register.

In the best of times, that deadline would be unreasonable.  But in light of the extraordinary burdens that have been placed on American colleges and universities in the wake of the COVID-19 global pandemic, that August 14 implementation deadline is problematic in the extreme.  Higher education institutions cannot meet it without diverting significant focus and resources from other mission-critical demands.

The higher education associations submit this brief to explain, independent of the merits challenges to the Final Rule, the imminent and irreparable harms that will befall colleges and universities if the compliance deadline is not stayed.  These harms speak solely to the balance of hardships and public interest factors associated with the standard for preliminary injunctive relief.  *Amici* support the request for a preliminary injunction of the implementation deadline set forth in the Final Rule to permit higher education institutions sufficient time to assess how most effectively to incorporate the new requirements into their policies and procedures.  *Amici* also

believe it would be prudent to delay implementation of the rule until there is a final resolution of the substantive issues in this lawsuit and reasonable certainty that the Final Rule is, in fact, to be a design parameter for policies and procedures on America's campuses. This request is particularly appropriate in that the current implementation deadline occurs during the summer when many administrators, faculty, and staff are absent from campuses either due to COVID-19 work-from-home relocation or the normal cadence of university operations.

## ARGUMENT

**I.    The Department's Final Rule Directs A Sea Change For Title IX Administration In Higher Education.**

Title IX is a cornerstone federal civil rights law enacted by Congress as part of the Education Amendments of 1972. It provides in pertinent part:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The last time full-dress regulations were issued under Title IX was in 1975, nearly half a century ago. *See* 45 C.F.R. § 86.1 *et seq.* The agency then tasked with implementing Title IX was the former Department of Health, Education, and Welfare, as those regulations predated the Department of Education itself by five years. *See* Department of Education Organization Act, Pub. L. No. 96–88, § 201, 93 Stat. 669, 671 (1979); Exec. Order No. 12212, 45 Fed. Reg. 29,557 (May 2, 1980).

In the decades since, various aspects of Title IX's requirements have been further construed and interpreted by the courts, *see, e.g.*, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60 (1992); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), as well as in informal guidance and "Dear Colleague" letters from the Department across administrations, *see, e.g.*, Sexual Harassment Guidance:  Harassment of

Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997), *revised* (Jan. 19, 2001)[2]; Dear Colleague Letter on Sexual Harassment (Jan. 25, 2006)[3]; Dear Colleague Letter:  Sexual Violence (Apr. 4, 2011),[4] *withdrawn* (Sept. 22, 2017)[5]; Questions and Answers on Title IX and Sexual Violence (Apr. 29, 2014),[6] *withdrawn* (Sept. 22, 2017).[7]

The current, once-in-multiple-generations Title IX rulemaking reflects a massive regulatory undertaking.   The Department's Office for Civil Rights released its Notice of Proposed Rulemaking at the end of November 2018.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462 (Nov. 29, 2018).   That proposal sought broad comment on several crucial and highly sensitive and complex issues of Title IX administration, including:

- How to define "sexual harassment" for Title IX purposes;

- What should trigger schools' legal obligations to respond to claims of sexual harassment;

- How schools should respond after receipt of a qualifying complaint;

- What features institutional individual grievance procedures should contain;

- How schools should conduct factual investigations into allegations of misconduct;

- What the evidentiary and adjudicative standards for making determinations of

---

[2] *Available at* https://bit.ly/3dc3mcG.

[3] *Available at* https://bit.ly/3dhCbxK.

[4] *Available at* https://bit.ly/3dglR0f.

[5] *Available at* https://bit.ly/2L4omGY.

[6] *Available at* https://bit.ly/2YNAYuf.

[7] *Available at* https://bit.ly/2L4omGY.

responsibility should be;

- How the appeals mechanism for responsibility determinations should work; and

- What record-keeping and disclosure obligations should attach to Title IX coordinators, investigators, and decisionmakers.

*See* 83 Fed. Reg. at 61,495–499; *see also* U.S. Dep't of Educ., Background & Summary of the Education Department's Proposed Title IX Regulation 3–6 (Nov. 2018).[8]  In response to the Proposed Rule, affected stakeholders and members of the public submitted over 120,000 comments.  *See* U.S. Dep't of Educ., Title IX of the Education Amendments of 1972, Docket ID: ED-2018-OCR-0064, https://www.regulations.gov (last visited June 24, 2020).  Those comments included a twenty-eight page letter submitted by sixty-one higher education associations, including virtually all the signatories to this amicus brief.

