**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMONWEALTH OF PENNSYLVANIA, *et al.*,

      Plaintiffs,

      v.

ELISABETH D. DEVOS, *in her official capacity as Secretary of Education et al.*,

      Defendants.

No. 20-cv-01468-CJN

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION OR 5 U.S.C. § 705 STAY PENDING JUDICIAL REVIEW**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

I.       Statutory Background and Prior OCR Guidance ................................... 2

II.      The Rule ................................................................................................. 3

         A.       General Obligation to Respond to Sexual Harassment ............... 3

         B.       A Fair Grievance Process to Resolve Formal Complaints .......... 5

LEGAL STANDARDS ...................................................................................... 8

ARGUMENT ..................................................................................................... 9

I.       Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims ....... 9

         A.       The Rule Does Not Impose Unlawful Geographical Restrictions .......... 9

         B.       The Rule's Definition of Sexual Harassment Is Reasonable ............... 12

         C.       The Rule Reasonably Links the Ability to File a Formal Complaint to
                  Participation or Attempted Participation in an Education Program or
                  Activity ............................................................................................... 18

         D.       Requiring Dismissal of Formal Complaints That Do Not Allege Sexual
                  Harassment Under Title IX Is Consistent With Title IX's Limits. ...... 20

         E.       The Final Rule Reasonably Requires That Postsecondary Institutions
                  Provide a Live Hearing With Cross-Examination By Third-Party Advisors ...... 21

                  1.       The Cross-Examination Requirement Rationally Balances the
                           Interests of Both Complainants And Respondents ................. 21

                  2.       Parties May Reasonably Select an Advisor of Their Choice. ...... 22

                  3.       ED Reasonably Declined to Adopt Plaintiffs' Preferred
                           Alternatives. ......................................................................... 24

                  4.       ED's Determinations Regarding Evidentiary Rules Are Reasonable ....... 26

         F.       The Rule's Provisions Are Consistent With the Special Environment of K-
                  12 Schools. ........................................................................................ 27

G.    There Is No Basis to Second-Guess ED's Cost-Benefit Analysis. ...................... 31

    1.    APA Review of an Agency's Cost-Benefit Analysis Under Executive Orders 12866 and 13563 Is Precluded. .................... 31

    2.    ED's Cost-Benefit Analysis Is Reasonable ................................................ 32

H.    The Rule's Effective Date Is Neither Arbitrary Nor Capricious. ......................... 37

I.    Plaintiffs' Logical Outgrowth Claim is Meritless.................................................. 40

II.    Plaintiffs Have Not Shown That Preliminary Relief Is Necessary to Prevent Irreparable Harm. ............................................................................................................. 44

A.    Plaintiffs Have Not Demonstrated Irreparable Harm From the Need to Implement the Rule............................................................................................... 44

B.    Plaintiffs Have Not Demonstrated Irreparable Harm Based on Their Speculation About the Rule's Ultimate Effects. .................................................. 47

III.    The Balance of Equities and Public Interest Make Injunctive Relief Inappropriate ........ 49

IV.    Any Injunctive Relief Should Be Limited to the Plaintiffs................................................. 49

CONCLUSION................................................................................................................................ 50

# TABLE OF AUTHORITIES

## CASES

*Agape Church, Inc. v. FCC*,
　738 F.3d 397 (D.C. Cir. 2013) ........................................................................ 40

*Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.*,
　732 F.2d 219 (D.C. Cir. 1984) ........................................................................ 33

*Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of U.S.*,
　840 F. Supp. 2d 327 (D.D.C. 2012) ................................................................ 45

*Air Transp. Ass'n v. FAA*,
　169 F.3d 1 (D.C. Cir. 1999) ............................................................................ 32

*All. for Natural Health v. Sebelius*,
　775 F. Supp. 2d 114 (D.D.C. 2011) ................................................................ 32

*AFL & CIO v. Chao*,
298 F. Supp. 2d 104 (D.D.C. 2004),
　*aff'd in part, vacated in part, rev'd in part*, 409 F.3d 377 (D.C. Cir. 2005) ..................... 39, 40

*Am. Iron & Steel Ins. v. EPA*,
　115 F.3d 979 (D.C. Cir. 1997) ........................................................................ 33

*Am. Min. Cong. v. EPA*,
　907 F.2d 1179 (D.C. Cir. 1990) ...................................................................... 35

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
　452 U.S. 490 (1981) ........................................................................................ 31

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*,
　724 F.3d 243 (D.C. Cir. 2013) ........................................................................ 32

*Appalachian Power Co. v. EPA*,
　135 F.3d 791 (D.C. Cir. 1998) ........................................................................ 42

*Barton v. District of Columbia*,
　131 F. Supp. 2d 236 (D.D.C. 2001) ................................................................ 46

*Cal. Ass'n of Private Postsecondary Schs. ("CAPPS") v. DeVos*,
　344 F. Supp. 3d 158 (D.D.C. 2018) ............................................................ 44, 45

*Carstens v. Nuclear Regulatory Comm'n*,
　742 F.2d 1546 (D.C. Cir. 1984) .................................................................. 15, 16

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2007) ............................................................... 44

*Commonwealth v. Dep't of Educ.*,
    340 F. Supp. 3d 7 (D.D.C. 2018) ........................................................... 48

*Consumer Elecs. Ass'n v. FCC*,
    347 F.3d 291 (D.C. Cir. 2003) ............................................................... 32

*Cornish v. Dudas*,
    540 F. Supp. 2d 61 (D.D.C. 2008) ......................................................... 49

*ConverDyn v. Moniz*,
    68 F. Supp. 3d 34 (D.D.C. 2014) ..................................................... 44, 45

*CSX Transp., Inc. v. Surface Transp. Bd.*,
    584 F.3d 1076 (D.C. Cir. 2009) ............................................................. 40

*Ctr. for Auto Safety v. Peck*,
    751 F.2d 1336 (D.C. Cir. 1985) ....................................................... 33, 35

*Davis v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999) ................................................................... *passim*

*Defs. of Wildlife v. Jackson*,
    791 F. Supp. 2d 96 (D.D.C. 2011) ......................................................... 32

*Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*,
    85 F. Supp. 3d 436 (D.D.C. 2015) ......................................................... 22

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ............................................................. 25, 27, 37

*Dist. of Columbia v. U.S. Dep't of Agric.*,
    No. CV 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020),
    appeal filed No. 20-5136 (D.C. Cir. May 14, 2020) ................................ 9, 46

*Doe v. Baum*,
    903 F.3d 575 (6th Cir. 2018) ................................................................. 25

*Doe v. E. Haven Bd. of Educ.*,
    200 F. App'x 46 (2d Cir. 2006) ............................................................. 10

*Doe v. Univ. of Scis.*,
    961 F.3d 203 (3d Cir. 2020) ................................................................. 25

*E.B. v. Dep't of State*,
   422 F. Supp. 3d 81 (D.D.C. 2019) ........................................................... 45

*Experience Works, Inc. v. Chao*,
   267 F. Supp. 2d 93 (D.D.C. 2003) ........................................................... 45

*Fla. Bankers Ass'n v. Dep't of Treas.*,
   19 F. Supp. 3d 111 (D.D.C. 2014),
   *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015) ..................... 32

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005) ..................................................................... 46

*Gebser v. Lago Vista Independent School Dist.*,
   524 U.S. 274 (1998) ................................................................................. 13

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ............................................................................. 49

*Goss v. Lopez*,
   419 U.S. 565 (1975) ................................................................................. 27

*Gov't of Manitoba v. Bernhardt*,
   923 F.3d 173 (D.C. Cir. 2019) ................................................................. 47

*Guedes v. ATF*,
   920 F.3d 1 (D.C. Cir. 2019) ....................................................................... 8

*Inv. Co. Inst. v. CFTC*,
   891 F. Supp. 2d 162 (D.D.C. 2012),
   *aff'd* 720 F.3d 370 (D.C. Cir. 2013) ...................................................... 34

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................................... 44, 47

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007) ................................................................................. 40

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................................. 50

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ................................................................................. 34

*MD/DC/DE Broadcasters Ass'n v. FCC*,
   236 F.3d 13 (D.C. Cir. 2001) ................................................................... 50

*Meyer v. Bush*,
   981 F.2d 1288 (D.C. Cir. 1993) ........................................................... 32

*Munaf v. Geren*,
   553 U.S. 674 (2008) ........................................................................... 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................ 13, 29, 36, 39

*Nat'l Ass'n for Surface Finishing v. EPA*,
   795 F.3d 1 (D.C. Cir. 2015) ................................................................. 40

*Nat'l Ass'n of Home Builders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012) ...................................................... 32, 33

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................... 44

*NRDC v. EPA*,
   529 F.3d 1077 (D.C. Cir. 2008) ........................................................... 49

*Pennsylvania ex rel. Shapp v. Kleppe*,
   533 F.2d 668 (D.C. Cir. 1976) ............................................................. 33

*Recording Indus. Ass'n of Am. v. Copyright Royalty Tribunal*,
   662 F.2d 1 (D.C. Cir. 1981) ................................................................. 48

*Save Jobs USA v. DHS*,
   105 F. Supp. 3d 108 (D.D.C. 2015) ...................................................... 45

*Sierra Club v. EPA*,
   167 F.3d 658 (D.C. Cir. 1999) ............................................................. 35

*State of Cal. By & Through Brown v. Watt*,
   712 F.2d 584 (D.C. Cir. 1983) ............................................................. 34

*Stringfellow Mem. Hosp. v. Azar*,
   317 F. Supp.3d 168 (D.D.C. 2018) ....................................................... 41

*Trawler Diane Marie, Inc. v. Brown*,
   918 F. Supp. 921 (E.D.N.C. 1995) ....................................................... 32

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ....................................................................... 50

*Verizon v. FCC*,
   740 F.3d 623 (D.C. Cir. 2014) ............................................................. 20

*Virginia ex rel. Cuccinelli v. Sebelius*,
  656 F.3d 253 (4th Cir. 2011) ................................................................. 46

*ViroPharma, Inc. v. Hamburg*,
  898 F. Supp. 2d 1 (D.D.C. 2012) .......................................................... 45

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................. 8, 48, 50

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .................................................. 44, 47, 48

**STATUTES**

5 U.S.C. § 553 ................................................................................ 33

5 U.S.C. § 705 ............................................................................. 8, 9

20 U.S.C. § 1089 ........................................................................... 38

20 U.S.C. § 1092 ......................................................................... 4, 15

20 U.S.C. § 1681 ................................................................. 1, 9, 18, 41

20 U.S.C. §§ 1681-88 ...................................................................... 31

34 U.S.C. § 12291 ....................................................................... 4, 15

**REGULATIONS**

34 C.F.R. § 100.7 ................................................................. 29, 31, 42

34 C.F.R. § 106.2 ........................................................................... 9

34 C.F.R. § 106.30 .................................................................. *passim*

34 C.F.R. § 106.44 .................................................................. *passim*

34 C.F.R. § 106.45 .................................................................. *passim*

34 C.F.R. § 106.6 .................................................................. 5, 9, 29

34 C.F.R. § 106.8 .................................................................. *passim*

34 C.F.R. § 106.71 ................................................................... 22, 30

66 Fed. Reg. 5,512–01 (Jan. 19, 2001) ....................................................................... 2

71 Fed. Reg. 62,530 (Oct. 25, 2006)......................................................................... 38

73 Fed. Reg. 74,806-01 (Dec. 9, 2008)...................................................................... 31

83 Fed. Reg. 61,462 (Nov. 29, 2018)..................................................................... *passim*

85 Fed. Reg. 30,026 (May 19, 2020) ..................................................................... *passim*

## RULES

Fed. R. Civ. P. 65 ...................................................................................................... 8

## OTHER AUTHORITIES

2011, *Dear Colleague Letter from Assistant Secretary for Civil Rights*, https://www2.ed.gov/
    about/offices/list/ocr/letters/colleague-201104.pdf ................................................. 2

2014, *Questions and Answers on Title IX and Sexual Violence*, https://www2.ed.gov/about/
    offices/list/ocr/docs/qa-201404-title-ix.pdf ............................................................ 2

Am. Coll. of Trial Lawyers, *White Paper on Campus Sexual Assault Invest.*, https://
    www.actl.com/docs/default-source/default-document-library/position-statements-and-white-
    papers/task_force_allegations_of_sexual_violence_white_paper_final.pdf ............................ 2

*Dear Colleague Letter from Assistant Secretary for Civil Rights*, https://www2.ed.gov/about/
    offices/list/ocr/letters/colleague-title-ix-201709.pdf ................................................. 3

Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) .................................................. 32

Exec. Order  No. 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011)...................................................... 32

Jeannie Suk Gersen, *How Concerning Are the Trump Administration's New Title IX
    Regulations?*, The New Yorker (May 16, 2020), https://www.newyorker.com/news/our-
    columnists/how-concerning-are-the-trump-administrations-new-title-ix-regulations.................3

https://atixa.org/r3/................................................................................................. 38, 39

*Open Letter from Members of the Penn Law School Faculty*, http://media.philly.com/documents/
    OpenLetter.pdf ....................................................................................................... 2

PR Newswire, https://www.prnewswire.com/news-releases/association-of-title-ix-administrators-
    atixa-to-facilitate-public-posting-of-its-title-ix-training-materials-
    301064168.html?tc=eml_cleartime .......................................................................... 36

## INTRODUCTION

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Yet while the Supreme Court has held that sexual harassment and sexual violence may constitute unlawful sex discrimination, *see, e.g.*, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), the United States Department of Education (ED) has never before issued regulations that treat such acts as unlawful sex discrimination.

The Rule that Plaintiffs challenge is a landmark step in ED's efforts to ensure that schools receiving federal funding do not tolerate sexual harassment, including sexual assault and sexual violence. It clearly defines behavior that constitutes sexual harassment under Title IX and sets forth fair procedures for addressing such misconduct, thus bringing clarity to a field that was once solely the province of a series of unenforceable and unclear guidance. The Rule obligates schools to take all allegations of sexual harassment seriously and to offer supportive measures to complainants promptly upon becoming aware of allegations of harassment. Where complainants elect to file formal complaints of sexual harassment, it obligates schools to investigate those complaints thoroughly and to provide remedies to complainants after allegations are proven, while respecting the due process rights of both parties. And it provides clarity for all involved, so there can be no doubt what students' rights are and what schools are obligated to do.

