## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

COMMONWEALTH OF PENNSYLVANIA,
et al.,

*Plaintiffs*,

v.

ELISABETH D. DEVOS, in her official capacity
as Secretary of the United States Department
of Education, et al.,

*Defendants*,

FOUNDATION FOR INDIVIDUAL RIGHTS
IN EDUCATION, INDEPENDENT
WOMEN'S LAW CENTER, SPEECH FIRST,
INC.,

*Intervenor-Defendants*.

No. 1:20-cv-1468-CJN

**EVIDENTIARY HEARING
REQUESTED**

## INTERVENORS' OPPOSITION TO PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

Charles J. Cooper (D.C. Bar #248070)
Brian W. Barnes (pro hac vice forthcoming)
Nicole J. Moss (D.C. Bar #472424)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com
bbarnes@cooperkirk.com
nmoss@cooperkirk.com

*Counsel for Foundation for
Individual Rights in Education*

William S. Consovoy (D.C. Bar #493423)
Cameron T. Norris
Alexa R. Baltes (pro hac vice pending)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
cam@consovoymccarthy.com
lexi@consovoymccarthy.com

*Counsel for Speech First, Inc. and
Independent Women's Law Center*

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................ ii

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 1

Argument ......................................................................................................................... 2

    I.     The Rule adopts protections for college students that the Constitution already
          requires .................................................................................................................... 2

         A.    Free Speech ................................................................................................ 2

         B.    Due Process ................................................................................................ 6

    II.    Because the Constitution requires many of the Final Rule's protections, Plaintiffs
          cannot obtain a preliminary injunction. ................................................................ 10

         A.    Likely Success on the Merits .................................................................. 10

         B.    The Equities ............................................................................................. 13

Conclusion ..................................................................................................................... 21

# TABLE OF AUTHORITIES

*Chief authority

## Cases

*Archdiocese of Wash. v. WMATA*,
  897 F.3d 314 (D.C. Cir. 2018) ................................................................. 14

*Bair v. Shippensburg Univ.*,
  280 F. Supp. 2d 357 (M.D. Pa. 2003) ........................................................ 5

*Bank of America, N.A. v. FDIC*,
  244 F.3d 1309 (11th Cir. 2001) ............................................................... 12

*Black v. LaHood*,
  882 F. Supp. 2d 98 (D.D.C. 2012) ........................................................... 11

*Booher v. Bd. of Regents, N. Ky. Univ.*,
  1998 WL 35867183 (E.D. Ky. July 22, 1998) ...................................... 5, 6

*Brenntag Int'l Chems., Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999) .................................................................... 13

*Brewer ex rel. Dreyfus v. Austin Indep. Sch. Dist.*,
  779 F.2d 260 (5th Cir. 1985) ..................................................................... 9

*Bristol Myers Co. v. FTC*,
  1978 WL 1410 (D.D.C. Sept. 22, 1978) ................................................... 19

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ................................................................................ 20

*California v. Green*,
  399 U.S. 149 (1970) ................................................................................... 9

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ................................................................................. 12

*Covenant Media of S.C., LLC v. City of North Charleston*,
  493 F.3d 421 (4th Cir. 2007) .................................................................. 11

*Dambrot v. Cent. Mich. Univ.*,
  55 F.3d 1177 (6th Cir. 1995) ..................................................................... 5

\**Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999) ................................................................................... 3

*DeAngelis v. El Paso Mun. Police Officers Ass'n*,
  51 F.3d 591 (5th Cir. 1995) .................................................................. 4, 6

*DeJohn v. Temple Univ.*,
  537 F.3d 301 (3d Cir. 2008) ................................................................. 5, 6

*Doe v. Baum*,
　903 F.3d 575 (6th Cir. 2018) ................................................................ 10

*Doe v. Brandeis Univ.*,
　177 F. Supp. 3d 561 (D. Mass. 2016) .............................................. 9, 10

*Doe v. Miami Univ.*,
　882 F.3d 579 (6th Cir. 2018) .................................................................. 8

*Doe v. Purdue Univ.*,
　928 F.3d 652 (7th Cir. 2019) .................................................................. 8

*\*Doe v. Univ. of Cincinnati*,
　872 F.3d 393 (6th Cir. 2017) ............................................ 7, 8, 9, 10, 12

*Donohue v. Baker*,
　976 F. Supp. 136 (N.D.N.Y. 1997) ...................................................... 10

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*,
　485 U.S. 568 (1988) .............................................................................. 12

*EPIC v. Presidential Advisory Comm'n on Election Integrity*,
　878 F.3d 371 (D.C. Cir. 2017) .............................................................. 10

*Fielder v. Bd. of Educ. of Sch. Dist. of Winnebago*,
　346 F. Supp. 722 (D. Neb. 1972) ......................................................... 13

*Fla. Family Policy Council v. Freeman*,
　561 F.3d 1246 (11th Cir. 2009) ............................................................ 11

*Flaim v. Med. Coll. of Ohio*,
　418 F.3d 629 (6th Cir. 2005) ................................................................ 13

*Food & Water Watch, Inc. v. Vilsack*,
　808 F.3d 905 (D.C. Cir. 2015) .............................................................. 10

*Gorman v. Univ. of R.I.*,
　837 F.2d 7 (1st Cir. 1988) ...................................................................... 8

*Goss v. Lopez*,
　429 U.S. 565 (1975) ................................................................................ 8

*Harp Advertising Ill., Inc. v. Village of Chi. Ridge*,
　9 F.3d 1290 (7th Cir. 1993) .................................................................. 11

