# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, et al., | |
| *Plaintiffs*, | |
| v. | No. 1:20-cv-1468-CJN |
| Elisabeth D. DEVOS, in her official capacity as Secretary of the United States Department of Education, et al., | |
| *Defendants*, | |
| FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, INDEPENDENT WOMEN'S LAW CENTER, SPEECH FIRST, INC., | |
| *Intervenor-Defendants*. | |

## APPENDIX TO INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

Exhibit 1…………………..........................................................................................................001

Exhibit 2…………………..........................................................................................................050

Exhibit 3…………………..........................................................................................................054

Exhibit 4…………………..........................................................................................................058

Exhibit 5…………………..........................................................................................................060

Exhibit 6…………………..........................................................................................................063

Exhibit 7…………………..........................................................................................................066

Exhibit 8…………………..........................................................................................................068

Exhibit 9…………………..........................................................................................................071

Exhibit 10…………………........................................................................................................073

Exhibit 11…………………........................................................................................................075

Exhibit 12…………………........................................................................................................078

Exhibit 13…………………........................................................................................................081

# Defendant-Intervenors' Preliminary Injunction Exhibit 1

Comment of the Foundation for Individual Rights in Education in Support of the
Department of Education's Proposed Regulations on Title IX Enforcement

Department of Education
Notice of Proposed Rulemaking

Docket No. ED-2018-OCR-0064, RIN 1870-AA14

Nondiscrimination on the Basis of Sex in Education Programs
or Activities Receiving Federal Financial Assistance

Submitted on January 30, 2019

Joseph Cohn, Legislative and Policy
Director
Tyler Coward, Legislative Counsel
Foundation for Individual Rights in
Education
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
(215) 717-3473

## Executive Summary

The Foundation for Individual Rights in Education (FIRE) commends the Department of
Education for following the Administrative Procedure Act to propose these regulations.
The proposed regulations from the Department are a marked improvement over previous
departmental policy and guidance in a number of important ways, though there are ways
FIRE believes the proposed rules could be strengthened.

FIRE has long argued that everybody on campus benefits from fundamentally fair
proceedings. The proposed rules take the rights of both complainants and accused students
seriously, and they make important strides toward ensuring that complaints of sexual
misconduct will be neither ignored nor prejudged. Though not perfect, the proposed
regulations will go a long way towards restoring meaningful due process protections to
campuses—to the ultimate benefit of both complainants and respondents alike.

Important protections in the proposed regulations include:

- The proposed regulations define student-on-student sexual harassment in
  accordance with established Supreme Court precedent in *Davis v. Monroe County
  Board of Education,* eliminating the confusion created by prior Department
  guidance and settlement agreements that have led institutions nationwide to adopt
  overly broad definitions of sexual harassment that threaten student and faculty
  speech. The *Davis* standard ensures that institutions combat discriminatory

harassment without infringing on speech protected by the First Amendment.

- The proposed regulations state that institutions of higher education "must provide for a live hearing" when adjudicating claims of sexual harassment or misconduct. Having a live hearing ensures that all parties see exactly the same evidence and testimony that the fact-finder is seeing, so the party can rebut or buttress that evidence and testimony in real time. Importantly, the live hearing requirement corrects prior guidance that allowed, and even encouraged, schools to use a "single investigator" to adjudicate sexual misconduct cases through a series of separate meetings with the parties and witnesses. The elimination of the "single investigator" model is of critical importance to the fairness and reliability of sexual misconduct proceedings. As one federal judge wrote in criticizing Brandeis University's use of a single investigator model, "The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions."

- The Department's proposed rules also require that institutions allow both sides to cross-examine (through an advisor) all witnesses at the hearing, including the parties themselves. The Supreme Court has identified cross-examination as "the greatest legal engine ever invented for the discovery of truth," and a number of courts have ruled, in the context of campus sexual misconduct adjudications, that it is a requirement of due process.

- The proposed regulations require that institutions of higher education give respondents written notice of alleged wrongdoing. The notice requirements provide critical protections for respondents and address serious deficiencies in the adjudication process at many colleges and universities, where students are often expected to begin answering for alleged wrongdoing with very little information about the accusations against them. The regulations also require both complainants and respondents to have an opportunity to review all relevant evidence in advance of a hearing, so that they have a meaningful opportunity to prepare.

- The proposed regulations would require institutions to review all relevant evidence, whether it is inculpatory or exculpatory. While the utility of such a requirement may seem obvious, legal complaints against universities stemming from their adjudication of Title IX claims are rife with allegations that universities have, in fact, ignored critical evidence, whether because of a rush to judgment or simply because of a process that did not provide appropriate avenues for the collection and review of evidence. Thus, this is one of the most significant protections introduced by the proposed regulations.

- The proposed regulations give flexibility to institutions to determine for themselves which standard of evidence to use when adjudicating claims of sexual misconduct,

2

provided that the same standard used in complaints against students is also used in complaints against employees, including faculty. Students, employees, and faculty all deserve robust procedural protections. Institutions should not be permitted to disfavor certain constituencies by requiring lower burdens of proof for them to be punished.

FIRE also believes that institutions should have a robust system for responding to reports of sexual misconduct from complainants, even when those who come forward are not comfortable with filing an official report or with pursuing disciplinary charges against the alleged perpetrator. In such situations, the proposed regulations state that these non-punitive supportive measures may be appropriate to restore or preserve a complainant's access to the institution's educational programs or activities. By prioritizing actions aimed at meeting individual needs of complainants, these regulations fulfill the commitment to nondiscrimination that Title IX demands for all students.

FIRE believes that the proposed regulations will greatly improve the fundamental fairness of campus sexual misconduct proceedings.

We again thank the Department for following formal procedures for proposing new regulations, allowing for informed feedback from all stakeholders.

<u>Introduction</u>

The Foundation for Individual Rights in Education (FIRE; thefire.org) is a nonpartisan, nonprofit organization dedicated to defending student and faculty rights on America's college campuses. These rights include freedom of speech, freedom of assembly, due process, academic freedom, legal equality, and freedom of conscience—the essential qualities of individual liberty.

On September 7, 2017, Secretary of Education Betsy DeVos announced that the Department was repealing prior agency mandates regarding the enforcement of Title IX, which had not been subjected to the notice-and-comment process required by the Administrative Procedure Act (the APA).[1] During that speech, Secretary DeVos indicated that the Department would replace those mandates with regulations that would be subjected to notice and comment under the APA.

Before addressing the content of the proposed regulations, FIRE wishes to note that simply subjecting the proposed regulations to this statutorily-required notice-and-comment

---

[1] Betsy DeVos, U.S. Sec'y of Educ., Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement ("In order to ensure that America's schools employ clear, equitable, just, and fair procedures that inspire trust and confidence, we will launch a transparent notice-and-comment process to incorporate the insights of all parties in developing a better way.").

3

process is in and of itself significant and welcome. As we wrote in our initial public statement following the publication of these proposed regulations:

> We commend the Department of Education for following formal rulemaking procedures to implement these changes, instead of mandating them through "guidance" or "Dear Colleague" letters. Public notice and comment is critically important because it allows for informed feedback from all stakeholders.[2]

The proposed rules—though not without room for improvement—are also laudable. In her September 2017 speech, Secretary DeVos set forth principles that would guide the Department's efforts: "Every survivor of sexual misconduct must be taken seriously. Every student accused of sexual misconduct must know that guilt is not predetermined. These are non-negotiable principles."[3] FIRE is gratified to see that the proposed regulations faithfully honor that balanced approach.

### Analysis

The proposed regulations offer a comprehensive approach that seeks to ensure that campuses prohibit and effectively address gender-based discriminatory harassment without infringing on the free speech or due process rights of students. FIRE has consistently argued that the twin responsibilities of combating discrimination and protecting constitutional rights need not be in tension. We believe these proposed regulations make serious strides towards providing a framework where both objectives can be realized.

Below, FIRE provides an analysis of the key sections of the proposed regulations, focusing on the proposal's fit with the guiding principles set forth by Secretary DeVos and whether the proposed regulations effectively balance institutions' twin responsibilities within an effective and constitutional framework.[4]

### Section 106.6 Effect of Other Requirements and Preservation of Rights

Section 106.6 declares that nothing in the proposed regulations requires an educational institution to:

> (1) Restrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution;

---

[2] FIRE, FIRE STATEMENT ON NEW, PROPOSED TITLE IX REGULATIONS (Nov. 16, 2018), *available at* https://www.thefire.org/fire-statement-on-new-proposed-title-ix-regulations.

[3] DeVos, *supra* note 1.

[4] The comment does not address sections of the proposed regulations that regulate K–12 schools, since FIRE's mission is exclusively to defend the rights of students and faculty in the higher education setting. Nor does the comment address sections of the proposed regulations on which FIRE does not have an opinion.

4

(2) Deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution; or

(3) Restrict any other rights guaranteed against government action by the U.S. Constitution.

This plain declaration that Title IX enforcement will be conducted within a framework that recognizes the essentiality of constitutional rights is an important component of the proposed regulations.

This language is helpful, and unfortunately necessary, in light of the growing number of disturbing instances in which institutions have violated students' due process rights in campus Title IX adjudications.[5] In fact, one prominent organization has argued in its comment that the procedural protections provided in these proposed regulations "undermine" Title IX.[6] Moreover, the repealed April 4, 2011 "Dear Colleague" letter explicitly mandated that institutions with higher burdens of proof lower them to the "preponderance of the evidence" standard, which the letter argued was required by Title IX.[7] This mandate threatened the fundamental fairness of campus Title IX proceedings, and was, at least in the eyes of one federal court, an unconstitutional violation of the right to due process. That court held that "preponderance of the evidence is not the proper standard for disciplinary investigations such as the one that led to [the plaintiff's] expulsion, given the significant consequences of having a permanent notation such as the one [the public university] placed on [the plaintiff's] transcript."[8]

**Section 106.30 Definitions**

The proposed regulations use the terms "complainant" and "respondent" throughout to describe the parties in Title IX proceedings. By using this neutral terminology, the Department of Education avoids injecting the bias generated by referring to anyone who makes an allegation of sexual misconduct as a "victim." Labeling an accuser a "victim" before there has been any investigation or adjudication is inappropriate because it assumes the accuracy of allegations, turning the principle of "innocent until proven guilty" on its

---

[5] *See, e.g.*, *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Alger*, 228 F. Supp. 3d 713 (W.D. Va. 2016); *Doe v. George Mason Univ.*, No. 1:15-cv-00209 (E.D. Va. Feb. 25, 2016).

[6] *Public Comment by the Victim Rights Law Center on the Department of Education's Proposed Regulations Regarding Title IX of the Educational Amendments of 1972*, at 21 (Jan. 15, 2019), *available at* https://www.regulations.gov/document?D=ED-2018-OCR-0064-6471 (hereinafter "VRLC Comment").

[7] Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter: Sexual Violence 11 (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "2011 Dear Colleague Letter").

[8] *Lee v. Univ. of N.M.*, No. 17-cv-01230 (D.N.M. Sept. 20, 2018). *See also Doe v. Univ. of Miss.*, No. 3:18-cv-00138, at 21 (S.D. Miss. Jan. 16, 2019) (noting that the constitutionality of the preponderance standard is a "thorny issue," and allowing plaintiff's due process claim to proceed).

5

head. As one court put it in an opinion allowing a procedural fairness claim against Brandeis University to proceed:

> Brandeis appears to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process. And it is not enough simply to say that such changes are appropriate because victims of sexual assault have not always achieved justice in the past. **Whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning.** Each case must be decided on its own merits, according to its own facts. If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision.[9]

Under Section 106.30, a "complainant" is defined as:

> an individual who has reported being the victim of conduct that could constitute sexual harassment, or on whose behalf the Title IX Coordinator has filed a formal complaint. For purposes of this definition, the person to whom the individual has reported must be the Title IX Coordinator or another person to whom notice of sexual harassment results in the recipient's actual knowledge under this section.

This definition is sensible. This definition references "actual knowledge," another term defined in the proposed regulation:

> *Actual knowledge* means notice of sexual harassment or allegations of sexual harassment to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient, or to a teacher in the elementary and secondary context with regard to student-on-student harassment. Imputation of knowledge based solely on *respondeat superior* or constructive notice is insufficient to constitute actual knowledge. This standard is not met when the only official of the recipient with actual knowledge is also the respondent. The mere ability or obligation to report sexual harassment does not qualify an employee, even if that employee is an official, as one who has authority to institute corrective measures on behalf of the recipient.

In *Davis v. Monroe County Board of Education,* the leading case in this area of the law, the Supreme Court of the United States established and limited institutional liability in Title IX lawsuits:

---

[9] *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 573 (D. Mass. 2016) (emphasis added).

> [F]unding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.[10]

The "actual knowledge" prong of *Davis* (like the other prongs of the standard) is not only applicable in the context of private actions seeking damages. As the Court in *Davis* explained,

> both the "deliberate indifference" standard and the language of Title IX narrowly circumscribe the set of parties whose known acts of sexual harassment can trigger some duty to respond on the part of funding recipients.[11]

Actual knowledge is imputed to an institution when notice of an allegation is given to the institution's Title IX coordinator or any official who has the authority to institute corrective measures. Because institutions decide who has that authority, this definition provides institutions with appropriately broad discretion. It is critical, however, that institutions publish which of its officials have that authority in a location easily accessible and known to the student body, so that those who wish to file complaints know how to do so effectively. The responsibility to do this is implied, but not explicitly stated, in Section 106.8(c), which requires institutions to "provide notice of the recipient's grievance procedures, including how to report sex discrimination and *how to file* or respond to a complaint of sex discrimination, to students and employees" (emphasis added).

**A significant strength of the proposed regulation is the fact that it defines "sexual harassment" in accordance with the Supreme Court's opinion in *Davis*, which carefully harmonizes schools' obligation under Title IX to address sexual harassment with their obligation to protect students' expressive rights**. Section 106.30 defines "sexual harassment" as:

> (1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct;

> (2) Unwelcome conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity[.]

Subsection (1) is a straightforward description of *quid pro quo* sexual harassment. As stated above, Subsection (2)'s language comes directly from the Supreme Court's decision in

---

[10] 526 U.S. 629, 651 (1999).
[11] *Id.* at 644.

*Davis.*[12] Courts have consistently struck down university anti-harassment policies as vague or overbroad when those policies failed to include the elements set forth in *Davis.*[13]

The *Davis* standard allows schools to prohibit sexual violence and other actions among peers that amount to sexual misconduct (properly defined), to discipline those who commit it, and to remedy its effects. It also allows schools to punish students when they determine that a student has engaged in expression (without accompanying physical or other conduct) that is discriminatory based on sex and that interferes with a student's access to education because of its severity, pervasiveness, and objective offensiveness.

It is precisely because expression, not just physical or other conduct, may be restricted or punished as harassment that the Supreme Court carefully crafted the *Davis* standard, reiterating it multiple times in its majority opinion. There is no doubt that First Amendment interests are implicated when expression on public college campuses is regulated. As the Supreme Court has established, "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."[14] The Court has also rejected the idea that, "because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'"[15] Further, these protections apply even to highly offensive speech on campus: "[T]he mere dissemination of ideas — no matter how offensive to good taste — on a state university campus may not be shut off in the name alone of 'conventions of decency.'"[16]

Given the long-recognized importance of First Amendment protections for students and faculty, the Department of Education's Office for Civil Rights (OCR) stated in 2003:

---

[12] *Id.*

[13] *McCauley v. Univ. of the V.I.*, 618 F.3d 232 (3d Cir. 2010) (upholding district court's invalidation of university harassment policy on First Amendment grounds); *DeJohn v. Temple Univ.*, 537 F.3d 301, 319 (3d Cir. 2008) (striking down former sexual harassment policy on First Amendment grounds and holding that because policy failed to require that speech in question "objectively" created a hostile environment, it provided "no shelter for core protected speech"); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995) (declaring university discriminatory harassment policy facially unconstitutional); *Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004) (finding university sexual harassment policy unconstitutionally overbroad); *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa. 2003) (enjoining enforcement of university harassment policy due to overbreadth); *Booher v. Bd. of Regents*, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. Jul. 21, 1998) (finding university sexual harassment policy void for vagueness and overbreadth); *Corry v. Leland Stanford Junior Univ.*, No. 740309 (Cal. Super. Ct. Feb. 27, 1995) (slip op.) (declaring "harassment by personal vilification" policy unconstitutional); *UWM Post, Inc. v. Bd. of Regents of the Univ. of Wis. Sys.*, 774 F. Supp. 1163 (E.D. Wis. 1991) (declaring university racial and discriminatory harassment policy facially unconstitutional); *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989) (enjoining enforcement of university discriminatory harassment policy due to unconstitutionality).

[14] *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

[15] *Healy v. James*, 408 U.S. 169, 180 (1972).

[16] *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973).

