**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMONWEALTH OF PENNSYLVANIA,
et al.,

*Plaintiffs*,

v.

Elisabeth D. DEVOS, *in her official capacity
as Secretary of the United States Department
of Education, et al*.,

*Defendants*,

FOUNDATION FOR INDIVIDUAL RIGHTS
IN EDUCATION
510 Walnut St.
Suite 1250
Philadelphia, PA 19106,

INDEPENDENT WOMEN'S LAW CENTER
4 Weems Lane, #312
Winchester, VA 22601,

SPEECH FIRST, INC.
1300 I St. NW
Suite 400E
Washington, D.C. 20005,

*Intervenor-Defendants*.

No. 1:20-cv-1468-CJN

**BRIEF OF FAMILIES ADVOCATING FOR CAMPUS EQUALITY AS *AMICUS CURIAE*
IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

———————————————

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iiii

STATEMENT OF INTEREST ................................................................................................. iii

SUMMARY OF ARGUMENT ..................................................................................................3

ARGUMENT ............................................................................................................................4

    I.    The Final Rules Are a Laudable Effort to Restore Fairness to Title IX Adjudications ........................4

    II.   FACE Family and Student Experiences .................................................................................5

CONCLUSION ........................................................................................................................18

# TABLE OF AUTHORITIES

<u>**Page**</u>

## <u>Rules and Regulations</u>

Final Rule, U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 FR 30026-01, at *30101 (May 19, 2020 (to be codified at 34 C.F.R. pt. 106)). ........................................................... 5


## <u>Other Authorities</u>

American Bar Association, *ABA Task Force on College Due Process Rights and Victim Protections releases final report*, June 26, 2017, https://www.americanbar.org/news/abanews-archives/2017/06/aba_task_force_onco/ ....................................................... 1

Erica L. Green, *DeVos's Rules Bolster Rights of Students Accused of Sexual Misconduct*, May 6, 2020, *New York Times*, https://www.nytimes.com/2020/05/06/us/politics/campus-sexual-misconduct-betsy-devos.html ........................................................... 5

Jake New, *Must vs. Should: Colleges say the Department of Education's guidance on campus sexual assault is vague and inconsistent*, Feb. 25, 2016, Inside Higher Ed, https://www.insidehighered.com/news/2016/02/25/colleges-frustrated-lack-clarification-title-ix-guidance ........................................................... 4

*Minding the Campus* by KC Johnson, https://www.mindingthecampus.org/author/kcjohnson/ ........ 4

National District Attorneys Assn., Women Prosecutors Section, White Paper; *National Sexual Assault Investigation and Prosecution Best Practices Guide*, January 3, 2018, https://www.ciclt.net/ul/ndaajustice/WhitepaperFinalDraft-SA.pdf. .............................................. 2

Samantha Harris and KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22:49, 58-60, 61-62, NYUJ Legis. & Pub. Pol'y, 2019, https://nyujlpp.org/wp-content/uploads/2019/12/Harris-Johnson-Campus-Courts-in-Court-22-nyujlpp-49.pdf ............................................................ 4

Title IX lawsuit database maintained by KC Johnson: https://docs.google.com/spreadsheets/d/1CsFhy86oxh26SgTkTq9GV_BBrv5NAA5z9cv178Fjk3o/edit#gid=0 ........................................................... 4

The American Law Institute (ALI) Principles of the Law, Student Sexual Misconduct: Procedural Frameworks for Colleges and Universities, https://www.ali.org/projects/show/project-sexual-and-gender-based-misconduct-campus-procedural-frameworks-and-analysis/ .............................. 1

## STATEMENT OF INTEREST

Families Advocating for Campus Equality (FACE) is a 501(c)(3) nonpartisan, nonprofit organization that advocates for equal treatment and due process for those affected by Title IX sexual misconduct campus disciplinary proceedings.  It was founded in 2013 by several mothers of sons who had been wrongfully accused of or erroneously found responsible for sexual misconduct at their respective colleges and universities without being given an adequate opportunity to defend themselves.  FACE strives to balance and protect the interests of all parties involved in campus sexual misconduct disputes.  It supports accusers' rights and protections and has welcomed accused women and LGBTQ students, though the vast majority of its accused student members are men.

