**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMONWEALTH OF PENNSYLVANIA, *et al.*,

        Plaintiffs,

    v.

ELISABETH D. DEVOS, *in her official capacity as
Secretary of Education*, *et al.*,

        Defendants,

    and

FOUNDATION FOR INDIVIDUAL RIGHTS
IN EDUCATION, *et al.*,

        Intervenor-Defendants.

Civil Action No. 20-cv-01468-CJN

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY
INJUNCTION OR 5 U.S.C. § 705 STAY PENDING JUDICIAL REVIEW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

ARGUMENT ....................................................................................................................... 1

I.      The Rule's unreasonable effective date alone warrants a stay. ........................................ 3

II.     The Rule's prescriptive and inflexible grievance procedures are unlawful...................... 6

    A.      The Rule's grievance process for K-12 schools exceeds agency
       authority and is arbitrary and capricious................................................................ 6

    B.      The Rule's hearing requirements for postsecondary schools are
       arbitrary and capricious......................................................................................... 11

    C.      The Rule abandons the Department's longstanding policies without
       adequate explanation. ............................................................................................ 14

III.    The Rule unlawfully narrows Title IX's protections. ...................................................... 15

    A.      The Department lacks authority to mandate dismissal of
       complaints............................................................................................................. 15

    B.      The Rule's interpretation of "program or activity" violates Title
       IX. ......................................................................................................................... 17

    C.      The Rule's definition of "sexual harassment" is unlawful,
       unreasonable, and upsets serious reliance interests. ............................................ 19

    D.      The Rule unlawfully limits who can file complaints and when........................... 22

IV.     The Rule's promulgation violates procedural and arbitrary and capricious
    prongs............................................................................................................................. 24

    A.      The Department relied on fatally flawed Regulatory Impact
       Analyses................................................................................................................ 24

    B.      The proposed rule did not provide sufficient notice for comments. ..................... 28

V.      Absent an injunction or stay, the Rule will impose irreparable harm on the
    States.............................................................................................................................. 29

VI.     The balance of the equities and public interest weigh in favor of a stay or
    injunction. ...................................................................................................................... 33

VII.    The proper remedy is a facial stay or injunction of the Rule pending
    judicial review................................................................................................................ 34

CONCLUSION.................................................................................................................. 35

## TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982) ....................... 32

*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Chao*, 297 F. Supp. 2d 155
    (D.D.C. 2003) ............................................................................................................ 31

*Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227 (D.C. Cir. 2008) .............................. 24, 26

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987) ...................................................... 34

*Barr v. Am. Ass'n of Political Consultants, Inc.*, – S. Ct. –, 2020 WL 3633780
    (July 6, 2020) ............................................................................................................ 34

*Barton v. District of Columbia*, 131 F. Supp. 2d 236 (D.D.C. 2001) ........................................ 32

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) ........................................... 6, 7, 10, 22

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ........................................................ 27

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) .................................................................... 32

*Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337 (D.C. Cir. 2019) ..................................... 35

*Connecticut Light and Power Co. v. NRC,* 673 F.2d 525 (D.C. Cir. 1982) ................................ 26

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) ........ 18, 20, 21, 22

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008) ............................................................ 22

*DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ..................................... passim

*District of Columbia v. USDA*, No. 20-119 (BAH), 2020 WL 1236657 (D.D.C.
    Mar. 13, 2020) ..................................................................................................... 30, 31

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) ........................................................................... 13

*Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93 (D.D.C. 2003) ........................................ 30

*Fertilizer Inst. v. EPA*, 935 F.2d 1303 (D.C. Cir. 1991) ..................................................... 28, 29

*Fund for Animals v. Williams*, 391 F. Supp. 2d 191 (D.D.C. 2005) .......................................... 25

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) .............................................. 20, 21

*Gorman v. Univ. of R.I.,* 837 F.2d 7 (1st Cir. 1988) ................................................................ 13

*Goss v. Lopez*, 419 U.S. 565 (1975) ............................................................................... 6, 7, 8

*Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019) ................................................. 32

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020) ................................................................................ 3

*Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56 (1st Cir. 2019) ................................................ 13

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ............................................................... 34

*Healy v. James*, 408 U.S. 169 (1972) .................................................................................... 19, 22

*La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355 (1986) ................................................................. 7

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ......................................... 32, 33

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ............................................................................ 32

*MD/DC/DE Broads. Ass'n v. F.C.C.*, 236 F.3d 13 (D.C. Cir. 2001)............................................ 35

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)............................................................... 22

*Michigan v. E.P.A.*, 135 S. Ct. 2699 (2015) ................................................................................. 24

*Morse v. Frederick*, 551 U.S. 393 (2007) ..................................................................................... 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463
U.S. 29 (1983)............................................................................................................... passim

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007).................................... 16

*Nat'l Ass'n of Indep. Television Producers & Distribs. v. FCC*, 502 F.2d 249 (2d
Cir. 1974) ............................................................................................................................. 3

*Neustar, Inc. v. FCC*, 857 F.3d 886 (D.C. Cir. 2017)................................................................... 15

*New Orleans v. SEC*, 969 F.2d 1163 (D.C. Cir. 1992) ................................................................. 25

*Open Communities All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ..................................... 30

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494
F.3d 188 (D.C. Cir. 2007)............................................................................................... 24, 25

*Pennsylvania v. Trump*, 930 F.3d 543 (3d Cir. 2019)................................................................... 33

*Portland Cement Ass'n v. EPA*, 665 F.3d 177 (D.C. Cir. 2011)................................................... 34

*Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375 (D.C. Cir. 1973)..................................... 26

*Pursuing Am.'s Greatness, v. FEC*, 831 F.3d 500 (D.C. Cir. 2016)............................................ 34

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992) .................................................. 22

*R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012) .......................... 26

*Ramaprakash v. FAA*, 346 F.3d 1121 (D.C. Cir. 2003) ................................................ 19

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001) .......................... 21, 22

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ...................................................................... 2

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ...................................................... 17

*Sierra Club v. EPA*, 167 F.3d 658 (D.C. Cir. 1999) ...................................................... 25

*Sierra Club v. EPA*, 719 F.2d 436 (D.C. Cir. 1983) ...................................................... 27

*Solite Corp. v. EPA*, 952 F.2d 473 (D.C. Cir. 1991) ...................................................... 26

*SurvJustice Inc. v. DeVos*, No. 18-535, 2019 WL 5684522 (N.D. Cal. Nov. 1, 2019) .................................................................................................................................. 9

*United States Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519 (D.C. Cir. 1978) ................................................................................................................................ 26

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ........................................ 10

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................ 34

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ...................................... 30

**Statutes**

5 U.S.C. § 553(b) .............................................................................................................. 28

5 U.S.C. § 705 .................................................................................................................. 34

5 U.S.C. § 706(2)(A) .......................................................................................................... 1

5 U.S.C. § 706(2)(C) .......................................................................................................... 1

5 U.S.C. § 706(2)(D) .......................................................................................................... 1

18 U.S.C. § 2252A ............................................................................................................ 11

20 U.S.C. § 1089(c)(1) ........................................................................................................ 6

20 U.S.C. § 1092(f)(6)(A)(v) ........................................................................................... 19

20 U.S.C. § 1092(f)(8) ...................................................................................................... 19

20 U.S.C. § 1681(a) ................................................................................................ passim

20 U.S.C. § 1682 ............................................................................................... 1, 7, 20

42 U.S.C. § 2000d ........................................................................................................ 18

**Regulations**

34 C.F.R. § 100.7(e) ............................................................................................. 10, 29

34 C.F.R. § 106.3 ......................................................................................................... 15

34 C.F.R. § 106.8(a) ...................................................................................................... 9

34 C.F.R. § 106.8(b) ...................................................................................................... 9

34 C.F.R. § 668.46(k)(2) ............................................................................................. 19

71 Fed. Reg. 62,530 (Oct. 25, 2006) ............................................................................ 6

73 Fed. Reg. 74,806 (Dec. 9, 2008) ........................................................................... 11

83 Fed. Reg. 61,462 (Nov. 29, 2018) .................................................................... 25, 28

85 Fed. Reg. 30,026 (May 19, 2020) ................................................................... passim

**Other Authorities**

Andrew DePietro, *Here's A Look at the Impact of Coronavirus (COVID-19) on
Colleges and Universities in the U.S.*, Forbes (Apr. 30, 2020)................................ 5

ATIXA, *2020 Title IX Resource Center* ........................................................................ 4

CDC, *Cases in the U.S.* (updated July 14, 2020) ......................................................... 5

CDC, *Considerations for Schools* (May 19, 2020) ....................................................... 4

CDC, *Reopening Guidance for Cleaning and Disinfecting Public Spaces,
Workplaces, Businesses, Schools, and Homes* ........................................................ 4

FBI, *Uniform Crime Reporting Program: National Incident-Based Reporting
System Offense Definitions* (2012) ........................................................................ 19

Fed. R. Evid. 804 ......................................................................................................... 14

Laura Meckler, *Trump and DeVos Want Schools 'Fully' Open, But Not Many Are
Listening*, Wash. Post (July 10, 2020) .................................................................... 5

Letter to Univ. of Hawai'i at Mānoa, from Linda Mangel, Regional Dir., U.S.
Dep't of Educ., OCR (Feb. 8, 2018) ........................................................................ 9

Letter to Wachter, from M.B. Hawes, Dir. of Student Privacy, U.S. Dep't of Ed.
(Dec. 7, 2017) .................................................................................................................... 11

S. Rep. 100-64 (1988).............................................................................................................. 15

## ARGUMENT

The Department of Education defends its new Title IX Rule on the ground that the Department's policy choices are unassailable. But the States' claims are not mere policy disagreement; they are based on Defendants' multiple violations of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A), (C)-(D). The Rule's mandatory dismissal provision and prescriptive grievance process for K-12 schools do not "effectuate" Title IX's mandate. 20 U.S.C. § 1682. The Rule's definitions are inconsistent with Title IX's mandate that no person "on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Rule's effective date, definitions, and grievance process reveal the Department "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [and] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And the Department has not accounted for the "serious reliance interests" of students, schools, and States in reversing nearly 30 years of consistent Department policy, Pls. Mem. 5-6 & nn.3-6, which was enforced by the Department for decades, *see infra* note 9, was referred to as "policy" by every administration, *e.g.*, Ex. 3 at 12,034, and some of which was published in the Federal Register after notice and comment, Compl. ¶ 67. *See DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

The States challenge the Rule because it will *weaken* protections against sexual harassment and *undermine* fair process, not to avoid providing students with supportive measures or fair process. Defs. Opp. 38. The Rule is already imposing significant harms because of the imminent effective date. Once in effect, the Rule will jeopardize the safety of our schools and their communities, as well as our students' right to an education free from sexual harassment. Indeed, neither Defendants nor Intervenors dispute that the Rule will impose costs; that it will result in a significant decrease in complaints opened, filed, and resolved; and that weaker Title IX protections increase sexual harassment. *E.g.*, 85 Fed. Reg. 30,026, 30,549 (May

19, 2020) (costs of between $48.6 and $62.2 million over ten years not accounting for increased perpetration); *id.* at 30,551, 30,565-68 (50 percent and 33 percent reduction in sexual harassment complaint investigations in K-12 and post-secondary, respectively, due to Rule); Defs. Opp. 36 n.19 ("weak sanctions against sexual violence perpetrators and weak laws and policies related to sexual violence and sex equality are associated with a greater likelihood of perpetration" (quoting 85 Fed. Reg. at 30,070)); Reply in Supp. Mot. to Intervene 12 (Dkt. No. 52). But Defendants and Intervenors fail to meaningfully address the many harms detailed in the States' motion and affirmed by dozens of national education associations. Pls. Mem. 8-13, 37-45; Brief of the Am. Council on Educ., *et al.* as Amici Curiae (Dkt. No. 47) ("ACE Amicus"); Brief of AASA, The School Superintendent's Ass'n, *et al.* as Amici Curiae (Dkt. No. 56) ("AASA Amicus"). Defendants call the Rule a "landmark step," Defs. Opp. 1, but elsewhere suggest that it only asks schools to make "minor adjustments" or that it is "similar" to the 2011 Dear Colleague Letter ("2011 DCL") withdrawn by this Administration. *Id.* 39, 46. Were this the case, Defendants have not explained why the Rule is so costly and must be implemented so quickly.

