# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMONWEALTH OF
PENNSYLVANIA, et al.,

                   *Plaintiffs*,

    v.

ELISABETH D. DEVOS, in her official
capacity as Secretary of Education, et al.,

                 *Defendants*.

Case No. 20-cv-01468-CJN

BRIEF OF THE STATES OF TEXAS, ALABAMA, ALASKA, ARKANSAS,
FLORIDA, GEORGIA, INDIANA, KENTUCKY, LOUISIANA, MISSISSIPPI,
NEBRASKA, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, AND
TENNESSEE, AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION AND INTEREST OF *AMICI* STATES ............................................ 1

ARGUMENT ...................................................................................................... 3

    I.   The Final Rule sets forth reasonable standards for combating gender discrimination in educational programs while safeguarding free speech and due process. ................................................................. 3

        A.   Unlike prior Department guidance, the Final Rule respects the freedom of speech. ................................................................. 3

        B.   The Final Rule protects the due process rights of both the accuser and the accused. ...................................................... 7

    II.  Plaintiffs' conscious failure to comply with Title IX and the constitutional norms—not the Final Rule—caused their alleged injuries. .......................................................................... 10

    III.  Students will suffer severe and irreparable harm from an injunction delaying the Final Rule. .................................................... 15

CONCLUSION .................................................................................................. 17

CERTIFICATE OF SERVICE .............................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Barnes v. Zaccari*,
  669 F.3d 1295 (11th Cir. 2012) ................................................................. 7

*Bd. of Curators of Univ. of Mo. v. Horowitz*,
  435 U.S. 78 (1978) ...................................................................................... 8

*Boermeester v. Carry*,
  263 Cal. Rptr. 3d 261 (Cal Ct. App. 2020) ............................................... 13

*Booher v. Bd. of Regents, N. Ky. Univ.*,
  No. 96-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 22, 1998) ....... 6

*Branum v. Clark*,
  927 F.2d 698 (2d Cir. 1991) ....................................................................... 7

*Dambrot v. Cent. Mich. Univ.*,
  55 F.3d 1177 (6th Cir. 1995) ...................................................................... 6

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
  526 U.S. 629 (1999) .......................................................................... 3, 5, 6

*DeJohn v. Temple Univ.*,
  537 F.3d 301 (3d Cir. 2008) ....................................................................... 6

*Dist. Title v. Warren*,
  181 F. Supp. 3d 16 (D.D.C. 2014), *aff'd sub nom.*
  *Dist. Title v. Warren*, 612 F. App'x 5 (D.C. Cir. 2015) .................... 11, 14

*Doe v. Allee*,
  30 Cal. App. 5th 1036 (Cal Ct. App. 2019) ............................................. 13

*Doe v. Baum*,
  903 F.3d 575 (6th Cir. 2018) ......................................................... 9, 12, 13

*Doe v. Brandeis Univ.*,
  177 F. Supp. 3d 561 (D. Mass. 2016) ..................................... 9, 12, 13, 16

*Doe v. Miami Univ.*,
  882 F.3d 579 (6th Cir. 2018) ...................................................................... 9

*Doe v. Purdue Univ.*,
  928 F.3d 652 (7th Cir. 2019) ............................................................ 7, 8, 12

*Doe v. Univ. of Cincinnati*,
  872 F.3d 393 (6th Cir. 2017) ............................................................. 13, 14

*Doe v. Univ. of Mich.,*
  721 F. Supp. 852 (E.D. Mich. 1989) ........................................................ 6

*Doe v. Univ. of Notre Dame,*
  3:17CV298, 2017 U.S. Dist. LEXIS 69645 (N.D. Ind. May 8, 2017)...................... 16

*Doe v. Univ. of Sciences,*
  961 F.3d 203 (3rd Cir. 2020) ............................................................. *passim*

*Flaim v. Med. Coll. of Ohio,*
  418 F.3d 629 (6th Cir. 2005) .............................................................. 7

*Gebser v. Lago Vista Independent School District,*
  524 U.S. 274 (1998) ...................................................................... 5

*Gorman v. Univ. of R.I.,*
  837 F.2d 7 (1st Cir. 1988)................................................................. 8

*Goss v. Lopez,*
  419 U.S. 565 (1975) ................................................................... 11, 16

*Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.,*
  245 F.3d 1172 (10th Cir. 2001) ........................................................... 7

