# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COMMONWEALTH OF
PENNSYLVANIA, et al.,

      *Plaintiffs*,

      v.

ELISABETH DEVOS, Secretary of the U.S.
Department of Education, et al.,

      *Defendants*.

Civil Action No. 1:20-cv-01468 (CJN)

## <u>MEMORANDUM OPINION</u>

Seventeen states and the District of Columbia filed this suit challenging the U.S.

Department of Education's final rule addressing Title IX obligations, which was published in the

Federal Register on May 19, 2020, and is scheduled to take effect on August 14, 2020.  *See*

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal

Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R pt. 106)

(the "Final Rule" or "Rule").  Plaintiffs later moved for a preliminary injunction enjoining

implementation of the Rule or, in the alternative, for a stay of its effective date pending judicial

review.  Although Plaintiffs have raised serious arguments about certain aspects of the Rule, they

have not established a likelihood of success on their claims, nor have they established that they

are likely to suffer substantial irreparable harm pending further litigation.  For those reasons,

discussed below, the Court denies Plaintiffs' Motion.

I.    **Background**[1]

In 1972, Congress enacted Title IX of the Education Amendments, 20 U.S.C.

§§ 1681–88, which prohibits discrimination on the basis of sex in education programs and

activities that receive federal financial assistance.  The statute provides that

> [n]o person in the United States shall, on the basis of sex, be
> excluded from participation in, be denied the benefits of, or be
> subjected to discrimination under any education program or activity
> receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a).  The statute also "authorize[s] and direct[s]" each federal department or

agency that extends federal financial assistance to any education program or activity, including

the Department of Education, "to effectuate the provisions of [section 1681] by issuing rules,

regulations, or orders of general applicability."  *Id.* § 1682.

In 1975, the Department of Health, Education, and Welfare (predecessor of the

Department of Education) promulgated regulations addressing Title IX's mandate "in hiring,

admissions, athletics, and other aspects of recipients' education programs or activities."  85 Fed.

Reg. at 30,028 (citing 40 Fed. Reg. 24,128 (June 4, 1975) (codified at 45 C.F.R. pt. 86 (2020))).

Those regulations further required recipients (i.e., schools and other entities receiving federal

funds in connection with education programs or activities) to "designate an employee to

coordinate" compliance efforts and to "adopt and publish grievance procedures providing for

prompt and equitable resolution of [Title IX] complaints."  *Id.* (citations omitted).

In 1997, the Department of Education's Office of Civil Rights issued a guidance

document addressing Title IX's application to sexual harassment and recipients' corresponding

---

[1] The Background summarizes the most relevant Title IX regulations and guidance documents,
as reflected in the Final Rule and the Parties' briefs.  It is not a comprehensive summary of all
guidance documents and provisions related to Title IX enforcement and recipients' liabilities.

obligations.  *See generally* Sexual Harassment Guidance: Harassment of Students by School

Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997),

https://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html#skipnav2.  The 1997 guidance

characterized sexual harassment as "quid pro quo" or "hostile environment" harassment.  62 Fed.

Reg. at 12,038.  The guidance informed schools that "liability for sexual harassment by its

employees is determined by application of agency principles," *id.,* and that "school[s] will

always be liable for even one instance of quid pro quo harassment by a school employee in a

position of authority . . . whether or not it knew, should have known, or approved of the

harassment at issue," *id.* at 12,039.  And the 1997 guidance defined "hostile environment"

harassment as:

> Sexually harassing conduct (which can include unwelcome sexual
> advances, requests for sexual favors, and other verbal, nonverbal, or
> physical conduct of a sexual nature) by an employee, by another
> student, or by a third party that is sufficiently severe, persistent, *or*
> pervasive to limit a student's ability to participate in or benefit from
> an education program or activity, or to create a hostile or abusive
> educational environment.

*Id.* at 12,038 (emphasis added).

After the 1997 guidance was issued, the Supreme Court decided two cases involving

schools' liability in private Title IX actions.[2]  In 1998, the Supreme Court held that in a private

action against a school district for the sexual harassment of the student by one of the district's

teachers, damages may be recovered only when a district official with the authority to institute

corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to,

---

[2] Following Title IX's enactment and the Department of Health, Education, and Welfare's early
regulations, the Supreme Court held that Title IX provided for an implied private right of action
and damages.  *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979) (holding Title IX
provided for an implied private cause of action); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S.
60 (1992) (holding a damages remedy is available).

the teacher's misconduct. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998). A year later, the Supreme Court held that schools can be liable for peer-to-peer harassment where such harassment is so "severe, pervasive, *and* objectively offensive" that it "undermines and detracts from the victims' educational experience, [such] that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650, 651 (1999) (emphasis added).

The Department issued additional guidance in 2001. *See* Revised Guidance on Sexual Harassment: Harassment of Students by School Employees, Other Students, or Third Parties (Jan. 19, 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. While the Department reiterated its previous compliance standards and stated that its regulatory definitions and standards were distinct from those that might apply in damages actions, the Department also explained that the *Davis* definition of hostile environment sexual harassment (conduct that is "severe, pervasive, and objectively offensive") was consistent with the definition included in its 1997 guidance (conduct that is "sufficiently severe, persistent, or pervasive"). *See* 2001 Guidance at v. As the Department put it, both were "contextual descriptions intended to capture . . . that under Title IX, the conduct must be sufficiently serious that it adversely affects a student's ability to participate in or benefit from the school's program." *Id.* at vi. The 2001 guidance also suggested schools take "interim measures," such as separating the victim and the accused into separate classrooms or housing arrangements, while they investigate a complaint. *Id.* at 16.

In 2011, the Department released a "Dear Colleague Letter" with additional guidance purporting to build on the 2001 guidance and providing additional information regarding schools' Title IX obligations as they relate to sexual violence. *See generally* Dear Colleague

Letter: Sexual Violence (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/
colleague-201104.pdf, *withdrawn by* Dear Colleague Letter (Sept. 22, 2017),
https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.  The 2011 Dear
Colleague Letter maintained the definition of "sexual harassment" as "unwelcome conduct of a
sexual nature" but added "sexual violence" as a form of sexual harassment and noted that
schools' obligations to address sexual harassment thus extended to addressing acts of sexual
violence.  2011 Dear Colleague Letter at 1, 3.  The Department also built on the 2001 guidance
and required schools "to take steps to protect the complainant as necessary, including taking
interim steps" to protect victims pending the completion of an investigation.  2011 Dear
Colleague Letter at 15, 16–17.  Prompted by schools' requests for assistance in complying with
the 2011 guidance, the agency issued additional guidance in 2014 in the form of a Q&A
document.  *See generally* Questions and Answers on Title IX and Sexual Violence (April 29,
2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf, *withdrawn by*
2017 Dear Colleague Letter.

