**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, *et al.*, | |
| Plaintiffs, | |
| v. | |
| ELISABETH D. DEVOS, *in her official capacity as Secretary of Education*, *et al.*, | Civil Action No. 20-cv-01468-CJN |
| Defendants, | |
| and | |
| FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, *et al.*, | |
| Intervenor-Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................... 2

ARGUMENT ............................................................................................................... 8

I.    The Rule exceeds ED's Title IX statutory authority (Count I). ........................... 9

    A.    The Rule bars proactive efforts to eliminate sexual harassment while prioritizing nonstatutory objectives. ...................................................... 10

        1.    The Rule prohibits schools from enforcing all aspects of Title IX. ......... 10

        2.    ED prioritized non-statutory objectives at the expense of Title IX. ........ 12

    B.    The underinclusive definition of "sexual harassment" does not "effectuate" § 1681(a). ......................................................................... 14

    C.    Requiring sexual harassment to be committed "in" a program or activity does not "effectuate" § 1681(a). ............................................ 16

    D.    Requiring sexual harassment be committed only "in the United States" does not "effectuate" § 1681(a). ............................................ 19

    E.    Limiting who can file a complaint does not "effectuate" § 1681(a). .................... 21

    F.    The Rule's mandatory grievance process for K-12 schools does not "effectuate" § 1681(a). ......................................................................... 22

II.    The Rule is not in accordance with Title IX (Count II). .................................... 26

III.    The Rule conflicts with schools' obligations to protect student privacy under FERPA (Counts I and III). ........................................................................ 28

IV.    The Rule is arbitrary, capricious, and an abuse of discretion (Count IV). ....... 30

    A.    The Rule improperly prioritizes non-statutory objectives. .................... 31

    B.    The Rule imposes unnecessarily prescriptive and arbitrary grievance procedures. ........................................................................................... 32

        1.    The Rule fails to adequately account for confidentiality concerns. .......... 32

        2.    Prescriptive grievance procedures are unreasonable in K-12 schools ................................................................................................ 36

        3.    Postsecondary school hearing provisions are arbitrary and capricious. ........................................................................................... 42

        4.    The Rule unreasonably limits Title IX's remedies. ............................... 47

    C.    The mandatory dismissal provision is arbitrary and capricious ............ 48

    D.    Limiting what constitutes sexual harassment and when a complaint can be filed is arbitrary and capricious .......................................... 49

    E.    The Rule improperly changed existing Title IX regulations. ............... 52

i

|   |   | 1. | Eliminating the bar on publications that "suggest" sex discrimination is arbitrary. | 52 |

|   |   | 2. | Eliminating advance written notice for a claim of religious exemption is arbitrary. | 53 |

|   | F. | ED arbitrarily includes conflicting requirements in the preamble. | 54 |

| V. | | The Rule was promulgated without observance of procedure required by law and is arbitrary and capricious (Counts IV and V). | 55 |

|   | A. | Reliance on flawed regulatory impact analyses is unreasonable. | 55 |

|   |   | 1. | ED relied on flawed methodology and analysis. | 57 |

|   |   | 2. | ED withheld key information and relied on inaccurate data | 61 |

|   | B. | The final Rule is not a logical outgrowth of the proposed rule. | 63 |

| CONCLUSION | | | 65 |

# TABLE OF AUTHORITIES

## Cases

*Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008)................................... 61, 62

*Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230 (D.D.C. 2003) ......................... 57

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017)................... 40, 45, 48

*Barrick Goldstrike Mines, Inc. v. Whitman*, 260 F. Supp. 2d 28 (D.D.C. 2003)................... 42, 54

*\*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986).................................................... passim

*Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020)............................................. 10, 16, 28

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ........................................................ 9

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011)......................................................... 58

*\*Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979)...................................................................... passim

*Ciox Health, LLC v. Azar*, No. 18-40, 2020 WL 418454 (D.D.C. Jan. 27, 2020)....................... 30

*Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914 (D.C. Cir. 1998)....................................... 58

*CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076 (D.C. Cir. 2009)................................ 64

*Dahmer v. W. Ky. Univ.*, No. 19-124, 2019 WL 1781770 (W.D. Ky. Apr. 22, 2019) ..................................................................................................................................... 30

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) ................................................................................................................................. passim

*\*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ................................................................................................................................. passim

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ..................................................... 52

*\*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)........................................ 37, 48, 52

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................................ 9

*Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60 (1992)............................................................ 2

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) ............................................. passim

*Gen. Chem. Corp. v. United States,* 817 F.2d 844 (D.C. Cir. 1987)...................................... 39, 59

*Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050 (D.C. Cir. 1986) ................................ 34, 38

*\*Goss v. Lopez*, 419 U.S. 565 (1975) ................................................................ passim

*\*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020) ........................................... 31, 32, 58

*Howard v. Pritzker*, 775 F.3d 430 (D.C. Cir. 2015) ............................................ 30

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ............................. 10, 24, 42

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191 (D.C. Cir. 1996) ................................................................................................................. 54

*King v. Bd. of Control of Mich. Univ.*, 221 F. Supp. 2d 783 (E.D. Mich. 2002) .......... 20

*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ...................................... 9, 12, 14

*\*Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936 (2020) ............................. 10, 14, 16, 26

*Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007) .................................. 63

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .......................................................... 39

*Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986) .................................................... 3

*Michigan v. E.P.A.*, 135 S. Ct. 2699 (2015) ...................................................... 55, 60

*Mohasco Corp. v. Silver*, 447 U.S. 807 (1980) ...................................................... 30

*Morrison v. Nat'l Austl. Bank*, 561 U.S. 247 (2010) ................................................ 20

*Morse v. Frederick*, 551 U.S. 393 (2007) .............................................................. 23

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................................................................................................... passim

*Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012) ............... 55, 57

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018) ...................................... 27

*Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554 (D.C. Cir. 2002) .................................... 55

*New Orleans v. SEC*, 969 F.2d 1163 (D.C. Cir. 1992) .............................................. 63

*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) ........................................... 10

*Office of Consumers' Counsel v. FERC*, 783 F.2d 206 (D.C. Cir. 1986) ................... 29

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007) ........................................................................... 58, 62

*\*Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164 (D.C. Cir. 1994) ................................. passim

*Phillips v. St. George's Univ.*, No. 07-1555, 2007 WL 3407728 (E.D.N.Y. Nov.
15, 2007) ................................................................................................................. 20

*Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375 (D.C. Cir. 1973) ........................ 61, 62

*R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012) ............................ 63

*RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090 (2016) ............................................ 19

*Scruton v. Korean Air Lines Co.*, 39 Cal. App. 4th 1596 (Ca. 1995) ........................... 35

*Sierra Club v. EPA*, 167 F.3d 658 (D.C. Cir. 1999) .................................................... 58

*Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506 (D.C. Cir.
1983) ....................................................................................................................... 64

*Solite Corp. v. EPA*, 952 F.2d 473 (D.C. Cir. 1991) ................................................... 62

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904 (D.C. Cir. 2018) .......... 20

*Sprint Nextel Corp. v. Fed. Commc'n. Comm'n.*, 508 F.3d 1129 (D.C. Cir. 2007) ...... 62

*Sullivan v. Zebley*, 493 U.S. 521 (1990) ................................................................... 25

*U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997 (D.C. Cir. 2002) ....................................... 57

*U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519 (D.C. Cir. 1978) ....................... 62

*United States v. Menasche*, 348 U.S. 528 (1955) ................................................... 10, 27

*\*Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008) ................. passim

*Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788 (D.C. Cir. 1984) ............... 62

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282 (11th Cir. 2007) ...... 21

**Statutes**

*Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g ...................... 2, 28

20 U.S.C. § 1232g(a)(1)(A) ..................................................................................... 29, 65

20 U.S.C. § 1232g(a)(4)(A)(i) ...................................................................................... 29

20 U.S.C. § 1232g(b) ........................................................................................... 29

20 U.S.C. § 1232g(b)(1) ...................................................................................... 28

Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics
Act (Clery Act), 20 U.S.C. § 1092(f) (1990) .................................................. 4, 14

20 U.S.C. § 1092(f)(6)(A)(v) ............................................................................. 15

Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 601-612 ........................................ 56

5 U.S.C. § 603 ...................................................................................................... 56

5 U.S.C. § 604 ...................................................................................................... 56

5 U.S.C. § 605 ...................................................................................................... 56

5 U.S.C. § 607 ...................................................................................................... 56

5 U.S.C. § 611 ...................................................................................................... 56

*Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ...................... passim

*20 U.S.C. § 1681(a) .......................................................................................... passim

20 U.S.C. § 1681(a)(3) ......................................................................................... 53

*20 U.S.C. § 1682 ............................................................................................... passim

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ............................... 2, 50, 51

Violence Against Women Reauthorization Act (VAWA) § 304, 20 U.S.C.
§ 1092(f) (2013) ................................................................................................. 4

18 U.S.C. § 2252A ................................................................................................ 33

34 U.S.C. § 12291(a)(10) ..................................................................................... 14

34 U.S.C. § 12291(a)(30) ..................................................................................... 14

5 U.S.C. § 553(b) .................................................................................................. 63

5 U.S.C. § 706(2)(A) ........................................................................................... passim

5 U.S.C. § 706(2)(C) ...................................................................................... 2, 8, 9, 29

5 U.S.C. § 706(2)(D) ..................................................................................... 2, 8, 56, 63

**Regulations & Policy Documents**

34 C.F.R. § 100.7(e) ........................................................................................ 7, 36

34 C.F.R. pt. 106 .................................................................................................. 3

    34 C.F.R. § 106.3(a) (effective until Aug. 14, 2020) ........................................ 7, 47

    34 C.F.R. § 106.8(a) (effective until Aug. 14, 2020) ................................ 37, 40, 41

    34 C.F.R. § 106.8(b) (effective until Aug. 14, 2020) ............................... 37, 40, 41

    34 C.F.R. § 106.9(b)(2) (effective until Aug. 14, 2020) ..................................... 8, 52

    34 C.F.R. § 106.12(b) (effective until Aug. 14, 2020) ....................................... 8, 53

34 C.F.R. § 668.46(k)(2) ...................................................................................... 14

34 C.F.R. § 99.12 ................................................................................................ 29

*Family Educational Rights and Privacy*, 73 Fed. Reg. 74,806 (Dec. 9, 2008) ........................... 29

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 83 Fed. Reg. 61,462 (Nov. 29, 2018) ............. passim

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) ............. passim

*Racial Incidents and Harassment Against Students at Educational Institutions*, 59 Fed. Reg. 11,448 (Mar. 10, 1994) ........................................................................ 51

*Revised Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties*, 66 Fed. Reg. 5512 (Jan. 19, 2001, rescinded Aug. 2020) ............................................................................................... passim

Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Aug. 31, 1998) ........................................... 4

Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Jan. 28, 1999) ........................................... 4

Russlyn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017) ................. 3, 4

*Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997) ................................... passim

Stephanie Monroe, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Jan. 25, 2006, rescinded Aug. 2020) .................. 3, 4

U.S. Dep't of Educ., *Q&A on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017) ............................................................................ 3, 4

U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017, rescinded Aug. 2020) .................................................................................................. 43

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................... 8

Fed. R. Evid. 403 ............................................................................................. 45

Fed. R. Evid. 702 ............................................................................................. 45

Fed. R. Evid. 703 ............................................................................................. 45

Fed. R. Evid. 704 ............................................................................................. 45

Fed. R. Evid. 705 ............................................................................................. 45

Fed. R. Evid. 801 ............................................................................................. 46

Fed. R. Evid. 803 ............................................................................................. 46

Fed. R. Evid. 804 ............................................................................................. 46

**Other Authorities**

Alexandra Brodsky, *How Much Does Sexual Assault Cost College Students Every Year?*, Wash. Post (Nov. 18, 2014) ............................................................... 5

Am. Council on Educ. Mem. to OIRA (Dec. 17, 2019) ................................. 42

Ass'n of Am. Univ., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct* (Oct. 15, 2019) ...................................................... 4

C.P. Smith & J.J. Freyd, *Institutional Betrayal*, 69(6) Am. Psychologist 575 (2014) .......................................................................................................... 5

Camille Gallivan Nelson et al., *Organizational Responses for Preventing and Stopping Sexual Harassment: Effective Deterrents or Continued Endurance?* 56 *Sex Roles* 811 (2007) ........................................................................... 50

Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18 J.C. Student Retention: Res., Theory & Prac. 234 (2015) .................................................................. 5

Christopher Krebs et al., U.S. Dep't of Justice, *Campus Climate Survey Validation Study: Final Technical Report* (Jan. 2016) ................................... 4

Claire McCaskill, S. Subcomm. on Financial & Contracting Oversight – Majority Staff, *Sexual Violence on Campus*, 113th Cong. (2014) ........................................................ 59

David Lisak & Paul Miller, *Repeat and Multiple Offending Among Undetected Rapists*, 17 Violence & Victims (2002) .................................................................. 50

*Effective*, Black's Law Dictionary (11th ed. 2019) ........................................................ 16

*Effectuate*, Merriam-Webster's New International Dictionary (2d ed. 1950) .............................. 9

*Effectuate*, Webster's Third New International Dictionary (1965) ...................................... 9

FBI, *Uniform Crime Reporting Program: National Incident-Based Reporting System Offense Definitions* (2012) .................................................................. 15

Inez Dekker & Jullian Barling, *Personal and Organizational Predictors of Workplace Sexual Harassment of Women by Men*, 3 *Journal of Occupational Health Psychology* 7 (1998) .................................................................. 50

Kaiser Family Found. & Wash. Post, *Survey of Current and Recent College Students on Sexual Assault* (June 12, 2015) .................................................................. 5

Letter from SAFE Campuses LLC to S. Comm. on Health, Educ., Labor & Pensions re: Reauthorizing Higher Educ. Act (Apr. 2, 2019) ...................................... 42

Letter to Wachter, from M.B. Hawes, Dir. of Student Privacy, U.S. Dep't of Educ. (Dec. 7, 2017) .................................................................. 29

Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* (Apr. 2017) .................................. 5

Peterson et al., *Lifetime Economic Burden of Rape Among U.S. Adults*, 52 Am. J. Preventive Med. 6 (2017) .................................................................. 60

Ronet Bachman et al., *The Rationality of Sexual Offending: Testing a Deterrence/Rational Choice Conception of Sexual Assault*, 26 Law & Soc'y Rev. 343 (1992) .................................................................. 50

S. Rep. No. 100-64 (1987) .................................................................. 9

*Sex Discrimination Regulations, Review of Regulations to Implement Title IX, Hearings before the Subcomm. on Postsecondary Educ. of the H. Comm. on Educ. and Labor*, 94th Cong., 1st Sess. (1975) .................................................. 51

Sofi Sinozich & Lynn Langton, U.S. Dep't of Justice, *Rape and Sexual Assault Victimization Among College-Age Females*, 1995-2013 (Dec. 2014) ............................ 17

Suzanne B. Goldberg, *Keep Cross-Examination Out of College Sexual-Assault Cases*, Chron. of Higher Educ. (Jan. 10, 2019) .................................................. 45

U.S. Dep't of Educ. *et al.*, Fed. Comm'n on School Safety, *Final Report of the Federal Commission on School Safety* (2018) .......................................................... 18

U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: Sexual Violence in K-12 Schools* (Oct. 2020)........................................................................................... 1, 4, 5

U.S. Dep't of Educ., *Institutions Currently Holding Religious Exemption* (June 14, 2018) ............................................................................................................ 54

U.S. Dep't of Educ., Letter from Dale King, Director of Family Policy Compliance Office (Nov. 6, 2015) ...................................................................... 29

U.S. Dep't of Educ., Office for Civil Rights, Policy Mem., Antonio J. Califa, Director for Litigation Enforcement and Policy Services (Aug. 31, 1981) ............................. 3

U.S. Dep't of Educ., *Other Correspondence* (July 24, 2020)...................................... 54

U.S. Dep't of Educ., *Sexual Harassment: It's Not Academic Pamphlet* (1988).......................... 33

U.S. Dep't of Educ., Response to Dec. 19, 2018 FOIA Request from National Center for Youth Law re: RIA in NPRM............................................................... 61

United Educators, *Confronting Campus Sexual Assault: An Examination of Higher Education Claims* (2015) ......................................................................... 17

Valerie Wright, The Sentencing Project, *Deterrence in Criminal Justice* (2010)....................... 50

**INTRODUCTION**

The new rule issued by the U.S. Department of Education (ED), *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (Title IX Rule or Rule), is unlawful. Congress enacted Title IX to accomplish two objectives: to provide individuals with effective protection against sex discrimination and harassment and to ensure that federal funds are not used to support such misconduct. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). The Rule furthers neither. Rather than attempt to reduce sexual harassment,[1] the Rule reduces investigations of sexual harassment and imposes burdensome new provisions that make sexual harassment even less regularly reported and remedied. Because of the Rule, it is harder for schools in Plaintiff States to deter sexual harassment, protect students, and provide safe and equitable school environments. The upshot is a regulation that contravenes Title IX and exceeds ED's statutory authority.

ED's rulemaking authority under Title IX is limited to rules that "effectuate" the statute's directive that no person, "on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under" a federally funded education program or activity. 20 U.S.C. §§ 1682, 1681(a). As ED acknowledges, sexual harassment violates Title IX: it creates unsafe and unwelcoming school environments, interferes with student learning, and significantly harms students' mental and physical health. And as ED concedes, sexual harassment is both vastly underreported and on the rise. *E.g.*, U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: Sexual Violence in K-12 Schools* 5 (Oct. 2020), https://tinyurl.com/CRDC2020 (nearly 15,000 reports of sexual violence in K-12 schools during 2017-2018 school year, a 55% increase) (CRDC 2020). But instead of limiting the instances and effects of sexual harassment, ED upends the plain text of § 1681 by limiting what constitutes sexual harassment, where it must occur, and when an investigation can take place—while threatening to punish

---

[1] Unless otherwise stated, the term "sexual harassment" encompasses all forms of sexual harassment, including sexual violence and sexual assault.

schools that take a more proactive approach. ED then mandates strict adherence to its novel and prescriptive grievance process, which discourages reporting, delays effective interventions, and creates an inequitable and harmful process for complainants and respondents alike.

Under the Administrative Procedure Act (APA), the Court must hold unlawful and set aside agency action that is "in excess of statutory . . . authority"; that is "arbitrary, capricious, [or] an abuse of discretion" or is "otherwise not in accordance with law"; or that was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). The Rule fails on all accounts: it does not "effectuate" § 1681(a) and therefore exceeds ED's statutory authority; it contravenes the plain language of Title IX; it violates the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating student privacy violations while purporting to supersede FERPA by regulation without statutory authorization; it imposes arbitrary and capricious burdens on schools and students; and it fails to comply with basic procedural requirements of APA rulemaking. The Court should grant summary judgment to Plaintiff States and vacate the Rule.

## FACTUAL BACKGROUND

Title IX is broad and unequivocal: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Sexual harassment runs afoul of this mandate and is prohibited by Title IX. *See Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75 (1992). Congress modeled Title IX on Title VI of the Civil Rights Act of 1964, which uses near-identical language to ban discrimination and harassment based on race, color, and national origin. 42 U.S.C. § 2000d. To enforce Title IX, Congress established a robust administrative scheme and authorized ED to withdraw federal funding for schools'[2] non-compliance and to issue rules only if they "effectuate" Title IX. 20 U.S.C. § 1682.

