UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, Secretary of the U.S. Department of Education, et al., <br><br> Defendants. | Civil Action No. 20-cv-01468-CJN |

## SUPPLEMENTAL DECLARATION OF MICHAEL MADOWITZ

I, Michael Madowitz, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

2. I submit this Supplemental Declaration in support of the litigation challenging the recently issued Rule entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*. 85 Fed. Reg. 30,026 (May 19, 2020) (the "Rule" or "Final Rule"). I have compiled the information in the statements set forth below in my personal capacity as an expert in public economics, cost-benefit analysis, and the methodology, analysis, and implementation of public policy.

3. This declaration is based on my personal knowledge; the knowledge and expertise I have acquired in my training and professional experience, including as an economist and technical expert at the Center for American Progress (the "Center"); my review of the U.S. Department of

Education's (the "Department") Notice of Proposed Rulemaking ("NPRM")[1] and the Final Rule and accompanying Regulatory Impact Analyses ("RIAs"). It is also based on my review of documents in the Administrative Record for this matter.

4. The first set of documents reviewed include excel spreadsheets that the Department used to calculate the RIA for the NPRM, which are entitled "IPEDS Data Pull" and "Data_5-10-2018—383." The documents were obtained via a Freedom of Information Act ("FOIA") request from a different organization after the comment period closed (first provided to me by counsel for Plaintiff State of California) and later made part of the administrative record in this case at AR 294861-294931 and AR 297385 (excel version of the OCR RIA Workbook for NPRM).

5. The second set of documents reviewed was two supplemental Indexes to the Title IX Final Rule Administrative Record (VOL08 and VOL09). These contained a) AR 294952-294960: a redacted document entitled "Stratifying Postsecondary Institutions, Policy, Analysis, and Forecasting Group, Office of Postsecondary Education, Department of Education (Mar. 2018)", provided in response to an appeal from a FOIA from another organization; b) AR 294932-294976: several University Title IX-related reports; and c) AR 294860 (excel form) and AR 294860.001-009 (PDF): "OCR RIA Workbook Revised for Final Rule" (Final Rule RIA Workbook), containing four worksheets, "Assumptions", "Investigations Analysis", "Activities", "Year by Year" provided to represent the Department's cost-estimation.

6. During the notice-and-comment period following the issuance of the NPRM for the Department's proposed rule relating to Title IX, the Center submitted a comment letter,[2] which identified concerns our organization had with regard to the RIA contained in the NPRM. I expounded

---

[1] *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance.* 83 Fed. Reg. 61,463 (Nov. 29, 2018).
[2] Center for American Progress Comment Letter (Jan. 30, 2019), https://www.regulations.gov/document?D=ED-2018-OCR-0064-31283 (AR 152533-152540).

Supp. Decl. of Michael Madowitz

upon these concerns in a declaration attached to Plaintiffs' Motion for Preliminary Injunction, which analyzed the RIAs contained in the NPRM and Final Rule and found them to be illogical and unreasonable due to a variety of factors, including the use of flawed data and inaccurate assumptions, use of costs that were systematically disregarded, failure to provide the complete methodology for reaching its conclusions, failure to provide key documents to the public, and calculations that did not add up.

7. Though the documents referenced in paragraphs four and five that comprise the subject of this declaration were relied upon in the RIA, they were new to me, as they were not provided to the general public, but were instead provided in response to a request to complete the administrative record (and for those in paragraph four, also in response to a FOIA request) well after the public comment period had closed. As such, I did not have the opportunity to review them prior to preparing my contributions to the Center's comment letter to the NPRM. Had I been afforded the opportunity to do so, the Center would have materially amended its comment letter to reflect the significant additional concerns reflected in this supplemental declaration.

