# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMONWEALTH OF PENNSYLVANIA, et al.,

     Plaintiffs,

v.                                                 CASE NO. 1:20-cv-01468-CJN

ELISABETH D. DEVOS, in her official capacity as

     Secretary of Education, et. al.,

     Defendants.

---

## *AMICUS* BRIEF OF THE NATIONAL ASSOCIATION OF SCHOLARS
## ("NAS")  IN SUPPORT OF DEFENDANTS

_____

Teresa R. Manning, J.D.

Policy Director
National Association of Scholars
420 Madison, 7th Floor
New York, New York 10017
www.nas.org
manning@nas.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES …………………………………. 6

INTEREST OF *AMICUS CURIAE* …………………………………. 5

INTRODUCTION AND SUMMARY OF ARGUMENT

…………………………………. 5

ARGUMENT

I. THE FINAL RULE CONFIRMS THAT THE *DAVIS* STANDARD REGARDING ACCESS TO EDUCATION IS THE TOUCHSTONE OF TITLE IX AND BRINGS CLARITY AND UNIFORMITY TO OFTEN CONFUSED CAMPUS TITLE IX POLICIES

…………………………………. 9

A.  School policies conflate Title IX prohibited conduct with all prohibitions of sexual misconduct and do not focus on access to education.

…………………………………. 12

B.  The result of these school policies is the expansion of power for the campus Title IX office - "drunk with power" – and its resulting arbitrary and capricious practices.

…………………………………. 14

II. BECAUSE THE FINAL RULE'S THIRD CATEGORY OF "PROHIBITED CONDUCT" DOES NOT REQUIRE A SHOWING OF HOW ALLEGED CONDUCT DENIES ACCESS TO EDUCATION, IT REPRESENTS ADMINISTRATIVE OVERREACH & WILL RESULT IN CONTINUED ARBITRARY & IMPROPER JURISDICTION BY THE TITLE IX OFFICE

…………………………………. 15

A.  The Final Rule defines three types, or categories, of prohibited conduct.

…………………………………. 15

B.  The third category of prohibited conduct constitutes unlawful agency over-reach because it does not require a showing of how this conduct affects educational access, the purpose of the law; it is also tied to definitions in other statutes, creating instability & confusion & inviting more arbitrary & capricious practices by Title IX offices.

…………………………………. 16

CONCLUSION …………………………………. 18

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Yale,*

459 F. Supp. 178 (2d Cir. 1980) …………………………………. 6

*Davis v. Monroe County Board of Education,*

536 U.S. 629 (1999) …………………………………. 8, 9, 10, 11, 12, 15

*See Franklin v. Gwinnett,*

503 U.S. 60 (1992) …………………………………. 11

*Gebser v. Lago Vista Independent School District*,

524 U.S. 274 (1998) …………………………………. 11


**Statutes**

20 U.S.C. 1681 et seq. …………………………………. 6

20 U.S.C. 1092(f)(6)(A)(v) …………………………………. 16

34 U.S.C. 12291(a)(8) – (30) …………………………………. 16


**Rules**

34 C.F.R. 30, 026 (Part 106),(2020) …………………………………. 7, 10, 15, 16

83 Fed. Reg. 230, 61465 …………………………………. 8, 10

85 Fed. Reg. 30, 026 …………………………………. 7, 10, 15, 16


**Other Authorities**

Kathleen F. Buckley, "Criminal Mischief: The Federalization of American Criminal Law," 4 *Hastings Law Journal* 46:1135 (1995)

…………………………………. 16

Samantha Harris and K.C. Johnson, *Campus Courts to Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications,* New York University Journal of Legislation and Public Policy 22, No. 1 (2020)

…………………………………. 7

National Association of Scholars, *Dear Colleague: The Weaponization of Title IX* (2020)

……………………………………. 6, 7, 8, 12, 13

Katherine Silbaugh, *Reactive to Proactive: Title IX's Unrealized Capacity to Prevent Campus Sexual Assault,* 95 Boston U. L. Rev. 3, 1049 (2015)

…………………………………. 6

State University of New York, Office of General Counsel, "A Comparison of Clery Act & Title IX Definitions of Sexual Assault & Related Violations," June 26, 2020.