The Final Rule was published in the Federal Register on May 19, 2020.  85 Fed. Reg. 30,026.[9]  As finalized, the new regulations mandate that our nation's colleges and universities follow a prescribed template that requires the vast majority of them to make broad-scale and fundamental changes to a wide variety of institution-specific practices and policies attendant to Title IX proceedings.  The Department's new regulations require that every college and university review policies, procedures, and practices in every aspect of their operations and make any necessary changes to assure their policies, procedures, and practices applicable to undergraduate and graduate students, as well as faculty and staff (whether unionized or not), comply with the Final Rule's myriad requirements, all by August 14.  For example:

- Colleges and universities must adopt or otherwise reconcile in their policies and

---

[8] *Available at* https://bit.ly/3e8Ul5w.

[9] Several days earlier, on May 6, the Final Rule was made public informally through a PDF document posted on the Department's website, *available at* https://bit.ly/3hCwzAZ.

procedures a new Title IX-specific definition of "sexual harassment," including to mean conduct that is so "severe" *and* "pervasive" *and* "objectively offensive" that it effectively denies a person equal access to the recipient's education program or activity. Notably, this construction runs counter to the Department's prior guidance regarding discriminatory harassment[10] and also is inconsistent with the "severe" *or* "pervasive" offensive conduct standard used in Title VII cases;

- They must meet a new set of mandatory response obligations triggered by a "deliberate indifference" standard, which in turn requires implementation of various newly mandated grievance, investigation, notice, and record-keeping obligations;

- They must adopt new practices for adjudicating Title IX complaints, including the use of "live hearing[s] with cross-examination" under prescribed evidentiary and procedural standards and a written responsibility determination based on either the "preponderance of the evidence" or the "clear and convincing" threshold;

- They must afford both parties to a responsibility determination a specified appeals mechanism to be made available in enumerated circumstances; and

- They must revise informal resolution procedures, such as mediation or restorative justice, to include certain features while prohibiting others, which may both expand and restrict colleges' and universities' current use of these alternatives.  For example, the

---

[10] *See, e.g.*, Q&A on Campus Sexual Misconduct 1 (Sept. 2017) ("[W]hen sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond."), *available at* https://bit.ly/35Up8jt; Dear Colleague Letter:  Harassment and Bullying 2 (Oct. 26, 2010) ("Harassment creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school.  When such harassment is based on race, color, national origin, sex, or disability, it violates the civil rights laws that OCR enforces."), *available at* https://bit.ly/2yPkXct.

Final Rule disallows an institution to offer an informal resolution process until after a formal complaint is filed, and in no case may an institution offer or facilitate an informal resolution process if the respondent is an employee.

*See generally* U.S. Dep't of Educ., Summary of Major Provisions of the Department of Education's Title IX Final Rule (May 6, 2020).[11] Taken together, these changes significantly alter the Title IX compliance landscape to require extensive re-drafting of procedures, policies, protocols, and handbooks and renegotiation of employee contracts.  In addition, because many of these changes import highly technical legal standards into institutional disciplinary proceedings that lay students, administrators, and faculty conduct, colleges and universities also now face significant re-training burdens in advance of rolling out the new policies and procedures.  In short, the Department's decision to set an August 14 implementation date for the Final Rule requires that every college and university in America devote an unprecedented amount of time and attention to assure compliance with "the most complex and challenging regulations the agency has ever issued," and demands that this be done "in just over three months, and when the institutions are closed."  Am. Council on Educ., Statement by ACE President Ted Mitchell on Final Title IX Regulations (May 6, 2020).[12]

## II.    The Abbreviated Compliance Deadline Set Forth In The Final Rule Will Be Difficult—If Not Impossible—For Institutions To Meet.

The Final Rule sets a compliance deadline of August 14—a mere 87 days after publication in the Federal Register (and only 100 days after the new regulations were first made public informally).  Even in the best of times, that deadline would be aggressive.

---

[11] *Available at* https://bit.ly/2xL9Ws4.

[12] *Available at* https://bit.ly/2Bceh8W.