While Plaintiffs evidently would prefer that ED adopt a different rule (or no rule at all), they are not entitled to preliminary (or indeed any) relief. First, Plaintiffs have not demonstrated that they are likely to succeed on the merits. Under arbitrary and capricious review, Plaintiffs bear a heavy burden to show that ED irrationally connected the facts to its conclusions. They have not met this burden. Instead, they mischaracterize the scope of the Rule, the definition of sexual harassment, and the extent to which the Rule applies to off-campus conduct. Plaintiffs' challenge to the grievance process, which requires recipients to adjudicate formal complaints fairly to reach factually reliable outcomes, fares no better. The grievance process promotes the interests of

1

complainants, respondents, and recipients by requiring postsecondary institutions to provide a live hearing with cross-examination by advisors, while including procedural safeguards to mitigate the risk of trauma to complainants. There is no basis to conclude that such requirements are arbitrary, particularly in light of several appellate decisions recognizing that procedures like those set forth in the Rule are necessary to prevent sex discrimination and comport with due process of law and fundamental fairness. Nor can Plaintiffs succeed in their arguments that ED's cost-benefit analysis, which is not subject to judicial review, contravenes the Administrative Procedure Act (APA), or that the Rule is not a logical outgrowth of the proposed rule. In any event, preliminary relief would be unwarranted because Plaintiffs have not established any imminent and substantial irreparable injury and the balance of the equities weighs in favor of the government.

## BACKGROUND

## I.      Statutory Background and Prior OCR Guidance

ED has never before issued binding regulations that specifically identify sexual harassment as unlawful sex discrimination under Title IX. ED's Office for Civil Rights ("OCR") has instead issued guidance documents that explained how it believed schools should resolve allegations of sexual harassment and sexual violence. This guidance included documents issued in 2001, 66 Fed. Reg. 5,512–01 (Jan. 19, 2001); 2011, *Dear Colleague Letter (DCL) from Assistant Secretary for Civil Rights*, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; and 2014, *Questions and Answers (Q&A) on Title IX and Sexual Violence*, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

The latter two guidance documents were widely derided for ignoring students' rights and failing to yield reliable outcomes. *E.g.*, Am. Coll. of Trial Lawyers, *White Paper on Campus Sexual Assault Investigations*, https://www.actl.com/docs/default-source/default-document-library/position-statements-and-white-papers/task_force_allegations_of_sexual_violence_white_paper_final.pdf; *Open Letter from Members of the Penn Law School Faculty*, http://media.philly.com/documents/OpenLetter.pdf. Students found responsible for sexual misconduct under these guidance documents regularly won lawsuits against their schools. *See* Jeannie Suk

2

Gersen, *How Concerning Are the Trump Administration's New Title IX Regulations?*, The New Yorker (May 16, 2020), https://www.newyorker.com/news/our-columnists/how-concerning-are-the-trump-administrations-new-title-ix-regulations ("Since 2011, hundreds of accused students have sued their schools for using unfair disciplinary procedures, and have won court judgments or received settlements.").

On September 22, 2017, OCR withdrew "the statements of policy and guidance reflected in" the 2011 DCL and the 2014 Q&A. *DCL from Assistant Secretary for Civil Rights*, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. OCR announced that it would engage in future rulemaking "to develop an approach to student sexual misconduct that responds to the concerns of stakeholders and that aligns with the purpose of Title IX to achieve fair access to educational benefits." *Id.*

## II.    The Rule

ED released its proposed rule on November 29, 2018. Proposed Rule, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462 (Nov. 29, 2018) ("NPRM"). ED released the final Rule informally on May 6, 2020, and it was published in the Federal Register on May 19, 2020. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) ("Rule"). Upon consideration of over 124,000 public comments, ED explained its responses to public comments, its reasoned basis for the provisions of the Rule, and its rationale for departures from prior guidance. *Id.* at 30,026-30,579. The Rule contains the following key provisions:

### A.    General Obligation to Respond to Sexual Harassment

Under the Rule, sexual harassment that violates Title IX includes (1) an employee of the recipient conditioning an educational benefit or service upon a person's participation in unwelcome sexual conduct; (2) unwelcome sexual conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; and (3) sexual assault, dating violence, domestic

violence, or stalking (as those offenses are defined in the Clery Act, 20 U.S.C. § 1092(f), and the Violence Against Women Act, 34 U.S.C. § 12291(a)). 34 C.F.R. § 106.30(a).

A recipient must respond to sexual harassment when (1) it has actual knowledge of sexual harassment (2) that occurred within the recipient's education program or activity (3) against a person in the United States. *Id.* § 106.44(a). "Actual knowledge" includes notice "to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient." *Id.* § 106.30(a). And recognizing the unique circumstances of K-12 students, the Rule defines actual knowledge to also include notice to "any employee of an elementary and secondary school."[1] An "education program or activity" includes situations over which the recipient exercises substantial control and buildings owned or controlled by student organizations officially recognized by a postsecondary institution. *Id.* § 106.44(a). A recipient violates Title IX when its response to sexual harassment is clearly unreasonable in light of the known circumstances. *Id.*

When a recipient has actual knowledge of sexual harassment, it must "promptly contact the complainant to discuss the availability of supportive measures as defined in § 106.30, consider the complainant's wishes with respect to supportive measures [and] inform the complainant of the availability of supportive measures with or without the filing of a formal complaint." *Id.* § 106.44(a). Supportive measures are "non-disciplinary, non-punitive individualized services" "designed to restore or preserve equal access to the recipient's education program or activity

---

[1] Recipients' websites must prominently display the contact information for the Title IX Coordinator, and recipients must notify applicants for admission and employment, students, parents or legal guardians of elementary and secondary school students, employees, and all unions of the Title IX Coordinator's name or title, office and e-mail address, and telephone number. 34 C.F.R. § 106.8(a)-(b). Any person (whether or not the alleged victim) may report sex discrimination, including sexual harassment, in person, by mail, by telephone, or by e-mail, using the information listed for the Title IX Coordinator, or by other means that result in the Title IX Coordinator receiving the person's report, including outside business hours. *Id.*

without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter sexual harassment." *Id.* § 106.30(a). The recipient's Title IX Coordinator must also explain the process for filing a formal complaint. *Id.* § 106.44(a).[2]

### B.      A Fair Grievance Process to Resolve Formal Complaints

Where a complainant (or the Title IX Coordinator) files a formal complaint of sexual harassment, the Rule mandates a consistent, transparent grievance process to resolve that complaint fairly and accurately. 34 C.F.R. § 106.45. Its principal features are summarized below.

**No Discipline Prior to Finding of Responsibility.** A grievance process must "provid[e] remedies to a complainant where a determination of responsibility for sexual harassment has been made against the respondent." *Id.* § 106.45(b)(1)(i). Because recipients must "[i]nclude a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process," *id.* § 106.45(b)(1)(iv), recipients must "follow[] a grievance process that complies with this section before the imposition of any disciplinary sanctions." *Id.* § 106.45(b)(1)(i).[3]

**Determinations Based on Evidence.** The Rule requires "an objective evaluation of all relevant evidence," *id.* § 106.45(b)(1)(ii); provides that "credibility determinations may not be based on a person's status as a complainant, respondent, or witness," *id.*; and requires that Title IX Coordinators, investigators, decision-makers, and facilitators of informal resolution "not have a conflict of interest or bias" for or against complainants or respondents. *Id.* § 106.45(b)(iii). Questions and evidence about the complainant's sexual predisposition or prior sexual behavior are not relevant, with limited exceptions. *Id.* § 106.45(b)(6)(i)-(ii).

---

[2] A formal complaint is defined in 34 C.F.R. § 106.30(a). The Rule clarifies that where parents or guardians have the right to act on behalf of a minor child under state law, that right extends to filing a formal complaint or otherwise acting under the Final Rule. *Id.* § 106.6(g).

[3] The Rule makes clear, however, that schools may immediately remove respondents on an emergency basis where appropriate. *Id*. § 106.44(c).

**Written Notice**. Upon receipt of a formal complaint, a recipient must provide written notice that includes "[n]otice of the recipient's grievance process," *id.* § 106.45(b)(2)(i)(A), and "[n]otice of the allegations of sexual harassment potentially constituting sexual harassment as defined in § 106.30, including sufficient details known at the time and with sufficient time to prepare a response before any initial interview." *Id.* § 106.45(b)(2)(i)(B). Sufficient detail is defined to "include the identities of the parties involved in the incident, if known, the conduct allegedly constituting sexual harassment under § 106.30, and the date and location of the alleged incident, if known." *Id.*[4]

**Investigations.** A recipient must investigate the allegations of every formal complaint. 34 C.F.R. § 106.45(b)(3)(i).[5] In doing so, a recipient must "[p]rovide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence." *Id.* § 106.45(b)(5)(ii). It may not "restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence." *Id.* § 106.45(b)(5)(iii). A recipient must send the parties and their advisors an electronic copy or hard copy of evidence that is directly related to the allegations, with ten days for the parties to review and respond. *Id.* § 106.45(b)(5)(vi). A recipient must then send the parties and their advisors a copy of the investigative report summarizing relevant evidence, with ten days to review and respond. *Id.* § 106.45(b)(5)(vii). The Rule also permits (but does not require) schools to facilitate

---

[4] Recipients must also provide written notice to parties about investigatory interviews and meetings. *Id.* § 106.45(b)(5)(v).

[5] A recipient must dismiss a formal complaint where "the conduct alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States." *Id.* § 106.45(b)(3)(i). Such a dismissal, however, is only for purposes of Title IX and "does not preclude action under another provision of the recipient's code of conduct." *Id.*

informal resolution of formal complaints, provided that the parties voluntarily agree and the allegations do not concern harassment of a student by an employee. *See id.* § 106.45(b)(9).

**Hearings Required at the Postsecondary Level.** Absent an informal resolution, postsecondary institutions must conduct live hearings before reaching a determination. *Id.* § 106.45(b)(6)(i). At a hearing, "the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility." *Id.* While cross-examination "must be conducted directly, orally, and in real time," it may only be conducted "by the party's advisor of choice and never by a party personally[.]" *Id.*[6] Moreover, "[a]t the request of either party, the recipient must provide for the live hearing to occur with the parties located in separate rooms with technology enabling the decision-maker(s) and parties to simultaneously see and hear the party or the witness answering questions." *Id.*[7] Only relevant cross-examination and other questions may be asked of a party or witness." *Id.* Before each answer, "the decision-maker(s) must first determine whether the question is relevant and explain any decision to exclude a question as not relevant." *Id.* Recipients other than postsecondary institutions (including K-12 schools) may, but need not, provide for a live hearing—though they must "afford each party the opportunity to submit written, relevant questions that a party wants asked of any party or witness, provide each party with the answers, and allow for additional, limited follow-up questions from each party." *Id.* § 106.45(b)(6)(ii).

**Standard of Evidence.** A school may elect "whether the standard of evidence to be used to determine responsibility [in its grievance process] is the preponderance of the evidence standard or the clear and convincing evidence standard," provided that the same standard applies (1) for

---

[6] "If a party does not have an advisor present at the live hearing, the recipient must provide without fee or charge to that party, an advisor of the recipient's choice, who may be, but is not required to be, an attorney, to conduct cross-examination on behalf of that party." *Id*. § 106.45(b)(6)(i).

[7] "If a party or witness does not submit to cross-examination . . . , the decision-maker(s) must not rely on any statement of that party or witness in reaching a determination regarding responsibility; provided, however, that the decision-maker(s) cannot draw an inference about the determination regarding responsibility based solely on a party's or witness's absence from the live hearing or refusal to answer cross-examination or other questions." 34 C.F.R. § 106.45(b)(6)(i).

claims against students as against employees, and (2) to all formal complaints of sexual harassment. *Id.* § 106.45(b)(1)(vii); *see also id.* § 106.45(b)(7)(i). At all times, "the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest[s] on the recipient and not on the parties." *Id.* § 106.45(b)(5)(i). Decision-makers must issue a written determination explaining the result and rationale as to each allegation and send the written determination simultaneously to both parties. *Id.* § 106.45(b)(7).

**Appeal Rights.** A recipient "must offer both parties an appeal from a determination regarding responsibility, and from a recipient's dismissal of a formal complaint or any allegations therein," on the bases of procedural irregularity, newly discovered evidence, or bias or conflict of interest, that affected the outcome of the matter. *Id.* § 106.45(b)(8)(i). Appeals may be offered on other bases if they are offered equally to both parties. *Id.* § 106.45(b)(8)(ii).

**Prompt Time Frames.** A grievance process must "[i]nclude reasonably prompt time frames for conclusion of the grievance process . . . and a process that allows for the temporary delay of the grievance process . . . for good cause with written notice to the complainant and the respondent of the delay or extension and the reasons for the action." *Id.* § 106.45(b)(1)(v).

## LEGAL STANDARDS

Plaintiffs have moved for a preliminary injunction under Federal Rule of Civil Procedure 65. "A preliminary injunction is an extraordinary and drastic remedy" and "should never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted). A plaintiff is entitled to such an "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To establish such entitlement, a plaintiff must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. The last two factors merge when the government is the opposing party. *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019).

Plaintiffs have alternatively moved for a stay under 5 U.S.C. § 705, which authorizes "the reviewing court" to stay "the effective date of an agency action" pending judicial review "to

prevent irreparable injury." 5 U.S.C. § 705. The same factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay. *Dist. of Columbia v. U.S. Dep't of Agric.*, No. CV 20-119 (BAH), 2020 WL 1236657, at *8 (D.D.C. Mar. 13, 2020) (citing authority).