*Healy v. James*,
　408 U.S. 169 (1972) ................................................................................ 6

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
　515 U.S. 557 (1995) ................................................................................ 5

*Iancu v. Brunetti*,
　139 S. Ct. 2294 (2019) ............................................................................ 5

*Klayman v. Obama,*
142 F. Supp. 3d 172 (D.D.C. 2015) ........................................................... 14

*Matal v. Tam,*
137 S. Ct. 1744 (2017) ................................................................................ 5

*Mathews v. Eldridge,*
424 U.S. 319 (1976) ................................................................................. 7, 8

*McCauley v. Univ. of V.I.,*
618 F.3d 232 (3d Cir. 2010) ....................................................................... 6

*Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.,*
554 U.S. 527 (2008) .................................................................................. 12

*Nat'l Ass'n of Clean Air Agencies v. EPA,*
489 F.3d 1221 (D.C. Cir. 2007) ............................................................... 12

*Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office of Immigration Review,*
No. 1:20-cv-00852-CJN, 2020 WL 2026971 (D.D.C. Apr. 28, 2020) ....... 2

*Neal v. Colo. State Univ.-Pueblo,*
2017 WL 633045 (D. Colo. 2017) ............................................................ 10

*NIFLA v. Becerra,*
138 S. Ct. 2361 (2018) ................................................................................ 5

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) .................................................................................... 6

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) .................................................................................... 4

*Roberts v. Haragan,*
346 F. Supp. 2d 853 (N.D. Tex. 2004) ....................................................... 5

*Roberts v. U.S. Jaycees,*
468 U.S. 609 (1984) .................................................................................... 6

*Russell-Murray Hospice, Inc. v. Sebelius,*
724 F. Supp. 2d 43 (D.D.C. 2010) ........................................................... 20

*\*Saxe v. State Coll. Area Sch. Dist.,*
240 F.3d 200 (3d Cir. 2001) .................................................................. 4, 5

*Scott-Blanton v. Universal City Studios Prods., LLLP,*
495 F. Supp. 2d 74 (D.D.C. 2007) ........................................................... 19

*Sierra Club v. U.S. Dep't of Energy,*
825 F. Supp. 2d 142 (D.D.C. 2011) ......................................................... 13

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs,*
531 U.S. 159 (2001) .................................................................................. 12

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ............................................................................................ 5

*United States Ass'n of Reptile Keepers, Inc. v. Jewell*,
  106 F. Supp. 3d 125 (D.D.C. 2015) ................................................................... 20

*UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis.*,
  774 F. Supp. 1163 (E.D. Wis. 1991) ................................................................... 5

*White v. United States*,
  601 F.3d 545 (6th Cir. 2010) ............................................................................. 11

*Winnick v. Manning* ,
  460 F.2d 545 (2d Cir. 1972) ................................................................................ 9

*Winter v. NRDC*,
  555 U.S. 7 (2008) ................................................................................................. 1

**Statutes**

5 U.S.C. § 706 ........................................................................................................... 20

**Other Authorities**

FIRE, Model Student Code,
  *available at* bit.ly/3gILgBx ............................................................................... 19

William J. Migler, *Comment: An Accused Student's Right to Cross-Examination
  in University Sexual Assault Adjudicatory Proceedings*,
  20 Chap. L. Rev. 357 (2017) .............................................................................. 13

**Regulations**

85 Fed. Reg. 30,026 ..................................................................................... 2, 7, 10, 13

**INTRODUCTION**

Plaintiffs represent public universities whose disciplinary proceedings are fully subject to the strictures of the First and Fourteenth Amendments. Those provisions of the Constitution place important limits on when and how public universities punish sexual misconduct—limits that Plaintiffs routinely exceed both in practice and as a matter of official policy. However objectionable Plaintiffs may find certain speech, the First Amendment does not allow public universities to punish "sexual harassment" unless it is severe, pervasive, *and* objectively offensive. And before life-altering, career-ending sanctions are imposed on a public university student, the accused is entitled to a hearing at which he has a meaningful opportunity to contest the credibility of the witnesses against him. There is no place in our society where freedom of speech and basic procedural fairness ought to be more valorized than on the campuses of our public colleges and universities. Yet in the offices of most university administrators, these constitutional values have long been subordinated to other goals.

Plaintiffs ask this Court for the extraordinary remedy of a nationwide preliminary injunction delaying enforcement of a Department of Education rule—one that is set to go into effect in a little over a month and that schools across the country have been diligently working to implement by the effective date. The Court should not accept these claims of burden without first holding an evidentiary hearing. After an evidentiary hearing, the Court should deny Plaintiffs' motion and prioritize the constitutional rights and academic careers of college students over the bureaucratic convenience of university administrators.

**BACKGROUND**

For the sake of efficiency, Intervenors adopt the background section from Defendants' brief.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). To get one, a plaintiff "must establish (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that the proposed relief is in the public interest." *Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office of Immigration Review*, No. 1:20-cv-00852-CJN, 2020 WL 2026971, at *5 (D.D.C. Apr. 28, 2020). The last two factors "merge" in a case like this one, where Defendants' "'interest *is* the public interest.'" *Id.* at *12.

Defendants' brief, which Intervenors adopt and incorporate, explains why these factors do not favor Plaintiffs. In addition to those reasons, Plaintiffs should not receive a preliminary injunction because many of the Rule's protections are already required by the First and Fourteenth Amendments. That fact tilts every preliminary-injunction factor decidedly against Plaintiffs.