8

> OCR has consistently maintained that schools in regulating the conduct of students and faculty to prevent or redress discrimination must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty, including those court precedents interpreting the concept of free speech. OCR's regulations and policies do not require or prescribe speech, conduct or harassment codes that impair the exercise of rights protected under the First Amendment. . . . OCR interprets its regulations consistent with the requirements of the First Amendment, and all actions taken by OCR must comport with First Amendment principles.[17]

Indeed, were the Department to issue regulations interpreting Title IX that required the violation of First Amendment rights, such an interpretation would receive no deference and would be subject to invalidation by a court.[18] Inclusion of all of the specific elements of the *Davis* standard in its definition of sexual harassment, then, is an important component of the Department's responsibility to issue constitutionally sound regulations, especially as "[b]road prophylactic rules in the area of free expression are suspect."[19]

For many years, the Department of Education stated that it defined sexual harassment consistently with the standard set forth in *Davis*. The Department's 2001 Revised Sexual Harassment Guidance, which also went through the notice-and-comment process, instructed educational institutions that "the definition of hostile environment sexual harassment used by the Court in *Davis* is consistent with the definition" used by the Department.[20]

OCR has also explicitly rejected the idea that a different standard for harassment should be used when a court determines liability in lawsuits against schools than when OCR determines a school has violated Title IX for its own enforcement purposes. The 2001 guidance explains: "[S]chools benefit from consistency and simplicity in understanding what is sexual harassment for which the school must take responsive action. A multiplicity of definitions would not serve this purpose."[21]

---

[17] Gerald A. Reynolds, Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter: First Amendment (July 28, 2003), *available at* https://www2.ed.gov/about/offices/list/ocr/firstamend.html.

[18] *See, e.g.*, *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1438 (1985) (holding that rules "fundamentally at odds with the First Amendment . . . can no longer be permitted to stand"); *see also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575–76 (1988) (observing that courts will "not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it").

[19] *NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.")(internal citations omitted).

[20] Office for Civil Rights, Dep't of Educ., Notice of Revised Sexual Harassment Guidance, 66 Fed. Reg. 5512 (Jan. 19, 2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

[21] *Id.* at vi.

Over the years, plaintiffs have successfully used the *Davis* standard to hold institutions accountable for their deliberate indifference to student-on-student harassment.[22] Courts have also effectively protected the First Amendment rights of students by applying the standard.[23]

In 2013, the Department of Education explicitly departed from the *Davis* standard, when it and the Department of Justice told colleges and universities across the country to define sexual harassment as "any unwelcome conduct of a sexual nature," including "verbal conduct."[24] The government's promulgation of this broad definition of harassment, which fails to meet even the basic Title IX requirement that the actions or expression labeled as "harassment" be targeted at someone *on the basis of sex*,[25] led many universities to adopt similar subjective and nearly limitless definitions of sexual harassment that infringe on students' and faculty members' right to free speech.[26]

---

[22] *See, e.g., Niesen v. Iowa St. Univ.*, 2017 U.S. Dist. LEXIS 221061 (S.D. Iowa Nov. 3, 2017) (denying motion to dismiss student's Title IX claim for retaliation that she experienced after reporting an alleged sexual assault because the university did not respond to her complaints about the retaliation); *S.K. v. N. Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 797–98 (W.D. Pa. 2016) (holding plaintiff adequately pled Title IX claim where bullying of plaintiff had grown to the point where it "was its own sport" and principal never punished the harassers); *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 365 (denying school district's motion for summary judgment on students' Title VI claim for anti-Semitic harassment in part because a reasonable jury could find that a "handful of assemblies . . . could not have plausibly changed the anti-Semitic sentiments of the student harassers"). Interestingly, in its comment criticizing the proposed regulation's departure from the 2011 Dear Colleague Letter, the Victim Rights Law Center argues that the letter's policies were necessary because, in their eight years of advocacy before it was issued, "VRLC attorneys practiced in an arena characterized by untrained adjudicators, unreliable and variable standards, and unaddressed complaints of sexual assault and rape." To support this contention, VRLC included a footnote (n.2) with a lengthy string cite of cases. In every one of those cases, however, the court cited the *Davis* decision to allow a student's lawsuit alleging that the institution had been deliberately indifferent to unlawful discriminatory harassment to proceed. These cases further demonstrate that the *Davis* standard is effective in holding institutions accountable under Title IX. VRLC Comment, *supra* note 6.

[23] *See, e.g., Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 366–67 (S.D.N.Y. 2017) (holding student accused of rape could not invoke Title IX to "censor the use of the terms 'rapist' and 'rape'" by the alleged victim of the crime on the grounds that the accusation bred an environment of pervasive and severe sexual harassment for the accused student); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, (3d Cir. 2013) (holding school district could not invoke Title IX to prohibit students from wearing "I <3 boobies" bracelets intended to increase breast cancer awareness); *cf. Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011) (dismissing Title VI claim because other students' criticisms of Israel and support for Hamas and Hezbollah in school plaza is pure political speech and expressive conduct that does not suffice to create a hostile environment).

[24] Letter from Anurima Bhargava, Chief, Civil Rights Div., U.S. Dep't of Justice, and Gary Jackson, Reg'l Dir., Office for Civil Rights, U.S. Dep't of Educ., to Royce Engstrom, President, Univ. of Mont. and Lucy France, Univ. Counsel, Univ. of Mont. (May 9, 2013), *available at* http://www.justice.gov/opa/documents/um-ltr-findings.pdf.

[25] 20 U.S.C. 1681(a). *See, e.g., Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011); *Burwell v. Pekin Cmty. High Sch. Dist. 303*, 213 F. Supp. 2d 917, 930 (C.D. Ill. 2002); *Gallant v. Bd. of Trs. of Cal. State Univ.*, 997 F. Supp. 1231, 1235 (N.D. Cal. 1998).

[26] Will Creeley, *A year later, impact of Feds' 'Blueprint' comes into focus*, FIRE (Aug. 28, 2014), https://www.thefire.org/year-later-impact-feds-blueprint-comes-focus.

10

To the extent the proposed regulations appear to be a departure, as some critics have alleged, that is only because the Departments of Education and Justice have, in recent years, insisted upon an unconstitutionally broad definition of sexual harassment unsupported by statutes, regulations, or case law. **The new proposed definition is in fact a welcome return to consistency with the law itself**.

One final point worth noting about *Davis* is that while it sets forth constitutional guidelines for what may and may not be *punished* under Title IX, it does not preclude institutions from addressing conduct that does not meet its standard in *non-punitive* ways. Examples of lawful responses to conduct that does not meet *Davis* would include providing the complainant with supportive measures, responding to the conduct in question with institutional speech, or offering programming designed to foster a welcoming campus climate more generally.

Helpfully, the proposed regulations define non-punitive "supportive measures":

> Proposed section 106.44(e)(4) defines "supportive measures" as non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge, to the complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed.

The proposed regulations further state:

> [S]uch measures are designed to restore or preserve access to the recipient's education program or activity, without unreasonably burdening the other party; protect the safety of all parties and the recipient's educational environment; and deter sexual harassment. Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures.

FIRE believes schools should have a robust system for responding to reports of sexual misconduct even when those who come forward are not comfortable with filing an official report or with pursuing disciplinary charges against the alleged perpetrator. While these measures must not be punitive, since no determination has been made of the validity of the accusation, that must not stop schools from taking non-punitive measures to aid reporting students. By focusing on providing these measures, the proposed rules return to Title IX's primary focus: ensuring that discrimination based on sex does not prevent students from pursuing their educations.

Another misunderstood aspect of the proposed regulations is the definition of the term "formal complaint." The proposed regulations define "formal complaint" as "a document signed by a complainant or by the Title IX Coordinator alleging sexual harassment against a

11

respondent about conduct within its education program or activity and requesting initiation of the recipient's grievance procedures consistent with § 106.45."

Critics have argued that this definition relieves institutions of the responsibility to respond to allegations of sexual misconduct that occur off campus.[27] This criticism is misplaced. In *Davis*, the Supreme Court discussed the jurisdictional limitations of Title IX at length:

> The language of Title IX itself—particularly when viewed in conjunction with the requirement that the recipient have notice of Title IX's prohibitions to be liable for damages—also cabins the range of misconduct that the statute proscribes. **The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs.** If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference "subject[s]" its students to harassment. That is, the deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it. Random House Dictionary of the English Language 1415 (1966) (defining "subject" as "to cause to undergo the action of something specified; expose" or "to make liable or vulnerable; lay open; expose"); Webster's Third New International Dictionary 2275 (1961) (defining "subject" as "to cause to undergo or submit to: make submit to a particular action or effect: EXPOSE"). Moreover, because the harassment must occur "under" "the operations of" a funding recipient, see 20 U.S.C. § 1681(a); § 1687 (defining "program or activity"), the harassment must take place in a context subject to the school district's control, Webster's Third New International Dictionary, *supra*, at 2487 (defining "under" as "in or into a condition of subjection, regulation, or subordination"; "subject to the guidance and instruction of"); Random House Dictionary, *supra*, at 1543 (defining "under" as "subject to the authority, direction, or supervision of").
>
> **These factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser <u>and the context</u> in which the known harassment occurs.** Only then can the recipient be said to "expose" its students to harassment or "cause" them to undergo it "under" the recipient's programs.
>
> [ . . . ]
>
> Where, as here, the misconduct occurs during school hours and on school grounds—the bulk of G. F.'s misconduct, in fact, took place in the classroom—

---

[27] Andrew Kreighbaum, *Sharp Divide Over Trump Administration's Title IX Overhaul*, Inside Higher Ed (Nov. 19, 2018), https://www.insidehighered.com/news/2018/11/19/devos-sexual-misconduct-rule-criticized-survivor-advocates.

12

the misconduct is taking place "under" an "operation" of the funding recipient. See *Doe v. University of Illinois,* 138 F.3d, at 661 (finding liability where school fails to respond properly to "student-on-student sexual harassment that takes place while the students are involved in school activities or otherwise under the supervision of school employees"). In these circumstances, the recipient retains substantial control over the context in which the harassment occurs. More importantly, however, in this setting the Board exercises significant control over the harasser. We have observed, for example, "that the nature of [the State's] power [over public school children] is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 655 (1995).[28]

The Supreme Court has defined the jurisdictional limits of Title IX. It is not within the authority of an agency to ignore those limitations. Further, when an incident of unlawful sexual misconduct occurs off campus, educational institutions may be poorly situated to properly investigate the situation compared with local law enforcement authorities. Educational institutions' attempts to investigate may also interfere with law enforcement's ability to investigate and prosecute crimes alleged to have taken place in their jurisdiction. Indeed, in a December 9, 2014, hearing before the U.S. Senate Judiciary Subcommittee on Crime and Terrorism, Angela Fleischer, Southern Oregon University's Assistant Director of Student Support and Intervention for Confidential Advising, testified:

> An assault happens. There is no clearly identified place for the victim to go for information, and she or he is encouraged by campus administrators to "just move on" or to accept help by engaging in the campus administrative process. The victim is never provided a clear explanation of the law enforcement response possibilities, or if police response is considered the investigation is often hindered by campus actions already taken.[29]

Testifying at the same hearing, Cornell University's Police Chief Kathy Zoner agreed that concurrent campus investigations have harmed law enforcement efforts. She explained:

> Concurrent investigations raise tricky issues for law enforcement and campus adjudicators to navigate. Campus police will, more likely than not, gather evidence that could be useful to the Title IX investigation. As a law enforcement officer conducting an investigation, my biggest concern is that sharing evidence may undercut a criminal case—which is on a much longer timeline—against a respondent. The collection and maintenance of evidence for a criminal prosecution is tightly controlled by procedural rules. This is

---

[28] *Davis*, 526 U.S. at 644–46 (emphases added).
[29] Joe Cohn, *More on Senate Committee's Hearing on Campus Sexual Assault*, FIRE (Dec. 10, 2014), https://www.thefire.org/senate-committees-hearing-campus-sexual-assault.

not the case with administrative proceedings. The way that campus officials receive and treat evidence in an administrative investigation can negatively impact its admissibility in court, potentially undermining a criminal case. Additionally, if evidence is discovered after an administrative case is closed that would affect or overturn a decision, both parties may have already suffered irreparable consequences.[30]

The commentary that accompanies the proposed regulation notes that courts have held that some activity that occurs off campus may still constitute an "education program and activity" subject to the requirements of Title IX. The commentary cites a recent federal case to illustrate the point:

> *Farmer* v. *Kansas State Univ.,* 2017 WL 980460, at * 8 (D. Kan. Mar. 14, 2017) (holding that a KSU fraternity is an "education program or activity" for purposes of Title IX because "KSU allegedly devotes significant resources to the promotion and oversight of fraternities through its websites, rules, and Office of Greek Affairs. Additionally, although the fraternity is housed off campus, it is considered a 'Kansas State University Organization,' is open only to KSU students, and is directed by a KSU instructor. Finally, KSU sanctioned the alleged assailant for his alcohol use, but not for the alleged assault. Presented with these allegations, the Court is convinced that the fraternity is an 'operation' of the University, and that KSU has substantial control over student conduct within the fraternity.").

The commentary's citation to *Farmer* clarifies that there is currently no bright-line rule in favor of or against Title IX jurisdiction for off-campus conduct. Rather, it demonstrates that to establish Title IX jurisdiction, the complainant will have to show some nexus—in addition to the parties' affiliation with the educational institution—between the alleged conduct and the institution.

Other objections to the formal complaint definition are similarly unpersuasive. The Victim Rights Law Center claims that requiring either the complainant or the Title IX coordinator to sign a complaint is too cumbersome. They argue:

> Consider, for instance, institutions with satellite campuses with just one Title IX Coordinator. An individual is tasked with going in person to the Title IX Coordinator to report sexual harassment or sexual assault to learn about their options. If they are not ready to move forward with a formal complaint, they face having to come back in-person to file a formal complaint with a signature. This is further complicated by those students who do not have reliable transportation or extra funds to spend on transportation. The

---

[30]*Id.*

restrictive definition imposes unnecessary barriers to filing a complaint that will detrimentally impact victims' willingness to do so.[31]

Of course, the proposed regulation does not require that the complainant and the Title IX coordinator meet in person. A student at a satellite campus could notify the Title IX coordinator on the telephone or through an electronic communication, and because a complaint can be initiated by the Title IX coordinator, that person can sign and initiate the complaint. FIRE is unaware of any case in which a court has found a lack of actual notice because the complaint was received by the institution electronically.

In a statement criticizing the proposed regulation, the American Civil Liberties Union had this to say about the proposed regulation's definition of "formal complaint":

> Under the new rule, colleges and universities would only be obligated to take action if students make formal complaints to designated high-level school officials. If students reported their assaults to resident advisors, teaching assistants, coaches, or other school employees whom they know and trust, schools would not be obligated to intervene. Under prior Department of Education rules, schools were required to take action when students reported sexual violence to a much broader range of school employees — anyone whom a student would reasonably believe had the authority or responsibility to redress harassment.[32]

The ACLU's comment overlooks the fact that there may be compelling reasons why complainants would prefer that faculty, resident advisors, teaching assistants, coaches, or other staff maintain their confidentiality. This provision may be kept in its current form; it could also be amended to allow institutions to decide which categories of its employees have an obligation to report information they receive from students to the Title IX coordinator.

The definitions section of the proposed regulation cites 34 C.F.R. 66.846(a) to define sexual assault so that institutions across the country are using a uniform definition. Local jurisdictions may define sexual assault differently from what is found in that regulation, so institutions may have a legal obligation to respond to conduct that meets the broadest of whichever definitions apply in their locality.

There is a good argument to be made that institutional definitions of potentially unlawful sexual conduct should be harmonized with the laws of the local jurisdiction in which the

---

[31] VRLC Comment, *supra* note 6.

[32] Emma J. Roth & Shayna Medley, *Betsy DeVos Wants to Roll Back Civil Rights Protections For Students Filing Complaints of Sexual Harassment or Assault*, ACLU (Nov. 16, 2018), https://www.aclu.org/blog/womens-rights/womens-rights-education/betsy-devos-wants-roll-back-civil-rights-protections.

15

campus is located so that young adults who attend college are not held to a different standard of sexual behavior than their peers who are not currently attending an educational institution. Nevertheless, tying the Department of Education's enforcement to the uniform federal definition is defensible. Doing so avoids a situation where the Department has jurisdiction over an institution's response to an allegation in one jurisdiction, but not over an institution's action (or inaction) with respect to identical conduct in another jurisdiction with a narrower definition of sexual assault.

**Section 106.44 Recipient's Response to Sexual Harassment**

Section 106.44 outlines educational institutions' responsibility to respond to known allegations of conduct that, if left unaddressed, may violate Title IX. The section begins:

> (a) *General.* A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States must respond in a manner that is not deliberately indifferent. A recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances.