Organized and operated primarily by women, FACE has brought together nearly 2,000 accused students, professors, and their families from across the country who were harmed by inequitable Title IX disciplinary processes.  In the wake of often traumatic Title IX campus disciplinary processes, these families provide invaluable encouragement, support, and advice to each other.  Many also assist FACE in advocating for policy and legislative change.

In support of that goal, FACE Co-President Cynthia P. Garrett has served on an American Bar Association Criminal Justice Section Task Force and as a liaison on an American Law Institute sexual misconduct project, both focused on developing equitable Title IX and sexual misconduct disciplinary procedures, and both populated by people with a variety of perspectives, including victims' advocates, campus administrators, and attorneys representing both Title IX complainants and respondents.[1]

---

[1] American Bar Association, "ABA Task Force on College Due Process Rights and Victim Protections releases final report," June 26, 2017, https://www.americanbar.org/news/abanews/aba-news-archives/2017/06/aba_task_force_onco/; The American Law Institute (ALI) Principles of the Law, Student Sexual Misconduct: Procedural Frameworks for Colleges and Universities, https://www.ali.org/projects/show/project-sexual-and-gender-based-misconduct-campus-procedural-frameworks-and-analysis/.

Since its founding seven years ago, FACE has been contacted by thousands of students and faculty members who have experienced result-driven Title IX disciplinary processes in which school officials have: refused to disclose details of the conduct of which they've been accused; denied them access to the evidence relied on to find them responsible; refused them the opportunity to question their accusers and witnesses; relied on hearsay and other evidence inadmissible in any other adjudicatory arena; ignored their lack of harmful intent or good-faith beliefs; and dispensed with any presumption that they may actually be innocent.

FACE knows all too well how hard it is for the accused, and especially for accused students, to defend themselves against sexual misconduct allegations. Innocent students often trust that they will be treated fairly and are told "just tell the truth and you'll be fine."  In reality, students have been blindsided by experienced campus attorneys and administrators who act as prosecutors, compiling evidence and testimony to establish their guilt, while denying them access to any equivalently experienced advocate, attorney, or even a parent.  Even more troubling are the constitutional implications of campus officials who sometimes solicit criminal investigators to listen in on student interviews without the latter's knowledge or legal advice.[2]

FACE is uniquely positioned to give genuine voice to the perspectives of accused students and their families.  Without FACE's involvement, these voices will not be adequately heard.  That is because unlike accusers, accused students will be publicly humiliated and vilified based only on an accusation.  If an accused student is found responsible, he will gain little or nothing from publicly insisting that he was falsely accused; most people will simply assume the accusation alone proves his guilt.  And if he is found not responsible and goes public, people will still think he did it

---

[2] National District Attorneys Assn., Women Prosecutors Section, White Paper; *National Sexual Assault Investigation and Prosecution Best Practices Guide*, January 3, 2018, https://www.ciclt.net/ul/ndaajustice/WhitepaperFinalDraft-SA.pdf.

and say, "he just got off."  There is nothing to gain, and much to lose, by telling someone you were falsely accused of a terrible crime.

Contrast that with the incentives for accusers.  If they win their case on campus, they are perfectly willing to go public, claim the mantle of victimhood, and be honored for their bravery in speaking out.  If they lose their case, they can *still* claim the mantle of victimhood and accuse the school of getting it wrong.  For accusers, in other words, it is "heads I win, tails you lose" when it comes to telling their stories—which is one reason that the stories of accusers, and not of the falsely accused, tend to dominate in the public sphere.  Accused students, whether they prevail or not, rarely gain from publicity. Thus, FACE's participation as an *amicus*, to tell some of those stories, is one of the few ways they can be heard and the public informed.

FACE believes the new Title IX regulations (the "Final Rules") will go a long way toward restoring balance and fairness in the adjudication of Title IX cases on college campuses, and in turn reduce the number of lawsuits filed by both complainants and respondents.  The fairer a process is, the less likely people will be to sue over it when it doesn't go their way.