Defendants respond by distancing themselves from the plain text of the Rule and its preamble. Their unwillingness to defend the Rule as originally written and explained, *compare* Defs. Opp. 19, 25 n.12, 29 n.15, *with infra* 23, 14, 9, is all the more reason to delay implementation pending full judicial review. *See Regents*, 140 S. Ct. at 1908-09. Defendants' shifting position is particularly prejudicial because States and their schools must strictly comply with every requirement of the Rule's grievance process or risk Department enforcement and loss of federal funding in the midst of a global pandemic. 85 Fed. Reg. at 30,288.

Finally, the Court should reject Intervenors' arguments that in postsecondary schools the Constitution requires the Rule's definition of "sexual harassment" and direct, oral cross-examination by advisors. The Court should disregard these arguments because the Department rejected them in promulgating the Rule, *e.g.*, 85 Fed. Reg. at 30,100-01, 30,165; *see SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943), and because they are entirely without basis in law.

## I.     The Rule's unreasonable effective date alone warrants a stay.

Defendants do not attempt to defend the merits of their choice to require compliance with the Rule in less than three months, in the middle of an ongoing pandemic, and as schools are grappling with whether and how to reopen in the fall. They say only that the Department "was aware of" the COVID-19 pandemic and other factors justifying a longer implementation period and "considered" them before deciding on an effective date of August 14—and that the APA requires nothing more. Defs. Opp. 37. Defendants' argument is unsupported by the law and the record and reflects a stunning indifference to the crisis facing American educational institutions.

Defendants do not dispute that an effective date is subject to arbitrary and capricious review. *Nat'l Ass'n of Indep. Television Producers & Distribs. v. FCC*, 502 F.2d 249, 254-55 (2d Cir. 1974). An agency's bare statement that it "considered" a relevant factor is not enough; the agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotations omitted); *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020) ("Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."). Decisions not "based on a consideration of the relevant factors" or that reflect "a clear error of judgment" cannot be upheld. *State Farm,* 463 U.S. at 42-43.

Rather than justify their decision on its merits, Defendants mischaracterize what schools must do to come into compliance by August 14. The Rule demands much more than just "training." *Compare* Defs. Opp. 38-39, *with* Compl. ¶¶ 160-161. The Rule adopts the "most complex and challenging regulations the agency has ever issued." ACE Amicus 8 (citation omitted). The Rule demands that schools "review policies, procedures, and practices in every aspect of their operations," ACE Amicus 6, adopt and implement the new or revised policies and procedures, and "reconcile those procedures with preexisting state-specific statutory obligations," AASA Amicus 5—all during the summer, when employees are away, local school boards do not meet, and shared governance procedures in higher education cannot operate, Pls. Mem. 11-12 & nn.12-13; ACE Amicus 10-11; AASA Amicus 3. Schools must also overhaul

their procedures for responding to complaints of sexual harassment; implement new procedures as needed; hire and train additional staff[1]; negotiate with labor unions; produce new training materials,[2] notices, and forms that reflect the changes brought about by the Rule; and educate all involved on the Rule's requirements—by August 14. Some schools will be forced to adopt interim policies due to the abbreviated timeline, foregoing critical stakeholder input, and subsequently revise them through their normal processes. Pls. Mem. 12.

Schools must take all these steps while making critical decisions about how to educate their students in the fall. Schools are currently devoting significant resources to adjusting procedures, delivering remote instruction, and planning for reopening in some fashion, including adapting facilities with plexiglass, hand-washing stations, and air filtration units; adjusting lunch, school, and bus schedules for social distancing and student cohorts; establishing procedures for screening, testing, and quarantining; and following the latest CDC guidelines, with an estimated cost of $1.8 million per K-12 school district or $25 billion nationwide.[3] The pandemic has

---

[1] The practical effect of the Rule requires schools to staff three new positions—an investigator, decision-maker, and appeal reviewer. Rule § 106.45(b)(7)(i), (b)(8)(iii)(B); Pls. Mem. 39-40 & nn.24, 26, 27.

[2] That the Association of Title IX Administrators (ATIXA) "has set up an entire site for Title IX Rule compliance," Defs. Opp. 38, only shows how daunting the task is. ATIXA offers for sale four different "compliance packages" and lists more than twenty different publications on the Rule itself that the organization has prepared or is in the process of preparing. ATIXA describes the Rule as "complex, confusing, contradictory." ATIXA, *2020 Title IX Resource Center*, https://atixa.org/r3/#mpp. That a private organization has gone to these lengths to make sense of the Rule and give schools a fighting chance to become complaint by August 14 disproves Defendants' claim that the States "overstate the burden" and schools may only need "minor adjustments" to come into compliance. Defs. Opp. 38-39. Moreover, compliance cannot be purchased. The Rule impacts local laws, codes of conduct, CBAs, forms, notices, procedures, staffing, training, and hiring; even the best third-party training cannot hire new staff, develop institution-specific policies, and train staff on those policies. Suggesting otherwise ignores schools' unique structures and needs. Pls. Mem. 38-40 nn.20, 21, 24, 26, 27.

[3] *See* CDC, *Considerations for Schools* (May 19, 2020), https://tinyurl.com/y7k7ofnw; *see also* AASA Amicus 12-13 (citing CDC, *Reopening Guidance for Cleaning and Disinfecting Public Spaces, Workplaces, Businesses, Schools, and Homes*, https://tinyurl.com/yaxeuvay (updated May 7, 2020)); Pedone ¶ 28 (discussing lost revenue due to COVID-19).

already resulted in school budget cuts in many states, affecting K-12 and postsecondary schools alike.[4] To make matters more difficult, the Department is now insisting that, notwithstanding the worsening crisis,[5] K-12 schools "must fully open and they must be fully operational."[6]

Nowhere in the preamble is there reasoned consideration of these circumstances. Schools must implement the Rule in a matter of weeks while they are unsure if they can safely reopen for instruction in the fall and while key stakeholders are absent from campus, working remotely due to COVID-19, not under contract, or on summer break. *See* Pls. Mem. 11-12 & n.12. Because the Rule demands significant changes to schools' sexual harassment policies, staffing, and grievance procedures, schools cannot comply by August 14 without expending significant resources and diverting funds from COVID-19 measures. Pls. Mem. 11-13. In choosing the August 14 date, the Department either decided that the pandemic had no bearing on schools' ability to fully implement the Rule, or recognized the significant impacts of COVID-19 but nonetheless decided that requiring compliance within three months made good sense, despite the costs many schools would incur attempting to comply while simultaneously addressing school safety and COVID-19 instructional alterations. Neither possibility meets the standard of a "rational connection" between the Department's decision and its findings. *State Farm*, 463 U.S. at 43.

Defendants' other arguments, Defs. Opp. 38, are equally unavailing. Defendants do not explain what steps schools should have taken between September 2017 and May 2020 that would have made compliance with a then-unpublished rule any easier. The Department's 30-day implementation period for a 2006 Title IX regulation proves nothing; that 15-page rule actually

---

[4] Pls. Mem. 9 & n.10; *see also* Andrew DePietro, *Here's A Look at the Impact of Coronavirus (COVID-19) on Colleges and Universities in the U.S.*, Forbes (Apr. 30, 2020), https://tinyurl.com/ybhqf353.

[5] *See, e.g.*, CDC, *Cases in the U.S.* (updated July 15, 2020), https://tinyurl.com/CDCtracker.

[6] Laura Meckler, *Trump and DeVos Want Schools 'Fully' Open, But Not Many Are Listening*, Wash. Post (July 10, 2020), https://tinyurl.com/y7vnrt9z.

*eased* requirements for schools and imposed no costs, 71 Fed. Reg. 62,530, 62,542 (Oct. 25, 2006) (final regulations "expanded flexibility" and "*do not require recipients to incur any additional costs*" (emphasis added)), while this 554-page Rule requires a complete overhaul of schools' policies and processes with significant costs. That the Department issued "past guidance" without advance notice is irrelevant because it has repeatedly argued that the 2011 DCL was not legally binding. *See, e.g.*, 85 Fed. Reg. at 30,029. And Defendants cannot distinguish other rules with much longer implementation windows, Pls. Mem. 10, when the effective dates in those cases went well beyond the statutory minimum, 20 U.S.C. § 1089(c)(1).

## II.    The Rule's prescriptive and inflexible grievance procedures are unlawful.

### A.    The Rule's grievance process for K-12 schools exceeds agency authority and is arbitrary and capricious.[7]

Defendants do not claim that current discipline procedures at States' K-12 schools fall short of constitutional due process standards. Nor do they dispute that under the Rule, K-12 schools cannot impose even minor discipline without following an inflexible ten-step, 20-plus day procedure with extraordinary new staffing expenditures. Defendants do not attempt to distinguish well-established precedent recognizing that inflexible procedures, like those in the Rule, undermine school safety by preventing expedient discipline after constitutionally sound process. *E.g.*, *Goss v. Lopez*, 419 U.S. 565, 578 (1975) ("very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation" (quotations omitted)); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) ("maintaining security and order in [] schools requires a certain degree of flexibility in school disciplinary procedures" (quotations omitted)). Their failure to address these issues is fatal.

The Rule's prescriptive grievance procedures fail to account for unique circumstances in K-12 schools. *See Goss*, 419 U.S. at 583 ("[In public schools, b]rief disciplinary suspensions are almost countless. To impose in each such case even truncated trial-type procedures might well

---

[7] Intervenors do not present arguments about due process in the K-12 context.

overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness."). These are exactly the inflexible requirements that the Supreme Court warned are "too costly as a regular disciplinary tool," divert educational resources, and may "destroy [the discipline process's] effectiveness as part of the teaching process." *Id.* For example, a school can no longer provide even after-school and in-school intervention—e.g., community service and training—until it strictly follows the Rule's requirements, waits more than 20 days, and offers an appeal.[8] Defs. Opp. 27; Rule §§ 106.44(a), 106.45. But nothing in Title IX's plain text gives Defendants authority to override constitutionally-sufficient K-12 procedures designed to maintain safety and provide effective relief from discrimination. 20 U.S.C. § 1682; *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) (agencies have "no power to act . . . unless and until Congress confers power upon it"); *see Goss*, 419 U.S. at 565. The Department's imposition of inflexible procedures before "any discipline" of minor students is unprecedented and far exceeds its authority under Title IX.