*Harris v. Blake,*
  798 F.2d 419 (10th Cir. 1986) ............................................................ 8

*Healy v. James,*
  408 U.S. 169 (1972) ...................................................................... 4

*Jaksa v. Regents of Univ. of Mich.,*
  597 F. Supp. 1245 (E.D. Mich. 1984), *aff'd,* 787 F.2d 590 (6th Cir. 1986) .............. 7

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
  385 U.S. 589 (1967) ...................................................................... 3

*Mathews v. Eldridge,*
  424 U.S. 319 (1976) ............................................................... 8, 12, 14

*McCauley v. Univ. of the V.I.,*
  618 F.3d 232 (3d Cir. 2010)............................................................... 6

*Mott Thoroughbred Stables, Inc. v. Rodriguez,*
  87 F. Supp. 3d 237 (D.D.C. 2015).......................................................... 11

*Pennsylvania v. New Jersey,*
  426 U.S. 660 (1976) ...................................................................... 10

*Plummer v. Univ. of Hous.*,
  860 F.3d 767 (5th Cir. 2017) .................................................................. 7, 8, 9

*Regents of Univ. of Mich. v. Ewing*,
  474 U.S. 214 (1985) ...................................................................................... 8

*Roberts v. Haragan*,
  346 F. Supp. 2d 853 (N.D. Tex. 2004) ........................................................ 6

*Saxe v. State Coll. Area Sch. Dist.*,
  240 F.3d 200 (3d Cir. 2001) ......................................................................... 6

*Sweezy v. State of N.H. by Wyman*,
  354 U.S. 234 (1957) ...................................................................................... 3

*Wis. Gas Co. v. F.E.R.C.*,
  758 F.2d 669 (D.C. Cir. 1985) .................................................................... 11

**Statutes and Rules**

62 Fed. Reg. 12,045 (1997) ............................................................................ 5

66 Fed. Reg. 5512 (Jan. 19, 2001) ................................................................. 5

85 Fed. Reg. 30,026 (May 19, 2020) ............................................................. 1

**Other Authorities**

Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J.C. & U.L. 385 (2009) ........................................................................................................... 4

Council on Postsecondary Education, Sexual Harassment and Sexual Violence Policy, https://web.uri.edu/hr/files/CPE-Sexual-Harassment-Sexual-Violence-Policy-FINAL-CPE-APPROVED-4-1-2015-w-Tech.-Rev.-031218.pdf ..................... 7

Eastern Illinois University, Internal Governing Policies, #175 – Sexual Harassment, https://castle.eiu.edu/auditing/175.php (last visited July 10, 2020) .. 7

Jackson, Candice, ORC, U.S. Dept. of Educ., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf .... 17

Russlynn Ali, OCR, U.S. Dept. of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf................................................................................................... 14

Title IX Legal Database, https://www.titleixforall.com/title-ix-legal-database ........ 19

## INTRODUCTION AND INTEREST OF AMICI STATES

No one denies the urgent need to prevent sexual harassment and to punish it when it occurs. Sexual harassment of any sort is unacceptable, including harassment at our nation's public schools and institutions of higher education. No student pursuing an education should do so in fear that she will be victimized and suffer a lifetime of trauma as a result.

For decades, however, educational institutions and the Department of Education have betrayed basic constitutional protections in an effort to purge anything offensive from campus. These constitutional abuses reached a crescendo when President Obama's Department of Education issued its misguided 2011 Dear Colleague Letter, which trampled the rights of students and created a false choice: either combat sexual harassment or protect constitutional liberties. We propose a different option: do both.

The Department of Education's new Final Rule[1] accomplishes this goal. It requires educational institutions to investigate and, where proved, punish allegations of sufficiently severe, pervasive, and objectively offensive sexual harassment.[2] It also provides a needed framework, consistent with long-standing Supreme Court precedent, that protects the foundational constitutional rights of due process and speech. Far from enabling those who would exploit the vulnerable, it affirms a culture

---

[1] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020).

[2] Unless otherwise stated, the term "sexual harassment" encompasses all forms of sexual harassment, including sexual violence and sexual assault. Likewise, unless otherwise stated, the term, "academic institutions" encompasses all entities covered by the new Final Rule issued by the Department, including schools, colleges, and universities, both primary and secondary.

of accountability within the contours of constitutional liberty. And nothing could better advance the cause of eradicating a culture of sexual harassment than ensuring that those who are punished are truly blameworthy.