        In September 2017, the Department withdrew the 2011 and 2014 guidance documents
because, while "well-intentioned," those documents confused schools about their obligations,
which in turn deprived accused students of "fair process" and denied victims "an adequate
resolution of their complaints."  2017 Dear Colleague Letter at 1–2.  The Department announced
that it would engage in notice-and-comment rulemaking to bring together stakeholders to
"develop an approach to student sexual misconduct . . . that aligns with the purpose of Title IX to
achieve fair access to educational benefits."  *Id.* at 2; *see also* September 2017 Q&A on Campus
Sexual Misconduct (Sept. 2017) at 1, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-
201709.pdf.  A little over a year later, the Department issued a Notice of Proposed Rulemaking,

*see generally* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462 (proposed Nov. 29, 2018), and in May of this year, the Department issued its Final Rule.

The Final Rule has a number of provisions relevant here.  It defines "sexual harassment" to mean:  (1) quid pro quo harassment, defined as "an employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an in individual's participation in unwanted sexual conduct; (2) "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity" (frequently referred to as "hostile environment harassment"); and (3) sexual assault, dating violence, domestic violence, or stalking as defined under the Jeane Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092(f) and Violence Against Women Act ("VAWA"), 34 U.S.C. §§ 12291–12512.[3]  *See* 85 Fed. Reg. at 30,101; 34 C.F.R. § 106.30.  The Final Rule defines "education program or activity" to "include[ ] locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution."  34 C.F.R. § 106.44(a).  The Rule obligates recipients to respond when they have active knowledge of sexual harassment and requires them to "respond promptly in a manner that is not deliberately indifferent."  *Id.*  "A

---

[3] The Clery Act and VAWA impose reporting requirements on institutions of higher education about certain criminal conduct.  The Clery Act specifically requires disclosure of campus crime statistics about offenses such as sexual assault, and VAWA amended the Clery Act to require additional information about domestic violence, dating violence, and stalking.  *See* 85 Fed. Reg. 30,511 (citing 20 U.S.C. § 1092(f)).

recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances." *Id.*

The Rule also prescribes a specific grievance process to handle sexual harassment complaints. *See id.* § 106.45.  That process requires recipients to have employees who are designated as investigator, decision-maker, and appeals reviewer—in addition to designating a Title IX coordinator.[4]  Each of those individuals—and anyone who "facilitates an informal resolution process"—must be properly trained to administer the Rule and its grievance process, including with respect to conducting an investigation, serving impartially, avoiding bias and prejudgment, and understanding what constitutes relevant evidence. *Id.* § 106.45(b)(1)(iii).

The Title IX coordinator is charged with being a school's point person to receive reports of sex discrimination or sexual harassment. *See id.* § 106.8.  Upon receiving a report, the Title IX coordinator must reach out to the victim, or "complainant," to discuss and offer "supportive measures," such as counseling, course-related adjustments, schedule adjustments or modifications, campus escort services, increased security, and leaves of absence. *Id.* §§ 106.30, 106.44.  The complainant must be a person "participating in or attempting to participate in the education program or activity of the recipient." *Id.*  Supportive measures are also to be offered to the accused, or "respondent," and any supportive measures offered to the victim of the alleged harassment cannot be punitive or unreasonably burden the respondent. *Id.* § 106.30; 85 Fed. Reg. at 30,045, 30,085 & n.429.  Although anyone may report sexual harassment, a complaint is

---

[4] Schools were already required to select at least one employee to coordinate the schools' Title IX compliance efforts.  *See* 1997 Guidance.  Although the person filling the role of decision-maker cannot also be a Title IX coordinator or investigator, there is nothing preventing the Title IX coordinator from also serving the role as an investigator.  85 Fed. Reg. at 30,371.

deemed "formal" if it is filed by the complainant[5] or signed by the Title IX coordinator.  34 C.F.R. § 106.30.  The complaint must also allege sexual harassment and request that the school investigate the harassment.

In the event that the Title IX coordinator receives a formal complaint of sexual harassment, the school must follow a procedure consistent with the Final Rule before imposing any disciplinary sanctions, with limited exceptions for emergency removals or administrative leave for non-student employees.[6]  *Id.* §§ 106.44(b)–(d), 106.45.  The recipient must provide written notice of the allegations against the respondent and inform both parties that that they are entitled to an advisor, who may be an attorney.  *Id.* § 106.45(b)(5)(iv).  Each party (and party advisor) is entitled to "inspect and review any evidence" that is related to the investigation and must have at least ten days to respond to the evidence in writing.  *Id.* § 106.45(b)(5)(vi).  The recipient shall consider the responses and then complete an investigative report summarizing the evidence and provide it to the parties at least ten days before the time of determination regarding responsibility, affording them the opportunity to respond to the report itself.  *Id.* §§ 106.45(b)(5)(vi)–(vii).  Although recipients that are not postsecondary institutions are not required to conduct hearings, they may do so between sending the investigative report to the parties and the determination of responsibility.  *Id.* § 106.45(b)(6)(ii).

---

[5] In cases involving a minor or a student with a disability, the complaint can also be filed by the complainant's parent or guardians.  *See* 34 C.F.R. §§ 106.6(g), 106.45(b)(5)(i) (citing *id.* § 99.3); 85 Fed. Reg. at 30,122, 30,136.