---

[2] With only limited exceptions, Title IX applies to all entities that receive federal funds,

In 1975, ED's predecessor promulgated such rules. 34 C.F.R. pt. 106. During the Reagan Administration, ED began affirmatively addressing sexual harassment as a serious problem in schools that contravenes Title IX,[3] consistent with its interpretation and enforcement of Titles VI and VII of the Civil Rights Act of 1964.[4] For decades, ED's policies consistently reaffirmed fundamental requirements for how schools must address sexual harassment.[5] These documents explained that under Title IX and its implementing regulations, schools were obligated to: (1) take affirmative steps to prevent, end, and remedy sexual harassment, defined as unwelcome conduct of a sexual nature that is so severe, persistent, *or* pervasive that it adversely affects a student's ability to participate in or benefit from the school's program or activity; (2) address harassment committed outside an education program or activity if it creates a hostile environment *in* an education program or activity; and (3) adopt a prompt and equitable grievance procedure, which could be incorporated into existing codes of conduct and procedures.

---

including schools, museums, libraries, and other entities that operate education programs or activities. Unless otherwise stated, the word "schools" refers generally to all recipients of federal funding subject to the new Title IX Rule.

[3] *E.g.*, U.S. Dep't of Educ., *Sexual Harassment: It's Not Academic Pamphlet* (1988) (ECF No. 22-3, Ex. 1) (quoting U.S. Dep't of Educ., Office for Civil Rights, Policy Mem., Antonio J. Califa, Director for Litigation Enforcement and Policy Services (Aug. 31, 1981)).

[4] *E.g.*, *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986) (Title VII); *Racial Incidents and Harassment Against Students at Educational Institutions*, 59 Fed. Reg. 11,448, 11,449, 11451 n.2 (Mar. 10, 1994) (ECF No. 22-3, Ex. 2) (Title VI).

[5] *Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997) (1997 Policy); *Revised Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties*, 66 Fed. Reg. 5512 (Jan. 19, 2001, rescinded Aug. 2020) (2001 Policy); Stephanie Monroe, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Jan. 25, 2006, rescinded Aug. 2020) (2006 Letter); Russlyn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017) (2011 Letter); U.S. Dep't of Educ., *Q&A on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017) (2014 Q&A); U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017, rescinded Aug. 2020) (2017 Q&A).

After the Supreme Court set heightened standards for plaintiffs seeking monetary damages under Title IX's implied private right of action, *see Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998), ED adhered to longstanding principles embodied in its prior policies and reaffirmed its authority to administratively enforce Title IX even in circumstances in which private parties could not obtain damages.[6] Congress also passed laws to enhance protections for individuals subjected to sexual assault on and off campus while providing flexibility in grievance procedures. *E.g.*, Violence Against Women Reauthorization Act (VAWA) § 304, 20 U.S.C. § 1092(f) (2013); Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act), 20 U.S.C. § 1092(f) (1990).

Schools have made great strides in reducing sex discrimination, in substantial part through compliance with Title IX. But sexual harassment continues at alarming rates and remains largely underreported, according to the federal government's own data. *See, e.g.*, CRDC 2020, *supra*, at 5; Christopher Krebs et al., U.S. Dep't of Justice, *Campus Climate Survey Validation Study: Final Technical Report* 107, App. E (Jan. 2016).[7] A 2019 study found that one in four undergraduate women, one in fifteen undergraduate men, and one in four transgender or gender-non-conforming undergraduates were sexually assaulted during college. Ass'n of Am. Univ., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct*, at ix (Oct. 15, 2019), https://tinyurl.com/AAUSurvey2019. Yet only about 12% of college survivors reported sexual assault. Kaiser Family Found. & Wash. Post, *Survey of Current and Recent*

---

[6] *E.g.*, Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Aug. 31, 1998) (ECF No. 22-3, Ex. 4); Richard W. Riley, U.S. Sec'y of Educ., U.S. Dep't of Educ., Dear Colleague Letter regarding *Gebser v. Lago Vista* (Jan. 28, 1999) (ECF No. 22-3, Ex. 5); 2001 Policy at iv; 2006 Letter at 1; 2011 Letter at 2; 2014 Q&A at ii; 2017 Q&A at 1.

[7] For the Court's convenience, Administrative Record (AR) citations for comments and other sources from the AR are located in the index accompanying this filing.

*College Students on Sexual Assault* 24 (June 12, 2015). More than 20% of girls aged fourteen to eighteen have been kissed or touched without their consent, but only 3% reported the incidents. Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 1, 2 (Apr. 2017); *see also* CRDC 2020, *supra* (55% increase in sexual violence in K-12 schools in 2017-18). Sexual harassment can impose debilitating costs and consequences—especially when not addressed properly. *E.g.*, Alexandra Brodsky, *How Much Does Sexual Assault Cost College Students Every Year?*, Wash. Post (Nov. 18, 2014); Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18 J.C. Student Retention: Res., Theory & Prac. 234 (2015); C.P. Smith & J.J. Freyd, *Institutional Betrayal*, 69(6) Am. Psychologist 575 (2014).

In 2018, ED published a notice of proposed rulemaking purporting to address sexual harassment. 83 Fed. Reg. 61,462 (Nov. 29, 2018). It generated over 124,000 comments, the vast majority of which pointed out problems with the proposal and suggested alternatives. Almost eighteen months later, in the midst of the COVID-19 pandemic, ED published the final rule and made it effective 87 days later. 85 Fed. Reg. 30,026 (May 19, 2020).

The Rule adopts three new sections applicable only to sexual harassment. Rule §§ 106.30, 106.44, 106.45. For the purposes of Title IX, the Rule defines "sexual harassment" to be "conduct on the basis of sex" that is (1) quid pro quo harassment committed by a school employee; (2) "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity," or (3) sexual assault, dating violence, domestic violence, and stalking as defined by VAWA and the Clery Act. Rule § 106.30(a) (*sexual harassment*) (emphasis added). The Rule prohibits sexual harassment under Title IX only if the respondent commits harassment *in* a school's education program or activity, which "includes locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a

postsecondary institution." Rule § 106.44(a). Where the allegations of a complaint "would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States," the school must dismiss the Title IX complaint, but that dismissal "does not preclude action under another provision of the recipient's code of conduct." Rule § 106.45(b)(3)(i). Parties are allowed to appeal dismissal of a formal complaint or any allegations therein. Rule § 106.45(8)(i).

Before a school can impose "any disciplinary sanctions or other actions that are not supportive measures,"[8] the school must follow the grievance procedures dictated by Rule § 106.45. Rule § 106.44(a). These procedures begin with a formal written complaint "filed by a complainant[9] or signed by the Title IX Coordinator." Rule § 106.30(a) (*formal complaint*). A complainant is any person "alleged to be the victim of conduct that could constitute sexual harassment." Rule § 106.30(a) (*complainant*). A formal complaint cannot be filed—and therefore no sanction or other non-supportive measures can be imposed—unless "[a]t the time of filing," the complainant is "participating in or attempting to participate in the education program or activity of the recipient with which the formal complaint is filed." Rule § 106.30(a) (*formal complaint*). Schools can unilaterally consolidate formal complaints "where the allegations of sexual harassment arise out of the same facts or circumstances." Rule § 106.45(b)(4). A Title IX Coordinator can file a complaint against the wishes of the complainant only if the Coordinator can point to "specific reasons justifying the filing of a formal complaint." 85 Fed. Reg. at 30,304.

The Rule's grievance procedures impose a 10-step process after complaint filing that necessitates more than 20 days before any school can impose even minor discipline. Rule

---

[8] Supportive measures are "non-disciplinary, non-punitive individualized services" that are "designed to restore or preserve equal access to the recipient's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter sexual harassment." Rule § 106.30(a) (*supportive measures*).

[9] A parent or guardian may file the formal complaint for a minor complainant. Rule § 106.6(g).

§ 160.45. Among other provisions, schools cannot "restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence" and must provide all parties and each party's advisor copies of "any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility." Rule § 106.45(b)(5)(iii), (iv), (vi). Postsecondary schools must hold a live hearing during which each party's advisor must be allowed to conduct direct, oral cross-examination of any other party or witness. Rule § 106.45(b)(6)(i). Postsecondary schools must provide an advisor to conduct cross-examination if a party does not have one. *Id.* If any party or witness "does not submit to cross-examination at the live hearing, the decision-maker(s) must not rely on any statement of that party or witness in reaching a determination regarding responsibility"—including written statements, medical and police records, rape kits, and statements against interest. *Id.*; 85 Fed. Reg. at 30,348-49. All other recipients, including museums and libraries, can forego a live hearing and instead allow the parties to submit written questions for each other and for witnesses. Rule § 106.45(b)(6)(ii). Except for relevance, schools are prohibited from adopting any widely used rules of evidence, such as those prohibiting unduly prejudicial evidence, to ensure an equitable hearing. 85 Fed. Reg. at 30,336-37.

The Rule purports to supersede FERPA and preempt conflicting state and local laws. Rule § 106.6(e), (h). The Rule also requires only the school—not other persons—to "keep confidential the identity of any individual who has made a report or complaint of sex discrimination" unless otherwise required by law. Rule § 106.71(a). But ED continues to incorporate a separate regulatory provision obligating "other persons," including the parties, to keep the complainant's identity confidential. Rule § 106.81 (incorporating 34 C.F.R. § 100.7(e)).

ED also changed key provisions of existing Title IX regulations. ED now only requires a school that has discriminated to "remedy the violation"—eliminating a longstanding regulation that the school must also "overcome the effects of such discrimination." *Compare* Rule § 106.3(a), *with* 34 C.F.R. § 106.3(a) (effective until Aug. 14, 2020). ED now only prohibits

schools from using or distributing publications that "stat[e] that the recipient treats applicants, students, or employees differently on the basis of sex"—eliminating a longstanding regulation that prohibited publications that "suggest[]" discrimination by text or illustration. *Compare* Rule § 106.8, *with* 34 C.F.R. § 106.9(b)(2) (effective until Aug. 14, 2020). And any school controlled by a religious organization that wishes to claim the statutory exemption from Title IX's requirements no longer needs to submit written notice in advance and needs only notify a student once the school is "under investigation for noncompliance" by ED. *Compare* Rule § 106.12(b), *with* 34 C.F.R. § 106.12(b) (effective until Aug. 14, 2020).

ED estimated that the Rule will reduce investigations of sexual harassment in K-12 and postsecondary schools by 50% and 33%, respectively. 85 Fed. Reg. at 30,551, 30,565-68. ED refused to estimate what impact the Rule would have on instances of sexual harassment, deterrence, or on students subjected to sexual harassment who were previously protected by Title IX but who are no longer so protected. 85 Fed. Reg. at 30,081, 30,548.

## ARGUMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the APA, the Rule must be held unlawful and set aside because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

The Rule does not "effectuate" § 1681(a) as required by § 1682 and therefore exceeds ED's statutory authority (Count I). The Rule adopts provisions that contravene Title IX (Count II). The Rule violates FERPA and purports to supersede it by regulation without statutory authorization (Counts I, III). The Rule imposes arbitrary and capricious requirements (Count IV). And the Rule violated basic requirements of APA rulemaking because ED did not providing a

reasoned analysis of the Rule's impact and withheld key information needed to allow for meaningful public comment (Counts VI, V). For these reasons, the Rule should be vacated.

**I.        The Rule exceeds ED's Title IX statutory authority (Count I).**

A federal agency "has no power to act[] . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). An agency "must give effect to the unambiguously expressed intent of Congress" and "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125-26 (2000) (quotations omitted); *see* 5 U.S.C. § 706(2)(C).

Congress enacted Title IX to ensure no person, "on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." § 1681(a). As the Supreme Court has recognized, Title IX exists for the "special benefit" of "persons discriminated against on the basis of sex." *Cannon*, 441 U.S. at 693-94. Title IX's mandate includes two complementary objectives: (1) to provide individuals "effective protection" against discrimination and other practices that limit or deny the benefits and opportunities of education, and (2) to prevent federal resources from supporting these practices. *Id.* at 704; *see also* S. Rep. No. 100-64, at 5 (1987) (in report on the Civil Rights Restoration Act of 1987, noting Congress intended Title IX to be "broadly interpreted to provide effective remedies against discrimination").

To enforce Title IX, Congress granted ED statutory authority to issue regulations that "effectuate the provisions of section 1681" and to enforce such regulations by terminating the funding of recipients that fail to comply with them. § 1682; *see Davis*, 526 U.S. at 638-39. "Effectuate" means "to bring about," "accomplish" or "execute." *Effectuate*, Webster's Third New International Dictionary (1965); *see also Effectuate*, Merriam-Webster's New International Dictionary (2d ed. 1950) ("to bring to pass; accomplish; give effect to"). To fall within ED's

authority, therefore, any regulation must bring about protections against sexual harassment—i.e., it must work to ensure no person, on the basis of sex, is excluded from participation in, denied the benefits of, or subjected to discrimination under any education program or activity receiving Federal financial assistance. § 1681(a); *see also Gebser*, 524 U.S. at 292 (ED can issue regulations that "do not purport to represent a definition of discrimination under the statute" only if such requirements "effectuate [Title IX's] nondiscrimination mandate").

The Supreme Court has long recognized that Title IX must be accorded "a sweep as broad as its language." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) (quoting *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982)); *see Gebser*, 524 U.S. at 296 (same). In construing what § 1681(a) requires, ED and the Court must apply the plain language of the statute, *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1749 (2020), and must give effect, "if possible, to every clause and word of a statute," *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1948 (2020) (quotations omitted); *accord United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (quotations omitted). Instead of faithfully carrying out the job delegated to it by Congress, ED imposed a Rule that turns Title IX on its head.

### A. The Rule bars proactive efforts to eliminate sexual harassment while prioritizing nonstatutory objectives.

The overall structure of the Rule discourages schools from, and even punishes schools for, taking active steps to eliminate sexual harassment. The Rule also unlawfully prioritizes non-statutory objectives at the expense of Title IX's mandate. By disregarding and contravening Congress's directive, ED has exceeded its authority.

#### 1. The Rule prohibits schools from enforcing all aspects of Title IX.

The Rule forbids schools from addressing under their Title IX policies and procedures certain conduct covered by the plain text of § 1681(a). Instead, for the purposes of Title IX, schools are bound by ED's narrow interpretation of what constitutes cognizable sexual harassment, where it must be committed, and when someone is allowed to file a formal complaint. *See infra* Parts I.B-E. If schools wish to address conduct that does not fall within the

Rule's narrow framework—even if that conduct is expressly prohibited by Title IX because it causes someone to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity" on the basis of sex—they must now use "non-Title IX" policies and procedures to do so. *E.g.*, 85 Fed. Reg. at 30,289 ("non-Title IX codes of conduct"). Indeed, schools must dismiss any Title IX harassment complaint that falls outside the Rule, i.e., any complaint that "would not constitute sexual harassment as defined in § 106.30 even if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States." Rule § 106.45(b)(3)(i).[10] The Rule is clear that "[c]onsequences for failing to comply" with these requirements include "placing the recipient's Federal funding at risk." 85 Fed. Reg. at 30,288; *see also, e.g.*, *id.* at 30,046 ("regulations impose specific requirements on recipients . . . and failure to comply constitutes a violation of these Title IX regulations"), 30,221 (ED will hold a school that does not comply with § 106.45 "accountable for violating these final regulations.").

These restrictions exceed ED's authority. Under Title IX, ED can only prohibit a school from taking action to enforce Title IX if such prohibition "effectuate[s]" § 1681(a)—i.e., it addresses a violation of § 1681(a) by the school itself or brings about effective protections against such violations. *See Gebser*, 524 U.S. at 292. But ED does not (and cannot) claim that a school's investigation under Title IX of alleged sexual harassment that does not meet the Rule's heightened restrictions would violate § 1681(a). Nor does ED claim that such an investigation would otherwise undermine Title IX's mandate. ED lacks authority to forbid schools from seeking to proactively enforce Title IX's mandate that "no person" be limited in benefits or

---

[10] In prior briefing in this matter, ED claimed for the first time that if it disagreed with a school's "characterization of a proceeding as falling under Title IX," ED would merely seek to clarify that the proceeding was not required by Title IX. Defs.' Suppl. Mem. at 6 (ECF No. 92). Such post hoc rationalizations are impermissible. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1909 (2020). The Rule plainly states that schools must dismiss these complaints and that failure to do so subjects them to enforcement action. *E.g.*, 85 Fed. Reg. at 30,288-89 (refusing to "make dismissal optional" and identifying potential penalties).

access or subjected to discrimination—indeed, that is precisely what schools can and should be doing under the statute.

### 2. ED prioritized non-statutory objectives at the expense of Title IX.

Because ED can only adopt rules that "effectuate" Title IX's mandate, § 1682, ED cannot, as it does here, prioritize other objectives at the expense of Title IX. *See La. Pub. Serv. Comm'n*, 476 U.S. at 374 (agency has no power outside scope of congressional delegation).

*First*, ED has prioritized strict compliance with the Rule's grievance procedures over eliminating sexual harassment. The Rule requires schools, after receiving a *formal complaint* of sexual harassment, to "follow[] a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." Rule § 106.44(a). A school that does not strictly implement ED's onerous procedures violates the Rule, risking federal investigation and loss of federal funding. *E.g.*, 85 Fed. Reg. at 30,288, 30,046. At the same time, the Rule requires schools, after receiving *notice* of sexual harassment, to respond to that harassment only in a manner that is not deliberately indifferent, defined as "clearly unreasonable in light of the known circumstances." Rule § 106.44(a). ED will not second guess a determination of responsibility and "whether or how" a school imposes sanctions on a respondent found responsible. Rule § 106.44(b)(2); 85 Fed. Reg. at 30,506. The result inverts Title IX: ED will punish schools if they attempt to eliminate sexual harassment by providing a more expeditious (and constitutionally sound, *see infra* Part I.F) investigation and response, but will not punish schools if they do nothing about sexual harassment until their responses are "clearly unreasonable."

*Second*, ED has prioritized consistency with the Supreme Court's heightened standard for liability in civil cases brought under Title IX's implied private right of action for monetary damages, *see* 85 Fed. Reg. at 30,032-46, to the exclusion of the statute's broad prohibition of all conduct that causes someone to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," on the basis of sex, § 1681(a). But in adopting what ED calls the

*Gebser*/*Davis* framework, the Supreme Court recognized it was being asked to "do more than define the scope of the behavior that Title IX proscribes." *Davis*, 629 U.S. at 639. The Court created a heightened standard for monetary damages precisely because Congress did not include an express private right of action in Title IX's statutory text. *See Cannon*, 441 U.S. at 717 (recognizing an implied right of action). To ensure that the implied remedy would not run afoul of the Spending Clause, the Supreme Court exposed schools to private damages liability only if they "had adequate notice that they could be liable for the conduct at issue." *Davis*, 526 U.S. at 639-40; *see Gebser*, 524 U.S. at 287-88. By contrast, Congress's express mechanism for administrative enforcement, § 1682, rests on an overt contractual framework focused on "'protecting' individuals from discriminatory practices," not "compensat[ing] victims of discrimination." *Gebser*, 524 U.S. at 287 (quoting *Cannon*, 441 U.S. at 704). The Court expected federal agencies to continue to "promulgate and enforce requirements that effectuate the statute's non-discrimination mandate . . . even if those requirements" would not be enforceable for money damages. *Gebser*, 524 U.S. at 292. Rather than support ED's novel requirement of a uniform standard, the *Gebser*/*Davis* framework shows the value of prospective federal enforcement to prevent discrimination and ensure equity, distinct from the separate and independent value of imposing monetary damages to compensate victims for past harm.