8. My review of these later-produced documents does not change the analysis that forms the basis of the conclusions in my first declaration. Instead, it reveals additional, undisclosed, and substantial errors in the Department's methodology and data that significantly bolster my prior conclusion that the Department has deprived the public of the ability to meaningfully understand and comment on issues that serve as the foundation for the Department's reasoning in both the NPRM and the Final Rule.

9. Review of these later produced documents also reveals that the Department's RIA in the Final Rule is fatally flawed, with data entry errors in the Department's analysis and questionable statistical practices. The errors include: (1) failing to properly impute missing Clery

Supp. Decl. of Michael Madowitz

Act Reporting data that remains unaddressed even after the Final Rule has been issued; (2) incorrectly recording the Clery Act Reporting data figures for small, medium, and large Institutions for Higher Education (IHEs); (3) treating a highly unrepresentative "convenience sample" of IHEs as if it were a randomly-selected, representative sample, skewing multiple parts of its analysis; and (4) misrecording data from the underlying reports from the 55 IHEs that made up the "convenience sample" in the spreadsheets upon which its calculations were based.

**Background, Responsibilities, and Qualifications**

10. I have been employed at the Center since 2013, where I have served as a nationally recognized expert on public economics. I use advanced valuation methodologies to measure the costs and benefits of programs and policy changes and have conducted hundreds of cost-benefit analyses and policy simulations focused on the long-term effects of public health, education, environmental, and macroeconomic policies. I regularly serve as a technical expert on the Center's high-profile institution-wide reports, ensuring methodological transparency and analytical accuracy. From 2011-12, I served as a Dissertation Fellow for Resources for the Future where I conducted empirical and simulation research on state and local tax revenue volatility, and the implications for design of carbon pricing policy at the state and federal level. I also served as a Forecasting Consultant at Southern California Edison from 2006-2008, where I worked on the production, improvement and support of short-term electricity demand forecasting models.

11. I also serve as a peer referee for cost-benefit analysis article submissions to highly selective academic journals and provide pre-publication reviews of proposals from academics, think tanks, and national and state-level campaigns for both political parties. I hold a doctoral candidacy in economics and a master's degree in applied mathematics from the University of

California, San Diego and received a bachelor's degree in economics and international relations from Pomona College in Claremont, CA in 2002. My curriculum vitae and a list of my publications in the past ten years was attached to the declaration I first submitted in this matter (Ex. 32, ECF No. 22-3 & 50).

12. In the past four years, I have not testified as an expert, at trial, or by deposition, in any matter.

13. I am being compensated at a rate of $400 per hour for my work on this declaration and this case.

## Missing and Misused Data

14. The Department relies on three sources of data for IHEs as inputs for its calculations—(1) the 2014 U.S. Senate Subcommittee on Financial and Contracting Oversight Report, which included survey data from 440 four-year IHEs regarding the number of investigations of sexual violence that had been conducted from 2009 to 2013; (2) public reporting of Title IX incident reports and investigations at 55 IHEs which comprise a "convenience sample"; and (3) Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f) ("Clery Act") reporting data, which applies to sexual offenses committed at educational institutions that receive Federal student financial aid through the programs authorized by Title IV of the Higher Education Act of 1965. The Department alters each of the data sources using statistical procedures that go unsupported or unexplained, yet form the bases of foundational calculations, such as what percentage of all Title IX complaints consist of complaints regarding sexual "misconduct", and the baseline number of investigations conducted by IHEs prior to and post-implementation of the Rule. *See* 85 Fed. Reg. at 30,565.

Supp. Decl. of Michael Madowitz

15.     For example, the Department is missing data for almost half of the Clery Act reporting data classifications on which it relies. AR 297385 (excel version), sheet 'Data_5-10-2018---383', [must click unhide rows], cells N1-U6735[3]). Although the reliance on missing data is not new, the new documents (specifically, AR 297385) reveal that the Department used formulas that record missing data as equivalent to zero reports; in other words, treating the missing data as if it were present and recorded as zero. This means that for the Department's calculated Clery Act reporting rate, a school that fails to report data appears to be doing a better job of rooting out problems than one that rigorously documents offenses. There is no way of identifying this mistake from documents publicly available prior to those released in the Administrative Record.