…………………………………. 17

**INTEREST OF** *AMICUS CURIAE*

**NATIONAL ASSOCIATION OF SCHOLARS  ("NAS")**

The National Association of Scholars ("NAS") is a network of scholars and citizens united by a commitment to academic freedom, disinterested scholarship, and excellence in American higher education, which includes the freedom to question and think independently and the freedom from ideological imposition.

In recent years, NAS has monitored the increasing number of campus Title IX cases where students have been accused of what look like criminal offenses, including assault and rape. These students were not being tried in the criminal justice system, however, where due process guarantees would have protected basic rights such as the presumption of innocence. Instead, they were "tried" in campus proceedings instigated and overseen by those without practical legal experience and under intense political pressure to fight campus sexual misconduct.

In 2019-2020, NAS undertook its Title IX Project to look more closely at the personnel, policies and practices of the campus Title IX office. Six state schools were surveyed. Their policies on discrimination and sexual misconduct were reviewed and personal interviews were conducted with staff, including those at Title IX partner entities on campus such as Student Health Centers, Women's Centers or Equal Opportunity Offices.

In October of 2020, NAS published its findings in a report titled *Dear Colleague: The Weaponization of Title IX*.  This Brief shares some of the findings of that report with the Court.

INTRODUCTION AND SUMMARY OF ARGUMENT

In 1972, Congress enacted Title IX as an equal access law in education: It bans discrimination on the basis of sex in educational institutions and programs receiving federal funds. The text reads:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. sec. 1681 et seq.

Early on, Title IX was known primarily for its effect on women's athletic teams in collegiate sports. It was soon also used, however, to address sexual misconduct in education on the theory that such misbehavior could interfere with educational opportunity.

Courts originally recognized *quid pro quo* propositions as the most obvious form of sex discrimination in education, where a teacher, professor or other superior conditioned a female student's advancement on sexual favors. *Alexander v. Yale,* 459 F. Supp. 178 (2d Cir. 1980).  But courts were then asked to recognize other situations as sex discrimination, including what is now called a "hostile environment" based on sex. *See* history provided in Katherine Silbaugh, *Reactive to Proactive: Title IX's Unrealized Capacity to Prevent Campus Sexual Assault,*" 95 Boston U. L. Rev. 3, 1049 (2015). Most recently, courts have addressed even more controversial behaviors as sex discrimination, including sexual assault and rape.

The application of a civil rights law to address this conduct, which is criminal in nature, has resulted in a "square the circle" aspect to Title IX discourse ever since.

In fact, many Title IX administrators now effectively ignore Title IX's basic and central guarantee of educational access, focusing, instead, on student sexual encounters.[1] Indeed, the campus Title IX office is frequently called the "campus sex police." Worse, its proceedings are known as "kangaroo courts" since they often operate under intense political pressure to fight sexual assault and, in the process, show bias in favor of female complainants and hostility toward accused male students. To date, approximately 600 lawsuits have been filed by male students, who claim to have been falsely accused of sexual misconduct and allege due process violations in the rush to find guilt. They've

---

[1] The purpose of equal access to education "appears to be completely lost on campus Title IX offices." See *Dear Colleague: The Weaponization of Title IX,* National Association of Scholars (2020) at https://www.nas.org/reports/dear-

received favorable rulings in almost half such cases.[2] Violations included schools having denied them the presumption of innocence ("Title IX offices … presume guilt")[3] or the right to see evidence ("fabricated evidence was withheld from me until the very last minute")[4] or the right to live hearings to allow cross-examination of witnesses and complainants.

For this reason, those concerned with due process have become strong voices for Title IX reform.

While issues of due process and sexual misconduct are aspects of Title IX, the United States Supreme Court has consistently recognized the law's central purpose as the guarantee of equal access to education free of discrimination based on sex. This understanding has also been affirmed by numerous education departments, including the current one.

Unlike prior administrations, however, President Trump's Education Secretary Elisabeth DeVos decided against issuing informal "guidance," or nonbinding directives about Title IX.[5] Instead she decided to promulgate new, formal and binding regulations pursuant to the Administrative Procedure Act precisely to address due process problems and to clarify what behavior constitutes discrimination under Title IX.