Because colleges and universities employ shared governance structures and have diverse constituencies, they must be responsive in their development of policies and procedures to multiple stakeholders, including faculty, staff, administrators, and students.  Each institution faces context-specific challenges in this respect:  Some are public while others are private; some are residential and full time, others serve commuter or part-time students; some are urban, others rural; some are institutions of tens of thousands of people, others a few hundred or fewer; some offer four-year and graduate degrees, others two-year degrees and certificates; and some are guided by a religious mission or identity while others are nondenominational or secular.  What's more, of the roughly 4,500 degree-granting colleges and universities throughout the United States, only 1,000 retain a dedicated general counsel.  Am. Council on Educ., Comment Letter on Proposed Rule Amending Title IX Regulations 23 & n.16 (Jan. 30, 2019) (hereinafter, "ACE Comment Ltr.").[13]  The Final Rule's complexity and adoption of more legalistic approaches make the role of counsel critical to successful implementation.  Moreover, institutions will have to reconcile the Final Rule and how to apply it on their campuses with any state statutes and judicial decisions that address similar topics.  In many cases, those state statutes and judicial decisions raise complex legal questions about how an institution may satisfy potentially inconsistent legal obligations, such as those related to standards of proof and process.  Thus, in order to assess and come into compliance with the new regulatory requirements, the vast majority of colleges and universities will be required to engage additional staff and/or hire outside attorneys and consultants.  That alone takes time.

But that is just the beginning of the problem.  Implementation of the Final Rule's centerpiece reforms to institutional investigatory and adjudicatory procedures requires a

---

[13] *Available at* https://bit.ly/35zEOs1.

substantial overhaul of each college and university's disciplinary system.  Indeed, the thicket of requirements that colleges and universities now face from the Final Rule, with scores of separately identifiable administrative requirements, will entail extensive and labor-intensive compliance mandates that these institutions now must each scramble to meet.  That process necessarily requires diversion of limited time and resources from other efforts, with related costs expected to skyrocket—especially for thinly staffed, less-resourced institutions like community colleges, small private liberal arts colleges, and faith-based institutions.  Those additional costs may ultimately be reflected in the costs for enrolling students.

Colleges and universities face a number of other real-world obstacles in terms of effective timely implementation of the Final Rule.  The Final Rule applies not only to Title IX proceedings that involve students, but also to those that involve faculty and other staff.  Those employees are often unionized, and their disciplinary processes are often written into existing collective-bargaining and other agreements, which in turn set predetermined time periods during which terms cannot be re-bargained.  *See* ACE Comment Ltr. at 20.  Many institutions have multiple such bargaining units, further compounding challenges with respect to coordination.  In addition to the time and effort required for the re-bargaining itself, any resulting changes are also subject to the National Labor Relations Act and state labor laws, which make the process for modifications to those agreements slow and arduous.

Then there is the need to update faculty handbooks and manuals, which outline how disciplinary proceedings are conducted for both unionized and non-unionized faculty members.  In keeping with established principles of shared governance, academic freedom, and tenure, faculty handbooks and manuals are developed through institution-specific, multi-layered governance bodies, often following extensive deliberative proceedings across the whole of the

institution.  As a result, campus administrators are often unable to impose top-down, unilateral change, much less do so swiftly.  *See* ACE Comment Ltr. at 20–21.  That problem is compounded ten-fold during the summer months, when, even in the best of times, many faculty and students have left campus, are pursuing research and other professional endeavors, or are otherwise unavailable to devote significant time to administrative duties.

Training is also a concern in terms of effective timely implementation of the Final Rule. Before implementation, all participants in the revamped Title IX investigatory and adjudicatory procedures will need to be re-trained, in a manner tailored to their individual roles, on the content and nature of the dozens of new administrative requirements related to complex and highly sensitive subject matters now being federally mandated for the first time.  That, too, requires significant commitments of time and attention from all involved.  Therefore, because the Final Rule was issued in late May and demands compliance by August, spanning a period where few people will be on campus, the Final Rule not only allows insufficient time to develop well and with appropriate stakeholder involvement the policies and procedures needed to address the Final Rule, it also allows insufficient time to provide the essential training needed to effectuate those policies and procedures in a manner that best serves campus communities.

For some public university systems, the Final Rule triggers an added layer of complexity and implementation steps.  Specifically, the rules and procedures that govern student discipline at some public institutions may be codified in State legislative and regulatory codes.  *See, e.g.*, Bd. of Regents of Univ. of Wis. Sys., Chapter UWS 17:  Student Nonacademic Disciplinary Procedures, UWS §§ 17.01–17.19 (eff. Sept. 1, 2009).[14]  In such case, changes to applicable procedures will require the participation of legislatures and state agencies on top of campus-

---

[14] *Available at* https://bit.ly/2xGV3XU.

based constituencies, and those legislatures and agencies may be out of session or may be operating with reduced staff during the summer.