## ARGUMENT

## I.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.

### A.   The Rule Does Not Impose Unlawful Geographical Restrictions.

Plaintiffs' argument that "the Rule unlawfully places geographic restrictions on Title IX's protections," Pls.' Mem. in Supp. of Mot. for Prelim. Inj. at 23, ECF No. 22-2 ("Mot."), rests on a misunderstanding of the Rule. The Rule's approach to sexual harassment occurring in an "education program or activity" reflects and applies (1) Title IX's statutory language ("education program or activity" in 20 U.S.C. § 1681(a)), (2) Title IX's statutory definition of "program or activity" in 20 U.S.C. § 1687, and (3) the Supreme Court's interpretation and application of these statutory phrases in the context of sexual harassment under Title IX. The Rule states, "A recipient with actual knowledge of sexual harassment *in an education program or activity of the recipient* against a person in the United States, must respond promptly in a manner that is not deliberately indifferent." 34 C.F.R. § 106.44(a) (emphasis added). The text of the Rule builds upon the definition of "program and activity" in 20 U.S.C. § 1687 and 34 C.F.R. § 106.2(h), by clarifying that an "education program or activity" is not limited to sexual harassment that occurs on campus, or even "locations . . . over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs." *Id.* Rather, an "education program or activity" means "all of the operations of" the recipient under § 1687, including "events" and "circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs." Rule at 30,196; *see also id.* at 30,196-97. The *only* geographic limitation in the Rule is that the sexual harassment must occur in the United States. Plaintiffs do not challenge that restriction, which follows directly from the plain text of Title IX. 20 U.S.C. § 1681(a).

Because Plaintiffs misconstrue the Rule, the allegedly "absurd results" that they criticize, *see* Mot. at 23, are not results of the Rule at all. For example, Plaintiffs assert that "on campus taunts and name calling after reported off-campus rape by two high-school boys may not meet the Rule's definition." *Id.* But this example *would* occur in an education program or activity because harassment that occurs "on campus" is part of the "operations of" the school. *See* 20 U.S.C. § 1687; Rule at 30,196 ("all of the operations of a recipient (per existing statutory and regulatory provisions), and the additional 'substantial control' language in these final regulations, clearly include all incidents of sexual harassment occurring on a recipient's campus"). In explaining that "sexual harassment incidents occurring off campus may fall under Title IX," ED noted approvingly a Second Circuit decision, in which the "plaintiff sufficiently alleged sexual harassment to which the school was deliberately indifferent where the harassment consisted of on-campus taunts and name-calling directed at the plaintiff after she had reported being raped off campus by two high-school boys." Rule at 30,200 (citing *Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46 (2d Cir. 2006)). ED concluded, "The final regulations would similarly analyze whether sexual harassment . . . in the recipient's program or activity triggered a recipient's response obligations regardless of whether such sexual harassment stemmed from the complainant's allegations of having suffered sexual assault (e.g., rape) outside the recipient's program or activity." *Id.*; *see also id.* at 30,196.

Plaintiffs also claim that "use of [a] personal phone to post sexually harassing messages online 'during class time' may fall under Title IX, but the same conduct five feet off campus would not." Mot. at 23. The Rule says nothing of the sort. Rather, in response to commenters' concerns that the Rule would not require schools to respond to sexual harassment that occurred electronically or online, ED stated that the "final regulations apply to sexual harassment perpetrated through use of cell phones or the internet if sexual harassment occurred in the recipient's education program or activity." Rule at 30,202. Such activities are not limited to school

grounds. The Rule does not exclude conduct that occurs five feet off campus so long as the circumstances indicate that the conduct occurred in the recipient's education program or activity.[8]

Further, even if these hypothetical scenarios were true, they do not support Plaintiffs' *facial* challenge to the Rule. To prevail on a facial challenge, "the plaintiffs 'must establish that no set of circumstances exists under which the [regulation] would be valid.'" *Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011). "The fact that [Plaintiffs] can point to a hypothetical case in which the rule might lead to an arbitrary result does not render the rule 'arbitrary or capricious.'" *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991). To the extent that the Rule does not reach some conduct that Plaintiffs believe it should reach, that result comes from the statute. As the Rule explains, "The Department's authority to regulate sexual harassment depends on whether sexual harassment occurs in 'any education program or activity' because the Department's regulatory authority is co-extensive with the scope of the Title IX statute." Rule at 30,195-205; *see also* 34 C.F.R. § 106.2(h) (incorporating Title IX's definition of "program or activity," 20 U.S.C. § 1687).[9]

ED reasonably relied in part on the Supreme Court's description of an "education program or activity" in *Davis* in crafting the Rule. *See* Rule at 30,200. The portion of *Davis* discussing this term does not narrow the statutory definition of "program or activity," *see* 20 U.S.C. § 1687. Instead, it clarifies that education programs or activities are not limited to on-campus education programs or activities. *See Davis*, 526 U.S. at 652 (holding that "the provision that the discrimination occur 'under any education program or activity' suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity"). ED found *Davis* persuasive in delineating Title IX's jurisdictional

---

[8] The last allegedly "absurd and arbitrary result" is a perceived inconsistency with Title VI, which, like Title IX, prohibits certain forms of discrimination. *See* Mot. at 25. Plaintiffs argue that because Title VI imposes no geographic restrictions, the Rule's alleged restrictions would lead to inconsistencies between the two statutes. But the Rule does not impose geographical restrictions. Therefore, there are no such inconsistencies with Title VI.

[9] In addition, ED explained that it also relied on other regulatory definitions of "program or activity." Rule at 30,196 (citing 34 C.F.R. § 106.2(h)).

boundaries because "the Supreme Court applied the language of the statute including the definitions of 'program or activity' provided in the statute." Rule at 30,196. True, the Supreme Court found the term "under" (which modifies "discrimination" rather than "excluded from participation" or "denied the benefits") significant in limiting the scope of harassment that could rise to actionable discrimination under Title IX. *See* Mot. at 25. But the Supreme Court did not cabin its analysis to this term. *See, e.g.*, *Davis*, 526 U.S. at 644 ("The statute's plain language confines the scope of prohibited conduct *based on the recipient's degree of control over the harasser and the environment in which the harassment occurs*." (emphasis added)). ED reasonably concluded that "education program or activity" means the same thing regardless of whether the implicated conduct is discrimination, exclusion from participation, or denial of benefits. *See* Rule at 30,202-03.

### B.    The Rule's Definition of Sexual Harassment Is Reasonable.

Plaintiffs' arguments that the Rule's definition of sexual harassment unreasonably "rescind[s] decades of consistent and longstanding Department policy," Mot. at 25, are wrong. Title IX does not mention sexual harassment, let alone define it. Nor has ED ever issued a regulation that defines sexual harassment. The Rule's definition thus "narrows" no legally binding definition of sexual harassment and should be evaluated on its own terms.

The Rule's definition is reasonable for the reasons explained at length in the preamble. *See* Rule at 30,139-80. Plaintiffs nevertheless contend that the first and second parts of the definition are arbitrary. Plaintiffs are incorrect on both points.

As to *quid pro quo* harassment, ED reasonably defined sexual harassment to include "[a]n employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct," 34 C.F.R. § 106.30(a). ED concluded that *quid pro quo* sexual harassment "strikes at the heart of Title IX's mandate that education programs and activities remain free from sex discrimination," and that "even a single instance of *quid pro quo* harassment . . . is inherently offensive and serious enough to jeopardize equal educational access." *See* Rule at 30,147. It defined this prong "broadly to encompass

12

situations where the *quid pro quo* nature of the incident is implied from the circumstances," *id.*, to "appl[y] to all of a recipient's employees," *id.* at 30,148. But ED rejected the suggestion, repeated by Plaintiffs here, that the rule extend to "all agents of a recipient," noting that it was "persuaded by the Supreme Court's rationale in *Gebser* [*v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998)] that Title IX and Title VII differ with respect to statutory reliance on agency principles" because Title VII "explicitly defines 'employer' to include 'any agent'" and Title IX does not. *Id.* at 30,148 & n.646. ED emphasized that "the unwelcome conduct of a non-employee individual may constitute sexual harassment under the second or third prongs of the § 106.30 definition." *Id.* at 30,148. And the Rule does not prevent a school from choosing to prohibit such harassment under its code of conduct, regardless of whether it amounts to a violation of Title IX. *Id.* at 30,158.

In the face of this explanation, Plaintiffs' assessment that the *quid pro quo* prong should extend to students in all circumstances is nothing more than an improper attempt "to substitute [their] judgment for that of the agency." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The APA does not require an agency to adopt the policy judgment of any particular commenter, but merely to "examine the relevant data," including comments submitted during the comment period, "and articulate a satisfactory explanation for its action." *Id.* Here, ED considered Plaintiffs' point of view and concluded that the *quid pro quo* definition should be limited to employees. *See* Rule at 30,148. ED explained that Title IX does not impose strict liability on schools for an individual's *quid pro quo* harassment if he or she is not an employee. *See id.* To evaluate the reasonableness of this conclusion, the Court need look no further than the Supreme Court, which similarly concluded, "Title IX contains no . . . reference to an educational institution's 'agents,' and so does not expressly call for application of agency principles." *See Gebser*, 524 U.S. at 283; *see also Davis*, 526 U.S. at 643.

Turning to the second prong of the definition, ED reasonably incorporated the *Davis* standard, prohibiting "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity," 34 C.F.R. § 106.30(a). This definition comes directly

13

from the Supreme Court's statement that, "in the context of student-on-student harassment, damages are available *only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect*." *Davis*, 526 U.S. at 652 (emphasis added). As the Supreme Court has observed, "students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it," behavior that may be characterized as sexual harassment. *Id.* at 651-52. Just because that behavior might be characterized as sexual harassment, however, does not mean "that it denies its victims the equal access to education that Title IX is designed to protect." *Id.* at 652. ED agreed with the Supreme Court's analysis, concluding that Title IX does not "represent[] a 'zero-tolerance' policy banning all sexual harassment. Rather, interpretations of . . . Title IX focus on sexual harassment that constitutes sex discrimination interfering with equal participation in a[n] educational environment." Rule at 30,154. Furthermore, ED concluded that adopting the *Davis* standard would ensure the imposition of consistent requirements in judicial and administrative contexts. *See id.* at 30,149-71.

Plaintiffs' response is yet another attempt to substitute their judgment for that of the agency. They assert that the *Davis* standard does not go far enough (i.e., that the definition should read "severe, pervasive, *or* objectively offensive" and that it should cover more conduct than that which "*effectively* denies equal access to education"). *See* Mot. at 26-27. But Plaintiffs cite nothing in the text or legislative history of Title IX that requires their preferred definition, nor do Plaintiffs explain how an expansion of the *Davis* standard sufficiently protects free speech and academic freedom in an educational environment. *See* Rule at 30,161-65. They also argue that the *Davis* standard will result in absurd outcomes. Once again, hypothetical applications of a regulation are "irrelevant" to a facial challenge. *See Sherley*, 644 F.3d at 397. And at any rate, Plaintiffs' example of "weeks of inappropriate sexual touching by a teacher or classmate" in fact would constitute "severe" conduct. As the Rule explains, schools should evaluate the severity element of the *Davis* standard in a common sense manner that takes into account the context and circumstances of

particular incidents, viewed as a reasonable person in the complainant's position. *Id.* at 30,156, 30,165.[10]

Plaintiffs' criticisms of the "effectively denies equal access to education" language in the *Davis* standard, *see* Mot. at 26-27, does not support an APA challenge for similar reasons. Again, Plaintiffs point to nothing in Title IX's text or legislative history that prohibits ED from defining *sexual harassment* as certain conduct that "effectively denies a person equal access to the recipient's education program or activity." They argue this language "has no home in the plain text" of the statute. *See id.* at 26. But ED relies on *Davis*, which held that to state a claim under Title IX, "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students *are effectively denied equal access to an institution's resources and opportunities*." 526 U.S. at 651 (emphasis added); *see also* Rule at 30,169-71.

Disregarding this reasonable reliance on the Supreme Court's formulation, Plaintiffs argue that students may be sexually harassed even if they are not *effectively* denied equal access to an education program or activity. *See* Mot. at 26. ED agrees. That is why the Rule covers forms of sexual harassment without evaluating whether it effectively denies equal access. *See* Rule at 30,169. The Rule also applies to *quid pro quo* sexual harassment as well as "'[s]exual assault' as defined in 20 U.S.C. 1092(f)(6)(A)(v), 'dating violence' as defined in 34 U.S.C. 12291(a)(10), 'domestic violence' as defined in 34 U.S.C. 12291(a)(8), or 'stalking' as defined in 34 U.S.C. 12291(a)(30)," none of which are evaluated for the *Davis* elements of severity, pervasiveness, objective offensiveness, or effective denial of equal access. *Id.* at 30,170; 34 C.F.R. § 106.30(a).

Plaintiffs also argue that ED should "define what conduct 'effectively denies equal access,'" Mot. at 26 n.16. But agencies are not obligated to define terms at such a level of granularity, particularly when such terms involve fact specific "judgment calls." *Carstens v.*

---

[10] Indeed, one instance of such inappropriate touching in the form of fondling constitutes "sexual assault," which is included in the Rule's definition of sexual harassment. 34 C.F.R. § 106.30(a); *see also* Rule at 30,574 (prohibiting "sexual assault," 20 U.S.C. § 1092(f)(6)(A)(v), which includes the offense of "fondling").

*Nuclear Regulatory Comm'n*, 742 F.2d 1546, 1558-59 (D.C. Cir. 1984). As ED has explained, what qualifies as effective denial is fact specific and must be evaluated from the perspective of a reasonable person from the complainant's perspective. Rule at 30,169–70. This standard "protects complainants against school officials inappropriately judging how a complainant has reacted to the sexual harassment." *Id.* Nevertheless, ED responded to comments inquiring how this definition would be applied, *id.* at 30,170, and directly refuted Plaintiffs' assertion that a student must "be actually cut off from their education before conduct is addressed," Mot. at 26. *See* Rule at 30,169 (stating that "this element does *not* require that a complainant has already suffered loss of education before being able to report sexual harassment").