## I.    The Rule adopts protections for college students that the Constitution already requires.

Though Plaintiffs ostensibly brought this case "to protect … students … in their States," Compl. ¶33, they ask the Court to throw out the Rule's new protections for students' rights to free speech and due process. But Plaintiffs should have been providing those protections anyway. For public universities, the Constitution makes these safeguards non-optional.

### A.    Free Speech

The Final Rule "verbatim" adopts the definition of sexual harassment from the Supreme Court's opinion in *Davis*. 85 Fed. Reg. 30,026 at 30,155 n.680 ; *see id.* at 30,574. According to *Davis*, Title IX covers sexual harassment of students that "is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities."

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). That standard is high, for good reason: anything lower would violate the First Amendment.

*Davis* involved a highly disturbed fifth-grade boy. For five months, the boy sexually harassed and assaulted his classmate LaShonda. Three times the boy "attempted to touch LaShonda's breasts and genital areas" while making "vulgar statements such as 'I want to get in bed with you' and 'I want to feel your boobs.'" *Id*. at 633. One time he stuck a "door stop in his pants and proceeded to act in a sexually aggressive manner toward LaShonda." *Id*. at 634. The boy also "rubbed his body against LaShonda in the school hallway … in a sexually suggestive manner." *Id*. This campaign of abuse tanked LaShonda's grades and made her suicidal. *Id*. Meanwhile, the school did virtually nothing to punish the boy. *Id*. at 634-35.

The question in *Davis* was whether LaShonda could sue her school for violating Title IX, even though her harasser was another student (rather than a teacher or other school employee). In a 5-4 opinion, the Supreme Court held that schools could be liable for student-on-student harassment "in certain limited circumstances." *Id*. at 643. The school must be "deliberately indifferent" to the harassment, which means it knew about the harassment and responded to it in a "clearly unreasonable" way. *Id*. at 648-49. And the harassment must be "sufficiently severe" that it rises to the level of "discrimination." *Id*. at 649-50.

Justice Kennedy dissented, joined by Chief Justice Rehnquist, Justice Scalia, and Justice Thomas. Justice Kennedy denied that Title IX makes schools "liable for peer sexual harassment." *Id*. at 658 (Kennedy, J., dissenting). He stressed that public schools' power to discipline their students is "circumscribed by the First Amendment." *Id*. at 667. "[U]niversity speech codes designed to deal with peer sexual and racial harassment," after all, are routinely invalidated in court. *Id*. But the majority's interpretation of Title IX would require universities to adopt speech-

restrictive codes, Justice Kennedy predicted, and expose themselves to liability from students whose "speech, even if offensive, is protected by the First Amendment." *Id*. at 657-58, 682-83.

In her majority opinion, Justice O'Connor acknowledged and addressed this concern. The *Davis* majority did not deny that schools face "legal constraints on their disciplinary authority" and admitted that punishing sexual harassment could "expose [them] to constitutional or statutory claims." *Id.* at 649 (majority op.). The Court stressed the "very real limitations" in its definition of actionable sexual harassment. *Id.* at 652. The definition excludes mere "teas[ing]" and "offensive name[-calling]." *Id.* It "depends *equally* on the alleged persistence *and* severity of the [students'] actions" *Id.* (emphasis added). And because "the behavior [must] be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity," a "single instance of sufficiently severe one-on-one peer harassment" almost never counts. *Id.* The Court's stringent definition of sexual harassment, it explained, "reconcile[s] the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored." *Id.* at 653. Those practical realities, of course, include First Amendment liability. *See id.* at 649.

All nine Justices were right to be concerned about the First Amendment in *Davis*. As Justice Alito explained when served on the Third Circuit, "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001). Broad bans on "sexual harassment" thus cover large swaths of protected speech. And they do so in a way that "imposes content-based, viewpoint-discriminatory restrictions on speech." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 597 (5th Cir. 1995). Under the First Amendment, content-based restrictions are "presumptively unconstitutional," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and viewpoint-based

restrictions are forbidden, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019). States have no legitimate interest in "preventing speech" because it is "hateful" or "demeans on the basis of … gender." *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017). The "very idea … grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 579 (1995).

Unsurprisingly then, federal courts routinely deem university "harassment" codes unconstitutional under the First and Fourteenth Amendments. *See, e.g.*, *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995) ("racial harassment"); *Booher v. Bd. of Regents, N. Ky. Univ.*, 1998 WL 35867183 (E.D. Ky. July 22, 1998); ("sexual harassment"); *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003); ("harassment"); *Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004) ("sexually harassing speech"); *DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008) ("sexual harassment"); *UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis.*, 774 F. Supp. 1163 (E.D. Wis. 1991) ("discriminatory" speech).

Not all regulations of "harassment," of course, are inconsistent with the First Amendment. "[N]on-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause," *Saxe*, 240 F.3d at 206, even if regulations of that conduct "impos[e] incidental burdens on speech," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). "While drawing the line between speech and conduct can be difficult, [court] precedents have long drawn it, and the line is long familiar to the bar." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (cleaned up).

The *Davis* standard draws that line between speech and conduct for Title IX's regulation of sexual harassment. When a student engages in a sexist campaign of severe, pervasive, and targeted ridicule that effectively prevents another student from getting her education, his speech

crosses over into conduct. If the university prohibits that kind of conduct, then it is regulating only the "secondary effects" of the speech (i.e., the victim's inability to attend school)—not the speech itself. *Booher*, 1998 WL 35867183, at *7; *accord R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623-24 (1984). Each element of the *Davis* standard is crafted to ensure schools maintain this distinction. It sets the bar high, requiring an "egregious" amount and degree of sexually harassing speech. *DeAngelis*, 51 F.3d at 593. If Title IX required schools to punish anything less than that, it would "steer[]" back into the First Amendment and regulate speech "on the basis of its expressive content." *Id*. at 596-97 & n.7.