This language faithfully tracks the Supreme Court's holding with respect to institutions' obligations under Title IX. In *Davis*, the Court explained:

> We stress that our conclusion here—that recipients may be liable for their deliberate indifference to known acts of peer sexual harassment—does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action. . . . **School administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed "deliberately indifferent" to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.** The dissent consistently mischaracterizes this standard to require funding recipients to "remedy" peer harassment, *post*, at 658, 662, 668, 683, and to "ensur[e] that . . . students conform their conduct to" certain rules, *post*, at 666. Title IX imposes no such requirements. On the contrary, the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable. This is not a mere "reasonableness" standard, as the dissent assumes. See *post*, at 679. In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not "clearly unreasonable" as a matter of law.[33]

---

[33] *Davis*, 526 U.S. at 648–49 (emphasis added).

16

The opinion, authored by Justice Sandra Day O'Connor and joined by Justices John Paul Stevens, David Souter, Stephen Breyer, and Ruth Bader Ginsburg, could not be clearer: Educational institutions violate Title IX *only* when they are "deliberately indifferent to known acts of peer harassment," which is demonstrated *only* "where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." That the Department would propose complying with the Supreme Court's jurisprudence should be unremarkable.

The safe harbor provisions found in Section 106.44(b) are also sensible. They begin:

> (b) *Specific circumstances.* (1) A recipient must follow procedures consistent with § 106.45 in response to a formal complaint. If the recipient follows procedures (including implementing any appropriate remedy as required) consistent with § 106.45 in response to a formal complaint, the recipient's response to the formal complaint is not deliberately indifferent and does not otherwise constitute discrimination under title IX.

Consistent with *Davis*, this provision states that when an institution properly opens a formal complaint, follows procedures consistent with the regulations, and "implement[s] any appropriate remedy as required," it will not be found by the Department to have been in violation of Title IX. The section also wisely requires institutions to open formal complaints into allegations "[w]hen a recipient [institution] has actual knowledge regarding reports by multiple complainants of conduct by the same respondent that could constitute sexual harassment."

The following paragraph, which addresses situations where no formal complaint has been filed, provides a safe harbor when the institution "offers and implements supportive measures designed to effectively restore or preserve the complainant's access to the recipient's education program or activity." Even then, to ensure that institutions aren't manipulating complainants into forgoing formal complaints, institutions are required, when they offer these supportive measures, to "in writing inform the complainant of the right to file a formal complaint at that time or a later date, consistent with other provisions of this part."

The focus on providing supportive measures, as opposed to taking punitive action, to meet an institution's obligations under Title IX—even in the absence of a formal complaint—further demonstrates that the proposed regulations take sex-based discrimination seriously. By prioritizing actions aimed at meeting the individual needs of complainants, these regulations fulfill the commitment to nondiscrimination that Title IX demands for all students.

Another noteworthy part of the safe harbor is Section 106.44(b)(5)'s explicit statement that "[t]he Assistant Secretary will not deem a recipient's determination regarding responsibility to be evidence of deliberate indifference by the recipient merely because the

17

Assistant Secretary would have reached a different determination based on an independent weighing of the evidence."[34] FIRE agrees that the role of the Department in this area is not to second-guess the outcomes of proceedings, but to ensure that complaints are addressed using procedures that are fair.

Finally, Section 106.44(c) makes clear that institutions have the authority to remove students on an emergency basis "provided that the recipient undertakes an individualized safety and risk analysis, determines that an immediate threat to the health or safety of students or employees justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal." The following paragraph describes institutions' similar authority to place non-student employees on administrative leave during pending investigations. Institutions must have this authority to ensure that campuses remain safe while conducting investigations and grievance procedures.

Taken as a whole, the safe harbor provisions mirror the commonsense approach developed by the Supreme Court in *Davis*. This return to *Davis* is particularly important given the readily observed tendency of funding recipients to overreact to directives from the Department that suggest that their own decisions, even if procedurally sound, will be subject to investigation and result in potentially expensive and embarrassing settlement agreements on one hand, or losses in court on the other.[35] Synchronizing the safe harbor provisions with Supreme Court precedent governing institutional liability while providing instruction on how to best deal with alleged incidents of sex-based discrimination—with or without the filing of a formal complaint—should incentivize institutions to comply with Title IX without prompting overreach that would compromise individual rights and cost institutions untold dollars in legal and reputational costs.

## Section 106.45 Grievance Procedures for Formal Complaints of Sexual Harassment

There is no doubt that institutions of higher education are legally and morally obligated to respond to known instances of sex-based discrimination, including acts of sexual harassment. In September 2017, when Secretary DeVos announced that the Department of Education would promulgate new Title IX regulations, she emphasized the importance of providing effective, fair grievance procedures to accomplish the goals of Title IX. As Secretary DeVos stated: "No one benefits from a system that does not have the public's

---

[34] This is similar to the treatment of good-faith investigations by employers into harassment under Title VII. *See, e.g.*, *Swenson v. Potter*, 271 F.3d 1184, 1196 (9th Cir. 2001); *Harris v. L & L Wings*, 132 F.3d 978, 984 (4th Cir. 1997).

[35] For example, "[t]he higher education insurance group United Educators did a study of the 262 insurance claims it paid to students between 2006 and 2010 because of campus sexual assault, at a cost to the group of $36 million. The vast majority of the payouts, 72 percent, went to the accused—young men who protested their treatment by universities." Emily Yoffe, *The College Rape Overcorrection*, SLATE (Dec. 7, 2014), http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_is_a_seriou s_problem_but_the_efforts.html.

18

trust—not survivors, not accused students, not institutions and not the public." FIRE strongly agrees.

Currently, public confidence in university Title IX grievance procedures across the country is low[36]—and for good reason. As the Rape, Abuse & Incest National Network (RAINN) argued in its 2014 letter to the White House Task Force to Protect Students from Sexual Assault:

> While we respect the seriousness with which many schools treat such internal processes, and the good intentions and good faith of many who devote their time to participating in such processes, the simple fact is that these internal boards were designed to adjudicate charges like plagiarism, not violent felonies. The crime of rape just does not fit the capabilities of such boards. They often offer the worst of both worlds: they lack protections for the accused while often tormenting victims.[37]

Campus sexual misconduct proceedings have too often failed complainants. For example, after the University of Michigan settled a lawsuit by agreeing to set aside its finding against the accused student, the complainant issued the following statement through her attorney:

> I caution all University of Michigan students and their parents to avoid reporting sexual violence or using the university's Title IX process at all costs. . . . I urge you to be aware: the university process will take far longer than they represent it to take, the university does not follow through on commitments of support they purport to offer, and it does not follow its own mandated procedures when investigating sexual violence on its campus. Worst of all, I have come to believe they do not care about individual students seeking help and are more concerned with producing the paperwork which demonstrates compliance with U.S. Department of Education mandates. With the multiple efforts and initiatives the university has undertaken and administrators have espoused, the biggest threat on campus has now become the Title IX Sexual Assault Policy as implemented by the University.[38]

---

[36] A 2014 HuffPost/YouGov poll found that only fourteen percent of those surveyed thought colleges and universities do a good job handling cases of students reporting rape, sexual assault, or harassment. Sixty percent said they trusted colleges and universities to properly handle someone reporting rape, sexual assault, or harassment "a little," while twenty three percent said they did not trust them at all. Peter Moore, *Poll Results: Sexual Assault*, YOUGOV (Feb. 3, 2014, 3:34 PM), https://today.yougov.com/topics/legal/articles-reports/2014/02/03/poll-results-sexual-assault.

[37] Rape, Abuse & Incest National Network, *Letter to the White House Task Force to Protect Students from Sexual Assault* (Feb. 28, 2014), *available at* https://www.rainn.org/images/03-2014/WH-Task-Force-RAINN-Recommendations.pdf.

[38] David Jesse, *U-M drops nonconsensual sex finding to settle suit*, DETROIT FREE PRESS (Sept. 12, 2015, 11:13 AM), https://www.freep.com/story/news/local/michigan/2015/09/12/u-m-drops-nonconsensual-sex-finding-settle-suit/72145304.

Litigation over the University of Kentucky's handling of Title IX complaints revealed how that school's process led a complainant to draw a similar conclusion.[39] In an editorial in the *Washington Examiner*, FIRE Vice President of Procedural Advocacy Samantha Harris explained how the woman's case demonstrates that procedural shortcomings of campus proceedings have harmed complainants as well as the accused:

> According to [the complainant's] lawsuit, the university held the first hearing without the accused student present, because he was attending a proceeding related to his criminal case. At the first university hearing, he was found responsible for sexual misconduct. But a university appeals board found that his due process rights had been violated because he had been unable to attend the hearing, and ordered a new, second hearing. The female student did not participate in the second hearing, and the accused student was again found responsible.

> However, the appeals board again found that the accused student's due process rights had been violated, this time because he had been unable to question his accuser. The appeals board ordered another, third hearing, which the female student says caused her "mental health to deteriorate." The accused student was found responsible a third time, the finding was overturned again on appeal, and the matter was sent back for a fourth hearing.

> When the university filed a motion asking the court to dismiss the woman's case, the court declined. The court stated that "the University bungled the disciplinary hearings so badly, so inexcusably, that it necessitated three appeals and reversals in an attempt to remedy the due process deficiencies," and that this had "profoundly affected Plaintiff's ability to obtain an education at the University of Kentucky." Moreover, the court held, the fact that the university had not yet scheduled a fourth hearing raised the possibility that the university had acted with "deliberate indifference" towards the alleged victim.

> Had the university conducted a full and fair hearing in the first place, this woman's ordeal could have been over years ago. Instead, it continues to drag on more than two years later because of an undisputed lack of due process. This is a prime example of why due process is critical to protecting the interests of everyone involved in a judicial proceeding.[40]

---

[39] *Doe v. Univ. of Ky.*, 2016 U.S. Dist. LEXIS 117606, *8 (E.D. Ky. Aug. 31, 2016), *modified on other grounds*, 2018 U.S. Dist. LEXIS 135633 (E.D. Ky. Aug. 10, 2018).

[40] Samantha Harris, *Due process is crucial to justice, both for accusers and the accused*, WASH. EXAMINER (Jan. 17, 2017), https://www.washingtonexaminer.com/due-process-is-crucial-to-justice-both-for-accusers-and-the-accused.

20

The examples from Michigan and Kentucky demonstrate that the presence of meaningful procedural protections furthers Title IX's goal of addressing sex-based discrimination. While courts have not yet been uniform in determining what procedural protections are necessary to satisfy the due process clause at public institutions, the Department has authority under Title IX to mandate procedures calculated to meet those requirements and advance the Department's mission to curb sex-based discrimination.[41] Increased attention to and effort in the area of procedural protections has been shown to produce benefits with regard to reducing repeat offenses[42] and encouraging cooperation with investigations,[43] both of which are vital components of any institutional effort to curb discrimination. Likewise, such protections coupled with impartial trainings also help ensure that conclusions reached in grievance procedures are not the result of gender stereotypes. All these benefits advance the mission of Title IX.[44]

Unfair proceedings, which unfortunately represent the status quo on our nation's campuses, benefit no one. By delivering errant results such as those discussed above, flawed proceedings undermine confidence in the system and cripple the ability of both the Department and individual educational institutions to effectively address sex-based discrimination. It is therefore unsurprising that current Title IX grievance procedures have faced overwhelming criticism from a diverse range of organizations, individuals, scholars, and state and federal courts for providing insufficient procedural protections. (See Appendices 1, 2, and 3.)

Section 106.45 takes great strides towards reforming the injustices of the status quo. Nevertheless, Section 106.45 could be improved through structural reorganization. The section is divided into subsections that address "grievance procedures" and subsections

---

[41] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998).

[42] *See, e.g.*, Angela R. Gover, Eve M. Brank, & John M. MacDonald, *A Specialized Domestic Violence Court in South Carolina: An Example of Procedural Justice for Victims and Defendants*, 13 VIOLENCE AGAINST WOMEN 603 (2007); Paternoster, Raymond, et al., *Do Fair Procedures Matter? The Effect of Procedural Justice on Spouse Assault*, 31 LAW & SOC'Y REV. 163 (1997).

[43] *See, e.g.*, Tom Tyler, Phillip Atiba Goff & Robert J. MacCoun, *The Impact of Psychological Science on Policing in the United States: Procedural Justice, Legitimacy, and Effective Law Enforcement*, 16 PSYCHOL. SCI. PUB. INT. 75 (2015); Tom R. Tyler & Jeffrey Fagan, *Legitimacy And Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 OHIO ST. J. CRIM. L. 231 (2008).

[44] Relatedly, both Harvard Law School professor Janet Halley and *Atlantic* columnist Emily Yoffe have also observed potential racial bias against accused men of color that may be permeating campus Title IX proceedings.  *See* Janet Halley, *Trading the Megaphone for the Gavel in Title IX Enforcement*, 128 HARV. L. REV. F. 103, 110–11 (Feb. 18, 2015), *available at* https://harvardlawreview.org/2015/02/trading-the-megaphone-for-the-gavel-in-title-ix-enforcement-2; *see also* Emily Yoffe, *The Question of Race in Campus Sexual-Assault Cases*, ATLANTIC (Sept. 11, 2017), https://www.theatlantic.com/education/archive/2017/09/the-question-of-race-in-campus-sexual-assault-cases/539361.  Under Title VI, institutions are also obligated to avoid discrimination based on race. Requiring meaningful due process protections aids in the efforts to eliminate racial discrimination because they ensure campus decisions are not made on the basis of racial stereotypes. Because the Department has a legal responsibility to enforce multiple anti-discrimination statutes, its regulations should be mindful of all of these obligations, and must avoid inviting one form of discrimination in the name of combatting the other.

that address "investigations into formal complaints." Neither term is defined to clarify whether one is a subset of the other, whether they overlap, or whether they are mutually exclusive. Moreover, there are some protections, like the right to present witnesses and evidence, that are set forth in the subsection on investigations into formal complaints but are absent from the subsection on rules governing grievance procedures. Finally, there are some paragraphs in the subsection dealing with investigations that discuss grievance procedures. The regulations would benefit from clarifying at which stages of the process the various rights provided apply. Unless a protection would not make sense in a specific context, it should apply throughout.

## Procedural Protections

Section 106.45(b)(1) sets forth the basic procedural requirements for grievance procedures to comply with Title IX. FIRE will analyze each requirement.

The first requirement is that the proceedings must treat complainants and respondents equitably:

> (i) Treat complainants and respondents equitably. An equitable resolution for a complainant must include remedies where a finding of responsibility for sexual harassment has been made against the respondent; such remedies must be designed to restore or preserve access to the recipient's education program or activity. An equitable resolution for a respondent must include due process protections before any disciplinary sanctions are imposed[.]

FIRE agrees with this language as written.

Next, Subsection (ii) requires institutions to review all relevant evidence, whether it is inculpatory or exculpatory. While this may seem obvious, **legal complaints against universities stemming from their adjudication of Title IX claims are rife with allegations that universities have, in fact, ignored critical evidence, whether in a rush to judgment or simply because of processes that do not provide appropriate avenues for the collection and review of evidence.[45] This is thus one of the most significant protections introduced by the proposed regulations.** The paragraph states:

> (ii) Require an objective evaluation of all relevant evidence—including both inculpatory and exculpatory evidence—and provide that credibility determinations may not be based on a person's status as a complainant, respondent, or witness[.]

---

[45] *See, e.g.*, *Doe v. Ohio St. Univ.*, 219 F. Supp. 3d 645, 663 (S.D. Ohio 2016) ("[I]t is plausible that Doe's right to cross-examination was effectively denied by the Administrators' failure to turn over critical impeachment evidence.").

22

We do not live in a world in which all complaints, of any type, have merit, nor do we live in one in which all allegations, of any type, are false. Sorting out the merits of individual cases requires reviewing all relevant evidence. FIRE supports this language.

Subsection (iii) prohibits conflicts of interest and requires those involved in the grievance process to receive unbiased trainings to promote fairness. It reads:

> (iii) Require that any individual designated by a recipient as a coordinator, investigator, or decision-maker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. A recipient must ensure that coordinators, investigators, and decision-makers receive training on both the definition of sexual harassment and how to conduct an investigation and grievance process, including hearings, if applicable, that protect the safety of students, ensure due process protections for all parties, and promote accountability. Any materials used to train coordinators, investigators, or decision-makers may not rely on sex stereotypes and must promote impartial investigations and adjudications of sexual harassment[.]

Too many institutions have used—or are still using—training materials that would not satisfy the requirements of this proposed language. For example, in 2011, Stanford University used materials that trained student jurors in sexual misconduct cases to believe that "act[ing] persuasive and logical" is a sign of guilt and that taking a neutral stand between the parties is the equivalent of siding with the accused.[46] Harvard Law professor Janet Halley wrote about the bias inherent in the training materials used in 2014 at her institution:

> Approximately two-thirds of the document is devoted to quotations from OCR documents and the Harvard Policy and Procedures about the standard to apply and the procedures to be used. The remaining third of the document (and thus the entire remainder of the training) provides a sixth-grade level summary of selected neurobiological research. The take-away lesson of these pages is that a victim of sexual assault may experience trauma, which in turn causes neurological changes, which in turn can result in "tonic immobility." Tonic immobility, in turn, can cause the victim to appear incoherent and to have emotional swings, memory fragmentation, and "flat affect." Her story "may come out fragmented or 'sketchy,'" and she can be "[m]isinterpreted as being cavalier about [the event] or lying." These problems, in turn, can cause

---

[46] *Stanford Trains Student Jurors That 'Acting Persuasive and Logical' is Sign of Guilt; Story of Student Judicial Nightmare in Today's 'New York Post,'* FIRE (July 20, 2011), https://www.thefire.org/stanford-trains-student-jurors-that-acting-persuasive-and-logical-is-sign-of-guilt-story-of-student-judicial-nightmare-in-todays-new-york-post-2; *see also* Excerpted Pages from Stanford Dean's Administrative Review Process Training Materials, 2010-2011, *available at* https://d28htnjz2elwuj.cloudfront.net/pdfs/bb4ff4c3aff9d3b2450c44e9ec2f28f1.pdf.