## SUMMARY OF ARGUMENT

Accusers in Title IX cases have dominated the public narrative of sexual assault on campus. Whether through accuser-focused movies like *The Hunting Ground*, credulous coverage in the national press, or self-serving narratives on social media, it is the accuser's side of the story that is most often told.  That is not because the accused has no story to tell; rather, it is because going public, even after *winning* a Title IX case, will rarely benefit the accused in the way that it can benefit an accuser.  FACE cannot, of course, begin to remedy that asymmetry with a single *amicus* brief, but it can at least make this Court aware that there is another side to the story that is rarely told.  In so doing, it hopes to show the Court how the Final Rules are an important and necessary measure to restore basic fairness in those proceedings on campus.

3

**ARGUMENT**

**I.**     **The Final Rules Are a Laudable Effort to Restore Fairness to Title IX Adjudications**

Attached in the Appendix are stories from just a small sampling of the 2,000 or so FACE families and students who have endured inequitable and result-driven Title IX procedures without adequate process—something that may have been avoided if they had been able to avail themselves of the protections afforded by the Final Rules.[3]  FACE families and students submitted many comments to the Education Department's Office for Civil Rights (OCR) and met with hundreds of legislators across the country, pleading for change in how schools have been conducting Title IX disciplinary proceedings.  Though silent and nameless, these students and families have been waiting and praying for that change for years, with the hope that no more students are forced to endure the soul-destroying processes to which they were subjected.

The Final Rules clarify OCR's previously "vague and inconsistent" policies on how and when schools should respond to sexual harassment.[4]  They specify the scope of conduct that falls under Title IX and the methods schools must use to reach accurate and equitable resolutions of complaints.  They take into account the nearly 600 post-2011 accused-student lawsuits filed over schools' flawed Title IX policies and procedures, as well as the almost 200 court decisions and rulings in favor of respondents.[5]  As the Department has explained, the grievance process set forth

---

[3] For readability's sake, given the short length of the stories in the Appendix, we have not provided pin cites where we quote from the stories.
[4] Jake New, "Must vs. Should**:** Colleges say the Department of Education's guidance on campus sexual assault is vague and inconsistent," Feb. 25, 2016, Inside Higher Ed, https://www.insidehighered.com/news/2016/02/25/colleges-frustrated-lack-clarification-title-ix-guidance; *see also* Samantha Harris and KC Johnson, *Campus Courts in Court; The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22:49, 58-60, 61-62, NYUJ Legis. & Pub. Pol'y, 2019, https://nyujlpp.org/wp-content/uploads/2019/12/Harris-Johnson-Campus-Courts-in-Court-22-nyujlpp-49.pdf.
[5] *See* Title IX lawsuit database maintained by KC Johnson: https://docs.google.com/spreadsheets/d/1CsFhy86oxh26SgTkTq9GV_BBrv5NAA5z9cv178Fjk3o/edit#gid=0; *see also Minding the Campus* by KC Johnson, https://www.mindingthecampus.org/author/kcjohnson/.

in the Final Rules "effectuates Title IX's non-discrimination mandate both by reducing the opportunity for sex discrimination to impact investigation and adjudication procedures" and "by promoting a reliable fact-finding process so that recipients are held liable for providing remedies to victims of sex discrimination...." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 FR 30026-01, at *30101 (May 19, 2020 (to be codified at 34 C.F.R. pt. 106)).

Secretary DeVos was absolutely correct in recognizing that "we can continue to combat sexual misconduct without abandoning our core values of fairness, presumption of innocence, and due process."[6] Enough *is* enough; the time for change is long overdue. We hope the stories of what some FACE families have suffered through will help make that clear to the Court.

## II.    FACE Family and Student Experiences

### A.  Student 1

Student 1 was falsely accused of sexual assault in 2015 and expelled. As his parents noted, it was "a traumatic experience for our son and entire family in which the university ignored significant exculpatory evidence in their quest to believe 'victims.'" After going through what they went through with their son, they felt "more comfortable sending our daughter to college than our younger sons." They are convinced that if they had had the benefit of the Final Rules, that "would have made a difference in the outcome of our son's case." Like so many families before them, they have concerns about the panel that decided their son's guilt. In this case, the panel "included two young female employees of the university who had been trained with [the] presumption of guilt."