As a panacea, Defendants point to provisions allowing schools to provide "supportive measures" and impose emergency removal. But these provisions do not provide "effective" relief, Defs. Opp. 27, and further demonstrate the failure to consider the circumstances in K-12 schools. The Department's fixed set of measures (e.g., changing students' class assignments) is inadequate to meet the needs of affected students and may have no relation to the misconduct alleged. Hall-Panameño ¶¶ 14, 34; Williams ¶¶ 30, 66; Darling-Hammond ¶ 17. Because these measures cannot discipline or "unreasonably burden[]" the respondent (e.g., a class change if no similar class is available), even after constitutional due process, their effectiveness is limited. Rule § 106.30(a) (*supportive measures*); Herman ¶ 16; Hall-Panameño ¶ 34; Ex. 12 at 34. A student who grabs another's genitals between classes or a teacher who shows sexually explicit

---

[8] Defendants call training and community service "inherently punitive," Defs. Opp. 27, but this is inconsistent with educators' role in teaching children socially appropriate behavior, *e.g.*, *Fraser*, 478 U.S. at 681, and an improper post-hoc rationalization, *Regents*, 140 S. Ct. at 1909.

photos to a child may need to be expeditiously "burden[ed]" after notice and informal hearing to ensure safety and prevent harm. Calling these measures "reasonable," Defs. Opp. 30, does not make them so. The emergency removal provision is also ineffective because it is limited to circumstances where there is "*an immediate threat to [] physical health or safety*," a high bar. Rule § 106.44(c) (emphasis added). The Supreme Court has often cautioned against overreach into locally controlled public education. *E.g.*, *Goss*, 419 U.S. at 578, 580-82. By improperly substituting its judgment about what might be "effective" to address "misconduct with [a] student minutes after it has occurred," while denying schools flexibility to determine an appropriate response after providing constitutionally-sufficient process, the Department risks escalation and significant harm. *Goss*, 419 U.S. at 580, 582, 578; Hall-Panameño ¶¶ 34-36, 53, 94-95; Williams ¶¶ 21, 30, 66; Darling-Hammond ¶¶ 17-18; Lynch ¶¶ 18, 43; Kammerud ¶¶ 37, 43.

Defendants say they considered how K-12 schools "have fewer resources than postsecondary schools," Defs. Opp. 28, but this is not apparent in a Rule mandating three different school employees—an investigator, decision-maker, and an appeals reviewer—with significant responsibilities for every Title IX sexual harassment incident that should be addressed with discipline, no matter how minor, Rule § 106.45(b)(7)(i), (b)(8)(iii)(B). This will require extraordinary staff resource expenditures. *E.g.*, Hall-Panameño ¶¶ 13, 59, 61-63, 78 (upwards of 3,969 staff to investigate and decide); Williams ¶¶ 50-53, 58, 67 (200 staff); *see* AASA Amicus 5, 12. Contrary to Defendants' unsupported assertion, Defs. Opp. 28, commenters offered "tangible criteria" for deciding when the person investigating should not issue discipline: the sanction's severity. *See Goss*, 419 U.S. at 584 (longer-term removals may require more formal procedures). But the Department rejected that alternative "within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913 (quotations omitted); 85 Fed. Reg. at 30,371.

Defendants do not dispute that the vast majority of K-12 complaints are made orally to "third-party" school employees, Defs. Opp. 29, and that many young students are unable to articulate concerns in writing or request a formal investigation, *e.g.*, Ex. 12 at 28, 33; Ex. 13 at 4.

These realities are reflected in the final Rule's expanded actual knowledge provision, Rule § 106.30(a) (*actual knowledge*), but inexplicably are not reflected in the unnecessary multi-step procedures required before investigation. Pls. Mem. 13-17. Defendants arbitrarily downplay these burdensome requirements, which depart from long-standing policy requiring an investigation and grievance process, not merely supportive measures, upon a report of Title IX harassment. 34 C.F.R. § 106.8(a), (b); Ex. 3 at 12,042; Ex. 6 at 15.[9] Despite Defendants' reinterpretation of the Rule in this litigation, Defs. Opp. 29 n.15, the Rule's inconsistent preamble requires Title IX Coordinators to have "specific reasons justifying" an investigation without child "consent[]." 85 Fed. Reg. at 30,305, 30,296 n.1162, 30,045.

Defendants' reason for these limitations—complainant autonomy—contradicts their acknowledgement that a school acts *in loco parentis*, "stand[ing] 'in the place of' a parent with respect to certain authority over, and responsibility for, its students" with a "duty of protection," and that school officials, as mandatory reporters, must act to prevent child sexual abuse. 85 Fed. Reg. at 30,039, 30, 039 n.129, 30,107. The Department fails to adequately explain how the need to provide "autonomy" and secure "consent" could be plausible reasons for limiting access to Title IX relief for child victims or severely disabled children, particularly those without an adult to fill the void. *Compare* Defs. Opp. 29 & n.15, *with* Hall-Panameño ¶ 25. The Department justifies the restrictions as needed to reduce the "burden" of "futile" investigations of "third-party" complaints (e.g., teacher report of student rape), Defs. Opp. 29, but such investigations are futile only because of the Department's unduly restrictive grievance procedures. And States have never asked the federal government to reduce their "burden" to protect their students from

---

[9] The Department has enforced these policies for decades. *E.g.*, *SurvJustice Inc. v. DeVos*, No. 18-535, 2019 WL 5684522, at *8 (N.D. Cal. Nov. 1, 2019) (Department uses signed assurances to enforce compliance with "notices . . . that [] Department published in the Federal Register" (quoting declaration of William E. Trachman, Senior Counsel to the Department's Office for Civil Rights ("OCR"))); Letter to Univ. of Hawai'i at Mānoa, from Linda Mangel, Regional Dir., U.S. Dep't of Educ., OCR (Feb. 8, 2018), https://tinyurl.com/ybnd2ldt.

egregious harm by limiting schools' discretion. *Cf. W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) (schools perform "delicate[] and highly discretionary functions").

Defendants fail to adequately explain the now-conflict between the existing regulatory prohibition on parties sharing complainants' identities "in the conduct of *any* investigation" or "hearing" except as necessary, Rule § 106.81 (incorporating 34 C.F.R. § 100.7(e) (emphasis added)); Ex. 3 at 12,043 n.78 (applying § 100.7(e) to schools), and the Rule's new provision allowing no "restrict[ion]" on the ability of parties "to discuss the allegations," including complainants' identities, Rule § 106.45(b)(5)(iii); 85 Fed. Reg. at 30,295-97; Defs. Opp. 29. Even under their interpretation, Defs. Opp. 42, Defendants fail to adequately explain why parties get more confidentiality protections in the context of a Department investigation than they do in a school investigation. There would be no dispute if the provision was, in fact, limited to discussions with "a parent, teacher, or counselor" or that are "necessary for parties to prepare for" the grievance process. *Id.* 30. But prohibiting schools from placing *any* limitation on parties' ability to discuss allegations, as the Rule plainly does, is arbitrary and capricious. Defendants cannot seriously contend they accounted for rapid information exchange between minors who, with a smartphone swipe, can share sensitive information with thousands, quickly creating a hostile school environment and a chilling effect that is "potentially exponential." *See* Ex. 19 at 7; Ex. 13 at 9; Ex. 18 at 5. The manner of dissemination of detailed allegations of a sexual nature need not be "intimidat[ing], threaten[ing], coerc[ive], or discriminating," Defs. Opp. 30, to cause actual harm, 85 Fed. Reg. at 30,039-40 n.129 (citing *Fraser*, 478 U.S. at 684 ("obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children . . . from exposure to sexually explicit [] speech")). That the Rule's preamble permits a principal extremely limited discretion to "warn students not to discuss allegations maliciously," Defs. Opp. 30, does nothing to stop minor parties from publishing "details" of extremely sensitive sexual activity along with student names on social media, reaching every student and beyond. Rule § 106.45(b)(2)(i)(B). A fair grievance process cannot occur when the school environment is disrupted due to widespread disclosure of sensitive or sexually explicit information. A mutual

no-contact order does not address the problem, nor does the ability to impose confidentiality requirements *only if* the school does not conduct an investigation. Defs. Opp. 30.

Defendants do not dispute that other Rule provisions exacerbate these problems. In fact, they concede that the Rule requires schools to re-transmit highly sensitive documents, such as nude photos of minors, to minor parties and minor (or adult) advisors, *id.*—acts that violate state (and possibly federal) law, *e.g.*, 18 U.S.C. § 2252A (criminalizing child pornography dissemination). Similarly, Defendants confirm that the Rule's preamble prohibits schools from redacting personally identifiable information ("PII"), including minor witness names. Defs. Opp. 31. And Defendants' suggestions for preventing widespread and harmful disclosure are unworkable: no file-sharing platform can prevent someone from photographing a picture on a computer, *id.* 30-31; minor parties and their advisors could refuse (or be unable to) sign a non-disclosure agreement, *id.* 30, forcing schools to choose between ending the investigation to avoid disclosure or proceeding and risking disclosure and liability; and notifications to the parties not to disseminate, *id.* 31, cannot put the proverbial cat back in the bag once information is shared.

The cited FERPA regulation, Defs. Opp. 31, does not permit dissemination of minor witness PII without redaction or consent, 73 Fed. Reg. 74,806, 74,831 (Dec. 9, 2008) (redacting PII, including names, necessary to comply with FERPA); *see also* Letter to Wachter, from M.B. Hawes, Dir. of Student Privacy, U.S. Dep't of Ed. 5 (Dec. 7, 2017), https://tinyurl.com/y8hploko (district could redact names of student-witnesses and would need consent before disclosing their identities). Students do not categorically lose FERPA protection by participating in school investigations. The States challenged the Rule for conflicting with FERPA, Compl. ¶¶ 145-152, 247-254, but reserved the issue for later briefing, Dkt. No. 22.

### B. The Rule's hearing requirements for postsecondary schools are arbitrary and capricious.

The States do not claim that parties and witnesses in a Title IX investigation should go unquestioned. Instead, the States argue that the Rule's specific mandate—live hearings with direct, oral cross-examination by a party advisor and with only limited rules of evidence—will

create inequitable hearings and cause significant harm to respondents, complainants, and witnesses without any concomitant benefit to truth-seeking. The Department acknowledges that it was presented with evidence of these harms during the rulemaking, Defs. Opp. 21-26; *see, e.g.*, Ex. 25 at 4 ("live cross-examination has the potential to re-traumatize victims" and "cause them to disengage with the systems that should be supporting them"); Ex. 21 at 4 (discussing "sharp inequities" from hiring third party advisors),[10] but acknowledgement is insufficient. The Department had to provide a reasoned explanation in the Rule justifying its choice over available alternatives and it failed to do so. *See Regents*, 140 S. Ct. at 1913; *State Farm*, 463 U.S. at 42-43.