The States of Texas, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Kentucky, Louisiana, Mississippi, Nebraska, Oklahoma, South Carolina, South Dakota, and Tennessee, all have robust public education systems that receive federal funding. Each has a compelling interest in the Department issuing clear, practical regulatory guidance, which enables them and the academic institutions within their borders to effectively combat sexual harassment without sacrificing their commitment to either free speech or due process, nor their receipt of federal funds.

The Final Rule helps them attain that balance. The Final Rule builds upon both well-established and emerging law to set forth reasonable standards for combating gender discrimination in educational programs while safeguarding free speech and due process. Moreover, because the Final Rule corresponds to accepted norms, multiple Plaintiffs and the academic institutions they claim to represent already have an obligation to provide students with many of the procedures and practices required under the Final Rule. To the extent either claims to be injured,[3] much of that alleged harm originates from Plaintiffs' own actions and their failure to previously comply with known constitutional standards. Indeed, if anything, the group that suffers irreparably are students, who face quasi-criminal penalties for their alleged conduct but enjoy none of the accompanying protections.

---

[3] Amici take no position with respect to whether the injuries asserted by individual schools and school districts in implementing the Final Rule can be attributable to Plaintiff States.

Accordingly, the balance of equities makes equitable relief here inappropriate. Amici therefore urge the Court to deny Plaintiffs' motion for a preliminary injunction and allow the Department to reaffirm Title IX's commitment to protecting students from actual harassment while respecting free speech and fair process.

## ARGUMENT

### I.   The Final Rule sets forth reasonable standards for combating gender discrimination in educational programs while safeguarding free speech and due process.

Despite Plaintiffs' assertion that the Final Rule marks a sea change in Title IX regulation, courts and previously-promulgated rules have acknowledged and accommodated the free speech and due process rights of those accused of sexual harassment and gender discrimination under Title IX. The Department's adoption of the *Davis* standard for actionable sexual harassment under Title IX is necessary to ensure that students' speech is limited only when necessary and to avoid First Amendment concerns. And the Final Rule's due process protections requiring live hearings, direct cross examination, and neutral fact-finders, reflect a reasonable, straightforward approach to resolution of Title IX complaints that protects both complainants and respondents' due process rights.

### A.   The Final Rule respects the freedom of speech.

"The essentiality of freedom in the community of American universities is almost self-evident." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (quoting *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957)). "Teachers and students must always remain free to inquire, to study and to evaluate,

3

to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id*. Though America has never lost sight, at least in theory, of this vision of the public university as a "marketplace of ideas," *Healy v. James*, 408 U.S. 169, 180 (1972), many universities—either in an intentional effort to create an ideological monopoly or in a good-faith, but misguided, attempt to protect students from controversial ideas—work to stifle speech on campus.[4] *See* Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J.C. & U.L. 385 (2009).

The Final Rule will effectuate the anti-discrimination purposes of Title IX without infringing on the free exchange of ideas. The Final Rule does so by clarifying the types of sexual misconduct to which universities must respond for Title IX purposes. Contrary to the Plaintiffs' assertion, the clarification coincides with longstanding Title IX and First Amendment jurisprudence. And as such, it rejects the notion that public universities can punish students for speech—no matter how offensive, disparaging, or unpopular it may be—unless it has been established that the speech prevents another student from participating in or enjoying the benefits of a recipient's education program.

Regulations promulgated by the Department in 1997, for example, readily acknowledged that public schools and universities must take care that Title IX

---

[4] The mode of suppression typically assumes one of two forms. First, the university can adopt and enforce overbroad "speech codes" and "harassment" policies. Second, the university can enforce its speech codes and harassment policies arbitrarily based on whether the university, or its stakeholders, find the speech objectionable. Neither tactic is exclusive of the other. And both are constitutionally impermissible.

enforcement does not infringe on students' free speech rights. *See* 62 Fed. Reg. 12,045 (1997), Pls.' App. ISO Mot. for Prelim. Inj. ("Pls.' App.") Ex. 3, ECF No. 22-3 ("Title IX is intended to protect students from sex discrimination, not to regulate the content of speech."). Likewise, when the Department updated these regulations in 2001 to reflect intervening Supreme Court precedents in *Gebser v. Lago Vista Independent School District*[5] and *Davis ex rel. LaShonda D. v. Monroe County Board of Education*[6] the Department incorporated and emphasized the standard that "harassment [must] rise[ ] to a level that it denies or limits a student's ability to participate in or benefit from the school's program based on sex." 66 Fed. Reg. 5512 (Jan. 19, 2001), Pls.' App. Ex. 6 at iii-iv, 5-6.