[6] Schools must "adopt and publish grievance procedures that provide for the prompt and equitable resolution of" sex discrimination or sexual harassment complaints.  34 C.F.R. § 106.8(c).  While schools retain some discretion over the proceedings, they must, at minimum, comply with the provisions of section 106.45.  *See id.*

At the postsecondary level, recipients must provide for a live hearing.  *Id.*
§ 106.45(b)(6)(i).  As in other meetings and proceedings, both the complainant and respondent
are entitled to have their advisors participate.  *Id.*  If a party does not have an advisor, the
recipient must provide the party an advisor of the recipient's choice free of charge.  *Id.*  In these
hearings, each party's advisor may conduct a cross-examination "directly, orally, and in real
time" of any party and witness, and the decisionmaker may not consider the statements of any
party or witness who does not submit to any cross-examination.  *Id.*  The recipient must
accommodate a request by either party that the parties be located in separate rooms during the
hearing and provide the necessary technology.  *Id.*

At both the K-12 and postsecondary levels, the decision-maker must issue a written
determination regarding responsibility, which summarizes the relevant allegations and
procedural steps and discusses the findings of fact, and conclusions and rationales.  *See
id.* § 106.45(b)(7)(ii).  The decision-maker must also state what sanctions shall be imposed, and
whether "remedies designed to restore or preserve equal access to the recipient's education
program or activity will be provided by the recipient to the complainant."  *Id.*
§ 106.45(b)(7)(ii)(E).  Once a determination has been made, either party may lodge an appeal,
*see id.* § 106.45(b)(8); each party will have the opportunity to submit a written statement,
§ *id.* 106.45(b)(8)(iii)(D); and the appellate decision-maker must issue a written decision,
*id.* § 106.45(b)(8)(iii)(E).  A recipient's determination regarding a respondent's responsibility (or
lack thereof) will not itself be "evidence of deliberate indifference."  *Id.* § 106.44(b)(2).

If a complainant's report of misconduct does not satisfy the Rule's definition of sexual
harassment, the school cannot treat the report as a formal complaint; even if the complainant
purports to file the complaint formally, the recipient must dismiss the complaint.  *See id.*

§ 106.45(b)(3)(i).  If during an investigation a complainant withdraws the formal complaint or

the recipient cannot "gather evidence sufficient to reach a determination as to the formal

complaint" or its allegations, the recipient has the option of dismissing the complaint.

*Id.*  §106.45(b)(3)(ii).[7]

Even though certain conduct may not constitute sexual harassment under the Rule (such

as by not meeting the Rule's definition or by occurring outside the United States), schools still

retain the authority to address and discipline such behavior through their own codes of conduct.

As the Department stated in one of its filings, and as counsel for the Department also represented

during the oral argument, "the Rule creates a grievance process only for conduct that falls within

the Department's definition of sexual harassment:  if an allegation of misconduct does not fall

within that definition, the Rule *does not require or prohibit anything of schools regarding*

*whether or how they must respond*."  Defs.' Suppl. Mem. at 3, ECF No. 92 (emphasis added);

*see also* July 24, 2020 Hr'g Tr. at 52–53, ECF No. 90.

The Final Rule goes into effect on August 14.  On June 4, seventeen states[8] and the

District of Columbia filed this suit, alleging the Department exceeded its statutory authority in

promulgating the Rule, that the Rule is arbitrary, capricious, and otherwise an abuse of

discretion, and that the Department did not properly observe the Administrative Procedure Act's

---

[7] If, however, the victim of alleged harassment does not wish to file a formal complaint, a "decision to initiate a grievance process against the wishes of a complainant is one that that must be undertaken only when the Title IX coordinator determines that signing a formal complaint initiating a grievance process against a respondent is not clearly unreasonable in light of the known circumstances."  85 Fed. Reg. at 30,296 n.1162.  The coordinator's decision to proceed with the grievance process against a complainant's wishes may constitute deliberate indifference. *See id.* at 30,045–46 & 30,045 n.177.

[8] Pennsylvania, New Jersey, California, Colorado, Delaware, Illinois, Massachusetts, Michigan, Minnesota, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Virginia, Washington, and Wisconsin.

(APA) notice-and-comment procedure.  *See* Compl. ¶¶ 235–273, ECF No. 1.  On June 23,

Plaintiffs filed a Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay Pending Judicial

Review, ECF No. 22.[9]  Following briefing and argument, the Court ordered supplemental

briefing on two questions raised during the argument:  "(1) whether the Department of Education

has the authority to make Plaintiffs' failure to comply with the Final Rule a violation of Title IX;

and (2) whether Plaintiffs properly preserved this argument."  Min. Order (July 24, 2020).

## II.      Legal Standard

"A preliminary injunction is an extraordinary remedy that should be granted only when

the party seeking the relief, by a clear showing, carries the burden of persuasion."  *Cobell v.*

*Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972

(1997)).  Under the standard for a stay or preliminary injunction, "a court considers four factors:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the

merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance

of the stay will substantially injure the other parties interested in the proceeding; and (4) where

the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted); *see also*

*Cobell*, 391 F.3d at 258.  These factors also govern the issuance of a stay under Section 705 of

the APA.  *See District of Columbia v. U.S. Dep't of Agric.*, No. CV 20-119, 2020 WL 1236657,

at \*8 (D.D.C. Mar. 13, 2020) (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972,

974 (D.C. Cir. 1985) (other citations omitted)), *appeal filed*, 20-5136, May 20, 2020.

---

[9] The Court also permitted various student organizations and interested advocacy groups to intervene as Defendants.  *See* Min. Order (July 6, 2020).

### III.    Likelihood of Success on the Merits

The scope of review is deferential under the arbitrary and capricious standard.  *Nat'l*

*Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007); *Ark Initiative v. Tidwell*,

816 F.3d 119, 127 (D.C. Cir. 2016).  A rule is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it
> to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not
> be ascribed to a difference in view or the product of agency
> expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).  The Court's role is limited to "confirm[ing] that the agency has fulfilled its duty to

'examine the relevant data and articulate a satisfactory explanation for its action including a

rational connection between the facts found and the choice made.'"  *Tidwell*, 816 F.3d at 127

(quoting *State Farm*, 463 U.S. at 43).  Although the Court may not "make up for [any]

deficiencies" in the agency's reasoning, once it is satisfied that the agency has discharged its

duty, the Court cannot substitute its judgment for the agency's, even where the decision may be

of "less than ideal clarity."  *State Farm*, 463 U.S. at 43 (citation omitted).