*Finally*, ED prioritizes theoretical due process and First Amendment concerns to the exclusion of the statutory directive to prevent and remedy actual sexual harassment. ED acknowledges that the Rule's grievance provisions are not all required by the Due Process Clause. *E.g.*, 85 Fed. Reg. at 30,303 ("this provision affords parties greater protection than some courts have determined is required under constitutional due process"), 30,330 ("regardless of whether the provisions in § 106.45(b)(6)(i) are required under constitutional due process of law"), 30,051 ("due process is flexible and calls for such procedural protections as the particular situation demands") (quotations omitted). Indeed, ED admits that "unfair imposition of discipline, even in a way that violates constitutional due process rights, does not necessarily equate to sex discrimination [against the accused] prohibited by Title IX." 85 Fed. Reg. at

30,101. But the Rule nonetheless invokes due process to adopt onerous grievance requirements that reduce the reporting, investigation, and remedying of actual sexual harassment. *See infra* Parts I.F, IV.B. Moreover, ED does not claim that the First Amendment compels any particular definition of sexual harassment. But purportedly for First Amendment reasons, the Rule prevents schools from using Title IX to address conduct that is prohibited by Title IX, thus violating the statute's plain text. *See infra* Part I.B; *Cannon*, 441 U.S. at 693-94. ED lacks authority to prioritize its own policy preferences over Congress's directive to "effectuate" § 1681(a). *La. Pub. Serv. Comm'n*, 476 U.S. at 374.

### B. The underinclusive definition of "sexual harassment" does not "effectuate" § 1681(a).

ED mandates dismissal of Title IX complaints that do not meet its overly narrow definition of "sexual harassment," which addresses only: (1) sexual assault, domestic violence, dating violence, and stalking as defined by the Clery Act/VAWA;[11] (2) "[u]nwelcome conduct" that is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access" to an "education program or activity"; and (3) quid pro quo harassment committed by an "employee." Rule §§ 106.30(a) (*sexual harassment*), 106.45(b)(3)(i). This definition does not prohibit all sexual harassment that causes someone to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity." § 1681(a). By adopting an interpretation that fails to give effect to every word of the statute, ED undermines § 1681(a) rather than effectuating it. *See Liu*, 140 S. Ct. at 1948.

Under the Rule, for anything short of physical violence, stalking, or quid pro quo harassment by an employee, students must undergo repeated instances of severe and offensive

---

[11] "Sexual assault" as defined in 20 U.S.C. § 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C. § 12291(a)(10), "domestic violence" as defined in 34 U.S.C. § 12291(a)(8), and "stalking" as defined in 34 U.S.C. § 12291(a)(30). The requirement that these offenses be resolved under the Rule's grievance process limits protections for survivors, because the Clery Act required a more flexible grievance process that "protects the safety" and confidentiality of "victims," 20 U.S.C. § 1092(f)(8); 34 C.F.R. § 668.46(k)(2).

harassment that "effectively denies" them equal access before the conduct becomes actionable. For example, the Clery Act offense of "sexual assault" reaches only the most egregious forms of sexual violence: forcible rape, forcible sodomy, sexual assault with an object, forcible fondling,[12] incest, and statutory rape. 20 U.S.C. § 1092(f)(6)(A)(v); FBI, *Uniform Crime Reporting Program: National Incident-Based Reporting System Offense Definitions* (2012). All other forms of inappropriate touching, even by teachers or against small children, are only actionable under the Rule if they are quid pro quo harassment by an employee or "so severe, pervasive, *and* objectively offensive that [they] effectively den[y] a person equal access" to education. Rule § 106.30(a) (*sexual harassment*) (emphasis added); *see* 85 Fed. Reg. at 30,142. Indecent exposure, inappropriate touching of other body parts, requests for sexual favors, inappropriate sexual gestures, sexual comments about a student's body, intrusions of personal space, and sharing of sexual images and videos fall under the same rubric. The mismatch with § 1681(a) is obvious: even a single instance of indecent exposure, for example, could cause a student fear and anxiety about interacting with that teacher again, thereby denying the student equal access to education. Likewise, several instances of inappropriate touching and intrusion of physical space by a professor may not be both "severe" and "objectively offensive" but may nevertheless cause a student to skip class and lose access to education.

Moreover, ED has narrowed the second category of harassment to only conduct that "effectively denies a person equal access" to education. ED does not define "effectively denies equal access" and suggests inconsistent standards in the preamble. *Compare* 85 Fed. Reg. at 30,170 (third grader "bed-wetting" or "crying at night due to sexual harassment" are only "likely" examples of "denial of equal access"), *with id.* (recognizing that neither Title VII nor Title IX "requires 'tangible adverse action or psychological harm' before the sexual harassment

---

[12] Forcible fondling requires showing the respondent (1) touched "the private body parts of another person," (2) "for the purpose of sexual gratification," and (3) "forcibly and/or against that person's will" or "in instances where the victim is incapable of giving consent."

may be actionable"). The word "effectively," however, ordinarily means that a student must be actually cut off from their education before conduct can be addressed. *Effective*, Black's Law Dictionary (11th ed. 2019) ("achieving a result"). This heightened requirement has no home in Title IX's plain text, which protects students from being "excluded from participation in," "denied the benefits of," *or* "subjected to discrimination under" a program or activity. § 1681(a). *See Bostock*, 140 S. Ct. at 1747 (if Congress chooses "not to include any exceptions to a broad rule, courts apply the broad rule"). Congress did not give ED authority to effectuate only the "excluded from" prong of the definition; ED must give effect to "every clause and word" of the statute. *Liu*, 140 S. Ct. at 1948 (quotations omitted).

ED also limits Title IX by excluding quid pro quo harassment perpetrated by students in positions of authority—including student teaching assistants—who may not be deemed employees under state or federal law. 85 Fed. Reg. at 30,147-48. As a result, a non-employee teaching assistant who conditions a grade on a sexual favor is not in violation of Title IX if the conduct is not "pervasive," even if the conduct caused the harassed student to avoid class or suffer academically and therefore be "denied the benefits of" education. *Cf.* 2001 Policy at 3 n.9 (quid pro quo harassment by teaching assistant falls under Title IX). ED claims this limitation is required by *Gebser*, which did not impose vicarious liability for damages under Title IX, 85 Fed. Reg. at 30,148, but this is a non sequitur. The heart of quid pro quo harassment is abuse of the authority granted by an institutional program or activity, not agency principles. Indeed, if agency principles controlled, as ED suggests, Title IX would be unavailable to address any student-student sexual harassment, including sexual assault, outside of an employment context.

### C. Requiring sexual harassment to be committed "in" a program or activity does not "effectuate" § 1681(a).

ED limits Title IX to only harassment that takes place "in" a school's education program or activity, which the Rule defines as "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context *in* which the harassment occurs" and "any building owned or controlled by a student organization that is

officially recognized by a postsecondary institution." Rule §§ 106.44(a) (emphasis added), 106.45(b)(3)(i). But the plain language of Title IX does not require a student to be harassed "in" an education program or activity before being "excluded from participation in" or "denied the benefits of" that program or activity. § 1681(a). *See also infra* Part II. Nor do any of the nine exceptions to Title IX involve the location of harassing conduct. § 1681(a)(1)-(9). This is because harassing conduct taking place outside a school's education program or activity can nevertheless contribute to a hostile environment that violates § 1681(a). The relevant inquiry is where the person experienced the exclusion, denial of benefits, or discrimination—not where the sexual misconduct itself was committed. The Rule, therefore, does not effectuate Title IX.

The number of incidents the Rule removes from Title IX protection is alarming: ED estimates that this provision alone will likely reduce the annual baseline estimate of 5.70 investigations per postsecondary school by at least 0.29—which would amount to a national annual reduction of nearly 1,000 investigations—while admitting this is likely a "severe under-estimate." 85 Fed. Reg. at 30,567 & n.1968. About 70% of college sexual assaults are committed at a home and 41% of college sexual assaults involve off-campus parties.[13] Sofi Sinozich & Lynn Langton, U.S. Dep't of Justice, *Rape and Sexual Assault Victimization Among College-Age Females*, 1995-2013, at 6 (Dec. 2014); United Educators, *Confronting Campus Sexual Assault: An Examination of Higher Education Claims* 6 (2015); *see also, e.g.*, Univ. of Wyo. Comm. 2 (80% of students who experienced sexual assault did so off-campus); Am. Psych. Ass'n Comm. 3 ("Campus climate surveys show that the clear majority of sexual misconduct occurs off-campus."); Women Helping Women Comm. 1-2 (vast majority of students that the agency serves are assaulted in locations like an off-campus apartment, local bar, sorority, or fraternity house); Conn. Coll. Comm. 1; 85 Fed. Reg. at 30,056, 30,194 (summarizing comments). Sexual harassment at a private home or event can have widespread effects that permeate the education

---

[13] Like ED, Plaintiffs "recognize[] some off-campus incidents may be part of a recipient's education program or activity." 85 Fed. Reg. at 30,567 & n.1968. But many are not.

environment, potentially forcing the harassed student to avoid certain classes, limit their educational activities, or drop out. *E.g.*, La Roche Coll. Comm. 1 (incidents that happen off campus, particularly with social media, can impact on campus education); South Ark. Cmty. Coll. Comm. 1 ("Off-campus sexual harassment has on campus effects[.]"); Am. Acad. Pediatrics Comm. 3-4; Am. Fed. of Teachers Comm. 3-4; Indep. Colls. & Univs. of Tex. Comm. 19; MIT Grad. Students Comm. 3; Mo. State Univ. Comm. 2-3; Nat'l Alliance to End Sexual Violence Comm. 4-6; Or. Dep't of Educ. Comm. 4; Roch. Med. Access. Coalition Comm. 2; Signatory Soc'ies. Comm. 4; Solano Beach Sch. Dist. Comm. 1; Victim Rights Law Ctr. Comm. 16; Wayne State Univ. Comm. 3-4. But under the Rule, a student raped at a private party by classmates whom the student sees every day at school would have no recourse under Title IX if the rape alone caused the student to fear going to school and therefore "denied" the student "the benefits of" an education. § 1681(a). *E.g.*, 85 Fed. Reg. at 30,198. Instead, the victim would have to be *subsequently* and *repeatedly* harassed by the same classmates *in* the school's program or activity in a manner that is "so severe, pervasive, and objectively offensive" that it "effectively denies" the student "equal access" to education. *Id.*; *see also* Rule § 106.30(a) (*sexual harassment*). And if the school investigated the student's harassers under Title IX, the school must ignore the rape, since a Title IX complaint can no longer be predicated on a sexual assault not "in" the school's education program or activity as defined.

In addition, online harassment is especially prevalent and destructive and by its nature frequently occurs outside the "substantial control" of a school. *E.g.*, U.S. Dep't of Educ. *et al*., Fed. Comm'n on School Safety, *Final Report of the Federal Commission on School Safety* 19 (2018) (noting testimony that "34 percent of high schoolers in America are cyberbullied"); Am. Psych. Ass'n Comm. 3 (online harassment impacts educational access and opportunity: 18% of victims did not wish to go to school; 13% found it hard to study; and 8% stayed home); Am. Fed. of Teachers Comm. 3; SFUSD Comm. 3; SSA Comm. 5. Primary and secondary students often attend classes with the same classmates in the same building, making it especially difficult for harassed students to avoid their abusers and more likely that the harassed students will lose

access to education. But under the Rule, sharing surreptitiously taken nude photos of a classmate with other students by private text message would fall outside Title IX if done after school while standing five feet off campus, as the school would not "exercise[] substantial control"—even though the harms to the harassed student would be identical to harms caused by the same harassment "during class time."[14] 85 Fed. Reg. at 30,202.

### D. Requiring sexual harassment be committed only "in the United States" does not "effectuate" § 1681(a).

The Rule requires schools to dismiss complaints alleging conduct "that did not occur against a person in the United States" on the theory that Title IX does not apply extraterritorially. Rule § 106.45(b)(3)(i). Even assuming this is so—a question that is not settled, *see* 85 Fed. Reg. at 30,206, and this Court need not reach—sexual harassment outside the United States may have direct consequences inside the United States that are prohibited under the statute because they result in a student being "denied the benefits of" and "excluded from participation in" an education program or activity. Enforcing Title IX in these circumstances involves no extraterritorial application. By categorically barring schools from moving forward with Title IX complaints alleging harassment outside the United States, ED fails to effectuate § 1681(a) and ignores Supreme Court precedent holding that even statutes without extraterritorial reach can apply in situations where some salient event occurred abroad.

When determining whether a statute without extraterritorial reach applies to a particular set of facts, courts consider whether "the conduct relevant to the statute's focus occurred in the United States" because if so, "the case involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2101 (2016). The focus of a statute turns on the "'objects of the statute's solicitude,' or what it is 'that the statute

---

[14] ED's rationale for the restriction is also unreasonable. 5 U.S.C. § 706(2)(A). ED acknowledges that its "regulatory authority is co-extensive with the scope of the Title IX statute" but then entirely disregards the three prongs of § 1681(a) that require ED to protect students from being denied or limited in their education benefit or opportunity on the basis of sex regardless of where the sexually harassing conduct occurs in the first instance. 85 Fed. Reg. at 30,196.

seeks to regulate' or protect." *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 913 (D.C. Cir. 2018) (quoting *Morrison v. Nat'l Austl. Bank*, 561 U.S. 247, 267 (2010)). The focus of Title IX is on providing individuals with "effective protections" against conduct that, on the basis of sex, excludes them from participation in, denies them the benefits of, or subjects them to discrimination in an education program or activity. § 1681(a); *Cannon*, 441 U.S. at 704. The relevant inquiry is therefore where the person experienced the exclusion, denial of benefits, or discrimination—which is not necessarily where the sexual misconduct itself was committed. For example, if a professor at an American university sexually harasses a student while the two are travelling abroad for a conference, and that student subsequently fails a class in the United States because the student fears being in the same room as the professor, a student "in the United States" has been "denied the benefits of" and "excluded from participation in" their education. The Rule's requirement that the school dismiss a complaint involving sexual misconduct that took place outside the United States focuses on the wrong "event," unlawfully excluding from Title IX's jurisdictional reach sexual harassment that falls squarely within the statute.

The primary case cited by ED, *Phillips v. St. George's Univ.*, No. 07-1555, 2007 WL 3407728 (E.D.N.Y. Nov. 15, 2007), does not support the Rule's restriction. There, the court held Title IX did not apply where the plaintiff alleged that she was harassed by an employee of the Grenadian university she was attending "and that [the Grenadian university's] employees ignored her complaints *in Grenada.*" *Id.* at *5 (emphasis added). The *Phillips* court explicitly distinguished its facts from those in *King v. Bd. of Control of Mich. Univ.*, 221 F. Supp. 2d 783 (E.D. Mich. 2002), which held Title IX applied to an American university's failure to respond to sexual harassment that occurred in its study abroad program. *Id.* at 791 ("A denial of equal opportunity in [study abroad] programs has ramifications on students' education as a whole and detracts from their overall education. Such detriment, denial of institutional resources and discrimination on the basis of sex, although initiated abroad, clearly happen to students attending universities and colleges in the U.S., that is to persons in the United States."). Rejecting *King* in

favor of *Phillips*, *see* 85 Fed. Reg. at 30,206, even though the two can be reconciled, violates Congress's directive to effectuate § 1681(a).[15]

### E.    Limiting who can file a complaint does not "effectuate" § 1681(a).

ED further undermines Title IX by placing an atextual hurdle in the way of Title IX investigations and remedies. Under the Rule, a school cannot take any action that "unreasonably burden[s]" a respondent who commits sexual harassment as defined by the Rule without following the Rule's grievance process. Rule §§ 106.44(a); 106.30(a) (*supportive measures*). But the grievance process cannot begin without a formal complaint, Rule § 105.45(b), and a formal complaint cannot be filed unless the complainant is participating or attempting to participate in the education program or activity *at the time a formal complaint is filed*, Rule § 106.30(a) (*formal complaint*). As a result, a school cannot investigate and punish sexual harassment if the victim left the school before filing a formal complaint—even if the victim left school *because of the harassment*.[16] *Cf. Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1297 (11th Cir. 2007) (student decision to drop out after rape was "reasonable and expected" and did not foreclose Title IX claim). Moreover, a school cannot take action if, for example, an employee repeatedly assaults only children unaffiliated with the school while on campus—there is no complainant eligible to initiate the grievance process and no way to sanction the employee absent that process. Eliminating the ability of a school to investigate a complaint concerning the very harassment that causes the statutory violation is the antithesis of providing individuals with

---

[15] For the same reasons, the categorical restriction on addressing conduct that occurs outside of the United States, even if it has on-campus effects in the United States, is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

[16] In prior briefing, ED asserted that a Title IX Coordinator can file a formal complaint even when the complainant is not "participating in or attempting to participate in" the education program or activity. Defs.' Opp. at 20 (ECF No. 63). This post hoc rationalization contravenes the Rule's plain language and is impermissible. *Regents*, 140 S. Ct. at 1909. Moreover, nowhere in the 544-page preamble does ED explicitly identify this exception.

effective protections, *Cannon*, 441 U.S. at 704, and threatens the safety of the entire school community, as unaddressed sexual harassment can increase perpetration, *see infra* note 22.

**F.      The Rule's mandatory grievance process for K-12 schools does not "effectuate" § 1681(a).**

Making it harder for schools to prevent and remedy sexual harassment under Title IX while punishing schools that proactively implement constitutionally sufficient processes does not "effectuate" § 1681(a). Yet the Rule requires K-12 schools to complete at least 12 procedural steps and wait more than 20 days before completing an investigation, imposing any discipline, or providing any remedies that may "unreasonably burden[]" a respondent. Rule §§ 106.30(a) (*supportive measures*), 106.44(a). The Rule's grievance procedures exceed ED's authority.

Before opening an investigation, K-12 schools must now: (1) determine which policy applies; and (2) if mandatory dismissal is not required, obtain a signed written complaint from the complainant or, if the complainant does not file a complaint, have the Title IX Coordinator determine whether to sign a complaint and whether doing so will subject the school to federal investigation. Rule §§ 106.30(a) (*formal complaint*), 106.45(b)(3)(i). After the formal complaint is filed, a school must (3) provide written notice of allegations, including names of minors involved; (4) provide written notice to the child and/or parent/guardian before any interview or meeting; (5) provide parties and advisors all evidence "directly related to the allegations"; (6) allow ten days to review and submit responses; (7) complete a written investigative report, and provide it to parties and advisors ten days before the determination; (8) have a separate decision-maker allow each party to submit written questions to any party or witness; (9) after receiving answers, allow for written follow-up questions of any party or witness; (10) explain decisions to exclude questions based on relevance; (11) make a final written determination; and (12) provide an appeal. Rule § 106.45(b)(2), (5)(iv)-(vii), (6)(i)-(ii), (7)(ii), (8). Failure to strictly follow every step can subject a school to federal investigation for prematurely imposing even minor discipline, such as an after-school detention, community service, or training. *E.g.*, 85 Fed. Reg. at 30,288.

The Supreme Court has long recognized that K-12 school authorities act *in loco parentis.* *E.g.*, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986). As such, K-12 policies and practices require flexibility and expediency in order to maintain safety, educate students, and avoid diversion of limited education resources toward "trial-like procedures." *See, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 580, 582, 583 (1975); *Fraser*, 478 U.S. at 686; *Morse v. Frederick*, 551 U.S. 393, 403-07 (2007) (collecting cases). As this Court has already recognized, *Goss* "underscored that such [disciplinary] proceedings [before short-term suspension] need not be cumbersome or prolonged, [419 U.S.] at 582 ('There need be no delay between the time "notice" is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred.')." Mem. Op. at 17 (ECF No. 97). But ED imposes exactly the type of inflexible, formal requirements that the Supreme Court warned are "too costly as a regular disciplinary tool," divert educational resources, and may "destroy [the discipline process's] effectiveness as part of the teaching process." *Goss*, 419 U.S. at 583.