17.     The Department also made material mistakes with the Clery Act reporting data it uses in its investigations analysis, including by entering data in the wrong place. These errors are substantial and substantially affect the Department's analysis.

18.     For example the actual figure for small two-year IHEs appears under the heading for medium two-year IHEs. And there are other places where the Department's calculations indicate the data has been mis-entered. In the RIAs, the Department records Clery Act offense reporting data to estimate the number of annual investigations at "large" two-year IHEs as 425, "medium" as 87, and "small" as 750, in order to ultimately reach its conclusion regarding the size of the gap in the rate of investigations between large and small IHEs. 83 Fed. Reg. at 61,491; 85 Fed. Reg. at 30,565 & 30,567. When re-tabulating data from individual IHEs (provided in AR 297385 "Data 5-10-2018"), however, I arrive at a value of: (a) 238 for "large" two-year IHEs instead of the value of 425 that the Department records; (b) 425 for "medium" two-year IHEs instead of the value of 87 that the

---

[3] The original categories are labeled in these cells 'oncampus', 'oncampushousing', 'noncampus', 'public property', 'reported by police', and are combined in various forms to yield the categories labeled 'total clery', 'total oncampus', 'total off-campus', and 'clery reports per 1,000 students'.

Department records; and (c) 87 for "small" two-year IHEs instead of the value of 750 that the Department records. While it appears as though two of the discrepancies in tabulations are due to the Department misplacing numbers (for large and medium IHEs), the source of the Department's error for small IHE's is unknown. The error is nonetheless material because the figure for small two-year IHEs is so far off (750 versus 87) that it overstates the rate for two-year small IHEs by more than eight times and, critically, more than doubles the total number of Clery Act investigations for *all* small IHEs - and the difference between the rate of investigation between small and large IHEs forms the basis for the Department's justification for the reduced overall rate of investigations. *See* 85 Fed. Reg. at 30,565 & 30,567; 83 Fed. Reg. at 61,491.

19. With regard to the Department's use of a "convenience sample," the new documents demonstrate that the Department has complete Title IX data for only 24 of the 55 IHEs in its sample and is missing roughly half of the data fields for its Clery Act reporting data, which renders the sample size even smaller than the Department represents it is. *Cf.* 85 Fed. Reg. at 30,565 ("Department examined public reports of Title IX reports and investigations at 55 IHEs nationwide, incidents of sexual misconduct represented, on average, 45 percent of investigations conducted."); 85 Fed. Reg. at 30,565 (noting "weaknesses" with Clery data in that it "may not capture all incidents of sexual harassment that occur on campus" but not that data is missing (zero) for roughly half of the data fields).

20. The Department also provided a list of titles/links to documents that it reviewed from the 55 IHEs in its "convenience sample." AR 294864-294865. Through my review of a random sample of the reports for the 55 IHEs provided by the Department, I found that in a number of cases the Department failed to accurately record the data provided by the IHEs in their reports in the spreadsheets that the Department used for its calculations. For example, the

Department records 26 Title IX complaints for the California State Polytechnic University-Pomona ("CPP") in AR 297385 ("Data_5-10-2018---383"), however the linked source for this information, which comes from AR 294864 shows CPP reported 61 title IX complaints. The Department omits the majority of these from its analysis, excluding all but the 26 which identified a student as the respondent. Such basic recording errors fundamentally undermine their methodology.

21. Because the Department only belatedly made its underlying data available, the public did not have the opportunity to identify that the Department's own analysis cannot be shown to support or reject its claims, including its claim that small schools will not be significantly impacted by the Title IX Rule. This error is all the more striking because the Center, among other commenters, raised issues about the quality and completeness of Clery Act reporting data in the comment process and the Department did not engage in a variety of well-known statistical techniques to handle missing data, such as multiple imputation.