This initiative took almost three years and required that the Education Department's Office for Civil Rights review over 125,000 comments – an unprecedented level of public participation. In May 2020, the Final Rule was issued along with over 200 pages of commentary and explanation. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* ("Final Rule"), 85 Fed. Reg. 30, 026; 34 C.F.R. Part 106 (RIN 1870-AA14).

---

[2] Samantha Harris and K.C. Johnson, "Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications," *New York University Journal of Legislation and Public Policy* 22, no. 1 (2020): 49 https://nyujlpp.org/wp-content/uploads/2019/12/Harris-Johnson-Campus-Courts-in-Court-22-nyujlpp-49.pdf.
[3] *Supra* note 1, quoting Brief of Families Advocating for Campus Equality ("FACE"), as *amicus curiae* in Opposition to Plaintiffs' Motion for Preliminary Injunction, in *Commonwealth of Pennsylvania, et. al. v. DeVos,* in the United States District Court for the District of Columbia, filed July 9, 2020.
[4] *Id.*
[5] See discussion in *Dear Colleague, supra* note 1, regarding controversial "Dear Colleague" guidance provided by the Obama Administration, asserting that sexual violence was a form of discrimination under Title IX and prescribing standards for enforcement, including the burden of proof as the preponderance of evidence and discouraging cross examination Lhamon, "Dear Colleague Letter on Title IX Coordinators" (OCR, 4/4/2011) https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

In the main, NAS supports this Rule and urges this Court to uphold it as a constitutional exercise of regulatory authority: Its promulgation followed the steps of the APA and represents a good faith effort – not arbitrary – to give effect to Title IX, despite one problematic area, discussed below.

NAS has long supported Title IX as a guarantee of equal access to education regardless of one's sex. NAS does not support, however, the transformation of Title IX from a civil rights law into a sex crimes law. And NAS opposes the quasi-criminal system that has developed on campus as part of this transformation, often resulting in the railroading of accused students (mostly male), many of whom have seen their academic careers and professional reputations destroyed. One such student explained: "I quickly descended into … the all-too-familiar pattern for those falsely accused: isolation from friends and family, loss of reputation, depression, substance abuse, and a suicide attempt."[6]

Title IX was never intended to apply to crimes. What's more, Title IX staff are not qualified to address crimes: Of 52 Title IX officials surveyed, only one had any experience in a courtroom practicing criminal law, for example.[7]

NAS agrees with the United States Supreme Court and most Title IX federal jurisprudence: If conduct complained of denies a student access to education, Title IX applies; if the conduct complained of does not deny a student access to education, Title IX does not apply.

Therefore this Brief urges this Court to uphold most of the Final Rule because it clarifies and restores the proper focus to campus Title IX administration - access to educational benefits and programs, not sexual misconduct as such. (As 2018 commentary from the Education Department correctly explained: *"Title IX does not focus on crimes per se.***"[8]) This standard was articulated by the United States Supreme Court in the 1999 case of *Davis v. Monroe County Board of Education,* 536 U.S. 629 (1999) (here after "*Davis*"). It clarified what behaviors  constituted a hostile environment of sex discrimination and therefore triggered Title IX: In order for a school to be found liable for student-on-student harassment, the Court stated explicitly that the harassing behavior must be "so

---

[6] *Supra* note 3 (from FACE *amicus* brief).
[7] *Supra* note 1.
[8] Proposed Rule, 83 Federal Reg. 230 (November 2018) at 61465, 61467.

severe, pervasive and objectively offensive that it denies its victims the equal access to education that Title IX is intended to protect." *Davis,* 536 U.S. 629 (1999).

At present, campus Title IX policies are confused, misleading and "all over the map" regarding what Title IX actually prohibits: Many schools have combined their Title IX policy with sex discrimination and sexual harassment policies such that the objective of Title IX – equal access to education free of sex discrimination - has been lost.[9]

Another result is that campus Title IX officials view themselves primarily as sex monitors, enforcing ever-changing norms of sexual conduct, rather than education access monitors, ensuring that students are not excluded from educational programs because of their sex.