In short, the Final Rule's short-fuse compliance deadline presents extreme challenges for institutions to come into compliance even under normal conditions.  But these are not, to understate the point, ordinary times.  It has now been three months since the President declared COVID-19 a national emergency, and roughly five months since the Secretary of Health and Human Services first declared the novel coronavirus SARS-CoV-2 a public-health emergency. President Donald J. Trump, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020).[15]  During that time, the country's colleges and universities have seen their operations upended.  Institutions have been working tirelessly to determine how best to restructure literally every aspect of their basic functioning—including how to manage operational risks for the fast-approaching fall semester. And serious challenges remain.

At the time this brief is being filed, more than 4,200 higher education institutions throughout the United States and over 25 million of their students have been directly impacted by the global COVID-19 pandemic.  *See* Entangled Solutions, COVID-19:  Higher Education Resource Center, https://bit.ly/2zafDAn (last visited June 24, 2020).  The response has been decisive and far-ranging, as colleges and universities have moved to close dorms and lock down campuses, instructed faculty and staff to work remotely, cancelled sports and extracurricular activities, and moved classes and graduations online.  Looking to the near future, some 190 institutions have already moved to change their admissions and academic requirements, such as by extending decision deadlines, waiving deposit fees, moving to test-optional admissions, and

---

[15] *Available at* https://bit.ly/2SFUCUQ.

abandoning minimum grade requirements; over 550 have announced hiring and staffing changes such as freezes, furloughs, and layoffs; and 78 are doing both. *Id.* Seventy-two have confirmed changes such as virtual courses or adjusted payment options for students for Fall 2020 and beyond, and seven have closed permanently. *Id.*

Those changes and others will doubtlessly intensify and multiply in the coming weeks, as many jurisdictions around the country begin to reopen and as best practices and public-health guidance continue to evolve. Decisions must be made about the fall semester, and contingency preparations must be undertaken for both continued on-line learning and an eventual return to on-campus learning, as social distancing guidelines are revised and the world returns to some semblance of a new normal. *See, e.g.*, Deirdre Fernandes, *Six Harvard graduate schools will hold only online classes this fall*, Boston Globe (June 3, 2020), https://bit.ly/37eGQib (explaining that several university graduate programs, including the Law School and School of Public Health, will be online only for Fall 2020 and observing that a decision for the undergraduate college is expected "later in June"). Because additional pressures on colleges and universities administrations to safely and effectively transition to these new realities will only increase going forward, hard choices will get only harder still. And making sure that higher education institutions will have the bandwidth to return to their full operating capacities as soon as practicable is hugely consequential for the national economy as a whole. *See, e.g.*, Christina Paxson, Opinion, *College Campuses Must Reopen in the Fall. Here's How We Do It.*, N.Y. Times (Apr. 26, 2020), https://nyti.ms/2WIeVSL.

To require that colleges and universities restructure their existing Title IX policies and procedures by August 14 while they prepare for the upcoming fall semester during a global pandemic threatens extraordinary—and needless—hardship and confusion for administrators,

faculty, and students.  Even in the best of times, that schedule is unrealistic. To truly fulfill the hope and promise of Title IX, the staff, faculty, and students on our nation's campuses should be encouraged by the Department to have the long-view in mind as they collectively consider and revise campus policies and procedures.  A hasty rush to "get into compliance" by August 14 will almost assuredly negatively affect the quality of the policies and procedures that institutions scramble to craft in order to meet the arbitrarily set deadline.

College and university staffs are in a zero sum game in terms of their available bandwidth at this time.  Institutions will not be able to hire additional personnel to accomplish the August 14 implementation.  So, in a period of catastrophe management, when key players will be socially isolating and, oftentimes, scattered across the country and even around the world, every hour devoted to restructuring existing procedures and practices to conform with the Final Rule's numerous federal mandates will be an hour that cannot be used for the innumerable risk-management tasks that higher education institutions will face in the days, weeks, and months to come.  Even prior to the Final Rule, Title IX coordinators and administrators had seen their work disrupted and capacities slowed as a result of the pandemic.  *See, e.g.*, Isabel L. Isselbacher, *Harvard Title IX Office Operations Continue Remotely During COVID-19 Crisis*, Harvard Crimson (Mar. 31, 2020), https://bit.ly/3b9UZxr (discussing delays in training programs); Sydney Czyzon, *Title IX investigations transition online, await new federal guidelines*, Marquette Wire (Apr. 29, 2020), https://bit.ly/2yoVPJw (discussing delays in investigations and problems raised by remote coordination).  It is hard to see how rushed implementation of the Final Rule during a time of increased uncertainty and novel operational strategies best serves the Title IX interests of our campus communities.