Next, Plaintiffs argue that administrative enforcement of the *Davis* standard is inconsistent with Title VI and Title VII. *See* Mot. at 27-28. In Plaintiffs' view, because Title VI and Title IX are similar, ED should have prohibited "severe, persistent, or pervasive" sexual harassment, as it has done in Title VI guidance documents (which are not legally enforceable) with respect to racial or national origin harassment. *See* Mot. at 27. This argument is incorrect. The *Davis* standard follows the Supreme Court's formulation of sexual harassment prohibited by Title IX; any difference from Title VI is baked into the Supreme Court's controlling formulation of sexual harassment under Title IX. Furthermore, Plaintiffs do not explain why this aspect of the Rule must be consistent with Title VI, other than to say that Title VI and Title IX are similar statutes. However, "[t]he APA does not require the Department to devise identical or even similar rules to eliminate discrimination on the bases of sex, race or disability," particularly where "[t]he statutory texts attending Title VI [and] Title IX . . . give no indication that regulations arising from . . . them must, or even may, serve as APA comparators." Rule at 30,528-29. In addition, a contrary principle would deny "agencies latitude to gradually promulgate regulations governing different subject matters under different statutes" and raise "gratuitous questions about whether to 'equalize up' or 'equalize down' the regulations across wide swaths of statutory regimes." *Id.* at 30,529. It would also fail "to account for the reasonable premise that the Federal government and its agencies are entitled to move cautiously, when they elect to do so at all, because of potentially significant

differences between how different statutes address different subject matters and the impact that too expeditious a shift might have on the field." *Id.*

There is no unlawful inconsistency with Title VII either. Plaintiffs are correct that there are some differences between the Rule's definition of *sexual harassment* under Title IX and that term's meaning under Title VII. But, as ED explained, these differences exist because of "[s]ignificant differences in these statutes." Rule at 30,151. The workplace is fundamentally different from schools, which are focused on "allowing for the social and developmental growth of young students learning how to interact with peers in the elementary and secondary school context; fostering robust exchange of speech, ideas, and beliefs in a college setting." *Id.* The Supreme Court has similarly warned that actionable sexual harassment varies depending on the context: "schools are unlike the adult workplace and . . . children may regularly interact in a manner that would be unacceptable among adults." *Davis*, 526 U.S. at 651. In light of these differences, ED concluded that the *Davis* standard was a permissible and preferable definition of *sexual harassment* in the educational context, and that it was not required to adopt an identical formulation of actionable sexual harassment as is applied under Title VII. Because Plaintiffs fail to explain why ED is precluded from adopting for administrative enforcement a definition of actionable sexual harassment applied by the Supreme Court in Title IX case law, their challenge fails.

Although the description of actionable harassment may differ among these statutes, it is not the case, as Plaintiffs suggest, that "students—and especially young children—should be subjected to more egregious physical or verbal mistreatment to have an actionable claim of harassment than adults in a workplace," Mot. at 27. In some respects, the Rule offers *more* protection for students than Title VII does for employees. As ED explained, "the final regulations obligate recipients to respond to single instances of sexual assault and sex-related violence more broadly than employers' response obligations under Title VII, where even physical conduct must be severe or pervasive and alter the conditions of employment, to be actionable." Rule at 30,151-52; *see also id.* at 30,574 (to be codified at 34 C.F.R. § 106.30(a)). And, once again, the Rule offers

17

a baseline of protection; misconduct that is not covered by Title IX still "may be actionable under another part of a recipient's code of conduct." *Id.* at 30,154.

Plaintiffs end their critique of the *Davis* standard by asserting that the Rule contains "no pages explaining why aligning with a judicially-created standard for private enforcement fulfills Title IX's mandate to eliminate sexual harassment." Mot. at 28-29. This assertion is not true; ED explained at length why the Rule appropriately adopted the *Davis* standard. *See, e.g.*, Rule at 30,036-38. More fundamentally, this argument reflects a misunderstanding of the Rule. The *Davis* standard is embodied in one of three prongs of the Rule's definition of *sexual harassment*; ED was not trying to, and did not, limit its definition to this prong. It simply concluded (reasonably) that its enforcement procedures should, at a minimum, include the Supreme Court's definition of *sexual harassment* under Title IX. *See id.* at 30,032-34 (discussing adoption, and adaption for administrative enforcement, of the Supreme Court's Title IX case law framework).

### C. The Rule Reasonably Links the Complainant's Ability to File a Formal Complaint to Participation or Attempted Participation in an Education Program or Activity.

To avoid denying potential remedies to sexual harassment victims due to the lapse of time, ED declined to impose an arbitrary time limit for filing a formal complaint. *See* Rule at 30,127, 30,086-87. Yet it also recognized that a Title IX recipient should not automatically be burdened with having to investigate formal complaints filed by individuals who are not associated in any way with the recipient. *Id.* Thus, the formal complaint definition tethers the obligation to investigate a formal complaint filed by a complainant to whether he or she is participating (or attempting to participate) in the recipient's education program or activity. *See id.* This condition is consistent with Title IX's application to "any education program or activity" receiving federal financial assistance, 20 U.S.C. § 1681(a), and is reasonably based on the complainant's connection to the recipient. *See* Rule at 30,127, 30,219. Moreover, the Rule makes clear that a complainant may be "attempting to participate" in a recipient's education program in a broad range of circumstances that do not require current enrollment, including *inter alia*, where a complainant (1) has withdrawn from a school due to alleged harassment and expresses a desire to re-enroll if the

recipient responds appropriately to the allegations, (2) has graduated but would like to participate in alumni events, or (3) is on a leave of absence to seek counseling. *See id*. at 30,138, 30,219. No such condition applies to reporting of sexual harassment, which anyone may do. *See id*. at 30,093, 30,129. When a school is on notice of sexual harassment, including through a report, § 106.44(a) the school is obligated promptly to contact the alleged victim and offer supportive measures, even if the alleged victim is not a student or employee of the school. *See id*. at 30,198 (definition of "complainant" as any "individual" means that a complainant entitled to supportive measures need not be a student or employee or have any relationship with the recipient).

Additionally, a Title IX Coordinator may sign a formal complaint even if the complainant is not participating in or attempting to participate in the education program or activity. 34 C.F.R. § 106.30(a) (definition of "formal complaint"). In some circumstances, a Title IX Coordinator's failure to file such a formal complaint may be considered deliberately indifferent (*i.e.*, clearly unreasonable in light of known circumstances). *Id*. § 106.44(a). If a Title IX Coordinator signs a formal complaint, the recipient must investigate the allegations, and must treat the alleged victim as the "complainant" and as a "party" to the grievance process; even a complainant with no relationship with the recipient could participate (or choose not to participate) in the grievance process. *See* Rule at 30,122 n.572.

Contrary to Plaintiffs' suggestion, the Rule's formal complaint definition does not prevent postsecondary institutions from responding to accusations that an employee assaulted non-student neighborhood residents. Mot. at 31. In such an instance, the Rule expressly allows a college to remove the employee on an emergency basis and does not require cross-examination of a complainant during the employee's post-removal opportunity to challenge that removal. *See* 34 C.F.R. § 106.44(c); *see also* Rule at 30,348; 34 C.F.R. § 106.6(f). Even without an emergency removal, a postsecondary institution could also institute supportive measures with respect to an employee-respondent accused of sexual assault, including restricting the employee from contacting other employees, students, or non-student neighborhood residents. Rule at 30,348. Thus, even under Plaintiffs' hypothetical, a postsecondary institution would be required to

promptly contact the complainant and offer supportive measures. 34 C.F.R. § 106.44(a). Finally, as noted above, the Rule allows an institution's Title IX Coordinator to sign a formal complaint even when the alleged victim chooses not to file one (or is not entitled to file one). *See id*. § 106.30(a) (defining "formal complaint").

### D. Requiring Dismissal of Formal Complaints That Do Not Allege Sexual Harassment Under Title IX Is Consistent With Title IX's Limits.

Even in addressing the serious problem of sexual harassment in schools, ED's authority is circumscribed to addressing conduct that may violate Title IX. *See* Rule at 30,289. "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Verizon v. FCC*, 740 F.3d 623, 634 (D.C. Cir. 2014) (citation omitted). Thus, § 106.45(b)(3)(i) specifies that if a recipient determines that the alleged conduct—even if proven— is not sexual harassment or that the conduct did not occur in an education program or activity, the recipient must dismiss the complaint for Title IX purposes. 34 C.F.R. § 106.45(b)(3)(i). Both parties must be notified of such a dismissal, *id*. § 106.45(b)(3)(iii), and have the equal right to appeal. *Id*. § 106.45(b)(8); *see* Rule at 30,289. Importantly, "such a dismissal does not preclude action under another provision of the recipient's code of conduct" and is only a dismissal "for purposes of" Title IX. 34 C.F.R. § 106.45(b)(3)(i).

ED specifically addressed commenters' unfounded concerns that this requirement would foster confusion and inefficiency by creating two different processes, one for sexual harassment and one for other sexual misconduct. Rule at 30,157. It explained that, as long as a recipient complies with the Rule for Title IX purposes, it retains discretion as to the process and standards it wishes to adopt to address non-Title IX misconduct. *Id*. Recipients could adopt a single policy for all sexual misconduct, regardless of whether it violates Title IX. *See id*. Or recipients could adopt a separate policy that involves sexual misconduct  that does not violate Title IX. *See id*. at 30,440; *see also infra* II.A. A recipient may also provide supportive measures to any alleged victim, regardless of whether the allegations involve sexual harassment covered under Title IX.

Thus, requiring dismissal of formal complaints that do not allege sexual harassment under Title IX is reasonable and consistent with ED's statutory authority.

      **E.**      **The Rule Reasonably Requires That Postsecondary Institutions Provide a Live Hearing With Cross-Examination By Advisors.**

            **1.**      **The Cross-Examination Requirement Rationally Balances the Interests of Both Complainants and Respondents.**

ED determined, consistent with the holdings of numerous appellate courts and after consideration of arguments for and against, that cross-examination is a valuable method of reaching reliable determinations and bolstering the legitimacy of Title IX hearings, thus serving the interests of complainants, respondents, and recipients. Rule at 30,311-14; *see also id.* at 30,359-62. ED noted that as "some States already provide rights to a robust hearing and cross-examination under State APA laws," "the notion of live hearings and cross-examination is not new or foreign to many postsecondary institutions." *Id.* at 30,313. Yet ED was also sensitive to concerns regarding the potential re-traumatization of complainants. To mitigate that risk while maintaining the utility of live hearings and cross-examination, the Rule provides numerous safeguards, including permitting recipients to adopt rules that ensure that any cross-examination is conducted in a non-abusive manner, allowing for the hearing to take place with the parties in separate rooms at the request of any party, limiting the questions to "[o]nly relevant cross-examination and other questions," excluding questions and evidence about the complainant's sexual predisposition or prior sexual behavior as not relevant with limited exceptions, and prohibiting a party from personally conducting a cross-examination. 34 C.F.R. § 106.45(b); *see also* Rule at 30,313-17. And a complainant must be offered supportive measures even if the complainant elects not to pursue a formal grievance process, or if the formal grievance process proceeds without the complainant's participation. 34 C.F.R. §§ 106.30(a), 106.44(a); *see also* Rule at 30,316, 30,551. ED thus reasonably balanced the competing interests and—consistent with other long-established adversarial proceedings—determined that the value of pursuing reliable, fair outcomes justified the cross-examination requirement.

Plaintiffs fall far short of demonstrating that the agency failed to consider the evidence before it. The "ample evidence" cited by Plaintiffs, *see* Mot. at 18-19—two articles, one which does not focus on the effects of cross-examination, and the other which pertains to a study of children in New Zealand ten years old or younger—was expressly acknowledged by ED in its discussion about the potential negative effects and reliability of cross-examination. Rule at 30,315 n.1200, 30,320-21 n.1222. That ED reasonably did not agree with Plaintiffs based on these sources does not render the rule deficient. *Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 436, 476-77 (D.D.C. 2015).

### 2.     Parties May Reasonably Select an Advisor of Their Choice.

Nor can Plaintiffs advance their argument by challenging the Rule's provision allowing third-party advisors to conduct cross-examination. Mot. at 19-20. ED took seriously commenters' concerns regarding the treatment of parties during cross-examination and required the aforementioned procedural safeguards for this reason. Rule at 30,315-17; *see also id.* at 30,339 (explaining the decision not to allow self-representation).[11] A teacher who has relationships with both the complainant and respondent, Mot. at 19, is not required to accept a role as advisor to either party, and regardless of the advisor's pre-existing relationship to the parties, a recipient's teacher is bound by the Rule's confidentiality provisions. 34 C.F.R. § 106.71. Irrespective of the advisor's relationship to the parties or the recipient, the recipient may require advisors to enter into a non-disclosure agreement consistent with the Rule. Rule at 30,297-98; *see also id.* at 30,340. And an "untrained angry parent or close friend," Mot. at 19, would be subject to the same rules of order and decorum as any other advisor, thus preventing the badgering of opposing parties and witnesses. Rule at 30,248; *see also id.* at 30,319-20.

Further, Plaintiffs ignore the benefits of allowing a party to choose his or her own advisor. There are "high stakes for all parties involved in sexual misconduct proceedings under Title IX,

---

[11] Again, the Rule confirms that ED appropriately considered the two sources cited by Plaintiffs— a law review article and a comment about the traumatization of complainants. *Compare* Mot. at 19-20 *with* Rule at 30,313-17.

and [] the outcomes of these cases can carry potentially life-altering consequences." *Id*. at 30,297. For that reason, "every party should have the right to seek advice and assistance from an advisor of the party's choice." *Id*. ED determined that "this provision will make the grievance process substantially more thorough and fairer and [] the resulting outcomes will be more reliable." *Id.*; *see also id.* at 30,298. Thus, *both* parties have the opportunity to obtain an advisor to ask questions on the party's behalf, and those advisors are equally subject to rules of order and decorum that recipients may adopt. *Id.* at 30,315, 30,339; *see also id.* at 30,324.