Public universities, especially, cannot weaken any aspect of the *Davis* standard. *Davis* was a case about fifth graders. Unlike children in grade school, adults at public universities have full First Amendment rights. *DeJohn*, 537 F.3d at 315, 318. Because universities are "peculiarly the marketplace of ideas," the "vigilant protection of constitutional freedoms is nowhere more vital." *Healy v. James*, 408 U.S. 169, 180 (1972). Public universities "'are granted less leeway in regulating student speech than are public elementary or high school[s]'" due to "the differing pedagogical goals of each institution, the *in loco parentis* role of public elementary and high school administrators, the special needs of school discipline in public elementary and high schools, the maturity of the students, and, finally, the fact that many university students reside on campus and thus are subject to university rules at almost all times." *McCauley v. Univ. of V.I.*, 618 F.3d 232, 242-43 (3d Cir. 2010). Accordingly, universities "must *at least*" satisfy "the limitations" from grade-school cases like *Davis*. *DeJohn*, 537 F.3d at 318. The Department's Final Rule ensures that they do.

### B.    Due Process

Plaintiffs train much of their fire on the Rule's cross-examination requirement, but they ask the Court to throw out the Rule's procedural provisions in their entirety. Among the provisions

that Plaintiffs would have the Court invalidate are its requirements that funding recipients conduct live hearings, 85 Fed. Reg. at 30,577, afford the accused a presumption of innocence, *id.* at 30,575, and resolve disputes through a neutral decisionmaker who considers all inculpatory and exculpatory evidence, *id.* at 30,575. One unfamiliar with university disciplinary proceedings might assume that these procedures are provided before schools expel a student and permanently brand him a sexual harasser or worse. But that assumption would be mistaken. Many of Plaintiffs' declarants admit that their universities do not conduct live hearings before making these weighty decisions. *E.g.*, Ball Decl. ¶ 16; Kirkland Decl. ¶ 18; Leone Decl. ¶ 13. Only a small fraction of universities afford the accused a presumption of innocence. Exhibit 1, at 025. And, in practice, universities that use the so-called "single investigator" model—where the same person conducts the investigation, presses the charges, and adjudicates the dispute—often resolve these cases based on the judgment of a single, partial individual. *See id.* at 34. If allowed to go into effect, the Final Rule's procedural provisions, including but not limited to its cross-examination requirement, will force public universities to correct widespread violations of the Due Process Clause.

Courts tasked with deciding which procedures a public university must follow before expelling a student for sexual misconduct apply the balancing test from *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). That test weighs the nature of the private interest at stake, the risk of erroneous deprivation under the procedures used, the value of any additional procedural safeguards, and the government's burden in providing additional procedures. *See Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). Although the extent of the accused's interest depends on the severity of the potential sanction, it cannot be doubted that university sexual misconduct proceedings concern extremely weighty liberty and property interests. A finding of guilt can bring with it a permanent and life-altering stigma that irreparably harms a student's

educational, professional, and social prospects, even if the finding is later reversed. Given these realities, accused students are constitutionally entitled to robust procedural protections. *See Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019); *Univ. of Cincinnati*, 872 F.3d at 400; *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988); *cf. Mathews*, 424 U.S. at 334.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," *Mathews*, 424 U.S. at 333, and the Supreme Court has held that even a suspension from a secondary school of a few days requires that the disciplined student receive "an explanation of the evidence the authorities have and an opportunity to present his side of the story" at "some kind of hearing," *Goss v. Lopez*, 419 U.S. 565, 579, 581 (1975). Applying these principles at the post-secondary level, federal courts have consistently concluded that before expelling a student for sexual misconduct a public university must hold a hearing and that the hearing must be "a real one, not a sham or pretense." *Purdue Univ.*, 928 F.3d at 663. And when "the credibility of an alleged victim is at issue"—as it almost always is in these cases—"the university must provide a way for the adjudicative body to evaluate the victim's credibility and to assess the demeanor of both the accused and his accuser." *Doe v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018).

"[T]o be fair in the due process sense," a hearing in this context must afford the accused "the opportunity to respond, explain, and defend," *Univ. of R.I.*, 837 F.2d at 13, and in a case that turns on witness credibility a live hearing is the only way to provide such an opportunity. When the entire dispute turns on a witness's credibility and demeanor, there is simply no way for the accused to effectively defend himself if he cannot hear the witness's testimony live and respond to it in person. Given the high stakes in these cases, both for the accused and the accuser, the benefits of live hearings overwhelmingly outweigh their costs.

Courts also consistently hold that university decisions in these cases must be made by "an impartial decision maker." *Winnick v. Manning*, 460 F.2d 545, 548 (2d Cir. 1972). And although some courts have declined to adopt a per se rule against allowing the same individual to initiate, investigate, prosecute, and judge a case, the Due Process Clause is violated when "a school official's involvement in an incident create[s] a bias such as to preclude his affording the student an impartial hearing." *Brewer ex rel. Dreyfus v. Austin Indep. Sch. Dist.*, 779 F.2d 260, 264 (5th Cir. 1985). "The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious," *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 606 (D. Mass. 2016), and the Final Rule's requirement that these roles be separated is an important prophylactic measure that will prevent biased adjudications that are all too common at public universities.