23

> police and sexual harassment investigators to dismiss serious claims, tragically because of symptoms of the trauma itself.
>
> So far, that is the only training provided to Harvard personnel handling sexual harassment claims directed to the social and psychological dynamics surrounding sexual assault. It is 100% aimed to convince them to believe complainants, precisely *when* they seem unreliable and incoherent. Without disputing the importance of the insights included in this section of the training, one can ask: precisely what do they prove? Surely not a claim that, *because* a complainant appears incoherent and unreliable, she *has* been assaulted.[47]

FIRE appreciates the importance of training first responders in how trauma may impact complainants so that contact is made in a manner that elicits vital information without discouraging complainants from coming forward. But training that suggests that those involved in disciplinary processes should treat factual inconsistencies in a complainant's account as proof that the alleged event took place is at odds with fundamental fairness. While some victims may indeed experience trauma in that way, it is problematic in the extreme to broadly assume (and to instruct fact-finders) that inconsistencies in an accuser's account are proof he or she is telling the truth, or that the logic and persuasiveness of the argument and/or evidence presented by the accused is properly understood as a sign of guilt.

Impartiality is an essential element of a fair process. By prohibiting conflicts of interest, forbidding institutions from using training materials that "rely on sex stereotypes," and instead requiring them to "promote impartial investigations and adjudications of sexual harassment," the proposed regulations take an important step towards removing bias from campus grievance procedures.

Section (iv) addresses another cornerstone of any fair process: the presumption of innocence. It instructs institutions to:

> (iv) Include a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process[.]

In FIRE's Spotlight on Due Process 2018, we analyzed the policies of America's top fifty three universities as rated by *U.S. News & World* Report in 2017. Troublingly, we found that nearly three-quarters (73.6%) of those institutions did not explicitly guarantee students

---

[47] Halley, *supra* note 44, at 109–10 (internal citations omitted) (emphasis in original).

24

that they will be presumed innocent until proven guilty.[48] This number was unchanged from the year before.[49]

Compounding this problem, many institutions have adopted definitions of consent that have effectively shifted the burden onto the accused student to prove that he or she had obtained consent.[50] As one court put it, under an affirmative consent policy, "the ability of an accused to prove the complaining party's consent strains credulity and is illusory."[51]

FIRE welcomes the language in subsection (iv). However, some institutions are using definitions of consent that recognize the validity of consent only if the tribunal concludes that it was clearly provided. Under these, and similar formulations, when it is unclear whether consent was provided, the presumption is that it was not. Few institutions will acknowledge that these definitions of consent shift the burden of proof and nullify the presumption of innocence. **To address this concern, we urge the Department to expand upon the section by adding a sentence declaring: "It is the obligation of the recipient to prove every element of every alleged offense before the accused student may be found responsible and punished for committing an alleged offense."** Finally, this section would also benefit from adding language clarifying that fact-finders cannot hold accused students' silence against them.

Subsection (v) requires institutions to complete grievance procedures in reasonably prompt timeframes. The section reads:

> (v) Include reasonably prompt timeframes for conclusion of the grievance process, including reasonably prompt timeframes for filing and resolving appeals if the recipient offers an appeal, and a process that allows for the temporary delay of the grievance process or the limited extension of timeframes for good cause with written notice to the complainant and the respondent of the delay or extension and the reasons for the action. Good cause may include considerations such as the absence of the parties or witnesses, concurrent law enforcement activity, or the need for language assistance or accommodation of disabilities[.]

This section replaces prior guidance stating that institutions should typically complete their grievance procedures within sixty days. While promptness is important, courts have

---

[48] Spotlight on Due Process 2018, FIRE, https://www.thefire.org/spotlight/due-process-reports/due-process-report-2018 (last visited Jan. 30, 2019).

[49] Spotlight on Due Process 2017, FIRE, https://www.thefire.org/spotlight/due-process-reports/due-process-report-2017 (last visited Jan 30, 2019).

[50] Tamara Rice Lave, *Affirmative consent and switching the burden of proof*, PRAWFSBLAWG (Sept. 3, 2015), https://prawfsblawg.blogs.com/prawfsblawg/2015/09/affirmative-consent-and-switching-the-burden-of-proof.html; Tamara Rice Lave, *Affirmative Consent and Burden Shifting, Take 2*, PRAWFSBLOG (Sept. 8, 2015), https://prawfsblawg.blogs.com/prawfsblawg/2015/09/affirmative-consent-and-burden-shifting-take-2.html.

[51] *Mock v. Univ. of Tenn. at Chattanooga*, No. 14-1687-II (Tenn. Ch. Ct. Aug. 10, 2015).

25

held that delayed completion of grievance proceedings is not necessarily sufficient to establish deliberate indifference. For example, in *Oden v. Northern Marianas College,* the United States Court of Appeals for the Ninth Circuit held that deliberate indifference was not established after an institution took nine months to hold a hearing and another ten months to rule on a complaint, as the institution took other responsive steps during that time period and there was no evidence that the delay prejudiced the complainant.[52] Delays may sometimes be necessary, especially when pushing forward too quickly could compromise a concurrent criminal investigation.

The language in the proposed regulation appropriately encourages diligence on behalf of institutions without imposing bright-line rules. FIRE supports this subsection.

Subsection (vi) and (vii) respectively require institutions' grievance procedures to "[d]escribe the range of possible sanctions and remedies that the recipient may implement following any determination of responsibility" and "[d]escribe the standard of evidence to be used to determine responsibility."

FIRE supports both of these commonsense requirements because they will increase parties' understanding of the proceedings and decrease the possibility of arbitrary, disproportionate, or inconsistent sanctions.

Subsection (viii) requires institutions' grievance procedures to "[i]nclude the procedures and permissible bases for the complainant and respondent to appeal if the recipient offers an appeal."

FIRE has two concerns about this language. First, it does not require that institutions allow students found responsible to appeal. Providing a student who may be facing a suspension or an expulsion the right to appeal is necessary to mitigate the risk that procedural irregularities could result in the erroneous termination of a student's education.

Second, we have long opposed requiring institutions to allow accusers to appeal a finding that the accused was not responsible. Allowing an institution to re-try the same case against a student cleared of wrongdoing is a threat to fundamental fairness prohibited in analogous criminal proceedings by the Fifth Amendment's bar against "double jeopardy." For the same reasons of fundamental fairness that our criminal justice system does not allow double jeopardy, colleges and universities should not force their students to face new hearings after being declared not guilty. Although these disciplinary hearings are not formal criminal trials with the full scope of constitutional due process rights, neither are they, as proponents of the "double jeopardy" provision like to assert, comparable to civil suits. (In civil suits, both parties traditionally have rights to appeal.) For instance, unlike a defendant in a civil lawsuit, accused students are not afforded the full panoply of procedural safeguards and certainly cannot pay money to settle a case. Furthermore, a guilty finding in a university disciplinary proceeding will result not simply in a loss of

---

[52] 440 F.3d 1085 (9th Cir. 2006).

26

money, but in a permanent and life-altering stigma that will cause irreparable harm to a student's educational, professional, and social prospects, even if the finding is later reversed.[53]

The regulations should require institutions to allow accused students to appeal. They should not require institutions to allow accusers to appeal.

Subsection (ix) requires that institutions' grievance procedures "[d]escribe the range of supportive measures available to complainants and respondents." FIRE supports this language because advising students about the remedies and resources available is a critical step towards ensuring that students use them.

### Rules Governing Notice of Formal Complaints

The next several sections describe the steps institutions must take upon receiving a formal complaint. Section 106.45(b)(2) states:

> (2) *Notice of allegations—*(i) *Notice upon receipt of formal complaint.* Upon receipt of a formal complaint, a recipient must provide the following written notice to the parties who are known:

> (A) Notice of the recipient's grievance procedures.

> (B) Notice of the allegations constituting a potential violation of the recipient's code of conduct, including sufficient details known at the time and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved in the incident, if known, the specific section of the recipient's code of conduct allegedly violated, the conduct allegedly constituting sexual harassment under this part and under the recipient's code of conduct, and the date and location of the alleged incident, if known. The written notice must include a statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process. The written notice must also inform the parties that they may request to inspect and review evidence under paragraph (b)(3)(viii) of this section and inform the parties of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process.

> (ii) *Ongoing notice requirement.* If, in the course of an investigation, the recipient decides to investigate allegations not included in the notice

---

[53] For a deeper look into why the dual appeals language should be revised, see Scott H. Greenfield, *The Title IX "Double Jeopardy" Question*, SIMPLE JUSTICE (Nov. 18, 2018), https://blog.simplejustice.us/2018/11/18/the-title-ix-double-jeopardy-question.

27

provided pursuant to paragraph (b)(2)(i)(B) of this section, the recipient must provide notice of the additional allegations to the parties, if known.

**These notice requirements provide critical protections for accused students and address serious deficiencies in the adjudication process at many colleges and universities.** The requirements of due process cannot be met at public institutions without providing the accused notice of the charges with enough detail to fully understand the allegations.[54] Adequate time to prepare is similarly crucial.[55] The proposed regulation's requirement that institutions notify the parties of any additional allegations should they choose to broaden the scope of their investigation is another important safeguard against arbitrary or unfair administrative action before or during a judicial proceeding.

FIRE supports the language in Section (2).

### Rules Governing Investigations into Formal Complaints

The next section of the proposed rules addresses what institutions must do to properly investigate formal complaints. The opening paragraph of the section is crucial:

> (3) *Investigations of a formal complaint.* The recipient must investigate the allegations in a formal complaint. If the conduct alleged by the complainant would not constitute sexual harassment as defined in § 106.30 even if proved or did not occur within the recipient's program or activity, the recipient must dismiss the formal complaint with regard to that conduct.

Some critics have alleged that the proposed regulation's use of the *Davis* standard to define student-on-student harassment prevents institutions from initiating investigations into a great deal of conduct. This criticism is misplaced.

As Section (3) sets forth, institutions "*must* investigate the allegations in a formal complaint" (emphasis added). Similar to the standard used by courts to evaluate motions to dismiss, only after the institution concludes that the conduct alleged by the complainant falls short of the *Davis* standard—even if it were to be proven true—is the institution required to dismiss the formal complaint. This provision ensures that no complaint is ignored without institutions considering the sufficiency of the complaint, while simultaneously preventing institutions from conducting lengthy investigations into

---

[54] *See Goss v. Lopez*, 419 U.S. 565, 579 (1975) (holding before a student could be suspended for ten or more days, the due process clause entitles the student to notice of the charges against them and an opportunity to contest them).

[55] *See Tanyi v. Appalachian St. Univ.*, 14-cv-170, 2015 U.S. Dist. LEXIS 95577, at *17–18 (W.D.N.C. July 22, 2015) ("For all intents and purposes, Tanyi received notice of the new harassment charge at the eleventh hour, when it was too late to mount an effective defense. . . . [A]t a minimum due process requires adequate notice.").

28

expression that is protected under the First Amendment. Lengthy investigations into protected speech violate the First Amendment.[56]

Like subsection (iv) in the section governing grievance procedures, subsection (i) in this section deals with burdens of proof. It specifies:

> When investigating a formal complaint, a recipient must—

> (i) Ensure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the recipient and not on the parties[.]

This language is a helpful reminder that the institutions themselves bear the burden of proving a violation of their codes of conduct during disciplinary hearings. The burden does not fall on the complainant to prove the allegation, even though the complainant's testimony may be a necessary component of proving the case. Nor does it fall on the accused student to prove his or her innocence. This subsection, like Section 106.45(b)(1)(iv) addressing the presumption of innocence in the grievance process, would benefit from the addition of language clarifying that **"it is the obligation of the recipient to prove every element of every alleged offense before the accused student may be found responsible and punished for committing an alleged offense."**

Subsection (ii) addresses the right of both the accused and the accuser to present witnesses and evidence during the investigation of formal complaints. It reads:

> (ii) Provide equal opportunity for the parties to present witnesses and other inculpatory and exculpatory evidence[.]

Investigations are insufficiently thorough and risk significant error when the right to present witnesses and evidence is not secured for both parties. Accordingly, FIRE supports this language as written. This right, however, must apply beyond the investigation stage. Students must enjoy this right during the hearings themselves and during the appellate process, where applicable.

Subsection (iii) prohibits schools from issuing gag orders on the parties during investigations or from preventing the parties from gathering evidence to support their cases. The subsection states that institutions may not:

> (iii) . . . restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence[.]

---

[56] *See, e.g., White v. Lee,* 227 F.3d 1214, 1226 (9th Cir. 2000) (holding an eight-month investigation into clearly protected speech, coupled with questioning and requests to produce documents, violated the First Amendment).

29

Too often, institutions issue gag orders on students prohibiting them from discussing their cases. In some instances, they have initiated disciplinary proceedings against students for discussing their cases publicly. Student Landen Gambill's experience at the University of North Carolina at Chapel Hill illustrates the need for Subsection (iii). Gambill faced disciplinary charges after she publicly criticized the university's handling of her allegation of sexual assault against a fellow student.[57] This should not happen; students must not face retaliation or punishment for complaining about how their grievances are handled.  As the proposed regulation and guidance before makes clear, institutions must not violate the First Amendment in their pursuit of enforcing Title IX. Section (iii) is appropriate. However, since the rights in this section should be protected beyond the time periods when the allegations are under investigation, the proposed regulation should clarify that this right is not thus limited.

Subsection (iv) addresses students' right to the assistance of an advisor during the grievance proceeding.[58] The subsection reads:

> (iv) Provide the parties with the same opportunities to have others present during any grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice, and not limit the choice of advisor or presence for either the complainant or respondent in any meeting or grievance proceeding; however, the recipient may establish restrictions regarding the extent to which the advisor may participate in the proceedings, as long as the restrictions apply equally to both parties[.]

**The right to the assistance of an advisor throughout the process is of paramount importance**. Advisors are necessary to help students effectively navigate the campus process, and to ensure that the proceedings are conducted fairly and by the rules.

The Department does not break new ground with this requirement, as this language mirrors the Department's regulations implementing the Violence Against Women Act (VAWA). The commentary accompanying that regulation clarifies that students cannot be prevented from selecting an attorney to serve as the "the advisor of their choice." As was the case with the VAWA regulations, though, Subsection (iv) unhelpfully allows institutions to prohibit students' advisors from actively participating throughout the

---

[57] Will Creeley, *Student Critic of University of North Carolina's Sexual Misconduct Procedures Faces Discipline under Speech Code*, FIRE (Feb. 26, 2013), https://www.thefire.org/student-critic-of-university-of-north-carolinas-sexual-misconduct-procedures-faces-discipline-under-speech-code.

[58] This subsection is found under the section dealing with investigations into formal complaints, but explicitly applies during any "grievance proceeding. "This is an example of one provision that would benefit from additional clarification, as there is another subsection dedicated to rights during "grievance proceedings." FIRE feels strongly that the right to assistance of an advisor should be extended to the accuser upon filing a complaint and to an accused student when he or she receives notice that a complaint has been filed against them. This right should be continuous through the end of any appellate process. The proposed regulation should be revised to reflect this.

grievance process. (Subsequent language in Section 106.45(3)(vii) of this proposed rule does provide for advisors to actively conduct cross-examinations.)

**While FIRE supports the Department's proposed rule requiring recipients to allow for advisors to participate during cross-examinations, as discussed below, subsection (iv) should be modified to allow for advisors to actively participate in all aspects of the investigation and adjudicatory processes.** Active participation of advisors is crucial because the stakes during campus proceedings are extremely high.[59] As FIRE has argued, "[s]uspensions and expulsions don't simply jeopardize a student's education—they can end a young person's career before it has even begun."[60] Except in a handful of states[61] that statutorily require institutions to allow counsel to provide active representation during campus disciplinary proceedings,

> students facing lengthy suspensions or expulsions typically faced these charges alone—or, if lucky, with an advisor who was nevertheless forbidden from actively participating in the hearing. Outside of North Carolina, eighteen-year-old students continue to be expected to competently represent themselves in proceedings, arguing against deans, administrators, and sometimes lawyers, many with decades of experience and advanced degrees. There is no way to make such a system fair to the accused without the right to representation.[62]

It is unreasonable to expect students with no legal training (and, most likely, no prior experience in an adjudication of this nature) to adequately defend their interests in judicial proceedings against campus administrators or institutional attorneys who do it for a living.[63] (Indeed, colleges and universities are perfectly free to fill every position in the hearing process with experienced lawyers, should they wish to do so.)