The parents also believe that cross-examination would have been enormously helpful to their son. Instead of having to answer difficult questions, the accuser in his case "did not have to

---

[6] Erica L. Green, "DeVos's Rules Bolster Rights of Students Accused of Sexual Misconduct," May 6, 2020, *New York Times*, https://www.nytimes.com/2020/05/06/us/politics/campus-sexual-misconduct-betsy-devos.html.

answer any questions about her story, and her words were taken as fact." Finally, this family believes that having "an adviser be an active part of the hearing would have been extremely helpful to our son." Instead, they had a lawyer who was forced to be, like all lawyers under the current system, a potted plant: "She was not allowed to speak to him, witnesses, the accuser, or the hearing panel." This family hopes that the Final Rules will go into effect and make Title IX processes fair for all students.

### B. Student 2

Student 2 had to suffer through a process involving the so-called "single investigator model," which "included a one-on-one interview with our son (about 45 minutes) and an interview with the complainant." Witnesses were interviewed, but there were no actual witnesses to what happened between her son and his accuser—"only the hearsay conversations." Moreover, not even one of the hearsay witnesses "heard the complainant allege any assault immediately after or within the first 48 hours." The investigator, who also served as both judge and jury, "did not pursue available physical evidence that would have corroborated our son's testimony" or "follow up or pursue numerous inconsistencies in the complainant's testimony and version of events."

Among the undisputed facts at the hearing, according to this family, were:

- "Respondent asked complainant to engage in sex.

- Complainant said 'no.'

- Respondent asked complainant to perform oral sex on him.

- Complainant performed oral sex on respondent.

- Complainant stopped performing oral sex after about 5- 10 seconds.

- Complainant and respondent resume kissing and holding for several minutes.

- Respondent's phone rang and after answering and a brief telephone conversation, respondent left."

In the end, the investigator somehow found *both* of them credible but found their son responsible. (This particular form of *doublethink* happens all the time in Title IX cases, as schools find it far easier to ruin someone's future than to call them a liar.)

This family, too, believes that the Final Rules would have made a difference in their son's case. The Final Rules require the collection and discovery of relevant evidence, whereas in this case the investigator "was not required to and was completely not interested in collecting any evidence," including "telephone and text messages (and corresponding time stamps) and key card time stamps to the dorm room." Nor, of course, did their son have a chance to cross-examine the complainant. The gravamen of her complaint was that she felt pressured. Her basis for feeling that was questionable at best, but no one ever asked her questions about it. This family said that during the course of this terribly unfair process, "we consistently wondered out loud, 'How could this happen in America?'"

**C.  Student 3**

Student 3 "was dragged through a university disciplinary process that shocked me to my core." He was not allowed:

- "to present [his] own evidence or witnesses without arbitrary administration approval (the administration had no criteria and they provided no explanation),"

- "to question my accuser or any of [complainant's] witnesses personally or through an advisor," [or]

- "to even question parts of my accuser's story."

In addition to effectively tying his hands behind his back, "the university refused to provide any details of the accusation until after the investigation had concluded." Finally, late on the night before the hearing, the school denied all but one of Student 3's witnesses, then at the hearing refused to ask any of his pre-submitted written questions. This is exactly why the Final Rules

provide for live questioning by a student's advisor: school officials, despite the duty of care they owe *both* parties, are often reluctant to ask pre-submitted written questions of an alleged victim.

Student 3's "life and career trajectories" were "permanently altered" by this experience, which included a two-and-a-half year suspension. It took his family thousands of dollars and the intervention of a court to provide Student 3 with the rights any student in America should receive when accused of a serious crime.