Defendants claim that advisors, as opposed to decision-makers, must conduct cross-examination "so that the recipient remains truly neutral throughout the grievance process" and to allow for cross-examination "in an adversarial manner." 85 Fed. Reg. at 30,316; *see also* Defs. Opp. 25. But the Department still does not explain why having a decision-maker conduct cross-examination—including by reading questions posed by a party or the party's advisor—compromises the decision-maker's or the recipient's neutrality, nor does it explain how cross-examination by an advisor cures this asserted problem, since nothing in the Rule prohibits the decision-maker from also examining witnesses, as judges routinely do in courtroom proceedings. Indeed, the Department's own 2017 Q&A endorsed such a method of cross-examination. Ex. 10 at 5. The Department rejected without adequate explanation the option of training neutral hearing officers to properly facilitate cross-examination, including ensuring that they do not refuse to ask relevant questions, even though States, commenters, and federal courts have all endorsed such methods, Pls. Mem. 20, and even though the Department elsewhere holds up training as its solution to other concerns about inequitable hearings, *see* 85 Fed. Reg. at 30,026, 30,337.

---

[10] Defendants claim, Defs. Opp. 22, that the States cited only two studies, Pls. Mem. 18-19, but the States' argument is based on *all* the record evidence. The States cited footnote 1200, which lists five evidentiary sources, and the Department had significant additional evidence on this issue. *See, e.g.*, 85 Fed. Reg. at 30,315 n.1201, 30,317 nn.1209, 1210.

Nor does the Due Process Clause require direct, oral cross-examination by a party advisor at every postsecondary Title IX hearing. Intvrs. Opp. 6-10. Intervenors do not identify a single decision supporting their position. To the contrary, Intervenor FIRE recently asserted that a range of procedures will satisfy due process and courts have upheld a range of truth-seeking methods. *E.g.*, *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019) (agreeing with FIRE's amicus brief "that due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, even if only through a hearing panel'" and rejecting a categorical rule for cross-examination by a party's representative); Pls. Mem. 20 (citing courts that endorse a range of cross-examination options). Indeed, Intervenors concede that the Rule may not be required in every case. Intvrs. Opp. 12; *see also*, *e.g.*, *Gorman v. Univ. of R.I.,* 837 F.2d 7, 12 (1st Cir. 1988). Even the cases cited by Defendants, Defs. Opp. 25, acknowledge that due process does not require this precise form of cross-examination, much less in all sexual harassment hearings. *See Doe v. Baum*, 903 F.3d 575, 584 (6th Cir. 2018).

Contrary to Defendants' arguments, Defs. Opp. 23-24, allowing parties to choose their own advisors *to conduct direct, oral cross-examination* aggravates, rather than ameliorates, the problem of inequitable hearings. Defendants do not address the States' concerns about faculty serving as advisors or the ability of attorney advisors to better elicit relevant evidence. Pls. Mem. 19-20. Defendants further assume equal access to advisors, disregarding comments observing that disparities in financial means will limit advisors for certain parties. *See, e.g.*, Ex. 25 at 4 ("[T]hose with power and privilege may have an unequal advantage in hearing proceedings. . . students with limited access to financial resources will be at a significant disadvantage."). Requiring schools to provide advisors for students lacking one, Rule § 106.45(b)(6)(i), cannot remedy this inequity, as the mere availability of an advisor does not close the potential gap in quality of representation. This is especially true because schools with resource limitations must bear the costs of training advisors or hiring attorneys to ensure effective cross-examination.

Defendants fail to adequately justify the Rule's arbitrary line between postsecondary schools, which must hold live hearings with direct, oral cross-examination by party advisors, and

all other recipients (including non-school recipients), which do not. Pls. Mem. 18. As a result, the Rule extends the live-hearing requirements to university-run daycare centers, sports camps, and 4-H programs and to high school students dual-enrolled in college courses. Defendants argue that university daycare centers are not covered by the Rule, Defs. Opp. 25 n.12, but the Rule's preamble addresses such daycare centers twice, even referring to "daycare students," 85 Fed. Reg. at 30,488-89, 30,493. The Department's cavalier solution—suggesting that minors simply forego the right to have any of their statements considered by the decision-maker, 85 Fed. Reg. at 30,489—fails to reasonably address this "important aspect of the problem," rendering the Rule arbitrary and capricious. *See Regents*, 140 S. Ct. at 1913 (quoting *State Farm*, 463 U.S. at 43).

Finally, Defendants inadequately address the Rule's arbitrary imposition of some evidentiary rules but prohibition of necessary corollaries. Pls. Mem. 21. The Department's desire to avoid a "courtroom"-like process, Def. Opp. 26, is belied by the Rule's courtroom-like procedural requirements. Moreover, permitting parties to present all "relevant" evidence, Rule § 106.45(b)(5)(iii), (6)(i), does not serve the truth-seeking process when the Rule prohibits reasonable limits on unreliable evidence while excluding relevant testimonial evidence. For example, parties can present expert witnesses, Rule § 106.45(b)(5)(ii), but schools cannot adopt any rules that govern the qualification of experts or the admissibility of expert testimony. The Rule also excludes all statements from individuals who do not submit to cross-examination— even though schools cannot compel them to participate and even if they have submitted to an investigator interview or made inculpatory statements—thus excluding statements against interest and reliable evidence under foundational hearsay exceptions. *See, e.g.*, Fed. R. Evid. 804. Defendants' desire to simplify proceedings cannot countenance these arbitrary results.

## C.   The Rule abandons the Department's longstanding policies without adequate explanation.

Defendants do not address the States' argument that the Rule establishes an unjustified dichotomy by strictly enforcing the grievance requirements but requiring only "not deliberate[] indifferen[ce]" to sexual harassment. Pls. Mem. 22. Defendants also mischaracterize, Defs. Opp.

43, the States' argument that the Department arbitrarily rescinded its longstanding policy that Title IX requires schools to take action "to overcome the effects of [] discrimination," 34 C.F.R. § 106.3, and "repair the educational environment," Ex. 3 at 12,043. The issue is whether the Department's interpretation "effectuates" Title IX, not whether schools are permitted to act above a floor; the Department's interpretation fails because it does not provide "effective remedies against discrimination," S. Rep. 100-64, at 5 (1988). The Department now says that when a "hostile environment" is found, Title IX only requires complainant-specific remedies that "restore and preserve access" and "remedy the violation." Rule §§ 106.45(7)(ii)(E); 106.3(a). But extant regulations and longstanding Department policy also require the schools to "overcome the effects of discrimination," 34 C.F.R. § 106.3, "stop and prevent further harassment," Ex. 1 at 5, and "eliminate any hostile environment," Ex. 3 at 12,043; Ex. 6 at 16. Until now, the Department recognized that its "policy and practice [was] consistent with the Congress' goal in enacting Title IX—the elimination of sex-based discrimination in federally assisted education programs," not just the restoration and preservation of access for a specific complainant. Ex. 3 at 12,034. The Department neglects to explain how effective remedies after a determination of responsibility impinge upon "fundamental fairness" for any party. Defs. Opp. 44.

## III. The Rule unlawfully narrows Title IX's protections.[11]

### A. The Department lacks authority to mandate dismissal of complaints.

Nothing in Title IX authorizes the Department to mandate dismissal of a formal complaint if the alleged conduct "would not constitute sexual harassment as defined in § 106.30 even if proved" or "did not occur in the recipient's education program or activity." Rule § 106.45(b)(3)(i). Defendants' answer to the States' argument, Pls. Mem. 31-32, is a conclusory statement that dismissal is "required" by the limitations on its authority, Defs. Opp. 20. But they

---

[11] Defendants declined to invoke *Chevron* deference in their brief. *Neustar, Inc. v. FCC*, 857 F.3d 886, 893-94 (D.C. Cir. 2017). Even if not waived, Defendants have identified no ambiguous portion of Title IX and their unreasonable interpretations would not be entitled to deference.

offer no reason why a school's investigation of complaints alleging conduct previously cognizable under Title IX but now characterized as "non-Title IX sexual harassment" would *itself* violate Title IX, such that the Rule could mandate dismissal and deprive a school of federal funds for pursuing such an investigation.

The Rule requires schools to "dismiss the complaint for Title IX purposes," notify both parties "of such a dismissal," and provide both with "equal right to appeal" the dismissal. Defs. Opp. 20. Defendants argue that schools can just "adopt a separate policy" to address sexual misconduct no longer covered by Title IX as a result of the Rule. *Id.* But the Department brushes aside the significant logistical problems, costs, and inefficiencies associated with schools adopting such parallel policies and procedures—something many schools will have to do to comply with state law.[12] Schools will have to wait until the Title IX dismissal is appealed and finalized before proceeding under a parallel policy, leading to significant delays. Defendants also ignore the unnecessary costs and confusion of moving cases between Title IX and non-Title IX processes, which may involve different investigators, investigation procedures, and offices. And Defendants do not respond to concerns about the chilling effect such a convoluted and lengthy process will have on complainants. Pl. Mem. 41-42. The Department's failure to address these "important aspect[s] of the problem" renders the Rule arbitrary and capricious. *See Regents*, 140 S. Ct. at 1913 (quoting *State Farm*, 463 U.S. at 43). Moreover, because the Rule requires schools to "dismiss the complaint for Title IX purposes," a school cannot "adopt a single policy for all sexual misconduct, *regardless of whether it violates Title IX*," Defs. Opp. 20 (emphasis added), without rendering the word "dismiss" meaningless, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 668-69 (2007) (regulations may not be read as mere surplusage). The text of the Rule itself requires States to distinguish between Title IX and non-Title IX matters such

---

[12] *E.g.*, Albertson ¶¶ 41-42, 69; Felix-Campos ¶ 23; Grice ¶ 13; Hasan ¶¶ 23-27; Hayes ¶¶ 32-35; Heroy ¶¶ 15-16, 22; Jackson ¶¶ 14-15, 22; O'Shaughnessy ¶ 20; Peoples ¶¶ 16-18; Richardson ¶ 56; Ryan ¶¶ 59-62; Taylor ¶ 20; Williams ¶ 35; Wilson ¶¶ 13-14; Allen ¶ 18.

that even if the "policy" is one document, schools must process complaints under two separate provisions and procedures.

**B.     The Rule's interpretation of "program or activity" violates Title IX.[13]**

Defendants' myopic focus on the word "geographic" in the States' motion mischaracterizes the States' argument: by prohibiting only harassment that takes place *in* a school's "education program or activity," Defendants are violating Title IX. Conduct taking place wholly outside the "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the harassment occurs," Rule § 106.44(a), can nevertheless contribute to a hostile environment that causes someone to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity," 20 U.S.C. § 1681(a). The Rule, in short, unlawfully limits what Title IX prohibits. For this reason, Defendants' invocation of *Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011), is inapt. There, the plaintiffs challenged an agency for funding research that the plaintiffs argued was entirely prohibited by statute, but the D.C. Circuit found that the funded research did not violate the statute in at least some circumstances. *Id.* at 397. Here, the States argue that the Rule conflicts with Title IX's mandate by prohibiting schools from addressing under Title IX harassment that causes someone to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity," 20 U.S.C. § 1681(a).