Notably, the 2001 regulations explicitly declined "to provide distinct definitions of sexual harassment to be used in administrative enforcement as distinguished from criteria used to maintain private actions for monetary damages." 66 Fed. Reg. 5512. In the 2001 regulations, the Department explained:

> [A]lthough the terms used by the Court in *Davis* are in some ways different from the words used to define hostile environment harassment in the 1997 guidance . . . the definitions are consistent. Both the Court's and the Department's definitions are contextual descriptions intended to capture the same concept—that under Title IX, the conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program.

*Id*. The Final Rule's reliance on the *Davis* standard is nothing new.

As Intervenors aptly articulate in their preliminary injunction response, the

---

[5] 524 U.S. 274, 290 (1998) (recognizing private cause of action against funding recipient based on deliberate indifference to sexually harassing conduct of school employee).

[6] 526 U.S. 629 (1999) (recognizing private cause of action against funding recipient based on deliberate indifference to sexual harassment by fellow students).

Supreme Court in *Davis,* with its eye on the First Amendment, carefully demarcated the line between constitutionally-protected speech and discriminatory conduct prohibited by Title IX. *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999); FIRE Intervenors' Prelim. Inj. Resp. at 2–4.

Not only does the Final Rule track the language of *Davis*, but it also presents a reasonable response to persistent misinterpretation of Title IX by universities. *See Davis*, 526 U.S. at 651. Despite almost uniform precedent instructing otherwise, universities have continued to adopt overbroad policies that chill speech and sanction students, erroneously in the name of Title IX.[7] Although courts routinely strike down such policies,[8] their continued prevalence has a deleterious effect on free speech since the only way for students to obtain relief is through prolonged litigation.

The Final Rule puts an end to this constant recycling of discredited, unconstitutional policies. It expressly links the definition of sexual harassment to an objective standard, which, in turn, cabins Title IX to incidents where the speech "undermines and detracts from the victims' educational experience," as Title IX has

---

[7] *See, e.g.*, Eastern Illinois University, Internal Governing Policies, #175 – Sexual Harassment, https://castle.eiu.edu/auditing/175.php (last visited July 10, 2020) (banning students from "a variety of behaviors including . . . offensive or inappropriate language or jokes;" encouraging complaints before "harassment reaches an intolerable level;" and further stating that that "[t]he university can and will address inappropriate behaviors even if those behaviors are not yet severe or pervasive");*see also* Council on Postsecondary Education, Sexual Harassment and Sexual Violence Policy, https://web.uri.edu/hr/files/CPE-Sexual-Harassment-Sexual-Violence-Policy-FINAL-CPE-APPROVED-4-1-2 015-w-Tech.-Rev.-031218.pdf (last visited July 10, 2020) (using a definition of sexual harassment that contemplates discipline arising from a single joke, comment, or innuendo from male colleagues, such as calling a female supervisor "bossy").

[8] *See, e.g., McCauley v. Univ. of the V.I.,* 618 F.3d 232 (3d Cir. 2010)*; DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J.); *Roberts v. Haragan*, 346 F. Supp. 2d 853, 872 (N.D. Tex. 2004); *Booher v. Bd. of Regents, N. Ky. Univ.*, No. 96-135, 1998 U.S. Dist. LEXIS 11404 (E.D. Ky. July 22, 1998); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1185 (6th Cir. 1995); *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989).

long provided. *Id*. Administrators will have the incentive to direct their university's policies to behavior that actually interferes with students' equal access to education and not mere expression of ideas—however controversial or unpopular. Students, meanwhile, will have an avenue of relief that is proactive, not reactive to the hijinks of a single institution determined to continue its unconstitutional and unlawful harassment policy.