Plaintiffs raise a number of challenges to specific provisions in the Rule.  Plaintiffs

contend that the Department's definition of sexual harassment contravenes the statute's purpose,

does not effectuate Title IX's mandate, and is arbitrary and capricious, Pls.' Mem. of P. & A. in

Supp. of Mot. for Prelim. Inj. or 5 U.S.C. § 705 Stay Pending Judicial Review ("Mot.") at 25–30,

ECF No. 22-2; Pls.' Reply in Supp. of Mot. ("Reply") at 19–22, ECF No. 75, and that the

Department exceeded its authority by mandating the dismissal of otherwise meritorious

complaints, *id.* at 31–32.  They also argue that the grievance process for K-12 schools exceeds

the Department's authority and is arbitrary and capricious because it does not account for the

unique circumstances in the K–12 environment, *see id.* at 14–17; Reply at 6–11, and that the grievance procedure in postsecondary schools is arbitrary and capricious because it imposes unreasonable live-hearing requirements and evidentiary rules, Mot. at 18–21; Reply at 11–14. Three of these arguments are discussed in more detail below, *see infra* at 17–24, while several of them warrant less discussion.

*Definition of Sexual Harassment*

Plaintiffs argue that the Department improperly reversed its decades-long definition of hostile environment harassment from "severe, persistent, or pervasive" to "severe, pervasive, and objectively offensive" and by adding the qualifier that such conduct must "*effectively* den[y] a person equal access."  Mot. at 26 (citing 34 C.F.R. § 106.30(a) (emphasis added)).  The new definition, Plaintiffs argue, is an unjustified change and imposes an atextual limit on Title IX's "broad reach," and is therefore arbitrary and capricious.  *Id.* at 22, 27 (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005)).

The Court disagrees that the Department did not adequately justify this change.  As the Department explained in the Final Rule, the 2001 guidance had made clear that the Department considered the *Davis* definition of hostile environment sexual harassment to be consistent with the 1997 guidance definition, despite the use of "different words."  85 Fed. Reg. at 30,036.  The 2001 guidance also emphasized the benefits of consistency between the *Davis* standard—which "cited approvingly to the underlying core factors described in the 1997 guidance for evaluating the context of the harassment"—and the Department's own definition.  2001 Guidance at vi.  As reflected in the Final Rule, the Department's prior view—that is, that the definitions were consistent—did not "bear out over time."  85 Fed. Reg. at 30,036.  Accordingly, the Department explained that it changed the regulatory definition to provide recipients with "consistency and

simplicity in understanding what is sexual harassment for which the school must take responsive action," and a "multiplicity of definitions would not serve this purpose"—the same reasons it had given in 2001. 85 Fed. Reg. at 30,036 (quoting 2001 Guidance at vi).

Moreover, contrary to Plaintiffs' argument, the Department did not "simply invoke[e] the *Davis* standard." Mot. at 29. Rather, by aligning the hostile environment prong with the *Davis* standard and adding a separate sexual violence prong, the Department exercised its authority to address "the tension between student and faculty freedom of speech[] and regulation of speech to prohibit sexual harassment" while "prohibit[ing] harassing and assaultive physical conduct." 85 Fed. Reg. at 30,164.[10] And in balancing Title IX and free speech considerations, the Department reasonably concluded that it need not follow Title VII's definition of sexual harassment because of key differences between the workplace and schools. Defs.' Opp'n to Mot. ("Opp'n") at 16, ECF No. 63. The Department reasoned its definition should "allow[] for the social and developmental growth of young students learning how to interact with peers in the elementary and secondary school context [and] foster robust exchange of speech, ideas, and beliefs in a college setting." 85 Fed. Reg. at 30,151. That Plaintiffs disagree with the Department's decision to factor in developmental considerations in this way does not mean the agency failed to explain the divergence from Title VII, and it certainly does not render the Rule arbitrary and capricious.[11]

---

[10] To be sure, it is possible that the Department's new definition may have prioritized free speech concerns over its statutory directive. But Plaintiffs do not explicitly raise this argument or suggest that the agency was not effectuating its mandate by attempting to balance Title IX and free speech and academic freedom.

[11] In addition, as Judge Koeltl recently explained, "[w]hile the [Department] acknowledged that it was not bound by the *Davis* formulation of sexual harassment, turning to that Supreme Court authority could hardly be characterized as 'arbitrary or capricious.'" *New York v. U.S. Dep't of Educ.*, No. 20-cv-4260, 2020 WL 4581595, at *8 (S.D.N.Y. Aug. 9, 2020).

*Quid Pro Quo Harassment*

Plaintiffs also argue that the Department's decision to limit quid pro quo harassment to "employees . . . arbitrarily excludes quid pro quo harassment perpetrated by students in positions of authority who may not be deemed employees." Mot. at 29 (citation omitted). The Department acknowledged that some non-employees may be in positions of power over students but, relying on *Gebser*, ultimately concluded that the text of Title IX did not broadly reference agents or "expressly call for application of agency principles." 85 Fed. Reg. at 30,148 & n.646 (citations omitted). Whether that was the best line to draw, Plaintiffs have not demonstrated that the Department relied on impermissible factors, "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

*Connection to the Education Program or Activity*

The new Rule requires "[a] recipient with actual knowledge of sexual harassment *in an education program or activity* of the recipient against a person in the United States[ to] respond promptly in a manner that is not deliberately indifferent." 34 C.F.R. § 106.44(a) (emphasis added). Plaintiffs challenge the Department's inclusion of language specifying that sexual harassment must be "in an education program or activity" as a "geographic restriction[]" that is "contrary to the statutory text and purpose" and lacking a "reasoned explanation." Mot. at 23. Because off-campus harassment may have repercussions that flow into the educational environment, Plaintiffs argue, the Department's narrower definition failed to consider an important aspect of the problem and will "lead to absurd and arbitrary results." Mot. at 24–25. In response, the Department explains that this language is linked to the definition of "program

and activity" set forth in 20 U.S.C. § 1687 and clarifies that the Rule is not as narrow as Plaintiffs understand. Opp'n at 9. The operative inquiry is not *where* the sexual harassment occurred,[12] but rather, whether it occurred at an operation "over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs." *Id.* at 9 (citing 85 Fed. Reg. at 30,196–97). Here, the Final Rule is rooted in the text of Title IX itself, and the Court cannot supplant the Department's view of its own authority with Plaintiffs' preference for a broader one.