ED can only require K-12 schools to adhere to the 12-step grievance process if doing so "effectuate[s]" § 1681(a)—i.e., it addresses a violation of § 1681(a) by the school itself or brings about effective protections against such violations. *See Gebser*, 524 U.S. at 292. But continuing to operate under constitutionally sound grievance procedures does not violate § 1681(a). Indeed, ED acknowledges that even unfair grievance procedures—which Plaintiff States' schools do not employ—do not categorically violate § 1681(a). 85 Fed. Reg. at 30,101. Nor do the Rule's rigid process and timeline effectively protect against sexual harassment. To the contrary, they impede the ability of schools to protect children (who are subject to compulsory education laws) in a manner consistent with students' developmental needs and the educational role of discipline. *See, e.g.*, Seattle Public Schs. Comm. 1 (focus is "to find educationally and behaviorally sound methods and interventions to appropriately modify student behavior, not to develop and enforce quasi-judicial processes"); Nat'l Educ. Ass'n Comm. 1, 2, 3 ("effective anti-harassment policies and early intervention are imperative to protecting child safety" at the "critical young age when

[students] are first forming ideas and attitudes about appropriate behaviors and healthy relationships," while "inflexible procedural requirements" are "blatantly inappropriate for young students"); Tex. Ass'n of Sch. Bds. Comm. 6 ("not an appropriate approach [in K-12]; . . . there is a need for intervention and education, not an adversarial process in which one side prevails"); Buckeye Elem. Sch. Dist. Comm. 1; Cal. Sch. Bds. Ass'n Comm. 1-3; Daniel Boone Area Sch. Dist. Comm. 1; Or. Dep't of Educ. Comm. 1, 2, 4; Ridley Sch. Dist. Comm. 1; South Bay Union Sch. Dist. Comm. 1; Wisc. Dep't of Pub. Instruction Comm. 1. Imposing a uniform, inflexible process directly contravenes the Supreme Court's acknowledgement that "maintaining security and order . . . *requires* a certain degree of flexibility in school disciplinary procedures." *Fraser*, 478 U.S. at 686 (quotations omitted, emphasis added); *see Goss*, 419 U.S. at 578.

ED also lacks authority to make it *more* difficult for school administrators to conduct investigations in a manner that minimizes trauma and long-term harm. "Title IX's enforcement scheme . . . depends on individual reporting." *Jackson*, 544 U.S. at 181. But under the Rule, K-12 schools must obtain a written complaint with a specific request for investigation *and* decide at the outset whether the conduct fits within the Rule's parameters before being permitted to investigate. Rule §§ 106.30(a) (*formal complaint*), 106.45(b)(3)(i). This process creates unnecessary delay and erects barriers for K-12 students that will chill reporting. *E.g.*, Cal. Dep't of Educ. Comm. 1; Multistate Comm. 10, 23; Solana Beach Sch. Dist. Comm. 2; Wash. State Sch. Dirs.' Ass'n Comm. 4; Wash. State Sup. of Pub. Instruction Comm. 5. Eliminating the discretion of K-12 school administrators to investigate and resolve incidents immediately risks a situation escalating and causing long-term harm to a child. *See, e.g.*, LAUSD Comm. 2-3 (discussing a CDC study finding that unchecked forms of misconduct, "if not resolved or redirected, may escalate in nature"); Or. Dep't of Educ. Comm. 6, 7; Tex. Ass'n of Sch. Bds. Comm. 7. Delays can also result in "more acute and prolonged harm [that] may discourage victims from coming forward." Mixson Decl. ¶ 12 (ECF No. 22-3, Ex. 73); *see* La Mesa-Spring Valley Sch. Dist. Comm. 1; Lakeside Union Sch. Dist. Comm. 1; SFUSD Comm. 2; Solana Beach Sch. Dist. Comm. 2. Cooper Decl. ¶ 13 (ECF No. 22-3, Ex. 45); Burke Harris Decl. ¶ 6,

10 (ECF No. 22-3, Ex. 40). Preventing schools from swiftly investigating and taking low-level disciplinary actions to provide effective relief to child victims neither "avoid[s] the use of federal resources to support discriminatory practices" nor "provide[s] individual [children] effective protection against those practices." *Cannon*, 441 U.S. at 704; *see also Sullivan v. Zebley*, 493 U.S. 521, 541 (1990) (rules that "do not carry out" statutory requirement "exceed[] [an agency's] statutory authority").

Finally, ED asserts authority to initiate federal enforcement against a school if its Title IX Coordinator chooses to investigate a sexual harassment report without student consent. 85 Fed. Reg. at 30,296 n.1162, 30,305. ED does not (and cannot) claim that a K-12 school's investigation on behalf of a child under Title IX, even without consent, violates Title IX. If a child complainant desires not to proceed, for example, due to fear of retaliation in a case of sexual molestation by school staff, the school district has an obligation to act *in loco parentis* to protect that child and other students on its campus from repeat perpetration. *Fraser*, 478 U.S. at 684; 85 Fed. Reg. at 30,091 n.439 (noting one in three employee respondents in K-12 schools sexually abuse multiple student victims). ED has unlawfully prioritized a non-statutory objective of complainant autonomy to the exclusion of "protect[ing]" children against sexual harassment and preventing recurrence of harassment or assault. *Cannon*, 441 U.S. at 704.

*     *     *

Congress enacted Title IX to end sex discrimination and related practices, such as sexual harassment, in educational programs that receive federal funds. *See Cannon*, 441 U.S. at 704. But the Rule does not reduce sexual harassment. Instead, it reduces the number of sexual harassment complaints filed, investigated, and resolved—without regard to how sexual harassment will increase. ED estimates that the Rule's narrowed interpretation of Title IX reduces investigations of sexual harassment by 50% in K-12 schools and 33% in postsecondary schools. 85 Fed. Reg. at 30,551, 30,565-68. In K-12 schools, this means 24,137 fewer Title IX investigations per year. Madowitz Decl. ¶ 39 n.41 (ECF No. 22-3, Ex. 31; ECF No. 51); 85 Fed. Reg. at 30,568, 30,572. In part because of the Rule's onerous grievance procedures, up to 75% of

the remaining investigations will never reach a resolution that results in remedies or sanctions. Madowitz Decl. ¶ 21. But nowhere does ED conclude that a substantial reduction in *investigations* causes a reduction in *instances* of sexual harassment or somehow results in more "effective" protection against sexual harassment. Nor could it. To the contrary, even ED recognizes that "weak sanctions against sexual violence perpetrators and weak laws and policies related to sexual violence and sex equality are associated with a greater likelihood of perpetration." 85 Fed. Reg. at 30,070; *see also infra* note 22. Because the Rule prevents schools from protecting students from sexual harassment, limits schools' ability to deter harassment, and undermines protections against harassment, ED has exceeded its statutory authority.

## II.     The Rule is not in accordance with Title IX (Count II).

Title IX provides that no person "on the basis of sex" shall "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." § 1681(a). Limiting what constitutes sexual harassment, where it must take place, and when someone can file a complaint is not consistent with the statute's plain text. 5 U.S.C. § 706(2)(A).

Under the Rule, anything short of physical violence, stalking, or quid pro quo harassment by an employee must be severe *and* pervasive *and* objectively offensive *and* effectively deny equal access in order to constitute sexual harassment under Title IX. Rule § 106.30(a) (*sexual harassment*). Even conduct meeting this bar will still fall outside the Rule if the respondent commits harassment outside the school's education program or activity or outside the United States. Rule §§ 106.44(a), 106.45(b)(3)(i). As explained in Parts I.B-D, *supra*, these provisions fail to effectuate Title IX's three distinct clauses: "excluded from participation in," "denied the benefits of," and "subjected to discrimination under" any education program or activity. § 1681(a). The Rule, therefore, is not in accordance with § 1681(a); it fails to give effect to "every clause and word." *See Liu*, 140 S. Ct. at 1948 (quotations omitted).

ED justifies narrowing the plain text of Title IX by seeking to align administrative enforcement with the later-adopted heightened framework for private civil monetary damages.

85 Fed. Reg. at 30,032-35, 30,195-96. But as explained in Part I.A.2, *supra*, *Gebser* and *Davis* do not "define the scope of the behavior that Title IX proscribes," *Davis*, 526 U.S. at 639—as ED itself acknowledges, 85 Fed. Reg. at 30,033. ED ignores the underlying logic of *Gebser* and *Davis*: Title IX's contractual nature and administrative scheme already put schools on notice for loss of federal funding, but the Spending Clause and fairness require schools to pay private damages only for harassment under their knowledge and control. *Davis*, 526 U.S. at 639-40; *Gebser*, 524 U.S. at 287-88. ED cannot graft a judicial standard created specifically for an implied private right of action onto the express administrative enforcement scheme of a statute enacted 25 years earlier, § 1682, when doing so excludes from Title IX's reach conduct that is covered by its plain text. Administrative enforcement of Title IX is "co-extensive with the scope of the Title IX statute," 85 Fed. Reg. at 30,196, and so must extend to the full range of the text.

But even if *Davis* controlled here, that analysis looked only at one of Title IX's three clauses: conduct that "subject[s]" students to discrimination "under" an educational program or activity. *Davis*, 526 U.S. at 645. This is because, in the context of a private civil suit for money damages, a school "may not be liable for damages unless its deliberate indifference '*subject[s]*' its students to harassment . . . '*under*' 'the operations of' a funding recipient." *Id.* at 644-45 (emphasis added). The Court looked at the dictionary definition of "under" to conclude that harassment must "take place in a context subject to the school district's control" in order to be the result of the school's deliberate indifference. *Id.* at 645. But the preposition "under" modifies only one type of prohibited conduct—conduct that causes someone to "be subjected to discrimination." § 1681(a). The Court did not apply its analysis to the rest of Title IX, which also prohibits sexual harassment that causes someone to "be excluded from participation *in*" and "be denied the benefits *of*" any education program or activity. *Id.* (emphasis added); *see Davis*, 526 U.S. at 650. ED is not authorized to interpret Title IX in a way that "create[s] surplusage" in the statute or that fails to "give effect" to "every word Congress used." *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 632 (2018); *accord Menasche*, 348 U.S. at 538-39.

Finally, even if the respondent commits sufficiently severe, pervasive, and objectively offensive sexual harassment in an education program or activity, the Rule also adds an atextual new limitation: the school cannot investigate or sanction the misconduct unless the victim is participating or attempting to participate in the education program or activity *at the time a formal complaint is filed.* Rule § 106.30(a) (*formal complaint, complainant*). The Supreme Court did not adopt this requirement for private civil suits and for good reason: it contravenes the plain text of § 1681(a) to require the complainant to be participating in an education program or activity before they can file a complaint that they have been "excluded from participation in . . . an education program or activity." § 1681(a). And by denying protection to individuals the moment the statute has been violated completely, the Rule upends the statute's "plain statutory command[]," *see Bostock*, 140 S. Ct. at 1754, to provide individuals with "effective protection" against discrimination and similar practices, *Cannon*, 441 U.S. at 704.

### III.    The Rule conflicts with schools' obligations to protect student privacy under FERPA (Counts I and III).

Congress enacted FERPA to protect the privacy, and limit the release, of student education records, including disciplinary records. 20 U.S.C. § 1232g. Relevant here, a school violates FERPA and risks losing federal funding if it adopts a "policy or practice of permitting the release of education records" without student or parent consent. § 1232g(b)(1). ED has enforced both Title IX and FERPA in parallel for decades, balancing privacy protections with fair process. *See, e.g.*, 2001 Policy at 17-18, 20 n.102. Although there is no inherent conflict between Title IX and FERPA,[17] the Rule creates two: schools must provide parties and their advisors with a copy of "any evidence obtained as part of the investigation," Rule § 106.45(b)(2)(i)(B), (5)(vi), and may consolidate formal complaints without party consent, Rule § 106.45(b)(4). These requirements violate FERPA by mandating disclosure of evidence to third

---

[17] ED asserts that if there is a statutory conflict, Title IX's specific prohibitions with respect to sexual harassment would control." 85 Fed. Reg. at 30,424. This is not such a situation, and ED lacks authority to resolve statutory conflicts in any event.

parties and that may be unrelated to the student receiving the disclosure. 5 U.S.C. § 706(2)(A).

Moreover, ED cannot create new regulatory requirements that force schools to violate FERPA's

more specific statutory protections of student privacy. 5 U.S.C. § 706(2)(C); *see Office of*

*Consumers' Counsel v. FERC*, 783 F.2d 206, 222 (D.C. Cir. 1986) (agency cannot promulgate

regulation that is "flatly inconsistent with Congress' clear message on this precise issue").

 *First*, FERPA generally prohibits the disclosure of student records to third parties without

prior written consent. 20 U.S.C. § 1232g(a)(1)(A); 34 C.F.R. § 99.12. ED had long recognized

that records relating to sexual harassment complaints may not be disclosed to third parties. *E.g.*,

U.S. Dep't of Educ., Letter from Dale King, Director of Family Policy Compliance Office (Nov.

6, 2015). Under a Title IX regulation consistent with FERPA, a student could obtain educational

records related to their own case, but could not see records of the other students involved in, for

example, a gang rape. But under the Rule, evidence concerning all students involved in a

consolidated complaint must be disclosed to all parties and to each party's advisor.

 *Second*, if records contain information about multiple students, FERPA only allows a

student and their parents to review the parts of other students' records that relate directly to the

reviewing student. 20 U.S.C. § 1232g(a)(1)(A), (a)(4)(A)(i), (b); *see also* 34 C.F.R. § 99.12

(imposing similar requirement); 85 Fed. Reg. at 30,438 (citing Letter to Wachter, from M.B.

Hawes, Dir. of Student Privacy, U.S. Dep't of Educ. 5 (Dec. 7, 2017), https://tinyurl.com/y8hp

loko). ED's longstanding policy had been that FERPA permits disclosure of a statement

containing information related to other students only if the related information cannot be

segregated or redacted without destroying meaning. *Family Educational Rights and Privacy*, 73

Fed. Reg. 74,806, 74,832-33 (Dec. 9, 2008) (explaining that in a hypothetical fight between three

teens, students John and Michael and their parents could both review a witness statement

"directly related to both students," such as "John grabbed Michael's backpack," but Michael's

parents could not review information about any other student not directly related to Michael,

such as "John also punched Steven in the stomach"); *see also* 1997 Policy at 12,037 (reminding

schools to assess FERPA prohibition on disclosure of a student's record without consent). But

under the Rule, all evidence directly related to the *allegations*—not just directly related to the reviewing student—must be disclosed (potentially to numerous parties) regardless of the privacy rights of unrelated or non-parties whose education records may have been collected.

Despite these clear conflicts, the Rule's preamble asserts that recipients "may comply with both these regulations and FERPA." 85 Fed. Reg. at 30,422. Not only is this inaccurate, it is belied by the Rule's explicit attempt to supersede FERPA by regulation. Rule § 106.6(e). ED lacks the authority to implement Title IX in a way that conflicts with FERPA, and it cannot resolve that conflict by superseding a statute (FERPA) with a regulation (the Rule). *See Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980) (agency "cannot supersede the language chosen by Congress" using a regulation).

And even if FERPA and Title IX were inherently inconsistent, canons of statutory construction would require FERPA's specific provisions with respect to the disclosure of information to control over Title IX's more general mandate to provide education free of discrimination and related misconduct. *See Howard v. Pritzker*, 775 F.3d 430, 438 (D.C. Cir. 2015); *Dahmer v. W. Ky. Univ.*, No. 19-124, 2019 WL 1781770, at *4 (W.D. Ky. Apr. 22, 2019) (recognizing that FERPA "specifically contemplates the disclosure of student records to a third-party entity with jurisdiction over a Complaint brought by a student who is the subject of those records" and ruling that FERPA requires that "to the extent that these records contain information regarding other students, their information must be protected"). Furthermore, ED cannot use its "general rulemaking authority" under Title IX to eliminate "a congressionally imposed restriction." *Ciox Health, LLC v. Azar*, No. 18-40, 2020 WL 418454, *23 (D.D.C. Jan. 27, 2020). FERPA's specific commands govern disclosure of student records and ED's attempt to supersede FERPA's privacy protections using the Rule cannot stand.

## IV.    The Rule is arbitrary, capricious, and an abuse of discretion (Count IV).

The Rule is arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A). ED has: (1) reversed decades of its own longstanding and long-enforced policy without "assess[ing] whether there were reliance interests, determin[ing] whether they were significant, and

weigh[ing] any such interest against competing policy concerns," *Regents*, 140 S. Ct. at 1915; (2) failed to consider less harmful alternatives "within the ambit of the existing" policy in order to supply the requisite "reasoned analysis," *id.* at 1913 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 51 (1983)); (3) failed to provide a "reasoned basis" and improperly "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43; (4) "failed to consider [] important aspect[s] of the problem," *id.*; (5) "offered an explanation for its decision that runs counter to the evidence before [it]," *id.*; and (6) failed to "take account of circumstances that appear to warrant different treatment for different parties," *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994). Because ED has not provided a "reasoned explanation" and the "record belies the agency's conclusion," the Court must vacate the Rule. *Id.*

### A.   The Rule improperly prioritizes non-statutory objectives.

The objective of Title IX is to provide individuals with "effective protection" against discrimination and other practices that limit or deny the benefits and opportunities of education, and to prevent federal resources from supporting these practices. *Cannon*, 441 U.S. at 704. But ED has instead "promot[ed] an entirely different set of objectives": incongruous alignment with the Supreme Court's liability standard for private civil money damages, strict adherence to uniform grievance procedures not necessary to prevent Title IX discrimination, and unwarranted solicitude for theoretical First Amendment and due process concerns. *See State Farm*, 463 U.S. at 43 (arbitrary and capricious to rely on factors Congress did not intend); *Gresham v. Azar*, 950 F.3d 93, 103-04 (D.C. Cir. 2020), *cert. granted*, 2020 WL 7086047 (Mem.) (U.S. Dec. 4, 2020) (No. 20-38) ("[I]t is not arbitrary or capricious to prioritize one statutorily identified objective over another, [but] it is an entirely different matter to prioritize non-statutory objectives to the exclusion of the statutory purpose."); Parts I.A.1, I.F, *supra*. And ED has done so at the expense of ensuring that no student will "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity" on the basis of sex.

31

§ 1681(a). ED's decision to "prioritize non-statutory objectives to the exclusion of the statutory purpose" is arbitrary and capricious and warrants vacatur. *See Gresham*, 950 F.3d at 101.

### B.     The Rule imposes unnecessarily prescriptive and arbitrary grievance procedures.

The Rule's onerous and prescriptive grievance process fails to protect confidentiality, imposes unreasonable requirements on K-12 schools, and mandates inequitable and unreliable hearings at postsecondary schools. In adopting these provisions, ED disregarded the "relevant data" showing that these procedures weaken protections for those subjected to sexual harassment, *State Farm*, 463 U.S. at 43; failed to consider circumstances that "warrant different treatment" for K-12 schools, as well as other programs for minors operated by postsecondary schools, *Petroleum Commc'ns*, 22 F.3d at 1172; and abandoned the principles of equity, fairness, and reliability that ED claims justify the process as a whole, 85 Fed. Reg. at 30,100-02, 30,263, in furtherance of certain procedures—such as exclusion of reliable evidence and unlimited disclosure of allegations—that are manifestly inequitable, unfair, and unreliable. At the same time, ED has failed to adequately assess the strength of reliance interests and consider less harmful alternatives "within the ambit of the existing" policy in order to supply the requisite "reasoned analysis," *Regents*, 140 S. Ct. at 1913 (quoting *State Farm*, 463 U.S. at 42, 51).