**Additional Limitations of the "Convenience Sample" Used**

22. In inspecting the Department's later-produced spreadsheets, the Department's methodology for estimating the effects of the proposed rule on IHEs is based on a much smaller and less complete set of data than a reasonable person—even one with considerable familiarity with regulatory impact analyses like myself—would have inferred based on the NPRM or the Final Rule.

23. For example, the "convenience sample" is overwhelmingly composed of data from only four state university systems, whose campuses comprise 39 of the 55 IHEs in this "convenience sample."[4] This "sample" is far less representative of the 6,766 IHEs nationwide,

---

[4] These IHEs are from The California State University System (17), Indiana University System (6), University of Missouri System (3) or University of Wisconsin system (13).

Supp. Decl. of Michael Madowitz

which includes, for example, many small and medium sized private colleges and universities, that the NPRM and Final Rule claims to provide an applicable model for. For example, it includes no historically black college or universities, no IHEs that meet the Department's definition of "small", and no IHEs with a full-time equivalent enrollment of less than 1474. As such, the entire "convenience sample" is drawn from the largest 30% of IHEs. Underscoring the lack of diversity and representativeness of Title IX processes in this sample, all the data on the 13 University of Wisconsin system campuses come from a single table in a single document[5], yet in spite of clear language in that document on sharing of information and practices between UW campuses, the department both uses and represents this data as if all 13 UW-system campuses were chosen at random from all 6766 IHEs.

24.     Small samples are inherently problematic because estimates based on such samples are highly imprecise. In order to combat this inherent problem, at minimum, the sample should be as randomly selected as possible to make it as representative as possible. The sample used by the Department is by no means random, but the Department has made no effort to correct for this well-established limitation, nor stated that it faced any technical or other obstacles in correcting for this limitation.  Correcting for sample biases is a fundamental concept in survey design and analysis. For example, if 30% of IHEs nationwide are large, but the sample is made up of 50% large IHEs, it is common statistical practice to downweight the large IHEs and upweight the others to balance out the overall results. If the Department was unable to conduct this common statistical practice, the Department should have explained that it faced technical obstacles in addressing issues presented by the data set in its RIA in the NPRM or in

---

[5] See https://www.wisconsin.edu/sexual-assault-harassment/download/uw_system_reports/2016-Sexual-Assault-Harrassment-Annual-Report.pdf P 27, link provided in AR 294865

Supp. Decl. of Michael Madowitz

the eventual Rule and otherwise corrected for the sample bias. Because factors such as the quality of reporting systems and consistent policies and training are likely to be far more similar at campuses of the same public university system than across the universe of higher education, the non-random sampling of schools likely produced several biases in the data. These biases are apparent from the FOIA documents, but they could not have been ascertained based on the information made available in the NPRM or Final Rule.

26. Other details of the "convenience sample"—the Department's sole offered basis for the percentage of IHE Title IX cases involving sexual harassment—are similarly important for understanding the basis of the Department's conclusions about the effects of the Rule.[6] The fact that the Department employed a small unrepresentative sample of IHEs, and that it represents such a significant percentage of overall sexual assaults investigated, is particularly problematic because these university systems depict a significant underlying difference in the rate of both Title IX complaints and Title IX investigations, which may not be representative of rates of institutions nationwide. AR 297385 (Data 5-10-2018-383). Nevertheless, the Department used this underlying differential as a foundational input to the Department's methodology in every part of the Department's modeling.