At the same time, however, NAS objects to the Final Rule's third category of prohibited conduct precisely because this category exempts itself from a showing related to educational access and continues confusion, instability and overreach in the Title IX field. It does this by defining conduct such as assault by reference to other laws, making it a moving target, and by asserting that such conduct intrinsically affects educational opportunity, not only without a factual showing of denied educational access but even without an allegation of it. This category therefore invites Title IX offices to continue to exercise questionable jurisdiction they were not intended to have (over crimes) and to neglect the jurisdiction they do (over educational opportunity). Indeed, that's precisely where things stand now and what the Final Rule would otherwise help correct.

ARGUMENT

I.

THE FINAL RULE CONFIRMS THAT THE *DAVIS* STANDARD REGARDING ACCESS TO EDUCATION IS THE TOUCHSTONE OF TITLE IX AND BRINGS CLARITY AND UNIFORMITY TO OFTEN CONFUSED CAMPUS TITLE IX POLICIES

The Final Rule reaffirms and clarifies that educational access is the sole purpose of Title IX (not issues of sexual harassment, sexual assault or sexual misconduct as such) by defining prohibited "sexual harassment" in relation to equal educational access, as articulated by the United States

---

[9] *Supra* note 1.

Supreme Court in in *Davis v. Monroe*, 536 U.S. 629 (1999). See Final Rule, Sec. 106.30 (a)(2).  The Education Department explained:

> *sexual harassment includes conduct that is also a crime (such as sexual assault)* **but Title IX does not focus on crimes per se."** [emphasis added].

> Because the purpose of Title IX is to prohibit a recipient from subjecting individuals to sex discrimination in its education program or activity, *the definition of sexual harassment under Title IX focuses on sexual conduct that jeopardizes a person's equal access to an education program or activity* [emphasis added].[10]

In short, the Final Rule reestablishes the *Davis* standard in hostile environment sexual misconduct cases.

The Rule is directed at recipients of federal funds – that is, schools and other educational institutions - since Title IX is a contractual agreement between the government and those schools. The agreement requires them to refrain from discriminatory conduct as a condition of receiving such funds. Any complaint of misconduct is, therefore, directed against the institution.

The focus on access was repeatedly emphasized in notes accompanying both the Final Rule and its predecessor, the proposed regulations issued in November 2018. Commentary included:

> "Thus, the proposed regulations set forth clear standards that trigger a recipient's obligation to respond to sexual harassment, *including defining conduct that rises to the level of Title IX as conduct serious enough to jeopardize a person's equal access to the recipient's education program or activity*… [emphasis added].[11]

The Final Rule affirmed:

> "[T]he way a school, college, or university responds to allegations of sexual harassment in an educational program or activity *has serious consequences for the equal educational access* [emphasis added] for complainants and respondents." Final Rule, 34 C.F.R. Part 106, RIN 1870-AA14.

---

[10] *Supra* note 8.
[11] *Id.*

Courts have moved incrementally with respect to how, when, and by whom a recipient school could be sued under Title IX for sexual misconduct. But they have been consistent in maintaining the focus of educational access as the threshold requirement for invoking the law.

For example, the Supreme Court decided in 1992 that a student could use Title IX to sue the county school district operating a high school when the school was notified that its teacher was harassing a student but the school took no action to stop it. (A private right of action for money damages was available under Title IX.) *See Franklin v. Gwinnett,* 503 U.S. 60 (1992). Later, in 1998, the Court clarified that in such cases of teacher-on-student harassment, the school violates its Title IX obligations if: 1) it has actual notice of the conduct jeopardizing a student's educational access; and 2) it is in a position to correct it; and 3) it does not act – that is, it shows "deliberate indifference." *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998).

But the final word on Title IX from the U.S. Supreme Court came in the 1999 case of *Davis v. Monroe*, which involved harassing behavior between two students, rather than between a teacher and a student.

In *Davis,* a 5th grade girl claimed her school had not protected her educational opportunity because of a classmate's sexual taunts (including, "I want to go to bed with you," "I want to feel your boobs," and also physical overtures such as allegedly rubbing his body against her). This behavior eventually caused her to miss school and to get lower grades. And, despite repeated notifications to the school by her parents, the school did nothing to address the situation.