In addition, to require universities and colleges to implement the Final Rule now, as they adapt protocols and procedures for socially distanced and virtual environments, will ultimately mean that universities and colleges will have to go through a second restructuring effort after life begins to normalize.  In effect, colleges and universities will have to *twice* restructure their Title IX policies to address the Final Rule effectively:  Once during the still-uncertain re-opening and transition period we currently face, and once again after students, faculty, and staff are able to return fully and safely to campus.

In issuing the Final Rule with an August 14 implementation date, the Department fails to recognize the enormous scope of this diversion of time and resources.  The Department asserts that "60 days would be sufficient for recipients to come into compliance" in "the ordinary course" and it concedes that "exigent circumstances exist as a result of the COVID-19 national emergency" that "require great attention and care on the part of" higher education institutions and others, but the Department nevertheless proceeded to select an effective date of August 14, 2020 as one that "adequately accommodates the needs of recipients."  Yet it does so without any analysis regarding any of the particular hardships discussed above.  *See* 85 Fed. Reg. at 30,534 (noting only that "[t]he Department recognizes that the length and scope of the current national emergency relating to COVID-19 is somewhat uncertain.").  An 87-day implementation deadline is a wholly insufficient allowance during these unprecedented times.  And the Department cannot plausibly justify its blanket assertion that a three-month implementation deadline is necessary now when the rulemaking itself lasted more than 1,000 days and the previously prevailing regulatory landscape had been in place for more than four decades.  Nor is it any answer for the Department to point to the time elapsed since its Proposed Rule.  Regulated entities lack any duty to radically overhaul longstanding policies and procedures following the mere

15

announcement of a proposed rulemaking.  Moreover, the highly institution-specific nature of individual higher education institutions' Title IX policies and procedures means that any large-scale reform effort requires first knowing the actual details of the Final Rule, which were not announced in any form until six weeks ago.

That failure to wrestle with our current reality is all the more notable because ACE, joined by numerous other concerned groups, submitted a letter to the Department months ago raising precisely these points, when the toll that COVID-19 would wreak had already been made clear.  Letter from Ted Mitchell, President, ACE, to Betsy DeVos, Sec'y of Educ., U.S. Dep't of Educ. (Mar. 24, 2020).[16]  As ACE explained, independent from the merits of the particular regulatory proposals contemplated by the Department's Title IX rulemaking, "institutions simply do not have the capacity to implement these proposals at this time" given the "challenges campuses face" in "these unprecedented times."  *Id.*

The Final Rule's implementation date patently ignores these pleas and the new reality of our COVID-19 world.  Instead, the Department mandated full compliance with dozens of new administrative requirements in less than three months.  That deadline will prove to be impossible to meet in an effective and well-considered matter for most if not all covered institutions in light of the unprecedented burdens imposed on colleges and universities resulting from the pandemic. Institutions will be forced to cobble together a hastily devised effort to comply that will not serve well the ultimate goals of the Final Rule.  A stay of the compliance deadline is necessary to prevent the immediate and extraordinary harms that otherwise will flow to colleges and universities nationwide if they are forced to reallocate increasingly scarce resources toward this massive new regulatory regime.

---

[16] *Available at* https://bit.ly/2W7Sdo8.

**CONCLUSION**

For these reasons, the Court should enjoin the August 14, 2020 effective date of the Final Rule in order to permit colleges and universities sufficient time to come into compliance with its new requirements in a manner that ultimately better serves Title IX's goals and the related interests of campus communities.

Respectfully submitted,

/s/  *Susan M. Cook*
Stephanie J. Gold (D.C. Bar No. 461086)
Susan M. Cook (D.C. Bar No. 462978)
Kyle M. Druding (D.C. Bar No. 1044631)
Megan M. Wilson (D.C. Bar No. 1046533)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Phone: (202) 637-5491
Fax: (202) 637-5910
stephanie.gold@hoganlovells.com

*Counsel for Amici Curiae*

Dated:  June 24, 2020