ED has not "fail[ed] to address the 'important aspect' of inequity in the process, . . . wherein one party may be able to afford to retain a skilled attorney, while the other party, due to financial reasons, may rely on a friend or relative with no legal background[.]" Mot. at 19 (citations omitted). In fact, ED devoted an entire section to this very issue. Rule at 30,332-33; *see also id.* at 30,266. As ED explained, the Rule permits, but does not require, that an advisor be an attorney, and an advisor provided by a recipient to a party unable to obtain one likewise may be, but is not required to be, an attorney. *Id.* at 30,332. While ED acknowledged that parties "may believe that hiring an attorney as an advisor may be beneficial for the party and that parties often will have different financial means," it noted that "the § 106.45 grievance process is designed to permit both parties to navigate the process with assistance from any advisor of choice." *Id.*; *see also id.* at 30,299. ED also emphasized that the outcome of Title IX proceedings should not turn on whether one party's advisor is an attorney. *Id.* at 30,332; *see also id.* at 30,297. Of course, "nothing in the final regulations precludes a recipient" from offering to provide attorney advisors, *id.* at 30,340; *see also id.* at 30,299, and recipients may restrict advisors' active participation in the grievance process to conducting cross-examination, thus further reducing any inequity that may result from one party's retention of an attorney. 34 C.F.R. § 106.45(b)(5)(iv); *see also id*. § 106.45(b)(5)(i) (providing that the burden of proof rests on the recipient and not the parties, such that regardless of the skill of any party's advisor, the recipient must objectively evaluate relevant evidence in determining responsibility or non-responsibility).

Dissatisfied with this rationale, Plaintiffs claim the Rule "misses the point" because "mandating procedures in which one student party in an education setting may be subjected to courtroom-like interrogation does not ensure the 'fair' or 'equitable' process ED says will follow from the requirement and is belied by the evidence." Mot. at 19. But the grievance process does not contemplate that only "one student party" will be subject to cross-examination by a third-party advisor. Rather, both parties (and witnesses) are subject to cross-examination by advisors, Rule at 30,315, 30,324, 30,339; all parties and their advisors must equally be subject to any rules of decorum adopted by a recipient; and "[i]f a party . . . does not submit to cross-examination at the live hearing, the decision-maker(s) must not rely on any statement of that party or witness in reaching a determination regarding responsibility[,]" 34 C.F.R. § 106.45(b)(6)(i).

### 3.    ED Reasonably Declined To Adopt Plaintiffs' Preferred Alternatives.

Plaintiffs also cannot establish that ED "disregard[ed]" the two alternatives that Plaintiffs prefer: "questioning by a hearing officer or allowing the parties to submit written questions in advance of or in real time at the hearing." Mot. at 20. ED considered these options but "agree[d] with commenters that in too many instances recipients who have refused to permit parties or their advisors to conduct cross-examination and instead allowed questions to be posed through hearing panels have stifled the value of cross-examination by, for example, refusing to ask relevant questions posed by a party, changing the wording of a party's question, or refusing to allow follow-up questions." Rule at 30,313; *see also id.* at 30,316, 30,330, 30,340. The live hearing requirement "appropriately and reasonably balances the truth-seeking function of live, real-time, adversarial cross-examination in the postsecondary institution context with protections against personal confrontation between the parties." *Id.* at 30,330; *see also id.* at 30,330-54. ED thus reasonably explained that having cross-examination questions posed by a neutral school administrator, based

on submission of written questions from the parties, is not an effective substitute for the value and benefits of cross-examination and jeopardizes the neutrality of the recipient.[12]

To the extent Plaintiffs would prefer that recipients categorically exclude faculty and staff from serving as advisors, Mot. at 20, ED reasonably rejected that approach. It considered comments asserting that advisors selected by students could "have a conflict of interest and will raise confidentiality issues," but determined that it should not second-guess a student's choice of advisor. Rule at 30,297. In the entirely hypothetical event that a party were to select as an advisor an individual who is also a witness, "the perceived 'conflict of interest' created under that situation would be taken into account by the decision-maker in weighing the credibility and persuasiveness of the advisor-witness's testimony." *Id*. at 30,299.

Even if "courts have endorsed" some of the alternatives proposed by Plaintiffs, Mot. at 20, that merely supports a conclusion that ED could have rationally adopted a different requirement; it does not mean that the course chosen by the agency is beyond "the bounds of reasoned decisionmaking." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019). Plaintiffs have identified no basis to set aside the Rule's requirement of a live hearing with cross-examination, especially given court decisions—binding on plaintiffs Pennsylvania, New Jersey, Delaware, and Michigan—requiring and extolling the benefits of a live hearing with cross-examination in student misconduct proceedings at postsecondary institutions. *See, e.g.*, *Doe v. Univ. of Scis*., 961 F.3d 203, 214-15 (3d Cir. 2020); *Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018).

---

[12] Plaintiffs assert in passing that "[u]nder the Rule, all postsecondary schools must provide live hearings before making a determination regarding responsibility, even for proceedings involving young children, such as those involving allegations of sexual harassment at a college daycare center." Mot. at 18. But Plaintiffs provide no reason to conclude that a daycare facility is "an education program or activity" or a "postsecondary institution" subject to the Rule's live hearing requirements. And even if the daycare facility is affiliated with or even considered part of the same entity as the postsecondary institution, the daycare facility is not a postsecondary institution subject to the live hearing requirements. *Cf*. Rule at 30,446.

###### 4.     ED's Determinations Regarding Evidentiary Rules Are Reasonable

Plaintiffs also erroneously contend that the Rule is arbitrary because it "allows school[s] to adopt other 'equitable' procedures" governing hearings, but "inconsistently prohibits schools from adopting other reasonable rules of evidence, such as unfair prejudice, that would protect parties and allow the hearing officer to control the process." Mot. at 21 (citing 34 C.F.R. § 106.45(b)). In actuality, the Rule is clear that recipients may "[n]ot restrict the ability of either party . . . to gather and present relevant evidence." 34 C.F.R. § 106.45(b)(5)(iii); *accord* Rule at 30,336-37 ("[T]he final regulations do not allow a recipient to impose rules of evidence that result in exclusion of relevant evidence."). Recipients may adopt certain *other* rules governing the grievance process, including hearings, and *these* rules must "apply equally to both parties." 34 C.F.R. § 106.45(b). Thus, while "relevant evidence must be considered . . . [t]his does not preclude, for instance, a recipient adopting a rule or providing training to a decision-maker regarding how to assign weight to a given type of relevant evidence, so long as such a rule applies equally to both parties." Rule at 30,248 n.1021. There is no conflict between the Rule and its preamble.

Plaintiffs further complain that the Rule does not import "commonly-used rules of evidence" that would permit consideration of statements made by individuals who do not submit to cross-examination. Mot. at 21. Yet ED acknowledged that its rule regarding hearsay "is a broader exclusionary rule than found in the Federal Rules of Evidence." Rule at 30,348. ED explained this decision, noting that "recipients are educational institutions that should not be converted into de facto courtrooms" and that it had therefore chosen "a process that simplifies evidentiary complexities while ensuring that determinations regarding responsibility result from consideration of relevant, reliable evidence." *Id.*; *see also id.* at 30,051 (schools "are not courts of law, and are not staffed with judges and attorneys or vested with subpoena powers"). The Rule does not require decisionmakers or advisors to be attorneys, and simple and administrable evidentiary rules avoid "over-legalizing" a grievance process that is "designed for implementation by non-lawyer recipient officials." *Id.* at 30,266, 30,348. Plaintiffs' disagreement with this decision

does not mean that ED did not consider the issues or that its choices were unreasonable.  *See Dep't of Commerce*, 139 S. Ct. at 2569.

 **F.** **The Rule's Provisions Are Consistent With the Special Environment of K-12 Schools.**

 Plaintiffs are mistaken that the Rule fails to account for the unique circumstances of K-12 schools. Mot. at 14-17. Plaintiffs contend that requiring a grievance process before taking disciplinary action ignores the interests of K-12 educators in taking emergency measures when necessary to stop sexual harassment incidents before they escalate. *Id*. at 14-15. But if an individual poses an immediate threat to a K-12 student's safety, § 106.44(c) allows for emergency removal of that individual at any time. 34 C.F.R. § 106.44(c); Rule at 30,181. Moreover, because many common K-12 school actions are designed to quickly prevent escalation of existing incidents without being punitive nor disciplinary, they would be "supportive measures" allowed by § 106.30. For example, sending students to the principal's office, changing students' seating or class assignments, or advising students of the school's anti-sexual harassment policy and code of conduct, are not inherently punitive or disciplinary. *See* Rule at 30,182, 30,308. The Rule also allows mutual "no-contact orders" that prohibit communication or proximity between students as a supportive measure. *See id.* at 30,184. The purpose of such measures is to ensure student safety and to deter sexual harassment. The Rule thus does not prevent K-12 teachers or officials from taking "immediate, effective action" by, *inter alia*, "discuss[ing] . . . alleged misconduct with [a] student minutes after it has occurred." *Goss v. Lopez*, 419 U.S. 565, 580, 582 (1975).

 ED reasonably drew the line, however, at inherently punitive or disciplinary sanctions, which a K-12 recipient may impose only following a grievance process that meets the minimum requirements outlined in the Rule. 34 C.F.R. § 106.45.[13] Such sanctions include measures such as mandatory training or community service imposed solely on a student accused of but not found responsible for sexual harassment—rather than as preventive measures provided for all students.

---

[13] A respondent may also agree to such measures as part of an informal resolution. *See* Rule at 30,190.

*See* 34 C.F.R. § 106.30(a); Rule at 30,190 (discussing similar issue). The reason, as explained at length in the preamble, is that allegations of sexual harassment have serious consequences for the futures of both complainants and respondents, and recipients have obligations toward both complainants and respondents. *See* Rule at 30,046-53.   Just as recipients must ensure that complainants are not effectively excluded from participation in, denied the benefits of, or subjected to discrimination in their education program or activity as a result of sexual harassment, recipients must also ensure that respondents are not subjected to the same based on unproven allegations. *See id*. The grievance process that ED adopted in the Rule ensures a baseline level of fairness and predictability for all students, while recognizing that the K-12 setting materially differs from the postsecondary setting. *See id*. at 30,051-53, 30,327.

Contrary to Plaintiffs' assertion, Mot. at 15, in deciding to prohibit the single-investigator model, ED recognized that elementary and secondary schools generally have fewer resources than postsecondary schools. Rule at 30,371-72. While acknowledging such concerns, ED made clear that separating investigative and adjudicative functions is crucial for reducing the risk of unfairness, increasing the reliability of fact-finding, and enhancing the accuracy of Title IX adjudications. *Id*. at 30,371. And Plaintiffs fail to offer any tangible criteria, in terms of staff resources or otherwise, for providing an exception to the general requirement that the same person should not investigate and adjudicate a case. *Id*.

Moreover, Plaintiffs' objection regarding the process of filing a formal complaint in the K-12 setting, Mot. at 15-17, is misplaced. The Rule distinguishes a school's general response to a reported sexual harassment incident from circumstances that obligate a school to initiate a grievance process. Rule at 30,122. Any person—including a parent, schoolmate, or staff member—may report sexual harassment to a K-12 school employee. *See* 34 C.F.R. §§ 106.8(a), 106.30(a); *see also* Rule at 30,121-22.[14] This would include reporting on behalf of students who

---

[14] A K-12 recipient is also charged with actual knowledge based on "notice" to any K-12 school employee, including when such an employee observes, witnesses, or hears about potential sexual harassment. *See* Rule at 30,107, 30,116.

cannot write because of their stage of development or disability and does not require the participation of a parent or guardian. Such notice triggers the school's obligation to respond, including by offering supportive measures to the alleged victim. *See* 34 C.F.R. § 106.44(a); *see also* Rule at 30,122. But a Title IX recipient is obligated to begin a grievance process only where the complainant (or the complainant's parent or guardian) files, or a Title IX Coordinator signs, a formal complaint. *See* 34 C.F.R. §§ 106.6(g), 106.30(a) (defining "formal complaint"), 106.44(b)(1) (response to formal complaint); *see also* Rule at 30,122. In cases involving a minor child or student with a disability, a parent or guardian may file a formal complaint. 34 C.F.R. § 106.6(g); Rule at 30,122, 30,136.[15] The Rule adopts the formal complaint requirement to respect the autonomy of alleged harassment victims who do not wish to file formal complaints or participate in grievance processes. The requirement also avoids the burden on recipients if they were required to undertake likely futile investigations based on third-party formal complaints where the alleged victims refuse to participate. Rule at 30,122. Thus, contrary to Plaintiffs' representation, ED did consider the "important aspect[s] of the problem" in the K-12 setting. *State Farm*, 463 U.S. at 43; *see also* Rule at 30,482-93 (discussing application in K-12 setting).

Plaintiffs also err in contending that the Rule conflicts with a Title IX regulation governing ED's investigation of recipients that requires complainants' identities to be "kept confidential except to the extent necessary to carry out [*inter alia*,] the conduct of any investigation, hearing, or judicial proceeding arising [under ED's Title IX regulations]." Mot. at 17; *see* 34 C.F.R. § 100.7(e). ED has determined that prohibiting Title IX recipients from "restrict[ing] the ability of" complainants and respondents "to discuss the allegations under investigation," 34 C.F.R. §

---

[15] Contrary to Plaintiffs' representation, the Rule does not state that a Title IX Coordinator who signs a formal complaint may violate Title IX unless the Coordinator provides specific reasons for doing so. Mot. at 16-17. Rather, it is only if the act of filing the formal complaint were deliberately indifferent—for instance, if a Coordinator had no reasons at all—that the recipient would violate Title IX. *See* 34 C.F.R. § 106.45(b)(10)(ii); Rule at 30,045. By contrast, if—as in Plaintiffs' hypothetical—a complainant consents to the grievance process but merely lacks the ability to file a formal complaint because of youth or disability, and a parent or guardian cannot fill the void, the Coordinator would not be deemed deliberately indifferent for the act of filing the formal complaint. *See* Rule at 30,045.