In the most serious cases that turn on witness credibility, the Due Process Clause also requires live cross-examination. Without live cross-examination, an accused party loses the chance to have his side of the story *meaningfully* heard, because cross-examination subjects an accusation to scrutiny in a way that nothing else can. Cross-examination is "essential to a fair hearing," *Brandeis Univ.*, 177 F. Supp. 3d at 605, "like no other procedural device" in its effectiveness, *Univ. of Cincinnati*, 872 F.3d at 401, and "the greatest legal engine ever invented for the discovery of truth," *California v. Green*, 399 U.S. 149, 158 (1970).

The importance of cross-examination is heightened in sexual misconduct cases, given the extremely frequent "he-said-she-said" nature of the inquiry. Overwhelmingly, courts affirm the due process right to cross-examination when the credibility of witnesses is at issue. *See, e.g.*, *Donohue v. Baker*, 976 F. Supp. 136, 147 (N.D.N.Y. 1997) (a university student was entitled to cross-examine accuser in a sexual assault case because the case turned on the accuser's credibility);

*Univ. of Cincinnati*, 872 F.3d at 401–02 (same); *Neal v. Colo. State Univ.-Pueblo*, 2017 WL 633045 (D. Colo. 2017) (same); *Brandeis Univ.*, 177 F. Supp. 3d at 605 (same). In the majority of cases affected by the Final Rule, adjudicators must sift through "plausible, competing narratives" to determine who is telling the truth. 85 Fed. Reg. at 30,328. This directly implicates witness credibility and therefore calls for cross-examination. Thus, Plaintiffs' proposed alternatives, such as written questions, are constitutionally insufficient. As the Sixth Circuit has explained, "cross-examination is essential in cases like [these] because it . . . takes aim at credibility like no other procedural device. Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives." *Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018). Accordingly, the Final Rule's cross-examination provision allows for the procedural fairness demanded by due process in campus sexual misconduct cases.

## II.    Because the Constitution requires many of the Final Rule's protections, Plaintiffs cannot obtain a preliminary injunction.

That the Final Rule adopts protections already required by the Constitution affects the resolution of every question currently before the Court. It bars Plaintiffs from succeeding on the merits of those claims, and it tips the equities of the entire case against Plaintiffs.

### A.    Likely Success on the Merits

**Standing.** To obtain a preliminary injunction, Plaintiffs "must show a substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (cleaned up). And "[b]ecause 'standing is not dispensed in gross,'" Plaintiffs must prove a "likelihood of standing on each of [their] APA claims." *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017). Plaintiffs do not have standing to complain that the Final Rule forces them to do things that the Constitution requires them to do

anyway. To the extent the Final Rule's definition of sexual harassment and many of its procedural protections enforce the requirements of the First Amendment and the Due Process Clause, Plaintiffs do not have standing to challenge these key aspects of the Final Rule.

A long line of cases shows that, if Intervenors' constitutional arguments are correct, then many of Plaintiffs' claims must be dismissed for lack of redressability. In *Black v. LaHood*, 882 F. Supp. 2d 98, 106 (D.D.C. 2012), for example, this Court dismissed a challenge to a federal trail project that permanently closed a road to automobile traffic. The plaintiffs' injuries from the federal project were not redressable, this Court explained, because a separate D.C. Council ordinance also prohibited drivers from using the road. *Id.* Many other cases reach similar results. *See, e.g.*, *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010) (economic injuries caused by federal prohibition on cockfighting not redressable because cockfighting is also illegal under state law); *Fla. Family Policy Council v. Freeman*, 561 F.3d 1246, 1256–58 (11th Cir. 2009) (injuries caused by canon of judicial conduct requiring disqualification were not redressable because unchallenged state statute also required disqualification); *Covenant Media of S.C., LLC v. City of North Charleston*, 493 F.3d 421, 430 (4th Cir. 2007) (billboard company lacked redressable injury from local ordinance challenged under the First Amendment because it could not place sign at desired location under separate, unchallenged ordinance). As Judge Easterbrook has explained, a plaintiff cannot establish redressability where "winning the case will not alter [the] situation." *Harp Advertising Ill., Inc. v. Village of Chi. Ridge*, 9 F.3d 1290, 1292 (7th Cir. 1993).

**APA Challenges.** Plaintiffs contend that the Rule's definition of "sexual harassment" contravenes the text of Title IX. *See* PI Br. 25-26. To assess this claim, this Court applies *Chevron*'s two-step framework. At Step One, the Court "examine[s] the statute *de novo*" to decide if the intent of Congress is clear. *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228

(D.C. Cir. 2007). The Court is not limited to the statutory interpretation arguments offered by the agency, *Bank of America, N.A. v. FDIC*, 244 F.3d 1309, 1319–20 (11th Cir. 2001), but instead must deploy "the ordinary tools of statutory construction," *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013), including the canon of constitutional avoidance. As explained, any definition of "sexual harassment" short of the standard from *Davis* would force public universities to violate the First Amendment. That is a powerful reason for this Court to reject Plaintiffs' interpretation. *See, e.g.*, *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001) (applying canon of constitutional avoidance at *Chevron* Step One); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 574–75 (1988) (same). It also supports the Department's reasoning at *Chevron* Step Two, and makes a remand futile even if that reasoning were somehow deficient. *See Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 544–45 (2008) (explaining that "[t]he *Chenery* doctrine has no application" when the agency is "required, under [a Supreme Court decision], to apply" a particular rule).