---

[59] The stakes are even higher for international students, studying in the United States on visas. Students who are no longer enrolled can lose their visas and face removal from the country. *See, e.g.*, *Doe v. Pa. St. Univ.*, No. 4:15-cv-02072, at 2 (M.D. Pa. Oct. 28, 2015) ("[B]ecause of Plaintiff's immigration status, there is a presently existing actual threat that should the alterations to his student status be entered, noticed, or otherwise transmitted by the University, they will result in the initiation of federal immigration proceedings against Plaintiff, with the ultimate consequence of his deportation from the United States and relocation to his homeland of Syria, where he will face the potential for serious bodily harm and related injuries.").

[60] Joe Cohn, *College students deserve the right to hire counsel in expulsion hearings*, THE HILL (Sept. 11, 2013), https://thehill.com/blogs/congress-blog/education/321679-college-students-deserve-the-right-to-hire-counsel-in-expulsion-hearings.

[61] N.C. Gen. Stat. § 116-40.11 (2018); N.D. Cent. Code § 15-10-56 (2018). Moreover, at least two states statutorily allow students in expulsion hearings to remove the proceedings to administrative law hearings where more comprehensive due process protections like the right to full legal representation is permitted. Tenn. Code. §§ 4-5-301–4-5-325 (2010); Or. Rev. Stat. §§ 183.415–183.500 (2017).

[62] Cohn, *supra* note 60.

[63] While the problem is particularly acute with respect to students on the autism spectrum or who suffer from other disabilities, it is also serious with respect to students without disabilities who struggle with verbal communications or have limited advocacy skills. In a lawsuit against Drake

31

Active representation is necessary not only for the fairness of campus adjudications, but also because of the potential ramifications of any concurrent or subsequent criminal prosecution based on the conduct at issue in the campus judicial proceeding. Students questioned by university administrators do not generally receive *Miranda* warnings prior to making statements to investigators. They are not informed of their right to remain silent, and, in some instances, universities have informed students that silence will be used as an inference against them. For example, in its subsequently revised 2013–2014 Student Handbook, Longwood University stated:

> The respondent may refrain from providing a statement or answering questions. However, the hearing board or officer, in determining student responsibility, may consider such silence, along with all other evidence in record, to determine responsibility or non-responsibility and/or appropriate sanctions.[64]

Complicating matters, statements made by students during campus tribunals may be used against them in a criminal proceeding, because statements against one's own interest are generally not considered hearsay under the rules of evidence. The admissibility of statements obtained in campus proceedings means that students who must represent themselves in campus proceedings may be irrevocably waiving their Fifth Amendment right to remain silent.

Susan Riseling, the chief of police and associate vice chancellor at the University of Wisconsin at Madison, seized on this dynamic while speaking to college law enforcement administrators. She reportedly

> described a case at Wisconsin, in which the Title IX investigation was the only reason police were able to arrest a student accused of raping his roommate's girlfriend.
>
> The accused student denied the charges when interviewed by police, Riseling said. In his disciplinary hearing, however, he changed his story in an apparent attempt to receive a lesser punishment by admitting he regretted what had

---

University, for example, a student with a language-based learning disability argued that the university had treated him unfairly in part because, due to "his learning disabilities, he was not qualified to serve as his own attorney for nine hours during the hearing process." Complaint ¶ 155, *Doe v. Drake* Univ., No. 16-cv-00623 (S.D. Iowa filed Dec. 1, 2016), ECF 1. While that claim did not survive summary judgment, and the case settled before that aspect of the decision could be appealed, it demonstrates that this is an issue that must be addressed. Providing the right to active representation of counsel in light of these concerns is hardly unprecedented. Indeed, Congress has provided K–12 students with disabilities the right to legal representation in the Individuals with Disabilities Education Act, 84 Stat. 175, as amended, 20 U.S.C. § 1415(h).

[64] Longwood University, *Student Handbook 2013–2014* 23 (Aug. 15, 2013), *available at* http://web.archive.org/web/20140404193823/http://www.longwood.edu/assets/judicial/Handbook.pdf.

occurred. That version of events was "in direct conflict with what he told police," Riseling said. Police subpoenaed the Title IX records of the hearing and were able to use that as evidence against the student.

"It's Title IX, not Miranda," Riseling said. "Use what you can."[65]

In one particularly alarming case at Auburn University, both parties were entitled to have attorneys present, but neither lawyer was allowed to actively participate during the proceeding. The case is nevertheless egregious because the attorney for the accuser was in fact *the city attorney prosecuting the accused student in criminal court* for a simple assault charge stemming from the same allegation, making a mockery of *Miranda* protections.[66]

The penalty for rape in states across the country is severe. Students should not have to choose between defending themselves on campus and preserving their Fifth Amendment rights. Providing students with the right to active assistance of counsel is the only way, shy of changing the rules of evidence in each jurisdiction, to avoid forcing students to make this impossible choice.

The insight and expertise provided by advisors (including but not limited to attorneys) is therefore crucially important throughout the proceedings, from the notification of allegation to the conclusion. FIRE urges the Department to revise the proposed rule to ensure these protections are included in the final rules.

The next subsection sets forth the requirement that institutions provide sufficiently detailed notice to the parties regarding each phase of the grievance process with sufficient time to prepare.

> (v) Provide to the party whose participation is invited or expected written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings with a party, with sufficient time for the party to prepare to participate[.]

Due process at public institutions requires adequate notice of the charges with enough detail to fully understand the allegations.[67] Adequate time to prepare is also crucial. FIRE supports the language in Subsection (v).

Subsection (vii) requires recipients at institutions of higher education to provide live hearings and to allow cross-examination of all parties, including witnesses, and it requires that advisors conduct cross-examination. The section states in part:

---

[65] Jake New, *Making Title IX Work*, INSIDE HIGHER ED (July 6, 2015), https://www.insidehighered.com/news/2015/07/06/college-law-enforcement-administrators-hear-approach-make-title-ix-more-effective.

[66] James Taranto, *Taranto: An Education in College Justice*, WALL ST. J., Dec. 6, 2013, https://www.wsj.com/articles/behind-the-auburn-curtainbehind-the-auburn-curtain-1385756706.

[67] *See Goss*, 419 U.S. at 579.

33

> For institutions of higher education, the recipient's grievance procedure must provide for a live hearing. At the hearing, the decision-maker must permit each party to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at a hearing must be conducted by the party's advisor of choice . . . . If a party does not have an advisor present at the hearing, the recipient must provide that party an advisor aligned with that party to conduct cross-examination.

A student's right to attend a university should be compromised only if he or she has been found responsible of serious misconduct after fair hearings that include meaningful procedural protections. FIRE supports the provisions in this subsection, which will increase the fundamental fairness of the proceedings in several ways.

The first important protection included in Subsection (vii) is the requirement that institutions of higher education provide a live hearing in their procedures for determining whether a violation has occurred. The proposed rule is a helpful correction to prior guidance that allowed, and even encouraged, schools to have a "single investigator" adjudicate sexual misconduct cases through a series of separate meetings with the parties and witnesses. **The elimination of the "single-investigator model" is of critical importance to the fairness and reliability of campus sexual misconduct proceedings.** Requiring a live hearing ensures that all parties see exactly the same evidence and testimony as the fact-finder, so that each party can rebut or buttress that evidence and testimony as fully as he or she is able. It also decreases the chance that the biases of a single investigator and/or fact-finder may warp the process to the extent that its outcome is determined not by the facts and a desire for a just outcome, but by prejudice, well-intentioned or otherwise.[68]

The proposed rule also requires institutions to allow meaningful cross-examination of all witnesses, including the parties. The Supreme Court of the United States has called cross-examination the "greatest legal engine ever invented for the discovery of truth,"[69] and it is especially crucial in cases turning on witness testimony or the credibility of a complainant or respondent. The United States Court of Appeals for the Sixth Circuit recently recognized the essential importance of cross-examination in campus adjudications involving a credibility determination, or when facts were in dispute, in September 2018. In *Doe v. Baum*, it held:

> [I]f a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an

---

[68] *See, e.g., Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass. 2016) ("The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.").

[69] *California v. Green*, 399 U.S. 149, 158 (1970).

34

opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder.[70]

The court further observed:

Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives. Nor can the fact-finder observe the witness's demeanor under that questioning. For that reason, written statements cannot substitute for cross-examination.[71]

For these reasons, **FIRE strongly supports the proposed rule requiring live hearings and cross-examination as essential to a fair and reliable process**.

While FIRE supports the Department's proposed rule requiring recipients to allow advisors to participate during cross-examinations, the rule should be modified to allow for advisors to actively participate in all aspects of the investigation and adjudicatory processes, as explained above. We also note that the lack of an advisor is not sufficient reason to deny a party his or her due process rights, including an opportunity to cross-examine witnesses.[72]

FIRE supports the provisions of Subsection (vii) regarding separate rooms for cross-examination of parties upon request of the complainant or respondent if the recipient provides technology that allows the decision-maker to see and hear the party answering questions. FIRE also supports the provision requiring a decision-maker to explain, on the record, the rationale behind any decision to deny the advisor the right to ask any specific question. Placing the rationale on the record lessens the potential for abuse of discretion and allows those involved in appeals processes, as well as courts, to better review those decisions if necessary.

Subsection (viii) requires an institution to disclose the evidence it has collected as part of its investigation into alleged sexual misconduct. The section reads:

(viii) Provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation. Prior to completion of the investigative report, the recipient must send to each party and the party's advisor, if any, the evidence subject to inspection and review in an electronic

---

[70] *Baum*, 903 F.3d at 578.
[71] *Id.* at 582 (internal citations omitted).
[72] *Faretta v. California*, 422 U.S. 806, 819–20 (1975).

35

format, such as a file sharing platform, that restricts the parties and advisors from downloading or copying the evidence, and the parties shall have at least ten days to submit a written response, which the investigator will consider prior to completion of the investigative report. The recipient must make all such evidence subject herein to the parties' inspection and review available at any hearing to give each party equal opportunity to refer to such evidence during the hearing, including for purposes of cross-examination[.]

This section is necessary because the language of the Department of Education's 2014 regulations on Violence Against Women Act requires only that "the accuser, the accused, and appropriate officials are given timely and equal access to information that will be used during informal and formal disciplinary meetings and hearings."[73] Under this formulation, an institution could conceal exculpatory or inculpatory evidence so long as it did not plan to use that evidence in its disciplinary proceedings. Such a rule presents a dangerous moral hazard by incentivizing institutions to hold back evidence that may not further their reputational or economic interests.

FIRE understands that the question of whether the Department of Education should further regulate what constitutes evidence "directly related to the allegations" is important given the sensitive nature of certain medical records that may be in an institution's possession. While FIRE takes no position on whether the Department should further regulate here, institutions will have to deal with instances where a student's behavior[74] or medical records[75] may be of relevance to a complaint and other instances where inclusion of such information could violate a student's privacy or be unduly prejudicial.

FIRE supports Subsection (viii) as it is written. We do not have an opinion on whether the Department should clarify this with further regulation.

Subsection (ix) obligates institutions to create an investigative report summarizing the evidence and to share it with the parties at least ten days prior to any adjudication. FIRE thinks this requirement is sensible because it allows sufficient time for all parties to be fully prepared for the proceedings.

### Rules Governing the Determination Regarding Responsibility

---

[73] Violence Against Women Act, 79 Fed. Reg. 62751 (effective July 1, 2015).

[74] *See, e.g.*, *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 966 (8th Cir. 1999); *State v. Garron*, 177 N.J. 147, 165–66 (2003).

[75] *See, e.g.*, *Doe v. Univ. of S. Cal.*, 29 Cal. App. 5th 1212, 1238 (2018) ("We agree USC violated its own procedures by failing *to request* that Jane provide her clothes or consent to release her medical records.") (emphasis in original); *Doe v. Regents of Univ. of Cal.*, 28 Cal. App. 5th 44, 57 (2018) ("Without access to the complete SART report, John did not have a fair opportunity to cross-examine the detective and challenge the medical finding in the report. The accused must be permitted to see the evidence against him. Need we say more?").

36

Section (4) sets forth the requirements of how institutions must make their determination of responsibility and how they must communicate that decision with the parties. Subsection (i) states:

> (i) The decision-maker(s), who cannot be the same person(s) as the Title IX Coordinator or the investigator(s), must issue a written determination regarding responsibility. To reach this determination, the recipient must apply either the preponderance of the evidence standard or the clear and convincing evidence standard, although the recipient may employ the preponderance of the evidence standard only if the recipient uses that standard for conduct code violations that do not involve sexual harassment but carry the same maximum disciplinary sanction. The recipient must also apply the same standard of evidence for complaints against students as it does for complaints against employees, including faculty.

First, this paragraph prevents institutions from allowing the Title IX Coordinator or investigators to render the decision. Separating those functions is important to reduce the possibility that one person's bias will permeate the process. Second, the paragraph requires institutions to place their decisions in writing. This is helpful to avoid any confusion as to what was decided and to provide a written record for appeals or other administrative needs.

The provision allows institutions to use either the preponderance of the evidence standard or the clear and convincing standard as its burden of proof, provided that the institution uses the same standard for hearings involving "conduct code violations that do not involve sexual harassment but carry the same maximum disciplinary sanction" and provided that the same standard used in complaints against students is also used in complaints against employees, including faculty.

**Students, employees, and faculty all deserve robust procedural protections. Accordingly, FIRE supports this uniformity requirement. Institutions should not be permitted to disfavor certain constituencies by requiring lower burdens of proof for them to be punished. Campuses should use the same standard of evidence whenever a hearing could lead to lengthy suspensions, expulsions, or termination of employment.**

FIRE has consistently criticized the Department of Education's 2011 "Dear Colleague" letter-era position, which was adopted without notice and comment and in violation of the Administrative Procedure Act, that institutions *must* use the preponderance of the evidence standard when adjudicating Title IX cases. Given the high stakes, we believe that institutions should be using the clear and convincing evidence standard instead.[76] This

---

[76] Letter from Will Creeley, Director of Legal and Public Advocacy, Foundation for Individual Rights in Education, to Russlynn Ali, Assistant Sec'y for Civil Rights, Office for Civil Rights, U.S. Dep't of Educ. (May 5, 2011), *available at* https://www.thefire.org/fire-letter-to-office-for-civil-rights-assistant-secretary-for-civil-rights-russlynn-ali-may-5-2011.

37

intermediate standard is appropriate for these types of disputes. As the Supreme Court explained in *Addington v. Texas*:

> One typical use of [this] standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money . . . .  Similarly, this Court has used the "clear, unequivocal and convincing" standard of proof to protect particularly important individual interests in various civil cases.[77]

As noted earlier, those accused of committing sexual misconduct before a campus tribunal cannot (and obviously should not be able to) resolve the accusation through the exchange of money with his or her accuser. Those found to have committed such offenses not only suffer reputational damage but also are likely to be prevented from ever completing their education. These consequences are fundamentally different from being on the losing side of a lawsuit for money damages. They are consequences that no amount of money can correct, and that warrant asking fact-finders to be more than 50.01 percent certain that those accused actually committed the offense.

Despite our strongly held belief that the clear and convincing evidence standard is the more appropriate standard to use in Title IX grievance procedures (and in other proceedings that could result in lengthy suspensions or expulsions), we have never argued that the use of the preponderance of the evidence standard, in and of itself, deprives accused students of fundamental fairness. Rather, we have argued that its use is inappropriate and unfair in settings that lack the procedural safeguards present in the civil and administrative proceedings where it is typically employed.[78]

The proposed regulations, in their current form, provide many of the procedural protections that FIRE identifies as necessary for a fair campus suspension or expulsion hearing. In our Spotlight on Due Process 2018 report, we list what we consider to be the essential elements of fundamental fairness in campus adjudications.[79] They are:

- A clearly stated presumption of innocence, including a statement that a person's silence shall not be held against them.

- Timely and adequate written notice of the allegations before any meeting with an investigator or administrator at which the student is expected to answer questions. Information provided should include the time and place of alleged policy violations, a specific statement of which policies

---

[77] 441 U.S. 418, 424 (1979).

[78] Joseph Cohn, *Campus is a Poor Court for Students Facing Sexual-Misconduct Charges*, Chron. of Higher Educ. (Oct. 1, 2012), https://www.chronicle.com/article/Campus-Is-a-Poor-Court-for/134770.

[79] Spotlight on Due Process 2018, FIRE, https://www.thefire.org/spotlight/due-process-reports/due-process-report-2018 (last visited Jan. 30, 2019).

38

were allegedly violated and by what actions, and a list of people allegedly involved in and affected by those actions.

- Adequate time to prepare for a reasonably prompt disciplinary hearing. Preparation shall include access to all evidence to be used at hearing.

- The right to impartial fact-finders, including the right to challenge fact-finders for conflicts of interest.