### D.  Student 4

Student 4's family tells a story that is familiarly Orwellian to people who have been through this process.  Six days after the alleged assault, the complainant told campus security that their son had sexually assaulted her.  Instead of being put through a normal process, their son was "abruptly pulled out of his lab class and told he was suspended" shortly after meeting with a school dean, during which he had been told only that "there was 'inappropriate touching' and he 'did not get affirmative consent.'"  Despite not even involving sexual intercourse, the charges made the news that night.  What is most striking about this family's story is how the accuser's version of events seems to have evolved over time.  The accuser texted her roommate that she had been "teasing him earlier that day, and I did kiss him and stuff," and she asked if what had happened between them "counted as sexual assault."  The roommate then pulled up the Justice Department's definition of sexual assault, and, after they reviewed it together, they decided that it "would count."  The accuser's *own mother* does not seem to have believed her daughter was assaulted.  Instead, her mother told her she "just needed to be more careful with boys."

Late on a Thursday afternoon, their son was told that he only had until Monday to submit a statement responding to the allegations, despite not knowing what his accuser was actually saying he did.  Instead, he was given only her "name, date, place and that he was 'charged' with 'rape' and 'inappropriate touching.'"  The Final Rules, of course, would require far more notice than that and

would not force an accused student to walk so blindly into the beginning of a process.  The

unfairness did not end there.  Her investigation consisted only of statements against their son, his

accuser, and her friends.  Their son "was then allowed to write one more statement in response to

what he viewed."  He received no hearing and did not have a chance to confront his accuser.

Indeed, even the investigator herself *never verbally questioned him*.  This family believes that

"cross-examination would have made a difference in the outcome of this case, as it is the best tool

for determining credibility."  Their son was ultimately found responsible and has suffered from

being stigmatized as a "sex offender."  This family signed their statement "anonymous and forever

changed."

>    **E.  Student 5**

When Student 5 received notice that he had been accused of sexual misconduct, his first

reaction was to be unconcerned. After all, though he "obviously understood that any allegation of

sexual misconduct is extremely serious," he also, like many other FACE students, "(naively)

believed that 'my innocence would protect me from harm. I assumed that 'the truth would set me

free.'" Although Student 5 "assumed" the adjudication process would be "neutral, fair, and

balanced [and] that the investigation would reveal that the allegation against me lacked merit," he

was "eventually found 'Responsible' on nothing more than my accuser's word."

Even though the allegations against Student 5 involved "a sexual encounter that occurred

hundreds of miles from campus, over summer break, with a girl who was not even a student at my

university," the school still conducted a disciplinary process.  This situation—where the

complainant was not even a student, the alleged incident occurred both hundreds of miles away,

and it was entirely unrelated to school activities—would never happen under the Final Rules.

Until "the last minute," the university withheld from Student 5 the fabricated evidence

submitted by the complainant.  As a result, Student 5 was unable to review the evidence against

him until the hearing was in process: "So there I was, a 22-year-old kid, sitting in front of a panel of university administrators, clumsily attempting to prove that the evidence was fake, but with no real way of doing so.  Had I been presented that false evidence prior to the hearing, I would have had an opportunity to develop a strategy for demonstrating that it was fraudulent."

Student 5 was not permitted to have an advocate, which in retrospect he realized was "self-evidently absurd": "A student accused of a Title IX violation has his entire educational and professional future hanging in the balance.  Expecting him to defend himself under such circumstances is not only cruel, but incongruous with the stated goal of a fair and effective process."  Neither was he permitted cross-examination allowing him to expose his accuser's "very well documented history of pathological dishonesty."  The protections promised by the Final Rules would not have let this happen—the school would have been forced to give him the evidence before the hearing and allowed an advisor to cross-examine his accuser about it.

In the end, Student 5 was forced to file a lawsuit and spend a significant amount of money to vindicate himself and restore his reputation. Unfortunately for accused students, justice often comes at a high price.

**F.  Student 6**

In 2017, two weeks before his last final exam, this family's son was summoned to the Title IX office and told that he had been charged with sexual assault.  The assault supposedly happened six months earlier, and a single investigator would be given the responsibility of deciding whether he did it or not.  In this case, their son was able to produce a photograph showing the accuser smiling "immediately after her encounter with [their] son," and he was also able to show that she had told people about two other sexual encounters she had had with other people that same night.