Defendants cannot dispute that the Rule will exclude harassment that takes place outside of the school's education program or activity but contributes to a hostile environment on campus; the Rule itself assumes "a further reduction" in annual post-secondary education investigations "of approximately 0.29 . . . of off-campus sexual harassment investigations currently being conducted[.]" 85 Fed. Reg. at 30,567. Defendants' attempts to sidestep the States' examples,

---

[13] The States challenged the Rule for limiting Title IX to harassment in the United States, Compl. ¶¶ 105-06, 114, 240.b, 245.a, 258.f, 258.i, but reserved the issue for later briefing, Dkt. No. 22.

Defs. Opp. 10-11, only underscore the Rule's conflict with Title IX's text. A high-school student raped off-campus by classmates, whom she would then see every day at school, would still have to be subjected to additional on-campus taunts and name calling before the Rule would allow her to bring a Title IX complaint—even if the rape alone caused her to fear going to school and therefore "denied" her "the benefits of" an education. 20 U.S.C. § 1681(a). Moreover, those on-campus taunts and name calling would have to be "so severe, pervasive, and objectively offensive" that they "effectively den[y]" her "equal access" to education before the Department would say Title IX applies. Rule § 106.30(a) (*sexual harassment*). Likewise, Defendants do not dispute that conduct five feet off campus (e.g., student using personal phone to post online a surreptitiously taken nude student photo) would fall outside Title IX if the school did not "exercise[] substantial control" over that situation—even if the consequences for the harassed student are identical to the same harassment committed "during class time." 85 Fed. Reg. at 30,202. The inconsistency with Title VI is obvious: Title VI prohibits the same three consequences of harassment based on race, color, or national origin, regardless of where the harassment takes place; but Title IX, despite its near-identical language, no longer does so for harassment on the basis of sex. *Compare* 42 U.S.C. § 2000d, *with* 20 U.S.C. § 1681(a).

Defendants' attempt to evade *Davis*'s limited analysis of harassment occurring "under" a "program or activity" fall short. *Compare* Pls. Mem. 25, *with* Defs. Opp. 12. The Supreme Court's discussion of Title IX's "plain language" immediately precedes the Court's statement that a school "may not be liable for damages unless its deliberate indifference '*subject[s]*' its students to harassment . . . '*under*' 'the operations of' a funding recipient," *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644-45 (1999) (emphasis added) (quoting dictionary definitions of "subject" and "under"). Defendants also ignore the underlying logic of *Davis*: under Title IX's implied private right of action, fairness requires that schools pay damages only for harassment under their control. *Id.* at 639-41. But administrative enforcement of Title IX must extend to the full range of the statute's plain text.

**C.**     **The Rule's definition of "sexual harassment" is unlawful, unreasonable, and upsets serious reliance interests.**

The Rule's definition of sexual harassment violates Title IX and is arbitrary and capricious—not least because it upsets the "serious reliance interests" of students, schools, and States who have operated under a "severe, persistent, or pervasive" definition for decades. *See Regents*, 140 S. Ct. at 1913. Defendants dismiss decades of Department policy because it was not a "regulation," Defs. Opp. 12, but the policy was published in the Federal Register after notice and comment, Ex. 3 at 12,034, and was enforced by the Department for years, *supra* note 9. The Court cannot consider the Rule "on its own terms," Defs. Opp. 12, divorced from this necessary context. *Ramaprakash v. FAA*, 346 F.3d 1121, 1124-25, 1130 (D.C. Cir. 2003).

The States challenge the definition not because they want schools to punish purely offensive speech but because the Department's narrowed definition excludes sexual harassment that "substantially interfere[s] with the opportunity of other students to obtain an education" in violation of Title IX. *Healy v. James*, 408 U.S. 169, 189 (1972); *see* 20 U.S.C. § 1681(a). For example, "sexual assault," Rule § 106.30(a) (*sexual harassment*), reaches only the most egregious forms of sexual violence: forcible rape, forcible sodomy, sexual assault with an object, forcible fondling, incest, and statutory rape. 20 U.S.C. § 1092(f)(6)(A)(v); FBI, *Uniform Crime Reporting Program: National Incident-Based Reporting System Offense Definitions* (2012), https://tinyurl.com/y9syqt6t. Inappropriate touching would only constitute fondling, Defs. Opp. n.10, if the respondent (1) touched "the private body parts of another person," (2) "for the purposes of sexual gratification," and (3) "forcibly and/or against that person's will" or "in instances where the victim is incapable of giving consent." *Id.*[14] All other forms of sexual harassment, even against small children, are only recognized by the Rule if they constitute quid

---

[14] Incorporation of the Clery Act offenses of sexual assault, stalking, domestic violence, and dating violence, Rule § 106.30(a) (*sexual harassment*), actually limits protections for survivors, because the Clery Act required a more flexible grievance process that "protects the safety" and confidentiality of "victims," 20 U.S.C. § 1092(f)(8); 34 C.F.R. § 668.46(k)(2).

pro quo harassment or are "so severe, pervasive, *and* objectively offensive that [they] effectively den[y] a person equal access" to education, Rule § 106.30(a) (*sexual harassment*) (emphasis added)—including indecent exposure, inappropriate touching of other body parts, requests for sexual favors, inappropriate sexual gestures, sexual comments about a student's body, intrusions of personal space, and sharing of sexual images and videos.

Defendants' adoption of the heightened *Davis* standard for administrative enforcement of Title IX both violates Title IX and is arbitrary and capricious. The plain language of the statute prohibits all conduct "on the basis of sex" that causes someone to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity." 20 U.S.C. § 1681(a). The Rule's heightened standard will exclude conduct that causes these effects—in part because anything short of physical violence, stalking, or quid pro quo harassment must first "effectively den[y] a person equal access" to education. Rule § 106.30(a) (*sexual harassment*). The States do not push a "preferred definition," Defs. Opp. 14, but instead explain how the Department's interpretation is inconsistent with the statute itself.

Defendants claim their adoption of the *Davis* standard is reasonable, but concede in the very next sentence that the Supreme Court adopted the definition only to determine when "damages are available." *Id.* 13-14 (quoting *Davis*, 526 U.S. at 652). Defendants' desire for "consistent requirements," *id.* 14, does not allow them to graft a judicial standard created specifically for an implied private right of action—adopted in the context of ensuring that the implied private right of action would not violate the Spending Clause, *Davis*, 526 U.S. at 639-40; *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287-88 (1998)—onto the express administrative enforcement scheme of a statute enacted 25 years earlier, 20 U.S.C. § 1682. The upshot is the Rule arbitrarily restricts how schools can respond to sexual harassment that has long been actionable under Title IX in a manner that was never contemplated by Congress.

Defendants cannot sidestep the States' arguments about Titles VI and VII by citing *Davis*, Defs. Opp. 16-17, because *Davis* did not establish the full range of conduct prohibited by Title IX. Defendants cannot credibly claim that Title VI is not a "comparator" for Title IX, given

that Congress explicitly and intentionally modeled the latter on the former. S*ee* Pls. Mem. 25. Nor can Defendants rely on a hypothetical future amendment of Title VI regulations to ignore the statutory consistency between Titles VI and IX. And to the extent the *Davis* Court suggested that under Title IX it is permissible to subject children to more harassment than their working adult counterparts, Defs. Opp. 17 (quoting *Davis,* 526 U.S. at 651), *Davis* cannot justify a definition that applies equally to harassment of children by adults.

Defendants' explanation for the Rule's quid pro quo definition, *id*. 13, is a non sequitur. The Rule does not impose "strict liability" on schools for any form of harassment by any individual, employee or not. Defining sexual harassment to include quid pro quo harassment by students in positions of authority but who may not be deemed employees under State and federal law no more invokes agency principles than defining sexual harassment to include sexual assault by students in positions of authority but who may not be deemed employees under State and federal law, as the Rule does. Despite Defendants' invocation of *Gebser*, Defs. Opp. 13, the Department has enforced Title IX against student quid pro quo harassment for decades, *e.g.*, Ex. 3 at 12,038 n.4 (applying Title IX to student teaching assistant with authority to assign grades). *Gebser* cannot support the Department's newfound interpretation of Title IX.

Finally, the First Amendment does not require adoption of the *Davis* standard. Intvrs. Opp. 3-6. Intervenors fail to identify even a single case holding that the First Amendment protects all speech unless it is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity," Rule § 106.30(a) (*sexual harassment*), or that the Department's decades-long definition of hostile environment harassment was categorically overbroad. The cases cited by Intervenors indicate just the opposite. For example, in *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001), then-Judge Alito explained that a hostile environment is created in part by conduct "objectively severe *or* pervasive enough that a reasonable person would agree that it is harassment." *Id.* at 205 (emphasis added); *see id.* at 217 ("severity or pervasiveness" is threshold). But in finding that hostile environment speech is not categorically *divested* of First Amendment protection, he did

not also find that punishing such hostile environment speech would categorically *violate* the First Amendment. *Id.* at 209-10; *see also DeJohn v. Temple Univ.*, 537 F.3d 301, 317-18 (3d Cir. 2008) (finding that university sexual harassment policy was overbroad precisely because it lacked "any requirement akin to a showing of severity *or* pervasiveness" (emphasis added)).

Nor can the First Amendment require the Department to adopt the *Davis* definition of sexual harassment in both K-12 and higher education. It is well-established that "the constitutional rights of K-12 students in public school are not automatically coextensive with the rights of adults in other settings." *Fraser*, 478 U.S. at 683 (First Amendment did not prohibit a public school district from punishing "lewd, indecent, or offensive speech"). Contrary to Intervenors' suggestion, Intvrs. Opp. 6, *Davis* did not alter this paradigm. *See Morse v. Frederick*, 551 U.S. 393, 396-97 (2007) (reaffirming *Fraser*). Moreover, in the community at large, speech loses First Amendment protection if it, for example, "substantially interfere[s] with the opportunity of other students to obtain an education," *Healy*, 408 U.S. at 189, or creates "secondary effects," *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 389 (1992). Likewise, punishing sexually harassing speech that is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment," *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quotations omitted), does not categorically violate the First Amendment, *Saxe*, 240 F.3d at 209-10. Intervenors forget that the Department's prior and longstanding definition of sexual harassment did not rest solely on "emotive impacts," *R.A.V.*, 505 U.S. at 394 (quotations omitted); instead, speech constituted sexual harassment only if was "sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program based on sex." Ex. 6 at 5. That some schools' policies have stretched beyond this standard, or punished conduct for only its "emotive impacts," Intvrs. Opp. 5, does not mean the First Amendment required the Department to promulgate the Rule.