### B. The Final Rule protects the due process rights of both the accuser and the accused.

Circuit courts across the country recognize that students have protected constitutional interests in their pursuit of higher education. *See, e.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019) (finding reputational harm of being branded a sex offender plus alteration in legal status through suspension and loss of ROTC scholarship created a protected liberty interest); *Plummer v. Univ. of Hous.*, 860 F.3d 767, 774 & n.6 (5th Cir. 2017) (students have a protected liberty interest in higher education); *Barnes v. Zaccari*, 669 F.3d 1295, 1304 (11th Cir. 2012) (college students have a state-created property interest in attending Georgia colleges); *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) (citing *Jaksa v. Regents of Univ. of Mich.*, 597 F. Supp. 1245 (E.D. Mich. 1984), *aff'd*, 787 F.2d 590 (6th Cir. 1986)) (students have a protected liberty interest in higher education); *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1181 (10th Cir. 2001) (students have a state-created property interest in attending Oklahoma public universities); *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991) (same for students attending New York colleges and universities); *Gorman v. Univ. of R.I.*, 837 F.2d 7,

12 (1st Cir. 1988) (a student's interest "in pursuing an education is included within the fourteenth amendment's protection of liberty and property"); *Harris v. Blake*, 798 F.2d 419, 422 (10th Cir. 1986) (students have a state-created property interest in in attending Colorado state colleges). And the Supreme Court has assumed such rights in deciding due process cases in the higher education context. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 222-23 (1985); *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84-85, 98 (1978).

The fundamental tenets of due process require public schools to avoid arbitrary decision making and reduce the risk of erroneous deprivations of protected rights by balancing the individual's interests with the cost of additional due process measures that would guard against that risk. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Courts have increasingly recognized that in the context of Title IX proceedings—where students or others are accused of criminal or quasi-criminal conduct like sexual assault and sexual harassment—students' protected interests are weighty. *Doe v. Univ. of Ky.*, 860 F.3d 365, 370 (6th Cir. 2017) (university sexual misconduct proceeding "was brought to sanction [the respondent] and could have severe consequences, such as expulsion and future career implications"); *Doe v. Purdue Univ.*, 928 F.3d at 661 (significant reputational damage may flow from university's finding of guilt for sexual assault); *Plummer*, 860 F.3d at 779 (Jones, J., dissenting) (characterizing sexual misconduct allegations in university setting as "quasi-criminal"); *Doe v. Univ. of Sciences*, 961 F.3d 203, 213 (3rd Cir. 2020) (recognizing

8

that even students at private universities "have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct").

The Final Rule aims to provide robust protection for individual rights by ameliorating the constitutional and statutory deficiencies caused by prior regulations and guidance. For instance, previous Department letter guidance authorized "single investigator" models prone to depriving respondents of impartial decision makers; erected barriers to live hearings and cross-examination, even when witness credibility was at issue; and effectively eliminated a presumption of innocence for those accused of sexual misconduct. Numerous courts have recognized the constitutional deficiencies of such procedures. *See, e.g.*, *Doe v. Baum*, 903 F.3d 575, 584 (6th Cir. 2018) ("[I]f credibility is in dispute and material to the outcome, due process requires cross-examination."); *Univ. of Sciences*, 961 F.3d at 216 ("Basic fairness" in the context of university sexual misconduct investigations "include[s] the modest procedural protections of a live, meaningful, and adversarial hearing and the chance to test witnesses' credibility through some method of cross-examination"); *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (under totality of circumstances, Title IX coordinator's dual role as investigator and hearing panel member created plausible inference of bias); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 606 (D. Mass. 2016) ("The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions."); *Plummer*, 860 F.3d at 779 (Jones,

J., dissenting) (noting that 2011 Dear Colleague Letter included an "extremely broad definition of 'sexual harassment' [that] has no counterpart in federal civil rights case law; and the procedures prescribed for adjudication of sexual misconduct are heavily weighted in favor of finding guilt").

On this backdrop, the Final Rule—adopted after notice and comment—imposes practical requirements to ensure procedural fairness and reliable fact-finding in the resolution of Title IX complaints, the outcomes of which often rely on witness credibility determinations. Although the specific requirements of constitutional due process vary on a case-by-case basis, the Final Rule sets forth a procedural due process standard that will pass constitutional muster in most, if not all, cases while instituting safeguards that will effectively eliminate the Plaintiffs' concerns about subjecting vulnerable witnesses to uncomfortable or intimidating situations and abuse of the proceedings. Among other things, the Final Rule prohibits cross examination by the parties themselves (while permitting it through advisors), provides the option to conduct proceedings with the complainant and respondent in different rooms, restricts the admissibility of a complainant's sexual history and proclivities, and institutes rules of decorum.