*Grievance Process*

Plaintiffs also lodge several objections to specific requirements regarding the grievance process that is triggered by the filing of a formal complaint, *see supra* at 8–11. Mot. at 18–21. In the commentary to the Final Rule, the Department explained that it believes the Rule's grievance process will

> provide individuals with effective protection from discriminatory practices, including remedies for sexual harassment victims, by consistent application of procedures that improve perceptions that Title IX sexual harassment allegations are resolved fairly, avoid injection of sex-based biases and stereotypes into Title IX proceedings, and promote reliable outcomes.

85 Fed. Reg. at 30,100–01; *see also id.* at 30,263 ("[F]air process with procedures rooted in principles of due process provides assurance that the outcome of a grievance process . . . is reliable and viewed as legitimate.") The Court has reviewed the Department's discussion of the formal grievance process and its reasons for having adopted it and concludes that it cannot be characterized as "arbitrary and capricious."

*       *       *

---

[12] So long as the harassment occurs in the United States. Opp'n at 9 (citing 20 U.S.C. § 1681(a)).

As noted above, Plaintiffs make three arguments that present closer questions than the foregoing arguments and warrant further discussion.

### A.      K-12 Institutions

It is generally understood that elementary and secondary schools are entitled to considerable latitude in setting rules and administering discipline.  *See, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 403–407 (2007) (collecting cases);[13] *Goss v. Lopez*, 419 U.S. 565, 580, 582 (1975).  In *Goss*, the Supreme Court held that due process entitled a student facing a ten-day suspension to notice of the charges against him, an explanation of the evidence against him, and an opportunity to present his case.  *Goss*, 419 U.S. at 581–82.  Although the Court rejected the argument that schools must be free to impose discipline without notice and comment to operate efficiently, *id.* at 581, it also underscored that such proceedings need not be cumbersome or prolonged, *id.* at 582 ("There need be no delay between the time 'notice' is given and the time of the hearing.  In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred.  We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.").

---

[13] *See Bd. of Educ. v. Earls*, 536 U.S. 822, 829–830 (2002) ("'special needs' inhere in the public school context"; "[w]hile schoolchildren do not shed their constitutional rights when they enter the schoolhouse, Fourth Amendment rights . . . are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children" (some quotation marks and citations omitted); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655–656 (1995) ("[W]hile children assuredly do not 'shed their constitutional rights . . . at the schoolhouse gate,' . . . the nature of those rights is what is appropriate for children in school." (citation omitted)); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986) (reasoning, in a case involving a student speech containing an "elaborate, graphic, and explicit sexual metaphor," that the "determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board").

Relying on *Goss* and similar cases, Plaintiffs argue the Rule's mandated grievance process in K-12 schools exceeds the Department's authority[14] and is arbitrary and capricious by impermissibly intruding into schools' disciplinary procedures and failing to account for the unique environment of K-12 schools.  Mot. at 13–17.  Plaintiffs argue that formal procedures are not appropriate across the board, especially when children are still developing and where such formality may interfere with the educational role of discipline.  *See, e.g.*, *Goss*, 419 U.S. at 583 ("[F]ormalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but *also destroy its effectiveness as part of the teaching process*." (emphasis added)); Pls.' App'x to Mot. ("App'x"), Ex. 20 at 1, ECF No. 22-3 ("We focus our efforts to find educationally and behaviorally sound methods and interventions to appropriately modify student behavior, not to develop and enforce quasi-judicial processes"); App'x Ex. 22 at 2, 3 (arguing that "effective anti-harassment policies and early intervention are imperative to protecting child safety" at the "critical young age when [students] are first forming ideas and attitudes about appropriate behaviors and healthy relationships"). And Plaintiffs contend that a grievance process that will delay any discipline by at least twenty days to allow for a formal investigation and inspection of evidence, 34 C.F.R. § 106.45(b), neglects the importance of promptly addressing misconduct when young children are involved. *See, e.g.*, App'x Ex. 19 at 2–3 ("Educators act in loco parentis and are thus obligated to take more affirmative protective measures with children/students"); *id.* at 3 (reciting findings in a CDC study that unchecked forms of misconduct, "if not resolved or redirected, may escalate in nature").

---

[14] Plaintiffs characterize the grievance process as unlawful in the K-12 context, but they do not clearly spell out whether the process is unlawful because they believe it to be arbitrary and capricious or if there is another constraint on the Department's authority.

The Department responds that the Rule expressly preserves schools' authority to promptly remove students who pose an immediate threat to another student's physical safety, Opp'n at 27 (citing 34 C.F.R. § 106.44(c)); authorizes and requires schools to promptly provide "supportive measures," such as counseling, course-related adjustments, schedule adjustments or modifications, escort services, increased security, and leaves of absence, §§ 106.30, 106.44; and does not mandate live hearings in elementary and secondary schools, 85 Fed. Reg. at 30,052.  As a result, the Department argues, the Rule permits schools to take such steps as "sending students to the principal's office, changing students' seating or class assignments, or advising students of the school's anti-sexual harassment policy and code of conduct" without going through the formal complaint process.  Opp'n at 27.  But, the Department argues, it "reasonably drew the line . . . at inherently punitive or disciplinary sanctions, which a K-12 recipient may impose only following a grievance process that meets the minimum requirements outlined in the Rule."  *Id.*

It may be that the Final Rule is overly prescriptive and that a Rule that grants Plaintiffs more flexibility to administer discipline would more properly balance the mandate to effectuate Title IX and the needs that are unique to the K-12 environment.  But the Court, of course, "is not to substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, nor to ask "whether a regulatory decision is the best one possible or even whether it is better than the alternatives," *F.E.R.C. v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  The Court cannot conclude that Plaintiffs are likely to show that the Final Rule is arbitrary and capricious in the context of K-12 schools.  Among other things, the Department considered and adopted different rules for K-12 and postsecondary institutions:  elementary and secondary schools are not subject to the live hearing requirement, 34 C.F.R. § 106.45; *any* person may report sexual harassment to a K-12 employee (thus accounting for students who are unable to write a formal complaint or parents

who are unable to participate in a formal process); and notice to any employee obligates a school

to respond accordingly and offer supportive measures, Opp'n at 28–29 & 29 n.15 (citations

omitted).  But the Department explained that it retained the formal complaint requirement to

allow victims to maintain their autonomy and accommodated the dynamics of the K-12

environment by allowing parents or guardians of minors or students with disabilities to file

complaints on students' behalf.  Opp'n at 29 (citing 34 C.F.R. § 106.6(g); 85 Fed. Reg. at

30,122, 30,136).  Where, as here, the Department has "examine[d] the relevant data and

articulate[d] a satisfactory explanation for its action including a rational connection between the

facts found and the choice made,'" *Tidwell*, 816 F.3d at 127 (internal quotation and citation

omitted), the Court "is not to substitute its judgment for that of the agency," *State Farm*, 463

U.S. at 43.