### 1.     The Rule fails to adequately account for confidentiality concerns.

Despite the highly sensitive nature of sexual harassment investigations, ED bars schools from setting reasonable limitations on the parties and their advisors to prevent the indiscriminate and harmful sharing of allegations and evidence. Rule § 106.45(b)(5)(iii), (vi). The record confirms that such limitations are necessary to protect confidentiality, especially of minor parties and witnesses; preserve the integrity of investigations; and avoid creating a hostile environment on campus and a concomitant risk of retaliation. *E.g.*, LAUSD Comm. 7 ("The trauma, increased risk of retaliation, and FERPA violations from [allowing parties to discuss student information with others] are potentially exponential."); 24 Priv. Liberal Arts Colls. & Univs. Comm. 18-19 (overbroad dissemination chills reporting and "risks fairness and integrity of the investigation");

32

Adams State Univ. of Colo. Comm. 3; Bowdoin Coll. Comm. 3-4; Cornerstone Univ. Comm. 3-4; Lourdes Univ. Comm. 26; SFUSD Comm. 5; N.Y. Dep't of Educ. Comm. 2; Tex. A&M Univ. Sys. Comm. 7; 85 Fed. Reg. at 30,295 (discussing commenters' concerns). Adopting regulations that fail to adequately protect sensitive information and consider less harmful alternatives is not reasonable decision-making. *Regents*, 140 S. Ct. at 1915; *State Farm*, 463 U.S. at 42.

Prior to the Rule, ED had long enforced a policy favoring confidentiality to protect parties, witnesses, and investigation integrity, especially when young children are involved. *E.g.*, U.S. Dep't of Educ., *Sexual Harassment: It's Not Academic Pamphlet* 7 (1988); 1997 Policy at 12,037-38. But to comply with the Rule, schools cannot limit the parties (including child complainants and respondents) from sharing the allegations with anyone, child or adult, for any reason—even if the allegations involve extremely sensitive information of a sexual nature. Rule § 106.45(b)(5)(iii). Schools must also provide *all* evidence in electronic or hard copy form to both parties (who may be young children) and their advisors, without regard to relevancy, confidentiality, the need to protect witnesses (who may also be young children), or the implications of sharing sensitive information. Rule § 106.45(b)(5)(vi). The Rule's preamble exacerbates these problems by prohibiting schools from redacting personally identifiable information, including minor witness names, thereby depriving schools of critical tools to prevent children from sharing information online or in school. 85 Fed. Reg. at 30,427. The Rule even requires schools to produce nude or sexually explicit photos or videos of minor students to advisors, who can be any third-party, relative, or child, even though this runs counter to state and federal laws, as well as common sense in the age of ubiquitous smartphones. 85 Fed. Reg. at 30,431-32; *see, e.g.*, 18 U.S.C. § 2252A (criminalizing child pornography dissemination).

ED fails to account for the unique circumstances of K-12 campuses with young children, where the spread of allegations of a sexual nature can rapidly lead to a hostile environment on campus, parent complaints, increased risk of retaliation, and a "potentially exponential" chilling effect on other complainants and witnesses. LAUSD Comm. 7; *see, e.g.*, SFUSD Comm. 5; Wash. State Sch. Dirs.' Ass'n Comm. 9; 85 Fed. Reg. at 30,295 (acknowledging and chronicling

33

concerns raised by many commenters). All of these factors undermine the integrity of an investigation and create further unsafe conditions for students. *Ibid*. ED acknowledged these harms, but "[s]tating that a factor was considered" is "not a substitute for considering it." *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Instead of responding to concerns, ED irrationally permits school principals to warn only against "malicious[]" discussion of allegations, 85 Fed. Reg. at 30,295-96, even though equal harm is caused by the spread of information without malicious intent, as often happens among children. ED also explains that the provision applies only if a child decides to proceed with the grievance process, 85 Fed. Reg. at 30,296, but this non-sequitur only demonstrates how the provision risks chilling reporting.

Indeed, ED does not dispute that widespread disclosure of sexually explicit information or yet-unproved allegations can harm respondents and complainants alike by disrupting the school environment and precluding a fair grievance process. 85 Fed. Reg. at 30,295-96. Instead, ED justifies its sweeping revision to longstanding policy by stating that it is needed to ensure parties are not restricted from seeking "advice and support," gathering evidence, or criticizing the recipient for its handling of the investigation or approach to Title IX. *Id.* But these justifications support a far more limited provision than the one ED actually promulgated, such as permitting disclosure of allegations only to those involved in the investigation (e.g., parents, guardians, and support persons). 85 Fed. Reg. at 30,295-96 (summarizing comments). Dismissing this less harmful and burdensome alternative is not reasoned analysis. *Regents*, 140 S. Ct. at 1913. ED "believes" that the "benefits" "outweigh the harm that could result," 85 Fed. Reg. at 30,296, but provides no support for the statement. The Rule allows for widespread and unmitigated disclosure far beyond what its rationale can support.[18] *State Farm*, 463 U.S. at 43.

Moreover, ED presents only unworkable (and therefore unreasonable) suggestions for mitigating widespread disclosure of prejudicial and harmful investigatory evidence. 85 Fed. Reg.

---

[18] This sweeping disclosure provision is also unrelated to the statutory purpose of preventing sexual harassment, and, as commenters shared with ED, is likely to lead to more of it.

at 30,296; *see, e.g.,* Northwest Christian Univ. Comm. 3-4 (insufficient to ensure information not "widely divulge[d]"); Ass'n of Am. Univs. Comm. 3-4 (private information "could be misused" and "potentially traumatize either party," potentially creating a "chilling effect on reporting"); Southern Wesleyan Univ. Comm. 4 (protections are "ineffective" for potential disclosure); Wash. State Sch. Dirs.' Ass'n Comm. 9. ED's suggestion to give principals limited discretion to warn students not to discuss allegations maliciously, 85 Fed. Reg. at 30,296, does not stop parties with smartphones from widely divulging student names and details of extremely sensitive sexual activity. Similarly, ED's reliance on the Rule's prohibition of conduct that is "intimidat[ing], threaten[ing], coerc[ive], or discriminat[ing]," Rule § 106.71(a), is insufficient because dissemination of information that does not meet this standard will still cause actual harm, especially when the "obvious concern" of K-12 educators acting *in loco parentis* is to "protect children . . . from exposure to sexually explicit" speech. 85 Fed. Reg. at 30,039-40 n.129 (citing *Fraser*, 478 U.S. at 684). A mutual no-contact order between the parties cannot address the problem because each party retains unfettered power to disseminate information to others. Rule § 106.45(b)(5)(iii). A school's ability to protect confidentiality *only if* there is no investigation is similarly ineffective and in fact will deter complaint filing and make it more difficult for schools to prevent repeat offenses. 85 Fed. Reg. at 30,296 ("non-disclosure" requirements may be imposed if no formal complaint is filed). As for ED's other suggestions: no file-sharing platform can prevent a smartphone from photographing a picture on a screen and re-distributing it (*e.g.*, Mo. State Univ. Comm. 3 ("not possible" to prevent "screenshots")); many minor parties cannot be bound by non-disclosure agreements, *e.g.*, *Scruton v. Korean Air Lines Co.*, 39 Cal. App. 4th 1596, 1606 (Ca. 1995) ("contracts are voidable by minors"); advisors can refuse to sign a nondisclosure agreement, forcing schools to choose between ending the investigation to avoid disclosure or proceeding and risking disclosure and liability; and notifications not to disseminate sensitive information cannot put the proverbial cat back in the bag once that information is shared. *E.g.*, 85 Fed. Reg. at 30,304; 30,432; Southern Wesleyan Univ. Comm. 4.

Finally, that schools cannot restrict the ability of parties "to discuss the allegations," including the complainants' identities, Rule § 106.45(b)(5)(iii); 85 Fed. Reg. at 30,295-97, directly conflicts with a different, preexisting provision preventing parties from sharing complainants' identities "in the conduct of any investigation" or "hearing" except as necessary, Rule § 106.81 (incorporating 34 C.F.R. § 100.7(e)). It is no answer to suggest that 34 C.F.R. § 100.7(e) only applies during an Office for Civil Rights (OCR) investigation; long-standing Department policy subjected to notice and comment reflects application to schools. 2001 Policy at 17 n.95. Nor does ED provide a rational and internally consistent justification for why parties get more confidentiality protections in the context of a Department investigation than they do in a school investigation. *See Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 934-35 (D.C. Cir. 2008) (action product of inconsistent reasoning is arbitrary and capricious). ED's failure to address the inconsistency within its own Rule has left schools in the untenable position of being required to violate one section of the Rule in order to comply with another.

## 2. Prescriptive grievance procedures are unreasonable in K-12 schools.

By requiring all K-12 schools to resolve every complaint of sexual harassment under the Rule's onerous and prescriptive 12-step process, ED arbitrarily and capriciously disregarded unique developmental and pedagogical circumstances and resource limitations in K-12 schools, ignored facts in the record showing that the procedures weaken student protections, and failed to provide adequate justification for its change in position or consideration of less harmful alternatives in mandating such procedures across the board.

*First*, as discussed in Part I.F, *supra*, by imposing a prescriptive, cumbersome, and inflexible process on all schools, the Rule unlawfully disregards evidence of the unique developmental and pedagogical circumstances of K-12 education. *See Petroleum Commc'ns, Inc.*, 22 F.3d at 1172 (arbitrary to ignore different circumstances for different parties); *Goss*, 419 U.S. at 583. ED improperly ignores the evidence before it that the 12-step, 20-day plus process weakens protections for K-12 students subjected to sexual harassment and neglects the importance of promptly addressing misconduct involving young children before it escalates. *See*

36

*State Farm*, 463 U.S. at 43; *see, e.g.*, Nat'l Educ. Ass'n Comm. 1; LAUSD Comm. 2-3; Seattle Pub. Schs. Comm. 1-2; SSA Comm. 4; *see also* 85 Fed. Reg. at 30,486 (discussing harms raised by commenters from significant delays).

ED's prior longstanding policy permitted schools to create "prompt and equitable" processes to address all forms of sexual harassment and to investigate and resolve harassment allegations. 34 C.F.R. § 106.8(a), (b) (effective until Aug. 14, 2020); 1997 Policy at 12,040; 2001 Policy at 14, 19-21. Decades of consistent policy created "serious reliance interests." *Regents*, 140 S. Ct. at 1913 (quotations omitted). Yet ED concluded that only 5% of schools would need to change their Title IX discipline processes to comply with the Rule. 85 Fed. Reg. at 30,566. This assessment of the "significance" and "weight" of such reliance interests, *Regents*, 140 S. Ct. at 1915, was contradicted by the evidence: Schools reported that the Rule's grievance procedures required massive change, resulted in exorbitant new costs, and created inconsistent, confusing, and duplicative processes. *E.g.*, 85 Fed. Reg. at 30,561 ("[T]wo ten-day requirements would especially increase the administrative burden on small institutions," would be a "significant drain on resources and would draw out the processing time of every investigation"); Wash. State Sch. Dirs.' Ass'n Comm. 9; *see also infra* Part V.A. The record fails to supply either "good reasons" or a "detailed justification" for why ED chose to disregard these circumstances. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

In addition, ED failed to provide a reasoned explanation for rejecting less harmful alternatives "within the ambit of the existing" policy, *see Regents*, 140 S. Ct. at 1913—e.g., applying formal procedures only to expulsions or long-term suspensions, consistent with *Goss* and comments in the record. ED claimed it did "not see the propriety in crafting different sets of procedural requirements" when short-term suspensions and lesser forms of discipline are to be imposed because all Title IX sexual harassment is "serious conduct." 85 Fed. Reg. at 30,371. But this conclusory response is insufficient for ignoring Supreme Court precedent and education and health expert comments regarding the need for flexibility and expediency in K-12 schools. *Regents*, 140 S. Ct. at 1913. And "[s]tating that a factor was considered" is "not a substitute for

considering it." *Getty*, 805 F.2d at 1055. To make matters worse, the Rule suggests key early interventions that teach children socially appropriate behavior, such as individual training, are "sanctions" that cannot be imposed without following § 106.45. *See* 85 Fed. Reg. at 30,182; *cf. Fraser*, 478 U.S. at 681 (recognizing educators' role in teaching socially appropriate behavior).

Allowing schools to provide "supportive measures" and impose emergency removal, 85 Fed. Reg. at 30,181, is no substitute for expeditious investigation and resolution of sexual harassment. Under the Rule, supportive measures cannot unreasonably burden the respondent and interim emergency removals require meeting a high threshold of "immediate threat" and "an individualized safety and risk analysis." Rule §§ 106.30(a) (*supportive measures*), 106.44(c). These do not offer the accountability or discipline necessary to promptly and effectively protect students. LAUSD Comm. 5-6; Multistate Comm. 34; SFUSD Comm. 2; *see also* Darling-Hammond Decl. ¶ 17 (ECF No. 22-3, Ex. 46); Herman Decl. ¶ 16 (ECF No. 22-3, Ex. 24; ECF No. 51), Harv. Undergrad. Council Comm. 1. For example, a student who grabs another's genitalia or shares sexually explicit photos of a classmate may need to be expeditiously "burden[ed]" by a one-way no-contact order or restriction of privileges after notice and informal hearing to prevent further harm, even if neither instance of sexual misconduct warrants emergency removal as "an immediate threat to [] physical health or safety." Rule § 106.44(c). It is irrational to deny schools the flexibility to determine, after constitutionally sufficient process, an appropriate response to prevent escalation of sexual harassment when ED is mandated to design a Rule to eliminate, not create, such harm. § 1682; *Goss*, 419 U.S. at 578, 580, 582; LAUSD Comm. 5-6; SFUSD Comm. 2-3; Mental Health Pros. Comm. 3; *see also* Darling-Hammond Decl. ¶¶ 17-18; Lynch Decl. ¶¶ 18, 43 (ECF No. 22-3, Ex. 71); Kammerud Decl. ¶¶ 37, 43 (ECF No. 22-3, Ex. 67). ED concedes the importance of accountability and sanctions for reducing the "likelihood of perpetration," 85 Fed. Reg. at 30,070, so cannot credibly claim that prohibiting schools from imposing even minimal discipline, such as detention, community service, or training, for more than 20 days could be an adequate substitute.

*Second*, requiring three different staff members to participate in every K-12 Title IX investigation that may involve remedies or sanctions, Rule § 106.45(b)(7)(i), (b)(8)(iii)(B), does not reflect a rational connection between the facts found and the choice made and ignores the different circumstances in K-12 schools. *State Farm*, 463 U.S. at 43; *Petroleum Commc'ns, Inc.*, 22 F.3d at 1172-73. K-12 school districts have fewer resources and more individual schools than postsecondary schools. *E.g.*, 85 Fed. Reg. at 30, 491, 30,559, 30,484. Before the Rule, schools generally handled a one or two-day suspension (or lesser discipline) with just one administrator operating as both investigator and decision-maker and did not provide an appeal process for low-level discipline like a detention. 85 Fed. Reg. at 30,491. Now, all schools that did not previously employ separate investigators, decision-makers, or appeal reviewers must allocate or reallocate limited educational resources to comply. LAUSD Comm. 9; SFUSD Comm. 4; Wash. State Sch. Dirs.' Ass'n Comm. 9; *see also* 85 Fed. Reg. at 30,559 (it is "especially burdensome" for small schools to have multiple individuals for each investigation).

ED was cognizant of these unique resource and organizational challenges for K-12 schools but justified ignoring them by claiming that it was "unclear what criteria would justify an exemption." 85 Fed. Reg. at 30,371. This response is entirely disingenuous because commenters provided ED with tangible "criteria" for deciding when the person investigating should not issue discipline: the sanction's severity. *Id.* ED's reason for rejecting this alternative "within the ambit of the existing policy" is insufficient, *Regents*, 140 S. Ct. at 1913 (quoting *State Farm*, 463 U.S. at 51), given that the Supreme Court and schools have long used this exact criterion to establish the level of procedure necessary—as ED is well aware, 85 Fed. Reg. at 30,051 (recognizing that "due process is flexible and calls for such procedural protections as the particular situation demands") (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)); *Goss*, 419 U.S. at 584 (longer-term removal may require more formal procedures); 85 Fed. Reg. at 30,371. ED cannot "have it both ways": rely on Supreme Court caselaw to justify narrowing Title IX but ignore it to impose a procedural regime that educators (and courts) agree reduces the ability of schools to keep students safe. *See Gen. Chem. Corp. v. United States,* 817 F.2d 844, 854 (D.C. Cir. 1987)

(agency's explanation must be rational and consistent). ED's failure to adequately analyze these critical facts renders the Rule unreasonable. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017).

*Third*, by requiring a written, formal complaint as a prerequisite to investigation in all cases, Rule § 106.30(a) (*formal complaint*), the Rule ignores an important aspect of the problem: writing, much less articulating, a formal complaint of sexual harassment is beyond the capacity of many children and students with disabilities, and many vulnerable children may lack a parent or guardian to fill the void. Or. Dep't of Educ. Comm. 6 (many students, "as well as parents, are not able to articulate in writing their complaints"); Wash. State Sch. Dirs.' Ass'n Comm. 4 (procedural barrier for students learning to write); LAUSD Comm. 3-4; *see also* Williams Decl. ¶¶ 17, 22 (ECF No. 22-3, Ex. 95); Darling-Hammond Decl. ¶¶ 32-33, 35; Lynch Decl. ¶ 20. As the evidence before ED demonstrated, the majority of complaints in K-12 schools are made orally and schools have developed serious reliance interests in moving expeditiously to protect children. Berkeley Unified Sch. Dist. Comm. 2; LAUSD Comm. 3-4; Multistate Comm. 28, 33; Or. Dep't of Educ. Comm. 5-7; SFUSD Comm. 2; Wash. State Sch. Dirs.' Ass'n Comm. 4; *see also* Hall-Panameño Decl. ¶ 25 (ECF No. 22-3, Ex. 57) (requiring child to instigate investigation process exacerbates harm of even a short delay in formal investigation and discipline). Demanding a formal complaint before a school can even begin investigating places an unnecessary burden on schools, interferes with their ability to carry out their legally recognized *in loco parentis* responsibilities, impedes schools' ability to promptly resolve and prevent further harassment, and chills reporting of sexual harassment. *Ibid.*; *see also* LAUSD Comm. 2-3 ("Educators act in loco parentis and thus are obligated to take more affirmative protective measures with children/students").

Indeed, longstanding ED regulations, now summarily reversed for sexual harassment, required an investigation and resolution (beyond supportive measures) after receipt of any "report" of Title IX harassment. 34 C.F.R. § 106.8(a), (b) (effective until Aug. 14, 2020); 1997 Policy at 12,042; 2001 Policy at 16, 19. ED's rationale for the new requirement—that a

complainant must make "an intentional decision" to proceed and specify that "an investigation" is "an action" the complainant "desires" due to the seriousness of the complaint process, *see* 85 Fed. Reg. at 30,130—assumes a measure of autonomy inappropriate for young children. Nor does it logically follow that a child's oral communication of such intention and desire to proceed should be an insufficient basis for a school principal to initiate an investigation. ED's failure to adequately account for and address these serious and undisputed differences renders the Rule arbitrary and capricious. *State Farm*, 463 U.S. at 43; *Petroleum Commc'ns*, 22 F.3d at 1172.