27. For example, links to documents in the administrative record for Michigan State University (MSU) include 74 completed Title IX claims and 19 pending claims. All pending cases are treated as not investigated in the Department's data, so they are counted as complaints, but not counted as investigations, bringing MSU's overall investigation rates down. MSU is an outlier in the "convenience sample", with 718 Title IX complaints (almost 13% of the total accounted for in the sample). It is clear from the additional information provided by the linked to

---

[6] 83 Fed Reg. at 61,485.

documents that a dramatic increase in Title IX reports occurred at MSU in the three years selected by the Department (2014-17)—increasing from 201 to 461 to 718 between the 2014-15 and 2016-17 academic years. By using MSU as a representative IHE for purposes of its sampling, the Department assumes that <u>all</u> IHEs investigate claims at the rates of large institutions such as MSU. But schools of that size are likely to deal with volumes of complaints and investigations that are atypical of a medium or small-size institution. Further, MSU's extremely unusual 350% increase in claims over three academic years could lead to a variety of aberrant outcomes in process, such as an increase in claims treated as "pending" i.e., not investigated, that may not be representative of IHEs nationwide.

28. Because the schools the Department included in its "convenience sample" were part of state-wide systems, it is reasonable to conclude that they employ similar Title IX reporting procedures, and thus provide little exposure to, or representation of, the widely varying systems of disclosure. As such, the Department's choice to use such data makes it problematic to draw larger conclusions about Title IX processes. But this could only have been ascertained upon seeing the later-produced documents.

**Errors in Analysis**

29. A series of substantial data errors that were only possible to understand on the basis of documents produced by the Department after the Final Rule was issued shed additional light on the Department's faulty methodology that was missing in the NPRM and Final Rule's RIAs.

30. For example, the Department used the "convenience sample" to determine the rates of sexual misconduct investigations in relation to all Title IX investigations. 85 Fed. Reg. at 30,565. However, the "convenience sample" data indicate that the Department had assault data but not assault investigation data for a number of IHEs in its sample. In order to proceed with its

Supp. Decl. of Michael Madowitz

analysis, the Department had to make assumptions regarding variables that, if made in certain ways, would increase the percent of sexual assault investigations, and if made in others, decreases the percent of sexual assault investigations. Because the Department is missing so much data (now apparent from recently produced records), the assumptions they made to complete the difference undermines their analysis and any conclusions derived thereof, as any outcomes are influenced by the choices the Department itself made.

31. For the public to have meaningfully commented on the Department's analysis, the public would have needed, at a minimum, the Department's methodology for resolving missing baseline data. However, the Department appears to have scaled up and down the effects and costs of the policy change in a way the public had no way of knowing or comprehending from documents made available in both the NPRM and Final Rule.

### No Basis for Local Education Agency Reduction Articulated

32. Finally, the Department continues to offer no basis for the calculation that the provisions in the NPRM and Final Rule will lead to a 50% reduction in local education agency Title IX investigations. The documents produced for the first time in the Administrative Record only confirm the lack of support for this figure. For example, in the spreadsheet AR 294860, the 50% reduction is listed in the tab labeled "Assumptions", but unlike other figures in the "Assumptions" section of the workbook, this links to no other calculation. Absent information, facts, or data, neither the public nor I have any ability to understand the underlying methodology for reaching this calculation.

### Conclusion

33. There are a number of questionable statistical practices, and what appear to be very large data entry errors in the Department's analysis. As discussed above, these errors

include: (1) failing to properly impute missing Clery Act reporting data that remains unaddressed even after the Final Rule has been issued; (2) incorrectly recording the Clery Act reporting data figures for small, medium, and large IHEs; (3) treating a highly unrepresentative "convenience sample" of IHEs as if it were a randomly-selected, representative sample, skewing multiple parts of its analysis; and (4) misrecording data from its 55 IHE "convenience sample" underlying reports in the spreadsheets upon which its calculations were based. While it is helpful to have this data now, the fact that the Department failed to produce any of this data before issuing the Final Rule has deprived the public of the ability to fully comment on the Department's representation of its costs and benefits.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 16th day of December, 2020

_____
Michael Madowitz
Economist, Center for American Progress

Supp. Decl. of Michael Madowitz