While *Davis* did significantly develop Title IX law by holding that schools could be liable not just for the conduct of their employees but also for the conduct of their students, the case only reinforced the longstanding Tittle IX requirement that a student's access to education must be at issue.

The *Davis* court explicitly found that in order for a student to successfully sue a school under Title IX for sexual harassment of the "hostile environment" type involving student-on-student conduct, the student must show that the school had 1) actual notice of the harassing conduct and 2) authority over the offending student and 3) the conduct at issue needed to be "so severe, pervasive

and objectively offensive as *to deny access to education*; and, finally, that 4) the school showed deliberate indifference.

Since *Davis,* however, campus Title IX administration has lost the focus of *access to education* amidst the emotionally and culturally charged claims of student-on-student sexual misconduct.

And, notwithstanding these U.S. Supreme Court precedents, campus Title IX offices have been both pressured, and then eager, to seek, find and punish sexual misconduct whenever it was alleged, even if no issues of educational access were raised.

A. <u>School policies conflate Title IX prohibited conduct with all prohibitions of sexual misconduct and do not focus on access to education.</u>

School policies reflect this lost focus and have contributed to Title IX confusion: They group together various policies on sex discrimination, sexual harassment and sexual misconduct, without distinguishing between behavior prohibited by Title IX (behavior which denies educational access) and behavior prohibited by other school policies, such as those found in a student handbook.

What's more, many schools have simply given campus Title IX offices authority over all alleged sexual misconduct quite apart from any question of educational access. As one state attorney general put it, "Despite almost uniform precedent instructing otherwise, universities have continued to adopt overbroad policies … *erroneously in the name of Title IX.*"[12]  The following summary is apt:

> "Many schools have expanded the definition of sexual harassment to include less severe conduct that may not affect educational access at all, and they have then proceeded to treat such conduct as falling under the authority of the campus Title IX office. By so doing, schools have extended the reach of Title IX beyond what the Supreme Court has authorized."[13]

---

[12] *Amicus* brief of the States of Texas, et al., in support of Defendants, in Commonwealth of Pennsylvania, et. al v. Devos, July 15, 2020, at p. 6.
[13] *Supra* note 1.

Policies at two Virginia schools illustrate the problem: Before the Final Rule, the webpage of James Madison University's ("JMU") Title IX office stated plainly that, "The Title IX office at JMU receives, responds to and address [sic] all reports of sexual misconduct involving members of the university community." The site featured Policy No. 1340 on "Sexual Misconduct," section (3) of which read:

> "Sex discrimination specifically includes *instances of sexual misconduct of any type.*"

With this stroke of a pen, JMU simply re-defined sexual misconduct, *of any type,* to be sex discrimination and therefore falling under Title IX, notwithstanding United States Supreme Court precedent saying otherwise.

In fact, JMU Policy 1340 never even mentions education, much less educational access: Nowhere in the 24-page document does the phrase, or the concept, even appear. Yet the Title IX office, whose central concern is supposed to be educational access, is tasked with enforcing 1340.

Thus has the equal educational opportunity law known as Title IX been transformed from its original purpose of educational opportunity into a tool to seek, find and punish dating behavior:

> "[T]he understanding of Title IX as an equal access law has, over time, been obscured by those who … use it, instead, as a means to achieve other goals, including top-down reform of dating behavior."[14]

Similarly, at George Mason University ("GMU"), Policy numbers 1201 and 1202 are called Nondiscrimination and Sexual and Gender-Based Harassment, respectively. While the section on prohibited conduct in Policy 1202 uses language similar to that in *Davis,* its focus is actually the subjective perception of offenses of a sexual nature, not denied educational access.

Its definition of "hostile environment sexual harassment" reads:

---

[14] *Supra* note 1.