106.45(b)(5)(iii), *is* necessary to carry out Title IX sexual harassment investigations. Rule at 30,295-97. Specifically, ED reasonably concluded that confidentiality concerns should not permit a recipient to impose a prior restraint on a students' ability to discuss allegations being investigated with, for example, a parent, teacher, or counselor. *Id*. at 30,295. Such discussions may be necessary for parties to prepare for their participation in the grievance process. *See id*. At the same time, in response to the concerns Plaintiffs articulate about a potential hostile environment or retaliation, the Rule prohibits any person from discussing allegations in a manner that is "intimidat[ing], threaten[ing], coerc[ing], or discriminating against any individual." 34 C.F.R. § 106.71; Rule at 30,296. This provision, *inter alia*, would allow a principal to warn students not to discuss allegations maliciously, because malicious discussion intended to interfere with Title IX rights constitutes prohibited retaliation. Rule at 30,296. ED considered restricting speech not rising to the level of retaliation or tortious conduct, and reasonably determined that the interest of a fair grievance process and the ability of students to confide in others generally outweighs concerns regarding such speech. *Id*. A school may, however, restrict parties from communicating with each other through mutual no-contact orders that constitute supportive measures. *Id*. at 30,297. And where sexual harassment is reported but no formal complaint is filed, a school may impose non-disclosure or confidentiality requirements on both complainants and respondents. *Id*. at 30,296.

Likewise, ED determined that affording a complainant and respondent an equal opportunity to inspect and review evidence obtained during an investigation, 34 C.F.R. § 106.45(b)(5)(vi), is necessary to carry out Title IX sexual harassment investigations. *See* Rule at 30,301-08. But once again, the Rule includes reasonable measures to ensure confidentiality: a school may require parties and advisors to sign a non-disclosure agreement that allows for review and use of such evidence only for purposes of the Title IX grievance process. *Id*. at 30,304. A school may also allow an investigator to redact information—including personally identifiable information—not directly related to the allegations. *Id*.; *see also id*. at 30,429. To prevent dissemination of sensitive materials such as photographs containing nudity, the Rule allows a school to use a file-sharing platform that restricts the ability of parties and advisors from

downloading or copying relevant evidence. *See id.* at 30,432. Schools may also notify parties that they may not photograph evidence or disseminate it to the public. *Id.* Therefore, Title IX recipients possess discretion to decide on appropriate measures to allow parties to respond to evidence, on the one hand, and to prevent its misuse in an impermissible manner, on the other, as long as such measures apply to both parties. *Id.* There is thus no conflict between these provisions and 34 C.F.R. § 100.7(e), which governs ED's investigation of recipients.

The Rule's provision regarding inspection of evidence also raises no concerns under the Family Educational Rights and Privacy Act (FERPA). In prior regulations, which Plaintiffs notably do not challenge, ED made clear that under FERPA, a parent or eligible student "has a right to inspect and review any witness statement that is directly related to the student, even if that statement contains information that is directly related to another student" if the information cannot be redacted without destroying its meaning. *See id.* at 30,424, 30,427 (quoting 73 Fed. Reg. 74,806, 74,832-33 (Dec. 9, 2008)). Evidence obtained as part of a Title IX investigation such as a witness's name in a witness statement cannot be meaningfully redacted because it directly relates to a formal complaint's allegations. *See id.* at 30,427; *see also id.* at 30,421-28 (discussing intersection between the Rule and FERPA). The Rule thus does not fail to account for confidentiality concerns, as Plaintiffs charge; it merely reaches a result different from one they would prefer.

### G.     There Is No Basis to Second-Guess ED's Cost-Benefit Analysis.

#### 1.     APA Review of an Agency's Cost-Benefit Analysis Under Executive Orders 12866 and 13563 Is Precluded.

Plaintiffs' claims relating to ED's cost-benefit analysis falter at the starting gate—that analysis is not subject to this Court's review. As an initial matter, "[w]hen Congress has intended that an agency engage in cost-benefit analysis, it has [generally] clearly indicated such intent on the face of the statute." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510 (1981). In Title IX, Congress not only declined to call for a cost-benefit analysis, but was silent as to costs altogether. 20 U.S.C. §§ 1681-88. That silence suggests that Congress would not expect agencies to forgo promoting civil rights merely for fear that doing so is too expensive. *See* Rule at 30,570.

Here, ED conducted a cost-benefit analysis, but only to comply with Executive Orders 12866 and 13563, Rule at 30,564, and alleged violations of these "Executive Orders cannot give rise to a cause of action" under the APA. *Fla. Bankers Ass'n v. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015). That is because "[a]n Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not subject to judicial review[,]" *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993). Executive Orders 12866 and 13563 are precisely such orders. Exec. Order No. 12866, §§ 1(b)(6), 10 (Sept. 30, 1993); Exec. Order No. 13563, §§ 1(b), 7(d) (Jan. 18, 2011). *See Air Transp. Ass'n v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999) (rejecting plaintiff's argument that "it does not seek to assert rights under the order but is merely referencing it to provide evidence of the arbitrary and capricious nature of the . . . decision," calling it "nothing more than an indirect—and impermissible—attempt to enforce private rights under the order").[16]

The D.C. Circuit's decision in *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012), provides no basis for review of ED's cost-benefit analysis. In that case, the court held that "when an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *Id.* at 1040. But ED did not "rely on" the cost-benefit analysis to justify the Rule; its assessment that the Rule's benefits justify the costs was not a reason for the Rule's adoption. *See* Rule at 30,028-30; *see also id.* at 30,564. ED's analysis is therefore not reviewable.

## 2.  ED's Cost-Benefit Analysis Is Reasonable.

Even if ED's cost-benefit analysis were reviewable, it would readily withstand scrutiny. The principle "that a court is not to substitute its judgment for that of the agency" is "especially true when the agency is called upon to weigh the costs and benefits of alternative policies." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (citations omitted).

---

[16] *Accord Fla. Bankers Ass'n*, 19 F. Supp. 3d at 118 n.1; *All. for Nat. Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 135 n.10 (D.D.C. 2011); *Trawler Diane Marie, Inc. v. Brown*, 918 F. Supp. 921, 932 (E.D.N.C. 1995); *cf. Defs. of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011).

Accordingly, courts "review an agency's cost-benefit analysis deferentially." *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 254 (D.C. Cir. 2013); *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040. A court must limit its role to determining "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985). It is not enough to argue that an agency "could have used *better* data," as "the sole question before [the court] is whether [the agency] has acted reasonably, not whether it has acted flawlessly." *NRDC v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008); *see also Am. Iron & Steel Ins. v. EPA*, 115 F.3d 979, 1004-05 (D.C. Cir. 1997) (explaining that a model that "may . . . be somewhat simplistic," or that "may at some level make assumptions that are not perfectly consistent with natural conditions . . . does not mean . . . that use of the model is arbitrary").

Plaintiffs suggest ED impermissibly "withheld underlying technical studies, reports, and information relied upon" in the NPRM, Mot. at 33, but ED appropriately apprised the public of the agency's initial economic impact analysis. 83 Fed. Reg. at 61,484-90. ED identified a Senate subcommittee report and Clery Act data as sources that informed how it established its baseline. *Id.* at 61,485. ED explained that its modeling took into account information from identified, publicly-available studies and statistics from the Labor Department. *Id.* at 61,485-86. And ED cited to publicly-available reports and studies underlying its initial cost estimates. *Id.* at 61,486-88; *see also* Rule at 30,550-51. ED also acknowledged its data limitations and invited comment from the public. 83 Fed. Reg. at 61,485-86; Rule at 30,551, 30,556.

Additionally, the APA requires only that an agency "set forth in its notice of proposed rulemaking 'either the terms or substance . . . or a description of the subjects and issues involved' in the proposed rule," *Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.*, 732 F.2d 219, 224 (D.C. Cir. 1984) (quoting 5 U.S.C. § 553(b)(3)), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). The comments ED received demonstrate that the agency provided sufficient information to generate meaningful comments, and ED accordingly revised its cost-benefit analysis in the Rule.

Rule at 30,565-69. Its changes were hardly nominal; whereas the regulatory impact analysis ("RIA") in the NPRM projected a net savings, the Rule projects a net cost of between $48.6 and $62.2 million over ten years. *Id.* at 30,565.

Plaintiffs' argument regarding the alleged withholding of information in the Rule, Mot. at 33, also fails. As in the NPRM, ED described how it arrived at a baseline, including a sensitivity analysis and citations to the sources relied on. Rule at 30,565-67. ED described (with citations) its assumptions for various recipient costs that underwent changes based on the comments submitted. *Id.* at 30,567-69. And in accordance with regulatory guidance, ED included "an accounting statement showing the classification of expenditures associated with the provisions of these final regulations." *Id.* at 30,570.[17]

Further, the record supports the calculations that Plaintiffs challenge. For instance, Plaintiffs claim that "the data sets contained in the Department's RIA calculating important baselines for determining costs, such as baseline numbers of investigations, were incomplete[.]" Mot. at 33-34. As ED explained, however, its baseline number of investigations is derived from publicly-available data from a Senate subcommittee report and the Clery Act. Rule at 30,552-54; *see also id.* at 30,555-56; 83 Fed. Reg. at 61,485-88. And importantly, ED "did not receive any quality alternatives[,]" notwithstanding its request that the public provide information about "any better approach to estimating these baselines." Rule at 30,565.

Plaintiffs assert that ED "failed to account for, or entirely underestimated," a variety of costs related to hiring, training, supportive measures, capital costs, investigations, and hearings, Mot. at 33, but that disagreement provides no basis for relief. The APA does not permit a court to set aside agency action, let alone stay an effective date, merely because plaintiffs disagree with the agency's reasonable calculations. *See Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 189 (D.D.C.

---

[17] Plaintiffs complain that their hired expert disagrees with some of ED's conclusions and has been unable to easily reproduce ED's calculations. Mot. at 33-34. However, a purported expert's assessment of the evidence is entirely irrelevant, as the Court's role is to determine if the agency's analysis was reasonable and supported by the record. *State of Cal. By & Through Brown v. Watt*, 712 F.2d 584, 606 (D.C. Cir. 1983); *see Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

2012), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013). And Plaintiffs' argument fails in light of the Rule itself, which demonstrates that ED considered the types of costs mentioned by Plaintiffs where warranted, including in response to submitted comments. *See* Rule at 30,548-68 (discussing costs related to, *inter alia*, hiring, training, revising policies, providing supportive measures, investigating complaints, conducting hearings, and facilitating informal resolutions; and revising estimates as appropriate). ED's analysis is more than sufficient. *See Inv. Co. Inst.*, 720 F.3d at 379; *see also Am. Min. Cong. v. EPA*, 907 F.2d 1179, 1186-87 (D.C. Cir. 1990).

Equally unavailing is Plaintiffs' assertion that ED "intentionally disregarded" and "ignored commenters' concerns" about costs associated with incidents of sexual harassment. Mot. at 33-34. The agency carefully considered these costs, *see* Rule at 30,538-69, but concluded that the costs of incidents of sexual harassment should not be included in the calculation of the likely effects of the Rule. *Id.* at 30,545-46. Specifically, because Clery Act data did not support a finding that the 2011 DCL affected the underlying rate of sexual harassment, ED lacked evidence to assume that the Rule would affect the underlying number of incidents of sexual harassment. *Id.* at 30,539-46; *see also id.* at 30,545.[18] An agency's analysis need only consider costs that are attributable to the rule itself. *See* OMB Circular A-4 at 15 (Sept. 17, 2003), https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf. *Cf. Ctr. for Auto Safety*, 751 F.2d at 1391. While Plaintiffs may disagree with ED's conclusion, they and other commenters failed to provide alternative data to more accurately capture an appropriate baseline, *see* 83 Fed. Reg. at 61,485-86; *see also* Rule at 30,551, and their alternative view of the evidence is insufficient to deem the Rule irrational. *See Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 12 (D.C. Cir. 2015); *see also Sierra Club v. EPA*, 167 F.3d 658, 662 (D.C. Cir. 1999) (when reviewing an agency's decision to proceed on the basis of "imperfect" data, courts "generally defer to an agency's decision").

---

[18] By contrast, other factors reported under the Clery Act such as the type of institution and the campus rate of crimes did correlate to the number of forcible sex offenses. Rule at 30,540.

Plaintiffs also contend that the Rule "will blunt deterrence and result in more harassment[.]" Mot. at 35. But the evidence before ED simply did not support that conclusion. Rule at 30,551. To reiterate, ED recognized that the available data established a relationship between certain factors and the number of incidents of sexual harassment, but was unable to conclude based on the evidence before it that the 2011 DCL had any definite effect on the underlying number of incidents of sexual harassment or assault. *Id.* at 30,540-41. ED thus lacked sufficient evidence to conclude that a student will refrain from committing sexual harassment based on regulatory action generally or the possibility of a Title IX investigation specifically. *Id.* at 30,539.[19] Nonetheless, ED now requires recipients to offer supportive measures because such measures are designed in part to "deter sexual harassment." 34 C.F.R. § 106.30(a); *see also* Rule at 30,539. In addition, schools can respond to misconduct that does not rise to the level of sexual harassment outside the Title IX context, *id.* at 30,037-38, and the possibility of criminal prosecution and/or tort claims will continue to have a deterrent effect on conduct for which such sanctions may be available.

In sum, none of Plaintiffs' miscellaneous objections to ED's cost-benefit analysis provides any basis for relief. ED has "explain[ed] the evidence which is available" and "offer[ed] a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 52 (citation omitted). Further, any error associated with ED's cost-benefit analysis would be harmless, particularly given the weighty benefits of the Rule. *See* 5 U.S.C. § 706; Rule at 30,560. ED's cost-benefit analysis survives any applicable APA scrutiny.