The same is true for Plaintiffs' challenges to the Rule's due process protections. *See* PI Br. 18-22. Plaintiffs' concerns over how cross-examination may traumatize the victims of sexual misconduct are unresponsive to this constitutional question. *See Univ. of Cincinnati*, 872 F.3d at 404 ("While protection of victims of sexual assault from unnecessary harassment is a laudable goal, the elimination of such a basic protection for the rights of the accused raises profound concerns."). Functionally, Plaintiffs argue that because parties might not be entitled to cross-examination in *every* case (such as low-stakes adjudications that do not turn on credibility), accused parties should be guaranteed its advantages in no case, *see* PI Br. at 20. But that would deprive students of their rights. Federal courts in four circuits have held that cross-examination is

required at least some of the time, William J. Migler, *Comment: An Accused Student's Right to Cross-Examination in University Sexual Assault Adjudicatory Proceedings*, 20 Chap. L. Rev. 357, 379-381 (2017), and even where cross-examination is not mandated it is still encouraged, *id.*; *Fielder v. Bd. of Educ. of Sch. Dist. of Winnebago*, 346 F. Supp. 722, 730 (D. Neb. 1972) (holding that affording an accused student the right to cross-examination is "good technique").

The preliminary injunction that Plaintiffs seek would deprive many accused students of their due process rights. That would be blatantly unfair, as the Department persuasively explained. *See* 85 Fed. Reg. at 30,329. And given that the "Due Process Clause . . . sets only the floor or lowest level of procedures acceptable," not the ceiling, *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636-37 (6th Cir. 2005), the Department acted well within its authority by standardizing procedures and providing for live hearings with cross-examination in all instances in which a post-secondary school punishes a student for sexual misconduct under Title IX.

### B.      The Equities

**Irreparable Injury.** For the same reasons that Plaintiffs' injuries are not redressable, Plaintiffs will not sustain any irreparable injury if the Final Rule goes into effect as scheduled on August 14. As a matter of law, Plaintiffs cannot sustain an irreparable injury from federal regulations that do no more than require them to comply with the Constitution. Although courts often ask whether a plaintiff will sustain irreparable injury "without" injunctive relief, it is "more accurate to phrase the question . . . as whether the plaintiff will suffer irreparable harm 'but for' the issuance of an injunction." *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011) (citing *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)). The inquiry is "whether the plaintiff has shown that the relief sought will actually prevent irreparable harm," *id.*, and Plaintiffs would not avoid any irreparable injury by being relieved of obligations under the Final Rule that overlap with their obligations under the Constitution.

**Balance of Hardships and the Public Interest.** Plaintiffs claim that university administrators will be harmed if the Rule's effective date is not moved. But the Rule is even more important to the students whose constitutional rights it protects. "The public interest favors the protection of constitutional rights." *Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 482 (D.C. Cir. 2018). "[E]ven minimal" deprivations of "constitutional freedoms" are "irreparable" and outweigh "the [other preliminary-injunction] factors." *Id.* at 334; *cf. Klayman v. Obama*, 142 F. Supp. 3d 172, 196 n.24 (D.D.C. 2015) (finding not "a single case in which a plaintiff who was likely to prevail on the merits of a constitutional claim was denied a preliminary injunction because of the gravity of the public interest").

Plaintiffs' compliance burdens are overstated, anyway. Plaintiffs claim that the Rule's August 14 effective date is "unrealistic" given the scope of the required changes and special challenges schools are facing due to COVID-19.  PI Br. 8–13. But numerous universities have publicly said that they are on track to do exactly that. Indeed, the Board of Regents for the University of Minnesota—the flagship university for one of the Plaintiffs in this case—met the day this brief was filed to take concrete steps towards implementation of the Final Rule. Exhibit 2, at 051. Before that meeting, officials at the University of Minnesota "consulted broadly with students, faculty and staff systemwide to determine how the University can best meet these federal mandates on all five of its campuses." *Id.* If the University of Minnesota can implement the Final Rule by August 14, there is no good reason why Minnesota State cannot. *See* Pickett Decl. ¶¶ 18–19, 26.

Since the rule was publicly announced on May 6, colleges and universities of all stripes—large and small, public and private—have signaled readiness to comply with the August 14 deadline:

- University of Toledo: "The new regulations go into effect on August 14, 2020. Between now and then, our Title IX team here on campus will make sure that our policies and procedures align with the new federal regulations, as well as with Ohio state laws, court decisions and our UToledo values and mission." Exhibit 3, at 056.

- University of North Florida: Actively working to revise Student Code of Conduct and sexual misconduct policies to comply with the Rule. University Board of Trustees will meet on August 11, 2020 to approve changes. Exhibit 4, at 059.

- South Dakota Board of Regents: Met to discuss implementation of the Final Rule at state's public universities on June 24, with plans to approve final changes to university policy during meeting in early August. Exhibit 5, at 062.

- University of Florida: "No matter what is defined as misbehavior that falls within the scope and definitions outlined by the Department of Education's new Final Rule as a 'Title IX violation,' we will continue to address sexual misconduct and strive to eliminate any instance of it through a multi-various approach . . . . None of those offerings will be impeded by the regulation changes that take effect beginning August 14th." Exhibit 6, at 064.

- Bates College: "Though we do not support certain changes required by the new regulations, we are confident that we can meet our legal obligations while also maintaining policies and procedures consistent with our values." Exhibit 7, at 067.