- The right to a meaningful hearing process. This includes having the case adjudicated by a person or group of people—ideally, a panel—distinct from the person or people who conducted the investigation (i.e. the institution must not employ a "single-investigator" model).

- The right to present all evidence directly to the fact-finder.

- The ability to question witnesses, including the complainant, in real time, and respond to another party's version of events.

- The active participation of an advisor of choice, including an attorney (at the student's sole discretion), during the investigation and at all proceedings, formal or informal.

- The meaningful right of the accused to appeal a finding or sanction.

- A requirement that factual findings leading to expulsion be agreed upon by a unanimous panel or supported by clear and convincing evidence.[80]

While the proposed regulations provide most of these protections, they do not prevent institutions from using a respondent's silence as evidence against him or her, require institutions to offer the accused student an appeal, provide students with the right to fully active legal representation at all stages of the process, or require that a hearing panel's decision must be unanimous to support an expulsion. While FIRE does not think it is wise to allow institutions to use any standard lower than that of clear and convincing evidence without requiring all of the above listed safeguards, we cannot support language that allows institutions to use the preponderance standard in proceedings that do not, at a minimum, allow the fully active participation of counsel. If the right to fully active representation by counsel was included in the proposed regulation, we would support Section (4)(i) as written. Without that addition, we urge the Department to require that institutions use the clear and convincing standard.

Section (4)(ii) sets forth the requirements of what institutions must include in their written determinations of Title IX proceedings. It states:

---

[80] *Id.*

(ii) The written determination must include—

(A) Identification of the section(s) of the recipient's code of conduct alleged to have been violated;

(B) A description of the procedural steps taken from the receipt of the complaint through the determination, including any notifications to the parties, interviews with parties and witnesses, site visits, methods used to gather other evidence, and hearings held;

(C) Findings of fact supporting the determination;

(D) Conclusions regarding the application of the recipient's code of conduct to the facts;

(E) A statement of, and rationale for, the result as to each allegation, including a determination regarding responsibility, any sanctions the recipient imposes on the respondent, and any remedies provided by the recipient to the complainant designed to restore or preserve access to the recipient's education program or activity; and

(F) The recipient's procedures and permissible bases for the complainant and respondent to appeal, if the recipient offers an appeal.

Requiring institutions to thoroughly document how they handled an allegation from beginning to end will benefit complainants, accused students, and institutions themselves. Not only do all parties deserve an explanation, but these records will both help students establish violations of their rights when corners have been unlawfully cut and exonerate institutions when they behaved reasonably in light of the known circumstances. Furthermore, requiring such documentation will itself lead institutions to take all due care to ensure that they are respecting the process and the rights of all parties. As with our earlier objection to allowing complainants to appeal cases when the accused has been exonerated, we maintain our objection to the language referencing complainants' rights to appeal presented in Section 106.45(4)(ii)(F). We support the remainder of Subsection (4)(ii).

The next paragraph governs an institution's responsibility to simultaneously notify both parties of the outcome and of appellate rights and deadlines. It also establishes when a determination becomes final. It reads:

(iii) The recipient must provide the written determination to the parties simultaneously. If the recipient does not offer an appeal, the determination regarding responsibility becomes final on the date that the recipient provides the parties with the written determination. If the recipient offers an appeal, the determination regarding responsibility becomes final at either the

40

conclusion of the appeal process, if an appeal is filed, or, if an appeal is not filed, the date on which an appeal would no longer be considered timely.

As advised above, offering the accused an appeal should not be optional. Any provisions, including this one, that make providing those appeals optional should be revised. FIRE supports the rest of the subsection.

Subsection (5) sets forth the requirements of appeals. It reads:

(5) *Appeals.* A recipient may choose to offer an appeal. If a recipient offers an appeal, it must allow both parties to appeal. In cases where there has been a finding of responsibility, although a complainant may appeal on the ground that the remedies are not designed to restore or preserve the complainant's access to the recipient's education program or activity, a complainant is not entitled to a particular sanction against the respondent. As to all appeals, the recipient must:

(i) Notify the other party in writing when an appeal is filed and implement appeal procedures equally for both parties;

(ii) Ensure that the appeal decision-maker is not the same person as any investigator(s) or decision-maker(s) that reached the determination of responsibility;

(iii) Ensure that the appeal decision-maker complies with the standards set forth in paragraph (b)(1)(iii) of this section;

(iv) Give both parties a reasonable, equal opportunity to submit a written statement in support of, or challenging, the outcome;

(v) Issue a written decision describing the result of the appeal and the rationale for the result; and

(vi) Provide the written decision simultaneously to both parties.

FIRE objects to the language that allows institutions to prohibit appeals altogether and the language that again requires institutions to allow complainants to appeal. If, however, an accused student appeals, we agree with the requirement in Subsection (iv) that both parties must be given "reasonable, equal opportunity to submit a written statement in support of, or challenging, the outcome."

Subsection (6) describes the rules governing informal resolutions of complaints. It states:

(6) *Informal resolution.* At any time prior to reaching a determination regarding responsibility the recipient may facilitate an informal resolution process, such as mediation, that does not involve a full investigation and adjudication, provided that the recipient—

41

(i) Provides to the parties a written notice disclosing—

(A) The allegations;

(B) The requirements of the informal resolution process including the circumstances under which it precludes the parties from resuming a formal complaint arising from the same allegations, if any; and

(C) Any consequences resulting from participating in the informal resolution process, including the records that will be maintained or could be shared; and

(ii) Obtains the parties' voluntary, written consent to the informal resolution process.

Other commenters have expressed concern about the fact that the proposed regulations would allow schools to utilize practices like mediation to resolve allegations, warning that mediation will harm reporting victims and chill students from coming forward. To take a representative example, the victims' rights advocacy organization Know Your IX argues that "[u]nregulated mediation will turn us back to a time when schools pushed survivors to 'work it out' with their rapists. Reverting us back to this harmful status quo will allow for schools and rapists to intimidate survivors into silence."[81]

This characterization of the proposed regulations is misleading and inaccurate. Rather than allowing for "unregulated" mediation, the proposed regulations would impose important rules to govern any institutional use of the practice. Schools would be required to satisfy several substantive conditions prior to attempting to resolve a complaint via mediation or another "informal resolution process."

To ensure that all participants are aware of what mediation would entail, the proposed regulations would require the institution to provide both parties with thorough written notice containing necessary details about the process. Specifically, both parties would be notified in writing about the allegation at issue; what mediation requires from participants; whether participation in mediation would prevent the parties from pursuing or resuming a formal complaint process; and "[a]ny consequences resulting from participating in the informal resolution process, including the records that will be maintained or could be shared." Requiring schools to provide students with this information prior to mediation means students will be able to make an informed choice about whether they want to participate.

Most vitally, under the proposed regulations, the school "must also obtain the parties' voluntary, written consent to the informal resolution process." In other words, mediation may be attempted *only* when both parties agree—*voluntarily, and in writing*—to participate.

---

[81] Know Your IX (@knowyourIX), Twitter (Nov. 16, 2018, 12:04 PM), https://twitter.com/knowyourIX/status/1063477925746524160.

If either party does not want to mediate the dispute, then mediation is barred. These proposed requirements anticipate and answer concerns about institutions pressuring reporting victims into a mediation process against their will, or without a clear understanding of what mediation will mean for them or their complaint. Any attempt by an institution to pressure a student into an informal resolution would contravene these regulations and should subject to investigation, sanction, and civil liability.

Moreover, as a recent comment by a group of attorneys and law professors points out, there are times when mediation or other informal resolution may be in the best interest of both parties:

> [M]isconduct is on a spectrum, and the facts are often nuanced. . . . For some cases, a constructive, non-punitive approach, in which schools take steps to resolve the specific concern and prevent recurrence of troublesome behavior while still ensuring that both parties can pursue their education, may be preferable and can avoid the disruption and potential long-term effects for both parties that result from a formal proceeding.[82]

The proposed regulations are also consistent with prior OCR practice with regard to sexual harassment allegations. In the 2001 Revised Sexual Harassment Guidance, OCR provided that "[g]rievance procedures may include informal mechanisms for resolving sexual harassment complaints to be used if the parties agree to do so," but noted that the office "has frequently advised schools, however, that it is not appropriate for a student who is complaining of harassment to be required to work out the problem directly with the individual alleged to be harassing him or her, and certainly not without appropriate involvement by the school (e.g., participation by a counselor, trained mediator, or, if appropriate, a teacher or administrator)."[83] Likewise, the now-rescinded 2011 "Dear Colleague" letter stated that "[g]rievance procedures generally may include voluntary informal mechanisms (e.g., mediation) for resolving some types of sexual harassment complaints."[84]

Rather than "reverting" to an "unregulated" status quo, then, the proposed rules would provide more regulation of mediation than previous agency guidance by requiring those schools that do allow for mediation to fully inform their students in writing about what it will entail and by explicitly requiring written, voluntary agreement prior to participation. Moreover, the proposed regulations do not require institutions to allow for mediation in

---

[82] *Comments of Concerned Lawyers and Educators in Support of Fundamental Fairness for All Parties in Title IX Grievance Proceedings*, at 9 (Jan. 28, 2019), *available at* https://www.thefire.org/comments-of-concerned-lawyers-and-educators-in-support-of-fundamental-fairness-for-all-parties-in-title-ix-grievance-proceedings.

[83] Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 66 Fed. Reg. 5512 (Jan. 19, 2001).

[84] 2011 Dear Colleague Letter, at 8.

43

any or all circumstances; a school could make clear, as OCR has previously recommended and mandated, that certain allegations are ineligible for mediation.

While FIRE supports the language in this subsection, we recommend adding language that would require institutions to use trained mediators. Students should also be given comprehensive written notice of the differences between the formal and informal processes before they make their decision. Moreover, Subsection (C) should explicitly state that statements made by students during the informal process will be excluded from consideration in the formal process, should the formal procedures be subsequently initiated to resolve the allegations arising out of the complaint. The subsection should also require institutions to advise students participating in this process that their statements provided during the informal process may be admissible against them in subsequent criminal proceedings, unless some other source of privilege exists.

The final section of the proposed regulations address recordkeeping. The proposed regulation states:

> (7) *Recordkeeping.* (i) A recipient must create, make available to the complainant and respondent, and maintain for a period of three years records of—
>
> (A) Each sexual harassment investigation including any determination regarding responsibility, any disciplinary sanctions imposed on the respondent, and any remedies provided to the complainant designed to restore or preserve access to the recipient's education program or activity;
>
> (B) Any appeal and the result therefrom;
>
> (C) Informal resolution, if any; and
>
> (D) All materials used to train coordinators, investigators, and decision-makers with regard to sexual harassment.
>
> (ii) A recipient must create and maintain for a period of three years records of any actions, including any supportive measures, taken in response to a report or formal complaint of sexual harassment. In each instance, the recipient must document the basis for its conclusion that its response was not clearly unreasonable, and document that it has taken measures designed to restore or preserve access to the recipient's educational program or activity. The documentation of certain bases or measures does not limit the recipient in the future from providing additional explanations or detailing additional measures taken.

FIRE supports Subsection (7). We note, however, that it would be appropriate for the proposed regulations to require institutions to make documents like the training materials

44

described in Section 106.45 (7)(i)(B) available to the public for review so that they may be assured of the funding recipient's compliance with Section 106.45(b)(1)(iii).

<u>Directed Questions</u>

At the conclusion of the proposed regulations, the Department asked a series of directed questions. Most of the questions dealt with topics outside of the scope of FIRE's mission. Others have been addressed in this comment in the sections dealing specifically with the issues raised in the questions.

FIRE does, however, also defend the rights of faculty, so we were pleased to see the Department inquire as to whether rights provided to students under the proposed regulations should also extend to employees. Faculty rights have been routinely threatened and violated through what one might charitably call "overzealous" enforcement of the previous Title IX mandates.[85] In the executive summary of its 2016 report titled "The History, Uses, and Abuses of Title IX," the American Association of University Professors explained with regard to faculty members:

> Critically, the current focus of Title IX on sexual violations has also been accompanied by regulation that conflates sexual misconduct (including sexual assault) with sexual harassment based on speech. This has resulted in violations of academic freedom through the punishment of protected speech by faculty in their teaching, research, and extra-mural speech. Recent interpretations of Title IX are characterized by an overly expansive definition of what amounts and kinds of speech create a "hostile environment" in violation of Title IX.[86]

Faculty should enjoy all the rights provided students through the proposed regulations. These regulations should expressly state that institutions must provide their faculty (defined broadly to include tenured faculty, non-tenured faculty, adjunct faculty, and all staff with teaching responsibilities) the rights set forth in the proposed regulations.

The definition of student-on-student harassment, however, does not apply in contexts where the parties are faculty members. The Supreme Court of the United States uses the "severe or pervasive" standard for evaluating whether conduct constitutes harassment in the employment context.[87] In provisions addressing the conduct of employees, the

---

[85] Jeannie Suk Gersen, *Laura Kipnis's Endless Trial by Title IX*, NEW YORKER (Sept. 20, 2017), https://www.newyorker.com/news/news-desk/laura-kipniss-endless-trial-by-title-ix; *see also* Susan Kruth, *Law professor still subject to sanctions from Howard University for Brazilian wax hypothetical on quiz*, FIRE (Dec. 19, 2017), https://www.thefire.org/law-professor-still-subject-to-sanctions-from-howard-university-for-brazilian-wax-hypothetical-on-quiz.

[86] American Association of University Professors, *The History, Uses, and Abuses of Title IX*, https://www.aaup.org/report/history-uses-and-abuses-title-ix (last visited Jan. 30, 2019).

[87] *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 60 (1986).

45

proposed regulations should apply standards the Supreme Court uses in the employment context.

The regulations should be clear that they do not preclude the obligation of institutions to honor any additional rights negotiated by faculty in any applicable collective bargaining agreement or employment contract.

## Additional Comments

Some states, including Tennessee and Oregon, have Administrative Procedure Acts that give students enrolled in public colleges and universities the right to have suspension and expulsion cases heard in administrative law proceedings.[88] The procedural safeguards provided to students in those proceedings generally exceed the rights set forth in these proposed regulations. For example, students participating in those proceedings enjoy the right to full representation of legal counsel.[89]

The proposed regulations would benefit from adding a provision that clarifies that nothing in these regulations shall be interpreted to prevent the accused student from choosing to have their case adjudicated in an administrative law setting, provided that the institution advises the accused student in writing that it is the accused student's sole choice as to whether to have their case decided under those procedures or those offered on campus. The notice should describe the differences between the procedures and rights provided in each process. The proposed rule should also clarify that a student's decision to have his or her case decided in an administrative hearing does not relieve the institution of its obligation under these regulations to provide both students with access to all of the evidence in its possession. Nor does it relieve the institution of its obligation to consider the appropriateness of providing non-disciplinary supportive measures.

Another way the proposed rule could be improved would be to add a rape shield provision in the sections dealing with both grievance procedures and formal investigations at institutions of higher education. In Section 106.45(b)(3)(vi), which governs only processes at "elementary and secondary schools," the proposed regulation states:

> [A]ll such questioning must exclude evidence of the complainant's sexual behavior or predisposition, unless such evidence about the complainant's sexual behavior is offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the evidence concerns specific incidents of the complainant's sexual behavior with respect to the respondent and is offered to prove consent. The decision-maker must explain to the party proposing the questions any decision to exclude questions as not relevant[.]

---

[88] Tenn. Code Ann. § 4-5-101 (2018) (Uniform Administrative Procedures Act); Tenn. Comp. R. & Regs. 1360-04-01 (revised 2004); *see also* Or. Rev. Stat. Ann. § 183.417 (2018).
[89] *Id.*

46

This language is thoughtful and should be added in the sections governing procedures (including investigations) at postsecondary institutions.

FIRE also recommends adding a provision that expressly releases institutions that are currently subject to settlement agreements with the Department from provisions that set forth ongoing obligations that are inconsistent with the new regulations. This release should be crafted carefully so that it does not affect any remedies provided to specific students under the terms of the agreements.

<u>Conclusion</u>

Combating sex-based discrimination through effective enforcement of Title IX without infringing on free speech or due process rights is necessary. Accordingly, FIRE is pleased that the Department of Education has revisited its approach to handling these responsibilities.

Too many critics of the Department's new approach have argued that by providing due process protections to the accused, the proposed regulations threaten the safety of victims. FIRE does not agree that procedural protections put victims at risk. Nor do many others, including Justice Ruth Bader Ginsburg. During a conversation with National Constitution Center president and CEO Jeffrey Rosen last February, Justice Ginsburg weighed in on the importance of restoring due process to these proceedings.[90] In discussing the #MeToo movement, Rosen asked the Justice, "What about due process for the accused?" Justice Ginsburg responded:

> Well, that must not be ignored and it goes beyond sexual harassment. The person who is accused has a right to defend herself or himself. And we certainly should not lose sight of that, recognizing that these are complaints that should be heard. So, there's been criticism of some college codes of conduct for not giving the accused person a fair opportunity to be heard, and that's one of the basic tenets of our system, as you know. Everyone deserves a fair hearing.