But only their son appears to have been charged.  He was found responsible simply because the single investigator found the accuser more credible.  As happens every time when a single-

10

investigator model is used, their son had no opportunity to question his accuser and no chance to put his case before a panel of neutral factfinders.  Indeed, the investigator in that case had "made public Facebook posts deriding neutrality and promoting a video likening college campus[es] to hunting grounds for sexual predators."  The proceeding was also rife with irregularities.  While their son's statement to the investigator "was included verbatim in the evidentiary file, only the investigator's summarized narrative of her impressions of witness testimony was presented for my son's review."  He was not able to read the testimony itself and was not able to confront any of the witnesses against him, as he would have been able to during a live hearing.  Their son was also only interviewed once "and was the last person to be interviewed."  By that time, of course, the investigator had clearly made up her mind.  Their son ultimately attempted suicide and was hospitalized.  Unlike the complainant, he had to seek out and pay for his own support, and the family "had to spend $25,000 just to defend our son from an overzealous and unfair process that threatened not only my son's educational and professional future, but also his very life."

###    G.  Student 7

Student 7's case started in September 2016, on a particularly odd note—the Title IX coordinator informed him that she had been told that he "*may* have been involved in a sexual assault involving another male student," which made little sense because he could not recall ever having met that person and was not gay.  He was not particularly concerned about it, especially since he was told that the incident took place more than two years earlier.  When he met with the Title IX coordinator, she told him that the school would provide an advocate for him.  They gave him a victim's advocate from the women's center.  After they received the investigation report, the family was certain that the case could not possibly move forward.  First, the accuser could not remember whether the alleged incident took place in March or April 2014—which seems unlikely for something that supposedly rose to the level of sexual assault.  Second, one of the three

witnesses put forward by the accuser told the investigator that the accuser never even characterized what had supposedly happened between him and their son as a sexual assault.  Despite their hopes that the case would be dropped then and there, it went all the way to the end, and "the effects of the process [have] been life altering for our entire family"—even though their son was found not responsible.

This family strongly believes that the Final Rules would have made a huge difference in their case and spared their son the trauma of a full investigation.  Among other things, their son would have had a hearing, and the accuser would have had to show up.  Here, he did not even bother to do that.  Moreover, there was never any chance to resolve the case informally because the school's processes prohibited that.  The Final Rules, of course, would allow common-sense resolutions to all complaints, including especially stale complaints brought by people who are no longer students at the school, which was the case here.

### H.  Student 8

The family of Student 8 was put through the trauma of a Title IX process for an email that he never actually sent.  Student 8 had been accused of sexual harassment in the email and immediately suspended from his college sports team.  This family was extremely grateful that their daughter worked for another university and was able to connect them with FACE, who helped point them in the direction of a lawyer.  With the help of the lawyer, their son "was able to prove almost immediately that he did not initiate the email chain where the girl said she was harassed.  In fact, he was able to prove that SHE started it."  Instead of calling a halt to things at that point, the case went all the way through.  When they finally got to the hearing, they learned that "the people on the panel had not even read the investigator's report!"  The family considers this "a broken system." They had to "pay thousands of dollars to exonerate our son from something that would have taken 30 minutes in a real investigation with people who are trained in this sort of thing to figure out."

This family concluded their statement by noting, "The havoc it wreaked and the emotional toll it took on our family and community was mind blowing to all who hear about it.  There has to be a better way."  And indeed, as the Department has found, there is.

### I.   Student 9

Student 9's story began in February of 2020, when he was falsely accused of sexual misconduct by someone who had also claimed to have previously been assaulted by five other men. His family could not afford to hire an attorney, so the father had to take off work repeatedly, book a hotel near the school, and help prepare and advise his son throughout the investigation.  Despite providing a great deal of exculpatory evidence to the school, he was still charged with several serious allegations.

When a bishop in the son's church asked to be interviewed by the investigators, because he had relevant knowledge about the claimant's attempts to disrupt Student 9's engagement to another woman, the investigators refused to interview him.  A disciplinary hearing was held, and still the family could not afford to hire a lawyer to help them.  Before the hearing started, "the complainant harassed, stalked, and attempted to publicly humiliate our son and his fiancée."  But the university did nothing about that, because they said she had a right to say it—while telling him he could not say anything publicly against her because "that would be intimidating to her."