     **D.**     **The Rule unlawfully limits who can file complaints and when.**

Defendants' suggestion that Title IX Coordinators can file formal complaints even when the complainant is not "participating in or attempting to participate in," Defs. Opp. 20, is

contradicted by the Rule's plain text: "At the time of filing a formal complaint, a complainant must be participating in or attempting to participate in the education program or activity of the recipient with which the formal complaint is filed," no matter who filed the complaint. Rule § 106.30(a) (*formal complaint*); *see id.* § 106.30(a) (*complainant*). While Defendants' attempted reinterpretation is preferable, they cannot rewrite the unambiguous text of the Rule in this litigation. The preamble only provides a school options when a complainant refuses to participate in the grievance process, not when a complaint is not participating in the education program or activity. Defs. Opp. 19 (likely citing 85 Fed. Reg. at 30,122 n.547).

Defendants' argument that the Rule is "consistent with Title IX's application to 'any education program or activity' receiving federal financial assistance," Defs. Opp. 18, likewise misses the mark—the Rule's definition is arbitrarily and unlawfully limited in time. Under the Rule, a complainant who experienced harassment in a school's education program, was actually denied benefits of the program on the basis of sex, and dropped out without plans to return *as a result of the harassment*, would be barred from filing a complaint. Rule § 106.30(a) (*formal complaint*). But Title IX protects a student from being "excluded from participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Nothing in the plain text allows the Department to eliminate the ability of a harassed student to file a complaint against the very harassment that caused the statutory violation.

The emergency removal and supportive measures provisions, Defs. Opp. 19-20, do not alleviate the campus safety concerns caused by the Rule's narrow definition of "formal complaint." First, an emergency removal cannot be made permanent without going through the Rule's grievance process. *See* 85 Fed. Reg. at 30,226 (an "emergency removal" is "not a substitute for the § 106.45 grievance process"). It is a band-aid, not a solution. Second, a no-contact order (as a supportive measure) is untenable as a long-term solution: a teacher suspected of serial harassment cannot perform job functions while restricted "from contacting other employees [or] students." Defs. Opp. 19. If the harasser only targets unaffiliated children in the

community, a school could *never* remove the employee because the children would not be eligible complainants. And even if Defendants' reading of the Rule were correct and a Title IX Coordinator could file on behalf of an ineligible complainant, *id.* 20, in the postsecondary context, unless the unaffiliated complainant—e.g., a neighborhood child—submits to direct, oral cross-examination by the respondent's advisor, the school cannot consider the complainant's statements, rendering the exercise futile, *see* Rule § 106.45(b)(6)(i).

## IV.    The Rule's promulgation violates procedural and arbitrary and capricious prongs.

### A.    The Department relied on fatally flawed Regulatory Impact Analyses.

*First*, States do not claim the Department's Regulatory Impact Analyses ("RIAs") violated an Executive Order or a provision of Title IX. Defs. Opp. 31-32. Rather, the RIAs are evidence of Defendants' flawed decision-making, which violates the APA's arbitrary and capricious and procedural prongs. *See Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 236 (D.C. Cir. 2008) (APA requires agency to provide "the technical studies and data upon which the agency relies in its rulemaking" (quotations and brackets omitted)); *State Farm,* 463 U.S. at 52, 54 ("reasoned decisionmaking" requires agencies to "look at the costs as well as the benefits" of actions); *Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) ("Notwithstanding the absence of a statutory duty . . . when an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable."); *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015) ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions.").

The Department "relied" on the RIAs to promulgate the Rule because the Department uses its flawed assumptions in the RIAs regarding monetary and non-monetary costs (and the materials relied upon in making those assumptions) to justify the Rule. *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.,* 494 F.3d 188, 206 (D.C. Cir. 2007) (vacating regulatory provision because cost-benefit analysis relied upon in support was based on an unexplained methodology). For example, the Department's overestimation of

the baseline cost of investigations informs and purports to justify the Rule's provisions seeking to reduce the number of investigations. *See* 83 Fed. Reg. 61,462, 61,564-65 (Nov. 29, 2018); Madowitz ¶ 28. And the Department's underestimation of and failure to account for costs associated with hiring, training, and supportive measures, as well as its intentional disregard of downstream economic and social consequences, informs and purports to justify the Rule's burdensome grievance process. *See* Pls. Mem. 34-35. The RIA thus contains "critical factual material" used to support the Rule and establish a range of costs for complying with it. *See Owner-Operator*, 494 F.3d. at 201.

*Second*, the Department's defense of its RIAs fails. Defendants do not deny that in the proposed rule, the Department identified only two problematic sources as informing its baseline costs.[15] Defendants do not deny that the Department failed to disclose other reports and data sources upon which it relied,[16] nor that commenters explained how conclusions reached by the Department could not be recreated and were unreliable. *See* 83 Fed. Reg. at 61,485; Madowitz ¶¶ 9-13.[17] While the Department engaged in simulations of its model, 83 Fed. Reg. at 61,489, and generated estimates,[18] it did not make any of the models or the underlying data upon which it

---

[15] Defendants cannot shift their burden to properly assess the economic impact of their actions to commenters. Defs Opp. 34; *New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992) (arbitrary to rely on report or study without determining the accuracy of the data contained therein or the methodology used to collect that data). In any event, commenters did identify additional sources of data. *See, e.g.*, 85 Fed. Reg. at 30,552. And the Department conveniently omits that in *Sierra Club v. EPA*, 167 F.3d 658, 664 (D.C. Cir. 1999), the court remanded to the agency after finding the agency's methodology "hopelessly irrational."

[16] In the proposed rule, the Department "examined public reports of Title IX reports and investigations at 55 [institutions of higher education] nationwide" and reviewed a "sample of public Title IX documents." 83 Fed. Reg. at 61,485, 61,487. But the Department did not explain how to locate those reports nor identify which institutions were the subject of the reports.

[17] The declaration of expert Michael Madowitz is relevant to the RIA because the Department failed to examine all relevant factors and adequately explain the grounds for its decision and because the RIA involves complex information the Court would benefit from understanding further. *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197-98 (D.D.C. 2005).

[18] *See* 83 Fed. Reg. at 61,485 n.18, 61,486 n.22, 61,487 nn.27 & 28, 61,487 n.28, 61,489 n.34.

relied available to the public for review in time for comment, despite requests from commenters for the information. *See* Pls. Mem. 33; *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973) ("It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, to a critical degree, is known only to the agency."). Accordingly, the Department "committ[ed] serious procedural error" because it "fail[ed] to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary," *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991) (quoting *Connecticut Light and Power Co. v. NRC,* 673 F.2d 525, 530-31 (D.C. Cir. 1982)), and the studies, reports, and data upon which it relied, *Am. Radio Relay League, Inc.*, 524 F.3d at 236; *United States Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519, 534 (D.C. Cir. 1978).

Defendants mischaracterize the States' identification of numerous serious flaws and unsupported assumptions in the RIA as mere "disagree[ment]" with the Department's "conclusions." *Compare* Pls. Mem. 33-34, *with* Defs. Opp. 35. "While APA review of final agency action is deferential, it surely does not require [Courts] to accept a flawed interpretation" of limited data or the agency's illogical conclusions. *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1220 (D.C. Cir. 2012), *overruled on other grounds by Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir. 2014). The Department's exclusion of costs attributable to increased incidents of sexual harassment and reduced deterrence likely to result from the Rule is but one of many examples of the Department's flawed analysis. *See also* Pls. Mem. 34-35. The Department projects a 33 percent and 50 percent reduction in investigations at post-secondary and K-12 schools respectively, 85 Fed. Reg. at 30,551, 30,565-68, which corresponds to further reductions at every level of the complaint process, including in findings made and resolutions involving disciplinary action, Madowitz ¶ 20, Fig. 1. This decrease in schools' ability to detect and address harassment will logically lead to a corresponding rise in the number of incidents. Pls. Mem. 34-35. Defendants do "not dispute the proposition that weak sanctions against sexual violence perpetrators and weak laws and policies related to sexual violence and sex equality are associated with a greater likelihood of perpetration," Defs. Opp. 36 n.19 (quoting 85 Fed. Reg. at 30,070),

nor that the Rule's "supportive measures" "are designed in part to 'deter sexual harassment,'" *id.*

36 (quoting Rule § 106.30(a) (*supportive measures*)). For purposes of litigation, however,

Defendants conveniently ignore their own data showing substantial decreases in investigation

and enforcement under the Rule. *Id.*; *see also* 85 Fed. Reg. at 30,539-40.

Defendants arbitrarily justify excluding costs resulting from increased rates of sexual

harassment on the purported lack of evidence that the 2011 DCL (Ex. 8)—an entirely different

policy—had an effect on the underlying rates of sexual harassment. Defs. Opp. 35-36. Even if

this was a proper way to assess the impact of this Rule, which the Department admits will

decrease investigations and remedies, the Department's analysis of the 2011 DCL's impact is

riddled with inaccuracies[19] and fatal limitations. *See* 85 Fed. Reg. at 30,540-41. The Department

admits it could not disprove that the 2011 DCL had no effect on the underlying rate of sexual

harassment and could not determine the effect of the Rule on rates of sexual harassment "due to

the significant differences in these two sets of policies." 85 Fed. Reg. at 30,541. The Department

describes numerous limitations in its 2011 DCL conclusions: omission of variables, use of poor

quality data (the same Clery Act data used to calculate the Rule's costs), correlation assumptions

"[it is] unable to substantiate," and use of controls "[it has] no reason to believe" would allow it

to arrive at a conclusion regarding the Rule's effect on the rate of sexual harassment. 85 Fed.

Reg. at 30,341. Relying on such analysis with knowledge of inconsistencies, inaccuracies, and

limitations is "the hallmark of arbitrary action." *See Sierra Club v. EPA*, 719 F.2d 436, 459 (D.C.

Cir. 1983); *see also Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011) (agency

acts arbitrarily when it inconsistently and opportunistically frames costs of a rule).

Finally, the Department's position that any error associated with its RIAs would be

harmless ignores obvious harms. Defs. Opp. 36. The States provided ample evidence of the

---

[19] For example, in discussing the 2011 DCL's effect on the number of forcible sex offenses, the Department says "institutions with higher enrollment report more forcible sex offenses (positive coefficient on enrollment)," but the Table to which the Department refers lists a corresponding coefficient is "0.00," which is not a "positive coefficient." 85 Fed. Reg. at 30,540.

inaccuracies and underestimations that inure to the Department's benefit while leaving the States to pay for substantial unaccounted-for costs and consequences. Pls. Mem. 38-41. The Rule's provisions make sweeping changes impacting every public and nearly every private school in the nation. The APA requires the Department to provide an accurate representation of the real costs imposed on the States, their schools, and their students, and a proper consideration of those costs in its ultimate decision. Defendants improperly failed to do so here.

**B.     The proposed rule did not provide sufficient notice for comments.**

Defendants must provide notice of the proposed content of a rule. 5 U.S.C. § 553(b). Defendants argue that third parties can satisfy this obligation if they chance upon a possible future provision Defendants have not disclosed and raise it in their comments. Defs. Opp. 41-42. But the Defendants "cannot bootstrap notice" of the Rule's preemptive provision onto comments submitted by other parties. *See Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (quotations omitted). The proposed rule's only mention of preemption said nothing "would prevent a recipient from initiating a student conduct proceeding" when alleged harassment fell outside the proposed regulations. 83 Fed. Reg. at 61,468. Nor does the proposed rule's cursory "Federalism section" provide adequate notice. Defs. Opp. 40. That section referred to 34 C.F.R. § 106.34 and 34 C.F.R. § 106.35, which were not proposed to be changed, are not amended by the Rule, and provided no notice of a preemption provision to be codified at Rule § 106.6(h).