## II.  Plaintiffs' conscious failure to comply with Title IX and the constitutional norms—not the Final Rule—caused their alleged injuries.

"No State can be heard to complain about damage inflicted by its own hand."

*Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976). Plaintiffs devote a significant amount of ink arguing that the Final Rule will cause them, and the academic institutions within their borders, irreparable harm. Specifically, they protest the

Final Rule's effective date, which, they contend, fails to give academic institutions sufficient time to redesign their disciplinary policies. Pls. Br. ISO Mot. Prelim. Inj. at 8–13. But the Final Rule merely adopts many due process protections already required by the Constitution and recognized by the courts. *See supra* Part I.B. Plaintiffs in fact have a legal obligation to provide students with these safeguards anyway, and they have known for years that constitutional norms favor more procedural protections for students accused of sexual harassment, not less.

Plaintiffs protest the effects of disciplinary practices and procedures that the law already compels them to provide. Accordingly, Plaintiffs have not, "by a clear showing, carrie[d] the burden of persuasion," incumbent for this court to issue such "an extraordinary remedy" as a preliminary injunction. *Mott Thoroughbred Stables, Inc. v. Rodriguez*, 87 F. Supp. 3d 237, 243 (D.D.C. 2015). To qualify for a preliminary injunction, Plaintiffs must establish that "the alleged harm will 'directly result' from the action that plaintiff seeks to enjoin." *Dist. Title v. Warren*, 181 F. Supp. 3d 16, 28 (D.D.C. 2014), *aff'd sub nom. Dist. Title v. Warren*, 612 F. App'x 5 (D.C. Cir. 2015) (quoting *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Here, the initial catalyst for many of the challenged policies is the constitutional right to due process, as interpreted by the courts, not the Final Rule. Enjoining the Final Rule will not change Plaintiffs' obligation with respect to these matters.

The Supreme Court has long recognized that students subject to disciplinary proceedings are entitled to due process. *See Goss v. Lopez*, 419 U.S. 565, 581 (1975). The "specific dictates" of that process vary in accordance with the balancing test

articulated in *Mathews*. *See* 424 U.S. at 335. But the Court has clarified that even for a few-day suspension, a student should receive, at minimum, "notice of the charges" and "if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story" at "some kind of hearing." *Goss*, 419 U.S. at 581. The Supreme Court, in other words, has articulated a floor that Plaintiffs and their associated institutions must meet, but it is one that many disciplinary policies fall beneath. *See* Spotlight on Due Process 2019–2020, FIRE, https://www.thefire.org /resources/spotlight/due-process-reports/dueprocess-report-2019-2020/ (last accessed July 12, 2020).

The lower courts offer instruction as well. In the years following the 2011 Dear Colleague Letter,[9] lower courts built upon the fundamentals of *Mathews* and *Goss*, identifying numerous safeguards vital to fair process and the context in which a student accused of sexual harassment is entitled to receive them.[10] As a consequence, the federal jurisdictions in which Plaintiffs Pennsylvania, New Jersey, Delaware, and Michigan reside already oblige academic institutions to provide students accused of sexual harassment with multiple safeguards contained in the Final Rule, including a live hearing and the opportunity to cross-examine witnesses, their accuser among

---

[9] *See* Russlynn Ali, OCR, U.S. Dept. of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[10] *See, e.g., Univ. of Sciences*, 961 F.3d at 214  (notions of fairness are satisfied when the accused has a chance to test witness credibility and a live, adversarial hearing); *Purdue Univ.*, 928 F.3d at 663 (student's hearing must be "a real one, not a sham or pretense"); *Baum*, 903 F.3d at 581 (student has a right to cross-examine witnesses and accuser when credibility is at issue*); Brandeis Univ.*, 177 F. Supp. 3d at 603–07 (single investigator model did not allow for effective review by a neutral party).

them. *See Univ. of Sciences*, 961 F.3d at 214; *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400–401 (6th Cir. 2017); *see also*, *Brandeis Univ.*, 177 F. Supp. 3d at 603–07.