### B.  Authority to Prohibit Schools from Taking a More Proactive Approach

As noted above, the Court ordered supplemental briefing on two issues discussed during

oral argument:  (1) whether the Department could prohibit (or at least withhold federal funding

from) recipients that do more than the Final Rule permits to investigate and punish what

recipients believe to be sexual harassment; and (2) whether Plaintiffs properly preserved this

argument.  Min. Order (July 24, 2020).  Plaintiffs challenge the Final Rule's requirement that

recipients must dismiss formal complaints that would not meet that definition (if, for example,

the alleged conduct does not meet the definition of sexual harassment, occurred outside the

United States, or the complainant was not attempting to participate in an educational program or

activity).  *See* Mot. at 25–32, ECF No. 22-2.  In Plaintiffs' view, the Final Rule's mandatory

dismissal requirement exceeds the Department's authority to further Title IX's anti-

discrimination mandate.  *See* Mot. at 13.

The argument that the Department exceeded its authority to further Title IX's anti-discrimination mandate could, in theory at least, apply to much of the Final Rule.  Under Section 1682, the Department has the authority to "issu[e] rules, regulations or orders of general applicability" that "effectuate" Title IX's mandate that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. §§ 1681–82.  That grant of authority surely permits the Department to set a floor for conduct that a recipient must investigate and punish or risk losing Title IX funding, but it is not obvious that the Department can set a ceiling above which a recipient cannot punish misconduct without risking its Title IX funding.  Put differently, if a recipient chose to take a broader view of Title IX and punish (as sexual harassment) conduct that does not fit within the Final Rule's definition, may the Department deem that discipline to constitute a violation of the Rule and withhold federal funding from the recipient under its authority to effectuate Title IX's anti-discrimination mandate?  Or can the Department withhold funding from a school for punishing sexual harassment occurring outside the United States, or imposing disciplinary measures before twenty days, based on a regulation promulgated to ensure that no person shall be excluded on the basis of sex from an educational program?

Perhaps in some cases it could be said that a recipient's investigation or punishment of conduct that does not fit within the Final Rule's definition could itself constitute discrimination on the basis of sex *by the recipient against the respondent*.  *See* 85 Fed. Reg. at 30,101 (noting "that a recipient's treatment of a respondent '*may* also constitute discrimination on the basis of sex'" (quoting 34 C.F.R. § 106.45(a)); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 667–670 (7th Cir. 2019) (permitting respondent's Title IX claim alleging that respondent deprived him of due

process on the basis of his sex to move forward).  But that seems unlikely to be true in all cases, and in any event the Department does not argue that its authority to limit how recipients respond to sexual harassment that does not meet the Final Rule's definition derives from the Department's power under Title IX to prohibit sex-based discrimination. *See id.* (noting that "unfair imposition of discipline, even in a way that violates constitutional due process rights, *does not necessarily equate to sex discrimination prohibited by Title IX*") (emphasis added).

Instead, the Department argues that it can only regulate conduct by peers or recipients' employees that violates Title IX's specific mandate to ensure equal access to education, which it concluded is the conduct that meets the new definition of sexual harassment.  Opp'n at 20.  The Department also argues that its regulatory authority is broader than merely prohibiting conduct (here, by recipients) that would itself violate Title IX.  Relying on *Grove City College v. Bell*, 465 U.S. 555, 574 (1984), and *Gebser*, 524 U.S. at 292, the Department argues that Title IX "leaves no doubt that [the Department] can issue rules that extend beyond the terms of the statute to promote its purpose, and the Supreme Court has been equally clear:  'Agencies generally have authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate, even if those requirements do not purport to represent a definition of discrimination under the statute.'"  Defs.' Suppl. Mem. at 2 (quoting *Gebser,* 524 U.S. at 292).  The Department also notes that the Supreme Court has stated that the Department "'could enforce . . . administratively' a requirement that a school 'promulgate a grievance procedure,' even though the failure to do so 'does not itself constitute "discrimination" under Title IX,'" and similarly, that the Department "may require schools to sign assurances of compliance pursuant to Title IX, even though the failure to sign such assurances is not itself a violation of Title IX (i.e., does not itself constitute sex discrimination by the recipient."  Defs.' Suppl. Mem. at 2 (omission in

original) (first quoting *Gebser*, 524 U.S. at 292; then citing *Grove City Coll*, 465 U.S. at 574). The Department further emphasizes that while it has defined sexual harassment and set forth specific obligations *under Title IX*, it has not prohibited recipients from investigating and punishing conduct that does not fit within the Rule's definition of sexual harassment, so long as recipients do not label that conduct Title IX sexual harassment. *Id*. at 3. ("[I]f an allegation of misconduct does not fall within [the Rule's] definition, the Rule does not require or prohibit anything of schools regarding whether or how they must respond."). And the Department underscores the importance of a consistent grievance process across all types of institutions. 85 Fed. Reg. at 30,052.

While it is a close question whether the Department has the authority to penalize recipients for taking a broader view of harassment that denies equal access to education and punishing such misconduct as Title IX violations, Plaintiffs have not established a likelihood of success on this argument for at least three reasons.

First, Plaintiffs have not squarely presented this argument. Although they contest the Department's narrower definition of "sexual harassment," and make generalized and conclusory assertions in their papers about the Department's authority, they do not clearly argue that the Department lacks authority to punish them (or at least withhold federal funding) for taking a more proactive approach to Title IX. They appear to have most closely touched on this issue in the context of the mandatory dismissal requirement, which the Court addresses below.