*Finally*, the Rule's preamble states that ED can initiate a federal enforcement action against a school if a Title IX Coordinator fails to provide "specific reasons justifying" an investigation without child consent. 85 Fed. Reg. at 30,305, 30,296 n.1162, 30,045. ED's rationale for this requirement—respecting the "autonomy" of an individual complainant, 85 Fed. Reg. at 30,034, over Title IX's non-discrimination mandate—is particularly unreasonable in the K-12 setting. As ED itself acknowledges, schools act *in loco parentis* and must act to prevent child sexual abuse. 85 Fed. Reg. at 30,039 & n.129, 30,107. As such, schools must be able to take actions to protect all of the young children on their campus, regardless of the wishes of one student. The curtailment of a school district's ability (and obligation) to investigate and respond on behalf of minor children is also a sharp and unjustified departure from long-standing Title IX regulation. 34 C.F.R. § 106.8(a), (b) (effective until Aug. 14, 2020). ED fails to adequately explain how the need to provide "autonomy" and secure "consent" could be plausible reasons for limiting access to Title IX for child victims or children with severe disabilities, particularly those without an adult to fill the void and particularly when other child victims may be harmed by a failure to investigate promptly. *E.g.*, 85 Fed. Reg. at 30,093, 30,106 n.482, 30,109-10 (discussing complainant autonomy in postsecondary schools and for adults but failing to address distinction of mandatory reporting and *in loco parentis*); *see also* Hall-Panameño Decl. ¶ 25. Furthermore, it turns Title IX on its head to punish a K-12 school for "deliberate indifference" because a Title IX Coordinator moves forward expeditiously with the "plain" Title IX "duty not to permit" harassment and to protect its minor students. *See Davis*, 526 U.S. at 642-43 (quotations omitted).

41

And the preamble's limitation on a Title IX Coordinator's discretion is inconsistent with the Rule's plain text, which includes no such limitation. *Barrick Goldstrike Mines, Inc. v. Whitman*, 260 F. Supp. 2d 28, 36 (D.D.C. 2003) (citation omitted) (when "the preamble to [a] rulemaking is inconsistent with the plain language of the regulation, it is invalid").

### 3. Postsecondary school hearing provisions are arbitrary and capricious.

The Rule requires all postsecondary schools to adopt a live-hearing grievance process with only limited rules of evidence and mandates that schools entirely disregard evidence from any party or witness who does not undergo direct, oral cross-examination by parties' advisors. Rule § 106.45(b)(6)(i). ED disregarded significant evidence that this process will create inequitable hearings and cause significant harm to respondents, complainants, and witnesses without any concomitant benefit to truth-seeking. ED's inadequate and illogical explanation for the requirement in the face of substantial harm is unreasonable and fails to address important aspects of the problem. *State Farm*, 463 U.S. at 43.

*First*, ED does not provide a reasonable explanation for why postsecondary schools must hold live hearings with direct, oral cross-examination by an advisor—who can be another child, relative, or attorney—but all other recipients, including K-12 schools, libraries, and museums, can resolve complaints fairly and effectively with indirect, written cross-examination facilitated by the decision-maker. It is unreasonable to deprive postsecondary schools of the same kind of discretion to fashion fair and effective grievance procedures—especially when ED received significant evidence that live cross-examination by a party's advisor unnecessarily traumatizes complainants, respondents, and witnesses and chills the "individual reporting" upon which the success of Title IX's enforcement scheme relies. *Jackson*, 544 U.S. at 181; *see, e.g.*, Am. Council on Educ. Mem. to OIRA 2-3 (Dec. 17, 2019) (submitted for EO12866 meeting) (ACE Mem.) (aggressive cross-examination increases the risk of re-traumatizing survivors and may discourage some from filing a complaint); Letter from SAFE Campuses LLC to S. Comm. on Health, Educ., Labor & Pensions re: Reauthorizing Higher Educ. Act 3 (Apr. 2, 2019) (proposed grievance processes would reverse the last decade's progress in fighting sexual violence and

deter reporting); Am. Psych. Ass'n Comm. 4 (acknowledging that "live cross-examination has the potential to re-traumatize victims" and "cause them to disengage with the systems that should be supporting them"); Nat'l Med. Access. Coalition Comm. 1 (impact on students with disabilities); AGB Comm. 3-4; Ass'n of Am. Univs. Comm. 3-4, 6; ATIXA Comm. 32; Cal Cmty. Coll. Comm. 7; Conn. Coll. Comm. 2; Matt Howard Vol. Vict. Advoc. Comm. 1; Mental Health Pros. Comm. 4; MIT Grad. Student Comm. 4; Mo. State Univ. Comm. 2-3; Northampton Cmty. Coll. Comm. 3-4; Regents of Univ. of Cal. Comm. 6; Roch. Med. Access. Coalition Comm. 4-6; Tex. State Univ. Sys. Comm. 4; Univ. of N.C. Sys. Comm. 5; Wyo. Cmty. Coll. Comm'n Comm. 1; 85 Fed. Reg. at 30,314-5 (process will "revictimize, retraumatize and scar survivors" and "chill reporting").

ED was required not merely to acknowledge these harms but to provide a reasoned explanation justifying its choice over available, less-harmful alternatives, such as written cross-examination questions read aloud by a neutral decision-maker. *See Regents*, 140 S. Ct. at 1913-15; *State Farm*, 463 U.S. at 42-43. It failed to do so. ED claims that the provision is required by several courts and designed to improve perceptions that Title IX proceedings are fair and free of sex bias. 85 Fed. Reg. at 30,100-01, 30,313. But this cannot be a rational basis because the Rule does not mandate live hearings with direct, oral cross-examination by advisors for all recipients where adults are present, such as museums and libraries. *See Venetian Casino*, 530 F.3d at 934. ED further claims that advisors, as opposed to decision-makers, must conduct cross-examination "so that the recipient remains truly neutral throughout the grievance process." 85 Fed. Reg. at 30,316. But ED fails to provide an adequate explanation as to why it has reversed course from its own 2017 Q&A that endorsed a neutral decision-maker reading questions posed by the parties or their representatives. 2017 Q&A at 5. Indeed, ED received evidence that schools have successfully used alternative methods of cross-examination, including indirect questioning via a neutral decision-maker. *See, e.g.*, Tex. State Univ. Sys. Comm. 4 (decision-maker conducting cross-examination with party questions is a "workable and effective" alternative); 24 Priv. Liberal Arts Colls. & Univs. Comm. 13; ACE Mem. 3; Cal. Cmty Coll. Comm. 7.

ED now claims that reading aloud a party's cross-examination questions requires the decision-maker to "step[] into the shoes of an advocate" or else "fail[] to fully probe the parties' statements for flaws." 85 Fed. Reg. at 30,330. But ED does not explain how asking *each* party and witness probing questions as to veracity and credibility is "advocacy" or how such a method would compromise a school's actual or perceived neutrality. ED's position is all the more arbitrary because the Rule permits the decision-maker to question parties and witnesses, 85 Fed. Reg. at 30,332, just as judges routinely do in civil and criminal cases. ED also claims that hearing panels have at times stifled the value of cross-examination by refusing to ask relevant questions, to use specific wording, or to pose follow-up questions requested by parties. 85 Fed. Reg. at 30,313. But ED does not explain why it did not then mandate the training of neutral decision-makers (or require all relevant questions to be asked) to properly facilitate cross-examination.[19] Failure to require such training is especially arbitrary where ED elsewhere holds up training as a means to ensure decision-maker impartiality and address other concerns about inequitable hearings. *E.g.*, 85 Fed. Reg. at 30,337.

*Second*, ED had before it substantial evidence that use of advisors to conduct cross-examination would create inequitable hearings due to disparities in the ability of students to obtain advisors skilled in cross-examination. *See, e.g.*, SSA Comm. 4 ("sharp inequities" from hiring third party advisors); Am. Psych. Ass'n Comm. 4 ("[T]hose with power and privilege may have an unequal advantage in hearing proceedings. . . students with limited access to financial resources will be at a significant disadvantage."); Tex. State Univ. Sys. Comm. 2 (requirement "fails to ensure parity for the parties"); AGB Comm. 4; ATIXA Comm. 33; South Ark. Cmty. Coll. Comm. 3; Wright State Univ. Comm. 1. ED suggests that allowing each party to select their own advisor will remedy these inequities, 85 Fed. Reg. at 30,332, but this unreasonably

---

[19] ED rejects decision-maker training as a solution to any purported problem with the appearance of neutrality, but suggests that schools instead educate the entire school community "about what cross-examination during a Title IX grievance process will look like," 85 Fed. Reg. at 30,316— an unnecessarily burdensome and less reliable solution.

assumes that all parties can pay for advisors of similar quality. Requiring schools to provide advisors for students lacking one, Rule § 106.45(b)(6)(i), cannot remedy this inequity; the mere availability of an advisor does not close the potential gap in quality of representation. This is especially true in schools with resource limitations, which must bear the costs of training advisors or hiring attorneys to ensure effective cross-examination.[20] ED claims that professional qualifications or skill level of a party's advisor are immaterial because cross-examination questions, answers, and evidence are evaluated by a decision-maker who is trained to be impartial. 85 Fed. Reg. at 30,332. But this ignores the fact that impartially evaluating evidence is a completely different function than eliciting evidence. "Brush[ing] aside critical facts" in this way thwarts reasoned decision-making. *Am. Wild Horse*, 873 F.3d at 932. ED's attempt to explain away the skill gap and its true impact on parties' ability to participate equally is irrational and ignores significant aspects of the problem. *Regents*, 140 S. Ct. at 1913.

*Third*, ED's purported attempt to "simplif[y] evidentiary complexities," 85 Fed. Reg. at 30,348, arbitrarily undermines the truth-seeking process by barring reasonable limits on unreliable evidence while excluding relevant and reliable testimonial evidence. On the one hand, schools are prohibited from adopting well-recognized evidentiary safeguards. 85 Fed. Reg. at 30,336-37. For example, a decision-maker cannot exclude evidence or cross-examination questions that are unfairly prejudicial, misleading, or would cause undue delay. *Cf.* Fed. R. Evid. 403. Although parties can present expert witnesses, Rule § 106.45(b)(5)(ii), schools cannot adopt any rules that govern the qualification of experts or the admissibility of expert testimony, *cf.* Fed. R. Evid. 702-705. These restrictions are all the more arbitrary because ED recognizes elsewhere that some evidentiary safeguards are necessary to avoid prejudicing the decision-maker and unnecessarily harming the parties, *e.g.*, 85 Fed. Reg. at 30,352 (limiting questions about sexual

---

[20] "Of more than 4,000 higher-education institutions in the United States, few have lawyers on staff to serve in that role, and even fewer (just over 200) have accredited law schools with faculty members or students who might pitch in." Suzanne B. Goldberg, *Keep Cross-Examination Out of College Sexual-Assault Cases* 3, Chron. of Higher Educ. (Jan. 10, 2019).

history or predisposition)—but refuses to allow schools to adopt other time-tested rules that reduce the same risks.

On the other hand, ED creates a new exclusionary rule that bars the decision-maker from considering *any* written or oral statements of a party or witness who refuses to "submit to cross-examination," even if the person becomes disabled or dies. Rule § 106.56(b)(6)(i); 85 Fed. Reg. at 30,348. ED claims this novel provision—not used in any civil, criminal, or administrative hearing process—is needed to ensure that only credible statements are considered by the decision-maker. 85 Fed. Reg. at 30,347. But the provision excludes evidence long considered reliable under foundational hearsay exceptions and exclusions, including medical and police records, rape kits and other medical evidence, authenticated text or email messages, and statements against interest. *E.g.*, Fed. R. Evid. 801, 803, 804. Because schools (and students) have no power to subpoena parties or compel testimony, 85 Fed. Reg. at 30,348, ED effectively permits a respondent who has confessed to committing sexual assault to avoid responsibility simply by refusing to participate in the school's formal investigation process. This runs counter to ED's repeatedly stated goal of ensuring a reliable outcome. *E.g.*, 85 Fed. Reg. at 30,101; *Venetian Casino*, 530 F.3d at 934-935 (inconsistent reasoning is arbitrary and capricious). ED also ignored evidence in the record that this novel exclusionary rule would re-traumatize survivors and chill reporting by creating an incentive for "extraordinarily aggressive posturing and questioning" to "intimidate the survivor, the accused, and/or witnesses" and deter them from appearing for cross-examination or reporting sexual harassment in the first place. ACE Mem. 2-3; *see also* Mo. State Univ. Comm. 2 ("very few respondents who are 'advised' by counsel agree to testify" and so school can only proceed if complainant agrees to "undergo withering cross-examination" while respondent need not do so); NASPA Comm. 12. Failure to address these incentives and the resulting chilling effect is "fail[ure] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43; *Regents*, 140 S. Ct. at 1913.

*Finally*, the Rule require this inequitable and harmful live hearing process be applied to minors participating in postsecondary programs, such as "daycare students" enrolled in

university-run daycare centers and young participants in university-run 4-H and sports programs, such as gymnastics. 85 Fed. Reg. at 30,488-89, 30,493; *see* CAPPA Comm. 23-24 ("large numbers" of colleges "operate child care centers" and "house youth sports"). ED had before it evidence that such a standard was arbitrary and would result in undue harm to minors; indeed, ED relied on such considerations in permitting the use of written questions, instead of direct, oral cross-examination, in the K-12 context. Rule § 106.45(b)(6)(ii); 85 Fed. Reg. at 30,334-35; *see, e.g.*, ACE Mem. 3. ED justifies blanket application of the live hearing requirement in all postsecondary investigations by suggesting that minors simply forego cross-examination—but this also requires foregoing their right to have their statements considered by the decision-maker. 85 Fed. Reg. at 30,488-89. Unless there are other witnesses to the harassment who submit to cross-examination, exclusion of complainants' statements will often result in dismissal of the complaint or a finding of non-responsibility. ED's capricious solution fails to reasonably address this important aspect of the problem, disregards the evidence, and leaves minors vulnerable to sexual harm without recourse under Title IX. *State Farm*, 463 U.S. at 43.

### 4. The Rule unreasonably limits Title IX's remedies.

ED eliminates a longstanding provision requiring remedies to "overcome the effects" of discrimination, 34 C.F.R. § 106.3(a) (effective until Aug. 14, 2020), and does away with a longstanding policy that schools must "eliminate a hostile environment if one has been created, and prevent harassment from occurring again," 2001 Policy at 15. Instead, schools now are only obligated to "remedy the [Title IX] violation." Rule § 106.3(a); *see* Rule § 106.45(b)(7)(ii)(E). ED provides no reasoned explanation for the change, stating only that "restor[ing] and preserv[ing] equal access" is "the appropriate focus" and referring readers to the deliberate indifference and *Gebser/Davis* sections for support. 85 Fed. Reg. at 30,244. As previously stated, *Gebser* and *Davis* are inapplicable, as they provide a framework for civil damages liability (which compensates victims for harm), not administrative enforcement (which both remedies and prevents violations). ED disregards ample evidence in the record that just addressing a specific violation is insufficient to ensure an educational experience free of harassment without also

eliminating a hostile environment, preventing further harassment, and remedying the long-term effects on the student (such as lost school time and mental health impacts). *E.g.*, 85 Fed. Reg. at 30,539 (40% of survivors experience PTSD, depression and chronic pain), 30,545 (long-term harms), 30,056 (describing how failure to prevent further harassment resulted in ongoing educational denials); Signatory Soc'ies Comm. 3; Univ. of Wyo. Comm. 3. And ED has not provided adequate justification or identified any change in circumstances to support disavowing these remedies, which are designed to provide "effective protections" against sexual harassment as required by Title IX. *Cannon*, 441 U.S. at 704; *Fox Television Stations, Inc.*, 556 U.S. at 515-16; *Petroleum Commc'ns, Inc.*, 22 F.3d at 1172.

      **C.**     **The mandatory dismissal provision is arbitrary and capricious.**

     ED improperly ignored the significant administrative burdens, costs, and confusion caused by the Rule's mandatory dismissal provision, Rule § 106.45(b)(3)(i), as well as the resulting institutional mistrust, reduction in reporting, and delays in resolution. ED's failure to address these "important aspect[s] of the problem" renders the Rule arbitrary and capricious. *See Regents*, 140 S. Ct. at 1913; *see also Am. Wild Horse*, 873 F.3d at 932 (critiquing an agency for "brush[ing] aside critical facts" and not "adequately analyz[ing]" consequences).

     Requiring a school to determine whether reported conduct is subject to Title IX (or a separate non-Title IX process) prior to investigating causes myriad problems. The school must gather enough information, *without* "investigating," to advise the complainant of the applicable procedure. Rule § 106.44(a). If the harassment took place in multiple locations then the cases must be split—a non-Title IX investigation for a rape at a near-campus bar, but a Title IX investigation for later in-hallway fondling involving the same students. If a school determines after a Title IX investigation begins that the harassment actually falls outside of the Rule's parameters, the school must determine how to "dismiss the complaint for Title IX purposes" while also transferring the investigation to non-Title IX staff. Rule § 106.45(b)(3)(i). Post-dismissal, to avoid federal enforcement, a school may feel compelled to wait until any appeal is completed before proceeding with a non-Title IX investigation. *See* Rule § 106.45(b)(8); 85 Fed.

Reg. at 30,283 n.1129 (explaining why a respondent might appeal dismissal). This will only cause further delays, which is especially problematic in the K-12 setting, where schools must often act quickly to stop incidents before they escalate. *See supra* Part I.F.

If a school determines during a non-Title IX investigation that harassment falls within Title IX, the school must provide new notice and transfer the investigation to the Title IX process subject to the Rule's strictures. Because a school may be penalized for using probative evidence from the non-Title IX process, it must re-investigate to avoid invalidating Title IX findings. 85 Fed. Reg. at 30,287 n.1142. All the while, the harassment may persist, exacerbating harm to the complainant and becoming harder to eliminate. Such a lengthy and confusing process also chills complaint filing and undermines a fair process. *E.g.*, Am. Psych. Ass'n Comm. 3-4; Cal. Cmty. Coll. Comm. 1, 3; Lourdes Univ. Comm. 18; Minn. State Colls. & Univs. Comm. 5; N.Y. Dep't of Educ. Comm. 2; Tex. Ass'n of Sch. Bds. Comm. 7. ED did not appropriately account for these factors or consequences in mandating the provision. *State Farm*, 463 U.S. at 43.

### D. Limiting what constitutes sexual harassment and when a complaint can be filed is arbitrary and capricious.

ED's decision to limit what constitutes sexual harassment fails to adequately address important aspects of the problem and is the product of irrational reasoning, and its decision to limit when a complaint can be filed is inadequately justified. *State Farm*, 463 U.S. at 43.

*First*, to be actionable under Title IX, hostile environment sexual harassment—i.e., harassment that does not involve physical violence, stalking, or quid pro quo harassment by an employee[21]—must now be "severe, persistent, and objectively offensive," Rule § 106.30(a) (*sexual harassment*). In prior longstanding Title IX guidance, however, hostile environment sexual harassment had to be sufficiently severe, persistent, *or* pervasive. *E.g.*, 1997 Policy at

---

[21] ED has also arbitrarily conflated the doctrine of vicarious liability with quid pro harassment, even though it separately addresses vicarious liability by mandating actual notice and proof that the recipient's own response was "deliberately indifferent" prior to any finding of non-compliance. Rule § 106.44(a).

12,038. In making this change, ED did not adequately address how schools can no longer use Title IX to remedy hostile environments caused by severe, persistent, *or* pervasive conduct. *See* Am. Fed. of Teachers Comm. 2; Am. Psych. Ass'n Comm. 2; Cal. Dep't of Educ. Comm. 1-2; SFUSD Comm. 2; SSA Comm. 2, 4. ED acknowledges that the Rule will reduce the number of sexual harassment investigations and had substantial evidence that a reduction in investigations will impair deterrence and increase harassment. *See* 85 Fed. Reg. at 30,070 (recognizing that weak enforcement encourages perpetration).[22] But ED counterfactually (and unreasonably) concluded that it "*does not* have evidence to assume these final regulations would have any effect on the underlying number of incidents of sexual harassment and assault." 85 Fed. Reg. at 30,545 (emphasis added), 30,568. ED also failed to consider the confusion and harm caused by adopting a heightened standard for sexual harassment of students, including children, despite decades of consistency with the "severe or pervasive" standard used for racial and national origin harassment and for all harassment in the workplace. *See supra* note 4, Kish Comm. 2.