Unwelcome conduct based on Protected Status that is *so severe, persistent or pervasive that it alters the conditions of education,* employment or participation in a University program or activity, *thereby creating an environment that a reasonable person in similar circumstances and with similar identities would find hostile, intimidating or abusive.*[15] (emphasis added)

The word "access" does appear two times in one paragraph of Policy 1202 (at 1202.V.A); however, the term "assault" appears ten (10) times, "violence" thirteen (13) times and "consent," twenty-nine (29) times.

Clearly GMU's discrimination policy is not so much about protecting educational opportunity as it is about monitoring student sexual encounters gone bad.

The Final Rule corrects this situation by restoring the *Davis* standard, which clarifies for schools that access to education is, and always has been, the purpose of Title IX.

It will therefore help end the confusion among these policies and also provide consistency in Title IX administration from campus to campus.

B.  The result of these school policies is the expansion of power for the campus Title IX office - "drunk with power" –  and its resulting arbitrary and capricious practices.

One under-discussed practical result of this confusion has been the expansion of power for the campus Title IX office, with little to no accountability for its staff. As explained by Laura Kipnis, a Northwestern University professor who was herself charged with a Title IX violation for an essay she wrote:

"They [Title IX staff] are enlarging the sense of what sexual misconduct is on a capricious and arbitrary *ad hoc* basis so it's very much up to individual Title IX offices

---

[15] University Policy Number 1202, Sexual and Gender Based Harassment and Other Forms of Interpersonal Misconduct at I (3), Scope. Also, Policy 1202.I.(3) prohibits any conduct based on sex that might have "continuing adverse effects" for students on campus (regardless of where or when such conduct occurs), and which therefore "alters the conditions of education." By this policy, the reach and jurisdiction of the GMU Title IX office is, indeed,  "overbroad" as noted above.

and schools – such as the undergraduate dean – to decide on what constitutes an offense [under Title IX].

A lot of this happens behind closed doors. There's no accountability in the Title IX field; some of these people have gotten drunk with power because there's no accountability and no oversight."[16]

The Final Rule's restoration of the *Davis* Supreme Court standard for what constitutes a discriminatory hostile environment triggering the application of Title IX will end the arbitrary and capricious nature of the Title IX field and bring the power of campus Title IX offices in line with their limited authority under the Title IX statute – to ensure equal opportunity in education regardless of sex.

II.

BECAUSE THE FINAL RULE'S THIRD CATEGORY OF "PROHIBITED CONDUCT" DOES NOT REQUIRE A SHOWING OF HOW ALLEGED CONDUCT DENIES ACCESS TO EDUCATION, IT REPRESENTS ADMINISTRATIVE OVERREACH AND WILL RESULT IN CONTINUED ARBITRARY AND IMPROPER JURISDICTION BY THE TITLE IX OFFICE

The Final Rule is not perfect, however. While it has clarified what constitutes a hostile environment (based on sex) by restoring the Supreme Court *Davis* standard and its focus on educational access, it has violated this very Supreme Court standard in its third category of prohibited conduct (defining sexual harassment) by removing any evaluation of this conduct with respect to educational access.

A.   The Final Rule defines three types, or categories, of prohibited conduct.

The Final Rule explicitly prohibits three categories of conduct: First, is *the quid pro quo* proposition, which no one disputes is sex discrimination; second is the hostile environment (based on sex) as defined by the *Davis* standard discussed above; but the third category includes "sexual assault,"

---

[16] Laura Kipnis, interview by Dave Rubin in Rubin Report, October 11, 2017.

"dating violence," "domestic violence," and "stalking" as defined in the Clery Act ("Clery") and the Violence Against Women's Act ("VAWA").[17]

This third category is problematic and NAS urges the Court to find it unconstitutional overreach because it has removed itself, simply by redefinition, from the central purpose of Title IX, which is educational access.

It also, in turn, invites Title IX offices to exercise jurisdiction it was not intended to have (over crimes) and neglect jurisdiction it does (over educational opportunity).

B.  <u>The third category of prohibited conduct constitutes unlawful agency over-reach because it does not require a showing of how this conduct affects educational access - the purpose of the law; it is also tied to definitions in other statutes, creating instability and confusion and inviting more arbitrary and capricious practices by Title IX offices, including improper jurisdiction.</u>

For starters, the definition of these behaviors is tied to definitions in other statutes, making the exact conduct prohibited a moving target. Any amendments to these other laws will automatically change the scope of Title IX's prohibitions, creating confusion and inconsistency in campus Title IX administration.