---

[19] The sources cited by Plaintiffs, Mot. at 35, do not focus on Title IX investigations or regulatory responses to sexual assault. Further, ED "d[id] not dispute the proposition that weak sanctions against sexual violence perpetrators and weak laws and policies related to sexual violence and sex equality are associated with a greater likelihood of perpetration." Rule at 30,070. ED nonetheless "believes that Title IX is a strong law, and that these final regulations constitute strong policy;" moreover, Title IX and the Rule remain focused on equal educational access for victims, and are not the sole source of sanctions for sexual violence. *Id.*

## H.      The Rule's Effective Date Is Neither Arbitrary Nor Capricious.

Plaintiffs incorrectly argue that ED acted arbitrarily in selecting the effective date for the Rule. Mot. at 8-13. The scope of arbitrary and capricious review is "narrow"—the Court determines "only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Commerce*, 139 S. Ct. at 2569 (citation omitted). As the Supreme Court has noted, "[i]t is not for us to ask whether [the agency's] decision was 'the best one possible' or even whether it was 'better than the alternatives.'" *Id.* (citation omitted)). Furthermore, "the agency normally retains considerable discretion to choose an effective date." *Recording Indus. Ass'n of Am. v. Copyright Royalty Tribunal*, 662 F.2d 1, 14 & n.34 (D.C. Cir. 1981) (collecting cases).

The effective date satisfies this deferential standard. ED was aware of the considerations that Plaintiffs identify—including COVID-19 and the vagaries of the states' own laws and collective bargaining agreements—and it considered those factors against the need to implement Title IX's nondiscrimination mandate through clear and legally binding rules. Rule at 30,028, 30,533-35. Plaintiffs simply second-guess ED's weighing of the disparate factors. But ED's decision was reasonable, particularly in light of the comments suggesting an effective date that would allow schools to come into compliance over "summer break" when recipients would have "more time and ability to address and implement the changes" and so that the new rule would be effective as students returned to classes for a fall term, which would reduce confusion over applying different rules to incidents in the same school year. Rule at 30,533-34. ED was not required to cater to the specific CBA or state statutory or regulatory context of every federal funding recipient; indeed, doing so would be unmanageable and could incentivize recipients to adopt burdensome procedures to impede regulation. *See id.* at 30,378 & n.1425.

Instead of catering to any one group, in selecting the effective date, ED considered both the need for recipients to come into compliance and the vital interest of students in the protections the Rule will afford. Indeed, because the Rule requires schools to offer supportive measures to all complainants and to adopt procedures that are unbiased, predictable, reliable, and fundamentally fair, students have a vital interest in the rapid adoption of such procedures. That interest need not

be abandoned because of the ongoing exigencies of COVID-19. Indeed, Plaintiffs do not claim that recipients' obligations under federal civil rights laws have been waived or stayed due to COVID-19, or identify any authority for such a waiver. Plaintiffs' suggestion that they be allotted years before they are required to provide, *inter alia*, complainants with supportive measures, 34 C.F.R. § 106.44(a), or complainants and respondents with due process, *id.* § 106.45(b)(1)-(8), indicates a puzzling indifference by Plaintiffs to the needs served by the Rule.

Furthermore, recipients and the public have been on notice since September 2017 that ED would be issuing regulations to address sexual harassment. Rule at 30,535. In fact, ED reasonably took recipients' interests into account by providing a longer effective date for the Rule than the 30-day transition period it has generally provided for other regulations promulgated under Title IX. *See, e.g.*, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 71 Fed. Reg. 62,530 (Oct. 25, 2006). Indeed, when ED issued past guidance on Title IX, such as the DCLs, it did so without advance notice. Plaintiffs gesture in an exhibit to other recent rules ED issued with longer transition times, Mot. at 10 (citing Ex. 12 at 68-19), but those rules were promulgated under Title IV of the Higher Education Act of 1965, as amended, which includes a statutorily-required transition period not applicable here. 20 U.S.C. § 1089(c)(1). ED declined to align the effective date of the Rule with that statutory scheme "because these final regulations concern improvement of civil rights protections for students and employees in the education programs and activities of all recipients of Federal financial assistance, not only those [postsecondary] institutions to which the Higher Education Act applies." Rule at 30,534.

In any event, Plaintiffs overstate the burden of the August 14 effective date.  Title IX training organizations have been training recipients on the Rule since the Rule was publicly released in May 2020, and continue to provide such training and advice on how to implement the Rule's provisions. One of the largest such training organizations, the Association of Title IX Administrators (ATIXA), has set up an entire site for Title IX Rule compliance, including offering members a Model Policy. 2020 Regs Rapid Response, ATIXA, https://atixa.org/r3/. The State University of New York (SUNY) system has been disseminating free guidance and advice

about implementing the Rule for colleges and universities, including a 14 step guide. 2020 Title IX Regulations, SUNY, https://system.suny.edu/sci/news/5-19-20-title-ix-regulations/index.html.

Plaintiffs likewise overstate their compliance burdens. For example, the Rule expressly does not mandate that recipients hire additional staff, Rule at 30,097, 30,252, and to the extent that the Rule requires advisors at hearings who can "ask the other party and any witnesses all relevant questions and follow-up questions," 34 C.F.R. § 106.45(b)(6), such advisors may be preexisting school employees. While Plaintiffs complain that they must "hire and/or train Title IX Coordinators," Mot. at 11, the requirement to designate a Title IX Coordinator has been in place since 1975, Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities § 86.8, 40 Fed. Reg. 24,139 (June 4, 1974). Indeed, if schools have followed ED's guidance they may need to make only minor adjustments to comply with the Rule, as described at 85 Fed. Reg. 30,034-036, 30,054-055, such as adjusting hearing procedures, posting the contact information of the Title IX Coordinator on the school's website, 34 C.F.R. § 106.8; offering supportive measures to complainants upon notice of a Title IX sexual harassment incident, *id.* § 106.44(a); and refraining from imposing discipline or punishment on a respondent unless the school follows the Rule's grievance process, *id.* §§ 106.44(a), 106.45(b)(1)(i). Similarly, while Plaintiffs cite the need to post training materials, Mot. at 11, ATIXA has already announced its intention to enable recipients to comply with the Rule's requirement to make training materials publicly available on school websites without violating the organization's intellectual property rights.[20]

Plaintiffs have identified no case that would require delay of the Rule's effective date under these circumstances. *See State Farm*, 463 U.S. at 43 (noting that "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute"). They cite *AFL & CIO v. Chao*, but

---

[20] *See, e.g.*, *Regs Rapid Response (R³)*, ATIXA, https://atixa.org/r3/; PR Newswire, www.prnewswire.com/news-releases/association-of-title-ix-administrators-atixa-to-facilitate-public-posting-of-its-title-ix-training-materials-301064168.html?tc=eml_cleartime.

there, the agency did not plan to make the required electronic reporting software available until *after* the effective date of the rule, and the court ultimately ordered the agency to set an effective date no more than ninety days after the reporting software was available. 298 F. Supp. 2d 104, 128 (D.D.C. 2004), *aff'd in part, vacated in part, rev'd in part*, 409 F.3d 377 (D.C. Cir. 2005). Here, the Rule is already available, and has been since it was informally released (identically to the formal publication) on May 6, 2020. Plaintiffs also cite *Nat'l Ass'n of Indep. Television Producers & Distributors v. FCC*, but there, the Second Circuit held an effective date unreasonable where the agency had adopted a much shorter compliance period than its earlier rulemakings on the subject and had failed to give third parties who had incurred significant costs in reliance on the existing rule "sufficient opportunity" to alleviate some of those costs. 502 F.2d 249 (2d Cir. 1974). By contrast, ED gave a longer compliance period than its earlier Title IX rulemakings and had no existing sexual harassment regulation that could have engendered analogous reliance. ED thus reasonably took into account the relevant factors, adopted an effective date within its statutory authority, and articulated a rational decision for its choice. The APA requires no more.

## I.     Plaintiffs' Logical Outgrowth Claim is Meritless.

Plaintiffs' claim that the NPRM provided no notice as to six of the Rule's provisions, Mot. at 35, is unavailing. It is hornbook law that the final rule need not be the one proposed in the NPRM; "[r]ather, '[a]n agency's final rule need only be a logical outgrowth of its notice.'" *Agape Church, Inc. v. FCC*, 738 F.3d 397, 422 (D.C. Cir. 2013) (citation omitted). The final rule is a logical outgrowth of the NPRM "if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009) (citation omitted). "The object, in short, is one of fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007).

First, contrary to Plaintiffs' claim, Plaintiffs had fair notice that the Rule would include a preemption provision. Mot. at 36. The NPRM contained a Federalism section, which acknowledged that provisions in the regulation would implicate federalism. *See* 83 Fed. Reg. at

61,495. And numerous commenters, including attorneys general from plaintiff-states, raised precisely the same federalism concerns that Plaintiffs now claim they could not anticipate. *See* Coalition of State Attorneys General comment ED-2018-OCR-0064-123878 at 51-52; Colorado Attorney General comment ED-2018-OCR-0064-10512, at 1; Virginia Attorney General comment ED-2018-OCR-0064-104600, at 4-5.[21] The submission of numerous comments on federalism and preemption confirms that commenters predicted that these issues could be in the Rule. *Stringfellow Mem'l Hosp. v. Azar*, 317 F. Supp.3d 168, 187 (D.D.C. 2018); *see* Rule at 30,454–63 (addressing numerous comments on federalism and preemption). And, of course, even without an express preemption provision, ED's regulation is within its authority to effectuate Title IX itself, 20 U.S.C. § 1682, and would thus preempt contrary state laws. *See Hillsborough Cty., Fla. Automated Med. Labs., Inc*., 471 U.S. 707, 713 (1985) ("We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes."). Thus, any supposed failure of notice would be harmless. *See FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 311 (D.D.C. 2016).

Second, though Plaintiffs claim that they lacked notice that schools cannot investigate misconduct under Title IX if a student is not "participating in or attempting to participate in the education program or activity," Mot. at 36, the NPRM's preamble contained the same language. *See* 83 Fed. Reg. at 61,468. That language is also drawn from the statute itself, which applies only to "any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. In any event, the Rule does not prohibit investigations into misconduct for students not participating in or attempting to participate in the education program or activity because the Rule gives Title IX Coordinators discretion to sign a formal complaint. 34 C.F.R. § 106.30.

Third, Plaintiffs had notice from the NPRM of the provision against retaliation that requires schools but not parties to keep information confidential during an investigation. Mot. at 37. The retaliation provision developed from the NPRM that recipients "not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence." 83

---

[21] Comments are accessible through Regulations.gov by the number of the comment or the name of the commenter.

Fed. Reg. at 61,498; *see also* 34 C.F.R. § 106.45(b)(5)(iii). It is also consistent with longstanding regulation, as ED never requires a complainant to keep confidential the name of the school or any of the parties at the school implicated by a complaint to ED. 34 C.F.R. § 100.7. Indeed, many commenters urged ED to include the retaliation provision, showing that they reasonably anticipated such a provision. 85 Fed. Reg. 30,535-38; *see, e.g.*, Student Advocates of Reed College's Sexual Assault Prevention and Response Program comment ED-2018-OCR-0064-9105 at 2; New York Six Liberal Arts Consortium comment ED-2018-OCR-0064-11903 at 5; Oregon Department of Education comment ED-2018-OCR-0064-104567 at 12.

Fourth, Plaintiffs challenge the Rule's severability provision, but that provision is not a substantive addition, so even if notice and comment were required, the error was not prejudicial. *See First Am. Discount Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (declining to decide whether final rule represented a logical outgrowth where petitioner suffered no prejudice). In any event, that provision reflected ED's conclusion that "each of the regulations discussed in this preamble would serve one or more important, related, but distinct purposes," Rule at 30,538, a conclusion that is supported by the NPRM's extensive discussion of those provisions. And this Court's ability to consider severability does not turn on the presence or absence of such a clause. *See Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990).

Fifth, the Rule's provision permitting consolidation of formal complaints if allegations arise out of the same circumstances, Mot. at 37 (citing § 106.45(b)(4)), *resulted* from ED's consideration of comments recommending revisions to the Rule to address situations with multiple parties. 85 Fed. Reg. at 30,291. After consideration, ED appropriately adopted commenters' suggestions. *See Appalachian Power Co. v. EPA*, 135 F.3d 791, 816 (D.C. Cir. 1998) (holding that "agency modification of a proposed rule, in response to the comments it solicited and received on alternative possibilities, complies with the requirements of administrative law"). Plaintiffs argue that if they had anticipated the consolidation provision, they would have commented that it would violate privacy interests. Mot. at 37. But the Rule does not require recipients to violate FERPA or

state privacy laws when consolidating complaints. The Rule permits but does not require consolidation. 34 C.F.R. § 106.45(b)(4).

Last, Plaintiffs assert that the Rule's preamble "sets forth new mandates" that are inconsistent with the Rule or make it more difficult for schools to limit harm to parties," Mot. at 37, but the only example cited is in fact consistent with the Rule, *see supra* I.E.4. Moreover, the NPRM proposed to "require recipients to provide parties with an equal opportunity to present witnesses and other inculpatory and exculpatory evidence," 83 Fed. Reg. at 61,475. This provision in the NPRM provided fair notice of ED's decision to allow a school to adopt "provisions, rules, or practices . . . as part of its grievance process for handling formal complaints of sexual harassment" so long as they "apply equally to both parties," Rule at 30,575. Plaintiffs' motion does not satisfy their burden to explain what further notice they believe the APA required.

✲✲

Finally, ED has not abandoned its longstanding objective to overcome discrimination, eliminate sex discrimination on campuses, and prevent harassment. *Contra* Mot. at 21-22. To the contrary, this Rule is a step forward in ED's efforts meaningfully to address sexual harassment. The Rule marks the first time that ED has set forth regulations for schools faced with allegations of sexual harassment in their education programs or activities. It imposes affirmative obligations on schools to respond to allegations of harassment, including by promptly offering supportive measures to complainants and informing complainants of the grievance process that is available to them to adjudicate any complaint they wish to file.

Contrary to Plaintiffs' assertions, the Rule nowhere limits the remedies for specific instances of sexual harassment to disciplinary sanctions. While the Rule requires recipients to "effectively implement remedies for the complainant, designed to restore or preserve the complainant's equal educational access," and it *allows* recipients to "impose disciplinary sanctions on the respondent," the Rule never *limits* recipients' responses to these actions, so long as the recipients do not otherwise violate the Rule. Rule at 30,044. ED has explained why the procedural floor set forth in the Rule is important. This floor ensures that schools provide due process for both

parties and that Title IX is enforced consistently with both constitutional due process and fundamental fairness. *Id*. at 30,047. Nothing in Title IX or ED's past practice prohibits these efforts.