- St. Olaf College: "We have been anticipating the release of these finalized regulations since 2018. . . . In order to remain legally compliant, St. Olaf must adopt and incorporate these regulations by August 14, 2020. Between now and then, members of the Title IX Team, along with other members from the St. Olaf community, will review and adapt the College's policies and procedures as necessary to align with the new federal regulations, along with Minnesota state laws and our values as a community." Exhibit 8, at 069.

- Wesleyan College: "Our Title IX Policy is currently under review and will be updated by August 14, 2020 to align with the U.S. Department of Education's Title IX Final Rule as released in May of 2020." Exhibit 9, at 072.

Plaintiffs argue that "[n]o responsible school would update its policies in reliance on a proposed rule," PI Br. 10, but many colleges and universities—including some represented by Plaintiffs—took reasonable steps to prepare in anticipation of the Final Rule's most significant requirements. For example, the Colorado School of Mines—a public university in one of the Plaintiff states—said that it "has been aware and preparing for these regulations since the proposed regulations were provided in November 2018" and that it will "[f]inalize, publish, and implement

the revised policies and procedures" in August. Exhibit 10, at 074. The University of Washington similarly indicated that the Final Rule's changes were something it had been "expecting for some time." Exhibit 11, at 076. When the Final Rule was announced, Baylor University said that it had "already been reviewing [its] current policies in anticipation of the new regulations." Exhibit 12, at 079.

Some notable gaps in Plaintiffs' evidence further confirm the reasonableness of the August 14 deadline. Consider for example, the declarations submitted on behalf of Oregon. One declarant—the Director of Grievance at Southern Oregon State University—says that it is not feasible for her university to conduct the necessary trainings prior to the deadline. Fleisher Decl. ¶ 30. But the Title IX Coordinators for the two largest universities in the state—Oregon State University and the University of Oregon—never suggest in their respective declarations that their offices cannot meet the deadline. *See* Heroy Decl.; Hildebrandt Decl. Similarly, while one declarant says that Colorado's community colleges cannot change their policies by August 14, Garcia Decl. ¶ 18, nothing in the record indicates that the same is true for the University of Colorado or Colorado State University.

Even for the handful of universities for which Plaintiffs have submitted evidence that the August 14 deadline poses problems, this evidence should not be taken at face value. University employees who work in this area share an overwhelming ideological commitment to punishing sexual misconduct without regard to the consequences for free speech, academic freedom, or due process. This ideological commitment is evident from many of Plaintiffs' own declarations, which, among other things, express concern that timely implementation of the Final Rule will make universities "complicit" "in historical and modern physical and cultural genocide of indigenous people," Stritikus Decl. ¶ 19, lament the effects of "invasive, unnecessary, and victim-blaming

questioning" on "historically marginalized group[s]," Addington Decl. ¶¶ 9–10, and say that it is essential that schools punish "any unwanted sexual . . . statement which a reasonable person would find offensive," Bakey Decl. ¶ 13.

The practical problems Plaintiffs identify with the August 14 deadline do not withstand serious scrutiny. Plaintiffs and many of their declarants say that the Final Rule will require universities to divert resources to Title IX compliance that would otherwise be used to address COVID-19, but no one looks to university Title IX Coordinators for advice on how to combat the spread of a respiratory disease. Plaintiffs submitted declarations from numerous Title IX Coordinators. Many of them discuss the challenges of working remotely, "which can hinder rapport-building." Ashkannejhad Decl. ¶ 20. But none suggest that they or their staff are responsible for setting university policy on COVID-19.

If anything, the diminished physical presence of students on college campuses makes now an *easier* time to implement the Final Rule, for sexual harassment complaints have significantly fallen during a period when university students are mostly on summer break or taking classes from their parents' homes via videoconferencing software. A declaration attached to this brief from a lawyer who represents accused students confirms that the number of new university disciplinary proceedings has declined as a result of COVID-19 and also notes that in her experience the need to conduct these proceedings over the telephone or via videoconferencing has not appreciably slowed down the speed with which university officials process pending cases. Exhibit 13, at 082. One of Plaintiffs' declarations also acknowledges that COVID-19 has been associated with a decline in the number of new sexual misconduct cases. Sánchez Decl. ¶ 14. Other declarations submitted by Plaintiffs elide the point by conveniently omitting statistics for the spring of 2020

when discussing overall trends in the number of sexual misconduct cases. *E.g.*, Fleischer Decl. ¶ 19; Catena Decl. ¶ 29.

Plaintiffs also make much of the cost of changing university policies and "reeducat[ing] the school community" once the rules are changed. PI Br. 12. But these costs need to be put into the perspective of overall university budgets. Washington State University—a school with a total enrollment of nearly 30,000 students and annual operating expenses of more than $1.1 billion— estimates that making the changes the Final Rule mandates will require "hundreds of hours and tens of thousands of dollars." Ashkannejhad Decl. ¶ 27. However burdensome implementation of the rule might be for that school's Title IX office, the magnitude of this estimate is difficult to reconcile with Plaintiffs' rhetoric about how the August 14 effective date threatens to prevent universities from adequately responding to a "global pandemic that has depleted their resources and disrupted their ordinary operations." PI Br. 3.