Rosen asked follow-up questions. The exchange went as follows:

> **Rosen**: Are some of those criticisms of the college codes valid?

> **Ginsburg**: Do I think they are? Yes.

> **Rosen**: I think people are hungry for your thoughts about how to balance the values of due process against the need for increased gender equality.

---

[90] National Constitution Center, *A Conversation with Justice Ruth Bader Ginsburg*, YOUTUBE (Feb. 12, 2018), https://www.youtube.com/watch?v=sN7rhjPBFts.

47

**Ginsburg**: It's not one or the other. It's both. We have a system of justice where people who are accused get due process, so it's just applying to this field what we have applied generally.

Justice Ginsburg's point is clear and persuasive: Due process for the accused and justice for victims must never be considered mutually exclusive. The proposed rules realize this truth and make great strides towards ensuring that the needs of complainants and accused students are both met.

Thank you for your attention to FIRE's analysis and suggestions. If the Department has any questions regarding our input, please do not hesitate to contact us.

Respectfully submitted,

Joseph Cohn                                          Tyler Coward
Legislative and Policy Director                      Legislative Counsel

48

# Defendant-Intervenors' Preliminary Injunction Exhibit 2

# University of Minnesota considers policy changes to comply with new Title IX regulations

*July 02, 2020*



**What and when:** University of Minnesota Board of Regents Meeting and Retreat (Wednesday, July 8 and Thursday, July 9, beginning at 9 a.m. both days)

**Where:** Due to the COVID-19 pandemic, these meetings will be conducted virtually with a livestream publicly available at **youtube.com/UMNRegents** (http://youtube.com/UMNRegents)

As public higher education institutions throughout the country consider necessary adjustments to sexual misconduct policies to comply with new federal Title IX regulations, the University of Minnesota Board of Regents will

051

Case 0:20-cv-01468-CJN  Document 64-1  Filed 07/08/20  Page 54 of 86

consider proposed amendments to the University's policies and processes during its July meeting.

## Released by the U.S. Department of Education (DOE) last month

(https://www.insidehighered.com/news/2020/05/07/education-department-releases-final-title-ix-regulations), these regulations narrow the scope of sexual misconduct (including sexual harassment, sexual assault, stalking, and relationship violence) that educational institutions are required to prohibit. They also set requirements for how institutions must conduct grievance processes related to Title IX concerns. The University's policies and procedures must comply with the federal regulations by Aug. 14.

In many places, the DOE regulations set minimum standards and allow individual institutions to make policy choices appropriate for their unique needs. Since the DOE publicly announced these changes, University leaders have reiterated that the discretion built into this guidance will allow the University to continue providing effective and fair response to all types of sexual misconduct that harms University community members, whether that misconduct occurs on- or off-campus.

The Board will discuss the following primary considerations related to these changes:

- A uniform standard of evidence for all Title IX cases, whether these matters involve students, faculty or staff;
- Adjustments to how live hearings are conducted, as well as the process for appealing University Title IX decisions;
- The size and composition of Title IX hearing panels;
- The scope of advisor roles for those assisting parties involved in these matters, and;
- The level of systemwide centralization the University will employ as it moves forward with updates to its processes.

Since the initial DOE announcement, the University's Office of Equal Opportunity and Affirmative Action, in collaboration with other University offices, has consulted broadly with students, faculty and staff systemwide to determine how the University can best meet these federal mandates on all five of its campuses. Though University administrators are continuing to gather feedback from governance groups and beyond, consultation in recent months is reflected in materials coming before the Board for consideration in July.

052

7/8/2020　　　　　University of Minnesota considers policy changes to comply with new Title IX regulations | University of Minnesota Twin Cities

Case 1:20-cv-01468-CJN　Document 64-1　Filed 07/08/20　Page 55 of 86

As part of its July meetings, the Board is also expected to:

- Act on a recommendation for a one-time employee retirement incentive option.
- Hear the annual report from the University of Minnesota Alumni Association, which represents nearly 500,000 alums from the University's Twin Cities and Rochester campuses.
- Act on the purchase of 501 Oak Street SE in Minneapolis and the sale of 1.66 acres at UMore Park in Rosemount.

For more information, including future meeting times, visit **regents.umn.edu (https://regents.umn.edu)**.

---

Read more: **COVID-19 Stories, Insights, Expertise**(/news-events/covid-19)

---

## Media Contacts

**Jake Ricker**　　　　University Public Relations　　　　612-625-7134　　　　rick0127@umn.edu

© 2020 Regents of the University of Minnesota. All rights reserved.

The University of Minnesota is an equal opportunity educator and employer. **Privacy Statement**

**Report Web Disability-Related Issue**

Defendant-Intervenors'
Preliminary Injunction
Exhibit 3

# TITLE IX INFORMATION

The University of Toledo is committed to creating a safe environment for everyone. Every person learning, living, working and receiving health care on a University of Toledo campus has the right to a safe and secure environment, free of harassment. The University has zero tolerance for sexual misconduct against members of the University community.

## Report/Complaint Form

## COVID-19 INFORMATION:

The Title IX Office remains open and is functioning remotely at this time. Anyone impacted by sex/gender discrimination is encouraged to make a report through our online reporting system. The Title IX Office is here to ensure that any reported sexual harassment, sexual violence, intimate partner violence, stalking, retaliation, or other sexually discriminatory behaviors are addressed equitably and promptly. You can file a report by clicking on the Report/Complaint Form button. You can also send an email to the Title IX Office at TitleIX@UToledo.Edu and a staff member will be in contact with you to follow-up on any questions or concerns. During this time, investigations will be conducted virtually. All prior cases and interim measures are still being processed and if you have any further questions please do not hesitate to reach out to the Title IX Office. Resources are still available during this time and can be found by clicking here. For additional updates from The University of Toledo on COVID-19 please click here. In case of an emergency please call 911.

---

## A STATEMENT ON THE NEW TITLE IX REGULATIONS:

Greetings Rocket Community,

The federal government earlier this week released new regulations regarding Title IX, the law that prohibits sex-based discrimination and harassment at schools, colleges and universities. The University of Toledo has been anticipating these new guidelines for a long time and we have been reviewing our policies and procedures in preparation for their potential impact on our campus.

Now that the new regulations are here, the real work begins: understanding them, explaining them and implementing them. In the coming weeks we will create opportunities for you to make your voice heard throughout the review process.

The new regulations go into effect on August 14, 2020. Between now and then, our Title IX team here on campus will make sure that our policies and procedures align with the new federal regulations, as well as with Ohio state laws, court decisions and our UToledo values and mission.

In the midst of changing laws and regulations, UToledo is committed to creating a safe environment for everyone. Every person learning, living, working and receiving healthcare on our campuses has the right to a safe and secure environment, free of harassment. The University has zero tolerance for sexual misconduct against members of the University community. We are committed to continued prevention and education programing.

Title IX actions are based in respect, sensitivity and dignity for all of our students, faculty and staff members. Please contact the University's Title IX Office at 419.530.4191, titleix@utoledo.edu or utoledo.edu/title-ix with any questions, ideas or concerns.

Sincerely,

**Phillip "Flapp" Cockrell, Ph.D.**
Vice President for Student Affairs
and Vice Provost

**Vicky Kulicke, CAAP**
Director, Title IX and Compliance

UToledo is committed to ending sexual misconduct. We can't do it alone. We all need to help. We can do it. But we have to work *together*.

**SEXUAL MISCONDUCT INFORMATION**        **UTOLEDO TITLE IX POLICY**

# WHAT IS TITLE IX

The University of Toledo is committed to educational and working environments that are free from sex discrimination, including sexual harassment, sexual assault, or retaliation. Title IX of the Education Amendments of 1972 (Title IX) is a federal law that prohibits sex discrimination. The University's policies are consistent with the requirements of Title IX, Title VII, as well as relevant state laws.

The University encourages the reporting of sexual misconduct (including sex discrimination, sexual harassment and sexual assault) or retaliation that may occur in its programs or activities, to ensure that the University has an opportunity to address prohibited conduct. Reports may be made by completing a complaint form or by contacting one of the Title IX deputies listed below.

If you are a student, faculty or staff member who believes you have been subjected to sexual misconduct which includes sex discrimination, sexual harassment, sexual violence, sexual assault, conduct that exploits another person in a sexual and non-consensual way (such as voyeurism and non-consensual recording), stalking, dating violence, domestic violence, and indecent exposure or retaliation, please submit complaints in writing to a Deputy Title IX Coordinator.

**Complaint Procedure And Form**

## UNIVERSITY OF TOLEDO TITLE IX & COMPLIANCE TEAM

In accordance with Title IX regulations, the University has designated Vicky Kulicke, Director, Title IX & Compliance with monitoring compliance with the Title IX regulations. Questions regarding Title IX, as well as concerns and complaints of non-compliance, may be directed to:

Defendant-Intervenors'
Preliminary Injunction
Exhibit 4



OFFICE OF THE GENERAL COUNSEL

UNIVERSITY *of*
NORTH FLORIDA.

July 8, 2020

Azhar Majeed                                    **Sent Via Email**
Vice President of Policy Reform
Foundation for Individual Rights in Education
510 Walnut Street, Suite 1250
Philadelphia, PA  19106

Dear Mr. Majeed:

Your June 18, 2020 letter to President David Szymanski was referred to my attention for review and response.  The University is proud to have earned FIRE's highest "green light" rating for its policies on student expression and appreciates FIRE's diligence in continuing to be in contact with us on matters of mutual concern.

Since the U.S. Department of Education released its Final Rule under Title IX of the Education Amendments of 1972 on May 6, 2020, the University has been working to revise not only its Student Code of Conduct, but also its Sexual Misconduct and Title IX Sexual Harassment Regulation and its Non-Discrimination, Equal Opportunity and Inclusion Regulation to comply with the final rule.

The University must follow the Florida Board of Governors Regulation Development Procedure for State University Boards of Trustees for promulgating its regulations. Currently, the regulations have been noticed for review and public comment.  Final approval lies with the University's Board of Trustees, which will meet on August 11, 2020.

You can access these regulations at https://www.unf.edu/trustees/Regulations.aspx.  Click on "Regulations Under Review" and then "New Regulations".  These are under new regulations because there were such significant changes we repealed the original version and are issuing new ones.  We welcome your review and any collaboration and feedback from FIRE during this notice and comment period.

Sincerely,

Justin C. Sorrell
Justin C. Sorrell
Senior Associate General Counsel

Building 1, Room 2100, 1 UNF DRIVE, JACKSONVILLE, FLORIDA 32224-7699
TEL: (904) 620.2828    FAX: (904) 620.2829
www.unf.edu
Equal Opportunity Employer/Equal Access/Affirmative Action Institution

059

Defendant-Intervenors'
Preliminary Injunction
Exhibit 5

Case 1:20-cv-01468-CJN Document 64-1 Filed 07/08/20 Page 63 of 86

**BREAKING NEWS /** COVID-19 in South Dakota: 79 new positive cases; Death toll remains at 98; Active cases at 864

**WEATHER ALERTS /**
Heat Advisory: **Lac Qui Parle, Redwood, Yellow Medicine**

CAPITOL NEWS BUREAU

# New Title IX policy on sexual harassment is taking shape for S.D. public universities



New Title IX policy on sexual harassment is taking shape for S.D. public universities | KELOLAND.com

New federal Title IX rules take effect August 14. The state Board of Regents considers possible changes during a teleconference June 24.

Final approval would come during the August 4-6 meeting in Pierre.

Schools nationwide will be required to adopt either a 'preponderance of evidence' or 'clear and convincing evidence' as the standard. The South Dakota board currently uses a 'preponderance' standard.

One of the federal changes calls for a live hearing when evidence may be challenged and witnesses cross-examined. The regents' central office staff recommends the use of a hearing officer and a contested-case format under state legal chapter 1-26 at the institutional level, rather than the current practice of later if a decision is appealed.

This would be an improvement, according to the memo. "Using a hearing examiner and affording full due process at the onset enhances the probability of getting to the correct outcome sooner, rather than a later, an issue that has haunted Title IX nationally in a litany of high profile court appeals in recent years."

The memo notes that the regents' current process is woven into a several areas of the policy manual, including the subsection on student code of conduct and the subsection on human rights complaints procedures.

"Consequently, the rough policy draft set forth in Attachment I represents a standalone policy that would be applicable to all sexual harassment matters. Once the substance of that policy is solidified, the ancillary policy adjustments will be addressed accordingly, with the final package coming back to the Board for final approval in August," according to the memo.

The regents govern South Dakota State University at Brookings, University of South Dakota at Vermillion, Dakota State University at Madison, Northern State University

Defendant-Intervenors'
Preliminary Injunction
Exhibit 6

# Statements By Year

**Pages**

---

# Statements Issued By

**Pages**

---

# UNIVERSITY OF FLORIDA'S COMMITMENT TO SEXUAL ASSAULT PREVENTION AND SUPPORT

*Assistant VP of ADA and Title IX Compliance Russell Froman*

June 19, 2020

UF prohibits discrimination against any person on the basis of race, color, national origin, religion, age, sex, gender, sexual orientation, gender expression, gender identity, gender transition status, sex- or gender-stereotyping, pregnancy, physical or mental disability, medical condition, genetic information, ancestry, marital status, citizenship, or protected veterans. As such, the University strives to protect students, employees and visitors from any form of sexual misconduct or gender-based harassment, including Sexual Harassment, Sexual Assault, Intimate Partner Violence, Sexual Exploitation, Stalking/Cyberstalking, Pregnancy Discrimination and associated Retaliatory Actions.  No matter what is defined as a misbehavior that falls within the scope and definitions outlined by the Department of Education's new Final Rule as a "Title IX violation", we will continue to address sexual misconduct and strive to eliminate any instance of it through a multi-various approach of sexual misconduct prevention education, healthy relationship modeling, and alcohol education in order to prevent harm from occurring, along with a multitude of support options offered for the harmed party once misconduct

Case 1:20-cv-01469-CJN Document 64-1 Filed 07/08/20 Page 67 of 86

We will continue to provide an educational and work environment that is safe and free of prohibited discriminatory acts as well as all support options for our community members under Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, the Americans with Disabilities Act, as amended, Section 504 of the Rehabilitation Act of 1973, and Title VII of the Civil Rights Act of 1964, as well as applicable state and local laws. This includes the formal Title IX investigatory process that leads to adjudication if the allegation of misconduct is substantiated.  The Office of Title IX Compliance will continue to work very closely with numerous partners who also offer support for people engaged in the process of a Title IX issue.  These partners include the University Police Department, the Office of Victim Advocates, the  Care Team in the Dean of Student's Office, the Office of Student Conduct and Conflict Resolution, the Gator Well Health Education Specialists, the Counseling and Wellness Center, the University Athletic Association, the Office of Human Resources, the Office of Employee Relations, the local Police Departments, the Alachua County Sexual Assault Prevention Coalition, and the Alachua County Alcohol Coalition.  We are also continuing to reach out to student groups in order to have their voices heard.  To that end, we have recently launched the Student Advisory Board to have students provide input on policies, training, and direction of programming and services provided by the Office of Title IX Compliance.  We have also recently added a critical full-time position of Education and Training Coordinator to help facilitate positive change and eradicate harm within our UF community.

In short, we are going to maintain our resolve to create and maintain the safe and healthy environment that each of our constituents expect and deserve, regardless of any changes that may have occurred within the Title IX regulations.



   

University of Florida
Gainesville, FL 32611

065

statements.ufl.edu/statements/2020/june/university-of-floridas-commitment-to-sexual-assault-prevention-and-support.html    2/3

Defendant-Intervenors'
Preliminary Injunction
Exhibit 7

NOTIFICATION    **Important Fall 2020 Information** ...Click to read more

## Bates: Office of the President

# Community Message: Revised Title IX Regulations

Dear Members of the Bates Community:

Yesterday, the U.S. Department of Education Office of Civil Rights released revised regulations governing the handling of sexual misconduct on college campuses under Title IX. The new rules will go into effect on August 14, 2020.  We write today to share with you how Bates plans to proceed in light of these regulatory changes.

We have worked hard over the past five years to implement policies consistent with federal regulations and reflective of best practices in addressing issues of sexual misconduct on college campuses. These new rules maintain many of the structures that we currently have in place, but also require changes in important policies and practices.

In January 2019, Bates submitted official comments to the federal government, outlining concerns about the potential impact of certain provisions on our ability to address issues of sex- and gender-based discrimination in a way that is fair and equitable to all parties involved and promotes a positive climate on campus. Since that time, we have been engaged in conversations about the proposed regulations prior to the release of final rules. At the same time, we have been exploring ways to meet the needs of our community while working within requirements of the new regulations.

Specifically, we remain concerned that some of the new requirements, such as the mandate of hearings with live cross-examination, will create significant burdens for all parties involved in the resolution process without guaranteeing a more equitable proceeding or more reliable outcomes. As we move forward, the college will craft a policy that mitigates burdens wherever possible.