Student 9's parents took a significant amount of time off work in the run-up to the hearing to help prepare him for it.  It lasted almost 11 hours, during which he could not cross-examine his accuser and had to sit and listen while she brought in impermissible character evidence.  He was ultimately found not responsible, but that has not ended the struggle this family has been through. "Even to this day, it has taken an emotional, physical, and monetary toll on our son, his fiancée, and us as a family."  The family cannot afford to take legal action against the school or the accuser, but their "emotional trauma" is severe.  They are deeply hopeful that the Final Rules will make

13

these processes fairer for all students.

   **J.  Student 10**

   Student 10's story makes clear that the harm of an unfair process can be deep and lasting even if you win, because sometimes you still have to go through a process that can look an awful lot like *Bleak House*.

   Student 10's case ran for an almost unimaginably long time—from October 8 of 2015, when he was first charged, to December 5, 2017, when he was finally exonerated.  The Title IX office reached out to him on October 9 to schedule a meeting, but the process slowed down significantly from that point on.  A single investigator was assigned to the case.  Unsurprisingly, she recommended a finding of responsibility and a sanction of suspension, which automatically triggered a disciplinary hearing.  Initially, and with absolutely no respect for Student 10's academic career, the hearing was scheduled for the week of final exams.  It was later pushed back one month, to January 15.

   Prior to the hearing, the school failed to provide all of the witness statements, including notes that the investigator had taken.  Incredibly, given what was at stake, the school limited the hearing to only two hours, "with the school taking up much of the time either explaining the process or presenting the accuser's claim."  That left, as one might imagine, "very little time" for Student 10's attorney to do anything.  The panel had more questions at the end, but they were instructed that there was no more time.  Imagine having fewer than two hours to defend yourself against a horrific accusation, only to hear that the people who held your fate in their hands had to stop asking questions.

   The panel found Student 10 responsible.  He had two appeals left at that point.  The first was to the chancellor of the school.  Between the hearing and the appeal, Student 10 had received DNA results showing that his DNA was not present on the complainant.  In rejecting his appeal, the

chancellor said that he did not think the DNA test would have "made a substantial difference in the outcome." After that, one appeal remained—to the Board of Regents. Student 10 had to file this final appeal after the conclusion of his criminal case, during which he was found not guilty on January 30, 2017.

His final appeal to the Board of Regents was filed on October 1, 2017. "It was 16 pages long with 198 pages of exhibits." Repeatedly, the family showed how the accuser's story did not match the evidence, and how the school had overlooked exculpatory evidence including the negative DNA test. On October 12, 2017, the Board of Regents remanded the case to the chancellor, instructing him to "carefully review all of the new evidence presented," "expunge the disciplinary record if the discipline is not sustainable," and—regardless of what he decided—"provide a full explanation of his decision." (In other words, this time you have to look at *all* of the evidence and, if you choose to ignore some of it, explain why.) The chancellor did what he was told, but it took him almost two months. On December 5, 2017, almost two years to the day after the case began, the chancellor reversed his decision and found Student 10 not responsible.

One might wonder what Student 10 has to complain about, given that he won. But the only person who would ask such a question is someone who has never been put through a two-year investigation or seen what that kind of thing can do to a person. "My son struggles dealing with the false accusation," his mother says. "What my son went through, no one should have to go through, the depression caused by the process is heart wrenching." She recounts holding her son for two hours while he cried without ceasing on Christmas Eve of 2016. He lost his friends and many educational opportunities, and defending the baseless charges cost them $150,000. To be sure, the Final Rules cannot prevent all harms, but they will stop the single-investigator process. They will also force schools to admit and consider exculpatory evidence, and they will give people like Student 10 a chance to defend themselves without having to spend almost two years in the Title IX

15

process.