The Department was likewise required to provide adequate notice of the Rule's consolidation and confidentiality provisions. Pls. Mem. 37. That some commenters discussed problems with multiple complaints arising from a single incident or the need for confidentiality, Defs. Opp. 42, does not satisfy the Department's obligation. *See Fertilizer Inst.*, 935 F.2d at 1312. Moreover, the comments relied upon by Defendants request an explanation of how a single incident with multiple parties would be addressed; commenters could not anticipate the Department would require schools to provide all parties with all information about every other party, a sharp departure from past policy. *Compare* 85 Fed. Reg. at 30,291, *with* Ex. 1 at 7; Ex. 3 at 12,037; Ex. 8 at 11 n.29; Ex. 9 at 18, 19 n.25. Likewise, commenters could not anticipate the

Department would include a new confidentiality provision directly conflicting with a more protective extant provision. *Compare* Rule § 106.71(a) (only schools, not parties, shall keep information confidential during investigation), *with* Rule § 106.81 (incorporating 34 C.F.R. § 100.7(e), "[t]he identity of complainants shall be kept confidential"). That the Department allows a complainant to share the name of the school or any party implicated, Defs. Opp. 41, does not address the conflict because section 100.7(e) protects complainants.

Defendants also cannot justify the Rule's new "participating in or attempting to participate in" precondition on the proposed rule's preamble. Although it used "the same language" as the Rule, Defs. Opp. 41, the context was much different, Pls. Mem. 36-37; *see also Fertilizer Inst.*, 935 F.2d at 1311 (notice and comment cannot be "a guessing game in which the inclusion of one subject indicates that a distant cousin of that subject might be addressed"). And as explained, *supra* Part III.D., the plain text of the Rule prevents a Title IX Coordinator from signing a formal complaint for students not participating in the education program or activity.

## V.   Absent an injunction or stay, the Rule will impose irreparable harm on the States.[20]

The Rule will inflict irreparable harm on the States' schools and students if it goes into effect on August 14, 2020. Recipients must comply with the Rule as written, not with post-hoc, inconsistent reinterpretations. To do so, schools must reallocate significant time and money from other critical operations to implement the onerous grievance process. Once implemented, the Rule will prevent schools from effectively addressing harassment, harming States' interests in providing their students with a safe and equal education. The resulting rise in unaddressed sexual harassment will result in higher State healthcare and social services expenditures.

Defendants and Intervenors fail to rebut States' showing that they will suffer irreparable harm if the Rule takes effect. Preliminary relief can be based on claims of irreparable harm from

---

[20] Intervenors' suggestion that the States lack standing, Intrvrs. Opp. 10-11, just re-packages their meritless constitutional arguments. In any event, the Department must comply with all of the APA's procedural and substantive requirements for all of the Rule—which it has not done.

irrecoverable financial loss that meets "some form of a significance test." *District of Columbia v. USDA*, No. 20-119 (BAH), 2020 WL 1236657, at *25 n.25 (D.D.C. Mar. 13, 2020).[21] The States' motion and nearly 70 declarations demonstrate in concrete and specific terms the significant costs and harms incurred as a result of the Rule. *See id.* at *25-26. Defendants' and Intervenors' attempts to discount schools' implementation costs as insignificant, as sunk costs, and as self-inflicted each fail in turn. Similarly, Defendants cannot dismiss the downstream healthcare and social services costs the States will incur as overly speculative in light of Defendants' own cost-benefit analysis and the States' declarations.

Defendants suggest that the States' implementation costs are "modest" and the States cannot rely on administrative costs to show irreparable harm. Defs. Opp. 45-46. But the States' declarations demonstrate that each state-funded school will be forced to spend up to hundreds of thousands of dollars each just to come into initial compliance with the Rule. *See, e.g.*, Grice ¶ 18; Leone ¶¶ 23, 27; Hall-Panameño ¶ 84; Alvarado ¶ 15; de Veyga ¶ 55; Sanchez ¶ 24. The changes the Rule requires—which will affect over 27 million students in the States—are "self-evidently onerous to implement," as they involve the "massive undertaking" of reviewing, revising, and adopting multiple policies, training and in some cases hiring new staff, and communicating new policies to students, all "on a very short time frame of less than three months." *District of Columbia*, 2020 WL 1236657, at *25. Defendants' claim that the States exaggerate the "scale of adjustments" needed to comply with the Rule, Defs. Opp. 46, is belied by the many changes the Rule requires and the complex new processes it imposes, which the Department needed 554

---

[21] Defendants seek to raise this bar, asserting that the States must show economic loss that would "endanger[]" their "ability to carry out [their] mission." Defs. Opp. 45 (citing *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96-97 (D.D.C. 2003)). But *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), on which *Experience Works* relies, is "inapposite" when a plaintiff's alleged money damages are unrecoverable, *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 178 (D.D.C. 2017), as the States' injuries are here because the APA's waiver of sovereign immunity does not extend to damages. Even if this standard applied, the loss of federal funding threatened by the Rule would endanger any school's ability to carry out its mission.

pages in the Federal Register and additional blog posts to describe. *See supra* Part I; Pls. Mem. 38-41 (citing declarations). Defendants cite no authority from this Circuit for the remarkable proposition that administrative costs are not irreparable harm, an argument rejected by courts in this District. *E.g.*, *District of Columbia*, 2020 WL 1236657, at *23-26; *see also Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Chao*, 297 F. Supp. 2d 155, 162 (D.D.C. 2003).

Intervenors claim that the States cannot show irreparable harm because they will already have incurred "most of the initial compliance costs" by the time the Court rules on the States' motion. Intvrs. Opp. 19. If this argument stands, agencies could always avoid injunctive relief by giving regulated parties so little time to comply that compliance costs would all be incurred before a court has an opportunity to consider a challenge. Moreover, it ignores the fact that schools will have to take interim measures to comply with the Rule by the effective date *and then* take more comprehensive measures over the course of several months (for example, to comply with multi-step policy revision procedures mandated by local law or school policy), which means they will spend as much if not more time and money after the effective date. *See* Pls. Mem. 11-12 (citing declarations).[22] They also disregard entirely the significant ongoing costs schools will incur from administering a Rule with both narrowed protections and an onerous grievance process.[23] *See, e.g.*, Nazario ¶ 35; Ryan ¶ 71; Sanchez ¶ 33. The Department itself estimates that the assessments required to comply with the Rule's "program or activity" requirement—just one of the Rule's many new requirements—will alone cost approximately $10,388,310 per year. 85 Fed. Reg. at 30,568.

---

[22] Contrary to Intervenors' suggestion, Intvrs. Opp. 16, States are not required to file declarations from all of the schools in their States. The States speak for all of their schools and students. *See* Compl. ¶¶ 199, 202, 218, 219. In addition, the States' motion has the support of amici representing a wide range of K-12 and post-secondary educational institutions. *See, e.g.*, ACE Amicus (representing more than 1700 colleges and universities and garnering the support of 24 other higher education organizations); AASA Amicus (professional organization for over 13,000 educational leaders and coalition of 76 of nation's largest urban public schools).

[23] Intervenors' arguments about the purported lack of credibility of States' declarants, Intvrs. Opp. 16-17, are specious and notably not shared by Defendants.

Defendants' argument that many of the costs the States expect to incur are "self-inflicted" is similarly unavailing. Defendants' claim that the Rule does not explicitly require schools to establish a parallel system for "non-Title IX" sexual harassment disregards the fact that in some Plaintiff States, schools are *required* by state law to investigate and adjudicate sexual harassment not covered by the Rule. *See supra* note 12. The fact that Plaintiff States could change their laws is irrelevant, as "Courts regularly entertain actions brought by states . . . that face economic injury, even though [they] theoretically could avoid the injury by enacting new legislation." *California v. Azar*, 911 F.3d 558, 574 (9th Cir. 2018).

Defendants also ignore the increased healthcare and social services costs that the States will bear because more cases of sexual harassment will go unaddressed. *See* Pls. Mem. 44-45.[24] Moreover, the Rule presents an either-or proposition: adopt a parallel system with additional costs or face even greater healthcare and social costs from unaddressed sexual harassment that the Rule excludes from Title IX's scope. This situation is utterly dissimilar to *Barton v. District of Columbia*, 131 F. Supp. 2d 236, 246-48 (D.D.C. 2001), the only case Defendants cite, where the plaintiff could have avoided all injuries by accepting defendants' earlier offer to enter into a contract preserving the status quo. These downstream financial harms are "actual" and "certain." *League of Women Voters v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (quotations omitted). The Department agrees the Rule will result in substantially fewer Title IX investigations, resolutions, and findings without any attendant decline in incidents. 85 Fed. Reg. at 30,551, 30,565-68 (33 percent decline in post-secondary schools and 50 percent in K-12 schools). As a result, many

---

[24] Defendants portray these costs as harms only to the interests of the States' residents, cognizable to States in their role as *parens patriae*. This is plainly incorrect. Increased costs of providing healthcare and social services will be incurred directly by States themselves. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601-02 (1982) (distinguishing between states' proprietary and quasi-sovereign interests). Defendants' argument would fail even if Plaintiff States were relying on injury to quasi-sovereign interests, as States would be relying on their *parens patriae* interests not to establish standing, but to demonstrate irreparable harm. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179-180 (D.C. Cir. 2019); *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923).

instances of sexual harassment will go unaddressed,[25] undermining schools' ability to end, remedy, and prevent sexual harassment, as the States extensively demonstrate, *see* Pls. Mem. 43-44 (citing declarations), and ultimately cause the incidence of sexual harassment to increase, *see* Pls. Mem. 35 (citing studies referenced in comment letters). This rise will cause the States to incur greater healthcare and social services costs than they would in the absence of the Rule. *See, e.g.*, Darling-Hammond ¶ 10; Rohner ¶¶ 18-19. Such costs constitute irreparable harm. *See Pennsylvania v. Trump*, 930 F.3d 543, 574 (3d Cir. 2019), *rev'd on other grounds sub nom. Little Sisters of the Poor v. Pennsylvania*, – S.Ct. –, 2020 WL 3808424 (July 8, 2020).

## VI.     The balance of the equities and public interest weigh in favor of a stay or injunction.

The States demonstrate precisely the kind of public harm that would weigh in favor of maintaining the status quo, pending judicial review with the full administrative record, of nearly 30 years of consistent Department policy. *See supra* Parts I, V. Any harm resulting from this— and Defendants have asserted only the generalized harm of not implementing a purportedly lawful rule—pales in comparison to the specific harms that have been demonstrated by the States resulting from schools being required to implement in less than three months a sea change in policy and incur significant compliance costs to meet the Rule's unreasonable requirements.