Nor have state courts remained silent on this matter. State courts in California, for example, have advised academic institutions within their jurisdictions that they cannot refuse basic procedural protections, such as neutral factfinders and the admission of evidence, while staying true the requirement of fair process. *See Boermeester v. Carry*, 263 Cal. Rptr. 3d 261, 280 (Cal Ct. App. 2020), as modified (June 4, 2020), reh'g denied (June 18, 2020) ("limited cross-examination . . . prevented [student] from fully presenting his defense, as required by fair procedure"); *Doe v. Allee*, 30 Cal. App. 5th 1036, 1070–71 (Cal Ct. App. 2019) (deficiencies are unavoidable in systems "which place[ ] in a single individual the overlapping and inconsistent roles of investigator, prosecutor, factfinder, and sentencer"). Nevertheless, Plaintiff California claims that regulations in the Final Rule, which endorse those very safeguards, will cause the state and academic institutions within the state irreparable harm.

Finally, Plaintiffs have been on notice for years that academic institutions cannot target students accused of sexual harassment for reduced procedural protections. *See Baum*, 903 F.3d at 582 (noting that the school provided a hearing with cross-examination in all misconduct cases other than those involving sexual assault); *Brandeis Univ.,* 177 F. Supp. 3d at 607 (noting that virtually all other types of misconduct were decided by a clear and convincing standard). The adjudication of sexual harassment claims has much in common with criminal proceedings with

13

respect to the conduct charged and the penalties imposed. *See supra* at 9–10, *infra* at 17–18; *see also Univ. of Ky.*, 860 F.3d at 370 (finding that a university Title IX hearing was sufficiently "akin to criminal prosecutions" to warrant *Younger* abstention). Courts therefore have consistently held under *Mathews* that students accused of sexual harassment merit stronger procedures to ward off false convictions when compared to other deprivations. *See, e.g., Univ. of Cincinnati*, 872 F.3d at 400 (characterizing the private interest as "compelling"); *see also supra* at 10–11.

Plaintiffs and the academic institutions they claim to represent could have heeded the text and spirit of these rulings at any time. Instead, schools, colleges, and universities across the country divested students of due process and waited for the courts to intervene. Even if the 2011 Dear Colleague Letter initially offered some legal basis for this decision, the Department rescinded that letter on September 22, 2017.[11] *Cf. Univ. of Sciences*, 961 F.3d at 213 (describing the pressure universities faced as a result of the letter and accompanying guidance). Nearly three years have passed since then, yet the policies the letter spurred remain in effect.

In short, the injuries alleged are self-imposed. The institutions cited by Plaintiffs in their memorandum chose to adopt a "wait and see" approach. They had notice that their disciplinary policies deviated from the dictates of due process law but did not act. If Plaintiffs and these institutions suffer harm because of the Final Rule's effective date, then that harm was self-inflicted and a preliminary injunction is not warranted. *See Dist. Title v. Warren,* 181 F. Supp. 3d 16, 28 (D.D.C. 2014), *aff'd*

---

[11] Jackson, Candice, ORC, U.S. Dept. of Educ., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

*sub nom. Dist. Title v. Warren*, 612 F. App'x 5 (D.C. Cir. 2015) (ruling that irreparable harm cannot arise from movant's own actions).

### III.   Students will suffer severe and irreparable harm from an injunction delaying the Final Rule.

In contrast to Plaintiffs' self-imposed injuries, students will suffer severe and irreparable harm if this court enjoins the Final Rule. The absence of meaningful safeguards in current disciplinary schemes means that academic institutions can and have imposed life-altering consequences on students without ever giving them a real opportunity to defend themselves. According to Plaintiffs' own declarants, many academic institutions deliberately eschew the procedures and practices associated with due process. *E.g.*, Pls.' App. Ex. 69, Kirkland Decl. ¶ 18; Ex. 70, Leone Decl. ¶ 13. Indeed, it has become commonplace for schools, colleges, and universities to abandon the adversarial model altogether in favor of an "educational" one. *E.g.*, Pls.' App. Ex. 63, Hoos Decl. ¶ 20; Ex. 69, Kirkland Decl.¶ 27; Ex. 87, Ryan Decl. ¶ 39. The Foundation for Individual Rights in Education reports that only a minority of colleges and universities opt to conduct a live hearing. *See* Spotlight on Due Process 2019–2020, FIRE. The vast majority deny students the right to present evidence or cross examine witnesses. *Id.* Less than half require that fact-finders be impartial. *Id.*