Second, the Department's authority to promulgate regulations is not strictly limited to those "purport[ing] to represent a definition of discrimination under the statute." Defs.' Suppl. Mem. at 2. While the Final Rule goes beyond a requirement that schools publish grievance procedures, as discussed in *Gebser,* 524 U.S. at 292, or a requirement that schools sign

compliance statements, as discussed in *Grove City College*, 465 U.S. at 574, these portions of the

Final Rule do appear rooted in Title IX's grant of authority to the Department to issue

regulations that effectuate the statute.

Finally, with respect to the mandatory dismissal requirement—where Plaintiffs most

expressly articulate this argument—the Department committed in its Supplemental Brief that:

> Even if Plaintiffs were right that the provision conceivably could
> lead to [the Department] terminating a school's federal funding for
> merely referring to a proceeding as a "Title IX proceeding" with
> respect to misconduct that falls outside Title IX, [the Department]
> has no intention of enforcing the Rule unreasonably, for instance by
> turning the Rule on its head and *reducing* the flexibility of recipients
> to proceed in whatever manner they prefer when conduct is not
> covered by the Rule's definition of the scope of Title IX.  If [the
> Department] disagreed with a recipient's characterization of a
> proceeding as falling under Title IX and a party dissatisfied with the
> recipient's handling of the proceeding filed an enforcement
> complaint, [the Department] would only seek to clarify for the
> recipient and the parties involved in the proceeding that the situation
> designated by the recipient as a "Title IX proceeding" was not
> actually required under Title IX.

Defs.' Suppl. Mem. at 6.  In light of these commitments from the Department, it is hard to see

how Plaintiffs are likely to succeed even on their narrow claim that the Department exceeded its

authority by mandating the dismissal of complaints alleging non-Title IX harassment.

### C.     August 14, 2020 Effective Date

Plaintiffs also argue that it was arbitrary and capricious for the Department to select an

implementation date of August 14, 2020.  Under the APA, final regulations typically cannot go

into effect until thirty days after they are published in the Federal Register.  85 Fed. Reg. at

30,534.  During the rulemaking process, commenters requested an implementation window

ranging from approximately ninety days to three years, noting they needed time to change their

grievance procedures, "for the Department to adequately explain to recipients" the new and

complicated processes, and to give recipients ample time to "accommodate budget cycles and to request additional resources for the subsequent fiscal year." *Id.*

In the Final Rule, the Department stated that a sixty-day implementation window would ordinarily be sufficient for recipients to come into compliance. *Id.* Given the national emergency resulting from COVID-19, however, the Department thought it appropriate to extend the effective date to August 14, 2020. *Id.* at 30,028, 30,534 (citing Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation 9994 of March 13, 2020, 85 Fed. Reg. at 15,337–38). The Department "appreciate[d]" the "exigent circumstances" of the pandemic, and "recognize[d] the practical necessity of allowing recipients . . . time to plan for implementing these final regulations." *Id.* at 30,028. It concluded that an effective date of August 14 would allow schools to work towards compliance during "summer break," while they are "out of session." *Id.* at 30,536. The Department acknowledged, however, "that the length and scope of the current national emergency relating to COVID-19 is somewhat uncertain," and "based on the information currently available to it," "the effective date of August 14, 2020, adequately accommodates the needs of recipients." *Id.* at 30,534.

Plaintiffs challenge the effective date as arbitrary and capricious in light of the Rule's broad requirements, "including hiring and training staff, engaging in required consultation with stakeholders, overhauling policies, revising grievance processes, and communicating the complex changes to students, families, and employees—all in the midst of [a] global pandemic that has depleted their resources and disrupted their ordinary operations." Mot. at 3.

The Court's scope of review here is, again, deferential under the arbitrary and capricious standard. *Defs. of Wildlife*, 551 U.S. at 658. And "when the statute authorizing agency action fails to specify a timetable for effectiveness of decisions, the agency normally retains

considerable discretion to choose an effective date." *Recording Indus. Ass'n of Am. v. Copyright Royalty Tribunal*, 662 F.2d 1, 14 (D.C. Cir. 1981) (citations omitted).  Nevertheless, the Court must still ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made,'" which here is the effective date.  *Tidwell*, 816 F.3d at 127 (internal quotation marks and citation omitted)

The Court recognizes the obvious seriousness of the COVID-19 pandemic; the fact that the pandemic has presented a series of serious and difficult questions about whether, to what extent, and how school activities will resume in the fall; and the substantial additional work burdening schools as they consider and address these issues.  In fact, for these and other reasons, a later effective date might have been a preferable policy decision.  But the Department considered the pandemic as well as the other concerns raised by commenters in the Final Rule, and the Court cannot conclude that Plaintiffs are likely to prevail in demonstrating that the August 14, 2020 effective date is arbitrary and capricious.

Schools have also long been on notice that the Final Rule, or at least something like the Final Rule, was likely to be published.  To be sure, schools could not be expected to actually change their policies in important ways based merely on a proposed rule.  Mot. at 10.  But the Final Rule is similar to the proposed rule in most respects, and thus schools have had almost two years to analyze and understand its requirements.  In these circumstances, the Court cannot conclude that it was arbitrary and capricious for the Department to make the Final Rule effective on August 14, 2020.[15]

---

[15] The Court has considered all of Plaintiffs' arguments and has addressed in this Opinion those on which Plaintiffs have primarily focused or that present close questions as to whether Plaintiffs have established a likelihood of success.  To the extent this Opinion does not expressly discuss

## IV.     Irreparable Harm

For the foregoing reasons, although Plaintiffs have raised some important questions about the Department's authority to issue certain parts of the Final Rule, they have failed to establish that they have a likelihood of success on the merits.  That would end the matter if, as has been suggested, a likelihood of success is now a free-standing prerequisite for preliminary injunctive relief.  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (stating that the Supreme Court's decisions have "made clear that a likelihood of success is an independent, free-standing requirement for a preliminary injunction").  And even if it not a free-standing requirement, it is a "key issue—often the dispositive one."  *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011) (citing *Munaf v. Geren*, 553 U.S. 674, 690 (2008)).