*Second*, ED failed to provide a reasoned basis for imposing novel and unique burdens on sexual harassment claims that diverge from racial harassment claims under Title VI. 85 Fed. Reg. at 30,222. ED's claim that the difference in treatment is permissible because Title VI is not a Title IX comparator is plainly erroneous. Congress, the Supreme Court, and ED itself have all

---

[22] *See, e.g.*, 85 Fed. Reg. at 30,546 ("offenders are more likely to be deterred from, and thus likely to engage in undesirable behaviors when there is reasonable certainty of some kind of accountability" (citing Valerie Wright, The Sentencing Project, *Deterrence in Criminal Justice* (2010), https://tinyurl.com/y5ztdug9)), 30,266 n.1095 (citing David Lisak & Paul Miller, *Repeat and Multiple Offending Among Undetected Rapists*, 17 Violence & Victims 1 (2002) ("undetected rapists" were repeat rapists and undetected repeat rapists committed on average of 5.8 rapes each)); CAP Comm. 5 n.22 (citing Ronet Bachman et al., *The Rationality of Sexual Offending: Testing a Deterrence/Rational Choice Conception of Sexual Assault*, 26 Law & Soc'y Rev. 343, 357 (1992); Camille Gallivan Nelson et al., *Organizational Responses for Preventing and Stopping Sexual Harassment: Effective Deterrents or Continued Endurance?* 56 Sex Roles 811, 812 (2007); Inez Dekker & Jullian Barling, *Personal and Organizational Predictors of Workplace Sexual Harassment of Women by Men*, 3 *Journal of Occupational Health Psychology* 7 (1998)); Signatory Soc'ies Comm. 4.

said otherwise. *E.g.*, *Cannon*, 441 U.S. at 704 ("Title IX, like its model, Title VI"); *Sex Discrimination Regulations, Review of Regulations to Implement Title IX, Hearings before the Subcomm. on Postsecondary Educ. of the H. Comm. on Educ. and Labor*, 94th Cong., 1st Sess., 170 (1975) (Statement of Sen. Bayh) (in setting up "an identical administrative structure" Congress intended to provide the "same coverage" and "same statutory scope for Title IX as for Title VI"); *Racial Incidents and Harassment Against Students at Educational Institutions*, 59 Fed. Reg. 11,448, 11,449, 11,451 n.2 (Mar. 10, 1994); 1997 Policy at 12,034. And disconnecting Title IX from Title VI will create significant problems for mixed harassment complaints that ED fails to adequately consider. *See State Farm*, 463 U.S. at 43; 85 Fed Reg. at 30,432 (stating that schools may use a different grievance process to address race or disability allegations), 30,071 (acknowledging concerns with diverging standards between Title IX and Title VI, but dismissing them by stating that Title VI regulations will continue to be enforced). For example, if a student faced discriminatory harassment based on sex and race in the same incident, the school would conduct two separate investigations and apply two separate legal standards for the same underlying harassing conduct. If a postsecondary student was harassed on the basis of sex and race in the same incident that could be proved through written admissions of a respondent who refuses to testify, the respondent could avoid responsibility for the sexual harassment entirely while being held accountable for the racial harassment. These absurd and inequitable results are dismissed without explanation by ED, which merely states that these regulations address the unique circumstances of sexual harassment. 85 Fed. Reg. at 30,382.

 *Finally*, ED fails to adequately explain why a student who dropped out of school because of sexual harassment and does not want to return, and was therefore fully denied educational access, cannot file a Title IX complaint. Rule § 106.30(a) (*formal complaint*). Nor does it explain why a school should not investigate and remedy alleged sexual harassment committed by a member of its community, even if the alleged victim is no longer part of the campus community. ED says only that the provision is intended to exclude anyone who "no longer has any involvement with the recipient," 85 Fed. Reg. at 30,087, but this disregards ample evidence that

failure to address sexual harassment not only can allow a hostile environment to persist but also can encourage repeat perpetration by the same offender. *See supra* note 22; *see also* 85 Fed. Reg. at 30,070 (recognizing that weak enforcement encourages perpetration). Apart from producing absurd results where sexual harassment victims have no recourse under Title IX due to the location of their harassment or a change in their status, the Rule excludes Title IX investigations into misconduct that could threaten others' education. Harassers may quickly realize that they can avoid accountability under Title IX by simply targeting victims in certain off-campus locations or targeting victims who will soon leave the institution.

**E.      The Rule improperly changed existing Title IX regulations.**

In addition to establishing new requirements for sexual harassment, ED changes longstanding Title IX regulations without a "reasoned explanation" for "why it deemed it necessary to overrule its previous position," *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016), and without "show[ing] that there are good reasons for the new policy," *Fox Television Stations, Inc.*, 556 U.S. at 515.

**1.      Eliminating the bar on publications that "suggest" sex discrimination is arbitrary.**

For 45 years, Title IX regulations prohibited schools from using or distributing any publication that "suggests, by text or illustration" that the recipient discriminates based on sex. 34 C.F.R. § 106.9(b)(2) (effective until Aug. 14, 2020). But under the Rule, schools are barred only from using or distributing a publication "*stating* that the recipient treats applicants, students, or employees differently on the basis of sex." Rule § 106.8(b)(2)(ii) (emphasis added). The repeal allows schools to avoid liability through a boilerplate disclaimer, while still publishing materials that give readers every reason to believe that the disclaimer is false.

ED asserts, without explanation, that a "clearly stated policy that [the school] does *not* discriminate" makes it unnecessary to scrutinize "graphics, photos, or illustrations." 85 Fed. Reg. at 30,468, 30,470 (emphasis added). But the mere existence of a non-discrimination policy does not preclude a school from contravening that policy using sex stereotyping in its publications—

such as photos of a school's engineering program featuring only men or photos of a school's nursing program featuring only women. Rather than impose a "proportionality requirement," 85 Fed. Reg. at 30,469, the longstanding provision protected against a fundamental form of discrimination: telling a student with pictures rather than words that they are not welcome because of their sex. The abrupt change is particularly incongruent because ED elsewhere places great importance on the harms of sex stereotyping: "materials used to train Title IX Coordinators, investigators, decision-makers" and others "must not rely on sex stereotypes." Rule § 106.45(b)(1)(iii); 85 Fed. Reg. at 30,575. Adding protections from discriminatory stereotypes in one part of the Rule but removing those same protections from another is arbitrary and capricious. *Venetian Casino*, 530 F.3d at 934.

### 2. Eliminating advance written notice for a claim of religious exemption is arbitrary.

An educational institution controlled by a religious organization is exempt from those parts of Title IX that conflict with the tenets of the controlling religious organization. 20 U.S.C. § 1681(a)(3). For 45 years, a school wishing to claim this exemption had to "submit[] in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization." 34 C.F.R. § 106.12(b) (effective until Aug. 14, 2020). The Rule eliminates this requirement, instead permitting a school to claim the exemption at any time—even after ED begins investigating alleged violations or a plaintiff has filed suit against the school. Rule § 106.12(a). And although the exemption applies only where Title IX "would not be consistent with the religious tenets of such organization," Rule §106.12(a), the Rule no longer requires the school to identify any specific conflict with a tenet of its controlling religious organization.

Despite "changing course," ED fails to address whether there was "legitimate reliance" on the prior regulation by students, parents, and the public. *Regents*, 140 S. Ct. at 1913-14. Ignoring this matter is arbitrary and capricious. *Id.* at 1913. ED has previously maintained a list of exempt schools, U.S. Dep't of Educ., *Institutions Currently Holding Religious Exemption*

(June 14, 2018), https://tinyurl.com/yygqa6kp, and posted on its website statements of religious exemption, U.S. Dep't of Educ., *Other Correspondence* (July 24, 2020), https://tinyurl.com/yxuss3rk. These lists allowed students, prospective students, employees, parents, and the public to know whether a particular school would comply with Title IX. The burden of notifying ED is minimal—indeed, ED does not explain how identifying religious tenets or related practices that conflict with Title IX is a burden. The elimination of a notice requirement is particularly arbitrary because ED elsewhere places great weight on the importance of notice. Rule §§ 106.44(c), 106.45(b)(1)(v), (b)(2), (b)(3)(iii), (b)(5)(v), (b)(9)(i); 85 Fed. Reg. at 30,287 n.1142 (school cannot use respondent statement in sexual assault report because no advance written notice was provided), 30,473 ("education community will be aware of the procedures involved in a . . . grievance process without the unfairness of waiting until a person becomes a party to discover what [the process] looks like").

### F.   ED arbitrarily includes conflicting requirements in the preamble.

Three major inconsistencies, in addition to the one identified at Part IV.B.2, *supra*, between the Rule and the preamble "render the action arbitrary and capricious." *See Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1220 (D.C. Cir. 1996). When "the preamble to [a] rulemaking is inconsistent with the plain language of the regulation, it is invalid." *Barrick Goldstrike Mines*, 260 F.Supp.2d at 36 (citation omitted).

*First*, the Rule requires a decision-maker to consider all relevant evidence, including "inculpatory and exculpatory evidence," Rule § 106.45(b)(ii), unless the evidence pertains to a complainant's sexual predisposition or prior sexual behavior, is protected by privilege, or is a statement from a party or witness who did not submit to direct, oral cross-examination, Rule § 106.45(b)(1)(x), (b)(6)(i)-(ii). But according to the preamble, a school will be found in noncompliance for using a respondent's statements from a sexual assault report in a subsequently-filed formal complaint process. 85 Fed. Reg. at 30,287 n.1142. The preamble's prohibition is inconsistent with the Rule's statement that "all relevant evidence," including "inculpatory" evidence, shall be objectively evaluated.

*Second*, during any hearing, "questions and evidence" about the complainant's sexual predisposition and prior sexual behavior are not relevant, subject to narrow exceptions. Rule § 106.45(b)(6)(i). Parties must also be allowed "to refer" to any evidence obtained during the investigation "during [any] hearing, including for purposes of cross-examination." Rule § 106.45(b)(5)(vi). But the preamble states that if the school obtains any evidence about a party's sexual predisposition or prior sexual behavior, the recipient should allow parties and advisors to review it, 85 Fed. Reg. at 30,428. Following the preamble's inconsistent directive allows parties to refer to such evidence during any hearing, defeating the Rule's own limitation.

*Finally*, the Rule requires schools to "treat complainants . . . equitably by offering supportive measures as defined in § 106.30 to a complainant[.]" Rule § 106.44(a). But even though the Rule does not require supportive measures for a respondent, the preamble warns that failure to provide a respondent with supportive measures could violate the Rule, even in the absence of a finding of sex discrimination. 85 Fed. Reg. at 30,273. The preamble to a Rule "is not an operative part of the [Rule] and it does not enlarge or confer powers on administrative agencies or officers." *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 569-70 (D.C. Cir. 2002) (citations omitted). Because the Rule does not mandate supportive measures for respondents, ED cannot through the preamble create a new mandate that results in federal enforcement action.

## V.   The Rule was promulgated without observance of procedure required by law and is arbitrary and capricious (Counts IV and V).

### A.   Reliance on flawed regulatory impact analyses is unreasonable.

"[R]easoned decisionmaking" requires agencies to "look at the costs as well as the benefits" of actions. *State Farm*, 463 U.S. at 52, 54; *see also Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015). ED's reliance on its regulatory impact analyses (RIAs) in the proposed rule and the final rule was arbitrary and capricious because the RIAs employed flawed methodology, ignored facts in the record, and failed to connect the Rule's impact with its rationale for the Rule. *State Farm*, 463 U.S. at 52, 54; *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039-40 (D.C. Cir. 2012) ("Notwithstanding the absence of a statutory duty . . . when an agency decides

to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable."). Moreover, ED violated 5 U.S.C. § 706(2)(D) by failing to provide the public with the requisite reports and data underlying the technical basis for its conclusions, depriving the public of an opportunity to meaningfully comment.

ED relied on the RIAs to reach its conclusions, *e.g.*, 85 Fed. Reg. at 30,559, 30,564 (agreeing that "practical effects of proposed regulations on regulated entities should be a primary concern when engaging in rulemaking" and "issuing these final regulations only on a reasoned determination that their benefits justify their costs"), and to fulfill its statutory duty to quantify the impact of the Rule on small entities, Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 603-605, 607, 611 (judicial review of agency compliance with RFA is under APA); 85 Fed. Reg. at 30,570 ("[A]nalysis, required by [RFA], presents an estimate of the effect of the final regulations on small entities."). Small schools uniformly informed ED that the Rule's prescriptive grievance process would have a significant economic impact on their operations. *E.g.*, 85 Fed. Reg. at 30,533 ("smaller schools will 'suffer inordinately'"), 30,547 ($500,000 per institution with few cases), 30,549 (requesting Department "pay particular attention to the impact of the proposed rules on smaller institutions"). ED also ignored pleas from small schools to consider alternatives, which it was required to do under the RFA. *E.g.*, Tex. State Univ. Sys. Comm. 2 ("significant fiscal implications"); Wyo. Cmty. Coll. Comm'n Comm. 1 ("stretches our resources beyond capacity"); Adams State Univ. of Colo. Comm. 4-6; AGB Comm. 5-6; Barton Cmty. Coll. Comm. 4-5; Cal. Cmty. Coll. Comm. 6, 8; CAPPA Comm. 13, 20; Conn. Coll. Comm. 2; Cornerstone Univ. Comm. 4-5; Dominican Univ. of Cal. 5; Indep. Colls. & Univs. of Tex. Comm. 4; Lourdes Univ. Comm. 6, 18, 26; Mass. Cmty. Coll. Comm. 7; Minn. State Colls. & Univs. Comm. 9; North Shore Cmty. Coll. Comm. 6; Northern Essex Cmty. Coll. 7; Northwest Christian Univ. Comm. 5; Pitzer Coll. Comm. 6-7; Reed Coll. Letter. 1-4; South Ark. Cmty. Coll. Comm. 5; Southern Wesleyan Univ. Comm. 4-6; Wash. State Sch. Dirs.' Ass'n Comm. 9; Wright State Univ. Comm. 1. Instead, based on the undisclosed and flawed RIA "model," ED

certified under the RFA that the Rule "will not have a significant economic impact" on the more than 8,500 small schools. 85 Fed. Reg. at 30,570, 30,533.

> ### 1.    ED relied on flawed methodology and analysis.

ED relied on erroneous assumptions and unexplained methodology, and intentionally disregarded relevant costs, rendering the rule unreasonable. *Nat'l Ass'n of Home Builders*, 682 F.3d at 1039-40; *U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1008 (D.C. Cir. 2002) (challenge to a model's methodology requires "a complete analytic defense") (quotations omitted); *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 251 (D.D.C. 2003) (failure "to articulate a rational basis for its decision" requires "remand for reasoned decision-making").

*First*, flawed and unsupported calculations go the heart of ED's conclusions; if corrected, they would reveal substantially higher implementation costs for schools throughout the nation. A close examination of the RIA reveals that 87% of the Rule's identified cost savings—$205 million—comes from the reduction in investigations caused by the Rule's narrowed interpretation of Title IX. Madowitz Decl. ¶ 14. Specifically, ED estimates a 33% reduction in investigations for postsecondary schools and a 50% for K-12 schools. 85 Fed. Reg. at 30,551, 30,565, 30,568. The math appears simple: investigations require time and resources, so reducing investigations saves money. 85 Fed. Reg. at 30,566-68. But to produce cost savings, ED had to assume that 95% of all schools were *already* providing grievance procedures consistent with the Rule's burdensome new provisions. 85 Fed. Reg. at 30,566, 30,568 (assuming only 5% of schools do not "comply with the requirements of these final regulations," and would face "increased costs to comply").[23] ED's assumption in the RIA directly contradicts ED's purported justification for promulgating the Rule: a need for more fair and reliable procedural protections

---

[23] Attempts to recreate ED's analysis show how ED assumed that prior to the Rule's enactment, 95% of colleges and universities were already spending $15,680 per formal complaint investigation, not including appeal costs. Madowitz Decl. ¶¶ 33-34 & Table 1. ED also assumed that at 95% of schools, attorney advisors had been engaging in equivalent preparation time pre-Rule as they would post-Rule, *id.*, even though the Rule imposes far more duties on advisors, including conducting adversarial cross-examination.

during investigations. *E.g.*, 85 Fed. Reg. at 30,101. The result "bears no rational relationship to the reality it purports to represent." *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998) (quotations omitted); *see also Venetian Casino*, 530 F.3d at 934-35 (action product of inconsistent reasoning is arbitrary and capricious). The APA does not permit an agency to engage in a bait and switch to achieve its policy outcome. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011) (agency acts arbitrarily when it inconsistently and opportunistically frames costs of a rule); *Sierra Club v. EPA*, 167 F.3d 658, 664 (D.C. Cir. 1999) (remanding after finding the agency's methodology "hopelessly irrational").

*Second*, ED does not explain how it made key determinations, such as how the Rule would result in such a significant reduction in investigations, including the elimination of 24,137 investigations in K-12 schools, 85 Fed. Reg. at 30,568; Madowitz Decl. ¶ 39 n.41, or how only 50% of sexual harassment incidents reported to the Civil Rights Data Collection would result in a formal complaint, 85 Fed. Reg. at 30,658. Schools (and the public) had a right to understand which cases ED identified as being eliminated, both to challenge and question its assumptions and to understand how ED would apply the Rule. ED deprived the public of information about its reasoning. The failure to adequately explain the methodology for these conclusions, which go to the very foundation of ED's analysis, is arbitrary and capricious. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 206 (D.C. Cir. 2007).

*Third*, ED improperly failed to account for significant monetary and non-monetary costs to be incurred by Plaintiff States' schools. *E.g.*, *Bus. Roundtable*, 647 F.3d at 1149, 1152; *Gresham*, 950 F.3d at 103. ED did not include costs for hiring advisors, decision-makers, appeal reviewers, and investigators; training all staff, students, and parents on the Rule's requirements; and buying equipment for live hearings. *See, e.g.*, 85 Fed. Reg. at 30,556-57 (hiring), 30,559-60 (hiring, training), 30,561-62 (hearings), 30,563 (small institutions); CAP Comm. 6-7; Madowitz Decl. ¶¶ 38, 45-46. ED did add a flat cost of $250 for each provision of supportive measures, 85 Fed. Reg. at 30,558, but this does not amount to even two hours of mental health counseling for a sexual assault survivor, Cooper Decl. ¶ 15, and is inconsistent with facts identified by ED

showing substantially higher costs of mental and physical health services for survivors, 85 Fed. Reg. at 30,080-81. ED also assumes that each set of supportive measures can be provided for less than $10.50 per hour, a cost not supported by any wage rate identified. Madowitz Decl. ¶ 41. A closer examination of the RIA demonstrates that ED estimated only five provisions of supportive measures per school per year, Madowitz Decl. ¶ 42, even though the 2014 Senate Report upon which ED relied to estimate other figures in the RIA (e.g. baseline investigation) indicated postsecondary schools receive as many as seven times more reports than they investigate, 85 Fed. Reg. at 30,565 (citing Claire McCaskill, S. Subcomm. on Financial & Contracting Oversight – Majority Staff, *Sexual Violence on Campus*, 113th Cong. (2014), https://tinyurl.com/y7zapjsd)). ED cannot "have it both ways"—on the one hand assert that supportive measures eliminate harm caused by the Rule and, on the other, grossly underestimate the cost of these measures to minimize the economic impact. *Gen. Chem. Corp.,* 817 F.2d at 854.