In this way, the third category takes away what the rest of the Rule provides (removing its clarity, stability and consistency).

But more concerning and indeed, unlawful, is the admission that allegations of prohibited conduct under category 3 (what are called Clery Act / VAWA offenses) "are not evaluated for … denial of equal educational access …"[18] The rationale for exempting this conduct from such an evaluation –

---

[17] See Final Rule, 85 Fed. Reg. 30, 026; 34 C.F.R. Part 106.30(a), defining *sexual harassment* :"sexual assault" as defined in 20 U.S.C. 1092(f)(6)(A)(v), "dating violence," as defined in 34 U.S.C. 12291(a)(10), "domestic violence" as defined in 34 U.S.C 12291(a)(8) or "stalking" as defined in 34 U.S.C. 12291 (a)(30)." The Clery Act requires post-secondary schools to keep and publish statistical data on violent crime on campus.

[18] *Summary of Major Provisions of the Department of Education's Title IX Final Rule,* at 1.

the exclusive purpose of Title IX – is that "such misconduct is sufficiently serious to deprive a person of equal access."[19]

First, removing an evaluation for "denial of equal educational access" raises red flags since the very purpose of the law is equal educational access. What's more, this statement runs contrary to almost all the commentary surrounding both the proposed regulations and the Final Rule, which recognized that not all acts of sexual misconduct deny educational access and trigger Title IX – only those that "rise to that level of scrutiny."[20] The rationale that "such misconduct is sufficiently serious" could also be said of many other serious and wrongful actions in a sexual or romantic relationship such as blackmail, forgery or trespass.

In sum, this rationale opens the door to unlimited jurisdiction for the campus Title IX office, provided a complainant can allege some connection to sex along with a claim of "seriousness."

Following from this, the category invites the Title IX office to neglect the jurisdiction it does have (over educational opportunity) to exercise jurisdiction it was not intended to have (over crimes).  In fact, that is precisely where things stand now and precisely what the Final Rule would otherwise help correct.

The inordinate focus of Title IX offices on criminal conduct such as sexual assault and dating violence,[21] almost to the exclusion of educational opportunity, returns adjudication of such acts to unqualified and politicized staff, who've lost sight of their purpose under Title IX.

This provision invites more of the same: arbitrary, capricious Title IX practice and amorphous jurisdiction untethered from educational opportunity.  In this way, it undoes much of the good that the rest of the Rule accomplishes.

---

[19] *Id.*

[20] Others have pointed out that definitions within the Clery Act are themselves indexed to other definitions, including the FBI's Criminal Justice Information Services (CJIS), Division Uniform Crime Reporting (UCR), intended for data collection systems, not legal practice, and are therefore "far more expansive," and not meant to be used for "charging persons." See Office of General Counsel, State University of New York, "A Comparison of Clery Act & Title IX Definitions of Sexual Assault & Related Violations," June 26, 2020.

[21] These acts are also mostly matters of state criminal law, not federal law (much less campus administration, changing from school to school). *See* discussion in Kathleen F. Buckley, "Criminal Mischief: The Federalization of American Criminal Law," *Hastings Law Journal* 46:1135 (1995).

It should be severed.

CONCLUSION

For the forgoing reasons, NAS urges this Court to find the Final Rule a lawful and constitutional exercise of regulatory authority, except the third category of prohibited conduct, defining sexual harassment by reference to Clery and VAWA, which should be severed.

Respectfully submitted,

_____
Teresa R. Manning, J.D.

Policy Director
National Association of Scholars
420 Madison, 7th Floor
New York, New York 10017
www.nas.org
manning@nas.org

Date: December 28, 2020

CERTIFICATE OF SERVICE

I, Teresa R. Manning, hereby certify that on December 28, 2020, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court, which will send notification  of such filing to all counsel of record.

_____
Teresa R. Manning, J.D.

Policy Director
National Association of Scholars
420 Madison, 7th Floor
New York, New York 10017
www.nas.org
manning@nas.org