## II. Plaintiffs Have Not Shown That Preliminary Relief Is Necessary to Prevent Irreparable Harm.

Plaintiffs have not demonstrated that they will suffer irreparable injury absent preliminary relief. The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). It is a "well known and indisputable principle[]" that an "unsubstantiated and speculative" harm cannot constitute an irreparable injury for purposes of injunctive relief. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). The movant must also "substantiate" its "claim that irreparable injury is 'likely' to occur" with appropriate evidence. *Id*. The harm must be "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citation omitted).

### A. Plaintiffs Have Not Demonstrated Irreparable Harm From the Need to Implement the Rule.

Plaintiffs assert that they will be injured by the "time and money" required to implement the Rule. Mot. at 38-41. However, even assuming that such injuries to the individual schools and school districts are attributable to plaintiff-states, this argument fails.

First, a merely economic injury does not provide a basis for injunctive relief, and Plaintiffs' effort to circumvent this principle by citing the federal government's sovereign immunity from damages is unavailing.[22] "[I]t proves too much to suggest that 'irreparable' injury exists, as a matter of course, whenever [an entity] seeks preliminarily to enjoin the implementation of a new regulatory burden," even given that "economic loss sustained due to a federal administrative action is typically 'uncompensable' in the sense that federal agencies enjoy sovereign immunity." *Cal.*

---

[22] Plaintiffs cite Judge Walton's decision in *Feinerman v. Bernardi*, 558 F. Supp. 2d 36 (D.D.C. 2008), as support, Mot. at 38, but fail to note that Judge Walton later held that *Feinerman* "goes too far" by characterizing such damages as irreparable *per se*. *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014).

*Ass'n of Private Postsecondary Schs. ("CAPPS") v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018). Instead, any "asserted economic harm must be significant, even where it is irretrievable because a defendant has sovereign immunity." *CAPPS*, 344 F. Supp. at 170 (citation omitted); *see also Save Jobs USA v. DHS*, 105 F. Supp. 3d 108, 115 (D.D.C. 2015); *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 25-26 (D.D.C. 2012); *Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). Indeed, "some concept of magnitude of injury is implicit in the preliminary injunction standards." *E.B. v. Dep't of State*, 422 F. Supp. 3d 81, 88 (D.D.C. 2019) (citation omitted).

Plaintiffs nowhere allege the sort of sufficiently severe economic losses that could justify emergency injunctive relief. Even a particularly large reduction in funds will not justify a preliminary injunction unless it endangers a plaintiff's ability to carry out its mission. *See Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96-97 (D.D.C. 2003) (holding that a reduction of more than $21 million in federal grants did not justify preliminary relief because plaintiff had not shown that the loss "so devastated its ability to carry out its mission that it will be unable to accept and implement the grant it did receive"). Here, many of the costs identified in Plaintiffs' declarations are quite modest and Plaintiffs make no effort to connect those costs to an inability of the Plaintiffs to carry out their missions. *See, e.g.*, Bakey Decl. ¶ 27, Ex. 38 (estimating that 12 individuals at the Goldey-Beacom College would need to receive training at the cost of "$100 to $500" each); Gardner Decl. ¶ 42, Ex 53 (estimating that Evergreen State College will need to re-print publications at an annual cost of $2,000). To conclude that Plaintiffs can meet their burden with such a minimal showing would mean that "a litigant seeking injunctive relief against the government would always satisfy the irreparable injury prong." *ConverDyn*, 68 F. Supp. 3d at 49.

Second, Plaintiffs' time and the performance of administrative work such as retraining and hiring staff or answering inquiries about the Rule fail to establish an irreparable injury. As noted above, Plaintiffs have not met the minimum threshold of establishing that such time and work would impose significant injuries on their operations, particularly given the breadth of state operations. If such administrative costs were sufficient, especially those arising at the local or

school level, states could challenge any change in federal policy having any effect on their residents.[23] Courts have rejected such sweeping state or local government claims as authority to sue the federal government. *Cf. Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 272 (4th Cir. 2011) (rejecting standing theory that would have permitted "each state [to] become a roving constitutional watchdog" of the federal government); *cf. Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (explaining that "ordinary compliance costs are typically insufficient to constitute irreparable harm" and collecting cases).

Plaintiffs also overstate the scale of the adjustments that will be necessary to the complaint processes of individual schools. Many aspects of the Rule that Plaintiffs criticize are similar to the 2011 DCL, which ED withdrew in September 2017, and to the processes that Plaintiffs identify at specific schools. For example, the 2011 DCL required that grievance procedures include an equal opportunity for both parties to present evidence. Rule at 30,054. Furthermore, many areas of divergence between the schools' current policies as identified by Plaintiffs and the Rule would actually *reduce* the burden on recipients if recipients choose to address only the misconduct covered by the Rule.

And much of the effort that Plaintiffs seek to rely on is *not* required by the Rule. For example, Plaintiffs suggest that they will be required to double their enforcement resources if schools choose to establish both a Title IX system and a parallel system, Mot. at 40-41, but Plaintiffs are free to decide whether to invest the time and money to create such non-Title IX systems. *See Barton v. Dist. of Columbia*, 131 F. Supp. 2d 236, 247 (D.D.C. 2001) ("A preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.") (citation omitted). If states could rely on voluntary change in response to governmental

---

[23] Although a court recently found irreparable harm based on states' compliance with a rule, the court determined the states' costs in the relevant program would "increase exponentially," as at least one state estimated its financial burden at $21 million over six years. *District of Columbia v. U.S. Dep't of Agric.*, No. CV 20-119 (BAH), 2020 WL 1236657, at *26 (D.D.C. Mar. 13, 2020), *appeal filed*, No. 20-5136 (D.C. Cir. May 14, 2020).  Here, plaintiff-states are far from alleging such an exponential increase in the cost of their educational programs.

action to establish irreparable harm, states would be able to show irreparable harm whenever the government did anything. That cannot be.

Likewise, Plaintiffs claim irreparable injury because of the resources that schools might expend to provide training to all students. Mot. at 39. But that is also not required by the Rule: § 106.45(b)(1)(iii) requires training only for the Title IX Coordinator, investigator, decisionmaker, or any person designated by a recipient to facilitate an informal resolution process. Rather, the Rule requires only *notification*, which can occur by e-mail, to the entire school community. 34 C.F.R. § 106.8. And the Rule allows recipients to economically conduct hearings, including video hearings, by using existing rooms and equipment "such as webcams, laptops, or cell phones" as well as "free video web conferencing platforms" and "voice memo apps." Rule at 30,562.

### B.   Plaintiffs Have Not Demonstrated Irreparable Harm Based on Their Speculation About the Rule's Ultimate Effects.

Plaintiffs also speculate that the Rule will increase the incidence of sexual harassment in the long run and, eventually, increase the plaintiff-states' "costs spent supporting victims of sexual harassment," Mot. at 41, but such speculation is insufficient. Plaintiffs cannot base irreparable injury upon purported harms that are not "actual" or "certain*." League of Women Voters*, 838 F.3d at 7-8. As the D.C. Circuit has explained, "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur. The movant must provide . . . proof indicating that the harm is certain to occur in the near future." *Wis. Gas Co.*, 758 F.2d at 674. And in making this showing, Plaintiffs must rely solely on injuries to themselves, not the interests of their residents as *parens patriae*, in this lawsuit against the United States. *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179-80, 183 (D.C. Cir. 2019). But Plaintiffs have offered only such bare allegations and speculation about the future results of the Rule. *See, e.g.*, Mot. at 44. And while Plaintiffs gesture to generalized harms from sexual harassment,[24] they make no

---

[24] Plaintiffs' declarations offer highly conclusory speculation about the future effects of implementing the Rule. *See, e.g.*, Pope Decl. ¶ 88, Ex. 83 ("As a result of the rule, it is not unreasonable to expect . . . that reporting of sexual harassment may go down[.]"); Pickett Decl. ¶ 35, Ex. 82 ("If reporting is chilled, our students will feel less safe on our campuses . . . .").

effort to quantify "the size of such impact, or the portion of such impact attributable to the [Rule]," *Commonwealth v. Dep't of Educ.*, 340 F. Supp. 3d 7, 17 (D.D.C. 2018), as required to justify a preliminary injunction. *See Winter*, 555 U.S. at 22 (mere "possibility" of irreparable harm cannot support preliminary injunction); *Wis. Gas Co.*, 758 F.2d at 675-76 (finding alleged harm "specious," given "common knowledge" that harm depends on many "variables"); *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) (reduced benefits though "a comprehensible harm to the economic interests of the state government" are "generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable").

Even the speculative arguments that Plaintiffs have offered rest on incorrect premises. *See also supra* I.G (addressing costs and benefits of the Rule). ED and Plaintiffs share a strong interest in ensuring that every student has access to a safe and equal educational experience, free of sexual harassment. The Rule does not undermine these goals, but rather provides the first legally binding regulations specifically requiring schools to provide fair and reliable processes in response to complaints of sexual harassment. Moreover, the Rule sets a minimum threshold, leaving plaintiff-states and individual schools free to take additional steps in most respects if they so choose. Although Plaintiffs argue that they will be burdened by "costs spent supporting victims of sexual harassment," Mot. at 41, it is, ironically, the Rule's supposedly overly narrow protections that ensure that recipients will offer support to victims. The Rule does not bar recipients from providing further support for misconduct not covered by Title IX.

Plaintiffs' assertions of harm in the K-12 context likewise are based on misunderstandings of the Rule. Specifically, Plaintiffs briefly claim that the Rule hinders K-12 educators' ability to respond to classroom harassment, *id*. at 42, but the Rule imposes procedural requirements only for addressing high-stakes complaints of severe and pervasive conduct and makes no changes to educators' ability to respond to other conduct. Nor does the Rule require "multiple employees at each site to address complaints," *id*. at 43, as the Rule does not require a separate Title IX Coordinator for each physical site or school in a school district, Rule at 30,557. And the Rule does

not require complainants to interact directly with respondents, 34 C.F.R. § 106.45(6)(i); answer irrelevant questions, *id.*; or undergo cross-examination to access supportive measures, *id.* § 106.44.

But even accepting the incorrect premises of Plaintiffs' motion, the asserted harms are all based on Plaintiffs' predictions about the course of future events, stretching years into the future, and their hypothetical impact on Plaintiffs' fiscs, none of which is sufficiently concrete to warrant a preliminary injunction.

### III.    The Balance of Equities and Public Interest Make Injunctive Relief Inappropriate.

The balance of hardships and the public interest weigh against issuing an injunction here. Where the government is a party, these two inquiries merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). There is inherent harm to an agency in preventing it from implementing regulations that Congress has found to be in the public interest to direct that agency to develop. *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). Here, in particular, ED has concluded that prior guidance "has created confusion and uncertainty among recipients, and has not adequately advised recipients as to how to uphold Title IX's non-discrimination mandate while at the same time meeting requirements of constitutional due process and fundamental fairness." Rule at 30,030 (footnotes omitted). Plaintiffs have not shown that any harm to them outweighs the public interest, especially when the Rule generally establishes a floor rather than a ceiling and permits funding recipients to maintain their systems for addressing misconduct not covered by Title IX. Moreover, the government, the public, schools, and students have a strong interest in legally binding requirements to uphold Title IX's nondiscrimination mandate.

### IV.    Any Injunctive Relief Should Be Limited to the Plaintiffs.

Even if the Court were to disagree with Defendants' arguments, any preliminary injunctive relief should be no broader than necessary to provide Plaintiffs with relief and therefore should extend only to the named plaintiffs. Although Plaintiffs do not expressly seek nationwide relief, they request postponement of the effective date or "preliminarily enjoin the Rule until judicial review of its validity has concluded." Mot. at 45. But "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and

"injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Entering broad relief would be particularly inappropriate here because the Rule is being challenged in other courts. *See Victims Rights Law Center v. DeVos*, No. 20-cv-11104 (D. Mass.); *State of N.Y. v. U.S. Dep't of Educ.*, No. 1:20-cv-04260 (S.D.N.Y.); *Know Your IX v. DeVos*, No. 1:20-cv-01224 (D. Md.). Issuing preliminary relief with nationwide effect would thus prevent important "legal questions from percolating through the federal courts." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (Thomas, J., concurring). Moreover, non-plaintiff recipients (including other states) may prefer for the Rule to take effect, affording them certainty as to their obligations under ED's enforcement regime for Title IX.[25]

In addition, should the Court enjoin any portion of the Rule, it should allow the remainder to go into effect. In determining whether severance is appropriate, courts look to both the agency's intent and whether the regulation can function sensibly without the excised provision(s). *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001). Here, ED "include[d] provisions . . . to make clear that these final regulations are designed to operate independently of each other and to convey [its] intent that the potential invalidity of one provision should not affect the remainder of the provisions." Rule at 30,538. Plaintiffs have not challenged every provision of the Rule, and they bear the burden to establish an entitlement to an injunction. *Winter*, 555 U.S. at 20. Plaintiffs have identified no functional reason the entire Rule must fall if the Court were to agree only with Plaintiffs' attacks on particular provisions, and this Court should accordingly not issue relief beyond any of those challenged provisions.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.

---

[25] *See, e.g.*, Todd Richmond, *Evers Gives UW System Go-Ahead for Sex Assault Rules*, Associated Press, July 6, 2020, https://www.timesunion.com/news/article/In-reversal-Evers-gives-UW-go-ahead-for-sex-15389465.php.

Dated: July 8, 2020                    Respectfully submitted,

                                       ETHAN P. DAVIS
                                       Acting Assistant Attorney General

                                       DAVID M. MORRELL
                                       Deputy Assistant Attorney General

                                       CARLOTTA P. WELLS
                                       Assistant Branch Director

                                       /s/ *Daniel Riess*
                                       DANIEL RIESS
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       Ben Franklin Station, P.O. Box No. 883
                                       Washington, DC 20044
                                       Phone: (202) 353-3098
                                       Fax: (202) 616-8460
                                       E-mail: Daniel.Riess@usdoj.gov

                                       *Attorneys for Defendants*