Moreover, many of the implementation costs and burdens Plaintiffs identify arise from their professed commitment to continuing to punish what they call "non-Title IX sexual harassment" and affording students who are accused of such misconduct different and less robust procedural protections than those required for sexual misconduct proceedings covered by the Final Rule. PI Br. 7; *see, e.g.*, Ashkannejhad Decl. ¶ 39. If universities limited themselves to punishing speech that does not enjoy First Amendment protection, implementation of the Final Rule would be a much simpler matter. Indeed, FIRE has published a model code of student conduct that comports with both the First Amendment and the Final Rule, and universities may freely borrow from that model to ease the burdens of meeting the August 14 deadline. *See* FIRE, Model Student Code, *available at* bit.ly/3gILgBx.

Finally, the Court should consider how much of the initial implementation costs discussed in Plaintiffs' declarations will have already been incurred by the time any preliminary injunction would issue. The purpose of a preliminary injunction is to *prevent* irreparable harm, not to reward the Plaintiffs for having already suffered it. *See Scott-Blanton v. Universal City Studios Prods., LLLP*, 495 F. Supp. 2d 74, 80 (D.D.C. 2007) (denying preliminary injunction where "injunctive relief would fail to cure any irreparable harm the plaintiff has already suffered"); *Bristol Myers Co. v. FTC*, 1978 WL 1410, at *4 (D.D.C. Sept. 22, 1978) ("Most of the claimed irreparable harm . . . has already occurred, and the court does not feel that the remainder is so substantial as to warrant injunctive relief."). After the Final Rule was announced, Plaintiffs waited four weeks to sue, and they did not move for a preliminary injunction until three weeks after that. By the time this Court rules on Plaintiffs' preliminary injunction motion, the August 14 compliance deadline will be at most a few weeks away. In the meantime, the public universities that Plaintiffs represent have been working to prepare to meet the deadline. *See, e.g.*, Ashkennejhad Decl. ¶ 21 ("Since the Rule was published on May 6, 2020, [Washington State University] has already engaged in multiple forums, trainings, meetings, and policy/procedure development involving multiple employees across the system . . . ."). Under these circumstances, there can be little doubt that most of the initial compliance costs bemoaned in Plaintiffs' declarations have already been incurred and would not be prevented by a preliminary injunction.

*       *       *

For the reasons already explained, the August 14 implementation deadline is entirely reasonable, and the Court should not stay a deadline that merely requires Plaintiffs to bring their conduct into closer conformity with the Constitution. But to the extent the Court disagrees, it should limit any stay to the specific schools for which there is evidence in the record that supports Plaintiffs' claims of irreparable injury.

19

This Court has authority to postpone the effective date of an administrative action only "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, and Plaintiffs have submitted no evidence that the vast majority of public universities in their states will have any trouble coming into compliance by August 14. That makes this case very similar to *United States Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 126 (D.D.C. 2015), in which this Court stayed enforcement of a final rule in some states but not others in view of its "obligation to tailor [preliminary] injunctive relief narrowly to remedy the harms alleged." *See also Russell-Murray Hospice, Inc. v. Sebelius*, 724 F. Supp. 2d 43, 60 (D.D.C. 2010). Whatever the scope of this Court's authority to "set aside" unlawful agency action at the conclusion of the case, *see* 5 U.S.C. § 706, at this stage injunctive relief may be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). In the absence of any evidence that most of Plaintiffs' universities cannot comply with the August 14 deadline and in view of Intervenors' evidence showing that many universities in fact can comply, the Court must carefully limit the scope of any preliminary injunction to prevent only the irreparable injuries that Plaintiffs are able to demonstrate.

This analysis is buttressed by the fact that the nationwide preliminary injunction Plaintiffs seek would significantly alter the legal obligations of states and universities that are not represented in this case. Schools that are actively preparing to comply with the Final Rule and that have not sued to have it enjoined should not have the rug pulled out from under them at the last minute by the issuance of a nationwide preliminary injunction in a case in which they are not parties. That is especially so because one of Plaintiffs' biggest complaints about the Final Rule is that it does not go far enough in requiring funding recipients to prevent and punish sexual harassment. *See* PI Br. 21-22, 25-30. Thus, if the Court grants the full relief Plaintiffs seek, the

upshot will be that nonparties to this case will have additional legal obligations after August 14 that they would not have under the Final Rule. These nonparties might well need to be joined under Rule 19 before the Court could properly issue such broad injunctive relief. And regardless of whether Rule 19 applies as a formal matter, there is a simple way that this Court can and should avoid prejudice to nonparties: "shaping the relief" it issues by staying the Final Rule's effective date for, at most, the small number of schools that say they cannot meet the August 14 deadline. *See* Fed. R. Civ. P. 19(b).

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: July 8, 2020                                       Respectfully submitted,

 /s/ Charles J. Cooper               /s/ William S. Consovoy          
Charles J. Cooper (D.C. Bar #248070)         William S. Consovoy (D.C. Bar #493423)
Brian W. Barnes (pro hac vice forthcoming)   Cameron T. Norris
Nicole J. Moss (D.C. Bar #472424)            Alexa R. Baltes (pro hac vice pending)
COOPER & KIRK, PLLC                          CONSOVOY MCCARTHY PLLC
1523 New Hampshire Ave., NW                  1600 Wilson Blvd., Ste. 700
Washington, D.C. 20036                       Arlington, VA 22209
(202) 220-9600                               (703) 243-9423
ccooper@cooperkirk.com                       will@consovoymccarthy.com
bbarnes@cooperkirk.com                       cam@consovoymccarthy.com
nmoss@cooperkirk.com                         lexi@consovoymccarthy.com

*Counsel for Foundation for*                 *Counsel for Speech First, Inc. and*
*Individual Rights in Education*             *Independent Women's Law Center*