While we will amend our policies and procedures to the extent required by law, we remain committed to providing full support to any community member affected by sexual violence or discrimination. At its core, our process will continue to treat all individuals involved in reports with dignity, respect, and care. We will conduct prompt, fair, thorough, and equitable investigations that uphold our community standards and maintain the safety of our campus. And, we will continue to develop and implement evidence-based training and education designed to reduce incidents of sexual misconduct and discrimination.

Though we do not support certain changes required by the new regulations, we are confident that we can meet our legal obligations while also maintaining policies and procedures consistent with our values. Over the coming months, we will clarify any changes in policy or procedures required under the new regulations, and we will revise our Sexual Misconduct and Harassment Policy as necessary.  We will be prepared to implement these procedures beginning in the fall of 2020.

We will keep you updated as the process unfolds. Information about the new regulations will be posted on the Title IX webpage in the next few days. In the meantime, please feel free to be in touch with Gwen Lexow at titleix@bates.edu with any questions or concerns. You may also submit questions and comments using this Google form.

And, as always, should you wish to talk with someone about sexual assault or other sexual misconduct, confidential support and private reporting resources are available.

Sincerely,

Clayton Spencer & Gwen Lexow

**Categories:**  President's Speeches and Statements  Update

# Contact

## Bates College

Office of the President
Lane Hall, Room 204
Lewiston, Maine 04240

# Defendant-Intervenors'
# Preliminary Injunction
# Exhibit 8

St. Olaf College is committed to a respectful, safe, and healthy environment and does not tolerate sex discrimination, sexual harassment, or sexual misconduct in any form. Prohibited behaviors include, but are not limited to, unwelcome sexual conduct or communication, rape and other forms of sexual assault, domestic violence, dating violence, and stalking. These behaviors are not only violations of an individual's rights and dignity, but are also attacks on our college community and violations of college policy. In addition, some forms of these behaviors are crimes.

St. Olaf is also committed to promptly, impartially, and equitably addressing and resolving all reports of sex discrimination, sexual harassment, and sexual misconduct. When the college finds that such behavior has occurred it will take steps to stop the behavior, to prevent its recurrence, and to remedy its effects.

Use the navigation links on the right to learn more about the college's Title IX Policy, and to access information and resources to support anyone who has been affected by, knows of, or wants to help prevent an incident or pattern of behavior. There are many individuals you can contact with questions and concerns, beginning with the St. Olaf College Title IX Coordinator Kari Hohn (https://www.stolaf.edu/profile/khohn) (507-786-3465).

## UPDATE: FEDERAL REGULATIONS FOR TITLE IX

June 29, 2020

On May 6, 2020, the U.S. Department of Education's Office for Civil Rights released new regulations regarding Title IX (https://www2.ed.gov/about/offices/list/ocr/newsroom.html), the law that prohibits sex-based discrimination and harassment at schools, colleges, and universities. In order to remain legally compliant, St. Olaf must adopt and incorporate these regulations by **August 14, 2020**. Between now and then, members of the Title IX Team (https://wp.stolaf.edu/title-ix/title-ix-team/), along with other members from the St. Olaf community, are reviewing and adapting the College's policies and procedures as necessary to align with the new federal regulations, along with Minnesota state laws and our values as a community. The Title IX Office is committed to ensuring that our Title IX actions are rooted in respect, sensitivity, and dignity for all of our students, faculty, and staff while also remaining compliant with the law.

Click here (https://wp.stolaf.edu/title-ix/new-federal-regulations-for-title-ix/) to access resources that help describe these new regulations and how St. Olaf plans to implement them. If you have questions, concerns, or feedback after reviewing these resources, please take a moment to fill out this Google Form (https://docs.google.com/forms/d/e/1FAIpQLScX0e1PseL9xlmQLHyfxJ-

SsiERAdXAJ88djXTBexgpgm5iNQ/viewform?usp=sf_link). The Title IX Advisory Group will be monitoring any feedback received, and the Title IX Office will work to answer questions and concerns by updating this website and through additional communication to our community.

Regardless of the changes that lie ahead, St. Olaf will always remain committed to a respectful, safe, and healthy environment that does not tolerate sex discrimination, sexual harassment, or sexual misconduct in any form. If the news about these Title IX changes is creating a need for increased support resources for you, please do not hesitate to reach out to the Title IX Coordinator (https://wp.stolaf.edu/title-ix/title-ix-coordinator/) or any of our confidential resources (https://wp.stolaf.edu/title-ix/campus-resources/) for assistance.

Defendant-Intervenors'
Preliminary Injunction
Exhibit 9


WESLEYAN (/index.cfm)

# WESLEYAN COLLEGE'S STATEMENT **ON NON-DISCRIMINATION**

Wesleyan College is committed to maintaining a diverse, academically talented, and well-rounded community of learners in an atmosphere of mutual respect and appreciation of differences.

Wesleyan College admits qualified students regardless of race, color, national and ethnic origin, sexual orientation, age, religion, creed, disability, marital status, pregnancy, status with regard to public assistance, veteran status, citizenship status, sex* or other status protected by applicable federal and state laws to all rights, privileges, programs and activities generally accorded to or made available to students at the college.

Wesleyan College does not discriminate on the basis of race, color, national and ethnic origin, sexual orientation, age, religion, creed, disability, marital status, pregnancy, status with regard to public assistance, veteran status, citizenship status, sex, genetic information, gender identity, gender expression, or any other category protected by applicable federal or state laws in its educational policies, programs, activities and employment.

Additional information regarding compliance with this statement can be found in Wesleyan's **Policy for Resolving Complaints of Discrimination, Harassment, and Sexual Misconduct. (/about/compliance/policyresolvingsexualassault.cfm)**

*Questions or concerns about discrimination should be addressed to:*

Tonya Parker
*Assistant Dean for Equity and Inclusion*
*OSP First Floor*
(478) 757-4028 **tparker@wesleyancollege.edu (mailto:tparker@wesleyancollege.edu)**

*\*Wesleyan College does not admit men to its baccalaureate programs, in accordance with Title IX.*

- **Policy Against Discrimination, Harassment, Sexual Assault, and Sexual Harassment (/about/compliance/titleixpolicy.cfm)**
- **Policy for Resolving Complaints of Discrimination, Harassment, Sexual Assault, and Sexual Harassment (/about/compliance/policyresolvingsexualassault.cfm)**
- **Discrimination, Harassment and Title IX Complaint Form (/about/upload/1920TitleIXComplaintFormada.pdf)** *(Download form and type in the information. Save it upon completion then electronically submit it to Tonya Parker:* **tparker@wesleyancollege.edu (mailto:tparker@wesleyancollege.edu)**)

*Our Title IX Policy is currently under review and will be updated by August 14, 2020 to align with the U.S. Department of Education's Title IX Final Rule as released in May of 2020. Any complaint filed before August 14, 2020 will follow the process as stated in this current Policy. Please contact* **Assistant Dean Tonya Parker (mailto:tparker@wesleyancollege.edu)**, *Title IX Coordinator, with any questions at (478) 757-4028. Thank you.*

Defendant-Intervenors'
Preliminary Injunction
Exhibit 10

MINES CLIMBS TOGETHER: COVID-19 resources, updates





# TITLE IX REGULATIONS

by Marisa Macias | May 31, 2020

The Department of Education issued the final Title IX regulations on May 6, 2020. The regulations will be effective on August 14, 2020. Colorado School of Mines has been aware and preparing for these regulations since the proposed regulations were provided in November 2018. The Title IX Office's plan for implementation is as follows:

- May: Review and interpret the requirements of the final regulations in consultation with national experts.
- June: Revise policies and procedures to comply with the final regulations.
- July: Host a community forum to answer questions about the final regulations and how Mines is moving forward. More information will be forthcoming.
- August: Finalize, publish, and implement the revised policies and procedures.

Additional Links:

- Title IX regulations (2033 pages)
- Overview (3 pages)
- Summary of Major Provisions (9 pages)

Defendant-Intervenors'
Preliminary Injunction
Exhibit 11

Case 3:20-cv-01468-CJN Document 64-1 Filed 07/08/20 Page 78 of 86

# Office of the President

May 12, 2020

# New Title IX regulations won't compromise our commitment to stopping sexual misconduct

**Ana Mari Cauce**

## Resources

**Sexual Assault Resources**

**Title IX Office**

**LiveWell Student Advocacy**
Serves Seattle campus students
livewell@uw.edu

**UW Bothell Victim Advocate & Educator**
Serves UW Bothell students
425-352-3851
uwbvae@uw.edu

**UW Tacoma Student Advocacy & Support**
Serves UW Tacoma students
253-692-4694
uwtsva@uw.edu

**UW Police Department Victim Advocate**
Serves individuals on the Seattle campus
206-543-9337
UWPDAdvocate@uw.edu

As we have been expecting for some time, the U.S Department of Education issued new Title IX regulations this week, which will go into effect on August 14, 2020. While we were hopeful the Department of Education would incorporate more of the feedback that we – and more than 120,000 others – provided during the notice -and-comment period that would have allowed us to maintain our present process, it's clear the new regulations will require some changes.

University personnel are working now to complete a thorough analysis of the final regulations, which run to more than 2,000 pages. Information will be posted in coming weeks on the Title IX website providing an initial overview of how those changes will impact us across the UW, and providing you with opportunity for input as we implement the new regulations.

These regulation changes do not diminish our shared responsibility to create a culture that does not tolerate sexual assault, harassment or misconduct. The University of Washington's commitment to preventing and responding to any and all kinds of sexual violence remains unwavering. We will continue to be a community in which survivors are supported and where equitable, fair processes are followed.

**UW SafeCampus**
Serves members of the UW
community on all campuses

Most importantly, we will maintain our commitment to an inclusive, respectful and caring University. The culture we create must be felt as clearly in our offices, labs and classrooms as in our residence halls and Greek houses. It must be part of who we are – all of us, students, faculty and staff – whenever and wherever we go.

Once again, I encourage everyone to remember that it's on each of us to do our part to end all forms of sexual assault and harassment. Together we can continue to foster a culture that enables everyone to feel safe, supported and free to thrive.

## JOIN US FOR A BACK-TO-SCHOOL TOWN HALL, JULY 10

The University of Washington recognizes that our community has questions about how the pandemic will affect autumn quarter. Join President Ana Mari Cauce and a panel of UW leaders for a virtual town hall on Friday, July 10 at 10:30 a.m. where they will address your questions.

**LEARN MORE**

Defendant-Intervenors'
Preliminary Injunction
Exhibit 12

Federal Guidelines | Title IX | Baylor University



## Title IX

# Federal Guidelines

   

**New Title IX Regulations**

On Wednesday, May 6, 2020, the Department of Education's Office for Civil Rights issued new Title IX regulations that will change the way institutions of higher education (IHEs) must address, investigate and adjudicate issues of sex and gender-based harassment, sexual misconduct, intimate partner violence and stalking.

The new regulations are scheduled to go into effect on August 14, 2020. Baylor's existing Title IX **policies** are in full compliance with the current regulations. Similar to other IHEs across the country, the University will be required to amend those policies to comply with the new regulations.

Baylor has already been reviewing our current policies in anticipation of the new regulations. Now that the regulations have been finalized, we will spend the coming weeks carefully reviewing them and determining the best way to implement these regulations, ensuring we maintain processes that are thorough, equitable and sensitive to the needs of all parties.

At this time, Baylor's Title IX policies for reporting, investigating and adjudicating issues of sex or gender-based harassment remain unchanged, and any existing processes will continue under the current policies in place. We will continue to monitor information and guidance from the Department of Education as we move forward.

As always, Baylor University is committed to providing a safe and non-discriminatory learning, living, and working environment for all members of the University community. For more information on the Baylor Title IX Office, visit **www.baylor.edu/titleix**. Information on how to report sex or gender-based harassment, sexual violence, intimate partner violence or stalking is available **here**.

---

**Title IX of the Education Amendments of 1972**
Title IX is a federal civil rights law that prohibits discrimination on the basis of sex against any person in education programs and activities receiving federal funding. Students have the right to pursue an education, including athletic programs, scholarships and other activities, free from sex discrimination, including sexual violence and harassment. Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.) requires schools that receive federal financial assistance to take necessary steps to prevent sexual assault on their campuses and to respond promptly and effectively when an assault is reported.

**Title IV of the 1964 Civil Rights Act**
This act (42 U.S.C. § 2000c et seq.) also requires public schools to respond to sexual assaults committed against their students.

**The Clery Act**
The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (20 USC § 1092(f)), commonly referred to as the Clery Act, requires colleges and universities that participate in federal financial aid programs to report annual statistics on crime on or near their campuses--including sexual assault and rape and to develop and disseminate prevention policies.



**VAWA**

The Violence Against Women Act (VAWA) established federal legal definitions of domestic violence, dating violence, sexual assault and stalking.

**Campus SaVE**

The Campus Sexual Violence Elimination Act (Campus SaVE) was enacted in March 2013 and amends the Jeanne Clery Act, creating additional protections for victims of dating violence, domestic violence, sexual assault and stalking, as well as creating more prescriptive requirements for prevention and awareness programs related to these offenses.

---

# The University's Title IX Coordinator

The Title IX Coordinator coordinates the University's compliance with Title IX and related provisions of the Clery Act (as amended by VAWA). The Title IX Coordinator oversees the University's centralized response to all reports of prohibited conduct to assure consistent implementation of this policy and ensure compliance with federal and state law. The Title IX Coordinator and designated staff will, among other steps:

- Communicate with all members of the University community regarding applicable law and policy and provide information about how individuals may access reporting and support options.
- Review applicable University policies to ensure institutional compliance with applicable federal and state law.
- Monitor the University's administration of its own applicable policies, including record keeping, adherence to timeframes, and other procedural requirements.
- Conduct training regarding Title IX, related provisions of the Clery Act (as amended by VAWA), and prohibited conduct defined in this policy.
- Respond to any report regarding conduct that may violate this policy. In this capacity, the Title IX Coordinator shall oversee the investigation and resolution of such alleged misconduct, direct the provision of any remedial and protective measures, and monitor the administration of any request for review of the finding.

The Title IX Coordinator may delegate responsibilities under this policy to designated administrators or external professionals, who will have appropriate training and/or experience. When used in this policy, the term Title IX Coordinator may include a Deputy Title IX Coordinator or appropriate designee.

The Title IX Coordinator's contact information is:

Laura Johnson, Ph.D.
Title IX Coordinator
Baylor University
One Bear Place #97011
Clifton Robinson Tower, Suite 285
Waco, Texas 76798
254-710-8454
TitleIX_Coordinator@baylor.edu
www.Baylor.edu/TitleIX

# Title IX

Baylor University does not discriminate on the basis of sex or gender in any of its education or employment programs and

 **Reporting**   **Employees**

 **Training**

# Defendant-Intervenors' Preliminary Injunction Exhibit 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, et al., | |
| *Plaintiffs*, | |
| v. | No. 1:20-cv-1468-CJN |
| Elisabeth D. DEVOS, in her official capacity as Secretary of the United States Department of Education, et al., | |
| *Defendants*, | |
| FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, INDEPENDENT WOMEN'S LAW CENTER, SPEECH FIRST, INC., | |
| *Intervenor-Defendants*. | |

## DECLARATION OF PATRICIA HAMILL

I, Patricia Hamill, declare as follows:

1.      I am a partner at Conrad O'Brien, a law firm based in Philadelphia, Pennsylvania. I am the Chair of Conrad O'Brien's Title IX, Due Process and Campus Discipline practice.

2.      For a number of years, I have had an active practice representing students and professors in campus disciplinary proceedings and related litigation. Over this time, I have represented approximately 200 students and professors in this area. I have a nationwide campus discipline practice and have represented clients in discipline-related matters involving more than 70 colleges and universities.

3.      In light of my extensive experience and expertise in this area, last year I was invited to testify before the United States Senate Committee on Health, Education, Labor & Pensions ("HELP") on what a fair process in a campus disciplinary proceeding involving alleged sexual assault should include.

4.      Partly because of my prominence in this field, Conrad O'Brien routinely receives outreach and referrals concerning possible representations of students in campus disciplinary proceedings. Since roughly this past mid-March, around the time many colleges and universities moved to remote instruction and closed their dormitories due to COVID-19, there has been a noticeable drop off in the number of such inquiries and referrals Conrad O'Brien has received when compared to the same time period in previous years.

5.      I have also spoken to other attorneys who specialize in representing students in campus disciplinary proceedings who have also noted a reduced number of calls received and new matters started in this same time frame.

6.      The reduction in the number of new matters arising in this area makes sense. When there are fewer students on campus, there are fewer opportunities for students to interact in ways that often give rise to complaints of alleged sexual misconduct.

7.      Although fewer new matters relating to university disciplinary proceedings have arisen since COVID-19 became a serious problem, disciplinary proceedings that were already pending have continued apace. In my experience, COVID-19 caused few if any delays in pending university sexual misconduct disciplinary proceedings. In the cases handled by me or others in our practice group, university administrators simply moved interviews and hearings that would have otherwise taken place in person to Zoom or other videoconferencing platforms.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on July 8, 2020.

Patricia M. Hamill