### K.  Student 11—Elliott Pitts

Elliott Pitts is the exception that proves the rule when it comes to going public in these cases.  That is because he was a student athlete.  When student athletes are charged, they are usually suspended from the team immediately.  When you are a basketball player at a Division I school, like Elliott was at the University of Arizona, that makes it impossible for you to disappear quietly.  So his case became public quickly, which is why he is the only student who was willing to identify himself by name in this brief.

Elliott was in his junior year, hoping to potentially go professional and coach one day, when everything started to fall apart.  On the morning of December 6, 2015, he came home after the team had a big road win against Gonzaga.  As college students tend to do, they celebrated with a party.  One of the people at the party was a female volleyball player who Elliott had been flirting back and forth with over the past several months.  At the party, she "proceeded to sit down next to the Elliott on the couch" where he was playing video games, and "put her hand on his crotch."  They started kissing and ultimately went back to his room.  She then asked him to get a condom, which he did, and he put the condom on.  She then proceeded to get on top of him and participate enthusiastically in sex.  After it was over, Elliott left the bedroom, leaving the accuser to fall asleep in his bed while he slept on the couch in the front room.  When the accuser's brother found out that Elliott and his sister had left the party together, "he came back to their apartment in a rage, found [his sister] naked in Elliott's bed, and proceeded to take her to the dorm room where he left her in her bed."  He then began to claim that Elliott had raped his sister.

The Tucson police opened a criminal investigation.  During that investigation, it came out that the complainant had said, "It was consensual," and claimed another time that she did not actually remember what happened.  The criminal investigation was, unsurprisingly, closed without

any charges being filed.

Little did Elliot know that the Title IX process would be much worse.

The Title IX process that followed is almost too bizarre to summarize sufficiently here. One fact that stands out is that the Title IX officer *herself* added charges to the investigation that even the complainant had not brought forward.  Ultimately, Elliott was faced with a terrible decision shortly before the hearing—go forward, and rely on what the family perceived to be a terribly unfair investigative process, or accept the functional equivalent of a plea offer, which would allow him to finish the semester, take a one-year suspension, and preserve his NCAA eligibility.  Like many defendants, he took the deal.

Unfortunately, preserving his eligibility did not help him: "Little did we know, that although 18 Division I colleges were approached regarding Elliott being available for transferring to play basketball, 100 percent of these colleges passed, due to the current climate.  The college administrators didn't want any negative attention that might come with Elliott's transfer." The family's story did not stop even there.  The accuser's family has "publicly outed the agreement Elliott signed with the family and the school.  They sent it to hundreds of U of A basketball alumni and parents, as well as reaching out to Tucson journalists on ESPN to tell their side of the story."

ESPN ultimately declined to run a story after hearing Elliott's version of events, but the efforts alone have been extraordinarily traumatic for the family.  Elliott ended up finishing college at a community college and had to watch the Arizona Wildcats win the Pac-12 championship without him in February of 2017.  His life has never been the same, and the difference that the procedural protections promised by the Final Rules would have made in his case, and in his life, are impossible to overstate.

## CONCLUSION

FACE hopes that, through its telling of stories that too rarely get told, this brief has helped inform the Court's analysis of what is at stake if the Final Rules are delayed further. The Final Rules must be allowed to become law; too many students' futures are dependent upon correcting the way our schools conduct Title IX disciplinary hearings.  FACE students, who range in age from six on up, have suffered and hoped for change long enough.

For the foregoing reasons, FACE thus respectfully urges this Court to deny the Plaintiffs' motion to enjoin the Final Rules.

Respectfully submitted,

*/s/ Cynthia P. Garrett*
Cynthia P. Garrett
California Bar No. 106218
(appearing under LCvR 83.2(c)(1))
Co-President, Families Advocating for
Campus Equality
3658 Warner Street
San Diego, CA 92106
T: (619) 823-5378
CPGarrett@FACECampusEquality.org

*/s/ Justin Dillon*
Justin Dillon (DC Bar No. 502322)
KAISERDILLON PLLC
1099 14th Street NW – 8th Floor West
Washington, DC 20005
T: (202) 640-2850
F:  (202) 280-1034
jdillon@kaiserdillon.com