Defendants rest their argument principally on the premise that the Rule is a lawful and reasonable exercise of the Department's authority. Defs. Opp. 49. That premise is incorrect, so implementing an illegal and arbitrary rule will not advance the public interest and this factor therefore weighs in favor of preliminary relief. *See Newby*, 838 F.3d at 12-15. The balance of equities also favors of the States here, because the Rule—as acknowledged by all parties—is intended to result in and will, if implemented, lead to fewer investigations and resolutions of sexual harassment, 85 Fed. Reg. at 30,551, 30,565-68; Intvrs. Mot. to Intervene 12; Pls. Mem. 17-18, 32, 38. But no one suggests it will decrease the actual incidence of sexual harassment.

---

[25] As discussed in Parts II.A and III.D, *supra*, the Department's claim that supportive measures will prevent these downstream costs is baseless.

This impedes students' rights to an education free from sexual harassment. *See, e.g.*, *Pursuing Am.'s Greatness, v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (public's interest in exercising civil rights outweighed the government's interest in promulgating an unlawful regulation).

Defendants' other arguments are similarly unavailing. That Congress authorized the Department to implement regulations to effectuate Title IX, Defs. Opp. 49, says nothing of the public interest for this particular Rule, especially as it contravenes Title IX. Defendants suggest that having rules in place—any rules—is in the public interest because the previous status quo involved too much uncertainty. *Id.*; *see also* 85 Fed. Reg. at 30,030. But the public interest inquiry, which the court must give "particular regard," *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987), rests on the specific rule at hand. *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24-33 (2008).

## VII.   The proper remedy is a facial stay or injunction of the Rule pending judicial review.

Facial remedies—such as postponing the Rule's effective date—are the norm in APA actions and a long-settled principle in this Circuit. *See, e.g.*, *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Just this term the Supreme Court made clear that vacated agency action has no force in any application. *See Regents*, 140 S. Ct. at 1916 n.7; *see also Barr v. Am. Ass'n of Political Consultants, Inc.*, – S. Ct. –, 2020 WL 3633780, at *9 n.8 (July 6, 2020) (plurality op.) (explaining that vacated statute is unenforceable in any application). This logic applies equally to preliminary relief, especially because the APA authorizes courts to "postpone the effective date of an agency action" to "prevent irreparable injury" and "preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Asserting, as Defendants do, Defs. Opp. 50, that some recipients' desire for "certainty" warrants altering what section 705 provides is unavailing. If anything, preserving the status quo provides all recipients more certainty by assuring them that they need modify their Title IX procedures only once (if at all), and only after judicial review is complete. That is the very reason courts are empowered to stay agency action while judicial review is ongoing. *See Portland Cement Ass'n v. EPA*, 665 F.3d 177, 189 (D.C. Cir. 2011).

Severance, as Defendants suggest, Defs. Opp. 50, is also inappropriate because the Rule's provisions are inextricably intertwined and the challenged provisions are integral to its operation. The Rule cannot "function sensibly" if any of the challenged provisions are vacated, *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) (quotations and citations omitted), and severance would "produce a rule strikingly different from anything [the agency] has ever considered," *MD/DC/DE Broads. Ass'n v. F.C.C.*, 236 F.3d 13, 23 (D.C. Cir. 2001). The Department itself agrees that individual aspects of the Rule's grievance process cannot be severed. 85 Fed. Reg. at 30,095 ("the ten groups of provisions that comprise § 106.45 apply as *a cohesive whole* to the handling of a formal complaint of sexual harassment" (emphasis added)). In addition, the mandatory dismissal requirement, Rule § 106.45(b)(3)(i), would have no practical effect without the provisions narrowing the substantive scope of the Rule, *e.g.*, Rule § 106.30(a) (*sexual harassment*); Rule § 106.44(a). Setting aside part of the Rule would also upend the cost-benefit analysis essential to the Department's justification of the Rule. For instance, the Department claims that the Rule's narrowed definition of sexual harassment will drive down the number of complaints and investigations, thus resulting in reduced costs for schools to counterbalance the Rule's burdensome new grievance process. 85 Fed. Reg. at 30,551, 30,565-68. If only some provisions take effect, the Department's already-flawed economic analysis could not be relied upon to sustain the remnants of the Rule.

## CONCLUSION

The Court should grant the States' motion and stay or enjoin the Rule pending judicial review.

Dated: July 15, 2020                                        Respectfully submitted,

**GURBIR S. GREWAL**                          **JOSH SHAPIRO**
*Attorney General*                                    *Attorney General*
*State of New Jersey*                                 *Commonwealth of Pennsylvania*
MAYUR P. SAXENA                              MICHAEL J. FISCHER
Assistant Attorney General                        Chief Deputy Attorney General

*/s/ Marie Soueid*                                      */s/ Aimee D. Thomson*

MARIE SOUEID
ESTELLE BRONSTEIN
EMILY WANGER
Deputy Attorneys General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-2564
Marie.Soueid@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

AIMEE D. THOMSON (D.C. Bar No.
1045758)
RYAN B. SMITH
JACOB B. BOYER
Deputy Attorneys General
Office of Attorney General
1600 Arch Street
Suite 300
Philadelphia, PA 19103
(267) 374-2787
athomson@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of
Pennsylvania*

**XAVIER BECERRA**
*Attorney General of California*
*State of California*
MICHAEL NEWMAN
Senior Assistant Attorney General
CHRISTINE CHUANG
Supervising Deputy Attorney General

*/s/ Laura Faer*
LAURA FAER
CHRISTINA RIEHL
MARISOL LEÓN
SHUBHRA SHIVPURI
SRIVIDYA PANCHALAM
Deputy Attorneys General
California Attorney General's Office
1515 Clay Street, 20th Floor
Oakland, CA 94612-0552
(510) 879-3305
Laura.Faer@doj.ca.gov
*Attorneys for Plaintiff State of California*

**PHILIP J. WEISER**
*Attorney General*
*State of Colorado*

*/s/ Eric R. Olson*
ERIC R. OLSON
Solicitor General
MARTHA FULFORD (D.C. Bar No. 101194)
First Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
eric.olson@coag.gov
martha.fulford@coag.gov
*Attorneys for Plaintiff State of Colorado*

**KATHLEEN JENNINGS**
*Attorney General*
*State of Delaware*

*/s/ Christian Douglas Wright*
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
Delaware Department of Justice
820 N. French Street, 5th Floor

**KARL A. RACINE**
*Attorney General*
*District of Columbia*

*/s/ Kathleen Konopka*
KATHLEEN KONOPKA (D.C. Bar No.
495257)
Deputy Attorney General, Public Advocacy
Division

Wilmington, DE 19801
(302) 577-8600
christian.wright@delaware.gov
*Attorney for Plaintiff State of Delaware*

MICHELLE THOMAS (D.C. Bar No. 993514)
Chief, Civil Rights Section, Public Interest
Division
BRENDAN DOWNES (D.C. Bar No. 187888)
NICOLE HILL (D.C. Bar No. 888324938)
SAMANTHA HALL[*]
KATE VLACH (D.C. Bar No. 1671390)
Assistant Attorneys General
Office of the Attorney General for the District
of Columbia
441 4th St., N.W.
Suite 630S
Washington, DC 20001
(202) 724-6610
Kathleen.Konopka@dc.gov
[*] *Practicing in the District of Columbia under
the direct supervision of Michelle D. Thomas,
a member of the D.C. Bar. See D.C. Court of
Appeals Rule 49(c).*
*Attorneys for Plaintiff District of Columbia*

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

/s/ *Alison V. Hill*
ALISON V. HILL
LIZA ROBERSON-YOUNG
GRETCHEN HELFRICH
Assistant Attorneys General
Office of the Attorney General State of Illinois
100 W. Randolph St.
Chicago, IL, 60601
(312) 814-3954
ahill@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

/s/ *Angela R. Brooks*
ANGELA R. BROOKS
ABIGAIL B. TAYLOR
ABRISHAM ESHGHI
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2590
angela.brooks@mass.gov
*Attorneys for Plaintiff Commonwealth of
Massachusetts*

**DANA NESSEL**
*Attorney General*
*State of Michigan*

/s/ *Fadwa A. Hammoud*
FADWA A. HAMMOUD
Solicitor General
TONI L. HARRIS

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

/s/ *Kevin Finnerty*
KEVIN FINNERTY
KATHRYN WOODRUFF
Assistant Attorneys General

NEIL GIOVANATTI
Assistant Attorneys General
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
HammoudF1@michigan.gov
Harrist19@michigan.gov
GiovanattiN@michigan.gov
*Attorneys for Plaintiff State of Michigan*

445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 757-1058 (Voice)
(651) 757-1361 (Voice)
kevin.finnerty@ag.state.mn.us
kathryn.woodruff@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*


**HECTOR BALDERAS**
*Attorney General*
*State of New Mexico*

*/s/ Tania Maestas*
_____
TANIA MAESTAS
Chief Deputy Attorney General
PO Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
tmaestas@nmag.gov
*Attorney for Plaintiff State of New Mexico*


**JOSHUA H. STEIN**
*Attorney General*
*State of North Carolina*

*/s/* Sripriya Narasimhan
_____
SRIPRIYA NARASIMHAN (D.C. Bar No:
1029549)
Deputy General Counsel
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6400
SNarasimhan@ncdoj.gov
*Attorney for Plaintiff State of North Carolina*


**ELLEN F. ROSENBLUM**
*Attorney General*
*State of Oregon*

*/s/ Elleanor H. Chin*
_____
ELLEANOR H. CHIN
BRIAN S. MARSHALL DC Bar No. 501670
Senior Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700
elleanor.chin@doj.state.or.us
*Attorney for Plaintiff State of Oregon*


**PETER F. NERONHA**
*Attorney General*
*State of Rhode Island*

*/s/ Shannon L. Haibon*
_____
SHANNON L. HAIBON
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 Ext. 2018
shaibon@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*


**THOMAS J. DONOVAN, JR.**
*Attorney General*
*State of Vermont*

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

JOSHUA R. DIAMOND
Deputy Attorney General

*/s/ Rachel E. Smith*
RACHEL E. SMITH
JULIO A. THOMPSON
Assistant Attorneys General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
(802) 828-3171
rachel.e.smith@vermont.gov
julio.thompson@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**ROBERT W. FERGUSON**
*Attorney General*
*State of Washington*

*/s/ Kristin Beneski*
KRISTIN BENESKI
Assistant Attorney General
AILEEN HUANG
Deputy Attorney General
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
kristin.beneski@atg.wa.gov
aileen.huang@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

*/s/ Jessica Merry Samuels*
JESSICA MERRY SAMUELS (D.C. Bar No.
1552258)
Assistant Solicitor General
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219
(804) 786-6835
solicitorgeneral@oag.state.va.us
*Attorney for Plaintiff Commonwealth of*
*Virginia*

**JOSHUA L. KAUL**
*Attorney General*
*State of Wisconsin*

*/s/ Jeffery A. Simcox*
ANNE M. BENSKY
Assistant Attorney General
JEFFERY A. SIMCOX
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 264-9451 (Bensky)
(608) 266-3861 (Simcox)
benskyam@doj.state.wi.us
simcoxja@doj.state.wi.us
*Attorneys for Plaintiff State of Wisconsin*