Academic institutions attempt to justify this abandonment of due process by characterizing disciplinary proceedings as an outgrowth of the institution's educational mission rather than a means of dispensing punishment. *See* Pls.' App. Ex. 96, Wilson Decl. ¶ 10. Their description, however, is "not credible." *Doe v. Univ. of Notre Dame*, 3:17CV298, 2017 U.S. Dist. LEXIS 69645, at *34 (N.D. Ind. May 8,

2017). A finding of guilt can exact severe monetary and reputational costs on students, ranging anywhere from expulsion and academic suspension to loss of tuition, housing, scholarships, and job opportunities. At the very least, it places a black mark on a student's record. At its most extreme, it can topple any chance a student has at a successful career. In either event, the consequences are "punishment[s] in any reasonable sense of that term." *Id.* And they warrant the protections of due process. *See Goss*, 419 U.S. at 574 (holding that due process forbids arbitrary deprivations, such as "[w]here a person's good name, reputation, honor, or integrity is at stake").

The need for procedural due process only increases in the context of sexual harassment and misconduct. Although not a criminal proceeding outright, the underlying act at issue in a harassment-related disciplinary hearing overlaps with illegal conduct. A finding of guilt attaches a special stigma to the accused party that will stay with them well after they exit campus. It is "a harsh consequence for an individual who has not been convicted of any crime, and who was not afforded the procedural protections of criminal proceedings." *Brandeis Univ.*, 177 F. Supp. 3d at 573, 602 ("If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision.").

To that end, the Final Rule steps in where academic institutions have failed. Academic institutions have known for years that many of their disciplinary policies fall short of constitutional minimums. Rather than adjusting, the institutions have

been content to wait for students to force the issue through litigation. *See*, *e.g.*, Title IX Legal Database, *available at* https://www.titleixforall.com/title-ix-legal-database/ (identifying 645 lawsuits). The Final Rule eliminates the need for students to suffer irreparable injuries before obtaining due process. It establishes a single, publicized standard that conforms to constitutional requirements. More to the point, it incentivizes academic institutions to meet this standard in advance by conditioning the receipt of federal funds on compliance. Should the Final Rule be delayed, then students will have no choice but to try their luck in a proceeding stacked against them. They may then seek redress through the courts, but legal vindication cannot restore missed opportunities, nor can it revive lost dreams or lost reputations. It is a partial remedy only.

## CONCLUSION

For the foregoing reasons, Amici States urge the Court to deny Plaintiffs' motion for a preliminary injunction and allow the Final Rule to take effect on August 14, 2020.

Date: July 15, 2020                                  Respectfully submitted.

KEN PAXTON                                           /s/ David J. Hacker
Attorney General of Texas                            DAVID J. HACKER
                                                     Associate Deputy Attorney General for Civil
JEFFREY C. MATEER                                    Litigation
First Assistant Attorney General
                                                     EMILY ARDOLINO
RYAN L. BANGERT                                      Deputy Division Chief for General Litigation
Deputy First Assistant Attorney General
                                                     KATHLEEN T. HUNKER
                                                     Special Counsel

                                                     OFFICE OF THE ATTORNEY GENERAL
                                                     P.O. Box 12548 (MC-009)
                                                     Austin, Texas 78711-2548
                                                     Tel.: (512) 936-1414
                                                     Fax: (512) 936-0545
                                                     ryan.bangert@oag.texas.gov
                                                     david.hacker@oag.texas.gov
                                                     emily.ardolino@oag.texas.gov
                                                     kathleen.hunker@oag.texas.gov

                                                     COUNSEL FOR AMICI STATES

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

KEVIN CLARKSON
Alaska Attorney General

LESLIE RUTLEDGE
Arkansas Attorney General

ASHLEY MOODY
Florida Attorney General

CHRIS CARR
Georgia Attorney General

CURTIS HILL
Indiana Attorney General

DANIEL CAMERON
Kentucky Attorney General

JEFF LANDRY
Louisiana Attorney General

LYNN FITCH
Mississippi Attorney General

DOUG PETERSON
Nebraska Attorney General

MIKE HUNTER
Oklahoma Attorney General

ALAN WILSON
South Carolina Attorney General

JASON RAVNSBORG
South Dakota Attorney General

HERBERT H. SLATERY III
Tennessee Attorney General &
Reporter

*Counsel for Amici States*

## CERTIFICATE OF SERVICE

I, David J. Hacker, hereby certify that on July 16, 2020, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ David J. Hacker*
DAVID J. HACKER
Associate Deputy Attorney General for Civil Litigation