In any event, Plaintiffs also have not established that they will suffer imminent irreparable injury.  "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is '*certain, great*[*,*] *and actual*—not theoretical—and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm."  *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. F.E.R.C*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Plaintiffs highlight the steps they must take to comply with the Rule, which include revising policies, codes of conduct, and training materials; hiring and training staff; renegotiating collective bargaining agreements; purchasing new technology; and determining how to address

---

an argument or claim, the Court holds that Plaintiffs did not meet their burden of demonstrating a likelihood of success on that argument.

non-Title IX sexual harassment.[16]  Mot. at 38–41.  Such efforts, Plaintiffs argue, will require

recipients to expend funds that are not recoverable because Defendants are immune from

damages, *id.* at 38, and will detract from schools' efforts to respond to the challenges posed by

the current pandemic, *id.* at 9.

The Department disputes that Plaintiffs' economic injury can be a basis for injunctive

relief:

> [I]t proves too much to suggest that irreparable injury exists, as a
> matter of course, whenever [an entity] seeks preliminarily to enjoin
> the implementation of a new regulatory burden, even given that
> economic loss sustained due to a federal administrative action is
> typically 'uncompensable' in the sense that federal agencies enjoy
> sovereign immunity.

Opp'n at 44–45 (quoting *Cal. Ass'n of Private Postsecondary Schs. v. DeVos* ("*CAPPS*"), 344 F.

Supp. 3d 158, 170 (D.D.C. 2018) (alterations in original) (internal quotation marks omitted)).

Economic harm may, however, be irreparable if the loss is "serious in terms of its effect on the

plaintiff."  *CAPPS*, 344 F. Supp. 3d at 170 (citation omitted).  And courts in this circuit have

considered administrative and compliance costs are part of the irreparable harm analysis.  *See,*

*e.g.*, *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014) (holding that while the inability

to recover funds is not necessarily "irreparable per se," it is a relevant factor where the plaintiff

has shown "that its harm will be sufficiently great"); *Dep't of Agric.*, 2020 WL 1236657, at *26

(finding state plaintiffs demonstrated that "absent an injunction or stay they will suffer

immediate, irreparable injury in the form of significant regulatory and administrative burdens"

such as "training new and existing staff").

---

[16] For some public universities, the process to change the relevant policies may be involved; the
policies are part of the "state regulatory code and must be updated through a notice-and-
comment process."  July 24, 2020 Hr'g Tr. 20: 6–9.

The Court concludes that the economic harms identified by Plaintiffs are not sufficiently significant to warrant injunctive relief.  As Judge Koeltl just concluded, Plaintiffs likely incurred many of these costs already because the Rule takes effect this week.  *See New York v. U.S. Dep't of Educ.*, 20-cv-4260, 2020 WL 4581595, at *13 (S.D.N.Y. Aug. 9, 2020).  (Plaintiffs also waited until June 23, more than a month after publication of the Rule, to file the Motion, even though they knew the effective date would be August 14.)  Moreover, while the costs of implementing the Rule are certainly not zero, the costs are not so substantial relative to Plaintiffs' budgets—even assuming that Plaintiffs had a likelihood of ultimately prevailing on their claims.  *See, e.g.*, *ConverDyn*, 68 F. Supp. 3d at 49 (explaining that even where a movant had demonstrated that "approximately forty percent of his business would be jeopardized in the absence of injunctive relief," he had "hardly presented an overwhelming case for irreparable injury" and only showed "that he was likely to suffer at least some degree of irreparable injury" (internal quotation marks and alternations omitted) (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50–51 (D.D.C. 2008))).

Plaintiffs also claim they would need to reallocate staff and other resources to comply with the Rule at a time when those resources are already strained due to the pandemic.  Mot. at 9; *see also* App'x Ex. 56 ¶ 13 (noting that the school would have to "cannibalize existing resources by reassigning existing staff either in full or at least in part to execute these new requirements, severely negatively impacting other current educational support services.").  But the Department considered these very points in concluding that August 14, 2020, was an appropriate effective date in light of the pandemic, a decision that was not unreasonable for the reasons discussed above.  More important, Plaintiffs have not demonstrated that complying with the Final Rule

would impose significant injuries on their operations, especially their ability to deal appropriately with the pandemic.

## V.      Balance of Equities and the Public Interest

Plaintiffs' inability to show a likelihood of success on the merits or irreparable harm likely ends the matter there. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) ("[T]he Court may deny a motion for preliminary injunction, without further inquiry, upon finding that a plaintiff is unable to show *either* irreparable injury or a likelihood of success on the merits.").

Regardless, the balance of hardships and the public interest do not warrant an injunction. Where the government is a party, these two inquiries merge. *Nken*, 556 U.S. at 435.  The Department obviously has an interest in the implementation of a rule that, for the reasons discussed above, represents a generally permissible exercise of its regulatory authority. *See Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008).  Moreover, the Department concluded that its prior guidance, which was not embodied in a regulation, "has created confusion and uncertainty among recipients, and has not adequately advised recipients as to how to uphold Title IX's non-discrimination mandate while at the same time meeting requirements of constitutional due process and fundamental fairness."  85 Fed. Reg. at 30,030 (footnotes omitted).  The Rule sought to reduce such confusion by detailing recipients' obligations to both complainants and respondents and by establishing a grievance process that is intended to produce reliable outcomes and ensure fundamental fairness.

Plaintiffs also argue that the Final Rule will result in more incidents of sexual harassment (or at least of incidents that they believe should fall within the definition of sexual harassment under the Rule) or more conduct that will escalate in severity. *See* Mot. at 14, 16, 35.  But the Department also considered important countervailing interests, including the fair treatment of

respondents and the protection of various constitutional rights implicated in sexual harassment investigations, in accordance with its longstanding guidance that "Title IX rights must be interpreted consistent with due process guarantees."  85 Fed. Reg. at 30,100 (citing 2001 guidance at 22).  Moreover, as the Department has repeatedly acknowledged, Plaintiffs are free to investigate and punish as violations of their codes of conduct or of state law behavior that does not meet the new definition of sexual harassment under the Final Rule.  *Id.* at 30,037–38. Because Plaintiffs retain the authority to punish such behavior (though not by labeling it as sexual harassment under Title IX), it is difficult to see how this harm will come to pass, at least while this litigation proceeds.

## VI.    Conclusion

For the reasons discussed above, Plaintiffs' Motion for Preliminary Injunction or 5 U.S.C. § 705 Stay Pending Judicial Review is **DENIED**.


DATE:  August 12, 2020

CARL J. NICHOLS
United States District Judge

31