*Fourth*, ED intentionally disregarded critical financial, health, and societal costs for sexual harassment survivors and States without a rational explanation for their exclusion. 85 Fed. Reg. at 30,538-48. Commenters expressed concern about increases in absenteeism costs, lost revenue from dropouts, and unemployment and health service costs that redound to States when students experience increased or un-remediated incidents of sexual harassment. *E.g.*, 85 Fed. Reg. at 30,544-45, 30,548; CAP Comm. 5-6; Colo. Dep't of Higher Educ. Comm. 2; Roch. Med. Access. Coalition Comm. 10-11; *see also* Madowitz Decl. ¶¶ 18-20; Herman Decl. ¶¶ 9-12; Burke Harris Decl. ¶¶ 6-7; Mixson Decl. ¶ 5. ED acknowledged these harms and identified relevant studies with cost estimates, 83 Fed. Reg. at 61,485, 85 Fed. Reg. at 30,081, but ultimately declined to include them in the final RIA "as doing so would be inappropriate," 85 Fed. Reg. at 30,548.

Few things are less reasonable than calling the costs of sexual harassment an "inappropriate" consideration in a rule establishing how schools must respond to sexual harassment. To the contrary, these economic and non-economic costs are "centrally relevant"— especially when ED changes whether and how sexual harassment will be investigated. *See*

*Michigan v. EPA*, 135 S. Ct. at 2707. ED does "not dispute the proposition that weak sanctions against sexual violence perpetrators and weak laws and policies related to sexual violence and sex equality are associated with a greater likelihood of perpetration." 85 Fed. Reg. at 30,070. Indeed, the record showed that significant reductions in investigations and resolutions resulting from the Rule (up to 75%, Madowitz Decl. ¶ 21, Fig. 1) will blunt deterrence and result in more (and repeat) harassment, *see supra* note 22. But ED ignores the rational next step—that a substantial decrease in schools' ability to investigate and sanction harassment will lead to a corresponding rise in incidents and additional costs for schools and victims. Madowitz Decl. ¶ 21; *see also* Peterson et al., *Lifetime Economic Burden of Rape Among U.S. Adults*, 52 Am. J. Preventive Med. 6 (2017). Because ED rightly does not assume a reduction in the amount of sexual harassment *taking place*—but instead, only a reduction in the amount of sexual harassment *being investigated*—it is irrational and illogical to assume that sexual harassment and attendant costs from non-investigation will not increase. Madowitz Decl. ¶ 21.

ED also improperly fails to account for the loss to students whose complaints will be dismissed prior to investigation under the Rule. In its analysis, ED recognizes that complainants place a significant value on having their Title IX complaint actually investigated by a school. Madowitz Decl. ¶ 39 ($4.9 million per year); 85 Fed. Reg. at 30,568, 30,570. In significantly decreasing the number of investigations that schools can investigate and resolve, ED was required to identify that the value of such investigations has been transferred away from complainants. Because the investigation benefit for the complainant transferred to the respondent in the form of a dismissal, ED was required to show that "distributional effect," as a cost benefit to the respondent. Madowitz Decl. ¶¶ 36-39. ED also needed to identify the increased costs to complainants who are now "forced to handle" sexual harassment "on their own." Roch. Med. Access. Coalition Comm. 10. Here, again, ED unlawfully avoided quantifying costs to hide the Rule's true impact on those whom Title IX is intended to protect.

*Finally*, ED's conclusion under the RFA that the Rule will not "place a substantial burden on small" schools is belied by the record. 85 Fed. Reg. at 30,533. Commenters consistently

explained how small schools would have to undergo substantial and costly changes to comply. *E.g.*, 85 Fed. Reg. at 30,559 ("especially burdensome" for small schools to have six people, including two advisors, required for each investigation), 30,563 ("small institutions lack the human resources to comply with the prohibition of the single investigator model"); *see supra* Part V.A. Nevertheless, ED unreasonably assumed that 95% of all schools, including small schools, were already complying with the Rule. 85 Fed. Reg. at 30,568.

### 2. ED withheld key information and relied on inaccurate data.

In addition to faulty reasoning, ED deprived the public of an opportunity to review and comment on the critical information about the methodology, reports, and data upon which ED relied to support its arbitrary conclusions. 85 Fed. Reg. at 30,502-03. An agency provides insufficient notice by not disclosing in full the studies and data relied upon in promulgating the rule. *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008).

For example, in the proposed rule, ED stated that it "examined public reports of Title IX reports and investigations at 55 [postsecondary schools] nationwide" and reviewed a "sample of public Title IX documents," 83 Fed. Reg. at 61,485, 61,487, in order to determine that "incidents of sexual misconduct only represented half of all current Title IX investigations," 85 Fed. Reg. at 30,502. But ED failed to explain how to locate the reports on which it relied or to identify which institutions were reported. Multistate Comm. 3. Well after the comment period had closed and only in response to Freedom of Information Act (FOIA) requests, ED provided additional, but still incomplete, information about the reports relied on in the proposed rule's RIA. *See* U.S. Dep't of Educ., Response to Dec. 19, 2018 FOIA Request from National Center for Youth Law re: RIA in NPRM. It is "not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of . . . data that, to a critical degree, is known only to the agency," *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973)—but that is exactly what ED did here. The failure to provide a reason for withholding such information from the public is even more troubling, where, as here, the baseline investigation number was fundamental to all of the cost savings identified by the Rule.

61

ED also failed to provide critical information about its methodology, including the data sets upon which it relied, which was "fundamentally unfair." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 793 (D.C. Cir. 1984); *Owner-Operator*, 494 F.3d at 206 (vacating regulatory provision where cost-benefit analysis was based on an unexplained methodology). ED withheld sources for its assumptions about pre- and post-Rule costs of Title IX proceedings and baseline investigation reductions, as well as the underlying data sets relied on for its $205 million cost savings. *E.g.*, 85 Fed. Reg. at 30,565; 83 Fed. Reg. at 61,485. The result made recreating ED's methodology impracticable and left the States and the public without the basis for its cost-savings figure. CAP Comm. 3-5; Madowitz Decl. ¶¶ 8, 14-17, 29-31. Commenters explained how conclusions reached by ED could not be recreated and were unreliable, and requested the information. *E.g.*, CAP Comm. 5 ("lack of transparency surrounding ED's cost calculations . . . leads the Center to request that ED halt its rulemaking . . . and make its underlying calculations available to the public"); Roch. Med. Access. Coalition Comm. 11. ED "committ[ed] serious procedural error" by "fail[ing] to reveal portions of the technical basis," *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991) (quotations omitted), and the studies, reports, and data upon which it relied in time for meaningful comment, *Am. Radio Relay League, Inc*., 524 F.3d at 236; *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 534 (D.C. Cir. 1978); *see also Sprint Nextel Corp. v. Fed. Commc'n. Comm'n*., 508 F.3d 1129, 1131 (D.C. Cir. 2007) (under the APA, the court "require[s] more than a result; [it] need[s] the agency's reasoning for that result"); *Portland Cement Ass'n*, 486 F.2d at 393.

Further, documents provided by ED only *after* the comment period closed (and some only in response to counsel's request to complete the administrative record) reveal that ED utilized incomplete and inaccurate data sets, an unreliable sample, and made basic calculation errors in its use of the data, only adding to previously identified flaws in ED's methodology, analysis and baseline investigation conclusions. *See* Madowitz Supp. Decl. ¶¶ 9, 15, 18, 20 (reviewing AR 294,860-976 & 297,385) (ECF No. 108-3). These errors were far from harmless, as the Rule's actual costs substantially exceed the flawed figures in the Rule.

To compound the harm, ED acknowledged that two of the three sources it chose for the postsecondary baseline investigation number were unreliable.[24] One, a 2014 Senate Report, only included data about investigations of "sexual violence," not sexual harassment, 85 Fed. Reg. at 30,565, and the other, a set of Clery Act data, only included acts of "forcible sexual offenses" and failed to include complete and accurate data, *id.* at 30,539-41. It is arbitrary to rely on reports or studies without "ascertaining the accuracy of the data contained" therein." *New Orleans v. SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992). Commenters identified additional sources of data that ED could use to establish a baseline estimate and ED had access to reliable sources from other government entities, but ED ignored these sources in issuing the final Rule. *See, e.g.*, 85 Fed. Reg. at 30,552.

The Court cannot accept this "flawed interpretation" of limited and inaccurate data or ED's illogical conclusions. *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1220 (D.C. Cir. 2012), *overruled on other grounds by Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir. 2014). The Rule's provisions make sweeping changes impacting nearly every school in the nation. 85 Fed. Reg. at 30,549 (schools "will need to identify sources of funding to cover those costs"). The APA requires ED to provide an accurate representation of the costs and benefits of its action, a rational connection between the facts found and choices made, and a proper consideration of all factors in its decision. Here, ED has failed on all accounts.

**B.     The final Rule is not a logical outgrowth of the proposed rule.**

The final Rule must be a logical outgrowth of the proposed rule in order to provide "fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007); 5 U.S.C. §§ 706(2)(D), 553(b). But multiple provisions here are not a logical outgrowth of the proposed

---

[24] The third source was the 55 postsecondary "convenience sample" of Title IX reports that was not revealed to the public. *See* 83 Fed. Reg. at 61,485, 61,487. Plaintiffs' review of documents belatedly produced by ED regarding this third source reveals it is also fundamentally flawed, because ED used a non-random sample of non-representative schools, largely from four public institutions, and made basic data transfer errors to render incorrect calculations. Madowitz Supp. Decl. ¶¶ 23-24, 30.

rule because "interested parties [could not] have anticipated that the change was possible, and thus reasonably [could not] have filed their comments on the subject during the notice-and-comment period." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009) (quotations omitted). Nor did ED "provide fair notice of what it plan[ned] to do." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 555 (D.C. Cir. 1983).

*First*, the final Rule preempts any "State or local law" that conflicts with "title IX as implemented by §§ 106.30, 106.44, and 106.45." Rule § 106.6(h). But in the proposed rule, ED stated "nothing in the proposed regulations would prevent a recipient from initiating a student conduct proceeding" when the alleged harassment does not fall within the proposed rule's new definitional or locational requirements. 83 Fed. Reg. at 61,468; *see also id.* at 61,475. The proposed rule instead provided a safe harbor for schools: if a school followed "procedures consistent with" the proposed rule in response to a formal complaint, the recipient would not be considered deliberately indifferent. 83 Fed. Reg. at 61,469; *see also* 85 Fed. Reg. at 30,212 (discussing removal of safe harbors to enforce "mandates"). As sovereigns, States have a unique interest in enforcing state laws and could not have anticipated the final Rule would purport to preempt conflicting State employee and student discipline and grievance procedures, as well as negotiated collective bargaining agreements that contain different but constitutionally adequate protections. *Compare* 83 Fed. Reg. at 61,469 (safe harbor), *with* 85 Fed. Reg. at 30,444 (recipients forego federal financial assistance if they will not renegotiate a collective bargaining agreement or are concerned about state law compliance).

*Second*, the Rule prohibits a school from investigating Title IX misconduct if the complainant is not "participating in or attempting to participate in the education program or activity." Rule § 106.30(a) (*formal complaint*). The proposed rule contained no such limitation. Instead, the proposed rule's preamble only referenced a case in which the limitation would apply if the complainant had *never* attempted to participate in the school, and ED stated nothing would prohibit a school from addressing such a complaint under its own conduct code. 83 Fed. Reg. at 61,468. The proposed rule did not provide fair notice that ED would eventually prevent schools

64

from investigating and resolving Title IX complaints brought by sexual assault survivors who waited to file until after safely transferring to another school or job.

*Third*, the proposed rule did not mention dismissal of complaints if a "respondent is no longer enrolled or employed by the recipient," including if the respondent leaves a school during the investigation. Rule § 106.45(b)(3)(ii). This deprived the States and the public of the opportunity to explain that dismissal could harm schools' ability to address repeat offenders who transfer schools or leave a school and later return after a complainant is no longer enrolled.

*Finally*, while the proposed rule made no mention of complaint consolidation, the Rule permits the consolidation against one or more respondents. Rule § 106.45(b)(4). The States and the public were deprived of the opportunity to caution ED that consolidation must account for student privacy and autonomy, given the amount of student data shared during the grievance process. *Compare* 20 U.S.C. § 1232g(a)(1)(A) (limiting student's right to review other student's education records), *with* Rule § 106.45(b)(5)(vi) (allowing all parties and advisors to review all evidence obtained as part of the investigation).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion and vacate the Rule.

Date: December 18, 2020                    Respectfully submitted,

**GURBIR S. GREWAL**                       **JOSH SHAPIRO**
*Attorney General*                         *Attorney General*
*State of New Jersey*                       *Commonwealth of Pennsylvania*
MAYUR P. SAXENA                            MICHAEL J. FISCHER
Assistant Attorney General                 Chief Deputy Attorney General

*/s/ Marie Soueid*                          */s/ Aimee D. Thomson*
MARIE SOUEID                               AIMEE D. THOMSON (D.C. Bar No. 1045758)
ESTELLE BRONSTEIN                          RYAN B. SMITH
EMILY WANGER                               JACOB B. BOYER
Deputy Attorneys General                   Deputy Attorneys General
New Jersey Attorney General's Office       Office of Attorney General
Richard J. Hughes Justice Complex          1600 Arch Street, Suite 300
25 Market Street                           Philadelphia, PA 19103
Trenton, NJ 08625                          (267) 374-2787
(609) 376-2564                             athomson@attorneygeneral.gov
Marie.Soueid@law.njoag.gov                 *Attorneys for Plaintiff Commonwealth of*
*Attorneys for Plaintiff State of New Jersey*   *Pennsylvania*

**XAVIER BECERRA**                         **PHILIP J. WEISER**
*Attorney General of California*            *Attorney General*
*State of California*                       *State of Colorado*
MICHAEL NEWMAN
Senior Assistant Attorney General          */s/ Eric R. Olson*
CHRISTINE CHUANG                           ERIC R. OLSON
Supervising Deputy Attorney General        Solicitor General
                                           MARTHA FULFORD (D.C. Bar No. 101194)
*/s/ Laura Faer*                            First Assistant Attorney General
LAURA FAER                                 1300 Broadway, 10th Floor
CHRISTINA RIEHL                            Denver, CO 80203
MARISOL LEÓN                               (720) 508-6000
SHUBHRA SHIVPURI                           eric.olson@coag.gov
SRIVIDYA PANCHALAM                         martha.fulford@coag.gov
Deputy Attorneys General                   *Attorneys for Plaintiff State of Colorado*
California Attorney General's Office
1515 Clay Street, 20th Floor
Oakland, CA 94612-0552
(510) 879-3305
Laura.Faer@doj.ca.gov
*Attorneys for Plaintiff State of California*

**KATHLEEN JENNINGS**
*Attorney General*
*State of Delaware*

*/s/ Christian Douglas Wright*
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
christian.wright@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**KARL A. RACINE**
*Attorney General*
*District of Columbia*

*/s/ Kathleen Konopka*
KATHLEEN KONOPKA (D.C. Bar No. 495257)
Deputy Attorney General, Public Advocacy Division
MICHELLE THOMAS (D.C. Bar No. 993514)
Chief, Civil Rights Section, Public Interest Division
BRENDAN DOWNES (D.C. Bar No. 187888)
NICOLE HILL (D.C. Bar No. 888324938)
SAMANTHA HALL[*]
KATE VLACH (D.C. Bar No. 1671390)
Assistant Attorneys General
Office of the Attorney General for the District of Columbia
400 6th Street, N.W., 10th Floor
Washington, DC 20001
 (202) 724-6610
Kathleen.Konopka@dc.gov
[*] *Practicing in the District of Columbia under the direct supervision of Michelle D. Thomas, a member of the D.C. Bar. See D.C. Court of Appeals Rule 49(c).*
*Attorneys for Plaintiff District of Columbia*

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

/s/ *Alison V. Hill*
ALISON V. HILL
LIZA ROBERSON-YOUNG
GRETCHEN HELFRICH
Assistant Attorneys General
Office of the Attorney General State of
Illinois
100 W. Randolph St.
Chicago, IL, 60601
(312) 814-3954
ahill@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

**DANA NESSEL**
*Attorney General*
*State of Michigan*

/s/ *Fadwa A. Hammoud*
FADWA A. HAMMOUD
Solicitor General
TONI L. HARRIS
NEIL GIOVANATTI
Assistant Attorneys General
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
HammoudF1@michigan.gov
Harrist19@michigan.gov
GiovanattiN@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

/s/ *Angela R. Brooks*
ANGELA R. BROOKS
ABIGAIL B. TAYLOR
ABRISHAM ESHGHI
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2590
angela.brooks@mass.gov
*Attorneys for Plaintiff Commonwealth of*
*Massachusetts*

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

/s/ *Kevin Finnerty*
KEVIN FINNERTY
KATHRYN WOODRUFF
Assistant Attorneys General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 757-1058 (Voice)
(651) 757-1361 (Voice)
kevin.finnerty@ag.state.mn.us
kathryn.woodruff@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

**AARON D. FORD**
*Attorney General*
*State of Nevada*

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
(702) 486-3594
HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

**JOSHUA H. STEIN**
*Attorney General*
*State of North Carolina*

*/s/* Sripriya Narasimhan
SRIPRIYA NARASIMHAN (D.C. Bar No:
1029549)
Deputy General Counsel
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6400
SNarasimhan@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

**PETER F. NERONHA**
*Attorney General*
*State of Rhode Island*

*/s/ Shannon L. Haibon*
SHANNON L. HAIBON
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 Ext. 2018
shaibon@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**HECTOR BALDERAS**
*Attorney General*
*State of New Mexico*

*/s/ Tania Maestas*
TANIA MAESTAS
Chief Deputy Attorney General
PO Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
tmaestas@nmag.gov
*Attorneys for Plaintiff State of New Mexico*

**ELLEN F. ROSENBLUM**
*Attorney General*
*State of Oregon*

*/s/ Elleanor H. Chin*
ELLEANOR H. CHIN
BRIAN S. MARSHALL DC Bar No. 501670
Senior Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301
(503) 947-4700
elleanor.chin@doj.state.or.us
*Attorneys for Plaintiff State of Oregon*

**THOMAS J. DONOVAN, JR.**
*Attorney General*
*State of Vermont*
JOSHUA R. DIAMOND
Deputy Attorney General

*/s/ Rachel E. Smith*
RACHEL E. SMITH
JULIO A. THOMPSON
Assistant Attorneys General
Vermont Attorney General's Office
109 State Street
Montpelier, VT 05609
(802) 828-3171
rachel.e.smith@vermont.gov
julio.thompson@vermont.gov
*Attorneys for Plaintiff State of Vermont*

69

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*

*/s/ Jessica Merry Samuels*
JESSICA MERRY SAMUELS (D.C. Bar No. 1552258)
Assistant Solicitor General
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219
(804) 786-6835
solicitorgeneral@oag.state.va.us
*Attorneys for Plaintiff Commonwealth of Virginia*

**JOSHUA L. KAUL**
*Attorney General*
*State of Wisconsin*

*/s/ Jeffery A. Simcox*
ANNE M. BENSKY
Assistant Attorney General
JEFFERY A. SIMCOX
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 264-9451 (Bensky)
(608) 266-3861 (Simcox)
benskyam@doj.state.wi.us
simcoxja@doj.state.wi.us
*Attorneys for Plaintiff State of Wisconsin*

**ROBERT W. FERGUSON**
*Attorney General*
*State of Washington*

*/s/ Kristin Beneski*
KRISTIN BENESKI
Assistant Attorney General
AILEEN HUANG
Deputy Attorney General
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
kristin.beneski@atg.wa.gov
aileen.huang@atg.wa.gov
*Attorneys for Plaintiff State of Washington*